1  DANIEL E. LUNGREN, Attorney General
   of the State of California

**ORIGINAL**

2  PETER J. SIGGINS, Senior
   Assistant Attorney General

3  MORRIS LENK, Senior Supervising
   Deputy Attorney General

FILED

4  GEORGE D. PRINCE, #133877
   JAMES M. HUMES, #147927

APR 2 6 1996

5  Deputy Attorneys General
   50 Fremont Street, Suite 300

6  San Francisco, California  94105-2239
   Telephone No. (415) 356-6037

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

7

8  Attorneys for Defendants

RECEIVED

9

APR 2 6 1996

UNITED STATES DISTRICT COURT

10

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

NORTHERN DISTRICT OF CALIFORNIA

11

12  JOHN ARMSTRONG, et al.,                )   No. C-94-2307 CW
                                           )
13                     Plaintiffs,         )
                                           )
14       v.                                )   STIPULATIONS
                                           )
15  PETE WILSON, et al.,                   )
                                           )
16                     Defendants.         )
    _____)

17

18        The plaintiffs and defendants, with the exception of

19  defendants Wilson, Sandoval, and Nielsen, through their

20  respective attorneys, hereby agree that the facts set forth below

21  are undisputed and constitute the settled facts in this case.

22                                  I.

23                            GENERAL FACTS

24        1.   The California Department of Corrections (the

25  "CDC") currently operates 31 prisons housing in excess of 130,000

26  male and female inmates.

27        2. For the last several years, CDC's requests for

28  specific funding to implement Title II of the Americans with

1 | Disabilities Act ("ADA") have been denied at various phases of
2 | the funding process.

3 |        3.   Some programs of the CDC receive federal funds.

4 |        4.   CDC's total budget for fiscal year 1995-96 is
5 | approximately 3.8 billion dollars.

6 |        5.   CDC has conducted various surveys to identify
7 | certain inmates with disabilities, the most recent of which
8 | occurred in January 1995 and January 1996.  Inmates with learning
9 | disabilities were not included as a category in these surveys.

10 |        6.   In its survey of January 1996, CDC counted 1375
11 | inmates with mobility, sight, hearing or speech impairments out
12 | of a total inmate population of 131,632.  The survey reflected
13 | that 345 inmates use wheelchairs due to a permanent disability.
14 | 134 of these inmates were housed at the California Medical
15 | Facility ("CMF").  The survey reflected that 650 inmates had a
16 | permanent lower extremity mobility impairment that substantially
17 | limited walking and which may have required the use of an
18 | assistive device such as a cane, prosthetic device, or walker.

19 |        7.   The survey reflected that 15 CDC prisons housed at
20 | least one inmate who used a wheelchair due to a permanent
21 | disability.  Almost all institutions house prisoners with less
22 | severe mobility impairments.

23 |        8.   The survey reflected that 141 inmates are deaf or
24 | have a hearing impairment such that their hearing, even when
25 | augmented with a hearing aide, did not enable them to hear
26 | effectively or to hear emergency warnings.

27 |        9.   The survey reflected that most CDC institutions
28 | housed at least one inmate with a hearing impairment.

1    10.  The survey reflected that 219 inmates are blind or
2    have vision that cannot be corrected to 20/200, even with
3    corrective lenses.

4    11.  In the past, CDC housed many inmates with severe
5    disabilities in certain prison facilities under an informal
6    clustering arrangement.  Blind inmates were normally housed at
7    CMF.  Inmates in wheelchairs were often housed at CMF, Avenal
8    State Prison, California Institution for Men ("CIM"), or
9    California Institution for Women ("CIW").  Inmates with severe
10   hearing impairments were often housed at the California Men's
11   Colony ("CMC"), Avenal, or CIM.  Not all inmates with
12   disabilities, however, were housed in only these four prisons.

13   12.  CDC has clustered and continues to cluster other
14   specialized inmate populations.  HIV-positive inmates are placed
15   in various units in facilities throughout the system.  Inmates
16   with mental health concerns are clustered and frequently
17   separated from other inmate populations.

18                              II.

19               **MISCELLANEOUS ADA PROVISIONS**

20   13.  In April 1995, notice of the ADA was provided to
21   CDC inmates and parolees by posting written notices and by
22   reading the notice to some inmates with severe vision
23   impairments.

24   14.  CDC has appointed a system-wide ADA Title II
25   coordinator and has appointed an ADA coordinator at each of its
26   prisons and parole regions.  The system-wide ADA coordinator
27   leads a unit of ten employees.  The unit has been funded in large
28   part by funds redirected from the CDC's Institutions Division.

1  All of the prison ADA coordinators have other responsibilities

2  aside from their ADA-related duties.

3      15.   CDC initiated its self-evaluation in 1995, but has

4  not completed it.   The CDC has begun implementation of its

5  transition plan, although it is not fully developed and has not

6  been completed.   The transition plan will not be completed until

7  after the self-evaluation.

8  III.

9  1824 GRIEVANCE PROCEDURE

10      16.   On or about April 15, 1995, CDC established and

11  implemented a new administrative grievance procedure to provide

12  inmates and parolees with disabilities with a special process to

13  submit grievances or requests for accommodations/modifications on

14  matters related to their disabilities.   This new procedure makes

15  use of a special form designated as a "CDC 1824."

16      17.   Once the form is completed, it is submitted to the

17  appeals coordinator of the facility, bypassing the informal level

18  of the normal appeals process.

19  IV.

20  COMMON FEATURES OF CDC PRISONS

21      18.   Prisons share common features.   All contain

22  housing units that are either dormitories (open spaces with bunks

23  or lockers) and/or cells.   Cells are equipped with a toilet,

24  sink, and bed or bunk.   Most cells have a shelf and table.   Many

25  housing units have a dayroom area which contains drinking

26  fountains, telephones, televisions, and tables.   All housing

27  units have shower facilities.   Every prison has at least one yard

28  for outdoor recreation.   Yards usually have drinking fountains,

1 toilets, sinks, and showers.  Yards may have basketball or
2 handball courts, weight piles, and other recreational equipment.

3     19.  Each prison with the exception of CRC has an
4 administrative segregation unit consisting of celled housing.
5 Administrative segregation units typically have their own yards
6 containing drinking fountains, showers, and toilets.

7     20.  Each prison has visiting areas.  There is
8 generally a large room or patio with tables where inmates have
9 contact visits, and another section where inmates have noncontact
10 visits.  Noncontact visits occur in booths, some of which require
11 communications by a telephone.  The visiting rooms normally
12 contain attorney visiting areas, both contact and noncontact.
13 All prisons also have family visiting units for overnight visits.

14     21.  Each prison has at least one law library.

15     22.  Each prison has at least one hearing room that is
16 used for hearings before the Board of Prison Terms.  Inmates
17 typically wait for their hearings in holding areas or cells,
18 which may contain toilets and sinks.

19     23.  Each prison has dining halls where most inmates
20 receive their meals.

21     24.  Each prison has a canteen where inmates may
22 purchase personal items such as hygiene products and snacks.

23     25.  Each prison has chapels for religious programs.

24     26.  Each prison has health care facilities for
25 appointments with health care providers.  Most prisons have an
26 infirmary.

27     27.  Each prison has classrooms for academic education.
28 Many prisons have classrooms and workshops for vocational

1   education in a wide variety of subjects.  Some prisons have

2   Prison Industry Authority or Joint Venture facilities.  These are

3   manufacturing facilities operated jointly by private companies

4   and the prison system, utilizing inmate labor.

## V.

### CONSTRUCTION PROJECTS

7          28.  New prison construction commenced as reflected on

8   the chart attached as Exhibit 1.

9          29.  Since at least 1980, non-peace officer staff and

10  visitor areas of new CDC prisons have been designed and

11  constructed in substantial compliance with state accessibility

12  standards, which met or exceeded federal standards.

## VI.

### RECEPTION CENTERS

15         30.  When an inmate enters the CDC system, he or she is

16  first processed through, and temporarily housed at, a reception

17  center.  There are a total of 13 operational reception centers in

18  the CDC system.

19         31.  Inmates are processed through particular reception

20  centers depending upon which county they are coming from,

21  regardless of the inmates' ultimate classification score or

22  custody level, and regardless of the presence of any disability.

23         32.  Inmates who are processed through reception

24  centers are screened through a medical examination, psychological

25  testing, and an educational grade-level assessment.

26         33.  All of the reception centers accept inmates with

27  disabilities, and no reception center may exclude any prisoner.

28         34.  In some reception centers, some inmates who use

1  wheelchairs or who are on dialysis have spent longer periods of
2  time (ranging from several months to a year) in the reception
3  center than that spent by inmates on average.

4       35.   Inmates in reception centers earn 1/3 sentence
5  credit (one day credit for every two days served).  They are not
6  provided with the opportunity to earn 1/2 sentence credit (one
7  day credit for every day served) through participation in work
8  assignments, educational courses, or vocational programs.
9  Inmates in reception centers generally do not have the same
10 degree of privileges as inmates in mainline institutions, such as
11 contact visits, family visits, and telephone calls.

12                                VII.

13                        EMERGENCY PROCEDURES

14      36.   The CDC has emergency-situation policies and
15 procedures -- such as for evacuation of facilities in the event
16 of fire, earthquake, or other disaster -- and provides training
17 to its staff in implementing emergency policies and procedures.

18      37.   Prisoners with disabilities may require special
19 accommodations in order to ensure that they are evacuated in the
20 event of an emergency.

21      38.   Most CDC facilities do not have written policies
22 or procedures that specifically address the evacuation of
23 prisoners with disabilities.

24      39.   Prisons are staffed with custodial officers 24
25 hours per day, seven days per week.  Custodial staff are trained
26 to evacuate prison facilities in the event of an emergency.

27      40.   Most CDC  facilities do not have visual alarms or
28 strobe lights in all areas to warn prisoners with hearing

Stipulations C-94-2307 CW                          7.

1   impairments of emergencies.

2        41.   The CDC does not have a system-wide

3   process/procedure for visual identification of inmates with

4   disabilities while not in their cells.   Emergency situations can

5   arise within the prisons in areas other than living units, such

6   as yards.

7                              VIII.

8            CLASSIFICATION AND INMATE ASSIGNMENTS

9        42.   Following a classification process that considers

10  a multitude of factors, inmates are assigned to one of four

11  classification levels, with level I being minimum custody and

12  level IV being maximum security.   Although an inmate cannot

13  choose where he or she will be incarcerated or the program, if

14  any, to which he or she will be assigned, the inmate's

15  preferences may be considered by prison officials as one of the

16  many factors considered when the officials make these assignment

17  decisions.

18       43.   The CDC classification process works as follows:

19  an inmate received at a reception center is medically screened,

20  tested for grade level by education staff, and assigned a

21  correctional counselor.   The inmate's pertinent files and

22  documents are reviewed for pertinent social and criminal history,

23  and the inmate is interviewed.   Based on this information, the

24  counselor prepares a detailed summary report and computes a

25  classification score.   The classification score is an objective

26  classification mechanism that accounts for a wide variety of

27  factors (such as marital status, graduation from high school,

28  employment history, criminal history, behavior during previous

1  incarcerations, length of term, etc.).  These elements go into
2  the calculation of a points score that determines the
3  classification score level.  Based on the classification score
4  level, security considerations, a determination about an
5  appropriate program, known enemy concerns, the inmate's medical
6  needs, and available housing, recommendations are made concerning
7  the inmate's institutional placement.

8          44.  Additional identifiers may also be assigned to the
9  inmate at the reception center that will affect his eventual
10 housing placement.  If the inmate has history of a sexual
11 offense, he may be given an "R" suffix.  If the inmate has a
12 history of arson, he may be given an "A" suffix.  Other
13 identifiers include, but are not limited to, the inmate's heat
14 risk, medical considerations, such as whether the inmate tested
15 positive for tuberculosis, or whether the inmate has special
16 skills that would qualify him for an inmate day labor assignment
17 or a camp crew assignment.

18         45.  An inmate's disability status has no direct impact
19 on his or her classification score.

20         46.  The placement recommendation is forwarded to a
21 classification score representative ("CSR") who makes a final
22 endorsement to a particular housing destination.  In making the
23 endorsement, the CSR reviews the recommendation, considers all
24 case factors in light of available housing, and approves the
25 inmate for placement.

26         47.  Once the inmate arrives at his assigned
27 institution, there is additional classification activity.  The
28 inmate is again assigned a correctional counselor who, based on a

1  similar review and interview, makes recommendations about custody
2  designations and program determination.  A classification
3  committee at the assigned institution makes the final custody
4  determination.  Many factors go into the determination of the
5  appropriate custody designation, the most important of which
6  involve security issues.

7        48.  The custody designation identified for the inmate
8  defines the inmate's supervision needs and restricts the inmate's
9  access to areas and programs in the institution.  For example,
10 inmates with close-custody designations require constant
11 supervision and are restricted in the areas that they can access.
12 They are prevented from going outside the security perimeter.
13 The custody designation can limit an inmate's ability to
14 participate in particular programs.

15       49.  The classification committee also makes the final
16 determination about the programming activity to which the inmate
17 will be assigned.

18       50.  An inmate does not choose his or her
19 classification level or custody designation.  The inmate does not
20 choose where he or she will be incarcerated or the program, if
21 any, to which he or she will be assigned, but the inmate's
22 preference is a factor that may be considered.

23       51.  The amount of privileges to which an inmate is
24 entitled depends on his or her assigned privilege group, and is
25 not dependent on the classification level of the institution to
26 which he or she is assigned.  Instead, it is dependent upon the
27 inmate's behavior and involvement in institutional programming.
28 The privilege group determines the amount of privileges that the

1  inmate is entitled to, such as phone calls, visiting, canteen,

2  and recreation time.

3       52.  All inmates who participate in educational

4  classes, vocational training, or who have work assignments,

5  including those inmates with disabilities, earn 1/2 time sentence

6  credits to reduce their time in custody.

7       53.  Health care providers can identify inmates as

8  "totally medically disabled," "medically unassigned," or "light

9  restricted duty."  A "totally medically disabled" classification

10 allows the inmate to earn 1/2 time sentence credits without

11 having to participate in programming, while a "medically

12 unassigned" classification allows the inmate to earn one-third

13 time sentence credits.  A "light restricted duty" designation

14 allows the inmate to participate in programming in accordance

15 with a specified restriction due to a physical or mental

16 condition.  The inmate will receive 1/2 time credit for his

17 participation.

18      54.  Most CDC facilities have waiting lists for work

19 assignments.

20      55.  Vocational, educational and work assignment

21 programs are not designed or intended to be available equally to

22 all inmates.  These programs vary greatly among institutions.

23      56.  Some inmates with disabilities currently

24 participate in at least the following vocational programs:

25 Avenal:  computer-related technology, electronics, graphic arts

26 and printing, and mechanical drawing; CIM: animal grooming,

27 computer repair, drafting, graphic arts and printing, and shoe

28 repair; CIW: clothing & textile manufacturing; CMF: horticulture

1  and landscaping and office services; Central California Women's
2  Facility ("CCWF"): maintenance, mill and cabinet, office
3  services, and upholstery; Pleasant Valley State Prison ("PVSP"):
4  graphic arts, masonry, mill and cabinet, silk screening, computer
5  technology, office services, landscape, and upholstery.

6                                IX.

7              **ADMINISTRATIVE SEGREGATION AND SHU**

8        57.   Inmates may be placed in an administrative
9  segregation unit pending a disciplinary violation, for protective
10 custody, or for other administrative reasons.  Inmates may be
11 placed in a security housing unit ("SHU") for a disciplinary
12 infraction, or for other reasons related to the safety and
13 security of the institution.

14       58.   CDC has no system-wide, specific written policies
15 or procedures regarding the use, removal, or restriction of
16 auxiliary aids, ambulatory devices, or prosthetic limbs for
17 inmates in administrative segregation or SHU.

18       59.   In some instances, at some institutions, auxiliary
19 aids, ambulatory aids, wheelchairs or and prosthetic limbs have
20 been removed from inmates with disabilities while in
21 administrative segregation or SHU without regard to the inmate's
22 medical needs or disciplinary record.

23       60.   Pursuant to CDC regulations, inmates who require
24 assistance in administrative segregation hearings may request and
25 may be assigned an investigative employee and/or staff assistant.
26 These assistants and employees may provide effective
27 communication in some cases and not in others.

28 \\\

Stipulations C-94-2307 CW                    12.

## X.

### INMATES WITH MOBILITY IMPAIRMENTS

61.   CDC is in the process of purchasing three wheelchair accessible vehicles for use in each of the three CDC-designated geographical regions, North, Central, and South.

## XI.

### INMATES WITH HEARING IMPAIRMENTS

62.   According to CDC survey taken in January 1996, there are 141 inmates, including three women, with hearing impairments so severe that they are unable to hear effectively even with the use of a hearing aid.

63.   Prisoners with hearing impairments communicate in a variety of methods.  Some can read and speak English; others do not.  Some prisoners can communicate most effectively through American Sign Language ("ASL"), some can communicate through gestures and signs, and a small minority can lip read effectively.

64.   For some inmates with hearing impairments, hearing aids enable them to communicate effectively; for others, hearing aids are ineffective.

65.   CDC currently does not have any system-wide, written policies or procedures that specifically address the needs of hearing-impaired inmates.

66.   At some institutions, one or two staff, who may not have formal training as interpreters, know ASL with varying proficiency and are occasionally used as interpreters.  CDC has no standardized process for evaluating the proficiency of these staff members.

67.   The dominant mode of exchanging information at formal hearings and during medical visits for inmates with severe hearing impairments is written communication.   For informal contacts, prison officials rely on the prisoner to read lips, respond to gestures, write notes, or use an informal staff or inmate interpreters.

68.   Prisons have public address systems used to make general announcements.   With the exception of CMC, prisons do not have formalized written procedures for notifying inmates with hearing impairments of announcements.

69.   Some prisons do not have closed-captioned capable televisions in inmate common areas; other prisons have one or multiple closed-captioned capable televisions in some inmate common areas.

70.   All prisons except CRC have noncontact visiting areas for inmates who have restrictions on their visiting privileges.   Noncontact visits are conducted in booths where communication occurs through a telephone.   These telephones are not equipped with volume control, nor can TDDs be used in these booths.

71.   Institutions have different procedures for replacing hearing aid batteries.

## XII.

### INMATES REQUIRING DIALYSIS

72.   Inmates with kidney impairments severe enough to require dialysis generally must receive dialysis two or three times per week.   Dialysis patients can benefit from a specialized diet.

1        73.  Few prisons have in-prison dialysis units.  Most

2 prisons housing inmates who need dialysis have contracts with

3 outside medical providers to perform necessary dialysis

4 treatments.

5        74.  Inmates who require kidney dialysis are excluded

6 from assignment to prison camps.

7        75.  Most inmates housed on the mainline who need

8 dialysis are classified as totally medically disabled.  Inmates

9 who are on dialysis, however, are not categorically precluded

10 from participation in programming such as vocational or

11 educational programs.

12 XIII.

13 INMATES WITH VISION IMPAIRMENTS

14        76.  Computerized assistive devices for inmates with

15 vision impairments are only available at CMF and CMC.  Only one

16 prison, CMF, has a "Reader's Edge" computer, which scans a

17 printed page and reads it back in a synthesized voice.

18        77.  Many inmates with significant vision impairments

19 develop their impairments while incarcerated.  No prison offers

20 daily living skills courses for inmates with vision impairments.

21 XIV.

22 INMATES WITH LEARNING DISABILITIES

23        78.  There are inmates with learning disabilities

24 within the CDC.

25        79.  The phrase "learning disability" is not defined by

26 the ADA or the regulations implementing it.  The phrase is

27 defined by other federal and state laws.

28        80.  The CDC does not normally undertake particularized

1  efforts to evaluate and assess whether inmates have learning
2  disabilities.

3          81.   The CDC prisons have educational programs that
4  include academic and vocational instruction.

5          82.   Inmate participation in CDC's educational program
6  is by assignment made by a classification committee from an array
7  of programming options.  Assignment to an educational program is
8  not an elective choice of the inmate, although the inmate's
9  preference in considered.

10         83.   CDC inmates are given an individualized assessment
11 to determine their grade level upon their arrival at a reception
12 center.  When an inmate's grade level is lower than the sixth
13 grade, it is CDC policy to place the inmate in an academic
14 program.

15         84.   CDC's educational program is based on a competency
16 based curriculum.  CDC has no "special education" programs.

17         85.   There are varying methods and techniques to treat
18 or remediate a learning disability.  There is no one method that
19 is most effective.  The effectiveness of any one particular
20 method varies from student to student, from teacher to teacher,
21 and from program to program.

22         86.   Some CDC inmates who have learning disabilities
23 attend academic classes or vocational programs.

24         87.   In some instances, regular classroom teachers can
25 successfully teach students with learning disabilities.

26         88.   CDC employs approximately 30 teachers who are
27 special education qualified and/or credentialed.  However, they
28 do not teach in special education classes.

89.   There is no written CDC policy or procedure that addresses accommodating inmates with learning disabilities.

90.   Various vocational programs and work assignments require a minimum education level for inmate participation.

91.   A CDC inmate who is unable to succeed in academic classes is eligible to be assigned to alternative programming through which the inmate acquires 1/2 sentence credits.

### XV.

### PAROLE

92.   The parole and community services division of the CDC is responsible for some community-based centers that house inmates and/or parolees.   These include community correctional centers and community correctional re-entry centers (commonly called work furlough).   There is also a substance abuse treatment unit and restitution center.

93.   Although inmates with mobility, sight, or hearing disabilities are not excluded by policy, mobility-impaired inmates who require a catheter or Foley bag or inmates on dialysis are excluded from programs at community-based centers. In January 1996, a CDC survey reflected that there were four inmates with mobility, sight, or hearing impairments at the community-based facilities.

94.   Most inmates released from incarceration are required to serve a three-year parole period.   Projections for 1996 indicate that there are approximately 90,000 parolees in California.

95.   Prior to being released on parole, parolees are provided with written notice of their conditions of parole, which

1  they are required to sign as a condition of release on parole.
2  Once released from prison, they must maintain regular contact
3  with a parole officer, usually by going to a parole office or by
4  speaking with their parole officer on the phone.  If a parole
5  officer believes a parolee has violated the terms of his or her
6  parole, the parole officer may cause the parolee to be arrested
7  for a parole violation.  A parolee receives written notice of the
8  alleged parole violation.

9       96.   Written notice commonly provided to parolees,
10 including conditions of parole and written notice of parole
11 violations, are not provided in alternative formats.  CDC does
12 not have any written policies or procedures that specifically
13 address the communication needs of hearing-impaired parolees.

14                              XVI.

15                  CDC'S DISABILITY PLACEMENT PLAN

16      97.   The CDC Disability Placement Plan ("DPP")
17 designates all reception centers, nine primary institutions, and
18 eight parole facilities to house inmates or parolees who have
19 certain mobility, speech, hearing, or vision impairments.

20      98.   The nine primary prisons included in the DPP are
21 the following: California Medical Facility, Corcoran State
22 Prison, Pleasant Valley State Prison, Avenal State Prison,
23 California Institution for Men, Central California Women's
24 Facility, California Institution for Women, High Desert State
25 Prison, and Salinas Valley State Prison.

26      99.   The designated facilities were chosen after taking
27 into consideration issues such as classification levels,
28 geographic location, physical characteristics (including the

1   availability of wheelchair-accessible housing), potential costs

2   of structural modifications, the unique missions of each

3   institution (including the availability of mental or physical

4   health services), and any experience an institution may have

5   developed from housing particular disabled populations under the

6   informal clustering arrangement.

7          100. The DPP was designed on the premise that some

8   disabilities are not severe enough to affect placement and on the

9   premise that it is unnecessary to house inmates with such less-

10  severe disabilities in specialized housing.

11         101. A disability verification process has been

12  established.

13

14  Dated  4/24/96

                                JAMES M. HUMES
15                              Deputy Attorney General
                                For the CDC Defendants
16

17

18

19  Dated  April 25, 1996

20                              DON SPECTER
                                Prison Law Office
21                              For the Plaintiffs

22

23

24                              APPROVED:

25

26

27  Dated  April 26, 1996

28                              HONORABLE CLAUDIA WILKEN
                                U.S. DISTRICT JUDGE

Stipulations C-94-2307 CW                    19.

1

2

## DECLARATION OF SERVICE BY MAIL

Case Name:   John Armstrong et. al, v. Pete Wilson et. al,
3                                         No. C-94 2307 CW

4   I am employed in the County of Marin, California.  I am over the
    age of 18 years and not a party to the within entitled cause: my
5   business address is Prison Law Office, General Delivery, San
    Quentin, California  94964.

6

7   On April 25, 1996, I served the attached

8

9   **STIPULATIONS**

10

11   in said cause, placing, or causing to be placed, a true copy
     thereof, enclosed in a sealed envelope with postage thereon fully
     prepaid in the United States Mail at San Rafael, California,
12   addressed as follows:

13

14   James Humes
     Deputy Attorney General
15   50 Fremont St., Suite 300
     San Francisco, CA 94105-2239

16

17

18

19   I declare under penalty of perjury under the laws of the State of
     California that the foregoing is true and correct, and that this
20   declaration was executed at San Rafael, California on April 25,
     1996.

21

22

23                        Bonnie Cash

24

25

26

27

28