

FILED

OCT - 8 1997

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

237

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG; JAMES AMAURIC;
RICHARD PONCIANO; JACK
SWENSEN; BILLY BECK; JUDY FENDT;
WALTER FRATUS; GREGORY
SANDOVAL; DARLENE MADISON; PETER
RICHARDSON; STEVEN HILL;
ROY ZATTIERO,

           Plaintiffs,

  v.

PETE WILSON; JOSEPH C. SANDOVAL;
JAMES GOMEZ, Dir. Dept. of
Corrections; KYLE MCKINSEY; KEVIN
CARRUTH; DAVID TRISTAN; MARISELA
MONTES, Deputy Director of the Parole
and Community Services
Division,

           Defendants.

-------------------------

UNITED STATES OF AMERICA

          Amicus Curiae

_____/

No. C 94-02307 CW

ORDER GRANTING IN
PART AND DENYING
IN PART
PLAINTIFFS'
MOTION TO REQUIRE
DEFENDANTS TO
MODIFY THEIR
REMEDIAL PLANS
(FIRST SET OF
CONTESTED ISSUES)

Plaintiff moves for an order requiring Defendants to modify
their remedial plans with respect to the first set of contested

issues designated in the June 4, 1997 Scheduling Order.  Defendants
oppose the motion.  The matter was heard on September 26, 1997.
Having considered all of the papers filed by the parties and oral
argument on the motion, the Court grants the motion in part, denies
it in part, and postpones deciding one issue until a later hearing.

<center>BACKGROUND</center>

Plaintiffs, 12 individuals representing a class of disabled
prisoners and parolees, have brought claims against State officials
involved in the California prison system for violations of Title II
of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-
34, and Section 504 of the Rehabilitation Act of 1973 (§ 504), 29
U.S.C. § 794.

On July 9, 1996, the Court approved a procedure for resolving
the substantive issues in this case in lieu of trial.  <u>See</u>
Stipulation and Order for Procedures to Determine Liability and
Remedy.  All parties but James Nielsen had stipulated to this
procedure as a result of settlement negotiations.  (Hereinafter,
"Defendants" will refer to all Defendants except Mr. Nielsen.)  The
stipulated procedure anticipated that Defendants would bring a
motion for summary judgment based on the legal arguments that
neither statute applied to State prisons and that Congress had not
validly abrogated Defendants' Eleventh Amendment immunity to suit
under the statutes.  Defendants brought that motion, which the
Court denied on September 20, 1996.  The Court certified the legal
issues in that motion for immediate appeal and the Ninth Circuit
upheld the Court's decision on August 27, 1997.  <u>Armstrong v.</u>
<u>Wilson</u>, 97 Daily Journal D.A.R. 11143; <u>see also</u> <u>Clark v. State of</u>

<center>2</center>

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

United States District Court
For the Northern District of California

1  California, 97 Daily Journal D.A.R. 11140 (addressing Eleventh
2  Amendment immunity issue in greater depth).

3      Defendants had agreed not to seek a stay of the case pending
4  appeal, so the stipulated procedure went forward.  On September 20,
5  1996, the Court adopted findings of fact and conclusions of law and
6  entered a remedial order and injunction, all of which were defined
7  in the stipulated procedure of July, 1996.  The Court found that
8  Defendants violated the ADA and § 504 and ordered that they remedy
9  the violations by developing, with advice from Plaintiffs, plans to
10 provide class members with accommodations, program access and means
11 of effective communication.  The Court found that this remedial
12 procedure "[was] narrowly drawn, extend[ed] no further than
13 necessary to correct the violation of the rights at issue and [was]
14 the least intrusive means necessary to correct the violation of
15 rights."

16     Specifically, the Remedial Order required Defendants to submit
17 several documents to Plaintiffs' counsel in the Fall of 1996:
18 1) the California Department of Corrections' (CDC's) program, plan
19 and procedures for implementation of its Disability Placement Plan
20 (DPP), which all parties agreed would involve clustering class
21 members with certain disabilities at designated institutions and
22 parole facilities; 2) CDC's self-evaluation as required by ADA
23 regulations 28 C.F.R. § 35.105; 3) CDC's transition plan as
24 required by ADA regulations 28 C.F.R. § 35.150(d); 4) a general
25 outline setting forth the methods by which class members would be
26 provided accommodations, program access, and effective means of
27 communication; and 5) guidelines, policies, procedures or plans
28                              3

United States District Court
For the Northern District of California

regarding seven specific areas of concern.  These areas included a) disability grievance procedures, b) reception center processing times, c) accommodations and structural features for disabled inmates in emergency situations, d) allowable assistive aids for disabled inmates in administrative segregation, security housing units and reception centers, e) accessibility features of new construction and alterations, f) criteria for determining whether inmates are totally medically disabled or medically unassigned, and g) school and job assignments for disabled prisoners.

The Remedial Order instructed Plaintiffs to serve written objections on Defendants, to which Defendants were to respond in writing.  The Order then instructed the parties to meet and confer and attempt to resolve their differences.  Plaintiffs had the right to request that the Court hold an evidentiary hearing in the event they were unable to reach resolution.  At any such hearing, the Court would review Defendants' plans for compliance with the ADA and § 504 and order modifications to the plans if violations were found.  If Plaintiffs did not object to Defendants' plans, the parties were instructed to file a stipulation and proposed order in a form substantially similar to one set forth as Appendix D to the July 9, 1996 Stipulation and Order.  Once this process was completed, the Remedial Order directed that a similar process take place regarding plans for individual institutions within the prison system.  The Order also addressed other issues not directly relevant here.

Plaintiffs filed objections to Defendants' plans on April 9, 1997.  On June 4, 1997, the Court issued a Scheduling Order in

4

United States District Court
For the Northern District of California

accordance with a stipulation by the parties.  The schedule divided
the issues into four phases.  First, the parties had until July 31,
1997[1] to propose the form of an order encompassing matters on which
they were able to agree.  Plaintiffs have submitted a Proposed
Order and a supporting brief, and Defendants have submitted a
Position on Entry or Form of Order Regarding Resolved Matters and a
supporting brief.  The following three phases of the schedule
covered briefing and hearings on three sets of unresolved issues.
This Order addresses the first set of contested issues, which
includes 1) geographic distribution, 2) applicable legal standards,
and 3) new construction and maintenance.[2]

<center>DISCUSSION</center>

I.   Legal Standard

In order to determine the appropriate legal standards to apply
in evaluating whether Defendants' plans comply with Title II of the
ADA and with § 504, the Court must consult four sources: the two
statutes, their implementing regulations, case law and agency
guidance on the scope of a public entity's duty to accommodate
disabled persons, and case law defining the appropriate limits of
judicial interference in State prison administration.

---

[1]The original deadline was June 23, but by stipulation and
order entered July 9, 1997, the deadline was extended to July 31.

[2]According to the Scheduling Order, self-evaluation for
Learning Disabled inmates was also included in this set of issues,
but the issue was not addressed in the briefs and apparently is no
longer in dispute.

A.   The Statutes

Section 504 provides

No otherwise qualified individual with a disability . . .
shall, solely by reason of her or his disability, be excluded
from participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity
receiving Federal financial assistance . . .

29 U.S.C. § 794(a).  The Act defines "program or activity" as

all of the operations of (1)(A) a department, activity,
special purpose district, or other instrumentality of a State
or of a local government; or (B) the entity of such State or
local government that distributes such assistance and each
such department or agency . . . to which the assistance is
extended, in the case of assistance to a State or local
government; . . . any part of which is extended Federal
financial assistance.

29 U.S.C. § 794(b)(1)(a) and (b).  The Court has found that some

programs of the CDC receive federal financial assistance as that

term is used in Title 29 U.S.C. § 794.  Therefore, § 504 applies to

all of the operations of the CDC.

Title II of the ADA provides that

no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be
denied the benefits of the services, programs, or activities
of a public entity, or be subjected to discrimination by such
entity.

42 U.S.C. § 12132.  Any department, agency or other instrumentality

of a State or local government is a "public entity" under the Act.

42 U.S.C. § 12131(1)(A) and (B).  Thus, the ADA applies to the

services, programs and activities of the CDC.

B.   The Regulations

The regulations implementing Title II of the ADA largely adopt

the language of the regulations implementing § 504 as it applies to

recipients of federal assistance, although the ADA regulations

United States District Court
For the Northern District of California

provide more guidance.  The following section describes the rules under both acts, unless otherwise specified.  Regulations implementing Title II of the ADA are found at Part 35 of Title 28 of the Code of Federal Regulations.  The regulations implementing § 504 with respect to entities receiving federal financial assistance are found at Part 41 of the same title.

1.   General Duties

The regulations first describe the general obligations imposed by the statutes.  A public entity may not deny disabled persons the opportunity to participate in or benefit from any aid, benefit or service, or afford an opportunity not equal to or not as effective as that enjoyed by nondisabled persons.  28 C.F.R. § 35.130(b)(1)(i)-(iii); 28 C.F.R. § 41.51(b)(i)-(iii).  Public entities may not provide different or separate aids, benefits or services to disabled persons, unless necessary to make them as effective as those provided to others.  28 C.F.R. § 35.130(b)(1)(iv); 28 C.F.R. § 41.51(b)(iv).  Nor may they "otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others in receiving the aid, benefit or service."  28 C.F.R. § 35.130(b)(1)(vii); 28 C.F.R. § 41.51(b)(vii).

Public entities are required to make reasonable modifications in policies, practices or procedures if necessary to avoid discriminating on the basis of disability, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or

United States District Court
For the Northern District of California

activity."   28 C.F.R. § 35.130(b)(7).[3]   Public entities must also administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.   28 C.F.R. § 35.130(b)(8)(c); 28 C.F.R. § 41.51(d).

        2.   Program Accessibility

Regulations specifically addressing "program accessibility" provide that disabled persons may not be excluded from participation in or be denied the benefits of the public entity's services, programs or activities or be subject to discrimination "because a public entity's facilities are inaccessible to or unusable by individuals with disabilities."   28 C.F.R. § 35.149; 28 C.F.R. § 41.56.   The regulations then dictate different standards for existing facilities and for new construction or alterations.

With respect to existing facilities, the regulations require that public entities operate each service, program or activity so that, "when viewed in its entirety, [it] is readily accessible to

---

[3]Part 41 does not include a comparable clause; however, the Department of Justice has explained that this reflects the timing of when the regulations were promulgated rather than any substantive difference in legal standards.   See 28 C.F.R. Part 39, Editorial Note ("Background").   The "fundamental alteration" language, as well as other language that refers to "undue financial and administrative burdens," reflects the holding of Southeastern Community College v. Davis, 442 U.S. 397 (1979), which limited the duty to accommodate disabled persons under § 504.   When the Department of Justice promulgated the regulations implementing § 504 with respect to activities conducted by the Department (Part 39 of Title 28), it included language taken directly from Davis. See, e.g., 28 C.F.R. § 39.150(a)(2).   These regulations in turn became the model for the ADA regulations.   See further discussion in Section I.C, infra.   In its commentary to the Part 39 regulations, republished as an "Editorial Note" in the Code of Federal Regulations, the Department explained that the Davis standard also applies to the Part 41 regulations, even though those regulations have not been revised to include the Davis language. 28 C.F.R. Part 39, Editorial Note ("Background").

United States District Court
For the Northern District of California

and usable by individuals with disabilities." 28 C.F.R.
§ 35.150(a); 28 C.F.R. § 41.57(a). However, a public entity need
not necessarily make each of its existing facilities accessible to
or usable by disabled persons, 28 C.F.R. § 35.150(a)(1); 28 C.F.R.
§ 41.57(a), nor take any action that it can demonstrate would
result in a fundamental alteration in the nature of a service,
program or activity or undue financial and administrative burdens.
28 C.F.R. §35.150(a)(3).[4] ADA regulations place on the public
entity the burden of proving that compliance with section 35.150(a)
would result in fundamental alterations or undue burdens. 28
C.F.R. § 35.150(a)(3). They require that the head of the entity or
his or her designee make that decision "after considering all
resources available for use in the funding and operation of the
service, program, or activity" and explain the decision in a
written statement. Id. Even if compliance would result in such
alterations or burdens, the public entity must still take any other
action that would not result in those alterations or burdens but
would nevertheless ensure that disabled persons receive the
benefits or services of the public entity. Id. No particular
methods are required for compliance, but priority should be given
to those methods that offer services, programs or benefits in the
most integrated setting appropriate. 28 C.F.R. § 35.150(b)(1).

When new facilities or parts of facilities are built, they
must be designed and constructed to be readily accessible to and
usable by individuals with disabilities. 28 C.F.R. § 35.151(a); 28

---

[4] See note 3, supra, and 28 C.F.R. § 39.150(a)(2).

United States District Court
For the Northern District of California

C.F.R. § 41.58.  When a public entity alters a facility or part of
a facility in a manner that could affect its usability, the public
entity must, to the maximum extent feasible, do so in such manner
that the altered portion is readily accessible to and usable by
disabled persons.  28 C.F.R. § 35.151(b); 28 C.F.R. § 41.58.  The
ADA regulations provide that work that conforms with the Uniform
Federal Accessibility Standards (UFAS) or the American with
Disabilities Act Accessibility Guidelines for Buildings and
Facilities (ADAAG) constitutes compliance, with exceptions not
relevant here.  28 C.F.R. § 35.151(c).  The regulations also permit
substitution of methods described in these federal standards when
it is clearly evident that equivalent access to the facility or
part of the facility is thereby provided.  Id.

Some ADA regulations not included under "Program
Accessibility" also affect decisions about a public entity's
physical facilities.  Public entities must "maintain in operable
working condition those features of facilities and equipment that
are required to be readily accessible to and usable by persons with
disabilities by the Act or this part," although "isolated or
temporary interruptions in service or access due to maintenance or
repairs" are permitted.  28 C.F.R. § 35.133.  Furthermore, in
determining the site or location of a facility, a public entity may
not make selections that have the effect of excluding disabled
persons, denying them benefits, or otherwise discriminating against
them, or that substantially impair the accomplishment of the
service, program or activity with respect to disabled persons.  28
C.F.R. § 35.130(b)(4).

C.   Case Law and Agency Guidance on Extent of Accommodation Duty

The scope of a public entity's duty to accommodate disabled persons under the ADA and § 504 is not well defined.   In Southeastern Community College v. Davis, 442 U.S. 397 (1979), the U.S. Supreme Court held that § 504 does not require accommodations that would result in a "fundamental alteration in the nature of a program." Id. at 410.   Where accommodations do not impose "undue financial and administrative burdens," however, failure to make those accommodations might be discriminatory and thus violate the act. Id. at 412-13.   In Davis, a deaf woman was denied admission to a nursing program because the school concluded that she could not safely participate in the normal clinical training program or safely care for patients, and that the program could not be modified without depriving the student of the benefits of the training. Id. at 401-02.   Accommodating the student, the Court concluded, would have required fundamental alterations in the nature of the program. Id. at 409-10.

In Alexander v. Choate, the Court reaffirmed its holding in Davis, describing it as striking a "balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs: while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones." Alexander v. Choate, 469 U.S. 287, 300 (1985).   See also Dempsey, by and through Dempsey v. Ladd, 840 F.2d 638, 641 (9th Cir. 1987)

United States District Court
For the Northern District of California

("A state agency must be permitted to 'strike a balance' between the particular interests of a handicapped person and a desire to defend the integrity of its programs.")(citing <u>Alexander v. Choate</u>).

The "fundamental alteration" language in these opinions defines the outer boundaries of what a public entity must do to comply with § 504: it need not take steps that fundamentally alter or substantially change the very nature of the program, service or activity offered.  The test for whether proposed modifications would impose "undue financial or administrative burdens," however, is much murkier.  <u>See, e.g.</u> <u>Hovsons, Inc. v. Township of Brick</u>, 89 F.3d 1096, 1104 (3rd Cir. 1996) ("We acknowledge that precisely what the 'reasonable accommodations' standard requires is not a model of clarity.")(applying § 504 standard to Federal Housing Amendments Act case).  In non-employment contexts, the Ninth Circuit has advised only that "[t]he reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination."  <u>United States v. California Mobile Home Park Management Co.</u>, 29 F.3d 1413, 1418 (9th Cir. 1994)(applying § 504 standard to Federal Housing Amendments Act case).

In response to <u>Davis</u> and subsequent circuit court decisions, the Department of Justice revised the § 504 regulations applicable to activities conducted by the agency.  These regulations include the current language that places the burden on the agency of proving a fundamental alteration or undue burden and requires the agency head to take responsibility for the decision, to consider all of the agency's resources, and to provide a written

12

United States District Court
For the Northern District of California

1   justification.  <u>See</u> Section I.B.2, <u>supra</u>.  The Department's

2   "Editorial Note" on these regulations further explains that

3   "because of the extensive resources and capabilities that could

4   properly be drawn upon for section 504 purposes by a large Federal

5   agency like the Department of Justice, the Department explicitly

6   acknowledges that, in most cases, making a Department program

7   accessible will likely not result in undue burdens."  28 C.F.R.

8   Part 39, Editorial Note (segment addressing § 39.150).  Although

9   the department's "entire budget is an inappropriate touchstone" for

10   evaluating financial and administrative burdens, because many parts

11   of the budget are earmarked for specific purposes, the Note

12   observes again that "[t]here are extensive resources available to

13   the Department and it is expected that the Department will, only on

14   very rare occasions, be faced with 'undue burdens' in meeting the

15   program accessibility or communications sections of the

16   regulation."  <u>Id.</u>

17       The foregoing Note was published when the related regulations

18   were adopted in September, 1984.  When Congress passed the ADA in

19   1990, it specifically directed that ADA Title II regulations with

20   respect to program accessibility and communications be consistent

21   with Title 28, Part 39 of the Code of Federal Regulations.  42

22   U.S.C. § 12134(b).  The regulations promulgated include the same

23   language as that discussed in the Editorial Note to Part 39.  <u>See</u>

24   28 C.F.R. §§ 35.150(a)(3), 35.164.  The explanatory appendix to the

25   ADA regulations, Title 28, Part 35, specifically refers to Part 39.

26   28 C.F.R. Part 35, Appendix A (segment relating to § 35.150). This

27   appendix states that "the program access requirement of title II

28                                     13

1  should enable individuals with disabilities to participate in and

2  benefit from the services, programs, or activities of public

3  entities in all but the most unusual cases."   Id.

4      Because these regulations are consistent with Davis and have

5  been implicitly endorsed by Congress, the Court will rely on them

6  in determining whether Plaintiffs' proposed modifications would

7  impose undue burdens on the CDC, subject to the appropriate level

8  of deference to the needs of effective prison administration,

9  discussed further in the next section.

10      D.   Judicial Deference to State Prison Administration

11      The Ninth Circuit has held that the statutory rights

12  applicable to the nation's general population must be applied to

13  prisons with due deference to the needs of effective prison

14  administration.   Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir.

15  1994).   Specifically addressing application of the ADA to prisons,

16  the Circuit found "no indication that Congress intended the Act to

17  apply to prison facilities irrespective of the considerations of

18  the reasonable requirements of effective prison administration."

19  Id. at 1447.   Thus, in applying the ADA to prisons, the Ninth

20  Circuit applied the standard of review prescribed by the Supreme

21  Court in Turner v. Safley for prison policies that infringe

22  inmates' constitutional rights: "the regulation is valid if it is

23  reasonably related to legitimate penological interests."   Id.

24  (quoting Turner v. Safley, 482 U.S. 78, 89 (1987).

25      The Supreme Court identified four factors relevant to

26  determining the reasonableness of prison policies, which the Ninth

27  Circuit has summarized as follows:

28                          14

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

> (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact that accommodation of the [] right will have on guards, on other inmates, or on the allocation of prison resources; and (4) whether the regulation or policy is an 'exaggerated response' to prison concerns. The burden is on the inmates to show that the challenged regulation is unreasonable under <u>Turner</u>.

<u>Casey v. Lewis</u>, 4 F.3d 1516, 1520 (9th Cir. 1993) (citations omitted).  To satisfy the first factor, prison officials "need merely '"put forward"' a legitimate government interest" and provide some evidence that that interest is the actual reason for the regulation.  <u>Casey</u>, 4 F.3d at 1520-21 (quoting <u>Turner</u>, 482 U.S. at 89).

Defendants, relying on the reference to "allocation of prison resources" in the third factor, argue that the Court must apply the <u>Turner</u> standard to policies justified by the costs of accommodating disabled prisoners.  The resources factor comes into consideration, however, only after Defendants have raised a legitimate penological justification for the CDC's policies.  Because cost is a concern the CDC shares with all public entities, it does not qualify as a penological objective.  Once Defendants have defended their policies based on a legitimate penological objective such as prison security, however, the Court must evaluate the reasonableness of that policy by considering the four factors summarized in <u>Casey</u>, including the costs of accommodation.

E.    Summary

In reviewing the contested aspects of Defendants' remedial plan, therefore, the Court will first inquire into whether the plan fails to comply with the plain language of the statutes and their

15

United States District Court

For the Northern District of California

1   implementing regulations.   To the extent Defendants raise an undue
2   burden defense, the Court will be guided by the regulatory language
3   placing the burden on Defendants to justify the defense and by the
4   commentary accompanying the regulations, which sheds light on the
5   threshold for when burdens become undue.   If Defendants "put
6   forward" legitimate penological justifications for aspects of their
7   plans that violate the statutes, the Court will apply the four-
8   factor <u>Turner</u> test to determine whether Defendants' policies are
9   reasonably related to those justifications.

10  II.   Geographic Distribution

11       The CDC has selected ten prisons and three Community
12  Correctional Reentry Centers (CCRC's) in the State to accommodate
13  disabled prisoners and parolees.   The CDC refers to these
14  facilities as DPP facilities or designated facilities.   Plaintiffs
15  do not object to the clustering concept, but they argue that
16  additional facilities should be included.   Specifically, they argue
17  that Defendants' choice of facilities violates the ADA and § 504
18  because it denies a significant percentage of disabled persons,
19  solely on the basis of disability, the benefit of a State statutory
20  requirement that they be incarcerated near their homes when
21  reasonable.   Defendants respond that 1) because the decision where
22  to place prisoners and parolees is discretionary, disabled class
23  members have not been denied any concrete benefit, and 2) because
24  the choice of facilities was made after an "extraordinarily
25  deliberate and conscientious" process in which the CDC weighed many
26  factors, including costs, administrative burdens and legitimate
27  penological objectives, the Court should defer to the agency's

28                                    16

United States District Court
For the Northern District of California

1   decision.

2        A.    Violations of ADA or § 504 Provisions

3        State law requires the CDC to investigate for each newly

4   committed prisoner "the existence of any strong community and

5   family ties, the maintenance of which may aid in the person's

6   rehabilitation" and "when reasonable" to "assign a prisoner to the

7   institution of the appropriate security level and gender population

8   nearest the prisoner's home, unless other classification factors

9   make such a placement unreasonable."  Cal. Penal Code § 5068.  The

10  statute defines "reasonable" as including consideration of "the

11  availability of institutional programs and housing."  Id.

12       In order to establish that the choice of designated prisons

13  violates the ADA or § 504, Plaintiffs must show that disabled

14  prisoners would be denied "the opportunity to participate in or

15  benefit from the aid, benefit or service" provided by the CDC, that

16  this opportunity would not be equal to or as effective as the

17  opportunities available to able-bodied prisoners, or that they

18  would otherwise be limited "in the enjoyment of any right,

19  privilege, advantage or opportunity enjoyed by others receiving the

20  aid, benefit, or service."  28 C.F.R. § 35.150(b)(1)(i), (ii),

21  (iii), (vii); 28 C.F.R. § 41.51(b)(1)(i), (ii), (iii), (vii).

22  Obviously, this language is quite broad and encompasses more than

23  the denial or abridgement of concrete rights.  The statute

24  requiring the CDC to place prisoners near their homes when

25  reasonable constitutes at least a privilege or opportunity.

26  Denying or diminishing this privilege or opportunity to prisoners

27  by further restricting the available institutions in which they can

28                                17

United States District Court

For the Northern District of California

1 be placed solely due to their disabilities, therefore, violates the
2 cited provisions of the ADA and § 504.

3    Defendants argue that because the CDC also limits the possible
4 assignments of other classes of prisoners, such as arsonists and
5 sex offenders, the restrictions on assignments of disabled
6 prisoners are not discriminatory.  Plaintiffs correctly point out,
7 however, that discrimination against classes not protected by
8 federal antidiscrimination laws does not excuse discrimination
9 against persons with disabilities, who are protected.

10    Defendants further argue that requiring them to amend their
11 plan so that disabled prisoners are not denied the benefits of
12 Penal Code section 5068 amounts to a federal court injunction
13 requiring them to enforce State law, which is barred by the
14 Eleventh Amendment.  Pennhurst State School & Hospital v.
15 Halderman, 465 U.S. 89, 106 (1984).  Pennhurst does not apply to
16 this case.  Plaintiffs have not asked the Court to order Defendants
17 to enforce State law; they have challenged practices of Defendants
18 that are allegedly discriminatory under federal law.  Defendants
19 cannot deny Plaintiffs the benefit of a State law solely on the
20 basis of disability.

21    B.   Undue Burden Defense

22    Defendants explain in some detail how they selected the DPP
23 facilities.  Most of the reasons cited fall into the category of
24 financial and administrative burdens.  These include concerns about
25 the inmates' housing and service needs, costs, concentration of
26 special resources, the age and physical structure of various
27 institutions, institutional resources and expertise, availability

28                                    18

United States District Court
For the Northern District of California

1  of beds and program areas, and unique delivery systems.  These
2  factors must be evaluated under the regulatory standards for an
3  affirmative undue burden defense.  That is, the decision that
4  accommodations would impose an undue burden must be made by the
5  head of the agency or his or her designee, must be made considering
6  all available resources, and must be justified in writing.  The
7  Justice Department's commentary on its regulations further implies
8  that an agency the size of the CDC should be able to accommodate
9  its disabled prisoners in all but the most unusual cases.  The
10  Court will analyze these in the context of each of Plaintiffs'
11  proposed modifications.

12      As a preliminary note, however, the Court observes that all of
13  Defendants' cost projections appear to be based on the need for
14  structural modifications.  Plaintiffs point out that accommodations
15  for  hearing- and vision-impaired prisoners and other disabled
16  prisoners who do not need to use wheelchairs do not necessarily
17  require structural modifications.  To the extent that Defendants
18  have failed to address the feasibility of adding facilities for
19  non-wheelchair-bound disabled prisoners in the following categories
20  so that they might be placed near their homes, they have failed to
21  meet their burden of proving that Plaintiffs' proposed
22  modifications would impose an undue burden.

23          1.   Women in the South

24      Plaintiffs note that the only designated facilities for women
25  are located in the central part of the State.  Plaintiffs argue
26  that the California Institution for Women (CIW), located in
27  Southern California, which is the home region of two-thirds of

28                                19

United States District Court

For the Northern District of California

women prisoners, also should be renovated.  Plaintiffs observe that the CDC has already renovated the reception center at CIW, demonstrating that renovations are feasible regardless of the age of the facility.  Plaintiffs also note that the California Institution for Men, another old facility, is being renovated. Arlene Solis, the CDC's Coordinator for Title II of the ADA, explained that CIW was rejected as a designated facility because the projected $2.8 million renovation cost was not justified by the system-wide need to house only 50 disabled women prisoners.  The ADA and § 504 regulations require, however, that the head of the CDC or his or her designee decide, considering all of the available resources, whether renovating CIW would impose an undue financial burden on the prison system in light of the incremental value of adding this facility as a possible placement for disabled women from Southern California.  It is not clear who made the decision not to designate the CIW to house disabled prisoners, whether that person was designated by the head of the CDC to make the decision, whether that person considered all available resources and prepared a written justification for his or her decision, and whether other actions could be taken to increase program accessibility. Therefore, Defendants have not established an affirmative undue burden defense with respect to facilities for disabled women.

2.   Level II, III and IV Men in the South

Plaintiffs note that the only designated facility in Southern California, which is the home region of two-thirds of male prisoners, is a Level I facility.  Plaintiffs propose that the CDC add California State Prison--Los Angeles County (Lancaster), a

20

United States District Court

For the Northern District of California

Level III and IV facility, R.J. Donovan Correctional Facility

(Donovan), a Level III facility, and California Correctional

Institution at Tehachapi, a Level II facility, as designated

facilities.  Defendants state that because none of the facilities

in the South was built to be accessible, the costs of renovating

them would be prohibitively high.  Plaintiffs note that both

Lancaster and Donovan were built while § 504 was in effect and

should have been designed to be accessible.  28 C.F.R. § 41.58.

Thus, they argue that Defendants should be estopped from raising an

undue burden defense based on the cost of renovating those

institutions.

Defendants have not met their burden of establishing an undue

burden defense with respect to their duty to make these

institutions accessible.  They have not met the procedural

requirements of the ADA regulations for this defense, which were

reviewed in more detail in the previous section, and have failed to

provide any specific information about the projected costs of

renovating these institutions.  Moreover, Defendants are out of

compliance with § 504 at these institutions because they were not

built to be accessible as required by the statute.

Defendants also claim that some Southern facilities cannot

take inmates with heat sensitivities.  They do not specify,

however, which facilities these are, how many inmates have such

sensitivities, or exactly what impact this has on the decision

whether to increase the number of facilities designated as DPP

facilities.  Defendants also note that they occasionally override

security level assignments so that Level II or III disabled inmates

21

United States District Court

For the Northern District of California

1  may be placed in Level I institutions.  Without more information
2  about whether and in what circumstances Defendants are committing
3  to override disabled prisoners' security levels, however, the Court
4  cannot conclude that this policy is sufficient to overcome the
5  discriminatory effect of the CDC's choice of designated facilities.

6       3.   Level II Men in the North

7       Plaintiffs originally objected that the only designated Level
8  II facility for male prisoners in Northern California, which is the
9  home region of 14% of male prisoners, is the California Medical
10 Facility (CMF), which ordinarily is restricted to prisoners with
11 medical problems.  At oral argument, however, Defendants confirmed
12 that all wheelchair-bound Level II prisoners are eligible for
13 placement at CMF, and Plaintiffs withdrew their objection.

14       4.   Parolees in Region IV

15      Plaintiffs argue that the CDC should add a designated CCRC for
16 parolees in Parole Region IV.  Defendants respond that the number
17 of parolees in that region is much smaller than in other regions,
18 and that as CDC's contracts with these facilities come up for
19 renewal, contractual language will be modified to provide
20 appropriate accommodations for disabled parolees.  Again,
21 Defendants have not met their burden of demonstrating that
22 immediate renovations in these facilities would be an undue burden.
23 Defendants must follow the procedures outlined in the ADA
24 regulations.  Any written justification for the policy should
25 provide more specific information regarding the expiration date of
26 contracts for Region IV facilities and the anticipated date that
27 accommodations would be provided.

28                              22

United States District Court

For the Northern District of California

1       C.   Legitimate Penological Objectives

2           Defendants also defend their choices with two penological

3   justifications, which they assert were primary factors in

4   determining which facilities to designate.[5]   These were the need to

5   accommodate the existing classification system, and safety and

6   security concerns.   The only explanation offered as to how the

7   CDC's choice of facilities advances these interests, however, is

8   Ms. Solis' explanation that the prison system needs flexibility to

9   respond to "population pressures."   Ms. Solis explains the

10  importance of maintaining the classification system, which

11  segregates prisoners of different security risks and houses

12  prisoners in facilities designed for their particular security

13  risk.   She persuasively describes the prison system's need to be

14  able quickly to convert housing units from one classification to

15  another as the number of prisoners at various levels of security

16  risk rises and falls.   The Court does not doubt that this ability

17  is critical to administering a prison system.   By increasing the

18  number of possible placements for disabled prisoners, however,

19  Plaintiffs' proposed modifications would seem to enhance the CDC's

20  flexibility.   Ms. Solis herself describes a situation in which the

21  ────────────────────

22       [5]Defendants also cite "community resources" as a reason for
    their choice of facilities, which could be a penological
23  justification if Defendants' intent was to cluster disabled persons
    in communities that offer unique resources that would aid in
24  rehabilitation.   Plaintiffs' argument, however, is that the CDC's
    choice of facilities blocks inmates' access to community resources,
25  specifically contact with family and community members in their
    home regions, which the California Legislature has found aids in
26  rehabilitation.   See 1989 Cal. Stat. c.1061 § 1.   Therefore, the
    record as it currently stands does not demonstrate a reasonable
27  relationship between Defendants' choice of facilities and the
    penological objective of rehabilitation.

28                                  23

United States District Court

For the Northern District of California

1  availability of accessible units at an institution that was not
2  intended to house disabled prisoners gave the CDC the flexibility
3  it needed to accommodate an increase in the number of level III
4  disabled prisoners.  See Solis Dec. at ¶ 20.

5      In the context of their defense of the CDC's two-percent
6  scoping policy,[6] Defendants argue that an excess of accessible
7  housing units in the system raises security threats.  This might be
8  a legitimate penological objective justifying denying some disabled
9  prisoners the opportunity to be placed near their homes, as
10 provided in Turner.[7]  Defendants, however, have not asserted that
11 the choice of facilities was shaped by a desire to limit the
12 overall number of accessible cells.  Nor have they adequately
13 explained how Plaintiffs' proposed modifications would prevent the
14 CDC from balancing its need for flexibility with its need to limit
15 the number of excess accessible cells in the system.

16 III.  Legal Standards

17     Plaintiffs raise a series of objections to language in the
18 CDC's Administrative Bulletin implementing the Department's
19 Disability Placement Program.[8]  Plaintiffs argue that it is

20

21     [6]"Scoping" refers to the percentage of cells in newly-
   constructed prisons that will be built to be structurally
22 accessible.  See Section IV.A, infra.

23     [7]If Defendants choose to make this argument, the Court must
   also determine whether a policy of limiting the number of
24 accessible cells is reasonably connected to Defendants' asserted
   security interests.  The Court does not reach that question in this
25 Order.

26     [8]The parties also addressed communications standards in the
   bulletin, but Plaintiffs later requested that this issue be
27 consolidated with other issues affecting hearing-impaired prisoners

28                                24

United States District Court
For the Northern District of California

1 | critical that the language in this bulletin accurately reflect the
2 | legal obligations of the prison system, because both prison staff
3 | and inmates will rely on the bulletin to understand their duties
4 | and rights.  Defendants argue that some of Plaintiffs' objections
5 | are unjustified and founded on mistrust, and others are based on a
6 | misunderstanding of appropriate legal standards.

7 | Defendants further object that Plaintiffs' objections are
8 | overly intrusive.  They emphasize that they have shown good faith
9 | in complying with the Remedial Order and have undertaken costly
10 | reforms to accommodate disabled prisoners.  They argue that
11 | Plaintiffs' objections "wrongfully attempt to impede on
12 | discretionary methods of statutory implementation, and involve
13 | concerns that are picayune and cannot reasonably be considered to
14 | be mandated by the statutes."  Def. Br. at 22.  Plaintiffs respond
15 | that they do not seek a court order dictating specific language.
16 | Rather, they seek an order that would require Defendants to modify
17 | their plans to comply with federal law, but would allow Defendants
18 | to draft the revisions.

19 | The Court's Remedial Order, to which the parties stipulated,
20 | anticipated that Plaintiffs would present objections to Defendants'
21 | plans to the Court, that the Court would determine whether the
22 | plans comply with federal law, and that if the Court determined

23 |

24 | that will be briefed and argued in the third set of contested
    | issues.  Defendants responded to two objections that Plaintiffs had
25 | not raised in their motion.  See Def. Br. at 21-22.  At oral
    | argument, Plaintiffs indicated that they were expecting these
26 | issues to be resolved in the final version of the Administrative
    | Bulletin, and were reserving their objections until this was
27 | confirmed.  The Court, therefore, has not addressed these issues.

28 | 25

United States District Court

For the Northern District of California

1  that they did not comply it would order Defendants to modify their
2  plans.   Defendants agreed that this remedy was the least intrusive
3  means necessary to correct the violations of Plaintiffs' rights.
4  For a bulletin to "comply," it must accurately state the CDC's
5  duties and prisoners' rights under the law.   Thus, Plaintiffs'
6  objections and this Court's review of the language of the bulletin
7  do not unduly interfere with the prison system's efforts to remedy
8  its established violations of federal law.

9      A.    Statement of Affirmative Duties under the ADA and § 504

10     Plaintiffs argue that the bulletin does not sufficiently
11 explain that the CDC has an affirmative obligation under the
12 statutes to accommodate disabled prisoners.   Plaintiffs cite only
13 one example of unacceptable language, however, in the section
14 describing Inmate Programs, on page 22 of the bulletin.

15     The bulletin essentially states that not all inmate programs
16 must be modified to be made accessible; however, a program may be
17 left inaccessible only if one of four criteria is met: safety or
18 security risk, fundamental alteration, undue burden, or disabled
19 persons' inability to perform the essential functions of the
20 program.   Plaintiffs want the language revised to state that the
21 CDC must modify all programs to make them accessible unless one of
22 those same four criteria is met.   Under either phrasing, the CDC's
23 duties and prisoners' rights are the same.   While Plaintiffs'
24 phrasing may more accurately reflect the spirit of the ADA, the
25 Court will not order Defendants to modify the language.

26     B.    Undue Burden Standard

27     Plaintiffs specifically argue that the undue burden is not

28                                 26

United States District Court

For the Northern District of California

properly defined in the Inmate Programs section.   The Court agrees
that the bulletin does not accurately describe the defense or the
steps the CDC would have to take to establish the defense.   Nor
does the bulletin explain that even if an undue burden is shown,
the CDC must still take any other action that would not result in a
fundamental alteration of the program or an undue burden but that
would nevertheless ensure that disabled inmates receive the
benefits or services of the program.   See, e.g. 28 C.F.R.
§ 35.150(a)(3).   The bulletin should be revised to explain
accurately the undue burden defense in accordance with the Court's
discussion in Sections I.B and I.C, supra.

> C.   Lack of Reference to Maintenance Requirement

Plaintiffs note that the Administrative Bulletin does not
specifically address Defendants' duty to maintain in operable
working condition the structural features and equipment necessary
to accommodate disabled prisoners.   See, e.g. 28 C.F.R. § 35.133.
Defendants state that maintenance need not be addressed in the
bulletin, because the CDC already has adequate maintenance systems
in place.   The Remedial Order, however, requires that Defendants
submit to Plaintiffs the CDC's plan and procedures for implementing
its Disability Placement Plan and a general substantive outline of
the methods by which class members will be provided accommodations
and program access.   If the first does not comprise plans for
maintaining accessibility features, the second certainly does.   If
Defendants plan to rely on their standard maintenance procedures,
they should provide these to Plaintiffs for their review.
Furthermore, because the bulletin "complies" with the ADA and § 504

only if it accurately describes the CDC's duties under these acts, the bulletin must be revised to describe the maintenance obligation as well.

IV.  New Construction and Alteration Policy

The Court's Remedial Order required Defendants to submit their guidelines, policies, procedures and plans regarding accessibility features of new construction and alterations of existing buildings. Defendants submitted a two-paragraph letter.  Plaintiffs object that this letter does not ensure compliance with the ADA and § 504, and specifically target three deficiencies.

A.  Scoping

Scoping refers to the proportion of housing units designed and built to be structurally accessible in new prison construction. Defendants' letter states that approximately two percent of bed capacity designed for new prisons will be accessible, and these units will be dispersed among housing units and aligned program areas.  Defendants state that the CDC will decide on a case-by-case basis if a new prison is to be a designated facility for disabled persons, and if so whether the two percent designed bed capacity will be sufficient and how it will be dispersed.  Defendants add that the CDC will, where appropriate, cluster accessible housing program areas within specified facilities.  Plaintiffs note that two percent scoping falls short of federal guidelines for new institutional construction.

ADA and § 504 regulations require that new facilities be designed and constructed in such manner that they be readily accessible to and usable by persons with disabilities.  28 C.F.R.

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  § 35.151(a); 28 C.F.R. 41.58(a).  The regulations provide that new
2  construction that conforms with one of two sets of federal
3  guidelines, the Uniform Federal Accessibility Standards (UFAS), 41
4  C.F.R. Part 101-19.6, Appendix A, or the ADA Accessibility
5  Guidelines (ADAAG), 28 C.F.R. Part 36, Appendix A, "shall be deemed
6  to comply" with ADA regulations.  Plaintiffs argue that Defendants
7  must comply with one of these standards, and note that the UFAS
8  require five percent scoping and an ADAAG final interim rule
9  applicable to State prisons requires three percent.[9]

10  The regulation, however, states only that conforming with
11  these standards is one method of complying with the fundamental
12  requirement that newly built facilities be accessible, not that
13  this is the only method.  Even if conforming with the standards
14  were required, the regulations explicitly permit substitution of
15  other methods when it is evident that equivalent access is
16  provided.  The touchstone of compliance, therefore, is the degree
17  of access afforded in the new facilities.

18  The federal standards demonstrate that, for a newly
19  constructed building to be accessible, it is not necessary that
20  every room in the building be structurally accessible.  Rather, the
21  building must be sufficiently accessible that disabled persons have
22  access to the programs and services of the public entity operating
23  the facility that is equal to, as effective as, and integrated with

---

24

25  [9]Furthermore, Plaintiffs note that these scoping guidelines
   refer to actual capacity.  Defendants have stated that the CDC's
26  two-percent policy is based on designed bed capacity, and will
   result in one-percent scoping in overcrowded conditions.
27  Plaintiffs noted at oral argument that the prison system is
   currently at 200 percent of its designed capacity.

28                               29

United States District Court

For the Northern District of California

the access enjoyed by able-bodied persons.   See Section I.B, supra.

Defendants explain that their two-percent scoping policy is designed to "limit the number of accessible placements in prisons to reflect the actual number of inmates who need them."   Solis Dec. ¶ 48.   That is, they want to provide a sufficient number of accessible units for disabled prisoners, but no more.[10]   Plaintiffs raise no apparent objection to a plan that provides just enough units to meet the prisons' needs, but question the CDC's population projections on which the two-percent figure is based.   This issue, however, is scheduled to be briefed in the second set of contested issues.   Absent accurate population projections based specifically on the California prison population, the only available guidelines for determining whether Defendants' new construction scoping plans comply with the ADA and § 504 are the federal standards. Therefore, unless Defendants can justify their projections in the next round of briefing, their plan for new construction is out of compliance with federal law.

Defendants claim that they are exceeding the ADA's requirements regarding program access in existing facilities, and that this should offset their accessibility obligations with respect to new construction.   Nothing in the ADA permits such an offset.   Defendants further argue that forcing the CDC to comply with federal accessibility standards would violate the federalism

---

[10]Based on Defendants' explanations for why the CDC does not want excess units, the Court deduces that they are referring only to units made structurally accessible for wheelchairs.   Apparently, Plaintiffs' objections also only address the need for wheelchair-accessible housing units.

United States District Court

For the Northern District of California

1   principles established in <u>Printz v. United States</u>, 1997 U.S. LEXIS
2   4044.  <u>Printz</u>, however, established that the federal government
3   cannot require State officers to carry out a federal regulatory
4   program.  Here, Defendants are merely being required to comply with
5   federal law.

6        Finally, Defendants assert financial and penological
7   justifications for "limit[ing] the number of accessible placements
8   in prisons to reflect the actual number of inmates who need them."
9   <u>See</u> Solis Dec. ¶ 48.  Because such a policy would not violate the
10  ADA or § 504, however, it is not necessary to evaluate these
11  asserted defenses.  The question that still must be resolved is
12  simply whether a two-percent scoping policy will in fact meet the
13  disabled prison population's needs.

14       B.   Aligned Program Areas

15       Defendants have stated in their letter describing their new
16  construction policy that inmate accessibility will be provided in
17  housing units and aligned program areas.  At oral argument,
18  Defendants explained that "aligned program areas" refers to all
19  program areas that would be available to able-bodied prisoners
20  living in the area of the prison where the structurally accessible
21  housing units are located.  Plaintiffs indicated that with this
22  understanding they would withdraw their objection.  Defendants
23  should revise their new construction and alteration policy to
24  reflect this definition of the term.

25       C.   Alterations in Existing Facilities

26       Defendants state that pursuant to State law the altered area
27  of the building will comply with accessibility requirements.

28                                   31

1  Plaintiffs argue, however, that alterations must comply with
2  federal standards, and that access must be provided in paths of
3  travel, restrooms and at least one entrance to the altered area if
4  the added cost is not disproportionate to the cost of the project.
5  Defendants did not specifically respond to this objection.

6      ADA and § 504 regulations require that alterations be designed
7  "to the maximum extent feasible" to be readily accessible to and
8  usable by disabled persons.  Defendants' plan commits the CDC only
9  to complying with accessibility codes regarding the specific
10 alteration, and states only that projected construction at
11 designated facilities will be reviewed at the design phase, without
12 committing to enhancing accessibility.  Therefore, Defendants'
13 plans regarding alterations of existing facilities do not comply
14 with the ADA or § 504.

<div align="center">CONCLUSION</div>

16     For the foregoing reasons, Plaintiff's motion is granted in
17 part and denied in part.

18     Plaintiffs have shown that Defendants' choice of DPP
19 facilities violates the ADA and § 504 by denying certain groups of
20 disabled prisoners the opportunity to be incarcerated near their
21 homes solely on the basis of disability.  Defendants have not
22 raised an adequate undue burden defense or justified their
23 noncompliance by articulating legitimate penological objectives
24 reasonably related to their policies.  The Court will accept
25 further briefing on these issues if Defendants wish to assert these
26 defenses according to the legal standards outlined in this Order.
27     Defendants must modify the Inmate Programs section of the

<div align="center">32</div>

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Administrative Bulletin to state accurately the requirements for
2  asserting an undue burden defense and to state that even if
3  requested accommodations would impose an undue burden or would
4  fundamentally alter a program, the CDC must take other action that
5  would not have those effects but would still enhance the program's
6  accessibility.  Defendants must also provide information about its
7  maintenance programs to Plaintiffs, which Plaintiffs may review and
8  criticize pursuant to the procedures outlined in the Remedial
9  Order, and must revise the Administrative Bulletin to state the
10 CDC's duties to maintain accessibility features.

11      Unless Defendants can justify their population projections
12 when briefing the second set of contested issues, CDC's two-percent
13 scoping policy will be found out of compliance with the ADA and
14 § 504.  Defendants' description of its plans for making program
15 areas in new construction accessible and for making accessibility
16 modifications while altering existing facilities likewise do not
17 comply with these statutes.  Defendants must submit revised plans
18 for new construction and alterations to Plaintiffs, which will then
19 be reviewed under the procedures outlined in the Remedial Order.

20
21
22 Dated:    OCT - 8 1997
                                        CLAUDIA WILKEN
23                                      United States District Judge
24
25
26 Copies mailed to counsel
   as noted on the following page
27
28                              33

Donald  Specter
Prison Law Office
General Delivery
San Quentin, CA 94964    [94cv2307 ]

Elaine  Feingold
Disability Rights Education & Defense Fu
2212 Sixth Street
Berkeley, CA 94710    [94cv2307 ]

Eve H. Shapiro
Howard Rice Nemerovski Canady Falk & R
Three Embarcadero Ctr 7th Flr
San Francisco, CA 94111    [94cv2307 ]

George D. Prince
CA State Atty General's Office
50 Fremont St Ste 300
San Francisco, CA 94105    [94cv2307 ]

Mary Beth Uitti
U.S. Attorney's Office
450 Golden Gate Avenue Rm 115
San Francisco, CA 94102    [94cv2307 ]

Michael W. Bien
Rosen Bien & Asaro
155 Montgomery St 8th Flr
San Francisco, CA 94104    [94cv2307 ]

Morris  Lenk
CA State Atty General's Office
50 Fremont St Ste 300
San Francisco, CA 94105    [94cv2307 ]

Sara Linda Norman
Prison Law Office
General Delivery
San Quentin, CA 94964    [94cv2307 ]

Sharon N. Perley
USDJ - Disability Rights Section
P.O. Box 66738
Washington, DC 20035    [94cv2307 ]

Warren E. George
McCutchen Doyle Brown & Enersen LLP
Three Embarcadero Ctr
San Francisco, CA 94111    [94cv2307 ]