FILED

MAR 2 0 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

275
9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, JAMES AMAURIC, RICHARD PONCIANO, JACK SWENSEN, BILLY BECK, JUDY FENDT, WALTER FRATUS, GREGORY SANDOVAL, DARLENE MADISON, PETER RICHARDSON, STEVEN HILL, ROY ZATTIERO, and all others similarly situated,<br><br>            Plaintiffs,<br><br>   v.<br><br>PETE WILSON, JOSEPH C. SANDOVAL, JAMES GOMEZ, Director, Department of Corrections, KYLE MCKINSEY, KEVIN CARRUTH, DAVID TRISTAN, MARISELA MONTES, Deputy Director of the Parole and Community Services Division,<br><br>            Defendants.<br><br>------------------------<br><br>UNITED STATES OF AMERICA,<br><br>            Amicus Curiae<br><br>_____/ | No. C 94-02307 CW<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS TO REQUIRE DEFENDANTS TO MODIFY THEIR REMEDIAL PLANS (SECOND AND THIRD SETS OF CONTESTED ISSUES AND TRANSITION PLAN) |

Plaintiffs seek an order requiring Defendants to modify their remedial plans (Docket # 213, 220) with respect to the second and third sets of contested issues, which were designated in the June

1 | 4, 1997 Scheduling Order.  Plaintiffs also ask the Court to order
2 | Defendants to modify their Transition Plan for structural
3 | modifications by adopting a contingency plan in case the California
4 | legislature fails to appropriate the required funds.  (Docket #248)
5 | Defendants oppose these motions.  The matter was heard on November
6 | 21, 1997.  Having considered all of the papers filed by the parties
7 | and oral argument on the motions, the Court grants the motions in
8 | part and denies them in part.

9 | <center>BACKGROUND</center>

10 | The procedural history of this case is explained in detail in
11 | the Court's October 8, 1997 Order Granting in Part and Denying in
12 | Part Plaintiffs' Motion to Require Defendants to Modify Their
13 | Remedial Plans (First Set of Contested Issues) (hereinafter,
14 | October 8 Order) on pages two to five.  Briefly, Plaintiff class of
15 | disabled prisoners and parolees under the supervision of the
16 | California Department of Corrections ("CDC") sued Defendants for
17 | violations of the Americans with Disabilities Act ("ADA") and
18 | Section 504 of the Rehabilitation Act of 1973.  In a September 20,
19 | 1996 order, the Court held that the ADA applies to prisons.  The
20 | parties stipulated to a remedial procedure whereby Defendants
21 | drafted plans to bring the prison system into compliance with the
22 | ADA and § 504, Plaintiffs had the opportunity to object to those
23 | plans, the parties met and conferred to try to resolve their
24 | disputes regarding the plans, and Plaintiffs had the right to bring
25 | unresolved issues to the Court, which would determine whether
26 | Defendants' plans complied with the ADA and § 504.  On June 4,
27 | 1997, the Court issued a Scheduling Order, which was amended on

28 | <center>2</center>

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  July 9, 1997, that set a briefing schedule for three sets of
2  unresolved issues.  The Court issued an order addressing the first
3  set of contested issues on October 8, 1997.  Both the second and
4  third sets of contested issues were argued on November 21, 1997.
5  Oral argument on Plaintiffs' motion on the Transition Plan was also
6  held on November 21, 1997.

7      In their motion on the second set of contested issues,
8  Plaintiffs argue 1) that the civil addicts at the California
9  Rehabilitation Center ("CRC") are members of the Plaintiff class
10 and therefore the CRC must be made accessible, 2) that the
11 grievance procedure for ADA complaints and requests for
12 accommodation is inadequate, 3) that the accommodations for
13 disabled inmates who stay in the prison system's Reception Centers
14 for extended periods of time solely due to their disabilities are
15 inadequate, 4) that CDC population projections for disabled inmates
16 are inaccurate and therefore that the CDC's scoping policy for
17 Disabled Placement Program ("DPP") designated facilities is
18 inadequate, and 5) that CDC's remedial plan does not ensure that
19 facilities with which it contracts will comply with the ADA and
20 § 504.  Plaintiffs agreed to set aside the issue of whether the San
21 Francisco Reception Center has a sufficient number of wheelchair-
22 accessible beds, pending further discovery.  Plaintiffs also raised
23 but later withdrew the issue of whether non-wheelchair-bound
24 inmates who are sent to the Valley Reception Center will be

28                                    3

transferred within 48 hours.[1]

In their motion on the third set of contested issues, Plaintiffs argue 1) that wheelchair-bound female inmates are denied access to long-term residential substance abuse programs solely because of their disabilities, 2) that the CDC Health Services procedures for verifying hearing impairments and evaluating whether inmates require hearing aids or other auxiliary aids or services are inadequate, 3) that the CDC's plan inadequately advises individual institutions about how to accommodate vision-impaired inmates in part by failing to provide guidelines for inmate assistance programs, and 4) that the CDC's classification system discriminates against certain disabled inmates solely due to their disabilities.  In the first set of contested issues, the parties briefed the issue of whether the CDC's guidelines for ensuring effective communications for hearing-impaired inmates complied with the law.  At Plaintiff's request, however, the Court deferred ruling on that issue until the Court could also consider the other issues affecting hearing-impaired inmates in the third set of

---

[1]In their reply brief, Plaintiffs state that they are withdrawing this issue because Defendants have put the transfer policy in writing, but that Plaintiffs continue to object to the CDC's plan to transfer these inmates within seven days rather than 48 hours.  Defendants explain that Department of Health regulations require the CDC to hold inmates at Reception Centers until their tuberculosis tests results have been evaluated, which takes longer than two days.  Plaintiffs did not respond to this argument in their reply brief.  In order to sustain their objection, Plaintiffs must explain why such a policy violates the ADA or § 504. Plaintiffs may address this argument again in their May 7 brief. See briefing schedule discussed in Conclusion, infra.  If necessary, Defendants shall provide Plaintiffs with the relevant health regulations by April 9.  See Second Declaration by Arlene Solis ¶ 56.

4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  contested issues.  <u>See</u> October 8 Order at 24 n.8.  The Court rules

2  on this effective communication issue in this Order after

3  considering Plaintiffs' objections to the CDC Health Service

4  procedures for evaluating hearing-impaired inmates.

5      In their motion regarding Defendants' Transition Plan,

6  Plaintiffs seek an order from this Court requiring Defendants to

7  develop a contingency plan in case the California legislature does

8  not appropriate the required funds in the 1997-1998 mid-year budget

9  process, which would ensure that the CDC makes the structural

10  modifications projected in the Transition Plan even if funding is

11  not approved.

                              DISCUSSION

13  I.   Legal Framework

14      The Court reviewed the legal framework governing this case at

15  length in its October 8 Order on pages five to 16.  To summarize,

16  the Court must first determine whether Defendants' plan complies

17  with the plain language of the ADA and § 504 and their implementing

18  regulations.  If the Court determines that Defendants' plan

19  violates these statutes, Defendants may raise the defense that

20  Plaintiffs' proposed modifications to their plans would impose an

21  undue burden on the agency or would fundamentally alter the

22  program, service or activity affected.  Defendants bear the burden

23  of demonstrating the undue burden or fundamental alteration.  The

24  decision to reject the proposed modification on these bases must be

25  made by the head of the agency or his or her designee after

26  considering all of the resources available for use in the program,

27  and the decision must be explained in a written statement.  The

28                              5

United States District Court
For the Northern District of California

1  agency must still take other action to accommodate disabled
2  prisoners that would not impose such an undue burden or fundamental
3  alteration.    If Defendants articulate legitimate penological
4  justifications for aspects of their plans that violate the
5  statutes, the Court must determine whether Defendants' policies are
6  reasonably related to those justifications.    That is, the Court
7  must determine whether there is a valid, rational connection
8  between the prison policy and the asserted penological interest,
9  whether there are alternative methods for exercising the prisoners'
10 rights, what impact the proposed accommodation would have on prison
11 guards, other inmates and the resources of the prison, and whether
12 the regulation is an exaggerated response to prison concerns.
13 II.   Accessibility of the California Rehabilitation Center
14        Plaintiffs claim that Defendants' remedial plans violate the
15 ADA and § 504 because certain disabled prisoners are excluded from
16 the Civil Addicts Program ("CAP"), which is conducted at the CRC.
17 Defendants argue that this issue is not properly before the Court
18 because the civil addicts committed to the CRC are not members of
19 Plaintiff class.   The Court will first address the issue of whether
20 these persons are members of the certified class.   Because the
21 Court concludes that they are, it will then consider whether
22 Defendants' policies about who may participate in the CRC program
23 violate the ADA or § 504.   Because the first issue in the third set
24 of contested issues, whether the exclusion of wheelchair-bound
25 female inmates from all long-term residential substance abuse
26 programs for women violates the ADA or § 504, is closely related to
27 this topic, the Court will then address that issue as well.
28                                    6

United States District Court
For the Northern District of California

1        A.    Factual and Legal Background

2        If it appears to a State court judge that a criminal defendant

3   may be addicted or may be in imminent danger of becoming addicted

4   to narcotics, California law requires that the judge, after the

5   defendant has been found guilty, commence involuntary commitment

6   proceedings or refer the defendant for such proceedings.  Cal.

7   Welf. & Inst. Code § 3050-51.  The judge must order the district

8   attorney to petition for commitment of the defendant "to the

9   Director of Corrections for confinement in the narcotic detention,

10  treatment and rehabilitation facility."  Id.  Execution of the

11  defendant's sentence is suspended pending the commitment

12  proceedings and during the commitment itself, if ordered.  Id.  If

13  after examination by a physician and after hearings related to the

14  commitment, the court determines that the defendant is not addicted

15  or in danger of becoming addicted, the judge may impose, modify or

16  suspend a sentence for the defendant's crime.  Id.

17       The committed defendants are confined in the CRC, where they

18  participate in a substance abuse treatment program.  The CDC refers

19  to them as "civil addicts" or as "residents involved in in-patient

20  programming" while at the CRC and as "out patients" after they are

21  released.  "The supervision, management and control of the [CRC]

22  and the responsibility for the care, custody, training, discipline,

23  employment and treatment of the persons confined in the center are

24  vested in the Director of Corrections."  Cal. Welf. & Inst. Code

25  § 3305.  The sections of the Penal Code that govern the

26  administration of the State prison system, Cal. Penal Code Part 3,

27  §§ 1999 - 10999, "appl[y] to the [CRC] as a prison under the

28                                  7

jurisdiction of the [CDC] and to the persons confined in the [CRC]"
as applicable.  Id.  Civil addicts are released by the Narcotic
Addict Evaluation Authority rather than by the Board of Prison
Terms, which releases most prisoners to parolee status, compare
Cal. Welf. & Inst. Code § 3150-51 with Cal. Penal Code § 5077, but
once released both groups are supervised by the CDC.  Cal. Welf. &
Inst. Code § 3051; Cal. Penal Code § 3056.

The CDC's Administrative Bulletin 96/23 (the "AB"), which
outlines the CDC's Disability Placement Program, addresses how CAP
should accommodate disabled "civil addict commitments" ("civil
addicts").  Second Solis Dec. Ex. A at 27.  Civil addicts who
arrive at the CRC are first screened to determine whether they are
DPP cases, that is, whether they have disabilities severe enough to
affect their placement in the prison system.  Id.  Those
preliminarily verified as DPP cases are transferred for further
evaluation to the reception center at California Institution for
Men ("CIM") if they are male, or to the center at California
Institution for Women ("CIW") if they are female, for further
verification of their disabled status.  Id.  If the CDC ultimately
determines that certain civil addicts are

> unsuitable for retention in the Civil Addict Program because
> of their not being available to participate in the essential
> elements of the in-patient or out-patient components of the
> program, they will be adjudged unamenable to the program.  The
> DPP civil addict commitment will then be returned to the court
> of original jurisdiction with a recommendation to vacate the
> civil commitment because of the civil addicts [sic]
> unsuitability.

Id.

The CRC is not structurally accessible to persons using

United States District Court
For the Northern District of California

1  wheelchairs.   The CRC building or buildings, which are located on
2  hilly terrain, originally were built in the early 1900's as a
3  hotel, and have been operated as a prison institution since 1962.

4      The CDC also operates a long-term residential substance abuse
5  treatment program for women, called Forever Free, at the CIW.
6  Forever Free participants are segregated from the general prison
7  population, spend four to six months in treatment conducted by ex-
8  offenders and recovering addicts, and participate in community-
9  based residential treatment for six months after their release from
10  prison.   Other than CAP at the CRC and Forever Free at the CIW, the
11  only substance abuse programs offered to women prisoners are
12  Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") groups,
13  which meet in every CDC institution.

14      B.   Class Membership

15      On January 13, 1995, the Court certified as Plaintiff class
16  "all present and future California State prisoners and parolees
17  with mobility, sight, hearing, learning and kidney disabilities
18  that substantially limit one or more of their major life
19  activities, except those prisoners with mobility impairments housed
20  at the California Medical Facility."   Defendants argue that the
21  civil addicts in CAP are not "prisoners" or "parolees" and thus are
22  not members of the class.

23      Civil addicts are prisoners in the common-sense meaning of
24  that term, that is, they are involuntarily confined to what
25  Defendants acknowledge is a prison after having been found guilty
26  of having committed a crime.   While at this prison, they are
27  subject to the California Penal Code sections that specifically

28                                   9

United States District Court
For the Northern District of California

1    address the conduct of State prisoners.  Although they live
2    separately from the general prison population, participate in a
3    unique treatment program, and obtain release from a specially
4    designated authority, civil addicts are under the supervision of
5    the State prison system both during their involuntary stay at the
6    CRC prison and after their release.

7        California courts have relied on this common-sense meaning of
8    the term "prisoner" in interpreting statutes that define certain
9    prisoner conduct as criminal.  "[T]he significance of the word
10   'prisoner' is not the manner of commitment but rather the fact of a
11   judicial commitment.  If a defendant is in custody at a state
12   prison as the result of due legal process, he is a prisoner within
13   the meaning of Penal Code, section 4502." People v. White, 177
14   Cal. App. 2d 383, 385 (1960)(applying penal code section that
15   establishes weapons possession by a prisoner as a felony to a
16   psychopathic delinquent involuntarily committed to a prison
17   hospital). See also People v. Petersen, 268 Cal. App. 2d 263, 266-
18   67 (1968)(applying statute that enhances criminal penalties for
19   crimes that are committed while in prison to a CRC civil addict);
20   People v. Pena Valenzuela, 116 Cal. App. 3d 798, 803-08
21   (1981)(applying statute that enhances criminal penalties for
22   defendants who have previously served a term in prison to a
23   defendant who had served time in CAP).

24       Furthermore, including civil addicts within the Plaintiff
25   class would further the purposes of the Court's class certification
26   order.  The claims that Plaintiffs have raised on behalf of the
27   civil addicts are similar to those that have been raised by other

28                                    10

United States District Court
For the Northern District of California

1  Plaintiff class members, that is, that the prison system does not
2  comply with the ADA or § 504 because it is not structurally
3  accessible and it does not provide reasonable accommodations to
4  permit disabled prisoners to benefit equally from the institution's
5  programs, activities or services.   Therefore, there are questions
6  of law and fact common to all members of the class, the named
7  Plaintiffs for the class present claims that are typical of the
8  claims of the rest of the class, and there is no reason to doubt
9  that the named representatives will fairly and adequately represent
10  their interests.   The AB, which sets forth the CDC's plans to
11  comply with the ADA and with § 504, applies to the CRC as well as
12  to all of the other CDC institutions in which other members of the
13  Plaintiff class are housed.   Thus, Defendants are acting in a
14  manner generally applicable to the class, and separate
15  adjudications of the civil addicts' claims might establish
16  incompatible standards of conduct for Defendants.   Furthermore,
17  including the claims of civil addicts in this litigation would help
18  achieve judicial economy, a fundamental purpose of the class
19  action.

20      The Court concludes, therefore, that civil addicts are members
21  of the Plaintiff class.

22      C.   Accessibility of the California Rehabilitation Center
23      The AB provides that certain civil addicts will be excluded
24  from the Civil Addict Program and will be returned to State court
25  for sentencing if, due to their disabilities, they cannot
26  participate in the essential elements of the program.   In their
27  responses to Plaintiffs' objections to their remedial plans,

28                              11

United States District Court
For the Northern District of California

1  Defendants explained that wheelchair-bound inmates cannot be
2  admitted to CAP because CRC is not structurally accessible.

3      On its face, this rule violates both the ADA and § 504 by
4  excluding otherwise qualified individuals from participating in a
5  CDC program solely by reason of their disabilities.   42 U.S.C.
6  § 12132, 28 C.F.R. § 35.130(b)(1)(i) (ADA); 29 U.S.C. § 794(a), 28
7  C.F.R. § 41.51(b)(i) (§ 504).

8      Public entities are not required to make all of their existing
9  facilities structurally accessible if other methods are effective
10 in achieving compliance.   28 C.F.R. §§ 35.150(a)(1), 35.150(b)(1).
11 Defendants have not shown, however, how CDC has otherwise complied
12 with the ADA and § 504 by granting wheelchair-bound civil addicts
13 equivalent access to the Civil Addict Program.   Rather, the AB
14 clearly states that civil addicts deemed to be unsuitable for CAP,
15 which Defendants have identified as those who use wheelchairs, will
16 be returned to court for imposition of a regular prison sentence.
17 In other words, they are excluded from CAP.

18     Some of the language used in the AB suggests that Defendants
19 assert a fundamental alteration defense for their policy of
20 excluding wheelchair users from CAP.   Civil addicts are rejected
21 from the program only if they are unable to participate in the
22 "essential elements" of the program.   Norman Second Mo. Dec. Ex. N
23 at 27.   Defendants have not explained, however, why providing
24 structural accessibility would fundamentally alter the nature of
25 the Civil Addict Program.   These circumstances are not like those
26 at issue in Southeastern Community College v. Davis, 442 U.S. 397
27 (1979).   In Davis, the Court held that accommodating a deaf nursing

28                                    12

United States District Court
For the Northern District of California

1 student by altering the program's curriculum so that the student
2 would be trained to carry out some but not all of the duties of a
3 registered nurse would fundamentally alter the nature of the
4 program because, as a result of the accommodation, the student
5 "would not receive even a rough equivalent of the training a
6 nursing program normally gives." Id. at 408-10.  Plaintiffs have
7 not requested that the CAP curriculum be modified to accommodate
8 disabled civil addicts, and Defendants have not shown that such a
9 modification would be necessary to accommodate wheelchair-bound
10 persons.  Rather, Plaintiffs seek structural modifications to the
11 CRC buildings so that wheelchair-bound civil addicts may
12 participate in the program in its current form.

13     Alternatively, Defendants suggest that it might be too costly
14 to modify the CRC structurally to make it accessible for
15 wheelchair-bound civil addicts.  Defendants note that the buildings
16 are decades old and are located on hilly terrain.  Defendants,
17 however, have not followed the procedural requirements for
18 asserting such a defense.  The head of the CDC or his designee must
19 make the decision that the requested accommodation would impose an
20 undue burden or cause a fundamental alteration to the program after
21 considering all resources available for use in the funding and
22 operation of the program, and must explain that decision in
23 writing.  Even if the CDC decides after following this procedure
24 that the accommodation would impose an undue burden, it must still
25 take any other action that would not result in such a burden, but
26 would nevertheless ensure that disabled persons receive the
27 benefits of the program.  Defendants have not demonstrated that the

28                                13

United States District Court
For the Northern District of California

1  CDC has complied with these requirements and therefore have not met
2  their burden of establishing an undue burden defense.

3      The Court concludes, therefore, that the exclusion of
4  wheelchair-bound and other disabled civil addicts from the Civil
5  Addict Program at the CRC violates the ADA and § 504.  The Court
6  sets forth in the Conclusion, infra, the procedure that the parties
7  must follow to ensure that CAP complies with these statutes.

8          D.   Long-Term Substance Abuse Programs for Women

9      In their motion on the third set of contested issues,
10 Plaintiffs argue that Defendants' remedial plan violates the ADA
11 and § 504 because the only two long-term residential substance
12 abuse treatment programs for women are operated at least in part at
13 the CIW, which is structurally inaccessible.  First, CAP places
14 female civil addicts at CIW for initial evaluation and as a
15 temporary placement if they are posing disciplinary problems at the
16 CRC.  Because CIW is structurally inaccessible, female wheelchair-
17 bound civil addicts face an additional obstacle to participating in
18 CAP, apart from the inaccessibility of the CRC.  Defendants have
19 not explained why some other accommodation of disabled female civil
20 addicts, such as placement in a DPP facility for initial evaluation
21 or in response to disciplinary problems, is infeasible.  The Court
22 concludes, therefore, that the CDC's exclusive use of an
23 inaccessible facility for these satellite functions of CAP violates
24 the ADA and § 504.

25     The second program, called Forever Free, also operates at CIW
26 and apparently serves prisoners who are not civil addicts.
27 Defendants explain that this program is open to all women prisoners

28                              14

with disabilities provided they "can be accommodated without special placement needs, the nature of which would significantly alter the program's administration, structure, or stated purpose." Third Solis Dec. ¶ 5.  Defendants explain that wheelchair-bound prisoners are barred from participating in the program, because the facility is structurally inaccessible.  As noted above with respect to the exclusion of wheelchair-bound civil addicts from the CAP, this exclusion on its face violates the ADA and § 504.

Defendants contend that the CDC is not required to make every program offered anywhere in the CDC system accessible to disabled inmates.  Rather, they argue, the CDC must ensure parity of programming: that is, DPP-designated facilities[2] must offer a wide range of programs and services and provide reasonable access to those programs and services to the disabled inmates placed at the facilities.  Defendants also argue that by accepting the clustering approach to ADA compliance, Plaintiffs implicitly accepted the fact that disabled inmates would not have access to programs provided at the non-DPP-designated facilities.  Defendants argue that because AA and NA programs are available at every CDC institution, female disabled inmates are provided reasonable access to substance abuse treatment programs offered by the CDC.

To support their argument that disabled inmates need not have access to every program in the prison system, Defendants analogize from the prison system's vocational training programs.  Each occupation-specific vocational program is offered at only one

---

[2]See October 8 Order at 16 for discussion of DPP designated facilities.

United States District Court

For the Northern District of California

1    institution in the system: deep sea diving at California
2    Institution for Men, poultry operations at Avenal State Prison, and
3    cosmetology at Valley State Prison for Women.  So long as
4    equivalent vocational programs are offered at other institutions in
5    the system, Defendants implicitly argue, inmates at those other
6    institutions nevertheless have reasonable access to the range of
7    programs offered by the CDC.  Access to a particular form of
8    occupational training, however, is not as critical to an inmate's
9    welfare and rehabilitation as access to intense and effective
10   substance abuse treatment.  Given the close relationship between
11   substance abuse and criminal activity, the Court finds that the
12   standard for achieving parity with respect to these treatment
13   programs must be higher than the standard for providing equal
14   access to specific vocational programs.

15       Plaintiffs note that the ADA and § 504 require that disabled
16   inmates enjoy access to programs and services that are equal to and
17   as effective as those provided to able-bodied inmates.  28 C.F.R.
18   § 35.130(b)(1)(ii), (iii) (ADA); 28 C.F.R. § 41.51(b)(ii), (iii)
19   (§ 504).  They assert that they agreed to the clustering concept
20   only if it was implemented in a manner consistent with the ADA, and
21   argue that because AA and NA programs are not equal to or as
22   effective as the Forever Free program, excluding wheelchair-bound
23   female prisoners from the latter program violates the ADA.

24       The Court agrees that AA and NA programs are not equivalent to
25   the Forever Free program.  Forever Free participants live
26   separately from the general prison population, the staff consists
27   of ex-offenders and recovering addicts, and the program lasts for

28                                      16

United States District Court
For the Northern District of California

1  four to six months in the prison, followed by a six-month
2  community-based residential treatment program following release.
3  These features make the program qualitatively different from
4  attendance at AA and NA recovery support groups.  Inmates with
5  severe substance abuse programs may only be able to benefit from
6  the sort of long-term, intensive treatment offered in programs such
7  as Forever Free.

8      Because wheelchair-bound female inmates are absolutely
9  precluded from participating in the long-term residential substance
10 abuse treatment program offered by the CDC solely because of their
11 disabilities, the plan violates the ADA and § 504.  Defendants must
12 either assert a valid defense or revise their remedial plans.  <u>See</u>
13 discussion in Conclusion, <u>infra</u>.

14 III. Grievance Procedure

15     Plaintiffs argue that the CDC's grievance procedure for
16 inmates seeking accommodations for disabilities fails to comply
17 with the ADA.  They argue that the procedure is not sufficiently
18 prompt and that prisoners should not bear the burden of verifying
19 their disabilities.

20     A.   Legal and Factual Background

21     ADA regulations require any public entity that employs 50 or
22 more persons to "adopt and publish grievance procedures providing
23 for prompt and equitable resolution of complaints alleging any
24 action that would be prohibited by this part."  28 C.F.R.
25 § 35.107(b).

26     Defendants' remedial plans provide for an Inmates/Parolees
27 with Disabilities Appeal Process, which has already been

28                                  17

United States District Court
For the Northern District of California

1  implemented but is currently being revised.  In the first step of
2  the grievance procedure, inmates prepare a Reasonable Modification
3  or Accommodation Request form ("1824 form"), on which they describe
4  their disability, any verification they have of their disability,
5  the problems they are facing, and the specific modifications or
6  accommodations they are seeking.  Cal. Code Regulations. tit. 15
7  § 3085(a).  This form is screened for clarity, duplicate requests,
8  ripeness, incompleteness, standing, or abuse of the appeals
9  process.  Id. at §§ 3085(a), 3083.  If the inmate's grievance
10 survives this screening, it is noted on the Inmate/Parolee Appeals
11 Log.  Id. at § 3085(a).  Although Plaintiffs claim that the time
12 limits for CDC responses to the grievance begin when the appeal is
13 logged, the regulations state that the time limits run from "the
14 date of receipt of the appeal document by the appeals coordinator."
15 Id. at § 3084.6(a).  An Associate Warden decides how to respond to
16 the grievance on the first level of review.  An inmate may appeal a
17 first-level decision to the institution head (second level of
18 review) and then to the Director of Corrections (third level of
19 review).  Each response must state the CDC's reasons for the
20 decision in writing.  Cal. Code Regs. tit. 15 § 3084.5(g).

21     The time limits within which the CDC must respond to the
22 prisoners' grievances have recently been revised.  The first level
23 response is due within 30 working days of the CDC's receipt of the
24 grievance.  Id. at § 3084.6(b)(2).  The inmate has 15 working days
25 to appeal to the second level of the grievance procedure.  Id. at
26 § 3084.6(c).  The CDC must respond to a second level appeal within
27 20 working days.  Id. at § 3084.6(b)(3).  Again, the inmate has 15

28                                    18

United States District Court
For the Northern District of California

1  working days to appeal to the third level. <u>Id.</u> at § 3084.6(c).
2  The CDC must respond at the third level within 60 working days.
3  <u>Id.</u> at § 3084.6(b)(4). The prior time limits for the CDC's
4  responses at these three levels of review were 15, ten and 20
5  working days, respectively. <u>See</u> Second Solis Dec. Ex. B at
6  § 3084.6(b). The regulations, however, provide for exceptions from
7  the time limits due to the "complexity of the decision, action or
8  policy" or "any administrative or operational necessity that
9  prevents the institution from responding within the normal time
10 frames," among other factors. <u>Id.</u> at § 3084.6(b)(5).

11     An emergency appeal process is available for all prisoners
12 when "the regular appeal time limits may result in a threat to the
13 appellant's safety or cause other serious and irreparable harm."
14 <u>Id.</u> at § 3084.7(a)(1). "Such circumstances include, but are not
15 limited to: (A) Need for protective custody; (B) Decision was made
16 to transfer the appellant to an institution housing an enemy;
17 (C) The appellant was scheduled for parole within 15 calendar days
18 and is appealing a serious disciplinary action resulting in credit
19 loss extending the release date" and one other irrelevant
20 provision. <u>Id.</u> When an inmate submits an emergency appeal and the
21 appeals coordinator agrees that emergency processing is warranted,
22 the first level of review is waived, and the second and third
23 levels of review shall each be completed within five working days.
24 <u>Id.</u> at § 3084.7(a)(2). Defendants assert that this procedure could
25 apply to some ADA grievances.

26     The CDC consulted with the United States Department of Justice
27 when it first designed the grievance procedure for disabled inmates

28                                   19

United States District Court
For the Northern District of California

1  in 1993.   The Department of Justice recommended that the CDC
2  provide each disabled inmate the opportunity "to identify the
3  nature of his or her disability and to request accommodations or
4  auxiliary aids and services."   The Justice Department also proposed
5  the following time limits for responses to requests for
6  accommodations: the inmate's counselor should have ten working days
7  to respond; if denied, the ADA Coordinator should have ten working
8  days to review and respond; if appealed, the Warden should have 15
9  working days to make a final decision.   In response, the CDC
10 proposed a time frame of 15-, ten- and 20-day time limits for the
11 first, second and third levels of review.   Defendants have not
12 submitted any evidence that the Department of Justice ever approved
13 this time frame.

14      This grievance procedure parallels the regular appeals process
15 for prisoner grievances, except that it excludes a preliminary ten-
16 day informal review process, and the original complaint form, the
17 1824 form, is specially designed for inmates with disabilities.

18      Plaintiffs cite two cases of what they claim to be excessive
19 delays in processing requests for accommodations.   One inmate filed
20 an 1824 form on January 31, 1997, requesting use of his prosthesis
21 and wheelchair.   He was interviewed as part of the first level of
22 review on April 30, approximately 60 working days after he filed
23 his complaint, his accommodation was approved on May 1, and the
24 decision was implemented on May 6.   A second inmate filed an appeal
25 January 8, 1997.   A response was due April 4, 1997.   He received a
26 notice on April 30 that the response to his appeal was delayed and
27 that a named staff member would explain the reasons for the delay

28                                20

1  and provide an estimated response date in writing.  At oral
2  argument, Defendants stated that these cases predated the CDC's use
3  of the Inmate/Parolee Disability Verification form.  Defendants
4  provide a table of the response dates for the ten ADA grievance
5  appeals that have reached the third level of review since December,
6  1996.  All of these cases were reviewed at the first level within
7  30 working days, the second level within 20 working days, and the
8  third level within 37 working days.  The average response time was
9  19 working days at the first level, 12 at the second level, and 30
10  at the third level.

11    Plaintiffs also provide evidence of two grievances that were
12  rejected at the first level because the inmates did not provide
13  documentation verifying their disabilities.  Although this
14  documentation often is present in prisoners' medical files and
15  prisoners have the right to review their medical files, prisoners
16  may face delays in arranging appointments to review these files
17  because a health services staff member must be present when they
18  review their files.

19    B.    Promptness

20    Plaintiffs argue that the grievance procedure violates ADA
21  regulations because it is not prompt.  They argue both that the
22  purported time limits are excessive and that the exceptions to the
23  time limits provide for unlimited delays.

24    Defendants defend the time limits on a number of grounds.
25  First, they note that the time frame for the ADA grievance
26  procedure is shorter than the regular prisoners' grievance
27  procedure because ADA grievances need not go through the 10-day

28                          21

United States District Court

For the Northern District of California

1  informal review.  This fact, of course, does not establish that the
2  ADA grievance procedure, viewed alone, is prompt.  Second,
3  Defendants dispute Plaintiffs' anecdotal evidence of inordinate
4  delays in responding to ADA grievances by providing evidence that
5  all ADA grievances filed since December, 1996 that have reached the
6  third level have been processed within the current time limits.
7  This undermines Plaintiffs' evidence that the nominal time limits
8  have been ignored, but does not address Plaintiffs' argument that
9  those time limits are nevertheless excessive.  Third, Defendants
10 claim that the Department of Justice approved the CDC's ADA
11 grievance procedure.  The evidence Defendants submit on this issue,
12 however, simply does not support their claim.  If anything, this
13 evidence suggests that the time limits in the CDC's current
14 grievance procedure exceed both what the Department of Justice
15 deems reasonable for an ADA grievance procedure and what the CDC
16 only a few years ago deemed feasible.

17     Finally, Defendants state that legitimate penological reasons
18 exist for these time limits, although they never clearly state what
19 those are.  Defendants at one point note that the ADA grievance
20 procedure was designed to complement and converge with the
21 procedure for handling all other prisoner complaints.  Perhaps
22 Defendants are concerned about whether unequal treatment of
23 disabled prisoners' ADA grievances will cause conflicts among the
24 prison population, leading to security risks.  Defendants have not
25 persuasively established that there is a rational connection
26 between this asserted interest and the CDC's disability grievance
27 procedure.  Moreover, it seems very unlikely that they could do so,
28                                    22

United States District Court
For the Northern District of California

1   because even under the CDC's current plans the procedures are
2   unequal.

3       Although Defendants' arguments fail, the Court must still
4   determine whether the ADA grievance procedure is prompt.  No case
5   law exists on this subject, so the Court must be guided by its
6   common sense.  The goal of this ADA requirement is that meritorious
7   accommodation requests be fulfilled as promptly as practicable.
8   Defendants do not explain why they recently increased the time
9   limits at the three levels of review from 15, ten and 20 working
10  days to 30, 20 and 60 working days.  This change more than doubled
11  the overall time frame of the grievance procedure, and the former
12  time frame more closely hewed to the Department of Justice
13  recommendations.  The most critical juncture in the grievance
14  procedure is the initial response to the complaint.  Presumably,
15  most meritorious requests will be granted at this first level.
16  Strict time limits are helpful in ensuring that these requests do
17  not linger on a busy employee's desk while a disabled prisoner is
18  perhaps immobilized because he lacks an accommodation: six weeks
19  (30 working days) is a long time to wait for a wheelchair or a
20  prosthetic leg.  Absent any further evidence that shorter deadlines
21  would impose an undue burden on the prison system, the Court
22  concludes that the time frame for a resolution of the grievance at
23  the first level of review is not prompt.

24      If the CDC significantly shortens the time limits for the
25  first level of review, however, the time limits for the later
26  stages of review are less worrisome.  The fact that the CDC must
27  explain in writing the reasons for its first level decision helps

28                                  23

United States District Court

For the Northern District of California

1 ensure that the initial response to the prisoner's request for
2 accommodation is a reasoned one. A four-month (80 working days, 16
3 weeks) administrative review process to reconsider this decision is
4 not excessive on its face.

5    The exceptions to the time limits, however, are patently
6 unreasonable. The exception for complex decisions will swallow up
7 the rule while the prison system is repeatedly confronting
8 accommodation issues of first impression. The exception for "any
9 administrative or operational necessity that prevents the
10 institution from responding within the normal time frames" is
11 simply limitless. Other exceptions in the regulations are much
12 more fact-specific and deal with particular obstacles that preclude
13 the CDC from resolving a prisoner's grievance. For example, time
14 limits may be waived if a witness is unavailable or the CDC needs
15 assistance from other agencies or jurisdictions. The two
16 exceptions discussed above, however, violate the ADA requirement
17 that the CDC's grievance procedure be prompt.

18    In sum, the Court concludes that the time limit for the first
19 level of review in the grievance procedure is not prompt and thus
20 violates the ADA. Furthermore, the exceptions from the time limits
21 for complex cases and for any administrative and operational
22 necessity that causes a delay violate the ADA requirement that the
23 grievance procedure be prompt.

24    C.    Burden of Verifying Disabilities

25    Plaintiffs raise two objections to the verification process
26 related to the grievance procedure. First, they claim that inmates
27 are required to verify their disabilities each time they file a

28                              24

United States District Court

For the Northern District of California

1  grievance and argue that this requirement creates unnecessary
2  delays.   Defendants have clarified that when a staff person
3  receives an ADA grievance, he or she must check the inmate's file
4  for an Inmate/Parolee Disability Verification form ("1845 form").
5  If the disability that is claimed on the grievance form is verified
6  in the inmate's file, the inmate is not required to provide
7  additional documentation.   Therefore, once an inmate's disability
8  has been verified, Defendants explain, the inmate will not be
9  required to submit repeated verifications.   This clarification
10  adequately addresses Plaintiffs' concerns.   Defendants must amend
11  their remedial plans, specifically the AB or the guidelines for
12  processing the 1824 form, to incorporate this clarification.

13      Second, Plaintiffs argue that prisoners should not bear the
14  burden of proving their disabilities.   This requirement makes the
15  grievance procedure inequitable, Plaintiffs argue, because many
16  inmates, particularly those with learning disabilities, will be
17  unable to obtain the required tests within the prison system and
18  will not be able to afford testing by outside professionals.
19  Defendants defend this requirement, but explain that it only
20  applies if the inmate's disability is not readily apparent.

21      In arguing that inmates bear the burden of verifying their
22  disabilities, Defendants rely on case law interpreting Title I of
23  the ADA, which prohibits employment discrimination against
24  qualified individuals with disabilities.   This title requires
25  employers to make "reasonable accommodations to the known physical
26  or mental limitations of an otherwise qualified individual with a
27  disability" unless it would cause undue hardship.   42 U.S.C.

28                          25

§ 12112(b)(5)(A)(emphasis added); see also 29 C.F.R. § 1630.9(a).
The Interpretive Guide to Title I of the ADA explains, "In general
. . . it is the responsibility of the individual with a disability
to inform the employer that an accommodation is needed."  29 C.F.R.
Part 1630, Appendix (segment addressing § 1630.9).  Based on this
statutory and regulatory language, courts of appeals have rejected
discrimination claims when the plaintiff has not established that
the employer knew of the employee's disability at the time of the
allegedly discriminatory behavior.  See, e.g. Hedberg v. Indiana
Bell Telephone Co., Inc., 46 F.3d 928, 934 (7th Cir. 1995)("The ADA
does not require clairvoyance.").  Here, Plaintiffs have not argued
that the CDC would violate the ADA or § 504 if it failed to detect
disabilities that have not been brought to its attention.  The
issue before the Court is whether inmates bear the burden of
verifying the disabilities that they claim to have, but that are
not obvious or readily apparent.

On this latter issue, Defendants note that the ADA Title I
Interpretive Guide provides, "When the need for an accommodation is
not obvious, an employer, before providing a reasonable
accommodation, may require that the individual with a disability
provide documentation of the need for accommodation."  29 C.F.R.
Part 1630, Appendix (segment addressing § 1630.9).  Defendants
argue that such a rule applies with even greater force in the
prison context, because inmates have greater incentives to distort
the truth than employees have.  Title I does not apply to this
case, however, and the Court finds that this rule does not apply by
analogy to Title II cases, such as this one.  No parallel language

26

is found in the Title II statute, regulations or Interpretive
Guidelines.  See 42 U.S.C. §§ 12131-34; 28 C.F.R. Part 35 &
Appendix.  In fact, Title II of the ADA imposes affirmative duties
on public entities that exceed an employer's duties under Title I.
Title II regulations require public entities, when they are first
bringing their programs and services into compliance with the ADA,
to evaluate their services, programs and activities to determine
whether they failed to comply with the statute and to "proceed to
make the necessary modifications."  28 C.F.R. § 35.105(a).  Thus,
even absent specific complaints or requests for accommodation by
particular disabled persons, public entities have a duty to ensure
that their programs are accessible.

In the context of the prison system, this affirmative duty
extends to the point that the CDC must verify credible claims of
disability.  In addition to the differences between Title I and
Title II of the ADA, the differences between the employer-employee
relationship and the prison-inmate relationship explain why the
CDC's duty extends this far.  Employers ordinarily have no role in
their employees' personal lives and no responsibility for their
employees' personal needs, such as their ability to feed
themselves, bathe themselves, or get themselves to work.  While
employers often provide health insurance to their employees, they
are not directly responsible for detecting and treating their
employees' medical problems.  A disabled employee will seek medical
assistance for his or her disability to assist in the employee's
personal life as well as his or her work situation.  Logically,
therefore, employees and not their employers bear the burden of

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  verifying their disabilities.  Prisons, on the other hand, are
2  responsible for ensuring that their prisoners are able to meet all
3  of these personal needs.  Prisoners are able to bathe, eat, move
4  around their institutions and obtain medical care only with
5  institutional permission and ordinarily only by using institutional
6  resources.  A disabled prisoner can seek medical care to assist him
7  or her in living with the disability only with prison cooperation
8  and ordinarily only at prison expense.  Thus, subject to the
9  ordinary rules governing when prisoners must pay for their own
10 health care in prison, prisoners must be able to use the prison
11 health services to verify their disabilities.

12      With respect to learning disabilities, however, the Court is
13 reluctant to require elaborate testing of any inmate who claims to
14 have trouble reading or comprehending new concepts.  At oral
15 argument, Plaintiffs offered to provide additional evidence
16 regarding the burden of requiring the CDC to verify learning
17 disabilities.  Plaintiffs must disclose this evidence to Defendants
18 and the parties must meet and confer to attempt to agree on the
19 CDC's proper role in verifying these disabilities before the Court
20 revisits the issue, as explained further in the Conclusion, _infra_.

21 IV.  Accommodations for Extended Reception Center Stays

22      Plaintiffs argue that Defendants' remedial plans violate the
23 ADA and § 504 because disabled inmates who are required to stay at
24 Reception Centers for extended periods of time solely due to their
25 disabilities are inadequately accommodated.  They argue that any
26 disabled inmates who stay at Reception Centers for longer than the
27 average stay solely due to their disabilities must be fully

28                                28

1  compensated for lost opportunities to earn good-time credits.
2  Defendants argue that Plaintiffs have not established that any stay
3  longer than the average is an extended stay, and defend their
4  accommodations as sufficient.

5       A.    Factual Background

6       Inmates entering the California prison system are initially
7  processed at one of 12 Reception Centers, where the CDC conducts
8  medical, educational and vocational tests, assigns them a security
9  classification, and determines where to place them.  The average
10 stay at Reception Centers for all inmates is 59 days.  The average
11 stay for disabled inmates only is unknown.  Plaintiffs cite one
12 case of a disabled inmate who stayed at a Reception Center for 134
13 days and some evidence that other disabled inmates have stayed up
14 to a year at Reception Centers.  Defendants claim that in August,
15 1997, of all inmates in the CDC's Reception Centers, disabled and
16 non-disabled, only nine had been there for more than 90 days.
17 Defendants also claim that delays in Reception Centers have been
18 declining and will continue to do so as the CDC implements its plan
19 to provide for more structurally accessible housing in the prisons.
20 Under current procedures, the ADA Coordinator tracks the status of
21 Reception Center stays for disabled inmates and, if they are
22 approaching 90 days, intervenes to help find a placement for the
23 inmate.

24      While staying at Reception Centers, all inmates are denied the
25 following privileges that are available to all inmates at the
26 mainline prison institutions: phone privileges other than for
27 emergency calls, contact visits, family visits, special packages,

28                              29

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   and special canteen purchases.  Cal. Code Regs., tit. 15
2   § 3044(h)(3).  Reception Centers also do not have weight-lifting
3   facilities, vocational or educational programs, or full-time work
4   opportunities that produce "one-for-one" credit, whereby an
5   inmate's sentence is reduced one day for each day he or she works.
6   Instead, inmates at Reception Centers earn one-for-two time,
7   whereby their sentence is reduced by one day for every two days in
8   prison.  Id. at § 3044(b)(7).  California law provides that "every
9   prisoner shall have a reasonable opportunity to participate in a
10  full-time credit qualifying assignment in a manner consistent with
11  institutional security and available resources."  Cal. Penal Code
12  § 2933(b).

13      The AB provides that disabled inmates must be processed out of
14  the Reception Centers in a timely manner and no longer than 90 days
15  from entering the prison system, unless prevented by factors beyond
16  the CDC's control, such as medical emergencies or court
17  appearances.  If an inmate spends more than 90 days at a Reception
18  Center (an "extended stay") and the excess time is solely due to
19  the inmate's disability, the AB requires the following
20  accommodation.  Upon transfer to a mainline institution, the inmate
21  is placed on the waiting list for a work assignment at the position
22  in the waiting list where the inmate would have been had he or she
23  arrived on the 91st day after entering the prison system.  While on
24  a waiting list, inmates are placed on A2 work group status and earn
25  one-for-two credit.  Cal. Code Regs., tit. 15 § 3044(b)(2).  If the
26  number of days the inmate remained at the Reception Center beyond
27  the initial 90 days exceeds the waiting period on the waiting list,

28                              30

1  the inmate is placed at the top of the list and granted A1 work
2  status.    Inmates on A1 status earn one-for-one time.  Id. at
3  § 3044(b)(1).   The 90-day threshold for this accommodation was
4  determined by adding approximately 30 days to the average Reception
5  Center stay "for purposes of reasonable administrative processing."

6      B.   Analysis

7      Plaintiffs raise several objections to the CDC's planned
8  accommodations of disabled inmates who are held at Reception
9  Centers for extended periods solely because of their disabilities.
10 First, they argue that the CDC's definition of an extended stay is
11 discriminatory.   Second, they argue that these inmates are not
12 compensated for the loss of privileges that they would have enjoyed
13 had they been in mainline institutions during these extended stays.
14 Third, they argue that under the CDC's plan not all of these
15 inmates will be fully compensated for the work credits they lost
16 due to the extended stay.   Finally, they object to Defendants'
17 suggestion that the disabled inmates might bear the burden of
18 proving that their extended stays were due to their disabled
19 status.

20     Plaintiffs first argue that the CDC's definition of an
21 extended stay for disabled inmates is discriminatory, because the
22 CDC has arbitrarily added 30 days to the average stay of all
23 inmates "for purposes of reasonable administrative processing."
24 Plaintiffs argue that disabled inmates should be compensated for
25 the loss of privileges due to any time spent at the Reception
26 Centers beyond 59 days, the average length of stay, solely because
27 of disabilities.   Defendants correctly note, however, that if 59

28                               31

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    days is the average Reception Center stay, then about half of all
2    inmates stay longer than 59 days.  It would be a distortion,
3    therefore, to characterize any period of 60 or more days as an
4    "extended" Reception Center stay.

5        Even if disabled inmates remain at Reception Centers for
6    longer periods than other inmates, these "extended stays" are not
7    necessarily discriminatory in violation the ADA or § 504,
8    regardless of their consequences.  The processing of disabled
9    inmates at the Reception Centers is part of the CDC's reasonable
10   accommodation duties.  As discussed above, the CDC is required by
11   the ADA and § 504 to verify the inmates' disabilities and determine
12   how to accommodate them by providing auxiliary aids or services or
13   by placing them in an accessible institution.  The mere fact that
14   the processing of disabled inmates lasts longer on average than the
15   processing of able-bodied inmates is not unreasonable, because
16   disabled inmates must be processed for reasons connected with their
17   disabilities in addition to all the other reasons for processing
18   that potentially apply to any particular inmate.  Excessive,
19   unreasonable delays for such processing, however, give rise to a
20   duty to accommodate these inmates by compensating them for the
21   costs of extended Reception Center stays.

22       More information is needed before the Court can determine
23   whether disabled inmates are subjected to unjustified extended
24   stays at Reception Centers.  First, it would be helpful to know the
25   range and distribution of Reception Center stays for all inmates
26   around the 59-day average.  If these stays vary from 50 to 70 days,
27   for example, any stay greater than 70 days could properly be

28                                    32

United States District Court
For the Northern District of California

1 characterized as "extended."  A description of the steps involved
2 in processing disabled inmates also would shed light on how long
3 the CDC reasonably requires to carry out this processing.
4 Defendants must provide Plaintiffs with this additional information
5 and the parties must then meet and confer to attempt to reach
6 agreement on what constitutes an extended stay.  If the parties
7 cannot reach agreement, Plaintiffs may file another motion asking
8 the Court to resolve the issue.  See briefing schedule set forth in
9 Conclusion, infra.

10      Plaintiffs also argue that, even accepting the CDC's 90-day
11 definition of an extended stay, the CDC's accommodations for
12 disabled inmates who have endured these extended stays are
13 inadequate.  First, these inmates are not accommodated during their
14 extended stays for the loss of privileges such as the rights to
15 make phone calls, have visitors and receive packages.  Plaintiffs
16 propose that disabled inmates held for extended periods be placed
17 in a different privilege status from other inmates at Reception
18 Centers so that they can enjoy these privileges.  Plaintiffs also
19 observe that it may be feasible to move some disabled prisoners who
20 do not need structurally accessible cells into the mainline
21 institutions to which the Reception Centers are attached, so that
22 they could use the institution's weight room facilities and
23 vocational programs pending their ultimate transfers.  Defendants
24 do not respond to this argument.  To the extent the CDC's plan
25 denies extended-stay disabled prisoners privileges they would enjoy
26 if they were transferred to mainline institutions, it fails to
27 comply with the ADA and § 504.

28                              33

United States District Court
For the Northern District of California

Plaintiffs' primary objection to the accommodations is that these inmates are not adequately compensated for their lost opportunity to earn work credits. For example, Plaintiffs posit the case of a disabled inmate who is detained at a Reception Center for 150 days solely because of his disability and who is transferred to an institution where the waiting period for work assignments is only 30 days long. If the inmate had been transferred on the 91st day of his Reception Center stay, he would have begun working on the 121st day. Because he was held at the Reception Center for 150 days, however, he was placed at the top of the waiting list on A1 status on the 151st day. Thus, this inmate lost 30 days of one-for-one work credit solely due to his disabilities, which translates to 30 extra days in prison.

Defendants do not argue that the CDC plan fully accommodates these inmates, but rather raise a penological justification for the plan. Defendants argue that any further accommodations would cause conflict among prisoners because of perceived favoritism benefitting inmates with disabilities. This argument is not credible. Defendants have not provided a declaration by a prison official with demonstrated expertise or direct experience with these matters to explain how the CDC's policy, which in fact already provides special treatment for disabled inmates to accommodate for the Reception Center stays, is rationally connected to this penological concern. Because the accommodations compensate for disadvantages that have been imposed on these inmates due to their disabilities, it is not clear that other inmates would perceive it as favoritism.

34

United States District Court
For the Northern District of California

Finally, Plaintiffs also object that the CDC might require the inmates to establish that their extended stays were due to their disabilities.  Although the AB is silent as to who bears the burden of establishing this issue, Defendants suggest in their brief that the disabled prisoners would have to show that the extended stay was due to their disabilities.  Plaintiffs correctly point out that these inmates are unlikely to have access to information about what factors prolonged their stay.  The CDC's proposed accommodations for extended stays due to disabilities are only realistic, therefore, if the CDC bears the burden of proving that the extended stay was not attributable to the inmate's disability if it decides not to accommodate the prisoner.  If the CDC's interpretation of the AB is inconsistent with this allocation of the burden of proof, it does not comply with the ADA or § 504.

In summary, CDC's plans for accommodating prisoners who are held at Reception Centers for prolonged periods solely due to their disabilities comply with the ADA and § 504 with the following exceptions.  Although Plaintiffs have not established that the CDC's definition of an extended stay is discriminatory, the parties must meet and confer on this issue.  If the parties cannot agree on a definition of an "extended stay," Plaintiffs may submit that issue again to the Court.  See briefing schedule in Conclusion, infra.  In the absence of such a motion, the AB definition, that an extended stay is one that exceeds 90 days solely due to an inmate's disability, will prevail.  Disabled inmates held at Reception Centers for extended stays must enjoy privileges available to inmates at mainline institutions and must be fully compensated for

35

1  work credits lost because of the extended stays.  The CDC cannot
2  require the prisoner to bear the burden of proving that an extended
3  stay was solely due to the prisoner's disabilities.

4  V.    Population Projections

5       Plaintiffs argue that the CDC's projections of the disabled
6  prisoner population are inaccurate because the CDC used faulty
7  methods to collect the data on which the projections are based.
8  Because the population projections are inaccurate, Plaintiffs
9  argue, the CDC cannot rely on these figures to defend its two-
10 percent scoping policy, see October 8 Order at 28-31, and must
11 instead adhere to the three- or five-percent scoping standards of
12 the ADAAG or UFAS guidelines.  See id. at 29.  Defendants defend
13 their population projections as accurate even if the methodology on
14 which those projections were based was flawed.

15      A.    Factual Background

16      Defendants conducted point-in-time surveys in January, 1996,
17 in which each institution in the prison system counted the disabled
18 inmates housed in that institution and identified their
19 disabilities.  In the tallies that resulted from these surveys, the
20 disabled inmates were identified by the nature of their disability
21 and by the classification level of the institution in which they
22 were placed.  No security level was recorded for inmates who were
23 still being held at Reception Centers.  The CDC has relied on these
24 figures to determine how many accessible housing units and other
25 accessible facilities it will need at each classification level in
26 the prison system.

27      At the time of the surveys, many disabled inmates were housed

28                                    36

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

at institutions that did not match their personal classification
levels.  CIM, a Level I institution, accepted male inmates who used
wheelchairs up to level III or IV if they needed to be in the
hospital or were in terminal condition.  Twelve of the 44 disabled
inmates counted at CIM in 1996 were in the hospital.  The
California Medical Facility ("CMF"), a Level III institution, also
accepted inmates at any security level if they needed medical
treatment.  The only Level II housing for men who used wheelchairs
at the time of the survey was Avenal State Prison ("Avenal").
Avenal, however, had only 48 accessible beds and at any one time an
average of seven Level II wheelchair-bound inmates were on the
waiting list to be assigned to these beds.  Meanwhile, these Level
II inmates were housed at other facilities.  Avenal also did not
accept inmates with catheters, colostomies or Foley bags.
Wheelchair-bound inmates who used these devices were housed at
other facilities.  As of late 1995, the prison system had no Level
IV accessible beds.  Only three Level IV male inmates who used
wheelchairs were identified as Level IV in the survey; as of June,
1997, however, the CDC identified 35 such inmates in the prison
system.

At the time of the surveys, Reception Centers had an unusual
backlog of inmates who used wheelchairs because of the lack of
structurally accessible cells in the prison system.  No security
level was noted for more than 20 percent of all wheelchair-bound
inmates counted in the survey.

Defendants report that its projections have exceeded the
actual numbers of disabled prisoners except in two areas, in which

37

1    they have fallen short: Level II and IV inmates in wheelchairs.
2    Defendants explain that the CDC has responded by adding Level IV
3    accessible beds at Salinas Valley State Prison and at the
4    California State Prison-Corcoran Substance Abuse Treatment Facility
5    ("SATF") and by adding Level II accessible beds at SATF.

6        B.    Analysis

7        Plaintiffs argue that because disabled inmates were identified
8    by the classification level of the institutions where they were
9    housed rather than by their personal classification levels, and
10   because certain identifiable groups of disabled prisoners were
11   housed outside their security levels at the time of the survey, the
12   survey over-counted the number of disabled prisoner in some levels
13   and under-counted them in others.  Specifically, Plaintiffs argue
14   that the survey over-counted Level I and III wheelchair users and
15   under-counted those at Levels II and IV.  They also argue that the
16   projected numbers of wheelchair users at each security level is too
17   low because a disproportionate number of these prisoners were being
18   held at Reception Centers at the time of the survey and thus were
19   identified with no security level classification at all.

20       Defendants' evidence confirms Plaintiffs' fears.  Defendants
21   report that the numbers of disabled inmates overall have fallen
22   short of their projections, that is, these inmates were over-
23   counted, except for wheelchair users at Levels II and IV, whose
24   numbers have exceeded their projections, that is, they were under-
25   counted.

26       In its October 8 Order, the Court held that in the absence of
27   reliable population projections the CDC's two-percent scoping

28                                    38

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  policy does not comply with the ADA or § 504.  See October 8 Order

2  at 30.  Defendants continue to defend the policy, however, by

3  noting that their projections have exceeded their needs in two

4  areas, Levels I and III, and by arguing that the CDC has adequately

5  responded to the shortfall of beds by adding Level II and IV beds

6  at some institutions.  They project that the CDC will be able to

7  meet the needs of its disabled inmates through 2001.  Furthermore,

8  Defendants reiterate their argument that the CDC has a legitimate

9  penological interest in limiting the number of accessible housing

10  units to actual requirements to reduce security risks.

11      Because the overall numbers in the CDC's population

12  projections seem to meet or exceed the actual numbers of disabled

13  prisoners in the system, it appears that Defendants might be able

14  to justify the CDC's scoping policy.  They cannot rely, however, on

15  data that has been proven to contain substantial inaccuracies.  The

16  distribution of disabled inmates, particularly wheelchair users,

17  among the security classifications and the overall number of

18  wheelchair users in the prison population were not accurately

19  reflected in the CDC's point-in-time survey.  It makes no sense for

20  the CDC to spend millions if not billions of dollars to renovate

21  existing institutions and design new institutions in a manner that

22  will not match the needs of its disabled prisoners, and the CDC

23  will not be fulfilling its duties under the ADA and § 504 if it

24  does so.

25      At oral argument, Defendants stated that the CDC no longer

26  needs to rely on the point-in-time surveys because it now has

27  actual numbers and identifying data for the disabled inmates in the

28                                    39

United States District Court

For the Northern District of California

1  prison system.  Defendants also claimed that the distribution of

2  disabled inmates among the four security levels is not a

3  significant problem because it is relatively easy for the CDC to

4  change the security classification of various prison facilities.

5  Defendants, however, have not met their burden of presenting this

6  evidence to the Court to defend their current scoping policy.  The

7  Court, therefore, finds that the CDC's plans for renovations and

8  new construction do not comply with the ADA or § 504.[3]

9  VI.  ADA Compliance by Facilities Under Contract with the CDC

10      The ADA prohibits public entities from discriminating against

11  individuals with disabilities "directly or through contractual,

12  licensing or other arrangements."  28 C.F.R. § 35.130(b)(1), (3).

13  Defendants do not dispute that they have a duty to ensure that the

14  organizations that operate facilities under contract with the CDC

15  do not violate the ADA.  They argue, however, that Plaintiffs have

16  not identified any violations of this duty at any specific

17  facilities.  Rather than identifying specific violations,

18  Plaintiffs seek language in the AB that clearly states that the CDC

19  has this duty.  The Court has already held that the AB complies

20  with the ADA only if it accurately describes the CDC's duties under

21  the statute.  October 8 Order at 27-28.  Therefore, the bulletin

22  must be revised to state the CDC's duty to ensure that

23  organizations that operate facilities under contract with the CDC

24

25      [3]While the Court has had this issue under submission,
   Defendants have submitted additional information regarding their
26  population projections.  Plaintiffs have challenged that evidence
   and requested further discovery.  The Court sets forth a schedule
27  for discovery and further briefing in the Conclusion, infra.

28                                    40

comply with the ADA and to describe how the CDC will fulfill that
duty.

VII. Evaluations of Hearing Impairments and Needs for Hearing Aids

Plaintiffs claim that Defendants' remedial plans violate the
ADA and § 504 because they do not require that qualified personnel
determine the extent of hearing-impaired inmates' hearing loss and
the type of auxiliary aids or services, if any, required to
accommodate these inmates.  Defendants contend that the inmate
bears the burden of demonstrating that he or she suffers from a
hearing loss.  Once a hearing impairment comes to the CDC's
attention, Defendants argue, the CDC's plans appropriately
accommodate the disabled inmates by providing adequate procedures
to determine the extent of the hearing loss and to determine
whether inmates need auxiliary aids or services.

A.   Factual and Legal Background

ADA regulations require public entities to ensure that
communications with disabled persons are "as effective as
communications with others."  28 C.F.R. §35.160(a); see also 28
C.F.R. § 41.51(e)(§ 504 regulation requiring that communications be
available to disabled persons).  The public entity must furnish
appropriate auxiliary aids and services where necessary to afford a
disabled person an equal opportunity to participate in and enjoy
the benefits of the entity's services, programs and activities.  28
C.F.R. §35.160(b)(1).  In determining which auxiliary aid or
service is necessary, the public entity must give primary
consideration to the requests of disabled persons.  28 C.F.R.
§35.160(b)(2).  The public entity must also ensure that hearing-

41

United States District Court

For the Northern District of California

1  impaired persons can obtain information as to the existence or
2  location of accessible services, activities and facilities.  28
3  C.F.R. §35.163.  A public entity need not make these
4  accommodations, however, if it can show that these actions would
5  result in a fundamental alteration to the program or activity or in
6  an undue burden on the entity.  28 C.F.R. §35.164.

7       Under the CDC's plan, incoming prisoners are screened at the
8  CDC's Reception Centers by a registered or licensed practical nurse
9  for evidence of disabilities.  If the inmate reports a disability
10 or the nurse observes one, the nurse refers the prisoner to other
11 licensed health care staff for verification of the disability.  A
12 similar screening process, which also might result in a referral
13 for verification of a disability by the health care staff, takes
14 place after the inmate arrives at the institution to which he or
15 she is transferred from the Reception Center.

16      The post-referral verification process is guided by the
17 Inmate/Parolee Disability Verification form, the 1845 form.  The
18 process begins with an unspecified examination or interview by a
19 clinical staff person, that is, a staff person with a valid health
20 care license, who makes an initial determination about whether the
21 inmate has a disability and if so whether the disability falls
22 within one of the five categories that affect an inmate's placement
23 (Section C of the 1845 form) or one of the five categories that do
24 not affect placement (Section D on the form).  These initial
25 determinations must be reviewed by a physician, who must sign the
26 form.  Defendants have stated that the physician's signature
27 establishes concurrence with the notations made in Sections A

28                                    42

through D.  The form does not include a section where auxiliary aids for the inmate are identified, although Defendants have stated that the medical staff may record such information in the Comments section on the bottom of the form.  After the physician signs the form, it is forwarded to CDC counseling staff, who record in Section E of the form whether the inmate requires auxiliary services, among other pieces of information.  Defendants have stated that the information recorded in Section E is collected from existing medical notations or from information gathered by meeting with the inmate, and that the counseling staff does not make medical decisions.

The 1845 form does not describe what procedures the clinician and physician should use to make these determinations, and Defendants have submitted no written medical protocol describing the required procedures.  Defendants have submitted a declaration from the Assistant Deputy Director for Health Policy of the CDC, Nadim K. Khoury, M.D., but Dr. Khoury does not clearly explain what the clinician and physician must do.  He states that typical medical practice is for a clinician to assist a physician by memorializing a patient's history and present condition, and also states that the CDC clinician records certain information in Sections A through D on the 1845 form.  He states further that the physician ultimately determines how to classify the inmate's disability, "based upon the inmate's history and physical examination," but he does not clarify whether the clinician or the physician conducts the physical examination, or even whether a physical examination is required in every case.  Dr. Khoury

43

United States District Court

For the Northern District of California

1 explains that if an inmate enters the prison system with a hearing
2 aid and reports no problems, and the medical staff observes no
3 hearing problems, no further diagnostic procedures or consultation
4 are necessary.  If the physician determines that the inmate has
5 disabilities severe enough to impact placement, Dr. Khoury
6 explains, he or she may order diagnostic and other services
7 pursuant to regulations that authorize such services when necessary
8 to protect life, prevent significant illness or disability, or
9 alleviate serious pain.  Although this definition does not seem to
10 include services necessary to identify whether auxiliary aids or
11 services are necessary reasonably to accommodate a disabled inmate,
12 Dr. Khoury states that such services may include an audiogram and
13 specialist consultation.  Again, Dr. Khoury does not explain how
14 the physicians determine whether the inmate has a disability
15 affecting placement.

16     Defendants' remedial plans do not explain who is responsible
17 for determining whether inmates require auxiliary aids or services,
18 or under what criteria such decisions will be made.  The Disability
19 Program Implementation Plan for Deuel Vocational Institution
20 provides that librarians will help determine whether inmates need
21 access to equipment such as voice synthesizers or large-print
22 readers to use the library, and that correctional staff will help
23 determine whether auxiliary aids pose security risks, but this
24 applies to only one institution in the CDC system.

25     Both Defendants and Plaintiffs have submitted declarations
26 from experts offering opinions about the adequacy of these
27 procedures.  Defendants have submitted an expert opinion by

28                                   44

Winthrop H. Hall, M.D., an otolaryngologist who works under contract with the CDC. While acknowledging that inmates with hearing impairments should be evaluated by an otolaryngologist to determine the extent of their hearing loss and the need for further testing, Dr. Hall opined that inmates who enter the prison system with hearing aids, and who therefore have already been evaluated by an otolaryngologist, do not require further evaluation if they appear to be functioning well with their aids. Dr. Hall also stated that hearing loss in inmates who are more than 50 years old can easily be measured by taking a careful history of the inmate and conducting a tuning fork evaluation. Finally, Dr. Hall asserted that according to CDC protocols any inmate with "sufficient impairment" is referred for ENT evaluation. Dr. Hall does not identify the protocols or define "sufficient impairment."

Plaintiffs have submitted a declaration from Robert W. Sweetow, Ph.D., Director of Audiology in the Department of Otolaryngology at the University of California at San Francisco. Dr. Sweetow expresses an expert opinion that the CDC's procedures to measure the ability of prisoners to hear and function in the prison environment are inadequate. In order to determine whether an inmate can function adequately in a prison environment, Dr. Sweetow asserts, the CDC must administer more than just a basic sensitivity test that measures the number of decibels the inmate can hear. The CDC should also administer a speech reception test and a speech discrimination test in both quiet and noisy environments, he argues; a tuning fork evaluation, as recommended by Dr. Hall, is not a sufficient measure of hearing loss.

45

United States District Court
For the Northern District of California

Dr. Sweetow states that even licensed medical personnel require specialized training to be able accurately to measure hearing loss. He states that these tests are easy to administer, last no longer than 10 to 15 minutes, and minimize the possibility of feigning by the inmate. He argues that the test results must be evaluated by a trained audiologist, who should be familiar with the prison environment and the settings in which the inmate will need to communicate, but that the test results could be sent to the audiologist by facsimile transmission, and the audiologist could simply phone in a diagnosis. Dr. Sweetow also opines that even inmates who arrive with hearing aids should be evaluated, both because they might not have been evaluated by an otolaryngologist recently and because the hearing aid might need to be adjusted for the prison environment.

Plaintiffs have also submitted a declaration by Anil K. Lalwani, M.D., Assistant Professor of Otolaryngology at the University of California at San Francisco. Dr. Lalwani expresses an expert opinion that tuning fork evaluations produce both false positive and false negative results and cannot determine the degree of a patient's hearing loss. Therefore, Dr. Lalwani asserts, this test should not be used alone.

Finally, Plaintiffs have also submitted an expert opinion by Michael Strong, Ph.D., who holds a doctorate in education and has conducted research in deafness for 15 years, with a special emphasis on the language of deaf persons. Dr. Strong opines that only social workers, psychologists, sign language interpreters or others trained in the linguistic or communication needs of the

46

United States District Court
For the Northern District of California

1    hearing-impaired are qualified to determine the auxiliary services
2    that hearing-impaired inmates need.  More specifically, Dr. Strong
3    argued that only a sign language interpreter who was fluent in both
4    ASL and signed English could evaluate what type of signing would be
5    most useful to an inmate.

6        B.    Analysis

7        The Court has already rejected Defendants' argument that
8    disabled inmates bear the burden of verifying their own
9    disabilities.  See discussion at pages 27 to 29, supra.  The
10   reasons why the CDC bears the burden of verifying credible claims
11   of disability also support the CDC's duty to conduct whatever tests
12   are necessary to determine the proper means of accommodating
13   hearing-impaired prisoners.  Indeed, the rationale is even stronger
14   in this context because the CDC's affirmative duty to accommodate
15   prisoners is more clearly stated in the statutes than is its duty
16   to verify prisoners' disabilities.  The only question, therefore,
17   is whether the CDC's procedures satisfy the CDC's duty, after it
18   becomes aware of a possible hearing disability, to verify the
19   disability, measure the type and degree of impairment, and identify
20   appropriate auxiliary aids or services to the extent necessary
21   reasonably to accommodate the disabled inmate.

22       The ADA regulations require public entities to ensure that
23   communications with disabled persons are as effective as
24   communications with others and if necessary to provide auxiliary

25
26
27
28                                    47

United States District Court
For the Northern District of California

aids and services.[4]  The CDC's procedures for examining hearing-impaired inmates fail to satisfy this requirement.  In order for the CDC to communicate as effectively with its hearing-impaired inmates as it communicates with its other inmates, it must ensure that these inmates can understand emergency warnings in an often noisy prison environment, communicate in emergency situations, and fully participate in settings such as disciplinary hearings that might involve multiple speakers and emotionally charged content. While the CDC charges its medical staff with determining whether hearing-impaired prisoners can "function adequately" with or without a hearing aid, adequate functioning is nowhere defined. The CDC has no specific medical protocol or other written guidelines for verifying and measuring hearing impairments or for determining what auxiliary aids or services might be needed.  The

[4]All parties seem to assume that the CDC's duty to accommodate its prisoners includes a duty to provide hearing aids, despite explicit language in the Title II regulations that public entities are not required to "provide to individuals personal devices, such as wheelchairs; individually prescribed devices, such as prescription eyeglasses or hearing aids; readers for personal use or study; or services of a personal nature including assistance in eating, toileting, or dressing."  28 C.F.R. § 35.135.  The Court agrees that this regulation cannot apply to the prison context.  As noted above, the prison setting is unique in that participants in the public entity's programs and services are completely dependent on the public entity for the freedom and resources to attend to their personal hygiene and basic needs, such as eating, or to pursue what ordinarily would be deemed personal activities, such as moving around the facility or reading or studying.  The public entity also controls these inmates' access to health care.  In providing the resources and opportunities for inmates to pursue these activities, the CDC must not discriminate against inmates and must accommodate their disabilities.  Subject to other nondiscriminatory prison rules about when inmates must pay for goods out of their own resources, therefore, the CDC must provide personal aids such as hearing aids if necessary to accommodate an inmate.

48

United States District Court
For the Northern District of California

1  CDC's Assistant Deputy Director for Health Policy has not clearly
2  explain what procedures the medical clinicians and physicians must
3  follow to make these determinations.  The CDC has not shown that
4  its medical staff have the requisite training to enable them
5  accurately to measure an inmate's hearing loss or to prescribe aids
6  or services, even if they take it upon themselves to conduct such
7  tests.  Consultations with professionals outside the CDC's Health
8  Services department are only permitted, much less required, to
9  protect life, prevent significant illness or disability, or
10 alleviate serious pain, and thus would not ordinarily be available
11 for these ADA diagnostic purposes.  The tuning fork evaluation
12 proposed, but not mandated, by the CDC measures only one dimension
13 of hearing loss and is not reliable.  Furthermore, the CDC has
14 indicated that it intends to infer from the fact that an inmate
15 enters with a hearing aid and appears to be "functioning
16 adequately," which as noted above is not defined, that the inmate
17 has recently been examined by an otolaryngologist and that the
18 prescribed aid is appropriate for the prison context.

19     In short, the evidence is clear that the CDC's procedures for
20 measuring hearing impairment and determining what auxiliary aids or
21 services are required to ensure that the inmate can communicate as
22 effectively in the prison environment as non-disabled inmates are
23 inadequate and thus violate the ADA.

24 VIII. Effective Communication Standards

25     Plaintiffs argue that the CDC has not fulfilled its obligation
26 to "ensure that communications with [disabled inmates] are as
27 effective as communications with others."  28 C.F.R. § 35.160(a).

28                              49

United States District Court

For the Northern District of California

1  Plaintiffs argue that language in the AB implies an inappropriate
2  two-tiered standard for communication assistance and thus does not
3  comply with the ADA.  Plaintiffs also contend that the CDC's plans
4  to determine communication assistance needs on a case-by-case basis
5  do not comply with the ADA.

6      A.   AB Provisions for Effective Communications
7      The following passages of the AB describe the CDC's obligation
8  to ensure effective communications for its disabled inmates:

9      [I.]D.   GENERAL DPP STANDARDS
       . . .
10     1. <u>Effective Communications</u>: Reasonable and appropriate
       modifications shall be employed to ensure equally <u>effective</u>
11     <u>communication</u> between staff, inmates/parolees and where
       applicable, the public.

12     General:

13
       Auxiliary aids which are reasonable, effective, and
14     appropriate to the needs of the inmate/parolee shall be
       provided when simple written or oral communication is not
15     effective. . . .

16     Effective Communications Involving Due Process:

17     Because of the critical importance of communication involving
       issues of due process, or in physician to patient
18     communication, the standard for what constitutes a reasonable
       modification shall be enhanced when these types of issues are
19     involved.  These modifications may include, but are not
       limited to, such aids as staff assistance, via qualified
20     interpreters and/or other assistive devices.  This enhanced
       modification which is based on a case-by-case determination
21     shall be provided for disabled inmates/parolees who are unable
       to communicate effectively, have difficulty comprehending due
22     process, or other similarly critical issues.  The DPP
       inmate/parolee shall be provided equally effective access to
23     the courts, attorneys, and health care services. . . .

24     . . .

25     [III.B.2.]a. <u>General Identification/Notification Procedures</u>
       . . .
26     <u>Inmate Disciplinary Process</u>
       . . .
27     In due process communications, an enhanced standard than is

28                                50

1    necessary in normal activities shall be met to ensure that the
      communication is understood.  Effective communication between
2    staff and inmates in the inmate disciplinary process may
      require other assistive devices necessary to disabled inmates
3    who are unable to communicate effectively or have difficulty
      comprehending due process issues.

4
      To ensure effective communication between staff and inmates in
5    the inmate disciplinary process, a Staff Assistant/
      Investigative Employee may need to be assigned to aid the
6    inmate.

7    Second Solis Dec. Ex. A at 3-4, 14-16 (emphasis in original).

8        The parties agree that the ADA requires the CDC to make

9    reasonable modifications necessary to ensure communications with

10   disabled inmates in all settings equally effective as

11   communications with other inmates.  The parties also agree that the

12   modifications necessary to ensure equally effective communication

13   will vary according to the content and context of the

14   communication.  For example, the Justice Department's Editorial

15   Note to the ADA regulation on effective communications explains:

16       Although in some circumstances a notepad and written materials
          may be sufficient to permit effective communication, in other
17       circumstances they may not be sufficient.  For example, a
          qualified interpreter may be necessary when the information
18       being communicated is complex, or is exchanged for a lengthy
          period of time.

19
20   28 C.F.R. Part 35, App. A at passage discussing § 35.160.

21       Plaintiffs' complaint is that the AB's references to an

22   "enhanced" standard in due process or patient-physician

23   communications implies that in other contexts the standard for

24   communications modifications is something less than "equally

25   effective."  They propose language that more clearly distinguishes

26   between the standard for the level of communication disabled

27   inmates should be able to enjoy and the methods that must be used

28                                      51

United States District Court
For the Northern District of California

1  to meet this standard.

2      Reasonable and appropriate modifications shall be employed to
       ensure equally effective communication between staff, inmates/
3      parolees and where applicable, the public.  The type of
       modification or assistive device required to provide
4      communication that is as effective as it would be with an
       individual without the disability depends on the circumstances
5      and the type of communication.  To be equally effective,
       simple and routine communications generally will require
6      different modifications than complicated and critical
       communications, such as those involving due process and health
7      care.

8  Plf. Br. on First Set of Issues at 16.  Plaintiffs state that

9  Defendants rejected this modified language.  Defendants note that

10 the AB states that the standard for communications assistance in

11 all cases is "to ensure equally effective communications," and they

12 defend the AB's particular focus on due process hearings and health

13 care communications as designed for the benefit of Plaintiff class

14 members.

15     The Court agrees with Defendants that the AB generally

16 complies with the ADA regulations and that the particular emphasis

17 on due process hearings and health care settings serves to protect

18 disabled inmates' interests.  If the AB is implemented in a manner

19 that diminishes the guarantee of effective communications in other

20 settings, Plaintiffs may challenge that practice as violating the

21 ADA or § 504.  Defendants' remedial plans, however, do not violate

22 the ADA or § 504.

23     B.    Case-by-Case Determinations

24     Plaintiffs also claim that under the CDC's plans, CDC staff

25 will determine what sort of modifications are necessary for a

26 disabled prisoner "each and every time communications occur."  Plf.

27 Br. on First Set of Issues at 18.  They argue that this "case-by-

28                                52

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 case determination of effective communication methods" does not
2 comply with ADA regulations because it adds an unnecessary step in
3 providing effective means of communication, inevitably delaying the
4 communication.  In some circumstances, such as a medical emergency,
5 delayed communication would not be equally effective communication.
6 Plaintiffs argue that the CDC should evaluate its hearing-impaired
7 inmates when they first enter the prison system to determine what
8 sort of assistance each prisoner needs for effective communication
9 in the typical range of situations that inmates encounter.  An
10 early evaluation would both eliminate the delay involved in ad hoc
11 evaluation of inmates' needs as communications requirements arise
12 and provide the CDC the information necessary to ensure that the
13 necessary resources are in place when these situations arise.
14 Defendants did not respond to these arguments.

15     While Plaintiffs' arguments are persuasive, their fears about
16 the CDC's plans may be misplaced.  Plaintiffs read a great deal
17 into the AB's statement that the enhanced modification for due
18 process and health care settings "is based on a case-by-case
19 determination."  Second Solis Dec. Ex. A at 3.  This phrase might
20 well refer to the ADA's requirement that the CDC conduct an
21 individualized inquiry into each disabled person's particular needs
22 for assistance.  Plaintiffs do not cite any other evidence that the
23 CDC plans to defer assessment of disabled prisoners' communications
24 needs until situations requiring communication arise.  Furthermore,
25 Plaintiffs' proposed solution, that the CDC evaluate each
26 prisoner's communication needs on arrival, does not account for
27 changes in a prisoner's condition during the length of his stay.

28                                     53

Even if the CDC conducts the proposed initial evaluations, which may well be required by the ADA, it would still have to respond to unanticipated needs that arise in particular settings.

Because Plaintiffs have not established that the CDC intends to evaluate hearing-impaired prisoners' communication needs only on an as-needed basis, the Court cannot conclude that Defendants' remedial plans fail to comply with the ADA or § 504.

IX.   Inmate Assistance Programs

Plaintiffs argue that Defendants' remedial plans are inadequate because they do not provide guidelines for Inmate Assistance Programs, which might be implemented at individual CDC institutions as an accommodation for their vision-impaired inmates. Defendants note that neither Plaintiffs nor the Court may order the CDC to adopt a certain form of accommodation for its disabled inmates, so long as the CDC complies with the ADA and § 504. Defendants also argue that Plaintiffs' objections are premature.

A.   Factual Background

The Remedial Order requires Defendants to submit to Plaintiffs the CDC's "program, plan and procedures for implementation of its Disability Placement Plan," and a "general substantive outline setting forth the methods by which class members will be provided accommodations, access to programs and effective communications" at CDC institutions.  Remedial Order at 3, § A(1)(a), (d).  The Remedial Order also requires Defendants to submit specific plans in seven compliance areas, including accommodations in emergency situations, administrative segregation and Reception Centers.  Id. at 2, § A(2)(b), (c), (d).  The AB addresses all of these areas in

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1 reasonable detail.  See Second Norman Dec., Ex. N at 12-13

2 (Reception Centers); 14, 16-17 (emergency situations); 25-26

3 (administrative segregation).  The Remedial Order provides that,

4 after the CDC's general compliance plans have been litigated,

5 Defendants must submit compliance plans for individual institutions

6 that are consistent with the CDC's general plans or any Court order

7 that results from this litigation.  Remedial Order at 3, § A(4).

8 Plaintiffs cite two of these individual plans as evidence that the

9 CDC has not provided sufficient guidance for Inmate Assistance

10 Programs at individual institutions.

11      The AB bulletin requires CDC institutions to "provide

12 reasonable modifications to the known physical or mental

13 limitations of a qualified inmate/parolee with a permanent

14 disability in a manner consistent with ensuring that the safety

15 and/or security of staff, inmates/parolees, or the public is

16 maintained."  Second Norman Dec., Ex. N at 14.  It also states,

17 "DPP inmates shall be provided reasonable modifications as

18 necessary to ensure access to inmate services and activities in a

19 manner consistent with their custody and privilege group

20 designation."  Id. at 17.  The bulletin identifies vision-impaired

21 inmates as among those who must be accommodated at CDC

22 institutions.  Id. at 5.

23      The bulletin does not describe in great detail how these

24 institutions must or may accommodate vision-impaired inmates,

25 although the amount of detail is comparable to that provided for

26 means of accommodating hearing- and speech-impaired inmates.  The

27 only provisions in the bulletin specific to vision-impaired inmates

28                              55

are the following.  Vision-impaired inmates must wear yellow vests
identifying them as vision impaired when they are in the yard, and
the copies of these inmates' identifications cards must be kept in
the unit office or control booth so CDC staff can quickly identify
them and assist them in emergency situations.  Id. at 14, 17.
Notices, announcements and other printed material, including an
explanation of the institution's evacuation procedures, must be
made available in large print or Braille or through computer
assistive devices or audio tape as necessary.  Id. at 15, 16, 17.
Each institution must review paths of travel and establish
accessible controlled movement routes for use during daylight and
darkness.  Id.  To ensure effective communication between staff and
inmates during disciplinary proceedings, the institution should
provide as necessary readers, taped texts, Braille materials or
large print materials.  Id. at 16.  Corrective lenses may be
prescribed by CDC Health Services to accommodate a vision-impaired
inmate.  Id. at 21.  Most of these provisions address
accommodations for hearing- and speech-impaired inmates as well.

   B.   Analysis

     The heart of this dispute is how detailed the CDC's plans need
to be in this first phase of the remedial process.  The Court
agrees that Plaintiffs' demands for specific guidelines for Inmate
Assistance Programs are premature.  Defendants have provided a
general outline of how the CDC will accommodate vision-impaired
inmates, as required by Remedial Order section A(1)(d).  The
Remedial Order's requirement that Defendants submit specific plans
in seven compliance areas in section A(2) implies that Defendants

United States District Court
For the Northern District of California

are not required to submit specific detailed plans in other areas,
as long as they submit a "general outline" of those areas pursuant
to section A(1)(d).  The CDC is certainly free to consider
Plaintiffs' advice about such programs as it oversees individual
institutions' efforts to comply with the ADA and § 504, and perhaps
it will take the opportunity to do so.  The Court, however, cannot
compel Defendants to act on this issue now.  The Remedial Order to
which Plaintiffs consented reserves this issue for a later date.

X.    Classification System

        Plaintiffs argue that the system by which the CDC classifies
inmates as one of four levels of security risk on entry into the
prison system, and periodically reclassifies them, discriminates
against disabled inmates because it relies in part on an inmate's
work and educational history without taking into consideration
employment discrimination or physical impediments to obtaining work
or attending school.  Defendants counter that these objections are
purely speculative and are based on stereotyping.

        A.    Factual Background

        The CDC assigns a classification level to every inmate who
enters the prison system.  The classification is based on a scoring
system that adds or subtracts points based on factors that the CDC
asserts predict whether or not the inmate is a security risk.
These factors are divided into "Background Factors" and "Prior
Incarceration Behavior."  Background Factors include the length of
the inmate's prison term, whether he or she had ever attempted to
escape from prison, and five "stability" factors, including whether
the inmate is at least 26 years old, has ever been married, has a

57

United States District Court
For the Northern District of California

high school diploma, has worked for an employer for more than six
months, has been a primary caretaker of a household, or has served
in the military.  The prior incarceration factors include escape
attempts, prison discipline, and offenses committed in prison, as
well as favorable prison behavior such as a clean disciplinary
record, successful tenure in a minimum-security facility, and
"average or above performance in work, school, or vocational
programs for last incarcerated year."  After these points are
tallied, the CDC considers the resulting score as well as other
placement factors, such as medical restrictions, to determine the
inmate's classification level and placement in the prison system.
The CDC periodically reclassifies inmates based on their behavior
during their prison term, including the inmate's "performance in
work, school or vocational program."

     The CDC has the discretion to override an inmate's
classification level based on this scoring system through an
"Administrative Placement" process, whereby a correctional
counselor, classification staff representative or classification
committee assigns a different security level on consideration of
individual cases.

     B.   Analysis

     Plaintiffs argue that work and educational experience and
performance are meaningless indicators of stability or security
risk for inmates who could not pursue these activities due to
discrimination or physical inability.  First, the Court notes that
many non-disabled prisoners could claim that these factors are
discriminatory for similar reasons.  Plaintiffs' argument,

1  therefore, could seriously jeopardize the CDC's classification
2  system.   Second, Plaintiffs' argument assumes that work and
3  education factors predict security risk because they measure an
4  inmate's motivation to pursue these activities.   They may, however,
5  predict security risk because of the experience itself.   That is,
6  for whatever reason a person has held a job for six months or
7  earned a high school diploma, the experience itself may have
8  instilled self-discipline or other qualities that reduce that
9  person's security risk.   For the classification system to be
10  workable, the CDC must be able to rely on objective, easily
11  verifiable indicators of security risk.   If these factors are
12  reliable indicators, and no nondiscriminatory substitutes are
13  available, the CDC may use them even if they have discriminatory
14  impacts.   Because Plaintiffs have not established that the work
15  experience and high school diploma factors are not reliable
16  indicators of security risk or that other factors with a less
17  discriminatory impact are equally reliable, the Court rejects
18  Plaintiffs' argument that the CDC's reliance on these factors
19  violates the ADA.

20  XI.   Transition Plan

21      Plaintiffs request that the Court order Defendants to develop
22  a contingency plan in case the California legislature does not
23  appropriate the funds necessary to implement the CDC's transition
24  plan for renovating existing facilities and designing and
25  constructing new facilities to provide structurally accessible
26  housing units for disabled prisoners.   The California legislature
27  rejected the CDC's six million dollar budget request for the

28                                    59

1  transition plan in the 1997-98 fiscal year.   The CDC has requested
2  the funds through a mid-year appropriation, which Defendants
3  expected the legislature to approve or deny by February, 1998.   If
4  that request was denied, the CDC planned to request the funds once
5  again in its 1998-99 budget.   Plaintiffs requested that the Court
6  order Defendants to develop, within 30 days, a contingency plan in
7  case the funds were not appropriated and to implement this
8  contingency plan if the funds for the current plan were not
9  appropriated by February, 1998.   At the November 21, 1998 hearing,
10  the Court informed the parties that it would not grant Plaintiffs'
11  request.

12      Defendants also argued that this issue was not ripe because
13  the CDC was not prepared to start implementing the transition plan
14  for two reasons.   First, the Court held in its October 8 Order that
15  the CDC's choice of DPP-designated facilities was discriminatory
16  and that Defendants had not met their burden of justifying this
17  discriminatory choice.   Second, even if the Court at some time in
18  the near future ordered Defendants to implement their compliance
19  plans, Defendants might choose to appeal that order and seek a stay
20  and the CDC would not begin renovations in the meantime.
21  Nevertheless, Defendants noted that the CDC has in fact been
22  seeking the funds necessary to implement the program and has begun
23  the design work necessary to implement the plan.   Because of the
24  CDC's demonstrated efforts to comply with the ADA and § 504 and
25  implement its plans, Defendants argued that the Court need not be
26  concerned that the CDC is attempting to thwart implementation of
27  the plans.   Finally, Defendants claimed that the Court order

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  requested by Plaintiffs would violate the Prison Litigation Reform
2  Act and the Eleventh Amendment.

3      The Court rejected Plaintiffs' request because the issue was
4  not and still is not ripe.  The Court has held that the CDC's
5  choice of DPP facilities and its scoping policy violate the ADA and
6  § 504.  Each of these issues directly affects the CDC's renovation
7  and new construction plans.  The Court cannot order Defendants to
8  begin implementing a plan that Plaintiffs have successfully argued
9  is discriminatory.  At oral argument, Plaintiffs argued that
10 certain parts of the transition plan, such as renovation of
11 reception centers, would not be affected by these unresolved
12 issues.  If Plaintiffs move the Court to order implementation of
13 certain parts of the transition plan, the Court will consider those
14 arguments at that time.

15                                CONCLUSION

16     For the foregoing reasons, Plaintiffs' motions are granted in
17 part and denied in part.

18     Many of the issues addressed in this Order and in the Court's
19 October 8 Order require further briefing.  At the hearing on
20 November 21, 1997, the Court ordered the parties to brief, by
21 certain dates in January and February, 1998, the unresolved issues
22 remaining from the first set of contested issues.  On January 22,
23 1998, Defendants submitted additional evidence related to those
24 issues, but did not submit a brief.  On February 13, 1998,
25 Plaintiffs filed a brief in which they objected to much of the
26 evidence and argued the legal issues to which this evidence was
27 related.  On February 26, 1998, Defendants replied with a short
28                            61

United States District Court

For the Northern District of California

1  brief responding to Plaintiffs' arguments.  On February 27, 1998,
2  while the Court has had the motions addressed in this Order under
3  submission, Plaintiffs have also applied for entry of a Court order
4  requiring Defendants to comply with their remedial plans.
5  Defendants filed a brief opposing this application on March 11,
6  1998.  On February 4, 1998, Defendants also submitted a copy of a
7  California appellate decision that they claim undermines the
8  Court's ruling with respect to the geographic distribution of DPP
9  facilities.

10      Having reviewed these recent filings, the Court orders the
11  parties to take the following actions to bring all pending issues
12  to a final resolution.

13      1) In the Oct. 8 Order, the Court determined that the
14  geographic distribution of DPP facilities projected in the
15  Defendants' remedial plans violates the ADA and § 504 because it
16  denies many disabled inmates an equal opportunity to be placed in
17  institutions near their homes.  On February 4, 1998, Defendants
18  submitted a copy of In re Rhodes, 1998 WL 28124 (Cal. App. Jan. 28,
19  1998), which Defendants claim undermines the basis for the Court's
20  Oct. 8 ruling.  This opinion merely describes the factors that the
21  CDC may consider when determining where to place inmates.  It does
22  not undermine the Court's earlier conclusion that disabled inmates
23  would be denied an equal opportunity to be placed near their homes
24  as a result of the CDC's choice of DPP facilities.  See Oct. 8
25  Order at 17-18.  Because the DPP does not, therefore, comply with
26  federal law, Defendants must either justify their choice of DPP
27  facilities by way of an undue burden, fundamental alteration or
28                                    62

United States District Court
For the Northern District of California

1  legitimate penological objectives defense or revise their remedial
2  plans.  Defendants submitted evidence related to an undue burden
3  defense on January 22, 1998.  Although Defendants did not present
4  an argument justifying the defense in those papers, Plaintiffs
5  argued in their February 13, 1998 brief that Defendants had failed
6  to present evidence sufficient to justify such a defense, and
7  Defendants responded to Plaintiffs' argument in a reply brief on
8  February 26, 1998.  The Court will treat this matter as fully
9  briefed, and will take the matter under submission.

10      2) In its Oct. 8 Order, the Court ruled that the CDC's scoping
11  policy violates the ADA and § 504 unless Defendants can establish
12  that the two-percent policy is sufficient to meet the prison
13  system's needs for structurally accessible housing units.  In their
14  January 22, 1998 papers, Defendants submitted evidence related to
15  the scoping policy, but did not submit a brief arguing why this
16  evidence justified a two-percent policy.  Plaintiffs have
17  challenged the reliability of this evidence and have requested an
18  opportunity to pursue further discovery regarding the source of
19  Defendants' evidence.  The Court grants this request.  Plaintiffs
20  must submit their discovery requests to Defendants within two weeks
21  of the date of this Order, and Defendants must provide the
22  information by April 9, 1998.  By May 7, 1998, Defendants must
23  submit a brief arguing why the two-percent scoping policy meets the
24  CDC's obligations under the ADA and § 504.  Plaintiffs must respond
25  by May 21 and Defendants may reply by May 28.  The Court will
26  decide the issue on the papers.

27      3) In this Order, the Court determines that Defendants have

28                                    63

United States District Court

For the Northern District of California

1  not provided sufficient information to justify the CDC's definition
2  of an extended stay for disabled inmates at Reception Centers as a
3  stay that exceeds 90 days.  By April 9, 1998, Defendants shall
4  provide Plaintiffs with the following information: detailed
5  information about the length of Reception Center stays for all
6  inmates that will permit Plaintiffs to determine the range and
7  distribution of Reception Center stays around the 59-day average,
8  and detailed information regarding the processing requirements for
9  disabled inmates at Reception Centers.  By April 23, 1998, the
10  parties must meet and confer to attempt to reach agreement on an
11  appropriate definition for an extended stay due to an inmate's
12  disability.  If the parties are unable to reach agreement on this
13  definition, Plaintiffs may submit a brief by May 7, 1998 proposing
14  and defending a definition of an extended stay.  Defendants must
15  file an opposition by May 21, proposing an alternative definition
16  if necessary, and Plaintiffs may reply by May 28.  The Court will
17  decide the issue on the papers.

18      4) In this Order, the Court reserves judgment on whether the
19  CDC should bear the burden of verifying inmates' learning
20  disabilities.  At the November 21, 1997 hearing, Plaintiffs
21  requested the opportunity to present additional evidence regarding
22  this issue.  Plaintiff must submit this evidence to Defendants by
23  April 9, 1998 and the parties must meet and confer by April 23,
24  1998 to attempt to reach agreement on the proper role of the CDC in
25  verifying learning disabilities.  If the parties are unable to
26  reach agreement, Plaintiffs may submit a brief by May 7, 1998
27  setting forth and justifying their proposal for the CDC's role in

28                                    64

United States District Court

For the Northern District of California

1  verifying these disabilities.  Defendants shall submit an
2  opposition brief by May 21, 1998, proposing an alternative if
3  necessary, and Plaintiffs may reply by May 28, 1998.  The Court
4  will decide the issue on the papers.

5      5) If Plaintiffs continue to object to the seven-day transfer
6  policy at the Valley Reception Center, see note 1, supra, they must
7  request the relevant Department of Health regulations from
8  Defendants by March 26 and Defendants must provide this information
9  by April 9.  The parties should meet and confer by April 23 to
10  attempt to reach agreement on an appropriate transfer policy.  If
11  the parties are unable to reach agreement, Plaintiffs may submit a
12  brief by May 7, 1998 setting forth and justifying their proposal on
13  the transfer policy.  Defendants shall submit an opposition brief
14  by May 21, 1998, proposing an alternative if necessary, and
15  Plaintiffs may reply by May 28, 1998.  The Court will decide the
16  issue on the papers.

17      6) In this Order, the Court concluded that civil addicts were
18  members of Plaintiff class and that the exclusion of certain
19  disabled civil addicts from CAP because of the inaccessibility of
20  CRC and CIW violated the ADA and § 504.  In their February 13, 1998
21  filing, Plaintiffs stated that the compliance issue was not before
22  the Court and that a favorable ruling on the class membership
23  should have initiated the meet-and-confer process set forth in the
24  Remedial Order.  Because Plaintiffs raised the noncompliance issue
25  in their brief on the second set of contested issues and because
26  Defendants have raised defenses against that claim, the Court
27  addressed the noncompliance issue above.  With the Court's ruling

28                                    65

in mind, Defendants must complete a Transition Plan with respect to
civil addicts and the parties must meet and confer pursuant to the
process in the Remedial Order.  The parties should quickly agree on
a timeline to complete this process and submit that schedule to the
Court.  If possible, the timeline should provide that any briefing
on the plan will be complete by May 28, 1998, in line with the rest
of this briefing schedule.

7) Finally, in this Order and in the Oct. 8 Order, the Court
has concluded that certain other aspects of Defendants' remedial
plans fail to comply with the ADA and § 504.  These include:

a) The AB fails to explain accurately the undue burden
defense under the ADA and § 504.

b) The AB fails to describe the CDC's obligation to
maintain structural features and equipment necessary to
accommodate disabled inmates.

c) The CDC's new construction and alteration policy fails
to define the term "aligned program areas."  Plaintiffs
withdrew their objection to this language based on
Defendants' representation to the Court that the term
referred to all program areas that would be available to
prisoners without disabilities living in the area of the
prison where structurally-accessible housing units are
located.  Defendants must revise the policy to clarify
the meaning of the term.

d) The CDC's new construction and alteration policy fails
to provide that alterations must be designed to be
accessible to disabled inmates "to the maximum extent
feasible."

e) Certain disabled female inmates cannot participate in
Forever Free solely due to their disabilities and are not
provided access to an equivalent program.  Defendants
have informed the Court that the Director of the CDC has
ordered his staff to consider providing these inmates
with access to an equivalent substance abuse program, but
have not presented evidence that their remedial plans
have been revised to ensure these inmates have access to
equivalent programs.

f) Defendants' remedial plans fail to ensure that

66

United States District Court
For the Northern District of California

1    disabled inmates will not bear the burden of verifying
     their own disabilities and that the verification process
2    will not have to be repeated or the verification
     documents resubmitted every time an inmate files a
3    disability-related grievance.

4    g) The CDC's plan for accommodating disabled inmates who
     remain in Reception Centers for extended periods due
5    solely to their disabilities does not fully compensate
     these inmates for lost privileges and work credits.
6
     h) Defendants' remedial plans fail to ensure that
7    organizations that operate facilities under contract with
     the CDC comply with the ADA and § 504.
8
     i) The CDC's procedures for measuring inmates' hearing
9    impairment and determining what auxiliary aids and
     services hearing-impaired inmates need are inadequate.
10
     j) The grievance procedure for grievances related to
11   inmates' disabilities, including requests for
     accommodations, does not provide for prompt responses and
12   disabled inmates improperly bear the burden of verifying
     their disabilities.
13
14        Because the Court must be careful not to interfere unduly with

15   the CDC's administration of the State prison system, the Court has

16   refrained from ordering Defendants to take specific steps to bring

17   their remedial plans into compliance with the ADA and § 504.  Where

18   the Court has found the language of the AB inadequate to satisfy

19   the CDC's obligations under these statutes, the Court has ordered

20   Defendants to revise the language to bring their plans into

21   compliance and has not dictated particular revisions that the

22   Defendants must adopt.

23        Plaintiffs naturally are anxious to bring this process to a

24   conclusion and to obtain an enforceable order requiring Defendants

25   to comply with the ADA and § 504.  On February 27, 1998, Plaintiffs

26   asked the Court to enter an order approving Defendants' plans and

27   requiring Defendants to comply with those plans.  Plaintiffs'

28                                67

United States District Court

For the Northern District of California

1  proposed order would require Defendants to implement the AB as
2  modified by clarifications that resulted from the meet and confer
3  process and as further modified by revisions "ordered by the Court"
4  in its Oct. 8 Order.  Plaintiffs attached these latter revisions as
5  Exhibit C to its proposed order, but they do not indicate who
6  drafted these revisions.  More importantly, however, this proposed
7  order would require Defendants to comply with parts of the AB that
8  the Court concludes in this Order, in response to motions brought
9  by Plaintiffs, violate the ADA and § 504.  <u>See, e.g.</u>, Proposed
10 Order Approving Dfts' Policies, Procedures and Plans, Ex. A (the
11 AB) at 13 (adjustments due to extended Reception Center stays), 27
12 (certain disabled inmates may be excluded from CAP).  The Court,
13 therefore, declines at this time to enter an order requiring
14 Defendants to comply with the AB.

15     The Court now orders Defendants to revise their remedial plans
16 to eliminate the areas of noncompliance listed above as 7(a)
17 through 7(j).  If Defendants fail to adopt revisions that comply
18 with the ADA and § 504, Plaintiffs may file a motion challenging
19 Defendants' noncompliance.  If Plaintiffs make such a motion, they
20 should propose specific revisions that Defendants could adopt to
21 bring their plans into compliance.  The Court will order Defendants
22 to adopt a particular revision in response to these briefs.  Once
23 the AB has been revised, the Court will order Defendants to comply
24 with the AB.

25     If Defendants intend to assert an undue burden, fundamental
26 alteration, or legitimate penological objectives defense to any of
27 these areas of noncompliance or any other aspect of their plans

28                                 68

that allegedly fails to comply with the ADA or § 504, they must assert and justify those defenses in briefing by May 7, 1998, or those defenses will be deemed waived.  Plaintiffs must oppose these arguments by May 21, 1998, and Defendants may reply by May 28. Even if Defendants assert such defenses, they must nevertheless propose revisions that, in the event their defenses fail, will bring their plans into compliance with the ADA and § 504, so as to avoid further delay in bringing this case to a resolution.

Dated: MAR 20 1998

CLAUDIA WILKEN
United States District Judge

Copies mailed to counsel
as noted on the following page

United States District Court
For the Northern District of California

Donald  Specter
Prison Law Office
General Delivery
San Quentin,CA 94964   [94cv2307 ]

Elaine  Feingold
Disability Rights Education & Defense
2212 Sixth Street
Berkeley,CA 94710   [94cv2307 ]

Eve H. Shapiro
Howard Rice Nemerovski Canady Falk & Rab
Three Embarcadero Ctr 7th Flr
San Francisco,CA 94111   [94cv2307 ]

George D. Prince
CA State Atty General's Office
50 Fremont St Ste 300
San Francisco,CA 94105   [94cv2307 ]

Mary Beth Uitti
U.S. Attorney's Office
450 Golden Gate Avenue Rm 115
San Francisco,CA 94102   [94cv2307 ]

Michael W. Bien
Rosen Bien & Asaro
155 Montgomery St 8th Flr
San Francisco,CA 94104   [94cv2307 ]

Morris  Lenk
CA State Atty General's Office
x
50 Fremont St Ste 300
San Francisco,CA 94105   [94cv2307 ]

Sara Linda Norman
Prison Law Office

General Delivery
San Quentin,CA 94964   [94cv2307 ]

Sharon N. Perley
USDJ - Disability Rights Section
P.O. Box 66738
Washington,DC 20035   [94cv2307 ]

Warren E. George
McCutchen Doyle Brown & Enersen LLP
Three Embarcadero Ctr
San Francisco,CA 94111   [94cv2307 ]