FILED

SEP 16 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

318

99

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, JAMES AMAURIC,
RICHARD PONCIANO, JACK SWENSEN, BILLY
BECK, JUDY FENDT, WALTER FRATUS,
GREGORY SANDOVAL, DARLENE MADISON,
PETER RICHARDSON, STEVEN HILL,
ROY ZATTIERO, and all others
similarly situated,

        Plaintiffs,

  v.

PETE WILSON, JOSEPH C. SANDOVAL,
JAMES GOMEZ, Director, Department of
Corrections, KYLE MCKINSEY, KEVIN
CARRUTH, DAVID TRISTAN, MARISELA
MONTES, Deputy Director of the Parole
and Community Services Division,

        Defendants.

------------------------

UNITED STATES OF AMERICA,

        Amicus Curiae

_____/

No. C 94-02307 CW

ORDER RESOLVING
OUTSTANDING
ISSUES

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1

BACKGROUND

2       Plaintiffs are a class of disabled prisoners and parolees

3  under the supervision of the California Department of Corrections

4  (CDC) with mobility, sight, hearing, learning and kidney

5  disabilities.   They claim that Defendants have violated the

6  Americans with Disabilities Act (ADA) and Section 504 of the

7  Rehabilitation Act of 1973 (§ 504) by discriminating against them

8  due to their disabilities and by failing to accommodate their

9  disabilities.

10       On July 9, 1996, the Court approved stipulated procedures for

11  determining Defendants'[1] liability and devising an appropriate

12  remedy in this case.   Stip. and Order for Proced. to Deter.

13  Liability and Remedy, filed July 9, 1996 (Stipulated Procedures).

14  Pursuant to these procedures, the parties submitted a statement of

15  stipulated facts to be used only for purposes of deciding

16  Defendants' liability.   Id. at ¶ 4, Ex. A (Statement of Stipulated

17  Facts).   Defendants filed a motion for summary judgment on the

18  ground that the ADA and § 504 do not apply to CDC programs, and

19  that the CDC is immune from liability based on the Eleventh

20  Amendment to the Constitution.   On September 20, 1996, the Court

21  granted summary judgment on these issues in favor of Plaintiffs,

22  and the Ninth Circuit affirmed that ruling on August 27, 1997.   See

23

24       [1]Defendant James Nielsen, Chairman of the Board of Prison
Terms, did not join the stipulation that led to the remedial
25  process at issue in this Order.   See Stipulation for Procedures to
Determine Liability and Remedy, filed July 9, 1996, at 2.   In the
present Order, "Defendants" refers to all Defendants except
26  Mr. Nielsen.   References to "Defendants" in the Court's Oct. 8
Order, see Oct. 8 Order at 2, and its March 20 Order also referred
27  to all Defendants except Mr. Nielsen.

28                                  2

1 | <u>Armstrong v. Wilson</u>, 124 F.3d 1019 (9th Cir. 1997), <u>cert. denied</u>,
2 | 66 U.S.L.W. 3308 (U.S. 1998); <u>see also</u> <u>Pennsylvania Dept. of</u>
3 | <u>Corrections v. Yeskey</u>, 98 Daily Journal D.A.R. 6224 (U.S.
4 | 1998)(holding that plain text of ADA unambiguously applies to State
5 | prison inmates).

6 |     Pursuant to the Stipulated Procedures, the Court entered a
7 | stipulated Remedial Order and Injunction on September 20, 1996 and
8 | the parties engaged in the remedial process while the case was
9 | pending on appeal.  Stipulated Procedures at ¶¶ 6-7; Remedial
10 | Order, Inj. & Certif. of Interlocutory Appeal, filed Sept. 20, 1996
11 | (Remedial Order).  The Remedial Order, which was drafted by the
12 | parties and approved by the Court, included the following
13 | statement:  "The Court finds that this Remedial Order is narrowly
14 | drawn, extends no further than necessary to correct the violation
15 | of the rights at issue and is the least intrusive means necessary
16 | to correct the violation of the rights."  Remedial Order at 1-2.

17 |     Pursuant to the Remedial Order, Defendants drafted plans to
18 | bring the prison system into compliance with the ADA and § 504.
19 | <u>See</u> Remedial Order § A(1), (2).  The CDC refers to these plans as
20 | the Disabled Placement Program (DPP), which was initially set forth
21 | in Administrative Bulletin 96/23 (the AB).  Plaintiffs then filed
22 | written objections to various aspects of those plans and the
23 | parties met and conferred to try to resolve their disputes
24 | regarding the plans.  <u>Id.</u> at § A(3).  The parties were unable to
25 | resolve a number of disputes.  Pursuant to the Remedial Order,
26 | Plaintiffs requested judicial review of these issues.  <u>Id.</u> at
27 | § A(3), § C.  The Remedial Order provides that the Court's review

28 |

3

United States District Court

For the Northern District of California

1  of Defendants' remedial plans is

> 2  limited to determining whether they comply with the [ADA] and
> 3  [§ 504].  If the Court finds that any aspect of [Defendants'
>    remedial plans] do not comply with the ADA or § 504, it may
> 4  order defendants to make appropriate modifications to their
>    [remedial plans], provided that those orders shall be limited
> 5  to ensuring that the [remedial plans] comply with the ADA and
>    § 504 and are otherwise proper under existing law.

6  Id. at § C.  Plaintiffs identified three sets of unresolved issues.

7  The Court addressed the first set of contested issues in the Order

8  Granting in Part and Denying in Part Plaintiffs' Motion to Require

9  Defendants to Modify Their Remedial Plans (First Set of Contested

10  Issues) (Oct. 8 Order) and addressed the second and third sets of

11  contested issues in the Order Granting in Part and Denying in Part

12  Plaintiffs' Motions to Require Defendants to Modify Their Remedial

13  Plans (Second and Third Sets of Contested Issues and Transition

14  Plan), filed March 20, 1998 (March 20 Order).  In the March 20

15  Order, the Court identified all outstanding issues that required

16  further briefing, and the Court addresses all of those issues in

17  this order, as described further below.

18     The Remedial Order provides that those aspects of Defendants'

19  plans to which Plaintiffs did not object shall be incorporated into

20  a stipulation and proposed order as set forth in Appendix D of the

21  Remedial Order.  Id.  This order contains the following language:

> 22  The parties . . . agree and hereby stipulate that the proposed
>     [plans, policies, procedures and/or evaluations] that are
> 23  attached hereto as Exhibit 1 are consistent with the standards
>     set forth in § D of the Remedial Order (Standards for Judicial
> 24  Review) and will be implemented by defendants.

> 25  The parties agree and request that the Court find that the
>     proposed [plans, policies, procedures and/or evaluations] that
> 26  are attached hereto as Exhibit 1 are narrowly drawn, extend no
>     further than necessary to correct the violation of the rights
> 27  at issue and are the least intrusive means necessary to

28                                    4

1    correct the violation of the rights.

2    Defendants may move to modify the order based on a need to
     change a policy or procedure.  The Court shall grant
3    defendants' motion if the proposed modification complies with
     the ADA and § 504.  Prior to making such a motion, defendants
4    must notify plaintiffs of a proposed change and provide them
     with the information necessary to evaluate such modification.

5
         In this Order, the Court decides all outstanding issues from
6
     the three sets of contested issues that have been presented to the
7
     Court and takes the preliminary steps toward issuing an order
8
     requiring Defendants to comply with their remedial plans.  In its
9
     March 20 Order, the Court set a discovery, meet-and-confer and
10
     briefing schedule on several unresolved issues in the remedial
11
     phase of this case.  Those issues are addressed below in Sections
12
     II through XII of this order.[2]  Defendants have asserted undue
13
     burden or fundamental alteration defenses to many of the
14
     accommodations requested by Plaintiffs.  The Court discusses the
15
     standard for the Court's review of these defenses in Section I, and
16
     addresses Defendants' arguments with respect to specific policies
17
     in the discussions of those policies in Sections II through XII.
18
     Defendants have also defended some of their policies based on
19
     penological objectives.  The Court addresses these arguments when
20

21        [2]See Section II (geographic distribution; March 20 Order at
     62-63 (#1)); Section III (scoping policy; March 20 Order at 63
22   (#2)); Section IV (verification of disabilities and grievance
     procedure; March 20 Order at 64-65 (#4), 66-67 (#7f, 7i, 7j));
23   Section V (extended Reception Center stays; March 20 Order at 63-64
     (#3), 67 (#7g)); Section VI (other Reception Center issues;
24   March 20 Order at 65 (#5)); Section VII (substance abuse programs;
     March 20 Order at 65-66 (#6), 66 (#7e)); Section VIII (undue burden
25   defense description; March 20 Order at 66 (#7a)); Section IX
     (maintenance obligation description; March 20 Order at 66 (#7b));
26   Section X (aligned program areas; March 20 Order at 66 (#7c));
     Section XI (alteration policy; March 20 Order at 66 (#7d)); Section
27   XII (organizations under contract; March 20 Order at 67 (#7h)).

28                                    5

United States District Court

For the Northern District of California

1  applicable in Sections II through XII.  In their brief filed May 7,
2  1998, Plaintiffs raised a contested issue that the parties had
3  agreed would not be presented to the Court pending discovery and
4  thus was not listed in the March 20 Order briefing schedule.  The
5  Court addresses this issue in Section VI(B).  In this brief,
6  Plaintiffs also moved for an order directing Defendants to
7  implement and comply with the plan that has resulted from the
8  remedial phase of this case.  The Court addresses this motion in
9  Section XIII.

10                               DISCUSSION

11  I.    Undue Burden/Fundamental Alteration Defense

12        The parties debate two issues that apply to all of Defendants'
13  undue burden and fundamental alteration defenses.  First,
14  Defendants argue that once a State agency complies with the
15  procedural requirements for asserting these defenses, the Court
16  must defer to the agency's judgment and conclude that the defenses
17  have been established.  Second, Plaintiffs argue that the undue
18  burden defense only applies to modifications required for program
19  access and does not apply to "policies," and thus is inapplicable
20  to certain aspects of Defendants' remedial plans.  The Court finds
21  neither of these arguments persuasive.

22        A.    Procedural Requirements and Standard of Review

23        As the Court noted in its Oct. 8 Order, an agency asserting an
24  undue burden or fundamental alteration defense bears the burden of
25  proving that accommodations for disabled inmates would impose undue
26  financial or administrative burdens on the agency, or would result
27  in a fundamental alteration of the affected program.  Oct. 8 Order

28                                    6

United States District Court

For the Northern District of California

1   at 9; 28 C.F.R. § 35.150(a)(3).  These regulations require an
2   agency to follow certain procedures when invoking these defenses:
3   the head of the agency or his or her designee must determine,
4   "after considering all resources available for use in the funding
5   and operation of the service, program, or activity," whether the
6   accommodations impose an undue burden or fundamentally alter the
7   program, and must explain the decision in a written statement.  Id.
8   If the agency finds that the accommodation would impose undue
9   burdens or fundamental alterations, it still must take any other
10  action that would not result in those burdens or alterations, but
11  would nevertheless ensure that disabled persons receive the
12  benefits or services of the agency.  Id.

13       Defendants have submitted two statements by the Director of
14  the CDC, C.A. Terhune, asserting that many of the accommodations
15  requested by Plaintiffs would impose undue financial or
16  administrative burdens on the prison system, or would fundamentally
17  alter the services, programs or activities provided by the prison
18  system.  This statement primarily consists of conclusory
19  assertions, with no supporting reasons or evidence.  For example,
20  with respect to the CDC's policies for evaluating learning
21  disabilities, Mr. Terhune states,

22           It is my conclusion that the CDC's policies and practices set
             forth an appropriate approach to evaluating and accommodating
23           inmates with learning disabilities.  It is my further
             conclusion that to impose additional mandates, standards or
24           guidelines to evaluate or accommodate inmates with learning
             disabilities would impose undue financial and administrative
25           burdens on the CDC.

26  Decl. of James M. Humes, filed May 5, 1998 (May 5 Humes Decl.)
27  Ex. A at 2.

28                                   7

1    Defendants urge the Court to defer to Mr. Terhune's judgment
2  on these matters.  The Court recognizes that Mr. Terhune has
3  expertise in prison matters that the Court does not share.  For
4  this reason, the Court defers to plausible arguments that
5  Plaintiffs' requested modifications would fundamentally alter
6  prison policy or services or that they would interfere with
7  legitimate penological objectives.  Budgetary issues are less
8  dependent on specialized expertise in prison affairs, but the Court
9  gives weight to Mr. Terhune's judgment regarding the competing
10  demands on the State's and the CDC's resources.

11    The Court cannot, however, simply adopt Mr. Terhune's
12  conclusions.  The Ninth Circuit has held that a district court
13  would be abdicating its responsibilities if it accepted an undue
14  burden or fundamental alteration defense based only on the fact
15  that the public entity had "thoughtfully and carefully considered
16  the policies at issue," as Defendants urge.  See Defs' Reply to
17  Opp'n to Defs' Br. in Supp. of Two Percent Scoping and Other
18  Matters, filed May 28, 1998, at 8.  In Crowder v. Kitagawa, 81 F.3d
19  1480 (9th Cir. 1996), the State legislature had thoroughly
20  considered and debated the plaintiffs' proposed alterations to the
21  State's quarantine program to accommodate visually impaired
22  travelers with seeing eye dogs, and had rejected them.  Id. at
23  1485.  The district court "concluded it could not assess the
24  reasonableness of the plaintiffs' proposed modifications in light
25  of the legislature's own consideration of the issue."  Id.  The
26  Ninth Circuit, however, reversed and remanded to the district court
27  for reconsideration of this defense:

28                                      8

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

> [I]n virtually all controversies involving the ADA and state
> policies that discriminate against disabled persons, courts
> will be faced with legislative (or executive agency)
> deliberation over relevant statutes, rules and regulations.
> The court's obligation under the ADA and accompanying
> regulations is to ensure that the decision reached by the
> state authority is appropriate under the law and in light of
> proposed alternatives.  Otherwise, any state could adopt
> requirements imposing unreasonable obstacles to the disabled,
> and when haled into court could evade the antidiscrimination
> mandate of the ADA merely by explaining that the state
> authority considered possible modifications and rejected them.
>         . . . [I]t is incumbent upon the courts to insure that
> the mandate of federal law is achieved.

Id.  Thus, the Ninth Circuit has expressly authorized district

courts to review States' defenses to ADA requirements.

Defendants rely on three inapposite cases in support of their

argument that the Court should give absolute deference to

Mr. Terhune's conclusions.  First, they cite Sandin v. Conner, 115

S. Ct. 2293 (1995).  In Sandin, the Court restricted the scope of

cognizable liberty interests created by prison regulations that

could give rise to a procedural due process claim.  Plaintiffs have

not raised procedural due process claims in this case.  Second,

Defendants cite Turner v. Safley, 482 U.S. 78 (1987).  As the Court

explained in its Oct. 8 Order at 14-15, Turner requires courts to

defer to a State's judgment that a proposed accommodation would

interfere with legitimate penological interests.  Although cost is

part of the Turner analysis, cost alone is not a penological

interest that would invoke the Turner analysis.  Finally,

Defendants cite Hoptowit v. Ray, 682 F.2d 1237 (9th Cir. 1982).

This case describes a deferential standard of review for Eighth

Amendment claims brought by State prisoners, based on "the

limitations of federalism and the narrowness of the Eighth

9

United States District Court

For the Northern District of California

1 Amendment." <u>Id.</u> at 1246.  Plaintiffs here have not raised Eighth

2 Amendment claims.  <u>See, e.g.</u>, Oct. 8 Order at 17.  Therefore, none

3 of the cases cited by Defendants call for a more deferential

4 standard than that described in <u>Crowder</u>.

5     Although Mr. Terhune's statement is a necessary element of

6 Defendants' undue burden or fundamental alteration defenses, it is

7 not sufficient to establish these defenses.  The Court must assess

8 whether the State has made its case that the policies or

9 accommodations sought by Plaintiffs and otherwise required by the

10 ADA or § 504 impose an undue burden on the State agency or require

11 a fundamental alteration in the program or service affected.

12     B.   Policies versus Programs

13     Plaintiffs argue that ADA regulations do not recognize an

14 undue burden defense for certain aspects of Defendants' remedial

15 plans.  Plaintiffs claim that the undue burden defense is

16 applicable only to modifications required for program access and

17 not to modifications of "policies."  They rely on a difference in

18 the phrasing of two regulations that bar discrimination in State

19 and local government services.  The first regulation, which appears

20 in Subpart B, "General Requirements," provides, "A public entity

21 shall make reasonable modifications in policies, practices, or

22 procedures when the modifications are necessary to avoid

23 discrimination on the basis of disability, unless the public entity

24 can demonstrate that making the modifications would <u>fundamentally</u>

25 <u>alter</u> the nature of the service, program, or activity."  28 C.F.R.

26 § 35.150(b)(7)(emphasis added).  The second regulation, which

27 appears in Subpart D, "Program Accessibility," provides,

28 10

United States District Court
For the Northern District of California

A public entity shall operate each service, program, or
activity so that the service, program, or activity, when
viewed in its entirety, is readily accessible to and usable by
individuals with disabilities.  This paragraph does not . . .
[r]equire a public entity to take any action that it can
demonstrate would result in a <u>fundamental alteration</u> in the
nature of a service, program, or activity <u>or</u> in <u>undue
financial and administrative burdens</u>.

28 C.F.R. § 35.150(a)(3)(emphasis added).

Plaintiffs read too much into the difference in phrasing in
these two regulations.  First, the Section-by-Section Analysis
appended to the regulations in Appendix A does not draw the
distinction that Plaintiffs ask the Court to recognize.  <u>See</u> 28
C.F.R. Part 35, App. A (segments addressing § 35.130(b)(7) and
§ 35.150(a)(3)).  Second, there is no principled way of determining
which of the two regulations should apply to Defendants' plans.
The first regulation refers to "policies, practices, or procedures"
related to a "service, program, or activity," whereas the second
regulation refers to the manner in which a State or local agency
operates a "service, program, or activity."  Because these two
phrases are essentially equivalent, any attempt to distinguish
between the applicability of the regulations would be arbitrary.
Third, Plaintiffs do not explain how they distinguished between the
proposals they claim are not subject to an undue burden defense and
those that they concede are subject to such a defense.  They argue
that the undue burden defense does not apply to Plaintiffs'
proposals for measuring hearing impairments, verifying learning
disabilities, or accommodating extended Reception Center stays, and
that it does apply to their proposals regarding scoping policy and
the CDC's policy regarding alterations of existing facilities.

11

United States District Court

For the Northern District of California

Plaintiffs seem to be drawing a distinction between those parts of
Defendants' remedial plans that require structural modifications of
CDC facilities and those that do not.  The regulations, however, do
not support this distinction.  The second regulation, under the
heading "Program Accessibility," expressly provides that a public
entity "is not required to make structural changes in existing
facilities where other methods are effective in achieving
compliance with this section." 28 C.F.R. § 35.150(b).  Therefore,
the second regulation, as well as the first, encompasses
modifications that do not require structural modifications.

The Court, therefore, concludes that ADA regulations do not
preclude Defendants from raising an undue burden defense to
portions of their remedial plans that may be characterized as
"policies."

II.  Geographic Distribution of DPP Facilities

The Remedial Order entered in this case, which was based on a
stipulation between the parties, provides, "As a component of the
DPP, CDC will cluster class members with certain disabilities at
designated institutions and parole facilities." Remedial Order,
Injunction, and Certification of Interlocutory Appeal Pursuant to
28 U.S.C. § 1292(b), filed September 20, 1996 (Remedial Order), at
2.  The CDC has designated ten prisons as facilities to house
disabled inmates:  Avenal State Prison (Avenal), California
Institution for Men (CIM), California Medical Facility (CMF),
California State Prison, Corcoran (Corcoran), Central California
Women's Facility (CCWF), High Desert State Prison (HDSP), Salinas
Valley State Prison (SVSP), Valley State Prison for Women (VSPW),

12

United States District Court
For the Northern District of California

Corcoran II State Prison (Corcoran II), Pleasant Valley State
Prison (PVSP).  The CDC has also designated three Community
Correctional Reentry Centers (CCRCs) to handle disabled parolees.
Defendants refer to these institutions as DPP facilities or DPP-
designated facilities.

In the October 8 Order, the Court ruled that Defendants'
choice of DPP facilities violates the ADA and § 504 because it
denies certain groups of disabled prisoners, solely on the basis of
their disability, the opportunity to be incarcerated near their
homes, an opportunity that is to some extent protected by State
law.  Oct. 8 Order at 32.  The Court reaffirmed this ruling in the
March 20 Order at 32-33.

Plaintiffs have identified three groups of prisoners who will
be adversely affected by Defendants' choice of DPP facilities and
have asked the Court to order Defendants to designate additional
facilities to serve these prisoners.  First, there are no DPP
facilities for female prisoners in Southern California.  Plaintiffs
ask the Court to order Defendants to designate California
Institution for Women (CIW) a DPP facility.  Second, there are no
DPP facilities for male prisoners classified at security levels II,
III or IV in Southern California.  Plaintiffs argue that Defendants
should be required to designate California Correctional Institution
(CCI), California State Prison -- Los Angeles County (Lancaster),
and Richard J. Donovan Correctional Facility (RJD) as DPP
facilities.  Finally, there is no designated CCRC to handle
disabled parolees in Region IV.  Plaintiffs request that at least
one CCRC in this region be designated a DPP facility.

13

United States District Court

For the Northern District of California

1   Defendants raise two arguments in opposition to Plaintiffs'
2   requests.  First, they challenge the Court's previous finding that
3   their choice of DPP facilities violates the ADA because it denies
4   certain groups of inmates an equal opportunity to be placed near
5   their homes.  Second, they argue that adding additional DPP
6   facilities will impose an undue financial burden on the CDC.  The
7   Court rejects each of these arguments and orders Defendants to
8   modify the facilities listed above to accommodate disabled
9   prisoners.

10      A.   Average Distances

11   Defendants present evidence that DPP inmates will be placed an
12   average of 252.7 miles from Los Angeles, and that non-DPP inmates
13   will be placed an average of 258.4 miles from Los Angeles.  Because
14   these averages are substantially equal, Defendants argue, the CDC's
15   choice of DPP facilities is not discriminatory.

16   This argument fails for two reasons.  First, Defendants could
17   have raised this argument when the Court first decided the issue of
18   whether the geographic distribution of DPP facilities was
19   discriminatory.  Second, the Court concludes that average distance
20   is not the relevant measure.  Defendants' approach of evaluating
21   the effect of their plans on disabled inmates on a collective
22   rather than an individual basis is reasonable.  Because the parties
23   have agreed to a clustering model, it is inevitable that disabled
24   inmates as a group will have fewer placement options than non-
25   disabled inmates, and thus that some disabled inmates will have a
26   diminished opportunity to be placed near their homes due solely to
27   their disabilities.  On the other hand, Plaintiffs did not agree

28                          14

United States District Court

For the Northern District of California

1  that Defendants could designate DPP facilities in a manner that

2  seriously compromises disabled inmates' rights under the ADA and

3  § 504.   Ultimately, the Court must apply a balancing test,

4  permitting Defendants to cluster disabled inmates as provided for

5  in the Remedial Order, while prohibiting discriminatory treatment

6  of those inmates to the greatest extent possible consistent with

7  the clustering model.

8      As noted above, Defendants argue that their plans do not

9  discriminate against disabled prisoners from southern California

10  because their placements will be the same average distance from Los

11  Angeles as the placements for nondisabled prisoners.   The averages

12  are roughly equal primarily because the facility located farthest

13  from Los Angeles, Pelican Bay State Prison, is not a DPP facility.

14  The purpose of the California statute that requires the CDC, when

15  reasonable, to place a prisoner near his or her home is to promote

16  the maintenance of family ties and the development of familial

17  relationships in aid of rehabilitation.   Cal. Penal Code § 5068,

18  Historical and Statutory Notes (West)(citing § 1 of Stats. 1989, c.

19  1061).   Placements within fifty miles of the prisoner's home are

20  much more likely to foster this purpose than placements 250 miles

21  or greater from the home.   Family members ordinarily would be able

22  to make many more visits if the prison is within one hour's

23  traveling distance than if it takes five hours or more to reach the

24  prison.   Indeed, one would expect the difference in family contact

25  for a prisoner placed fifty miles from home and a prisoner placed

26  250 miles or more from home to be much greater than the difference

27  in contact for a prisoner 250 miles from home and 500 miles from

28                              15

United States District Court

For the Northern District of California

home.  Given the time and expense involved in traveling 250 miles or greater, the number of family visits ordinarily would be quite limited.  Therefore, average distance is not a fair comparison.  If the only possible placements for disabled prisoners are 250 miles away from home, but nondisabled prisoners have an equal chance of being placed in their home community or 500 miles away, the average distance of the placements will be the same, but the nondisabled prisoners have a 50% chance of being placed in a location where they realistically could receive regular family visits, whereas the disabled prisoners would not.  Therefore, the Court rejects Defendants' argument that the CDC's choice of DPP facilities is not discriminatory because the average distance of DPP and non-DPP placements from Los Angeles is roughly equal.

    B.    Undue Financial Burden

        Defendants also raise an undue burden defense, based on a statement by CDC Director C.A. Terhune justifying Defendants' choice of DPP facilities.  See Defs' Add'l Info. Pursuant to Order of Oct. 8, 1997, filed January 22, 1998, Att. 1.  Mr. Terhune states that, based on information presented in the first and fifth declarations by Arlene Solis, the CDC Coordinator for Title II of the ADA, he concluded that designating additional DPP facilities would not be justified on a cost/benefit analysis.  Id. at 1.  He notes that the ten designated DPP facilities provide more than enough placements for disabled inmates.  He also claims that the CDC has insufficient funds in its current budget to renovate additional prisons:

        Even if the benefits of adding DPP placements in the south

16

1       warranted the high costs, which in my view they do not,
2       sufficient funds are unavailable from the current year's
      budget to fund additional DPP placements in southern prisons.
3       . . . [However,] I have directed my staff to consider the
      appropriateness of adding additional southern placements when
      and if the CDC is given authorization to construct a new
4       southern prison.

5  Id.

6         1.    The Undue Burden Standard

7       Mr. Terhune's argument that the modifications are not

8  justified on a cost/benefit analysis, because the CDC already has

9  sufficient DPP placements for its disabled population, fails

10  because it does not take into account the intended benefit of

11  designating additional DPP facilities in the south.  The point of

12  this requested modification is not to increase the total number of

13  DPP placements, but rather to permit more disabled prisoners to be

14  placed near their homes.

15       Mr. Terhune's second argument is that, based on current

16  appropriations, the CDC does not have the funds to pay for these

17  modifications.  Mr. Terhune's statement refers to funds in "the

18  current year's budget."  Ms. Solis' declarations also state that

19  the CDC cannot pay for structural modifications at additional DPP

20  facilities from currently-appropriated funds.  She explains that

21  the agency has little flexibility in how it may spend funds

22  appropriated for capital projects.  Fifth Solis Decl. at ¶ 31-36.

23  Current appropriations for capital projects, however, are an

24  inappropriate measure of the resources that are available for use

25  in funding the prison system's DPP.  First, the DPP is a long-term

26  plan to accommodate disabled prisoners, which has been and will

27  continue to be implemented over a several-year period.  Funds to

28

                  17

United States District Court

For the Northern District of California

implement the DPP, therefore, need not necessarily come from current appropriations.  Second, the legislature appropriates funds for capital projects only if the agency requests them.  If the CDC has never requested funds to make additional facilities accessible, the legislature would not have appropriated such funds.  Third, the State legislature may not exempt the prison system from its obligations under federal law by refusing to appropriate the funds necessary to comply with these laws.  If the Court finds that Defendants must designate additional prisons DPP facilities, and Defendants do not establish that this would impose an undue burden on the agency, the CDC will have to request and the State legislature will have to appropriate funds to make those prisons accessible.  Therefore, the Court concludes that the available resources for funding the services, programs and activities of the prison system that must be made accessible to disabled inmates are not necessarily limited to current appropriations for capital projects or for other purposes.

ADA regulations require agency heads to consider "all resources available for use in the funding and operation of the service, program or activity" when deciding whether a requested accommodation would impose an undue burden on the agency.  28 C.F.R. § 35.150(a)(3).  ADA guidelines for the Department of Justice illustrate what constitutes an undue financial burden for a large governmental agency:  "because of the extensive resources and capabilities that could properly be drawn upon for section 504 purposes by a large Federal agency like the Department of Justice, the Department explicitly acknowledges that, in most cases, making

18

United States District Court

For the Northern District of California

1  a Department program accessible will likely not result in undue

2  burdens."  28 C.F.R. Part 39, Editorial Note (segment addressing

3  § 39.150).  Although the department's "entire budget is an

4  inappropriate touchstone" for evaluating financial and

5  administrative burdens, because many parts of the budget are

6  earmarked for specific purposes, the Note observes again that

7  "[t]here are extensive resources available to the Department and it

8  is expected that the Department will, only on very rare occasions,

9  be faced with 'undue burdens' in meeting the program accessibility

10  or communications sections of the regulation."  Id.; see also, 28

11  C.F.R. Part 35, Appendix A (segment relating to § 35.150)("the

12  program access requirement of title II should enable individuals

13  with disabilities to participate in and benefit from the services,

14  programs, or activities of public entities in all but the most

15  unusual cases."); Oct. 8 Order at 13-14 (explaining why Parts 35

16  and 39 should be interpreted consistently).  See also L.C. by

17  Zimring v. Omstead, 138 F.3d 893 (11th Cir. 1998)("Unless the State

18  can prove that requiring it to make these additional expenditures

19  would be so unreasonable given the demands of the State's mental

20  health budget that it would fundamentally alter the service it

21  provides, the ADA requires the State to make these additional

22  expenditures.").

23      The Court concludes, therefore, that the CDC's "available

24  resources" are that portion of the State budget that may be made

25  available for these purposes, in light of all of the competing

26  demands on the State budget.

27          2.   Application

28
19

United States District Court

For the Northern District of California

1    Defendants have provided detailed information regarding the

2  costs of Plaintiffs' proposed modifications, broken down by

3  institution and by particular disabilities that might be

4  accommodated.  Defendants provided supplemental information on the

5  Court's request, and Plaintiffs have had the opportunity to conduct

6  discovery and challenge the accuracy of these figures.  Plaintiffs

7  have informed the Court that they do not contest the accuracy of

8  Defendants' latest figures and the Court sees no reason to question

9  them.

10    Defendants report that the cost of modifying all of the

11  additional institutions that Plaintiffs seek to be added as DPP

12  facilities would total approximately $11.5 million and would add a

13  total of 272 additional DPP placements.  Decl. of James M. Humes in

14  Supp. of Defs' Submission of Add'l Info. Pursuant to Order of

15  June 18, 1998, filed July 7, 1998 (July 7 Humes Decl.), Ex. A.  By

16  way of contrast, Defendants estimate the cost of renovating

17  currently-designated DPP facilities, which will provide 2,118

18  placements, at approximately $5.4 million.  Id.  The average cost

19  per DPP placement of renovating Plaintiffs' proposed additional

20  facilities to accommodate all disabilities is $51,017; for

21  currently designated DPP facilities, the average cost is $3,940.

22  Id.  The reason for these differences in costs and number of

23  placements appears to be that prison facilities in the southern

24  part of the State are generally older and smaller than the

25  institutions in the central part of the State, where most of the

26  DPP facilities are located.  See Decl. of Arlene Solis, filed

27  August 25, 1997 (First Solis Decl.) Ex. B; Decl. of Sara Norman,

28                                    20

United States District Court

For the Northern District of California

1  filed September 12, 1997, Ex. B.  Because the institutions are
2  older, more renovations are required and those renovations are more
3  costly.  Because the institutions are smaller, renovations produce
4  fewer placements per dollar.

5     Two-thirds of California prisoners come from southern
6  California.  Decl. of Sara Norman, filed July 15, 1997 (July 1997
7  Norman Decl.), Ex. C.  More than half of these come from Los
8  Angeles County.  Id.  About one-third of all prisoners are housed
9  in southern California.  See Sept. 12 Norman Decl. at Ex. B;
10 Sept. 26 Norman Decl. Ex. B.[3]  According to Defendants' remedial
11 plans, however, fewer than ten percent of all disabled inmates
12 would be placed in southern institutions.[4]  The additional
13 placements requested by Plaintiffs would triple the number of DPP
14 placements in the south and increase the percentage of DPP
15 placements in the south to about twenty percent.  Defendants'
16 current plans provide no DPP placements in Southern California for
17 women prisoners, or male prisoners at security levels II, III and
18 IV.  The two DPP facilities for women are 250 miles north of Los
19 Angeles.  Decl. of Sara Norman, filed Feb. 13, 1998 (Feb. 13 Norman
20 Decl.), ¶ 8.  Plaintiffs suggest designating CIW, which is about
21 fifty miles southeast of Los Angeles, as an additional DPP

22

23    [3]The Court arrived at this figure by totaling the number of
24 male felons housed at each institution in Southern California, as
   far north as the North Kern State Prison, and comparing this number
25 to the total number of male felons in the prison system.

26    [4]The only southern DPP institution is CIM, which has 134 DPP
   placements, excluding Reception Center placements.  See Fifth Solis
27 Decl. Ex. G.  The total number of DPP placements, excluding female
   and Reception Center placements, is 2,034.

28                              21

1  facility.  Id.  The closest DPP facilities for Level II, III and IV

2  men are each about 200 miles north of Los Angeles.  Fifth Solis

3  Decl. at ¶ 50.  Plaintiffs propose designating CCI, which is about

4  120 miles north of Los Angeles, as an additional Level II facility;

5  Lancaster, which is about seventy miles north of Los Angeles, as an

6  additional Level IV facility; and RJD, which is near San Diego,

7  about 140 miles south of Los Angeles, as an additional Level III

8  facility.

9      The Court finds that designating additional southern DPP

10  placements will confer a significant benefit on disabled prisoners.

11  Adding these institutions to the DPP will triple the number of DPP

12  placements in the south, thus substantially increasing the chances

13  that disabled inmates from this region of the State will be placed

14  near their homes.  The difference between being placed in a prison

15  one to two hours from home and being placed in a prison four to

16  five hours from home may be the difference between being able to

17  maintain family ties and not being able to do so.

18      The Court also finds that the cost of adding these placements

19  will not impose an undue financial burden on the CDC.  The CDC's

20  operating budget for fiscal year 1996-1997 was $3.6 billion, which

21  was eight percent of the State budget.  Decl. of Sara Norman in

22  Supp. of Plfs' Reply, filed Sept. 12, 1997 (Sept. 1997 Norman

23  Decl.), Ex. A ("CDC Facts" printed from CDC's web page,

24  www.cdc.state.ca.us).  CDC's prison construction program since the

25  early 1980s has cost $5.27 billion.  Id.  The State has also

26  appropriated millions of dollars for structural retrofitting of CDC

27  buildings, ranging from $314,000 to about $23 million per building.

28                              22

United States District Court

For the Northern District of California

Decl. of Sara Norman in Supp. of Plfs' Opp'n to Defs' Add'l Info.,
filed Feb. 13, 1998 (Feb. 13 Norman Decl.), Ex. B (Supplemental
Report of the 1997 Budget Act, 1997-98 Fiscal Year, Part IV).   The
CDC has requested $23 million to implement the DPP over a three-
year period, a relatively modest amount to bring the entire prison
system into compliance with the ADA and § 504.   In the context of
these numbers, increasing the costs for the DPP by $11.4 million is
not exorbitant.

Therefore, the Court orders Defendants to designate CIW,
Lancaster, RJD and CCI as additional DPP facilities.   If the CDC
obtains authorization to build a new prison in southern California
or it can otherwise provide an equal number of DPP placements there
for all disabilities, security levels and genders, it may apply to
the Court for a modification of this order.   Plaintiffs have also
asked Defendants to designate a CCRC in Parole Region IV as a DPP
facility and Defendants have not provided any evidence to
demonstrate that doing so would impose an undue burden on the CDC.
Therefore, the Court orders Defendants to designate such a facility
and promptly make it accessible to disabled parolees.

III. Scoping Policy

Defendants' remedial plans adopt a two percent scoping policy
for new prison construction, based on designed bed capacity.
Scoping refers to the percentage of housing units that will be
constructed to be structurally accessible.   Defendants explain that
designed bed capacity refers to the optimal conditions of housing
only one inmate in each cell, although the cells are built to
accommodate two inmates.   Defendants do not explain what designed

23

United States District Court

For the Northern District of California

bed capacity means in facilities that are organized as barracks or dormitories.  Pursuant to the scoping policy, two percent of cells in new celled facilities will be built to be accessible and two percent of beds in other facilities will be accessible.

In its October 8 Order, the Court ruled that Defendants must modify their remedial plans to conform to federal scoping guidelines unless they demonstrate, based on accurate population projections, that their plans will meet the needs of the disabled prison population into the foreseeable future.  October 8 Order at 30.

Defendants initially based their population projections on point-in-time surveys of the prison system's disabled population. In its March 20 Order, however, the Court found that these surveys did not provide reliable figures for the number of inmates with particular disabilities and security classifications.  See March 20 Order at 36-40.  Defendants argue that they no longer need to rely on the point-in-time surveys to determine the numbers of disabled inmates in the prison system, because the CDC now maintains actual counts of such prisoners.  Defendants claim that these actual counts demonstrate that their two-percent scoping policy is more than sufficient to meet disabled prisoners' needs.  Plaintiffs raise a number of objections to the CDC's methodology in arriving at these figures.

A.   Defendants' Data

Defendants provide the actual count data in a number of formats.  First, they provide tables showing the number of disabled inmates at each institution, divided by security level and type of

24

United States District Court

For the Northern District of California

1  disability, on a weekly basis from December 16, 1996 to January 16,

2  1998.  Fifth Decl. of Arlene Solis (Fifth Solis Decl.) Ex. H at 1-9

3  ("DPP Inmate Population Tracking").  Based on these charts, the

4  greatest number of disabled inmates counted in the prison system in

5  a given week was 1,027 on the week including November 3, 1997.  The

6  lowest number was 773 in the week of January 13, 1997.  The number

7  of disabled inmates counted in the week of January 2, 1998, which

8  formed the basis of the next chart, was 908.

9      Second, Defendants provide a table that compares the number of

10  DPP placements available at each institution as of January 2, 1998

11  at each security level and for each type of disability with the

12  actual number of disabled inmates housed at those institutions on

13  that date at those security levels and with those disabilities.

14  Id. at Ex. H at 19 ("Disability Placement Program (DPP) By

15  Levels").  The number of placements exceeds the corresponding

16  number of inmates in all but two categories: wheelchair users at

17  levels II and IV.[5]  Id.  Additional placements in these categories

18  are scheduled to be available by the end of fiscal year 1997-98.

19  Id. at Ex. G.  The additional placements for Level I wheelchair

20  users should meet the projected need for such placements through

21  2003, but the additional placements for Level IV wheelchair users

22

23

24

25      [5]There also are several categories of housing in
    administrative segregation and in the Security Housing Unit for
26  which the number of inmates exceeds the number of placements.
    Plaintiffs, however, have not raised any objections regarding
27  Defendants' plans to accommodate disabled prisoners in these areas.

28                            25

United States District Court
For the Northern District of California

1    might fall short.[6]  At a six-percent growth rate, the reported

2    number of Level IV wheelchair users in the system on January 2,

3    1998, sixty-three, id. at Ex. I, would reach eighty-five by 2003.

4    The DPP only provides for a total of seventy-two Level IV

5    wheelchair placements.  Id. at Ex. G.  Plaintiffs, however, have

6    not raised a specific concern about the number of available

7    placements for this category of inmate.  Moreover, Defendants claim

8    that there is sufficient flexibility in the DPP placement system

9    for all disabled prisoners to be accommodated, even if this

10   requires overriding some inmates' security classification.[7]

11   Furthermore, the number of DPP placements does not include

12   placements that might become available through new construction or

13   additional placements that will be created as a result of the

14   Court's rulings in § II of this order.  For all other categories of

15   disabled inmates at all security levels, the DPP already provides

16   sufficient placements to meet the needs of the projected DPP

17   population through 2003.

18       Third, Defendants provide a table showing fluctuations in the

19   disabled prison population on a monthly basis from December 29,

20   _____

21   [6]This observation is based on the numbers provided in
     Exhibit H and the Court's calculations of the projected population
22   in 2003, based on a six-percent annual growth rate.

23   [7]Arlene Solis, the CDC's Coordinator for Title II of the ADA,
     claims that the DPP system "as a whole has more than enough
     flexibility to accommodate placement needs for its DPP inmate
24   population."  Id. at ¶ 39.  She states that the CDC is in the
     process of hiring a full-time employee to track and monitor the DPP
25   inmate population, compiling charts to reflect current DPP
     placements by level and by special housing, and that the CDC can
26   transfer inmates to other units if a particular facility lacks
     sufficient placements for inmates with certain disabilities.  Id.
27   at ¶¶ 39-40.

28                              26

United States District Court

For the Northern District of California

1996 to December 28, 1997, both as a raw number and a percentage of

the prison population. Id. at Ex. I. According to this table,

from December, 1996 to December, 1997, the percentage of the total

inmate population that is disabled fluctuated between 0.5% and

0.7%. Id. at Ex. I.

Finally, Defendants provide tables projecting the growth of

the disabled prison population through the year 2003. Id. at

Ex. J. These projections are based on the highest actual count of

disabled inmates during the last year, for the week of November 3,

1997, and a six-percent growth rate. Plaintiffs do not challenge

the accuracy of this projected growth rate. Defendants have

projected the population of disabled inmates, broken down by

security classification and gender, through the year 2003. In

every year, for men and women in each security classification, the

number of DPP placements scheduled to be available in existing CDC

facilities by fiscal year 1998-99, see id. at Ex. G, exceeds the

projected number of disabled inmates requiring such placements.

The total disabled population projected for the year 2003 is 1,376.

The DPP will provide 2,639 placements by the end of fiscal year

1998-99. Id. at ¶¶ 41, 45. This comparison does not take into

account any additional placements that may become available when

the CDC builds new prisons.

B.   Analysis

1.   Sufficiency of Number of DPP Placements

Plaintiffs challenge the accuracy of the CDC's actual counts

of the disabled population, based on errors that were detected in

the CDC's internal review of individual facilities' compliance with

27

United States District Court

For the Northern District of California

the DPP.  None of these errors, however, demonstrates that the CDC has substantially undercounted the disabled prison population, that the planned number of DPP placements should be increased, or that the two percent scoping policy is inadequate.

First, Plaintiffs note that the CDC compliance review discovered that in 31% of cases reviewed, the disability verification forms (Form 1845) that identify an inmate as disabled were not reviewed by a physician, as required by the AB. Plaintiffs do not, however, provide any evidence that this resulted in an undercounting of disabled inmates.  They do not even allege that physicians are more likely than other staff to identify inmates as disabled.  The Court, therefore, finds that this noncompliance factor does not demonstrate that the CDC's actual counts of disabled prisoners are inaccurate.

Second, Plaintiffs note that in 33% of the cases reviewed, DPP codes based on Form 1845 were not entered on the inmates' classification score sheets, the document from which inmates are entered into the DPP tracking system database.  Plaintiffs allege that this tracking system was the source of the CDC's actual population counts.  Plfs' Opp'n to Defs' Br. in Supp. of their Scoping Policy, filed May 22, 1998 (Plfs' May 22 Br.) at 5 n.3.  In their brief, Defendants claim that their numbers were not based on the tracking system, but on population counts reported by each facility.  Reply to Plfs' Opp'n to Defs' Br. in Supp. of Two Percent Scoping Policy, filed May 28, 1998 (Defs' May 28 Reply Br.) at 5.  This claim is consistent with the AB.  <u>See</u> May 22 Norman Decl. Ex. G. at 11 ("Each institution shall maintain a census of

28

all DPP identified inmates housed within their facility," which shall be faxed to the Classification Services Unit (CSU) every week so that department can identify vacant DPP placements).  Therefore, the Court cannot conclude that these errors resulted in an undercounting of the disabled population.  Even if this error resulted in a 33% undercounting of disabled inmates, the number of planned DPP placements exceeds the projected number of disabled inmates by more than 33% in most cases.[8]

Third, Plaintiffs note that the compliance review found inaccuracies in the tracking systems of four institutions: Corcoran, CCI Level IV, Northern California Women's Facility (NCWF) and Central California Women's Facility (CCWF).  At Corcoran, however, the compliance review only reported that the institution listings in the prison's tracking reports were inaccurate. Plaintiffs do not explain how this caused the institution to undercount the number of disabled inmates.  The problem reported at CCWF is de minimis:  in ten percent of the cases, the facility did not rely on Form 1845 to prepare the tracking report.  Plaintiffs do not provide evidence that this caused the institution to

---

[8]The number of planned DPP placements is 2,639, which is 192% of 1,376, the projected disabled population in 2003.  The number of planned DPP placements for male disabled inmates at all security levels also exceeds the projected number of inmates in 2003 by more than 33%: Level I, 420 (250% of 169); Level II, 498 (190% of 260); Level III, 671 (160% of 423); Level IV, 379 (140% of 265); Reception Center, 192 (140% of 136).  See Fifth Solis Decl. at Ex. G, J.  The number of DPP placements for female disabled inmates, 86, is only 120% of 72, the projected population in 2003. Id.  As noted in the text above, however, Plaintiffs have not demonstrated that the CDC's counts of the current disabled population are inaccurately low, much less that the margin of inaccuracy is 33%.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  undercount the number of disabled inmates.  At both CCI Level IV

2  and NCWF, the review reported inaccurate tracking, a problem that

3  could affect the CDC's actual counts.  Plaintiffs, however, do not

4  attempt to quantify the effect of these two institutions' lapses.

5  Based on the proportion of the overall prison population that is

6  housed at these two institutions, the margin for error in the DPP

7  plan should more than compensate for any undercounting at these

8  institutions.[9]

9      Fourth, Plaintiffs note that, in carrying out its compliance

10 review, the CDC only checked the files of inmates identified as

11 disabled on a Form 1845 or in the database.  This observation

12 merely establishes that the compliance review did not determine

13 whether the CDC has failed to identify some inmates as disabled; it

14 does not establish that the CDC in fact has failed to do this.  The

15 Court granted Plaintiffs an opportunity to conduct discovery on the

16 accuracy of the CDC's actual counts of disabled inmates and

17 Plaintiffs have not presented evidence that these counts are low.

18     Finally, Plaintiffs note that the Court has found that the

19

20     [9]In March, 1997, CCI housed 1,882 inmates in its Level IV
   facilities, and a total of 22,639 inmates were housed in all Level
21 IV facilities in the prison system.  Therefore, CCI apparently
   holds less than 10% of the CDC's Level IV population.  The number
22 of planned Level IV DPP institutions is 140% of the CDC's projected
   Level IV population in 2003.
23     Although there are no comparisons of female prison populations
   in the record of this case, the Court retrieved the following
24 institutional population figures from the CDC's web page
   (www.cdc.state.ca.us/facility/facil.htm) on June 23, 1998: CIW,
25 1,706; CCWF, 3,148; NCWF, 721; VSPW, 2,960.  Therefore, NCWF
   apparently holds less than 10% of the total female prison
26 population, which totals 8,535.  The number of planned DPP
   placements for female disabled inmates is 86, which is 120% of the
27 CDC's projected female disabled population, 72.

28                                30

United States District Court
For the Northern District of California

CDC's evaluation of hearing impairments is flawed, implying that the number of hearing-impaired inmates may well be undercounted. Again, however, Plaintiffs have not attempted to quantify the undercounting that results from this factor. Given the large margins for error in the DPP, the Court concludes that this factor, alone or in combination with the other factors discussed above, does not establish that the number of disabled placements in the DPP will be inadequate to meet the DPP's needs through 2003.

The Court concludes, therefore, that the number of DPP placements in Defendants' remedial plans is sufficient to meet the needs of the disabled population through the year 2003.

2.    Scoping Policy

Plaintiffs challenge the CDC's two percent scoping policy as inadequate to meet the future needs of the disabled prison population. In its October 8 Order, the Court stated that Defendants could comply with the ADA and § 504 either by following federal guidelines for new construction or by otherwise assuring that the new facilities are readily accessible to disabled prisoners. Oct. 8 Order at 28-29. Defendants defend the CDC's two percent scoping policy on both bases. First, they note that the federal scoping guidelines for correctional institutions have been revised since the parties first briefed this issue. The ADA Accessibility Guidelines (ADAAG) for prisons now recommend a two percent scoping policy for holding and housing cells in detention and correctional facilities. 63 Fed. Reg. 2000, 2010 (§ 12.4.1)

31

United States District Court

For the Northern District of California

(1998)(to be codified at 36 C.F.R. Part 1191).[10]  Defendants also argue that this scoping policy is more than adequate to meet the demonstrated needs of disabled prisoners.  Plaintiffs, however, note that the scoping policy is based on designed bed capacity and that the prison population as of April 1, 1997 was almost 200 percent of the CDC's designed bed capacity.  Sept. 12 Norman Decl. Ex. A.  Therefore, Plaintiffs argue, the "two percent" scoping policy will only ensure that one percent of beds in prevailing overcrowded conditions will be accessible.  Even if this is true, which is not entirely clear,[11] the CDC's highest actual counts of disabled prisoners amount to less than 0.7% of the total prison population.  Therefore, a one percent scoping policy would meet disabled prisoners' needs.

The Court concludes, therefore, that the two percent scoping policy for new prison construction complies with the ADA and § 504.

---

[10]Plaintiffs claim that the CDC's scoping policy does not meet this standard because it is based on designed bed capacity rather than housing cells or rooms.  The new guidelines require that "a minimum of two percent, but not less than one, of the total number of holding or general housing cells or rooms provided in a facility be accessible in new construction."  63 Fed. Reg. at 2010 (§ 12.4.1).  Defendants explain that the CDC's policy requires that two percent of cells be accessible in celled facilities, and requires that two percent of beds in barracks or dormitory facilities, as well as paths of travel and common areas in the rooms in which those beds are located, be accessible.  This appears to comply with the new guidelines.  Even if it does not, Defendants have made a sufficient showing that the CDC's scoping policy will meet the disabled prison population's needs, and thus complies with the ADA and § 504.

[11]Defendants state that two percent of cells, which are designed to hold one inmate, in new celled facilities will be built to be accessible.  In overcrowded conditions, these cells hold two inmates.  Defendants do not explain whether structurally accessible cells will be able to accommodate two disabled prisoners in overcrowded conditions.

32

IV.   Verification of Disabilities and Grievance Procedure

     In its March 20 Order, the Court made a number of rulings on
the related issues of who bears the burden of verifying inmates'
and parolees' disabilities, what procedures the CDC must follow in
considering inmates' requests for accommodations, and what
procedures the CDC must follow when verifying hearing impairments
and learning disabilities.  In the course of briefing these issues
further, an additional disputed issue has emerged: whether the CDC
should follow the same procedures when verifying disabilities in
response to requests for accommodations and disability-related
grievances as those it uses when verifying disabilities for
purposes of placement.  The Court discusses all of these related
issues in this section.  At the conclusion of this section, the
Court lists the revisions that Defendants must incorporate into
their remedial plans.

     A.   Defendants' Most Recent Proposals

     During the course of briefing on these issues, Defendants have
submitted revisions of their plans and the parties have continued
to meet and confer about Plaintiffs' objections.  Defendants
submitted the following policies related to the CDC's methods for
verifying inmates' disabilities and responding to requests for
accommodations.  Plaintiffs have not had an opportunity to respond
to these specific revisions; however, the underlying issues
implicated in these policies have been extensively briefed.

     The first policy addresses the CDC's procedures for verifying
and documenting disabilities for purpose of placement in the prison
system.  This policy is called the "1845 Verification Process,"

33

United States District Court

For the Northern District of California

1  a reference to Form 1845, the Inmate/Parolee Disability

2  Verification Form.  The policy provides:

3                    1845 VERIFICATION PROCESS

4      <u>Purpose</u>:  The purpose of the 1845 verification process is to
       ensure appropriate identification of inmates/parolees with
5      permanent disabilities to determine appropriate placement in a
       DPP designated or non-designated facility according to
6      severity of disability.  The process does not require the
       automatic screening of all inmates/parolees to identify
7      disabilities.

8      <u>Responsibility</u>: . . . Verification may be triggered by any of
       the following:
9
       1)   The inmate/parolee self-identifies or claims to have a
10          disability.
       2)   Staff observe what appears to be a disability severe
11          enough to impact placement or present a safety or
            security concern.
12     3)   The inmate's/parolee's health care or central file
            contains documentation of a disability; or
13     4)   A third party (such as a family member) requests an
            evaluation of the inmate/parolee for an alleged
14          disability.

15     <u>Documentation</u>:  Verification of a disability for purposes of
       placement shall be recorded on a CDC Form 1845.   Sections A
16     through D of Form 1845 shall be completed or approved by a
       physician.  Once completed and approved, Form 1845 shall
17     become part of the inmate's/parolee's file and shall be
       effective until a change in the inmate's condition causes it
18     to be canceled or superseded.

19  July 20 Humes Decl. Ex. A.

20      The second policy addresses the CDC's procedures for

21  responding to inmates' and parolees' requests for accommodations

22  and complaints of disability-related discrimination.  The policy is

23  called an "Appeal Process" because it is designed to parallel the

24  prison system's grievance procedure.  The CDC refers to prisoner

25  grievances as "appeals."  The policy sets forth the timelines for

26  this grievance procedure and also describes the steps that the CDC

27  must take to verify disabilities in response to such grievances

28                              34

from inmates and parolees whose disabilities were not verified during the 1845 Verification Process. As amended on August 25, 1998, the policy provides:

> An inmate/parolee with a disability may request an accommodation or grieve alleged discrimination through the 1824 grievance process. Forms and staff assistance to use the appeal process shall be provided to all qualifying inmates/parolees.
>
> The inmate/parolee shall submit the request for accommodation on a CDC Form 1824, along with relevant documentation, to the Appeals Coordinator for the inmate's/parolee's facility or parole region. When an inmate/parolee files an appeal on an inappropriate form, i.e., CDC Form 602, Inmate/Parolee Appeal Form, the Appeals Coordinator shall attach the appropriate form and process the appeal in accord with established policy. The Appeals Coordinator shall screen the request to determine if it meets the eligibility criteria under applicable law and Department policy. If the request is screened out, a copy of the CDC Form 1824 shall be maintained on file in the Appeal Coordinator's office. Comments explaining the reason why the request was screened out shall be entered in the comments field of the Inmate Appeals Automatic Tracking System.
>
> It is the mutual responsibility of the inmate/parolee and the Department to verify a disability when a request for accommodation is made. If the inmate/parolee fails to provide documentation to verify a disability and the request otherwise meets the eligibility criteria of Section 3084 [the regulation governing all inmate appeals], the Appeals Coordinator shall accept and log the appeal and assign it to the appropriate Division Head for the first level review. The Division Head or designee shall review the central file to determine whether the disability can be verified from a CDC Form 1845, a CDC Form 128-C Medical Chrono, or another applicable record. If verification cannot be made from the file, the Division Head or designee shall contact appropriate staff (e.g., medical, education) for access to additional records or information. If verification is not obtained after that inquiry and, during the face-to-face first level interview the inmate does not appear to have a qualifying disability, the interviewer shall generate a CDC Form 128-B, General Information Chrono, documenting that fact and shall forward it to the Appeals Coordinator.
>
> The claim of a qualifying disability by the inmate/parolee shall be assumed valid for purposes of the 1824 appeal unless unsupported by the evidence or overcome by contrary evidence. If the evidence demonstrates that the inmate/parolee does not have a disability qualifying for the 1824 appeal process the

appeal will be processed as a 602 appeal.

A non-emergency Form 1824 appeal is subject to three formal levels of review:

1)    First level of review.  The first level of review is made by the appropriate Division Head or designee, who shall render a decision and return it to the inmate or parolee within 15 working days of receipt of the appeal by the Appeals Coordinator.  The decision shall be set forth on the CDC Form 1824.

2)    Second level of review.  The second level of review is initiated by the inmate/parolee attaching the request to a CDC Form 602, completing Section F, and forwarding the document to the Appeals Coordinator within 15 working days of receipt of the decision by the Division Head.  In Section F, the inmate/parolee shall explain the nature of dissatisfaction and suggest an appropriate resolution. The Appeals Coordinator shall forward the second level appeal to the Warden or Regional Parole Administrator or designee, who must render a decision and return it to the inmate/parolee within ten working days of receipt, or 20 working days of receipt if the first level of review is bypassed.

3)    Third level of review.  The third level of review is initiated by the inmate/parolee resubmitting the appeal to the Appeals Coordinator within 15 working days of receipt of the decision by the Warden or Administrator. The third level response is made by the Director or designee, who shall render a decision and return it to the inmate/parolee within 20 working days from receipt.

4)    Extension of time.  A non-emergency request for accommodation made through the 1824 process is not subject to the exceptions to the appeals time limits found in Section 3084.6(b)(5).  However, the above time limits may be extended for ten working days when the issue requires expert consultation.

If the request for accommodation involves a matter that may result in an immediate threat to the inmate's/parolee's safety, health or well-being, or cause other serious or irreparable harm, the request shall be processed according to the expedited appeal process described in Section 3084.7.  The inmate/parolee shall identify the appeal as an emergency; however, the Appeals Coordinator shall review each appeal to ascertain those that qualify for expedited processing and shall respond appropriately.  Appeals that qualify for an expedited appeal may included (sic), but are not limited to, the following:

36

1     1)    Providing appliances or aids that are essential to
performing major life activities;

2     2)    Providing equipment or modifications essential to safety;
and

3     3)    Providing assistance to permit effective communications
in due process settings or for health care provider
communications.

Other provisions of these rules pertaining to inmate/parolee
appeals not addressed herein shall apply.

B.    Burden of Verifying Disabilities

In its March 20 Order, the Court ruled that the CDC bears the

burden of verifying credible claims of disability both for purposes

of placement and in response to requests for accommodations, and

ordered Defendants to revise their remedial plans accordingly.

March 20 Order at 27, 47.  The Court also ordered Defendants to

revise the AB to clarify that, once an inmate's disability has been

documented, the inmate will not have to attach documentation

verifying the disability to each request for accommodation.

March 20 Order at 25.

Defendants' revised policies do not accurately describe the

CDC's duty to verify inmates' disabilities.  The proposed 1845

Verification Process states, "Verification of disabilities is a

shared responsibility of the inmate/parolee and the Department."

The Appeal Process policy states, "It is the mutual responsibility

of the inmate/parolee and the Department to verify a disability

when a request for accommodation is made."  While the CDC may

require the inmate to cooperate with efforts to verify the inmate's

disability, for example, by signing forms permitting schools and

doctors to release information, by answering questions about the

inmate's educational history, and by submitting to examinations

37

United States District Court
For the Northern District of California

designed to identify or measure the disability, the CDC cannot require the inmate to produce documentation of the disability that is not readily available to the inmate.  Plaintiffs propose revising the policy to include language stating that inmates and parolees must cooperate with verification efforts, while clarifying that the CDC bears the burden of verifying inmates' disabilities. The Court adopts this proposal below.

Defendants' proposed policies only partially address the Court's other concern that, once an inmate's or parolee's disability has been verified, it will not be necessary to verify the disability again in response to subsequent requests for accommodation.  Defendants' proposed 1845 Verification Process policy states in relevant part, "Verification of a disability for purposes of placement shall be recorded on a CDC Form 1845. . . . Once completed and approved, the CDC Form 1845 shall become part of the inmate's/parolee's file and shall be effective until a change in the inmate's condition causes it to be canceled or superseded." This provision helps avoid duplication of effort.  Defendants' proposed Appeal Process policy, however, leaves open the possibility that disabilities will have to be re-verified.  The policy provides that if the inmate or parolee fails to document his or her disability and the inmate's central file does not contain documentation of a disability, the CDC staff person must "contact appropriate staff (e.g., medical, education) for access to additional records or information" and assess the disability claim during a face-to-face interview.  If the staff person verifies a disability in these ways, however, the policy does not require the

38

United States District Court

For the Northern District of California

1  staff person to document the disability so these steps will not
2  have to be repeated in response to later requests for
3  accommodation.   Therefore, the Court orders Defendants to revise
4  the policy, as provided below.

5      C.   Verification of Disabilities for Accommodation

6      Defendants' proposed policies adopt a two-pronged approach to
7  the CDC's duty to verify inmates' and parolees' disabilities.
8  Defendants have limited the 1845 Verification Process, which has
9  been the primary subject of the parties' briefing on this issue to
10 date, to verification of disabilities for purposes of placement.
11 The disability-related grievance procedure, the Appeal Process,
12 does not incorporate the 1845 Verification Process.   Rather, it
13 sets forth a limited number of steps that CDC must take to verify
14 disabilities in response to requests for accommodations or
15 complaints about discrimination.

16     The Appeal Process policy does not satisfy the CDC's
17 obligation to verify all credible claims of disability.   The policy
18 only requires the CDC to take four measures to verify an inmate's
19 or parolee's disability in response to a request for accommodation:
20 first, determine whether the inmate submitted relevant
21 documentation of his or her disability with the request for
22 accommodation; second, determine whether the individual's central
23 file contains documentation of the disability; third, inquire of
24 unspecified "appropriate staff" to determine whether the CDC
25 otherwise know of the disability; and fourth, have untrained staff
26 observe the inmate or parolee during the first-level grievance
27 interview to determine whether the disability is readily

28                                  39

United States District Court

For the Northern District of California

1  identifiable.  If the staff person is not able to verify the
2  disability after taking these four steps, the CDC is not required
3  to take further measures to verify the disability.  Instead, the
4  CDC could rely on a lack of evidence substantiating the claim of
5  disability to conclude that the inmate or parolee is not disabled.
6  Defendants' proposed policy does not simply weed out non-credible
7  claims of disability.  Many prisoners' health and education records
8  will be incomplete because they have had only sporadic access to
9  health care, because they have not attended school regularly, or
10 because their disabilities simply did not come to the attention of
11 their physicians or teachers.  Some disabilities, such as learning
12 disabilities, are not readily identifiable, particularly to the
13 untrained observer.  Therefore, under Defendants' proposed
14 policies, many legitimate requests for accommodation could be
15 denied simply because the inmate or parolee was not able
16 independently to document his or her disability.  This is contrary
17 to the Court's ruling that the CDC bears the burden of verifying
18 disabilities.

19    Defendants do not explain why the 1845 Verification Process is
20 used only for verification of disabilities for purposes of
21 placement.  Defendants may not be required to screen all inmates
22 and parolees for disabilities, but in order to comply with the ADA
23 and § 504, they do need to verify disabilities for purposes of
24 placement and in response to specific requests for accommodations.
25 Because the verification procedures included in the Appeal Process
26 are inadequate, Defendants must develop new procedures to verify
27 disabilities in response to requests for accommodations.  The

28                              40

United States District Court

For the Northern District of California

1  easiest course seems to be to use the 1845 Verification Process for
2  this purpose.  Therefore, the Court orders Defendants to revise the
3  Appeal Process to require CDC staff, after taking the four steps
4  described in the current procedure, either to provide the requested
5  accommodation or to refer the inmate or parolee for Form 1845
6  processing.  Furthermore, because the verification process might
7  cause undue delay in the grievance procedure, which would violate
8  the ADA, the Court orders Defendants to revise the Appeal Process
9  policy to provide for temporary accommodations pending verification
10 in certain cases.

11     As currently written, Form 1845 only refers to disabilities
12 that might affect placement.  Notably, it does not refer to
13 learning disabilities.  Plaintiffs suggest that the Court require
14 Defendants to prepare "other appropriate forms of documentation"
15 for these disabilities.  Throughout this remedial process, however,
16 the parties have disputed the specific wording of the CDC's forms
17 and policies, and general instructions from the Court have not
18 resolved the problems.  The Court will not leave any issues
19 unresolved when it orders Defendants to comply with their remedial
20 plans.  Therefore, the Court below orders Defendants to revise Form
21 1845 to permit the documentation of learning disabilities.  If the
22 parties are able to stipulate to an alternative form of
23 documentation, they may submit such a stipulation and proposed
24 modification order to the Court.  Alternatively, Defendants may
25 develop an alternative form that serves the same function and that
26 complies with the ADA and § 504 and may move the Court to modify
27 its order to permit Defendants to use the alternative form rather

28                                 41

United States District Court

For the Northern District of California

1  than modifying Form 1845.  Indeed, the parties may take these steps

2  with respect to any part of this Order or any of the Court's

3  previous Orders that they find problematic or that prove unworkable

4  in practice, as long as their proposed modifications also comply

5  with the ADA and § 504.

6      D.   Grievance Procedure

7      In its March 20 Order, the Court ruled that the time limit for

8  the first level of review in the grievance procedure and the

9  exceptions from the time limits for complex cases, and for any

10 administrative and operational necessity that causes a delay,

11 violated the ADA requirement that the grievance procedure be

12 prompt.  March 20 Order at 24.  Defendants' proposed Appeal Process

13 policy shortens the time limits for all three levels of the

14 disability-related grievance procedure and provides additional

15 guidelines for the invocation of the expedited emergency appeal

16 process for inmates or parolees seeking accommodations.  Defendants

17 have also revised the exceptions to these time limits that are

18 included in the regulations governing the grievance procedure.

19 These revisions substantially address the Court's concerns and

20 shall be incorporated into the AB.

21     E.   Evaluation of Hearing Impairments

22     In its March 20 Order, the Court ruled that the CDC's

23 procedures for measuring hearing impairments and determining

24 hearing-impaired inmates' needs for auxiliary aids and services

25 were inadequate and thus violated the ADA.  March 20 Order at 49.

26 On August 13, 1998, Defendants submitted a copy of revised

27 procedures upon which the parties have agreed.  The Court orders

28

42

United States District Court

For the Northern District of California

1  Defendants to incorporate these procedures as an appendix to the
2  AB, as provided below.

3       F.   Verification of Learning Disabilities

4       In its March 20 Order, the Court ruled that the CDC "must
5  verify credible claims of disability" asserted in inmates' requests
6  for accommodation.  March 20 Order at 27.  With respect to learning
7  disabilities, however, the Court stated that it was "reluctant to
8  require elaborate testing of any inmate who claims to have trouble
9  reading or comprehending new concepts." Id. at 28.  Plaintiffs
10  offered to provide additional evidence regarding the burden of
11  verifying learning disabilities and the Court reserved judgment on
12  this issue pending further briefing.  Id.

13       Plaintiffs recommend, based on expert evidence, that
14  Defendants adopt a four-stage process for verifying inmates'
15  learning disabilities when these inmates request accommodations.
16  See generally, Decl. of Michael W. Bien in Supp. of Suppl. Br.,
17  filed May 7, 1998 (Bien Decl.), Ex. A.  Pursuant to these
18  procedures, CDC staff first would ask the prisoners a series of
19  screening questions about school grades, reading and writing
20  ability, special education placement, and prior identification of
21  learning disabilities.  Second, CDC staff would review the
22  prisoners' central and medical files.  These files include many
23  documents that might provide information about the inmates'
24  learning disabilities, including parole reports, probation records,
25  sentencing reports, school records, test scores and family
26  information.  Plaintiffs' expert provided many examples of
27  documentation in prisoners' files that supported diagnoses of

28                                    43

United States District Court
For the Northern District of California

1   learning disabilities.  Plaintiffs also report that Defendants
2   stated during the parties' meet and confer session that CDC
3   educational staff routinely request school records of participating
4   inmates.  Bien Decl. Ex. B at 2.  Third, CDC staff would review the
5   inmates' scores on any tests that had been administered by the CDC.
6   CDC staff routinely administer the full battery of TABE tests when
7   inmates are placed on academic or vocational waiting lists, Bien
8   Decl. Ex. A at 3, App. I, and some Reception Centers apparently
9   administer IQ testing, Bien Decl. Ex. A at 3, App. J, K.  Based on
10  these first three stages of information gathering, trained CDC
11  staff could perform a simple IQ-achievement discrepancy evaluation
12  to identify prisoners who are likely to have a learning disability.
13  The fourth level of verification involves professional testing,
14  although certain CDC staff members could be trained to administer
15  these tests.

16      Under Plaintiffs' proposed plan, the CDC would decide at each
17  stage of the verification process whether it has sufficient
18  evidence of the inmate's learning disability to justify granting
19  the requested accommodation or whether it must proceed to the next
20  stage of verification.  Defendants would be required to proceed to
21  the fourth level of verification, professional testing, only if the
22  first three levels of verification uncover evidence that the inmate
23  is likely to have a learning disability and the CDC still is
24  unwilling to provide the requested accommodation, or if specific
25  information about the learning disability is necessary in order to
26  identify an appropriate accommodation for the inmate.  Bien Decl.
27  Ex. A at 3.

28                              44

United States District Court

For the Northern District of California

1    Defendants offer no specific objections to Plaintiffs'
2 proposal, but assert that their plans for verifying disabilities
3 are adequate and that any additional requirements would go beyond
4 the requirements of the ADA and § 504 and impose an undue burden on
5 the prison system.  The Court concludes that Defendants'
6 verification procedures are inadequate.  The 1845 Verification
7 Process, discussed above, as proposed by Defendants, does not apply
8 to learning disabilities, because this is not considered a
9 disability that could affect placement.  The verification
10 procedures incorporated into Defendants' proposed grievance
11 procedure are inadequate because they only require CDC staff to
12 take four minimal measures to verify disabilities, and thus do not
13 satisfy the CDC's duty.  Defendants have proposed no specific
14 procedures tailored to identifying learning disabilities.
15 Therefore, the Court rejects Defendants' argument that its
16 currently proposed policies comply with the ADA and § 504.

17    The Court also finds that Plaintiffs' plan does not go beyond
18 the requirements of the ADA and § 504.  The requirement that the
19 CDC review an inmate's files and records and ask basic screening
20 questions for all claims of learning disabilities is consistent
21 with the Court's ruling that Defendants bear the burden of
22 verifying inmates' disabilities.  Plaintiffs' plan requires the CDC
23 to arrange for professional testing only when the earlier
24 verification stages have produced evidence that the inmate is
25 likely to have a learning disability, that is, that the inmate's
26 claim of a disability is credible.  Defendants have not identified
27 particular aspects of Plaintiffs' plan that go beyond the

28                                    45

United States District Court

For the Northern District of California

1  requirements of the ADA and § 504.

2       The Court also rejects Defendants' undue burden argument.

3  Defendants have submitted a statement by CDC Director Terhune that

4  imposing requirements in addition to those already incorporated in

5  CDC policies would impose undue financial and administrative

6  burdens on the agency and would result in an irresponsible

7  expenditure of public funds.  Decl. of James M. Humes in Supp. of

8  Defs' Br. in Supp. of Two Percent Scoping Policy, filed May 5, 1998

9  (May 5 Humes Decl.), Att. A at 2.  Mr. Terhune provides no reasons

10 to support these conclusions.  Id.  As discussed in Section I,

11 above, a mere assertion that complying with the ADA or § 504 would

12 impose an undue burden is insufficient to relieve an agency of the

13 duty to comply with these laws.  Even if the agency articulates

14 reasons why compliance imposes an undue burden, the Court has a

15 duty to evaluate whether those reasons are convincing.  Defendants

16 have failed to establish an undue burden defense here.

17      Therefore, the Court requires Defendants to adopt Plaintiffs'

18 proposal for verification of learning disabilities, as set forth in

19 the April 8, 1998 letter by Michael W. Bien to James Humes.  See

20 Bien Decl. Ex. A.

21      G.    Revisions

22      The Court orders Defendants to replace Section II(A) of the

23 AB, "DPP Verification Process," up to but not including the last

24 paragraph on page eight, with the following:

25      A.    DISABILITY VERIFICATION PROCESS

26      The CDC bears the burden of verifying inmates' and parolees'
        disabilities that might affect their placement in the prison
27      system, and of verifying credible claims of disability in

28                              46

response to requests for accommodation or complaints about disability-based discrimination.  The CDC is not required to automatically screen all inmates and parolees to identify disabilities.  Inmates and parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

Verification may be triggered by any of the following:

1)    The inmate/parolee self-identifies or claims to have a disability.
2)    Staff observe what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern.
3)    The inmate's or parolee's health care or central file contains documentation of a disability; or
4)    A third party (such as a family member) requests an evaluation of the inmate or parolee for an alleged disability.

Verification of a disability for any purpose shall be recorded on a CDC Form 1845.  Once completed and approved, Form 1845 shall become part of the inmate's or parolee's file and shall be effective until a change in the inmate's or parolee's condition causes it to be canceled or superseded.

Identification of disabilities affecting placement shall usually occur during Reception Center processing; however, if an inmate or parolee appears to have a disability that might affect placement, a staff member may refer the inmate or parolee for verification of the disability.  The referral is made by directing a standard CDC Form 128B, Chrono-General, to the institution/facility health care services.  The health care staff shall verify the disability using Form 1845. Similarly, if an inmate or parolee files a request for accommodation or a disability-based discrimination complaint but does not provide documentation of the claimed disability and his or her file does not contain documentation of the claimed disability, staff shall either grant the accommodation or refer the inmate or parolee for verification of the disability using the procedures described above.

The last paragraph on page 8 of the AB shall be revised to include the following two sentences after the first sentence:  "Health care staff shall follow CDC protocols for verifying disabilities.  These protocols are set forth in an appendix to this bulletin."  The first sentence of the first paragraph on page nine of the AB shall be revised to refer to "five categories of disability" rather than

47

United States District Court

For the Northern District of California

"four categories of disability."  Defendants shall include
protocols for verifying each of the four categories of disability
as an appendix to the AB.  The protocol for verifying hearing
impairments shall be that set forth in Section VC, _supra_, and the
protocol for verifying learning disabilities shall be that set
forth in Section VD, _supra_.

The Court orders Defendants to revise the Form 1845 as
follows:  Section B, "Categories of Disability," shall include a
box marked "Learning Disability."  Section D shall include a box
marked F, "Learning Disability," with an explanatory phrase in
smaller print below the box that reads, "Describe disability and
required accommodations in Section E, Comments."  The instructions
on the reverse of Form 1845 shall be revised as follows: The third
sentence, "The Inmate/Parolee Disability Verification (I/PDV) is to
be used . . . speech impaired," shall be deleted.  Subsection (b)
following the current fourth sentence shall be revised to read:
"Staff observes what appears to be a disability severe enough to
impact placement, affect program access, or present a safety or
security concern."  Defendants shall add as subsection (d)
following the current fourth sentence:  "A third party (such as a
family member) requests an evaluation of the inmate or parolee for
an alleged disability."  The paragraph beginning, "Responsibility
for completion of Sections A-D . . ." shall be revised to insert
the following after the first sentence of the paragraph:  "Health
care staff shall follow CDC protocols for verifying disabilities.
These protocols are set forth in an appendix to the AB [or other
official CDC document that includes protocols]."  The explanatory

48

United States District Court

For the Northern District of California

1  paragraph related to Section B shall be revised to refer to "five
2  categories of disability" rather than "four categories of
3  disability."  The second paragraph beginning with the phrase, "IF
4  THE INMATE/PAROLEE," shall be revised to include the following
5  final phrase:  "--Has a learning disability, check box 'F' and
6  describe the disability and required accommodations in Section E,
7  Comments."  Defendants shall include the revised Form 1845 as an
8  addendum to the AB.

9       The Court orders Defendants to add the following new
10  Section III(F) to the AB preceding Section IV, "Glossary of Terms,"
11  on page thirty three of the AB:

12       F.   DISABILITY-RELATED APPEAL PROCESS

13       An inmate/parolee with a disability may request an
         accommodation or grieve alleged discrimination through the
14       1824 grievance process.  The 1824 forms shall be provided to
         all inmates and parolees who claim to be disabled, and staff
15       assistance in using the appeal process shall be provided to
         all disabled inmates or parolees who require such assistance.
16
         The inmate/parolee shall submit the request for accommodation
17       on a CDC Form 1824 to the Appeals Coordinator for the
         inmate/parolee's facility or parole region.  The
18       inmate/parolee shall attach any relevant documentation of his
         or her disability that is in the inmate's/parolee's possession
19       or is easily obtainable by the inmate/parolee and that is not
         already in his or her CDC files.  When an inmate/
20       parolee files an appeal on an inappropriate form, the Appeals
         Coordinator shall attach the appropriate form and process the
21       appeal as a Form 1824 appeal.  The Appeals Coordinator shall
         screen the request to determine if it meets the eligibility
22       criteria of Cal. Code Regulations. tit. 15 § 3084.  If the
         request is screened out, a copy of the CDC Form 1824 shall be
23       maintained on file in the Appeal Coordinator's office.
         Comments explaining the reason why the request was screened
24       out shall be entered in the comments field of the Inmate
         Appeals Automatic Tracking System.
25
         The CDC bears the burden of verifying credible claims of
26       disability raised in inmates' or parolees' appeals.  The
         inmate or parolee, however, must cooperate with CDC staff in
27       the staff's efforts to obtain documents or other information

28                                    49

necessary to verify the claimed disability.

If the inmate/parolee fails to provide documentation to verify a disability and the request otherwise meets the eligibility criteria of § 3084, the Appeals Coordinator shall accept and log the appeal and assign it to the appropriate Division Head for the first level review. The Division Head or designee shall review the central file to determine whether the disability can be verified from a CDC Form 1845, a CDC Form 128-C Medical Chrono, or other applicable record. If verification cannot be made from the file, the Division Head or designee shall contact CDC medical, educational or other appropriate staff for access to additional records or information. If the Division Head or designee is able to verify the disability in this manner, he or she shall ensure that documentation of the disability is added to the inmate/parolee's central file. If the Division Head or designee is not able to verify the disability in this manner, he or she shall conduct a face-to-face first level interview with the inmate. If the Division Head determines during this interview that the inmate/parolee has the claimed disability, he or she shall document this finding and add that documentation to the inmate/parolee's central file. If the Division Head or designee cannot determine based on this interview that the inmate/parolee has the claimed disability, he or she shall either grant the requested accommodation or the requested remedy for discrimination, or shall refer the inmate/parolee for verification of the disability, as provided in Section II(A) of the AB. The Appeals Coordinator may temporarily grant an accommodation pending verification, on the condition that the accommodation will be withdrawn if the CDC is unable to verify the disability. Such conditional grants are particularly appropriate where the lack of an accommodation may cause serious or irreparable harm.

A non-emergency Form 1824 appeal is subject to three formal levels of review:

1)    First level of review. The first level of review is made by the appropriate Division Head or designee, who shall render a decision and return it to the inmate or parolee within 15 working days of receipt of the appeal by the Appeals Coordinator. The decision shall be set forth on the CDC Form 1824.

2)    Second level of review. The second level of review is initiated by the inmate/parolee attaching the request to a CDC Form 602, completing Section F, and forwarding the document to the Appeals Coordinator within 15 working days of receipt of the decision by the Division Head. In Section F, the inmate/parolee shall explain the nature of dissatisfaction and suggest an appropriate resolution.

United States District Court

For the Northern District of California

The Appeals Coordinator shall forward the second level appeal to the Warden or Regional Parole Administrator or designee, who must render a decision and return it to the inmate/parolee within ten working days of receipt, or 20 working days of receipt if the first level of review is bypassed.

3)   Third level of review.  The third level of review is initiated by the inmate's/parolee's resubmitting the appeal to the Appeals Coordinator within 15 working days of receipt of the decision by the Warden or Administrator.  The third level response is made by the Director or designee, who shall render a decision and return it to the inmate/parolee within 20 working days from receipt.

4)   Extension of time.  A non-emergency request for accommodation made through the 1824 process is not subject to the exceptions to the appeals time limits found in Section 3084.6(b)(5).  However, the above time limits may be extended for ten working days when the issue requires expert consultation.

If the request for accommodation involves a matter that may result in an immediate threat to the inmate's/parolee's safety, health or well-being, or may cause other serious or irreparable harm, the request shall be processed according to the expedited appeal process described in § 3084.7.  The inmate/parolee shall identify the appeal as an emergency; however, the Appeals Coordinator shall review each appeal to ascertain those that qualify for expedited processing and shall respond appropriately.  Appeals that qualify for an expedited appeal may include, but are not limited to, the following:

1)   Providing appliances or aids that are essential to performing major life activities;
2)   Providing equipment or modifications essential to safety; and
3)   Providing assistance to permit effective communications in due process settings or for health care provider communications.

Other provisions of these rules pertaining to inmate/parolee appeals not addressed herein shall apply.

V.   Extended Stays at Reception Centers

Plaintiffs and Defendants have agreed in principle that disabled inmates who remain at Reception Centers for extended periods of time solely due to their disabilities shall be

51

United States District Court

For the Northern District of California

accommodated for those extended stays.  The parties also agree that an extended stay shall be defined as a stay exceeding a fixed number of days.  They disagree about the number of days that should define an extended Reception Center stay, about some of the details in the CDC's plans to accommodate inmates for lost opportunities to earn sentencing credits, and about whether extended-stay inmates should be granted privileges available to inmates housed in mainline institutions.

In its March 20 Order, the Court ruled that the CDC violates the ADA and § 504 if it unreasonably detains disabled inmates at Reception Centers solely due to their disabilities, thus depriving them of privileges that are available in mainline institutions and depriving them of the opportunity to earn sentencing credits.  The Court noted, however, that extended stays attributable to reasonable processing requirements for disabled inmates were not discriminatory.  Id. at 32.

In its March 20 Order, the Court rejected both parties' proposed definitions of an extended stay for disabled inmates. Defendants defined an extended stay as one exceeding ninety days. Defendants arrived at this figure by adding about thirty days "for purposes of reasonable administrative processing" to the average Reception Center stay, which they stated was fifty nine days.  The Court declined to adopt this definition because Defendants had not provided evidence that the reasonable processing requirements for disabled inmates lasted thirty days.  The Court also rejected Plaintiffs' argument that any stay exceeding the fifty-nine-day average stay was an extended stay.  The Court noted that

52

United States District Court

For the Northern District of California

1  characterizing all such stays as "extended stays" would be a

2  distortion because half of all inmates stayed in Reception Centers

3  longer than fifty nine days.  Id. at 31-32.

4      In order to permit a more informed decision about how to

5  define an extended stay, the Court ordered Defendants to provide

6  Plaintiffs with a description of "the steps involved in processing

7  disabled inmates" and with data showing the range and distribution

8  of Reception Center stays for all inmates around the fifty-nine-day

9  average.  Id. at 32-33.  After Defendants provided this

10 information, the parties were to meet and confer and attempt to

11 agree on a definition of an extended stay.  Id. at 33.  If this

12 effort proved unsuccessful, Plaintiffs were permitted to resubmit

13 the issue to the Court for resolution.  Id.  Because the parties

14 were not able to agree on a definition of an extended stay, the

15 Court addresses this issue below.

16     In its March 20 Order, the Court also found Defendants' plans

17 for accommodating extended-stay inmates inadequate.  Id. at 33-34.

18 The Court ordered Defendants to revise their remedial plans to

19 ensure that these inmates would receive mainline privileges during

20 their extended stays and would be fully compensated for the lost

21 opportunity to earn sentencing credits.  Alternatively, Defendants

22 could argue that these accommodations would impose an undue burden

23 on the CDC, would result in a fundamental alteration of CDC

24 programs, or would interfere with legitimate penological

25 objectives.  The Court addresses this issue further below.

26     A.   Definition of Extended Stays

27     In response to the Court's order that Defendants provide

28                                   53

United States District Court

For the Northern District of California

Plaintiffs with a description of the processing requirements for disabled inmates, Defendants provided Plaintiffs with a letter referring them to the AB, the CDC's Operations Manual, and the declarations of Arlene Solis.  May 7 Norman Decl. Ex. B at 4. Plaintiffs argue that the evidence to which in Defendants' letter refers, some of which has not been separately presented to the Court, does not justify increased processing time.  In their briefs, Defendants argue that health screening for disabled inmates usually takes more time than is required to screen nondisabled prisoners, but they provide no evidence to substantiate this claim or to quantify the additional time that is required.  Therefore, Defendants have not established that extended Reception Center stays for disabled inmates are justified, in whole or in part, by reasonable processing requirements for these inmates.

Defendants also provided Plaintiffs with a chart showing the number of inmates who spent from zero to thirty three months in Reception Centers in fiscal year 1996-97.  <u>See</u> Decl. of Sara Norman in Supp. of Plfs' Suppl. Briefing, filed May 7, 1998 (May 7 Norman Decl.), Ex. A at INS 22321.  This chart indicates that 66.3% of inmates spent up to two months, or approximately sixty days, in Reception Centers, and that 89.9% of inmates spent up to three months, or approximately ninety days, in Reception Centers.[12]  <u>Id.</u>

---

[12]The terms on the chart are not defined.  The chart is entitled "Time in Initial Reception Centers Placement," and the column that apparently refers to length of stay is entitled, "RC_MOS," which presumably refers to Reception Center Months, or the number of months an inmate stayed at the initial Reception Center.  The first row on the chart indicates that 1,472 inmates stayed zero "RC_MOS" at the Reception Center.  Because the Court understands that all inmates pass through Reception Centers, this

54

United States District Court

For the Northern District of California

1  Defendants indicated that they were unable to provide separate
2  figures for the length of disabled inmates' reception center stays.
3  Id. at Ex. A at INS 22316.

4      Based on this information, the Court concludes that a period
5  of time exceeding sixty days is fairly characterized as an
6  "extended stay" because about two-thirds of inmates are transferred
7  out of Reception Centers within sixty days.  Defendants raise two
8  objections to this definition of an extended stay, but neither is
9  persuasive.  First, Defendants claim that Plaintiffs have not
10  provided any evidence that the percentage of disabled inmates who
11  stay in Reception Centers longer than sixty days is greater than
12  the percentage of nondisabled inmates who do so.  This criticism is
13  unfounded because Plaintiffs have requested the information they
14  would need to make such a showing and Defendants have not provided
15  it to them.  Second, Defendants argue that if an extended stay is
16  defined by reference to when most inmates leave Reception Centers,
17  accommodations for extended stays should be measured by reference
18  to when most inmates begin earning sentencing credit, which
19  Defendants claim is 112.3 days after an inmate enters the prison
20  system.  Defendants, however, do not describe the factors that

21  _____

22  presumably cannot refer to inmates who spent no time at a Reception
    Center.  It might represent inmates who stayed a negligible amount
23  of time at a Reception Center, for example, inmates who were
    transferred out on the day they arrived, or it might represent
24  inmates who stayed less than one month in a Reception Center.
    Similarly, the row listing the number of inmates who stayed two
25  "RC_MOS" could mean they stayed up to two months or it could mean
    they stayed at least two but less than three months.  Plaintiffs
26  have represented that this row refers to the number of inmates who
    stayed no more than two months, or sixty days, and Defendants, who
27  were responsible for producing this chart, have not challenged that
    interpretation.  Therefore, the Court so interprets the chart.

28                              55

United States District Court
For the Northern District of California

1  contribute to this figure.  If two-thirds of inmates transfer out
2  of Reception Centers within sixty days of their entry into the
3  prison system, but most do not start earning sentencing credits for
4  another fifty two days, some other factors must cause the
5  additional delay.  The accommodations for extended-stay disabled
6  inmates only require the CDC to place the disabled inmate in the
7  position he or she would have held on a vocational or similar
8  waiting list had the inmate been transferred prior to the extended
9  stay.  Any other factors that affect all inmates' ability to earn
10  sentencing credits, therefore, presumably will affect extended-stay
11  inmates as well as other inmates.

12      The Court notes that by agreeing that an extended stay will be
13  defined as a stay that exceeds a fixed number of days, the parties
14  have implicitly agreed to a compromise.  Absent this agreement, any
15  inmate who could show that his Reception Center stay was extended
16  solely due to his disability, and not for purposes of reasonable
17  administrative processing related to his disability, would have a
18  right to be accommodated.  That is, if a disabled inmate would have
19  been transferred after two weeks in the Reception Center if he had
20  not been disabled, but remained at the Reception Center for four
21  weeks because no DPP placements were available for him until that
22  time, that inmate suffered discrimination solely due to his
23  disability and the CDC would have a duty to accommodate him for
24  lost privileges and for the lost opportunity to earn sentencing
25  credits.  By agreeing that an extended stay will be defined as a
26  fixed number of days that is greater than four weeks, Plaintiffs
27  have implicitly agreed that this hypothetical inmate will not be

28                              56

United States District Court

For the Northern District of California

accommodated for the discrimination he suffered.  Moreover,
Plaintiffs have implicitly agreed that the maximum period of time
for which an inmate must be accommodated is the period of the pre-
defined extended stay.  That is, if an inmate ordinarily would have
been transferred after ten days in the Reception Center, but
remained 150 days solely due to his disability, and an extended
stay is defined as ninety days, the inmate will be accommodated
only for sixty days rather than for the full 140 days of the
disability-related delay.  In turn, Defendants have implicitly
agreed that disabled inmates who remain in Reception Centers will
be presumed to have been detained for an extended period of time
solely due to their disabilities and not because of reasonable
processing requirements.  In its March 20 Order, the Court ruled
that the parties' accommodation scheme was only realistic if the
CDC bore the burden of establishing that extended stays were not
attributable to an inmate's disability.  March 20 Order at 35.

     As a compromise measure, the plans for accommodating disabled
prisoners' extended stays may sometimes exceed and sometimes fall
short of what the ADA and § 504 require.  Under the terms of the
stipulated remedial procedure in this case, the Court cannot order
Defendants to adopt policies that exceed the requirements of the
ADA and § 504.  Therefore, if Defendants are not willing to accept
the revisions to their plan set forth in Section B below,
Defendants must adopt a policy that meets but does not exceed the
requirements of these statutes:  the CDC must accommodate all
inmates whose Reception Center stays are extended due to the
inmates' disabilities.  If an inmate claims that he or she has been

57

subject to an extended stay due to a disability, the CDC shall
provide the inmate with all relevant information that would permit
the inmate to determine if his or her transfer from the Reception
Center has been delayed for disability-related reasons.  Extended-
stay inmates must receive mainline privileges during such an
extended stay and must be compensated for lost sentencing credits
due to the extended stay.  Revisions effectuating these alternative
policies are set out in Section C below.

B.   Accommodations for Extended Reception Center Stays

In its March 20 Order, the Court ruled that Defendants must
accommodate inmates who endure extended Reception Center stays
solely due to their disabilities in two ways.  First, during their
extended Reception Center stay, the CDC must provide them with
privileges they would enjoy if they were in mainline institutions.
Second, they must ensure that these inmates have the same
opportunity to earn sentencing credits that they would have had if
their transfers out of Reception Centers not been delayed due to
their disabilities.

1.   Mainline Privileges

Regarding the first issue, Defendants raise an undue burden
and fundamental alteration defense and claim that the policy of
providing equal privileges to all inmates in Reception Centers is
justified by legitimate penological objectives.  To support these
arguments, Defendants again rely on a statement by CDC Director
Terhune.  The only specific reasons Mr. Terhune offers in support
of these defenses are the following:

Reception centers do not have the mechanisms to provide such

58

United States District Court
For the Northern District of California

privileges, and providing them to these inmates when they are
unavailable to the inmate population generally would be
contrary to legitimate penological interests. Among other
problems, providing privileges to these inmates would endanger
their safety and the security of the facilities.

May 5 Humes Decl. Att. A at 2. These statements are too general or
conclusory to establish the asserted defenses. As the Court
explained in Section I, above, the fact that a State agency
complied with the procedural requirements for asserting an undue
burden or fundamental alteration defense is not sufficient to
establish the defense. The agency must prove that the
accommodation would result in an undue burden or fundamental
alteration, and even if it makes this showing, must nevertheless
take other action that will accommodate disabled inmates without
causing undue burdens or fundamental alterations. Defendants offer
no evidence that the Reception Centers cannot provide these
privileges, and do not explain whether providing the privileges
would impose undue financial or administrative costs or would
somehow interfere with other activities central to the mission of
these facilities. Nor do they distinguish among various privileges
to determine whether some could be provided without imposing an
undue burden or fundamentally altering the Reception Center
mission. See March 20 Order at 29-30 (listing various mainline
privileges that are not available in Receptions Centers, ranging
from phone privileges to access to weight-lifting facilities).
Although it may be that providing certain mainline privileges would
impose an undue burden on the prison system, Defendants have failed
to provide information that would permit the Court to discriminate
between the privileges at issue. Therefore, the Court must

United States District Court

For the Northern District of California

conclude that Defendants have failed to establish that this accommodation would impose an undue burden or would fundamentally alter the nature of Reception Center services, programs or activities.

Defendants have also failed to justify their claim that providing this accommodation would interfere with legitimate penological objectives.  Mr. Terhune claims that providing extended-stay disabled inmates with privileges unavailable to other prisoners would endanger their safety and the security of the facilities, but does not explain why it would have this effect. Previously, Defendants argued that this accommodation would cause conflict among prisoners because of perceived favoritism benefitting disabled inmates.  The Court did not find this argument credible, in part because the CDC had already agreed to provide other sorts of accommodation for this same group of inmates.  See March 20 Order at 34.  The Court noted that Defendants had not provided a declaration by a prison official with demonstrated expertise in this area to explain how the CDC's policy was rationally related to the asserted penological concern. Mr. Terhune, as Director of the prison system, presumably has expertise in this area, but his statement provides even less explanation than Defendants previously offered to the Court, and does not persuade the Court that there is a rational connection between the accommodation and penological concerns.  Therefore, Defendants have failed to demonstrate that their policy of refusing to provide mainline privileges to accommodate extended-stay disabled inmates is justified by legitimate penological concerns.

United States District Court

For the Northern District of California

1    The Court below orders Defendants to revise their remedial
2    plans to ensure that inmates who remain at Reception Centers for
3    extended periods of time solely due to their disabilities enjoy
4    mainline privileges during those extended stays.

5        2.    Sentencing Credits

6        In its March 20 Order, the Court considered whether
7    Defendants' plans adequately accommodated extended-stay disabled
8    inmates for the lost opportunity to earn sentencing credits.  At
9    that time, the AB required that when an extended-stay inmate was
10   transferred to a mainline institution, he or she would be placed on
11   the waiting list for a work assignment at the position in the
12   waiting list where the inmate would have been had he or she arrived
13   on the ninety first day after entering the prison system.  March 20
14   Order at 30.  If the length of the inmate's extended stay exceeded
15   the waiting period on the list, the inmate would be placed at the
16   top of the waiting list and granted A1 work status, earning one-
17   for-one time.  Id. at 30-31.  The Court noted that this plan
18   undercompensated inmates whose extended stays lasted longer than
19   the waiting period on the list, id. at 34, and ordered Defendants
20   to revise their plan accordingly, id. at 35-36, 67.

21       Defendants have proposed the following revision:

22                   RECEPTION CENTER PROCESSING

23       Generally -- Inmates with disabilities will be processed out
         of Reception Centers in a timely manner, in no more than 90
24       days from the date they are received by the Department, unless
         detained by factors not attributable to the Department's delay
25       (e.g., medical necessity, court appearances, etc.).

26       Extended Reception Center Policy -- The central file of all
         inmates with disabilities received from Reception Centers will
27       be reviewed at the receiving program institution to determine

28                              61

1
2
3
4
5
6
7
8
9

> if the inmate's stay exceeded 90 days.  If so, the case will
> be reviewed to determine if the extended stay was caused by
> the inmate's disability (e.g., no accessible bedspace, need
> for an interpreter, need to obtain a diagnosis, etc.) or by
> other factors.  If the inmate's disability was the sole cause,
> adjustment to the inmate's worktime credits will be made, once
> the inmate is received at the program institution, to reflect
> credits as if the inmate were engaged in the work program on
> the 91st day.  If the extended stay was not due to the
> disability alone, the inmate will not be granted relief.  An
> inmate who is determined to have been on extended stay due
> solely to a disability, but whose stay was further extended
> due to an occurrence not specifically associated with the
> disability, will be given worktime credit relief only for the
> extended period that preceded the occurrence, whether or not
> the inmate was responsible for it.  Relief will not be given
> for the day of the occurrence or for any period that follows
> it.

10
11
12
13

Decl. of James M. Humes, filed June 19, 1998 (June 19 Humes Decl.),

Att. A at 2-3.  The Court finds this revision unacceptable for

three reasons.

14
15
16
17
18
19
20
21
22
23
24
25
26
27

First, Plaintiffs note that Defendants' plans only require

accommodations after an inmate has been transferred out of a

Reception Center.  As discussed above, the plans provide no

mechanism for extending mainline privileges to extended-stay

inmates while they remain at Reception Centers, and they provide no

means of adjusting the sentencing credits for inmates with short

sentences who never are transferred out of a Reception Center.

With respect to inmates with short sentences, Defendants note that

many inmates with short sentences, whether disabled or not, serve

their entire terms at Reception Centers.  Therefore, Defendants

argue, disabled inmates who find themselves in that situation are

not suffering disability-related discrimination.  Plaintiffs,

however, only seek accommodation for disabled inmates who serve

their entire sentences at Reception Centers only because of their

28

United States District Court
For the Northern District of California

disabilities.  So tailored, Plaintiffs' requested modification
addresses a violation of the ADA and § 504 and does not go beyond
the requirements of these statutes.  Therefore, the Court revises
the policy to address Plaintiffs' concerns, as set forth in the
following section.

Second, Defendants' proposed policy contains ambiguities that
invite further litigation.  The policy requires receiving
institutions to review disabled inmates' central files to determine
"if the extended stay was caused by the inmate's disability."  It
is not clear, however, whether the CDC is to review the inmate's
entire stay to determine if disability-related delays occurred or
is only required to check whether disability-related delays
occurred during the period of the extended stay, that is, on or
after the sixty first day of the inmate's stay.  Later, the policy
states that, when a non-disability-related delay occurs during the
extended stay period, the inmate "will be given worktime credit
relief only for the extended period that preceded the occurrence."
This implies that inmates will be accommodated only if disability-
related delays occur during the period of the extended stay.  This
statement also suggests that the CDC must identify discrete periods
of delay that are solely attributable to the inmate's disability
and accommodate the inmate for those delays, but only for those
delays.  Elsewhere, however, the policy states, "If the extended
stay was not due to the disability alone, the inmate will not be
granted relief."  This could be interpreted to bar all relief if at
any time the inmate's transfer was delayed due to reasons other
than the inmate's disability.

63

1    In order to avoid unnecessary litigation over the meaning of
2    this policy, the Court revises it to conform to the terms of the
3    implicit compromise reached by the parties.  As the Court explained
4    above, Plaintiffs have agreed to limit the CDC's duty to
5    accommodate inmates for extended stays.  In turn, Defendants have
6    agreed that disabled inmates whose stays exceed a fixed period of
7    time will be presumed to have been delayed at some point because of
8    their disabilities.  The CDC bears the burden of proving otherwise.
9    Therefore, the Court revises the policy as follows:

> If a disabled inmate remains at a Reception Center for more
> than sixty days, a presumption arises that the extended stay
> is solely due to the inmate's disability.  To overcome this
> presumption, the CDC must demonstrate that the inmate's
> transfer out of the Reception Center was at no time delayed
> solely due to the inmate's disability.  In this case, the CDC
> need not accommodate the inmate for the extended stay.
> Alternatively, the CDC may demonstrate that the cumulative
> period of all disability-related delays was shorter than the
> inmate's extended stay, in which case the CDC need only
> accommodate the inmate for the cumulative period of
> disability-related delays.

C.   Revisions

Defendants shall replace Section III(B)(1) of the AB, at page
thirteen of the AB, with one of the following policies.  The first
policy is based on a fixed definition of an extended stay.  If
Defendants object to adopting this policy, they must adopt the
second policy instead.  The first policy is the following:

> 1.   Adjustments Due to Extended RC Stay:  Inmates with
> disabilities will be processed out of Reception Centers
> in a timely manner, in no more than sixty days from the
> date they are received by the Department, unless detained
> due to factors not attributable to the Department's delay
> (e.g., medical necessity, court appearances).  Any period
> of time beyond the initial sixty days of a disabled
> inmate's stay at a Reception Center shall be referred to
> as the inmate's extended stay.

64

If a disabled inmate remains at a Reception Center for more than sixty days, a presumption arises that the extended stay is solely due to the inmate's disability. To overcome this presumption, the CDC must demonstrate that the inmate's transfer out of the Reception Center was at no time delayed solely due to the inmate's disability. In this case, the CDC need not accommodate the inmate for the extended stay. Alternatively, the CDC may demonstrate that the cumulative period of all disability-related delays was shorter than the inmate's extended stay, in which case the CDC need only accommodate the inmate for the cumulative period of disability-related delays.

When it comes to the CDC's attention that a disabled inmate's Reception Center stay has been extended beyond sixty days solely due to the inmate's disability, the CDC shall accommodate the inmate as described below. A disabled inmate may also file a Form 1824 grievance, as provided in Section ___ of the AB, to request accommodation for an extended stay.

Accommodations:
Disabled inmates who remain at Reception Centers for extended stays shall be granted, during their extended stays, privileges that are available at mainline institutions.

Disabled inmates who remain at Reception Centers for extended stays and who are serving sentences of less than one year shall, pursuant to the procedures described below, receive sentencing credits that they could have earned if they had been transferred to a mainline institution on the sixty first day of their Reception Center stay.

The central file of all inmates with disabilities received from Reception Centers will be reviewed at the receiving program institution to determine if the inmate's stay exceeded sixty days. If so, the inmate's extended stay shall be presumed to be solely due to the inmate's disability unless the CDC can overcome this presumption as provided above.

If the inmate's disability was the sole cause, adjustment to the inmate's worktime credits will be made, once the inmate is received at the program institution, to reflect credits as if the inmate were engaged in the work program on the sixty first day.

If Defendants do not wish to adopt the foregoing policy, they must adopt the following policy in its place:

65

United States District Court

For the Northern District of California

1.    Adjustments Due to Extended RC Stay:  Any disabled inmate whose stay in a Reception Center is extended at any point solely due to his or her disability shall be accommodated for this extended stay as provided below.

When it comes to the CDC's attention that a disabled inmate's Reception Center stay has been extended solely due to the inmate's disability, the CDC shall accommodate the inmate as described below.  A disabled inmate may also file a Form 1824 grievance, as provided in Section ___ of the AB, to request accommodation for an extended stay.

Accommodations:
Disabled inmates who remain at Reception Centers for extended stays shall be granted privileges that are available at mainline institutions during their extended stays.

Disabled inmates who remain at Reception Centers for extended stays and who are serving sentences of less than one year shall receive sentencing credits that they could have earned if their transfer to a mainline institution had not been delayed due to their disabilities.

The central file of all inmates with disabilities received from Reception Centers will be reviewed at the receiving program institution to determine if their Reception Center stays were extended for reasons solely due to their disabilities.  If so, the inmates shall be accommodated for the lost opportunity to earn sentencing credits during the period ~~for~~ of any and all disability-related delays.

VI.  Other Reception Center Issues

A.    Seven-Day Transfer Policy at Reception Centers

The CDC has designated all but six Reception Centers as DPP facilities.  The AB provides that disabled inmates who enter the system through one of the nondesignated Reception Centers be transferred to a designated Reception Center within seven days of their arrival.  Plaintiffs have argued that the time limit for transfer should be reduced to forty eight hours because disabled inmates will experience significant hardship in facilities that are not designed to accommodate them.  Defendants, however, have

66

1   represented that all nondesignated Reception Centers will have
2   accessible beds.  Plaintiffs agree that the seven-day transfer
3   policy is acceptable if Defendants guarantee in their remedial
4   plans that all Reception Centers will provide accessible beds.

5       The Court, therefore, orders Defendants to ensure that all
6   non-DPP Reception Centers have accessible beds sufficient to
7   accommodate disabled inmates during their seven-day stays pending
8   transfer to a DPP Reception Center.  The Court also orders
9   Defendants to revise Section I(F)(1) of the AB by adding the
10  following sentence to the paragraph beginning, "Refer to the RC
11  Processing Policy . . .":  "All Reception Centers, however, will
12  have sufficient accessible beds to accommodate disabled inmates
13  awaiting transfer to a DPP Reception Center."

14      B.   Reception Center Beds in San Francisco Bay Area

15      Plaintiffs argue that the Reception Center at Deuel Vocational
16  Institution (DVI) provides insufficient wheelchair-accessible beds.
17  DVI has six accessible beds, but the number of wheelchair users
18  averaged 6.2 in the first three months of 1998.  The maximum number
19  of wheelchair users at DVI in this period was ten.  In the last six
20  months of 1997, the average number of wheelchair users in the DVI
21  Reception Center was 11.6 and the maximum was 20.  From mid-
22  September, 1996 through June, 1997, the average was 6.3 and the
23  maximum was 11.  Plaintiffs also note that Defendants project that
24  the Reception Center population will grow by six percent annually.
25  Based on the 6.2 average population in the early months of 1998 and
26  the maximum of ten, the DVI Reception Center population should
27  reach an average of eight and a maximum of thirteen by 2003.

28                              67

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  Defendants currently have no plans to increase the number of
2  accessible beds at this Reception Center.

3       Defendants defend their plans by explaining that the evidence
4  is still inconclusive regarding the number of accessible beds
5  required at DVI.  They explain that they are monitoring the
6  situation and, if necessary, will increase the number of accessible
7  beds there.  Defendants claim that the evidence is inconclusive for
8  three reasons.  First, they state that the backlog of wheelchair
9  users in Reception Centers that existed before the CDC implemented
10 the DPP has gradually declined and will continue to decline.
11 However, it appears that a year ago the numbers were roughly the
12 same as they were in early 1998, but that they rose in the second
13 half of 1997 and dropped again at the beginning of this year.
14 Defendants do not explain this pattern.  Second, Defendants claim
15 that they have the flexibility to redirect wheelchair users from
16 DVI to other Reception Centers with accessible beds and note that
17 the DPP provides 108 accessible Reception Center beds throughout
18 the prison system, whereas the actual count of wheelchair users in
19 Reception Centers has never exceeded sixty-nine.  Defendants do not
20 explain, however, why the CDC has not been able to exercise this
21 flexibility to keep the number of wheelchair users at DVI down to
22 six, or why it will be able to do so in the future if it has not
23 yet done so.  Plaintiffs note that they alerted Defendants to the
24 problems faced by wheelchair users at DVI in a detailed letter
25 dated September 24, 1997.  See Decl. of Sara Norman in Supp. of
26 Plfs' Reply to Defs' Oppos. to Plfs' Suppl. Br., filed May 28, 1998
27 (May 28 Norman Decl.), Ex. A.  Third, Defendants argue that DVI

28                                         68

United States District Court

For the Northern District of California

1  overcounted the number of wheelchair users in the facility, by
2  including inmates who need wheelchairs only to travel long
3  distances, but who do not need structurally modified cells.
4  Defendants have not, however, provided corrected numbers.
5  Plaintiffs note that inmates who are able to move short distances
6  without wheelchairs may still need accessible paths of travel
7  adjacent to their cells, which might only be available near
8  accessible cells.

9       The Court concludes that Plaintiffs have shown that providing
10 only six accessible beds in the DVI Reception Center is
11 insufficient to meet the needs of the center's inmates who use
12 wheelchairs.  Although the number of accessible Reception Center
13 beds in the whole prison system appears to exceed the number of
14 Reception Center inmates who use wheelchairs, Defendants have not
15 demonstrated that the system provides sufficient flexibility to
16 avoid the chronic shortage of wheelchair-accessible beds at DVI.
17 Plaintiffs have not made a specific proposal for the number of
18 accessible beds that should be made available at DVI.  If the
19 number of accessible beds equals the average number of inmates who
20 use wheelchairs, the facility will provide insufficient wheelchair-
21 accessible beds half the time.  Therefore, the Court, giving
22 Defendants the benefit of the assumption that the higher numbers in
23 late 1997 were an aberration, relies on the maximum number in the
24 early months of 1997 and 1998, adjusted by the projected six
25 percent growth rate in the prison system's population.  Therefore,
26 the Court orders Defendants to revise their remedial plans so that
27 DVI's Reception Center will have at least thirteen accessible beds.
28                                69

United States District Court

For the Northern District of California

1  VII.  Substance Abuse Programs

2      A.    Access to CAP

3      In a letter dated June 22, 1998, Defendants informed the Court

4  that the parties have agreed on a transition plan for the female

5  civil addict program and substance abuse program as ordered in the

6  March 20 Order at 66, and that these programs are expected to be

7  operational in July, 1998.  This agreement has not been submitted

8  to the Court.  The Court orders Defendants to incorporate these

9  agreements into their remedial plans and to revise Section III(C)

10  to be consistent with the Court's rulings and the parties'

11  agreements.

12      B.    Long-Term Substance Abuse Treatment for Women

13      In its March 20 Order, the Court ruled that Defendants'

14  remedial plans violate the ADA and § 504 because disabled inmates

15  are excluded from the CDC's only long-term substance abuse

16  treatment program for women, Forever Free.  Defendants report that

17  the CDC has opened New Choice, an accessible long-term substance

18  abuse treatment program at CCWF, a DPP facility.  The program was

19  scheduled to open on July 1, 1998 and was to be open to disabled

20  inmates from its inception.  As described by Defendants, the

21  program is comparable to Forever Free: the participants live

22  together, they are segregated from the general prison population,

23  they remain in the program for six to twelve months, and they

24  participate in community-based aftercare programs after their

25  release.  Plaintiffs agree that this program provides equivalent

26  access to disabled inmates, but request that documents establishing

27  and implementing the program be incorporated into Defendants'

28                                      70

remedial plans.  Defendants object to this request as unnecessary.

The Court orders Defendants to revise the AB to include a new paragraph 5 under Roman Numeral I, "DPP Basic Components," and subheading F, "DPP Designated Sites" at page seven of the AB:

> 5.  Equivalent Programming:  DPP facilities shall offer disabled inmates a range of programming equivalent to that available to non-disabled inmates.  For example, a DPP facility for women shall offer an accessible long-term substance abuse treatment program equivalent to the Forever Free program at CIW.

Defendants need not provide specific documentation regarding the establishment or implementation of the New Choice program.

VIII. Explanation of Undue Burden Defense in AB

In its October 8 Order, the Court ruled that the AB failed to comply with the ADA and § 504 because it did not properly describe either the substantive or the procedural requirements for establishing an undue burden or fundamental alteration defense under these laws, or explain that, even if the CDC can establish these defenses, it must still take other actions to accommodate disabled inmates that will not result in undue burdens or fundamental alterations of CDC programs.  See Oct. 8 Order at 26-27.  Defendants' Supplemental AB includes the following language:

> Undue Burden:  A requested accommodation may be denied for the reason that it poses an undue burden.  An undue burden may be administrative or financial.  A requested accommodation is unduly financially burdensome when, in a cost benefit analysis, its cost would be an unjustifiable waste of public money.  The Warden, P&CSD Regional Administrator, or (in the case of some medical accommodation) Health Care Manager or Regional Administrator or his/her designee is responsible for the determination of undue burden.  Requested accommodations may also be denied because they would fundamentally alter the nature of the program or operation to which they apply.

Decl. of James M. Humes in Supp. of Dfts' Response to Court Order

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  of May 4, 1998, filed May 14, 1998 (May 14 Humes Decl.), Att. B at
2  5.  This statement does not correctly describe the undue burden and
3  fundamental alteration defenses under the ADA and § 504.  See
4  generally, Oct. 8 Order at 7-8 & n.3, 9, 11-14.  The decision that
5  an accommodation would result in an undue burden must be made by
6  the director of the agency or his or her designee, after
7  consideration of all available resources, and must be explained in
8  a written statement.  The standard for compliance is whether the
9  accommodation would impose an undue burden after considering all
10  available resources, not whether the agency deems the accommodation
11  an unjustifiable waste of public resources.  The statement does not
12  explain that, even if the CDC is able to establish that an
13  accommodation would result in an undue burden or fundamental
14  alteration, the CDC still must take other action necessary to
15  accommodate disabled inmates.

16      Plaintiffs propose alternative language that corrects these
17  errors.  For reasons stated in Section I, above, the Court has
18  omitted the last sentence of Plaintiffs' proposed revision.  The
19  Court has also incorporated the fundamental alteration defense into
20  the same passage.  The Court orders Defendants to replace
21  Section I(D)(6) of the AB with the following:

22      Undue Burden and Fundamental Alteration Defenses:  The CDC
        need not take an action to provide accessibility to a service,
23      program or activity if it can prove that the action would
        impose an undue financial or administrative burden on the
24      agency or would fundamentally alter the nature of the service,
        program or activity.  The determination that an action would
25      result in an undue burden or fundamental alteration may only
        be made by the Director or his or her designee.  The decision
26      must be made only after consideration of all resources
        available for use in the funding and operation of the service,
27      program, or activity, and must be accompanied by a written

28                                  72

statement of the reasons for reaching that conclusion.  Even
if the requested action would impose an undue burden or
fundamentally alter a service, program or activity, the CDC
must take any other action that would not result in an undue
burden or fundamental alteration, but would still ensure that
disabled inmates receive the benefits of the service, program
or activity.

IX.  Explanation of Maintenance Obligation in AB

In its October 8 Order, the Court ruled that the AB did not

comply with the ADA or § 504 because it did not accurately describe

the CDC's obligations to maintain in operable working condition the

structural features and equipment necessary to accommodate disabled

prisoners.  See Oct. 8 Order at 27 (citing 28 C.F.R. § 35.133).

The CDC's Supplemental AB addresses the agency's maintenance

obligations for health care appliances and wheelchairs.  May 14

Humes Decl. Att. B at 31-32.  These paragraphs do not cover all

equipment or structural features, necessary to accommodate disabled

inmates, that might require maintenance.  Therefore, the Court

orders Defendants to add the following language to Section I(D) of

the AB as a new paragraph 8:

> Maintenance of Accessible Features and Equipment:  The CDC has
> a duty to maintain in operable working condition structural
> features and equipment necessary to make the prison system's
> services, programs and activities accessible to disabled
> inmates.  Isolated or temporary interruptions in service or
> access due to maintenance or repairs are not prohibited.

X.  Definition of "Aligned Program Areas"

In the briefs on the first set of contested issues, Plaintiffs

argued that Defendants' policy for new prison construction did not

comply with the ADA or § 504.  The policy provided that two percent

of housing units and "aligned program areas" would be designed and

built to be accessible.  Plaintiffs argued that the term "aligned

73

United States District Court

For the Northern District of California

1  program areas" was too narrow, because federal guidelines required
2  that all common use areas must be built to be accessible.  At oral
3  argument, Defendants stated that "aligned program areas" referred
4  to all program areas that would be available to able-bodied
5  prisoners living in the area of the prison where the structurally-
6  accessible housing units are located.  Plaintiffs withdrew their
7  objection based on this representation.  The Court has directed
8  Defendants to revise their policy to reflect this definition of the
9  term.  See, e.g., Oct. 8 Order at 31; March 20 Order at 66.

10  Defendants' revision of the policy defines "aligned program
11  areas" as "those program areas that are adjacent to and that will
12  service the units that have accessible bedspace."  May 5 Humes
13  Decl. Att. A at Ex. A.  This language includes an additional
14  requirement, that the areas be adjacent to the accessible beds,
15  which was not part of Defendants' prior representations about the
16  meaning of "aligned program areas."  This language also fails to
17  comply with federal regulations or guidelines.  ADA and § 504
18  regulations require that new facilities be designed and constructed
19  in such manner that they be readily accessible to and usable by
20  persons with disabilities.  28 C.F.R. § 35.151(a); 28 C.F.R.
21  § 41.58(a).  New construction that conforms with the Uniform
22  Federal Accessibility Standards (UFAS) or ADA Accessibility
23  Guidelines (ADAAG) is deemed to comply with ADA regulations.  28
24  C.F.R. § 35.151(c).  Because Defendants' policy only requires that
25  program areas adjacent to accessible housing units be built to be
26  structurally accessible, the policy does not ensure that the new
27  prison will be readily accessible to disabled inmates, and thus
28  
                                    74

fails to comply with ADA or § 504 regulations.  The policy also does not comply with UFAS guidelines, which require that "all common use" areas be built to be accessible, 41 C.F.R. Part 101-19.6, Appendix A at § 4.1.4(9)(c), or with ADAAG guidelines, which require that "[a]ll public areas and those common use areas serving accessible cells" be designed and built to be accessible.  63 Fed. Reg. 2000, 2009 (§ 12.1).  Defendants' policy would require only those common use areas adjacent to accessible beds to be accessible.

Plaintiffs propose language that reflects Defendants' prior representations about the meaning of "aligned program areas."  The Court modifies it slightly to refer expressly to "common use areas," as suggested by the federal guidelines.  Therefore, the Court orders Defendants to revise the new prison construction policy set forth in Exhibit A of Attachment A of the May 5 Humes declaration by replacing the third sentence of the first paragraph with the following:  "All program and common use areas that would be available to non-disabled prisoners living in the area of the prison where the structurally accessible housing units are located shall also be designed and built to be accessible."

XI.  Alteration to Existing Facilities Policy

Defendants note that federal guidelines for alterations of detention and correctional facilities no longer require that altered areas be made structurally accessible to the maximum extent possible.  <u>See</u> 63 Fed. Reg. 2011.  Plaintiffs concede this point. Therefore, based on a change in the regulations, the Court reverses its prior ruling that Defendants' plans regarding alterations of

United States District Court

For the Northern District of California

1  existing facilities do not comply with the ADA or § 504.  <u>See</u>
2  Oct. 8 Order at 32.
3  XII. Compliance by Organizations under Contract with CDC
4       In its March 20 Order, the Court ruled that Defendants must
5  revise the AB to state the CDC's duty to ensure that organizations
6  that operate facilities under contract with the CDC comply with the
7  ADA and to describe how the CDC will fulfill that duty.  March 20
8  Order at 40-41 (citing 28 C.F.R. § 35.130(b)(1), (3)).  Defendants
9  have submitted a statement by Steven Cambra, Chief Deputy Director
10  of California Corrections, stating that the CDC has a policy of
11  including in all of its contracts with community-based facilities
12  "substantially the following language":  "'By signing this
13  contract, Contractor assures the State that it complies with the
14  Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101,
15  et seq., which prohibits discrimination on the basis of disability,
16  and with applicable regulations and guidelines issued pursuant to
17  the ADA.'"  Decl. of James M. Humes in Supp. of Defs' Second
18  Response to Court Order of May 4, 1998, filed June 19, 1998
19  (June 19 Humes Decl.) Att. A at 3.  Mr. Cambra notes, however, that
20  the CDC intends to cluster disabled inmates in designated Community
21  Correctional Rehabilitation Centers (CCRCs) in each parole region,
22  and does not intend to require that each CCRC be accessible.  <u>Id.</u>
23  Plaintiffs agree that the contractual language quoted above would
24  satisfy the CDC's obligations under the ADA and § 504.  The Court,
25  therefore, orders Defendants to add the following new Section
26  I(F)(5) on page seven of the AB:
27       5.   <u>Facilities Operated Under Contract:</u>  The CDC shall

28

include substantially the following language in all of its contracts for the operation of facilities that provide services, programs or activities for inmates or parolees:  "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

The fact that the CDC includes this language in each contract shall not preclude the CDC from employing the clustering approach to providing accessible community-based facilities for inmates and parolees:  the CDC will provide at least one DPP-accessible facility to serve male and female inmates in each Parole Region.

XIII. Order to Implement and Comply with Remedial Plan

Plaintiffs request that the Court enter an order requiring Defendants to comply with the AB, as clarified in documents generated during the parties' meet-and-confer process and as revised pursuant to this Court's orders.  They also request that the Court order Defendants to incorporate the AB, the meet-and-confer clarifications and the Court-ordered revisions into a single document, and that the Court order Defendants to comply with this superseding document.  Defendants argue that the Court should distinguish between those areas resolved by the parties in the meet-and-confer process and those areas resolved through litigation before the Court.  They argue that the Court should simply approve Defendants' plans to the extent they cover the former areas, and order Defendants to comply only with the latter areas.  The parties briefed these issues previously, in July, 1997.  See Plfs' Memo. of P&A in Supp. of Proposed Order, filed July 31, 1997; Defs' Position on Entry or Form of Order Regarding Resolved Matters, filed July 30, 1997.  The Court ruled on these arguments at a hearing held on

United States District Court

For the Northern District of California

1  September 26, 1997.  The Court stated that it would order
2  Defendants to comply with the entire remedial plan, but that
3  Defendants could seek a modification of any aspect of the plan that
4  exceeds what is required under the ADA or § 504.  Absent a motion
5  to modify the plan, however, Defendants could be held in contempt
6  for failing to abide by the plan.  Therefore, this issue has
7  already been decided.

8      At the September 26, 1997 hearing, the Court gave Defendants
9  the options of either including language required by the Prison
10 Litigation Reform Act, stating that the order was narrowly tailored
11 and the least intrusive means necessary to correct the violations
12 found by the Court, or excluding that language upon a stipulation
13 that Defendants will not challenge the order based on the absence
14 of that language.  See May 28 Norman Decl. Ex. B at 17:7-11, 18:21-
15 19:10.  The Court includes the language in this Order, but will
16 remove it if Defendants submit the necessary stipulation.

17     Defendants object to Plaintiffs' suggestion that the AB be
18 incorporated into a Court order requiring Plaintiffs to comply with
19 their remedial plans.  Defendants explain that the AB is scheduled
20 to expire in the fall of 1998, that they never intended the AB to
21 be a permanent document, and that they wish to enact their remedial
22 plans as a regulation.  The Court will order Defendants to comply
23 with the AB, as modified during the meet and confer process and by
24 this Court's orders, but also establishes a procedure by which
25 Defendants must incorporate these plans into a single document.
26 The Court will then issue a superseding order requiring Defendants
27 to comply with this single document.  If Defendants also wish to

28                                    78

enact these remedial plans as regulations, they may do so.

CONCLUSION

For the foregoing reasons, the Court orders Defendants to revise their remedial plans as provided in this order.

On or about November 2, 1998, the Court also intends to issue the attached order requiring Defendants to comply with the remedial plans that have resulted from the stipulated remedial procedure set forth in Sections A(1)-(3) and C of the Remedial Order.  These plans shall include, but may not be limited to, the AB, the clarifications to the AB agreed upon by the parties during the meet-and-confer process, see May 7 Norman Decl. Ex. L, Defendants' new construction policy, and three orders issued by this Court, the Oct. 8 Order, the March 20 Order and this Order.  By October 9, 1998, the parties submit to the Court any additional documents that are part of these remedial plans and that should be incorporated into the order and shall bring to the Court's attention any clerical errors in the revisions ordered by the Court.  If the Court concludes that the attached order should be modified, it shall inform the parties by October 23, 1998.  By October 27, 1998, the parties shall submit to the Court the attached stipulation, which is substantially similar to the stipulation attached as Exhibit D to the Stipulated Procedures and referred to in § A(3) of the Remedial Order.  All documents that form part of Defendants' remedial plans shall be attached to that stipulation.

The Court also orders Defendants to produce a single document that incorporates the elements of their remedial plans that are contained in these separate documents.  By November 4, 1998,

79

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  Defendants shall submit this document to Plaintiffs; the parties
2  shall meet and confer during the month of November to correct any
3  errors noted by Plaintiffs, and by November 30, 1998, Defendants
4  shall submit this document to the Court on paper and on disk in
5  WordPerfect format (version 6.1 or earlier).  Plaintiffs may submit
6  a brief two weeks thereafter objecting to any of the contents of
7  the document on the basis that the document does not accurately
8  reflect the contents of the separate documents that comprise
9  Defendants' remedial plans.  The Court shall revise the document if
10 necessary and issue a superseding order requiring Defendants to
11 comply with the integrated remedial plan.  This process of
12 integrating Defendants' plans into a single document shall not
13 delay Defendants' duty to comply with the Court's order effective
14 November 2, 1998.

15

16 Dated:   SEP 16 1998

                                CLAUDIA WILKEN
17                              United States District Judge
18
19
20 Copies mailed to counsel
   as noted on the following page
21
22
23
24
25
26
27
28                                  80

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7               FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   JOHN ARMSTRONG, JAMES AMAURIC,            No. C 94-02307 CW
    RICHARD PONCIANO, JACK SWENSEN,
10  BILLY BECK, JUDY FENDT, WALTER            ORDER DIRECTING
    FRATUS, GREGORY SANDOVAL, DARLENE         DEFENDANTS TO
11  MADISON, PETER RICHARDSON, STEVEN         COMPLY WITH
    HILL, ROY ZATTIERO, and all others       REMEDIAL PLANS
12  similarly situated,

13            Plaintiffs,

14      v.

15  PETE WILSON, JOSEPH C. SANDOVAL,
16  JAMES GOMEZ, Director, Department of
    Corrections, KYLE MCKINSEY, KEVIN
17  CARRUTH, DAVID TRISTAN, MARISELA
    MONTES, Deputy Director of the Parole
18  and Community Services Division,

19            Defendants.

20  ------------------------

21  UNITED STATES OF AMERICA,

22            Amicus Curiae

23  _____/

24

25

26       Pursuant to the stipulated Remedial Order and Injunction filed

27  on September 20, 1996, Defendants have proposed remedial plans to

28  correct violations of the Americans with Disabilities Act (ADA) and

United States District Court

For the Northern District of California

1  § 504 of the Rehabilitation Act of 1973 (§ 504) in the California
2  Department of Corrections (CDC) with respect to the certified class
3  of disabled prisoners and parolees.   Pursuant to Section A of that
4  Order the parties have met and conferred about Defendants'
5  submission.   The parties came to agreement on most aspects of these
6  plans and have submitted a stipulation stating that these parts of
7  the plans are consistent with the standards set forth in Section C
8  of the Remedial Order (Standards for Judicial Review) and will be
9  implemented by Defendants.   This stipulation is attached hereto as
10 Exhibit 1.   They have stipulated, and request the Court to find,
11 that these parts of the remedial plans are narrowly drawn, extend
12 no further than necessary to correct the violation of the rights at
13 issue, and are the least intrusive means necessary to correct the
14 violation of the rights.   The Court so finds.

15      Pursuant to Sections A(3) and C of the Remedial Order,
16 Plaintiffs have submitted several contested issues regarding these
17 remedial plans to the Court for review.   In response to Plaintiffs'
18 motions, the Court has determined that several aspects of
19 Defendants' remedial plans did not comply with the ADA and § 504
20 and thus ordered Defendants to modify those plans so that they
21 would comply with these statutes.   The Court's orders were narrowly
22 drawn, extended no further than necessary to correct the violation
23 of the rights at issue and were the least intrusive means necessary
24 to correct the violation of the rights.

25      The Court orders Defendants to comply with the remedial plans
26 attached hereto as Exhibit 2.   Any part of the documents included
27 in Exhibit 2 that conflict with the Court's orders that are

28                                    2

United States District Court
For the Northern District of California

1 included in Exhibit 2 are superseded by the Court's orders.
2 Defendants may move to modify this order based on a need to change
3 a policy or procedure.  The Court will grant Defendants' motion if
4 the proposed modification complies with the ADA and § 504.  Prior
5 to making such a motion, Defendants must notify Plaintiffs of a
6 proposed change and provide them with the information necessary to
7 evaluate such modification.

8     Plaintiffs shall be entitled to reasonable access to
9 information sufficient to monitor Defendants' compliance with these
10 remedial plans.  Such monitoring shall include access to relevant
11 documents, receiving reports from Defendants on subjects specified
12 in Section A of the Remedial Order, tours of the institutions with
13 and without consultants and experts, interviews or depositions of
14 institution and departmental staff and scheduled interviews with
15 inmates.  Brief interviews with inmates may be conducted during the
16 tours, which may be conducted no more than every quarter at each
17 institution or facility.

18     The Court shall retain jurisdiction to enforce the terms of
19 this Order.  If Plaintiffs' counsel have reason to believe that
20 Defendants are not complying with the terms of the remedial plans
21 attached to this Order, they shall notify Defendants.  The parties
22 shall attempt to resolve the issue informally before pursuing a
23 judicial remedy.  Upon appropriate motion, the Court may issue an
24 order permitted by law, including contempt, necessary to ensure
25 that Defendants comply with the attached remedial plans.
26 Defendants may move the Court to vacate this order on the ground
27 that they have substantially complied with its provisions for a

28                                3

1  period of two years, provided that such motion shall not be made

2  earlier than one year after the date of this Order.  This motion

3  shall be filed pursuant to Rule 60(b)(5) of the Federal Rules of

4  Civil Procedure or other applicable law.

5      IT IS SO ORDERED.

6

7

8  Dated:                                    _____

9                                            CLAUDIA WILKEN
                                             United States District Judge

10

11

12  Copies mailed to counsel
    as noted on the following page

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, JAMES AMAURIC,
RICHARD PONCIANO, JACK SWENSEN,
BILLY BECK, JUDY FENDT, WALTER
FRATUS, GREGORY SANDOVAL, DARLENE
MADISON, PETER RICHARDSON, STEVEN
HILL, ROY ZATTIERO, and all others
similarly situated,

        Plaintiffs,

  v.

PETE WILSON, JOSEPH C. SANDOVAL,
JAMES GOMEZ, Director, Department of
Corrections, KYLE MCKINSEY, KEVIN
CARRUTH, DAVID TRISTAN, MARISELA
MONTES, Deputy Director of the Parole
and Community Services Division,

        Defendants.

------------------------

UNITED STATES OF AMERICA,

        Amicus Curiae

_____/

No. C 94-02307 CW

STIPULATION
APPROVING
DEFENDANTS'
REMEDIAL PLANS

Pursuant to the Remedial Order and Injunction filed on

United States District Court

For the Northern District of California

September 20, 1996, Defendants[1] have proposed remedial plans to correct violations of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act of 1973 (§ 504) in the California Department of Corrections (CDC) with respect to the certified class of disabled prisoners and parolees.  Pursuant to Section A of that Order, the parties have met and conferred about Defendants' submission.  The parties, through their attorneys, agree and hereby stipulate that the remedial plans attached hereto as Exhibit 1 are consistent with the standards set forth in Section C of the Remedial Order (Standards for Judicial Review) and will be implemented by Defendants.  The parties agree and request that the Court find that the remedial plans that are attached hereto as Exhibit 1 are narrowly drawn, extend no further than necessary to correct the violation of the rights at issue and are the least intrusive means necessary to correct the violation of the rights.

This stipulation does not apply to any aspect of these remedial plans that the United States District Court ordered Defendants to adopt or revise, in any oral or written ruling, including the following:  Order Granting in Part and Denying in Part Plaintiffs' Motion to Require Defendants to Modify their Remedial Plans (First Set of Contested Issues), filed October 8, 1997; Order Granting in Part and Denying in Part Plaintiffs' Motions to Require Defendants to Modify their Remedial Plans (Second and Third Sets of Contested Issues and Transition Plan),

---

[1]"Defendants" refers to all Defendants except Mr. Nielsen.

2

filed March 20, 1998; Order Resolving Outstanding Issues, filed

_____.

Dated: _____
                                            _____
                                            Attorney for Plaintiffs


Dated: _____
                                            _____
                                            Deputy Attorney General
                                            Attorney for Defendants

United States District Court
For the Northern District of California

√ Donald  Specter
  Prison Law Office
  General Delivery
  San Quentin,CA 94964   [94cv2307 ]

√ Elaine  Feingold
  Disability Rights Education & Defense
  2212 Sixth Street
  Berkeley,CA 94710   [94cv2307 ]

√ Eve H. Shapiro
  Howard Rice Nemerovski Canady Falk & Rab
  Three Embarcadero Ctr 7th Flr
  San Francisco,CA 94111   [94cv2307 ]

√ *James Humes*
  George D. Prince
  CA State Atty General's Office
  50 Fremont St Ste 300
  San Francisco,CA 94105   [94cv2307 ]

√ Mary Beth Uitti
  U.S. Attorney's Office
  450 Golden Gate Ave 10th Flr Rm 115
  San Francisco,CA 94102   [94cv2307 ]

√ Michael W. Bien
  Rosen Bien & Asaro
  155 Montgomery St 8th Flr
  San Francisco,CA 94104   [94cv2307 ]

  Morris  Lenk
  CA State Atty General's Office
  50 Fremont St Ste 300
  San Francisco,CA 94105   [94cv2307 ]

  Sara Linda Norman
  Prison Law Office
  General Delivery
  San Quentin,CA 94964   [94cv2307 ]

√ Sharon N. Perley
  USDJ - Disability Rights Section
  P.O. Box 66738
  Washington,DC 20035   [94cv2307 ]

√ Warren E. George
  McCutchen Doyle Brown & Enersen LLP
  Three Embarcadero Ctr
  San Francisco,CA 94111   [94cv2307 ]