

FILED

JAN - 8 1999

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

349
99

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, JAMES AMAURIC,
RICHARD PONCIANO, JACK SWENSEN,
BILLY BECK, JUDY FENDT, WALTER
FRATUS, GREGORY SANDOVAL, DARLENE
MADISON, PETER RICHARDSON, STEVEN
HILL, and all others similarly
situated,

        Plaintiffs,

    v.

PETE WILSON, JOSEPH C. SANDOVAL,
JAMES GOMEZ, Director, Department of
Corrections, KYLE MCKINSEY, KEVIN
CARRUTH, DAVID TRISTAN, MARISELA
MONTES, Deputy Director of the Parole
and Community Services Division,

        Defendants.

------------------------

UNITED STATES OF AMERICA,

        Amicus Curiae

_____/

No. C 94-02307 CW

ORDER DIRECTING
DEFENDANTS TO
COMPLY WITH
REMEDIAL PLAN

    Pursuant to the stipulated Remedial Order and Injunction filed

United States District Court

For the Northern District of California

on September 20, 1996, Defendants[1] proposed remedial plans to correct violations of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act of 1973 (§ 504) in the California Department of Corrections (CDC) with respect to the certified class of disabled prisoners and parolees.

Defendants concede that they had agreed that if Plaintiffs did not object to Defendants' proposed remedial plans, Defendants would stipulate that the plans were consistent with the standards set forth in Section C of the Remedial Order (Standards for Judicial Review) and would implement the plans.  Defendants also concede that they agreed that they would stipulate, and request the Court to find, that such remedial plans were narrowly drawn, extended no further than necessary to correct the violation of the rights at issue, and were the least intrusive means necessary to correct the violation of the rights.  As to any portions of Defendants' remedial plans to which Plaintiffs did not object, the Court so finds, based upon Defendants' agreement.

However, Plaintiffs objected to certain portions of the remedial plans Defendants proposed.  Pursuant to Section A of the Remedial Order, the parties met and conferred about Defendants' proposed remedial plans.  In the course of meeting and conferring, the parties reached agreements on some of these objections.

---

[1]Defendant James Nielsen, Chairman of the Board of Prison Terms, did not join the stipulation that led to the remedial process at issue in this Order.  See Stipulation for Procedures to Determine Liability and Remedy, filed July 9, 1996, at 2.  In the present Order, "Defendants" refers to all Defendants except Mr. Nielsen.  References to "Defendants" in the Court's Oct. 8 Order, see Oct. 8 Order at 2, and its March 20 Order also referred to all Defendants except Mr. Nielsen.

2

**United States District Court**
For the Northern District of California

1    Plaintiffs believe that Defendants agreed to stipulate that these
2    negotiated modifications to the remedial plans were also narrowly
3    drawn, extended no further than necessary to correct the violation
4    of the rights at issue, and were the least intrusive means
5    necessary to correct the violation of the rights.  Defendants
6    assert that they did not agree to so stipulate as to negotiated
7    modifications, and that, in fact, some of these negotiated
8    modifications extend further than necessary to comply with the
9    ADA and § 504.

10       The Court is not able to determine at this time whether the
11    negotiated modifications are narrowly drawn, extend further than
12    necessary to correct the violation of the rights at issue, and are
13    the least intrusive means necessary to correct the violation of the
14    rights at issue, because these issues were not briefed.  It would
15    be wasteful of the resources of the Court and the parties to brief
16    and decide this now, because both parties agree that the negotiated
17    modifications should be implemented.

18       Nonetheless, the Court will order Defendants to implement all
19    aspects of the remedial plan, those which they originally proposed,
20    those which they negotiated, and those which the Court ordered.
21    If, at any time, Defendants wish to be relieved of their agreement
22    to implement any negotiated aspect of the plan that is not narrowly
23    drawn, that extends further than necessary to correct the violation
24    of the rights at issue, and that is not the least intrusive means
25    necessary to correct the violation of the rights, Defendants may
26    move this Court for such relief.  Prior to making such a motion,
27    Defendants must notify Plaintiffs of the proposed change and

28                                   3

United States District Court

For the Northern District of California

provide them with the information necessary to evaluate such modification.

The parties could not resolve some of their disagreements about the remedial plans.  Pursuant to Sections A(3) and C of the Remedial Order, the parties submitted the contested issues regarding these remedial plans to the Court for review.  The Court determined that several aspects of Defendants' remedial plans did not comply with the ADA and § 504 and thus ordered Defendants to modify those plans so that they would comply with these statutes. The Court's orders were narrowly drawn, extended no further than necessary to correct the violation of the rights at issue and were the least intrusive means necessary to correct the violation of the rights.

The parties have prepared the Remedial Plan attached as Exhibit 1, to include matters Defendants originally proposed, matters as to which the parties agreed in the meet and confer process, and matters which were ordered by the Court.  The Court orders Defendants to comply with the Remedial Plan attached as Exhibit 1.  Any part of Exhibit 1 that conflicts with the Court's orders is superseded by the Court's orders.

Plaintiffs shall be entitled to reasonable access to information sufficient to monitor Defendants' compliance with the Remedial Plan.  Such monitoring shall include access to relevant documents, receiving reports from Defendants on subjects specified in Section A of the Remedial Order, tours of the institutions with and without consultants and experts, interviews or depositions of institution and departmental staff and scheduled interviews with

4

United States District Court
For the Northern District of California

1   inmates.   Brief interviews with inmates may be conducted during the
2   tours, which may be conducted no more than every quarter at each
3   institution or facility.

4        The Court shall retain jurisdiction to enforce the terms of
5   this Order.   If Plaintiffs' counsel have reason to believe that
6   Defendants are not complying with the terms of the Remedial Plan
7   attached to this Order, they shall notify Defendants.   The parties
8   shall attempt to resolve the issue informally before pursuing a
9   judicial remedy.   Upon appropriate motion, the Court may issue an
10  order permitted by law, including contempt, necessary to ensure
11  that Defendants comply with the attached Remedial Plan.

12       If Defendants wish to be relieved of their agreement to
13  implement any negotiated portion of these plans that is not
14  narrowly drawn, that extends further than necessary to correct the
15  violation of the rights at issue, and that is not the least
16  intrusive means necessary to correct the violation of the rights,
17  they shall notify Plaintiffs.   The parties shall attempt to resolve
18  the issue informally before pursuing a judicial remedy.   Upon
19  appropriate motion, the Court will grant such relief.

20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28

5

United States District Court
For the Northern District of California

1      Defendants may move the Court to vacate this order on the

2  ground that they have substantially complied with its provisions

3  for a period of two years, provided that such motion shall not be

4  made earlier than one year after the date of this Order.  This

5  motion shall be filed pursuant to Rule 60(b)(5) of the Federal

6  Rules of Civil Procedure or other applicable law.

7      IT IS SO ORDERED.

8

9

10  Dated:  JAN - 8 1999

                  CLAUDIA WILKEN

11                    United States District Judge

12

13

14  Copies mailed to counsel
as noted on the following page

15

16

17

18

19

20

21

22

23

24

25

26

27

28                    6

# REMEDIAL PLAN

## I.  POLICY

It is the policy of the California Department of Corrections (CDC) to provide access to its programs and services to inmates and parolees with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests.  No qualified inmate or parolee with a disability–as defined in Title 42 of the United States Code, Section 12102–shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination.  All institutions/facilities housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and Department policy.

### A.  SCOPE

The Disability Placement Program (DPP) is the Department's set of plans, policies, and procedures to assure nondiscrimination against inmates/parolees with disabilities.  The DPP applies to all of the Department's institutions/facilities, all programs which the Department provides or operates, and to all inmates who have disabilities that affect a major life function whether or not the disabilities impact placement.

Although the program covers all inmates/parolees with disabilities, whether or not they require special placement or other accommodation, it is facilitated in part through "clustering" or designating accessible sites (designated facilities) for qualified inmates requiring special placement.  Inmates with permanent mobility, hearing, vision, and speech impairments, and other disabilities or compound conditions severe enough to require special housing and programming will be assigned to special placement in designated DPP facilities, which include reception centers (RC), institutions, and other facilities.  Inmates with an impairment of lesser severity or which is temporary will not be assigned to special placement.

## II.  STANDARDS

### A.  QUALIFIED INMATE/PAROLEE

A "qualified inmate/parolee" is one with a permanent physical or mental impairment which substantially limits the inmate/parolee's ability to perform a major life activity.

### B.  PERMANENT DISABILITY

A "permanent disability or impairment" is one which is not expected to improve within six months.

## C. CATEGORIES & CRITERIA FOR SPECIAL PLACEMENT

### 1. Permanent Mobility Impairments

*a)* Permanent Wheelchair: Inmates/parolees who use wheelchairs full or part time due to a permanent disability.

*b)* Permanent Mobility Impairment (nonwheelchair): Inmates/parolees who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking; i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without a pause. Such impairment may require use of a cane, prosthesis, or walker, etc.

### 2. Permanent Hearing Impairments

Inmates/parolees who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning.

### 3. Permanent Vision Impairments

Inmates/parolees who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

### 4. Permanent Speech Impairments

Inmates/parolees who have a permanent speech impairment, such as a difficult speech pattern, or no speech, and do not communicate effectively in writing.

### 5. Learning Disability

The term "learning disability" means a disorder in one or more of the basic processes involved in understanding or using spoken or written language. It may show up as a problem in a person's ability to listen, think, speak, read, write, spell, or do math. The term "learning disabled" does not refer to learning problems which are primarily the result of visual, hearing, or physical handicaps; mental retardation; emotional disturbance; or environmental, cultural, or economic disadvantage. Inmates/parolees will not normally require special placement due solely to a learning disability. The criteria is provided to determine the need for reasonable accommodation.

### 6. Other

Inmates/parolees with a disability other than those specified above who due to the severity of their disability may require special placement in a designated DPP facility.

## D. EFFECTIVE COMMUNICATION

### 1. General

Reasonable accommodation shall be afforded inmates/parolees with disabilities to ensure equally effective communication with staff, other inmates, and where applicable, the public. Auxiliary aids which are reasonable, effective, and appropriate to the needs of the inmate/parolee shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides (inmates or staff) or qualified interpreters, readers, sound amplification devices, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audiotaped texts, Braille materials, large print materials, and signage.

### 2. Communication Implicating Due Process and Delivery of Health Care

Because of the critical importance of communication involving due process or health care, the standard for equally effective communication is higher when these interests are involved. The degree of enhanced communication accommodation that may be warranted under these special circumstances shall be determined on a case-by-case basis. Staff responsible for completion of all forms involving due process shall document steps taken to ensure equally effective communication for inmates/parolees with disabilities. Communication assistance involving health care delivery shall recognize the privacy interests involved between the health care provider and the inmate/patient.

### 3. Equal Access

Accommodations shall be made to afford equal access for inmates/parolees with disabilities to the courts, to legal representation, and to health care services.

### 4. Qualified Interpreters

A qualified interpreter is an individual who is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary. A qualified interpreter includes a person adept at American Sign Language. Each DPP facility will be responsible for obtaining and monitoring contracts for local interpreters.

## E. REASONABLE ACCOMMODATION/MODIFICATION

The Department shall provide reasonable accommodations or modifications for known physical or mental disabilities of a qualified inmate/parolee. The Department shall consider, on a case-by-case basis, accommodations for inmates/parolees with disabilities that are temporary in nature. Examples of reasonable accommodations include providing special equipment (such as readers, sound amplification devices, or Braille materials), providing inmate or staff assistance, bilingual or qualified sign language interpreters, or modifying work or program schedules.

F.   JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION

### 1. Legitimate Penological Interest

A request for accommodation may be denied when it would pose a risk to the safety or security of the institution, staff, or the public; or when the request would adversely impact other legitimate penological interests, including deterring crime and maintaining inmate discipline. In all determinations of reasonable accommodation, public safety and the health, safety, and security of all inmates and staff shall remain the overriding consideration.

### 2. Undue Burden and Fundamental Alteration Defenses

The CDC need not take an action to provide accessibility to a service, program, or activity if it can prove that the action would impose an undue financial or administrative burden on the agency, or would fundamentally alter the nature of the service, program, or activity. The determination that an action would result in an undue burden or fundamental alteration may only be made by the Director or his/her designee. The decision must be made only after consideration of all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of reasons for reaching that conclusion. Even if the requested action would impose an undue burden or fundamentally alter a service, program or activity, CDC must take any other action that would not result in an undue burden or fundamental alteration, but would still ensure that disabled inmates receive the benefits of the service, program, or activity.

### 3. Direct Threat

A request for accommodation may be denied when it poses a direct threat of substantial harm to the health or safety of the inmate or anyone else, including the public.

### 4. Equally Effective Means

A request for accommodation may be denied if equally effective access to a program, service, or activity may be afforded through an alternate method which is less costly or intrusive. Alternative methods, those which may be less costly or intrusive to the existing operation/program, may be utilized to provide reasonable access in lieu of modifications requested by the inmate/parolee, so long as they are effective.

G.   EQUIVALENT PROGRAMMING

The designated DPP facilities shall offer disabled inmates a range of programming equivalent to that available to nondisabled inmates. For example, a DPP facility for women shall offer an acceptable long-term substance abuse treatment program equivalent to the Forever Free Program at the California Institution for Women.

## III.   RECEPTION CENTER PROCESSING

All RC facilities are designated to provide temporary housing and processing for inmates/parolees identified as meeting DPP criteria with the exception of the following, whose responsibility for processing DPP inmates is limited:

**California State Prison, San Quentin**
All inmates (except condemned cases) who arrive at California Sate Prison, San Quentin's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to Deuel Vocational Institution's RC for processing.

**California Correctional Institution**
All inmates who arrive at California Correctional Institution's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to North Kern State Prison's RC for processing.  Wheelchair users may also be transferred to Wasco State Prison's (WSP) RC.

**Wasco State Prison**
All inmates who arrive at WSP preliminarily identified as mobility impaired nonwheelchair, hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within seven days to NKSP's RC for processing. The WSP's RC is designated with a wheelchair-only mission.

**California Rehabilitation Center**
Refer to Section IV, H, 22b of this plan, Civil Addict Program, for CDC's Policy on DPP civil addict cases.

**Northern California Women's Facility**
All female parole violators/pending revocation or parole violators/return-to-custody who arrive at the Northern California Women's Facility (NCWF) RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to the Central California Women's Facility (CCWF) RC.  Wheelchair users may also be transferred to Valley State Prison for Women's (VSPW) RC.  These cases shall be transported back to NCWF as needed for parole revocation hearings, on out-to-court/hearing status and returned the same day.

**Valley State Prison for Women**
All inmates who arrive at VSPW's RC preliminarily identified as mobility impaired nonwheelchair, hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within seven days to CCWF's RC for processing.  The VSPW's RC is designated with a wheelchair-only mission.

All RC's, however, will have sufficient accessible beds to accommodate disabled inmates awaiting transfer to a DPP RC.

Generally, inmates with disabilities shall be processed out of the RC's in a timely manner, no

more than 60 days from the date they are received by the Department, unless detained by factors not attributable to the Department's delay; e.g., medical necessity, court appearances, etc.

### A.   ADJUSTMENTS DUE TO EXTENDED RECEPTION CENTER STAY

Inmates with disabilities will be processed out of RC's in a timely manner, in no more than 60 days from the date they are received by the Department, unless detained due to factors not attributable to the Department's delay; e.g., medical necessity, court appearance, etc. Any period of time beyond the initial 60 days of a disabled inmate's stay at an RC shall be referred to as the inmate's extended stay.

If a disabled inmate remains at a RC for more than 60 days, a presumption arises that the extended stay is solely due to the inmate's disability. To overcome this presumption, CDC must demonstrate that the inmate's transfer out of the RC was at no time delayed solely due to the inmate's disability. In this case, CDC need not accommodate the inmate for the extended stay. Alternatively, CDC may demonstrate that the cumulative period of all disability-related delays was shorter than the inmate's extended stay, in which case CDC need only accommodate the inmate for the cumulative period of disability-related delays.

When it comes to CDC's attention that a disabled inmate's RC stay has been extended beyond 60 days solely due to the inmate's disability, CDC shall accommodate the inmate as described below. A disabled inmate may also file a CDC Form 1824, Reasonable Accommodation or Modification Request, to request accommodation for an extended stay.

### B.   ACCOMMODATIONS

Disabled inmates who remain at RC's for extended stays shall be granted, during their extended stays, privileges that are available at mainline institutions. Disabled inmates who remain at RC's for extended stays and who are serving sentences of less than one year, shall, pursuant to the procedures described below, receive sentencing credits that they could have earned if they had been transferred to a mainline institution on the 61st day of RC stay.

The central file of all inmates with disabilities received from RC's will be reviewed at the receiving program institution to determine if the inmate's stay exceeded 60 days. If so, the inmate's extended stay shall be presumed to be solely due to the inmate's disability unless CDC can overcome this presumption as provided above.

If the inmate's disability was the sole cause, adjustment to the inmate's worktime credits will be made, once the inmate is received at the program institution, to reflect credits as if the inmate were engaged in the work program on the 61st day.

## IV. FIELD OPERATIONS

### A. DESIGNATED DPP FACILITIES

The institutions identified below are designated DPP facilities:

| MALE INSTITUTIONS |
| --- |
| Avenal State Prison |
| California Correctional Institution |
| California Institution for Men |
| California Medical Facility |
| California State Prison, Corcoran |
| California State Prison, Los Angeles County |
| California Substance Abuse Treatment Facility & State Prison Corcoran |
| High Desert State Prison |
| Pleasant Valley State Prison |
| Richard J. Donovan Correctional Facility at Rock Mountain |
| Salinas Valley State Prison |

| FEMALE INSTITUTIONS |
| --- |
| Central California Women's Facility |
| California Institution for Women |
| Valley State Prison for Women |

### B. VERIFICATION PROCESS

The CDC bears the burden of verifying inmates' and parolees' disabilities that might affect their placement in the prison system, and of verifying credible claims of disability in response to requests for accommodation or complaints about disability-based discrimination. The CDC is not required to automatically screen all inmates/parolees to identify disabilities. Inmates/parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability. Verification may be triggered by any of the following:

**1.** The inmate/parolee self-identifies or claims to have a disability.

**2.** Staff observe what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern.

**3.** The inmate/parolee's health care or central file contains documentation of a disability.

**4.** A third party (such as a family member) requests an evaluation of the inmate/parolee for an alleged disability.

Verification of a disability for any purpose shall be recorded on a CDC Form 1845, Inmate/Parolee Disability Verification Form (Exhibit A). Once completed and approved, the CDC Form 1845 shall become part of the inmate's or parolee's file and shall be effective until a change in the inmate's or parolee's condition causes it to be canceled or superseded.

Identification of disabilities affecting placement shall usually occur during RC processing; however, if an inmate/parolee appears to have a disability that might affect placement, a staff member may refer the inmate/parolee for verification of the disability. The referral is made by directing a standard CDC Form 128B, Chrono-General, to the institution/facility's health care services. Health care staff shall verify the disability using a CDC Form 1845. Similarly, if an inmate/parolee files a request for accommodation or a disability-based discrimination complaint but does not provide documentation of the claimed disability and his/her file does not contain documentation of the claimed disability, staff shall either grant the accommodation or refer the inmate/parolee for verification of the disability using the procedures described above.

Responsibility for completion of Sections A through D of the CDC Form 1845 rests with institution/facility health care services licensed clinical staff, except inmates/parolees with a claimed learning disability, whose forms will be completed by appropriate staff. Health care staff shall follow CDC protocols for verifying disabilities. These protocols are set forth in Exhibit B to this Remedial Plan. Except for those inmates with a learning disability, Sections A through D shall be completed or approved by a physician. Health care services staff shall forward the partially completed CDC Form 1845 to the institution/facility Correctional Counselor III (CC III) for RC's or the Classification & Parole Representative (C&PR) for general population institutions. They shall be responsible for completing Section E and the sign-off information below Section E. The CC III/C&PR shall then route the form to the assigned CC I.

If it is determined the inmate/parolee does not have one of the five categories of disability that may impact placement, the physician making the decision shall check the appropriate box below Section D and enter an explanation in the Comments Section. The reviewing physician shall then sign and date the incompleteCDC Form 1845. A check in any of the boxes in Section C indicates a need for placement in one of the designated DPP facilities.

If it is determined that an inmate has a permanent disability other than the five listed on the CDC Form 1845, and the disability is severe enough that the inmate would benefit from placement in a designated DPP facility, health care staff should initiate a CDC Form 1845. A check should be entered on the CDC Form 1845 in Sections B and C, indicating Other Impacting Placement; and an entry in the Comments Section should be made indicating the inmate would benefit from placement in a designated facility. The CDC Form 1845 shall be signed by a physician and processed in the same manner as any other. A CDC Form 128C, Chrono-Medical, Psych, Dental, shall be prepared listing the inmate's limitations, special health care needs, and any other information which might be pertinent to making a placement decision.

Special concerns, such as documented mental or physical health care needs, are addressed on the CDC Form 1845 by checking the appropriate box(es) & completing the requested information. Assistance with daily living activities shall also be noted on the form, with appropriate CDC Form 128C documentation noting specific need(s). Additional notes, references, explanations, and/or information not listed elsewhere on the CDC Form 1845 are to be placed in the Comments Section. Once the CDC Form 1845 is completed as referenced above, it shall be distributed according to the instructions indicated on the form.

If it is determined that an inmate/parolee has a learning disability and no other disability that may impact placement, appropriate staff shall check the Learning Disability box in Sections B and D, complete Section E, and sign the form in the space provided below Section D.

If it is determined that an inmate/parolee does not have a learning disability, appropriate staff shall check the Learning Disability box in Section B, check the appropriate box below Section D, and enter an explanation in the Comments Section. The appropriate staff making the decision shall then sign and date Section E.

The completed CDC Form 1845 shall then be routed to the CC III/C&PR for assignment to the CC I. If the inmate/parolee has a disability that may impact placement, a physician shall complete Sections A through D of the CDC Form 1845, as indicated above.

C.   PLACEMENT

1.   All inmates verified to have a disability in Section C of the CDC Form 1845 (requiring special placement in a designated DPP facility) shall be referred to a Classification Staff Representative (CSR) for review and endorsement.

In assessing appropriate placement, the CSR shall determine the inmate's prevailing case factors, status as documented on the CDC Form 1845, and any additional health care placement concerns documented thereon. The CSR shall then endorse the inmate, with reference to the CDC Form 1845, according to the following guidelines:

*a)*      Where a verified DPP Section C inmate does not have any additional significant health care concerns, the inmate shall be placed in an appropriate designated DPP facility.

*b)*      Where a verified DPP Section C inmate has additional significant health care concerns, the CSR, in consultation with Health Care Population Management (HCPM) staff, shall place the inmate in an appropriate designated DPP facility that has an established health care delivery system suited to the inmate's condition.

*c)*      In the exceptional case where placement cannot directly meet both the health care and DPP needs of the inmate, HCPM and Classification Services Unit staff will work together to address the inmate's dual needs in an appropriate placement.

2.   Designated DPP placement of an inmate verified to have a disability under Section C of the CDC Form 1845 requires endorsement by a CSR. Once the inmate is endorsed for special placement, any change in DPP status requires subsequent CSR review and endorsement.

3.   An inmate with a disability not impacting placement may be housed at any facility

consistent with applicable case factors.

4. Case management for all DPP inmates shall comply with all established classification procedures. The CSR shall not endorse cases where the central file indicates the inmate may have significant mobility, hearing, vision, and/or speech impairment(s), and there is no CDC Form 1845 in the central file. Inmates will not normally require special placement due solely to a learning disability. The criteria is provided for use only when responding to requests for reasonable accommodation.

5. The inmate's health care needs shall take precedence in determining placement. Overriding medical needs may dictate placement in a health care setting. When an inmate requires placement in a licensed health care facility, California Code of Regulations (CCR), Title 22, will be followed.

6. To initiate the transfer process for inmates who have overriding health care treatment needs and require special placement, the referring clinician shall prepare a CDC Form 128C identifying the health care need(s) and related conditions necessitating the transfer, including the urgency of any required treatment.

## D.   TRACKING

1. Inmates assigned to DPP categories shall be tracked in the Classification Tracking System database by utilizing the CDC Form 839, CDC Classification Score Sheet, and CDC Form 840, CDC Reclassification Score Sheet, consistent with current policy. The codes are as follows:

| Inmate Requires Special Placement at Designated DPP Facility | Inmate Does Not Require Special Placement and May Be Placed at any Facility According to Case Factors |
|---|---|
| DPW - Wheelchair User<br>DPM - Mobility Impaired<br>DPH - Hearing Impaired<br>DPV - Vision Impaired<br>DPS - Speech Impaired<br>DPO - Other | DNM - Mobility Impaired<br>DNH - Hearing Impaired<br>DNV - Vision Impaired<br>DNS - Speech Impaired |

2. The C&PR's and RC CC III's shall develop institution procedures for tracking inmates with disabilities based on the CDC Form 1845. These procedures shall include annotating the disability and the section of the CDC Form 1845 in which it was verified on the following documents: Institutional Staff Recommendation Summary; CDC Form 816, RC Readmission Summary; CDC Form 128G, Chrono-Classification (Regular); CDC Form 839; and CDC Form 840.

## E.   HEALTH CARE APPLIANCES

### 1.   DEFINITION

Health care appliances are assistive devices or medical support equipment which have

---

been prescribed for the inmate and approved by the Correctional Captain and Health Care Manager or their respective designees. Health care appliances include, but are not limited to, orthopedic prostheses, orthopedic braces or shoes, crutches, canes, walkers, wheelchairs, hearing aids, prescription eyeglasses, artificial eyes, dental prostheses, breathing devices, gloves for wheelchair use only, and identifying vests.

## 2. PRESCRIPTION AND APPROVAL

Health care appliances shall be prescribed and approved for eligible inmates by licensed CDC health care providers, subject to medical necessity, safety, and security. Inmate health care appliances, including those belonging to the inmate prior to entry into CDC's system, must be approved by custody staff for conformance with safety and security standards. If custody staff, upon inspecting the appliance, denies it to the inmate for safety or security reasons, a physician, Health Care Manager, or Chief Medical Officer shall be consulted immediately to determine appropriate action to accommodate the inmate's needs. Accommodation may include modifying the appliance or substituting a different appliance at state expense.

## 3. POSSESSION OF HEALTH CARE APPLIANCES

Health care appliances shall be documented as property of the inmate and appropriately identified as such, in accord with departmental and institutional policy; however, they shall not be included in the volume limit for personal property established in CCR Section 3190. No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a Department physician or dentist determines that the appliance is no longer medically necessary or appropriate. Possession of health care appliances in Special Placement Housing is governed by CCR Section 3380.20.

## 4. PURCHASE OF HEALTH CARE APPLIANCES

Prescribed appliances, except for identifying vests, shall be purchased by the inmate through the Department or a vendor of the inmate's choosing, with the approval of the Health Care Manager, Chief Medical Officer or Chief Dental Officer. Identifying vests shall be issued to the inmate from the Department without a CDC Form 193, Trust Account Withdrawal Order. Prior to issuance of any other appliance, the inmate must sign a CDC Form 193 for the cost of the appliance. If an inmate is indigent, the appliance shall be provided and the inmate held financially accountable for the cost of the appliance in accord with departmental procedure. No inmate shall be denied a health care appliance because he or she is indigent.

Health care staff shall receive health appliances ordered in accordance with a licensed CDC health care physician's prescription. The appliance shall be evaluated by health care staff to ensure it corresponds to the physician's order and that there is a current CDC Form 128C communicating the order to custody staff. The procedure to verify and identify appliances shall not cause an unreasonable delay in the delivery of prescribed health appliances.

## 5. Maintenance and Repair of Health Care Appliances

It is the joint responsibility of CDC and the inmate to maintain all health care appliances in good repair and operation. Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the inmate shall utilize approved CDC procedures for notifying health care staff of health care needs. Health care staff shall ducat the inmate for an appointment and evaluate the condition of the appliance. Once the need for repair or replacement is verified, the inmate shall be issued an appropriate appliance or accommodation. This procedure applies to replacement of batteries for hearing aids and other appliances. The inmate shall be financially responsible for damage, repair and replacement of appliances, parts and batteries, and shall be charged for the cost thereof through a CDC Form 193 in accordance with departmental policy and procedure.

## 6. Maintenance and Repair of Wheelchairs

The CDC shall maintain a maintenance log and conduct periodic inspections on all wheelchairs. A state-issued wheelchair in need of repair shall be exchanged for one in good working condition. When a personal wheelchair is submitted for repair, the inmate shall be loaned another for the duration of the repair. The inmate shall be financially responsible for damage, repair, and replacement of wheelchairs, parts, and batteries as provided above.

Health care appliances, except for identifying vests, shall be retained and maintained by inmates upon release to parole.

## F. Maintenance of Accessible Features And Equipment

The CDC has a duty to maintain in operable working condition structural features and equipment necessary to make the prison system's services, programs, and activities accessible to disabled inmates. Isolated or temporary interruptions in service or access due to maintenance or repairs are not prohibited.

## G. Library Equipment

Electronic equipment is intended for use in the recreational library, education areas, and the law library. Each facility will be responsible for training staff and inmates in the proper use of the equipment to provide access for inmates with disabilities. Procedures and rules regarding access to the equipment will be established by each facility. Inmates will not normally be restricted to using the equipment for only legal text.

## H. Institution Procedures

### 1. Notices, Announcements, and Alarms

#### a) Written Materials

Each institution/facility shall ensure that the California Code of Regulations, notices, orientation packages, announcements and similar printed materials

which it distributes to inmates are accessible to inmates with disabilities. Accommodations such as large print, computer assisted devices, audiotapes and Braille shall be given when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that inmates who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations, and procedures.

*b)* **Verbal Announcements and Alarms**

Each institution/facility shall ensure that effective communication is made with inmates with disabilities regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc. Local policies, procedures and post orders shall be adopted to reflect this obligation.

**2. SPECIAL IDENTIFICATION**

Custody staff for each housing unit to which a hearing or vision impaired inmate is assigned shall maintain a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff to provide for the special needs of the inmate.

**3. YARD IDENTIFICATION**

*a)*    Each inmate identified as having a hearing or vision impairment sufficiently severe as to affect placement shall be issued an identifying vest. The vest shall indicate that the person wearing it has a vision or hearing impairment.

*b)*    Upon verification on the CDC Form 1845 that the inmate's hearing or vision impairment requires placement in a designated DPP facility, medical staff shall issue a CDC Form 128C, documenting the inmate's permanent authorization to possess the vest.

*c)*    All hearing or vision impaired inmates who are pending CDC Form 1845 verification or who have been verified to require placement in a designated DPP facility shall wear the vest at all times outside the inmate's housing area or cell. The vest shall be worn over the inmate's outer clothing. All hearing or vision impaired inmates who are able to function in a nondesignated facility due to a prescribed health care appliance shall be temporarily issued an identifying vest whenever their prescribed health care appliance is not available or working properly. Those inmates shall wear the vest outside the inmate's housing area or cell at all such times.

*d)* The vest is a prescribed health care appliance, as provided in CCR Section 3358, retained by the inmate in accordance with that section.

**4. EVACUATION PROCEDURES**

*a)* Each institution/facility shall ensure the safe and effective evacuation of inmates

with disabilities.

*b)* Local evacuation procedures shall be adopted at each facility.

*c)* All inmates with disabilities will be provided evacuation/emergency procedures in an accessible format during orientation.

## 5. COUNT

Inmates who have a verified disability that prevents them from standing during count shall be reasonably accommodated to provide for effective performance of count.

Each institution/facility shall develop local procedures to reasonably accommodate inmates who are unable to stand for count due to a verified disability.

## 6. RESTRAINTS

Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical restraints shall be applied so as to assure effective application while reasonably accommodating the inmate's disability.

## 7. SEARCHES

*a)* Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.

* Inmates who use wheelchairs and who have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.

* If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff. If forcible removal of an appliance from an noncompliant inmate is necessary, it shall be removed only by qualified medical personnel, provided that it is safe for them to do so.

* No inmate/parolee shall be required to lie or sit on extremely hot or cold surfaces to perform strip search maneuvers.

* Health appliances attached to the inmate's/parolee's body will be removed for inspection only during an unclothed body search.

* Complex devices (i.e., electronic medical devices, etc.) shall be disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device. Inspection of such devices shall require approval from a captain or above after consultation with appropriate

---

medical staff. Only a competent professional shall disassemble such devices.

b) To ensure the safety of staff and inmates/parolees, all institutions/facilities shall establish procedures for the routine inspection of health care appliances.

## 8. TRANSPORTATION

a) The special needs of inmates with disabilities shall be considered in transporting them. An inmate's/parolee's special health care aids and appliances shall accompany the inmate/parolee upon transfer.

b) Accessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability necessitates specialized transportation. All other inmates/parolees shall be transported in standard vehicles.

c) Institutions/facilities may contact the Transportation Services Unit (TSU) hubs directly to request transport of inmates/parolees who require transportation in accessible vehicles. When TSU does not have available resources to facilitate the required transfers, TSU shall coordinate with the sending institution/facility, who shall be responsible for arranging the transportation with local resources.

d) All applicable transportation policies and procedures apply to DPP inmates.

## 9. TELECOMMUNICATION DEVICES FOR THE DEAF/ TELEPHONES

Use of a Telecommunication Device for the Deaf (TDD) and telephones for inmates with disabilities shall be consistent with CCR Section 3282(h). Verification of an inmate's need for TDD may be confirmed with local Health Care Services staff, or by reviewing a copy of the CDC Form 1845. If the inmate does not have a severe hearing/speech impairment but desires to call an outside party who requires the use of a TDD, the outside party shall forward a physician's statement of TDD verification to the inmate's Correctional Counselor. Upon meeting all verification requirements, the inmate may sign up for telephone calls according to his/her privilege group designation. The TDD sign-up sheets covering seven days shall be maintained and logged weekly. Sign-up sheets shall be divided into 40-minute increments. The TDD calls shall have extended time increments due to the time delay associated with the TDD relay process.

Public telephones with volume control will be accessible to inmates in all locations where inmates with hearing impairments are housed.

## 10. VISITING

a) Reasonable accommodation shall be afforded inmates with disabilities to facilitate their full participation in visiting as provided in these rules, whether contact, noncontact, or family visiting.

*b)* Noncontact visiting booths will be accessible for inmates with disabilities. Auxiliary aids and assistive devices for effective communication will be provided for noncontact visits.

*c)* Inmates with disabilities shall be provided with the modifications necessary for them to participate in the contact visiting program. The modifications shall be provided as appropriate to assist inmates with their participation in the contact visiting program and shall be in a manner consistent with ensuring the safety and security of staff, inmates, or the public.

*d)* Visitors shall not be permitted to bring in outside equipment for effective communication when it is available at the institution. Any equipment that visitors are permitted to bring in will be subject to search.

*e)* Inmates with disabilities requiring accommodation for family visits shall give 72-hours notice of any request for accommodation.

## 11. RECREATION

Reasonable accommodation for inmates with disabilities at designated facilities may include the provision of accessible recreation areas and specially fitted equipment. At nondesignated DPP facilities, requests for such accommodation may be granted on a case-by-case basis. The successful completion of a test to show proper and safe use of fitness apparatus items shall be required and documented on a CDC Form 128B, Chrono–General.

## 12. INMATE PROGRAMS AND WORK ASSIGNMENTS

*a)* It is the policy of CDC to ensure that inmates with disabilities are afforded the opportunity to participate in educational (including vocational) and work programs.

*b)* Inmates shall be evaluated to participate in an educational or work program on a case-by-case basis. Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program with or without reasonable accommodations.

*c)* Reasonable accommodations shall be provided for dialysis patients who may need to be excused from programs at times to permit dialysis treatment. Such reasonable accommodations may include modified work or school schedules as long as reasonable accommodations do not prohibit the inmate from performing essential functions.

*d)* Classification Committee actions shall be periodically monitored to ensure that assignments of inmates with disabilities are nondiscriminatory.

*e)* Only when an inmate's disability, even with reasonable accommodation, renders the inmate ineligible to participate in any available work, educational or other

such program for which the inmate is otherwise qualified will the inmate be deemed "Medical (or Psychiatric) Unassigned" or "Medically Disabled."

*f)* Evaluation of an inmate's removal from a program assignment shall be done on a case-by-case basis, and will take into account a number of factors including the inmates ability to perform the essential functions of the program or the inmates misbehavior or refusal or failure to work as directed.

## 13. ESSENTIAL FUNCTIONS

Essential functions are the basic duties/requirements of services, assignments, or programs an inmate/parolee performs, receives, or desires. This does not include the marginal duties of the position, services, assignments, or programs. Duties/requirements should be examined to determine which tasks are essential and which are nonessential.

## 14. VOCATIONAL ASSIGNMENTS

Reasonable modifications shall be provided when appropriate for qualified inmates with disabilities to participate in all programs, services, or activities including vocational assignments, unless affected by one of the exclusions as set forth in these rules. The inmate, with or without reasonable accommodations, must meet the eligibility criteria of the vocational assignment as defined in the course description and be able to perform the essential functions of the assignment. All inmates shall be assigned on a case-by-case basis to appropriate work/academic/vocational programs by classification committee action.

## 15. ACADEMIC ASSIGNMENTS

The individualized, self-paced learning format inherent in competency based instruction is adaptable to the needs of inmates with disabilities who can perform the essential functions necessary for achieving the goals of the academic class. The competency based education model adopted for academic classes and vocational programs foster individualized, self paced instruction for assigned students. Open entry and exit into and from the education programs allows inmates at all levels to progress at their own speed and to begin or complete classes or programs within their own time frames.

## 16. CONSERVATION CAMPS

Inmates with disabilities shall not be precluded from assignment to a conservation camp based solely upon their disability. The CDC shall evaluate inmate disabilities in consideration of camp assignment on a case-by-case basis and shall determine if they are capable of performing essential functions of that assignment. When possible, without jeopardizing the fundamental nature of the camp program or legitimate penological interest, CDC may provide reasonable modifications for inmates with disabilities to allow participation in conservation camp assignments.

17. HEALTH CARE STATUS DETERMINATION

*a)* When an inmate's disability limits the inmate's ability to participate in work, educational or other programs, Health Care Services staff shall document the nature and severity of the inmate's limitations and, in conjunction with the Classification Committee and Education and Work Assignment staff, shall evaluate the inmate's ability to participate in work, educational and other programs. Based on that evaluation, a determination shall be made as to the inmate's work group status.

*b)* Only when the inmate's documented limitations are such that the inmate, even with reasonable accommodation, is unable to perform the essential functions of any work, educational or other such program, will the inmate be placed in one of the two following categories:

* MEDICAL/PSYCHIATRIC UNASSIGNED  Unable to participate in any assigned work, educational or other such program activity, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to or does last for less than six months. Inmates on Medical/Psychiatric Unassigned status shall be scheduled for classification review no less often than every six months for reevaluation of status.

* MEDICALLY DISABLED  Unable to participate in any assigned work, educational or other such program activity, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to result in death or lasts for six months or more.

18. DISCIPLINARY PROCESS

*a)* Reasonable accommodations shall be afforded inmates with disabilities in the disciplinary process.

*b)* To assure a fair and just proceeding, the assistance of a Staff Assistant and/or an Investigative Employee, as provided in CCR Sections 3315 (d)(1) and (2), may be required for the inmate, and those persons may need to be, or to be assisted by, a bilingual aide, qualified interpreter, signer or reader.  Other additional accommodations may be appropriate.

19. SPECIAL PLACEMENT HOUSING

The Department shall provide accessible special placement housing for inmates with disabilities as follows:

*a)* Administrative Segregation Unit (ASU)  Designated DPP facilities shall provide accessible ASU housing to accommodate inmates' disabilities.  Where accessible ASU housing is unavailable, alternate placement may be made temporarily in another appropriate location consistent with CCR Section 3335, such as the highest security level accessible cell available.  As a last resort to transfer, an ASU inmate with a disability affecting placement may be housed temporarily in

an infirmary.

*b)* <u>Security Housing Unit (SHU)</u>  Accessible SHU housing as provided in CCR Section 3341.5(c) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement.  The SHU inmates unable to utilize a sports wheelchair to enter a SHU cell will be provided accommodation on a case-by-case basis.

*c)* <u>Protective Housing Unit (PHU)</u>  Accessible PHU housing as provided in CCR Section 3341.5(a) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement.  Where accessible PHU housing is unavailable, alternate secured housing may be utilized temporarily.

*d)* <u>Condemned Housing</u>  Condemned inmates with disabilities affecting placement shall be accommodated in existing condemned units for each gender.  When alternate housing is necessary, a secure accessible location shall be provided.  On a temporary basis, condemned inmates with disabilities affecting placement may be housed in an infirmary.  Condemned inmates with disabilities are to receive access to the same type of programs as condemned inmates who are not disabled.  Any exceptions to participation must meet the exclusions outlined in Section II-F of this plan.

*e)* <u>Placement in Infirmaries</u>  Inmates with disabilities who do not have a medical condition for which infirmary placement is appropriate may be placed in an infirmary only temporarily when no other accessible housing is reasonably available.  Such inmates shall have access to the same type of general population programs for which they are otherwise eligible.  Such programs shall be provided in a manner that does not adversely impact health care operations.  When an inmate with a disability affecting placement is housed in an infirmary for long term placement due to health care needs, the inmate shall be afforded the same type of programs provided to nondisabled inmates similarly situated.

## 20. REMOVAL OF HEALTH CARE APPLIANCES IN ASU/SHU/DISCIPLINARY DETENTION UNITS

*a)* Health care appliances, as defined in CCR Section 3358, shall be taken away from an inmate in ASU, SHU or other disciplinary detention units only to ensure the safety of persons, the security of the institution, or to assist in an investigation (which may include collecting the appliance as evidence of a crime) and only when supported by documented evidence.  No inmate will be deprived of his or her appliance because of the acts of another inmate.

*b)* If the health care appliance presents a direct and immediate threat to safety and security, the appliance may be taken away immediately by any custody staff.  The senior custody officer on duty may temporarily authorize the taking away of an inmate's appliance for any of the reasons listed in the foregoing paragraph; however, the process described below must be followed as soon as possible, at least by the next business day, if the appliance is to be retained.  In no event

shall the procedures set out herein obstruct standard protocols for crime scene preservation, evidence collection, emergency response or any other measure necessary for the safety of persons and security of the institution.

c)   When a health care appliance is taken away from an inmate in special housing for reasons of safety and security, the senior custody officer in charge shall consult the Health Care Manager, Chief Medical Officer or designee, regarding the inmate's need for the appliance and reasonable alternative in-cell accommodations. The senior officer in charge shall then inform the Warden or designee of the incident and the alternative means to accommodate the inmate. The Warden or designee shall decide what course to take regarding depriving the inmate of the appliance and providing alternative in-cell accommodation. If the decision is to retain the appliance, it will be stored in a designated location in the unit and provided to the inmate if needed when released from his or her cell for yard, escorts, visits, etc. Medical staff shall evaluate the inmate's ability to function without the appliance, as appropriate.

d)   The misconduct which caused removal of the appliance shall be charged against the inmate in an appropriate CDC Form 115, Rules Violation Report. The inmate shall be referred to the next scheduled classification committee hearing for confirmation of removal of the appliance, pending adjudication of the disciplinary charges. If the removal is confirmed and the inmate found guilty of the offense, a term of removal shall be assessed according to the credit loss range for the offense as outlined in CCR Section 3323. The term of removal shall commence on the day the appliance was taken away from the inmate. The necessity to continue the removal shall be reviewed by a classification committee at least as often as every 90 days. Review shall include a medical evaluation of the inmate's progress without the appliance.

e)   A pattern of behavior involving the inappropriate use of a health care appliance may result in removal of the appliance for an indeterminate period. In such case, the need for removal shall be reviewed by a classification committee at regularly scheduled classification hearings. Review shall include a medical evaluation of the inmate's progress without the appliance.

f)   Institution staff may replace the cane of an inmate placed in ASU/SHU/Disciplinary Detention Unit with a walker if there is a legitimate safety and security concern associated with allowing use of the cane.

21.   APPEAL PROCESS FOR OBTAINING ACCOMMODATION

a)   An inmate/parolee with a disability may request an accommodation or grieve alleged discrimination through the CDC Form 1824 grievance process. The CDC Form 1824 shall be provided to all inmates and parolees who claim to be disabled, and staff assistance in using the appeal process shall be provided to all disabled inmates or parolees who require such assistance.

*b)* The inmate/parolee shall submit the request for accommodation on a CDC Form 1824 to the Appeals Coordinator for the inmate's/parolee's facility or parole region. The inmate/parolee shall attach any relevant documentation of his or her disability that is in the inmate's/parolee's possession or is easily obtainable by the inmate/parolee and that is not already in his or her CDC files. When an inmate/parolee files an appeal on an inappropriate form, the Appeals Coordinator shall attach the appropriate form and process the appeal as a CDC Form 1824. The Appeals Coordinator shall screen the request to determine if it meets eligibility criteria of CCR Section 3084. If the request is screened out, a copy of the CDC Form 1824 shall be maintained on file in the Appeal Coordinator's office. Comments explaining the reason why the request was screened out shall be entered in the comments field of the Inmate Appeals Automated Tracking System.

*c)* The CDC bears the burden of verifying credible claims of disability raised in inmates/parolees' appeals. The inmates/parolees, however, must cooperate with CDC staff in the staff's efforts to obtain documents or other information necessary to verify the claimed disability.

*d)* If the inmate/parolee fails to provide documentation to verify a disability and the request otherwise meets the eligibility criteria of CCR Section 3084, the Appeals Coordinator shall accept and log the appeal and assign it to the appropriate Division Head for the first level review. The Division Head or designee shall review the central file to determine whether the disability can be verified from a CDC Form 1845, a CDC Form 128C, Health Care Chrono, or other applicable record. If verification cannot be made from the file, the Division Head/designee shall contact CDC medical, educational, or other appropriate staff for access to additional records or information. If the Division Head or designee is able to verify the disability in this manner, he/she shall ensure that documentation of the disability is added to the inmate/parolee's central file. If the Division Head or designee is not able to verify the disability in this manner, he/she shall conduct a face-to-face first level interview with the inmate/parolee. If the Division Head determines during this interview that the inmate/parole has the claimed disability, he/she shall document this finding and add that documentation to the inmate/parolee's central file. If the Division Head or designee cannot determine based on this interview that the inmate/parolee has the claimed disability, he/she shall either grant the requested accommodation or the requested remedy for discrimination, or shall refer the inmate/parolee for verification of the disability, as provided in Section IV (B) of this document. The Appeals Coordinator may temporarily grant an accommodation pending verification, on the condition that the accommodation will be withdrawn if CDC is unable to verify the disability. Such conditional grants are particularly appropriate where the lack of an accommodation may cause serious or irreparable harm.

*e)* A nonemergency CDC Form 1824 appeal is subject to 3 formal levels of review:

    \*  FIRST LEVEL OF REVIEW  The first level of review is made by the appropriate Division Head or designee, who shall render a decision and return it to the inmate/parolee within 15 working days of receipt of the request by the Appeals Coordinator. The decision shall be set forth on the CDC Form 1824.

    \*  SECOND LEVEL OF REVIEW  The second level of review is initiated by the inmate's/parolee's attaching the request to a CDC Form 602, Inmate/Parolee Appeal Form, completing Section F, and forwarding the document to the Appeals Coordinator within 15 working days of receipt of the decision of the Division Head. In Section F, the inmate/parolee shall explain the nature of dissatisfaction and suggest an appropriate resolution. The Appeals Coordinator shall forward the second level appeal to the Warden or Regional Parole Administrator or designee, who must render a decision and return it to the inmate/parolee within 10 working days of receipt, or 20 working days of receipt if the first level of review is bypassed.

    \*  THIRD LEVEL OF REVIEW  The third level of review is initiated by the inmate/parolee's resubmitting the appeal to the Director's office within 15 working days of receipt of the decision by the Warden or Administrator. The third level response is made by the Director or designee, who shall render a decision and return it to the inmate/parolee within 20 working days from receipt.

    \*  EXTENSION OF TIME  A nonemergency request for accommodation made through the CDC Form 1824 process is not subject to the exceptions to the appeals time limits found in CCR Section 3084.6(b)(5). However, the above time limits may be extended for ten working days when the issue requires expert consultation.

*f)* If the request for accommodation involves a matter that may result in an immediate threat to the inmate's/parolee's safety, health or well being, or may cause other serious or irreparable harm, the request shall be processed according to the expedited appeal process described in CCR Section 3084.7. The inmate/parolee shall identify the appeal as an emergency; however, the Appeals Coordinator shall review each appeal to ascertain those that qualify for expedited processing and shall respond appropriately. Appeals that qualify for an expedited appeal may included, but are not limited to, the following:

    \*  Providing appliances or aids that are essential to performing major life activities;

    \*  Providing equipment or modifications essential to safety; and

    \*  Providing assistance to permit effective communications in due process settings or for health care provider communications.

*g)* Other provisions of these rules pertaining to inmate/parolee appeals not addressed herein shall apply.

22. SUBSTANCE ABUSE AND CIVIL ADDICT PROGRAMS

*a)* SUBSTANCE ABUSE TREATMENT   The Department shall provide accessible long-term intensive substance abuse treatment programs for male and female inmates with disabilities comparable to those programs provided to nondisabled inmates.

* Currently the Substance Abuse Program at the California Substance Abuse Treatment Facility and State Prison at Corcoran (SATF) is designated to provide substance abuse treatment for male inmates with disabilities.

* Currently the Substance Abuse Program at the Central California Women's Facility (CCWF) is designated to provide substance abuse treatment for female inmates with disabilities.

*b)* CIVIL ADDICT PROGRAM   The Department shall provide accessible placement for male and female civil addicts with disabilities in a Civil Addict Program (CAP) comparable to that provided to nondisabled civil addicts.

* Currently, SATF is the designated satellite CAP for male civil addicts with disabilities requiring designated DPP placement.

* Currently, CCWF is the designated satellite CAP for female civil addicts with disabilities requiring designated DPP placement.

* All male civil addict commitments arriving at the California Rehabilitation Center (CRC) who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred to another institution, currently the California Institution for Men's (CIM) RC, for further evaluation/verification and processing consistent with CAP policies and procedures.

* All female civil addict commitments arriving at CRC who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred to another institution, currently the California Institution for Women's (CIW) RC for further evaluation/verification and processing consistent with CAP policies and procedures.

* Upon completion of RC processing, inmates who are suitable for the CAP will be transferred to SATF or CCWF if their disability impacts placement, or CRC if their disability does not impact placement.

## I.   BOARD OF PRISON TERMS ACCOMMODATION PLAN

Department staff shall facilitate reasonable accommodations in Board of Prison Terms (BPT) hearings by serving the BPT Form 1073, Reasonable Accommodation Notice and Request, with other prehearing documents, by effectively communicating with inmates as provided in CCR Section 3080.31 (captioned "Effective Communication" herein below) to assist them in completing the form, and by providing to the BPT documentation

pertaining to inmates/parolees' verified disabilities.

The counselor/parole agent shall review the central/field file for documentation (i.e., CDC Form 1845, CDC Form 611, CDC Form 128C) to determine whether or not the inmate has been verified with a disability. The BPT Form 1073, with all supporting documents on the issue of the disability, shall be forwarded to the BPT Americans with Disabilities Act (ADA) Coordinator at least 21 calendar days prior to the scheduled hearing. The original copy of the BPT Form 1073 shall be filed in the BPT section of the central file along with the other prehearing documents.

Within 90 days from either the date the inmate/parolee receives the completed BPT Form 1073 documenting the decision by BPT to deny reasonable accommodation for a hearing, or from the actual date of that hearing, an inmate may appeal that decision by filing a BPT Form 1040 to the BPT.

The BPT subpoenas to witnesses and notifications to victims and/or their families will include instructions to contact the BPT ADA Coordinator 10 days prior to the hearing for any disability related accommodation request.

## J.   COMMUNITY CORRECTIONAL REENTRY CENTERS

1. Inmates with disabilities will not be excluded from participation in the Community Correctional Reentry Center (CCRC) program based solely on their disability. Inmates with disabilities who require special placement will be assigned to designated CCRC's. At least one designated CCRC to accommodate inmates of each gender will be maintained to serve each of CDC's four parole regions, including Parole Region IV.

2. Inmates shall be considered for CCRC placement based on the totality of their classification criteria and medical/psychiatric needs. Overriding ongoing medical or psychiatric treatment needs may disqualify an inmate from CCRC placement.

3. Contracts with CCRC contractors shall require the contractor to adhere to ADA. However, because CDC will place inmates who require special placement only in designated CCRC's, nondesignated CCRC's need not be fully accessible to all inmates with disabilities.

## K.   DESIGNATED COMMUNITY CORRECTIONAL REENTRY CENTERS

Currently, the following CCRC programs are designated DPP CCRC's.

| NAME OF CENTER | LOCATION | GENDER | REGION |
|---|---|---|---|
| Turning Point, "G" Street | Fresno | male | I |
| Volunteers of America, Oakland West | Oakland | male | II |

| Marvin Gardens | Los Angeles | male | III |
| Volunteers of America, Long Beach | Long Beach | male | IV |
| California Mother-Infant/Project | San Diego | female | IV |
| Working Alternatives | Los Angeles | female | III |

Note: These designated CCRC's may change.

## L.   HUB INSTITUTIONS

Identified below are the current HUB institutions and the CCRC's they serve.

| HUB INSTITUTION | CCRC'S SERVED |
| --- | --- |
| COR | Turning Point, G Street |
| SQ | Volunteers of America, Oakland West |
| CIM | Marvin Gardens, Los Angeles |
| CIW | Working Alternatives, Inglewood; California Mother/Infant Project Success |
| CRC | Volunteers of America, Long Beach |

1. The HUB institution responsibilities are:

   a) To provide nonroutine medical and dental care to DPP inmates.

   b) To enter into ambulance, medical, and dental contracts within the surrounding area of the designated CCRC for emergency and on-going care that otherwise cannot be effectively managed at the CCRC.

   c) To transport inmates to complete the DPP verification process when necessary.

## M.   TRANSPORTATION

Institutions shall notify the Community Correctional Center Administration and the Regional Reentry Coordinator (RRC) at least one week prior to transferring DPP inmates endorsed for special placement at designated DPP CCRC's. The RRC shall coordinate transportation with the Transportation HUB.

The TSU shall be responsible for arrangement of DPP inmate/parolee transportation to the sending and/or receiving institution as outlined in Subsection 18, Transportation. If a DPP inmate/parolee requires staff administered medication or medical treatment during transportation from a CCRC to a HUB institution or to an established health care provider, the inmate/parolee shall be transported by ambulance or as directed by the HCM or designee. The TSU will not be responsible for coordinating such moves. The TSU

responsibilities for DPP inmates/parolees at CCRC's include:

* Initial transports to the facility.
* Medical/dental transports.
* Disciplinary roll-up transports.
* Administrative roll-up transports.
* Parole transports (from the designated CCRC to an agreed upon public transportation terminal).

The TSU shall conduct medical/dental, disciplinary, administrative, and parole transports upon request from CDC staff at the designated CCRC. If CDC staff are not available, CCRC personnel are required to contact the appropriate Regional Parole Office. After hours emergency transportation needs for DPP inmates housed in a CCRC shall be handled through the appropriate Regional Administrative Officer of the Day (AOD). The AOD shall call TSU to arrange for immediate transport. The HUB institution's contracted ambulance service shall conduct all medical emergency transportation of DPP inmates at CCRC's.

The TSU shall transport DPP parolees held in county jails as "Our Hold Only" to CDC institutions, court proceedings, and parole revocation hearings in accordance with TSU transportation policy.

## N. FAMILY FOUNDATIONS PROGRAM

Selected Family Foundations Program (FFP) facilities shall be designated as new facilities are approved. The CDC is in the process of siting three Family Foundation facilities in California. Based upon available funding, the FFP's will be located in three counties with a population over 450,000 as specified by the authorizing statute. The CDC will construct and own each of the FFP facilities. The Planning and Construction Division and the Women and Children Services Unit (WCSU) are participating in the architectural design of each facility and will ensure that all facilities in each of the three counties are appropriately accessible. As with the Community Prisoner Mother Program (CPMP), the WCSU will place eligible women in appropriate FFP facilities in conformity with CDC's policy.

## O. COMMUNITY PRISONER MOTHER PROGRAM

The WCSU will place eligible women in appropriate Community Prisoner Mother Program (CPMP) facilities in compliance with DPP. Currently, the following CPMP's have been designated for placement and housing of inmates identified as meeting DPP criteria:

| FACILITY | LOCATION |
| --- | --- |
| Desert Counseling Makeit | Bakersfield |
| Los Angeles Center for Alcohol and Drug Abuse | Santa Fe Springs |
| Prototypes Women's Center | Pomona |

### P. FACILITIES OPERATED UNDER CONTRACT

The CDC shall include substantially the following language in all of its contracts for the operation of facilities that provide services, programs or activities for inmates or parolees: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990, 42 United States Code, Section 12101 et Seq., which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

The fact that the CDC includes this language in each contract shall not preclude the CDC from employing the clustering approach to providing accessible community-based facilities for inmates and parolees:  the CDC will provide at least one DPP-accessible facility to serve male and female in each parole region.

### Q. CONSTRUCTION POLICY

#### 1. NEW PRISON CONSTRUCTION

It is the policy of CDC to provide for structural accessibility to inmates with disabilities in the construction of new prisons, consistent with this policy.  In new prison construction, two percent of designed bed capacity will be designed to be structurally accessible.  All program and common use areas that would be available to nondisabled prisoners living in the areas of the prison where the structurally accessible housing units are located shall also be designed and built to be accessible. The CDC will cluster accessible beds and aligned program areas within specified structures and facilities of new prisons.

During the design phase of each new prison, CDC will determine whether the prison is to be designated one that will house inmates requiring specialized housing under DPP.  When a new prison is so designated, CDC will determine whether the two percent scoping standard is sufficient or should be increase.

#### 2. ALTERATION TO EXISTING FACILITIES

With respect to existing DPP facilities, alterations to inmate areas that house inmates with disabilities will be designed to be accessible to the maximum extent feasible, pursuant to state and federal accessibility standards.   With respect to non-DPP facilities and areas of DPP facilities that will not house inmates with disabilities, structural alterations will be reviewed at the project design phase for compliance with accessibility requirements.   At that time, a determination will be made whether structural accessibility to the maximum extent feasible is warranted, in view of budgetary and penological considerations.

### R. PAROLE FIELD OPERATIONS

#### 1. POLICY  It is the policy of the Department to provide reasonable accommodation to

parolees with disabilities consistent with established departmental policies and procedures. Parole planning and supervising is conducted on a case-by-case basis to meet the unique needs of the parolee while protecting legitimate parole interests of CDC.

2. RELEASE PROGRAM STUDY   Prior to a parolee's release from custody, CDC Form 611, Release Program Study, shall be used to provide documentation and notice to field staff of special needs related to the parolee's disability; i.e., need for qualified interpreters, referral to the California Department of Rehabilitation, or need for TDD access. Classification and Parole Representatives are responsible for notifying parole field staff, via the CDC Form 611 process, if an inmate has a verified disability and what the inmate's specific needs are. The CDC Form 611 shall be forwarded to the appropriate parole region at least 210 days prior to the inmate's release date in order to ensure sufficient time for reentry processing.

3. EFFECTIVE COMMUNICATION   Field staff shall ensure that parolees with disabilities, upon reporting to a parole unit, are afforded effective means of communication in receiving orientation and evaluation. If the parolee's disability prevents the parolee from reporting to the assigned unit, reasonable accommodation shall be made to meet the parolee's needs.

4. FIELD SUPERVISION/OFFICE VISITS   Parole Agents shall continue to follow existing procedures as they pertain to the supervision of parolees. The main services received by parolees in a parole office are counseling services provided by the parole agent and basic mental health services provided by the Parole Outpatient Clinics. However, if a parolee has a disability, the unit supervisor, or designee, shall make reasonable modifications in procedures, if necessary, to ensure that services are provided at an accessible location; i.e., parole office or parolee's residence.

5. PAROLE OUTPATIENT CLINICS   The Parole Outpatient Clinic shall provide evaluation or mental health diagnosis, and transitional, or occasionally, sustained therapeutic intervention on an outpatient basis to parolees with disabilities. Treatment services may be supplemented by interagency agreements/contracts with other state and county agencies. All nonroutine services shall be reviewed by the Regional Parole Administrator and Mental Health Program Administrator prior to implementation.

6. REVOCATION HEARINGS   If a parolee has a physical disability that impairs his/her ability to attend the hearing or communicate effectively with the hearing officer, then arrangements shall be made in advance to provide modifications for the disability. Refer to BPT, CCR Sections 2692 and 2694 for further details.

S.   TRAINING

The CDC will provide DPP training to field staff, which shall include evacuation and emergency procedures.

STATE OF CALIFORNIA
INMATE/PAROLEE DISABILITY VERIFICATION
CDC 1845 (Rev. 11/98)

DEPARTMENT OF CORRECTIONS

*CHECK ALL OF THE BOXES APPLICABLE*

| INMATE'S NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|

*Section A - D to be completed by a physician only*

## SECTION A: REASON FOR INITIATION OF FORM

- [ ] Inmate voluntarily self-identified to staff
- [ ] Observation by staff    [ ] Third party evaluation request
- [ ] Medical documentation or Central File information

## SECTION B: CATEGORIES OF DISABILITY

- [ ] Blind/Vision Impaired        [ ] Speech Imparied
- [ ] Deaf/Hearing Impaired        [ ] Learning Disability
- [ ] Mobility Impaired            [ ] Other

## SECTION C: DISABILITIES IMPACTING PLACEMENT

1. [ ] PERMANENT WHEELCHAIR USER
2. [ ] PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)
   *Cannot* walk 100 yards or up a flight of stairs without pausing *with* the use of aids (crutches, prothesis, or walker).
3. [ ] PERMANENTLY DEAF/HEARING IMPAIRED
   So severe they must rely on written communication, lip reading or signing as their residual hearing, with aids, will not enable them to hear an emergency warning, or effectively communicate.
4. [ ] PERMANENTLY BLIND/VISION IMPAIRED
   *Not* correctable to central vision acuity of less than 20/200 *with* corrective lenses.
5. [ ] PERMANENT INDISCERNIBLE/NO SPEECH
   *No* effective written communication.
6. [ ] OTHER IMPACTING PLACEMENT (See Comments below)

## SECTION D: DISABILITIES NOT IMPACTING PLACEMENT

A. [ ] PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)
   Walks 100 yards or up a flight of stairs without pause
   [ ] *without* aids    [ ] *with* aids (crutches, prothesis, or walker)
B. [ ] PERMANENT NONAMBULATORY MOBILITY IMPAIRMENT
   (e.g., arm or hand prostheses, or missing digit(s))
C. [ ] PERMANENTLY HEARING IMPAIRED
   With residual hearing at a functional level *with* hearing aid(s).
D. [ ] PERMANENTLY BLIND/VISION IMPAIRED
   *Correctable* to central vision acuity less than 20/200 with corrective lenses.
E. [ ] PERMANENT INDISCERNIBLE/NO SPEECH
   Communicates *effectively* in writing.
F. [ ] LEARNING DISABILITY
   Describe disability and required accommodations in Section E, Comments.

SECTIONS A through D COMPLETED BY:

Physician's Name (Print)

Physician's Signature | Date Signed:

LEARNING DISABILITY VERIFIED BY APPROPRIATE STAFF

Name (Print) | Title (Print)

Staff Signature | Date Signature

- [ ] DISABILITY **NOT** VERIFIED (*Explain in comments section*)
- [ ] VERIFIED DISABILITY IN: [ ] SECTION C   [ ] SECTION D

## SECTION E: ADDITIONAL PLACEMENT FACTORS AND INFORMATION

*For completion by correctional counseling staff*

List assistance needed with daily living activities: (*i.e., eating, bathing, dressing, etc.*)

[ ] NO ADDITIONAL INFORMATION AVAILABLE

Per 128C(s) dated:

- [ ] Uses American Sign Language (A.S.L.)
- [ ] Uses Signing Exact English (S.E.E.)
- [ ] Communicates in writing    [ ] Reads lips
- [ ] Reads braille              [ ] Requires large print

Has the following documented health care needs:

- [ ] In-patient  [ ] Sun Sensitive  [ ] Out-patient
- [ ] Heat Risk/Alert  [ ] Cannot be exposed to particulates in the air

DOCUMENTED MENTAL HEALTH NEEDS

- [ ] CCCMS  [ ] EOP  [ ] MHCB  [ ] DMH

Refer to 128C(s) dated:                    Refer to 128C(s) dated:

SECTION E COMPLETED BY:

NAME: | TITLE: | DATE SIGNED:

## COMMENTS

DISTRIBUTION: Original - General Chrono Section of Central File   Pink - Health Care Services for Health Care Record   Yellow - Inmate/Parolee

*(EXHIBIT B)*

# PROTOCOLS FOR VERIFYING DISABILITIES

## *I.* EVALUATION OF INMATES WITH HEARING IMPAIRMENTS

The following protocol will clarify the following:

- ★ The mechanism for identifying inmates with a hearing impairment;
- ★ The procedure for measuring and verifying the impairment; and
- ★ The procedure for referring hearing impaired inmates to a specialist in audiology or otolaryngology for further services as needed.

### *A.* IDENTIFICATION OF INMATES WITH A HEARING IMPAIRMENT IN A RECEPTION CENTER

**1.** All inmates, within 24 hours of their arrival, go through an initial health care screening process, which includes a qualitative and functional evaluation of the inmate's hearing as part of the review of the inmate's health care needs. The process consists of at least the following:

*a)* The standardized bus screening process

*b)* A health history and physical examination

*c)* A dental screening, and

*d)* A <u>mental</u> health screening and evaluation.

**2.** The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

*a)* The initial assessment period in reception centers (RC) provides the inmate with the opportunity to report possible health care problems.

*b)* During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes possible hearing impairment which might impact placement and/or require referral for evaluation and treatment, possibly including the provision of assistive devices such as hearing aids.

**3.** Within 24 hours of the inmate's arrival, the evaluation begins with the standardized bus screening. This is an interactive process between the inmate and the licensed health care staff. Staff interact with the inmate both in group settings and one-to-one. It includes a review of health records for previously identified health problems. Health care needs identified through this process are triaged by registered nurses (RN) or physicians who initiate referrals conforming to the urgency appropriate to the need.

4. Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment, which includes past and current health history; family history; identification of health risk factors; and medical, dental, and mental health evaluations.

5. Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functional hearing capacity, speech receptivity, and comprehension in the prison setting. This process involves a determination of functional hearing and comprehension through interactive speaking and writing, and conforms with appropriate medical practice standards for determining the inmate's hearing ability and need, if any, for additional evaluation and treatment.

   a) A visual and otoscopic examination of the ears is performed on all inmates as part of the RC physical examination, whether or not they are identified as having a possible hearing impairment.

   b) The visual and otoscopic examination of the ears allows for the determination of whether an acute condition exists that provides an etiology for the symptomatology of diminished hearing; e.g., cerumen (earwax) or foreign body occlusion of the ear canal.

   c) Inmates wearing hearing aids, even if they maintain they have no hearing problem while wearing their aids, must remove their aids for this examination. The hearing aids are inspected for visible damage.

6. On the basis of the history and physical examination, the physician may suspect a possible hearing impairment and shall at that point perform, or refer the inmate for, verification or diagnostic testing.

   a) However, if the inmate's hearing problem appears to be the result of an obvious acute condition, such as a cerumen impaction, the condition is addressed by the physician.

   b) If treatment of the condition resolves the hearing impairment, the verification and measurement process in Section B, below, is not done unless specifically determined by the physician to be medically necessary.

## B. VERIFICATION AND MEASUREMENT OF POSSIBLE HEARING IMPAIRMENTS

1. Inmates who have identified themselves as having a hearing impairment, or who have otherwise been identified as having a possible hearing impairment, are further evaluated for verification of impairment.

2. Based on results of the RC assessments, comprehensive history, and physical examination, a physician determines which of the components in Section B, Verification and Measurement, are indicated pursuant to applicable standards of care. The appropriate evaluation(s) may be ordered by the primary care physician during the time that the inmate's stay at the RC or may be obtained by referral to a specialist

in audiology or otolaryngology, which referral may be done at the receiving institution.

3. A physician can refer the inmate to a hearing specialist, whether or not all components of the screening and verification evaluation are completed, whenever there is sufficient information to indicate that the inmate has a significant hearing impairment which is an impairment that could affect the safety and security of either the hearing impaired inmate or the institution, or could affect the program and medical needs of the inmate.

4. The RC verification and measurement process consists of quantitative standardized measurements and specialty evaluations to assess functional hearing capacity and speech receptivity and comprehension in the prison setting. The evaluation consists of one or more of the following:

   a) Speech discrimination testing;

   b) Conduction and lateralization testing (Rinne' and Weber);

   c) Specialty referral, if indicated; and

   d) Pure tone audiogram testing, if indicated.

5. The verification and measurement of hearing impairments shall conform to the following expectations:

   a) Speech discrimination and comprehension is tested by speaking in a conversational voice, at six feet from the inmate, words from a phonetically balanced word list by an RN or physician. The inmate is positioned facing away from the speaker to avoid lip reading. An accepted standard is 70 percent accuracy in repeating the spoken words.

   b) Rinne' and Weber tuning fork testing for bone and air conduction and lateralization shall be performed, if indicated, by an RN or physician using a 512 or 1024 Hz tuning fork.

   c) A standard pure tone air conduction screening audiogram is performed when necessary to verify and measure the degree and type of hearing impairment.

      ★ Only health care staff who are trained in administering and recording pure tone audiograms perform screening audiograms.

      ★ If the inmate does not demonstrate that he/she hears tones at 1000, 2000, 3000, and 4000 Hz at 30 dB, he/she shall be referred to a specialist in audiology or an otolaryngologist under contract to CDC for further evaluation and recommendation for treatment or the need for assistive devices, such as hearing aids.

6. Inmates who are verified by the screening process to have a hearing impairment, including inmates with hearing aids who report changes or have persistent uncorrected

hearing impairment, shall be referred to a specialist in audiology or otolaryngology for identification of any pathologic conditions and recommendations for further care, if needed.

*a)* In order not to prolong the time in the RC due to a referral to complete the evaluation and obtain recommendations for treatment or the use of assistive devices such as hearing aids, the inmate may be transferred to an appropriate receiving institution and the referral made from there. This also allows the use of referral resources close to the receiving institution.

*b)* The CDC shall request that the recommendations from specialists specify which auxiliary aids and services may be needed by the inmate and that the recommendations take into account the context of the prison environment in order to provide for the safety and security of both the hearing impaired inmate and the institution and the program and medical needs of the inmate.

## *ii.* EVALUATION OF INMATES WITH SPEECH, MOBILITY, VISION AND OTHER IMPAIRMENTS

The purpose of this protocol is to clarify:

★ The mechanism for identifying inmates with impairments that might impact placement.

★ The procedure for evaluating and verifying the impact of an impairment on placement

## *A.* IDENTIFICATION OF INMATES WITH IMPAIRMENTS THAT MIGHT IMPACT PLACEMENT

**1.** All inmates receive an initial health care screening within 24 hours of their arrival at a Reception Center (RC), which includes a qualitative evaluation of the inmate's health care status. This includes visual acuity, evidence of mobility problems, the ability to communicate, or other potentially disabling conditions as part of a review of the inmate's health care needs. The process consist of at least the following:

*a)*    The standardized bus screening process

*b)*    A health history and physical examination

*c)*    A dental screening, and

*d)*    A <u>mental</u> health screening and evaluation.

**2.** The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

**3.** The initial assessment period in RC's provides the inmate with the opportunity to report possible health care problems.

4.  During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes the health care needs which might impact placement and/or require referral for further evaluation and treatment.

5.  Within 24 hours of the inmate's arrival, the evaluation begins with the standardized bus screening. This is an interactive process between the inmate and licensed health care staff. Staff interacts with the inmate both in group settings and one to one. It includes a review of health care records for previously identified health problems. Health care needs identified through this process are triaged by RN's or physicians who initiate referrals conforming to the urgency appropriate to the need.

6.  Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment which includes past and current health history, family history, identification of health risks factors and medical, dental and mental health evaluations.

7.  Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning ability to communicate about their health care history and concerns and respond to verbal directions, or written if appropriate.

8.  If the inmate has difficulty walking or is using crutches, or a walker or has a prosthesis for mobility purposes the mobility impairment is noted and the appropriateness of the current assistive aid is evaluated.

9.  All inmates receive a visual acuity screening with and without correction. If the inmate requires additional evaluation to determine the overall visual impairment the RC health care staff refer the inmate accordingly.

10. All inmates transferring from one general population (GP) institution to another general population institution are processed via the standardized bus screening process upon arrival. Each inmate is evaluated by health care staff to identify disabilities that may impact placement.

11. If the medical screening either in the RC or on entry to a GP reveal that the inmate has a visual acuity not correctable in at least one eye to better than 20/200, "no effective written communication," or cannot walk 100 yards, or up a flight of stairs without pausing with the use of aids, the disability is determined to impact placement.

12. If the examination determines that the inmate has a visual acuity of better than 20/200 in one eye, is able to communicate in writing or, is able to walk 100 yards or up a flight of stairs without pause with or without aids, the disability does not impact placement.

Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning capacity. This process involves a review of previous medical records

including information of general physical and medical needs, and performing or referring for further testing if necessary to identify disabilities other than visual, mobility, speech, and hearing that may impact placement.

On the basis of the above examinations, if an inmate has been determined to have a permanent disability corresponding to the five listed on the CDC Form 1845, (or other disability that impacts placement), the physician will complete the CDC 1845. The physician will indicate the impact on placement of the disability in the correct section of the CDC form 1845 so that inmate can be recommended for placement in a designated DPP facility.

### III.  EVALUATION OF INMATES WITH LEARNING DISABILITIES

The following protocol will be utilized when evaluating an inmate's claim of having a learning disability.

A.  Institution staff will ask the inmate if he/she has been identified learning disabled or has participated in special education programs in school.

  1.  Identifying markers should include participation in programs labeled: Resource Specialist Program (RSP), Learning Disability Group (LDG), Educationally Handicapped (EH), or Special Day Class (SDC).

  2.  Basic screening questions for a learning disability include questions about grades, reading and writing ability, special education placement, resource program placement, and the existence of an Independent Education Plan.

B.  If institution staff cannot verify a learning disability after completing the steps in Section A, institution staff will review the inmate's central file; i.e., probation officer's report, probation records, sentencing reports, school records, test results, family records, and medical file.

C.  The third level of inquiry to verify the existence of a learning disability is a review of current test scores. In addition, trained staff can perform a simple IQ-achievement discrepancy evaluation – comparing IQ scores, TABE scores, and last grade completed in school to screen out prisoners with possible learning disabilities. Inmates that test at the eighth-grade level or higher will be screened out of the learning disabled inmates needing basic accommodations.

D.  Institution staff will request professional testing if the first three levels of verification uncover evidence that the inmate is likely to have a learning disability and CDC still is unwilling to provide the requested accommodation. This is also true if specific information about the learning disability is necessary in order to identify an appropriate accommodation for the inmate.

The evaluation may be made at the RC or the receiving institution.

Three Embarcadero Ctr 7th Flr
San Francisco, CA  94111

Morris Lenk, Esq.
CA State Attorney General's Office
50 Fremont Street
Room 300
San Francisco, CA  94105

James Humes
George D. Prince, Esq.
CA State Attorney General's Office
50 Fremont Street
Room 300
San Francisco, CA  94105

Warren E. George, Esq.
McCutchen Doyle Brown & Enersen LLP
Three Embarcadero Ctr
San Francisco, CA  94111

Michael W. Bien, Esq.
Rosen Bien & Asaro
155 Montgomery St 8th Flr
San Francisco, CA  94104

Elaine Feingold, Esq.
Disability Rights Education & Defense Fund, Inc
2212 Sixth Street
Berkeley, CA  94710


Richard W. Wieking, Clerk

BY: _____
    Deputy Clerk

scc

United States District Court
for the
Northern District of California
January 8, 1999

\* \* CERTIFICATE OF SERVICE \* \*

Case Number:4:94-cv-02307

Armstrong

   vs

Wilson

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on  January 8, 1999, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

Mary Beth Uitti, Esq.
U.S. Attorney's Office
Rm 115
450 Golden Gate Ave 10th Flr
P.O. Box 36055
San Francisco, CA  94102

Sharon N. Perley, Esq.
USDJ - Disability Rights Section
Civil Rights Division
P.O. Box 66738
Washington, DC  20035-6738

Sara Linda Norman, Esq.
Prison Law Office
General Delivery
San Quentin, CA  94964

Donald Specter, Esq.
Prison Law Office
General Delivery
San Quentin, CA  94964

Eve H. Shapiro, Esq.
Howard Rice Nemerovski Canady Falk & Rabin