ORIGINAL

FILED

FEB 27 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

681n

1  BILL LOCKYER
   Attorney General
2  DAVID P. DRULINER
   Chief Assistant Attorney General
3  PAUL D. GIFFORD
   Senior Assistant Attorney General
4  DANETTE E. VALDEZ
   Supervising Deputy Attorney General
5  G. MICHAEL GERMAN, #103312
   Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-3664
7  Telephone:    (415) 703-5629
   Fax:          (415) 703-5843
8
9  Attorneys for Defendants

10

11             UNITED STATES DISTRICT COURT

12         FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

**JOHN ARMSTRONG, et al.,**              No.: C-94-2307 CW

15                        **Plaintiffs,**    **AMENDED  REMEDIAL PLAN**

16

17             **v.**

   **GRAY DAVIS, et al.,**
18
                          **Defendants.**
19

20         Defendants hereby submit the Amended Remedial Plan to the Court, as Exhibit A attached

21  hereto.

22                                    BILL LOCKYER
                                      Attorney General
23

24  DATED: February 26, 2001    By: _G. Michael German_

25                                    G. MICHAEL GERMAN
                                      Deputy Attorney General
26                                    Attorney for Defendants

27

28

AMENDED REMEDIAL PLAN
                                      1

# EXHIBIT A

# ARMSTRONG

## V.

## DAVIS



## COURT ORDERED
## REMEDIAL PLAN

**Amended**
**January 3, 2001**

# ~ Table of Contents ~

*I.* POLICY ...........................................................................................................1

   *A.* Scope ........................................................................................................1

*II.* STANDARDS ...............................................................................................1

   *A.* QUALIFIED INMATE/PAROLEE ...........................................................1

   *B.* PERMANENT DISABILITY.....................................................................2

   *C.* CATEGORIES AND CRITERIA FOR SPECIAL PLACEMENT ...................2

      *1.* PERMANENT MOBILITY IMPAIRMENTS......................................2

         *a)* PERMANENT WHEELCHAIR....................................................2

         *b)* PERMANENT MOBILITY IMPAIRMENT (NONWHEELCHAIR) ......3

      *2.* PERMANENT HEARING IMPAIRMENTS.........................................3

      *3.* PERMANENT VISION IMPAIRMENTS ............................................3

      *4.* PERMANENT SPEECH IMPAIRMENTS ...........................................3

      *5.* OTHER ....................................................................................3

   *D.* CATEGORIES AND CRITERIA WHICH DO NOT REQUIRE SPECIAL PLACEMENT .......3

      *1.* PERMANENT MOBILITY IMPAIRMENTS.........................................4

      *2.* PERMANENT NONAMBULATORY IMPAIRMENTS ...........................4

      *3.* PERMANENT HEARING IMPAIRMENTS.........................................4

      *4.* PERMANENT VISION IMPAIRMENTS ............................................4

      *5.* PERMANENT SPEECH IMPAIRMENTS ...........................................4

   *E.* EFFECTIVE COMMUNICATION ............................................................4

      *1.* GENERAL ................................................................................4

      *2.* COMMUNICATION IMPLICATING DUE PROCESS AND DELIVERY OF HEALTH CARE........................................................................4

      *3.* QUALIFIED INTERPRETERS ........................................................7

   *F.* REASONABLE ACCOMMODATION/MODIFICATION................................7

   *G.* EQUAL ACCESS ..................................................................................7

   *H.* JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION..8

      *1.* LEGITIMATE PENOLOGICAL INTEREST ........................................8

      *2.* UNDUE BURDEN AND FUNDAMENTAL ALTERATION DEFENSES ....8

      *3.* DIRECT THREAT ......................................................................8

      *4.* EQUALLY EFFECTIVE MEANS ....................................................8

   *I.* EQUIVALENT PROGRAMMING .............................................................9

*III.* RECEPTION CENTER PROCESSING ........................................................9

   *A.* ADJUSTMENTS DUE TO EXTENDED RECEPTION CENTER STAY ............10

   *B.* ACCOMMODATIONS ...........................................................................11

      *1.* PRIVILEGES ............................................................................11

      *2.* WORK GROUP CREDITS...........................................................11

IV. FIELD OPERATIONS ...................................................................................13

   A. DESIGNATED DPP FACILITIES ....................................................................13

   B. VERIFICATION PROCESS .............................................................................13

      1. VERIFICATION OF A DISABILITY (CDC FORM 1845) ....................................13

      2. VERIFICATION OF A DISABILITY AS A RESULT OF A REQUEST FOR
         REASONABLE ACCOMMODATION (CDC FORM 1824) OR OTHERWISE ....15

   C. PLACEMENT ...............................................................................................16

   D. EXPEDITED TRANSFERS .............................................................................17

   E. TRACKING .................................................................................................18

   F. HEALTH CARE APPLIANCES .......................................................................18

      1. DEFINITION ...........................................................................................18

      2. PRESCRIPTION AND APPROVAL ...............................................................19

      3. POSSESSION OF HEALTH CARE APPLIANCES .............................................19

      4. PURCHASE OF HEALTH CARE APPLIANCES ...............................................19

      5. MAINTENANCE AND REPAIR OF HEALTH CARE APPLIANCES .....................20

      6. MAINTENANCE AND REPAIR OF WHEELCHAIRS .......................................20

   G. MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT ............................21

   H. LIBRARY EQUIPMENT .................................................................................21

   I. INSTITUTION PROCEDURES ..........................................................................21

      1. INMATE ORIENTATION PROCESS ..............................................................21

      2. NOTICES, ANNOUNCEMENTS, AND ALARMS .............................................22

         a) WRITTEN MATERIALS .........................................................................22

         b) VERBAL ANNOUNCEMENTS AND ALARMS ...........................................23

      3. SPECIAL IDENTIFICATION ........................................................................23

      4. YARD IDENTIFICATION ............................................................................24

      5. EVACUATION PROCEDURES .....................................................................24

      6. COUNT .................................................................................................25

      7. RESTRAINTS ..........................................................................................25

      8. SEARCHES .............................................................................................26

      9. TRANSPORTATION ..................................................................................26

      10. TELECOMMUNICATION DEVICES FOR THE DEAF / TELEPHONES ..................27

      11. CLOSED CAPTIONED TELEVISION .............................................................28

      12. VISITING ..............................................................................................28

      13. RECREATION .........................................................................................29

      14. INMATE PROGRAMS AND WORK ASSIGNMENTS .........................................29

      15. ESSENTIAL FUNCTIONS ...........................................................................30

      16. VOCATIONAL ASSIGNMENTS ...................................................................30

      17. ACADEMIC ASSIGNMENTS .......................................................................31

      18. CONSERVATION CAMPS ..........................................................................31

      19. HEALTH CARE STATUS DETERMINATION ...................................................31

      20. DISCIPLINARY PROCESS ..........................................................................32

21. SPECIAL HOUSING PLACEMENT .................................................................33
    a) ADMINISTRATIVE SEGREGATION UNIT (ASU) .................................33
    b) SECURITY HOUSING UNIT (SHU) ...................................................33
    c) PROTECTIVE HOUSING UNIT (PHU)................................................33
    d) CONDEMNED HOUSING ................................................................33
    e) MEDICAL PLACEMENT .................................................................34
22. REMOVAL OF HEALTH CARE APPLIANCES IN ASU/SHU/DISCIPLINARY
    DETENTION UNITS .............................................................................34
23. APPEALS PROCESS FOR OBTAINING ACCOMMODATIONS............................36
    a) GENERAL ....................................................................................36
    b) APPEAL SCREENING PROCESS........................................................36
    c) MEDICAL VERIFICATION PROCESS ..................................................37
    d) NONMEDICAL VERIFICATION PROCESS.............................................38
    e) TIME FRAMES .............................................................................40
    f) EXPEDITED APPEAL PROCESS.........................................................40
24. SUBSTANCE ABUSE AND CIVIL ADDICT PROGRAMS ...............................41
    a) SUBSTANCE ABUSE TREATMENT ...................................................41
    b) CIVIL ADDICT PROGRAM ..............................................................41
J. BOARD OF PRISON TERMS ACCOMMODATION PLAN.............................................42
K. COMMUNITY CORRECTIONAL REENTRY CENTERS...............................................43
L. DESIGNATED COMMUNITY CORRECTIONAL REENTRY CENTERS........................44
M. HUB INSTITUTIONS ......................................................................................44
N. TRANSPORTATION .......................................................................................45
O. FAMILY FOUNDATIONS PROGRAM ................................................................45
P. COMMUNITY PRISONER MOTHER PROGRAM ..................................................46
Q. FACILITIES OPERATED UNDER CONTRACT .......................................................46
R. CONSTRUCTION POLICY ................................................................................46
    1. NEW PRISON CONSTRUCTION ...........................................................46
    2. ALTERATION TO EXISTING FACILITIES .................................................47
S. PAROLE FIELD OPERATIONS..........................................................................47
    1. POLICY .........................................................................................47
    2. RELEASE PROGRAM STUDY ...............................................................47
    3. EFFECTIVE COMMUNICATION ............................................................47
    4. WRITTEN COMMUNICATION ..............................................................47
    5. FIELD SUPERVISION/OFFICE VISITS .....................................................48
    6. PURCHASE OF HEALTH CARE APPLIANCES ...........................................48
    7. MAINTENANCE AND REPAIR OF WHEELCHAIRS.....................................48
    8. PAROLE OUTPATIENT CLINICS............................................................49
    9. EVACUATION PROCEDURES ...............................................................49
    10. RESTRAINTS .................................................................................49
    11. TRANSPORTATION .........................................................................49
    12. REVOCATION HEARINGS .................................................................50
T. TRAINING .................................................................................................50

# REMEDIAL PLAN

## *I.* __POLICY__

It is the policy of the California Department of Corrections (CDC) to provide access to its programs and services to inmates and parolees with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No qualified inmate or parolee with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination. All institutions/facilities housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and Department policy.

### *A.* SCOPE

The Disability Placement Program (DPP) is the Department's set of plans, policies, and procedures to assure nondiscrimination against inmates/parolees with disabilities. The DPP applies to all of the Department's institutions/facilities, all programs that the Department provides or operates, and to all inmates who have disabilities that affect a major life activity whether or not the disabilities impact placement.

Although the program covers all inmates/parolees with disabilities, whether or not they require special placement or other accommodation, it is facilitated in part through "clustering" or designating accessible sites (designated facilities) for qualified inmates requiring special placement. Inmates with permanent mobility, hearing, vision, and speech impairments, or other disability or compound conditions severe enough to require special housing and programming, will be assigned to special placement in a designated DPP facility. Inmates with a permanent impairment of lesser severity, learning disability, or a kidney disability, may be assigned to any of the Department's institutions/facilities (designated DPP institutions or nondesignated DPP institutions) consistent with existing case factors.

## *II.* __STANDARDS__

### *A.* QUALIFIED INMATE/PAROLEE

A "qualified inmate/parolee" is one with a permanent physical or mental impairment which substantially limits the inmate/parolee's ability to perform a major life activity. Major life activities are functions such as caring for one's self, performing essential manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

*B.* **PERMANENT DISABILITY**

A "permanent disability or impairment" is one which is not expected to improve within six months. Temporary impairments such as a broken leg or hernia operation do not constitute a permanent disability or impairment.

*C.* **CATEGORIES AND CRITERIA FOR SPECIAL PLACEMENT**

The following categories and criteria apply to inmates with Disabilities Impacting Placement as identified via the CDC Form 1845 (Section C):

*1.* **PERMANENT MOBILITY IMPAIRMENTS**

*a)* **PERMANENT WHEELCHAIR**:  Inmates/parolees who use wheelchairs full or part time due to a permanent disability.

**Wheelchair Category Designations**

❖ **DPW -- Wheelchair Dependent**:  Inmates/parolees who are medically prescribed a wheelchair for full time use both within and outside the assigned cell due to a permanent disability shall be designated as DPW. All designated DPW inmates/parolees must be housed in a designated facility and require housing in a wheelchair accessible cell.

❖ **DPM -- Mobility Impaired**:  Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a permanent lower extremity mobility impairment that substantially limits walking, shall be designated as DPM. All designated DPM inmates/parolees require housing in a designated facility but <u>do not</u> require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

❖ **DPO -- Other**:  Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a disability other than a lower extremity mobility impairment, i.e., emphysema, serious heart condition, etc., who, due to the severity of their disability, require placement in a designated facility, shall be designated as DPO. All designated DPO inmates/parolees require housing in a designated facility but <u>do not</u> require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

The above criteria will also be applied to inmates currently undergoing RC processing and those inmates housed in dormitory settings as they may be placed in Administrative Segregation for factors as defined by the California Code of Regulations (CCR), Title 15, Section 3335 or subsequently endorsed for transfer to a celled environment as outlined in CCR, Title 15, Section 3375, et. seq.

b) **PERMANENT MOBILITY IMPAIRMENT (NONWHEELCHAIR):** Inmates/ parolees who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking; i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without pausing with the use of aids, i.e., crutches, prosthesis, or walker, shall also be designated as DPM. These inmates may also require in-cell accommodation, e.g., grab bars or raised toilet seats, as documented on a CDC Form 1845 or 128C.

2. **PERMANENT HEARING IMPAIRMENTS**

Inmates/parolees who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning shall be designated as DPH.

3. **PERMANENT VISION IMPAIRMENTS**

Inmates/parolees who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses, shall be designated as DPV.

4. **PERMANENT SPEECH IMPAIRMENTS**

Inmates/parolees who have a permanent speech impairment, such as a difficult speech pattern or no speech, and do not communicate effectively in writing shall be designated as DPS.

5. **OTHER**

Inmates/parolees with a disability other than those specified above, e.g., emphysema or other upper respiratory condition, which due to the severity of their disability may require special placement in a designated DPP facility. These inmates shall also be designated as DPO.

D. **CATEGORIES AND CRITERIA WHICH DO NOT REQUIRE SPECIAL PLACEMENT**

The following categories and criteria apply to inmates with disabilities that do not impact placement as identified via the CDC Form 1845 (Section D):

*1.* **PERMANENT MOBILITY IMPAIRMENTS**

Inmates/parolees with permanent lower extremity mobility impairments who can walk 100 yards and up a flight of stairs without pausing, with or without aids, shall be designated as DNM.

*2.* **PERMANENT NONAMBULATORY IMPAIRMENTS**

Inmates/parolees who have an arm or hand prosthesis, or missing digits. These inmates do not have a specific category code.

*3.* **PERMANENT HEARING IMPAIRMENTS**

Inmates/parolees who have residual hearing at a functional level with hearing aids shall be designated as DNH.

*4.* **PERMANENT VISION IMPAIRMENTS**

Inmates/parolees who have a vision impairment correctable to central vision acuity better than 20/200 with corrective lenses shall be designated as DNV.

*5.* **PERMANENT SPEECH IMPAIRMENTS**

Inmates/parolees who have a permanent speech impairment, such as a difficult speech pattern or no speech, and communicate effectively in writing shall be designated as DNS.

*E.* **EFFECTIVE COMMUNICATION**

*1.* **GENERAL**

Reasonable accommodation shall be afforded inmates/parolees with disabilities, e.g., vision, speech, hearing impaired, and learning disabled inmates, to ensure equally effective communication with staff, other inmates, and, where applicable, the public. Auxiliary aids which are reasonable, effective, and appropriate to the needs of the inmate/parolee shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides (inmates, parolees, or staff), qualified interpreters, readers, sound amplification devices, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audiotaped texts, Braille materials, large print materials, and signage.

*2.* **COMMUNICATION IMPLICATING DUE PROCESS AND DELIVERY OF HEALTH CARE**

Because of the critical importance of communication involving due process or health care, the standard for equally effective communication is higher when these interests are involved. It is the obligation of CDC staff to provide

effective communication under all circumstances, but the degree of accommodation that is required under these special circumstances shall be determined on a case-by-case basis and is subject to the following requirements:.

*a)* *Space reserved for Test of Adult Basic Education (TABE)*

*b)* *Space reserved for Test of Adult Basic Education (TABE)*

*c)* Staff shall document the determination that the inmate understood the process and shall record the basis for that determination and how the determination was made. For example, "the responsive written notes generated by a hearing impaired inmate indicated that he/she understood the process," "the sign language interpreter, e.g., American Sign Language (ASL) interpreter appeared to communicate effectively with the hearing impaired inmate as indicated by the inmate's substantive response via sign language," *Space reserved for Test of Adult Basic Education (TABE)*

*d)* Qualified sign language interpreters, as defined below, will be provided for all due process functions and medical consultations that fall within the scope of those described below when sign language is the inmate's primary or only means of effective communication, unless the inmate waives the assistance of an interpreter, reasonable attempts to obtain one are not successful, and/or

delay would pose a safety or security risk. In the event a qualified sign language interpreter is not available, or is waived by the inmate, and communication is attempted, staff shall employ the most effective form of communication available, using written notes; staff interpreters who are able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary; or any other appropriate means.

Medical consultations for which qualified sign language interpreters will be provided include those pertaining to:

❖ Determination of the inmate patient's medical history or description of ailment or injury;

❖ Provision of the inmate patient's rights, informed consent or permission for treatment;

❖ Diagnosis or prognosis of ailment or injury;

❖ Explanation of procedures, tests, treatment, treatment options, or surgery;

❖ Explanation of medications prescribed (such a dosage, instructions for how and when to be taken, side effects, food or drug interactions);

❖ Blood donations and apheresis;

❖ Discharge instructions;

❖ Provision of mental health evaluations, group and individual therapy, counseling and other therapeutic activities;

❖ Educational counseling.

The foregoing list is neither exhaustive nor mandatory, and shall not imply that there are no other circumstances when it may be appropriate to provide interpreters for effective communication nor that an interpreter must always be provided in these circumstances.

e) Videoconferencing is an appropriate and acceptable means of providing qualified sign language interpretive services, and may be employed when available.

f) An inmate's ability to lip read shall not be the sole source used by staff as a means of effective communication involving due process or medical consultations, unless the inmate has no other means of communication.

### 3. QUALIFIED INTERPRETERS

A qualified sign language interpreter includes a person adept at American Sign Language. To qualify as an ASL interpreter, an individual must pass a test and qualify in one of the five categories established by the National Association for the Deaf (NAD), one of the three categories established by the Registry of Interpreters for the Deaf (RID), or as a Support Services Assistant Interpreter from the California Department of Rehabilitation.

Staff who are able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary may be utilized as an interpreter, in the event a qualified sign language interpreter/ASL interpreter is not reasonably available, or is waived by the inmate.

Each institution (designated DPP, nondesignated DPP, and reception center) and Parole Region is to establish a contract or service agreement with a local signing interpreter service organization in order to provide interpretive services for hearing impaired inmates during due process functions and medical consultations.

## F. REASONABLE ACCOMMODATION/MODIFICATION

The Department shall provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates/parolees. The Department shall consider, on a case-by-case basis, accommodations for inmates/parolees with impairments that are temporary in nature. Examples of reasonable accommodations include special equipment (such as readers, sound amplification devices, or Braille materials), inmate or staff assistance, bilingual or qualified sign language interpreters, modifying work or program schedules, or grab bars installed for mobility impaired inmates who require such (including mobility impaired inmates whose disability does not impact placement).

## G. EQUAL ACCESS

Accommodations shall be made to afford equal access to the court, to legal representation, and to health care services, for inmates/parolees with disabilities, e.g., vision, speech, hearing, and learning disabled.

Accommodations may include but are not limited to access to magnifiers, electronic readers, and sound amplification devices.

To assist in accommodating an inmate's equal access to the court, the institutions shall provide a letter to the court identifying the nature and severity of the inmate's disability and limitation(s), including a brief description of the inmate's request for accommodation by the court.

### *H.* JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION

#### *1.* LEGITIMATE PENOLOGICAL INTEREST

A request for accommodation may be denied when the denial is based on legitimate penological interests. The factors to be considered in determining whether the accommodation can be denied on this basis are those four factors articulated by the Supreme Court in Turner v. Safley (1987) 482 U.S. 78. They are: 1) whether there is a valid, rational connection between the denial and a legitimate governmental interest; 2) whether there are alternative means for the inmate to exercise his rights; 3) the impact of accommodating the request on security, staff, other inmates and the allocation of prison resources generally; and 4) whether the denial represents an exaggerated response to prison concerns. In all evaluations of requests for reasonable accommodation, public safety and the health, safety, and security of all inmates and staff shall remain the overriding consideration.

#### *2.* UNDUE BURDEN AND FUNDAMENTAL ALTERATION DEFENSES

A request for accommodation may be denied when the requested accommodation would impose an undue financial or administrative burden on the agency, or would fundamentally alter the nature of the service, program, or activity. An accommodation is an undue financial burden when, in a cost-benefit analysis, its cost would be an unjustifiable waste of public funds. The Warden, Regional Parole Administrator, or (in the case of some medical accommodations) the Health Care Manager or designee, will make the determination that an accommodation would result in an undue burden or fundamental alteration.

#### *3.* DIRECT THREAT

A request for accommodation may be denied when it poses a direct threat of substantial harm to the health or safety of the inmate, parolee, or anyone else, including the public.

#### *4.* EQUALLY EFFECTIVE MEANS

A request for accommodation may be denied if equally effective access to a program, service, or activity may be afforded through an alternate method which is less costly or intrusive. Alternative methods, which may be less costly or intrusive to the existing operation/program, may be utilized to provide reasonable access in lieu of modifications requested by the inmate/parolee, so long as they are effective.

*I.*   **E**QUIVALENT **P**ROGRAMMING

The designated DPP facilities shall offer disabled inmates a range of programming equivalent to that available to nondisabled inmates. For example, a DPP facility for women shall offer an acceptable long-term substance abuse treatment program equivalent to the Forever Free Program at the California Institution for Women.

## *III.*   RECEPTION CENTER PROCESSING

All reception center (RC) facilities are designated to provide temporary housing and processing for inmates/parolees identified as meeting DPP criteria with the exception of the following, whose responsibility for processing DPP inmates is limited:

❖   **California State Prison, San Quentin**   All inmates (except condemned cases) who arrive at California State Prison, San Quentin's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within <u>seven days</u> to Deuel Vocational Institution's RC for processing.

❖   **California Correctional Institution**   All inmates who arrive at California Correctional Institution's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within <u>seven days</u> to North Kern State Prison's (NKSP) RC for processing. Wheelchair users may also be transferred to Wasco State Prison's (WSP) RC.

❖   **Wasco State Prison**   All inmates who arrive at WSP preliminarily identified as mobility impaired nonwheelchair, as defined in Section II, C, 1, b), hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within <u>seven days</u> to NKSP's RC for processing. The WSP's RC is designated with a wheelchair-only mission, as defined in Section II, C, 1, a).

❖   **California Rehabilitation Center**   Refer to Section IV, I, 24, b) of this plan, Civil Addict Program, for CDC's Policy on DPP civil addict cases.

❖   **Northern California Women's Facility**   All female parole violators/pending revocation or parole violators/return-to-custody who arrive at the Northern California Women's Facility (NCWF) RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within <u>seven days</u> to the Central California Women's Facility (CCWF) RC. Wheelchair users may also be transferred to Valley State Prison for Women's (VSPW) RC. These cases shall be transported back to NCWF as needed for parole revocation hearings, on out-to-court/hearing status and returned the same day.

❖ **Valley State Prison for Women**  All inmates who arrive at VSPW's RC preliminarily identified as mobility impaired nonwheelchair, as defined in Section II, C, 1, b), hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within <u>seven days</u> to CCWF's RC for processing. The VSPW's RC is designated with a wheelchair-only mission, as defined in Section II, C, 1, a).

All RC's, however, will have sufficient accessible beds to accommodate disabled inmates awaiting transfer to a DPP RC.

Generally, inmates with disabilities shall be processed out of RC's in a timely manner, no more than 60 days from the date they are received by the Department, unless detained by factors not attributable to the Department's delay; e.g., medical necessity, court appearances, disciplinary proceedings, no documented in-level bed availability systemwide, etc.

## A.  ADJUSTMENTS DUE TO EXTENDED RECEPTION CENTER STAY

Inmates with disabilities will be processed out of RC's in a timely manner, in no more than 60 days from the date they are received by the Department, unless detained due to factors not attributable to the Department's delay; e.g., medical necessity, court appearance, disciplinary proceedings, no documented in-level bed availability systemwide, etc.  Any period of time beyond the initial 60 days of a disabled inmate's stay at an RC shall be referred to as the inmate's extended stay.

If a disabled inmate remains at a RC for more than 60 days, a presumption arises that the extended stay is solely due to the inmate's disability.  To overcome this presumption, CDC must demonstrate that the inmate's transfer out of the RC was at no time delayed solely due to the inmate's disability.  In this case, CDC need not accommodate the inmate for the extended stay.  Alternatively, CDC may demonstrate that the cumulative period of all disability-related delays was shorter than the inmate's extended stay, in which case CDC need only accommodate the inmate for the cumulative period of disability-related delays.

Verification that the inmate's extended stay in the RC was not due to the disability may be demonstrated by documentation reflecting that the inmate's disability does not impact placement, i.e., CDC Forms 1845 (Section D), 128C, or 128G.  This provision does not apply to inmates undergoing dialysis treatment.

When it comes to CDC's attention that a disabled inmate's RC stay has been extended beyond 60 days solely due to the inmate's disability that impacts placement (Section C inmates) or the inmate's undergoing dialysis treatment, CDC shall accommodate the inmate as described below.  The below provisions for an extended RC stay are only available to inmates whose disability impacts placement and those who are undergoing dialysis treatment.  Qualifying inmates may file a CDC Form 1824, Reasonable Accommodation or Modification Request, to request accommodation for an extended stay.

*B.* **ACCOMMODATIONS**

*1.* **PRIVILEGES**

Disabled inmates with disabilities severe enough to impact placement as documented on CDC Forms 1845 (Section C), 128G, or 128C (or inmates undergoing dialysis treatment), who remain at RC's for extended stays solely due to the inmate's disability shall be granted, during their extended stays, privileges that are available at mainline institutions, as outlined in CCR, Title 15, Section 3044(d), Privilege Group A.

When it comes to the RC's attention that the RC stay of an inmate with a disability severe enough to impact placement, as documented on a CDC Form 1845 (Section C), 128G or 128C (or inmates undergoing dialysis treatment), has been extended beyond 60 days, the inmate's case will be presented to a classification committee on the 61st day for determination whether the extended stay is solely due to the disability. The determination by the classification committee shall be documented on a CDC Form 128G. If the classification committee determines that the extended stay is solely due to the disability, the corresponding CDC Form 128G granting Privilege Group A shall be forwarded to appropriate custody staff to ensure privileges are provided as required.

If the classification committee determines that the extended RC stay is not solely due to the disability, the CDC Form 128G shall document the decision and reflect that determination and the fact that the inmate is not eligible for Privilege Group A during his/her extended stay in the RC.

*2.* **WORK GROUP CREDITS**

*a)* Disabled inmates with disabilities severe enough to impact placement who remain at RC's for extended stays solely due to their disability and who are serving sentences of less than one year, or have less than one year remaining on their sentence while undergoing RC processing, shall, pursuant to the procedures described below, receive sentencing credits that they could have earned if they had been transferred to a mainline institution on the 61st day of RC stay.

When it comes to the RC's attention that an inmate with a disability severe enough to impact placement as documented on CDC Forms 1845 (Section C), 128G or 128C, (or inmates undergoing dialysis treatment), has an RC stay that has been extended beyond 60 days, and who are serving sentences of less than one year, or have less than one year remaining on their sentence while undergoing RC processing, the inmate's case will be presented to a classification committee on the 61st day for determination whether the extended stay is solely due to the disability. The determination by the classification committee shall be documented on a CDC Form 128G.

If the classification committee determines that the extended stay is solely due to the disability, the corresponding CDC Form 128G granting work time credits shall be forwarded to the Case Records manager to apply the applicable credits as outlined in CCR, Title 15, Section 3044(b)(1), Work Group A1.  Inmates with disabilities, who are, by law, ineligible to earn worktime credits are exempt from this requirement.

If the classification committee determines that the extended RC stay is not solely due to the disability, the CDC Form 128G shall document the decision and reflect that determination and the fact that the inmate is not eligible for worktime credits during his extended stay in the RC.

*b)* The receiving program institution shall review the central file of all inmates with disabilities severe enough to impact placement and those who required dialysis treatment at the RC's to determine if their  stay exceeded 60 days.  If so, the inmate's extended stay shall be presumed to be solely due to the inmate's disability unless CDC can overcome this presumption as provided above, i.e., detained by factors not attributable to the Department's delay or classification committee determination that extended stay was not due to the disability.  If the inmate's disability was the sole cause, adjustment to the inmate's worktime credits will be made, once the inmate is received at the program institution, to reflect credits as if the inmate were engaged in the work program on the 61st day, as outlined in CCR, Title 15, Section 3044(b)(1), Work Group A1.

Once the inmate is received by the program institution, the RC extended stay time period ends and the inmate's work/privilege group reverts to U/U (unclassified) until the date of the initial classification committee.  The initial classification committee will then designate an appropriate work/privilege group for the inmate and place him/her on an assignment waiting list.

Credit relief shall be accomplished by a statement from the classification committee on the CDC Form 128G, similar to that used in a time gap chrono covering the period(s) of disability related delays.  At no time shall the credit relief exceed the total period of the extended stay.  Inmates with disabilities who are, by law, ineligible to earn worktime credit are exempt from this requirement.

## *IV.* **FIELD OPERATIONS**

### *A.* DESIGNATED DPP FACILITIES

The institutions identified below are designated DPP facilities:

| MALE INSTITUTIONS |
| --- |
| Avenal State Prison |
| California Institution for Men |
| California Medical Facility |
| California State Prison, Corcoran |
| California Substance Abuse Treatment Facility & State Prison Corcoran |
| High Desert State Prison |
| Pleasant Valley State Prison |
| Salinas Valley State Prison |

| FEMALE INSTITUTIONS |
| --- |
| Central California Women's Facility |
| Valley State Prison for Women |

Designated DPP institutions may be added or deleted as needed. The CDC shall notify plaintiffs 60 days in advance of any action to add or delete designated institutions.

### *B.* VERIFICATION PROCESS

It is the mutual responsibility of the inmate/parolee and CDC to verify disabilities that might affect their placement in the prison system, and of verifying credible claims of disability in response to requests for accommodation or complaints about disability-based discrimination. The CDC is not required to automatically screen all inmates/parolees to identify disabilities. Inmates/parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

### *1.* VERIFICATION OF A DISABILITY (CDC FORM 1845)

Verification may be triggered by any of the following:

*a)* The inmate/parolee self-identifies or claims to have a disability.

*b)* Staff observe what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern.

*c)* The inmate/parolee's health care or central file contains documentation of a disability.

*d)* A third party (such as a family member) requests an evaluation of the inmate/parolee for an alleged disability.

Verification of a disability that may impact placement shall be recorded on a CDC Form 1845, Inmate/Parolee Disability Verification Form (Exhibit A).

Once completed and approved, the CDC Form 1845 shall become part of the inmate's or parolee's file and shall be effective until a change in the inmate's or parolee's condition causes it to be canceled or superseded.

Identification of disabilities affecting placement shall usually occur during RC processing; however, if an inmate/parolee appears to have a disability that might affect placement, a staff member shall refer the inmate/parolee for verification of the disability. The referral is made by directing a standard CDC Form 128B, Chrono-General, to the institution/facility's health care services. Health care staff shall verify the disability using a CDC Form 1845 with appropriate CDC Form 128C documentation listing the inmate's limitations.

Responsibility for completion of Sections A through E of the CDC Form 1845 rests with institution/facility health care services licensed clinical staff. Health care staff shall follow CDC protocols for verifying disabilities. These protocols are set forth in Exhibit B to this Remedial Plan. Sections A through E shall be completed by a physician.

If an inmate is evaluated utilizing the CDC Form 1845 and it is determined the inmate/parolee does not have one of the categories of disability specified in Section II, C or D, of this plan, the physician making the decision shall check the appropriate box indicating "Disability Not Verified" and enter an explanation in the Comments Section. The physician shall then sign and date the CDC Form 1845.

If it is determined the inmate/parolee has a permanent disability specified in Section II, D, of this plan, that does not impact placement, the physician making the decision shall check the appropriate box indicating "Disabilities Not Impacting Placement." The physician shall then sign and date the CDC Form 1845.

A check in any of the boxes in Section D and no checks in Section C indicate that the inmate may be assigned to any of the Department's institutions/facilities consistent with applicable case factors.

If it is determined that an inmate has a permanent disability specified in Section II, C, of the ARP, and the disability impacts placement, the physician making the decision shall check the appropriate box in Section C indicating "Disabilities Impacting Placement." The physician shall then sign and date the CDC Form 1845.

If it is determined that an inmate has a permanent disability specified in Section II, C, 5 (Other), and the disability is severe enough that the inmate would benefit from placement in a designated DPP facility, the physician shall specify the condition/disability in the Comments Section of the CDC Form 1845. The physician shall then complete a CDC Form 128C, Chrono-Medical, Psych, Dental, listing the inmate's limitations, special health care needs, and any other information which might be pertinent to making a placement decision. The physician shall then sign and date the CDC Form 1845.

A check in any of the boxes in Section C indicates a need for placement in one of the designated DPP institutions/facilities.

Special concerns, such as documented mental or physical health care needs, are addressed on the CDC Form 1845 by checking the appropriate box(es) and completing the requested information in Section E. Assistance with daily living activities shall also be noted on the form, with appropriate CDC Form 128C documentation noting the specific need(s). Additional notes, references, explanations, and/or information not listed elsewhere on the CDC Form 1845 are to be placed in the Comments Section of the CDC Form 1845.

Once the CDC Form 1845 is completed as referenced above, the physician shall sign and date in Section E, and forward the CDC Form 1845 to the institution/facility Correctional Counselor III (CC III) for RC's or the Classification & Parole Representative (C&PR) for general population institutions, within 72 hours.

The CC III/C&PR shall log and track the CDC Form 1845 as outlined in Section IV, E. The CC III/C&PR shall route the CDC Form 1845 to the assigned CC I who shall complete Section F and add any additional information available from the inmate's Central File, e.g., uses American Sign Language, reads Braille, etc.

The CC I, upon completion of Section F, shall sign, date, and distribute the CDC Form 1845, according to the instructions on the form.

2. **VERIFICATION OF A DISABILITY AS A RESULT OF A REQUEST FOR REASONABLE ACCOMMODATION (CDC FORM 1824) OR OTHERWISE**

Verification of a disability may also be required for resolving requests for reasonable accommodation. Verification of a disability for this purpose may be documented on a CDC Form 1845, for disabilities that may impact placement; CDC Form 128C, for disabilities not covered by the CDC Form 1845 (i.e., mental illness, dialysis, etc.); or CDC Form 128B, for learning disabled.

If an inmate/parolee files a request for accommodation or a disability-based discrimination complaint (CDC Form 1824), but does not provide

documentation of the disability, the Appeals Coordinator shall forward all appeals requiring medical verification of the claimed disability to health care services staff as outlined in Section IV, I, 23.

## C.  PLACEMENT

All inmates verified to have a disability in Section C of the CDC Form 1845 (requiring special placement in a designated DPP facility) shall be referred to a Classification Staff Representative (CSR) for review and endorsement.

*1.* In assessing appropriate placement, the CSR shall consider the inmate's prevailing case factors, status as documented on the CDC Form 1845, and any additional health care placement concerns documented thereon. The CSR shall then endorse the inmate, with reference to the CDC Form 1845, according to the following guidelines:

*a)* Where a verified DPP Section C inmate does not have any additional significant health care concerns, the inmate shall be placed in an appropriate designated DPP facility.

*b)* Where a verified DPP Section C inmate has additional significant health care concerns, the CSR, in consultation with Health Care Population Management (HCPM) staff, shall place the inmate in an appropriate designated DPP facility that has an established health care delivery system suited to the inmate's condition.

*c)* In the exceptional case where placement cannot directly meet both the health care and DPP needs of the inmate, HCPM and Classification Services Unit staff will work together to address the inmate's dual needs for an appropriate placement.

The inmate's health care needs shall take precedence in determining placement. Overriding medical needs may dictate placement in a health care setting. When an inmate requires placement in a licensed health care facility, policies and procedures for the specific facility as noted in the CCR, Title 22, will be followed.

*2.* To initiate the transfer process for inmates who have overriding health care treatment needs and require special placement, the referring clinician shall prepare a CDC Form 128C identifying the health care need(s) and related conditions necessitating the transfer, including the urgency of any required treatment.

*3.* Designated DPP placement of an inmate verified to have a disability under Section C of the CDC Form 1845 requires endorsement by a CSR.

4. Once the inmate is endorsed for special placement, any verified change in DPP status requires subsequent CSR review and endorsement.

5. An inmate with a disability not impacting placement may be housed at any facility consistent with applicable case factors.

6. Case management for all DPP inmates shall comply with all established classification procedures.

7. The CSR shall not endorse cases where the central file indicates the inmate may have significant mobility, hearing, vision, and/or speech impairment(s), and there is no CDC Form 1845 in the central file.

8. Efforts shall be made to house inmates identified with disabilities impacting placement (Section C of the CDC Form 1845) in DPP designated institutions while on Out-to-Court status, consistent with legitimate safety and security concerns.

## D. EXPEDITED TRANSFERS

All nondesignated institutions are to ensure the expeditious transfer of inmates with disabilities impacting placement to appropriate DPP designated institutions/ facilities.

Once an inmate is verified as having a disability impacting placement via a CDC Form 1845 (Section C), the C&PR at nondesignated institutions shall ensure the inmate appears before an appropriate Classification Committee for referral to a CSR.   All necessary committee actions and follow-up documentation, i.e., CDC Form 128G, shall be completed and available for CSR review within 14 working days of verification of the disability.

Once the inmate has been endorsed for transfer to a designated DPP institution by the CSR, the C&PR will ensure the inmate is expeditiously transferred.

Upon endorsement by a CSR, the C&PR shall be responsible to ensure that the DPP designation is entered into the comments/purpose field on the Distributed Data Processing System/Interim Transportation Scheduling System (ITSS) during the weekly bus seat request process.   In the event the requested bus seat does not appear on the subsequent ITSS send and intake notice, the C&PR shall contact the Institution Standards and Operations Section (ISOS) at Headquarters to obtain the status of the requested transfer.  The ISOS will then liaison with the Transportation Services Unit to expedite the transfer.   Reasonable accommodations shall be provided to the inmate pending transfer.

### E. TRACKING

*1.* Inmates assigned to DPP categories shall be tracked in the Classification Tracking System database by utilizing the CDC Form 839, Classification Score Sheet, and CDC Form 840, Reclassification Score Sheet, consistent with current policy. The codes are as follows:

| Inmate Requires Special Placement at Designated DPP Facility | Inmate Does Not Require Special Placement and May be Placed at any Facility According to Case Factors |
|---|---|
| DPW - Wheelchair Dependent<br>DPM - Mobility Impaired<br>DPH - Hearing Impaired<br>DPV - Vision Impaired<br>DPS - Speech Impaired<br>DPO - Other | DNM - Mobility Impaired<br>DNH - Hearing Impaired<br>DNV - Vision Impaired<br>DNS - Speech Impaired |

*2.* The C&PR's and RC CC III's shall develop institution procedures for tracking inmates with disabilities based on the CDC Form 1845. These procedures shall include annotating the disability and the section of the CDC Form 1845 in which it was verified on the following documents: Institutional Staff Recommendation Summary; CDC Form 816, RC Readmission Summary; CDC Form 128G; CDC Form 839; and CDC Form 840.

*3.* It is the responsibility of the C&PR and/or CC III to maintain a census of all inmates with disabilities based on the CDC Form 1845 (Section C and D).

*4.* Health care staff shall forward a copy of the CDC Form 1845 to the C&PR and/or CC III as expeditiously as possible, but no later than 72 hours after completion as described in Section IV, B, 1. The C&PR will then include the inmate's name on the tracking log. The tracking log will be maintained in the C&PR/CC III's office.

### F. HEALTH CARE APPLIANCES

*1.* DEFINITION

Health care appliances are assistive devices or medical support equipment which have been prescribed for the inmate and approved by the Correctional Captain and Health Care Manager, or their respective designees. Health care appliances include, but are not limited to, durable medical equipment, prosthetic and orthotic appliances, eyeglasses, prosthetic eyes, and other eye appliances as defined in CCR, Title 22, Section 51160 through 51162.

To ensure the safety of the inmates, health care appliances shall be provided to inmates with disabilities as noted on the CDC Form 1845 or CDC Form 128C.

2. **PRESCRIPTION AND APPROVAL**

Health care appliances shall be prescribed and approved for eligible inmates by licensed CDC health care providers, subject to medical necessity.  Inmate health care appliances, including those belonging to the inmate prior to entry into CDC's system, must be approved by custody staff for conformance with safety and security standards.  If custody staff, upon inspecting the appliance, determines there is a safety or security  concern, a physician, Health Care Manager, or Chief Medical Officer shall be consulted immediately to determine appropriate action to accommodate the inmate's needs.  Accommodation may include modifying the appliance or substituting a different appliance at state expense.

Once a departmental physician or dentist prescribes and/or approves an appliance, custody staff will inspect and make every effort to approve the appliance.  If legitimate safety and security concerns are evident, custody staff will consult with health care staff in order to modify the appliance for approval.  Only under exceptional circumstances will an appliance be rejected and an alternate means provided.  All such circumstances shall be appropriately documented in the inmate's C-file and/or medical file.

3. **POSSESSION OF HEALTH CARE APPLIANCES**

Health care appliances shall be documented as property of the inmate and appropriately identified as such, in accord with departmental and institutional policy; however, they shall not be included in the volume limit for personal property established in CCR, Title 15, Section 3190.  No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a Department physician or dentist determines that the appliance is no longer medically necessary or appropriate.   Possession of health care appliances in Special Placement Housing is governed by CCR, Title 15, Section 3380.20.

Health care appliances shall be retained and maintained by inmates upon release to parole.

4. **PURCHASE OF HEALTH CARE APPLIANCES**

Prescribed appliances shall be purchased by the inmate through the Department or a vendor of the inmate's choosing, with the approval of the Health Care Manager, Chief Medical Officer or Chief Dental Officer. Prior to issuance of any other appliance, the inmate must sign a CDC Form 193 for the cost of the appliance.  If an inmate is indigent, as defined in CCR, Title 15, Section 3000,

or does not have enough money in his/her trust account to cover the cost of the appliance, the appliance shall be provided at State expense in accordance with CDC inmate trust accounting procedures. The inmate shall be required to contribute towards the cost of the device all funds contained or received in the account from the date the appliance is ordered to the date it is received, in accordance with departmental procedure. If the inmate is not indigent, he or she shall be held financially accountable for the cost of the appliance in accordance with departmental procedure. No inmate shall be denied a health care appliance because he or she is indigent.

Health care staff shall receive health appliances ordered in accordance with a licensed CDC health care physician's prescription. The appliance shall be evaluated by health care staff to ensure it corresponds to the physician's order and that there is a current CDC Form 128C communicating the order to custody staff. The procedure to verify and identify appliances shall not cause an unreasonable delay in the delivery of prescribed health appliances. Should any unreasonable delay in delivery occur, health care staff shall clearly document the nature of the delay and communicate this information to the inmate and his/her assigned counselor.

5.  **MAINTENANCE AND REPAIR OF HEALTH CARE APPLIANCES**

It is the joint responsibility of CDC and the inmate/parolee to maintain all health care appliances in good repair and operation. Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the inmate shall utilize approved CDC procedures for notifying health care staff of health care needs. Health care staff shall ducat the inmate for an appointment and evaluate the condition of the appliance. Once the need for repair or replacement is verified, the inmate shall be issued an appropriate appliance or accommodation. This procedure applies to replacement of batteries for hearing aids and other appliances. The inmate shall be financially responsible for damage, repair and replacement of appliances, and parts, and shall be charged for the cost thereof through a CDC Form 193 in accordance with departmental policy and procedure.

6.  **MAINTENANCE AND REPAIR OF WHEELCHAIRS**

Custody staff shall conduct and log periodic safety and security inspections on all wheelchairs on at least a monthly basis. If a wheelchair needs repair, Health Care Services personnel shall be notified to secure the necessary repairs. The Health Care Services shall maintain the appropriate service contracts for wheelchair maintenance.

A State-issued wheelchair in need of repair shall be exchanged for one in good working condition. When a personal wheelchair is submitted for repair, the inmate shall be loaned a State issued wheelchair for the duration of the repair.

The inmate shall be financially responsible for damage, repair, and replacement of wheelchairs and parts, provided above.

### G. MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT

The CDC has a duty to maintain in operable working condition structural features and equipment necessary to make the prison/parole system's services, programs, and activities accessible to disabled inmates/parolees. Isolated or temporary interruptions in service or access due to maintenance or repairs are not prohibited.

### H. LIBRARY EQUIPMENT

Electronic equipment is intended for use in the recreational library, education areas, and the law library. Each facility will be responsible for training staff and inmates in the proper use of the equipment to provide access for inmates with disabilities, e.g., inmates with hearing, and vision impairments and inmates with learning disabilities. Procedures and rules regarding access to the equipment will be established by each facility. Disabled inmates will not be restricted to using the equipment for legal text; however, legal users will be given priority access.

All institutions (DPP designated, nondesignated institutions, and reception centers) are to inform disabled inmates of the existence of the equipment, what equipment is available (type of equipment is dependent upon mission designation), how inmates can access the equipment, i.e., staff or inmate assistance, when the equipment can be accessed, and where the equipment is located. This information will be provided to disabled inmates during the orientation process.

Disabled inmates may request access to electronic equipment by submitting a written request to the librarian. Disabled inmates who are unable to write may verbally request such access.

### I. INSTITUTION PROCEDURES

#### 1. INMATE ORIENTATION PROCESS

Comprehensive information as outlined below shall be provided to all disabled inmates in accessible format during the inmate orientation process. Vision/hearing impaired and learning disabled inmates shall be accommodated with alternate forms of communication, e.g., verbal communication, video/audio presentation, and written material (large print), in order to ensure effective communication of information.

The following information shall be effectively communicated in alternate formats whenever a vision/hearing impaired or learning disabled inmate is undergoing the orientation process:

◆ The purpose of the inmate Disability Placement Program.

◆ Availability of the CCRs, Armstrong Remedial Plan, and similar printed materials in accessible formats to inmates with disabilities.

◆ CDC Form 1824 Reasonable Accommodation or Accommodation Request process and the location of the forms.

◆ Reasonable accommodations/modifications available to qualified inmates, e.g., sign language interpreters for due process settings, e.g., CDC 115 hearings, medical consultation, Board of Prison Terms (BPT) hearings, etc.

◆ Access to inmate/staff readers or scribes and availability of specialized library equipment for qualified hearing/vision impaired, learning disabled inmates such as text magnifiers, large print materials, audiocassette tapes, etc.

◆ The process of personal notification by staff and possible use of a dry erase/chalk board for notification of announcements, visits, ducats, messages, etc., in the housing unit.

◆ Access to a telecommunication device for the deaf (TDD) and/or volume control telephone.

◆ Access to a close captioned television in the housing unit.

◆ The institution's Inmate Assistance Program (upon completion).

◆ Verified case-by-case medical exceptions to institutional count procedures.

◆ Information regarding emergency alarms/evacuations, announcements and notices.

## 2. NOTICES, ANNOUNCEMENTS, AND ALARMS

### a) WRITTEN MATERIALS

Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that the CCRs, Notices, Orientation Packages, Job Announcements, and similar printed materials that it distributes to inmates are accessible to inmates with disabilities.

Each institution/facility shall ensure that accommodations such as magnifiers, photocopying machines with capability to enlarge print for vision-impaired inmates, inmate or staff assistance, computer assisted devices, audiotapes and Braille are provided when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that inmates who have difficulty reading and/or communicating in writing, e.g., learning disabled inmates, are provided reasonable access to forms, CCRs, and procedures.

The type of equipment available will vary based upon the institution's mission designation. Information regarding access to written materials will be provided to disabled inmates during the orientation process.

### b) VERBAL ANNOUNCEMENTS AND ALARMS

Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that effective communication is made with inmates who have hearing impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc.

All verbal announcements in housing units where inmates with hearing impairments impacting placement reside shall be done on the public address system (if applicable) and by flicking the unit lights on and off several times alerting hearing impaired inmates that an announcement is imminent.

The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc. These procedures shall be communicated to disabled inmates during the orientation process. These requirements shall also be incorporated into unit staff post orders.

Inmates with hearing impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

Local policies and procedures shall be adopted to reflect this obligation.

### 3. SPECIAL IDENTIFICATION

Each institution/facility (DPP designated institution, nondesignated institution, and reception center), shall ensure custody staff in housing units where an inmate with impairments that impact placement resides, maintains a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs of the inmate during count, emergency evacuation, verbal announcements, etc. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision impaired inmates in responding to ducats or emergency evacuations. These procedures shall also be incorporated into unit staff's post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

4. **YARD IDENTIFICATION**

   *a)* Each inmate identified, per the CDC Form 1845, as having a hearing or vision impairment that impacts placement shall be issued an identifying vest by custody staff.  The vest (yellow) shall identify (BLACK LETTERING printed on back of vest) the inmate's disability, i.e., vision or hearing impairment.

   *b)* Identifying vests shall be issued to the inmate from the Department without a CDC Form 193, Trust Account Withdrawal Order.  However, the inmate shall be financially responsible, except for normal wear, for damage, repair and replacement of identifying vests and shall be charged for the cost thereof through a CDC Form 193 in accordance with departmental policy and procedure.

   *c)* All hearing or vision impaired inmates who are pending CDC Form 1845 verification or who have been verified to require placement in a designated DPP facility shall wear the vest at all times outside the inmate's assigned bed area or cell.  The vest shall be worn over the inmate's outer clothing.

   *d)* All hearing or vision impaired inmates who are able to function in a nondesignated facility with prescription lenses (acuity correctable to better than 20/200) or hearing aid shall be temporarily issued an identifying vest whenever the prescribed health care appliance is not available or working properly.

   Those inmates shall wear the vest outside the inmate's assigned bed area or cell at all such times while their appliance is not available or working properly.  These inmates shall not be required to wear the identifying vest when their health appliance becomes available and working properly.

5. **EVACUATION PROCEDURES**

   Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.

   Local evacuation procedures shall be adopted at each facility.

   Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of

the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency evacuations.

Evacuation procedures shall be effectively communicated to disabled inmates during the orientation process. These procedures shall also be incorporated into unit staff's post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

6. **COUNT**

Each institution/facility (DPP designated institution, nondesignated institution and reception center) shall ensure that inmates who have a verified disability that prevents them from standing during count shall be reasonably accommodated to provide for effective performance of count.

Each institution/facility shall develop local procedures to reasonably accommodate inmates who are unable to stand for count due to a verified disability.

All standing counts in units housing inmates with disabilities impacting placement shall be announced on the buildings PA system as outlined above in Section IV, I, 2, (b) (Verbal Announcements and Alarms).

If there is a verified condition as reflected on a CDC Form 1845 or CDC Form 128C that prevents the inmate from standing during count, the inmate may be allowed to sit on his/her bed, or in a wheelchair next to the bed, etc. The standing count process will be communicated to disabled inmates during the orientation process. These requirements shall also be incorporated into unit staff post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

7. **RESTRAINTS**

Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical

restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

8. **SEARCHES**

   *a)* Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.

   ❖ Inmates who use wheelchairs and who have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.

   ❖ If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff. If forcible removal of an appliance from an noncompliant inmate is necessary, health care staff shall be available for consultation regarding the safe removal of the appliance.

   ❖ No inmate/parolee shall be required to lie or sit on extremely hot or cold surfaces to perform strip search maneuvers.

   ❖ Health appliances attached to the inmate's/parolee's body will be removed for inspection only during an unclothed body search.

   ❖ Complex devices (i.e., electronic medical devices, etc.) shall be disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device. Inspection of such devices shall require approval from a Captain or above after consultation with appropriate medical staff. Only a trained professional shall disassemble such devices.

   *b)* To ensure the safety of staff and inmates/parolees, all institutions/facilities (DPP designated institutions, nondesignated institutions, and reception centers) shall establish procedures for the routine inspection of health care appliances, i.e., inspection of a mobility impaired inmate's prosthetic device whose disability does not impact placement.

9. **TRANSPORTATION**

   *a)* The special needs of inmates with disabilities shall be considered in transporting them. An inmate's/parolee's special health care aids and appliances shall be transported with the inmate/parolee upon transfer.

*b)* Accessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability, i.e., mobility, necessitates specialized transportation. All other inmates/parolees shall be transported in standard vehicles.

*c)* Institutions/facilities/county jail facilities may contact the Transportation Services Unit (TSU) hubs directly to request transport of inmates/parolees who require transportation in accessible vehicles. When TSU does not have available resources to facilitate the required transfers, TSU shall coordinate with the sending institution/facility, who shall be responsible for arranging the transportation with local resources.

*d)* Request for accessible transportation must be received in advance so that the maximum number of requests can be scheduled utilizing existing resources.

*e)* The CDC will provide accessible transportation to mobility impaired inmates for BPT parole hearings, unless local law enforcement agencies do so themselves. The request for these transports must be received in advance by TSU so that the maximum number of requests can be scheduled utilizing existing resources If TSU resources are not available, the Regional Revocation Coordinator shall contact the nearest designated DPP institution for assistance.

*f)* All applicable transportation policies and procedures apply to DPP inmates.

*10.* **TELECOMMUNICATION DEVICES FOR THE DEAF / TELEPHONES**

Access and use of a Telecommunication Device for the Deaf (TDD) and telephones for inmates with disabilities shall be consistent with CCR, Title 15, Section 3282(h). Verification of an inmate's need for TDD may be confirmed with local health care services staff, the assigned Correctional Counselor, or by reviewing a copy of the CDC Form 1845. An inmate who has been approved by the institution to use the TDD and who wishes to call a party who does not have use of a TDD shall be permitted to use the California Relay Service.

If the inmate does not have a severe hearing/speech impairment but desires to call an outside party who requires the use of a TDD, the outside party shall forward a physician's statement of TDD verification to the inmate's Correctional Counselor. Upon meeting all verification requirements, the inmate may sign up for telephone calls according to his/her privilege group designation.

The TDD sign-up sheets covering seven days shall be maintained and logged weekly. Sign-up sheets shall be divided into 40-minute increments. The TDD calls shall have extended time increments due to the time delay associated with

the TDD relay process.  TDD access for the hearing impaired shall be consistent and similar to telephone access provided for nondisabled inmates.

An inmate's request for use of a TDD for confidential purposes, i.e., attorney/client privilege, shall be in accordance with CCR, Title 15, Section 3282(g)(1) and (h).  Any printer paper containing the text of the verbal exchange shall be relinquished to the inmate, if requested.  Should the inmate not wish to retain the written text, staff shall dispose of the unread text in accordance with institutional policy and procedure regarding the disposal of confidential documents, etc.  Public telephones with volume control will be accessible to inmates in all locations where inmates with hearing impairments are housed.

## 11. CLOSED CAPTIONED TELEVISION

All designated DPP institutions and RCs (with the exception of California State Prison-San Quentin, California Correctional Institution, Valley State Prison for Women, and Northern California Women's Facility) are to ensure that at least one institutional television, located in housing units where hearing impaired inmates reside, utilizes the closed captioned function at all times while the television is in use.  If a housing unit has only one television, the institution is to purchase an additional television to offset any associated concerns/issues raised by hearing impaired inmates.  Please note that funds were allocated to all designated DPP institutions and RCs (except those noted above) for the purchase of closed captioned televisions.

Nondesignated institutions are not required to have closed captioned television; however, may do so at the discretion of the Warden.

## 12. VISITING

*a)* Reasonable accommodation shall be afforded inmates with disabilities to facilitate their full participation in visiting as provided in these rules, whether contact, noncontact, or family visiting.

*b)* Noncontact visiting booths will be accessible for inmates with disabilities. Auxiliary aids and assistive devices, such as volume control or writing materials, shall be provided for effective communication for noncontact visits.

*c)* Inmates with disabilities shall be provided with the modifications necessary for them to participate in the contact visiting program.  The modifications shall be provided as appropriate to assist inmates with their participation in the contact visiting program and shall be in a manner consistent with ensuring the safety and security of staff, inmates, or the public.

 *d)*   Visitors shall not be permitted to bring in outside equipment for effective communication when it is available at the institution. Any equipment that visitors are permitted to bring in will be subject to search, pursuant to CCR, Title 15, Section 3173.

 *e)*   Inmates with disabilities requiring accommodation for family visits shall give 72-hours notice of any request for accommodation to the institution staff responsible for setting up the family visit.

## 13. RECREATION

Reasonable accommodation for inmates with disabilities at designated facilities may include the provision of accessible recreation areas and specially fitted equipment. At nondesignated DPP institutions/facilities, requests for such accommodation may be granted on a case-by-case basis. The successful completion of a test to show proper and safe use of fitness apparatus items shall be required and documented on a CDC Form 128B.

## 14. INMATE PROGRAMS AND WORK ASSIGNMENTS

 *a)*   It is the policy of CDC to ensure that all inmates, regardless of any type of disability, participate in educational/vocational, and work programs, including Prison Industry Authority and Joint Venture programs.

 *b)*   Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program, with or without reasonable accommodations. Participation in these programs may be considered regardless of reading level if the inmate/student has the capacity to benefit from a program based on individual need and assessment. Inmates with disabilities shall be evaluated by health care services staff who will document the inmate's physical limitations and/or restrictions on a CDC Form 128C. A copy of the chrono will be forwarded to the inmate's Correctional Counselor who will schedule the inmate for classification committee review. The classification committee will determine if the inmate is able to participate in an academic/vocational, or work program based on the information provided by the health care services staff and a recommendation from the Inmate Assignment Lieutenant (IAL) or Work Incentive Coordinator (WIC).

 *c)*   Reasonable accommodations shall be provided for dialysis inmates who may need to be excused from programs at times to permit dialysis treatment, including if necessary the times before and after the dialysis treatment when the inmate is not able to attend or return to the assigned programs. Such reasonable accommodations may include modified work or school schedules as long as reasonable accommodations do not prohibit the inmate from performing essential functions.

*d)* Reasonable accommodations for all other disabled inmates to access program assignments, as determined via classification committee review, may include, but are not limited to, a modified work or school schedule, early release to/from meals, or assignments for mobility/vision impaired inmates, etc.

*e)* Classification Committee actions shall be periodically monitored/audited to ensure that assignments of inmates with disabilities are nondiscriminatory.

*f)* Only when an inmate's disability, even with reasonable accommodation, renders the inmate ineligible to participate in any available academic/vocational or work program for which the inmate is otherwise qualified, will the inmate be deemed "Medical (or Psychiatric) Unassigned" or "Medically Disabled" by the Unit Classification Committee, consistent with Section IV, I, 19, b) of this plan. It will be only on the rarest of occasions that the classification committee will place an inmate on medical/psychiatric unassigned or medically disabled status.

*g)* Removal of an inmate from an academic/vocational or work program shall only be done by a classification committee, CCR, Title 15, Section 3375(c). When the work supervisor has determined that the inmate cannot perform the essential functions of the assignment, he/she must document the specific essential functions that the inmate cannot perform on a CDC 128B. The CDC 128B will be forwarded to the inmate's counselor. The counselor will schedule the inmate for a program review as soon as possible. The inmate will remain on "S" time pending the results of the program review.

## 15. ESSENTIAL FUNCTIONS

Essential functions are the basic duties/requirements of services, assignments, or programs an inmate/parolee performs, receives, or desires. This does not include the marginal duties of the position, services, assignments, or programs. Duties/requirements should be examined to determine which tasks are essential and which are nonessential.

## 16. VOCATIONAL ASSIGNMENTS

Reasonable modifications/accommodations shall be provided to ensure access when appropriate for qualified inmates with disabilities to participate in all programs, services, or activities including vocational assignments, unless affected by one of the exclusions as set forth in these rules. Participation in these programs may be considered regardless of reading level if the inmate/student has the capacity to benefit from a program based on individual need and assessment. The inmate, with or without reasonable accommodations, must meet the eligibility criteria of the vocational assignment as defined in the course description and be able to perform the essential functions of the

assignment. All inmates (including those with learning disabilities) shall be assigned on a case-by-case basis to appropriate work/academic/vocational programs by classification committee action.

### 17. ACADEMIC ASSIGNMENTS

Reasonable modifications/accommodations shall be provided to ensure access to academic programs. The individualized, self-paced learning format inherent in competency based instruction is available to inmates with disabilities who can perform the essential functions necessary for achieving the goals of the academic class. The competency based education model adopted for academic classes and vocational programs fosters individualized, self paced instruction for assigned students. Open entry and exit into and from the education programs is provided to allow inmates at all levels (including those with learning disabilities) to progress at their own speed and to begin or complete classes or programs within their own time frames.

### 18. CONSERVATION CAMPS

Inmates with disabilities shall not be precluded from assignment to a conservation camp based upon their disability. The CDC shall evaluate inmate disabilities in consideration of camp assignment on a case-by-case basis and shall determine if they are capable of performing essential functions of that assignment. When possible, without jeopardizing the fundamental nature of the camp program or legitimate penological interest, CDC may provide reasonable modifications for inmates with disabilities to allow participation in conservation camp assignments.

### 19. HEALTH CARE STATUS DETERMINATION

*a)* When an inmate's disability limits his/her ability to participate in an academic/vocational or work program, health care services staff shall document the nature, severity, and expected duration of the inmate's limitations on a CDC Form 128C and forward it to the inmate's assigned Correctional Counselor. The counselor will then schedule the inmate for classification committee review. The medical/psychiatric staff shall not make program assignment recommendations or decisions on the CDC Form 128C. The classification committee has the sole responsibility for making program assignment decisions based on information provided on the CDC Form 128C and evaluation of the inmate's ability to perform the essential functions of the assignment with/without any necessary reasonable accommodation. The classification committee, in conjunction with staff representation from the affected work area, academic/vocational program and the IAL or WIC, shall evaluate the inmate's ability to participate in work, educational and other programs. Based on the results of the classification committee's evaluation, a determination shall be made as to the inmate's program assignment and work group status.

*b)* Only when the inmate's documented limitations are such that the inmate, even with reasonable accommodation, is unable to perform the essential functions of any work, educational or other such program, will the inmate be placed in one of the two following categories by a classification committee:

❖ **TEMPORARY MEDICAL/PSYCHIATRIC UNASSIGNMENT**   When a disabled inmate is unable to participate in any academic/vocational or work program, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to last for less than six months, the classification committee shall place the inmate on Temporary Medical/Psychiatric Unassignment. Inmates on Temporary Medical/Psychiatric Unassignment status shall be scheduled for classification review any time there are changes in his/her physical/mental impairment or no less often than every six months for a reevaluation of his/her status. The inmate's credit earning status shall be in accordance with CCR, Title 15, Section 3044 (b) (2), Work Group A2, upon exhaustion of any accrued ETO. If the inmate's condition lasts six months and the classification committee still cannot assign the inmate due to the impairment, his/her credit earning status shall be changed to be in accordance with CCR, Title 15, Section 3044 (b) (1), Work Group A1 and appropriate Privilege Group retroactive to the first day of the unassignment.

Note:  The medical/psychiatric staff still has the authority to authorize short-term medical/psychiatric lay-in for illness as described in CCR, Title 15, Section 3043.5 (2) (A).

❖ **MEDICALLY DISABLED**   When an inmate is unable to participate in any assigned work, educational or other such program activity, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to result in death or lasts for six months or more, the classification committee shall place the inmate on medically disabled status. The inmate credit earning status shall be in accordance with CCR, Title 15, Section 3044 (b)(1), Work Group A1 and Privilege Group A.

## *20.* DISCIPLINARY PROCESS

*a)* Reasonable accommodations shall be afforded inmates with disabilities in the disciplinary process.

*b)* To assure a fair and just proceeding, the assignment of a Staff Assistant (SA) and/or an Investigative Employee (IE), as provided in CCR Sections 3315 (d)(1) and (2), may be required for the inmate. The inmate and/or SA or IE may need to be assisted by a bilingual aide or qualified interpreter in order to ensure effective communication.

Additional accommodations may be appropriate. All written notes utilized and exchanged for effective communication between the inmate and staff shall be attached and included with the disciplinary documents for placement in the inmate's central file.

*Space    reserved    for    Test    of    Adult    Basic    Education    (TABE)*

*21.* **SPECIAL HOUSING PLACEMENT**

The Department shall provide accessible special placement housing for inmates with disabilities as follows:

*a)* **ADMINISTRATIVE SEGREGATION UNIT (ASU)**: Designated DPP facilities shall provide accessible ASU housing to accommodate inmates' disabilities. Where accessible ASU housing is unavailable, alternate placement may be made temporarily in another appropriate location consistent with CCR, Title 15, Section 3335, such as the highest security level accessible cell available. As a last resort prior to transfer to a designated DPP institution, an ASU inmate designated as "DPW" may be admitted by a physician temporarily to a medical bed when there is a medical judgment that the inmate requires nursing care consistent with that setting and/or there is a risk of possible injury to self if housed in a nonaccessible cell.

*b)* **SECURITY HOUSING UNIT (SHU)**: Accessible SHU housing as provided in CCR, Title 15, Section 3341.5(c) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement. The SHU inmates unable to utilize a sports wheelchair to enter a SHU cell will be provided accommodation on a case-by-case basis.

*c)* **PROTECTIVE HOUSING UNIT (PHU)**: Accessible PHU housing as provided in CCR, Title 15, Section 3341.5(a) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement. Where accessible PHU housing is unavailable, alternate secured housing may be utilized temporarily.

*d)* **CONDEMNED HOUSING**: Condemned inmates at San Quentin with disabilities affecting placement shall be accommodated in existing condemned units. When alternate housing is necessary, a secure accessible location shall be provided. On a temporary basis, condemned inmates with disabilities affecting placement may be housed in an infirmary. Condemned inmates with disabilities are to receive access to the same type of programs as condemned inmates who are not disabled.

Any exceptions to participation must meet the exclusions outlined in Section II F of this plan.

*e)* **MEDICAL PLACEMENT**: Inmates with disabilities may be admitted by a physician to a medical bed when there is a medical judgment that the inmate requires nursing care consistent with that setting and/or there is a risk of injury to self if the inmate is not so housed because no accessible cell is available.

Inmates with disabilities who are placed in medical beds because of their disability (including those placed in medical beds for the sole purpose of assistance with activities of daily living and those so placed because of a risk of injury to themselves) shall have access to equivalent programs and privileges for which they are eligible according to their privilege group and which they would be receiving if they were placed in a nonmedical setting unless the individual condition, needs, or limitations of the inmate make access to the program or privilege unreasonable. Such programs and privileges shall be provided in a manner that does not adversely impact health care operations. A program or privilege may be disallowed on a case-by-case basis if a physician determines that it would endanger the health or safety of the inmate or would impair health care.

When an inmate with a disability is housed in a medical setting because of an overriding medical need that requires nursing care, the inmate shall be afforded equivalent programs and privileges provided nondisabled inmates who are housed in that setting consistent with their medical needs.

## 22. REMOVAL OF HEALTH CARE APPLIANCES IN ASU/SHU/DISCIPLINARY DETENTION UNITS

Health care appliances, as defined in CCR, Title 15, Section 3358, shall be taken away from an inmate in ASU, SHU or other disciplinary detention units only to ensure the safety of persons, the security of the institution, or to assist in an investigation (which may include collecting the appliance as evidence of a crime) and only when supported by documented evidence. No inmate will be deprived of his or her appliance because of the acts of another inmate.

If the health care appliance presents a direct and immediate threat to safety and security, the appliance may be taken away immediately by any custody staff. The senior custody officer on duty may temporarily authorize the taking away of an inmate's appliance for any of the reasons listed in the foregoing paragraph; however, the process described below must be followed as soon as possible, at least by the next business day, if the appliance is to be retained. In no event shall the procedures set out herein obstruct standard protocols for crime scene preservation, evidence collection, emergency response or any other measure necessary for the safety of persons and security of the institution.

The inmate shall be deprived of the appliance for only so long as the appliance continues to pose a direct threat to safety and security.

When a health care appliance is taken away from an inmate for reasons of safety and security, the senior custody officer in charge shall consult the Health Care Manager, Chief Medical Officer or designee, regarding the inmate's need for the appliance and reasonable alternative in-cell accommodations. The senior officer in charge shall then inform the Warden or designee of the incident and the alternative means to accommodate the inmate. The Warden or designee shall decide what course to take regarding depriving the inmate of the appliance and providing alternative in-cell accommodation. If the decision is to retain the appliance, it will be stored in a designated location in the unit and provided to the inmate if needed when released from his or her cell for yard, escorts, visits, etc. During the period of alternative in-cell accommodation, health care staff shall regularly observe the health condition and document observed changes on a CDC Form 7219, Medical Report of Injury or Unusual Occurrence. If evidence of deterioration is observed, the health care staff shall immediately advise custody staff of need for medically necessary changes to the in-cell care.

The misconduct that caused removal of the appliance shall be charged against the inmate in an appropriate CDC Form 115, Rules Violation Report. The inmate shall be referred to the next scheduled classification committee hearing for confirmation of removal of the appliance, pending adjudication of the disciplinary charges. The inmate shall be deprived of the appliance as long as the appliance continues to pose a threat to the safety and security of the inmate or others. The necessity to continue the removal shall be reviewed by a classification committee at least as often as every 90 days. Review shall include a medical evaluation of the inmate's progress without the appliance.

The Health Care Manager or designee shall be consulted immediately to determine appropriate action to accommodate the inmate's needs. Accommodation may include modifying the appliance or substituting with a different appliance at CDC's expense.

A pattern of behavior involving the inappropriate use of a specific health care appliance may result in a custody decision to provide an alternate, but effective accommodation with medical consultation. In such case, the need for removal shall be approved by a classification committee.

Institution staff may replace the cane of an inmate placed in ASU/SHU/Disciplinary Detention Unit with other accommodations or useful care if there is a legitimate safety and security concern associated with allowing use of the cane.

### 23. APPEALS PROCESS FOR OBTAINING ACCOMMODATIONS

#### a) GENERAL

An inmate/parolee with a disability may request an accommodation, to access programs, services, activities or grieve alleged discrimination, through the CDC Form 1824 appeal process. The CDC Form 1824 shall be readily available to inmates/paroles.  Departmental staff shall provide assistance to all disabled inmates/parolees who require assistance in using the appeal process.

The inmate/parolee shall submit the request for accommodation on a CDC Form 1824 to the Appeals Coordinator for the inmate's/parolee's facility or parole region.  The inmate/parolee shall attach any relevant documentation of his or her disability that is in the inmate's/parolee's possession or is easily obtainable by the inmate/parolee.  When an inmate/parolee files an accommodation or modification appeal on an inappropriate form, i.e., CDC Form 602, the Appeals Coordinator shall attach a CDC Form 1824 and process the appeal according to the timeliness in this section.

It is the mutual responsibility of the inmate/parolee and the CDC to verify a disability when a request for accommodation is made.    The inmates/parolees must cooperate with staff's efforts to obtain documents or other information necessary to verify the claimed disability.

#### b) APPEAL SCREENING PROCESS

Upon date of receipt, the Appeals Coordinator shall review the CDC Form 1824 to determine whether the appeal meets one or more the following guidelines:

❖ An issue covered in the Armstrong Remedial Plan.

❖ Allegation of discrimination on the basis of a disability under the ADA.

❖ A request for access to a program, service, or activity based on a disability.

❖ The appeal includes both ADA and non-ADA issues (respond to ADA issues first).  Advise the inmate that he/she may file a CDC Form 602 to appeal the non-ADA issue.

❖ The appeal concerns an issue that substantially limits a major life activity.

If the Appeals Coordinator determines that the appeal meets the above criteria, it will be assigned to the appropriate Division Head for review and response.

If the inmate/parolee fails to provide documentation to verify a disability and specifically states that he/she does not have any relevant documentation in their possession and/or specifically states there is no relevant documentation contained in their files (central/medical/ education) and the request otherwise meets the eligibility criteria of CCR, Title 15, Section 3084, the Appeals Coordinator shall accept and log the appeal and assign it to the appropriate Division Head for the first level review as described below.  Otherwise, the appeal shall be returned to the inmate with instructions to attach the required documentation as required in CCR, Title 15, Section 3084.3 (c)(5).

If the Appeals Coordinator determines that the appeal is not an ADA issue it shall be recategorized to the appropriate category and processed as a CDC Form 602 according to the provisions of CCR, Title 15, Section 3084. Reasons for recategorization may include, but not be limited to  any of the following:

❖   The appellant complains about pain and requests medical treatment with no indication that program access is impeded.

❖   The appellant requests a transfer solely for medical treatment.

❖   The appellant requests medical treatment for a condition that does not substantially limit a major life activity as defined and verified in Section II A.

If the request is recategorized or rejected per CCR, Title 15, Section 3084.3 (exclusive of (c) (5)), a copy of the CDC Form 1824 shall be maintained on file in the Appeal Coordinator's office.  Comments explaining the reason why the request was recategorized or rejected shall be entered in the comments field of the Inmate Appeals Automated Tracking System or similarly documented in the Regional Parole Reentry Unit.

### c)  MEDICAL VERIFICATION PROCESS

If the appeal requires medical staff verification of a disability and/or identification of associated limitation, the Appeals Coordinator shall refer the CDC Form 1824 to medical staff.

❖   Medical staff should examine the unit health record (UHR) without delay, in any event within 5 working days of the date the appeal was received by the Appeals Coordinator.  If health care staff locate verification of the disability and any associated limitations within the

unit health record (UHR), health care staff shall note that such documentation exists and/or attach relevant copies of any CDC Form 128Cs or CDC Form 1845s and return the appeal to the Appeals Coordinator within 5 working days of initial receipt by the Appeals Coordinator.

The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within 15 working days of initial receipt by the Appeals Coordinator.

If verification is not available in the UHR, medical staff shall determine whether a disability exists and identify and document any associated limitations and return the appeal to the Appeals Coordinator within 15 working days of receipt by the Appeals Coordinator. The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within the required time frames as outlined in Section e).

If verification is not available in the UHR and health care staff determine that referral to an expert consultant (outside of CDC) is required to make the necessary evaluations as to whether a disability and any associated limitations exist, within 10 days of the determination, an appointment with the expert consultant shall be scheduled. Upon determination that expert consultant is required, medical staff shall inform the Appeals Coordinator of the referral and the appeal time frames shall be suspended until the expert consultants report is received by health care staff.

❖ Upon receipt of the expert consultant's report, the appeal with all required documentation shall be returned to the Appeals Coordinator within 5 working days. The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within the required time frames as outlined in Section e).

### d) NONMEDICAL VERIFICATION PROCESS

If the appeal requires verification of a nonmedical disability, e.g., learning disability, the Appeals Coordinator shall refer the CDC Form 1824 to the appropriate Division Head for response within the required time as outlined in Section e).

❖ The Division Head or designee shall review the central file to determine whether the nonmedical disability can be verified from a CDC Form 128B, or other applicable records.

❖ If the Division Head or designee is not able to verify the nonmedical disability in the above manner, he/she shall contact education or other appropriate staff for access to additional records or information. If the Division Head or designee is able to verify the disability in this manner, he/she shall ensure that documentation of the disability is added to the inmate/parolee's central file and respond to the request for accommodation or alleged discrimination within the required time frames as outlined in Section e).

❖ If the Division Head or designee is not able to verify the disability in the above manner, he/she shall conduct a face-to-face first level interview with the inmate/parolee.  If the reviewer determines that there was discrimination or that the appellant would benefit from the requested reasonable accommodation or modification, he/she shall document that finding in the inmate's central file.  The reviewer shall respond to the request for accommodation or alleged discrimination within the required time frames as outlined in Section e).

❖ If the Division Head or designee is not able to verify the disability in the above manner, he/she shall either grant the requested accommodation or requested remedy for discrimination, deny the appeal based on provisions outlined in Section II, H, within the required time frames as outlined in Section e) or shall refer the inmate/parolee to appropriate staff, expert consultant, for verification of the alleged nonmedical disability.

❖ If the inmate is referred to an expert consultant (outside of institution) for verification, the assigned Division Head shall inform the Appeals Coordinator of the referral and the appeal time frames shall be suspended until the expert consultants report is received by the Division Head.

❖ An appointment with the expert consultant (outside of CDC) shall be scheduled within 10 days of the referral.  The expert consultation shall be scheduled to occur at the earliest available date.

❖ Upon receipt of the expert consultant's report, the appeal with all required documentation shall be responded to by the assigned Division Head and returned to the inmate via the Appeals Coordinator within 15 working days.

In appropriate circumstances the Appeals Coordinator or the assigned Division Head may temporarily grant an accommodation pending verification of an alleged disability, on the condition that the accommodation will be withdrawn if CDC is unable to verify the disability. Such conditional grants are particularly appropriate where the lack of an accommodation may cause serious or irreparable harm.

An appeal requesting an accommodation may be denied by appropriate staff, i.e., Warden or designee, Appeals Coordinator or Division Head, based on any of the criteria outlined in ARP, Section II, H, Justification for Denial of Requests for Reasonable Accommodation.

*e)* TIME FRAMES

A nonemergency CDC Form 1824 appeal is subject to three formal levels of review:

❖ **FIRST LEVEL OF REVIEW**:  The first level of review is made by the appropriate Division Head or designee, who shall render a decision and return it to the inmate/parolee within 15 working days of receipt of the request by the Appeals Coordinator, except for item f) below.  The decision shall be set forth on the CDC Form 1824.

❖ **SECOND LEVEL OF REVIEW**:  The second level of review is initiated by the inmate's/parolee's attaching the request to a CDC Form 602, Inmate/Parolee Appeal Form, completing Section F, and forwarding the document to the Appeals Coordinator within 15 working days of receipt of the decision of the Division Head.  In Section F, the inmate/parolee shall explain the nature of dissatisfaction and suggest an appropriate resolution.  The Appeals Coordinator shall forward the second level appeal to the Warden, Health Care Manager, or Regional Parole Administrator or designee, who must render a decision and return it to the inmate/parolee within 10 working days of receipt, or 20 working days of receipt if the first level of review is bypassed.

❖ **THIRD LEVEL OF REVIEW**:  The third level of review is initiated by the inmate/parolee's resubmitting the appeal to the Director's office within 15 working days of receipt of the decision by the Warden or Administrator.  The third level response is made by the Director or designee, who shall render a decision and return it to the inmate/parolee within 20 working days from receipt.

❖ **EXTENSION OF TIME**:  A nonemergency request for accommodation made through the CDC Form 1824 process is not subject to the exceptions to the appeals time limits found in CCR, Title 15, Section 3084.6(b)(5).

*f)* EXPEDITED APPEAL PROCESS

If the request for accommodation involves a matter that presents an immediate threat to the inmate's/parolee's safety, health or well being, or may result in other serious or irreparable harm, the request shall be processed according to the expedited appeal process described in CCR, Title 15, Section 3084.7.  The inmate/parolee shall identify the appeal as an

emergency; however, the Appeals Coordinator shall review each appeal to ascertain those that qualify for expedited processing and shall respond accordingly. Appeals that qualify for an expedited appeal may included, but are not limited to, the following:

❖ Providing appliances or aids that are essential to performing major life activities;

❖ Providing equipment or modifications essential to safety; and

❖ Providing assistance to permit effective communications in due process settings or for health care provider communications.

Other provisions of these rules pertaining to inmate/parolee appeals not addressed herein shall apply.

24. **SUBSTANCE ABUSE AND CIVIL ADDICT PROGRAMS**

a) **SUBSTANCE ABUSE TREATMENT**: The Department shall provide accessible long-term intensive substance abuse treatment programs for male and female inmates with disabilities comparable to those programs provided to nondisabled inmates.

❖ Currently the Substance Abuse Program at the California Substance Abuse Treatment Facility and State Prison at Corcoran (SATF) is designated to provide substance abuse treatment for male inmates with disabilities.

❖ Currently the Substance Abuse Program at the Central California Women's Facility (CCWF) is designated to provide substance abuse treatment for female inmates with disabilities.

b) **CIVIL ADDICT PROGRAM**: The Department shall provide accessible placement for male and female civil addicts with disabilities in a Civil Addict Program (CAP) comparable to that provided to nondisabled civil addicts.

❖ Currently, SATF is the designated satellite CAP for male civil addicts with disabilities requiring designated DPP placement.

❖ Currently, CCWF is the designated satellite CAP for female civil addicts with disabilities requiring designated DPP placement.

❖ All male civil addict commitments arriving at the California Rehabilitation Center (CRC) who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred as soon as possible but no later than seven days to another institution, currently the California Institution for

Men's (CIM) RC, for further evaluation/verification and processing consistent with CAP policies and procedures.

❖ All female civil addict commitments arriving at CRC who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred as soon as possible but no later than seven days to another institution, currently the California Institution for Women's (CIW) RC for further evaluation/verification and processing consistent with CAP policies and procedures.

❖ Upon completion of RC processing, inmates who are suitable for the CAP will be transferred to SATF or CCWF if their disability impacts placement, or CRC if their disability does not impact placement.

## J. BOARD OF PRISON TERMS ACCOMMODATION PLAN

It is the policy of the BPT to provide equal access to all parole proceedings to inmates/parolees with disabilities, with or without reasonable accommodation. It is the Board's objective to ensure that its communications with inmates/parolees with disabilities are as effective as communications with inmates/parolees without disabilities. Effective communication is imperative in assuring due process and equal access.

Department staff shall facilitate reasonable accommodations in parole proceedings by serving the BPT Form 1073, Reasonable Accommodation Notice and Request, with other prehearing documents. This will ensure effective communication with inmates to assist them in completing the form, and by providing to the BPT documentation pertaining to inmates/parolees' verified disabilities.

It is the responsibility of the inmate/parolee to request a reasonable accommodation in order to ensure effective communication and/or equal access by correctly completing the BPT Form 1073. When an inmate's/parolee's disability impedes his/her ability to request an accommodation, it is the responsibility of CDC and/or BPT staff who are aware of the disability, or should be reasonably aware of the disability, to request reasonable accommodation on his/her behalf.

In such cases where an inmate/parolee is unable to complete the form due to his/her disability, it is the responsibility of the BPT and/or CDC staff who are aware or should be reasonably aware of such disability to assist/complete the BPT Form 1073 for the inmate/parolee.

Effective January – March 2001, all case-carrying parole agents shall initiate the BPT Form 1073 for all parolees under their supervision. New releases not processed through the RC shall have the BPT Form 1073 initiated during their initial interview. The CDC and BPT will work to develop a tracking system, which captures central file and medical file information regarding disabilities covered by

the ADA. The BPT will provide guidelines for Unit Supervisor review of the parole violation report. Cases that are subsequently referred for revocation will follow the adopted Parole Revocation Process.

The counselor/parole agent shall review the central/field file for documentation (i.e., CDC Form 1845, CDC Form 611, CDC Form 128C) to determine whether or not the inmate has been verified with a disability. The BPT Form 1073, with all supporting documents on the issue of the disability, shall be forwarded to the BPT Americans with Disabilities Act (ADA) Coordinator at least 21 calendar days prior to the scheduled hearing. The original copy of the BPT Form 1073 shall be filed in the BPT section of the central file along with the other prehearing documents.

Inmates/parolees who elect to file a grievance based on the denial of their request for accommodation submitted on a BPT Form 1073. All complaints related to denials of requests for accommodations shall be handled by the grievance process, BPT Form 1074, Review of Reasonable Accommodation Request and Grievance Process. All BPT Form 1074 grievances shall be sent directly to the Chief Deputy Commissioner along with supporting documents; i.e., BPT Form 1073, etc. The Chief Deputy Commissioner shall render a decision within five working days from the date the BPT received the copy of the BPT Form 1073 and BPT Form 1074 forms and/or other relevant information. The inmate/parolee may also pursue the denial after the BPT hearing using the BPT Form 1040 appeal with accompanying BPT Form 1073 and BPT Form 1074 forms attached.

The BPT subpoenas to witnesses and notifications to victims and/or their families will include instructions to contact the BPT ADA Coordinator 10 days prior to the hearing for any disability related accommodation request.

### K.   COMMUNITY CORRECTIONAL REENTRY CENTERS

Inmates with disabilities will not be excluded from participation in the Community Correctional Reentry Center (CCRC) program based solely on their disability. The CDC will place inmates who require special placement in designated CCRC facilities. At least one designated CCRC to accommodate inmates of each gender will be maintained to serve in each of CDC's four parole regions.

An inmate requiring accommodation, otherwise eligible for CCRC placement but without a designated facility within or servicing his/her county of last legal residence, will be endorsed for placement in an appropriate designated CCRC facility.

Inmates shall be considered for CCRC placement based on the totality of their classification criteria and medical/psychiatric needs. Overriding ongoing medical or psychiatric treatment needs may disqualify an inmate from CCRC placement.

Contracts with CCRC contractors shall require the contractor to adhere to the ADA. However, nondesignated facilities need not be fully accessible to inmates with disabilities.

## L. DESIGNATED COMMUNITY CORRECTIONAL REENTRY CENTERS

Currently, the following CCRCs have been designated for permanent placement and housing of inmates meeting the eligibility criteria. The CDC is currently seeking additional locations for placement of female inmates in Region I and Region II through the State contracting process. Designated CCRCs are subject to change to increase DPP placements or to replace designated facilities.

| NAME OF CENTER | LOCATION | GENDER | REGION |
|---|---|---|---|
| Turning Point, "G" Street | Fresno | male | I |
| Volunteers of America, Oakland West | Oakland | male | II |
| Marvin Gardens | Los Angeles | male | III |
| Volunteers of America, Long Beach | Long Beach | male | IV |
| California Mother-Infant/Project Success | San Diego | female | IV |
| Working Alternatives | Los Angeles | female | III |

Note: These designated CCRC's may change.

## M. HUB INSTITUTIONS

Identified below are the current HUB institutions and the CCRC's they serve.

| HUB INSTITUTION | CCRC'S SERVED |
|---|---|
| COR | Turning Point, G Street |
| SQ | Volunteers of America, Oakland West |
| CIM | Marvin Gardens, Los Angeles |
| CIW | Working Alternatives, Inglewood; California Mother/Infant Project Success |
| CRC | Volunteers of America, Long Beach |

The HUB institution responsibilities are:

- To provide nonroutine medical and dental care to DPP inmates.

- To enter into ambulance, medical, and dental contracts within the surrounding area of the designated CCRC for emergency and ongoing care that otherwise cannot be effectively managed at the CCRC.

- To transport inmates to complete the DPP verification process when necessary.

## N. TRANSPORTATION

Institutions shall notify the Community Correctional Center Administration and the Regional Reentry Coordinator (RRC) at least one week prior to transferring DPP inmates endorsed for special placement at designated DPP CCRC's. The RRC shall coordinate transportation with the Transportation HUB.

The TSU shall be responsible for arrangement of DPP inmate/parolee transportation to the sending and/or receiving institution as outlined in Subsection 18, Transportation. If a DPP inmate/parolee requires staff administered medication or medical treatment during transportation from a CCRC to a HUB institution or to an established health care provider, the inmate/parolee shall be transported by ambulance or as directed by the HCM or designee. The TSU will not be responsible for coordinating such moves. The TSU responsibilities for DPP inmates/parolees at CCRC's include:

Initial transports to the facility.

Medical/dental transports.

Disciplinary roll-up transports.

Administrative roll-up transports.

The TSU shall conduct medical/dental, disciplinary, and administrative transports upon request from CDC staff at the designated CCRC. After hours emergency transportation needs for DPP inmates housed in a CCRC shall be handled through the appropriate Regional Administrative Officer of the Day (AOD). The AOD shall call TSU to arrange for immediate transport. The HUB institution's contracted ambulance service shall conduct all medical emergency transportation of DPP inmates at CCRC's.

The TSU shall transport DPP parolees held in county jails as "Our Hold Only" to CDC institutions, court proceedings, and parole revocation hearings in accordance with TSU transportation policy.

## O. FAMILY FOUNDATIONS PROGRAM

Selected Family Foundations Program (FFP) facilities shall be designated as new facilities are approved. The FFP currently has two operational programs located in Santa Fe Springs and San Diego. The third program located in Fresno is scheduled to be operational in July 2001. Each program is designed to be appropriately accessible to inmates with disabilities. The Women and Children's Services Unit (WCSU) will place eligible women in an appropriate FFP facility in accordance with the CDC's policy.

### P. COMMUNITY PRISONER MOTHER PROGRAM

The WCSU has identified two Community Prisoner Mother Program (CPMP) facilities as appropriately accessible to inmates with disabilities that impact placement. Eligible women identified as meeting DPP criteria will be placed into the following CPMP location:

| NAME OF CENTER | LOCATION |
|---|---|
| Prototypes Women's Center | Pomona |
| Booth Family Apartments | Oakland |

### Q. FACILITIES OPERATED UNDER CONTRACT

The CDC shall include substantially the following language in all of its contracts for the operation of facilities that provide services, programs or activities for inmates or parolees: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990, 42 United States Code, Section 12101, et seq., which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

The fact that the CDC includes this language in each contract shall not preclude the CDC from employing the "clustering approach" to providing accessible community-based facilities for inmates and parolees. The CDC will provide at least one DPP-accessible facility to serve male and female inmates/parolees in each parole region.

### R. CONSTRUCTION POLICY

#### 1. NEW PRISON CONSTRUCTION

It is the policy of CDC to provide for structural accessibility to inmates with disabilities in the construction of new prisons, consistent with this policy. In new prison construction, two percent of designed bed capacity will be designed to be structurally accessible. All program and common use areas shall be designed and built to be ADA compliant. The CDC will "cluster" accessible beds and aligned program areas within specified structures and facilities of new prisons.

During the design phase of each new prison, CDC will determine whether the prison is to be designated to house inmates requiring specialized housing under DPP. When a new prison is so designated, CDC will determine whether the two percent scoping standard is sufficient or should be increased.

---

### 2. ALTERATION TO EXISTING FACILITIES

With respect to existing DPP facilities, alterations to inmate areas that house inmates with disabilities will be designed to be accessible, pursuant to state and federal accessibility standards. With respect to nondesignated DPP facilities and areas of DPP facilities that will not house inmates with disabilities, structural alterations will be reviewed in view of budgetary and penological considerations on a case-by-case basis.

### S. PAROLE FIELD OPERATIONS

### 1. POLICY

It is the policy of the Department to provide reasonable accommodation to parolees with disabilities consistent with established departmental policies and procedures. Parole planning and supervising is conducted on a case-by-case basis to meet the unique needs of the parolee while protecting legitimate parole interests of CDC.

### 2. RELEASE PROGRAM STUDY

Prior to a parolee's release from custody, a CDC Form 611, Release Program Study, shall be used to provide documentation and notice to field staff of special needs related to the parolee's disability; e.g., need for qualified interpreters, referral to the California Department of Rehabilitation, or need for TDD access. The C&PRs are responsible for notifying parole field staff, via the CDC Form 611 process, if an inmate has a verified disability and delineate the inmate's specific needs. The CDC Form 611 shall be forwarded to the appropriate parole region at least 210 days prior to the inmate's release date in order to ensure sufficient time for reentry processing.

### 3. EFFECTIVE COMMUNICATION

Field staff shall ensure that parolees with disabilities, upon reporting to a parole unit, are afforded effective means of communication in receiving orientation, Conditions of Parole, e.g., Penal Code, Section 290 Registration, etc. If the parolee's disability prevents the parolee from reporting to the assigned unit, reasonable accommodation shall be made to meet the parolee's needs.

### 4. WRITTEN COMMUNICATION

Each Parole Office shall ensure that the CCRs, Notices, Orientation Packages, Conditions of Parole, Job Announcements, and similar printed materials that are distributed to parolees are accessible to parolees with disabilities. Accommodations such as large print, computer assisted devices, audio tapes and Braille shall be provided when necessary. Parole staff shall provide the

assistance and make available equipment necessary to all parolees with disabilities on a case-by-case basis to ensure that parolees who have difficulties reading and/or communicating in writing will be provided reasonable access to forms, regulations and procedures.

5. **FIELD SUPERVISION/OFFICE VISITS**

Parole Agents shall continue to follow existing procedures as they pertain to the supervision of parolees. The main services received by parolees in a parole office are basic counseling services and supervision provided by the parole agent and mental health services, including testing, counseling and prescribed medication, provided by the Parole Outpatient Clinics. However, if a parolee has a disability, the unit supervisor, or designee, shall make reasonable modifications in procedures, if necessary, to ensure that services are provided at an accessible location; i.e., parole office or parolee's residence.

It is the mutual responsibility of the parolee and the P&CSD to verify disabilities that might affect the parolees' placement in community programs and functioning while in the community and of verifying credible claims of a disability in response to a request for reasonable accommodations. Verification of a disability shall be achieved by completing a BPT Form 1073. All case-carrying agents are required to automatically screen all active parolees under their supervision on or before January-March 2001, to identify all parolees with disabilities. New releases, not processed through an RC, shall be screened during the initial interview process. Parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

6. **PURCHASE OF HEALTH CARE APPLIANCES**

If a parolee is indigent, the Department operates under the reasonable assumption that he or she may qualify for Medi-Cal or Medicare benefits that would cover the financial responsibility of any/all health care appliances. If the parolee does not qualify for Medi-Cal or Medicare benefits, or the application process exceeds normal processing time frames, or the processing delays, hinders, or exacerbates the parolee's medical conditions, the CDC will provide financial assistance to the parolee in accordance with departmental policy and procedure. No parolee shall be denied a health care appliance solely because he/she is indigent.

7. **MAINTENANCE AND REPAIR OF WHEELCHAIRS**

Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the parolee shall report the repair need to their parole agent for a determination on the appropriate steps for accomplishing the repair, e.g., return to the physician/health care provider who prescribed the appliance for an appointment to evaluate the condition of the appliance or to a legitimate repair

agency or medical supply vendor. Once the need for repair or replacement is verified, the parolee shall follow the prescribed process for repair/replacement as set forth by his/her benefit provider. The parolee shall be responsible for damage, repair and replacement of appliances, parts and batteries. In the event the benefit provider does not cover the total cost of the repair or replacement and the parolee or their families are unable to absorb the difference in cost, the Department will provide financial assistance to the parolee in accordance with departmental policy and procedure.

## 8. PAROLE OUTPATIENT CLINICS

The Parole Outpatient Clinic shall provide evaluation or mental health diagnosis, and transitional, or occasionally, sustained therapeutic intervention on an outpatient basis to parolees with disabilities who have an Axis I diagnosis. Treatment services may be supplemented by interagency agreements/contracts with other state and county agencies. All nonroutine services shall be reviewed by the Regional Parole Administrator and Mental Health Program Administrator prior to implementation.

## 9. EVACUATION PROCEDURES

*a)* In the event of an emergency requiring building evacuation, each parole office shall ensure the safe and effective evacuation of parolees with disabilities.

*b)* Local evacuation procedures shall be adopted at each parole office.

## 10. RESTRAINTS

Parolees who have a disability that prevents the application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the Unit Supervisor or designee. Mechanical restraints shall be applied so as to assure effective application while reasonably accommodating the parolee's disability.

## 11. TRANSPORTATION

The special needs of parolees with disabilities shall be considered in transporting them. A parolee's special health care aids and appliances shall accompany the parolee upon transport. All applicable transportation policies and procedures apply to DPP parolees.

*12.* **REVOCATION HEARINGS**

If a parolee has a physical disability that impairs his/her ability to attend the hearing or communicate effectively with the hearing officer, then arrangements shall be made in advance to provide modifications for the disability. Refer to BPT, CCR, Sections 2692 and 2694 for further details.

*T.* **TRAINING**

The CDC will provide DPP training to institution/parole staff on ADA regulations and DPP requirements. This training shall include but not limited to evacuation and emergency procedures, reasonable accommodations and effective communication.

STATE OF CALIFORNIA
INMATE/PAROLEE DISABILITY VERIFICATION (I/P DV)
CDC 1845 Provisional (Rev. 01/01)

DEPARTMENT OF CORRECTIONS

*CHECK ALL OF THE BOXES APPLICABLE*

| INMATE'S NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|

*Section A – E to be completed by a physician only*

| SECTION A: REASON FOR INITIATION OF FORM | SECTION B: CATEGORIES OF DISABILITY |
|---|---|

**SECTION A: REASON FOR INITIATION OF FORM**
- ☐ Inmate voluntarily self-identified to staff
- ☐ Observation by staff    ☐ Third party evaluation request
- ☐ Medical documentation or Central File information

**SECTION B: CATEGORIES OF DISABILITY**
- ☐ Blind/Vision Impaired    ☐ Speech Impaired
- ☐ Deaf/Hearing Impaired    ☐ Other
- ☐ Mobility Impaired

**SECTION C: DISABILITIES IMPACTING PLACEMENT**

1. ☐ PERMANENT WHEELCHAIR USER -**DPW**
2. ☐ PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-**DPM**
   *Cannot* walk 100 yards or up a flight of stairs without pausing *with* the use of aids (crutches, prothesis, or walker).
3. ☐ PERMANENTLY DEAF/HEARING IMPAIRED-**DPH**
   So severe they must rely on written communication, lip reading or signing as their residual hearing, with aids, will not enable them to hear an emergency warning, or effectively communicate.
4. ☐ PERMANENTLY BLIND/VISION IMPAIRED -**DPV**
   *Not* correctable to central vision acuity of less than 20/200 *with* corrective lenses.
5. ☐ PERMANENT INDISCERNIBLE/NO SPEECH-**DPS**
   *No* effective written communication.
6. ☐ OTHER IMPACTING PLACEMENT (See Comments below)-**DPO**

**SECTION D: DISABILITIES *NOT* IMPACTING PLACMENT**

A. ☐ PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-**DNM**
   Walks 100 yards or up a flight of stairs without pause
   ☐ *without* aids ☐ *with* aids (crutches, prothesis, or walker)
B. ☐ PERMANENT NONAMBULATORY MOBILITY IMPAIRMENT
   (e.g., arm or hand prostheses, or missing digit(s))
C. ☐ PERMANENTLY HEARING IMPAIRED-**DNH**
   With residual hearing at a functional level *with* hearing aid(s).
D. ☐ PERMANENTLY BLIND/VISION IMPAIRED-**DNV**
   *Correctable* to central vision acuity less than 20/200 with corrective lenses.
E. ☐ PERMANENT INDISCERNIBLE/NO SPEECH-**DNS**
   Communicates *effectively* in writing.

**SECTION E: Additional Medical Information**

List assistance needed with daily living activities: (*i.e., eating, bathing, dressing, etc.*)

Per 128C(s) dated:

Has the following documented health care needs:
- ☐ In-patient    ☐ Sun Sensitive    ☐ Out-patient
- ☐ Heat Risk/Alert    ☐ Cannot be exposed to particulates in the air

Refer to 128C(s) dated:

☐ DISABILITY **NOT** VERIFIED *(Explain in comments section)*

☐ VERIFIED DISABILITY IN:
   ☐ SECTION C    ☐ SECTION D

DOCUMENTED MENTAL HEALTH NEEDS
- ☐ CCCMS    ☐ EOP    ☐ MHCB    ☐ DMH

Refer to 128C(s) dated:

**SECTIONS A through E COMPLETED BY:**

| Physician's Name (Print) | Physician's Signature | Date Signed |
|---|---|---|

**SECTION F: ADDITIONAL PLACEMENT FACTORS AND INFORMATION**

*For completion by correctional counseling staff*

- ☐ Uses American Sign Language (A.S.L.)
- ☐ Uses Signing Exact English (S.E.E.)
- ☐ Communicates in writing    ☐ Reads lips
- ☐ Reads braille    ☐ Requires large print

☐ NO ADDITIONAL INFORMATION AVAILABLE

SECTION F COMPLETED BY:

| NAME: | TITLE: | DATE SIGNED: |
|---|---|---|

**COMMENTS**

DISTRIBUTION: Original - General Chrono Section of Central File    Pink - Health Care Services for Health Care Record    Yellow - Inmate/Parolee

STATE OF CALIFORNIA **GENERAL INSTRUCTIONS** DEPARTMENT OF CORRECTIONS
INMATE/PAROLEE DISABILITY VERIFICATION (I/P v .,
CDC .1845 Provisional (Rev. 01/01)

This process does not require nor is it to result in the automatic screening of all inmates/parolees to identify disabilities. This process ensures standardization of CDC policy and procedures dealing with the verification of a disability and placement of inmates/parolees with disabilities covered by the Disability Placement Program (DPP). The use of this form will be initiated only in response to one or more of the following actions:

a) The inmate/parolee voluntarily self-identifies or claims to have one of the six categories of disability;
b) During interaction with the inmate/parolee, staff observes what appears to be a disability, severe enough to impact placement, affect program access or present a safety/security concern;
c) The health or central file record contains documentation regarding one of the six categories of disability.
d) A third party (such as a family member) requests an evaluation of the inmate or parolee for an alleged disability.

Identification of inmates/parolees who may meet the DPP parameters will usually occur during reception center processing, but if an inmate/parolee appears to meet disability criteria indicated on the form, all of the institution/facilities will use the I/PDV. A verification referral, based on observation or interaction with the inmate/parolee, can be directed to the institution/facility health care service by a staff member via a CDC Form 128B.

Responsibility for verification of the disability through completion of Sections A-E of the I/PDV, rests with the health care services physicians. Health care staff shall follow CDC protocols for verifying disabilities. These protocols are set forth in Exhibit B (or other official CDC document that includes protocols). Upon completing Sections A through E, the physician signs in the appropriate signature block in Section E. Health care staff forwards the partially completed I/PDV to the Classification and Parole Representative or RC CC III for tracking. Counseling staff completes the form by completing Section F and signing the signature box below Section F. Appropriate education staff shall verify learning disabilities by completing Sections A, B, and D. The staff member shall complete the identifying information and explain needed accommodations (if any) in the Comments Section. Learning disabilities will be verified only to determine the need for reasonable accommodation.

### COMPLETION OF THE FORM:
Enter identifying information about the inmate/parolee and the date the I/PDV was initiated.

**SECTION A:** Mark the reason for initiating this form in the appropriate box.
**SECTION B:** Mark the category of disability to be verified. *If it is determined during the verification process the inmate/parolee does not have one of the six categories of disability, completion of this form need not proceed. Place a check in the box below Section D, indicating "Disability not Verified," enter an explanation in the Comments Section, sign and date the incomplete form, and file the original in the General Chrono section of the central file and a copy in the health record.*
**SECTION C:** A mark made in any of these boxes, indicates a need for special housing or programming and will result in placement in one of the designated institutions or facilities. **NOTE:** The word *permanent* is defined as a condition not expected to improve within six months. Check all boxes that apply using the definitions below:
### IF THE INMATE/PAROLEE:
--Uses a wheelchair full time due to a **permanent** condition and requires use of the wheelchair both within and outside the assigned cell, check box 1.
--Cannot walk 100 yards or up a flight of stairs without stopping due to a permanent lower extremity ambulatory impairment and do not require a wheelchair full time but is medically prescribed a wheelchair for use outside of the assigned cell, check box 2.
--Must rely on written communication, lip reading or signing because their residual hearing even if augmented by aids, will not enable them to hear an emergency warning or to effectively communicate, check box 3.
--Is permanently blind or has a vision impairment not correctable to central vision acuity of less than 20/200 *with* corrective lenses, check box 4.
--Has a permanent speech impairment resulting in indiscernible speech or **NO** speech and does **not** communicate effectively **in writing**, check box 5.
--Has a permanent disability other than the five identified, or do not require a wheelchair full time but is medically prescribed a wheelchair for use outside of the assigned cell, due to a disability other than a lower extremity mobility impairment, i.e., emphysema, serious heart condition, etc., and it is severe enough the inmate would benefit from placement in a designated institution, check box 6.

**SECTION D:** A mark made in any of these boxes will not necessarily result in the placement of the inmate/parolee in special housing or programming in one of the designated institutions/facilities, unless 1) a disability in Section C exists, or 2) the severity/compound condition results in a physician recommendation for DPP placement. For this type of recommendation, a CDC Form 128C and notes in the Comments Section should be completed by the physician. Check all boxes that apply using the definitions below:
### IF THE INMATE/PAROLEE:
--Has a lower extremity ambulatory impairment but **can** walk 100 yards or up a flight of stairs without pausing. Mark box "A" and **with** or **without aids**.
--Uses an upper extremity prosthesis, is missing an arm, hand or digits, check box "B."
--Has a hearing loss but follows conversation at normal speaking levels and can hear an emergency warning using a hearing aid(s), check box "C."
--Can see well enough to score better than at a 20/200 level with corrective lenses, check box "D."
--Has indecernible or no speech but communicates effectively in writing, check box "E."

**SECTION E:** If there has been CDC Form documentation, medical file review, health care staff observation or interaction with the inmate/parolee, health care staff must complete this section.
### IF THE INMATE/PAROLEE:
--Need assistance with daily living activities, list both the needs and the date of the 128c documenting the need(s).
--Has documented health care or mental health needs, mark the appropriate box(es) and list by date the 128c(s) that note the condidtion(s).

**SECTION F:** If there has been CDC Form 128C documentation, Central File review, staff observation or interaction with the inmate/parolee, counseling staff must complete this section. If none of these factors exist, and there are no additional factors or information, mark the "NO ADDITIONAL INFORMATION AVAILABLE" box, sign, date, and insert title in the signature box.
### IF THE INMATE/PAROLEE:
--Claims ability to communicate effectively by sign language (list years of training and years of use in the Comments Section), reading lips, Braille, reading large print, or by writing, mark the box(es) that apply.

**COMMENT SECTION:** For notes, references, explanations of disabilities and any information not listed elsewhere on the I/PDV.
**♦♦Verifying Staff:** Complete Sections A-E. Route this form to the assigned Correctional Counselor I.
**♦♦Counseling Staff:** Complete Section F, as appropriate. After processing, the original I/PDV is to be filed in the General Chrono Section of the Central File. The pink copy is to be forwarded to Health Care Services for filing in the Health Care Record. The yellow copy is to be given to the inmate/parolee.

*(Exhibit B)*

# PROTOCOLS FOR VERIFYING DISABILITIES

## I. STANDARDIZED HEALTH SCREENING OF INMATES WITH HEARING IMPAIRMENTS

The following protocol will clarify the following:

- ❖ The mechanism for identifying inmates with a hearing impairment;

- ❖ The procedure for measuring and verifying the impairment; and

- ❖ The procedure for referring hearing impaired inmates to a specialist in audiology or otolaryngology for further services as needed.

### A. IDENTIFICATION OF INMATES WITH A HEARING IMPAIRMENT IN A RECEPTION CENTER

1. All inmates, within 24 hours of their arrival, go through an initial health care screening process, which includes a qualitative and functional evaluation of the inmate's hearing as part of the review of the inmate's health care needs. The process consists of at least the following:

   a) The standardized health screening process

   b) A health history and physical examination

   c) A dental screening, and

   d) A mental health screening and evaluation.

2. The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

   a) The initial assessment period in reception centers (RC) provides the inmate with the opportunity to report possible health care problems.

   b) During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes a possible hearing impairment which might impact placement and/or require referral for evaluation and treatment, possibly including the provision of assistive devices such as hearing aids.

3.  Within 24 hours of the inmate's arrival, the screening begins with the standardized health screening. This is an interactive process between the inmate and the licensed health care staff. Staff interact with the inmate both in group settings and one-to-one. It includes a review of health records for previously identified health problems. Health care needs identified through this process are triaged by registered nurses (RN) or physicians who initiate referrals conforming to the urgency appropriate to the need.

4.  Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment, which includes past and current health history; family history; identification of health risk factors; and medical, dental, and mental health evaluations.

5.  Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functional hearing capacity, speech receptivity, and comprehension in the prison setting. This process involves a determination of functional hearing and comprehension through interactive speaking and writing, and conforms with appropriate medical practice standards for determining the inmate's hearing ability and need, if any, for additional evaluation and treatment.

    a)  A visual and otoscopic examination of the ears is performed on all inmates as part of the RC physical examination, whether or not they are identified as having a possible hearing impairment.

    b)  The visual and otoscopic examination of the ears allows for the determination of whether an acute condition exists that provides an etiology for the symptomatology of diminished hearing; e.g., cerumen (earwax) or foreign body occlusion of the ear canal.

    c)  Inmates wearing hearing aids, even if they maintain they have no hearing problem while wearing their aids, must remove their aids for this examination. The hearing aids are inspected for visible damage.

6.  On the basis of the history and physical examination, the physician may suspect a possible hearing impairment and shall at that point perform, or refer the inmate for, verification or diagnostic testing.

    a)  However, if the inmate's hearing problem appears to be the result of an obvious acute condition, such as a cerumen impaction, the condition is addressed by the physician.

    b)  If treatment of the condition resolves the hearing impairment, the verification and measurement process in Section B, below, is not done unless specifically determined by the physician to be medically necessary.

**B.  VERIFICATION AND MEASUREMENT OF POSSIBLE HEARING IMPAIRMENTS**

*1.*  Inmates who have identified themselves as having a hearing impairment, or who have otherwise been identified as having a possible hearing impairment, are further evaluated for verification of impairment.

*2.*  Based on results of the RC assessments, comprehensive history, and physical examination, a physician determines which of the components in Section B, Verification and Measurement, are indicated pursuant to applicable standards of care.  The appropriate evaluation(s) may be ordered by the primary care physician during the time of the inmate's stay at the RC or may be obtained by referral to a specialist in audiology or otolaryngology, which referral may be done at the receiving institution.

*3.*  A physician can refer the inmate to a hearing specialist, whether or not all components of the screening and verification evaluation are completed, whenever there is sufficient information to indicate that the inmate has a significant hearing impairment which is an impairment that could affect the safety and security of either the hearing impaired inmate or the institution, or could affect the program and medical needs of the inmate.

*4.*  The RC verification and measurement process consists of quantitative standardized measurements and specialty evaluations to assess functional hearing capacity and speech receptivity and comprehension in the prison setting.  The evaluation consists of one or more of the following:

*a)*  Speech discrimination testing;

*b)*  Conduction and lateralization testing (Rinne' and Weber);

*c)*  Specialty referral, if indicated; and

*d)*  Pure tone audiogram testing, if indicated.

*5.*  The verification and measurement of hearing impairments shall conform to the following expectations:

*a)*  Speech discrimination and comprehension is tested by speaking in a conversational voice, at six feet from the inmate, words from a phonetically balanced word list by an RN or physician.  The inmate is positioned facing away from the speaker to avoid lip reading.  An accepted standard is 70 percent accuracy in repeating the spoken words.

*b)*  Rinne' and Weber tuning fork testing for bone and air conduction and lateralization shall be performed, if indicated, by an RN or physician using a 512 or 1024 Hz tuning fork.

*c)* A standard pure tone air conduction screening audiogram is performed when necessary to verify and measure the degree and type of hearing impairment.

❖ Only health care staff who are trained in administering and recording pure tone audiograms perform screening audiograms.

❖ If the inmate does not demonstrate that he/she hears tones at 1000, 2000, 3000, and 4000 Hz at 30 dB, he/she shall be referred to a specialist in audiology or an otolaryngologist under contract to CDC for further evaluation and recommendation for treatment or the need for assistive devices, such as hearing aids.

**6.** Inmates who are verified by the screening process to have a hearing impairment, including inmates with hearing aids who report changes or have persistent uncorrected hearing impairment, shall be referred to a specialist in audiology or otolaryngology for identification of any pathologic conditions and recommendations for further care, if needed.

*a)* In order not to prolong the time in the RC due to a referral to complete the evaluation and obtain recommendations for treatment or the use of assistive devices such as hearing aids, the inmate may be transferred to an appropriate receiving institution and the referral made from there. This also allows the use of referral resources close to the receiving institution.

*b)* The CDC shall request that the recommendations from specialists specify which auxiliary aids and services may be needed by the inmate and that the recommendations take into account the context of the prison environment in order to provide for the safety and security of both the hearing impaired inmate and the institution and the program and medical needs of the inmate.

## *II.* STANDARDIZED HEALTH SCREENING OF INMATES WITH SPEECH, MOBILITY, VISION AND OTHER IMPAIRMENTS

The purpose of this protocol is to clarify:

❖ The mechanism for identifying inmates with impairments that might impact placement.

❖ The procedure for evaluating and verifying the impact of an impairment on placement

### *A.* IDENTIFICATION OF INMATES WITH IMPAIRMENTS THAT MIGHT IMPACT PLACEMENT

*1.* All inmates receive an initial health care screening within 24 hours of their arrival at a Reception Center (RC), which includes a qualitative evaluation of the inmate's health care status. This includes visual acuity, evidence of mobility problems, the ability to communicate, or other potentially disabling conditions as part of a review of the inmate's health care needs. The process consist of at least the following:

    *a)* The standardized health screening process

    *b)* A health history and physical examination

    *c)* A dental screening, and

    *d)* A mental health screening and evaluation.

*2.* The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

*3.* The initial assessment period in RC's provides the inmate with the opportunity to report possible health care problems.

*4.* During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes the health care needs which might impact placement and/or require referral for further evaluation and treatment.

*5.* Within 24 hours of the inmate's arrival, the screening begins with the standardized health screening. This is an interactive process between the inmate and licensed health care staff. Staff interacts with the inmate both in group settings and one to one. It includes a review of health care records for previously identified health problems. Health care needs identified through this process are triaged by RN's or physicians who initiate referrals conforming to the urgency appropriate to the need.

*6.* Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment which includes past and current health history, family history, identification of health risks factors and medical, dental and mental health evaluations.

*7.* Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning ability to communicate about their health care history and concerns and respond to verbal directions, or written if appropriate.

8.  If the inmate has difficulty walking or is using crutches, or a walker or has a prosthesis for mobility purposes the mobility impairment is noted and the appropriateness of the current assistive aid is evaluated.

9.  All inmates receive a visual acuity screening with and without correction. If the inmate requires additional evaluation to determine the overall visual impairment the RC health care staff refer the inmate accordingly.

10. All inmates transferring from one general population (GP) institution to another general population institution are processed via the standardized health screening process upon arrival. Each inmate is evaluated by health care staff to identify disabilities that may impact placement.

11. If the medical screening either in the RC or on entry to a GP reveal that the inmate has a visual acuity not correctable in at least one eye to better than 20/200, "no effective written communication," or cannot walk 100 yards, or up a flight of stairs without pausing with the use of aids, the disability is determined to impact placement.

12. If the examination determines that the inmate has a visual acuity of better than 20/200 in one eye, is able to communicate in writing or, is able to walk 100 yards or up a flight of stairs without pause with or without aids, the disability does not impact placement.

Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning capacity. This process involves a review of previous medical records including information of general physical and medical needs, and performing or referring for further testing if necessary to identify disabilities other than visual, mobility, speech, and hearing that may impact placement.

On the basis of the above examinations, if an inmate has been determined to have a permanent disability corresponding to the five listed on the CDC Form 1845, (or other disability that impacts placement), the physician will complete the CDC Form 1845. The physician will indicate the impact on placement of the disability in the correct section of the CDC Form 1845 so that inmate can be recommended for placement in a designated DPP facility.

## DECLARATION OF SERVICE

**Case Name:** *John Armstrong, et al. v. Gray Davis, et al.*    **Case No.**    **C-94-2307-CW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the Bar of this Court at which member's direction this service is made. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On February 27, 2001, I placed the attached

### AMENDED REMEDIAL PLAN

in the internal mail collection system at the Office of the Attorney General, 455 Golden Gate Avenue, Room 11000, San Francisco, California 94102, for deposit in the United States Postal Service that same day in the ordinary course of business, in a sealed envelope, postage fully postpaid, addressed as follows:

**DONALD SPECTER**
**PRISON LAW OFFICE**
**GENERAL DELIVERY**
**SAN QUENTIN, CA  94964**

**ROSEN BIEN & ASARO**
**MICHAEL W. BIEN**
**155 MONTGOMERY ST. 8TH FL.**
**SAN FRANCISCO, CA  94104**

I declare under penalty of perjury the foregoing is true and correct and that this declaration was executed on February 27, 2001 at San Francisco, California.

C. VILLALON

C:\DAT\GERMAN\1POS\ArmstrongREMEDIAL POS
USDC-ND OAKLAND DIV.
CF97CS0005