1    PRISON LAW OFFICE
     DONALD SPECTER – 83925
2    SARA NORMAN – 189536
     General Delivery
3    San Quentin, California 94964
     Telephone: (415) 457-9144
4

5    DISABILITY RIGHTS EDUCATION &
     DEFENSE FUND, INC.
     LINDA KILB -- 136101
6    2212 6th Street
     Berkeley, California 94710
7    Telephone: (510) 644-2555

8    JONES DAY
     CAROLINE N. MITCHELL - 143124
9    555 California Street, 25th Floor
     San Francisco, CA 94104
10   Telephone: (415) 875-5712

BINGHAM McCUTCHEN, LLP
WARREN E. GEORGE – 53588
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

LAW OFFICES OF ELAINE B. FEINGOLD
ELAINE B. FEINGOLD – 99226
1524 Scenic Avenue
Berkeley, California 94708
Telephone: (510) 848-8125

11   Attorneys for Plaintiffs

12         IN THE UNITED STATES DISTRICT COURT

13           NORTHERN DISTRICT OF CALIFORNIA

14                OAKLAND DIVISION

| | |
|---|---|
| 15   JOHN ARMSTRONG, et al., | Case No. C 94-2307 CW |
| 16       Plaintiffs, | **NOTICE OF MOTION AND MOTION TO CONVENE A THREE JUDGE PANEL TO LIMIT PRISON POPULATION** |
| 17   v. | |
| 18   ARNOLD SCHWARZENEGGER, et al., | |
| 19       Defendants. | |
| 20 | HEARING |
| 21 | Date: December 22, 2006 |
| 22 | Time: 10:00 a.m. |
| | Dept: Courtroom 2, Fourth Floor |
| 23 | Judge: Hon. Claudia Wilken |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

FILED
NOV 15 2006
RICHARD W. WIEKING
CLERK, U.S. DISTRICT C...
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

**TABLE OF CONTENTS**

NOTICE OF MOTION ...................................................................................................1

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...........................................................................................3

     I.      THE OVERCROWDING CRISIS GENERALLY ...........................................3

     II.    OVERCROWDING HARMS PRISONERS WITH
             DISABILITIES ...............................................................................................6

LEGAL ARGUMENT ..................................................................................................9

     I.      THE PRISON LITIGATION REFORM ACT'S
             REQUIREMENTS FOR CONVENING A THREE JUDGE
             PANEL TO LIMIT THE PRISON POPULATION ARE
             SATISFIED AND THIS COURT SHOULD REFER THIS
             MATTER TO SUCH A PANEL. ....................................................................9

             A.     Previous Less Intrusive Relief Ordered By This Court
                     Has Failed To Remedy The Deprivation Of The Federal
                     Rights Of The Plaintiff Class To Safe And Accessible
                     Housing And Other Accommodations. ..................................12

             B.     Defendants Have Had Reasonable Time To Comply With
                     Previous Court Orders And the *Armstrong* Remedial
                     Plan. ....................................................................................13

     II.    AN ORDER LIMITING THE PRISON POPULATION
             SHOULD BE ENTERED IN THIS CASE BECAUSE
             OVERCROWDING IS THE PRIMARY CAUSE OF THE
             VIOLATIONS OF PLAINTIFFS' FEDERAL RIGHTS TO
             DISABILITY ACCOMMODATIONS, THE VIOLATIONS
             CANNOT BE REMEDIED WITHOUT RELIEF FROM
             OVERCROWDING, AND THIS COURT SHOULD REFER
             THE MATTER TO A THREE-JUDGE PANEL THAT CAN
             ENTER AN ORDER LIMITING THE POPULATION ...................................14

CONCLUSION .............................................................................................................15

1

# TABLE OF AUTHORITIES

2

## Federal Cases

3

*Benjamin v. Malcolm,*
4
    564 F.Supp. 668 (S.D.N.Y. 1983) ..................................................................11

5
*Essex County Jail Inmates v. Amato,*
    726 F. Supp. 539 (D.N.J. 1989)......................................................................11

6
*Grubbs v. Bradley,*
7
    552 F.Supp. 1052 (M.D. Tenn. 1982) ...........................................................11

8
*Harris v. Angelina County, Tex.,*
    31 F.3d 331 (5th Cir. 1994)............................................................................10

9
*Inmates of Allegheny County Jail v. Wecht,*
10
    565 F.Supp. 1278 (W.D. Pa. 1983),
    *aff'd in rel. part,* 754 F.2d 120 (3d Cir. 1985).............................................11

11
*Inmates of Occoquan v. Barry,*
12
    717 F.Supp. 854 (D.D.C. 1989) ....................................................................10

13
*Palmigiano v. Garrahy,*
    639 F.Supp. 244 (D.R.I. 1986) .................................................................10, 12

14
*Ruiz v. Estelle,*
15
    679 F.2d 1115 (5th Cir. 1982)
    *vacated on other grounds by* 688 F.2d 266 (5th Cir. 1982) ..........................10

16
*Vazquez v. Carver,*
17
    729 F. Supp. 1063 (E.D. Pa. 1989).................................................................11

18
*Wellman v. Faulkner,*
    715 F.2d 269 (7th Cir. 1983) .........................................................................10

19

20

## Statutes

21
18 U.S.C. § 2284 (Prison Litigation Reform Act) ...................................................9

22
18 U.S.C. § 3626(a)(3) (Prison Litigation Reform Act)...................................passim

23
18 U.S.C. § 3626(a)(3)(A) (Prison Litigation Reform Act) ...................................9

24
18 U.S.C. § 3626(g)(4) (Prison Litigation Reform Act)..........................................9

25
28 U.S.C. § 2284 (Prison Litigation Reform Act) .................................................15

26
29 U.S.C.§ 794 (Rehabilitation Act, Section 504)...................................................1

27
42 U.S.C. § 12101, *et seq.* (Americans with Disabilities Act) ...............................1

28

PLAINTIFFS' NOTICE OF MOTION & MOTION TO
CONVENE THREE JUDGE PANEL TO LIMIT PRISON
POPULATION, Case No. C-94-2307 CW

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2        PLEASE TAKE NOTICE that on December 22, 2006 at 10:00 a.m., or as soon

3    thereafter as the matter may be heard, in the Courtroom of the Honorable Claudia Wilken,

4    located at 1301 Clay Street, Courtroom 2, Fourth Floor, Plaintiffs John Armstrong, *et al.*,

5    will and hereby do move the Court for an Order to Convene a Three Judge Panel to Limit

6    Prison Population in this action.

7        Plaintiffs are simultaneously filing a separate motion seeking an Enforcement Order

8    remedying Defendants' violations of the Permanent Injunction, the American with

9    Disabilities Act, the Rehabilitation Act and the *Armstrong* Remedial Plan through their

10   continued failure to accommodate and ongoing discriminatory treatment of members of the

11   plaintiff class.  However, due to the extreme overcrowding in California's prisons, specific

12   remedial orders cannot succeed unless and until the prison population is limited.  Parallel

13   motions to convene three judge panels have been filed this week in this Court in *Plata v.*

14   *Schwarzenegger*, No. 01-cv-10351 TEH and in the Eastern District in *Coleman v.*

15   *Schwarzenegger*, No. Civ S 90-0520 LKK-JFM.

16       This motion is based on this Notice of Motion and Memorandum of Points and

17   Authorities and Proposed Order, filed and served herewith, the Declarations of Michael

18   Bien, Sara Norman, Gay Grunfeld, Thomas Nolan, Amy Whelan, Anne Mania, Megan

19   Hagler, and numerous class members, filed and served herewith in support of this motion,

20   the Court files in this action, and such other materials and argument as may be presented

21   before or at the hearing.

22                          **INTRODUCTION**

23       A decade after defendants purported to resolve this litigation and began compliance

24   efforts, serious and systematic discrimination against the plaintiff class persists.  *See* Motion

25   for Enforcement and Further Remedial Others ("Enforcement Motion"), filed herewith.

26       Defendants' efforts to comply with the Americans with Disabilities Act ("ADA"),

27   Section 504 of the Rehabilitation Act, the Permanent Injunction, and the *Armstrong*

28   Remedial Plan are increasingly frustrated by the unprecedented overcrowding crisis in the

1   California prison system.  On October 4, 2006, Governor Schwarzenegger declared that "a

2   State of Emergency exists within the State of California's prison system."  Declaration of

3   Michael Bien ("Bien Decl."), ¶ 9 & Exhibit B (Prison Overcrowding State of Emergency

4   Proclamation) (hereinafter "Overcrowding Proclamation").  "[C]onditions of extreme peril

5   to the safety of persons and property exist in the 29 CDCR prisons identified [in the

6   proclamation], due to severe overcrowding, and that the magnitude of the circumstances

7   exceeds the capabilities of the services, personnel, equipment, and facilities of any

8   geographical area in the state."  *Id.*  The Governor explained that this severe overcrowding

9   "causes harm to people and property, leads to inmate unrest and misconduct, reduces or

10  eliminates programs, and increases recidivism as shown within this state…"  *Id.*

11  Photographs posted by the CDCR on its own website provide vivid and disturbing evidence

12  of the Governor's statements, showing inmates triple-bunked and packed into every

13  available space.  Bien Decl., ¶ 16 & Exhibit I.

14       The effects of the overcrowding emergency on the plaintiff class of inmates with

15  disabilities are grave.  Inmates with severe mobility impairments lack adequate or accessible

16  cells.  They are crammed into triple bunks, risking dangerous falls more likely.  They are

17  inappropriately housed in more restrictive placements such as administrative segregation or

18  infirmaries, where they receive little or no programming, have extremely limited property

19  and privileges, and spend most of the day in their cells.  Bien Decl., ¶ 20.  They languish for

20  months in reception centers, where they receive virtually no programming or are forced to

21  rely on other prisoners for basic toileting needs or risk falling in the inaccessible showers.

22  They are denied specialist visits and adequate medical care.  Their disability grievances go

23  unanswered because there is not enough staff to respond.  Enforcement Motion at 8-12;

24  23-24.

25       Plaintiffs have demonstrated these and other systemic violations of their rights in the

26  Enforcement Motion, and have asked for narrowly tailored remedies to address defendants'

27  ongoing violations of the ADA, Rehabilitation Act, Permanent Injunction, and *Armstrong*

28  Remedial Plan.  But the bottom line is this:  without relief from the conditions created by

PLAINTIFFS' NOTICE OF MOTION & MOTION TO
CONVENE THREE JUDGE PANEL TO LIMIT PRISON
POPULATION, Case No. C-94-2307 CW

1  severe overcrowding, there is no real likelihood that defendants will be able to

2  accommodate prisoners with disabilities in the foreseeable future.  The executive and

3  legislative branches of the California government, including the Governor and other

4  defendants in this case, have abdicated their responsibility to provide any realistic plan for

5  addressing the needs of the state's prison population in a reasonable time frame, even in the

6  face of a constant flow of orders from federal Courts.  In a recent hearing in front of Judge

7  Henderson in *Madrid v. Tilton,* another prison class action lawsuit, the attorney representing

8  the Governor stated that "it is [the Governor's] belief that overcrowding affects virtually all

9  of the issues that the Court is concerned about…it is something that affects prisoners

10 throughout the State," and conveyed the Governor's request to "tell Judge Henderson that I

11 can use all the help from him I can get."  Bien Decl., ¶ 25 & Exhibit P (10/5/2006

12 Transcript at 32:21-34:5).  Defendants do indeed need help.

13         The only remedy left to address this crisis is to impose strict limits on the population

14 of prisoners.  Consequently, plaintiffs move for this Court to convene a three-judge panel,

15 as required under 18 U.S.C. § 3626(a)(3), so that an order limiting prison population may be

16 entered, and critical relief may be obtained for the plaintiff class.

17                              **STATEMENT OF FACTS**

18 **I.      THE OVERCROWDING CRISIS GENERALLY**

19         The California Department of Corrections and Rehabilitation ("CDCR") prison

20 population is at an all-time high, with the count currently at 173,322 inmates.  Nearly

21 70,000 additional prisoners are projected by defendants for the first six months of 2007.[1]

22 Bien Decl., ¶ 12 & Exhibit F at 1 (population data downloaded from CDCR website).

23 System-wide, the CDCR is now at nearly 200% of its design capacity, with fourteen

24 institutions *above* 200% of design capacity.  *Id.,* ¶ 10.  As a result, more than 15,000

25

26 [1] The unprecedented overcrowding will be even further aggravated in the next few months
   because defendants and Los Angeles County are planning to terminate a contract under
27 which 1,300 CDCR prisoners are housed at the Pitchess Detention Center of the Los
   Angeles County Jail.  *See* Bien Decl., ¶ 11 & Exhibit E.
28

1    inmates are housed in prison areas "never designed or intended for inmate housing,

2    including, but not limited to, common areas such as prison gymnasiums, dayrooms, and

3    program rooms, with approximately 1,500 inmates sleeping in triple bunks."  Overcrowding

4    Proclamation at 1, Bien Decl., Exhibit B.  CDCR Secretary Tilton acknowledged that the

5    practice of housing inmates in these beds is not only "nontraditional," but also "unsafe."

6    9/1/2006 Tilton Memorandum at 2, Bien Decl., ¶ 18 & Exhibit J.  According to defendants,

7    overcrowding has resulted not only in increased security concerns and severely affected the

8    CDCR's ability to provide work, training, and educational programs to prisoners, but has

9    also "been a major contributor to court intervention regarding CDCR's health care services

10   delivery."  Bien Decl., Exhibit J at 1.

11         Yet, in the face of these horrific conditions, the state of California has merely thrown

12   up its hands, failing to adopt any practical proposals aimed at alleviating the overcrowding

13   crisis, even in the special session of the Legislature convened for that very reason.  *See*

14   9/1/2006 Tilton Memorandum ("I am deeply disheartened that the special legislative session

15   concluded last night without the passage by the Assembly of any measures to provide either

16   short-term relief or long-term remedies to alleviate the prison overcrowding crisis."), Bien

17   Decl., Exhibit J.  The Governor has admitted the California government's inability to

18   address this overcrowding crisis.  *See* Overcrowding Proclamation (California Legislature

19   denied multiple proposals by Governor, failed to adopt proposals submitted by CDCR, and

20   failed to adopt any proposals of its own).

21         The number of prisoners is not the only factor in the overcrowding equation:

22   defendants also face severe and chronic shortages in custodial, administrative, and clinical

23   staff.  Declaration of Gay Grunfeld ("Grunfeld Decl."), ¶ 58; Bien Decl., ¶ 21 & Exhibit L.

24   Defendants have also been unable or unwilling to maintain contracts with outside specialists

25   and consultants, exacerbating their ability to meet the needs of the *Armstrong* class.

26   Declaration of Amy Whelan ("Whelan Decl."), ¶¶ 32-37.

27         This problem is not new.  In 2004, the Corrections Independent Review Panel found

28   that "the overall population of male prisoners exceed a safe maximum, and individual

-4-    PLAINTIFFS' NOTICE OF MOTION & MOTION TO
       CONVENE THREE JUDGE PANEL TO LIMIT PRISON
       POPULATION, Case No. C-94-2307 CW

1  housing units in some prisons are so severely over-crowded as to be at a crisis stage." Bien

2  Decl., ¶ 14 & Exhibit H at 4 (Deukmejian Report, Inmate/Parolee Population Management).

3  The Deukmejian Report found that the solution to unconstitutional conditions in CDCR was

4  to reduce the population size. Bien Decl., Exhibit H at 3 ("The key to reforming the system

5  lies in reducing the numbers."). Since that recommendation in 2004, the CDCR inmate

6  population has increased by fourteen percent, or nearly 20,000 inmates. (CDCR pop stats).

7  Bien Decl., ¶ 15.

8       The Overcrowding Proclamation details the litany of grave dangers that directly

9  result from overcrowding, including:

10      •   increased, substantial risk of violence;

11      •   increased, substantial risk for transmission of infectious illnesses;

12      •   increased, substantial security risk;

13      •   increased, substantial risk to the health and safety of CDCR staff, inmates, and

14          the public, including blackouts, sewage spills and environmental

15          contamination;

16      •   increased recidivism;

17      •   severe modification or elimination of inmate programs;

18      •   substantial restrictions on inmate movement; and

19      •   increased risk of deadly prison riots.

20  See Bien Decl., Exhibit B (Overcrowding Proclamation). The Governor has also stated,

21  through his counsel, that "it is his belief that overcrowding affects virtually all of the issues

22  that the [Madrid] Court is concerned about." Id., ¶ 25 & Exhibit P (10/6/2006 Transcript at

23  33:23-25). Both the CDCR Director of Adult Services, John Dovey, and the prison guards'

24  union (CCPOA) have declared that overpopulation creates danger to both inmates and staff,

25  and public safety concerns. Id., ¶¶ 13, 21 & Exhibits G and L (Dovey and Cox memos).

26

27

28

PLAINTIFFS' NOTICE OF MOTION & MOTION TO
CONVENE THREE JUDGE PANEL TO LIMIT PRISON
POPULATION, Case No. C-94-2307 CW

## II.    OVERCROWDING HARMS PRISONERS WITH DISABILITIES

Overcrowding directly impacts CDCR's ability to meet the needs of the plaintiff class. Repeatedly, during monitoring tours, defendants have cited the lack of accessible beds, lack of adequate staff, and lack of adequate funding and resources as justifications for their failure to accommodate prisoners with disabilities. Norman Decl., ¶¶ 7-8; Whelan Decl., ¶¶ 12-16; 32-45; Grunfeld Decl., ¶¶ 43-46, 58; *see also*, Bien Decl., ¶ 19 & Exhibit K at 1 (CDCR Draft Inmate Population, Rehabilitation, and Housing Management Plan, July 2006) ("[T]he CDCR is currently experiencing custodial staff shortages that will be exacerbated by demands placed on staffing based upon the projected increases in population."). These excuses all stem from population growth in the CDCR that is out of control.

Overcrowding affects plaintiffs with disabilities in at least four ways. First, *Armstrong* class members with severe mobility impairments need specialized housing placement such as wheelchair accessible cells. Yet there is a shortage of these cells throughout the system, at designated institutions and in reception centers. Enforcement Motion at 8-12. There is also a shortage of working, safe, accessible showers and toilets for wheelchair users and others with severe mobility impairments. *Id*. Class members are forced to "hop" to the toilet or be lifted on and off of it by other prisoners. *Id.* The more prisoners admitted to CDCR, the more pressure it puts on the scarce resource of accessible facilities. And it becomes harder to honor housing restrictions, such as those requiring low bunks and bottom story placement, when there are simply too few beds to go around. *Id.*

Accommodating the needs of prisoners with disabilities is particularly difficult given the shortages of custody staff. For example, without adequate custody staff for escorts, these prisoners may not be able to be transported to accessible showers located in remote areas of the prison. Norman Decl., ¶¶ 29-33; Hines Decl., ¶ 53. And custody staff may not be readily available for disability grievance interviews or to consider requests for specialized housing placement.

Second, *Armstrong* class members, who by definition suffer from mobility, kidney,

1   hearing, and vision impairments, are the most likely and frequent users of CDCR's non-

2   functional, overwhelmed medical system.  As the Governor's own attorney recently

3   recognized, the overcrowding crisis has made it impossible to rectify problems in health

4   care delivery – even after Judge Henderson of this Court appointed a Receiver in *Plata v.*

5   *Schwarzenegger*, the class action regarding medical care in California prisons.  The *Plata*

6   Receiver has stated numerous times that the medical care system is in a state of failure, that

7   without alleviating overcrowding it may be impossible to fix, and that the state has proven

8   itself utterly incapable of addressing the overcrowding crisis.  *See, e.g.,* Bien Decl., ¶ 23 &

9   Exhibit N, Receiver's Second Bi-Monthly Report at 2-4, Receiver's First Bi-Monthly

10  Report at 2-3 ("Unless and until the living conditions of some prisons and the

11  overpopulation experienced system-wide is effectively addressed, the Receiver will be

12  impeded in applying systemic and even some ad hoc remedies to the medical care system.").

13      This analysis also applies to the problems facing prisoners with disabilities, many of

14  which overlap with or are identical to those of the medical care system.  Members of the

15  *Armstrong* class need medical evaluations of their disabilities, accommodations such as

16  hearing aids and canes, and restrictions on their housing – all of which must come from the

17  overworked medical staff.  All too often *Armstrong* class members are denied the

18  appropriate housing restrictions and other accommodations they need.  Enforcement Memo

19  at 9-11.  Such denials occur in part because there are simply no safe beds available or

20  because CDCR's contracts with outside specialists have been cancelled.  *Id.; see also*

21  Grunfeld Decl., ¶¶ 43-46.

22      Class members' only recourse at that point is to file a disability grievance.  Yet

23  overworked grievance staff, who receive an ever increasing number of grievances from the

24  distressed prison population, are unable to answer the grievances in a timely or effective

25  fashion.  *Id.*, ¶¶ 47-59; *see also* Enforcement Motion at 22-24.

26      Third, as the Governor has acknowledged, there were thousands of incidents of

27  violence by prisoners against prisoners at California's prisons over the past year, caused by

28  the overcrowded conditions.  The Governor also notes that "overcrowded prisons in other

PLAINTIFFS' NOTICE OF MOTION & MOTION TO
CONVENE THREE JUDGE PANEL TO LIMIT PRISON
POPULATION, Case No. C-94-2307 CW

1  states have experienced some of the deadliest prison riots in American history, including[]"

2  Attica, New York, in 1971, New Mexico State Penitentiary in 1981, and Lucasville, Ohio,

3  in 1993. Bien Decl, Exhibit B at 3-5 (Overcrowding Proclamation). The Governor's

4  Proclamation describes California's systemic violence in detail, listing each of the 29 most

5  severely overcrowded institutions and how many "incidents of assault/battery by inmates[,]

6  ... riots/melees, and ... weapon confiscations" occurred at each. *Id.* The majority of the

7  institutions designated to house prisoners with severe disabilities that impact their

8  placement are included in the list of the 29 most crowded and therefore most violent

9  institutions. *Id.*; *see also* Norman Decl., ¶ 4 (listing designated institutions). Yet *Armstrong*

10 class members are the most vulnerable prisoners in the system. Many cannot see or hear.

11 Many have trouble walking. All too often, they must rely on other prisoners for assistance

12 with transportation around the prison, reading basic forms, toileting, and showering. This

13 epidemic of violence makes the plaintiff class even less safe than usual.

14        Finally, the only remedy the State has adopted to address overcrowding – the transfer

15 of at most 5,000 prisoners to out of state prisons – is being denied to much of the *Armstrong*

16 class. Bien Decl., Ex. B at 8-9 (Overcrowding Proclamation); Bien Decl., ¶ 32 & Exhibit

17 W. Because of their disabilities, these prisoners are forced to remain behind in unbearable,

18 crowded conditions, with no possibility of transfer. They thus bear the brunt of

19 overcrowding more than the prison population at large.

20        Plaintiffs have patiently monitored CDCR institutions for years, seeking to cajole

21 defendants to provide accommodations to prisoners with disabilities. But defendants have

22 repeatedly shown their inability or unwillingness to meet these needs. Thus, plaintiffs are

23 required to seek further remedial orders from this Court. *See* Enforcement Motion at 8-24.

24 At the same time, however, unless this Court promptly intervenes to control the CDCR

25 population, plaintiffs' proposed remedies will fail, and defendants' treatment of prisoners

26 with disabilities will likely revert to the horrific conditions prevailing in 1996. Such

27 backsliding would be tragic for the plaintiff class. It must not be permitted.

28

## LEGAL ARGUMENT

I.   **THE PRISON LITIGATION REFORM ACT'S REQUIREMENTS FOR CONVENING A THREE JUDGE PANEL TO LIMIT THE PRISON POPULATION ARE SATISFIED AND THIS COURT SHOULD REFER THIS MATTER TO SUCH A PANEL.**

The Prison Litigation Reform Act (PLRA) specifically contemplates circumstances requiring judicial intervention in the form of a "prisoner release order," whereby a three-judge panel orders a limitation on the prison population in order to protect the federal rights of prisoners. 18 U.S.C. § 3626(a)(3). The PLRA defines a "prisoner release order" as "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison." 18 U.S.C. § 3626(g)(4). A prisoner release order is appropriate for consideration when: (1) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the federal right sought to be remedied through the prisoner release order; and (2) the defendant has had a reasonable amount of time to comply with the previous court orders. 18 U.S.C. § 3626(a)(3)(A).

When a court determines that these requirements are satisfied, it can order that the matter be referred to a three-judge court, in accordance with 18 U.S.C. § 2284, for consideration of whether an order limiting the prison population should be entered. 18 U.S.C. § 3626(a)(3).

Such an order has precedent. Earlier this year, a federal district court in Ohio found that "it is unlikely that the plan to maintain constitutional population levels at the jail will be effective without some intervention by this Court in the form of a prisoner release mechanism … Defendants have been given an opportunity to correct the problem of jail overcrowding and have been unable to do so without further intervention by this Court." Bien Decl., ¶ 26 & Exhibit Q at 5 (5/25/2006 Order, *Roberts v. County of Mahoning*, D.Ohio, Case No. 4:03-cv-02329-DDD). That Court had begun a remedial process a year earlier. The Court noted that subsequent to its previous order, there was a "great amount of effort and work" by defendants to "attempt to solve those problems" identified by the Court

1    in its decision, and "progress ha[d] been made toward resolving a number of the findings."

2    *Id.* However, because the Court found that "the central issue of population control to

3    prevent future overcrowding remains unsolved" approximately one year later, it recognized

4    the need for the further intervention by the Court authorized by the PLRA. *Id.*

5          Similarly, in 1998, a three-judge panel convened pursuant to 18 U.S.C. § 3626(a)(3)

6    entered a Population Consent Order in a District of Columbia case, *Inmates of Occoquan v.*

7    *Barry*, No. 86-2128(JLG). *See* Bien Decl., ¶ 27 & Exhibit R (Population Consent Order).

8    There, the District Court had held in 1989 that defendants were violating the constitutional

9    rights of the plaintiff inmate class, and a Special Master had been appointed. *See Inmates of*

10   *Occoquan v. Barry*, 717 F.Supp. 854 (D.D.C. 1989).  Nine years later, a three-judge panel

11   found that the District Court's previous orders had failed to remedy plaintiffs' constitutional

12   rights, and that defendants had had a reasonable amount of time to comply with the previous

13   court orders.  Bien Decl., Ex. R (Population Consent Order at 1-2).  The panel also held that

14   because crowding was a primary cause of the violation of the plaintiffs' federal

15   constitutional rights, and no relief other than that set forth in the Population Consent Order

16   would remedy the violation, "the factual predicate for imposition of a prisoner release

17   order…has been established." *Id* at 2.

18         Prior to the passage of the PLRA, many courts found population caps necessary in

19   order to achieve constitutional conditions within prisons and jails.  *See, e.g., Harris v.*

20   *Angelina County, Tex.*, 31 F.3d 331, 335-38 (5th Cir. 1994) (upholding population cap

21   because of conditions, but also emphasizing deliberate action of defendants, because the

22   county continued to "pick up" inmates even when aware of overcrowding); *Wellman v.*

23   *Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983) (upholding order for population reduction,

24   citing inadequate medical care, lack of exercise time, deficient maintenance and food

25   service); *Ruiz v. Estelle*, 679 F.2d 1115, 1148 (5th Cir. 1982) *vacated on other grounds by*

26   688 F.2d 266 (5th Cir. 1982) (upholding population cap as an appropriate remedy

27   considering the harms that existed as a result of the overcrowded conditions in the Texas

28   prisons); *Palmigiano v. Garrahy*, 639 F.Supp. 244, 258 (D.R.I. 1986) (stating population

1   caps are "commonplace" and citing caselaw); *Vazquez v. Carver*, 729 F. Supp. 1063, 1069

2   (E.D. Pa. 1989) (enforcing population cap); *Essex County Jail Inmates v. Amato*, 726 F.

3   Supp. 539, 541 (D.N.J. 1989) (discussing necessity of population cap and imposing a fine

4   for defendants' non-compliance with cap); *Benjamin v. Malcolm*, 564 F.Supp. 668, 685

5   (S.D.N.Y. 1983) (denying motion to increase population limit where there are inadequate

6   safety, unsanitary conditions, and extensive time spent by inmates in the cellblock); *Inmates*

7   *of Allegheny County Jail v. Wecht*, 565 F.Supp. 1278 (W.D. Pa. 1983), *aff'd in rel. part*, 754

8   F.2d 120 (3d Cir. 1985) (population limits imposed; ordering additional relief based on

9   conditions); *Grubbs v. Bradley*, 552 F.Supp. 1052, 1126 (M.D. Tenn. 1982) (double-celling

10  banned in certain units at Tennessee State Penitentiary: "overcrowding is a primary source

11  of all the most serious problems. . . . the only effective remedy is to reduce the prison's

12  population . . ." ).

13      Although the PLRA now creates additional requirements for the issuance of a

14  prisoner release order, it plainly anticipates that there will be times when overcrowded

15  conditions block the remedy of violations of federal rights, and that judicial intervention

16  will be necessary to alleviate those overcrowded conditions and protect the federal rights of

17  prisoners.  The State of California is now at one of these junctures.  As exhaustively

18  documented in the Enforcement Motion, the plaintiff class of prisoners with disabilities are

19  not receiving accessible housing, other needed accommodations, or an effective disability

20  grievance system.  Enforcement Motion at 8-13; 23-24.  Despite this Court's 1996 landmark

21  decision applying the ADA and Rehabilitation Act to defendants, an enforcement order in

22  2002, and seven years of intensive monitoring, plaintiffs' fundamental rights continued to

23  be denied.  Plaintiffs need immediate relief and have no other recourse than to request that

24  this Court invoke the remedy provided in the PLRA, which begins with an order of referral

25  to a three-judge panel.

26

27

28

PLAINTIFFS' NOTICE OF MOTION & MOTION TO
CONVENE THREE JUDGE PANEL TO LIMIT PRISON
POPULATION, Case No. C-94-2307 CW

**A.  Previous Less Intrusive Relief Ordered By This Court Has Failed To Remedy The Deprivation Of The Federal Rights Of The Plaintiff Class To Safe And Accessible Housing And Other Accommodations.**

The Court is familiar with the lengthy history of this case. *See also* Enforcement Motion at 2-4.  From the Stipulation and Order and published opinion in 1996, to the Remedial Plan in 2001, to the Housing Order in 2002, defendants have struggled with compliance.  Some progress has been made through the monitoring process, but it has been slow in coming and inadequate.  Bien Decl., ¶ 6; Norman Decl., ¶ 7.  And while further remedial orders are necessary to fix extensive problems identified in the Enforcement Motion, these orders will not succeed unless this Court acts to limit the CDCR population.

Put differently, the work by the parties and the Court over the past ten years is wholly inadequate in the face of the state of emergency resulting from the out-of-control overcrowding and abysmal conditions throughout the CDCR system.  As a district court in Rhode Island found in *Palmigiano v. Garrahy*, 639 F.Supp. 244, 258 (D.R.I. 1986), when it imposed prison population limitations nine years after its initial finding of constitutional violations:

> The record shows that for nine years this court has employed all the artifices it could conceive to have the defendants cure the many constitutional violations it found.  I have been imperious, didactic, and supplicatory; I have cajoled and waited as though for Godot.  I have ever been reluctant to interfere with the operation of the prison…The veritable fortune that has been poured into [the] institution will all be for naught if positive firm steps are not immediately invoked.  The overcrowding must be confronted before it becomes uncontrollable.  A delay under the present conditions can give rise to problems of staggering magnitude not the least of which could be serious riots and/or a medical epidemic.

Simply put, California prisoners are currently facing horrific conditions that plainly violate the ADA, Rehabilitation Act, Permanent Injunction, and the *Armstrong* Remedial Plan.  The state government has no plan for providing any remedy to prisoners with disabilities.  This must not continue.  This Court has tried less intrusive remedies – to no avail – and must act now to safeguard the rights of the thousands of prisoners with disabilities confined in CDCR's overburdened system.

PLAINTIFFS' NOTICE OF MOTION & MOTION TO CONVENE THREE JUDGE PANEL TO LIMIT PRISON POPULATION, Case No. C-94-2307 CW

1

**B.    Defendants Have Had Reasonable Time To Comply With Previous Court Orders And the *Armstrong* Remedial Plan.**

2

3    Defendants have had more than a reasonable time to comply with previous court

4  orders and the Remedial Plan in this case.  The Court issued its decision in this case in 1996,

5  ten years ago.  Since that time, defendants have repeatedly demonstrated that they are

6  unable to cure their violations of rights of the plaintiff class to safe and accessible housing

7  and other accommodations.  Enforcement Motion at 8-24.

8    Moreover, there is absolutely no reason to believe that more time will help

9  defendants remedy their ongoing violations.  As the *Plata* Receiver stated in his September

10  19, 2006 Report, "Despite dire warnings from CDCR administrators that California's

11  prisons will be out of space by June 2007, despite the fact that population levels are now in

12  excess of 200% of designed capacity, nothing was presented to the Legislature by the

13  Administration that provided for immediate relief for Prison Wardens and Health Care

14  Man[a]gers.  Likewise, the Legislature itself offered no realistic proposals to deal with the

15  problems faced within California's prisons in a timely and adequate manner."  Bien Decl.,

16  Exhibit N at 3:1-6 (Receiver's Second Bi-Monthly Report).  Although the Governor has

17  ordered the immediate transfer of a few thousand prisoners to out-of-state placements, this

18  action will ultimately do little to alleviate the overcrowded conditions in the system.  There

19  are currently thousands of individuals in county jails throughout the state waiting to be sent

20  to CDCR to fill the places of inmates transferred out-of-state.[2]  Bien Decl., ¶ 12 & Exhibit

21  F.  In any event, these transfers have been categorically denied to many *Armstrong* class

22  members.  Bien Decl., ¶ 32 & Exhibit W.

23    For California prisoners, time is up:  they are incarcerated now, in conditions so dire

24  _____

25  [2]  In fact, the largest county jail, Los Angeles, has recently cancelled its contract with
CDCR to house 1300 inmates and will return that population to CDCR in the next few
months.  Dr. Peter Farber-Szekrenyi has stated to Special Master Keating in the *Coleman*

26  case and Receiver Sillen in the *Plata* case that the cancellation of the Los Angeles County
contract will substantially worsen conditions in the CDCR for all prisoners and that he has

27  no adequate plans to address the crisis.  September 1, 2006 Memorandum to Keating and
Sillen, Bien Decl., Exhibit E.

28

1  that the Governor has declared a state of emergency.  For the thousands of prisoners with

2  disabilities, these conditions have even more grave:  suffering the consequences of

3  inaccessible housing and toilets, unsafe sleeping arrangements, and dangerous showers,

4  with little hope that their disability grievances will be answered in a timely and effective

5  manner.

6  **II.    AN ORDER LIMITING THE PRISON POPULATION SHOULD BE
         ENTERED IN THIS CASE BECAUSE OVERCROWDING IS THE
7        PRIMARY CAUSE OF THE VIOLATIONS OF PLAINTIFFS' FEDERAL
         RIGHTS TO DISABILITY ACCOMMODATIONS, THE VIOLATIONS
8        CANNOT BE REMEDIED WITHOUT RELIEF FROM OVERCROWDING,
         AND THIS COURT SHOULD REFER THE MATTER TO A THREE-JUDGE
9        PANEL THAT CAN ENTER AN ORDER LIMITING THE POPULATION.**

10  The PLRA, in relevant part, states:

11  A party seeking a prisoner release order in Federal court shall file *with any
    request for such relief*, a request for a three-judge court and materials
12  sufficient to demonstrate that the requirements of subparagraph (A) have been
    met.

13

14  18 U.S.C. § 3626(a)(3)(C)(emphasis added).  Thus, although a prisoner release order may

15  not be entered until the three-judge panel has been convened, the statute requires that

16  plaintiffs make the request for such relief in their motion before the District Court.  The

17  *Armstrong* plaintiff class requests relief in the form of a limitation on prison population

18  because the overcrowding emergency in California's prisons prevents the plaintiff class

19  from receiving safe, accessible housing, adequate disability accommodations, and an

20  effective and timely disability grievance system.  No other relief will fully remedy the

21  violations of plaintiffs' federal rights under the ADA and § 504.

22       As described above, the current overcrowding crisis prevents full implementation of

23  this Court's prior orders and defendants' own Remedial Plan.  Because of the ever growing

24  population of CDCR, there is inadequate housing for prisoners with disabilities, and

25  insufficient clinical, custody, and other staff to provide the services and disability

26  grievances mandated by the Remedial Plan.  Defendants have repeatedly acknowledged that

27  there are no actions they can take to provide an immediate, or even short-term, remedy for

28  the violation of plaintiffs' rights, in light of the severe overcrowding crisis.

1    Given CDCR's own prediction that its population will continue to grow at escalating

2    rates, with 70,000 additional prisoners expected in the next six months, and the state's

3    admitted inability to effectively address the crisis, there is no conceivable remedy without

4    intervention by the Court in the form of a limitation on prison population.  Plaintiffs have

5    demonstrated that the requirements for convening a three-judge panel have been met, and

6    that the three-judge panel is likely to find by clear and convincing evidence that a limit on

7    prison population should be entered in this case.

8                                      **CONCLUSION**

9    For the foregoing reasons, the motion should be granted, and this Court should

10   convene a  three-judge panel to limit California's prison population, pursuant to 28 U.S.C. §

11   2284 and 18 U.S.C. § 3626(a)(3).[3]

12   Dated:  November 15, 2006                    Respectfully submitted,

13                                                ROSEN, BIEN & GALVAN, LLP

14

15                                               By:

16                                                    Michael W. Bien
                                                      Gay C. Grunfeld
17                                                    Attorneys for Plaintiffs

18                                               PRISON LAW OFFICES

19

20                                               By:
                                                      Donald Specter
21                                                    Sara Norman
                                                      Attorneys for Plaintiffs

22

23

24

25

26

27   [3]  Plaintiffs respectfully request that the Court consider the appropriateness of a joint
     hearing with the other federal courts considering this issue in *Plata* and *Coleman*.  See
28   Order Setting June 8, 2006 Hearing in *Plata* and *Coleman*.  Bien Decl., Exhibit U.