PRISON LAW OFFICE
DONALD SPECTER – 83925
SARA NORMAN – 189536
General Delivery
San Quentin, California 94964
Telephone: (415) 457-9144

BINGHAM McCUTCHEN, LLP
WARREN E. GEORGE – 53588
Three Embarcadero Center
San Francisco, California 94111-4066
Telephone: (415) 393-2000

DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
LINDA KILB -- 136101
2212 6th Street
Berkeley, California 94710
Telephone: (510) 644-2555

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone (415) 433-6830

JONES DAY
CAROLINE N. MITCHELL - 143124
555 California Street, 25th Floor
San Francisco, CA 94104
Telephone: (415) 875-5712

LAW OFFICES OF ELAINE B. FEINGOLD
ELAINE B. FEINGOLD – 99226
1524 Scenic Avenue
Berkeley, California 94708
Telephone: (510) 848-8125

950

FILED

NOV 15 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JOHN ARMSTRONG, et al., | ) Case No. C 94-2307 CW |
| Plaintiffs, | ) **PLAINTIFFS' NOTICE OF MOTION AND** |
| | ) **MOTION FOR ENFORCEMENT AND** |
| v. | ) **FURTHER REMEDIAL ORDERS** |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| Defendants. | ) |
| | ) <u>HEARING</u> |
| | ) |
| | ) Date: December 22, 2006 |
| | ) Time: 10:00 a.m. |
| | ) Dept: Courtroom 2, Fourth Floor |
| | ) Judge: Hon. Claudia Wilken |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..........................................................................................................1

PROCEDURAL BACKGROUND.................................................................................2

GENERAL FACTUAL BACKGROUND .....................................................................4

ARGUMENT ..................................................................................................................6

    I.     DEFENDANTS HOUSE PRISONERS WITH DISABILITIES IN
          DANGEROUS AND UNSANITARY CONDITIONS THAT
          VIOLATE THEIR RIGHTS UNDER FEDERAL LAW AND
          ORDERS OF THIS COURT ................................................................................6

        A.     Failure To Provide and Maintain Accessible Facilities
               Violates §504, the ADA, the Permanent Injunction, and
               Defendants' Own Remedial Plan........................................................6

        B.     Defendants Harm Plaintiff Class Members By Their Failure
               To Provide Accessible Housing To Prisoners With
               Disabilities. ..........................................................................................7

             1.     Defendants Do Not Provide Accessible Housing to
                    Wheelchair Users. ..............................................................8

              2.     Other Class Members Are Also Denied Needed
                    Accommodations. ...............................................................9

              3.     Defendants Fail to Promptly Transfer Prisoners With
                    Serious Disabilities to Prisons Designed to House
                    Them. ..................................................................................11

               4.     Defendants Fail to Provide Working Toilets, Shower
                    Chairs, and Other Accommodations to Prisoners Who
                    Need Them..........................................................................12

        C.     Defendants Must Systematically Track Prisoners' Housing
                Needs And Provide Accessible, Safe Housing. ...............................14

II.    DEFENDANTS' FAILURE TO PROVIDE SIGN-LANGUAGE
       INTERPRETERS TO PRISONERS WHO SIGN VIOLATES THEIR
       FEDERAL RIGHTS AND THE ORDERS OF THIS COURT .........................15

        A.     Defendants Are Legally Obligated To Provide Sign Language
               Interpreters To Ensure Effective Communication. ........................15

         B.     CDCR Repeatedly Denies Sign Language Interpreters To
               Deaf And Hard Of Hearing Prisoners.............................................16

         C.     CDCR Houses Signers In The Wrong Prisons, Denying Them
               Effective Communication. .................................................................18

        D.    CDCR Must Comprehensively Track Deaf Signers and Provide Them With Sign Language Interpreters. ..........................................19

III.    DEFENDANTS DEPRIVE CLASS MEMBERS OF THEIR CANES, WHEELCHAIRS, HEARING AIDS, AND OTHER ASSISTIVE DEVICES WITHOUT JUSTIFICATION AND IN VIOLATION OF FEDERAL LAW, THIS COURT'S ORDERS, AND THEIR OWN REMEDIAL PLAN..............................19

        A.    The ADA, §504, and Defendants' Own Remedial Plan Prohibit Removal of Assistive Devices Without Justification......................19

        B.    CDCR Staff Regularly Confiscate Assistive Devices Without Justification. ................................................................................20

        C.    CDCR Must Be Required To Increase Enforcement Of The Prohibition On Removal Of Assistive Devices. ..........................22

IV.    DEFENDANTS FAIL TO PROVIDE PROMPT AND EQUITABLE RESPONSES TO DISABILITY GRIEVANCES IN VIOLATION OF FEDERAL LAW AND THEIR OWN REMEDIAL PLAN ..............................22

        A.    CDCR Is Legally Obligated To Provide, And Follow, A Prompt and Equitable Disability Grievance Procedure. ..................22

        B.    CDCR'S Current Disability Grievance Procedure Is In Disarray....................................................................................23

        C.    Staffing Changes Are Needed to Cure Lateness............................................24

V.    PLAINTIFFS SEEK FURTHER REMEDIAL ORDERS THAT ARE NARROWLY TAILORED TO REMEDY THE ONGOING VIOLATIONS OF THE ADA, §504, THE PERMANENT INJUNCITON, AND THE REMEDIAL PLAN. ....................................24

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Armstrong v. Wilson*
    942 F. Supp. 1252 (N.D. Cal. 1996),
    *aff'd*, 124 F.3d 1019 (9th Cir. 1997),
    *cert. denied*, 524 U.S. 937 (1998) .................................................................................. 2, 3, 7

*Bonner v. Lewis*,
    857 F.2d 559 (9th Cir. 1988) ........................................................................................... 15

*Clarkson v. Coughlin*,
    898 F.Supp. 1019 (S.D.N.Y. 1995) ................................................................................. 22

*Degrafinreid v. Ricks*,
    417 F. Supp. 2d 403 (S.D.N.Y. 2006) .............................................................................. 20

*Duffy v. Riveland*,
    98 F.3d 447 (9th Cir. 1996) ............................................................................................. 15

*Pennsylvania Dept. of Corr. v. Yeskey*,
    524 U.S. 206, 118 S. Ct. 1952 (1998) ............................................................................... 6

*Smith v. Masterson*,
    2006 WL 2883009 (S.D.N.Y. Sept. 29, 2006) ................................................................ 20

*United States v. Georgia*,
    546 U.S. 151, 126 S. Ct. 877 (2006) ................................................................................. 6

## FEDERAL STATUTES

42 U.S.C. § 12101, *et seq.* (Americans with Disabilities Act) .......................................... 2

29 U.S.C. § 794 (Rehabilitation Act. Section 504) ............................................................. 2

18 U.S.C. § 3626(a)(1) (Prison Litigation Reform Act) ..................................................... 3

28 C.F.R. § 35.133 ............................................................................................................... 7

28 C.F.R. § 35.107(b) ......................................................................................................... 22

28 C.F.R. § 35.150(a) ........................................................................................................... 7

1

## STATE STATUTES

2 | Cal. Gov't Code

3 | § 12838.4.................................................................................................... 3

4 | § 12838.5.................................................................................................... 1

5 | § 12838.8.................................................................................................... 3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
ENFORCE MENT & FURTHER REMEDIAL ORDERS,
Case No. C-94-2307 CW

1   TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on December 22, 2006 at 10:00 a.m., or as soon thereafter as

3   the matter may be heard, in the Courtroom of the Honorable Claudia Wilken, located at 1301 Clay

4   Street, Courtroom 2, Fourth Floor, Plaintiffs John Armstrong, *et al.*, will and hereby do move the

5   Court for an Enforcement Order and Further Remedial Orders in this action.

6       Through this motion, plaintiffs seek an Order remedying defendants' violations of the

7   Permanent Injunction, the American with Disabilities Act, the Rehabilitation Act, and the

8   *Armstrong* Remedial Plan through their continued failure to accommodate disabilities and their

9   ongoing discriminatory treatment of members of the plaintiff class. While the relief requested in

10  this motion is necessary, it is not sufficient unless and until the severe prison overcrowding crisis is

11  also addressed. Plaintiffs are therefore simultaneously filing a separate motion to convene a three-

12  judge panel to limit the prison population.

13      This motion is based on this Notice of Motion and Memorandum of Points and Authorities

14  and Proposed Order filed and served herewith, the Declarations of Michael Bien, Sara Norman, Gay

15  Grunfeld, Thomas Nolan, Amy Whelan, Anne Mania, Megan Hagler,[1] and class members, filed and

16  served in support of this motion, the Court files in this action, and such other materials and

17  argument as may be presented before or at the hearing.

18                              **INTRODUCTION**

19      Defendant California Department of Corrections and Rehabilitation ("CDCR," formerly

20  "CDC")[2] is in crisis, dangerously overcrowded and floundering out of control. The situation has

21  reached extraordinary proportions: the Governor, a defendant in this case, has declared a State of

22  Emergency, admitting that most of the state's prisons "are so overcrowded that the CDCR is

23  required to house more than 15,000 inmates in conditions that pose substantial safety risks" and that

24  at most California prisons, "the current severe overcrowding . . . has caused substantial risk to the

25  
─────────────────────────
26  [1]  With one exception (Michael Bien), the attorney declarations filed in support of this motion
    contain "personal information" about prisoners and parolees which is protected by a 1995
    Protective Order in this case. The attorney declarations have therefore been filed with an
27  administrative motion seeking this Court's permission to be kept under seal.

28  [2]  Until July 1, 2005, the CDCR was known as the California Department of Corrections. Cal.
    Gov't Code §12838.5.

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
                                            ENFORCE MENT & FURTHER REMEDIAL ORDERS,
                                            Case No. C-94-2307 CW

1   health and safety of the . . . inmates housed in them . . . ."  Governor's Proclamation of October 4,

2   2006, Exhibit B to Declaration of Michael Bien ("Bien Decl.")

3        Ten years after defendants reached a settlement with the plaintiff class, CDCR cannot, or

4   will not, accommodate prisoners' disabilities.  In late 2006, it is unacceptable for a wheelchair user

5   to be forced to hop onto a toilet with no grab bars.  It is unacceptable for suicidal deaf prisoners

6   who use sign language to be forced to communicate with mental health clinicians through written

7   notes.  It is unacceptable to force a disabled prisoner to kneel on the floor for an attorney visit.  And

8   it is unacceptable for a prisoner to wait months for a response to a disability grievance, a response

9   that instructs him that he will not receive hearing aids until the prison obtains a contract with an

10   audiologist at some unknown future date.

11        Seven years after monitoring of CDCR's compliance with the *Armstrong* Remedial Plan

12   began, deaf prisoners *still* cannot obtain sign language interpretation for important medical

13   appointments or hearings.  Many wheelchair users in CDCR's institutions *still* do not have safe,

14   clean or accessible housing.  Correctional officers *still* confiscate prisoners' canes, wheelchairs, and

15   hearing aids without any security justification.  Disability grievances all too often receive responses

16   so late as to render the system essentially useless.

17        Seven years of monitoring, hundreds of monitoring tour reports and meetings, and countless

18   letters, telephone calls, emails, and exit interviews have not achieved anything near substantial

19   compliance with applicable law and orders.  Now plaintiffs return to this Court, seeking further

20   remedial orders to ensure the safety and dignity of the *Armstrong* class.  As described below,

21   plaintiffs seek an order to force defendants to provide accessible housing and effective

22   communication to class members, allow class members to retain their assistive devices, and provide

23   an effective and timely disability grievance system.

24                        **PROCEDURAL BACKGROUND**

25        This case is a class action brought under the Americans with Disabilities  Act 42 U.S.C. §§

26   12101, *et seq.* ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

27   ("Rehab Act") by prisoners and parolees with hearing, vision, mobility, kidney, and learning

28   impairments against various state and prison officials.  *Armstrong v. Wilson*, 942 F. Supp. 1252,

1   1254 (N.D. Cal. 1996) ), *aff'd*, 124 F.3d 1019 (9th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998).

2   On the eve of trial, plaintiffs and state officials[3] reached agreement on a Stipulation and Order For

3   Procedures to Determine Liability and Remedy, filed July 9, 1996 (Stipulation and Order)  The

4   Stipulation and Order "require[d] defendants to operate programs, activities, services and facilities

5   of the California Department of Corrections in accordance with" the ADA and §504.  Stipulation

6   and Order at 5; *see also Armstrong v. Wilson*, 942 F. Supp. at 1258, 1262.

7        This Court subsequently found that defendants systemically violated class members' rights

8   under the ADA and §504, Findings of Fact and Conclusions of Law, Sept. 20, 1996, and issued a

9   Remedial Order requiring defendants to formulate a comprehensive remedy.  Remedial Order,

10  Injunction and Certification for Interlocutory Appeal, September 20, 1996 (Remedial Order).  The

11  Remedial Order required defendants to develop plans to ensure that their facilities were readily

12  accessible to and usable by prisoners with disabilities and policies establishing a prompt and

13  equitable disability grievance procedure, allowable assistive aids for prisoners with disabilities in

14  segregation units and reception centers, and accessibility features of new construction and

15  alterations.  Remedial Order at 2-3.  The Court retained jurisdiction to enforce its terms.  *Id.* at 5.

16       Defendants drafted the required plans, plaintiffs filed objections, and the parties met and

17  conferred and subsequently litigated several of the unresolved issues.  After the Court ruled on the

18  litigated matters,[4] defendants issued a Remedial Plan encompassing the Court-ordered changes on

19  January 8, 1999.  At the same time, the Court issued an order requiring defendants to comply with

20  the Remedial Plan.  Order Directing Defendants to Comply with Remedial Plan, January 8, 1999.

21  This Court also found that the portions of the Remedial Plan to which plaintiffs had never objected

22  _____

23  [3]  Defendants in this case are Arnold Schwarzenegger, Governor of the State of California; James
    E. Tilton, Secretary, CDCR; Kingston W. Prunty, Jr., Undersecretary, CDCR; Peter Farber-
    Szekrenyi, Director, Division of Correctional Health Care Services; George A. Sifuentes, Deputy

24  Director, Office of Facilities Management; John Dovey, Director of Adult Institutions; and Marisela
    Montes, Chief Deputy Secretary, Adult Programs.  Defendants are substituted for their

25  predecessors-in-interest pursuant to Federal Rule of Civil Procedure 25(d)(1).  *See also* Cal. Gov't
    Code §§ 12838.4, 12838.8 (CDCR reorganization statute).

26  [4]  Order Granting in Part and Denying in Part Plaintiffs' Motion to Require Defendants to Modify
    Their Remedial Plans (First Set of Contested Issues), October 8, 1997; Order Granting in Part and

27  Denying in Part Plaintiffs' Motions to Require Defendants to Modify Their Transition Plans

(continued on next page)

28

3

1  complied with the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1) (PLRA). *Id.* at p. 2.

2  Defendants appealed several aspects of the Remedial Plan. The Ninth Circuit, in an

3  unpublished opinion, vacated the Court's Order requiring implementation of the Remedial Plan as

4  to those portions of the plan negotiated between the parties because they lacked the requisite PLRA

5  findings, but not as to those portions of the plan never objected to by plaintiffs, nor as to those

6  portions resulting from Court Orders that were litigated by the parties. *Armstrong v. Davis*, No. 99-

7  15152, 2000 WL 36922 (9th Cir. Apr. 11, 2000).

8  On remand, this Court ordered defendants to comply with the ADA and §504 in eight

9  specific areas previously litigated. Permanent Injunction, March 21, 2001, Declaration of Sara

10  Norman ("Norman Decl."), Exhibit B. Defendants issued the Remedial Plan in its current form on

11  January 3, 2001.[5] Norman Decl., Exhibit A.

12  In 2002, six years after the case settled, defendants still had utterly failed to make prison

13  housing fully accessible to members of the plaintiff class, forcing plaintiffs to file their first

14  enforcement motion. This Court agreed with plaintiffs' February 2002 motion regarding the

15  removal of architectural barriers and issued an Order Requiring Defendants to Make Prison

16  Facilities Structurally Accessible, February 8, 2002, Norman Decl., Exhibit C. Now, more than

17  four years later, plaintiffs must once again seek the Court's intervention to stop defendants'

18  continued disregard for the rights of plaintiff class members.

19  **GENERAL FACTUAL BACKGROUND**

20  Since 1999, plaintiffs' counsel have conducted extensive monitoring of CDCR prisons for

21  compliance with the *Armstrong* Remedial Plan ("Remedial Plan"), this Court's Permanent

22  Injunction, the ADA, and §504. Norman Decl., ¶¶ 3-7. There are currently thirty-three state

23  prisons operated by CDCR. Plaintiffs' counsel have divided the monitoring responsibilities

24  between attorneys at the Prison Law Office and the law firm of Rosen, Bien and Galvan. *Id.*;

25  _____

26  (continued from previous page)
(Second and Third Sets of Contested Issues and Transition Plan), March 20, 1998, and Order

27  Resolving Outstanding Issues, September 16, 1998.

[5] Plaintiffs and defendants recently submitted a stipulation to the Court containing amendments to

28  the parole section of the *Armstrong* Remedial Plan, which are unrelated to this motion.

1  Declaration of Gay Grunfeld ("Grunfeld Decl."), ¶ 4.

2      Routine monitoring in this case consists of reviewing documents generated by a given

3  institution (including prisoners' disability grievance forms ("1824s")), touring the prison, sending

4  reports of the tours to CDCR and the prison wardens, advocating for individual prisoners, and

5  reviewing and responding to prisoner mail. *Id.*, ¶ 7. Tours are conducted one to four times a year,

6  depending on the institution's compliance level. A tour normally consists of a day of class member

7  interviews and file reviews and a day at the prison spent interviewing various staff and observing

8  the housing units and other facilities. *Id.*

9      Plaintiffs' counsel have conducted hundreds of tours since monitoring began and have

10  written hundreds of reports methodically informing defendants of Remedial Plan violations.

11  Norman Decl., ¶¶ 6-7; Grunfeld ¶ 16. While some individual prisons have improved their

12  compliance, it has become increasingly clear that defendants are unable to meet their obligations.

13  Norman Decl., ¶¶ 7-8. In the last year alone, monitors from the Prison Law Office and Rosen, Bien

14  & Galvan have documented countless violations of the Remedial Plan, the Injunction, the ADA,

15  and §504. This inability to comply with the Court's Orders and with federal law harms plaintiff

16  class members, as repeatedly demonstrated in the many declarations from monitors and prisoners

17  and accompanying documentary evidence filed with this Motion. Even when institutions have the

18  will to comply, they have neither the resources nor the expertise nor the support from defendant

19  Schwarzenegger's administration to do so – particularly in light of the overcrowding crisis. *Id.*

20      First, defendants have committed inadequate resources to the task: a small team of

21  headquarters staff cannot monitor compliance and provide remedial training and guidance at thirty-

22  three institutions. *Id.* No institution has staff dedicated to *Armstrong* compliance issues.

23  (Associate Wardens who are designated as ADA Coordinators at each institution must shoulder

24  those duties in addition to a full workload of other assignments.) *Id.*, ¶ 8. Second, the CDCR's

25  broken bureaucracy and the "entrenched paralysis and dysfunction" that Judge Henderson of this

26  Court identified and eloquently explained in the *Plata* case similarly operate to deprive *Armstrong*

27  class members of their rights. Findings of Fact and Conclusions of Law, October 3, 2005, *Plata v.*

28  *Schwarzenegger*, No. C01-1351 TEH (N. D. Cal.), Norman Decl., Exhibit D. Third, and perhaps

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
ENFORCE MENT & FURTHER REMEDIAL ORDERS,
Case No C-94-2307 CW

1   most importantly, the California prison system is so extraordinarily overcrowded that it is

2   impossible to provide reasonable accommodations to class members – just as it is impossible to

3   provide constitutionally adequate health care, leading to the extraordinary remedy of a federal

4   Receiver in the *Plata* lawsuit.  *Id.*

5        Defendant Schwarzenegger has recently issued a Proclamation describing in some detail the

6   harms caused by the extreme overcrowding at CDCR institutions.  Bien Decl., Exhibit B.  The

7   Governor's Proclamation states:

8       [D]ue to the record number of inmates currently housed in prison in California, all
        33 CDCR prisons are now at or above maximum operational capacity, and 29 of the
9       prisons are so overcrowded that the CDCR is required to house more than 15,000
        inmates in conditions that pose substantial safety risks, namely, prison areas never
10      designed or intended for inmate housing, including, but not limited to, common areas
        such as prison gymnasiums, dayrooms, and program rooms, with approximately
11      1,500 inmates sleeping in triple-bunks . . . .

12  *Id.*  The Governor also acknowledges the "substantial risk" overcrowding causes to the health and

13  safety of those who live in California's prisons, including increased violence and disease and loss of

14  academic, vocational, and rehabilitative programs.  *Id.*  Photographs from the CDCR's own website

15  graphically illustrate the overcrowded conditions, with prisoners crammed into triple bunks in

16  dayrooms throughout the system.  Bien Decl., Exhibit I.  Overcrowding has reached such crisis

17  proportions that defendant Schwarzenegger has already suggested that Judge Henderson's

18  intervention is necessary to alleviate this emergency.  Norman Decl., Exhibit E (Transcript, Oct. 5,

19  2006, Hearing, *Madrid v. Tilton*, C 90-3084 TEH, at 32:25-33:1).

20                                         **ARGUMENT**

21  **I.    DEFENDANTS HOUSE PRISONERS WITH DISABILITIES IN DANGEROUS AND
        UNSANITARY CONDITIONS THAT VIOLATE THEIR RIGHTS UNDER**
22  **    FEDERAL LAW AND ORDERS OF THIS COURT.**

23      **A.    Failure To Provide and Maintain Accessible Facilities Violates §504, the
             ADA, the Permanent Injunction, and Defendants' Own Remedial Plan.**

24

25      The ADA and §504 apply to defendants.  *Pennsylvania Dept. of Corr. v. Yeskey*, 524 U.S.

26  206, 118 S. Ct. 1952 (1998); *see also United States v. Georgia*, 546 U.S. 151, 126 S. Ct. 877, 881

27  (2006) (overturning dismissal of ADA claim by paraplegic prisoner who had been denied an

28  accessible cell, shower, and toilet).  Defendants are legally obligated to "maintain in operable

1  working condition those features of facilities and equipment that are required to be readily

2  accessible to and usable by persons with disabilities[,]" 28 C.F.R. § 35.133, and to "operate each

3  service, program, or activity so that the service, program, or activity, when viewed in its entirety, is

4  readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).[6]

5      The Permanent Injunction issued in this case imposes on defendants "a duty to maintain in

6  operable working condition structural features and equipment necessary to make the prison

7  system's services, programs, and activities accessible to disabled inmates." Norman Decl., Exhibit

8  B (Permanent Injunction, ¶ 4); *see also id.*, Exhibit C (Order Requiring Defendants to Make Prison

9  Facilities Structurally Accessible). To attain that end, defendants chose to cluster prisoners with the

10  most severe disabilities at certain institutions:

11      Inmates with permanent mobility, hearing, vision, and speech impairments, or other
        disability or compound conditions severe enough to require special housing and
12      programming, will be assigned to special placement in a designated DPP [Disability
        Placement Program] facility. Inmates with a permanent impairment of lesser
13      severity, learning disability, or a kidney disability, may be assigned to any of the
        Department's institutions/facilities . . . .

14

15  Norman Decl., Exhibit A (Remedial Plan at 1). Designated institutions are required to provide

16  wheelchair accessible cells, grab bars for toilets and showers, raised toilet seats, and accessible

17  paths of travel. *Id.* at 2-3. The designated institutions that defendants claim provide accessible

18  housing to prisoners with mobility impairments are Avenal, Pleasant Valley, California Institution

19  for Men, Salinas Valley, High Desert, Kern Valley, Central California Women's Facility, Valley

20  State Prison for Women, the Substance Abuse Treatment Facility and State Prison at Corcoran

21  (SATF), and California Medical Facility. Norman Decl., ¶ 4.

22      **B.    Defendants Harm Plaintiff Class Members By Their Failure To Provide
               Accessible Housing To Prisoners With Disabilities.**

23

24      Notwithstanding these clear-cut strictures, defendants operate their prisons in utter disregard

    of the needs of wheelchair users and others with serious mobility impairments.

25

26

27

───────────────────────

28  [6]  The ADA "is to be judicially interpreted in the same manner as the Rehabilitation Act."
    *Armstrong*, 942 F. Supp. at 1256 (quotations omitted).

1        **1.**    **Defendants Do Not Provide Accessible Housing to Wheelchair**

2            **Users**.

3        Defendants *still* do not have enough wheelchair-accessible housing. Over the past year,

4    plaintiffs' counsel have identified multiple examples of prisoners who are full-time wheelchair

5    users housed inaccessibly, including at Pleasant Valley, High Desert, Salinas Valley, and CIM, and

6    have repeatedly informed defendants of this problem. Declaration of Megan Hagler ("Hagler

7    Decl."), ¶¶ 6-29. This failure causes serious harm to *Armstrong* class members. For example,

8    wheelchair users at CIM have had to be lifted on and off the toilet because there was no functioning

9    accessible toilet. Declaration of Paul Bonaiuto, ¶ 6.

10       The shortage of wheelchair-accessible beds is particularly acute in specialized placements.

11   Prisoners must be separated based on factors such as security levels, mental health status, and the

12   need for protection from other prisoners, often because of the nature of their commitment offense or

13   their gang status. Hagler Decl., ¶ 8. Protective custody prisoners and some mentally ill prisoners

14   are not housed on general population yards. *Id.* Administrative segregation is yet another category

15   of specialized housing. Prisoners are usually placed in administrative segregation for disciplinary

16   reasons, and are allowed far fewer privileges than in general population housing. *Id.* CDCR houses

17   these separate classifications of prisoners separately, yet defendants have not provided adequate

18   wheelchair accessible placements in these classifications. *Id.*, ¶¶ 7-21.

19       On recent monitoring tours, plaintiffs' counsel have discovered a severe shortage of high

20   security protective housing placements available for wheelchair users. Norman Decl., ¶ 11; Hagler

21   Decl., ¶¶ 7-21. Because of the inadequate quantity of accessible placements, class members who

22   need protective housing have been placed into punitive segregation units, essentially forced to

23   choose between receiving needed and legally required accommodations and putting themselves at

24   risk of harm. Hagler Decl., ¶¶ 17-18; Mania Decl., ¶ 15; Nolan Decl., ¶ 10. CDCR also lacks

25   accessible beds in protective housing units in reception centers. There are no wheelchair-accessible

26   cells in the protective housing units in the reception centers at Deuel Vocational Institution or R.J.

27   Donovan. Nolan Decl., ¶¶ 6-9; Mania Decl., ¶ 12.

28       Wheelchair users in the general population are housed or offered housing at more restrictive

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
ENFORCE MENT & FURTHER REMEDIAL ORDERS,
Case No. C-94-2307 CW

security levels because there are no wheelchair-accessible cells available at the appropriate security level. Hagler Decl., ¶ 13; Nolan Decl., ¶ 10. Wheelchair users housed in administrative segregation who require mental health treatment are also denied needed accommodations. For example, in February 2006, a mentally ill prisoner was housed inaccessibly in administrative segregation at Pleasant Valley. Hagler Decl., ¶ 20.

One reason defendants are unable to properly house wheelchair users is that they have no accurate method for tracking them.[7] In 2006, defendants still run a paper-based system, hand-writing information on various forms and placing them in large paper files. Grunfeld Decl., ¶ 10. Paper files can easily be misplaced or lost. *See, e.g.*, Nolan Decl., ¶ 29. And while most prisons have computers, their computer systems are generally incompatible with each other. Grunfeld Decl., ¶ 11; Mania Decl., ¶ 44, 46.

As a result, prisoners who need wheelchair-accessible cells are not tracked by a state-wide database readily accessible to prison staff. Instead, each prison is supposed to identify prisoners with disabilities and put that information into an internal database (and their paper files) every time a prisoner is transferred between prisons or returned to the CDCR from parole. *Id.*, ¶ 46.

Forcing defendants to institute a tracking mechanism, while necessary, is not sufficient to remedy this chronic problem. Plaintiffs' counsel have repeatedly informed defendants of this problem for several years and it has not been solved. Unless defendants are forced to make additional accessible placements, and unless they are forced to adopt measures to strengthen their own ability to monitor and correct such problems, they will never come into compliance with this Court's prior Orders, the ADA, and § 504.

## 2. Other Class Members Are Also Denied Needed Accommodations.

Defendants also fail to provide needed accommodations such as grab bars, shower benches, and safe housing to prisoners with serious mobility impairments. The most disturbing example of this violation is defendants' practice of forcing prisoners who cannot climb stairs or lift themselves

---

[7] At one point, CDCR headquarters staff maintained a census of how many wheelchair users were at each prison compared to the number to the number of wheelchair-accessible beds available. Headquarters staff recently reported to plaintiffs' counsel that they have not conducted a wheelchair census in the past year. Hagler Decl., ¶ 10.

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
ENFORCEMENT & FURTHER REMEDIAL ORDERS,
Case No. C-94-2307 CW

1    onto an upper bunk into upper tier and upper bunk housing.

2          Prisoners with serious mobility or vision impairments who are unable to climb stairs and/or

3    into an upper bunk are supposed to receive written instructions ("chronos") from medical staff,

4    requiring appropriate housing.  Over the past year alone, however, plaintiffs' counsel have

5    documented scores of examples of prisoners denied safe housing.  Whelan Decl., ¶¶ 12-20; Norman

6    Decl., ¶¶ 12-17 & Exhibits F-U.  The situation is exacerbated by CDCR's extreme overcrowding,

7    which has forced at least 1,500 prisoners into triple bunks, which are impossible for many class

8    members to use.  Exhibits B & I to Bien Decl.

9          San Quentin has a particularly bad record of mis-housing class members on upper bunks and

10   tiers when they are physically unable to climb stairs or onto an upper bunk without placing

11   themselves at risk of injury or severe pain, even after report after report from plaintiffs' counsel has

12   documented these violations and demanded remedial action.  Norman Decl., ¶¶ 13-17.  In an

13   especially egregious example, Mr. Cole, whose knees buckle frequently and whose feet are often

14   swollen and numb or painful, was forced to spend months on an upper bunk in violation of medical

15   staff's order that he be housed in a lower bunk, even after repeatedly bringing the violation to the

16   attention of building staff.  Declaration of Peter Cole ("Cole Decl."), ¶¶ 2-8.  Several months ago,

17   Mr. Cole fell from his upper bunk while trying to climb down using his cane, and crashed into the

18   lockers below and punctured and broke his jaw and tore his left rotator cuff.  He needed ten stitches

19   in his cheek and had his jaw wired shut.  Id., ¶¶ 9-10.  Mr. Cole remained in the Correctional

20   Treatment Center for two months, where his jaw had to be rewired after he vomited his liquid diet

21   and tore the wire in his jaw.  Id., ¶¶ 11-13.

22         Other CDCR prisons also ignore housing restrictions.  Hagler Decl., ¶¶ 39-40 (CIM houses

23   prisoners who cannot climb stairs on upper bunks and/or second tier housing) and ¶ 41 (Pleasant

24   Valley lacks adequate lower bunk/lower tier placements to accommodate prisoners with orders for

25   such housing).  The Correctional Training Facility (CTF) has made a conscious decision to violate

26   class members' rights by ignoring housing restrictions: prison administrators issued a memorandum

27   that describes severe shortages of lower bunks and admits that "[d]uring this temporary housing

28   crunch, inmates with Lower Bunk Chronos will be housed in race-appropriate upper bunks, except

10    PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
      ENFORCEMENT & FURTHER REMEDIAL ORDERS,
      Case No. C-94-2307 CW

1   for those inmates with <u>documented</u> Seizure disorders . . . Inmates with Lower Bunk Chronos who

2   are temporarily housed in upper bunks during this time will have <u>priority placement</u> into any lower

3   bunks that become available in the wings." Whelan Decl., ¶ 12 & Exhibit C. Such "priority

4   placement" will offer little solace to a prisoner, like Mr. Cole, who broke his jaw through

5   defendants' failure to comply with their own rules and Orders of this Court.[8]

6   **3.    Defendants Fail to Promptly Transfer Prisoners With Serious
        Disabilities to Prisons Designed to House Them**.

7   CDCR's decision to "cluster" class members with serious disabilities at designated

8   institutions means that these prisoners must be promptly transferred out of reception centers and

9   non-designated prisons that cannot properly house them. Norman Decl., Exhibit A (Remedial Plan

10  at 2, 9, 16-17). Reception Center prisoners arriving at San Quentin, California Correctional

11  Institution, and Wasco State Prison must be transferred to a designated reception center within

12  seven days. *Id.* at 9. Prisoners with serious disabilities who are at non-designated main line

13  housing units must be "endorsed" for a transfer within 14 days of being identified and then

14  transferred expeditiously. *Id.* at 17.

15  Defendants violate these requirements routinely. San Quentin has one of the worst records.

16  Instead of the required seven days, prisoners at San Quentin with serious disabilities frequently wait

17  months to be transferred to a prison designed to provide them with the accommodations they

18  require. Norman Decl., ¶¶ 18-26. Years of reports from plaintiffs' counsel describing this situation

19  and demanding remediation have done nothing to solve or improve the problem.

20  North Kern and CTF also routinely delay prisoners' transfers, which typically results in

21  inferior housing with few or no privileges. Grunfeld Decl., ¶ 21; Whelan Decl., ¶¶ 6-11; *see also*,

22  Declaration of Carlos Marsh, ¶¶ 2-6. This is also true at Sierra Conservation Center, where the

23  library and educational facilities on the medium security yard are not accessible to prisoners with

24

25  [8]  Prisoners with serious vision impairments have also been improperly housed. One legally blind
    prisoner was dangerously housed at CTF with no eye glasses, vest, or other accommodation for six

26  months, despite his inability to see "towers, officers station [sic], hand signs, clocks, T.V." or to
    distinguish between staff and other inmates. Whelan Decl., ¶¶ 17-20 & Exhibits G-I. A prisoner

27  with a serious vision impairment at R.J. Donovan was placed in administrative segregation three
    times because he refused to be housed on an upper bunk on an upper tier in violation of his

28  documented need for lower bunk/lower tier housing. Mania Decl., ¶ 17.

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
                        ENFORCEMENT & FURTHER REMEDIAL ORDERS,
                        Case No. C-94-2307 CW

1    serious mobility impairments because they are located at the top of two flights of stairs.  Mania

2    Decl., ¶ 22.

3              **4.    Defendants Fail to Provide Working Toilets, Shower Chairs, and
                       Other Accommodations to Prisoners Who Need Them.**

4

5         The Court ordered defendants to maintain structural features and equipment necessary to

6    make programs, services, and activities accessible to disabled prisoners.  Norman Decl., Exhibit B

7    (Permanent Injunction, ¶ 4).  Defendants have violated this order on numerous occasions,

8    particularly at the California Institution for Men (CIM), San Quentin, and the newly constructed

9    Kern Valley State Prison.

10        Plaintiffs' counsel have repeatedly objected to the conditions in CIM's dayrooms, which

11   have been converted into extremely overcrowded dormitories housing a large number of wheelchair

12   users in filthy, cockroach-infested conditions.  Hagler Decl., ¶¶ 30-31; *see also* Bien Decl., Exhibit

13   I (CDCR photos).  In November 2005, the only wheelchair-accessible toilet in one CIM dayroom

14   had been broken for at least four months, despite the repeated written and verbal complaints of

15   prisoners with disabilities.  Hagler Decl., ¶ 31.  At the same time, the only accessible toilet in

16   another day room had been broken for an unknown length of time.  *Id.*  The accessible toilets have

17   been broken and unusable for periods of two weeks to two months during the year 2006.

18   Declaration of Elsie Barnes ("Barnes Decl."), ¶¶ 1, 3; Declaration of Darryl Slack ("Slack Decl."), ¶

19   3.  As a result, paralyzed prisoners have been forced to rely on other prisoners to lift them on and

20   off the toilets and in and out of the shower.  Barnes Decl., ¶5; *see also* Slack Decl., ¶¶ 4, 7

21   (describing how he must "hop" to use the toilet with no grab bars).  Being forced to rely on fellow,

22   untrained prisoners makes those with disabilities vulnerable to exploitation and injury.

23        The showers in these units are also inaccessible to wheelchair users and prisoners with

24   severe mobility impairments.  Slack Decl., ¶ 5; *see also* Declaration of Paul Bonaiuto, ¶¶ 4, 7-9.

25   Almost ten years after plaintiffs first brought the issue to the attention of defendants, the yard toilets

26   in CIM's administrative segregation unit also remain inaccessible to wheelchair users.  Hagler

27   Decl., ¶ 37; Plaintiffs' Objections to Defendants' Plans to Comply with the ADA and §504, April 8,

28   1997.  Despite repeated complaints from plaintiffs' counsel and individual class members, CIM

1   administrators have demonstrated an inability to identify and correct these violations in a timely

2   manner. Hagler Decl., ¶¶ 30-35, 37.

3          San Quentin also fails to provide and maintain an adequate supply of wheelchairs or

4   accessible showers. In October 2005, plaintiffs' counsel discovered that the eight wheelchair users

5   housed in San Quentin's East Block (for condemned prisoners) were forced to share one or two

6   wheelchairs between them. Norman Decl., ¶¶ 35-36. Several prisoners missed medical

7   appointments, showers, law library, and yard because there were no wheelchairs available to

8   transport them. *Id.*; Declaration of Gary Hines ("Hines Decl."), ¶ 3.

9          Wheelchair users in East Block did not have access to a wheelchair-accessible shower until

10  June 2006 – after years of objections by plaintiffs' counsel. Norman Decl., ¶¶ 28-34. A year

11  earlier, in mid-2005, staff reported that prisoners requiring an accessible shower were taken to the

12  hospital for showers, since the East Block shower had numerous uncorrectable architectural

13  barriers. *Id.*, ¶ 29. However, the hospital shower was not accessible either: there were no grab bars,

14  the shower head was very high, and there was no hand-held hose. *Id.*, ¶ 30; Hines Decl., ¶ 6.

15  Moreover, prisoners were not provided the required three showers a week in the hospital. *Id.*,

16  ¶¶ 29-33. For example, since January 2006, Mr. Hines was only sporadically allowed to use the

17  inaccessible showers in the hospital. Hines Decl., ¶¶ 4-7.

18         Despite being opened in 2005 – almost a decade after settlement of this lawsuit and issuance

19  of the Remedial Plan – Kern Valley State Prison has consistently failed to provide safe and legally

20  required shower accommodations to prisoners who need them. Norman Decl., ¶¶ 37-40. On a

21  recent tour of Kern Valley, plaintiffs' counsel discovered that the legally required fold-down

22  benches, installed pursuant to agreement with CDCR administrators to provide benches in all

23  housing units designated for prisoners with serious mobility impairments, were locked into an

24  upright, unusable position. Staff explained that they were worried the benches would fall and hurt

25  someone, so they locked them out of the way, in complete disregard of the needs of *Armstrong* class

26  members. *Id.*, ¶¶ 37, 39.

27         Other CDCR institutions also deny safe showers and toilets to prisoners who need them.

28  *See* Mania Decl., ¶¶ 18-21; Grunfeld Decl., ¶ 20; Nolan Decl., ¶¶ 13-14.

## C. Defendants Must Systematically Track Prisoners' Housing Needs And Provide Accessible, Safe Housing.

Several remedies are necessary to end once and for all defendants' illegal and unacceptable housing practices. First, defendants must adopt a state-wide, computerized, networked, real-time tracking system to track prisoners with disabilities.

Second, defendants must conduct and maintain a census of full-time wheelchair users (those designated DPW), prisoners whose mobility impairments impact their placement but do not require wheelchair accessible housing (those designated DPM, DPO and DNM with housing restrictions), and prisoners whose vision impairments impact their placement (those designated DPV), and the beds that are accessible to each of these groups. The census must also include information about prisoners' security levels, mental health status, developmental disability status, and need for protective custody, administrative segregation, Security Housing Unit, and other placement factors, and the specific accommodations available for each. Defendants must conduct and maintain an inventory of the wheelchair accessible placements and those placements appropriate for DPO, DPM, and DNM (with housing restrictions) prisoners, including numbers of such beds available in the different types of specialized housing the CDCR maintains (for example, for protective custody, mental health needs, developmentally disabled prisoners, SHU placement, etc.), and the current state of repair of accessible showers, toilets, and sinks.

Third, defendants must immediately begin constructing accessible cells, toilets, and showers in all prisons identified as lacking these by plaintiffs' counsel, including but not limited to San Quentin and CIM.

Fourth, in order to ensure that officers in each housing unit honor prisoners' housing restrictions, the post orders (duty statements) for these positions must be revised to allow any failure to honor housing restrictions to be a basis for discipline.

Fifth, defendants must have sufficient capacity to identify such violations and to correct them. To that end, defendants need more headquarters staff reporting to a higher level of authority within CDCR headquarters, as well as trained, dedicated ADA coordinators in the institutions assigned to oversee *Armstrong* compliance.

None of these remedies will work, however, unless the overcrowding crisis is also resolved,

14

1   as discussed in Plaintiffs' Motion to Convene a Three Judge Panel, filed herewith.

2   **II.    DEFENDANTS' FAILURE TO PROVIDE SIGN-LANGUAGE INTERPRETERS TO PRISONERS WHO SIGN VIOLATES THEIR FEDERAL RIGHTS AND THE ORDERS OF THIS COURT**

3

4   **A.    Defendants Are Legally Obligated To Provide Sign Language Interpreters To Ensure Effective Communication.**

5

6        The ADA requires defendants to ensure that communications with disabled prisoners are "as

7   effective as communication with others." 28 C.F.R. § 35.160(a). Defendants must furnish

8   appropriate auxiliary aids and services in order to provide prisoners with disabilities equally

9   effective communication. 28 C.F.R. § 35.160(b)(1). "Auxiliary aids and services" include

10  qualified sign language interpreters. 28 C.F.R. § 35.104(1). Primary consideration must be given

11  to the requests of the person with a disability when determining what auxiliary aid or service is

12  necessary. 28 C.F.R. § 35.160(b)(2).

13       The Ninth Circuit has applied these regulations to correctional institutions. In *Duffy v.*

14  *Riveland*, 98 F.3d 447 (9th Cir. 1996), the court found potential ADA and Rehabilitation Act

15  violations in the failure to provide a prisoner with a qualified sign language interpreter for

16  disciplinary and classification hearings. *See id.* at 459; *see also Bonner v. Lewis*, 857 F.2d 559 (9th

17  Cir. 1988) (reversing a grant of summary judgment to the state, and remanding for consideration of

18  a prisoner's claim that §504 required the provision of a qualified (non-prisoner) interpreter for

19  disciplinary and medical proceedings).

20       Under the *Armstrong* Remedial Plan, all CDCR prisons are required to maintain contracts

21  with sign language interpreters to allow effective communication with prisoners whose primary

22  form of communication is sign language.[2] In addition, prisoners with hearing impairments who

23  require sign language interpreters to communicate effectively must be housed in only certain

24  designated institutions: CIM, California Medical Facility, High Desert State Prison, SATF, and

25  Central California Women's Facility. Hagler Decl., ¶ 43.

26

27  _____
    [2] Correctional Training Facility recently allowed its sign language interpretation contract to lapse for at least six months, however. Whelan Decl., ¶ 37. And SCC's contract is out of date. Mania
28  Decl., ¶ 40.

1    **B.    CDCR Repeatedly Denies Sign Language Interpreters To Deaf And Hard
          Of Hearing Prisoners**.

2

3          Contrary to these cases, regulations, and the CDCR's own Remedial Plan, sign language

4    interpreters are consistently denied to deaf prisoners.  Within designated prisons, the violations

5    occur most frequently at deaf prisoner's medical and mental health appointments.  Hagler Decl.,

6    ¶ 43.  Most shockingly, suicidal prisoners at Salinas Valley and R.J. Donovan have been denied

7    interpreters for their meetings with mental health clinicians.  *Id.*, ¶¶ 82-83; Nolan Decl., ¶¶ 37-39.

8    Signers must not be forced to rely on ineffective and inadequate forms of communication such as

9    lip reading and written notes.  Norman Decl., ¶ 49.

10         Defendants' failure to provide interpreters for prisoners whose primary or preferred mode of

11   communication is sign language is all the more unacceptable because there are only approximately

12   80-100 such prisoners in the CDCR, and because they are all "clustered" at the six prisons noted

13   above.  Norman Decl., ¶ 48.  Defendants should be able to provide a limited population, housed at

14   only a few locations, with a well-defined service.  But they do not.  In reviewing numerous medical

15   and central files of prisoners at the Substance Abuse Treatment Facility and State Prison at

16   Corcoran (SATF), CIM, CMF, CCWF, and High Desert, plaintiffs' counsel observed that prisoners

17   at these institutions are not provided sign language interpretation at many medical, dental, and

18   mental health encounters with staff.  Hagler Decl., ¶¶ 43-80.  Furthermore, some deaf prisoners

19   were not provided sign language interpretation when required at Salinas Valley and at reception

20   centers at North Kern State Prison, Deuel Vocational Institution, R.J. Donovan, and California

21   Correctional Institution.  *Id.*, ¶¶ 81-100.

22         Salinas Valley, for example, rarely if ever provided interpreters during psychology and

23   psychiatry visits for two sign language users who were placed there in order to receive the highest

24   level of mental health treatment.  The medical record of a deaf class member with paranoid

25   schizophrenia who, according to CDCR mental health staff, "decompensated to a point of grave

26   disability as the result of an acute exacerbation of psychosis," indicates that no sign language

27   interpreter was present for any of the five mental health evaluations following his release from

28   suicide watch.  Hagler Decl., ¶¶ 81-90.  Interpreters were present during only approximately 20% of

16    PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
      ENFORCE MENT & FURTHER REMEDIAL ORDERS,
      Case No. C-94-2307 CW

1    his mental health visits. *Id.* Salinas Valley also failed to provide sign language interpretation

2    during another deaf signer's mental health appointments. Declaration of Anthony Craig, ¶ 5.

3    Without an interpreter, this prisoner could not communicate his suicidal feelings to Salinas Valley

4    mental health staff, and could not understand the treatment plan for his depression. *Id.*, ¶¶5- 6.

5         High Desert and CIM have also repeatedly failed to provide interpreters at medical

6    appointments, including psychiatric contacts involving suicidality. Interpreters are not provided in

7    the majority of appointments with medical doctors, psychologists, and psychiatrists. Interpreters

8    are not provided for most nursing appointments, because both institutions claim they need at least a

9    week to schedule an interpreter for an appointment due to their remote locations. Hagler Decl.,

10   ¶ 45, 52. The tracking system at CIM is unreliable; at least one deaf signer has not appeared on the

11   tracking list and this class member was not provided interpretation when required. *Id.*, ¶ 52; *see*

12   *also* Norman Decl., ¶ 50 (describing Corcoran's denial of sign language interpretation.)

13        At R.J. Donovan, a reception center that houses deaf prisoners awaiting transfer, no sign

14   language interpreter was recorded for any medical or psychiatric appointment from at least October

15   2003 to October 2005. Mania Decl., ¶ 29 & Exhibit N. As a result of R.J. Donovan's indifference,

16   deaf signers are denied fundamental due process. For example, one deaf signer was denied sign

17   language interpretation during a hearing to determine his placement in administrative segregation,

18   an interview with a mental health clinician where he expressed suicidal ideation, and an interview

19   with a counselor regarding his safety concerns and his obligation to register as a sex offender. *Id.*,

20   ¶¶ 32-36 & Exhibit P. R.J. Donovan also denied sign language interpretation to a deaf signer

21   during his entire stay in a Mental Health Crisis Bed on suicide watch. Nolan Decl., ¶ 39. Similar

22   problems persist at the reception centers at North Kern and Deuel Vocational Institution. *Id.*,

23   ¶¶ 26-34; Hagler Decl., ¶¶ 92-99.

24        These violations occur even at SATF, which has a population of approximately thirty

25   prisoners who sign, where a review of medical records uncovered numerous occasions in the past

26   year during which no sign language interpreters were present. *Id.*, ¶¶ 59-77. Most of these

27   appointments were for dental and nursing appointments. For example, Mr. Roby, a profoundly deaf

28   class member, several months ago saw a dentist for tooth pain but was not provided with a sign

1  language interpreter. Declaration of Kory Roby, ¶¶ 2, 5. A month later, Mr. Roby returned to

2  SATF's dentist, again without the assistance of a certified sign language interpreter. He was unable

3  to effectively communicate with the dentist during the removal of all of his teeth. Two months after

4  the surgery, Mr. Roby still does not know when or if he will receive false teeth. *Id.*, ¶¶ 5-6.

5      Class members are also harmed when sign language interpretation is denied during

6  educational and rehabilitative programs. Signers at SATF complain that the prisoner "interpreters"

7  are not skilled enough to follow the teachers or that there are no interpreters at all. Mr. Cerna, for

8  example, cannot understand his education class (and has consequently failed the pre-GED three

9  times) or his Narcotics Anonymous meetings. Declaration of Jamie Cerna, ¶¶ 3-4. Similarly, High

10 Desert refuses to provide sign language interpretation during adult basic education courses. As a

11 result, prisoners are bored and frustrated, and denied the benefit of the educational program being

12 provided to nondisabled prisoners. Declaration of Mark Arrington, ¶¶ 3-5.

13      **C.   CDCR Houses Signers In The Wrong Prisons, Denying Them Effective
              Communication**.

14

15      Defendants also fail to properly identify prisoners who require a sign language interpreter

16 and placement in a designated prison. Proper placement is essential for these prisoners since

17 defendants established the clustering program in order to ensure signers access to auxiliary aids and

18 services such as certified interpreters. Nondesignated institutions have far less familiarity with the

19 use of interpreters and effective communication needs of deaf prisoners.

20      In an egregious example of this problem, one deaf signer, improperly housed at Los Angeles

21 County State Prison ("Lancaster"), filed a disability grievance in March 2005, requesting that a sign

22 language interpreter be provided for him to discuss his safety concerns with Lancaster staff. The

23 prison denied his request for an interpreter, stating "A sign language interpreter is not available and

24 not necessary in your case since you are able to hear with your hearing aide [sic] and are able to

25 speak and communicate." Grunfeld Decl., ¶ 31. It took sixteen months before Lancaster staff

26 finally had him evaluated, correctly found that he had a severe hearing loss, and arranged for his

27 transfer to a designated prison. *Id.*, ¶ 30-36.

28      Other examples of CDCR's failure to properly identify, accommodate, and transfer

prisoners who need sign language interpreters are all too prevalent. Chuckawalla Valley did not even include a deaf signer on its disability tracking log. *Id.*, ¶ 38-41. Similarly, Deuel Vocational Institution denied interpretative services to a deaf signer who barely understands written English. Nolan Decl., ¶¶ 27-28. Sierra Conservation Center denied an interpreter for a disciplinary hearing to yet another deaf prisoner who uses sign language as his primary means of communication. Mania Decl., ¶ 39.

### D.    CDCR Must Comprehensively Track Deaf Signers and Provide Them With Sign Language Interpreters.

To rectify this ongoing discrimination against *Armstrong* class members, signers must be tracked on a system-wide, networked computer system, so that defendants are aware of their needs and locations at all times. As new prisoners are identified as needing sign language interpretation, they must be added to this database. Identification of signers must be made by interviewing the prisoner with a sign language interpreter.

Interpreters must be provided for all medical appointments (including nursing, psychiatric, and dental appointments), all classification hearings, and all disciplinary hearings, as well as other communications that are too complex or important to leave to mimicry and the extremely imperfect technique of lip reading. Norman Decl., ¶ 49 & Exhibit FF. To achieve this, defendants will need to hire certified sign language interpreters as prison staff to perform only interpreting functions at the designated prisons. Further, all correctional counselors and medical staff must receive thorough training by independent experts so that they understand their obligations under the ADA and the *Armstrong* Remedial Plan to provide equally effective communication to deaf prisoners, especially those who need sign language interpretation. Headquarters staff must have the capacity to self-monitor and self-correct violations such as those described above.

### III.    DEFENDANTS DEPRIVE CLASS MEMBERS OF THEIR CANES, WHEELCHAIRS, HEARING AIDS, AND OTHER ASSISTIVE DEVICES WITHOUT JUSTIFICATION AND IN VIOLATION OF FEDERAL LAW, THIS COURT'S ORDERS, AND THEIR OWN REMEDIAL PLAN

### A.    The ADA, §504, and Defendants' Own Remedial Plan Prohibit Removal of Assistive Devices Without Justification.

Confiscation of prisoners' assistive devices such as wheelchairs, canes, and hearing aids,

1    without justification, violates prisoners' rights under the ADA and §504. In *Degrafinreid v. Ricks*,

2    417 F. Supp. 2d 403 (S.D.N.Y. 2006), for example, the court held that plaintiff's allegations that

3    prison officials' unreasonable confiscation and destruction of his hearing aid, and the fourteen-

4    month delay in replacing it, "set forth conduct that violates [both] Title II of the ADA and the

5    Eighth Amendment as it is incorporated against the states through the Fourteenth Amendment." *Id,*

6    at 413; *see also Smith v. Masterson*, 2006 WL 2883009 (S.D.N.Y. Sept. 29, 2006) (denying motion

7    to dismiss plaintiff's claim that a prison's confiscation of his hearing aid and refusal to replace it

8    violated the ADA).

9         The *Armstrong* Remedial Plan states that "No inmate shall be deprived of a health care

10   appliance that was in the inmate's possession upon entry into the CDC system or was properly

11   obtained while in CDC custody, unless for documented safety or security reasons or a Department

12   physician or dentist determines that the appliance is no longer medically necessary or appropriate."

13   Norman Decl., Exhibit A (Remedial Plan at 19). This prohibition also applies in disciplinary

14   housing such as administrative segregation (ASU) or the Security Housing Unit (SHU). *Id.* at 34-

15   35. Under the Remedial Plan, health care appliances "shall be taken away from an inmate in ASU,

16   SHU or other disciplinary detention units *only* to ensure the safety of persons, the security of the

17   institution, or to assist in an investigation (which may include collecting the appliance as evidence

18   of a crime) and only when supported by documented evidence." *Id.* at 34 (emphasis added). When

19   such appliances are removed "for reasons of safety and security, the senior custody officer in charge

20   shall consult the Health Care Manager, Chief Medical Officer or designee, regarding the inmate's

21   need for the appliance and reasonable alternative in-cell accommodations." *Id.*

22        **B.    CDCR Staff Regularly Confiscate Assistive Devices Without Justification**.

23        Despite clear written and posted polices describing defendants' prohibition on staff removal

24   of assistive devices, the problem is pervasive and long-standing, as documented in scores of

25   monitoring reports issued since 1999. Over the past year, the most serious problems have occurred

26   at San Quentin, Avenal, Salinas Valley, Kern Valley, CIM, Pleasant Valley, Lancaster, Deuel

27   Vocational Institution, Solano, Mule Creek, and R.J. Donovan. Since August 2005, monitors at

28   these institutions have discovered multiple confiscations of wheelchairs, canes, hearing aids, and

1    tapping canes from prisoners in Receiving and Release (also known as "R&R," where prisoners

2    arriving at an institution are processed, evaluated, and sent to their housing units), general

3    population, and administrative segregation housing. Norman Decl., ¶¶ 41-47; Hagler Decl., ¶¶ 102-

4    108; Nolan Decl., ¶¶ 16-25; Grunfeld Decl., ¶¶ 25-28; Whelan Decl., ¶¶ 21-28; Mania Decl., ¶¶ 26-

5    28. Such confiscations make it difficult or impossible for prisoners to ambulate or hear in prison,

6    putting them at significant risk of injury.

7         Mr. Hines of San Quentin illustrates these difficulties. He is a permanent wheelchair user

8    due to paralysis on his right side. Hines Decl., ¶ 2. When Mr. Hines was placed in administrative

9    segregation in October 2005, his wheelchair, walker, wrist braces, and bucket (used to maneuver in

10   his cell and wash his clothes) were taken from him. *Id.*, ¶¶ 8-9. As a result, Mr. Hines fell down in

11   his cell several times. *Id.*, ¶ 9. In August 2006, staff again removed his walker, pressure mattress,

12   wedge pillow, thermal long underwear, extra sheets, and bucket without justification. Hines Decl.,

13   ¶ 12.

14        Mr. Ewing, who also has a mobility impairment, had his cane confiscated on arrival at San

15   Quentin in July 2006. Declaration of William Ewing, ¶ 3. It was taken away because it was metal,

16   although some San Quentin staff agree that metal canes are allowable. Norman Decl., ¶ 44. He

17   was not given a replacement for a full week, forcing him to walk slowly, painfully, and with

18   difficulty around the prison. Ewing Decl., ¶¶ 3-4; *see also* Declaration of Javier Balbuena, ¶ ¶ 2-8

19   (describing confiscation of his glasses and denial of other assistive devices).

20        Some institutions follow a *policy* of routine confiscation. In October and November 2005,

21   for example, staff at Lancaster, R.J. Donovan, and Sierra Conservation Center all admitted that they

22   routinely remove assistive devices from prisoners in administrative segregation housing units.

23   Grunfeld Decl., ¶ 25; Mania Decl., ¶¶ 26, 28. Consistent with this ultra vires approach, Lancaster

24   staff tried to force one wheelchair user to kneel or sit on a blanket on the floor during an attorney

25   interview rather than allow him his wheelchair. Grunfeld Dec., ¶ 25.

26        Directly after fixing the problem, at least temporarily, at Lancaster, it recurred at Mule

27   Creek State Prison. During the May 2006 tour there, both the line officer and the supervising

28   Sergeant in the overflow administrative segregation unit reported that they routinely remove canes

1   from prisoners.  Nolan Decl., ¶ 25.

2       Solano follows an institutional policy of denying group yard time to prisoners in

3   administrative segregation with assistive devices.  Whelan Decl., ¶ 29.  This policy effectively

4   deprives these prisoners of six additional yard slots each week.  *Id.*, ¶ 30.

5       Institutional confiscation policies have also been uncovered at Deuel Vocational Institution

6   and R.J. Donovan, where staff remove expandable tapping canes used by prisoners with vision

7   impairments upon their arrival.  Nolan Decl., ¶¶ 19, 23-24.  Expandable tapping canes make it

8   possible for those with severe vision impairments to navigate through prisons independently with

9   less chance of injury.  *Id.*, ¶ 19.  Their removal should occur only if the prisoner misuses the device

10  or otherwise triggers a bona fide security concern.

11      **C.    CDCR Must Be Required To Increase Enforcement Of The Prohibition On**
            **Removal Of Assistive Devices**.

12

13      As these examples illustrate, the Remedial Plan's strictures against confiscation require

14  greater enforcement measures.  Plaintiffs' counsel seek several remedial provisions. First, thorough

15  and ongoing training must occur for all CDCR correctional officers, sergeants, lieutenants, captains,

16  and associate wardens.  Second, post orders must be revised to include the prohibition on routine

17  removal of assistive devices as part of the officers' job description, and CDCR must commit to

18  disciplining officers who violate the post orders – creating a strong disincentive to ongoing

19  confiscation.  Third, expandable tapping canes used by prisoners with severe vision impairments

20  (DPV) should be considered assistive devices, protected from confiscation by the Remedial Plan.

21  **IV.   DEFENDANTS FAIL TO PROVIDE PROMPT AND EQUITABLE RESPONSES TO**
        **DISABILITY GRIEVANCES IN VIOLATION OF FEDERAL LAW AND THEIR**
22      **OWN REMEDIAL PLAN**.

23      **A.    CDCR Is Legally Obligated To Provide, And Follow, A Prompt and**
            **Equitable Disability Grievance Procedure**.
24

25      Public entities such as the CDCR must establish prompt and equitable grievance procedures

26  to address complaints of disability discrimination. 28 C.F.R. § 35.107(b).  *See also Clarkson v.*

27  *Coughlin,* 898 F.Supp. 1019, 1044-45 (S.D.N.Y. 1995).  The *Armstrong* Remedial Plan contains a

28  detailed process for prisoners to seek disability accommodation or object to disability

1    discrimination. Norman Decl., Exhibit A (Remedial Plan, pp. 36-41). Pursuant to the Remedial

2    Plan, "[a]n inmate/parolee with a disability may request an accommodation, to access programs,

3    services, activities or grieve alleged discrimination through the CDC Form 1824 appeal process."

4    *Id.*, at 35. A nonemergency CDC Form 1824 is subject to three formal levels of review and

5    deadlines. The first level is required to be "return[ed] . . . to the inmate/parolee within 15 working

6    days of receipt of the request by the Appeals Coordinator . . . ." *Id.*, at 39-40. The second level

7    must be decided and "return[ed] . . . to the inmate/parolee within 10 working days of receipt, or 20

8    working days of receipt if the first level of review is bypassed." *Id.* Third level responses must be

9    "return[ed] … to the inmate/parolee within 20 working days from receipt." *Id.* This Court's

10   Permanent Injunction provides that "[t]he initial timeframe for the CDC to respond to a grievance

11   must be less than thirty days . . . ." Norman Decl., Exhibit B.

12        **B.    CDCR'S Current Disability Grievance Procedure Is In Disarray**.

13        CDCR complies neither with the 30-day requirement of the Injunction nor the 15-working-

14   day requirement (approximately 21 calendar days) of the Remedial Plan. Plaintiffs' counsel have

15   documented persistent, often drastically late responses to disability grievances at multiple CDCR

16   institutions over the past seven years. Within the past year, lateness has been particularly pervasive

17   at Lancaster, Chuckawalla Valley, Ironwood, Avenal, Pelican Bay, Pleasant Valley, Solano,

18   Corcoran, Valley State, and the Correctional Training Facility. Norman Decl., ¶¶ 51-53; Grunfeld

19   Decl., ¶¶ 48-57; Hagler Decl., ¶¶ 109-116; Whelan Decl., ¶¶ 47-52.

20        Some institutions respond chronically late – as often as 70 to 90 percent of the time – to

21   disability grievances. Grunfeld Decl., ¶¶ 50, 52; Whelan Decl., ¶¶ 50, 52. As a result, class

22   members are subjected to extraordinarily long waits for hearing aids and other accommodations.

23   *Id.* Some institutions simply stop processing grievances, as occurred at Pelican Bay earlier this year

24   and at Correctional Training Facility in the summer of 2006, when there was no staff person

25   (medical appeals analyst) available to process disability grievances. Whelan Decl. ¶¶ 38-44;

26   Norman Decl., ¶ 52. Still others, such as Corcoran, fail to retrieve the grievances from the box

27   where prisoners are instructed to leave them. These stuffed boxes sat unnoticed for months while

28   prisoners waited in vain for a response. *Id.*, ¶ 53.

PLAINTIFFS' NOTICE OF MOTION & MOTION FOR
ENFORCE MENT & FURTHER REMEDIAL ORDERS,
Case No. C-94-2307 CW

1    Through myriad ways, CDCR prisons give short shrift to the very mechanism they require

2  prisoners with disabilities to follow. A particularly large number of the disability grievances that

3  received no or a very late response involved prisoners with hearing impairments. Grunfeld Decl.,

4  ¶ 55 & Exhibits S-U. These prisoners cannot hear alarms or meal calls, and fear for their safety. *Id.*

5    Defendants have been repeatedly informed of their lateness. An excuse often provided is

6  that they lack the staff to process the grievances in a timely manner. *See, e.g.*, Whelan Decl., ¶¶ 38-

7  45; Grunfeld Decl., ¶ 58. The institutions also claim that, even with staff, they lack contracts with

8  outside specialists that would enable them to provide accommodations to prisoners' disabilities.

9  *Id.*; ¶¶ 43-46; *see also* Whelan Decl., ¶¶ 32-36.

10    **C.    Staffing Changes Are Needed to Cure Lateness**.

11    Staffing orders and sanctions are necessary to improve lateness. Plaintiffs seek an order that

12  provides the following: a) CDCR shall obtain funding for and fill the position of a dedicated ADA

13  coordinator assigned only to ADA compliance at each designated institution; b) CDCR shall obtain

14  funding for and fill the position of one appeals coordinator and one medical appeals analyst at all

15  institutions, designated and non-designated; and c) CDCR shall obtain funding for and fill the

16  position of assistants to the appeals coordinator and medical appeals analyst whose job function is

17  to assist with providing timely and effective 1824 responses at all institutions, designated and non-

18  designated.

19    Institutions whose disability grievance responses are late more than 50% of the time for a

20  period of six months or more must be subject to immediate and emergency appointment of

21  additional, trained staff members to process appeals and, if untimely responses persist, appointment

22  of an outside expert, approved by plaintiffs' counsel, to manage the appeals.

23  **V.    PLAINTIFFS SEEK FURTHER REMEDIAL ORDERS THAT ARE NARROWLY
        TAILORED TO REMEDY THE ONGOING VIOLATIONS OF THE ADA, §504,
24      THE PERMANENT INJUNCTION, AND THE REMEDIAL PLAN.**

25    Under the PLRA, prospective relief must be narrowly drawn, extend no further than

26  necessary to correct the violation of the federal right, and be the least intrusive means necessary to

27  correct the violation. 18 U.S.C. § 3626(a)(1). The relief plaintiffs request here meets this standard.

28    As demonstrated in this brief and accompanying declarations, defendants have repeatedly

1   and systemically violated the rights of *Armstrong* class members. Defendants' attempts at

2   compliance have been stymied by a lack of individual accountability, inadequate systems for

3   identifying and tracking prisoners with disabilities, insufficient resources, extreme overcrowding,

4   and a lack of commitment at the highest level to remediate the violations. Each of plaintiffs'

5   requested remedies described in this motion has been thoughtfully crafted and narrowly tailored to

6   address systemic issues identified in monitoring tours.

7         The plaintiff class needs this Court's intervention. Without it, the egregious, longstanding

8   violations outlined in this motion not only will continue, but will worsen due to the overcrowding

9   crisis.

10                      **CONCLUSION**

11         For the above reasons, plaintiffs respectfully request that this Court enter further remedial

12   orders to remedy defendants' ongoing violations of the ADA, Section 504, the Permanent

13   Injunction, and the *Armstrong* Remedial Plan.

14   Dated: November 15, 2006             Respectfully submitted,

15                              ROSEN, BIEN & GALVAN, LLP

16

17                              By:        

18                                  Michael W. Bien

19                                  Gay C. Grunfeld
                                    Attorneys for Plaintiffs

20                              PRISON LAW OFFICES

21

22                              By:        
                                  Donald Specter

23                                  Sara Norman
                                    Attorneys for Plaintiffs

24

25

26

27

28