IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>    Defendants.<br>_____/ | No. C 94-2307 CW<br><br>ORDER APPROVING COORDINATION STATEMENTS ATTACHED TO JUNE 26, 2007 ORDER |

On June 26, 2007, the Court entered an order seeking the parties' positions on whether it should adopt the six statements drafted by the court representatives in Coleman v. Schwarzenegger, 90-0520 (E.D. Cal.), Plata v. Schwarzenegger, 01-1351 (N.D. Cal.), and Perez v. Tilton, 05-5241 (N.D. Cal.) and adopted by those courts.

The Court has reviewed the statements, the parties' positions and the response of the Receiver in Plata. Accordingly and good cause appearing therefor, the Court hereby orders that:

(1) The Court hereby adopts the above-identified six statements. Although the Receiver filed a modified version of the statement related to IT, it is the Court's understanding that there have been additional modifications to that statement. Further, in order to

modify the statements that have been adopted by the four courts, the court representatives in all of the cases must agree to the proposed changes and then present them to their respective courts for approval.

(2) The Receiver shall henceforth file quarterly progress reports as he has been ordered to do so in the other cases and agreed to do so here. The reports shall address (a) all tasks and metrics necessary to the contracting function, implementation of long-term information technology, and pharmacy services for mental health care, with degree of completion and date of anticipated completion for each task and metric; (b) particular problems being faced by the Receiver in connection with the contracting functions, implementation of long-term information technology, and pharmacy services for mental health care; and (c) particular successes achieved by the Receiver in connection with the contracting functions, implementation of long-term information technology, and pharmacy services for mental health care. The first report shall be due on October 1, 2007.

IT IS SO ORDERED.

Dated: 8/24/07

CLAUDIA WILKEN
United States District Judge

cc: Judge Thelton Henderson
    Judge Jeffrey White
    Judge Lawrence Karlton, EDCA
    Robert Sillen, Receiver

2

## **CIM-GACH**

The Receiver and the Special Master have agreed that the General Acute Care Hospital (GACH) license at the California Institute for Men (CIM) should be suspended. The physical unit will remain open and house 40-45 Mental Health Crisis Beds (MHCBs). Staffing levels will not change for mental health care.

The Receiver and the Special Master are concerned that defendants will not be allowed to operate MHCBs in unlicensed facilities. A state court decision, Budd, et al. v. Cambra, et al., Case No.319578, required the California Department of Corrections and Rehabilitation (CDCR) to bring its correctional treatment centers (CTCs) into compliance with state law licensing requirements. Counsel for the parties may argue that Budd requires defendants to provide inpatient health services to inmates presently below an acute level of care in a licensed facility.

The Coleman Special Master has agreed to explore whether a CTC license is necessary to operate a MHCB. If such a license is necessary, the Special Master will seek an emergency order from the Coleman Court to allow for the operation of the MHCBs at CIM, as was done in the case of CMC.

On May 1, 2006, when faced with a MHCB crisis, the Coleman Court ordered the establishment of 36 MHCBs in the former locked observation unit (LOU) at California Men's Colony (CMC). The LOU at CMC had been closed and reopened as an outpatient housing unit, in light of Budd. The Coleman Court stated that until further notice and on a temporary emergency basis "defendants shall not close any intermediate inpatient bed or mental health crisis bed on the basis of state licensing requirements without approval of the special master." In its order, the Court stated that "it is essential to provide immediately mental health crisis beds to critically ill inmates in the CDCR…Under present circumstances, state licensing requirements must temporarily give way to measures necessary to remedy the Eighth Amendment violations that remained unsolved in this action." (See Coleman Order dated May 1, 2006, document number 1800).

The purpose of the order was to provide, on an interim basis, sufficient temporary MHCBs until the 50-bed MHCB projects at CMF and CMC were completed. Allowing the license to remain for the 40-45 agreed upon MHCBs at CIM-GACH could possibly avoid Budd-driven complications.

3

## **Contracts**

Effective April 17, 2006 the Receiver assumed responsibility for overseeing the State's compliance with the Federal Court's mandate (1) that "all current outstanding, valid, and CDCR-approved medical invoices" be paid within 60 days of March 30, 2006; and (2) that under the direction of the Receiver, the CDCR and State entities responsible for contracts develop and institute health care-oriented policies and standards to govern the CDCR medical contract management system considering both the need for timely on-going care and the fiscal concerns of the State.

The Receiver has created a Contract Pilot Unit that includes personnel from CDCR's Office of Business Services, staff who now report directly to the Office of the Receiver through the Plata Support Division. In addition, selected personnel from the Health Care Operations Support Section of the DCHCS, as well as personnel from the Health Care Cost and Utilization Program have been added to the Pilot, as have staff at four prisons (San Quentin State Prison, Pelican Bay State Prison, California Medical Facility, and the Central California Women's Facility) and two Regional Accounting Offices (North Coast and Corcoran). Upon successful completion of the Pilot, the new streamlined contract procurement and payment policies established by the Pilot will be adopted by all CDCR facilities according to a time-phase schedule which has not yet been determined.

These new policies are supported by a newly created, computerized Health Care Document Management System (HCDMS) which will manage all medical contracts, replacing the former paper based system. The HCDMS has three primary components in that it:
- Assists CDCR staff by utilizing uniform contract templates for the creation of contracts that do not permit deviation from health care policies and standards.
- Stores all health care contracts in a database accessible to all authorized users.
- Establishes an effective payment system designed to receive, store and communicate invoices electronically. By computerizing all contracts and invoices, the HCDMS eliminates the time spent transferring paper copies throughout CDCR and electronically prints invoices with their governing contracts for faster information retrieval.

The Receiver will assume responsibility for direct oversight of the contracting functions for medical, dental and mental health programs. The Coleman Special Master and Perez Court appointed experts will participate in the design and implementation of periodic reports to monitor the status of contract management. The Coleman Special Master and Perez Court appointed experts, along with defendants' mental health and dental administrators, will also be involved in establishing standards (including proposed rates of reimbursement for contract clinicians) for registry contracts within their respective areas of concern.

4

## **Credentialing**

**Credentialing** is the process of obtaining, verifying, and assessing the qualifications of an applicant to provide patient care, treatment, and services in a California Department of Corrections and Rehabilitation (CDCR) medical facility. The credentials review process is the basis for making appointments to the clinical staff; it also provides information for granting clinical privileges to licensed independent practitioners. The purpose of verifying credential data is to ensure that the individual requesting privileges is in fact the same individual that is identified in the credentialing documents. In addition, it is to ensure that the applicant has attained the credentials as stated, that the credentials are current, and that there are no challenges to any of the credentials.

**Privileging** is the process used to grant to a specific practitioner the authorization to provide specific inmate-patient care services. Privileging ensures that the individual is capable of providing those services in accordance with the standard of care of the Division of Correctional Health Care Services (DCHCS).

These processes are performed at time of appointment and at least every two years to ensure the credentials remain current. Final approvals of credentialing/privileging are made by the chief of either the medical, dental or mental health programs as appropriate.

These functions are currently performed by the Division of Correctional Health Care Services Pre-Employment Credential Unit which consists of three positions. These positions are all classified as Staff Services Analyst/Associate Governmental Program Analyst.

The Receiver will assume responsibility for the credentialing/privileging functions for the medical, mental health, and dental programs to include direct oversight of the Pre-Employment Credential Unit.

The <u>Coleman</u> Special Master and the <u>Perez</u> Court experts will consult with the defendants' mental health and dental administrators and will participate in, and have final approval of, the establishment of credentialing/privileging standard within their respective disciplines.

# **Hiring**

The Receiver has established the Plata Support Division to provide administrative support for the reform initiatives he has established. The Personnel Services and Staff Development Section have implemented new recruiting and hiring programs to improve the retention of medical staff (including creating new or revising current job classifications, implementing salary increases for specified classifications, designing new hiring and on-boarding processes, establishing training programs for institution personnel staff and for new supervisors, and improving the credentialing process of medical staff). This section has assumed full responsibility for all human resources-related functions for the Plata classifications, removing those functions from the CDCR's Support Services Division.

The Plata Workforce Development Section is working to recruit and hire additional medical professionals to fill the many vacancies that exist throughout California's prison system. To ensure that proactive steps are taken on a daily basis to fill medical professions vacancies in an expeditious manner, a pilot for "one-day hiring" was rolled out February 22, 2007.

The Receiver will assume responsibility for hiring of medical personnel only. However, Plata Support Division staff will provide consultation to the Coleman Special Master and Perez Court experts, as well as to defendants' mental health and dental administrators, on recruitment and hiring practices.

The Receiver will consider assuming responsibility for hiring dental and mental health personnel only after:

- The Plata hiring programs are fully implemented and the future workload has been assessed.

## **IT**

The objective of the Receiver's long term IT program is to construct and support the California Correction Health Care Information System based on the importance of "correct data at the point of care." The core design is based on an Electronic Medical Record (EMR) for each inmate/patient. The EMR will be paperless, medical information gathered in one location for physicians and clinicians to access, at various locations, and thereby enable them to make informed and safe medical decisions. All data obtained will be patient centric to allow for an "Information at the Point of Care" system.

To support the establishment of an EMR, a foundation will be formed. It will contain four components: 1) technical infrastructure, 2) clinical infrastructure, 3) data infrastructure, and 4) operational infrastructure. The technical infrastructure will provide a high-speed connection to a network of multiple sites. The clinical infrastructure will provide a repository of standardized data through verifiable data processes and compile medical data across all compliant data sources into a unified database that can be used to generate information valuable for patient care and healthcare management. The data infrastructure will implement a secure clinical web-based portal tool that allows clinical staff appropriate access to verified and standardized patient data at the point of care or clinical work areas (i.e. university hospitals, local specialty care centers). The operational infrastructure will provide clinical informatics with a near zero fault tolerance system to support various operations (i.e. Maxor Pharmaceuticals).

Upon this foundation, the EMR will be supported by uniform clinical data provided by two types of clinical information systems: 1) clinical business systems and 2) clinical systems. The Clinical Business System will sustain such areas as access tracking, scheduling, correctional interface, clinical resource scheduling, clinical contracting, credentialing, and CME (define acronym) verification. The clinical systems will sustain such areas as laboratory, radiology, pharmacy, clinical department workflow, telemedicine, digital imaging, dental systems and mental health systems.

Based on these systems the EMR will facilitate:

- a clinical data warehouse
- views on data - patient, clinician, administrator portals and reports
- integrated patient care at the a regional level
- clinical/case management and outcome reporting
- chronic disease registries
- enterprise wide/common scheduling
- supported clinical decisions
- cost effective and timely patient-centered care

7

1 • telemedicine delivery

2   The Receiver will assume responsibility for implementation of the long term IT program to include the medical, dental and mental health programs.  The <u>Coleman</u> Special Master, the <u>Perez</u> Court experts, and defendants' mental health and dental administrators will be kept informed of the progress of this long range project and will provide necessary input concerning mental health and dental clinical data needs.

   Telemedicine is a critical component of the Receiver's plan to bring the California Prison Health Care system to a constitutional standard.  The Receiver has determined that the current Telemedicine program managed by the Division of Correctional Health Care Services (DCHCS) has been mismanaged resulting in lack of utilization and understaffing.  The Receiver will assume responsibility for the telemedicine program serving the medical, dental and mental health programs to include direct oversight of the office of telemedicine services comprised of eight personnel (4 RNs, 2 SSAs, 1 HRT II, and 1 TCA II).  The <u>Coleman</u> Special Master will consult with defendants' mental health administrators to assist in establishing clinical guidelines for the mental health component of the telemedicine program.

   The Receiver will assume responsibility to support the current Mental Health Tracking System until it can be integrated into the long term IT program.

   The <u>Perez</u> Court experts will meet with the Receiver's IT staff to determine:
• Whether the "intermediate" dental IT system ordered by Judge White can be implemented within the prescribed time constraints?
• If it cannot be implemented as directed, whether the Court experts should seek a modification of the court order to integrate the dental IT system within the infrastructure and timeline of the long term IT program?

8

# Pharmacy

In late 2006 the Office of the Receiver entered into an agreement with Maxor National Pharmacy Services Corporation (Maxor) to provide pharmacy management consulting services. That contract was effective January 1, 2007. On March 30, 2007 the Receiver's request for an order nunc pro tunc to waive state law applicable to this agreement was granted by the Court.

Maxor has developed a "road map" designed to restructure and manage a constitutionally adequate pharmacy services delivery system. The primary objective of the road map is to produce sustainable, patient-centered, outcome-driven processes, with the ultimate goal of creating a CDCR-managed and operated "best practice" pharmacy system within three years.
The road map consists of the following interior goals for pharmacy operations that will serve medical, dental and mental health delivery systems:

- Develop meaningful and effective centralized oversight, control and monitoring of the pharmacy services program.
- Implement and enforce clinical pharmacy management processes including formulary controls, Pharmacy and Therapeutics (P&T) committee, disease management guidelines, and the establishment of a program of regular institutional operational audits.
- Establish a comprehensive program to review, audit and monitor pharmaceutical contracting and procurement processes to ensure cost efficiency in pharmaceutical purchases.
- Develop a meaningful pharmacy human resource program that effectively manages staffing, compensation, job descriptions, competency, performance, assessment, discipline, training, and use of the workforce including temporary employees and non-pharmacist staff.
- Redesign and standardize overall institution level pharmacy drug distribution operations for inpatient and outpatient needs. Design, construct and operate a centralized pharmacy facility.
- Design and implement a uniform pharmacy information management system needed to successfully operate and maintain the CDCR pharmacy operation in a safe, effective and cost efficient way, based on a thorough understanding of a redesigned work process.
- Develop a process to assure that CDCR pharmacy meets accreditation standards of the designated healthcare review body (NCCHC or ACA) and assist in obtaining accredited status.

The Receiver through Maxor will assume oversight of pharmacy operations serving medical, dental and mental health programs.

9

1  <u>Coleman</u> and <u>Perez</u> Court appointed experts will consult with
2  defendants' mental health and dental administrators and participate in the P&T committee in development of formularies within their respective areas of concern.  Maxor will provide periodic reports
3  to the Receiver, the <u>Coleman</u> Special Master and the <u>Perez</u> Court appointed experts concerning road map compliance.