KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DANIELLE F. O'BANNON
Deputy Attorney General
SCOTT J. FEUDALE
Deputy Attorney General
State Bar No. 242671
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-5871
 Fax: (415) 703-5843
 E-mail: Scott.Feudale@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JOHN ARMSTRONG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et. al., <br><br> Defendants. | Case No. C 94 2307 CW <br><br> **DECLARATION OF GARY GREENFIELD IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL COMPENSATION** |

## Declaration of Gary Greenfield

I, Gary Greenfield, declare:

1. I am making this Declaration in support of the Opposition to plaintiffs' Motion to Compel Compensation at 2010 Hourly Rates ("Motion"). I have personal knowledge of the matters set forth in this Declaration and, if called upon to testify, I could and would competently testify thereto.

2. I am the founder of Litigation Cost Management (LCM), based in Oakland, California. LCM is in the business of consulting regarding legal fee-related issues. As part of our business, we regularly conduct analyses of legal and expert witness fees regarding the reasonableness, appropriateness and allocation of the time, fees, rates and expenses being sought in litigation, and consult with clients regarding how to manage their outside litigation more effectively and efficiently.

3. LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management. Our clients include law firms, businesses, public entities and agencies, and institutions (such as universities).

4. Since LCM was founded in January, 1991, I have conducted several hundred analyses of the legal fees and expenses in cases of various types and sizes. These have included individual and multi-party suits, as well as class actions. The cases have included the full range of civil litigation, including patent and other intellectual property, real property, False Claims Act, bankruptcy, breach of contract, securities, antitrust, environmental, insurance bad faith, discrimination, disability, civil rights, constitutional law, inverse condemnation, personal injury and products liability cases. I have myself been personally involved in, conducted analysis in and supervised each of these analyses. A number of

the projects have been post-trial or post-settlement attorneys' fees applications or motions.

5. As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues, both on behalf of parties submitting fee applications and on behalf of law firms or clients opposing them. Roughly half of my work is for parties seeking fees, and half for parties opposing fee requests. I would estimate that I have prepared over a hundred reports in these various types of cases. In almost all the cases, I have undertaken some evaluation of the rates being sought, either for the case overall or for particular projects.

6. I have also qualified and testified previously as an expert witness in litigation (both in court and in arbitrations) regarding legal fees, both on behalf of parties seeking to recover their attorneys' fees and parties opposing requests for attorneys' fees. I have testified in trials or arbitrations a minimum of ten times and been designated and deposed as an expert witness at least thirty times.

7. I was also appointed a Special Master to analyze the fees and expenses of various law firms and experts in the Golden Eagle Insurance Company conservation proceeding before the San Francisco Superior Court. A major issue in that analysis was the appropriateness of the rates being sought.

8. Prior to starting LCM in January, 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981. During my career at my former law firm, I handled general commercial litigation, including the full gamut of litigation from pre-filing preparation and negotiations through trials and appeals. I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation. I

represented both plaintiffs and defendants. I handled both contingency cases and cases where we were compensated on an hourly basis. I graduated from the Boalt Hall School of Law in 1975 and received my undergraduate degree from Stanford University in 1971. A copy of my Resume is attached hereto as Exhibit 1.

9. A major aspect of our work is to review and analyze bills and time entries from law firms. The bills virtually always contain (or we otherwise obtain) the rates being charged for the various billers in the law firms whose fees I am analyzing. As a result, we have acquired a large quantity of information regarding the rates being charged by law firms of various sizes and types (ranging from solo practices to large, international firms and hundreds of lawyers of various expertise and levels of experience.) The rates are from cases of different types, but virtually all involve business or other complex civil litigation, and we maintain a database of the rates which I review on a regular basis as part of my work. [1]

---

[1] The types of cases from which we obtain and maintain our rate information include 1) various types of commercial disputes such as breach of contract cases, patent cases and other types of cases where there are contractual or statutory fee-shifting provisions whereby the prevailing party in the litigation is seeking to recover fees actually billed during the course of the cases to their clients, 2) insurance coverage cases where the fees actually paid to counsel are sought to be recovered as damages, 3) statutory and private attorney general cases where firms which regularly bill clients on an hourly basis are seeking fees from their opponent at their regular billing rates, and 4) bankruptcy cases where the fees sought are based on rates approved by the Bankruptcy Court for services to the debtor or other participants in the bankruptcy cases. We maintain the rates in a database which I review continually. We do not include rates in the database that are merely sought in a case by a firm unless it has fee-paying clients that are paying

10. Because it is integral to my work, I also regularly review various compilations of rates and surveys of billing rates published by legal periodicals and assembled by legal consultants; materials filed in cases other than those I am involved in, judicial decisions which discuss rates sought and awarded, and orders in cases in which I am not involved that deal with rates being sought in those cases.

11. As a result of my work as described above, I am familiar with the range of rates being charged for various types of complex litigation both in the San Francisco Bay Area and across the country.

12. I have been asked by the defendants in this case to provide my opinion regarding the degree to which rates in the San Francisco Bay Area have increased since 2008.

13. There are some generally accepted principles regarding rates to be used in fee-shifting cases such as this. The basic rule is that the rates to be awarded are the rates charged by comparable lawyers, in terms of experience, reputation and skill, doing comparable work in the market (which initially and usually ultimately is the geographic area of the forum, here the Northern District of California.) [2]

14. In the real market for legal services, however, rates are not simply determined by the experience, reputation and skill of the lawyer or the complexity of the type of work. In

---

those rates or a Court has determined that the rate is the appropriate rate for the particular biller in the market.

[2] One is not limited to looking at work in the same type of litigation, although rates awarded in similar litigation is certainly relevant.

my experience, the most important factors that drive the rates being charged in the market for complex litigation is the size of the firm, the nature of the clients and the particular specialty involved. Thus, large firms typically charge higher rates for otherwise comparable lawyers than small firms[3/]; and insurance companies often pay significantly lower rates for lawyers in complex cases where the insurer hires the lawyers (often because they promise or have the ability to provide a large quantity of work.) [4/] I am not suggesting that the economics of law firm practice is to be analyzed in determining rates in a fee-shifting case, but rather that, in looking at rates in the market to be used as a comparison for purposes of awarding rates, the market is broader than large firms. Thus, while the rates charged by large firms is clearly relevant to determining the appropriate rates to be applied in a fee-shifting case, the fact that large firms charge higher rates than small to moderate-sized firms for comparable lawyers in terms of experience, reputation

---

[3] That is not to say that the higher rates of large firms may not be justified for the same lawyer. Large firms provide both a breadth of expertise and depth of personnel and have other attributes that may be required in various cases and transactions and which justify the overall higher rates they charge. However, if one is looking simply at a lawyer's experience, expertise and reputation, the same lawyer will typically bill at a significantly lower rate in a small to moderate size firm in comparison to a large firm.

[4] In fact, excellent lawyers leave large firm practices specifically because they wish to provide services to clients at lower rates than the large firm charges. They are the same lawyer in terms of their experience, reputation and expertise when they start or join a smaller practice, but, because of the economics of the practice, the types of clients they may have and the types of problems they can handle, they typically charge significantly lower rates.

1 and expertise, needs to be considered in looking at rate trends as well. [5/]

2

3  15.   It is generally recognized in the legal community that law firm billing rates, including
4         large firm rates, have not increased in the last several years at the same pace as in prior
5         years, and this is consistent with my observations of rates based on my work in analyzing
6         legal fees and review of the various materials we collect as discussed above. Moreover,
7         this is apparent from reviewing the rate data and surveys supplied by plaintiffs on their
8         Motion.

9

10 16.   For example, plaintiffs refer to and rely on the annual rate surveys by the National Law
11        Journal (the "NLJ") regarding rates billed by the nation's largest law firms in 2008 and
12        2009. Copies of the survey results are attached as Exhibit 3 and 4 to the Declaration of
13        Maria Morris in support of the Motion ("Morris Declaration"). In the article
14        accompanying the publication of 2010 NLJ survey, the overall results of the survey are
15        summarized as follows:

16

17         "The average firmwide billing rate–a combination of associate and partner
18         rates–increased by 2.7 percent in 2010, according to the National Law Journal's annual
19         survey of hourly billing rates. It's the second straight year of growth rates less than 3
20         percent, which is a far cry from the standard 6 percent to 8 percent increases from 2004
21         until 2008 and just slightly higher than the rate of inflation."

22  _____

23   [5] There is no clear cut definition of a "large firm". The National Law Journal annually
24  conducts various surveys and studies of what it identifies as the largest 250 law firms in the
25  United States (often referred to as the NLJ 250), which, as of October, 2010, included firms with
26
27  160 lawyers or more. That is a reasonable definition of what is generally considered to be a
28  "large firm."

A copy of the article is attached as Exhibit 2 hereto. The article accompanying the publication of the NLJ survey of 2009 rates noted that the average firmwide rate increase among the firms responding to the survey was 2.5%. A copy of that article is attached as Exhibit 3 hereto. Mr. Sangster, in his Declaration filed in support of the Motion, while indicating that law firms have raised rates since 2008, refers to an article projecting that, in 2010, rates would go up an average of 3.2% (itself a low number relative to earlier years), Sangster Declaration, para. 8, whereas, based on the NLJ survey discussed above, in fact the average increase was ultimately only 2.7%.

17. The views expressed in the NLJ article are consistent with my observations of the market for rates, and, it is generally recognized that the increase in rates slowed considerably in 2008, 2009 and 2010. Moreover, the information in the NLJ surveys is consistent with the other survey and publicly available rate information provided by plaintiffs on the Motion. Thus:

  a.  The analysis attached as Exhibit D to the Declaration of Gregory Holtz, a partner in the San Francisco office of Bingham McCutchen, supporting the Motion (the "Holtz Declaration") indicates that, with respect to Bingham McCutcheon's "peer group" of firms (which I understand to mean similar firms providing similar services), the rate increases from 2008 to 2009 were 3.2% for "equity partners", 2.9% for "partners" and 4.2% for "lawyers" (presumably meaning for the lawyers overall);

  b.  Mr. Loran, a partner in the San Francisco office of Pillsbury Winthrop states in his Declaration supporting the Motion that his firm's rates went up "slightly" in 2009, which, while vague, I interpret as being in the 2 to 5% range (Declaration of Thomas V. Loran III in support of the Motion, para. 10 (the "Loran Declaration");

7

  c.  The chart in Ms. Morris' Declaration that is based on several Northern District of California bankruptcy court filings indicates that, with respect to the only partners on the chart for whom rates were supplied for both 2009 and 2010, the rate of Keith Shapiro, a partner at Greenberg Traurig, went up 9.6% from 2009 to 2010 (from $775 to $850), but also that the rate of Michael Ahrens, a partner at Sheppard Mullin Richter & Hampton rose 1.9% ($755 to $770) (Morris Declaration, para. 30);

  d.  The table in paragraph 30 of Ms. Morris' Declaration is based in part on a fee application by Greenberg Traurig in a bankruptcy proceeding in the Northern District of California, and, among the other partners at Greenberg, Traurig on Exhibit 9 to the Morris Declaration, from 2008 to 2009, the rates of Alan Annex went up 3% ($775 to $800), David Baddley's rate went up 5.7% ($525 to $555), and the rate of Leslie Corwin went up 6.6% ($750 to $800) Morris Declaration, Exhibit 9;

  e.  With respect to the only two billers whose rates are shown for multiple years on Exhibit 2 to the Morris Declaration, which reflects San Francisco Bay Area lawyers, the rate of Peter Benvenutti, a partner at Jones Day, went up 4%, and the rate of Peter Crosby, counsel at Jones Day, did not go up at all.

18. The foregoing focuses on partner rates. Associate rates have similarly increased at a much slower pace in the last several years. Exhibit D to the Holtz Declaration indicates that the average rate increase for associates among the Bingham McCutchen "peer group" from 2008 to 2009 was 3.2%. Exhibit 5 to the Morris Declaration indicates that the average rate increase based on an analysis of the <u>NLJ</u> rate data for associates was 2.41%.

19. Thus, while many large firms have sought to raise rates, one is not seeing the across the

board annual 5% to 10% rate increases that were fairly standard until 2008 among the large firms. In the cases I have personally worked on, the norm was for firms (including large firms) not to raise rates at all from 2008 to 2009. For example, the rates of one of those firms–Manatt, Phelps & Phillips ("Manatt")–is set forth in the Declaration of Richard Pearl accompanying the Motion ("Pearl Declaration"), which indicates that Manatt not only did not raise its rates in 2009, but it reduced the lower range of its associate rates as well, Pearl Declaration, p. 13, which is consistent with the rates in the Manatt bills I reviewed.

20. Moreover, a firm's "published" rates, i.e., what they indicate to be their standard rates and which are normally the rates provided for surveys such as the NLJ surveys, often do not reflect their actual billed rates because firms, including large firms, now routinely give rate discounts when clients request them (a typical discount is 5 to10% off the "published" rate). In addition, lawyers often charge different rates at the same time, depending on various factors. For example, Mr. Loran at Pillsbury Winthrop notes that his current rate varies between $705 and $775 per hour (essentially a 10% variation), depending on the nature of the matter and his involvement. Loran Declaration, para. 10. Finally, firms will often not increase rates during the course of a multi-year engagement or agree to maintain their rates for a certain number of years if the case goes on for a number of years. Thus, one cannot simply use a firm's "published" rates as a benchmark for the rates actually being charged in the market at a particular time.

21. In summary, in my opinion, the discussions in the NLJ articles referenced above is an accurate reflection of what has occurred in the San Francisco Bay Area market with respect to the rates of large firms handling complex litigation in the period from 2008 through 2010–average rate increases of 2.5% in 2009 and 2.7% in 2010. [6/]

---

[6] As noted earlier, the market of comparable lawyers providing comparable services is

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed at Alameda County, California.

Dated: February 25, 2011

_____
Gary Greenfield

---

not limited to large firms despite the focus on large firm rates in both plaintiffs' and my analyses (due in part to the existence of far more publicly available rate information for large firms.) Small and moderate-sized firms typically have lower rates and have had even less flexibility to raise rates in the last several years because of the economy and its impact on the legal profession so the percentage increases indicated in the NLJ articles would be even lower if the rates of smaller firms were also taken into consideration.