1  PRISON LAW OFFICE
   DONALD SPECTER – 83925
2  REBEKAH EVENSON – 207825
   CORENE KENDRICK - 226642
3  PENNY GODBOLD – 226925
   MEGAN HAGLER – 230628
4  1917 Fifth Street
   Berkeley, California  94710
5  Telephone:  (510) 280-2621

6  DISABILITY RIGHTS EDUCATION &
   DEFENSE FUND, INC.
7  LINDA KILB – 136101
   2212 Sixth Street
8  Berkeley, California  94710
   Telephone:  (510) 644-2555
9
   ROSEN, BIEN & GALVAN, LLP
10 MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
11 315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
12 Telephone:  (415) 433-6830

13 Attorneys for Plaintiffs

KAMALA D. HARRIS
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL – 122626
Supervising Deputy Attorney General
SCOTT J. FEUDALE – 242671
Deputy Attorney General
DANIELLE F. O'BANNON – 207095
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:  (415) 703-5717
Email: Jay.Russell@doj.ca.gov

Attorneys for Defendants

14

15                UNITED STATES DISTRICT COURT

16               NORTHERN DISTRICT OF CALIFORNIA

17                        OAKLAND DIVISION

18

19 JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW

20         Plaintiffs,                  **JOINT CASE STATUS STATEMENT**

21 v.

22 EDMUND G. BROWN JR. et al.,

23         Defendants.

24

25         The parties submit this Joint Case Status Statement pursuant to the Stipulation and

26 Order entered March 28, 2011 (Docket No. 1868), which provides that "[t]he parties will file

27 periodic joint statements describing the status of the litigation" on the 15th day of every other

28 month (or the first business day thereafter), beginning on May 16, 2011.

1  *Defendants' Statement.*

2  As discussed in past status statements, Defendants have complied with the issues

3  addressed in the January 2007 Injunction. Specifically, Defendants have developed a

4  computerized real-time tracking system—the Disability and Effective Communication System

5  (DECS)—to track inmates with disabilities, have created and updated an inventory of

6  accessible placements available to inmates with disabilities, have developed a system to

7  investigate alleged Americans with Disabilities Act (ADA) and remedial plan violations and to

8  hold staff accountable, have developed and implemented a program to provide training in

9  effective communication and use of health-care appliances, regularly provide additional staff

10  time to address grievances at institutions in which grievance responses are untimely, and have

11  established permanent civil service positions for qualified sign language interpreters at

12  institutions designed to house inmates with hearing disabilities.

13  Defendants have also made significant progress in remedying newly alleged issues

14  raised by Plaintiffs. For example, since the filing of the last status statement, Defendants have

15  (1) agreed with Plaintiffs' counsel on the design and implementation of wheelchair-accessible

16  treatment modules to be used in group therapy sessions for high-security inmates; (2) formed a

17  committee to determine (with Plaintiffs' counsel's input) Disability Placement Program (DPP)

18  population projections and to assess and rank CDCR institutions for DPP mission-suitability;

19  (3) worked with the Library of Congress to create a "talking books" application for hearing-

20  impaired inmates; and (4) formulated a plan to assist developmentally disabled life inmates

21  with formulating viable parole plans.

22  Defendants believe that the purpose of the status statements is to inform the Court of

23  Defendants' progress in complying with the January 2007 and other prior court orders. (*See*

24  2007 Inj. 5; Stip. & Order Re; Jt. Filing Periodic Status Stmts. 2.) Defendants believe that

25  because most of the issues raised below are not addressed in the January 2007 Injunction or

26  any other order, they are not properly before the Court. Specifically, Defendants believe that

27  the following issues are inappropriately raised in this status statement: (1) class members'

28  ability to retain assistive devices while housed in Mental Health Crisis Beds; (2) inmate

assistance to class members in accessing programs, services, and activities; (3) changes to forms used to track and identify an inmate's accommodation needs; (4) the housing of inmates with extra-wide wheelchairs; (5) the provision of wheelchair-accessible therapeutic treatment modules; and (6) the provision of identifying vest for inmates with mobility and hearing impairments.  Without waiving any of their legal rights or arguments, Defendants address the issues below raised by Plaintiffs.

*Plaintiffs' Statement.*

Defendants remain significantly out of compliance with the ADA, the Rehabilitation Act, and this Court's orders, and Plaintiffs continue to point out deficiencies in their monitoring reports and other correspondence with Defendants, and to work closely with Defendants in an effort to resolve those issues informally.  Without conceding the accuracy of the items of progress identified above or the validity of Defendants' objections in any way, the matters addressed below represent some of the key areas in which Defendants are violating applicable law and this Court's orders.

**A.     ADA Structural Issues**

      1.     California Institution for Men (CIM)

Plaintiffs raised serious and urgent concerns about the accessibility of the California Institution for Men (CIM), which is designated to house prisoners with disabilities affecting their placement, and sought to reach agreement with Defendants about how and when to remove the architectural barriers identified in the architectural expert's report and earlier monitoring reports.  Without waiving any of their legal rights, Defendants have developed a plan to make all repairs identified by Plaintiffs' architectural expert, have secured funding to do so, and have negotiated contracts with an architectural and engineering firm.  Defendants began construction in early November 2011, and the repairs will be completed by the end of July 2012.

*Plaintiff's Statement.*

Defendants also have conducted a survey of the rest of the prison identifying additional ADA repairs.  However, Defendants have not agreed to provide that survey to Plaintiffs.

*Defendants' Statement.*

At Defendants' counsel's direction, Defendants' architectural expert conducted an additional survey of CIM to determine if there were any other structural barriers to access at the prison.  Defendants will share relevant information gathered from that survey when the issues are addressed as part of the "Master Plan" accessibility project.  Sharing such information is premature at this time especially given the changes in inmate housing assignments following realignment.  Indeed, CIM recently closed the Facility-C Gym housing unit in their Reception Center.  Plaintiffs had complained that the conditions of confinement in the gym violated the Eighth Amendment and the ADA.

### 2.    Other prisons

Plaintiffs are continuing to investigate allegations of structural barriers at other prisons, including the California Medical Facility (CMF), R.J. Donovan Correctional Facility (RJD), Deuel Vocational Institution, Avenal State Prison, and others, and have informed Defendants about their concerns.  Plaintiffs' architectural expert and Defendants' architectural expert have jointly toured the prisons identified as having the most serious problems, so that they can identify structural barriers at those facilities and propose interim solutions pending the completion of Defendants' master plan.

In light of the realignment of the prison population to the counties, beginning October 1, 2011, Defendants and the *Plata* Receivers' office are working together to identify which institutions are best suited for various population groups, in addition to what Defendants had previously categorized in past *Armstrong* case statements as the "master plan" for evaluating CDCR institutions for both ADA accessibility and Disability Placement Program suitability, and which Defendants now characterize as the "accessibility subgroup" to the larger post-realignment assessment initiative.  The process includes:  1) an assessment of accessibility issues at all prisons in the state, 2) a determination of whether to change the missions of prisons designated to house prisoners with disabilities affecting placement ("designated prisons"), and 3) the identification and remediation of structural barriers at prisons that will

1    continue to be designated prisons.  The outcome of the tours by the architectural experts will

2    inform and become part of the accessibility planning process.

3         Defendants and Plaintiffs have discussed the 15-month accessibility subgroup planning

4    process, which began August 15, 2011.  Plaintiffs requested that they be able to participate in

5    the process so that the parties are on the same page regarding the assumptions and analysis

6    being done throughout the various steps of the planning.  At the parties' November 9, 2011

7    meeting, Defendants provided a draft memo proposing the role of Plaintiffs' counsel in the

8    ongoing development of the process.  Defendants also met with Plaintiffs' counsel on

9    November 18, 2011, and provided Plaintiffs with an overview of the Master Plan project,

10   including projected timelines for completion of various events, and discussed Defendants'

11   population projections for disabled inmates.  Defendants  will meet again with Plaintiffs'

12   counsel in early December to discuss developing a tool to assess and evaluate CDCR

13   institutions for DPP-mission suitability.

14        Defendants asked Plaintiffs to provide a prioritized list of the most important physical

15   barriers identified at the prisons, with the hope that some barriers can be remediated while the

16   accessibility planning is underway.  In September, Counsel for Plaintiffs provided Defendants

17   with a list of the most problematic physical barriers at prisons.  Defendants agreed to provide a

18   response before November 1, 2011.  Defendants have reviewed Plaintiffs' prioritized list and

19   have identified various interim measures designed to mitigate these barriers, including minor

20   repairs, programmatic remedies, and housing reassignments.  Defendants will provide

21   Plaintiffs with a letter identifying these remedial measures.

22   **B.    Armstrong Class Members Housed in County Jails**

23        On September 16, 2009, this Court issued an order requiring Defendants to develop a

24   plan to accommodate *Armstrong* class members housed in county jails.  *See* Order Granting

25   Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of Armstrong

26   Class Members Housed in County Jails and Ensure Access to a Workable Grievance

27   Procedure, September 16, 2009 (Docket No. 1587) at 10-15.  Defendants filed an appeal, and

28   on September 7, 2010, the Ninth Circuit issued its opinion vacating the order and remanding

1   the matter to the district court. The mandate issued on December 28, 2010.

2       While the appeal was pending, and without waiving any of their rights, Defendants

3   developed a plan to comply with the September 16, 2009 order, and notified Plaintiffs that

4   their plan had been implemented and distributed on April 1, 2010. The parties agreed that, in

5   the interest of avoiding unnecessary litigation, Defendants would implement the plan, and

6   Plaintiffs would reserve their right to raise objections to the plan while monitoring its

7   implementation.

8       *Plaintiffs' Statement*

9       On August 4, 2011, Plaintiffs filed their Renewed Motion to Require Defendants to

10  Track and Accommodate Needs of *Armstrong* Class Members Housed in County Jails and

11  Ensure Access to a Grievance Procedure and Motion to Enforce 2001 Permanent Injunction.

12  For months before filing the motion – and as recently as a November 9, 2011 meeting between

13  the parties – Plaintiffs made extensive efforts to meet and confer with Defendants about the

14  scope of a future County Jail Order, but those efforts were uniformly unsuccessful. Plaintiffs

15  fully complied with the Court's May 24, 2011 Order. A hearing on Plaintiffs' renewed motion

16  occurred on October 27, 2011.

17      *Defendants' Statement*

18      Without waiving any rights, Defendants' attempted to meet and confer with Plaintiffs

19  regarding their allegations concerning parole proceedings in county jails so that Plaintiffs'

20  allegations could be investigated and remedied, but Plaintiffs refused and instead conducted

21  discovery. Defendants in turn propounded discovery to investigate Plaintiffs' allegations.

22  Before providing Defendants with all evidence they believe justifies amending Defendants'

23  county jail plan, as required under the Court's May 24, 2011 order, Plaintiffs filed a renewed

24  motion to require Defendants to track and accommodate *Armstrong* class members housed in

25  county jails and to establish a workable grievance system.

26      ///

27      ///

28      ///

**C.      Access to Mental Health Crisis Care for Suicidal Prisoners with Assistive Devices**

Plaintiffs have raised concerns about whether class members with assistive devices, including full time wheelchair users, are allowed to retain their assistive devices in mental health crisis beds (MHCBs), and whether institutions which lack accessible MHCBs have policies in place to accommodate wheelchair users.  In February, Defendants agreed to provide Plaintiffs with each prison's local operating procedure for their MHCBs.  Defendants provided local operating procedures to Plaintiffs on July 13, 2011.  The parties are now in discussions regarding possible amendments to local operating procedures for MHCBs to ensure accommodation for mobility impaired class members.

**D.      ADA Appeals Guidelines**

In June, 2011 Defendants and the *Plata* Receiver's office implemented a new set of guidelines governing ADA appeals.  Plaintiffs' chief concerns about the guidelines are detailed at pages 8-9 of the Joint Case Status Statement filed on July 22, 2011.  (Docket No. 1887).  One concern is that the new appeal guidelines are in violation of the requirement in this Court's 2001 injunction that ADA appeals must be answered within 30 days.  The appeal guidelines allow for responses within 30 **working** days.  Another concern of Plaintiffs is that under the new guidelines, staff will remove from the ADA appeals process and re-categorize as health care appeals, all appeals that challenge a decision of a medical professional, even if it concerns a possible ADA violation (e.g., an appeal challenging a doctor's decision to deny a prisoner a wheelchair will no longer be treated as an ADA appeal).  At the parties' July 13 and September 1, 2011 meetings, representatives from the Receiver's office stated they will separately track ADA-related 602-HC appeals, will create data reports about the timeliness of those appeal responses, and will provide copies of the ADA-related 602-HC appeals to Plaintiffs.  Starting January 1, 2012, these reports and appeals will be provided to Plaintiffs as part of the document production made prior to monitoring tours.

*Plaintiffs' Statement*

Plaintiffs repeatedly have expressed concern that taking such matters out of the ADA

1   appeals process would erode adherence to the ADA grievance processing timelines (as

2   described in this Court's 2001 and 2007 Injunctions), and that it will create significant barriers

3   to monitoring Defendants' responses to appeals alleging ADA violations.

4          Since the implementation of the new guidelines, Plaintiffs' counsel have noted in their

5   monitoring tours, and have raised the issue with Defendants and the Receiver's Office, that no

6   instructions have been provided to Health Care Appeals analysts about how to handle the re-

7   categorized ADA-related appeals.  At some institutions, Plaintiffs' counsel have observed that

8   the ADA-related appeals are being screened out instead of being re-categorized and processed

9   as 602-HC appeals per the guidelines; at other prisons, they are re-categorized but then

10  screened out by medical staff for not first attempting to informally resolve the issue or for not

11  first filing a request for medical services.  As a result, class members are experiencing delays,

12  or are not receiving answers to their ADA-related appeals.

13         Defendants and Plaintiffs' counsel will work together to identify problematic

14  institutions.  Plaintiffs will monitor this issue closely.

15         *Defendants' Statement*

16         Defendants believe that it is the Injunction's intent that inmates needing disability

17  accommodations are promptly evaluated and accommodated.  Defendants are complying with

18  that intent.  Under the new appeals guidelines, Defendants provide interim accommodations to

19  inmates who submit ADA grievances.  These interim accommodations are provided until

20  medical staff responds to the inmate's grievance and makes a decision as to the propriety of the

21  requested accommodation.  Defendants believe this system provides medical staff with

22  sufficient time to medically evaluate inmates and their often challenging medical presentations,

23  while ensuring that a class member's potential disability needs are accommodated during the

24  evaluation process.

25         Defendants disagree that no training has been provided. All prisons have received

26  training on the appeals guidelines as a result of a joint training program between CDCR and

27  CCHCS. While Defendants deny that Plaintiffs' concerns related to appeals processing are

28

1   systematic, they will issue a clarification to health care appeals staff about processing the

2   recategorized appeals.

3        **E.      Sign Language Interpretation**

4        Plaintiffs have raised concerns with Defendants regarding the alleged consistent failure

5   to provide sign language interpreter (SLI) services to deaf prisoners in education, medical, and

6   mental health appointments, primarily at California Medical Facility (CMF) and California

7   Substance Abuse Treatment Facility (SATF), despite this Court's Order of October 20, 2009

8   (Docket No. 1661).

9        Defendants are conducting a six-month audit of CMF to evaluate improvements in the

10  provision of SLI services to inmates who rely upon American Sign Language, and will provide

11  monthly updates to Plaintiffs.  Defendants have agreed to implement interim measures if their

12  monitoring reveals that inmates are not being accommodated as a result of a failure to receive

13  sign language interpretation.

14       In early October, Defendants provided the first month's report of a six-month audit of

15  CMF on the instances in which interpretation was not provided as required.  Unfortunately, in

16  a monitoring tour conducted on November 2 and 3, 2011 at CMF, Plaintiffs' counsel

17  discovered that the first month's report was incomplete, and did not accurately reflect the

18  information within the medical and central files of deaf prisoners.  Defendants, Plaintiffs'

19  counsel, and CMF staff have met to identify where the breakdowns are in providing SLI

20  services and in recording information about medical, educational, or due process encounters at

21  which SLI services must be provided.

22       At SATF, Defendants have investigated means to improve the provision of SLI services.

23  Without waiving any of their rights or admitting liability, medical staff at SATF stated that

24  they are asking the Receiver's Office to designate a fulltime SLI position to work solely at

25  medical and mental health appointments.  Defendants believe this measure will free up the

26  existing SLI so that he or she may provide interpretation services for substance abuse and

27  education classes and other events involving due process.  Plaintiffs will monitor these issues

28  closely.

**F.     Inmate Assistants**

Plaintiffs have raised concerns that some class members face barriers to access to prison programs, activities and services because they do not receive the assistance they need from others (e.g., wheelchair users who need to be pushed to programs, prisoners who need help carrying trays or packages, etc.).  Defendants, without waiving their legal rights, developed a statewide "inmate assistant" program, which will standardize the job descriptions, qualifications, and supervision for inmates assigned to assist *Armstrong* class members.  The inmate assistance program guidelines are currently awaiting review and signature from the Director of Adult Institutions.

**G.     Changes to Forms Used to Track Class Members' Accommodation Requirements – CDCR Form 1845**

Over the last year, Plaintiffs have raised concerns about prisoners who are mis-housed in units that Plaintiffs claim do not accommodate their disabilities (e.g., prisoners with mobility impairments who cannot access the showers in their units because there is a step going to the shower, or prisoners who require level terrain being housed in units where there may be a few steps or other barriers).  At the March 9, 2011, ADA Committee meeting, Plaintiffs, Defendants and the Receiver agreed to work together to modify the existing forms that track class members' accommodation requirements, so that many of these problems could potentially be eliminated.  The CDCR Form 1845 revision subcommittee has met several times, and has jointly developed new forms.  During the November 9 meet and confer, Plaintiffs informed Defendants that they had some comments to the form, and provided those comments on November 11.  Plaintiffs await further revisions to the form, as well as the Receiver's draft of instructions designed to inform doctors how to complete the revised form.  The 1845 form will be reviewed by CDCR's Department of Adult Institutions.

**H.     Receiver's Accountability Plan/ Training Receiver's Staff**

The *Plata* Receiver has developed new training modules to provide an overview of *Armstrong* issues specifically for medical staff.  These modules are intended to supplement, not replace, existing CDCR training modules.  The trainings of medical staff began the week

after Labor Day, 2011.  The Receiver's Office has not yet completed the training of all medical staff at all facilities, and has not provided a firm date when the training will be completed. Once the training is complete, the accountability logs can be used.  These logs will be part of the monthly document production to Counsel for Plaintiffs.  Once these trainings are complete, the Receiver's accountability plan will go into full effect.

**I.     Revision to Defendants' Policies and Procedures for Providing Accommodations in Parole Proceedings**

Paragraph 24 of the September 11, 2007 Order requires Defendants to revise their policies and procedures for providing accommodations in parole proceedings, and train staff on the revised plan.  Following extensive negotiations between the parties, Defendants revised their policies for providing accommodations in parole proceedings, known as the *Armstrong* Remedial Plan II (ARP II).  At the parties' November 9, 2011 meeting, Defendants provided Plaintiffs with the final and complete copy of the ARP II, and Defendants informed Plaintiffs that the document was sent to institutions and parole offices on November 10, 2011.  Plaintiffs will monitor distribution and availability of the revised ARP II.

**J.     Lack of Wheelchair Accessible Cages/Mental Health Treatment Modules**

*Plaintiffs' Statement*

As detailed in the Joint Case Status Statements filed July 22, 2011 at pages 11-12 and September 15, 2011 at pages 9-10, Plaintiffs are concerned about prisoners who use wheelchairs being denied access to mental health treatment in segregated housing units because the cage-like modules in which group therapy and other mental health services are provided in those units are not wheelchair accessible.

Although Plaintiffs are opposed to the use of these cage-like modules, Plaintiffs and Defendants have reached an agreement on the design and use of them.  Defendants are in the process of drafting a directive to institutions explaining the criteria for the modules' design and use.  Plaintiffs have requested a copy of the draft directive, the opportunity to comment on the directive, and have requested that Defendants inform Plaintiffs as the accessible modules are

1  rolled-out in the institutions so that Plaintiffs can monitor their safety and use by prisoners who

2  use wheelchairs.

3      *Defendants' Position*

4      Defendants object to Plaintiffs' use of the term "cage" to describe the therapeutic

5  modules used in group therapy sessions that allow inmates-patients to participate in the

6  Enhanced Outpatient Program (EOP) and the Correctional Clinical Case Management System

7  (CCCMS).  The therapeutic modules have been deployed under *Coleman*, and are used so that

8  patient-inmates can participate in EOP and CCCMS group therapy safely and securely, and

9  they assist in promoting the safety and security of all inmates, staff, and the public.  Without

10 these therapeutic modules, Defendants' ability to offer inmate-patients appropriate mental

11 health care and treatment would be significantly impaired, to the detriment of all *Coleman* and

12 *Armstrong* class members.  Defendants agreed to address Plaintiffs' counsel's concerns

13 regarding wheelchair-accessible therapeutic modules by designing and building a prototype

14 that was put into use on a trial basis at CSP-Sacramento.

15     On September 27, 2011 the parties met and conferred regarding the design

16 specifications of the therapeutic treatment modules and corresponding policies related to the

17 use of these modules.  Following the meeting, there was a dispute among the parties as to the

18 terms of the agreement.  All differences were resolved during the November 9, 2011 meet and

19 confer.  Defendants will provide Plaintiffs with a copy of the draft directive incorporating the

20 parties agreement concerning this issue.  Once the parties agree on the draft directive's

21 language, the directive will be distributed to the field and the modules will be constructed.

22 **K.    Housing for Prisoners with Wide Wheelchairs**

23     In early 2011, Plaintiffs raised a concern that CDCR is not adequately accommodating

24 prisoners with wide wheelchairs at CIM, RJD, and California State Prison-Sacramento.  In

25 May, Plaintiffs requested that Defendants provide further information concerning this issue;

26 specifically, Plaintiffs requested information about the widths of the standard state-issued

27 wheelchairs, and the widths of the DPW cell doors.  Defendants conducted an audit of these

28 facilities' cell doorways to evaluate if wide wheelchairs could fit through them.  Defendants

provided some information about this audit to Plaintiffs' counsel on September 6, 2011.

However, the information gathered from the audit was over-inclusive of Plaintiffs' request and confusing to understand. Accordingly, Defendants did not provide Plaintiffs' with a copy of the audit. At Plaintiffs' counsel's request, Defendants are compiling additional information and will provide Plaintiffs with a summary of their findings. Plaintiffs will continue to monitor this issue.

### L.   Mobility Vest Medical Criteria and Guidelines for Alarms

Plaintiffs have expressed concern that each prison has its own criteria for the issuance of special vests to identify mobility impaired prisoners. Special vests also are issued for vision-impaired and hearing-impaired prisoners. The purpose of these vests is so that staff can easily identify the prisoners who may not be able to respond quickly and immediately to alarms and emergencies due to mobility, vision, or hearing problems, and in the case of mobility-impaired prisoners, to identify prisoners who are physically unable to sit down or lie on the ground ("prone out") during an emergency.

Plaintiffs are concerned that the guidelines to staff and mobility-impaired prisoners as to what they should do during emergencies and alarms vary by institution. At some facilities, mobility impaired prisoners are told to sit on the closest bench or chair, in other institutions, they are expected to freeze in place or lean against a wall. Some facilities do not issue mobility vests at all. Plaintiffs believe this inconsistency is confusing to prisoners and staff.

To address this issue, the *Plata* Receiver's office is developing uniform criteria to be used by medical staff state-wide to determine whether a prisoner needs a mobility vest. The medical criteria were originally supposed to be proposed by November 1, 2011; the Receiver's Office now anticipates providing the draft criteria to Plaintiffs and Defendants prior to their next case meeting scheduled for January 25, 2012. Once the criteria are set, Defendants will send statewide guidelines and instructions to staff on how to treat prisoners with vests in cases of emergencies and alarms. Defendants will also provide training to their staff on their responsibilities related to this issue. When issuing a vest, Defendants will further provide

1   inmates with instructional materials notifying the inmate of his or her responsibilities during

2   emergencies and alarms.

3        **M.**    **2012 Monitoring Tour Schedule**

4        The parties have finalized the 2012 schedule for monitoring tours of Defendants'

5   institutions.

6   Dated:  November 22, 2011           Respectfully submitted,

7                           PRISON LAW OFFICE

8                                */s/ Corene Kendrick*
                        By:  Corene Kendrick

9                                Attorneys for Plaintiffs

10

11                           KAMALA D. HARRIS
                        Attorney General of the State of California

12                                */s/ Scott J. Feudale*
                        By:  Scott J. Feudale

13                                Deputy Attorney General

14                                Attorneys for Defendants

15        Pursuant to Northern District General Order 45(X)(B), I hereby attest that I have on file

16   approvals for any signatures indicated by a "conformed" signature (/s/) within this e-filed

17   document.

18   Dated:  November 22, 2011           Respectfully submitted,

19                           PRISON LAW OFFICE

20                                */s/ Corene Kendrick*
                        By:  Corene Kendrick

21                                Attorneys for Plaintiffs

22

23

24

25

26

27

28

JOINT CASE STATUS STATEMENT - CASE NO. C94 2307 CW