IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | No. C 94-2307 CW |
| Plaintiffs, | AMENDED ORDER GRANTING PLAINTIFFS' RENEWED MOTION TO REQUIRE DEFENDANTS TO TRACK AND ACCOMMODATE NEEDS OF ARMSTRONG CLASS MEMBERS HOUSED IN COUNTY JAILS, ENSURE ACCESS TO A GRIEVANCE PROCEDURE, AND TO ENFORCE 2001 PERMANENT INJUNCTION (Docket No. 1912) |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |
| _____/ | |

Plaintiffs move for an order requiring Defendants to track and accommodate the needs of Armstrong class members housed in county jails and to provide access to a workable grievance procedure. Defendants oppose the motion. The matter was heard on October 27, 2011. Having considered oral arguments and all of the materials submitted by both parties, the Court GRANTS Plaintiffs' motion.

BACKGROUND

This lawsuit was originally filed seventeen years ago by disabled prisoners and parolees against the California officials with responsibility over the corrections and parole systems. This Court certified Plaintiffs as representatives for a class

including "all present and future California state prisoners and paroles with mobility, sight, hearing, learning, developmental and kidney disabilities that substantially limit one or more of their major life activities." Order Granting Pls.' Mots. to Am. Compl. and Modify the Class, Docket No. 345, January 5, 1999, at 2.[1] On behalf of the class, Plaintiffs sought accommodations for their disabilities, as required under federal statutes and the United States Constitution.

Initially, Plaintiffs sued two divisions of the then California Youth and Adult Corrections Authority (the Agency). The two divisions sued had separate areas of responsibility toward prisoners and parolees: the Board of Prison Terms (BPT) had authority over parole and parole revocation hearings, and the California Department of Corrections (CDC) was responsible for all other aspects of prisoners' and parolees' lives, including

---

[1] The Plaintiff class was certified on January 13, 1995. On December 24, 1998, the parties stipulated to amend the class definition to include "all present and future California state prisoners and parolees with mobility, sight, hearing, learning and kidney disabilities that substantially limit one or more of their major life activities." Stipulation and Order Amending Pl. Class, Docket No. 342, December 24, 1998, at 2. The class definition was subsequently modified, as to Defendants Board of Prison Terms (BPT) and Chairman of the BPT only, to add prisoners and parolees with developmental disabilities on January 5, 1999. Order Granting Pls.' Mots. to Am. Compl. and Modify the Class, January 5, 1999, at 2.

supervision of parolees.[2]  By agreement of the parties, litigation against the two divisions was initially bifurcated and proceeded on two separate tracks.

On September 20, 1996, this Court ordered CDC and related Defendants to develop plans to ensure that their facilities and programs were compliant with the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12131 et seq., and readily accessible to and usable by prisoners and parolees with disabilities.  The order also required Defendants to develop policies to provide a prompt and equitable disability grievance procedure, to allow approved assistive aids for prisoners with disabilities in segregation units and reception centers, and to ensure accessibility in new construction and alterations.  Remedial Order, Injunction and Certification for Interlocutory Appeal, September 20, 1996.  The Court retained jurisdiction to enforce its terms.  Id. at 5.[3]

Following a bench trial in April and May 1999, the Court found on December 22, 1999 that BPT and other Defendants responsible for conducting parole proceedings were in violation of the ADA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.

---

[2] Since this lawsuit was originally commenced, the Agency has been reorganized and superseded by the California Department of Corrections and Rehabilitation (CDCR).  BPT is now the Board of Parole Hearings (BPH).  CDC has been replaced by the Division of Adult Institutions (DAI) and the Division of Adult Parole Operations (DAPO).

[3] The Ninth Circuit affirmed the injunction against the CDC Defendants on appeal.  See Armstrong v. Wilson, 124 F.3d 1019 (9th Cir. 1997), cert. denied, 524 U.S. 937 (1998).

§ 794, and the Due Process Clause of the Fourteenth Amendment. Findings of Fact and Conclusions of Law, December 22, 1999, Docket No. 523.

The Court's Findings of Fact and Conclusions of Law held that:

> Defendants cannot avoid ADA and Section 504 liability by delegating responsibility for their delivery of programs, services and activities, or for the facilities in which they provide these programs, to the CDC or any other entity. The implementing regulations of both the ADA and Section 504 prohibit covered entities from discriminating against individuals with disabilities "directly or through contractual, licensing, or other arrangements." The BPT is thus legally obliged to ensure non-discrimination wherever programs, services or activities are provided to Plaintiff class members. Additionally, the BPT cannot avoid liability for violations of the physical accessibility standards by holding its programs in locations under the control of other entities.

Findings of Fact and Conclusions of Law, at 90 (internal citations omitted). At that time, the Court also found that certain large jail facilities utilized by these Defendants for parole proceedings, including the Los Angeles County Men's Jail, were inaccessible for people with disabilities, which raised an inference that this was a system-wide problem. Id. at 31-32. The Court determined that these Defendants violated the rights of class members in county facilities for parole revocation proceedings in many of the same ways alleged in the instant motion, including depriving them of assistive devices for mobility problems or accommodations for hearing and vision impairments. Id. at 32-38, 41-43, 45-47, 49-52, 60-66. The Court also

4

United States District Court
For the Northern District of California

recognized that these Defendants did not have an adequate system for tracking the facts of parolees' disabilities in their files, or for allowing parolees to communicate their accommodation needs. Id. at 38-40.  Based on its Findings of Fact and Conclusions of Law, the Court entered a permanent injunction as to these Defendants.  Permanent Injunction, Docket No. 524.[4]

On January 3, 2001, the CDC Defendants amended their Court Ordered Remedial Plan regarding the provision of programs and

---

[4] On appeal, the Ninth Circuit affirmed the injunction against the BPT Defendants with minor changes.  See Armstrong v. Davis, 275 F.3d 849, 879 (9th Cir. 2001), cert. denied, 537 U.S. 812 (2002).  Several cases have since indicated that the Ninth Circuit's decision in Armstrong was abrogated in part by Johnson v. California, 543 U.S. 499, 504-05 (2005).  See, e.g., Harris v. Alvarado, 402 Fed. Appx. 180, 181 (9th Cir. 2010); Kirola v. City of San Francisco, 2011 WL 1330853, at *4 (N.D. Cal.); Melendres v. Arpaio, 2011 WL 6740711, at *19 (D. Ariz.).  However, this is not accurate.

In Johnson v. California, the Supreme Court held that the CDC's policy of racially segregating inmates, like all racial classifications imposed by the government, should be considered under strict scrutiny, rather than under the deferential standard articulated in Turner v. Safley, 482 U.S. 78 (1987), under which a court considers whether regulations that burden the prisoners' fundamental rights are reasonably related to legitimate penological interests.  543 U.S. at 504-15.

Armstrong, however, did not concern or discuss racial classification; instead, it concerned appropriate accommodations for prisoners and parolees with disabilities.  In Armstrong, the Ninth Circuit considered whether the state had provided a legitimate penological justification for its failure to comply with the ADA under the standard articulated in Turner v. Safley, assuming, without deciding, for the purposes of its discussion that this standard applied to both prisoners and parolees.  275 F.3d at 873-74.  It did not review "race-based prison regulations" as some courts apparently believe that it did.  Harris v. Alvarado, 402 Fed. Appx. at 181.

services to inmates and parolees with disabilities. The Remedial Plan requires Defendants to ensure that prisoners and parolees with disabilities are accessibly housed, that they are able to obtain and keep necessary assistive devices, and that they receive effective communication regarding accommodations. Id. at 1-7, 27-28, 32, 34, 46-47. The Remedial Plan also requires Defendants to include in all contracts language that requires subcontractors to comply with the ADA. Id. at 46.

The Court entered a Revised Permanent Injunction against the BPT Defendants on February 11, 2002. The Revised Permanent Injunction requires these Defendants to provide accommodations, at all parole proceedings, to prisoners and parolees with disabilities. Revised Permanent Injunction, February 11, 2002, ¶ 17. The subsequent Order Granting Motion to Enforce Revised Permanent Injunction issued on May 30, 2006, requires that Defendants develop and implement a plan to ensure that necessary accommodations are provided to class members without delay. Order Granting Motion to Enforce Revised Permanent Injunction, May 30, 2006, at 8-9. In that Order, the Court found that Defendants did not have an adequate system to track parolees with disabilities. Id. at 4. The Court also found that, as a result, parolees with disabilities were not being provided with required accommodations, including mobility assistance for paraplegics and sign language interpreters for deaf parolees. Id. at 5-6. At that time, Defendants did not contest the extensive evidence that Plaintiffs

United States District Court
For the Northern District of California

6

submitted to demonstrate ongoing violations of the same type alleged in the instant motion, such as evidence that a paraplegic parolee had to drag himself up stairs.   Id.

On September 11, 2007, in response to Plaintiffs' motion to enforce the May, 2006 Order Granting Motion to Enforce Revised Permanent Injunction, this Court Ordered:

> Within thirty days of this order, Defendants shall report to Plaintiffs' counsel which housing units in Alameda, Sacramento and Los Angeles County Jail facilities are wheelchair accessible and how Defendants ensure that class members at those institutions who are designated DPW and DPO are housed in the accessible facilities and receive necessary accommodations and assistive devices in both their housing units and at their hearings. Within ninety days of this order, Defendants shall do the same with the remaining county jails.  A necessary component of both reports is how Defendants track class members who are housed in county facilities due to parole holds.

Order Granting in Part Plaintiffs' Motion to Enforce the May 30, 2006 Order, ¶ 19.  At that time, the Court found that Defendants' tracking system for information about disabilities of prisoners and parolees was still inadequate.  Id. at 4-6.  The Court also found that Defendants had failed to develop an adequate plan to provide needed accommodations for parole proceedings in county jails and rejected Defendants' assertion that "county jails provide adequate access to necessary assistive devices for class members" as without proof.  Id. at 9-10.

On May 28, 2009, Plaintiffs filed a Motion to Require Defendants to Track and Accommodate Needs of Armstrong Class

Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure.

On September 16, 2009, this Court held that Defendants are responsible for ensuring that Armstrong class members receive reasonable accommodations when Defendants elect to house them in county jails. Order Granting Plaintiffs' Motion to Require Defendants to Track and Accommodate Needs of Armstrong Class Members Housed in County Jails and Ensure Access to a Workable Grievance Procedure, September 16, 2009, at 7-9. The Court stated that Plaintiffs had submitted evidence demonstrating that, pursuant to their authority, Defendants were housing a significant number of persons in county jails, including an average of 480 parolees a day in the San Mateo County Jail, an average of 1,000 parolees a day in the Sacramento County Jail, and 770 individuals in In-Custody Drug Treatment Program (ICDTP) placements in county jails. Id. at 4-5. The Court also held that Plaintiffs had submitted sufficient evidence that class members being housed in county jails were not receiving accommodations to which they were entitled. Id. at 9-10. Accordingly, the Court entered an order requiring that Defendants, within thirty days, submit a plan "for ensuring timely and appropriate accommodations for Armstrong class members in county jails[.]" Id. at 11. The September 16 Order provided Defendants with flexibility to devise the specifics of the plan, but also required that the plan contain certain elements. Id. at 11-14. The Court also found, pursuant to

8

requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A), that the relief it ordered was "narrowly drawn, extend[ed] no further than necessary to correct the violation of federal rights, and [was] the least intrusive means necessary to correct the violation of the federal rights[.]" Id. at 11.

Defendants appealed this Court's September 16 Order. Nonetheless, on October 15, 2009, as required by the September 16 Order, Defendants provided "written notification and instruction to all county jail facilities of their duty to comply with the ADA in housing Armstrong class members and that defendants will enforce those obligations." September 16 Order, at 11.

On April 1, 2010, after negotiations between the parties, Defendants issued their County Jail Plan, entitled the "County Jail Accommodation Process," in a further effort to comply with the September 16 Order.

On September 7, 2010, the Ninth Circuit affirmed in part and vacated in part the September 16 Order, and remanded the case to this Court for further proceedings. The Ninth Circuit affirmed this Court's holdings that "defendants are responsible for providing reasonable accommodations to the disabled prisoners and parolees that they house in county jails." Armstrong v. Schwarzenegger, 622 F.3d 1058, 1063 (9th Cir. 2010). The Ninth Circuit held that: (1) the validly enacted ADA Title II regulations provide that "a public entity, in providing any aid, benefit, or service, may not, directly or through contractual,

United States District Court
For the Northern District of California

9

United States District Court
For the Northern District of California

licensing, or other arrangements, discriminate against individuals with disabilities[,]" id. at 1065 (quoting 28 C.F.R. § 35.130(b)(1)); (2) the ADA requires that when Defendants house state prisoners and parolees in county jails, the state is responsible to ensure that the state prisoners and parolees with disabilities can access the county jails' benefits and services "to the same extent that they are provided to all other detainees and prisoners," id. at 1068; (3) neither principles of federalism nor deference to correctional authorities nor the Prison Litigation Reform Act prohibited this Court's order requiring that when Defendants "become aware of a class member housed in a county jail who is not being accommodated, they either see to it that that jail accommodates the class member, or they move the class member to a facility . . . which can accommodate his needs[,]" id. at 1069, or that when Defendants "become aware of a 'pattern' of ADA noncompliance, they are to notify county jail officials and take steps to remedy the pattern of noncompliance[.]" Id. at 1069-1070.

Although the Ninth Circuit affirmed this Court's rulings on the requirements of the ADA, it ruled that the system-wide scope of relief ordered required development of additional evidence concerning the nature and extent of the violations. Id. at 1063, 1073-1074. It found that the type of relief ordered would be appropriate if such additional evidence were presented. Id. at 1070-1074. In finding that the evidence was insufficient to

justify the scope of September 16 Order, the Ninth Circuit stated that this Court failed to identify any "past determinations that show that class members housed in county jails are not being accommodated . . . and thus, we are required to conclude, did not rely on them when determining the scope of its order." Id. at 1073.  The Ninth Circuit reversed the September 16 Order and remanded to this Court "to allow it to take such additional evidence as may be necessary concerning the nature and extent of the violations of class members' rights taking place in the county jails." Id. at 1073.  The Ninth Circuit described Plaintiffs' evidentiary burden on remand as "far from insurmountable" and explained that "in light of the State's failure to track many of the class members that it houses in the County Jails, not much more evidence than that already provided may be required to approve the [September 16 Order]." Id. at 1074.

On October 1, 2011, state legislation commonly known as the prison "realignment" law went into effect.  Under realignment, parolees who were already placed on state parole prior to October 1, 2011 remain under the supervision of Defendants.  Cal. Penal Code § 3000.09(b).  Further, persons released from state prison on or after October 1, 2011, who fall into certain categories, including conviction of serious or violent felonies, continue to be placed on state parole under the jurisdiction and supervision of Defendants.  Cal. Penal Code § 3000.08(a), (c).  Under realignment, low-level offenders who are released from state

11

United States District Court
For the Northern District of California

prison on or after October 1, 2011 and do not fall into the above-mentioned categories are instead supervised on release by counties under the newly created Post-Release Community Supervision program.  Cal. Penal Code § 3000.08(a), 3451.[5]  Realignment also amended Penal Code section 3056, which now provides, in relevant part:

> Prisoners on parole shall remain under the supervision of the department. . . . [U]pon revocation of parole, a parolee may be housed in a county jail for a maximum of 180 days.  When housed in county facilities, parolees shall be under the legal custody and jurisdiction of local county facilities.  When released from custody, parolees shall be returned to the parole supervision of the department for the duration of parole.

Cal. Penal Code § 3056(a).

Plaintiffs have submitted evidence that there are currently over 100,000 parolees under Defendants' supervision.  Grunfeld Reply Decl. ¶ 25, Ex. O.  In February 2011, Defendants classified approximately seven percent of the incarcerated population as individuals with disabilities, excluding learning disabilities and mental health concerns.  Grunfeld Decl. ¶ 53.  According to Defendants' own estimates, approximately half of the individuals released from prison in the state after October 1, 2011 will be placed on state parole under the jurisdiction and supervision of Defendants.

_____

[5] Plaintiffs state that their present motion is not meant to encompass individuals in the PRCS program, and is limited to state prisoners and state parolees.  Accordingly, the Court limits its analysis and does not consider Defendants' responsibility to individuals in the PRCS program, who are housed in county jails.

Grunfeld Decl. ¶ 43, Exs. FFF, HHH. Defendants also project that thousands of parolees will be housed in county jails on a daily basis.  Id.

DISCUSSION

Defendants now no longer dispute that "California state prisoners and parolees with mobility, sight, hearing, learning and developmental disabilities" are not being provided proper accommodations while housed at county jails or that they are suffering harm as a result.  Defendants also do not dispute that these parolees do not have access to a proper grievance system. Instead, Defendants primarily argue that, under the realignment statute, state parolees are no longer members of the Armstrong class when they are housed in county jails and thus that the proposed injunction is broader than necessary to accommodate the needs of class members.  Defendants also contend that the proposed injunction would violate the federalism principles set forth in Printz v. United States, 521 U.S. 898 (1997), and that the relief requested here concerns the same issues being litigated in other pending federal class action cases, so this Court should abstain from exercising jurisdiction here.

I.   Responsibility for Providing Accommodations in County Jails

The Ninth Circuit has held that, under the ADA and the Rehabilitation Act, Defendants have the legal responsibility to ensure ADA-compliant conditions for Armstrong class members whom they house in county jails.  Armstrong, 622 F.3d at 1068, 1074.

Defendants rely heavily on sections of the California Penal Code that have not yet gone into effect. As these codes sections are currently written, after July 1, 2013, control over parole revocation proceedings and decisions will transfer from Defendants to local courts, although Defendants will continue to supervise parolees. However, this Court must apply the law currently in effect and will not speculate as to what effect, if any, potential changes to the applicable laws may have on its rulings in the future.

Defendants do not dispute that they continue to have responsibility for certain groups of state prisoners and parolees housed in county jails: those already there "as of October 1, 2011 pending parole revocation proceedings, offenders sentenced to life terms who may return to state prison, and state inmates housed in county jail for county proceedings." Opp. at 6. Defendants also not dispute that they continue to house substantial numbers of CDCR prisoners and parolees pursuant to various contracts and other arrangements. These include contracts with Alameda and Sacramento Counties that Defendants renewed only months before the realignment statute went into effect and that provide for payments to those counties of up to $160 million over the next five years to house as many as 1,150 state inmates per day. See Grunfeld Decl. ¶ 38, Ex. DDD; Grunfeld Reply Decl. ¶ 33, Ex. Q. Defendants also contract with a number of counties to house state prisoners in jail-based ICDTPs. Grunfeld Decl. ¶ 33, Exs. MM, OO. See also

Cal. Penal Code § 4115 (local counties "may enter into a contract with the Department of Corrections and Rehabilitation to house inmates who are within 60 days or less of release from the state prison to a county jail facility for the purpose of reentry and community transition purposes"). Defendants do not dispute that they are still empowered, under various code sections, to hold local county jails accountable for not adhering to minimum standards prescribed by Defendants. See, e.g., Cal. Penal Code § 4016.5 (allowing Defendants to withhold reimbursements to counties for housing certain state prisoners if the county's "facilities do not conform to minimum standards for local detention facilities" and the county fails to make reasonable efforts to correct the violations); Cal. Gov. Code § 76101 (providing that any jail or addition "constructed with moneys from the Criminal Justice Facilities Construction Fund shall comply with the 'Minimum Standards for Local Detention Facilities' promulgated by the Board of Corrections").

Defendants disclaim responsibility for state parolees who are taken into custody for alleged parole violations or whose parole is revoked and who are housed in county jails. They argue that state law now provides that these state parolees are to be housed in county jails and that, during the time of such incarceration, the county has custody and jurisdiction over these state parolees. Defendants aver that this relieves Defendants of responsibility

toward those who may be <u>Armstrong</u> class members.  <u>See</u> Cal. Penal Code § 3056(a).

However, as prior to the enactment of the realignment statute, state parolees housed by Defendants in county jails are in the custody and control of the county, while simultaneously in the continuing custody and control of Defendants.  <u>See, e.g.,</u> <u>Samson v. California</u>, 547 U.S. 843, 851 (2006) (noting, prior to realignment, that "an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term").  As before the realignment statute went into effect, Defendants continue to maintain control and authority over whether the state parolees under their supervision are to be taken into custody and placed into a county jail.  Parolees are placed into county jails by virtue of their status as state parolees and do not cease being state parolees while they are also county jail inmates.  Defendants BPH and Brown continue to be the only ones able to place a parole hold on a parolee and to have the parolee taken into custody for an alleged violation of parole terms without being eligible for bail.  Cal. Penal Code §§ 3056, 3062; <u>In re Law</u>, 10 Cal. 3d 21, 24-26 (1973).  Under Defendants' implementing policies, county jails are not typically permitted to turn away parolees who have been medically cleared and whom Defendants bring to the county jails, but if they do so, Defendants must "maintain custody" of the parolee while Defendants determine how to resolve the situation.  Grunfeld Reply Decl., Ex.

**United States District Court**
For the Northern District of California

K at 4.  State law does not appear to prevent Defendants from then placing the parolee in a different county jail.  Further, under Defendants' policies, when county authorities release a parolee before revocation processing is complete, Defendants retain the discretion to return the parolee to custody or to allow the parolee to remain in the community.  Grunfeld Reply Decl., Ex. L at 4.  Under current law, Defendants BPH and Brown alone have the authority to adjudicate whether a parolee has in fact violated his parole or to decide his sanction, including detention in a county jail.  Cal. Penal Code §§ 3000(b)(8), 3000.09(d), 3060, 3062. State law does not mandate this sanction, and it does not designate the particular county facility where the parolee is to be held; these are decisions left to Defendants, who can choose to transfer parolees away from facilities that unable to meet their needs.  Defendants also continue to compensate counties for housing state parolees in county jails during the revocation process and during the term of the revocation, now through the use of newly established Local Community Corrections Accounts, which compensates a county based on the number of prisoners that the county is expected to supervise and house, an amount that thus could be reduced if Defendants chose to house parolees in other county jails instead.  Cal. Government Code §§ 30025, 30029(c). The fact that state parolees are under the control and custody of the county, as well as of Defendants, during the time of their incarceration does not relieve Defendants of their independent

17

obligations and responsibilities toward to these individuals.  See

Armstrong, 622 F.3d at 1072.

Accordingly, Defendants continue to house state prisoners and

parolees in county jails pursuant to their authority under both

contracts and state law, as they did at the time of the Ninth

Circuit's earlier opinion in this case.  Thus, as the Ninth

Circuit previously held, Defendants are obliged to ensure

ADA-compliant conditions for the prisoners and parolees that they

house under their own authority in county jails.

II.  Evidence of Violation of Class Members' Rights

Plaintiffs' evidence demonstrates that, both before and after

Defendants issued the County Jail Plan, Armstrong class members

have suffered significant violations of their ADA rights while

housed in county jails.  Plaintiffs submitted substantial

evidence, including more than sixty declarations from class

members, demonstrating that class members in jails throughout the

State are injured and are denied access to housing, programs, and

services because of Defendants' failure to accommodate their

disabilities.[6]  Although Defendants again disclaim their

---

[6]  In their reply, Plaintiffs clarified that the county-based
Post-Release Community Supervision (PRCS) program was not covered
by the instant motion.  On October 20, 2011, a week after
Plaintiffs filed their reply, Defendants filed objections to the
declarations that Plaintiffs had submitted with their opening
brief and with their reply.  Defendants challenged the
admissibility of the declarations on the grounds that the
declarants do not make clear what their commitment offenses were
and thus if they are state parolees or part of the PRCS program.
However, under the provisions of re-alignment, the declarants
could not be part of the PRCS program.  Each declarant attests

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

responsibility toward these individuals as discussed above,
Defendants do not dispute that these violations are still
occurring more than a decade after this Court first found that
Defendants were failing to accommodate the needs of class members
in County facilities.  The overwhelming and disturbing evidence is
summarized below.

Class members with mobility impairments were denied assistive
devices, or had assistive devices taken away from them, while
housed in county jails, even though Defendants had previously
determined the assistive devices were necessary for the class

---

that he or she was on parole prior to October 1, 2011.  Under
state law, the PRCS program only began prospectively on that date;
that is, state law provides that those already on parole prior to
October 1, 2011 are not eligible to participate in it.  Cal. Penal
Code § 3451(a).

Four days later, on October 24, 2011, without seeking leave
of Court to do so, Defendants filed further objections to the
evidence that Plaintiffs had submitted with their reply.  Civil
Local Rule 7-3 allows a party, without seeking prior Court
approval, to file a single document objecting to new evidence
submitted with a reply within seven days after the reply is filed.
See Civil Local Rule 7(d).  Defendants' supplementary objections
were untimely and unauthorized by Local Rule 7-3, because
Defendants had already filed an objection to Plaintiffs' reply
evidence.

In this document, Defendants argue that evidence Plaintiffs
offered with their reply, including eight additional declarations,
should not be considered, as it was "procedurally improper" to
offer it in this way.  It is true that "[u]nder such
circumstances, the court has discretion to 'decline to consider'
the new evidence."  Mercado v. Sandoval, 2009 U.S. Dist. LEXIS
63267, at *6 (E.D. Cal.).  Unlike in the cases cited by
Defendants, however, Defendants here have had the opportunity to
address this new evidence at a subsequent hearing.  See, e.g.,
Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031
(9th Cir. 2001).  Accordingly, the Court overrules Defendants'
objections to the reply evidence submitted by Plaintiffs, because
the objections were submitted in violation of Local Rule 7-3 and
because Defendants had the opportunity to respond to this evidence
at the hearing.

United States District Court
For the Northern District of California

members to access programs and services while in custody. Class members were not provided with accessible housing, making it difficult and dangerous for them to access their beds, toilets, showers, chow halls, exercise yards, meetings with attorneys, and parole proceedings. One class member was forced to sleep on the floor for sixteen nights. Other class members crawled or limped in pain to hearings and meetings in county jails. Still others received wheelchairs while in revocation hearing rooms, but not in transit to and from those same hearing rooms. A class member housed at the Yuba County Jail had his wheelchair taken away and not returned, and was unable to shower as a result. This also happened during the same class member's separate stay at the Sutter County Jail. Both jails informed this prisoner that there was no appeals process. Another class member with a mobility impairment being held at the San Francisco County Jail was initially informed by an officer that he could not use his wheelchair to travel long distances, despite a written verification from his doctor. The jail refused to allow this prisoner any assistive devices inside his cell, which sometimes required him to hop around his cell. He had to sleep on a mattress on the floor for approximately seven days because the jail would not provide him with a lower bunk. Staff at Stanislaus County Jail took away the wheelchair of a parolee who required it to travel more than ten feet. As a result, another prisoner was required to hold him up and help him to the shower. The prisoner

was told there was no appeals process at the jail.  Similarly, staff at the Alameda County Jail in Santa Rita denied a wheelchair to another prisoner with a severe mobility impairment, making it painful and difficult for him to get around.  Jail staff also failed to provide him with a shower chair, which made it difficult and dangerous for him to shower.  Staff at Sonoma, Sutter, and Sacramento County jails have removed canes from class members, making it painful and hard for them to walk distances, shower, and go up and down stairs.

Class members with hearing and vision impairments did not receive accommodations necessary for effective communication while housed in county jails.  Sign language interpreting services were not regularly available to class members housed in county jails.  Class members with hearing impairments were not provided with sign language interpreters for important medical and mental health care appointments, which impeded or obstructed their access to those services.  One parolee with severe hearing loss was provided with a sign language interpreter only once in the seventy-five days he was at the Santa Rita jail, and went to medical appointments on three or four occasions without being provided access to a sign language interpreter.

Deaf class members could not access the telecommunications devices for the deaf (TDD/TTY telephones) they need to prepare their defenses and communicate with family and the outside world.  Because the Santa Rita TDD/TTY telephone was broken, a deaf

parolee was only able to use the telephone three times in the seventy-five days he was in the jail. Another deaf parolee had a similar experience at Santa Rita.

A class member housed by Defendants at the Los Angeles County Jail's Twin Towers facility was not provided with a sign language interpreter for medical visits or psychiatric appointments, despite his request for one. A deaf parolee housed at the San Diego Jail was also denied a sign language interpreter for medical and dental appointments. Because some officers did not know this prisoner was deaf, officers would "get mad" at him when he did not respond to verbal commands. This prisoner missed meals, yard, appointments, and canteen call because he was unable to hear the events announced over the loudspeaker and no one notified him of the events. He was also unable to participate in psychiatric treatments and therapy groups and had trouble communicating with jail staff about his need for the TDD/TTY telephone. A blind class member was denied a tapping cane at the San Francisco County Jail.

Armstrong class members housed in county jail are frequently forced to rely upon other prisoners to help them access programs and services as a result of the failure by Defendants and the county jails to provide reasonable accommodations. Reliance on other prisoners for access to basic services, such as food, mail, showers and toilets by prisoners with disabilities leaves them vulnerable to exploitation and is a dangerous correctional

22

practice.

Class members do not have access to functional and timely grievance procedures at county jails to request and obtain disability accommodations. As noted above, at some jails, class members were informed that no grievance procedure exists. At other jails, class members were able to submit grievances but never received a response or did not receive a response in a timely manner.

III. Defendants' Failure to Address System-wide Violations

Plaintiffs contend, and Defendants do not dispute, that Defendants' efforts to comply with the ADA, the Rehabilitation Act and prior orders of this Court, and to provide accommodations to class members housed in county jails, have been wholly inadequate and ineffective on a system-wide level, resulting in widespread and continuing violations of class members' rights as described above. The Court finds it troubling that Defendants continue to oppose Plaintiffs' request for relief while apparently recognizing that all of the evidence demonstrates that it is needed.

Although Defendants have developed a computerized, real-time system called the Disability and Effective Communication System (DECS) for tracking disabilities and effective communication needs of prisoners housed in CDCR prisons and on parole, Defendants still have not developed any system, electronic or otherwise, for identifying or tracking such disabilities and needs of CDCR prisoners housed in county jails and facilities. Defendants still

do not know the specific location at which those class members are housed, and what accommodations in housing, programs, services, and effective communication those class members require.

The contracts between Defendants and Alameda and Sacramento Counties for the housing of CDCR prisoners in those jails violate the March 21, 2001 Permanent Injunction because they do not include the following provision or one substantially similar, as required by Paragraph 8 of the Injunction:  "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

Defendants also contract with several counties to provide drug counseling in lieu of parole revocation through the In-Custody Drug Treatment Program (ICDTP).  Armstrong class members continue to have only limited access to ICDTPs offered at county jails because several of Defendants' ICDTP contracts violate the ADA through their Local Jail Exclusionary Criteria which ban persons with disabilities from participation. Defendants' own tracking system shows that one parolee in a wheelchair was rejected from the ICDTP due to a mobility impairment.  Another parolee's file indicates that the fact that he is in a wheelchair may limit his ICDTP-jail placement.

The County Jail Plan as drafted and implemented by Defendants

**United States District Court**
For the Northern District of California

has been inadequate and ineffective in remedying the ongoing violations of the rights of class members housed in county jails. It is troubling that Defendants do not defend the sufficiency of the Plan in any way or show that they have properly implemented even the basic mandates of their own Plan.  Defendants also do not respond to the declarations that demonstrate that class members continue to suffer harm after their Plan was purportedly "operating appropriately."  The Plan does not have any provision for Defendants promptly to provide the County Jails with information about previously-identified disabilities or necessary accommodations for class members housed in county jails.  It also does not have any provision for Defendants to determine whether a CDCR prisoner or parolee who is housed at a county jail requires any accommodations.  In the Plan, Defendants elected to rely on the existing grievance procedures available at the county jails, but failed to confirm that the county jails' grievance procedures were adequate or appropriate as written or in practice. Defendants do not monitor grievances of class members in the county jails or have a means for providing to Plaintiffs' counsel a copy of every disability-related grievance filed by an <u>Armstrong</u> class member housed in a county jail.

Defendants' County Jail Plan is, on its face, insufficient to ensure the accommodation of class members housed in county jails. Only a single provision in the Plan--that Division of Adult Parole Operation (DAPO) and BPH employees must contact the county jail if

a parolee held in the jail pending revocation requests an accommodation or if the employees observe or become aware of the need for an accommodation--might result in the accommodation of a class member who otherwise would not be accommodated while in county jail.  The County Jail Plan does not, however, require that Defendants' staff do anything to verify that class members are in fact being accommodated by the county jails.  Nor it does it provide for Defendants to share information regarding class members' disabilities and accommodation needs with the county jails, even though Defendants have a computerized tracking system--DECS--dedicated to that purpose.  The County Jail Plan also has no provisions whatsoever that could result in the accommodation of class members housed in county jail who are not parolees pending parole revocation.  This include parolees serving their revocation terms, CDCR prisoners who are "out-to-court," and prisoners at jail-based In-Custody Drug Treatment Programs.  The Plan does not even provide that these class members may be moved away from a facility that is unable to meet their needs.

The evidence shows, and Defendants do not dispute, that Defendants rarely comply with the provision of the County Jail Plan requiring them to request disability accommodations from county jails on behalf of class members.  Out of many thousands of BPH Form 1073 documents completed over the past year, only a handful reflect appropriate follow-up by CDCR officials with knowledge of a class member's disability needs.

United States District Court
For the Northern District of California

Moreover, Defendants substantially delayed the implementation of critical provisions of their County Jail Plan. For example, the County Jail Plan explicitly provides that BPH would modify the BPH 1073 form to create a space for Notice Agents, and other staff who interact with CDCR prisoners in county jails, to indicate when they had contacted county jail staff, to request an accommodation for a class member. Defendants took more than six months to modify the electronic version of the BPH 1073 form and took more than thirteen months to modify the paper version of the form. DAPO never trained its staff regarding how to use the new functionalities of the revised electronic BPH 1073 form.

Defendants do not dispute that they have failed to provide appropriate training and supervision for the staff responsible for implementing the County Jail Plan. Defendants did not effectively monitor or supervise their own employees to determine if they were complying with the Plan or whether the Plan was effective in assuring that class members were receiving accommodations while housed in county jails. BPH waited more than two and a half months after the Plan was purportedly implemented even to inform its staff of their obligations under the Plan. Despite the Plan's reliance on the Correctional Standards Authority (CSA) to "monitor this matter" and describe "problems," Defendants did not even inform the CSA that the final County Jail Plan had been issued, much less instruct the CSA to monitor for ADA compliance. No monitoring by the CSA has occurred.

Defendants have abdicated their responsibility for accommodating Armstrong class members to the county jails. Defendants possess little to no knowledge regarding whether the county jail facilities in which they house Armstrong class members are physically accessible to wheelchair users. Defendants' knowledge of the wheelchair accessibility of the county jails is derived from a 2007 survey whereby Defendants sent a letter to the counties requesting that they self-report the accessibility of cells in their jails. Defendants then compiled the answers that they received into a single document. In its final form, the survey results lacked information for many of the county facilities. Moreover, Defendants never endeavored to confirm that the information provided to them by the counties was accurate. Defendants are aware of court orders and litigation pending against Orange and Los Angeles Counties regarding the inadequacy of their wheelchair accessible housing. Defendants are also aware that certain facilities in San Diego County lack wheelchair accessible housing. Yet Defendants have taken no steps to ensure that Armstrong class members are protected when housed in those counties.

Defendants do not dispute that they have not taken any steps to investigate the allegations of ADA violations made in the declarations of Armstrong class members housed in county jails that Plaintiffs have provided to Defendants from September 2009 forward.

Defendants' communication of the County Jail Plan to the counties--in a single letter from CDCR's General Counsel on April 12, 2010--did not adequately convey to the counties their existing obligations under the ADA and Rehabilitation Act.  In particular, CDCR's statement in that letter that the County Jail Plan "does not require county jails to change any policies or procedures already in place" renders meaningless any report that Defendants might make to the counties of patterns of ADA non-compliance. Given this statement, any county informed of such a pattern will believe that it is not required to do anything to address or resolve such a pattern.  In addition, the evidence shows that Defendants did not follow up with any counties regarding the implementation of the County Jail Plan after that letter.

Defendants have never engaged in any comprehensive effort to verify that the disability-related county jail policies and procedures, including grievance procedures, are adequate to ensure the accommodation of class members.  Despite claiming to rely on these policies and procedures as adequate for this purpose, Defendants gathered these policies for only a handful of counties. In February 2011, Plaintiffs provided Defendants with more than 5,000 pages of county disability-related policies and procedures that Plaintiffs had collected through California Public Records Act requests.  Defendants do not dispute that they have done nothing to review or analyze the policies.

The Court adopts the findings and opinions of Plaintiffs'

well-qualified expert, Jeanne Woodford, former warden at San Quentin State Prison and former acting Secretary of the CDCR.  Ms. Woodford examined a number of disability-related county jail policies and procedures and found many of them to be deficient in their mechanisms timely and effectively to identify, track, and ensure the provision of accommodations to prisoners with disabilities.  Defendants have not challenged Ms. Woodford's report or its findings.  Ms. Woodford concluded that many counties lack a comprehensive plan describing the basic ADA policies and procedures for their jail systems or have ADA-related policies that are so vague and indefinite as to be almost useless. Ms. Woodford found that many counties had policies prohibiting prisoners from possessing assistive devices, such as canes, walkers, and wheelchairs, based upon unfounded fears about prisoners using assistive devices as weapons.  Ms. Woodford also identified a number of counties that lacked timely and effective grievance procedures to provide prisoners a mechanism for seeking accommodations.  She further noted that many county jail policies provide for the segregation of prisoners with disabilities from the general population and, by so doing, likely deprive prisoners with disabilities of equal access to programs and services within the jail.

IV.  Scope of Appropriate Relief

     Defendants have only identified two objections that Plaintiffs' proposed relief is not narrowly tailored to the

30

violations shown.

First, Defendants state that the functions of their agents that are referred to in the proposed injunction "will likely be assumed by various county personnel" at a future date, if further legislative changes take effect, and after that time, they will no longer have representatives regularly visiting county jail facilities. Thus, it would purportedly be unduly burdensome for Defendants to be required to interview those who recently have arrived on a parole hold and to collect grievance forms, should Defendants choose not to rely on the county jail's grievance procedures. However, at the hearing, Defendants acknowledged that their parole agents are currently going to county jails twice per week as part of the parole revocation process. Accordingly, it will not be unduly burdensome for them to perform these tasks during these regular visits. Alternatively, Defendants may avoid performing these tasks if they can certify that the jail has an adequate disability grievance procedure.

Secondly, Defendants argue that system-wide relief is not necessary to address the injuries suffered by the reduced number of class members housed in county jails after October 1, 2011. However, the Court is not persuaded that the number of class members will decrease. Regarding the individuals for whom Defendants do not dispute they have responsibility, Defendants state only that they anticipate the numbers of these individuals will decrease in the future, in part because they may choose to

move offenders sentenced to life terms to state prison.  Based on
this conjecture, Defendants argue that the relief sought will be
broader than necessary to protect the remaining individuals.  Id.
Defendants do not address the individuals held in county jails
pursuant to contracts, those who are in ICDTPs in county jails or
the state inmates housed in county jail for county proceedings.
Regarding state parolees, they argue only that these individuals
are no longer class members; the Court already held above that
they continue to be class members.  According to Defendants' own
projections, the numbers of these individuals in county jails will
increase under realignment.  Thus, the relief is not too broad for
this reason.

Further, Defendants do not dispute that there will continue
to be class members in county jails.  The Ninth Circuit has
repeatedly held in prior decisions related to this case that "'if
the injury is the result of violations of a statute . . . that are
attributable to policies or practices pervading the whole system
(even though injuring a relatively small number of plaintiffs),'
then '[s]ystem-wide relief is required.'"  Armstrong v.
Schwarzenegger, 622 F.3d at 1072-73 (quoting Armstrong v. Davis,
275 F.3d 849, 870 (9th Cir. 2001)).  Defendants do not dispute
that there are currently class members still housed in county
jails or that Defendants' system-wide policies and practices have
caused, and continue to cause, substantial injury to class
members, even if they dispute the size of this group.

**United States District Court**
For the Northern District of California

Given the ineffectiveness of Defendants' County Jail Plan, Defendants' consequent reliance on the county jails to accommodate Armstrong class members, and the deficiencies identified in the disability-related county jail policies and procedures and in certain facilities' housing, the Court finds that the types of ADA violations experienced by the class member-declarants have been, and will continue to be, experienced by many other class members who have been and will be housed in county jails throughout California.  The serious violations of the rights of class members while housed in county jails are systemic, persistent, and continuing throughout the State and are directly attributable to Defendants' failure to implement appropriate policies and procedures to identify, track, and accommodate these class members, to communicate appropriate information to the county jails, and to monitor compliance by the county jails.  The Court finds that the harm experienced by class members is caused not only by Defendants' statewide policies (or lack thereof) regarding the housing of Armstrong class members in county jails, but also by Defendants' ongoing failure to train, supervise, and monitor CDCR employees and agents concerning their responsibilities, ongoing failure to communicate with county jails regarding the known needs of class members, and ongoing failure to take responsibility for and to assert influence over county jails through contracts, regulations, letters, meetings, or other communications.  The Court therefore finds that only system-wide

United States District Court
For the Northern District of California

injunctive relief could prevent Armstrong class members from experiencing future ADA violations when housed in county jails.

V.   Constitutionality under Printz v. United States and New York v. United States

Defendants repeat an argument previously made and rejected by the Ninth Circuit that the relief sought would "commandeer" them "to enforce federal law," in violation of Printz v. United States, 521 U.S. 898 (1997) and New York v. United States, 505 U.S. 144 (1992).  Opp. at 8-9.  Defendants argue that, under realignment, they no longer "choose to house" parolees in county jails, and thus that the relief sought would "require Defendants to ensure ADA-compliant conditions not for class members, but rather for offenders being held under the counties' authority."  Opp. at 8.

First, as the Ninth Circuit already recognized, unlike in Printz and New York, this is not an action by the federal government seeking to commandeer a local entity to carry out a federal obligation; it is instead an action by private parties-- parolees who fit the class definition--seeking to enforce their constitutional rights, and thus these cases are not relevant here. Armstrong, 622 F.3d at 1089.  Further, as already discussed above, the relief that Plaintiffs seek would require only that Defendants ensure ADA-compliant conditions for state prisoners and parolees who are being held in county facilities pursuant to Defendants' contractual and statutory authority.  Thus, the order does not mean that the State would have to ensure that county jails follow

34

**United States District Court**
For the Northern District of California

federal law, but rather that the State itself must follow federal

law. Id. at 1069. Accordingly, the proposed injunction does not

violate the principles set forth in Printz and New York.

VI.  Abstention

Defendants state that this Court should decline to exercise

its jurisdiction over matters pertaining to county jails because

of two class action suits addressing conditions of confinement in

particular jails, Pierce v. County of Orange, No. 01-00981 (C.D.

Cal.)[7] and Johnson v. Los Angeles Co. Sheriff's Dep't, No. 08-3515

(C.D. Cal.), a consent decree concerning jail conditions in Santa

Clara County, Padilla v. Ryan, No. 98-2309 (N.D. Cal.), and a

settlement between the U.S. Department of Justice and Alameda

County concerning jail conditions.

However, none of these cases upon which Defendants rely

counsel abstention in the instant situation.  In Pacesetter Sys.,

Inc. v. Medtronic, Inc., 678 F.2d 93 (9th Cir. 1982), the Ninth

Circuit upheld the district court's dismissal of an action because

an identical complaint involving the same parties and issues had

first been filed in another court. Id. at 94-97. In Church of

Scientology v. U.S. Dep't of Army, 611 F.2d 738 (9th Cir. 1979),

the Ninth Circuit recognized that, under comity, a court generally

defers to previously filed litigation, but decided to defer to a

---

[7] While Defendants represent that issues similar to the ones at hand are currently being litigated in Pierce, a judgment was entered in that case on June 28, 2011 and the only issue presently being litigated is attorneys' fees.

subsequently filed case, because that litigation, which presented an identical issue, had already progressed through several substantial litigation steps.  Id. at 749-50.  In Crawford v. Bell, 599 F.2d 890 (9th Cir. 1979), the court dismissed an individual case where the plaintiff was a class member in an ongoing class action addressing the same issues.  Id. at 893.

None of the other actions to which Defendants point necessitate abstention in this case.  None present the same issues or parties.  Each is limited to one or two jails within a single county and was brought against county defendants.  None were brought against state defendants or involve state parolees held in jails throughout the State.  Further, this action was brought well before any of the other cases and has already required a tremendous amount of litigation prior to this point.  Accordingly, this Court does not decline jurisdiction over this matter in light of the cases that Defendants raise.

CONCLUSION

In order to remedy the ongoing harm to Armstrong class members, to ensure that Defendants meet their obligations under the ADA and Rehabilitation Act and prior Court orders, and to enforce the March 21, 2001 Permanent Injunction, and based on the entire record in this action, the Court hereby ORDERS the following relief, all of which it finds is narrowly drawn, extends no further than necessary to correct the violations of federal rights, and is the least intrusive means necessary to correct the

violations of the federal rights:

1. Within thirty days of this Order, Defendants shall develop a revised plan for ensuring timely and appropriate accommodations for Armstrong class members in county jails that includes, at a minimum, the following elements:

a. On a daily basis, Defendants shall send to each county a list of all Armstrong class members being housed in the county jail facilities of that county. For each class member, the list shall include the class member's name, CDCR identification number, CDCR disability placement program classification and all accommodations in housing and programming that the Disability and Effective Communication System (DECS) states the class member receives when in custody in one of Defendants' facilities.

b. Within three business days of the arrival of a prisoner at a county jail facility pursuant to a parole hold, Defendants' agent (whether Parole Agent, Notice Agent, Board Revocation Representative, or other agent) shall check DECS, interview the parolee, and review any available 1073 forms and source documents to determine what, if any, reasonable accommodations in housing, programming, or parole proceedings the parolee requires under the Armstrong Remedial Plan, the ADA, and/or the Rehabilitation Act and whether these accommodations have been provided to the parolee by the county jail. If DECS, the file review, and/or the interview show that an accommodation is required and has not been provided, within four business days

of the parolee's arrival, Defendants' agent must notify a designated staff member at the county jail facility of the accommodations in housing and programming that the class member requires and must document that notification on an appropriate form such as the BPH Form 1073.

c.      Class members housed in county jails must have ready access to disability grievance forms, either the CDCR's Reasonable Modification or Accommodation Request form (CDC 1824) or a separate county jail grievance form.  If Defendants elect to utilize the CDC 1824 form in any of the counties, Defendants shall collect the grievance forms from class members no less than twice a week, and shall provide copies to a designated person at the county jail.  Defendants shall respond to all grievances within fifteen calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided. If a class member identifies the grievance as urgent or an emergency (i.e., if it alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding), Defendants shall respond to such a grievance within five calendar days of receipt and make their best efforts to ensure that necessary and reasonable accommodations are provided on an interim basis.  For the first six months in which the plan is in effect, Defendants must produce to Plaintiffs' counsel on a monthly basis all grievances collected by Defendants pursuant to this

subsection.  Production may shift to two times a year after the first six months.

d.   If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, Defendants must certify, within thirty days of the acceptance of their plan, that each such jail's disability grievance policy contains the following elements:

i.   Is readily available to all class members housed in that county's jail facilities;

ii.  Has an initial response deadline of no later than fifteen calendar days from receipt by the designated jail staff member;

iii. Contains a provision for expediting a response if the appeal alleges a condition which is a threat to the parolee's health or safety, or is necessary for participation or effective communication in a parole revocation proceeding;

iv.  Includes a provision for review of the parolee's request by medical staff, if necessary;

v.   Provides a right to appeal denials; and

vi.  Requires that a copy of each and every grievance and response be provided to Defendants at the same time it is provided to the Armstrong class member.

e.   If Defendants contend that the process outlined in Paragraph (1)(c) is unnecessary because a jail has an adequate disability grievance process, for the first six months in which

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

the plan is in effect, Defendants must produce to Plaintiffs'
counsel on a monthly basis all grievances provided to Defendants
pursuant to subsection (d)(vi) of this paragraph.  Production may
shift to two times a year after the first six months.

     f.   If, either through a grievance or otherwise,
Defendants become aware of a class member who is housed in a
county jail and not receiving accommodations that he or she
requires, Defendants shall immediately take steps with county jail
staff to ensure that such accommodations are promptly provided or
transfer the class member to a facility that is able to provide
accommodations.

     g.   If Defendants become aware, either through a
grievance or otherwise, of a pattern of denials of disability
accommodations, such as improper housing and/or denial of
assistive devices to class members at a particular county jail
facility, or grievance process delays or obstacles, they shall
take the following steps:

     i.   Within five calendar days of becoming aware of
the pattern, Defendants shall notify the county jail facility
administrator in writing of the issue, providing specific dates
and incidents, and demanding that the conduct cease and desist;

     ii.  At the same time, provide a copy of this
notification to Plaintiffs' counsel; and

     iii. Assign a staff person to investigate the
county jail facility and report back to Defendants within thirty

days, with a copy to Plaintiffs' counsel, regarding the pattern and steps to be taken to remedy it, including any available monetary fines and penalties for continued violations.

2.   Within forty-five days of this Order, Defendants shall issue the plan in final form and disseminate it to all jail facilities in the fifty-eight counties.  Defendants shall also disseminate the plan to all relevant personnel employed by Defendants and conduct training of such personnel on the plan upon its dissemination and thereafter on an annual basis.

3.   Defendants shall permit Plaintiffs' counsel to monitor the plan and the accommodations provided to Armstrong class members while housed in county jails.  Reasonable monitoring shall include, at a minimum:

a.   The ability to conduct a sufficient number of tours per year of county jail facilities in which Armstrong class members are held to determine compliance with this order;

b.   The right during the aforementioned monitoring tours to conduct interviews with county jail staff members and with Armstrong class members housed in county jails, and to review all files and documents pertaining to Armstrong class members, including class members' jail custody and medical files and jail policies and procedures affecting prisoners with disabilities;

c.   The opportunity to review and comment on materials used to train Defendants' staff who work in or with county jails about the ADA, the Rehabilitation Act, and the Armstrong case

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

sufficiently in advance of training sessions and to observe those sessions.

        d.    A monthly document production that includes all memoranda, DECS County Jail Accommodations Reports, BPH Form 1073s, tracking logs, and other documents related to the plan.

    4.    Pursuant to this Court's March 21, 2001 Permanent Injunction, Defendants must add the following language, or substantially similar language, to any existing or future contracts with a county for the housing of CDCR prisoners, parolees, or supervised releasees in county jails, including Defendants' contracts for the housing of CDCR prisoners in the jail facilities of Alameda and Sacramento Counties and Defendants' contracts with any counties to operate jail-based In-Custody Drug Treatment Programs: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., which prohibits discrimination on the basis of disability and with applicable regulations and guidelines issued pursuant to the ADA."

    5.    The parties shall agree on a mechanism for promptly addressing concerns raised by Plaintiffs' counsel regarding individual class members housed in county jails and emergencies.

    6.    Defendants must present drafts of all plans, policies, and procedures developed pursuant to this Order to Plaintiffs' counsel at least fifteen days in advance of the deadlines.  Both parties must make all possible efforts to resolve any

disagreements as to their adequacy.  Defendants shall ensure that staff with sufficient authority to amend and approve procedures attend all meet and confer sessions.  In the event that disagreements cannot be resolved, Defendants shall implement the procedures as written on the date ordered and Plaintiffs' counsel shall file objections with the Court.  The Court will rule on the objections and issue orders amending procedures as necessary.

7.   This Order shall apply to Defendants, their agents, employees, successors in office, and all persons with knowledge of it.  The Court shall retain jurisdiction to enforce the terms of this Injunction.

IT IS SO ORDERED.

Dated: 4/11/2012

_____
CLAUDIA WILKEN
United States District Judge