IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al., on behalf
of themselves and as
representatives of the class,

        Plaintiffs,

    v.

EDMUND G. BROWN, JR., Governor of
the State of California;
CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION;
MICHAEL MINOR, Director of the
Division of Juvenile Justice; DR.
JEFFREY A. BEARD, Secretary of
the California Department of
Corrections and Rehabilitation;
JENNIFER SHAFFER, the Executive
Officer of the Board of Parole
Hearings; DIANA TOCHE, Acting
Director of the Division of
Correctional Health Care
Services; CHRIS MEYER, Director
of the Division of Facility
Planning, Construction and
Management; KATHLEEN DICKINSON,
Director of Adult Institutions;
and DAN STONE, Director of
Division of Adult Parole
Operations,

        Defendants.

_____/

No. C 94-2307 CW

ORDER GRANTING
MOTION FOR A
FURTHER
ENFORCEMENT ORDER
AND DENYING
MOTION TO HOLD
DEFENDANTS IN
CONTEMPT OF COURT
(Docket No. 2236)

    Plaintiffs move to enforce, and hold Defendants in contempt

for violating, the Court's prior orders, on the basis that

Defendants have consistently failed to provide sign language

interpreters (SLIs) during education and vocational programs at

the Substance Abuse Treatment Facility (SATF) and for failing to

provide SLIs during psychiatric technicians' rounds for patients

housed in administrative segregation housing units.  Defendants

United States District Court
For the Northern District of California

oppose Plaintiffs' motion.  For the reasons set forth below, the
Court GRANTS the motion to enforce its prior orders and DENIES the
motion to hold Defendants in contempt.

BACKGROUND

In a series of orders between 1996 and 2002, the Court found
that Defendants' treatment of prisoners with disabilities violated
the American with Disabilities Act (ADA) and section 504 of the
Rehabilitation Act.

On January 3, 2001, Defendants issued the amended Armstrong
Remedial Plan (ARP) setting forth their own policies and plans to
come into compliance with their obligations under these federal
laws.  See Kendrick Decl. ¶ 2, Ex. 1 (ARP).

Among other things, the ARP addressed effective communication
for deaf inmates.  It recognized, "Because of the critical
importance of communication involving due process or health care,
the standard for equally effective communication is higher when
these interests are involved."  Kendrick Decl. ¶ 2, Ex. 1, 4,
§ II.E.2.  The ARP mandates that an "inmate's ability to lip read
shall not be the sole source used by staff as a means of effective
communication involving due process or medical consultations,
unless the inmate has no other means of communication."  Id. at 6,
§ II.E.2.f.  The ARP also provides, "Qualified sign language
interpreters . . . will be provided for all due process functions
and medical consultations that fall within the scope of those
described below when sign language is the inmate's primary or only
means of effective communication, unless the inmate waives the
assistance of an interpreter, reasonable attempts to obtain one
are not successful, and/or delay would pose a safety or security

United States District Court
For the Northern District of California

2

risk." Id. at 5, § II.E.2.d. In the event that "a qualified sign language interpreter is not available, or is waived by the inmate, and communication is attempted," staff are required to "employ the most effective form of communication available, using written notes; staff interpreters who are able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary; or any other appropriate means." Id. at 5-6. Covered medical consultations included, for example, those pertaining to "[e]xplanation of procedures, tests, treatment, treatment options, or surgery," and "mental health evaluations, group and individual therapy, counseling and other therapeutic activities." Id. at 6. The list of medical consultations is "neither exhaustive nor mandatory, and shall not imply that there are no other circumstances when it may be appropriate to provide interpreters for effective communication nor that an interpreter must always be provided in these circumstances." Id. The ARP also requires equal access for deaf prisoners, providing, "Accommodations shall be made to afford equal access to the court, to legal representation, and to health care services, for inmates/parolees with disabilities; e.g., vision, speech, hearing, and learning disabled." Id. at 7, § II.G.[1]

---

[1] The ARP designates as DPH "Inmates/parolees who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning." Kendrick Decl. ¶ 2, Ex. 1, 3, § II.C.2. The Court uses the term DPH and deaf interchangeably herein.

The federal ADA regulations define "qualified interpreter" as "an interpreter who . . . is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."  28 C.F.R. § 35.104. The ARP defines "qualified sign language interpreter" to include "a person adept at American Sign Language."  Kendrick Decl. ¶ 2, Ex. 1, 6, § II.E.3.  Under the ARP, to "qualify as an ASL interpreter, an individual must pass a test and qualify in one of the five categories established by the National Association for the Deaf (NAD), one of the three categories established by the Registry of Interpreters for the Deaf (RID), or as a Support Services Assistant Interpreter from the California Department of Rehabilitation."  Id. at 6-7.[2]  Under the ARP, each institution is required "to establish a contract or service agreement with a local signing interpreter service organization in order to provide interpretive services for hearing impaired inmates during due process functions and medical consultations."  Id.

The ARP further states, "It is the policy of CDC to ensure that all inmates, regardless of any type of disability, participate in educational/vocational, and work programs."  Id. at 29, § IV.I.14.a.  Thus, it provided, "Reasonable modifications/accommodations shall be provided to ensure access when appropriate for qualified inmates with disabilities to participate in all programs, services, or activities including vocational assignments," and "Reasonable

---

[2] Plaintiffs state that NAD and RID merged their tests into a single examination called the NIC after the issuance of the ARP. Pls.' Reply at 5 n.6.

modifications/accommodations shall be provided to ensure access to academic programs." Id. at 30, § IV.I.16-17; see also id. at 7, § II.F ("The Department shall provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates/parolees."). "Examples of reasonable accommodations include special equipment (such as readers, sound amplification devices, or Braille materials), inmate or staff assistance, [and] bilingual or qualified sign language interpreters." Id. at 7, § II.F.

On January 18, 2007, the Court found that Defendants had not met their obligations to comply with federal law and the Court's orders and continued to violate the rights of prisoners with disabilities in four significant areas. Docket No. 1045, 2. As relevant here, the Court found,

> Contrary to law and the Armstrong Remedial Plan, defendants consistently and systemically deny sign language interpreters to deaf prisoners. Within designated prisons, the violations occur most frequently at deaf [prisoners'] medical and mental health appointments. Plaintiffs have also presented pervasive evidence of violations with regard to suicidal prisoners; in education, work, and other programming; and during classification hearings, harming deaf signers by forcing them to rely on ineffective and inadequate forms of communication such as lip reading and written notes. As such, deaf signers are unable to understand or comprehend significant due process proceedings and medical care provided to them.

Id. at 3. The Court ordered Defendants to "establish as permanent civil service positions qualified sign language interpreters for each prison designated to house prisoners whose hearing disabilities impact their placement (DPH)" and to "employ, through whatever salary is necessary, sufficient qualified interpreters to serve the needs of the DPH prisoners housed at each institution."

United States District Court
For the Northern District of California

Id. at 8.  The Court also required Defendants to comply with the policies and procedures contained in the ARP related to these issues, specifically including those regarding effective communication for deaf prisoners contained in Section II.E.  Id. at 9.

On October 20, 2009, the Court found that "Plaintiffs have demonstrated that Defendants have violated the rights of prisoners with disabilities under the ADA and Section 504 by . . . denying sign language interpreters to prisoners who need them in educational and substance abuse programs."  Docket No. 1661, 2. The Court found specifically that "Defendants continue to deny deaf inmates access to adequate sign language interpretation in educational programs" and that "sign language interpretation may not be adequate in Defendants' substance abuse programs."  Docket No. 1700, 5.  The Court noted, for example, that in one instance, when an inmate complained that "her inmate interpreter cannot keep up with the course instructor," in response, "Defendants provided her with written notes and lip reading," which the Court already found to be inadequate in the 2007 order.  Id.

To remedy these violations, the Court ordered Defendants to "develop a Plan that includes funding, staffing, training, resources and an implementation schedule."  Docket No. 1661, 2. The Court directed Defendants to file the plan within sixty days and ordered that the plan "must provide for rapid implementation and funding," with "no implementation date in the Plan . . . later than August 14, 2010."  Id. at 2-3.  The Court required that Defendants include a "plan to provide sufficient certified sign language interpreters at, or remove deaf inmates from, prisons

that do not have interpreters in education and substance abuse programs," or "alternatively, a plan for providing sign language interpretation through the Receiver's videoconferencing capacity including explanation of how any problems or delays in implementing such plan will be resolved." Id. at 4.[3]  The Court also ordered that "CDCR staff shall comply with the policies and procedures contained in their Armstrong Remedial Plan relevant to the issues outlined above," specifically including all of the provisions quoted above, such as Sections II.E, II.F, IV.I.14, IV.I.16 and IV.I.17.  Id. at 4-5.

On December 21, 2009, Defendants filed their plan to comply with the October 20, 2009 order.  Docket No. 1686.

On January 11, 2010, Plaintiffs filed their objections to this plan.  Docket No. 1690.

On February 3, 2010, the Court noted that it "has not ordered Defendants to implement their plan" to comply with the October 20, 2009 order "or any other," and that "Plaintiffs indicate that they intend to move for implementation of Defendants' plan, with modifications."  Docket No. 1700, 6. The Court stated that it would entertain Plaintiffs' motion.  Id.

No such motion was filed.  In subsequent joint case status statements, the parties represented that Defendants modified their plan after Plaintiffs filed their objections, provided Plaintiffs

---

[3] In the 2009 order, the Court did not intend the word "certified" to carry a different meaning than the word "qualified" that was used in the ARP and the 2007 order.  Accordingly, as discussed at the hearing without opposition from the parties, the Court substitutes the word "qualified" for "certified" in the 2009 order.

with their updated plan on May 3, 2010 and began providing in-person sign language interpretation in educational and substance abuse programs in August 2010.  See Docket No. 1706, 9-10; Docket No. 1720, 9-12; Docket No. 1729, 8; Docket No. 1799, 8.  The parties also indicated that Plaintiffs were monitoring Defendants' compliance with the modified plan.

LEGAL STANDARD

A district court has the authority to make an enforcement order to secure compliance with its earlier orders and governing law.  See, e.g., March 21, 2006 Permanent Injunction, Docket No. 694, 4-5; Sept. 20, 1996 Remedial Order, Docket 158, 5.

A district court also has the inherent authority to enforce compliance with its orders through a civil contempt proceeding. International Union, UMWA v. Bagwell, 512 U.S. 821, 827-28 (1994). A contempt sanction is considered civil if it "is remedial, and for the benefit of the complainant."  Id.  A contempt fine is considered civil and remedial if it either "coerce[s] the defendant into compliance with the court's order, [or] . . . compensate[s] the complainant for losses sustained."  United States v. United Mine Workers, 330 U.S. 258, 303-304 (1947).

"The standard for finding a party in civil contempt is well settled: The moving party has the burden of showing by clear and convincing evidence that the [non-moving party] violated a specific and definite order of the court."  FTC v. Affordable Media, LLC, 179 F.3d 1228, 1239 (9th Cir. 1999) (quoting Stone v. City & Cnty. of San Francisco, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).  The contempt "need not be willful, and there is no good faith exception to the requirement of obedience to a court order."

In re Dual-Deck Video Cassette Recorder Antitrust Litig., 10 F.3d 693, 695 (9th Cir. 1993).  "But a person should not be held in contempt if his action appears to be based on a good faith and reasonable interpretation of the court's order."  Id. (internal formatting and quotation marks omitted).  "'Substantial compliance' with the court order is a defense to civil contempt, and is not vitiated by 'a few technical violations' where every reasonable effort has been made to comply."  Id. (citing Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 891 (9th Cir. 1982)).

Thus, the Court may grant a motion for an order of contempt if it finds that Defendants (1) violated a court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence.  Id.  Once the moving party has met its burden, the burden "shifts to the contemnors to demonstrate why they were unable to comply" with the court order.  Stone, 968 F.2d at 856 n.9 (citing Donovan v. Mazzola, 716 F.2d 1226, 1240 (9th Cir. 1983)).  "They must show they took every reasonable step to comply."  Id. (citing Sekaquaptewa v. MacDonald, 544 F.2d 396, 406 (9th Cir. 1976)).

Civil sanctions are appropriate, at the court's discretion, to encourage Defendants to comply with its order.  United States v. United Mine Workers, 330 U.S. 258, 303-04 (1947).  In deciding whether to impose a civil contempt sanction, the Court should consider: the harm from non-compliance; the probable effectiveness of the sanction; the contemnor's financial resources; and the burden the sanctions may impose.  Id. at 303-304.

DISCUSSION

As noted, Plaintiffs move for an enforcement order and to hold Defendants in contempt for setting a policy that SLIs would not be provided during psychiatric technicians' rounds for patients housed in administrative segregation housing units, and for consistently failing to provide qualified SLIs during educations programs at SATF, a facility that houses a large number of deaf inmates.

I.   Mental health encounters in segregated housing units

Plaintiffs contend that Defendants are violating the ARP by failing to provide an SLI for hearing-impaired inmates during the rounds that psychiatric technicians conduct for prisoners housed in the segregation units.  As quoted above, and acknowledged by both parties, the ARP provides that, when sign language is the inmate's primary or only means of effective communication, qualified sign language interpreters must be provided for medical consultations that fall within the scope of a list of examples, including mental health evaluations and other therapeutic activities.

On January 3, 2013, Defendants promulgated a new policy detailing sign-language interpretation requirements for medical and mental health encounters.  Kendrick Decl., Ex. 31; Eargle Decl. ¶ 4, Ex. A; see also Defs.' Opp. at 6.  This policy provides in relevant part,

> Licensed Psychiatric Technician (PT) rounds are required
> for all inmates housed in an Administrative Segregation
> Unit (ASU) and Security Housing Units (SHU).  These
> rounds are conducted in ASU's daily seven days a week
> and weekly for Mental Health Services Delivery System
> (MHSDS) inmates or biweekly for non-MHSDS inmates in
> SHU's.  The interaction between an inmate and the PT on

United States District Court
For the Northern District of California

these rounds does not typically require gathering or the exchange of medical information or making a mental health evaluation or assessment. Instead, the PT observes the inmate and notes what he/she sees. If the inmate indicates a problem by using "hand gestures" (see below) or other means of communication, or if a psych tech has a concern as a result of his/her observation, the PT should contact the physician or other clinician on duty for a clinical evaluation/assessment with the assistance of the SLI on duty (or a contractor if need be). In such a situation staff shall maintain one-on-one observation of the inmate until appropriate clinical intervention is obtained. Although the Coleman MHSDS Program Guide notes that the PT is to attend to the mental health needs of the inmates in ASU, that does not mean that every encounter between a PT and an inmate is an evaluation covered by the Armstrong Remedial Plan (ARP) or that observations of the inmate on rounds are equivalent to evaluation.

CDCR realizes that mental health clinician encounters require effective communication. Initial placement in ASU can occur on any day of the week, at any time of the day. At the pre-placement screen an SLI will be provided. At that time the PT and the I/P (with the assistance of the SLI) will establish additional hand signals to indicate levels of stress (low, medium, and high) for the inmate to use during PT rounds at which an SLI is not present or available. . . .

Eargle Decl. ¶ 4, Ex. A.

Dr. Amy Eargle, the Chief Psychologist of the Headquarters Clinical Support Unit for CDCR's Mental Health Program, states that no SLI assistance is needed during the psychiatric technicians' rounds, because they "observe inmates' appearance and behavior and note their observations," and "the exchange of important medical information takes place" instead during the "first interaction with the Primary care Provider . . ., which happens at the initial placement meeting for ASI or SHU Housing where an SLI is present. Eargle Decl. ¶ 6. Dr. Timothy Belavich, the Acting Director of the Division of Health Care Services of CDCR, states that the "daily or weekly rounds are brief, unstructured, interpersonal interactions, typically occurring at

cell front," which "are conducted to ensure an inmate-patient's general well-being and/or determine the potential need for services."  Belavich Decl. ¶ 8.  He states that the interaction "during rounds does not require the [licensed psychiatric technician (LPT)] to gather or exchange medical information."  Id. "Rather, during rounds, the LPT observes the inmate-patient and notes what he or she sees."  Id.

As acknowledged in the January 2013 policy, CDCR's MHSDS Program Guide states that these rounds are to be conducted daily in administrative segregation units and weekly or bi-weekly in security housing units "to attend to the mental health needs" of inmates.  Pls.' Request for Judicial Notice (RJN), Ex. 1, 12-8-7.[4] It provides that the interactions in these clinical rounds "shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days" that they are in administrative segregation.  Id. at 12-7-5.  During the rounds, the psychiatric technician is expected to identify "inmates who have not been previously identified as having mental health treatment needs but exhibit possible signs and symptoms of a serious mental disorder" and refer to them for a clinical evaluation, and to document any "unusual findings that may require closer observation."  Id. at 12-8-7.  The psychiatric technicians apparently expect to talk to the inmates; the Program Guide

_____

[4] Plaintiffs request, and Defendants do not oppose, that the Court take judicial notice of excerpts of Defendants' MHSDS Program Guide, which was filed in Coleman v. Brown, Case No. 90-520.

United States District Court
For the Northern District of California

states, "If an inmate refuses to talk to the LPTs, the LPT will discuss the inmate's functioning with custody staff."  Id.

Defendants argue that the psychiatric technician rounds are not clinical assessments or evaluations and thus that there is no Court order that they have violated by failing to provide a sign language interpreter at these interactions.  However, the descriptions of these interactions provided by Defendants' witnesses and their own materials show that these are interactions in which the inmates' mental health status is evaluated or assessed in some manner.  Thus, under the ARP, with which this Court has ordered Defendants to comply, they are required to provide a qualified sign language interpreter at these encounters.

Defendants argue that they have complied with the Court's orders, the ARP and the ADA because it is sufficient to meet the needs of these prisoners to provide qualified sign language interpreters during other mental health encounters or to use the predetermined hand signals to communicate.  They state that, according to their policy, if the psychiatric technician has any concerns about the inmate based on his or her observations during rounds, he or she is required to contact a clinician to conduct an assessment, which would be conducted with the assistance of an SLI.  However, these rounds may be the only mental health encounters for some or all of the deaf inmates in administrative segregation and they occur much more frequently than other such encounters.  The Court also has previously found that Defendants harm deaf prisoners by forcing them to rely on inadequate and ineffective forms of communication, such as reading lips and written notes.  Docket No. 1045, 3.  The limited hand signals that

United States District Court
For the Northern District of California

Defendants use here--in essence, thumbs up or thumbs down--are not

adequate "to ascertain the inmate's mental condition" as the

technicians are supposed to do here.  If the technician and a deaf

inmate cannot communicate effectively during rounds, the

technician does not have a comparable opportunity to evaluate a

deaf inmate for concerns that would lead him or her to contact a

clinician for a full assessment, as for an inmate without a

disability.  The declarations submitted by class members further

demonstrate that they felt that they could not communicate their

feelings adequately with the technicians.  See, e.g., Kendrick

Reply Dec., Ex. 4.[5]

_____

[5] Defendants object to portions of Plaintiffs' reply and supplemental evidence on the basis that it is untimely and should have been submitted with their moving papers.  Defendants move to file evidence regarding additional SLI positions created at SATF, which took place after they filed their opposition brief.  In the interest of considering a full evidentiary record, the Court GRANTS Defendants' motion to submit additional evidence, OVERRULES Defendants' objections to Plaintiffs' reply and supplemental evidence and DENIES Defendants' motion to strike.  Both sides had an opportunity to address the additional evidence at the hearing on this motion.  Further, the evidence submitted by Plaintiffs with their reply properly responds to issues raised by Defendants in their opposition.

Defendants also object that the inmate declarations submitted with Plaintiffs' reply brief are inadmissible because they were written with the assistance of sign language interpreters, who did not submit declarations addressing their qualifications and the accuracy of their translations.  Even if authentication by the interpreters who assisted the inmates with the preparation of these declarations were required, Plaintiffs have since provided such declarations, see Docket Nos. 2284-6, and Defendants have not argued that they suffered any prejudice as a result of the interpreter declarations being filed subsequently.  To the extent that Defendants argue that the inmate declarations are hearsay, this is unavailing.  The inmates themselves signed the declarations and attested to the truthfulness of their contents under penalty of perjury, regardless of who prepared the documents themselves.

United States District Court
For the Northern District of California

Plaintiffs have offered clear and convincing evidence that Defendants have adopted a policy not to provide these interpreters and have not substantially complied with the Court's orders.  To ensure compliance with the Court's past orders, the Court issues an enforcement order requiring Defendants, for all deaf prisoners whose primary means of communication is sign language, to provide a qualified sign language interpreter during all regularly-scheduled mental health rounds and all other encounters within the definition of the ARP.  Because there appears to have been a good faith misunderstanding about whether these mental health encounters fell within the terms of the ARP and the Court's prior orders, which have now been clarified in this order, the Court declines to impose sanctions at this time.

Defendants do not argue that they were unable to comply with the Court's orders or that it would be impossible to do so in the future.  Instead, they argue that Plaintiffs' requested monetary sanctions--"$1,000 for each failure to provide an interpreter for mental health professionals' rounds when deaf prisoners are housed in segregated housing units," Pls.' Proposed Order, Docket No. 2240, 5--are not warranted because Plaintiffs have not shown that any inmates have been harmed or that the policy to use pre-arranged hand signals does not work to evaluate the mental health of a deaf inmate.

Although monetary sanctions will not be imposed at this time, the Court notes that Plaintiffs have shown that Defendants' lack of compliance on this issue has created a substantial and unnecessary risk to class members.  Plaintiffs have offered substantial evidence that inmates who are in administrative

United States District Court
For the Northern District of California

segregation are at a substantially increased risk of having mental health needs, self-harm and suicide.  Thirty-four percent of all suicides in CDCR were in segregated housing.  The <u>Coleman</u> Special Master found that "the likelihood of a CDCR inmate committing suicide in segregated housing units in CDCR prisons is 33.09 times greater than it is in non-segregated housing units, based on total suicides in 2011."  Stewart Reply Decl. ¶ 25, Ex. C, 16-17;[6] <u>see also</u> RJN, Ex. 2 (<u>Coleman</u> Special Master's report showing that thirty-four percent of the inmates who committed suicide in 2010 were housed in ASU at the time of their deaths).  Defendants object that these statistics are irrelevant because they are not specific to deaf prisoners in segregated housing units.  However, these statistics include those prisoners; they show an increased risk to all inmates in segregated housing units, not only to those who are not deaf.[7]  Plaintiffs also have offered declarations from deaf prisoners who have been in administrative segregation, who felt depressed and who wanted or attempted to hurt themselves.  Kendrick Reply Decl., Exs. 4, 5.  They said that they wanted to

---

[6] Defendants object to Dr. Stewart's declaration as improper expert witness testimony because "he is not qualified as an expert on effective communication with hearing-impaired individuals." Docket No. 2279, 1.  However, he has shown that he is an expert on mental health treatment and suicide prevention in prisons, including in segregated housing units.  <u>See, e.g.</u>, Stewart Reply Decl. ¶¶ 1-14.  Thus, he is qualified to testify on the standards of mental health practices in such settings, which is the subject on which he opines.

[7] Plaintiffs request that the Court take judicial notice of the Special Master's first report, which was filed in the <u>Coleman</u> case.  Defendants object on the basis that the subject matter of the report is not limited to hearing-impaired prisoners.  Because the Court has overruled Defendants' only basis for objection, the Court grants Plaintiffs' request for judicial notice of the report.

**United States District Court**
For the Northern District of California

tell the mental health staff about their feelings but could not communicate with them.  Id.  To the extent that Defendants argue that deaf prisoners were not harmed because none have actually succeeded at committing suicide since this policy was implemented, the Court need not wait until a death to require compliance with its orders.  The Court already found in the 2007 order that Defendants had consistently and systematically denied sign language interpreters to deaf prisoners, including to suicidal prisoners, causing them significant harm.  Docket No. 1045, 2-3.

Accordingly, the Court GRANTS Plaintiffs' motion for an enforcement order and directs Defendants to provide qualified sign language interpreters during psychiatric technician rounds, and DENIES the motion for contempt.

II.  Education and vocational programs at SATF

As of March 22, 2013, there were forty-one deaf inmates at SATF who require SLIs.  Ramirez Decl. ¶ 5.  Of these, twelve are currently enrolled in vocational or educational classes.  Id. at ¶ 6.  At the time that this motion was briefed, SATF employed one full-time SLI, who provided interpretation services primarily for due process encounters.  For SLI services for vocational or educational classes, SATF utilized three companies under contracts with CDCR.  Id. at 7.

Plaintiffs contend that Defendants have consistently failed to provide SLIs at many educational and vocational classes attended by deaf prisoners at SATF.  In support of this contention, they offer evidence of the SLI logs that were prepared by the SLI scheduler at SATF.  See Kendrick Decl. ¶¶ 5-13, 15,

Exs. 2-10, 12; Kendrick Reply Decl. ¶¶ 4-5, Ex. 1;[8] see also

Sweeny Decl. ¶¶ 6-7, 11-17 & Exs. B, C.  Defendants acknowledge

that these logs "reflect every session of a course where a DPH

inmate is enrolled" and "whether or not a certified SLI was

present for a class."  Sweeny Decl. ¶¶ 6-9, 11-17; see also Opp.

at 11.  There is no dispute that the logs show that an SLI was not

present at more than a quarter of the classes in which a deaf

inmate was enrolled between August 14, 2010 and February 15,

2013.[9]  Further, there is no dispute that, between November 1,

2012 and February 15, 2013, the time period covered by the most

---

[8] Defendants object to the statement in the Kendrick
declarations that SLIs were "needed" but not provided in various
class sessions but do not appear to object to the admissibility of
the logs, which are attached as exhibits to these declarations and
which Defendants have independently offered as evidence and
authenticated.  The Court overrules their objection.  The Court
understands the statements in the Kendrick declaration to mean
that these were class sessions in which a DPH inmate was enrolled
and no SLI was provided.  To the extent that the parties dispute
whether the SLIs were "needed" or not in these instances, the
Court addresses the substance of their dispute later in this
order.

[9] Defendants submit the declaration of Aniah Sweeny, who
prepared the SLI scheduling logs.  Ms. Sweeny attests that, in
addition to tracking education and vocational classes, the logs
also track the "medical and due process encounters at SATF where
an SLI was scheduled to attend."  Sweeny Decl. ¶ 9.  She states
that, of the 5,805 total encounters tracked on the logs between
August 14, 2010 and February 15, 2013, "SLIs were not present for
553 of the encounters (or 9.5%)."  Id.  She also states that 4,055
of these encounters "were medical, mental health, dental or due
process (disciplinary) appointments," and of these 4,055
encounters, "an SLI was not present for 57 of the encounters
(1.4%)."  Id. at ¶ 10.  Subtracting the latter numbers from the
total numbers reveals that, of the remaining approximately 1,750
encounters, which were the educational and vocational classes, an
SLI was not present in about 496 instances, or about 28% of the
time.  Cf. Pls.' Reply, 4 & n.5 (calculating "a 28% error rate"
for this time period).

**United States District Court**
For the Northern District of California

recent log produced by Defendants,[10] the entries show that there was no SLI present for at least twenty-five percent of the classes that included deaf inmates.[11]

Plaintiffs also submit evidence that deaf prisoners at SATF have filed grievances about the lack of SLIs in their educational and vocational classes.  See Kendrick Decl. ¶¶ 17-18, Exs. 14 & 15.  In one of these, dated June 20, 2012, a deaf prisoner wrote that he had not had an interpreter for over a month in his class and that this was disruptive to him.  Id. at ¶ 17, Ex. 14.  In response, the warden admitted that

> the State has a contract with three companies that provide Sign Language Interpreters (SLI).  The SLI are freelance and the institution has no control over when they choose to work.  It is noted there are not enough SLIs for one to be assigned to all classes within the Education and Vocational classes.  Moreover, the institution does not have back up interpreters.

Id.  The warden stated that, although teachers inform the SLIs when they "are scheduled to lecture, . . . the SLIs are not available."  Id.  In another grievance, an inmate requested an SLI in his electronics vocational course.  Id. at ¶ 18, Ex. 15.  In

---

[10] Defendants argue that Plaintiffs did not provide with their moving papers any logs covering a period more recent than October 2012.  However, Defendants did not turn over the more recent logs from November 2012 through February 2013 until March 7, 2013, a week after Plaintiffs filed their motion on February 28, 2013.  See Kendrick Reply Decl. ¶ 4; Docket No. 2236.  In addition, Defendants submitted the updated logs with their opposition brief and Plaintiffs also offered them with their reply brief, to which Defendants did not object.

[11] Defendants' evidence indicates that the "log entries . . . show a certified SLI was present for 74.4% of the classes during this time period."  Sweeny Decl. ¶ 7.  Plaintiffs calculate from the logs that there were ninety-one classes without an SLI, out of a total of 334 classes during this time period, resulting in twenty-seven percent of classes being without an SLI.  Kendrick Reply Decl. ¶ 5.

United States District Court
For the Northern District of California

response, on September 25, 2012, the associate warden wrote, "Continuous efforts have been made to provide SLI services; however there are not enough SLI interpreters to facilitate the need." Id. He added that the institution would "continue diligent efforts to provide SLI services on a rotational basis depending upon availability of the SLI's." Id.

Defendants further argue that the logs do not show those instances where they use the services of an inmate sign language aide (SLA) instead of a qualified SLI to interpret for a deaf prisoner in a class. Id. at 11-12. Plaintiffs respond that Defendants did not show how often these SLAs were in classes or that these individuals were qualified as required by the Court's order. The Court has previously found that Defendants were continuing to deny deaf inmates access to adequate sign language interpretation in education and vocational programs and that the unqualified inmate interpreters were not sufficient for this purpose. Docket No. 1700, 4-5; see also Docket No. 523, 11 (recognizing that "using unqualified interpreters may hinder communication"). Defendants have not offered evidence that the SLAs are qualified under the ARP or the ADA.[12] The Court notes that, because of the failure to provide adequate interpretation, it has already ordered Defendants to establish permanent civil

---

[12] Defendants have provided evidence that the "inmate job description" for SLAs includes as a requirement that the inmate be "Able to communicate using American Sign Language" as "determined by Mr. Shaewitz, the certified sign language interpreter on permanent staff at SATF." Ramirez Decl. ¶¶ 9-10 & Ex. F, 3. No evidence is provided to show, among other things, that the SLAs are adept at American Sign Language, are able to interpret effectively, accurately, and impartially, or have passed any of the required tests or qualifications.

service positions for qualified sign language interpreters at each prison designated to house prisoners with hearing disabilities.

Defendants also contend that their logs are insufficient to show that they failed to comply with any requirement that they provide qualified interpreters in that the logs do not track instances where the class did not require an interpreter "because the lesson plan did not require verbal communication for that session," where the deaf student refused the SLI's services, where a class was cancelled or where the deaf student was absent from the class in which he was enrolled. Defs.' Opp. at 11. However, the logs do identify at least some instances in which the deaf prisoner was absent, the class was cancelled or the deaf prisoner refused the services of an SLI. See, e.g., Aniah Decl., Ex. B, 48 (indicating "Inmate Refused"); Aniah Decl., Ex. C, 24 (indicating "CLASS CANCELLED"); Aniah Decl., Ex. C, 37 (indicating "INMATE NOT IN CLASS"). Defendants have not offered evidence of how many classes listed on their logs had lesson plans that did not require verbal communication. Defendants, not Plaintiffs, control what information is or is not logged and Defendants, but not Plaintiffs, could have chosen to document these reasons. Because Defendants failed to log consistently the information that might show that an SLI was not required for a particular class meeting, and in light of the written acknowledgments from the wardens about the reasons that SLIs were not always provided as needed, the Court declines to infer that Defendants' claimed vitiating circumstances existed regularly. Thus, the Court finds that these arguments do not undermine Plaintiffs' prima facie showing that Defendants did not provide SLIs in many education and vocational

United States District Court
For the Northern District of California

classes in which deaf inmates were enrolled.

Defendants also represent that they have made an effort to schedule a qualified SLI at each class in which a deaf student was enrolled since the middle of 2010 by utilizing contractors, but that the contractors they use are sometimes unable to provide SLIs and that the facility "cannot obtain SLI coverage through other contractors because [it is] required to use the three state-approved contractors." Sweeny Decl. ¶ 3; see also Ramirez Decl. ¶ 6 (noting that the state was required to "accept the lowest-priced proposal" when contracting for these services). However, this excuse is unavailing. The Court previously required Defendants to establish permanent civil service positions, at whatever salary necessary, in order to provide adequate services for these purposes. Defendants are required to have sufficient SLIs on staff to provide the needed interpretation services. Although there may be instances in which an SLI is unavailable, for example, if a staff member is unexpectedly ill and no substitute can be located, failing to provide an interpreter in education and vocational classes twenty-five percent of the time, without addressing the problem, for years before Plaintiffs filed a motion for contempt, simply does not constitute making a reasonable effort to comply with the Court's prior orders.

Defendants could have sought approval for additional civil service positions or increased contractor services but failed to do so, until after Plaintiffs brought this motion. Since that time, Defendants obtained approval to increase the funding for contract SLIs by the equivalent of one full-time position, bringing its total contract SLIs from 2.5 to 3.5 full-time

United States District Court
For the Northern District of California

equivalents.  Sweeny Decl. ¶ 5.  The increased contractor services went into effect on April 8, 2013.  Between April 8, 2013[13] and April 30, 2013, the SLIs did not attend eleven of the one hundred scheduled classes; the logs indicate that the reasons for these absences were that a contract "SLI called in sick" or there was "no SLI available per contractor."  Sweeny Suppl. Decl. ¶ 2, Ex. A.[14]  After this motion was briefed, Defendants submitted evidence that they have also obtained authorization to increase from one to three the number of full-time qualified SLIs at SATF that they employ directly in civil service positions.  Defendants contend that this increase will make them less reliant on contract SLI services.  Knowles Suppl. Decl. ¶ 8 & Exs. A-C.  At the hearing, Defendants also represented that they planned to begin consistently logging additional information, including if a class was cancelled or if a deaf inmate was absent from a class meeting.

Because of Defendants' extended failure to provide SLIs in many education and vocational classes in violation of the Court's prior orders, the Court GRANTS Plaintiffs' motion to enforce those orders.  Because Defendants have demonstrated that they are presently making substantial efforts to reach compliance with the Court's orders and the ADA requirements by voluntarily increasing both the contract and civil services positions for qualified SLIs at SATF, the Court finds that no civil contempt sanctions are

_____

[13] It appears that there were no classes scheduled between April 3 and 8.  Sweeny Suppl. Decl. ¶ 2, Ex. A.

[14] The Court notes that the logs do not show whether Defendants made efforts to find a substitute SLI when one called in sick or whether none of the three contractors was able to provide an SLI.

**United States District Court**
For the Northern District of California

needed at the present time to coerce their compliance.
Accordingly, Plaintiffs' motion for contempt for their failure to
provide qualified SLIs at educational and vocational classes at
the facility is DENIED.  This denial is without prejudice to
renewal if Defendants fail to provide proper services in the
future.

                              CONCLUSION

     For the reasons set forth above, the Court GRANTS Plaintiffs'
motion to enforce and DENIES the motion to hold Defendants in
contempt (Docket No. 2236).  This order also resolves Docket Nos.
2297 and 2304.

     The Court hereby orders:

     1)   For all deaf prisoners whose primary means of
communication is sign language, Defendants shall provide a
qualified sign language interpreter during all regularly-scheduled
mental health rounds, as well as all other encounters within the
definition of the Armstrong Remedial Plan.

     2)   Defendants shall implement their plan regarding sign
language interpretation in educational and substance abuse
programs, provided to Plaintiffs on May 3, 2010.  As required in
the Court's prior orders, Defendants shall establish permanent
civil service positions for qualified sign language interpreters
for SATF, for as long as it is designated to house DPH prisoners.
Defendants shall employ, through whatever salary is necessary,
sufficient qualified interpreters to serve the needs of the DPH
prisoners housed at SATF, including at all educational and
vocational classes in which a DPH inmate is enrolled, barring
unforeseen circumstances.  Defendants may seek relief from this

United States District Court
For the Northern District of California

                                24

provision at SATF if their video conferencing facilities become sufficient to provide all necessary sign language services at that institution.

3)    Defendants shall continue to maintain logs on all educational and vocational programs at SATF to document whether deaf prisoners who rely upon sign language as their primary means of communication were provided a qualified sign language interpreter during the program and who the interpreter was.  If a qualified sign language interpreter was not provided, Defendants shall document the reason therefor.  Defendants must produce the previous month's logs to counsel for Plaintiffs by the fifteenth of each month.

The Court finds that the relief ordered herein is narrowly drawn, extends no further than necessary to correct the violation of federal rights, and is the least intrusive means necessary to correct the violation of the federal rights.

IT IS SO ORDERED.


Dated:  6/4/2013

CLAUDIA WILKEN
United States District Judge