1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:    (510) 280-2621
   Facsimile:     (510) 280-2704
5
   MICHAEL W. BIEN – 096891
6  GAY C. GRUNFELD – 121944
   PENNY GODBOLD – 226925
7  MICHAEL FREEDMAN – 262850
   ROSEN BIEN
8  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
9  San Francisco, California  94105-1738
   Telephone:    (415) 433-6830
10 Facsimile:     (415) 433-7104

11 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
12 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
13 Berkeley, California  94703
   Telephone:    (510) 644-2555
14 Facsimile:     (510) 841-8645

15 Attorneys for Plaintiffs

16                UNITED STATES DISTRICT COURT

17                NORTHERN DISTRICT OF CALIFORNIA

18                     OAKLAND DIVISION

19 | JOHN ARMSTRONG, et al.,        | Case No. C94 2307 CW

20 |          Plaintiffs,           | **NOTICE OF MOTION AND MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES AT R.J. DONOVAN CORRECTIONAL FACILITY; MEMORANDUM OF POINTS AND AUTHORITIES**

21 |      v.

22 | GAVIN NEWSOM, et al.,

23 |          Defendants.

24
25 | Judge:  Hon. Claudia Wilken
   | Date:   May 19, 2020
26 | Time:   2:00 p.m.
   | Crtrm.: TBD, Oakland

27

28

[3486656.13]

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 4

I.  RJD IS CENTRAL TO CDCR'S COMPLIANCE IN LAWSUITS ON BEHALF OF PEOPLE WITH DISABILITIES, INCLUDING MARGINALIZED AND VULNERABLE *ARMSTRONG*, *COLEMAN* AND *CLARK* CLASS MEMBERS ........................................................................ 4

II.  STAFF AT RJD ARE ASSAULTING AND RETALIATING AGAINST *ARMSTRONG* CLASS MEMBERS AND OTHER PEOPLE WITH DISABILITIES ........................................................................................ 4

    A.  Staff Are Abusing *Armstrong* Class Members Because of Their Disabilities ........................................................................... 5

    B.  Officers' Abuse of Incarcerated People Is Brazen and Public ....................... 8

    C.  The Injuries and Other Harm Resulting from the Assaults and Abuse Are Extraordinary and Extraordinarily Costly to the Victims, CDCR Employees, and California Taxpayers ........................................... 11

    D.  Officers Retaliate Against People Who File Grievances or Staff Complaints, Rendering Complaint Processes, Including 1824s, Functionally Unavailable to the People Who Need Them Most ................. 14

    E.  Officers Retaliated Against a Psychologist Who Reported An Officer's Excessive Use of Force .................................................. 17

    F.  The Scope of the Abuses at RJD Is Staggering ........................................... 18

III.  *ARMSTRONG* CLASS MEMBERS AND VULNERABLE INDIVIDUALS ARE SO TERRIFIED OF CUSTODY STAFF THAT THEY REFRAIN FROM ASKING FOR NEEDED ACCOMMODATIONS AND HELP ............... 18

IV.  CDCR HAS KNOWN FOR MORE THAN THREE YEARS OF PERVASIVE PROBLEMS AT RJD WITH STAFF ABUSING PEOPLE WITH DISABILITIES ......................................................................... 20

V.  CDCR'S RESPONSE TO THE CRISIS AT RJD HAS BEEN INADEQUATE ....................................................................................... 22

    A.  Since January 1, 2017, CDCR Has Decided to Dismiss Only Five Officers for Misconduct Against Incarcerated People ................................. 23

    B.  CDCR Failed to Adequately Investigate Allegations of Misconduct, As California's Inspector General Has Recognized ..................................... 23

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

C.     Despite CDCR's Agreement that Cameras Are Critical for Reducing Abuse, the Vast Majority of RJD Still Has No Camera Coverage ............... 26

D.     CDCR Has Failed to Follow Other Recommendations Made By Its Own Staff for Addressing the Staff Misconduct Crisis at RJD.................... 28

E.     The Few Changes that Defendants Have Made or Are in the Process of Making Are Inadequate to Address the Crisis at RJD ............................ 29

F.     CDCR Does Not Know Whether Any Steps It Has Taken at RJD Have Improved Conditions and Lacks Any Reliable System to Provide that Information.................................................................... 31

G.     CDCR Has Not Developed a Plan to Stop Staff Misconduct in Response to Plaintiffs' November 2019 Demand Letter ............................. 32

H.     Officers Continue to Regularly Abuse, Assault and Retaliate Against People with Disabilities at RJD ......................................................... 32

I.     Defendants Have Taken the Position, On Accountability Logs and Elsewhere, that Staff Misconduct Almost Never Constitutes a Violation of the ADA ..................................................................... 34

VI.     OFFICERS ARE AND HAVE BEEN ABUSING PEOPLE WITH DISABILITIES AT OTHER CDCR PRISONS.......................................... 35

ARGUMENT ................................................................................ 37

I.     DEFENDANTS ARE VIOLATING THE ADA, RA, AND ORDERS OF THIS COURT BY ALLOWING SYSTEMIC ABUSE AIMED AT *ARMSTRONG* CLASS MEMBERS ................................................... 37

II.     THE ENVIRONMENT AT RJD—WHERE *ARMSTRONG* CLASS MEMBERS ARE TOO AFRAID OF STAFF TO REQUEST ACCOMMODATIONS FOR THEIR DISABILITIES—VIOLATES THE ADA, RA, AND PRIOR ORDERS OF THIS COURT ............................ 38

III.     DEFENDANTS ARE IN VIOLATION OF THIS COURT'S ORDERS REGARDING ACCOUNTABILITY ................................................. 40

IV.     THE COURT SHOULD REQUIRE THAT DEFENDANTS DEVELOP A PLAN TO STOP OFFICERS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES AT RJD................. 41

CONCLUSION.............................................................................. 45

[3486656.13]

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

# TABLE OF AUTHORITIES

**Page**

## CASES

*Arizona Dream Act Coalition v. Brewer,*
      855 F.3d 957 (9th Cir. 2017) ................................................................... 42

*Armstrong v. Brown,*
      768 F.3d 975 (9th Cir. 2014) ................................................................... 45

*Armstrong v. Wilson,*
      942 F. Supp. 1252 (N.D. Cal. 1996) ........................................................ 37

*Ashker v. Newsom,*
      No. 09-CV-05796-CW (RMI), 2019 WL 330461 (N.D. Cal. Jan. 25, 2019) ......... 42

*Brown v. City of Tucson,*
      336 F.3d 1181 (9th Cir. 2003) ................................................................. 39

*Brown v. Plata,*
      563 U.S. 493 (2011) .............................................................................. 42

*Chess v. Dovey,*
      790 F.3d 961 (9th Cir. 2015) ................................................................... 42

*Coleman v. Brown,*
      28 F. Supp. 3d 1068 (E.D. Cal. 2014) ...................................................... 35

*Duvall v. Cty. of Kitsap,*
      260 F.3d 1124 (9th Cir. 2001) ................................................................. 37

*EEOC v. Day & Zimmerman NPS, Inc.,*
      265 F. Supp. 3d 179 (D. Conn. 2017) ...................................................... 39

*Farmer v. Brennan,*
      511 U.S. 825 (1994) .............................................................................. 42

*Hoptowit v. Spellman,*
      753 F.2d 779 (9th Cir. 1985) ................................................................... 42

*Hudson v. McMillian,*
      503 U.S. 1 (1992) ................................................................................. 42

*Kiman v. New Hampshire Dep't of Corr.,*
      451 F.3d 274 (1st Cir. 2006) ................................................................... 39

*Parsons v. Ryan,*
      949. F. 3d 443 (9th Cir. 2020) ................................................................. 41

*Purcell v. Pennsylvania Dep't of Corr.,*
      No. CIV. A. 95-6720, 1998 WL 10236 (E.D. Pa. Jan. 9, 1998) ...................... 39

Case No. C94 2307 CW

[3486656.13]

*Sheehan v. City and County of San Francisco*,
    743 F.3d 1211 (9th Cir. 2014) ................................................................ 38

*Updike v. Multnomah Cty.*,
    870 F.3d 939 (9th Cir. 2017) .................................................................. 38

*Vos v. City of Newport Beach*,
    892 F.3d 1024 (9th Cir. 2018) .......................................................... 37, 38

*Wolff v. McDonnell*,
    418 U.S. 539 (1974) ............................................................................. 42


**STATUTES**

18 U.S.C. § 3626 ........................................................................................ 44

42 U.S.C. § 12132 ...................................................................................... 37

42 U.S.C. § 12203 ................................................................... 37, 39, 40, 44


**REGULATIONS**

28 C.F.R. § 35.107 ............................................................................... 39, 40

28 C.F.R. § 35.130 ............................................................................... 38, 40


**RULES**

Fed. R. Civ. P. 65 ....................................................................................... 42

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

[3486656.13]

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 19, 2020, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Claudia Wilken, located at 1301 Clay Street, Plaintiffs John Armstrong, *et al.*, will and hereby do move the Court for an order to stop Defendants Gavin Newsom, *et al.*, from assaulting, abusing and retaliating against people with disabilities at R.J. Donovan Correctional Facility ("Motion").

This Motion is based on this Notice of Motion and Memorandum of Points and Authorities, the Proposed Order and Declarations of Gay Crosthwait Grunfeld, Michael Freedman, Penny Godbold, and Eldon Vail, filed herewith, the Court files in this action, and such other materials and argument as may be presented before or at the hearing.

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Correctional officers are assaulting and terrorizing incarcerated people with disabilities at R.J. Donovan Correctional Facility ("RJD"). As described in the fifty-four declarations that accompany this Motion, all of which are signed by people with disabilities, officers are throwing people out of wheelchairs, punching deaf people when they cannot hear spoken orders, beating people with disabilities who request help carrying heavy packages, closing cell doors on people who use walkers and wheelchairs, and attacking suicidal people when they ask for mental health care. Witnesses report at least one and possibly two instances where staff used force in a way that contributed to the deaths of incarcerated people. Broken bones, shattered teeth, bloodied faces, and concussions are routine. Officers assault people who are restrained and not resisting or who they have already knocked unconscious. Those who complain about mistreatment become the officers' next victims or receive false disciplinary write-ups. Officers have even retaliated against a CDCR psychologist who, following policy, reported misconduct perpetrated by custody staff.

The systemic, omnipresent violence and retaliation have made incarcerated people

[3486656.13]

too afraid to ask staff for basic disability accommodations, either informally or using the court-ordered disability grievance process. Out of fear, people have foregone requesting wheelchair pushers, wheelchair repairs, hearing aid batteries, writing supplies needed to communicate, access to mental health clinicians when they are feeling unwell, and toilet paper, clean clothes, and showers when they soil themselves. This widespread abuse has destroyed the protections at the heart of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), the *Armstrong* Remedial Plan ("ARP"), and this Court's prior orders: the right to request and receive reasonable accommodations and to be free from discrimination based on disability.

The California Department of Corrections and Rehabilitation ("CDCR" or "Defendants") has known of profound problems at RJD for years. Since 2016, Plaintiffs' counsel has notified Defendants of more than fifty discrete and specific allegations of misconduct at RJD in advocacy letters and *Armstrong* monitoring tour reports. In September 2018, following a joint *Armstrong* monitoring tour at RJD, CDCR's auditors and Plaintiffs' counsel each wrote to CDCR regarding significant reports of abuse of people with disabilities. In December 2018, CDCR sent a "strike team" to conduct more than one hundred interviews with incarcerated people on one yard at RJD. Investigators heard over and over again that officers were targeting people with disabilities with violence, hiring incarcerated people to assault other incarcerated people, retaliating against anyone who dared speak up, and engaging in "gang-like" activity. CDCR's Chief Ombudsman, who reports to the Secretary of CDCR, wrote that she had never previously heard "accusations like these in all my years" or "such despair, hopelessness, and fear from inmates."

In the face of this crisis at RJD, CDCR's response has been shockingly inadequate. Since January 1, 2017, CDCR has only issued terminations to five RJD officers for engaging in misconduct against incarcerated people. Despite evidence of criminal assaults, not a single officer has been criminally charged for hurting an incarcerated person. CDCR still has not completed investigations into the allegations raised during its

[3486656.13]

1  December 2018 strike team interviews, has not investigated many of the allegations raised

2  by Plaintiffs' counsel, and has largely failed to document any staff misconduct allegations

3  on the non-compliance logs mandated by this Court's orders regarding accountability.

4  Despite a December 2018 recommendation by the strike team that cameras be installed

5  everywhere at RJD and agreement from all stakeholders that cameras are critical for

6  reducing staff misconduct, CDCR has not installed any additional cameras; the vast

7  majority of the prison, including most of the areas in which assaults have occurred, has no

8  camera coverage and will not until June 2021, at the earliest.  CDCR has no functioning

9  system to investigate or track allegations of misconduct and no early warning system to

10  detect problems.  Most damningly, horrifying staff assaults involving serious injuries and

11  trauma continue to occur on a regular basis, including nearly thirty incidents in the last six

12  months at RJD.  And though this Motion focuses on the shocking abuses at RJD, staff

13  misconduct against people with disabilities is a systemic problem at many of CDCR's

14  high-security prisons, as reflected in multiple reports by the Office of the Inspector

15  General ("OIG"), advocacy from Plaintiffs' counsel, and a court order in *Coleman v.*

16  *Newson* requiring CDCR to improve its use of force policies for people with mental

17  illness.  CDCR's actions and inaction violate the ADA, the RA, the ARP, and this Court's

18  prior orders, including the 2007 injunction and the orders regarding accountability.

19       Informal efforts through the parties' meet-and-confer process have failed to stop the

20  crisis.  Until class members are protected, no other efforts toward a sustainable remedy—

21  such as the accountability orders or the parties' joint audit tool—can work.  Instead,

22  Defendants must immediately focus their efforts on developing and implementing a

23  comprehensive plan, as described in the accompanying Proposed Order, to stop staff at

24  RJD from assaulting, abusing and retaliating against incarcerated people with disabilities.

25

26

27

28

# FACTUAL BACKGROUND

## I. RJD IS CENTRAL TO CDCR'S COMPLIANCE IN LAWSUITS ON BEHALF OF PEOPLE WITH DISABILITIES, INCLUDING MARGINALIZED AND VULNERABLE *ARMSTRONG*, *COLEMAN* AND *CLARK* CLASS MEMBERS

CDCR has chosen to make RJD, which houses nearly 4,000 people, one of its most important prisons for accommodating people with disabilities and caring for people with physical and mental health problems. Decl. of Gay Crosthwait Grunfeld in Supp. of Mot. ("Grunfeld Decl."), filed herewith, Ex. II, at 184. With nearly 1,000 *Armstrong* class members, RJD has the second largest population in CDCR of incarcerated people with disabilities, including 297 people who use wheelchairs, 217 people who are deaf or hard of hearing (including more than 10 who use sign language as their primary method of communication), and 13 blind class members. *Id.* at 188-89; *id.*, Ex. HH. In addition, RJD houses more than 2,000 *Coleman* class members, including more than 700 individuals in CDCR's enhanced mental health program; 92 class members in *Clark v. California*, Case No. 3:96-cv-01486-CRB (N.D. Cal.) with developmental disabilities; and more than 1,500 people with high-risk medical conditions. *See* Grunfeld Decl., Ex. II, at 185-87, 189; *id.*, ¶ 72 & Ex. JJ.

## II. STAFF AT RJD ARE ASSAULTING AND RETALIATING AGAINST *ARMSTRONG* CLASS MEMBERS AND OTHER PEOPLE WITH DISABILITIES

Given CDCR's decision to cluster thousands of its sickest and most vulnerable people at RJD, CDCR has a responsibility to ensure staff at the prison are able to accommodate and meet the needs of the population. Instead, as reflected in the fifty-four declarations from people with disabilities[1] and other evidence filed in support of this Motion, correctional officers at RJD are attacking and bullying people with disabilities and

---

[1] Thirty-four of the declarants are both *Armstrong* and *Coleman* class members, nine are only *Armstrong* class members, ten are only *Coleman* class members, and one is an *Armstrong*, *Clark*, and *Coleman* class member. *Clark* and *Coleman* class members are people with disabilities. *See* 42 U.S.C. § 12102(1). Their experiences are highly relevant to whether Defendants are violating the rights of *Armstrong* class members.

retaliating against those who ask for help or complain about abuse. As one class member who uses a wheelchair put it, "CDCR filled this place with dying men in wheelchairs, yet the staff do not demonstrate an understanding of disabilities or mental illness." Decl. of Michael Freedman in Supp. of Mot. ("Freedman Decl."), filed herewith under seal, Ex. 14, ¶ 22.

### A.   Staff Are Abusing *Armstrong* Class Members Because of Their Disabilities

Correctional officers at RJD have repeatedly assaulted, threatened, intimidated, or otherwise harassed people with disabilities because of their disabilities or because they have requested disability accommodations. For example:

- An officer called a class member who uses a walker a "crippled motherfucker," before pepper spraying him in the face, hitting him in the face with the pepper spray canister, and then kicking and stomping on the class member's back and neck. The assault occurred because the person had threatened to complain about the officer refusing to provide assistance carrying a heavy box of legal mail. Freedman Decl., Ex. 21, ¶¶ 4, 7-9 & Ex. 21a, at 1, 3, 5.

- An officer punched a deaf class member in the face after he failed to hear and follow the officer's orders. At the time, the class member was wearing the required vest indicating that he had a hearing disability and had attempted to use gestures to communicate to the officer that he was deaf and could not understand what the officer was saying. Freedman Decl., Ex. 7, ¶¶ 5, 8-15.

- In three separate incidents, officers slammed class members who used canes and walkers to the ground when they requested that officers handcuff them if front of their bodies, rather than behind their backs, as an accommodation for their disabilities. Freedman Decl., Ex. 10, ¶¶ 4, 9-13; Ex. 10a, at 1; Ex. 8, ¶¶ 7-12; Ex. 8a, at 1; Ex. 32, ¶¶ 15-17; Ex. 45, ¶¶ 4-9.

- An older class member who uses a wheelchair filed an ADA complaint after an officer, in response to the class member's request for someone to help push his wheelchair, called the class member a "piece of shit" and told him "[g]et the fuck out of here, you don't need a wheelchair." The same officer previously refused the class member access to the shower to clean himself after an incontinence accident. The class member dropped the complaint after being pressured by a lieutenant to do so, because he knew that the officer could make his life "far worse if [he] continued to speak out" about the denials of accommodations. Freedman Decl., Ex. 35, ¶¶ 4, 8-11 & Ex. 35a.

- An elderly person who uses a walker withdrew an ADA complaint about an officer repeatedly closing his cell door on him after another officer threatened retaliation. Freedman Decl., Ex. 36, ¶¶ 9-11 & Ex. 36a.

According to Plaintiffs' expert, Eldon Vail, the former Secretary of the Washington

Department of Corrections, in multiple cases, staff's failure to recognize and accommodate people's disabilities directly led to uses of force. *See, e.g.*, Decl. of Eldon Vail in Supp. of Mot. ("Vail Decl."), filed herewith under seal, ¶¶ 4, 27, 30.

Officers at RJD demonstrate a deep disregard for and discriminatory animus toward individuals with disabilities and other vulnerable groups of people. Without adequate or sometimes any justification, staff have thrown multiple people out of wheelchairs or beat them so badly that they fell out of their wheelchairs.[2] Officers have unnecessarily attacked other people with obvious disabilities, such as those who were using walkers.[3] Officers routinely and intentionally closed cell doors on people with disabilities and elderly people who move slowly.[4] Staff accused people of faking disabilities or used discriminatory language to refer to people with disabilities and minorities.[5] One class member explained how when he first started using a wheelchair, an officer said, "Oh, you must be a big pussy now that you're in a wheelchair. Aren't you?" Freedman Decl., Ex. 50, ¶ 32. Officers

---

[2] *See* Freedman Decl., Ex. 50, ¶¶ 9-13 (staff intentionally tipped class member over in his wheelchair, then, after he was back in his chair, beat him so badly he fell out of his chair again); Ex. 29, ¶ 17 & Ex. A, at 6-7 (witnessing same incident); Ex. 47, ¶¶ 9-10 (staff beat class member so badly he fell out of his wheelchair, then dragged him without his wheelchair approximately 200 yards to the gym); Ex. 9, ¶¶ 6-13 (staff left wheelchair user in handcuffs in cell for more than 48 hours); Ex. 18, ¶¶ 20-23 (three officers punched class member in wheelchair over a dozen times); Ex. 27, ¶ 16 (officer dumped person out of wheelchair); Ex. 42, ¶¶ 6-7 (staff dumped class member out of wheelchair); Ex. 38, ¶¶ 16, 18 (officer knocked people out of wheelchairs in two separate incidents).

[3] *See* Freedman Decl., Ex. 6, ¶¶ 8-9 (officer threw person using walker to the ground); Ex. 11, ¶¶ 9-11 (officer threw person who used walker against wall); Ex. 49, ¶ 13 (officers threw walker at person after beating him up); Ex. 58, ¶ 12 (officer threw person's walker aside during unnecessarily forceful search); *see also* Freedman Decl., ¶¶ 259-261.

[4] *See* Freedman Decl., Ex. 11, ¶¶ 20-23; Ex. 17, ¶¶ 6-8; Ex. 24, ¶ 18; Ex. 25, ¶ 11; Ex. 26, ¶ 18; Ex. 36, ¶¶ 8-9, 11, 13; Ex. 55, ¶¶ 7, 10.

[5] Freedman Decl., Ex. 21, ¶ 9 (before assault, officer called class member a "crippled motherfucker"); Ex. 23, ¶ 28 (staff accused class member and others of faking disability); Ex. 50, ¶¶ 32-33 (officer said "don't think that wheelchair is going to prevent us from putting hands on you if we have to"); Ex. 10, ¶ 15 (officers accused class member of faking injuries and disability); Ex. 14, ¶ 21 (officers accused person in wheelchair of faking disability); Ex. 35, ¶ 10 (officer accused person of faking need for wheelchair); Ex. 34, ¶ 7 (officer called transgender person "gay boy" and a "tranny" during strip search); Ex. 37, ¶ 8 (officers asked person if he was "retarded" or "stupid"); Ex. 11, ¶ 35 (officer commonly used the "n" word over the PA system).

[3486656.13]

frequently targeted transgender people.[6]

Officers have also abused numerous people in mental health crisis. In one shocking instance, staff stood on the back of an acutely suicidal person while he yelled, "I can't breathe!" He died. Prior to his death, officers ignored this man's cries for help for thirty minutes before finally dragging him out of his cell and handcuffing his badly bleeding wrists. Freedman Decl., ¶¶ 10-14; *id.,* Ex. 50, ¶¶ 26-27; Ex. 51, ¶¶ 24-26; Ex. 5 (records related to his death). Staff have assaulted people in mental health crisis,[7] encouraged people to engage in acts of self-harm,[8] ignored suicidality,[9] and given away people's property if they are admitted for treatment.[10]

The vast majority of abuses described in the declarations occurred against people with disabilities. This evidence establishes a pattern and practice of officers hurting class members and other vulnerable incarcerated people. By focusing their violence and harassment on people with disabilities and other vulnerable incarcerated people, staff have created a near-universal perception among incarcerated people that staff intentionally select people with disabilities for abuse.[11] Class members believe that staff single out people with disabilities for a number of reasons, including because people with disabilities are easy targets, weak, or otherwise unable to defend themselves,[12] and because staff react

---

[6] *See* Freedman Decl., Ex. 33, ¶ 22; Ex. 34, ¶¶ 4, 7-10, 15; Ex. 51, ¶¶ 2, 7-22; Ex. 52, ¶ 8; Ex. 56, ¶¶ 4, 7-12.

[7] *See* Freedman Decl., Ex. 32, ¶¶ 15-17; Ex. 49, ¶¶ 9-13; Ex. 31, ¶¶ 9-10; Ex. 48, ¶¶ 9-14.

[8] *See* Freedman Decl., Ex. 51, ¶¶ 7-13; Ex. 32, ¶ 9; Ex. 37, ¶ 19.

[9] *See* Freedman Decl., Ex. 31 ¶ 11; Ex. 58, ¶ 16.

[10] *See* Freedman Decl., Ex. 31, ¶ 12.

[11] *See* Freedman Decl., Ex. 9, ¶ 16; Ex. 10, ¶ 21; Ex. 11, ¶ 39; Ex. 12, ¶ 15; Ex. 13, ¶ 22; Ex. 14, ¶ 20; Ex. 15, ¶ 27; Ex. 16, ¶ 18; Ex. 17, ¶ 13; Ex. 20, ¶ 32; Ex. 22, ¶ 21; Ex. 23, ¶ 28; Ex. 25, ¶ 29; Ex. 26, ¶¶ 18-19; Ex. 27, ¶ 17; Ex. 28, ¶ 14; Ex. 32, ¶¶ 11, 19; Ex. 33, ¶¶ 24-25; Ex. 34, ¶ 18; Ex. 38, ¶ 19; Ex. 39, ¶ 15; Ex. 43, ¶¶ 24-25; Ex. 45, ¶¶ 23-24; Ex. 46, ¶ 13; Ex. 47, ¶¶ 17-18; Ex. 49, ¶ 28; Ex. 50, ¶¶ 31-33; Ex. 52, ¶ 14; Ex. 54, ¶ 36; Ex. 56, ¶ 25.

[12] *See, e.g.,* Freedman Decl., Ex. 11, ¶ 38 (class member explained that he feels like a "sitting duck due to his age and disability"); Ex. 9 ¶ 16; Ex. 20 ¶ 32; Ex. 34, ¶ 20; Ex. 54 ¶ 36; Ex. 56, ¶ 25.

[3486656.13]

negatively to the extra work required to provide disability accommodations.[13]  Regardless of the precise explanation, Plaintiffs' expert identified "[a] pattern of physical violence against class members in this case as well as class members in *Coleman v. Newsom* who are housed at RJD."  Vail Decl., ¶ 13.

CDCR is well aware of this pattern.  In December 2018, in response to reports by Plaintiffs' counsel and CDCR's own auditors in the Office of Audit and Court Compliance ("OACC") after a joint *Armstrong* monitoring audit at RJD, CDCR sent a strike team of investigators to conduct interviews with more than one hundred incarcerated people on Facility C at RJD.  Freedman Decl., Ex. 2, at 1-3; Grunfeld Decl., Exs. F, G.  Associate Warden Bishop, who led the strike team, wrote a memorandum (the "Bishop Report") in which he concluded that "[m]entally disordered offenders, developmentally disabled offenders, sex offenders, and homosexual/transgender offenders [are] being targeted for assault and/or abuse by staff."  Freedman Decl., Ex. 2, at 1; *see also id.*, at 4-5 (same).  Of the forty-eight specific allegations of misconduct listed in the Bishop Report for further investigation, six involved incidents where staff stomped on, jumped on, pepper sprayed, or otherwise assaulted people in wheelchairs.  *Id.* at 14-17.  Two months later, after completing some follow-up interviews at RJD, one of the CDCR investigators wrote two memoranda concluding that the "[m]ajority of these allegations are being made by the Enhanced Outpatient inmate population or **wheelchair designated inmates**."  Freedman Decl., Ex. 3, at 8 & Ex. 4, at 8 (emphasis added).

**B.  Officers' Abuse of Incarcerated People Is Brazen and Public**

Many of the officers' assaults on incarcerated people are noteworthy for their publicness and brutality.  Some of the most public displays of abuse include the following:

- Officers trapped an aging class member who has mental illness and is hard of hearing in an isolated hallway and then attacked him, breaking his arm and jaw. Officers then obstructed his access to medical attention for seven hours.  Five declarants and many other incarcerated people witnessed events related to the incident, including officers denying the victim medical care then accusing him of

---

[13] *See, e.g.*, Freedman Decl., Ex. 31, ¶ 17; Ex. 46, ¶ 15; Ex. 51 ¶ 31.

[3486656.13]

"inciting a riot" and ordering him to return to his cell because his visible injuries and pain were upsetting to multiple people in the housing unit. Freedman Decl., ¶¶ 237-242; *id.*, Ex. 57, ¶¶ 2, 4-6, 7-22; Ex. 57a, at 6-13; Ex. 11, ¶¶ 30-34; Ex. 16, ¶¶ 6-13, 18; Ex. 23, ¶¶ 23-24; Ex. 24, ¶¶ 7-14; Ex. 54, ¶¶ 5-17.

- An officer sucker punched an aging class member with a mobility disability and mental illness, knocking him unconscious when he hit the concrete floor face first. Multiple officers then beat this class member while he was unconscious, stomping and kicking him on the floor of a crowded dayroom. Witnesses, of which there were many, reported that observing the assault caused fear, anxiety, nightmares, a sense of powerlessness and, in some cases, suicidality. Freedman Decl., ¶¶ 77-79; *id.*, Ex. 23, ¶¶ 2, 5-16; Ex. 11, ¶¶ 24-28, 38 (quotation); Ex. 16, ¶¶ 15, 18-19; Ex. 54, ¶¶ 20-22, 34-35.

- An officer, who was literally upset over spilt milk, threw an aging, paralyzed, class member with mental illness from his wheelchair, causing him to hit his head on the concrete floor of a crowded, occupied dining hall. Officers then yelled at him multiple times to "get up!" Finally, an officer yanked him up by his hair and the back of his collar. A witness to this incident reported that when he thinks about being transferred back to RJD, his anxiety is so bad it overwhelms him and he feels like killing himself. Freedman Decl., ¶¶ 200-202, Ex. 50, ¶¶ 5-25; Ex. 29, ¶ 17, 49 & Ex. A to Ex. 29, at 6-7.

- In one incident—the only one for which Defendants have produced surveillance video footage to Plaintiffs—officers threw a class member to the ground from the seat of his walker in front of the dining hall, even though the person did not appear to be posing any threat to the officers or the institution. The video shows that this assault occurred in front of many other incarcerated people, including people with disabilities. Freedman Decl., Ex. 89 (video); Ex. 90 (zoomed in version of the video); *id.*, ¶¶ 259-261 & Exs. 62, 62b; Ex. 29, ¶ 29 (witnessed same incident).

Other assaults were also witnessed by many people. Freedman Decl., Ex. 47, ¶¶ 8-9 (officers assaulted a wheelchair user, punching, kicking and stomping him in the face while he was handcuffed in the middle of an occupied dayroom); Ex. 20, ¶¶ 7-15 (officers broke person's arm, then threw him to the ground, in an occupied dining hall); Ex. 28, ¶¶ 7-9 (witnessed same incident); Ex. 56, ¶¶ 4, 7-11 (officers broke ankle of transgender person with mental illness in occupied housing unit); Ex. 33, ¶¶ 20 (officer intentionally shoved the face of an elderly person with mental illness into puddle of discharged pepper spray on ground in occupied dining hall); Ex. 43, ¶¶ 6-12 (officers permitted incarcerated people to assault class member in cell).

In some cases, officers used force when none, whatsoever, was justified;[14] in others,

---

[14] *See* Freedman Decl., Ex. 6, ¶ 8; Ex. 7, ¶¶ 13-15; Ex. 11, ¶¶ 9-11; Ex. 12, ¶ 8; Ex. 13, (footnote continued)

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

[3486656.13]

staff utilized plainly excessive force.[15]  Officers frequently assaulted incarcerated people

who were already in handcuffs.[16]  As Mr. Vail explained, "[t]he level of threat used to

cause such injuries in these incidents does not match the age, disability, or behavior of the

class members in their conflicts with RJD staff."  Vail Decl., ¶ 13.

Officers are brazen in other respects.  The Bishop Report included consistent

reports from interviewees that staff work with and hire incarcerated people, including

members of prison gangs, to assault other incarcerated people; that staff give incarcerated

people permission to assault or to steal the property of other incarcerated people; that staff

intentionally delay in responding to fights between incarcerated people and then use

excessive force when they do; that staff set up incarcerated people to fight one another,

with the loser being assaulted further by staff; that staff viewed the "procession of inmates

coming out of the dining hall as a target rich environment to pick victims from and harass

them"; and that staff deny medical care to incarcerated people who have been involved in

incidents.  Freedman Decl., Ex. 2, at 4-6.  Multiple interviewees reported that **custody

staff themselves were engaging in** "**gang-like activity**," and that two separate gangs of

custody officers, the members of which identified themselves with distinctive ways of

wearing their uniforms, were operating on Facility C.  *Id.* at 5 (emphasis added).  The

declarations from class members echo many of these reports.[17]

---

¶¶ 20-21; Ex. 15, ¶ 12; Ex. 16, ¶¶ 7, 15; Ex. 18, ¶ 23; Ex. 21, ¶ 9; Ex. 23, ¶ 24; Ex. 24,
¶¶ 7-14; Ex. 28, ¶ 10; Ex. 29, ¶¶ 7-9, 13, 21-24, 29; Ex. 30, ¶¶ 8-14, 27; Ex. 31, ¶¶ 9-10;
Ex. 32 ¶¶ 15-17; Ex. 33, ¶¶ 9-11, 20, 22; Ex. 34, ¶¶ 8-9; Ex. 38, ¶¶ 15-18; Ex. 39, ¶¶ 6-7;
Ex. 45, ¶¶ 8, 21-22; Ex. 46, ¶ 8; Ex. 49, ¶¶ 10-12; Ex. 50, ¶¶ 8-17, 26-27; Ex. 51, ¶ 24;
Ex. 53, ¶ 23; Ex. 54, ¶ 9; Ex. 57, ¶¶ 7-11.

[15]  *See* Freedman Decl., Ex. 6, ¶ 15; Ex. 10, ¶¶ 9-13, Ex. 11, ¶¶ 24-25; Ex. 13, ¶¶ 13-16;
Ex. 15, ¶¶ 6-8; Ex. 16, ¶ 15; Ex. 22, ¶ 8; Ex. 23, ¶¶ 8-11; Ex. 25, ¶ 21; Ex. 27, ¶¶ 8-9;
Ex. 28, ¶¶ 7-9; Ex. 29, ¶¶ 10-11; Ex. 32, ¶¶ 8, 13; Ex. 34, ¶ 15; Ex. 40, ¶ 13; Ex. 43, ¶ 21;
Ex. 47, ¶ 9; Ex. 48, ¶¶ 12-14; Ex. 49, ¶ 16; Ex. 50, ¶¶ 28-29; Ex. 52, ¶¶ 8-9; Ex. 53, ¶ 19;
Ex. 54, ¶¶ 20-23; Ex. 56, ¶¶ 7-8, 19.

[16] *See* Freedman Decl., Ex. 11, ¶ 25; Ex. 13, ¶¶ 13-14; Ex. 15, ¶¶ 7-8, 11-12; Ex. 23, ¶¶ 11-
12; Ex. 25, ¶¶ 21; Ex. 29, ¶¶ 7-8; Ex. 32, ¶ 13; Ex. 33, ¶¶ 9-10; Ex. 45, ¶¶ 7-8; Ex. 48,
¶ 13; Ex. 50, ¶¶ 10-11, 13-17.

[17] For incidents where staff used incarcerated people to attack their victims, see Freedman
(footnote continued)

10

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

[3486656.13]

1

2

**C.     The Injuries and Other Harm Resulting from the Assaults and Abuse Are Extraordinary and Extraordinarily Costly to the Victims, CDCR Employees, and California Taxpayers**

3        The injuries caused by staff are extraordinary and send a clear message to

4   incarcerated people: Cross us and we will hurt you badly.  As Mr. Vail noted, "[w]hat is

5   startling … is the frequency of broken bones and stitches required for class members after

6   a use of force incident at RJD."  Vail Decl., ¶ 13; *see also id.* (describing how officers at

7   RJD use "closed fist punches and kicks, that result in serious injury to the class members

8   far beyond the norm found in other institutions or jurisdictions of which I am aware").

9   Staff and incarcerated people working at staff's behest have broken victims' arms, wrists,

10  ribs, legs, orbital sockets, teeth, feet, fingers, and jaws; many of the broken bones required

11  surgical repairs.[18]  In multiple incidents, staff knocked victims unconscious and then,

12  ────────────────────

13  Decl., Ex. 13 ¶¶ 6-11 (after filing complaint, officer conspired with other incarcerated
    people to assault the person); Ex. 15, ¶ 24 (staff member threatened person that if he did
14  not take his medication, "I'll have inmates go into your cell and fuck you up."); Ex. 18,
    ¶¶ 6-8 (staff paid incarcerated person to assault victim); Ex. 22, ¶¶ 14-16 (officer informed
15  incarcerated people that a person was a child molester to incite them to attack him); Ex. 29,
    ¶¶ 30-40 (after officers discovered incarcerated person was speaking with investigators
16  regarding staff misconduct, officers had another incarcerated person assault the person);
    Ex. 41, ¶¶ 12-15 (person was attacked by incarcerated people in retaliation for filing
17  complaints against two officers); Ex. 48, ¶¶ 16-18 (officer paid incarcerated people to beat
    up other incarcerated people); Ex. 50, ¶ 29 (officer conspired with incarcerated people to
18  start a fight so that the officer could shoot incarcerated person with the block gun).

19  For incidents where officers "greenlighted" attacks by incarcerated people on other
    incarcerated people, i.e., looked the other way while attacks occurred, see Freedman Decl.,
20  Ex. 14, ¶¶ 15-16; Ex. 18, ¶¶ 6-8; Ex. 19, ¶ 11; Ex. 29, ¶ 18; Ex. 43, ¶ 6-11; Ex. 56, ¶ 18.

    For incidents where officers failed to respond timely to a fight between incarcerated
21  people, see Freedman Decl., Ex. 14, ¶¶ 15-16; Ex. 15, ¶ 23; Ex. 18, ¶¶ 6-8; Ex. 37, ¶ 18;
    Ex. 43, ¶¶ 6-11; Ex. 48, ¶¶ 16-17; Ex. 50, ¶ 29; Ex. 52, ¶ 12; Ex. 56, ¶ 18; Ex. 58, ¶ 17.

22  For incidents where officers permitted or offered to permit an incarcerated person to take
    another incarcerated person's property, see Freedman Decl., Ex. 13, ¶ 6; Ex. 19, ¶ 11;
23  Ex. 31, ¶ 12; Ex. 41, ¶ 17; Ex. 51, ¶ 20.

24  [18] *See* Freedman Decl., Ex. 20, ¶¶ 10-13, 15 & Ex. 20a, at 1-2, 4-5 (two fractures in 61-
    year old class member's wrist requiring surgery); Ex. 33, ¶¶ 9-11 & Ex. 33a, at 1-6
25  (broken foot, finger, and tooth, plus internal bleeding); Ex. 47, ¶ 12 & Ex. 47a, at 1-4
    (broken ribs); Ex. 50, ¶ 28 (broken jaw); Ex. 53, ¶¶ 19-20 (broken eye socket); Ex. 56,
26  ¶¶ 8-12 & Ex. 56a, at 1-4 (broken leg requiring surgery); Ex. 29, ¶¶ 36-39 & Ex. 29a, at 3-
    4 (broken eye socket, displaced eyeball requiring emergency surgery, and bleeding from
27  ear canal); Ex. 57, ¶¶ 7-10 & Ex. 57a, at 12-16 (broken arm and jaw); Ex. 43, ¶ 15 &
    Ex. 43a, at 4, 6-9 (facial fractures requiring two surgeries); Ex. 43, ¶ 21 (broken arm).

28

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

1  sometimes, continued the assaults.[19]  Other times, staff caused large cuts requiring stitches

2  or other significant damage.[20]  At least twelve of the assaults by staff resulted in the victim

3  being transported from RJD to a hospital for medical attention.[21]

4      As discussed above, staff are believed to have contributed to the death of a suicidal

5  person by standing on his back while he was bleeding from self-inflicted wounds.  *See*

6  Freedman Decl., ¶¶ 10-14 & Ex. 50, ¶¶ 26-27; Ex. 51, ¶¶ 24-26; Ex. 5.  Declarants

7  witnessed another incident that may have resulted in the death of an incarcerated person, in

8  which officers assaulted a person restrained in handcuffs and stomped the person's head

9  into the ground two times. Freedman Decl., Ex. 13, ¶¶ 13-16; Ex. 25, ¶¶ 21-24.

10      Following attacks by custody staff, some *Armstrong* class members' disabilities

11  have become more severe, including a few for whom doctors changed the class members'

12  disability designations to reflect higher levels of impairment.[22]  Declarants' mental health

13  has also declined as a result of what they have experienced and witnessed.  Two people

---

[19] *See* Freedman Decl., Ex. 8, ¶¶ 8-10 & Ex. 8a, at 5; Ex. 10, ¶¶ 11-12; Ex. 15, ¶¶ 12, 15; Ex. 23, ¶¶ 10-11; Ex. 29, ¶ 36.

[20] *See* Freedman Decl., Ex. 47, ¶ 12 & Ex. 47a, at 1-4 (stitches to lip, closed head injury, facial contusions); Ex. 30, ¶¶ 14, 18 & Ex. 30a, at 1-4 (stitches to chin); Ex. 12, ¶ 8 (staff dropped unconscious person's head hard on the ground to see if he was faking); Ex. 13, ¶ 10 & Ex. 13a, at 1-4 (periorbital bruising and torn cornea); Ex. 18, ¶¶ 6-8 & Ex. 18a, at 1 (stabbed with a nail by other incarcerated person at behest of officers); Ex. 33, ¶ 22 (staff assaulted a transgender person so badly there was a pool of blood on the ground); Ex. 34, ¶¶ 4, 8-9, 13 (officer punched and choked transgender person and repeatedly slammed her head into the ground until she was lying in a pool of her own blood, then he penetrated her anus with his finger); Ex. 38, ¶ 18 (person in wheelchair's face covered in blood after assault by staff); Ex. 41, ¶¶ 15-17 & Ex. 41a, at 1-2 (stabbed by other incarcerated people at officer's behest).

[21] *See* Freedman Decl., Ex. 8, ¶ 12 & Ex. 8a, at 9; Ex. 10, ¶ 15 & Ex. 10a, at 3-4; Ex. 13, ¶ 10 & Ex. 13a, at 1-4; Ex. 15, ¶ 15 & Ex. 15a, at 1-3; Ex. 20, ¶¶ 14-15 & Ex. 20a, at 1-2, 4-5; Ex. 29, ¶¶ 37-39 & Ex. 29a, at 1-2; Ex. 33a, at 1-6; Ex. 38, ¶ 9 & Ex. 38a, at 1; Ex. 41, ¶ 16 & Ex. 41a, at 1-2; Ex. 43, ¶¶ 14-15 & Ex. 43a, at 4, 6-9; Ex. 47, ¶ 12 & Ex. 47a, at 1-4; Ex. 56, ¶¶ 11-12 & Ex. 56a, at 1-4.

[22] *See* Freedman Decl., Ex. 11, ¶ 19; Ex. 11a, at 4 (required wheelchair rather than just a walker because unable to stand); Ex. 10, ¶ 20 (increased nerve pain that worsens mobility); Ex. 30, ¶ 24 (greater difficulty walking and standing requiring wheelchair or walker); Ex. 18, ¶ 24 (exacerbated existing knee injury requiring wheelchair); Ex. 49, ¶ 22 (lasting damage to his knee that impacts his mobility).

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

attempted suicide as a direct result of being victimized by staff,[23] while others' mental health worsened, including additional symptoms, changes of or increases in doses for medications, and admittance to higher levels of care.[24]  One class member, speaking with a clinician after a suicide attempt following a brutal assault by staff, said "I just want to die[.]  I got beat up by officers on the yard, look at my bruises[.]  I can't do it anymore.  Please, just leave me alone[.]  I just want to go to sleep."  Freedman Decl., Ex. 50c.

The ever-present danger and abuse at RJD undermines rehabilitation.  One of the declarants died on February 19, 2020—just days prior to the filing of this Motion—after being assaulted in his cell by other incarcerated people.  Freedman Decl., ¶¶ 73-74 & Ex. 22b, at 4 ("assaulted by multiple persons").  As this class member testified:

> I am trying my best, but I do not have a healthy outlet for all of the stress and anxiety caused by the environment at RJD.  I feel like staff took away my sense of safety and my peace of mind.  Staff have thrown my sense of right and wrong off balance because the very people who took an oath to protect me are the ones causing so much harm to me and others.  It has made it hard to be a good person.

*Id.*, Ex. 22, ¶ 19.

In addition to the heavy toll on incarcerated people, taxpayers must pay the cost of medical care for the injuries and mental health decompensation caused by staff.  Staff regularly exposed to this conduct can be traumatized, which can negatively impact their mental health, productivity, and attendance.  Vail Decl., ¶ 119.  As a CDCR psychologist[25] testified in a deposition less than three weeks ago, staff abuse of incarcerated people "is a traumatic thing to see."  Freedman Decl., Ex. 84, at 53:11-12; *see also id.* at 55:16-19 (explaining negative "physiological responses," including "becom[ing] really

---

[23] *See* Freedman Decl., Ex. 8, ¶ 13 & Ex. 8a, at 11-13; Ex. 50, ¶ 24 & Ex. 50a, at 7.

[24] *See* Freedman Decl., Ex. 7, ¶ 28; Ex. 9, ¶ 15; Ex. 18, ¶¶ 25-27 & Ex. 18a, at 4; Ex. 20, ¶¶ 27, 29; Ex. 22, ¶ 19; Ex. 23, ¶ 15 & Ex. 23a, 3, 5; Ex. 27, ¶ 18; Ex. 29, ¶¶ 41-42, 45; Ex. 34, ¶ 18; Ex. 37, ¶ 20; Ex. 38, ¶ 14; Ex. 49, ¶¶ 14-15; Ex. 54, ¶¶ 33-34; Ex. 56, ¶ 17; Ex. 58, ¶ 14, 18.

[25] Plaintiffs have filed the transcript of the psychologist's deposition under seal based on her credible fears of retaliation, discussed in Factual Background, Section II.E, *infra*.

13

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

1    overwhelmed" and "cry[ing] ... in [her] supervisor's office," to witnessing an officer use

2    excessive force on a *Coleman* class member); *id.* at 79:6-8.

### D.   Officers Retaliate Against People Who File Grievances or Staff Complaints, Rendering Complaint Processes, Including 1824s, Functionally Unavailable to the People Who Need Them Most

5    When people report staff misconduct or staff's failure to provide accommodations,

6    staff frequently engage in or threaten serious retaliation.  For example:

7    •   After staff learned that a person with mental illness had spoken with investigators from outside of RJD about staff misconduct at RJD, officers began harassing him, including asking him questions about what he told investigators and whether he was wearing a wire.  One day, one of the harassing officers asked the person whether he would be coming out for evening dayroom.  The person said he was.  During evening dayroom, the person was attacked by another incarcerated person, suffering injuries requiring surgery to repair a fractured orbital socket and displaced eye.  Freedman Decl., Ex. 29, ¶¶ 26-27, 30-42 & Ex. 29a, at 3-4.

11   •   In retaliation for filing staff complaints, officers working in the administrative segregation unit intentionally left a person with mental illness in his wheelchair locked in his cell handcuffed behind his back.  Though the person was ultimately able to maneuver the cuffs to the front of his body, officers left him in handcuffs for more than 48 hours.  Freedman Decl., Ex. 9, ¶¶ 5-13.

14   •   Officers in the same building intentionally left another person with mental illness— who had just returned from the hospital for treatment for a broken finger—locked in his cell in handcuffs for more than ten hours, then threatened the person when he reported the problem.  Freedman Decl., Ex. 44, ¶¶ 15, 0-16 & Ex. 44a.

17   •   Officers and incarcerated people threatened a class member to drop complaints against two officers regarding staff misconduct,  When he refused, the person was stabbed by other incarcerated people.  Freedman Decl., Ex. 41, ¶¶ 5, 9-15.

19   •   After being brutally assaulted by officers, a class member with mental illness who is in a wheelchair was placed in administrative segregation and filed a complaint about the attack.  When his time in administrative segregation ended, two officers, one of whom was one of the assailants, transported the person to general housing.  During transport, the assailant said "You look healthy.  What's happening with the [complaint] you filed?"  The other officer said "You're lucky it was [the assailant] and not me [who assaulted you] because I would have stomped you out," i.e., killed him.  Freedman Decl., Ex. 50, ¶¶ 6-16, 21, 25.

23   •   After a person with mental illness filed a complaint regarding an assault by officers, staff began a campaign of harassment, including trashing his cell.  When he asked an officer why they were harassing him, the officer explicitly stated it was because he had complained about the assault.  Freedman Decl., Ex. 15, ¶¶ 3, 11-12, 20-22.

26   •   As discussed above, an officer assaulted a person for threatening to write up the officer for failing to provide assistance carrying a box.  Freedman Decl., Ex. 21, ¶¶ 7-9.

28

[3486656.13]

- In two separate instances, after an officer assaulted class members, the officer accompanied the class members when receiving medical treatment for their injuries in order to intimidate them into not reporting the assaults to medical staff. Freedman Decl., Ex. 27, ¶¶ 10-12 & Ex. 27a, at 1; Ex. Ex. 50, ¶ 18.

- An officer asked class member with a mobility disability if he had been speaking with Plaintiffs' counsel because "[s]ome snitch is complaining about not getting their ducats." Freedman Decl., Ex. 36, ¶ 14.

A significant number of additional declarants also experienced retaliation and threats.[26]

Officers also use the CDCR disciplinary process, called Rules Violation Reports ("RVRs"), as a form of retaliation, fabricating RVRs against the people they assault to cover up inappropriate uses of force. As an example, a psychologist—who reported an officer's excessive use of force that resulted in the officer's dismissal—testified at her deposition that the *Coleman* class member who an officer kicked with "extreme force" never physically threatened or touched any officers. Freedman Decl., Ex. 84, at 44:14-45:13, 96:16-97:11; *id.* at 38:7-13 (testifying that the officer kicked the incarcerated person like he "kicking a soccer ball as hard as you can"); *see also* Freedman Decl., ¶¶ 268-270 & Ex. 66a, at 6; Freedman Decl., Ex. 83, at 66:12-16, 67:19-68:15. Yet, officers falsely charged the victim of the excessive force with an RVR for assaulting an officer, resulting

---

[26] *See* Freedman Decl., Ex. 14, ¶¶ 11-12 (officers intentionally attempted to trigger PTSD because the person filed 1824s related to his disability); Ex. 18, ¶¶ 14, 28 (staff retaliated because he frequently files complaints); Ex. 19, ¶ 11 (officers frequently told him to stop putting in paperwork; new cellmate then told him that officers had told him he could have victim's property if he fought victim); Ex. 22, ¶ 9-10, 15 (officers threatened him when he complained about excessive force used against another incarcerated person; other incarcerated people later told him that staff had offered $1000 to incarcerated people to assault him in retaliation for a lawsuit he had filed); Ex. 30, ¶¶ 8-14, 26 (incarcerated person assaulted for complaining about lack of early release for access to Kosher meals); Ex. 32, ¶ 8 (assaulted for indicating he was going to report improper cell search); Ex. 36, ¶¶ 9-10 (withdrew 1824 regarding officer closing cell door on him after another officer threatened him about the 1824); Ex. 39, ¶¶ 8-11 (threatened by officer multiple times for filing complaint); Ex. 42, ¶¶ 13-14 (officer who dumped person out of wheelchair threatened him for filing complaint, saying "I remember everything"); Ex. 45, ¶¶ 6-8, 12 (officer said that person was "a real asshole" and "the cause of a lot of stuff around here," before throwing him to ground); Ex. 46, ¶¶ 7-8 (elderly person attacked by staff for complaining that staff would not give him toilet paper); Ex. 51, ¶¶ 9-17 (officers harassed person and denied requests for toilet paper because person filed complaint about officer ignoring suicidality); Ex. 56, ¶¶ 8-9, 14, 21 (threatened by staff for filing complaint about incident where officer broke her ankle).

[3486656.13]

in a loss of sixty-one days of earned credits. Freedman Decl., Ex. 66a, at 15-30. Many declarants had similar experiences.[27] The declarants also describe unfair RVR hearings, including hearings in which hearing officers refused to permit them to call witnesses and explicitly stated that, no matter what evidence an incarcerated person produced in his defense, they would be found guilty.[28]

During their interviews in December 2018, CDCR's strike team documented multiple reports of retaliation. The investigators found that "custody staff actively retaliat[e] against inmates for filing appeals or staff complaints, or requesting assistance with safety concerns." Freedman Decl., Ex. 2, at 4; *id.* at 9 ("[W]ithin 24 hours of an inmate dropping off an appeal … retaliation begins."). The retaliation took a number of forms, including assaulting complainants in places with limited visibility; arranging for incarcerated people in gangs to assault the complainant; seizing the complainant's property; announcing to other incarcerated people that the complainant had a disfavored

---

[27] *See* Freedman Decl., Ex. 7, ¶¶ 5, 11-13, 24 (deaf person who an officer punched in the face for not hearing an order received an RVR for resisting a peace officer in the course of his duties and lost 90 days of credit); Ex. 10, ¶11-12, 16, 18 (unnecessary use of force by staff resulted in an RVR for battery on staff, a referral to the district attorney (which declined to prosecuted), and loss of 150 days credit); Ex. 20, ¶¶ 10, 24 (officers who broke a person's arm escorting him out of the dining hall charged victim with delaying an officer resulting in loss of 60 days credit; the RVR did not mention the use of force or his serious injuries); Ex. 21, ¶ 10 (officer who assaulted person who asked for assistance carrying a box charged the victim with assault (for allegedly spitting on the officer), which resulted in a Security Housing Unit term); Ex. 23, ¶¶ 10, 21 (person sucker punched by an officer was charged with and found guilty of resisting an officer); Ex. 26, ¶¶6-11 (person received false RVR for battery on a peace officer, resulting in a referral to the district attorney, criminal charges, and loss of 150 days of credit, when it was the officers who used excessive force); Ex. 33, ¶¶ 10, 12, 14 (after staff brutally assaulted person for no reason, staff charged victim with assault on staff, resulting in 90-day credit loss); Ex. 45, ¶¶ 16-17 (person found guilty of false RVR for delaying a peace officer); Ex. 47, ¶¶ 9, 15 (after staff assault, victim was found guilty of false RVR for assaulting an officer, resulting in six month term in administrative segregation); Ex. 56, ¶¶ 4, 7-8, 16 (transgender person assaulted by an officer for no reason, resulting in a broken ankle, was charged with and found guilty of battery on an officer); Ex. 50, ¶¶ 8-9, 13, 20, 23 (person tossed out of his wheelchair by an officer over a dispute over a bagged lunch and then assaulted further in an isolated location was found guilty of throwing the lunch at the officer).

[28] *See* Freedman Decl., Ex. 10, ¶ 19 (not permitted to call witnesses); Ex. 23, ¶ 21 (hearing officer said "I believe my staff, and I'm going to find you guilty" and refused request to call witnesses); Ex. 26, ¶ 12 (not permitted to call witnesses); Ex. 45, ¶ 17 (hearing officer said "I believe my officer, and I'm going to find you guilty" and refused request to call witnesses); Ex. 56, ¶ 16 (not permitted to call witnesses).

Case No. C94 2307 CW

[3486656.13]

commitment offense (e.g., rape or child molestation); or announcing that the complainant was responsible for other incarcerated people not receiving programs (such as television, dayroom, showers, etc.). *Id.* at 4, 9. Thirty-eight percent of interviewees reported knowing of someone who received an intentionally falsified RVR and forty-four percent reported knowing someone who had been charged with resisting or assaulting staff when staff had, in fact, assaulted the incarcerated person. *Id.* at 10; *see also* Vail Decl., ¶ 67 (summarizing "the culture of physical brutality and fear of retaliation if incarcerated persons report staff misconduct at RJD" reflected in the interview worksheets completed by the December 2018 interviewers).

As explained by Mr. Vail, in light of the ever-present threat of retaliation at RJD, the fifty-four declarants "have little to gain and much to lose by describing the misconduct they have experienced or witnessed and specifically identifying the officers who engaged in misconduct. If the officers ever became aware of the declarations, the declarants would be at serious risk of retaliation." Vail Decl., ¶ 88; *see also* Grunfeld Decl., Ex. W (letter to Defendants demanding confidentiality of declarations "[d]ue to credible fears of retaliation"). That the declarants submitted their declarations notwithstanding this risk adds significantly to their credibility. Vail Decl., ¶ 88.

### E. Officers Retaliated Against a Psychologist Who Reported An Officer's Excessive Use of Force

As discussed above, an RJD psychologist reported that an officer used unnecessary and excessive force against a *Coleman* class member. Following her reporting of the excessive use of force, officers at RJD retaliated against her. An officer entered her locked office without permission, went into her desk, removed some feminine hygiene products, broke them, and then scattered them on the floor of the office. Freedman Decl., Ex. 84, at 134:19-136:21, 140:2-18. The psychologist reported this incident to her superiors and to the associate warden responsible for the yard on which she worked, but no one ever followed up with her. *Id.* at 140:9-18. The psychologist, who still works at RJD, remains fearful of additional retaliation from custody staff. *Id.* at 183:7-186:4. The psychologist

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

1   also testified that a CDCR employee stopped coming to work, resulting in CDCR not
2   renewing the person's contract, because of harassment by correctional officers in
3   retaliation for reporting misconduct.  *Id.* at 72:12-79:8.

4       **F.      The Scope of the Abuses at RJD Is Staggering**

5           According to Mr. Vail, "[t]he staff misconduct [at RJD], both in terms of its scope
6   and severity, is highly concerning and much more systemic than what [he] ha[s] seen in
7   any other correctional system or facility."  Vail Decl., ¶ 30; *see also id*., ¶ 94 ("Rarely in a
8   single prison have I encountered such a volume of reports of physical and verbal
9   abuse ….").  The fifty-four declarations describe well over one hundred discrete instances
10  of abuse occurring since 2016.  Freedman Decl., ¶¶ 7, 248.  The misconduct has occurred
11  in almost every area of the prison, including on all five yards at RJD, and at all times of the
12  day and night.  Vail Decl., ¶ 84.  The declarants identify, by name, eighty-nine different
13  officers who have participated directly in misconduct, including thirty-nine who
14  participated in more than one incident.  Freedman Decl., ¶¶ 249-253.[29]  Declarants did not
15  know the names of dozens of other officers who participated directly in the wrongdoing.
16  *Id.*, ¶ 250.  Given the very public nature of much of the abuse, many additional staff
17  members, all of whom have an affirmative obligation to report misconduct, likely
18  witnessed the misdeeds.  *Id.*, ¶ 254; Grunfeld Decl., ¶ 74 & Ex. LL (citing CDCR
19  Department Operations Manual sections that mandate employees report misconduct or face
20  discipline); Cal. Code Regs., Title 15, § 3268.1 (requiring staff report use of force).

21  **III.    *ARMSTRONG* CLASS MEMBERS AND VULNERABLE INDIVIDUALS
         ARE SO TERRIFIED OF CUSTODY STAFF THAT THEY REFRAIN**
22  **FROM ASKING FOR NEEDED ACCOMMODATIONS AND HELP**

23          The officers' violence toward and retaliation against people with disabilities has had
24  a profound chilling effect on class members' exercise of their rights under the ADA.

---

[29] One officer was involved in nine incidents, three officers were involved in eight
26  incidents each, one officer was involved in six incidents, four officers were involved five
    incidents each, five officers were involved in four incidents each, six officers were
27  involved in three incidents each, and nineteen officers were involved in two incidents each.
    *See* Freedman Decl., ¶ 253.

28

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

[3486656.13]

1 Incarcerated people are terrified of custody staff. To avoid becoming the next victim,

2 people with disabilities forgo requesting the disability accommodations they need to

3 participate in CDCR programs, services and activities. The same fear causes class

4 members to refrain from complaining, either informally or using grievances, when staff

5 deny them accommodations to which they are entitled. For example:

6 • The deaf person with mental illness who an officer punched in the face for not
   hearing an order, out of fear of being assaulted again by staff, does not request the

7 writing supplies he needs to be able to communicate with staff. He also sometimes
   misses mental health treatment groups because he cannot hear announcements and

8 is afraid to ask staff to notify him of his group meetings. Freedman Decl., Ex. 7,
   ¶¶ 27-29.

9
   • A class member with developmental and mobility disabilities and with mental

10 illness, who is scared of staff because of misconduct he has witnessed, refrains from
   requesting that staff assist him filling out forms and writing letters. He also

11 sometimes does not ask staff to provide him with showers, new sheets, or new
   clothes after he has incontinence accidents, so instead tries to clean himself in the

12 sink and waits for the next laundry exchange, meaning he sleeps on soiled sheets for
   multiple days. Freedman Decl., Ex. 31, ¶¶ 15, 16.

13
   • A class member with hearing and mobility disabilities, out of fear of custody staff

14 who had previously brutally beaten him, went without hearing aid batteries for two
   months while in administrative segregation until he was transferred to another

15 prison. Freedman Decl., Ex. 47, ¶ 16.

16 Other people with disabilities refrained from requesting various accommodations

17 from custody staff, including showers, new linens, or new clothes after incontinence

18 accidents;[30] toilet paper;[31] wheelchair pushers;[32] wheelchair repairs;[33] assistance cleaning

19 their cells;[34] access to a mental health clinician when suicidal or otherwise

20 decompensating;[35] access to mental health groups;[36] single cell status;[37] glucose tablets

21

22 [30] See Freedman Decl., Ex. 6, ¶ 20; Ex. 31, ¶ 16; Ex. 36, ¶ 16; Ex. 14, ¶ 19.

23 [31] See Freedman Decl., Ex. 56, ¶ 22; Ex. 46, ¶ 12; Ex. 48, ¶ 22; Ex. 43, ¶ 23; Ex. 11, ¶ 37.

24 [32] See Freedman Decl., Ex. 6, ¶ 20; Ex. 25, ¶ 28; Ex. 33, ¶ 23.

   [33] See Freedman Decl., Ex. 48, ¶ 23.

25 [34] See Freedman Decl., Ex. 12, ¶ 14; Ex. 46, ¶ 11; Ex. 48, ¶ 22.

26 [35] See Freedman Decl., Ex. 31, ¶ 10; Ex. 32, ¶ 18; Ex. 22, ¶ 20; Ex. 56, ¶ 23.

27 [36] See Freedman Decl., Ex.7, ¶ 29; Ex. 88, ¶ 9; Ex. 38, ¶ 21.

   [37] See Freedman Decl., Ex. 35, ¶ 13.

28

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

1    when blood sugar gets low;[38] and medical treatment.[39]  Still other declarants expressed a

2    general fear of interacting with staff or using grievances processes to request or complain

3    about anything.[40]  That same fear resulted in many individuals who experienced or

4    witnessed abuse refusing to provide permission for  Plaintiffs' counsel to share their

5    stories.  Decl. of Penny Godbold in Supp. of Mot. ("Godbold Decl."), filed herewith, ¶ 4.

6    As the December 2018 strike team concluded, "[t]he inmate allegations, taken as a whole,

7    seem to describe an environment with no relief mechanism for inmates who feel mistreated

8    by staff."  Freedman Decl., Ex. 2, at 11.  As a result of custody staff's concerted efforts to

9    stifle and punish complaints, "[i]nmates … 'hide' within their daily routines and suffer

10   minor abuse in order to avoid greater abuses."  *Id.*

11   **IV.    CDCR HAS KNOWN FOR MORE THAN THREE YEARS OF PERVASIVE
12          PROBLEMS AT RJD WITH STAFF ABUSING PEOPLE WITH
             DISABILITIES**

13          In *Armstrong* monitoring tour reports issued in November 2016 and May 2017,

14   Plaintiffs' counsel began sounding the alarm regarding violence against and harassment of

15   people with disabilities at RJD.  Freedman Decl., ¶ 271, 273, *id.*, Exs. 67, 69.  In the May

16   2017 report, Plaintiffs' counsel informed Defendants that **half of the incarcerated people**

17   **interviewed on Facility C** during that tour reported that they had either observed or been

18   the target of excessive force by staff members against people with disabilities.  *Id.*, Ex. 69,

19   at 3.  Over the next two years Plaintiffs' counsel continued to document serious allegations

20   of staff members attacking, assaulting and abusing *Armstrong* class members at RJD in

21   more than twenty advocacy letters and two additional monitoring reports.  Freedman Decl.,

22   Exs. 11b, 15b, 21b, 27b, 38b, 41b, 41c, 43b, 45b, 47b, 51b, 57b, 57c, 59-66 (advocacy

23   letters); *id.*, Exs. 71, 73 (tour reports).  In all, between November 15, 2016 and October 29,

24   2019, Plaintiffs' counsel brought more than fifty discrete allegations of staff misconduct to

25   ---
[38] *See* Freedman Decl., Ex. 46, ¶ 12.

26   [39] *See* Freedman Decl., Ex. 17, ¶ 11; Ex. 49, ¶ 27; Ex. 38, ¶ 21.

27   [40] *See* Freedman Decl., Ex. 16, ¶ 20; Ex, 27, ¶ 20; Ex. 29, ¶ 48; Ex. 43, ¶ 20; Ex. 18, ¶ 27;
      Ex. 50, ¶ 35; Ex. 57, ¶ 26; Ex. 35, ¶ 12.

28

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

1    Defendants' attention.  *See* Freedman Decl., ¶ 279.

2         In August 2018, during an *Armstrong* audit at RJD jointly conducted by CDCR's

3    OACC and Plaintiffs' counsel, incarcerated people reported multiple, serious incidents of

4    staff misconduct on Facility C at RJD.  Godbold Decl., ¶ 7.  Plaintiffs' counsel reported

5    those allegations to CDCR's Secretary Ralph Diaz.  Grunfeld Decl., Ex. F.  In addition, the

6    Deputy Director of OACC issued a memo to CDCR's Director of the Division of Adult

7    Institutions ("DAI"), confirming that interviewers heard "multiple allegations of serious

8    staff misconduct," including:

9         allegations of … staff members forcefully removing some inmates from
          wheelchairs; staff members assaulting inmates that were already secured
10        with restraint equipment; and inmates being accused of assaulting officers
          when, in fact, it was the staff member who had assaulted the inmate.  Many
11        of the details of staff misconduct alleged by the inmates were consistent ….

12   *Id.*, Ex. G, at 1.  OACC recommended that "[b]ecause of the nature and consistency of the

13   allegations, … DAI and RJD management should promptly take all reasonable actions to

14   ensure that these incidents do not occur in the future, and that the historical allegations are

15   thoroughly investigated."  *Id.*

16        In December 2018, without informing Plaintiffs' counsel, CDCR sent the

17   aforementioned strike team of investigators to conduct interviews with incarcerated people

18   at RJD.  Freedman Decl., Ex. 2, at 1-2.  One-third of the 150 incarcerated people who had

19   been randomly selected for interviews refused to speak to investigators.  *Id.* at 3.  "[O]ver

20   82% of the inmates who were actually interviewed, spoke of significant problems on

21   Facility C, RJD, similar to" the concerns expressed in Plaintiffs' counsel's September 2018

22   letter following the joint audit.  *Id.* at 3.  Interviewees consistently reported unwarranted

23   assaults by officers or incarcerated people hired by officers, retaliation against anyone who

24   complained, and fear of filing any grievances.  *Id.* at 1-11.

25        After the interviews concluded on December 5, 2018, the Chief Ombudsman for

26   CDCR, who reports directly to Secretary Diaz and who was part of the strike team, wrote

27   the following in an email to CDCR's Director of DAI:

28        [W]hat we heard was overwhelming accusations of abuse by the Officers

[3486656.13]

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

with Sgt's and Lt's looking in the other direction. **I have never heard accusations like these in all my years.** I would strongly suggest placing a strike team on this yard immediately. Many of the inmates have expressed fear of what will happen to them tomorrow when the [strike team] is not there…. **This is a very serious situation and needs immediate attention. If there is any means of installing cameras immediately I would strongly suggest it**, at least in the blind spots and the back door by the gym. **A review of the appeal process, RVR's and staff complaints off that yard also needs to take place ASAP**.

Grunfeld Decl., Ex. H, at DOJ00013202 (emphasis added); *see id.*, Ex. P, at 223:1-5

(Ombudsmen "serve the Secretary"). The next day, the Chief Ombudsman wrote:

> **[T]here has been little to no progress since September**…. I am not typically an alarmist, but again, **I have never heard such despair, hopelessness, and fear from inmates** and I have been on quite a few of these teams to review and interview inmates. The C[alifornia] I[nstitution for] W[omen] ["CIW"] tour results don't come close to this and CIW was very bad.

*Id.* at DOJ00013200 (emphasis added).

Throughout this period, incarcerated people, including *Armstrong* and *Coleman* class members, have filed a number of credible lawsuits regarding staff misconduct at RJD, putting Defendants on further notice of the epidemic of staff violence and retaliation. Freedman Decl., Ex. 1, at 4 n.2.

## V. CDCR'S RESPONSE TO THE CRISIS AT RJD HAS BEEN INADEQUATE

CDCR's efforts to address the crisis of abuse and harassment at RJD have been both inadequate and ineffective. CDCR has failed (1) to discipline or refer for criminal prosecution the officers who have engaged in misconduct; (2) to investigate all of the allegations of misconduct about which it was aware; (3) to install cameras in all areas to which incarcerated people have access; and (4) to take any steps to determine whether misconduct was occurring in areas of the prison other than Facility C or whether its effort to reduce staff misconduct have been successful. The few efforts CDCR has made involve minor changes in staffing and training. Because CDCR has refused to take the problem seriously, officers continue to abuse people with disabilities at an alarming rate.

**A. Since January 1, 2017, CDCR Has Decided to Dismiss Only Five Officers for Misconduct Against Incarcerated People**

CDCR has failed to discipline, terminate, and refer for prosecution custody officers who have abused and assaulted incarcerated people at RJD. Since January 1, 2017, there have been approximately 1,100 staff complaints made at RJD. Grunfeld Decl., Ex. P, at 235:7-16. During that same time period, the hiring authority at RJD has only decided to terminate five officers for their involvement in three incidents of staff misconduct against incarcerated people. Godbold Decl., ¶ 15. Even those terminations may not be final. Not a single officer has been referred for criminal prosecution for hurting an incarcerated person. Grunfeld Decl., Ex. P, at 256:12-257:1; *id.*, Ex. R, at 139:14-140:15. CDCR has not even placed any officers on administrative time off while it investigated allegations of misconduct. Freedman Decl., Ex. 83, at 160:9-14.

Plaintiffs' expert estimates that to adequately address the misconduct at RJD and change the culture, CDCR would need to dismiss many more officers. *See* Vail Decl., ¶ 89 ("Given my understanding of the scope of the misconduct at RJD, [five] dismissals is far too low."). CDCR's termination of such a small number of officers and its failure to refer blatantly criminal behavior for criminal prosecution demonstrate a systematic failure to take the allegations of incarcerated people seriously. *Id.*; *see also id.*, ¶¶ 49, 116.

**B. CDCR Failed to Adequately Investigate Allegations of Misconduct, As California's Inspector General Has Recognized**

The miniscule number of terminations stems, at least in part, from CDCR's failure to adequately investigate or otherwise respond to serious allegations of staff misconduct.

To begin with, after fourteen months, CDCR **still** has not completed its investigations into the specific allegations of abuse raised by forty-eight incarcerated people during the December 2018 strike team interviews. Freedman Decl., Ex. 2, at 12 (recommending "[p]rompt review should be made of all actionable information brought forward by inmate interviewees…."); *id.* at 14-17 (listing specific allegations of misconduct); *id.*, Ex. 83, at 133:15-19, 156:13-23; Grunfeld Decl., Ex. P, at 221:18-222:2.

[3486656.13]

Defendants **still** have not conducted a thorough investigation into or contacted any criminal investigative agencies about the reports of "**gang-like activity by custody staff**." Freedman Decl., Ex. 2, at 5; *id.*, Ex. 83, at 165:10-24.

Defendants have not provided any response to many allegations of misconduct raised in Plaintiffs' counsel's tour reports and advocacy letters. *See* Grunfeld Decl., ¶ 32. The OIG conducted its own review of CDCR's responses to Plaintiffs' advocacy letters and found a "pervasive lack of timely follow through," including that CDCR "ignored" many allegations, failed to investigate twenty-eight allegations not previously known to CDCR, and failed to refer pertinent information to the Office of Internal Affairs ("OIA") when warranted. *Id.*, Ex. J, at 1, 3, 5. Secretary Diaz sent a response to a draft of the OIG's findings that did not dispute a single one of the OIG's conclusions and instead accused the OIG of improper motives in publicizing CDCR's failures. *See id.*, ¶ 35 & Ex. K.

In cases where CDCR conducted investigations, the investigations were often seriously flawed and of poor quality. *See* Vail Decl., ¶¶ 63. As but one example, a class member's statement that staff used excessive force and broke multiple ribs was supported by medical records and corroborated by an incarcerated witness. *Id.* However, in deciding not to confirm the allegation, CDCR relied on interviews from three random incarcerated people who, in two cases, stated that they did not even witness the event. *Id.* CDCR also stated that, contrary to their own policy and common sense, the person's broken ribs did not constitute serious bodily injury. Freedman Decl., ¶ 190 & Ex. 47d, at 2.

The OIG has extensively documented problems with CDCR's investigation system. Regarding Salinas Valley State Prison ("SVSP"), the OIG reported that the "review of the process revealed a complete failure of the high-level due process goals and that the process appears entirely driven by the purpose to exonerate staff." Assembly Budget Subcommittee No. 5 on Public Safety at 1:48:35 (March 4, 2019) *available at* http://calchannel.granicus.com/MediaPlayer.php?view_id=7&clip_id=5951. Among other things, the Inspector General found the investigators:

displayed signs of bias in favor of their fellow staff when conducting their staff complaint inquiries; they … often compromised the confidentiality of the process. … [I]n the cases we reviewed, the compromised confidentiality could have exposed inmates to retaliation for complaining about staff.

Grunfeld Decl., Ex. GG, at 2. The problematic appeal process at SVSP is the same one that was in use at all CDCR prisons. *See id.* at 89 ("[T]he process we reviewed [at SVSP] is in place at prisons statewide. Therefore, the conditions we found may also exist to some degree at other institutions.").

The very small number of investigations that resulted in CDCR terminating officers at RJD stand out in one respect—corroborating evidence, namely video of the incident or a statement from a CDCR employee who witnessed the misconduct. Vail Decl., ¶ 63. The OIG and one of CDCR's persons most knowledgeable[41] testified that it is not common for CDCR to sustain a staff misconduct allegation based on statements from incarcerated people alone and that there is bias against the testimony of incarcerated people. Grunfeld Decl., Ex. R, at 164:8-168:10 (CDCR's PMK testifying that if all OIA has "is a statement from an officer and a statement from an incarcerated person and they are inconsistent, OIA will believe the version of events from the officer"); *id.*, Ex. S, at 22:20-25; 25:18-26:1 (OIG testifying regarding bias in CDCR against testimony from incarcerated people). From Mr. Vail's limited review of investigation files, he agrees that the testimony of incarcerated people is essentially disregarded unless it exonerates staff. *See* Vail Decl., ¶ 63 ("Based on the few cases I reviewed from RJD, it appears that in staff misconduct inquiries staff only rely on statements from incarcerated people to exonerate staff and never rely on such statements to find staff guilty, except where video evidence or staff member statements corroborate such statements.").

---

[41] In response to Plaintiffs' Notice of Deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), CDCR designated two people as persons most knowledgeable: Kimberly Seibel, the Deputy Director of CDCR's DAI, and Patricia Ramos, CDCR's Chief of Headquarters Operations for OIA. Grunfeld Decl, ¶ 45; *id.*, Ex. P (non-confidential portion of Seibel deposition transcript); Ex. R (Ramos deposition transcript); Freedman Decl., Ex. 83 (confidential portion of Seibel transcript).

In fact, the OIG recently reported on a particularly egregious case in which CDCR's Office of Legal Affairs ("OLA") decided not to pursue dismissal of two officers because, according to OLA, the allegations could not be sustained solely upon the testimony of incarcerated people. Grunfeld Decl., Ex. KK. The OIG wrote:

> the department attorneys' actions suggest an apparent bias and hostility against inmate testimony and evidence provided by inmates, and set a dangerous precedent in which widespread officer misconduct, which in some cases cannot be proven by any means other than evidence or testimony provided by inmates, will go undiscovered and unpunished…. [E]vidence concerning staff misconduct provided by an inmate and subsequent testimony proffered in a legal proceeding should not be disregarded, based simply on the fact that it came from an inmate. The credibility of information and testimony concerning staff misconduct provided by inmates must be independently assessed for credibility, like any other witness testimony, and should not be dismissed outright because the provider of the testimony is an inmate…. Unless department attorneys change their approach and bias regarding inmate testimony, we question whether they can effectively represent the department in such cases.

*Id.* at 2; *see also id.*, Ex. S, at 25:15-17 (OIG testifying that properly corroborated testimony from incarcerated people should be afforded weight).

Given that statements from incarcerated people are the only support for most staff complaints (especially due to CDCR's decision not to install cameras yet at RJD and elsewhere, discussed *infra*), CDCR must be willing to consider information from incarcerated people if staff members are to be held accountable. RJD's track record, in which it has only confirmed abuse allegations supported by video evidence or CDCR employee testimony, suggests that the scales are unfairly and unjustifiably tilted in favor of exonerating officers.

C. **Despite CDCR's Agreement that Cameras Are Critical for Reducing Abuse, the Vast Majority of RJD Still Has No Camera Coverage**

The December 2018 strike team, CDCR's Chief Ombudsman, both of CDCR's persons most knowledgeable, and the OIG all agree that cameras are critical for deterring misconduct and holding accountable officers who engage in misconduct. Freedman Decl., Ex. 2, at 12; *id.*, Ex. 83, at 104:23-106:10, 107:2-108:3; Grunfeld Decl., Ex. R, at 181:5-11; *id.*, Ex. H at DOJ00013202 (recommending immediate installation of cameras); *id.*,

[3486656.13]

Ex. S, at 23:1-3.  A CDCR study of the effect of cameras installed at High Desert State Prison showed a 50% reduction in violence in areas with camera coverage.  Grunfeld Decl., Ex. FF, at 9.  Consistent with this recognition of the importance of cameras, the first recommendation of the Bishop Report was to install cameras at RJD in most areas to which incarcerated people had access, especially in a number of identified blind spots. Freedman Decl., Ex. 2, at 12.

In the fourteen months since the issuance of the Bishop Report, CDCR has not added any camera coverage at RJD.  *See* Grunfeld Decl., ¶¶ 41, 59, 62.  As was the case in December 2018, the vast majority of RJD, including most of the areas to which incarcerated people have access and in which officers assault incarcerated people, has no camera coverage.  Freedman Decl., Ex. 83, at 108:4-112:12.

To fund cameras at RJD and other dangerous prisons, CDCR could have sought emergency funding from the legislature, as it has done to address other problems in the past two years.  *See* Grunfeld Decl., ¶¶ 60-61; *id.*, Ex. Z, at GG2-GG3; *id.*, Ex. AA, at 851-53.  CDCR chose not to.  See *id.*, ¶ 62.  Instead, CDCR waited until January 2020, thirteen months after the Bishop report recommended cameras, to submit a budget change proposal ("BCP") for the purchase and installation of some cameras at RJD, SVSP, and CIW.  *See* Grunfeld Decl., ¶ 59 & Ex. Y.  If approved, the BCP would not result in operational cameras at these three prisons until June of 2021 at the earliest.  *Id.*, Ex. Y, Attach. D; Freedman Decl., Ex. 83, at 127:3-6.  CDCR has no plan to purchase or use body-worn cameras, which are essential for achieving full camera coverage, including in cells and other areas in which the budget change proposal cameras will not reach, and for capturing sound.  Vail Decl., ¶ 97 (explaining that body-worn cameras can be "invaluable" and that "[t]he staff misconduct problem at RJD is a crisis that requires all available measures, including body-worn cameras"); Grunfeld Decl., ¶ 41 (CDCR refusing to consider body cameras at RJD); *id.*, Ex. EE, at 37-38 (OIG recommending in 2015 that CDCR pilot body-worn cameras); Freedman Decl., Ex. 83, at 128:25-129:2 (CDCR's PMK testifying

27

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING & RETALIATING AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

[3486656.13]

1  that there are no plans for body-worn cameras at RJD).[42]

2  **D.    CDCR Has Failed to Follow Other Recommendations Made By Its Own
          Staff for Addressing the Staff Misconduct Crisis at RJD**

3

4          Defendants have failed to implement other recommendations their own staff made

5  in response to the staff misconduct problems at RJD.  The Bishop Report recommended

6  increases in supervisory staff on Facility C at RJD.  Freedman Decl., Ex. 2, at 12.

7  Defendants placed one extra sergeant on Facility C for one year and another for two

8  months.  *Id.*, Ex. 83, at 167:24-168:19, 171:9-15.  CDCR later determined that no extra

9  supervisory staff was necessary.  *Id.* at 172:9-25.

10         The Bishop Report recommended that RJD conduct additional training regarding

11  effective communication.  Freedman Decl., Ex. 2, at 13.  Staff may have received some

12  impromptu training regarding effective communications at some captain's meetings

13  conducted shortly after the December 2018 interviews.  *Id.*, Ex. 83, at 182:6-16.

14  Otherwise, the only training that staff may have received regarding effective

15  communication is their annual training, in which all personnel must participate.  *Id.*

16         The strike team recommended that RJD conduct a review to reduce the impact of

17  gangs on Facility C.  *Id.*, Ex. 2, at 12.  CDCR elected not to allocate any additional

18  resources to RJD to conduct such a review and has not done anything outside of ordinary

19  procedures to identify gangs.  *Id.*, Ex. 83, at 166:18-22, 167:4-23.  The Bishop Report

20  recommended that RJD enforce its policy regarding uniforms to combat the existence of

21  the officer gangs on Facility C.  *Id.*, Ex. 2, at 12.  RJD took no action on this score, as

22  compliance was already an expectation.  *Id.*, Ex. 83, at 175:16-24.  Following the joint

23  audit at RJD in August 2018, CDCR's own OACC ordered RJD to produce a corrective

24  action plan to address the "multiple allegations of serious staff misconduct."  Grunfeld

25

26  _____
    [42] CDCR's current policies do not even require the consideration of video evidence, when
27  available, in staff misconduct inquiries and investigations.  Freedman Decl., Ex. 83, at
    122:1-6; *see* Vail Decl., ¶ 101 (explaining that CDCR must have policies requiring the
    review of video for staff misconduct or use of force investigations).

28

1  Decl., Ex. G, at 1.  CDCR never did so.  *Id.*, Ex. P, at 30:11-31:1.

2      **E.**    **The Few Changes that Defendants Have Made or Are in the Process of Making Are Inadequate to Address the Crisis at RJD**

3

4         The few changes that CDCR has made are not sufficient to meaningfully address

5  the problems at RJD.  CDCR's largest and most relevant change is that, as of January 2020

6  and as part of a statewide initiative, a new group called the Allegation Inquiry

7  Management Section ("AIMS") housed within OIA will conduct initial inquiries into staff

8  misconduct, rather than local investigators from the Investigative Services Unit at RJD.

9  Freedman Decl., Ex. 83, at 98:11-99:3; Grunfeld Decl., Ex. P, at 226:5-227:20.  Though

10  AIMS is a step in the right direction, it has serious flaws and limitations.  First, the OIG,

11  who is charged with monitoring AIMS, *see* Penal Code § 6126(i), was not given adequate

12  funding for that purpose and therefore will "not be able to give [CDCR] any reliable data

13  on how the process is working."  Grunfeld Decl., Ex. S, at 63:18-65:16.  In addition, as it

14  stands, use of force allegations have been excised from the new process.  *Id.* at 37:6-38:14.

15  As a result, many of allegations included in this Motion, which involved reported uses of

16  force, would not be investigated by AIMS.  *See id.*  Moreover, it will likely take years

17  before CDCR and the OIG can assess whether AIMS has improved inquiries into staff

18  misconduct.  *See id.*, 65:12-16.  Lastly, without better tools for gathering evidence,

19  including cameras and better enforcement of reporting requirements for staff, AIMS will

20  suffer from the same problems as the current system, where allegations are rejected for

21  lack of corroborating evidence and officers go undisciplined and undeterred.  *See* Vail

22  Decl., ¶ 63 (discussing how cameras would make investigations "more complete").

23         CDCR did make a few other changes in response to reports of staff misconduct,

24  including: limiting officers' access to certain areas where assaults frequently occurred,

25  Freedman Decl., Ex. 83, at 173:22-175:15; moving the Facility C Captain's and Associate

26  Warden's offices onto Facility C, *id.* at 95:4-12; altering the way in which appeals are

27  collected on Facility C to provide greater confidentiality, *id.* at 95:13-18, 183:6-20; having

28  the RJD warden review all staff complaints from Facility C, *id.* at 95:19-21; Grunfeld

[3486656.13]

Case No. C94 2307 CW

NOTICE OF MOTION AND MOTION TO STOP DEFS. FROM ASSAULTING, HARASSING & RETALIATING
AGAINST PEOPLE W/ DISABILITIES AT R.J. DONOVAN CORR. FACILITY; MEM. OF P. & A.

Decl., Ex. P, 190:21-191:24; training of managers and supervisors, including by subject-matter experts on use of force, Freedman Decl., Ex. 83, at 95:22-23, 96:5-14, 178:1-181:4; Grunfeld Decl., Ex. P, at 191:25-195:15, 213:20-216:25, 222:9-25; specially-assigning some staff for short periods of time to address backlogs in advocacy letters and staff complaints, Freedman Decl., Ex. 83, at 97:7-13, 98:6-10; Grunfeld Decl., Ex. P, at 225:7-226:4, 233:7-234:15; and providing the wardens with mentors, Freedman Decl., Ex. 83, at 98:1-5; Grunfeld Decl., Ex. P, at 217:1-218:23.

According to Plaintiffs' expert, the crisis at RJD—now in its fourth year—requires an extraordinary response. Vail Decl, ¶ 89. The minor changes identified by CDCR are marginal, at best, and profoundly inadequate. *See* Vail Decl., ¶¶ 87, 93. Many of the changes took place **before** the December 2018 strike team interviews, so could not have addressed the problems identified by the strike team or in Plaintiffs' counsel's many advocacy letters in 2019. *See*, *e.g.*, Grunfeld Decl., Ex. P, at 191:25-195:15 (many trainings touted by CDCR occurred prior to December 2018); *id.* 195:16-198:3 (headquarters' monitoring of RJD's use of force committee ceased prior to December 2018); *id.* at 213:20-216:25 (subject matter experts visited RJD prior to December 2018). Furthermore, many of the changes were specific to Facility C and therefore not capable of addressing problems in other areas of the prison. *See, e.g.*, Freedman Decl., Ex. 83, at 173:22-175:15 (limiting officers' access to certain areas of the prison); *id*. at 95:4-12 (moving Facility C Captain's and Associate Warden's offices); *id*. at 95:13-21, 183:6-20; Grunfeld Decl., Ex. P, at 190:21-191:24 (changing procedures for appeals and staff complaints on Facility C).

RJD faces other challenges that impede its ability to stop staff from abusing incarcerated people. As of January 29, 2020, three of the six associate warden positions at the prison were vacant and being filled by staff serving in acting capacities as opposed to permanent placement. Grunfeld Decl., Ex. P, at 229:10-231:22; Grunfeld. Decl., ¶¶ 40-41. CDCR admitted that it is more "difficult to effect change at an institution when the leadership is comprised of a lot of actors." Grunfeld Decl., Ex. P, at 229:24-230:2. RJD

has had three wardens in the last eighteen months.  *See* Freedman Decl., Ex. 83, at 80:7-14.

CDCR conceded that the transition to a third warden resulted in "hav[ing] to step back a

few steps to get the groove going again."  Grunfeld Decl., Ex. P, at 232:9-11.

**F.  CDCR Does Not Know Whether Any Steps It Has Taken at RJD Have Improved Conditions and Lacks Any Reliable System to Provide that Information**

CDCR has done very little to determine whether conditions at RJD have improved.

CDCR admits that because it has not conducted any follow-up interviews with incarcerated

people on Facility C, it does not know if the measures it has put in place have made any

difference or if people on Facility C are less afraid than they were in December 2018.

Grunfeld Decl., Ex. P, at 264:5-15, 269:19-270:8.  CDCR never even considered

conducting any interviews with incarcerated people on other yards at RJD to determine

whether problems similar to those on Facility C exist elsewhere in the prison.  Freedman

Decl., Ex. 83, at 186:1-7.  As shown in the declarations, however, problems exist on all

five of the yards at RJD.  *See generally id.*, Exs. 6-58, 88 (declarations); Vail Decl., ¶ 84.

CDCR also has no reliable system capable of capturing relevant information about

staff misconduct.  CDCR's tracking systems, to the extent they exist, are patchwork

repositories, none of which talk to each other.  RJD has a new electronic system for

tracking use of force incidents, but it became operational in January 2020 and covers only

reported uses of force and therefore cannot be used to track other types of misconduct

unrelated to force or unreported uses of force.  Grunfeld Decl., Ex. P, at 200:6-205:10,

209:6-9.  RJD maintains a separate, manually-generated log of all allegations of staff

misconduct, but it is so primitive that the only way to determine whether an allegation

involves an incarcerated person as a victim is to look in each individual case file.  *Id.* at

205:7-207:20; Grunfeld Decl., ¶ 50.  OIA has a somewhat more sophisticated system to

track its investigations into staff misconduct, but it also is unable to distinguish between

cases that involved an incarcerated person as a victim and all other types of misconduct.

Grunfeld Decl., Ex. R, at 103:6-24, 144:4-160:25.  Because of the lack of any adequate

tracking system, CDCR was unable to respond to a straightforward interrogatory

[3486656.13]

requesting, for the period from January 1, 2017 to the present, the number of officers who were terminated for misconduct at RJD where the victim of the misconduct was an incarcerated person. Grunfeld Decl., ¶¶ 49-50.

Despite promising to develop an early warning system for nearly a year, *see* Dkt. 2844, at 9, CDCR has little or no information regarding the current scope of problems at RJD (or other prisons) and no means of using data to signal if there are problematic officers, locations, or times of day. *See* Vail Decl., ¶ 64 (concluding that "CDCR has no reliable means of tracking incidents of misconduct" and that "[s]uch a system is necessary to identify the scope of problems and also to track staff who are repeat offenders of misconduct in order to take appropriate disciplinary action").

## G. CDCR Has Not Developed a Plan to Stop Staff Misconduct in Response to Plaintiffs' November 2019 Demand Letter

As of late 2019, class members continued to report to Plaintiffs' counsel horrifying instances of abuse and assaults at RJD. Grunfeld Decl., ¶ 37. Moreover, Defendants still had not provided Plaintiffs with responses to many advocacy letters and had not presented Plaintiffs with any plan for stopping the abuses at the prison. *Id.*, ¶ 32. Accordingly, on November 13, 2019, Plaintiffs sent a letter setting forth substantial evidence of the problems at RJD and demanded that, by January 1, 2020, Defendants develop a plan to stop staff misconduct at the prison. Freedman Decl., Ex. 1. To date, though Defendants have provided some information about the changes they have made and hope to make at RJD, Defendants have produced no such plan. Grunfeld Decl., ¶¶ 40-42.

## H. Officers Continue to Regularly Abuse, Assault and Retaliate Against People with Disabilities at RJD

CDCR admits that there is "currently a serious problem at RJD with respect to staff misconduct." Grunfeld Decl., Ex. P, at 267:12-22. CDCR also admits that there is "is still a serious problem at RJD with excessive and unnecessary force." *Id.* at 268:16-20. The declarations from people with disabilities—which describe **nearly thirty discrete allegations of horrific abuse from the last six months alone** and nearly seventy incidents

since the December 2018 strike team interviews—support these concessions and demonstrate the inadequacy of CDCR's efforts to improve conditions at RJD.[43] Among the worst incidents during that time period (some of which are discussed above), an officer attacked a suicidal person for asking that he be handcuffed in front of his body as a disability accommodation (January 13, 2020), Freedman Decl., Ex. 8, ¶¶ 7-15; Ex. 32, ¶¶ 15-17; an officer punched a deaf class member in the face because the person did not understand spoken orders (December 21, 2019), Ex. 7, ¶¶ 8-21; officers left a person in a wheelchair in handcuffs for over forty-eight hours in retaliation for his filing of staff complaints (November 27-29, 2019), Ex. 9, ¶¶ 6-13; an officer threw a transgender person to the ground in the dining hall for refusing to pull up her pants (November 19, 2019), Ex. 34, ¶ 15; an officer sucker punched a person in the face who was waiting in line in the dining hall (September 2019), Ex. 28, ¶ 10; and officers beat a person unconscious in his cell and then delayed his access to medical care (September 10, 2019), Ex. 15, ¶¶ 11-22. Violence is a way of life at RJD and in CDCR, as evidenced by the brutal attack on one of the class member declarants on February 4, 2020, and his death on February 19, 2020. Freedman Decl., ¶¶ 72-74 & Exs. 22, 22a, 22b.

As explained by Mr. Vail, "[t]o date, CDCR appears to be incapable of changing the staff culture…—a culture more representative of gang behavior than professional corrections staff—despite having a wealth of information from credible sources about the nature and depth of the problem of staff misconduct." Vail Decl., ¶ 19.

---

[43] See the following class member declarations, beginning with the most recent incidents: Freedman Decl., Ex. 8, ¶¶ 7-12; Ex. 32, ¶¶ 7-11, 13, 15-17; Ex. 7, ¶¶ 8-21; Ex. 19, ¶ 11; Ex. 14, ¶¶ 13, 15-16; Ex. 17, ¶¶ 6-8; Ex. 55, ¶¶ 7-10; Ex. 28, ¶¶ 7-11; Ex. 12, ¶¶ 8-9, 11-13; Ex. 44, ¶¶ 7, 11-16; Ex. 36, ¶¶ 9-13; Ex. 48, ¶¶ 16-17, 20; Ex. 9, ¶¶ 6-13; Ex. 88, ¶¶ 7-8; Ex. 31, ¶¶ 9-10, 12; Ex. 34, ¶¶ 7-14, 15; Ex. 37, ¶¶ 8-15; Ex. 56, ¶¶ 18-19; Ex. 24, ¶ 18; Ex. 45, ¶¶ 5-18, 21-22; Ex. 15, ¶¶ 6-10, 11-22, 25; Ex. 52, ¶¶ 9, 11; Ex. 46, ¶¶ 7-10; Ex. 42, ¶¶ 6-17; Ex. 22, ¶¶ 8-10; Ex. 10, ¶¶ 6-15; Ex. 26, ¶¶ 6-14; Ex. 11, ¶¶ 20-23, 30-35; Ex. 54, ¶ 23; Ex. 20, ¶¶ 7-23; Ex. 23, ¶¶ 23-24; Ex. 16, ¶¶ 6-13; Ex. 24, ¶¶ 7-14; Ex. 54, ¶¶ 5-17; Ex. 57, ¶¶ 7-22; Ex. 13, ¶¶ 13-16; Ex. 25, ¶¶ 11-18, 21-24; Ex. 47, ¶¶ 8-13; Ex. 41, ¶¶ 8-17; Ex. 49, ¶¶ 9-17, 23-24; Ex. 43, ¶¶ 6-19; Ex. 53, ¶¶ 19-20; Ex. 35, ¶ 8; Ex. 51, ¶¶ 7-22, 29, Ex. 29, ¶¶ 29-39.

[3486656.13]

## I. Defendants Have Taken the Position, On Accountability Logs and Elsewhere, that Staff Misconduct Almost Never Constitutes a Violation of the ADA

In the midst of the crisis at RJD, Defendants have repeatedly represented to this Court that "not every allegation of staff misconduct is appropriately before the *Armstrong* Court, nor is every allegation of staff misconduct necessarily related to the [ARP], the ADA, or this Court's orders." Dkt. 2844, at 8; *see also* Grunfeld Decl., ¶ 30 (gathering similar statements from other Joint Case Status Statements). CDCR has used this mantra to avoid confronting their own investigators' findings that staff at RJD specifically target people with disabilities.

Defendants failed to include on their court-ordered accountability logs at least twelve allegations of staff misconduct (1) that Plaintiffs' counsel raised with Defendants in advocacy letters and tour reports and (2) that are directly related to Defendants' compliance with the ADA, the RA, the ARP, and prior Court orders. *See* Grunfeld Decl., Exs. B-D; Freedman Decl., ¶¶ 279-280 & Ex. 75. For example, Defendants did not log allegations that staff tipped over a person in a wheelchair, threw a person out of a walker, or orchestrated incarcerated people to assault a person because he had spoken with interviewers during the *Armstrong* joint audit. *Id.*, ¶ 280.[44] Defendants also frequently did not log allegations within ten business days of receipt of the notice of the allegation. *Id.*, ¶ 281.

Moreover, the accountability logs for RJD provide no hint of the epidemic of officer-led violence against people with disabilities. For September 2016 through December 2019, the logs include very few allegations of excessive force against class members. *Id.*, ¶ 283. During that same time period, Defendants' logs show that they confirmed **only one allegation** of staff misconduct and have made only two referrals to OIA. *Id.*, ¶ 283. CDCR did not include on the logs any of the allegations of misconduct identified by its strike team. *Id.*, ¶ 282.

---

[44] For the other allegations that Defendants failed to log, see Freedman Declaration, ¶ 280.

[3486656.13]

Notwithstanding the parties' close working relationship (including a long-standing, court-ordered collaboration to develop joint monitoring tools, Grunfeld Decl., ¶¶ 10-11) and the fact that Plaintiffs' counsel repeatedly notified CDCR of the disability-related abuse of *Armstrong* class members, CDCR has not been transparent with information about the scope of the problems at RJD. On December 10, 2018, days after the strike team left RJD, Defendants promised to inform Plaintiffs of the results of the interviews. Grunfeld Decl., ¶ 26; Godbold Decl., ¶ 10. Defendants did not, however, provide any specific information about their horrific findings at RJD until they produced the Bishop Report on January 24, 2020, in response to discovery served by Plaintiffs. Grunfeld Decl., ¶¶ 27-29, 31.

## VI. OFFICERS ARE AND HAVE BEEN ABUSING PEOPLE WITH DISABILITIES AT OTHER CDCR PRISONS

The problems with officers abusing people with disabilities at RJD are part of a larger pattern of abuse throughout the CDCR system. In 2014, Judge Karlton issued a sweeping order requiring CDCR to improve the way officers treat people with mental illness in forced cell extractions. *See Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014). Then, in 2015, the OIG issued a scathing report regarding the "callous" indifference of staff members at High Desert State Prison ("HDSP") towards vulnerable incarcerated people—including *Armstrong* class members. Grunfeld Decl., Ex. EE, at 41. The OIG found that "[h]ardline officers run some yards with little regard for vulnerable inmates," that there were alarming reports of use of force at that prison, that the appeals system was not functioning, and that processes for incarcerated people to complain about mistreatment by staff were broken. *Id.* at ii. The OIG reported on three egregious cases involving people with disabilities, two of which would not have been referred for investigation if not for the OIG's review. *Id.* at 41. The OIG recommended that CDCR install cameras at HDSP, which it has done. *Id.* at 36 (recommending cameras at HDSP and opining that "[video] surveillance is invaluable in capturing misconduct, documenting inmate activity, and exonerating employees who have been wrongly accused of

1  misconduct."); Grunfeld Decl., Ex. Y, Background/History (discussing installation of

2  cameras at HDSP).  Since then, however, CDCR has only installed cameras at two

3  additional institutions, Central California Women's Facility ("CCWF") and California

4  State Prison – Sacramento ("SAC").  Grunfeld Decl., Ex. Y, Background/History.  In the

5  same report, the OIG also recommended, more than four years ago, that CDCR pilot a

6  program for using body cameras.  *Id.*, Ex. EE, at 37 (reporting that in Wisconsin, body

7  cameras reduced use of force incidents, were "effective for interactions at cell doors and

8  when speaking to inmates," and "enhanced the professionalism of staff and how they

9  communicated with inmates").

10      In 2018, the OIG issued a report in which he concluded that more than half of staff

11  complaint inquiries at SVSP were inadequate.  *Id.*, Ex. GG, at 3.  The OIG further found

12  that investigators "sometimes displayed bias in favor of their fellow staff members,

13  sometimes ignored inmate witness testimony, and often compromised confidentiality."  *Id.*

14  at 5.  The OIG's review at SVSP was driven, in large part, by advocacy sent by Plaintiffs'

15  counsel on behalf of *Armstrong* class members.  Grunfeld Decl., ¶ 67.

16      In the last year, Plaintiffs' counsel has been reporting on serious allegations of

17  abuse at other prisons throughout California, including California State Prison – Los

18  Angeles County ("LAC"), California State Prison – Corcoran ("COR"), Substance Abuse

19  Treatment Facility ("SATF"), CIW, and SAC.  *See* Grunfeld Decl., ¶¶ 68-69; Freedman

20  Decl., Exs. 76, 78, 80-82, 85-87.  For example, at COR,  an *Armstrong* class member with

21  a mobility disability protested on September 24, 2019 that an officer was searching him in

22  a way that was incompatible with his disability-based limitations.  Freedman Decl., Ex. 81,

23  at 2.  In response, the officer told the class member, "I don't give a shit," slammed the

24  class member to the ground, and then punched and kicked him in the face and ribs.  *Id.*

25  After the class member was restrained in handcuffs, the officer stepped on the class

26  member's head and high-fived nearby staff members.  *Id.*  At LAC, an *Armstrong* class

27  member with a mobility disability was assaulted by an officer on June 17, 2018 after a

28  dispute over accommodations for the class member's disability.  *Id.*, Ex. 76, at 23-24.  The

[3486656.13]

1  officer lifted the victim out of his wheelchair in his cell before slamming his head into his

2  top bunk and punching him in the face.  *Id.*

## ARGUMENT

3

4  **I.  DEFENDANTS ARE VIOLATING THE ADA, RA, AND ORDERS OF THIS COURT BY ALLOWING SYSTEMIC ABUSE AIMED AT *ARMSTRONG***

5  **CLASS MEMBERS**

6      Officers are hurting, permanently injuring, retaliating against, and otherwise

7  terrorizing people with disabilities at RJD because they have disabilities.  This conduct

8  violates the ADA, the RA, and prior orders of this Court.

9      Title II of the ADA provides that "no qualified individual with a disability shall, by

10  reason of such disability, be excluded from participation in or be denied the benefits of the

11  services, programs, or activities of a public entity, or be subjected to discrimination by any

12  such entity."  42 U.S.C. § 12132.[45]  In 2007, the Court ordered Defendants to comply with

13  this provision.  *See* Grunfeld Decl., Ex. B ("2007 Injunction"), Dkt. 1045, at 9; Grunfeld

14  Decl., Ex. A (ARP), § I (copying language from 42 U.S.C. § 12132); *Duvall v. Cty. of*

15  *Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  The ADA also prohibits any individuals,

16  including public entities, from retaliating against people who exercise their rights under

17  Title II.  *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual

18  because such individual has opposed any act or practice made unlawful by this chapter or

19  because such individual made a charge, testified, assisted, or participated in any manner in

20  an investigation, proceeding, or hearing under this chapter.").

21      The evidence is overwhelming that CDCR is allowing officers to attack and

22  retaliate against people with disabilities at RJD by reason of their disabilities or for

23  exercising their rights under the ADA.  *See* Factual Background, § II.A, *supra*.  It is

24  difficult to conceive of conduct that more squarely violates the statute than assaulting a

25  person for requesting a disability accommodation, for complaining about an officer's

26

27  [45] "The [ADA and Rehabilitation Act] provide identical remedies, procedures and rights." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036 (9th Cir. 2018) (internal quotation marks omitted); *Armstrong v. Wilson*, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996).

28

1  failure to provide an accommodation, or for being unable, because of disability, to hear an

2  officer's order.

3       Furthermore, the unnecessary and excessive force used by RJD officers against

4  people with disabilities violates Title II of the ADA.  Law enforcement officers violate the

5  ADA if, in the course of an arrest, they "caus[e] the person [with a disability] to suffer

6  greater injury or indignity in that process than other arrestees."  *See Sheehan v. City and*

7  *County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) (holding police officers

8  who shot a person in mental health crisis who was threatening to harm herself and others

9  violated the ADA by failing to use de-escalation techniques to avoid use of force), *rev'd in*

10 *part on other grounds*, 575 U.S. 600 (2015); *Vos v. City of Newport Beach*, 892 F.3d 1024,

11 1036-38 (9th Cir. 2018) (same).  The same principle applies here.  When officers at RJD

12 have used force to unnecessarily throw people out of wheelchairs and walkers or have

13 intentionally closed cell doors on people with disabilities who move slowly, the people

14 with disabilities suffer "greater injury or indignity" than people without disabilities.

15 **II.     THE ENVIRONMENT AT RJD—WHERE *ARMSTRONG* CLASS
         MEMBERS ARE TOO AFRAID OF STAFF TO REQUEST
16       ACCOMMODATIONS FOR THEIR DISABILITIES—VIOLATES THE
         ADA, RA, AND PRIOR ORDERS OF THIS COURT**
17

18       The pervasive violence at RJD has made *Armstrong* class members too afraid to

19 exercise their right to request and receive reasonable accommodations needed to

20 participate in CDCR programs, services, and activities.  "Title II and § 504 include an

21 affirmative obligation for public entities to make benefits, services, and programs

22 accessible to people with disabilities."  *Updike v. Multnomah Cty.*, 870 F.3d 939, 949 (9th

23 Cir. 2017).  The ADA's implementing regulations require that "[a] public entity shall make

24 reasonable modifications in policies, practices, or procedures when the modifications are

25 necessary to avoid discrimination on the basis of disability, unless the public entity can

26 demonstrate that making the modifications would fundamentally alter the nature of the

27 service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  The Court has ordered CDCR

28 to abide by this requirement.  *See* Grunfeld Decl., Ex. B, at 9; *id.* Ex. A, § II.F ("The

1   Department shall provide reasonable accommodations or modifications for known physical

2   or mental disabilities of qualified inmates/parolees.").

3       Title II's accommodation mandate is generally triggered once a person with a

4   disability requests an accommodation. *See Kiman v. New Hampshire Dep't of Corr.*, 451

5   F.3d 274, 283 (1st Cir. 2006). As such, the ADA's implementing regulations recognize

6   the importance of a process for requesting accommodations, mandating that all public

7   entities "adopt and publish a grievance procedure providing for prompt and equitable

8   resolution" of requests for accommodation. 28 C.F.R. § 35.107(b). The Court has ordered

9   CDCR to provide a special grievance process for incarcerated people to request

10   accommodations. *See* Grunfeld Decl., Ex. B, at 9; *id.* Ex. A, § IV.I.23 (setting forth

11   procedures for people with disabilities to "request an accommodation").

12       The ADA also includes a broad anti-interference provision, which makes it

13        unlawful to coerce, intimidate, threaten, or interfere with any individual in
the exercise or enjoyment of, or on account of his or her having exercised or

14        enjoyed, or on account of his or her having aided or encouraged any other
individual in the exercise or enjoyment of, any right granted or protected by

15        [Chapter 126, which includes Title II].

16   42 U.S.C. § 12203(b). This provision prohibits not only retaliation against people who

17   expressly exercise their rights under the ADA, but also conduct that has a chilling effect on

18   others' exercise of their ADA rights. *See Brown v. City of Tucson*, 336 F.3d 1181, 1190-

19   92 (9th Cir. 2003) (noting broad sweep of ADA's anti-interference provision); *EEOC v.*

20   *Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 206 (D. Conn. 2017) (disclosing name

21   of employee who filed an ADA complaint to other employees would violate anti-

22   interference provision because such disclosure "could have the effect of interfering with or

23   intimidating the [other employees] with respect to communicating with the EEOC about

24   possible disability discrimination"); *Purcell v. Pennsylvania Dep't of Corr.*, No. CIV. A.

25   95-6720, 1998 WL 10236, at *4, 9-10 (E.D. Pa. Jan. 9, 1998) (plaintiff-prisoner

26   established triable issue of fact for purposes of ADA interference claim premised, in part,

27   on evidence that prison superintendent sent "derogatory letters" relating to his disabilities).

28       As reflected in declaration after declaration, people with disabilities are so terrified

[3486656.13]

of becoming the next victim of staff misconduct at RJD that they refrain from requesting accommodations they require to participate in CDCR programs, services, and activities. *See* Factual Background, § III, *supra*. Defendants, by tolerating such an environment, violate 42 U.S.C. § 12203(b), 28 C.F.R. § 35.130(b)(7)(i), 28 C.F.R. § 35.107(b), and the Court's 2007 Injunction. Put simply, Defendants cannot satisfy their obligations to people with disabilities, including the court-ordered requirement for a disability-specific grievance procedure, so long as a climate of fear prevents people from asking for accommodations in the first place.

## III. DEFENDANTS ARE IN VIOLATION OF THIS COURT'S ORDERS REGARDING ACCOUNTABILITY

To help Defendants create a durable remedy in this case, the Court has required Defendants to log and investigate allegations of non-compliance with the ADA, RA, ARP, and orders of the Court. *See* Grunfeld Decl., ¶¶ 3-9 & Exs. B-D ("Accountability Orders"). Pursuant to the 2007 Injunction, Defendants must "track the record of each institution and the conduct of individual staff members" who were non-compliant and "refer individuals with repeated instances of noncompliance to the [OIA] for investigation and discipline, if appropriate." *Id.*, Ex. B, at 7. An important purpose of the accountability process was to ensure that CDCR develop "effective internal oversight and accountability procedures to ensure that Defendants learned what was taking place in their facilities, in order to find violations, rectify them and prevent them from recurring in the future, without involvement by Plaintiffs' counsel or the Court." *Id.*, Ex. C, at 10. In 2012, the Court found that Defendants were not complying with the accountability process and modified it to mandate that Defendants timely investigate allegations of non-compliance and provide Plaintiffs with the documents underlying the investigation. *Id.* at 10-12, 18. The Court ordered Defendants to log and initiate investigations within ten days of receipt of all allegations of non-compliance. *Id.*, Ex. D, at 1-2.

Defendants have failed to log and investigate many allegations of ADA non-compliance related to staff misconduct at RJD. *See* Factual Background, § V.I, *supra*.

[3486656.13]

1    Defendants have also failed to log all allegations within ten business days of receipt.  *Id.*

2    Accordingly, Defendants are violating the careful accountability protections put in place

3    by this Court.  Grunfeld Decl., Ex. D, at 1-2.

4          Defendants' compliance with their accountability obligations would not, standing

5    alone, have solved the problems at RJD.  Nevertheless, had Defendants complied, they

6    would have possessed a complete record of searchable allegations by officer and allegation

7    type.  Grunfeld Decl., Ex. C, at 20-21.  As discussed above, CDCR does not have another

8    mechanism for tracking this level of detail.  *See* Factual Background, § V.F, *supra*.  A

9    complete accountability log would also have made it possible for CDCR to impose

10   progressive discipline and to engage the OIA more thoroughly in the officer misconduct at

11   issue here, including through criminal referrals.

12         Furthermore, CDCR's inability to keep people with disabilities safe at RJD has

13   rendered the Court's Accountability Orders futile and feckless.  For the accountability

14   remedies to work, Defendants must have mechanisms for self-monitoring non-compliance.

15   If, however, *Armstrong* class members at RJD are too afraid to complain when staff violate

16   their rights, *see* Factual Background, § III, *supra*, and if Defendants hide or ignore their

17   own strike team's recommendations, CDCR has lost the central means for discovering,

18   logging, investigating, and remedying non-compliance, including through imposing

19   discipline on officers.  For too long, CDCR has buried its head in the sand while

20   *Armstrong* class members and other incarcerated people with disabilities suffer

21   unimaginably.  The time has come to put an end to this nightmare.

22   **IV.   THE COURT SHOULD REQUIRE THAT DEFENDANTS DEVELOP A**
     **PLAN TO STOP OFFICERS FROM ASSAULTING, ABUSING AND**
23   **RETALIATING AGAINST PEOPLE WITH DISABILITIES AT RJD**

24         To remedy Defendants' violations of the 2007 Injunction, Accountability Orders,

25   the ADA, and the RA, the Court should require Defendants to develop, within forty-five

26   days, a plan to end assaults, abuse, and retaliation against class members at RJD.  This

27   Court has the inherent power to issue further remedial orders to effectuate its prior

28   injunctions.  *See, e.g.*, *Parsons v. Ryan*, 949. F. 3d 443, 454 (9th Cir. 2020) (recognizing

[3486656.13]

court's inherent power to effectuate prior order); *Brown v. Plata*, 563 U.S. 493, 542-43

(2011) (holding that a court exercising equitable powers has the "duty and responsibility to

assess the efficacy and consequences" of prior orders and "to make further amendments …

as warranted by the exercise of its sound discretion").  This Court also has the power to

issue additional injunctive relief under Federal Rule of Civil Procedure 65.  *See Arizona*

*Dream Act Coalition v. Brewer*, 855 F.3d 957, 977 (9th Cir. 2017).

A strong remedial order is especially warranted and well within the Court's power,

because CDCR's actions not only violate the ADA and prior Court orders, but also the

Eighth and Fourteenth Amendments to the United States Constitution.  Officers'

harassment, retaliation, and use of violence against incarcerated people, along with prison

officials' willful lack of responsiveness in the face of systemic abuse of class members,

demonstrate CDCR and RJD staff members' malicious and sadistic, let alone deliberately

indifferent, attitude toward incarcerated people at RJD.  *See Farmer v. Brennan*, 511 U.S.

825, 833 (1994); *Hudson v. McMillian*, 503 U.S. 1, 5-6 (1992); *Chess v. Dovey*, 790 F.3d

961, 972-73 (9th Cir. 2015); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985).[46]

CDCR's actions and inactions also have directly impeded class members' basic Fourteenth

Amendment Due Process rights, including, for example, their abilities to have fair hearings

regarding their RVRs.  *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)

(requiring adequate notice of and opportunity to present a meaningful defense in

disciplinary proceedings); *Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001); *Ashker*

*v. Newsom*, No. 09-CV-05796-CW (RMI), 2019 WL 330461, *13 (N.D. Cal. Jan. 25,

2019) (knowing reliance on fabricated evidence in prison disciplinary hearing violates due

process).  RVRs that are false or that incarcerated people are too afraid to challenge will

lengthen prison sentences and undermine class members' ability to obtain their release

---

[46] Regardless of the standard the Court applies to evaluate Defendants' subjective state of mind—deliberate indifference, *see Farmer*, 511 U.S. at 834, or malicious and sadistic, *see Hudson*, 503 U.S. at 5-6—the evidence amply supports finding an Eighth Amendment violation.

[3486656.13]

1 through the Board of Parole Hearings.

2       Given the scope of the misconduct at RJD and the horrific violations of class

3 members' rights, Defendants' plan must be comprehensive.  See Vail Decl., ¶ 89 ("RJD is

4 in a crisis that requires extraordinary remedies.").  As described in greater detail in

5 Plaintiffs' Proposed Order, Defendants' plan should include, at a minimum, the following

6 elements:

7       **Cameras** – Within 90 days, CDCR should install operational surveillance cameras

8 with coverage of all areas of RJD to which incarcerated people have access.  Within 180

9 days, CDCR should purchase and begin using body-worn cameras for all correctional

10 officers at RJD.  CDCR should adopt appropriate policies and procedures and then conduct

11 training regarding the use of camera footage.  Vail Decl., ¶¶ 83, 94-98.

12      **Staffing** – CDCR should significantly increase supervisory staff on all watches on

13 all yards at RJD and should create non-uniformed supervisory positions in housing units to

14 improve relationships between uniformed staff and incarcerated people.  Vail Decl., ¶ 103.

15      **Training** – CDCR should develop and implement Human Rights, de-escalation,

16 and cultural training for all custody, mental health staff, and medical staff at RJD to

17 include discussion of reporting requirements, whistleblowing, non-retaliation, and

18 treatment of incarcerated people as patients.  Vail Decl., ¶¶ 111-113.

19      **Data Collection and Early Warning System** – CDCR should immediately

20 develop an effective, electronic system to track all incidents so that it can identify non-

21 compliance and proactively address staff misconduct and other problems.  Vail Decl.,

22 ¶¶ 114-118.

23      **Oversight** – CDCR headquarters should exercise additional oversight over all staff

24 complaints, use of force reviews, staff disciplinary proceedings, and RVRs at RJD and

25 should conduct quarterly interviews of randomly-selected incarcerated people to determine

26 if the changes are working.  Vail Decl., ¶ 89.

27      **Information Sharing** – CDCR should produce to Plaintiffs' counsel on a quarterly

28 basis all documents related to staff complaints in which the alleged victim is an *Armstrong*

1 class member. CDCR should also provide Plaintiffs' counsel with monthly, written

2 updates regarding progress in implementing its plan to stop misconduct at RJD.

3     **Anti-Retaliation** – CDCR should put an end to retaliation against class members

4 and staff, like the psychologist discussed in Factual Background, Section II.E, *supra*, who

5 report staff misconduct and must ensure complainants' safety. 42 U.S.C. § 12203(a).

6     **Criminal Referrals and Staff Discipline** – CDCR should develop a plan,

7 consistent with the Accountability Orders, to discipline employees who engage in or fail to

8 report misconduct and to prosecute employees who commit crimes against incarcerated

9 people. Vail Decl., ¶ 49.

10     **Other Remedies** – CDCR should adopt a policy requiring that all pepper spray

11 canisters be weighed before and after use; review all RVRs issued in the last three years to

12 *Armstrong* class members and individuals who filed declarations in support of this Motion;

13 and monitor the conduct and treatment of incarcerated people who file staff complaints to

14 ensure staff are not engaging in retaliation. Vail Decl., ¶¶ 68-72, 102, 117.

15     **Suspension of State Law** – If any provisions of state law interfere with CDCR's

16 ability to enact remedies necessary to remedy the violations of the ADA, RA, ARP, and

17 orders of this Court, CDCR should request a court order suspending those provisions.

18 including the suspension of state law if necessary to achieve these purposes.

19     **Other Prisons** – CDCR must also explain, in light of evidence of the problems with

20 misconduct and violence at other prisons, whether and under what circumstances it will

21 install cameras and undertake the remedies listed here at other CDCR institutions.

22     If Defendants fail to develop an appropriate plan or to timely implement their plan,

23 *Armstrong* class members should have the option to request and receive transfer from RJD

24 and CDCR should stop transferring *Armstrong* class member to RJD.

25     These remedies are all consistent with the Prison Litigation Reform Act's

26 requirement that the Court's orders be narrowly drawn, extend no further than necessary to

27 correct the violation of a federal right, and be the least intrusive means necessary to correct

28 the violation. *See* 18 U.S.C. § 3626(a)(1)(A). Anything short of these remedies will not

[3486656.13]

put an end to Defendants' ongoing and pervasive violation of *Armstrong* class members' rights.  Given CDCR's failure to adequately address the staff misconduct crisis at RJD over the past three plus years, the specificity of the remedies is appropriate.  *See Armstrong v. Brown*, 768 F.3d 975, 985-86 (9th Cir. 2014) ("[A] court may … provide specific instructions to the State without running afoul of the PLRA," and has "considerable discretion in fashioning relief" where, as here, the Court has supervised the litigation for a long time).

## CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that the Court grant this Motion and issue the Proposed Order.

DATED:  February 28, 2020

Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael Freedman*
Michael Freedman

Attorneys for Plaintiffs

[3486656.13]