DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:   Hon. Claudia Wilken |
| | Crtrm:   TBD, Oakland |

[3576536.4]

Case No. C94 2307 CW

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ............................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 3

I.     THE NOVEL CORONAVIRUS IS A DEADLY VIRUS THAT HAS SPREAD THROUGHOUT THE CALIFORNIA PRISON SYSTEM OVER THE PAST FOUR MONTHS, INFECTING THOUSANDS OF PEOPLE. ............. 3

II.    *ARMSTRONG* CLASS MEMBERS ARE AT INCREASED RISK OF SERIOUS COMPLICATIONS AND DEATH IF INFECTED WITH THE NOVEL CORONAVIRUS. ........................................................................... 4

III.   SINCE THE PANDEMIC BEGAN IN MARCH 2020, DEFENDANTS HAVE NOT DEVELOPED A PLAN TO KEEP *ARMSTRONG* CLASS MEMBERS PROTECTED FROM THE NOVEL CORONAVIRUS AND HOUSED IN LOCATIONS WHERE THEY CAN SAFELY ACCESS TOILETS, SHOWERS, AND OTHER AREAS .......................................................... 5

     A.     Defendants Have Not Developed or Implemented a Plan to Ensure Sufficient Accessible Medical Isolation and Quarantine Housing for *Armstrong* Class Members. ................................................. 6

          1.    Defendants Placed and Continue to Place *Armstrong* Class Members in Dangerous and Inaccessible Housing During the Months-Long Outbreak at the California Institution for Men. ........... 6

              (a)     Defendants have placed *Armstrong* class members in inaccessible areas as the novel coronavirus spread throughout the institution for months. ....................................... 7

              (b)     Defendants kept *Armstrong* class members in dormitories with shared toilets, showers, and sinks, alongside people with confirmed, active cases of COVID-19, simply because there was no other accessible housing area available. .......................................... 10

          2.    Defendants Have Failed to Account for the Needs of *Armstrong* Class Members in Their COVID-19 Bed Plans. .............. 15

     B.     Defendants Have Not Developed a Plan to Ensure that *Armstrong* Class Members Are Safely Assisted by ADA Workers, Volunteers, or Staff to Accommodate Their Disabilities During the Pandemic. .................. 18

ARGUMENT ................................................................................................................ 20

I.     THIS COURT SHOULD ORDER DEFENDANTS TO ESTABLISH AND MAINTAIN SUFFICIENT ACCESSIBLE HOUSING DURING THE PANDEMIC AND TAKE IMMEDIATE ACTION TO PREPARE FOR OUTBREAKS IN CALIFORNIA PRISONS. ......................................................... 20

i                 Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

II.    PLAINTIFFS' PROPOSED ORDER COMPLIES WITH THE PRISON
       LITIGATION REFORM ACT. ................................................................. 24

CONCLUSION ........................................................................................ 25

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING
COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armstrong v. Brown*,
        768 F.3d 975 (9th Cir. 2014) ....................................................................... 24

*Brooklyn Center for Independence of the Disabled v. Bloomberg*,
        980 F. Supp. 2d 588 (S.D.N.Y. 2013) ...................................................... 23

*California Found. for Indep. Living Centers v. Cty. of Sacramento*,
        142 F. Supp. 3d 1035 (E.D. Cal. 2015) .................................................... 23

*Communities Actively Living Indep. & Free v. City of Los Angeles*,
        No. CV 09-0287 CBM RZX, 2011 WL 4595993 (C.D. Cal. Feb. 10, 2011) .......... 23

*Lee v. City of Los Angeles*,
        250 F.3d 668 (9th Cir. 2001) ....................................................................... 23

## STATUTES

18 U.S.C. § 3626.......................................................................................................... 24

42 U.S.C.A. § 12132 .................................................................................................... 20

## REGULATIONS

28 C.F.R. § 35.133........................................................................................................ 20

28 C.F.R. § 35.150........................................................................................................ 20

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING
COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 4, 2020, or as soon thereafter as the matter may be heard by the above Court, Plaintiffs will and hereby do move, pursuant to Civil L.R. 7-1 and 65-2, for an order directing Defendants to provide safe, accessible housing to all *Armstrong* class members in a manner that does not put them at increased risk of infection from COVID-19 and to take urgent steps to account for *Armstrong* class members in its pandemic planning measures.

This Motion is supported by the following Memorandum of Points and Authorities, the Proposed Order, the supporting declarations, and the entire record in this matter.

DATED:  July 14, 2020                       Respectfully submitted,

PRISON LAW OFFICE

By:   */s/ Rita Lomio*
            Rita Lomio
            Margot Mendelson
            Patrick Booth
            Corene Kendrick
      Attorneys for Plaintiffs

[3576536.4]

## MEMORANDUM OF POINTS AND AUTHORITIES

People with disabilities have long been unable to safely live in California prisons, struggling to access toilets, showers, sinks, and other areas. Over the past two decades, this Court has issued order after order prohibiting Defendants from placing *Armstrong* class members in unsafe, inappropriate housing due to the persistent shortage of accessible housing locations in the state prison system.

Today, in the midst of the COVID-19 pandemic, the stakes are ever higher. As housing units are repurposed and reconfigured to implement social distancing and create medical isolation and quarantine settings, accessible housing has become even scarcer. In the three and a half months since the first reported case of COVID-19 in a California prison, Plaintiffs repeatedly have demanded that Defendants account for *Armstrong* class members' heightened vulnerability to the disease and distinct housing and program needs, including through bed planning, physical plant construction, installation of accessible features, and the use of custody overrides.

Nonetheless, because of ongoing overcrowding, Defendants lack sufficient space to house class members in accessible areas while also protecting them from COVID-19. For months, Defendants have placed class members at the California Institution for Men in inaccessible settings with inadequate or no grab bars in the restrooms and showers, and with insufficient access to ADA workers to help with their daily living needs. And, as recently as last week, class members who had never before tested positive for COVID-19, including those described by an attorney for Defendants as "elderly and incontinent," were housed in the same crowded dormitory as people with confirmed, active cases, sharing the same toilets, sinks, showers, dayroom, and sleeping areas, because Defendants had no other accessible housing for them. Unsurprisingly, they quickly became infected too.

This is unacceptable. We repeatedly have seen how quickly the novel coronavirus, once introduced, can spread throughout a prison, most recently at the California Institution for Men and San Quentin State Prison. And we now understand that this pandemic will continue for the foreseeable future. Defendants must take immediate steps to ensure that

[3576536.4]

*Armstrong* class members are safely housed in the event of additional and expected outbreaks in the California prison system. Their current plans, generated much too late and only in response to Plaintiffs' repeated demands, are woefully deficient and endorse an *ad hoc*, wait-and-see approach that already has been found to violate federal law by courts around the country. As a result, Plaintiffs seek an order enforcing their right to safe, accessible housing and directing Defendants to ensure that the disability needs of *Armstrong* class members are met during the pandemic.

**FACTUAL BACKGROUND**

**I.    THE NOVEL CORONAVIRUS IS A DEADLY VIRUS THAT HAS SPREAD THROUGHOUT THE CALIFORNIA PRISON SYSTEM OVER THE PAST FOUR MONTHS, INFECTING THOUSANDS OF PEOPLE.**

On March 4, 2020, Defendant Gavin Newsom declared a state of emergency to address the emerging threat of the novel coronavirus. Declaration of Patrick Booth in Support of Plaintiffs' Motion ("Booth Decl."), filed herewith, Ex. A. Seven days later, the World Health Organization declared a pandemic. *Id.*, Ex. B. Since then, the virus and the disease caused by it, COVID-19, have spread throughout the state. Over 325,000 people in the state have tested positive for the virus, and over 7,000 people have died. *Id.*, Ex. C.

There is no vaccine for COVID-19, and there is no cure. Declaration of Tara Vijayan, M.D., in Support of Plaintiffs' Motion ("Vijayan Decl."), filed herewith, ¶ 4. It is easily transmissible, spreading "through droplets generated when an infected person coughs, sneezes, or even speaks loudly, or through droplets of saliva or nasal discharge." *Id.* ¶ 6. It can be spread by people who are infected but asymptomatic or pre-symptomatic and therefore are "not aware that they are carrying and shedding the virus." *Id.* ¶ 7. "The time course of the disease can be rapid. People can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate soon after that." *Id.* ¶ 4. The effects of COVID-19 are very serious and can include severe respiratory illness, major organ damage, blood clots (in the lungs as well as strokes), multisystem inflammatory syndrome, and death. *Id.* ¶ 5. Preventative measures, including social distancing and face coverings, are critical to safeguard against the virus. *Id.* ¶ 8.

Nowhere in the state has been more affected by the novel coronavirus than the prison system. On March 20, 2020, the California Department of Corrections and Rehabilitation ("CDCR") recorded its first case of COVID-19 after a person housed at the California State Prison, Los Angeles County, tested positive. Booth Decl., Ex. E. Since that time, 6,323 people in California prisons have tested positive for the virus, including nearly 600 *Armstrong* class members. *Id.* ¶¶ 7, 14 & Exs. F, L. Thirty-four incarcerated people have died, and 80 now are receiving advanced care at outside hospitals. *Id.* ¶ 7 & Ex. L. Between staff and the incarcerated population, the virus has made its way into all 35 California prisons. *Id.* ¶ 8 & Ex. G. And the numbers continue to rise.

Unfortunately, the pandemic is expected to last "at least another year, likely until a safe and effective vaccine is developed." Vijayan Decl. ¶ 3.

## II.   *ARMSTRONG* CLASS MEMBERS ARE AT INCREASED RISK OF SERIOUS COMPLICATIONS AND DEATH IF INFECTED WITH THE NOVEL CORONAVIRUS.

*Armstrong* class members are at increased risk of getting very sick or dying from COVID-19. First, *Armstrong* class members are more likely to have underlying health conditions that increase their risk of complications from COVID-19. *See* Vijayan Decl. ¶ 4 (explaining that advanced age and certain underlying medical conditions put people at an increased risk of severe illness from COVID-19). Defendants employ a weighted risk scoring system in their reports on people in custody with an elevated risk of complications from COVID-19 infections.[1] Over 83% of people with a weighted risk score of 9 or higher are *Armstrong* class members. Declaration of Ernest Galvan in Support of Plaintiffs' Motion ("Galvan Decl."), filed herewith, ¶ 16.

---

[1] The system is based on the following risk factors, with their weights listed in parentheses: "Age 65+ (4), Advanced Liver Disease (2), Persistent Asthma (1), High Risk Cancer (2), Chronic Lung Disease - Other (including Cystic Fibrosis, Pneumoconiosis, or Pulmonary Fibrosis) (1), COPD (2), Diabetes (1), High Risk Diabetes (1), On Dialysis (2), Heart Disease (1), High Risk Heart Disease (1), HIV/AIDS (1), Poorly Controlled HIV/AIDS (1), Immunocompromised (2), Morbid Obesity (1), Other High Risk Chronic Conditions (1), and Pregnancy (1)." Galvan Decl. ¶ 4. The total of the weighted scores for each risk factor is reported as the COVID Weighted Risk Score.

[3576536.4]

Second, because of their disabilities, *Armstrong* class members often must be in close proximity or direct contact with others. Blind class members, for example, often are aided by sighted guides to move around the prison. And people who use wheelchairs often depend on others to push their wheelchairs or carry their food trays. *See* Booth Decl. ¶ 5 & Ex. D (Centers for Disease Control and Prevention, People with Disabilities (last visited July 10, 2020)) (noting that "[p]eople who have limited mobility or who cannot avoid coming into close contact with others who may be infected, such as direct support providers and family members," "might be at increased risk of becoming infected").

These increased risks have been realized in the California prison system during the pandemic. *Armstrong* class members make up only 10% of the total prison population, but account for 53% of the total COVID-related deaths. Galvan Decl. ¶¶ 12, 20.

**III.   SINCE THE PANDEMIC BEGAN IN MARCH 2020, DEFENDANTS HAVE NOT DEVELOPED A PLAN TO KEEP *ARMSTRONG* CLASS MEMBERS PROTECTED FROM THE NOVEL CORONAVIRUS AND HOUSED IN LOCATIONS WHERE THEY CAN SAFELY ACCESS TOILETS, SHOWERS, AND OTHER AREAS.**

Since March 2020, Plaintiffs repeatedly have raised concerns about how *Armstrong* class members would be accommodated during the pandemic, including the need to ensure accessible housing for purposes of medical isolation (for confirmed cases) and quarantine (for suspected cases). *See, e.g.*, Declaration of Penny Godbold in Support of Plaintiffs' Motion ("Godbold Decl."), filed herewith, ¶¶ 4 (March 31), 6 (April 9), 12 (April 23), 15 (April 29), 17 (May 6), 21 (May 20), 23 (June 3), 25 (June 9), 28 (June 24). Plaintiffs also raised concerns regarding the reduced number of accessible beds due to Defendants' rearrangement of sleeping areas to allow some measure of social distancing. *Id.* Plaintiffs explained that Defendants must account for the disability needs of class members in pandemic response and planning. *Id.* Over four months after the World Health Organization declared a pandemic, however, Defendants have not done so.[2]

---

[2] Defendants recently announced several steps to expand eligibility for early release in order to reduce the overall prison population. It is not clear how, if at all, these general measures will address the widespread shortage of available accessible housing for people with disabilities. *See* Godbold Decl. ¶ 30 & Ex. Q.

5

[3576536.4]

**A.  Defendants Have Not Developed or Implemented a Plan to Ensure Sufficient Accessible Medical Isolation and Quarantine Housing for *Armstrong* Class Members.**

Defendants were unable to articulate an adequate plan to ensure sufficient accessible medical isolation and quarantine housing for *Armstrong* class members during meetings with Plaintiffs and the Court Expert on April 7, April 10, April 17, April 24, May 1, May 8, May 22, June 5, June 11, and June 26, 2020. Godbold Decl. ¶¶ 5, 7, 10, 13, 16, 18, 22, 24, 26, 29. In late April, Defendants conceded that they had not planned for accessible medical isolation or quarantine beds in the event of an outbreak. *Id.* ¶ 13. Over a month later, on June 5, 2020, Defendants acknowledged that they still had not directed institutions to plan for housing *Armstrong* class members in accessible locations during an outbreak; instead, Defendants said, custody and healthcare staff would work together to identify appropriate housing only *after* an outbreak occurs. *Id.* ¶ 24.

The danger and callousness of this *ad hoc*, wait-and-see approach is illustrated by the ongoing plight of people with disabilities during a months-long outbreak at one prison.

**1.  Defendants Placed and Continue to Place *Armstrong* Class Members in Dangerous and Inaccessible Housing During the Months-Long Outbreak at the California Institution for Men.**

The California Institution for Men ("CIM"), located in Chino, California, houses 2,956 people. Booth Decl. ¶ 17 & Ex. N. Of those, at least 592 are *Armstrong* class members, including 316 people designated as having an "impacting placement" disability. *Id.* ¶ 16 & Ex. M. That means that they may be housed only in certain institutions that have the requisite accessible features, including level terrain, grab bars, and wheelchair-accessible beds and cells. *Armstrong* Remedial Plan ("ARP") § 1 at 1. At least 80 people who use wheelchairs (designated DPW or DPO), 216 people with other serious mobility disabilities (DPM or DLT), and 17 blind people (DPV) are housed at CIM. Booth Decl. ¶ 16 & Ex. M; *see* ARP § II(C)-(D) (defining DP*x* codes); Godbold Decl. ¶ 27 (DLT).

The first person incarcerated at CIM with a confirmed case of COVID-19 was tested on March 27, 2020. Booth Decl. ¶ 21. As of July 10, 945 people at the institution have been infected with the virus, including 245 (or 41% of) *Armstrong* class members and

6

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

28 (or 32.5% of) ADA workers. *Id.* ¶¶ 22, 26. Seventeen people, including ten *Armstrong* class members, have died. *Id.* ¶ 22. Nonetheless, Defendants never developed or implemented a plan to accommodate people with disabilities at CIM during the outbreak. Godbold Decl. ¶ 27. Instead, they have taken an entirely reactive approach, resulting in class members being held in dangerous living conditions, either because (a) they are housed in inaccessible areas or (b) they are left in accessible areas but in the same dorm as people with active cases of the disease—sometimes without the full knowledge of CDCR headquarters staff or the institution's medical, custody, and ADA administrative staff.

      **(a)**      **Defendants have placed *Armstrong* class members in inaccessible areas as the novel coronavirus spread throughout the institution for months.**

      For months, *Armstrong* class members have been housed in inaccessible locations at CIM during the outbreak. For example, on June 11, 2020, Plaintiffs informed Defendants that a 74-year-old class member had not showered for 42 consecutive days because he was being held in inaccessible locations without grab bars or a shower chair or bench, even though, Plaintiffs later learned, he had been medically cleared from quarantine status on May 14. *See* Declaration of Rita Lomio in Support of Plaintiffs' Motion ("Lomio Decl."), filed herewith, Ex. F; Declaration of Gay Grunfeld in Support of Plaintiffs' Motion ("Grunfeld Decl."), filed herewith, ¶ 17. Plaintiffs noted that the class member "reported that he did try to talk to custody staff on multiple occasions about his disability-related issues, but they expressed that the situation was out of their hands given the pandemic." Lomio Decl., Ex. F. According to the medical record, the class member was found lying on the ground next to the toilet in his cell the day after Plaintiffs reported their concerns. *See* Grunfeld Decl. ¶ 19. He has been in an outside hospital ever since. *Id.* ¶¶ 20-21.

      This was not an isolated occurrence. Plaintiffs reported by letters and emails on May 6, May 7, June 5, and June 18, 2020, that Defendants appeared to have a policy or practice of inappropriately housing *Armstrong* class members in inaccessible locations while pending test results, during medical isolation, and after negative test results were received. Godbold Decl., Ex. I; Lomio Decl., Exs. D, E, G.

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

> We reviewed the housing history reports for people who had a DPW or DPO code and who also had tested positive for COVID-19. Of the 22 people who met that criteria on June 3, 2020, 36% were housed in at least one inaccessible location between March 1, 2020, and June 15, 2020, and 18% were housed in multiple inaccessible locations during that period. The lengths of stay in inaccessible placements varied; a class member with a DPW code spent six days in inaccessible housing, and a class member with a DPO code spent 44 days in three different inaccessible locations.

Lomio Decl., Ex. G at 3; Booth Decl. ¶ 12 (same); *see, e.g.*, Grunfeld Decl. ¶¶ 5-9 (class member designated DPM was housed in inaccessible areas for at least 54 days after testing positive for COVID-19, and continued to be so housed as of July 1, 2020, based on the most recent housing report produced by Defendants at the time of Plaintiffs' review).

In response to Plaintiffs' letters, the Assistant Deputy Director, Program Operations, Division of Adult Institutions, and the Director, Corrections Services, California Correctional Health Care Services, visited CIM on June 24, 2020. Lomio Decl., Ex. H. In an oral report to Plaintiffs and the Court Expert two days later, Defendants stated that *Armstrong* class members were housed in inaccessible placements longer than Defendants believed was medically necessary.[3] *Id.* ¶ 12; *see also* Grunfeld Decl. ¶¶ 22-25 (class member designated DPO was housed in inaccessible areas for at least 48 days after medical staff determined him to be recovered from COVID-19, and continued to be so housed as of July 1, 2020); ¶¶ 26-31 (class member designated DPM was housed in inaccessible areas at least 32 days after medical staff determined him to be recovered from COVID-19, and continued to be so housed as of July 1, 2020); ¶¶ 32-41 (class member designated DPM was housed in inaccessible areas at least 13 days after medical staff determined him to be recovered from COVID-19).

On July 1, 2020, ADA staff at the institution reported that there is little they can do in light of the insufficient number of accessible beds other than put people up for "expedited" transfer, which they acknowledged is of no practical benefit as transfers have been indefinitely suspended. Lomio Decl. ¶ 16; *see* Godbold Decl., Ex. R. ADA staff

---

[3] Plaintiffs, of course, believe that medical isolation and quarantine housing always should be accessible.

[3576536.4]

reported that over a dozen class members were housed in inaccessible areas because there were no appropriate, accessible beds available. Lomio Decl. ¶ 18; *see also* Declaration of Tania Amarillas Diaz in Support of Plaintiffs' Motion ("Amarillas Decl."), filed herewith, ¶ 9 (finding thirteen class members inappropriately housed at CIM as of July 1, 2020). And the number will only increase. Three class members who previously were housed in an accessible dorm are presently in outside hospitals and will need to be re-housed upon their return, and some of the 23 class members who currently are receiving medical treatment in the Outpatient Housing Unit ("OHU") likely also will require re-housing upon discharge, further straining the scarce supply of accessible beds. Booth Decl. ¶ 23.

       To date, Defendants have not presented, much less implemented, a plan to address the shortage of accessible housing at CIM. Godbold Decl. ¶ 27. Four impacting-placement class members tested positive after tests administered on July 6, 2020. Booth Decl. ¶¶ 37-38. After the results were received on July 8, Defendants still could not answer where the class members would be housed, what accessible features were there, and how many people could be accommodated. Lomio Decl. ¶ 32. The class members later were moved to an inaccessible housing location, where they reported difficulty safely accessing toilets and showers and that no staff person had met with them to discuss their disability needs in their new housing unit. A 59-year-old class member, for example, reported that "no one informed me of the accommodations that would or would not be available in [this new housing area]. I was simply told by custody staff to pack my property because I was moving." Booth Decl. ¶ 53 & Ex. HH ¶¶ 2, 5. He further reported:

> There is not enough room in the bathroom door and entrance to accommodate my wheelchair. … There are no grab bars in the shower area, so I have to be careful when using the showers. … The toilets in [this unit] are very low to the ground. Only one of the four toilets has a grab bar, but even that bar is difficult to use because it is too low to effectively help me get up from the toilet. There is not enough room between the toilets to get on the toilet from my wheelchair, so I have to walk to the toilets without my wheelchair.

*Id.*, Ex. HH ¶¶ 7-9; *see also id.*, Exs. KK, GG ¶¶ 5-6, 8, Ex. II.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

And another *Armstrong* class member who uses a wheelchair and walker reported that after he tested positive for COVID-19 on June 30, he was told to move to an inaccessible housing unit. Booth Decl., Ex. FF ¶¶ 5-6. He reported that there "are no bars in the cell for me to grab onto to stabilize myself," that he is unable to fit his walker next to his bed, and that he has twice fallen in his cell "because I stood up and could not reach my walker to stabilize myself." *Id.* ¶ 6.

> **(b)  Defendants kept *Armstrong* class members in dormitories with shared toilets, showers, and sinks, alongside people with confirmed, active cases of COVID-19, simply because there was no other accessible housing area available.**

Defendants also have endangered *Armstrong* class members who have not yet been infected with the virus by keeping them in cramped dorms alongside people with confirmed, active cases of COVID-19, apparently because no other accessible housing is available. As a consequence, *Armstrong* class members have been subjected to direct and unreasonable exposure to this deadly disease due to their disabilities.

Only one of the dormitory housing units on Facility A, referred to as Joshua Hall or A6, is designated for people with impacting-placement disabilities.[4] Booth Decl. ¶ 18 & Ex. O. Joshua Hall has two sides that are connected by a communal toilet and shower area. Lomio Decl., Ex. M at 4. The two sides of the dorm also share a dayroom. *Id.* Each side of Joshua Hall has four rows of bunk beds. *Id.* Some bunk beds are not in use to allow some measure of social distancing while sleeping. *Id.* at 1, 5-6. As a result, each side of Joshua Hall currently has 28 bunks available for use. *Id.* at 5. As of July 1, 2020, 64 *Armstrong* class members were housed in Joshua Hall, in all 56 bunk beds. Booth Decl. ¶¶ 27, 28; *see also id.* ¶ 40(e) (noting that one class member may have been at an outside hospital).

---

[4] *Armstrong* class members are housed on all four facilities at CIM: A, B, C, and D. Booth Decl. ¶ 18 & Ex. O. Facilities A, B, and D have some housing that is accessible for people with impacting-placement disabilities. *Id.* Facility A is a Level II yard, and consists of eight dormitory housing units. *Id.* ¶ 20 & Ex. Q. Facility B primarily is used for administrative segregation and the Reception Center, and consists of celled housing units. *Id.* Facility C is a Level II yard, and consists of four celled housing units. *Id.* Facility D is a Level I yard, with ten housing units in use, including eight dormitory housing units and two celled housing units. *Id.*

[3576536.4]



**Two Rows of Bunk Beds in Dorm on Facility A, CIM (May 22, 2020)**
(Lomio Decl. ¶ 6)

Plaintiffs do not know the exact date when the first person housed in Joshua Hall was infected with the novel coronavirus. Booth Decl. ¶ 29. But it appears people housed in Joshua Hall tested positive after tests administered on May 8 (1 person), May 19 (1), May 20 (1), May 25 (1), May 26 (1), May 27 (1), May 28 (1), May 29 (2), May 31 (1), and June 13 (2). *Id.* ¶¶ 32-33 & Ex. V. It does not appear that people in Joshua Hall were tested again until June 23, 2020. *Id.* ¶ 34. On June 25, Defendants learned that 22 people, including 15 *Armstrong* class members with impacting-placement disabilities, had tested positive, and the next day, they learned that another person had tested positive. *Id.*

On June 26, 2020, Defendants informed Plaintiffs that there had been another outbreak in Joshua Hall; that to save their lives, Defendants might have to move *Armstrong* class members to inaccessible placements; and that they welcomed any recommendations from Plaintiffs. Lomio Decl. ¶ 12.

Defendants, however, did not engage in discussion with Plaintiffs. Lomio Decl. ¶¶ 13-14. Instead, Defendants simply left the 23 people with confirmed, active cases in Joshua Hall, alongside 40 *Armstrong* class members who had not tested positive for the disease. Booth Decl. ¶¶ 41-43 & Ex. Y. This includes 27 class members in their 60s, 70s, and 80s, and class members with underlying medical conditions that put them at very high risk of dangerous complications from a COVID-19 infection. *Id.* ¶ 41. "Positive" and "negative" class members had adjoining beds on the same side of the dorm.[5] *Id.* ¶ 42;

---

[5] Defendants three times represented to Plaintiffs that "positive" and "negative" class members were housed on separate sides of Joshua Hall, separated by the bathroom area.

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

Lomio Decl., Ex. M at 4. They shared the same toilets, showers, sinks, dayroom, and mini

yard at the same time. Booth Decl., Exs. Z ¶ 6 (declaration of 70-year-old class member

who uses a wheelchair and has been diagnosed with COPD, cancer, and cardiovascular

disease); AA ¶ 7 (declaration of 67-year-old class member who uses a wheelchair); BB ¶ 7

(declaration of 62-year-old class who uses a wheelchair and has been diagnosed with

cancer, cardiovascular disease, diabetes, and immunosuppression); Y (list of underlying

medical conditions for people housed in Joshua Hall on July 1, 2020). Indeed, even an

attorney for Defendants conceded: "The separate populations have access to the restroom

at the same time. The scheduling of use of the restroom to separate times would negative

[sic] impact the population, **especially the elderly and incontinent**, who need access more

frequently." Lomio Decl., Ex. Q at 2 (emphasis added). Those facilities are cleaned only a

few times a day. *Id.* ("The restrooms are cleaned by trained porters six times a day");

Booth Decl., Exs. Z ¶ 10 ("The showers and restrooms in my dorm get cleaned four times

per day, but they are not cleaned at all between 3 p.m. and 6 a.m."); BB ¶ 10 ("the grab

bars in the bathroom are wiped only every couple of hours").

      When asked why "positive" and "negative" class members were left in the same

dorm, Defendants responded that there was no other accessible housing available for them.

Lomio Decl. ¶¶ 16, 19.

      Class members fear they will become infected and die from the disease.[6] A 70-year-

---

Lomio Decl. ¶¶ 14 (meeting with Chief Executive Officer, Chief Medical Executive, and Chief Nurse Executive on June 30), 16 (meeting with ADA Coordinator and CAMU CCII on July 1) & Ex. M at 1 (email from Defendants' attorney on July 7) ("Confirmed positive cases are not housed on the same side as individuals that are negative."). That was false. Defendants still have not explained "[w]hy the CEO, CME, CNE, ADAC, CAMU CII, and Warden all were unaware, for at least twelve days, that people with confirmed, active cases were housed on the same side of Joshua Hall as people who had not before tested positive." *Id.* ¶ 35.

[6] Notably, class members also fear that, should they be infected, they will be moved to an inaccessible location that is not safe for them. Booth Decl. Exs., BB ¶¶ 2-3, 11 (declaration from 62-year-old class member with limited mobility due to cancer that affects his spine and who therefore uses a wheelchair, reporting, "I would not want to move to a different housing unit. . . . I would have a difficulty navigating in a housing unit that is not wheelchair-accessible. I have extra space at my current bunk that fits my wheelchair, and the shower chair and grab bars in the shower help me shower without falling."); CC ¶¶ 2-4 (declaration from 65-year-old class member who uses a wheelchair and has COPD, Type 2

[3576536.4]

old class member with COPD and asthma, who previously had a heart attack and stroke, and who is a full-time wheelchair user, reported: "I am scared that I could become positive living in this dorm. I fear that if I got the virus, I would die, given my age and my underlying health conditions." Booth Decl., Ex. Z ¶¶ 2-3, 13. Similarly, a 67-year-old class member, who has high blood pressure and uses a wheelchair, reported: "I am worried that because of my age and my health, I could become very sick if I got COVID-19." *Id.*, Ex. AA ¶¶ 2-3, 13.

These concerns are well-founded. Dr. Tara Vijayan, Assistant Professor of Medicine in the Division of Infectious Diseases at the UCLA David Geffen School of Medicine, who currently oversees treatment of patients with COVID-19, reviewed documentation of conditions in Joshua Hall. Vijayan Decl. ¶ 9. She concluded: "It is my strong opinion that people who are positive for COVID-19 should not be housed in Joshua Hall with people who are COVID-19-negative. The risk of transmission simply is too high. I am particularly concerned that many of the people in the dorm who are COVID-19-negative are of advanced age and/or have serious underlying medical conditions, putting them at significantly increased risk of complications or death from COVID-19." *Id.* ¶ 16; *see also id.* ¶¶ 14-15 (concluding that the plastic extension on the pony walls and Defendants' cleaning schedule are not adequate to contain spread of the virus).

Perhaps unsurprisingly, given the dangerous living conditions, six people housed in Joshua Hall, including five *Armstrong* class members, tested positive for the virus after tests administered on July 6, 2020. Booth Decl. ¶ 37.

/ / /

/ / /

/ / /

/ / /

---

diabetes, and high blood pressure, reporting that when he previously was housed in an inaccessible location, he fell in the shower multiple times and "had to crawl on the floor to get to [his] wheelchair"); Ex. Z ¶ 13; Ex. AA ¶ 14.

[3576536.4]



**Joshua Hall, California Institution for Men, on July 1, 2020[7]**

**A** — *Armstrong* class member with negative results after tests on 6/23 and 7/6/20.

■ (green) — Person with resolved case as of 6/23/20.

■ (red) — Person with positive test result after test on 6/23/20, and negative test result after test on 7/6/20.

■ (orange) — Person with negative test result after test on 6/23/20, and positive test result after test on 7/6/20.

- "A" indicates *Armstrong* class member, and "N" indicates non-class member.
- Whenever beds with two occupants are indicated on the diagram, the top symbol represents the person living on the top bunk and the bottom symbol represents the person on the bottom bunk.

Defendants informed Plaintiffs on July 10, 2020, that class members who had newly tested positive had been moved out of Joshua Hall—to a unit not designated for people with disabilities. Lomio Decl. ¶ 35 & Ex. T. Defendants still have no available accessible housing, particularly for full-time wheelchair users, in the event that another person in Joshua Hall tests positive. *Id.* ¶ 36. Plaintiffs repeatedly have proposed that Defendants construct additional accessible housing (temporary or permanent), issue custody overrides to move class members to other accessible facilities, or consider releasing class members from custody if they cannot accessibly house them. *See, e.g.*, *id.* ¶¶ 12, 16, 18, 36 & Ex. L at 2, 10. Defendants failed to take any of these steps. In the months since the first person in Joshua Hall tested positive, Defendants still have no housing available to safely and accessibly house all *Armstrong* class members should the outbreak continue.

---

[7] For information about how this diagram was made, please see the Declaration of Tania Amarillas Diaz. For additional detail, please view the diagram at 400% zoom.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING
COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

**2.      Defendants Have Failed to Account for the Needs of *Armstrong* Class Members in Their COVID-19 Bed Plans.**

In light of Defendants' failure to safely house class members at CIM, Plaintiffs requested written plans outlining how each institution that houses class members with disabilities impacting placement will accommodate them during an outbreak. Lomio Decl., Ex. E at 14. Plaintiffs asked Defendants to identify which areas at each institution will be designated for medical isolation and quarantine and what physical plant modifications have been or will be made. *Id.* On June 19, 2020, Defendants produced plans, in the form of short Excel spreadsheets, for twenty designated institutions.[8] Godbold Decl., Ex. O.

Those plans fail to protect the *Armstrong* class. They are cursory and superficial, and fail to demonstrate the planning and actions necessary to prevent the unsafe housing of *Armstrong* class members that has occurred during the months-long outbreak at CIM.

First, in nearly every bed plan, Defendants identify quarantine and isolation housing units that would be too small to provide sufficient accessible housing in the event of a medium or large outbreak, similar to those that already have occurred at San Quentin State Prison (1,923 confirmed cases), Chuckawalla Valley State Prison (1,032), Avenal State Prison (948), California Institution for Men (948), and California Correctional Center (397). Booth Decl. ¶ 9. For example:

- The plan for the California Medical Facility ("CMF") states that if someone in the OHU or Correctional Treatment Center ("CTC") tests positive for COVID-19, they will be moved to S3, which is an empty administrative segregation unit with 18 beds. There currently are 72 class members with impacting-placement codes in the OHU and CTC. The 18-bed unit therefore would be unable to meet their needs if more than a quarter of class members in the OHU and CTC are infected. Moreover, 22 of those class members are full-time wheelchair users (DPW), and S3 apparently cannot accommodate any DPWs. Godbold Decl., Ex. O at 5; Amarillas Decl. ¶ 2.

- The plan for the California Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF"), states that people from Facilities A, E, F, and G all will be placed on E1 for purposes of "quarantine/isolation." Facility A alone, however, houses 14 DPW class members, and E1 has only two DPW beds. Godbold Decl., Ex. O at 16; Amarillas Decl. ¶ 2.

---

[8] Defendants did not produce a bed plan for CIM. Godbold Decl. ¶ 27. They also did not produce bed plans for institutions designated only to house DLT class members, who frequently require lower bunk/lower tier placements. *Id.*

15

Case No. C94 2307 CW

[3576536.4]

- The plan for CSP-Sacramento ("SAC") designates only two cells in the CTC for isolation of class members in segregated housing units. Currently, there are 11 class members with impacting placement codes living in those segregation units. Godbold Decl., Ex. O at 15; Amarillas Decl. ¶ 2.

Second, the plans fail to provide a comprehensive account of how class members will be housed in the event of an outbreak. Most of the bed plans indicate that specific accessible cells will be used for quarantine or isolation without addressing where the class members who currently occupy those cells will be placed. It is not clear whether those class members will be left in the unit alongside people with active cases, as class members were in Joshua Hall at CIM, putting them at increased risk of infection. For example:

- The plan for CSP-Corcoran ("COR") states that ten cells in the CTC "will be used for both Isolation/Quarantine DPW inmates. Upon notice from medical that a DPW code inmate requires the use of these beds, the current occupants will be moved out." But all ten of those cells currently are occupied by DPW class members. The plan does not indicate where those class members will be housed if those cells are repurposed in the event of an outbreak. Godbold Decl., Ex. O at 6; Amarillas Decl. ¶ 2.

- Defendants' plan for Richard J. Donovan Correctional Facility ("RJD") proposes to provide quarantine and isolation housing for class members in the dorms on Facility E by moving them to Facilities A, B, and D. Defendants have designated buildings A1, A5, and B10 on these facilities to house DPW class members in isolation and quarantine. Between these three buildings, there are 36 DPW cells. However, there are currently 19 DPWs on Facility E and all but one of the 36 DPW beds on Facilities A, B, and D already are occupied by class members. Godbold Decl., Ex. O at 14; Amarillas Decl. ¶ 2.

- The plan for SATF designates one section of the Short-Term Restricted Housing Unit ("STRH") to house people in medical isolation. That section has the STRH's only two DPW cells, which currently are occupied by *Armstrong* class members designated DPW. Godbold Decl., Ex. O at 16; Amarillas Decl. ¶ 2.

Third, in light of the shortage of accessible beds, it is likely that some institutions will have to designate additional housing areas, as CIM and San Quentin found it necessary to do through placing people in gyms, tents, and previously-unoccupied housing units, and may have to install additional accessible features in existing housing units. *See* Joint Case Management Conference Statement, *Plata v. Newsom*, No. 01-cv-01351-JST, Doc. 3322 at 3 (N.D. Cal. May 13, 2020) (use of tents for housing); Joint Case Management Conference Statement, *Plata v. Newsom*, No. 01-cv-01351-JST, Doc. 3315 at 9-10 (N.D. Cal. May 6, 2020) (use of gyms for housing). Very few of the plans, however,

[3576536.4]

contemplate the creation or use of nontraditional housing settings. And those that do provide no information beyond a cursory statement that, for example, a gym "can be used to house quarantined inmates with Administrative approval" (SATF). Godbold Decl., Ex. O at 16. No information is provided about whether and which class members can be housed there or what if any construction will be done in advance to expand accessibility.[9]

Finally, for many institutions, Defendants' plan is simply to make a plan. The plan for the California Health Care Facility, Stockton ("CHCF"), which houses 1,259 class members, for example, is to "[i]n the event of a large scale outbreak affecting multiple housing units, CHCF will collaborate with the Health Care Placement Oversight Program team to assist with inter-facility transfers of I/Ps." Godbold Decl., Ex. O at 4. A plan that relies on inter-facility transfers during an outbreak is unlikely to succeed, as the tragedy at San Quentin starkly illustrates. Similarly, for almost every institution with specialized medical or mental health beds, Defendants reported that they will consult with "HCPOP and CCHCS in utilizing and/or creating space to house the affected inmate(s)." *Id.* at 1 (CCWF), 5 (CMF), 8 (DVI), 9 (HDSP), 10 (KVSP), 11 (MCSP), 12 (NKSP), 14 (RJD), 15 (SAC), 16 (COR), 17 (SQ). It is not clear how space will be created or utilized, and regardless, it is unacceptable to wait for an outbreak to start consultation and only then, as the virus moves rapidly through the prison, identify needed resources and begin

---

[9] Although Defendants likely will need to use temporary and nontraditional housing units at times during the pandemic, reliance on these housing placements raises serious ADA concerns and requires advance planning and oversight that Defendants thus far have failed to demonstrate. At the California Health Care Facility, Stockton, for example, class members with disabilities impacting placement were assigned to cots in the dayrooms. *See* Declaration of Corene Kendrick in Support of Plaintiffs' Motion ("Kendrick Decl."), filed herewith, ¶¶ 4-5, 8. Class members reported that no one assessed their disability needs before they were transferred to the cots and that they were in fact discouraged from reporting problems. *Id.* ¶ 10, 12. Mobility-impaired class members reported that it was very difficult to get on and off the cots because they were so low to the ground. *Id.* ¶ 11, One class member said that when he attempts to get off a cot, he feels like "a turtle struggling to get off his back." *Id.* Class members on dialysis with fistulas in their arms said that having to push off the cot with their arm caused pain near and in the fistula. *Id.* Remarkably, when class members reported disability-related problems with their living environment through the CDCR 1824, Reasonable Accommodation Request Process, the Reasonable Accommodation Panel ("RAP") denied the requests on the grounds that "the RAP is not the subject matter expert for bed moves." *Id.* ¶ 14.

17

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

construction and procurement. The purpose of a plan is to prevent the *ad hoc* scramble that found CIM unprepared to accommodate *Armstrong* class members during the outbreak and that resulted in serious, ongoing harm.

Indeed, several bed plans simply fail to set forth a plan or process to address class members' housing needs. For Mule Creek State Prison, which houses 857 class members, Defendants' plan states four times that "COVID 19 positive inmates will be evaluated for placement on a case-by-case basis." Godbold Decl., Ex. O at 11. For RJD, which houses 967 class members, the plan simply is that "[u]pon notice from medical that an inmate requires isolation or quarantine the inmates will be moved out of the cell to alternate accessible housing." *Id.* at 14. The plan for Kern Valley State Prison states that "ADA inmates will be housed commensurate with their case factors and ADA needs." *Id.* at 10. There is no indication that Defendants have considered how this can or will be achieved.

In sum, Defendants' plans fail to meaningfully account for the housing needs of *Armstrong* class members in event of future COVID-19 outbreaks. The plans do not address the limited supply of accessible housing—a shortage that has grown more acute as a result of social distancing measures and restrictions on transfers between institutions.

**B.     Defendants Have Not Developed a Plan to Ensure that *Armstrong* Class Members Are Safely Assisted by ADA Workers, Volunteers, or Staff to Accommodate Their Disabilities During the Pandemic.**

Even if Defendants were able to designate sufficient accessible housing, they must also ensure that class members are otherwise accommodated in light of the significant program restrictions and modifications now in place. Defendants rely heavily on the ADA worker program to meet the requirements of *Armstrong* and the Americans with Disabilities Act, but they have failed to present a plan to ensure that class members have safe and continued access to ADA workers or other forms of disability-related assistance as housing units are re-purposed and movement is restricted to implement social distancing measures. *See* Booth Decl. ¶ 24 & Ex. R (describing duties of ADA workers).

Since March 2020, Plaintiffs have asked Defendants to address serious concerns about the ADA worker program in light of the pandemic. Godbold Decl. ¶ 2. In particular,

[3576536.4]

Plaintiffs repeatedly have raised concerns about class members' access to ADA workers in new and reconfigured housing units; the provision of personal protective equipment to ADA workers, who often come into direct contact with class members when performing their job duties; and education and training for ADA workers about how to safely perform their job functions. *See, e.g.*, *id.*, Exs. A. B, E, F, H, I, M, N, P.

Notwithstanding these requests, serious and dangerous problems with Defendants' ADA worker program persist. The program appears to run differently at different prisons (and within different yards and buildings within prisons). Class members at CIM, RJD, and SATF, for example, have reported that they cannot access ADA workers when they need them and that custody staff refuse to let ADA workers perform their job duties. *See, e.g.*, Godbold Decl., Ex. G; Lomio Decl., Exs. C, E at 8-11, G at 5-6, J. People who use wheelchairs have reported that they are unable to obtain assistance getting to pill call or carrying their meal trays at the dining hall. *Id.* A blind class member reported that since the pandemic started, he frequently is unable to access an ADA worker to serve as a sighted guide. Lomio Decl., Ex. J. Even now, class members at CIM report that they cannot access ADA workers to assist with basic functions like opening heavy doors. *See* Booth Decl., Ex. CC ¶ 2. In other cases, ADA workers appear to be directed to help people outside of their cohort or building, placing them at increased risk of infection. An ADA worker at CIM, for example, reported that he worked long hours with increased caseloads due to a paucity of ADA workers, that he had been directed to assist people with COVID-19 symptoms and people in different housing units, and that he had difficulty accessing gloves and hand sanitizer. *Id.*, Ex. LL ¶¶ 2-3. Unsurprisingly in light of these working conditions, that ADA worker soon became infected himself. *Id*. During the parties' bimonthly meet and confer on July 14, 2020, Defendants stated that, contrary to their previous representations, no guidance had been issued by headquarters directing that ADA workers should remain within their cohort while performing their job duties. Godbold Decl. ¶ 31.

These failures have had tragic consequences. As of July 10, 2020, a third of the ADA workers at CIM have been infected with the virus. *See* Booth Decl. ¶ 26 & Exs. T, U.

[3576536.4]

And these risks are borne not only by ADA workers. Defendants repeatedly have stated that because ADA workers are not available to all class members in light of program restrictions, they expect incarcerated people to volunteer to help. Godbold Decl. ¶¶ 19, 22 & Ex. J ("Volunteers are utilized to help in areas such as Facility D, D-6 (Cedar Hall) where no ADA workers were housed"). Yet Defendants have provided no plan for equipping or training these volunteers to ensure their safety and the safety of class members who need help. In May 2020, Melford Henson, a 65-year-old *Armstrong* class member, died from COVID-19. Before he died, he told his family that he believed he contracted the disease from a hard-of-hearing friend also at CIM, whose wheelchair Mr. Henson would push and to whom Mr. Henson would repeat conversations so his friend would not feel so isolated due to his hearing disability. Booth Decl. ¶ 25 & Ex. S.

To prevent unnecessary suffering and to meet their legal obligations, Defendants must present a coherent plan for ensuring that the ADA worker program can effectively function at the institutions during the pandemic or is replaced by a safe alternative method of providing disability-related assistance to class members.

## ARGUMENT

**I.   THIS COURT SHOULD ORDER DEFENDANTS TO ESTABLISH AND MAINTAIN SUFFICIENT ACCESSIBLE HOUSING DURING THE PANDEMIC AND TAKE IMMEDIATE ACTION TO PREPARE FOR OUTBREAKS IN CALIFORNIA PRISONS.**

It is well established under federal disability law, the *Armstrong* Remedial Plan, and the orders of this Court that Defendants must provide accessible housing for people with disabilities. The ADA provides that no person with a disability "shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. The implementing regulations require a public entity to provide and maintain facilities and to operate programs that are "readily accessible to and usable by persons with disabilities." 28 C.F.R. § 35.133(a); *id.* § 35.150(a).

[3576536.4]

1   This Court already has declared that Defendants have "a duty to maintain in
2   operable working condition structural features and equipment necessary to make the prison
3   system's services, programs, and activities accessible to disabled inmates." Permanent
4   Injunction, Doc. 694 at ¶ 4 (Mar. 21, 2001). To do so, Defendants direct that people with
5   disabilities "severe enough to require special housing and programming … be assigned to
6   special placement in a designated DPP facility." ARP § I.A at 1. Those prisons must
7   provide, among other things, wheelchair accessible cells, grab bars for toilets and showers,
8   raised toilet seats, and accessible paths of travel. *Id*. § II.C at 2-3.

9   Defendants' failure to provide accessible housing to people with disabilities has
10  been the subject of multiple enforcement orders by this Court. *See* Order Requiring
11  Defendants to Make Prison Facilities Structurally Accessible, Doc. 785 (Feb. 8, 2002);
12  Stipulation and Order Regarding Defendants' Compliance with the Court's Order to Make
13  Prison Facilities Structurally Accessible, Doc. 828 (June 12, 2002). In 2007, the Court
14  found that "[c]ontrary to law, the Permanent Injunction, and the Armstrong Remedial Plan,
15  defendants are systematically failing to provide safe, accessible housing to prisoners with
16  mobility impairments, resulting in significant harm to the plaintiff class, including through
17  increased risk of injury." Injunction, Doc. 1045 at 2-3 (Jan. 18, 2007). The Court ordered
18  Defendants to inventory housing for class members requiring accommodations, and
19  "[u]pon completion of the inventory, CDCR may no longer house DPW, DPO, and DPM
20  prisoners at any placements without adequate accessible housing …." *Id*. at 6.

21  Despite these orders, Defendants continued to house class members in unsafe
22  settings due to the lack of appropriate, accessible beds. In 2009, the Court found that
23  Defendants lacked appropriate beds for people who use wheelchairs, leaving people unable
24  to transfer from their wheelchairs to the toilet, unable to use their sinks, unable to access
25  mental health care, and retained indefinitely at inappropriate security levels. *See* Findings
26  of Fact for Enforcement Order of Oct. 20, 2009, Doc. 1700 at 2-4 (Feb. 3, 2010). In 2015,
27  the Court found that Defendants were housing class members in administrative segregation
28  because of the unavailability of accessible beds at appropriate security levels, in violation

21

Case No. C94 2307 CW
PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING
COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[3576536.4]

1  of the *Armstrong* Remedial Plan, the Court's prior orders, and federal disability law. *See*

2  Order Granting Motion for Further Enforcement, Doc. 2496 at 1-3 (Feb. 3, 2015).

3     Now, in the midst of a life-threatening pandemic, Defendants again are failing to

4  ensure safe, accessible housing or to meet the disability needs of *Armstrong* class

5  members. Defendants have failed to provide accessible housing for the last several months

6  at CIM, which houses hundreds of *Armstrong* class members, subjecting them to unsafe

7  and degrading conditions. *See supra* § III.A.1.a; Lomio Decl., Ex. F.

8     For many class members in Joshua Hall, the situation is even more dire. Those who

9  have not been infected with the novel coronavirus have been subjected to an unacceptable

10  risk of contracting the disease because Defendants lack sufficient accessible housing to

11  separate them from people with active cases. *See* § III.A.1.b, *supra*; Vijayan Decl. ¶¶ 9-16.

12  In the three months since the first COVID-19 case was reported at CIM, Defendants failed

13  to take action to prevent this life-threatening situation, such as by erecting additional

14  accessible housing (temporary or permanent), installing accessible features such as ramps

15  and grab bars, issuing custody overrides to accessible locations, or releasing people from

16  custody. In so doing, Defendants failed to meet their legal obligations.

17     These failures are not limited to CIM. As explained previously, Defendants' plans

18  for quarantine and isolation of *Armstrong* class members at other institutions are woefully

19  inadequate. They fail to provide meaningful or coherent direction to the institutions about

20  how class members' housing needs will be met in the likely event of future outbreaks.

21  They overlook critical aspects of class members' housing needs, and in many cases, simply

22  fail to set forth a plan at all, instead deferring critical decisions, program modifications,

23  and physical plant construction until *after* an outbreak has occurred. That will be too late.

24     Defendants' failure to plan and prepare for future outbreaks violates the *Armstrong*

25  Remedial Plan and federal disability law. Defendants' failure to devise quarantine and

26  isolation housing plans that adequately account for the housing needs of people with

27  disabilities denies class members "the benefits of services, programs, or activities of the

28  Department," in violation of the *Armstrong* Remedial Plan, the ADA, and this Court's

[3576536.4]

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING
COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

permanent injunctions. Title II of the ADA covers everything that a public agency does, including emergency planning and response. *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). Courts specifically have found that emergency preparedness programs are a program, service, or activity within the meaning of the ADA and the Rehabilitation Act, and that failing to account for the needs of people with disabilities in those programs constitutes discrimination in violation of those statutes. In *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 640 (S.D.N.Y. 2013), the court found that that New York City's emergency preparedness plans failed to address the particular needs of people with disabilities. There, as here, the defendant asserted that it would respond on a case-by-case basis to the needs of people with disabilities in the event of an emergency. The court rejected that defense, noting that the needs of people with disabilities "could only be accommodated through advance planning." *Id.* at 644. Among other things, the court held that the City had a legal obligation to ensure that the housing designated for emergency use was "sufficiently accessible, … architecturally [and] programmatically, to accommodate people with disabilities." *Id.* at 658.

Other courts, too, have emphasized a public entity's affirmative obligation to account for the needs of people with disabilities in its emergency plans and programs. *See California Found. for Indep. Living Centers v. Cty. of Sacramento*, 142 F. Supp. 3d 1035, 1064 (E.D. Cal. 2015) ("the County's emergency preparedness plan is intended as a general and comprehensive plan to benefit the general public, but its features do not adequately anticipate and account for the plaintiffs' needs as people with disabilities."); *Communities Actively Living Indep. & Free v. City of Los Angeles*, No. CV 09-0287 CBM RZX, 2011 WL 4595993, at *14 (C.D. Cal. Feb. 10, 2011) (rejecting "the City's contentions that it can make *ad hoc* reasonable accommodations upon request" on the basis that such an approach is "both legally inadequate and practically unrealistic," and observing that "[t]he purpose of the City's emergency preparedness program is to anticipate the needs of its residents in the event of an emergency and to *minimize* the very type of last-minute, individualized requests for assistance described by the City,

[3576536.4]

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

particularly when the City's infrastructure may be substantially compromised or strained by an imminent or ongoing emergency or disaster.").

Given the near certainty of future outbreaks in California prisons, and the expected duration of the pandemic, Defendants' failure to devise and implement adequate plans to safely house people with disabilities during the pandemic is urgent. Four prisons already have experienced devastating outbreaks involving at least 900 incarcerated people, and ten institutions have had outbreaks involving over 100 incarcerated people. *See* Booth Decl. ¶ 9. Public health experts have concluded that all California prisons "are certain to experience an outbreak if they have not already." *See id.*, ¶ 10 & Ex. H at 1. Judge Tigar recently stated that outbreaks of the novel coronavirus "will occur at every institution. It's inevitable." *See id.* ¶ 11, Ex. I at 33:5-6.

Defendants have demonstrated again and again over the past four months that they do not appreciate the gravity of the situation and are unable to develop plans on their own. As a result, Plaintiffs request that the Court direct the Court Expert or another expert approved by Plaintiffs to review how Defendants can establish and maintain sufficient accessible housing during the pandemic, including for purposes of medical isolation and quarantine, and to submit to the Court recommendations as soon as practicable.

## II.   PLAINTIFFS' PROPOSED ORDER COMPLIES WITH THE PRISON LITIGATION REFORM ACT.

Plaintiffs' proposed order satisfies the needs-narrowness-intrusiveness requirements of the Prison Litigation Reform Act. *See* 18 U.S.C. § 3626(a)(1)(A) ("The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."). In light of the long history of this litigation and Defendants' long-standing failure to provide adequate appropriate accessible housing, the Court is well within its authority to require Defendants to comply with its existing orders, the *Armstrong* Remedial Plan, and federal disability law. *See Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) ("A court

[3576536.4]

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO PROTECT *ARMSTRONG* CLASS MEMBERS DURING COVID-19 PANDEMIC; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

may … provide specific instructions to the State without running afoul of the PLRA," and has "considerable discretion in fashioning relief" where, as here, the court has supervised the litigation for a long time). The proposed order affords Defendants considerable latitude to select the means by which they meet their legal obligations. For example, Defendants may elect to provide accessible housing to class members by repurposing housing units, erecting temporary housing spaces, undertaking construction on existing physical structures, or releasing *Armstrong* class members from CDCR custody into community or parole supervision.

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' motion and order Defendants to establish and maintain adequate safe, accessible housing at all institutions housing class members with impacting-placement disabilities for the duration of the pandemic. To assist Defendants in doing so without further delay, the Court should direct its expert or another expert approved by Plaintiffs to conduct a review of the sufficiency of such housing, including for purposes of medical isolation and quarantine in the event of COVID-19 outbreaks, and present their recommendations to the Court as soon as possible. Finally, the Court should order Defendants to develop and implement a plan to ensure that the ADA worker program can effectively function at the institutions or is replaced by a safe alternative method of providing disability-related assistance to class members.

DATED:  July 14, 2020                     Respectfully submitted,

                                          PRISON LAW OFFICE

                                          By:  */s/ Rita Lomio*
                                               Rita Lomio
                                               Margot Mendelson
                                               Patrick Booth
                                               Corene Kendrick
                                          Attorneys for Plaintiffs

Case No. C94 2307 CW

[3576536.4]