1
2
3
4
5
6
7                    IN THE UNITED STATES DISTRICT COURT

8                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   JOHN ARMSTRONG, et al.,              Case No. 94-cv-02307 CW

11              Plaintiffs,               ORDER GRANTING IN PART MOTION
                                          FOR A PRELIMINARY INJUNCTION
12         v.
                                          (Re: Dkt. Nos. 2978, 2979)
13   GAVIN C. NEWSOM, et al.,

14              Defendants.

15

16        Before the Court is Plaintiffs' motion for a preliminary

17   injunction to continue in effect the transfer of Inmate 1[1] and

18   Inmate 2 (Witnesses) from R.J. Donovan Correctional Facility

19   (RJD) to another facility in light of the Witnesses' concerns for

20   their safety at RJD.  Having carefully considered the parties'

21   submissions, and the argument presented at the hearing held on

22   July 16, 2020, the Court GRANTS IN PART the motion for a

23   preliminary injunction.

24   //

25

26   ───────────────────
          [1] The Court finds that the parties have shown that compelling
27   reasons exist for using pseudonyms to maintain the names of the
     inmates discussed in this order as confidential.  The real names
28   of the inmates will be listed in a separate order that will be
     filed under seal.

FINDINGS OF FACT

I.   Procedural History

In 1994, Plaintiffs, "a class of all present and future California state prison inmates and parolees with certain disabilities, sued defendants, California state officials with responsibility for the operation of the Department of Corrections and Rehabilitation (the CDCR) and the Board of Parole Hearings (BPH), challenging the State's treatment of disabled prisoners and parolees." Armstrong v. Schwarzenegger, 622 F.3d 1058, 1063 (9th Cir. 2010) (internal quotation marks omitted).  A series of orders by this Court and the Ninth Circuit "established that the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131–34, and the Rehabilitation Act (RA), 29 U.S.C. § 794, applied to state prisoners, and that defendants' policies and procedures with regard to disabled prisoners and parolees were inadequate and violative of" the ADA and the RA.  Id. (citations and internal quotation marks omitted); Armstrong v. Wilson, 124 F.3d 1019, 1023 (9th Cir. 1997) ("[W]e conclude that the plain language of the ADA and RA, and our prior interpretations of that language, support application of the statutes to state prisons.").

CDCR Defendants produced a remedial plan in January 2001 intended to "ensure that disabled inmates had access to programs and facilities in California's prisons." Armstrong v. Schwarzenegger, 622 F.3d at 1063 (citation omitted).  In March 2001, the Court entered a permanent injunction directing enforcement of that plan.  Id. (citation omitted).  The Court entered a comparable permanent injunction with respect to the BPH defendants in 1999 and a revised permanent injunction in 2002. Id. (citation omitted).

United States District Court
Northern District of California

"By 2007, however, the State had failed to bring its correctional facilities into compliance with the remedial plan and the 2001 Injunction." Armstrong v. Brown, 768 F.3d 975, 978 (9th Cir. 2014) (citation omitted). Accordingly, the Court issued another injunction in 2007, which required Defendants to develop accountability procedures to track their non-compliance with the remedial plan and the Court's orders. The Court has modified the 2007 injunction several times to clarify Defendants' obligations regarding accountability. Id.

Since then, the litigation has been in a remedial phase, with Defendants evaluating and modifying their procedures and policies and Plaintiffs monitoring Defendants' compliance with the injunctions and the remedial plan and at times seeking enforcement. Id.

In February and June 2020, respectively, Plaintiffs filed two motions (enforcement motions) in which they argue that Defendants' employees have engaged and continue to engage in adverse actions against Armstrong class members that violate the ADA, the RA, the remedial plan, and this Court's prior orders, including the 2007 injunction and the Court's subsequent orders regarding accountability. Docket Nos. 2922, 2948. The conduct alleged involves abuse specifically directed at class members, who are more vulnerable to abuse and less able to defend themselves in light of their disabilities, as well as acts of retaliation against class members who report the abuse. This conduct has allegedly deterred class members from requesting disability accommodations, either informally or through the Court-ordered disability grievance process, because class members

3

United States District Court
Northern District of California

fear that such requests will invite more abuse.  The first enforcement motion addresses alleged abuse and retaliation against class members at RJD (RJD enforcement motion), and the second enforcement motion addresses alleged abuse and retaliation at other prisons throughout California (state-wide enforcement motion).  The enforcement motions have not been fully briefed and remain pending.  Part of the support for the motions consists of 112 declarations of inmates (inmate-declarants) who are or were incarcerated at RJD and other prisons and who suffered or witnessed the conduct at issue.

The Witnesses are two of the inmate-declarants who filed declarations in support of the enforcement motions.  In the present proceeding, the Witnesses claim that staff at RJD have retaliated against them, on multiple occasions, for submitting declarations in support of the enforcement motions and, in particular, for describing in such declarations that a certain officer, Officer Rucker, ignored the requests of Inmate 4, another inmate-declarant, to be transferred to another cell because of safety concerns related to his cellmate.  On February 4, 2020, Inmate 4 was attacked by his cellmate and died on February 19, 2020.  The Witnesses believe that at least some of the retaliation they have suffered since they filed declarations in support of the enforcement motions is the result of having made statements in such declarations that implicate Officer Rucker in Inmate 4's death.

Plaintiffs argue that the alleged retaliation against the Witnesses has continued to occur despite this Court's stipulated order of March 17, 2020, which provides, "Defendants and their

4

employees are prohibited from retaliating against the Declarants, Armstrong class members at RJD, or incarcerated people at RJD for participating in the [RJD motion]." Order at 1, Docket No. 2931. The order also provides, "If the Court finds that retaliation has occurred, the Court will issue appropriate relief." Id. at 4.

In light of the continued alleged acts of retaliation against the Witnesses, Plaintiffs moved for a temporary restraining order and preliminary and permanent injunction requiring Defendants to transfer the Witnesses out of RJD. On July 2, 2020, the Court issued an order granting this motion in part and deferring it in part. Order, Docket No. 2972. The Court ordered Defendants to propose a plan for transferring the Witnesses to another placement that satisfied certain criteria. The criteria were based on the Witnesses' disabilities, the pre-existing conditions that make them vulnerable to Covid-19 complications, their security level, and their vulnerability to acts of retaliation because of their assistance with the enforcement motions. Id. at 3-5. The Court also ordered the parties to meet and confer and to file by July 9, 2020, a joint statement describing their positions as to the appropriate placement for the Witnesses. Id. The parties did so.

On July 10, 2020, the Court granted Plaintiffs' motion for a temporary restraining order to transfer the Witnesses out of RJD. The Court ordered that, no later than July 12, 2020, (1) Inmate 2 be transferred to a Mental Health Crisis Bed (MHCB) at the California Health Care Facility (CHCF), Docket No. 2979; and (2) Inmate 1 be transferred to an Enhanced Outpatient Program Housing unit on Facility D or E at Mule Creek State Prison (MCSP) or to

United States District Court
Northern District of California

5

United States District Court
Northern District of California

CHCF, Docket No. 2978.  On July 12, 2020, the parties stipulated to a different placement, with the transfer of each Witness to take place the morning after each Witness received a negative Covid-19 test result.  Docket No. 2987.  Inmate 2 would be transferred to the MHCB at California Men's Colony (CMC) on a temporary basis pending placement at CHCF once it is open for transfers, and Inmate 1 would be transferred to an Enhanced Outpatient Program housing unit on Facility D at MCSP.  Id.  The Court approved this stipulation on July 13, 2020.  Docket No. 2991.

The Court ordered Defendants to show cause why a preliminary injunction should not issue to continue in effect the order to transfer the Witnesses out of RJD and retain the Witnesses at a suitable non-RJD facility, and it held a hearing on July 16, 2020.

II.  Factual Findings on Current Motion[2]

A.  Protected Activity

As noted, Plaintiffs argue in the RJD enforcement motion that Defendants' employees abuse and retaliate against class

---

[2] Both sides have submitted materials that do not strictly comply with the Federal Rules of Evidence.  The Court will exercise its discretion to consider these materials in light of the difficulties created by the present pandemic.  Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) ("Due to the urgency of obtaining a preliminary injunction . . . when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings."); Republic of the Philippines v. Marcos, 862 F.2d 1355, 1363 (9th Cir. 1988) ("It was within the discretion of the district court to accept . . . hearsay for purposes of deciding . . . the preliminary injunction.").  Questions as to the submitted materials' reliability will go to their weight rather than to their admissibility.

United States District Court
Northern District of California

1  members at RJD in violation of the ADA, the RA, the remedial

2  plan, and this Court's prior orders, including the 2007

3  injunction and the Court's subsequent orders regarding

4  accountability.  Docket No. 2922.  Assisting with such a motion

5  is protected activity.  Defendants filed their response to this

6  enforcement motion on July 15, 2020.  Docket No. 3006.

7  Plaintiffs have not yet filed their reply.  The Court has

8  reviewed the evidence filed to date by both sides in connection

9  with the enforcement motion and finds it relevant to the present

10 motion.

11     RJD has the second largest population of incarcerated people

12 with disabilities in CDCR, with nearly 1,000 Armstrong class

13 members, including 297 people who use wheelchairs, 217 people who

14 are deaf or hard of hearing, and thirteen people who are blind.

15 Grunfeld Decl., Ex. II at 184-89, Docket No. 2922-1.

16     In 2018, CDCR sent a strike team to investigate allegations

17 of staff misconduct on Facility C at RJD.  The team was comprised

18 of fourteen investigative staff and seven ombudsmen.  Bishop

19 Report at 1-3, Docket No. 2921-6.  The strike team sought to

20 interview 150 inmates on Facility C, but only 102 inmates agreed

21 to be interviewed.  Id.  The interviewees reported, in relevant

22 part, that RJD staff specifically targeted for abuse inmates with

23 disabilities and other vulnerable inmates, that RJD staff hired

24 inmates to assault other inmates, that RJD staff engaged in gang-

25 like behavior, and that RJD staff retaliated against inmates who

26 reported the abuse with further abuse or by making false

27 allegations against them so that the inmates would be subjected

28 to disciplinary action.  Id. at 4-9.  Forty-eight inmates out of

the 102 who chose to participate in the interviews supported their claims of misconduct by RJD staff with detailed and "actionable" allegations.  Id. at 14-17.  Associate Warden Bishop, who led the strike team and wrote its report based on his assessment of the interviews, recommended that the allegations of these forty-eight inmates be investigated "promptly."  Id. Associate Warden Bishop also recommended, among other things, that live-feed cameras be installed in all areas of limited or obstructed visibility; that non-managerial RJD staff be restricted from accessing areas of low visibility; that management prohibit RJD staff from wearing non-approved clothing items that could be used as gang identifiers; and that the inmate appeals process be modified to ensure that staff are not able to interfere with the process.  Id. at 12-13.

Defendants have admitted that the Bishop Report "formally recognized serious problems with aspects of R.J. Donovan's operations, and specifically within Facility C, and that responsive action should be taken."  Defs.' Resp. to RJD Mot. at 19, Docket No. 3006.  As of January 29, 2020, however, Defendants still had not completed their investigations of the specific and "actionable" allegations of abuse made by the forty-eight strike-team interviewees.  See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 133, 156, Docket No. 2921-8; id. at 221-22, Docket No. 2922-1.

Plaintiffs' expert, Jeffrey Schwartz, has assisted prisons and jails over the last twenty years in applying national correctional standards to their operations.  Schwartz Decl. ¶ 2, Docket No. 2947-9.  Schwartz was retained by Plaintiffs to opine

8

on CDCR's inquiry, investigation, and disciplinary process as it relates to allegations of staff misconduct and the discipline of staff for misconduct. Id. ¶ 9. As part of his assignment, Schwartz analyzed the files of forty-three investigations of allegations of staff misconduct at RJD. Id. ¶ 11. Schwartz opines that the situation at RJD is "horrifying" for inmates with disabilities and other vulnerable inmates, and that there is "substantial evidence that these vulnerable inmates are targeted and preyed upon by a significant number of staff at RJD." Id. ¶¶ 23-27. According to Schwartz, "Inmates are afraid to file grievances/complaints and afraid to provide testimony during investigations. Pressure to withdraw complaints and other forms of intimidation are common." Id. ¶ 60. Schwartz attributes this situation to RJD's "dysfunctional staff culture," which "will not be changed quickly or easily." Id. ¶ 93. According to Schwartz, this dysfunctional culture stems in part from the ineffectiveness of CDCR's system for investigating misconduct and disciplining staff; the investigations of staff misconduct at RJD are incomplete, unprofessional, and biased against incarcerated complainants and witnesses. Id. ¶¶ 93, 40-47, 84, 181, 187, 273, 276, 327. Schwartz opines that inmate testimony is often discounted or ignored and that plagiarism and other collusion in staff reports is ignored. Id. ¶¶ 40-49. Schwartz notes that staff is disciplined primarily when there is video evidence or staff reports of misconduct. Id. ¶¶ 53, 126, 127, 172, 208, 210, 219.

Plaintiff's other expert, Eldon Vail, is a former correctional administrator with thirty-five years of experience

United States District Court
Northern District of California

working in and administering adult correctional institutions. Vail Decl. ¶ 3, Docket No. 2020-5.  He has served as the Warden of three adult correctional institutions, and he served as the Secretary of the Department of Corrections of Washington for four years.  Id. ¶ 4.  As part of his assignment, Vail reviewed the declarations of fifty-four inmate-declarants, CDCR policies, and various other case materials.  Id. ¶ 10.  Vail concludes that there is a pattern of violence against class members at RJD and that staff at RJD routinely use force against class members after failing to recognize and accommodate inmates' disabilities.  Id. ¶¶ 13, 4, 27, 30.  In his opinion, the level of force used by RJD staff against class members often is excessive and the frequency with which such force is used is "startling."  Id.  According to Vail, the "unnecessary and excessive use of force, including closed fist punches and kicks, that result in serious injury to the class members is far beyond the norm found in other institutions or jurisdictions of which I am aware."  Id. ¶ 13. Vail also identified a pattern of retaliation against class members who report abuse, and widespread fear among class members of reporting allegations of staff misconduct as a result.  Id. ¶¶ 16, 59-62, 88.

In their response to the RJD enforcement motion, Defendants argue that they have taken steps to change the culture at RJD and improve staff accountability, such as providing RJD staff with additional training, making changes to the personnel at RJD, referring staff complaints to the Office of Internal Affairs, and taking adverse action against officers found to have engaged in misconduct against inmates.  Defs.' Resp. to RJD Mot. at 17-20.

United States District Court
Northern District of California

Defendants note that these steps have already proved effective to some extent, as the number of RJD staff who have been disciplined for misconduct against inmates has increased since 2017.  Id.; see also Miller Decl. ¶¶ 34-35 (providing that RJD dismissed one officer in 2017, two in 2018, and six in 2019; RJD made one referral for criminal prosecution against an officer in 2018 and three in 2019; and that from 2017 to 2019, there were thirty-five suspensions without pay or salary reductions for staff misconduct involving an inmate).  Defendants also note that the number of use-of-force incidents involving Armstrong class members has decreased.  See Defs.' Resp. to RJD Mot. at 20.

Nothing in Defendants' response to the RJD enforcement motion suggests that the issues described in the Schwartz and Vail declarations have been eradicated or even substantially diminished.  Defendants' response suggests that there has been some improvement in the conditions at RJD for disabled inmates.  Defendants admit, however, that there is still "staff misconduct that does occur" at RJD.  See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 267, Docket No. 2922-1.

B.    Adverse Action and Causation: Inmate 2

Inmate 2 is close to seventy years old and has a mobility disability that requires him to use a wheelchair.  Inmate 2 Decl. of March 27, 2020 ¶¶ 2-3, Docket No. 2969-7.  He is serving a 504-month sentence for a robbery conviction and has been incarcerated since 1996.  Freedman Decl. ¶ 23, Docket No. 2969-7.  His California Static Risk Assessment (CSRA) score, a measure that CDCR uses to assess risk of recidivism, is "low."  Id.  Defendants have designated Inmate 2 as risk level 1, meaning that

he is at high risk of complications from Covid-19 in light of his various medical conditions, which include diabetes, chronic kidney disease, and cardiovascular disease.  Id. ¶ 23.

Inmate 2 signed a declaration dated March 27, 2020, which Plaintiffs filed in support of the enforcement motion.  There, Inmate 2 declared that, in December 2019, Inmate 4 told him that he was trying to get transferred out of Building 1 on Facility A at RJD because Officer Rucker and others were trying to arrange an assault on him by other incarcerated people.  Inmate 2 Decl. of March 27, 2020 ¶ 7.  Then, on or around February 17, 2020, while Inmate 2 was in the hospital for surgery, Inmate 4 was moved into his hospital room.  Id. ¶ 8.  Inmate 4 told Inmate 2 that he was in the hospital because of injuries that were caused by an attack by his cellmate.  Id. ¶ 9.  Inmate 4 also said that, prior to the attack, he had repeatedly asked to be moved to another cell because he and his cellmate were not getting along, and that Officer Rucker told him in response each time he asked for a transfer to "fuck or fight," meaning that he either had to learn to get along with his cellmate or had to attack his cellmate to get moved to another cell, and that he would only leave his cell if he were dead.  Id. ¶¶ 10-11.  Inmate 4 died several days later.  Id. ¶ 14.  When Inmate 2 returned to RJD a few days thereafter, Officer Rucker asked him what Inmate 4 had told him at the hospital.  Id. ¶ 17.

In a later declaration, Inmate 2 states that, when they were both in the hospital in February 2020, Inmate 4 told him that Officer Rucker had attacked him and had hurt him.  Inmate 2 Decl. of July 13, 2020 ¶¶ 5-6, Docket No. 2998-6.  Inmate 2 had assumed

1    that this attack had taken place on the same date on which Inmate

2    4 was assaulted by his cellmate.  Id.  Inmate 2 later realized

3    that this assumption had been incorrect when counsel for

4    Plaintiffs told him that Officer Rucker had not been working on

5    the day that Inmate 4 was attacked by his cellmate.  Id.  The

6    Court finds this explanation credible and that it does not damage

7    Inmate 2's credibility.

8         In another declaration, signed on June 25, 2020, Inmate 2

9    states that, after he began to speak with Plaintiffs' counsel to

10   prepare the declaration in support of the enforcement motion

11   after his release from the hospital, staff at RJD began to take

12   adverse actions against him.  Inmate 2 Decl. of June 25, 2020 ¶¶

13   4-6, Docket No. 2969-7.  Inmate 2 declares that RJD staff

14   repeatedly failed to release him from his cell in time to take

15   his diabetes medication and other medications, which he must take

16   several times per day.  Id.  These assertions are corroborated by

17   the declarations of Inmate 1 and Inmate 3, who, like Inmate 2,

18   reside in Building 1, on Facility A at RJD, and are released for

19   medications at the same time that Inmate 2 is supposed to be

20   released.  Inmate 1 Decl. of June 26, 2020 ¶¶ 2, 5; Inmate 3

21   Decl. of June 30, 2020 ¶¶ 7, 9, 19.

22        On June 17, 2020, at around 8:30 p.m., RJD Officer Montreuil

23   used force against Inmate 2.  According to the declarations of

24   Inmates 2, 1, and 3, Inmate 2 was not released on time for his

25   medications, and this caused him to yell and make noise to be let

26   out.  Inmate 2 Decl. of June 25, 2020 ¶¶ 7-8; Inmate 1 Decl. of

27   June 26, 2020 ¶¶ 5-6; Inmate 3 Decl. of June 30, 2020 ¶¶ 7-18.

28   Once he was released, Inmate 2 travelled in his wheelchair,

United States District Court
Northern District of California

carrying a cup of water to take his medications.  Inmate 2 Decl. of June 25, 2020 ¶ 8; Inmate 1 Decl. of June 26, 2020 ¶ 7; Inmate 3 Decl. of June 30, 2020 ¶ 21.  He yelled at the officers for not letting him out of his cell earlier, and the officers, including Officer Montreuil, yelled back.  Inmate 2 Decl. of June 25, 2020 ¶ 8; Inmate 1 Decl. of June 26, 2020 ¶ 7; Inmate 3 Decl. of June 30, 2020 ¶¶ 19-22.  Even though he posed no threat to Officer Montreuil, the officer grabbed him and slammed him to the ground. Inmate 2 Decl. of June 25, 2020 ¶ 9; Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of June 30, 2020 ¶ 22.  Inmate 2 landed on his head and stomach, face down, and lost consciousness. Inmate 2 Decl. of June 25, 2020 ¶ 9; Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of June 30, 2020 ¶ 24.

Officer Montreuil then got on top of Inmate 2 and put his knee into Inmate 2's upper back and neck.  Inmate 2 Decl. of June 25, 2020 ¶ 9; Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of June 30, 2020 ¶ 24.  Inmate 2 yelled that he could not breathe and believed that Officer Montreuil was going to kill him. Inmate 2 Decl. of June 25, 2020 ¶¶ 9, 12.  After handcuffing him, Officer Montreuil pressed a sharp object on Inmate 2's right arm and said, "This is for my homeboy Rucker, motherfucker."  Inmate 2 Decl. of June 25, 2020 ¶ 9.  Staff escorted Inmate 2 out of the building.  Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of June 30, 2020 ¶ 25.  Inmate 1 and Inmate 3 have not seen Inmate 2 since the incident.  Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of June 30, 2020 ¶ 26.

The Court finds the description of the June 17 incident in the declarations of Inmates 2, 1, and 3 to be credible.  The

14

declarations are consistent in all material respects.  All three inmates declared that Inmate 2 was in his wheelchair and did not assault or pose a threat to Officer Montreuil.  It is undisputed that Inmate 1 and Inmate 3 were housed in cells that were a few feet away from Inmate 2's cell and observed the entire incident. Inmate 1 Decl. of June 26, 2020 ¶ 5; Inmate 3 Decl. of June 30, 2020 ¶¶ 7, 19.  Inmate 1 and Inmate 3 have not had any contact with Inmate 2 since the June 17 incident, which eliminates the possibility that Inmate 2 could have colluded with Inmate 1 and Inmate 3 as to the contents of their declarations.

The declarations of Inmates 2, 1, and 3 are further corroborated by a memorandum written by a social worker named J. Clayton, which states that another inmate reported to him on June 18, 2020, that he witnessed the June 17 incident.  This inmate reported that Inmate 2 did not resist the officer but two officers twisted Inmate 2's arm behind his back until he started "bucking in pain."  Freedman Decl., Ex. 14, Docket No. 2998-6.

Defendants' version of the June 17 incident is based on the declaration of Francisco Armenta, who is an Associate Warden at RJD.  Armenta Decl. of July 10, 2020, Docket No. 2984.  In his declaration, Associate Warden Armenta provides "a summary" of the June 17 incident that is based, not on his personal knowledge, but on his review of a preliminary incident report package that, in turn, is based on incident reports authored by officers at RJD.  See id. ¶ 5 & Ex. F.  The incident reports are not signed under penalty of perjury, and none of the officers who filed an incident report has submitted a sworn declaration describing the June 17 incident.

United States District Court
Northern District of California

Armenta declares that when Inmate 2 was released from his cell for his medications in the evening of June 17, he walked out of his cell without a wheelchair, yelled obscenities at Officers Montreuil and Gomez, and asked to speak with the sergeant before he received his medications.  Id. ¶ 6.  The officers told Inmate 2 that the sergeant was unavailable.  Id.  In response, Inmate 2 made derogatory comments about the officers and threatened to throw at them the liquid in his cup, which Inmate 2 allegedly claimed contained "piss, shit, and blood."  Id.  Inmate 2 allegedly moved toward Officer Montreuil and attempted to throw the liquid onto him but missed.  Id.  Officer Montreuil then used his body weight to take Inmate 2 to the ground.  Id.

Once Inmate 2 was on the ground, Officer Montreuil handcuffed him and searched him for contraband.  Id.  While Officer Montreuil found no contraband on Inmate 2's person, "staff" smelled alcohol coming from Inmate 2 and later found an alcoholic substance known as "pruno" in his cell.  Id.  Later that night, staff ordered Inmate 2 to provide a urine sample for analysis, and he refused.  Id. ¶ 9.  Officer Montreuil sustained pain, bruising, and redness on his right shoulder.  Id. ¶ 10.

Defendants' description of the June 17 incident lacks credibility.  It is not at all clear that Inmate 2's cup did contain bodily fluids.  There are no photographs of the contents or records showing that the healthcare facility maintenance (HFM) team was called to clean up.  Inmate 3 declares that, if the spilled liquid had been bodily fluids, Defendants would have called the HFM team to clean and sanitize the area, but the HFM team did not respond to the incident or clean the liquid.  Inmate

16

1    3 Decl. of June 30, 2020 ¶ 23.  Inmate 3, who was a few feet

2    away, also declares that the spilled liquid appeared to be clear

3    and odor-free.  Id. ¶¶ 19, 23.

4        Defendants argue that Inmate 2 stated in a video interview

5    following the June 17 incident that some of the other inmates who

6    witnessed the incident were yelling that the cup in Inmate 2's

7    hand contained bodily fluids.  This does not equate to a threat

8    by Inmate 2.  Further, even if he had made such a threat and even

9    if he had thrown the liquid, that would not justify the force

10   that Officer Montreuil used against him.  Officer Montreuil took

11   Inmate 2 face down onto the ground using the weight of the

12   officer's body on the inmate's back, instead of using less force

13   or no force at all.  The officer apparently used enough force to

14   injure his own shoulder and to render Inmate 2 unconscious.

15       Defendants have not offered any declarations to dispute the

16   sworn statements of Inmates 1, 2, and 3 that the force that

17   Officer Montreuil used against Inmate 2 was unprovoked and

18   sufficient to render him unconscious.  Inmate 2 Decl. of June 25,

19   2020 ¶ 9; Inmate 1 Decl. of June 26, 2020 ¶ 8; Inmate 3 Decl. of

20   June 30, 2020 ¶ 24.  Defendants also have not disputed Inmate 3's

21   declaration that, in light of his age and disabilities, Inmate 2

22   posed no physical threat to Officer Montreuil.  Inmate 3 Decl. of

23   June 30, 2020 ¶ 19.

24       Defendants claim that Inmate 2 was under the influence of

25   alcohol during the June 17 incident, and that inmate-made alcohol

26   was found in his cell afterward.  Some of the incident reports

27   attached to Associate Warden Armenta's declaration do state that

28   Inmate 2 had smelled of alcohol or may have been intoxicated.

United States District Court
Northern District of California

17

These statements are not credible, and are of little relevance. Notably, the incident report prepared by Officer Montreuil, who had significant physical contact with Inmate 2, does not mention that Inmate 2 smelled of alcohol, or that he appeared to be intoxicated.  See Incident Report, Docket No. 2984 at 41.  Nor do the medical records corroborate this claim.  A medical note dated June 17, 2020, which followed a full physical examination of Inmate 2, does not mention that he was intoxicated or smelled of alcohol.  Freedman Decl., Ex. 10, Docket No. 2969-7.  Another medical note dated that day states that Inmate 2 complained to first responders that he could not breathe and that the pain on his neck was 9 on a 10-point scale.  Freedman Decl., Ex. 5, Docket No. 2996-6.  This note does not say that Inmate 2 smelled of alcohol or appeared to be intoxicated.  Id.  Finally, Defendants did not photograph or retain the alcohol allegedly found in Inmate 2's cell.

The statements in the incident report regarding alcohol are contradicted by Inmate 2's declaration of July 13, 2020.  There, Inmate 2 denies being drunk or having had alcohol in his cell on June 17, denies that he was asked to take a urine test, and states that nobody on June 17 accused him of being intoxicated or of possessing alcohol.  Inmate 2 Decl. of July 13, 2020 ¶¶ 7-10, Docket No. 2998-6.  He also states that it was not until two weeks after the June 17 incident that officers filed a Rules Violation Report (RVR) against him for assaulting an officer and another for possession of alcohol on June 17, 2020.  Id. ¶ 7. Defendants do not explain why these RVRs were not issued until two weeks after the incident.  See Armenta Decl., Ex. A & B.  And

18

even if Inmate 2 was under the influence of pruno found in his cell, that would not justify the force used against him.

In light of the foregoing, the Court finds that Defendants' description of the June 17 incident based on Associate Warden Armenta's declaration and the incident reports attached thereto lacks credibility.

Plaintiffs allege that the adverse actions taken against Inmate 2 were motivated by retaliation for his participation in the motions to enforce this Court's orders originating from the ADA litigation.  In the declaration that Inmate 2 signed on June 25, 2020, he states that staff at RJD began to retaliate against him after he began to speak with Plaintiffs' counsel to prepare the declaration in support of the enforcement motions, after his release from the hospital in February.  Inmate 2 Decl. of June 25, 2020 ¶¶ 4-6, Docket No. 2969-7.  That was the declaration stating that Office Rucker failed to act on Inmate 4's requests to transfer to another cell because of safety concerns about his cellmate, after which Inmate 4 was fatally attacked by his cellmate.  Inmate 2 Decl. of June 25, 2020 ¶ 9.  Inmate 2 believes that RJD staff are aware that he is assisting with these proceedings because RJD staff set up his calls with Plaintiffs' counsel.  Id. ¶ 6.  Inmate 2 was told by other inmates that staff at RJD refer to him as a "rat" and a "snitch."  Id.  ¶ 4.

Inmate 2 asserts that officers repeatedly failed to release him from his cell on a timely basis so that he could take his medications, and he believes that such failures are connected to his assistance with the enforcement motions.  The Court finds these assertions credible.  In their declarations, Inmate 1 and

Inmate 3 state that RJD staff have regularly delayed or simply failed to release Inmate 2 for his medications since on or around February 2020. Inmate 1 Decl. of June 26, 2020 ¶¶ 4-5; Inmate 3 Decl. of June 30, 2020 ¶¶ 7, 9. This coincides with the timeframe that Inmate 2 came back from the hospital after Inmate 4's death.

The Court also finds credible that Officer Montreuil's use of force against Inmate 2 was in retaliation for Inmate 2 submitting a declaration in support of the enforcement motion. As noted above, Inmate 2 heard Officer Montreuil tell him during the incident, "This is for my homeboy Rucker." This connection is also shown by Inmate 1's declaration that he heard Officer Montreuil say to Inmate 2 something to the effect of, "Explain that to the lawyers you talk to." Inmate 1 Decl. of June 26, 2020 ¶ 8. Defendants have not submitted a declaration by Officer Montreuil denying that he made these statements. After the incident, according to Inmate 3, the officer in the control tower, Officer Armstead, announced over the PA system, "Yeah, motherfucker, that's what you get. That's how we do it." Inmate 3 Decl. of June 30, 2020 ¶ 25. Defendants have not submitted a declaration from Officer Armstead, nor have they submitted declarations by other RJD staff who witnessed the incident.

After the June 17 incident, Inmate 2 reported to medical staff that he was extremely upset and afraid for his safety, and he was placed on suicide watch. See, e.g., Freedman Decl., Ex. 11, 12, 13, Docket No. 2969-7. While he was on suicide watch, someone slipped nail clippers and a note stating "kill yourself" under his door. Inmate 2 Decl. of July 3, 2020 ¶ 4, Docket No.

1    2998-6.   Inmate 2 swallowed the nail clippers because he was

2    upset and afraid and wanted to get out of RJD.   Id.   Surgery was

3    required to remove the nail clippers.   Freedman Decl. ¶¶ 20-22 &

4    Ex. 15, 16.   Defendants do not dispute that that these events

5    occurred as Inmate 2 describes them.

6        Inmate 2 declares that the incidents of retaliation against

7    him have led him to feel unsafe at RJD, to fear for his life, and

8    to wish that he were dead.   Inmate 2 Decl. of June 25, 2020 ¶ 12.

9    Inmate 2 states that, given these incidents, he "w[ill] not stick

10   [his] neck out again and try to help in the Armstrong case

11   because the harassment is not worth dying for."   Id.   The Court

12   finds that these statements are credible.

13       C.    Adverse Action and Causation: Inmate 1

14       Inmate 1 is in her late forties, has hearing and mobility

15   disabilities, is serving a 348-month sentence for a conviction of

16   grand theft, and has been incarcerated since 1996.   Freedman

17   Decl. ¶ 24, Docket No. 2969-7.   Her CSRA score, or risk of

18   recidivism, is "low."   Id.   Defendants have designated Inmate 1

19   as risk level 1, meaning that she is at high risk of

20   complications from Covid-19 in light of her multiple pre-existing

21   medical conditions, which include asthma, seizures, and sleep

22   apnea.   Id.

23       On January 29, 2020, Inmate 1 signed a declaration, which

24   Plaintiffs submitted in support of the RJD enforcement motion, in

25   which she states that in November 2019 she was placed in

26   administrative segregation and left in her cell in handcuffs for

27   approximately forty-eight hours in retaliation for filing a

28   Prison Rape Elimination Act (PREA) claim.   See Inmate 1 Decl. of

United States District Court
Northern District of California

United States District Court
Northern District of California

January 29, 2020 ¶¶ 6-11, Docket No. 2969-7.  During this episode, Inmate 1 was forced to urinate and defecate in her own clothing more than once.  Id. ¶ 10.  Inmate 1 declares that the handcuffs that were used during this incident belonged to Officer Toele.  Id. ¶ 12.  Following the incident, Inmate 1 was interviewed by the Watch Commander, who told her that it had been reported that a pair of handcuffs was missing, but staff failed to conduct a search for the handcuffs.  Id. ¶ 13.  Inmate 1 believes that no search was conducted because she told everyone who passed by her cell during that period that she was handcuffed.  Id.  Inmate 1 reported this incident; the investigation remains pending.  Id. ¶¶ 13-15.  Defendants do not dispute that this incident occurred and they have offered no contrary evidence, such as declarations by Officer Toele or the Watch Commander.

Inmate 1 signed a second declaration on March 27, 2020, which Plaintiffs submitted in support of the state-wide injunction motion, in which she states that, on or around January 28, 2020, Inmate 4 told her that Inmate 4 was having problems with his cellmate and that he was trying to get transferred to another cell.  Inmate 1 Decl. of March 27, 2020 ¶ 5, Docket No. 2969-7.  A few days later, Inmate 1 heard Officer Rucker tell Inmate 4 to "fuck or fight" and to "[g]et the fuck out of [his] face."  Id. ¶ 6.  Inmate 1 believes that this statement was a response to a request by Inmate 4 to move to another cell, because Inmate 1 had heard Officer Rucker tell other inmates who asked for a cell transfer to "fuck or fight."  Id. ¶ 7.  On February 4, 2020, Inmate 1 heard Inmate 4's cellmate yell, "Man

22

down!"  Id. ¶¶ 10-11.  Nursing staff carried Inmate 4, who

appeared to be unconscious, out of his cell in a gurney.  Id.

   In a declaration signed on May 21, 2020, Inmate 1 states

that, about a month after Inmate 4's death in February 2020, she

heard from multiple people at RJD that Officer Rucker had been

transferred to work in the mailroom, and that Officer Doyle, a

partner of Officer Rucker, had made comments to inmates

indicating that she believed that Officer Rucker's transfer was

the result of conversations that inmates were having with lawyers

or investigators regarding Inmate 4's death.  Inmate 1 Decl. of

May 21, 2020 ¶¶ 5-6.

   On April 8, 2020, Inmate 1 had a seizure in her cell and

became unconscious.  Id. ¶ 7.  When she woke up, she felt sharp

pain in her wrists and ankles and saw Officer Doyle and Officer

Garcia among the several people who were surrounding her as she

woke up.  Id.  Inmate 1 was taken to a Triage and Treatment Area,

where she reported pain in her wrists and ankles and asked to be

examined by a doctor.  Id.  While waiting for the doctor, another

inmate, whom Inmate 1 does not want to name because of the

inmate's fear of retaliation, told Inmate 1 that he saw Officer

Doyle and Officer Garcia enter her cell and saw Officer Garcia

step on her hands and Officer Doyle step on her ankles before

dragging her out of her cell.  Id. ¶ 9.  When the doctor arrived,

Inmate 1 reported what she heard from the inmate and asked to

file an excessive force complaint against Officer Doyle and

Officer Garcia.  Id. ¶ 10.  Inmate 1 recalls that, when she was

sent back to her cell, Officer Doyle made a comment to her about

officers being aware of inmates talking with lawyers or

United States District Court
Northern District of California

United States District Court
Northern District of California

1   investigators to complain about staff, including Officer Rucker.

2   Id. ¶ 11.   Inmate 1 interpreted this comment as a warning that

3   Officer Doyle believed that Officer Rucker had been sent to the

4   mailroom because of what Inmate 1 said about Officer Rucker in

5   her declaration for these proceedings.   Id.   The next day, on

6   April 9, 2020, Inmate 1 filed complaints of excessive force and

7   retaliation against Officer Doyle and Officer Garcia in

8   connection with the prior day's incident.   Id. ¶ 12.

9        On April 15, 2020, Inmate 1 had a conversation with

10   Plaintiffs' counsel in a room from which Inmate 1 believes the

11   Watch Commander can hear what is being said.   Id. ¶¶ 13-14.   When

12   Inmate 1 returned to her building after the interview, Officer

13   Doyle confronted her and told her that "the Watch Commander told

14   me every fucking thing you said, you need to find something else

15   to do besides making complaints."   Id. ¶ 15.

16        On May 13, 2020, Officer Mesa called Inmate 1 by name over

17   the public-announcement system, saying, "Internal Affairs is here

18   to see you in One Building."   This made Inmate 1 afraid for her

19   safety because it is known among staff and inmates that inmates

20   who talk with Internal Affairs do so to report misconduct by

21   staff or other inmates, which in turn can invite acts of violence

22   or other forms of retaliation against the person reporting

23   misconduct.   Id. ¶ 17.   Inmate 3 heard Officer Mesa call out

24   Inmate 1 over the public-announcement system.   Inmate 3 Decl. of

25   June 30, 2020 ¶ 18.

26        When Inmate 1 reported to the building as directed, she was

27   told that staff from the Appeal Inquiry Management System (AIMS)

28   were there to talk with her about the complaints she had filed

24

against Officer Doyle and Officer Garcia.  Inmate 1 Decl. of May
21, 2020 ¶ 18.  Inmate 1 saw that Officer Doyle and Officer
Garcia were standing outside of the room where the interview
would take place.  Id.  Further, Inmate 1 believes that there is
a slot in the room, which the Tower Officer can open to listen to
what is being said in the room.  Id. ¶ 22.  Inmate 1 suspects
that Officer Mesa had opened the slot during the interview
because other inmates told her that they had seen Officer Mesa
talking to Officer Doyle and Officer Garcia after the interview.
Id.

Later that day, Officer Mesa opened Inmate 1's cell and
allowed four other inmates to enter, one of whom told Inmate 1,
"Doyle don't want no problems with you, we work with her, so we
need you not to make any more complaints about her," and told her
to let the complaints she had already filed against Officer Doyle
"go."  Id. ¶ 23.  Inmate 3 saw a group of inmates speak to Inmate
1 but could not hear what was said.  Inmate 3 Decl. of June 25,
2020 ¶ 18.

On May 19, 2020, another inmate told Inmate 1 that Officer
Mesa and Officer Doyle had told a group of inmates that a new
rule limiting telephone calls and showers to every other day was
caused by the complaints that Inmate 1 had filed.  Inmate 1 Decl.
of May 21, 2020 ¶ 24.  Inmate 1 believes that these officers
blamed Inmate 1 for these unpopular rule changes in order to put
a target on her back.  Id.

On June 17, 2020, Inmate 1 observed the incident during
which Officer Montreuil used force against Inmate 2.  Inmate 1
Decl. of June 26, 2020 ¶¶ 4-8.  Inmate 1 declares that she lives

25

United States District Court
Northern District of California

1   in "great fear" following what happened to Inmate 2 on June 17.

2   Id. ¶ 9.  Inmate 1 believes that RJD staff know that she is

3   assisting in this litigation because staff routinely call her a

4   "snitch" and announce over the speaker system that she has phone

5   calls with Plaintiffs' counsel.  Id.  Inmate 1 declares that it

6   is very "dangerous" to be publicly called out for talking with

7   Plaintiffs' counsel because "[t]alking to the Armstrong attorneys

8   is considered the equivalent of snitching on staff[.]"  Id.

9        On June 25, 2020, Inmate 1 had an interview with Internal

10  Affairs about a complaint she filed and Officer Mesa called out

11  Inmate 1 by name over the public-announcement system and

12  announced, "[I]t's time for you to go talk to Internal Affairs."

13  Inmate 1 Decl. of June 26, 2020 ¶ 10.  As Inmate 1 passed by

14  Officer Sanchez's door on the way to this meeting, Officer

15  Sanchez said to Inmate 1, "I know you are snitching, make sure

16  you spell my name right."  Id.  The interview with Internal

17  Affairs took place in the chapel on the prison yard, which means

18  that everyone on the yard saw the Internal Affairs officer and

19  Inmate 1 go to the chapel for the interview.  Id.  Inmate 1 is

20  "very afraid for [her] safety" as a result.  Id.

21       On or around June 29, 2020, Inmate 3 heard Officer Mesa

22  announce over the public-announcement system that Inmate 1 was

23  meeting with Internal Affairs.  Inmate 3 Decl. of June 30, 2020

24  ¶ 29.

25       The Court finds Inmate 1's allegations of retaliation for

26  assisting Plaintiffs' counsel with these proceedings, and of

27  living in fear for her safety at RJD, to be credible.  Most of

28  the incidents Inmate 1 describes in her declarations involve

Officer Doyle, who she claims is Officer Rucker's partner, which
Defendants do not dispute.  Inmate 1 Decl. of June 26, 2020 ¶ 9.
Inmate 1 believes that a connection exists between Officer
Doyle's actions and Inmate 1's participation in this litigation
because her participation has involved complaining about Officer
Rucker's involvement in the events leading up to Inmate 4's
death.  Id.

Defendants have offered no affirmative evidence to dispute
that any of the incidents that Inmate 1 describes in her
declaration occurred, including the multiple instances of being
called out over the public-announcement system as having meetings
with Plaintiffs' counsel and Internal Affairs, and the multiple
instances in which an officer approached Inmate 1 to say
something to discourage her from complaining about staff or to
make her aware that staff know about her discussions with
Plaintiffs' counsel or complaints about staff.  Inmate 3's
declaration corroborates some of these incidents.

Instead, Defendants argue that Inmate 1's declarations are
not credible because she stated during a videotaped interview on
July 7, 2020, that she had no safety concerns on Facility A,
which is inconsistent with the statement in her declaration of
June 26, 2020, that she was "very afraid for [her] safety."  See
Inmate 1 Decl. of June 26, 2020 ¶ 10, Docket No. 2969-7.

Associate Warden Scott Anderson conducted the July 7 video
interview of Inmate 1 for the purpose of determining whether she

United States District Court
Northern District of California

27

United States District Court
Northern District of California

had any safety concerns on Facility A.[3]  See Armenta Decl., Ex. E,
Docket No. 2984.  During the interview, Associate Warden Anderson
states that he and staff were "made aware" that Inmate 1 "might
have safety concerns on the facility," and asks Inmate 1 whether
she has "any safety concerns staying in Facility A."  Id.  Inmate
1 responds that she does not have safety concerns and that, if
she had any, she would say so.  Id.

Inmate 1 signed a declaration dated July 11, 2020, in which
she explains her statements during the video interview of July 7.
Inmate 1 states that, starting in May 2020, she had been
interviewed by various RJD staff about whether she had any safety
concerns.  Inmate 1 Decl. of July 11, 2020 ¶ 4.  Even though
Inmate 1 did "fear for [her] safety" because "officers on
Facility A have engaged in a campaign of harassment and
retaliation against [her] for complaining about staff misconduct
and participating in Plaintiffs' motions," Inmate 1 "denied
having safety concerns when asked because [she] did not want to
go to administrative segregation," as she had been left in
handcuffs for forty-eight hours the last time she was there.  Id.

On July 7, 2020, before the videotaped interview with
Associate Warden Anderson, four officers, Officers Torrones,
Lacroix, Silkk, and another officer whose name Inmate 1 does not

---

[3] Plaintiffs move to strike this video on the grounds that it
violates the Court's order of March 17, 2020, and California Rule
of Professional Conduct 4.2, because Defendants conducted the
video interview without first obtaining consent from Plaintiffs'
counsel.  Defendants represented during the hearing on July 16,
2020, that they questioned Inmate 1 about her safety concerns in
order to ensure her safety.  In an abundance of caution, the
Court will consider the video and weigh it in light of the
circumstances.

know, and two sergeants whose names Inmate 1 does not know, came to Inmate 1's cell and told her that she was being taken to administrative segregation for safety concerns. <u>Id.</u> ¶ 5. Inmate 1 refused to go to administrative segregation and said that she did not have any safety concerns. <u>Id.</u> ¶¶ 5-7. About an hour later, Sergeant Jackson and a female lieutenant told Inmate 1, "Your lawyer called and said that you have safety concerns." <u>Id.</u> ¶ 8. Inmate 1 responded that she never told her lawyer that she wanted to be placed in administrative segregation for safety, and that it was "safer for [her] in Building 1 than in ad-seg." <u>Id.</u>

Defendants have not filed any declarations by Officers Torrones, Lacroix, and Silkk, or Sergeant Jackson, to dispute Inmate 1's version of these events.

About an hour and a half later, Associate Warden Anderson and Counselor Belmares came to Inmate 1's cell and Anderson told Inmate 1 that she had to go to the mental health building to sign a chrono stating that she did not want to go to administrative segregation. <u>Id.</u> ¶¶ 8-9. Associate Warden Anderson then took Inmate 1 to Associate Warden Armenta's office in the mental health building and filmed the interview discussed above. <u>Id.</u> ¶ 9. After the end of the videotaped interview, Inmate 1 told Anderson and Armenta about the time she was left in handcuffs for forty-eight hours in administrative segregation to explain why she did not want to go to administrative segregation. <u>Id.</u> The Associate Wardens have not filed a declaration that contradicts Inmate 1's version of the events.

Inmate 1 declares that she remains afraid for her safety on Facility A but is "terrified" of being sent to administrative

United States District Court
Northern District of California

1  segregation, where she "fears staff would hurt [her]" like they

2  did during the handcuffs incident and where staff could also

3  allow other incarcerated people to hurt her.   Id. ¶ 10.

4      The Court does not find the videotaped interview of July 7

5  to be probative of whether Inmate 1 did, in fact, have concerns

6  for her safety at RJD.   Nor does this video undermine Inmate 1's

7  credibility.

8      In sum, Inmate 1's sworn statements regarding multiple acts

9  by RJD staff, which Inmate 1 believes were intended to intimidate

10  her, threaten her, and discourage her from cooperating with

11  Plaintiffs' counsel in these proceedings and from complaining

12  about staff in general, are uncontroverted.   Inmate 1 has

13  connected these incidents to her assistance with the enforcement

14  motions by declaring that, during some of the incidents, officers

15  have made references to Officer Rucker and to Inmate 1 talking

16  with Plaintiffs' counsel.   Further, Defendants' attack on Inmate

17  1's credibility is ineffective.   Accordingly, the Court finds

18  that Inmate 1's statements regarding the incidents described

19  above, and their connection to her assistance with the

20  enforcement motions, are credible.

21      D.   Findings Related to Winter Factors

22      As will be discussed below, the issuance of a preliminary

23  injunction requires findings (1) that the movant is likely to

24  succeed on the merits; (2) that he is likely to suffer

25  irreparable harm in the absence of preliminary relief; (3) that

26  the balance of the equities tips in his favor; and (4) that a

27  preliminary injunction is in the public interest.   The Court's

28

United States District Court
Northern District of California

1    factual findings with respect to each of these factors are as

2    follows.

3            1.   Likelihood of Success on the Merits

4        Based on the evidence detailed above, the Court finds that

5    Plaintiffs have shown that they are likely to succeed on the

6    merits of their claims that the Witnesses have suffered adverse

7    actions due to retaliation, in violation of the ADA, or that, at

8    the very least, Plaintiffs have raised serious questions as to

9    such claims.

10       The Court finds that the enforcement motions are ADA

11   proceedings because they seek to enforce class members' rights

12   under the ADA.  In their enforcement motions, Plaintiffs argue

13   that Defendants' employees have violated class members' rights

14   under the ADA and the RA, and have violated the Court's

15   injunctions and orders in this action, by attacking and

16   retaliating against class members on account of their

17   disabilities or for exercising their statutory rights.

18       The Witnesses have filed declarations in support of the

19   enforcement motions, and such declarations, as well as the

20   Witnesses' assistance to Plaintiffs' counsel, are protected

21   activity under the ADA.

22       The Court further finds that Plaintiffs have shown that they

23   are likely to succeed on their claims that the Witnesses suffered

24   adverse actions that were retaliatory, in that they were caused

25   by the Witnesses' assistance with the enforcement motions.

26   //

27

28

                                      31

2.    Irreparable Harm

The Court finds that Plaintiffs have shown that they are likely to suffer irreparable harm absent a preliminary injunction.

The situation for inmates with disabilities and otherwise vulnerable to abuse at RJD has been described by Plaintiffs' expert as "horrifying" in light of the "substantial evidence that these vulnerable inmates are targeted and preyed upon by a significant number of staff at RJD." Schwartz Decl. ¶¶ 23-27. The alleged misconduct by RJD staff includes the use of excessive force, which is employed against RJD inmates at a "startling" rate that is "far beyond the norm[.]" Vail Decl. ¶ 13.  The Bishop Report of December 2018 describes allegations by inmates of violence and retaliation by RJD staff aimed at vulnerable populations, including disabled inmates.

Defendants have acknowledged that the Bishop Report "formally recognized serious problems with aspects of R.J. Donovan's operations . . . and that responsive action should be taken."  Defs.' Resp. to RJD Mot. at 19.  But, as Plaintiffs' expert noted and Defendants have not disputed, the situation at RJD is the result of the "dysfunctional staff culture," which "will not be changed quickly or easily."  Schwartz Decl. ¶ 93. Thus, while Defendants have taken steps to improve the conditions for class members housed at RJD since the Bishop Report, the Court finds a likelihood that the Witnesses who now seek injunctive relief will suffer from acts of retaliation and abuse that could cause them great bodily or psychological injury, and violations of their statutory rights, absent injunctive relief.

United States District Court
Northern District of California

1    As noted, the Court finds that Plaintiffs have shown a

2    likelihood that the Witnesses have suffered acts of retaliation

3    even after Defendants, pursuant to the Court's order of March 17,

4    2020, posted anti-retaliation notices in the housing units at

5    RJD, provided RJD staff with additional anti-retaliation

6    training, and took other steps to ensure that inmate-declarants

7    would suffer no retaliation as a result of having provided

8    assistance to Plaintiffs' counsel in connection with the

9    enforcement motions.  The incidents of retaliation at issue took

10   place even after Defendants began to report allegations of staff

11   misconduct to AIMS.  Each of these incidents put the Witnesses in

12   danger of bodily or psychological harm, or of further violations

13   of their rights under the ADA to participate or assist in these

14   proceedings.

15       The fact that these incidents likely occurred as Inmate 2

16   and Inmate 1 describe them in their declarations, which, as

17   discussed above, the Court finds to be credible in light of the

18   totality of the record now before it, shows that nothing the

19   Court or Defendants have done so far has been effective at

20   preventing retaliation against the Witnesses.  There is no

21   indication in the record that any effective mechanism is in place

22   to guarantee that this conduct against the Witnesses will stop if

23   the Witnesses remain at RJD.  As Defendants have admitted, there

24   is still "staff misconduct that does occur" at RJD.  See Defs.'

25   Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 267, Docket

26   No. 2922-1.  Accordingly, Plaintiffs have shown that further

27   retaliatory conduct against the Witnesses is likely to occur

28   absent an injunction.

The Court therefore finds that Plaintiffs have shown that the Witnesses are at risk of suffering irreparable harm and that their participation as witnesses in this litigation could be at risk absent a preliminary injunction that continues in effect the order requiring that they be transferred to and housed in a suitable place outside of RJD.

### 3.   Balance of the Equities

The Court finds that the balance of the equities tips sharply in Plaintiffs' favor.  Plaintiffs have shown that, in the absence of a preliminary injunction, they would suffer significant burdens, which include serious bodily and psychological harm, and violations of their rights under the ADA in the form of further retaliation for their assistance in these proceedings.

On the other hand, Defendants have not pointed to any burdens that the issuance of a preliminary injunction, continuing in effect the transfer to and housing of the Witnesses at a suitable non-RJD facility, would impose upon them.  The only burdens that Defendants have identified do not appear to be related to such a transfer.  Defendants argue that a preliminary injunction could result in future requests for transfer by other inmates, and that it would be burdensome to remove officers each time an allegation of misconduct is lodged against such officers. Defendants, however, do not explain how these matters relate to the preliminary injunction at issue here.  Defendants' arguments are unpersuasive for the additional reasons that Plaintiffs have not yet requested to remove any officers and that, in the lengthy

history of this action, Plaintiffs have never before moved to transfer particular inmates from one prison to another.

The present pandemic presents special challenges to prison management, but such challenges affect every aspect of the prison system.  The Court finds that any such challenges in the context of the preliminary injunctive relief at issue here, which is limited to the transfer and housing of two inmates at a suitable non-RJD facility, are slight when weighed against the burdens that the Witnesses would suffer in the absence of a preliminary injunction.

Accordingly, the Court finds that the burden on Defendants and on prison administration of transferring and housing the two Witnesses in a suitable facility other than RJD is minimal, and that any such burdens are heavily outweighed by the burdens that the Witnesses could face if they continue to be housed at RJD.

### 4.   Public interest

The Court finds that Plaintiffs have shown that a preliminary injunction is in the public interest.

After experiencing various incidents involving threats, intimidation, and even violence, Inmate 2 and Inmate 1 believe that reporting misconduct by RJD staff and assisting with these proceedings has placed their personal safety at risk.  Inmate 2 Decl. of June 26, 2020 ¶ 12; Inmate 1 Decl. of June 26, 2020 ¶ 10.  If such incidents continue, the ability or willingness of the Witnesses and other inmates to assist with or participate in these proceedings could be negatively impacted.  Inmate 2, for one, has stated that he "will not stick out [his] neck out again and try to help in the Armstrong case because the harassment is

not worth dying for."  Inmate 2 Decl. of June 26, 2020 ¶ 12.
Inmate 1, for another, has refused to ask other inmates to come
forward to corroborate the incidents she describes in her
declarations because she "know[s] that they will not be protected
from retaliation."  Inmate 1 Decl. of May 21, 2020 ¶ 26.  In
light of these sworn statements, which the Court deems credible,
the Court finds that the integrity of these proceedings would
deteriorate in the absence of a preliminary injunction.  The
Court further finds that a preliminary injunction would promote
the enforcement of the ADA's anti-interference and anti-
retaliation provisions, which is in the public interest.

Defendants argue that the public interest weighs in favor of
non-interference with prison administration.  As discussed above,
Defendants have not shown how the preliminary injunction at issue
here would burden the prison system or would otherwise improperly
interfere with prison administration.

Accordingly, the Court finds that a preliminary injunction
that would continue in effect the order to transfer and house the
inmates at a suitable non-RJD facility is in the public interest.

LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish
that he is likely to succeed on the merits, that he is likely to
suffer irreparable harm in the absence of preliminary relief,
that the balance of equities tips in his favor, and that an
injunction is in the public interest."  Winter v. Natural Res.
Def. Council, Inc., 555 U.S. 7, 20 (2008).

Alternatively, "a preliminary injunction could issue where
the likelihood of success is such that serious questions going to

United States District Court
Northern District of California

1  the merits were raised and the balance of hardships tips sharply

2  in plaintiff's favor," so long as the plaintiff demonstrates

3  irreparable harm and shows that the injunction is in the public

4  interest.  Alliance for the Wild Rockies v. Cottrell, 632 F.3d

5  1127, 1131 (9th Cir. 2011) (citation and internal quotation and

6  editing marks omitted).  A court employs a sliding scale when

7  considering a plaintiff's showing as to the likelihood of success

8  on the merits and the likelihood of irreparable harm.  Id.

9  "Under this approach, the elements of the preliminary injunction

10 test are balanced, so that a stronger showing of one element may

11 offset a weaker showing of another."  Id.

CONCLUSIONS OF LAW

12

13 I.  Plaintiffs Have Shown that a Preliminary Injunction is
       Warranted
14

15      As discussed below, and based on the factual findings above,

16 the Court concludes that Plaintiffs have met their burden to show

17 that the issuance of a preliminary injunction to transfer and

18 maintain the Witnesses out of RJD is warranted because they have

19 shown that each of the four factors of the Winter framework is

20 met.  However, even if Plaintiffs had, instead of showing a

21 likelihood of success on the merits of their claims of

22 retaliation in violation of the ADA, only shown that serious

23 questions exist as to such claims, the preliminary injunction

24 would be justified under the alternative sliding-scale standard

25 based on the Court's factual findings, and conclusions below,

26 that the balance of hardships tips sharply in Plaintiffs' favor,

27 that Plaintiffs have demonstrated a likelihood of irreparable

28

harm, and that the injunction is in the public interest.  <u>See</u>
<u>Alliance for the Wild Rockies</u>, 632 F.3d at 1131.

That the preliminary injunction at issue here is a mandatory,
and not a prohibitory, injunction does not undermine the Court's
conclusion.  A court can issue a mandatory injunction where, as
here, the facts and law clearly favor the moving party.  <u>See</u>
<u>Stanley v. Univ. of S. California</u>, 13 F.3d 1313, 1320 (9th Cir.
1994); <u>see also</u> Charles A. Wright & Arthur R. Miller, 11A <u>Fed.</u>
<u>Prac. & Proc. Civ.</u> § 2942 (3d ed.) ("It has been said that courts
are more reluctant to grant a mandatory, or affirmative,
injunction than a prohibitory, or negative, one.  Nonetheless,
injunctions compelling the doing of some act, as opposed to
forbidding the continuation of a course of conduct, are an ancient
and familiar tool of equity courts and will be used whenever the
circumstances warrant.").

A.   Likelihood of Success on the Merits

The Court first must determine what legal standard governs
the Witnesses' claims of retaliation.  Defendants argue that the
standard is that for proving retaliation in violation of the First
Amendment, and Plaintiffs argue that the standard is that for
proving retaliation in violation of the ADA.

The retaliation about which the Witnesses complain is
allegedly connected to their assistance with or participation in
Plaintiffs' enforcement motions, which in turn seek redress for
violations of the ADA, the RA, the remedial plan, and the Court's
injunctions and related orders.  Plaintiffs do not argue that the
retaliation that underlies their request for preliminary
injunctive relief was in violation of the Witnesses' First

Amendment rights.  Accordingly, the Court concludes that the relevant standard here is the standard for proving retaliation in violation of the ADA.

A claim for retaliation in violation of the ADA requires a showing "that (1) [the plaintiff] engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity."  Rinehart v. Weitzell, __F.3d__, No. 18-3263, 2020 WL 3579862, at *4 (8th Cir. July 2, 2020) (applying test for retaliation in violation of the ADA to claim brought by incarcerated person).

As discussed below, and based on the facts found above, Plaintiffs are likely to show that all three prongs for a claim of retaliation in violation of the ADA have been met with respect to each Witness.  Accordingly, Plaintiffs have shown that they are likely to succeed on the merits of their claims for retaliation in violation of the ADA as to each Witness, as well as their claims for violations of the Court's order of March 17, 2020.  In the alternative, the Court concludes that, at the very least, Plaintiffs have raised serious questions with respect to the merits of their retaliation claims.

    1.   Protected Activity Under the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA applies to state prisons.  Armstrong v. Wilson,

1    124 F.3d at 1023 ("[W]e conclude that the plain language of the

2    ADA and RA, and our prior interpretations of that language,

3    support application of the statutes to state prisons.").

4          In their enforcement motions, Plaintiffs argue that

5    Defendants' employees have violated class members' rights under

6    the ADA and the RA, and have violated the remedial plan and the

7    Court's injunctions and orders in this action, by attacking and

8    retaliating against class members on account of their

9    disabilities or for exercising their rights under the ADA and the

10   RA.  Because the enforcement motions are brought to protect class

11   members' rights under the ADA, such motions are ADA proceedings.

12         The ADA prohibits retaliation for or interference with

13   assisting or testifying in connection with an ADA proceeding.

14   Specifically, 42 U.S.C. § 12203(a) provides, "No person shall

15   discriminate against any individual because such individual has

16   opposed any act or practice made unlawful by this chapter or

17   because such individual made a charge, testified, assisted, or

18   participated in any manner in an investigation, proceeding, or

19   hearing under this chapter."  Additionally, 42 U.S.C. § 12203(b)

20   provides, "It shall be unlawful to coerce, intimidate, threaten,

21   or interfere with any individual in the exercise or enjoyment of,

22   or on account of his or her having exercised or enjoyed, or on

23   account of his or her having aided or encouraged any other

24   individual in the exercise or enjoyment of, any right granted or

25   protected by this chapter."

26         Here, the Witnesses have filed declarations in support of

27   the enforcement motions, which, as found and concluded, are ADA

28   proceedings.  The Witnesses' assistance with the enforcement

United States District Court
Northern District of California

40

motions, therefore, is protected activity under the ADA, 42
U.S.C. §§ 12203(a) and (b).  Accordingly, the first prong of a
claim for retaliation in violation of the ADA is met.

### 2.   Adverse Action and Causation

The Court next addresses the second and third prongs of a
claim for retaliation in violation of the ADA, which here require
a showing that adverse action related to the Witnesses'
declarations in support of the enforcement motions was taken
against the Witnesses.  After carefully reviewing all of the
materials presented by both sides, the Court has found and
concludes that Plaintiffs are likely to show that the Witnesses
suffered adverse actions that were caused by their assistance
with the enforcement motions.

Specifically, as discussed in more detail in the Findings of
Fact, the Court has found that Plaintiffs are likely to show that
Inmate 2 suffered several adverse actions by staff at RJD that
have a causal nexus to his assistance with the enforcement
motions.  These actions include: that RJD staff delayed in
providing, or failed to provide, Inmate 2 with his medications on
multiple occasions; that Officer Montreuil used excessive force
against Inmate 2 on June 17, 2020; and that RJD staff allowed
nail clippers in Inmate 2's cell and a note encouraging him to
kill himself while he was on suicide watch.

The Court also has found that Plaintiffs are likely to show
that Inmate 1 suffered several adverse actions by staff at RJD
that have a causal nexus to her assistance with the enforcement
motions.  These actions include: that staff at RJD, on multiple
instances, stated over the public-announcement system that Inmate

41

1 was meeting with Plaintiffs' counsel and internal

investigators; and that officers made statements or otherwise

behaved in a way intended to intimidate, threaten, or discourage

Inmate 1 from assisting Plaintiffs' counsel in these proceedings

or otherwise complaining about staff misconduct.

Defendants argue that the June 17 incident involving Inmate

2 is not an act of retaliation because Officer Montreuil's use of

force against him "was not because of Inmate 2's protected

conduct, but instead advanced a legitimate correctional goal."

Defs.' Resp. at 5, Docket No. 2981-3.  But Defendants have cited

no case showing that a claim for retaliation in violation of the

ADA fails where the adverse action in question "advanced a

legitimate correctional goal."  The cases upon which Defendants

rely to support that proposition are inapposite, because they

address claims for retaliation in violation of the First

Amendment, which require proof of an additional element not

required for a retaliation claim under the ADA, namely that the

adverse conduct in question did not advance a legitimate

correctional goal.  See, e.g., Pratt v. Rowland, 65 F.3d 802, 806

(9th Cir. 1995) (holding that, "[b]ecause a prisoner's First

Amendment rights are necessarily curtailed" while in custody, "a

successful retaliation claim [under the First Amendment] requires

a finding that the prison authorities' retaliatory action did not

advance legitimate goals of the correctional institution or was

not tailored narrowly enough to achieve such goals").

Further, the record does not support a finding that Officer

Montreuil's use of force advanced a legitimate correctional goal

in any case.  As discussed above, Defendants have not shown that

United States District Court
Northern District of California

42

United States District Court
Northern District of California

1  level of force that Officer Montreuil used against Inmate 2,

2  which was enough to render him unconscious, was appropriate even

3  if Inmate 2 had, in fact, been walking toward Officer Montreuil

4  and had tried to throw bodily fluids at the officer.

5       With respect to Inmate 1, Defendants argue that she has no

6  actionable retaliation claim because the acts about which she

7  complains amount to "bad mouthing" and verbal threats that do not

8  violate her First Amendment rights.  Defs.' Resp. at 9-10, Docket

9  No. 2981-3.  As discussed above, however, the relevant standard

10 for proving retaliation here is the one under the ADA, not the

11 First Amendment.

12      Accordingly, the first factor under the Winter framework

13 weighs in favor of issuing a preliminary injunction.

14      B.   Irreparable Harm

15      The Court finds that Plaintiffs have made a strong showing

16 that the Witnesses are likely to suffer irreparable harm absent a

17 preliminary injunction.  As discussed in more detail in the

18 Findings of Fact, it is undisputed that staff misconduct at RJD

19 continues to occur notwithstanding the Court's orders and the

20 steps that Defendants have taken.  The Court has found that the

21 Witnesses likely have suffered acts of retaliation despite the

22 efforts that the Court and the parties have taken to protect

23 class members from retaliation.  In the absence of any indication

24 in the record that there is any effective mechanism in place to

25 guarantee that retaliatory conduct against the Witnesses will

26 stop, the Court has found that the Witnesses are likely to suffer

27 irreparable harm in the form of serious physical or psychological

28 injury, and further retaliation in violation of their rights

United States District Court
Northern District of California

under the ADA, absent a preliminary injunction.  Cf. Goldie's Bookstore, Inc. v. Superior Court of State of Cal., 739 F.2d 466, 472 (9th Cir. 1984) (holding that finding of potential injury that was "not based on any factual allegations" was insufficient because "[s]peculative injury does not constitute irreparable injury").

Defendants argue that the Witnesses have not shown that they are likely to suffer irreparable harm because their declarations are not credible.  Defendants note that Inmate 1 changed her story about having safety concerns as shown in the July 7 video interview, and that Inmate 2 changed his story about Officer Rucker's physical involvement in Inmate 4's death.  For the reasons discussed above, the Court has found that these attacks on the Witnesses' credibility are ineffective.

Accordingly, this factor weighs strongly in favor of issuing a preliminary injunction.[4]

C.   Balance of the Equities

Plaintiffs have shown that the balance of the equities weighs heavily in the Witnesses' favor.  As discussed in more detail in the Findings of Fact, the Court has found that the burden, if any, on Defendants and on prison administration of transferring and housing the Witnesses in a suitable facility other than RJD is minimal, and that any such burden is heavily outweighed by the burdens that the Witnesses could face if they

---

[4] The strong showing that Plaintiffs have made with respect to the factor of irreparable harm would more than offset any weakness in Plaintiffs' showing with respect to the likelihood of success on the merits.  See Alliance for the Wild Rockies, 632 F.3d at 1131.

United States District Court
Northern District of California

1   continue to be housed at RJD, which include the possibility of

2   serious bodily injury, psychological harm, and ongoing violations

3   of their rights.  See Hernandez v. Sessions, 872 F.3d 976, 996

4   (9th Cir. 2017) ("Faced with . . . preventable human suffering,

5   [the Ninth Circuit] ha[s] little difficulty concluding that the

6   balance of hardships tips decidedly in plaintiffs' favor.")

7   (citation and internal quotation marks omitted).

8        Accordingly, this factor weighs in favor of issuing a

9   preliminary injunction.

10       D.    Public Interest

11       Plaintiffs have shown that issuing a preliminary injunction

12   is in the public interest.

13       As discussed in the Findings of Fact, the Court has found

14   that a preliminary injunction would preserve the integrity of

15   these proceedings by protecting the Witnesses from retaliation

16   for assisting Plaintiffs' counsel with the enforcement motions.

17   This is in the public interest and is consistent with Defendants'

18   legal obligations.  See, e.g., 15 Cal. Code Regs. § 3270 ("The

19   requirement of custodial security and of staff, inmate and public

20   safety must take precedence over all other consideration in the

21   operation of all the programs and activities of the institutions

22   of the department."); 15 Cal. Code Regs. § 3271 ("Every employee,

23   regardless of his or her assignment, is responsible for the safe

24   custody of the inmates confined in the institutions of the

25   department.").

26       The Court also has found that a preliminary injunction would

27   protect the Witnesses' rights under the ADA, which also is in the

28

45

United States District Court
Northern District of California

1  public interest.  See Enyart v. Nat'l Conference of Bar

2  Examiners, Inc., 630 F.3d 1153, 1167 (9th Cir. 2011).

3      The Court also has found that Defendants have not shown that

4  the preliminary injunction at issue would improperly interfere

5  with prison administration.

6      Accordingly, this factor also weighs in favor of issuing a

7  preliminary injunction.

8  II.  The Preliminary Injunction Is Consistent with the Prison
         Litigation Reform Act
9

10     The Prison Litigation Reform Act (PLRA) provides that courts

11 "shall not grant or approve any prospective relief [with respect

12 to prison conditions] unless the court finds that such relief is

13 narrowly drawn, extends no further than necessary to correct the

14 violation of the Federal right, and is the least intrusive means

15 necessary to correct the violation of the Federal right."  18

16 U.S.C. § 3626(a)(1)(A).  Whether prospective relief is

17 appropriate in light of the PLRA depends on whether the court

18 finds, in light of the "order as a whole," "that the set of

19 reforms being ordered—the 'relief'—corrects the violations of

20 prisoners' rights with the minimal impact possible on defendants'

21 discretion over their policies and procedures."  Armstrong v.

22 Schwarzenegger, 622 F.3d at 1071.

23     The Court concludes that a preliminary injunction that

24 continues in effect the transfer to and housing of the Witnesses

25 at a suitable facility that is not RJD meets the requirements of

26 the PLRA.  The preliminary injunction is narrowly tailored

27 because it requires action only with respect to the two inmates

28 who have shown a likelihood of success on their claims of

United States District Court
Northern District of California

retaliation, and because the transfer of the Witnesses is the least that can be done to keep the Witnesses safe from further incidents that could cause them serious bodily or psychological injury and violations of their rights under the ADA.  Id. at 1072 (holding that the scope of permissible injunctive relief "is dictated by the extent of the violation established") (citation and internal quotation marks omitted).

The preliminary injunction is not overly intrusive because it does not micromanage the process of transferring the Witnesses out of RJD.  That the Court has required that the new placements for the Witnesses meet certain criteria in light of the Witnesses' disabilities, medical conditions, security level, and vulnerability to acts of retaliation in violation of the ADA does not change this conclusion.  See Armstrong v. Brown, 768 F.3d at 986 (holding that "[a] court may, as the district court did here, provide specific instructions to the State without running afoul of the PLRA").  Such criteria are necessary to ensure that the Witnesses are not deprived of their rights at the new location. As the Ninth Circuit has held, "the defendants have the responsibility of ensuring that their prisoners are afforded their rights under the ADA, regardless of where the State incarcerates them[.]"  See Armstrong v. Schwarzenegger, 622 F.3d at 1072.

Critically, Defendants have not advanced any viable alternative means to protect the Witnesses' rights that are narrower or less intrusive.  Ordering that the Witnesses remain at RJD is not a viable alternative to the preliminary injunction at issue because the record shows that prior orders by the Court and prior actions by Defendants to protect class members at RJD

47

from retaliation have been ineffective.  See Armstrong v. Brown,
768 at 986 (noting that, where the "the district court has
attempted narrower, less intrusive alternatives—and those
alternatives have failed," the court has discretion to order
relief that might have raised concerns about breadth and
intrusiveness under the PLRA in the first instance) (citation and
internal quotation marks omitted).

Further, the Court has considered Defendants' arguments
regarding the potential burdens that the preliminary injunction
would impose on them, and it has found that the potential
burdens, if any, would be minimal.  Even if complying with the
preliminary injunction were burdensome for Defendants, however,
"[a] demonstration that an order is burdensome does nothing to
prove that it was overly intrusive," which is the relevant
consideration under the PLRA.  Armstrong v. Schwarzenegger, 622
F.3d at 1071 ("With Congress having made the decision to
recognize the rights of disabled persons, the question is not
whether the relief the court ordered to vindicate those rights is
expensive, or difficult to achieve, but whether the same
vindication of federal rights could have been achieved with less
involvement by the court in directing the details of defendants'
operations.").

Accordingly, the Court finds that the issuance of the
preliminary injunction at issue is appropriate.

                              CONCLUSION

The Court GRANTS IN PART Plaintiffs' motion for a
preliminary injunction.  The preliminary injunction will issue as
a separate order.  The Witnesses have been transferred out of RJD

United States District Court
Northern District of California

pursuant to the Court's temporary restraining order.  Inmate 2 shall remain housed at the MHCB at CMC on a temporary basis pending placement at CHCF once it is open for transfers, and Inmate 1 shall remain housed at an Enhanced Outpatient Program housing unit on Facility D at Mule Creek State Prison, subject to the exceptions set forth in the preliminary injunction.  While the Witnesses are housed at these facilities, Defendants shall have the ADA coordinator meet with each Witness on a regular basis to discuss whether the Witness has any safety concerns or has faced retaliation, and Defendants shall arrange for regular confidential telephone calls between each Witness and Plaintiffs' counsel.

No security shall be required because the Witnesses are incarcerated and presumably indigent.

The preliminary injunction shall remain in effect for ninety days of the date of this order.  See 18 U.S.C. § 3626(a)(2).  The Court will make the injunction final before the expiration of the ninety-day period based on the findings set forth herein, unless Defendants make a further factual showing that they were unable to make in opposition to the issuance of a preliminary injunction in light of the expedited schedule for that proceeding.  No later than September 21, 2020, Defendants may submit a brief of not more than ten pages and supporting evidentiary materials showing that a final injunction should not issue.  Plaintiffs may file a response of equal length no later than October 5, 2020.  The Court defers ruling on Plaintiffs' request to strike Inmate 2's RVRs from the incident on June 17, 2020, pending the results of the internal RVR hearings.  Defendants shall report on the

49

1    results of these hearings in their next brief and Plaintiffs may

2    respond.

3        IT IS SO ORDERED.

4    Dated:  July 30, 2020



     CLAUDIA WILKEN
5    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California