United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

      Plaintiffs,

   v.

GAVIN C. NEWSOM, et al.,

      Defendants.

Case No. 94-cv-02307 CW

ORDER GRANTING IN PART MOTION TO MODIFY REMEDIAL ORDERS AND INJUNCTIONS

(Re: Dkt. No. 2922)

    In this class action for violations of disabled prisoners' rights under the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (RA), which is in the remedial phase, Plaintiffs contend that staff at R.J. Donovan Correctional Facility (RJD) continue to deprive class members of their rights under the ADA in violation of this Court's prior remedial orders and injunctions. Docket No. 2922. Plaintiffs seek an order modifying the Court's prior remedial orders and injunctions to require the implementation of new remedial measures at RJD to prevent further violations of class members' rights. Defendants oppose the motion. Having carefully considered the parties' submissions, and the argument presented at the hearing held on August 11, 2020, the Court GRANTS IN PART Plaintiffs' motion to modify the Court's remedial orders and injunctions.

FINDINGS OF FACT[1][2]

I.   Procedural history

    In 1994, Plaintiffs, "a class of all present and future California state prison inmates and parolees with certain disabilities, sued defendants, California state officials with responsibility for the operation of the Department of Corrections and Rehabilitation (the CDCR) and the Board of Parole Hearings (BPH), challenging the State's treatment of disabled prisoners and parolees." Armstrong v. Schwarzenegger, 622 F.3d 1058, 1063 (9th Cir. 2010) (internal quotation marks omitted).  The claims against the CDCR were litigated separately from the claims against the BPH; only the former claims are relevant to the present motion.

    On July 9, 1996, on the eve of trial, Plaintiffs and CDCR Defendants reached an agreement on a Stipulation and Order for Procedures to Determine Liability and Remedy.  Docket No. 148.  The Stipulation and Order provides:

> It is the intent of this Stipulation to require defendants to operate programs, activities, services and facilities of the California Department of Corrections in accordance with the Americans with Disabilities Act and § 504 of the

---

[1] Defendants objected to the Court's consideration of new matters that were raised and attached to Plaintiffs' reply on the ground that Defendants did not have an opportunity to respond to them.  Objections 1-3, Docket No. 3033.  The Court permitted Defendants to file a supplemental brief to respond.  Defendants filed a supplemental brief, but it contains no response to most of the matters to which Defendants originally objected.  See Defs.' Supp. Resp., Docket No. 3045.  Defendants have thus waived these objections.

[2] Defendants object to certain portions of the declarations of Gay Grunfeld and Michael Freedman, upon which the Court has not relied.  The Court overrules these objections as moot.

> Rehabilitation Act of 1973, if the Court
> determines that the ADA and § 504 apply to
> the California Department of Corrections.

Stipulation and Order ¶ 12, Docket No. 148.

On September 20, 1996, this Court held that the ADA and RA apply to state prisoners, Docket No. 157, and that Defendants' policies and procedures with regard to disabled prisoners were inadequate and violative of the ADA and the RA, Docket No. 159. See also Armstrong v. Wilson, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996), aff'd, 124 F.3d 1019 (9th Cir. 1997).

On the same date, the Court entered a Remedial Order and Injunction, which required CDCR Defendants to develop plans, policies, and procedures, including disability-grievance procedures, to ensure that their facilities and programs were compliant with the ADA and RA. Remedial Order and Injunction at 1-4, Docket No. 158. The Court retained jurisdiction to enforce the terms of the Remedial Order and Injunction, as well as to issue "any order permitted by law, including contempt, necessary to ensure that defendants comply with the guidelines, policies, procedures, plans and evaluations" required by the Remedial Order and Injunction. Id. at 5.

In accordance with the Remedial Order and Injunction, Defendants produced a remedial plan in 1998, Docket No. 337, which they amended in January 2001, Docket No. 681. The Amended Remedial Plan of January 2001 (ARP), Section I, incorporates the ADA's anti-discrimination and access provisions, 42 U.S.C. § 12132, by providing as follows:

> No qualified inmate or parolee with a
> disability as defined in Title 42 of the
> United States Code, Section 12102 shall,

3

1
2
3
>           because of that disability, be excluded from
>           participation in or denied the benefits of
>           services, programs, or activities of the
>           Department or be subjected to
>           discrimination.

4  ARP at 1, Docket No. 681.  Section II.F. of the ARP requires CDCR

5  to "provide reasonable accommodations or modifications for known

6  physical or mental disabilities of qualified inmates/parolees."

7  Id. at 7.  The remainder of the ARP describes various types of

8  accommodations that CDCR must provide, such as "staff

9  assistance," sign language interpreters, alternative methods for

10 restraining inmates who cannot be restrained with traditional

11 restraint equipment in the ordinary prescribed manner, and

12 accessible vehicles for transporting inmates.  Id. at 22-34.  The

13 ARP requires each institution to take steps to ensure that staff

14 are aware at all times of which inmates have disabilities that

15 require accommodations.  Id.  For example, the ARP requires each

16 institution to issue an identifying vest to each inmate who has

17 vision or hearing disabilities, which the inmate must wear over

18 his clothing when outside of his cell or bed area.  Id.

19 Defendants used the ARP as a model to craft remedial plans that

20 were specifically tailored to each CDCR institution.  See

21 Individual Remedial Plans, Docket Nos. 782, 783, 784.  The Court

22 approved the remedial plans for each institution, including RJD,

23 on February 6, 2002.  Docket No. 781; RJD Remedial Plan, Docket

24 No. 784-2.

25     In November 2006, Plaintiffs filed a motion for a further

26 remedial order, in which they argued that Defendants were in

27 violation of the ARP and the Court's orders.  Docket No. 950.  As

28 a result of this motion, the Court issued another injunction in

4

United States District Court
Northern District of California

2007 (2007 injunction), which required Defendants, in relevant part, to comply with the ARP, including Section I, and to develop accountability procedures to track their noncompliance with the ARP and the Court's orders.  2007 Injunction at 7, 9, Docket No. 1045.  Since then, the Court has modified the 2007 injunction several times to clarify Defendants' obligations regarding reporting and accountability.  See Armstrong v. Brown, 768 F.3d 975, 979 (9th Cir. 2014); see also Order Modifying Permanent Injunction of August 2, 2012, Docket No. 2180; Order Modifying 2007 Injunction of December 29, 2014, Docket No. 2479.

In February and June 2020, respectively, Plaintiffs filed two motions (enforcement motions) in which they argue that Defendants' employees have engaged and continue to engage in conduct that violates class members' rights under the ARP and ADA contrary to this Court's prior orders and injunctions.  Docket Nos. 2922, 2948.  The conduct alleged involves misconduct directed at class members, who are more vulnerable to abuse and less able to defend themselves in light of their disabilities, as well as acts that have served to discourage class members from requesting reasonable accommodations for their disabilities, either through the formal grievance process or otherwise.

The first enforcement motion is the one now before the Court, which seeks relief for alleged violations of class members' rights under the ARP and ADA at RJD (RJD enforcement motion), and the second enforcement motion seeks relief for alleged violations of class members' rights at other prisons throughout California (state-wide enforcement motion).  The

United States District Court
Northern District of California

1  state-wide enforcement motion has not been fully briefed and

2  remains pending.

3  II.  The continued lack of accountability for staff at RJD
        enables violations of the ARP and the Court's remedial
4        orders and injunctions

5      RJD has the second largest population of incarcerated people

6  with disabilities in CDCR, with nearly 1,000 <u>Armstrong</u> class

7  members, including 297 people who use wheelchairs, 217 people who

8  are deaf or hard of hearing, and thirteen people who are blind.

9  Grunfeld Decl., Ex. II at 184-89, Docket No. 2922-1.[3]

10     Beginning in September 2016, Plaintiffs' counsel notified

11 Defendants of allegations of noncompliance with the ARP and the

12 Court's orders and injunctions based on claims that RJD staff

13 were denying class members reasonable accommodations and were

14 using excessive force against class members.  <u>See, e.g.</u>, Freedman

15 Decl., Ex. 67, 69, 71, 73, Docket No. 2921-2.[4]

16     In August 2018, auditors from the Office of Audits and Court

17 Compliance (OACC) and Plaintiffs' counsel conducted a joint

18

19 _____

20     [3] Defendants object to this exhibit on the ground that it was
   not properly authenticated.  The Court overrules this objection.
21 Gay Grunfeld declares that this exhibit is a true and correct
   copy of excerpts of data from Defendants' COMPSTAT system, which
22 Defendants produced to Plaintiffs' counsel on January 13, 2020.
   Grunfeld Decl. ¶ 71, Docket No. 2922-1.  That is sufficient to
   find that the exhibit is what Ms. Grunfeld claims it is.
23 Moreover, Defendants do not argue that the exhibit is not
   authentic.
24
       [4] Defendants object to Exhibits 67, 69, and 71 to the
25 Freedman Declaration on the ground that the declarant lacks
   personal knowledge.  These exhibits are copies of the monitoring
26 reports written by Plaintiffs' counsel, and the declarant is
   counsel for Plaintiffs.  These documents are being offered to
27 show that Plaintiffs' counsel alerted Defendants to allegations
   of noncompliance with the ARP and the Court's orders.  The
28 objections are, therefore, overruled.

United States District Court
Northern District of California

compliance review of the Disability Placement Program at RJD,
during which the joint team interviewed twelve class members.
Grunfeld Decl. ¶ 16 & Ex. G at 1-2, Docket No. 2922-1.  After the
joint review, the OACC wrote a letter to CDCR's Division of Adult
Institutions (DAI) dated September 20, 2018, in which the OACC
reported that seven of the interviewees made allegations of
"staff members forcefully removing some inmates from wheelchairs;
staff members assaulting inmates that were already secured with
restraint equipment; and inmates being accused of assaulting
officers when, in fact, it was the staff member who had assaulted
the inmate."  Grunfeld Decl., Ex. G at 1, Docket No. 2922-1.[5]  The
OACC recommended, based "on the nature and consistency of the
allegations," that CDCR and RJD management "promptly take all
reasonable actions to ensure that these incidents do not occur in
the future, and that the historical allegations are thoroughly
investigated."  Id. (emphasis added).  The OACC requested that
CDCR provide it with a "Corrective Action Plan (CAP) to address
these allegations," identifying steps RJD and CDCR plan to take
to "mitigate these issues and address confirmed violations, along
with projected completion dates for each task," by October 5,
2018.  Id.; Miller Decl. ¶¶ 4, 5, 10.  As of January 2020, CDCR
had not produced the Corrective Action Plan that OACC requested

_____

[5] Defendants object to Exhibit G on the ground that it was
not properly authenticated.  The Court overrules this objection.
Gay Grunfeld declares that this exhibit is a true and correct
copy of the September 20, 2018, memorandum to Connie Gipson,
Director of DAI, from Matt Espenshade, Deputy Director of OACC,
regarding the joint interviews.  Grunfeld Decl. ¶ 17, Docket No.
2922-1.  That is sufficient to find that the exhibit is what Ms.
Grunfeld claims it is.  Moreover, Defendants do not argue that
the exhibit is not authentic.

in September 2018.  CDCR's Rule 30(b)(6) Designee (Seibel) Dep.
Tr. at 30, Docket No. 2922-1.

In December 2018, CDCR sent a strike team to investigate
allegations of staff misconduct on Facility C at RJD.  The team
was comprised of fourteen investigative staff and seven
ombudsmen.  Bishop Report at 1-3, Docket No. 2921-6.  The strike
team sought to interview 150 inmates on Facility C, but only 102
inmates agreed to be interviewed.  Id.  The interviewees
reported, in relevant part, that RJD staff specifically targeted
for abuse inmates with disabilities and other vulnerable inmates;
that RJD staff hired inmates to assault other inmates; that RJD
staff engaged in gang-like behavior; and that RJD staff
retaliated against inmates who reported the abuse with further
abuse or by making false allegations against them so that the
inmates would be subjected to disciplinary action.  Id. at 4-9.
Forty-eight inmates out of the 102 who chose to participate in
the interviews supported their claims of misconduct by RJD staff
with detailed and "actionable" allegations.  Id. at 14-17.

At the time that these interviews were conducted, there were
some fixed cameras at RJD outside of the five housing units, six
cameras in the gym, and ninety cameras in Facility E, which is a
newer facility that was built with cameras.  CDCR's Rule 30(b)(6)
Designee (Seibel) Dep. Tr. at 108-12, Docket No. 2921-8.  The
cameras in places other than in Facility E are "old," their
"clarity is very poor," they have blind spots, and some were
inoperable at the time of the December 2018 interviews.  Id.
Despite the presence of some cameras at RJD, CDCR does not have a

1  written policy that requires that video footage be reviewed when

2  an allegation of staff misconduct is investigated.  Id. at 129.

3      The Chief Ombudsman for CDCR, and who was part of the strike

4  team, wrote the following in an email to DAI's director and

5  others at CDCR immediately after conducting the interviews in

6  December 2018:

> [W]hat we heard was overwhelming accusations
> of abuse by the Officers with Sgt's and Lt's
> looking in the other direction.  I have never
> heard accusations like these in all my years.
> I would strongly suggest placing a strike
> team on this yard immediately.  Many of the
> inmates have expressed fear of what will
> happen to them tomorrow when the team is not
> there.  This is a very serious situation and
> needs immediate attention.  If there is any
> means of installing cameras immediately I
> would strongly suggest it, at least in the
> blind spots and the back door by the gym.  A
> review of the appeal process, RVR's and staff
> complaints off that yard also needs to take
> place ASAP.

16  Grunfeld Decl., Ex. H, Docket No. 2922-1 (emphasis added).[6]

17      Associate Warden Bishop, who led the strike team, wrote a

18  report based on his assessment of the interviews and recommended

19  that the "actionable" allegations of forty-eight inmates be

20  investigated "promptly."  Bishop Report at 14-17, Docket No.

21  2921-6.  Yet, it is undisputed that the investigations of some of

22  these "actionable" allegations made in December 2018 were not

---

25  [6] Defendants object to this exhibit on the ground that it was
not properly authenticated.  The Court overrules this objection.
Gay Grunfeld declares that this exhibit is a true and correct
copy of an email sent by Sara Malone, who is the Chief Ombudsman
for CDCR, to Kimberly Seibel and Connie Gipson of CDCR.  Grunfeld
Decl. ¶ 22, Docket No. 2922-1.  That is sufficient to find that
the exhibit is what Ms. Grunfeld claims it is.  Moreover,
Defendants do not argue that the exhibit is not authentic.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   complete as of January 2020.  See Defs.' Rule 30(b)(6) Designee

2   (Kimberly Seibel) Dep. Tr. at 133, 156, Docket No. 2921-8; id. at

3   221-22, Docket No. 2922-1.

4       Associate Warden Bishop also recommended, among other

5   things, that live-feed cameras be installed in all areas of

6   limited or obstructed visibility; that CDCR conduct a

7   comprehensive review and investigation of staff gang activity on

8   Facility C by trained gang investigation staff; and that CDCR

9   increase managerial presence on Facility C during all hours.

10  Bishop Report at 12-13, Docket No. 2921-6.

11      Notwithstanding these recommendations, and Defendants'

12  acknowledgement that the Bishop Report "formally recognized

13  serious problems with aspects of R.J. Donovan's operations,"

14  Defs.' Resp. at 19, as of the date of this order, CDCR has not

15  installed additional live-feed cameras at RJD[7]; has not devoted

16  any additional resources to investigate or address gang-like

17  behavior among RJD staff; and has not increased managerial

18  presence on Facility C or elsewhere at RJD.[8]  CDCR's Rule 30(b)(6)

19  Designee (Kimberly Seibel) Dep. Tr. at 168-69, Docket No. 2921-8.

20

21  ─────────────

22      [7] CDCR had requested funds for the installation of additional
    cameras at RJD during the 2020-2021 fiscal year as part of its
    Audio Video Surveillance Solution system.  Macomber Decl. ¶ 8.

23  Because of the Covid-19 pandemic, the Governor of California
    withdrew CDCR's request from the state's budget proposal without

24  prejudice in May 2020.  Req. for Judicial Notice, Ex. K.
    Defendants represent that they remain committed to installing

25  additional cameras at RJD in the future.

26      [8] Two field training sergeants provided additional managerial
    presence at RJD for about a year, but neither of these field

27  sergeants is currently at RJD.  CDCR's Rule 30(b)(6) Designee
    (Kimberly Seibel) Dep. Tr. at 168-69, Docket No. 2921-8.

28  Accordingly, there is no additional managerial presence at RJD at
    this time.

1       Two correctional sergeant investigators from outside RJD

2   conducted follow-up interviews with some of the Bishop Report

3   interviewees in January and February 2019, and wrote memoranda in

4   which they concluded that the majority of the allegations of

5   staff misconduct and use of excessive force were being made by

6   "wheelchair designated inmates" or inmates suffering from severe

7   mental illness.  Freedman Decl., Ex. 3 (DOJ0000057), Docket No.

8   2921-6; id., Ex. 4 (DOJ00000425).  Although the allegations have

9   "not yet been proven," the investigators emphasized that the

10  allegations were "brought up in numerous interviews by different

11  inmates, and even by an inmate who claims to have assaulted

12  inmates on behalf of custody staff."  Id.  Accordingly, the

13  investigators recommended, among other things, that CDCR install

14  cameras inside housing units and rotundas.  Id.

15      Plaintiffs represent, and Defendants do not dispute, that

16  Defendants failed to disclose to Plaintiffs' counsel the Bishop

17  Report from December 2018, and the memoranda of the two

18  investigators from early 2019, until January 2020, when

19  Defendants produced them in response to formal discovery requests

20  by Plaintiffs.  Grunfeld Decl. ¶ 31, Docket No. 2922-1.

21      Starting in January 2019, Plaintiffs' counsel began to send

22  copies of its advocacy letters to the Office of the Inspector

23  General (OIG) regarding class members' allegations of violations

24  of the ARP and their ADA rights.  Grunfeld Decl., Ex. J, Docket

25  No. 2922-1.[9]  The OIG reviewed CDCR's responses to sixteen of

26

27      _____

            [9] Defendants object to this exhibit on the ground that it was
28  not properly authenticated.  The Court overrules this objection.

United States District Court
Northern District of California

1  Plaintiffs' advocacy letters from 2019 and concluded in January

2  2020 that each described "serious" misconduct that, "if true,

3  would result in disciplinary action for the subject employees."

4  Id. at 1.  The OIG found a "pervasive lack of timely follow

5  through," including that CDCR "ignored" many allegations, failed

6  to investigate twenty-eight allegations not previously known to

7  CDCR, and failed to refer pertinent information to the Office of

8  Internal Affairs when appropriate.  Id.

9      Plaintiffs' expert, Jeffrey Schwartz, has assisted prisons

10  and jails over the last twenty years in applying national

11  correctional standards to their operations.  Schwartz Decl. ¶ 2,

12  Docket No. 2947-9.  Schwartz was retained by Plaintiffs to opine

13  on CDCR's inquiry, investigation, and disciplinary process as it

14  relates to allegations of staff misconduct and the discipline of

15  staff for misconduct.  Id. ¶ 9.  As part of his assignment,

16  Schwartz analyzed the files of forty-three investigations of

17  allegations of staff misconduct at RJD.  Id. ¶ 11.  Schwartz

18  opines that the situation at RJD is "horrifying" for inmates with

19  disabilities and other vulnerable inmates, and that there is

20  "substantial evidence that these vulnerable inmates are targeted

21  and preyed upon by a significant number of staff at RJD."  Id. ¶¶

22  23-27.  According to Schwartz, "Inmates are afraid to file

23  grievances/complaints and afraid to provide testimony during

24  investigations.  Pressure to withdraw complaints and other forms

25  _____

26  Gay Grunfeld declares that this exhibit is a true and correct
   copy of a letter sent on January 17, 2020, by Inspector General

27  Roy Wesley to CDCR Secretary Ralph Diaz.  Grunfeld Decl. ¶ 34,
   Docket No. 2922-1.  That is sufficient to find that the exhibit

28  is what Ms. Grunfeld claims it is.  Moreover, Defendants do not
   argue that the exhibit is not authentic.

United States District Court
Northern District of California

of intimidation are common." Id. ¶ 60.  Schwartz attributes this
situation to RJD's "dysfunctional staff culture," which "will not
be changed quickly or easily." Id. ¶ 93.  According to Schwartz,
this dysfunctional culture stems in part from the ineffectiveness
of CDCR's system for investigating misconduct and disciplining
staff; the investigations of staff misconduct at RJD are
incomplete, unprofessional, and biased against incarcerated
complainants and witnesses. Id. ¶¶ 93, 40-47, 84, 181, 187, 273,
276, 327.  Schwartz opines that inmate testimony is often
discounted or ignored and that plagiarism and other collusion in
staff reports is disregarded. Id. ¶¶ 40-49.  Schwartz notes that
staff is disciplined primarily when there is video evidence or
staff reports of misconduct. Id. ¶¶ 53, 126, 127, 172, 208, 210,
219.

Defendants have not proffered any evidence to dispute
Schwartz's conclusions that, despite the existence of policies
and procedures for investigations of and discipline in connection
with staff misconduct, the policies and procedures are
ineffective because they are not properly followed when it comes
to staff misconduct at RJD.  To the contrary, Defendants' own
expert, Ken McGinnis, agrees that "there have been breakdowns and
failures in the decisions of those involved in the [investigation
and disciplinary] processes that have resulted in inappropriate
outcomes." McGinnis Decl., Ex. B. at 8-9, Docket No. 3006-2.

Schwartz's opinions are supported by the fact that the
current investigation and discipline system has resulted in only
nine terminations of RJD staff since 2017 for misconduct in which
the victim was an inmate; only two of these dismissals are final.

United States District Court
Northern District of California

See Miller Decl. ¶¶ 34-36, Docket No. 3006-1.  One of these
terminated staff members was reinstated, and another resigned
before the termination became final.  Id.  Each of these
terminations involved misconduct against a disabled inmate.  See
Grunfeld Decl. ¶ 39, Docket No. 3023-5.  Each of the terminations
was based, at least in part, on either a video or a staff report
of the misconduct.  Id. ¶ 40.  Plaintiffs represent, and
Defendants do not dispute, that no terminations of RJD staff have
occurred where no video or staff report of misconduct was
available.  Further, there have been no reports of staff
misconduct made by correctional staff who witnessed another
correctional officer engaged in misconduct.  Defs.' Rule 30(b)(6)
Designee (Kimberly Seibel) Dep. Tr. at 257, Docket No. 2922-1.

Out of the forty-eight "actionable" allegations of
misconduct identified in the Bishop Report, only two resulted in
any discipline.  See Grunfeld Decl., Ex. OO, Docket No. 3023-5.

Plaintiffs' other expert, Eldon Vail, is a former
correctional administrator with thirty-five years of experience
working in and administering adult correctional institutions.
Vail Decl. ¶ 3, Docket No. 2020-5.  He has served as the Warden
of three adult correctional institutions, and he served as the
Secretary of the Department of Corrections of Washington for four
years.  Id. ¶ 4.  As part of his assignment, Vail reviewed the
declarations of inmate-declarants, relevant CDCR policies, and
various other case materials and filings.  Id. ¶ 10.  Vail
concludes that there is a pattern of violence against class
members at RJD and that staff at RJD routinely use force against
class members after failing to recognize and reasonably

United States District Court
Northern District of California

accommodate inmates' disabilities.  Id. ¶¶ 13, 4, 27, 30.  In his
opinion, the level of force used by RJD staff against class
members often is excessive and the frequency with which such
force is used is "startling."  Id.  According to Vail, the
"unnecessary and excessive use of force, including closed fist
punches and kicks, that result in serious injury to the class
members is far beyond the norm found in other institutions or
jurisdictions of which I am aware."  Id. ¶ 13.  Vail also
identified a pattern of retaliation against class members who
report abuse, and widespread fear among class members of
reporting allegations of staff misconduct as a result.  Id. ¶¶
16, 59-62, 88.

Vail reviewed some of the confidential closure memoranda
regarding the follow-up investigations of the allegations
described in the Bishop Report.  Vail Decl. ¶¶ 41-51, Docket No.
3023-9.  He opines that these investigations were inadequate.
Id. (concluding that "the follow-up investigations, or lack
thereof, [were] shocking" and that investigators "demonstrate[d]
flawed investigative techniques and bias against incarcerated
people").  For example, Vail notes that investigators deemed
allegations that certain RJD officers allowed inmates into
certain cells to steal other inmates' property to be "unfounded"
even though the inmate who made the allegations told
investigators that he himself was allowed by those RJD officers
to go into cells to steal property, and that he did so often.
Id. ¶¶ 42-44.  As another example, an inmate told investigators
that he had been hired by an RJD officer to assault other

United States District Court
Northern District of California

inmates; that allegation also was deemed to be unsubstantiated. Id. ¶¶ 49-50.

Defendants admit that, as of 2018, RJD had "serious problems" derived from staff misconduct. See, e.g., Defs.' Resp. at 1, Docket No. 3006 ("Defendants recognize that the R.J. Donovan Correctional Facility has challenges necessitating support."); id. at 18 (acknowledging that in 2018 "incidents of staff misconduct were occurring on [RJD]'s Facility C at an unacceptable rate"); McGinnis Decl., Ex. B at 41, Docket No. 3006-2 ("[C]DCR, by its own reports and documents, acknowledged a problem of staff misconduct at RJD and an environment that needed to change."). Defendants also admit that there is still "staff misconduct that does occur" at RJD. See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 267, Docket No. 2922-1.

In July 2020, the Court ordered the transfer of two class members out of RJD to other prisons based on evidence that these class members had suffered retaliation and were at imminent risk of suffering harm for submitting declarations in support of the enforcement motions. Orders, Docket Nos. 2978, 2979, 3025. One of these class members alleged that he received another threat on the eve of his transfer out of RJD in the form of a note that was signed with the initials of a correctional officer gang. See Godbold Decl., Ex. A-D, Docket No. 3017; Grunfeld Decl., Ex. Q-S, Docket No. 3023-5. Defendants have not submitted any evidence to dispute this new allegation, which suggests that RJD staff continue to engage in gang-like conduct. Defendants agreed to transfer a third inmate who witnessed the retaliation against the two class members who were transferred after that third inmate

16

1  alleged that he faced retaliation for having assisted with the

2  transfer of the other two class members.  See Grunfeld Decl. ¶ 21

3  & Ex. H, T, U, Docket No. 3023-5.

III. Staff at RJD violated the ARP and the Court's prior orders
     and injunctions

    A.    Staff at RJD denied class members reasonable
          accommodations for their disabilities

7      As will be discussed in the Conclusions of Law below, a

8  violation of the ADA's anti-discrimination and access provisions,

9  42 U.S.C. § 12132, which are incorporated into Section I of the

10 ARP, occurs where a disabled individual is denied a reasonable

11 accommodation so that he can enjoy benefits of a public entity's

12 services, programs, or activities, or is otherwise discriminated

13 against by the public entity, by reason of his disability.  ARP

14 at 1, Docket No. 681.  A failure to provide a reasonable

15 accommodation can occur where a correctional officer could have

16 used less force or no force during the performance of his

17 penological duties with respect to a disabled person.

18     Plaintiffs have submitted eighty-seven declarations from

19 sixty-six current or former inmates at RJD.[10]  These declarations

20 describe dozens of incidents in which staff at RJD denied class

21 members reasonable accommodations for their disabilities.[11]  Some

22 _____

23     [10] See Freedman Decl., Ex. 6-58, 88, Docket No. 2922-2 to
   Docket No. 2922-5; Freedman Decl., Ex. 3-5, 9-24, Docket No.
24 2947-5; Freedman Decl. Ex. 3, 5, 9, Docket No. 2970-1; Freedman
   Decl. Ex. 1-4, 11, Docket No. 2999-1; Grunfeld Decl., Ex. H, M-P,
25 Docket No. 3023-5; Godbold Decl., Ex. B, Docket 3023-7.

26     [11] Defendants object to certain portions of these
   declarations on the grounds that: (1) they contain evidence the
27 probative value of which is substantially outweighed by the
   danger of unfair prejudice under Federal Rule of Evidence 403;
   (2) they contain hearsay; (3) the declarants lack personal
28

17

of the incidents involve the use of force against class members even though they appear to have posed no imminent threat to staff or other inmates.  The incidents are from 2017, 2018, and 2019, and some are as recent as April 2020.  The incidents took place at various locations at RJD and are not limited to Facility C. For none of these incidents have Defendants submitted evidence to show that the denial of reasonable accommodations, or the use of unnecessary force, which itself can be a denial of a reasonable accommodation, was necessary for the performance of legitimate penological duties.  The following are illustrative examples.

An RJD officer denied a class member a reasonable accommodation for his hearing disabilities when he tried to communicate with the class member.  Freedman Decl., Ex. 7, ¶¶ 1-26, Docket No. 2921-6 (December 2019, Facility A).  The class member tried to indicate to the officer that he had a hearing disability by pointing to his disability vest and his ears, and he tried to request that they should communicate in writing by making a writing motion with his hands.  Id.  Instead of using an ADA-appropriate technique for communicating with the class member, the RJD officer yelled at the class member and then

_____

knowledge; or (4) the declarants improperly offer testimony that requires medical or mental-health expertise.  See Defs.' Resp. at 42-45; Objections at 4-5, Docket No. 3033.  The Court overrules these objections.  The Court declines to exclude any portions of the inmate declarations on the basis of Federal Rule of Evidence 403, because there is no danger of unfair prejudice as the Court, not a jury, is making factual determinations.  The Court finds that the rest of Defendants' objections lack merit.  The statements in the inmate declarations at issue are not subject to exclusion because they (1) are not hearsay, as they are not made for the truth of the matter asserted or fall within one of the hearsay exceptions under Federal Rule of Evidence 803; (2) are based on the declarants' personal knowledge and perceptions.

18

United States District Court
Northern District of California

punched the class member in the face.  Id.  As a result of this incident, the class member is afraid to ask staff for writing supplies so that he can communicate, for fear of being assaulted again.  Id. ¶¶ 27-28.

A class member with mobility disabilities who uses a cane and walker asked an RJD officer not to handcuff him behind his back because his disability requires a handcuffing accommodation. Freedman Decl., Ex. 10 ¶¶ 1-11, Docket No. 2921-6 (July 2019, Facility A).  Instead of accommodating him, the officer body-slammed the class member to the ground, causing him to hit his head on the concrete floor and lose consciousness for several seconds.  Id.  After he regained consciousness, the officer put his knee on the class member's throat and then kneed him in the face.  Id. ¶¶ 12-13.  The class member had to be taken to the hospital, where he was diagnosed with acute contusions to the back of his neck and head; he was transported back to RJD in a van that was not accessible.  Id. ¶ 15; Freedman Decl., Ex. 10a.

Other class members with mobility disabilities who requested a handcuffing accommodation also were thrown to the ground by RJD officers instead of accommodated.  Freedman Decl., Ex. 6 ¶¶ 1-8, Docket No. 2921-6; Freedman Decl., Ex. 8 ¶¶ 1-9, 17-18, Docket No. 2921-6 (January 2020, C14 Unit); Freedman Decl., Ex. 45 ¶¶ 1-10, 17-18, Docket No. 2921-7 (September 2019, Facility A); Freedman Decl., Ex. 26 ¶¶ 1-14, Docket No. 2921-6 (July 2019, Facility A).

A class member with incontinence issues asked an RJD officer to allow an ADA shower after an incontinence incident, and the officer refused.  Freedman Decl., Ex. 35 ¶¶ 1-11, Docket No.

United States District Court
Northern District of California

2921-7 (February 2019, Facility A).  Other class members also report being denied requests for showers or cleaning supplies after incontinence incidents.  Freedman Decl., Ex. 6 ¶ 20, Docket No. 2921-6; Freedman Decl., Ex. 14 ¶ 12, Docket No. 2921-6.

RJD officers have forced some class members to stand for long periods of time or to walk significant distances without their walkers or other assistive devices despite the class members' requests for accommodations; in some cases, this has caused the class members' disabilities to worsen.  See, e.g., Freedman Decl., Ex. 11 ¶¶ 1-12, 19, Docket No. 2921-6 (September 2018, Facility A).

RJD officers also have denied class members' requests for wheelchair pushers.  Freedman Decl., Ex. 6 ¶ 20, Docket No. 2921-6; Freedman Decl., Ex. 35 ¶¶ 1-11, Docket No. 2921-7 (February 2019, Facility A).

A class member was rendered unable to move his wheelchair in his own cell and was forced to sleep on the floor because an RJD officer conducted a search in the cell and left his property in disarray, rendering the cell inaccessible.  Freedman Decl., Ex. 53 ¶¶ 1-16, Docket No. 2921-6 (December 2016).  The class member requested assistance to restore his cell to an accessible condition, but RJD staff ignored his requests.  Id.  When the class member filed a grievance, the same RJD officer trashed his cell again.  Id. (2007).

Many class members who use wheelchairs or walkers describe RJD officers intentionally closing cell doors on them and other class members with mobility disabilities despite requests for additional time to enter and exit cells in light of their

United States District Court
Northern District of California

impairments.  See, e.g., Freedman Decl., Ex. 10 ¶ 21, Docket No. 2921-6 (July 2019, Facility A); Freedman Decl., Ex. 11 ¶¶ 20-21, Docket No. 2921-6 (June 2019, Facility A); Freedman Decl., Ex. 17 ¶¶ 1-12, Docket No. 2921-6 (December 2019, Facility D); Freedman Decl., Ex. 25 ¶¶ 1-23, Docket No. 2921-6 (April 2019, Facility C); Freedman Decl., Ex. 40 ¶ 7, Docket No. 2921-7; Freedman Decl., Ex. 55 ¶¶ 1-10, Docket No. 2921-6 (December 2019).

Declarants also describe RJD officers throwing class members out of their wheelchairs and then slamming them into the ground or beating them.  See, e.g., Freedman Decl., Ex. 27 ¶ 16, Docket No. 2921-6 (2018); Freedman Decl., Ex. 38 ¶¶ 16-18, Docket No. 2921-6 (July 2018).

A class member asked an RJD officer for help in lifting a heavy package of mail and the officer refused.  Freedman Decl., Ex. 21 ¶¶ 1-10, Docket No. 2921-6 (August 2018, Facility C). When the class member stated that he intended to file a complaint based on the officer's refusal, the officer pepper sprayed the class member in the face, hit him in the face with the pepper spray canister, and then kicked him.  Id.

A class member with a vision disability asked RJD staff to stop shining his flashlight in his eyes because it exacerbates his disability and is painful.  Freedman Decl., Ex. 23 ¶¶ 1-12, Docket No. 2921-6 (November 2018, Facility A).  When the officer failed to stop and the class member asked to speak with a sergeant, another officer punched the class member in the jaw, causing him to fall on the floor and lose consciousness.  Id. The officer later threatened the class member to charge him with

United States District Court
Northern District of California

1   a false rules violation report (RVR) if he filed a grievance

2   about the incident.   Id.

3       A class member was launched from his wheelchair and onto the

4   ground when a wheelchair pusher pushed his wheelchair into an

5   obvious large hole in the pavement.   Freedman Decl., Ex. 42 ¶¶ 1-

6   17, Docket No. 2921-6 (August 2019).   The class member hit his

7   head and knee on the pavement because he was in handcuffs and

8   could not break his fall.   Id.   After the class member filed a

9   complaint against the wheelchair pusher, the wheelchair pusher,

10   who was present during the class member's interview in connection

11   with the complaint, threatened the class member.   Id. ¶¶ 13-14.

12   The class member now avoids asking staff for ADA showers or

13   toilet paper for fear of retaliation.   Id. ¶ 18.

14       Thirty-three of the inmate declarations describe incidents

15   that have occurred since February 2020, when Plaintiffs filed the

16   present enforcement motion.   These are a few examples.

17       In March 2020, an RJD officer denied a class member with

18   mobility and developmental disabilities a reasonable

19   accommodation in the form of an alternative handcuffing method.

20   Freedman Decl., Ex. 23 ¶¶ 9-10, Docket No. 2947-5 (Facility A).

21   When the class member became upset after the officer threatened

22   him with pepper spray, another officer activated an alarm and

23   summoned a group of officers who, upon their arrival, tackled the

24   class member without saying or doing anything to try to

25   deescalate the situation without the use of force.   Id.   The

26   class member hit his head on the ground and blacked out.   Id.

27   When the inmate woke up, his eyes were burning from what he

28   suspected was pepper spray.   Id. ¶ 10.   The officers then put a

United States District Court
Northern District of California

22

United States District Court
Northern District of California

cover over the class member's head, handcuffed his hands behind his back, shackled his legs, and carried him into a sally port, where they then dropped him forcefully, causing him to hit his head against the wall.  Id. ¶¶ 1-3.  Another inmate who witnessed this incident submitted a declaration corroborating the class member's version of the events, adding that the class member never tried to harm any of the officers and ducked to protect himself once the group of officers arrived to tackle him.  Freedman Decl., Ex. 14 ¶¶ 1-6, Docket No. 2947-5.  The witness also saw the officers use pepper spray on the class member.  Id.

In April 2020, class members with mobility disabilities had a cell door closed on them.  Freedman Decl., Ex. 13 ¶¶ 13-15, Docket No. 2947-5 (Facility D); Freedman Decl., Ex. 24 ¶¶ 1-5, Docket No. 2947-5 (Facility A).

The declarants believe, based on their experiences and observations at RJD, that RJD staff target inmates with disabilities for mistreatment because they are more vulnerable and are less likely to fight back.  See, e.g., Freedman Decl., Ex. 13 ¶ 16, Docket No. 2947-5; Freedman Decl., Ex. 10 ¶¶ 1-11, Docket No. 2921-6; Freedman Decl., Ex. 11 ¶ 39, Docket No. 2921-6; Freedman Decl., Ex. 23 ¶ 28, Docket No. 2921-6; Freedman Decl., Ex. 26 ¶ 18, Docket No. 2921-6; Freedman Decl., Ex. 25 ¶¶ 1-23, Docket No. 2921-6; Freedman Decl., Ex. 55 ¶ 11, Docket No. 2921-6; Freedman Decl., Ex. 38 ¶ 19, Docket No. 2921-6.  These beliefs are consistent with the allegations described in the Bishop Report and the memoranda of the two correctional investigative sergeants, and with the opinions of Plaintiffs' experts.

23

United States District Court
Northern District of California

The Court finds the descriptions of the incidents in the declarations submitted by Plaintiffs to be credible.  The declarants paint a very consistent picture of the conduct by RJD staff that disabled inmates experience.  The incidents described in the declarations also are highly consistent with those that the Bishop Report described as "actionable" and the OACC and two correctional investigative sergeants described as worthy of further investigation and immediate action.  Further corroboration is found in the medical records for some of the class members who suffered injuries requiring medical attention as a result of the incidents.  See, e.g., Freedman Decl., Ex. 10a, Docket No. 2921-6; Freedman Decl., Ex. 23 ¶ 14 & Ex. 23a, Docket No. 2921-6; Freedman Decl., Ex. 25a, Docket No. 2921-6; Freedman Decl., Ex. 42a, Docket No. 2921-6.  The descriptions also are consistent with those in declarations by other inmates. See, e.g., Freedman Decl., Ex. 32 ¶¶ 15-16, Docket No. 2921-6 (witnessed incident described in Exhibit 8 to the Freedman Declaration); Freedman Decl., Ex. 14 ¶¶ 1-6, Docket No. 2947-5 (witnessed incident described in Exhibit 23 to the Freedman Declaration).  The declarations also are consistent with videos that Plaintiffs submitted, which show wheelchair-bound inmates being thrown out of their wheelchairs by RJD staff even though they appeared to pose no threat to staff or other inmates.  See Grunfeld Decl., Ex. HH, II, JJ, Docket No. 3023-5.

The Court finds, based on the foregoing, that RJD staff have denied reasonable accommodations to class members on many occasions, and that such denials were by reason of the class members' disabilities.

United States District Court
Northern District of California

1    Defendants have not offered any declarations or other

2  evidence to dispute the sworn statements of the declarants with

3  respect to the incidents in question.  Notably, many of the

4  declarations identify the officers who engaged in the conduct at

5  issue by name, but none of the identified officers has submitted

6  a declaration disputing the inmate's version of the events.  The

7  declarants' version of the incidents is, therefore,

8  uncontroverted.

9    Defendants attack the declarations on the grounds that (1)

10  eleven of the declarants are not class members; (2) one of the

11  declarants was not a class member at the time the incident

12  alleged in his declaration occurred; (3) eighteen of the

13  declarants are no longer at RJD; (4) "many" of the declarants do

14  not allege that the staff misconduct occurred because of their

15  disability; (5) those who do allege that the staff misconduct was

16  connected to their disability "provide little or no factual

17  support" for the allegation; and (6) Defendants have sent letters

18  to Plaintiffs' counsel in which Defendants state that certain

19  inmate allegations of staff misconduct lack merit or have been

20  referred to the Office of Internal Affairs for investigation.

21  Defs.' Resp. at 15.

22    Defendants' arguments are unpersuasive.  First, the Court

23  finds that the declarations submitted are relevant and probative

24  as to whether class members' rights under the ARP and the ADA

25  were violated, regardless of whether the declarant is currently a

26  class member.  Many of the declarants who are not class members

27  describe incidents they observed in which RJD staff denied class

28  members reasonable accommodations or otherwise discriminated

United States District Court
Northern District of California

against class members.  Second, the Court finds that Defendants have provided no support for their assertions, either in their response to the present motion or in letters they have sent to Plaintiffs' counsel, that certain of the allegations in the declarations lack merit.  Defendants do not identify which of the allegations have been investigated, how they were investigated, when, and by whom, and how such investigations demonstrated that the allegations lack merit.  Further, Defendants' assertions that certain of the allegations lack merit contradict Defendants' representation in their briefs that they take each of the declarations "seriously" and for that reason have referred all of them to the Office of Internal Affairs for further investigation.

Third, Defendants challenge certain of the declarations on the ground that the declarants do not explicitly establish a causal link between the violations of the ARP and ADA that they describe and their disabilities.  The Court is not persuaded. This causal link need not be expressly alleged by each of the declarants.  Some of the misconduct could only be committed because the victim was disabled, such as throwing him out of a wheelchair or closing a cell door on a person who walks slowly with a walker.  In addition, the causal link can be inferred from the totality of the allegations in the declarations; the allegations described and credited in the Bishop Report, the OACC letter, and the memoranda of the two correctional investigative sergeants; and from the undisputed evidence discussed in more detail above, which shows that it is a part of the staff culture at RJD to target inmates with disabilities for mistreatment, abuse, retaliation, and other improper behavior.  The record

United States District Court
Northern District of California

1    supports a finding that the incidents described in the

2    declarations are manifestations of that culture.

3        B.   RJD staff interfered with class members' rights under
             the ADA
4

5        As will be discussed in the Conclusions of Law below, a

6    violation of the ADA's anti-interference provisions, 42 U.S.C. §

7    12203(b), occurs where (1) a person threatens, intimidates, or

8    coerces a person with a disability; (2) the threat, intimidation,

9    or coercion has a nexus to the exercise or enjoyment of an ADA

10   right; and (3) the disabled person suffers distinct and palpable

11   injury as a result, by virtue of giving up his ADA rights or some

12   other injury which resulted from his refusal to give up his

13   rights, or from the threat or intimidation or coercion itself.

14       Plaintiffs have submitted declarations by class members

15   stating that RJD staff have threatened, intimidated, or coerced

16   them when they have requested reasonable accommodations or have

17   filed or stated they would file ADA-related grievances, and that

18   this has caused them to refrain from requesting accommodations or

19   filing ADA grievances, or to experience severe emotional

20   distress.  The declarations, which are uncontested, establish

21   that RJD staff have violated 42 U.S.C. § 12203(b).  Below, the

22   Court describes a few examples.  Some of these incidents were

23   also discussed in the previous section of this order because they

24   involve denials of reasonable accommodations, as well as

25   violations of § 12203(b).

26       An elderly class member who uses a walker and has

27   incontinence issues withdrew an ADA complaint about an officer

28   who repeatedly closed his cell door on him, after another officer

27

asked him about the complaint in an aggressive and threatening manner.  Freedman Decl., Ex. 36, ¶¶ 1-10, 15 (September 2019, D20 unit).  Weeks later, when a different RJD officer closed the class member's cell door on him, hurting his rib, the class member did not file a grievance against the officer because of what happened with his prior complaint.  Id. ¶¶ 11-12 (December 2019, D20 unit).  As a result of these incidents, the class member has not asked for certain accommodations, such as for an extra shower or extra linens after an incontinence incident.  Id. ¶ 15.  The class member prefers to sit in soiled clothes rather than risk retaliation by RJD staff.  Id. ¶ 16.

An RJD officer, instead of accommodating a class member's deafness when trying to communicate with him, yelled at the class member and then punched him in the face.  Freedman Decl., Ex. 7, ¶¶ 1-26, Docket No. 2921-6 (December 2019).  As a result of this incident, the class member does not ask staff for writing supplies as accommodations for his deafness for fear of being assaulted again.  Id. ¶¶ 27-28.

A class member who requested a handcuffing accommodation and was slammed to the ground and then kicked by RJD officers instead of being accommodated is now afraid of requesting disability accommodations as a result the incident.  Freedman Decl., Ex. 8 ¶¶ 1-9, 17-18, Docket No. 2921-6 (January 2020, C14 Unit).

An RJD officer closed the cell door on a class member who uses a walker, trapping him between the door and the wall, and causing him to cry out in pain.  Freedman Decl., Ex. 13 ¶¶ 13-15, Docket No. 2947-5.  The class member did not file a grievance against the officer for fear of retaliation.  Id. ¶ 15.

United States District Court
Northern District of California

1    A class member with mobility disabilities who requested a

2    handcuffing accommodation and was thrown to the ground by RJD

3    staff instead of accommodated did not file a grievance against

4    the officer for fear of retaliation.  Freedman Decl., Ex. 6 ¶¶ 1-

5    8, 14, Docket No. 2921-6.

6    A class member with a vision disability asked RJD staff to

7    stop shining his flashlight in his eyes because it exacerbates

8    his disability and is painful.  Freedman Decl., Ex. 23 ¶¶ 1-12,

9    Docket No. 2921-6 (November 2018, Facility A).  When the class

10   member asked to speak with a sergeant, another officer punched

11   the class member in the jaw, causing him to fall on the floor and

12   lose consciousness.  Id.  The officer later threatened to charge

13   the class member with a false rules violation report if he filed

14   a grievance about the incident.  Id.  The situation made the

15   class member feel powerless and suicidal.  Id. ¶ 15.

16   A class member who had cell doors closed on him, and who was

17   made to walk a long distance without his walker, does not ask for

18   accommodations such as extra toilet paper to manage his

19   incontinence for fear of getting hurt by RJD staff.  Freedman

20   Decl., Ex. 11 ¶¶ 20-21, 37, Docket No. 2921-6 (June 2019,

21   Facility A).

22   A class member who has PTSD no longer asks for

23   accommodations for his incontinence disability because an RJD

24   officer has repeatedly tried to trigger his PTSD by making loud

25   noises after the class member filed grievances against the RJD

26   officer based on the officer's failure to provide him with

27   incontinence supplies.  Freedman Decl., Ex. 14 ¶¶ 1-12, 19,

28   Docket No. 2921-6.

United States District Court
Northern District of California

1      An older class member who uses a wheelchair and suffers from

2 incontinence filed an ADA grievance after an officer refused to

3 call a wheelchair pusher, denied him access to a shower to clean

4 himself after an incontinence incident, and made derogatory

5 comments about his use of a wheelchair.  Freedman Decl., Ex. 35,

6 ¶¶ 4, 8-11 (February 2019).  The class member dropped the

7 complaint and has stopped filing disability-related requests and

8 complaints because, based on the RJD officer's behavior, he feels

9 that the officer could make his life "far worse if [he] continued

10 to speak out" about the denials of accommodations.  Freedman

11 Decl., Ex. 35, ¶¶ 4, 8-12, Docket No. 2921-7.

12      As discussed above, Defendants have not submitted any

13 evidence, such as declarations by the officers who allegedly

14 engaged in intimidation, threats, or coercion, to dispute the

15 occurrence of these incidents and similar incidents described in

16 the declarations that Plaintiffs submitted.

17      The Court finds the inmate declarants to be credible for the

18 same reasons discussed in the prior section, and because of the

19 absence of any evidence that contradicts the version of the

20 events described in these declarations.

21      Defendants argue that they have not violated § 12203(b)

22 because the alleged conduct by RJD staff has not stopped class

23 members from filing ADA requests or grievances.  In support, they

24 submitted data for the years 2017 to 2019 showing that class

25 members, including some of the ones who filed declarations, filed

26 ADA requests and grievances.  See Olgin Decl., Docket No. 3006-3;

27 Olgin Decl., Docket No. 3050.  These data show that class members

28 filed some ADA requests and grievances, but do not negate the

United States District Court
Northern District of California

possibility that class members refrained from filing ADA requests
or grievances that they would have filed but for the threats,
intimidation, or coercion by RJD staff.  By definition, these
data do not take into account ADA requests and grievances that
class members did <u>not</u> make or submit, nor do they take into
account requests and grievances that class members withdrew.  As
discussed above, some of the declarants state that they filed
some ADA requests or grievances but later withdrew them, or that
they decided not to make new requests because of the threats,
intimidation, or coercion they experienced.  Further, the data
that Defendants submitted show that more than half of the class
members housed at RJD from 2017 through 2019 did not file a
single ADA request or grievance during that time period, which
supports the inference that some class members are choosing to
forgo their ADA rights as a result of threats, coercion, or
intimidation by RJD staff.  <u>See</u> Olgin Decl., Docket No. 3050;
Grunfeld Decl. ¶¶ 28-29, Docket No. 3051-4.  Accordingly, the
Court finds that Defendants' data do not impact its finding that
Defendants violated class members' rights under § 12203(b).

IV.   Defendants failed to log instances of non-compliance with
      the ARP and ADA in the Court-ordered accountability logs

      As noted above, the Court ordered Defendants to track
allegations of non-compliance with the ARP and the Court's
remedial orders starting in 2007.  <u>See</u> 2007 Injunction; Order
modifying 2007 Injunction.  Defendants' tracking obligations are
set forth in the Court's order of December 29, 2014, which
modifies the 2007 injunction and clarifies Defendants' reporting
obligations with respect to the accountability log.  It provides:

31

United States District Court
Northern District of California

> Defendants, their agents and employees
> (Defendants) shall track any allegation that
> any employee of the Department of
> Corrections and Rehabilitation was
> responsible <u>for any member of the Plaintiff
> class not receiving access to services,
> programs, activities, accommodations or
> assistive devices required by any of the
> following: the Armstrong Remedial Plan, the
> Americans with Disabilities Act or this
> Court's prior orders.</u>  Allegations to be
> tracked include, but are not limited to,
> those received from CDCR staff, prisoners,
> Plaintiffs' counsel, administrative appeals
> and third parties.  All such allegations
> shall be tracked, even if the non-compliance
> was unintentional, unavoidable, done without
> malice, done by an unidentified actor or
> subsequently remedied.

Order Modifying 2007 Injunction at 1, Docket No. 2479 (emphasis added).

Plaintiffs argue that Defendants are in violation of that requirement because they failed to log certain allegations of staff misconduct at RJD, including (1) allegations that RJD staff denied class members reasonable accommodations for their disabilities; (2) allegations that class members suffered retaliation for filing complaints against RJD staff or otherwise participating in investigations regarding RJD staff misconduct; (3) allegations that class members suffered physical[12] or verbal abuse[13] by RJD staff; and (4) allegations described in the Bishop

---

[12] These allegations include that RJD officers flipped over a class member while he was in his wheelchair, and that an RJD officer grabbed a class member's hand and cane and caused him to lose balance before slamming the class member's head into a table.

[13] These allegations include that RJD staff make remarks to people with disabilities such as, "go sit your crippled ass down."

1  Report that involved class members.  See Freedman Decl. ¶ 280,

2  Docket No. 2921-2.

3      Defendants do not dispute that they have failed to log the

4  allegations that Plaintiffs have identified.  Defendants argue

5  that their failure to log these allegations is justified because

6  such allegations do not involve the denial of access to services,

7  programs, activities, accommodations, or assistive devices, which

8  is what the Court's Order Modifying the 2007 Injunction requires.

9      The Court finds that its Order Modifying the 2007 Injunction

10 requires Defendants to log allegations only to the extent that

11 they involve the denial of or failure to receive access to

12 services, programs, activities, accommodations, or assistive

13 devices.  Order Modifying 2007 Injunction at 1, Docket No. 2479.

14 This Order does not require Defendants to log allegations of

15 discrimination or retaliation in violation of the ADA (or

16 otherwise) that do not involve the denial of access to services,

17 programs, activities, accommodations, or assistive devices.

18     Nonetheless, most of the allegations that Plaintiffs contend

19 were not logged by Defendants involve failures to provide

20 reasonable accommodations to class members, such as by denying

21 class members alternative handcuffing methods, wheelchairs, and

22 additional time to enter or leave a cell.  See Freedman Decl. ¶

23 280.  Defendants do not dispute that these allegations involve

24 denials of reasonable accommodations required by the ARP and ADA.

25 Defendants' failure to log these allegations constitutes a

26 violation of the Order Modifying the 2007 Injunction.

27     The parties disagree as to whether allegations involving

28 physical or verbal abuse against a class member should be logged.

United States District Court
Northern District of California

33

As discussed in more detail in the Conclusions of Law, a denial of reasonable accommodations in violation of the ADA can take place where a law enforcement officer could have used less force or no force during the performance of his law-enforcement duties with respect to a disabled person. When that rule is applied in the context of correctional facilities, it follows that a denial of reasonable accommodations in violation of the ADA can take place where a correctional officer could have used less force or no force during the performance of his penological duties with respect to a disabled person. Accordingly, allegations that fall in this category must be logged by Defendants, including those that were described in the Bishop Report.

Plaintiffs have not shown that verbal abuse, without more, can qualify as a failure to provide a reasonable accommodation in violation of the ADA. Accordingly, the Court denies, without prejudice, Plaintiffs' request to find that Defendants violated the Court's prior orders and injunctions when they failed to log allegations of verbal abuse.

The parties disagree as to whether allegations of intimidation or retaliation in violation of the ADA must be logged. As noted, the Order Modifying the 2017 Injunction does not require Defendants to log such allegations if they do not involve the denial of access to services, programs, activities, accommodations, or assistive devices. Accordingly, Defendants' failure to date to log allegations of this type does not constitute a violation of that order.

The parties' and the Court's intent at the outset of the remedial phase of this litigation, however, was to require

34

United States District Court
Northern District of California

Defendants to operate their facilities and programs in accordance with the ADA and RA.  Stipulation and Order ¶ 12, Docket No. 148. Tracking alleged violations of the ADA's anti-retaliation and anti-interference provisions, 42 U.S.C. § 12203(a) and (b), would be consistent with that intent, as it would promote Defendants' compliance with all provisions of the ADA.  Accordingly, the Court will modify its prior orders and injunctions to require Defendants to track allegations of violations of the ADA's anti-retaliation and anti-interference provisions.

V.    Additional remedial measures are necessary to end the ongoing violations of the ARP and ADA

     The Court finds that the root cause of the violations of the ARP and class members' ADA rights is the systemic and long-term failure by CDCR to effectively investigate and discipline violations of the ARP and class members' ADA rights by RJD staff. The policies, procedures, and monitoring mechanisms currently in place, despite recent modifications made by Defendants, have proven to be ineffective at curbing the violations.  This is evidenced by the multiple ARP and ADA violations that have occurred since the present enforcement motion was filed in February 2020, which are of the same nature as the ones that Plaintiffs' counsel first reported to Defendants in September 2016.

     The ineffectiveness of the policies and procedures currently in place appears to be the consequence of two factors.  First is the deeply ingrained staff culture at RJD of looking the other way, so to speak, whenever staff misconduct occurs or is alleged by an inmate, notwithstanding any official requirements to report

35

United States District Court
Northern District of California

1   and investigate the misconduct.  This culture is enforced through

2   retaliatory acts by staff who wish to maintain the culture

3   against inmates and other staff who might report acts of

4   misconduct, and by CDCR's failure to conduct prompt and effective

5   investigations of allegations of misconduct, particularly where

6   there is no video evidence or corroboration by staff of the

7   misconduct.  Second is the reluctance of inmates and staff at RJD

8   to assist with the documentation and investigation of acts of

9   misconduct by staff for fear of retaliation.  Each of these

10  factors appears to feed the other in a cycle that has proven to

11  be difficult to break.

12       Defendants make several arguments to try to show that

13  requiring them to implement additional remedial measures is

14  unnecessary, but these arguments are unpersuasive.

15       Defendants contend that further remedial measures are

16  premature at this juncture because investigations of class

17  members' allegations have not yet been completed.  The Court is

18  not convinced that the pendency of the investigations warrants a

19  delay in implementing additional remedial measures.  Defendants

20  have provided no timeline for when the Court could expect the

21  investigations to be completed; based on the record, it seems

22  reasonable to expect that investigations could take many months,

23  if not years.  As discussed above, the OIG, in reviewing CDCR's

24  response to class members' allegations of staff misconduct, noted

25  that CDCR's investigations of such allegations had been

26  inordinately delayed or abandoned.  The Court is reluctant to

27  allow further violations of class members' rights under the ARP

28  and ADA to occur while the investigations are pending.  Further,

United States District Court
Northern District of California

1    the Chief Ombudsman, Associate Warden Bishop, the OACC, and the

2    two correctional investigative sergeants from outside of RJD

3    recommended that CDCR take immediate concrete actions, including

4    installing new surveillance cameras, based on allegations of

5    staff misconduct that had not yet been proven.  Their recommended

6    remedial measures were not contingent on the completion of

7    investigations of the allegations.  The allegations of staff

8    misconduct alone, because of their number and consistency, were

9    sufficient for these state officials to decide that immediate

10   remedial actions were necessary.  Here, the Court has before it

11   actual unrefuted evidence that violations of class members'

12   rights under the ARP and ADA have occurred, which is more than

13   the state officials had when they recommended that CDCR take

14   immediate remedial action.

15       Defendants next contend that conditions at RJD have improved

16   since 2017 as a result of the steps they have taken to date to

17   change the culture and improve staff accountability there, such

18   as providing staff with additional training, replacing certain

19   supervisors, reducing blind spots, taking disciplinary actions

20   against nine RJD officers, assigning additional staff to address

21   complaints about conditions at RJD, and deploying the Allegation

22   Inquiry Management System (AIMS), which is a new system

23   implemented at RJD in January 2020 that is intended to provide

24   second-level review outside of RJD of staff misconduct complaints

25   that involve serious bodily injury.  Miller Decl. ¶¶ 11-16, 21-

26   22, 34-52, 53-57; McGinnis Decl., Ex. B at 18-22, 41.

27       The only evidence that Defendants cite to support the

28   proposition that conditions at RJD have improved as a result of

37

the measures they have implemented is data showing that reported incidents involving the use of force (UOF) have decreased on Facility C by forty-four percent from 2018 to 2019, Miller Decl. ¶ 65, and that staff misconduct complaints on Facility C have decreased by forty percent over the same time period, id.

The Court finds that reliable inferences about whether conditions for class members at RJD have improved cannot be drawn from Defendants' data.  First, Defendants have not shown that a reduction of UOF and staff misconduct incidents on Facility C, which is the focus of their analysis, indicates a similar reduction on other facilities at RJD.  The violations of class members' ARP and ADA rights have taken place throughout RJD, not just on Facility C.  Plaintiffs represent, and Defendants do not dispute, that UOF incidents increased from 2017 to 2019 on Facility D by fifty percent and on Facility A by almost sixteen percent.  Grunfeld Decl. ¶¶ 64-65, Docket No. 3023-5.  This increase, and the inmate declarations now before the Court, are consistent with the inference that the measures that Defendants have implemented have not been effective at stopping or even reducing acts of misconduct by RJD staff against class members.  As discussed above, some of the incidents described in the inmate declarations took place in facilities other than Facility C in April 2020, and in the case of the two inmates who were transferred out of RJD pursuant to the Court's order, as late as June 2020.

Second, Defendants acknowledged at the August 11 hearing that the data upon which they rely capture only UOF or staff misconduct incidents that were reported.  The Court cannot draw

United States District Court
Northern District of California

any conclusions from this data because the record shows that a significant number of UOF or staff misconduct incidents are <u>not</u> reported and therefore not reflected in Defendants' data.  For example, the Bishop Report states that sixty-six inmates out of the 102 who were interviewed (or seventy percent) responded that they expected a negative outcome if they reported staff misconduct or the use of excessive force.  Bishop Report at 9. That number may actually be higher, because the "inmates who stated they were neutral or refused to answer [the question] sometimes stated they would not answer the question for fear of reprisal."  <u>Id.</u>  Additionally, many of the inmate declarations now before the Court also state that class members are reluctant to report staff misconduct or the improper use of force for fear of retaliation or further abuse.

Because Defendants' UOF and staff misconduct data likely are under-representative of the actual UOF or staff misconduct incidents that take place at RJD, the Court cannot find, based on the data, that UOF and staff misconduct incidents have decreased at RJD as a result of the measures that Defendants have implemented thus far.  It is possible that the actual number of UOF or staff misconduct incidents has remained constant, or even increased, since 2017, and that the decline in reported UOF or staff misconduct incidents is merely the result of increasing unwillingness on the part of inmates to report the incidents. <u>See</u> Vail Decl. ¶ 34, Docket No. 3023-9 ("Given the history of retaliation at RJD, I am not convinced that a reduction in staff misconduct complaints at Facility C represents progress.").

United States District Court
Northern District of California

1    The Court does take note of the fact that Defendants' data

2  show that twenty percent to twenty-four percent of the reported

3  UOF incidents between 2017 and 2019 involved a class member.

4  Because class members are in wheelchairs, have severe mobility

5  issues, have hearing or visual impairments, or suffer from other

6  significant impairments, common sense suggests that the

7  proportion of reported UOF incidents involving class members

8  should be much lower, because class members do not pose as much

9  of a threat to staff or other inmates as other inmates who are

10  not disabled.  The relatively high incidence of reported UOF

11  incidents involving class members is not explained by Defendants.

12  The Court finds that this high incidence of UOF incidents

13  involving class members lends additional credibility to the

14  inmate declarations, and the allegations described in the Bishop

15  Report and correctional investigative sergeants' memoranda, that

16  staff at RJD target class members and other vulnerable inmates

17  for physical and other forms of abuse.

18    Defendants and their expert also posit that no additional

19  remedial measures are necessary because the current policies and

20  procedures "are adequate when properly utilized and applied in

21  the review of staff misconduct including excessive use of force."

22  McGinnis Decl., Ex. B at 8-9, Docket No. 3006-2 (emphasis added).

23  This argument misses the point.  It fails to acknowledge that the

24  evidence shows that the current policies and procedures are not

25  being properly utilized and applied.  As discussed above, the

26  record shows that CDCR's investigation of staff misconduct

27  incidents has been deficient and slow notwithstanding the current

28  policies and procedures.  Further, the implementation of the new

United States District Court
Northern District of California

1    AIMS system, which Defendants tout as one of the most significant

2    improvements they have enacted to respond to allegations of staff

3    misconduct, is unlikely to be a panacea, at least for class

4    members in this case, because it provides automatic second-level

5    review outside of RJD for allegations of staff misconduct, but

6    only if they involve serious bodily injury.  Not every alleged

7    denial of a reasonable accommodation to a class member involves

8    serious bodily injury, yet every such denial should be the

9    subject of a proper, unbiased investigation.  Under AIMS, alleged

10   denials of a reasonable accommodation that do not involve serious

11   bodily injury will not receive an automatic second-level review

12   outside of RJD, meaning that if RJD staff determine during the

13   first-level review that the allegations are unfounded, then the

14   inquiry at all levels will end there.

15        Even with AIMS in place in addition to all of the other

16   changes that Defendants have implemented in the last few years,

17   class members have shown that RJD staff have continued to violate

18   their rights under the ARP and the ADA well into 2020.

19   Defendants themselves admit that misconduct at RJD is ongoing.

20   See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at

21   267, Docket No. 2922-1.  For this reason, the Court cannot find

22   that measures that Defendants have implemented recently have been

23   effective or will be effective at stopping the ongoing violations

24   of class members' rights under the ARP and ADA in the absence of

25   additional remedial measures.

26        The Court finds that adopting a wait-and-see approach would

27   be contrary to the parties' and the Court's intent for the

28   remedial phase of this litigation, which was to bring CDCR into

41

compliance with the ARP and ADA.  Pursuant to the parties'
agreement, the Court's role during the remedial phase is to give
force to that intent.  In light of the substantial evidence of
noncompliance now before it, and the evidence showing that the
current policies and procedures have already proven to be
ineffective at bringing Defendants into compliance, the Court
finds that requiring Defendants to implement additional remedial
measures is both necessary and warranted.

Plaintiffs request that the Court require Defendants to
develop a plan within thirty days to implement the additional
remedial measures described in more detail below.  The plan would
be implemented within forty-five days after the parties meet and
confer.  See Revised Proposed Order at 17-21, Docket No. 3024-6.[14]

The Court finds that requiring Defendants to design, and
ultimately implement, a plan that requires them to adopt a
combination of certain of the remedial measures that Plaintiffs
propose, with modifications, as discussed below, is necessary to
prevent further violations of the ARP and class members' ADA
rights at RJD.  These additional remedial measures are intended
and tailored to improve policies and procedures for supervising
RJD staff's interactions with inmates, investigating RJD staff
misconduct, and disciplining RJD staff by enhancing the process
for gathering and reviewing evidence that can be used to hold

[14] Defendants object to Plaintiffs' revised proposed order on
the ground that Plaintiffs filed it after they filed their
initial brief in support of their enforcement motion.  The Court
overrules Defendants' objection because the Court provided
Defendants with the opportunity to file a supplemental brief in
which they could respond to any new matters raised in or attached
to Plaintiffs' reply.

United States District Court
Northern District of California

United States District Court
Northern District of California

staff accountable for any violations of the ARP and class

members' ADA rights.  These additional measures, when considered

as a whole, constitute an incremental expansion of processes and

systems that are already in place pursuant to the Court's prior

orders and injunctions.  See, e.g., Order Modifying 2007

Injunction at 1-4 , Docket No. 247 (requiring that Defendants

follow certain procedures for tracking non-compliance with the

ARP, the ADA, and the Court's prior orders; for conducting

investigations of employee non-compliance; and for conducting

disciplinary proceedings against employees who engaged in

noncompliance); Remedial Order and Injunction at 5 (providing for

information-sharing with Plaintiffs' counsel for monitoring

purposes).

> 1.  Surveillance cameras

Plaintiffs request that (1) Defendants install additional

surveillance cameras in all areas at RJD to which incarcerated

people have access, including, but not limited to, all exercise

yards, housing units, sally-ports, dining halls, program areas,

and gyms, within ninety days; (2) CDCR adopt policies and

procedures regarding the use of camera footage, including

requirements that all footage be retained for a minimum of ninety

days, that footage of use of force and other triggering events be

retained indefinitely, and that footage, when available, be

reviewed and considered as part of the investigation of the

incident; and (3) CDCR train RJD staff regarding how and when to

request that footage be retained and reviewed.

Both parties and their experts agree that the installation

of additional surveillance cameras at RJD is necessary.  See,

43

United States District Court
Northern District of California

1    e.g., Defs.' Resp. at 13 (admitting that "[s]urveillance systems

2    are an effective tool to investigate incidents of violence,

3    provide transparency in staff misconduct allegations, and reduce

4    contraband activity"); Schwartz Decl. ¶¶ 87, 94-98; Vail Decl. ¶¶

5    83, 94-101.  The reason for the consensus is obvious.  Video

6    footage provides objective evidence that cannot easily be

7    disregarded.  As Defendants' expert explains, a more

8    comprehensive surveillance system:

> [W]ill substantially improve the ability of
> the CDCR and RJD administration to hold staff
> and inmate [sic] accountable for all
> inappropriate behavior, provide an efficient
> tool for internal affairs and criminal
> investigators to fully resolve complaints and
> allegations, will serve as a deterrent for
> inappropriate behavior by both staff and
> inmates, and provide the facility the ability
> to monitor locations that are now difficult
> to monitor on an ongoing basis.

15    McGinnis Decl., Ex. B. at 27.

16      Defendants nevertheless oppose Plaintiffs' request to

17    require them to install additional surveillance cameras at RJD

18    for two reasons: (1) they intend to submit a funding request to

19    install them in the future, so an order requiring them to install

20    them now is unnecessary; and (2) installing a video surveillance

21    system at RJD in ninety days as Plaintiffs request is not

22    feasible because, in Defendants' view, it would take at least a

23    year to install and deploy the system.  Macomber Decl. ¶¶ 9-13;

24    McGinnis Decl. Ex. B at 27.

25      The Court is not persuaded.  Defendants' arguments fail to

26    acknowledge that violations of class members' rights under the

27    ARP and ADA are likely to continue to take place in the absence

28    of the additional surveillance cameras, and that such a scenario

United States District Court
Northern District of California

1   is unacceptable.  Because cameras are critical in achieving true

2   accountability and compliance at RJD for the reasons set forth

3   above, the Court finds that the installation of additional

4   surveillance cameras is necessary and that it must be done as

5   soon as possible.  Plaintiffs have submitted evidence, which

6   Defendants have not rebutted, showing that surveillance cameras

7   could be installed and fully deployed at RJD within four months.

8   Vail Decl. ¶¶ 59-61, Docket No. 3023-9.  In light of the pressing

9   need for additional surveillance cameras at RJD, the Court finds

10  that any burdens associated with installing them on a time frame

11  that is shorter than what Defendants initially anticipated are

12  outweighed by the significant benefits of having additional

13  surveillance cameras at RJD.  Defendants already have a contract

14  in place with a vendor for the installation of surveillance

15  cameras at CDCR institutions through June 2023.  Diaz Decl. ¶ 42;

16  Macomber Decl. ¶ 12.  This existing contract should facilitate

17  the installation and deployment process.

18      Defendants have not raised an objection in their briefs to

19  Plaintiffs' request that their plan include policies and

20  procedures regarding the use of camera footage and training for

21  RJD staff regarding the same, as discussed in more detail above.

22  In the absence of a showing to the contrary, the Court finds that

23  policies, procedures, and training on the use of camera footage

24  are necessary and should be a part of Defendants' plan.

25          2.   Body cameras

26      Plaintiffs request that CDCR purchase and begin using body-

27  worn cameras for all correctional officers at RJD within sixty

28  days.

1    Defendants oppose the request on the grounds that (1) body

2  cameras are not typically used in correctional facilities and

3  jails, and CDCR lacks enough information to determine whether the

4  use of body cameras would be effective, both in terms of the

5  footage they would capture and their cost; (2) Defendants' expert

6  opines that body cameras may not be as effective as surveillance

7  cameras because they require the user to turn them on and off at

8  the appropriate times, and because body cameras may not capture

9  certain incidents that would be captured by fixed cameras as a

10  result of the angle and perspective of their lenses, McGinnis

11  Decl., Ex. B at 28-29; (3) procuring hundreds of body cameras in

12  sixty days may not be feasible in light of the logistical issues

13  raised by the present pandemic and the procurement procedures

14  that CDCR must follow, Defs.' Supp. Resp. at 4-5; and (4)

15  policies for the use of body cameras must be in place before they

16  are used at RJD..

17    The Court finds that body cameras are likely to improve

18  investigations of misconduct by RJD staff and to reduce the

19  incidence of violations of class members' rights under the ARP

20  and ADA.  They are, therefore, necessary and should be deployed

21  at RJD as soon as possible.  The Court finds the opinions of

22  Plaintiffs' expert, which Defendants have not rebutted with any

23  evidence, to be persuasive.  Eldon Vail opines, based on research

24  and studies on the topic, that the use of body cameras in

25  correctional facilities has resulted in "increased officer and

26  inmate safety, fewer uses of force," and improved investigations

27  of internal misconduct by officers, particularly when used in

28  conjunction with surveillance cameras.  Vail Decl. ¶¶ 64-66,

United States District Court
Northern District of California

Docket No. 3023-9.  He further opines that issues about when cameras should be turned on or off, and privacy concerns, can be addressed through policymaking and training.  Id. ¶¶ 67-68.  Vail also opines that body cameras can be procured and deployed at RJD in two months.  Id. ¶ 70.

Defendants have not shown that procuring the body-worn cameras in the time frame that Plaintiffs have proposed would not be feasible.  Defendants note that the pandemic has "disrupt[ed] manufacturing centers and supply chains across the globe," Supp. Resp. at 4, but they do not point to any evidence showing that these disruptions would prevent them from procuring the body-worn cameras in the time frame that Plaintiffs have proposed.  They also speculate that "[r]equiring Defendants to rush to award a sizeable contract on such short notice would risk thwarting" the state's policies with respect to government procurement, which Defendants represent are intended to eliminate favoritism, fraud, and corruption in the award of public contracts.  Id. (emphasis added).  Defendants have not proffered any evidence showing that requiring them to procure body-worn cameras in the time frame that Plaintiffs have proposed would require them to violate these policies.

In light of the foregoing, the Court finds that body-worn cameras can be procured and deployed in the time frame that Plaintiffs have proposed.

The Court agrees with Defendants that having policies and procedures in place before body cameras are deployed at RJD is sensible, and it will incorporate this sequence into its order describing the additional remedial measures required herein.

### 3. Processes for complaints, investigations, discipline, and oversight

Plaintiffs request that Defendants be required to develop a plan to reform the staff complaint, investigation, and discipline process to ensure (1) that CDCR completes unbiased, comprehensive investigations into all allegations of staff misconduct in which the victim was a class member; (2) that CDCR imposes appropriate and consistent discipline against employees who engage in misconduct against class members; and (3) that employees who engage in criminal misconduct against class members are appropriately investigated and, if warranted, referred for prosecution. Plaintiffs also request that CDCR headquarters be required to exercise oversight over all staff complaints, use of force reviews, and related staff disciplinary proceedings at RJD in which an employee is accused of engaging in misconduct against an incarcerated person, and to conduct quarterly interviews of randomly-selected incarcerated people at RJD using the methodology and interview questionnaire utilized by the December 2018 investigators.

Defendants oppose these requests, arguing that CDCR already has existing processes, policies, and oversight systems in place to investigate misconduct and discipline employees who commit it, which they contend are effective mechanisms because (1) the Inspector General testified that CDCR does well in assessing UOF incidents handled at the local level, and he agrees with CDCR's assessment about UOF incidents ninety-five percent of the time; (2) the current policies and procedures were developed in response to unrelated litigation, namely Madrid v. Gomez, Case No. 90-3094 (N.D. Cal.), and they balance the interests of

48

United States District Court
Northern District of California

multiple stakeholders, including CDCR staff.  Defs.' Resp. at 34–35; Diaz Decl. ¶ 11.

Defendants' arguments miss the point.  First, Defendants fail to acknowledge that, based on the evidence discussed above, the current policies and procedures have failed to prevent violations of the ARP and of class members' rights under the ADA at RJD.  These violations did not all involve the use of force.  Defendants rely on the Inspector General's testimony that the OIG monitors forty percent of CDCR's assessments as to use-of-force incidents state-wide, and that, of those, it agrees with CDCR's assessments ninety-five percent of the time.  Roy Wesley Dep. Tr. at 38, Grunfeld Decl., Ex. S, Docket No. 2922-1.  This testimony, however, speaks to CDCR's assessments on a state-wide basis and says nothing about whether the current policies and procedures are effective in preventing violations of the ARP and class members' ADA rights at RJD, whether the violations involve the use of force or not.  As discussed above, when it comes to investigations of alleged violations of class members' ADA rights and other staff abuse at RJD, the OIG has been critical of CDCR's performance.  Grunfeld Decl., Ex. J, Docket No. 2922-1.

Second, that the current policies and procedures were developed in connection with the Madrid litigation, which involved, in relevant part, the review of CDCR's policies and procedures with respect to the use of force and CDCR's investigation and enforcement of violations of the same, also says nothing about whether such policies and procedures are adequate to prevent further violations of the ARP and class members' ADA rights at RJD.

United States District Court
Northern District of California

1    Here, the Court has found that it is necessary to stop

2    ongoing violations of the ARP and class members' ADA rights at

3    RJD, and that the current policies and procedures are incapable

4    of achieving that.  Accordingly, the Court finds that requiring

5    Defendants to craft a plan to modify the current policies,

6    procedures, and oversight of staff complaints to achieve

7    compliance with the ARP and ADA at RJD is necessary and

8    appropriate.  By providing Defendants with discretion to craft

9    this plan, the Court gives them the opportunity to balance the

10   interests of any stakeholders who would be impacted by the

11   modifications.

12          4.   Third-party monitoring

13   Plaintiffs request that the additional remedial measures

14   include the appointment of an expert pursuant to Federal Rule of

15   Evidence 706 to monitor Defendants' implementation of their plan

16   to reform the staff complaint, investigation, and discipline

17   policies and procedures, and that the expert have access to

18   documents necessary to conduct its monitoring.

19   Defendants have not raised an objection in their briefs to

20   this request.  In the absence of a showing to the contrary, the

21   Court finds that requiring the appointment of an expert for

22   monitoring purposes would make the implementation of the plan

23   required herein more effective, and would assist Defendants in

24   achieving compliance with the ARP and ADA.  Accordingly, the

25   Court finds that the appointment of an expert is necessary and

26   appropriate.

27   //

28

5.    Information-sharing with Plaintiffs' counsel and
the Court Expert

Plaintiffs request that Defendants share with Plaintiffs'
counsel and the court expert all documents related to staff
complaints at RJD in which the alleged victim is a class member,
as well as monthly written updates regarding the implementation
of any additional remedial measures.

Defendants have not raised an objection in their briefs to
this request.  In the absence of a showing to the contrary, the
Court finds that requiring the sharing of documents as described
above is necessary for the effective monitoring of Defendants'
implementation of the additional remedial measures and is
appropriate.

6.    Supervisory staffing

Plaintiffs request that CDCR significantly increase
supervisory staff on all watches on all yards at RJD and create
non-uniformed supervisory positions in each housing unit.

Defendants argue that no changes to their staffing structure
are necessary in light of the changes they already have made to
their staffing policies and procedures.  Defs.' Resp. at 36-37.
Defendants note that CDCR has dedicated a full-time ombudsman at
RJD for six months.

The Court finds that additional supervisory staff in the
form of additional sergeants is necessary at RJD.  The Bishop
Report, which Defendants have endorsed, and Defendants' own
expert, recommended increasing supervisory staff on Facility C at
RJD in light of the allegations of misconduct that were made with
respect to that facility.  See Bishop Report at 12-13, Docket No.
2921-6; McGinnis Decl., Ex. B at 34, Docket No. 3024-6.  Those

United States District Court
Northern District of California

recommendations can be extrapolated to the rest of RJD in light of the evidence discussed above, which shows that violations of the ARP and class members' ADA rights are taking place throughout RJD under circumstances similar to those that formed the basis of the recommendations in the Bishop Report.  As discussed above, at present, the managerial presence at RJD in the form of sergeants, whether at Facility C or otherwise, is not any higher than it was in December 2018.  CDCR's Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 168-69, Docket No. 2921-8.  The Court cannot conclude that the presence of a full-time ombudsman at RJD is an adequate replacement for the additional managerial presence that the Bishop Report recommended, as Defendants have not shown that the full-time ombudsman performs functions that are equivalent to those that supervisory staff, such as sergeants, perform at RJD. Accordingly, the Court finds that requiring CDCR to increase managerial presence at RJD in the form of additional sergeants is necessary.

The Court declines at this time to require CDCR to create non-uniformed supervisory positions at RJD.  The parties' experts disagree about the effectiveness of such non-uniformed positions, McGinnis Decl., Ex. B at 32; Vail Decl. ¶ 79, and the Court finds that there is insufficient evidence in the record outside of the experts' conflicting declarations to make a determination as to whether non-unformed supervisory positions are needed.

### 7.    Training

Plaintiffs request that CDCR develop and implement human rights, de-escalation, and cultural training for all custody, mental health, and medical staff at RJD to include discussion of

reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people as patients.

Defendants object to requiring them to provide RJD staff with additional training beyond what they already provide.

In light of the evidence discussed above showing that the measures that CDCR has implemented to date, including providing staff with additional training, have proven to be ineffective at stopping violations of the ARP and class members' ADA rights, the Court finds that it is necessary to require Defendants to develop additional training programs for RJD staff and supervisors that are tailored to achieving staff compliance with the ARP and ADA.

8.    Data collection and early-warning system

Plaintiffs request that CDCR develop an electronic system for tracking all incidents at RJD by date, time, location, staff involved, incarcerated people involved, that includes information about whether inmates are class members, any injuries they suffered, and related medical records.

Defendants oppose this request, on the grounds that the newly created Enterprise Risk Management Branch, within the Office of Audits and Court Compliance, is responsible for a data-collection and early-warning system that appropriately addresses Plaintiffs' concerns.  Diaz Decl. ¶ 32.  This system collects, compiles, and analyzes information, evidence, and data from multiple CDCR offices, databases, and other tracking tools.  Id.

In their reply, Plaintiffs argue that this new system is not operational and is insufficient to achieve the level of tracking that they request, but do not explain why.  In the absence of sufficient evidence in the record to make a determination as to

United States District Court
Northern District of California

United States District Court
Northern District of California

1  whether additional tracking by CDCR is necessary with respect to

2  incidents involving class members at RJD, the Court declines to

3  require additional tracking at this time.

4          9.   Pepper spray

5      Plaintiffs request a policy requiring that all pepper spray

6  canisters at RJD be weighed before and after use.

7      Defendants and their expert oppose this request on the

8  grounds that it would be unnecessarily burdensome and could

9  potentially delay the movement of officers to their posts.

10     In light of the evidence discussed above, which shows that

11 pepper spray was used on multiple occasions against class members

12 where there was no evidence that the class members posed an

13 imminent threat to RJD staff or other inmates, or that the use of

14 pepper spray served a legitimate penological interest, the Court

15 finds that it is necessary to require CDCR to craft a plan to

16 modify its policies to more effectively monitor and control the

17 use of pepper spray by RJD staff with respect to class members.

18         10.  Anti-retaliation

19     Plaintiffs request that CDCR be required to put an end to

20 retaliation against class members and staff at RJD who report

21 staff misconduct and to ensure complainants' safety.

22     Defendants did not object to this request in their briefs.

23     The Court finds that requiring CDCR to take steps to stop

24 retaliation against class members at RJD in violation of the ADA

25 is necessary.

26                        LEGAL STANDARD

27     "It is well established that the district court has the

28 inherent authority to enforce compliance with a consent decree

United States District Court
Northern District of California

that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree." Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846, 860 (9th Cir. 2007); Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance.  Once entered, a consent decree may be enforced.").  Further, a district court has "wide discretion" to modify its own injunctions "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 647 (1961); see also Swift & Co., 286 U.S. 206, 114 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need").

The interpretation of a consent decree is for the court, and not the parties subject to the decree. Nehmer, 494 F.3d at 860 ("Although a party may ask the district court to issue an order clarifying, enforcing, or modifying a decree and suggest a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval.")  The court's discretion in interpreting a consent decree is particularly wide where the court has been overseeing a remedial decree for many years. Id.; Armstrong v. Schwarzenegger, 622 F.3d at 1073 (holding that a court that has been "overseeing complex institutional reform litigation for a long period of time" is entitled to "heightened deference").

55

CONCLUSIONS OF LAW

I.   Plaintiffs have shown that Defendants violated the ARP and
     the Court's prior orders and injunctions[15]

     A.   Denial of reasonable accommodations for class members'
          disabilities

     Section I of the ARP requires Defendants to comply with the

ADA's anti-discrimination and access provisions, 42 U.S.C. §

12132[16].  It provides, "No qualified inmate or parolee with a

disability as defined in Title 42 of the United States Code,

Section 12102 shall, because of that disability, be excluded from

participation in or denied the benefits of services, programs, or

activities of the Department or be subjected to discrimination."

ARP at 1, Docket No. 681.  As discussed above, the Court retained

jurisdiction to enforce Defendants' compliance with the ARP.

Remedial Order and Injunction at 5, Docket No. 158.

---

[15] Defendants argue that the allegations of staff misconduct
addressed herein fall outside of the scope of this litigation
because the operative complaint "does not allege that officers or
other prison staff are using excessive force or retaliating
against disabled inmates."  Defs.' Resp. at 24-25.  The Court is
not persuaded.  Every iteration of the complaint has made the
same key allegation, namely that "[s]tate officials have
discriminated against plaintiffs and the class they represent by
reason of their disability."  See, e.g., Compl. ¶ 1, Docket No.
1.  The incidents now at issue are alleged to be instances of
discrimination against class members by reason of their
disability; accordingly, such allegations are well within the
scope of this action.  Further, the ARP expressly requires
Defendants to abstain from denying class members reasonable
accommodations or discriminating against them by reason of their
disability.  The Court retained jurisdiction to enforce
Defendants' compliance with the ARP and any orders issued in
connection with the same.  The allegations of discrimination and
denials of reasonable accommodations now before the Court fall
within the scope of that jurisdiction.

[16] The language in Section 1 of ARP mirrors the language of
Title II of the ADA, 42 U.S.C. § 12132, which provides, "No
qualified individual with a disability shall, by reason of such
disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any such entity."

United States District Court
Northern District of California

United States District Court
Northern District of California

1     To prove that a public program or service violated § 12132,

2 a plaintiff must show: (1) that he is a "qualified individual

3 with a disability"; (2) that he was either excluded from

4 participation in or denied the benefits of a public entity's

5 services, programs, or activities, or was otherwise discriminated

6 against by the public entity; and (3) that such exclusion, denial

7 of benefits, or discrimination was by reason of his disability.

8 Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as

9 amended on denial of reh'g (Oct. 11, 2001).

10     The Ninth Circuit has held that the second element of this

11 test can be satisfied where a law enforcement officer could have

12 used less force or no force during the performance of his law-

13 enforcement duties with respect to a disabled person.  See

14 Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1232-33

15 (9th Cir. 2014), rev'd on other grounds sub nom., City & Cty. of

16 San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015) (holding

17 that a failure to reasonably accommodate a person's disability in

18 the course of an investigation or arrest by using unnecessary

19 force, causing the person to suffer "greater injury or indignity

20 in that process than other arrestees," gives rise to a claim

21 under § 12132, and that a reasonable jury could conclude that a

22 police officer's failure to use less force or no force during an

23 arrest of a person with mental illness could constitute a failure

24 to provide a reasonable accommodation in violation of § 12132);

25 Vos v. City of Newport Beach, 892 F.3d 1024, 1037 (9th Cir.

26 2018), cert. denied sub nom. City of Newport Beach, Cal. v. Vos,

27 139 S. Ct. 2613 (2019) (same).  When applied in the prison

28 context, it follows that the second element of a § 12132 claim

1  can be satisfied where a correctional officer could have used

2  less force or no force during the performance of his penological

3  duties with respect to a disabled person.[17]

4      Defendants did not address, much less distinguish, these

5  authorities in their briefs, nor did they dispute that the second

6  element of a § 12132 claim can be satisfied in the manner just

7  described.

8      Here, it is undisputed that class members are "qualified

9  individuals with a disability" within the meaning of the ADA, and

10  that the first element is met.  At issue is whether Plaintiffs

11  have shown, as required by the second and third elements of a

12  claim under § 12132, that RJD staff denied class members the

13  benefits of RJD's services, programs, or activities, or otherwise

14  discriminated against them, by reason of their disabilities.

15      As discussed in more detail in the Findings of Fact, the

16  Court has found that RJD staff failed on numerous occasions to

17  reasonably accommodate the disabilities of class members.  RJD

18  staff refused class members' requests for alternative methods for

19  communication (in the case of deaf inmates); for the use

20

21      [17] The OIG's interpretation of CDCR's use-of-force policy is

22  consistent with the notion that correctional officers have an
    obligation under the ADA to reasonably accommodate an inmate's

23  disabilities when considering the use of force in the performance
    of their penological duties.  See OIG Report, Monitoring the Use-

24  of-Force Review Process of the California Department of
    Corrections and Rehabilitation (July 13, 2020) at 5, Grunfeld

25  Decl., Ex. VV ("According to departmental policy, when
    determining the best course of action to resolve a particular

26  situation, staff must evaluate the totality of the circumstances,
    including an inmate's demeanor, mental health status and medical

27  concerns (if known), and the inmate's ability to understand and
    comply with orders.  Policy further states that staff should

28  attempt to verbally persuade, whenever possible, to mitigate the
    need for force.").

United States District Court
Northern District of California

1    alternative handcuffing methods (in the case of mobility-impaired

2    inmates); for assistance with operating wheelchairs (in the case

3    of wheelchair-bound inmates); for showers and cleaning supplies

4    (for inmates with incontinence problems); for additional time to

5    safely enter and exit cells (for mobility-impaired inmates); and

6    for adequate transportation methods (for mobility-impaired

7    inmates).  Defendants do not dispute that these class members

8    required, and that RJD staff failed to provide them with,

9    reasonable accommodations, nor do they dispute that these

10   failures constitute denials of the benefits of CDCR's services,

11   programs, or activities or discrimination within the meaning of §

12   12132.  Accordingly, the second element is met as to these

13   incidents.

14        The Court also has found that RJD staff failed to provide

15   reasonable accommodations for class members' disabilities when

16   RJD staff failed to use less force or no force when performing

17   their penological duties, such as by throwing class members out

18   of wheelchairs, punching them, kicking them, or using pepper

19   spray where the undisputed evidence shows that the class members

20   posed no threat to RJD staff that would warrant the use of such

21   force.  The second element also is met as to these incidents.

22        As to the third element, whether these failures to provide

23   reasonable accommodations were due to the class members'

24   disabilities, the Court found that this element is met based on

25   the totality of the evidence.  Inmates state in their

26   declarations that they believe, based on their own experiences

27   and observations, that RJD staff targets people with disabilities

28   and other vulnerable inmates for mistreatment.  These beliefs are

59

consistent with the allegations credited in the Bishop Report and the memoranda by the two sergeant investigators, and the opinions of Plaintiffs' experts, which Defendants have not disputed. Defendants have not proffered any evidence from which the Court could infer an alternative cause for the incidents in question, such as a legitimate penological interest or the lack of a reasonable accommodation that RJD staff could have provided to the class members.

Accordingly, the Court finds that Defendants have violated Section I of the ARP and the Court's prior orders by violating § 12132.

B.    Interference with class members' ADA rights

Plaintiffs contend that staff at RJD have interfered with class members' exercise of their rights under the ADA in violation of the ADA's anti-interference provision, 42 U.S.C. § 12203(b), which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

Section 12203(b) was not expressly incorporated into the ARP.  Nevertheless, the Court concludes that Defendants are required to comply with § 12203(b), which is a part of the ADA. The stipulated order that the Court entered at the outset of the remedial phase of this litigation makes clear that "the intent" of the parties was "to require defendants to operate programs, activities, services and facilities of the California Department

United States District Court
Northern District of California

United States District Court
Northern District of California

of Corrections in accordance with the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973[.]"  Stipulation and Order ¶ 12, Docket No. 148.  The purpose of the ARP was to set forth specific actions that Defendants would take to bring their programs, activities, services, and facilities into compliance with the ADA and the RA.  One of such action was to set up a system to facilitate class members' requests for reasonable accommodations and ADA-related grievances.  When RJD staff frustrate the effectiveness of that system by threatening, coercing, or intimidating class members into foregoing their rights to request reasonable accommodations or file ADA-related grievances, that constitutes a violation of the ARP and the Court's prior orders and injunctions regarding the same.

The Ninth Circuit has not specifically described the elements required to establish a violation of § 12203(b), nor has it defined what "intimidation" or "coercion" mean in the context of § 12203(b).  The Court finds Brown v. City of Tucson to be instructive.  336 F.3d 1181, 1191-93 (9th Cir. 2003).  There, the Ninth Circuit held that the plaintiff had stated a claim for a violation of § 12203(b) by alleging facts showing that (1) her employer threatened her with an adverse action; (2) the threat had a nexus to her exercise or enjoyment of an ADA right; and (3) she suffered "distinct and palpable" injury as a result of the threat.  Id.  The Ninth Circuit held that the requisite injury "could consist of either the giving up of her ADA rights, or some other injury which resulted from her refusal to give up her rights, or from the threat itself."  Id.

61

United States District Court
Northern District of California

As discussed in more detail in the Findings of Fact, the Court has found that staff members at RJD have interfered with certain class members' enjoyment of their rights under the ADA and ARP in violation of § 12203(b) by intimidating, threatening, or coercing them into abstaining from making requests for reasonable accommodations or filing ADA grievances.  As a result of the intimidation, threats, and coercion, these class members suffered injury in the form of giving up their rights to make requests for reasonable accommodations or to file ADA grievances, or in the form of severe emotional distress.  See Brown, 336 F.3d at 1193 (holding that the plaintiff alleged an injury within the meaning of § 12203(b) by alleging that she "suffered short-term memory problems and felt extremely stressed, harassed, and pressured" by her employer's threats).

These violations of § 12203(b) constitute violations of the ARP and the Court's prior orders and injunctions regarding the same.

II.  Plaintiffs have shown that Defendants failed to comply with their Court-ordered tracking and accountability obligations

As discussed above, the Court has found that its Order Modifying the 2007 Injunction requires Defendants to log allegations only to the extent that they involve the denial of or failure to receive "access to services, programs, activities, accommodations or assistive devices required by any of the following: the Armstrong Remedial Plan, the Americans with Disabilities Act or this Court's prior orders."  Order Modifying 2007 Injunction at 1, Docket No. 2479 (emphasis added).

United States District Court
Northern District of California

It is undisputed that Defendants failed to log alleged failures to provide reasonable accommodations to class members, such as by denying class members alternative handcuffing methods, wheelchairs, and additional time to enter or leave a cell.  See Freedman Decl. ¶ 280.  It is also undisputed that Defendants failed to log alleged failures by RJD staff to provide reasonable accommodations to class members where the reasonable accommodation would have been the use of less force or no force during the performance of penological duties.  The Court has found that Defendants violated the Court's prior orders and injunctions by failing to log these allegations.

The Court will modify its prior orders and injunctions to require Defendants to track allegations of retaliation and interference in violation of the ADA's anti-retaliation and anti-interference provisions, 42 U.S.C. §§ 12203(a) and (b).  The Court has found that including such allegations in the accountability log is consistent with the parties' intent to require Defendants, during the remedial phase of this litigation, to operate their facilities and programs in accordance with the ADA and RA.  See Stipulation and Order ¶ 12, Docket No. 148.

III.   The implementation of additional remedial measures is necessary to ensure compliance with the ARP and ADA

The Court retained jurisdiction to enforce the terms of the Remedial Order and Injunction, as well as to issue "any order permitted by law, including contempt, necessary to ensure that defendants comply with the guidelines, policies, procedures, plans and evaluations" required by the Remedial Order and Injunction.  Remedial Order and Injunction at 5, Docket No. 158.

United States District Court
Northern District of California

1    The Court has found that the additional remedial measures

2    discussed above are necessary to ensure that Defendants comply

3    with their obligation under the ARP and ADA to provide reasonable

4    accommodations for class members' disabilities and to otherwise

5    refrain from discriminating against class members by reason of

6    their disabilities.  They also are necessary to effectuate the

7    parties' and the Court's intent "to require defendants to operate

8    programs, activities, services and facilities of the California

9    Department of Corrections in accordance with the Americans with

10   Disabilities Act and § 504 of the Rehabilitation Act of 1973[.]"

11   Stipulation and Order ¶ 12, Docket No. 148.  Accordingly, the

12   Court will modify its prior orders and injunctions to require

13   Defendants to develop a plan to implement the additional remedial

14   measures that the Court has found to be necessary to bring

15   Defendants into compliance with the ARP and ADA.[18]

16

17   ────────────────────

18       [18] Defendants contend that the modification of an injunction
     requires new findings of (1) irreparable injury; (2)

19   unavailability of adequate remedies at law; (3) balance of
     hardships; and (4) consideration of the public interest.  To

20   support that proposition, Defendants rely on Arizona Dream Act
     Coal. v. Brewer, 855 F.3d 957, 963 (9th Cir. 2017).  Brewer is

21   distinguishable, because the permanent injunction there was
     issued after the district court granted summary judgment in favor

22   of the plaintiffs.  There was no modification of a prior
     injunction in Brewer.  Here, by contrast, the Court entered the

23   Remedial Order and Injunction pursuant to the parties' agreement
     after they settled this action.  Stipulation and Order Re:

24   Liability and Remedy ¶ 6, Docket No. 148.  During the remedial
     phase of this litigation, the Court has modified its injunctions

25   several times in response to enforcement motions such as the
     present one pursuant to the jurisdiction it retained to enter

26   "any order permitted by law, including contempt, necessary to
     ensure that defendants comply" with the ARP.  Remedial Order and

27   Injunction at 5, Docket No. 158.  Defendants cite no authority
     showing that the Court must make any specific findings when

28   enforcing the ARP under the terms of the parties' settlement

64

IV.  The additional remedial measures ordered herein are
     consistent with the PLRA

The Prison Litigation Reform Act (PLRA) provides that courts "shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The Court is required to give substantial weight to "any adverse impact on public safety or the operation of a criminal justice system caused by" the prospective relief. Id. Whether prospective relief is appropriate in light of the PLRA[19] depends on whether the Court finds, in light of the

---

agreement.  In an abundance of caution, however, the Court finds and concludes that the record amply supports the modification of the Court's prior injunctions to require Defendants to implement the remedial measures ordered here based on the four factors described in Brewer.  Class members would suffer irreparable harm in the absence of the additional remedial measures, because RJD staff are likely to continue to violate the ARP and class members' ADA rights in the absence of such measures.  The balance of hardships tips strongly in the class members' favor, because their physical and mental health, as well as their ability to request and obtain reasonable accommodations for their disabilities and exercise their ADA rights, would be at risk absent the additional remedial measures.  The burden on Defendants of implementing such measures is severely outweighed by the hardship that the class members would suffer in the absence of the measures.  Class members do not have an adequate remedy of law because damages for past violations of their ADA rights would do nothing to prevent further violations, which are likely.  Finally, the public has a strong interest in the enforcement of the ADA.

[19] The PLRA, 18 U.S.C. § 3626(a)(1)(B), also requires that the Court make certain findings to the extent that any prospective relief requires a government official to exceed his or her authority under state or local law.  Defendants have not identified any state or local law that they must violate to implement the additional remedial measures ordered herein.  Accordingly, the Court need not make any findings under 18 U.S.C. § 3626(a)(1)(B).

United States District Court
Northern District of California

"order as a whole," "that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures."  Armstrong v. Schwarzenegger, 622 F.3d at 1071.

A.    Narrowly tailored

The Court concludes that the additional remedial measures discussed above meet the requirements of the PLRA.  They are narrowly tailored because they require action only with respect to RJD, which is where violations of the ARP and class members' ADA rights have been established, and because they are the least that can be done to protect class members at RJD from further violations of their rights under the ARP and ADA.  Id. at 1072 (holding that the scope of permissible injunctive relief "is dictated by the extent of the violation established") (citation and internal quotation marks omitted).  As discussed above, the substantial evidence that Plaintiffs have presented, and that Defendants have not successfully refuted, shows that the violations of class members' rights are not limited to isolated incidents.  The dozens of ARP and ADA violations described in the inmates' declarations were widespread in every sense of the word; they affected class members who suffer from a wide range of disabilities; they were caused by many identified RJD staff members; and they took place at a variety of locations at RJD.

As discussed, the incidents appear to be the result of a persistent failure to adequately supervise and hold RJD staff accountable for violations of class members' ARP and ADA rights. It remains possible, under the current policies and procedures,

United States District Court
Northern District of California

1    for RJD staff members to continue to violate class members' ARP

2    and ADA rights while potentially avoiding accountability for

3    their actions.  The additional remedial measures in question are

4    specifically designed to remedy this, and they are therefore

5    necessary to prevent further violations of the ARP and class

6    members' ADA rights.  See, e.g., Armstrong v. Brown, 768 F.3d at

7    984 (affirming order requiring CDCR Defendants to implement

8    remedial measures intended to enhance CDCR's accountability);

9    Armstrong v. Schwarzenegger, 622 F.3d at 1073-74 (noting the

10   importance of accountability measures in ensuring ADA

11   compliance); Morales Feliciano v. Rullan, 378 F.3d 42, 55-56 (1st

12   Cir. 2004) (noting the importance of accountability in ensuring

13   the long-term success of the health care system in Puerto Rico's

14   prisons).

15       B.   Least Intrusive

16       The additional remedial measures ordered herein are not

17   impermissibly intrusive because they do not micromanage RJD's

18   operations.  Defendants have the discretion to craft policies and

19   procedures to implement the additional remedial measures.

20   Armstrong v. Schwarzenegger, 622 F.3d at 1071 ("Intrusiveness is

21   a particularly difficult issue for defendants to argue, as by

22   ordering them to draft and promulgate a plan, the district court

23   left to defendants' discretion as many of the particulars

24   regarding how to deliver the relief as it deemed possible.

25   Allowing defendants to develop policies and procedures to meet

26   the ADA's requirements is precisely the type of process that the

27   Supreme Court has indicated is appropriate for devising a

28   suitable remedial plan in a prison litigation case.").  That the

United States District Court
Northern District of California

Court describes the additional remedial measures with some specificity does not change this conclusion. See Armstrong v. Brown, 768 F.3d at 986 (holding that "[a] court may, as the district court did here, provide specific instructions to the State without running afoul of the PLRA").

Critically, Defendants have not advanced any viable alternative means to protect class members at RJD that are narrower or less intrusive. As discussed, Defendants suggest that the appropriate course is to wait and see whether the steps that they have taken in the last few years eventually will end the ongoing violations of the ARP and class members' ADA rights. The Court finds that such a proposal is not a viable alternative to the additional remedial measures ordered herein, because the record shows that the rights of class members are likely to continue to be violated under the current policies and procedures.

The goal and intent of the parties and Court's Remedial Order and Injunction at the outset of the remedial phase of this litigation was to bring all of CDCR's prisons into compliance with the ADA and the RA. Almost twenty-four years after the issuance of that order and injunction, Defendants are not yet in compliance. This is so even though the parties and the Court have attempted various iterations of remedial measures that are narrower and less intrusive than the ones now ordered. The Court has found, as discussed in more detail above, that the policies and systems currently in place at RJD, which are the product of the parties' and the Court's prior efforts to bring Defendants into full compliance, are insufficient to end the ongoing

68

United States District Court
Northern District of California

1   violations of class members' rights.  Accordingly, the Court's

2   implementation of additional and broader remedial measures is

3   warranted.  <u>Armstrong v. Brown</u>, 768 F.3d at 986 (noting that,

4   where the "the district court has attempted narrower, less

5   intrusive alternatives—and those alternatives have failed," the

6   court has discretion to order relief that might have raised

7   concerns about breadth and intrusiveness under the PLRA in the

8   first instance) (citation and internal quotation marks omitted).

9       The Court has carefully considered and weighed the arguments

10  and evidence presented by Defendants, and it has found that

11  Defendants have not shown that the additional remedial measures

12  would have any adverse impact on public safety or the operation

13  of a criminal justice system.  <u>Id.</u>  Defendants object to the

14  additional remedial measures on the ground that they are

15  unnecessary.  The Court disagrees with Defendants on this point

16  based on the evidence discussed at length above.  Defendants also

17  object to the additional measures on the ground that they would

18  be burdensome to implement in the time frame that Plaintiffs have

19  proposed.  Even if it were the case that implementing the

20  additional remedial measures in the time frame that Plaintiffs

21  have proposed would be burdensome for Defendants, "[a]

22  demonstration that an order is burdensome does nothing to prove

23  that it was overly intrusive" or otherwise inconsistent with the

24  requirements of the PLRA.  <u>Armstrong v. Schwarzenegger</u>, 622 F.3d

25  at 1071.  Where, as here, the Court has found that the additional

26  remedial measures are necessary to ensure Defendants' compliance

27  with the ARP and ADA, and that no viable less restrictive

28  alternative exists, the question of whether the additional

United States District Court
Northern District of California

remedial measures require some expenditure of resources by Defendants is not determinative.  See id. ("With Congress having made the decision to recognize the rights of disabled persons, the question is not whether the relief the court ordered to vindicate those rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations.").

Defendants argue that the additional remedial measures do not comply with the PLRA because they are overly intrusive in light of their specificity.  Defendants rely on Lewis v. Casey, 518 U.S. 343, 347-61 (1996) to support that argument.

Lewis is distinguishable.  There, the Supreme Court reversed an injunction that the district court issued after it found, at summary judgment, that the State of Arizona Department of Corrections (ADOC) had failed to provide prisoners with access to the courts and legal services.  The injunction required ADOC to make changes to its library and legal assistance policies for inmates, which were "specified in minute detail."  Id.  The Supreme Court held that the injunction could not stand, in relevant part, because the district court had "failed to accord adequate deference to the judgment of the prison authorities," and because the court had allowed a special master to craft the injunction.  Id. at 361-62.  The Supreme Court reasoned that the "proper procedure" would have been for the district court to charge ADOC "with the task of devising a Constitutionally sound program to assure inmate access to the courts."  Id. at 362 (citation and internal quotation marks omitted).

70

Here, in contrast to <u>Lewis</u>, the Court will charge Defendants with the task of crafting a remedial plan.  Requiring Defendants to comply with certain conditions when crafting the plan does not violate the PLRA, for the reasons discussed above.

In light of the foregoing, the Court finds that the additional remedial measures ordered here are necessary and consistent with the PLRA.

//

CONCLUSION

The Court GRANTS IN PART Plaintiffs' motion to modify its prior orders and injunctions to require Defendants to design, and then implement, a plan that requires additional remedial measures at RJD.  The Court will issue a separate order describing the additional remedial measures that Defendants' plan must include. The Court also will modify its prior orders and injunctions to require Defendants to log alleged violations of the ADA's anti-interference and anti-retaliation provisions.  The Court defers ruling on Plaintiffs' request to order the implementation of additional remedial measures at other CDCR prisons pending the resolution of the pending state-wide enforcement motion.  The Court also defers ruling on Plaintiffs' request to set aside Inmate 2's RVRs from the incident on June 17, 2020.  Defendants shall provide the Court immediately with the written report of the RVR hearing and any materials relied upon that have not been provided.  Defendants shall also diligently pursue a determination of whether a video of the June 17, 2020, incident exists, and if it does, shall provide a copy immediately. Defendants shall report on their progress in this regard within fourteen days of the date of this order.

IT IS SO ORDERED.

Dated: September 8, 2020

_____
CLAUDIA WILKEN
United States District Judge