1  XAVIER BECERRA
   Attorney General of California
2  JOANNA B. HOOD
   Supervising Deputy Attorney General
3  ALICIA A. BOWER
   Deputy Attorney General
4  State Bar No. 287799
     1515 Clay Street, Suite 2000
5    Oakland, CA  94612
     Telephone:  (510) 879-1982
6    Fax:  (510) 622-2270
     E-mail:  Alicia.Bower@doj.ca.gov
7  *Attorneys for Defendants Governor Newsom and the*
   *California Department of Corrections and*
8  *Rehabilitation*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      OAKLAND DIVISION

12

13

14  **JOHN ARMSTRONG, et al.,**          Case No. 94-cv-02307 CW

15                        Plaintiffs,    **DEFENDANTS' NOTICE OF APPEAL
                                         TO THE UNITED STATES COURT OF
16       **v.**                          APPEALS FOR THE NINTH CIRCUIT**

17  **GAVIN NEWSOM, et al.,**

18                        Defendants.

19

20

21

22      **TO THE COURT AND ALL COUNSEL OF RECORD:**

23      **NOTICE IS HEREBY GIVEN** that Defendants Governor Newsom and the California

24  Department of Corrections and Rehabilitation appeal to the United States Court of Appeals for

25  the Ninth Circuit from this Court's September 8, 2020 Order Granting in Part Motion to Modify

26  Remedial Orders and Injunctions (ECF No. 3059) and September 8, 2020 Order for Additional

27  Remedial Measures (ECF No. 3060).  Defendants also appeal from all earlier, non-final orders

28

                                    1

1    that produced the September 8, 2020 orders and are merged with them.  *See Am. Ironworks &*

2    *Erectors Inc. v. N. Am. Const. Corp.*, 248 F.3d 892, 897 (9th Cir. 2001).

3

4    Dated:  September 25, 2020                    Respectfully submitted,

5                                                 XAVIER BECERRA
                                                  Attorney General of California
6                                                 JOANNA B. HOOD
                                                  Supervising Deputy Attorney General
7

8
                                                  */s/ Alicia A. Bower*
9                                                 ALICIA A. BOWER
                                                  Deputy Attorney General
10                                                *Attorneys for Defendants Governor Newsom*
                                                  *and the California Department of*
11                                                *Corrections and Rehabilitation*

12
     CF1997CS0005
13   91294524

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# ATTACHMENT
# ECF NO. 3059 ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. 94-cv-02307 CW |
| Plaintiffs, | ORDER GRANTING IN PART MOTION TO MODIFY REMEDIAL ORDERS AND INJUNCTIONS |
| v. | |
| GAVIN C. NEWSOM, et al., | (Re: Dkt. No. 2922) |
| Defendants. | |

In this class action for violations of disabled prisoners'
rights under the Americans with Disabilities Act (ADA) and § 504
of the Rehabilitation Act (RA), which is in the remedial phase,
Plaintiffs contend that staff at R.J. Donovan Correctional
Facility (RJD) continue to deprive class members of their rights
under the ADA in violation of this Court's prior remedial orders
and injunctions.  Docket No. 2922.  Plaintiffs seek an order
modifying the Court's prior remedial orders and injunctions to
require the implementation of new remedial measures at RJD to
prevent further violations of class members' rights.  Defendants
oppose the motion.  Having carefully considered the parties'
submissions, and the argument presented at the hearing held on
August 11, 2020, the Court GRANTS IN PART Plaintiffs' motion to
modify the Court's remedial orders and injunctions.

FINDINGS OF FACT[1][2]

I.   Procedural history

In 1994, Plaintiffs, "a class of all present and future California state prison inmates and parolees with certain disabilities, sued defendants, California state officials with responsibility for the operation of the Department of Corrections and Rehabilitation (the CDCR) and the Board of Parole Hearings (BPH), challenging the State's treatment of disabled prisoners and parolees." Armstrong v. Schwarzenegger, 622 F.3d 1058, 1063 (9th Cir. 2010) (internal quotation marks omitted).  The claims against the CDCR were litigated separately from the claims against the BPH; only the former claims are relevant to the present motion.

On July 9, 1996, on the eve of trial, Plaintiffs and CDCR Defendants reached an agreement on a Stipulation and Order for Procedures to Determine Liability and Remedy.  Docket No. 148.  The Stipulation and Order provides:

> It is the intent of this Stipulation to require defendants to operate programs, activities, services and facilities of the California Department of Corrections in accordance with the Americans with Disabilities Act and § 504 of the

---

[1] Defendants objected to the Court's consideration of new matters that were raised and attached to Plaintiffs' reply on the ground that Defendants did not have an opportunity to respond to them.  Objections 1-3, Docket No. 3033.  The Court permitted Defendants to file a supplemental brief to respond.  Defendants filed a supplemental brief, but it contains no response to most of the matters to which Defendants originally objected.  See Defs.' Supp. Resp., Docket No. 3045.  Defendants have thus waived these objections.

[2] Defendants object to certain portions of the declarations of Gay Grunfeld and Michael Freedman, upon which the Court has not relied.  The Court overrules these objections as moot.

United States District Court
Northern District of California

> Rehabilitation Act of 1973, if the Court
> determines that the ADA and § 504 apply to
> the California Department of Corrections.

Stipulation and Order ¶ 12, Docket No. 148.

On September 20, 1996, this Court held that the ADA and RA apply to state prisoners, Docket No. 157, and that Defendants' policies and procedures with regard to disabled prisoners were inadequate and violative of the ADA and the RA, Docket No. 159. See also Armstrong v. Wilson, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996), aff'd, 124 F.3d 1019 (9th Cir. 1997).

On the same date, the Court entered a Remedial Order and Injunction, which required CDCR Defendants to develop plans, policies, and procedures, including disability-grievance procedures, to ensure that their facilities and programs were compliant with the ADA and RA. Remedial Order and Injunction at 1-4, Docket No. 158. The Court retained jurisdiction to enforce the terms of the Remedial Order and Injunction, as well as to issue "any order permitted by law, including contempt, necessary to ensure that defendants comply with the guidelines, policies, procedures, plans and evaluations" required by the Remedial Order and Injunction. Id. at 5.

In accordance with the Remedial Order and Injunction, Defendants produced a remedial plan in 1998, Docket No. 337, which they amended in January 2001, Docket No. 681. The Amended Remedial Plan of January 2001 (ARP), Section I, incorporates the ADA's anti-discrimination and access provisions, 42 U.S.C. § 12132, by providing as follows:

> No qualified inmate or parolee with a
> disability as defined in Title 42 of the
> United States Code, Section 12102 shall,

3

> because of that disability, be excluded from
> participation in or denied the benefits of
> services, programs, or activities of the
> Department or be subjected to
> discrimination.

ARP at 1, Docket No. 681.  Section II.F. of the ARP requires CDCR to "provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates/parolees." Id. at 7.  The remainder of the ARP describes various types of accommodations that CDCR must provide, such as "staff assistance," sign language interpreters, alternative methods for restraining inmates who cannot be restrained with traditional restraint equipment in the ordinary prescribed manner, and accessible vehicles for transporting inmates.  Id. at 22-34.  The ARP requires each institution to take steps to ensure that staff are aware at all times of which inmates have disabilities that require accommodations.  Id.  For example, the ARP requires each institution to issue an identifying vest to each inmate who has vision or hearing disabilities, which the inmate must wear over his clothing when outside of his cell or bed area.  Id. Defendants used the ARP as a model to craft remedial plans that were specifically tailored to each CDCR institution.  See Individual Remedial Plans, Docket Nos. 782, 783, 784.  The Court approved the remedial plans for each institution, including RJD, on February 6, 2002.  Docket No. 781; RJD Remedial Plan, Docket No. 784-2.

In November 2006, Plaintiffs filed a motion for a further remedial order, in which they argued that Defendants were in violation of the ARP and the Court's orders.  Docket No. 950.  As a result of this motion, the Court issued another injunction in

4

2007 (2007 injunction), which required Defendants, in relevant part, to comply with the ARP, including Section I, and to develop accountability procedures to track their noncompliance with the ARP and the Court's orders.  2007 Injunction at 7, 9, Docket No. 1045.  Since then, the Court has modified the 2007 injunction several times to clarify Defendants' obligations regarding reporting and accountability.  See Armstrong v. Brown, 768 F.3d 975, 979 (9th Cir. 2014); see also Order Modifying Permanent Injunction of August 2, 2012, Docket No. 2180; Order Modifying 2007 Injunction of December 29, 2014, Docket No. 2479.

In February and June 2020, respectively, Plaintiffs filed two motions (enforcement motions) in which they argue that Defendants' employees have engaged and continue to engage in conduct that violates class members' rights under the ARP and ADA contrary to this Court's prior orders and injunctions.  Docket Nos. 2922, 2948.  The conduct alleged involves misconduct directed at class members, who are more vulnerable to abuse and less able to defend themselves in light of their disabilities, as well as acts that have served to discourage class members from requesting reasonable accommodations for their disabilities, either through the formal grievance process or otherwise.

The first enforcement motion is the one now before the Court, which seeks relief for alleged violations of class members' rights under the ARP and ADA at RJD (RJD enforcement motion), and the second enforcement motion seeks relief for alleged violations of class members' rights at other prisons throughout California (state-wide enforcement motion).  The

1    state-wide enforcement motion has not been fully briefed and

2    remains pending.

3    II.   The continued lack of accountability for staff at RJD
          enables violations of the ARP and the Court's remedial

4          orders and injunctions

5          RJD has the second largest population of incarcerated people

6    with disabilities in CDCR, with nearly 1,000 <u>Armstrong</u> class

7    members, including 297 people who use wheelchairs, 217 people who

8    are deaf or hard of hearing, and thirteen people who are blind.

9    Grunfeld Decl., Ex. II at 184-89, Docket No. 2922-1.[3]

10         Beginning in September 2016, Plaintiffs' counsel notified

11   Defendants of allegations of noncompliance with the ARP and the

12   Court's orders and injunctions based on claims that RJD staff

13   were denying class members reasonable accommodations and were

14   using excessive force against class members.  <u>See, e.g.</u>, Freedman

15   Decl., Ex. 67, 69, 71, 73, Docket No. 2921-2.[4]

16         In August 2018, auditors from the Office of Audits and Court

17   Compliance (OACC) and Plaintiffs' counsel conducted a joint

18

19   ───────────────────

20         [3] Defendants object to this exhibit on the ground that it was
     not properly authenticated.  The Court overrules this objection.
21   Gay Grunfeld declares that this exhibit is a true and correct
     copy of excerpts of data from Defendants' COMPSTAT system, which
22   Defendants produced to Plaintiffs' counsel on January 13, 2020.
     Grunfeld Decl. ¶ 71, Docket No. 2922-1.  That is sufficient to
     find that the exhibit is what Ms. Grunfeld claims it is.
23   Moreover, Defendants do not argue that the exhibit is not
     authentic.

24         [4] Defendants object to Exhibits 67, 69, and 71 to the
25   Freedman Declaration on the ground that the declarant lacks
     personal knowledge.  These exhibits are copies of the monitoring
26   reports written by Plaintiffs' counsel, and the declarant is
     counsel for Plaintiffs.  These documents are being offered to
27   show that Plaintiffs' counsel alerted Defendants to allegations
     of noncompliance with the ARP and the Court's orders.  The
     objections are, therefore, overruled.
28

6

United States District Court
Northern District of California

1    compliance review of the Disability Placement Program at RJD,

2    during which the joint team interviewed twelve class members.

3    Grunfeld Decl. ¶ 16 & Ex. G at 1-2, Docket No. 2922-1.  After the

4    joint review, the OACC wrote a letter to CDCR's Division of Adult

5    Institutions (DAI) dated September 20, 2018, in which the OACC

6    reported that seven of the interviewees made allegations of

7    "staff members forcefully removing some inmates from wheelchairs;

8    staff members assaulting inmates that were already secured with

9    restraint equipment; and inmates being accused of assaulting

10   officers when, in fact, it was the staff member who had assaulted

11   the inmate."  Grunfeld Decl., Ex. G at 1, Docket No. 2922-1.[5]  The

12   OACC recommended, based "on the nature and consistency of the

13   allegations," that CDCR and RJD management "promptly take all

14   reasonable actions to ensure that these incidents do not occur in

15   the future, and that the historical allegations are thoroughly

16   investigated."  Id. (emphasis added).  The OACC requested that

17   CDCR provide it with a "Corrective Action Plan (CAP) to address

18   these allegations," identifying steps RJD and CDCR plan to take

19   to "mitigate these issues and address confirmed violations, along

20   with projected completion dates for each task," by October 5,

21   2018.  Id.; Miller Decl. ¶¶ 4, 5, 10.  As of January 2020, CDCR

22   had not produced the Corrective Action Plan that OACC requested

23

24   _____

25        [5] Defendants object to Exhibit G on the ground that it was
     not properly authenticated.  The Court overrules this objection.
26   Gay Grunfeld declares that this exhibit is a true and correct
     copy of the September 20, 2018, memorandum to Connie Gipson,
27   Director of DAI, from Matt Espenshade, Deputy Director of OACC,
     regarding the joint interviews.  Grunfeld Decl. ¶ 17, Docket No.
28   2922-1.  That is sufficient to find that the exhibit is what Ms.
     Grunfeld claims it is.  Moreover, Defendants do not argue that
     the exhibit is not authentic.

in September 2018.  CDCR's Rule 30(b)(6) Designee (Seibel) Dep. Tr. at 30, Docket No. 2922-1.

In December 2018, CDCR sent a strike team to investigate allegations of staff misconduct on Facility C at RJD.  The team was comprised of fourteen investigative staff and seven ombudsmen.  Bishop Report at 1-3, Docket No. 2921-6.  The strike team sought to interview 150 inmates on Facility C, but only 102 inmates agreed to be interviewed.  Id.  The interviewees reported, in relevant part, that RJD staff specifically targeted for abuse inmates with disabilities and other vulnerable inmates; that RJD staff hired inmates to assault other inmates; that RJD staff engaged in gang-like behavior; and that RJD staff retaliated against inmates who reported the abuse with further abuse or by making false allegations against them so that the inmates would be subjected to disciplinary action.  Id. at 4-9. Forty-eight inmates out of the 102 who chose to participate in the interviews supported their claims of misconduct by RJD staff with detailed and "actionable" allegations.  Id. at 14-17.

At the time that these interviews were conducted, there were some fixed cameras at RJD outside of the five housing units, six cameras in the gym, and ninety cameras in Facility E, which is a newer facility that was built with cameras.  CDCR's Rule 30(b)(6) Designee (Seibel) Dep. Tr. at 108-12, Docket No. 2921-8.  The cameras in places other than in Facility E are "old," their "clarity is very poor," they have blind spots, and some were inoperable at the time of the December 2018 interviews.  Id. Despite the presence of some cameras at RJD, CDCR does not have a

United States District Court
Northern District of California

written policy that requires that video footage be reviewed when an allegation of staff misconduct is investigated.  Id. at 129.

The Chief Ombudsman for CDCR, and who was part of the strike team, wrote the following in an email to DAI's director and others at CDCR immediately after conducting the interviews in December 2018:

> [W]hat we heard was overwhelming accusations of abuse by the Officers with Sgt's and Lt's looking in the other direction.  I have never heard accusations like these in all my years. I would strongly suggest placing a strike team on this yard immediately.  Many of the inmates have expressed fear of what will happen to them tomorrow when the team is not there.  <u>This is a very serious situation and needs immediate attention.  If there is any means of installing cameras immediately I would strongly suggest it</u>, at least in the blind spots and the back door by the gym.  A review of the appeal process, RVR's and staff complaints off that yard also needs to take place ASAP.

Grunfeld Decl., Ex. H, Docket No. 2922-1 (emphasis added).[6]

Associate Warden Bishop, who led the strike team, wrote a report based on his assessment of the interviews and recommended that the "actionable" allegations of forty-eight inmates be investigated "promptly."  Bishop Report at 14-17, Docket No. 2921-6.  Yet, it is undisputed that the investigations of some of these "actionable" allegations made in December 2018 were not

---

[6] Defendants object to this exhibit on the ground that it was not properly authenticated.  The Court overrules this objection. Gay Grunfeld declares that this exhibit is a true and correct copy of an email sent by Sara Malone, who is the Chief Ombudsman for CDCR, to Kimberly Seibel and Connie Gipson of CDCR.  Grunfeld Decl. ¶ 22, Docket No. 2922-1.  That is sufficient to find that the exhibit is what Ms. Grunfeld claims it is.  Moreover, Defendants do not argue that the exhibit is not authentic.

complete as of January 2020.  See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 133, 156, Docket No. 2921-8; id. at 221-22, Docket No. 2922-1.

Associate Warden Bishop also recommended, among other things, that live-feed cameras be installed in all areas of limited or obstructed visibility; that CDCR conduct a comprehensive review and investigation of staff gang activity on Facility C by trained gang investigation staff; and that CDCR increase managerial presence on Facility C during all hours. Bishop Report at 12-13, Docket No. 2921-6.

Notwithstanding these recommendations, and Defendants' acknowledgement that the Bishop Report "formally recognized serious problems with aspects of R.J. Donovan's operations," Defs.' Resp. at 19, as of the date of this order, CDCR has not installed additional live-feed cameras at RJD[7]; has not devoted any additional resources to investigate or address gang-like behavior among RJD staff; and has not increased managerial presence on Facility C or elsewhere at RJD.[8]  CDCR's Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 168-69, Docket No. 2921-8.

---

[7] CDCR had requested funds for the installation of additional cameras at RJD during the 2020-2021 fiscal year as part of its Audio Video Surveillance Solution system.  Macomber Decl. ¶ 8. Because of the Covid-19 pandemic, the Governor of California withdrew CDCR's request from the state's budget proposal without prejudice in May 2020.  Req. for Judicial Notice, Ex. K. Defendants represent that they remain committed to installing additional cameras at RJD in the future.

[8] Two field training sergeants provided additional managerial presence at RJD for about a year, but neither of these field sergeants is currently at RJD.  CDCR's Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 168-69, Docket No. 2921-8. Accordingly, there is no additional managerial presence at RJD at this time.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Two correctional sergeant investigators from outside RJD

2  conducted follow-up interviews with some of the Bishop Report

3  interviewees in January and February 2019, and wrote memoranda in

4  which they concluded that the majority of the allegations of

5  staff misconduct and use of excessive force were being made by

6  "wheelchair designated inmates" or inmates suffering from severe

7  mental illness.  Freedman Decl., Ex. 3 (DOJ0000057), Docket No.

8  2921-6; id., Ex. 4 (DOJ00000425).  Although the allegations have

9  "not yet been proven," the investigators emphasized that the

10 allegations were "brought up in numerous interviews by different

11 inmates, and even by an inmate who claims to have assaulted

12 inmates on behalf of custody staff."  Id.  Accordingly, the

13 investigators recommended, among other things, that CDCR install

14 cameras inside housing units and rotundas.  Id.

15   Plaintiffs represent, and Defendants do not dispute, that

16 Defendants failed to disclose to Plaintiffs' counsel the Bishop

17 Report from December 2018, and the memoranda of the two

18 investigators from early 2019, until January 2020, when

19 Defendants produced them in response to formal discovery requests

20 by Plaintiffs.  Grunfeld Decl. ¶ 31, Docket No. 2922-1.

21   Starting in January 2019, Plaintiffs' counsel began to send

22 copies of its advocacy letters to the Office of the Inspector

23 General (OIG) regarding class members' allegations of violations

24 of the ARP and their ADA rights.  Grunfeld Decl., Ex. J, Docket

25 No. 2922-1.[9]  The OIG reviewed CDCR's responses to sixteen of

27        [9] Defendants object to this exhibit on the ground that it was
28 not properly authenticated.  The Court overrules this objection.

11

United States District Court
Northern District of California

1    Plaintiffs' advocacy letters from 2019 and concluded in January

2    2020 that each described "serious" misconduct that, "if true,

3    would result in disciplinary action for the subject employees."

4    Id. at 1.  The OIG found a "pervasive lack of timely follow

5    through," including that CDCR "ignored" many allegations, failed

6    to investigate twenty-eight allegations not previously known to

7    CDCR, and failed to refer pertinent information to the Office of

8    Internal Affairs when appropriate.  Id.

9        Plaintiffs' expert, Jeffrey Schwartz, has assisted prisons

10   and jails over the last twenty years in applying national

11   correctional standards to their operations.  Schwartz Decl. ¶ 2,

12   Docket No. 2947-9.  Schwartz was retained by Plaintiffs to opine

13   on CDCR's inquiry, investigation, and disciplinary process as it

14   relates to allegations of staff misconduct and the discipline of

15   staff for misconduct.  Id. ¶ 9.  As part of his assignment,

16   Schwartz analyzed the files of forty-three investigations of

17   allegations of staff misconduct at RJD.  Id. ¶ 11.  Schwartz

18   opines that the situation at RJD is "horrifying" for inmates with

19   disabilities and other vulnerable inmates, and that there is

20   "substantial evidence that these vulnerable inmates are targeted

21   and preyed upon by a significant number of staff at RJD."  Id. ¶¶

22   23-27.  According to Schwartz, "Inmates are afraid to file

23   grievances/complaints and afraid to provide testimony during

24   investigations.  Pressure to withdraw complaints and other forms

25   _____

26   Gay Grunfeld declares that this exhibit is a true and correct
     copy of a letter sent on January 17, 2020, by Inspector General
27   Roy Wesley to CDCR Secretary Ralph Diaz.  Grunfeld Decl. ¶ 34,
     Docket No. 2922-1.  That is sufficient to find that the exhibit
28   is what Ms. Grunfeld claims it is.  Moreover, Defendants do not
     argue that the exhibit is not authentic.

of intimidation are common." Id. ¶ 60.  Schwartz attributes this situation to RJD's "dysfunctional staff culture," which "will not be changed quickly or easily." Id. ¶ 93.  According to Schwartz, this dysfunctional culture stems in part from the ineffectiveness of CDCR's system for investigating misconduct and disciplining staff; the investigations of staff misconduct at RJD are incomplete, unprofessional, and biased against incarcerated complainants and witnesses. Id. ¶¶ 93, 40-47, 84, 181, 187, 273, 276, 327.  Schwartz opines that inmate testimony is often discounted or ignored and that plagiarism and other collusion in staff reports is disregarded. Id. ¶¶ 40-49.  Schwartz notes that staff is disciplined primarily when there is video evidence or staff reports of misconduct. Id. ¶¶ 53, 126, 127, 172, 208, 210, 219.

Defendants have not proffered any evidence to dispute Schwartz's conclusions that, despite the existence of policies and procedures for investigations of and discipline in connection with staff misconduct, the policies and procedures are ineffective because they are not properly followed when it comes to staff misconduct at RJD.  To the contrary, Defendants' own expert, Ken McGinnis, agrees that "there have been breakdowns and failures in the decisions of those involved in the [investigation and disciplinary] processes that have resulted in inappropriate outcomes." McGinnis Decl., Ex. B. at 8-9, Docket No. 3006-2.

Schwartz's opinions are supported by the fact that the current investigation and discipline system has resulted in only nine terminations of RJD staff since 2017 for misconduct in which the victim was an inmate; only two of these dismissals are final.

United States District Court
Northern District of California

See Miller Decl. ¶¶ 34-36, Docket No. 3006-1.  One of these terminated staff members was reinstated, and another resigned before the termination became final.  Id.  Each of these terminations involved misconduct against a disabled inmate.  See Grunfeld Decl. ¶ 39, Docket No. 3023-5.  Each of the terminations was based, at least in part, on either a video or a staff report of the misconduct.  Id. ¶ 40.  Plaintiffs represent, and Defendants do not dispute, that no terminations of RJD staff have occurred where no video or staff report of misconduct was available.  Further, there have been no reports of staff misconduct made by correctional staff who witnessed another correctional officer engaged in misconduct.  Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at 257, Docket No. 2922-1.

Out of the forty-eight "actionable" allegations of misconduct identified in the Bishop Report, only two resulted in any discipline.  See Grunfeld Decl., Ex. OO, Docket No. 3023-5.

Plaintiffs' other expert, Eldon Vail, is a former correctional administrator with thirty-five years of experience working in and administering adult correctional institutions.  Vail Decl. ¶ 3, Docket No. 2020-5.  He has served as the Warden of three adult correctional institutions, and he served as the Secretary of the Department of Corrections of Washington for four years.  Id. ¶ 4.  As part of his assignment, Vail reviewed the declarations of inmate-declarants, relevant CDCR policies, and various other case materials and filings.  Id. ¶ 10.  Vail concludes that there is a pattern of violence against class members at RJD and that staff at RJD routinely use force against class members after failing to recognize and reasonably

14

United States District Court
Northern District of California

1   accommodate inmates' disabilities.  Id. ¶¶ 13, 4, 27, 30.  In his

2   opinion, the level of force used by RJD staff against class

3   members often is excessive and the frequency with which such

4   force is used is "startling."  Id.  According to Vail, the

5   "unnecessary and excessive use of force, including closed fist

6   punches and kicks, that result in serious injury to the class

7   members is far beyond the norm found in other institutions or

8   jurisdictions of which I am aware."  Id. ¶ 13.  Vail also

9   identified a pattern of retaliation against class members who

10  report abuse, and widespread fear among class members of

11  reporting allegations of staff misconduct as a result.  Id. ¶¶

12  16, 59-62, 88.

13      Vail reviewed some of the confidential closure memoranda

14  regarding the follow-up investigations of the allegations

15  described in the Bishop Report.  Vail Decl. ¶¶ 41-51, Docket No.

16  3023-9.  He opines that these investigations were inadequate.

17  Id. (concluding that "the follow-up investigations, or lack

18  thereof, [were] shocking" and that investigators "demonstrate[d]

19  flawed investigative techniques and bias against incarcerated

20  people").  For example, Vail notes that investigators deemed

21  allegations that certain RJD officers allowed inmates into

22  certain cells to steal other inmates' property to be "unfounded"

23  even though the inmate who made the allegations told

24  investigators that he himself was allowed by those RJD officers

25  to go into cells to steal property, and that he did so often.

26  Id. ¶¶ 42-44.  As another example, an inmate told investigators

27  that he had been hired by an RJD officer to assault other

28

15

United States District Court
Northern District of California

1   inmates; that allegation also was deemed to be unsubstantiated.

2   Id. ¶¶ 49-50.

3        Defendants admit that, as of 2018, RJD had "serious

4   problems" derived from staff misconduct.  See, e.g., Defs.' Resp.

5   at 1, Docket No. 3006 ("Defendants recognize that the R.J.

6   Donovan Correctional Facility has challenges necessitating

7   support."); id. at 18 (acknowledging that in 2018 "incidents of

8   staff misconduct were occurring on [RJD]'s Facility C at an

9   unacceptable rate"); McGinnis Decl., Ex. B at 41, Docket No.

10  3006-2 ("[C]DCR, by its own reports and documents, acknowledged a

11  problem of staff misconduct at RJD and an environment that needed

12  to change.").  Defendants also admit that there is still "staff

13  misconduct that does occur" at RJD.  See Defs.' Rule 30(b)(6)

14  Designee (Kimberly Seibel) Dep. Tr. at 267, Docket No. 2922-1.

15       In July 2020, the Court ordered the transfer of two class

16  members out of RJD to other prisons based on evidence that these

17  class members had suffered retaliation and were at imminent risk

18  of suffering harm for submitting declarations in support of the

19  enforcement motions.  Orders, Docket Nos. 2978, 2979, 3025.  One

20  of these class members alleged that he received another threat on

21  the eve of his transfer out of RJD in the form of a note that was

22  signed with the initials of a correctional officer gang.  See

23  Godbold Decl., Ex. A-D, Docket No. 3017; Grunfeld Decl., Ex. Q-S,

24  Docket No. 3023-5.  Defendants have not submitted any evidence to

25  dispute this new allegation, which suggests that RJD staff

26  continue to engage in gang-like conduct.  Defendants agreed to

27  transfer a third inmate who witnessed the retaliation against the

28  two class members who were transferred after that third inmate

16

United States District Court
Northern District of California

1  alleged that he faced retaliation for having assisted with the

2  transfer of the other two class members.  See Grunfeld Decl. ¶ 21

3  & Ex. H, T, U, Docket No. 3023-5.

III. Staff at RJD violated the ARP and the Court's prior orders
     and injunctions

     A.   Staff at RJD denied class members reasonable
          accommodations for their disabilities

7  As will be discussed in the Conclusions of Law below, a

8  violation of the ADA's anti-discrimination and access provisions,

9  42 U.S.C. § 12132, which are incorporated into Section I of the

10 ARP, occurs where a disabled individual is denied a reasonable

11 accommodation so that he can enjoy benefits of a public entity's

12 services, programs, or activities, or is otherwise discriminated

13 against by the public entity, by reason of his disability.  ARP

14 at 1, Docket No. 681.  A failure to provide a reasonable

15 accommodation can occur where a correctional officer could have

16 used less force or no force during the performance of his

17 penological duties with respect to a disabled person.

18 Plaintiffs have submitted eighty-seven declarations from

19 sixty-six current or former inmates at RJD.[10]  These declarations

20 describe dozens of incidents in which staff at RJD denied class

21 members reasonable accommodations for their disabilities.[11]  Some

23      [10] See Freedman Decl., Ex. 6-58, 88, Docket No. 2922-2 to
Docket No. 2922-5; Freedman Decl., Ex. 3-5, 9-24, Docket No.
24 2947-5; Freedman Decl. Ex. 3, 5, 9, Docket No. 2970-1; Freedman
Decl. Ex. 1-4, 11, Docket No. 2999-1; Grunfeld Decl., Ex. H, M-P,
25 Docket No. 3023-5; Godbold Decl., Ex. B, Docket 3023-7.

26      [11] Defendants object to certain portions of these
declarations on the grounds that: (1) they contain evidence the
27 probative value of which is substantially outweighed by the
danger of unfair prejudice under Federal Rule of Evidence 403;
(2) they contain hearsay; (3) the declarants lack personal

17

United States District Court
Northern District of California

of the incidents involve the use of force against class members even though they appear to have posed no imminent threat to staff or other inmates.  The incidents are from 2017, 2018, and 2019, and some are as recent as April 2020.  The incidents took place at various locations at RJD and are not limited to Facility C. For none of these incidents have Defendants submitted evidence to show that the denial of reasonable accommodations, or the use of unnecessary force, which itself can be a denial of a reasonable accommodation, was necessary for the performance of legitimate penological duties.  The following are illustrative examples.

An RJD officer denied a class member a reasonable accommodation for his hearing disabilities when he tried to communicate with the class member.  Freedman Decl., Ex. 7, ¶¶ 1-26, Docket No. 2921-6 (December 2019, Facility A).  The class member tried to indicate to the officer that he had a hearing disability by pointing to his disability vest and his ears, and he tried to request that they should communicate in writing by making a writing motion with his hands.  Id.  Instead of using an ADA-appropriate technique for communicating with the class member, the RJD officer yelled at the class member and then

_____

knowledge; or (4) the declarants improperly offer testimony that requires medical or mental-health expertise.  See Defs.' Resp. at 42-45; Objections at 4-5, Docket No. 3033.  The Court overrules these objections.  The Court declines to exclude any portions of the inmate declarations on the basis of Federal Rule of Evidence 403, because there is no danger of unfair prejudice as the Court, not a jury, is making factual determinations.  The Court finds that the rest of Defendants' objections lack merit.  The statements in the inmate declarations at issue are not subject to exclusion because they (1) are not hearsay, as they are not made for the truth of the matter asserted or fall within one of the hearsay exceptions under Federal Rule of Evidence 803; (2) are based on the declarants' personal knowledge and perceptions.

punched the class member in the face.  Id.  As a result of this incident, the class member is afraid to ask staff for writing supplies so that he can communicate, for fear of being assaulted again.  Id. ¶¶ 27-28.

A class member with mobility disabilities who uses a cane and walker asked an RJD officer not to handcuff him behind his back because his disability requires a handcuffing accommodation. Freedman Decl., Ex. 10 ¶¶ 1-11, Docket No. 2921-6 (July 2019, Facility A).  Instead of accommodating him, the officer body-slammed the class member to the ground, causing him to hit his head on the concrete floor and lose consciousness for several seconds.  Id.  After he regained consciousness, the officer put his knee on the class member's throat and then kneed him in the face.  Id. ¶¶ 12-13.  The class member had to be taken to the hospital, where he was diagnosed with acute contusions to the back of his neck and head; he was transported back to RJD in a van that was not accessible.  Id. ¶ 15; Freedman Decl., Ex. 10a.

Other class members with mobility disabilities who requested a handcuffing accommodation also were thrown to the ground by RJD officers instead of accommodated.  Freedman Decl., Ex. 6 ¶¶ 1-8, Docket No. 2921-6; Freedman Decl., Ex. 8 ¶¶ 1-9, 17-18, Docket No. 2921-6 (January 2020, C14 Unit); Freedman Decl., Ex. 45 ¶¶ 1-10, 17-18, Docket No. 2921-7 (September 2019, Facility A); Freedman Decl., Ex. 26 ¶¶ 1-14, Docket No. 2921-6 (July 2019, Facility A).

A class member with incontinence issues asked an RJD officer to allow an ADA shower after an incontinence incident, and the officer refused.  Freedman Decl., Ex. 35 ¶¶ 1-11, Docket No.

United States District Court
Northern District of California

2921-7 (February 2019, Facility A).  Other class members also
report being denied requests for showers or cleaning supplies
after incontinence incidents.  Freedman Decl., Ex. 6 ¶ 20, Docket
No. 2921-6; Freedman Decl., Ex. 14 ¶ 12, Docket No. 2921-6.

RJD officers have forced some class members to stand for
long periods of time or to walk significant distances without
their walkers or other assistive devices despite the class
members' requests for accommodations; in some cases, this has
caused the class members' disabilities to worsen.  See, e.g.,
Freedman Decl., Ex. 11 ¶¶ 1-12, 19, Docket No. 2921-6 (September
2018, Facility A).

RJD officers also have denied class members' requests for
wheelchair pushers.  Freedman Decl., Ex. 6 ¶ 20, Docket No. 2921-
6; Freedman Decl., Ex. 35 ¶¶ 1-11, Docket No. 2921-7 (February
2019, Facility A).

A class member was rendered unable to move his wheelchair in
his own cell and was forced to sleep on the floor because an RJD
officer conducted a search in the cell and left his property in
disarray, rendering the cell inaccessible.  Freedman Decl., Ex.
53 ¶¶ 1-16, Docket No. 2921-6 (December 2016).  The class member
requested assistance to restore his cell to an accessible
condition, but RJD staff ignored his requests.  Id.  When the
class member filed a grievance, the same RJD officer trashed his
cell again.  Id. (2007).

Many class members who use wheelchairs or walkers describe
RJD officers intentionally closing cell doors on them and other
class members with mobility disabilities despite requests for
additional time to enter and exit cells in light of their

United States District Court
Northern District of California

impairments.  See, e.g., Freedman Decl., Ex. 10 ¶ 21, Docket No.
2921-6 (July 2019, Facility A); Freedman Decl., Ex. 11 ¶¶ 20-21,
Docket No. 2921-6 (June 2019, Facility A); Freedman Decl., Ex. 17
¶¶ 1-12, Docket No. 2921-6 (December 2019, Facility D); Freedman
Decl., Ex. 25 ¶¶ 1-23, Docket No. 2921-6 (April 2019, Facility
C); Freedman Decl., Ex. 40 ¶ 7, Docket No. 2921-7; Freedman
Decl., Ex. 55 ¶¶ 1-10, Docket No. 2921-6 (December 2019).

Declarants also describe RJD officers throwing class members
out of their wheelchairs and then slamming them into the ground
or beating them.  See, e.g., Freedman Decl., Ex. 27 ¶ 16, Docket
No. 2921-6 (2018); Freedman Decl., Ex. 38 ¶¶ 16-18, Docket No.
2921-6 (July 2018).

A class member asked an RJD officer for help in lifting a
heavy package of mail and the officer refused.  Freedman Decl.,
Ex. 21 ¶¶ 1-10, Docket No. 2921-6 (August 2018, Facility C).
When the class member stated that he intended to file a complaint
based on the officer's refusal, the officer pepper sprayed the
class member in the face, hit him in the face with the pepper
spray canister, and then kicked him.  Id.

A class member with a vision disability asked RJD staff to
stop shining his flashlight in his eyes because it exacerbates
his disability and is painful.  Freedman Decl., Ex. 23 ¶¶ 1-12,
Docket No. 2921-6 (November 2018, Facility A).  When the officer
failed to stop and the class member asked to speak with a
sergeant, another officer punched the class member in the jaw,
causing him to fall on the floor and lose consciousness.  Id.
The officer later threatened the class member to charge him with

United States District Court
Northern District of California

1    a false rules violation report (RVR) if he filed a grievance

2    about the incident.  <u>Id.</u>

3       A class member was launched from his wheelchair and onto the

4    ground when a wheelchair pusher pushed his wheelchair into an

5    obvious large hole in the pavement.  Freedman Decl., Ex. 42 ¶¶ 1-

6    17, Docket No. 2921-6 (August 2019).  The class member hit his

7    head and knee on the pavement because he was in handcuffs and

8    could not break his fall.  <u>Id.</u>  After the class member filed a

9    complaint against the wheelchair pusher, the wheelchair pusher,

10    who was present during the class member's interview in connection

11    with the complaint, threatened the class member.  <u>Id.</u> ¶¶ 13-14.

12    The class member now avoids asking staff for ADA showers or

13    toilet paper for fear of retaliation.  <u>Id.</u> ¶ 18.

14       Thirty-three of the inmate declarations describe incidents

15    that have occurred since February 2020, when Plaintiffs filed the

16    present enforcement motion.  These are a few examples.

17       In March 2020, an RJD officer denied a class member with

18    mobility and developmental disabilities a reasonable

19    accommodation in the form of an alternative handcuffing method.

20    Freedman Decl., Ex. 23 ¶¶ 9-10, Docket No. 2947-5 (Facility A).

21    When the class member became upset after the officer threatened

22    him with pepper spray, another officer activated an alarm and

23    summoned a group of officers who, upon their arrival, tackled the

24    class member without saying or doing anything to try to

25    deescalate the situation without the use of force.  <u>Id.</u>  The

26    class member hit his head on the ground and blacked out.  <u>Id.</u>

27    When the inmate woke up, his eyes were burning from what he

28    suspected was pepper spray.  <u>Id.</u> ¶ 10.  The officers then put a

United States District Court
Northern District of California

cover over the class member's head, handcuffed his hands behind his back, shackled his legs, and carried him into a sally port, where they then dropped him forcefully, causing him to hit his head against the wall. Id. ¶¶ 1-3. Another inmate who witnessed this incident submitted a declaration corroborating the class member's version of the events, adding that the class member never tried to harm any of the officers and ducked to protect himself once the group of officers arrived to tackle him. Freedman Decl., Ex. 14 ¶¶ 1-6, Docket No. 2947-5. The witness also saw the officers use pepper spray on the class member. Id.

In April 2020, class members with mobility disabilities had a cell door closed on them. Freedman Decl., Ex. 13 ¶¶ 13-15, Docket No. 2947-5 (Facility D); Freedman Decl., Ex. 24 ¶¶ 1-5, Docket No. 2947-5 (Facility A).

The declarants believe, based on their experiences and observations at RJD, that RJD staff target inmates with disabilities for mistreatment because they are more vulnerable and are less likely to fight back. See, e.g., Freedman Decl., Ex. 13 ¶ 16, Docket No. 2947-5; Freedman Decl., Ex. 10 ¶¶ 1-11, Docket No. 2921-6; Freedman Decl., Ex. 11 ¶ 39, Docket No. 2921-6; Freedman Decl., Ex. 23 ¶ 28, Docket No. 2921-6; Freedman Decl., Ex. 26 ¶ 18, Docket No. 2921-6; Freedman Decl., Ex. 25 ¶¶ 1-23, Docket No. 2921-6; Freedman Decl., Ex. 55 ¶ 11, Docket No. 2921-6; Freedman Decl., Ex. 38 ¶ 19, Docket No. 2921-6. These beliefs are consistent with the allegations described in the Bishop Report and the memoranda of the two correctional investigative sergeants, and with the opinions of Plaintiffs' experts.

23

United States District Court
Northern District of California

The Court finds the descriptions of the incidents in the declarations submitted by Plaintiffs to be credible.  The declarants paint a very consistent picture of the conduct by RJD staff that disabled inmates experience.  The incidents described in the declarations also are highly consistent with those that the Bishop Report described as "actionable" and the OACC and two correctional investigative sergeants described as worthy of further investigation and immediate action.  Further corroboration is found in the medical records for some of the class members who suffered injuries requiring medical attention as a result of the incidents.  See, e.g., Freedman Decl., Ex. 10a, Docket No. 2921-6; Freedman Decl., Ex. 23 ¶ 14 & Ex. 23a, Docket No. 2921-6; Freedman Decl., Ex. 25a, Docket No. 2921-6; Freedman Decl., Ex. 42a, Docket No. 2921-6.  The descriptions also are consistent with those in declarations by other inmates. See, e.g., Freedman Decl., Ex. 32 ¶¶ 15-16, Docket No. 2921-6 (witnessed incident described in Exhibit 8 to the Freedman Declaration); Freedman Decl., Ex. 14 ¶¶ 1-6, Docket No. 2947-5 (witnessed incident described in Exhibit 23 to the Freedman Declaration).  The declarations also are consistent with videos that Plaintiffs submitted, which show wheelchair-bound inmates being thrown out of their wheelchairs by RJD staff even though they appeared to pose no threat to staff or other inmates.  See Grunfeld Decl., Ex. HH, II, JJ, Docket No. 3023-5.

The Court finds, based on the foregoing, that RJD staff have denied reasonable accommodations to class members on many occasions, and that such denials were by reason of the class members' disabilities.

United States District Court
Northern District of California

Defendants have not offered any declarations or other evidence to dispute the sworn statements of the declarants with respect to the incidents in question.  Notably, many of the declarations identify the officers who engaged in the conduct at issue by name, but none of the identified officers has submitted a declaration disputing the inmate's version of the events.  The declarants' version of the incidents is, therefore, uncontroverted.

Defendants attack the declarations on the grounds that (1) eleven of the declarants are not class members; (2) one of the declarants was not a class member at the time the incident alleged in his declaration occurred; (3) eighteen of the declarants are no longer at RJD; (4) "many" of the declarants do not allege that the staff misconduct occurred because of their disability; (5) those who do allege that the staff misconduct was connected to their disability "provide little or no factual support" for the allegation; and (6) Defendants have sent letters to Plaintiffs' counsel in which Defendants state that certain inmate allegations of staff misconduct lack merit or have been referred to the Office of Internal Affairs for investigation. Defs.' Resp. at 15.

Defendants' arguments are unpersuasive.  First, the Court finds that the declarations submitted are relevant and probative as to whether class members' rights under the ARP and the ADA were violated, regardless of whether the declarant is currently a class member.  Many of the declarants who are not class members describe incidents they observed in which RJD staff denied class members reasonable accommodations or otherwise discriminated

25

United States District Court
Northern District of California

against class members.  Second, the Court finds that Defendants have provided no support for their assertions, either in their response to the present motion or in letters they have sent to Plaintiffs' counsel, that certain of the allegations in the declarations lack merit.  Defendants do not identify which of the allegations have been investigated, how they were investigated, when, and by whom, and how such investigations demonstrated that the allegations lack merit.  Further, Defendants' assertions that certain of the allegations lack merit contradict Defendants' representation in their briefs that they take each of the declarations "seriously" and for that reason have referred all of them to the Office of Internal Affairs for further investigation.

Third, Defendants challenge certain of the declarations on the ground that the declarants do not explicitly establish a causal link between the violations of the ARP and ADA that they describe and their disabilities.  The Court is not persuaded.  This causal link need not be expressly alleged by each of the declarants.  Some of the misconduct could only be committed because the victim was disabled, such as throwing him out of a wheelchair or closing a cell door on a person who walks slowly with a walker.  In addition, the causal link can be inferred from the totality of the allegations in the declarations; the allegations described and credited in the Bishop Report, the OACC letter, and the memoranda of the two correctional investigative sergeants; and from the undisputed evidence discussed in more detail above, which shows that it is a part of the staff culture at RJD to target inmates with disabilities for mistreatment, abuse, retaliation, and other improper behavior.  The record

26

United States District Court
Northern District of California

1  supports a finding that the incidents described in the

2  declarations are manifestations of that culture.

3      B.   RJD staff interfered with class members' rights under
           the ADA

4

5      As will be discussed in the Conclusions of Law below, a

6  violation of the ADA's anti-interference provisions, 42 U.S.C. §

7  12203(b), occurs where (1) a person threatens, intimidates, or

8  coerces a person with a disability; (2) the threat, intimidation,

9  or coercion has a nexus to the exercise or enjoyment of an ADA

10 right; and (3) the disabled person suffers distinct and palpable

11 injury as a result, by virtue of giving up his ADA rights or some

12 other injury which resulted from his refusal to give up his

13 rights, or from the threat or intimidation or coercion itself.

14     Plaintiffs have submitted declarations by class members

15 stating that RJD staff have threatened, intimidated, or coerced

16 them when they have requested reasonable accommodations or have

17 filed or stated they would file ADA-related grievances, and that

18 this has caused them to refrain from requesting accommodations or

19 filing ADA grievances, or to experience severe emotional

20 distress.  The declarations, which are uncontested, establish

21 that RJD staff have violated 42 U.S.C. § 12203(b).  Below, the

22 Court describes a few examples.  Some of these incidents were

23 also discussed in the previous section of this order because they

24 involve denials of reasonable accommodations, as well as

25 violations of § 12203(b).

26     An elderly class member who uses a walker and has

27 incontinence issues withdrew an ADA complaint about an officer

28 who repeatedly closed his cell door on him, after another officer

27

United States District Court
Northern District of California

asked him about the complaint in an aggressive and threatening manner. Freedman Decl., Ex. 36, ¶¶ 1-10, 15 (September 2019, D20 unit). Weeks later, when a different RJD officer closed the class member's cell door on him, hurting his rib, the class member did not file a grievance against the officer because of what happened with his prior complaint. Id. ¶¶ 11-12 (December 2019, D20 unit). As a result of these incidents, the class member has not asked for certain accommodations, such as for an extra shower or extra linens after an incontinence incident. Id. ¶ 15. The class member prefers to sit in soiled clothes rather than risk retaliation by RJD staff. Id. ¶ 16.

An RJD officer, instead of accommodating a class member's deafness when trying to communicate with him, yelled at the class member and then punched him in the face. Freedman Decl., Ex. 7, ¶¶ 1-26, Docket No. 2921-6 (December 2019). As a result of this incident, the class member does not ask staff for writing supplies as accommodations for his deafness for fear of being assaulted again. Id. ¶¶ 27-28.

A class member who requested a handcuffing accommodation and was slammed to the ground and then kicked by RJD officers instead of being accommodated is now afraid of requesting disability accommodations as a result the incident. Freedman Decl., Ex. 8 ¶¶ 1-9, 17-18, Docket No. 2921-6 (January 2020, C14 Unit).

An RJD officer closed the cell door on a class member who uses a walker, trapping him between the door and the wall, and causing him to cry out in pain. Freedman Decl., Ex. 13 ¶¶ 13-15, Docket No. 2947-5. The class member did not file a grievance against the officer for fear of retaliation. Id. ¶ 15.

A class member with mobility disabilities who requested a handcuffing accommodation and was thrown to the ground by RJD staff instead of accommodated did not file a grievance against the officer for fear of retaliation. Freedman Decl., Ex. 6 ¶¶ 1-8, 14, Docket No. 2921-6.

A class member with a vision disability asked RJD staff to stop shining his flashlight in his eyes because it exacerbates his disability and is painful. Freedman Decl., Ex. 23 ¶¶ 1-12, Docket No. 2921-6 (November 2018, Facility A).  When the class member asked to speak with a sergeant, another officer punched the class member in the jaw, causing him to fall on the floor and lose consciousness.  Id.  The officer later threatened to charge the class member with a false rules violation report if he filed a grievance about the incident.  Id.  The situation made the class member feel powerless and suicidal.  Id. ¶ 15.

A class member who had cell doors closed on him, and who was made to walk a long distance without his walker, does not ask for accommodations such as extra toilet paper to manage his incontinence for fear of getting hurt by RJD staff.  Freedman Decl., Ex. 11 ¶¶ 20-21, 37, Docket No. 2921-6 (June 2019, Facility A).

A class member who has PTSD no longer asks for accommodations for his incontinence disability because an RJD officer has repeatedly tried to trigger his PTSD by making loud noises after the class member filed grievances against the RJD officer based on the officer's failure to provide him with incontinence supplies.  Freedman Decl., Ex. 14 ¶¶ 1-12, 19, Docket No. 2921-6.

United States District Court
Northern District of California

1    An older class member who uses a wheelchair and suffers from

2    incontinence filed an ADA grievance after an officer refused to

3    call a wheelchair pusher, denied him access to a shower to clean

4    himself after an incontinence incident, and made derogatory

5    comments about his use of a wheelchair.  Freedman Decl., Ex. 35,

6    ¶¶ 4, 8-11 (February 2019).  The class member dropped the

7    complaint and has stopped filing disability-related requests and

8    complaints because, based on the RJD officer's behavior, he feels

9    that the officer could make his life "far worse if [he] continued

10   to speak out" about the denials of accommodations.  Freedman

11   Decl., Ex. 35, ¶¶ 4, 8-12, Docket No. 2921-7.

12   As discussed above, Defendants have not submitted any

13   evidence, such as declarations by the officers who allegedly

14   engaged in intimidation, threats, or coercion, to dispute the

15   occurrence of these incidents and similar incidents described in

16   the declarations that Plaintiffs submitted.

17   The Court finds the inmate declarants to be credible for the

18   same reasons discussed in the prior section, and because of the

19   absence of any evidence that contradicts the version of the

20   events described in these declarations.

21   Defendants argue that they have not violated § 12203(b)

22   because the alleged conduct by RJD staff has not stopped class

23   members from filing ADA requests or grievances.  In support, they

24   submitted data for the years 2017 to 2019 showing that class

25   members, including some of the ones who filed declarations, filed

26   ADA requests and grievances.  See Olgin Decl., Docket No. 3006-3;

27   Olgin Decl., Docket No. 3050.  These data show that class members

28   filed some ADA requests and grievances, but do not negate the

United States District Court
Northern District of California

possibility that class members refrained from filing ADA requests
or grievances that they would have filed but for the threats,
intimidation, or coercion by RJD staff.  By definition, these
data do not take into account ADA requests and grievances that
class members did not make or submit, nor do they take into
account requests and grievances that class members withdrew.  As
discussed above, some of the declarants state that they filed
some ADA requests or grievances but later withdrew them, or that
they decided not to make new requests because of the threats,
intimidation, or coercion they experienced.  Further, the data
that Defendants submitted show that more than half of the class
members housed at RJD from 2017 through 2019 did not file a
single ADA request or grievance during that time period, which
supports the inference that some class members are choosing to
forgo their ADA rights as a result of threats, coercion, or
intimidation by RJD staff.  See Olgin Decl., Docket No. 3050;
Grunfeld Decl. ¶¶ 28-29, Docket No. 3051-4.  Accordingly, the
Court finds that Defendants' data do not impact its finding that
Defendants violated class members' rights under § 12203(b).

IV.   Defendants failed to log instances of non-compliance with
      the ARP and ADA in the Court-ordered accountability logs

     As noted above, the Court ordered Defendants to track
allegations of non-compliance with the ARP and the Court's
remedial orders starting in 2007.  See 2007 Injunction; Order
modifying 2007 Injunction.  Defendants' tracking obligations are
set forth in the Court's order of December 29, 2014, which
modifies the 2007 injunction and clarifies Defendants' reporting
obligations with respect to the accountability log.  It provides:

31

> Defendants, their agents and employees
> (Defendants) shall track any allegation that
> any employee of the Department of
> Corrections and Rehabilitation was
> responsible <u>for any member of the Plaintiff
> class not receiving access to services,
> programs, activities, accommodations or
> assistive devices required by any of the
> following: the Armstrong Remedial Plan, the
> Americans with Disabilities Act or this
> Court's prior orders</u>.  Allegations to be
> tracked include, but are not limited to,
> those received from CDCR staff, prisoners,
> Plaintiffs' counsel, administrative appeals
> and third parties.  All such allegations
> shall be tracked, even if the non-compliance
> was unintentional, unavoidable, done without
> malice, done by an unidentified actor or
> subsequently remedied.

Order Modifying 2007 Injunction at 1, Docket No. 2479 (emphasis added).

Plaintiffs argue that Defendants are in violation of that requirement because they failed to log certain allegations of staff misconduct at RJD, including (1) allegations that RJD staff denied class members reasonable accommodations for their disabilities; (2) allegations that class members suffered retaliation for filing complaints against RJD staff or otherwise participating in investigations regarding RJD staff misconduct; (3) allegations that class members suffered physical[12] or verbal abuse[13] by RJD staff; and (4) allegations described in the Bishop

---

[12] These allegations include that RJD officers flipped over a class member while he was in his wheelchair, and that an RJD officer grabbed a class member's hand and cane and caused him to lose balance before slamming the class member's head into a table.

[13] These allegations include that RJD staff make remarks to people with disabilities such as, "go sit your crippled ass down."

32

United States District Court
Northern District of California

1  Report that involved class members.  See Freedman Decl. ¶ 280,

2  Docket No. 2921-2.

3      Defendants do not dispute that they have failed to log the

4  allegations that Plaintiffs have identified.  Defendants argue

5  that their failure to log these allegations is justified because

6  such allegations do not involve the denial of access to services,

7  programs, activities, accommodations, or assistive devices, which

8  is what the Court's Order Modifying the 2007 Injunction requires.

9      The Court finds that its Order Modifying the 2007 Injunction

10  requires Defendants to log allegations only to the extent that

11  they involve the denial of or failure to receive access to

12  services, programs, activities, accommodations, or assistive

13  devices.  Order Modifying 2007 Injunction at 1, Docket No. 2479.

14  This Order does not require Defendants to log allegations of

15  discrimination or retaliation in violation of the ADA (or

16  otherwise) that do not involve the denial of access to services,

17  programs, activities, accommodations, or assistive devices.

18      Nonetheless, most of the allegations that Plaintiffs contend

19  were not logged by Defendants involve failures to provide

20  reasonable accommodations to class members, such as by denying

21  class members alternative handcuffing methods, wheelchairs, and

22  additional time to enter or leave a cell.  See Freedman Decl. ¶

23  280.  Defendants do not dispute that these allegations involve

24  denials of reasonable accommodations required by the ARP and ADA.

25  Defendants' failure to log these allegations constitutes a

26  violation of the Order Modifying the 2007 Injunction.

27      The parties disagree as to whether allegations involving

28  physical or verbal abuse against a class member should be logged.

33

United States District Court
Northern District of California

As discussed in more detail in the Conclusions of Law, a denial of reasonable accommodations in violation of the ADA can take place where a law enforcement officer could have used less force or no force during the performance of his law-enforcement duties with respect to a disabled person.  When that rule is applied in the context of correctional facilities, it follows that a denial of reasonable accommodations in violation of the ADA can take place where a correctional officer could have used less force or no force during the performance of his penological duties with respect to a disabled person.  Accordingly, allegations that fall in this category must be logged by Defendants, including those that were described in the Bishop Report.

Plaintiffs have not shown that verbal abuse, without more, can qualify as a failure to provide a reasonable accommodation in violation of the ADA.  Accordingly, the Court denies, without prejudice, Plaintiffs' request to find that Defendants violated the Court's prior orders and injunctions when they failed to log allegations of verbal abuse.

The parties disagree as to whether allegations of intimidation or retaliation in violation of the ADA must be logged.  As noted, the Order Modifying the 2017 Injunction does not require Defendants to log such allegations if they do not involve the denial of access to services, programs, activities, accommodations, or assistive devices.  Accordingly, Defendants' failure to date to log allegations of this type does not constitute a violation of that order.

The parties' and the Court's intent at the outset of the remedial phase of this litigation, however, was to require

1    Defendants to operate their facilities and programs in accordance

2    with the ADA and RA.  Stipulation and Order ¶ 12, Docket No. 148.

3    Tracking alleged violations of the ADA's anti-retaliation and

4    anti-interference provisions, 42 U.S.C. § 12203(a) and (b), would

5    be consistent with that intent, as it would promote Defendants'

6    compliance with all provisions of the ADA.  Accordingly, the

7    Court will modify its prior orders and injunctions to require

8    Defendants to track allegations of violations of the ADA's anti-

9    retaliation and anti-interference provisions.

10   V.   Additional remedial measures are necessary to end the
          ongoing violations of the ARP and ADA
11

12        The Court finds that the root cause of the violations of the

13   ARP and class members' ADA rights is the systemic and long-term

14   failure by CDCR to effectively investigate and discipline

15   violations of the ARP and class members' ADA rights by RJD staff.

16   The policies, procedures, and monitoring mechanisms currently in

17   place, despite recent modifications made by Defendants, have

18   proven to be ineffective at curbing the violations.  This is

19   evidenced by the multiple ARP and ADA violations that have

20   occurred since the present enforcement motion was filed in

21   February 2020, which are of the same nature as the ones that

22   Plaintiffs' counsel first reported to Defendants in September

23   2016.

24        The ineffectiveness of the policies and procedures currently

25   in place appears to be the consequence of two factors.  First is

26   the deeply ingrained staff culture at RJD of looking the other

27   way, so to speak, whenever staff misconduct occurs or is alleged

28   by an inmate, notwithstanding any official requirements to report

United States District Court
Northern District of California

United States District Court
Northern District of California

and investigate the misconduct.  This culture is enforced through retaliatory acts by staff who wish to maintain the culture against inmates and other staff who might report acts of misconduct, and by CDCR's failure to conduct prompt and effective investigations of allegations of misconduct, particularly where there is no video evidence or corroboration by staff of the misconduct.  Second is the reluctance of inmates and staff at RJD to assist with the documentation and investigation of acts of misconduct by staff for fear of retaliation.  Each of these factors appears to feed the other in a cycle that has proven to be difficult to break.

Defendants make several arguments to try to show that requiring them to implement additional remedial measures is unnecessary, but these arguments are unpersuasive.

Defendants contend that further remedial measures are premature at this juncture because investigations of class members' allegations have not yet been completed.  The Court is not convinced that the pendency of the investigations warrants a delay in implementing additional remedial measures.  Defendants have provided no timeline for when the Court could expect the investigations to be completed; based on the record, it seems reasonable to expect that investigations could take many months, if not years.  As discussed above, the OIG, in reviewing CDCR's response to class members' allegations of staff misconduct, noted that CDCR's investigations of such allegations had been inordinately delayed or abandoned.  The Court is reluctant to allow further violations of class members' rights under the ARP and ADA to occur while the investigations are pending.  Further,

1    the Chief Ombudsman, Associate Warden Bishop, the OACC, and the

2    two correctional investigative sergeants from outside of RJD

3    recommended that CDCR take immediate concrete actions, including

4    installing new surveillance cameras, based on allegations of

5    staff misconduct that had not yet been proven.  Their recommended

6    remedial measures were not contingent on the completion of

7    investigations of the allegations.  The allegations of staff

8    misconduct alone, because of their number and consistency, were

9    sufficient for these state officials to decide that immediate

10   remedial actions were necessary.  Here, the Court has before it

11   actual unrefuted evidence that violations of class members'

12   rights under the ARP and ADA have occurred, which is more than

13   the state officials had when they recommended that CDCR take

14   immediate remedial action.

15       Defendants next contend that conditions at RJD have improved

16   since 2017 as a result of the steps they have taken to date to

17   change the culture and improve staff accountability there, such

18   as providing staff with additional training, replacing certain

19   supervisors, reducing blind spots, taking disciplinary actions

20   against nine RJD officers, assigning additional staff to address

21   complaints about conditions at RJD, and deploying the Allegation

22   Inquiry Management System (AIMS), which is a new system

23   implemented at RJD in January 2020 that is intended to provide

24   second-level review outside of RJD of staff misconduct complaints

25   that involve serious bodily injury.  Miller Decl. ¶¶ 11-16, 21-

26   22, 34-52, 53-57; McGinnis Decl., Ex. B at 18-22, 41.

27       The only evidence that Defendants cite to support the

28   proposition that conditions at RJD have improved as a result of

37

United States District Court
Northern District of California

the measures they have implemented is data showing that reported incidents involving the use of force (UOF) have decreased on Facility C by forty-four percent from 2018 to 2019, Miller Decl. ¶ 65, and that staff misconduct complaints on Facility C have decreased by forty percent over the same time period, id.

The Court finds that reliable inferences about whether conditions for class members at RJD have improved cannot be drawn from Defendants' data.  First, Defendants have not shown that a reduction of UOF and staff misconduct incidents on Facility C, which is the focus of their analysis, indicates a similar reduction on other facilities at RJD.  The violations of class members' ARP and ADA rights have taken place throughout RJD, not just on Facility C.  Plaintiffs represent, and Defendants do not dispute, that UOF incidents increased from 2017 to 2019 on Facility D by fifty percent and on Facility A by almost sixteen percent.  Grunfeld Decl. ¶¶ 64-65, Docket No. 3023-5.  This increase, and the inmate declarations now before the Court, are consistent with the inference that the measures that Defendants have implemented have not been effective at stopping or even reducing acts of misconduct by RJD staff against class members. As discussed above, some of the incidents described in the inmate declarations took place in facilities other than Facility C in April 2020, and in the case of the two inmates who were transferred out of RJD pursuant to the Court's order, as late as June 2020.

Second, Defendants acknowledged at the August 11 hearing that the data upon which they rely capture only UOF or staff misconduct incidents that were reported.  The Court cannot draw

38

any conclusions from this data because the record shows that a significant number of UOF or staff misconduct incidents are not reported and therefore not reflected in Defendants' data.  For example, the Bishop Report states that sixty-six inmates out of the 102 who were interviewed (or seventy percent) responded that they expected a negative outcome if they reported staff misconduct or the use of excessive force.  Bishop Report at 9.  That number may actually be higher, because the "inmates who stated they were neutral or refused to answer [the question] sometimes stated they would not answer the question for fear of reprisal."  Id.  Additionally, many of the inmate declarations now before the Court also state that class members are reluctant to report staff misconduct or the improper use of force for fear of retaliation or further abuse.

Because Defendants' UOF and staff misconduct data likely are under-representative of the actual UOF or staff misconduct incidents that take place at RJD, the Court cannot find, based on the data, that UOF and staff misconduct incidents have decreased at RJD as a result of the measures that Defendants have implemented thus far.  It is possible that the actual number of UOF or staff misconduct incidents has remained constant, or even increased, since 2017, and that the decline in reported UOF or staff misconduct incidents is merely the result of increasing unwillingness on the part of inmates to report the incidents.  See Vail Decl. ¶ 34, Docket No. 3023-9 ("Given the history of retaliation at RJD, I am not convinced that a reduction in staff misconduct complaints at Facility C represents progress.").

39

The Court does take note of the fact that Defendants' data show that twenty percent to twenty-four percent of the reported UOF incidents between 2017 and 2019 involved a class member. Because class members are in wheelchairs, have severe mobility issues, have hearing or visual impairments, or suffer from other significant impairments, common sense suggests that the proportion of reported UOF incidents involving class members should be much lower, because class members do not pose as much of a threat to staff or other inmates as other inmates who are not disabled. The relatively high incidence of reported UOF incidents involving class members is not explained by Defendants. The Court finds that this high incidence of UOF incidents involving class members lends additional credibility to the inmate declarations, and the allegations described in the Bishop Report and correctional investigative sergeants' memoranda, that staff at RJD target class members and other vulnerable inmates for physical and other forms of abuse.

Defendants and their expert also posit that no additional remedial measures are necessary because the current policies and procedures "are adequate when properly utilized and applied in the review of staff misconduct including excessive use of force." McGinnis Decl., Ex. B at 8-9, Docket No. 3006-2 (emphasis added). This argument misses the point. It fails to acknowledge that the evidence shows that the current policies and procedures are not being properly utilized and applied. As discussed above, the record shows that CDCR's investigation of staff misconduct incidents has been deficient and slow notwithstanding the current policies and procedures. Further, the implementation of the new

40

United States District Court
Northern District of California

1   AIMS system, which Defendants tout as one of the most significant

2   improvements they have enacted to respond to allegations of staff

3   misconduct, is unlikely to be a panacea, at least for class

4   members in this case, because it provides automatic second-level

5   review outside of RJD for allegations of staff misconduct, but

6   only if they involve serious bodily injury.  Not every alleged

7   denial of a reasonable accommodation to a class member involves

8   serious bodily injury, yet every such denial should be the

9   subject of a proper, unbiased investigation.  Under AIMS, alleged

10  denials of a reasonable accommodation that do not involve serious

11  bodily injury will not receive an automatic second-level review

12  outside of RJD, meaning that if RJD staff determine during the

13  first-level review that the allegations are unfounded, then the

14  inquiry at all levels will end there.

15      Even with AIMS in place in addition to all of the other

16  changes that Defendants have implemented in the last few years,

17  class members have shown that RJD staff have continued to violate

18  their rights under the ARP and the ADA well into 2020.

19  Defendants themselves admit that misconduct at RJD is ongoing.

20  See Defs.' Rule 30(b)(6) Designee (Kimberly Seibel) Dep. Tr. at

21  267, Docket No. 2922-1.  For this reason, the Court cannot find

22  that measures that Defendants have implemented recently have been

23  effective or will be effective at stopping the ongoing violations

24  of class members' rights under the ARP and ADA in the absence of

25  additional remedial measures.

26      The Court finds that adopting a wait-and-see approach would

27  be contrary to the parties' and the Court's intent for the

28  remedial phase of this litigation, which was to bring CDCR into

United States District Court
Northern District of California

compliance with the ARP and ADA.  Pursuant to the parties'
agreement, the Court's role during the remedial phase is to give
force to that intent.  In light of the substantial evidence of
noncompliance now before it, and the evidence showing that the
current policies and procedures have already proven to be
ineffective at bringing Defendants into compliance, the Court
finds that requiring Defendants to implement additional remedial
measures is both necessary and warranted.

Plaintiffs request that the Court require Defendants to
develop a plan within thirty days to implement the additional
remedial measures described in more detail below.  The plan would
be implemented within forty-five days after the parties meet and
confer.  See Revised Proposed Order at 17-21, Docket No. 3024-6.[14]

The Court finds that requiring Defendants to design, and
ultimately implement, a plan that requires them to adopt a
combination of certain of the remedial measures that Plaintiffs
propose, with modifications, as discussed below, is necessary to
prevent further violations of the ARP and class members' ADA
rights at RJD.  These additional remedial measures are intended
and tailored to improve policies and procedures for supervising
RJD staff's interactions with inmates, investigating RJD staff
misconduct, and disciplining RJD staff by enhancing the process
for gathering and reviewing evidence that can be used to hold

---

[14] Defendants object to Plaintiffs' revised proposed order on
the ground that Plaintiffs filed it after they filed their
initial brief in support of their enforcement motion.  The Court
overrules Defendants' objection because the Court provided
Defendants with the opportunity to file a supplemental brief in
which they could respond to any new matters raised in or attached
to Plaintiffs' reply.

United States District Court
Northern District of California

1  staff accountable for any violations of the ARP and class

2  members' ADA rights.  These additional measures, when considered

3  as a whole, constitute an incremental expansion of processes and

4  systems that are already in place pursuant to the Court's prior

5  orders and injunctions.  See, e.g., Order Modifying 2007

6  Injunction at 1-4 , Docket No. 247 (requiring that Defendants

7  follow certain procedures for tracking non-compliance with the

8  ARP, the ADA, and the Court's prior orders; for conducting

9  investigations of employee non-compliance; and for conducting

10  disciplinary proceedings against employees who engaged in

11  noncompliance); Remedial Order and Injunction at 5 (providing for

12  information-sharing with Plaintiffs' counsel for monitoring

13  purposes).

14        1.   Surveillance cameras

15        Plaintiffs request that (1) Defendants install additional

16  surveillance cameras in all areas at RJD to which incarcerated

17  people have access, including, but not limited to, all exercise

18  yards, housing units, sally-ports, dining halls, program areas,

19  and gyms, within ninety days; (2) CDCR adopt policies and

20  procedures regarding the use of camera footage, including

21  requirements that all footage be retained for a minimum of ninety

22  days, that footage of use of force and other triggering events be

23  retained indefinitely, and that footage, when available, be

24  reviewed and considered as part of the investigation of the

25  incident; and (3) CDCR train RJD staff regarding how and when to

26  request that footage be retained and reviewed.

27        Both parties and their experts agree that the installation

28  of additional surveillance cameras at RJD is necessary.  See,

43

e.g., Defs.' Resp. at 13 (admitting that "[s]urveillance systems are an effective tool to investigate incidents of violence, provide transparency in staff misconduct allegations, and reduce contraband activity"); Schwartz Decl. ¶¶ 87, 94-98; Vail Decl. ¶¶ 83, 94-101.  The reason for the consensus is obvious.  Video footage provides objective evidence that cannot easily be disregarded.  As Defendants' expert explains, a more comprehensive surveillance system:

> [W]ill substantially improve the ability of the CDCR and RJD administration to hold staff and inmate [sic] accountable for all inappropriate behavior, provide an efficient tool for internal affairs and criminal investigators to fully resolve complaints and allegations, will serve as a deterrent for inappropriate behavior by both staff and inmates, and provide the facility the ability to monitor locations that are now difficult to monitor on an ongoing basis.

McGinnis Decl., Ex. B. at 27.

Defendants nevertheless oppose Plaintiffs' request to require them to install additional surveillance cameras at RJD for two reasons: (1) they intend to submit a funding request to install them in the future, so an order requiring them to install them now is unnecessary; and (2) installing a video surveillance system at RJD in ninety days as Plaintiffs request is not feasible because, in Defendants' view, it would take at least a year to install and deploy the system.  Macomber Decl. ¶¶ 9-13; McGinnis Decl. Ex. B at 27.

The Court is not persuaded.  Defendants' arguments fail to acknowledge that violations of class members' rights under the ARP and ADA are likely to continue to take place in the absence of the additional surveillance cameras, and that such a scenario

United States District Court
Northern District of California

United States District Court
Northern District of California

1  is unacceptable.  Because cameras are critical in achieving true

2  accountability and compliance at RJD for the reasons set forth

3  above, the Court finds that the installation of additional

4  surveillance cameras is necessary and that it must be done as

5  soon as possible.  Plaintiffs have submitted evidence, which

6  Defendants have not rebutted, showing that surveillance cameras

7  could be installed and fully deployed at RJD within four months.

8  Vail Decl. ¶¶ 59-61, Docket No. 3023-9.  In light of the pressing

9  need for additional surveillance cameras at RJD, the Court finds

10 that any burdens associated with installing them on a time frame

11 that is shorter than what Defendants initially anticipated are

12 outweighed by the significant benefits of having additional

13 surveillance cameras at RJD.  Defendants already have a contract

14 in place with a vendor for the installation of surveillance

15 cameras at CDCR institutions through June 2023.  Diaz Decl. ¶ 42;

16 Macomber Decl. ¶ 12.  This existing contract should facilitate

17 the installation and deployment process.

18      Defendants have not raised an objection in their briefs to

19 Plaintiffs' request that their plan include policies and

20 procedures regarding the use of camera footage and training for

21 RJD staff regarding the same, as discussed in more detail above.

22 In the absence of a showing to the contrary, the Court finds that

23 policies, procedures, and training on the use of camera footage

24 are necessary and should be a part of Defendants' plan.

25           2.    Body cameras

26      Plaintiffs request that CDCR purchase and begin using body-

27 worn cameras for all correctional officers at RJD within sixty

28 days.

45

United States District Court
Northern District of California

1    Defendants oppose the request on the grounds that (1) body

2    cameras are not typically used in correctional facilities and

3    jails, and CDCR lacks enough information to determine whether the

4    use of body cameras would be effective, both in terms of the

5    footage they would capture and their cost; (2) Defendants' expert

6    opines that body cameras may not be as effective as surveillance

7    cameras because they require the user to turn them on and off at

8    the appropriate times, and because body cameras may not capture

9    certain incidents that would be captured by fixed cameras as a

10   result of the angle and perspective of their lenses, McGinnis

11   Decl., Ex. B at 28-29; (3) procuring hundreds of body cameras in

12   sixty days may not be feasible in light of the logistical issues

13   raised by the present pandemic and the procurement procedures

14   that CDCR must follow, Defs.' Supp. Resp. at 4-5; and (4)

15   policies for the use of body cameras must be in place before they

16   are used at RJD..

17   The Court finds that body cameras are likely to improve

18   investigations of misconduct by RJD staff and to reduce the

19   incidence of violations of class members' rights under the ARP

20   and ADA.  They are, therefore, necessary and should be deployed

21   at RJD as soon as possible.  The Court finds the opinions of

22   Plaintiffs' expert, which Defendants have not rebutted with any

23   evidence, to be persuasive.  Eldon Vail opines, based on research

24   and studies on the topic, that the use of body cameras in

25   correctional facilities has resulted in "increased officer and

26   inmate safety, fewer uses of force," and improved investigations

27   of internal misconduct by officers, particularly when used in

28   conjunction with surveillance cameras.  Vail Decl. ¶¶ 64-66,

1   Docket No. 3023-9.  He further opines that issues about when

2   cameras should be turned on or off, and privacy concerns, can be

3   addressed through policymaking and training.  Id. ¶¶ 67-68.  Vail

4   also opines that body cameras can be procured and deployed at RJD

5   in two months.  Id. ¶ 70.

6        Defendants have not shown that procuring the body-worn

7   cameras in the time frame that Plaintiffs have proposed would not

8   be feasible.  Defendants note that the pandemic has "disrupt[ed]

9   manufacturing centers and supply chains across the globe," Supp.

10  Resp. at 4, but they do not point to any evidence showing that

11  these disruptions would prevent them from procuring the body-worn

12  cameras in the time frame that Plaintiffs have proposed.  They

13  also speculate that "[r]equiring Defendants to rush to award a

14  sizeable contract on such short notice would risk thwarting" the

15  state's policies with respect to government procurement, which

16  Defendants represent are intended to eliminate favoritism, fraud,

17  and corruption in the award of public contracts.  Id. (emphasis

18  added).  Defendants have not proffered any evidence showing that

19  requiring them to procure body-worn cameras in the time frame

20  that Plaintiffs have proposed would require them to violate these

21  policies.

22       In light of the foregoing, the Court finds that body-worn

23  cameras can be procured and deployed in the time frame that

24  Plaintiffs have proposed.

25       The Court agrees with Defendants that having policies and

26  procedures in place before body cameras are deployed at RJD is

27  sensible, and it will incorporate this sequence into its order

28  describing the additional remedial measures required herein.

47

United States District Court
Northern District of California

### 3. Processes for complaints, investigations, discipline, and oversight

Plaintiffs request that Defendants be required to develop a plan to reform the staff complaint, investigation, and discipline process to ensure (1) that CDCR completes unbiased, comprehensive investigations into all allegations of staff misconduct in which the victim was a class member; (2) that CDCR imposes appropriate and consistent discipline against employees who engage in misconduct against class members; and (3) that employees who engage in criminal misconduct against class members are appropriately investigated and, if warranted, referred for prosecution. Plaintiffs also request that CDCR headquarters be required to exercise oversight over all staff complaints, use of force reviews, and related staff disciplinary proceedings at RJD in which an employee is accused of engaging in misconduct against an incarcerated person, and to conduct quarterly interviews of randomly-selected incarcerated people at RJD using the methodology and interview questionnaire utilized by the December 2018 investigators.

Defendants oppose these requests, arguing that CDCR already has existing processes, policies, and oversight systems in place to investigate misconduct and discipline employees who commit it, which they contend are effective mechanisms because (1) the Inspector General testified that CDCR does well in assessing UOF incidents handled at the local level, and he agrees with CDCR's assessment about UOF incidents ninety-five percent of the time; (2) the current policies and procedures were developed in response to unrelated litigation, namely Madrid v. Gomez, Case No. 90-3094 (N.D. Cal.), and they balance the interests of

48

1   multiple stakeholders, including CDCR staff.  Defs.' Resp. at 34–
2   35; Diaz Decl. ¶ 11.

3       Defendants' arguments miss the point.  First, Defendants
4   fail to acknowledge that, based on the evidence discussed above,
5   the current policies and procedures have failed to prevent
6   violations of the ARP and of class members' rights under the ADA
7   at RJD.  These violations did not all involve the use of force.
8   Defendants rely on the Inspector General's testimony that the OIG
9   monitors forty percent of CDCR's assessments as to use-of-force
10  incidents state-wide, and that, of those, it agrees with CDCR's
11  assessments ninety-five percent of the time.  Roy Wesley Dep. Tr.
12  at 38, Grunfeld Decl., Ex. S, Docket No. 2922-1.  This testimony,
13  however, speaks to CDCR's assessments on a state-wide basis and
14  says nothing about whether the current policies and procedures
15  are effective in preventing violations of the ARP and class
16  members' ADA rights at RJD, whether the violations involve the
17  use of force or not.  As discussed above, when it comes to
18  investigations of alleged violations of class members' ADA rights
19  and other staff abuse at RJD, the OIG has been critical of CDCR's
20  performance.  Grunfeld Decl., Ex. J, Docket No. 2922-1.

21      Second, that the current policies and procedures were
22  developed in connection with the Madrid litigation, which
23  involved, in relevant part, the review of CDCR's policies and
24  procedures with respect to the use of force and CDCR's
25  investigation and enforcement of violations of the same, also
26  says nothing about whether such policies and procedures are
27  adequate to prevent further violations of the ARP and class
28  members' ADA rights at RJD.

49

United States District Court
Northern District of California

Here, the Court has found that it is necessary to stop ongoing violations of the ARP and class members' ADA rights at RJD, and that the current policies and procedures are incapable of achieving that.  Accordingly, the Court finds that requiring Defendants to craft a plan to modify the current policies, procedures, and oversight of staff complaints to achieve compliance with the ARP and ADA at RJD is necessary and appropriate.  By providing Defendants with discretion to craft this plan, the Court gives them the opportunity to balance the interests of any stakeholders who would be impacted by the modifications.

### 4.   Third-party monitoring

Plaintiffs request that the additional remedial measures include the appointment of an expert pursuant to Federal Rule of Evidence 706 to monitor Defendants' implementation of their plan to reform the staff complaint, investigation, and discipline policies and procedures, and that the expert have access to documents necessary to conduct its monitoring.

Defendants have not raised an objection in their briefs to this request.  In the absence of a showing to the contrary, the Court finds that requiring the appointment of an expert for monitoring purposes would make the implementation of the plan required herein more effective, and would assist Defendants in achieving compliance with the ARP and ADA.  Accordingly, the Court finds that the appointment of an expert is necessary and appropriate.

//

5.   Information-sharing with Plaintiffs' counsel and the Court Expert

Plaintiffs request that Defendants share with Plaintiffs' counsel and the court expert all documents related to staff complaints at RJD in which the alleged victim is a class member, as well as monthly written updates regarding the implementation of any additional remedial measures.

Defendants have not raised an objection in their briefs to this request.  In the absence of a showing to the contrary, the Court finds that requiring the sharing of documents as described above is necessary for the effective monitoring of Defendants' implementation of the additional remedial measures and is appropriate.

6.   Supervisory staffing

Plaintiffs request that CDCR significantly increase supervisory staff on all watches on all yards at RJD and create non-uniformed supervisory positions in each housing unit.

Defendants argue that no changes to their staffing structure are necessary in light of the changes they already have made to their staffing policies and procedures.  Defs.' Resp. at 36-37. Defendants note that CDCR has dedicated a full-time ombudsman at RJD for six months.

The Court finds that additional supervisory staff in the form of additional sergeants is necessary at RJD.  The Bishop Report, which Defendants have endorsed, and Defendants' own expert, recommended increasing supervisory staff on Facility C at RJD in light of the allegations of misconduct that were made with respect to that facility.  See Bishop Report at 12-13, Docket No. 2921-6; McGinnis Decl., Ex. B at 34, Docket No. 3024-6.  Those

51

United States District Court
Northern District of California

1  recommendations can be extrapolated to the rest of RJD in light

2  of the evidence discussed above, which shows that violations of

3  the ARP and class members' ADA rights are taking place throughout

4  RJD under circumstances similar to those that formed the basis of

5  the recommendations in the Bishop Report.  As discussed above, at

6  present, the managerial presence at RJD in the form of sergeants,

7  whether at Facility C or otherwise, is not any higher than it was

8  in December 2018.  CDCR's Rule 30(b)(6) Designee (Kimberly

9  Seibel) Dep. Tr. at 168-69, Docket No. 2921-8.  The Court cannot

10 conclude that the presence of a full-time ombudsman at RJD is an

11 adequate replacement for the additional managerial presence that

12 the Bishop Report recommended, as Defendants have not shown that

13 the full-time ombudsman performs functions that are equivalent to

14 those that supervisory staff, such as sergeants, perform at RJD.

15 Accordingly, the Court finds that requiring CDCR to increase

16 managerial presence at RJD in the form of additional sergeants is

17 necessary.

18     The Court declines at this time to require CDCR to create

19 non-uniformed supervisory positions at RJD.  The parties' experts

20 disagree about the effectiveness of such non-uniformed positions,

21 McGinnis Decl., Ex. B at 32; Vail Decl. ¶ 79, and the Court finds

22 that there is insufficient evidence in the record outside of the

23 experts' conflicting declarations to make a determination as to

24 whether non-unformed supervisory positions are needed.

25          7.   Training

26     Plaintiffs request that CDCR develop and implement human

27 rights, de-escalation, and cultural training for all custody,

28 mental health, and medical staff at RJD to include discussion of

United States District Court
Northern District of California

reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people as patients.

Defendants object to requiring them to provide RJD staff with additional training beyond what they already provide.

In light of the evidence discussed above showing that the measures that CDCR has implemented to date, including providing staff with additional training, have proven to be ineffective at stopping violations of the ARP and class members' ADA rights, the Court finds that it is necessary to require Defendants to develop additional training programs for RJD staff and supervisors that are tailored to achieving staff compliance with the ARP and ADA.

### 8.   Data collection and early-warning system

Plaintiffs request that CDCR develop an electronic system for tracking all incidents at RJD by date, time, location, staff involved, incarcerated people involved, that includes information about whether inmates are class members, any injuries they suffered, and related medical records.

Defendants oppose this request, on the grounds that the newly created Enterprise Risk Management Branch, within the Office of Audits and Court Compliance, is responsible for a data-collection and early-warning system that appropriately addresses Plaintiffs' concerns.  Diaz Decl. ¶ 32.  This system collects, compiles, and analyzes information, evidence, and data from multiple CDCR offices, databases, and other tracking tools.  Id.

In their reply, Plaintiffs argue that this new system is not operational and is insufficient to achieve the level of tracking that they request, but do not explain why.  In the absence of sufficient evidence in the record to make a determination as to

United States District Court
Northern District of California

whether additional tracking by CDCR is necessary with respect to incidents involving class members at RJD, the Court declines to require additional tracking at this time.

9.   Pepper spray

Plaintiffs request a policy requiring that all pepper spray canisters at RJD be weighed before and after use.

Defendants and their expert oppose this request on the grounds that it would be unnecessarily burdensome and could potentially delay the movement of officers to their posts.

In light of the evidence discussed above, which shows that pepper spray was used on multiple occasions against class members where there was no evidence that the class members posed an imminent threat to RJD staff or other inmates, or that the use of pepper spray served a legitimate penological interest, the Court finds that it is necessary to require CDCR to craft a plan to modify its policies to more effectively monitor and control the use of pepper spray by RJD staff with respect to class members.

10.   Anti-retaliation

Plaintiffs request that CDCR be required to put an end to retaliation against class members and staff at RJD who report staff misconduct and to ensure complainants' safety.

Defendants did not object to this request in their briefs.

The Court finds that requiring CDCR to take steps to stop retaliation against class members at RJD in violation of the ADA is necessary.

LEGAL STANDARD

"It is well established that the district court has the inherent authority to enforce compliance with a consent decree

United States District Court
Northern District of California

that it has entered in an order, to hold parties in contempt for violating the terms therein, and to modify a decree." Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846, 860 (9th Cir. 2007); Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."). Further, a district court has "wide discretion" to modify its own injunctions "if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 647 (1961); see also Swift & Co., 286 U.S. 206, 114 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need").

The interpretation of a consent decree is for the court, and not the parties subject to the decree. Nehmer, 494 F.3d at 860 ("Although a party may ask the district court to issue an order clarifying, enforcing, or modifying a decree and suggest a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval.") The court's discretion in interpreting a consent decree is particularly wide where the court has been overseeing a remedial decree for many years. Id.; Armstrong v. Schwarzenegger, 622 F.3d at 1073 (holding that a court that has been "overseeing complex institutional reform litigation for a long period of time" is entitled to "heightened deference").

CONCLUSIONS OF LAW

I.   Plaintiffs have shown that Defendants violated the ARP and
     the Court's prior orders and injunctions[15]

     A.   Denial of reasonable accommodations for class members'
          disabilities

Section I of the ARP requires Defendants to comply with the

ADA's anti-discrimination and access provisions, 42 U.S.C. §

12132[16].  It provides, "No qualified inmate or parolee with a

disability as defined in Title 42 of the United States Code,

Section 12102 shall, because of that disability, be excluded from

participation in or denied the benefits of services, programs, or

activities of the Department or be subjected to discrimination."

ARP at 1, Docket No. 681.  As discussed above, the Court retained

jurisdiction to enforce Defendants' compliance with the ARP.

Remedial Order and Injunction at 5, Docket No. 158.

---

[15] Defendants argue that the allegations of staff misconduct
addressed herein fall outside of the scope of this litigation
because the operative complaint "does not allege that officers or
other prison staff are using excessive force or retaliating
against disabled inmates." Defs.' Resp. at 24-25.  The Court is
not persuaded.  Every iteration of the complaint has made the
same key allegation, namely that "[s]tate officials have
discriminated against plaintiffs and the class they represent by
reason of their disability." See, e.g., Compl. ¶ 1, Docket No.
1.  The incidents now at issue are alleged to be instances of
discrimination against class members by reason of their
disability; accordingly, such allegations are well within the
scope of this action.  Further, the ARP expressly requires
Defendants to abstain from denying class members reasonable
accommodations or discriminating against them by reason of their
disability.  The Court retained jurisdiction to enforce
Defendants' compliance with the ARP and any orders issued in
connection with the same.  The allegations of discrimination and
denials of reasonable accommodations now before the Court fall
within the scope of that jurisdiction.

[16] The language in Section 1 of ARP mirrors the language of
Title II of the ADA, 42 U.S.C. § 12132, which provides, "No
qualified individual with a disability shall, by reason of such
disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any such entity."

United States District Court
Northern District of California

1     To prove that a public program or service violated § 12132,

2  a plaintiff must show: (1) that he is a "qualified individual

3  with a disability"; (2) that he was either excluded from

4  participation in or denied the benefits of a public entity's

5  services, programs, or activities, or was otherwise discriminated

6  against by the public entity; and (3) that such exclusion, denial

7  of benefits, or discrimination was by reason of his disability.

8  Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as

9  amended on denial of reh'g (Oct. 11, 2001).

10     The Ninth Circuit has held that the second element of this

11  test can be satisfied where a law enforcement officer could have

12  used less force or no force during the performance of his law-

13  enforcement duties with respect to a disabled person.  See

14  Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1232-33

15  (9th Cir. 2014), rev'd on other grounds sub nom., City & Cty. of

16  San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015) (holding

17  that a failure to reasonably accommodate a person's disability in

18  the course of an investigation or arrest by using unnecessary

19  force, causing the person to suffer "greater injury or indignity

20  in that process than other arrestees," gives rise to a claim

21  under § 12132, and that a reasonable jury could conclude that a

22  police officer's failure to use less force or no force during an

23  arrest of a person with mental illness could constitute a failure

24  to provide a reasonable accommodation in violation of § 12132);

25  Vos v. City of Newport Beach, 892 F.3d 1024, 1037 (9th Cir.

26  2018), cert. denied sub nom. City of Newport Beach, Cal. v. Vos,

27  139 S. Ct. 2613 (2019) (same).  When applied in the prison

28  context, it follows that the second element of a § 12132 claim

United States District Court
Northern District of California

1  can be satisfied where a correctional officer could have used

2  less force or no force during the performance of his penological

3  duties with respect to a disabled person.[17]

4      Defendants did not address, much less distinguish, these

5  authorities in their briefs, nor did they dispute that the second

6  element of a § 12132 claim can be satisfied in the manner just

7  described.

8      Here, it is undisputed that class members are "qualified

9  individuals with a disability" within the meaning of the ADA, and

10 that the first element is met.  At issue is whether Plaintiffs

11 have shown, as required by the second and third elements of a

12 claim under § 12132, that RJD staff denied class members the

13 benefits of RJD's services, programs, or activities, or otherwise

14 discriminated against them, by reason of their disabilities.

15      As discussed in more detail in the Findings of Fact, the

16 Court has found that RJD staff failed on numerous occasions to

17 reasonably accommodate the disabilities of class members.  RJD

18 staff refused class members' requests for alternative methods for

19 communication (in the case of deaf inmates); for the use

20

21      [17] The OIG's interpretation of CDCR's use-of-force policy is
22 consistent with the notion that correctional officers have an
   obligation under the ADA to reasonably accommodate an inmate's
23 disabilities when considering the use of force in the performance
   of their penological duties.  See OIG Report, Monitoring the Use-
24 of-Force Review Process of the California Department of
   Corrections and Rehabilitation (July 13, 2020) at 5, Grunfeld
25 Decl., Ex. VV ("According to departmental policy, when
   determining the best course of action to resolve a particular
26 situation, staff must evaluate the totality of the circumstances,
   including an inmate's demeanor, mental health status and medical
27 concerns (if known), and the inmate's ability to understand and
   comply with orders.  Policy further states that staff should
28 attempt to verbally persuade, whenever possible, to mitigate the
   need for force.").

United States District Court
Northern District of California

1   alternative handcuffing methods (in the case of mobility-impaired

2   inmates); for assistance with operating wheelchairs (in the case

3   of wheelchair-bound inmates); for showers and cleaning supplies

4   (for inmates with incontinence problems); for additional time to

5   safely enter and exit cells (for mobility-impaired inmates); and

6   for adequate transportation methods (for mobility-impaired

7   inmates).  Defendants do not dispute that these class members

8   required, and that RJD staff failed to provide them with,

9   reasonable accommodations, nor do they dispute that these

10  failures constitute denials of the benefits of CDCR's services,

11  programs, or activities or discrimination within the meaning of §

12  12132.  Accordingly, the second element is met as to these

13  incidents.

14       The Court also has found that RJD staff failed to provide

15  reasonable accommodations for class members' disabilities when

16  RJD staff failed to use less force or no force when performing

17  their penological duties, such as by throwing class members out

18  of wheelchairs, punching them, kicking them, or using pepper

19  spray where the undisputed evidence shows that the class members

20  posed no threat to RJD staff that would warrant the use of such

21  force.  The second element also is met as to these incidents.

22       As to the third element, whether these failures to provide

23  reasonable accommodations were due to the class members'

24  disabilities, the Court found that this element is met based on

25  the totality of the evidence.  Inmates state in their

26  declarations that they believe, based on their own experiences

27  and observations, that RJD staff targets people with disabilities

28  and other vulnerable inmates for mistreatment.  These beliefs are

United States District Court
Northern District of California

consistent with the allegations credited in the Bishop Report and the memoranda by the two sergeant investigators, and the opinions of Plaintiffs' experts, which Defendants have not disputed. Defendants have not proffered any evidence from which the Court could infer an alternative cause for the incidents in question, such as a legitimate penological interest or the lack of a reasonable accommodation that RJD staff could have provided to the class members.

Accordingly, the Court finds that Defendants have violated Section I of the ARP and the Court's prior orders by violating § 12132.

B.    Interference with class members' ADA rights

Plaintiffs contend that staff at RJD have interfered with class members' exercise of their rights under the ADA in violation of the ADA's anti-interference provision, 42 U.S.C. § 12203(b), which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

Section 12203(b) was not expressly incorporated into the ARP.  Nevertheless, the Court concludes that Defendants are required to comply with § 12203(b), which is a part of the ADA. The stipulated order that the Court entered at the outset of the remedial phase of this litigation makes clear that "the intent" of the parties was "to require defendants to operate programs, activities, services and facilities of the California Department

60

United States District Court
Northern District of California

of Corrections in accordance with the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973[.]" Stipulation and Order ¶ 12, Docket No. 148. The purpose of the ARP was to set forth specific actions that Defendants would take to bring their programs, activities, services, and facilities into compliance with the ADA and the RA. One of such action was to set up a system to facilitate class members' requests for reasonable accommodations and ADA-related grievances. When RJD staff frustrate the effectiveness of that system by threatening, coercing, or intimidating class members into foregoing their rights to request reasonable accommodations or file ADA-related grievances, that constitutes a violation of the ARP and the Court's prior orders and injunctions regarding the same.

The Ninth Circuit has not specifically described the elements required to establish a violation of § 12203(b), nor has it defined what "intimidation" or "coercion" mean in the context of § 12203(b). The Court finds Brown v. City of Tucson to be instructive. 336 F.3d 1181, 1191-93 (9th Cir. 2003). There, the Ninth Circuit held that the plaintiff had stated a claim for a violation of § 12203(b) by alleging facts showing that (1) her employer threatened her with an adverse action; (2) the threat had a nexus to her exercise or enjoyment of an ADA right; and (3) she suffered "distinct and palpable" injury as a result of the threat. Id. The Ninth Circuit held that the requisite injury "could consist of either the giving up of her ADA rights, or some other injury which resulted from her refusal to give up her rights, or from the threat itself." Id.

61

United States District Court
Northern District of California

As discussed in more detail in the Findings of Fact, the Court has found that staff members at RJD have interfered with certain class members' enjoyment of their rights under the ADA and ARP in violation of § 12203(b) by intimidating, threatening, or coercing them into abstaining from making requests for reasonable accommodations or filing ADA grievances.  As a result of the intimidation, threats, and coercion, these class members suffered injury in the form of giving up their rights to make requests for reasonable accommodations or to file ADA grievances, or in the form of severe emotional distress.  See Brown, 336 F.3d at 1193 (holding that the plaintiff alleged an injury within the meaning of § 12203(b) by alleging that she "suffered short-term memory problems and felt extremely stressed, harassed, and pressured" by her employer's threats).

These violations of § 12203(b) constitute violations of the ARP and the Court's prior orders and injunctions regarding the same.

II.  Plaintiffs have shown that Defendants failed to comply with their Court-ordered tracking and accountability obligations

As discussed above, the Court has found that its Order Modifying the 2007 Injunction requires Defendants to log allegations only to the extent that they involve the denial of or failure to receive "access to services, programs, activities, accommodations or assistive devices required by any of the following: the Armstrong Remedial Plan, the Americans with Disabilities Act or this Court's prior orders."  Order Modifying 2007 Injunction at 1, Docket No. 2479 (emphasis added).

United States District Court
Northern District of California

1    It is undisputed that Defendants failed to log alleged

2  failures to provide reasonable accommodations to class members,

3  such as by denying class members alternative handcuffing methods,

4  wheelchairs, and additional time to enter or leave a cell.  See

5  Freedman Decl. ¶ 280.  It is also undisputed that Defendants

6  failed to log alleged failures by RJD staff to provide reasonable

7  accommodations to class members where the reasonable

8  accommodation would have been the use of less force or no force

9  during the performance of penological duties.  The Court has

10  found that Defendants violated the Court's prior orders and

11  injunctions by failing to log these allegations.

12    The Court will modify its prior orders and injunctions to

13  require Defendants to track allegations of retaliation and

14  interference in violation of the ADA's anti-retaliation and anti-

15  interference provisions, 42 U.S.C. §§ 12203(a) and (b).  The

16  Court has found that including such allegations in the

17  accountability log is consistent with the parties' intent to

18  require Defendants, during the remedial phase of this litigation,

19  to operate their facilities and programs in accordance with the

20  ADA and RA.  See Stipulation and Order ¶ 12, Docket No. 148.

21  III.  The implementation of additional remedial measures is
         necessary to ensure compliance with the ARP and ADA
22

23    The Court retained jurisdiction to enforce the terms of the

24  Remedial Order and Injunction, as well as to issue "any order

25  permitted by law, including contempt, necessary to ensure that

26  defendants comply with the guidelines, policies, procedures,

27  plans and evaluations" required by the Remedial Order and

28  Injunction.  Remedial Order and Injunction at 5, Docket No. 158.

The Court has found that the additional remedial measures
discussed above are necessary to ensure that Defendants comply
with their obligation under the ARP and ADA to provide reasonable
accommodations for class members' disabilities and to otherwise
refrain from discriminating against class members by reason of
their disabilities.  They also are necessary to effectuate the
parties' and the Court's intent "to require defendants to operate
programs, activities, services and facilities of the California
Department of Corrections in accordance with the Americans with
Disabilities Act and § 504 of the Rehabilitation Act of 1973[.]"
Stipulation and Order ¶ 12, Docket No. 148.  Accordingly, the
Court will modify its prior orders and injunctions to require
Defendants to develop a plan to implement the additional remedial
measures that the Court has found to be necessary to bring
Defendants into compliance with the ARP and ADA.[18]

---

[18] Defendants contend that the modification of an injunction
requires new findings of (1) irreparable injury; (2)
unavailability of adequate remedies at law; (3) balance of
hardships; and (4) consideration of the public interest.  To
support that proposition, Defendants rely on Arizona Dream Act
Coal. v. Brewer, 855 F.3d 957, 963 (9th Cir. 2017).  Brewer is
distinguishable, because the permanent injunction there was
issued after the district court granted summary judgment in favor
of the plaintiffs.  There was no modification of a prior
injunction in Brewer.  Here, by contrast, the Court entered the
Remedial Order and Injunction pursuant to the parties' agreement
after they settled this action.  Stipulation and Order Re:
Liability and Remedy ¶ 6, Docket No. 148.  During the remedial
phase of this litigation, the Court has modified its injunctions
several times in response to enforcement motions such as the
present one pursuant to the jurisdiction it retained to enter
"any order permitted by law, including contempt, necessary to
ensure that defendants comply" with the ARP.  Remedial Order and
Injunction at 5, Docket No. 158.  Defendants cite no authority
showing that the Court must make any specific findings when
enforcing the ARP under the terms of the parties' settlement

United States District Court
Northern District of California

IV. The additional remedial measures ordered herein are
consistent with the PLRA

The Prison Litigation Reform Act (PLRA) provides that courts "shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The Court is required to give substantial weight to "any adverse impact on public safety or the operation of a criminal justice system caused by" the prospective relief. Id. Whether prospective relief is appropriate in light of the PLRA[19] depends on whether the Court finds, in light of the

---

agreement. In an abundance of caution, however, the Court finds and concludes that the record amply supports the modification of the Court's prior injunctions to require Defendants to implement the remedial measures ordered here based on the four factors described in Brewer. Class members would suffer irreparable harm in the absence of the additional remedial measures, because RJD staff are likely to continue to violate the ARP and class members' ADA rights in the absence of such measures. The balance of hardships tips strongly in the class members' favor, because their physical and mental health, as well as their ability to request and obtain reasonable accommodations for their disabilities and exercise their ADA rights, would be at risk absent the additional remedial measures. The burden on Defendants of implementing such measures is severely outweighed by the hardship that the class members would suffer in the absence of the measures. Class members do not have an adequate remedy of law because damages for past violations of their ADA rights would do nothing to prevent further violations, which are likely. Finally, the public has a strong interest in the enforcement of the ADA.

[19] The PLRA, 18 U.S.C. § 3626(a)(1)(B), also requires that the Court make certain findings to the extent that any prospective relief requires a government official to exceed his or her authority under state or local law. Defendants have not identified any state or local law that they must violate to implement the additional remedial measures ordered herein. Accordingly, the Court need not make any findings under 18 U.S.C. § 3626(a)(1)(B).

"order as a whole," "that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." Armstrong v. Schwarzenegger, 622 F.3d at 1071.

        A.   Narrowly tailored

        The Court concludes that the additional remedial measures discussed above meet the requirements of the PLRA.  They are narrowly tailored because they require action only with respect to RJD, which is where violations of the ARP and class members' ADA rights have been established, and because they are the least that can be done to protect class members at RJD from further violations of their rights under the ARP and ADA.  Id. at 1072 (holding that the scope of permissible injunctive relief "is dictated by the extent of the violation established") (citation and internal quotation marks omitted).  As discussed above, the substantial evidence that Plaintiffs have presented, and that Defendants have not successfully refuted, shows that the violations of class members' rights are not limited to isolated incidents.  The dozens of ARP and ADA violations described in the inmates' declarations were widespread in every sense of the word; they affected class members who suffer from a wide range of disabilities; they were caused by many identified RJD staff members; and they took place at a variety of locations at RJD.

        As discussed, the incidents appear to be the result of a persistent failure to adequately supervise and hold RJD staff accountable for violations of class members' ARP and ADA rights.  It remains possible, under the current policies and procedures,

United States District Court
Northern District of California

1  for RJD staff members to continue to violate class members' ARP

2  and ADA rights while potentially avoiding accountability for

3  their actions.  The additional remedial measures in question are

4  specifically designed to remedy this, and they are therefore

5  necessary to prevent further violations of the ARP and class

6  members' ADA rights.  See, e.g., Armstrong v. Brown, 768 F.3d at

7  984 (affirming order requiring CDCR Defendants to implement

8  remedial measures intended to enhance CDCR's accountability);

9  Armstrong v. Schwarzenegger, 622 F.3d at 1073-74 (noting the

10  importance of accountability measures in ensuring ADA

11  compliance); Morales Feliciano v. Rullan, 378 F.3d 42, 55-56 (1st

12  Cir. 2004) (noting the importance of accountability in ensuring

13  the long-term success of the health care system in Puerto Rico's

14  prisons).

15      B.   Least Intrusive

16      The additional remedial measures ordered herein are not

17  impermissibly intrusive because they do not micromanage RJD's

18  operations.  Defendants have the discretion to craft policies and

19  procedures to implement the additional remedial measures.

20  Armstrong v. Schwarzenegger, 622 F.3d at 1071 ("Intrusiveness is

21  a particularly difficult issue for defendants to argue, as by

22  ordering them to draft and promulgate a plan, the district court

23  left to defendants' discretion as many of the particulars

24  regarding how to deliver the relief as it deemed possible.

25  Allowing defendants to develop policies and procedures to meet

26  the ADA's requirements is precisely the type of process that the

27  Supreme Court has indicated is appropriate for devising a

28  suitable remedial plan in a prison litigation case.").  That the

Court describes the additional remedial measures with some specificity does not change this conclusion.  See Armstrong v. Brown, 768 F.3d at 986 (holding that "[a] court may, as the district court did here, provide specific instructions to the State without running afoul of the PLRA").

Critically, Defendants have not advanced any viable alternative means to protect class members at RJD that are narrower or less intrusive.  As discussed, Defendants suggest that the appropriate course is to wait and see whether the steps that they have taken in the last few years eventually will end the ongoing violations of the ARP and class members' ADA rights.  The Court finds that such a proposal is not a viable alternative to the additional remedial measures ordered herein, because the record shows that the rights of class members are likely to continue to be violated under the current policies and procedures.

The goal and intent of the parties and Court's Remedial Order and Injunction at the outset of the remedial phase of this litigation was to bring all of CDCR's prisons into compliance with the ADA and the RA.  Almost twenty-four years after the issuance of that order and injunction, Defendants are not yet in compliance.  This is so even though the parties and the Court have attempted various iterations of remedial measures that are narrower and less intrusive than the ones now ordered.  The Court has found, as discussed in more detail above, that the policies and systems currently in place at RJD, which are the product of the parties' and the Court's prior efforts to bring Defendants into full compliance, are insufficient to end the ongoing

United States District Court
Northern District of California

violations of class members' rights.  Accordingly, the Court's
implementation of additional and broader remedial measures is
warranted.  Armstrong v. Brown, 768 F.3d at 986 (noting that,
where the "the district court has attempted narrower, less
intrusive alternatives—and those alternatives have failed," the
court has discretion to order relief that might have raised
concerns about breadth and intrusiveness under the PLRA in the
first instance) (citation and internal quotation marks omitted).

The Court has carefully considered and weighed the arguments
and evidence presented by Defendants, and it has found that
Defendants have not shown that the additional remedial measures
would have any adverse impact on public safety or the operation
of a criminal justice system.  Id.  Defendants object to the
additional remedial measures on the ground that they are
unnecessary.  The Court disagrees with Defendants on this point
based on the evidence discussed at length above.  Defendants also
object to the additional measures on the ground that they would
be burdensome to implement in the time frame that Plaintiffs have
proposed.  Even if it were the case that implementing the
additional remedial measures in the time frame that Plaintiffs
have proposed would be burdensome for Defendants, "[a]
demonstration that an order is burdensome does nothing to prove
that it was overly intrusive" or otherwise inconsistent with the
requirements of the PLRA.  Armstrong v. Schwarzenegger, 622 F.3d
at 1071.  Where, as here, the Court has found that the additional
remedial measures are necessary to ensure Defendants' compliance
with the ARP and ADA, and that no viable less restrictive
alternative exists, the question of whether the additional

69

United States District Court
Northern District of California

remedial measures require some expenditure of resources by Defendants is not determinative.  See id. ("With Congress having made the decision to recognize the rights of disabled persons, the question is not whether the relief the court ordered to vindicate those rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations.").

Defendants argue that the additional remedial measures do not comply with the PLRA because they are overly intrusive in light of their specificity.  Defendants rely on Lewis v. Casey, 518 U.S. 343, 347-61 (1996) to support that argument.

Lewis is distinguishable.  There, the Supreme Court reversed an injunction that the district court issued after it found, at summary judgment, that the State of Arizona Department of Corrections (ADOC) had failed to provide prisoners with access to the courts and legal services.  The injunction required ADOC to make changes to its library and legal assistance policies for inmates, which were "specified in minute detail."  Id.  The Supreme Court held that the injunction could not stand, in relevant part, because the district court had "failed to accord adequate deference to the judgment of the prison authorities," and because the court had allowed a special master to craft the injunction.  Id. at 361-62.  The Supreme Court reasoned that the "proper procedure" would have been for the district court to charge ADOC "with the task of devising a Constitutionally sound program to assure inmate access to the courts."  Id. at 362 (citation and internal quotation marks omitted).

70

United States District Court
Northern District of California

1       Here, in contrast to <u>Lewis</u>, the Court will charge Defendants

2   with the task of crafting a remedial plan.  Requiring Defendants

3   to comply with certain conditions when crafting the plan does not

4   violate the PLRA, for the reasons discussed above.

5       In light of the foregoing, the Court finds that the

6   additional remedial measures ordered here are necessary and

7   consistent with the PLRA.

8   //

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONCLUSION

The Court GRANTS IN PART Plaintiffs' motion to modify its prior orders and injunctions to require Defendants to design, and then implement, a plan that requires additional remedial measures at RJD.  The Court will issue a separate order describing the additional remedial measures that Defendants' plan must include. The Court also will modify its prior orders and injunctions to require Defendants to log alleged violations of the ADA's anti-interference and anti-retaliation provisions.  The Court defers ruling on Plaintiffs' request to order the implementation of additional remedial measures at other CDCR prisons pending the resolution of the pending state-wide enforcement motion.  The Court also defers ruling on Plaintiffs' request to set aside Inmate 2's RVRs from the incident on June 17, 2020.  Defendants shall provide the Court immediately with the written report of the RVR hearing and any materials relied upon that have not been provided.  Defendants shall also diligently pursue a determination of whether a video of the June 17, 2020, incident exists, and if it does, shall provide a copy immediately. Defendants shall report on their progress in this regard within fourteen days of the date of this order.

IT IS SO ORDERED.

Dated: September 8, 2020

CLAUDIA WILKEN
United States District Judge

# ATTACHMENT
# ECF NO. 3060 ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

        Plaintiffs,

   v.

GAVIN C. NEWSOM, et al.,

        Defendants.

Case No. 94-cv-02307 CW

ORDER FOR ADDITIONAL REMEDIAL MEASURES

Re: Dkt. No. 2922

For the reasons set forth in the Court's order granting in part Plaintiffs' motion to modify its prior remedial orders and injunctions, the Court hereby orders as follows:

1.   No later than twenty-one days of the date this Order is filed, Defendants must draft and present to Plaintiffs for their review a plan for achieving compliance with the <u>Armstrong</u> Remedial Plan (ARP) and the Americans with Disabilities Act (ADA) that includes the components described below (the RJD Remedial Plan).  To the extent possible, Defendants shall provide to Plaintiffs drafts of the components that must be included in the RJD Remedial Plan on a rolling basis prior to twenty-one days of the date this Order is filed.

United States District Court
Northern District of California

2.   Plaintiffs shall provide comments to Defendants as to the drafts within seven days of receiving them.[1]

3.   The parties shall meet and confer promptly to resolve any disagreements as to the adequacy of the RJD Remedial Plan or any of its components.  Defendants shall ensure that staff with sufficient authority to amend and approve any plans, policies, and procedures in the RJD Remedial Plan attend all meet-and-confer sessions.

4.   In the event that a disagreement is not resolved within forty-two days of the date this Order is filed, Plaintiffs shall file objections with the Court no later than forty-nine days of the date this Order is filed in a brief of no more than ten pages; Defendants may respond to the objections within seven days thereafter in a brief of no more than fifteen pages; and Plaintiffs may file a reply of no more than five pages within four days thereafter.  The Court will rule on the objections and issue any necessary order, consistent with its rulings in its Order granting in part Plaintiffs' motion to modify its prior remedial orders and injunctions.

5.   Within fourteen days of reaching agreement with Plaintiffs, or receiving this Court's order resolving any disagreements, Defendants shall issue the RJD Remedial Plan in final form and implement its provisions pursuant to the terms described below, unless the RJD Remedial Plan sets a different

---

[1] Each side shall, respectively, provide copies of any drafts and comments to the same to counsel for the parties in <u>Coleman v. Newsom</u>, Case No. 90-cv-00529 (E.D. Cal.), and <u>Plata v. Newsom</u>, Case No. 01-cv-01351 (N.D. Cal.), as well as to the special master and receiver in those actions.

2

date for the implementation of a component of the RJD Remedial Plan.

      a.   Cameras.  Within ninety days of the finalization of the RJD Remedial Plan, CDCR shall install operational surveillance cameras that cover all areas of RJD to which class members have access, including, but not limited to, all exercise yards, housing units, sally-ports, dining halls, program areas, and gyms.  Within sixty days of the finalization of the RJD Remedial Plan, CDCR must begin using body-worn cameras for all correctional officers at RJD who may have any interactions with class members.  The RJD Remedial Plan shall describe the steps that Defendants will take to achieve these deadlines.

      b.   The RJD Remedial Plan must contain policies and procedures regarding the use of body-worn cameras and the use of camera footage at RJD from any type of camera, including requirements that all footage be retained for a minimum of ninety days, that footage of use of force and other triggering events involving class members at RJD be retained indefinitely, and that footage, when available, be reviewed and considered as part of the investigation of any incident.  The RJD Remedial Plan also must contain policies and procedures for training RJD staff regarding how and when to use a body-worn camera and how to ensure that footage is retained and reviewed.

      c.   Reforms to Staff Complaint, Investigation, and Discipline Process at RJD.  CDCR must develop measures to reform the staff complaint, investigation, and discipline process (Investigation and Discipline Section of the RJD Remedial Plan), which shall be included in the RJD Remedial Plan, to ensure (1)

3

United States District Court
Northern District of California

1    that CDCR completes unbiased, comprehensive investigations into

2    all allegations of staff misconduct violative of the rights of

3    any class member under the ARP or the ADA; (2) that CDCR imposes

4    appropriate and consistent discipline against employees who

5    engage in violations of the ARP or ADA with respect to class

6    members at RJD; and (3) that employees who engage in criminal

7    misconduct against class members at RJD in violation of the ARP

8    or ADA are appropriately investigated and, if warranted, referred

9    for prosecution.  The Investigation and Discipline Section of the

10   RJD Remedial Plan also shall ensure that officers accused of

11   serial violations of the ARP or ADA with respect to class members

12   at RJD are reassigned.  The Investigation and Discipline Section

13   of the RJD Remedial Plan also shall provide for effective

14   mechanisms for oversight over all staff complaints, use-of-force

15   reviews, and related staff disciplinary proceedings at RJD that

16   involve alleged violations of class members' rights under the ARP

17   or ADA.  The Investigation and Discipline Section of the RJD

18   Remedial Plan shall require quarterly interviews of randomly-

19   selected class members at RJD using the methodology and interview

20   questionnaire utilized by the December 2018 investigators.

21         d.    Third-Party Expert Monitoring of Defendants'

22   Investigation and Discipline Section of the RJD Remedial Plan.

23   The Court delegates to Edward Swanson, its court expert, pursuant

24   to Federal Rule of Evidence 706, the additional duties of

25   monitoring Defendants' implementation of their Investigation and

26   Discipline Section of the RJD Remedial Plan.  Mr. Swanson shall

27   have access to all documents reasonably necessary for monitoring

28   Defendants' implementation of their Investigation and Discipline

Section of the RJD Remedial Plan. Mr. Swanson shall issue quarterly reports regarding Defendants' implementation of the Investigation and Discipline Section of the RJD Remedial Plan. Prior to the issuance of each quarterly report, the parties and Mr. Swanson shall meet and confer regarding his findings for the quarter.

e. Information Sharing with Plaintiffs' counsel and the court expert. CDCR must produce to Plaintiffs' counsel and the court expert, Mr. Swanson, on a quarterly basis, all documents related to RJD staff complaints in which the alleged victim is a class member and alleges violations of his or her rights under the ARP or ADA, including, but not limited to, grievances, incident reports, documents from staff misconduct inquiries, documents from Institutional Executive Review Committee inquiries in which the class member alleges excessive use of force or other staff misconduct in violation of his or her rights under the ARP or ADA, 989 forms and all supporting documents, responses of the Central Intake Unit of OIA to 989 forms, investigation reports produced by the OIA, and 402 and 403 forms issued by the hiring authority. CDCR must also provide Plaintiffs' counsel with monthly, written updates regarding progress on the implementation of the RJD Remedial Plan at RJD, including data regarding staff complaints and use of force involving a class member where there is a possible violation of the class member's rights under the ARP or ADA.

f. Staffing. CDCR must significantly increase supervisory staff by posting additional sergeants on all watches on all yards at RJD.

g.     Training. CDCR must develop and implement training intended to eliminate violations of the ARP and ADA at RJD, such as human rights, de-escalation, and cultural training, for all custody, mental health, and medical staff at RJD who interact with class members. The training must include discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people with disabilities.

h.     Anti-Retaliation. CDCR shall develop mechanisms to end and prevent any retaliation against class members who report violations of their rights under the ARP or ADA and to ensure their safety. These mechanisms shall be described in the RJD Remedial Plan.

i.     Other Remedies. CDCR shall develop a plan to modify its policies to more effectively monitor and control the use of pepper spray by RJD staff with respect to class members. This plan shall be described in the RJD Remedial Plan.

6.     Starting on the date this Order is filed, Defendants shall include in the Court-ordered accountability log any allegations of violations of class members' rights under the ADA's anti-retaliation and anti-interference provisions.

7.     The Court finds that these additional remedial measures are consistent with the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626(a).

IT IS SO ORDERED.

Dated: September 8, 2020

_____

CLAUDIA WILKEN
United States District Judge

United States District Court
Northern District of California

# ATTACHMENT
## REPRESENTATION STATEMENT
## & STATEMENT OF RELATED CASES

No. _____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**JOHN ARMSTRONG, et al.,**

Plaintiffs-Appellees,

**v.**

**GAVIN NEWSOM, et al.,**

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California

No. 94-cv-02307 CW
The Honorable Claudia Wilken, District Judge

**DEFENDANTS-APPELLANTS'
REPRESENTATION STATEMENT**

XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
NEAH HUYNH
Supervising Deputy Attorney General
ALICIA A. BOWER
Deputy Attorney General
State Bar No. 287799
  1515 Clay Street, Suite 2000
  Oakland, CA  94612
  Telephone: (510) 879-1982
  Email:  Alicia.Bower@doj.ca.gov
*Attorneys for Defendants-Appellants*
*Governor Newsom and the California*
*Department of Corrections and*
*Rehabilitation*

The undersigned represents Defendants-Appellants Governor Newsom and the California Department of Corrections and Rehabilitation in this class action.  Plaintiffs-Appellees are all present and future California state prisoners with certain physical disabilities that substantially limit one or more of their major life activities.  Contact information for Plaintiff-Appellees' counsel, as well as the district court-appointed expert, is below.

Donald Specter
Rita K. Lomio
Margo Mendelson
PRISON LAW OFFICE
  1917 Fifth Street
  Berkeley, California  94710-1916
  Telephone:   (510) 280-2621
  Facsimile:   (510) 280-2704
*Attorneys for Plaintiffs*

Michael W. Bien
Gay C. Grunfeld
Thomas Nolan
Penny Godbold
Michael Freedman
ROSEN BIEN GALVAN & GRUNFELD LLP
  101 Mission Street, Sixth Floor
  San Francisco, California  94105-1738
  Telephone:   (415) 433-6830
  Facsimile:   (415) 433-7104
*Attorneys for Plaintiffs*

Linda D. Kilb
DISABILITY RIGHTS EDUCATION & DEFENSE FUND, INC.
  3075 Adeline Street, Suite 201
  Berkeley, California  94703
  Telephone:   (510) 644-2555
  Facsimile:   (510) 841-8645
*Attorneys for Plaintiffs*

1

Edward Swanson
SWANSON, MCNAMARA & HALLER LLP
 300 Montgomery Street, Suite 1100
 San Francisco, CA 94104
 Telephone:  415-477-3800
 Facsimile:   415-477-9010
*Court-Appointed Expert*

 The party listing in the district court's docket also includes numerous

associated counsel for many parties, as well as additional intervenors,

"interested parties," and amici curiae, who are not included above.

Dated:  September 25, 2020          Respectfully Submitted,

                                   XAVIER BECERRA
                                   Attorney General of California
                                   MONICA N. ANDERSON
                                   Senior Assistant Attorney General
                                   NEAH HUYNH
                                   Supervising Deputy Attorney General


                                   */s/ Alicia A. Bower*
                                   ALICIA A. BOWER
                                   Deputy Attorney General
                                   *Attorneys for Defendants Governor*
                                   *Newsom and the California Department of*
                                   *Corrections and Rehabilitation*

CF1997CS0005
91294579

No. _____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**JOHN ARMSTRONG, et al.,**

Plaintiffs-Appellees,

**v.**

**GAVIN NEWSOM, et al.,**

Defendants-Appellants.

**STATEMENT OF RELATED CASES**

To the best of our knowledge, there are no related cases.

Dated: September 25, 2020     Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
NEAH HUYNH
Supervising Deputy Attorney General

_/s/ Alicia A. Bower_
ALICIA A. BOWER
Deputy Attorney General
*Attorneys for Defendants-Appellants Governor*
*Newsom and the California Department of*
*Corrections and Rehabilitation*

3