DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **[REDACTED] REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE WITH DISABILITIES AND EXHIBITS 1-57a** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:   Hon. Claudia Wilken |
| | Date:    October 6, 2020 |
| | Time:    2:30 p.m. |
| | Crtrm.:  Remote |

[3618118.1]

Case No. C94 2307 CW

I, Gay Crosthwait Grunfeld, declare:

1.      I am an attorney duly admitted to practice before this Court.  I am a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this reply declaration in support of Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing, and Retaliating Against People With Disabilities.

2.      I incorporate by reference the following pleadings: my declaration filed February 28, 2020, Docket No. 2922-1 ("Grunfeld RJD Decl."), in support of Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against People with Disabilities at R.J. Donovan Correctional Facility ("RJD Motion"), Docket No. 2922; my declaration filed June 3, 2020, Docket No. 2948-1 ("Grunfeld Statewide Decl."), in support of Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against Persons with Disabilities ("Statewide Motion," and collectively, with the RJD Motion, "the Motions"), Docket No. 2948; my declaration filed July 15, 2020, Docket No. 2999-2 ("Grunfeld PI Decl."), in support of Plaintiffs' Response in Support of Preliminary Injunction ("PI Resp."), Docket No. 2999; my declaration filed July 29, 2020, Docket No. 3024-1 ("Grunfeld Reply Decl."), in support of Plaintiffs' Reply in Support of the RJD Motion, Docket No. 3024 ("RJD Reply"); my declaration filed August 25, 2020, Docket No. 3052-1 ("Grunfeld New Material Reply Decl."), in support of Plaintiffs' Reply to Defendants' Response to New Material in Plaintiffs' Reply in support of RJD Motion and Renewed Request to Rescind RVRs Against Inmate 2 ("New Material Reply"), my declaration filed September 10, 2020, Docket No. 3074-4 ("Grunfeld Protective Order Decl."), in support of Plaintiffs' Motion for Protective Order regarding Depositions of *Armstrong* Class Members ("Protective Order Motion").  Attached hereto as an Appendix is an Index of the Exhibits attached to this declaration.

1

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

**In Total, Plaintiffs Have Filed 179 Declarations from 148 Declarants Regarding Abuse and Retaliation They Have Experienced or Witnessed in 12 Different CDCR Prisons**

3.     Plaintiffs have now submitted 179 separate declarations from people with disabilities regarding abuse they have experienced or witnessed at twelve different CDCR prisons, broken down as follows:

(a)     In support of the RJD Motion, Plaintiffs filed fifty-four declarations. *See* Decl. of Michael Freedman in Supp. of RJD Mot.("Freedman RJD Decl."), Docket Nos. 2922-2 to 5, Exs. 6-58, 88.

(b)     In support of the Statewide Motion, Plaintiffs filed fifty-eight declarations.  *See* Decl. of Michael Freedman in Supp. of Statewide Mot. ("Freedman Statewide Decl."), Docket No. 2947-5, Exs. 3-5, 9-63.

(c)     In support of Plaintiffs' Ex Parte Motion for Temporary Restraining Order ("TRO Motion"), Docket. No. 2970, filed July 1, 2020, Plaintiffs filed three declarations.  *See* Decl. of Michael Freedman in Supp. of TRO Mot. ("Freedman TRO Decl."), Docket 2970-1, Exs. 3, 5, 9.

(d)     In support of the PI Response, Plaintiffs filed five declarations.  *See* Decl. of Michael Freedman in Supp. of PI Resp. ("Freedman PI Decl."), Docket No. 2999-1, Exs. 1-4, 11.

(e)     In support of Plaintiffs' RJD Reply, Plaintiffs filed six declarations. *See* Grunfeld Reply Decl., Exs. H, M-P; Reply Decl. of Penny Godbold in Supp. of RJD Mot., Ex. B.

(f)     In support of Plaintiffs' New Material Reply, Plaintiffs filed two declarations.  *See* Grunfeld New Material Reply Decl., Exs. A-B.

(g)     In support of Plaintiffs' Protective Order Motion, Plaintiffs filed three declarations.  *See* Grunfeld Protective Order Decl., Exs. R-T.

(h)     In support of Plaintiffs' Reply in support of the Statewide Motion, Plaintiffs are submitting herewith forty-eight new declarations.  *See* Exs. 2-18a; 20-36a; 41-43; 50-52; 54-59a; 68-70a; 81-83.

4.      In total, one hundred and forty-eight people with disabilities have submitted declarations regarding misconduct they experienced or witnessed at twelve CDCR prisons: RJD, California State Prison—Los Angeles County ("LAC"), California State Prison – Corcoran ("COR"), Kern Valley State Prison ("KVSP"), California Correctional Institution ("CCI"), California Substance Abuse Treatment Facility ("SATF"), California Institution for Women ("CIW"), California State Prison—Sacramento ("SAC"), California Medical Facility ("CMF"), Correctional Training Facility ("CTF"), Mule Creek State Prison ("MCSP"), and ███████████████████. The reason there are more declarations than declarants is because some declarants have filed more than one declaration in support of Plaintiffs' filings.

5.      Since Plaintiffs' counsel filed the Statewide Motion on June 3, 2020, we have continued to gather evidence demonstrating that CDCR, as a system, is unsafe for and violates the rights of people with disabilities.  These declarations show that the problems identified by this Court at RJD are not limited to one prison or a few bad apples among the custody staff.  The new declarations show that custody staff across the state are assaulting, abusing, and retaliating against people with disabilities.  Many of the incidents catalogued in the attached declarations occurred after the filing of the Statewide Motion on June 3, 2020.

6.      Attached to this declaration are fifty-one[1] additional declarations from incarcerated people regarding staff misconduct they have experienced or witnessed at CDCR prisons.  Three of these additional declarations describe further misconduct and retaliation at RJD, all of which occurred after Plaintiffs filed the RJD Reply.  Thirteen declarations describe misconduct at LAC.  Eighteen declarations describe misconduct at COR.  Seven declarations describe misconduct at KVSP.  Two declarations describe misconduct at SATF.  Three declarations describe misconduct at CIW.  Two declarations

---

[1] Three of these declarations have already been filed with the Court in support of Plaintiffs' Protective Order Motion.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

describe misconduct at CMF.  One declaration describes misconduct at CTF.  Two declarations describe misconduct at MCSP.  Two declarations describe misconduct at SAC.  Two declarations describe misconduct at ███.  The reason there are more declarations by institution (fifty-five) than declarations overall (fifty-one) is because some declarations describe misconduct at multiple prisons, and therefore are double counted when considering the number of declarations that describe misconduct at each institution.  All of these declarations were obtained following the filing of the Statewide Motion.

7.     On March 17, 2020, counsel for CDCR notified Plaintiffs' counsel in an email that the Secretary of CDCR had suspended Plaintiffs' counsel's visits to CDCR institutions in response to the COVID-19 pandemic.  On March 24, 2020, Governor Newsom issued Executive Order N-36-20 suspending all visitation into CDCR institutions.  Because of these policies and the ongoing COVID-19 pandemic, Plaintiffs' counsel was unable to meet with the declarants in person for the declarants to sign their declarations.  Instead, Plaintiffs' counsel spoke with each declarant by telephone.

8.     Furthermore, incarcerated people who have complained of misconduct have experienced pervasive retaliation, as reflected in many of the declarations filed with this Court.  Accordingly, Plaintiffs' counsel was not willing to endanger the welfare of the declarants by sending declarations into the prisons for the declarants to sign and then return by mail.  Given what Plaintiffs' counsel has learned in the course of this investigation, trusting officers not to read legal mail from our office was too risky.  Instead, Plaintiffs' counsel read the contents of each person's declaration, verbatim, to the declarant by telephone during a confidential telephone call.  Each declarant then orally confirmed that the contents of the declaration were true and correct.  Each declarant also orally granted Plaintiffs' counsel permission to affix his or her signature to the declaration and to file the declaration in this matter.

9.     Plaintiffs' counsel has previously provided copies of the fifty-one declarations to Defendants, as well as the *Coleman* Special Master and a representative of the *Plata* receiver, through a secure file sharing website.  Plaintiffs' counsel shared three

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   declarations on July 10, 2020, six declarations on August 21, 2020, four declarations on

2   August 28, 2020, nine declarations on September 1, 2020, nine declarations on

3   September 4, 2020, fifteen declarations on September 21, 2020, one declaration on

4   September 22, 2020, three declarations on September 23, 2020, and one declaration on

5   September 24, 2020.  The September 21, 22, and 23, 2020 uploads included prisons not

6   previously represented among the declarations submitted.  Consistent with prior practice,

7   at the time of uploading the declarations, I sent letters to Defendants and their counsel, true

8   and correct copies of which are attached hereto as **Exhibit 1**, with a variety of admonitions

9   designed to protect the declarants from retaliation.

10  **Defendants' Employees Continue to Abuse the RJD Witnesses Even After the Court
    Ordered their Transfer Due to Defendants' Inability to Protect Them at RJD**

11

12          10.     Attached hereto as **Exhibit 2** is a true and correct copy of a fifth

13  supplemental declaration from *Armstrong* and *Coleman* class member ███████

14  ███████  DPO, EOP, 69 years old), signed on September 23, 2020.

15          11.     Attached hereto as **Exhibit 3** is a true and correct copy of a fourth

16  supplemental declaration from *Coleman* class member ███████████, EOP, 56 years

17  old), signed on September 23, 2020.

18          12.     Attached hereto as **Exhibit 4** and **Exhibit 5** are true and correct copies of

19  screen recordings of video surveillance videos corroborating Mr. ████ and Mr. ███'s new

20  declarations.

21      **Additional Declarations Documenting Assaults, Abuse and Retaliation at LAC**

22          13.     The declarations attached hereto as **Exhibits 6** to **18a** describe misconduct

23  the declarants experienced or witnessed at LAC.  Nearly all of the misconduct described in

24  these declarations occurred after the filing of the Statewide Motion on June 3, 2020.

25          14.     Attached hereto as **Exhibit 6** is a true and correct copy of a declaration from

26  *Armstrong* and *Coleman* class member ██████████████, DNH, mobility and

27

28  [3618118.1]                                          5                    Case No. C94 2307 CW

vision disabilities,[2] EOP, 47 years old), signed on September 8, 2020.  Attached hereto as **Exhibit 6a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮'s declaration.

15.     Attached hereto as **Exhibit 7** is a true and correct copy of a declaration from *Coleman* class member ▮▮▮▮▮▮▮▮, EOP, 60 years old), signed on July 6, 2020.  Attached hereto as **Exhibit 7a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮'s declaration.

16.     Attached hereto as **Exhibit 8** is a true and correct copy of a declaration from *Armstrong* and *Coleman* class member ▮▮▮▮▮▮▮20, DPM, DPV, EOP, 54 years old), signed on August 26, 2020. Attached hereto as **Exhibit 8a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮'s declaration.

17.     Attached hereto as **Exhibit 9** is a true and correct copy of a declaration from *Coleman* class member ▮▮▮▮▮▮▮▮, EOP, 37 years old), signed on September 1, 2020.  Attached hereto as **Exhibit 9a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮'s declaration.

18.     Attached hereto as **Exhibit 10** is a true and correct copy of a declaration from *Coleman* class member ▮▮▮▮▮▮▮▮, ICF, 28 years old), signed on July 14, 2020.  Attached hereto as **Exhibit 10a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮'s declaration.

19.     Attached hereto as **Exhibit 11** is a true and correct copy of a declaration from  *Coleman* class member ▮▮▮▮▮▮▮▮, CCCMS, 27 years old), signed on July 30, 2020.  Attached hereto as **Exhibit 11a** are true and correct copies of excerpts of documents corroborating Mr. ▮▮▮▮' declaration.

20.     Attached hereto as **Exhibit 12** is a true and correct copy of a supplemental declaration from *Armstrong* and *Coleman* class member ▮▮▮▮▮▮▮▮, DNH,

---

[2] Mr. ▮▮▮▮'s declaration describes that he has mobility and vision disabilities that are not verified by CDCR.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1    CCCMS, 42 years old), signed on August 18, 2020.  Mr. ████'s first declaration was

2    signed on April 21, 2020 and filed in support of the Statewide Motion.  *See* Freedman

3    Statewide Decl., Ex. 34.

4           21.     Attached hereto as **Exhibit 13** is a true and correct copy of a declaration

5    from *Armstrong* and *Coleman* class member ████████████, DNH, EOP, 34

6    years old), signed on September 4, 2020.  Attached hereto as **Exhibit 13a** are true and

7    correct copies of excerpts of documents corroborating Mr. ████'s declaration.

8           22.     Attached hereto as **Exhibit 14** is a true and correct copy of a declaration

9    from *Coleman* class member ████████████, EOP, 36 years old), signed on

10   July 31, 2020.  Attached hereto as **Exhibit 14a** are true and correct copies of excerpts of

11   documents corroborating Mr. ████'s declaration.

12          23.     Attached hereto as **Exhibit 15** is a true and correct copy of a declaration

13   from *Coleman* class member ████████████, CCCMS,[3] 43 years old), signed on

14   July 21, 2020.  Attached hereto as **Exhibit 15a** are true and correct copies of excerpts of

15   documents corroborating Mr.████' declaration.

16          24.     Attached hereto as **Exhibit 16** is a true and correct copy of a declaration

17   from *Coleman* class member ████████████, EOP, 42 years old), signed on

18   August 6, 2020.  Attached hereto as **Exhibit 16a** are true and correct copies of excerpts of

19   documents corroborating Mr. ████'s declaration.  Mr. ████'s declaration also describes

20   staff misconduct he experienced at KVSP and SAC.

21          25.     Attached hereto as **Exhibit 17** is a true and correct copy of a declaration

22   from *Coleman* class member ████████████, CCCMS, 31 years old), signed

23   on August 14, 2020.  Mr. ████' declaration was previously filed in support of

24   Plaintiffs' Protective Order Motion.  See Grunfeld Protective Order Decl., Ex. S. Attached

25   hereto as **Exhibit 17a** are true and correct copies of excerpts of documents corroborating

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [3] Mr. ████' declaration describes that, since the events described in his declaration, he has
     been discharged from the CCCMS level of care and is no longer a participant in the Mental

28   Health Services Delivery System ("MHSDS").

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   Mr. ███████' declaration.  Mr. ████████' declaration also describes staff misconduct at

2   COR.

3         26.    Attached hereto as **Exhibit 18** is a true and correct copy of a supplemental

4   declaration from *Armstrong* and *Coleman* class member ████████████████, DNH,

5   CCCMS, 52 years old), signed on July 22, 2020.  Mr. ███████'s declaration was previously

6   filed in support of Plaintiffs' Protective Order Motion.  See Grunfeld Protective Order

7   Decl., Ex. T. Attached hereto as **Exhibit 18a** are true and correct copies of excerpts of

8   documents corroborating Mr. ██████ declaration.  Mr. ██████'s first declaration was

9   signed on April 21, 2020 and filed in support of the Statewide Motion.  *See* Freedman

10  Statewide Decl., Ex. 51.

11      **Defendants Still Have Not Investigated or Addressed Staff Misconduct at LAC**

12        27.    In the Declaration of Thomas Nolan filed in support of the Statewide Motion

13  on June 3, 2020, Dkt. No. 2948-3, Plaintiffs' counsel represented that CDCR had

14  responded to 34 of the 88 discrete allegations raised by Plaintiffs' counsel in either

15  (a) Defendants' written responses to Plaintiffs' tour reports or (b) in 15 individual

16  allegation response letters.  *See* Nolan Decl., Exs. P-DD.  That number was in error.

17  Instead, as of June 3, 2020, Defendants had *acknowledged* 34 of the 88 discrete allegations

18  raised by Plaintiffs' counsel in the form of acknowledgment letters, but had only provided

19  substantive responses to 9 of the 88 allegations raised by Plaintiffs' counsel.  Since June 3,

20  2020, Plaintiffs' counsel has received substantive responses to 24 of the 88 allegations

21  raised by Plaintiffs' counsel.  In total, Defendants have responded substantively to 33 of

22  the 88 allegations. Defendants have not provided a substantive response to 55 outstanding

23  allegations.

24        28.    True and correct copies of the 24 response letters sent by Defendants'

25  counsel after June 3, 2020 are attached hereto as **Exhibit 19.**

26        29.    In only one of these response letters did Defendants represent that the

27  allegations might have merit and would be referred to the Office of Internal Affairs

28

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

("OIA") for possible investigation.[4]  *Id.* at 66.  After the Office of Internal Affairs conducted its investigation, some allegations of misconduct were sustained against one of the officers involved.  *See* Schwartz Statewide Reply Decl., ¶ 131.  For the other 23 allegations to which Defendants have responded, Defendants found that the allegations were unfounded.

**Additional Declarations Documenting Assaults, Abuse and Retaliation at COR**

30.  The declarations attached hereto as **Exhibits 20** to **36a** describe misconduct the declarants experienced or witnessed at COR.

31.  Attached hereto as **Exhibit 20** is a true and correct copy of a declaration from *Armstrong* and *Coleman* class member ███████████, mobility disability,[5] EOP, 49 years old), signed on August 12, 2020.  Attached hereto as **Exhibit 20a** are true and correct copies of excerpts of documents corroborating Mr. ███' declaration.

32.  Attached hereto as **Exhibit 21** is a true and correct copy of a declaration from *Coleman* class member ███████████ CCCMS, 48 years old), signed on June 24, 2020.  Attached hereto as **Exhibit 21a** are true and correct copies of excerpts of documents corroborating Mr. ████'s declaration.

33.  Attached hereto as **Exhibit 22** is a true and correct copy of a declaration from *Armstrong* and *Coleman* class member ███████████, DPO, CCCMS, 57 years old), signed on September 2, 2020.

34.  Attached hereto as **Exhibit 23** is a true and correct copy of a declaration from *Coleman* class member ███████████, EOP, 29 years old), signed on August 28, 2020.

35.  Attached hereto as **Exhibit 24** is a true and correct copy of a declaration

---

[4] Defendants have also referred one additional case about which Plaintiffs advocated to the OIA, although Defendants have not yet responded to Plaintiffs' advocacy letter.  *See* Reply Declaration of Jeffrey A. Schwartz, Ph.D. in Support of Statewide Motion, filed herewith, ("Schwartz Statewide Reply Decl."), ¶¶ 193-221; Nolan Statewide Decl., Ex. O.  The allegations in that case were not sustained by the Hiring Authority.  *Id.* ¶ 221.

[5] Mr. ████' declaration describes that he has a mobility disability that is not verified by CDCR.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   from *Coleman* class member ███████████, CCCMS, 37 years old), signed on

2   June 26, 2020.  Attached hereto as **Exhibit 24a** are true and correct copies of excerpts of

3   documents corroborating Mr. ████'s declaration.

4         36.     Attached hereto as **Exhibit 25** is a true and correct copy of a declaration

5   from *Armstrong* and *Coleman* class member ███████████, DPM, EOP, 49

6   years old), signed on June 15, 2020.  Attached hereto as **Exhibit 25a** are true and correct

7   copies of excerpts of documents corroborating Mr. █████'s declaration.

8         37.     Attached hereto as **Exhibit 26** is a true and correct copy of a declaration

9   from *Coleman* class member ███████████ CCCMS, 49 years old), signed on

10  August 28, 2020.  Attached hereto as **Exhibit 26a** are true and correct copies of excerpts of

11  documents corroborating Mr. ████' declaration.

12        38.     Attached hereto as **Exhibit 27** is a true and correct copy of a declaration

13  from *Coleman* class member ███████████, EOP, 39 years old), signed on

14  September 3, 2020. Attached hereto as **Exhibit 27a** are true and correct copies of excerpts

15  of documents corrborating Mr. █████'s declaration.  Mr. ██████'s declaration also

16  describes staff misconduct at SATF.

17        39.     Attached hereto as **Exhibit 28** is a true and correct copy of a declaration

18  from *Armstrong* and *Coleman* class member ██████████, mobility disability,[6]

19  EOP, 46 years old), signed on September 18, 2020.  Attached hereto as **Exhibit 28a** are

20  true and correct copies of excerpts of documents corroborating Mr. █████'s declaration.

21        40.     Attached hereto as **Exhibit 29** is a true and correct copy of a declaration

22  from *Armstrong* and *Coleman* class member ██████████, DPO, CCCMS, 60

23  years old), signed on June 19, 2020.  Attached hereto as **Exhibit 29a** are true and correct

24  copies of excerpts of documents corroborating Mr. ████'s declaration.

25        41.     Attached hereto as **Exhibit 30** is a true and correct copy of a declaration

26

27  ───────────────

[6] Mr. █████ declaration describes that he uses knee braces and compression stockings

28  and has a mobility disability that is not verified by CDCR.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   from *Armstrong* and *Coleman* class member ███████████████, DPM,

2   EOP, 44 years old), signed on August 6, 2020.  Attached hereto as **Exhibit 30a** are true

3   and correct copies of excerpts of documents corroborating Mr. █████'s declaration.

4         42.     Attached hereto as **Exhibit 31** is a true and correct copy of a declaration

5   from *Armstrong* and *Coleman* class member ███████████████, mobility

6   disability,[7] CCCMS, 44 years old), signed on July 2, 2020.  Attached hereto as

7   **Exhibit 31a** are true and correct copies of excerpts of documents corroborating

8   Mr. █████' declaration.

9         43.     Attached hereto as **Exhibit 32** is a true and correct copy of a declaration

10  from *Coleman* class member ██████████, EOP, 67 years old), signed on July 8,

11  2020.

12        44.     Attached hereto as **Exhibit 33** is a true and correct copy of a declaration

13  from *Armstrong* and *Coleman* class member ██████████████, DPM, CCCMS, 51

14  years old), signed on June 15, 2020.  Attached hereto as **Exhibit 33a** are true and correct

15  copies of excerpts of documents corroborating Mr. ███'s declaration.

16        45.     Attached hereto as **Exhibit 34** is a true and correct copy of a declaration

17  from *Coleman* class member █████████████, CCCMS, 43 years old), signed on

18  July 31, 2020.  Attached hereto as **Exhibit 34a** are true and correct copies of excerpts of

19  documents corroborating Mr. ████████'s declaration.

20        46.     Attached hereto as **Exhibit 35** is a true and correct copy of a declaration

21  from *Coleman* class member █████████████, ACUTE, 29 years old), signed on

22  June 29, 2020.  Attached hereto as **Exhibit 35a** are true and correct copies of excerpts of

23  documents corroborating Mr. ████'s declaration.

24        47.     Mr. ████████' declaration, attached previously as **Exhibit 17**, describes

25  misconduct at LAC and COR.  *See* Ex. 17, ¶¶ 8-21.

26

27  _____

[7] Mr. ████████ declaration describes that he walks with a cane and has a mobility
28  disability that is not verified by CDCR.

48.     Attached hereto as **Exhibit 36** is a true and correct copy of a declaration from *Coleman* class member ████████████, EOP, 27 years old), signed on September 23, 2020.  Attached hereto as **Exhibit 36a** are true and correct copies of excerpts of documents corroborating Mr. ██████'s declaration.

**Plaintiffs' Counsel Has Raised Concerns about Assaults, Abuse, and Retaliation Against Class Members at COR in Multiple Reports and Letters**

49.     In support of the RJD Motion, Plaintiffs' counsel filed two letters from Plaintiffs' counsel to Defendants regarding assaults, abuse, and retaliation against people with disabilities at COR.  *See* Freedman RJD Decl., Exs. 81-82.  Defendants have not yet responded to those letters.

50.     Attached hereto as **Exhibit 37** is a true and correct excerpted copy of Plaintiffs' Report regarding the November 2019 *Armstrong* monitoring tour of COR, issued on June 29, 2020.

51.     Attached hereto as **Exhibit 38** is a true and correct excerpted copy of a February 21, 2020 letter with exhibits from co-counsel Patrick Booth of the Prison Law Office to Defendants' counsel Russa Boyd titled "*Armstrong* Advocacy Letter ████ ██████, COR" regarding disability-related misconduct at COR.

52.     Attached hereto as **Exhibit 39** is a true and correct excerpted copy of a June 8, 2020 letter with exhibits from Mr. Booth and co-counsel Margot Mendelson of the Prison Law office to Defendants' counsel Nicholas Weber titled "*Coleman* Advocacy Letter ████████████, KVSP" regarding disability-related misconduct at KVSP.

53.     Attached hereto as **Exhibit 40** is a true and correct excerpted copy of an August 27, 2020 letter with exhibits omitted from Mr. Booth and Ms. Mendelson to Mr. Weber titled "*Coleman* Advocacy Letter ██████████, KVSP."  Enclosed within Exhibit 40 is a true and correct copy of a June 8, 2020 letter from co-counsel Don Specter of the Prison Law Office to CDCR Secretary Ralph Diaz regarding "Corcoran Staff Misconduct."

54.     Defendants have not responded to Plaintiffs' November 2019 *Armstrong* Monitoring Tour Report, nor any of the five individual letters sent by Plaintiffs' counsel regarding assaults, abuse, retaliation, and denial of access to the grievance process at COR.

### Declarations Documenting Assaults, Abuse and Retaliation at CIW

55.     Attached hereto as **Exhibit 41** is a declaration from *Armstrong* and *Coleman* class member ███████████, DLT, CCCMS, 39 years old), signed on September 22, 2020.  Attached hereto as **Exhibit 41a** are true and correct copies of excerpts of documents corroborating Mr. █████ 's declaration.

56.     Attached hereto as **Exhibit 42** is a declaration from *Coleman* class member ███████████, CCCMS, 39 years old), signed on September 17, 2020. Attached hereto as **Exhibit 42a** are true and correct copies of excerpts of documents corroborating Ms. █████ 's declaration.

57.     Attached hereto as **Exhibit 43** is a declaration from *Armstrong* and *Coleman* class member ███████████, DNH, CCCMS, 28 years old), signed on September 21, 2020.

### Plaintiffs' Counsel Has Raised Concerns about Assaults, Abuse, and Retaliation Against Class Members at CIW in Multiple Reports and Letters

58.     In support of the RJD Motion, Plaintiffs' counsel filed a January 24, 2020 letter from Plaintiffs' counsel to Defendants regarding assaults, abuse, and retaliation against people with disabilities at CIW.  *See* Freedman RJD Decl., Ex. 80.  Attached hereto as **Exhibit 44** is a true and correct copy of a response to that letter dated January 31, 2020 from Robin Stringer, CDCR Office of Legal Affairs, to Plaintiffs' counsel titled "CIW: Non Class Action Allegations."  Defendants characterized the allegations raised in the January 24, 2020 letter as "non-class action allegations."  *See* Ex. 44.  Defendants have not yet provided a substantive response to the January 24, 2020 letter.

59.     Attached hereto as **Exhibit 45** is a true and correct excerpted copy of Plaintiffs' Report regarding allegations of staff misconduct raised during the December 2016 *Armstrong* monitoring tour of CIW, issued on February 7, 2017.

60. Attached hereto as **Exhibit 46** are true and correct excerpted copies of Defendants' Responses to Plaintiffs' Report regarding the December 2016 *Armstrong* monitoring tour of CIW, issued on June 7, 2017 and October 2, 2017.  In the June 7, 2017 response, Defendants did not respond to the five allegations of misconduct raised by Plaintiffs' counsel.  They stated that "CIW takes PLO's allegations of staff misconduct very seriously and is in the process of investigating these allegations listed above and will follow Department policy on any employee discipline matters."  On October 2, 2017, Defendants sent a letter responding substantively to one out of the five allegations of staff misconduct raised in the monitoring tour report.  They have yet to provide substantive responses to any of the other four allegations.

61. Attached hereto as **Exhibit 47** is a true and correct copy of Plaintiffs' Report regarding allegations of staff misconduct raised during the December 2017 *Armstrong* monitoring tour of CIW, issued on March 9, 2018.  This report is separate from the main *Armstrong* Monitoring Tour Report.

62.  Attached hereto as **Exhibit 48** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the December 2017 *Armstrong* monitoring tour of CIW, dated August 14, 2018 and issued by Defendants on August 20, 2018.

63. Attached hereto as **Exhibit 49** is a true and correct excerpted copy of an article published by KQED, dated November 14, 2019, titled "#MeToo Behind Bars: Records Shed Light on Sexual Abuse Inside State Women's Prisons."  According to the article, "[i]n 2017 alone, three officers at the California Institution for Women in San Bernardino County had sexual contact with inmates in or near their housing units."

## Declarations Documenting Assaults, Abuse and Retaliation at CMF

64. The declarations attached hereto as **Exhibits 50** to **51a** describe misconduct the declarants experienced or witnessed at CMF.

65. Attached hereto as **Exhibit 50** is a true and correct copy of a declaration from *Armstrong* and *Coleman* class member ████████████████, DPW, DPV,

1   EOP, 55 years old), signed on September 2, 2020. Attached hereto as **Exhibit 50a** are true

2   and correct copies of excerpts of documents corroborating Mr. ██████ 's declaration.

3       66.     Attached hereto as **Exhibit 51** is a true and correct copy of a declaration

4   from *Coleman* class member ████████████ , ICF, 23 years old), signed on May

5   19, 2020.  Attached hereto as **Exhibit 51a** are true and correct copies of excerpts of

6   documents corroborating Mr. ████ 's declaration.

7                   **Assaults, Abuse and Retaliation at CTF**

8       67.     Attached hereto as **Exhibit 52** is a declaration from *Armstrong* class member

9   ████████████ , DNM, 65 years old), signed on September 3, 2020.

10      68.     Attached hereto as **Exhibit 53** is a true and correct copy of an email, sent on

11  August 20, 2020, from co-counsel Sara Norman of the Prison Law Office to then Acting

12  Secretary of CDCR Ralph Diaz and Connie Gipson.  The email describes an incident of

13  staff misconduct that occurred at CTF on July 20, 2020 in which, "dozens of Black people

14  housed in CTF were roughly pulled from their cells, placed in flexicuffs/zip ties with their

15  arms behind their backs, and brought to the dining hall … Several people said they were

16  beaten on the way to the dining hall, despite being restrained … Some said they heard staff

17  use racial slurs and taunts such as "Black lives don't f—g matter" and "We don't care if

18  you n—s catch coronavirus." *Id.*

19  **Additional Declarations Regarding Assaults, Abuse and Retaliation at KVSP**

20      69.     The declarations attached hereto as **Exhibits 54** to **59a** describe misconduct

21  the declarants experienced or witnessed at KVSP.

22      70.     Attached hereto as **Exhibit 54** is a true and correct copy of a declaration

23  from *Armstrong* and *Coleman* class member ████████████ , DNH, CCCMS, 49

24  years old), signed on September 3, 2020.  Attached hereto as **Exhibit 54a** are true and

25  correct copies of excerpts of documents corroborating Mr. ████ 's declaration.

26      71.     Attached hereto as **Exhibit 55** is a true and correct copy of a declaration

27  from *Coleman* class member ████████████ , CCCMS, 28 years old), signed

28  on August 28, 2020.  Attached hereto as **Exhibit 55a** are true and correct copies of

1  excerpts of documents corroborating Mr. ███ 's declaration.

2      72.    Attached hereto as **Exhibit 56** is a true and correct copy of a declaration

3  from *Coleman* class member ███████████, EOP, 23 years old), signed on June 17,

4  2020.  Attached hereto as **Exhibit 56a** are true and correct copies of excerpts of documents

5  corroborating Mr. ███ s declaration.

6      73.    Attached hereto as **Exhibit 57** is a true and correct copy of a declaration

7  from *Armstrong* and *Coleman* class member ████████████, DNM, EOP. 51 years

8  old), signed on August 24, 2020.  Attached hereto as **Exhibit 57a** are true and correct

9  copies of excerpts of documents corroborating Mr. ████ 's declaration.

10      74.    Attached hereto as **Exhibit 58** is a true and correct copy of a declaration

11  from *Armstrong* and *Coleman* class member ████████████, mobility

12  disability,[8] CCCMS, 56 years old), signed on September 24,  2020.  Attached hereto as

13  **Exhibit 58a** are true and correct copies of excerpts of documents corroborating

14  Mr. ████ ' declaration.

15      75.    Attached hereto as **Exhibit 59** is a true and correct copy of a declaration

16  from *Coleman* class member ███████████, CCCMS, 29 years old), signed

17  on August 24, 2020.  Attached hereto as **Exhibit 59a** are true and correct copies of

18  excerpts of documents corroborating Mr. ████ 's declaration.

19      76.    Mr. ████ 's declaration, attached previously as **Exhibit 16**, describes

20  misconduct at KVSP.  *See* Ex. **16**, ¶¶ 8-14.

21      **Plaintiffs' Counsel Has Raised Concerns about Assaults, Abuse, and Retaliation**
       **Against Class Members at KVSP in Multiple Reports**
22

23      77.    Attached hereto as **Exhibit 60** is a true and correct excerpted copy of

24  Plaintiffs' Report regarding the December 2015 *Armstrong* document-review only

25  monitoring tour of KVSP, issued on January 12, 2016.

26

27  ───────────────
    [8] Mr. ████ describes in his declaration that he has issues with his spine, uses a back and
28  knee brace, and has a mobility disability that is not verified by CDCR.

78.     Attached hereto as **Exhibit 61** is a true and correct excerpted copy of Plaintiffs' Report regarding the August 2016 *Armstrong* monitoring tour of KVSP, issued on October 5, 2016.

79.     Attached hereto as **Exhibit 62** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the August 2016 *Armstrong* monitoring tour of KVSP, dated May 12, 2017 and issued by Defendants on May 22, 2017.

80.     Attached hereto as **Exhibit 63** is a true and correct excerpted copy of Plaintiffs' Report regarding the June 2017 *Armstrong* monitoring tour of KVSP, issued on July 14, 2017.

81.     Attached hereto as **Exhibit 64** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the June 2017 *Armstrong* monitoring tour of KVSP, dated January 31, 2018 and issued by Defendants on February 21, 2018.

82.     Attached hereto as **Exhibit 65** is a true and correct excerpted copy of Plaintiffs' Report regarding the August 2018 *Armstrong* monitoring tour of KVSP, issued on March 1, 2019.

83.     Attached hereto as **Exhibit 66** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the August 2018 *Armstrong* monitoring tour of KVSP, dated August 5, 2019 and issued by Defendants on August 13, 2019.

**Declarations Regarding Assaults, Abuse and Retaliation at MCSP**

84.     The declarations attached hereto as **Exhibits 67** to **68a** describe misconduct the declarants experienced or witnessed at MCSP.

85.     All of the misconduct described in these declarations occurred after the filing of the Statewide Motion on June 3, 2020.

86.     Attached hereto as **Exhibit 67** is a declaration from *Armstrong* and *Coleman* class member ████████████, DPM, DNH, EOP, 59 years old), signed on September 3, 2020. Attached hereto as **Exhibit 67a** are true and correct copies of excerpts of documents corroborating Mr. ████'s declaration.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

87.     Attached hereto as **Exhibit 68** is a declaration from *Coleman* and *Clark* class member ████████, EOP, DD2, 34 years old), signed on September 17, 2020. Attached hereto as **Exhibit 68a** are true and correct copies of excerpts of documents corroborating Mr. ████' declaration.

## Declarations Regarding Assaults, Abuse and Retaliation at SAC

88.     The declarations attached hereto as **Exhibits 69 to 69a** describe misconduct the declarants experienced or witnessed at SAC.  Nearly all of the misconduct described in these declarations occurred after the filing of the Statewide Motion on June 3, 2020.

89.     Attached hereto as **Exhibit 69** is a declaration from *Armstrong* and *Coleman* class member ████████, mobility disability,[9] CCCMS, 41 years old), signed on September 21, 2020.  Attached hereto as **Exhibit 69a** are true and correct copies of excerpts of documents corroborating Mr. ████' declaration.

90.     Mr. ████'s declaration, attached previously as **Exhibit 16**, describes misconduct at MCSP and SAC.  *See* Ex. **16**, ¶¶ 24-29.

## Additional Declarations Regarding Assaults, Abuse and Retaliation at SATF

91.     The declaration attached hereto as **Exhibit 70** describes misconduct the declarant experienced or witnessed at SATF.  Nearly all of the misconduct described in these declarations occurred after the filing of the Statewide Motion on June 3, 2020.

92.     Attached hereto as **Exhibit 70** is a true and correct copy of a declaration from *Armstrong* and *Coleman* class member ████████, DNH, CCCMS, 36 years old), signed on August 14, 2020.

93.     Mr. ████'s declaration, attached previously as **Exhibit 27**, describes misconduct at COR and SATF.  *See* Ex. **27**, ¶¶ 9-21.

---

[9] Mr. ████ describes in his declaration that he suffers from incontinence, difficulty climbing, and has a mobility disability that is not verified by CDCR.

**Plaintiffs' Counsel Has Raised Concerns about Assaults, Abuse, and Retaliation Against Class Members at SATF in Multiple Reports and Letters**

94.     In support of the RJD Motion, Plaintiffs' counsel filed an excerpted copy of Plaintiffs' Report regarding the April and June 2019 monitoring tour of SATF.  *See* Freedman RJD Decl., Ex. 86.

95.     Attached hereto as **Exhibit 71** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the April and June 2019 *Armstrong* monitoring tour of SATF, dated January 17, 2020 and issued by Defendants on January 17, 2020.

96.     Attached hereto as **Exhibit 72** is a true and correct excerpted copy of Plaintiffs' Report regarding the October 2019 and February 2020 *Armstrong* monitoring tour of SATF regarding class members with mobility disabilities, issued on June 1, 2020.

97.     Attached hereto as **Exhibit 73** is a true and correct excerpted copy of Defendants' Response to Plaintiffs' Report regarding the October 2019 and February 2020 *Armstrong* monitoring tour of SATF, dated August 27, 2020 and issued by Defendants on August 27, 2020.

98.     Attached hereto as **Exhibit 74** is a true and correct copy of a letter dated June 12, 2020 from Rita Lomio, Plaintiffs' counsel, to Tamiya Davis of CDCR's Office of Legal Affairs titled "*Armstrong* Advocacy Letter ███████████, DNH, SATF." Attached hereto as **Exhibit 75** is a true and correct copy of a follow-up letter dated June 22, 2020 from Ms. Lomio to Ms. Davis titled "*Armstrong* Advocacy Letter ███ ███████, DNH, SATF."  Attached hereto as **Exhibit 76** is a true and correct copy of a second follow-up letter dated September 10, 2020 from Ms. Lomio to Ms. Davis titled "*Armstrong* Advocacy Letter ██████████, DNH, SATF."

99.     Attached hereto as **Exhibit 77** is a true and correct copy of a letter dated July 9, 2020 from Ms. Lomio to Ms. Davis titled "*Armstrong* Advocacy Letter █████████ ███████ DPH, SATF."

100.     Attached hereto as **Exhibit 78** is a true and correct copy of a letter dated

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  August 25, 2020 from Ms. Lomio and Skye Lovett, Plaintiffs' counsel, to Ms. Davis titled

2  "*Armstrong* Advocacy Letter ████████████████████, DPW, DNH, LD (unverified),

3  SATF."

4       101.   Attached hereto as **Exhibit 79** is a true and correct copy of a letter dated

5  September 8, 2020 from Ms. Lomio to Ms. Davis titled "*Armstrong* Advocacy Letter

6  ████████████, DLT, SATF." Attached hereto as **Exhibit 80** are true and correct

7  copies of CDCR Form 1824 requests for accommodation filed by Mr. ████.

8       102.   To date, Defendants' counsel have not responded to the advocacy letters

9  regarding Mr. ████, Mr. ████ Mr. ████, or Mr. ████.

10       **Additional Declarations Regarding Assaults, Abuse and Retaliation at RJD**

11       103.   The declarations attached hereto as **Exhibits 81-83** describe misconduct

12  the declarants experienced or witnessed at RJD. All of the misconduct described in these

13  declarations occurred after the filing of the RJD Reply on July 29, 2020.

14       104.   Attached hereto as **Exhibit 81** is a true and correct copy of a supplemental

15  declaration from *Coleman* class member ████████████, EOP, 44 years old),

16  signed on September 1, 2020. Mr. ████'s supplemental declaration was previously

17  filed in support of Plaintiffs' Protective Order Motion. *See* Grunfeld Protective Order

18  Decl., Ex. R. Attached hereto as **Exhibit 81a** are true and correct copies of excerpts of

19  documents corroborating Mr. ████'s declaration.

20       105.   Attached hereto as **Exhibit 82** is a true and correct copy of a second

21  supplemental declaration from *Coleman* class member ████████████, EOP, 33

22  years old), signed on August 18, 2020. Attached hereto as **Exhibit 82a** are true and

23  correct copies of excerpts of documents corroborating Mr. ████' declaration.

24       106.   Attached here to as **Exhibit 83** is a true and correct copy of a supplemental

25  declaration from *Armstrong* class member ████████████, DPW, 76 years old),

26  signed on September 10, 2020.

27

28

[3618118.1]          20              Case No. C94 2307 CW

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

**Defendants Have Not Investigated or Responded to Any of the Declarations
Describing Abuse and Retaliating Against People with Disabilities at Prisons
Other Than RJD**

107.    As set forth in previous filings, Defendants' newly-created Declaration Allegation Review Team ("DART") within the Office of Internal Affairs ("OIA") has been conducting interviews with some of the declarants who submitted declarations about misconduct at RJD.  To my knowledge, Defendants have not conducted DART interviews with any of the people who filed the thirty-nine declarations on June 3, 2020 in support of the Statewide Motion regarding assaults, abuse, and retaliation occurring at prisons other than RJD.  Defendants also have not expressed that they intend to conduct DART interviews of these thirty-eight declarants.  Defendants have not provided Plaintiffs' counsel information about how they intend to investigate and address the abuse at LAC, CCI, COR, KVSP and SATF raised in the June 3, 2020 declarations filed in support of the Statewide Motion.

**Defendants Still Have Not Provided Proof that They are in Compliance With the
Court's Statewide Anti-retaliation Order**

108.    Since the filing of the RJD Motion, Plaintiffs' counsel has raised concerns with Defendants' counsel regarding retaliation against class members and other incarcerated people with disabilities who filed declarations, given the nature of the allegations at issue.  Since at least July 22, 2020, following the filing of the Statewide Motion and the filing of Plaintiffs' TRO, Plaintiffs have attempted to negotiate a stipulated Anti-retaliation Order preventing retaliation against the declarants who testified in support of the Statewide Motion.  On August 4, 2020 the parties submitted a Stipulation and [Proposed] Order Prohibiting Retaliation in Prisons Subject to Statewide Motion. *See* Dkt. No. 3032.  On August 6, 2020, the Court issued the order. *See* Dkt. No. 3034. ("Statewide Anti-retaliation Order").  The Anti-retaliation Order prohibits "Defendants and their employees … from retaliating against the Declarants, *Armstrong* class members, or incarcerated people at [the prisons] for participating in [the Statewide Motion]." *Id.* at 1.

109.    The order required Defendants to post anti-retaliation notices in all housing

units at the prisons that are subject to the Statewide Motion. *Id.* at 2(c).  On August 21, 2020, I sent an email, a true and correct copy of which is attached hereto as **Exhibit 84**, to Defendants' counsel Trace Maiorino requesting that Defendants provide Plaintiffs' counsel with a draft of the Anti-retaliation Notice to be posted in accordance with the Court's Order.  On August 24, 2020, Mr. Maiorino responded with a proposed Anti-Retaliation Notice attached to his email.  On August 26, 2020, I approved the proposed Anti-retaliation Notice and inquired as to when the Notice would be posted at the prisons and the location within the prisons where the Notice would be posted.  Attached hereto as **Exhibit 85** is a true and correct copy of the notice to which the parties agreed on August 26, 2020.

110.    On September 2, 2020, I again followed up on the issue, requesting that Defendants post the Notices because of reports I was receiving of ongoing retaliation against people with disabilities for participation in the Statewide Motion.  A true and correct copy of my September 2, 2020 email is attached hereto as **Exhibit 86**.

111.    On September 9, 2020, Mr. Maiorino represented in an email, a true and correct copy of which is attached hereto as **Exhibit 87**, that the Anti-retaliation Notices had been posted at KVSP, LAC, and SATF.  In that same email, Mr. Maiorino stated that "[w]e are not inclined to agree to additional pages in your reply brief." *Id.*  On September 11, 2020, Mr. Maiorino represented in an email, a true and correct copy of which is attached hereto as **Exhibit 88**, that "[t]he posting of anti-retaliation notices have been completed in accordance with the order, with receipt of a proof of practice from the respective prisons."  On September 12, 2020, I requested that Defendants produce a copy of the referenced proof of practice for each prison at which the Notice was posted.  Ex. 88. Defendants did not respond to my email, so I sent a follow-up email on September 14, 2020 again requesting the production of the proof of practice for each of the prisons.  *Id.* To date, Defendants have not produced any proof of practice certifying that the Anti-retaliation Notice has been posted at any of the prisons subject to the Court's Anti-retaliation Order.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

**Even Though the Infrastructure for Video Surveillance Systems is Installed at Ten Prisons, Including LAC and CCI, Defendants Have Failed to Implement Their Long-Planned and Much Needed Video Surveillance Systems**

112.    As discussed in my declaration in support of the RJD Reply, Defendants have contracted with Stanley Convergence Security Solutions Inc. to "design and install an enterprise State wide Correctional Video Surveillance ('SCVS') solution for …" CDCR. *See* Declaration of Gay Crosthwait Grunfeld in Support of RJD Motion ("Grunfeld RJD Reply"), Dkt. No. 3023-5, Ex. NN.  This contract runs from February 29, 2016 through June 30, 2023.  *Id.*

113.    In addition, documents produced by Defendants on July 24, 2020 demonstrate that the infrastructure for video surveillance systems is already installed at ten prisons, at least.

114.    Attached hereto as **Exhibit 89** and **Exhibit 90** are true and correct copies of March 1, 2016 and September 13, 2016 letters from Craig Martinez, Staff Services Manager with the CDCR IT Procurement Unit, to Patrick Gould, Verizon Business, acknowledging the full site completion of the installation of data drops (i.e., lines of cable) for the Video Surveillance Project at LAC.  The letters acknowledge that "all documents have been received and reconciled, all work has been completed, and all deliverables have been met."  *See* Exs. 89-90.

115.    A similar full site completion acknowledgment letter dated August 1, 2017, a true and correct copy of which is attached hereto as **Exhibit 91**, was produced by Defendants for CCI.

**Defendants Have Refused to Produce Their Person-Most-Knowledgeable Deponent and Responded Substantively to Only Two of Four Sets of Interrogatories**

116.    On August 6, 2020, Plaintiffs' counsel served Defendants with a notice of deposition of CDCR's person-most-knowledgeable ("PMK") on ten subjects related to misconduct against incarcerated people at LAC, COR, CCI, and KVSP, including whether Defendants have taken any steps to reduce staff misconduct at those institutions.  On that same day, Plaintiffs also served four sets of Special Interrogatories relating to discipline

1   imposed by Hiring Authorities after sustaining allegations of custody staff misconduct

2   against incarcerated people at LAC, CCI, KVSP, and COR.

3       117.   On August 21, 2020, Defendants served their responses that only consisted

4   of objections to Plaintiffs' August 6, 2020 notice of deposition.

5       118.   Defendants initially represented in an August 29, 2020 email that they would

6   be unable to produce a person-most-knowledgeable deponent or responses to Plaintiffs'

7   Special Interrogatories unless the Court provided Defendants with an extension of time.

8   *See* Declaration of Maiorino, Dkt. 3053-1, Ex. B.  When Plaintiffs' counsel asked how

9   much additional time Defendants needed to produce responses and a person-most-

10  knowledgeable deponent, Defendants refused to answer and stated that "locating

11  responsive information is time consuming."  Declaration of Michael Freedman in

12  Opposition to Defendants' Administrative Motion to Change Time to File an Opposition to

13  Plaintiffs' Statewide Motion, Dkt. No. 3056-1, Ex. A.

14      119.   With respect to the designated person-most-knowledgeable deponent,

15  Defendants refused to produce a witness by September 18, 2020 but agreed by

16  September 11 to provide a tentative deposition date.  *See* Grunfeld Protective Order Decl.,

17  Dkt. No. 3074-4, Ex. Q (September 9, 2020 email from Trace Maiorino). Mr. Maiorino

18  also noted that "information must also be collected to cover overlapping topics in the PMK

19  depositions, and we anticipate having at least one PMK for each of the four prisons."  *Id.*

20      120.   Defendants did not provide a deposition date on or before September 11,

21  2020.  In his September 11 email, Mr. Maiorino represented that Defendants "continue to

22  work on the outstanding discovery issues, including the PMK depositions, and will provide

23  you with an update as soon as we can." *See* Ex. 89.

24      121.   On September 16, 2020, in response to a subpoena served on Defendants'

25  expert Matthew Cate, Defendants produced three spreadsheets titled "2018 CSP-LAC

26  SUSTAINED DISCIPLINE," "2019 CSP-LAC SUSTAINED DISCIPLINE," and "2020

27  CSP-LAC SUSTAINED DISCIPLINE."  On September 17, 2020, my colleague

28  Mr. Freedman sent a letter with the three spreadsheets enclosed, a true and correct copy of

[3618118.1]                                24                      Case No. C94 2307 CW

which is attached hereto with exhibits omitted as **Exhibit 92**, regarding Defendants' failure to timely produce responses to Plaintiffs' Special Interrogatories.  In that letter, Plaintiffs noted that the information contained in the spreadsheets "provide sufficient information for Defendants to either answer Interrogatories 13(a), 14(a), 15, 16, 17, 18, and 19 regarding LAC for 2018-2020 or to answer those interrogatories with relatively minimal additional effort."  Ex. 92.  Plaintiffs' demanded that Defendants at least provide responses to Interrogatories 13(a), 14(a), 15, 16, 17, 18, and 19 with respect to LAC no later than September 21, 2020, so that Plaintiffs' counsel would be able to review and incorporate that data into the Reply pleadings.  *Id.*  Plaintiffs also demanded the production of any similar spreadsheets for the other institutions covered by the three sets of Special Interrogatories (COR, KVSP, CCI); and if similar documents or spreadsheets existed for those three institutions, that Defendants produce responses to Interrogatories 13(a), 14(a), 15, 16, 17, 18, and 19 for the remaining three sets of Special Interrogatories.  *Id.*

122.    On September 18, 2020, Defendants' counsel Sean Lodholz sent a response letter, a true and correct copy of which is attached hereto as **Exhibit 93**, asserting that Defendants "are under no obligation to provide Plaintiffs partial or incomplete interrogatory responses."  Mr. Lodholz also asserted that at least two sets of Defendants' responses to the Special Interrogatories would not be completed until after the filing of Plaintiffs' Reply:  "Defendants anticipate having substantive responses for Corcoran completed on or before September 23, 2020, and may have responses for LAC completed by that date as well.  CCI responses should be completed by October 14, 2020, and responses for KVSP by October 21, 2020."  Ex. 93.

123.    On September 23, 2020, Defendants served their responses to the Special Interrogatories concerning only two of the four institutions: LAC and COR.  True and correct copies of these responses are attached hereto as **Exhibits 94** and **95**.  In total, Plaintiffs' counsel have filed 133 declarations from *Armstrong* and *Coleman* class members that describe abuses they experienced or witnessed at RJD and LAC.  Defendants have produced to Plaintiffs' counsel all disciplinary files associated with allegations of

staff misconduct involving *Armstrong* and *Coleman* class members at LAC.  Defendants have produced to Plaintiffs' counsel all disciplinary files associated with allegations of staff misconduct involving *Armstrong* class members at RJD.  *See* Grunfeld RJD Reply Decl., ¶ 44.  As far as I am aware from our review of these disciplinary files, Defendants have only imposed adverse action against four officers for their involvement in two incidents of disability-related misconduct raised in the 133 declarations submitted by Plaintiffs' counsel regarding abuse at RJD and LAC.  *Id.*; Schwartz Statewide Reply Decl., ¶ 131.  Defendants did not produce disciplinary files for LAC until August 17, 2020.

124.    As of the date of the filing of this declaration, Defendants still have not produced their person(s)-most-knowledgeable deponent(s) nor agreed on a date for their deposition.  Although we served LAC document requests on April 2, 2020, *see* Grunfeld Statewide Decl., ¶¶ 21-22, Defendants did not begin producing LAC documents until July 13, 2020, did not produce all relevant investigative and disciplinary records until August 31, 2020, still have not produced any ESI and have given no date for completion of the LAC document production.

**Defendants Allow Their Employees to Continue Working their Posts During the Pendency of Investigations into Allegations of Misconduct So Serious That They Ultimately Result in Termination**

125.    In the declaration of Jeffrey Schwartz filed in support of the RJD Motion, Mr. Schwartz criticizes Defendants' failure to place on administrative time-off or otherwise re-direct officers accused of serious misconduct against people with disabilities:

> It appears that either two of the three Officers or all three Officers remained on duty and without any assignment restrictions during the lengthy pendency of this investigation. All told, the Officers were allowed to work at RJD with ████ lary and benefits interacting with prisoners for a year after they threw Mr. ████ to the ground. All three Officers should have been placed on administrative leave until the investigation was completed or, at a minimum, reassigned away from Facility C to non-inmate contact positions. It did not make sense to leave these three Officers in posit____ where any of them might have tried to influence or retaliate against M████ or inmate witnesses or hurt other prisoners.  Schwartz Decl., ¶ 220 (████ Case, S-RJD-086-19-A).

Documents produced by Defendants indicate that there are only five cases involving custody staff misconduct against people with disabilities at RJD and LAC in which the

1   allegations of misconduct were sustained and the officer(s) accused were terminated.

2   These five cases resulted in the dismissal of nine staff members: S-RJD-144-18-A (one

3   officer), S-RJD-198-18-A (one officer), S-RJD-026-19-A (three officers), S-RJD-086-19-

4   A (three officers), and S-LAC-369-19-A (one sergeant).  Defendants have not produced

5   any documents associated with these cases that indicate that the Hiring Authority placed

6   any of the nine dismissed officers on administrative time-off or administrative re-direction

7   to a position not involving contact with incarcerated people during the pendency of the

8   OIA investigation.  Because allegations of misconduct are referred by the Hiring Authority

9   to OIA only if there is a reasonable belief that the misconduct occurred and would result in

10  adverse action, and accepted or rejected by OIA based on that same "reasonable belief"

11  standard, all nine of these officers were allowed to continue working their posts even

12  though both the Warden and OIA determined that they had likely committed misconduct

13  for which they could be terminated.

14  **Defendants' Expert Declarations Should be Stricken for Bias, Poor Methodology, and
    Lack of Foundation; Even If They Are Not Stricken, Defendants' Experts Agree that**

15  **Cameras Would Be Helpful**

16           126.    As part of their Opposition to the Statewide Motion, Defendants filed under

17  seal declarations from three experts:  Matthew Cate, the former secretary of CDCR and

18  former Inspector General of California, Bernard Warner, the former head of CDCR's

19  Division of Juvenile Justice, and John Baldwin, the former head of the Illinois Department

20  of Corrections.  Plaintiffs' counsel immediately noticed their depositions.

21           127.    I took the deposition of Matthew Cate on September 17, 2020.  Attached

22  hereto as **Exhibit 96** is a true and correct copy of the certified transcript of Mr. Cate's

23  deposition, without exhibits.

24           128.    I took the deposition of Bernard Warner on September 18, 2020.  Attached

25  hereto as **Exhibit 97** is a true and correct copy of the certified transcript of Mr. Warner's

26  deposition, divided into non-confidential and confidential portions, without exhibits.

27           129.    My colleague Thomas Nolan took the deposition of John Baldwin on

28  September 21, 2020.  Attached hereto as **Exhibit 98** is a true and correct copy of the

rough transcript of Mr. Baldwin's deposition, without exhibits.  Mr. Baldwin's certified deposition transcript is attached as Exhibit 140, *infra*, *see* ¶ 250.

130.    In each of these depositions, Defendants' counsel made almost continuous and lengthy objections.  Sometimes the witnesses forgot the questions by the time the objections were over.  Other times the witness was coached and responded in accordance with the objection.  My colleague Mr. Nolan and I asked Defendants' counsel to stipulate that all of our questions were objectionable on the grounds repeatedly stated in order to expedite the completion of the depositions.  Defendants' counsel would not so stipulate. Defendants' counsel's conduct during the expert depositions is inconsistent with Northern District of California Guidance on Professional Conduct, section 9(h), which states in pertinent part:

> A lawyer representing a deponent or another party should limit objections to those that are well-founded and necessary for the protection of his or her client's interest.  A lawyer should remember that most objections are preserved and need to be made only when the form of a question is defective or privileged information is sought.

*See also Claypole v. County of Monterey*, Case No. 14-cv-02730-BLF, 2016 WL 145557, at *2-4 (N.D. Cal. Jan. 12, 2016), (sanctioning counsel for "extremely long speaking objections[] [and] coaching witnesses[]" during expert and other depositions) (footnotes omitted).

**Defendants' Expert Matthew Cate, a CDCR Insider now turned Lobbyist, Expressed Pride in the *Madrid* System but Has No Basis for Claiming the System Currently Works to Hold Staff Accountable**

131.    Defendants' expert Mr. Cate has never served as an expert before, but thought it would be "interesting to expand [his] practice in that way…"  Ex. 96 at 17:23-18:1.  Mr. Cate's declaration makes broad assertions about the validity of the grievance system, CDCR's policies and practices for reporting staff misconduct, CDCR's use of force policies, and the remedies Plaintiffs seek.  *See* Unredacted Declaration of Matthew Cate in Support of Defendants' Opposition to Plaintiffs' Motion for a Permanent Injunction at Seven additional Prisons and Statewide ("Cate Decl."), filed under seal, Dkt. No. 3083-5, ¶ 2.  In support of these opinions, Mr. Cate provides a lengthy description of

his experience culminating in a description of his role at Stanford University School of Law. *See id.* ¶¶ 3-8. Mr. Cate's declaration omits, however, that he has done very little with Stanford in the last two years. Ex. 96 at 100:8-101:21. Instead, he spends time lobbying on behalf of entities such as GTL, many of whom have or seek contracts with CDCR. *Id.* at 96:25-100:7, 101:22-108:15. A description of Mr. Cate's lobbying activities took up about ten pages of the deposition transcript. *Id.* at 96:25-100:7, 101:22-108:15.

132.    Mr. Cate's deposition transcript full-throatedly endorses the *Madrid* system that he presided over as Inspector General and CDCR Secretary. *Id.* at 65:14-66:11, 67:10-20, 68:13-15, 237:9-23. In support of that opinion, he spoke to CDCR employees who used to work for him, including Mr. Warner, Amy Miller, Director of CDCR's Division of Correctional Policy Research and Internal Oversight, LAC Warden Johnson, and soon to be CDCR Secretary Kathy Allison. *Id.* at 73:7-19, 199:10-201:3. He admits to retaining Mr. Warner as the head of DJJ, being in touch with Mr. Warner "every month or two," being "friends," and socializing "occasionally." *Id.* at 200:15-202:16. Mr. Cate claims to have interviewed the current Inspector General Roy Wesley, whom he also hired, but admits the interview only lasted 10-15 minutes. *Id.* at 87:10. Mr. Wesley did not know he was being interviewed. *See infra*, ¶ 204. Mr. Cate regularly has coffee with current CDCR Secretary Diaz. Ex. 96 at 47:5-10.

133.    The deposition transcript shows that Mr. Cate cherry picked information to support the eight opinions that were spoon-fed to him by the Office of the Attorney General. *Id.* at 94:12-22; *see also* Cate Decl., ¶ 2. Mr. Cate did not review many of the pertinent OIG reports, including HDSP. Ex. 96 at 89:15. He testified that he "may have" reviewed the SVSP report, and did not "recall the specifics" of it, notwithstanding admitting that SVSP was the worst prison for the Code of Silence when he was at the OIG. *Id.* at 34:25-35:6, 39:4-12, 89:1-90:16. He did not ask for or receive data on officer discipline or terminations at the prisons at issue in this motion other than LAC. *Id.* at 233:2. And he ignored the LAC data, instead choosing to cite seemingly more helpful data from RJD. *Id.* at 231:7-17. Mr. Cate spent only five hours at LAC. *Id.* at 135:23-136:3.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

Mr. Cate was not aware of the 2013 use of force trial held before Judge Karlton or of changes made to the cell extraction process as a result. *Id.* at 236: 8-18. Mr. Cate did not read this Court's decisions granting a preliminary injunction transferring two class members out of RJD Correctional Facility or granting in part an injunction regarding that prison. *Id.* at 32:7-33:13, 244:18-245:8.

134.    Mr. Cate reviewed no reports in which staff misconduct allegations were sustained. *Id.* at 115:2-4. He claimed to have concerns about one investigation and believed it had been referred to the OIA. *Id.* at 139:10-12. In fact, however, the allegations in that case were not sustained after investigation. *See* Schwartz Reply Decl., ¶ 221.

135.    Mr. Cate reviewed only 15 of the LAC declarations submitted in support of the Statewide Motion. Ex. 96 at 116:9-11. He did not know whether or not any of Plaintiffs' 148 allegations concerning LAC had been sustained or action had been taken to respond to them. *Id.* at 139:4-12.

136.    Mr. Cate made broad assertions about wardens being best suited to make disciplinary decisions based on officers' personnel files (*id.* at 216:10-25.), but seemed unfamiliar with CCPOA rules allowing purging of the personnel files. *See id.* at 118:7-13; see also *infra*, ¶¶ 216-217.

137.    Mr. Cate objects to the cost of body-warn cameras but has never overseen a correctional institution using body-worn cameras or made any estimates of the of the costs involved. Ex. 96 at 238:6-239:22. Mr. Cate agreed that "more corrections systems[] are beginning to experiment with body-worn cameras." *Id.* at 240:21-23. And he stated he was "impressed by the materials … in Eldon Vail's expert report … on body cameras…." *Id.* at 243:2-4.

### Mr. Cate Admitted Flaws in the Current System Even Based Upon His Superficial Review

138.    Notwithstanding his superficial review, Mr. Cate criticized the current system in several respects. He recommends that there be a timeframe to complete use-of-

force incident packets of as soon as possible and no later than two weeks.  *Id.* at 22:11-18.
Mr. Cate also recommends the installation of cameras at LAC Unit D.  *Id.* at 73:24-75:1.
Mr. Cate agrees that cameras can be useful.  *Id.* at 37-38, 73-77, 172, 178, 185, 194-95.
He further recommends that the IERC, the committee that evaluates use of force, avoid
including members from the same facility as the force occurred.  *Id.* at 235:13-22.

139.    Of the fifteen cases he reviewed, Mr. Cate took issue with the investigations
of two of them: ███ and ███.  *Id.* at 198:5-9.  He stated that "in the ███ case, the
wrong result happened, possibly, or in the ███ case that we needed more investigation
through the internal affairs process." *Id.*

**Mr. Cate Took Unsupported Positions in Support of His Former Employer**

140.    During the course of his deposition, Mr. Cate admitted to reading the Bishop
report regarding gang-like activity among officers at RJD, Mr. Cate testified that these
officers could have worn a ███ scarf to show "closeness" and "solidarity" with fellow
officers.  *Id.* at 55:9-56:16.

141.    When Mr. Cate was asked "whether a person who is asking to be closer to
pill line so he can get there easier, who's on chemotherapy and he needs to get his pills,
whether that person would be [making] a request for accommodation under the Americans
With Disabilities Act[,]" he replied "I don't know.  And that's not what I was trying to
opine on." *Id.* at 171:10-19.

**Mr. Cate Relied In Part on Interviews with *Armstrong* Class Members Outside the
Presence of Their Counsel, Requiring That His Opinions Be Stricken
From the Record**

142.    Mr. Cate admitted that he was retained for litigation purposes and that he
interviewed people in wheelchairs without the permission of Plaintiffs' counsel or their
presence.  *Id.* at 15:22-16:2, 121:20-123:20.  He did not identify himself as an expert for
the State in meeting with those class members.  *Id.* at 125:15-126:2.  He claimed not to
know about Judge Karlton's 2013 decision prohibiting Defendants' experts from meeting
directly with class members. *Coleman v. Brown*, 938 F. Supp. 2d 955, 968 (E.D. Cal.
2013).  *Id.* at 124:6-11.  Mr. Cate is a member of the California Bar (No. 161573) and

1  bound by California Rule of Professional Conduct 4.2.  To the extent his opinions rest

2  upon his class member interviews, those opinions should be stricken from the record.

3  **CDCR Refused to Produce Mr. Cate's Notes Until Shortly Before the**
   **Reply Pleadings Were Due**

4

5       143.    Among the many improper objections raised at the deposition of Mr. Cate,

6  Defendants' counsel refused to produce the notes that Mr. Cate took as part of his

7  assignment.  Ex. 96 at 13:12-15:20, 69:21-70:11, 81:7-8.  To the extent the notes reflect

8  facts learned by the expert in connection with his assignment, they are required to be

9  produced.  *See* Fed R. Civ P. 26(b)(4)(B)-(C) Advisory Committee's note to 2010

10  amendment ("Rules 26(b)(4)(B) and (C) do not impede discovery about the opinions to be

11  offered by the expert or the development, foundation, or basis of those opinions.  For

12  example, the expert's testing of material involved in litigation, and notes of any such

13  testing, would not be exempted from discovery by this rule.").

14       144.    Perhaps regretting their improper position and fearing that the testimony

15  might be stricken, Defendants' counsel Jeremy Duggan suddenly produced Mr. Cate's

16  notes on September 23, 2020, after the deposition and just two days before the reply

17  pleadings were due.  Attached hereto as **Exhibit 99** is a true and correct copy of

18  Mr. Duggan's email attaching Mr. Cate's notes.

19       145.    These notes appear to contain several concessions, which have been

20  highlighted in yellow for the Court's convenience:

21       (a)     Ms. Miller told Mr. Cate that the reasons CDCR created AIMS

22  included the "OIG report into staff misconduct at SVSP" and the fact that "CDCR

23  concluded these problems likely existed elsewhere."  *Id.*

24       (b)     That same page of the notes includes a reference to "interview[ing]

25  Paul Edwards," a person who was never mentioned in Mr. Cate's report or deposition.

26  This raises the question of whether he failed to follow up on a key point or received

27  information from Mr. Edwards adverse to CDCR.

28       (c)     Mr. Cate's notes also appear to state that Ms. Miller told Mr. Cate that

1  "CMF Vacaville needs cameras."  This raises the question of the other institutions also

2  listed on that page and whether they "need cameras" as well.

3        (d)    Another page of Mr. Cate's notes lists statistics on use of force at

4  LAC, showing it has been increasing over time.

5        (e)    Another page of notes based on an apparent interview with

6  Mr. Johnson states "warden doesn't know the AIMS process."  This is an important

7  admission.

8      146.   One page of the notes contains extensive numbers regarding use of force that

9  are incomprehensible without talking to Mr. Cate.  On this page and especially the

10  highlighted ones, Plaintiffs were deprived of their opportunity to cross-examine Mr. Cate

11  about the underlying facts in support of his opinions.  For this reason as well, the Cate

12  Declaration should be stricken and disregarded.

13          **Mr. Warner's Experience in Corrections and Compliance Litigation**

14      147.   Mr. Warner has never before been designated to serve as an expert witness.

15  *See* Ex. 97 at 187:24-188:7.

16      148.   Mr. Warner served as Chief Deputy Secretary, Juvenile Justice, for CDCR

17  between 2005 and 2010.  *See* Unredacted Declaration of Bernard Warner In Support of

18  Defendants' Opposition to Plaintiffs' Motion for a Permanent Injunction at Seven

19  Additional Prisons and Statewide ("Warner Decl."), Dkt. No. 3083-6, ¶ 3.  During that

20  time, he "led CDCR's effort to resolve the class action lawsuit" *Farrell v. Cate*, Case No.

21  RG03-079344 (Superior Court, County of Alameda).  *Id.*  I am informed and believe that

22  those efforts remained unresolved when he resigned from his position in 2010, and

23  significant additional litigation in *Farrell* was required before the case could be

24  terminated.

25      149.   Three years into Mr. Warner's five-year tenure with the Division of Juvenile

26  Justice ("DJJ"), on October 27, 2008, the Court in *Farrell* issued an order for further relief

27  after the State failed to comply with a Consent Decree issued on November 2004. A true

28  and correct copy of the Court's October 27, 2008 order is attached hereto as **Exhibit 100**.

1    The Court noted that neutral, court-appointed experts had "cited profound concerns over

2    DJJ's leadership and commitment to and capacity for change."  Exhibit 100 at 3.  The

3    Court further found: "In some areas, the State has failed to take even the most basic,

4    foundational steps to implement reform."  *Id.* at 4.

5         150.    During Mr. Warner's tenure as head of DJJ, the organization also resisted

6    efforts to reform its juvenile parole system, which Judge Karlton found violated

7    constitutional guarantees of due process.  *See L.H. v. Schwarzenegger*, 519 F. Supp. 2d

8    1072 (E.D. Cal. 2007).

9         151.    In his declaration and the *curriculum vitae* attached thereto, Mr. Warner

10   states that he was the Secretary of the Washington State Department of Corrections from

11   2010 to 2015.  Warner Decl., ¶ 4 & Ex. A.  In his deposition, he conceded that he became

12   Secretary in July 2011, not 2010.  Ex. 97 at 42:23-43:7.  He testified that he previously

13   served as a correctional counselor, not a correctional officer.  *Id.* at 44:5-8.  Plaintiffs'

14   expert Eldon Vail, who also held the position of Secretary of the Washington State

15   Department of Corrections before Mr. Warner, had a different path to the position:

16        I think Mr. Vail was a good secretary of corrections in Washington, he
     was—he was well-liked, he was well-respected, he has tremendous value of
17   being sort of a person that came up through the ranks of the department,
     knew it well, and was able to provide good leadership for that agency.
18

19   *Id.* at 43:16-21.

20               **Mr. Warner's Perfunctory Visits to SVSP, KVSP, and SATF**

21        152.    Mr. Warner states in his declaration that he "personally visited SVSP, KVSP,

22   and SATF as part of my assessment," and that "[t]hese on-site visits were important to help

23   me understand the operations of the facilities and to observe interactions between staff

24   members and interactions between inmates and staff so that I could assess the culture at the

25   prisons."  Warner Decl., ¶ 8.  He further asserts that the visits "allowed for validation of

26   policies and practice in daily operations."  *Id.*

27        153.    However, at his deposition, Mr. Warner conceded that the site visits were not

28   "a compliance audit" and were not "a thorough cultural assessment."  Ex. 97 at 92:1-7.  He

did not directly observe interactions between incarcerated people and staff. *Id.* at 65:23-67:11, 70:14-16. He instead characterized the site visits as "an opportunity given very limited amount of time to … understand the processes that occur in those institutions." *Id.* at 92:1-7. It appears that Mr. Warner simply learned from institution staff what the general process is for requesting disability accommodations. He did not evaluate whether that process is in fact effective or being implemented properly at each institution. *Id.* at 73:12-74:18, 81:8-82:7, 96:4-16. Notably, he reported that he did not recall the topic of retaliation against incarcerated people "coming up on the tour," and conceded that he did not ask staff whether "they were aware of any inmates afraid" of asking for help. *Id.* at 91:19-21, 112:1-113:1.

154. Mr. Warner's visits to SVSP, KVSP, and SATF were brief. He could not remember the names of the majority of staff he met at these prisons. *Id.* at 64:23-65:10, 78:1-17, 95:22-96:3.

155. Mr. Warner visited SVSP for three-and-a-half or four hours on August 17, 2020. *Id.* at 77:16-25. He testified that he visited a housing unit for "no more than 20 minutes" to "familiarize myself a little bit with the facility." *Id.* at 78:20-22, 79:23-80:1.

156. Mr. Warner visited KVSP for four hours on August 18, 2020. *Id.* at 92:9-23. He reported that he visited only one housing unit, which was empty at the time, for "maybe 10 or 15 minutes," because "I just kind of wanted to get a representative picture of what the housing units looked like." *Id.* at 96:19-97:17

157. Mr. Warner visited SATF for "three to four hours" on August 18, 2020. *Id.* at 64:1-5, 68:4. He "[p]ass[ed] through" undefined housing units and "did not witness any conversations between staff and between inmates." *Id.* at 68:5-22.

**Mr. Warner's Opinions Regarding Access to the Process to Request Reasonable Accommodations Are Irrelevant and Unfounded**

158. In his declaration, Mr. Warner states that "it is my opinion that disabled inmates at SATF, SVSP, and KVSP have access to the processes in place to request and obtain reasonable accommodations for their disabilities." Warner Decl., ¶ 13.

159.   In his deposition, Mr. Warner conceded that he determined only that such a process exists; he did not review whether it is effective and whether people with disabilities are, in fact, able to obtain reasonable accommodations at the prisons he visited. Ex. 97 at 73:8-74:18.  He further conceded that he did not examine whether staff at each institution is properly documenting information on the non-compliance log.  *Id.* at 75:1-76:17.  Mr. Warner also was not aware that one purpose of the non-compliance log is to track repeat offenders among staff.  *Id.* at 76:11-17

160.   Plaintiffs do not dispute the existence of a CDCR 1824 process.  Plaintiffs instead have concerns as to whether it is effective, whether it discounts reports of disability-related staff misconduct by people with disabilities (and credits instead only staff reports), and whether allegations of staff misconduct are properly being entered onto the non-compliance logs.  Mr. Warner did not review those issues and his opinions are therefore not useful to the Court.

**Mr. Warner's Opinions Based on ADA Grievance and Staff Complaint Data**

161.   Mr. Warner reviewed data provided to him by Defendants showing the total number of "ADA Grievances/Requests for Accommodation" and "Staff Complaints" filed at SATF, KVSP, and SVSP in 2017, 2018, and 2019, as well as the percentage filed by "Armstrong Class Members."  Warner Decl., ¶¶ 16, 19.  Mr. Warner did not know how Defendants had determined whether someone was a member of the *Armstrong* class.  *Id.* at 101:14-16.

162.   Mr. Warner draws sweeping conclusions from this limited data set:

(a)   "[T]he number of ADA Appeals and Requests for Accommodation filed by class members at these institutions is in line with what should be expected based on their respective populations within each institution.  There is no indication that class members are refraining from requesting accommodations or unable to access the grievance process."  Warner Decl., ¶ 17.

(b)   "The data shows that class members are not refraining from accessing

the processes in place due to any form of discrimination or retaliation related to their disabilities.  If that were true, I would expect to see disproportionally fewer staff complaints submitted by *Armstrong* class members when compared to non-class members, but the data does not show that here."  Warner Decl., ¶ 20.

163.    Mr. Warner does not explain in his declaration the reasoning underlying his "proportionate" approach, how he determined "what should be expected," and why his conclusions otherwise were analytically sound.  He also does not identify any specialized knowledge or experience for making such conclusions based on the data.

164.    Mr. Warner's rudimentary analysis is the same relied on by Defendants in their briefing regarding Richard J. Donovan Correctional Facility, *see* Dkt. No. 3006 at 9, and rejected by this Court, in its September 8, 2020 Order.  *See* Dkt. No. 3059 at 30-31. Mr. Warner's analysis contains the same flaws and omissions, possibly because he had not reviewed the Court's Order.  Ex. 97 at 21:1-15.

165.    Mr. Warner testified that he did not receive data on whether any of the grievances or appeals had been withdrawn.  *Id.* at 110:7-10.  Defendants' own COMPSTAT data, which is publicly available on the CDCR website (https://www.cdcr.ca.gov/research/compstat/) and which Defendants produced in response to our request for all information that Mr. Warner relied on, however, shows that in April 2020 alone, 124 appeals were withdrawn at SATF, 115 appeals were withdrawn at SVSP, and 47 appeals were withdrawn at KVSP.

166.    Attached as **Exhibit 101** is a true and correct excerpted copy of the COMPSTAT data for High Security institutions that Defendants produced in response to Plaintiffs' request for all information that Mr. Warner relied on.  Exhibit 101 shows data regarding withdrawn appeals at KVSP, SATF, and SVSP.

167.    In his deposition, Mr. Warner acknowledged that he did not ask about or include in his analysis the possibility that concerns about retaliation prevented people with disabilities from requesting accommodations or filing staff complaints.  Ex. 97 at 111:18-

113:1.  Instead, he asserted, when asked whether someone with a disability would file a complaint after they previously had been threatened or beaten up, that he "can't speak to that specific issue." *Id.* at 115:12-18.  Mr. Warner testified that he could not recall the topic of retaliation against incarcerated people "coming up" during his site visits, and that he did not ask staff whether "they were aware of any inmates afraid" of asking for help. *Id.* at 91:19-21, 112:1-113:1.

168.    Mr. Warner seemed oblivious to the dangerous atmosphere prevailing at the prisons he visited.  For example, since June 2019, six incarcerated people have been killed by other incarcerated people at SATF. *See* Ex. 75.  Three of these individuals were deaf or hard-of-hearing.  *Id.*  In June 2020 alone, two incarcerated people at SATF were killed by other incarcerated people.  True and correct copies of the two news releases published on the CDCR website, both entitled, "California Substance Abuse Treatment Facility Investigating Inmate Death as a Homicide," are attached hereto as **Exhibits 102** and **103**.

169.    With regard to the OIG's 2019 Special Review of Salinas Valley State Prison's Processing of Inmate Allegations of Staff Misconduct, Grunfeld RJD Decl., Ex. GG, Mr. Warner testified that he "probably read the first third of the report."  Ex. 97 at 89:5-90:9.  His declaration, however, does not discuss, and his analysis does not account for, the Inspector General's findings regarding incarcerated people's fear of retaliation for filing a staff complaint.

170.    The Court previously found data regarding how many distinct class members at RJD submitted an ADA request or grievance to be relevant.  *See* Dkt. No. 3059 at 31. Mr. Warner, however, did not review how many distinct *Armstrong* class members submitted an ADA request or grievance at SATF, SVSP, and KVSP.  Ex. 97 at 110:16-111:4, 115:20-116:8.

**Mr. Warner's Conclusions Regarding Use of Force Are Unsupported**

171.    Mr. Warner does not appear to have any specialized knowledge, experience, or training in reviewing use of force.  In his past correctional experience, Mr. Warner did not investigate uses of force and did not review investigation files.  *Id.* at 116:25-117:16.

He testified that he may have reviewed discipline files, although not as "a specific part of my role." *Id.* at 116:25-117:16, 121:2-18.  He reported that he has never testified in a use of force case and could not recall ever being involved in a use of force lawsuit.  *Id.* at 118:2-8.

172.    Mr. Warner conducted incomplete reviews of specific uses of force against three class members. *See* Warner Decl., ¶¶ 21-33.

173.    Mr. Warner acknowledged in his deposition that he did not review all relevant information, including a witness declaration and inconsistent incident reports submitted by officers.  *See* Ex. 97 at 128:11-155:7.  He conceded that the opinions reflected in his declaration were "based on the information that I had available," and that the evidence that had been brought to his attention during the deposition merited "closer attention in terms of what my conclusion was."  *Id.* at 146:22-147:4  He conceded that video evidence would have been helpful in investigating incidents.  *Id.* at 152:22-153:18.

174.    Mr. Warner acknowledged that "there has been an increase in use of force" at KVSP, SATF, and SVSP.  *Id.* at 183:2-184:25.

**Mr. Warner Agrees that CDCR Should Install Fixed Cameras; His View that It Cannot Be Done in 90 Days Is Unsupported**

175.    In his declaration, Mr. Warner asserts, "I noted during my tours of KVSP, SVSP, and SATF, that these facilities had limited camera coverage."  Warner Decl., ¶ 35. In his deposition, however, Mr. Warner conceded that he was aware only of cameras at KVSP, SVSP, and SATF to monitor "activity outside  of the main entryway into the institutions," including "deliveries of goods and services."  Ex. 97 at 125:6-126:7, 181:4-182:6.

176.    Mr. Warner further opines in his declaration that "there are advantages in having additional camera coverage" and that "[c]ameras can provide visual evidence in an investigation, may reduce the frequency of assaults by inmates, and provide remote-video monitoring."  *See* Warner Decl., ¶ 35.  Mr. Warner recommends that "CDCR conduct a comprehensive analysis of high-risk areas within high security prisons and prioritize the

1  living areas most susceptible to incidents." *Id.*

2      177.   In his deposition, Mr. Warner acknowledged that he "can't dispute that

3  adding cameras at high-security facilities provides you better ability to provide

4  surveillance, forensic information and would contribute to the ongoing security and safety

5  of the facility." Ex. 97 at 22:12-23:2.  He testified that "the issue is the scope and the time

6  frame to be able to do that." *Id.*

7      178.   In his declaration, Mr. Warner opines: "I do not believe that ninety days is a

8  realistic estimate to install fixed-cameras that are reliable and operational.  Instead, I

9  estimate that nine to twelve months, at least, would be necessary for this installation." *See*

10  Warner Decl., ¶ 35.

11      179.   Mr. Warner does not identify any particular specialized knowledge,

12  experience, or training to support his opinions regarding the time period to deploy fixed

13  cameras.  *See id.*  Mr. Warner has never overseen a camera deployment project.  Ex. 97 at

14  24:7-9.  He testified that he when working at the private prison corporation MTC, he had

15  not talked to anyone in any detail regarding installation of cameras and "how long it took

16  to get cameras up and running in a facility." *Id.* at 24:10-25:21.

17      180.   At his deposition, Mr. Warner conceded that he is "not aware of all the

18  planning that CDCR has done to be able to make an informed decision" regarding camera

19  deployment, and that he at most could "just … raise some concerns about the time frame,

20  the number of cameras." *Id.*at 23:3-13.  He further admitted that, "without really

21  sufficiently looking at a detailed work plan, it would be hard for me to say whether 90 days

22  is possible." *Id.* at 25:22-24.  He further admitted that Defendants had not provided him

23  with "a copy of their 2016 contract in which they laid out the plan to put cameras in every

24  prison in the state," or "documents showing that LAC, for example, is already cabled for

25  cameras[.]" *Id.* at 26:5-12.

26      **Mr. Warner's Opinions Regarding Body Worn Cameras Lack Support**

27      181.   In his declaration, Mr. Warner opines that Defendants should not "be ordered

28  to implement the use of body cameras in its institutions." *See* Warner Decl., ¶ 36.

182.   Mr. Warner does not identify any particular basis for his opinions, including any specialized knowledge, experience, or training, regarding body cameras.  In fact, Mr. Warner conceded that "I have no direct experience with CDCR in knowing what their specific barriers would be" and instead referenced undefined, general experience "implementing technology."  Ex. 97 at 35:13-36:8.  Mr. Warner was not aware that Los Angeles County Jail is using body-worn cameras.  *Id.* at 28:17-19.  He also was not familiar with the Office of Inspector General's recent report "involving two officers who beat a person with mental illness behind a tarp …."  *Id.* at 33:7-13.

183.   Instead, the only specific information on which Mr. Warner relies is a conversation he had with Ricky Dixon, whom he identifies as "Florida's Deputy Director," about the Florida Department of Corrections' "pilot program using body cameras in a correctional setting."  *See* Warner Decl., ¶ 36.  Mr. Warner acknowledged that Mr. Dixon said "they were open to reconsidering [body cameras] in the future."  Ex. 97 at 29:20-22

184.   Mr. Warner agreed that "law enforcement is certainly moving toward increased use of body cameras for officers to get more detailed view of incidents that occur."  *Id.* at 33:2-5.

**Mr. Warner's Possible Personal Bias Further Undermines His Testimony**

185.   Mr. Warner is a CDCR insider, approved for his DJJ position by co-expert and friend Mr. Cate.  *Id.* at 39:7-16.  In addition, Mr. Warner testified that he initially was contacted for this assignment by Monica Anderson, an attorney with the Office of the Attorney General.  *Id.* at 16:2-6, 17:2-14.  He testified that she accompanied him on the drive to his prison site visits, but denied that she participated in the visits or discussed the *Armstrong* case with him during their trip.  *Id.* at 92:20-93:14.  According to a July 27, 2020 pleading filed in *Plata v. Newsom*,  Case No. 01-1351 JST (N.D. Cal.), a true and correct copy of which is attached here to as **Exhibit 104**, Ms. Anderson is the Senior Assistant Attorney General for Defendants in *Plata*, a case that is coordinated with this one.

186.   Based on the manner in which Mr. Warner answered questions regarding

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1    Ms. Anderson, his trip with her to visit four distant prisons, Ex. 97 at 77:16-25, 92:9-25, and

2    the lack of any apparent professional reason for Ms. Anderson to join Mr. Warner for hours-

3    long drives during his multi-day site visits, Mr. Warner may be biased due to a romantic

4    relationship with Ms. Anderson.  *Cf. Madden v. U.S. Dep't of Veterans Affairs*, 873 F.3d

5    971, 974 (7th Cir. 2017).  Mr. Warner refused to answer under oath whether he is in a

6    romantic relationship with Ms. Anderson.  Ex. 97 at 188:8-15.

7    **Defendants' Expert Mr. Baldwin Admitted that He Finds Fixed Cameras Beneficial
8    and that the Wardens at CCI, Corcoran and CIW All Wanted More Fixed Cameras
     and/or Body Cameras**

9    187.    Also a first-time expert, Mr. Baldwin expressed the view that "cameras have

10   overall been beneficial" in his experience because they "give[] you a broad perspective on

11   an incident and it — it helps both the staff and the offender."  Ex. 98 at 20:3-6, 26:12-14.

12   Mr. Baldwin agreed that cameras provide an objective view of what took place during an

13   incident between staff and incarcerated individuals.  *Id*. at 21:6-9. He also said "[c]on-

14   versely it [also] does not help the staff or offender," because "when you are in a situation

15   that is getting tense, your perspective on [an] event changes." *Id*. at 20:6-7, 22:18-20.  In

16   other words, the camera perspective can cause problems for either staff or incarcerated

17   people because it captures what truly took place.

18   188.    Mr. Baldwin said that he had a conversation with fellow experts Mr. Cate

19   and Mr. Warner about cameras and other remedies.  In the discussion of cameras,

20   Mr. Baldwin remembered that Mr. Cate "thought, that they were good for limited use[s]"

21   but said that "my view on cameras is more expansive."  *Id*. at 18:21-2, 19:3-5.

22   Mr. Baldwin said that his experience with stationary cameras was favorable.  *Id*. at 19:12-

23   17.  One of the benefits of cameras is "it gives[] a very clear picture of what happened"

24   and "people can review it and have much better picture instead of relying on reports or

25   witness statements."  *Id.* at 20:25-21:1, 21:19-21.

26   189.    Mr. Baldwin reported that when he was in corrections in Iowa, he expanded

27   the use of fixed camera video monitoring systems, adding them to new institutions starting

28   in the 1990s and especially in higher security prisons.  *Id*. at 37:22-38:14.  When he was

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

Director of Corrections in Illinois, Mr. Baldwin acknowledged putting video monitoring systems into a new prison hospital being built and into the behavioral health units he opened. *Id.* at 41:5-9. Mr. Baldwin also reported that when faced with reports that custody staff members were intimidating mental health staff in Illinois, he "had cameras installed in parking lots by the state police to see if the statements were true … about correctional officers or staff confronting [mental health practitioners] in the parking lots" at the prisons. *Id.* at 212:21-25.

190. Mr. Baldwin stated that he spoke to the Wardens of the three prisons he focused on, CCI, COR and CIW, and that all three Wardens indicated they want more cameras. Attached hereto as **Exhibit 105** is a true and correct copy of notes from Mr. Baldwin's telephonic meetings with the Wardens and key managers at CIW, CCI, and COR, produced by counsel for defendants on September 18, 2020. The Warden and staff at CCI told Mr. Baldwin they were getting 30 more cameras to replace broken ones on the Level IV yards there, and the Warden indicated that he wanted "surface cameras." *Id.* and Ex. 98 at 60:23-61:15. The Warden at CIW told Mr. Baldwin he or she wanted both fixed cameras and body cameras. *Id.* at 83:6-84:4 & Ex. 98. The Warden at Corcoran told Mr. Baldwin he wanted body cameras with audio. Ex. 98 at 75:4-9 & Ex. 98.

**Mr. Baldwin's View of Wheelchair Riders is Out of Step with Common Sense**

191. Notwithstanding his position on cameras, during his deposition, Mr. Baldwin espoused some extreme positions. For example, when asked if he thought there should be less use of force against *Armstrong* class members than typical general population prisoners, he indicated "no." Ex. 98 at 134:3-134:10. When asked, "would you agree that someone in a wheelchair is less of a threat to custody staff?" Mr. Baldwin responded "I would not always agree with that" although he acknowledged that "wheelchair bound people can be less dangerous than other people." *Id*. at 134:23-135:14; *see also id*. at 140:12-141:9. He also testified in response to the question "In general do you think people who are cuffed are less dangerous" saying "No, I do not think people in cuffs are automatically less dangerous." *Id*. at 135:24-136:8.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

**Mr. Baldwin's Review of The Key Issues In His Report Was Superficial**

192.    Mr. Baldwin reviewed CDCR data, Plaintiffs' class member declarations, and spoke with CDCR staff including the Wardens at COR, CCI and CIW in preparing his Unredacted Declaration of John Baldwin in Support of Defendants' Opposition to Plaintiffs' Motion for a Permanent Injunction at Seven Additional Prisons and Statewide, Dkt. No. 3083-3, filed under seal, ("Baldwin Decl.") at ¶¶ 6-8.

193.    Mr. Baldwin did not review and/or was not familiar with some of the key data on use of force in CDCR prisons in 2020 that was provided to him by the CDCR Office of Research.  Mr. Baldwin's Declaration reports that he did review at least some use of force data.  *See* Baldwin Decl., ¶ 7 ("I also reviewed various statistical reports provided by the State of California [which] included CDCR Statistical Reports and CompStat Reports (for example, on inmate populations and staff uses of force)."

194.    However, during Mr. Baldwin's deposition, when he was shown portions of the CDCR Office of Research data produced to Plaintiffs as one of the documents Mr. Baldwin reviewed in preparing his opinion, he was not familiar with the specific report sections shown to him.  Ex. 98 at 112:16-113:15.

195.    Attached here to as **Exhibit 106** are true and correct copies of two portions of this data that were shown to Mr. Baldwin during his deposition.  Ex. 98 at 113:20-118:25.  The first two pages from this report shown to Mr. Baldwin, pages 5 and 6, set forth data for the first six months of 2020 of the number of incidents of OC pepper spray use at each CDCR prison.  Ex. 106.  The data show that only six prisons had more than 100 incidents where OC pepper spray was used in the first six months of 2020 (in order of total number of incidents), most of them the subject of this motion: SVSP (209 incidents), CCI (163 incidents), KVSP (159 incidents), SAC (150 incidents), HDSP (133 incidents) and LAC (132 incidents).  *Id*.  Mr. Baldwin acknowledged that as a Director of Corrections he would have found this kind of data valuable.  Ex. 98 at 115:17-20.

196.    CDCR also uses a weapon called a 40mm launcher which fires rubber or bean bag projectiles at prisoners.  *See* CDCR Departmental Operating Manual (DOM),

§ 51020.14   Data on the use of 40 mm launchers for the first six months of 2020 was included in the same data set as the OC pepper spray data, at pages 12 and 13 of the report. Ex. 106.  The data shows that two CDCR prisons with the most incidents in which a 40 mm launcher was used against incarcerated individuals in the first six months of 2020 were CCI-Tehachapi with 100 incidents and KVSP with 79 incidents.  Ex. 106.  This was also shown to Mr. Baldwin, who was not familiar with the report either, and he admitted that as Director of Corrections he would have found this to be valuable data.  Ex. 98 at 115:17-20.

197.    Mr. Baldwin acknowledged that his review of the 1824 process did not include a review of any information that would allow him to determine whether people were actually able to obtain accommodations through 1824 requests.  *Id*. at 159:13-17.  He was not sure whether he reviewed any 1824 appeals.  *Id*. at 160:21-25.

### Mr. Baldwin Is Not A Use of Force Expert

198.    Mr. Baldwin has no background on use of force matters.  He started out as a business manager and never served as a correctional officer or as part of the security personnel at a prison.  *Id*. at 26:15-23.  He never reviewed use of force incidents as a first line custody supervisor.  *Id*. at 29:2-7.  He never served as a Warden.  *Id*. at 28:19-20. When he was Deputy Director of the Iowa Department of Corrections, he would review cases 2 to 4 times per year to make sure he supported the proposed sanction in the case from the personnel department.  *Id*. at 31:22-32:1.  He did not agree or disagree when asked if he considers himself a use of force expert, rather, he said "I consider myself to have [] a working knowledge of use of force instances."  *Id*. at 32:2-11.

199.    Mr. Baldwin misstated the selection criteria for use of force cases to be directed to AIMS.  *Id*. at 58:20-24 ("Way I understand it, is if there is reasonable expectation, that the incident happened, it stays at the institution.  If there is otherwise it would go to [AIMS] for investigation.")  This is the opposite of the true AIMS policy.

### Mr. Baldwin's Interviews Showed AIMS Is Not Being Fully Utilized at CCI and CIW

200.    Mr. Baldwin testified that when he spoke with Amy Miller, one of the CDCR officials overseeing the implementation of AIMS, that AIMS was introduced for

1   Northern CDCR institutions in January and for Southern CDCR institutions beginning

2   April 20, 2020.  Ex. 98 at 56:24-57:19.  At the time of the interview with Mr. Baldwin on

3   August 5, 2020, Ms. Miller reported that they were just getting all their AIMS staff jobs

4   filled.  *Id.* at 89:15-25.

5         201.   Mr. Baldwin also testified that when he spoke with CCI in early August, they

6   had not sent any incidents to AIMS, even though the program had been operating in that

7   region since April 20, 2020.  Ex. 98 at 55:3-12, 57:7-19 & Ex. 105.  He also testified that

8   the Warden of CIW also told him in early August they had only sent two to three cases to

9   AIMS total.  Ex. 98 at 86:18-24 & Ex. 106.  He did not include this information about

10  AIMS utilization in his declaration.  He apparently did not ask the Corcoran Warden about

11  this issue, as it is not reflected in his notes from the call.  *See* Ex. 105.

12  **The OIG Has Continued to Criticize CDCR's Investigations into and Discipline of
    Officers Accused of Serious Misconduct Against Incarcerated People**

13

14        202.   As part of our ongoing monitoring of disability-related staff abuse against

15  incarcerated people, my colleagues and I speak from time to time with Roy Wesley,

16  California's Inspector General.  We also closely follow OIG reports.  By statutory

17  mandate, these reports may not reveal the individual names of officers involved and

18  therefore also omit the name of the prison.  On August 19, 2020, the OIG published

19  Sentinel Case Number 20-04.  In its report, the OIG found that Defendants made egregious

20  errors in judgment and relied on poor legal advice when Defendants failed to dismiss two

21  officers who were shown on video surveillance footage to have brutalized a *Coleman* class

22  member on November 21, 2018.  *See* Grunfeld New Material Reply, Dkt. No. 3051-5.

23  Based on a conversation with Mr. Wesley, I learned confidentially that this report involved

24  █████

25        203.   On August 14, 2020, Plaintiffs' counsel served Defendants with a request for

26  production of documents relating to the incident described in Sentinel Case Number 20-04.

27  On August 31, 2020, Defendants produced responsive documents to Plaintiffs' request.

28  Attached hereto as **Exhibit 107** is a true and correct copy of the raw surveillance footage

1   produced by Defendants relating to the November 21, 2018 incident, along with a

2   Windows application produced by Defendants that allows for viewing of the raw footage

3   saved in a proprietary file format.  For the convenience of the Court, attached hereto as

4   **Exhibits 108**, **109**, **110**, **111**, **112**, and **113** are true and correct copies of screen recordings

5   of the video surveillance footage produced by Defendants from one perspective that shows

6   the perspective of five individual cameras, as well as recordings of each individual camera.

7   This video surveillance shows two officers engage in a coordinated attack on a person with

8   a disability behind a tarp.  The beating is difficult to observe fully due to the lack of body

9   worn cameras.  Neither officer lost his job.

10       204.   On September 14, 2020 I called Mr. Wesley to discuss the Declaration of

11   Matthew Cate.  In our call, Mr. Wesley described his frustration with the manner in which

12   the AIMS process was being implemented across the state.  He stated that CDCR used

13   their Budget Change Proposal ("BCP") to obtain $10 million from the Department of

14   Finance in order to review 6,300 grievances per year in conjunction with the OIG.  After

15   CDCR's BCP was granted, Mr. Wesley stated that he felt that his office was being cut out

16   of the review process.  He expressed that there is no outside oversight into which

17   allegations are routed through the AIMS process, and the warden is effectively the only

18   decision-maker, rendering AIMS no better than the former system.  Mr. Wesley also

19   expressed surprise that Mr. Cate claims to have interviewed him.  Mr. Wesley described a

20   29-minute telephone conversation that was mostly pleasantries.  He did not know he was

21   being interviewed about any pertinent issue.

22       205.   I spoke again with Mr. Wesley by telephone on September 21, 2020.  In our

23   call, Mr. Wesley confirmed confidentially that Sentinel Report No. 20-01, attached as

24   Exhibit KK to the Grunfeld RJD Decl., Dkt. No. 2922-1, involved ███.  Mr. Wesley also

25   stated that he intended to issue reports in the near future regarding deficiencies in the

26   DART and AIMS processes.  He also expressed to me that AIMS is "pretty broken" and

27   has been implemented by CDCR "to maintain the status quo."

28       206.   Attached hereto as **Exhibit 114** is a true and correct copy of an August 20,

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

2020 letter from Penny Godbold to Tamiya Davis and Joanna Hood regarding "Problems with AIMS."  In that letter, Plaintiffs' counsel outlined concerns similar to Mr. Wesley's: that the new AIMS process, as its being implemented in the field, suffers from the same problems that plagued the old staff misconduct investigative and disciplinary system. Ms. Godbold's letter includes a class member letter filed in this Court (Dkt. No. 3036) that suggests that allegations of staff misconduct that should have been routed through AIMS according to the AIMS regulations were instead being investigated by institutional staff. Even worse, the warden who determined that the allegation should be investigated in-house rather than through AIMS was the subject of the allegation.

**Defendants' Interviews of the Class Member Declarants Have Been Biased and Incompetent, and Defendants Still Refuse to Provide Plaintiffs' Counsel with a Complete Explanation of the Purpose of these Interviews**

207.    As discussed in the Declaration of Penny Godbold in support of Plaintiffs' RJD Reply ("Godbold Reply Decl."), Defendants have referred the allegations contained in the fifty-four RJD class member declarations to a special team of OIA investigators referred to as the Declarant Allegation Review Team ("DART"), specifically assembled for the purpose of reviewing and investigating Plaintiffs' declarations.  Godbold Reply Decl., Dkt. No. 3024-2, ¶ 2.

208.    As of the filing of this declaration, Plaintiffs' counsel has participated in approximately thirty interviews of declarants conducted by DART investigators; the OIG, while originally kept in the dark, has also now participated in a number of these interviews.

209.    While Plaintiffs' counsel encourages Defendants' attempts to investigate the allegations contained in the declarations and take appropriate personnel action in response, we are concerned about the manner in which the DART team has conducted these interviews.  Defendants have not informed Plaintiffs' counsel of the purpose of the DART interviews, and whether these interviews are part of neutral fact-gathering or instead aimed at gathering evidence for their defense in the ongoing litigation.  I raised this concern with Defendants in an email on August 5, 2020, a true and correct copy of which is attached

1    hereto as **Exhibit 115**.

2        210.    We are also concerned that Defendants are failing to notify the declarants

3    about the purpose of the interviews in advance.  On one such occasion, the declarant did

4    not bring his glasses to the interview because he did not know why he was being

5    interviewed.  Because he could not see, he was unable to read his declaration during the

6    interview.  Plaintiffs' counsel is also concerned that the declarants are not being given

7    access to their declarations and other documents that investigators rely upon when

8    questioning the declarants.  I raised these concerns in an email to Tamiya Davis and

9    Patricia Ferguson on August 20, 2020.  Ex. 115.  On September 10, 2020, Ms. Davis sent

10   me an email, a true and correct copy of which is attached hereto as **Exhibit 116**, stating

11   that CDCR was still considering whether to allow the declarants to refer to their

12   declarations during the course of their interviews.  Ms. Davis also stated that she was

13   "unclear as to what is concerning you regarding the purpose of the interviews.  CDCR has

14   an obligation to review and investigate the serious allegations raised in the declarations,

15   and is doing so.  These interviews are part of that process."  Defendants have failed to

16   explain this "process," including whether they are producing any investigative work

17   product or reports in connection with the DART interviews.  Defendants have not stated

18   whether they intend to use the DART interviews primarily for litigation purposes, or

19   instead, to investigate and hold staff accountable for the misconduct described in the

20   declarations.  Defendants also have failed to describe the scope of the DART inquiries,

21   including whether DART investigators will also be interviewing staff members and

22   witnesses to the incidents discussed in the DART interviews, and whether DART will be

23   extended to non-RJD declarants.

24       211.    Plaintiffs' counsel remains concerned that the DART investigators can be

25   biased and incompetent in ways that undermine their ability to perform thorough and

26   neutral investigations into the allegations contained in the declarations.  The problems with

27   the DART interviews that were initially raised in the Ms. Godbold's Declaration—*e.g.*,

28   that the DART investigators ask leading questions designed to exonerate staff and harp on

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  immaterial "inconsistencies" between the declarant's statements that, in fact, are not

2  inconsistent at all—also appear to be present in subsequent DART interviews that I and my

3  colleagues have staffed.  *See* Godbold Reply Decl., ¶¶ 6-9.

**Defendants Have Interviewed Multiple Declarants Outside of Our Presence About**
4
**the Subject Matter of their Declarations**
5

6      212.   On May 7, 2020, I sent a letter to Defendants, a true and correct copy of

7  which was attached to the Grunfeld Statewide Declaration, Dkt. No. 2948-1, Ex. D,

8  notifying Defendants that Plaintiffs' counsel intended to share with them nine declarations

9  from people with disabilities about staff misconduct at LAC.  In that letter, I admonished

10  Defendants:

11          Pursuant to the prohibition on communications with a represented party,
            neither Defendants nor Defendants' counsel may communicate with the
12          declarants or class members referenced in the declarations regarding the
            allegations in the declarations. *See* California Rule of Professional Conduct
13          4.2.  Any communications with the declarants or class members referenced
            in the declarations about the content of the declarations must be made
14          through Plaintiffs' counsel or with Plaintiffs' counsel present.

15      213.   Before sharing declarations with Defendants describing misconduct at other

16  prisons, including CCI, COR, KVSP, SATF, and CMF, I sent similar letters on May 21,

17  2020, May 26, 2020, August 21, 2020, and September 21, 2020.  *See* Ex. 1.  In each letter,

18  I included the same admonishment.

19      214.   Despite my admonishments, without the consent of or advance warning to

20  Plaintiffs' counsel, Defendants have interviewed at least four declarants outside of our

21  presence:

22      •   Mr. ███, whose declaration was shared with Defendants on May 29, 2020,
            was interviewed by Defendants' employees 12 days later on June 10, 2020
23          according to a document produced by Defendants, a true and correct
            excerpted copy of which is attached hereto as **Exhibit 117**.
24
25      •   Mr. ███, whose declaration was shared with Defendants on May 15, 2020,
            was interviewed by Defendants' employees 54 days later on July 8, 2020
26          according to a document produced by Defendants, a true and correct
            excerpted copy of which is attached hereto as **Exhibit 118**.

27

28

- Mr. ███████, whose declaration was shared with Defendants on May 7, 2020, was interviewed by Defendants' employees 21 days later on May 28, 2020 according to a document produced by Defendants, a true and correct excerpted copy of which is attached hereto as **Exhibit 119**.

- Mr. ███, whose declaration was shared with Defendants on May 7, 2020, was interviewed by Defendants' employees 35 days later on June 11, 2020 according to a document produced by Defendants, a true and correct excerpted copy of which is attached hereto as **Exhibit 120**.

**Defendants' Contract with the California Correctional Peace Officers Association Thwarts Accountability**

215.    The California Correctional Peace Officers Association ("CCPOA") represents CDCR's correctional officers.  Their latest contract with the State of California, effective from July 3, 2020 to July 2, 2022 ("2020 contract") is partially available on the California Department of Human Resources ("CalHR") website.  Unit 6 – Corrections, California Department of Human Resources (accessed on June 23, 2020), https://www.calhr.ca.gov/labor-relations/Pages/Unit-06-Corrections.aspx.  In an email to Jack Rhein Gleiberman, a paralegal at our firm, a true and correct copy of which is attached hereto as **Exhibit 121**, CalHR represented that the 2020 contract posted on its website consists solely of provisions that differ from the July 3, 2019–July 2, 2020 contract ("2019 contract"), and that all other provisions are rolled over from the 2019 contract to the 2020 contract.  True and correct copies of pertinent excerpts of the 2020 and 2019 contracts and sideletter discussed below are attached hereto as **Exhibit 122**.

216.    Section 9.06, subsection A of the 2019 contract requires the purge of notices of adverse action; documentation leading to, supporting, or proposing adverse action; and all State Personnel Board ("SPB") decisions upon an officer's written request after three years from the effective date of the adverse action, unless there is a litigation hold on the file.  The provision reads:

> Upon the Bargaining Unit 6 member's written request, all official Notices of Adverse Action, all documentation leading to or supporting or proposing such action, and all SPB decisions rendered in such cases will be purged from the employee's official personnel file(s) after three (3) years from the effective date of the adverse action, unless there is a litigation hold on the file.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1

2  *See* Section 9.06, subsection A.  The sections of the 2020 contract available on the CalHR

3  website do not include this Section; based on the CalHR email, this subsection will be the

4  same in the 2020 contract.

5      217.    Similarly, under subsection B of the same section, CDCR must purge

6  citizen's complaints, reports, and findings upon an officer's written request after five

7  years:

8          Upon the employee's written request, all citizen's complaints, reports and
        findings related to Penal Code Section 832.5 shall be purged from the
9          Department's files after a period of five (5) years.

10  *See id.*, subsection B.

11      218.    This section of the contract is consistent with CDCR's "Administration of

12  Offender Services, Division of Administrative Services, Human Resources retention

13  schedule," a true and correct copy of which is attached hereto as **Exhibit 123**, which only

14  requires CDCR to retain adverse action records for three years.  The agency must retain

15  supervisory files for one year following the employee's transfer or termination from

16  CDCR.

17      219.    Section 9.09, subsections C through F of the CCPOA contract requires

18  Defendants to provide their employees documentation when a complaint is filed against

19  them, including a copy of the 602 or other complaint filed against them, video or audio

20  recordings of statements or complaints made against them, and an opportunity to view a

21  video recording of a cell extraction prior to the interview.  Section 9.09, subsection G

22  generally requires Defendants to complete any investigations into custody staff misconduct

23  within twelve months pursuant to the Peace Officers Bill of Rights ("POBOR"),

24  incorporated in Government Code Sections 3304 and 3309.5.

25      220.    According to Section 9.16 (Video Recordings), subsection C (Misconduct,

26  Administrative, Criminal & DFIT Investigations), custody staff is permitted to review

27  videos relating to incidents of staff misconduct so long as the Hiring Authority has not

28  initiated the 989 process or administrative action is contemplated.  If the Unit 6 employee

1  (correctional officer) is denied the opportunity to review any video on those grounds, the

2  Hiring Authority may not ask further questions or clarifications of the staff member.

3        221.   In routine matters not involving allegations of misconduct, pursuant to

4  Section 9.16, subsection B, Defendants allow their employees to review video evidence

5  after writing and submitting their reports, at which point, they are entitled to submit a

6  supplemental report after viewing the video evidence.

7        222.   Section 8.05 states, "All employees shall be provided with a minimum of

8  sixty (60) hours of annual training," and specifies, "The sixty (60) hours of training is

9  divided between forty-eight (48) hours of Off-Post Training Sessions (OPTS) and twelve

10  (12) hours of On-the-Job Training (OJT)."  However, Defendants recently entered into a

11  Sideletter XX COVID-19 Pandemic Recession, Section II(A) that modifies this provision

12  in the 2020 contract.  The sideletter states:  "Thirty-two (32) hours of the off-post training

13  identified in Article 8.05 7k Training Program are converted to, for example, non-

14  classroom, On-the-Job or online training consistent with CDCR's Modified Training

15  Program."  Ex. 122.  This modification effectively allows CDCR to reduce the amount of

16  off-post training, i.e., classroom training, from 48 hours per year to just 16 hours per year.

17        223.   In telephonic conversations regarding discovery issues and the protective

18  orders in these Motions, Mr. Lodholz has informed me that the CCPOA has been granted

19  access to all confidential disciplinary and investigative files in CDCR's possession as a

20  result of a state court settlement with CDCR.  Mr. Lodholz also informed me that his office

21  was producing to the CCPOA copies of all personnel and investigative documents marked

22  "highly confidential" and produced to Plaintiffs  in response to our November 2019 and

23  April 2020 requests for production of documents.

24  **Defendants' Employees Call for Violence Against Incarcerated People on Social
    Media, and Defendants Have Not Taken Adequate Steps to Rectify the Problem**
25  **With their Culture**

26        224.   Attached hereto as **Exhibit 124** is a true and correct copy of an August 26,

27  2020 letter from Penny Godbold to Joanna Hood and Tamiya Davis, counsel for

28  Defendants, titled "Demand for Investigation into Unprofessional Online Conduct by

[3618118.1]

53

Case No. C94 2307 CW

CDCR Employees."  Plaintiffs previously reported on unprofessional online conduct by CDCR employees in the Statewide Motion, where we raised concerns that The Late Relief, an Instagram account, openly mocks and threatens incarcerated people with disabilities from the perspective of CDCR custody staff. *See* Grunfeld Statewide Decl., Dkt. No. 2948-1, ¶ 42 & Ex. W; *see also* https://www.instagram.com/thelaterelief/, last accessed September 20, 2020.  In the August 26, 2020 letter, Plaintiffs' counsel reported that RJD staff made unprofessional comments on The Late Relief's page and Facebook that incited violence and called for the death of an incarcerated person who was reportedly involved in an August 16, 2020 incident that occurred at RJD.  *See* https://www.cdcr.ca.gov/news/2020/08/16/inmate-attack-on-correctional-officers-at-richard-j-donovan-correctional-facility-under-investigation/, last accessed September 10, 2020.

225.  On September 9, 2020, one day after the Court granted in part Plaintiffs' RJD Motion, The Late Relief posted about the Court's Order.  Attached hereto as **Exhibit 125** are true and correct copies of The Late Relief's September 9, 2020 post and comments left on the post.

226.  Attached hereto as **Exhibit 126** is a true and correct copy of a *Los Angeles Times* article, published on September 17, 2020, titled "California prison guard union places bull's-eye on Black lawmaker's photo in political ad."  The advertisement depicts CCPOA President Glen Stailey pointing at an image of crosshairs covering the face of Assemblyman Reggie Jones-Sawyer, who is Black.

**Review of OIG Monitoring of CDCR's Investigative and Disciplinary Processes**

227.  The OIG maintains a public database of cases reviewed as part of its semiannual reporting on Defendants' internal investigative and disciplinary processes, as mandated by California Penal Code sections 6126(a) and 6133(b)(1).  *See* OIG Data Explorer, Case Summaries, at https://www.oig.ca.gov/data-explorer/#/dmu/caseSummaries (last accessed September 19, 2020).  In its review, the OIG assesses the performance of the three entities within CDCR responsible for conducting internal investigations and handling

1   the employee disciplinary process: Hiring Authorities, the Office of Internal Affairs, and

2   CDCR attorneys.

3       228.   The Data Explorer includes the following information about each of the

4   cases monitored by the OIG:

5           (a)    The date of the incident, the OIG case number, the type of allegations

6   involved, and the type of investigation conducted (e.g., administrative investigation,

7   criminal investigation, direct adverse action, or subject-only inquiry);

8           (b)    A summary of the incident;

9           (c)    The disposition of the case, including whether the allegations were

10  sustained, whether the Hiring Authority elected to discipline the subject of the

11  investigation, and whether the discipline was modified after being imposed at the *Skelly* or

12  State Personnel Bord stages; as well as the OIG's evaluation of the disposition of the case;

13          (d)    The OIG's overall case rating, whose possible values are poor (red),

14  satisfactory (green), or superior (blue); and

15          (e)    The OIG's rating for six performance indicators used in its

16  methodology, whose possible values are poor, satisfactory, or superior:

17          **Indicator 1:**   How well did the department discover and refer
                               allegations of employee misconduct?

18
19          **Indicator 2:**   How well did the Office of Internal Affairs process
                               and analyze allegations from the hiring authorities?

20          **Indicator 3:**   How well did the department investigate allegations
                               of employee misconduct?

21
22          **Indicator 4:**   How well did the department determine its findings
                               for alleged misconduct and process the case?

23          **Indicator 5:**   How well did the department attorney provide legal
                               advice during the Office of Internal Affairs Central
24                             Intake Panel meeting and the Investigative process?

25          **Indicator 6:**   How well did the department provide legal
                               representation during litigation?

26
27      229.   Mr. Gleiberman, working under my direction and supervision, reviewed the

28  OIG's Data Explorer for cases monitored and closed by the OIG from January 1, 2019

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  through June 30, 2020 ("monitoring period").  By using the built-in filter features,

2  Mr. Gleiberman found that the OIG reviewed and closed a total of 481 cases during the

3  monitoring period.

4        230.    For each of these 481 cases, Mr. Gleiberman reviewed the summary of the

5  incident provided by the OIG to determine whether the alleged misconduct involved either

6  intentional harm or negligence by custody staff toward incarcerated people in the custody

7  of CDCR.  For the purpose of determining which allegations involved harm or negligence

8  toward incarcerated people, Mr. Gleiberman only included allegations of custody staff

9  misconduct against people incarcerated in CDCR custody; he did not include misconduct

10 against parolees, misconduct committed by medical or other staff in CDCR, or misconduct

11 against offenders incarcerated in the Division of Juvenile Justice because those types of

12 misconduct are not at issue in the Motions.  Mr. Gleiberman also did not include

13 allegations that staff had engaged in misconduct with the consent of incarcerated people

14 (e.g., a consensual sexual relationship or conspiracy to introduce contraband into an

15 institution).

16       231.    Mr. Gleiberman then created a spreadsheet, a true and correct copy of which

17 is attached hereto as **Exhibit 127**, containing all cases monitored and closed by the OIG

18 during the monitoring period in which the allegation at issue involved harm or negligence

19 by custody staff toward incarcerated people.  Mr. Gleiberman found that, of the 481 cases

20 monitored and closed by the OIG during the monitoring period, only 116 (24.1%) involved

21 custody staff misconduct toward incarcerated people.  The remaining 365 cases (75.9%)

22 did not involve allegations of custody staff misconduct toward incarcerated people.

23       232.    The OIG found that the Department's overall performance in 28 of the 116

24 (24.1%) cases was "poor."  The OIG issued a "poor" rating for at least one of the six

25 performance indicators in 73 out of 116 cases (62.9%).[10]  For 45 out of 116 cases (38.8%),

26

27 ───────────────

[10] If the OIG did not assign a rating for a particular indicator because that indicator was not
28 applicable to the case, the indicator is blank in the spreadsheet.

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   the OIG found that CDCR performed poorly in determining its findings for alleged

2   misconduct and processing the case (OIG Indicator 4).  The OIG did not issue an overall

3   "superior" rating for any of the 116 cases involving misconduct against incarcerated

4   people during the monitoring period.

5          233.    Five cases monitored by the OIG during the monitoring period have also

6   been reviewed and discussed by Plaintiffs' expert, Mr. Schwartz.  Even though the case

7   reports made public by the OIG are anonymized, it was possible to determine that the cases

8   discussed by Mr. Schwartz were the same as those reviewed by the OIG by comparing the

9   date of the incidents and the summary provided by the OIG.  For each of these cases

10  discussed below, the summary and date provided by the OIG matches the information for

11  cases reviewed by Mr. Schwartz.  For each of these cases, Mr. Schwartz and the OIG

12  disagreed regarding the Department's performance.  In all five cases, the OIG approved of

13  parts of the Department's performance where Mr. Schwartz found the Department had

14  performed poorly.

15         234.    Attached hereto as **Exhibit 128** is a true and correct copy of the OIG's case

16  summary of OIG Case Number 19-0031468-DM.  This case corresponds to Office of

17  Internal Affairs Case Number S-LAC-379-19-A, discussed in the Schwartz Reply Decl.,

18  ¶¶ 193-221.  Mr. Schwartz found that "[t]he correct conclusion in this case, based on

19  ample evidence, is that two staff used excessive force on Mr. ████ in order to retaliate for

20  his verbal statements to them and then they and two other staff failed to report the

21  unnecessary and excessive force and wrote false reports and then provided false

22  information during interviews with an OIA investigator."  *Id*. ¶ 221.  According to the case

23  summary, however, the OIG concurred with the Hiring Authority's determination that

24  there was insufficient evidence to sustain the allegation (Indicator 4).  *See* Ex. 128.

25         235.    Attached hereto as **Exhibit 129** is a true and correct copy of the OIG's case

26  summary of OIG Case Number 18-0026277-DM.  This case corresponds to Office of

27  Internal Affairs Case Number S-RJD-144-18-A, discussed in Mr. Schwartz's Declaration

28  at ¶¶ 205-211.  Although Mr. Schwartz found that the disciplinary outcome in this case

1  was satisfactory, he found that "the OIA investigation itself is biased and incompetent."

2  Schwartz Decl., ¶ 209.  According to the case summary, however, the OIG's review of the

3  OIA investigation (Indicator 3) found "no major deficiencies, resulting in a satisfactory

4  assessment."  Ex. 129.

5  236.    Attached hereto as **Exhibit 130** is a true and correct copy of the OIG's case

6  summary of OIG Case Number 19-0028406-DM.  This case corresponds to Office of

7  Internal Affairs Case Number S-RJD-439-18-A, discussed in Mr. Schwartz's Declaration

8  at ¶¶ 182-196.  Mr. Schwartz found that "the Officer and Sgt. incident reports and

9  interviews make no sense and the investigation is both incomplete and incompetent."

10  Schwartz Decl., ¶ 187.  According to the case summary, however, the OIG's review of the

11  OIA investigation (Indicator 3) found "no major deficiencies, resulting in a satisfactory

12  assessment."  Ex. 130.  The OIG and Mr. Schwartz agreed that the Hiring Authority did

13  not make appropriate findings based upon the evidence gathered in the case.  Ex. 130;

14  Schwartz Decl., ¶ 194 ("Even as bad as the OIA investigation was, some facts were clearly

15  established that should have been the basis for findings of staff misconduct.").  Despite

16  finding that the Hiring Authority's disciplinary determinations were poor (Indicator 4), the

17  OIG inexplicably "did not seek a higher level of review," even though the OIG may

18  challenge the outcome of a case through multiple levels of executive review, up to and

19  including the Secretary of CDCR.  *See* Department Operations Manual, § 33030.14.

20  237.    Attached hereto as **Exhibit 131** is a true and correct excerpted copy of the

21  Appendices to the July-December 2018 Semiannual Disciplinary Monitoring Report,

22  issued by the OIG on June 6, 2019.  The excerpt includes the summary of OIG Case

23  Number 18-0027077-IR.  This case corresponds to Office of Internal Affairs Case Number

24  S-RJD-427-17-A, discussed in Mr. Schwartz's Declaration at ¶¶ 139-154.  Mr. Schwartz

25  found that the OIA investigation was biased, untimely, and incomplete.  Schwartz Decl.,

26  ¶¶ 149, 152.  According to the case summary, however, the OIG issued the case a

27  substantive rating of "sufficient."  Ex. 131.  In its analysis of the Investigative Phase, the

28  OIG only critiqued the failure of the medical Hiring Authority to timely review the

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

investigation into medical staff misconduct.  *Id.*

238.    Attached hereto as **Exhibit 132** is a true and correct excerpted copy of the Appendices to the January-June 2018 Semiannual Disciplinary Monitoring Report, issued by the OIG on November 20, 2018.  The excerpt includes the summary of OIG Case Number 17-0023834-IR.  This case corresponds to Office of Internal Affairs Case Number S-RJD-086-19-A, discussed in Mr. Schwartz's Declaration at ¶¶ 197-204.  Mr. Schwartz found that the OIA investigation was biased and an example of how "CDCR's flawed process and approach" leads to an inability to sustain findings of staff misconduct against incarcerated people.  Schwartz Decl., ¶¶ 202, 204.  According to the case summary, however, the OIG issued the case a substantive rating of "sufficient."  Ex. 132.  In its analysis of the Investigative Phase, the OIG only critiqued the Hiring Authority's delay in referring the matter to OIA.  *Id.*

**Plaintiffs' Review of the Accountability Logs Involved in This Motion**

239.    Ellie Heywood, a paralegal working under my direction and supervision, reviewed DAI Employee Non-Compliance Logs ("Accountability Logs") for the months of January 2016 through July 2020, which is the most recent log produced to Plaintiffs' counsel by Defendants, for LAC and COR.

240.    Many of the allegations that we raised in advocacy letters and tour reports about class members being denied access to programs, services and activities, were not included.  For example, Defendants failed to log the following allegations:

- ████████████████████, **EOP, LAC:**  On August 27, 2019, Mr. ███ requested o be housed closer to the medication window because he was undergoing chemotherapy at the time and struggled to walk long distances, In response, an officer mocked his appearance and assaulted him, throwing him out of his wheelchair and beating him.  *See* Freedman Statewide Decl., Ex. 53.

- ████████████████████████ **CMS, LAC:**  On December 1, 2018, an ██████████████████████' Durable Medical Equipment ("DME") from him,  including his TENS unit, nasal inhaler, therapeutic boots, and braces. Officers then assaulted him after he requested medical attention for the pain he was in without his DME. Plaintiffs' counsel first raised this incident in an *Armstrong* monitoring tour report of LAC, issued on July 16, 2019. *See* Nolan Decl., Ex. K.

1   • ████████████████████████, **DPW, LAC:** On November 14, 2018, LAC
        ins, pulled him out of his wheelch        o
2       the cell door. The Officers then took the cuffs off, making Mr. ██████
        fall backwards into his cell, laughing and remarking "you stood up now"
3       along with a racial slur. Plaintiffs' counsel first raised this incident in an
        *Armstrong* monitoring tour report of LAC, issued on March 19, 2019. *See*
4       Nolan Decl., Ex. I.

5   • ████████████████████ **DP___, CCCMS, COR:** During a body se___h, an
        Mr. ████'s legs further apart even after Mr. ████ told
6       him that he was unable to spread them fart___ because of his mobility
        disability. The officer then assaulted Mr. ████, slamming him to the ground
7       and fracturing his nose. Plaintiffs' counsel first raised this incident in an
        advocacy letter to Defendants, dated February 12, 2020. *See*. Freedman RJD
8       Decl., Ex. 81.

9   • ████████████████████ **DP___OR:** Officers instructed Mr. ████ to
        Mr. ████ explained that he needed waist chains in
10      orde____sh his walker and walk safely. Officers proceed___force
        Mr. ████'s arms behind his back. They then pulled Mr. ████ by his
11      clothes and zip tied his hands so tightly that they began to turn purple.
        Plaintiffs' counsel raised this incident in an *Armstrong* monitoring tour
12      report of COR, issued on June 29, 2020. *See* Ex. 37.

13                     **Demographics of the Statewide Prisons**

14      241.   Attached hereto as **Exhibit 133** is a true and correct copy of the publicly

15  accessible "Weekly Report of Population as of Midnight, September 2, 2020" showing the

16  population at each CDCR institution as of September 2, 2020 and downloaded from

17  https://www.cdcr.ca.gov/research/wp-

18  content/uploads/sites/174/2020/09/Tpop1d200902.pdf on September 8, 2020.

19      242.   Attached hereto as **Exhibit 134** is a true and correct copy of the "Disability

20  Inmate Counts," showing the population of *Armstrong* class members at each CDCR

21  institution as of September 1, 2020, which was produced by Defendants on September 8,

22  2020.

23      243.   Attached hereto as **Exhibit 135** is a true and correct copy of excerpts of data

24  from the "Summary of Mental Health Population by Institution and Level of Care (H1)" as

25  of August 25, 2020, produced by Defendants' counsel in *Coleman v. Newsom* on

26  August 25, 2020.

27      244.   Attached hereto as **Exhibit 136** is a true and correct copy of "Disability

28  Inmate Counts," showing the population of *Clark* class members with developmental

[3618118.1]
                                        60                      Case No. C94 2307 CW

1  disabilities at each CDCR institution as of September 1, 2020, which was produced by

2  Defendants' counsel in *Clark v. California* on September 1, 2020.

3      245.   Mr. Gleiberman, under my direction and supervision, reviewed "PLO High

4  Risk Population 20200702," a spreadsheet produced by California Correctional Health

5  Care Services ("CCHCS") to Plaintiffs' counsel in *Coleman v. Newsom* on July 6, 2020.

6  Mr. Gleiberman filtered the spreadsheet by institution and then determined the number of

7  class members who are designated medical high risk level 1 or 2 at each of the prisons that

8  are the subject of the Statewide Motion.

9      246.   Mr. Gleiberman then created a table summarizing in relevant parts of the

10  data contained in Exhibits 133-136.

| Prisons | Total Population | *Armstrong* Population (%) | *Coleman* Population (%) | *Clark* Population (%) | Medical High Risk Population (%) |
|---|---|---|---|---|---|
| CCI | 3,308 | 113 (3.42%) | 1168 (35.31%) | 0 | 176 (5.32%) |
| CMF | 2,147 | 822 (38.29%) | 1303 (60.69%) | 186 (8.66%) | 1278 (59.52%) |
| COR | 3,315 | 224 (6.76%) | 1301 (39.25%) | 17 (.51%) | 325 (9.80%) |
| CTF | 4,435 | 437 (9.85%) | 1,103 (24.87%) | 2 (.05%) | 482 (10.87%) |
| KVSP | 3,516 | 214 (6.09%) | 1140 (32.42%) | 7 (.20%) | 297 (8.45%) |
| LAC | 3,013 | 413 (13.71%) | 1327 (44.04%) | 47 (1.56%) | 904 (30.00%) |
| MCSP | 3,819 | 882 (23.10%) | 2,088 (54.67%) | 111 (2.91%) | 1,858 (48.65%) |
| RJD | 3,618 | 951 (26.29%) | 2,118 (58.54%) | 101 (2.79%) | 1,424 (39.26%) |
| SAC | 2,246 | 129 (5.74%) | 1245 (55.43%) | 29 (1.29%) | 447 (19.90%) |
| SATF | 4,528 | 771 (17.03%) | 2166 (47.84%) | 249 (5.50%) | 634 (14.00%) |

26      247.   Notwithstanding their recent and laudable decision with respect to Inmate 2,

27  Defendants continue to impose false and retaliatory RVRs on *Armstrong* class members

28  and other people with disabilities.  Attached hereto as **Exhibit 137** is a true and correct

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   copy of a letter without its exhibits dated September 24, 2020 from my colleague,

2   Mr. Nolan, to Nicholas Weber and Melissa Bentz of CDCR's Office of Legal Affairs,

3   titled "*Coleman v. Newsom*:  Plaintiffs' Concerns about the Issuance of False and

4   Retaliatory Rule Violation Reports Against Class Members."

5           248.    Attached hereto as **Exhibit 138** is a true and correct copy of the OIG's

6   Report "Monitoring the Use-of-Force Review Process of the California Department of

7   Corrections  and Rehabilitation," issued in July 2020.

8           249.    Attached hereto as **Exhibit 139** is a true and correct copy of the OIG's

9   Sentinel Case No. 20-03, "The Department Refused to Take Disciplinary Action Against

10  an Officer Despite Evidence That Suggested He Punched His Girlfriend and Slammed a

11  Truck Door on Her Hand, Which Cut Off Part of Her Thumb," dated June 15, 2020.  The

12  OIG informed me confidentially that the officer involved in this case is employed at ▮

13  and Warden ▮ decided to not sustain the allegations against this officer.

14          250.    Attached hereto as **Exhibit 140** is a true and correct copy of the certified

15  transcript of the deposition of James Baldwin, filed entirely under seal.  The certified copy

16  was not provided until after 6:00 p.m. on September 24, 2020, too late to redact and review

17  for this filing.

18

19          I declare under penalty of perjury under the laws of the United States of America

20  that the foregoing is true and correct, and that this declaration is executed at San Francisco,

21  California this 25th day of September, 2020.

22

23                                  */s/ Crosthwait Grunfeld*

24                                  Gay Crosthwait Grunfeld

25

26

27

28

REPLY DECL. OF GAY CROSTHWAIT GRUNFELD ISO PLS.' MOTION TO STOP DEFS. FROM
ASSAULTING, ABUSING, & RETALIATING AGAINST PEOPLE W/ DISABILITIES

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES
Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 1 | | Letters from Gay Grunfeld to Defendants re upload of confidential class member declarations, dated September 21 and 23, 2020 |
| 2 | | Fifth supplemental declaration from *Armstrong* and *Coleman* class member ███████████████, DPO, EOP, 69 years old), signed on September 23, 2020 |
| 3 | | Fourth supplemental declaration from *Coleman* class member ██████████, EOP, 56 years old), signed on September 23, 2020 |
| 4 | | Screen recording of video surveillance videos corroborating Mr. ████'s fifth supplemental and Mr. ███l's fourth supplemental declarations |
| 5 | | Screen recording of video surveillance videos corroborating Mr. ████'s fifth supplemental and Mr. ████'s fourth supplemental declarations |
| 6 | | Declaration from *Armstrong* and *Coleman* class member ██████ ██████████ DNH, mobility and vision disabilities, EOP, 47 years old), signed on September 8, 2020 |
| 6 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 7 | | Declaration from  *Coleman* class member ████████ EOP, 60 years old), signed on July 6, 2020 |
| 7 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 8 | | Declaration from *Armstrong* and *Coleman* class member ██████ ██████████, DPM, DPV, EOP, 54 years old), signed on August 26, 2020 |
| 8 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 9 | | Declaration from *Coleman* class member ██████████, EOP, 37 years old), signed on September 1, 2020 |
| 9 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 10 | | Declaration from  *Coleman* class member ██████████, ICF, 28 years old), signed on July 14, 2020 |
| 10 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 11 | | Declaration from  *Coleman* class member ██████████ CCCMS, 27 years old), signed on July 30, 2020 |
| 11 | a | Excerpts of documents corroborating Mr. █████' declaration |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES
Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|------------|-------------|
| 12 | | Supplemental declaration from *Armstrong* and *Coleman* class member ███████████, DNH, CCCMS, 42 years old), signed on August 18, 2020 |
| 13 | | Declaration from *Armstrong* and *Coleman* class member ███ ███████████, DNH, EOP, 34 years old), signed on September 4, 2020 |
| 13 | a | Excerpts of documents corroborating Mr. █████'s declaration |
| 14 | | Declaration from *Coleman* class member ████████████, EOP, 36 years old), signed on July 31, 2020 |
| 14 | a | Excerpts of documents corroborating Mr. ██████ declaration |
| 15 | | Declaration from *Coleman* class member ██████████, CCCMS, 43 years old), signed on July 21, 2020 |
| 15 | a | Excerpts of documents corroborating Mr. █████' declaration |
| 16 | | Declaration from *Coleman* class member ██████████, EOP, 42 years old), signed on August 6, 2020 |
| 16 | a | Excerpts of documents corroborating Mr. █████'s declaration |
| 17 | | Declaration from *Coleman* class member █████████, CCCMS, 31 years old), signed on August 14, 2020 |
| 17 | a | Excerpts of documents corroborating Mr. ██████s' declaration |
| 18 | | Supplemental declaration from *Armstrong* and *Coleman* class member ████████████, DNH, CCCMS, 52 years old), signed on July 22, 2020 |
| 18 | a | Excerpts of documents corroborating Mr. █████r's declaration |
| 19 | | Twenty-four letters sent by Defendants' counsel after June 3, 2020, responding to Plaintiffs' allegations re staff misconduct |
| 20 | | Declaration from *Armstrong* and *Coleman* class member █████ ████████████, mobility disability, EOP, 49 years old), signed on August 12, 2020 |
| 20 | a | Excerpts of documents corroborating Mr. █████' declaration |
| 21 | | Declaration from *Coleman* class member █████████████, 48 years old), signed on June 24, 2020 |
| 21 | a | Excerpts of documents corroborating Mr. █████'s declaration |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|-----------|-------------|
| 22 | | Declaration from *Armstrong* and *Coleman* class member ███████ ███████, DPO, CCCMS, 57 years old), signed on September 2, 2020 |
| 23 | | Declaration from *Coleman* class member ███████████, EOP, 29 years old), signed on August 28, 2020 |
| 24 | | Declaration from *Coleman* class member ███████████, CCCMS, 37 years old), signed on June 26, 2020 |
| 24 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 25 | | Declaration from *Armstrong* and *Coleman* class member ███████ ████████ DPM, EOP, 49 years old), signed on June 15, 2020 |
| 25 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 26 | | Declaration from *Coleman* class member ███████ ███████, CCCMS, 49 years old), signed on August 28, 2020 |
| 26 | a | Excerpts of documents corrborating Mr. █████'s declaration |
| 27 | | Declaration from *Coleman* class member ███████ ███████, EOP, 39 years old), signed on September 3, 2020 |
| 27 | a | Excerpts of documents corroborating Mr. ███████'s declaration |
| 28 | | Declaration from *Armstrong* and *Coleman* class member █████ ██████████, mobility disability, EOP, 46 years old), signed on September 18, 2020 |
| 28 | a | Excerpts of documents corroborating Mr. █████'s declaration |
| 29 | | Declaration from *Armstrong* and *Coleman* class member ████ ██████████ DPO, CCCMS, 60 years old), signed on June 19, 2020 |
| 29 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 30 | | Declaration from *Armstrong* and *Coleman* class member ██████ ██████████, DPM, EOP, 44 years old), signed on August 6, 2020 |
| 30 | a | Excerpts of documents corroborating Mr. ███████ declaration |
| 31 | | Declaration from *Armstrong* and *Coleman* class member ██████ ██████████, mobility disability, CCCMS, 44 years old), signed on July 2, 2020 |
| 31 | a | Excerpts of documents corroborating Mr. ██████' declaration |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 32 | | Declaration from *Coleman* class member █████████████, EOP, 67 years old), signed on July 8, 2020 |
| 33 | | Declaration from *Armstrong* and *Coleman* class member ██████ █████████, DPM, CCCMS, 51 years old), signed on June 15, 2020 |
| 33 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 34 | | Declaration from *Coleman* class member ████████, CCCMS, 43 years old), signed on July 31, 2020 |
| 34 | a | Excerpts of documents corroborating Mr. ███████'s declaration |
| 35 | | Declaration from *Coleman* class member J████████████, ACUTE, 29 years old), signed on June 29, 2020 |
| 35 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 36 | | Declaration from *Coleman* class member ██████████ █████, EOP, 27 years old), signed on September 23, 2020 |
| 36 | a | Excerpts of documents corroborating Mr. ███████'s declaration |
| 37 | | Excerpt of Plaintiffs' Report regarding the November 2019 *Armstrong* monitoring tour of COR, issued on June 29, 2020 |
| 38 | | Excerpt of a letter from the Prison Law Office to Defendants' counsel Russa Boyd, titled "*Armstrong* Advocacy Letter ████ ██████████, COR," dated February 21, 2020 |
| 39 | | Excerpt of a letter from the Prison Law Office to Defendants' counsel Nicholas Weber, titled "*Coleman* Advocacy Letter ████████████, KVSP," dated June 8, 2020 |
| 40 | | Excerpt of a letter from the Prison Law Office to Defendants' counsel Nicholas Weber, titled "*Coleman* Advocacy Letter ███ KVSP," dated August 27, 2020 |
| 41 | | Declaration from *Armstrong* and *Coleman* class member █████ ██████████ DLT, CCCMS, 39 years old), signed on September 22, 2020 |
| 41 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 42 | | Declaration from *Coleman* class member ████████████ ████████ CCCMS, 39 years old), signed on September 17, 2020 |
| 42 | a | Excerpts of documents corroborating ████████'s declaration |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES
Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 43 | | Declaration from *Armstrong* and *Coleman* class member ████ ████████, DNH, CCCMS, 28 years old), signed on September 21, 2020 |
| 44 | | Response from Robin Stringer, CDCR Office of Legal Affairs, to Plaintiffs' counsel, titled "CIW: Non Class Action Allegations," dated January 31, 2020 |
| 45 | | Excerpt of Plaintiffs' Report regarding allegations of staff misconduct raised during the December 2016 *Armstrong* monitoring tour of CIW, issued on February 7, 2017 |
| 46 | | Excerpt of Defendants' Responses to Plaintiffs' Report regarding the December 2016 *Armstrong* monitoring tour of CIW, issued on June 7, 2017 and October 2, 2017 |
| 47 | | Plaintiffs' Report regarding allegations of staff misconduct raised during the December 2017 *Armstrong* monitoring tour of CIW, issued on March 9, 2018 |
| 48 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the December 2017 *Armstrong* monitoring tour of CIW, dated August 14, 2018 and issued on August 20, 2018 |
| 49 | | Excerpt of an article published by KQED, titled "#MeToo Behind Bars: Records Shed Light on Sexual Abuse Inside State Women's Prisons," dated November 14, 2019 |
| 50 | | Declaration from *Armstrong* and *Coleman* class member ████████████ 707, DPW, DPV, EOP, 55 years old), signed on September 2, 2020 |
| 50 | a | Excerpts of documents corroborating Mr. ███████'s declaration |
| 51 | | Declaration from *Coleman* class member ████████, ICF, 23 years old), signed on May 19, 2020 |
| 51 | a | Excerpts of documents corroborating Mr. ████████'s declaration |
| 52 | | Declaration from *Armstrong* class member ████████████ ████████ DNM, 65 years old), signed on September 3, 2020 |
| 53 | | Email from Sara Norman of the Prison Law Office to then Acting Secretary of CDCR Ralph Diaz and Connie Gipson, sent on August 20, 2020 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 54 | | Declaration from *Armstrong* and *Coleman* class member ████ ████, DNH, CCCMS, 49 years old), signed on September 3, 2020 |
| 54 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 55 | | Declaration from *Coleman* class member ████ (████, CCCMS, 28 years old), signed on August 28, 2020 |
| 55 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 56 | | Declaration from *Coleman* class member EOP, 23 years old), signed on June 17, 2020 |
| 56 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 57 | | Declaration from *Armstrong* and *Coleman* class member ████ ████, DNM, EOP. 51 years old), signed on August 24, 2020 |
| 57 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 58 | | Declaration from *Armstrong* and *Coleman* class member ████ ████, mobility disability, CCCMS, 56 years old), signed on September 24, 2020 |
| 58 | a | Excerpts of documents corroborating Mr. ████' declaration |
| 59 | | Declaration from *Coleman* class member ████ ████, CCCMS, 29 years old), signed on August 24, 2020 |
| 59 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 60 | | Excerpt of Plaintiffs' Report regarding the December 2015 *Armstrong*  document-review only monitoring tour of KVSP, issued on January 12, 2016 |
| 61 | | Excerpt of Plaintiffs' Report regarding the August 2016 *Armstrong* monitoring tour of KVSP, issued on October 5, 2016 |
| 62 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the August 2016 *Armstrong* monitoring tour of KVSP, dated May 12, 2017 and issued on May 22, 2017 |
| 63 | | Excerpt of Plaintiffs' Report regarding the June 2017 *Armstrong* monitoring tour of KVSP, issued on July 14, 2017 |
| 64 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the June 2017 *Armstrong* monitoring tour of KVSP, dated January 31, 2018 and issued on February 21, 2018 |

<table>
<tr><td colspan="3">INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE WITH DISABILITIES<br>Redacted and Under Seal versions filed on September 25, 2020</td></tr>
</table>

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 65 | | Excerpt of Plaintiffs' Report regarding the August 2018 *Armstrong* monitoring tour of KVSP, issued on March 1, 2019 |
| 66 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the August 2018 *Armstrong* monitoring tour of KVSP, dated August 5, 2019 and issued on August 13, 2019 |
| 67 | | Declaration from *Armstrong* and *Coleman* class member ███████, DPM, DNH, EOP, 59 years old), signed on September 3, 2020 |
| 67 | a | Excerpts of documents corroborating Mr. ████'s declaration |
| 68 | | Declaration from *Coleman* and *Clark* class member ███████, EOP, DD2, 34 years old), signed on September 17, 2020 |
| 68 | a | Excerpts of documents corroborating Mr. █████' declaration |
| 69 | | Declaration from *Armstrong* and *Coleman* class member ███████, mobility disability, CCCMS, 41 years old), signed on September 21, 2020 |
| 69 | a | Excerpts of documents corroborating Mr. █████' declaration |
| 70 | | Declaration from *Armstrong* and *Coleman* class member ███████, DNH, CCCMS, 36 years old), signed on August 14, 2020 |
| 71 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the April and June 2019 *Armstrong* monitoring tour of SATF, dated and issued on January 17, 2020 |
| 72 | | Excerpt of Plaintiffs' Report regarding the October 2019 and February 2020 *Armstrong* monitoring tour of SATF regarding class members with mobility disabilities, issued on June 1, 2020 |
| 73 | | Excerpt of Defendants' Response to Plaintiffs' Report regarding the October 2019 and February 2020 *Armstrong* monitoring tour of SATF, dated and issued on August 27, 2020 |
| 74 | | Letter from Rita Lomio to Tamiya Davis, titled "*Armstrong* Advocacy Letter ███████, DNH, SATF," dated June 12, 2020 |
| 75 | | Follow-up letter from Rita Lomio to Tamiya Davis, titled "*Armstrong* Advocacy Letter ███████, DNH, SATF," dated June 22, 2020 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---|---|---|
| 76 | | Second follow-up letter from Rita Lomio to Tamiya Davis, titled "*Armstrong* Advocacy Letter ███████████, DNH, SATF," dated September 10, 2020 |
| 77 | | Letter from Rita Lomio to Tamiya Davis, titled "*Armstrong* Advocacy Letter ███████████, DPH, SATF," dated July 9, 2020 |
| 78 | | Letter from Rita Lomio and Skye Lovett to Tamiya Davis, titled "*Armstrong* Advocacy Letter ██████████ 25, DPW, DNH, LD (unverified), SATF," dated August 25, 2020 |
| 79 | | Letter from Rita Lomio to Tamiya Davis, titled "*Armstrong* Advocacy Letter ███████████, DLT, SATF," dated September 8, 2020 |
| 80 | | CDCR Form 1824 requests for accommodation filed by Mr. ███ |
| 81 | | Supplemental declaration from *Coleman* class member ███████████, EOP, 44 years old), signed on September 1, 2020 |
| 81 | a | Excerpts of documents corroborating Mr. ██████'s declaration |
| 82 | | Second supplemental declaration from *Coleman* class member ███████████, EOP, 33 years old), signed on August 18, 2020 |
| 82 | a | Excerpts of documents corroborating Mr. █████' declaration |
| 83 | | Supplemental declaration from *Armstrong* class member ███████████, DPW, 76 years old), signed on September 10, 2020 |
| 84 | | Email from Gay Grunfeld to Trace Maiorino regarding Defendants' draft of the Anti-retaliation Notice, dated August 21, 2020 |
| 85 | | Anti-retaliation Notice agreed to by parties on August 26, 2020 |
| 86 | | Follow-Up Email from Gay Grunfeld to Trace Maiorino regarding posting of the Anti-retaliation Notice, dated September 2, 2020 |
| 87 | | Email from Trace Maiorino to Gay Grunfeld regarding posting of the Anti-retaliation Notice at KVSP, LAC, and SATF, dated September 9, 2020 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|------------|-------------|
| 88 | | Email from Trace Maiorino to Gay Grunfeld confirming posting of the Anti-retaliation Notice, dated September 11, 2020 |
| 89 | | Letter from Craig Martinez, Staff Services Manager with the CDCR IT Procurement Unit, to Patrick Gould, Verizon Business, regarding installation of data drops for the Video Surveillance Project at LAC, dated March 1, 2016 |
| 90 | | Letter from Craig Martinez, Staff Services Manager with the CDCR IT Procurement Unit, to Patrick Gould, Verizon Business, regarding installation of data drops for the Video Surveillance Project at LAC, dated September 13, 2018 |
| 91 | | Letter from Craig Martinez, Staff Services Manager with the CDCR IT Procurement Unit, to Ken Burdine, Verizon Business, regarding installation of data drops for the Video Surveillance Project at CCI, dated August 1, 2017 |
| 92 | | Letter from Mike Freedman to Defendants regarding Defendants' failure to timely produce responses to Plaintiffs' Special Interrogatories, dated September 17, 2020 |
| 93 | | Response from Sean Lodholz to Plaintiffs regarding Defendants' responses to Plaintiffs' Special Interrogatories, dated September 18, 2020 |
| 94 | | Defendants' responses to Plaintiffs' Special Interrogatories regarding LAC, issued on September 23, 2020 |
| 95 | | Defendants' responses to Plaintiffs' Special Interrogatories regarding COR, issued on September 23, 2020 |
| 96 | | Certified transcript of Matthew Cate's deposition, taken on September 17, 2020 |
| 97 | | Certified transcript of Bernard Warner's deposition, taken on September 18, 2020 |
| 98 | | Rough transcript of John Baldwin's deposition, taken on September 21, 2020 |
| 99 | | Email from Jeremy Duggan to Plaintiffs' counsel regarding Matthew Cate's notes, dated September 23, 2020 and attached notes of Matthew Cate |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|-----------|-------------|
| 100 | | Alameda County Superior Court Order in *Farrell v. Cate*, Case No. RG03-079344, dated October 27, 2008 |
| 101 | | Excerpts of COMPSTAT data for High Security institutions regarding withdrawn appeals at KVSP, SATF, and SVSP |
| 102 | | CDCR news release, titled "California Substance Abuse Treatment Facility Investigating Inmate Death as a Homicide," dated June 11, 2020 |
| 103 | | CDCR news release, titled "California Substance Abuse Treatment Facility Investigating Inmate Death as a Homicide," dated June 12, 2020 |
| 104 | | Court pleading filed in *Plata v. Newsom*, Case No. 01-1351 JST, dated July 27, 2020 |
| 105 | | Notes from John Baldwin's telephonic meetings with the Wardens and key managers at CIW, CCI-Tehachapi and Corcoran, produced by Defendants on September 18, 2020, and marked as Baldwin deposition exhibits 5, 6, 7 |
| 106 | | Portions of the CDCR Office of Research data shown to John Baldwin during his deposition on September 21, 2020, and marked as Baldwin deposition exhibits 10 and 11 |
| 107 | | Raw surveillance footage, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04, with a Windows application that allows for its viewing, produced by Defendants |
| 108 | | Screen recording of the video surveillance footage produced by Defendants from Cameras 1 through 5, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |
| 109 | | Recording of the video surveillance footage produced by Defendants from Camera 1, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |
| 110 | | Recording of the video surveillance footage produced by Defendants from Camera 2, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub –<br>Exh. | Description |
|---------|---------------|-------------|
| 111 | | Recording of the video surveillance footage produced by Defendants from Camera 3, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |
| 112 | | Recording of the video surveillance footage produced by Defendants from Camera 4, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |
| 113 | | Recording of the video surveillance footage produced by Defendants from Camera 5, relating to the November 21, 2018 incident described in OIG Sentinel Case Number 20-04 |
| 114 | | Letter from Penny Godbold to Tamiya Davis and Joanna Hood regarding "Problems with AIMS," dated August 20, 2020 |
| 115 | | Email from Gay Grunfeld to Defendants regarding DART interview concerns, dated August 5, 2020 |
| 116 | | Email from Tamiya Davis to Gay Grunfeld regarding declarants' access to their declarations and other documents, dated September 10, 2020 |
| 117 | | Document corroborating Defendants' interview of Mr. ███ without Plaintiffs' counsel present, on June 10, 2020 |
| 118 | | Document corroborating Defendants' interview of Mr. ███ without Plaintiffs' counsel present, on July 8, 2020 |
| 119 | | Document corroborating Defendants' interview of Mr. ████ without Plaintiffs' counsel present, on May 28, 2020 |
| 120 | | Document corroborating Defendants' interview of Mr. ██ without Plaintiffs' counsel present, on June 11, 2020 |
| 121 | | Email from California Department of Human Resources to Jack Gleiberman regarding the 2020 CCPOA contract |
| 122 | | Excerpts of California Department of Human Resources' 2020 and 2019 CCPOA contracts |
| 123 | | "CDCR's Administration of Offender Services, Division of Administrative Services, Human Resources Retention Schedule" |
| 124 | | Letter from Penny Godbold to Joanna Hood and Tamiya Davis, titled "Demand for Investigation into Unprofessional Online Conduct by CDCR Employees," dated August 26, 2020 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|------------|-------------|
| 125 | | Instagram account "The Late Relief"'s post and subsequent comments, published on September 9, 2020 |
| 126 | | A *Los Angeles Times* article, titled "California prison guard union places bull's-eye on Black lawmaker's photo in political ad," published on September 17, 2020 |
| 127 | | Spreadsheet created by RBGG paralegal Jack Gleiberman of cases monitored and closed by the OIG during the monitoring period in which the allegation at issue involved harm or negligence by custody staff toward incarcerated people |
| 128 | | OIG's case summary of OIG Case Number 19-0031468-DM |
| 129 | | OIG's case summary of OIG Case Number 18-0026277-DM |
| 130 | | OIG's case summary of OIG Case Number 19-0028406-DM |
| 131 | | Excerpt of the Appendices to the July-December 2018 Semiannual Disciplinary Monitoring Report, issued by the OIG on June 6, 2019 |
| 132 | | Excerpt of the Appendices to the January-June 2018 Semiannual Disciplinary Monitoring Report, issued by the OIG on November 20, 2018 |
| 133 | | Population report at each CDCR institution, titled "Weekly Report of Population as of Midnight, September 2, 2020," downloaded on September 8, 2020 |
| 134 | | *Armstrong* class member population report, titled "Disability Inmate Counts," produced by Defendants on September 8, 2020 |
| 135 | | Excerpts of data from the "Summary of Mental Health Population by Institution and Level of Care (H1)," as of August 25, 2020 |
| 136 | | *Clark* class member population report, "Disability Inmate Counts," produced by Defendants' counsel in *Clark v. California* on September 1, 2020 |
| 137 | | Letter from Thomas Nolan, to Nicholas Weber and Melissa Bentz of CDCR's Office of Legal Affairs, titled "*Coleman v. Newsom*: Plaintiffs' Concerns about the Issuance of False and Retaliatory Rule Violation Reports Against Class Members," dated September 24, 2020 |

INDEX OF EXHIBITS TO REPLY DECLARATION OF GAY CROSTHWAIT
GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS
FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE
WITH DISABILITIES

Redacted and Under Seal versions filed on September 25, 2020

| Exhibit | Sub – Exh. | Description |
|---------|------------|-------------|
| 138 | | OIG's Report "Monitoring the Use-of-Force Review Process of the California Department of Corrections  and Rehabilitation," issued in July 2020 |
| 139 | | OIG's Sentinel Case No. 20-03, "The Department Refused to Take Disciplinary Action Against an Officer Despite Evidence That Suggested He Punched His Girlfriend and Slammed a Truck Door on Her Hand, Which Cut Off Part of Her Thumb," dated June 15, 2020 |
| 140 | | Certified transcript of the deposition of John Baldwin, taken September 21, 2020 |

# Exhibit 1



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

September 21, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

> **PRIVILEGED AND
> CONFIDENTIAL**
>
> **SUBJECT TO
> PROTECTIVE ORDERS**

Tamiya Davis
Nicholas Weber
CDCR Office of Legal Affairs
P.O. Box 94283-0001
Tamiya.Davis@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov

Damon McClain
Joanna Hood
Office of the Attorney General
1300 I Street
Sacramento, CA 95814
Damon.McClain@doj.ca.gov
Joanna.Hood@doj.ca.gov

Re:   *Armstrong v. Newsom*; *Coleman v. Newsom*
      Declarations Demonstrating Disability-related Staff Misconduct at
      Multiple CDCR Prisons
      <u>Our File Nos. 0581-03; 0489-03</u>

Dear Counsel:

   We will shortly upload to the ShareFile declarations from *Armstrong* and
*Coleman* class members regarding disability-related staff misconduct at Mule Creek State
Prison ("MCSP"), California Institution for Women ("CIW"), and Correctional Training
Facility ("CTF"). We have previously used the ShareFile to share declarations from class
members regarding Richard J. Donovan Correctional Facility ("RJD"), California State
Prison – Los Angeles County ("LAC"), California Correctional Institution – Tehachapi
("CCI"), California State Prison – Corcoran ("COR"), California Substance Abuse
Treatment Facility ("SATF"), Kern Valley State Prison ("KVSP"), California Medical
Facility ("CMF"), and California State Prison—Sacramento ("SAC").

   As is the case with LAC, CCI, COR, SATF, KVSP, CMF, and SAC, these
declarations demonstrate that discrimination and abuse of class members and other
incarcerated people with disabilities at the hands of CDCR custody staff is unfortunately
not limited to RJD. *See* Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing,

[3618103.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Weber
Damon McClain
Joanna Hood
September 21, 2020
Page 2

and Retaliating Against People with Disabilities at Richard J. Donovan Correctional Facility, Dkt. 2922, at 35-37; *see also* Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against Persons with Disabilities, Dkt. 2948; and, Judge Wilken's September 8, 2020 Order Granting in Part Motion to Modify Remedial Orders and Injunctions, Dkt. 3059.  Defendants should immediately investigate all allegations contained in the declarations using staff from outside the prison and should place the allegations related to *Armstrong* class members on the *Armstrong* accountability log.

The situations at RJD, LAC, CCI, COR, SATF, KVSP, CMF, SAC, MCSP, CIW, and CTF are intolerable and directly undermine the Department's efforts to comply with the Americans with Disabilities Act.  In order to keep the Court apprised of the scope of these problems within CDCR, especially in its high security institutions, we intend to file these and other declarations with the Court.

Pursuant to the prohibition on communications with a represented party, neither Defendants nor Defendants' counsel may communicate with the declarants or class members referenced in the declarations regarding the allegations in the declarations.  *See* California Rule of Professional Conduct 4.2.  Any communications with the declarants or class members referenced in the declarations about the content of the declarations must be made through Plaintiffs' counsel or with Plaintiffs' counsel present.

The declarations are subject to the protective orders in the cases and shall be kept confidential.  Due to credible fears of retaliation, we expect that Defendants will limit access to the declarations to only those individuals necessary to respond to and investigate the allegations.  *See* Stipulation and Order Prohibiting Retaliation in Prisons Subject to Statewide Motion, Dkt. 3034, at 1-5.

Given the dangerous environment at MCSP, CIW, and CTF, we also want to emphasize Defendants' obligation to protect the declarants and other incarcerated people referenced in the declarations from retaliation.  Plaintiffs' counsel will bring any instances of retaliation to the attention of the Court.

/ / /

/ / /

[3618103.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Weber
Damon McClain
Joanna Hood
September 21, 2020
Page 3


      Please do not hesitate to contact me if you would like to discuss this matter further.

<div style="text-align:right">

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:  Gay Crosthwait Grunfeld

</div>

GCG:eh

cc: (*via email only*)

| | | |
|---|---|---|
| *Coleman* Special Master Team | Ed Swanson | Tyler Heath |
| Adam Fouch | Roy Wesley (*w/o encls.*) | Lucas Hennes |
| Elise Thorn | Bruce Beland | Sean Lodholz |
| Melissa Bentz | Alexander Powell | Jeremy Duggan |
| Eureka Daye | Patricia Ferguson | Anthony Tartaglio |
| Adriano Hvartin | Tamiya Davis | Trace Maiorino |
| Kyle Lewis | *Armstrong* OLA | Clark Kelso |
| Dawn Lorey | Dillon Hockerson | *Armstrong* Co-Counsel |
| | Katie Riley | *Coleman* Co-Counsel |



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email: ggrunfeld@rbgg.com

September 23, 2020

<u>VIA ELECTRONIC MAIL ONLY</u>

<div style="border:1px solid black">

**PRIVILEGED AND
CONFIDENTIAL**

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Tamiya Davis
Nicholas Weber
CDCR Office of Legal Affairs
P.O. Box 94283-0001
Tamiya.Davis@cdcr.ca.gov
Nicholas.Weber@cdcr.ca.gov

Damon McClain
Joanna Hood
Office of the Attorney General
1300 I Street
Sacramento, CA 95814
Damon.McClain@doj.ca.gov
Joanna.Hood@doj.ca.gov

Re:    *Armstrong v. Newsom*; *Coleman v. Newsom*
Declarations Demonstrating Disability-related Staff Misconduct at
Multiple CDCR Prisons
<u>Our File Nos. 0581-03; 0489-03</u>

Dear Counsel:

We will shortly upload to the ShareFile declarations from *Armstrong* and
*Coleman* class members regarding disability-related staff misconduct at California Health
Care Facility ("CHCF"). We have previously used the ShareFile to share declarations
from class members regarding Richard J. Donovan Correctional Facility ("RJD"),
California State Prison – Los Angeles County ("LAC"), California Correctional
Institution – Tehachapi ("CCI"), California State Prison – Corcoran ("COR"), California
Substance Abuse Treatment Facility ("SATF"), Kern Valley State Prison ("KVSP"),
California Medical Facility ("CMF"), California State Prison—Sacramento ("SAC"),
Mule Creek State Prison ("MCSP"), California Institution for Women ("CIW"), and
Correctional Training Facility ("CTF").

As is the case with LAC, CCI, COR, SATF, KVSP, CMF, SAC, MCSP, CIW, and
CTF, these declarations demonstrate that discrimination and abuse of class members and
other incarcerated people with disabilities at the hands of CDCR custody staff is

[3620165.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Weber
Damon McClain
Joanna Hood
September 23, 2020
Page 2


unfortunately not limited to RJD.  *See* Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing, and Retaliating Against People with Disabilities at Richard J. Donovan Correctional Facility, Dkt. 2922, at 35-37; *see also* Plaintiffs' Motion to Stop Defendants from Assaulting, Abusing and Retaliating Against Persons with Disabilities, Dkt. 2948; and, Judge Wilken's September 8, 2020 Order Granting in Part Motion to Modify Remedial Orders and Injunctions, Dkt. 3059.  Defendants should immediately investigate all allegations contained in the declarations using staff from outside the prison and should place the allegations related to *Armstrong* class members on the *Armstrong* accountability log.

The situations at RJD, LAC, CCI, COR, SATF, KVSP, CMF, SAC, MCSP, CIW, CTF, and CHCF are intolerable and directly undermine the Department's efforts to comply with the Americans with Disabilities Act.  In order to keep the Court apprised of the scope of these problems within CDCR, especially in its high security institutions, we intend to file these and other declarations with the Court.

Pursuant to the prohibition on communications with a represented party, neither Defendants nor Defendants' counsel may communicate with the declarants or class members referenced in the declarations regarding the allegations in the declarations.  *See* California Rule of Professional Conduct 4.2.  Any communications with the declarants or class members referenced in the declarations about the content of the declarations must be made through Plaintiffs' counsel or with Plaintiffs' counsel present.

The declarations are subject to the protective orders in the cases and shall be kept confidential.  Due to credible fears of retaliation, we expect that Defendants will limit access to the declarations to only those individuals necessary to respond to and investigate the allegations.  *See* Stipulation and Order Prohibiting Retaliation in Prisons Subject to Statewide Motion, Dkt. 3034, at 1-5.

Given the dangerous environment at CHCF, we also want to emphasize Defendants' obligation to protect the declarants and other incarcerated people referenced in the declarations from retaliation.  Plaintiffs' counsel will bring any instances of retaliation to the attention of the Court.

/ / /

/ / /

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
Nicholas Weber
Damon McClain
Joanna Hood
September 23, 2020
Page 3


       Please do not hesitate to contact me if you would like to discuss this matter further.

<div align="right">

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:  Gay Crosthwait Grunfeld

</div>

GCG:eh

cc:  (*via email only*)
   *Coleman* Special Master Team

| | | |
|---|---|---|
| Adam Fouch | Ed Swanson | Tyler Heath |
| Elise Thorn | Roy Wesley (*w/o encls.*) | Lucas Hennes |
| Melissa Bentz | Bruce Beland | Sean Lodholz |
| Eureka Daye | Alexander Powell | Jeremy Duggan |
| Adriano Hvartin | Patricia Ferguson | Anthony Tartaglio |
| Kyle Lewis | Tamiya Davis | Trace Maiorino |
| Dawn Lorey | *Armstrong* OLA | Clark Kelso |
| | Dillon Hockerson | *Armstrong* Co-Counsel |
| | Katie Riley | *Coleman* Co-Counsel |

# Exhibit 2

**FIFTH SUPPLEMENTAL DECLARATION OF** ██████ ██████

I, ██████ ██████ declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ██████ I am currently housed at the ████████████████████ in Building E1B1.  I am 69 years old.

3.      I have previously submitted four declarations about my experiences with staff misconduct at Richard J. Donovan Correctional Facility ("RJD"), which I signed on March 27, 2020, June 5, 2020, July 3, 2020, and July 13, 2020.  My fifth declaration, which I signed on August 21, 2020, was about the biased RVR hearing conducted at ██████ related to the June 17, 2020 incident at RJD.

4.      I submit this supplemental declaration about the ongoing staff misconduct and further retaliation that I have experienced from custody staff due to my role as a witness in the *Armstrong* case.

5.      On Friday, September 4, 2020, I was in E1B1 waiting to get my medication during the after dinner pill line, at approximately 6:00 p.m.  I got into a verbal altercation with a nurse, and ended up returning to my cell without having taken my medication because I was frustrated.

6.      At the hours of sleep ("HS") pill line, sometime at approximately 8:00 p.m., the officers were making their rounds and releasing people for medication.  In the E1B1 unit, officers have to individually open up each cell door with a key.  The floor officer skipped over my cell and continued releasing people for pill line.  This immediately brought back memories of what happened to me at RJD, where officers frequently refused to release me for my medication.  I began yelling and banging on the door to be let out for my medication.

[3612332.1]                                    1

7.      After a few minutes of protesting, and after everyone had already been released to get their medication, the floor officer finally came to my cell.  Through the closed cell door, I asked the officer why he was refusing to let me out of my cell.  In response, he said something like, "I don't have to do what you want me to do, I do what I want to do."

8.      The officer's delay in releasing me for my medication upset me very much. When I was at RJD, I experienced similar harassment from custody staff, where they refused to release me for my medication, after they found out that I had submitted a declaration about staff's involvement in the death of another incarcerated person, Mr. ███████.

9.      The officer then opened my cell door partially.  He stuck his head out, almost into my cell, as I stood inside the cell, a few feet away from the doorway.  The officer and I argued over the fact that he refused to let me out of my cell for my medication. Eventually, I could not take the harassment anymore, so I asked to speak with a sergeant. The officer denied my request and told me something like, "You're not gonna snitch on me, like you snitched on those officers at Donovan.  I know you and ███ are rats."  The officer then shut the cell door in my face.  After the officer slammed the door in my face, I again asked to speak with a sergeant.  I told him that I would board up my cell if I did not get to speak with a sergeant about being denied my medication.  Through the closed cell door, the officer responded, "Yeah, well if you do, I'll be the first one to come in your cell to fuck you up, motherfucker."

10.     I did not receive my medication that night.

11.     A few weeks after the event, on Friday, September 18, 2020, the same officer once again called me a "rat" while I was in the dayroom.  The dayroom was occupied with many incarcerated people because the dayroom was open at the time.  I believe that incarcerated people in my unit may have heard the "rat" comment.

12.     In prison, people who report misconduct by officers or other incarcerated people are often called "rats."  I interpreted the officer's comment calling me and Mr. ▇ "rats" to be a reference to the fact that Mr. ▇ and I reported misconduct by officers at RJD.  After officers at RJD retaliated against me for speaking up, including by throwing me to the ground for no reason, the *Armstrong* court ordered that CDCR transfer me from RJD to ▇   It is my understanding that Mr. ▇ submitted a declaration in *Armstrong* about officers at RJD assaulting me.  It is also my understanding that, when officers at RJD threatened Mr. ▇ CDCR agreed to transfer him from RJD to ▇.

13.     The fact that staff at ▇ are harassing me because of my involvement in the *Armstrong* case makes me absolutely terrified.  The Court ordered my transfer to ▇ because it had security cameras, which I hoped would deter staff from abusing me. Even though there are cameras, I am still being harassed.  If I cannot be safe at ▇, I do not think I can be safe anywhere in CDCR.

14.     As I discussed in my previous declarations, I am trying to be on my best behavior so that I am granted parole during my elderly parole hearing in January 2021. What happened at RJD, and the events that followed, have made me more stressed and anxious than ever before in my life, both inside and outside of prison.  Before the September 4, 2020 incident, I was doing very well and keeping to the program.  I was opening up with my clinician, regularly participating in mental health groups, treating officers and other incarcerated people with respect, and keeping to myself for the most part.  After having experienced further abuse and harassment related to the misconduct I reported at RJD, I am afraid to leave my cell to do anything.  On many days, I do not leave my cell because I want to avoid any possible confrontation with officers.  Because I realize that staff know about what happened at RJD and are willing to retaliate against me for it,  I am extremely fearful that they will continue to harass and retaliate against me.  Given the similarities between what I experienced at ▇ and RJD, I am scared that their misconduct and retaliation might end in them assaulting, or even killing me.

1       I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct, and that this declaration is executed at ███████

3   California this 23rd day of September, 2020.

4

5

6

7

8       On September 23, 2020, due to the closure of ████ in light of the COVID-19

9   pandemic and ongoing concerns that officers might retaliate against witnesses in support of

10  Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail

11  system at ████ I read the contents of this declaration, verbatim, to ████████,

12  ████ by telephone.  Mr. Allen orally confirmed that the contents of the declaration

13  were true and correct.  Mr. Allen also orally granted me permission to affix his signature to

14  the declaration and to file the declaration in this matter.

15

16  DATED: September 23, 2020

17                                      Jack Rhein Gleiberman

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 3

**FOURTH SUPPLEMENTAL DECLARATION OF** ███████████

I, ██████████ declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ████████  I am currently housed at ████████████████████████████ in Facility E1B1.  I am 56 years old.

3.      I have previously submitted three declarations about my experiences with staff misconduct at Richard J. Donovan Correctional Facility ("RJD"), which I signed on June 20, 2020, July 13, 2020, and July 22, 2020.  I also submitted a fourth declaration regarding the RVRs issued to ██████████ which I signed on August 24, 2020.

4.      I live in the same housing unit, E1B1, at ████████ as ██████████  On Friday, September 4, 2020, I was in the dayroom waiting in line to get my medication during the after-dinner pill line.  I noticed that ████████ got into a verbal altercation with the nurse, and then saw ████████ walk back to his cell without taking his medication.

5.      A few hours later, during the hours of sleep ("HS") pill line at approximately 8:15 p.m., I noticed that officers did not release ████████ from his cell to get his medication.  As I waited for my medication, I heard him yelling and slamming on his door, saying things like, "I want my meds!"  At this point, I was still in the pill line, about fifteen to twenty feet away from ████████ cell.  I saw an officer approach ████████ cell and open up the cell door partially.  I started walking toward ████████ cell to observe the interaction.

6.      I could see the officer standing almost between the open door and the door frame.  I could not see ████████  While I could not hear exactly what was said, it sounded like ████████ and the officer were arguing.  I heard him say to ████████ through the partially open cell door something to the effect of, "You and ████ aren't nothing but rats anyway."  The officer said that comment loud enough for me to hear it from about five to

1    ten feet away.  All of a sudden, I saw the officer push the cell door closed.  The door made

2    a very loud noise when it closed.  Based on his facial expressions and body language, the

3    officer looked very angry.

4         7.    On September 18, 2020, I saw ██ ██ having an argument with the same

5    officer in the dayroom.  I could not hear what was said, but the officer looked very

6    menacing and angry.  ██ ██ looked frustrated after they exchanged words for a minute

7    or two.  I then saw him return to his cell.  Once ██ ██ was in his cell, the officer

8    announced loudly to the dayroom that, "Old scary ass rat ██ went into his cell," with a

9    smug look on his face.  His conduct reminded me of Officer Armstead during the June 17

10   incident at RJD.

11        8.    In prison, people who report misconduct by officers or other incarcerated

12   people are often called "rats."  I interpreted the officer's comment calling me and

13   ██ ██ "rats" to be a reference to ██ ██ and me reporting staff misconduct of

14   officers at RJD.  I submitted multiple declarations about officers assaulting ██ ██ at

15   RJD.  I also submitted a declaration about officers threatening me at RJD after they found

16   out I had reported their abuse of ██ ██ It is my understanding that, after attorneys at

17   Rosen Bien Galvan & Grunfeld told CDCR that officers at RJD had threatened me, CDCR

18   agreed to transfer me to ██ for my safety.

19        9.    I believe that the officer harassed and assaulted ██ ██ because it is well

20   known that ██ ██ reported on staff misconduct at RJD and had to be transferred to

21   ██ because CDCR was unable to keep him safe at RJD.  As I noted in my previous

22   declaration, staff at ██ have made references to the ██ ██ to my face, which I

23   understood as an attempt to signal that staff thought of me as a "rat."  Those comments,

24   combined with what just happened to ██ ██ make me confident that staff at ██

25   know about what happened at RJD and are continuing the campaign of retaliation against

26   us. While I do not know exactly how staff at ██ became aware of what happened at

27   RJD, the fact that they know that ██ ██ and I are witnesses—or "rats" in their eyes—

28

[3612329 3]                                    2

1  makes me very fearful for my safety here.  It is unbelievable to me that officers are willing
2  to continue retaliating against us even when their misconduct is caught on camera.

3

4       I declare under penalty of perjury under the laws of the United States of America
5  that the foregoing is true and correct, and that this declaration is executed at ███████
6  California this 23rd day of September, 2020.

7

8                                              ████████

9

10

11      On September 23, 2020, due to the closure of ██████ in light of the COVID-19
12  pandemic and ongoing concerns that officers might retaliate against witnesses in support of
13  Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail
14  system at ██████, I read the contents of this declaration, verbatim, to ████████
15  by telephone. ██████ orally confirmed that the contents of the declaration were true and
16  correct. ██████ also orally granted me permission to affix his signature to the declaration
17  and to file the declaration in this matter.

18

19  DATED: September 23, 2020

20                                              Jack Rhein Gleiberman

21

22

23

24

25

26

27

28

# Exhibit 4

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **EXHIBITS 4, 5, 107, 108, 109, 110, 111, 112, AND 113**  TO THE REPLY DECLARATION OF GAY CROSTHWAIT GRUNFELD IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS FROM ASSAULTING, ABUSING, AND RETALIATING AGAINST PEOPLE WITH DISABILITIES |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:   Hon. Claudia Wilken |
| | Date:    October 6, 2020 |
| | Time:    2:30 p.m. |
| | Crtrm.:  Remote |

Case No. C94 2307 CW

[3586067.1]

**Manual Filing Notification**

Regarding: Exhibits 4, 5, 107, 108, 109, 110, 111, 112, 113 to the Reply Declaration of Gay Crosthwait Grunfeld

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served in hard-copy shortly. For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

1. ☐ Unable to Scan Documents
2. ☐ Physical Object (please describe):
3. ☑ Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media
4. ☐ Item Under Seal in Criminal Case
5. ☐ Conformance with the Judicial Conference Privacy Policy (General Order 53)
6. ☑ Other (please describe): **Exhibits 4, 5, 107, 108, 109, 110, 111, 112, AND 113 are also being filed under seal**


DATED:  September 25, 2020          Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By:  */s/ Gay Crosthwait Grunfeld*
     Gay Crosthwait Grunfeld

Attorneys for Plaintiffs

Case No. C94 2307 CW

1

NOTICE OF MANUAL FILING OF EXHIBITS 4, 5, 107, 108, 109, 110, 111, 112, AND 113 TO THE REPLY
DECLARATION OF GAY CROSTHWAIT GRUNFELD

[3586067.1]

# Exhibit 5

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621
   Facsimile:    (510) 280-2704
5
6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
   MICHAEL FREEDMAN – 262850
8  ROSEN BIEN
   GALVAN & GRUNFELD LLP
9  101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
10 Telephone:   (415) 433-6830
   Facsimile:    (415) 433-7104
11
12 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14 Berkeley, California  94703
   Telephone:   (510) 644-2555
15 Facsimile:    (510) 841-8645

16 Attorneys for Plaintiffs

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19                   OAKLAND DIVISION

20 JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW

21           Plaintiffs,               **EXHIBITS 4, 5, 107, 108, 109, 110, 111,
                                        112, AND 113** TO THE REPLY
22     v.                              DECLARATION OF GAY
                                        CROSTHWAIT GRUNFELD IN
23 GAVIN NEWSOM, et al.,                SUPPORT OF PLAINTIFFS' MOTION
                                        TO STOP DEFENDANTS FROM
24           Defendants.               ASSAULTING, ABUSING, AND
                                        RETALIATING AGAINST PEOPLE
25                                      WITH DISABILITIES

26                                      Judge:  Hon. Claudia Wilken
                                        Date:    October 6, 2020
27                                      Time:    2:30 p.m.
                                        Crtrm.:  Remote
28
                                        Case No. C94 2307 CW

[3586067.1]

**Manual Filing Notification**

Regarding: Exhibits 4, 5, 107, 108, 109, 110, 111, 112, 113 to the Reply Declaration of Gay Crosthwait Grunfeld

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served in hard-copy shortly. For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

1. ☐ Unable to Scan Documents
2. ☐ Physical Object (please describe):
3. ☑ Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media
4. ☐ Item Under Seal in Criminal Case
5. ☐ Conformance with the Judicial Conference Privacy Policy (General Order 53)
6. ☑ Other (please describe): **Exhibits 4, 5, 107, 108, 109, 110, 111, 112, AND 113 are also being filed under seal**

DATED:  September 25, 2020           Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP


By:  */s/ Gay Crosthwait Grunfeld*
      Gay Crosthwait Grunfeld

Attorneys for Plaintiffs

Case No. C94 2307 CW

[3586067.1]

# Exhibit 6

**DECLARATION OF** ██████████████

I, ████████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at California State Prison, Los Angeles County ("LAC") on Facility D in Building 3. I am 47 years old.

3.      I have a number of serious medical conditions. I am designated as high risk medical. I previously had kidney cancer. I suffer from chronic kidney disease, neuropathy in my feet and legs, recurrent, chronic, urinary tract infections, and chronic pain. I also have a bulging disk in my neck. I also suffer from chronic obstructive pulmonary disease ("COPD").

4.      I am an *Armstrong* class member. I am designated as DNH, which means I have a hearing disability that does not affect my housing placement in prisons. I wear hearing aids and have a hearing disability vest to signal that I have a hearing disability.

5.      Although I do not have a DPP code designating my mobility impairment, I have mobility issues. Due to my chronic pain and neuropathy, I have a ground floor-limited stairs chrono, meaning I can only be housed on the ground floor, as well as a lower-bunk chrono, meaning I can only be housed on the lower bunk in a cell.

6.      Since April 2020, I have been using a cane to get around and also wear orthotic shoes. In April 2020, I had been having issues walking where my right foot had started dragging. My neurosurgeon who was treating my bulging disk thought this was related to the bulging disk, so shortly after I started having these issues my neurosurgeon had told me that he thought this was related to my bulging disk. I was given a cane and orthotic boots to help me walk.

7.      I also have a vision disability, though I do not have a DPP code for this either. I got shingles in November of 2019 and got a really bad scratch in my cornea. As a

1   result, I have lost almost all the vision in my left eye.  I have to get a cornea transplant, but

2   it has been put on hold due to COVID-19.

3        8.     I have submitted multiple 1824 reasonable accommodation requests to get

4   audiobooks, because reading with one eye gives me really bad headaches.  I have

5   repeatedly been denied this because my vision impairment is "temporary" according to

6   CDCR, even though I've been suffering from this for about a year.  I wear eyeglasses and

7   have a vision-impaired disability vest that makes staff aware I am vision impaired.

8        9.     I am a *Coleman* class member.  I am at the Enhanced Outpatient Program

9   level of care.  EOP patients live in separate housing units with other EOP individuals,

10  where we are supposed to receive enhanced mental health care including 10 hours each

11  week of structured therapeutic activities, along with more frequent meetings with our cases

12  managers.  I suffer from anxiety, depression, and post-traumatic stress disorder ("PTSD").

13  My level of care was elevated to the EOP level of care on June 18, 2020, due to an

14  increase in my depression after the incident described below.  Prior to June 18, 2020, I was

15  at the Correctional Clinical Case Management System ("CCCMS") level of care, a lower

16  level of mental health care.

17       10.    I have been housed at LAC from May 2, 2019 to the present.  During my

18  time at LAC, I have been housed in the following locations: C-Yard, Building 1, C -Yard,

19  Building 2, C -Yard, Building 4, D-Yard, Building 3, and the Correctional Treatment

20  Center ("CTC").

21       11.    I was a victim of staff misconduct at LAC.  Early in my time at LAC, around

22  July 4, 2019, I was walking to work right after count time in the mid-afternoon.  At the

23  time, I lived in C-1 but had a job as a porter in C-3.  As I was walking to work, on the track

24  on the yard near the medical station, an officer whose name I do not know yelled over to

25  me and said he needed to search me.  I asked why he needed to search me, as I was on my

26  way to work.  He then told me to cuff up.  He told me he was taking me to the gym to

27  search me.  He handcuffed me.  As he handcuffed me, Officer Delatorres, an officer that

28  worked in C-2 at the time, showed up.  After the officer whose name I do not know cuffed

1   me, Officer Delatorres grabbed me on the shoulder and started to walk me towards the

2   gym.  The other officer whose name I do not know walked alongside us.  As we walked,

3   every few steps Officer Delatorres would squeeze my shoulder and pull me towards him,

4   jerking me around.  Each time he did this, my body would instinctively pull away.  I felt

5   that him pushing me around was unnecessary.  I asked him why he was jerking me around

6   and he did not reply but continued to pull me every few steps.

7          12.    As soon as Officer Delatorres and I crossed the threshold into the gym,

8   Officer Delatorres put his foot in front of my feet and shoved me forward, tripping me.

9   When I fell to the floor, he and the other officer jumped on top of me and started kicking

10  and punching me.  At least four other officers who were standing around, including an

11  officer named Officer Lewis, joined in to start attacking me.  I remember Officer Lewis

12  specifically jumping on me and driving his elbow into my head.

13         13.    After what felt like a minute or two, the officers, I do not remember who

14  specifically, took my handcuffs off.  One of the officers, I do not remember who, hit their

15  alarm.  Ten or fifteen other officers responded to the alarm and started to assault me again.

16  I curled up on the ground as they continued to beat me.  After a short period of this, they

17  picked me up and placed me into a holding cage in the room.

18         14.    While I was in the holding cage, a sergeant whose name I do not know came

19  to speak with me.  I did not tell him what had happened and told him that I did not want to

20  have any issues with the officers.  I assumed that by not reporting what had happened, I

21  would avoid further issues with the officers.  A nurse also came to see me while I was in

22  the holding cage, and I lied and told her that my injuries-- bruising on the left side of my

23  face, a black eye, and a goose egg-sized bump on the right side of my head-- were due to a

24  fall.  I refused medical attention and did not report the misconduct so that I could avoid

25  future issues with the officers.  After this, I was returned to my cell.

26         15.    The next day, I was charged with an RVR for "resisting staff."  The RVR

27  stated that the officer told me to cuff up and I resisted the handcuffs.  I was found guilty

28  and lost yard and dayroom for thirty days.

16.     After this incident, I changed my whole attitude and decided to stop speaking up for myself to the officers.  I realized that advocating for myself would only get me in trouble or harmed, so I kept my head down and just programmed as best as I could.

17.     I was a victim of staff misconduct again recently.  On June 8, 2020, I was in my cell in C-4.  Around 8:30 a.m., I stood up from my bunk to get my morning medications.  As I was showing my identification card to the nurse to get my medications at the door of my cell, I fell.  I learned later that I fell because my blood pressure was low.  This has happened three or four times since the start of this year, at times when I have suddenly stood up.  I lost consciousness for a few seconds.  Officer S. Ongaro came to my cell to respond to my fall.  He approached my cell with a wheelchair.  As I was becoming lucid, I heard him say, "get up, and get in the wheelchair."  I told him I could not get up, as I was still feeling weak.  He then came into my cell and started kicking and stomping on my mid-section and head as I lay on the ground.  I would say he kicked or stomped me at least ten times.  After he was done assaulting me, he picked me up under the arms and placed me in the wheelchair.  As I was getting in the wheelchair, I heard him say, "looks like I'm going to search this cell."

18.     By the end of the assault, I was screaming in agony.  After Officer Ongaro placed me in the wheelchair, another floor officer who was not a regular, and whose name I do not know, wheeled me over to the TTA.  At the TTA, staff there took my blood pressure and vitals.  I told them I was in a lot of pain and something felt wrong.  The staff in the TTA decided that I needed to go to the hospital.  I waited for two hours for the ambulance to pick me up, as it was not designated as an emergency ambulance, despite the fact that I was in tremendous pain.

19.     I was taken to the emergency room at Antelope Valley Hospital ("AVH").  Over the time between the assault and being admitted to the emergency room, my pain gradually got worse, and about five or so hours after the assault I was experiencing the worst pain of my life.  The doctors at AVH gave me an MRI to figure out what the issue

1  was.  They discovered from the MRI that my spleen had ruptured, and I went immediately

2  into emergency surgery.

3       20.    I was at AVH recovering from this surgery for about a week.  I was told by

4  the doctors in the hospital that my spleen ruptured due to the impact from being assaulted.

5  They asked me how I had been assaulted. I told them I was not assaulted or in a fight.

6  They did not seem to believe me.  I did not report the assault to the medical staff at AVH

7  because two officers were standing near me at all times, and I did not want to get in trouble

8  or get assaulted while I was vulnerable and at the hospital, or when I eventually returned to

9  LAC.

10       21.    When I got back to LAC from AVH on June 15, 2020, I was placed back in

11  my cell where I had been assaulted.  When I got back to my cell, I discovered that my

12  radio, TV, headphones, rechargeable batteries, and my beard trimmer were gone.  My

13  cellmate told me that Officer Ongaro had come in and taken everything that was gone.  My

14  cellmate also told me that while I was gone from the hospital, Officer Ongaro had torn up

15  my paperwork.

16       22.    Upon discovering that I was missing these electronics and hearing that

17  Officer Ongaro was the one who took them, I decided to go to the office on the unit where

18  the floor staff sat and try to smooth things over and get my electronics back.  Officer

19  Ongaro was there at the time.  I went to directly to him and tried to apologize to him about

20  not being able to get up after fainting.  I also asked him, "Why did you come in there and

21  start kicking on me?"  Officer Ongaro said, "Because you embarrassed me."  I was not sure

22  exactly what he meant, as I had simply been struggling to get in the wheelchair when he

23  started assaulting me.  I was shocked that he was blaming this incident on me and walked

24  away back to my cell.  I still have not managed to get my TV and radio back, despite

25  requesting this multiple times in the last couple of months.

26       23.    Within days after arriving back at LAC, I was in extreme pain again in my

27  appendix and lower back.  I reported this to the medical staff at LAC who discovered I had

28  sepsis on June 22, 2020.  I was re-admitted to AVH immediately.  I spent two more weeks

in the hospital before being returned back to LAC on July 2, 2020.  When I got back to

LAC, I was housed in the Correctional Treatment Center ("CTC"), the medical infirmary

at LAC, for six weeks, until August 13, 2020, when I was moved to D-3.  While I was in

the CTC, I was bed-ridden for at least three weeks.  I was in extreme pain and could barely

move.  I am still in a lot of pain, but it is nothing like it was in those first few weeks.

24.     I did not file a 602 against Officer Ongaro because I was scared to file

anything.  I have seen others who have filed complaints about these officers get singled out

after doing so.  I was afraid of that happening and did not want to put myself at risk.

25.     In my time at LAC, there have been a few times that I needed help but didn't

ask for it or was hesitant to ask for it because I was afraid of what would happen to me.

For example, after being moved to D-3, I was not given laundry for two weeks.  I asked

Officer Williams, a D-3 floor officer, for my laundry, but he refused to get it for me.  I

have also asked for my religious meal, which I have not been getting on second watch.  I

have asked the officer to call over to the kitchen and see what's going on with my food,

but he refuses to help me.  Given the attitude that the officers give me, I have stopped

asking for my laundry and food unless I cannot live without what I am asking for.

26.     My physical health was greatly impacted by the assault.  Due to my ruptured

spleen, I had issues with my mobility.  When I got back from LAC and was housed in the

CTC, I did not get out of bed for anything for at least three weeks.  After about three

weeks of antibiotics and morphine, I began to get out of bed but needed to use a walker in

order to get around.  I am starting to get my strength back now, but am still in a lot of pain

and having issues getting around.

27.     My mental health greatly worsened after this assault, to the point where I had

to change my level of mental health care to receive more treatment.  I was extremely

stressed after the assault.  When I got back from the hospital the first time, I had an

appointment with my clinician.  During the appointment, I broke down crying and told my

clinician everything that had happened.  He referred me to EOP at that time, but I did not

end up moving to D-Yard and starting the EOP program until I got back from the hospital

the second time.  Since I have moved to D-Yard and started to program at EOP, I have been feeling better, though I am still having a hard time sleeping after the assault due to nightmares about the incident and physical pain from my injuries.

28.   In my opinion, staff target people with disabilities, medical issues, and mental illness.  One would think that people with these issues would be more protected than the population without these issues, but these people are targeted because we are vulnerable and officers know that they can get away with assaulting and harassing us.

29.   I believe the reason there is so much staff misconduct at LAC is because officers are allowed to do whatever they want without accountability from their supervisors or from cameras.  I was at High Desert State Prison ("HDSP") from December 27, 2015 to February or March of 2019.  When I was housed there, cameras were installed.  After cameras were implemented, the demeanor of the officers visibly changed.  They started behaving and looking over their shoulder when they were interacting with me and other incarcerated people.  I and others felt a lot safer on the yard because we knew that if something happened, there would be some sort of accountability and evidence as to what actually happened.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 8th day of September, 2020.

_____

On September 8, 2020, due to the closure of California State Prison- Los Angeles County ("LAC") in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ████████████, by telephone.  ████████████ orally

1  confirmed that the contents of the declaration were true and correct. ███████ also

2  orally granted me permission to affix his signature to the declaration and to file the

3  declaration in this matter.

4

5  DATED: September 8, 2020

6  Emma Cook

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 6a

## Filed Under Seal

# Exhibit 7

**DECLARATION OF** ████████████

I, ████████████, do hereby declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ██████.  I am currently housed at California State Prison – Los Angeles County ("LAC") on D-Yard in Building 1.  I am 60 years old.

3.      I am a *Coleman* class member.  I am at the Enhanced Outpatient Program ("EOP") level of mental health care.  EOP patients live in separate housing units with other EOP individuals, where we are supposed to receive enhanced mental health care including 10 hours each week of structured therapeutic activities, along with more frequent meetings with our cases managers.  I have been EOP for the majority of my time in the CDCR, except for a few short periods when I was at the Correctional Clinical Case Management System ("CCCMS") level of care.

4.      I suffer from depression.  When I have struggled with my mental health issues, I have sometimes experienced suicidal ideation.  I have been to a Mental Health Crisis Bed ("MHCB") unit twice during my incarceration.  An MHCB is a short-term intensive care unit for people experiencing severe mental health crises.  The first time that I went to an MHCB was in August of 2018, and I was sent there because I was having thoughts of suicide.  The second time was in November of 2019, and I was not suicidal at the time.  I believe the second trip to an MHCB was in retaliation for reporting staff misconduct at LAC.  This retaliation is described in further detail below.

5.      I have been incarcerated in the CDCR since December 1, 2018.  I have been at LAC since August 26, 2019.  Before that time, I was at Kern Valley State Prison. ("KVSP").

6.      During my time at LAC, I have been housed in the following locations:  D-Yard Buildings 1, 2, 3, 4, and 5.  Building 5 is the EOP Administrative Segregation Unit.  All of the housing units on D-Yard at LAC are designated to house EOP patients.

7.     I have reported staff misconduct against other EOP patients and I have been retaliated against by staff since I arrived at LAC in August of 2019.

8.     When I first arrived at LAC, I was initially housed in the D-Yard, Building 3 EOP unit.  While in D-Yard, Building 3, I witnessed frequent instances of staff misconduct, particularly by Officers Williams and Moisa.

9.     In September of 2019, shortly after arriving at LAC, I witnessed an incident where three inmates from a different building came into Building 3 and ambushed an EOP patient from my building during second watch.  At the time this took place, I was in my cell standing in the door watching them.  They tried to punch the patient from my unit but he fought back and avoided their punches.  Officer Williams hit his alarm and told the inmates who were fighting to get down on the ground.  Once the patient from my building was lying on the ground and cuffed up, Officer Williams emptied a whole can of pepper spray in his face.  Then Officer Williams started laughing.

10.     Custody staff then escorted the patient from my building who was assaulted out of the housing unit.  I believe they took the patient to D-Yard, Building 5, which is the EOP ASU.  I do not think the three individuals who attacked the individual from my building were taken to the ASU because they work in the program office and I saw them on the yard after the assault.  Those individuals should never have been allowed into the building, which is why I believe correctional officers were behind the attack.

11.     The next incident of staff misconduct I observed in D-Yard, Building 3 was about a week later, around September 20, 2019.  At the time, I was in my cell standing at the door, observing the unit.  Officer Williams intercepted an incarcerated person walking across the dayroom floor and Officer Williams told the individual to get on the ground. The individual laid down on the ground.  Officer Williams then hit his alarm, handcuffed the inmate, and sprayed him in the face with a whole can of pepper spray.  Custody staff then took the incarcerated individual out of the housing unit.

12.     The next incident I observed in D-Yard Building 3 took place on or around October 1, 2019.  At the time, people in the housing unit were being cell fed because the

1  program was locked down, and the officers in the unit were passing out the food trays from

2  cell to cell.  At the time I was in my cell, cell ███, and Mr. ███ was on the second tier in

3  a cell that I could see from my cell (I was in the A-section and he was in the B-section of

4  the housing unit.)  I heard Mr. ███ tell officers he wanted to see the doctor because he

5  was not getting his medication.  In response, Officer Oliver sprayed Mr. ███ in the face

6  with pepper spray through his cell door.  Officer Oliver then asked the tower officer to

7  open Mr. ███'s cell door.  It seemed like the tower officer was reluctant to open the

8  door, but eventually did, after a few seconds.  I observed the exchange and Officer Oliver

9  had to tell the control booth officer a second time to open the door, before he did so.  Once

10 the door was open, I heard Officer Oliver tell Mr. ███ to back out of the cell and lie face

11 down.  I saw Mr. ███ comply.  Officer Oliver then straddled Mr. ███ and punched

12 him in the side of his head.  I observed him pick Mr. ███'s head up and slam it hard on

13 the floor.  At that point, another member of custody staff pulled Officer Oliver off of

14 Mr. ███.  Officer Oliver is very large and Mr. ███ is pretty small.  I believe Officer

15 Oliver could have seriously injured, or killed, Mr. ███.  Next, I observed Mr. ███

16 being taken out of the unit.  I could see that he was bleeding profusely.  I have not seen

17 Mr. ███ since that time.

18      13.   I wrote to CDCR Internal Affairs about these incidents of staff misconduct in

19 September, October, and November of 2019.  About 10 days before the Thanksgiving

20 holiday, I was transferred to an MHCB at KVSP.  At the time, I was not suicidal and I had

21 not reported being suicidal.  However, I had recently written to the Warden complaining

22 about Officer Moisa.  In the letter, I complained that Officer Moisa was harassing me and

23 retaliating against me because of a complaint I filed as a witness about Officer Williams'

24 assault on the EOP patient in D-Yard, Building 3.  I put the letter to the Warden in the 602

25 appeals box in the D-Yard, Building 3 housing unit.  It is well known by incarcerated

26 people that officers in D-Yard, Building 3 will use a hook to fish appeals and letters out of

27 the locked appeals box.  I have personally observed them doing this.

28

14.     When I wrote to the Warden, I believe Officer Moisa intercepted the letter from the appeals box.  I believe this for several reasons.  First, when I returned from the MHCB, the Warden Mr. Johnson and the Deputy Warden Eric Jordan talked to me and told me they never got the letter I had written.  Second, in the letter, I had explained that the harassment by Officer Moisa was causing me to have suicidal ideation.  When I was sent to the MHCB, it was supposedly because I had reported that I was suicidal.  However, the only place I reported having some suicidal thoughts was in the letter to the Warden that the Warden later on told me that he never received.

15.     To be clear, in that letter, I explained that I was not going to kill myself even though I had suicidal feelings due to the harassment I was experiencing at the hands of custody staff in my unit.  Also, before I was sent to the MHCB, I told the clinician evaluating me that I was not suicidal, but they sent me anyway.

16.     In March 2020, I was a victim of additional staff misconduct at LAC.  I returned to LAC on March 5, 2020, after being out to court.  After arriving back at LAC, I was taken to be housed in D-Yard, Building 2, Cell ██.  Once I was in the cell, I realized that the officers never gave me back my prison identification card after escorting me to the cell.  You are supposed to have your prison identification card on your person at all times in the prison.  Once I went into the cell, another incarcerated person came and told me to give him my identification card.  I said I did not have my card because the officers who escorted me had kept it.  The other individual told me to give him something with my name on it.  When I asked him why, he told me that he was going to have me moved to a different cell.  I was then moved to cell ██.

17.     A few days later, around 9:45 p.m., another incarcerated person told me that I needed to move from cell ██ to cell ██, because my cell needed to be used temporarily for a person on suicide watch.  That person had a lower bunk chrono, and I was sleeping on a lower bunk in cell ██ but did not have a lower bunk chrono, so I agreed and moved into cell ██.  I shared cell ██ with another incarcerated person that night, but I expected

1  that I would return to cell ■ the following morning.  However, Officers Lewis and

2  Hodack told me the next day that I would not be moving back to cell ■.

3        18.    That following morning, I realized that my new cell mate in cell ■ was

4  sick.  I believed he was sick with COVID-19, and I wanted to get out of the cell as soon as

5  possible.  I observed that my cell mate's nose was running, he was sneezing, and he told

6  me he was feeling very sick.  He told me he had a sore throat and headache.  His eyes

7  looked watery.  He told me he had shortness of breath.  Later that morning, I told Officers

8  Lewis, Hodack, and Aveto that I wanted to be moved back to cell ■, which was empty.  I

9  told them I wanted to move because my cellie was sick with COVID-19.  They refused.

10  They said, "We're not moving you nowhere."

11        19.    I believe I was moved into cell ■ with the intention of making me sick

12  with COVID-19 in retaliation for my reporting concerning staff misconduct.  At the time, I

13  had been speaking with Plaintiffs' Counsel, filing appeals, and complaining to different

14  parties about the staff misconduct on D-Yard at LAC.  Officer Williams also told me that

15  he intentionally put me in the cell to get me sick with COVID-19.

16        20.    I tested positive for COVID-19 a month after being celled with this

17  individual.  When I was sick with COVID-19, the symptoms included shortness of breath

18  and a very painful cough.  I recovered after a few weeks.  In addition to the illness, it was

19  extremely stressful worrying that I would develop even more severe symptoms, and

20  possibly die from the disease.  I am 60 years old.

21        21.    Since I was intentionally exposed to COVID-19, I wrote about this incident

22  to a number of individuals and organization, asking them to investigate.  I wrote to the

23  CDCR Office of Internal Affairs, the CDCR Ombudsman for LAC, the CDCR Inspector

24  General, and Plaintiffs' Counsel in *Armstrong* about these incidents.  I also wrote some

25  individuals such as the Governor.

26        22.    I have not heard back from anyone in the CDCR except the Ombudsman,

27  who told me they had received my complaint.  They instructed me to file a CDCR Form

28

[3574787.1]                                    5

1   602 about the incident, and send it to the appeals coordinator.  They said they would

2   monitor the appeal to make sure it went through all of the regular processes.

3        23.    I have not had any interviews or responses about my reporting of this

4   misconduct.  I have not yet filed the appeal about the COVID-19 issue, but I plan to do so

5   in the near future as instructed by the Ombudsman.

6        24.    I have also experienced intimidation related to my calls and conversations

7   with Plaintiffs' Counsel in *Armstrong*.  On June 18, 2020, I had a confidential attorney-

8   client call with *Armstrong* lawyers.  At the time, I was housed in D-Yard, Building 1.

9   After that call, I was returned to the housing unit to my cell.  Shortly thereafter, I went out

10  to yard.  As I was about to exit my building, Officer Moisa and Williams were standing

11  just inside my housing unit, staring at me in an intimidating manner.  Officer Moisa said to

12  me, "You are looking everywhere except over here."  I believe they were trying to

13  intimidate me or to provoke me.  Both officers work in D-Yard, Building 3, so there was

14  no reason for them to be in my building.

15       25.    I have experienced other retaliation recently.  On an earlier occasion, in early

16  to mid-June, I was on the yard and Officer Williams had tried to provoke me – Officer

17  Williams challenged me to a fist fight, but I just walked away.  On other recent occasions,

18  Officers Williams and Moisa have harassed me and threatened me.  During early June,

19  Officer Moisa intentionally stepped on my glasses and broke them.  Then he laughed about

20  it afterwards.

21       26.    In the past few months, I have also witnessed several other incidents of

22  horrible abuse by correctional officers here at LAC.  On April 13, 2020,  I saw Officers

23  Castello and Mendoz in D-Yard, Building 4 pick up another incarcerated person while he

24  was in a wheelchair and try to force him into cell ███.  I heard this person tell the officers

25  that he was unable to stand up or get on to a top bunk.  I was able to overhear because I

26  was in my cell nearby and could see clearly what took place.  I was about 10 to 15 feet

27  away around the corner across from his cell.  They were trying to force him to house in an

28  upper bunk when he was not able to because of his disability.  He explained he could not

get onto the top bunk and tried to refuse to go into the cell.  When he refused to go into the cell, Officers Castello and Mendoz started to punch him in his sides.  They then forced him into the cell.  They took his arm and placed it into the cell door and told the control tower officer to close the door.  The tower officer could not see what was taking place because the officers were blocking his view.  Once the door was closed, they moved aside.  The individual whose arm was in the door was yelling at the time.  When the tower officer saw the incarcerated individual's arm stuck in the door, he opened the door back up.  I later spoke with this individual, who told me that Sergeant Matthews had ordered the officers to force him back into the cell in an upper bunk.  The individual asked to see a nurse after the incident, but custody staff refused.

27.     On April 14, 2020, around 1:40 p.m., I was single celled in cell ██ on D-Yard, Building 4.  At the time, I was quarantined in the cell because I had tested positive for COVID-19.  My cell was "capped" meaning that I was not allowed to come out to dayroom or to the yard, a measure to keep me from spreading the disease.  At the time,  I saw Officer Castello and several other officers approach another incarcerated by the name of ███████████.  I believe Mr. ██████ had just come back to the housing unit after being on suicide watch.  I heard Mr. █████ tell Officer Castello that he was suicidal and he was not going in to cell ██ – my cell.  The officers then handcuffed Mr. ██████ and tried to force him into my cell.  I saw Mr. ██████ get down on his knees, resisting, and then Officer Castello slammed Mr. ██████ to the ground, face-first.  He busted his head open and there was blood everywhere.  Then the officers picked him up off the floor, and put a mask over his face, and took him to the ASU.

28.     When I saw this happen, I felt shocked at the viciousness of the staff's actions, and their lack of regard for human life.  I could not believe how sadistic the staff are here.  Clearly, they were trying to intentionally infect someone with COVID-19.

29.     I still have to interact with the officers that have been involved in the staff misconduct against me and others.  I still see Officer Castello, Officer Mendoza, Officer

Aveto, Officer Williams, Officer Moisa, and Officer Lewis on the yard.  As explained above, Officers Williams and Moisa routinely harass me and try to provoke me.

30.     In my time at LAC, there have been times when I was suicidal, and I felt too scared to tell custody staff about it because of the staff abuse.  In those situations, I try to stay calm and reach out to the Plaintiffs' lawyers in *Armstrong* and *Coleman*.  Also, staff here will intentionally interfere with my mental health treatment, by telling mental health staff that I refused appointments.  They also have relationships with mental health staff and they tell mental health staff not to assist me.

31.     I believe that mental health staff know what is going on with custody staff abusing EOP patients, but they have become overly friendly with custody staff, and they will often look the other way when staff misconduct is taking place.

32.      I have not filed appeals about a variety of incidents that have taken place here, because the staff misconduct is so bad here and because I do not think it will make any difference.

33.     In my opinion, staff target EOPs for mistreatment, because these officers are untrained and do not know anything about mental health issues.  They also have a gangster mentally and it makes them feel powerful to beat up EOPs.  Officer Williams is a leader of a gang of abusive officers on this yard.  There are at least five or six such officers.  They routinely attack EOPs for little or no reason.  The violence is unpredictable and it makes it extremely stressful to be an EOP patient here at LAC.  These custody staff do not view us as human beings.  They seem to enjoy tormenting and antagonizing us.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

34.     I believe the reason there is so much staff misconduct at LAC is that these officers are not supervised.  The abusive officers go from building to building, even when they are not working in those buildings, to torment people who have complained about them.  This should be an easy thing for supervisors to spot and put a stop to.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 6th day of July, 2020.

/s/ ███████████

███████████

On July 6, 2020, due to the closure of LAC in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ███████████ by telephone. ███████████ orally confirmed that the contents of the declaration were true and correct. ███████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: July 6, 2020

Thomas Nolan

[3574787.1]                                                          9

# Exhibit 7a

**Filed Under Seal**

# Exhibit 8

**DECLARATION OF** ██████████████

I, ██████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ██████.  I am currently housed at California State Prison- Los Angeles County ("LAC")  on Facility D in Building 5.  I am 54 years old.

3.     I am an *Armstrong* class member.  I am designated as DPM and DPV, meaning I have both a mobility and vision impairment.  I have vision in my right eye but I have no vision in my left eye.  In my right eye, I have nearsighted vision, meaning I can see things that are at a distance, but I have no farsighted vision.  This means that while I can see some things that happen at a distance, I cannot see things up close.  Because of this, I have difficulty getting around, and I rely on others to help me do so.  In order to read and write, I have to use a magnifying glass to see with my right eye.  Because of my vision impairment, I need eyeglasses and wear a vision impaired vest that signals to staff that I have a vision impairment and need assistance with getting around, reading, and writing.

4.     Because of my mobility disability, I use a cane, walker, and I wear a mobility vest that signals to staff that I cannot get on the ground.  I use my cane in the cell and my walker outside of the cell because I cannot fit my walker in the cell due to the fact that I am in a non-ADA cell.  I am in a non-ADA cell because staff have told me when I arrived that there are a limited number of ADA cells in D-5.  I have a housing restriction in my file requiring that I be housed on a lower bunk, on the ground floor of my housing unit. There are no ADA workers in the EOP Hub so I have to rely on officers and other incarcerated people who are willing to help me.  Some officers are willing to help me with getting around, but in D-5 some of the officers leave me to my devices to get around. They will walk alongside of me and let me bump into things.

5.     I am a *Coleman* class member.  Up until recently, I have been housed at LAC at the Enhanced Outpatient Program ("EOP") level of care, which means I am

housed in a special housing unit with other EOP patients, and I receive about 10 hours of structured groups and other mental health care each week.  I am currently still at LAC due to restrictions on transfers due to COVID-19, but as of July 6, 2020 I have been awaiting transfer to a higher level of mental health care in the Psychiatric Inpatient Program ("PIP") at CHCF, SVSP, or CMF.  Psychiatric Inpatient Programs are licensed psychiatric hospitals that provide intensive mental health treatment to individuals who struggle to function in an outpatient program or a shorter term inpatient program.  Even though I am being referred to ICF, I have heard from officers who have tried to help me, whose names I do not feel comfortable disclosing without their permission, that some D-5 officers are trying to persuade my new clinician to drop me to CCCMS, the lowest level of mental health care.  According to the officers who have told me this, the officers trying to convince my clinician to drop me are doing this because she is new and does not seem to feel comfortable standing up to custody staff.

6.      I struggle with bipolar disorder, depression and ongoing, intense suicidal ideation.  I have been to inpatient programs and the mental health crisis bed ("MHCB"), which a short-term intensive care unit for people experiencing severe mental health crises, many times during my time in CDCR to try to treat my depression and suicidality.  At present, I am feeling hopeless and depressed because my brother tried to commit suicide just recently.  I often feel as if my life has run its course.

7.      I have a number of serious medical conditions.  I have valley fever, asthma, hypertension, HIV, and diabetes.  I also have chronic obstructive pulmonary disease ("COPD") and use a C-PAP machine to treat this.  I have been housed at LAC from February 2, 2019 to now.

8.      During my time at LAC, I was housed in the following locations: D-Yard, Building 2, D-Yard, Building 4, C-Yard, Building 2, and C-Yard, Building 1, D-Yard, Building 5, and the MHCB.

9.      I have been a victim of staff misconduct at LAC.

10.    Before arriving in D-5, I was housed in C-1.  In mid-April 2020, a nurse who works in C-1 named Bocock began mixing my HIV medications with medications that are not prescribed to me.  Because of my vision impairment, I need assistance identifying and taking my medications.  Another incarcerated person in C-1 used to help me with my meds when they were keep-on-person ("KOP"), which means medications that I can carry and administer to myself.  However, this person moved, so my medications had to change from KOP to nurse-administered, so that the nurse could assist me in taking my medications properly in place of my friend who used to help me.  I take about 15-20 pills in the morning and 6-8 at night to treat my HIV, valley fever, blood pressure, and asthma.  The LVNs who dispense medications seemed to be frustrated that they now had to spend time dispensing all of my medications.

11.    LVN Bocock and LVN Hall told Officer Richardson and Officer Williams, two officers in C-1, that I have HIV.  After learning this, Officer Richardson and Officer Williams told ADA workers and other people on the unit to "watch out when escorting Inmate ███ because he has AIDS."  The officers also told one ADA worker that I "must be a faggot" because I have AIDS.  After learning this, this ADA worker and other incarcerated people he is associated with came to my cell and told me I had 48 hours to "get off the yard", meaning leave C-1 or else I would be hurt.  Another incarcerated person told me he had heard that this ADA worker and others were going to attack me.

12.    An incident took place after which I was charged with an RVR and placed in the ASU.  I did not attend my RVR hearing because I felt that even if I explained the safety concerns that led to my actions, staff would do what they wanted and find me guilty.  As punishment, I am currently serving a 24-month term in segregation.

13.    After I got to the ASU, I told Captain J. Miller, the C-Yard captain, how I had gotten into this situation and the threats I had received.  He told me to "deal with it" when I got back to the yard after my segregation term.  Before this RVR, I had not received an RVR during my time on LAC C-Yard and D-Yard.  I remain scared of going back to C-Yard.

14.     Apart from learning confidential information from medical staff, many officers, including Officer Travino, Officer Flore, Officer Richardson, Officer White, Officer Williamson, and Officer Nava, take information from electronic files of incarcerated people and give that information to other incarcerated people who will attack or assault those people for favors from the officers.  I have heard of them doing this to people who are sex offenders, as well as to people who file staff complaints and lawsuits against officers.  I know that Officer Richardson and Officer Williams let incarcerated people keep cellphones and drugs in their cells in exchange for attacking any and all incarcerated people who the officers want harmed or removed from the yard.  Prior to the incident that placed me in segregation, I and other incarcerated people in C-1 told Captain Miller about the lack of supervision of these officers and what they were doing to us.

15.     In June 2020, while I was in the D-5 EOP ASU Hub, I filed 1824 forms, which are requests for accommodations for my disability, about the ADA showers in D-5. I filed these forms because D-5 staff were using the ADA shower for incarcerated people not designated as ADA so that the staff members did not have to escort the non-ADA incarcerated people from the lower tier in B-Section over to A or C-Section.  Since I am both mobility and vision impaired, I and other disabled people need access to this shower. Because staff in D-5 were using the shower for non-ADA incarcerated people, I and others were forced to take showers in the non-ADA showers.  I struggled to use these showers because of my disabilities.  On July 9, 2020, other incarcerated people in D-5 told me that Sergeant Dotey knew that I had filed these 1824 forms.  Sergeant Dotey is also aware that I write frequently to report these conditions to Rosen, Bien, Galvan, and Grunfeld, the attorneys who monitor disability accommodation  and mental health care issues at LAC. Recently, D-5 officers who are involved in the misconduct with Sergeant Dotey have started losing my canteen slips. I believe this is in retaliation for reporting the poor conditions for people with disabilities in D-5.

16.     Other incarcerated people have also told me that Sergeant Dotey has instructed Officer Rodriguez and Officer Castellano to ask incarcerated people to "tune me

1  up", or assault me, in exchange for favors, including extra phone calls, and an extra

2  quarterly package.  One of these people, ██████████, told me that Officer Rodriguez

3  asked him to "fuck me up" for him, Officer Castellano, and Sergeant Dotey.  ██████

4  ██ refused and told me about what Officer Rodriguez had asked him.  He told me that

5  Officer Rodriguez had told him he could get out of D-5 and back to a mainline unit if he

6  attacked me.  After he refused to attack me, ██████████ told me he has been harassed by

7  these officers and has been struggling with his mental health.

8      17.    ██████████ and others have also told me that the officers have told them

9  that if they attack me, the officers will make sure that the person that attacks me does not

10  get an RVR.  In order to facilitate the attack, the officers have told people that they will

11  keep handcuffs loose on the person so that the person can slip his hand out of the cuffs to

12  attack me.  I learned this from ██████████ and another incarcerated person who wishes

13  to remain anonymous, who officers also tried to recruit to get me attacked.

14      18.    Recently, Officer Rodriguez has been escorting me to and from various

15  interviews and appointments I have.  A few weeks ago, I was coming off the yard and he

16  was escorting me.  Another incarcerated person asked Officer Rodriguez where he was

17  going.  He said "I'm escorting this rat" referring to me.  A number of the people that

18  overheard that know me and would not believe Officer Rodriguez, but after he made that

19  comment, I was afraid that those that overheard it who do not know me may actually

20  believe I am a "rat" and try to harm me.

21      19.    Given what I have heard from other incarcerated people about being

22  attacked, I am terrified to be around Officer Rodriguez and the other officers.  I believe

23  that staff are threatening me and are ordering that I be attacked because I have been

24  reporting staff misconduct and disability accommodation issues in D-5 by filing CDCR

25  1824 forms and by writing to my attorneys.  I submitted an emergency 602 directly to the

26  Warden on July 26, 2020 reporting these safety concerns in the hopes that someone will

27  intervene to keep me safe.  After not receiving a response, I filed another 602 about this

28

[3603642.2]

5

1  same issue about three weeks after the first 602.  I have not yet received an assignment

2  notice or any sort of response to either appeal.

3        20.    At the same time that I submitted my emergency appeal reporting my safety

4  concerns, I submitted a different 602 against LVN Flores, who works in D-5 and

5  frequently passes out medications.  I recently had an episode that felt like I was having a

6  stroke.  Shortly after this happened, I requested a sick call slip from LVN Flores to request

7  an appointment with medical staff.  When I asked her for a medical slip, she told me I

8  could not have one, and said I was "lucky" I "didn't get any D-Con in my crushed and

9  floated pain medications."  D-Con is rat poison.  I immediately submitted the 602 reporting

10  this, to which I have not received an assignment notice or response.

11        21.    I have also witnessed staff engage in misconduct against other people at

12  LAC.  On July 11, 2020, Office Castellano, Officer Martinez, and the sergeant that works

13  in D-5 on the weekend, Sgt. Barbaur, as well as other custody staff members whose names

14  I do not know, assaulted another incarcerated person on my unit.  Around 11:00 a.m. an

15  alarm sounded in the unit.  The incarcerated person was out on the yard and apparently got

16  in a confrontation with an officer.  When he got into the unit, I could see that his face was

17  busted open, bruised, and bloody, and he had a spit mask on.  He was bleeding through the

18  spit mask.  He had handcuffs and leg restraints on.  The officers dragged him into the

19  dayroom.  He could not walk because the leg restraints he had on were very tight, and he

20  could not seem to move his feet.  In the dayroom, in front of everyone on the unit, the

21  officers slammed him back into the cement ground face down.  When they picked him

22  back up, the officers placed him in a wheelchair and staff took two bedsheets, twisted the

23  sheets, and wrapped them around the person and the wheelchair, securing the person to the

24  wheelchair like a straitjacket.  The officers had taken the wheelchair from another

25  incarcerated person in D-5 that is paralyzed.

26        22.    After the assault, I heard Sergeant Barbaur tell a nurse named Rios to clear

27  the person without medical treatment for his injuries.  LVN Rios did so around 11:15 a.m.,

28  and the officers placed the incarcerated person, bloody and tied to his wheelchair, back in

his assigned cell.  Most if not all of the black incarcerated people in D-5, including myself, started to protest what had happened to this person by kicking our cell doors and yelling that this person needed medical attention.  When yard time was called just minutes after we started banging our doors and yelling, we told Sergeant Barbaur that we would not come out of our cells with handcuffs, and would hold the handcuffs hostage if they tried to cuff us, until this person received medical attention.  We then watched Sergeant Barbaur gather the officers involved in the assault earlier that morning.  Sergeant Barbaur and the officers were standing where the officers sit, which, if I am looking out of my cell, is just to the right of my cell door.  I overheard them discussing a "cover story." Myself and other people on the unit overheard Sergeant Barbaur state that they could say that the incarcerated person attacked a female staff member.  They were clearly trying to create a story with details that would justify the force they used against this person.

23.     Around 11:30 a.m., the lieutenant in D-5, Lieutenant Williams, came into the unit.  Under her supervision the person who had been assaulted was removed from his cell. I assume he was taken to the Triage and Treatment Area ("TTA"), to get medical treatment.  This person returned around 1:15 or 1:30 p.m.  He was walking.  I was unable to see his face because there was some sort of big bag with ice in it covering his face.  I did not see LVN Rios or medical staff in the unit give this person any medical attention at any time.  He was only able to get treatment when the lieutenant sent him out to TTA.  This made it clear that medical staff in the unit were trying to help the officers and Sergeant Barbaur cover up their violent assault, even though this person was in distress after the assault.

24.     Right after the assault, no one from ISU came to ask questions about what had happened.  This signaled to me that staff and the administration at LAC knew that staff had assaulted the incarcerated person, and not the other way around.  Whenever an incarcerated person attacks a staff member, ISU tends to show up almost immediately to ask questions and take photos.  I saw ISU eventually come to the door of the person who was attacked about two weeks later, around July 28, 2020, to interview him.

25.     While I have been in D-5, I have heard Sergeant Dotey, the second watch D-5 sergeant, threaten people on the unit.  For example, he and the officers who work for him frequently tell people to stay in their cell.  Although my unit is a segregation unit, people go out to go to yard and go to EOP treatment.  We are escorted when we leave our cell, which creates a lot of work for these officers.  They say that if the person comes out, they will be "stomped out."  This discourages us from getting out of our cell to receive the medical and mental health treatment we need.

26.     I recently witnessed Sergeant Dotey and two officers, Officer Rodriguez and Officer Castellano, threaten my neighbor with harm.  A few days after I arrived in D-5, my neighbor was talking to Sergeant Dotey.  I went to my door to hear what was going on.  Sergeant Dotey told my neighbor, "I just heard some shit about you that I don't like.  I also heard about an IEX you did.  You can get a fade."  A fade is a one-on-one fight.  Sergeant Dotey told my neighbor that he would take off his badge and utility belt if they fought.  Sergeant Dotey also told my neighbor that he would tell his officers not to get involved if they fought, and that he would not give my neighbor an RVR for this fight as long as no one filed a 602 about this.  My neighbor refused to fight Sgt. Dotey, and since has been called a coward for not fighting by Sgt. Dotey and his officers.  They have also told him that he "better not come out" of his cell for anything, including mental health ducats, preventing him from getting help he needs as an EOP patient.

27.     Shortly after my neighbor was threatened and asked to fight, LAC ISU officers came to interview me and this person that had been threatened.  I was interviewed about this again about a week after the first interview by five ISU sergeants.  I told them everything about what had happened.  Very recently, my neighbor who Sgt. Dotey tried to fight had been released from D-5 to a mainline unit on D-Yard.  I believe Sgt. Dotey is trying to harm my neighbor because this person who was released to mainline told me that he had a documented enemy on the mainline units on D-Yard, and cannot go to B-Yard or C-Yard at LAC due to his case factors and mental health level of care.  He also cannot

1    transfer to a different prison at this time due to COVID-19.  I have no idea where he has

2    gone, but I am worried his life is in danger.

3         28.    Sergeant Dotey and his officers frequently attack people in the unit when

4    they are already handcuffed.  For instance, I heard from multiple other incarcerated people

5    in D-5 that shortly before I got to D-5, Sergeant Doty, Officer Rodriguez, and Officer

6    Castellano handcuffed another incarcerated person, picked him up, and slammed him

7    down into the ground face and head first.  Apparently he had very serious injuries—he

8    looked badly beaten up and had blood and bruises on his face.  The other people on the

9    unit told me they were very worried about this person because he is severely mentally ill

10   and elderly.  He did not do anything to the officers and was handcuffed, but they assaulted

11   him anyways.

12        29.    On July 8, 2020, Sergeant Dotey, Officer Castillo, and Officer Frakin

13   attacked this person again.  I witnessed this assault, as I had moved into D-5 around this

14   time.  Around 9 a.m. that day, this person was taking a shower and Sergeant Dotey and the

15   officers entered the shower while this person was naked, grabbed him, and paraded him by

16   walking him from the shower all the way down the tier.  This person tried to lay down on

17   the ground, and the officers started kicking him.  After kicking him, they dragged him into

18   his cell.  I could not see inside his cell easily, but I could hear the staff hitting him and

19   yelling at him inside the cell.  When they were finished assaulting him in the cell, I

20   watched the staff leave the cell.  Both my neighbor and I decided to document this incident

21   by writing down what happened because we were very concerned.  In early August 2020,

22   mental health clinicians placed this person on suicide watch.  About a day into suicide

23   watch, he was moved out of the unit.  I asked my clinician where he went, because I was

24   concerned for his safety.  My clinician told me he had moved to the MHCB.

25        30.    I have also seen officers especially mistreat people in C-Section of D-5.  I

26   used to live in C-Section, but now live in A-Section.  C-Section is known as being the

27   place that Lieutenant Williams and Sergeant Dotey have put incarcerated people that have

28   been charged with indecent exposure ("IEX") rules violations.  Officers see this section as

containing the problematic people in the unit, and the officers treat the people there as such.  They are extremely disrespectful of the people in C-Section and do not afford people their rights there.  I lived in C-Section up until recently, even though I have never engaged in or been charged with IEX, because there were supposedly no other cells available when I first arrived in D-5.  In C-Section, I and others were routinely denied yard, showers, and phone calls.  There are also no cell cleaning unit staff, so everyone's cells stay dirty.  Officers would stack big toilet paper boxes in front of the cells and the showers so that people could not look at female staff members in the tower.  This is extremely dangerous because if an incarcerated person cannot see out of the cell or shower, the tower officers cannot see into the cell or shower to see what is going on.

31.    I and others on the unit filed numerous requests reporting the conditions and asking for interviews with Lt. Williams about these conditions in C-Section.  However, I heard Lt. Williams say, even after we sent these requests and reports, that she has not received any requests from people in the unit reporting any problems.  This means she is either lying to us, or her staff are throwing the requests away before she can see them.

32.    I have continually had trouble getting medical treatment and disability accommodations while at LAC.

33.    Yesterday, I was supposed to go to Bakersfield to meet with my orthopedic surgeon as a pre-appointment to my orthopedic surgery.  Around 6:45 a.m. yesterday morning, officers came to my door to tell me that the two vehicles with lifts, which are used to transport people with mobility disabilities like myself, were unavailable.  They told me I could get in a vehicle without a lift, or not go to my appointment.  I told them I could not go without the lift and showed them my accommodation chrono saying that I needed a lift in any vehicle I went in.  After talking with the officers, medical staff are supposed to come to my cell to check and make sure that I actually refused the medical appointment.  No medical staff member ever came to my cell to ask me to sign a form saying I refused my appointment.  Every time I go out to the hospital, I have been able to access a vehicle with a lift, and staff generally know this about me and are able to make sure I have a

1   vehicle with a lift.  I believe that custody staff were purposefully preventing me from

2   going to my appointment and shielding this from LAC medical staff as retaliation for

3   reporting staff misconduct.

4            34.     In my time at LAC, there have been many times I have needed help and been

5   afraid to ask for it.  Because of my medical conditions, disabilities, and mental illness, I

6   rely heavily on staff for help.  Given all the staff misconduct I have experienced,

7   witnessed, and heard about, I am afraid every time I ask staff for help, even though I have

8   to ask staff for help or else I would not be able to survive.  I am especially vulnerable due

9   to my vision impairment, and feel unsafe oftentimes because I cannot see what is going on

10   and have to trust these corrupt officers and sometimes the incarcerated people that work

11   with them.  This places my life and danger and makes me afraid to ask for assistance, even

12   though I need it.  For instance, when I needed assistance with my medications from the

13   nurses in C-1, they used my medical information against me and threatened my life,

14   causing me to have to defend myself and get charged with a serious crime in the process.

15            35.     In my opinion, staff target people with disabilities and vulnerable prisoners

16   with staff misconduct.  I and others with disabilities can be taken advantage of in a way

17   that prisoners without these disabilities cannot be.  Staff know this and use my inability to

18   see and move easily against me.  They know they can get away with harassing and

19   threatening me because I cannot defend myself as well as a person without disabilities.

20   Staff also know I and others with disabilities cannot avoid them, because we have to

21   interact with them and get help from them.  Because of this, staff have a control over us

22   that they can use to make us do what they want and to abuse us when they want to put us

23   in our place.

24            36.     I believe the reason there is so much staff misconduct at LAC is because

25   officers function like a gang, and are allowed to run the units and do whatever they want.

26   The lieutenants and LAC administration do not intervene even when they know that people

27   in these units are being abused.  In addition to custody staff covering for each other,

28

medical staff also work with the officers to cover up misconduct.  Because of that, people do not get the care they need even after they are assaulted and mistreated.

37.    I have been at many high security prisons in CDCR at many different times throughout the last thirty years—CSP-Sacramento, Pelican Bay, Mule Creek, California Medical Facility, Salinas Valley, Richard J. Donovan, California Health Care Facility, Solano, and San Quentin—and LAC in 2020 is the most corrupt and dangerous prison at which I have ever been housed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 26th day of August, 2020.

On August 26, 2020 due to the closure of LAC in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ███████ by telephone. ███████ orally confirmed that the contents of the declaration were true and correct. ███████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 26, 2020

Emma Cook

# Exhibit 8a

## Filed Under Seal

# Exhibit 9

**DECLARATION OF ███████████**

I, ████████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ████████.  I am currently housed at California State Prison-Los Angeles County ("LAC") on Facility D in Building 5.  I am 37 years old.

3.      I am a *Coleman* class member.  I am at the Enhanced Outpatient Program ("EOP") level of care, which means I am housed in a special housing unit with other EOP patients, and that I receive about 10 hours of structured groups and other mental health care each week.  I have been at the EOP level of care for most of my time in CDCR.  I suffer from anxiety and depression.  I also struggle with ongoing suicidality.  I have attempted suicide a few times during my stay in CDCR.  Most recently, in late June, I tried to hang myself in my cell while I was on suicide watch.  I have also tried to commit suicide by ingesting razors.

4.      I have been housed at LAC from December 19, 2018 to now.

5.      During my time at LAC, I have been housed in the following locations: D-Yard Building 3, and D-Yard Building 5, which is the EOP Administrative Segregation Unit ("EOP ASU").

6.      I have been a victim of staff misconduct at LAC.

7.      On July 8, 2020, I had just gotten off suicide watch and was scheduled to go to an Interdisciplinary Treatment Team ("IDTT") meeting that day.  An IDTT is a meeting where an incarcerated person in the mental health system meets with their team of clinicians that work with them on mental health issues.

8.      Officer Rodriguez, a floor officer in D-5, escorted me to IDTT.  As he was escorting me, he said, "What's up with your neighbor?  He's a rat." I asked what he meant by this.  He said that my neighbor, ████████████, had been talking to the Investigative Services Unit ("ISU") and other agencies.  Officer Rodriguez then asked me, "If you were

walking with me, could you fuck someone up for me?" He then asked me more about how I would kick and attack someone while walking. It was an odd conversation, and I tried not to engage with what Officer Rodriguez was saying. I did not question him at the time because I did not fully understand what he was asking me.

9.      After my IDTT meeting, Officer Rodriguez came to escort me back to D-5. As he started to walk me back to D-5, he asked me, "Could you fuck your neighbor up for us?" referring to Mr. ███. I asked him who "us" was. He said, "me, Cas, and Dotey", referring to Officer Castellanos, another D-5 floor officer, and Sergeant Dotey, one of the sergeants that works in D-5. Officer Rodriguez then told me that he heard that Mr. ███ was going to report the misconduct that Sergeant Dotey had been doing. He told me that Sergeant Dotey would be able to get me out of D-5 if I did this. I took from this conversation that he wanted me to attack Mr. ███ because he had reported staff misconduct. I told him I would not attack Mr. ███, and I was going to be leaving D-5 soon.

10.      Mr. ███, like myself, suffers from mental illness and is in the EOP program. He is also severely vision impaired and mobility impaired, which makes him extremely vulnerable. I thought it was cruel for the officers to even be thinking about harming him.

11.      The next day, on July 9, 2020, I was scheduled for Institutional Classification Committee ("ICC"), a hearing in which staff and incarcerated people discuss housing decisions, and was prepared to discuss my release from the EOP ASU. I figured that I would be getting out of D-5, as my 90-day maximum punishment for the rules violation that had placed me in the ASU had finished a while before. On July 8, 2020, shortly after I refused to attack Mr. ███, Officer Rodriguez came to my cell and said "Well, it looks like your name has been scratched off the list for ICC." He was laughing and walked away before I was able to say anything.

12.     I believe that Officer Rodriguez and Sergeant Dotey somehow got my name taken off the ICC list because I refused to attack Mr. ████ and take the deal from Officer Rodriguez to be released from the ASU.

13.     That same day, I told Mr. ████ what had happened to make him aware that Sergeant Dotey, Officer Castellanos, and Officer Rodriguez were trying to get him attacked. I also decided to provide him a declaration about what happened that he could use in support of his 602 staff complaint reporting the misconduct against him. He submitted his 602 that day. I also submitted a separate 602 myself on July 29, 2020, reporting that the officers had asked me to attack ████████. I have not received a log number for this 602, over a month later.

14.     I speculate that the officers are going to try to force me to withdraw my 602 in exchange for being released from D-5 back to the mainline at my next ICC. I have asked my counselor when I am going to be re-scheduled for ICC. She told me, "I don't know and I don't care." I was recently told that I should have an ICC soon, but I am not sure it will actually happen. Even if I was to move off the yard, I am worried about leaving Mr. ████ behind. I am also worried about my safety, as the officers at LAC all seem to know each other and reporting staff misconduct in D-5 still could get me attacked on another yard.

15.     Three ISU officers—Sergeant Coker, Lieutenant Romero, and an officer whose name I do not know—came to speak with me on July 28, 2020 about Mr. ████'s allegations. I was taken to the back room of the mental health building for the meeting. The ISU officers seemed to be pushing against my story. Lieutenant Romero asked me, "How do we know that you're not mad we didn't give you what you asked for?" I asked him what he meant, as I had no idea what he was talking about and had not asked for anything. He suddenly looked at the recorder and seemed to realize that I was serious and I was not reporting this just to get privileges or other special treatment. I have not heard anything more about the ISU investigation since that meeting.

16.     After I met with ISU on July 28, 2020, and submitted my 602 the next day, July 29, 2020, the harassment against me increased.  On August 10, 2020, Officer Castellanos was escorting to me to yard around 8:30 a.m. or so when he asked, "Is everything cool with us?"  I said yes, everything cool.  "If me and you got a problem, we can talk about it?" he asked.  I said yes but did not say much more.  It seemed he was trying to say that he and I had an issue with each other, because I had refused to attack Mr. ██████ for him, Officer Rodriguez, and Sergeant Dotey.  The conversation ended when I was placed in the cages on the yard to have my yard time.

17.     After yard ended around 10:40 a.m., Officer Castellanos came to escort me back.  I thought we were going back to my cell in D-5, but he stopped with me at the sergeant's office on the way back.  Sergeant Dotey was in the office when we stepped in.  Sergeant Dotey said, "You?" in a shocked voice.  I said, "Me what?"  He said, "You going to do some shit like this?"  I asked him what he meant.  He said, "You joining in on the bullshit your neighbor is doing?"  He asked me why I was reporting "his" officers.  Sergeant Dotey told me his officer, referring to Officer Rodriguez, would never have asked me to attack someone.  I said, "You don't know what the fuck your officer told me."  He then said something along the lines of, "we will handle you", and did not say anything else.  I felt unsafe at this point and asked to go back my cell.  Officer Castellanos escorted me back to my cell.  He was quiet during the walk.  It seemed like he was in awe that I had stood up to Sergeant Dotey.

18.     On August 14, 2020, Officer Rodriguez came by my cell to do a security check when I was bird-bathing, or cleaning myself with water and soap in my cell.  He said, "Let me see your face ██████, make sure you're alright."  His voice did not sound normal, so I did not know it was Officer Rodriguez.  I opened the privacy curtain to let him see my face.  He said, "I don't care about your bird-bathing, you rat bitch.  Let me see your pussy."  Within minutes, he came back, opened the food port, and snapped the privacy curtain while I was naked.

[3596457.3]

4

19.     I submitted a 602 regarding this harassment.  I also reported this to my mental health clinician during a meeting with her the same day, and she told me she would report it so that I could get a PREA evaluation.  I never received any PREA evaluation or follow up.  I never received a log number for my 602, either.

20.     Being asked to assault Mr. ████, and the subsequent retaliation by staff, caused my anxiety and depression to skyrocket.  I did not sleep for days after I was asked to attack him, and I am still not sleeping well.  I am feeling extremely lost and do not believe that I will make it through this.  I have asked my mental health clinician to help me, but so far I have not received the help I need.  Every time I go to my clinicians, they let me talk but do not act on what I am saying or seem to report the misconduct we discuss.

21.     I was feeling suicidal in the weeks after July 9, 2020.  I reported my suicidality to Rosen Bien Galvan and Grunfeld in late July 2020, and my clinician, Ms. Brooks, came to meet with me.  Before these events, Ms. Brooks seemed to be close with the officers.  Since meeting with me in late July 2020, I have seen her gradually move away from the officers and talk with them less and less on the unit.  I do not fully trust her, but I have been able to work with her a little more frequently.

22.     In addition to threats and assaults, there is little to no due process at LAC, especially in D-5, where many of the patients have been charged with at least one rules violation report.

23.     At ICC when I got to the ASU on April 9, 2020, I told the members of my ICC that my placement in ASU was unjustified, because I had been placed there for contraband, which was not a very serious charge.  Warden Johnson, who was present at my ICC, looked at the paperwork and said he was fine with me going back to the yard and that I should not be placed in segregation.  The captain at the hearing, Captain Shumaker, turned to him and said, "This is going to be a deadly weapon if I want it to be."  Captain Shumaker was suggesting that my charge be elevated to the highest level.   At this time, I had not yet had my RVR hearing determining my punishment for the contraband.

24.     I had my RVR hearing for the contraband on April 20, 2020.  When I arrived at the hearing, Captain Shumaker was already there.  Before the hearing started, Captain Shumaker told the lieutenant running the hearing whose name I do not remember, "Find him guilty of the highest charge, manufacturing a deadly weapon."  Both Captain Shumaker and Sergeant Dotey were at both the April 20 RVR hearing and my ICC on April 9, 2020, which is against policy.  I was found guilty of the charge of "manufacturing a deadly weapon."  I was given a maximum 90-day term in segregation.

25.     I filed a 602 about Captain Shumaker impacting my hearing on May 21, 2020.  My 602 was denied on the grounds that that my 115 hearing did not start until Captain Shumaker left, so he could not have influenced the outcome of the hearing.

26.     While the entire culture at LAC is terrible, there are a few officers that are especially bad.  For example, Officer D. Moisa, an officer that used to work in D-5 and was recently promoted to the gang investigations unit at LAC, does whatever he wants.  I have witnessed him set up fights between incarcerated people, plant evidence to charge people he does not like with false charges, and assault people.

27.     Officer Moisa frequently will charge people with false rules violations after they have reported him for misconduct.  He will also write confidential informant reports that falsely note people as confidential informants, or document enemy reports that are not accurate.  These reports manufacture conflict that is fake so that one of the people involved in the fake conflict is either moved out of the unit or kept in the unit when they do not want to be there.  He does this to incarcerated people he finds problematic.

28.     I have experienced Officer Moisa manipulating peoples' housing placements in order to reward certain incarcerated people and punish other incarcerated people.  Shortly after I submitted a 602 reporting what had happened at my initial ICC on April 9, 2020, while I was in D-5, Officer Moisa wrote that me and another person on mainline would have enemy concerns with each other.  I received this report on May 27, 2020 from counselor Soto at my cell door.  The report stated that a confidential informant had told officers that I was his enemy.  That person was not my enemy, but Officer Moisa

1  documenting that we were enemies kept me in the ASU.  I told Counselor Soto this

2  document was false, but she just walked away from my cell.

3      29.    On May 31, 2020, I filed a 602 reporting this document about my enemy

4  concerns was fake.  This 602 vanished, and I never received a log number or response.

5  When I asked the appeals office, they told me they never got that 602.  Sergeant Dotey told

6  me after this, when we were still on decent terms, to stop writing 602s because the warden

7  told him that Officer Moisa was writing too many of these reports.

8      30.    I have witnessed staff engage in misconduct against other people at LAC

9  continually throughout my time here.

10      31.    For example, in early July 2020, a nurse named Fletcher was giving another

11  incarcerated person his insulin shot.  LVN Fletcher poked him a little hard with the needle

12  and he yelled "bitch!"  Suddenly, I saw Sergeant Dotey run over and slam this person

13  head-first on the ground.  The impact of Sergeant Dotey slamming the head was so great

14  that the floor shook.  There was blood oozing from the person's head.  Lieutenant

15  Williams came onto the unit right after this person was assaulted and demanded that he get

16  medical attention.  I believe this person would not have received treatment if Lieutenant

17  Williams had not intervened.

18      32.    I still have to interact with the officers that were involved in the staff

19  misconduct against me and that I have witnessed.  Because D-5 is the only ASU where

20  EOP patients like myself can be housed at LAC, we are constantly around the same

21  officers unless we finish our segregation term or get removed from the unit for some

22  reason.

23      33.    I have barely come out of my cell over the past couple months because I fear

24  being assaulted and experiencing more harassment than I already have.  My mental health

25  has suffered greatly.  I barely attend my mental health groups.  I also do not go to shower

26  or go to yard when Officer Rodriguez is working, which is five out of seven days of the

27  week.  I have also had mail that I sent to family returned to me, and my family has had

28  mail they sent me returned to them.

34.     I did not have these issues prior to reporting the staff misconduct against Mr. ███ and me.  I was someone who got along with most of the officers and other incarcerated people and attended my mental health groups.  These events over the past couple months have completely changed my experience at LAC.

35.     I am afraid to ask staff to see mental health, to ask them for a shower, or ask about why my mail is being messed with, because I fear they will make the situation even worse than it already is.

36.     In my opinion, staff target people with mental illness and disabilities with staff misconduct.  In D-5, every person has mental health issues and is at the EOP level of care, and many of the patients also have developmental disabilities and are part of the developmental disability program ("DDP"), a program that provides assistance and accommodations to people with developmental disabilities.  Many of the patients also have physical disabilities and/or serious medical conditions.  In general, everyone in D-5 is vulnerable to some extent.  The officers in this unit know this and use this to wield power because they know that people on this unit do not have the power to speak up.  We are stuck between a rock and a hard place where we need staff to help us even though we are assaulted and mistreated by them.  Because we are vulnerable and have these issues, staff do not believe us or trust us.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

37.     I believe the reason there is so much staff misconduct at LAC is officers and other lower level custody staff are not held accountable.  Captains and the warden let the sergeants and officers dictate how things operate.  Because of this, officers can do whatever they want.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 1st day of September, 2020.

_____

On September 1, 2020, due to the closure of California State Prison-Los Angeles County in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ███████████, by telephone.  ███████████ orally confirmed that the contents of the declaration were true and correct.  ███████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 1, 2020

_____
Emma Cook

# Exhibit 9a

## Filed Under Seal

# Exhibit 10

**DECLARATION OF** ██████████

I, ██████████ declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ██████. I am currently housed at California Health Care Facility-Stockton ("CHCF") on B-Yard in the Psychiatric Inpatient Program ("PIP"). I am 28 years old.

3.      I am a *Coleman* class member. During my time at LAC, I was at the Enhanced Outpatient Program or "EOP" level of mental health care. EOP patients live in separate housing units with other EOP individuals, where we are supposed to receive enhanced mental health care including 10 hours each week of structured therapeutic activities and frequent meetings with our case managers.

4.      My mental health condition is Bipolar Disorder. It causes me to have mood swings. At times I also struggle with depression. I also have a Penal Code 2602 Order in place allowing CDCR to medicate me against my will. However, I currently understand my need to take mental health medications to be well. At times when I am feeling depressed, I experience suicidal ideation. In the last few years, I have been sent to a crisis bed unit multiple times due to suicidal ideation.

5.      Following the staff misconduct I experienced at LAC, described below, my mental health deteriorated to the point where I needed more intensive mental health services than the EOP program provides. As a result, I am now housed in the Psychiatric Inpatient Program ("PIP") at CHCF. Psychiatric Inpatient Programs are licensed psychiatric hospitals that provide intensive mental health treatment to individuals who struggle to function in an outpatient program or a shorter term inpatient program.

6.      I was housed at LAC from August 22, 2019 to October 23, 2019.

7.      During my time at LAC, I was housed in D-Yard, Building 3 and for several weeks in the MHCB unit, before being transferred to CHCF to the PIP.

8.      I was a victim of staff misconduct at LAC.

9.      On September 30, 2019, the day before the incident of excessive force and staff misconduct, I was involved in an argument with another incarcerated individual in the D-Yard, Building 3 EOP housing unit.  The other individual threatened to stab me if I remained on D-Yard.  We were arguing and the individual ended up threatening me.

10.     I reported my resulting safety concerns to Officer Oliver, a third watch officer in the housing unit.  However, Officer Oliver told me, "I don't give a fuck," and walked away.

11.     The next morning, October 1, 2019, during breakfast at approximately 6:00 a.m., I again reported my safety concerns, this time to a female officer, who replied, "We'll get you out of this [unit]," before walking away.  After two hours of waiting, the female officer returned to my cell at around 8:00 a.m..  I told her that I was feeling suicidal.  The female officer left to find a member of mental health staff.

12.     Approximately two hours later, at around 10:00 a.m., my clinician came to see me at my cell front.  My clinician told me, "I'm going to get you to a crisis bed, hold tight," before walking away.

13.     I then waited in my cell for another seven hours.  I was never taken to a crisis bed.  As time passed, I became increasingly panicked.  I was worried that staff were ignoring my safety needs and that I would end up getting badly hurt.  I was scared.

14.     At around 5:00 p.m., officers on third watch came through the unit to provide dinner.  As the officers passed out dinner trays, I yelled, "When are you guys going to get me out of here?"  In response, Officer Oliver locked my tray-slot and told me I would not receive any dinner.  He then walked away.

15.     Next, I yelled, "Hey Oliver, come back here."  At this point, LAC staff members allege that I threw bodily fluids toward Officer Oliver.

16.     Officer Oliver yelled for the control tower to open my cell and then pepper sprayed me through the open door.  After pepper-spraying me, Officer Oliver told me to lie on the ground in my cell and crawl out of my cell on my hands and knees.  I complied with his request.  Once I crawled out of my cell and lay on the floor of the second tier, Officer

1  Oliver directed me to put my hands behind my back.  I did so.  However, Officer Oliver

2  punched me twice in the face with a closed fist before cuffing me up.

3       17.    Officer Mobley and three other officers then escorted me out of the unit and

4  brought me to the gym.  After closing the door to the gym, the officers knocked me to the

5  ground and repeatedly kicked and punched me in the face and body.  The assault lasted for

6  about half a minute.  I was still cuffed up behind my back and unable to block their blows.

7  I was terrified because there was no one present but the officers who were assaulting me.  I

8  was worried the assault would not end and that I would be badly injured.  I believe I lost

9  consciousness during the assault.  I am not completely sure how long I was out, but I

10 believe it was a brief period of time.  When I woke up I was very disoriented and in pain.

11 My right eye was swollen shut.

12      18.    I was then placed into a holding cage in the gym before being brought to the

13 Treatment and Triage Area, or "TTA," which is a medical clinic at a central location in the

14 prison.  At the TTA, nursing staff evaluated me.  The nursing staff documented that I had a

15 possible facial fracture to my right orbital bone in addition to multiple scratches and

16 abrasions to my face, head, and body.  I informed nursing staff that I had been assaulted by

17 officers.  After the evaluation, I was transferred to the Palmdale Regional Hospital, where I

18 received an X-ray for my facial fracture and stitches for the cuts around my right eye.  I

19 was then discharged back to LAC.  I have been told that these injuries are all well

20 documented in my medical records.

21      19.    When I returned from the hospital, I was evaluated by mental health staff

22 who referred me to a mental health crisis bed because my mental health condition had

23 deteriorated a lot and I was feeling suicidal.  I had already been in distress before the

24 assault, but my mental health deteriorated significantly as a result of the assault.  While in

25 the crisis bed on October 2, 2019, a Sergeant and Lieutenant conducted a videotaped

26 interview of me due to my excessive use of force complaint and my documented serious

27 bodily injury (the broken orbital bone).  The officers did not ask me for the names of

28 witnesses to the incident and ended the interview after only ten minutes.  The officers were

1  not sympathetic and did not seem interested in my story.  Except for this interview, no one
2  investigating the use of force has spoken to me about the incident.

3      20.    I filed a 602 about the incident the morning after I was assaulted.  I have
4  never heard anything back about it.

5      21.    Although I suffered from mental health issues prior to this excessive use of
6  force incident, I have gone downhill since LAC staff beat me up.  In the months following
7  the assault, I also became suicidal and experienced thoughts of violence towards others.
8  On October 21, 2019, I was written up for threatening a psychiatrist at LAC.  I was just
9  mad because I did not think my PC 2602 Order was valid and they were extending it.  In
10  general I was just not doing well, and I became furious with him.  I now believe this
11  behavior was a symptom of my mental health declining after I was assaulted.

12      22.    The main injury from the assault I experienced was the fractured orbital bone
13  below my right eye.  The injured has healed over time, but it was very painful for several
14  weeks.

15      23.    I received an RVR for gassing Officer Oliver.  My RVR has not been
16  adjudicated.  I believe the RVR was related to my mental health condition because at the
17  time of the incident I was feeling very suicidal and very scared for my safety, and I was
18  not thinking clearly.

19      24.    Since the incident, I have been in the PIP at CHCF.  My mental health has
20  been improving.

21      25.    I have not had to interact with the officers since the assault, because I was
22  moved immediately afterward to the MHCB unit and then the PIP at CHCF.

23      26.    I believe the entire incident I experienced could have been avoided if LAC
24  custody staff were better trained in how to respond when someone is having a mental
25  health crisis.  At the time of the incident, I felt unsafe and suicidal.

26      27.    In my opinion, some staff at LAC harass people with mental health issues.  I
27  am not sure why they do this.

28

[3577482.1]                                                    4

28.     I believe I was beaten in the gym because there are no cameras there and there were no witnesses to the beating except for the officers involved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Stockton, California this 14th day of July, 2020.

On July 14 2020, due to the closure of CHCF in light of the COVID-19 pandemic, and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CHCF,  I read the contents of this declaration, verbatim, to ▉▉▉▉, by telephone. ▉▉▉▉ orally confirmed that the contents of the declaration were true and correct. ▉▉▉▉ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: July 14, 2020

Thomas Nolan

# Exhibit 10a
## Filed Under Seal

# Exhibit 11

**DECLARATION OF** ████████

I, ████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at California State Prison- Los Angeles County ("LAC") on Facility B in Building 1. I am 27 years old.

3.     I am a *Coleman* class member. I am at the CCCMS level of care. I suffer from bipolar affective disorder. Because of this, I periodically have very bad mood swings. I also sometimes feel depressed and angry. In the past year, I have also experienced terrible nightmares. When I have these, I sleep very little, which makes my other mental health issues even worse. Recently, I have been doing better and not experiencing these symptoms as frequently as I was a few months ago. I still have nightmares periodically but have been sleeping a little bit more recently. At the time of the staff misconduct incident described below, I was not on the mental health caseload despite my history of mental health issues, because I was managing my symptoms fairly well. After the incident described below, and because of it, I entered the mental health system in late October 2019, because I was experiencing a lack of sleep, increased anger, and increased stress. My depression also increased. During my initial meeting with my clinician after I entered CCCMS, he told me I was suffering from post-traumatic stress disorder ("PTSD") symptoms due to the staff misconduct I had experienced.

4.     I am not a member of the *Armstrong* class, but I believe I have an undiagnosed learning disability. I struggled to understand things in school growing up and sometimes have issues understanding things in prison that I read or hear. It also takes me a while to write everything down and convey it in a way that makes sense to me and others reading it.

5.     I have been housed at LAC from January 11, 2017 to now, with the exception of a month and a half period when I was at RJD, from July 31, 2019 to

1  September 15, 2019.  I went to RJD for this period to be in a segregation unit after being

2  charged with my Rules Violation Report ("RVR"), described below.

3    6.    During my time at LAC, I have been housed in the following locations: B

4  Yard, Building 1, B Yard, Building 3, and B Yard, Building 5.

5    7.    I was a victim of staff misconduct at LAC.

6    8.    On July 14, 2019 around 10 a.m., packages were getting passed out to people

7  in my housing unit at the time, B-5.  The tower officer whose name I do not know popped

8  my cell door open to let me out to get my package.  When I got to the gym where packages

9  were being distributed the staff member handing out packages whose name I do not know

10  told me I was on loss of privileges ("LOP"), meaning that, among other restrictions, I was

11  not allowed to get packages.  I was very confused about this because, to my knowledge, I

12  was not on LOP at the time, and therefore should have been getting my package that day.

13    9.    I asked to speak to Sergeant Mendoza, a Sergeant on B-Yard.  The officer by

14  the gate to the gym in B-5 told me that Sergeant Mendoza was in B-3 at the time.  I walked

15  over to B-3 to try to find him.  I stood in front of the B-3 gate and told the tower officer

16  that I needed to speak to Sergeant Mendoza.  They called Sergeant Mendoza over.  I asked

17  him if he could fix what was in the computer because I had been wrongly made LOP.  He

18  did not respond to my question, and said "cuff up I'm walking you back."  I complied and

19  was handcuffed, and Officer Serrano walked me back to B-5.  Before we left B-3 near the

20  gate, Officer Serrano slammed me on the ground face first.  As I was on the ground laying

21  on my stomach, he got on top of me and placed his knee on my head, driving my head into

22  the ground.  I was handcuffed the entire time.

23    10.    While I was on the ground, about five other officers responded to the scene

24  and they all with Officer Serrano picked me up and walked me to the gym.  At the gym,

25  they placed me in a holding cage and told me to take off all my clothes.  There were about

26  ten officers surrounding me at the time.  At first I was refusing to take off my clothes, but

27  one of the officers threatened to spray me if I did not take them off.  Then I consented and

28

[3586306 2]                                    2

took my clothes off.  Right after they had me stripped down, a nurse whose name I did not know came.  I was telling the nurse I was bleeding from my face and my leg, but the nurse barely looked at my injuries and suddenly left.  She filled the 7219 form documenting my injuries, but did not really evaluate me.  I was too afraid to plead for medical help from the nurse because there are no cameras around the gym, and I was worried that medical staff would not take me seriously and would tell the officers I was requesting help, or the officers would see me requesting help and assault me again.

11.    After I saw medical, I was taken to the ASU.  I had a really bad headache from Officer Serrano slamming my face into the ground and putting his knee into my head. I had scratches on my face.  My back also really hurt.  I never received medical attention after Officer Serrano assaulted me.  I learned later when I got the incident report that a nurse had filled out a 7219 and said I had some marks on my face and legs, but did not fully describe my injuries.  I never received any sort of medical attention for my injuries, and they had to heal on their own.  My scratches lasted for about a week or two.  I still have headaches and pain in my face, more than a year later.

12.    When I was sitting in the ASU, I started to get very nervous because I wasn't really thinking well and knew I had not done anything.  I believe Officer Serrano assaulted me because I am vulnerable due to my mental health issues, and because I am black. Officer Serrano is a known abuser of black incarcerated people at LAC.  Even before this assault, I heard things from other people in my unit about him intimidating and harassing other black people on B-Yard.  Because of this, I was already wary of him before this incident.

13.    On the same day of the assault, I was told I was charged with an RVR for "Assault on a Peace Officer by Means Not Likely to Cause Great Bodily Injury ("GBI")." I did not receive a paper copy of my RVR until two weeks later, on July 26, 2019.  The original RVR contains a lot of false information.  The RVR says I was yelling at the officers to get into B-3, which I did not do.  The RVR also states, accurately, that I

1  complied to being handcuffed, but falsely indicates that after I was handcuffed I started

2  flexing my muscles and resisting, and eventually started twisting my body and trying to

3  strike the officers with my body.  The RVR claims that officers had to use force against me

4  when I started resisting.  The RVR did not say anything about officers slamming my face

5  to the floor.  It also does not make sense – why would someone resist after they are

6  handcuffed and totally vulnerable?

7        14.    I did not receive an RVR hearing after getting the RVR.  On August 21,

8  2019, I filed a 602 reporting that I had not yet been to my RVR hearing, and also asking

9  that CDCR not charge me with my RVR because I never did what was said in the RVR.  I

10  also reported my injuries in this 602 and said that my mood had completely changed since

11  the attack and I was fearful of being around officers.  I also pointed out that I was not

12  resisting, I was just very tense and flexing my bicep because I was uncomfortable being

13  around a known abuser and did not like that he was wrapping his hand around my arm and

14  not my restraints.  The day after I submitted this 602, on August 22, 2019, I had my RVR

15  hearing while I was housed at RJD.

16        15.    At the RVR hearing, the Senior Hearing Officer found that I had not

17  assaulted Officer Serrano as written up in the RVR and even told me the charge did not

18  make sense as written.  They reduced the charge  from assault on an officer to the lesser

19  charge of "resisting staff", and found me guilty of that charge.  My punishment was 90

20  days of credit loss and 90 days loss of yard.  I was also sent back to LAC because I was no

21  longer being charged with a serious charge.  I believe that my charge was reduced because

22  they knew I had not done what the RVR said, but still felt they needed to charge me with

23  something to cover up what they had done to me.

24        16.    My 602 was bypassed at the first level of review and sent to the second level

25  on September 4, 2019.  On October 29, 2019, I was interviewed about my 602 by

26  Lieutenant Melendrez.  I told him I had attended the 602 hearing and we discussed what

27  had happened at the hearing.  On November 5, 2019, I received the second level response

28

to my 602.  CDCR denied my request to have the RVR removed from my file and claimed that I had been afforded due process.  I sent the appeal to the final level of review shortly after it was denied at the second level.  On March 30, 2020, I received notice from the CDCR Office of Appeals that they would not be issuing a third and final level response to my appeal due to time constraints, and the second level denial of my appeal would be the final decision.

17.    The assault made me fear for my life.  After I was assaulted, I noticed my mood completely changed.  I became scared and afraid of everything, and no longer felt comfortable alone with officers, and no longer wanted to speak with them.  The assault really emasculated me and made me feel like I had completely changed as a man.  My mental health issues were fairly under control before this incident, but after this happened I had a mental health crisis that I am still dealing with today.

18.    When I got back to LAC after going to RJD, I still had to interact with the officers that were involved in the staff misconduct against me often, even after they were accused of staff misconduct.  The moment I arrived back at LAC from RJD, Officer Serrano was there to meet me.  He walked me to the gate to go back to the yard.  He asked me if we were "good."  I was confused by this and didn't really respond.

19.    After the assault, I had a recurring nightmare for months in which Officer Serrano repeatedly slammed my face into the ground.  When I would have these nightmares, I would wake up suddenly, sweating and angry.  I could not sleep for more than about thirty minutes to an hour at a time and had to start seeing mental health regularly because I was so stressed out.  This is still happening to me about a year later, though I'm able to sleep for slightly longer stretches now.  I have asked medical and mental health for medications to help me sleep and cope with my nightmares, but they have told me that they do not issue medications for nightmares.

20.    In my time at LAC, there have been multiple times that I needed help but didn't ask for it because I was afraid of what would happen to me.  After I was assaulted, I

1   was afraid to ask for medical attention or to even tell any member of LAC staff what had

2   happened to me, because I felt they would not believe me.  I was also afraid of retaliation.

3   After the assault, when I got back from RJD, I was moved to B-1.  Officer Serrano moved

4   to work in B-1 around that time in November or December 2019.  After he moved to B-1,

5   he and other officers who work with him searched my cell randomly two times.  The

6   officers who searched my cell trashed my stuff.  I was not written up for anything and

7   never got a cell search receipt either of these times.  In the days after they searched the

8   cell, Officer Serrano came to me and told me "So, are you trying to start a lawsuit on me?"

9   I did not respond to this and walked away.  After this, I was scared and I stopped talking to

10   staff almost altogether and started to stay in my cell by myself.

11       21.    Though I was afraid after this assault, I have continued to file 602s reporting

12   this because I feel that staff should not get away with charging me and others with things

13   we did not do.

14       22.    In my opinion, staff target people with mental illness and other needs with

15   staff misconduct.  When people have more needs, staff do not want to deal with it and get

16   in their face and assault them to prevent them from asking for help.  A lot of people with

17   mental illness and disabilities have serious problems.  The officers do not understand how

18   to deal with people's problems or do not want to deal with them, which causes conflict and

19   causes them to assault us, mistreat us, and cover it up.

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28

1    23.    I believe the reason there is so much staff misconduct at LAC is because

2    there is a system of staff that cover for each other.  Officers know how to routinely abuse

3    and cover things up for people.  When I was assaulted, I felt like Officer Serrano and other

4    officers had done this before, as they knew to take me to the gym where there were no

5    cameras.

6    I declare under penalty of perjury under the laws of the United States of America

7    that the foregoing is true and correct, and that this declaration is executed at Lancaster,

8    California this 30th day of July, 2020.

9

10

11    /s/ ███████

12

13

14    On July 30, 2020 due to the closure of California-State Prison-Los Angeles County,

15    in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate

16    against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the

17    confidentiality of the legal mail system at LAC, I read the contents of this declaration,

18    verbatim, to ███████ by telephone. ███████ orally confirmed that the contents of

19

20    the declaration were true and correct. ███████ also orally granted me permission to

21    affix his signature to the declaration and to file the declaration in this matter.

22

23    DATED: July 30, 2020

24    Emma Cook

25

26

27

28
[3586306 2]

7

# Exhibit 11a

**Filed Under Seal**

# Exhibit 12

1        **SUPPLEMENTAL DECLARATION OF** ████████████

2        I, ████████████, declare:

3        1.      I have personal knowledge of the matters set forth herein, and if called as a

4   witness, I could and would competently so testify.

5        2.      My California Department of Corrections and Rehabilitation ("CDCR")

6   number is ████. I am currently housed at California State Prison – Los Angeles County

7   ("LAC") in the "Stand-Alone" Administrative Segregation Unit ("ASU"). I am part of the

8   Short-Term Restricted Housing ("STRH") program, which is a form of segregation for

9   individuals who are at the Correctional Clinical Case Management System ("CCCMS")

10  level of mental health care. I am 42 years old.

11       3.      This declaration is a supplement to the declaration that I signed regarding

12  previous staff misconduct at LAC.

13       4.      I continue to be threatened and retaliated against by staff at LAC.

14       5.      On May 13, 2020, I received the third level response to my 602 reporting the

15  assault against me by Officer R. Chirinos, detailed in my previous declaration about staff

16  misconduct at LAC. My appeal was partially granted at the third level. The appeal

17  response noted that "an inquiry was completed" by the institution and "staff did not violate

18  policy," referring to the second level response I had received, but that the examiner at the

19  third level determined "not all allegations were addressed, therefore remedy is warranted."

20  The examiner also wrote that they did not agree with the conclusion of the institutional

21  review at the second level to deny my appeal. The review to which they are referring was

22  based on my 602 interview at the second level on January 14, 2020. At this interview,

23  Lieutenant Romero tried to get me to withdraw the appeal at the second level, saying that

24  he would "help me out" if I cooperated. I shut him down right when he started try to

25  bargain with me and told him I would not cooperate or sign off and wanted to pursue my

26  appeal. He said, "Well, I will not help you and I will deny your 602." He then ended the

27  interview and was stand-offish. After this, I sent my appeal to the third level.

28

[3597373.2]                                          1

6.      The third level response to my 602 also granted me a staff separation from Officer Chirinos.  I went to Institutional Classification Committee ("ICC"), a hearing in which staff and incarcerated people discuss housing decisions, on July 27, 2020.  I was expecting to be transferred because my staff separation from Officer Chirinos had been granted in May.  At ICC, I was told by Associate Warden M. Stratman that I was going back to C-1, where I had been assaulted, because my staff separation did not matter anymore.  I asked why my staff separation did not matter, and AW Stratman told me that Officer Chirinos had been fired.  I told ICC that I could not go back to C-1 even without Chirinos there, because the officers who had harassed me and were close with Chirinos were still there.  Despite this, I was told to go back to C-1 at the end of my ICC.

7.      When I arrived back to C-1 after ICC, I complied with being housed but continued to voice my concerns about being there.  On the day I was moved to C-1, Officer B. Rodriguez and Officer C. Harris, both officers who had been close with Officer Chirinos and had been involved in his misconduct, called me a "crybaby" and a "snitch." They both used profanity against me, and both asked me, "Why did you do that to Chirinos?"  I came out of my cell later that day to ask to talk to the sergeant.  Officer Rodriguez and Officer Harris ordered me to go back to my cell.  I refused, so they placed me on the ground, handcuffed me, and placed me in a holding cage in the gym, which was filthy.  They called the sergeant while I was in the holding cage.  Sergeant Hernandez came to speak with me.  He listened to my concerns and decided to send me back to the ASU.

8.      I have also been harassed and retaliated against by staff while I have been in the ASU.  For example, there is an officer named Officer G. Shamirian who was involved in the initial staff misconduct I experienced in January 2020 in C-1.  In early June, around June 9, 2020, he was working an overtime shift in the ASU where I was housed.  On that day, he came to my cell and threatened me.  He said that if I came out of my cell for any reason like a shower or phone call he would "take me down for snitching on Chrinos" and for "writing paperwork" and "making a scene" about my assault.  I filed a 602 about this

1   immediately after it happened.  In the 602, I reported this threat and reiterated that I

2   wanted to be transferred out of LAC.  I had a staff complaint interview about this 602 just

3   under a month after the threat.  My appeal about this issue is currently pending at the third

4   level of review.

5           9.      My mother has also written a letter to the Office of the Inspector General

6   about the retaliation I have been enduring at LAC.  I have also continually written to the

7   warden almost every other day over the last couple months about this ongoing harassment

8   and retaliation.  I have received no response.

9           10.     I have also written to the warden about other vulnerable incarcerated people

10  who officers are releasing to the yard.  At the end of July 2020, while housed in the ASU, I

11  saw officers take another incarcerated person with disabilities out of his cell and release

12  him to a mainline yard.  They strapped him to his wheelchair and took him out.  Officers

13  have been telling us they are doing this because of space issues due to COVID-19.  I have

14  been very worried about people like this being released to the mainline because they are

15  extremely vulnerable and their disabilities may not be accommodated.  This incarcerated

16  person they released to the yard in late July 2020 came back to the ASU the same day.   He

17  told me that he similarly was harassed and was also beaten by Officer Rodriguez, Officer

18  Harris, and other officers in C-1.  He filed a 602 about this.  Last week, I witnessed them

19  come to his cell to do a videotaped excessive force interview.

20          11.     The physical and mental pain of my assault and retaliation are ongoing.  I am

21  still waiting an appointment for a doctor at Mercy Hospital to examine my jaw, which was

22  injured during the assault.  My mental health has also worsened significantly recently as I

23  have been worried about this constant retaliation.  I do not feel safe anywhere in this

24  prison, and fear asking for help from staff, or doing small things like coming out for a

25  shower.  I would really like to get out of LAC so I can have some peace of mind away

26  from these officers.  Even with the person who assaulted me fired, I do not feel safe being

27  here because the officers are so close to each other and will always cover things up for

28  each other.

12.     I believe that staff at LAC are retaliating against me for reporting staff misconduct and for my involvement in the *Coleman* and *Armstrong* cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 18th day of August, 2020.

On August 18, 2020 due to the closure of CSP-Los Angeles County in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ███ ███ by telephone. ███████ orally confirmed that the contents of the declaration were true and correct. ██████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 18, 2020

Emma Cook

# Exhibit 13

1       **DECLARATION OF** ██████████████

2       I, ███████████, declare:

3       1.     I have personal knowledge of the matters set forth herein, and if called as a

4 witness, I could and would competently so testify.

5       2.     My California Department of Corrections and Rehabilitation ("CDCR")

6 number is ████████. I am currently housed at California State Prison—Los Angeles

7 County ("LAC") on D-Yard in Building 4. I am 34 years old.

8       3.     I am an *Armstrong* class member. I am designated as DNH, which means I

9 have a hearing disability that does not affect my housing placement in prisons. I wear

10 hearing aids and have a hearing disability vest to help me. I also have been trying to

11 obtain a pocket talker as an accommodation, because my hearing aids do not work very

12 well in many situations when I need to hear people. I recently filed an 1824 reasonable

13 accommodation request, asking for a pocket talker, and I was told in response that I do not

14 qualify for one. However, I need a pocket talker to hear, especially when I am on the

15 phone. I have also asked to use a TDD phone, but I was told I do not qualify to use it at

16 this time. I also have a mobility impairment. One of my legs is shorter than the other one,

17 so I sometimes struggle to walk with ease. I am approved to wear orthotics shoes to help

18 me walk but they have not arrived yet.

19       4.     I am a *Coleman* class member. Up until recently, I have been housed at

20 LAC at the Enhanced Outpatient Program ("EOP") level of care, which means I am

21 housed in a special housing unit with other EOP patients, and I receive about 10 hours of

22 structured groups and other mental health care each week. I am currently still at LAC due

23 to restrictions on transfers due to COVID-19, but as of March 18, 2020, I have been

24 awaiting transfer to a higher level of mental health care in the Psychiatric Inpatient

25 Program ("PIP") at CHCF, SVSP, or CMF. Psychiatric Inpatient Programs are licensed

26 psychiatric hospitals that provide intensive mental health treatment to individuals who

27 struggle to function in an outpatient program or a shorter-term inpatient program. I am

28 currently on an order for involuntary medications. However, I recognize that I need to

1   take my psychiatric medications.  I am receiving EOP level of care treatment, even though

2   I am waiting for placement into an inpatient mental health program.   To my knowledge, I

3   am not part of a Temporary Mental Health Treatment Unit or TMHU for people needing a

4   higher level of care treatment.

5          5.      My mental health symptoms include depression and suicidal thoughts.  I

6   have attempted suicide multiple times while incarcerated.  When I am feeling depressed or

7   suicidal, I can often cope with my feelings by listening to music.  I previously received

8   intensive mental health treatment in one of the Department of State Hospitals ("DSH")

9   facilities, Atascadero State Hospital ("ASH"), from October 2018 to April 2019.

10         6.      I have been housed at LAC since sometime around late 2019 or early 2020.

11         7.      During my time at LAC, I have been housed in the following locations: D-

12  Yard, Buildings 1, 4 and 5.  D-Yard Building 5 is the Administrative Segregation Unit

13  ("ASU") designated to house only EOP patients.

14         8.      I was a victim of staff misconduct at LAC.  On April 27, 2020, Officer

15  Makarade slammed the left side of my face into a wall.  At the time, my cellie had tested

16  positive for Coronavirus, and we were not getting our phone calls.  On the day in question,

17  I refused my court-ordered medication because we were not getting our phone calls.  As a

18  result, a Sergeant Mayo came to see me, and told me I would get a phone call later that

19  day.  I agreed to take my medication.  As a result of this, Officer Makarade was mad at me.

20  When I came out to go get my medication, Officer Makarade claimed that I had some stuff

21  in my hands and was going to "gass" him.  However, there was nothing in my hands at the

22  time.  Based on the false claim I was going to gass him, Officer Makarade hit his alarm

23  and took me to the rotunda, a passageway in and out of the building where there would be

24  fewer witnesses than in the day room.  He then roughly pushed me up against the wall of

25  the corridor, grinding my face into the wall.  I had bruises on my face after the incident.  I

26  also felt his baton pressing in between my buttocks while he held me against the wall.  I

27  was in a pair of boxers at the time.  I also had bruising on my buttocks after the assault.

28  Officer Makarade was screaming at me the whole time.

9.      After the incident, I was taken to the gym.  While in the gym, a nurse named Vicente came to evaluate me and document my injuries.  She did not document any of my injuries.  I told staff I was suicidal in response to this.  When mental health came to see me, I told them about the assault, and they contacted the Investigative Services Unit ("ISU") about the assault.  Investigators from ISU came to see me right away and the ISU staff wrote down my injuries on the 7219.  Then the ISU officer had the nurse come in and she did the same documentation of my injuries.  I have not been given copies of their Form 7219 documenting my injuries, despite asking for it repeatedly.

10.      I was interviewed by ISU officers about the incident about a week after it took place.  I was interviewed by Sergeant Coker.  The interview was videotaped and lasted approximately 20 minutes.  He told me not to talk about the sexual assault part of the incident on camera, but to only speak about the use of force.  I did as he instructed.  He claimed someone else would come and talk to me about the sexual assault/PREA issue, but that never took place.

11.      I filed a 602 about this appeal about two days after the incident.  My appeal was granted at the first level.  After the appeal was granted, I sent it to the second level in Sacramento.

12.      After the assault, I was sent to the MHCB unit at LAC for 22 days.

13.      I was given an RVR in connection with the incident.  I was charged with threatening a peace officer and I was found guilty.  I believe the RVR process was unfair because staff lied and said I had feces in my hand when I came out of my cell, which was totally false.  I did have a phone book in my hand at the time.  I asked for witnesses at the RVR hearing but the hearing officer said it would not make any difference and denied my request for witnesses.  I was punished with a loss of 60 days of good time credits, 90 days of package restrictions, and 60 days of dayroom restriction.  (At the time we were not getting dayroom anyway because of COVID-19.  We would get showers and phone calls.)  I never received the final paperwork for the RVR.  On April 30, 2020, a mental health clinician conducted a mental health assessment for my RVR and determined that my

1   mental health did not play a role in my behavior.  I believe he was siding with the

2   Correctional Officers.  The clinician reported that I was doing well at the time of the

3   incident and had been going to work, but this was completely false – I had not been going

4   to work and did not even know I was assigned to a job.

5          14.     This incident had a very negative impact on my mental health.  The

6   following day, on April 28, 2020, I tried to kill myself by ingesting pills.  I was taken to an

7   outside hospital, Antelope Valley Hospital ("AVH"), around 12:00 p.m.  I returned to LAC

8   the same day and staff admitted me to the MHCB, where I stayed for 22 days.  While in

9   the MHCB, I was referred for transfer to an inpatient hospital treatment program.

10   However, I have not yet been sent to an inpatient mental health hospital program due to

11   COVID-19-related restrictions on transfer.

12          15.     I also learned that officers broke my television the day after the incident.  I

13   believe this was in retaliation for going suicidal.  I learned that my television was broken

14   the same day I was sent to an MHCB.  I was in the shower and when I came out, my

15   property was packed up and I was taken to the gym.  When I was in the gym waiting to go

16   the MHCB, I saw Correctional Officer Makarade slam my television on the counter and

17   break it.  I spoke with a Sergeant and Lieutenant about it, and they both told me my

18   television would be replaced.  I also wrote a 602 about the issue which was granted.

19   However, my television was never replaced.

20          16.     When I was in the MHCB, Sergeant Taylor threatened me by saying he

21   could kill me and get away with it.   At the time, I had just tried to hang myself, and he had

22   pepper sprayed me in my cell.  Afterwards, when I was in the shower to remove the pepper

23   spray, he came to talk to me and told me not to keep going suicidal or else he could kill me

24   and get away with it.  At the time, I believed him.  If I see him now, he laughs at me, but at

25   the time, I believed he was serious.  I was in the crisis bed struggling with depression at the

26   time, and this threat made my condition worse.

27          17.     I never heard anything about the results of the ISU investigation.

28

18.     I have not been retaliated against, but I am constantly worried I will be targeted by staff in retaliation for reporting the misconduct against me.  I have witnessed a lot of staff misconduct and retaliation here at LAC.  For example, about four months ago, I saw staff in D-4 beat up a DDP individual who had filed a 602.  My understanding is that he was taken to the hospital afterwards.

19.     Sometimes, I have to ask staff to repeat themselves because of my hearing impairment.  They tell me that they do not like having to repeat themselves.  When I struggle to hear what staff are telling me, I will often give up before really understanding what they are saying, because I am afraid they might attack me if I keep asking them to repeat themselves.  I ask my cellie to notify me about announcements in the unit.

20.     I still have to interact with Officer Makarade, who sometimes works in my building.  I will stay in my cell to avoid him when he is in the building.

21.     When I am feeling suicidal, I will not tell custody, although I will tell mental health staff.  I do not tell custody staff because they do not care, they will say, "Go ahead and do it."  They will not do anything to help unless you are bleeding or unconscious.  I have also been told by a housing unit officer here that if I go suicidal, all my property will come up missing.

22.     Although I have filed several 602 grievances, at times I have not filed a grievance because of fear of retaliation.  Sometimes staff have cautioned me against filing a 602 appeal saying, "You know what happens when you file that."

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

23.     I believe the reason there is so much staff misconduct at LAC is because staff have no respect for the prisoners here.  They do not like it when we file paperwork and retaliate against us all the time.  Because staff know I have family members who will call Sacramento if I am mistreated, I experience much less retaliation than people I see on the unit who do not have family to advocate for them.  I see retaliation against people like that all the time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 4th day of September, 2020.

On September 4, 2020, due to the closure of LAC in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ██████████, by telephone.  Mr. ███████ orally confirmed that the contents of the declaration were true and correct.  Mr. ███████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 4, 2020

Thomas Nolan

6

# Exhibit 13a

## Filed Under Seal

# Exhibit 14

1        **DECLARATION OF** ███████████████

2        I, ████████████, declare:

3        1.      I have personal knowledge of the matters set forth herein, and if called as a

4   witness, I could and would competently so testify.

5        2.      My California Department of Corrections and Rehabilitation ("CDCR")

6   number is ██████.  I am currently housed at California State Prison –Los Angeles County

7   ("LAC") on D-Yard in Building 3.  I am 36 years old.

8        3.      I am a *Coleman* class member.  I am at the Enhanced Outpatient Program

9   ("EOP") level of mental health care.  EOP patients live in separate housing units with other

10  EOP individuals, where we are supposed to receive enhanced mental health care including

11  10 hours each week of structured therapeutic activities, along with more frequent meetings

12  with our cases managers.  I suffer from bipolar disorder.  When I am having difficulties

13  relating to my mental illness, sometimes I become depressed and sometimes I become

14  manic.  At times, I also become anxious and have suicidal thoughts.

15       4.      I do not have a formal disability code, but I believe I am an *Armstrong* class

16  member due to my learning disability.  I am currently trying to get my learning disability

17  verified by CDCR.  I have struggled with learning issues since childhood.  As a kid, I

18  never completed a full grade of school and I was in special education classes.  Each time I

19  take the Test of Adult Basic Education ("TABE") for CDCR I do not understand the

20  questions, and I guess at many of the answers.  I can read basic text, but have difficulty

21  understanding text and reading complex sentences.  Because of this, filling out certain

22  legal paperwork and understanding some of the things I am supposed to do in prison is

23  difficult.  I receive no assistance for this from CDCR staff.  When I cannot understand or

24  read something, I feel stupid and worthless, which triggers my anxiety and suicidal

25  thoughts.  I also have a stutter and speech impediment, which are worse when I am

26  anxious.

27       5.      I have been housed at LAC from January 28, 2020 to the present.

28       6.      During my time at LAC, I have been housed in D Yard, Building 3, D-Yard

1   Building 2, and D-Yard Building 5, which is the EOP Administrative Segregation Unit

2   ("EOP ASU").

3          7.      I was a victim of staff misconduct at LAC.

4          8.      On April 15, 2020, I was housed in a cell in D-2 with another incarcerated

5   person who had tested positive for COVID-19, and had received his results the day before.

6   At 2:00 p.m. on April 15, 2020, I called Officer Avalos to my cell and asked him to move

7   me out of my cell.  My cellmate was clearly sick and was coughing and I felt very scared

8   that he would give me COVID-19.  It was my belief that my cell mate was actually

9   actively trying to give me the disease, because, since I was a porter who had been helping

10  serve meals to individuals in the building, he blamed me for giving him the illness.

11         9.      Office Avalos told me that when a cell mate tests positive, the cell mate has

12  to stay in the cell with him –they wanted to quarantine both of us together.  I told him that

13  I was going to exit the cell when they opened the door for the nurses to take vitals during

14  3rd watch and refuse to return.  He told me that, "If you pull a stunt like that during my

15  shift, we are going to fuck you up and charge you with battery."

16         10.     At the time, I was not experiencing any symptoms, and I eventually found

17  out I tested negative for COVID-19, so it is certain that I did not have COVID-19 at this

18  time.

19         11.     The next thing that happened was that Officer Avalos came back to the cell

20  with bags for me and my cell mate to pack our stuff to go to another cell with a Plexiglas

21  cover on the front door.   LAC at the time was using these covers to create a solid front

22  door to limit the spread of the virus between cells.

23         12.     When he brought the bags over, it was right after 4:00 p.m. count.  At the

24  time, we had a short conversation and he told me again that I was going to be required to

25  move into the other cell with my current cell mate.  Officer Avalos then walked away from

26  my cell.  I complained to people on the tier about what he had said to me.  At around this

27  time I noticed that there were several additional officers in the unit from outside my unit.

28  After dinner was served, the three additional officers were still in the unit, which made me

1    concerned they were going to use force against me.

2        13.     Shortly after that, I had a conversation with an incarcerated individual who is

3    the porter for the shift in that building.  He told me to just move, because he said, "They

4    are going to come and fuck you up.  These officers, that is what they do here.  You should

5    just move."  I made my decision right then and there that I would go to Administrative

6    Segregation rather than go to the other cell.  I believe that Office Avalos and the other

7    officers overheard this conversation.

8        14.     I was housed on the second floor.  About 15 minutes later, I heard the keys

9    of multiple officers running up the stairs.  There were about 5 officers.  They ran up the

10   stairs and had the tower officer crack open the door to my cell.  It is against policy to open

11   the door of a cell in this manner, unless there is some kind of emergency – for example if

12   someone is actively harming themselves or others.  Even if people are fighting they will

13   not open the door right away.  This was a serious breach of their security policy.

14       15.     Next the officers, including Officer Avalos, Officer Chavarria, Officer

15   Morales, Officer Ramirez, and Officer Ko, came up to my cell.  Two officers, Morales and

16   Avalos, entered into my cell.  They told me to cuff up.  I said, "Am I going to the hole?"

17   They said yes, and I allowed them to cuff me.  While I was being cuffed up, my cell mate

18   was allowed to walk to the other cell with the Plexiglass front.

19       16.     After I was cuffed, I was expecting to be moved to Administrative

20   Segregation.  However, as soon as we exited my cell, instead of heading to the stairs, the

21   officers began to pull me towards the cell on the second tier where my cell mate with

22   COVID-19 had gone.  At that time I was scared and upset, and I started trying anything I

23   could think of to keep from going into the cell.  I told the officers I was suicidal and had

24   safety concerns, and I yelled "man down," but they ignored me and continued to escort me

25   to the cell with my old cell mate.  When we got in front of the cell, the officers were trying

26   to force me into the cell with my COVID-positive cell mate.  I told them, "I am not going

27   in there," and I put my foot on the right side of the door hinges to prevent them from

28   forcing me into the cell.  As soon as I did that the officers started to attack me.  I was

cuffed at the time.  The first thing that happened is someone kicked me in the knee, forcing me down onto my knees.  Next someone grabbed my hair and pulled me backwards.  The officers were kicking me and Officer Morales was trying to punch me in the face.  I twisted onto the ground and the officers continued to punch and kick me while I was on the ground.  Officer Morales punched me two times in the face at this point.  The officers were on top of me.  The attack went on for about a minute or two before the alarm went off.   Officers Avalos and Ramirez were kicking me and at one point when I was on my side, they were dropping onto me with their knees smashing into my ribs.

17.    At the time, I was shocked and scared about being assaulted with cuffs on and having no way to block their punches or protect myself from severe, serious injury.  Later that night and the next day I experienced extreme pain.  I felt like my rib was broken, and I was sore every time I took a breath.  Later on, I also began to have pain in my knees and wrists, and pain in my back.  My wrists bled during and after the assault from the cuffs lacerating me.  Since the assault I have had a hard time running.

18.    After the assault, I was taken to the gym for an initial 7219, a form used to evaluate injuries after an incident.  The nurse, M. Jones, evaluated me and documented my injuries.  He missed a few of my injuries, so I asked for a more complete evaluation the next morning.   After the evaluation on the night of the attack, I was taken to the D-5 EOP Administrative Segregation Unit ("ASU").

19.     I filed numerous requests for medical care to treat my injuries, but most of the requests were either thrown away or ignored.  On the day of the assault, I filed a 7362 Medical Request Form asking for treatment for the pain I was having in my neck, back, and ribs.  I wrote that my pain was a 10 out of 10 and that I thought my ribs were broken.  I still did not get medical attention, and so I filed another 7362 request two days later on April 17, 2020, requesting treatment again and asking for an MRI and X-rays.  I also submitted a separate Form 7362 on April 17, 2020 reporting that I was feeling suicidal and the officers were ignoring me.  On April 18, 2020, I had been taking ibuprofen but my pain was still strong and I submitted yet another request saying I was in extreme pain.  I also

1   told them I was having shortness of breath.  In these 7362s requesting medical care, I

2   reported that these injuries were because staff had assaulted me.  I eventually was able to

3   see mental health on April 19, 2020, but I never received proper medical care.

4        20.      After the assault, for more than a day after I was placed in the ASU, I was

5   not allowed to make a report of excessive force, and was denied the names of the officers

6   who attacked me.  I was also denied medical attention and CDCR 602 Forms and CDCR

7   Form 22s, which I needed to report the assault and request information and medical help.

8        21.      Because I was feeling desperate for medical attention and information, on

9   April 17, 2020, I boarded up my cell, hid under my bunk, and told staff I was suicidal.

10  Later that day, a captain came to my cell and asked me if I was making use of force

11  allegations by an officer.  I said yes.  The next day, on April 18, 2020, I was interviewed

12  on camera about the use of force by Sergeant Hyde and Sergeant Ramsey, who is the same

13  officer that ordered me to be moved into the cell with the person with COVID-19.

14       22.      During the interview, I told these Sergeants about each injury I had and gave

15  them specific details about the assault.  On the way back to my cell from this interview, I

16  was given the 602 forms I had been requesting.  I also asked for the officers names again,

17  so that I could fill out my 602.  I was told to wait for the RVR incident reports to get their

18  names.  I then asked them for my ASU lock up order, for the 7219 report documenting my

19  injuries, and for the 1083 inventory receipt that showed the location of my property.  I

20  wanted my property report because D-Yard staff are notorious for damaging and

21  intentionally losing property after they have an incident with someone.  I was denied all of

22  these documents.  I wrote down all the things I was being denied on a 602 grievance form

23  and submitted this 602 on April 17 or 18, 2020.  Three days after that, I received my RVR,

24  the incident reports, the lock up order, the 7219 report, and the 1083 inventory receipt.

25  Once I had these documents, I submitted a detailed 602 staff complaint about the assault.

26       23.      A week after I submitted the appeal, it was returned as rejected for being a

27  duplicate of an appeal with a different log number.  I was confused, because I had not filed

28  an appeal about the assault prior to the one I had just submitted.  It later turned out that this

1   prior appeal that LAC claimed was the same, was in fact an appeal about officers in

2   Building 5 not giving me the blank forms I needed.

3        24.   Because of the rejection, I submitted a second 602 identical to my initial 602,

4   and resubmitted both of these appeals.  Another week later, both of the appeals I had filed

5   were once again rejected because they were supposedly duplicates of the same earlier

6   appeal about ASU issues with paperwork.  I requested an interview with the appeals

7   coordinator to discuss this.  I never received an interview.

8        25.   On May 13, 2020, I was called out for my 602 interview with Lieutenant

9   Soisuvarn.  At the interview, I requested to see the 602 that we were supposed to be

10  discussing, since my 602s about the assault had been rejected, to my understanding.

11  Lieutenant Sousivarn did not have the 602 with him.  I felt like I was being given the run

12  around.  Lieutenant Sousivarn asked me if I had any additional information to add to this

13  appeal.  Because I did not know what the appeal we were discussing was about, I spent 30-

14  40 minutes giving him every detail about the assault, including a list of names and cell

15  numbers of witnesses.  I also reminded him about the videotaped use of force interview

16  that showed my injuries.

17       26.   Lieutenant Sousivarn told me he would thoroughly go through the officers'

18  statements and compare them to mine.  He also said he would interview my witnesses.  I

19  told him at the end of the interview that he should investigate these officers because a lot

20  of them were already being investigated for assaulting other incarcerated people.

21       27.   I felt that the interview was productive and that Lieutenant Sousivarn had

22  listened to me and wanted to investigate my issues.  Given that I had provided him a lot of

23  information, I expected the investigation to take at least a few days or a week.  The day

24  after my interview with Lieutenant Sousivarn, on May 14, 2020, I received a response to

25  my staff complaint.  My staff complaint had been denied, and the statements in the inquiry

26  were full of lies.  Lieutenant Sousivarn had said that I had not provided additional

27  information or documentation to support my claim, even though I had provided him tons

28  of information at the interview, including witnesses.  I looked at the 602 that was attached

to the inquiry and discovered that the 602 they had interviewed me for was about an officer in a different building, D-5, who refused to give me legal supplies.  This 602 had nothing to with the officers in D-2 that assaulted me.

28.     I immediately filed a new 602 on June 7, 2020, reporting the appeals office's error and requesting that I be re-interviewed and that the appeals office process my appeal reporting the assault.  The appeals office has refused to address this 602 and correct their error.  Because of this, I have been unable to exhaust my appeals.  I recently sent my appeal to the third level with an explanation of why my appeal was delayed and why the use of force was not considered.  I have not received a response from headquarters yet.  I feel that LAC purposefully stonewalled my appeal, improperly screened out my appeals, and processed the wrong appeal as a staff complaint in order to prevent me from reporting the assault through the proper channels.

29.     I was charged with a Rules Violation Report ("RVR") for "Battery on a Peace Officer" on the same day as the assault.  The RVR contains a number of false details.  The RVR states that I was refusing to move out of my cell, then consented to moving in the cell with the person that was COVID-19 positive, then suddenly started to attack the officers.  I never consented to moving into the cell, and the officers had told me they would move me to the ASU.  The report also falsely says that I grabbed Officer Morales' baton belt with both of my hands and pushed him backwards.  The report also states that Officer Morales punched me repeatedly in the face, claiming it was because he needed  to get me to loosen my grip on his baton belt.  Officer Ramirez also claimed that I punched him twice with my left hand.

30.     Of course, it is not possible to throw punches or resist in this way with both hands cuffed.

31.     The report also says that I tried to kick Officer Ko, which I did not do.  The incident reports from various officers also report in many instances that they could not see the use of force used on me by their fellow officers, because they were distracted or trying to control me.  This does not make sense to me because all of them were close together

1   assaulting me.  The RVR also does not explain my injuries from my handcuffs.

2          32.     The RVR process for my alleged assault was also very unfair.  When I

3   received my RVR documents from my assigned Staff Assistant ("SA") for my RVR

4   investigation, I recognized that this officer, Officer B. Gonzalez, was also one of the

5   officers who had responded to my assault when the alarm was activated.  I took the RVR

6   papers from Officer Gonzalez and told her I would like a different Staff Assistant.  I later

7   got my property receipt and found out this same officer had lost and damaged 200 dollars-

8   worth of my property.  My assigned investigative employee ("IE") , Officer Jauregui, was

9   also someone who had responded to the scene of the incident.  I told Officers Gonzalez

10  and Jauregui that I did not want either of them as my SA and IE, and they just laughed at

11  me.

12         33.     A few days later, they both came back to my cell and demanded my list of

13  questions for the RVR hearing, and said otherwise they would mark me down as refusing

14  my hearing.  I explained to them that I needed more time and needed help writing my

15  questions, because of my learning disability.  They refused to help and told me I had until

16  Monday, which was on or around April 27, 2020 to provide my questions.  They came

17  back on Monday and I gave them my questions even though I was not finished with them

18  and wanted help finishing them.

19         34.     I filed multiple 22 forms after this requesting to speak with someone about

20  my issues with these officers.  I had also previously filed a 602 on April 23, 2020 reporting

21  that they were not assisting me as they were supposed to be.  I never received assistance

22  with these issues, and these officers remained assigned as my IE and SA.  Officer Jauregui

23  even wrote on my RVR supplemental forms that I had "no objections" to him being my IE,

24  even though I had repeatedly objected to this.

25         35.     I had my RVR hearing on May 13, 2020.  During the hearing, all my

26  questions for the officers involved were deemed "irrelevant."  The Senior Hearing Officer

27  for my hearing was Sergeant Hyde, the same Sergeant who had done my videotaped use of

28  force interview.  During the hearing, I raised some of the inconsistencies in the officers'

reports.  Lieutenant Legier, who was doing some of the questioning, told me in response to my concerns that these are, "Simple errors officers tend to make in the heat of battle."  I showed them my injuries and asked them to use these injuries instead of the fake 7219 form.  I was not allowed any witnesses and was not allowed to question the reporting officer.  My hearing was very short, and I was found guilty.  I lost 121 days of credit, and 60 days of canteen, phone privileges, yard, and dayroom.  I was initially given a 21-month SHU-term, but thankfully during my Institutional Classification Committee ("ICC"), a hearing in which staff and incarcerated people discuss housing decisions, my mental health clinicians stepped in and advocated for me to return to a mainline EOP unit.  I filed a 602 complaint reporting the due process violations during my RVR hearing and I have not received a response yet.

36.     Before I was released from ASU on or around June 20, 2020, I was called out to discuss my 602 appeal concerning the RVR hearing.  I attached the RVR packet to the appeal.  I received a note shortly after filing about another appeal being assigned. Next, I was called out for a second level hearing with the Lieutenant.  I asked to see the 602 that he was processing.  He showed me the appeal.  The appeal had nothing to do with my RVR.  It was about the prior complaint about the staff assistant and the investigative employee prior to my hearing.  It was the wrong issue.  I withdrew that appeal, so I could move with the real RVR appeal, which is Log No. LAC-D-20-02866.

37.     I waited for the hearing on the second level appeal of the RVR, and it never came.  I wrote to the appeals office, and they wrote me telling me both the RVR appeal and another one had been processed, completed and forwarded to me.  However, I was not given a copy of the final appeal at the second level.  I waited for the appeal and never received it.  About 30 days later, after I wrote them again, the appeals office told me to get copies from my counselor.  Once I got the copy of the RVR appeal response from my counselor, it was six days past the deadline for filing the 3rd level appeal.

38.     I have also written to Warden Johnson about this assault multiple times through letters and Form 22 requests, but have not received a response.  My family has

1  also called LAC multiple times to report what was done to me.

2      39.     I have also witnessed staff engage in misconduct against other people at

3  LAC.  Though I have only been at LAC about six months, I have witnessed multiple other

4  incarcerated people be victimized by officers at LAC.  I have also observed people getting

5  victimized by the group of incarcerated people who work for these officers.  Most of these

6  incarcerated people who work for the officers are not in the EOP program, meaning they

7  should not even be allowed to come on to D-Yard, which is an all-EOP yard.

8      40.     In addition to witnessing staff misconduct, I have also heard about different

9  officers that are being investigated for past incidents.  For example, I have been told that

10 Officer Chavarria and Officer J. Ramirez, two of the officers that assaulted me, are being

11 investigated for assaulting another EOP patient on D-Yard, ███████████, on

12 December 20, 2019.  The leadership here at LAC knows these officers are being

13 investigated for repeated assaults on EOP patients, but nothing is done about it.

14     41.     I still have to interact with the officers that were involved in the staff

15 misconduct against me.  Right now, every day, these same officers taunt me and give me a

16 hard time.  Every day they come into my building to serve meals.  They laugh at me and

17 make fun of me.  When I go to yard, they call me over to pat me down when there is no

18 reason to single me out.  When we go to yard we are just in a T-Shirt and boxers, carrying

19 our clothing.  I also have a hard time getting to the law library and getting copies of

20 appeals and legal work.  Due to COVID-19, we are required to send our materials to the

21 library to get copies made.  The way to do this is to give copies to officers to mail to the

22 library.  I have done this and many of my important legal documents are missing,

23 including supporting documents for my claim that these same officers assaulted me.

24     42.     Aside from being afraid to ask for help from staff, I have become

25 disheartened by the process of asking for help, since everyone gives me the run around.

26 When I speak with my mental health clinicians about issues with my appeals and due

27 process, they tell me to talk to my counselor about these issues.  When I go to my

28 counselor, I am told to file a 602 or 22 Form and use that process.  I have tried to use that

process extensively, but it has not worked for me.  This is an endless cycle that makes me feel like even when I do advocate for myself, I cannot get anywhere because staff are working together to prevent me from getting the assistance I need.

43.     The assaults I experienced and witnessed have made me fear for my life at LAC.  After I was assaulted, when I was in ASU, I was afraid of doing small, routine, things such as going to the shower or out to yard.  I became scared to do the things that I need to do to take care of myself and cope with being in prison.  I am also fearful every time I have to put handcuffs on, because I am afraid the officers will assault me again.

44.     In my opinion, staff here target people with disabilities and mental illness. People like myself have lots of needs and so staff get frustrated with us and also know they can get away with picking on us and assaulting us.  Throughout this process of me trying to get my appeals processed and going through my RVR hearing, staff seem to get frustrated with me because of my mental illness and learning disability.  This seems to happen a lot on D-Yard because everyone on the yard is EOP, and many people have learning and other disabilities.  This creates a situation where the officers on D-Yard are insensitive to our needs and know they can use these needs against us to assault us and get away with it.

45.     I believe the reason there is so much staff misconduct at LAC is because there is a system where the LAC administration allows officers to run the prison.  It is ridiculous to me that the Warden and other high level staff assist with covering up what goes on at LAC by signing our RVRs that have inconsistencies and not keeping staff off the units that have a history of abusing mentally ill and disabled people.  Because LAC is willing to cover up for these officers, the assaults continue.

46.     I also believe there is so much staff misconduct at LAC because there are no cameras.  If there were cameras, there would more accountability for the officers and it would be much easier to prove our side of the story.  From July 2018 to October 2019, I was housed at High Desert State Prison.  In my over a year of time there, I saw very few instances of staff misconduct and staff assault, as compared to the many instances I have

1   seen in six short months at LAC.  I believe the difference is because HDSP has cameras,

2   which limit the officers' ability to assault people and falsify reports to cover up the assault.

3   LAC would be a much safer place if cameras were installed here.

4       I declare under penalty of perjury under the laws of the United States of America

5   that the foregoing is true and correct, and that this declaration is executed at Lancaster,

6   California this 31st day of July, 2020

7

8                                          /s/ ███████████

9                               ████████████

10      On July 31, 2020, due to the closure of LAC in light of the COVID-19 pandemic and

11  ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs'

12  Motion, including ongoing concerns about the confidentiality of the legal mail system at

13  LAC, I read the contents of this declaration, verbatim, to ████████ by

14  telephone. ████████ orally confirmed that the contents of the declaration were true

15  and correct. ████████ also orally granted me permission to affix his signature to the

16  declaration and to file the declaration in this matter.

17

18  DATED: July 31, 2020          _Thomas Nolan_____

19                                          Thomas Nolan

20

21

22

23

24

25

26

27

28

[3589149.1]                              12

# Exhibit 14a

## Filed Under Seal

# Exhibit 15

1                               **DECLARATION OF** ███████████

2         I, ████████████, declare:

3         1.     I have personal knowledge of the matters set forth herein, and if called as a

4 witness, I could and would competently so testify.

5         2.     My California Department of Corrections and Rehabilitation ("CDCR")

6 number is ███████ I am currently housed at Kern Valley State Prison ("KVSP") on

7 Facility A in Building 3. I am 43 years old.

8         3.     I was formerly a *Coleman* class member. I am currently not in the Mental

9 Health Services Delivery System ("MHSDS"), as I was recently discharged from the

10 Correctional Clinical Case Management System ("CCCMS") level of care, the lowest level

11 of care in CDCR, on June 23, 2020. My clinician asked me if I wanted to discharged from

12 CCCMS level of care, because I do not take any medications and felt my mental health

13 conditions are under control. I felt she was right and agreed to the discharge. My clinician

14 assured me I would be able to speak to her if I felt like I needed mental services.

15         4.     Though as of now I am not in the MHSDS, I have a long history of receiving

16 mental health treatment in the CDCR. I have schizoaffective disorder and occasionally

17 experience paranoia. I have been to the mental health crisis bed ("MHCB") five times. An

18 MHCB is a short-term intensive care unit for people experiencing severe mental health

19 crises. My most recent stay in the MHCB was in February and March 2020. I was also

20 treated at the Enhanced Outpatient Program ("EOP") level of care for a period of time

21 between late 2017 and early 2018. During the time I was at California State Prison-

22 Lancaster ("LAC"), my mental health issues were worse than they are today. When I was

23 there, I experienced paranoia and thought people were going to do bad things to me. I

24 received care at the CCCMS level while I was at LAC.

25         5.     I have hypertension and high blood pressure. I take medication to treat these

26 issues. If I do not take this medication, my blood pressure spikes.

27         6.     I was housed at LAC from November 16, 2017 to April 30, 2019, with the

28 exception of March 6 to March 8, 2019 when I was housed at Richard J. Donovan

[3579057.2]

("RJD").  Staff did not tell me why I was transferred.  I believe the transfer was to prevent my family from visiting me at LAC on or around March 6 as retaliation for reporting that I was attacked by LAC staff.

7.      During my time at LAC, I was housed in the following locations: B Yard, Building 5, B-Yard, Building 1, D-Yard, Building 5, and D-Yard, Building 4.

8.      I was a victim of and witness to staff misconduct at LAC.

9.      On February 16, 2019, I was in my cell in B Yard, Building 1 when I witnessed officers assault another incarcerated person.  The incarcerated person came out of his cell and spoke to the tower officer.  I called him over to my cell to ask what the problem was, and he told me he was trying to get a shower.  I told him he needed to talk to the floor officer.  All of a sudden, a group of 10-12 officers formed a circle around this incarcerated person.  He explained to them that he was trying to get a shower and asked to speak to a sergeant.  The officers placed him in handcuffs.  They escorted him back toward a side door.

10.      When they were in front of his cell, they started to push him into his cell. This individual was only five feet, two inches to five feet, four inches tall, so he was no match for the officers.  I then witnessed the officers pick the person up and slam him to the floor.  I could not see what happened because so many officers were crowded around him, but I later saw blood on the floor in front of his cell.  I assume they assaulted him.

11.      While they were huddled around him, I believed they were attacking him, so I protested.  I asked them why they slammed him to the ground, when all he wanted was a shower.  I banged on my cell door to try to make them stop.  The officers put restraints on his ankles and walked him out of the building.

12.      As I continued protesting against them, Officers D. Montoya, A. Ayon, J. Ferroso, Rosas, Carpio, Campbell, J. Collins, Lopez, and Khodabakhshyan, came over. Officers Montoya, Ayon, and Ferroso handcuffed me and then removed me from my cell. Lieutenant A. Martinez was standing in the housing area near the door.  As the group of officers removed me from my cell, I watched Officer Lopez, who had assaulted the other

1   incarcerated person, break my T.V. with an attached CD player in my cell.

2         13.    Officers Montoya, Ayon, and Ferroso escorted me from my cell to the gym,

3   while Lieutenant Martinez watched, and told me that I would speak to the sergeant.  I had

4   asked to speak to a sergeant, rather than Lieutenant Martinez, because I wanted to report

5   the incident through the proper channels.  As we were walking into the gym, I saw

6   Sergeant Campbell.   Lieutenant Martinez, Sergeant Campbell, and Officers Rosas, Carpio,

7   Collins, and Khodabakhshyan came to the holding cage in which Officers Montoya, Ayon,

8   and Ferroso were putting me.  As this group approached me, and two of the officers,

9   Officer Montoya and Officer Ayon slammed my face into the steel door of the holding

10  cage face first, and then all of the officers, aside from Sergeant Campbell and Lieutenant

11  Martinez, started punching me all over my facial area, on my mouth, jaw, head, and ears.

12  Sergeant Campbell and Lieutenant Martinez watched the officers assault me.

13        14.    I fell to the ground due to the force and they started punching and kicking

14  my body, hitting my ribs and kidney area.  I was handcuffed while they attacked me, so I

15  could not protect myself from their blows.  As a practicing Muslim, I turned to my faith to

16  help me.  I said, "Allahu akbar."  One of the officers said, as he hit me, "What is 'Allahu

17  akbar' going to do for you now?"  Then an officer stomped on my groin area.  At some

18  point, an officer yelled, "That's enough!" and the officers stopped.

19        15.    They then picked me off the ground and dragged me to the holding cage.

20        16.    The assault lasted about a couple of minutes, but it felt like a long time.

21        17.    In the holding cage, I asked to be seen by a medical doctor because my chest

22  hurt in the areas of my ribs and kidneys, my mouth was cut open, my head was in pain, and

23  my groin hurt.  The metal cuffs had cut the skin on my wrists.

24        18.    About thirty minutes to an hour later, a nurse came to the holding cage to

25  examine me and document my injuries.  According to the evaluation form I received, she

26  indicated I had injuries to my head, my mouth, my wrists, and my stomach.

27        19.    Two hours after the medical evaluation, two Investigative Services Unit

28  ("ISU") officers came to speak to me in the gym to take pictures of my injuries.  They told

[3579057.2]

3

1  me they had already taken pictures of my cell.  Then they left.

2      20.   About thirty minutes to an hour later, two officers came to the holding cage I

3  was in.  They told me that the other incarcerated person had declined to be interviewed

4  about the use of force against him and suggested to me that I should also decline.  I told

5  them I did not care what the other person did and I wanted to report what happened.  The

6  officers asked me what happened.  I told them what happened and about my injuries.  They

7  did not want me to show my injuries to the camera.  The interview lasted about 15 minutes

8  and was videotaped.  I do not know if they further investigated the attack.

9      21.   After the interview, a couple officers escorted me to the Administrative

10  Segregation Unit ("ASU").

11      22.   While I was in the ASU, I submitted four or five medical forms requesting

12  care for my injuries.  Finally, a few days after the attack, I was taken by ambulance to the

13  Correctional Treatment Center ("CTC"), a medical clinic at the prison.  At the CTC, a

14  nurse asked me what happened.  I reported to this nurse that my ribs hurt really badly.  I

15  also told her that I had been urinating blood and noticed I was urinating more frequently

16  since the attack.  The nurse prescribed ibuprofen for me and sent me to my cell in the

17  ASU.  She did not address the blood in my urine.

18      23.   After the medical visit, I still had pain in my chest, hands, wrists, ankles, and

19  feet.  I was experiencing headaches.  Both of my ankles were swollen.  My ears were

20  continuously ringing.  About two days after that medical visit, my feet and legs were so

21  swollen, I could hardly walk.  I told the nurse who checks people in the ASU.

22      24.   About an hour later, two officers came to escort me to the CTC.  My ankles

23  were so swollen they could not put leg restraints on me.  They gave me some medication

24  for the pain and sent me back to the ASU without giving me any other medical treatment.

25  I ended up receiving x-rays on my ribs.  They did not x-ray my ankles.  Shortly after a

26  doctor told me nothing was broken, but something was wrong with my lymph system and I

27  would need further x-rays.  He checked my reflexes and said my reflexes were slow.  They

28  never explained what was wrong with my ankles.

25.     A couple weeks later, they x-rayed my rib cage area, but they did not tell me the results of the x-rays.

26.     I believe I was attacked for speaking out against the excessive force used against the handcuffed person.

27.     I also believe I was attacked because of my Muslim faith.  I have heard officers say things against Islam, saying that Muslim beliefs are backwards.  Officers are more disrespectful to the Muslim community in prison than people of other faiths.

28.     I also feel that officers are more aggressive with people with mental health issues, because the officers do not know how to interact with people with mental illness.  They do not understand that sometimes people act out because of their mental illness and need treatment.  They are not properly trained.

29.     I also think they may have been retaliating against me, because, at that time, I had a federal lawsuit against CDCR for staff misconduct at Substance Abuse Treatment Facility – Corcoran ("SATF") from when I was housed there previously.  The LAC officers knew I had sued, because they could overhear me talking on the phone and they could see I received a lot of legal mail.  They could also see this in my C-file, my prison records.

30.     I was charged with a Rules Violation Report ("RVR") for Battery on a Peace Officer.  I got the RVR a few days after the incident.  The report states that I kicked out a window, and that, when they came to escort me, I was screaming things about Grape Street and Crips to get the attention of gang members.  They said I was also screaming, "Allah is going to kill you!" and that I kicked either Officer Lopez or Officer Ferroso.

31.     Within 30 days of receiving the report, in March, I had a hearing about the RVR.  An ASU lieutenant found me guilty and disciplined me by taking away 365 days of good time credit.  The loss of good time credit delays the date that I can go to the Board of Parole to argue for parole.  It also looks bad to the Board of Parole that I have been disciplined, so this RVR could prevent the Board from paroling me.

32.     The hearing was not fair.  Because the assault happened in the gym, away

from the view of any possible witnesses, I was not able to call anyone who could speak on my behalf.  It was my word against the word of about 15 officers.  There are no cameras in the gym, so the officers could get away with lying.

33.     About a week after the hearing, I filed a 602 staff complaint regarding the RVR and hearing.  I never received a response to this 602.

34.     On March 16, 2019, I filed another 602 staff complaint reporting the assault, mailing it to the Office of Internal Affairs ("OIA").  I was delayed in filing the 602 because I was placed in the ASU and denied access to my legal work.  I needed my legal work to write the 602 to reference the rules CDCR staff must follow regarding use of force.  While I was in the ASU, I was transferred to RJD for four days, from March 6, 2019 to March 10, 2019, and did not have my legal property there either.  I ended up filing the 602 without  reviewing my legal work, because I wanted to report the misconduct and did not believe I would I would receive my legal papers.  I ended up receiving these papers in April when I was at SATF.

35.     In the 602, I reported the assault and that I had repeatedly requested medical help after the assault to no avail.  I reported that I had lost a lot of weight, was continually dizzy, and thought I had damage to my ribs and kidneys.  I also informed CDCR in the 602 that I would be filing a 1983 civil suit and wanted the officers involved to take polygraph tests.

36.     I received a response on April 30, 2019 from the LAC appeal officer saying that my appeal was cancelled because LAC did not receive my appeal until April 29, 2019, so I had not met the time constraints.  I assume someone from the OIA sent my 602 to LAC.  I do not know why there was such a long delay between my sending the 602 to OIA and when the appeal officer received it.  He canceled my appeal.

37.     I also received a letter from LAC Chief Deputy Warden D. Ulstad about my report to the OIA.  The letter stated that the 602 I sent to the OIA was duplicative of a 602 received by LAC on April 29, 2019, even though I never sent a 602 to LAC.  He also canceled my 602, this time because it was duplicative of the one the appeal officer claimed

1   was untimely.

2        38.     The 602 I had sent to the OIA was timely, so I believe this was mishandled.

3        39.     I filed another appeal on June 12, 2019 explaining that my appeal should not

4   be cancelled because the appeals coordinator failed to return my 602 and I was denied

5   access to my legal work.  I received a second level response to this 602 on August 5, 2019.

6   My appeal was denied and I was told that there was no reason that I could not have

7   submitted my appeal in time, even though the appeal response acknowledges that I did

8   submit my appeal on March 16, 2020, but CDCR did not receive it until April 29, 2020.

9   The response also states that my appeal was not forwarded to the OIA, though I had

10  received a response to my letter to the OIA from the Deputy Chief Warden.

11       40.     On December 16, 2019, I sent this appeal to the third level and expressed

12  that I was dissatisfied with the response because the appeal had been sent to the OIA and I

13  had received a response from the warden, making CDCR's response to my appeal

14  incorrect.  I did not receive a third-level response until March 19, 2020.  I was told in that

15  response that CDCR would not be issuing a third-level response, and the denial at the

16  second-level would be their final response.

17       41.     I then submitted a claim for $75,000 to the California Office of Risk and

18  Insurance Management, Government Claims Program regarding the excessive use of force

19  and attaching documents about the assault.

20       42.     To this day, I have not been able to get my appeal about the assault

21  processed and have not been able to get any sort of investigation into the incident.

22       43.     The attack was very painful, physically and emotionally.  I felt depressed and

23  stressed.  I lost a lot of weight.  My family was worried that something else would happen

24  to me at LAC.  I felt concerned, almost paranoid, about losing my life at the hands of

25  officers.  I felt that, if they killed me, nothing would happen to them, because it would be

26  their word against the word of any incarcerated witnesses.

27       44.     After the assault I was not only in tremendous physical pain from the assault

28  itself but experienced other medical and mental health issues.  After the assault, my blood

1   pressure spiked because the medications I take for my hypertension and high blood

2   pressure did not come over with me from B-1 to the ASU.  I also decompensated shortly

3   after arriving in the ASU.  On March 2, 2019, staff found me lying under my bed naked

4   and not eating.  I was scared that staff was going to assault me.  The attack had triggered a

5   mental health crisis.

6      45.   In my time at LAC, I tried to stay out of the way of officers, because I was

7   afraid they would attack me.

8      46.   In addition to the incident I witnessed on the day I was assaulted, I have also

9   witnessed staff engage in misconduct against other people at LAC.  On October 13, 2018, I

10  watched another incarcerated person get attacked on B yard outside of chow hall.  I saw

11  this person exchanging words with Officer Gollette and saw Officer Gollette, Officer

12  Ayon, Officer Lopez, and Officer Khodabakhsyhyan start attacking this person.  They

13  slammed him to the ground, kicked him, and punched him.  These officers beat his leg

14  with a baton.  They had to carry him out on a stretcher because he could not walk.  These

15  were some of the same officers that ended up attacking me just four months later.

16

17      I declare under penalty of perjury under the laws of the United States of America

18  that the foregoing is true and correct, and that this declaration is executed at Delano,

19  California this 21st day of July, 2020.

20

21  ███████████████

22  _____

23

24      On July 21, 2020, due to the closure of Kern Valley State Prison in light of the

25  COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses

26  in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of

27  the legal mail system at KVSP, I read the contents of this declaration, verbatim, to

28  ███████████  by telephone.  ███████████  orally confirmed that the contents of the

1  declaration were true and correct. ▮▮▮▮▮▮ also orally granted me permission to

2  affix his signature to the declaration and to file the declaration in this matter.

3

4  DATED: July 21, 2020     _____

5                            Rekha Arulanantham

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 15a

## Filed Under Seal

# Exhibit 16

**DECLARATION OF ███████████**

I, ███████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ███████.  I am currently housed at California State Prison – Sacramento ("SAC")  on Facility A in Building 1.  My unit at SAC is called the Psychiatric Services Unit ("PSU"), which is a punishment unit for EOP patients.  I am 42 years old.

3.     I am a *Coleman* class member.  I suffer from a mood disorder.  I often feel depressed.  I am at the Enhanced Outpatient Program ("EOP") level of care, which means I am housed in a special housing unit with other EOP patients, and that I receive about 10 hours of structured groups and other mental health care each week.  I have been at EOP my entire time in the CDCR.  Despite my high level of mental health care, I have been in segregation units for much of my stay in CDCR.  At this time, I have been in segregation for over a year straight.  During my time at California State Prison – Los Angeles County ("LAC") and Kern Valley State Prison ("KVSP") my mental health issues were similar to the ones I have today at SAC.

4.     I suffered a traumatic brain injury ("TBI") in a car accident when I was 17.  I severed my spine and had severe damage to my frontal and temporal lobes of my brain.  My TBI has severely affected my life.  It has made me impulsive, and exacerbated my mental health issues.  Because of the TBI, I have a lot of anger, mood swings, and verbal outbursts.  I also find it difficult to focus and have a short attention span.  The TBI has also impacted my interpersonal skills—I have little filter when conversing with people due to the damage to the decision-making parts of my brain, which can get me into difficult situations in prison.  My language skills were also affected by the TBI, so I have a stutter and slurred speech that makes it hard to communicate at times.  I also have been diagnosed with adult ADHD as a result of the accident.  My TBI has exacerbated my mental illness and together my mental health issues and TBI symptoms have made it very hard for me to

1  function.  In the accident during which I got my TBI, I also hurt my neck, and have been

2  living with severe neck pain and numbness since.

3       5.      I also have a seizure disorder as a result of the TBI.  In January 2019,

4  because of my seizures, a neurologist did a CT scan on my brain and found that I have

5  right temporal encephalomalacia, which is the loss of brain tissue.  My neurologist told me

6  that condition is an indicator of very serious, ongoing brain injury.  He also told me that

7  there is a good chance that the part of my brain impacted by the TBI will be completely

8  dysfunctional eventually.

9       6.      I have spent much of the last two years at KVSP and LAC.  I was housed at

10 KVSP from July 17, 2018 to October 8, 2018.  From October 8, 2018 to December 14,

11 2018, I was at LAC.  I was then transferred back to KVSP from December 14, 2018 to

12 April 26, 2019.  On April 26, 2019, I was moved back to LAC until December 23, 2019,

13 when I was moved to SAC.

14      7.      During my time at KVSP, I was housed in C-Yard, Building 8, the EOP unit

15 there, and the Administrative Segregation Unit ("ASU").  During my time at LAC, I was

16 solely housed in D-Yard, Building 5, the EOP ASU.

17      8.      I was a victim of staff misconduct at KVSP.

18      9.      On April 2, 2019, around 10 a.m., I was returning from a mental health

19 group to my cell in C-8.  Officer Easter then came to my door and told me to cuff up.  I

20 refused and said, "What for?"  Officer Hunt then signaled to the tower officer to open the

21 door of my cell.  I was standing at the front of my cell near the door.  Suddenly, six or

22 seven officers rushed into my cell and slammed my body from the front of the cell against

23 the wall of my cell.  During the assault, Officer Easter slammed my head against the wall

24 of my cell at least two times.  While she was doing this, she called me a "dirty fucking

25 Jew."  The assault last about 30 seconds to a minute.  The assault felt very invasive.

26      10.     After the officers were done assaulting me, my face hurt badly and I was

27 profusely bleeding from my head and face.  Some of the officers who assaulted me, I do

28 not remember exactly who, took me to a holding cage in the program office.  I was not

evaluated by medical after the incident.  I later found out that a psychiatric technician, Ms. Loera, documented that I had refused medical attention.  However, no one had asked me if I wanted medical attention or came to see me.  While I was in the holding cage in the program office, I repeatedly asked to see Mr. Chazen, my mental health clinician at the time.  Lieutenant Rodriguez, a lieutenant that worked in C-8, came to my cell as I was asking to see Mr. Chazen.  Lt. Rodriguez said "no one cares," slammed the holding cage door, and walked away.  I also told Lt. Rodriguez that I wanted a videotaped use of force interview to document my injuries.  He ignored me.  I did end up receiving my video-taped use of force interview the next day, on April 3, 2019.

11.     After a few hours in the program office holding cage, I was moved to the ASU at KVSP.  Shortly after arriving, a psych tech named Ms. Dillard came to my cell. She saw that I was bleeding and gave me gauze to clean my cuts, and documented that I had cuts on my right eye and swelling of my nose and eye.  She asked me if I wanted to be seen by medical, and I said yes.  I was then brought to the Treatment and Triage Area ("TTA"), a medical clinic on prison grounds, around 3:15 p.m..

12.     At the TTA, a doctor whose name I did not know glued the cut above my right eye.  The doctor also told me I had a swollen black eye and bruising across the bridge of my nose.  My cut took at least two weeks to fully heal, and my swelling lasted for at least a few weeks.  I also had cuts and bruises on both of my knees and elbows.

13.     I was charged with a Rules Violation Report ("RVR") for "assault on a peace officer by means not likely to cause great bodily injury."  The RVR says that I was at my cell door yelling at Officer Fralin and Easter.  The RVR states that the officers tried to de-escalate the situation by counseling me, and that I continued yelling.  According to the RVR, Officer Fralin told me to turn around and cuff up, and I did turn around and put my hands behind my back.  The RVR then states that when Officer Fralin and Officer Easter approached me to handcuff me as my back was to them, I turned around as they tried to cuff me and swung my right elbow towards Officer Fralin, missing his face.  Officer Fralin

1  then pushed me away from him in response, which caused me to hit my torso and face into

2  the wall.

3      14.     I filed a 602 reporting the staff misconduct at KVSP on April 16, 2019.  I

4  reported the assault and the anti-Semitic comment.  My 602 was bypassed at the first level

5  of review and sent to the second level.  While I was waiting for a second level response to

6  my 602, I was moved from KVSP to LAC.  On April 24, 2019, while I was still at KVSP, I

7  was told by the appeals coordinator to submit a new appeal separating my use of force

8  complaint from my staff complaint.  Due to the restriction of only being able to file one

9  appeal every 14 days, I had to wait to file my appeal until April 30, 2019.  On April 26,

10  2019, I was moved to LAC.  On April 30 at LAC, I re-wrote my appeal and gave it to a

11  third watch officer, who placed it in an inter-office envelope to the appeals coordinator

12  with instruction on the envelope to send to KVSP.  I did not receive a response from KVSP

13  for a few weeks, which caused me to miss the deadline for filing the appeal at the third

14  level.

15      15.     I was also a victim of staff misconduct at LAC.

16      16.     On July 24, 2019, I was in one of my mental health groups when I got into

17  an argument with another incarcerated person in the group.  Officer Estrada came over to

18  handcuff me and remove me from the group.  He walked me out of the mental health

19  building and back to my unit, D-5.  When we arrived at D-5, he passed me off to Officer

20  Wingfield and Officer Martinez, two of the D-5 officers, to escort me back to my cell.  As

21  they were escorting me, they walked me past my assigned cell to a new cell.  I saw Officer

22  A. Martin packing up my old cell.  I asked him what was going on, and was told I had been

23  assigned a new cell during group.  I was already agitated and was having trouble

24  processing the sudden change.  I protested going to the new cell by stopping walking.

25  Four or five officers, including Officer Wingfield and Officer Martinez, gathered behind

26  me and pushed me towards my newly assigned cell.  About six inches from the door,

27  Officer Wingfield and Officer Martinez threw me inside the cell.  The right side of my

28  head hit the wall of the cell.  Officer Wingfield stepped into the cell and shoved me onto

the floor, hitting my head and face on the cement.  I could feel that I was bleeding.  My hands were behind my back, handcuffed, the entire time.  I was lying on the ground, face down, when Officer Wingfield sat with all of his weight on my back.  I felt like my body was being crushed, as Officer Wingfield weighed at last 250 pounds.  As he was straddling me, he punched me on the left side of my face three times.  I was struggling to breathe and afraid for my life, so I tried to kick Officer Wingfield in the groin by kicking my leg back at him as he was sitting on me.  I missed.  I then tried to bite him on his lower thigh, which was near my face.  I was trying to do anything I could to get him off me.  He then placed his hands around my neck and was trying to choke me.  I could feel his hands on my esophagus.  He then let go of my throat and punched me three more times.  During the final three punches that I remember, he was yelling, "This is your punishment!"  After these three punches, I do not remember much about what happened.  I do not think I lost consciousness, but I was very out of it for about a minute or 90 seconds.

17.     When the assault was over, Officer Wingfield stepped back from me and left me lying on the ground.  I saw the gloves he was wearing were drenched in blood, and there was blood on the wall of the cell and floor.  He left the cell and closed the door.

18.     I was taken to the medical unit on the yard in D-5 shortly after the assault.  The nurse at the medical unit on the yard said that I had to go to TTA.  I was then taken to TTA.  At the TTA, the nurse there told me that I had multiple cuts on the right side of my scalp and face, a cut in the middle of my forehead, and two cuts on my eyebrows.  Both of my eyes were also swollen and bruised, and I had bruises all over my body.  They stapled my forehead and the back of my head.

19.     I received an RVR after the incident for "battery on a peace officer."  The RVR states that as I walked by my old cell to my new one, I was belligerent and agitated, and slowed down my pace to stop myself from going into the new cell.  The report then states that I quickly turned my body around and spat in Officer Wingfield's face.  The report states that Officer Wingfield pushed to me to the ground face first in response to this. Officer Wingfield landed on his left knee near my face with his right leg over my

1   upper torso.  The RVR states that at this point I started twisting my body and yelling "you

2   made me bleed!" and I then proceeded to bite him above the left knee.  The RVR states

3   that at that point Officer Wingfield punched me.  The RVR then goes on to say that I bit

4   Officer Martinez's left hand and Officer Martinez then punched me in the face.  None of

5   the events involving Officer Martinez happened—after he threw me into the cell, he did

6   not enter the cell.  Officer Wingfield was the only officer that assaulted me.  The incident

7   was referred to the District Attorney for prosecution, but the DA chose not to take the case

8   on December 11, 2019.

9       20.     I received a videotaped use of force interview by Sergeant Aguirre on July

10  29, 2019, five days after the assault.

11      21.     I reported the assault in a 602 about two weeks after the assault.  I had to

12  wait about two weeks because I had filed a 602 about something separate just before I was

13  assaulted and we have to wait 14 days between 602s.

14      22.     After I reported the 602, in October 2019, I went through a period where

15  there was no lights in my cell in D-5.  Before this, my lights were on the brightest setting

16  for 24 hours a day.  For one or two weeks, I repeatedly requested that my lights be turned

17  down.  On October 25, 2019, I had a verbal outburst at my clinician because I was

18  frustrated about my lights.  As I was yelling about the lights, Sergeant Dotey, the D-5

19  sergeant at the time, came to my door, and signaled to the tower officer to open my door,

20  without saying anything to me or giving reason to open my door.  Sgt. Dotey rushed into

21  my cell, grabbed me by my throat with his right hand and made me sit down on my bed.

22  He said, "I did that to calm you down", referring to grabbing my throat and seating me on

23  the bed.  A number of officers responded to the scene but did not enter my cell.  I told Sgt.

24  Dotey I had been asking the officers to have my lights fixed.  He told me he "knew his

25  guys" and that the officers would have told him if I had said that.  I took this as him calling

26  me a liar and covering for his officers.

27      23.     Later that evening, Officer Ohaya walked by my cell to give me my dinner

28  tray and threw the tray in the cell, spilling food all over the floor.  On October 26, 2019,

my lights went off twice, and the second time, they stayed off for over a week straight. My heat was also turned off for this time period, with the exception of a couple of hours on November 2, 2019.  I was very cold, as the temperatures were below freezing in Lancaster on those days.  Officer Ohaya also refused to feed me on November 1, 2019.

24.     I also experienced staff misconduct at SAC.

25.     On March 9, 2020, at 8:40 a.m., Officer Hord and Officer Kurgen were escorting me from A-1 through the rotunda to my mental health group.  I was handcuffed, as I am whenever I leave my cell in the PSU.  I stopped them from walking me to speak with another officer in the rotunda, Officer Kirchenman, about a package I was expecting that day.  Officer Hord and Officer Kurgen told me that I would have to go back to my cell.  They told me to face a desk in the rotunda.  I have epilepsy and started having an aura or petit mal, which is a feeling you get before having a grand mal, or larger seizure.  I stopped talking and moving.  I believe they thought I was purposefully resisting them and did not know or ignored that I was having a seizure.  They suddenly shoved me to the ground.  As I was falling, I hit the front of my head on a door jam.  I landed on the ground face down.  I could not stop my fall because my hands were cuffed behind my back.  After I fell to the ground, Officer Hord punched me in the back of the head.

26.     After Officer Hord punched me, he and Officer Kurgen picked me up off the ground.  Eventually they and some psych techs who arrived on the scene placed me on a gurney.  I was taken to the TTA.  At the TTA, I was told I had a laceration over each of my eyebrows, bruises on my head and elbows, and abrasions on my right temple, knees, and elbows.  My hips, pelvis, and lower back were in tremendous pain.  The doctor glued the laceration on my right eyebrow, and gave me five stitches for my left eyebrow laceration. I have ongoing, daily pelvic and hip pain.  I am unable to exercise or move around easily, which is affecting my quality of life.  I have repeatedly asked for medical attention for this pain, but have been told that I cannot get medical help right now due to the COVID-19 delays in providing treatment.

27.     I was charged with an RVR for "resisting a peace officer resulting in the use of force."  The RVR states, accurately, that I stopped walking with the officers to ask about my package, and complied with turning to face the desk when the officers asked me to do so.  The RVR then states that I became highly agitated and when being escorted back to my cell stiffened my legs and pushed back on the officers.  I never did this, as I was experiencing the beginning of a seizure and simply stopped moving.  The report also states that the officers ordered me two times to get down on the ground, and that when I refused the second time, they used their momentum to push me into a prone position on the ground.  The RVR says that I hit my head on the door due to this push, and did not resist when I was on the ground.  The RVR does not explain how I ended up having multiple bruises and cuts to my face.

28.     I had difficulty getting my videotaped use of force interview after the assault. I asked numerous floor officers, Sgt. Roebuck, and Captain O'Lecky, multiple times to have my interview, and also filed two 22 forms requesting the interview.  I did not get my videotaped use of force interview until May 29, 2020.

29.     Because SAC has video cameras, this incident was captured on camera.  I was shown the tape on April 9, 2020.  I noticed while viewing it that part of the assault was sped up.  I asked why that part of the video was sped up.  They did not give me an answer, but I suspected they sped it up because I was assaulted on the video.  I have not been able to see the video not sped up.  I asked Officer Kolgen, one of the officers who initially showed me the video, to play me the video without it being sped up.  He told me that he cannot show it, and that it is up on the wall because after they show the video once, they don't touch it anymore.  I have filed multiple 602s about this and they have told me they can't read my 602 due to my handwriting, and have refused to process my 602 even though I have tried multiple times.

30.     Even though I have not been able to see the video of the assault not sped up, I am glad I at least have a video of the incident, unlike in the other assaults I experienced at

1  KVSP or LAC.   I believe that all of the prisons need cameras, like SAC, and that the

2  officers at these prisons need body cameras to truly capture everything that goes on.

3          31.     I still had to interact with the officers that were involved in the staff

4  misconduct against me every day.  Because I was in the one EOP unit at KVSP, and have

5  always been in the EOP ASU at LAC, I interact with the same officers even after the

6  assaults.

7          32.     In my time at KVSP, LAC, and SAC, there have been many times that I have

8  needed help and been afraid to ask for it.  I need a lot of assistance due to my TBI, and am

9  often afraid to ask for help because this has gotten me into situations where I have been

10  assaulted.  I feel that every time I communicate with custody staff about my needs, I am at

11  risk of being assaulted.

12          33.      At SAC, LAC, and KVSP, I have had to ask officers for mental health help

13  at times when I am feeling distressed or suicidal.  To see mental health, I usually have to

14  ask the officers to contact them for me.  In all three prisons, I have had instances where

15  staff have ignored me and refused to contact mental health, leaving me without help in my

16  cell.  For instance, on March 11, 2020, just after being assaulted by Officer Hord, I was

17  feeling homicidal and suicidal and asked the officers in my unit for help.  They ignored

18  me.  Because I have been in segregation units for much of my time in CDCR, I am locked

19  down a lot, and rely on the officers for help contacting mental health staff.  When officers

20  ignore me, I am left in my cell alone and without help.

21          34.     At SAC, I also have had issues with officers losing and damaging my

22  property.  In early February, I asked officers on the unit repeatedly to speak to a sergeant

23  about this.  The officers laughed in my face and ignored me.

24          35.     In my opinion, staff target people with disabilities, mental health issues, and

25  other serious needs.  Officers get frustrated by all the help that people like myself need,

26  and feel they can provoke and harm us because we have no way to defend against our

27  actions.  They feel they can blame any violent reaction they had to us on our disability.

28  This creates a vicious cycle where people with disabilities are assaulted, and their

1  disability worsens from this assault.  The officers get frustrated as the disability gets worse

2  and people are more needy, and assault the person again.  This has happened in my case--

3  during my time in CDCR, I have suffered about 20 head injuries.  Most of these were at

4  the hands of officers using excessive force or assaulting me.  With each head injury, my

5  TBI and mental health gets worse.  As this happens, I exhibit more symptoms and staff

6  grow more frustrated with me, and I get assaulted again.

7

8      I declare under penalty of perjury under the laws of the United States of America

9  that the foregoing is true and correct, and that this declaration is executed at Sacramento,

10  California this 6th day of August, 2020.

11

12  ███████████████

13  ██████████

14

15      On August 6, 2020, due to the closure of SAC in light of the COVID-19 pandemic

16  and ongoing concerns that officers might retaliate against witnesses in support of

17  Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail

18  system at SAC, I read the contents of this declaration, verbatim, to █████████ by

19  telephone.  █████████ orally confirmed that the contents of the declaration were true

20  and correct.  █████████ also orally granted me permission to affix his signature to the

21  declaration and to file the declaration in this matter.

22

23  DATED: August 6, 2020

24                                          Emma Cook

25

26

27

28

# Exhibit 16a

## Filed Under Seal

# Exhibit 17

1                               **DECLARATION OF** ▮▮▮▮▮▮

2     I, ▮▮▮▮▮▮▮, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation ("CDCR") number is ▮▮▮▮. I am currently housed at California State Prison-Los Angeles County ("LAC") on Facility B, Building 2. I am 31 years old.

3. I am a *Coleman* class member. I am currently at the Correctional Clinical Case Management System ("CCCMS") level of care, which means that I live and program on mainline CDCR yards, alongside incarcerated individuals who do not have a mental health condition. I have major depressive disorder, anxiety, and PTSD. When I am depressed, I do not sleep well, I lose my appetite, and feel hopeless. I also sometimes hear voices, usually when I am alone. Before August of 2019, I was hearing the voices every day and they were very intense. Since then, my voices have decreased in intensity and I only hear them about once or twice a week, due to the help of my medications and the ability to listen to music. My voices grew in intensity when I was assaulted and become more intense when I have negative interactions. I also have attempted suicide multiple times while in prison, when I have felt especially hopeless.

4. I also have a number of serious medical conditions. I have sleep apnea and have to use a CPAP machine to breathe at night. I have also had difficulty breathing in my cell due to lack of ventilation and have recently gone out to the hospital to be treated for this. I have high blood pressure. I frequently experience episodes where I temporarily faint or lose consciousness. When I pass out suddenly during these episodes, I often fall and injure myself. Recently, I had to go to an outside hospital because I fainted when walking to the bathroom and hit my jaw against the railing in my cell. I also have experienced pain and numbness in my chest due to my high blood pressure.

5. I also experience epileptic seizures. These come periodically and at times I am unsure whether I have had a seizure or simply passed out. I have requested multiple

[3596554.1]                 1

1   times to be housed with a cellmate since my arrival at LAC so that someone is there to get

2   medical attention for me if I need it due to my heart issues and seizures, but LAC refuses

3   to house me with a cellmate.  I have a lower bunk-lower tier chrono because of my seizure

4   disorder.  Because of my various medical issues, I am designated as high risk medical.

5       6.      I was housed at California State Prison-Corcoran ("COR") from July 16,

6   2017 through July 31, 2019.

7       7.      During my time at COR, I was housed in the following locations: 3C01,

8   3C02, 3C03, and 3C05.  Since I have been at LAC, I have been housed in the following

9   locations: B Yard, Building 2, B Yard, Building 1, and B Yard, Building 3.

10      8.      I was a victim of staff misconduct at COR.

11      9.      On May 1, 2019, around 10:00 a.m., I was called out of my cell in 3C03 to

12  go to an appointment in the Treatment and Triage Area ("TTA"), in the Correctional

13  Treatment Center ("CTC), a central medical building at COR where there are medical

14  clinics.  I also was told by Officer Delacruz, an officer in my housing unit, that I may be

15  getting a permanent CPAP instead of the loaner I had been using, and that I needed to get

16  the CPAP data taken off my machine so that the doctors could review the data.  I did not

17  have a ducat for this appointment so I was confused as to why I was being called out of my

18  cell to the CTC, but I complied.

19      10.     I was escorted to the CTC by Officer Delacruz.  During this time, the rest of

20  my unit was on lockdown.  When I arrived at the CTC, I met with a male nurse that I had

21  never met before named Phelan.  He started loading the data from my CPAP off of the

22  machine and onto his computer.  As he was loading the data onto the computer, he told me

23  that he had received an email from my doctor instructing him to take his CPAP from me

24  because I was not in compliance.  I asked to see this email.  The officers and Phelan let me

25  stand up and look at the screen.  I saw no new emails on the screen.  I said I was not

26  leaving without my CPAP, since I did not see the email that instructed Phelan to take it

27  from me.  As I was questioning him, I was told by Officer Delacruz to cuff up.  I complied

28  and was handcuffed behind my back.  He walked me out of Phelan's office.  When he got

1 to ███████████████████████████████████, the officer who was guarding the

2 hallway into the TTA, whose name I do not know, walked up to Officer Delacruz as we

3 walked towards him.  When he got to us, this unknown officer grabbed my arms while I

4 was in handcuffs and held my arms up so that Officer Delacruz could punch me.  Officer

5 Delacruz was yelling at me, "You fucked up!" repeatedly as he punched me.  I believe he

6 was referring to my questions about my CPAP machine.  After a short bit of holding my

7 arms up, the other officer joined Officer Delacruz in punching me.  The two officers

8 repeatedly punched me and pulled my left shoulder, knocking me to the ground.  I was also

9 hit in the back of the head with what felt like a baton and slammed against the window by

10 the double doors.  I believe they did this here because there is a known █████████████

11 ███████████████████████████████████████.  I was handcuffed

12 the entire time.  The assault lasted for about a minute.

13       11.    As I was being dragged to the holding cage after the assault, I was yelling for

14 help, but the CTC sergeant we walked by, Sergeant J. Vasquez, ignored my cries for help.

15 I was placed in the holding cage and I saw Sergeant Vasquez pull Officer Delacruz and the

16 other officer to the side.  I was close enough to hear him ask the officers why they had not

17 hit their alarm.  Neither officer had pressed their alarm during or after the assault.  Officers

18 usually do this immediately if an incarcerated individual is assaulting them, in order to call

19 other officers for backup.

20       12.    I sat in the holding cage for about thirty minutes.  I was still handcuffed

21 while I sat in the cage and my left shoulder was sticking out in a weird way because it was

22 dislocated.  While I was in the holding cage, I repeatedly told Sergeant Vasquez and the

23 officers working in the CTC, as well as the medical staff walking by, that I needed to see

24 medical because of the pain in my left shoulder and the injuries to my face.  I also told

25 them I felt like I was going to black out and faint because I was in so much pain.  After

26 about thirty minutes, a nurse named Vasquez came to evaluate me.  She did not take my

27 vitals or assess my injuries, and almost immediately cleared me to go back to my cell.  She

28 stood at the cell door and asked me what my injuries were.  I told her she should come

over here and assess me and look at my shoulder.  She told me that she could see it from the door, and told the officers that I was cleared to go back to my cell.  I asked her why she was trying to help the officers cover up my injuries, and she left the building without responding to my question.  I returned to my cell without being treated for any of my injuries.  I learned later when I was given my incident reports with my RVR that RN Vasquez did fill out a 7219 form documenting my injuries, but the form said I had no injuries.

13.     I was in still in pain and continued to request medical treatment throughout that day and night.  I requested help from LVN Barkhurst while I was in my cell, but she refused to help me.  My left shoulder was in severe pain and my face and eyes were swollen and hurting.  Staff refused to treat my injuries until the next evening, May 2, 2019, over 24 hours after I was assaulted.  On the evening of May 2, 2019, I was called out of my cell for the videotaped use of force interview about the assault.  Before that interview, the nurse who evaluated me decided I needed to be treated at medical.  I was taken to the CTC, the same place I was assaulted.  At the CTC the nurses treated my head and shoulder injuries by giving me Tylenol and a sling for my left shoulder.  They also did X-rays on my shoulder.  The nurses told me the X-rays showed some sort of injury, but there was an issue with the number of images in the X-ray, so the X-rays were inconclusive and would need to be re-taken at a later date.  I returned to my cell in 3C03 after this appointment and did not end up having my videotaped use of force interview that day.

14.     I continued to experience pain over the next few days and was dizzy and seeing spots in my vision.  I thought I might have a concussion.  During those few days after the assault, I submitted multiple 7362 forms, which are requests for care, reporting that I was having these symptoms and requesting medical attention.  On May 6, 2019, I was waiting in the medical line to see my doctor for a routine medical appointment.  While I was waiting in line, I felt a dent in the back of my head that was soft with liquid.  When I got to my appointment and saw my doctor over tele-med, my doctor said I did not look like I was doing too well.  I told him what happened and that I had pain in my shoulder and

1   head and was having issues with my vision and kept blacking out.  I also told him that

2   medical staff were refusing me substantive medical treatment up to this point.  He had the

3   medical assistant who was helping him feel the dent on my head.  He was concerned that

4   staff had not sent me to an outside medical facility for treatment.  He called the CTC

5   doctor and told him to send me to the outside hospital.

6        15.    After the appointment, I was sent to Adventist Health Bakersfield, a local

7   hospital, where I stayed overnight.  At the hospital, medical staff told me that I had an

8   orbital fracture, which is a broken bone under the eye.  I was also diagnosed with a left

9   shoulder strain, a left cervical strain, and a concussion.  A couple of weeks later, I saw an

10  ophthalmologist who examined me and confirmed my orbital fracture.  My surgery to fix

11  the pinched nerve in my shoulder finally got approved on January 30, 2020.  I am still

12  waiting for this surgery due to COVID-19.  I am looking forward to this surgery as I have

13  been in tremendous pain and have not been able to lift my arms over my head since the

14  assault.

15       16.    The day after the incident, on May 2, 2019, I was charged with "willfully

16  delaying a peace officer in the performance of duties."  I did not receive notice of this

17  charge, or a copy of my Rules Violation Report ("RVR") until two days later, on May 4,

18  2019.

19       17.    The RVR is full of false details.  The RVR says that I became agitated and

20  started yelling at the respiratory therapist, the person who I thought was a nurse who took

21  my CPAP from me.  The report says that Officer Delacruz then ordered me to cuff up and

22  that I turned away from him and resisted the handcuffs.  Because I was turning my body

23  towards him, Officer Delacruz pushed me against a wall.  The report says that after I

24  pushed against the wall, I complied with being handcuffed and was escorted to the TTA.

25  The RVR makes no attempt to explain the injuries to my face and shoulder, and also

26  falsely says I was taken to the TTA after the incident and had a 7219 form filled out

27  documenting my injuries, when in reality I was denied medical care for almost 36 hours.

28

18.     In addition to the issues with the content of the RVR, I noticed that Officer N. Bright was listed as both my investigative staff and staff assistant, which are two different roles in the RVR process.  I pointed this out and told staff this was against protocol, and was assigned a different staff assistant, Officer Bustos.  However, Officer Bustos did not come see me before the hearing, as she was supposed to per protocol, so I ended up meeting her for the first time at the hearing.  In my final RVR paperwork listing the hearing results, Officer Bustos claims that she came to see me on May 17, 2019, and at this meeting she asked me what information she should gather and what witnesses she should call for the hearing.  For my RVR hearing, I asked to call Sergeant Vasquez, the CTC sergeant who failed to intervene when I was screaming for help during the assault, along with other staff, but the Senior Hearing Officer denied my request for witnesses to appear and deemed all of the questions I asked them irrelevant.  I also requested that Officer Delacruz, one of the officers who assaulted me, appear at the hearing.  I was told that Officer Delacruz had retired the day that I was assaulted, and the final RVR paperwork I was given says that he could not answer the questions I submitted because he was no longer employed by CDCR.

19.     I had my RVR hearing on June 5, 2019 and was found guilty.  I did not attend this hearing because I was not told about the hearing.  Staff took 30 days of yard from me as punishment.  I received the final copy of my RVR at my annual ICC which took place on June 17, 2020, over a year after I was charged with the RVR.  In the final copy of the RVR, COR staff wrote that I had bruises, which was not consistent with the original RVR I received that was based on the 7219 done by RN Vasquez, which claimed I had no injuries.  The paperwork states that I refused to attend my RVR hearing, even though I did not know about it.  This same paperwork says that I made a statement at the hearing saying the RVR was false, directly contradicting staff's claim that I did not attend the hearing.

20.     On May 5, 2019, I filed a CDCR Form 602 staff complaint grievance against Officer Delacruz and the other officer who attacked me, reporting that I had been assaulted

1  and that medical had confiscated my CPAP.  I requested an investigation and stated my

2  intention to file a lawsuit about this issue.  My 602 was bypassed at the first level of

3  review and sent to the second level of review.  The documentation I was given states that I

4  was interviewed about my staff complaint on July 18, 2019, by ISU Lieutenant C. Brown

5  and ISU Sergeant Montano, in the appeals office at COR.  This interview never took place,

6  and my second level response states that I was interviewed by Sgt. Montano the first time

7  on May 3, 2019.  At that point, I had not filed my 602 yet, so it would not make sense for

8  Sgt. Montano to say he had interviewed me then about my 602.  I sent the appeal to the

9  third level and wrote on the appeal that I was dissatisfied with the second level response

10  because my 602 interview had never taken place.  On November 20, 2019, my CDCR

11  Form 602 was denied at the third and final level.  The response said my complaint was

12  properly addressed and that CDCR staff had not violated any sort of policy.

13      21.      I also filed a separate 602 grievance on June 24, 2019, reporting that RN

14  Vasquez, LVN Barkhurst, and other medical staff refused me emergency medical

15  treatment after the assault.  I was interviewed about this 602 on August 9, 2019 by G.

16  Rodriguez, a supervising nurse at COR.  The documents say I was called for two

17  interviews, one about RN Vasquez and one about the LVN Barkhurst, but my meeting with

18  Ms. Rodriguez was only about RN Vasquez.  I never had an interview about LVN

19  Barkhurst.  My meeting with Ms. Rodriguez was brief, and she barely asked me any

20  questions.  On August 20, 2019, I received a written second level response to my appeal.

21  The response denied my appeal and stated that staff did not violate CDCR policy, and that

22  there would be no intervention on this issue.  I sent this 602 to the third level and was

23  denied again on November 20, 2019.  I did not get my CPAP machine back until about a

24  month after the assault, in June 2019.

25      22.      When I arrived at LAC on August 1, 2019, I was told by a B-Yard yard

26  lieutenant whose name I do not know that I needed to have my RVR hearing for the RVR I

27  received on May 2, 2019.  He said the computer was saying that this RVR had never been

28  heard.  I told him that this RVR had already been heard and I had received my punishment

1   two months ago.  The lieutenant told me, "I'll call up my friend at Corcoran."  I assume he

2   made that call and was told that the RVR had already been heard, as I never heard anything

3   else about a new RVR hearing from that lieutenant or other staff at LAC.  However, this

4   incident made clear to me that custody staff at LAC knew that I had been accused of

5   assaulting staff at COR.

6           23.     I have experienced retaliation and witnessed abusive custody staff conduct

7   since my arrival at LAC on August 1, 2019.  When the lieutenant told me that my RVR

8   was going to be heard when I arrived at LAC, even though it had already been heard and I

9   had already been punished, I had told him that I would write him up if he re-heard the

10  RVR and punished me again.  I did end up filing a complaint on him because I wanted to

11  do everything in my power to make sure my RVR was not re-heard.  After saying I would

12  file a complaint if the RVR was re-heard, officers searched my cell in B Yard, Building 3,

13  in back to back weeks, on August 12, 2019 and August 21, 2019.  During these searches, a

14  group of B-3 officers, including Officer Serrano and Officer Montoya, trashed my cell and

15  threw all of my property on the floor.  Officer Serrano came to my cell when I first got to

16  LAC and told me, "You like to take off on officers, huh?"  He told me that he had looked

17  on the computer and seen my history.  From the beginning of my time at LAC, officers

18  have made it known that they are aware I reported being assaulted at Corcoran and have

19  been hostile to me because of that.

20          24.     After the August 21, 2019 search, Officer Montoya and Officer Serrano

21  came to my cell to try to intimidate me.  Officer Montoya said, "Oh, you think you can just

22  rat on my friends at Corcoran and try to get them fired and move to Lancaster thinking it's

23  over?  You fucked up every day while you're here, I'm going to give you hell until you do

24  something."  I took this as him trying to provoke me into doing something that would

25  cause LAC officers to assault me and charge me with a staff assault.  He called me a

26  "bitch" and "victim" repeatedly, and told me that if I 602 him it will "come up lost."

27          25.     These issues continued after these first searches in August 2019.  After I

28  talked to my attorneys at Rosen Bien Galvan and Grunfeld in April of 2020, the group of

1  officers in B-3 the very next week searched my cell multiple times.  I believe they

2  overheard my phone call with my attorneys reporting the issues in this declaration, because

3  they were sitting right outside the door, and they decided to retaliate against me again.

4       26.     On August 12, 2019, Officer Bolton and Officer Drayton took the TVs of

5  many people in B-3, regardless of whether the incarcerated individuals had chronos saying

6  they needed a TV for mental health reasons.  My TV was confiscated, even though I have

7  a chrono that says I need a TV to cope with my mental illness.  After this happened, I and

8  other patients on the unit asked to speak with the psychiatrist to tell them that staff had

9  taken away our TVs despite our mental health chronos that said we needed the TVs.  The

10  custody staff on the unit refused to call the psychiatrist or another member of mental health

11  staff for us, so I and others sat down on the floor of the dayroom in a peaceful protest, to

12  try to get them to let us speak to mental health staff.  I and others were charged with

13  "unlawful assembly" that same day.  I was found guilty of that RVR and lost yard and

14  dayroom for 30 days.  I and others filed a group 602 reporting that staff had taken away

15  our TVs, but that 602 was denied.  I believe these searches and the confiscation of the TVs

16  are both excuses for staff to take property and otherwise mess with patients like myself

17  who report staff misconduct.  I sent a letter to the ombudsman dated August 21, 2019,

18  reporting these retaliatory acts.

19       27.     On November 20, 2019, Officer Bolton denied me my religious service.

20  When I asked her why she was denying me this, she said "because you like writing stuff

21  up."  I filed a 602 reporting this and was denied at all three levels.

22       28.     I have also been threatened with harm at LAC.  One day in September 2019,

23  I was walking on the yard when the B-3 Yard tower officer at LAC pointed an AR-14 at

24  me from the tower.  I was walking to pill call and was told to put my blue shirt on to go to

25  pill call.  He yelled at me "put your shirt on" from the tower and raised the gun at me.  I

26  was not being hostile or refusing to comply.  I filed a 602 about this, but I think that the

27  602 came up missing because I never received a response or had an interview with anyone

28  about this.  This often happens where I and others lose appeals after we put them in the

1   box and never receive a response.  I believe that the person who picks up the appeals and

2   members of the appeals office are friendly with the officers, so they pick and choose which

3   appeals to process.

4          29.     On June 19, 2020, I had a confidential call with staff at Rosen, Bien, Galvan,

5   and Grunfeld ("RBGG"), my attorneys to which I have been reporting these issues. Later

6   in the day after this call with RBGG, one of the floor officers, who I call Officer P,

7   because I do not know how to spell her last name exactly, asked me why I was reporting

8   staff.  She told me, "It's best if you refuse talking to them", meaning the RBGG attorneys,

9   "so that you can make it home."  I asked her, "What do you mean by that?"  She said,

10  "Take it how you want to."  I took this as a threat that she and other staff were going to

11  harm me or set me up if I continue to report these issues.  I believe that some of the

12  officers heard my call with RBGG because I was talking on speakerphone and they were

13  walking by the door constantly during the call, even though it was supposed to be

14  confidential.

15         30.     I also was recently on quarantine status after returning from the hospital.  On

16  July 22, 2020, a nurse came to my door and told me that July 23, 2020 would be my last

17  day of my scheduled 14-day quarantine.  The next day, I was set to come off quarantine.  I

18  also happened to be scheduled to speak with RBGG again on July 23, 2020.  As the nurse

19  was walking towards me to let me off quarantine on the morning of the 23rd, Officer P

20  called her over a couple steps away by the stairs near my cell.  I and my neighbors

21  overheard Officer P telling the nurse to keep me on quarantine for seven more days.

22  Officer Mercy, who was also nearby, stepped in and told Officer P that I was supposed to

23  come off quarantine that day.  Officer P ignored him.  The nurse ended up telling me I had

24  to stay on quarantine because I had refused a COVID-19 test, even though I had never

25  refused a test.  I was never tested in the seven days after my quarantine was extended.  I

26  believe that Officer P was trying to harass me and prevent me from speaking with my

27  attorneys.  Despite these threats and actions, I continue to report these issues because I

28  need to stand up for myself and others.

31.     I have also witnessed staff engage in misconduct against other people at LAC.  Sometime in 2019, Officer Serrano was walking someone on my unit back to our cell while he was handcuffed, and I saw the officer suddenly slam this person face first into the ground.  Once he was on the ground on his back, the officer put his knee into his head.  He was cuffed the entire time.  They took him to the holding cages in B-3, where we could not see.  I am not sure what happened after that, but they charged him with an RVR and gave him a SHU term.  I know this because after he came back from his SHU term, he moved into my cell with me.

32.     I believe staff feel they can threaten me because I am mentally ill and weak due to my medical conditions, and because I have reported staff abuse in the past and have been falsely charged with batteries on staff.

33.     I have had some difficulty getting to medical appointments, as custody staff have been failing to notify me of my appointments and then falsely telling medical staff that I refused the appointment   I also have periodically had difficulty getting my CPAP, most recently in early March.  At that time, I went out to court and stayed at LA County Jail.  When I returned to LAC from LA County Jail, staff did not give me back my CPAP, and it took three weeks for me to get my CPAP back.  During that period, I was having trouble breathing at night and requested my CPAP back multiple times both in writing and verbally.  Because floor staff at LAC would not let me speak to medical, I was unable to report these concerns directly to medical staff for weeks.

34.     In my time at COR and during my time at LAC, there have been many times I needed help from staff but have been afraid to ask.  Because of my various medical conditions, I need staff's help to see medical staff and to get medical treatment.  After being refused medical treatment after being assaulted, I am afraid to ask staff to help me see medical staff.  In the times when I have asked staff for help, they refuse to help me, making me even more afraid and even less willing to ask for help in the future.  I also will not ask mental health staff for help when I am feeling depressed and feeling suicidal, as I am afraid they will talk to custody staff about me.  I generally try to keep to myself and let

1    custody staff do what they are going to do, because nothing I do is going to change how

2    they act.  I fear the officers so much that shortly after the assault I started trying to lock my

3    door by putting books in the door, so that staff could not easily enter my cell at night while

4    I am sleeping.  At LAC, I continue to have this fear because even though I have not been

5    assaulted there, staff have made it clear to me that they will not help me because I reported

6    this assault at Corcoran.

7          35.    My mental health worsened after I was assaulted in May 2019.  In the weeks

8    before the assault, my sister passed away, and I was experiencing a lot of anxiety and

9    stress as I was processing my sadness about my sister passing.  After I was assaulted, I

10   experienced even more anxiety because I was afraid of being assaulted again.  I told my

11   clinicians that I was scared all the time and distrustful of all of the officers after this

12   assault.  I was not able to sleep and unable to relax when around others.  My voices grew

13   stronger, and I was experiencing these voices every night very intensely before going to

14   sleep.  I do not trust mental health staff at all after this assault because they appear close

15   with the officers and seem to share information with each other.  This makes me afraid that

16   custody staff will be told the private issues I express to mental health staff.

17         36.    I also have ongoing medical issues as a result of being assaulted.  I continued

18   to experience issues with my eye after the assault and was scheduled to see an

19   ophthalmologist in November 2019 for a consult for surgery on my eye.  However, I

20   moved to LAC before that consult could take place, and staff at LAC decided to refer me

21   to a different specialist.  I have yet to receive surgery on my eye.  I am also still waiting for

22   surgery on my left shoulder.

23         37.    In my opinion, staff target people with mental health issues, medical issues,

24   and people with disabilities with staff misconduct, because these groups of people are

25   vulnerable.  I believe that staff felt they could assault me at my medical appointment

26   because I was vulnerable.  They confiscated my CPAP because they knew I needed it, then

27   assaulted me.  I do not believe this would have happened to me if I had not had the medical

28   issues that I do.  I have noticed that staff at both COR and LAC target vulnerable people

1   because we rely on staff for help more than the average prisoner without medical issues,

2   disabilities, or mental health issues.

3        38.    I believe the reason there is so much staff misconduct at COR and LAC is

4   because staff cover for each other and create a system where they cover things up for each

5   other even when you report these issues.  This is a corrupt system because staff know that

6   as incarcerated people that we do not have easy access to the outside world.  Because of

7   this, they can create a system where medical and mental health staff cover things up for

8   custody staff, and vice versa, so that it seems like we are getting a fair shake but really are

9   not.  I have seen this pattern for years where staff commit assaults or other misconduct and

10  they get away with it because they cannot be properly investigated.

11      I declare under penalty of perjury under the laws of the United States of America

12  that the foregoing is true and correct, and that this declaration is executed at Lancaster,

13  California this 14th day of August, 2020.

14

15  ████████████████████ _____

16  ██████████████

17      On August 14, 2020, due to the closure of California State Prison-Lancaster, in light

18  of the COVID-19 pandemic and ongoing concerns that officers might retaliate against

19  witnesses in support of Plaintiffs' Motion, including ongoing concerns about the

20  confidentiality of the legal mail system at LAC, I read the contents of this declaration,

21  verbatim, to ████████████, by telephone.  ████████████ orally confirmed that the

22  contents of the declaration were true and correct.  ████████████ also orally granted me

23  permission to affix his signature to the declaration and to file the declaration in this matter.

24

25

26  DATED: August 14, 2020

27                             Emma Cook

28

# Exhibit 17a

## Filed Under Seal

# Exhibit 18

1    **SUPPLEMENTAL DECLARATION OF** ██████ ██████

2    I, ██████ ██████ declare:

3    1.    I have personal knowledge of the matters set forth herein, and if called as a

4    witness, I could and would competently so testify.

5    2.    My California Department of Corrections and Rehabilitation ("CDCR")

6    number is ██████ I am currently housed at California State Prison – Los Angeles County

7    ("LAC") in the Short-Term Restricted Housing ("STRH") unit, which is a type of

8    Administrative Segregation Unit ("ASU") for individuals in the mental health program at

9    the CCCMS level of care.  I am in Building 1, Cell ██████ I am 52 years old.  I have been

10   housed at LAC from December 18, 2018 to now.

11   3.    I am an *Armstrong* class member.  I am designated as DNH, which means I

12   have a hearing disability that does not require a special housing placement.  I have to use

13   hearing aids in settings with background noise, and I wear a hearing disability vest.

14   4.    I am also a *Coleman* class member.  I am at the CCCMS level of care.  I

15   suffer from anxiety and depression.

16   5.    I also have a number of serious medical conditions.  I am being treated for

17   arthritis, chronic migraines, and Hepatitis C.  I have foot deformities, for which I've been

18   recommended in the past for reconstructive surgery in both feet.  I am classified as high

19   risk medical.

20   6.    I was recently a victim of an assault by staff at LAC that was as a result of

21   my prior declaration in support of Plaintiffs' Motion to stop Defendants from Assaulting,

22   Abusing and Retaliating against People with Disabilities, filed on June 3, 2020, which

23   detailed staff misconduct at the prison.

24   7.    On July 7, 2020, Officer Keeton handed me a breakfast tray missing the

25   main course, which was eggs, and said to me, "Fuck you."  Because I am in Administrative

26   Segregation, officers serve meals to incarcerated people in our cells.  I was confused about

27   why Officer Keeton said this to me.

28

[3582077.1]                                             1

8.      I called out to other officers in my housing area to get my main course. After 10 to 20 minutes, Officer Keeton returned to my cell with a tray containing scrambled eggs and said loudly, "Here you go, Snitch." I was even more confused by this, because I have never been an informant against incarcerated people. When officers speak to people in neighboring cells in my housing area, I can hear them, so I believe a number of incarcerated people in nearby cells would have heard him call me a "snitch." I worried at the time that this might start a rumor among people incarcerated in the prison and endanger my safety, because sometimes incarcerated people attack people purported to be informants.

9.      At approximately 10 a.m. the same day, Officer Keeton approached my cell again, asking if I wanted to go to yard. I responded, "Yes." At approximately 10:45 a.m., Officer Keeton returned to my cell. As I was handing him clothing through the tray slot in my door for him to search before allowing me to go to the yard, I asked him why he called me a snitch and served me a tray without eggs. He responded, "Think about it, Snitch." I was angry that Officer Keeton had again put my safety at risk. He searched my clothing and returned it to me.

10.      Next, apparently frustrated by my questions, Officer Keeton said, "Fuck you. You're not going to yard!" and slammed shut my tray slot. I immediately asked Officer Keeton and Officer Salazar, who was conducting security checks on neighboring cells if I could speak to Sergeant Hodges, Officer Keeton's supervisor. Approximately five minutes later, I heard Sergeant Hodges speaking to Officer Keeton at the open doorway to the yard (which is near my cell) about why I was not allowed to access the yard or use the hair clippers. Staff normally allow us to use hair clippers to cut our hair every other week, and I was supposed to be able to use them that same day.

11.      I waited until Officer Keeton was finished speaking for my turn to address the Sergeant. However, Sergeant Hodges began walking away, right by my cell, without stopping. I called to him, "Excuse me, Sergeant, can I speak to you about my yard rights?"

12.      Sergeant Hodges responded, "No, ███████ and continued walking away.

13.     A few minutes thereafter, Officer Contreras, who normally escorts people with Officer Miller to dental and medical visits at the Treatment and Triage Area (the "TTA"), a medical clinic on prison grounds, approached my cell to tell me I had a dental appointment that day.  After my dental appointment, while Officers Contreras and Miller were escorting me back to the STRH, I asked them if I could speak to a lieutenant.  Officer Miller said, "We'll put you in the holding cell and you can talk to the Sergeant, 'cause there's no lieutenant here."

14.     I took a seat on a metal bench inside the holding cell near the offices for the STRH.  Almost immediately, Sergeant Hodges, who works during second watch, and Sergeant Puentes, who works during third watch, approached the holding cell.  I told the two sergeants what had happened earlier in the day with Officer Keeton and asked Sergeants Hodges and Puentes to give me their word that I would be given the opportunity to use the hair clippers within the next few days.  Both sergeants said no to this request.

15.     Officer Hodges then stated, "You're going back to your cell right now.  I don't want to hear this shit anymore."  I responded, "Can I speak to a lieutenant, because I don't think this is an unreasonable request?"

16.     Sergeant Puentes looked at Sergeant Hodges and said, "This is the asshole that wrote a declaration for Rosen, Bien, Galvan."  Sergeant Hodges then responded, "Really?  Okay."  Without saying anything more, Sergeant Puentes grabbed my left arm and shoulder, and Sergeant Hodges grabbed my right arm and shoulder.  Together, they lifted me off the metal bench and carried me to the corridor outside the holding cell, where they put my feet down on the ground.  Five officers, Officers Miller, Contreras, Banks, Perucho, and Eckler were standing nearby.

17.     Surrounded by the officers and sergeants, I widened my leg stance to avoid being knocked off balance and falling on the hard concrete.  At the time I was in waist restraints.  Officers Miller, Contreras, Banks, Perucho, and Eckler, as well as Sergeants Hodges and Puentes grabbed me, punched me, and knocked me to the floor.  They then kicked my body and punched me repeatedly.  Three times, in the process of taking me

back to my cell, the officers picked me up off the concrete floor and then beat me down onto the hallway floor again.  Once right outside the holding tank and two more times in the hallway on the way to my cell the officers beat me on the ground.  In between the initial beating and second beating, I was put into a wheelchair and I immediately told Sergeant Hodges, "Let me speak to a clinician, I am feeling suicidal."  He just laughed at me.  As we were going down the hallway towards my cell, staff then dumped me from the wheelchair onto the cement floor and beat me the second time.  The wheelchair got knocked out of the way.  I was then picked up, and thrown back to the ground and beaten a third time.

18.     While I was on the ground each of the three times, the officers used their body weight to put pressure on my neck and back causing me to experience breathing difficulties and intense pain.  I lost track of time, but I would estimate these three initial beatings lasted five to ten minutes.  Since the incident, I have continued to experience ongoing severe neck and back pain.

19.     After the third beating in the hallway, the officers took me to my cell, and threw me on the floor of my cell, slamming me onto my knees and arms on the cement, and began beating me once again.  I was cuffed in waist chains the entire time I was being beaten.  After I was on the ground they sat on top of me again, and kept beating me.  At this point I said, "That's enough, it's over, I am in my cell, it's over, close the door and let me uncuff."  One of the Sergeants said, "You don't decide when this stops, we make those decisions, keep your mouth shut."  Then I was picked up again and slammed back down onto the cement again.

20.     During the attacks in the hallway, the doors at the front and rear of Sections A through H were closed.  These section doors are always open, so I believe the tower officer closed them to keep other incarcerated people from seeing and hearing what staff were doing to me, and to keep people from hearing me calling out for help.

21.     Following the assault, I was covered in lacerations, bumps, swelling, and bruises all over my body.  My lip was busted, and I was bleeding.  I was bleeding from my

1    ankles, legs, wrist and arms.  I felt extreme pain, my lip was swollen and burning.  My

2    back and neck and limbs were all in severe pain and were swollen.  I had bruising on my

3    wrists and arms.

4          22.    After 15-30 minutes in my cell, I notified the floor staff in my wing (1) that I

5    wanted a videotape made of my injuries; (2) that I was feeling suicidal and I needed to

6    speak to mental health staff; and (3) that I wanted medical attention for my injuries.

7          23.    They acknowledged my requests.  However, I never saw anyone from mental

8    health that evening.  I was given a videotaped interview regarding the use of force that

9    evening.  All of my injuries were videotaped by two Sergeants, and according to them, the

10   video would then be placed into an evidence locker.

11         24.    When I was going out to do the video interview, a nurse asked me if she

12   wanted me to have her clean the injuries.  I told her I would appreciate it if she could clean

13   up my injuries after the videotaped interview.  However, when I was done with the

14   videotaped interview she was no longer around, and no one ever came back to clean up my

15   injuries.  I never saw anyone from mental health that day or the next morning.

16         25.    On the evening of the incident, a nurse came to my cell front and did a Form

17   7219 medical injury report.  After I filed an excessive force 602 appeal, nursing staff did a

18   second Form 7219 to document my injuries.  The second 7219 form was six days after the

19   assault on me, and my injuries were videotaped a second time.  Of course, six days after

20   the injury, some of my injuries had begun to heal.

21         26.    I received RVR # 7015722 regarding the incident.  I was charged with

22   Battery on a Peace Officer.  I have not yet had a hearing on the RVR.  I postponed the

23   hearing pending a decision on the DA referral that has yet to be made regarding this

24   incident.  It is my understanding from other incarcerated individuals at LAC, that when

25   staff assault a prisoner, they typically then turn around and charge the prisoner with assault

26   on staff to cover up the assault and justify the injuries.  In my opinion, the charges in the

27   RVR are very implausible, given that I was in waist restraints at the time of the alleged

28   incidents in the RVR.

[3582077.1]                                          5

27.     The beating has had a major impact on my mental health, and has worsened my depression and anxiety.  I am currently experiencing severe depression and anxiety. Every time I hear staff coming down the tier with handcuffs I become anxious – thinking they are coming for me.  I get panicked, jittery and sometimes nauseated.  I am constantly worried I will be beaten again.

28.     I constantly interact with the same officers who beat me.  They control my showers, access to food, yard, phones, clippers, razors, access to mental health and medical.  I say as little as possible to them but there is no way to avoid them.

29.     I have also experienced other staff retaliation since I gave the first declaration in this matter.   On June 24, 2020, staff in R&R sent my new personal television that my family purchased back to the vendor.  A property captain signed off on the document sending it back to the vendor.  There is no reason that the television should have been rejected by R&R staff, and none was given on the paperwork.  I believe this was pure retaliation for my cooperation with Plaintiffs' Counsel.

30.     In submitting this second declaration, I am in fear for my safety.  I do not know how the officers and sergeants learned of my participation in the *Armstrong* motion, and I am concerned I will be attacked or otherwise retaliated against for this second declaration documenting their misconduct.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

31.    Despite these fears, I have drafted this second declaration hoping that making known the staff misconduct that occurs behind closed prison doors will lead to change in the culture of violence amongst LAC staff members.  I worry for the other people in this prison who may be too scared to report similar incidents.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 22nd day of July, 2020.

/s/ █████████ _____

On July 22, 2020, due to the closure of LAC in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at LAC, I read the contents of this declaration, verbatim, to ████ ████ by telephone.  ████ ████ orally confirmed that the contents of the declaration were true and correct.  ████ ████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: July 22, 2020                 _____
                                     Thomas Nolan

# Exhibit 18a

**Filed Under Seal**

# Exhibit 19

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 20, 2020


Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com


Dear Mr. Nolan:

This status letter is in response to your March 27, 2020, letter containing various allegations of staff misconduct targeting inmate ███████████) at the California State Prison – Los Angeles County (LAC). The California Department of Corrections and Rehabilitation takes every allegation serious, and as such, LAC conducted an inquiry[1] into the allegations raised in your letter.

Inmate ██ paroled from LAC on March 21, 2020, on post release community supervision. On July 9, 2020, staff conducted a telephonic interview with inmate ███ to discuss his allegations. Inmate ███ refused to participate in the interview regarding his allegations. LAC staff confirmed with the Office of Appeals that inmate ███ did not file a staff complaint or appeal concerning these allegations.

On December 11, 2019, at approximately 1015 hours, inmate ███ attended a confidential health session and attempted to hand his clinician a note. The doctor indicated that she could not take the note, but that he could read it out loud. Inmate ███ then stated that he wanted the doctor to bring him a cellular telephone. The doctor then terminated the session and inmate ███ threw the note. Staff then escorted inmate ███ to the Program Office. Staff retrieved the note and it was clear that inmate ███ was attempting to initiate a romantic relationship with the doctor and have her bring a contraband cellular telephone into the institution so they could maintain communication. The note did not contain information with regards to safety concerns as alleged in your advocacy letter.

---

[1] LAC conducted the fact-finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22. The Department is in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

Thomas Nolan
Page 2


After being informed that staff recovered the note and that he was being charged with overfamiliarity, inmate ███ claimed he was suicidal.  Inmate ███ was then escorted to the Facility "D" gymnasium holding cell to be evaluated by mental health staff.

Inmate ███ was evaluated by mental health staff and cleared to return to his assigned housing. At approximately 1331 hours, as correctional officer Coleman opened the holding cell door, inmate ███ attempted to punch Officer Coleman, and grabbed his protective vest.  In response, staff utilized force to quell the incident and gain compliance.   (See incident log LAC-DGYM-19-12-1073).   Medical staff examined inmate ███ after the incident and noted no injuries as a result of the incident.   When medical staff asked inmate ███ to give a brief statement as to the circumstances of the incident, inmate ███ replied "no comment."  The Institutional Executive Review Committee (IERC) use of force review determined that staffs' actions were appropriate and in compliance with Department use of force policy.  Inmate ███ received a Rules Violation Report (RVR log no. 6942346) for Battery on Staff and was found guilty. Inmate ███ was also charged with overfamiliarity (RVR log no. 6942348) and found guilty.

LAC staff determined that the allegations contained herein lack cause for further investigation and are deemed to be not sustained.  LAC has closed the inquiry into this matter.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

MICHAEL MUELLER
Attorney IV
Office of Legal Affairs


cc:  Raybon Johnson, Warden

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 4, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:    *COLEMAN V. NEWSOM, ARMSTRONG V. NEWSOM*: ADVOCACY LETTER FOR EOP CLASS
         MEMBER ███████████████) REGARDING ALLEGATIONS OF EXCESSIVE FORCE AT
         CSP – LOS ANGELES COUNTY ON NOVEMBER 8, 2019
         YOUR FILE NO. 0489-03, 0581-03

Dear Mr. Nolan:

I write to respond to your March 27, 2020, letter regarding inmate ███ ████████ who
alleges he was subjected to excessive force by correctional staff at California State Prison –
Los Angeles County (LAC) on or about November 8, 2019.  To briefly summarize what was stated
in your letter, ███ ████ alleges that on November 8, 2019, an officer grabbed him by the arm
and slammed him to the ground. The officer then kneed him in the back and head and placed
him in handcuffs. ██████ alleges that as he lay on the ground, the officer put his fist into
██ ██████ face, then waved it there, and told him "Stop resisting or I'm going to hit you in
your fucking face." ███ █████ also alleges that he waited in a holding cage for two or three
hours, where an officer came in and said, "What's going on ██████ You're not going to file a
claim, are you?"

In April 2020, a specially assigned investigator opened a new inquiry based on the above
allegations of staff misconduct.[1] The independent inquiry included a review of all available
documentation, including multiple incident reports, the incident commander review, manager's
review, two Institutional Executive Review Committee (IERC) reviews of the incident, appeal
inquiry results, and the relevant Rules Violation Report (RVR), as well as all associated case

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance
with the Department's Operations Manual, Article 22. The Department is currently in the process
of revising that policy and, once approved and adopted, future fact-finding inquiries will comply
with the new policy.

factors.  In addition, the investigator conducted an interview with ▮▮ ▮▮▮▮ on May 1, 2020, and interviews with identified inmate witnesses on April 29, 2020.

**▮▮ ▮▮▮▮▮ did not comply with the orders to return to his cell and responded to the order to submit to restraints by kicking the officer, which resulted in an immediate use of force.**

The investigator reviewed multiple reports filed that describe how ▮▮ ▮▮▮▮ joined an evening medication line when he was not scheduled for medication. He was ordered to go back to his cell, which he did not do. ▮▮▮▮▮ was ordered to submit to handcuffs and appeared to initially comply, but then did not by breaking free from the officer, and ▮▮▮▮▮ then placed a "mule kick" to the officer's knee. Staff responded and utilized immediate force to subdue ▮▮▮▮▮ attack and to overcome his active physical resistance.

A Report of Findings (ROF) was generated in response to the incident and included an interview. ▮▮▮▮▮ confirmed he was standing near the medication line although he had no medication to pick up. As noted in the summary, ▮▮▮▮▮ stated in the interview that he refused an order to go back and stayed there in protest. ▮▮▮▮▮ did allege that he was thrown to the ground and that a knee was placed on his head. During the interview, ▮▮▮▮▮ said words to the effect that he "did not kick [the officer] because if he had kicked him he would be missing his teeth."  As further documented, two inmates identified by ▮▮▮▮▮ as witnesses were interviewed. One provided little information, other than to note that as the officer proceeded to place ▮▮▮▮▮ in handcuffs, ▮▮▮▮▮ "turned, possibly to return to the building." The other did corroborate that ▮▮▮▮▮ did not comply with the order to go back and that he did not comply with the order to submit to handcuffs. The inmate witness stated he then saw ▮▮▮▮▮ taken to the ground. He stated he did not see "excessive force and stuff like that" or words to that effect. The ROF concluded there was no evidence of staff misconduct. The specially assigned investigator noted that in ▮▮▮▮▮ interview, he contradicted the statements made in the letter from counsel. In one account, ▮▮▮▮▮ stated he was "frozen" and unsure of what to do. In another account, ▮▮▮▮▮ stated he willfully refused the order and stood there in protest. ▮▮▮▮▮ also does not confirm in his interview any of the statements or fist shaking purportedly made by the restraining officer.

**▮▮▮▮▮ medical exam reflected an arm scratch after the incident and there were no corroborating witnesses or post-incident injuries to support his allegation that he was kneed in the back and head.**

The incident commander, the manager, and the Associate Warden, reviewed and approved incident reports connected to ▮▮▮▮▮ following established protocols. The 7219 Medical

Mr. Thomas Nolan
Page 3

Report of Injury form (7219) was attached to the incident packet and the injuries listed were consistent with the documented incident. The document reflected an abrasion to the arm. The investigator noted ████████ did not make a statement or an allegation of unnecessary or excessive force at the time he was examined for the 7219. The incident was closed on November 18, 2019, noting no further action was warranted.

On or about November 25, 2019, ████████ prepared and signed a 602 alleging unnecessary or excessive force for the November 8, 2019 incident. Upon receipt of the 602, an Appeals inquiry was opened and ████████ was video interviewed. The Appeal inquiry included interviews of five staff members. ████████ asserted during the interview "the officers are trying to manufacture [the RVR]." However, staff corroborated that ████████ failed to comply when he was ordered to return to his cell. Four out of five interviewed stated ████████ responded to the order with words to the effect of "Fuck you […] I'm not going back." There was a slight discrepancy in the statement the officers reported. Three said the statement included the ordering officer's name and one said that the words "hold on" were said after the expletive. In addition, the four officers who observed the incident noted that ████████ did kick an officer. The fifth staff member did not observe the incident but did respond with a wheelchair to remove ████████ from the yard.  The Appeal inquiry resulted in the conclusion that there was no violation of policy.

The IERC completed a second review, pursuant to the appeal, of the incident on January 21, 2020, and the second review concluded no further action was warranted, in concurrence with the first IERC conclusion.

**No independent witnesses corroborated ████████ account of an officer threatening him with a fist or questioning him about filing a complaint.**

In ████████ May 1, 2020 telephonic interview with the specially assigned investigator, ████████ stated he was ordered to return to his cell but he told officers to "hold on one second because [he] was talking to someone." He then stated an officer approached him and gave him another order to return to his cell and he chose not to respond but stood there in protest. ████████ then described an officer attempting to place him in cuffs and that he "collapsed on the ground" prior to being handcuffed. ████████ did generally reiterate two allegations of verbal abuse that are made in counsel's letter. However, neither allegation was corroborated by inmate or staff witnesses who were interviewed in response to these allegations. The investigator also noted that ████████ did not make any verbal abuse allegations in prior interviews regarding this incident.

Mr. Thomas Nolan
Page 4

Two inmates identified in counsel's letter were interviewed in April 2020. One inmate confirmed that ███████ had been ordered to return to his cell, as he had no reason to be in the medication line. The witness did state that ███████ was "acting paranoid." The inmate stated that ███████ ignored the order to return to his cell, continuing to talk with another inmate. Once staff approached ███████, the eyewitness said that ███████ then "froze" and just stood there. However, with additional questioning, the witness later stated that ███████ continued talking to another inmate after four or five orders from staff to return to his cell.

The second inmate witness interview was also held on April 29, 2020.  The witness confirmed ███████ was near the medication line. The witness provided statements in conflict with those made in counsel's letter, including statements made regarding ███████ being placed in leg restraints and subsequently placed on a gurney.

Relative to this incident, ███████ did receive a Rules Violation Report (RVR) for Battery on a Peace Officer (6929456) to which he pled Not Guilty. A hearing was conducted on November 25, 2019, and based on a preponderance of evidence, ███████ was found guilty. In his defense, ███████ stated words to the effect of, "If I were to kick [the officer], why wasn't I sprayed or beaten within an inch of my life?"

It is noted by the investigator that ███████ was interviewed on multiple occasions regarding the incident and his statements are inconsistent in those interviews. In at least one interview, notably after ███████ raised the allegations to counsel, he mentioned verbal abuse. However, the sequence of events and the staff accused of misconduct change. Additionally, inmate witness accounts also varied and generally did not corroborate the allegations. The investigator concluded that ███████ allegations were somewhat embellished, based on the lack of corroborating evidence.

In sum, the independent review resulted in a recommendation by the investigator that the allegations of excessive force were unsustained.  CDCR has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 22, 2020


<u>VIA EMAIL ONLY</u>

Cara Trapani

Rosen, Bien, Galvan & Grunfeld, LLP

ctrapani@rbgg.com


RE:     ***COLEMAN V. NEWSOM:* EOP CLASS MEMBER** █████████████████
         **REPORT REGARDING STAFF MISCONDUCT AT LAC; <u>YOUR FILE NO. 0489-03</u>**


Dear Ms. Trapani:

I write to respond to certain allegations in your August 8, 2019, letter regarding inmate ███████████████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  The following allegations were extracted from the letter for further independent inquiry:

- ███████████ alleges that on June 27, 2019 officers used excessive and unnecessary force on ██████
- ████████████ alleges that on June 27, 2019 staff failed to act when ████████ swallowed razor blades.


In March 2020, an independent investigator opened an inquiry to address the above allegations of staff misconduct.[1]  This included review of all available and relevant documentation, including but not limited to the CDCR 837 Incident Package, Rules Violation Reports (RVR), and the Electronic Records Management System (ERMS).

The investigator, as a result of the review, noted there were no appeals or grievances filed by ██████████ regarding his allegation of excessive or unnecessary use of force.  ███████████ did not raise the allegation except as a defense to an RVR for Battery on a Peace Officer (687070187), which was heard on July 31, 2019.

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance with the Department's Operations Manual, Article 22. The Department is currently in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

Ms. Cara Trapani
Page 2

Earlier on June 27, 2019, the same date of the alleged excessive/unnecessary force, staff documented, via an RVR, a conversation with ███████ that occurred during a treatment team meeting.  In this conversation, ███████ "repeatedly stated he was going to report whatever he needed to," including making homicidal and suicidal statements, in order to be placed back into the Enhanced Outpatient Program (EOP).  Staff noted he was not in acute distress and he had been cleared by a mental health evaluation.  ███████ later pled guilty to the RVR for Unlawful Influence (6869330).

The investigator reviewed the June 27, 2019 Incident Packet and the associated documents, as well as the Report of Findings and the recorded interviews. Officers documented ███████ did not want to return to his housing unit after his earlier mental health evaluation and interaction with his treatment team. He stated something to the effect of: "I am not going back, I am going to see the Doctor no matter what." ███████ then turned and hit an officer in the face with his fist. ███████ was subsequently "taken to ground" and restrained by two officers, one on his back and the other placing his hands on the ███████ upper back area. ███████ resisted by trying to get up while the officers were attempting to restrain him.  Additional staff arrived and ███████ was placed in restraints.

The Medical Report of Injury or Unusual Occurrence (7219) was completed June 27, 2019, immediately after the use of force and the 7219 noted ███████ reported he swallowed three razor blades.  The 7219 documented abdominal pain and a discolored area near ███████ left eye. These injuries were not consistent with the later allegation ███████ made regarding injuries sustained, as a result, of use of force.

The Institutional Executive Review Committee reviewed the 837 package and found staff actions to be in compliance with policy. ███████ was interviewed and videotaped on August 7, 2019 as part of the inquiry into the allegation of excessive/unnecessary use of force.  In the Report of Findings, ███████ was quoted as stating something to the effect of "I was trying to go suicidal and they didn't let me go." In that interview, ███████ was unable to identify any staff or inmate witnesses to his allegation of unnecessary or excessive force.

███████ was medically evaluated on August 7, 2019 prior to his interview.  The 7219 noted lower back pain, which was a new complaint not consistent with the June 27, 2019 medical evaluation.  In this new 7219, ███████ stated he needed an x-ray due to lower back pain. There were no visible injuries noted at the time.

Ms. Cara Trapani
Page 3

On March 18, 2020, the investigator offered a personal interview to ▮▮▮▮▮▮ in order to obtain corroborating or supplemental information to support the new inquiry into the past allegations. ▮▮▮▮▮▮ refused to participate in the interview.

As to the reported failure to act when ▮▮▮▮▮▮ had reportedly ingested razor blades, the investigator was able to confirm ▮▮▮▮▮▮ was sent the same day (June 27, 2019) to an external medical provider where it was confirmed that a "foreign item" was located in ▮▮▮▮▮▮ and it was likely due to ingestion. ▮▮▮▮▮▮ received treatment at that time.

In summary, the inquiry into the above listed allegations resulted in a recommendation by the investigator that there was insufficient evidence at the time of the inquiry to support ▮▮▮▮▮▮ allegations of staff misconduct and no further investigation is warranted at this time. CDCR has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

cc: R.C. Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 22, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:   *ARMSTRONG V. NEWSOM:* PLAINTIFFS' REPORT RE MAY 21-24, 2019
      MONITORING TOUR OF CALIFORNIA STATE PRISON – LOS ANGELES COUNTY; <u>YOUR</u>
      <u>FILE NO. 0581-03</u>

Dear Mr. Nolan:

I write to respond to your July 16, 2019, letter with a report including inmate ███████████,
████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  As
to Mr. ██████ allegations of staff misconduct, the following was extracted from the report:

1.  Mr. ████████ reported that he was severely beaten by officers on August 25, 2018 while
    he was asleep in his cell.
2.  Due to his injuries, he requested a wheelchair, a permanent cane, neck brace, knee brace,
    elbow brace, seizure helmet, dentures, and ankle brace. In response to his request, he
    was provided with dentures and a helmet was ordered for his seizures.

As to the first allegation, that of Mr. ███████ being beaten during sleep in his cell, a detailed
response was provided to your office from CDCR counsel, Michael Stone, dated July 8, 2020.
CDCR's inquiry into that specific allegation has been closed.

In March 2020, an independent and separate inquiry was opened into the second allegation of
staff misconduct.[1]  An independent investigator completed review of all available and relevant
documentation, including but not limited to the Electronic Records Management System,
Healthcare Appeal logs (CDCR 602 HC), CDCR form 1824, Reasonable Modification or

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance
with the Department's Operations Manual, Article 22. The Department is currently in the process
of revising that policy and, once approved and adopted, future fact-finding inquiries will comply
with the new policy.

<u>CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

Accommodation Request, and the Reasonable Accommodation Panel (RAP) response, as well as all associated case factors.

The investigator noted that RAP did respond to ███████ request for Durable Medical Equipment (DME) on or about September 12, 2018. DME request included a wheelchair, permanent cane, neck brace, knee brace, elbow brace, helmet, dentures, ankle brace, pressure stockings, "Boost", and a renal diet. The RAP partially approved the request and noted that the allegation would not be placed on the non-compliance log as there was "no nexus to ███████ disability and it [the complaint] is already in the staff complaint process."

The RAP noted that ███████ was already receiving "Boost" three times per day and a helmet was on order prior to the complaint.  A physician noted that ███████ medical condition at that time did not warrant the need for a neck brace, elbow brace, wheelchair, or pressure stockings. The RAP also redirected ███████ request for dentures to the appropriate process for dental care.

The investigator notes that ███████ submitted a number of Health Care Appeals within a short period of time and one filed on or about September 10, 2018, was rejected due to excessive filing.  This was found to be an appropriate response as ███████ had filed a prior Health Care Appeal on or about September 5, 2018.  ███████ was provided forms and information regarding filing timelines and procedures.

███████ was personally interviewed and digitally recorded as part of an appeal inquiry into this matter on March 17, 2020.  ███████ confirmed that he had received certain DME he had requested and that while he did not agree with the RAP physician's medical assessment and denial of DME, he chose not to appeal because "all health care and DME issues outlined within his CDCR 1824 were adequately addressed."

Also, note, the investigator reviewed past Health Care Appeals and outcomes, and noted that ███████ has established a pattern of requesting DME and program placement that has not been deemed medically necessary.

///
///

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 3

In summary, the inquiry into the above listed allegations resulted in a recommendation that there was insufficient evidence to support ███████ allegations of staff misconduct and no further investigation is warranted at this time. CDCR has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

cc: Raybon Johnson, Warden (A)

**<u>CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY</u>**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 21, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY


RE:    COLEMAN LAC REPORT (APRIL 29, 2019):


Dear Mr. Nolan:

This letter is in response to your office's correspondence received on July 16, 2019, concerning allegations of staff misconduct at California State Prison, Los Angeles County (LAC).

California State Prison-Los Angeles County ("LAC") conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> "In another appeal (*A-19-00972*), ▮▮▮▮ reported on February 11, 2019 that it was twenty-four degrees Fahrenheit in his unit and yet officers refused to turn on the heat. According to ▮▮ ▮▮▮▮ allegations, officers instead taunted inmates for being cold and belittled their need for a livable temperature. He requested that officers be rotated from his unit so that he and other prisoners did not have to face harassment from officers. His request was screened out as non-ADA related and he was directed to file a 602 about his concerns."

CDCR takes every allegation made against the Department seriously, and as such, LAC conducted an inquiry into these allegations by referencing various documents, databases, and records, as well as by conducting interviews, where appropriate, to procure information regarding the allegations.


LAC reviewed records related to inmate ▮▮▮ in the Electronic Records Management System

---

[1] LAC conducted the fact-finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

Mr. Nolan
Page 2

(ERMS) and the Inmate Appeals Tracking System (IATS).  LAC determined that inmate ███████ filed no appeals concerning heat in the buildings.  LAC also reviewed a bed history report to determine other possible inmate witnesses.  An appeal was identified from another inmate housed in the unit at the same time as ██████ but that appeal was about his cell being too hot (as opposed to insufficient heating, as alleged by inmate ████████).

LAC's investigator spoke with a Plant Operations Manager regarding heating and air in Facility A, Building 4 (where inmate ██████ was housed at the time of his allegation).  The Plant Operation Manager informed the investigator that custody staff do not have the ability to adjust the heat in the housing units (that can only be accomplished by submitting a work order to plant operation staff).  The investigator was informed that custody staff can shut down the system via the fire control unit, but only in case of a fire.

LAC interviewed inmate ██████ at California Medical Facility (CMF) in a face-to-face interview on March 16, 2020.  When pressed on what exactly staff said while they were allegedly taunting inmates about the heat or who those staff were, inmate ██████ said that staff were ignoring inmates rather than affirmatively taunting them.  Inmate ██████ indicated to the investigator that he believed control booth officers had the ability to adjust the heat.  Inmate ██████ further indicated that he was aware that there were technical issues with the heating equipment in the building during the relevant time period.  The LAC investigator found work orders for the heating and air systems that were placed in January and February.

Two additional inmates who were housed at Facility A, Building 4, during the relevant time period, were also interviewed by LAC.  One corroborated issues with the heating in the facility that was mechanical in nature, and the other could not recall any issues with the heating.

Based upon the documentary review, and the information derived from the interviews, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of inmate ██████.

Should you have any questions, please contact the undersigned at 916-324-1421.

Thank you,

ERIC DUESDIEKER
Attorney III Legal Liaison, High Security Mission
Office of Legal Affairs

cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 15, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY

Re:    COLEMAN LAC REPORT (APRIL 29, 2019):

Dear Mr. Nolan:

This letter is in response to the allegations in your office's letter regarding alleged misconduct received from your office on April 29, 2019 regarding ███████████

California State Prison-Los Angeles County (LAC) conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> "███████████████ reported that excessive force was used against him when he refused to accept assigned housing. He reported staff used force on him after he refused to accept a cellmate on December 7, 2018, shortly after arriving at LAC. He informed the inmate housing assignment sergeant and lieutenant he had mental health issues, suffered from trauma from sexual harassment, and he required a single cell. The sergeant reportedly told ████████ he would be housed by himself. However, ████████ was taken to a cell occupied by another individual who was a known gang member. ████████ refused to enter the cell. Upon hearing his refusal, B-Yard Sergeants Perez and Sanchez reportedly told ████████ that if he wanted to be housed by himself then he needed to kill his cellmate. ████████ was then handcuffed and officers attempted to force him into the cell. Because he continued to refuse to enter the cell, the officers slammed ████████ to the ground while handcuffed and then kneed him in the back. He was then taken to segregation with a charge of battery on staff."

The California Department of Corrections and Rehabilitation takes every allegation made against the Department seriously, and as such, LAC conducted an inquiry into these allegations by referencing various documents, databases, and records, as well as by conducting interviews, where appropriate, to procure information regarding the allegations.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Mr. Nolan
Page 2

During the inquiry, LAC reviewed appeal # LAC-B-19-00324, the appeal filed by ███████████ covering these allegations, as well as the second and third level reviews of that appeal. Additionally, LAC reviewed incident log # LAC–B05-18-12-1079, which was authored on December 8, 2018, regarding the incident from which inmate ██████ allegations stem.

LAC reviewed inmate ███████ Initial Housing Review dated December 7, 2018, indicating that ██████ was cleared for double cell housing.  A review of the PREA screening from that same day noted that ██████ was not identified to be at risk as a victim or abuser.

LAC reviewed the findings of the Institutional Executive Review Committee (IERC) regarding this incident which found that staff actions before, during, and after the use of force were in compliance with current Departmental use of force policy, procedures, and training.  LAC also conducted a review of two CDCR 7219 Report of Injury or Unusual Occurrences that were completed on inmate ██████ on the date of the incident (one just over an hour after the first one, at inmate ██████ request).  Neither CDCR 7219 notes any injury to inmate ██████.

LAC reviewed the video interview of inmate ██████ that took place on December 7, 2018 and reviewed Rules Violation Report #6182247, issued to ██████ ██████ regarding this incident.

LAC interviewed inmate ██████ shortly after the incident and again on February 6, 2020, during the course of the inquiry.  During the inquiry process, LAC also interviewed five other inmates, including an inmate indicated by ██████ as a witness.  Only one witness corroborated inmate ██████ claims of excessive force but their version of events was determined by LAC to lack credibility because their statement at the time of the inquiry directly contradicted statements they had made previously and included claims that no other witness corroborated (including inmate ██████ himself).

Based upon the documentary review, and the information derived from the interviews, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of inmate ██████t.

Should you have any questions, please contact the undersigned at 916-324-1421.

Thank you,

ERIC DUESDIEKER
Attorney III Legal Liaison, High Security Mission
Office of Legal Affairs


cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 10, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:    *ARMSTRONG V. NEWSOM:* PLAINTIFFS' REPORT RE MAY 21-24, 2019
       MONITORING  TOUR  OF  CALIFORNIA  STATE  PRISON  —  LOS  ANGELES  COUNTY;
       <u>YOUR FILE NO. 0581-03</u>

Dear Mr. Nolan:

I write to respond to your July 16, 2019, letter with a report including inmate ███████ ████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  As to Mr. ██████ allegations of staff misconduct, the following was extracted from the report:

- Mr. ███████ reported that he was assaulted by [an officer] on April 15, 2019. According to Mr. ████████ he was then later approached by the same officer, had his arm twisted, his helmet knocked off of his head, and asked "who's a bitch now?" Mr. ████████ said his left hearing aid was broken during this incident. Mr. ███████ also stated he had not been allowed to leave his cell and could not get his medication.

In March 2020, an inquiry was opened based on the above allegations of staff misconduct.[1]  An independent investigator completed review of all available and relevant documentation, including but not limited to the Electronic Records Management System (ERMS) records, 602 Inmate/Parolee Appeal form (602) and the associated file, applicable Rules Violation Reports

---

[1] LAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance with the Department's Operations Manual, Article 22. The Department is currently in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

(RVR), and the Institutional Executive Review Committee (IERC) Allegation Review, as well as all associated case factors.

The investigator noted that, on April 15, 2019, Mr. ███████ was the subject of two separate RVRs. The first was for Threatening Staff, and was relevant to Mr. ███████ allegations of staff misconduct. The RVR describes the interaction between Mr. ███████ and an officer who asked him to tuck in his shirt before going into the dining hall. Mr. ███████ reportedly responded with words to the effect of: "Fuck you motherfucker I don't have to do shit!" The officer observed Mr. ███████ was visibly tense and with closed fists. He then directed Mr. ███████ to turn, in order to be placed in handcuffs. At first, Mr. ███████ did not comply with the order, but replied with words to the effect of: "You're lucky this isn't back in the day we would have fucked you up!" After the officer again directed Mr. ███████ to submit to being handcuffed, he complied. He was then escorted to the holding cell in Facility D Gym without incident.

Approximately 90 minutes later on April 15, 2019, having already returned to his cell, Mr. ███████ alerted an officer to a medical emergency where he was bleeding from the back of his head. He was removed from his cell via gurney for medical attention. An officer retrieved Mr. ███████ helmet to bring it to him, and at that time, a wrapped and freshly bloodied razor blade was found concealed within the helmet. The officer reported injuries on Mr. ███████ right eyebrow and back of the head that were consistent with a razor blade. Mr. ███████ had been alone in his cell and the injuries appear to have been self-inflicted. Mr. ███████ subsequently received an RVR for Possession of dangerous contraband. Of note in this RVR, there were no claims raised by Mr. ███████ of unnecessary or excessive force. It was also noted that Mr. ███████ had returned to his cell after staying in a holding cell and there had been no injuries observed, documented, or reported by Mr. ███████ other inmates, or staff. His injuries appear to have been self-inflicted with the contraband razor blade shortly after he returned to his regular cell.

The following day, on April 16, 2019, a Medical Report of Injury or Unusual Occurrence (7219) was completed. Mr. ███████ was medically assessed prior to placement into the Administrative Segregation Unit (ASU), which is a standard administrative procedure. Cuts and lacerations were documented as "old injuries" and included a calf cut. The investigator noted that Mr. ███████ did not raise any concern or statement at the time of excessive or unnecessary force from the prior day.

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 3

Both RVRs were heard on May 1, 2019 and, at the time, Mr. ███████ made no statements regarding excessive or unnecessary force.  The investigator also notes Mr. ███████ did not request witnesses to refute the RVRs.  Shortly after the RVRs were completed, Mr. ███████ filed a 602 Inmate/Parolee Appeal form (602).  The 602 contained allegations of staff misconduct consistent with your reported allegations.

In March 2020, the investigator reviewed the 602 and the associated file, as well as the Report of Findings and the recorded interviews.

On May 3, 2019, Mr. ███████ was video interviewed after the California Department of Corrections and Rehabilitation (CDCR) received his allegation of unnecessary or excessive force. During the video interview, Mr. ███████ stated he was thrown at least three times by an officer, before he was placed in the Facility D Gym (Gym) Holding Cell, and that there were inmate and staff witnesses.  The 7219 completed in response to this use of excessive/unnecessary force allegation showed no visible injuries and Mr. ███████ chose not to make a statement to include on the report.

Mr. ███████ identified an inmate witness in his video testimony.  Shortly thereafter, that inmate witness was interviewed and was unable to corroborate Mr. ███████ version of events except to confirm Mr. ███████ was placed in handcuffs outside of the dining hall on April 15, 2019.  Three staff members were interviewed as part of the Appeal inquiry and there was no corroboration of the allegations of excessive or unnecessary force. One staff member did share a later observation of Mr. ███████ "hiding beneath [his] lower bunk bleeding from the head."  That staff member recalled the injuries to be a result of self-injurious behavior.

On March 18, 2020, the independent investigator interviewed Mr. ███████ for further information regarding his allegations.  Mr. ███████ stated during the interview that he was verbally abused by an officer and that his wrist was twisted.  He further stated his helmet was slapped off of his head, that he was thrown against the dining hall wall, and that he was thrown against a window in in the Gym, which resulted in bleeding.  Mr. ███████ also stated he was thrown against the holding cell in the Gym.  Staff and inmate witnesses were identified. Mr. ███████ stated he was having a seizure outside the Gym before he entered the Gym. Mr. ███████ stated he was denied his seizure medication on April 13, 2019, and was sent to outside medical treatment due to a seizure.  Mr. ███████ provided the names of two inmate witnesses, including one he stated "was right behind him and observed the entire incident."

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 4


Of the two inmate witnesses identified, one had already been interviewed during the Appeal inquiry and had not corroborated the allegations of staff misconduct.  The second inmate, whose name was provided by Mr. ███████ as a percipient witness, was verified to have not been housed at LAC at the time of the event.  The named inmate arrived to LAC only in July 2019, and had been housed at an entirely different institution in April 2019.

As to the allegation that Mr. ███████ was not allowed to leave his cell for medicine, the investigator confirmed with LAC medical staff that Mr. ███████ received his seizure medication as scheduled on April 13, 2019.  The medical staff person also advised that Mr. ███████ had not been sent to an outside medical facility for seizures as he may have conveyed in several interviews, but for treatment due to a head injury with lacerations.

In summary, the inquiry into the above listed allegations resulted in a recommendation by the independent investigator that there was insufficient evidence to support Mr. ███████ allegations of staff misconduct and no further investigation is warranted at this time.  CDCR has thoroughly reviewed the allegations and now considers the matter closed.


Sincerely,


*/s/ Ursula Stuter*


URSULA STUTER
Attorney
Office of Legal Affairs


**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 8, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY


RE:  COLEMAN REPORT MARCH 20, 2020


Dear Mr. Nolan:

This letter is in response to the allegations in your office's letter regarding alleged misconduct by **Sergeant (Sgt.) Sarmiento** against ███████████) received from your office on March 20, 2020.

California State Prison-Los Angeles County (LAC) conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> ████████████████ **alleges on November 20, 2019, Sergeant (Sgt.) Sarmiento stated to him, "Those are my officers you're talking about, watch your mouth," when** ██████ **made a complaint in regards to Facility C staff.**

> ████████ **alleges Sgt. Sarmiento stated, "This interview is over. Watch your fucking mouth."**

> █████████ **alleges as he stood up to leave the room, Sergeant Sarmiento rose with him and suddenly struck him in the face with a closed fist. Startled, Mr.** ██████████ **reflexively pushed Sergeant Sarmiento backwards with a closed fist.**

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

███ alleges multiple officers ran into the room at once, so he dropped to the ground and lay prone with his arms behind him. The officers kneed ███ in the back and in the face while they placed him in handcuffs.

███ alleges he showed the nurse his fresh injuries, including bruising on his knees, back, and tailbone and an abrasion on his left elbow, the nurse documented that his injuries were not sustained from the incident, recording instead that they were old injuries.

███ alleges he told the ASU Captain that he was feeling suicidal due to the incident. Shortly thereafter, another member of the nursing staff walked in to interview him about his reported suicidality. Despite his report, Mr. ███ was not referred to a crisis bed unit.

███ alleges after this evaluation, a Sergeant and a Lieutenant conducted an excessive force interview with Mr. ███ This interview lasted approximately five minutes and consisted only of Mr. ███ giving a brief account of the incident. The officers only asked one question - "Do you have any witnesses?" before terminating the interview.

███ alleges he was interviewed in regards to an appeal he filed relative to the incident. This interview was similarly brief. Like the other officers, Lieutenant Johnson asked few questions and smirked, shaking his head, after Mr. ███ alleged that Sergeant Sarmiento had struck him with no provocation.

███ alleges at the RVR hearing, the Senior Hearing Officer, Lieutenant Lugo, found Mr. ███ guilty because the incident was "Your word against the word of the officer."

The California Department of Corrections and Rehabilitation (CDCR) takes every allegation made against the Department seriously, and as such, please be advised that LAC conducted an inquiry into these allegations by referencing various documents, databases, and records to procure all useful information regarding the allegations. LAC conducted an inquiry into all of these allegations. During this inquiry, ███ was interviewed. The investigation also reviewed documents contained in ERMS and SOMS including appeals filed by ███ Following policy, ISU also utilized other methods of investigation including looking at documents and records outside of ERMS and SOMS.

On December 2, 2019, the LAC, Inmate Appeals Office (IAO) received a CDCR 602 Appeal from ███ containing allegations of staff misconduct. Reports reviewed in regards to the incident indicate ███ physically battered Correctional Sergeant (Sgt.) R. Sarmiento during an interview in the Facility C Program Office. Staff utilized immediate, physical force to subdue his attack,

Thomas Nolan
Page 3

effect custody, and gain compliance with officers' lawful orders.  All levels of review indicate staff actions prior, during, and after the use of force were in compliance with the current department use of force policy, procedures, and training.  The CDCR 7219 notes injuries sustained by █████ on the date of the incident, which are consistent with the force utilized.

According to the RVR related to this incident, █████ aggressively stood up and pushed his chair towards Sgt. Sarmiento. The RVR also notes Sgt. Sarmiento immediately stood up from his chair and █████ lunged towards him, striking him in the left side of the neck with his fist. Sgt. Sarmiento notes he utilized immediate physical force to stop █████ attack. Sgt. Sarmiento notes responding staff arrived and utilized physical force on █████ to subdue his active physical resistance. The supplemental report to the RVR indicates █████ willfully confessed to have battered Sgt. Sarmiento.  It is noted in the report; █████ statements were unsolicited.

█████ alleges he told the ASU Captain that he was feeling suicidal due to the incident. Shortly thereafter, another member of the nursing staff walked in to interview him about his reported suicidality. Despite his report, Mr. █████ was not referred to a crisis bed unit. According to Dr. Topchyan, █████ was evaluated on November 20, 2019, and he did not meet the criteria for a higher level of care. Dr. Topchyan mentioned █████ was evaluated again on November 21, 2019, and he did not meet the criteria for referral to a higher level of care.

The videotaped interview related to this use of force incident was conducted pursuant to established CDCR policies and procedures. █████ was given the opportunity to describe his accounts of the incident. There is no established timeframe for how long the interview should last. It was noted █████ was not asked if he sustained any other injuries during the interview. This issue was addressed.

On December 1-2, 2019, a Lieutenant conducted an interview with █████ and afforded him the opportunity to review the complaint that he submitted. █████ reviewed his complaint and said that everything he needed to say was covered in the complaint and just wanted, "justice" for Sgt. Sarmiento's wrongdoing.  The interview concluded as █████ had no additional information to provide or documentation to present.

The inquiry recommends closure based upon a conclusion that allegations by █████ lacks cause for further inquiry and this matter is deemed not sustained.  Based upon the documentary review, and the information derived from the interviews attempted and conducted, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of █████

Should you have any questions, please contact the undersigned at ██████████.

Thank you,

Thomas Nolan
Page 4


MICHAEL A. STONE
Attorney III Legal Liaison, Female Offenders and Program Services
Office of Legal Affairs


cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 8, 2020

Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY

Re:  JULY 23, 2019 ARMSTRONG REPORT:

Dear Mr. Nolan:

This letter is in response to the allegations in your office's letter regarding alleged misconduct by correctional officer Chirinos against inmate ███████ received from your office on July 23, 2019.

California State Prison-Los Angeles County (LAC) conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> ███████  ███████ alleges the on March 22, 2019, Officer Chirinos searched his cell and threw the contents of the cell on the floor. ███████ also alleges that the cell search receipt was falsified.

The California Department of Corrections and Rehabilitation takes every allegation made against the Department seriously, and as such, please be advised that LAC conducted an inquiry into these allegations by referencing various documents, databases, and records to procure all useful information regarding the allegations.

LAC conducted an inquiry into all of these allegations.  During this inquiry, LAC reviewed documents contained in ERMS and SOMS.  Specifically, Mr. ███████ received a Rules Violation Report (RVR) for possession of alcohol.  Correctional officer Chirinos found inmate

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

manufactured alcohol in ███████ cell. Mr. ██████ did not appeal this RVR. Mr. █████ has a history of RVRs for this same issue. Following policy, ISU also utilized other methods of investigation including looking at documents and records outside of ERMS and SOMS.

A review of ███████ SOMS and ERMS disciplinary files show that there was a RVR log number 6736653 for Possession of Alcohol authored by Officer Chirinos on March 22, 2019. ████████ questioned staff about the cell search receipt. Officer Romo-Munoz was asked if he signed the cell search receipt, Officer Romo-Munoz replied, "I signed it" and gave it to ████████ Officer Romo-Munoz was asked if he falsely filled out the cell search receipt, Officer Romo-Munoz replied, "We both searched the cell." The RVR hearing was held on April 23, 2019, ████████ was found guilty. ████████ was issued his final copies of the RVR on May 15, 2019.

Based upon the documentary review, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of Mr. ██████

Should you have any questions, please contact the undersigned at ████████.

Thank you,

MICHAEL A. STONE
Attorney III Legal Liaison, Female Offenders and Program Services
Office of Legal Affairs

cc: Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 8, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY


RE:  JULY 23, 2019 ARMSTRONG REPORT:


Dear Mr. Nolan:

This letter is in response to the allegations in your office's letter regarding alleged misconduct by correctional officer Chirinos against inmate ████████ received from your office on July 23, 2019.

California State Prison-Los Angeles County (LAC) conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> Mr. ████████  ████████  D5, DPO, reported that Officer Chirinos in the C5  Unit threatened him for a whole month in August 2018.  On August 23, 2018 he was at the medical window and Officer Chirinos told him to go back to his cell.  He pulled away and then Chirinos claimed he struck him.  He was written up with battery on a peace officer and has been in ASU since that time.  He said that Officer Chirinos has a history of beating up inmates, especially EOPs, SNYs, and those with disabilities.  On August 25, 2018, officers in D5 Unit assaulted him in his cell in retaliation for his alleged assault on Officer Chirinos.  He does not know the names of these officers, but says they were the first watch ASU staff.

The California Department of Corrections and Rehabilitation takes every allegation made against the Department seriously, and as such, please be advised that LAC conducted an inquiry into these allegations by referencing various documents, databases, and records to procure all useful information regarding the allegations.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

LAC conducted an inquiry into all of these allegations.   During this inquiry, LAC reviewed documents contained in ERMS and SOMS.   A review of institutional records reflects inmate ▮▮▮▮▮ filed an Inmate Appeal (CDCR 602) Log number LAC-D-18-04597 relevant to the allegation of Excessive and/or Unnecessary force, which occurred on August 23, 2018.

**▮▮▮▮▮ alleges that Chirinos threatened him for a whole month in August 2018.**

▮▮▮▮▮ identified two occurrences wherein he alleges to have been threatened by Officer Chirinos.  ▮▮▮▮▮ failed to provide witnesses or documentation to corroborate his allegations.  Additionally, ▮▮▮▮▮ allegations could not be corroborated through investigation. When requested to provide a witness to the alleged threats, ▮▮▮▮▮ either stated he was alone during the occurrence, or provided a reason why his witness did not directly observe the misconduct as alleged.

**August 23, 2018 Incident**

In his appeal, ▮▮▮▮▮ alleges on August 23, 2018 Correctional Officer R. Chirinos continued to tell ▮▮▮▮▮ to return to his cell.   Inmate ▮▮▮▮▮ alleges Officer Chirinos grabbed inmate ▮▮▮▮▮ arm, pushed him, and punched him across the face with a closed fist.   A thorough review was conducted associated with this appeal, which included staff and inmate witness interviews as well as a staff subject interview.   ▮▮▮▮▮ was afforded a personal interview relevant to his appeal.   ▮▮▮▮▮ elected to participate and was subsequently interviewed by a Correctional Sergeant.   During the course of the interview, inmate ▮▮▮▮▮ reiterated the contents of his written appeal and provided no new information.

On October 4, 2018, a Correctional Lieutenant conducted a witness interview with a correctional officer relevant to the allegations made by inmate ▮▮▮▮▮ This correctional officer confirmed he conducted an unrelated escort from Facility D, Building 5 to Facility C, Building 5 and was present at the time of the incident.   He observed ▮▮▮▮▮ take a swing at Officer Chirinos. Subsequently this correctional officer observed Officer Chirinos force inmate ▮▮▮▮▮ to the ground.

Injuries documented on the COCR 7219 dated August 23, 2018, are consistent with the staff's reports of force used and force observed.  There were no injuries consistent with being kicked in the face documented on the CDCR 7219 dated August 23, 2018.  Additionally, in the interviews following the initial interview, ▮▮▮▮▮ did not mention being kicked in the face.

One inmate interviewed regarding this incident stated that ▮▮▮▮▮ threw a punch at Officer Chirinos.  Another inmate interviewed during this inquiry stated ▮▮▮▮▮ threw an elbow at Officer Chirinos after he was asked to return to his cell.  Several other inmates declined to be interviewed regarding this matter.

Thomas Nolan
Page 3

During his interview, Officer Chirinos stated he was instructing ████ to return to his assigned housing.  Officer Chirinos further stated inmate ████ was receptive initially, but ████ suddenly swung his arm striking Chirinos in the left shoulder. Chirinos stated he utilized physical force and then forced inmate ████ to the floor.

**August 25, 2018 Incident**

In his appeal ████ alleges on August 25, 2018, at approximately 0515 hours that ████ was sound asleep, Officers entered ████ cell and severely beat inmate ████ and used unnecessary force.  Officers slammed ████ head to the cement, kicked inmate ████ repeatedly, drove knees into inmate ████ buttocks, and stated, "This is First Watch motherfucker we don't play this and this is for ████  A thorough review was conducted associated to inmate ████ allegation, which included staff and inmate witness interviews. Inmate ████ elected to participate and was subsequently interviewed by a Correctional Lieutenant.  During the course of the interview, Inmate ████ reiterated the contents of his written appeal and provided no new information.

Injuries documented on the CDCR 7219 dated August 25, 2018 and September 7, 2018, which were documented on the date of occurrence and prior to the use of force allegation videotaped interview associated with inmate ████ allegations of staff misconduct are inconsistent with the allegations made.  No obvious visual trauma, bruising, or discoloration indicative of physical force was observed during the medical evaluation.  No injuries consistent with being kneed in the back, head trauma, or a chipped and/or cracked tooth were documented on the CDCR 7219 dated August 25, 2018 or September 7, 2018.  Additionally, ████ repeatedly changed his accounts of the incident, going back and forth between being asleep and unresponsive, and being awake and alert while utilizing a tablet.

During the August 25, 2018 incident, ████ covered his cell window, obstructing Officers view into the cell and was unresponsive to staff orders to remove the covering.  Staff activated their personal alarm device, initiated Alarm Response and Emergency Medical Response, and made entry into ████ cell once sufficient staff arrived. ████ was placed into restraints pursuant to CDCR and local Policy relevant to Administrative Segregation Unit procedures.  ████ was escorted to the Treatment Triage Area (TTA) where he was evaluated.  ████ account of the incident and alleged injuries received were inconsistent with the CDCR 7219 relevant to his medical emergency.

Based upon the documentary review, and the information derived from the interviews attempted and conducted, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of Mr. ████

Thomas Nolan
Page 4


Should you have any questions, please contact the undersigned at ███████████.

Thank you,


MICHAEL A. STONE
Attorney III Legal Liaison, Female Offenders and Program Services
Office of Legal Affairs


cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 6, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:     **ARMSTRONG V. NEWSOM: PLAINTIFF'S REPORT RE NOVEMBER 18-21, 2019**
        **Monitoring Tour of California State Prison – Los Angeles County; <u>Your File No. 0581-03</u>**

Dear Mr. Nolan:

I write to respond to your February 7, 2020, letter with a report including inmate ████
████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  As to
Mr. ████ allegations of staff misconduct, the following was extracted from the report:

- Mr. ████ D3, DPV, reported that in August 2019 he was feeding some birds on
  D-Yard when multiple officers came up to him and grabbed by the arms without warning.
  The officers…twisted his arms tightly and then walked him to the gym, where a sergeant
  came and asked him "What do you have to say for yourself?" Because [the officer] was
  vigorously twisting his arm, he reported that he squeezed out of the Officer's grasp and
  they told him he was resisting and that he "gave up all of his rights" when he was
  sentenced. [Another officer] then told him he would be let off with "a warning" and sent
  him go back to his cell without further incident.

In April 2020, an inquiry was opened based on the above allegations of staff misconduct.[1]  An
investigator completed review of all available documentation, including the Electronic Records
Management System as well as all associated case factors. The investigator discovered that there
was no incident package (837), staff complaint, appeal, or Rules Violation Report (RVR) associated

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance with the
Department's Operations Manual, Article 22. The Department is currently in the process of revising that policy and,
once approved and adopted, future fact-finding inquiries will comply with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

this allegation of staff misconduct. The investigator initiated interviews with staff and an interview with Mr. ███████.

The investigator noted that staff who had worked in the area where Mr. ██████ was housed had no recollection of an incident involving Mr. ██████ either feeding birds and subsequently escorting him off the yard to the Gymnasium, or in a use of force incident altogether in 2019. Staff also expressed that Mr. ██████ has had a history of relatively little interaction with correctional staff and he "often stays within his assigned cell."

On April 26, 2020, Mr. ██████ was interviewed to seek further information to help investigate his claim. He was unable to provide a specific date in August 2019 when the alleged incident took place.  Mr. ██████ stated he had no injuries from the interaction other than his wrist being sore. Further, in the interview, the investigator noted that Mr. ██████ expressed that he felt the issue was resolved and his main concern was to continue to receive his mental health therapy. Mr. ██████ also indicated that he gets along well with staff on Facility D and he has no issue with continuing to program at LAC.

In summary, the inquiry into the above listed allegations resulted in a recommendation by the investigator that there was insufficient evidence to support Mr. ██████ allegations of staff misconduct and no further investigation is warranted at this time. CDCR has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 3, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY


RE:      APRIL 29, 2019 COLEMAN LAC REPORT:


Dear Mr. Nolan:

This letter is in response to the allegation in the April 29, 2019, the California State Prison - Los Angeles County (LAC) report regarding the Coleman class action.

California State Prison-Los Angeles County (LAC) conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> ███████████████████ **reported that he attempted suicide sometime in early March 2019. 1w Officers discovered him, cut him down. One of the officers reportedly threatened him "don't say anything [to nursing staff]. We will talk to them." Officers claimed that he had been found unresponsive on the floor of his cell.**

> ███████████████ **reported that the day after he attempted suicide Clinician Ms. Parker asked him, "Do you have a desire to die right now?" He replied yes." However, Ms. Parker decided to clear him anyway.**

A review of institutional records reflects ████ did not file an Inmate Appeal relevant to the allegation of staff misconduct, which occurred on February 23, 2019. ████ did file a Health Care Grievance (CDCR 602 HG) Log number LAC-HC-19-000829 relevant to the allegation of

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

misconduct, which occurred on February 23, 2019. ███ made a request to have Dr. Chadorchi and Dr. Parker's actions investigated. A thorough review was conducted of Dr. Topchyan's inquiry associated with ███ ███ elected not to be interviewed in regards to his grievance by not initialing the appropriate portion of the CDCR-602 HC form.

In response to ███ HC appeal, LAC stated that his, "health care record is considered legal documentation, as such all documents entered into your health record are permanent and may not be removed. Per the Inmate Medical Services Policies and Procedures, Volume 13, Chapter 13. 7, Patient Privacy Rights Policy, patients have the right to request that California Correctional Health Care Services amend their Personally Identifiable Information/Protected Health Information in their health record. All requests for amendments shall be made in writing and submitted to Health Information Management staff."

Dr. Parker conducted the SRE relevant to ███ attempted suicide on February 23, 2019. A personal alarm device was activated at approximately 0154 hours on Facility 'D', Building 5. The nature of the emergency was noted as an unresponsive inmate in ███, which was solely occupied by ███ ███ was subsequently observed on the ground in his cell with his hands and feet tied together. Additionally, ███ was observed to be conscious and breathing. No ligature marks were observed on ███ neck, no obvious or possible trauma was observed to ███ neck area, and no noose was observed or discovered at any time during or after the response to this medical emergency. No evidence of a possible hanging were discovered at any time. ███ was rehoused and placed on Suicide Watch by the Psychiatrist on Call. ███ made the following unsolicited self-admission to Dr. Parker during the SRE interview, "I was planning to hang myself, made a noose and everything, but then I blacked out and can't remember what happened. All I remember is that I was preparing to tie my hands and feet, but then I blacked out and when I came to it, custody was on my back, telling me not to move."

███ refused to exit his cell or participate in the interview regarding these allegations. The attempt to interview Inmate ███ along with Inmate ███ refusal was documented on a CDC-1288 Informational Chrono.

Based on the information obtained during this inquiry, which included interviews with ███ and one other inmate who was housed in a neighboring cell at the time of the incident, a review of Health Care Grievance Log number LAC-HC-19-000829, Suicide Risk and Self-Harm Evaluation, and all associated case factors, ISU concluded the allegations of staff misconduct relevant to both of these allegations are without merit and should be closed.

Based upon the documentary review, and the information derived from the interviews attempted and conducted, LAC will be closing the inquiry into the allegation(s) presented in the Report as presented on behalf of Mr. ███

Thomas Nolan
Page 3


Should you have any questions, please contact the undersigned at ███████.

Thank you,

MICHAEL A. STONE
Attorney III Legal Liaison, Female Offenders and Program Services
Office of Legal Affairs

cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 3, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:     *ARMSTRONG V. NEWSOM:* **PLAINTIFFS' REPORT RE MAY 21-24, 2019 MONITORING TOUR OF CALIFORNIA STATE PRISON – LOS ANGELES COUNTY, <u>YOUR FILE NO. 0581-03</u>**

Dear Mr. Nolan:

I write to respond to your July 16, 2019, report regarding inmate ██████████████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  To summarize Mr. ███████ allegations of staff misconduct, the following was extracted from the report:

- Mr. ███████ said that he was assaulted by multiple correctional officers on June 13, 2017.
- Mr. ███████ reported on May 21, 2019 that officers continually call him "Coleman Snitch" because of the role he played in testifying in the 2013 Enforcement Hearings in *Coleman v. Newsom*.
- Mr. ███████ reported that officers on second watch regularly abuse and use excessive force against mentally ill prisoners.
- Mr. ███████ also reported that multiple prisoners in the EOP hub are ignored after they engage in self-harm.

In March 2020, a new inquiry was opened based on the above allegations of staff misconduct.[1] An investigator completed review of all available documentation, including multiple incident reports, the incident commander review, manager's review, and the Institutional Executive Review Committee (IERC) review, as well as relevant past inquiries related to the Appeal and allegations of staff misconduct. The investigator initiated interviews with inmates, including a new interview with Mr. ███████

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance with the Department's Operations Manual, Article 22. The Department is currently in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Case 4:94-cv-02307-CW   Document 3107-1   Filed 09/25/20   Page 286 of 691

The investigator noted that prior to receipt of your report and in June of 2017, Mr. █████ submitted a 602 Appeal to the LAC Inmate Appeals Office alleging multiple instances of staff misconduct. The Appeal filed by Mr. █████ was relative to the incident requiring Use of Force (UOF) on or about June 13, 2017 and reviewed by the investigator in March 2020. A verbal allegation of unnecessary or excessive force was made by Mr. █████ at the time of the UOF and he was promptly interviewed.  A report of findings was generated. In the findings, it noted that Mr. █████ admitted to being resistive and to "cussing out" a correctional officer. An inmate interviewed in March of 2020 about the incident recalled Mr. █████ not being completely cooperative with staff and stated "They didn't rough him up like he said they did." The 7219 Medical Report of Injury form (7219) reflected Mr. █████ sustained injuries consistent with the reported use of force. The IERC noted one discrepancy in filing paperwork per the Department Operations Manual, and that was by an officer who had been taken to an outside medical facility for assessment of his injuries from the June 13, 2017 incident. Several staff received injuries during the incident.  The response by officers was noted as being within expected policy under the circumstances.

In March 2020, the investigator interviewed several inmates who were housed in the area where Mr. █████ was housed during the timeframe of his allegations. None of the inmates to corroborated Mr. █████ allegation of being called a "Coleman Snitch" by staff.

On or about March 11, 2020, Mr. █████ was offered an additional opportunity for an interview with the investigator to provide any additional information to support his allegations. Mr. █████ participated in a recorded interview at that time. The investigator noted that Mr. █████ statements in the interview were in direct contradiction with his past interviews and with the documentation, he provided for his appeal.

As to the allegation that officers on second watch regularly abuse and use excessive force against mentally ill prisoners, Mr. █████ was interviewed to seek further information to help investigate his claim. He was unable to provide specific examples; however, he did state that his attorney had a list of victims of excessive force.   Multiple inmates were interviewed in March 2020 and there was no corroboration for the allegations of regular abuse and excessive force against mentally ill prisoners.

Regarding the allegation of staff ignoring prisoners who engage in self-harm in the EOP, multiple interviews were conducted. In addition, there were several inquiries that had been performed subsequent to concerns raised by Plaintiffs' counsel in prior years. Those inquiries resulted in no findings of misconduct. The most recent inquiry, in March 2020, resulted in identifying one

Mr. Thomas Nolan
Page 3

inmate who completed suicide in August 2017. The investigator noted the incident was thoroughly investigated by the Office of Internal Affairs and the Healthcare Suicide Investigation Team. The investigator found that there was no information indicating that the inmate who completed suicide expressed any suicidal ideations to staff, and thus, there was no finding of staff ignoring inmates who engaged in self-harm.

In summary, the inquiry into the above listed allegations resulted in a recommendation by the investigator that there was insufficient evidence to support Mr. ███████ allegations of staff misconduct. CDCR has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 3, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:   *ARMSTRONG V. NEWSOM:* **PLAINTIFFS' REPORT RE MAY 21-24, 2019**
      **MONITORING TOUR OF CALIFORNIA STATE PRISON – LOS ANGELES COUNTY;**
      <u>**YOUR FILE NO. 0581-03**</u>

Dear Mr. Nolan:

I write to respond to your July 16, 2019, letter with a report including inmate L. ▮▮▮▮▮▮
who alleges staff misconduct at California State Prison – Los Angeles County (LAC).   As to
Mr. ▮▮▮▮ allegations of staff misconduct, the following was extracted from the report:

- Mr. ▮▮▮▮ reported on December 18, 2018 that [an officer] in the D4 Unit took all of his
  DMEs from him on December 1, 2018, including his TENS unit, nasal inhaler, therapeutic
  boots, and braces.   According to Mr. ▮▮▮▮ multiple officers, who hit him in the back,
  knees, and chest, then assaulted him.

In March 2020, an inquiry was opened based on the above allegations of staff misconduct.[1]   An
investigator completed review of all available and relevant documentation, including but not
limited to the Incident Packet, 602 Inmate/Parolee Appeal form (602) and file, Rules Violation
Report (RVR), and the Reasonable Accommodation Request form (1824) as well as all associated
case factors.

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance
with the Department's Operations Manual, Article 22. The Department is currently in the process
of revising that policy and, once approved and adopted, future fact-finding inquiries will comply
with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

The investigator reviewed the Incident Packet and the associated documents, as well as the Report of Findings and the recorded interviews. Officers reported the incident and noted Mr. ███ was resistive on December 1, 2018. The Medical Report of Injury or Unusual Occurrence (7219) was completed and the 7219 noted a scratch on the right shin and lower back pain. The investigator noted these injuries were consistent with the reported use of force, and did not reflect any injuries consistent with being punched by five to seven officers. Notably, Mr. ███ later stated he already had what he described as severe back pain before he chose to resist being taken back to his building.

On December 21, 2018, Mr. ███ was video interviewed after CDCR received his allegation of unnecessary or excessive force. During the video interview, Mr. ███ admitted that he did not want to go back to his building and he decided to fall in order to avoid going back to his cell. He was placed into a wheelchair, where the investigator noted he states he purposefully left the wheelchair and went to the ground. When officers responded, Mr. ███ grabbed the nearby chain link fence to avoid being handcuffed. He was repeatedly instructed to stop resisting and only ceased resisting due to back pain. He stated, "I quit resisting after that." The 7219 completed on December 21, 2018 showed no visible injuries.

Mr. ███ was later telephonically interviewed as part of an appeal inquiry into this matter on January 11, 2019. Mr. ███ was unable to provide names of witnesses. Four inmates who were working in the area at the time were identified by CDCR and interviewed. None were able to provide information that would confirm the allegations.

Mr. ███ did receive an RVR for Resisting Staff (6120668) and was found Guilty. The penalty was not applied, as the RVR did not meet time constraints.

As to the reported missing Durable Medical Equipment, Mr. ███ received a response from the Reasonable Accommodation Panel (RAP). The RAP noted on December 18 and December 24, 2018, Mr. ███ had been medically evaluated and there was no medical indication for most of the items he stated he needed at that time. Those items were wrist, knee, and ankle braces, a TENS unit, walker, and orthopedic shoes. Mr. ███ was granted an inhaler refill per his medical condition.

///
///

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 3


In summary, the inquiry into the above listed allegations resulted in a recommendation by the investigator that there was insufficient evidence to support Mr. ████ allegations of staff misconduct and no further investigation is warranted at this time. CDCR has thoroughly reviewed the allegations and now considers the matter closed.


Sincerely,


*/s/ Ursula Stuter*


URSULA STUTER
Attorney
Office of Legal Affairs


**<u>CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY</u>**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                  GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 3, 2020

<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com

RE:   *ARMSTRONG V. NEWSOM:* **PLAINTIFFS' REPORT RE MAY 21-24, 2019**
**MONITORING TOUR OF CALIFORNIA STATE PRISON – LOS ANGELES COUNTY;**
<u>**YOUR FILE NO. 0581-03**</u>

Dear Mr. Nolan:

I write to respond to your July 16, 2019, letter with a report including inmate ███████
███████ who alleges staff misconduct at California State Prison – Los Angeles County (LAC).  As
to Mr. ███████ allegations of staff misconduct, the following was extracted from the report:

- Mr. ███████ reported on August 27, 2018 that Officers in the D4 EOP Unit refused to
  provide him with assistance when he was experiencing severe chest pains.

In March 2020, an inquiry was opened based on the above allegations of staff misconduct.[1]  An
investigator completed review of all available and relevant documentation, including the
Strategic Offender Management System, appeals, and the Reasonable Accommodation Request
form (1824) as well as all associated case factors. The investigator noted that the 1824 was filed
on September 4, 2018, and referred to the allegation of staff misconduct from August 27, 2018.
The 1824 was reviewed by the Reasonable Accommodation Panel on September 11, 2018, was
deemed a potential staff complaint, and was subsequently referred to the Inmate Appeals Office
for inquiry under the staff complaint process (Appeal # LAC-D-18-04532).

---

[1] SAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance
with the Department's Operations Manual, Article 22. The Department is currently in the process
of revising that policy and, once approved and adopted, future fact-finding inquiries will comply
with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

On March 16, 2020, the investigator reviewed the above noted appeal file, which included several interviews and resulted in a finding of no violation of policy. In fact, Mr. ███████ elected to withdraw the appeal. Additionally, the investigator noted that Mr. ███████ had been attempting to have medical staff deliver his medication to his cell door rather than walking to the Facility D medical clinic himself. Mr. ███████ was subsequently counseled in 2018 for this behavior as well as for filing false claims.

On March 17, 2020, Mr. ███████ was interviewed telephonically to seek further information to help investigate his claim. Mr. ███████ reiterated his claim but was unable to identify officers who he stated did not believe his claims of chest pain. Mr. ███████ repeatedly asked for the names of the officers on duty that day from the investigator. Once informed of officers who were on duty at that time, Mr. ███████ then selected the names of officers he said he informed, but those particular officers were in the control booth and inside the office during the alleged event and would not have been accessible to Mr. ███████ When confronted with this discrepancy, Mr. ███████ stated he actually informed the inmate porters on duty, who in turn informed the officers.  As noted by the investigator, Mr. ███████ stated he filed an appeal regarding the events of August 27, 2018, which he stated was still pending and for which he did not recall being interviewed. The investigator informed Mr. ███████ that the appeal file documented an interview where Mr. ███████ decided to withdraw the appeal based on a resolution of his issues with the officers identified.  Mr. ███████ informed the investigator that, as a result of the officers' refusal to provide medical assistance, later in the evening of August 27, 2018, he "received Nitroglycerin and was sent to an outside medical facility "911" in the city of Bakersfield for higher level of medical care." The investigator noted in his report that there was no corroborating documentation to support that Mr. ███████ was transported to an outside medical facility as he claimed. The investigator noted that Mr. ███████ contradicted his earlier account of events and appeared to be deceptive in his responses.

On or about March 18, 2020, the investigator initiated interviews with other inmates identified by Mr. ███████ as those he informed of his chest pain. The interviews with other inmates who were on the housing unit on the date Mr. ███████ said the incident occurred were unable to corroborate Mr. ███████ account of events. In fact, one inmate stated he had "never witnessed any officers in D4 refuse any inmate medical assistance."

///
///

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 3


In summary, the inquiry into the above listed allegations resulted in a recommendation by the investigator that there was insufficient evidence to support Mr. ████████ allegations of staff misconduct and no further investigation is warranted at this time. CDCR has thoroughly reviewed the allegations and now considers the matter closed.


Sincerely,


*/s/ Ursula Stuter*


URSULA STUTER
Attorney
Office of Legal Affairs


**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                          GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 3, 2020


Thomas Nolan
Rosen Bien Galvan Grunfeld
tnolan@rbgg.com
VIA EMAIL ONLY


Re:   Coleman LAC Report (April 29, 2019):

Dear Mr. Nolan:

This letter is in response to the allegations in your office's letter regarding alleged misconduct by correctional officer Lee received from your office on April 29, 2019 regarding inmate █████

California State Prison-Los Angeles County ("LAC") conducted an inquiry[1] into the allegations raised in your office's letter, as follows:

> "███████████████████ stated that C5 Officer Lee called him a "nigger" on February 28, 2018 while he was housed in that unit."

The California Department of Corrections and Rehabilitation takes every allegation made against the Department seriously, and as such, LAC conducted an inquiry into these allegations by referencing various documents, databases, and records, as well as by conducting interviews, where appropriate, to procure information regarding the allegations.

During the inquiry, LAC reviewed appeal #LAC-C-18-01307, an appeal filed by inmate ████ covering the same alleged incident.  In the appeal, which was never withdrawn, inmate ████ indicated only one potential witness (other than Lee and ████ a correctional officer, who did not corroborate the inmate's claims.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is currently in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

In an attempt to identify potential inmate witnesses, LAC reviewed inmate ███ work assignment rosters from the relevant timeframe.  LAC interviewed five inmates in February of 2020 whose work positions made it more likely that they would have been within earshot during the alleged incident.  None of the inmates could corroborate the allegations of inmate ███

In June of 2020, inmate ███ was interviewed and was unable to provide any additional witnesses or other corroboration.

Based upon the documentary review, and the information derived from the interviews, LAC will be closing the inquiries into the allegation(s) presented in the Report as presented on behalf of inmate ███

Should you have any questions, please contact the undersigned at 916-324-1421.

Thank you,

ERIC DUESDIEKER
Attorney III Legal Liaison, High Security Mission
Office of Legal Affairs

cc:  Raybon Johnson, Warden (A)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 2, 2020

Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com

Dear Mr. Nolan:

This status letter is in response to your March 27, 2020, letter containing various allegations of staff misconduct targeting inmate ▮▮▮▮▮▮▮▮▮▮ at the California State Prison – Los Angeles County (LAC).

The California Department of Corrections and Rehabilitation takes every allegation serious, and as such, LAC conducted an inquiry[1] into the allegations raised in your letter. LAC staff checked with the Office of Appeals and it was determined that inmate Robinson did not file a staff complaint or appeal concerning these allegations.

Staff reviewed incident log #LAC-D03-19-12-1095 concerning an incident that took place involving inmate ▮▮▮▮▮▮ on December 20, 2019. Contrary to inmate ▮▮▮▮▮▮ statement that he had time left on his call as part of his allotted phone time, inmate ▮▮▮▮▮▮ was not approved for telephone use on December 20, 2019. ▮▮▮▮▮▮ became verbally confrontational when staff asked him to get off of the inmate telephone, refused to return to his cell, and refused to be cuffed. Inmate ▮▮▮▮▮ then punched Officer Mobely in the face causing injuries. Officer Chavarria responded to the assault on Officer Mobely and utilized physical force to subdue inmate ▮▮▮▮▮ attack on officers. During ▮▮▮▮▮ continued resistance, force was utilized to take him to the ground and restrain him. Inmate ▮▮▮▮▮ was issued a Rules Violation Report (RVR) for Battery on a Peace Officer.

LAC staff reviewed the Medical Report of Injuries (CDCR 7219) for Officer Mobely, Officer Chavarria, and inmate ▮▮▮▮▮ Officer Mobely sustained pain and swelling to the left side of the face, pain and swelling on his left arm, right knee, and left knee. Officer Mobely's injuries are consistent with being punched in the face and the ensuing struggle to control a physically

---

[1] LAC conducted the fact-finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22. The Department is in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

assaultive inmate.  Officer Chavarria sustained damage to the right side of his face causing active bleeding and pain, and a bruised and discolored right wrist.  Inmate ███████ sustained an abrasion/scratch on his right elbow, and a swollen area on the fingers of his left hand.

As indicated above, inmate ███████ was issued an RVR for Battery on a Peace Officer.  ███████ was found guilty as charged.   LAC staff then reviewed the LAC Institutional Executive Review Committee (IERC) Use of Force package and it was determined that staffs' actions were appropriate and in compliance with Departmental Use of Force policy.  Inmate ███████ refused to participate in a video recorded interview concerning the injuries he sustained during the incident.

LAC staff reviewed the Facility D, Housing Unit 3, Inmate Telephone List and confirmed that inmate ███████ was not approved for a telephone call on December 20, 2019.  LAC staff interviewed inmate ███████ as part of this inquiry.  During the interview, inmate ███████ gave substantially similar allegations as those outlined in your letter.  Inmate ███████ confirmed that he resisted officers by forcing his hands under his stomach as he was face down on the ground. LAC staff also interviewed inmates ████████████████.  All have differing versions of the incident.  Inmate ████ indicated the inmate ██████ was punched 75-100 times, Inmate ███████ indicated that inmate ██████ was punched 30-50 times, and inmate ███████ indicated that ██████ was punched 13-14 times by staff.  The incident package indicates that inmate ██████ was punched two times in order to stop his attack.  The injuries sustained by inmate ██████ and Officers Mobely and Chavarria are consistent with the Officers' recollection of the incident.  Inmate ███████ suffered a swollen left hand and an abrasion on his right elbow. Inmate ██████ suffered no injuries to his head or facial area during the incident in question. LAC staff determined that the allegations that Officer Chavarria "suddenly punched Mr. ██████ in the face" and "Officer Mobely began punching Mr. ██████ as well, striking him hard in the face and body" are not supported by the evidence.  The injuries sustained by inmate ██████ are consistent with staff reports indicating they had to use physical force and body weight to force inmate ██████ to the ground to stop his attack on officers.

LAC staff determined that the allegations contained herein lack cause for further investigation and are deemed to be not sustained.  LAC has closed the inquiry into this matter.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

MICHAEL MUELLER
Attorney IV
Office of Legal Affairs

cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 24, 2020

Cara E. Trapani, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
ctrapani@rbgg.com

Dear Ms. Trapani:

This status letter is in response to your March 27, 2020, letter containing various allegations of staff misconduct targeting inmate ▇▇▇▇▇▇▇▇▇▇ at the California State Prison – Los Angeles County (LAC).

The California Department of Corrections and Rehabilitation takes every allegation serious, and as such, LAC conducted an inquiry[1] into the allegations raised in your letter.  LAC staff determined that inmate ▇▇▇ filed an inmate appeal (LAC-D-19-04923) relevant to the allegation of excessive and/or unnecessary force.  Inmate ▇▇▇ appeal was referred to the Office of Internal Affairs for further investigation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

MICHAEL MUELLER
Attorney IV
Office of Legal Affairs

cc:  Raybon Johnson, Warden

---

[1] LAC conducted the fact-finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 23, 2020


Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com


Dear Mr. Nolan:

This letter is in response to your July 16, 2019, letter containing various allegations of staff misconduct targeting *Coleman* and *Armstrong* class members at the California State Prison – Los Angeles County (LAC).

CDCR takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter.  This response specifically addresses the following allegation from your letter:

> "███████████ DPO, ██████, also reported a disturbing use of force incident that occurred in early April 2019. When he arrived to LAC from RJD on April 10, 2019, he was placed into the ASU building without any of his property. He told one of the officers in the building that he needed his testosterone shot and his morphine, but was told that they did not have the testosterone shot and that his morphine had been discontinued. He began to suffer withdrawals from morphine and broke the windows in his cell, so staff took him out of his cell and placed him in a holding cage. After he was placed in the cage, he continued to inform officers of his withdrawals, to which the 3rd Watch Sergeant told him "fuck you man." He grew frustrated and began to kick the door of his holding cell, so the Sergeant opened the cell door, put a lock around his fist to form makeshift brass knuckles, stepped on Mr. ██████ bad foot, and said challengingly "kick me, motherfucker, kick me." During this altercation, the Lieutenant walked around the corner, saw what was happening, and spun on his heel to leave the vicinity without intervening. The Sergeant then shut and locked the cage, leaving Mr. ██████ there for the next three hours. Then two officers came, retrieved Mr. ██████ and placed him in ███████ which was covered in feces. He was left in that cell for five days and did not receive any cleaning supplies the whole time. He filed a staff misconduct appeal about these events, but as of the time of his interview on May 23, 2019 had yet to receive a response or a log number."

LAC conducted an inquiry into this matter by referencing various documents, databases, records, and interviews.  LAC staff interviewed inmate ██████ in an attempt to gather additional details

---
[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

concerning the allegations.   Unfortunately, inmate ██████ recollection of the alleged event remains thin on detailed facts and differs from the allegations he made to the PLO.  Inmate ████ indicated the following:

> "They kept fucking with my meds, and fucking with my meds. Me and this cop or Sergeant already had issues the first night I got there over my meds. I knocked the windows out. So he comes and gets me one day, cause my meds were fucked up again. My whole left side is metal. So, if I don't have something for pain, I'm in pain. So, when I'm in pain, I want you to be in pain too, make sense? So he comes to my cell and gets me, and takes me to a holding cell chained up in a chair, puts me in a cage, and I asked him what's this about. He told me fuck you. I said huh. So, I started kicking the door. He opened the door up, put the Jock around his hand, put it in his fist, and said kick me mother fucker, kick me motherfucker. I told him, you are not even going to give me a chance."

LAC staff contacted the Inmate Appeals Office and there were no appeals relevant to this allegation. Next, staff contacted the Health Care Grievance Coordinator and there was no health care grievance relative to these allegations.

The Notice of Unusual Occurrence/Incident (NOU) indicates that on April 10, 2019, at 1800 hours, inmate ████ used the armrest from his wheelchair to break the windows on his ADA cell door. Staff then relocated inmate ████ from the broken window cell to a holding cell.  Inmate ████ was interviewed and he indicated he was upset because he had not received his medication. ████ then began kicking the holding cell door and screaming for his Morphine and Victoza shot.

The Rules Violation Report indicates that on April 10, 2019, 1800 hours, a Psychiatric Technician informed ████ that she had his medication, but did not have the proper needle to administer it. At that moment, ████ became angry and began kicking the door, picked up the armrest, and struck the door windows shattering both of them.  Medical staff obtained the correct needle and administered the medication.

In his allegation, inmate ████ alleges "he comes and gets me one day, cause my meds were fucked up again."   Inmate ████ makes a clear distinction between the night that he bashed out the windows of the ADA cell with the armrest from his wheelchair and the day the Sergeant allegedly pulled him out of his cell and threatened him. Inmate ████ allegations are inconsistent with the documentation surrounding the cell move.

Lastly, inmate ████ alleges that the Lieutenant observed the misconduct and failed to intervene. During the interview, inmate ████ explained that the Lieutenant that witnessed the incident is the same individual that interviewed him for a Rules Violation Report for breaking the cell windows. LAC staff determined that Lt. Varela is the staff member inmate ████ identified as failing to intervene on April 10, 2019, at 1800 hours.  However, Lt. Varela was not working in Z Wing on the night of the incident.  Lt. Varela worked on Facility C on April 10, 2019, and left work at 1730 hours.

LAC staff determined that the allegations contained herein lack cause for further investigation and are deemed to be not sustained.  LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

Thomas Nolan
Page 3


Michael Mueller
Attorney IV
Office of Legal Affairs

cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                              GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 23, 2020

Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com

Dear Mr. Nolan:

This letter is in response to your July 16, 2019, letter containing various allegations of staff misconduct targeting *Coleman* and *Armstrong* class members at the California State Prison – Los Angeles County (LAC).

The California Department of Corrections and Rehabilitation takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter. This response specifically addresses the following allegation from your letter:

> "▉▉▉▉▉▉▉▉▉▉ EOP, ▉▉▉▉▉▉▉, reported that he attempted suicide on July 18, 2018 and was beaten up by guards on C-Yard as a result. He reported that this incident severely impacted his mental health and that he was severely depressed as a result. Rather than treat his appeal as a staff misconduct problem or convert it to a 602-SM, the RAP merely told him to file a new 602-SM about the incident."

LAC conducted an inquiry into this matter. LAC staff reviewed the Crime Incident Report that documented inmate ▉▉▉▉▉ act of Battery on Staff resulting in the use of force (LAC-CYRD-18-07-0608). Reports indicate that staff observed inmate ▉▉▉▉▉ wobbling, stumbling, and having slurred speech. Staff placed inmate ▉▉▉▉ into restraints and began to escort him to medical. Inmate ▉▉▉▉ became resistive and staff had to take him to the ground to regain control. While on the ground inmate ▉▉▉▉▉ continued to twist his body around, kick and spit at officers. A spit mask was utilized to protect staff from the bodily fluids.

---

[1] LAC conducted the fact-finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22. The Department is in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

Inmate ███ was then placed in a wheelchair to be transported to medical, he continued to resist, and placed his feet on the floor attempting to stand.  Once at the cell door, ███ continued to resist and kick and spit at custody staff.  The incident was reviewed at the Incident Commanders level, First Level Manager, Second Level Manager, and by the Institutional Executive Review Committee.  The use of force was deemed to be within policy and no further action was warranted.

During his Rules Violation Report hearing, inmate ███ indicated the following:  "There was a death in my family.  I had about a gallon of white lightening.  I don't remember what happened." As part of this inquiry, staff interviewed inmate ███  Inmate ███ recalls being interviewed by the Prison Law Office (PLO), but does not recall what he told the PLO and does not recall making any allegations of excessive or unnecessary use of force.  Inmate ███ remembers July 18 as it is his wife's birthday and he drank a gallon of white lightening because he was really depressed and thought of committing suicide because he was "in a bad way" due to a death in his family.  Inmate ███ stated, "It wasn't about any staff it was about what I was going through mentally and emotionally."  When asked whether he made any allegations about staff using excessive force, inmate ███ stated "no."

LAC staff also interviewed two inmate workers that were on the yard on the day in question and neither could remember such an incident occurring.

LAC staff determined that the allegations contained herein lack cause for further investigation and are deemed to be not sustained.  LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

MICHAEL MUELLER
Attorney IV
Office of Legal Affairs


cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 23, 2020

Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com

Dear Mr. Nolan:

This letter is in response to your March 11, 2020, letter containing various allegations of staff misconduct targeting *Coleman* and *Armstrong* class members at the California State Prison – Los Angeles County (LAC).

CDCR takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter.   This response specifically addresses the following allegation from your letter:

> "████████████████ Z1, DPM, reported serious staff misconduct problems on C-Yard. In March 2019, while housed in the C3 Unit, Mr. ██████ overheard Officer De La Torre inform other incarcerated people in the unit (who were allegedly part of the 25ers) that Mr. ██████ is incarcerated for a sex offense. Mr. ██████ also reported that he heard Officer De La Torre tell the gang members "When you stab him, stab towards the heart." Fearing for his life, Mr. ██████ told Sergeant Espino later that day that he felt suicidal, but that the sergeant ignored his request for help. He reports that he then told other officers that he had safety concerns and asked to be placed in segregation, but that they also refused to help him. He reported that, in his panic, he decided his only way to get to safety was to attack a random incarcerated person on the yard, so that he would be placed into segregation. He reported that he then assaulted another individual on the yard; while this assault successfully moved him to safety, he is now facing serious charges of assault with a deadly weapon. Neither his assault nor the pending charges would have occurred without officers' assistance and indifference to his safety concerns."

LAC conducted an inquiry into this matter. LAC staff reviewed the Crime Incident Report and it indicates inmate ████████ was observed pursuing another inmate swinging his right hand toward the inmate's facial area.  The victim of inmate ████████ attack received 22 sutures to close the lacerations on his right cheek and neck.  Staff conducted a review of the inmate appeal (#LAC-C-19-03947) inmate ████████ submitted containing similar allegations to those presented here.  There was no evidence to support ████████ allegations so the appeal was subsequently denied.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

While previously housed at MCSP, inmate ████ made almost identical allegations as those alleged here (i.e. staff divulged commitment offense). The MCSP appeal was denied.

Staff reviewed the Strategic Offender Management System (SOMS) and Electronic Records Management System (ERMS). While ████ was housed at MCSP, staff generated a CDCR 128B for Manipulation of Staff regarding non-specific safety concerns due to ████ falsifying suicidal ideation. ████ indicated "it was the best way to get off the yard." ████ also appears to have a history of refusing to accept assigned housing and possibly attempts to manipulate his housing placement by various means.

LAC staff reviewed the Rules Violation Report (RVR) for Battery on a prisoner with a deadly weapon and resulting mental health assessment that was completed. During the mental health assessment, ████ never made mention of the allegations about staff to the clinician.

On April 6, 2020, LAC staff interviewed inmate ████ regarding his allegations. ████ described the allegations as alleged by RBGG, but indicated the events took place in April 2019. When asked how sure he was that staff showed his case factors to other inmates, ████ indicated he was not 100 percent sure. When asked whether he had issues with the Security Threat Group 25ers, ████ indicated he has.

Although ████ seems confused as to when alleged events took place and lacks detail, his inmate appeal indicates he stated that correctional staff showed his case factors to other inmates on April 24, 2019. In his allegation to the PLO, ████ alleges he "told Sergeant Espino later that day that he felt suicidal, but that the sergeant ignored his request for help." LAC staff confirmed through the Telestaff assignment system that Sergeant Espino was not on duty on April 24-25, 2019, therefore Sergeant Espino could not have ignored inmate ████ alleged request for help.

LAC staff determined that the allegations contained herein lack cause for further investigation and are deemed to be not sustained. LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

Michael Mueller
Attorney IV
Office of Legal Affairs

cc: Raybon Johnson, Warden

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 19, 2020


Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com


Dear Mr. Nolan:

This letter is in response to your April 10, 2019, letter containing various allegations of staff misconduct targeting *Coleman* class members at the California State Prison – Los Angeles County (LAC).

CDCR takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter.  This response specifically addresses the following allegation from your letter:

> "Another patient who requested to remain anonymous for fear of retaliation told us that his mental health clinician in the ASU EOP Hub divulged confidential information he had shared in a 1-on-1 to custody staff."

Despite the fact that the allegation is anonymous and lacks critical information, LAC conducted an inquiry into this allegation.  LAC staff conducted a tour of Facilities C, D, and the Administrative Segregation Unit to observe medical and custody staff and to determine what, if any, confidential medical information is being shared.  The LAC health care grievance coordinator indicated that they did not received any appeals alleging mental health staff were divulging confidential inmate-patient information to custody staff.

LAC staff referenced various documents, databases, and records, including a housing review of housing unit D5.  Staff identified inmates that were housed in D5 during the time period in question and interviewed them to gather any possible relevant information concerning the allegation.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

One inmate housed in D5 during the time in question was interviewed on April 15, 2020.  LAC staff specifically asked this inmate if he ever suspected his mental health doctor of divulging confidential information.  This inmate stated, "No, none of the mental health staff have ever given me that kind of impression."

Another inmate housed in D5 during the time in question was interviewed on April 15, 2020. This inmate was asked whether he had the impression that mental health staff would divulge confidential inmate-patient information to custody staff.  This inmate state, "No, I never experienced that."

The inquiry determined that there is not sufficient evidence to support the allegation, and as such, the allegation was not sustained.  LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

Michael Mueller
Attorney IV
Office of Legal Affairs


cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 19, 2020


Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com


Dear Mr. Nolan:

This letter is in response to your April 10, 2019, letter containing various allegations of staff misconduct targeting *Coleman* class members at the California State Prison – Los Angeles County (LAC).

CDCR takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter.  This response specifically addresses the following allegation from your letter:

> "▓▓▓▓▓▓▓▓▓▓▓▓, reported that he arrived to LAC from MCSP at around 2:30 p.m. on Friday, November 30, 2018. Mr. ▓▓▓▓▓ was at the EOP level of care at the time.  Mr. ▓▓▓▓▓ reported that when he arrived at LAC, he told custody staff that he would not cell up with anyone due to his paranoia and history of in-cell fights. He was then placed into a holding cell. Within two minutes of being placed into the holding cell, Sergeant P. Carranza arrived and asked Mr. ▓▓▓▓▓ why he was refusing to house. After Mr. ▓▓▓▓▓ reiterated he did not want a cellmate, Sergeant Carranza reportedly said, "You're giving me a battery, you're not going to Ad-Seg without one!" Mr. ▓▓▓▓▓ was then evaluated by a nurse in the holding cage. During the evaluation, Lieutenant A. Galaviz arrived and moved Mr. ▓▓▓▓▓ to the back of R&R to a holding cage. During the transport, Lieutenant A. Galaviz reportedly said "this guy's going to get his ass beat!" Once in the holding cage, the Lieutenant again told Mr. ▓▓▓▓▓ "you're giving us a battery." Mr. ▓▓▓▓▓ responded "I don't have to prove anything to you, so go ahead and beat me up." The Lieutenant reportedly replied "you're not going to have a mark on you, but you're giving me a battery ... you're gonna give me a battery, I'm gonna bash my head on this

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

cage or better yet I'll have one of my officers come punch me in the face. Who do you think they're gonna believe – a lieutenant with 25 years or some punk convict, wait you're not even a convict, a punk inmate! I'll make sure you spend the rest of your life in here." Mr. ███████ did not clarify in his report to us what happened immediately after this exchange. Ultimately, it appears Mr. ███████ was placed into segregation, where he remained until he was moved to a different cell on D-Yard a few days later."

An inquiry was opened by LAC regarding this allegation.  Two inmates identified as being in Receiving and Release during the time of the alleged incident were interviewed.  Both inmates indicated that they did not observe or overhear Sergeant Carranza or Lieutenant A. Galaviz make the statements as alleged.  Two additional inmates that were identified as arriving at LAC on the date of the alleged incident (November 30, 2018), were interviewed as well.  One of the inmates refused to participate and the other indicated that he did not recognize inmate ███████ did not remember arriving at LAC on November 30, 2018, and then elected not to participate in the interview.  On February 18, 2020, LAC staff interviewed inmate ███████ and he confirmed that he did not report the alleged incident to CDCR.  LAC staff confirmed there is no inmate appeal or medical report of injury related to inmate ███████ allegation.

LAC reviewed documents, databases, and records, including notes from the initial housing review and Administrative Segregation Unit Placement Notice.   The CDCR 128B containing notes from the initial housing review indicate that inmate ███████ stated he could not program safely on Facility D EOP.  Specifically, ███████ feared for his life claiming he would batter the first inmate on Facility D, considering all inmates his enemy.  Inmate ███████ was subsequently placed in ASU for threatening another inmate.

Inmate ███████ has a history of refusing to accept assigned housing.  During a disciplinary hearing related to a RVR dated 09/19/18, inmate ███████ indicated that his refusal to accept assigned housing is not based on any safety or enemy concerns, but it is instead due to his aversion to housing with "chomos, rapists, and gays."

The evidence gathered during the inquiry does not support or substantiate inmate ███████ allegation, and as such, this allegation was not sustained.  LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

Michael Mueller
Attorney IV
Office of Legal Affairs

cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                      GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 19, 2020


Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld
101 Mission Street, Sixth Floor
San Francisco, CA 94105
tnolan@rbgg.com


Dear Mr. Nolan:

This letter is in response to your April 10, 2019, letter containing various allegations of staff misconduct targeting *Coleman* class members at the California State Prison – Los Angeles County (LAC).

CDCR takes every allegation serious, and as such, LAC has conducted an inquiry[1] into the numerous allegations raised in your letter.  This response specifically addresses the following allegation from your letter:

> "Another class member who requested to remain anonymous reported that Hispanic custody staff on B-Yard second watch, including Sergeant Olmos and Lieutenant Martinez, specifically assault and harass African-American prisoners, causing many of them to stay in their cells to avoid being targeted. This results in class members missing out on mental health treatment, the bulk of which is scheduled to occur during second watch."

LAC conducted an inquiry into this matter. LAC staff contacted the Inmate Appeals Office and the Appeals Coordinator determined there were no appeals submitted concerning this allegation. LAC staff spoke with the Health Care Grievance Coordinator and determined there were no health care grievances submitted with the above-mentioned allegation.  Next, LAC staff reviewed the Access Quality Report and identified African American inmates housed in Facility B that had missed their scheduled appointments during the time period in question.

---

[1] LAC conducted the fact finding inquiries into the allegations identified in this Tour Report in accordance with the Department's Operations Manual, Article 22.  The Department is in the process of revising that policy and, once approved and adopted, future fact finding inquiries will comply with the new policy.

Thomas Nolan
Page 2

The first inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 22, 2019.  This inmate stated, "I was scheduled to have final exams from Antelope Valley College during that appointment and me missing that appointment had nothing to do with any of the officers on the yard nor have I ever seen or heard of the Hispanic staff on the yard use excessive or unnecessary force."

The second inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 14, 2019.  This inmate stated, "I was unaware that I had an appointment on that day but I always go to my appointments and have no issues from every yard staff to building staff to the supervisors on this yard no one has done anything illegal at all."

The third inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 25, 2019.  This inmate stated, "I didn't want to go to the appointment and I don't have any issues with any of the Hispanic staff or supervisor nor have I seen any excessive or unnecessary force."

The fourth inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 15, 2019.  This inmate stated, "I don't recall missing it but it has nothing to do with any of the officers or supervisors of any race on the yard and I have never seen anything excessive or unnecessary force of any kind since I've been here."

The fifth inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 19, 2019.  This inmate stated, "I probably was too tired and didn't want to go and it has nothing to do with any of the Hispanic staff or supervisors here we have a very harmonious relationship with the officers and supervisors on this yard and never seen anything excessive or unnecessary."

The sixth inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 14, 2019.  This inmate stated, "I don't remember why I didn't go but no one has issues with any staff here Hispanic or any race they treat us right and everybody good. I've never seen any Hispanic staff or supervisors use excessive or unnecessary force of any kind here."

The seventh inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 28, 2019.  This inmate stated, "I don't remember why I missed it but I know it had nothing to do with the cops or supervisors here and no they don't do anything illegal excessive or unnecessary at all."

The eighth inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 27, 2019.  This inmate stated, "I wasn't feeling well that day and was probably knocked out asleep but me missing it had nothing to do with the officers or supervisors of any race and no never seen them or anyone use unnecessary or excessive force here."

Thomas Nolan
Page 3

The ninth inmate was interviewed and asked why he refused to go to his scheduled mental health appointment on February 15, 2019.  This inmate stated, "I didn't know about it but I do know that me missing it had nothing to do with the Hispanic cops or supervisors on this facility all that is a bunch of BS that someone made up and nobody's done anything excessive or unnecessary."

The inquiry determined that there is not sufficient evidence to support the allegation, and as such, the allegation was not sustained.  LAC has closed the inquiry into this allegation.

Should you have any questions, please contact the undersigned at 916-445-6896.

Sincerely,

/s/ Michael Mueller

Michael Mueller
Attorney IV
Office of Legal Affairs

cc:  Raybon Johnson, Warden

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 17, 2020


<u>VIA EMAIL ONLY</u>
Thomas Nolan
Rosen, Bien, Galvan & Grunfeld, LLP
tnolan@rbgg.com


RE:     *Coleman v. Newsom, Armstrong v. Newsom:* EOP Class Member ███████
        Report Regarding Staff Misconduct at LAC
        Your File No. 0489-03, 0581-03


Dear Mr. Nolan:

I write to respond to your November 15, 2019, letter regarding inmate ████████████████ who alleges he was subjected to excessive and unreasonable force from correctional staff at California State Prison – Los Angeles County (LAC) on or about September 9, 2019.  In excerpt of what was stated in your letter, Mr. ████ said he was ordered back to his cell by an officer, after he was "dealing with raw emotions and mental duress." Mr. ████ stated he yelled at the officers and banged on his cell door to get the officer's attention.   Mr. ████ stated that officers approached him and asked if he "wanted to go to the gym" to discuss his feelings. Your letter describes the gym as a place where inmate beatings occur.  At some point, Mr. ████ was directed to cuff up which he stated he refused to do.  He was then pepper-sprayed allegedly at point blank range in the face.  Mr. ████ further said that he was then cuffed and allegedly punched and kicked repeatedly in the face and the body while he begged officers to stop.  Mr. ████ was medically evaluated and reported to you that he was denied a copy of his 7219 when he requested it from his ASU cell.

On or about March 24, 2020, an inquiry was opened by an independent investigator based on the above allegations of staff misconduct.[1]   Prior to receipt of your advocacy letter, an

---

[1] LAC conducted the fact-finding inquiry into the allegations identified in this letter in accordance with the Department's Operations Manual, Article 22. The Department is currently in the process of revising that policy and, once approved and adopted, future fact-finding inquiries will comply with the new policy.

<u>**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**</u>
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 2

Incident Report was completed, and Institutional Executive Review Committee (IERC) review was finalized on October 9, 2019.  Associated reports reflect that Mr. ▅▅▅ was banging his head without ceasing in his cell, which led to officers' attempts to interrupt the behavior by releasing Oleoresin Capsicum (OC) spray in the cell. The IERC found that the OC spray was not released at the optimal distance, but based on a totality of circumstances, including Mr. ▅▅▅ severely self-injurious behavior, use of the OC spray did not violate procedure or policy.  The OC spray did not cause Mr. ▅▅▅ to stop beating his head on the cell, and once there was an adequate number of officers available, an emergency cell rescue of Mr. ▅▅▅ was conducted. An officer was reported as injured in the incident, and another reported being struck by Mr. ▅▅▅  During the incident, officers noted the smell of ethanol emanating from Mr. ▅▅▅  An inmate interview later corroborated that Mr. ▅▅▅ smelled of alcohol on September 9, 2019, and the inmate further stated that Mr. ▅▅▅ was "drunk."  The investigator notes that additional reports, including medical notes, document the strong odor of alcohol emitting from Mr. ▅▅▅ on September 9, 2019.  Notes also support that Mr. ▅▅▅ admitted to medical staff at that time that he had consumed alcohol that day.

Mr. ▅▅▅ did require medical attention after the incident and the corresponding reports state that the injuries were sustained because Mr. ▅▅▅ was beating his head against the cell wall. Medical staff evaluated his condition after the incident, using the 7219 Medical Report of Injury form (7219), which reflects the exposure to a chemical agent as well as bleeding and lacerations to the front of the head.  Mr. ▅▅▅ made a statement at that time that does not indicate there were any other injuries than those noted on the front of his head and the exposure to a chemical agent. There are no broken bones documented or noted.

Mr. ▅▅▅ filed a 602 on or about March 6, 2020 relative to the allegation of excessive force on September 9, 2019.  The investigator notes that Mr. ▅▅▅ appears familiar with the 602 processes and would likely have been aware that his 602 was not timely filed. Even so, Mr. ▅▅▅ was approached on March 6, 2020 for an interview regarding his allegations, and at that time, he declined to participate.  Six inmate interviews were conducted in April 2020 regarding the incident, resulting in information that was contradictory to that presented by the advocacy letter and to that provided by the other inmates.  One inmate witness admitted he did not actually see the incident.  Mr. ▅▅▅ did participate in a new interview with the reviewing investigator in early April 2020.

In early 2020, the investigator completed review of all available documentation, including multiple incident reports, the incident commander review, manager's review, and the Institutional Executive Review Committee (IERC) review, as well as all associated case factors.

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

Mr. Thomas Nolan
Page 3

The investigator initiated interviews with multiple inmates. The investigator's review also included an interview with Mr. ███ during which Mr. ███ stated he intentionally waited six months to file his appeal, in order to obtain medical attention.

Mr. ███ did receive a Rules Violation Report (RVR) for battery on a Non-Prisoner (6902801) in October 2019, to which he pled guilty. Mr. ███ did not raise any allegations of excessive or unnecessary force during or preceding the RVR Hearing.

The independent review resulted in a recommendation by the investigator that Mr. ███ allegations of excessive or unnecessary force were not sustained. The California Department of Corrections and Rehabilitation has thoroughly reviewed the allegations and now considers the matter closed.

Sincerely,

*/s/ Ursula Stuter*

URSULA STUTER
Attorney
Office of Legal Affairs

**CONFIDENTIAL:  FOR ATTORNEYS' EYES ONLY**
SUBJECT TO PROTECTIVE ORDERS

# Exhibit 20

1        **DECLARATION OF** ▮▮▮▮▮▮▮▮

2        I, ▮▮▮▮▮▮▮, declare:

3        1.        I have personal knowledge of the matters set forth herein, and if called as a

4   witness, I could and would competently so testify.

5        2.        My California Department of Corrections and Rehabilitation ("CDCR")

6   number is ▮▮▮▮.  I am currently housed at California State Prison – Corcoran ("COR"),

7   in a mental health crisis bed, though I was formerly housed on Facility 3A in Building 4.  I

8   am 49 years old.

9        3.        I am a *Coleman* class member.  I am at the Enhanced Outpatient Program

10  ("EOP") level of mental health care.  EOP patients live in separate housing units with other

11  EOP individuals, where they receive enhanced mental health care, including 10 hours each

12  week of structured therapeutic activities and frequent meetings with their cases managers.

13  I suffer from post-traumatic stress disorder, mood swings, and depression.  When my

14  mental health symptoms are at their worst, I experience thoughts of suicide.  As an outlet

15  for these feelings, I try to advocate for other inmates in the prison who are experiencing

16  problems.  It takes my mind off of my problems when I am helping other people.

17       4.        Although CDCR has not given me an *Armstrong* disability code, I believe I

18  do have a disability.  I have mobility issues and experience a significant amount of pain in

19  my feet.  I have been trying to receive orthopedic boots as an accommodation, but COR

20  medical staff have denied my requests.  Although medical staff prescribed therapeutic

21  shoes for me in May 2020, I have not received them due to the COVID-19 pandemic.

22       5.        I have a number of serious medical conditions.  I have chronic kidney

23  disease, hypertension, gout, deformities of my feet; edema; eczema; and poor eyesight for

24  which I use transition glasses.  I also have a history of seizures and blackouts.

25       6.        I have been housed at COR multiple times since September 2, 2017.  I have

26  mainly left COR when transferring out to Psychiatric Inpatient Programs ("PIPs") for my

27  mental health treatment.  A PIP is an inpatient program intended to provide more intensive

28  mental health care to incarcerated patients.  Most recently, I had been housed at California

1  Medical Facility's ("CMF") PIP at the ICF level of care from November 8, 2018 until I

2  transferred back to COR on March 2, 2020.

3      7.      I was housed at COR for over a year, from June 28, 2018 until I transferred

4  to the PIP at California Health Care Facility-Stockton ("CHCF") on August 27, 2019.  I

5  had previously been housed at COR from October 18, 2018 until March 31, 2018.  In

6  2018, I had numerous stays at various institutions other than COR, including California

7  Men's Colony ("CMC"), CMF, Kern Valley State Prison ("KVSP"), and CHCF.

8      8.      During my time at COR, I have been housed in  the following locations:

9  Facility 3A, Building 4; Facility 3B, Building 2; and Facility 3D, Building 1.

10     9.      I have been a witness to multiple incidents of staff misconduct against people

11 with disabilities, mental illness, and medical conditions at COR.

12     10.     On Facility 3A, I have witnessed correctional officers harass, intimidate, and

13 physically abuse people with severe mental illnesses on a routine basis.  These rogue staff

14 members include Officers Seifken, Gonzalez, Nolan, Ward, Flores, Ortega, Cagle,

15 Wooden, Rocha, Wolf, Hernandez, Ward, Kiesley, and Balboa, Sergeants M. Medina, D

16 Case, and Hubbert, and Lieutenant Winward.  These officers are known by incarcerated

17 people as "The Hit Squad."  In my opinion, they single out EOP patients for harassment

18 and abuse.

19     11.     On the morning of April 7, 2020, I observed several officers viciously attack

20 ███████████, another EOP patient.  I witnessed the assault take place from the

21 exercise equipment on the 3A Yard.  Although I was about 100 yards away, from where I

22 was standing, I could clearly see the patio where Mr. ███████ was attacked.

23     12.     That morning, Mr. ████████ and I were working out on the exercise

24 equipment when we heard his named called over the intercom system for him to go to an

25 Inter-Disciplinary Treatment Team meeting ("IDTT").  IDTT meetings are when all of the

26 different mental health clinicians who work with a given patient meet with the patient to

27 plan out his or her mental health care.

28

13.     Although Mr. ███████ did not want to attend the meeting, I advised him to tell officers inside Facility 3A that he did not want to meet with his treatment team.  Mr. ███████ started walking towards the gate to the medical area in order to get to the mental health building.  Officers were sitting on a walkway covered by a canopy.  To get to the mental health building, Mr. ███████ had to use this walkway.

14.     When Mr. ███████ passed the officers, one of the officers turned to Mr. ███████ and spoke to him.  I saw the officer grab Mr. ███████ by the head and slam him to the ground.  While he was on the ground, over nine officers, including Officer Ochoa, Sgt. Case, Sgt. Hubbert, Lieutenant Winward, and Lieutenant Hurlbut, and a female sergeant, rushed over and began kicking Mr. ███████.  One officer grabbed Mr. ███████'s feet and another officer cuffed him.  The officers also put a spit mask on him. They began to lead him to the gym.  Because of the spit mask on Mr. ███████, I could not see injuries to his face.  Once he was inside the gym, I could not see what happened.

15.     I believe officers attacked Mr. ███████, because he has mental health issues and they know they can pick on him.

16.     About 15 to 20 minutes after the assault, I returned to my housing area.

17.     At around 12 p.m., I observed Officers Cable and Wooden give Mr. ███████'s personal property, including his TV, radio, food,  and hygiene supplies, to other incarcerated people.  I went over to the officers and the porter to try to get back a Scarface CD I had lent to Mr. ███████ and Mr. ███████'s other CDs, so I could give them back to him.  I recovered two CDs, which I plan to return to Mr. ███████.

18.     I believe staff gave away Mr. ███████'s property to retaliate against him for assaulting an officer, even though the officers had attacked Mr. ███████.

19.     On May 13, 2020, around 5:30 p.m., Officers Rocha and Ward taunted and harassed a fellow incarcerated person in my housing area by continuously opening his cell door after he asked them for his dinner tray.  I could see what happened from my cell.

20.     The person was lying on his bed, and Officer Ward, who was in the control booth, opened the door.  The person got up from his bed and closed the door.  As soon the

he went back to his bed, Officer Ward opened the door again.  The incarcerated person went back to the door and asked Officer Ward, "Why did you do that?  Why are you harassing me?" and closed the door again.  Officer Rocha instructed Officer Ward to open the door again.  This man is known to keep to himself around the housing unit.  I believe Officers Rocha and Ward repeatedly opened his cell door without his permission as a form of intimidation and harassment.  It was entertainment for them.

21.     The person, who was annoyed by the officers, came out of his cell, and began talking to Officer Rocha about why they kept opening his cell door.  While the man was talking to Officer Rocha, Officers Rocha and Seifken grabbed him by the neck and brought him to the ground.  The officers kicked him in the body for a few minutes, before three to four more officers arrived in response to an alarm.

22.     They then handcuffed him and dragged him out of the housing unit.  I heard the inmate screaming in pain outside the building, leading me to believe they continued to beat him outside.

23.     On April 14, 2020 at nighttime, during third watch, Officer Rocha assaulted another incarcerated person in my housing area.  I could see and hear what happened from my cell.  That night, Officer Rocha took a food item off of an inmate's door.  The inmate went to Officers Rocha and Seifken to ask for the food item back.  They said no.  He requested to speak to a sergeant and told them he would sit on the floor until they got the sergeant.  He then sat down.

24.     The officers handcuffed him, and he lay down on the ground on his stomach with his hands behind his back, so they would know he was not resisting them.  He asked again to see the sergeant.  Instead, the officers dragged him by his feet over to his cell.

25.     In front of his cell, they took the handcuffs off of him, and Officer Rocha began kicking the man to push him fully into the cell.  The inmate still had his arm outside of the cell, so they slammed the door on his arm.

26.     The inmate pulled his arm in and the officers closed the door.

27.     After 30 minutes, Officers Rocha, Seifken, Hernandez, and a sergeant called the man out of his cell and took him outside.

28.     The inmate told me later that when he was outside, the officers told him if he reported the attack, they would write a false Rules Violation Report to delay his parole date, stating that he had a shank.

29.     In April or May 2020, Sergeant Medina interviewed me about this staff assault.  I told him what I saw.  Once I was done, he went into the office and closed the door.  The interview lasted about five minutes.

30.     I have personally seen officers destroy incarcerated peoples' appeals documents and staff complaints during cell searches.  Property Officer Nolan extorts incarcerated people by forcing them to give up their own personal property to other individuals, mainly porters in different housing units.  I believe Officer Nolan gives out these items in exchange for favors from these porters.  These favors include attacking other incarcerated people at the behest of custody staff.  Although I have not heard officers direct a porter to attack someone, on or around July 8, I saw four porters take an individual out of his cell and assault him right in front of the officers.  The officers did nothing to stop the attack even though it was right in front of their eyes.  The porters stopped attacking the individuals when Sergeant Case said, "That's enough."

31.     When I asked one of the porters why they attacked the man, he told me that Officer Cagle told them to hurt him because he had refused to shower.

32.     Officers have destroyed my personal property.  On July 31, 2019, I moved to a mental health crisis bed.  In November 2019, I requested my property.  In January 2020, I received some of my property, but the documents from my legal cases against CDCR staff and my staff complaints were missing.  I believe staff took these documents intentionally to interfere in my legal cases.

33.     I was a victim of staff misconduct at COR .

34.     On August 9, 2019, I was in a mental health crisis bed after I attempted to kill myself in July.  At approximately 9:59 p.m., a psychiatric technician approached my

cell, requesting to see what I had in my hands.  I showed her that I had a 2.5 inch string from my socks that I use to tie my hair.

35.     A few minutes later, Officers Alcocer and Bobadilla approached my cell and requested the string.  I complied, handing the hair tie through the food port in the door to my cell.

36.     A few minutes after that, Officers Alcocer and Bobadilla returned to my cell front and instructed me to sit on my bed.  I complied.  Officer Bobadilla opened my cell door with his key.  Officers Alcocer, Bobadilla, six other officers, and a sergeant entered my cell.  Crisis bed cells are large, so they were all able to fit inside.  Officer Alcocer ordered me to strip off all my clothing and then move to the back of the cell and face the wall.  I complied.  Officer Bobadilla then shut the cell door, and Officer Alocer followed me to the back of the cell.

37.     While I was facing the back of the cell, still naked, Officer Alcocer slammed my face into the wall by placing his hand on the back of my neck and pushing my head and neck.  I felt my lip split open from the impact against the hard, cement wall.  The other officers and the sergeant watched this happen.

38.     Officer Alcocer then ordered me to kneel down.  I began to get down, still facing the wall with the officers and sergeant behind me, when I felt his boot kick the back of my right leg, just above the knee.

39.     I asked, "What is this about?"

40.     Without responding to my question, Officer Alcocer grabbed me by the neck and slammed me to the ground, face first.  I felt pain from the blow and blood on my face, around my mouth.  Officer Alcocer then placed his knee on my back, pushing his body weight on me.  Officer Alcocer looks to me to be about 235 pounds.  I could not breathe with him on my back.

41.     I asked for the sergeant to stop Officer Alcocer from assaulting me, but the sergeant ignored me.  After about six minutes of Officer Alcocer kneeling on my back

1  while the sergeant looked at some of my papers, the sergeant ordered Officer Alcocer,

2  "Get the fuck off of him."  The officers left the cell and closed the door.

3      42.    From the attack, I had a bruise and laceration on my knee and a laceration on

4  my lip.  I asked officers for a medical evaluation of my injuries, but they ignored me.

5      43.    The next day, I asked my clinician for a video interview about the assault.

6  My clinician ordered a medical evaluation.

7      44.    On August 11, 2019, a nurse evaluated my injuries.  She noted the

8  lacerations on my knee and lip.

9      45.    That same day, Sergeant Mason and another sergeant conducted a

10  videotaped interview about the August 9th use of force.  During the interview, I was kept in

11  a holding cell.  I believe sergeants did not take me out of the holding cell so my injuries

12  would not show in the video tape.  The interview was only ten minutes long.  During the

13  interview, the sergeants asked questions to try to poke holes in my story to discredit my

14  account.

15      46.    I did not receive a Rules Violation Report for this incident.

16      47.    I believe Officer Alcocer targeted me because I am incarcerated on a rape

17  conviction.  He knows my commitment offense from my records.  I believe Officer

18  Alcocer picked on me because I have mental health issues, and he thought I could not

19  advocate for myself.

20      48.    The day after the attack, I filed a staff complaint 602 about the assault.  I

21  have not yet received a response, and I do not know if CDCR is investigating it.

22      49.    On December 13, 2019, I filed a lawsuit against Officer Alcocer regarding

23  this incident.

24      50.    The assault made me feel depressed, hopeless, and suicidal.  I was

25  humiliated, because I was attacked, while naked, in front of several officers.  I felt

26  vulnerable and scared.  My mental health decompensated.  A couple weeks after the attack,

27  on August 29, 2019, I was transferred to the PIP at CHCF, because of my suicidal feelings.

28

51.     After I returned to COR, staff continue to retaliate against me because of my lawsuit and staff complaints.  On July 27, 2020, during recreational therapy, I complained to a sergeant at about 9:45 a.m. about staff taking and breaking the property of incarcerated individuals.

52.     At 11:30 a.m., I went back to my housing area in Facility 3A.  I heard Officer Cagle instruct a porter to pretend to fight in the area near my cell.  I do not believe Officer Cagle knew I could hear him.  Five to ten minutes later, I saw the porters pretend to fight.  They did not actually hurt each other.  Officer Cagle told them, "Break it up."

53.     A few minutes later, Sergeants Case and Hubbert came in, spoke to Cagle, then left the building.  Four or five minutes later, they came back to the building with 6-7 officers.  They approached cell 108, then 109, then 123, and took the individuals out of their cells.

54.     Then they came to my cell.  They told me I had been selling my narcotic medication.  I told the officers I am taking blood pressure medication, anxiety medication, and anti-epileptic medication, but I am not taking any narcotic medication.  They told me that I was extorting other incarcerated people for their narcotic medications.  They packed my property, but did not search my cell for any medication or other contraband, so I do not think they actually thought I was selling narcotics.

55.     The officers escorted me to a holding cell in the administration building.  Scared and anxious about what they would do to me, I felt suicidal and told them so.  Despite my suicidal feelings, at 4:45 p.m., officers moved me to administrative segregation.

56.     On July 28, 2020, I requested to see my clinician because I was still feeling suicidal, but the officers ignored me.

57.     The next day, I again informed officers that I needed to see my clinician and that I had taken 16 of my blood pressure pills to commit suicide.

58.     A few minutes later, a crisis team escorted me to a mental health crisis bed.  There, staff monitored me to make sure the pills did not cause a medical emergency.

59.     On August 2, 2020, I received an RVR saying that I was accused of selling narcotics.

60.     I have been in the mental health crisis bed since July 29, 2020.  I have asked Sergeant Case, Sergeant Hubbert, Clinician Lozano, and another clinician whose name I have forgotten when I could move to a housing unit.  They all told me that I would be going to administrative segregation, not a housing unit, because I have filed lawsuits against staff.  An officer told me that the individuals also accused of selling narcotics, with the exception of one, were returned to their housing units.  I believe officers fabricated this RVR in an attempt to keep me in administrative segregation to punish me for filing staff complaints and to silence me from filing more.

61.     In my time at COR, there have been a times that I needed help but did not ask for it because I was afraid of what would happen to me.  I do not feel that staff will take me seriously when I feel suicidal, because staff have ignored my requests to see my clinician.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

62.     In my opinion, staff target people with mental illness with staff misconduct. Most of the assaults I have heard about or seen involve people with mental health issues. Staff pick on people with mental illness because they know patients with mental illness have difficulty reporting misconduct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 12 day of August, 2020.

On August 12, 2020, due to the closure of California State Prison – Corcoran in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at California State Prison – Corcoran, I read the contents of this declaration, verbatim, to ▮▮▮▮ by telephone. ▮▮▮▮ orally confirmed that the contents of the declaration were true and correct. ▮▮▮▮ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 12, 2020

Rekha Arulanantham

# Exhibit 20a

## Filed Under Seal

# Exhibit 21

**DECLARATION OF** ▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ▮▮▮.  I am currently housed at California State Prison – Corcoran ("Corcoran") on Facility 4A in Building 1 Right ("4A1R").  I am currently housed in Long Term Restricted Housing ("LTRH"), which is a security housing unit ("SHU") building where people at the CCCMS level of care are housed after being found guilty of a SHU-term eligible Rules Violation Report ("RVR").  I am 48 years old.

3.     I have been housed at Corcoran since early January 2018.  At various points from January 2018 to the present, I was transferred to the Psychiatric Security Unit ("PSU") at California State Prison – SAC to receive mental health care at the Enhanced Outpatient level of care in a SHU building.

4.     During my time at Corcoran, I have been housed in 4A1R and Building 2 Left on Facility 4A ("4A2L"), which are both SHU buildings for people who are CCCMS.

5.     I am a *Coleman* class member.  I am at the CCCMS level of care.  I suffer from bipolar disorder and paranoia.  In order to manage my mental health symptoms, I take Trileptal and Abilify.

6.     I have a number of serious medical conditions.  I am diagnosed with anemia, asthma, Diabetes, hypertension, and GERD.  I also had Valley Fever in early 2019, which has caused my respiratory system and breathing to suffer greatly.  I was hospitalized in February 2019 for pneumonia, a complication of my Valley Fever.  I am classified as high risk medical and a chronic care patient, meaning that my medical conditions are closely monitored by staff.

7.     I was a victim of staff misconduct at Corcoran.  My troubles with staff at Corcoran began at the end of May 2019.  At the time, I was housed in Building 4A2L.  In SHU buildings, like 4A2L, officers are prohibited from entering people's cells unless there

1   is an emergency extraction, and no one is allowed to leave their cell without being

2   restrained in handcuffs and escorted.  On the day in question, I observed staff assault my

3   neighbor, Mr. ███, who was housed in cell ██ (although I am not certain of his

4   housing).  In particular, I observed Sergeant Navarro, Officer Medina, Officer Vera, and a

5   few other officers escort Mr. ███ out of his cell.  As soon as they brought him out onto

6   the tier, they threw him to the ground and began kicking, hitting, and stomping on him.  I

7   also saw Sergeant Navarro pepper-spray him as he lay on the ground in handcuffs,

8   completely defenseless.  At no point did Mr. ███ threaten or attempt to hurt these

9   officers.

10          8.      During the attack, I yelled out to Sergeant Navarro to stop assaulting

11   Mr. ███.  In response, Sergeant Navarro told me, "You're next," which I took to mean

12   that he was planning to assault me.  I then told Sergeant Navarro that I would file a staff

13   complaint about his behavior.  Sergeant Navarro responded, "I don't give a shit, I'll just

14   say it was an emergency."  I interpreted this to mean that Sergeant Navarro was planning

15   to enter my cell under the false pretense that there was an emergency in order to assault

16   me.

17          9.      There was absolutely no reason for these officers to assault Mr. ███

18   Brutal and unprovoked attacks of this sort were very common in my experience in the

19   SHU at Corcoran.

20          10.     After this incident, I wrote the Ombudsman about what had happened, as

21   well as Plaintiffs' counsel in *Armstrong* and *Coleman*.  On June 17, 2019, two officers

22   approached my cell:  Officer Allison and Officer Medina.  They asked me whether I was

23   coming out, and I asked them in response, "coming out for what?"  They then walked

24   away without saying anything further.  About thirty seconds later, Officer Allison and

25   Officer Medina returned, along with Sergeant Navarro, Officer Ramos, and Officer

26   Pacheco, who all started walking toward my cell.  I noticed that one or two of the officers

27   was holding a shield, and they had all put on helmets.  Generally, when officers wear

28   equipment like this, that means that they are going to perform an emergency cell entry and

extraction.  When they approached my cell, Sergeant Navarro yelled to the tower officer, Officer Salinas, to open up my cell.  Once Officer Salinas opened up my cell, Sergeant Navarro immediately pepper-sprayed me.  One of the officers then hit me with his shield, knocking me down to the floor.  I immediately put my hands behind my back, and they then applied handcuffs to me.  Even though I was restrained on the ground, the officers then kicked me, punched me, stomped on my legs, and hit me with their shields.  I believe that that went on for a couple of minutes.  They then picked me up and dragged me onto the tier, and continued beating me for another minute.  They then escorted me finally to the rotunda – the entrance and exit to the building – and it was then that they first activated the alarm.  Inside the rotunda, I was met by Captain Gallagher, who told me, "Oh, you like to file 602s?  We give you your food."  I interpreted that to mean that Captain Gallagher did not understand why I was complaining about staff abuse.  It was as if he was saying that, as long as I was being fed, staff could do whatever they wanted to me and I had no right to complain.  As a result of my injuries – which included serious swelling in my legs – I was unable to walk or stand properly for about three weeks after this incident.  The only treatment I got for my injuries was a compression sock and an ultrasound.

11.    After this incident, I continued to face constant harassment and abuse by the same officers who beat me up on June 17, 2019.  These officers, Officer Allison, Officer Medina, Sergeant Navarro, Officer Ramos, and Officer Pacheco, would frequently come by my cell, kick on it, and threaten me to stop filing 602 staff complaints.  I was frequently denied food by these officers.  On some occasions, they even sprayed pepper-spray through the food-port of my cell for no reason whatsoever.  This abuse got to me so much and I became so scared that I never left my cell.  I never made it to a mental health appointment because I was too afraid to leave my cell.  I refused to leave my cell even for yard, for groups, and for showers.

12.    On May 24, 2020, three officers, Officers Allison, Rodriguez, and Lor, approached my cell and threatened me.  The officers told me that they were going to fuck me up again, and that they "were going to make me scream like a bitch."  One of the

1    officers, Officer Allison, then showed me some disturbing images on his phone through

2    the window of my door.  Then, the three officers walked away.

3         13.    The next day, at around 2:00 p.m. on May 25, 2020, Officer Cervantes stood

4    by my cell door.  I then heard Officer Cervantes order Officer Lor, who was working in the

5    tower as the control officer, to open up my cell door.  Officer Cervantes then ordered me to

6    sit on my bunk.  I did not sit on my bunk because the officers are not even supposed to

7    enter our cells, and I was afraid that they would beat me if I sat on my bunk.  Officer Lor

8    then opened up my cell door and Officer Cervantes rushed into my cell and punched me in

9    the face.  Officer Cervantes used a closed fist to hit me on my lips, but I was able to

10   partially avoid the punch by moving my face back.  I immediately got down on the floor

11   and put my hands behind my back.  Before I could even get down, Officers Beralanga,

12   Cerda, and Ceja, the floor officers at the time, stormed into my cell.  As soon as they

13   entered, these officers handcuffed me and applied leg restraints, and then started kicking,

14   hitting, and punching me while I lay on the ground handcuffed.  At no point did I resist or

15   behave violently toward these officers.  Officer Cervantes then pinned me down by my

16   neck with his foot, as he pulled on both of my arms, pulling them backwards with extreme

17   force.  As he pulled at my arms, one of the officers repeatedly kicked me in the ribs.

18        14.    Then, the officers dragged me out onto the tier.  Officer Cervantes continued

19   to pull my arms back, pulling them out of my shoulder socket, while he was ordering me to

20   get up even though I was handcuffed and faced down.  They then dragged me to the

21   rotunda, where Sergeant Moreno was waiting for me with a chair.  Whenever there is a use

22   of force incident, they bring the victim to the sally-port for a medical evaluation.  As soon

23   as I sat down on the chair, I saw Sergeant Moreno put on leather gloves.  He then

24   proceeded to stick his boot in between my leg-chains, and kicked the chain, cutting the

25   handcuffs directly into my legs.  Sergeant Moreno then punched me in the face three times

26   before choking me firmly with both of his hands.  He choked me for about fifteen seconds.

27   All the while, two Psych Techs, PT Contreras and PT Gomez, stood by the office of the

28

1  building in a direct line of sight of the sally port.  I directly observed PT Contreras watch

2  as Sergeant Moreno choked me and assaulted me in the sally port.

3      15.    I was then escorted to the CTC after a number of lieutenants arrived at the

4  building to respond to the alarm.  At the CTC, they refused to remove the handcuffs from

5  me despite the fact that my shoulders were in extreme pain.  Eventually, after waiting more

6  than forty five minutes, a nurse told me that the doctor could not examine me for another

7  forty five minutes due to the Memorial Day holiday, and that he could not take the

8  handcuffs off until then.  The nurse also told me that my shoulders look fine, and he then

9  asked me whether I was refusing treatment.  Although I denied that I refused treatment, the

10  nurse ordered the custody staff to return me to my cell without any medical treatment.

11      16.    The next day, on May 26, 2020, I was transported to Adventist Health in

12  Bakersfield, where I was diagnosed with a dislocated left shoulder.  When the doctor was

13  performing a reduction on my left shoulder, he told me that he realized that my right

14  shoulder was also dislocated and that he had to perform surgery on the right shoulder as

15  well.  As a result of this incident, I have serious bruising and pain in the right side of my

16  rib cage.  My ribs and my shoulders are still in severe pain to this day, but I have not

17  received any treatment for my ribs.  My neck is also still extremely sore right at the spot

18  where Officer Cervantes stood on it.  In addition, I suffered cuts on my ankles, and a few

19  bruises on my elbows and my knees.  While I can still move my fingers a bit, I cannot lift

20  my left arm at all.  Because I am left-handed, I am completely unable to write, which has

21  made it very difficult for me to conduct my legal matters.

22      17.    I received a Rules Violation Report ("RVR") for battery on a peace officer in

23  connection with this incident.  In the RVR, Officer Cervantes claimed that, after he

24  restrained me in my cell so that I could leave to go shower, I kicked him for no reason at

25  all, which necessitated the use of force.  The entire RVR was a falsehood.  Officer

26  Cervantes had no injuries.  I very rarely leave my cell for a shower, and I certainly did not

27  leave my cell on May 25, 2020 in order to shower.  Corcoran referred the RVR to the

28  District Attorney, and I have postponed my RVR hearing until the District Attorney

decides whether to press charges.  I received a similarly false RVR for battery on a peace officer in connection with the June 2019 incident.  With respect to that incident, the District Attorney decided to press charges, and I am currently litigating that matter in criminal court.  In my experience, whenever staff assault incarcerated people at Corcoran, staff then turn things around and issue a false RVR against the victim of their abuse. Because they do this, they are never held accountable for their misconduct.

18.     In my time at Corcoran, there have been many times that I needed help but didn't ask for it because I was afraid of what would happen to me.  Ever since reporting misconduct at Corcoran, I have received threats that I would be assaulted by staff for complaining.  Staff have also told me that they will have other incarcerated people assault me when I am released from the SHU in retaliation for my complaining about misconduct. In fact, I was assaulted multiple times for complaining about staff, in addition to the many other instances of harassment and abuse that I faced, and continue to face, at Corcoran. For that reason, I cannot trust staff with anything.  As a result of this abuse, I have refused to leave my cell from June 2019 through the present.  I do not come out of my cell except in very limited circumstances.  I only just started coming out of my cell to see my clinician in the past few weeks, but I am even scared to do that.  Before a few weeks ago, I never left my cell to receive mental health treatment.  Because I have been unable to come out of my cell due to this staff abuse, my mental health has seriously suffered.  I have become much more paranoid and impulsive.  My mental health has become much more difficult to manage because, for the past nine months, I have been unable to leave my cell to speak with a clinician.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 24th day of June, 2020.

On June 24, 2020, due to the closure of California State Prison – Corcoran in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at California State Prison – Corcoran, I read the contents of this declaration, verbatim, to ▮▮▮▮▮ by telephone.  Mr. ▮▮▮▮ orally confirmed that the contents of the declaration were true and correct.  Mr. ▮▮▮▮ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

Dated: June 24, 2020

Jack Rhein Gleiberman

# Exhibit 21a

## Filed Under Seal

# Exhibit 22

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮▮▮▮, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation ("CDCR") number is ▮▮▮▮. I am currently housed at California State Prison-Corcoran ("COR") on Facility 4A in Building 3L. I am 57 years old.

3. I am an *Armstrong* class member. I am designated as DPO. I cannot lift heavy items. I use a cane to move around. I cannot walk up stairs very well. My legs get tired after walking.

4. I am a *Coleman* class member. I am at the Correctional Clinical Case Management System ("CCCMS") level of mental health care. I am diagnosed with antisocial personal disorder.

5. From October 24, 2019 to April 23, 2020, I was at the CCCMS level of care. From April 23, 2020 to June 24, 2020, I was at the Enhanced Outpatient Program ("EOP") level of care. Since June 24, 2020, I have been at the CCCMS level of care.

6. I have a number of serious medical conditions. I have high blood pressure and chronic kidney failure. I have bleeding in my stomach. I am classified as high risk medical.

7. I have been housed at COR from October 24, 2019 to now, with brief departures to stay at outside hospitals.

8. During my time at COR, I have been housed in the following locations: COR 4A1L, which is the CCCMS Long Term Restricted Housing ("LTRH") unit, the COR Infirmary, and COR 3A03, which is the EOP Administrative Segregation Unit ("ASU"). I am currently housed in COR 4A3L.

9. I witnessed staff misconduct in COR3A03, the EOP ASU, on about May 10, 2020.

10.     I was in my cell during second watch, which runs 6:00 a.m. to 2:00 p.m. every day.  I am not sure what time it was exactly as I do not have a clock in my cell.  I was watching TV.  From my cell, I could see through the crack in the door all the way down to the other side of unit.  I was sitting down on my bed.

11.     I heard other incarcerated people begin to call out "they are coming for you." So I went to the window to look out.  I saw a large group of officers leaving the unit.  I was not sure who they were.  They may have been responding to an alarm.  I did not hear the alarm, but when an alarm goes off, a large group of officers come to the area where the alarm has gone off.

12.     I also saw a group of four to five officers wearing helmets.  One officer had a shield.  They walked toward a cell that was about seven to eight cells away from me.  I had to duck to look through the crack in my door to see what happened.  The group of officers entered the cell.  I could hear scuffling.  While they were in the cell, I could not see what happened.

13.     After a few minutes, officers dragged someone out.  He was a Black man.  I do not remember his name.  I had never spoken to him before.  I usually only spoke to the people in cells right next to me.  This person was cuffed and had leg restraints on.  Officers dragged the man to the ground outside of his cell, right in front of the doorway to his cell. I could see him from my cell once they dragged him out.

14.     One officer was a small white guy.  While this incarcerated person was lying on the ground, one officer was holding his legs, the other had his knee in the man's back. His chest was on the ground, with his back facing the ceiling.  His head was sideways, like he was listening to the concrete.  One officer was punching him in the leg.  The incarcerated person was yelling.  The sergeant, a big, tall white guy, came with a baton. The sergeant struck the man three times: at least once was in the head.  I saw the sergeant swinging the baton and saw the sergeant hit the man in the right side of his head.

15.     After that, the officers picked him up and dragged him to the dayroom.  Once they picked him up, I could see that his head was bleeding.  He had blood all over his face, especially his right side.

16.     The officers put him in a cage in the dayroom.  In the cage, they handcuffed him.  Both of his arms were sticking out of the food tray slot.  He was handcuffed and they put a triangle device on his arms.  The incarcerated person was yelling for the nurse, asking to be checked out.

17.     While this person was in the cage, other incarcerated people began to call out to him.  Some said they saw what happened and offered to be witnesses.

18.     I saw the nurses walking around the unit.  They did not go to check him until an ambulance arrived.  I know an ambulance arrived because they brought in the stretcher that only comes with the ambulance.  A nurse brought it in.  The ambulance arrived a little after the event.  I do not know who called the ambulance.  When the ambulance arrived, he was put in the stretcher and carried out.

19.     This incarcerated person later returned to our unit.  I am not sure when he returned but I saw him a few days later.

20.     There was an excessive use of force investigation for this incident.  I was not interviewed, but I told my clinician that I wanted to be interviewed on May 12, 2020.  I believe that the IGI, the gang investigation unit, conducted the interviews a few weeks later.  They pulled my neighbor out of his cell to be interviewed.  I am not sure if anything happened as a result because I moved housing.

21.     I also witnessed staff misconduct in COR 3A03, the EOP ASU, around June 18, 2020.

22.     I was in my cell, COR 3A03▮▮; I moved to this cell sometime at the end of May.  The unit is shaped like an L, my cell was at top of L, in the corner looking down the unit.

23.     Another incarcerated person in cell ▮▮ was in his cell.  His cell was in the middle of the short part of the L, right by the shower.  I could see that this person had

boarded up, which means to cover the window of your cell.  I heard the alarm go off.  Many officers rushed into the unit.  The sergeant spoke to them.  I could not hear what was said.  After the sergeant finished speaking, most of the officers left.  A few remained to chat, but they all left within minutes.

24.     After the officers responding to the alarm left, the officers from the unit came to his cell.  About four officers wearing helmets came to his cell.  One officer had a shield.  The officer with the shield went in first.  I could hear what sounded to me like fighting and cussing.  I heard someone yelling "get down, don't move, stop resisting!"  Once they were in the cell, I could not see directly in.

25.     After a few minutes, officers dragged him out.  He was wearing handcuffs and leg restraints.  They dragged him to the floor not far from his cell, maybe a few feet away, with his chest on the floor and his back facing the ceiling.  I could not see him, except for a few officers holding him down.  There was one officer holding his legs down.  Another held down his arms down.  There were three to four holding him down in total, I think.  A few were standing around, maybe three more officers.

26.     While he was on the ground, a female sergeant kicked him in the head.  I could not see everything, but I saw her leg go back to kick him.  She was short with dark hair.  She had some weight on her.  I had seen her before, but I do not think she was the regular sergeant in that unit.  When she kicked him, there were officers holding his back and legs.  They were swarmed on him like ants on a cookie.

27.     After she kicked him, many other incarcerated people began kicking their cell doors and yelling.  They were yelling, "Did you see that?"  "Open this door!  Come and get me!"  It was loud.

28.     Afterwards, officers put him in a wheelchair and wheeled him out behind the building.  After a few minutes, they brought him back the building to the door.

29.     When he was being wheeled out, I could not see him clearly because officers walked in a group around his wheelchair, blocking him from sight.

1       30.     As they wheeled him out, I saw the nurse and the officer who usually drive

2   the ambulance.  They were standing near the exit as this person was wheeled out.  So I

3   think he was taken away in the ambulance.

4       31.     A few weeks later, the IGI came to conduct interviews.  It was about four

5   officers and they stopped interviewing about three cells away from me.  I saw them pulling

6   people out.  Those investigating officers wore different uniform patches than other

7   officers.

8       32.     Because of the behavior of officers in COR 3A03, I was hesitant to access

9   mental health care.  I was worried that I would be beaten up if I needed mental health help

10  or even medical care.  Sometimes I fall down in my cell and I worried about being able to

11  access medical care.

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

33.     If I needed help in COR 3A03 and asked, I worried that I would be beaten.  I felt like I would need to decide if it was worth it.  Sometimes I decided not to ask because I did not want to be beaten.  On the night that I arrived in COR 3A03, one officer warned me that if I went suicidal or man down, they would "whip my ass."  He was a short white man, the same officer who held the man down on May 10, 2020.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 2nd day of September, 2020.

█████████████ _____

████████████

On September 2, 2020, due to the closure of COR in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at COR, I read the contents of this declaration, verbatim, to ███████████ by telephone. ███████████ orally confirmed that the contents of the declaration were true and correct.  ███████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 2, 2020          _____
                                 Catherine M. Johnson

# Exhibit 23

**DECLARATION OF** ███████████

I, ███████████ declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ███████.  I am currently housed at California State Prison-Sacramento ("SAC") on Facility A in Building 6.  I am 29 years old.

3.     I am a *Coleman* class member.  I am at the Enhanced Outpatient Program ("EOP") level of care.  I am diagnosed with depression.  During the time that I was at COR, my mental health issues were similar to the issues that I experience today.

4.     I have been at the EOP level of care since February 19, 2020.

5.     I was housed at California State Prison-Corcoran ("COR") from August 6, 2019 until June 1, 2020.  During my time at COR, I was housed in the following locations. From August 6, 2019 to February 11, 2020, I was housed in COR 3B01.  From February 11, 2020 to February 19, 2020, I was housed in the COR CTC, which is the Mental Health Crisis Bed ("MHCB").  From February 19, 2020 to June 1, 2020, I was housed in COR 3A03, which is the EOP Administrative Segregation Unit ("ASU").  On June 1, 2020, I transferred to SAC.

6.     I witnessed staff misconduct at COR.

7.     On the morning of April 6, 2020, I went to yard.  The yard in the EOP ASU is made up of many cages.  They are squares, about ten feet by ten feet.  The cages do not touch each other.  There is space between them to walk through.

8.     I was being escorted by an officer to a cage for yard.  As I neared my cage, I saw Officer Hernandez and Officer Ruiz.  These two officers were stopped with another incarcerated person.  He was tall.  I think his last name was ███████.  His cell was just up the hallway from me in COR 3A03.  I saw him every day.

9.     Officer Hernandez and Officer Ruiz were stopped in the middle of the walkway with the incarcerated person named ███████.  They were cussing at him.

[3604661.2]

10.     After a few moments, Officer Hernandez and Officer Ruiz grabbed him and slammed him against the wall of one of the yard cages.  They were behind him.  Officer Ruiz was on his left side and Officer Hernandez was on his right side.  The other incarcerated person was handcuffed at the time.  The two officers pulled his arms up behind him and smashed his head into the fence.  I have been in this position before.  It feels helpless and is very uncomfortable.

11.     These officers are in positions of authority.  They are supposed to set examples but they do everything wrong.

12.     As this happened, the officer walking with me kept walking me to my cage, as if this were normal.  We actually walked around Inmate ███████ and the two officers to get to my cage.

13.     While the person named ██████ stood in that position, the officers called him a "little bitch."  They were still standing behind him.  Then Officer Ruiz punched ███████ three to four times in his back, while Officer Hernandez held his arms up and pushed his face against the fence.  After Officer Ruiz punched him, they switched.  Officer Hernandez then punched his back four to five times.

14.     There were other people on the yard, including Inmate ███████ and my neighbors.  There were also other officers.  Other incarcerated people started yelling, but we were handcuffed or in cages.  There was nothing we could do.  The other officers did not help Inmate ██████.

15.     Watching this made me feel sick in my stomach.  It was sad and I felt Inmate ███████'s pain.

16.     I believe Inmate ██████ filed a 602 about this and listed me as a witness. He told me that he did.  I was never interviewed about the 602.

17.     On May 4, 2020, I was in my cell in COR 3A03.  My neighbor wanted his medications or medical help.  I am not sure of his name, but his nickname was ████. I could hear him asking for medical help.  █████ was yelling for about 30 minutes.  Staff

1  were not helping him.  It is my understanding that they did not want to give him his meds.

2  I could hear and see.  Members of the nursing staff said, "yeah, whatever."

3      18.    I heard ███ say, "If you don't give me my meds, I am boarding up."  At

4  some point, he did board up.  "Boarding up" means to cover the window of your cell.  I

5  could not see his cell, but I heard the officers saying about ten minutes later, "You're going

6  to board up?  You're going to play this game?  You want to go mother fucker, we can go."

7  There were about three officers and a sergeant outside of his door.

8      19.    One officer had a shield.  Then the officers opened the door to his cell.  The

9  officer with a shield went in first, then the others ran in behind him.  I could hear

10 thumping.  It sounded like people hitting the wall and the bunks.  The officers were in his

11 cell for a few minutes.

12     20.    I do not think anyone was videotaping the cell extraction.  I did not see

13 anyone with a camera.  After the officers ran into the cell, the alarm went off.

14     21.    After the alarm went off, the officers dragged ███ out of the cell.  He was

15 cuffed.  ███ was covered in blood.  The officers placed him on the ground with his chest

16 facing the ground.  Two officers held him down; the other officers kept hitting him.  One

17 person hit him in the face with a baton.  I did not see who, but I saw the baton swinging.

18     22.    Many officers came to respond to the alarm.  They did not help ███.  I saw

19 some officers laughing at him from the window of my cell.

20     23.    His eye was bleeding a lot because he had been hit in the face with the baton.

21 The officers kept beating him for a few more minutes after the alarm went off.  Then,

22 officers put ███ in a chair in the dayroom.  I saw medical staff go over and check him.

23 They checked him over, but it looked like they did not really care.  It looked rushed.  Then

24 they put him back in the cell.  I believe he got medical attention later that day.

25     24.    Watching this made me feel angry.  I could not help and thought this was

26 unfair.  At COR I felt like nobody would help us, no one on staff.  I worried that if I

27 needed mental health help, no one would help me.  I saw the officers deny other people

28

suicide watch when they needed it.  I worried the officers would stop me from getting

mental health help at COR.

  I declare under penalty of perjury under the laws of the State of California that the

foregoing is true and correct, and that this declaration is executed at Sacramento,

California this 28th day of August, 2020.

  On August 28, 2020, due to the closure of  CSP-Sacramento in light of the COVID-

19 pandemic and ongoing concerns that officers might retaliate against witnesses in

support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the

legal mail system at CSP-Sacramento, I read the contents of this declaration, verbatim, to

████████, by telephone.  ██████████ orally confirmed that the contents of the

declaration were true and correct.  ██████████ also orally granted me permission to affix

his signature to the declaration and to file the declaration in this matter.

DATED: August 28, 2020

Catherine M. Johnson

# Exhibit 24

**DECLARATION OF** ▮▮▮▮▮▮▮▮

I, ▮▮▮▮▮▮, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ▮▮▮▮.  I am currently housed in Building 3 on Facility B at California State Prison – Sacramento ("SAC").  I am 37 years old.

3.      I have been housed at SAC since early June 2020.  Before being transferred to SAC, I was housed at California State Prison – Corcoran ("Corcoran") from the middle of 2016 through the beginning of June 2020.

4.      During my time at Corcoran, I was housed in Building 1 on Facility A, Building 4 on Facility C, the administrative segregation unit ("ASU") building on 4A Facility, and the security housing unit ("SHU") building, which is called 4A3-Right ("4A3R").

5.      I am a *Coleman* class member.  I am at the CCCMS level of care.  My mental health symptoms were caused, in part, by my being assaulted by staff at Corcoran. Prior to the assault in December 2019, I did not access mental health services and I could manage my mental state without medication, therapy, or groups.  As a result of the assault, I have experienced nightmares, general anxiety, paranoia, and trouble sleeping on a daily basis.  In order to manage my mental health symptoms, I now take Vistaril and Zoloft.  I also speak with a clinician whenever I am feeling anxious.

6.      On December 16, 2019, I was assaulted by staff at Corcoran.  At the time, I was housed in Building 4 on Facility C.  That evening, as officers were letting people out of their cells for evening dayroom, I flagged the floor officers, Officer Rocha and Officer Cruz, and asked them to be let out of my cell to take a shower.  Officer Rocha responded, "Oh, I thought ISIS didn't take showers," and then walked away without opening my cell door.  I believe that Officer Rocha made this comment because I appear Middle-Eastern based on the color of my skin and my beard.  Although I did not take offense to the

comment at the time, I now realize that it was a racist remark.  I also did not understand

why these officers refused to let me out of my cell when they were letting everyone else

out for dayroom.

7.    After the officers walked away, some people on the dayroom approached my

cell and asked me what was going on.  I then asked them to talk to the officers on my

behalf.  They then came back to my cell and told me that the officers said they did not

want to let me out.  I called out to Officer Sarmiento, who was also stationed on the floor,

and asked him to release me so that I could shower.  In response, Officer Sarmiento called

me a "bitch."  I then called him a "bitch" back and returned to my bed.

8.    During evening pill call, at around 8:30 p.m. or 8:45 p.m., one of my

neighbors approached my cell and told me something to the effect of, "I heard they're

coming over here to beat your ass."  Because of what had happened earlier with the

officers, I took this to mean that this person overheard that the officers were conspiring to

harm me.  A few minutes later, pill call ended and the officers began locking everyone up

on the dayroom floor in their cells.  Once everyone was locked up, I saw Officer Rocha

and Officer Sarmiento talking to each other in their office while looking in the direction of

my cell.  After a few seconds, I saw Officer Sarmiento take his utility belt off and place it

on the office desk.  I then watched Officer Sarmiento walk up the tier and toward my cell.

Just as he was a few feet away from my cell, my cell door opened.  I then observed that

Officer Cruz, who was previously stationed on the floor, was now working in the tower

unit and staring right at me.

9.    Usually, when officers enter people's cells, they have to signal to the tower

officer to open the cell door.  This time, however, my cell door was opened just as Officer

Sarmiento arrived.  Because this sort of thing is so unusual, I believe that Officer

Sarmiento had coordinated with Officer Cruz, who had control over cell doors as the tower

control officer, to open my cell door.

10.    After he walked into my cell, Officer Sarmiento stood a few feet away from

me and stared at me for about five seconds.  He then approached me and, without saying

[3560870.2]                                                    2

anything, swung his right hand with a closed fist against my face.  He hit me with such force that I was launched backwards into my bunk.  Officer Sarmiento then climbed on top of me, as I lay in my bunk, and punched me repeatedly in the face with both of his hands. He punched me over and over again in my temples, on my chin, and against my cheeks. My lip was busted open and bleeding from his punches.  My face immediately stung and swelled up from his punches.

11.     Because I already have two strikes and did not want to incur a third strike, I chose not to fight back.  Instead, I just tried to push Officer Sarmiento off of me while he pinned me against the bed and punched me.  I did not even try to shield my face because I was worried that Officer Sarmiento would claim that I assaulted him.  I also thought that, regardless of whether I defended myself, I was going to be seriously injured, so I just let him continue hitting me without much resistance because that way, he could not claim that I was assaultive or resisting.  I was in extreme pain in my face because I was not able to defend myself by blocking his punches.

12.     Officer Sarmiento punched me for about twenty to twenty five seconds before I heard an alarm start going off in the building.  As soon as the alarm went off, Officer Rocha ran into my cell through the door.  As he ran through the door, I saw him holding his pepper spray canister.  Because he was holding his pepper spray canister, I took that to mean that he was ready to spray me immediately.  In fact, he immediately sprayed me as soon as he entered the cell, from about four to six feet away.  Officer Rocha did not say anything to me before spraying me.  I was issued no commands to stop resisting or to prepare to be cuffed.  In fact, during the whole incident, not one of the officers involved gave me any commands or orders.  They just beat me up.

13.     As soon as Officer Rocha sprayed me, Officer Sarmiento flinched and loosened his grip on me.  I believe that he flinched because he had been hit by some of Officer Rocha's pepper spray.  I took that as an opportunity to get away.  I was able to push Officer Sarmiento off of me and stand up from my bed.  I then tried to run out of my cell through the door, but after taking a few steps, Officer Rocha began hitting me in the

head with his baton.  I estimate that Officer Rocha hit me on the top of my head about six to eight times.  While Officer Rocha hit me from the front of my body, Officer Sarmiento punched me in the back of my head repeatedly.  I believe that Officer Sarmiento hit me in the back of my head about three or four times.

14.     Eventually, I was able to escape my cell by charging past Officer Rocha.  As soon as I got out of the cell, I dove on the ground and immediately put my hands behind my back so that the officers could not claim that I was resisting.  While on the ground, I noticed that my left hand was in a lot of pain.  I felt a sharp, throbbing pain throughout my hand.  Because of that pain, I suspected that Officer Rocha had hit my left hand with his baton as I was trying to escape from the cell.

15.     As soon as I was on the ground, I heard keys jangling very loudly.  In prison, when keys are jangling, that usually means that officers are running to respond to an incident.  As I lay on the ground, I also saw Officer Cruz holding a rifle and pointing it at me from the control tower.

16.     At this point, I became very fearful for my life.  I was worried in particular that the officers would claim that I was carrying a weapon, which they would then use as an excuse for Officer Cruz to shoot me.  Because I believe they coordinated this attack as a result of the way they opened my cell door and were talking about harming me beforehand, I felt that it wasn't a stretch for them to try to kill me.  While I was housed at Corcoran, I heard of multiple people getting shot by staff without any justification at all.  Knowing that such violence was commonplace, and that there are no video surveillance cameras at Corcoran, I was terrified that I was going to be killed.

17.     While I was on the ground, and before the responding officers arrived, one of the officers cuffed me.  I could not see whether it was Officer Rocha or Officer Sarmiento.  Then, one of the officers – again, I could not see which one – stomped on my right hand with extreme force.  There was absolutely no justification for this, as I was already on the ground and cuffed behind my back.

18.     Four responding officers then picked me up and escorted me to the shower. They then placed me at the step of the shower, waited a second, and then escorted me out of the building.  At no point did they allow me to decontaminate the pepper spray from my eyes, which was still burning badly at this point.  I believe that they made me wait outside of the shower for a moment in order to claim that they decontaminated me, even though they did not do that.

19.     Once we were outside of the building, one of the escorting officers, Officer Rin, started raising my arms, which were still handcuffed behind my back, which was extremely painful in my shoulders.  I believe that Officer Rin did that solely to inflict pain on me.  When I turned around to tell him to stop lifting my arms, he yelled at me, "If you turn around again, we're going to beat your ass again right here."

20.     I was then placed in a holding cage in the program office and the cuffs were removed from my wrist.  I waited about ten minutes before Sergeant Perez entered the office.  At this point, although I was still having a lot of trouble seeing due to the pepper spray in my eyes, I could see and feel that something was seriously wrong with my left thumb.  It was drooping and deformed.  While I could still feel my thumb a little bit, I could not move it at all.  I first asked Sergeant Perez to decontaminate my eyes, but he just ignored my request and told me that I was "going to be in here for a while."  When I then told him that my thumb was injured and that I needed medical attention, he just walked out of the office.

21.     After waiting about an hour, Sergeant Perez returned to the office and started reading aloud a Rules Violation Report ("RVR") about the incident.  Sergeant Perez wanted me to sign some paperwork, but I refused to because I was upset about my mistreatment and I was having trouble reading at the time.  At this point, I was starting to feel groggy and out of it.  My head was also throbbing from a headache.  Because of these symptoms, I now believe that I suffered a concussion as a result of the incident.

22.     A staff member – I cannot quite remember who this was because I was quite disoriented at the time – then conducted an examination of my injuries and recorded them

1  on a body chart.  I showed that staff member the injuries on my hands, including my

2  deformed left thumb, but they did not mark those injuries on the chart.

3        23.    About an hour later – and about two hours in total after the incident – I was

4  finally escorted to the medical clinic.  Medical staff placed a popsicle-stick splint on my

5  left thumb and wrapped it with adhesive and an Ace bandage.

6        24.    After being treated at the clinic, custody staff again returned me to a cage in

7  the program office, where I waited for about another hour to an hour and a half.  Staff then

8  escorted me to the Correctional Treatment Center ("CTC").  I was given X-rays.  Doctors

9  told me that my left hand at the thumb was broken.  I also showed the doctor my right

10  palm where it meets the thumb, which was severely swollen compared to my broken left

11  hand, but my doctor still did not want to do an X-ray.  He downplayed that injury and told

12  me that it was "just swelling."  I also told him that my jaw was in severe pain, but he again

13  told me that he did not want to do any more X-rays.  He also told me that if I continued

14  experiencing symptoms, I should just submit a medical request form.  Staff then escorted

15  me to the ASU on the 4A Facility at Corcoran, where I was housed for the coming week.

16        25.    The morning after the incident, staff pulled me out of my cell and escorted

17  me to the CTC once again.  At the CTC, they removed the bandage from my left thumb

18  and put a proper brace on my thumb.  A supervising custody staff member, either a

19  Lieutenant or a Captain, also came to see me in the CTC.  I told her that I had been

20  assaulted by staff for no reason, but she didn't seem very interested in hearing my side of

21  the story.  She stated that she was going to transfer me to a 180 degree prison, which is the

22  most secure and restricted type of prison outside of segregation units, and that I would

23  have to serve a SHU term.

24        26.    About three days after I was placed in administrative segregation, two

25  sergeants came to interview me.  I participated in a video-taped interview with them in a

26  confidential room in the building.  They also filled out a second body chart which was

27  much more comprehensive than the first body chart, and it included the injuries on my

28  hands.  They also video-taped my injuries.

27.     About five days after the incident, I was taken to Building 4A3R, which is the SHU building at Corcoran.  All the while, I had filed multiple medical forms because my right thumb and my jaw continued to hurt a lot.  Because of the concussion I suffered, I was also very disoriented for about five days after the incident.  I had trouble remembering things, I frequently did not know what time of day or date it was, and I was having trouble thinking about things for more than a few seconds.  I couldn't even focus enough to read more than three sentences.

28.     Eventually, I was escorted to California Substance Abuse Treatment Facility ("SATF") for X-rays of my jaw and my right hand.  When I returned to the medical clinic on 4A at Corcoran, a nurse told me that I had no injuries on my jaw or hand.  That did not make sense to me because my hand was still in severe pain.  In fact, my right hand hurt more than my broken left hand.  My jaw was clicking whenever I moved it.  I told medical staff about these concerns, but they did not listen to me.

29.     A few weeks after the incident, I was scheduled for an outside specialist visit for my right hand injury.  The outside doctor confirmed once again that my left hand was fractured.  The doctor also told me that my right thumb was dislocated, and advised that I might have to do surgery.  In mid-January of 2020, I had a closed reduction surgery on my right hand to fix the dislocation.  A pin was also placed in my hand to help relocate my thumb, and I wore a cast on my right hand for about four to six weeks.  In March of 2020, the pin was surgically removed from my hand.  After the surgery, a nurse at Corcoran told me that my doctor had noted that I would have nerve damage in my right pinkie because the pin had moved while it was in my hand.  Ever since the pin was installed, I have noticed that I have very little sensation of touch on the outer part of my right pinkie.

30.     For about three weeks after the incident, my jaw was swollen and in severe pain.  I also had lumps and bumps on my head from where Officer Rocha hit me with his baton.  Even though my hands are healing, I still wear a brace on my right hand to this day.  Both of my hands, and my thumbs specifically, are still very painful, which makes it hard for me to do things.  Before this assault, I was a very fit and athletic person.  I worked out

1    and played all types of sports, like basketball and baseball, on nearly a daily basis.  Since

2    the assault, however, I have been unable to do any of those things.  I cannot even do a

3    single push-up.  Because I cannot exercise, I have gained a lot of weight, which has caused

4    me to become even more depressed.  I can also only write for about fifteen to twenty

5    minutes before my hand starts hurting to the point that I have to stop.

6        31.    I received a Rules Violation Report ("RVR") for "assault on a peace officer

7    not likely to cause great bodily injury" in connection with this incident.  In the RVR,

8    Officer Sarmiento wrote that I tried to assault him after he entered my cell to conduct a

9    welfare check.  Officer Sarmiento then claimed that his pepper spray "accidentally"

10   discharged, and he caught some of the spray in his eyes.  He then said that he observed me

11   run out of the cell, slip, and fall right on my hands.  Officer Sarmiento did not mention the

12   fact that Officer Rocha entered the cell and pepper-sprayed me and hit me with his baton.

13   In fact, in his incident report, Officer Rocha claimed that he was downstairs while the

14   incident occurred.  Further, while the report dismisses my hand injuries by claiming that I

15   fell on my hands, it does not explain the injuries to the top of my head and my face.  The

16   entire RVR was full of inconsistencies.

17       32.    At my classification committee, staff claimed that I was guilty of this false

18   RVR even before the RVR had been heard.  They then told me, as the captain had said

19   previously, that I was going to have an 8 month SHU-term and that I would eventually be

20   transferred to a 180-degree prison.  Eventually, I was transferred to SAC, the 180-degree

21   prison where I am currently housed, even though I still have not been found guilty of the

22   RVR.  My RVR has still not been heard because I deferred the hearing until the District

23   Attorney has decided whether to take the case against me.

24       33.    I filed multiple 602s about this incident.  I filed a 602 about the unnecessary

25   use of force itself, as well as 602s about the RVR and the classification committee action.

26   These 602s are at the third level of review after they were all denied at the second level.

27       34.    In the weeks after the incident, I was harassed and retaliated against by staff

28   at Corcoran after submitting complaints about this incident.  For example, a few weeks

1 after the incident, I overheard one officer, Officer Burden, talking about me to other staff.

2 When I confronted him about it, Officer Burden told me to "stay out of trouble," which I

3 took as a threat, as if he was going to make trouble for me.

4      35.    After I was moved to the SHU in 4A3R, Sergeant Perez, Officer Rocha, and

5 Officer Rin were re-assigned to the third watch shift in the building.  It made me extremely

6 uncomfortable to have to interact with and see these officers on a near-daily basis.

7 Whenever these officers were on duty, a lot of my mail was misplaced.  One time, for

8 example, I sent legal mail to the Government Claims Board while these officers were

9 working in the building.  About a week later, my letter was returned to me and it had been

10 opened and covered up with tape.  Similarly, I received mail from my attorney that had

11 been opened before it was delivered to me on multiple occasions.  Someone who came to

12 4A3R from my former yard, C-yard, also told me that Officers Rocha and Rin threw out

13 my property after I had been transferred to administrative segregation.  I believe that these

14 staff members were messing with my property and my legal mail in retaliation for my

15 complaints against them.

16      36.    As a result of this incident, I have had a lot of trouble sleeping.  I experience

17 nightmares on a near-daily basis about the incident.  With every nightmare, the incident is a

18 little different, but each one ends with my death.  Sometimes, the nightmare ends with

19 Officer Cruz shooting me dead from the tower, and other times, it ends with Officer

20 Sarmiento and Officer Rocha bashing my head in.  When I have these nightmares, I am

21 often unable to fall back to sleep once they wake me up, which just worsens my mental

22 health.  Throughout the day, I experience racing thoughts, anxiety, and paranoia, all of

23 which are heightened by interactions with staff.

24      37.    In my time at Corcoran and SAC, there have been a few times that I needed

25 help but didn't ask for it because I was afraid of what would happen to me.  In general, I

26 am scared of staff because of what they did to me at Corcoran.  If I am feeling really

27 mentally down and need to talk to a clinician really badly, I do not ask staff for help

28 because I don't feel comfortable around them and I know they would not help me.  Based

1    on what happened to me, I do not think that staff have good intentions. I cannot trust them

2    to do anything to help me.  Because of my right hand dislocation and nerve damage, for

3    example, I need help with writing letters and filling out forms, but I do not feel

4    comfortable asking staff for this sort of help.  Instead, I have been trying to learn how to

5    write with my left hand so that I do not need to ask anyone for help.

6

7         I declare under penalty of perjury under the laws of the United States of America

8    that the foregoing is true and correct, and that this declaration is executed at Represa,

9    California this 26th day of June, 2020.

10

11   

12

13        On June 26, 2020, due to the closure of California State Prison – Sacramento in

14   light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against

15   witnesses in support of Plaintiffs' Motion, including ongoing concerns about the

16   confidentiality of the legal mail system at California State Prison – Sacramento, I read the

17   contents of this declaration, verbatim, to ███████ by telephone.  Mr. ███ orally

18   confirmed that the contents of the declaration were true and correct.  Mr. ███ also orally

19   granted me permission to affix his signature to the declaration and to file the declaration in

20   this matter.

21

22   DATED: June 26, 2020

23                                                          Jack Rhein Gleiberman

24

25

26

27

28

# Exhibit 24a

## Filed Under Seal

# Exhibit 25

1        **DECLARATION OF** ████████████

2      I, ████████████, declare:

3        1.      I have personal knowledge of the matters set forth herein, and if called as a

4  witness, I could and would competently so testify.

5        2.      My California Department of Corrections and Rehabilitation ("CDCR")

6  number is ██████.  I am currently housed at California State Prison – Corcoran ("COR")

7  on Facility B in Building 01.  I am 49 years old.

8        3.      I am an *Armstrong* class member.  I am designated as DPM, which means I

9  need an assistive device to help me walk.  I have a ground floor housing restriction with no

10 stairs because I cannot climb up or down them.  I use a cane to help me walk.  I also have

11 foot orthoses, a mobility disability vest, and eyeglass frames as durable medical equipment

12 ("DME").

13       4.      When I transferred to COR in early July 2019, I was designated as DLT and

14 also used a cane.  Since December 2018, I have been recovering from a surgery on my

15 right ankle.  I also have diabetes and frequently experience issues with my feet, including

16 ulcers and swelling.  As a result, medical staff at COR prescribed me with a temporary

17 wheelchair on July 30, 2019, to allow me to keep pressure off of my foot.  By January

18 2020, I still needed a wheelchair to move around and my disability code was changed to

19 DPO, which stands for intermittent wheelchair-user.  I still struggle with my mobility, but I

20 no longer require a wheelchair.

21       5.      I am a *Coleman* class member.  I am at the Enhanced Outpatient Program

22 ("EOP") level of mental health care.  EOP patients live in separate, sheltered, housing

23 units with other EOP individuals.  They receive individualized mental health treatment,

24 including 10 hours each week of structured therapeutic activities and frequent meetings

25 with their case managers.  I suffer from depression and anxiety.  When my mental health

26 symptoms are at their worst, I feel suicidal.

27

28

[3562235.1]                                        1

6. Along with my diabetes, I have other serious medical conditions. I have been diagnosed with Hepatitis C, high blood pressure, and cataracts. I am classified as high risk medical.

7. I have been housed at COR from July 16, 2019 to present. I was previously housed at COR from April 2012 until May 2014 and then again from July 2016 until late February 2017. I have been housed in the following locations at COR: Facility B, Building 01 and Facility A, Buildings 01 and 03. Building 03 is an Administrative Segregation Unit ("ASU") that houses EOP patients.

8. I was a victim of staff misconduct at COR.

9. A few months ago, around October 16, 2019, in housing unit 3A-04, I asked third-watch custody officers in my housing unit if I could bring my wheelchair into my cell. Because of my disability, I cannot stand for prolonged periods of time. I am stuck in my bed all day if I do not have a wheelchair to sit on. From my bed I can't see out of my cell door and staff are unable to see me. I am diabetic, and if I go man down or need medical attention, I have no way to get the attention of staff. The officers, Officer Parra and his female partner, I do not know her name, refused to allow me to have my wheelchair in my cell. I did not understand why I was not allowed to have my chair because other officers in the unit let me have my wheelchair in my cell. Also, I was just in Ad Seg, a more restrictive environment, where I was allowed to have my wheelchair in my cell.

10. Instead of letting me have my wheelchair, Officer Parra and his partner ordered me to lock it up. Because I did not understand why I was not allowed to have my wheelchair, and I was worried about my medical condition, instead of locking up in my cell I locked myself in the shower. I understood that it was protocol for a sergeant to be called over if someone was locked in the shower, so I locked myself in the shower hoping to speak with a sergeant. Next, Officer Parra said, "You obviously do not know Corcoran very well" and both officers walked out of the building. I thought they left to go get the sergeant. Less than five minutes later, they returned and they had three other officers with

1   them.  One was a female officer named Officer Gamboa.  The other two officers were

2   male.  The younger male officer was Officer Timothy Wolfe.  Officer Wolfe said

3   something like, "Now you're going to learn what it is like at Corcoran," and he told the

4   tower officer to pop the shower door open.  At that point I asked to see the sergeant.  Next

5   thing I know, Officer Wolfe swung and hit me in the face.  The other officers entered the

6   shower and started to beat me.  They were kicking and punching me, and striking me with

7   their batons, for at least five minutes.  At some point I lost consciousness.  When I came

8   to,  I was being dragged from the shower to my cell.  I could hear many incarcerated

9   people yelling and banging on their cell doors so I knew they could see what was

10  happening.  The officers left me in my cell with no cane, no wheelchair.  I was just left

11  there bleeding in my cell all night.  It took me 30 minutes before I could even get up off

12  the floor.

13          11.     There were two Psych Technicians in the unit at the time the assault occurred

14  but they did nothing.  I saw the officers tell the Psych Technicians to go in to the office and

15  shut the door and I saw them walk in to the office.  They stayed in the office with the

16  blinds closed the entire time.  The next day I attempted to talk to one of the Psych

17  Technicians that had been in the unit but she told me that she did not want to get involved

18  and that she was very close to retiring.

19          12.     As far as I am aware, staff did not sound an alarm during the incident.

20          13.     The next morning, multiple people told me that they reported what they had

21  witnessed to the recreational therapist during their mental health groups.  The recreational

22  therapist told the group that she would email her supervisor and the yard Captain.  I did not

23  go to group because I was too afraid to come out of my cell.

24          14.     Two sergeants came and spoke with me the next night.  The sergeants asked

25  me to tell them what happened.  But, before I started talking, they warned me "off the

26  record" that I should be careful what I report because, if I report staff misconduct, things

27  will get much worse for me.  They said that if I instead reported that I slipped and fell, they

28  could do me a favor and get me moved out of my cell to a better one with electricity.  Off

the record, I told them what happened. On the record, I told them I slipped and fell. They had a nurse document the injuries on a 7219 and they took a video of my injuries and recorded me saying on video that I slipped and fell. My injuries were so severe, I think I would have had to have fallen off a ten story building to look as bad as I did from a supposed slip and fall. I had difficulty breathing for six months after the assault and I still have pain and difficulty moving my hand where they stomped on it.

15.     I requested treatment less than a week after the assault because I was having difficulty breathing. Approximately three weeks after the incident staff took X-rays of my back and ribs but I did not have any broken bones.

16.     The same sergeants who talked to me also talked to at least 15 different incarcerated people in the unit. Most of them told me that they reported what they saw. Multiple people told me that they were threatened by the sergeants who took their statement but that they reported what they witnessed anyway. A few of them told me that they said they did not want to be involved and did not report what they saw.

17.     Staff assaults were almost a daily occurrence in 3A-04 during the time I was housed there.

18.     I became very afraid of custody officers after I was assaulted. I do not think I can ask staff for help with my serious medical conditions or any of my disability needs. I fear that if I ask for help again, staff might kill me. For at least three weeks after the assault, I had an open wound on my foot and I was supposed to get my dressing changed daily. In order to get my dressings changed, I had to ask custody staff to take me to medical and to wait there for me. I stopped asking to be taken to medical to change my dressing after I was assaulted. Instead I just replaced the dressing with clean toilet paper in my cell. I had an active infection for several months and finally had to receive surgery on my foot in February 2020.

/ / /

/ / /

/ / /

[3562235.1]

4

19.     There have been multiple times when I have needed insulin but I have not wanted to ask staff for help so I have passed out.  Most recently, I passed out in my cell about two weeks ago.  I was given glucose tabs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 15th day of June, 2020.

On June 15, 2020, due to the closure of California State Prison – Corcoran in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at California State Prison – Corcoran, I read the contents of this declaration, verbatim, to ████████████, by telephone.  ████████ ████████ orally confirmed that the contents of the declaration were true and correct. ████████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: June 15, 2020

_____
Penny Godbold

# Exhibit 25a

## Filed Under Seal

# Exhibit 26

1    **DECLARATION OF** <span style="background:black">        </span>

2    I, <span style="background:black">     </span>, declare:

3    1.    I have personal knowledge of the matters set forth herein, and if called as a

4    witness, I could and would competently so testify.

5    2.    My California Department of Corrections and Rehabilitation ("CDCR")

6    number is <span style="background:black">   </span>.  I am currently housed at California State Prison, Corcoran ("COR")

7    on Facility 4A in Building 2L.  I am 49 years old.

8    3.    I am a *Coleman* class member.  I am at the Correctional Clinical Case

9    Management System ("CCCMS") level of mental health care.  From February 7, 2020 to

10   May 6, 2020 I was at the Enhanced Outpatient Program ("EOP") level of mental health

11   care.  From May 6, 2020 to May 30, 2020 I was at the CCCMS level of care.  From

12   May 30, 2020 until June 12, 2020, I was at the Mental Health Crisis Bed ("MHCB") level

13   of care.  Since June 12, 2020 I have been at the CCCMS level of care.

14   4.    I am diagnosed with major depressive disorder with psychotic features and

15   anxiety.  For these conditions, I take Remeron, Buspar, Vistaril  and Zyprexa.

16   5.    I have been housed at COR since January 19, 2018, with a break from

17   January 27, 2020 to February 7, 2020, when I was in the MHCB at the California

18   Institution for Men.  From February 7, 2020 until May 30, 2020 I was housed in COR

19   3B01.  From May 30, 2020 until June 4, 2020 I was housed in COR 4A3L, the Temporary

20   Mental Health Unit ("THMU").  From June 4, 2020 to June 12, 2020 I was housed in the

21   COR CTC, which is the MHCB.  From June 12, 2020 until August 19, 2020 I was housed

22   in COR 3B02.  On August 19, 2020, I transferred to COR 4A2L, my current unit.

23   6.    I was a victim of staff misconduct at COR on May 30, 2020.

24   7.    On May 6, 2020 I discharged from the EOP level of care to the CCCMS

25   level of care.

26   8.    Before I was dropped to CCCMS, my aunt's sister called to inform staff that

27   my aunt passed away, so they could inform me.  My aunt's sister spoke to Dr. Glatstein,

28   the EOP supervisor, and informed him.  Dr. Glatstein did not tell me until later in May,

1  after I had been moved to CCCMS.  He said he waited because my aunt was not an

2  immediate family member.  My grandmother also passed away a few months ago in

3  January of 2020.  I was sentenced to life with the possibility of parole.  I hoped someday to

4  live with either my grandmother or my aunt.  After I found out that my aunt passed away

5  too, I stopped taking my medications and stayed in my cell for several weeks.  Because I

6  stopped taking my medications, my voices came back.  I was feeling paranoid, like people

7  were out to get me, so I did not come out of my cell.  On May 30, 2020, I attended med

8  pass for the first time in about two weeks.  I had been contemplating suicide and I had

9  made a rope in my cell.  I was thinking about suicide a lot at that time, so I went to tell

10  staff because I needed help.

11       9.       When I was housed in that unit we went to med pass near the medical

12  building.  There is one building with education, the library, program office, medical,

13  canteen, the chow hall and the kitchen, in one long row.  The med pass for my building

14  was held in front of medical.  I was standing in line in front of the nurse, who was inside

15  the medical building.  I went inside to get my medication; the line was outside the

16  building.

17       10.      Typically there are around five officers standing around when we do med

18  pass.  There are two psych techs, passing out medications.  Incarcerated people stand in

19  line for medication outside.  Officers stand nearby supervising.  Sometimes they speak to

20  us, asking questions or chatting.

21       11.      At med pass on May 30, 2020 at about 4:30 p.m., when I made it to the front

22  of the line, I told the psych tech, Ms. Winfield, that I was feeling suicidal.  At this point

23  there were three other incarcerated people, including my cellmate, nearby in line.  My

24  cellmate told me later that he witnessed what happened.

25       12.      Ms. Winfield pointed to the officer nearby, Officer L. Lujan.  That officer

26  took me against the wall, with my chest against the wall and my hands behind my back,

27  and cuffed me up.  An officer told me to face the wall.  This is normal in my experience:

28  typically you cuff up after reporting suicidality, then they put you in a cage to wait to see

1   the doctor.  Sometimes it takes several hours to see the doctor and you are just waiting in

2   the cage.

3          13.      In this case, after I cuffed up and was standing against the wall, facing the

4   wall, Officer L. Martinez-Toledo came over.  When he came over, I turned to face him.

5   He stood next to me on the right side, holding my arm.  He asked something like, "Why

6   are you trying to roll-up off the yard?"  To "roll-up" means to change housing and leave

7   that yard.  I said I was not.  He said, "This isn't going to work.  You're going to have to do

8   something to go suicidal."  He began to try to escort me back to my cell.  He said that I had

9   to "earn it."  It is my understanding that he was saying that I needed to take some action to

10  hurt myself in order to go suicidal.

11         14.      While this happened, I believe Sergeant J. Holland was inside his office.

12  The sergeant's office is next door to med pass, inside another room.  I am not sure if the

13  sergeant could hear what was happening.

14         15.      I refused and told Officer Martinez-Toledo that I was not going back to my

15  cell.  I began to turn back towards the wall, with Officer Martinez-Toledo still holding my

16  right arm.  Officer J. Rosales, Officer E. Martinez, and Officer Lujan were all standing

17  nearby, observing med pass.  Officer J. Garcia was in the tower, about 20 feet away over

18  the gymnasium.  After I refused and turned back to the wall, I felt another person grab me.

19  Then I hit the ground.  Once I hit the ground it felt like about three different people were

20  holding me.  After I hit the ground I could feel weight on my legs, knees and back.  Then I

21  was knocked out.

22         16.      Sergeant Holland later told me that after this, he said I was put into a cage

23  and that he came to speak with me in the cage in the program office.  I do not remember

24  being in the program office in a cage or speaking with him.

25         17.      I woke up in an ambulance.  I am not sure how much time had passed since I

26  was knocked out, enough time for the ambulance to be called and arrive at the yard.

27         18.      When I woke up in the ambulance, we were stopped in front of the program

28  building.  There were a lot of officers around.  I think the alarm went off, but I do not

1 remember it going off.  Because of the number of officers around, I think it did.  The

2 program building is about ten feet away from the medical building where I was knocked

3 out.  The ambulance came about ten feet away from the medical building, to the left if you

4 are facing the yard.  First the ambulance took me to the COR on-site hospital, the TTA.  I

5 told doctors at the TTA that an officer knocked me out.  Officer Rosales took me to the

6 TTA and he also said officers knocked me out.

7       19.    Sergeant Holland came to speak with me again in TTA.  Sergeant Holland

8 then said that he had tried to speak to me earlier in the cage but that I was unconscious.  I

9 do not remember him saying anything about what happened to me, about officers knocking

10 me out.  He said nothing about the use of force.

11       20.    I went to the Adventist Health Hanford emergency room to be evaluated

12 after I fell unconscious.  They took a CT Scan of my head because I had been knocked out.

13 I did not receive the medical paperwork, but no one told me that I had a concussion.

14 Doctors at the emergency room asked me if officers had knocked me out and I said yes.  It

15 is my understanding that an officer told the ambulance driver what happened.  Then the

16 driver told the doctor so he knew what happened.  I did not have to explain because the

17 doctor came and said, "The officer slammed you to the ground and knocked you out," and

18 I just said yes.  I was discharged the same night and went back to COR.

19       21.    After I returned to COR, I was evaluated by a Crisis Intervention Team

20 ("CIT") at midnight on May 30, 2020.  I explained that I was suicidal and thinking of

21 killing myself.  I told the CIT team that I was hearing voices telling me to hurt myself.

22 After I spoke to the CIT team, I moved to COR 4A3L, which is the THMU for a higher

23 level of mental health care.  I was put on 1:1 suicide watch.  On June 4, 2020, I moved to

24 the MHCB.  I stayed at the MHCB level of care for about 12 days total.

25       22.    It is my understanding that my MHCB clinician, Ms. Houston, reported this

26 incident.  She told me that she would report it.

27       23.    After 8 days at the MHCB, I was interviewed with a camera for a use of

28 force investigation.  Sergeant Holland came to interview me, but because he had been there

1  that night, I refused to participate.  I did not want to speak to him about it.  I believe this

2  interview was a response to my clinician's report.

3      24.    About 12 days after the incident, around June 16, after I was discharged from

4  the crisis bed, a lieutenant came to speak with me.  She interviewed me, asking me what

5  happened, where was I when I was slammed to the ground, which officers were involved.

6  I felt more able to speak with her.  By then, I was out of the MHCB and back on the yard.

7  It was one-on-one; I felt more safe speaking with her then Sergeant Holland.  Sergeant

8  Holland was there at the scene when all this happened so I worried he was not neutral.

9  About August 15, 2020, I received the investigation report.  They talked to officers and

10  some inmates.  It said this incident did not meet the criteria.  So I understand there will not

11  be further action taken.

12      25.    I received an RVR for "Willfully Delaying a Peace Officer" for this incident.

13  I was found guilty and 90 days of credit were taken.  There was no mental health

14  assessment conducted for this RVR because I was at the CCCMS level of care and it did

15  not result in a segregation term.  I believe that this RVR was falsified.  This is only the

16  second RVR that I have received during the last five years.  The other RVR was for being

17  late to work in 2019.

18      26.    I filed a 602 about this RVR on about July 28, 2020.  I wrote that the hearing

19  process was unfair and they would not call any of my witnesses.  Because I appealed the

20  first hearing, at which I was found guilty, I have another hearing on October 23, 2020.  On

21  October 23, I will find out if the RVR will be reheard or if the original guilty ruling stands.

22      27.    I have also witnessed staff misconduct at COR.

23      28.    When I was EOP in COR 3B01, from about 2018 to April 2019, I worked as

24  a porter cleaning the building.  I was out of my cell frequently.  Sometimes, someone

25  would call me over to ask me to tell the officers that they were suicidal.  I would go tell the

26  officers.  Once, an officer said, "You didn't tell me," and then never went to check on that

27  person.  I worked as a porter for about a year and a half.  This happened a lot, that the

28

1  officer would not check on someone who was suicidal.  This happened more than ten times
2  in my estimation.

3      29.     The incident on May 30, 2020 made me feel hurt.  I could not understand
4  why they slammed me to the ground after I asked for help.  It makes me reluctant to ask
5  for help at COR.  There is no telling what custody staff at COR will do if you ask for help.
6  This was an unprovoked incident.  I was not arguing or resisting.  If I start to have mental
7  health problems, I do not want to talk to staff.  I do not want to ask the officers for help if I
8  need it.  I would try to find a member of mental health to talk to.  I do not trust officers
9  because of what I experienced.

10      30.     In my experience, people at the EOP level of care are targeted by officers.
11  Officers say that we are faking, they say we are not "crazy" and that we are faking our
12  symptoms.  I tell officers that it is not about being crazy, it is about depression and about
13  other things going on in our lives.  In my opinion, officers think EOP people are taking
14  advantage of the system.  They do not help us when we need it.
15  / / /
16  / / /
17  / / /
18  / / /
19  / / /
20  / / /
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

31.     In terms of staff misconduct, COR is one of the worst prisons that I have been to.  There is more staff misconduct than anywhere else I have been.  I have been in prison since 1991.  I don't know why it is so much worse at COR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 28th day of August, 2020.

On August 28, 2020, due to the closure of COR in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at COR, I read the contents of this declaration, verbatim, to ███████ by telephone. ███████ orally confirmed that the contents of the declaration were true and correct. ███████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 28, 2020

Catherine M. Johnson

# Exhibit 26a

## Filed Under Seal

# Exhibit 27

**DECLARATION OF** ███████████████

I, ████████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ██████. I am currently housed at Richard J. Donovan Correctional Facility ("RJD") on Facility C in Building 14. I am 39 years old.

3.      I am a *Coleman* class member. I am at the Enhanced Outpatient Program ("EOP") level of mental health care. I am diagnosed with depression. For my depression, I take sertraline, trazodone, and Vistaril. During the time that I was housed at California State Prison, Corcoran ("COR") and the California Substance Abuse Treatment Facility ("SATF"), my mental health issues were similar to the issues I experience today.

4.      From November 7, 2019 to January 15, 2020, I was not in the Mental Health Services Delivery System. From January 15, 2020 to February 2, 2020, I was at the Mental Health Crisis Bed ("MHCB") level of care. From February 2, 2020 to March 5, 2020, I was at the ACUTE level of mental health care. From March 5, 2020 to March 17, 2020, I was at the ICF level of mental health care. Since March 17, 2020, I have been at the EOP level of mental health care.

5.      I was housed at SATF from November 7, 2019 to January 14, 2020; from January 7, 2020 until January 10, 2020, I was admitted to the Adventist Hospital Hanford ("AHH"). I was housed at COR from January 14, 2020 to February 2, 2020. I was housed at the California Health Care Facility ("CHCF") from February 2, 2020 to March 5, 2020. From March 5, 2020 to March 17, 2020, I was housed in the Department of State Hospitals, Atascadero ("ASH"). I returned to COR on March 17, 2020 and remained there until my transfer to RJD on May 26, 2020.

6.      During my time at SATF, I was housed in the following locations. From November 7, 2019 until December 13, 2019 I was housed in SATF Facility D-3. From December 13, 2019 until January 7, 2020 I was housed in SATF Facility E-1, which is an

1   Administrative Segregation Unit ("ASU").  From January 7, 2020 to January 10, 2020, I

2   stayed at an outside hospital.  From January 10, 2020 to January 14, 2020 I was again

3   housed in SATF Facility E-1.

4          7.      During my time at COR, I was housed in the following locations.  From

5   January 14, 2020 to January 15, 2020, I was housed in COR Facility 4A3L, which is an

6   ASU.  From January 15, 2020 to February 2, 2020, I was housed in the COR CIT, which is

7   the MHCB.  On February 2, 2020, I transferred to CHCF.

8          8.      I returned to COR on March 17, 2020.  From March 17, 2020 until my

9   transfer on May 26, 2020, I was housed in COR Facility 3A03, the EOP ASU.

10          9.      I was a victim of staff misconduct at SATF.

11          10.     On January 1, 2020, my daughter passed away in a car accident.  She and her

12   mother were driving to visit me.  It was very traumatic.  After this accident, I was

13   struggling with a lot of anxiety.

14          11.     On January 7, 2020 at about 1:30 p.m., I told the inmate-porter on my unit

15   that I was experiencing chest pains and that it was an emergency; I asked him to find

16   Officer Bott.  I asked for Officer Bott because he was the regular officer on duty on the

17   floor that day.  I was in my cell, maybe cell ███, alone.  I had a cellmate, but he was not in

18   the cell at that time.  After I spoke to the porter, from my cell, I called out to Officer Bott

19   that I was not ok and needed help.  He was about ten feet away from my cell door.  My cell

20   was on the second floor and he was downstairs.  There was no activity in the unit so I

21   believe that he could hear me.  I told Officer Bott that I was experiencing chest pains and

22   that I felt suicidal.  Officer Bott said, "you'll be ok" and walked away.  It is my

23   understanding that because 1:30 p.m. is close to the change of shift at 2:00 p.m., Officer

24   Bott was reluctant to help me.  Additionally, on another yard previously I had problems

25   with Lieutenant Lunes and when I arrived on the yard where Officer Bott worked, he made

26   a point of telling me that Lieutenant Lunes was a "friend of his."

27          12.     But I needed help; I only needed an officer to say that he would help.  My

28   resolve to live was gone.  My mental state was shot.  When I asked for help, Officer Bott

1  threw it out the window.  That felt like a sign, saying that I was worthless.  It took courage

2  for me to ask for help from Officer Bott.  I was on orientation status at the time because I

3  had recently arrived on the unit.  I could not go to yard or seek help outside of my cell.

4       13.    Around 2:00 p.m., my cellie came back to our cell; he had been at clinic.  He

5  did not know what was going on.  He had just moved in two days prior.  I did not know

6  him well and did not tell him that I was feeling suicidal or that my daughter passed away.

7  When he came back from clinic, my cellie asked me what happened.  He said, "did

8  something happen with Officer Bott?"  I replied that I had tried to get Officer Bott to come

9  to our cell door.  My cellie then said "When I was walking up the stairs, Officer Bott said

10 that 'if I have any stuff that I better get it because you're going to the Hole.'"  I felt

11 confused, but my mind was elsewhere.  I was in a bad state.  My cellie put on his

12 headphones and went into his top bunk.  He was oblivious to the world, watching

13 television.

14      14.    At about 3:00 p.m., I tried to commit suicide.  My heart stopped because of

15 my attempt and the next time I woke up, I was in the back of an ambulance.  I do not know

16 how I got medical help.

17      15.    I stayed at AHH for four days.  My ribs were broken during chest

18 compressions to revive me.  Prior to my suicide attempt, I was having chest pains, which I

19 attributed to my anxiety.  Medical staff at SATF gave me Narcan to try to wake me up and

20 at AHH I received morphine for the chest pains.  The hospital also said that I had

21 pneumonia and a problem with one of the valves of my heart.  I rested for these conditions

22 and did a stress test, among other things.  Medical staff gave me blood and urine

23 screenings: I was negative for everything.  I had not taken narcotics.  The toxicology report

24 returned all negative for drugs such as narcotics and amphetamines.  I took morphine after

25 providing the blood and urine samples for the toxicology report.

26      16.    When I was staying at the hospital, I could not talk to my family.  My wife

27 visits every Saturday and Sunday.  I asked to be released on Friday, January 10, 2020, in

28 time to return to SATF for her visit.

17.     When I returned to SATF on Friday, January 10, 2020, officers said that I was being moved to the ASU for safety concerns.  First they took me to SATF CTC to be medically cleared to go back to yard.  I was cleared and then the escort officer took me out, but instead of taking me back to my building he placed me in a cage in the program office.  That escort officer told me I was going to the ASU.  I asked why and he went to get the third watch sergeant.  I spoke to the sergeant and explained that Officer Bott denied me help.  The sergeant gave me copies of the lock-up order and the 1030 form, which is a confidential disclosure form.  He also asked me to do a urine test, which I did but I also explained that I had one in the hospital already.

18.     Typically when you are placed in ASU, staff provide you with a copy of the lock-up order.  The lock-up order said that I asked to be moved for safety concerns.  This lock-up order was written by Officer Bott.  It stated that Officer Bott received information that I had safety concerns.  The 1030 disclosure form was signed that day, January 10, 2020.  The 1030 form says that Officer Bott received confidential information that I no longer wanted to be on the yard because of a drug debt on SATF E-Yard.

19.     This is false.  I did not ask to be moved; I had just returned from the hospital.  It is my opinion that because Officer Bott denied me help, he was trying to cover his tracks.  While I was in the SATF ASU on the day after I returned from the hospital, Saturday, January 11, 2020, ISU officers came to pull me out.  There were two officers, a male and female officer, who came to interview me about what happened on January 7, 2020.  These officers told me that ISU searched my cell with a canine after January 7, 2020.  I said that I asked Officer Bott for help.

20.     I filed a 602 about Officer Bott on a weekday, around January 15, 2020 while I was still in the SATF ASU.  When I was at CHCF around the middle of February, Lieutenant Smith interviewed me on the phone about this 602.  It is my understanding that an investigation was conducted of Officer Bott, his partner and the tower officers.  It is also my understanding that this investigation was started because of my 602.  Another incarcerated person who I did not know, who was the porter for Officer Bott, my cellie and

a neighbor were also interviewed.  I did not receive the results of the investigation, just that they found that his actions were acceptable.  I disagreed, what happened to me did not have to happen.  So I kept pushing the 602s.

21.     The SATF ASU is not equipped for people at the EOP level of care and my level of care was going to be increased to EOP.  So after my return from the hospital on January 15, 2020 I transferred to COR.

22.     I was a victim of staff misconduct on April 6, 2020 at COR.

23.     On April 6, 2020 at 8:30 a.m. I was in my cell, number ███.  Typically after breakfast, an officer would walk the floor with the clip-board, calling for requests of incarcerated people who want to go to yard.  If you want to go, you call out your cell number.  On that day, I signed up for yard.  Officer Ruiz came to my cell to pull me out for yard.  Officer Ruiz had me strip to check for contraband before we left, then cuffed me up.

24.     In general, I am respectful to officers and try not to be rude.  I do not file lots of 602s.  I thought everything was cool.  I pay attention to my own business and just try to keep my head down and get by.

25.     On April 6, 2020 I cuffed up and I left my cell, escorted by Officer Ruiz.  Usually in the EOP ASU, incarcerated people go to "yard" in "small management yards" or "SMYs."  These yards are small cages about the size of a bathroom surrounded by chain link fencing and set up on a concrete pad.  They remind me of big dog kennels.  The cages are back to back.  One is across from another.  If you saw it from above, it would look like many small squares with dirt around.  There is no shade.

26.     With Officer Ruiz, I went out to yard.  I was the second to last person taken out to yard on April 6, 2020.  My neighbor ████████████ was last.  Often officers start releasing people for yard at cell 101 and work their way down.  My cell, ███, was near the end of the line.  At that point, the entire top tier of the building—cells 201 to 250—was empty.  Only cells 101-146 were occupied with a few empty cells between.  Additionally, not all eligible people come out to yard so on April 6, 2020, I estimate there were around

1   20 incarcerated people outside already.  There were also other officers who had just

2   escorted other incarcerated people out.

3        27.    Officer Ruiz walked me to the back of the yard, holding my left elbow, to the

4   last few cages.  I was chatting with Officer Ruiz, who seemed nervous.  I saw Officer Ruiz

5   almost every day; I had an idea of his mannerisms.  His manner on April 6, 2020 seemed

6   off.  When we neared the third cage from the end, Officer Hernandez was standing there.

7   Officer Hernandez is the yard officer and he held the cage keys.  Typically, only yard

8   officers have the keys to the cages.  When we got close to him, Officer Hernandez grabbed

9   my right elbow.  Officer Ruiz was still holding my left elbow.  Together they smashed me

10  against the chain link fence of the cage face first.  Both of them called me names.  Officer

11  Ruiz said I was a "rat-bitch" and said "suck my dick, you motherfucking rat."

12       28.    The word "rat" could put my life in danger.  Other incarcerated people may

13  not know what is going on; they just hear officers calling me a rat.  They do not know if

14  officers are referring to me ratting on other incarcerated people, for example.  I felt like the

15  officers were trying to put my safety in danger using that word.  Officer Ruiz used this

16  word at other times too, giving me my dinner tray for example.  Other people down the

17  hallway could hear this.  He said it throughout the day during my entire time in that unit.

18       29.    On April 6, 2020, while I was still pressed against the side of the cage with

19  an officer on each side, Officer Ruiz gave me 4 or 5 closed-fist punches to my back and

20  kidney area.  I started yelling.

21       30.    I could hear other incarcerated people yelling for help.  I could not believe

22  what was going on.  There were other officers only four feet away who I believe could see

23  what was happening.  Officer Ruiz told me to "shut the fuck up."  Then Officer Hernandez

24  punched me, also to the back and kidney area but on the right side.  I yelled for them to

25  stop.  Officer Ruiz grabbed my head and banged it on the cage, yelling at me to shut up.

26       31.    By then I was freaking out, asking for help, asking why.  Then I went into

27  the yard cage, still cuffed up.  Officer Ruiz pushed me in.  Once inside the cage, there is a

28  lot of room.  I walked in and demanded to see the sergeant.  They said, "you don't want to

6

1   do that.  Give us the cuffs or we will come in and get them."  Usually, once inside the yard

2   cage, officers remove your cuffs.  I refused to uncuff because I wanted to talk to the

3   sergeant.  Because usually we are uncuffed inside the cages, I thought keeping the cuffs

4   would force officers to get the sergeant.  But I felt like an ass-whipping was coming.  So I

5   got scared and gave the cuffs back.  I asked again to see a sergeant.  Officer Ruiz and

6   Officer Hernandez told me that they knew I had a wife and was going home soon, and that

7   could change.  Officers said they might find something in my cell, that they might set me

8   up.  I felt humiliated.  Nothing like this had ever happened before to me.  After I gave back

9   my cuffs, they left me in my yard cage.

10      32.   ████████████████████, came out as this happened, escorted by another

11   officer and heading to a cage nearby.  The officer did not help me.  He purposely turned

12   his back, standing in front of ███████████ so that he could not intervene.  It is my

13   understanding that the officer turned his back so that he could not be a witness.

14      33.   Other incarcerated people including ████████████ and ████

15   ████████ also witnessed these events.  They were already outside in cages when

16   this occurred and they told me later that they saw what happened.

17      34.   I filed a 602 about this exactly 30 days later.  I tried to file a 602 earlier than

18   that.  I know that 602 did not go out because I never received a receipt with a log number.

19   I waited as long as possible, then I asked my clinician.  She helped me by taking the 602 to

20   another 602 box in another building.  In the ASU we had to give the 602 to officers with

21   our mail.  I believed they would not accept any 602 from me in that unit.  After my

22   clinician submitted it, I received a log number.

23      35.   After my 602 was submitted, I was interviewed about a week later.  Two

24   sergeants video-taped me.  I do not remember their names, but one of them was the regular

25   3A03 sergeant.  I knew that he was letting a lot of this happened.  But I decided to

26   participate anyway because I had no other way to get this reported.

27      36.   After the interview, the Office of Internal Affairs ("OIA") came to conduct

28   interviews about this incident.  Officer Ruiz came to escort me to that interview with OIA.

He called me a rat.  I refused to go with him.  Officer Ruiz then told the OIA officers that I was refusing.  I heard him and then the OIA officer came over with a refusal sheet for me to sign. I explained to the OIA officer that Officer Ruiz was the person I had a complaint about.  He understood and escorted me himself.  After the interview, the OIA officer walked me back.  My cell had been trashed.

37.      My neighbor, ███████████, told me that Officer Ruiz had come and trashed my cell while I was away.  Officer Ruiz threw out my legal paperwork.  The OIA officer came back to my cell with me.  He saw that the cell was such a mess and said "I'll take care of it."

38.      Officer Ruiz and Officer Hernandez also began retaliating against incarcerated people who could be witnesses for me.  Officer Ruiz was the property officer.  He threatened to take people's packages.  We only have access to the store once a month, so that is a big threat.  One person who told me at first that they would be witness, and who I listed on my 602, later told me that he had to refuse the interview.  He wanted to get his property.  I had to respect that.

39.      I have been waiting for the results of the investigation.  I recently received a letter saying that this investigation was "exceptionally delayed" due to COVID-19.  The letter said they would get back to me in September.

40.      I also witnessed staff misconduct at COR.

41.      One incarcerated person tried to go man-down in late April of 2020.  He started to kick his door and shouted that he had chest pains.  He kept yelling for help for about 40 minutes.  He was in cell ██ or ██ in my memory.  I do not know his name.

42.      I could see those cells from my cell and hear from the other side of the building.  The building in shaped like a U.  I was in C-section and he was in A-section; he was directly across from me.

43.      Officer Ruiz and Officer Hernandez brought him out of his cell, cuffed, and to a cage.  They shouted, "you want to go man-down mother fucker?"

44.     Once the incarcerated person was in the cage, Officer Ruiz and Officer Hernandez used a long T-bar weight on his wrists.  They left him in the cage for about two hours with the weight on.  He was screaming and it seemed like he was in pain.  He yelled for the nurses and the sergeants.  On this day, no one went to help that person.

45.     In that building, they do not let you go man-down for medical or mental health reasons.  In my experience if you try to go man down, officers in COR 3A03 will assault you.  If you are trying to seek medical or mental health attention, they will not let that happen.  The officers run that building and will tell nurses to "mind their own business."  I do not understand it, maybe they see it as an inconvenience.  It is a terrible place.

46.     COR 3A03 was a mental health building.  The people who caused disturbances, kicking or banging the door, were targets.  But I did not do any of that, and I caught this flack.  Other people not acting out were also targeted.  It felt like everyone in the unit was targeted.  And we were all at the EOP level of care, needing mental health treatment.

47.     Because of these incidents, I stopped going to yard, stopped meeting with my clinician and stopped attending mental health groups.  The officers escorted me to these groups and meetings.  I did not go to my mental health appointments because I did not want to engage with officers.  Between April 6 and May 26, 2020, I only left my cell for the interview with the OIA and to transfer out of COR.  I stopped receiving most mental health care because I did not want to deal with the officers in COR 3A03.  I could only see my clinician cell-side because I do not leave my cell.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

48.     Not only was I physically abused, but the officers in COR3A03 called me a "rat."  That could put me in danger with other incarcerated people.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at San Diego, California this 3rd day of September, 2020.

On September 3, 2020, due to the closure of RJD in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at RJD, I read the contents of this declaration, verbatim, to ███████████, by telephone. ████████████ orally confirmed that the contents of the declaration were true and correct. ████████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 3, 2020

Catherine M. Johnson

[3594280.5]                                              10

# Exhibit 27a

## Filed Under Seal

# Exhibit 28

1    **DECLARATION OF** ███████████

2    I, ████████████, declare:

3    1.    I have personal knowledge of the matters set forth herein, and if called as a

4    witness, I could and would competently so testify.

5    2.    My California Department of Corrections and Rehabilitation ("CDCR")

6    number is ████████   I am currently housed at California State Prison – Sacramento

7    ("SAC") on Facility B in Building 7, which is the Protected Security Housing Unit

8    ("PSU").  I am 46 years old.

9    3.    I am a *Coleman* class member.  I am at the Enhanced Outpatient Program

10   ("EOP") level of mental health care.  EOP patients live in separate, sheltered, housing

11   units with other EOP individuals.  They receive individualized mental health treatment,

12   including 10 hours each week of structured therapeutic activities and frequent meetings

13   with their case managers.  During my previous incarceration, I spent time at a Psychiatric

14   Inpatient Program ("PIP").  PIPs are licensed psychiatric hospitals that provide intensive

15   mental health treatment to individuals who struggle to function in an outpatient program or

16   a shorter-term inpatient program.  During the time of the incidents below, I was at the

17   Correctional Clinical Case Management System ("CCCMS") level of care, a lower level of

18   mental health care.  I was made EOP after the incidents described below.

19   4.    I am diagnosed with Bipolar disorder.  I also suffer from depression.  When

20   my mental health symptoms are at their worst, I feel suicidal.  My mental health also

21   causes me to feel angry at times.  I have engaged in self-harm in the past.  During the time

22   I was at COR, my mental health issues were similar to the issues I experience today.

23   5.    Although CDCR has not designated me with an *Armstrong* disability code, I

24   do have mobility issues.  I currently use knee braces and compression stockings to help me

25   walk.  My chronic knee pain, which makes it more difficult for me to walk, started after I

26   was in a car accident a few years ago.  My mobility issues have gotten worse since I was at

27   COR, after the incidents described below further impacted my mobility.  I am currently

28   trying to get CDCR to issue me a cane to help me get around.

[3562905.2]                                1

6.      I was housed at COR from December 24, 2017 until December 11, 2019, when I transferred to SAC.  I was also previously housed at COR from early 2010 until late May 2013, and again for three months starting in early August 2017.  Most recently, I went back to COR for a few days in February 2020 while out to court.

7.      During my time at COR, I was housed in the following locations: Facility 3A Building 3, which is an Administrative Segregation Unit ("ASU") for EOP patients and Facility 4A in Building 2, which is a CCCMS building.

8.      It is widely known that you will get a "beat down" by officers if you report misconduct.  When misconduct happens in the unit, you can hear people yelling from their cells, "I'm going to report you to *Coleman*!"  So, if you are known to correspond with the "*Coleman* Attorneys" at Rosen, Bien, Galvan and Grunfeld ("RBGG") or Prison Law Office ("PLO"), it's as good as being a staff "snitch."  The officers know who sends letters to "*Coleman* Attorneys" because the legal mail letters are handed directly to the officers – both when they are sent out of the prison and when they are received.  As soon as you get a letter from one of those law offices and see that letterhead stamped on the envelope it feels like, "Oh sh—, I have been exposed.  These officers now know I am in contact with these attorneys.  Now I need to watch myself, I am in big trouble."  You might get a letter from the law office even if you didn't ask for it, if you were identified as a potential witness or if they think you might have information.  The officers don't know who is talking and who is not so they have to get to everyone to keep them quiet.  They do this by making sure that you know that they know you are getting mail from those offices.  For example, during routine escorts, multiple times I have heard officers say, "So, you are writing to Coleman?  You are snitching, huh?"

9.      On September 23, 2019, I witnessed staff assault someone in my housing unit on Facility 4A2L.  I saw the officers pull him out of his cell and I heard them accuse him of exposing himself to one of the Psychiatric Technicians, Ms. Campos, who is commonly known to be the girlfriend of an officer.  I think they used this allegation to lure him out of his cell in order to beat him.

10.     Once they took him out of his cell, they walked him towards the rotunda and slammed him to the ground.  I saw them punch and kick him in view of others in the housing unit.  When the officers noticed that we could see what was going on, I saw them grab the incarcerated person's legs and drag him on the ground to an area that is out of eyesight, just past the door way area as you exit the living section. ███████████ ████████████████████████████████████████████ ████████████████   I couldn't see him but I could hear the muffled sounds of a scuffle and I could hear that incarcerated person yelling, "Help me! Help me!  They are trying to kill me."  I could hear the officers yelling, "Shut the fuck up!"  That went on for approximately two minutes.

11.     When they brought him back to his cell he looked badly beaten and was bleeding from his face.  He was walking with his hands above his head and no handcuffs on, which I took to mean that staff were showing him and his injuries off to the other incarcerated people in the housing unit, because staff are required to escort people in handcuffs.  The fact that they were not doing so in his case showed me that they knew they were flouting the rules and were doing so on purpose.  I felt like it was done to intimidate us.

12.     When they put him back in his cell, he was still crying out for help and he was saying that he couldn't breathe.  I called out to him to ask what help he needed.  He said he needed medical attention.  He felt like something was broken in his chest.  I filled out a sick call slip for him, called the Psych Tech over and told him to check on him.  The Psych Tech went to his cell and within a few seconds of talking to him, pulled a medical alarm.  Next thing I saw, multiple custody officers rushed over to the cell and started giving the Psych Tech a hard time for pulling the medical alarm.  They were saying things like, "We know he is in there like that, we put him in there….leave it alone.  He doesn't need medical help."  But, the alarm was already called.

13.     Supervisors showed up and they took him out of his cell.  Everyone was standing around trying to figure out what to do.  I heard one of the officers say, "He did it

to himself." That seemed crazy—he was badly injured and there was no way he could have done that to himself. Medical staff came within a few minutes and they took him out on a stretcher. After he left, I saw staff clean his cell out, and throw some of his property in the trash.

14.     When he got back from the hospital late that night, they had stripped his cell bare. I helped him fill out a staff complaint and gave the complaint to him. I am not sure whether he re-wrote it and submitted himself or submitted the form that I wrote for him.

15.     The following day, on September 24, 2019, Officers I. Medina, Officer Fugate and Sergeant J. Navarro were walking around the tier. I overheard them telling people, "hey man, you didn't hear or say anything, did you? Don't get involved in this shit. That guy exposed himself to Campos." They then approached me and asked me why I filled out a sick call slip for this person. They asked me whether I had filled out a 602 about the incident for him, as well. They said that he was a piece of shit and that he had exposed himself. I told them that what had happened yesterday was messed up. They just said, "We had to do what we had to do." I told them there was protocol they had to follow before doing illegal stuff. They said, "Come on man, that dude's a piece of shit." They were upset with me and threatened to assault me next because of what I had done—they said, "Why don't you come out man, you're next, you'll see."

16.     They were trying to get me to turn on him. It is a known fact that these officers do not tolerate you reporting misconduct. These officers were regular officers in 4A2L. I and other incarcerated people on the unit could tell that they did not like when people on the unit reported things because they got visibly angry and would call people snitches.

17.     Over the next few days, the officers repeatedly came to my cell door and made more threats to assault or kill me. Officer Medina would call me a "snitch," in front of other incarcerated people in my housing unit. Both custody staff and incarcerated people know that people are assaulted in prison for being labelled as snitches. I believe

1   Officer Medina called me a snitch in front of others to threaten me and signal to other

2   incarcerated people that they should not trust me.

3        18.    I was terrified.  I felt like my life was in immediate danger.  Fearing for my

4   safety, I wrote letters to as many authorities as I could think of – CDCR headquarters, the

5   Kings County Sheriff Department, the Kings County District Attorney, the Ombudsman's

6   office, the Office of the Inspector General, and the Prison Law Office.  I wanted to report

7   these officers making threats on my life and report what these officers had done to the

8   person I had watched them assault.

9        19.    My mental health deteriorated because of the threats.  On September 30,

10  2019, I submitted a 7362 requesting mental health services.  I wrote that Officers Medina,

11  Fugate, and Sergeant Navarro kept coming to my cell, making threats to kill and assault

12  me.  I wrote that their actions had jeopardized my life and were causing me mental

13  anguish.  I wanted to speak with a member of mental health staff about my safety

14  concerns.  When I did meet with a member of mental health staff in-person, I stated I

15  wanted custody staff to stop threatening me.

16       20.    Before the other incarcerated person was assaulted, my cellmate during the

17  summer of 2019 started telling me that when he went out to yard, Officer Floodgate and

18  Officer Medina were telling him that I was a snitch and he should beat me up.  My

19  cellmate never assaulted me and was moved out of my cell in August of 2019, before the

20  September 2019 incidents.

21       21.    On October 2, 2019, Captain Gallagher and Lieutenant Randolph approached

22  my cell in the early morning.  They told me that if I did not withdraw my various

23  complaints that I had made against custody staff, I would be assaulted that day. They tried

24  to get me to sign a cell agreement form that would let my old cellmate, who officers had

25  told to assault me, come back into my cell with me.  I said that I did not want him in my

26  cell because I feared for my safety.  Captain Gallagher stated "I'm going to move your old

27  cellie back into your cell so that he can kill you."  That same day, Officers Medina and

28

Fugate also told other incarcerated people in my housing unit that I was a "prison snitch, and a sex offender/child molester."

22.    Although I feared for my safety, I refused to withdraw the staff complaints I had filed.

23.    A few hours later, Officers Fugate and Vera approached my cell and ordered me to submit to handcuffs.  I complied.  They told me to step to the back of my cell.  The officers then placed my former cellmate into the cell with me.  They shut the door and took his handcuffs off through the cuffing port, but did not remove my handcuffs.  I did not have enough time to ask why my handcuffs were not removed, because as soon as they released him from his handcuffs, he punched me. After he punched me a few times, he said "I can't do this."   The officers kept saying "do it, or we're going to fuck you up."  He said, "no, I can't do it man" and refused to continue assaulting me.

24.    When he refused, the officers ordered my old cellmate to re-submit to handcuffs.  After they handcuffed him, Officer Vera sprayed an entire can of pepper spray through the food port while my old cellmate and I were still inside the cell.  I was coughing and my eyes were burning, and all my property got destroyed by the pepper spray.  The officers then removed my former cellmate from the cell and placed him in the shower to wash off the pepper spray.

25.    Officer Vera then took me out of my cell and sprayed me directly in the face for a second time.  Nearby, custody officers Vera, Medina, Ceballos and Fugate then rushed at me and punched me in the face and head several times.  I have been sprayed so many times that I have a bit of immunity to it, so while the pepper spray was burning, I could still see which officers were involved.  They slammed me to the ground and repeatedly kicked and stomped on me, including my hand.  While I was being kicked, I heard Sergeant Navarro yelling "kick his ass!  Kick his ass!" I think they also struck me with their batons.  Officer Vera then dragged me out of my cell and kicked me in the face, chipping my teeth.  After I was dragged out of the cell, someone hit the alarm.

26.     Once the alarm was sounding, I was dragged out to the nearby staff hallway. At the time, I was bleeding from my eyes and mouth, and in a lot of pain.  While in the hallway, Psych Tech Campos attempted to do a 7219 on me.  This is the same psych tech that had accused the person whose assault I had witnessed on September 23, 2019 of exposing himself to her.  She tried to cover up my injuries by not documenting my injuries on the 7219 form and saying, "He's fine, he can go back to his cell."  Another psych tech who frequently administers medications in the morning in my unit, whose name I do not remember, walked by us in the staff hallway, and seeing that I needed medical attention, starting talking to me.  I told her that I was having chest pains.  She turned to the sergeant and said, "He's having chest pains."  Sergeant Navarro said, "He's not having any chest pains, he's just trying to go up to the TTA to report this.  Campos just cleared him to go back to the cell."  The psych tech said, "I can't ignore this."  She gave me a pill for my chest pain and called the ambulance.

27.     I was sent to the Treatment and Triage Area ("TTA"), an onsite medical clinic at COR, where a physician evaluated my injuries and recommended that I go to an outside hospital.  Around 2:30 P.M., I was transported to the emergency room at the Bakersfield Adventist Hospital to treat my injuries.  I had lost two of my upper teeth and had lacerations above my right eye, upper lip, and right hip.  I also had cuts on my left leg, hands and wrists.  The back of my skull was swollen and my thumb had significant bruising after one of the officers had stomped on it.  I was in severe pain.  I still have back pain from this incident that has caused mobility issues.  I have been trying to get a cane to help me get around.

28.     At the hospital, medical staff took multiple X-Rays of my spine, chest, face, brain, wrists and hands.  Fortunately, staff found that none of my bones had been broken, but discovered cuts behind my eyeballs.  I saw an eye specialist after this and had to take eye drops and get treatment for my eye sockets.  The eye specialist believes the injuries to my eye are because of the pepper spray used against me in the assault.  My teeth are still chipped in half, and I still have not received dental work.

29.     I returned to COR around 10:45 p.m. that same evening.  When I got back, I talked with Dr. Clark, a medical doctor. He told me that he didn't want me to go back to my unit, as he had seen a lot of people be assaulted in the unit where I had been assaulted. I was placed in a Mental Health Crisis Bed ("MHCB"), a short-term intensive care unit for mental health patients, because I expressed feeling suicidal to him.  I was in the MHCB on one to one suicide watch for about two weeks.  When I was discharged from the MHCB, my mental health level of care was raised to EOP, and I was moved to a different building than the one in which I was assaulted.

30.     This assault made me feel terrified and abused.  During the incident, I legitimately thought that I was going to be killed.  I still believe that staff intended to kill me.  I could not see out of my eyes after the assault and was in severe pain.  My mental health also suffered in the days after the assault.  In meetings with my clinician, I continued to maintain that custody staff had assaulted me.  I reported that my injuries were not from an altercation with my cellmate, but from custody staff assaulting me.  I did not want to talk to mental health staff much during this time.  I was feeling very depressed after what happened to me.

31.     I and my old cellmate were both charged with RVRs for "fighting" immediately after this happened.  The RVR I received claims that we had a cell fight and both of us got pepper sprayed.  The RVR claims that my injuries were caused solely by my old cellmate.  The author of the RVR was Officer Floodgate, one of the officers who had been trying to get my old cellmate to assault me.  As punishment, I lost 180 days of packages, property, and other privileges.  I never was called for my RVR hearing, so I never got to state my side of the story.  I heard from another incarcerated person that my old cellmate's RVR got dismissed, although I do not know that for sure.

32.     When I was admitted to the crisis bed, Officer Medina and Officer Vera came to the crisis bed at least once a day for at least five days after I was admitted, to threaten me.  They would say things like, "If you come back to the yard, we're gonna get you", and "you better not file that complaint, you better stop snitching and telling these

1 people what happened." They said this in front of the staff member watching me on

2 suicide watch. One of these times, they came to see me right after I had talked to

3 Ms. Meek, one of the clinicians. Apparently, she overheard these officers come to my

4 door right after she left. I later learned that after overhearing these comments, Ms. Meek

5 wrote 128B chronos for me, or forms stating enemy concerns, saying that these officers

6 were threatening me. I learned that she had written these after I submitted requests for all

7 my medical and mental health records around the time of the assault and reviewed the

8 records.

9      33.     In my time at COR, there were many times that I needed help but didn't ask

10 for it because I was afraid of what would happen to me. After this assault, I did not feel

11 comfortable at all reporting my mental health issues to staff. I did not even feel

12 comfortable asking the officers to see my clinician, as I have seen officers assault people

13 just for referencing mental health issues. I also was afraid to report potentially life-

14 threatening medical conditions like chest pains I was having, because the officers did not

15 help me with my chest pains after this incident, and I have seen other incarcerated people

16 report medical issues and be ignored and/or assaulted for reporting.

17      34.     In my opinion, staff target mentally ill people and people with disabilities.

18 4A2L, to my knowledge, is only CCCMS patients. There are signs in the building

19 describing the *Coleman* case and giving numbers to call people. When officers see people

20 looking at these posters, see legal mail from *Coleman* attorneys, or the *Coleman* Special

21 Master or attorneys come for a tour, they feel threatened and retaliate against people with

22 mental health issues and disabilities who have spoken to these offices. The staff there have

23 a knowledge of *Coleman* and *Armstrong* and specifically target people that have mental

24 health issues and disabilities, and raise these issues with the PLO and RBGG.

25      35.     It is also well known that mental health patients often write to RBGG and

26 PLO about urgent mental health issues, and when the issues are urgent, PLO and RBGG

27 contact headquarters to get us seen by mental health staff. When I have been seen by

28 mental health staff through these processes, officers are always nearby and are aware that

1   we have contacted our attorneys and that headquarters has asked that we be seen by mental

2   health staff.  I believe this process is utilized a lot by patients at COR because they do not

3   feel comfortable reporting these concerns directly to the officers.

4        36.     I believe the reason there is so much staff misconduct at COR is because the

5   officers are a gang.  They are extremely close with each other and with the mental health

6   and medical staff and are able to influence these staff so that we do not get the help we

7   need.  Their main goal is to make sure that no one among incarcerated people or staff

8   reports them.  They abuse people in order to protect themselves.

9        I declare under penalty of perjury under the laws of the United States of America

10   that the foregoing is true and correct, and that this declaration is executed at Represa,

11   California this 18th day of September, 2020

12

13

14

15

16        On September 18, 2020 due to the closure of California State Prison—Sacramento

17   in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate

18   against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the

19   confidentiality of the legal mail system at SAC, I read the contents of this declaration,

20   verbatim, to █████, by telephone. █████ orally confirmed that the

21   contents of the declaration were true and correct. █████ also orally granted me

22   permission to affix his signature to the declaration and to file the declaration in this matter.

23   DATED: September 18, 2020

24        Emma Cook

25

26

27

28

[3562905.2]

10

# Exhibit 28a

## Filed Under Seal

# Exhibit 29

**DECLARATION OF** ████████

I, ████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at Salinas Valley State Prison ("SVSP") on D-Yard in Building 7. I have been incarcerated in the CDCR since 1986. I am 60 years old.

3.     I am an *Armstrong* class member. I am designated as DPO, which means I am an intermittent wheelchair user. I experience acute back spasms and my legs will give out on me randomly. I currently have the following durable medical equipment ("DME") to help me with my disability: a wheelchair, walkers, a cane, mobility disability vest, orthotic shoes, and eye glass frames. I can only be housed on the ground floor with no stairs. I also have disability chronos requiring me to have special cuffing, a lower bunk, and restrictions on how much weight I can lift. I suffer from disability-related incontinence and so I receive hygiene supplies.

4.     During the time I was at COR, I had similar issues and limitations with my mobility disability, but I was designated with a disability code of DPM. When I was housed at California State Prison –Los Angeles County ("LAC"), doctors issued me a temporary wheelchair in May 2019. I had my temporary wheelchair with me when I arrived at COR in September 2019.

5.     I have a number of serious medical conditions. I am diagnosed with Hepatitis C, high blood pressure, and deep vein thrombosis ("DVT"). I have Atrial fibrillation ("AFib"), which means I have an irregular, slower, heartbeat.  In 2012, I had an operation to place a valve in my heart and I currently take blood thinners. I am often dizzy due to my heart conditions and at risk of falling. I have a seizure disorder and I wear a helmet to protect my head in case I suffer an attack. I am classified as high risk medical. During the time I was at COR, my medical issues were similar to the issues I experience today.

6.      I am a *Coleman* class member.  I am at the Correctional Clinical Case Management System ("CCCMS") level of mental health care.  I suffer from depression and Post-Traumatic Stress Disorder ("PTSD").  My medical and disability-related issues often exacerbate my mental health symptoms.  When I am not receiving the treatment I need or when I am in great pain, I sometimes feel suicidal.  During the time I was at COR, my mental health issues were similar to the issues I experience today.

7.      I have been housed at COR several times during my incarceration.  I was housed at COR off and on from March 2012 until January 31, 2020.

8.      I was a victim of staff misconduct at COR.

9.      I was placed in a mental health crisis in mid to late October of 2019.  I was experiencing severe pain due to my medical conditions.  I believed staff at Corcoran were not providing me with adequate medical treatment.  I was in so much pain that I started to feel suicidal.  I reported to a mental health worker that I was ready to end my life to stop the pain.  Mental health staff evaluated me and decided to send me to a Mental Health Crisis Bed ("MHCB"), a short term crisis unit for people experiencing acute mental health issues.

10.      I remained in a mental health crisis bed and I continued to have severe pains in my chest, lower back, left shoulder and right hip.  On October 27, 2019, doctors sent me to the local community hospital, Adventist Health Bakersfield ("ABH"), to perform a stress test.  When I left the prison, I had a walker, a cane, and a disability vest.  The officer said that I did not need to bring my assistive devices with me because they would have everything I needed, including a wheelchair, to escort me.  The officer came to my cell with a wheelchair to escort me so I left all of my devices behind at the prison.  I left them outside of my cell.  When I arrived at the hospital a different officer, a female, asked me where my assistive devices were.  I told her that I left them at the prison because the officer told me to.

11.     On October 28, 2019, around 10:30 p.m., I was discharged from ABH and transferred back to COR, this time to the Correctional Treatment Center ("CTC"), to continue my care.

12.     When I arrived at the CTC, I asked for my cane, walker, and vest.  Staff said they did not have my assistive devices in the CTC.  Instead of going to get me a temporary device to help me walk, staff pulled me out of the holding cage and started to escort me to my hospital cell.  Two officers grabbed me, one on each side, and they were carrying me down the hallway because I am unable to walk on my own.

13.     I am unable to walk due to injuries and disabilities that stem from an assault in prison 17 years ago, on May 24, 2003, where I was attacked from behind, knocked unconscious and, as I later learned, was violently sexually assaulted while unconscious.  I filed a lawsuit against CDCR because I did not receive adequate care following that attack. I have already undergone eight surgeries as a result of injuries I received during that attack and I have significant ongoing pain, disabilities, and mental health trauma as a result.

14.     As the officers carried me down the halfway at COR, the officer on my right side dropped me and I fell to the ground.  That officer then said that I should not have complained about being sexually assaulted years ago.  Next thing I know both officers started punching and kicking me.  They dragged me in to a medical room off the hallway where they continued to punch and kick me.  There were five or six other officers following us down the hallway and they also followed us in to the room.  The other officers just stood there and did nothing to stop the two officers who were beating me.  I think the beating lasted for about 10 minutes.  During the beating one of the two officers had his boot on my head and he was pinning me down to the ground while they were kicking me.  I wanted to get up and fight back, or at least defend myself, but I can't stand up on my own.  I felt helpless.

15.     I reported the assault to medical staff the next day.  I think they documented the incident, but I am not sure.  Two officers came to ask me about the incident in November, about a week or so after the incident occurred.  They did not take a video of the

1  interview.  The interview lasted about 15 minutes, they asked me what happened and I told

2  them.  I have not heard anything more about it since then.

3         16.    I am still dealing with my sexual assault, and the ongoing pain and injuries

4  that resulted.  It has been a lot to deal with.  On top of that stress, my mental health

5  severely decompensated after I was assaulted by staff at COR.  I want to be able to trust

6  staff so that I can talk to them and get help for my disabilities and sexual assault trauma.

7  But, after being assaulted by staff, I feel even more like it is hard to know who to trust.

8         17.    After the assault I remained on suicide watch.  I stayed there for over a week.

9         18.    One of the officers who assaulted me, the one who said that I shouldn't have

10 complained about being sexually assaulted, worked in the CTC while I was housed there

11 after the assault.  I would sometimes see him at my cell front.  One time, when he was at

12 my cell front, I asked him if he came to finish the job.  He claimed he didn't know what I

13 was talking about.

14 / / /

15 / / /

16 / / /

17 / / /

18 / / /

19 / / /

20 / / /

21 / / /

22 / / /

23 / / /

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

19.    Sometimes I feel suicidal but I do not ask for help because I do not think I will get help from staff.  I do not trust them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Salinas, California this 19th day of June, 2020.

████████

On June 19, 2020, due to the closure of SVSP in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at SVSP, I read the contents of this declaration, verbatim, to ████, by telephone. ████ orally confirmed that the contents of the declaration were true and correct. ████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: June 19, 2020

Penny Godbold

# Exhibit 29a

## Filed Under Seal

# Exhibit 30

**DECLARATION OF** ███████████████

1   I, ███████████████, declare:

2   1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

3   2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ███. I am currently housed at California State Prison-Corcoran ("COR") on Facility 3A in Building 03. I am 44 years old.

4   3.    I am an *Armstrong* class member. I am designated as DPM. I need special cuffing and a bottom bunk. I have trouble walking up stairs and need to stay on the ground floor. I cannot lift heavy things. I use a cane, a back brace and knee braces every day.

5   4.    I am a *Coleman* class member. I am currently at the Enhanced Outpatient Program ("EOP") level of mental health care. I am diagnosed with episodic mood disorder, bipolar disorder, Posttraumatic Stress Disorder, and Intermittent Explosive Disorder. These diagnoses do impact my daily life. I have received mental health treatment since I was a child. I have difficulty controlling my emotions and my anger, even with my family. I hate that this happens and that I cannot control myself when I get very angry.

6   5.    Until June 24, 2020, I was at the Correctional Clinician Case Management System ("CCCMS") level of mental health care. From June 24, 2020 to July 2, 2020, I was at the Mental Health Crisis Bed ("MHCB") level of care. Since July 2, 2020, I have been at the EOP level of care.

7   6.    I have been housed at COR from May of 2015 until the present. From March 22, 2019 until January 9, 2020 I was housed in COR Facility 4A Building A1L. From December 27, 2019 until May 8, 2020 I was housed in COR Facility Z, which is a Short Term Restricted Housing unit ("STRH"). From May 9, 2020 until June 24, 2020, I was housed in COR Facility 4A Building A1L. From June 24, 2020 to July 2, 2020 I was housed in COR CTC, which is the MHCB. Since July 2, 2020, I have been housed in COR 3A03, the EOP Administrative Segregation Unit ("ASU").

[3568248.4]

1    7.    I was the victim of staff misconduct at COR on May 20, 2020.

2    8.    I was in my cell, COR 4A-███████.  I was having a mental health crisis.

3  While in STRH from December of 2019 to May of 2020, I opened up to a clinician,

4  Dr. Copeland, for the first time.  This reopened trauma that I experienced as a child and I

5  was feeling upset.  Usually I am just angry, but with Dr. Copeland I started unloading it.

6  Then things began to resurface and it was hard for me to handle.  I was not sleeping

7  because when I fell asleep, I had to relive that trauma.  When I returned to 4A1L on May

8  9, I was assigned a new clinician, Ms. Angel.  I did not feel comfortable working with  my

9  new clinician.  I did not feel able to share with her.  I was only sleeping 2-3 hours a day.  It

10  felt overwhelming.

11    9.    In the days before May 20 I had informed my clinician, Ms. Angel, that I

12  was feeling overwhelmed.  On May 20 at about 6:50 a.m. I told Officer Garcia that I was

13  not feeling well.  He said "I don't know what to tell you" and kept serving breakfast.

14  When he finished serving breakfast, he left.  When Officer Garcia came to pick up my tray

15  about forty minutes later, around 7:30 a.m., and I told him again.  He did not do anything.

16    10.    During pill call, which takes place sometime between 6:30 a.m. and 8:00

17  a.m. depending on the day I told the psych tech who was passing out medications how I

18  was feeling.  I said I was feeling anxious, not good, that I was freaking out.  She asked me

19  why I did not tell Ms. Angel.  I said I do tell Ms. Angel and asked the psych tech to call

20  Ms. Angel.

21    11.    At about 9:00 a.m. or 9:30 a.m., Ms. Angel came and said, "What do you

22  want me to do?"  That set me off, so I started screaming.  I do not remember what I was

23  yelling.  Later another incarcerated person who lived nearby, said that I was yelling, "if

24  you want me to do something stupid I'll do something stupid."  Ms. Angel did not say

25  anything.  She left.  Five to ten minutes later, at about 10:00 a.m. on May 20, 2020, I cut

26  myself using a razor that I usually use to shave with in my cell.  At CCCMS in General

27  Population units we are allowed to keep razors in our cells to shave with.  I cut myself on

28  the arm because of how I was feeling, because everything felt like too much.

12.     Inmate ███ saw this happening from the dayroom.  I saw him inform Officer Espinoza and could hear what was said.  Inmate ███ said "Hey man, Martinez just cut himself."  It is my understanding that Officer Espinoza called other staff members.

13.     Right afterwards, Officer Limon and Officer Garcia came and saw that I cut myself.  They did not speak to me, but left and came back with Sergeant Cerda about three minutes later.

14.     Sergeant Cerda asked me to cuff up.  I said no.  I am not sure why I said no; I was not in the right frame of mind.  I was yelling, "if you guys want some problems, come get some!"  Sergeant Cerda said that if I didn't cuff up, they would "fuck me up."  They left and came back in helmets and shields.  Sergeant Cerda came by my cell and he shook his canister of pepper spray at me.  He did not use the pepper spray.

15.     Officer Limon started to mock me.  He repeated whatever I was yelling in a mocking way and mimicked my movements.  I was limping back and forth in my cell. When I get angry, I have a tic and my head moves to the left and my shoulder shrugs up at the same time.  Officer Limon copied these movements and whatever I was yelling. Officer Garcia and Sergeant Cerda laughed nearby.  Officer Limon held his fists up to his eye as if to call me a crybaby.

16.     They knew this was upsetting me because I was screaming and yelling. Officer Garcia has known me for years and knew that if he made me angry, I would try to fight.  Sergeant Cerda threatened me.  I became even more upset.  I could not stop myself, I knew that I was upset but I could not stop myself.  I have several diagnoses and I know I have anger issues.  This is because of trauma I suffered in my past, I cannot apologize for this.  It is not right for them to egg me on.

17.     Sergeant Cerda called me a rat mother-fucker and a J-Cat.

18.     A J-Cat refers to Category J.  Category J used to be the term that referred to people who needed mental health care in the California prisons.  Now, it is used as an insult.  Instead of saying "person who is CCCMS" or "mental health patient," people use J-Cat as a slur.  It makes the person called a J-Cat seem crazy.  This term is used often by

officers at COR.  Some officers yell at people in crisis in my experience, instead of seeking mental health help for those people.  When someone that I know calls me a J-Cat, they are playing.  But sometimes I know that officers are using it to put me down and that makes me feel ashamed.  It is not my fault that I have mental health issues.  It makes me feel like I should stop seeking help, like I should be ashamed of it.

19.    When Sergeant Cerda called me a J-Cat on May 20, I became very agitated and could feel myself flying off of the handle.  I shouted at them, I cut myself, I kicked the door to my cell.  The more they agitated me, the angrier I became.  The officers knew that their actions were upsetting me because they laughed while they mocked me.

20.    I am not sure how much time passed.  I had removed my watch before I cut myself because I did not want to get blood on it.  I am not sure why I thought to remove it. Officer Limon, Officer Garcia, Sergeant Cerda and four other officers pulled me out of my cell.  They escorted me to a holding cage in the rotunda.  Someone called medical staff and I was transported to the CTC, the COR on-site hospital, in an ambulance.  Medical staff cleaned and bandaged the cuts.  I met with a Mexican-American psychologist, who sent me back to my cell.  It is my understanding that this psychologist recommended that I continue to meet with Dr. Copeland.  Dr. Copeland told me this.

21.    I submitted a 602 about this incident on May 22, 2020.  Lieutenant Randolph interviewed me about this 602 about three weeks ago.

22.    After I spoke to Lieutenant Randolph about the 602, Sergeant Cerda came by my cell.  He said, "hey, what's up with that 1824 and 602 you put in on me."  I told him he should not be questioning me about this.  My neighbor heard my raised voice and pounded on the wall, as a warning.  I said thank you, turned around and listened to a CD.  After a few minutes, Sergeant Cerda walked away.

23.    After this incident, Dr. Copeland got permission to continue to see me in my new unit.  About a week after May 20 around 4:00 p.m., Dr. Copeland came to my cell, asking if I cut myself.  She said that she received an urgent note that I cut myself.  But I had not cut myself.  I think this was retaliation, though I am not sure who she received a

4

1   note from.  It is my impression that officers in my unit did not like her or were upset that I

2   filed a 602 about the May 20 incident.

3        24.    I filed a 602 about retaliation from Sergeant Cerda on June 9, 2020.

4   Lieutenant Munoz interviewed me about this 602 on Thursday, July 2, 2020 in the

5   morning.  He asked if I had anything to add to the 602 and I said no.  Then Lieutenant

6   Munoz began to threaten me, saying that they "had something for me" when I returned to

7   the unit.  Lieutenant Munoz said that he had mental health issues, too.  I suggested that

8   Lieutenant Munoz could see a therapist and he said, "No, I ain't no pussy."  The inmate

9   across from me, Inmate ██████, heard this exchange.

10       25.    Recently I received this 602 back.  It was denied for a lack of evidence.

11  Many members of staff denied hearing anything.

12       26.    After I filed a 602 about the retaliation, on June 19, 2020, I was in dayroom

13  and Sergeant Cerda came to the door.  He asked if I had seen my clinician.  I said yes.  He

14  said "I can't do anything to you, but I can get that bitch."  I asked how and he said, "When

15  you are out, I am going to plant something on you and say she gave it to you."  I think he

16  was threatening to plant contraband on me.  I said he should leave her alone.  He said he

17  didn't like my clinician.  Sergeant Cerda told me that every time Dr. Copeland came to see

18  me, they would search my cell and the other cells in the unit.  I think this was also an

19  attempt to turn other incarcerated people against me.  I felt like they were trying to stop me

20  from seeing my clinician.  Other incarcerated people kept telling me not to see her, that I

21  was bringing heat upon them and that they would lose their property.

22       27.    On June 24, 2020 in the morning, Sergeant Cerda came to my cell and made

23  a throat slashing gesture.  Then he walked to a group of officers and said something that I

24  could not hear.  Then the group turned to look at me and started laughing.  The group

25  included Officer Limon and Officer Garcia.  I became nervous because last year, there was

26  a problem with officers opening the doors up at the wrong time.  That is a problem because

27  it might allow incarcerated people to attack other incarcerated people.  The officers'

28  laughing in this way made me worried that they would open cell doors at the wrong time,

1  setting me up for attack.  I was especially concerned because other incarcerated people had

2  already told me not to speak to Dr. Copeland.

3        28.    I was fuming all day on June 24, 2020.  I tried to talk to Sergeant Moreno

4  about the officers on second watch around 7:30 p.m. during mail call.  Sergeant Moreno

5  told me if I did anything "they would light me up."  In response, I boarded up my door and

6  was yelling because the officer was threatening me.  "Boarding up" means to cover the

7  window of the cell, so that no one can see into it from outside the cell.  I felt like I would

8  not get any help.  I yelled until about 8:00 p.m.  No one checked to make sure I was okay

9  once I stopped yelling, even though my door was boarded up.  It is my understanding that

10  usually when someone is boarded up, members of staff check to make sure the person

11  inside is okay.

12        29.    At 9:00 p.m. there is supposed to be a count, but no one checked on me.  I

13  was still boarded up.

14        30.    At 9:35 p.m. on June 24, I was still boarded up.  Sergeant Moreno, Officer

15  Herrera and Officer Magana came to my door.  I could see their shoes through the sheet

16  covering my door.  They asked me what I was doing.  I said, "I cut myself."  At that point I

17  pulled down the sheet so that they could see.  My forearm was bleeding.  There was blood

18  on the window.  Sergeant Moreno said, "Okay, we have to go home now."  Then all three

19  left my door.  I stayed inside.

20        31.    I did not receive medical treatment for cutting myself until first watch began

21  at around 10:00 p.m.  When first watch began, Inmate ██████ in cell ██, Inmate ██████ in

22  cell ██ and Inmate ██████ in cell ██ all called "man down" for me.  They told staff that I

23  cut myself.  Inmate ██████ told the night officer what happened, that staff were messing

24  with me.  I could hear this.

25        32.    At 10:15 p.m., the regular night man, an older white man, came to my cell.

26  He called Sergeant Martinez and a nurse, who works first watch in the crisis unit.  They

27  escorted me to a cage to meet with a clinician to do a suicide risk assessment.  After, they

28  sent me to COR 4A3L for the evening because the MHCB was full.  Then, the next

morning, I moved to the MHCB.  I stayed at the MHCB for seven days, until I transferred to COR 3A03, my current unit.

33.     I filed a 602 about this incident.  I have not yet received a response.

34.     I have also witnessed staff misconduct at COR.

35.     In COR Facility Z, which is a STRH unit, in April of 2020, someone that we called ███████████, a white inmate, was beaten.  He was housed in ██.  I was housed nearby in cell ██.  I do not know his real name, only his nickname.

36.     I saw ███████████ try to kick Officer Fugate, whom we call Big Fugate because his brother also worked in the unit.  We called his brother Little Fugate.

37.     The night prior to this, ███████████ was roughed up by the officers for taking too long in the shower.  My cell is close to the shower and I could hear this.

38.     The next morning, when officers pulled him out for yard, ███████████ ██ kicked Officer Fugate while cuffed in the rotunda.  Officer Fugate and a few other officers pulled ███████████ to the floor.  Officer Fugate then dropped his full weight on ██'s head.  Officer Fugate is about six foot two inches and maybe 250 pounds.  ██'s head split open on the left side.  There was blood everywhere.  After this, Officer Fugate dragged ██ out.  I am not sure where officers took ██

39.     Later that day, ███████████ returned with staples in his head.

40.     The next day, Officer Ramos and a female officer pulled ███████████ ██ out of his cell to go to law library.  They only walked him to the front of the section, 15 feet away from his cell.  I could hear and see this happening from my cell.  Sergeant Navarro left his office and threatened ███████████ not to participate in the video interview about the use of force or else he would get beat up.  Officer Ramos and the other officer did not say anything.  Then Officer Ramos and the female officer returned ██ to his cell.

41.     Once ███████████ was back in his cell, Sergeant Navarro came with the video camera.  I did not hear ██ saying "no" to the interview.  Sergeant Navarro left

1    with the camera.  He came back without it and threatened ▮ again and then came back

2    with the camera and ▮ refused to do the interview.

3           42.    I also witnessed staff misconduct at COR on or around May 1, 2020.

4           43.    Around May 1, 2020 an inmate arrived from the California Substance Abuse

5    Treatment Facility ("SATF").  I believe that he had previously attacked a member of staff

6    at SATF.  I know this because when they were kicking him in the genitals, the officer said,

7    "you want to assault the staff?"  A group of three officers brought him into the section.

8    One of the officers was Sergeant Navarro.  I could not identify the other two.  In front of

9    cell 198, the new person said something to the officers.  The three officers and new person

10   stopped in front of cell 198.  I was housed in cell ▮ at the time.  The new person was

11   cuffed up.  Sergeant Navarro began kicking him in the genitals saying "you can get more

12   off this."  The other two officers kept holding him; they did not kick him.  After a few

13   minutes, Sergeant Navarro stopped and the officers took this person to his new cell.

14          44.    I did not file a 602 about these incidents because I cannot file on their behalf.

15          45.    In my experience, staff do target certain people with misconduct.  I have

16   mostly stayed in CCCMS buildings.  Officers there tend to target people who are yelling or

17   banging on doors.  These are symptoms of mental health disorders and should not be met

18   with violence.  Officers in my experience will yell back at people who are yelling, but they

19   should try to help.

20          46.    I feel that I am targeted because I file 602s and report misconduct.  I filed a

21   lawsuit about a 2016 assault by a member of staff.  Staff are aware of this and I think this

22   makes me a target.

23          47.    In my experience, almost every other prison has less misconduct than COR.

24   I have been to High Desert State Prison, California State Prison-Sacramento, Salinas

25   Valley State Prison, Mule Creek State Prison, and California Correctional Institution.

26          48.    Most staff at COR are good.  But certain bad apples at COR cause a lot of

27   misconduct.  Good staff allow the program to run more smoothly.  But in some units,

28   everyone is trying to be "the man" and it does not work.  In my current unit, staff will try

to speak calmly to people yelling and screaming.  They try to calm the situation down.  I was stunned when I came to this building because it was so different from my past experience in COR 4A1L and STRH.  I am finally treated like a human being and not like garbage.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 6th day of August, 2020.

‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ‎ ██████████████████

On August 6, 2020, due to the closure of COR in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at COR, I read the contents of this declaration, verbatim, to ███████████ ███████ by telephone. ████████████████ orally confirmed that the contents of the declaration were true and correct. ██████████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 6, 2020

*Cate Johnson*

Catherine M. Johnson

# Exhibit 30a

## Filed Under Seal

# Exhibit 31

**DECLARATION OF** ███████████████

I, ████████████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ███████.  I am currently housed at Kern Valley State Prison ("KVSP") on Facility A in Building 3.  I am 44 years old.

3.    I am not identified as an *Armstrong* class member though I have mobility disabilities, as a result of the staff assault described below, and I walk with a cane.

4.    I am a *Coleman* class member.  I am at the Correctional Clinical Case Management System ("CCCMS") level of mental health care.  I am diagnosed with depression.  I take Remeron for my depression.  I am depressed about being in prison for the past 18 years and about recent deaths in my family.  During the time I was at California State Prison-Corcoran ("COR"), my mental health issues were similar to the issues I experience today.

5.    From approximately August 15, 2019 to March 6, 2020, I was housed at COR.  From August 15, 2019 to December 24, 2019, I was housed in COR Facility 3C Building 4.  From December 24, 2019 to December 31, 2019, I was housed at the Community Regional Medical Center-Fresno, a local hospital.  From December 31, 2019 to February 17, 2020, I was housed in the COR S Infirmary Building B1, which is the on-site hospital at COR.  From February 18, 2020 to March 6, 2020, I was housed in COR Facility Z1, Building D1, which is the Short-Term Restricted Housing ("STRH").  On March 6, 2020, I transferred to KVSP.

6.    I was a victim of staff misconduct at COR.

7.    On December 24, 2019, I was in my cell in COR 3C04 by myself, when I saw a cellphone slide under my cell door.  When I saw the phone, I was surprised but I assumed it was from my friend.  I had previously asked him if I could borrow his phone. A few minutes later, Officers Rojas and Officer Guzman came to my cell and asked for the

phone saying, "slide that phone back under the door." I was confused and scared. At this point I still thought the phone was from my friend and I thought that the officers were trying to get me to admit that I had an illegal phone. So, I denied that I had it.

8.      Next, the officers came back a few minutes later with two other incarcerated people from my neighborhood in Oakland. These friends tried to convince me to return the phone to the officers. But Officer Guzman and Officer Rojas were standing there while this conversation was happening. I still thought the officers were setting me up for punishment so I told my friends and the officers that I did not have a cellphone.

9.      I now believe, after talking to other incarcerated people, that it was the officers who slid the phone under my door. Those officers are apparently known for being involved in the cell phone trade. I believe they accidentally slid the cellphone under my door, when they meant to slide it under someone else's door, and they were just trying to get it back.

10.     After the officers and my friends failed in getting me to return the phone, I heard one of the officers say they would "handle the problem" on their own. Next thing I know the officers put on gloves and, without even cuffing me up, they entered my cell. Officer Rojas suddenly rushed at me and slammed into me. The impact caused the back of my head to knock against the wall. Then, I was bracing myself when Officer Guzman punched me in the jaw. I fell to the floor. The officers kept beating me while I lay on the floor. At some point I was knocked unconscious. I remember the officers beating me for a minute before I blacked out. I was beaten so badly that I believe they kept beating me after I was unconscious. I do not know how long I was in my cell unconscious.

11.     I woke up at the Community Regional Medical Center-Fresno and my jaw was wired shut. My jaw had been shattered and needed surgery. It was wired shut for over a month. I could only drink liquids. I had to wear a neck brace collar for weeks because part of my spine was fractured. I had a traumatic brain injury. I still get dizzy and have trouble with things I could easily do before my attack. For example, now I am wobbly and I can't stand up straight. I now use a cane and have great difficulty walking.

One whole side of my body, my right side, no longer works the same.  I had multiple fractures in my face.

12.     On December 31, 2019, I moved back to COR.  I was housed in the on-site hospital, the CTC.  I remained at the hospital until February 18, 2020, 50 days in total.  I needed to be there for longer term medical care as a result of my injuries.  I could not eat solid food until February 22, 2020.

13.     When I received my property in the CTC, my television, radio, and chain necklace were all missing.  My property is still missing.  There was another incarcerated person in the CTC who was from my unit.  That person said that it was known in the housing unit that Officer Rojas and Officer Guzman took my property as "compensation" for the phone.

14.     At first, I could not remember what happened, maybe because of my brain injury.  Slowly in the weeks that followed, I started to remember what had happened.  Sometime around the end of January or early February, I remembered the officers who were involved and what they had done to me.  I asked to speak to the sergeant.

15.     I talked to the CTC sergeant and I also filed a 602 to document what happened.  I was interviewed on video.  I never received a response to my 602.

16.     On February 25, 2020 I moved from the CTC to the COR STRH.  I was there for non-disciplinary reasons—for my safety.

17.     I did not receive a Rules Violation Report ("RVR") for the December 24, 2019 incident.

18.     When I was in the CTC, one of the officers involved in the incident, I am not sure which one it was, came to my CTC cell and threatened me saying, "You're going to fucking file a lawsuit…" and then he grabbed my neck brace and took it with him out of the cell.  I was in pain and it was dangerous for me to be without my neck brace because my neck was broken.  I had to go back to the neurosurgeon to get another brace.

19.     Since this incident, I am scared of custody staff.  I believe many staff in CDCR know about what happened.  Staff at this prison make comments to me that make

me know that they know about what happened to me at Corcoran.  For example, when I
arrived, the staff in receiving and release said, "We know about your situation.  We can
keep tabs on you here since we are right next to Corcoran."  KVSP is a more restrictive
environment, it is called a 180 degree design prison.  Staff here tell me that I was sent here
because I was going to file a lawsuit on staff at Corcoran.  I think I should have been sent
to a different prison, one that is a 270 degree design facility since that is less restrictive and
is consistent with my security level requirements.  I believe, based on comments made by
staff here, that I was sent to KVSP on purpose.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

20.     As a result of this incident, I now have disabilities and require additional help.  I am not comfortable asking staff for that help because I do not trust them.  For example, as a result of my serious back and neck injuries, I would like to have an accommodation of an egg crate mattress because I am unable to sleep.  I know they are available because I have seen other people with egg crate mattresses.  But, I am too afraid to ask staff for one.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Kern Valley State Prison, California this second day of July, 2020.

On July 2, 2020, due to the closure of KVSP in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at KVSP, I read the contents of this declaration, verbatim, to ▮▮▮▮▮▮ by telephone.  ▮▮▮▮▮▮ orally confirmed that the contents of the declaration were true and correct.  ▮▮▮▮▮▮ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: July 2, 2020

Penny Godbold

# Exhibit 31a

## Filed Under Seal

# Exhibit 32

**DECLARATION OF** ████████

I, ████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at California State Prison-Corcoran ("COR") on Facility 3A in Building 4. I am 67 years old.

3.      I am a *Coleman* class member. I am currently at the Enhanced Outpatient Program ("EOP") level of mental health care. I am diagnosed with depression, anxiety and schizoaffective disorder. I sometimes hear auditory hallucinations. For these conditions I take Clozaril, Cogentin, Vistaril and Buspar.

4.      I have a number of serious medical conditions. I have cirrhosis of the liver and receive treatment for Hepatitis C. I have plantar fasciitis. I have hypertension and hyperlipidemia. I have cataracts. I have gynecomastia as a side effect of a medication that I used to take.

5.      I have been housed in COR 3A04, the EOP unit, since the end of 2019.

6.      I witnessed staff misconduct at COR on April 7, 2020. I was at my job in the Rec Box. People can come check out equipment and exercise materials there, such as medicine balls. The Rec Box is about the size of a dumpster, with a large window at the front. The equipment is inside. I pass out equipment on the yard on the east side from 8:00am to 4:00pm every day when we are not in lockdown. The yard is divided into east and west by a fence.

7.      I was chatting with ████████ at the Rec Box sometime between 9:00 a.m. and 10:00 a.m. ████████ used to come check out a jump rope, a medicine ball or boxing gloves every day. Then he exercised about ten yards away typically.

8.      On this morning, he came and checked out some gloves, I think. Then he exercised and we were chatting for about 20 to 30 minutes before he left. He had a ducat for that morning and he was heading to either a medical or mental health appointment. I

[3562610.5]

1 am not sure which, but they are in the same building, A-Yard clinic.  I continued to work

2 at the Rec Box.  A-Yard Medical Clinic is about 40 to 50 yards away from the Rec Box.

3          9.          ███████████  headed off to his appointment and I kept working.  The

4 yard is surrounded by a fence and outside the fence is a large building with different parts,

5 from the church to medical and mental health offices, the canteen, the gym and the dining

6 room.  It is on the south side on the yard outside the fence.

7          10.     About fifteen to twenty minutes after ████████ left me, the alarm

8 went off.  When the alarm goes off, there is a loud horn that sounds in the yard.  I looked

9 around to see what was happening, where the problem was.  When an alarm sounds,

10 incarcerated people usually get down, but they look around to see why the alarm is

11 sounding.  Fifteen officers will often run to the problem.  Because I was in the Rec Box, I

12 was shielded from view on certain sides so I did not have to lie all the way down.  Instead I

13 stood up and watched.  None of the staff were paying attention to me, so I just stayed

14 standing.  Other people in the yard not near the Rec Box got down.

15          11.     Right in front of medical, I saw a big group of officers, maybe ten people,

16 swinging and kicking at a person who was on the ground.  ████████y is bald and

17 had just gone over there.  I recognized him as the man on the ground because of his size—

18 he is short, about 5'7"—and his bald head.  And I knew that he had just gone over there.

19          12.     I am not sure why ████████ was attacked.  As far as I knew, he had

20 just met with his clinician and was returning to the yard.  It did not appear that he was

21 doing anything wrong.  There was no reason that I knew of for this assault.

22          13.     I could hear a female voice shouting, 'Stop resisting."  ████████ was

23 not resisting from what I could see.  Any resistance would be futile because there were so

24 many officers on him.  He was overwhelmed.  It was a brutal beating.  This went on for

25 between five and ten minutes.

26          14.     I recognized Officer Ochoa because he was a canteen guard a few weeks

27 earlier.  I had recently given my canteen list to him so I remembered what he looked like

28 and could identify him.  I could not identify the other officers but I knew that they were

1   Security and Escort Guards.  Security and Escort Guards are always sitting by that gate

2   when we go to medical or mental health appointments.

3       15.    Then, officers dragged ████████████ up off the ground, put his hands

4   behind his back with his thumbs facing up. ████████████ was wearing handcuffs.

5   Then they pulled up on his arms to force him to completely bend over. I have been in this

6   position before while cuffed.  It is terribly painful in my experience.  Officers walked

7   ████████████ back into the medical building, cuffed and bent over.  The pain in this

8   position is excruciating in my experience.  I could see all of this occurring as clear as day

9   because I was standing up in the Rec Box, watching.

10      16.    Then things went back to normal on the yard and I went back to working at

11  the Rec Box.  But I was upset and so was everyone around me.  The yard was fairly

12  crowded when this happened.  I did not talk to anyone because I keep to myself.  But I

13  could hear other people were talking about it and we all felt it was wrong.

14      17.    Between 30 and 40 minutes later a Mexican-American officer of medium

15  height wheeled ████████████ out of the building in a wheelchair with a large bandage

16  on his head.  The bandage covered his entire face.  The officer wheeled him in the opposite

17  direction from the Hole.  He was wheeling him in the direction of the transport to the main

18  COR on-site hospital, the CTC, but I did not see where they actually took him.

19      18.    I have not seen ████████████ since then.

20      19.    I again witnessed staff misconduct at COR on May 13, 2020 at med pass in

21  3A04, an EOP unit at COR.  Psych techs give out medications in front of cells 111, 112

22  and 113, about 15-20 yards away from the cell doors.  I was housed in ██.  The psych

23  techs usually give out medications to incarcerated people who are standing in two lines.

24      20.    In this unit, 3A04, the officers stand in a group of four or six and intimidate

25  us.  The officers stand just off the side of the med lines.  They watch us get our

26  medications and make comments.  They make a variety of comments about mental illness,

27  how you look, other things that would hurt your feelings or racial comments.  For example,

28  on this day Officer Ward, Officer Rocha and Officer Siefken asked one person why he

1  could not walk standing straight up, because he walked bent over.  They said that he

2  walked like a chimpanzee or a gorilla and that he looked like a gorilla.  Officers stand near

3  med pass very frequently.  It is my understanding that the most of the officers do not need

4  to stand there.  In other units I have received medication where only one to two officers

5  were nearby, but not four to six and not standing so close.  I find the process of getting

6  medications in this unit scary.

7  　　　　　21.　　At about 3:30 p.m. on May 13, 2020, I got in line for medications.  I heard

8  Officer Ward, who was the tower guard, calling from the tower's sliding door windows

9  and Officer D. Rocha and Officer Siefken, the building guards standing near med pass.

10  They were teasing the incarcerated person who walked bent over.  They continued to make

11  fun of him for the way he was walking.  I was in one line and he was in the other line.   He

12  asked them to stop teasing him.  The other incarcerated person said, "please leave me

13  alone" several times.  Officer Ward, Officer Rocha and Officer Siefken did not listen and

14  continued to mock him.  He got his meds and went back to his cell.

15  　　　　　22.　　The person was housed in cell ███, on the upper tier.  I don't know his name,

16  but I know his cell because I asked other people on May 14, the day after, as I was getting

17  food.  No one knew his name but people knew his cell number.  He was a quiet person and

18  kept to himself, so no one knew his name.

19  　　　　　23.　　That evening between 8:00 and 8:30 p.m., when the medications were being

20  given out again, I went and got my meds and returned my cell, ███.  Officer Ward, Officer

21  Rocha and Officer Siefken were again in the group of guards watching, along with Officer

22  Hernandez, Officer Gamboa and a few others whom I do not know.

23  　　　　　24.　　I returned to my cell and about five minutes after, the alarm when off.  I

24  think Officer Ward in the tower pushed the alarm because it went off.  I went to see out of

25  the window of my cell.  Officer Rocha, Officer Siefken, Officer Hernandez and one other

26  officer, I am not sure which, had jumped on the person from cell ███.  He was lying on the

27  ground.  They kicked and punched him and pulled on his arms.  The person was on his

28  stomach, not resisting.  Officer Rocha had his knee on the man's neck for the entire time.

The others kicked and punched him for about five or six minutes.  About six other officers watched this happen without stopping it.

25.     About two to three minutes after the alarm when off, the building was flooded with 12-15 officers from other parts of the yard.  That is a standard response to an alarm.  These officers created a perimeter, right around the four officers and the incarcerated person, trying to block our views from the cells.  None of these officers tried to stop the attack.

26.     Then a few minutes later Officer Rocha and Officer Siefken dragged the man out of the building.  He was surrounded by other officers, so I could not see him clearly.  It was quiet after they left the unit.  In the following days, other incarcerated people were talking about this.

27.     I have not seen that man since.  I do not know why they attacked him.  I assume it was because he asked them to stop teasing him.

28.     Watching this made me feel sad and angry.  When you see a bunch of people beating and whipping another person, who is already on the ground, your heart breaks.

29.     I try not to interact with any officers.  I keep quiet because I am worried about staff misconduct.  They behave like Dr. Jekyll and Mr. Hyde.  They will smile at you then attack you sometimes.  I keep to myself and keep quiet.

30.     Incidents like this make me and others feel like we have nowhere to turn for help.  When you seem suicidal, staff hate it, they cuff you behind your back, naked, and leave you for in a cage a long time.  This is to discourage you from being suicidal because they do not want to do the paperwork, I think.

31.     This scares and depresses me.  It makes me angry because I can do nothing about it.  I have no one to talk to about it.  The clinicians, in my understanding, are as afraid of the officers as I am.  I think the clinicians worry that the guards will try to get them fired.  The clinicians try to stay out of it so they do not jeopardize their jobs.

32.     In my opinion, staff target certain people that they do not like with staff misconduct.  Usually they target people who need more help.  People who are less well

functioning, staff pick on them by saying things to hurt their feelings.  They mock and make fun of people; they laugh at certain people who have disabilities.

33.    I believe more staff misconduct happens at COR than at other places.  I believe that COR has a reputation among incarcerated people for mistreating us.  They used to let out warring factions onto the yard and bet who would win.

34.    I have been at Salinas Valley State Prison, California State Prison-Sacramento and California State Prison-Los Angeles County.  I have been in prison for almost 25 years.  COR is the worst prison that I have been to in terms of how much staff misconduct there is.

35.    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this eighth day of July, 2020.

████████

On July 8, 2020, due to the closure of COR in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at COR, I read the contents of this declaration, verbatim, to ████████ by telephone.  ████ ████ orally confirmed that the contents of the declaration were true and correct.  ████ ████s also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: July 8, 2020

_Cat Johnson_
_____
Catherine M. Johnson

# Exhibit 33

**DECLARATION OF** ███████████

I, ████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ██████.  I am currently housed at the Sierra Conservation Center ("SCC") on Facility C in Building 2.  I am 51 years old.  The incidents of staff misconduct that I describe in this declaration occurred at California State Prison – Corcoran ("Corcoran").  I am at SCC because I am out to Court here facing charges relating to a fight with another inmate.

3.      I am an *Armstrong* class member.  I am designated as DPM.  I cannot climb up stairs or walk around without an assistive device.  I can only be housed on the ground floor and I have medical chronos for a lower bunk and special cuffing.  My disability also prevents me from lifting heavy things.  I currently use either a cane or walker to assist my movement.  I also have a mobility disability vest, a wedge pillow, orthotic shoes, and eyeglass frames prescribed to me.  Because of my disability, I cannot spread my legs farther apart than shoulder width, and if someone forces me to do so, it is very painful.

4.      For most of my time at Corcoran, my mobility issues were not as severe as they are currently.  Before I experienced the staff misconduct described below, I was designated as DNM, which is a disability code for mobility impairments that do not require any specialized prison placement.  I was able to walk up and down stairs.  I still struggled with some movement, such as spreading my legs apart, and I used a cane.  After the assault I experienced at Corcoran, my mobility disability worsened.  Medical staff changed my disability designation to DPM on April 29, 2020.  Ever since the assault, I use a cane and/or a walker to get around the prison.

5.      I am a *Coleman* class member.  I am at the Correctional Clinical Case Management System ("CCCMS") level of mental health care.  I suffer from depression and anxiety.  My mental health symptoms sometimes disturb my sleep, causing me to have

insomnia.  During the time I was at Corcoran, my mental health issues were similar to the issues I experience today, although my depression and anxiety are now somewhat worse because of the staff misconduct I experienced.

6.      I have a few medical conditions.  I am pre-diabetic and I suffer from chronic lower back pain, sciatic nerve damage and glaucoma.  During the time I was at Corcoran, my medical issues were similar to the issues I experience today.  However, immediately after the staff misconduct incident, I also learned that I now have two hernias, which I believe are the result of the incident.  My nose was also fractured during the staff assault.

7.      I was housed at Corcoran from July 1, 2019 to June 1, 2020.  On June 2, 2020, I was sent to SCC to go out to Court.

8.      During my time at Corcoran, I was housed in the following locations: Facility Z in Building 1, which is also known as a Short Term Restricted Housing Unit ("STRH"), Facility 3A01, Facility 3A05, and Facility 3A03, which is an EOP Administrative Segregation Unit ("ASU").

9.      I was a victim of staff misconduct at Corcoran.

10.      On September 24, 2019, at around 6:00 p.m., I exited the Westside Dining Hall on Facility 3A.  I was carrying my food and a cup of tea.  I am on a Kosher diet, which means I am allowed to eat my food in my housing unit.  On my way out of the dining hall, I had a brief conversation with Lieutenant Hurlbrut.  He ordered me to get rid of my tea before going back to my housing unit.  I poured the liquid out onto the ground to comply with his request.  At this time, Lieutenant Hurlbrut told me to continue back to my unit.

11.      Immediately after speaking with Lieutenant Hurlbrut, Officer T. Wolfe stopped me and took the kosher meal and the empty cup from my hand and threw them on the ground.  He also broke my watch off my wrist in the process.  He then got on the radio and told the officer in the control booth to put the yard down.  He then asked me to submit to a clothed body search, which I complied with.  He then got behind me and leaned in about half an inch from my ear and ordered, through clenched teeth, "Raise your fucking

arms." I protested, explaining to him that I am Kosher and allowed to eat my food in my housing unit. Officer Wolfe responded, "So fucking what?"

12.     At this point, I was still standing right outside the chow hall in the body search position, with Officer Wolfe behind me. Many other incarcerated people were leaving the dining hall to walk back to their housing unit.

13.     Suddenly, Officer Wolfe roughly kicked the inside of my legs. I believe he did this because he wanted to make me spread my legs further. However, because of my mobility disability, it causes me great pain to spread my legs apart farther than shoulder width. In response to his request, I tried to spread my legs as far as I could.

14.     I suppose he was not satisfied with how far I had spread them and so he kicked the inside of my legs again. This caused me excruciating pain.

15.     I turned my head without moving the rest of my body and told Officer Wolfe about my mobility issues, and that his repeated kicking was very painful. Officer Wolfe responded by saying, "I don't give a shit!" and immediately slammed me to the ground. Then, Officer Wolfe punched me in my left eye and kicked me in the ribs on my left side. He then placed a handcuff on my left arm and put his entire body weight onto the back of my head, pressing my face into the concrete floor, which was extremely painful and which fractured my nose.

16.     Officer Wolfe then cuffed my right arm and stood up. I continued to lay on the ground. Officer Wolfe then placed his left foot on top of my head and I heard and partially saw him high-fiving three correctional officers who were nearby:  Lieutenant. Hurlbut, Officers D. Shelton, and Officer H. Flores.

17.     After the assault,  I was helped to stand up by a female officer. Once I was standing, I observed Officer Wolfe stomping on my watch. I also saw him pick up the broken watch and rip the band off of it.

18.     I was then escorted to the Treatment and Triage Area ("TTA"), where nursing staff evaluated me. They documented my injuries on a CDCR Form 7219, which documented the injuries to my face and legs. I told them I had been assaulted by Officer

Wolfe.  My nose was swollen, bruised and fractured.  I had scratches on my right elbow and bruises on my inner arm from when Officer Wolfe grabbed me and slammed me on the ground.  Medical staff ordered an x-ray of my nose two days later, but they did not initially document the fracture to my nose.  I was only told about a month or two later after a second x-ray that my nose was fractured.  Medical staff determined I also had a deviated septum from the assault.

19.     Because Officer Wolfe had repeatedly kicked my legs, my chronic hip pain has worsened.  Immediately after the assault, I was in serious pain and I struggled to walk.  In the months following the assault, I put in several requests to medical for help.  On November 13, 2019, medical staff finally issued me a four-wheeled walker to alleviate the leg pain I suffered when walking.  My disability also worsened as a result of the attack to the point where I needed a higher disability code.  On April 29, 2020, medical staff evaluated me and designated me as DPM.

20.     Officer Wolfe did not assault me out of retaliation for anything I had done previously.  I believe he assaulted me because he intentionally targets people with mobility or mental health issues.  He seems to enjoy beating up these incarcerated people.

21.     Officer Wolfe issued me a Rules Violation Report ("RVR") for "Assault on a Peace Officer by Means Not Likely to Cause Great Bodily Harm."  The RVR was false.  In the RVR paperwork, Officer Wolfe reported that he ordered me to raise my arms, and I became agitated, but complied.  He alleged that when he began his body search, I abruptly turned to his right and attempted to strike him with my right elbow in his face.  This action lead him to use physical force to take me to the ground.  But I did not turn my body at all, nor did I try to strike Officer Wolfe with my elbow.  I only turned my head to tell Officer Wolfe to stop kicking my legs painfully.

22.     I do not think the RVR process was fair.  Lieutenant Hurlbut, one of the officers that high-fived Officer Wolfe while his foot was on top of my head, was both a witness to the incident and the Reviewing Supervisor for the RVR.  I also gave Corcoran the names of two witnesses to the incident with Officer Wolfe, but staff did not interview

them or allow them to provide testimony.  Instead, they interviewed a random incarcerated person that I did not know.  I am not sure that individual was even present when Officer Wolfe assaulted me.  One of my witnesses, ▮▮▮▮▮▮▮▮, told me he was not interviewed.  In the paperwork, it falsely indicated that he was interviewed and told them he was not present at the time I was assaulted.

23.    On November 27, 2019, I was found guilty of the RVR by Hearing Officer Lieutenant Marin.  I was then placed on C-Status for 60 days.  I did not lose any time because the RVR was untimely.  However, I have lost significant time because during my time in administrative segregation, I do not get day-for-day credit earning.  Also, my custody points have increased from Level II points to Level IV points, meaning I will serve my time in a harsher, high custody environment.

24.    However, the false claim of a staff assault was referred to the local District Attorney for prosecution.  I went to Court today, by phone, and learned for the first time that I am in fact being prosecuted in connection with this false claim that I committed a staff assault.  I also requested that my RVR hearing be postponed pending a decision on the referral to the local DA, but staff went ahead with the RVR hearing anyway.

25.    On October 29, 2019, I filed a 602 grievance reporting the assault. Corcoran's response to my staff complaint was due on December 2, 2019.  However, during my time at Corcoran, I received several notices delaying the review of my 602.  I believe the last notice I received was in April 2020.  Because Corcoran has failed to respond to my initial complaint, I have been unable to exhaust my administrative remedies.

26.    I believe I have been assaulted because I am black and because, as a result of my disabilities, I am perceived as weaker and more vulnerable.  In a sense, I think people with disabilities like myself are viewed as easy targets.

27.    Officer Wolfe is part of group of Officers who call themselves the "hit squad."  When Officer Wolfe assaulted me, the other officers present were also part of the hit squad.  Sometimes they are referred to as ▮▮▮▮▮▮▮▮▮

28.     I have been interviewed about the incident by the local Corcoran Investigative Services Unit ("ISU").  They were hostile when they interviewed me.  The interview lasted about 5-10 minutes.  The interview was video recorded.  They did not interview me until about three weeks after the assault.  By that time, my bruising had gone down and the swelling on my face was gone.  They also falsely told me that my nose was not broken.  I told them I felt and heard my nose crack when I was assaulted.

29.     I have not been told anything about the results of the ISU investigation, and I still have not heard back about my 602 staff complaint.

30.     I believe that part of reason that staff complaints and ISU investigations do not work at Corcoran is the lack of video evidence of what takes place in the prison.  I believe another problem is that the ISU investigations are designed to protect staff, not to get at the truth.  This is shown by the delay taken in interviewing me, until my visible injuries and bruising had significantly healed.

31.     Since the staff assault, I have experienced significant retaliation.  On April 15, 2020, around 3:00 p.m., I was stopped by Officer D. Silva, who worked in the 3A05 building control tower.  He stated, "You need to drop that staff complaint against Wolfe, or bad things could happen to you and that release date."  I told him to mind his own fucking business.  When I turned to walk away, he yelled, "Okay, smart ass."

32.     The following day, on April 16, 2020, I was taken to the ASU for a charge of "Threatening Staff."   I believe that the fact that a whole day elapsed before they came to take me shows that Officer Silva took his time to determine how to retaliate against me, and made up the false charge.  I have been in the ASU since April 16, 2020.

33.     While in the ASU at Corcoran, I have also experienced significant retaliation.  For the last three weeks that I was in the ASU at Corcoran, before coming to SCC on June 1, 2020, my food would be thrown through the food port in my cell door, onto the floor of my cell repeatedly by Officer Vera.  He also repeatedly made sexual comments and gestures towards me in a demeaning manner.  I filed a PREA complaint against the officer for this behavior.

34.     At one point, on or around May 20, 2020, staff came into my cell and my neighbor's cell to conduct cell searches.  Once I was cuffed, I was escorted down to a non-ADA shower.  On the way there, Officer Vera made abusive remarks, calling me a "bitch" and telling me to drop the staff complaint against Officer Wolfe.  I told him to go to hell. When we got to the shower, he shoved me into the shower, and it caused me to strike my left toe against the lip of the non-ADA shower, which caused my toe to bleed.  On the way back from the shower, I told officer Vera he had injured me pushing me into the shower. He responded by asking me, "Have you ever been fucked by a C.O.?"  He also told me to suck his dick.  When I returned to my cell, I noticed that a large swastika had been made with soap on the metal panel behind the sink and toilet.  Also, they ripped open my legal work, and my copies of my medical records, and ripped up the paperwork, crumpled it and piled it on top of my bed.  They also took all of my new canteen and hygiene items and smashed the items and threw them around the cell and on my bunk, in one big mess.  They then threw me in the cell and said, "Now clean that up."  I asked to speak to a Lieutenant, and Officer Vera grabbed his crotch and said, "Here is your Lieutenant right here."  He said, "Do you want a confiscation receipt?" and I said yes.  He laughed and gave me the finger and walked away.

35.     The staff misconduct has made my mental health worse.  After the abusive cell search, I asked the guard who was doing rounding using the Guard One device to go and get my clinician.  I told her I was feeling suicidal and wanted to go to a crisis bed.  She pulled me out and called a psychologist.  Once the doctor came, they evaluated me and sent me back to my cell.

36.     Once I was back in my cell, Officer Vera found out that I had filed a PREA complaint against him and a 602 complaint.  He came to my cell door and indicated he wanted to talk to me.  He said, "I was just messing around," and asked me what it would take to get me to dismiss the staff misconduct claims.  The next day, the officer brought me some canteen items to replace a little bit of what had been destroyed in the abusive cell search.  He asked if I was going to dismiss the 602 and the PREA complaint.  I said that I

1    might.  The next day, I was moved to the Corcoran SHU.  I was sent to SCC about two

2    weeks later, where I remain at this time.

3          37.     I have also witnessed staff engage in misconduct against other people at

4    Corcoran.  On or around the end of March or the beginning of April, I was in my cell in

5    Unit 3A05, and I observed several officers, including Officer Wolfe, beat an incarcerated

6    individual who is Cuban American.

7          38.     In my time at Corcoran, there were times that I needed help for medical or

8    disability concerns and staff refused to provide me with assistance.  At Corcoran, I asked

9    to be moved to a medical facility so that my needs could be met, but staff did nothing in

10   response to this request.  Also when I was suicidal after the assault, staff failed to move me

11   to an MHCB unit.  However, they took me back to my cell instead.

12   / / /

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

39.     I believe there is so much staff misconduct at Corcoran because there are no cameras to prove what takes place.  Staff here commit misconduct without any fear of being caught.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Jamestown, California this 15th day of June, 2020.



On June 15, 2020, due to the closure of Sierra Conservation Center, in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at Sierra Conservation Center, I read the contents of this declaration, verbatim, to ███████████, by telephone. ████████████ orally confirmed that the contents of the declaration were true and correct. ████████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.


DATED: June 15, 2020                                    _____
                                                        Thomas Nolan

# Exhibit 33a

## Filed Under Seal

# Exhibit 34

**DECLARATION OF** ████████████

I, ████████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at Salinas Valley State Prison ("SVSP") on Facility A in Building 3 in cell ██. I am 43 years old.

3.     I am a *Coleman* class member. I am diagnosed with adjustment disorder. When I am struggling with my mental health issues, I tend to try to go outside and walk around or write in my journal. During the time I was at COR, my mental health issues were similar to the issues I experience today. From November 21, 2019 to January 23, 2020, I was at the Correctional Clinician Case Management System ("CCCMS") level of mental health care. From January 23, 2020 to May 20, 2020, I was at the EOP level of mental health care. From May 20, 2020 until today, I have been at the CCCMS level of mental health care.

4.     From November 21, 2019 to June 3, 2020, I was housed at California State Prison-Corcoran ("COR"). From November 21, 2019 to January 24, 2020, I was housed in COR Facility 3A Building 1. From January 25, 2020 to March 16, 2020, I was housed in COR Facility 3A in Building 4. From March 17, 2020 to March 27, 2020 I was housed in COR Facility 3A Building 3, which is an Enhanced Outpatient Program Administrative Segregation Unit ("EOP ASU"), a specialized segregation unit for EOP level of care individuals. From March 27, 2020 to May 20, 2020, I was housed in COR Facility 3B Building 1. From May 20, 2020 to June 3, 2020, I was housed in COR Facility 3B Building 2. On June 3, 2020 I transferred to SVSP.

5.     I was a victim of staff misconduct at COR on March 19, 2020.

6.     In January of 2020, my prior clinician, Ms. Pettinger, recommended that I transfer from the CCCMS to EOP level of care. I did not want to be EOP because I would need to move buildings and possibly get a cell mate. I wanted to stay in COR 3A01. I had

[3591428.1]

no cellmate.  I also did not want to move to an EOP building because officers at COR are known to dislike and to harass EOP incarcerated people.  But I moved to an EOP building, COR 3A04, on January 25, 2020.

7.      On February 11, 2020 I was in my cell, 3A04-███, when Officer N. Siefken, Officer A. Rocha, Office D. Rocha, Officer M. Kiaris came into my cell.  Another officer stayed outside.  They came inside my cell without warning.  I was in my boxers on my bed.  Officer N. Siefken, Officer A. Rocha, Office D. Rocha, and Officer M. Kiaris said they would beat me up and take my property.  Officer A. Rocha and Officer D. Rocha are father and son.  This group of officers has a reputation for beating up inmates.  They asked me questions about my neighbors.  I felt shocked and scared and did not know how to respond.  I did not know what to say.  I flattened myself against the wall.  One officer sat down on my bed.  They stayed for around 10 minutes.  They asked me about my personal background, and about the other inmates around me.  I told them I would cooperate, just don't hurt me or my property.  I did not know how to answer so I said I would cooperate because I did not want to get hurt.

8.      No officer had ever come into my cell or asked me about other incarcerated people in that way.  I try not to communicate with officers more than I have to—only to provide outgoing mail or to sign forms—nothing like this.

9.      I do not know why they did this to me.  I did not ask, I did not want them to stay any longer.  They seemed angry.

10.      I told my clinician Dr. Mejia about this on February 13, 2020.  I am not sure she recorded it.

11.      In that building, inmate-porters, who deliver envelopes and other supplies, also signed up other inmates to use the phone.  These porters had power over other incarcerated people and, in my understanding, are chosen by custody staff to serve as porters.  They asked me for payment to use the phone.  I did not pay the required fees and the porters became aggressive.  Some porters threatened that if I did not pay, I would not get phone time and would have other problems.

12.     I complained to Officer N. Siefken, Officer A. Rocha, and Officer D. Rocha, Sergeant Medina, and Lieutenant Hurlbut verbally starting in early March of 2020.  I wrote several 22 forms, asking for an interview with a captain of the yard, and submitted a 22 form asking to meet with the warden.  I also submitted a 602 about this issue on about March 4, 2020 and believe that the warden should have been notified as it mentioned safety concerns.  I informed my clinician on March 13, 2020 about my safety concerns.

13.     Officers did not take any action to stop the porters' behavior, but I believe that reporting it made the situation worse for me.  In the days following my reports, the porters became more aggressive.  It is my understanding that officers informed other incarcerated people about my complaints.  I heard Officer A. Rocha speaking to the other porters about this on about March 4, 2020.

14.     Another person in 3A04 cell ███, named ████, warned me to be careful, that this group of porters and officers had attacked him for similar reasons.  Another person named █████████, in cell ███ or ███, also warned me about this group of incarcerated people and officers.  He said that he was witnessed people being beaten up.  Inmate ████████ warned to me be careful.

15.     On March 17, 2020 I moved again to COR 3A03, the EOP ASU, for non-disciplinary reasons—specifically, my concerns regarding my safety.  Staff did not inform me why I was moving or what my lock-up order was.  Prior to my transfer, I submitted a 602 about the inappropriate behavior of custody officers, that they informed other incarcerated people about me.  I also submitted a 22 form, asking for an interview with the warden.  Because I was moved just after submitting these, I believe the move was connected to my complaints.  I was also supposed to receive a hearing within 72 hours of my move with the initial classification committee.  I did not receive the hearing.  I asked staff about why I wasn't getting my hearing.  I wanted to complain but staff would not give me 602s.  Neither Sergeant Hacksworth nor Sergeant Lee would address this with me.  My cell in 3A03 was across from the sergeant's office.  I tried to ask them once I moved and they both refused to speak with me.

16.     On the morning of March 19, 2020, I needed to speak to a mental health clinician for an urgent mental health matter.  I was in my cell.  A nurse came to my cell for pill call.  Between 8:30 and 9:00 a.m.  I informed the nurse, who was not wearing a name tag, that I needed to speak to a member of mental health staff.  I was feeling anxious and depressed.  I was very upset and confused by this situation.  When I moved to 3A03, none of my property came with me.  I did not have any legal paperwork.

17.     It is my understanding that the nurse then informed officers about my situation.  My clinician was not available at that moment to speak to me.  Officer Mercado, Officer Ruiz, Officer Cruz, Officer Daz and Sergeant Hacksworth came to my cell then.  Officer Gutierrez was nearby.  They told me to get out of my clothes and turn around.  They did not explain why I needed to undress.  In my experience usually I do not need to take my clothes off to see my clinician.  I listened to them.  I did not know why I was there in 3A03 so I listened.  They cuffed me very tightly.

18.     They walked me wearing only boxers and cuffed me in a cage in 3A03.  My cell was on A-Side, they walked me to B-Side and put me in a cage.  They left me cuffed, but pulled my hands outside of the tray slot.  Then I felt a weight on the handcuffs, it was heavy and metal.  I could not turn around fully because my hands were outside in the tray slot and I could not move much.  Later, when the weight was removed, I saw it.  The weight was a heavy triangle, formed of metal.  It was about 12 inches wide and 12 inches tall.  The bar was about the thickness of a quarter.  I had never seen anything like it before.

19.     While I was cuffed in the cage like that, someone pulled my boxers down below my buttocks.  My genitals were exposed.  It was very painful and humiliating.  I was in the cage, exposed and cuffed like that for approximately three hours.

20.     After they put the weight on me, I asked Officer Ruiz, Officer Daz, Officer Cruz, Officer Mercado, Officer Gutierrez, and Sergeant Hacksworth to help me.  As they walked away back to A-side, I screamed out for help.  It was painful and I screamed out.  The building from above would look like a circle divided into two: A and B side.  My cell was on A-side, with most of the other occupied cells.  On B-Side, the cages are near the

wall across from the door between A-side and B-side.  There are cells across from the

cage.  Cells 134, 135, 137 and 138 were occupied that day.  The second tier is above, but

no one was housed in the second tier.

21.     Other incarcerated people housed in 3A03 on B-side saw this happening.

Inmates ███, ███, and ███ all saw this happening.  They told me later.

22.     My clinician Daniels came to speak to me in the cage around 9:00 a.m.  I

told him I was in pain and that I was suffering.  I told him that the weight was heavy.  He

said, "Is it 10 or 15 pounds?" in a way that felt mocking.  He did not otherwise

acknowledge my statements about pain, he said that the CIT team would come later.  Then

he left.

23.     If you go through the door from B-side to A-side and continuing walking

past A-side, you will reach administrative offices, EOP group areas, and a medical clinic.

This door was constantly in use by staff and is the only way out and in of B-side.  People

using the door could see me.  I was screaming and I know they could see me.  Staff looked

at me but did not want to get involved, I think.  Dr. Mejia walked by, as did my clinician

Daniels.  One female officer looked at me and said "ew."  This made me feel horrible and

embarrassed.

24.     Over the course of several hours, only one person, a gentleman wearing a

grey suit, came over.  He looked to be of Middle Eastern descent to me.  He said that he

talked to Sergeant Hacksworth and was going to email either the sergeant or someone in

administration about this.  He said the sergeant should come.

25.     Around 11:30 a.m. a crisis intervention team ("CIT") came to interview me.

I asked them for help.  I was in the same position, cuffed and almost naked, I was

experiencing a mental health crisis.  The CIT team, along with two trainees, came to

interview me.  Sergeant Hackworth was there the entire time along with Officer Daz and

Officer Ruiz.  I could see the officers and the CIT team standing to the left of my cage by

turning my head.  It was very hard for me to speak because the officers intimidated me and

1   I was in pain.  I did not want additional punishment.  I had no privacy to speak about my

2   mental health and medical concerns.  I told them I was in pain but nothing more.

3        26.    After we spoke, the CIT team walked away with the sergeant and the

4   officers.  The CIT team did not come back.  Sergeant B. Hacksworth did come back with

5   Officer Daz and Officer Ruiz.  I remained in the cage in the same position, almost nude

6   and cuffed to a weight.  After the CIT team left, I kept screaming and asking the officers

7   for help.  Officer Ruiz and Officer Daz stabbed me with their keys on my hands and arms

8   while I remained in the cage.  I think they stabbed me because I asked for help.

9        27.    Officer Ruiz and Officer Daz let me out of the cage around noon.  Officer

10  Mercado and Officer Cruz were nearby.  I saw them following us back to my cell.  I

11  returned to my cell with them.  They removed my breakfast from that morning, which I

12  had not eaten, from my cell.  They left a banana, which Officer Daz stepped on.

13       28.    After I returned to my cell, I asked Officer Daz and Officer Ruiz to provide

14  7362 forms or let me see a doctor, but they refused. I also asked Officer Cruz and Officer

15  Mercado, who were nearby.  These forms allow you to request medical or mental health

16  help.  I also asked them to contact the captain, but they refused to do so.

17       29.    None of the people on the nursing staff assisted me after I was back in my

18  cell.  I called out from my door, asking for medical help.  I screamed through the crack on

19  the side of the door.  I asked for medical care, for 602s, or 22s.  No one gave me anything

20  that day or the following days.  I am not sure why they refused.  I assume they did not

21  want me to document these issues.

22       30.    I met with my clinician Daniels the following day, March 20, for my one-on-

23  one before my IDTT.  I did not trust him because he had seen me in the cage the day

24  before and did not help me.  I did not think he would help me now.

25       31.    I filed a 602 about all of these events more recently, after I arrived at SVSP.

26  I wanted to make a photo copy because 602 forms are often lost or never responded to at

27  COR, especially if they concern staff misconduct.  When you submit a 602, you are

28  supposed to get a receipt for submitting the 602 to the appeals box.  You are also supposed

1   to get a log number within 7 days and a response with 30 days.  In my experience, at COR,

2   they often fail to give log numbers or follow these other procedures.  If the first 602 is not

3   responded to, you must 602 the issue again.  The second appeal is sometimes denied

4   because it was submitted more than 30 days of the incident.  It is another headache, and

5   appeals often get lost.  This process discourages incarcerated people with disabilities from

6   wanting to do the same 602 again and again and I believe a significant number of people

7   just give up.  I make copies so that I will have a record of what I submitted, in case it is

8   lost or not responded to.  In this case I submitted a 602 weeks later because I could not

9   access the law library to make copies at COR.  I waited to submit until I arrived at SVSP

10  and could make a copy.

11      32.      I had an interview on June 7, 2020 at SVSP with Lieutenant Parks and

12  Sergeant Cervantes to discuss this 602.  I believe that there is an on-going investigation.

13      33.      I was the victim of a second incident of staff misconduct during the week of

14  May 11, 2020.  On May 8, 2020 I met with my clinician for a weekly meeting.  We did not

15  discuss changing my level of care during the May 8, 2020 meeting.  On Monday, May 11,

16  2020, I had a confidential legal call.  It is my understanding that a member of custody staff

17  informed my clinician in 3A04, Patricia Hurt, about my legal call.  Custody staff had been

18  receiving my 22 forms at COR.  The 22 form can be submitted in the mail or I can ask the

19  officer to sign it, which confirms that it will be delivered.  Usually they read it before they

20  sign it, but that way is more secure than the mail.  I think officers told my clinician about

21  my complaints about staff and my legal calls.  I was not speaking to my clinician about

22  these issues anymore because she had been hostile to my concerns in the past.

23      34.      Five days after my last meeting with my clinician, on May 13, 2020, I had a

24  second meeting with Ms. Hurt.  Usually I only have one meeting per week.  But in this

25  case we met on May 8 and May 13, 2020.  In an earlier meeting on April 29, 2020,

26  Ms. Hurt had said she would not change my level of care because I was waiting for

27  transfer.  I was just waiting to transfer to Richard J. Donovan to be closer to my family.

28  But on May 13, 2020, we met again and Ms. Hurt informed me that I would be dropping to

the CCCMS level of care.  Ms. Hurt had only recently become my clinician.  I had only met with her twice before this.  I protested that I did not feel ready and asked for more time at EOP.  Ms. Hurt said that I would have an Interdisciplinary Treatment Team ("IDTT") meeting on May 20, 2020 and would have my level of care dropped to CCCMS.  She did not explain why I was being dropped.  I believe it was due to learning about my 602 and staff misconduct issues.  I asked to talk to her supervisor, Dr. Glatstein.  Dr. Glatstein, who came into the room with me and Ms. Hurt, asked what my problem with Ms. Hurt was.  Ms. Hurt was still in the room when Dr. Glatstein asked this question.  I did not feel comfortable explaining with Ms. Hurt present to listen.

35.     On May 20, 2020 I attended my IDTT and asked to remain EOP.  Despite my request, I was dropped to CCCMS and moved housing that same day.  It is my belief, based on the fact that at our May 8 meeting Ms. Hurt told me she would leave me at EOP before my transfer, that my level of care was dropped in retaliation for my 602 staff complaints and for my contact with attorneys.  I feel that as soon as I began complaining about the conditions of my confinement and staff misconduct, Ms. Hurt would cut me off.  She would say, "that is just a rumor" as I was discussing my personal experiences.  I could not talk to her about my problems and had a fear that she would retaliate against me.  At this point, I had a conversation with an attorney over the phone and filed a 602 complaint recently.  After these two actions, on May 13 Ms. Hurt's attitude had completely shifted from our May 8 meeting.  She said suddenly that I would be dropped a level of care, a complete turnaround, after she learned that I was speaking to attorneys and complaining.  Since then I have remained at the CCCMS level of care.

36.     After this incident, I felt that I could not share my experiences with my clinicians out of fear of retaliation.  Instead I hold this humiliation inside and cannot let it out.  After this took place, I could not deal with my depression or my loss of appetite.  I could not bring these issues up with my clinician because I worried that she would inform other staff, or remove me from treatment altogether.  I had no one to talk about these problems with.

37.     I believe that officers have huge and inappropriate influence on mental health clinicians at COR.  For example, when I have had a negative experience with an officer and tried to mention it to my clinician, the clinician will dismiss this concern.  This has happened to me with multiple clinicians.  In my experience, clinicians often take officers' thoughts into account when making treatment decisions.

38.     In my opinion, staff at COR target people who have problems.  They target people who need help or ask for things.  For example, I might file a 602 about a situation. I would later be called into the program office to discuss.  When I go, the sergeant and other officers are present to listen, surrounding me.  The other officers will interject and try to persuade me to withdraw my complaints or appeals.  If I do not, then problems start.  It is a very threatening atmosphere.

39.     I also believe that staff at COR target mentally ill people at the EOP level of care.  They take advantage of people who cannot advocate for themselves as well.  The people who could not express themselves or were afraid got targeted in the EOP ASU.

40.     COR is very bad in terms of staff misconduct.  I think installing video or audio surveillance systems would be helpful.  At COR there is a culture of allowing inmates to do things that officers should do.  There is also a bullying culture of officers profiting from incarcerated people by taking and reselling or renting inmates' property at COR.  I have witnessed this myself and have seen this rental system in action.  I have never seen anything like such open and obvious staff misconduct.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Salinas, California this 31st day of July, 2020.

/s/ █████████

On July 31, 2020, due to the closure of SVSP in light of the COVID-19 pandemic

1    and ongoing concerns that officers might retaliate against witnesses in support of

2    Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail

3    system at SVSP, I read the contents of this declaration, verbatim, to ▮▮▮▮▮▮▮ by

4    telephone. ▮▮▮▮▮▮ orally confirmed that the contents of the declaration were true

5    and correct. ▮▮▮▮▮▮ also orally granted me permission to affix his signature to

6    the declaration and to file the declaration in this matter.

7

8    DATED: July 31, 2020

9                                             Catherine M. Johnson

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 34a

## Filed Under Seal

# Exhibit 35

1 **DECLARATION OF** ████████████

2     I, ████████, declare:

3     1.    I have personal knowledge of the matters set forth herein, and if called as a

4 witness, I could and would competently so testify.

5     2.    My California Department of Corrections and Rehabilitation ("CDCR")

6 number is ████████.  I am currently housed at Corcoran ("COR") in the Central Service

7 Facility, in the Infirmary, in INFC1.  From February 10, 2020 to February 14, 2020, I was

8 housed in COR in Facility 3A, Building 03, which is an Enhanced Outpatient Program

9 Administrative Segregation Unit ("EOP ASU"), a specialized segregation unit for EOP

10 level of care individuals.  From February 14, 2020 to February 16, 2020 I went out to

11 Bakersfield Adventist Hospital ("BAH").  From February 16, 2020 to February 18, 2020, I

12 was housed in the COR Infirmary.  From February 18, 2020 to May 29, 2020, I was

13 housed in COR in Facility 3A, Building 03, the EOP ASU.  I am 29 years old.

14     3.    I am a *Coleman* class member.  Currently, I am at the ACUTE level of

15 mental health care.  From January 28, 2020 to February 16, 2020 and from February 18,

16 2020 to May 29, 2020, I was at the Enhanced Outpatient Program ("EOP") level of care.

17 From February 16, 2020 to February 18, 2020 and from May 29, 2020 to June 8, 2020, I

18 was at the Mental Health Crisis Bed ("MHCB") level of care.  From June 8 until today, I

19 have been at the ACUTE level of care, but remain housed in the MHCB due to COVID-19

20 related transfer restrictions.

21     4.    I am diagnosed with bipolar disorder, depression and anxiety, and

22 schizoaffective disorder.  I take Haldol and Strattera for these conditions.

23     5.    On May 4, 2020 I was the victim of staff misconduct at COR.  I was in my

24 cell, ████████ in the EOP ASU, during second watch when, around 8:30 a.m., I told

25 Officer H. Hernandez, Officer E. Ruiz, Officer E. Diaz, and Nurse V. Alvarez that I had

26 chest pains as they walked across the tier.  Nurse Alvarez told me to go lay down and drink

27 water, that it was anxiety.  After she said that, I boarded up my cell.  I was upset because I

28 believed I needed and was not receiving medical attention so I boarded up, which means

1  covering up the window to my cell, in order to receive medical attention.  I could see

2  through the gap in my door and hear other incarcerated people begin kicking their doors,

3  trying to help get me medical attention.  They yelled "Man down, ███."  I left my window

4  boarded up.

5        6.      From about 11:30 to 1:30 p.m. Officer H. Hernandez, Officer E. Ruiz,

6  Officer E. Diaz and Sergeant Hacksworth were standing outside of my door.  They kicked

7  my door.  They were saying offensive things.  I did not respond.

8        7.      At about 1:30 pm that day, I was still boarded up.  My clinician S. Yang

9  came over and asked Officer H. Hernandez, Officer E. Ruiz, Officer E. Diaz and Sergeant

10  Hacksworth why they were not doing anything.  I heard the officers say that I was not

11  worth their time.  She said ok and walked away.  I could hear her talking to the officers

12  about me, but she did not speak to me.  I think my clinician is friends with the officers.

13        8.      On third watch, at about 2:00 p.m. or 2:30 p.m. my cell was still boarded up.

14  Other incarcerated people were still kicking their cell doors and calling out about me.

15  Around 4:30 p.m., Officer F. Godoy, Sergeant Holland, Officer Velasquez, and one officer

16  whose name I don't know came over to my cell with Nurse Chronister and Nurse Silva.

17  Nurse Silva is now Nurse Sanchez because she got married.  Other incarcerated people

18  stopped kicking their doors when this group came to my cell.  I again said that I had chest

19  pains.  The nurses just told me go to lay down.  People around me started their door

20  kicking again.

21        9.      Then at about 4:30 p.m. Sergeant Holland, Officer Velasquez, Officer

22  Godoy, Officer Caldron and another officer opened my door.  They did not give me any

23  warning.  They are supposed to give a warning before opening a cell.  No one was

24  videotaping.  I was laying on the floor because it is cooler when they came into my cell.  In

25  the cell, they kicked and punched me while I was on the ground.  It was very painful.

26  They kicked my entire body, stomping on me.

27        10.     They dragged me out of my cell.  I was covered in blood.  They cuffed my

28  hands and ankles really tightly.  They put a spit mask on me.  They then kicked, punched,

used the bottom of their pepper spray bottles and a baton on me.  I was hit in the face with a baton.  Officers told me, "you ain't nothing but a n\*gg\*r."  I passed out while outside the cell cuffed up.  I did not wake up fully until I was in the outside hospital, Bakersfield Adventist Hospital.

11.     Other incarcerated people could see what was happening.  They asked staff to stop.  When I was still in my cell, before the officers came in, I could hear officers yelling at my neighbors to  "shut up you mentally ill people."  My neighbors ███████, ████████ and ██████ witnessed this.  I think the entire tier could see.

12.     Afterwards, Officer Bang in the tower sounded an alarm at about 4:40 p.m.  I was not fully conscious but I could hear the alarm.  I believe Officer Bang saw the entire thing and waited to sound the alarm to get me medical treatment.  Medical staff came to my cell, ████████, to treat me.  They cleaned a large cut on my right cheek where I was hit a with baton.  My vision was blurred in my right eye.  I felt nauseous and my back hurt.

13.     I went to the COR CTC and then was transported to BAH for treatment at about 6:30pm.  At BAH, I had a CT scan of my head and my lower face.  My right nasal bone was fractured.  They also took images of my spine and sutured the cut in my cheek in six places.  I returned to COR on May 5 early in the morning after waiting in the emergency room for several hours.

14.     On May 5, I went to the ophthalmologist.  I could only see shadows with my right eye.  I could not see anything more clearly.  I also had bad headaches after being hit with a baton.  The eye doctor said that I had a tear in my retina in my right eye and recommended laser surgery in both eyes because my vision is not good in either eye.  I have not yet received surgery.  I wear glasses.  To this day I have trouble seeing from my right eye and have migraines.

15.     I received a Rules Violation Report ("RVR") for Battery on a Peace Officer for this incident.  I had a hearing, maybe a week later, and they found me guilty.  But I think the RVR was false.  The RVR said I kicked and punched the officers, but I was laying on the floor when they came in and I did not kick or punch them.  I was on C-status

1  for 90 days as a result of the RVR.  I also received 18 months added to my time in a
2  segregation unit.

3      16.    I tried to submit a 602 about the false RVR on May 6.  It was never
4  responded to.  There was no investigation in to the RVR that I know of.

5      17.    On May 13, I had a Mental Health Assessment ("MHA") for that RVR.  I
6  told the clinician that what officers wrote in the text of the RVR was not the truth.  I also
7  said that my mental health was a factor.  The clinician wrote down that it was not a factor.

8      18.    I have also witnessed staff engage in misconduct against other people at
9  COR.

10     19.    On the morning of March 19, 2020, I was in my cell in the COR EOP ASU.
11 Around 9:00 a.m., Officer Ruiz, Officer Diaz, Sergeant Hacksworth, and Officer
12 Hernandez escorted ███████████ out from the door to the yard towards my cell.  They
13 were calling him stupid and a "n*gger."

14     20.    They put him inside one of the cages on the way to the showers.  He was in a
15 cage, facing the wall.  The officers pulled his hands out of the tray slot, cuffed, and put a
16 triangle restraint device on his wrists.  They left the restraint device there for several hours.

17     21.    While ███████████ was in this position, Officer Ruiz, Hernandez and
18 Diaz cut his boxers off.  His genitals were left exposed.

19     22.    At about 9:30 a.m., a crisis intervention team ("CIT") came to meet with
20 ███████████.  The CIT team, along Sergeant Hacksworth, stood behind ███████
21 ███████.  The sergeant kept saying that ███████████ was not suicidal, that he was an
22 IEX-er.  "IEX" means "indecent exposure."  Being accused of being an IEX-er can put
23 your life in jeopardy from other incarcerated people and from officers.

24     23.    In my experience, a meeting with the CIT team is supposed to be
25 confidential.  Because the officer was present, this did not look confidential to me.  I could
26 also hear.

27

28

24.    The CIT team left after speaking with ███████████ for about five minutes.  They walked away with the sergeant.  ████████████ was left in the cage nude until later that day.

25.    At around 9:50 a.m. I left my cell to attend my EOP mental health group.  I returned at around 11:50 a.m. to my cell.  When I came back to my cell, Officer Diaz, Officer Ruiz, Officer Hernandez and Sergeant Hacksworth were around the cage harassing ██████████.  They reached into the cage, grabbing his buttocks and saying "you have a little weenie."

26.    I think this incident happened because ████████████ reported that he was suicidal.  People who report suicidality are beaten up often in this unit.  I do not know why they do this.  I think it establishes dominance.

27.    I filed a 602 on that day about the incident.  I wrote that I saw ████████ ████████ exposed in the cage and the officers grabbing at him.  It was never responded to. There was no investigation that I am aware of.

28.    These incidents that I have experienced and witnessed impact my ability to access mental health care.  It is difficult to access mental health care at COR because I feel that the mental health staff inform the officers about my mental health issues.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

29.     I fear for my safety and security because I am at COR.  In terms of staff misconduct, COR is one of the worst prisons that I have been to.  I have been at COR since 2018 and have witnessed many incidents of staff misconduct.  I am really frustrated because I feel that at COR there is no justice or consequences for the officers' actions.  The officers are sworn police officers: they should be protecting us, not antagonizing us.

30.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration is executed at Corcoran, California this 29th day of June, 2020.

On June 29, 2020 due to the closure of COR in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at COR, I read the contents of this declaration, verbatim, to ███████, by telephone. ███████ orally confirmed that the contents of the declaration were true and correct. ███████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: June 29, 2020

Catherine M. Johnson

# Exhibit 35a

## Filed Under Seal

# Exhibit 36

**DECLARATION OF** ██████████

I, ██████████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number was ██████ I am 27 years old.

3.      From April 1, 2020 until my release from prison in September of 2020, I was at the Enhanced Outpatient Program ("EOP") level of mental health care.  I am diagnosed with bipolar disorder.  During the time that I was at California State Prison-Corcoran ("COR"), my mental health issues were similar to the issues that I experience today.

4.      I was housed at COR from January 31, 2019 to June 1, 2020.  From January 31, 2019 until October 6, 2019, I was housed in COR Facility 3B Building 2. Several times from January to July of 2019 I was out to court at Calipatria State Prison and at the Richard J. Donovan Correctional Facility.  From October 6, 2019 until April 1, 2020, I was housed in COR Facility Z, which is a Short-Term Restricted Housing unit ("STRH"). The STRH is a specialized Administrative Segregation Unit ("ASU") for CCCMS level of care individuals.  From April 1, 2020 until June 1, 2020, I was housed in COR Facility 3A Building 3, which is an EOP Administrative Segregation Unit ("EOP ASU"), a specialized segregation unit for EOP level of care individuals.  On June 1, 2020 I transferred to California State Prison-Sacramento ("SAC") and in early September, I was released from prison.

5.      I witnessed staff misconduct against other people at COR.

6.      On April 6, 2020 at about 9:00 a.m. I was walking to yard, handcuffed and escorted by Officer Riley.  Typically, in the EOP ASU, incarcerated people went to "yard" in what are known as "small management yards" or "SMYs."  These yards are small cages about the size of a bathroom surrounded by chain link fencing and set up on a concrete pad.

7.      On April 6, 2020 Officer Riley was walking me to my specific walk alone cage on the yard.  As I was walking through, I saw Officer Hernandez, the second watch yard runner, and Officer Ruiz, the 3A03 floor officer.  Officer Hernandez and Officer Ruiz were stopped in the middle of the walkway speaking with another incarcerated person, ██████ ████████  I could not hear what they said.

8.      After a few moments, Officer Hernandez and Officer Ruiz slammed ██████ ████████ against the wall of one of the yard cages.  Officer Ruiz was on ██████ ████████ left side and Officer Hernandez was on ██████ right side.  ██████ ████████ was handcuffed at the time.  The two officers pulled his arms up behind him high and smashed his head into the fence.

9.      While ██████ ████████ stood in that position, Officer Ruiz loudly said "Suck my dick."  Then Officer Ruiz punched ██████ ████████ three to four times in his rib and kidney area, while Officer Hernandez held ██████ arms up and pushed his face against the fence.  After Officer Ruiz punched ██████ left side, they switched.  Officer Hernandez then punched his right rib and kidney area four to five times.

10.     Other incarcerated people were calling out from other cages.  They said stop. I called out "Hey! Stop that! Stop hitting him – I'll write you up."  To "write up" staff means filing an administrative grievance about them.  Officer Riley, who was escorting me, told me to shut up.  Then Officer Riley put me in the cage next to ██████ ████████ I told ██████ of his right to appeal or file an emergency 602.

11.     After this incident, I was taunted by officers from this tier.  They called me a rat and a snitch.  I honestly believe that my safety might well have been impacted by those officers' actions, if I had not been moved to SAC.

12.     Sometime in May, the Office of Internal Affairs ("OIA") came to speak to people who witnessed this.  It is my understanding that the OIA came because ██████ filed a 602 about this.  The OIA interviewed me about this incident.  On the same day that I was interviewed, my cell was searched and I was written up for destroying a mattress.  I did not destroy a mattress.  It is my understanding that this was retaliation.

1          13.     On May 4, 2020, I was in my cell, COR ███████ I could see and hear

2 what took place at many cells around the tier.

3          14.     During the afternoon of May 4, 2020, another incarcerated person named

4 ████ ███ told staff that he had chest pains right before shift change around noon.

5 Medical staff never came to check on him.  In this unit staff typically do welfare checks

6 every thirty minutes.  During third watch he also told staff when they did welfare checks.

7 No one checked on him.  He boarded up his cell, ██████████ in response, because he

8 wanted medical care.  "Boarding up" means to cover the window of a cell.  He was

9 boarded up for at least an hour.  From my cell, I had an unobstructed view of ██████

10 cell, and I was about 10 yards from his cell, so I could see everything that happened.

11          15.     After dinner Sergeant Holland and a few other officers did a welfare check

12 on ████ ██████  They checked to make sure that he responded to them, because they could

13 not see into his cell.  He did not respond to them.  Sergeant Holland opened the tray slot

14 and stuck his hand in to remove the covers.  He said, "You wanna play, we can play."

15 Then the officers walked away.

16          16.     After removing the coverings on his window, Sergeant Holland, Officer

17 Velasquez, Officer Godoy, Officer Caldron and Officer Gaxiola cell-extracted ████

18 ████  A "cell extraction" is when officers remove a person from his or her cell

19 involuntarily, typically using some degree of force.  When time permits, officers are

20 supposed to videotape cell extractions done to *Coleman* class members, unless there is an

21 emergency.  At the time of this incident, ████ ████ cell had been boarded up for at least

22 an hour so there was clearly no emergency.  When they cell extracted ████ ████ no one

23 was videotaping the cell extraction.

24          17.     As part of the cell-extraction, Sergeant Holland, Officer Velasquez, Officer

25 Godoy, Officer Caldron and Officer Gaxiola entered ████ ████ cell.  Officer Godoy

26 went in with a shield first, then Sergeant Holland, Officer Velasquez, Officer Caldron and

27 Officer Gaxiola.  They did not give any warning.  Once they entered, I could not see inside

28

the cell, but I heard them beating him up.  It sounded like thunder or a loud drum for about 30 seconds.

18.    After 30 seconds, Sergeant Holland, Officer Velasquez, Officer Godoy, Officer Caldron and Officer Gaxiola dragged ██████ ██████ out of his cell.  ██████ ██████ was covered in blood and hogtied.  He was wearing a spit-mask, was cuffed at the ankles and the hands.  Officer Velasquez, Officer Godoy, Officer Caldron and Officer Gaxiola placed him on the ground outside of his cell and continued to beat him up.  Sergeant Holland held him down.  They kicked and punched him while he lay there cuffed.  I could hear him being beaten and his right cheek was split open wide as if he had been in a boxing match, an open gash.  I could see him on the ground.

19.    I think a left-handed officer hit ██████ ██████ with a baton because the gash was on his right cheek.

20.    The tower hit the alarm.  Sergeant Holland, the third watch sergeant, said "What the fuck, why did you hit the alarm?"  The officer in the tower said "That guy is bleeding."  After the alarm, many officers rushed into the building.  They surrounded ██████ ██████ Officer Velasquez and Officer Godoy left, I think they may have injured themselves.  Officers moved ██████ ██████ into the dayroom near his cell.

21.    At about 4:40 p.m. after the alarm, Nurse Silva and Nurse Chronister came near to ██████ ██████ cell to treat him.  He had a large cut on his face and his right eye was swollen.  They asked what was wrong and he said, "My face hurts."  Nurse Silva said, "Did you deserve it?"  They did not provide him with any treatment.  ██████ ██████ got very upset and starting cursing.  Someone called an emergency response vehicle and they left for the on-site hospital about five minutes later.

22.    About four days after this a lieutenant and a sergeant came to see him.  I believe they were interviewing him about staff misconduct.  I believe this also made ██████ ██████ a target for more harassment on the unit.

23.    I also witnessed staff misconduct against another incarcerated person on May 10, 2020.

24.     During breakfast there was a commotion, and I heard Officer Riley responding.  He and other officers walked past my cell into the hallway to get their gear.

25.     About two minutes later, Officer Ruiz and Officer Hernandez stood in front of my door arguing about who would enter the cell first.  They were wearing riot helmets and gloves.  Officer Ruiz was wearing mechanic gloves with plastic pieces on the knuckles.  Officer Hernandez wore motorcycle gloves with metal pieces.  The shields were sitting nearby.  These gloves protect their hands but could also inflict damage.  They were not wearing cell extraction gear.  Cell extraction gear is a white hazmat suit with a head covering, a protective helmet, protective vest, gloves, kneepads and elbow pads.  It is my understanding that they did not wear this to have better range of movement.

26.     Once Officer Riley and Officer Contreras had on helmets and shields, they walked with Officer Ruiz and Officer Hernandez to the incarcerated person's cell.  They asked, "You wanna play games?"  Then Officer Hernandez, Officer Ruiz, a sergeant, and Officer Diaz ran into the person's cell.  Officer Riley and Officer Contreras stepped off to the side.  They did not give the incarcerated person any other warning before they rushed into the cell.  They did not provide him a chance to cooperate or cuff up.

27.     Once they ran into his cell, they beat him down for about a minute.  I was not able to see into the cell because I was standing in my cell and from there I could not see into the cell.  His cell was to the right of mine.  I could hear the hits; it sounded like crunching, as if you were crunching dry ramen noodles.

28.     After about a minute, Officer Hernandez, Officer Ruiz, Officer Diaz and the sergeant brought the person out of his cell in handcuffs.  I could hear his labored breathing and his moaning in pain.  They continued to hit him outside the cell about ten feet from his door.  Officer Hernandez knelt on his neck and hit his head.  I could see this happening through the crack in the right side of the door.  In prison, the doors to the cells slide to the side.  If I looked through where the door slid open, I could see clearly.  Officer Ruiz knelt on his legs and hit his kidney and spine.  The sergeant was holding his legs.  I think Officer Diaz went to get medical staff.  This went on for more a minute.

29.     After more than a minute, someone hit an alarm because the incarcerated person needed medical treatment.  Officer Hernandez, Officer Ruiz, Officer Diaz and the sergeant picked him up, shackled and handcuffed and brought him about 20 feet to a cage. He was wearing a spit mask.  He struck his cuffs outside the cage and they put a triangle device on him.  The sergeant asked if he was good, if he needed medical treatment.  He said he did.  A psych tech named Miller and a nurse came to the cage.  They asked the incarcerated person if he was ok.  Before he said anything, Officer Hernandez said he was good and shooed them away.  The medical staff protested but Officer Hernandez told them to go away.  I think the medical staff are intimidated by custody staff.

30.     This incarcerated person is an older man, perhaps 60 years old, and only about 5 feet tall.  I have known him since September or October 2019.  The officers who assaulted him were each approximately 100 pounds heavier than he is.  It is my understanding that this person already has serious mental health issues and other medical ailments.  He does not always remember what happens.

31.     At some point afterwards, the incarcerated person submitted a 602.  He told me that he did.  I believe that Officer Ruiz and Officer Hernandez were sent to escort him to the interview, so he refused it.  I think he was worried about being assaulted

32.     Witnessing this was scary.  I was SNY and I feel like I have seen it all.  I was incarcerated for over eight years.  But to be in a place where I was not safe alone in my cell, worrying about officers, was scary and unnerving.  I worried that officers would break my neck.  Chokeholds are the norm at COR.  I stopped attending yard because of staff.  I refused because I did not feel safe going.  I felt like I would be attacked because of all the misconduct that I witnessed.  Many other people also refused; I saw them.  I would attend EOP group because different officers escorted me there.

33.     In my opinion, staff target people in the EOP ASU who need help.  We need treatment and help and we are unable to access it because we worried about being assaulted.  Custody officers try to make it impossible to access mental health care.  I believe people who were suicidal were not able to tell staff that they felt suicidal because

1 they did not trust that they would get mental health care.  Staff would put you in a cage,

2 search your cell and beat you up.  I believe they did not want to do the paperwork

3 associated with people who felt suicidal.

4       34.     We call it "Crooked Corcoran" for a reason.  COR has some of the worst

5 misconduct of any other prison that I have been to.  I have been to SAC, Folsom State

6 Prison, Salinas Valley State Prison, Wasco State Prison, California Substance Abuse

7 Treatment Facility, California Correctional Institution, Richard J. Donovan Correctional

8 Facility, Ironwood State Prison, Calipatria State Prison, High Desert State Prison, San

9 Quentin State Prison, North Kern State Prison, and Kern Valley State Prison.

10      I declare under penalty of perjury under the laws of the State of California that the

11 foregoing is true and correct, and that this declaration is executed at Harbor City,

12 California this 23rd day of September, 2020.

# Exhibit 36a

## Filed Under Seal

# Exhibit 37

**CALIFORNIA STATE PRISON, CORCORAN**
***Armstrong* Monitoring Tour Report**
**November 2019**

I.      INTRODUCTION ...................................................................2

II.     CUSTODY STAFF RESPONSIBILITIES ..............................................3

      A.      ADA Orientation for Class Members and Staff.............................3

      B.      Access to TTY/TDD for Class Members with Hearing Impairments..................................................................5

      C.      Individual Disability Accommodation Concerns ...........................6

III.    JOINT CUSTODY AND HEALTH CARE STAFF RESPONSIBILITIES .....9

      A.      Program Access for Class Members in the CTC...........................9

IV.     PHYSICAL PLANT CONCERNS.....................................................10

      A.      Access to ADA Showers .....................................................10

      B.      Access to Dayroom in LTRH Units...............................19

      C.      Path of Travel .................................................................20

      D.      In-Cell Accommodations for Wheelchair Users..........................22

V.      REASONABLE ACCOMMODATIONS PANEL (RAP) RESPONSIBILITIES ..............................................................22

      A.      Failure to Identify or Address Disability-Related Concerns...........23

      B.      Failure to Conduct and Document Disability-Related Evaluations... 24

      C.      Failure to Consider and Facilitate Reasonable Accommodations .26

      D.      Failure to Substantively Respond to Disability-Related Requests .... 27

VI.     STAFF MISCONDUCT ...............................................................28

VII.    REQUESTS AND RECOMMENDATIONS.....................................31

ATTACHMENTS:

- Attachment A: Letter from Don Specter, Prison Law Office, to Ralph Diaz, Secretary of CDCR, Corcoran Staff Misconduct (June 8, 2020)

- Attachment B: List of Class Members who are Inappropriately Housed per DPP Matrix

- Attachment C: Housing Accommodations (produced by Corcoran ADA staff in response to Attachment B)

## I.   INTRODUCTION

In November 2019, a team from the Prison Law Office visited the California State Prison, Corcoran (COR) to monitor the prison's compliance with the *Armstrong* Remedial Plan (ARP), *Armstrong* court orders, and Americans with Disabilities Act (ADA).

The information in this report is based upon interviews with class members, interviews with staff, tours of the facility, and review of documents received during this monitoring period of February 2019 to October 2019.  During the tours, we interviewed 41 class members—approximately 22% of the total DPP population housed at the institution at the time of the tour.

| DPP Codes (November 2019) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DPW | DPO | DPM | DLT | DNM | DNH | DPV | DNV | DPS | LD |
| 14 | 16 | 14 | 57 | 35 | 48 | 4 | 1 | 3 | 4 |

This report does not contain an exhaustive list of every class member who raised a concern; some class members, including those fearing retaliation, did not authorize us to use their names.  Many of the issues raised in this report were presented to Corcoran and headquarters staff over the course of the November 2019 tour.  Throughout this report, we make recommendations and requests for information. These requests and recommendations are summarized again at the end of the report.  We have indicated with an asterisk (*) the allegations of noncompliance that we believe should be documented on the accountability logs.

As we reported at our exit meeting, and have subsequently discussed with CDCR's Office of Legal Affairs, we are troubled by Corcoran's performance with respect to the provision of disability accommodations.  Our document review and interviews with staff and class member at Corcoran demonstrated major deficiencies in the DPP program. Members of custody staff lacked basic knowledge of disability issues (*see* pages 3-7). Class members reported serious physical plant access issues, including widespread problems with shower accessibility (*see* pages 9-20).  The performance of Reasonable Accommodations Panel was particularly poor (*see* pages 20-25).  In numerous instances,

3.      Mr. ██, ████, DPO, 4A, 19-04668, requested a sliding board to help him transfer in and out of his wheelchair, along with other property lost when he left KVSP.  The RAP response, issued on August 7, 2019, states, "Per ARP § IV.B.2, you will be evaluated for verification of disability and medical necessity of a sliding board."  First, the statement incorrectly uses the medical necessity standard rather than the reasonable accommodation standard appropriate for these types of requests.      Second, the RAP response fails to render a decision regarding Mr. ██ 's request.  The RAP should have waited to receive input from Mr. ██ 's PCP regarding this request and then issue a response.

## VI.     STAFF MISCONDUCT

Nearly all class members we spoke with reported experiencing some form of staff misconduct at Corcoran.   As noted, we have received more than 40 allegations of harassment and brutality by custody officers at Corcoran.   We have sent numerous advocacy letters on behalf of *Armstrong* and *Coleman* class members who have experienced serious physical abuse by officers.  Earlier this month, our office sent a letter to Secretary Diaz detailing these reports and calling for action to address these serious problems. *See* Attachment A.

Most people we interviewed did not want their experiences or names shared due to fear of retaliation by custody staff.  Class members expressed they often do not request accommodations because they fear custody staff will retaliate against them.  Several class members also reported that they do not submit 602s because they fear that officers will retaliate.   One class member reported that he was severely beaten by custody officers.  When the class member filed a 602, custody staff pulled him into the chapel and told him to withdraw the 602 or he would continue to suffer beatings.  The class member said that he withdrew the 602 after custody staff's threats.  Another class member reported that he was beaten by custody officers, but, before he could file a 602, officers told him that he would be beaten again if he reported the incident by filing a 602.  One class member plainly stated, "Staff will retaliate if you file a 602."  Class members also reported that they frequently do not receive responses to the 602s they file.

We also received a number of staff misconduct reports alleging physical violence or threats of physical violence, undue cell searches, and destruction of personal property.  Class members expressed a pervasive mistrust of custody officers at Corcoran.   For example:

1.      Mr. ████, ████, DPO, 04A██, reported that he often has his dayroom privileges cut short by Officer Rangel in the tower.  Mr. ██

reported that he has to yell and bang on his door to be let out for programming. Mr. ██ believes Officer Rangel's unwillingness to let him out of dayroom is due to a PREA complaint Mr. ██ filed against Officer Rangel in June 2018. Mr. ██ reported that on or around October 2, 2019, Officer Rangel told him, "This is what happens when people file complaints," referring to his loss of dayroom time and the PREA complaint. In another instances, Mr. ██ reported that Officer Rangel stated, "You and ██ (another person in Mr. ██'s section) are like rabid dogs. You know what we do to rabid dogs on the street? Put a bullet in their head." Mr. ██ believes that he cannot talk to any correctional staff about the issues with Officer Rangel because other officers will not help him. Mr. ██ also noted that in October 2019, the yard captain came in to his section and tore up everyone's cell for no apparent reason.

2.      Mr. ██, ██, DPM, 4A██, reported that on or around November 10, 2019, during second watch, a search was conducted of his section. Mr. ██ was instructed by officers to cuff up behind his back. Mr. ██ explained that he needs waist chains in order to push his walker and walk safely. The officers told Mr. ██ that they did not have waist chains, so his hands would need to be zip tied behind his back. The officers proceeded to force Mr. ██'s arms behind his back. They then pulled Mr. ██ by his clothes and zip tied his hands so tightly that they began to turn purple. Mr. ██ was placed in a holding cell after being escorted by four officers. While he was being placed in the holding cell, Mr. ██ heard one officer say, "Break it," to another officer—referring to Mr. ██'s finger, which the officer had in his hand. The officer then said: "We run this how we run this," meaning that the officers have control of how things are done at Corcoran. Mr. ██ does not know the officers names, but noted that Sgt. Brown was present.

3.      Mr. ██, ██, DLT, 4A██, reported that on May 10, 2019, his section had mandatory yard. Mr. ██'s walker at the time had a broken wheel, which made it difficult to use. Because of the broken walker, Mr. ██ explained to officers that he could not go all the way out to the yard recreation cages and asked if he could be put in the hallway holding cell during yard. Officers initially agreed to Mr. ██'s request, but then changed their minds and told Mr. ██ he would have to go to the yard. Mr. ██ tried explaining that he had already come to an understanding with officers. The officer told Mr. ██ that he was not going to get any "special accommodations." Mr. ██ was struggling to walk with his

broken walker as officers grew impatient. Mr. ██ reported that officers then threw him to the ground because he was not walking fast enough. The officers pinned Mr. ██ down and began to punch him in the face. Mr. ██ received a RVR for allegedly kicking an officer during the incident, which Mr. ██ denies doing. Mr. ██ wrote an 1824, 19-3165, after the incident. The RAP response states that a non-compliance log entry was initiated and the 1824 was converted to a 602 (CSPC-7-19-3166) for processing as a staff misconduct complaint. The 602 response issued to Mr. ██ found that staff did not violate CDCR policy during this incident.

4.     Mr. ██, ██, DNM, Z, reported that on September 24, 2019, he went to pick up his kosher meal from the chow hall on 3A. Mr. ██ typically takes his meal and drink with him to eat in his cell. On this day, Mr. ██ was stopped by a lieutenant and told that he cannot bring his beverage out of the chow hall. Mr. ██ had only been at Corcoran for five days at the time and had no issue bringing a beverage home the previous four days. However, Mr. ██ complied with the lieutenant's request and dumped the drink and continued on his way to his cell. Mr. ██ was then stopped by Officer Wolfe. Officer Wolfe asked Mr. ██ if he had any problem with him, calling Mr. ██ back. Officer Wolfe then grabbed Mr. ██ by the shoulder and said, "Put your fucking arms up," while holding onto Mr. ██'s shirt collar and pushing him against a wall. Officer Wolfe kicked Mr. ██'s legs, causing them to buckle, and slammed Mr. ██ on the ground, while putting his knees on his face. Mr. ██ heard his nose crack under the weight of Officer Wolfe's knee. Mr. ██ told Officer Wolfe that he has a mobility impairment, and Officer Wolfe said, "So fucking what?" Officer Wolfe then proceeded to put his boot on Mr. ██'s head as he high-fived the lieutenant and gave other officers fist bumps. Mr. ██ was assisted up by a female officer and placed in a seated position. Officer Wolfe then took Mr. ██'s watch forcefully, ripping the band, and stomped on it. Mr. ██ angered by what had transpired, told Officer Wolfe, "You're a straight bitch" for breaking his watch. Officer Wolfe responded that he has people on the yard who can "jump on [him]." Mr. ██ was placed into a holding cell after the incident and received a RVR for allegedly trying to elbow Officer Wolfe while he was against the wall. Mr. ██ explained that in the 30 years he has been in and out of prison, he has never had a confrontation with an officer. Mr. ██ does not know why Officer Wolfe would target him in this way. When Mr. ██ arrived to Corcoran five days prior to the incident, he heard other officers confronting people and calling them names like "little bitch." Mr. ██

tends to keep his distance from officers and not bother them, so he was confused as to why Officer Wolfe would assault him.  Mr. ▆▆ now fears being attacked again.  Mr. ▆▆ reported he filed a 602 regarding the incident, but had not received a response.  An individual advocacy letter was sent to CDCR on Mr. ▆▆'s behalf, but we have not received a response at this time.  *See* Letter from Patrick Booth, Prison Law Office, to Russa Boyd, Office of Legal Affairs, ▆▆▆▆▆, ▆▆▆▆, COR (Feb. 12, 2020).

5.      A DLT class member in 3A reported that he was beaten up by correctional officers for wanting to bring his wheelchair into his cell.  He said that he was beaten in the open, and that the lieutenant on third watch knows about the beating.  He also reported that officers told him that if he reported the incident, the beatings would continue to happen.  He also said that the beatings occur frequently, and Officer Wolfe is the biggest instigator of violence.  He reported that he has seen third watch officers (Officer Wolfe, Officer Parra, and a female officer) assault five people in the last three weeks prior to the tour.

        The issue of staff misconduct at Corcoran appears to broadly affect *Armstrong* and *Coleman* class members, as well as non-class members, housed on all yards of the prison.  We have reported to CDCR incidents of Corcoran staff brutally assaulting *Coleman* class members in retaliation for reporting staff misconduct.  *See* Letter from Margot Mendelson & Patrick Booth, Prison Law Office, to Nick Weber, Office of Legal Affairs, ▆▆▆▆▆, ▆▆▆▆, CSP-SAC (Feb. 14, 2020).  We have also reported to CDCR allegations of Corcoran custody staff engaging in a cell phone trade and organizing "gladiator fights."  *See* Letter from Margot Mendelson & Patrick Booth, Prison Law Office, to Nick Weber, Office of Legal Affairs, ▆▆▆▆▆▆, ▆▆▆▆, COR (June 8, 2020).  The staggering number of reports that we have received about staff misconduct at Corcoran indicate that significant action must be taken to address the culture of violence and lack of accountability at the institution.

## VII.    REQUESTS AND RECOMMENDATIONS

•    We recommend that Corcoran ADA staff make greater efforts to inform class members of the accommodations available to them during orientation.  We also recommend that class members be better informed regarding the availability and use of 1824 forms.  This could be done by having ADA staff meet one-on-one with incoming class members, as is the practice at other institutions.

     Additionally, we recommend that staff be retrained on ADA accommodations and the DPP, including training on the difference between the DPP and DDP.  We also

# Exhibit 38



<div align="center">

**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

</div>

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Shira Tevah

VIA EMAIL ONLY

February 21, 2020

Ms. Russa Boyd
CDCR Office of Legal Affairs

    RE:   *Armstrong* Advocacy Letter
        ███████ ███████, COR

Dear Ms. Boyd:

    We write on behalf of *Armstrong* class member ███████ DNH, DLT, who is housed at California State Prison, Corcoran ("Corcoran"). Mr. ████ reports that custody officers at Corcoran improperly confiscated the hearing aids he purchased, which have not yet been returned to him.

    In April 2017, Mr. ████ was housed at North Kern State Prison, where he requested and was approved to order two "Oticon miniRITE" hearing aids. Exhibit A, CDCR 7536 DME Supply Receipt, April 21, 2017. The CDCR 7536 documenting the approval for his request states that the combined cost of the hearing aids was $1,190.00. *Id.* Similarly, Mr. ████'s CDCR Inmate Statement Report has three separate withdrawals from April 24, 2017, to May 9, 2017 for hearing aids, totaling $1010.93. Exhibit B, CDCR Inmate Statement Report, July 18, 2019. Mr. ████ reports that he received the hearing aids, and they worked very well for him. He states that these hearing aids allowed him to him hear much more clearly than he could when he used the state-issued hearing aids.

    In June 2017, Mr. ████ was transferred from North Kern State Prison to Centinela State Prison, and in December 2018, he was transferred to Corcoran. During this period, Mr. ████ reports that he was permitted to continue using his personal Oticon hearing aids. On October 22, 2019, however, more than two years after purchasing and continuously using his hearing aids, Mr. ████ reports that custody officers searched his cell and confiscated his hearing aids. Exhibit C, CDCR Form 1824, Log No. 19-6764. He reports that custody staff did not give him a CDCR Form 1083, or a cell-search receipt, to document the confiscation, but they did tell him that medical staff "will give [him] new and better [hearing aids] for free." *Id.* at p. 2. On October 28, 2019, Mr. ████ was referred for an audiology appointment, and he received state-issued hearing aids on November 21, 2019. CDCR 7536 DME Supply Receipt, November 21, 2019. He reports that he hears less clearly with his state-issued hearing aid than he did with the hearing aid that he had previously purchased.

    On October 29, 2019, Mr. ████ submitted a CDCR Form 1824 ("1824") to request "my hearing aids back and or [*sic*] be reimbursed the money that I payed [*sic*] for those hearing aids off my trust account dated 4-21-17, 4-27-17, 5-9-17." Exhibit C, *supra*, at p. 2. On November 12, 2019, the RAP issued its response to Mr. ████, stating in part, "your reimbursement concerns would be best addressed

<div align="center">

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

</div>



Ms. Russa Boyd
Re: ▇▇▇▇
February 21, 2020
Page 2

through the Inmate Appeals (CDCR 602) system." *Id.* at p. 1.  The RAP response does not address Mr. ▇▇▇'s allegation of the inappropriate confiscation of his DME by custody officers.  Mr. ▇▇▇ reports that he submitted a CDCR Form 602 ("602") on October 29, the same day he submitted his 1824, but he never received a response.[*]  He still has not received his original hearing aids back, nor has he been reimbursed.

Mr. ▇▇▇'s report raises two important issues.  First, we are concerned that custody officers at Corcoran improperly confiscated Mr. ▇▇▇'s DME and provided no documentation.  Upon transferring to Corcoran, Mr. ▇▇▇ should have been permitted to keep his hearing aids unless his primary care physician evaluated him and determined that the hearing aids were no longer appropriate.  *See* California Correctional Health Care System, Health Care Department Operations Manual ["HCDOM"], 3.6.1 (e)(8)(B) ("At the receiving institution, all previously prescribed DME and medical supplies shall continue to be provided unless a PCP at the receiving institution re-evaluates the patient and determines the DME or medical supplies are no longer medically necessary to ensure patients have equal access to prison services, programs, or activities.").

Second, we are concerned about the RAP's failure to address the substantive issues raised in Mr. ▇▇▇'s 1824.  The Americans with Disabilities Act and *Armstrong* Remedial Plan both require a grievance procedure that provides prompt and equitable resolution of disability-related complaints.  *See* 28 C.F.R. §35.107; ARP § IV (I)(23)(a).  The RAP here does not address the allegation that custody officers inappropriately confiscated Mr. ▇▇▇'s DME and does not appear to have placed the allegations on the non-compliance log.  The RAP therefore failed in its purpose to investigate and address disability-related issues.  For example, it may be that additional training should be provided to officers about DME removal.  By failing to address Mr. ▇▇▇'s main concern – that his hearing aids were improperly confiscated – the RAP also does not provide him with a complete response.  *See* 1824 Desk Reference Manual (October 2, 2017) at 13 ("The importance of providing a thorough response to the inmate cannot be overstated.  In addition to providing a means to inform the inmate of the RAP's decision, a well written RAP response also becomes the basis for auditors, appeal/grievance staff, and ultimately the courts to determine whether an issue raised on a CDCR 1824 was thoroughly addressed.").  As you know, we have expressed concern that the poorly functioning RAP system at Corcoran undermines the goals of the *Armstrong* Remedial Plan.  *See, e.g.*, Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ▇▇▇, ▇▇▇, COR (Feb. 11, 2020) ("The RAP's continual

---

[*]  A number of class members at Corcoran on all yards have reported that their 602s go unanswered.  Others report that 602s reporting staff misconduct are not kept confidential and that they are told to withdraw them.  *See, e.g.*, Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ▇▇▇, ▇▇▇, COR (Feb. 12, 2020) ("One class member reported that when he filed a 602 to report his own assault, custody staff brought him into a secluded area and told him that if he did not withdraw the 602, he would suffer more beatings.  He reported that he immediately withdrew his 602.").  Not only is the appeals process important for safe and fair operation of the prison, but it is also a necessary component of the *Armstrong* Remedial Plan ("ARP").  ARP § IV (I)(23)(a) ("An inmate/parolee with a disability may request an accommodation, to access programs, services, activities or grieve alleged discrimination, through the CDC Form 1824 appeal process.").  Multiple *Armstrong* class members have reported to our office that they do not file 602s or 1824s because they believe it is futile.



Ms. Russa Boyd
Re:
February 21, 2020
Page 3

failure to reasonably address disability-related requests threatens to undermine the 1824 process. Multiple *Armstrong* class members have reported to our office that they do not file 1824s, even if they need an accommodation, because of the insufficient RAP responses.").

*****

In light of these concerns, we request:

1. An explanation why Mr. █████'s hearing aids were confiscated and all related documentation;

2. That  Corcoran ADA and custody staff receive additional training about whether and when someone's DME may be removed by custody staff;

3. That Corcoran ADA staff receive additional training on how to adequately address disability-related requests through the 1824 process; and

4. That Mr. █████'s hearing aids be returned to him or that he be reimbursed for them.

Thank you for your prompt attention to this matter.

Sincerely,

Patrick Booth
Legal Fellow

cc:     Mr. █████ (redacted)
        Co-Counsel
        Ed Swanson, Court Expert
        Nicholas Meyer, Erin Anderson, Alexander Powell, Amber Lopez,
        OLAArmstrongCAT@cdcr.ca.gov, Tamiya Davis, Patricia Ferguson (OLA)
        Lois Welch, Matt Espenshade, Steven Faris (OACC)
        Kelly Mitchell, Teauna Miranda, Laurie Hoogland, Landon Bravo (DAI)
        John Dovey, Vince Cullen, Don Meier, Laurene Payne, Ceasar Aguila, Samantha Lawrence-
        Chastain, Olga Dobrynina, m_CCHCSAccntLog@cdcr.ca.gov, Alexandrea Tonis, Barbara Pires,
        Bruce Beland, Bryan McCloughan, Cathy Jefferson, Ceasar Aguila, Cindy Flores, Dawn Malone-
        Stevens, Desiree Collum, Donald Meier, Gently Armedo, John Dovey, Laurene Payne, Lynda
        Robinson, Ngoc Vo, Robin Hart, Steven Blum, Joseph Williams (CCHCS)
        Adriano Hrvatin, Joanna Hood, Damon McClain, Sean Lodholz (DOJ)
        Annakarina De La Torre-Fennell (OAG)

# EXHIBIT A

Case 4:94-cv-02307-CW Document 3107-1 Filed 09/25/20 Page 497 of 691

STATE OF CALIFORNIA
DURABLE MEDICAL EQUIPMENT AND MEDICAL SUPPLY RECEIPT
CDCR 7536 (12/15)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 1 of 1
Instructions: Pages 2 and 3

**Section A (Approved DME/Medical Supply To Be Issued):**

I have received the following items today:

DME/Medical Supply: _Hearing Aids_  Quantity: _2_

DME/Medical Supply (if not listed in drop down): _____  Quantity: _____

Make: _Oticon_  ☐ N/A

Model: _Rim 2_

Model (if not listed in drop down): _NWINIRITE_

Serial Number: _44407469/45470313_ ☐ N/A  Size: _____  Other: _____

Vendor: _YHN_  Vendor (if not listed in drop down): _____  ☐ N/A

Type of Issuance: ☑ Purchased  ☐ Loaned  ☐ One-for-One Exchange

☑ Permanent  ☐ Temporary  Expiration Date: _____

Cost of DME: $1190.00  ☐ CDC 193, Trust Account Withdrawal Order, completed  ☐ N/A

Comments:

**Section B:**

☑ Received DME/Medical Supply  ☐ Refused DME/Medical Supply (Initiate referral to provider to complete CDC 7225, Refusal of Examination and/or Treatment, and discuss Patient Education.)

☐ PATIENT REFUSED TO SIGN RECEIPT
*WITNESS NAME/SIGNATURE REQUIRED IF PATIENT REFUSED TO SIGN

Patient Signature  Date: 4-21-17  RECEIPT

Issuing Staff (Print Name and Title): Veronica Balderas II.S  Issuing Staff Signature  Date: 4-21-17

Witness (Print Name and Title)  Witness Signature  Date

**Section C:**
Date of CDCR 7221-DME: 4-21-17  Ordering Provider's Name: Veronica Balderas

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☑ Additional time | ☑ Patient asked questions | CDCR #: |
| ☐ DPH☐ DPV☐ LD | ☐ Equipment☐ SLI | ☑ Patient summed information | Last Name: |
| ☐ DPS☐ DNH | ☐ Louder☑ Slower | Please check one: | |
| ☐ DNS☐ DDP | ☐ Basic☐ Transcribe | ☐ Not reached*☑ Reached | First Name: MI: |
| ☐ Not Applicable | ☑ Other* | *See chrono/notes | DOB: Housing: D3 Institution: |
| 4. Comments: Hearing Aids to U + take 6.7 | | | |

Distribution: Original-Health Record-Property Receipts; Receipts-Miscellaneous, Main Tab-Misc/OF; Copies-Patient, C&PR/RC CCIII, Assistant C&PR, ADA Coordinator, Class Action
Management Unit CCII, Institutional Health Care Compliance Analyst, R&R Property, Trust Office
Content 360: Event Code/Doc Type-DME/Health Care Appliances-Scan; Grouper-Procedures/Interventions; Sub Grouper-Durable Medical Equipment
Scanning Location: Outpatient; Property Receipts; Receipts-Misc; Misc\OF-Main Tab, Inpatient; Property Transfer Receipt; Sub Tab; Admin

Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.

# EXHIBIT B

Date\Time: 7/18/2019 6:45:14 AM
Institution: COR

**CDCR**
Verified: _____

# Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| ▇▇▇ | ▇▇▇▇▇▇ | COR | 03B002 1 | ▇▇▇ |

**Current Available Balance:** $0.00

## Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 03/17/2017 | NKSP | BEGINNING BALANCE | | | | $0.00 |
| 03/17/2017 | NKSP | INMATE DEPOSIT | 31717 SCL1096013 | 8862 | $634.68 | $634.68 |
| 03/22/2017 | NKSP | SALES | 18 | | ($109.85) | $524.83 |
| 03/31/2017 | NKSP | JPAY | 0000000070523129 | | $200.00 | $724.83 |
| 04/04/2017 | NKSP | MEDICAL COPAY | 33017 MD | | ($5.00) | $719.83 |
| 04/12/2017 | NKSP | JPAY | 0000000071000609 | | $200.00 | $919.83 |
| 04/19/2017 | NKSP | SALES | 15 | | ($108.90) | $810.93 |
| 04/24/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($810.93) | $0.00 |
| 04/27/2017 | NKSP | JPAY | 0000000071502774 | | $200.00 | $200.00 |
| 04/27/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 04/27/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 04/27/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($90.00) | $0.00 |
| 05/09/2017 | NKSP | JPAY | 0000000071989598 | | $200.00 | $200.00 |
| 05/09/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 05/09/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 05/09/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($90.00) | $0.00 |
| 05/27/2017 | NKSP | JPAY | 0000000072566795 | | $200.00 | $200.00 |
| 05/27/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 05/27/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 05/27/2017 | NKSP | DAMAGES - PERSONAL ITEMS | 51717 SHOES | | ($7.85) | $82.15 |
| 06/10/2017 | CEN | TRACS TRANSFER IN | TX06102017 | | $82.15 | $82.15 |
| 06/10/2017 | NKSP | TRACS TRANSFER OUT | TX06102017 | | ($82.15) | $0.00 |
| 06/20/2017 | CEN | SALES | 44 | | ($82.15) | $0.00 |
| 07/07/2017 | CEN | JPAY | 0000000074002980 | | $33.00 | $33.00 |
| 07/11/2017 | CEN | GROUP TRANSFER OUT | CKN/BC5169 | | ($31.50) | $1.50 |
| 07/12/2017 | CEN | SALES | 61 | | ($1.50) | $0.00 |
| 07/20/2017 | CEN | JPAY | 0000000074443801 | | $150.00 | $150.00 |
| 07/20/2017 | CEN | JPAY | 0000000074466238 | | $50.00 | $200.00 |
| 07/21/2017 | CEN | SALES | 11 | | ($200.00) | $0.00 |
| 07/27/2017 | CEN | GROUP TRANSFER IN | CKN/BC5169 | | $5.00 | $5.00 |
| 08/03/2017 | CEN | JPAY | 0000000074912632 | | $160.00 | $165.00 |

*total $1,096.93* (handwritten annotation)

# EXHIBIT C

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

RAP Meeting Date: 11/7/2019          Date IAC Received 1824: 11/1/2019          1824 Log Number: CSPC -19-6764

Inmate's Name: [ ]          CDCR #: [ ]          Housing: 3B02- [ ]

**RAP Staff Present:**          ADA Coordinator   R. Juarez , Custody Appeals Coordinator   J. Ceballos , Health Care Appeals Coordinator A. Ybarra, Health Care Compliance Analyst  C. Aguilera ,  Chief Medical Executive   M. Russell , Psychologist B, Adam,    Education staff  G. Doan , ADA LVN  K. James

**Summary of Inmate's 1824 Request:** Claims hearing aids were thrown out during cell searches. Requesting to be reimbursed.

### Interim Accommodation:

☒ No interim accommodation required:

☐ Interim Accommodation provided (List accommodation and date provided):

☐ RAP rescinding interim accommodation:

### FINAL RESPONSE:

**Response:** Your request was initially reviewed on 11/07/2019 and the Reasonable Accommodation Panel (RAP) was able to render a decision. You are identified as having a physical/hearing disability and are designated as DLT and DNH. It is noted you are a participant in the Mental Health Delivery System (MHDS) at the Correctional Clinical Case Management System (CCCMS) level of care. The RAP notes your TABE is 6.2. It is noted on the Interim Accommodation Procedure (IAP) you are safely accessing all programs, services, and activities. Per the Medical Disability Verification Process (DVP) Worksheet dated 11/07/2019; "I/P was seen by the PCP on 10/28/2019 in which an RFS was submitted for audiology. The RFS was entered as medium priority..." The RAP notes your reimbursement concerns would be best addressed through the Inmate Appeals (CDCR 602) system. While you are without your hearing aids, you are to wear your Hearing Impaired vest while outside of your cell.

**Direction if dissatisfied:** If you disagree with a medical diagnosis or treatment decision on which the Reasonable Accommodation Panel (RAP) relied in reaching its conclusion, you can file a blue CDCR 602 Health Care Grievance. Other disagreements with disability access or disability discrimination decisions should be filed on a green CDCR 602. Ensure you attach a copy of this response along with your CDCR 1824 as supporting documents.

**EFFECTIVE COMMUNICATION:** A review of the Test of Adult Basic Education list reveals you have a Reading Grade Point Level **above 4.0**, however, the Strategic Offender Management System (SOMS) shows you are DNH, therefore you **do require special accommodation** to achieve effective communication.

R. JUAREZ
ADA Coordinator/Designee          Signature          Date sent to inmate:   NOV 1 2 2019

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDCR Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| | 19-01064 | RECEIVED NOV - 1 2019 INMATE APPEALS OFFICE |

*********TALK TO STAFF IF YOU HAVE AN EMERGENCY*********
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| | | | 3-B-0-2 |

INSTRUCTIONS:
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
The Problem is 10-22-19 My Cell Was Searched and My Hearing Aids Were thrown Away. With the trash I ask the Officer and He Said that I was Not Allowed to Have those kind any more ation "Mininite" People First and that they will give Me New and Better ones For Free I Replaced that I payed For those all My trust Account

**WHY CAN'T YOU DO IT?**
Officer Replyed thay Don't Care So I Didn't argue I Have Reported this to Dr. Warner and She Has Schulte me For Hearing No Regard ess I payed For those Hearing Aids off My trust Account I Shold Have Been Giving the Option to Mail Home or Donate Not only that Officers

**WHAT DO YOU NEED?**
Should Be trained properly on DME that we Can & Cant Have Im Requesting For My Hearing Aids Back and or Be Reimbursed the Money that I payed For those Hearing Aids off my trust Account Dated 4-21-17  4-27-19  5-9-17 those and the Dates that Money was took off trust Account For these Hearing Aids I under Stand DME is Free Now But then it Wasn't it payed For those Hearing Aids And Would like to be Reinbursed and/or Coinsated For My Hearing  (Use the back of this form if more space is needed)
Aids that I Where throwin away than s You

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**  Yes ☐  No ☐  Not Sure ☐
List and attach documents, if available:

I understand that staff have a ███████ failure to cooperate may cause this request to be disapproved.

_____  10-27-19
**INMATE'S SIGNATURE**  **DATE SIGNED**

Assistance in completing this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

Date\Time: 12/12/2017 3:45:57 PM

Institution: HDSP

CDCR

Verified: _____

Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| | | HDSP | B 001 1 | |

Current Available Balance: $30.02

## Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 03/15/2017 | NKSP | BEGINNING BALANCE | | | | $0.00 |
| 03/17/2017 | NKSP | INMATE DEPOSIT | 31717 SCL1096013 | 8852 | $634.68 | $634.68 |
| 03/22/2017 | NKSP | SALES | 18 | | ($109.85) | $524.83 |
| 03/31/2017 | NKSP | JPAY | 0000000070523129 | | $200.00 | $724.83 |
| 04/04/2017 | NKSP | MEDICAL COPAY | 33017 MD | | ($5.00) | $719.83 |
| 04/12/2017 | NKSP | JPAY | 0000000071000609 | | $200.00 | $919.83 |
| 04/19/2017 | NKSP | SALES | 16 | | ($108.90) | $810.93 |
| 04/24/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($810.93) | $0.00 |
| 04/27/2017 | NKSP | JPAY | 0000000071502774 | | $200.00 | $200.00 |
| 04/27/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 04/27/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 04/27/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($90.00) | $0.00 |
| 05/09/2017 | NKSP | JPAY | 0000000071989598 | | $200.00 | $200.00 |
| 05/09/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 05/09/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 05/09/2017 | NKSP | ARTIFICIAL APPLIANCE | 42117 HEARING AIDS | | ($90.00) | $0.00 |
| 05/27/2017 | NKSP | JPAY | 0000000072566795 | | $200.00 | $200.00 |
| 05/27/2017 | NKSP | RESTITUTION FINE PAYMENT | | | ($100.00) | $100.00 |
| 05/27/2017 | NKSP | ADMINISTRATIVE FEE | | | ($10.00) | $90.00 |
| 05/27/2017 | NKSP | DAMAGES - PERSONAL ITEMS | 51717 SHOES | | ($7.85) | $82.15 |
| 06/10/2017 | CEN | TRACS TRANSFER IN | TX06102017 | | $82.15 | $82.15 |
| 06/10/2017 | NKSP | TRACS TRANSFER OUT | TX06102017 | | ($82.15) | $0.00 |
| 06/20/2017 | CEN | SALES | 44 | | ($82.15) | $0.00 |
| 07/07/2017 | CEN | JPAY | 0000000074002980 | | $33.00 | $33.00 |
| 07/11/2017 | CEN | GROUP TRANSFER OUT | CKN/BC5169 | | ($31.50) | $1.50 |
| 07/12/2017 | CEN | SALES | 61 | | ($1.50) | $0.00 |
| 07/20/2017 | CEN | JPAY | 0000000074443801 | | $150.00 | $150.00 |
| 07/20/2017 | CEN | JPAY | 0000000074466238 | | $50.00 | $200.00 |
| 07/21/2017 | CEN | SALES | 11 | | ($200.00) | $0.00 |
| 07/27/2017 | CEN | GROUP TRANSFER IN | CKN/BC5169 | | $5.00 | $5.00 |
| 08/03/2017 | CEN | JPAY | 0000000074912632 | | $160.00 | $165.00 |

2

Date\Time: 12/12/2017 3:45:57 PM

Institution: HDSP

**CDCR**
**Inmate Statement Report**

Verified: _____

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 08/09/2017 | CEN | SALES | 17 | | ($19.99) | $145.01 |
| 08/16/2017 | CEN | JPAY | 0000000075406449 | | $50.00 | $195.01 |
| 08/17/2017 | CEN | JPAY | 0000000075418149 | | $180.00 | $375.01 |
| 08/22/2017 | CEN | SALES | 3 | | ($220.00) | $155.01 |
| 09/19/2017 | CEN | TRACS TRANSFER OUT | TX09192017 | | ($155.01) | $0.00 |
| 09/19/2017 | CIM | TRACS TRANSFER IN | TX09192017 | | $155.01 | $155.01 |
| 09/20/2017 | COR | TRACS TRANSFER IN | TX09202017 | | $155.01 | $155.01 |
| 09/20/2017 | CIM | TRACS TRANSFER OUT | TX09202017 | | ($155.01) | $0.00 |
| 09/21/2017 | COR | TRACS TRANSFER OUT | TX09212017 | | ($155.01) | $0.00 |
| 09/21/2017 | HDSP | TRACS TRANSFER IN | TX09212017 | | $155.01 | $155.01 |
| 10/05/2017 | HDSP | JPAY | 0000000077099361 | | $160.00 | $315.01 |
| 10/05/2017 | HDSP | SALES | 7 | | ($164.99) | $150.02 |
| 10/06/2017 | HDSP | JPAY | 0000000077165749 | | $20.00 | $170.02 |
| 10/18/2017 | HDSP | MEDICAL COPAY | MED 10/16/17 | | ($5.00) | $165.02 |
| 10/19/2017 | HDSP | SALES | 13 | | ($165.00) | $0.02 |
| 10/27/2017 | HDSP | JPAY | 0000000077837030 | | $200.00 | $200.02 |
| 11/21/2017 | HDSP | MEDICAL COPAY | MED 11/20/17 | | ($5.00) | $195.02 |
| 11/22/2017 | HDSP | SALES | 9 | | ($165.00) | $30.02 |

**Encumbrance List**

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|
| | **No information was found for the given criteria.** | |

**Obligation List**

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|
| | | **No information was found for the given criteria.** | | |

**Restitution List**

| Restitution | Court Case# | Status | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|---|---|
| RESTITUTION FINE | B1686542 | Fulfilled | $300.00 | $0.00 | ($300.00) | $0.00 |

3

# Exhibit 39



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

June 8, 2020

Nick Weber
CDCR Office of Legal Affairs

> Re: *Coleman* Advocacy Letter
> ███████████, ██████, KVSP

Dear Mr. Weber:

We write on behalf of *Coleman* class member ███████████, ██████, CCCMS, who is housed at Kern Valley State Prison ("KVSP"). Prior to being housed at KVSP, Mr. ██████ was housed at California State Prison, Corcoran ("Corcoran"), where he reports that he was assaulted by correctional officers in December 2019.

What follows is Mr. ████████'s account of the staff misconduct incident. On December 24, 2019, around 4 AM, Mr. ████████ was in his cell in Corcoran's Unit 3C04, when he saw Correctional Officers A. Guzman and S. Rojas slide a cellphone under his cell door. Mr. ██████ reports that everyone in his housing unit was in their cells at the time. When the phone appeared in his cell, Mr. ██████ was confused and scared. He initially believed that the officers were "setting him up" – or planting contraband in his cell before conducting a raid in order to punish him. Shortly before this incident, Mr. ██████ had reported to the sergeant that he was not being permitted to shower in the evenings, even though he was a night worker and should have been allowed to do so. Mr. ██████ feared that Officers Guzman and Rojas might be retaliating against him after his reports to their superior. To conceal the contraband evidence and avoid punishment, Mr. ██████ immediately inserted the cellphone into his rectum.

Minutes after the two officers slid the phone under his door, they returned to his cell and asked him to hand the phone back. Mr. ████████, still believing the officers to be setting him up, denied possessing the cellphone. The officers asked him again to return the phone, and Mr. ██████ again denied having it. The officers then left his cell and returned several minutes later with two other incarcerated men who were housed in the same unit. Both of these individuals are from the same community outside of prison as Mr. ██████, and they are all friends in prison as well. Mr. ██████ believed the officers asked his two friends to persuade him to return the phone. Indeed, the two incarcerated individuals attempted to convince Mr. ██████ to hand the phone to the officers. However, the officers were still present when this conversation was happening, and Mr. ████████ continued to believe that the officers were setting him up for punishment. Accordingly, he told his friends and the officers that he did not have the cellphone.

The officers brought the two individuals back to their respective cells after their attempts to persuade Mr. ██████ were unsuccessful. Mr. ██████ heard the officers say that they would "handle

**Board of Directors**
Penelope Cooper, President, Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Mr. Nick Weber
Re: █████████████,
June 8, 2020
Page 2

the problem" on their own.  They put on gloves and entered his cell.  Mr. █████ was not ordered to submit to cuffing.  Instead, Officer Rojas suddenly rushed at him and slammed into him, causing the back of Mr. █████'s head to knock against the wall.  While Mr. █████ was bracing himself, Officer Guzman punched Mr. █████ in the jaw, knocking him to floor.  The officers continued to beat Mr. █████ when he was on the floor.

After Mr. █████ was assaulted, emergency medical services were activated at 4:51 AM.  *See* First Medical Responder – DCT, December 24, 2019.  When medical staff first arrived on the scene, Mr. █████ was "confused" and in an "[a]ltered level of consciousness."  *Id.*  Additionally, "[b]oth of his eyes were shut due to eyelid swelling," his "whole face [was] swollen," he had "[d]ried blood in his mouth," a "small laceration … at the back L ear and at the corner of the R eye," as well as "[a]brasions noted at the R side of his neck and R shoulder area."  Progress Note Nurse, December 24, 2019.  Mr. █████ was transferred to an outside hospital for emergency care, where he spent the next seven days.  *See* Outside Records – Hospital, December 31, 2019.  Hospital records indicate that a "foreign body" was also found in and removed from Mr. █████'s rectum.  *See* Outside Records – Hospital, December 31, 2019 at 3.

At the outside hospital, Mr. █████ was determined to have suffered multiple and significant fractures in his face.  *See id.* at 3.  He had "[c]omminuted fractures of the right mandibular angle, [a]dditional fractures of the right zygomatic arch and posterior maxillary antral wall," and a "C6 spinous process fracture."  *Id.*  Because his jaw was broken so severely, it had to be surgically repaired and wired shut for more than a month; Mr. █████ was subsequently placed on a liquid diet plan.  *See id*; *see also* Outside Records – Hospital, January 30, 2020 (noting that Mr. █████'s "[h]ardware from the mandible was removed" on January 30).  Similarly, he was required to wear a neck collar at all times because of the fracture of his spinous process.  *See* Outside Records – Hospital, December 31, 2019 at 3. In addition to his multiple fractures, Mr. █████ suffered a subarachnoid hemorrhage and an intracranial subdural hematoma.  *See id.*  His hospital records also indicate that he experienced cognitive issues as a result of a traumatic brain injury.  *Id.* at 2 ("Pt continues to be limited by impaired safety awareness, impaired problem solving, and dizziness, resulting in decreased independence with self-care tasks."); *id.* at 5 (noting Mr. █████ suffered a "traumatic brain injury").

Upon returning to Corcoran, Mr. █████ was housed in the CTC for 50 days, until February 18, 2020, when he discharged to Corcoran's Administrative Segregation Unit ("ASU") for non-disciplinary reasons.  *See* ASU PrePlacement, February 18, 2020; MHPC Intake Assessment, February 25, 2020.  He remained on a medically-altered diet until February 22, 2020 because of the damage done to his jaw.  *See* Inpatient Progress Note, January 31, 2020.  He reports that when he received his property in the CTC, he was missing his television, his radio, and his chain necklace.  He reports that he still has not received his missing property, and he believes that Officers Rojas and Guzman took his property as "compensation" for the phone that Mr. █████ refused to return.

In the weeks after returning from the outside hospital, the CTC sergeant met with Mr. █████ several times to ask him who assaulted him.  Specifically, the sergeant asked Mr. █████ if custody staff was responsible for the beating.  Mr. █████ says that, for weeks after the incident, he could not

Mr. Nick Weber
Re: ███████████, ███████
June 8, 2020
Page 3

clearly remember what happened to him that night.[1]  Consequently, he was unable to report to the sergeant who had attacked him.  About a month later, however, Mr. ███████'s memory slowly came back to him.  Sometime in late January or early February, he remembered that he was assaulted by Officers Rojas and Guzman, and he requested to speak with the CTC sergeant to report the details of the assault.[2]

When he spoke with the CTC sergeant, the entire conversation was video recorded.  Additionally, Mr. ███████ filed a CDCR Form 602 ("602") to officially document the misconduct.  However, Mr. ███████ was transferred to KVSP on March 6, 2020.  *See* Initial Health Screening, March 6, 2020.  To date, he has not received a response to his 602, nor has he met with anyone about an ongoing investigation into the officers' conduct.

Mr. ███████ was not disciplined for his conduct on December 24, 2019.  Instead, he reports that the two incarcerated men who were sent into his cell to persuade him to return the phone to the officers were punished.  Mr. ███████ believes that both individuals received RVRs and that the officers held these men responsible for Mr. ███████'s injuries.

***Cellphone Trade at Corcoran***

Mr. ███████ reports that some custody officers at Corcoran, including Officers Rojas and Guzman, sell cellphones to individuals housed at the prison.  He reports that officers sell higher value smartphones for $2500 and cheaper phones for $1500.  Mr. ███████ believes that the cellphone that was slid under his cell door on December 24, 2019 was part of this officer-run cellphone trade.  Although Mr. ███████ believed at the time of his attack that he was being set up for punishment, he now believes that the officers mistakenly slid the phone under his door then came back to recover it.  Mr. ███████ reports that he had moved into that cell only two weeks prior to his assault.  He believes that officers either intended to give the cellphone to the previous occupant of that cell or to someone in a different cell in the

---

[1] Retrograde amnesia – or a "partial or total loss of the ability to recall events that have occurred during the period immediately preceding brain injury" – is a common symptom of traumatic brain injuries ("TBIs").  Robert Cantu, *Posttraumatic Retrograde and Anterograde Amnesia: Pathophysiology and Implications in Grading and Safe Return to Play*, Journal of Athletic Training, 2001.  The extent of memory loss differs from case to case, and it is possible for a person to "retrieve" memories that he could previously not recall because of a TBI.  *See* Alice Park, *Scientists Figure Out How to Retrieve 'Lost' Memories*, Time, May 28, 2015 (summarizing a recent study that demonstrates "that memories in certain forms of amnesia aren't erased, but remain intact and potentially retrievable.").

[2] Although Mr. ███████ cannot remember the exact date when he requested to speak with the sergeant, a note in his medical records from February 5, 2020 indicates that Mr. ███████ "was talking to custody officers at cell front and he wanted to talk to the sergeant."  Progress Note – Nurse, February 5, 2020, 18:40:00 PST.  He then "went to see the Hospital Sgt @ 1825 escorted by custody officers and back at 1835."  Progress Note – Nurse, February 5, 2020, 18:53:00.  Two days later, Mr. ███████ reported to his mental health clinician that his medical issues were a result of when he "was assaulted by 'custody.'"  MHPC Intake Assessment, February 7, 2020.

Mr. Nick Weber
Re: ███████████
June 8, 2020
Page 4

same housing unit. Mr. ███████ believes that when the officers mistakenly slid the phone into his cell, they had to recover it in order to give it to the "rightful purchaser." Mr. ███████ reports that Officers Rojas and Guzman are not the only two officers at Corcoran that are engaged in a cellphone trade.

### *Gladiator Fighting*

Mr. ███████ also reports that some officers on Corcoran's 3C yard orchestrate "gladiator fights" when the units are locked down. Mr. ███████ reports having witnessed these gladiator fights on multiple occasions. He says that some floor officers arrange to have two members of one gang fight two members of a rival gang in the dayroom. Mr. ███████ reports that the officers first search all four people to ensure that they have no weapons, then they let the individuals fistfight in the dayroom while officers watch in the control tower. Mr. ███████ reports that the officers place bets on who will win, and the "winners" of the fights receive "prizes" from the officers, like extra snacks from canteen or property that the officers had previously confiscated from other incarcerated people. Based on what Mr. ███████ has heard from incarcerated people on Corcoran's 3C yard, he believes that the gladiator fighting happens in all five buildings on the yard.

Mr. ███████ says that he was once approached by custody officers and asked to participate in one of these fights, but Mr. ███████ declined. He also says that he was too scared to report the gladiator fighting while he was housed at Corcoran. Now that he has been transferred to KVSP, he feels safer speaking out about the ongoing misconduct at Corcoran.

*****

Mr. ███████'s reports, as well as his significant injuries, raise a number of concerns. **First**, we have raised the issue of staff misconduct at Corcoran several times in recent months. In February, we highlighted the significant number of reports we had received about staff assaults and their impact on *Coleman* and *Armstrong* class members:

> During the four month period of September 1 to December 31, 2019, our office has received fifteen additional reports of staff assaults at Corcoran, thirteen of which were reported by *Coleman* class members. Many *Coleman* class members, like Mr. ███████, are reporting to our office that the culture of violence and retaliation perpetuated by custody staff is significantly impacting their mental health. In fact, many of the individuals that have reported staff misconduct to our office allege that custody staff is specifically targeting people with mental health issues. This is unacceptable.

Letter from Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ███████, ███████, CSP-SAC (February 14, 2020).

Since that time, we have continued to receive reports of staff misconduct from *Coleman* class members housed at Corcoran. As we previously noted, CDCR's own data supports these reports, which demonstrates that, "depending on the month, between 65 percent and 88 percent of all use of force incidents at Corcoran involve *Coleman* class members, even though they make up only 44 percent of the



Mr. Nick Weber
Re: █████████,
June 8, 2020
Page 5

institution's population." *Id.* (citing CDCR COMPSTAT DAI Statistical Report – 13 Month (July 11, 2019)).  In short, Mr. ████████'s assault is not an outlier; it appears to be part of a larger pattern of brutal staff misconduct committed against *Coleman* class members at Corcoran.

**Second**, we are concerned that the grievance system at Corcoran is not properly functioning. Many *Coleman* class members have reported to us that they have filed 602s to report staff misconduct, but they never receive a response from the prison.  Similarly, in February, we raised an allegation from a class member "that custody staff are screening out CDCR Form 602s ("602") and other grievance paperwork."  *Id.*  We have also raised the issue of the failed grievance process at Corcoran a number of times in advocacy letters sent on behalf of *Armstrong* class members.  *See, e.g.*, Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ████████, ████████, COR (February 12, 2020) ("Unsurprisingly, other class members that alleged staff misconduct to our office refused to allow us to use their names when reporting to CDCR, each of them fearing retaliation from custody staff.  One class member reported that when he filed a 602 to report his own assault, custody staff brought him into a secluded area and told him that if he did not withdraw the 602, he would suffer more beatings."); Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ████████████, ████████, COR (February 12, 2020) ("A number of class members at Corcoran on all yards have reported that their 602s go unanswered. Others report that 602s reporting staff misconduct are not kept confidential and that they are told to withdraw them.").

Individuals housed at Corcoran are entitled to appeal "any policy, decision, action, condition, or omission" that has "a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs., tit. 15, § 3084.1 (a).  Importantly, "[n]o reprisal shall be taken against an inmate or parolee for filing an appeal." Cal. Code Regs., tit. 15, § 3084.1 (d).  Based on the reports that we have received, serious defects in Corcoran's 602 process impede individuals' ability to grieve legitimate concerns about staff misconduct.

**Third**, Mr. ████████'s reports about officers dealing cellphones and orchestrating gladiator fights are deeply disturbing.  These reports are similar to the significant staff misconduct that occurred at Corcoran in the 1990s, when the FBI "accused [custody officers] of staging gladiator-style fights among prisoners in exercise yards and shooting at the inmates when they did not stop fighting on command." Evelyn Nieves, *California Examines Brutal, Deadly Prisons*, The New York Times, Nov. 7, 1998 (available at: https://www.nytimes.com/1998/11/07/us/california-examines-brutal-deadly-prisons.html). That this type of corruption may be continuing at Corcoran only underscores a profound failure of accountability at the institution.

In light of these concerns, we request that CDCR conduct a full and impartial investigation into Mr. ████████'s allegations of staff abuse and take steps to monitor the conduct of officers in Mr. ████████'s housing unit. We request that this matter be investigated by CDCR staff members from outside Corcoran and referred to the relevant local law enforcement officials if appropriate.  We also ask that CDCR investigate the reports of gladiator fighting during lockdowns in 3C and an illegal cellphone trade.  Please report back on your findings.

Mr. Nick Weber
Re: ███████████, ███████
June 8, 2020
Page 6

Sincerely,

Patrick Booth
Legal Fellow

Margot Mendelson
Staff Attorney

Cc:     Mr. ████████ (redacted)
        Co-Counsel
        *Coleman* Special Master Team
        Nick Weber
        Michael Stone
        Adriano Hrvatin
        Elise Thorn
        Tyler Heath
        Damon McClain
        Roman Silberfeld
        Glenn Danas
        Kyle Lewis
        Jerome Hessick
        Melissa Bentz
        Dillon Hockerson
        Carrie Stafford

# Exhibit 40



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

August 27, 2020

Nick Weber
CDCR Office of Legal Affairs

Re: *Coleman* Advocacy Letter
████████, ██████, KVSP

Dear Mr. Weber:

We write on behalf of ████████, ██████, a *Coleman* class member at the CCCMS level of care, currently housed at Kern Valley State Prison (KVSP).[1]  Mr. ██████ reports that he was assaulted by custody staff in September 2019, when he was housed at California State Prison, Corcoran.  We previously reported on a related matter.  On February 14, 2020, we reported that ████████, ██████, EOP, was assaulted by custody officers at Corcoran in September 2019 because he submitted a CDCR Form 7362 (7362) on behalf of an anonymous victim.  *See* Letter from Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ████████, ██████, CSP-SAC (February 14, 2020).  Specifically, we wrote:

> Mr. ██████ reports that he was assaulted by custody staff when he was housed at California State Prison, Corcoran.  He says that his assault was committed in retaliation for him alerting medical staff about an assault by staff on another *Coleman* class member in his housing unit.

> Mr. ██████ reports that on September 23, 2019, correctional officers physically assaulted another *Coleman* class member that lives in Mr. ██████'s housing unit, seriously injuring this person.  Later that evening, Mr. ██████ submitted a CDCR Form 7362 ("7362") on behalf of the victim.  The victim of this assault does not want his name to be reported to CDCR, for fear of further retaliation, but his medical records indicate that a 7362 was submitted on September 23, 2019.  The handwriting of the 7362 is consistent with Mr. ██████'s handwriting, and the victim of the assault received emergency medical attention that night at an outside hospital.

*Id*. at 1.

Mr. ██████ reports that he was the victim of the September 23, 2019 assault, and that Mr. ██████ submitted a 7362 on his behalf.

---

[1] Mr. ██████ was at the EOP level of care at the time of his assault, on September 23, 2019.

**Board of Directors**
Penelope Cooper, President, Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

[3603703.1]

<div align="right">
Mr. Nick Weber

Re: ███████,

August 27, 2020

Page 2
</div>

## I. MR. ███'S REPEATED PLEAS FOR HELP AND HIS EVENTUAL ASSAULT

On September 3, 2019, Mr. ███ transferred from KVSP to Corcoran. *See* Pre-Boarding Transfer Screening, September 3, 2019. Shortly after Mr. ███'s arrival to Corcoran, an officer came to his cell to alert him that he had a phone call in the program office. Mr. ███ had filed a CDCR Form 602 (602) while housed at KVSP, and his call in the program office was with the KVSP Appeals Coordinator to investigate the reports he made. Mr. ███ reports that five Corcoran officers, including Sergeant Navarro, were in the program office when he arrived for his call. Although the officers did not remain in the room during the call, Mr. ███ believes that the officers knew that he was reporting an incident of staff misconduct. When the call ended, Mr. ███ reports that Sergeant Navarro said, "We ran your license plate. We see that you have an IEX [indecent exposure] in your file."

Mr. ███ understood Sergeant Navarro's comments to be a threat against him for reporting staff misconduct. Mr. ███ said that officers in his unit at Corcoran, 4A2R, had a practice of "running people's license plates," or checking the central files of new arrivals to gain access to sensitive information. According to Mr. ███, officers strategically revealed this information to other people in the housing unit as a means of retaliation. By revealing to other people in Mr. ███'s housing unit that he had a sex-related offense, Sergeant Navarro could make Mr. ███ a target of attack. Mr. ███ reports that officers at Corcoran often inappropriately disclose people's commitment offenses or other sensitive information in order to create an unsafe environment for certain individuals.[2]

Mr. ███ reported that, for the few weeks following this interaction, custody officers in his housing unit tried to agitate him and make him uncomfortable or frustrated. On multiple occasions, for example, officers did not allow Mr. ███ to shower or go to yard, even though others in his housing unit were allowed to do so. He says that officers also picked on his status as a *Coleman* class member, calling him and other class members in the unit "weirdos."

During this period, Mr. ███ continually reported to his mental health clinician that custody officers were treating him in an inappropriate manner, which was affecting his mental health. On September 10, 2019, for example, Mr. ███ reported to his mental health clinician that custody officers were "out to get him." MHPC Intake Assessment, September 10, 2019. The clinician noted that Mr. ███'s concerns "do[] not appear to be psychotic paranoia," and that he was "heavily focused on custody related issues during the interview." He also told his clinician that he has "IEX on my file so COs [are] treatin[g] me based off that." Suicide Risk and Self-Harm Evaluation, September 10, 2019. Similarly, during a cell-front meeting on September 18, 2019, Mr. ███ told his clinician that "[a]t ICC, they told me they know about history. IEX all that and that I will have a hard time here." MHPC Progress Note, September 18, 2019. He also reported that everyone in his housing unit, except for him, received a radio the previous day. *Id.* He said, "They are purposely trying to mess with me. Don't let them lie to you." *Id.*

---

[2] When Mr. ███ was eventually assaulted, it was not clear whether officers did so because he had previously made a staff complaint at KVSP, because he reportedly had an IEX in his file, because he is a *Coleman* class member, or some combination of these reasons.


Mr. ▮▮▮ reports that the officers' weeks-long campaign of mistreatment culminated in a brutal physical assault.  Mr.▮▮▮ says that on September 22, 2019, as Sergeant Navarro's shift was ending, he and Mr.▮▮▮ exchanged words.  After several comments back and forth between them, Sergeant Navarro said to Mr.▮▮▮, "We're going to come in your cell tomorrow, and we're going to give you action."  Mr.▮▮▮ understood this meant the officers would assault him.  He had witnessed officers at Corcoran assault other people in his unit, so he took Sergeant Navarro's threat seriously.  Consumed with fear and anxiety, Mr.▮▮▮ reports that he was unable to sleep that night.  Around 5 AM, before Sergeant Navarro's shift began, Mr.▮▮▮ reports that he placed a towel in the sink in his cell, and he flooded the cell with soap and water.  He says that he thought officers would not be able to assault him in his cell if they could not get proper footing in his soapy cell.

Mr.▮▮▮ had a medical appointment at 11 AM.  *See* Vitals/Height/Weight – Text, September 23, 2019 (indicating that Mr.▮▮▮ had an appointment for a 7362 follow-up at 10:59 AM); *see also* Discharge Instructions, September 23, 2019 (indicating that Mr.▮▮▮'s medical appointment ended around 11:14 AM).  After his medical appointment, Mr.▮▮▮, still wearing waist chains, was placed in a holding cage in the rotunda instead of his cell.  From the holding cage, Mr.▮▮▮ could see two psychiatric technicians (psych techs), Ms. Gonzales and Mr. Campos, passing out medication to people in his housing unit.  Mr.▮▮▮ tried to quietly alert the one of the psych techs, Ms. Gonzales, that he believed he was about to be assaulted by custody officers, and he asked her to help him.  But during this brief exchange, one of the officers on duty called her and the other psych tech over to have a brief conversation out of Mr.▮▮▮'s earshot.  Immediately after this short conversation between the psych techs and the officer, the A section door of the housing unit shut, followed by the B section door, followed by the C section door, followed by the kitchen door.[3]  Mr.▮▮▮ was still in a holding cell in the rotunda and wearing waist chains, with no one to help him when officers attacked him.

Mr.▮▮▮ reports that Officers Vera, Medina, Alison, Hurrita, and Sergeant Navarro then approached the holding cage, and Officer Vera said, "We want to talk to you."  He opened the cage and took Mr.▮▮▮ out.  Mr.▮▮▮ reports that Officer Vera began to punch him and slammed him onto his back on the ground.  Mr.▮▮▮ could not protect himself because he was still chained.  While the officers continually punched and kicked Mr.▮▮▮, Officer Vera said, "IEX, huh? You wanna pull your dick out?"  Officer Vera then pinned Mr.▮▮▮'s right leg down, which he wore a knee brace on, while Officer Medina repeatedly kicked Mr.▮▮▮ in or near his testicles.  Mr.▮▮▮ thrashed on the floor in an attempt to avoid the kicks.  At the same time, Officer Medina said, referring to Mr.▮▮▮'s IEX, "Come on, pull it out, let me see it."  Officer Vera pulled Mr.▮▮▮'s boxers way up on his waist, causing Mr.▮▮▮ great discomfort, and tried inserting his fingers into Mr.▮▮▮'s anus over his boxers.  Mr.▮▮▮ said that, by thrashing on the floor, he was able to avoid Officer Vera's fingers from penetrating him.  While this was happening, Sergeant Navarro put Mr.▮▮▮ in a headlock, and another officer put ankle restraints on him.  Mr.▮▮▮ reports that he was having trouble catching his breath, and he exclaimed, "I can't breathe!"  He says that he continued to scream for help for minutes as he was beaten by the officers.  Sergeant Navarro reportedly said, "You want to yell for fucking help?!"  Officer Vera then kicked Mr.▮▮▮ in the chest, which was the final blow of the assault.

---

[3] Mr.▮▮▮'s housing unit at Corcoran is a 180 design, and there are doors that separate each section from the rotunda.



Mr. ████ reports that after the beating, he was escorted back into his dayroom and sat on a chair. The officers brought over the two psych techs to check on him. When Psych Tech Gonzales asked if he was experiencing any pain, Mr. ████ said that his private parts hurt, and Officer Medina slapped him across the face because of the language that he used. When Psych Tech Gonzales continued to ask about any injuries he suffered, Sergeant Navarro and Psych Tech Campos repeatedly interrupted him to assert that Mr. ████ was okay and not in any pain. The psych techs cleared Mr. ████ and sent him back to his cell, but the other people in housing unit could see that Mr. ████ was in significant pain and required medical attention. Mr. ████ reports that the psych techs falsified a CDCR Form 7219 to indicate that Mr. ████ did not have any injuries. When Mr. ████ went back to his cell, other people in the unit began to yell, "Man down," indicating that Mr. ████ needed emergent medical care. According to Mr. ████, Sergeant Navarro and Officer Vera went to the door of several people's cells and asked, "Why are you sticking up for him? He has an IEX." Before leaving at the end of his shift, Sergeant Navarro warned Mr. ████, "If you put this on black and white, you'll be hanging in your cell."

Later that night, when Sergeant Navarro was no longer working, ████████ submitted a 7362 on behalf of Mr. ████, unbeknownst to Mr. ████ at the time. *See* 7362 – Medical, September 24, 2019. Mr. ████ had seen through the window of his cell door how much pain Mr. ████ was in, and he thought that Mr. ████ needed medical attention. The 7362 that Mr. ████ submitted on behalf of Mr. ████ based on his observation of the events confirms Mr. ████'s report:

> Today, I was beaten-up by C/O D. Allison, C/O Medina, C/O Vera, the Unit Sgt. [Navarro] and officer unidentified [C/O Hurrita]. I was punched in my face several times, kicked in my chest and ribs. I have several physical injuries. The on duty psych tech "Campos" covered the incident up for the officers. Right now, my chest hurt badly. I can't breathe and there's a bone that's cracked.

*Id.* (emphasis in original).

In response to Mr. ████'s 7362, emergency response services were dispatched to Mr. ████ at 5:06 PM, well after the second watch shift had ended. *See* Progress Note – Nurse, September 23, 2019 (noting the emergency response times). Mr. ████ was taken to an outside hospital, where he reported to medical staff that he was experiencing chest, knee, and generalized body pain following a "s/p [staff/patient] assault." Outside Records – Hospital, September 23, 2019, at p. 2. While at the hospital, he underwent X-rays and CT scans, and his medical records indicate that he suffered a chest wall contusion, a right knee strain, and a left facial contusion. *Id.* at p. 4.

Despite being assaulted, Mr. ████ was issued a Rules Violation Report (RVR) on September 23, 2019. Exhibit A. As we have noted on multiple occasions, custody officers at Corcoran have a practice of issuing an RVR to a person that they have assaulted. *See, e.g.,* Exhibit B, Letter from Don Specter, Plaintiffs' Counsel, to Ralph Diaz, Secretary of CDCR, Corcoran Staff Misconduct (June 8, 2020) at pp. 1-2 ("We have also received a number of reports that officers have a practice of issuing a Rules Violation Report ('RVR') to an individual who is a victim of assault by custody officers. These RVRs often falsely accuse the victim of committing a battery against an officer, necessitating the use of force. Many of the

people that have written to our office about staff misconduct have expressed concern because they were issued an RVR after being assaulted, and now they are subject to a longer prison term and another potential criminal charge.").

The conduct cited in Mr. ████'s RVR is "Behavior which could lead to violence." Exhibit A. The RVR paperwork, authored by Officer Allison, states that officers searched Mr. ████'s cell on September 23, 2019 at 11:15 AM, and found five milk containers that appeared to contain urine. *Id.* The paperwork then states that Officer Allison confronted Mr. █████, who was in a holding cell in the rotunda, about the containers, and Mr. ████ became verbally aggressive. *Id.* According to Officer Allison's report, he attempted to handcuff Mr. ████, but Mr. █████ became resistant and continued to be verbally aggressive. Officer Allison claims that he eventually handcuffed Mr. █████ and issued him an RVR for his defiant behavior. *Id.* Mr. ████ reports that none of this is true.

Notably, the RVR paperwork does not explain the significant injuries that Mr. █████ suffered, which necessitated his transfer to an outside hospital. Mr. ████ reports that second watch officers (Allison, Medina, Vera, Hurrita, and Navarro) believed that he would not seek medical attention later that evening because the psych techs had already sent him back to his cell. Mr. █████ says that the falsified RVR paperwork, therefore, did not take into account the documentation generated when Mr. █████ sought further medical attention. Mr. █████ believes that, had officers known he would have required medical care at an outside hospital, they likely would have issued an RVR for "Battery on a Peace Officer," and falsified facts that would have better accounted for Mr. █████'s injuries.

## II. MR. ████'S REPORTS AFTER THE ASSAULT

In the weeks following the assault, Mr. ████ continued to report the incident to his mental health clinicians. For example, on September 25, 2019, two days after the assault, Mr. ████ met with his mental health clinician and reported the following:

> IP recalled events (Monday, 9/23/2019) between himself and custody officers in 4A2. IP made allegations of excessive force against the following COs: Sgt. Navarro, Ve[]ra, and Medina. IP stated that he was pulled out to the rotunda and left in his cuffs. He stated that he was "fearful that they were gonna beat me up. I told these psych techs that they were go[nna] get me. They didn't do nothing. I asked them to help me… Asked to be let out of my cuffs so I could at least fight back and they wouldn't… I told them 'handle yalls business' and I got on my knees cause I knew what was coming… they beat me up bad… In the middle of the fight they cuffed [me] by my ankles and just kept beating me up. Slapping me. Tried kicking me in [the] head." IP reported that while he "was getting beat up" custody officers made statements such as the following: "you got in IEX in your file and you're a rat. You like to write 602s… You're in Corcoran now." IP also stated the following: "I felt something sticking thru my butt, like with my boxers. (made motion with his hand of someone trying to stick their finger in his anus) Wasn't doing it for sexual gratification. It was like to humiliate me. They grabbed my privates, my dick, and said "Let me see it." IP further reported that, "They said they'll kill me, hang me if I told

anyone.  If this ends up in black and white, they'll kill me.  I'm scared of these dudes.  I'm contemplating suicide.

MHPC Progress Note, September 25, 2019.

At the same appointment, Mr. ████ reported serious mental health decompensation as a result of the officer assault.  He told his clinician that he had a plan to kill himself: "This is my plan, look: I'm gonna report it (excessive force incident) first, write my 602, THEN kill myself so my family knows why I did it."  *Id.*  Mr. ████ told his clinician that he had already asked people on his tier if they had anything he could use to kill himself, but that he was only able to find "a bunch of ibuprofen from some guy but I don't think that'll work."  *Id.*  As a result of Mr. ████'s suicidal ideation, a mental health crisis intervention team was initiated.  *Id.*  At a follow-up appointment with the crisis intervention team, Mr. ████ stated that he "feel[s] like giving up," and that his current depression was a "full ten" on a scale of one to ten.  Suicide Risk and Self-Harm Evaluation, September 25, 2019.  Again, at this evaluation, Mr. ████ cited custody staff as the reason his mental health was significantly worsening.  *See id.*

Again, on September 26, 2019, Mr. ████ reiterated his report to the clinician conducting the intake for the mental health crisis bed.  *See* History and Physical, Mental Health Crisis Bed Admission H&P, September 26, 2019.  Specifically, he reported that "choked out by 1 of the officers.  He said that he had immediate pain in his central chest which hurts when he takes a deep breath, cough[s], or sneezes."  *Id.*  He also reported jaw pain, neck pain, difficulty swallowing, and that his knees hurt, all a result of the September 23, 2019 assault.  *Id.*[4]

Mr. ████ also filed and exhausted multiple 602s to redress the significant harm he suffered.  On October 3, 2019, Mr. ████ filed a Healthcare-related 602 (602 HC) about the two psych techs that failed to prevent his September 23rd assault, even though Mr. ████ had warned them of the impending attack moments before it happened.  Exhibit C, CDCR Form 602 HC, Log No. 19001041 (Oct. 3, 2020).  Specifically, he wrote:

On September 23, 2019, I informed the 4A2L Nurse[s] Gonzales & Campos that the 4A2L Sgt. Navarro, C/O N. Vera, C/O I. Medina, C/O A. Allison, & C/O J. Hurrita are about to assault me & both failed to report it in order to prevent it. 5 minutes later I was assaulted by the above mention[ed] staff & both Nurse Gonzales and Campos witnessed the assault & fabricated a[] 7219 report as if I had no injuries[.] Both nurses committed gross negligence and deliberate indifference.

---

[4] For the following weeks, Mr. ████ continued to report physical health issues that resulted from his September 23, 2019 assault.  For example, on October 4, 2019, he submitted a 7362, which stated: "On 9-23-19 I was kicked in my chest & I'm in severe pain. Every time I move a bone cracks in my chest. I have a cracked bone in the middle of my chest."  7362 – Nursing, October 5, 2019.  Also on October 4, Mr. ████ had an optometry consultation because he was seeing "floaters" and "flashes of light" as a result of "9-23-19 blunt force trauma."  Optometry Consultation, October 4, 2019.



*Id*.  More than two months later, on December 9, 2019, Mr. ███████ was interviewed for his 602 HC, and he reported the same facts listed above.  *Id*.  On December 19, 2019, Mr. ███████'s 602 HC was denied because staff "did not violate California Department of Corrections at Rehabilitation policy," with no further justification.  *Id*.

Mr. ███████ continued to experience and report harassment by officers.  On October 20, 2019, Mr. ███████ filed a 602, alleging that Officer Vera came to his door on October 16, 2019, while Mr. ███████ was in the CTC, and flipped him off.  Exhibit D, CDCR Form 602, Log No. 19-6716.  Mr. ███████ also wrote in the 602 that Officer Vera said, "You snitched on me & my partners & we will make sure that you can't go to C-3 Yard & program anymore, you['re] a rat."  *Id*.  Mr. ███████ asked for a separation chrono between him and Officers Vera, Medina, Alison, Hurrita, and Sergeant Navarro because those officers had been retaliating against him for filing paperwork about the September 23, 2019 assault.  *Id*.  Mr. ███████ wrote that he fears for his safety at Corcoran.  *Id*.  Mr. ███████ reports that Lieutenant Brown interviewed him about his 602.  Mr. ███████ 602 was subsequently denied at the first level, and he timely appealed to the second level, where his appeal was again denied.  He appealed to the third level and, on March 27, 2020, was denied again.

Although prior to his assault Mr. ███████ consistently alerted mental health staff, even in the moments before the assault, that he feared assault by custody staff, no action was taken to protect him. After he was brutally beaten, he was issued an RVR based on information falsified by custody officers in an attempt to cover their misconduct.  Then, when Mr. ███████ properly filed a grievance to address the abuse that he suffered, his grievance was summarily denied at every level with little to no justification. Mr. ███████'s report illustrates a broken system that not only fails to protect *Coleman* class members, but allows officers to abuse *Coleman* class members with impunity.

### III. Corcoran's Culture of Violence Against *Coleman* Class Members

We are deeply concerned about Mr. ███████'s report of egregious staff misconduct at Corcoran, which is well supported by the Department's medical and mental health records.  Mr. ███████'s report represents just one of many similar reports of staff misconduct that our office has received from *Coleman* class members housed at Corcoran.  In fact, since February 2020, we have written three advocacy letters, including this one, on behalf *Coleman* class members about staff misconduct at Corcoran.  *See* Letter from Margot Mendelson & Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ███████████, ███████, CSP-SAC (Feb. 14, 2020); Letter from Margot Mendelson & Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ███████████, ███████, KVSP (June 8, 2020).  Additionally, our office has reported staff misconduct at Corcoran to *Armstrong* Defendants (Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ███████████, ███████, COR (Feb. 12, 2020)), as well to the Secretary of CDCR.  *See* Exhibit B.

The volume and the level of brutality described in reports to our office about Corcoran staff misconduct is truly disturbing.  In total, our office has received more than 40 reports of staff misconduct at Corcoran since September 2019.  We have now reported to CDCR four different individuals who

required emergency medical care at an outside hospital after being beaten by custody staff.[5]  Similarly, in their *Armstrong* motion about staff misconduct, our co-counsel has shared with Defendants declarations from seven individuals that were assaulted at Corcoran.  Multiple class members have reported that custody officers at Corcoran operate in an organized, gang-like fashion, doling out assaults on a regular basis and covering for each other through falsified RVRs.[6]  Many class members also describe a disciplinary and appeals system that allows officers to make false statements on CDCR paperwork and lie under oath with impunity.  *See* Office of the Inspector General, Sentinel Case No. 20-02 (June 11, 2020) (concluding that CDCR has a "lack of understanding regarding the importance of peace officers providing truthful testimony under oath," and that "[t]he department's unwillingness to dismiss a dishonest peace officer from its ranks is troubling.").

The incidents alleged here speak to a culture of fear and terror at CSP-Corcoran. Mr. ████ was subjected to weeks of targeted harassment by officers in his housing unit, culminating in his physical and sexual assault.  The mental toll of the harassment, retaliation, and physical abuse led Mr. ████ to decompensate and experience serious suicidal ideation.  As we previously reported, when another *Coleman* class member, ███████, requested medical attention for Mr. ████ after his assault, Mr. ████ himself was subjected to mental abuse.  *See* Letter from Margot Mendelson & Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ███████, ██████, CSP-SAC (Feb. 14, 2020) at p. 1.  He, too, sought mental health services at the time because custody staff's retaliation was significantly impacting his psychological welfare.  *Id.*  Again, no one intervened to help him before he was beaten so badly by custody staff that he needed to be transferred to an outside hospital. *Id.*  The pattern and practice of vicious abuse against *Coleman* class members at Corcoran requires immediate attention and significant action.

We ask that Defendants conduct a full and impartial investigation into Mr. ████'s allegations. We also request that Defendants dismiss his September 23, 2019 RVR.  Please report back on your findings, and provide all non-confidential documentation resulting from that investigation.

Sincerely,

Patrick Booth
Legal Fellow

Margot Mendelson
Staff Attorney

---

[5] *See* Exhibit B, (noting that ███████, ███████, and ███████ each received outside medical care after being attacked by custody staff).

[6] The Office of the Inspector General (OIG) recently published a report detailing CDCR prison staff misconduct similar to that alleged by Mr. ████ and others housed at Corcoran.  *See* Office of the Inspector General, Sentinel Case No. 20-04 (August 19, 2020).  The OIG's report describes an incident in which two custody officers coordinated an assault on an individual, then issued the victim a falsified RVR for "Battery on a Peace Officer."  *See id.* at 2.

Mr. Nick Weber
Re: ██████████, ██████████
August 27, 2020
Page 9


Cc:    Mr. ██████ (redacted)
          Co-Counsel
          *Coleman* Special Master Team
          Nick Weber
          Michael Stone
          Adriano Hrvatin
          Elise Thorn
          Tyler Heath
          Damon McClain
          Roman Silberfeld
          Glenn Danas
          Kyle Lewis
          Lucas Hennes
          Melissa Bentz
          Dillon Hockerson
          Carrie Stafford
          OLAColemanCAT@cdcr.ca.gov

# EXHIBIT A



CALIFORNIA DEPARTMENT of
Corrections and Rehabilitation

# DISCIPLINARY HEARING RESULTS

| Institution: California State Prison, Corcoran | Facility: COR-Facility 04A | Logging Number: 006914786 |
|---|---|---|
| Inmate Name: | CDC #: | Bed Number: C-04A - 04AA2L01 - |
| TABE Score: 11.8 | MH LOC: CCCMS | DPP Status: NC |

## DUE PROCESS

| | | | |
|---|---|---|---|
| Rule Violation: 3005(a) | | Specific Act: Behavior which could lead | violence |
| Level: | | Offense Division: D | |
| Offense Occurrence: 1st Occurrence | | | |
| Violation: 09/23/2019 | | Violation Time: 11:1 | |
| Hearing: 09/30/2019 | | Hearing Time: 13:2 | |
| Did a laboratory confirm the evidence tested positive for Controlled substances?: N/A | | | |

### Actions Taken

| Date | Time | Type/Reason | Staff | Elapsed Days |
|---|---|---|---|---|
| 09 | 12:42:52 | RVR Ready for Review by Supv. | D. Allison | 0 |
| 09 | 13:56:03 | RVR Ready for Review by Supv. | D. Allison | 0 |
| 10 | 08:18:32 | RVR Ready for Review by Supv. | L. Allison | 13 |
| 10 | 07:39:07 | RVR Approved by Supervisor | . Gar z | 14 |
| 10 | 07:55:17 | RVR Classified | C. Gonzale | 1 |
| 10 | 07:55:18 | MH Assessment Request | .. Gonzale | 14 |
| 10 | 09:00:00 | SA Assigned | .Gar 1 | 15 |
| 10 | 09:01:00 | IE Assigned | . Gar a | 15 |
| 10 | 10:31:08 | Inmate Copy Served Initial Rules Violation Report | . G 4 | 15 |
| 10 | 10:35:14 | IE Report Prepared | . Ga J | |
| 10 | 10:55:52 | IE Report Ready for Rev | | |

| 10 | 10:10:18 | IE Report Approved By | | 1 |
| 10, | 10:41:40 | SA Inmate Interaction | | 15 |
| 10, | 12:00:00 | Inmate Copy Served Investigative Report | | 15 |
| 10 | 15:48:12 | MH Assessment Received | | 12 |
| 10, | 09:48:55 | Inmate Copy Served MH Assessment Report | | 3 |

All T ____nts ___ t?: Yes          SHO/HO ___ C ___          s

**Du** **Additional Information:**

## HEARING

S ____ :d not to participate in the adjudication process by r ____     o a ____     ___ ___ rin . An
In     Chrono was generated documenting the refusal to a ____    e h ____ ___
S ____ ____resent, in good health and ready to proceed.

He ____ ___tional Information

## DISABILITY

H ____sion | Mobility | Learning | Developm ___ tc/ og ___
O ____e

Req ____          ___odation?  No

### DDP Specific Information

128-        ___?  Yes          Stating Dat ___

Did t ____ Employee document the use of Adaptat ___  Support ___

| ___aptive Support | Contribu ___ | ___o |
| | | |
| | | |

| Victimization | Contribu ___ | Hiv ___ |
| | | |

Dis ____ ___dition al Information:

## MENTAL HEALTH ASSESS ___

Mental Health Assessment Requested: Yes

Reason for Mental Health Assessment Request: MH LOC EOP or higher

Clinical Staff Recommended Staff Assistance Assignment: N/A

Clinical Staff determined Mental Health Symptoms strongly ____ ____ or ____ ____ alter ____
document: No

Clinical Staff determined Developmental Disability strongly ____ ____ or ____ ____ alter ____
document: No

Clinical Staff determined Mental Health Symptoms contribute to behavior or No

Clinical Staff determined Developmental Disability contributed to behavior: N/A

Clinical Staff provided information when assessing the person's: Yes

## STAFF ASSISTANT

Staff ____ Assigned: Yes

Reason ____ ment of Staff Assistant: MH LOC EOP or ____

| SA | Date Assigned | Certified? | Meet 24 hour ____ ____ to ____ | Present |
|----|---------------|------------|--------------------------------|---------|
| J. ____ | 10/08/2019 | Yes | Yes | No |

Staff Assistant Additional Information:
Inmate ____ C is CCCMS with a TABE of 11.8; therefore ____ does ____ ct t ____ ____ a ____ of as ____ ont

## INVESTIGATIVE ____ ____

Investigative Employee Assigned: Yes

Reason ____ ment of Investigative Employee: Housing ____

Investigative Employee Additional Information:
This ____ to consideration the investigative employ ____ ____ ____ ____ ____ ____ d not
provid ____ ent to his investigative employee and did ____ provide ____ ____ ____ with ____ ____ art of
his d ____ ate Redix's IE has no evidentiary value. T ____ ____ ____ ____ ort ____ add ____ e as
the I ____ an attempt to obtain a statement or ques ____ ____ ____ Re ____ ____ Re ____ ____ to
prov ____

## CONFIDENTIAL ____ ____

Confidential ____ mation Used: No

| Co ____ D ____ | Author of Confidential Document | Date of Confidential Document | Review ____ by SHO ____ | ____ Cr ____ d tial | Reason ____ mation was ____ Confidential ____ |
|---|---|---|---|---|---|
| | | | | | ____ nt ____ ____ in ____ lar ____ per ____ nation ____ ____ inm ____ opar ____ of th ____ |

| Con Do N. | Confidential Source Number | Confidential Disclosure Form Issued | Sufficient Information Disclosed | Reason | |
|---|---|---|---|---|---|
| | | | | | |

**Con     Additional Information:**

**WITNESSES**

Witnesses ... sted at Hearing

☐ Re     ployee          ☐ Staff Assistant                          y

☐ Ot                       ☐ Inmate                        

**Non-Inmate Witness  s)**

| Name | Rank | Type | anted? |
|---|---|---|---|
| Que... | ked | | |

### Inmate Witness(...)

| | Name | | Bed | ...ed? |
|---|---|---|---|---|
| Que... | ...ked | | | |

**Wi... ...tional Information:**

### PLEA AND S... EMENT

PLEA ...ENT: The above circumstances were read ... to su...  ...ta: Not G...

☒ S... ...ed to make a ...atement
☐ S... ...a statement

Co... 

### FINDI...

Subj... ...nd: Guilty as Charged based on a prepo... ...of

Less ...Charge:

Leve... ...Div...

Offen... ...nce:

Co... 

### MENTAL HEALTH ASSESS... COR...

(Doc... ...of opinions to ... used for consideration ... ...ar... ...oning...
docu... his section.)

Co...
This ...to considera... the mental health asses... ...d ... ... the revi...ing
clini... ...nician stated there is no evidence that inm... s beha... ...ed by sym...toms of
a (a) ...ess and/or (b) developmental disability/co... ...ive or a... ...b... ...icits that the inmate
woul... ...served by documenting this behavior in a... ...errate ... clinician ...ate... in
revi... ...entation it does not appear he was dealing ...th any ... ...hat would ...o the
beh... ...RVR. Progress notes dated back to appro... ...y to ... RVR ... ...te
any ...oms that coul... be contributed to this RV... ...a 'di... ...o nc...
area... ...that would ... o this RVR. Therefore, ... ...de
acco... his actions.

### EVID...

The ...idence was us... to support the findings:

# EXHIBIT B



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

June 8, 2020

Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
1515 S Street
Sacramento, CA

Re: Corcoran Staff Misconduct

Dear Secretary Diaz:

We write regarding our serious concerns about staff misconduct at California State Prison, Corcoran. Over the last nine months, we have received more than 40 reports of brutal and rampant staff misconduct at Corcoran, including reports of custody officers egregiously assaulting people; falsifying RVR paperwork; destroying or inappropriately confiscating people's personal property; retaliating against people for submitting CDCR Form 602s; engaging in an extensive cellphone trade; and even organizing "gladiator fights" when housing units are locked down. Perhaps most disturbing is the volume and consistency of the reports we have received to date. The similarities in the allegations we have received suggest that these incidents are not outliers. Rather, it appears that custody officers at Corcoran are engaged in a pattern and practice of vicious abuse against individuals housed at the prison.

The reports that we have received are not isolated to a particular yard, housing unit, or officer. We have heard reports of staff misconduct occurring on each yard at Corcoran, against *Armstrong* and *Coleman* class members, as well as non-class members, and perpetrated by a number of different staff members. Specifically, more than 45 different officers have been named in the reports we have received in the last nine months. In short, custody officers at Corcoran have created a culture of violence and retaliation that permeates the institution.

To highlight examples of the concerning pattern of staff misconduct at Corcoran, we have summarized below several of the reports that we have received over the last nine months. We have also attached exhibits of our recent advocacy letters concerning staff misconduct at Corcoran.

## I.  Egregious Physical Assaults on People Housed at Corcoran

Custody officers at Corcoran continually use unnecessary and excessive force on people housed at the prison. In many cases, medical records confirm that individuals have suffered fractured bones, broken teeth, or traumatic brain injuries at the hands of custody officers. Based on the reports we have received, some of these incidents of force are committed in retaliation for perceived disrespect against an officer, while other incidents appear to be unprovoked. We have also received a number of reports that officers have a practice of issuing a Rules Violation Report ("RVR") to an individual who is a victim of assault by custody officers. These RVRs often falsely accuse the victim of committing a battery against an officer, necessitating the use of force. Many of the people that have written to our office about staff misconduct

**Board of Directors**
Penelope Cooper, President, Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Secretary Ralph Diaz
Re: Corcoran Staff Misconduct
June 8, 2020
Page 2

have expressed concern because they were issued an RVR after being assaulted, and now they are subject to a longer prison term and another potential criminal charge.

The examples below detail allegations of unacceptable and violent staff misconduct; they represent only a fraction of the reports we have received to date.

- ████████, ████, was assaulted by custody officers in October 2019 after he submitted a CDCR 7362 ("7362") on behalf of another incarcerated person who had been assaulted by custody officers. At the time, Mr. ████ was housed on 4A-Facility at Corcoran. When the officers discovered that Mr. ████ submitted a 7362 for the victim, they threatened to retaliate against Mr. ████ and told others in his housing unit that he was a "prison snitch and a sex offender/child molester." On September 30, 2019, Mr. ████ submitted a 7362 to request mental health services, stating, "C/O I. Medina, C/O Fugate, and their supervisor J. Navarro keep coming to my living cell making threats to kill and assault me. And C/O I. Medina keep calling me a 'snitch' openly in front of my peers because I sued him and filed a staff complaint. Their actions have now jeopardized my life, and is causing me mental anguish. I am now concerned for my welfare, and am seeking mental health services." CDCR 7362, September 30, 2019 (emphasis in original). Two days later, officers ordered Mr. ████ to submit to cuffing in his cell, then they escorted a known-enemy into Mr. ████'s cell. Officers uncuffed that individual and ordered him to attack Mr. ████, who was still handcuffed. The man began to beat Mr. ████. Several minutes later, after he refused to continue to beat a handcuffed Mr. ████. The officers then pepper-sprayed both men, pulled the other person out of the cell, and attacked Mr. ████ again. Mr. ████ was transferred to an outside hospital, and his medical records indicate that he suffered significant injuries, including lacerations all over his face and a broken tooth. Progress Note – Nurse, CIT Activation, October 2, 2019. We sent an advocacy letter to CDCR on Mr. ████'s behalf and have yet to receive a response. Exhibit A, Letter from Margot Mendelson & Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, ████ ████, ████, CSP-SAC (Feb. 14, 2020).

- ████████, ████, reported that Officers Guzman and Rojas slid a cellphone under his cell door on December 24, 2019. When officers came back to retrieve the cellphone minutes later, Mr. ████ denied possessing it. Mr. ████ believed at the time that the officers were setting him up for punishment. The officers brought two of Mr. ████'s friends from the housing unit into his cell to persuade him to return the phone. Because Mr. ████ continued to believe he was being set up, he again denied possessing the phone. The officers then brought the two friends back to their respective cells, came back and entered Mr. ████'s cell, and attacked him. His injuries were so severe that he was immediately transferred to an outside hospital, where it was determined that he suffered multiple facial fractures, a fracture of his spinous process, and a traumatic brain injury, among other ailments. *See* Outside Records – Hospital, December 31, 2019 at 3. Mr. ████ had his jaw wired shut for nearly two months. He remained at the outside hospital for seven days and was transferred to Corcoran's CTC, where he stayed for another 50 days. Mr. ████ reported the assault to the CTC sergeant, but he has not received an update about the status of the investigation since that time. We recently sent an advocacy letter to CDCR on behalf of Mr. ████. Exhibit B, Letter from Margot Mendelson

Secretary Ralph Diaz
Re: Corcoran Staff Misconduct
June 8, 2020
Page 3

& Patrick Booth, Plaintiffs' Counsel, to Nick Weber, CDCR Office of Legal Affairs, █████
███████████, KVSP (June 8, 2020).

- ██████████, ██████, reported that he was physically and sexually assaulted multiple times
by custody officers in September 2019.  On September 3, 2019, when Mr. ██████████ was walking
to chow hall on Corcoran 3C-Facility, Officer I. Benitez asked to randomly search him, and he
complied.  While she was patting him down, she grabbed his penis and testicles.  When Mr.
███████ asked her to stop, she replied, "Is that a fucking demand?"  She then grabbed Mr.
████████'s ID and told him not to disrespect her.  After this interaction, Mr. █████████ informed
Sergeant JD Wilson of what had happened, then he returned to his cell, where he wrote a staff
complaint.  He planned to file the complaint later that day on the way to his appointment in the
medical building.  At about 10:00 AM, while Mr. ███████ was walking unescorted from his
housing unit to the clinic for his appointment, Officer Benitez approached him outside of medical
and grabbed him by the back of his shirt, knocking him backwards to the ground.  Officer Benitez
grabbed the completed 602 form that he had intended to file against her.  Officer Barrett then
placed his feet on Mr. █████████'s chest and said, "Don't fucking move," and rolled him to his
stomach. Then both officers helped him off the ground and cuffed him.  Officer Benitez put her
knee in his back and slammed him against program office.  She searched him again, and again
touched his penis.  When Mr. ████████ jumped, she asked, "What, you don't like getting
searched by woman?  Are you fucking gay?"  Officer Benitez and Officer Barrett then escorted
him into the program office.  Sergeant JD Wilson, Sergeant Gutierrez and Officer Ibara were all in
the program office at the time, and Sergeant Wilson told Officer Benitez to pat Mr. █████████
down again.  When Officer Benitez patted him down again, she falsely told them that she felt a
weapon during the search. After she said that, Sergeant Wilson, Sergeant Gutierrez, Officer Ibara,
Officer Benitez and Officer Barrett beat him in the program office for approximately five minutes.
Mr. ████████ was handcuffed and fell to the ground while the officers were punching and
kicking him.  No one sounded the alarm.

    After the beating, Mr. █████████ was placed in a cage inside the program office, where he
stayed until approximately 1:00 PM, when he was then escorted to administrative segregation.  On
his way to administrative segregation, Mr. █████████ was physically assaulted a second time.
When he reached the pedestrian gate with escorting Officers Trevino and Chacon, Officer Trevino
walked back into the program office.  Mr. ████████ asked Officer Chacon why they were
waiting and she said, "You will see right now."  Then Officer Hamilton, Officer Menendez,
Officer Rios, and Officer Rins came out of the gym through the pedestrian gate.  Sergeant Wilson,
Officer Gutierrez, Sergeant Perez, Officer Ibara, Officer Benitez, Officer Trevino, Officer
"Tugaue," and an unnamed officer came from the program office and approached Mr. ██████████
as well.  Mr. ████████ believes that that officers only ran dayroom that day, and not yard, so
many staff could participate in the assault.  One officer told Officer Chacon to back off.  The
remaining officers pulled Mr. ████████ into the pedestrian gate, outside of the gym, where
Officers Hamilton and Menendez slammed him to the ground.  The rest of the group started
punching him. During the attack, Mr. █████████ was wearing waist and ankle chains.  Officer
"Tugaue" hit Mr. █████████ near his chin with a baton, which knocked Mr. █████████
unconscious.  Mr. ████████ woke up on his way to 3A, while still on the yard.  When he

Secretary Ralph Diaz
Re: Corcoran Staff Misconduct
June 8, 2020
Page 4

regained consciousness, he was slammed against a wall by Sergeant Perez, Officer Rins, and Officer Rios.  They then started punching him against the wall.  Sergeant Perez slammed his head against the wall. They punched him all over his body and knocked him unconscious again.  Mr. ███████ lost his eyeglasses during the assault, which still have not been replaced.  When Mr. ███████ regained consciousness for the second time, he was in a cell in 3A03, with his jaw throbbing.  He was unable to speak because of the pain.  During pill call, a nurse saw Mr. ███████ pointing to his jaw, and she notified the unit sergeant, who recommended that Mr. ███████ be sent to the CTC.  *See* TTA Progress Note, September 3, 2019 ("Non verbal. Pt has swelling and pain to the Lt. face and is unable to speak. Pt. appears to have a jaw injury with … 10/10 pain…. Pt. did appear to have loose bottom teeth.").  Medical records indicate that Mr. ███████ suffered a broken jaw which he believes was a result of the baton strike to the chin, and a broken nose.  *See* Outside Records – Hospital, September 5, 2019 ("Nasal fracture… [and] fracture of left side of mandible").  Like Mr. ███████, he had his jaw wired shut.  Mr. ███████ also received two RVRs from the incident.  His report of misconduct was included in Plaintiffs' June 3, 2020 Motion to Stop Defendants from Assaulting, Abusing, and Retaliating Against People with Disabilities, *Armstrong v. Newsom*, Case 4:94-cv-02307-CW, Declaration of Michael Freedman, Ex. 59.

- ███████, ███████, was assaulted by custody officers when returning to his housing unit from chow hall.  Mr. ███ reported that Officer Wolfe on Corcoran's 3A-Facility ordered Mr. ███ to submit to a clothed body search when Mr. ███ was returning to his housing unit.  Mr. ███ complied with the search, but Officer Wolfe continued to kick the inside of Mr. ███'s legs during the search so that Mr. ███ would separate his legs farther apart.  Mr. ███ has a documented mobility impairment and is unable to spread his legs further than shoulder-width apart.  When Mr. ███ tried explaining his limited mobility to Officer Wolfe, and that the repeated kicks were painful, Officer Wolfe threw Mr. ███ to the ground.  Officer Wolfe then punched him in the left eye and kicked him in the rib area on his left side.  Officer Wolfe placed a handcuff on Mr. ███'s left arm and put his entire body weight onto the back of Mr. ███'s head, pressing his face into the concrete floor.  When Officer Wolfe cuffed Mr. ███'s right arm, Mr. ███ continued to lay on the ground as Officer Wolfe stood up. Mr. ███ reports that Officer Wolfe then placed his left foot on top of Mr. ███'s head and proceeded to high-five three correctional officers who were in the vicinity, Lt. Hurlbut, Officer D. Shelton, and Officer H. Flores.  Mr. ███'s medical records confirm that he suffered a nondisplaced nasal fracture and a deviated septum in his nose as a result of this incident. *See* XR Nasal Bones – 3 VWS, November 4, 2019; Outpatient Progress Note, November 26, 2019 ("The patient on physical examination is noted to have a deviated septum").  He also reports that his chronic hip pain was aggravated by Officer's Wolfe repeated kicking.  Mr. ███ also received an RVR for the incident for "Assault on a Peace Officer by Means Not Likely to Cause Great Bodily Harm."  We sent an advocacy letter to CDCR on Mr. ███'s behalf and have yet to receive a response.  Exhibit C, Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ███████, ███████, COR (Feb. 12, 2020).

We have also received numerous reports that a group of officers on Corcoran's 3A-Facility refer to themselves as the "Hit Squad" because of the frequency with which they assault people.  Based on the

reports we have received, this group of officers works on third-watch and is led by Officer Wolfe.  In our advocacy letter on behalf of Mr. ███, we noted:

> Mr. ███ reports that … Officer Wolfe "intentionally targets people with mobility or mental health issues."  Similarly, another class member said that, while staff's use of excessive force is not uncommon at Corcoran, "Officer Wolfe is the worst offender" and that he "seems to take pleasure in beating people up."  A *Coleman* class member, who also reports that Officer Wolfe assaulted him, said that Wolfe is "extremely dangerous" because he is the "head honcho" of "the hit squad."  The consistent allegations of excessive and unnecessary force against Armstrong class member by Corcoran custody staff, especially against Officer Wolfe, are troubling.

Exhibit C at 3.  In the past nine months, we have received seven allegations of excessive or unnecessary force involving Officer Wolfe.

## II. Property Theft or Destruction

Many people have reported to our office that custody officers intentionally destroy people's personal property, often to intimidate people or as a threat of future violence.  Some have reported that officers also destroy property in retaliation for apparent disrespect or for filing 602s.  Many of the reporters have been unwilling to authorize us to disclose their names due to fear of retaliation by officers.

- ███████████, ██████, reported that when he transferred to Facility 3A from 4A, officers warned him that they would "beat his ass" if he went man down.  Mr. ██████ has a history of initiating hunger-strikes when he is not properly accommodated for his disabilities. When he is hunger striking, he becomes light-headed, falls frequently, and "goes man down."  Officers on 3A were apparently trying to prevent him from doing this.  After threatening Mr. █████████, the officers then broke his television as a warning of future violence if he went man down. Mr. █████████ reported that officers in 3A03 have a practice of breaking people's televisions to intimidate them.

- ███████████, ██████, reported that officers confiscated his legal handbook and intentionally broke his television during a cell raid in December 2019.

- An individual on Corcoran's 4A-Facility reported that Officers Medina and Moreno have threatened to attack him while he has restraints on, so he is terrified to leave his cell.  He says that the few times he has left his cell, Officers Medina and Moreno trash his cell and take his property. He reports that he has received an RVR for refusing medical appointments, but he is still too afraid to leave his cell.

- An individual on Corcoran's 3A-Facility reported that Officer Nolan, who distributes packages, has repeatedly asked the individual what his commitment offense is in the presence of other incarcerated people.  On one occasion when the individual refused to answer, Officer Nolan confiscated $160 worth of his property and gave it to other people on the yard.  He reported that

Officer Nolan distributed his property so that the other incarcerated people could sell it on the yard.

Additionally, we have received numerous reports that officers inappropriately confiscate property or allow other incarcerated people to steal the property of individuals that are moved to the CTC, the OHU, or a mental health crisis bed.  For example:

- ████████████, ██████, reported that custody staff stole his television, radio, and chain necklace after they assaulted him.  He was transferred to an outside hospital for seven days, then moved to the CTC for 50 days.  Mr. ██████ says that he never received these items back when he returned from his outside hospital stay.

- An individual on Corcoran's 3A-Facility reported that custody staff frequently steal and/or destroy people's property.  He also said that he has witnessed custody officers direct porters to take people's belongings when they are sent to a crisis bed or administrative segregation.

## III. Ineffectiveness of the 602 Process

We have received a significant number of reports that the 602 process is not functional at Corcoran.  Numerous people have reported that after submitting a 602, they never received a log number or a response.  Others have reported that the officers who were the subject of the grievance were inappropriately made aware of the 602 and confronted the person who filed it.  In some instances, officers have demanded that an individual withdraw a grievance or suffer more beatings.

- ████████████, ██████, reported that, when he was housed at Corcoran, he had filed several 602s about issues relating to staff misconduct.  He said that a lieutenant on his yard, 3B, reviewed the 602s then sent them to the sergeant and the custody officers who were the subject of the 602s.  On several occasions after he filed 602s at Corcoran, the officers whose conduct he was grieving confronted him about the content of the grievance and threatened to retaliate against him.

- ████████████, ██████, reported that custody officers require him to keep his wheelchair outside of his cell, even though he has a mobility impairment.  On one occasion, Mr. ██████ asked officers if he could bring his wheelchair into his cell, and two third-watch officers told him he was not allowed to do so.  When Mr. ██████ began asking the officers about the basis for their decision, they assaulted him in the dayroom as other people in his housing unit watched.  Mr. ██████ reported that he filed a 602 after the beating.  Several days later, the two officers involved in the assault approached Mr. ██████ and told him that if he did not withdraw his 602, they would continue to assault him.

- ████████████, ██████, reported that he was assaulted on September 24, 2019 by a custody officer when returning to his housing unit.  We detailed his allegations in an advocacy letter to CDCR on his behalf.  Exhibit C, Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ████████████, ██████, COR (Feb. 12, 2020).  Mr. ██ filed a 602 to report his assault, but he never received a substantive response.  Instead, the institution sent him

several notices delaying the review of his 602. Mr. ███ was unable to exhaust his administrative remedies because he never even received a first level response to his 602.

- ███████████, ███████, reported that custody officers took his hearing aids during a raid on his cell in October 2019. We sent an advocacy letter to CDCR on his behalf about his hearing aids. Letter from Patrick Booth, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, ███████████ ████████, COR (Feb. 21, 2020). Mr. ████████ filed a 602 on October 29 about the inappropriate confiscation of his DME, but he never received a response.

- An individual on Corcoran's 3A-Facility, reported that, in January 2020, he filed a 602 after the package officer inappropriately confiscated his property, but that package officer destroyed his 602 in front of him.

## IV. Officer-Led Cellphone Trade

We have received multiple reports that officers at Corcoran are engaged in a cellphone trade. For example, ███████████, ███████, reported that some custody officers at Corcoran, including Officers Rojas and Guzman, sell higher value smartphones for $2500 and cheaper phones for $1500. Mr. ████████ believes that the cellphone slid under his cell door on December 24, 2019, resulting in his assault, was part of this officer-run cellphone trade.

Others have reported similar allegations about officers orchestrating a cellphone trade. Several people have reported that officers also enlist incarcerated people to participate in the cellphone trade, and if a person refuses to participate, officers arrange to have him repeatedly assaulted. People have reported to our office that they fear for their lives if they were to stop trading cellphones at the direction of custody officers.

## V. Officer-Organized "Gladiator Fights"

People have reported to our office that custody officers on Corcoran's 3C-Facility orchestrate "gladiator fights" when units are locked down. ███████████, ███████, reports having witnessed these gladiator fights on multiple occasions. He says that some floor officers arrange to have two members of one gang fight two members of a rival gang in the dayroom. Mr. ████████ reports that the officers first search all four people to ensure that they have no weapons, then they let the individuals fistfight in the dayroom while officers watch in the control tower. Mr. ████████ reports that he has witnessed the officers placing bets on who will win, and he has seen the "winners" of the fights receive "prizes" from the officers, like extra snacks from canteen or property that the officers had previously confiscated from other incarcerated people. Based on what Mr. ████████ has heard from incarcerated people on Corcoran's 3C yard, he believes that the gladiator fighting happens in all five buildings on the yard.

Mr. ████████ says that he was once approached by custody officers and asked to participate in one of these fights, but Mr. ████████ declined. He also says that he was too scared to report the gladiator fighting while he was housed at Corcoran. Now that he has been transferred to KVSP, he feels safer speaking out about the ongoing misconduct at Corcoran.

Secretary Ralph Diaz
Re: Corcoran Staff Misconduct
June 8, 2020
Page 8

Most troubling, these reports are consistent with reporting from 2019, when multiple outlets detailed Corcoran's gladiator fighting. In one such article, an individual housed at Corcoran explained, "[A]t least once a week, they run incrementals, which is basically gladiator fights. They only let out four inmates, two from each group that don't get along. The COs are the ones that choose who goes out and [who they] want to see fight, stabbed or seriously injured." Brian Sonenstein, Torture in Corcoran: Endless Lockdown and Gladiator Fights, Again, SF Bay View (February 15, 2019).[1]

\*\*\*\*\*

These reports represent only a small share of the ongoing complaints about serious staff misconduct at CSP-Corcoran. As you know, many people do not report incidents of staff misconduct because they fear retaliation for coming forward. Most of the people who reported issues of Corcoran staff misconduct to our office have refused to allow us to use their names when reporting to CDCR. One person, for example, sent us his mother's phone number and address because he believed that custody officers might murder him for reporting staff misconduct to our office. He said that if he was killed, we should tell his mother that custody officers were responsible. Another person conveyed to his mental health clinician after he was assaulted that officers told him they were going to kill him if he reported his assault. He said he would rather take his own life than allow officers to murder him, so he planned to file a 602 then kill himself "so my family knows why I did it."

I am sure you will agree that the officer conduct reported by incarcerated people at CSP-Corcoran is unacceptable and intolerable. These reports reflect a culture of impunity for custody officers and a lack of accountability at the institution. They also demonstrate the urgent need for sensible measures to detect and address staff misconduct, such as a functional early warning system and widespread use of cameras.

Corcoran is the fourth institution that we have raised similar concerns about. As you know, the OIG corroborated our concerns in their reports on SVSP and HDSP. There is strong evidence of similar misconduct in the current litigation about these same issues regarding RJD. It is clear to us that the current system for protecting incarcerated people from staff misconduct is broken, as I testified a few months ago during the Assembly hearing on this topic. More than two decades ago, the federal court in *Madrid* sanctioned a new investigation and disciplinary process. While that process worked well for some time, it is not working now and needs to be overhauled

I know that you and your staff do not condone this type of staff misconduct, as evidenced by your recent actions with respect to the officers who made inappropriate statements about George Floyd. Please let me know whether the Department is interested in working together (with the assistance of outside experts) to improve this essential component of California's prison system.

Sincerely,

*/s/ Don Specter*
Don Specter

[1] Available at: https://sfbayview.com/2019/02/torture-in-corcoran-endless-lockdown-and-gladiator-fights-again/

# EXHIBIT C

 

**CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

### Institutional Level Response

**Closing Date:** DEC 19 2019

**To:**
S. INFC10███
California State Prison – Corcoran
P.O. Box 8800
Corcoran, CA 93212-8309

**Tracking #**   COR SC 19000163

## RULES AND REGULATIONS
The rules governing these issues are: California Code of Regulations, Title 15; Health Care Department Operations Manual; Mental Health Services Delivery System Program Guide; California Department of Corrections and Rehabilitation Department Operations Manual.

## HEALTH CARE GRIEVANCE SUMMARY
Refer to the attached CDCR 602 HC, Health Care Grievance, in which you explained the decision, action, condition, omission, policy, or regulation that has had a material adverse effect upon your health or welfare for which you seek administrative remedy.

The reviewing authority completed a review of the allegation of staff misconduct presented in the attached CDCR 602 HC, Health Care Grievance, and categorized your health care grievance as a staff complaint. Your health care grievance was referred for a confidential inquiry to address the allegation of staff misconduct.

All issues unrelated to the allegation of staff misconduct must be grieved separately and will not be addressed herein.

## GRIEVANT INTERVIEW
On December 9, 2019 you were interviewed by F. Escamilla, Unit Supervisor. Interviewer asked to provide addition detail for the complaint where you alleged that Psychiatric Technician C. Gonzalez committed gross negligence by not reporting that custody officers were going to assault you. You stated you were in the 4A2L rotunda and you only remembered that it was after the second time they pass medications. You stated Psychiatric Technician Gonzalez was coming into the rotunda from the C section door and you  called her over to you and said they are about to assault you and could she please report it. You stated Psychiatric Technician Gonzales stated, "Huh." then before you could finish they called her away. You stated it was Sgt Navarro, CO Medina, CO Vera, CO Allison, and CO Herrera. You stated they were all in huddle in the rotunda and they pulled her away from talking to you. Interviewer asked you if they physically moved her, did you see where she went, and did she leave the rotunda. You stated No, they called her over to join the little gathering, she did not leave she went with them and you could not hear anything, they were whispering. You stated that is when Psychiatric Technician Campos walked in through the A section door and they called her over too. They whispered some more and then both of the nurses walked toward the door that leads to yard. You stated that is when A section door closed, then B Section, and C section door closed and you told them if you are going to do this at least let you out of the cuffs. They opened the rotunda and started beating you, kicked you, and everything. You stated you started yelling help, and when they were done you noticed the nurses were right there like they never left the room. You stated the CO's sat you in a chair backwards, like they do when you have medical issues. You stated you were in cuffs and you saw Psychiatric Technician Gonzalez come

 RECEIVED HCCAB



COR SC 19000163
Page 2 of 3

toward you with a clipboard to fill out one of those 7219 things. You stated Psychiatric Technician Gonzalez asked if you were ok and Psychiatric Technician Campos would just say, "He is ok." You stated Psychiatric Technician Gonzalez tried and kept asking you what you said. You stated you kept telling her your eyes and your whole body was hurting and you saw her writing. You stated you told her your nuts hurt and Sgt Navarro slapped you right in front of her. You stated he slapped you twice where you knew she saw because you were not speaking to her respectfully. You stated you did not receive medical attention until 3ʳᵈ watch and it was because other inmates were yelling. You stated you think she was trying to do the right thing but she did not do anything to help you.

## WITNESS INTERVIEW(S)

☐ No witnesses were interviewed.

☒ The following witnesses were interviewed: C. Lewis, Psychiatric Technician

## SUBJECT OF THE STAFF COMPLAINT INTERVIEW
C. Gonzalez, Psychiatric Technician was interviewed.

## INSTITUTIONAL LEVEL DISPOSITION
No intervention, as the confidential inquiry is complete and all issues were adequately addressed.

## BASIS FOR INSTITUTIONAL LEVEL DISPOSITION
Your health care grievance package and health record and all pertinent departmental policies and procedures were reviewed.

With respect to one or more of the issues grieved, it has been concluded that staff:

☒ did not violate California Department of Corrections and Rehabilitation policy.

☐ violated California Department of Corrections and Rehabilitation policy.

Complaints against staff are taken seriously and all efforts are made to ensure these matters are thoroughly researched and responded to in accordance with governing laws, rules, and policies. Any report generated or action taken is confidential and will not be released to inmates under any circumstances.

If you have health care needs, you may access health care services by utilizing approved processes in accordance with California Correctional Health Care Services policy.

If you are dissatisfied with the Institutional Level Response, follow the instructions on the CDCR 602 HC, Health Care Grievance, and submit the entire health care grievance package for headquarters' level review. The headquarters' level review constitutes the final disposition on your health care grievance and exhausts your administrative remedies.



Note 1: The institutional level review is based on records available as of the date the Institutional Level Response is signed by the reviewing authority.
Note 2: The closing date reflects the closed/mailed/delivered date of the health care grievance.

COR SC 19000163
Page 3 of 3

_____
Interviewer
F. Escamilla
Unit Supervisor
California State Prison – Corcoran

12/16/19
_____
Reviewed and Signed Date

For C Bell, CEO (X̶Ñ̶d̶b̶ CNE(A))
_____
Reviewing Authority
C. Bell
Chief Executive Officer
California State Prison – Corcoran

12/19/19
_____
Reviewed and Signed Date



Note 1: The institutional level review is based on records available as of the date the Institutional Level Response is signed by the reviewing authority.
Note 2: The closing date reflects the closed, mailed delivered date of the health care grievance.
Note 3: Permanent health care grievance document. Do not remove from the health care grievance package.

TE OF CALIFORNIA
**ALTH CARE GRIEVANCE**
CR 602 HC (Rev. 06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

CORSC 19000163

**FF USE ONLY**   Expedited?   ☐ Yes   ☒ No   Institution: COR HC 19001041   Tracking #:

S Dougherty RN   | S Dougherty RN | 10/09/19
Name and Title (Print)   | Signature | Date

ou think you have a medical, mental health or dental emergency, notify staff immediately. If additional space is needed, only one CDCR 602 HC A
th Care Grievance Attachment will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to
ornia Code of Regulations (CCR), Title 15, Section 3087 for further guidance with the health care grievance process.

ot exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

e (Last, First, MI): | | CDCR #: | Unit/Cell #:

**CTION A:**   Explain the decision, action, condition, omission, policy, or regulation that has had a material adverse effect upon your health and welfare for
which you seek administrative remedy.

J SEPT 23rd 2019 I INFORMED THE 4A2L NURSE GONZALES & CAMPOS
AT THE 4A2L SGT NAVARRO, C/O N. VERA, C/O I. MEDINA, C/O A. ALLI-
SON & C/O J. HUARITA ARE ABOUT TO ASSAULT ME & BOTH FAILED TO
PORT IT IN ORDER TO PREVENT IT. 5 MINUTES LATER I WAS ASS-
ILTED BY THE ABOVE MENTION STAFF & BOTH NURSE GONZALES &
AMPOS DIDN'T WITNESS THE ASSAULT & THEN FABRICATED AN 7219
PORT AS IF I HAD NO INJURIES BOTH NURSES COMMITTED —

*If you need more space, use Section A of the CDCR 602 HC A*

Supporting Documents: Refer to CCR 3087.2. List supporting documents attached:

No, I have not attached any supporting documents. Reason:

vant Signature: | Date Submitted: 10-3-19

LACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL.

LTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only   Is a CDCR 602 HC A attached?   ☐ Yes   ☐ No

grievance has been:

Rejected (See attached letter for instruction): Date: _____   Date: _____

Vithdrawn (see section C)

Accepted   Assigned To: _____   Title: _____   Date Assigned: _____   Date Due: _____

iew Conducted?   ☐ Yes   ☐ No   Date of interview: _____   Interview Location: _____

iewer Name and Title (print): _____   Signature: _____   Date: _____

ewing Authority
e and Title (print): _____   Signature: _____   Date: _____

osition: See attached letter   ☐ Intervention   ☐ No Further Intervention   ☐ No intervention

*If dissatisfied with Institutional Level Response, complete Section B.*

IO Use Only: Date closed and mailed/delivered to grievant:

| isability Code: | 2. Accommodation: | 3. Effective Communication: |
| TABE score ≤ 4.0 | ☐ Additional time | ☐ Patient asked questions |
| PH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information |
| PS ☐ DNH | ☐ Louder ☐ Slower | Please check one: |
| DP | ☐ Basic ☐ Transcribe | ☐ Not reached ☐ Reached |
| Not Applicable | ☐ Other | *See chrono/notes |

omments:

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
CDCR 602 HC (Rev. 06/17)

CORSC 19000163
CorHc 19001041

DEPARTMENT OF CORRECTIONS AND REHABILITATIO
Page 2 of

Tracking #:

**SECTION B:** Health Care Grievance Appeal. If you are dissatisfied with the Institutional Level Grievance Response, explain the reason below (if mor space is needed, use Section B of the CDCR 602 HC A), and submit the entire health care grievance package by mail for Headquarters' (HQ) Leve health care grievance appeal review. Mail to: Health Care Correspondence and Appeals Branch, P.O. Box 588500, Elk Grove, CA 95758.

POLICY WAS CLEARLY VIOLATED

| Grievant Signature: | | Date Submitted: | 12·29·19 |
|---|---|---|---|

**HEALTH CARE GRIEVANCE APPEAL REVIEW HQ LEVEL: Staff Use Only**   Is a CDCR 602 HC A attached?  ☐ Yes   ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction):   Date:        Date:

☐ Withdrawn (see section C)

☐ Accepted

Interview Conducted?   ☐ Yes  ☐ No   Date of Interview:        Interview Location:

Interviewer Name and Title (print):        Signature:        Date:

**Disposition:** See attached letter   ☐ Intervention   ☐ No Further Intervention   ☐ No Intervention

*This decision exhausts your administrative remedies.*

HQ Use Only: Date closed and mailed/delivered to grievant:

**SECTION C:** Grievant requests to WITHDRAW health care grievance: I request that this health care grievance be withdrawn from further review. Reason:

| Grievant Signature: | | Date Submitted: | |
|---|---|---|---|
| Staff Name and Title (Print): | | Signature: | | Date: |

**STAFF USE ONLY**

Distribution: Original - Returned to grievant after completed; Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws*

**HEALTH CARE GRIEVANCE ATTACHMENT**
CDCR 602 HC A (06/17)

Page 1 of 2

CORSC 19000163

**STAFF USE ONLY**

Institution: COR HC   Tracking #: 19001041

Attach this form to the CDCR 602 HC, Health Care Grievance, only if more space is needed. Only one CDCR 602 HC A may be used.
Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

Name (Last, First, MI): ███████████   CDCR Number: ███   Unit/Cell Number: ███

SECTION A | Continuation of CDCR 602 HC, Health Care Grievance, Section A only (Explain the decision, action, condition, omission, policy or regulation that has had a material adverse effect upon your health and welfare for which you seek administrative remedy):

GROSS NEGLIGENCE & DELIBERATE INDIFFERENCE

Grievant Signature: ███████████   Date Submitted: 10-3-19

SECTION B | Continuation of CDCR 602 HC, Health Care Grievance Appeal, Section B only (Dissatisfied with Health Care Grievance Response):

Grievant Signature:   Date Submitted:

RECEIVED
STAFF USE ONLY
HCGO   HCGO
COR   COR
HCCAB   HCCAB
JAN 0 6 2020   MAR 2 6 2020

STATE OF CALIFORNIA
HEALTH CARE GRIEVANCE ATTACHMENT
CDCR 602 HC A (06/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 2 of 2

COR HC 19000163
COR HC 19001091

Tracking #:

STAFF USE ONLY | Grievants do not write in this area. Grievance Interview Clarification: Document issue(s) clarified during interview

Staff Name and Title: _____

Signature: _____     Date: _____

STAFF USE ONLY

Distribution: Original - Returned to grievant after completed, Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
**HEALTH CARE GRIEVANCE**
Page 1 of 2
CDCR 602 HC (Rev. 10/18)

CORSC 19000163

| STAFF USE ONLY | Expedited?  ☐ Yes  ☐ No | Tracking # |
|---|---|---|

COR HC 19000104T

S Dougherty RN — S Dougherty — 10/9/19
Staff Name and Title (Print) — Signature — Date

If you think you have a medical, mental health or dental emergency, notify staff immediately. If additional space is needed, use Section A of the CDCR 602 HC A Health Care Grievance Attachment. Only one CDCR 602 HC A will be accepted. You must submit this health care grievance to the Health Care Grievance Office for processing. Refer to California Code of Regulations (CCR), Title 15, Chapter 2, Subchapter 2, Article 5 for further guidance with the health care grievance process.
Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

**SECTION A:** Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy:

SEE ATTACHED
CDC-1824/602

Supporting Documents Attached. Refer to CCR 3999.227   ☐ Yes   ☐ No

Grievant Signature: _____    Date Submitted: _____

BY PLACING MY INITIALS IN THIS BOX, I REQUEST TO RECEIVE AN INTERVIEW AT THE INSTITUTIONAL LEVEL.  _____

**SECTION B:** HEALTH CARE GRIEVANCE REVIEW INSTITUTIONAL LEVEL: Staff Use Only     Is a CDCR 602 HC A attached? ☒ Yes   ☐ No

This grievance has been:

☐ Rejected (See attached letter for instruction). Date: _____    Date: _____

☐ Withdrawn (see section E)

☒ Accepted     Assigned To: Nursing   Title: CEO     Date Assigned: 10/31/19   Date Due: 12/16/19

Interview Conducted? ☒ Yes ☐ No   Date of Interview: 12/4/19   Interview Location: 3C Program

Interviewer Name and Title (print): Fercamille Unit Supervisor   Signature: _____   Date: 12/4/19

Reviewing Authority
Name and Title (print): R. C Bell CEO (Adkins CNE(A))   Signature: _____   Date: 12/19/19

Disposition: See attached letter   ☐ Intervention   ☒ No Intervention

HCGO Use Only: Date closed and mailed/delivered to grievant:   DEC 19 2019

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☒ Patient asked questions | |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☒ Patient summed information | |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | |
| ☐ DDP | ☒ Basic ☐ Transcribe | ☐ Not reached ☒ Reached | |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes | |

4. Comments:

STAFF USE ONLY

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE**
CDCR 602 HC (Rev. 10/18)

CDRSC 19000163
COR HC 19001041

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 2 of 2

Tracking #:

| SECTION C: | Health Care Grievance Appeal. If you are dissatisfied with the Institutional Level Grievance Response, explain the reason below (if more space is needed, use Section C of the CDCR 602 HC A), and submit the entire health care grievance package by mail for Headquarters' (HQ) Level health care grievance appeal review. Mail to: Health Care Correspondence and Appeals Branch, P.O. Box 588500, Elk Grove, CA 95758. |

MEDICAL STAFF DID VIOLATE POLICY

Grievant Signature: ███████████████████     Date Submitted: 12.29.19

| SECTION D: | HEALTH CARE GRIEVANCE APPEAL REVIEW HQ LEVEL: Staff Use Only | Is a CDCR 602 HC A attached? ☑ Yes ☐ No |

This grievance has been:

☐ Rejected (See attached letter for instruction):   Date:_____   Date:_____

☐ Withdrawn (see section E)   ☑ Accepted

☐ Amendment   Date:_____

Interview Conducted?   ☐ Yes ☑ No   Date of Interview:_____   Interview Location:_____

Interviewer Name and Title (print):_____   Signature:_____   Date:_____

| Disposition: See attached letter | ☐ Intervention | ☑ No Intervention |

*This decision exhausts your administrative remedies.*

HQ Use Only: Date closed and mailed/delivered to grievant:   MAR 2 0 2020

| SECTION E: | Grievant requests to WITHDRAW health care grievance: I request that this health care grievance be withdrawn from further review. Reason: |

Grievant Signature:_____   Date Submitted:_____

Staff Name and Title (Print):_____   Signature:_____   Date:_____

# STAFF USE ONLY

Distribution: Original - Returned to grievant after completed. Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record).

*Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.*

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE ATTACHMENT**
CDCR 602 HC A (10/15)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 2

OORSC 19000163

| STAFF USE ONLY | |
|---|---|
| Tracking #: | CORHC 19001041 |

Attach this form to the CDCR 602 HC, Health Care Grievance, only if more space is needed. Only one CDCR 602 HC A may be used.
Do not exceed more than one row of text per line. WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

|  | CDCR Number: | Unit/Cell Number: |
|---|---|---|

**SECTION A** Continuation of CDCR 602 HC, Health Care Grievance, Section A only (Explain the applied health care policy, decision, action, condition, or omission that has had a material adverse effect upon your health or welfare for which you seek administrative remedy):

SEE ATTACHED
CDC-1824/602

Grievant Signature: _____    Date Submitted: _____

**SECTION B** Staff Use Only: Grievants do not write in this area. Grievance Interview Clarification. Document issue(s) clarified during interview.

Name and Title: _____    Signature: _____    Date: _____

COR SC 19000163

STATE OF CALIFORNIA
**HEALTH CARE GRIEVANCE ATTACHMENT**
CDCR 602 HC A (10/18)

DEPARTMENT OF CORRECTIONS AND REHABILITY
Page 2

COR HC 19001041

Tracking #:

**SECTION C:** Continuation of CDCR 602 HC, Health Care Grievance Appeal, Section C only (Dissatisfied with Health Care Grievance Response):

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Grievant Signature: _____   Date Submitted: _____

**SECTION D:** Staff Use Only: Grievants do not write in this area. Grievance Appeal Interview Clarification. Document issue(s) clarified during interview (if necessary at HQ Level).

_____
_____
_____
_____
_____
_____

Name and Title: _____   Signature: _____   Date : _____

## STAFF USE ONLY

Distribution: Original - Returned to grievant after completed, Scanned Copy - Health Care Appeals and Risk Tracking System 2.0 (Do not place in central file or health record)

Unauthorized collection, creation, use, disclosure, modification or destruction of personally identifiable information and/or protected health information may subject individuals to c liability under applicable federal and state laws.



CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES



### Headquarters' Level Response

**Closing Date:**  MAR 2 0 2020

**To:**

██████████████

Kern Valley State Prison
PO Box 3130
Delano, CA 93216

**From:**  California Correctional Health Care Services
Health Care Correspondence and Appeals Branch
P.O. Box 588500
Elk Grove, CA 95758

**Tracking #:**  COR SC 19000163

## RULES AND REGULATIONS
The rules governing these issues are: California Code of Regulations, Title 15; Health Care Department Operations Manual; Mental Health Services Delivery System Program Guide; California Department of Corrections and Rehabilitation Department Operations Manual.

## HEALTH CARE GRIEVANCE SUMMARY
Refer to the attached CDCR 602 HC, Health Care Grievance, in which you explained the decision, action, condition, omission, policy, or regulation that has had a material adverse effect upon your health or welfare for which you seek administrative remedy.

The institutional level reviewing authority categorized your health care grievance as a staff complaint and referred your health care grievance for a confidential inquiry to address the allegation of staff misconduct.

All issues unrelated to the allegation of staff misconduct must be grieved separately and will not be addressed herein. This response does not exhaust administrative remedies on any unrelated issue not addressed or concerning any staff you did not identify in the attached health care grievance.

## HEADQUARTERS' LEVEL DISPOSITION

☒ No intervention.          ☐ Intervention.

## BASIS FOR HEADQUARTERS' LEVEL DISPOSITION
Your health care grievance package and health record, the supervisor's Confidential Inquiry Report, and all pertinent departmental policies and procedures were reviewed. Records indicate the content of the Confidential Inquiry Report supported the conclusion that staff did not violate California Department of Corrections and Rehabilitation policy.

Complaints against staff are taken seriously and all efforts are made to ensure these matters are thoroughly researched and responded to in accordance with governing laws, rules, and policies. Any report generated or

Note 1:  The headquarters' level review is based on records available as of the date the Headquarters' Level Response is signed by the reviewing authority.
Note 2.  The closing date reflects the closed, mailed/delivered date of the health care grievance.



COR SC 19000163
Page 2 of 2

action taken is confidential and will not be released to inmates under any circumstances. You have been provided all information to which you have a right under California Code of Regulations, Title 15, Section 3999.231.

The institution's reviewing authority deemed your health care grievance a staff complaint and referred the allegation to the applicable authority for an allegation inquiry or investigation per California Code of Regulations, Title 15, Section 3999.231(b).

Per California Code of Regulations, Title 15, Section 3999.227(e), "The grievant is limited to one issue or set of issues related to a single health care discipline that can reasonably be addressed in a single health care grievance response." As such, this response will only address your allegations against C. Gonzalez, Psychiatric Technician. Your allegations against H. Campos, Psychiatric Technician, are being addressed in health care staff complaint tracking number COR SC 19000164.

While you may not agree with the decisions of your treatment team, it does not constitute staff misconduct or deliberate indifference to your health care needs.

You alleged negligent care; however, your allegation is refuted by professional health care staff familiar with your health care history, as well as a review of your health record.

If you have health care needs, you may access health care services by utilizing approved processes in accordance with California Correctional Health Care Services policy.

This decision exhausts your administrative remedies.

S. Gates, Chief
Health Care Correspondence and Appeals Branch
Policy and Risk Management Services
California Correctional Health Care Services

3/25/20

Reviewed and Signed Date

Note 1: The headquarters' level review is based on records available as of the date the Headquarters' Level Response is signed by the reviewing authority.
Note 2: The closing date reflects the closed, mailed/delivered date of the health care grievance

CALIFORNIA CORRECTIONAL

# EXHIBIT D

C-FILE COPY

STATE OF CALIFORNIA
INMATE/PAROLEE APPEAL
CDCR 602 (REV. 03/12)

CITIZENS COMPLAINT

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| | IAB USE ONLY | Institution/Parole Region | Log #. | Category |
|---|---|---|---|---|
| | | CSP CORCORAN P-CORCORAN | 14-6716 | 7 |
| | | | FOR STAFF USE ONLY | |

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

Appeal is subject to rejection if one row of text per line is exceeded.   WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First) | CDC Number | Unit/Cell Number | Assignment |
|---|---|---|---|
| | | HU03 | |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):

RETALIATION

A. Explain your issue (if you need more space, use Section A of the CDCR 602-A): ON OCT·16·19 THE C.S.P. COR C/O N. VERA CAME TO MY DOOR WHILE BEING HOUSED IN THE ACUTE CARE HOSPITAL CTC & FLIP ME OFF WITH HIS MIDDLE FINGER MOVING IT IN AN UP→

B. Action requested (if you need more space, use Section B of the CDCR 602-A): # TO PLEASE GENERATE AN SEPERATION CHER CHRONO BETWEEN ME & C/O'S N. VERA. I. MEDINA. D. ALLISON. J. HURRITA & SGT J. NAVARRO TO PREVENT FUTHER RETALIATION.

Supporting Documents: Refer to CCR 3084.3.

☐ Yes. I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____   _____

_____   _____

_____   _____

☐ No, I have not attached any supporting documents.  Reason :

_____

_____

_____

| Inmate/Parolee Signature: | Date Submitted: 10-20-19 |
|---|---|

☐ By placing my initials in this box, I waive my right to receive an interview.

C. First Level - Staff Use Only          Staff – Check One: Is CDCR 602-A Attached?  ☑ Yes  ☐ No

This appeal has been:
☑ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instruction)  Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____  Title: _____  Date Assigned: _____  Date Due: _____

First Level Responder: Complete a First Level response. Include interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____  Interview Location: _____

Your appeal issue is:  ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____  Title: _____  Signature: _____  Date completed: _____
(Print Name)

Reviewer: _____  Title: _____  Signature: _____
(Print Name)

Date received by AC: _____

AC Use Only
Date mailed/delivered to appellant _____ / _____ / _____

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 2

D. If you are dissatisfied with the First Level response, explain the reason below; attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.  If you need more space, use Section D of the CDCR 602-A.

Inmate/Parolee Signature: _____   Date Submitted : _____

**E.  Second Level - Staff Use Only**

Staff – Check One:  Is CDCR 602-A Attached?  ☑ Yes   ☐ No

This appeal has been:
☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter)
☑ Accepted at the Second Level of Review

Assigned to: R.W.S. St Brown   Title: _____   Date Assigned: 11/1/19   Date Due: 13/17/19

Second Level Responder: Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: 12/13/19   Interview Location: 3C

Your appeal issue is: ☐ Granted  ☑ Granted in Part  ☐ Denied  ☐ Other: _____
See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: Olsown   Title: LV   Signature: _____   Date completed: 12/13/19

Reviewer: M. Snyder   Title: DV   Signature: _____
          (Print Name)

Date received by AC:  12/19/19

**AC Use Only**
Date mailed/delivered to appellant 12/19/19

F.  If you are dissatisfied with the Second Level response, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

Inmate/Parolee Signature: _____   Date Submitted: _____

**G.  Third Level - Staff Use Only**
This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter)  Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____
    See attached Third Level response.

**Third Level Use Only**
Date mailed/delivered to appellant ____ /____ /____

H. Request to Withdraw Appeal:  I request that this appeal be withdrawn from further review because: State reason. (If withdrawal is conditional, list conditions.)

_____ Inmate/Parolee Signature: _____  Date:_____
Print Staff Name: _____ Title: _____ Signature:_____ Date:_____

"CITIZEN'S COMPLAINT"

STATE OF CALIFORNIA
INMATE/PAROLEE APPEAL FORM ATTACHMENT

DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDCR 602-A (08/09)

Side 1

| IAB USE ONLY | Institution/Parole Region: Log #: | Category |
|---|---|---|
| | CSP-CORCORAN | 7 |
| | FOR STAFF USE ONLY | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

Appeal is subject to rejection if one row of text per line is exceeded.          WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

Name (Last, First):                                CDC Number:     Unit/Cell Number:
[redacted]                                          [redacted]      HU03 [redacted]

A. Continuation of CDCR 602, Section A only (Explain your issue): AND DOWN MOTION
AND STATED "YOU SNITCHED ON ME & MY PARTNERS &
WE WILL MAKE SURE YOU CAN'T GO TO C-3 YARD & PRO-
GRAM ANY MORE. YOUR A RAT." HIS ACTION WERE
DONE OUT OF RETALIATION DUE TO ME FILING AN PREV-
IOUS EXCESSIVE FORCE & SEXUAL ASSAULT ON HIM &
SEVERAL OTHER C/O'S THAT TOOK PLACE ON 9-23-19. I
FEAR FOR MY SAFETY AMONG C/O N. VERA. D. ALLISON,
I. MEDINA, J. HURRITA & SGT J. NAVARRO. THIS HAS
TAKEN AN ADVERSE EFFECT ON ME & MY MENTAL
HEALTH. N. VERA STATED THAT "HE WOULD BE WORKING ON
C-3 YARD ON THAT UP COMING FRIDAY 10-18-19 & HE WILL
WILL LET THE INMATES KNOW TO TAKE CARE OF ME"
INDICATING TO ASSAULT ME.

Inmate/Parolee Signature: [redacted]          Date Submitted:
10-20-19

B. Continuation of CDCR 602, Section B only (Action requested): 2# GENERATE A SAFETY CHRONO
AMONGS ME & THE ABOVE MENTION C/O'S CAUSE I FEAR FOR
MY SAFETY OF THEM. 3# EMERGENCY TRANSFER TO LANCASTER STATE
PRISON 270 DESIGN LEVEL 4 TO PLACE ME CLOSE TO MY MOTHER

Inmate/Parolee Signature: [redacted]          Date Submitted: 10-20-19

Allegation oro 9/23/19 pending under Appeal Log CSP-C-2-19-06416
SP-OINC-19-06416
050

Template Date 4/4/2012
State of California

Attachment E-1
Department of Corrections and Rehabilitation

# Memorandum

Date : December 13, 2019

To :    ███████████
        3C01███

Subject: **STAFF COMPLAINT RESPONSE - APPEAL # CSPC-2-19-06716** *SECOND* **LEVEL RESPONSE.**
(COR-2140-19-525)

**APPEAL ISSUE:** You allege on October 16, 2019, Officer Vera came to your cell door while you were housed in the Correctional Treatment Center and flipped you off with his middle finger and stated, "You snitched on him and his partners and we will make sure you can't go to 3C yard and program anymore you rat". You allege Officer Vera's actions were done in retaliation, due to you filing a complaint against him.

All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response. You do not exhaust administrative remedies on any unrelated issue not covered in this response or concerning any staff member not identified by you in this complaint. If you are unable to name all involved staff you may request assistance in establishing their identity.

**DETERMINATION OF ISSUE:** A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal is:

Being processed as an Appeal Inquiry.

You were interviewed on December 13, 2019, by Correctional Lieutenant C. Brown, you stated what you wrote in your appeal is what happened and had nothing else to add.

**EFFECTIVE COMMUNICATION:** A review of the Disability and Effective Communication System (DECS) reveals you have a Test of Adult Basic Education (TABE) score of (6.2).You do not have a documented disability which requires special accommodation to achieve effective communication.

During your interview with Lt. C. Brown, you were afforded the opportunity to fully explain your appeal and provide any additional information. Your personal interaction with the interviewer indicated you understood the conversation, satisfying the interviewer that effective communication was achieved.

Template Date 4/4/2012

Attachment E-1

Page 2

**Your appeal is PARTIALLY GRANTED in that:**

> The **Appeal inquiry** is has been reviewed and all issues were adequately addressed.

The following witness (es) will be / were questioned: Officers Thompson and Brandon. The following information will be / was reviewed as a result of your allegations of staff misconduct: CDCR-602 Inmate/Parolee Appeal Log # CSPC-2-19-06716.

Staff: **did** ☐ **did not** ☒ violate CDCR policy with respect to one or more of the issues appealed.

ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE.

- As such, the details of any inquiry will not be shared with staff, members of the public, or offender appellants.
- Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff complaint process. A variety of personnel actions may be initiated by the Department based upon the content of your complaint and the outcome of any investigation or inquiry conducted as a result of your complaint.
- Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process.

If you wish to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of Review. Once a decision has been rendered at the Third Level, administrative remedies will be considered exhausted.

*[Print Name, Sign and Date]:*

Print: _____ Sign: _____ Date: 12/13/1_
Interviewer

Print: _____ Sign: _____ Date: 12/6/1_
Hiring Authority

STATE OF CALIFORNIA                          DEPARTMENT OF CORRECTIONS AND REHABILITATION
RIGHTS AND RESPONSIBILITY STATEMENT
CDCR 1858 (Rev. 10/06)


# RIGHTS AND RESPONSIBILITY STATEMENT

*The California Department of Corrections and Rehabilitation has added departmental language (shown inside brackets, in non-boldface type) for clarification purposes.*


*Pursuant to Penal Code 148.6, anyone wishing to file an allegation of misconduct by a departmental peace officer must read, sign and submit the following statement:*


**YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER** [this includes a departmental peace officer] **FOR ANY IMPROPER POLICE** [or peace] **OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS'** [or inmates'/parolee's] **COMPLAINTS. YOU HAVE THE RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN** [or inmate/parolee] **COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.**


| COMPLAINANT'S PRINTED NAME | COMPLAINANT'S SIGNATURE | DATE SIGNED | |
|---|---|---|---|
| INMATE/PAROLEE PRINTED NAME | INMATE/PAROLEE'S SIGNATURE | CDC NUMBER | DATE SIGNED 12·13·19 |
| RECEIVING STAFF'S PRINTED NAME | RECEIVING STAFF'S SIGNATURE | DATE SIGNED 12/13/19 | |

DISTRIBUTION:
ORIGINAL
Public-Institution Head/Parole Administrator
Inmate/Parolee-Attach to CDC Form 602
Employee-Institution Head/Parole Administrator
COPY-Complainant

ATTACHMENT A (Rev. 9/08)

## EFFECTIVE COMMUNICATION DETERMINATION FOR FORMAL LEVEL
### CDC 602 INMATE/PAROLEE APPEAL

Inmate [REDACTED]          CDC# [REDACTED]          Appeal Log# CSPC - 2 - 19 - 06716

☑ Test of Adult Basic Education (TABE) above 4.0 (provide RGPL _11.8_ / verify
  source if other than RGPL_____ )

☐ Test of Adult Basic Education (TABE) below 4.0 (provide RGPL ____ )

☐ Learning Disability (LD)

☐ Non-English speaking

  * All first level responses must indicate whether inmate does or does not require
  effective communication.  If RGPL is 4.0 or below, first level responder must also
  identify how Effective Communication was established within response.

_____          ᴸᵀ_____          12/13/19
Staff Signature                  Title                       Date

_____
Print Name

PERMANENT APPEAL ATTACHMENT -- DO NOT REMOVE

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                         GAVIN NEWSOM, GOVERNOR

**OFFICE OF APPEALS**
P.O. BOX 942883
SACRAMENTO, CA 94283-0001



## OFFICE OF APPEALS (THIRD LEVEL) DECISION

Date:   MAR 2 7 2020

In re   ▮▮▮▮▮▮▮▮▮▮▮▮              TLR Case No.: 2000089      Local Log No.: COR-19-06716
        KVSP

### I.  ISSUE ON APPEAL:

The claimant alleges that on October 16, 2019, while housed in the Correctional Treatment Center, Correctional Officer (CO) N. Vera came to his cell door, flipped him off with his middle finger and stated: "You snitched on me & my partners and we will make sure you don't go to 'C' Yard and program anymore. Your a rat (sic)." The claimant also claims that CO Vera stated: "He would be working on C-3 Yard on ... October 18, 2019, and he will let the inmates know to take care of me." The claimant is requesting a safety separation chrono from COs Vera, I. Medina, D. Allison, J. Hurrita and Sergeant J. Navarro; and a transfer to Lancaster 270 design prison to be close to his mother.

### II.  RULES AND REFERENCES:

#### A.  CONTROLLING AUTHORITY:

*   California Penal Code Section 832.7 and 832.8
*   California Code of Regulations, Title 15, (CCR) Section 3084.9 and 3391
*   Department Operations Manual (DOM), Section 33030.3.1 and 54100.25

#### B.  DOCUMENTS CONSIDERED:

*   CDCR 602 Appeal Form Log No.: COR-19-06716
*   Confidential Inquiry for Appeal COR-19-06716 by Correctional Lieutenant C. Brown
*   Claimants Electronic Records Management System and Strategic Offender Management System files

### III. REASONING AND DECISION: DENIED

Upon review of the documentation submitted, the Third Level of Review (TLR) Examiner determined that the claimant's allegations were appropriately reviewed and evaluated by administrative staff. Witnesses were interviewed and their statements were annotated on a Confidential Inquiry pursuant to the CCR and DOM. If the conduct of staff was determined not in compliance with policy, the institution would take the appropriate course of action. In this case, the Second Level of Review informed the claimant that an inquiry was completed and disclosed the determination. The institution's response complies with departmental policy and the claimant's staff misconduct complaint allegations were properly addressed.

The claimant has added new claims in section "F" of this appeal. These claims will not be addressed at the TLR, as the institution did not have an opportunity to review them.

This appeal only addresses the staff misconduct complaint at the TLR. The appellant would have to address his staff separation safety issue with appropriate staff and his transfer request with his assigned counselor and the Unit Classification Committee.



Page 2 of 2

It is the order of the Office of Appeals that this appeal at the TLR is **DENIED**. This decision exhausts the administrative remedies available to the claimant with CDCR.

**IV. REMEDY:** Your appeal has been denied, therefore there is no applicable remedy.

S. K. HEMENWAY, Appeals Examiner
Office of Appeals
cc:    Warden, COR
        Grievance Coordinator, COR and KVSP

# Exhibit 41

**DECLARATION OF** ███████████

I, ███████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ██████. I am currently housed at the California Institution for Women ("CIW") in the Security Housing Unit ("SHU"). I am 39 years old. I am a transgender man and use he/him pronouns. I am in the process of legally changing my name to ████ ███████████.

3.    I am an *Armstrong* class member. I am designated as DLT. Ever since I was in a vehicular accident, I have limited movement in my back, legs, shoulders, and hands. I use a walker, eye glasses, and wrist, elbow and back braces. I require a lower bunk and lower tier housing.

4.    I am a *Coleman* class member. I am at the Correctional Clinical Case Management ("CCCMS") level of care. I am diagnosed with PTSD, and I experience anxiety and depression.

5.    I have a number of serious medical conditions. I have seizures, asthma, neuropathy, carpal tunnel, high blood pressure, and sleep apnea. I use a C-PAP machine and I always carry an inhaler.

6.    I have been incarcerated in CDCR since 2011. Since then, I have been at CIW on and off and most recently returned in February 2017 after I was assaulted by staff in January 2018 at the Central California Women's Facility ("CCWF").

7.    Since returning to CIW in February 2017, I have been in SHU, a solitary confinement unit, with the exception of a few months. I was released from SHU around January 28, 2020, and moved to Harrison-A, ██████. I was in Harrison-A for about two or three weeks until I moved to Harrison-B, ██████. Then I moved to SHU on February 24, 2020. I was in SHU until around March 9, 2020, when they released me back to the

1  yard, to Emmons-B, ███████ .  Then I moved back to SHU on June 26, 2020, where I

2  currently reside.

3        8.      I was a victim of staff misconduct at CIW.  Since the time I was first

4  released from SHU in February, custody officers have taunted and verbally harassed me.

5  For example, the week of February 3, 2020, around 8:00 p.m. in front of Barneberg

6  building, Officer Harris said to me, "Hey you fuckin' punk. Your bitch ass ain't locked up

7  any more."  Officer Harris put down his bike, approached me, and said, "What the fuck are

8  you gonna do now?"  I reported the incident to Officer Garcia and Officer Perez, who said

9  they did not want "anything to do with it."  The following day, I reported the incident to

10  Sergeant "H" who told me that because I had not reported the incident "right away," that it

11  "didn't happen."

12        9.      The week of February 10, 2020, I was in the medication line when Officer

13  Romo – who was not working near the medication line but was in the area – repeatedly

14  called me "Shorty."  I told Officer Romo that his behavior was unprofessional and that he

15  was not working in the post where he was supposed to be working.  Officer Romo replied

16  that his post was, "Wherever I fucking want it to be."  Officer Romo then asked me to step

17  to the side corner with him, out of sight of others. I refused and Officer Romo entered the

18  medication room where staff were and continued to call me "Shorty." I received my

19  medications and walked away. These incidents are only examples of the many times

20  custody staff made negative comments about my release from SHU such as, "Who the

21  fuck let you out?" "Fuck, you're still out?" I was being made a target for staff to send back

22  to isolation.  The only thing I got out of being out of SHU was talking on the phone and

23  seeing old friends.  Otherwise it was a total nightmare.

24        10.     On February 24, 2020, around 8:00 p.m., I verbally argued with my

25  roommate, while she was cleaning the floor. A custody officer arrived and opened the cell

26  door. The custody officer sounded the alarm and other officers arrived, including Sergeant

27  Blair, Sergeant McDonald, Sergeant Rodriguez, Officer Estrada, Officer Flores.  I stepped

28  out into the hallway and leaned my back against the wall. Sergeant Blair asked me to cuff

behind my back. I refused because I require special cuffing to accommodate my disability. Sergeant Blair said, "Fuck no. Fucking cuff up." Officer Estrada then grabbed my neck, attempting to bring me to the ground. Other custody officers then attempted to pull me to the ground. I knelt on the ground and then one custody officer pushed me down and held a knee on my back. Another officer had his knee next to my head. The officers cuffed me behind my back and left me on the ground for three to five minutes. Sergeant McDonald said, "Have a nice fucking time in ASU because you're going back to SHU."

11.    When this incident occurred, I had shortness of breath. Officer De la Fuentes escorted me to the CTC, where I was left in a holding cell handcuffed behind my back for nearly two hours until Officer Eggenberger confirmed that I have restraint restrictions and removed the handcuffs. At approximately 1:00 or 2:00 a.m., Lieutenant Brown arrived to the holding cell with a lock-up order "pending investigation of possible battery on the roommate." I told staff that I did not want to go to ASU and asked instead to go to a crisis bed. I did not want to return to ASU because I did not want to hear staff say the results of their bets on whether I would return to the detention unit or make more comments that they knew I would not "make it" outside of isolation.

12.    I never received any paperwork about being locked up in SHU. Staff said that they investigated the incident and determined that there was no assault on my roommate, so I was released from SHU to Emmons. To this day, nobody ever apologized for sending me to SHU, they've just moved on like it didn't affect me.

13.    Again when I was released from SHU, staff continued to harass me. Officer Estrada frequently made comments to me, calling me "she." Shortly after I arrived to Emmons, Ms. Thorpe approached me. She runs the SAP program. She said, "I don't fucking want you in my building. You're a menace. You're going to bring down my image. I don't trust you. The first thing you do, I'm getting you out of my building." I felt like I was walking on eggshells. I was cleaning the unit even though I wasn't able to get a paid position doing so because I had just got out of SHU, but I wanted to show people that I wasn't what they thought.

14.     In May 2020, Officer Villanueva woke me up to search my room.  He was not wearing a mask or gloves.  I asked him to leave my room because he wasn't wearing a mask or gloves and I was worried about getting sick from the coronavirus.  He pushed the alarm, and Sergeant Pineda arrived.  The sergeant allowed Officer Villanueva to go into my room with no mask or gloves.  When I returned to my room, my TV was flipped upside down and my C-PAP machine bag was opened and the cord was on the ground where it could get dusty.

15.     Around the week of June 22, 2020, for the entire week, Officer Sanchez had been harassing me, calling me "she." Around June 24 or 26, 2020, around 6:00 p.m., I went to the medication line.  I was standing in line.  Officer Sanchez told me to go back and change my sleeveless shirt, which we were allowed to wear.  I asked her why.  She said she could see my bra, but that wasn't true.  She called Code 1 for a "defiant inmate." Other officers arrived, including Officer Hyde, Sergeant Weiss, and Sergeant Mejia. Officer Hyde and Sergeant Mejia said they would escort me back to the building so I could change my shirt.  While we were walking back, they asked me what was going on.  I said that Officer Sanchez was picking on me.  They agreed that to call a Code 1 for the shirt was ridiculous.  When we arrived at Barneberg, Officer Estrada came behind me and yanked my arm.  I asked him, "what are you doing?"  He told me to cuff up behind my back.  I told him I couldn't and needed front cuffs because of my disability. He pushed me, I lost my balance, and staggered a couple of steps toward him. Sergeant Mejia then said to cuff up in the front, which I did.

16.     They escorted me to a holding cage in the program office. I could hear them writing the report in their office.  I heard them coordinate their reports of the incident and tell each other what to write.  I thought they were supposed to write what they witnessed, not what others tell them to write.  They gave me three lock up orders: one saying that I assaulted staff; one saying that I lunged at staff; and a third saying I attempted to assault a peace officer.  Their reports are very different from what actually happened. If they installed the cameras, it would prevent a lot of this.

17.     After I went to SHU, Lieutenant Ortega approached my cell and said, "This is all bullshit, you'll be out on Monday." Lieutenant Ortega came to my RVR hearing and said, "You know how to do a grievance procedure, right? You're going to have to do it." In the RVR paperwork, Lieutenant Ortega wrote that I said during the hearing that this was the second incident with CO Estrada, but I never said that during the hearing. I only told that to another staff person. They found me guilty of assault on staff and I was sentenced to stay in SHU until October 2020. When I received my property in SHU, my television was broken. I think somebody wanted me in the SHU because I sued CDCR about the abuse I endured at CCWF.

18.     I filed a 602 about unnecessary use of force when CO Estrada yanked my arm and pushed me, but it was denied. I appealed it and am waiting for a response. I also filed a 602 about the improper hearing, but I haven't yet received a response. I also filed a 602 about my television being broken, which was granted.

19.     When I was out of SHU, with the exception of staff who harassed me, I was around a lot of stable people and mentors that were helping me prepare for society. It really destroyed me having to go back to SHU. I got depressed and stopped eating. I felt hopeless. I felt that I was never going to be in peace during this prison term because staff were always going to judge me because of my lawsuit against CDCR and because of my past. I feel like the prison is trying to teach me how to fight by continually assaulting me. Who wants to live that way? Sometimes in the middle of the night, I wonder if today will be the day when they assault me and I don't wake up.

20.     In my opinion, staff target people who are transgender, people who have physical disabilities, people with mental illness, and people who have long sentences. They could care less about somebody's mental health. They are very mean to people who are seriously mentally ill.

21.     I believe there is so much staff misconduct at CIW because they can get away with it. Staff cover for each other and they don't get reprimanded. Nobody's watching them. The people they hire to be lieutenants and sergeants cover for employees.

The people who are superiors are the worst offenders. People who are incarcerated are too afraid to put their allegations on paper because they know staff will retaliate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corona, California, on this 22nd day of September, 2020.

_____

On September 22, 2020, due to the closure of CIW in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CIW, I read the contents of this declaration, verbatim, to ████████ by telephone. ████████ orally confirmed that the contents of the declaration were true and correct. ████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 22, 2020

_Kendrick_
_____
Corene T. Kendrick

# Exhibit 41a

## Filed Under Seal

# Exhibit 42

**DECLARATION OF** ▉▉▉▉▉▉▉▉

I, ▉▉▉▉▉▉▉, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ▉▉▉▉.  I am currently housed at California Institution for Women ("CIW") on Facility Miller-A.  I am 39 years old.

3.    I am a *Coleman* class member.  I am at the Correctional Clinical Case Management System ("CCCMS") level of care.  Patients at the CCCMS level of care live in general population units throughout the CDCR and receive infrequent contacts with their mental health case manager and treatment team.  Prior to the incidents described below, I did not receive mental health services in CDCR and was not on any mental health medications.  After this incident, my anxiety and depression became so bad that I was referred into the Mental Health Services Delivery System ("MHSDS") to receive regular mental health treatment.

4.    After the incidents described below, I began to have thoughts about harming myself.  I was admitted to the Mental Health Crisis Bed ("MHCB") in mid-June 2020.  An MHCB is a short-term intensive care unit for people experiencing severe mental health crises.  This was the first time that I was admitted to the MHCB.

5.    I have been housed at CIW from September 1, 2019 to now.

6.    During my time at CIW, I have been housed in the following locations: Miller-A Building, Miller-B Building, and the MHCB.  I was also housed briefly in the Reception Center recently, when me and a number of other people in my unit tested positive for COVID-19.

7.    I was raped by a staff member at CIW.

8.    On April 21, 2020, Mr. Johnson, a male kitchen worker employed by CDCR, caught me stealing vegetables in the kitchen when I was working.  At the end of my shift, I asked if there was something I could do to make up for stealing the vegetables.  When I

asked this, I was suggesting that I perform an extra shift or extra work task.  Mr. Johnson did not respond and walked to the bathroom and gestured for me to follow him.  I was thinking he wanted me to clean the bathroom, so I followed him into the bathroom.  When we got into the bathroom, he closed the door and kept his hand on it to keep it shut.  He told me that unless I performed oral sex on him he would write me up for a Rules Violation Report ("RVR") for stealing.  I felt that I had no choice but to perform oral sex on him, because if I received another RVR at that time I would have been placed in a segregation unit and on C-Status, which is a restrictive punishment status that consists of not having most privileges such as phone calls, yard, and canteen.

9.     As I was performing oral sex on him, he told me to stand up.  As I was standing up, he started pulling my pants down with both of his hands. I repeatedly said no, but he did not stop, and pulled my pants down.  He then forced his penis inside of me and raped me.  When he finished, he told me, "If you tell anybody, you'll end up in the SHU for assault."  He was suggesting that if I reported this, I would be charged with a very serious RVR, and placed in the Security Housing Unit ("SHU"), a solitary confinement unit.

10.     I went back to my cell and told one of good friends who was incarcerated with me at the time about the rape.  She wanted me to report it, but I was too afraid and did not report it.

11.     About two weeks later, I was working again in the kitchen and could not get one of my rings off my finger.  I asked the officers working nearby to go to medical to get my ring removed.  They sent me back to talk to Mr. Johnson in his office, where there is a tool room, because the tool room had wire cutters and he could remove my ring.  I went back into his office.

12.     In his office, Mr. Johnson pulled his penis out of his pants and said I was going to give him oral sex again.  I said I was not going to do that again.  He said, "Why not?  You did it before."  I continued to tell him no.  Then he threatened me and told me again that I would end up in the SHU, unless I performed oral sex on him.  He said that if I

1  did not do what he was asking "no one would ever believe me" over him.  I felt I had to do

2  what he was demanding, so I performed oral sex on him again.

3        13.    In early July 2020, Mr. Johnson was fired.  To my knowledge, Mr. Johnson

4  was fired because he did similar things that he did to me to at least five other incarcerated

5  people.  Even after he was fired, I still felt scared to report the rapes for fear of being

6  retaliated against or sent to the SHU by other staff members.  My friend ended up

7  reporting it for me because she was tired of seeing me in so much distress.  When I told my

8  friend that Mr. Johnson had been fired, she told me I should report what had happened and

9  that she was tired of seeing me withdrawn and distressed.  I told her I was still not going to

10  report it, because I was afraid.  On July 14, 2020, my friend submitted a 22 Form reporting

11  the rapes.  CIW Investigative Services Unit ("ISU") staff interviewed her shortly after the

12  incident.  ISU called me immediately after her interview for an interview.  I was

13  interviewed by Sergeant Washington, an ISU sergeant.  I told him what had happened, and

14  he listened to me and sympathized with me.

15        14.    Sergeant Washington came to see me about a month after my initial

16  interview with him, when I was housed in the Reception Center.  He told me he was

17  following up to see whether I had additional details about what had happened to me.  I told

18  him I did not have any additional details.  I have not heard anything since about the ISU

19  investigation.

20        15.    On September 17, 2020, I filed a 602 staff complaint.  I reported that I was

21  raped and that since then I have not been offered any mental health treatment related to the

22  rape.

23        16.    Being raped and being forced to perform oral sex on Mr. Johnson twice was

24  extremely degrading and made me feel like staff could do whatever they wanted to me.  It

25  was very humiliating.  I also felt powerless knowing that staff could force me to do things

26  like this to them by threatening unjust punishment and telling me that I would never be

27  believed.

28

17.     I still had to interact with Mr. Johnson in the weeks after these incidents happened, for at least three days a week when I would work in the kitchen.  While he never assaulted or raped me again after the second rape, he continued to harass me verbally.  For example, one day while I was working my shirt was wet after washing dishes, and he said "wet T-shirt contest!  It's better wet anyways, isn't it."  These types of comments made me feel extremely uncomfortable, and just seeing him made my skin crawl.  If I was able to walk away from him when he made these comments, I did so, but I often was unable to leave, because I had to work.

18.     I struggled greatly with my mental health after this incident.  Since early May 2020, I have been having bad anxiety attacks, and my depression has increased.  During my anxiety attacks, I could not breathe.  These symptoms were unlike anything I'd ever experienced in my life.  I was started on four different anxiety medications.  Due to my increased anxiety and depression, I barely slept.  When I did fall asleep, I would wake up in a panic shortly after falling asleep.  After a number of weeks of increased anxiety and depression, I began to feel suicidal in late May 2020, and reported this to mental health staff.  I was not admitted to the MHCB at that time, but the dosage of some of my anxiety medications was increased in order to help manage my anxiety.  I was also referred at this time into the MHSDS, when I previously was not receiving regular mental health services.

19.     Even after my medication dosage was increased and I was admitted to the MHSDS, I continued to have suicidal feelings and increased anxiety and depression and was eventually admitted to the MHCB on June 12, 2020.  I stayed there until June 18, 2020.  While I am not doing as badly as I was at that time, I am still struggling with my mental health after this incident.  I still have anxiety and feel agitated.  I am still not sleeping very well, and wake up to 20 times in a single night.  I have nightmares about the rapes.

20.     Since these rapes, I have expressed my mental health issues to mental health staff at CIW.  Multiple members of CIW mental health staff are aware of what has happened to me after it was reported on June 14, 2020, but I have not received any sort of

1  counseling or treatment specific to sexual assault that would help me cope with this.  I

2  have only seen mental health staff one or two times since reporting my rapes in July 2020.

3  When I have talked to them, they only ask whether or not I am suicidal, and are otherwise

4  only interested in my medications.  I do not feel I can talk to them about these issues,

5  because when I have tried, they seem to be unwilling to help me.

6       21.     The lack of action by mental health staff has made me unable to trust them

7  and has made me feel as if I cannot ask them for help when I need it.  The only help I have

8  received is through Riverside Area Crisis Center, who I wrote to after the incident.  They

9  told me they would try to talk to staff at CIW to get me some assistance, but to this day I

10  have not received any sort of treatment specific to the assaults I experienced.

11      22.     In addition to being unable to ask for help with my mental health, I have

12  been afraid to ask for any sort of help from male officers since these incidents.  I feel

13  uncomfortable being around men.

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

23.     In my opinion, staff target vulnerable people with staff misconduct.  Custody staff know that because we are institutionalized and subject to CDCR, they can threaten us and force us to do things by holding things against us.  Because we are not free, we are extremely vulnerable and can be abused as a result.  Since being admitted into the mental health system after this incident, I have felt even more vulnerable, as staff know that I struggle with mental health issues and can use these issues against me.  Staff treat us like we are nothing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Chino, California this 17th day of September, 2020.

On September 17, 2020, due to the closure of California Institution for Women in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CIW, I read the contents of this declaration, verbatim, to ███████████ by telephone. ███████████ orally confirmed that the contents of the declaration were true and correct. ███████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 17, 2020

Emma Cook

# Exhibit 42a

## Filed Under Seal

# Exhibit 43

**DECLARATION OF** █████████████

I, ████████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ████████.  I am currently housed at the California Institution for Women ("CIW") in the ASU, room ███.  I am 28 years old.

3.     I am an *Armstrong* class member.  I am designated as DNH.  I am hard of hearing and I use hearing aids.  I usually wear glasses, but my glasses were lost when I went to the hospital.  I have been waiting to see the optometrist, but that has been delayed because of the pandemic.  I also wear a wrist brace for a ganglion cyst on my left wrist.

4.     I am a *Coleman* class member.  I am at the CCCMS level of care.  I am diagnosed with major depression and anxiety.

5.     I have a number of serious medical conditions.  I have fluid around my brain and eyes, I think they call it hypertension.

6.     I arrived to CDCR around September 2017 and was incarcerated in the Central California Women's Facility ("CCWF").  I arrived to CIW in approximately February 2018.  I was first in the SHU.  I have spent most of time in SHU or ASU, but have also lived in in Wilson and in Harrison.

7.     I have witnessed staff engage in misconduct against other people at CIW.

8.     In May 2019, I was in my cell around 1 or 2 p.m. in SHU when I witnessed another person incarcerated in the SHU, who was restrained in hand and leg chains, returning to the SHU building. This incarcerated person and Officer Ulloa approached this person's cell ████████ and the individual started asking what happened to the property in his cell.  Officer Ulloa then said that this person was resisting, and other custody officers arrived and they picked him up and threw him to the ground.  Officer Ulloa punched this person in the face multiple times.

9.      In March or April 2019, I was in my cell in the SHU when I saw Officer Ochoa passing out breakfast. Another person who was also incarcerated in the SHU, had his arm sticking out of the slot in the cell door because he did not get a food tray that day and was asking for the sack lunch.  Officer Ochoa attempted to force the slot door closed onto this person's arm while calling him "bitch" and saying that he "did not give a fuck." This person formally reported the incident to CDCR and I was called as a witness.

10.      I was also the victim of staff misconduct at CIW.  On September 16, 2020, I was outside during rec time and Officer Baca arrived to escort me to committee.  He put handcuffs on my left wrist where I have the ganglion cyst, but he put them on backwards. They were very tight and I could barely move my wrist.  I told him that the cuff was too tight. While the handcuff was still locked on my wrist, he twisted the cuffs to turn them around and then cuffed my right wrist just as tight as the left.  I felt it scrape my bones.

11.      Officer Baca escorted me into the building while holding my right arm very tight.  He was very rough while escorting me, shoving me while I was walking ahead of him.  I asked him to ease up and he didn't say anything, he just continued to shove me. When we arrived at the committee room, he shoved me into the room.  When I got back to my cell and the handcuffs were removed, I saw that my arm had the handcuff print.  The next day, it still felt tender.

12.      I have to interact with Officer Baca almost every day.  Because of what I experienced and witnessed, my emotions are running rapidly.  I feel helpless and powerless.  I usually ask the nurse if I need anything for my hearing aids, like a battery.  I don't know how CO Baca would respond if I asked him.  Also on September 16, my toilet was backed up and there was water all over the floor. I repeatedly asked him for a plunger because he was standing right next to my cell talking with somebody else, but he just ignored me. After about ten minutes, another officer was doing rounds, looked inside my cell and saw the water everywhere.  That officer gave me the plunger.

[3617375.1]

2

13. In my opinion, staff target people who have disabilities with staff misconduct. They know that we talk with people from outside organizations and they get worried that their misconduct will come to light.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corona, California on this 21st day of September, 2020.

On September 21, 2020, due to the closure of CIW in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CIW, I read the contents of this declaration, verbatim, to ███████, by telephone.  Ms. ███ orally confirmed that the contents of the declaration were true and correct.  Ms. ███ also orally granted me permission to affix her signature to the declaration and to file the declaration in this matter.

DATED: September 21, 2020

Corene T. Kendrick

[3617375.1]                3

# Exhibit 44

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 31, 2020

<u>VIA EMAIL ONLY</u>

Margot Mendelson
Amber Norris
Prison Law Office
mmendelson@prisonlaw.com
anorris@prisonlaw.com

Re:   CIW: Non Class Action Allegations

Dear Ms. Mendelson and Ms. Norris

This letter is to acknowledge receipt of the correspondence received from your office on January 24, 2020 concerning allegations at CIW.

The allegations that were presented in your correspondence were routed to the appropriate personnel at CDCR.

The Legal Liaison for the Female Offender Programs and Services Mission, Michael Stone, will provide you with information on the non-class action allegations when it becomes available.  If we need any additional information in order to address these matters, we will contact your office.


Sincerely,

*/s/ Robin Stringer*

ROBIN STRINGER
Class Action Coordinator
Office of Legal Affairs


cc:    Russa Boyd, Attorney IV
        Tamiya Davis, Attorney III
        Michael Stone, Attorney III

# Exhibit 45

**California Institute for Women**
***Armstrong* Monitoring Tour**
**December 2016**

Prison Law Office attorney Corene Kendrick, Investigator Amber Norris, and Litigation Assistant Isaac Dalke toured the California Institute for Women (CIW) on December 12-13, 2016, to monitor the prison's compliance with the *Armstrong* Remedial Plan (ARP), court orders, and the Americans with Disabilities Act (ADA). At the time of the tour, 166 class members lived at the prison. The information in this report is based upon formal and informal interviews with class members, interviews with staff, and review of documents for this monitoring period (Oct. 16, 2015 - Nov. 1, 2016). We thank institution staff for their assistance in facilitating the interviews and tour.

CIW remains in violation of the Armstrong Remedial Plan and *Armstrong* Court orders in several ways, including:

- Physical plant problems and needed repairs throughout the prison, including to accessible showers and paths of travel, creating dangerous conditions for people with mobility and vision disabilities;
- Insufficient number of ADA workers and inadequate training of ADA workers and staff regarding the scope of their duties;
- Delays in the repair of durable medical equipment, failure of health care staff to maintain repair logs, and an inefficient system for stocking DME; and
- Problematic processing of 1824 requests for disability accommodations.

I.      **PHYSICAL PLANT**

Plaintiffs' counsel appreciates the opportunity to discuss and view current and planned construction that will remedy problems with the paths of travel throughout the prison. In this report, we highlight physical plant concerns that are not addressed by the Master Plan process or should be addressed sooner than planned in order to keep class members safe. At the request of Mr. Knowles, we already provided much of this information on December 20, 2016, but repeat it here for the sake of completion.

**A. Inaccessible paths of travel**

The monitors observed the following inaccessible paths of travel:

**SCU (EOP building)** – the path around the yard is only half paved, as illustrated by the photo on the next page. In addition, the door to the laundry area is only 26 inches wide, while the ADA requires doors to be at least 32 inches wide, (See 2010 ADA Standards for Accessible Design, Section 404.2.3)

consent and with staff supervision.  However, class members reported that staff had instructed them to obtain help from their cellmates because ADA workers were not allowed to assist with cleaning at all. Ms. ██████, ██████, DNM, SCU; Ms. ██████, ██████, DLT/DNH, ██████; Ms. ██████, ██████, DNM.██████; and Ms. ██████, ██████, DNM/DNH, ██████, all reported that they needed assistance with cleaning their cells.

Other class members, including Ms. ██████, ██████, DNM, ██████; and Ms. ██████, ██████, DNM.██████, reported that unit staff told them ADA workers were not permitted to assist them with carrying items from canteen. The December 12, 2016, memo states ADA workers cannot "handle canteen or property items *in owner's absence*." (emphasis added).  However, ADA workers are permitted to assist in carrying canteen items in the owner's presence.  Staff must ensure that class members who cannot carry their canteen items because of their disability are appropriately accommodated with assistance from ADA workers or staff.

**Please provide an update regarding what steps have and will be taken to fill all of the ADA worker positions, to ensure that there are enough positions to fulfill all of the duties listed in the December 2016 Memo, and to provide adequate training to ADA workers and their supervisors regarding their job duties. CIW must update its LOP to be consistent with the statewide memo issued on December 12, 2016, and provide related training to staff and ADA workers.**

### B.  Allegations of staff misconduct

Public entities and their employees may not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of […] any right granted or protected" by the Americans with Disabilities Act. *See* Sect. 12203 of the ADA; 35 C.F.R. § 35.134(b). CDCR's Disability Placement Program (DPP) was created to "assure nondiscrimination against inmates/parolees with disabilities." ARP § I.A.

As an initial matter, multiple prisoners reported that in the past year they had sent mail to the PLO, but the PLO has no record of this correspondence.  (Our office had only received 12 letters in total from CIW class members between Jan. 1 and Dec. 1, 2016). Multiple class members were concerned that staff were tampering with their legal mail.[1]

---

[1] See CDCR Department of Operations Manual Sec. 54010.12.1 (providing that inmates may correspond confidentially with attorneys and legal services organizations, specifically mentioning the Prison Law Office by name).  "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid."  *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401

Some class members reported staff behavior that could be misconduct. A limited number of class members agreed to let us use their name when reporting allegations of staff misconduct. Below are incidents reported in the document production or in interviews with class members who gave us permission to share their experiences:

1. Ms. ██████, ██████, HB, A-16-00548, is a *Coleman* class member and filed an appeal alleging custody staff bully and embarrass her in public. **This appeal was not documented in the noncompliance logs.**
2. Ms. ██████, ██████, DNM, SHU (NDS), reported that on 10/16/16, she was living in Barneburg, she was having some problems with her cellmate, which she reported to custody staff. When another prisoner threatened her, Ms. ████ states that she asked CO Hadnot (unsure of spellling?) to lock the door to her cell. She reported that the CO did not lock her door. Three women then came into her room and beat her up. Medical records confirm she was assaulted.
3. Ms. ████████, ███████, DLT/DNH, RC-127, reported that on 11/7/16, CO Reyes submitted Ms. ████████ to a strip search, asking her to spread her labia, which Ms. ████████ found this maneuver especially difficult because there was no rail or grab bar in the room for her to hold on to. She filed a staff complaint (16-01313, enclosed as Exhibit 1 to this report), but it was rejected on the ground that there were too many issues on the 602.
4. Ms. ████, ██████, reported that CO Rodarte who works third watch at Latham Hall regularly yells, screams, and curses at prisoners, and she filed a staff complaint about his behavior. She reported that a couple weeks prior to our visit, he called another prisoner "nigger".
5. Ms. █████, ███████, DNM, ████████ reported that she has spoken with staff multiple times about ill-fitting ankle restraints. She reported that no changes were made and, as a result, she fell on October 28, 2016, causing her to black out and requiring several stitches in her chin. She filed a 602 about the incident. Her medical record confirms she was at an outside appointment and that she fell, resulting in sutures. On November 1, 2016 the provider noted that "Upon returning she fell down an elevator with the lose shackles and a bump her head with the some laceration under the chin and bruising on left eye brow."

**We request that the allegations listed above at # 1-5 be investigated, and that Defendants provide an update on the findings of the investigations.**

---

(1989). Legal mail systems are critical to a prisoner's constitutional rights to free speech, to legal counsel, and access to the courts. *Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014). Interference with prisoners' communications with attorneys also violates the lawyers' First Amendment rights, as these are communications in which "the interests of both parties are inextricably meshed." *Procunier*, 416 U.S. at 408-09.

### C.  Inappropriate housing

CDCR prisons must ensure that prisoners with disabilities are reasonably and appropriately housed. ARP § I. Plaintiffs' counsel identified the following class members who were inappropriately housed during this monitoring period:

1. Ms. ████████, ████████, DLT/DNH, RC-127, reported she is in the RC because she needs handrails. Previously, she was in Miller without handrails despite needing them. On 8/9/16, nursing staff diagnosed her as a fall risk.  On 8/18/16 she requested a chrono to be housed in a room with grab bars, however there is no documentation that she was evaluated for this accommodation. She also filed multiple 1824s (A-16-00878; A-16-00883; A-16-00901) reporting she could not access the shower or toilet, and the responses did not assess her need for an interim accommodation.
2. Ms. ████████, ████████ DNM with walker, Miller A, requires grab bars per DECS. However, at the time of our visit, she was living in Cell ▮ that did not have grab bars. During our visit she was moved to a location with grab bars.

### D.  Failure to Transfer Assistive Devices

Ms. ████████, ████████, A-15-01306, reported that when she returned from the OHU, most of her property – including her prescription glasses – were missing. The response states that she was referred to optometry.

## III.    HEALTH CARE STAFF RESPONSIBILITIES

### A.  Inefficient DME repair system & failure to track DME repairs

Class members reported insufficient and delayed durable medical equipment repair, particularly for walkers and wheelchairs. For example, Ms. ████, ████████, A-16-00096, reported that her PCP recommended that she have a walker on 10/23/15 and 11/18/15, but as of 1/24/16, she still did not have a walker. The response, issued on 2/23/16, confirms that the walker was ordered on 1/19/16 and she received it ten days later, on 1/29/16. Ms. ████'s medical records confirm that on 11/18/15 the medical provider ordered a walker.  (See Appendix A for a complete list of findings.) In addition to delays, some class members reported that they did not receive "loaner" DME at all when their devices broke because staff told them that there were none in stock.

When monitors visited the clinic and CTC, where the stock of DME is maintained, we found only two wheelchairs and approximately six walkers.  The clinic did not have any canes, cane tips, walkers, or wheelchair footrests. Instead, these items are kept in the CTC, and a health care staff person has to run the medical supplies over to the clinic from

# Exhibit 46

State of California                                     Department of Corrections and Rehabilitation

# Memorandum

Date :   June 7, 2017

To    :   Amy Miller                                    Robert Herrick
         Associate Director                            Regional Health Care
         Female Offender Programs and                  Executive, Region IV
         Services/Special Housing

Subject:   **CIW RESPONSE TO THE ARMSTRONG MONITORING TOUR –DECEMBER 12-13, 2016**

Please find the attached information to the Prison Law Office (PLO) report from the Armstrong
Monitoring Tour, which took place at California Institute for Women (CIW) in December 2016.
The documentation provided includes a response to the report from the institution, to include
Health Care Services Response as well, and the Request for Information and supporting
documentation PLO has asked for in their report.

The response that follows has been organized to follow the format of the PLO report.  The
response and "Request for Information" provide information and rebuttal to some points raised in
the PLO report. While it is recognized that there were some areas of concern raised in the report
that show room for improvement by the institution, it should be noted that the tour report shows
CIW has made marked improvements by all staff to be in compliance with the Armstrong
Remedial Plan and departmental policy regarding the care and treatment of incarcerated inmate-
patients who are identified as Armstrong class members.

Please find the California Institution for Women's (CIW) responses inserted directly below the
Plaintiff's findings.

## I.   PHYSICAL PLANT

Plaintiffs' counsel appreciates the opportunity to discuss and view current and  planned
construction that will remedy problems with the paths of travel throughout the  prison.  In this
report, we highlight physical plant concerns that are not addressed by the  Master Plan process or
should be addressed sooner than planned in order to keep class  members safe.  At the request of
Mr. Knowles, we already provided much of this  information on December 20, 2016, but repeat it
here for the sake of completion.

### A.  Inaccessible paths of travel

The monitors observed the following inaccessible paths of travel:

**SCU (EOP building)** – the path around the yard is only half paved, as illustrated by the
photo on the next page. In addition, the door to the laundry area is only 26 inches wide, while the
ADA requires doors to be at least 32 inches wide, (See 2010 ADA  Standards for Accessible
Design, *Section* 404.2.3)

**Please provide an update regarding what steps have and will be taken to fill all of the ADA worker positions, to ensure that there are enough positions to fulfill all of the duties listed in the December 2016 Memo, and to provide adequate training to ADA workers and their supervisors regarding their job duties. CIW must update it's LOP to be consistent with the statewide memo issued on December 12, 2016, and provide related training to staff and ADA workers.**

Response: The ADA Coordinator reached out to the Women's Advisory Council to notify inmates of the need for ADA Workers. Within the last three months the number of ADA Workers has increased from 11 to 28 workers. Numerous requests to become ADA workers have been received from inmates, and are currently being screened to verify eligibility per the December 2016 memorandum outlining the new exclusionary factors. CIW estimates there should be approximately six ADA workers per housing unit in order to fulfill the institution's needs, and for full coverage of hours from 0600 to 2200. As mentioned above, requests to become an ADA Worker are currently being screened, to verify eligibility. On February 23, 2017, training was given to all Correctional Counselors on the December 2016 memorandum titled Americans with Disabilities Act Inmate Assistance Program, detailing the scope of ADA worker job duties. CIW will train all ADA workers as well as custody supervisors according to the most current memorandum, to ensure the scope of their duties is understood.

### B.  Allegations of staff misconduct

Public entities and their employees may not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of [...] any right granted or protected" by the Americans with Disabilities Act. *See* Sect. 12203 of the ADA; 35
C.F.R. § 35.134(b). CDCR's Disability Placement Program (DPP) was created to "assure nondiscrimination against inmates/parolees with disabilities." ARP § I.A.

As an initial matter, multiple prisoners reported that in the past year they had sent mail to the PLO, but the PLO has no record of this correspondence. (Our office had only received 12 letters in total from CIW class members between Jan. 1 and Dec. 1, 2016).
Multiple class members were concerned staff were tampering with their legal mail.[1]

Response: Per Department Operations Manual Supplement 54010.12.2 Processing Outgoing Confidential Mail states, all legal mail shall be placed in the outgoing letter tray(s) after being logged in the unit log book by unit staff. CIW follows institutional procedures for handling outgoing legal mail, and will look in to these concerns and ensure they are handled at an institutional level.

---

[1]  See CDCR Department of Operations Manual Sec. 54010.12.1 (providing that inmates may correspond confidentially with attorneys and legal services organizations, specifically mentioning the Prison Law Office by name). "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401

Some class members reported staff behavior that could be misconduct. A limited number of class members agreed to let us use their name when reporting allegations of staff misconduct. Below are incidents reported in the document production or in interviews with class members who

gave us permission to share their experiences:



1. Ms.⬛⬛⬛, HB, A-16-00548, is a *Coleman* class member and filed an appeal alleging custody staff bully and embarrass her in public. **This appeal was not documented in the noncompliance logs.**

2. Ms.⬛⬛⬛ DNM, ⬛⬛⬛, reported that on October 16, 2016, she was living in Barneburg, she was having some problems with her cellmate, which she reported to custody staff. When another prisoner threatened her, Ms.⬛⬛⬛ states that she asked CO to lock the door to her cell. She reported that the CO did not lock her door. Three women then came into her room and beat her up. Medical records confirm she was assaulted.

3. Ms.⬛⬛⬛ DLT/DNH, reported that on November 7, 2016, CO⬛⬛⬛ submitted Ms.⬛⬛⬛ to a strip search, asking her to spread her labia, which Ms.⬛⬛⬛ found this maneuver especially difficult because there was no rail or grab bar in the room for her to hold on to. She filed a staff complaint (16-01313, enclosed as Exhibit 1 to this report), but it was rejected on the ground that there were too many issues on the 602.

4. Ms.⬛⬛⬛ reported that CO⬛⬛⬛ who works third watch at Latham Hall regularly yells, screams, and curses at prisoners, and she filed a staff complaint about his behavior. She reported that a couple weeks prior to our visit, he called another prisoner "nigger".

5. Ms.⬛⬛⬛, DNM, Wilson, reported that she has spoken with staff multiple times about ill-fitting ankle restraints. She reported that no changes were made and, as a result, she fell on October 28, 2016, causing her to black out and requiring several stitches in her chin. She filed a 602 about the incident. Her medical record confirms she was at an outside appointment and that she fell, resulting in sutures. On November 1, 2016 the provider noted that "Upon returning she fell down an elevator with the lose shackles and a bump her head with the some laceration under the chin and bruising on left eye brow."

**We request that the allegations listed above at # 1-5 be investigated, and that Defendants provide an update on the findings of the investigations.**

Response:⬛⬛⬛.⬛⬛⬛ HB, A-16-00548, allegations of staff misconduct were not included in the Armstrong non-compliance log because she is not an Armstrong class member. CIW takes PLO's allegations of staff misconduct very seriously and is in the process of investigating these allegations listed above and will follow Department policy on any employee discipline matters.

---

(1989). Legal mail systems are critical to a prisoner's constitutional rights to free speech, to legal counsel, and access to the courts. *Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014). Interference with prisoners' communications with attorneys also violates the lawyers' First Amendment rights, as these are communications in which "the interests of both parties are inextricably meshed." *Procunier*, 416 U.S. at 408-09.

### C. Inappropriate housing

CDCR prisons must ensure that prisoners with disabilities are reasonably and appropriately housed. ARP § I. Plaintiffs' counsel identified the following class members who were inappropriately housed during this monitoring period:

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 2, 2017


Ms. Corene Kendrick
Prison Law Office
General Delivery
San Quentin, CA 94964


Dear Ms. Kendrick:


This letter is in response to the allegations raised in your December 2016 *Armstrong* Monitoring Tour report concerning California Institution for Women (CIW).  The California Department of Corrections and Rehabilitation (CDCR) takes every allegation made against the Department seriously, and as such, please be advised that CIW reviewed inmate ████'s allegation that:

- Ms. ██████ ██████) reported that on 11/7/16, a CO submitted her to a strip search, asking her to spread her labia, which ██████ found this maneuver especially difficult because there was no rail or grab bar in the room for her to hold onto.  She filed a staff complaint but it was rejected on the ground that there were too many issues on the 602.

As a result of this allegation, CIW Appeals Office reopened the appeal as a staff complaint and forwarded it to the CDW/Warden for review and assignment to the appropriate division head.  After a complete review of all documents related to this incident and interviews, CIW found that the correctional officer followed CDCR policy related to unclothed body searches.

At this point, we will be closing the inquiry into the allegation(s) raised in the PLO report emanating from inmate ████.  In the event that you need any additional information, please feel free to contact me.

Thank you,


MICHAEL A STONE
Attorney III Legal Liaison,
Female Offenders Program Services Mission
Office of Legal Affairs

# Exhibit 47

**California Institution for Women**
*Armstrong* **December 2017 Monitoring Tour**
**Reports of Allegations of Staff Misconduct**

The Prison Law Office visited California Institution for Women ("CIW") in December 2017 to evaluate compliance with the requirements of *Armstrong v. Brown* and the Americans with Disabilities Act.  This report is separate from the main *Armstrong* report. This report documents what we learned about the current culture of retaliation and violence that has been documented in multiple past reports.  *See* December 2016 CIW Report at 7.

Class members reported incidents of staff misconduct, including excessive use of force, sexual abuse, and failure to protect vulnerable and disabled people who are incarcerated at the prison.  This report does not include all reports we received about staff misconduct at the prison. Instead, we provide illustrative examples where we could gather as many details as possible, including to the extent possible, confirmation from their medical records and central files. About half of the prisoners did not want us to use their names or stories out of fear that staff would retaliate against them.  Of note, multiple class members reported that they had sent mail to the Prison Law Office and to others, but the PLO had no record of this correspondence.  Class members again expressed concern that staff tampered with their legal mail.[1]

### 1. Physical Abuse

a.  **Prisoner 1**, DPM, reported that she witnessed staff assault **Prisoner 2** (*Coleman* class member) in the PSU in October 2017 during second watch. At the time, the two women were in adjacent cells and Prisoner 1 had a clear line of vision to witness the assault. According to Prisoner 1, Prisoner 2 was suicidal, and told staff. She yelled for help, prompting officers to approach her cell. Prisoner 2 did not resist, but was put on the floor, on her stomach, and cuffed. **Officer A**, second watch, then hit Prisoner 2 with a baton. **Officer B** kicked her in the head once. Officer B was lifting Ms. ███████ up to put her in her wheelchair, and Prisoner 1 believes Officer B tried to make the kick look like an accident.  According to Prisoner 1, Prisoner 2 yelled, "You kicked me in the head." The officers dragged Prisoner 2 into the hallway and took her away. Prisoner 1 told us that she filed a staff complaint reporting what she had witnessed.  Plaintiffs' counsel spoke

---

[1] See CDCR Department of Operations Manual Sec. 54010.12.1 (providing that CDCR prisoners may correspond confidentially with attorneys and legal services organizations, specifically mentioning the Prison Law Office by name).  "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989).  Legal mail systems are critical to an incarcerated person's constitutional rights to free speech, to legal counsel, and access to the courts. *Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014).  Interference with their communications with attorneys also violates the lawyers' First Amendment rights, as these are communications in which "the interests of both parties are inextricably meshed." *Procunier*, 416 U.S. at 408-09.

with Prisoner 2, who described the incident in a very similar manner.  She reported that no staff ever spoke with her about Prisoner 1's 602 report.

b.  **Prisoner 3**, DPW, CTC, 17-00249, reported in an 1824 (log 17-00249) that **Officer C** rammed her foot into the hall door. The response states that her staff complaint was being investigated.

### 2.  *Retaliation for Reporting Staff Misconduct*

a.  **Prisoner 1** reported that she was retaliated against by staff while in the PSU for reporting the above-mentioned assault against Prisoner 2. She reportedly told **Officer D** about the incident who in-turn told Officer B, Officer E, Officer F, and other staff about the allegations. Since then, staff withheld her yard time, food, and other privileges, taken her radio and TV, reduced her privilege level.  **Officer F** threatened to physically assault her. In November, while distributing a meal, he also told her "We don't have to give you breakfast." He then asked, "Do you want it?" and proceeded to give the food to someone else.  Prisoner 1 notes that she only has problems with second watch staff, and all of the staff members she named are on second watch. She does not have any problems with first or third watch. Third watch staff are good, and "make you feel safe." She filed a 602 regarding **Officer D** telling other officers of her report of witnessing the assault. She states that she never received a response or a log number. Staff told her that she is not allowed copies of her 602.

### 3.  *Inadequate Investigation Process / Inappropriate Sexual Comments*

a.  **Prisoner 4** reported that on August 3, 2017, another woman destroyed her property, and physically and sexually assaulted her, by hitting her in the head and inserting her fingers into Prisoner 4's vagina.  There were two witnesses who were present and saw the assaults. A 7219 done on August 3, 2017 documented red areas on her face, the side of her head, chest, and arm.  Her medical record also shows that she was treated for an acute eardrum perforation to her left ear on August 4, 2017. On August 4, she went to suicide watch after she threatened to cut herself because she feared for her safety.  She reported that after being in suicide watch, she was taken to an outside hospital where a rape kit test was completed.

Prisoner 4 reported that on August 28, 2017, ISU **Officer G** and **Officer H** interviewed her about the PREA allegation.  She reported that Officer G said, "We are aware that she put her hands in your vagina to check for dope, *but you get your oil checked when you're in the game.  Whoever hired her will hire somebody else to check your oil*."  It is wholly inappropriate for a PREA investigator to describe a sexual assault as "checking your oil."  She also reports that Officer H yelled at her in the interview.

Prisoner 4 reported Officer G's comments to CDCR Ombudsman Sara Malone, and at Ms. Malone's suggestion filed a 602 reporting these allegations. She stated that she has not received a response. In addition, she has sent letters to her attorney, and she said that her attorney did not receive her correspondence.

*4.  Sexual Abuse*

a.  Prisoner 5, DLT, Wilson-B, reported that **Officer I** flirts with people living in the building.  In the late summer, he brought a woman living in the building gifts.  Her first name was ▇▇▇▇ and she has since paroled. Prisoner 5 reported that this woman was often in the officer's office with him and she often wore little clothing.

b.  One class member who wished to remain anonymous reported that **Officer J**, who works in Harrison, is in a relationship with the woman who cleans his office. This woman is reportedly allowed to remain out of her cell when everyone gets locked in, and is released for meals before others. She is reportedly allowed to keep contraband. Officer J is generally rude, curses at people, and withholds toilet paper.

*5.  Improper Removal or Destruction of Durable Medical Equipment*

a.  **Prisoner 6,** DNH, Latham B, reported in an 1824 (log 17-01038) that her hearing aid was broken by staff during a cell search in June 2017. Her medical record confirms that it was broken, and includes the allegation that staff broke it.

b.  **Prisoner 7**, DPM, SCU, reported in an 1824 (log 17-00967) that on 7/21/17 custody staff took away her wheelchair with no explanation.  The response, issued on 8/25/17, states that she was provided a replacement wheelchair on 8/1/17.  There is no indication that possible staff misconduct was investigated. When we met with Prisoner 7, she explained that this was **Officer K** and the only explanation he gave was that he was told to take it away. The CO on the next shift gave her another person's wheelchair who was out to medical until staff gave Prisoner 7 a new wheelchair.

*6.  Failure to Protect*

a.  **Prisoner 8**, DLT, Wilson-B, reported that in November 2017, she told **Officer L** that her property was stolen and he told her to "handle her business."

b.  **Prisoner 9,** DLT/DNH, reports that she was attacked by her cellmate on November 17, 2017 immediately after being locked in her cell.  The cellmate reportedly hit her in the face with a lock, drawing blood. Ms. ▇▇▇▇ banged on the door and shouted to get the attention of staff, but it took five minutes before an officer responded.  Ms. ▇▇▇▇ was taken to the clinic, and her medical record shows that she had multiple scratches on her face and arm.

# Exhibit 48

State of California

Department of Corrections and Rehabilitation

# **Memorandum**

Date : August 14, 2018

To : Amy Miller
Associate Director
Female Offender Programs and
Services/Special Housing

Robert Herrick
Regional Health Care Executive
Region IV

Subject: **CALIFORNIA INSTITUTION FOR WOMEN RESPONSE TO THE ARMSTRONG MONITORING TOUR REPORT – DECEMBER 2017**

The purpose of this memorandum is to respond to the Prison Law Office (PLO) report generated as a result of the *Armstrong* Monitoring Tour (AMT), which took place at the California Institution for Women (CIW) in December 2017. The following documentation includes a combined response to the report from both the Institution and Health Care Services, and the request for information and supporting documentation requested by the PLO.

The response that follows has been organized to follow the format of the PLO report. The response and "Request for Information" provide information and rebuttal to some points raised in the PLO report. While it is recognized that there were some areas of concern raised in the report, CIW has made marked improvements by all staff to be in compliance with the *Armstrong* Remedial Plan (ARP) and departmental policy regarding the care and treatment of incarcerated inmate-patients who are identified as *Armstrong* class members.

**California Institution for Women**
***Armstrong* Monitoring Tour**
**Report December 2017**

## I. INTRODUCTION

Prison Law Office Staff Attorney Corene Kendrick, Litigation Assistant Molly Petchenik, and Investigator Amber Norris conducted a tour of California Institution for Women (CIW)on December 11-12, 2017, in order to monitor the prison's compliance with the *Armstrong* Remedial Plan (ARP), *Armstrong* court orders, and federal and state disability law. We thank ADA Associate Warden Thorpe and her staff for their assistance in facilitating our tour.

At the time of our visit CIW housed approximately 152 *Armstrong* class members. The information in this report is based upon interviews with class members, interviews with staff, a review of documents received during the monitoring period (November 2, 2016 - October 30, 2017), and review of some class-members' medical and central files. This report does not contain an exhaustive list of every class member who raised a disability-related concern.

Plaintiffs' counsel will separately provide Office of Legal Affairs with allegations of staff misconduct at the institution that we believe is negatively impacting the ability of vulnerable class members to request assistance with their disability.

## II. PHYSICAL PLANT

Plaintiffs' counsel identified the following structural barriers or areas that needed repairs at the prison.

California Institution for Women
*Armstrong* Monitoring Tour
Report Response December 2017

Page 26

California Institution for Women *Armstrong* Monitoring Tour
December 2017
Reports of Allegations of Staff Misconduct

The Prison Law Office visited California Institution for Women (CIW) in December 2017 to evaluate compliance with the requirements of *Armstrong v. Brown* and the Americans with Disabilities Act. This report is separate from the main *Armstrong* report. This report documents what we learned about the current culture of retaliation and violence that has been documented in multiple past reports. *See* December 2016 CIW Report at 7.

Class members reported incidents of staff misconduct, including excessive use of force, sexual abuse, and failure to protect vulnerable and disabled people who are incarcerated at the prison. This report does not include all reports we received about staff misconduct at the prison. Instead, we provide illustrative examples where we could gather as many details as possible, including to the extent possible, confirmation from their medical records and central files. About half of the prisoners did not want us to use their names or stories out of fear that staff would retaliate against them. Of note, multiple class members reported that they had sent mail to the Prison Law Office and to others, but the PLO had no record of this correspondence. Class members again expressed concern that staff tampered with their legal mail.[1]

### I. *Improper Removal or Destruction of Durable Medical Equipment*

a. **Prisoner 6, DNH,**      reported in an 1824 (log 17-01038) that her hearing aid was broken by staff during a cell search in June 2017. Her medical record confirms that it was broken, and includes the allegation that staff broke it.

**Response:** On June 13, 2017, CIW received a CDCR-22 Inmate/Parolee Request for Interview, Item or Service from Inmate      dated June 7, 2017. Inmate      alleged on June 6, 2017, Correctional Officer A. Morales broke her hearing aid during a search of her cell. Officer Morales responded back on June 20, 2017, stating all appliances were left in working order and only contraband was removed.

On June 29, 2017, the CIW Medical Appeals department received a CDCR-602 HC, Health Care Grievance from Inmate      which was partly converted to a CDCR 1824 Reasonable Accommodation Request (CIW-A-17-07038) for the repair/replacement of her hearing aid. The request was partially granted and Inmate      was scheduled to see the audiologist to determine the replacement or repair of her hearing aid. On August 8, 2017, Inmate      s hearing aid was replaced and signed for on a DME receipt CDCR 7536. On August 21, 2017, the CIW, Medical Appeals department received an additional CDCR-0602 HC from Inmate      requesting refund of the $595.00 she was charged to replace her hearing aid. The request was denied due to the fact there was no evidence to support her three year old hearing aid was damaged during the cell search. Additionally, on August 7, 2017, Inmate      signed a Trust Withdrawal Order for the hearing aid purchase in the amount of $595.00. At no time

---

[1] See CDCR Department of Operations Manual Sec. 54010.12.1 (providing that CDCR prisoners may correspond confidentially with attorneys and legal services organizations, specifically mentioning the Prison Law Office by name). "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Legal mail systems are critical to an incarcerated person's constitutional rights to free speech, to legal counsel, and access to the courts. *Nordstrom v. Ryan*, 762 F.3d 903, 909 (9th Cir. 2014). Interference with their communications with attorneys also violates the lawyers' First Amendment rights, as these are communications in which "the interests of both parties are inextricably meshed." *Procunier*, 416 U.S. at 408-09

California Institution for Women
*Armstrong* Monitoring Tour
Report Response December 2017

Page 27

did Inmate ▮ indicate she disagreed with the charge nor did she note the hearing aid was damaged by staff. On Wednesday, March 28, 2018, at approximately 1700 hours, an interview with Inmate ▮ was conducted. During the interview Inmate ▮ was not able to provide any additional information or witnesses to support her claim Correctional Officer A. Morales broke her hearing aid.

Based the interview with Inmate ▮ and the lack of supporting evidence, it was not confirmed that Officer Morales broke Inmate ▮ s hearing aid during a cell search on June 6, 2017.

b. **Prisoner 7**, DPM, SCU, reported in an 1824 (log 17-00967) that on 7/21/17, custody staff took away her wheelchair with no explanation. The response, issued on 8/25/17, states she was provided a replacement wheelchair on 8/1/17. There is no indication that possible staff misconduct was investigated. When we met with Prisoner 7, she explained that this was Officer K and the only explanation he gave was that he was told to take it away. The CO on the next shift gave her another person's wheelchair who was out to medical until staff gave Prisoner 7 a new wheelchair.

**Response:** Numerous attempts were made by Correctional Captain R. Montes to establish contact with Parolee ▮ who is currently on active parole. Parolee ▮ is unavailable for interview due to her current level of psychiatric care at UCLA Harbor Hospital. On March 23, 2018, at approximately 1300 hours, Parole Agent Robinson (Agent of the Day) was contacted and informed of the nature of the inquiry. Agent Robinson confirmed he provided Parolee ▮ with the information to include Captain Montes' contact information. Parolee ▮ never established contact with Captain Montes. On March 30, 2018, at approximately 1500 hours, Captain Montes contacted Parole Agent D. Alvarez as a follow up to the inquiry. Captain Montes informed Agent Alvarez of the nature of the inquiry and that he did not receive a call back from Parolee ▮ Agent Alvarez informed Captain Montes of Parolee ▮ s psychiatric admission and directed him to contact Dr. Shirty, Psychiatrist. At approximately 1515 hours, Captain Montes contacted Dr. Shirty and informed her of the nature of his call. Captain Montes asked Dr. Shirty if Parolee ▮ was mentally stable to participate in an interview. Dr. Shirty informed him she could not share any information with him nor transfer Captain Montes to Parolee ▮ Dr. Shirty could only confirm Parolee ▮ is currently hospitalized at her facility.

On March 26, 2018, a review of Officer T. Foster's Employee Work History was completed and confirmed he was assigned as the Support Care Unit Floor #2 Officer on the date of the allegation. At approximately 1032 hours, Captain Montes interviewed Officer Foster regarding the complaint. Officer Foster denies ever taking a wheelchair away from Parolee ▮ Officer Foster had no additional information relative to the allegation.

At this time CIW is unable to confirm the above allegation.

M. HILL
Warden
California Institution for Women
Division of Adult Institutions

JAMES K. ELLIOT, MA, CCHP
Chief Executive Officer
Health Care Services
California Institution for Women

cc:   Kathleen Allison, Director
      Division of Adult Institutions

      Vincent Cullen, Director, Corrections Services
      California Correctional Health Care Services

# Exhibit 49

# #MeToo Behind Bars: Records Shed Light on Sexual Abuse Inside State Women's Prisons

Nov 14, 2019



Former inmates protest sexual misconduct by California correctional officers outside state prison system headquarters in Sacramento on Oct. 30. *(Courtesy of the Young Women's Freedom Center)*

A state prison inmate incarcerated at the Central California Women's Facility was awaiting her group therapy session on Aug. 23, 2017. She stepped backward in her cell toward the door, where Correctional Officer Israel Trevino waited with waist restraints.

As he attached the chains, he reached down with both of his hands "to grope and fondle her buttocks," according to an internal investigation that led to Trevino's firing.

"Hey, what the fuck are you doing?" the inmate, whose name was redacted in reports, is quoted as saying.

*'What does it mean to feel constantly harassed, where they think it's consensual and we think it's not but we can't ever say it?'Amika Mota, Formerly Incarcerated Advocate*

"You have a big butt," Trevino replied.

This wasn't the only time Trevino sexually abused an inmate in his custody, according to the investigation's findings.

The former correctional officer — who was responsible for escorting inmates from their cells to their appointments and to the shower — tried to pull up a woman's shirt and put his hand down her pants on an unspecified date in 2017, investigators for the California Department of Corrections and Rehabilitation found.

That inmate said Trevino squeezed her buttocks over her clothing while escorting her and tried to get her to expose her breasts and vagina.

"Come on, show me something," he pressured her, according to the records.

Trevino was investigated after an inmate complained about the groping to her prison social worker, who reported the allegation.

Prison officials fired Trevino in 2018 for sexual misconduct. He had worked at the women's prison for over a decade and had been formally warned for making sexually harassing comments to inmates, according to records from the Office of the Inspector General for California prisons.

Attempts to reach Trevino for comment were unsuccessful.

Prison system spokeswoman Dana Simas responded in a written statement

that officials moved to protect incarcerated women when the 2017 allegations surfaced.

"Trevino was barred from entering the secured perimeter of the prison to prevent further inmate contact during the pendency of the investigation," Simas wrote.

The department fired at least six male correctional officers for sexually abusing women in their custody between 2014 and 2018, according to internal records released to KQED under a new state transparency law and court filings.

Some groped the inmates, while others engaged in oral sex or intercourse. The disciplinary records, which are still incomplete, provide a first-ever glimpse into how the prison system deals with sexual exploitation by its officers.

The names of the women involved are redacted in the records, and two named witnesses did not respond to requests for interviews.

While the number of dismissals for sexual misconduct is extremely rare among the roughly 26,000 correctional officers who work at California prisons, inmate advocates say sexual abuse by staff is more rampant than the records show because few officers get reported or investigated.

Amika Mota is trying to change that. She spent most of a nine-year prison sentence for vehicular manslaughter at the Central California Women's Facility in Chowchilla, north of Fresno in the Central Valley. She said she and other incarcerated women put up with sexual advances because they depended on correctional officers for access to clean laundry, phone calls, tampons, time out of their cell and other basic needs.



"There's not a bone in my body that ever felt attracted to any of these officers or felt like any of the words we spoke were true," Mota said. "It was just this survival technique to play along."

Amika Mota on picture day in 2011 at the Central California Women's Facility. *(Courtesy of Amika Mota)*

Officers can also write up inmates, which can result in extending a prison sentence.

One officer in her housing unit, who Mota declined to name, demanded that she write sexually explicit letters to him. She also described an officer who expected to see women without their clothes on.

"He would be really appreciative if during count we were in our bras," she said.

Mota said she never reported any harassment, fearing retaliation.

She joined the Bay Area-based Young Women's Freedom Center after she was released in 2015. She's now part of a new movement called Me Too Behind Bars, working to expose sexual abuse of people in prison and jail.

"What does it mean to feel constantly harassed, where they think it's consensual and we think it's not but we can't ever say it?" Mota said.

The state's inmate population includes nearly 5,000 women, about 4% of the 124,000 prisoners in the system.

State prison officials say they have been trying to improve conditions for female inmates in recent years, including enforcing a zero tolerance policy for sexual misconduct.

"All sexual violence, staff sexual misconduct, and sexual harassment is strictly prohibited," prisons spokeswoman Simas wrote in an Oct. 11 email.

The state prison system also investigates and tracks all allegations of sexual assault and harassment by staff, including correctional officers, to comply with

the federal Prison Rape Elimination Act. In 2018, 337 staff-on-inmate incidents were reported in California prisons.

Investigations substantiated just three of those allegations.



(Kelly Heigert/KQED)

Independent probes into the culture in women's lockups have found that these formally reported allegations likely capture only a fraction of the abuse and harassment of incarcerated women by prison staff.

The Prison Law Office, which monitors conditions for inmates as part of a settlement in a decades-old federal class action lawsuit, has interviewed hundreds of women at the Central Valley prison and documented their complaints for the court.

The firm reported in 2016 that out of a random sample of 80 women, nearly all had experienced sexual abuse or harassment while incarcerated. A second round of interviews turned up similar complaints, often at the hands of the same officers. The firm faulted a culture of bigotry and sexism at the prison.

"It was a constant stream of verbal sexual harassment or misogynist statements," attorney Corene Kendrick said, "kind of cat-calling at its highest level."

A lot of women complained the prison officers constantly addressed them as "bitches" or "hos," Kendrick said. "When they'd make the announcements on the PA system, you know, it'd be 'Hey bitches, time to go to lunch.' "



Amika Mota poses for a portrait at her home in the San Francisco Bay Area on Sept. 26, holding a framed collage of her 'prison family.' *(Julie Small/KQED)*

Sexual abuse of female prisoners isn't confined to a single facility, records obtained by KQED revealed. Four correctional officers in the state's other major women's prison — in Southern California — were also fired in recent years for sexual misconduct.

In 2017 alone, three officers at the California Institution for Women in San Bernardino County had sexual contact with inmates in or near their housing units.

Officer Robert Darrow was working an overtime shift in a housing unit on May 12, 2017, when he pulled one of the women responsible for cleaning and mopping the dorm into a broom closet, according to a transcript of a preliminary hearing in a criminal case against him.

"She said that he entered in behind her," an investigator testified. "She was facing away from him. He closed the door. And then he bent her over, pulled her sweatpants down — she didn't have any underwear — and then he moved his head down and orally copulated her."

The encounter lasted only three minutes, according to the testimony, because Darrow heard a noise outside the closet and stopped.

In that same month, Officer Tony Garcia sent all the women in a housing unit to breakfast, but one. The woman performed oral sex on him in her cell. He ejaculated on her nightgown, which the woman hid and later turned over to internal affairs. Investigators tested the semen on the nightgown and confirmed it belonged to Garcia.

A third case involved Officer Stephen Merrill entering the cell of two female inmates at 3:30 a.m. on Oct. 30, 2017, and groping them.

An investigation found, "As inmate [REDACTED] stood by the door facing the inside of the cell, she bent over and you inserted your right hand from behind her into her underwear. You grabbed her buttocks. After removing your hand from her underwear, you tasted your fingers by placing them into your mouth."

The other inmate then faced the inside of the cell and bent over. Merrill reportedly also groped her from behind.

The disciplinary decision released by prison officials doesn't provide further

details about the incident.

Under state and federal statutes, inmates cannot consent to sex with prison guards. Sustained findings of sexual misconduct by a correctional officer will result in dismissal, according to prison policies, and can be grounds for criminal prosecution. All three correctional officers at the Southern California women's prison were fired and charged with felony sex crimes. Attorneys representing them did not return requests for comment.

Merrill and Garcia took plea deals, according to court records. Garcia served two days in jail and was placed on probation. Merrill's two-year prison sentence was suspended as he completes three years of probation. He was also sentenced to less than a year of county jail time, eligible for work and weekend release.

Prosecutors in the case against Darrow argued he had "a history of being investigated for sexual activity with inmates," according to a preliminary hearing transcript in the case. But the San Bernardino County district attorney suddenly dropped the charges against him in March of this year. Deputy DA Lisa Mann, who prosecuted the case, declined to answer any questions.

Some officers are never even charged, though.

In Israel Trevino's case from the Central Valley prison, it took officials eight months to dismiss him for sexually abusing inmates. He was fired in April 2018.

Prison officials never referred Trevino for criminal charges — due to insufficient evidence, according to a spokeswoman. That's despite investigators' findings that he repeatedly groped women in his custody.

"The Central Region Criminal Investigation team, after a full review of the material, recommended the case instead be opened as an administrative investigation," spokeswoman Simas wrote.

The Office of Inspector General for California prisons monitors all investigations of sexual assault and harassment by officers and issues public reports.

**'Our power is to write about it and to bring transparency to the public because otherwise nobody knows what happens in these things.'***Roy Wesley, Inspector General for California Prisons*

In Trevino's case, the Office of the Inspector General noted several deficiencies in the prison's investigation. A prison investigator "scheduled case conferences and critical witness interviews for when he knew the OIG would not be available, and only cooperated after the OIG elevated the issue to his supervisor," according to a 2018 inspector general's discipline monitoring report.

The office's case review also faulted the investigation for failing to substantiate that Trevino was dishonest "when he denied that he made inappropriate, derogatory and sexually harassing comments to inmates."

"We have no authority to tell the department, 'You have to do what we think you should do,' " said Inspector General Roy Wesley. "Our power is to write about it and to bring transparency to the public because otherwise nobody knows what happens in these things."

Inmate advocates would like California to create another oversight body with more teeth.

They also agree with the Prison Law Office's recommendation that CDCR hire mostly female correctional officers to work inside the women's housing units.

All of the male officers fired for sexual misconduct inside California women's prisons in recent years had access to areas of the housing units where women are changing. Federal law mandates that male officers announce their presence upon entering those areas, but otherwise does not restrict their presence.

Attorneys with the Prison Law Office think prison officials could prevent a lot of abuse by cutting off that access.



UNSEALED:
California's Secret Police Files

"Washington Department of Corrections at one of their women's prisons made it a requirement that only women apply for certain positions working inside the housing units where the women live, sleep and bathe," said Prison Law Office attorney Kendrick.

The California prison system has been moving in that direction, according to spokeswoman Simas. A greater percentage of jobs in housing units are designated for female officers only, and the prison system is pushing to recruit more women.

Currently, women make up roughly a third of officers at the two main female prisons in the state.

Mota is still working to turn her experience in prison into an instrument for change. Thinking about the years she was scrutinized and objectified in prison by officers who considered her "their girl" makes her anxious and shaky.

"It's not the rules, or the regulations, it's the culture," Mota said. "How do you deeply affect this culture that's existed for so long where it's 'normal' and 'OK' to do this shit in prison?"



*This story was produced by the California Reporting Project, a coalition of 40*

*news organizations across the state. The project was formed to request and report on previously secret records of police misconduct and use of force in California.*

# Exhibit 50

1    **DECLARATION OF** ███████████████

2    I, █████████████, declare:

3    1.    I have personal knowledge of the matters set forth herein and if called as a

4    witness, I could and would competently so testify.

5    2.    My California Department of Corrections and Rehabilitation ("CDCR")

6    number is ██████. I am currently housed at California Medical Facility, in Vacaville

7    ("CMF"), on facility G in building 3. I am 55 years-old. I have been housed at CMF off

8    and on since 2018.

9    3.    I am a *Coleman* class member. I am at the EOP level of care. I have been

10   diagnosed with severe depression. I currently do not take any mental health medications.

11   4.    I am an *Armstrong* class member. I am legally blind and have been for over

12   thirty years. I currently wear a visual impairment vest. I also have mobility disabilities; I

13   use a wheelchair. My current DPP codes are DPW and DPV.

14   5.    I have stage IV throat cancer. I also suffered a head injury and a torn rotator

15   cuff during the December 19, 2019 staff misconduct incident I describe below. I am

16   classified as high-risk medical.

17   6.    On December 19, 2019, I got into a fight with another incarcerated person.

18   To break up the fight, Officer Caster-John pepper-sprayed me in the face. I fell to the

19   ground, with my eyes burning. When I was on the ground, Officer Caster-John turned me

20   onto my stomach and handcuffed me behind my back. He then picked me up roughly

21   using the handcuffs. When he picked me up, he tore the rotator cuff in my left shoulder.

22   This injury was later diagnosed by doctors at an outside medical facility.

23   7.    After Officer Caster-John picked me up, he led me to the shower area in the

24   L3 housing unit to decontaminate me from the pepper spray. Officer Caster-John turned

25   on the water in the shower, but then jumped backward immediately so as not to get wet.

26   When he jumped backward, Officer Caster-John still was holding my handcuffs. His

27   motion caused me to fall over backward. I hit the back of my head hard on the shower

28   pole. I blacked out. Other individuals who witnessed the incident told me that I was

1  unconscious for approximately two minutes.

2         8.      After December 19, 2019 but before December 31, 2019, I filed a staff

3  complaint of excessive force on Officer Caster-John using a green 602 form.

4         9.      On December 31, 2019, Officer Evans walked into my cell and threatened

5  me.  When he entered the cell, I was in the process of undressing because I had urinated on

6  myself.  I was naked except for my shirt – I was in the process of taking my shirt off.

7  Officer Evans called me "faggot" and told me to drop the appeal I had filed against Officer

8  Caster-John.  He said that if I didn't drop my excessive force complaint and appeal he

9  would shove his baton up my rectum.  I was scared and told Officer Evans that I didn't

10  want any trouble.  Officer Evans then took his baton and started striking the side of my bed

11  in a threatening way.  After he hit the bed approximately 3 times, Officer Evans struck me

12  hard in the lower part of my right leg with his baton.  I asked Officer Evans to call the

13  sergeant so I could speak with him, but Officer Evans refused.  His eyes were bloodshot

14  and he seemed to be inebriated.  He then walked out of the cell without saying anything

15  else.

16        10.     The next day, January 1, 2020, I spoke to Sergeant Chernis and reported

17  what Officer Evans had done to me.  On multiple occasions, I also reported the incident

18  with Officer Evans and its impacts on my mental health to mental health staff.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

11.     As a result of Officer Evans assaulting and retaliating against me, I feel more paranoid about custody staff.  I am concerned when custody officers look at me.  At times I have refused necessary medical treatment because I was so scared that I would have to interact with certain custody officers.  I continue to feel very unsafe at CMF and have been requesting for some time to be transferred out of the institution.  I also feel very unsafe coming out of my cell.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Vacaville, California this 2nd day of September, 2020.

/s/ ████████████████

On September 2, 2020, due to the closure of CMF in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system, I read the contents of this declaration, verbatim, to ███████████ by telephone. Mr. ██████ orally confirmed that the contents of the declaration were true and correct. Mr. ██████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 2, 2020

Gregorio Gonzalez

[3546004.8]

3

# Exhibit 50a

## Filed Under Seal

# Exhibit 51

1

**DECLARATION OF** ███████████████

2    I, ███████████, declare:

3    1.    I have personal knowledge of the matters set forth herein, and if called as a

4 witness, I could and would competently so testify.

5    2.    My California Department of Corrections and Rehabilitation ("CDCR")

6 number is ████████. I am currently housed at California Medical Facility ("CMF") in the P

7 Building, Unit 3, an inpatient mental health unit in CDCR. I am 23 years old.

8    3.    I am a *Coleman* class member. I suffer from anxiety, depression, and

9 psychosis. I often feel sad and hopeless, and also have periods, about twice a week for a

10 few hours at a time, when I hallucinate and hear voices talking to me. I also become

11 agitated at times, and when I become agitated, I shake, twitch, and feel angry. I am at the

12 intermediate ("ICF") level of care, which is intensive, inpatient mental health treatment.

13 There are two levels of longer-term inpatient mental health treatment: ICF and Acute.

14 Acute is a higher level of care, and ICF is the step below it. People such as myself are

15 admitted to these programs for inpatient psychiatric hospitalization, and the programs are

16 meant to work like a psychiatric hospital within CDCR. I was admitted to the Acute

17 program at CMF in early November 2019, and was in that program for about two months

18 before being discharged to the ICF level of care, where I have been since early January

19 2020. I have been referred to the mental health crisis bed ("MHCB"), a short-term program

20 for mental health crises, multiple times, when I have attempted to kill myself or expressed

21 a desire and plan to kill myself. I was admitted to the Acute program in November 2019

22 after first being admitted to the MHCB at California Men's Colony because I was feeling

23 suicidal and wanted to hang or cut myself to end my life.

24    4.    I have been housed at CMF since November 15, 2019.

25    5.    During my time at CMF, I have been housed in Q Building, Unit 2; P

26 Building, Unit 2; Q Building, Unit 3; and P Building, Unit 3. All of those units house

27 inpatient mental health patients.

28

6.          Staff at CMF abused me three times in a single week in November 2019.

7.          On November 22, 2019, I was taking a shower in Q-2, the unit I lived in at the time.  I was on single shower status at the time, meaning I showered alone and others were not allowed to shower at the same time as me.  When I exited the shower I was handcuffed by another officer whose named I do not remember and I was in a smock.  Medical Technical Assistant ("MTA") Cudjoe was also standing outside of the shower.  MTAs are custody staff in inpatient mental health units that are trained to administer medications and do a few other things that regular custody staff cannot do.  As I walked past him, he went to search me without asking me.  Whenever I have showered in the past, if I have a smock and am on solo shower status they do not search me.  I did not agree at any point to the search but he went ahead and searched me anyways.  During the search, he touched my buttocks.  I asked him "what's your problem?"  He didn't respond to me.  He and the other officer then took me back to my cell in Q-2.  I felt extremely violated by him touching me.  The same day, I was moved out of Q-2 to P-2.  They did not tell me why I was moved, but I believe it was because someone I had a fight with at a past prison moved onto the same unit as me.  They decided to move me out of the unit even though me and this other person had signed a marriage chrono, which is basically an agreement that we could house on the same unit together and did not have to be separated moving forward.

8.          I filed a Prison Rape Elimination Act ("PREA") Complaint against MTA Cudjoe the day after he touched my buttocks.  I had two interviews with staff members from the CMF Investigative Services Unit ("ISU").  The first interview was performed by Sergeant Ledesmas on the day that I filed the complaint, on November 23, 2019, and the second interview was done by Officer Thomas on November 27, 2019.  In both of these interviews, the Officer and Sergeant did not seem to care at all.  They each wrote my version of the story down.  However, neither of them seemed to believe me because they kept calling my story "allegations."  In the interviews, they each wrote my report down and left, and did not ask me further questions.  Each interview was about 10 minutes long.

9.      After my interview on November 27, 2019, I received a sheet of paper stating that what MTA Cudjoe did to me was not against departmental policy, no PREA investigation was warranted, and the CMF ISU was considering the investigation into this incident closed.  I did not pursue any further complaints regarding the PREA incident after this.

10.     PREA complaints are supposed to be confidential in that only the person accused, the victim, and the investigating staff are supposed to know about the complaint.  However, shortly after I filed my complaint against MTA Cudjoe, I became aware that other MTAs that work in the Acute program knew about my PREA complaint.  One MTA told me that he had heard what happened with my PREA complaint, even though he was not involved in the incident.  Other MTAs did not directly tell me they knew about my PREA complaint, but it seemed like they knew something about the PREA report, because they started acting differently towards me.  They were giving me hostile looks they did not give before the complaint, and generally seemed more suspicious of me.

11.     MTA Cudjoe continued to harass me after learning about the complaint.  He came by the door one morning shortly after I filed the complaint, and hit the door of my cell with his keys, which I interpreted as a threatening gesture, and said, "I'm gonna fuck you up."  He also came by my cell on the same day I reported the incident and said, "you got what's coming for you."  He would say these threats in front of the other MTAs, and they would not do anything about them and just ignored them.  Both times he threatened me, I asked the other MTAs to call the Sergeant so that I could report these threats, but they did not call him for me or otherwise intervene.

12.     On Tuesday, November 26, 2019, I was sitting in my cell in P-2.  MTA Cudjoe came by my cell and yelled, "This is my fucking unit, you don't run shit here."  I did not reply to him.  He then said, "Fuck your mom, I'm not gonna do shit."  I then called him a "bitch" because I was very upset that he had insulted my family.  Suddenly, he opened the door to my cell.  MTA Cudjoe entered my cell and pushed me in the chest with

1   his left hand, causing me to fall backward.  After pushing me, he left my cell and shut the

2   door.  He called me a "bitch" and said he wasn't going to "do shit."  MTA Cariaga

3   witnessed this incident, but did nothing to intervene.  MTA Holloway, the officer in charge

4   of the MTAs, came to my cell to talk to me after the incident, and I reported my side of the

5   story to him.  He pulled me out for an interview the next day about the incident.  Neither of

6   these interviews were videotaped use of force interviews.  He made me feel like he was

7   taking MTA Cudjoe's side, and told me that staff can put their hands on me whenever they

8   want.  I never received a videotaped use of force interview for this incident.

9          13.     A few days later, on Friday, November 29, 2019, I was exiting the showers

10  again.  MTA Harrison handcuffed me behind my back.  I was back in my clothes after

11  showering.  After the handcuffs were applied, MTA Cudjoe, who was sitting in his chair

12  about three feet away from the entrance to the showers, got up out of his seat and rushed

13  towards me without saying anything to me.  He rushed at me and was reaching out his

14  arms to grab the upper part of my body.  MTA Harrison's was between us, so MTA

15  Cudjoe could not reach me initially.  MTA Harrison suddenly stepped back from me,

16  allowing MTA Cudjoe to attack me.  MTA Cudjoe grabbed my neck with both of his

17  hands and choked me.  He then slammed my head repeatedly against the wall near the

18  showers.  He was choking me so hard I was struggling to breathe.  MTA Harrison told

19  MTA Cudjoe to let me go, but MTA Cudjoe kept choking me.  Then MTA Harrison joined

20  into the assault and they both grabbed one side of my body and threw me to the ground

21  face first by shoving me and punching me.  I did not and could not resist because I was

22  handcuffed behind my back.  Ultimately, they both threw me to the ground and I landed on

23  my stomach.  I could not brace myself from the fall because I was handcuffed behind my

24  back.  MTA Harrison drove his knee into my back while MTA Cudjoe grabbed my head

25  and slammed my face into the concrete at least five times.  Eventually, someone sounded

26  the alarm.  When the alarm went off, about five or six other officers joined MTA Cudjoe

27  and MTA Harrison.  When these officers got there, MTA Cudjoe and Harrison were

28

finishing assaulting me.  The five or six officers who came onto the scene did not join in on the assault, and shortly after they arrived, Harrison and Cudjoe stopped assaulting me.  The entire assault lasted about two minutes.

14.     Officer Harrison and another officer, whose name I do not know, picked me up off the ground and escorted me to the dayroom.  When I got to the dayroom, I sat down at one of the tables in the dayroom and a sergeant whose name I do not know read me my Miranda Rights.  I told him I wanted to talk to an attorney.  I said I had nothing to say to him before talking to an attorney, but he continued questioning me about the assault.

15.     While I was in the dayroom, a nurse came in and evaluated my injuries and documented them on a 7219 form.  I told the nurse that I was attacked by officers.  She documented that I had cuts and bruises on my face and on the side and back of my neck.

16.     Another nurse and tried to give me medications, including Benadryl and Thorazine.  I told the nurse and officers there, whose names I did not know, that I did not want medications.  They said they were required to give the medication to me because they had been ordered by one of the doctors.  The nurse gave me five injections of medication into different parts of my body.  I started to feel sedated and sleepy.  I continued to refuse to speak to the officers and asked for an attorney.  Staff refused my request.  At some point, the officers performed an interview with me.  I was so sedated by the time I was interviewed that I do not remember them performing the interview and do not know who performed the interview.  A sergeant whose name I did not know told me later that day, when I was less sedated, that I had been interviewed.  I only found out I was interviewed after the medications wore off.  They did not tell me if I had said anything during the interview, they just said that I was interviewed.

17.     I believe that I was verbally harassed and ultimately attacked by MTA Cudjoe for reporting him under PREA, and because he is generally a bad officer.  Before I reported him under PREA, he had told me, "I run this fucking unit."  He had never

1   assaulted me but definitely had scared me.  After he grabbed my buttocks and I reported

2   him, he grew increasingly angry and volatile towards me.

3       18.     On November 29, 2019, I received a Rules Violation Report ("RVR") for

4   "battery on a peace officer," and was moved to the administrative segregation unit

5   ("ASU").  The RVR states that as I was exiting the shower I started cursing at MTA

6   Cudjoe, and then rushed at him.  MTA Harrison claims that he tried to stop me and that I

7   pushed through him.  The report also says I continued to resist even when I was on the

8   floor.  Both MTA Harrison's and MTA Cudjoe's reports say that they each did not see the

9   type of force the other used on me.  Both of the officers lied in their reports.  I did not rush

10  at MTA Cudjoe or threaten him or MTA Harrison in any way.  MTA Cudjoe attacked me

11  and MTA Harrison joined in.

12      19.     I have postponed the RVR hearing pending the referral to the District

13  Attorney.  My case has been referred to the DA and the DA has decided to take the case.  I

14  am scheduled to go to court to fight the battery on a peace officer charge on August 6,

15  2020.

16      20.     I was made maximum custody, which is a very punitive custody designation

17  for those that have committed serious and sometimes violent rules violations.  Maximum

18  custody status is the inpatient version of segregation—meaning that if I was not in

19  psychiatric hospital, I would be in administrative segregation or a segregated housing unit.

20  Those on maximum custody cannot go to groups with other patients or meetings with a

21  clinician without being in restrained in a cage.  Class members on maximum custody status

22  receive very little out-of-cell time overall, including not only for mental health treatment

23  but also yard and dayroom.  Being on maximum custody made my mental health worse by

24  isolating me from my clinician and other patients.

25      21.     I filed a 602 about this assault about two days after the assault.  I submitted

26  my appeal through the third and final of level of review, and it was denied at all three

27  levels.

28

22.     I was never interviewed by the CMF ISU about this assault or the other time that MTA Cudjoe assaulted me.  They only interviewed me for the PREA incident.

23.     These assaults that I have experienced have made me feel very angry because I was innocent and staff came after me.  I also have felt very afraid after these incidents and fear for my safety around staff.  I am also worried about my falsified RVR and possibly getting a lot more time on my sentence.  I am also worried about spending a long time on maximum custody and in segregation.  I was already struggling at the time of the assault and was just starting to make some progress with intensive inpatient treatment.  After the assault, I slipped again and my mental health got a lot worse.  After the assault, I felt more sad and miserable and my episodes with my voices increased in frequency a bit.

24.     I still had to interact with the officers that were involved in the staff misconduct against me when I was in P-2 and Q-2.  I still regularly saw MTA Cudjoe and MTA Harrison in those units, as well as other MTAs who did not assault me but failed to protect me.  The inpatient program at CMF is relatively small and the MTAs work in almost all the program buildings.  However, now that I am in P-3 I do not see them as much because they do not work in my current building.  After the assaults, I requested a staff separation from MTA Cudjoe and MTA Harrison while at an Institutional Classification Committee ("ICC") meeting, a meeting in which housing and other custody-related decisions are made.  At the meeting, the warden told me he would not grant the staff separation, so it is possible they could move me back onto a unit where MTA Cudjoe works.

25.     In my time at CMF, there have been a few times that I needed help but didn't ask for it because I was afraid of what would happen to me.  I am afraid to ask for certain things that should normally be easy to ask for, such as my mail because I am afraid that staff will not help me because they know about the complaints I have filed against their fellow staff members.

26.     At the time of the assaults, I was already receiving the highest level of mental health care in CDCR.  I was hoping to get better in that program.  The abuse from by MTA Cudjoe, MTA Harrison, and other staff has my mental health worse. After the incident, I felt like I wanted to hurt myself but did not end up trying to hurt myself.  My suicidal ideation has decreased recently but I still struggle with periodic suicidal thoughts.

27.     In my opinion, staff select mentally ill prisoners to abuse.  The unit I was in at the time I experienced these assaults, as well as the unit I am currently in, are inpatient mental health units.  The people who work here work exclusively with the most mentally ill prisoners in CDCR.  It is makes no sense to me that these staff members who should be making the unit feel like a hospital where people can receive intensive mental health care are instead assaulting people.  I believe that certain staff in the CMF inpatient mental health units feel they can assault people because mentally ill prisoners housed in these units cannot defend themselves because.  I believe that if I and other mentally ill prisoners try to report staff abuse, they will turn it around and try to say that they got attacked, even if the patient did nothing.   No one believed me when I told them these officers assaulted me.  I believe they think I am making it up because I am mentally ill.  It is upsetting that staff that were supposed to protect me and help me receive treatment for my mental illness assaulted me without any consequences for them.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

28.    I believe there is staff misconduct at CMF is because no one at CMF, especially the warden and the administration, are doing anything to hold the MTAs and other line staff accountable.  Even the clinicians, who are a critical part of the treatment in the CMF inpatient units, tend to look the other way when staff misconduct happens.  This allows a culture where the MTAs and officers can do what they want to patients, even if an environment that is supposed to be more like a psychiatric hospital than prison.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Vacaville, California this 19th day of May, 2020.

/s/ ██████████

On May 19, 2020, due to the closure of CMF, in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CMF, I read the contents of this declaration, verbatim, to ████████ by telephone. ████████ orally confirmed that the contents of the declaration were true and correct. ████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: May 19, 2020

Emma Cook

[3546579.1]

9

# Exhibit 51a

## Filed Under Seal

# Exhibit 52

**DECLARATION OF** ████████████

I, ████████████ , declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation ("CDCR") number is ████ .  I am currently housed at Correctional Training Facility ("CTF") on Facility C in Building C-Wing.  I am 65 years old.

3.     I am an *Armstrong* class member.  I have a mobility disability, and I am designated as DNM.  I have lifting restrictions and a special cuffing chrono, a bottom bunk chrono, and I need to be transported in a special van with a lift due to my difficulty climbing stairs.  I have a number of assistive devices that I use to help me get around.  I have a cane, back and wrist braces, orthopedic shoes, foot orthoses, and a mobility impaired vest to indicate to staff that I have a mobility disability.  I also have a machine to reduce my lower back pain, which I keep in my cell.

4.     I have a number of serious medical conditions.  I suffer from cervical radiculitis, GERD (gastroesophageal reflux disease), hypertension, idiopathic progressive polyneuropathy, leukocytoclastic vasculitis, lumbar spondylosis, and NSAID-associated gastropathy.  My doctor told me that I am at high risk for serious illness from coronavirus due to my heart condition.

5.     I have been housed at CTF since April 2016.

6.     During my time at CTF, I have been housed in Facility C, in the following wings: C-wing, D-wing, F-wing, G-Wing, X-wing, Z-wing.

7.     Recently, I witnessed staff misconduct during a raid.

8.     On July 20, 2020, at about 3:30 am, I was asleep in my cell in Facility C, G-wing, when I woke up to the sound of boot steps going up stairs.  At nighttime, we sleep with the building lights dimmed, but when I woke up the lights were totally out.  I looked out the window of my cell and saw officers with helmets and lights.  They were walking quickly right behind each other.  They were on each of the three tiers of the building, going

[3607674.1]

1

to particular cells.  They looked like they knew where they were going.  I could see that their nametags were covered and that some of them were not wearing masks.

9.      They began taking Black people out of their cells.  I heard officers use the N-word, as they yelled, "Don't talk. Shut up."  In about five to ten minutes, they moved about ten to fifteen people out of my building.

10.     I learned later that these officers were from the Office of Security of Corrections, which is what they wrote on the property receipts they gave individuals whose cells were searched.  I saw these property receipts because I helped individuals file 602 staff complaints about the raid.

11.     Several officers remained in the building after the raid.  They turned the lights back on and packed up the property of the individuals who had been taken out of the building.

12.     About five hours later, all of the individuals who had been taken out of G-wing at 3:30 a.m. came back.  I spoke to some of these individuals and they told me they had been kept in the dining hall in zip ties, without masks, and some without clothes, for approximately 5 hours.

13.     Two or three days later, I heard the officers call for those people to pick up their property.  This means they had been without their property for two to three days.

14.     About five days after the incident, I helped two individuals file 602 staff complaints about their injuries from the raid.

15.     According to an article I read in the San Francisco Bay View, the raid targeted alleged gang members.  I think this is a lie, because the two individuals whom I helped are not gang members.

16.     While the raid was happening, I was scared that they would come get me.  I frequently submit 602 staff complaints, and I worried that I would be targeted in retaliation.  I feared that the officers would injure me physically or send another incarcerated person to beat me up.

17.     I was also a victim of staff misconduct at CTF.  I believe I was moved to a new housing area in retaliation for 602 staff complaints I have written.

18.     On July 11, 2020, I wrote a staff complaint against Officer R. Garcia for not wearing a mask.  On July 17, 2020, Officer Garcia confronted me in the dayroom, in front of approximately 30 incarcerated people, about the complaint.  He said, "███████, before you write me up, you have to write up him, him, him, and him," pointing his finger at several incarcerated people who were not wearing masks.

19.     On July 23, 2020, I went to the medical area for Facility C.  I asked Officers G. Campbell and I. Flores, who were in the medical building, to wear masks.  Officer Flores put his on, but took it off about 30 seconds later.  Officer Campbell refused.

20.     I told medical staff I was leaving because the officers refused to wear their masks.  I signed a refusal form and went back to my housing unit where I submitted a 602 staff complaint.  Because I am especially vulnerable to serious illness from COVID-19, I take precautions very seriously.  I do not want to get sick and die because of these officers.

21.     On or around August 14, 2020, I asked Officer Garcia why our programs were restricted even though we were not in COVID-19 quarantine.  He ignored me and then said, "Don't talk to me about that."  He then told me that I would be moved if I filed more staff complaints.

22.     On August 27, 2020, Officer Garcia told me I would be moving to C-wing that day.  I knew C-wing was under quarantine from a Program Status Report from the Warden of CTF issued on or around August 14, 2020.  My housing unit at the time, G-wing, was not under quarantine, and I wondered why they were moving me, as a high-risk medical patient, to a unit where individuals may have coronavirus.

23.     Officer Garcia told me, "I told you if you write me up again, I would move you out of the unit.  I hope you catch COVID-19."  Based on this conversation, I believe I was moved intentionally to a unit where I could be exposed to COVID-19 in retaliation for my staff complaints.

[3607674.1]                                                   3

24.     I am scared to file staff complaints, but feel like I have to continue to submit them to create a paper trail documenting staff misconduct at CTF.  If something happens to me, I hope that my family could see these complaints and figure out what happened.  There are certain things about which I have not submitted 602 staff complaints, because I fear staff will retaliate against me.  For example, I did not file a staff complaint after I was denied a disability accommodation for more freedom to walk around to help with my mobility disability, because Officer Garcia said I would be moved out of the building if I filed more staff complaints.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Soledad, California this 3rd day of September, 2020.

/s/ ███████████

On September 3, 2020 due to the closure of CTF in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at CTF, I read the contents of this declaration, verbatim, to ███████████ by telephone. ███████████ orally confirmed that the contents of the declaration were true and correct. ███████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 3, 2020

_____
Rekha Arulanantham

# Exhibit 53

From: Sara Norman [mailto:snorman@prisonlaw.com]
Sent: Thursday, August 20, 2020 1:47 PM
To: 'ralph.diaz@cdcr.ca.gov' <ralph.diaz@cdcr.ca.gov>; 'Connie.Gipson@cdcr.ca.gov'
<Connie.Gipson@cdcr.ca.gov>
Cc: jennifer.neill@cdcr.ca.gov; Don Specter <dspecter@prisonlaw.com>; Steven Fama
<sfama@prisonlaw.com>
Subject: request for investigation

Dear Ralph and Connie,

We write with some alarm after receiving multiple first-hand reports about an event that took place
the early morning of July 20 at CTF.  From these remarkably consistent accounts, here is what we are
told happened:

At approximately 3 or 4 a.m. the morning of July 20, dozens of Black people housed in CTF were
roughly pulled from their cells, placed in flexicuffs/zip ties with their arms behind their backs, and
brought to the dining hall.  They were not allowed to bring face masks.  Various people said that the
staff performing these acts were wearing "riot gear" (helmets and face guards) and one person said
they had no name tags.

Several people said they were beaten on the way to the dining hall, despite being restrained. Many
were wearing only boxer shorts, with no shoes or socks.  Several people estimated there were 100 or
more people gathered there.  They were seated very close together and were not allowed to put on
face masks.  Staff were also unmasked.  They remained there, cuffed behind the back, for at least
four hours.  Some said they were cuffed tightly, causing pain and numbness in wrists and hands.
Some said the length of time caused shoulder pain.  Some said they heard staff use racial slurs and
taunts such as "Black lives don't f---g matter" and "We don't care if you n---s catch coronavirus."
They were not allowed to use the toilet.  After some hours, they were taken one by one for
questioning about Black Lives Matter and gang affiliations.

On returning to their cells, some said they found them in disarray, with personal items such as family
photographs, books and artwork missing or destroyed.  Some said they were subsequently validated
as gang members despite no gang involvement and based on old information (facts of crime many
years before, photographs many years old, etc.).

If these remarkably consistent accounts are true, they tell an extraordinarily disturbing story of
excessive force, racist statements, and violations of health rules that put all of their lives at risk.  We
demand a full formal investigation of this matter by CDCR's Office of Internal Affairs, including
whether (a) any excessive force was used or inappropriate restraints, (b) any racists slurs or
statements were uttered, (c) there was justification for First Watch action with so many people for
such a long period of time, (d) property was inappropriately destroyed or taken, (e) the interrogations
involved matters properly under review (Black Lives Matter is not a criminal enterprise), and (f) any
subsequent gang validations were supported by concrete, reliable evidence.

Please inform us of any actions you have already taken or intend to take to investigate these
allegations.  I would appreciate a thorough response to these very serious allegations.

--Sara

# Exhibit 54

**DECLARATION OF** ███████████

I, ███████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ███████. I am currently housed at Kern Valley State Prison ("KVSP") on Facility C in Building 1. I am 49 years old.

3.      I am an *Armstrong* class member. I am designated as DNH, which means I have a hearing disability that does not require a special housing placement. I cannot hear from my left ear and have to use a hearing aid in order to hear out of that ear. I also am losing hearing in my right ear. I have tried to get CDCR to document my hearing issues in both ears, but they have not documented my hearing loss in my right ear. I also wear a hearing disability vest signaling that I am hard of hearing. I am also designated as DNM, which is the code for a mobility impairment that does not require special placement or limit the person's use of stairs. I wear a mobility disability vest. I also have a lower bunk chrono because I cannot climb to a top bunk due to my mobility impairment. Because of my mobility impairment, it is painful for me to walk without assistance for stretches of time. I also have balance issues because of my hearing loss in my left ear. I need a cane to get around, but medical staff at KVSP took my cane on October 24, 2019, so I have been having to get around without it since.

4.      I also have a vision impairment in my left eye and wear eyeglasses. I had surgery to remove a brain tumor a number of years ago. The removal of my tumor injured my left facial nerve, which caused left facial palsy, or drooping of the left side of my face. The nerve damage also caused glaucoma and optic atrophy that impacts the vision in my left eye. Surgeons have repeatedly tried to give me a corneal transplant to improve my vision in my left eye, but it has not worked. I have some vision in my right eye, but according to my doctors, my left eye likely will continue to get worse. I do not have a DPP code to indicate my vision impairment. I have requested to be classified with one so

[3602626 3]

1

1  that I can receive accommodations for my vision, but medical staff at KVSP have refused

2  to acknowledge and treat the issues with my vision.

3       5.    I am a *Coleman* class member.  I am at the Correctional Clinical Case

4  Management System ("CCCMS") level of care, the lowest level of mental health care.  At

5  CCCMS, I am able to live and program on mainline CDCR yards, alongside incarcerated

6  individuals who do not have a mental health condition.  I suffer from anxiety.  I

7  participate in the Mental Health Services Delivery System ("MHSDS") in order to cope

8  with being in prison.  I have been to the Mental Health Crisis Bed ("MHCB") multiple

9  times, usually when I am feeling unsafe and hopeless.  A MHCB is a short-term intensive

10  care unit for people experiencing severe mental health crises.

11       6.    I have been housed at KVSP from October 10, 2018 to now.

12       7.    During my time at KVSP, I have been housed in the following locations:

13  C-Yard, Building 7; C-Yard, Building 6; C Yard, Building 2; C Yard, Building 4; C Yard,

14  Building 1; D Yard, Building 5; D Yard, Building 6; D Yard Building 3; the

15  Administrative Segregation Unit ("ASU"), and the MHCB.

16       8.    I was a victim of staff misconduct at KVSP.

17       9.    On July 22, 2019, I attended one of my mental health groups, called

18  "Community" in the C-Yard, Building 4 ("C-4") dining room.  Community group consists

19  of people in the denial management and substance abuse programs groups coming together

20  to discuss politics and news topics and do recreational activities, like drawing, reading, and

21  writing.

22       10.    After community group ended at 12:15 p.m., my denial management group

23  started.  I remained in the chair I always sat in during community group, a chair at the front

24  of the classroom.  I sat there because my hearing and vision disabilities make it difficult

25  for me to participate, and I would be able to better see and hear the instructor from that

26  seat.  The instructor is aware of my hearing and vision disabilities.

27       11.    From 12:15 p.m. to about 1:30 p.m., I worked on my classwork for denial

28  management group at my seat.  Around 1:30 p.m., as group was ending, I got out of my

seat and walked to the window of the room, where the instructor had written out a number of remedies and ideas to help with self-awareness of denial.  We were supposed to choose a remedy we would use and write our name next to it on the board.  I did so and went back to my chair to continue to work on my classwork.

12.     Shortly after sitting down, I heard a voice say "█████, stand up."  At this time, everyone in the group, as well as the instructor, was still in the room.  I reached for my glasses so that I could put them on and see who was talking to me, as I did not recognize the voice.

13.     Before I could manage to put my glasses on, the person rushed at me, grabbed me out of my seat, and slammed me to the ground.  When I was on the ground on my stomach the person put handcuffs on me and started punching me in the head.  As the assault went on, I recognized this officer as Officer J. Harmon, one of the officers who work in C-4.  Officer Harmon was yelling, "Stop resisting!  Stop resisting!" as he was punching me and kicking me in the head.  I was not resisting at all—I was frozen in shock, overwhelmed by the attack.  I believe that Officer Harmon was yelling this to justify the force he used against me.

14.     The officers at KVSP commonly say, "Stop resisting," while they are assaulting incarcerated people in order to claim that they needed to use force against us because we were resisting.

15.     As Officer Harmon was punching me, I rolled over on my stomach to try to protect my face.  Officer J. Welch, who had also come to the group room with Officer Harmon, started stomping on my head.  I recognized him as Officer Welch after he assaulted me.  He also punched me in the back of the head.  I was handcuffed this entire time.  After punching me in the back of the head, Officer Welch kneeled on my lower back and grabbed my left index finger, which was behind my back in handcuffs.  He bent my finger backwards to my wrist, trying to break my finger.  My finger still hurts from this.  Officer Harmon said, "You piece of shit, you're jacking off."  I believe he was accusing me of masturbating to justify why he had randomly assaulted me.

16.     I said, "I didn't do nothing, and you both are trying to kill me."

17.     I heard a voice, which I later identified as Officer Cortez say, "You want leg restraints?"

18.     Officer Harmon said, "Yes," and the officers put leg restraints on my ankles. After putting the leg restraints on me, Officer Welch picked my head up off the ground and slammed it back into the concrete.  The impact and pain of my head being slammed was so intense that I thought I was going to die.  I felt blood coming out of the corner of my left eye.

19.     Officer Cortez, an officer who works on C-Yard patio, and Officer Harmon, each grabbed under one of my arms and lifted me off the ground to my feet.  Officer Cortez carried me by holding the right side of my body.  Officer Harmon carried me on my left side.  Officer Welch stood to the left of Officer Harmon.

20.     I said, "Officer Cortez?" in order to make sure I was identifying him correctly.

21.     He responded "Yeah, Cortez.  You piece of shit.  Walking around like you have problems with everyone, filing complaints against officers."  I believe he was referring to two complaints I had filed against officers at California State Prison-Corcoran ("COR") for falsifying documents and using incarcerated people to attack other incarcerated people the officers saw as problematic.  I had sent information about this court case regarding Corcoran to my brother about two hours before I was assaulted.  I believe that the officers may have known about these cases by reading my mail to my brother and by witnessing some of my interviews with Corcoran investigative staff that took place while I was at KVSP.

22.     I did not respond to Officer Cortez.  Officer Cortez and Officer Harmon carried me to the C-Yard program office and placed me in the holding cage.  As I was being placed into the holding cage, I turned my head to look to my right.  As I turned my head, Officer Cortez slammed my head against the left wall of the holding cage.  I felt faint and fell, sliding against the wall of the holding cage.  As I was sliding against the wall,

Officer Cortez kicked me on the left side of my face in my jaw.  This kick knocked me unconscious.

23.     I am not sure how long I was unconscious.  When I came to in the holding cage, a nurse was standing above me.  Sergeant Hernandez, one of the sergeants that works on C-Yard, was standing with her.

24.     The nurse asked me if I was injured.  I told her I was and began to tell her where I was in pain.  The nurse stared at me as I listed my injuries, not writing anything down.  I did not see her fill a 7219 form out at all.  At the time, I was bleeding out of my head and my eye area and could feel a bump about the size of an egg on my head.  My arms, legs, and back were bleeding as well.

25.     After I described these injuries to the nurse, she and Sergeant Hernandez left the holding cage without saying anything about my injuries.  After they walked out, I told Lieutenant Hernandez, Sergeant Alvarez, and Officer Molina, who were all in the C-Yard program office at the time, that I needed medical attention and that my injuries were not documented.  The only response I got was from Officer Molina, who told me to ask to go to medical when I got to the ASU.

26.     I was in the holding cage for what felt like a few hours.  I knew it was a few hours because there was the 2:00 p.m. shift change while I was in the holding cage.  Shortly after I was given dinner in the cage, around 4:30 p.m., I was taken to the ASU by Officer Molina and another officer whose name I do not recall.  Once I got to the ASU, I asked for medical attention.  The nurses at the ASU told me to file a 7362 medical request form, requesting treatment.  I was not able to get a 7362 form that day, so I could not file a request for medical care.

27.     During my first few hours in the ASU, one of the officers in the ASU whose name I do not remember saw me struggling to get medical attention.  He went and got a copy of my 7219 form documenting my injuries.  He told me that the 7219 said that I had no injuries and that I had provided no comment about my injuries.  Neither of these things

1   was true—I had injuries and I had repeatedly asked for medical attention.  This officer left,

2   and I did not get medical care that day.

3        28.     The next morning, I passed out in my cell while trying to place my morning

4   tray on the ground after eating breakfast. I am not sure why I passed out, but I believe it

5   was in part due to my injuries from the assault.  Officers saw me passed out on the floor of

6   my cell and thought I was having a seizure because I was shaking a bit on the ground.

7   Medical staff came to my cell and brought me to the Triage and Treatment Area ("TTA") a

8   medical clinic at KVSP.  I told the doctor there that I had been beaten up by custody staff.

9   The nurse assisting the doctor, Nurse Yarborough, evaluated my injuries and filled out a

10   7219 medical evaluation form documenting my injuries.  I asked Nurse Yarborough if all

11   my injuries were documented.  He told me that the 7219 he filled out only pertained to the

12   injuries I sustained the day when I fainted.  I asked him to document my injuries from the

13   day prior as well, and Nurse Yarborough filled out a new 7219 documenting all of my

14   injuries.  These injuries were cuts and bruises on both my knees, my shoulders, back, arms,

15   elbows, and face.

16        29.     After meeting with the doctor, I was transferred to Adventist Health, an

17   outside hospital.  I stayed overnight at the hospital and returned to KVSP on July 24, 2019.

18   At the hospital they told me I had only external injuries.  I tried to explain the pain I was

19   in, but they assured me I did not have serious internal injuries.

20        30.     The day after I got back to KVSP, on July 25, 2019, I finally was able to

21   access a 7362 form, and filed a 7362 medical request requesting medical treatment and

22   requesting that my injuries be documented.  I was taken to the TTA later that day and saw

23   medical staff.  They documented my injuries again but did not give me any medication or

24   treatment for my pain.

25        31.     I was charged with an RVR for "indecent exposure" on the same day as the

26   incident, July 22, 2019.  The RVR states that Ms. Lopez, my instructor, went to release our

27   group for break around 1:30 p.m. when she looked over at me and saw me exposing myself

28   to her.  The RVR states that I refused her orders to stop doing this, and that she activated

her alarm.  The RVR states that Officer Harmon and Officer Welch responded to the alarm and escorted me to the C-Yard program office.  I never exposed myself to Ms. Lopez.  I believe that I was charged with indecent exposure in order to justify Officer Harmon and Officer Welch coming to the classroom to assault me.

32.     The RVR also omits some details, including all of the details of the assault and the fact that Officer Cortez was involved.  The RVR does not mention Officer Cortez at all, even though he attempted to break my finger, applied the leg restraints on my ankles, and carried me to the program office.

33.     Eventually, this RVR was removed from my file.  I learned this from my brother, who had called the prison to request my records.  I was never told why this RVR was removed from my file, but I believe that they removed it because they knew I had been assaulted.

34.     I filed a 602 reporting the assault on August 11, 2019.  In the 602, I reported my injuries and requested that I have a videotaped use of force interview about the incident.  I did not have that interview until November 16, 2019.  The interview was with Lieutenant Osterling.  Sergeant Huckleberry was also present and was recording the interview.  They asked me a few questions about the particulars of how I was assaulted, but the meeting was very quick.  My appeal was never processed, so I never received a response.  I tried multiple times to get this appeal processed but was unable to.  I also sent letters to the Office of the Inspector General, the Ombudsman, and the Office of Internal Affairs reporting the assaults against me.

35.     On August 9, 2019, I filed an 1824 Reasonable Accommodation Request, a form to request disability accommodations, asking to be transferred because I could not protect myself due to my hearing, vision, and mobility disabilities.  On August 15, 2019, I went to Institutional Classification Committee ("ICC"), a meeting in which custody staff and incarcerated people discuss housing decisions.  At this meeting, I was told I was being moved out of ASU back to my previous housing area and given single cell status.  I expressed that I was not comfortable with moving back to that housing area, as I was

1  worried for my safety there, because I would have to interact with the officers who

2  attacked me.  My concerns were ignored, and I was moved to C-Yard, Building 2 ("C-2")

3  against my wishes.

4       36.    At about 9:45 a.m. on the morning I arrived in C-2, I was told by another

5  incarcerated person working as a porter in C-2 that I was being moved to another building,

6  C-Yard, Building 4.  C-4 is primarily housing for gang affiliates and/or people that are on

7  C-Status, an intensive punishment status that consists of the loss of privileges like yard,

8  phone calls, and TVs/radios, among other things.  I was not on C-Status at the time and am

9  not a gang affiliate, so I told the porter there was no reason I was moving to C-4.

10      37.    Five minutes after the porter told me this, Sergeant Charles and Officer

11  Furlong came over to me and told me to cuff up so that I could be placed in a holding cage

12  pending transfer.  I complied, and Sergeant Charles handcuffed me.

13      38.    Sergeant Charles and Officer Furlong walked me out to the C-Yard patio.

14  Another officer, whom I did not recognize, was on the patio.  I later found out he was a

15  lieutenant, but because of my vision impairment, I could not see the bars on his shirt that

16  signify he is a lieutenant.  This lieutenant whose name I did not know told me that I was

17  being moved to C-4 to be around officers who would be "better equipped to deal" with me

18  if I were to expose myself again.  I took this as the him telling me that I would be assaulted

19  again, if I was accused of exposing myself.  I told this officer I had not exposed myself and

20  had not been found guilty of the charge yet, as I had not yet had my RVR hearing.  I also

21  told him that moving me to C-4 was a violation of my due process rights, because they

22  were punishing me before I had been found guilty.

23      39.    A number of officers, most of whom I did not know, gathered around the

24  lieutenant and me on the patio as we were talking.  The only officer I recognized was

25  Officer Furlong, who was present when I was assaulted on July 22.  There were also a

26  number of other incarcerated people on the patio, waiting to enter the building to go to

27  education class and the library.  The lieutenant seemed to be getting frustrated with me and

28  started to look around the patio.

40.     He told Officer Furlong, "Clear the patio.  Put all these inmates somewhere." Officer Furlong told the incarcerated people on the patio to go into the chapel.

41.     As soon as all of the other incarcerated people had left the patio, the lieutenant told me, "If you don't go to Building 4 on your own, we will fuck you up."

42.     I had a hard time hearing what he was saying, so I asked him to repeat himself.  He repeated more loudly, "If you don't go to Building 4, we will fuck you up."

43.     I again told him and the officers surrounding him that I was not on C-Status and that being forced to move to C-4 was a violation of my due process rights.  He told me he would make sure I was not placed in the C-Status section of the building, but one of the other sections.  I said this was still a due process violation, as I had not gone to ICC to discuss these issues, but I would comply because I was surrounded by officers and threatened with being attacked.  I asked him for his name, and he told me his name was R. Rodriguez.  I told Lt. Rodriguez that I would be writing OIG about these due process violations.  He said that was fine, and he, Sergeant Charles, and Officer Furlong started to walk me over to C-4.

44.     As we were walking, Lt. Rodriguez asked staff in C-4 over his radio what cell I would be housed in.  The officer responded with a cell number that I knew was in the C-Status section of the building.  I asked Lt. Rodriguez why I was being housed in a C-Status section when he had said I would not be.

45.     He said, "I know that you aren't C-Status.  You'll get your property."  We arrived at C-4 around 10:10 a.m., and I entered the cell in which was to be housed.  The cell had no mattress, no blankets, and no cleaning supplies.  My property was also nowhere to be found.  I told custody staff around noon during count that there was nothing in my cell.  No one responded to me.

46.     Around 4:00 p.m., I waved at the control tower to let me out to retrieve antibiotic medications I was taking at the time.  The tower officer opened my cell door and I walked over the medical window to get my medications from the nurse.

47.     As I was getting my medications, I told the nurse that I should not be housed in this unit.  After getting my medications, I walked back to my cell.

48.     As I entered the building, two other incarcerated people asked me, "Hey, is your last name ███████?"

49.     I said, "Yes," and they told me that my property was on the yard in a purple cart, and that I should talk to Officer Torres, the tower officer, to get my property.  I walked over to the tower and told Officer Torres that I was not supposed to be housed in this building, and that I did not have my property, a mattress, blankets, or cleaning supplies in my cell.  He said he would look into the situation.  I went back to my cell.

50.     Around 8:30 p.m., I attempted to come out to get my antibiotics again.  At the time, I was taking this antibiotic four times a day.  Officer Torres in the tower told me to stay in my cell and that I would get my mattress soon.  Later that day, I was given my mattress and my property.  My property was missing my TV and my tablet.  I asked a floor officer named Officer Pereira about this, and he told me he needed to check and see whether I was on C-Status.  I continued to report my safety concerns, but no one would listen to me.

51.     On August 17, 2019, while I was housed in C-4, I heard Sergeant Charles tell two other incarcerated people to "two on one him, just fuck him up" referring to me.  I did not think they would comply to his request to hurt me until later that evening when I was walking back from medical line at 12:00 p.m.  As I was walking back to my cell, two incarcerated people attacked me from behind.  I was not given medical attention and was placed back in my cell.

52.     Later that evening, another incarcerated person approached me, trying to fight me.  I was able to walk away and not engage in the fight and was not attacked at that point.  I again made staff aware of my safety concerns but was not interviewed or moved.

53.     I was given an RVR for "mutual combat" that same day.  The RVR says that I initiated the fight.  After I was attacked, Sergeant Charles, Sergeant Flores, and Officer Furlong forced me to sign a 128G chrono, a chrono saying that I did not have an issue with

the people that attacked me.  I signed the chrono not because I was feeling safe around the people that attacked me, but because the officers told me that if I did not sign the chrono, I would be put back in C-4 where I just recently been attacked.

54.     Around 8:30 p.m. on August 19. 2019, I was attacked again.  I was returning to my cell from getting my medications at afternoon pill call when I was attacked from behind by two incarcerated people on the yard.  They punched me and fell hard onto the dirt.  I was briefly unconscious.

55.     When I was becoming conscious again, I felt Officer Molina, an officer on C-Yard, tap me on the back and call my name.  I recognized his voice.  I moaned, because I was in so much pain I could not form a word.  I had blood pouring out of my face, and one of my teeth fell out.  I had cuts on both of my elbows and both of my knees.

56.     Officer Molina handcuffed me behind my back.  Another officer, Officer Ronquillo, was standing nearby.  I was able to speak now and asked him to grab my cane that had been knocked out of my hand.  He did so, and the officers lifted me to my feet and escorted me to the C-Yard medical clinic.

57.     This entire time, Sergeant Alvarez was standing nearby.  She witnessed the entire incident.  She did not intervene, and after I was assaulted, as I was lying on the ground, she walked by and said, "They said that you suing on them." As Officer Ronquillo and Officer Molina escorted me off the yard, Sergeant Alvarez approached me and asked me, "You're going to sign off on this, yes or no?"  She was referring to a chrono, or a form stating that I had been fighting with the incarcerated person that attacked me.  I emphatically said no.

58.     When I arrived at C-Yard medical, I was placed into a holding cage.  After about five minutes, Sergeant Alvarez and Sergeant Lerma, another C-Yard sergeant, approached me.  Sergeant Alvarez said, "If you don't sign off on this, my partner is going to say you were swinging your cane at them, and we're going to charge you with using your cane as a weapon."

59.     I said, "That's a lie.  You know I'm the victim, and you just saw me unconscious on the ground.  Now you're threatening me that if I don't sign off, you're going to charge me with a crime?  I'm not safe.  I need to be placed in the ASU for safety concerns."  Neither of the sergeants responded, and they both walked away.

60.     Officer Sotello, an officer that works in the C-Yard medical building, came to the holding cage and offered me a larger holding cell.  I accepted and started to walk toward the other holding cell.

61.     All of a sudden, while walking, I felt dizzy, but did not pass out.  About thirty minutes later, a nurse pulled me out of the holding cage and documented some of my injuries.  She documented some of my bruises and cuts but not document the injuries to my wrist.  I was placed back in the holding cage.

62.     While in the holding cage, I told Officer Sotello, "Custody is literally trying to kill me," and explained what had happened over the last few days.  Officer Sotello gestured at me to hold on and left the room.

63.     About 15 minutes later, Sergeant Alvarez came to my holding cage, holding handcuffs.  She handcuffed me behind my back through the holding cage port.  Officer Molina, Officer Ronquillo, Officer Suarez, and Sergeant Lerma all gathered around the holding cage with Sergeant Alvarez.  They had a wheelchair, and Sergeant Alvarez told me to sit down in it.  I complied without knowing where we were going because I was feeling intimidated by the number of officers surrounding me.

64.     The group of officers began to walk alongside me, as Sergeant Alvarez wheeled me back to the C-Yard housing units.  I asked Sergeant Alvarez, "Where am I going?"

65.     Sergeant Alvarez responded: "I gave you three chances."

66.     I did not know exactly what Sergeant Alvarez meant, but took this as a threat and said, "Are you putting me back on the same yard I just got knocked out on?  I'm going to make your actions known."  I was wheeled to C-Yard, Building 6 ("C-6"), a different housing unit, close to 10:00 p.m. that night.

67.     As he was leaving C-6, Officer Molina said, "I told you that was your last chance to leave."  He was referring to my conversation with Sergeant Lerma and Sergeant Alvarez in which they asked me to sign off on the form saying I was fighting. I took this as a warning that I would still be harassed while I was on C-Yard, even if I was in a different building.

68.     I filed a 602 reporting the incidents on and around August 17 and August 19, 2019 on October 20, 2019.  I sent this appeal out, but it was never processed at the second level.  I am still trying to get this appeal processed.

69.     These assaults were incredibly stressful, particularly because I cannot defend myself due to my disabilities, so I am very susceptible.  I felt so unsafe that after the second attack by other incarcerated people, I began to think seriously about killing myself. I told Officer Corona, a floor officer in C-6, that I was considering killing myself to get away from all of this.  He referred me to see mental health staff on August 27, 2019, and they decided to place me in an MHCB.

70.     Throughout my time in the MHCB, I told multiple clinicians what had happened to me, and I continued to feel like I was going to hurt myself.  Despite still feeling suicidal, I was discharged from the MHCB on September 3, 2019, and moved to D-Yard, Building 6 ("D-6").

71.     When I got to D-6, I did not come out of my cell for weeks except to periodically take a shower, because I was terrified of being hurt again.

72.     The threats and harassment did not end after August 2019.  On December 2, 2019, another incarcerated person approached my cell in D-6 and asked me what I was in prison for.  I was shocked that he asked me that, as that is something that is not openly discussed among incarcerated people.  I asked him why he was asking me that.  He said, "Don't get loud, but people are saying you are a cho-mo."

73.     "Cho-mo" is short for child molester.  I am not incarcerated for a sex crime. I became upset about this because I had a suspicion custody staff had told other incarcerated people this lie in order to get me attacked or killed.

74.     Later that day, I went out to dayroom reluctantly because I was afraid of being attacked but needed more information.  I asked another incarcerated person who knows the person who asked me about my commitment offense whether he had any idea about why custody told this incarcerated person lies about my commitment offense.  This incarcerated person told he had heard that this person was asking me this because the officers wanted me hurt because I had filed complaints against them.

75.     In my time at KVSP, there have been many times that I needed help but did not ask for it because I was afraid of what would happen to me.  On both C-Yard and D-Yard, I rarely ask officers for assistance getting around, even though I need this assistance due to my mobility, hearing, and vision impairments, because I am afraid of being attacked.  I also do not ask the officers to repeat the things they say to me, even when I have difficulty hearing due to my hearing impairment.  Because of this, I often miss information.  Nearly every time I tell officers, mental health or medical staff about my disability and mental health needs, they say that I am "faking it" or ignore me completely.

76.     After the July 2019 assault, my mental health gradually got worse and worse.  As previously mentioned, I stayed in the MHCB from late August to early September.  On December 10, 2019 while I was on D-Yard, shortly after I learned the officers were accusing me of being a child molester, I met with a psychologist, Mr. Kym.  He asked me about my MHCB stay in late August/early September.  I explained what had happened and told him about my ongoing safety concerns and suicidal feelings related to my safety.  He told me he was going to have me admitted to the MHCB again because I seemed to be really stressed.  I was also told that after my MHCB stay, he would try to make sure I was discharged to the Enhanced Outpatient Program ("EOP") level of care, a higher level of mental health care than the CCCMS level of care I was presently at.  EOP would afford me more groups and contacts with my clinician, so that I could better work through my suicidal feelings.  I went back to D-Facility after this appointment feeling like I was going to get the care I needed.  When I arrived back at D-Facility, Mr. Beach, a clinician, and

1  Sergeant Huckleberry told me that they had decided placing me in the MHCB was not

2  necessary.  I was very frustrated by this.

3        77.    I continued to experience suicidal thoughts after this meeting and was

4  eventually admitted to the MHCB on December 27, 2019.  I stayed there for three days

5  before being discharged to CCCMS. I wanted to stay for longer because I was still feeling

6  suicidal, but I was told by my treatment team in the MHCB that my issues were custody-

7  related and not mental health-related.  My mental health level of care was never raised to

8  EOP, as I was told it would be.  I continue to experience ongoing mental health issues that

9  were made worse by the assaults and harassment I have experienced.  I am extremely

10  stressed and worried around officers.  I also do not sleep more than four hours a night

11  because of the stress this harassment has caused me.

12        78.    In my opinion, staff target people with disabilities and mental illness because

13  we are vulnerable.  Staff also become easily frustrated us because we require a lot of

14  assistance, which leads them to feel like they can assault us.

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

79.     I believe the reason there is so much staff misconduct at KVSP is because the officers function like a gang.  Because of this, officers cover for each other and create an environment where they are always right, and incarcerated people are always wrong.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Delano, California this 3rd day of September, 2020.

/s/ ████████████

On September 3, 2020, due to the closure of Kern Valley State Prison in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at KVSP, I read the contents of this declaration, verbatim, to ████ ████, by telephone.  ████████████ orally confirmed that the contents of the declaration were true and correct.  ████████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: September 3, 2020

Emma Cook

[3602626 3]                                                    16

# Exhibit 54a

## Filed Under Seal

# Exhibit 55

1

**DECLARATION OF** ███████████

2          I, ███████████, declare:

3          1.      I have personal knowledge of the matters set forth herein, and if called as a

4    witness, I could and would competently so testify.

5          2.      My California Department of Corrections and Rehabilitation ("CDCR")

6    number is ██████.  I am currently housed at Kern Valley State Prison ("KVSP") on

7    Facility B in Building 1.  This housing unit is a Short-Term Restricted Housing ("STRH")

8    unit, which is a segregation unit for mental health patients at the CCCMS level of care.  I

9    am 28 years old.

10         3.      I am a *Coleman* class member.  I am at the Correctional Clinical Case

11   Management System ("CCCMS") level of care, which is the lowest level of mental health

12   care provided in CDCR.  Patients at the CCCMS level of care live in general population

13   units throughout CDCR and receive infrequent contacts with their mental health case

14   manager and treatment team.  I suffer from depression.  I sometimes struggle with anger

15   and suicidal ideation.  I have attempted to take my life multiple times during my time in

16   CDCR.  When I have attempted suicide and during other intense periods of suicidal

17   ideation, I have been admitted to the Mental Health Crisis Bed ("MHCB").  An MHCB is a

18   short-term intensive care unit for people experiencing severe mental health crises.  Most

19   recently, I attempted suicide in early April 2020 after the incidents described below.  I was

20   admitted the KVSP MHCB as a result.

21         4.      Though I am not an *Armstrong* class member and do not have a permanent

22   disability, I was severely mobility impaired as a result of the March 2, 2020 assault on me

23   described below.  I was issued a wheelchair while in the Wasco State Prison ("WSP")

24   MHCB to help me get around.  Shortly after I returned to KVSP from WSP, they gave me

25   a walker instead of a wheelchair because my mobility had improved a bit, but mostly

26   because I wanted to be able to get around myself due to the harassment I experienced,

27   described below.  I lost my walker after the March 27, 2020 incident described below, in

28

[3604416 2]                                    1

1   which I was accused of throwing my walker at officers.  I continued to have mobility

2   issues after this incident and struggled without the walker.

3         5.      I have been housed at KVSP from September 19, 2018 to the present, except

4   for the period between March 3, 2020 and March 11, 2020, when I was at WSP.  I was

5   transferred to WSP to be admitted into the MHCB during a mental health crisis I was

6   having after the first incident described below.

7         6.      During my time at KVSP, I have been housed in the following locations: B

8   Yard, Building 1 (the STRH), A Yard, Building 3, A Yard, Building 1, A Yard Building 8,

9   and the MHCB.

10        7.      I have been a victim of staff misconduct at KVSP on multiple occasions.

11        8.      On March 2, 2020, while I was housed in A-2, I was feeling suicidal because

12  I had recently learned that my grandmother, who basically raised me, had passed away.  I

13  was also in some arguments with some of my friends, and had recently lost my job as a

14  porter.  I told officers on the unit that I was suicidal, and at around 10:30 a.m. the KVSP

15  Crisis Intervention Team ("CIT") pulled me out of my cell to see me in a holding cage in

16  the program office.  The CIT is a team of mental health, nursing, and custody staff

17  members who respond to urgent mental health concerns and address the problems of

18  suicidal prisoners.  When they came to see me, I asked to speak to the CIT mental health

19  clinician, Ms. Price, alone.  She did not let me speak to her alone, but I did still tell

20  Ms. Price and the officers with her how I was feeling.  Despite telling them I was suicidal,

21  they told me they were going to send me back to my cell.  During this meeting, Ms. Price

22  responded to my suicidality by trying to convince me that I was "going to hell" if I killed

23  myself, after I told her I was Muslim.

24        9.      When I learned that I was going to be sent back to my cell, I started to refuse

25  to leave the holding cage.  I continued to say I was suicidal and needed help.  At the time,

26  there were about five officers in the program office, including Officer Castellanos and

27  Officer Figueroa, and Sergeant Haddad.  Suddenly, Officer Figueroa opened the holding

28  cage door and he and the other officers rushed into the holding cage.  They grabbed me by

my arms.  I instinctively pulled away from them as they tried to grab me.  As I pulled away, at least two of them started to punch me.  One of the officers whose name I do not know grabbed me by my dreadlocks and pulled me out of the holding cage.  They continued to assault me outside of the cage in the room with the holding cages.  They lifted me off my feet into the air and carried me into the hallway.  When we got to the hallway, they slammed me face first into the ground.  They started stomping on the back of my head and the side of my face.  After they were done assaulting me in the hallway, they handcuffed me while I was on the ground face first, and placed ankle restraints on me. The ankle restraints on my ankles were so tight that my ankles were bleeding.  I still have scars on my ankles from this.

10.     After cuffing me, the officers picked me up off my feet started to carry me back to my cell.  When we got out of the program office onto the patio, they dropped me to my feet and started dragging me back to my cell.  I was placed back in my cell without medical attention.  I had throbbing numbness in my back and legs that made it difficult to stand up for days.  I also had cuts on my face, wrists, and ankles.

11.     When I was placed back in my cell in A-2, I was in shock and did not talk to anyone for a while except my cellmate.  I had my cellmate cut my dreadlocks off because I was so traumatized about how the officers had just pulled me by my hair.

12.     After the officers left at the end of their shift, I told the officers on the next watch that I had been assaulted.  Lieutenant M. McCollough came and did a videotaped use of force interview and a body scan.  Lt. McCollough asked me questions about what had happened and who was involved.  He also had me show him my injuries.  The interview was fairly brief, but I was able to tell him what had happened.

13.     Throughout this time, I was feeling suicidal, and after some of the shock of the assault wore off, I reported that I was suicidal to the officers again as they were passing out dinner.  The CIT came to my cell door again around 4:30 p.m., and the clinician that came to see me was again Ms. Price.  I was hesitant to speak with her after the meeting I had had with her that morning.  However, one of the officers who I get along with

1   convinced me to talk with her.  I ended up telling her how I was feeling and what had

2   happened.  Ms. Price referred me to the MHCB.

3       14.     I was placed in A-1 on suicide watch overnight, and was transferred to the

4   WSP MHCB the next day.

5       15.     I did not receive a Rules Violation Report ("RVR") in relation to the

6   March 2, 2020 assault.

7       16.     I submitted a 602 staff complaint reporting this assault.  My 602 was denied

8   at the second level.  I sent this 602 to the third and final level of review on March 18, 2020

9   but have not yet received a response.

10      17.     On March 11, 2020, I got back from the WSP MHCB to KVSP, and was

11  placed in C-1.  This yard is a sensitive needs yard ("SNY") that housed people in protected

12  groups and people who are in the Enhanced Outpatient Program ("EOP"), a higher level of

13  mental health care than CCCMS.  I am not designated SNY and was not EOP, so I told

14  staff that I could not be on this yard.  After I told the officers this, I spoke with a counselor

15  and learned that I was not endorsed to C-1 and should not be there.  A day or two after

16  arriving on C-1, I was put in the STRH so they could figure out the correct yard for me.

17  This process took a while, so I was in the STRH for a few weeks.

18      18.     While I was in the STRH, the officers there, including Officer Cruz and

19  other officers whose names I do not remember, would ask me how the officers on the other

20  yard assaulted me.  They would also make fun of me because I had to use a wheelchair due

21  to my injuries.  While they were escorting me pushing me in the wheelchair, Officer Cruz

22  and some of the other officers whose names I do not remember would lean over and

23  whisper in my ear things like: "you don't need that wheelchair," "You're alright.  Stop

24  faking."  Officer Cruz even told me a few times, "You had five guys on you and all they

25  did was sprain your ankle and hurt your back?"

26      19.     Shortly into my stay in the STRH, I told staff in the ASU that I did not need

27  the wheelchair and was ready for the walker, even though I was still in pain, because I did

28

not want officers pushing me around and taunting me.  It made me feel unsafe and like less of man.

20.    I went at least two weeks without a shower because the officers did not want the extra work of having to escort me to the ADA shower, which is farther away than the non-ADA showers.  At the time, I needed the ADA shower to be able to wash myself safely and effectively.

21.    The officers also denied me my property and refused to allow me phone calls, even though I was not on a disciplinary or punishment status, and was only in the STRH pending a move to another yard.

22.    About two weeks later, on March 27, 2020, I reported that I was feeling suicidal to a nursing staff member named Ms. Garcia who was doing rounds on my unit shortly before 8:00 a.m.  I told Ms. Garcia that I was feeling suicidal because the officers on the unit were harassing me and that Officer Duran had denied me a phone call that morning.  I told Ms. Garcia I had been feeling paranoid and having anxiety attacks since I woke up that morning.  Ms. Garcia said, "Well, what do you want me to do?"  Her tone was sarcastic.  I asked her to go get my clinician.  She said, "Okay," and walked away without asking me any other questions.  Ms. Garcia never came back.  I learned later after requesting and reviewing my mental health records that she had not written down anything that I had said during this meeting.

23.    When I realized that Ms. Garcia was not coming back, I boarded my windows up with cardboard.  I was trying to get the attention of staff so that I could see mental health staff.  Officer Castellanos walked by while I was boarded up.  He asked me what was going on, and I told him I wanted to speak with the sergeant.  This was the only time anyone asked me what was going on.

24.    Right after he asked me this, my cell door suddenly opened and I saw Officer Castellanos standing there with pepper spray in his hand, looking at me as I was sitting on the toilet.  Officer Castellanos told the tower officer to close the door.  Officer Castellanos left.  About twenty minutes after that, Officer Castellanos and a number of other officers,

including Officer Cruz, Officer B., who is a female officer in the ASU, and Officer Godfrey, rushed into the cell. They took me to the ground and started punching me. They also stomped on my head. After this, Officer Castellanos pepper-sprayed me. Officer B. poured water from the toilet into my mouth. As she did this, I was having trouble breathing because there was a knee on my neck, so I choked on the water. It felt like I was being tortured. I became numb as they continued to punch and stomp on me.

25.     I was dragged out of the cell into the hallway on the unit by three of the officers, including Officer Castellanos. Officer Castellanos was walking in front of me and two other officers, I could not see who, were dragging me by my feet. While they were walking and dragging me, Officer Castellanos kicked me in the face. My left eye started bleeding profusely. They dragged me over to the other side of the unit and dropped my legs. I could see there was blood all over the floor. The officers decided to hit the alarm at this time, after dragging me across the tier. I saw Sergeant Brown run over. I was taken to a holding cage in the ASU that was just down the tier, a few yards away. I was leaking blood down the hall as I was walked over there.

26.     At the time I was assaulted I was not a threat to anyone. I was still injured from the first assault and using a walker.

27.     After the assault, a nurse came to the holding cage in the ASU to evaluate me for my injuries. On the 7219 form documenting my injuries, the nurse wrote that my face was bleeding and cut up, and that my face and head were swollen. The 7219 form also documented that my wrists and arms had cuts and bruises on them.

28.     Shortly after seeing the nurse, I was taken to the TTA and got three stitches sewing up the cut on my left eyelid. I was then taken to Delano Regional Medical Center ("DRMC"), an outside hospital. I do not remember what I was told at the hospital because I was very out of it, and everything was a blur.

29.     When I returned to KVSP the same day, I was placed back in the cell where I was assaulted. I was placed on suicide watch, so I had to wear a smock. Officer E. Figueroa watched me all night to make sure I did not harm myself. I was taken off suicide

1  watch in the morning, despite telling Officer Figueroa and mental health staff I was still

2  suicidal.

3        30.    I continued to feel suicidal in the next few days and continued to report this

4  to the officers, though I did not trust them, so I reported this less and less.  Eventually, I

5  was able to speak with my clinician at the time, Ms. Farhadzadeh.  She listened to my

6  issues and ended up referring me to the MHCB at KVSP, where I stayed from April 4,

7  2020, to April 13, 2020.

8        31.    I believe this assault was in retaliation for submitting a 602 about the

9  March 2 assault.  The officers had made it clear to me, by asking me how the officers had

10  assaulted me and teasing me about my wheelchair, that they knew I had been assaulted and

11  was vulnerable.  I believe they also knew that they could assault me and get away with it

12  under the guise of a cell extraction, because of the mental health issues I was having.

13        32.    I was charged with an RVR related to the March 27 incident, for "assault and

14  battery with a deadly weapon."  The RVR states that the officers entered my cell because

15  my windows were boarded up.  The RVR states that as they entered the cell, I suddenly got

16  up off the bottom bunk where I was lying down, grabbed my walker from next to my bunk,

17  and swung it at the officers.  I did not swing my walker at them, but it is surprising that

18  they claim a walker is a deadly weapon.

19        33.    The RVR states that Officer Cruz then ordered me to get down, but I

20  continued swinging my walker.  The RVR states that Officer Duran then yelled at me to

21  get down, and when I ignored him, he "attempted to defend himself" by striking me with

22  his fists on the left and right side of my torso and face.  The RVR states that I continued to

23  come at Officer Duran and Officer Cruz, so they both grabbed me and took me to the

24  ground.  The RVR states Officer Castellanos handcuffed me, and the officers started to

25  walk me out of the cell.  As we were walking out of the cell, the RVR states that I tried to

26  hit the officers by thrashing my face and torso from side to side.  The RVR states that in

27  response to this, Officer Duran and Officer Cruz pushed me to the ground again.

28

34.     The RVR does not acknowledge that KVSP staff did not follow the procedures for cell extractions.  The protocol for a cell extraction in Title 15 says that mental health staff have to be physically present during cell extraction except during emergencies.  During the assault, only custody staff were present.  Title 15 also states that cell extractions can take place in this type of situation only when the person is unresponsive and staff have tried repeatedly to get the person to respond.  The officers also made only one attempt to talk to me while I was boarded up, and at no point was I unresponsive.

35.     I was found guilty of the RVR and given a 4-year segregation term.  The RVR was also referred to the District Attorney ("DA").  I have not been told yet whether the DA is going to prosecute the case.

36.     I was given an RVR mental health assessment ("MHA") to evaluate the role my mental health condition played in the assault.  I told the clinician doing the assessment that the assault I was being charged with had not happened – that I was the one who was assaulted, not the officers.  I also told her that I was in a very bad mental state and feeling suicidal at the time I was assaulted.  Despite expressing all of this, the clinician noted that my mental health had nothing to do with the actions described in the RVR.

37.     A few days after the assault, I submitted a 602 staff complaint reporting the March 27, 2020 assault.  That 602 staff complaint is currently at the third and final level review.  I do not recall being interviewed about the assault at any point.

38.     I still have to interact with the officers who were involved in the staff misconduct against me.  They say things like, "what's up ███?" and grin at me.  It makes me feel very intimidated and like they are making fun of the pain I have been through.  I try to avoid them, but they still approach me and try to talk with me.

39.     Since being at KVSP, there have been many times that I needed help but didn't ask for it because I was afraid of what would happen to me.  After the March 2 assault, I was scared to ask for the ADA showers and assistance I needed due to the mobility issues I was having.  Recently, I have stopped asking officers even for small

things like food, laundry exchange, disinfectant, soap, or mail because I am afraid they will hurt me.  I also feel extremely anxious having to initiate even a short conversation with them.

40.     I have asked for help less and less because during the times that I have asked for help when I have really needed it, I am blatantly ignored.  For instance, on June 11, 2020 at 4:30 p.m. pill call, I was in my cell and feeling like I was having a panic attack.  I have been having periodic panic attacks since being assaulted because I often feel very overwhelmed, depressed, and suicidal about what is happening to me.  When the nurse, whose name I do not know, came by to give medications to my neighbor, I told her I was suicidal and anxious, and she said, "Okay."  She and the officer who was walking around with the nurse turned away from me and walked away, up the stairs.

41.     At 8:00 p.m. pill call, the same nurse and the officer walked by again.  I attempted to get their attention as they gave my neighbor his medications again, but they ignored me and kept walking.  Feeling like I was not going to get help that day, I got into my bed and started crying, trying to sleep.  I was not able to sleep, so I got up and started to do pushups to try to reduce my stress and push away my suicidal thoughts.  I continued to feel suicidal throughout the night but did not ask for help again.  I wrote a 602 about this, but never received a log number.

42.     Since I was ignored on June 11, I have not told officers or nurses that I am feeling suicidal, even though I have felt this way many times since.  I do not trust medical and mental health staff any longer, because they seem to always side with the officers even when I am the one struggling.

43.     I do not go out to my mental health groups because the officers who assaulted me are there.  I rarely go to yard, because they are there as well.  I do not feel safe anywhere.  I even feel unsafe in my cell, because I know that officers can enter my cell again and find a way to cover it up and justify their entrance.

44.     Since the assault, my mental state has become worse and worse.  I now get anxious and angry every time someone tries to speak with me.  I am hesitant to trust other

1   incarcerated people and staff members now, even the ones who seem to be trying to help

2   me.  Feeling unsafe all the time has led me to be even more suicidal, paranoid, and stressed

3   out.

4        45.      In my opinion, staff target incarcerated people with disabilities and mental

5   illness because they feel they can get away with targeting these populations.  In my case, I

6   believe that officers thought I was vulnerable while I was going through a mental health

7   crisis and using a walker and felt that because of this it was easy to attack me.  I also think

8   that officers feel they can get away with people undergoing these issues because they can

9   flip the story and say that the incarcerated person was agitated and in distress and attacked

10  the officers.  With vulnerable people, the officers have even more power over the narrative

11  than they would with an incarcerated person who is less vulnerable.

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    46.    I believe the reason there is so much staff misconduct at KVSP is because

2  the officers run the prison.  The officers are not held accountable by their supervisors, who

3  not only condone their actions but participate in them.  Custody staff also know they can

4  influence medical and mental health staff, meaning they can easily cover up situations to

5  prevent the truth from coming out.

6       I declare under penalty of perjury under the laws of the United States of America

7  that the foregoing is true and correct, and that this declaration is executed at Delano,

8  California this 28th day of August, 2020.

9

10                              /s/ █████████████

11                              █████████████

12

13       On August 28, 2020, due to the closure of Kern Valley State Prison in light of the

14  COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses

15  in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of

16  the legal mail system at LAC, I read the contents of this declaration, verbatim, to

17  █████████████, by telephone.  █████████████ orally confirmed that the contents of

18  the declaration were true and correct.  █████████████ also orally granted me permission

19  to affix his signature to the declaration and to file the declaration in this matter.

20

21  DATED: August 28, 2020

                              Emma Cook

22

23

24

25

26

27

28

# Exhibit 55a

## Filed Under Seal

# Exhibit 56

## DECLARATION OF ███████████

I, ████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ██████.  I am currently housed at California State Prison-Los Angeles County ("LAC") on Facility D in Building 4.  I am 23 years old.

3.    I am a *Coleman* class member.  I am at the Enhanced Outpatient Program ("EOP") level of care, which means I am housed in a special housing unit with other EOP patients, and that I receive about 10 hours of groups and other mental health care each week.  I have depression, anxiety, and schizophrenia.  As a result, I have heard voices and seen things throughout my entire life, and go through periods where these auditory and visual hallucinations are very intense.  In 2018, my voices came back very intensely after I suffered the loss of my son, and now they are most intense in the evening when I am trying to go to sleep.  I also experience mood swings.  I have been admitted a few times to the mental health crisis bed ("MHCB"), a short term unit where people go to stabilize during mental health crises.  The last time I was at the MHCB was in July 2019, when my voices had grown really loud after I suffered a number of family losses.  I had also attempted suicide in June, shortly before I was admitted to the MHCB.  Before then, I was in Correctional Clinical Case Management System ("CCCMS") level of care, which is the lowest level of mental health care in the CDCR.  Due to my mental health issues and traumatic family losses, my level of care was increased and I was moved into the EOP program.

4.    When I was younger, I was diagnosed with ADHD and had learning issues, partly due to the fact that English is my second language.  CDCR has not diagnosed me with a learning disability, but I have trouble comprehending what I have read and heard after reading or hearing something.

5.      I was housed at KVSP from July 11, 2018 to October 10, 2019.  During the time I was at Kern Valley State Prison ("KVSP"), my mental health issues were similar to, if not worse than, the issues I experience today.

6.      During my time at KVSP, I was housed in the following locations: A-Yard, Building 1, A-Yard Building 8, B-Yard, Building 5, B Building 6, B Building 7, D-Yard, Building 6, C-Yard, Building 8, the Administrative Segregation Unit ("ASU"), and the Short Term Restricted Housing Unit ("STRH"), which is the administrative segregation unit for CCCMS patients.

7.      I was both a victim of and a witness to staff misconduct at KVSP.

8.      On August 27, 2019, me and my cellmate, ████, got into a fight with another incarcerated person on the C-8 yard.  While we were fighting, a member of staff sounded the alarm and custody officers rushed onto the yard.  When the officers got on the yard, we stopped fighting.  An officer whose name I do not remember asked me to cuff up. I complied and was handcuffed.  While me and Mr. ██ were standing on the yard handcuffed, Officer Hunt walked up to us without saying anything and started pepper spraying us.  After we were pepper sprayed, we were walked to a holding cage in the C-8 building.  Both me and Mr. ██ asked for cold water to rinse our pepper spray off, but we were denied and were left to sit in the cage with pepper spray on our face and body.  We were in the cage for about thirty minutes when Officer Hunt walked back into the building. We asked him why he had sprayed us and he laughed and said, "Welcome to Kern Valley."  Shortly after we were placed in the cages, a nurse came to check if I had cuts and bruises.  I, along with Mr. ███ and the person we were fighting with, signed a chrono agreeing that we would get along, so we could all go back to our cells.  After signing the chrono, Mr. ██ went to CTC because his hand was messed up.  I sat in the cage for about four or five more hours after signing the chrono, before being allowed to go back to my cell.  When I got back to my cell, I put milk and baby powder on my face and body to get

the pepper spray off, but it did not work very well and my face and body were still stinging.

9.      I was charged with a Rules Violation Report ("RVR") for "Fighting."  I had my RVR hearing on September 21, 2019, and was found guilty.  I did not attend the hearing because I was never called for the hearing.  I did not know the hearing had happened until I got the final copy of the RVR.  I lost 90 days of time credit.

10.     I filed a 602 staff complaint about the August 27, 2019 incident on the day it happened or the day after.  I was told on September 12, 2019 that my staff complaint had been bypassed at the first level of review and was being reviewed at the second level.  I had my videotaped use of force interview two days after I submitted the 602 on Officer Hunt.  Sergeant Alvarez did my video interview.  Before the interview started she kept asking me, are you sure you want to go through with this?  I kept telling her yes, and insisting that I would not have written the 602 if I did not want to go through with it.  Two other officers were standing near her.  The whole time, I felt intimidated.  At the end of the interview, she said, "Well, you did it."  I believe she was referring to the fact that she thought I was guilty.  I still have not received a written response to this 602.

11.     A few days after the incident, Hunt came by my cell and told me, "You're really going to hit me with the excessive force?"  He was referring to the 602 I filed about the pepper spray.  I explained to him that I thought this was the perfect example of excessive force.  He bit his lip and shook his head, then walked away from my cell.

12.     After the incident, I experienced increasing harassment from officers and staff.  Officer Hunt had a close relationship with my clinician at the time, Ms. Nakashyan, and he told Ms. Nakashyan that I was arguing with the officers and was trying to fight the officers, which was untrue.  During my mental health meetings, she started telling me that officers had told her various things about me.  One or two weeks after she starting hearing things about me, she began telling me she was going to drop my level of care from EOP to CCCMS.  She even tried to hold my IDTT—a meeting with your team of clinicians and

other staff to discuss your mental health care and make level of care decisions—a month earlier than it was scheduled to get me dropped out of EOP. I only managed to stay in EOP after that IDTT meeting because other members of mental health staff, such as the rec therapists, expressed that I was programming really well and that I should stay in EOP.

13.     On September 16, 2019, around 8:00 p.m., I was in my cell with my cell-mate, ████, in C-8 A Section, where we were housed at the time. At that time, which was around the end of evening dayroom, Mr. ███ told Officer Ga and Officer Martinez (two of the third watch C-8 building officers) that he had safety concerns. Officer Ga and Officer Martinez placed Mr. ███ in handcuffs and walked him to a holding cage in the C-8 rotunda, and the officers locked everyone else down in their cells.

14.     The nurses did pill pass, and right after pill pass, about five minutes later, Officer Ga and Officer Martinez came back to my cell holding a plastic bag and told me to pack Mr. ███'s property. I complied and started to put his things in the bag. I packed his property, and after about thirty minutes I heard the door to C-8 A section opening. I assumed it was the officers escorting Mr. ███ to come back and get his property. When I looked up, however, I saw Mr. ███ coming back into the unit with two officers whose names I do not know. He was handcuffed and in leg restraints, and they were chicken winging him, meaning they were holding his arms high at his sides with his hands still cuffed, and had his head pointed toward the floor. Sergeant Lerma and Sergeant Alvarez were walking behind the officers and Mr. ███ As they were passing the tables in the dayroom, I saw the two officers, who were on either side of Mr. ███, lift Mr. ███ up by the arms and then slam him face first to the floor. Our cell is only about a table length away from the tables in the dayroom, so I had a very clear view of the incident. Then the officers, Sergeant Lerma, and Sergeant Alvarez all started kicking and punching him repeatedly, all over his body. I saw Sergeant Alvarez stick her fingers in Mr. ███'s mouth. She seemed to hit a pressure point that knocked him out.

15.     After they started assaulting him, I started yelling out from inside my cell, "Stop beating his ass! Stop beating him!  He isn't doing shit!" and other things along those lines to try to get them to stop.  After about five minutes of the assault, Sergeant Lerma stepped away from Mr. ██ and signaled to Officer Johnson, the officer in the tower, to hit the alarm.  The alarm sounded.  Sergeant Lerma then walked over to my cell and told Officer Johnson to open my cell door.  During this time, the other officers besides Sgt. Lerma were still beating Mr. ██.  When Sgt. Lerma  opened my door, I instinctively turned towards the wall with my back to him so that he could handcuff me.  He handcuffed me and told me to back up.  After I backed a few steps out of the cell, he put me in a chokehold.  With his arm around my neck, he pulled me out of the cell and slammed me on my head on the floor.  After being slammed on the head I fell to the ground and heard Sergeant Lerma say, "602 this, bitch."  Suddenly I was swarmed by five or six officers whose names I did not know.  They kicked and punched me in the head, face, and ribs for what felt like four or five minutes.

16.     After assaulting me, the officers each grabbed part of my body and picked me up off the ground.  They carried me over to the shower and threw me inside head first. My legs were hanging out of the shower door when I landed, and they slammed my legs in the shower door twice.  They closed the door of the shower and walked back over to Mr. ██ and took him out of C-8.  I could see them walking him out from the shower.  He seemed very dazed and out of it as he was walked out of the building.  Shortly after he left the building Sergeant Alvarez, Sergeant Lerma, and the same four or five officers who had assaulted Mr. ██, as well as another officer, came back to the shower.  Sergeant Lerma told Officer Johnson to open the shower door.  They pulled me out of the shower and escorted me outside while I was handcuffed.  I was being chicken winged like Mr. ██ was, with my head facing the ground and arms out to the side.  Once we were outside and walking, Sergeant Alvarez kicked me once in the testicles and said, "That's for snitching

on my officer." I believe she was referring to the 602 I submitted about Officer Hunt and what happened on August 27.

17.     I fell to the ground due to the impact of the kick and after I fell, the escorting officers starting kicking and punching me again while I was on the yard, right in front of the C-8 door we had just exited. Sergeant Alvarez told Officer Johnson to "put the mini on me," meaning point the rifle at me from the tower. From the tower, I heard Officer Johnson say, "Don't let me put one in your ass boy." I was surprised to hear him being so harsh to me, because I knew Officer Johnson from a different yard and we had always gotten along. I started crying and was begging them to please not shoot me. Sergeant Alvarez said, "I'm going to put a case on you and your cellie," then told the escorting officers to pick me back up. She said to me, "Stop crying like a bitch. You weren't crying like a bitch when you ratted on my officer."

18.     After the escorting officers picked me up off the ground, they walked me to the program office. When I arrived at the program office, they placed me in a holding cage for about two hours. My handcuffs were on the entire time, even in the cage. At one point I yelled out to a lieutenant whose name I do not know who was standing by the holding cells and told him that I could not feel my hands. I asked if my handcuffs could be taken off, since I was in the cell. He told me to "fuck off." While I was in the holding cage, nurses came to see me two or three different times. I reported pain in my legs and head each time. The first two times they came to evaluate me, they did not use a flashlight to look at my injuries and documented no injuries on me. The third time the nurse came, she used a flashlight but only documented some of my injuries and refused to document my leg and ankle injury, even though it was clearly swollen.

19.     After I was in the holding cage for a couple of hours, I was taken from the holding cage in the C-Yard program office to the Triage and Treatment Area ("TTA"), a medical unit. I told a nurse in the TTA that I was assaulted. I also had a headache and felt lightheaded when standing up and had pain in my legs. I reported this all to the nurse at

the TTA whose name I do not know.  I was also feeling suicidal after the assault, and the distress of the assault had caused the voices in my head to grow stronger over the couple of hours since the assault.  I told the nurse that the voices were telling me to kill myself.

20.     I was transported from the TTA to Delano Regional Medical Center ('DRMC").  At DRMC, I told staff that officers had assaulted me, and reported my headache, which had become severe at that point, as well as the pain in my legs.  I was diagnosed with a head injury and an ankle sprain.  The CT scan they did on my brain to check for head injuries showed swelling of my scalp, and the X-rays of my ankles showed swelling in my right ankle.

21.     I was discharged from the hospital and returned to KVSP early in the morning on September 17, 2019.  I was placed on suicide watch overnight due to the suicidal thoughts I had reported before leaving for DRMC.  The next day, I was seen by a mental health clinician, whose name I do not know, about my suicidality. She was surprised to see that I was using a walker to get to the appointment, and asked me what had happened.  After I told her the story, she did not seem surprised and even shared that she had seen multiple people who had been beaten up by these officers.  She told me that she wanted to admit me to the mental health crisis bed for my suicidal thoughts, but I said that I no longer wanted to go.  I said this not because I was not suicidal, but because I wanted to stay in the cell with Mr. ███ because he has seizures, and I was worried about his condition after being assaulted.  I also told her I felt like I was being targeted for filing a 602 about being pepper sprayed.  After that contact, I was moved from alternative housing, the short term housing I was in overnight, to the ASU.  About a month after being placed in the ASU, I was moved to LAC so that I could be in the EOP ASU there.

22.     I believe that Sergeant Lerma, Sergeant Alvarez, and the officers assaulted me in an attempt to stop my 602 about being pepper sprayed by Officer Hunt.  They were trying to intimidate me into dropping my complaints about him.  Sergeant Lerma and

Sergeant Alvarez directly told me multiple times during the assault that they were assaulting me because I had reported "their officer."

23.     Shortly after being placed in the ASU, I was issued a Rules Violation Report ("RVR") for "Threatening Staff." The RVR is false. The RVR says that I blocked Mr. ███ from entering the cell when they tried to re-house him with me, and that they had to take me to the shower after I refused to house with him. The RVR says that once I was moved into the shower, they asked Mr. ███ to go back into our shared cell. The RVR then says that he yelled: "Fuck you motherfuckers! I'm not staying!" and attempted to assault the officers with his torso and elbows, and tried to mule kick them. None of this ever happened. I never blocked Mr. ███ from entering the cell, and it would have been very difficult, if not impossible, for him to assault the officers with his elbow and his legs, given that he was cuffed at both the hands and ankles. The RVR then goes on to say that from the shower, I yelled at the officers: "Fuck them up ███!" This never happened; I did not say that.

24.     Besides being false, the RVR I received also makes no attempt to explain the injuries I received while in the shower and afterwards. From being in CDCR for a number of years I know that when staff try to cover up an assault, they often charge the person with "Battery on a Peace Officer," so that they can say the person obtained any injuries they have because they provoked the officers to assault them or necessitated the force used against them in some way. However, staff did not charge me with Battery on a Peace Officer, and made no attempt to explain the injuries that the staff at TTA and at the hospital found on me. Those injuries did not just appear out of thin air; they assaulted me. I believe they did not charge me with Battery on a Peace Officer, and instead charged me with a lesser charge of threatening staff, because they knew that they could not justify the charge. The RVR still has not been heard because I postponed it pending DA referral, and am still waiting on that decision.

25.     I filed a 602 staff complaint about the September 16 assault around September 19, 2020.  On September 26, 2019, I was told that my 602 was bypassed at the first level of review and sent to the second level of review.  On September 26, 2019, I was given a video-taped use of force interview.  Because staff waited a full week after the incident to do my videotaped interview, my injuries had mostly healed.  During the interview, I expected to be checked by a nurse, which usually happens before these interviews.  I asked why I was not being checked by a nurse, and staff told me that they already had a 7219 form to refer to.  They showed me one of my 7219 forms, which did not show any injuries.  I then asked for another evaluation and they brought a nurse in to check me before the interview.  Initially, she marked no injuries but I showed her the knots in my head and on my ankle, and eventually she documented those injuries.  After she checked my injuries, Sergeant Rallo started the videotaped interview.  He told me not to describe the incident in detail and to only tell him what I had told other staff before and written in my 602.  The interview lasted about five minutes.  They seemed to not be taking me seriously.  Every time I tried to explain something further, they cut me off and told me not to mention anything that was not in my 602.  They basically had me re-read my 602, and did not ask me any questions or follow up.

26.     In my time at KVSP, there were many times that I have needed or wanted help and not been able to ask for it.  After the assault, even though we were in the ASU and away from C-8, me and Mr. ▆▆▆ were scared to eat because we were worried the food had been spit in or otherwise messed with.  When you are charged with a staff assault, officers in the ASU make your life hell, so it is scary to ask for anything.  Mr. ▆▆▆ had to ask for his seizure medication while in the ASU, and they gave him a hard time and did not give him his medication on time.  Officers in the ASU also refused to give me and Mr. ▆▆▆ our shower shoes.  We ending up having to bird bath, which is taking a shower in the cell, and officers were laughing as we did that.

27.      I am afraid of filings 602s, especially after being assaulted because of filing one.  I still report very bad incidents that happen to me because I feel I need to stand up for myself, but I am still pretty scared every time I do so.

28.      After the assault, I continued to struggle with my mental health.  In the period of time before the assault, the voices that I hear had escalated and I was having a hard time tuning them out.  When I was assaulted and placed in segregation, this caused the voices to continue and to intensify.  I also experience ongoing nightmares, which in combination with the voices make it very hard to sleep.  When I mention this to mental health staff at KVSP and LAC, all they do is put me on new medications.  I have expressed that I do not really want to take lots of medications and want better therapy instead, but I have not been able to get that.

29.      In my opinion, staff target people with mental illness and weak prisoners.  Staff feel like they have an easy target with these vulnerable groups of people.  I also think staff feel like they can take their frustrations out on us because we will not report it or fight back often.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

30.     I believe there is so much staff misconduct at KVSP because the Warden's office and mental health staff do not do anything to stop the officers from assaulting and terrorizing people at KVSP.  I feel like there is a culture where officers who are laid back and there to simply do their jobs get sucked in and start to follow the problematic officers around, creating a sort of gang-like culture where officers can do whatever they want.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Lancaster, California this 17th day of June, 2020.

On June 17, 2020, due to the closure of California State Prison –Los Angeles County in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at California State Prison – Los Angeles County, I read the contents of this declaration, verbatim, to ████████, by telephone. ████████ orally confirmed that the contents of the declaration were true and correct. ████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: June 17, 2020

Emma Cook

# Exhibit 56a

## Filed Under Seal

# Exhibit 57

**DECLARATION OF** █████████████

I, ████████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at Mule Creek State Prison ("MCSP") on Facility C in Building 12. I am 51 years old.

3.    I am an *Armstrong* class member. I have a Disability Placement Program ("DPP") code of DNM, which is the code for a mobility impairment that does not require special placement or limit the person's use of stairs. I use orthotics on my knees and ankles, and a back brace, to help with my mobility. I also have a lower bunk chrono because I cannot climb to a top bunk due to my mobility impairment. During the time I was at Kern Valley State Prison ("KVSP"), my disability and accommodation needs were similar to what they are today.

4.    I am a *Coleman* class member. I am at the Enhanced Outpatient Program ("EOP") level of mental health care. EOP patients live in separate housing units with other EOP individuals, where we are supposed to receive enhanced mental health care including 10 hours each week of structured therapeutic activities, along with more frequent meetings with our cases managers. I suffer from anxiety and depression.

5.    During the time I was at KVSP, I was at the Correctional Clinical Case Management System ("CCCMS") level of care, a level of mental health care lower than EOP. At CCCMS, I was able to live and program on mainline CDCR yards, alongside incarcerated individuals who do not have a mental health condition. After the incident described below, my mental health symptoms worsened quickly. I was admitted to a Mental Health Crisis Bed ("MHCB") in late February 2020. An MHCB is a short-term intensive care unit for people experiencing severe mental health crises. After I was in the MHCB, mental health staff decided I needed a higher level of mental health care than CCCMS and placed me in EOP.

6.      I was housed at KVSP from September 24, 2019 to February 28, 2020.  On February 28, 2020, I was transferred to California Health Care Facility ("CHCF"), where I stayed for about a week and a half in the MHCB until I transferred to MCSP on March 9, 2020.

7.      During my time at KVSP, I was housed in the Administrative Segregation Unit ("ASU"), which houses CCCMS patients and incarcerated people not in the mental health system, and C Yard, Building 7.

8.      I was a victim of staff misconduct at KVSP.

9.      On February 27, 2020, around 6:30 a.m., I walked to the C-Yard patio from my cell in C-7 to get my morning medication.  When I arrived at the patio, three officers were standing at the entrance, supervising entry into the medication line.  One of the officers, Officer M. Pompano, saw me as I was about to step through the metal detectors by the patio, and said "███████, go back and put on your orthopedic shoes.  You got state issued shoes, go put them on."  I told him that I did not need to have my orthopedic shoes on to get medications but agreed to go put them on.  I went back to C-7, put on my shoes, and returned to the patio.  I walked through the metal detectors at the entrance to the patio and walked by Officer Pompano on my way to the medical window.  At the time I did not know his name and was not sure how he knew my name and knew that I wore orthopedic shoes.  I asked him his name and he said "Pompano, capital P."

10.     One of the other officers standing by the entrance to the patio with Officer Pompano did not give me his name and did not have his name tag on.  When I asked his name, he said, "shut the fuck up and get your meds." I later found out this officer's name was Officer S. Furlong.  I was frustrated and said back, "you shut the fuck up, you can't talk to me that way.  I will file a complaint on you."  Officer Pompano and Officer Furlong rushed over to the window where I was standing and Officer Pompano said, "You want to talk shit, motherfucker?  Okay!"  Officer Pompano and Officer Furlong handcuffed me right after I handed my ID to the nurse to get my medications.  After I was cuffed, I expected that they were going to grab my arms and have me turn around, but instead they

slammed my head face first into the medical window.  My lip was busted open.  I said, "see you in court!" to let the officers know that I was going to report what had just happened.  Officer Furlong responded, "I don't give a fuck.  Do you know how many times I've had to go to court?"  Officer Pompano said "alright, you want to talk shit we'll see motherfucker, let's go."  They each grabbed under one of my armpits from behind me and lifted me, stretching my arms in an unnatural way.  I thought they were trying to dislocate my shoulder or break my arms.

11.   Officer Furlong and Officer Pompano carried me like this into the C-Yard program office, which is about ten feet from the medical window.  As we were about eight feet into the hallway after entering the building, Officer Furlong and Officer Pompano again slammed me face and chest first into an office window that partitioned the hallway.  Sergeant Espinosa and Sergeant True were sitting at a table behind the glass that I was slammed into.  When I was slammed into the window, they both looked up suddenly.  Sergeant True stood up to intervene, and Officer Pompano said, "don't worry Sergeant, we got this."  Officer Pompano punched me in my jaw and I fell to the ground onto my stomach, face first, with my head turned so that my left cheek was on the floor.  Officer Pompano kicked the exposed right side of my face.  I heard one of the officers say "oooh, watch out!" and was kicked again in the face, I believe by Officer Furlong.  At this point, I lost consciousness.  I'm not sure how long I was unconscious.  When I regained consciousness, I was being lifted off the floor.  As I was being picked up, I could see my blood splattered over the wall and floor in the hallway.

12.   Officer Mendoza, the third officer who had been with Officer Pompano and Officer Furlong manning the gate to the patio, came into the program office hallway at some point while I was being assaulted, or right after.  Officer Mendoza walked me to a closet-like room in the program office with holding cages.  I was placed in a cage that was filthy with blood and sweat.  In the room, Officer Mendoza took my handcuffs off, wiped the blood off of the cuffs, and handed them to Officer Pompano.  Officer Mendoza had me

take my clothes off except for my sweatpants and left with Officer Pompano. I was left alone in the holding cage. The door to the room with the holding cages was partially open.

13.     Within a minute of being placed in the cage, I saw Sergeant Espinoza and another incarcerated person working as a porter walk by. I called out to Sergeant Espinoza and he popped his head through the partially open door to talk to me. I asked him not to clean up the blood on the floor and asked that the KVSP Investigative Services Unit ("ISU") take photos of the blood. He leaned back away from me towards the hallway, and partially closed the door. I heard him tell the porter "mop it up." ISU officers showed up a few minutes after this. I heard one of the ISU officers in the hallway ask, "where was he beat?" I heard Sergeant True say "that's where they beat him." Another one of the ISU officers asked the porter "who told you to mop this up?" I did not hear what the porter's response was. As this was happening, ISU Sergeant Iouza then came into the room where I was with a camera to take pictures. I told him my chest hurt badly. He chose not to take pictures of my injuries and left to get me medical attention and to speak with Officer Pompano.

14.     Very shortly after he left, a nurse came into the room where I was in the holding cage. This was the nurse who distributed medication at the medical window where my face had initially been slammed. The nurse examined my face but did not document any injuries. She decided that I needed to go to medical and/or the hospital due to my chest pains, and I was taken to the Triage and Treatment Area ("TTA"), a medical clinic at KVSP. I was wheeled over to the TTA in a wheelchair. During the escort, Sergeant Espinosa was squeezing my fingers in the handcuffs. I believe he was trying to intimidate me.

15.     The nurses at the TTA examined me again and tried to wipe the blood off my face, but the officers gave them a stern look and they stopped wiping the blood away. The nurses also documented that I had cuts on my face but did not document that my eyes were swollen. I still had dried blood on my face when I went to the hospital.

16.     I was sent to Delano Regional Medical Center ("DRMC") in the late morning and was there for a few hours before returning to KVSP.  I told the staff there that I had been assaulted by officers just a couple of hours ago.  I was diagnosed at the visit with assault by blunt trauma, and a laceration on my face.  The medical staff glued my laceration closed.

17.     When I returned to KVSP from DRMC, I was placed in the ASU and charged with "battery on a peace officer."  After the assault and through that evening in the ASU, my mental health got a lot worse and I started feeling like I was going to hurt myself.  I was hearing voices telling me to kill myself—to "go ahead and do it"—and I was seeing myself in blood and hanging.  My thoughts were racing and I was feeling very anxious and depressed.  I reported this to the officers in the ASU early the next morning.

18.     Before being seen for my mental health issues, I had my videotaped use of force interview on the morning of February 28, 2020.  Lieutenant Thompson was the person leading the interview.  Another staff member at the interview told the nurses to evaluate me.  They filled out a 7219 form fully documenting my injuries.  I went back in the room with two copies of the 7219, to resume my interview with Lieutenant Thompson.  As the other staff member was videotaping the interview, he went to capture the 7219 on the video camera.  Lieutenant Thompson said "no, no, no" and stopped him from recording the 7219.  Lt. Thompson also threw one of the two 7219 forms in the trash and ended the interview quickly.  The interview lasted for no more than a few minutes.

19.     I believe that Lieutenant Thompson did not do my interview correctly in retaliation for a past incident I had with him.  Lieutenant Thompson used to work at California State Prison-Corcoran ("COR"), and was a defendant named in one of my pending civil lawsuits against CDCR concerning COR.  I requested an injunction in my lawsuit asking to not be sent out of the ASU at KVSP because I did not feel safe on a mainline yard at KVSP and figured the court might be able to address that in my civil case.  About a week after I filed the injunction, Lieutenant Thompson told me I was leaving the ASU to go to the mainline yard in C-7 even though I had filed the injunction requesting

1  not to go out to the yard.  I was moved to C-7 around February 1, 2020.  When I got to C-

2  7, I was placed in a cell with another incarcerated person.  This person told me that he was

3  released to the mainline without a classification hearing.  He was feeling unsafe because a

4  person who had previously stabbed him was still in C-7.  He told me that he told the

5  officers he was feeling unsafe, and they said he could go back to the ASU if he "took care

6  of ███████."  He refused to do so, and I was not hurt at that time, but I believe that

7  Lieutenant Thompson and other officers were trying to set me up to be hurt.

8      20.      After the videotaped use of force interview, around 9:00 a.m. on

9  February 28, 2020, I met with the crisis intervention team ("CIT"), a group of staff

10  including members of mental health staff, medical staff, and custody staff, that responds to

11  mental health crises.  After discussing how I was feeling with them, they referred me to the

12  MHCB at CHCF so that I could get some care for my mental health crisis.  They also had a

13  nurse evaluate me again and fill out another 7219 after seeing my injuries.  The nurse that

14  did this 7219 was much more careful about documenting my injuries based on what I saw

15  her fill out.  I have not yet received the 7219 reports or the incident packages about the

16  assault.  I found out about what injuries were documented by requesting and reviewing my

17  medical records, but I have never seen my 7219s.  I don't know why.

18      21.      I was transported to the CHCF MHCB and stayed there until March 9, 2020.

19  For the first seven days or so at CHCF, I could not eat because I felt like I was having a

20  constant anxiety attack.  By the end of my time in the MHCB, I was feeling slightly better

21  than I had right after the assault but was still struggling with my anxiety and depression

22  about what had happened.  Because of this, my clinicians at CHCF discharged me to EOP

23  instead of back to CCCMS, and I was moved to MCSP.

24      22.      I filed a 602 staff complaint reporting this assault the day after I was

25  assaulted.  CDCR quickly denied this complaint at the second level.  The investigation was

26  based on the brief videotaped use of force interview done by Lt. Thompson.  This appeal is

27  currently at the third and final level of review.  The response was due earlier this month

28  and is currently late.

23.     The Rules Violation Report ("RVR") charging me with battery on a peace officer is full of false details.  The RVR only mentions Officer Pompano, even though other officers were involved in assaulting me.  The RVR states that I set off a metal detector while entering the patio, and that Officer Pompano took me to the C-Yard program office, in order to search me.  The report also states that I was not handcuffed because they were going to conduct an unclothed body search.  This is not true—I was handcuffed from the time I was at the medical window, which is not included in the report, until after the assault.  The report states that as Officer Pompano walked me, not handcuffed, into the hallway of the program office, I yelled "fuck this!" and swung my head backwards, hitting Officer Pompano's face.  The report says that Officer Pompano ordered me to get down, and I refused and continued to swing my head at him.  The report states that Officer Pompano then pushed me to the ground, face forward.  According to the report, I continued to resist, even as Officer Pompano was yelling "stop resisting."  It is well known that officers in CDCR and particularly at KVSP will yell out "stop resisting" while they are assaulting an incarcerated person, in order to justify the misconduct.  If it is documented that they were claiming during the assault that the person was resisting, even if they weren't, they can justify using force during the interaction.

24.     The report also states that I started grabbing his thigh, and he punched me in the face multiple times in order to get me to loosen my grip on him.  I have an injury to my hand he accused me of grabbing him with—my fingers are bent and in a claw, and I cannot grab things easily with that hand.  It would not have been possible for me to have grabbed his thigh.  I asked to postpone my hearing for my RVR and still have not had it.

25.     Even though I left KVSP right after this assault, the assault has made me even more afraid to be around officers than I already was.  I still have lingering medical issues from this assault.  I have ongoing pain in my back and neck, that has made my pre-existing mobility issues even worse.  It has been harder to get around since the assault.  I also have had an issue with my jaw since being punched.  My jaw clicks when I open it.

26.     My mental health quickly deteriorated after the assault into one of the most intense mental health crises I have had.  Before the assault, I had mental health symptoms but was managing my symptoms through medication and CCCMS treatment.  After the assault, my anxiety and depression were a 10/10 for multiple weeks, even during and after my stay in the MHCB.  My voices were telling me to self-harm, and I was constantly seeing in my head the images of me bleeding and hanging.  I also had issues with sleeping for a long time after the assault and had a recurring nightmare in which my face was smashed against the wall, and blood was everywhere.

27.     In my opinion, staff target people who are disabled and/or who have a mental illness.  When officers know that incarcerated people have a disability, suffer from mental illness, or have any sort of vulnerability, they are more likely to pick on that person and know that they can get away with assaulting them because they are weaker.

28.     I believe there is so much staff misconduct at KVSP because there is a system in place that lets officers get away with misconduct.  It is well known that the officers assault people, including myself, in the program office.  In the program office, there are usually no other incarcerated people, but many officers, sergeants, lieutenants, and captains work in that office.  That means that all of these staff members, even the well-meaning ones, witness and are complicit in these assaults.  Assaulting people in the program office or other specific locations with lots of staff members means that KVSP can easily cover up assaults by staff members.  I believe that these prisons should use the polygraph tests described in Title 15 to get the truth of these situations.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

29.   A code of silence at KVSP is so ingrained that the nurses and mental health staff are intimidated into not providing treatment for incarcerated people. The links between staff members at KVSP are so deep that they have created their own world where they can be the judge, jury, and executioner.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Ione, California this 24th day of August, 2020.

/s/ ████████

On August 24, 2020, due to the closure of MCSP in light of the COVID-19 pandemic and ongoing concerns that officers might retaliate against witnesses in support of Plaintiffs' Motion, including ongoing concerns about the confidentiality of the legal mail system at MCSP, I read the contents of this declaration, verbatim, to ████████, by telephone. ████████ orally confirmed that the contents of the declaration were true and correct. ████████ also orally granted me permission to affix his signature to the declaration and to file the declaration in this matter.

DATED: August 24, 2020

Emma Cook

[3601628 3]

9

# Exhibit 57a

## Filed Under Seal