XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General
SEAN LODHOLZ
ANTHONY J. TARTAGLIO
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3594
  Fax: (415) 703-5843
  E-mail: Trace.Maiorino@doj.ca.gov
*Attorneys for Defendants Gavin Newsom and the California Department of Corrections and Rehabilitation*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>    Defendants. | Case No. 94-2307-CW<br><br>**DECLARATION OF CATE IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO DEFENDANTS' R.J. DONOVAN PARTIAL REMEDIAL PLAN [ECF No. 3177]** |

I, Matthew Cate, declare:

1. I make the following declaration of facts based on my own knowledge. I previously submitted two declarations on Defendants' behalf in this case on September 11, 2020 and on November 17, 2020. (*See* ECF Nos. 3083-5 & 3160-60.) My employment history, background, and qualifications are the same as stated in those declarations. If called, I can testify competently to the facts contained in this declaration.

1

Cate Decl. Supp. Defs.' Resp. Pls.' Objs. Defs.' R.J. Donovan Partial Remedial Plan (Case No. 94-2307-CW))

2. I understand that on September 8, 2020, the Court granted, in part, Plaintiffs' motion seeking injunctive relief at the Richard J. Donovan Correctional Facility (RJD) and issued an order for remedial measures. As part of these orders, the Court ordered the California Department of Corrections and Rehabilitation (CDCR) to develop a remedial plan and to meet and confer with Plaintiffs and the Court Expert, Ed Swanson. I have reviewed these orders and understand that the parties and Mr. Swanson have engaged in extensive meet-and-confer sessions concerning a proposed remedial plan. I further understand that the parties have agreed to continue their discussions concerning the portion of the remedial plan that addresses the "staff complaint, investigation, and disciplinary process" at RJD. I have reviewed CDCR's partial remedial plan, Plaintiffs' objections to the partial remedial plan, the Declaration of Michael Freedman, and the exhibits attached to his declaration.

3. I understand that Plaintiffs have objected to the portion of the remedial plan that addresses the use of oleoresin capsicum spray, commonly referred to as pepper spray or OC-spray. I further understand that Plaintiffs have proposed weighing the canisters after use and have proposed that CDCR model its policy after the Federal Bureau of Prisons' policy. I have previously opined on this issue for Defendants and summarize those opinions in this declaration. As previously noted, my opinion is based on my personal opinion and my conversation with CDCR Captain Tracy Snyder, who is leading a CDCR task force on the use of OC spray.

4. I understand that the most common pepper spray canister assigned to CDCR staff is the MK-9. This canister uses a propellant to discharge the active ingredients in a spray form. The canister is designed to hold 9-13 ounces of spray, depending on the design, but may contain more or less than the indicated amount. The MK-9 has a tab or pin on the canister designed to be ejected when the canister is discharged, thereby indicating that the chemical agent has been discharged. Once the tab or pin is off and the canister has been discharged, even partially, CDCR does not use the canister again. The tab/pin can break off if an officer bumps the canister against a hard object, such as the arm of a chair while seated. The older versions could also inadvertently discharge in this manner.

2

Cate Decl. Supp. Defs.' Resp. Pls.' Objs. Defs.' R.J. Donovan Partial Remedial Plan (Case No. 94-2307-CW))

5. As I have previously noted, the weighing of canisters would not provide useful information and would not address Plaintiffs' concerns. This, in part, is because of the nature of the pepper spray and the fact that the discharge of pepper spray is dependent on multiple factors. The weather is a factor that dictates the amount of pepper spray to be used to be effective. In colder weather, the trigger or button must be depressed for a longer period of time to discharge the same amount of pepper spray. Conversely, in warmer weather, the spray is released more easily and requires a shorter activation period. Similarly, wind can impact the amount of pepper spray necessary to be effective. Obviously, in windy conditions or in the presence of a fan, the spray can be disbursed over a large area quickly, thereby failing to provide a sufficient amount to the targeted area. In still conditions, this is not a factor. Another factor that must be considered is the proximity of the target because it can impact the amount of pepper spray that is needed. The manufacturer recommends a maximum range of 18-20 feet, but less spray would likely be needed at shorter range.

6. As I also have previously noted, weighing the pepper spray canisters as suggested by Plaintiffs does not effectively address their concerns. There are hundreds of correctional staff carrying canisters on each facility and these officers share the canisters in different ways depending on their assignments. The logistics of weighing all those canisters before and after use would be very burdensome. Further, setting specific guidelines for number of ounces of pepper spray that should be used is a difficult task and is dependent upon many conditions, including those described above. Weighing the canisters after use, therefore, would not be particularly helpful in addressing a concern regarding overuse. Because one canister can weigh more or less than another, it is impossible to say exactly how much spray was discharged without weighing every canister before and after use. Even if an accurate weight of the spray used were determined, that number would not show whether an appropriate amount of spray was used as that depends on the particular circumstances.

7. I understand that Plaintiffs have proposed that CDCR modify its policy to limit pepper spray use in accordance with the Bureau of Prison's policy. I further understand that Plaintiffs' proposal is meant to address the use of pepper spray during the immediate uses of

3

force. In their brief, citing the Department Operations Manual, sections 51020.15 and 51020.15.1, Plaintiffs state that "CDCR use of force policy, which places quantitative limits on the use of pepper spray in controlled uses of force but, for immediate uses of force, provides only that officers 'shall only administer the amount of chemical agents necessary to reasonable to accomplish the objective.'" (ECF No. 3177 at 9.) Plaintiffs fail to note that the CDCR's current policy for application of pepper spray in a controlled use of force setting is already very similar to the federal policy in that it allows a one to three-second burst of spray, as compared to the federal policy which allows a two-second burst of spray. Both policies also restrict the number of applications in a controlled setting to two bursts of spray. The key difference then is in an uncontrolled situation. As Plaintiffs note, during an uncontrolled use of force, CDCR's regulations restrict the use of pepper spray to only that amount "necessary and reasonable to accomplish the lawful objective." This is reasonable and appropriate for several reasons.

8. First, in an uncontrolled use of force situation, the lives of the officer and/or inmate may be in imminent peril. There are many instances of inmate-on-inmate violence or inmate-on-staff assaults that could result in catastrophic injury or death if the assault or attack is not quickly and effectively stopped. Accordingly, it is imperative that the officer have the discretion to utilize that amount of pepper spray that he or she deems necessary to achieve immediate compliance. Second, as noted above, the amount needed in a particular situation will vary depending on the weather, the physical location, and the distance between the parties. In a confined setting, during warm weather, and with the target in fairly close proximity, only a one-to-two-second burst may be necessary to achieve compliance with orders. However, in cold or windy conditions, in an open setting, and with the target 15-18 feet away, the amount of spray necessary to stop a violent attack may be significantly higher and the burst significantly longer in duration. Accordingly, a strict limit of two-second bursts in all uncontrolled use of force situations is not a helpful or appropriate regulatory solution.

9. Moreover, the installation and use of fixed and body-worn cameras may have an impact on the use of pepper spray. Assuming, for the sake of argument, that some staff are using an excessive amount of pepper spray in confined settings, the use of cameras alone will identify

4

Cate Decl. Supp. Defs.' Resp. Pls.' Objs. Defs.' R.J. Donovan Partial Remedial Plan (Case No. 94-2307-CW))

the excessive discharge and the staff misconduct complaint, investigation and disciplinary process should mitigate that practice. Accordingly, in my opinion, the Court should not take action to change the CDCR regulations until the impact of the cameras on the use of pepper spray is determined.

I swear under penalty of perjury that the statements in this declaration are true and correct to the best of my knowledge. Signed at Sacramento, California, on December 14, 2020.

_____
MATTHEW CATE

CF1997CS0005

5

Cate Decl. Supp. Defs.' Resp. Pls.' Objs. Defs.' R.J. Donovan Partial Remedial Plan (Case No. 94-2307-CW))