IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

       Plaintiffs,

   v.

GAVIN C. NEWSOM, et al.,

       Defendants.

Case No. 94-cv-02307 CW

ORDER GRANTING IN PART MOTION TO MODIFY REMEDIAL ORDERS AND INJUNCTIONS

(Re: Dkt. No. 2948)

In this class action for violations of disabled prisoners' rights under the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act (RA), which is in the remedial phase, Plaintiffs contend that staff at seven state prisons continue to deprive class members of their rights under the Armstrong Remedial Plan (ARP) and the ADA.  Docket No. 2948.  Plaintiffs seek an order modifying the Court's prior remedial orders and injunctions to require the implementation of new remedial measures to prevent further violations of the ARP and ADA. Defendants oppose the motion.  Having carefully considered the parties' submissions, and the argument presented at the hearings held on October 6, 2020, and December 8, 2020,[1] the Court GRANTS

---

    [1] Defendants objected to the Court's consideration of new matters that were raised and attached to Plaintiffs' reply on the ground that Defendants did not have an opportunity to respond to them.  Objections 1-3, Docket No. 3116.  These objections are

1  IN PART Plaintiffs' motion to modify the Court's remedial orders

2  and injunctions.

3                          FINDINGS OF FACT

4  I.   Procedural history

5       In 1994, Plaintiffs, a class of all present and future

6  California state prison inmates and parolees with certain

7  disabilities, sued defendants, California state officials with

8  responsibility for the operation of the Department of Corrections

9  and Rehabilitation (the CDCR) and the Board of Parole Hearings

10 (BPH), challenging the State's treatment of disabled prisoners

11 and parolees.  The claims against the CDCR were litigated

12 separately from the claims against the BPH; only the former

13 claims are relevant to the present motion.

14      On July 9, 1996, on the eve of trial, Plaintiffs and CDCR

15 Defendants reached an agreement on a Stipulation and Order for

16 Procedures to Determine Liability and Remedy.  Docket No. 148.

17 The Stipulation and Order provides:

18           It is the intent of this Stipulation to
             require defendants to operate programs,
19           activities, services and facilities of the
             California Department of Corrections in
20           accordance with the Americans with
             Disabilities Act and § 504 of the
21           Rehabilitation Act of 1973, if the Court
             determines that the ADA and § 504 apply to
22           the California Department of Corrections.

23 Stipulation and Order ¶ 12, Docket No. 148.

24

25

26 ─────────────────
   moot, as the Court allowed Defendants additional time and an
27 opportunity to respond.  Defendants further objected to certain
   portions of the declarations of Gay Grunfeld and Michael
28 Freedman, upon which the Court has not relied.  The Court
   overrules these objections as moot.

United States District Court
Northern District of California

On September 20, 1996, this Court held that the ADA and RA do apply to state prisoners, Docket No. 157, and that Defendants' policies and procedures with regard to disabled prisoners were inadequate and violative of the ADA and the RA, Docket No. 159. See also Armstrong v. Wilson, 942 F. Supp. 1252, 1258 (N.D. Cal. 1996), aff'd, 124 F.3d 1019 (9th Cir. 1997).

On the same date, the Court entered the parties' stipulated Remedial Order and Injunction, which required CDCR Defendants to develop plans, policies, and procedures, including disability-grievance procedures, to ensure that their facilities and programs were compliant with the ADA and RA.  Remedial Order and Injunction at 1-4, Docket No. 158.  The Court retained jurisdiction to enforce the terms of the Remedial Order and Injunction, as well as to issue "any order permitted by law, including contempt, necessary to ensure that defendants comply with the guidelines, policies, procedures, plans and evaluations" required by the Remedial Order and Injunction.  Id. at 5.

In accordance with the Remedial Order and Injunction, Defendants produced the ARP in 1998, Docket No. 337, amended in January 2001, Docket No. 681.  The ARP, Section I, incorporates the ADA's anti-discrimination and access provisions, 42 U.S.C. § 12132, by providing as follows:

> No qualified inmate or parolee with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination.

ARP at 1, Docket No. 681.  Section II.F. of the ARP requires CDCR

to "provide reasonable accommodations or modifications for known

physical or mental disabilities of qualified inmates/parolees."

Id. at 7.  The remainder of the ARP describes various types of

accommodations that CDCR must provide, such as "staff

assistance," sign language interpreters, alternative methods for

restraining inmates who cannot be restrained with traditional

restraint equipment in the ordinary prescribed manner, and

accessible vehicles for transporting inmates.  Id. at 22-34.  The

ARP requires each institution to take steps to ensure that staff

are aware, at all times, of which inmates have disabilities that

require accommodations.  Id.  For example, the ARP requires each

institution to issue an identifying vest to each inmate who has

vision or hearing disabilities, which the inmates must wear over

their clothing when outside of their cell or bed area.  Id.

Defendants used the ARP as a model to craft remedial plans that

were specifically tailored to each CDCR institution.  See

Individual Remedial Plans, Docket Nos. 782, 783, 784.  The Court

approved the remedial plans for each institution on February 6,

2002.  Docket No. 781.

In November 2006, Plaintiffs filed a motion for a further

remedial order, in which they argued that Defendants were in

violation of the ARP and the Court's orders.  Docket No. 950.  As

a result of this motion, the Court issued another injunction in

2007 (2007 injunction), which required Defendants, in relevant

part, to comply with the ARP, including Section I, and to develop

accountability procedures to ensure their compliance with the ARP

and the Court's orders.  2007 Injunction at 7, 9, Docket No. 1045.

4

1  Since then, in response to enforcement motions brought by

2  Plaintiffs, the Court has modified the 2007 injunction several

3  times to clarify Defendants' accountability obligations.  See

4  Armstrong v. Schwarzenegger, 622 F.3d 1058, 1073 (9th Cir. 2010);

5  Armstrong v. Brown, 768 F.3d 975, 979 (9th Cir. 2014); see also

6  Order Modifying Permanent Injunction of August 2, 2012, Docket No.

7  2180; Order Modifying 2007 Injunction of December 29, 2014, Docket

8  No. 2479.

9      In February and June 2020, respectively, Plaintiffs filed

10  two enforcement motions, in which they argue that Defendants'

11  employees have engaged and continue to engage in conduct that

12  violates disabled inmates' rights under the ARP and ADA contrary

13  to this Court's prior orders and injunctions.  Docket Nos. 2922,

14  2948.  The acts alleged involve misconduct directed at disabled

15  inmates, who are vulnerable to abuse and less able than others to

16  defend themselves in light of their disabilities, as well as acts

17  that have served to discourage disabled inmates from requesting

18  reasonable accommodations for their disabilities, either through

19  the formal grievance process or otherwise.

20      The first enforcement motion sought a modification of the

21  Court's prior orders and injunctions to require the

22  implementation of new remedial measures at Richard J. Donovan

23  Correctional Facility (RJD) to end ongoing violations of the ARP

24  and ADA at that prison.  Docket No. 2922.  On September 8, 2020,

25  the Court granted the RJD enforcement motion in part, Order,

26  Docket No. 3059, and it ordered Defendants to draft a plan for

27  achieving compliance with the ARP and ADA at that prison that

28

United States District Court
Northern District of California

1  includes certain remedial measures, Order for Additional Remedial

2  Measures, Docket No. 3060.

3      The second enforcement motion is the one presently before

4  the Court.  It seeks a modification of the Court's prior orders

5  and injunctions to require the implementation of new remedial

6  measures at seven prisons, namely California State Prison, Los

7  Angeles County (LAC); California Correctional Institution (CCI);

8  Kern Valley State Prison (KVSP); California State Prison,

9  Corcoran (COR); Substance Abuse Treatment Facility (SATF);

10  California Institute for Women (CIW); and Salinas Valley State

11  Prison (SVSP) (collectively, the prisons at issue).

II.  **Staff at LAC, COR, SATF, CIW, and KVSP violated the ARP, the ADA, and the Court's prior orders and injunctions[2]**

A.  **Staff denied qualified inmates with disabilities reasonable accommodations for their disabilities**

15      As will be discussed in the Conclusions of Law, below, a

16  violation of the ADA's anti-discrimination and access provisions,

17  42 U.S.C. § 12132, which are incorporated into Section I of the

18  ARP, occurs where a disabled inmate is discriminated against by a

19  public entity or is otherwise denied the benefits of a public

20  entity's services, programs, or activities by reason of his or

21  her disability.  ARP at 1, Docket No. 681.  A failure to provide

22  a reasonable accommodation can occur where a correctional officer

23  could have used less force or no force during the performance of

24  his or her penological duties with respect to a disabled person.

25  A failure to provide a reasonable accommodation, or

26

27      [2] Plaintiffs have not shown that staff violated the rights
28  under the ARP or ADA of qualified inmates with disabilities at
    SVSP or CCI.

6

United States District Court
Northern District of California

1  discrimination by reason of disability, constitutes a violation

2  of the ADA, as well as the ARP.

3      Plaintiffs have submitted declarations[3] from current or

4  former inmates at LAC, COR, SATF, CIW, and KVSP.[4]  These

5  declarations describe dozens of incidents in which staff at LAC,

6  COR, SATF, CIW, and KVSP denied disabled inmates at these prisons

7  reasonable accommodations for their physical or mental

8  disabilities.  Some of the incidents involve the use of force

9  against mentally or physically disabled inmates even though the

10  disabled inmates appear to have posed no imminent threat to the

11  safety of staff or other inmates.  For none of the incidents

12  described below have Defendants submitted evidence to show that

13  the denial of reasonable accommodations, or the use of

14  unnecessary force, which itself can be a denial of a reasonable

_____

16      [3] Defendants object to certain portions of these declarations
on the grounds that: (1) they contain evidence the probative

17  value of which is substantially outweighed by the danger of
unfair prejudice under Federal Rule of Evidence 403; (2) they

18  contain hearsay; or (3) the declarants lack personal knowledge.
The Court overrules these objections.  The Court declines to

19  exclude any portions of the inmate declarations on the basis of
Federal Rule of Evidence 403, because there is no danger of

20  unfair prejudice as the Court, not a jury, is making factual
determinations.  The Court finds that the rest of Defendants'

21  objections lack merit.  The statements in the inmate declarations
at issue are not subject to exclusion because they (1) are not

22  hearsay, as they are not made for the truth of the matter
asserted or fall within one of the hearsay exceptions under

23  Federal Rule of Evidence 803; and (2) are based on the
declarants' personal knowledge and perceptions.

24      [4] Defendants move to strike the declarations of three inmate-
declarants on the ground that they refused to answer certain

25  questions during their depositions by invoking the Fifth
Amendment.  The Court denies the motion because the questions the

26  inmate-declarants refused to answer are collateral to the matters
at issue in the present motion.  Further, the Court has not

27  relied on the declarations of these three inmate-declarants, or
on the transcripts of their depositions, for the purpose of

28  deciding the present motion.

United States District Court
Northern District of California

1  accommodation, was necessary for the performance of legitimate

2  penological duties.[5]  The following are illustrative examples.

3      An inmate at LAC who uses a wheelchair is frequently denied

4  ADA assistance, to take a shower, by a particular officer.[6]

5  Freedman Decl., Ex. 35 ¶¶ 1-12, Docket No. 2947-5.  The inmate no

6  longer asks for ADA showers when that officer is on her shift.

7      An inmate at LAC who has mobility, vision, and mental

8  disabilities was not provided with a vehicle with a lift so that

9  he could be transported to his medical appointment in August

10  2020, and the inmate missed his appointment as a result.[7]

11  Grunfeld Reply Decl., Ex. 8 ¶¶ 32-33, Docket No. 3108-1.  The

12  inmate believes that staff prevented him from going to his

13  medical appointment in retaliation for reporting staff misconduct

14  at LAC.  Id.

15      An inmate at LAC who suffers from bipolar disorder and is

16  assigned to an EOP unit experienced a manic episode in December

17  2019, after which several officers brought the inmate to the

18  ground.  Freedman Decl., Ex. 29 ¶¶ 17-18.  Once the inmate was

19

20      [5] Defendants submitted declarations by prison staff disputing
21  some, but not all, of the incidents that some of the inmate-
    declarants describe.  The incidents described in this order are
22  examples of alleged incidents for which Defendants have not
    pointed to any evidence that contradicts the inmate-declarants'
23  version of the events.

24      [6] Defendants submitted evidence that they argue contradicts
    the declaration of this inmate.  See Docket No. 3080-4.  But that
25  evidence does not speak to the incidents described in this order
    in which a specific officer identified by name allegedly denied
26  the inmate access to ADA assistance to take a shower.

27      [7] Defendants filed declarations by officers at LAC that
    address other unrelated incidents involving this inmate that took
28  place in April 2020.  Defendants filed no evidence to dispute
    that the inmate missed an appointment for lack of an accessible
    vehicle in August 2020.

under the control of the officers, one of the officers unloaded an entire can of pepper spray on the inmate, and then beat the inmate.  Id.  Then, after the inmate was in handcuffs, the officers beat him again.  Id. ¶ 19.  The inmate now refrains from asking for help.  Id. ¶ 36.

An inmate at LAC who has mobility disabilities and suffers from bipolar disorder and is assigned to an EOP unit experienced hallucinations and sought mental health treatment in June 2019. Freedman Decl., Ex. 49 ¶¶ 1-10, Docket No. 2947-5.  After a mental health evaluation, he was being returned to his cell, while handcuffed, by two officers when the officers and the inmate had a verbal altercation; once they reached his cell, the officers slammed him to the ground face first and punched him in the head.  Id. ¶¶ 10-17.  The inmate now is afraid of asking for help for his disabilities.  Id. ¶ 32.

An inmate at LAC who suffers from schizoaffective disorder and is housed in an EOP unit reported that he was suicidal in March 2018 and was ignored for hours, after which he tried to hang himself.  Freedman Decl., Ex. 33 ¶¶ 8-10, Docket No. 2947-5. Instead of providing him with mental health care, an officer pepper sprayed him in the face.  Id.

An inmate at LAC who suffers from depression and anxiety and is housed in an EOP unit asked to speak to his mental health clinician because he had learned that his father had cancer, and an officer pepper sprayed him instead.  Freedman Decl., Ex. 37 ¶¶ 1-11, Docket No. 2947-5.

An inmate at COR who is housed in an EOP unit observed officers beat another EOP inmate after he asked for medications.

9

United States District Court
Northern District of California

Grunfeld Reply Decl., Ex. 23 ¶¶ 1-24, Docket No. 3108-1.  The inmate now worries that staff will deny him mental healthcare. Id. ¶ 24.

An inmate at COR who is housed in an EOP unit was beaten by an officer after a suicide attempt in August 2019.  Grunfeld Reply Decl., Ex. 20 ¶¶ 34-42, Docket No. 3108-1.  The inmate believes that the officer beat him because he suffers from mental health issues and cannot advocate for himself.  Id. ¶ 47.  The inmate now refrains from asking for help because he is afraid of what would happen to him.  Id. ¶ 61.

An inmate at COR who is housed in an EOP unit reported that he was suicidal in July 2020 but staff ignored him.  Grunfeld Reply Decl., Ex. 20 ¶¶ 56-58, Docket No. 3108-1.

An inmate at SATF who has a hearing disability repeatedly asked for a telecommunication device for the deaf in February 2020, and staff ignored his request for months, until June 2020.[8] Grunfeld Reply Decl., Ex. 70 ¶¶ 1-17, Docket No. 3109-1.

An inmate at CIW who has a mobility disability requested a handcuffing accommodation in February 2020, and the officer ignored her request.  Grunfeld Decl., Ex. 41 ¶¶ 1-13, Docket No. 3108-1.  The inmate was handcuffed behind her back for two hours

[8] Defendants argue that the inmate's declaration is contradicted by evidence that he did receive access to the telecommunications device from June through August of 2020. Docket No. 3162 at 6.  Defendants, however, point to no evidence to dispute the inmate's declaration that he requested the telecommunications device in February 2020 but Defendants failed to provide him access to it until June 2020.

until another officer confirmed that the inmate requires a handcuffing accommodation and removed the handcuffs.[9]  Id. ¶ 11.

An inmate at KVSP who is designated as EOP and has permanent nerve damage in his wrists, Freedman Decl., Ex. 26 ¶¶ 1-5, Docket No. 2947-5, requested a change of bandages in May 2020 because he had had wrist surgery and, instead of accommodating him, an officer hit him with a mace can, Freedman Decl. ¶ 72 & Ex. 62 ¶¶ 1-9, Docket No. 2947-5.  The inmate believes that staff at KVSP are retaliating against him for providing assistance in the Coleman and Armstrong litigation.  Freedman Decl., Ex. 62 ¶ 18, Docket No. 2947-5.

The declarants believe, based on their experiences and observations, that staff target inmates with disabilities for mistreatment because they are vulnerable and unlikely to fight back.  See, e.g., Grunfeld Reply Decl., Ex. 8 ¶¶ 34-35, Docket No. 3108-1; Freedman Decl., Ex. 29 ¶ 36; Freedman Decl., Ex. 33 ¶ 29, Docket No. 2947-5; Grunfeld Reply Decl., Ex. 70 ¶ 45, Docket No. 3109-1; Grunfeld Reply Decl., Ex. 43 ¶ 13, Docket No. 3108-1; Grunfeld Decl., Ex. 41 ¶ 20, Docket No. 3108-1; Freedman Decl., Ex. 35 ¶ 21, Docket No. 2947-5; Freedman Decl., Ex. 49 ¶ 37, Docket No. 2947-5.  The Court finds the inmate declarations to be credible.  The descriptions in these declarations of the behavior

---

[9] Defendants argue that this inmate's description of the incident is contradicted by medical records, which state that "I/P was escorted cuffed in front to TTA exam room[.]"  Grunfeld Decl., Ex. 41a, Docket No. 3108-1.  These medical records, which state that the inmate was handcuffed in the front while she was being escorted do not contradict the inmate's declaration that she was handcuffed behind her back for two hours in a holding cell before the handcuffs were removed.

United States District Court
Northern District of California

of staff toward disabled inmates are remarkably consistent.
Further, the declarants appear to lack any incentive to fabricate
the incidents they describe with such great detail.  Finally, as
noted, Defendants have not pointed to declarations or other
evidence to dispute the sworn statements of the declarants with
respect to the incidents described above.[10]  The declarants'
version of the incidents described above is, therefore,
uncontroverted.

Defendants note that some of the inmate declarations that
Plaintiffs filed are by members of the class in Coleman v.
Newsom, Case No. 90-cv-00529 (E.D. Cal.) and argue that these
declarations cannot establish violations of the ARP to the extent
that they describe denials of reasonable accommodations as to
Coleman class members.  The Coleman class includes "all inmates
with serious mental disorders who are now, or who will in the
future, be confined within the California Department of
Corrections."  Coleman v. Schwarzenegger, 922 F. Supp. 2d 882,
899 n.11 (E.D. Cal. 2009) (citation and internal quotation marks
omitted).  Defendants contend that the ARP does not apply to
Coleman class members by virtue of their mental disorders unless
the mental disorders are learning disabilities.  See Tr. of Oct.
6, 2020, Hr'g at 25-26, Docket No. 3131.

---

[10] Defendants argue that the "current page limitations" made
it "impossible" for them to "make extended discussions" of some
of the inmate declarations.  Docket No. 3162.  Defendants'
failure to cite evidence that contradicts the inmates'
declarations, to the extent that any such evidence exists, is not
justified by the page limitations the Court imposed on the
parties.  Pointing to contrary evidence does not require extended
discussions of the evidence.  Further, Defendants never moved for
additional pages.

United States District Court
Northern District of California

As noted, the Court's Remedial Order and Injunction requires Defendants to ensure that their facilities and programs are compliant with the ADA and RA.  Remedial Order and Injunction at 1-4, Docket No. 158.  The ARP, Section I, which incorporates the ADA's anti-discrimination and access provisions, 42 U.S.C. § 12132, provides that any "qualified inmate or parolee with a disability" is protected from discrimination or exclusion because of that disability:

> No qualified inmate or parolee with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination.

ARP at 1, Docket No. 681.  Section II.A of the ARP defines a "qualified inmate or parolee" as "one with a permanent physical or mental impairment which substantially limits the inmate/parolee's ability to perform a major life activity," id. at 1, and Section II.B. of the ARP defines a "permanent disability or impairment" as one that is not expected to improve within six months, id. at 2.  The ARP does not define or limit the conditions that may constitute a covered "mental impairment."

In light of the plain language of the ARP, the Court concludes that Coleman class members are "qualified inmates" under the ARP if the record suggests that they suffer from any known physical or mental impairment that substantially limits their ability to perform a major life activity and that is not expected to improve within six months.  The Court finds no

United States District Court
Northern District of California

support in the ARP for limiting the scope of the term "mental impairment" to learning disabilities, as Defendants propose.

During the hearing held on December 8, 2020, Plaintiffs argued that Coleman class members who "have been classified by CDCR as belonging to EOP, Enhanced Outpatient Placement," are qualified inmates within the meaning of the ARP because "they require special housing, special programming" and "are very ill." Tr. at 37, Docket No. 3184.  The record in the Coleman litigation supports that argument.  It shows that Coleman class members designated as EOP suffer from serious mental disorders such as depression, panic attacks, bipolar disorder, and post-traumatic stress disorder, which cause them to suffer from "crisis symptoms which require extensive treatment" or prevent them from functioning in the general prison population.  See CDCR Mental Health Services Delivery System Program Guide, 2018 Revision, at 7-8, Docket No. 5864-1, Coleman v. Newsom, Case No. 90-cv-00520 (E.D. Cal.); see also Order at 5, Docket No. 5131, Coleman v. Newsom, Case No. 90-cv-00520 (E.D. Cal.) (noting that Coleman class members designated as EOP suffer from serious mental disorders that render them "unable to function in the general prison population").  As a result, Coleman class members designated as EOP require special housing apart from the general prison population and special extensive mental-health treatment.

As will be discussed in more detail in the Conclusions of Law, below, a mental impairment that prevents an inmate from functioning in the general prison population and that requires the inmate to receive special and extensive mental-health treatment constitutes a disability within the meaning of the ARP

14

1  and ADA, as that impairment substantially limits the inmate's

2  ability to perform a major life activity.  Accordingly, <u>Coleman</u>

3  class members who are designated as EOP are "qualified inmates"

4  within the meaning of the ARP and are covered by the ARP and ADA.

5  As such, any failure by Defendants' employees to provide EOP

6  <u>Coleman</u> class members with reasonable accommodations for their

7  disabilities constitutes a violation of the ARP and ADA.  <u>See</u> ARP

8  at 7, Section II.F., Docket No. 681 (requiring CDCR to "provide

9  reasonable accommodations or modifications for known physical <u>or</u>

10  <u>mental disabilities</u> of qualified inmates/parolees") (emphasis

11  added).

12      The declarations of <u>Coleman</u> class members are also relevant

13  to the resolution of the present motion to the extent that they

14  contain evidence of violations of <u>Armstrong</u> class members' rights

15  under the ARP or ADA, and to the extent that they contain

16  evidence that is probative of the conditions that disabled

17  inmates experience in CDCR's prisons.

18      For the foregoing reasons, the Court considers the

19  declarations of <u>Coleman</u> class members when deciding the present

20  motion.

21      Defendants next argue that certain of the declarants do not

22  explicitly establish a causal link between the violations of the

23  ARP and ADA that they describe and their disabilities.  The Court

24  is not persuaded.  This causal link need not be expressly alleged

25  by each of the declarants.  The causal link can be inferred from

26  the totality of the allegations in the declarations and the

27  evidence discussed below, which shows that it is part of the

28  staff culture at LAC, COR, SATF, CIW, and KVSP to target inmates

United States District Court
Northern District of California

with disabilities for mistreatment, abuse, retaliation, and other improper behavior.

The Court finds, based on the foregoing, that staff have denied reasonable accommodations to inmates with disabilities on multiple occasions at LAC, COR, CIW, SATF, and KVSP, and that such denials were by reason of the inmates' disabilities.

B.    Staff interfered with the ADA rights of qualified inmates with disabilities

As will be discussed in the Conclusions of Law below, a violation of the ADA's anti-interference provisions, 42 U.S.C. § 12203(b), occurs where (1) a person threatens, intimidates, or coerces a person with a disability; (2) the threat, intimidation, or coercion has a nexus to the exercise or enjoyment of an ADA right; and (3) the disabled person suffers distinct and palpable injury as a result, by virtue of giving up his ADA rights or some other injury which resulted from his refusal to give up his rights, or from the threat or intimidation or coercion itself.

Plaintiffs have submitted declarations by inmates stating that staff have threatened, intimidated, or coerced them when they requested reasonable accommodations or indicated that they would file ADA-related grievances, and that this has caused them to refrain from requesting accommodations or filing ADA grievances, or to experience severe emotional distress.  As discussed below, the incidents described in the declarations, which are uncontested, establish that staff have violated 42 U.S.C. § 12203(b).  Below, the Court describes a few examples. Some of these incidents were also discussed in the previous

16

United States District Court
Northern District of California

section of this order because they involve denials of reasonable accommodations, as well as violations of § 12203(b).

The inmate at LAC who uses a wheelchair, who is frequently denied by a particular officer of ADA assistance to take a shower, no longer asks for ADA showers when that officer is on her shift.[11]  Freedman Decl., Ex. 35 ¶¶ 1-12, Docket No. 2947-5.

An inmate at LAC who suffers from depression and anxiety and is housed in an EOP unit and was assaulted by officers after he asked to speak to his mental health clinician filed a complaint regarding the incident and then experienced retaliation by officers in the form of an unwarranted placement in segregation in November 2019.  Freedman Decl., Ex. 37 ¶¶ 1-11, 20-26, Docket No. 2947-5.  The inmate now refrains from asking for mental health treatment when he feels suicidal.  Id. ¶ 38.

An inmate at LAC who has mobility, vision, and mental disabilities was accused by an officer at LAC, while in the presence of other inmates, of reporting staff misconduct and denials of disability accommodations.[12]  Grunfeld Reply Decl., Ex. 8 ¶¶ 18-19, Docket No. 3108-1.  The inmate now worries about his safety and refrains from asking for assistance he needs in light of his disabilities.  Id. ¶¶ 18-19, 34.

---

[11] As noted above, Defendants submitted evidence that they argue contradicts the declaration of this inmate.  See Docket No. 3080-4.  But none of that evidence addresses the incidents described in this order in which a specific officer identified by name allegedly denied the inmate access to ADA assistance to take a shower.

[12] Defendants filed declarations by officers at LAC that address other unrelated incidents.  Defendants have filed no evidence to dispute that this inmate suffered retaliation in the summer of 2020.

United States District Court
Northern District of California

1   Described above is an inmate at LAC who has mobility

2   disabilities and suffers from bipolar disorder and is assigned to

3   an EOP unit; this inmate experienced hallucinations and sought

4   mental health treatment in June 2019.  Freedman Decl., Ex. 49 ¶¶

5   1-10, Docket No. 2947-5.  After a mental health evaluation, he

6   was being returned to his cell, while handcuffed, by two officers

7   when the officers and the inmate had a verbal altercation; once

8   they reached his cell, the officers slammed him to the ground

9   face first and punched him in the head.  Id. ¶¶ 10-17.  The

10  inmate is now afraid of asking for help for his disabilities.

11  Id. ¶ 32.

12  An inmate at COR who has mobility disabilities filed a staff

13  complaint against an officer who allegedly kicked him on the

14  inside of his legs in September 2019 during a body search,

15  causing him excruciating pain and worsening his mobility

16  disability.[13]  Grunfeld Reply Decl., Ex. 33 ¶¶ 1-18, Docket No.

17  3108-1.  Since then, two other officers have threatened him and

18  told him to drop his complaints against the officer who kicked

19  him.[14]  Id. ¶¶ 25-34.

20  An inmate at COR who was being housed in an EOP unit in June

21  2020 observed officers extract another EOP inmate from his cell

22  while he was wearing handcuffs and leg restraints; while that

23  _____

24  [13] The officer who allegedly kicked the inmate filed a
    declaration, in which he does not deny having kicked the inmate.
25  See Docket No. 3160-19.

26  [14] One of the officers who allegedly threatened the inmate
    filed a declaration.  Docket No. 3160-17.  This officer does not
27  deny threatening or telling the inmate to drop his complaints
    against the officer who allegedly kicked the inmate.  Id.  The
28  other officer who allegedly threatened and told the inmate to
    drop the complaints did not file a declaration.

inmate was on the floor, a female officer kicked the inmate in the head.  Grunfeld Reply Decl., Ex. 22 ¶¶ 1-226, Docket No. 3108-1.  The inmate who observed the incident now refrains from asking for treatment for his mental illness.  Id. ¶ 32.

An inmate at CIW asked for a handcuffing accommodation and was ignored, and she now refrains from asking for accommodations for her hearing disability as a result of the incident.  Grunfeld Reply Decl., Ex. 43 ¶¶ 9-12, Docket No. 3108-1.

The inmate at KVSP who is designated as EOP and has permanent nerve damage in his wrists, Freedman Decl., Ex. 26 ¶¶ 1-5, Docket No. 2947-5, requested a change of bandages in May 2020 because he had had wrist surgery and, instead of accommodating him, an officer hit him with a mace can, Freedman Decl. ¶ 72 & Ex. 62 ¶¶ 1-9, Docket No. 2947-5.  The inmate believes that staff at KVSP are retaliating against him for his assistance in the Coleman and Armstrong litigation.  Freedman Decl., Ex. 62 ¶ 18, Docket No. 2947-5.

For each of the examples just described, Defendants have not submitted any evidence, such as declarations by the officers who allegedly engaged in intimidation, threats, or coercion, to dispute the occurrence of these incidents.

The Court finds the inmate declarants to be credible for the same reasons discussed in the prior section, and because of the absence of any evidence that contradicts the version of the events described in these declarations.

United States District Court
Northern District of California

1    Defendants argue that they have not violated § 12203(b)

2  because their experts, Matthew Cate[15], Bernard Warner[16], and John

3  Baldwin[17], opine that disabled inmates have access to, and

4  regularly utilize, systems for requesting accommodations and for

5  reporting officer misconduct.  Cate Decl. ¶¶ 21-39, Docket No.

6  3083-5.  Defendants retained these experts to determine whether

7  inmates with disabilities are systemically being denied or

8  discouraged from requesting accommodations; and whether they are

9  targeted for abuse, retaliation, and harassment for doing so, or

10  on the basis of their disabilities.  Warner examined these issues

11  with respect to SATF, SVSP, KVSP; Baldwin with respect to COR,

12  CIW, and CCI; and Cate with respect to LAC.

13    The Court gives little weight to these experts' opinions

14  because they do not consider or take into account the possibility

15  that, despite the existence of systems for requesting

16  accommodations and reporting staff misconduct, and the fact that

17  some inmates employ such systems, some disabled inmates refrain

18  from filing ADA requests or staff misconduct grievances that they

19  would have filed but for the threats, intimidation, or coercion

20  by staff.  The data upon which Defendants' experts rely, which

21  

22    [15] Cate previously served as the Inspector General of

23  California, and as the Secretary of CDCR.  Cate Decl. ¶¶ 1-6,
   Docket No. 3083-5.

24    [16] Bernard Warner has forty years of experience in the field
   of corrections and served as CDCR's Chief Deputy Secretary for

25  the Department of Juvenile Justice and as the Secretary of the
   Washington Department of Corrections.  Warner Decl. ¶ 3, Docket

26  No. 3083-6.

27    [17] John Baldwin has more than forty-two years of experience
   in the field of corrections and served as the Director of the

28  Iowa Department of Corrections.  Baldwin Decl. ¶ 3, Docket No.
   3083-4.

1  show that disabled inmates are filing some ADA requests and

2  grievances, does not take into account requests or grievances

3  that disabled inmates did <u>not</u> make or submit, nor do they take

4  into account requests and grievances that disabled inmates

5  withdrew, because of threats, coercion, or intimidation.

6  Accordingly, the Court finds that the opinions of Defendants'

7  experts do not impact its finding that Defendants violated

8  disabled inmates' rights under § 12203(b).[18]

9  III.  Defendants have failed to comply with their Court-ordered
10        accountability obligations

11      In 2007, more than ten years after the Court entered its

12  first Remedial Order and Injunction requiring Defendants to

13  develop plans, policies, and procedures to ensure that their

14  facilities and programs comply with the ADA and RA, the Court

15  found that Defendants were not yet in compliance with the ADA,

16  the ARP, or the Court's Remedial Order and Injunction.  <u>See</u>

17  Order, Docket No. 1045.  Accordingly, the Court entered the 2007

18  injunction, which required Defendants to develop and implement a

19  system for holding wardens and other staff accountable for

20  compliance with the ARP and the Court's orders (accountability

21  obligations).  Order at 7, Docket No. 1045.  Since that time, the

22  Court has clarified Defendants' accountability obligations to

23  specify the actions that Defendants must take to ensure that they

24  comply with the ARP and ADA, such as tracking allegations of

25

26

27      [18] For the same reasons, the Court's conclusion is not
    altered by data showing that disabled inmates submitted ADA-
28  related appeals and grievances in the last several years.  <u>See</u>
    Olgin Decl., Ex. A-G, Docket No. 3083-7.

21

United States District Court
Northern District of California

United States District Court
Northern District of California

violations of the ARP, the ADA, and the Court's orders;
conducting prompt investigations of any such alleged violations;
and ensuring that any staff who violate the ARP, ADA, or the
Court's orders receive the appropriate discipline.  See 2012
Order, Docket No. 2180; 2014 Order Modifying 2007 Injunction at
1, Docket No. 2479; 2020 Order, Docket No. 3059.

As noted above, Defendants have repeatedly failed to comply
with their accountability obligations.  See, e.g., 2012 Order at
4-6, Docket No. 2180; 2020 Order at 31-35, Docket No. 3059.

In their present motion, Plaintiffs have shown that
Defendants continue to violate multiple aspects of their Court-
ordered accountability obligations.

A.   Defendants' system for investigating and holding staff
     accountable for violations of the ARP and ADA is
     ineffective

In 2007, the Court ordered Defendants to develop and
implement a system for holding wardens and other staff
accountable for compliance with the ARP, the ADA, and the Court's
orders.  Order at 7, Docket No. 1045.  In 2012, the Court
clarified that this requires, among other things, that Defendants
"investigate promptly and appropriately all allegations of
violations, regardless of the source[.]"  Order at 16, Docket No.
2180.

Plaintiffs have shown that Defendants' system for
investigating alleged violations of the ARP and the ADA is flawed
and that the results of investigations conducted pursuant to that
system are unreliable.

Plaintiffs' expert, Eldon Vail, is a former correctional
administrator with thirty-five years of experience working in and

22

United States District Court
Northern District of California

administering adult correctional institutions.  Vail Decl. ¶ 3,
Docket No. 2020-5.  He has served as the Warden of three adult
correctional institutions, and he served as the Secretary of the
Department of Corrections of Washington for four years.  Id. ¶ 4.
He is familiar with CDCR prisons, as he was an expert in several
actions involving CDCR prisons, including the Coleman litigation.
Vail Decl. ¶¶ 1-8, Docket No. 3106-7.  As part of his assignment,
Vail reviewed, among other things, 170 declarations by inmate-
declarants that describe incidents of abuse directed at disabled
inmates at eight prisons, including incidents that constitute
violations of the ARP and ADA.  Id. ¶ 8.

Vail opines that Defendants' investigations of the
allegations made by the inmate-declarants were systematically
inadequate, as investigators "overlooked or intentionally
ignored" evidence that supports the inmate-declarants' version of
the events and that undermines officer statements and incident
reports generated by prison staff.  Id. ¶ 28.

For example, Vail analyzed the investigation of allegations
of abuse by an inmate at LAC who has mobility disabilities and
uses a wheelchair, and he concluded that this investigation, like
many others, was flawed.  Vail Decl. ¶¶ 72-79, Docket No. 3106-7.
This inmate stated in his declaration that, on August 7, 2019, he
requested multiple accommodations, including an ADA shower and
extra supplies to clean up after an incontinence accident, but
instead of accommodating him, an officer threw him out of his
wheelchair and then put his knee on his back before handcuffing
him.  Freedman Decl., Ex. 27, Docket No. 2947-5.

United States District Court
Northern District of California

To dispute this inmate's allegations, Defendants filed the declaration of the officer who allegedly threw the inmate out of his wheelchair.  The officer attached to his declaration an incident report that he wrote after the incident, which states that the inmate stood up from his wheelchair, yelled profanities at the officer, and then threw a plastic bag containing disposable diapers at his chest and face.  Docket No. 3083-2, Ex. A.  According to the incident report, when the officer ordered the inmate to get on the floor, the inmate refused, and the officer then pushed the inmate to the floor and handcuffed him. Id.  The incident report lists three other officers as witnesses, but no inmate witnesses.  Id.  Defendants did not file any declarations by any of the three officers listed as witnesses.

Vail reviewed the incident report and medical report just described, as well as other documents that Defendants did not file, including a second report that was written in 2020 summarizing the results of Defendants' inquiry into the incident. See Vail Decl. ¶¶ 72-79 & Ex. GGG, Docket No. 3106-7.  This second report summarizes an interview with an inmate who witnessed the incident and corroborated the subject inmate's description of it; the witness stated that he saw the officer lift the inmate's wheelchair from the back, forcing the inmate to fall out of the chair.  The investigator wrote that he did not find the subject inmate's or the witness's accounts to be credible because (1) the inmate and the witness did not mention that the inmate threw a bag of dirty diapers at the officer as the officer wrote in the incident report; (2) the witness failed to mention that the inmate "stood up from his wheelchair" as the

officer had written in the incident report; (3) the witness "is
friends with" the inmate and therefore colluded with the inmate
to tell the same story; and (4) the witness and the inmate
differed in their accounts as to whether the inmate received an
ADA shower prior to the incident.  Vail Decl., Ex. GGG at 2-4,
Docket No. 3106-7.  The investigator concluded that the inmate's
allegations of excessive force and staff misconduct "have no
merit and should be closed . . . based on the lack of
corroborating witnesses and supporting evidence which
contradict[s]" the inmate's allegations.  Id. at 8.

Vail opines that the investigator improperly assumed that
the officer's version of the incident was true, and that he
improperly discounted the subject inmate's and the witness's
statements on the ground that such statements did not match the
officer's version of the incident.  Vail Decl. ¶¶ 75-77.  Vail
further opines that the investigator erred in assuming, without
proof, that the similarities between the inmate's and the
witness's version of the events was the result of collusion or
fabrication, as opposed to being the truth.  Id. ¶ 75.  Finally,
Vail opines that the investigator erred in discounting the
inmate's and the witness's statements on the basis that their
stories conflicted as to whether the inmate took an ADA shower
before the officer threw him out of his wheelchair, because
whether or not the inmate took an ADA shower was not material to
whether he was thrown out of the wheelchair.  Id. ¶ 76.

Neither Defendants nor their experts dispute Vail's analysis
and conclusions with respect to the investigation of this
inmate's allegations.

United States District Court
Northern District of California

1    Plaintiffs' other expert, Jeffrey Schwartz, who has assisted

2    prisons and jails over the last twenty years in applying national

3    correctional standards to their operations, concurs with Vail's

4    opinions and further opines that the problems and failures of

5    Defendants' process for investigating and disciplining

6    allegations of staff misconduct directed at disabled inmates are

7    systemic.  Schwartz Decl. ¶ 2, Docket No. 2947-9; Schwartz Decl.

8    ¶ 6, Docket No. 3106-5.

9    The Court finds Vail's and Schwartz's opinions about the

10   systemic inadequacies of Defendants' investigation of allegations

11   of staff misconduct directed at disabled inmates to be credible

12   and reliable.  They are consistent with the data published by the

13   Office of the Inspector General (OIG)[19], which shows that a

14

15         [19] Pursuant to California Penal Code § 6133(a), the OIG is
"responsible for contemporaneous public oversight of the
16   Department of Corrections and Rehabilitation investigations and
staff grievance inquiries conducted by the Department of
17   Corrections and Rehabilitation's Office of Internal Affairs . . .
. The Office of the Inspector General shall have discretion to
18   provide public oversight of other Department of Corrections and
Rehabilitation personnel investigations as needed."  The OIG's
19   records, reports, statements, and data compilations are
presumptively admissible under the public records hearsay
20   exception, Federal Rule of Evidence 803(8).  See Johnson v. City
of Pleasanton, 982 F.2d 350, 352 (9th Cir. 1992) ("A trial court
21   may presume that public records are authentic and trustworthy.
The burden of establishing otherwise falls on the opponent of the
22   evidence, who must come 'forward with enough negative factors to
persuade a court that a report should not be admitted.'"); Estate
23   of Gonzales v. Hickman, No. 05-660 MMM (RCX), 2007 WL 3237727, at
*2 n.3 (C.D. Cal. May 30, 2007) (holding that OIG report was
24   admissible under Rule 803(8) because the report contained factual
findings and conclusions resulting from an investigation made by
25   the OIG pursuant to its authority granted by law, and because the
opponents did not meet their burden to show that the report was
26   unreliable or untrustworthy); Lorraine v. Markel Am. Ins. Co.,
241 F.R.D. 534, 551 (D. Md. 2007) (holding that "official
27   publications posted on government agency websites should be
admitted into evidence easily" based on Federal Rules of Evidence

28

United States District Court
Northern District of California

significant percentage of Defendants' investigations of

allegations of staff misconduct involving inmates are inadequate.

The OIG monitored 116 cases involving allegations of harm or

negligence against incarcerated people dated January 1, 2019, to

June 30, 2020, and it concluded that, in twenty-eight out of the

116 cases (or twenty-four percent), CDCR's overall performance in

investigating the allegations was "poor", and that in forty-five

out of the 116 cases (or thirty-eight percent), CDCR performed

poorly in determining its findings for alleged misconduct and

processing the case.  See Grunfeld Reply Decl. ¶¶ 227-231 & Ex.

127, Docket No. 3108-1.[20]  The OIG did not issue an overall

"superior" rating for any of the 116 cases.[21]  Id.

---

803(8) and 902(5)).  Here, Defendants have not rebutted the
presumption that the OIG data and OIG reports discussed in this
order are admissible under Rule 803(8) because Defendants have
not shown that such data and reports are unreliable or
untrustworthy.

[20] These calculations are based on data that Plaintiffs
obtained from the OIG's website based on criteria described in
detail in the declaration of Gay Grunfeld.  Defendants object to
the Court's consideration of the calculations on the ground that
the calculations are hearsay.  The Court overrules this objection
because Defendants do not dispute that the underlying data came
from the OIG's website and is therefore admissible under Federal
Rules of Evidence 803(8) and 902(5).  Further, Defendants have
not shown that the calculations at issue, which are based on the
OIG's data, are inaccurate.  To the contrary, during the hearing
held on December 8, 2020, Defendants stated that they do not
argue that "the calculations were done incorrectly."  See Tr. at
8, Docket No. 3187.

[21] Defendants' expert, Matthew Cate, states in his report
that the OIG concluded that CDCR's performance in the first six
months of 2019 in terms of "the internal investigation and
employee disciplinary process" was satisfactory overall and
excellent based on certain specific metrics.  Cate Decl. ¶¶ 86-
88, Docket No. 3083-5.  The OIG data that Cate summarizes in his
report, however, does not appear to speak specifically to CDCR's
performance in investigating or disciplining staff misconduct of
the type that is at issue in the present motion, namely staff
misconduct directed at inmates.  For that reason, the Court gives
little weight to Cate's opinions based on this data.

United States District Court
Northern District of California

Vail's and Schwartz's opinions also are consistent with the OIG's findings that the statewide system for investigating allegations of staff misconduct is flawed and ineffective.  For a report dated January 2019, the OIG reviewed 188 staff misconduct inquiries at SVSP to determine whether the statewide staff misconduct complaint process had functioned as intended. Grunfeld Decl., Ex. GG, Docket No. 2922-1.  Out of the 188 staff misconduct complaint inquiries the OIG reviewed, the OIG found that the hiring authority determined in ninety-seven percent of them that the staff accused of misconduct had not violated policy.  Id. at 1.  However, according to the OIG, the "dependability of the staff complaint inquiries" upon which the hiring authority's determinations were based was "significantly marred by inadequate investigative skills" that staff misconduct complaint reviewers had demonstrated.  Id. at 3.  The OIG found that staff misconduct complaint reviewers "displayed signs of bias in favor of their fellow staff when conducting their staff complaint inquiries; they sometimes ignored corroborating evidence offered by inmate witnesses and often compromised the confidentiality of the process."  Id. at 2.  The OIG concluded that the staff misconduct complaint reviewers' "ability to remain impartial" could have been affected by the fact that the reviewers were "frequently peers or coworkers of the staff members they were investigating" and "must always rely on fellow staff for their physical safety."  Id. at 5.

The OIG recommended that CDCR "consider a complete overhaul of the staff complaint inquiry process" across the entire state on the ground that the problems the OIG found at SVSP—namely,

United States District Court
Northern District of California

that staff complaint reviewers "did not follow sound practices with respect to interviewing, collecting evidence, and writing reports" and "lack[ed] of independence"—"may also be found to some extent at other institutions" because the same staff misconduct complaint inquiry process "is in place statewide." Id. at 89-90.  The OIG specifically "urge[d] the department to reassign the responsibility of conducting staff complaint inquiries to employees who work outside of the prison's command structure[.]"  Id. at 89.

After this OIG report was published, CDCR implemented the Allegation Inquiry Management Section (AIMS) in certain prisons in January 2020, and statewide in April 2020.  Amy Miller Decl. ¶ 57, Docket No. 3006-1.  According to Defendants, AIMS "is able to provide reviews of staff complaints that are more independent than the reviews performed at the institutions themselves."  Id. ¶ 53.  "AIMS is responsible for completing allegation inquiries for most allegations against staff submitted through the grievance process which, if true, meet the definition of staff misconduct, but for which the reviewing authority does not have the reasonable belief the alleged misconduct occurred."  Id. ¶ 53.  In other words, "[w]hen the warden or chief deputy warden determines that the allegations, if true, would more likely than not result in adverse disciplinary action, but there is no reasonable belief that the misconduct occurred, the grievance will be directed to AIMS for an allegation inquiry."  Id. ¶ 55.  Once a grievance is sent to AIMS for an allegation inquiry, AIMS conducts interviews and reviews documents, and it then provides a report to the warden so that the warden can decide whether (1) no

United States District Court
Northern District of California

action should be taken against staff because there was no evidence to substantiate the allegations, or (2) the matter should be forwarded to the Office of Internal Affairs for formal investigation or for direct adverse action. Id. ¶ 56.

On February 16, 2021, the OIG issued a new report in which it analyzed whether the implementation of AIMS has solved the structural problems it identified in its January 2019 report as to the statewide system for investigating and disciplining staff misconduct.[22] OIG Report, Docket No. 3205. The OIG concluded that the "lack of independence" it found in its report of January 2019 "still persists" notwithstanding the implementation of AIMS. Id. at 1. The OIG found that wardens had mostly circumvented the AIMS process by "largely avoid[ing] referring staff misconduct grievances" to AIMS and by retaining such grievances at the prison for internal investigation. Id. at 1. The OIG concluded that the wardens were able to retain grievances for investigation within the prison instead of sending them to AIMS because, under the current statewide system, the determination of whether a grievance should be sent to AIMS is within the wardens'

---

[22] Defendants object to the Court's consideration of this report on the grounds that (1) Plaintiffs filed it after the December 8, 2020, hearing on the present motion, and (2) the report is inadmissible. See Docket No. 3207. The Court will consider the report because it is relevant to the Court's determination of the present motion, and because the Court provided Defendants with an opportunity to respond to the report. The Court overrules Defendants' admissibility objections on the ground that Defendants have not rebutted the presumption that the report is admissible as a public record under Federal Rule of Evidence 803(8), as they have not shown that the report is unreliable or untrustworthy.

United States District Court
Northern District of California

discretion, and the exercise of that discretion is not subject to any oversight.  Id.

The OIG also found that, out of the grievances that wardens did refer to AIMS, AIMS did not conduct investigations into various categories of grievances, including staff misconduct related to the ADA reasonable accommodations process and staff misconduct involving the reported use of excessive force that did not result in serious bodily injury.  Id. at 3.  For the grievances that AIMS did investigate, the OIG found that AIMS terminated the investigations before completing them as soon as an AIMS investigator formed a reasonable belief that any misconduct occurred; at that point, AIMS sent a report to the warden even though the investigators may not have gathered all relevant evidence.  Id. at 3-4.  The OIG found this to be problematic because, once a warden receives a report from AIMS, the warden has the discretion to decide, based on AIMS' incomplete investigation, that no action should be taken against staff because there was no evidence to substantiate the allegations.  Id.

The OIG expressed a "deep concern[] about the low rate at which wardens determined their staff violated policy (regardless of the entity that prepared the inquiry), which raises serious issues about the overall fairness of the process."  Id. at 2.  Specifically, "of the 1,293 allegations that wardens resolved between June 1, 2020, and August 31, 2020, wardens found that their staff violated policy in only 22 (1.7 percent)."  Id.

Finally, the OIG found that CDCR's mechanisms for tracking and collecting staff misconduct data are inadequate and preclude

31

1  any meaningful analysis or assessment of CDCR's effectiveness in

2  investigating staff misconduct grievances.  Id.  Notably, the

3  inadequacy of the tracking system has resulted in CDCR "severely

4  undercount[ing]" the number of allegations of staff misconduct,

5  "possibly by the thousands."  Id.

6      The Secretary for CDCR, Kathleen Allison, sent a letter to

7  the OIG responding to the OIG's new report.  See id. at 69-70.

8  In that letter, the Secretary states that the OIG's conclusions

9  as to the effect of AIMS are "premature" because AIMS was

10  implemented statewide in April 2020 and CDCR is still in the

11  process of implementing the new procedures and training staff.

12  Id. at 69-70.  The OIG responded to the Secretary's letter,

13  noting that the problems it identified in its February 2021

14  report "are structural and are not dependent on when [CDCR]

15  activated AIMS.  The primary reason we published this progress

16  report was to highlight structural problems in the department's

17  regulations and to point out that those problems will remain

18  until the department changes the regulations (and its process),

19  again."  Id. at 71.

20      Defendants do not dispute any of the OIG's findings with

21  respect to the structural flaws in the statewide system for

22  investigating and disciplining staff misconduct.  See Docket No.

23  3211.  Defendants state only that CDCR acknowledges the report

24  and is in the process of considering the report's recommendations

25  for the development of further policies.  Id. at 1-2.  Defendants

26  also note that, on March 1, 2021, the Secretary for CDCR

27  testified before the California Assembly's Budget Subcommittee

28  about "proactive measures CDCR is prepared to take" in light of

United States District Court
Northern District of California

the OIG's report, namely centralizing the complaint screening process outside the institutions; expanding the scope of AIMS to cover all allegations of excessive or unnecessary force when there is any injury; and requiring AIMS investigators to state a conclusion about whether a complete inquiry has been conducted and whether or not it has established a reasonable belief that misconduct occurred.  See Kathleen Allison Decl. ¶¶ 3-4, Docket No. 3212-1.  Defendants provide no indication of whether, and if so, when, any of these "proactive measures CDCR is prepared to take" will become CDCR policy.

The Court finds, based on the foregoing, that Defendants' system for investigating staff misconduct is deficient and ineffective, and that the results of any investigations conducted pursuant to that system cannot be relied upon to hold wardens and staff accountable for violations of the ARP and ADA.

Defendants' experts, Matthew Cate, Bernard Warner, and John Baldwin, admit that the investigations of at least some of the incidents described in the inmates' declarations were deficient. See, e.g., Cate Decl. ¶ 5, Docket No. 3160-6 (opining that "most" investigations were conducted "in a professional manner" and that the findings of the hiring authorities were "typically reasonable under the circumstances"); Baldwin Decl. ¶ 35, Docket No. 3083-4 (admitting that at least one of the incident reports he reviewed "should have been more thorough, which makes it difficult to determine what actually happened in that incident").

Defendants nevertheless argue, based on Cate's opinions, that the statewide system for investigating allegations of staff misconduct has worked properly with respect to the allegations of

United States District Court
Northern District of California

1   misconduct made by the inmate-declarants.  Cate opines that,

2   "[w]hile not perfect, the investigations generally produced a

3   result that, based on [his] expertise, was reasonable and

4   appropriate," Cate Decl. ¶¶ 75-78, 84, Docket No. 3160-7, and

5   that "a few poor investigations" cannot be used as a means to

6   conclude that the system is broken, id. ¶ 20.  Cate further

7   opines that AIMS will "improve the system" by allowing for

8   investigations of certain categories of allegations outside of

9   the prisons.  Id. ¶ 90.

10       Cate's opinions do not impact the Court's determinations,

11  because his opinions are inconsistent with the OIG's findings,

12  discussed in more detail above.  Cate does not square his

13  opinions with the OIG's findings from January 2019 that the

14  statewide system is prone to generating unreliable investigation

15  results because of the reviewers' lack of independence and poor

16  investigative skills.[23]  Further, Cate's opinion that AIMS will

17  improve the system also is contradicted by the OIG's findings of

18  February 2021 that AIMS has not, and will not, solve any of the

19  structural problems the OIG identified in its January 2019

20  report.

21       In light of the foregoing, the Court finds that Plaintiffs

22  have shown that Defendants have failed to implement an effective

23  system for investigating and disciplining violations of the ARP

24

25       [23] The OIG's report of February 2021 was published after Cate
26  wrote his declarations in connection with the present motion, but
    the OIG's January 2019 report was available on the OIG's website
27  at the time that Cate wrote his declarations.  Indeed, Cate
    states in his second declaration that he reviewed this report.
28  See Cate Decl., List of Documents Reviewed at 4, Docket No. 3160-
    60.

and ADA.  This constitutes a violation of the Court's prior
orders.

> B.   Defendants failed to log alleged violations of the ARP
>      and ADA

In 2012, the Court ordered Defendants to track and
investigate all allegations of violations of the ARP and ADA.
Order, Docket No. 2180.  In December 2014, the Court clarified
Defendants' obligations to track allegations of violations of the
ARP, the ADA, and the Court's prior orders and injunctions as
follows:

> Defendants, their agents and employees
> (Defendants) shall track any allegation that
> any employee of the Department of
> Corrections and Rehabilitation was
> responsible <u>for any member of the Plaintiff
> class not receiving access to services,
> programs, activities, accommodations or
> assistive devices required by any of the
> following: the Armstrong Remedial Plan, the
> Americans with Disabilities Act or this
> Court's prior orders</u>.  Allegations to be
> tracked include, but are not limited to,
> those received from CDCR staff, prisoners,
> Plaintiffs' counsel, administrative appeals
> and third parties.  All such allegations
> shall be tracked, even if the non-compliance
> was unintentional, unavoidable, done without
> malice, done by an unidentified actor or
> subsequently remedied.

Order Modifying 2007 Injunction at 1, Docket No. 2479 (emphasis
added).

In its order of September 8, 2020, the Court modified its
prior orders and injunctions to require Defendants to also track
allegations of violations of the ADA's anti-retaliation and anti-
interference provisions, on the ground that the Court's intent at
the outset of the remedial phase of this litigation was to
require Defendants to operate their facilities and programs in

United States District Court
Northern District of California

United States District Court
Northern District of California

accordance with the ADA and RA.  Order of September 8, 2020, at

34-35, Docket No. 3059.

Plaintiffs have shown, and Defendants do not dispute, that

Defendants failed to log many of the allegations of violations of

the ARP that Plaintiffs' counsel raised in their advocacy

letters, including (1) allegations that staff denied disabled

inmates reasonable accommodations for their disabilities[24]; and

(2) allegations that disabled inmates suffered physical abuse by

staff after requesting reasonable accommodations[25].  See Grunfeld

Reply Decl. ¶¶ 239-49, Docket No. 3108-1.  This constitutes a

violation of the Court's prior orders.

C.    Defendants do not timely initiate or complete
      investigations of alleged violations of the ARP and ADA

In 2012, the Court required Defendants to initiate an

investigation of any violation of the ARP, the ADA, or the orders

of this Court "within ten business days of receiving notice of

such allegation" and to complete any such investigation "as

promptly as possible."  Order at 17, 21, Docket No. 2180.

Plaintiffs have shown, and Defendants do not dispute, that

Defendants often fail to initiate, or delay in initiating,

investigations of alleged violations of the ARP and ADA.

---

[24] These allegations include that, during a body search, an
officer at COR kicked and then slammed to the ground an inmate
who requested an accommodation for his mobility disability during
the search.  Grunfeld Reply Decl., Ex. 33 ¶¶ 12-17, Docket No.
3108-1.

[25] These allegations include that an inmate with mobility
impairments who was undergoing chemotherapy was thrown out of his
wheelchair by an officer after he requested to be housed closer
to the medication window because he could not walk long
distances.  Freedman Decl., Ex. 53 ¶¶ 15-23, Docket No. 2947-5.

36

In January 2020, the OIG concluded that CDCR had been untimely in responding to, and in initiating investigations of, allegations of staff misconduct directed at disabled and other vulnerable inmates.  Grunfeld Decl., Ex. J at 1, Docket No. 2922-1.  The OIG reviewed CDCR's responses to advocacy letters sent by Plaintiffs' counsel to CDCR in 2019 and concluded that each described "serious" misconduct that, "if true, would result in disciplinary action for the subject employees."  Id.  The allegations included that an officer assaulted an elderly disabled inmate; that a disabled inmate requested, but was denied, an ADA shower and an officer threatened to have the inmate attacked if he filed a complaint; and that an inmate with a mobility disability requested, but was denied, a handcuffing accommodation and was then thrown to the ground by an officer.  Id. at 3-23.  The OIG found a "pervasive lack of timely follow through," including that CDCR "ignored" many allegations, failed to investigate dozens of allegations, and failed to refer pertinent information to the Office of Internal Affairs when appropriate.  Id. at 1.  This constitutes a violation of the Court's prior orders.

> D.   Defendants do not timely provide to Plaintiffs' counsel information about investigations of alleged violations of the ARP and ADA

In 2012, the Court ordered Defendants to provide Plaintiffs' counsel with access to the results of investigations of alleged violations of the ARP or the Court's orders, including all sources of information relied on to substantiate or refute the allegations.  Order at 18, Docket No. 2180.

Plaintiffs have shown, and Defendants do not dispute, that Defendants have failed to provide, or have delayed in providing, them with information regarding the status or results of investigations of alleged violations of the ARP.

For example, on September 25, 2020, Defendants agreed to provide in a spreadsheet information about investigations, findings of misconduct, and discipline imposed in connection with 168 alleged incidents of staff misconduct against disabled inmates at LAC, COR, KVSP, and CCI that were described in inmate declarations.  Grunfeld Decl. ¶ 4, Docket No. 3169-4.  On November 13, 2020, Defendants produced information with respect to only ninety-eight of the 198 allegations of misconduct and did not provide information as to seventy of the allegations.  Id. at 7.  Defendants did not provide a date by which they would produce the requested information for the seventy incidents.  See Ex. 1, 4 to Grunfeld Sur-Reply Decl., Docket No. 3169-4.  Notably, of the ninety-eight allegations for which Defendants provided information, Defendants' responses show that that they failed to investigate seven of the allegations (or seven percent).

As another example, Defendants agreed to provide information about investigations, findings of misconduct, and discipline imposed in connection with each distinct allegation of misconduct contained in Plaintiffs' tour reports from 2018 to 2020 for LAC, COR, KVSP, and CCI.  Id. ¶ 5.  Defendants did not provide any information for forty-four of the fifty-three allegations, or a date by which they would do so.  See Ex. 2 to Grunfeld Sur-Reply Decl., Docket No. 3169-4.

United States District Court
Northern District of California

1    These failures by Defendants violate the Court's prior

2  orders.

3         E.    Defendants' tracking systems do not enable them to
               identify staff who repeatedly violate the ARP or other
4               information critical to monitoring their compliance

5    In 2007, the Court required Defendants to "refer individuals

6  with repeated instances of non-compliance to the Office of

7  Internal Affairs for investigation and discipline, if

8  appropriate."  Order at 7, Docket No. 1045.  To facilitate this

9  process, the Court ordered Defendants in 2012 to track

10  allegations of violations of the ARP and the Court's orders,

11  including "the number of prior allegations of non-compliance

12  against the involved employees or employees."  Order at 16-17,

13  Docket No. 2180.

14    In its report of February 16, 2021, the OIG stated that,

15  "[d]espite having numerous information systems that contain data

16  related to the staff misconduct process, [CDCR] lacks the ability

17  to produce reports that are capable of identifying the names of

18  all staff accused of misconduct or the names of all staff who

19  were found to have violated policy as well as several other types

20  of critical information."  Docket No. 3205 at 1.

21    Defendants' tracking systems are, therefore, in violation of

22  the Court's prior orders.

23  IV.  Defendants' failure to comply with their accountability
        obligations is resulting in ongoing violations of disabled
24       inmates' rights under the ARP and ADA

25    As discussed in the preceding sections, Plaintiffs have

26  shown that Defendants have violated the ARP and ADA by failing to

27  provide reasonable accommodations to, or by interfering with the

28  ADA rights of, qualified inmates with disabilities at LAC, COR,

SATF, CIW, and KVSP.  Plaintiffs have also shown that Defendants have violated their accountability obligations by failing to track alleged violations of the ARP and ADA; failing to promptly and properly investigate alleged violations of the ARP and ADA; failing to provide Plaintiffs' counsel with information about the status and results of their investigations; and failing to implement an effective system for holding wardens and other staff accountable for non-compliance with the ARP and ADA.

Plaintiffs' expert, Eldon Vail, opines that CDCR's ineffective system for holding staff accountable for misconduct leads to and perpetuates a staff culture in which staff target inmates with disabilities for abuse, mistreatment, retaliation. See, e.g., Vail Decl. ¶ 9, Docket No. 3106-7.  Vail opines that, if inmates and staff know that nothing will happen to staff who abuse inmates, then incarcerated people become reluctant to report misconduct and staff become less likely to stop the pattern of abuse.  Id.

The Court finds Vail's opinions to be credible and consistent with other evidence in the record.  They are consistent with the OIG's finding that "an inadequately functioning staff complaint process that lacks independence fosters distrust among inmates[.]"  Grunfeld Decl., Ex. GG at 2, Docket No. 2922-1.  Further, as noted above, many declarants describe a staff culture at LAC, COR, SATF, CIW, and KVSP of staff targeting inmates with disabilities and other vulnerable inmates for mistreatment, abuse, retaliation, and other improper behavior that, among other things, violates the ARP and ADA. See, e.g., Grunfeld Reply Decl., Ex. 8 ¶¶ 34-35, Docket No. 3108-

1; Freedman Decl., Ex. 29 ¶ 36; Freedman Decl., Ex. 33 ¶ 29,

Docket No. 2947-5; Grunfeld Reply Decl., Ex. 70 ¶ 45, Docket No.

3109-1; Grunfeld Reply Decl., Ex. 43 ¶ 13, Docket No. 3108-1;

Grunfeld Decl., Ex. 41 ¶ 20, Docket No. 3108-1; Freedman Decl.,

Ex. 61 ¶¶ 33-36, Docket No. 2947-5; Freedman Decl., Ex. 35 ¶ 21,

Docket No. 2947-5.  The descriptions of the staff culture in

these declarations are remarkably consistent even though the

declarants reside at different prisons and in different locations

within each prison.  The Court finds that this lends credibility

to the declarations and to Vail's opinions.

The data produced by Defendants also support the notion that

a staff culture exists in which staff target disabled inmates for

abuse.  The data show that, despite the dozens of allegations of

abuse by inmates, only a relatively small number of the incidents

have resulted in discipline, and that out of the incidents that

have resulted in discipline, disabled inmates are

overrepresented.  For example, from 2017 to 2020, despite the

dozens of allegations of abuse at LAC, there were six staff

misconduct incidents at LAC involving incarcerated people that

resulted in discipline, and three of the six incidents (or fifty

percent) involved misconduct directed at an <u>Armstrong</u> or <u>Coleman</u>

class member.[26]  Grunfeld Decl. ¶ 14, Docket No. 3169-4.  At COR,

---

[26] These figures are based on data that Defendants produced
to Plaintiffs in their interrogatory responses.  The criteria
that Plaintiffs used to calculate these figures is described in
detail in the declaration of Gay Grunfeld.  Defendants object to
the Court's consideration of the figures on the grounds that the
criteria used to generate the figures is "nebulous" and that
Plaintiffs' counsel lack expertise in data analysis.  The Court
overrules this objection because Defendants do not dispute that
the underlying data came from their interrogatory responses.

United States District Court
Northern District of California

1    from 2017 to 2020, there were eighteen staff misconduct incidents

2    involving incarcerated people that resulted in discipline, and

3    all of them (one hundred percent) involved misconduct directed at

4    an Armstrong or Coleman class member.  Id. ¶ 15.  At KVSP, from

5    2017 to 2020, there were twenty-four staff misconduct incidents

6    involving incarcerated people that resulted in discipline, and

7    sixteen of them (or sixty-six percent) involved misconduct

8    directed at an Armstrong or Coleman class member.  Id. ¶ 17.

9        Defendants' experts, Cate, Baldwin, and Warner, opine that

10   "disabled inmates" are not being targeted by prison staff for

11   conduct that is violative of the ARP and ADA because of their

12   disabilities.  Cate Decl. ¶ 11, Docket No. 3083-5.  The Court is

13   not persuaded by these experts' opinions on this issue for the

14   following reasons.  First, the experts' definition of "disabled

15   inmate" is under-inclusive, as it excludes inmates such as

16   Coleman class members who have been designated as EOP by virtue

17   of the severity of their mental impairments.  As a result of this

18   definitional limitation, these experts appear to have excluded

19   from their analysis the experiences of inmates who suffer from

20   mental impairments that are covered under the ARP.  Second, the

21   experts do not explain how their opinions can be reconciled with

22   the data discussed in more detail above, which shows that

23

24

_____

25   Further, the calculations from which the figures were derived do
     not require any expertise; the calculations involve parsing data
26   from Defendants' interrogatory responses and performing basic
     arithmetic, as described in detail in the Grunfeld Declaration.
27   Finally, Defendants have not shown that the figures in question
     are inaccurate or are inconsistent with the data contained in
28   their interrogatory responses.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  disabled inmates are overrepresented in incidents of staff

2  misconduct that resulted in discipline.

3  V.    Additional remedial measures are necessary to end the
          ongoing violations of the ARP and ADA

4

5      For the reasons discussed in the preceding section, the

6  policies, procedures, and monitoring mechanisms currently in

7  place, despite recent modifications made by Defendants (including

8  the implementation of AIMS), have proven to be ineffective at

9  bringing Defendants into compliance with the ARP and ADA.

10  Accordingly, the Court finds that the implementation of

11  additional remedial measures at LAC, COR, SATF, CIW, and KVSP is

12  necessary to improve the effectiveness of the system for

13  investigating and disciplining violations of the ARP and ADA and

14  to end the ongoing violations of the ARP and ADA.

15      Defendants contend that further remedial measures are

16  premature at this juncture because investigations of some

17  disabled inmates' allegations have not yet been completed.  The

18  Court is not convinced that the pendency of the investigations

19  warrants a delay in implementing additional remedial measures.

20  Defendants have provided no timeline for when the Court could

21  expect the investigations to be completed; based on the record,

22  it seems reasonable to expect that investigations could take many

23  months, if not years.  As discussed above, the OIG, in reviewing

24  CDCR's response to disabled inmates' allegations of staff

25  misconduct, noted that CDCR's investigations of such allegations

26  had been inordinately delayed or abandoned.  The Court is

27  reluctant to allow further violations of disabled inmates' rights

28

United States District Court
Northern District of California

1  under the ARP and ADA to occur while the investigations are

2  pending.

3      Defendants' expert, Matthew Cate, opines that no additional

4  remedial measures are necessary because "disabled inmates can

5  request accommodations in a variety of ways" and "[e]ven if class

6  members were afraid to request accommodations from officers due

7  to officer wrongdoing, they still have all of the other ways

8  . . . to request accommodations that do not involve the

9  officers."  Cate Decl. ¶ 94, Docket No. 3083-5.  The Court is not

10 persuaded by this argument, because it misses the point.

11 Plaintiffs have shown that the ongoing violations of the ARP and

12 ADA are the consequence of the ineffectiveness of the system for

13 investigating and disciplining violations of the ARP and ADA and

14 the resulting staff culture of targeting inmates with

15 disabilities.  Defendants have presented no evidence to show that

16 the ongoing violations are the result of a lack of access to

17 methods for requesting accommodations.  Accordingly, the Court

18 cannot conclude that providing additional methods to disabled

19 inmates for requesting accommodations, as Defendants propose,

20 would end the ongoing violations of the ARP and ADA.

21     Plaintiffs request that the Court require Defendants to

22 develop a plan within thirty days to implement the additional

23 remedial measures described in more detail below.  The plan would

24 be implemented within forty-five days after the parties meet and

25 confer.  See Proposed Order at 17-21, Docket No. 2948-6.

26     The Court finds that requiring Defendants to design, and

27 ultimately implement, a plan that requires them to adopt a

28 combination of certain of the remedial measures that Plaintiffs

United States District Court
Northern District of California

1   propose, with modifications, as discussed below, is necessary to

2   prevent further violations of the ARP and disabled inmates' ADA

3   rights.  These additional remedial measures are intended and

4   tailored to improve policies and procedures for supervising

5   staff's interactions with inmates, investigating staff

6   misconduct, and disciplining staff by enhancing the process for

7   gathering and reviewing evidence that can be used to hold staff

8   accountable for any violations of the ARP and disabled inmates'

9   ADA rights.  These additional measures, when considered as a

10  whole, constitute an incremental expansion of processes and

11  systems that are already in place pursuant to the Court's prior

12  orders and injunctions.

13          1.   Surveillance cameras

14      Plaintiffs request that (1) Defendants install surveillance

15  cameras in all areas at the prisons at issue to which

16  incarcerated people have access, including, but not limited to,

17  all exercise yards, housing units, sally-ports, dining halls,

18  program areas, and gyms, within ninety days; (2) CDCR adopt

19  policies and procedures regarding the use of camera footage,

20  including requirements that all footage be retained for a minimum

21  of ninety days, that footage of use of force and other triggering

22  events be retained indefinitely, and that footage, when

23  available, be reviewed and considered as part of the

24  investigation of the incident; and (3) CDCR train staff regarding

25  how and when to request that footage be retained and reviewed.

26      Both sides and their experts agree that the installation of

27  additional surveillance cameras would help reduce misconduct and

28  would facilitate the investigation of any misconduct that does

45

1   occur.  See, e.g., Cate Decl. ¶ 97, Docket No. 3083-5.

2   ("[I]nstalling cameras would be beneficial to every institution

3   in the CDCR system.  It would serve to deter misconduct on the

4   part of inmates and officers alike.  It would also make it easier

5   to investigate misconduct should it occur.").

6       Defendants nevertheless oppose Plaintiffs' request to require

7   them to install surveillance cameras based on the following

8   grounds: (1) certain facilities already have camera coverage, and

9   Defendants are moving forward to procure and deploy cameras at

10  RJD and at two facilities in LAC; (2) the installation of cameras

11  is not necessary to correct the violations of the ARP and ADA

12  shown; and (3) even if additional fixed cameras were necessary,

13  they should not be installed anywhere other than yards that house

14  the most vulnerable inmates.

15      The Court is not persuaded.  Defendants' arguments fail to

16  acknowledge that violations of disabled inmates' rights under the

17  ARP and ADA are likely to continue to take place throughout LAC,

18  COR, SATF, CIW, and KVSP in the absence of surveillance cameras,

19  and that this is unacceptable.  In light of Defendants' failure

20  to comply with the ADA and ARP after the Court ordered them to

21  implement lesser measures, the Court finds that the installation

22  of surveillance cameras at LAC, COR, SATF, CIW, and KVSP is

23  necessary and that it must be done as soon as possible.  Further,

24  Defendants already have a contract in place with a vendor for the

25  installation of surveillance cameras at CDCR institutions through

26  June 2023.  Diaz Decl. ¶ 42; Macomber Decl. ¶ 12.  This existing

27  contract should facilitate the installation and deployment

28  process.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Defendants have not raised an objection in their briefs to

2    Plaintiffs' request that their plan include policies and

3    procedures regarding the use of camera footage and training for

4    staff regarding the same, as discussed in more detail above.  In

5    the absence of a showing to the contrary, the Court finds that

6    policies, procedures, and training on the use of camera footage

7    are necessary and should be a part of Defendants' plan.

8            2.   Body cameras

9    Plaintiffs request that CDCR purchase and begin using body-

10   worn cameras for all correctional officers at the prisons at

11   issue within sixty days.

12   Defendants oppose the request on the ground that their

13   expert, Matthew Cate, opines that (1) body cameras are not

14   necessary to redress the ARP and ADA violations shown; (2) they

15   are expensive; and (3) fixed cameras are superior to body

16   cameras.  Br. at 18-19, Docket No. 3082-0; Cate Decl. ¶ 99,

17   Docket No. 3083-5.

18   The Court finds that body cameras are likely to improve

19   investigations of misconduct by staff and to reduce the incidence

20   of violations of disabled inmates' rights under the ARP and ADA.

21   They are, therefore, necessary and should be deployed at LAC,

22   COR, SATF, CIW, and KVSP as soon as possible.  The Court finds

23   the opinions of Plaintiffs' expert, which Defendants have not

24   meaningfully rebutted, to be persuasive.  Eldon Vail opines,

25   based on research and studies on the topic, that the use of body

26   cameras in correctional facilities has resulted in "increased

27   officer and inmate safety, fewer uses of force," and improved

28   investigations of internal misconduct by officers, particularly

47

United States District Court
Northern District of California

1    when used in conjunction with surveillance cameras.  Vail Decl.

2    ¶¶ 64-66, Docket No. 3023-9.  He further opines that issues about

3    when cameras should be turned on or off, and privacy concerns,

4    can be addressed through policymaking and training.  Id. ¶¶ 67-

5    68.

6         Defendants' expert, Matthew Cate, does not provide any basis

7    for his opinion that the cost of body cameras would be

8    "prohibitive."  Cate Decl. ¶ 99.  Accordingly, the Court gives

9    this opinion no weight.  Defendants also have not shown that

10   procuring the body-worn cameras in the time frame that Plaintiffs

11   have proposed would not be feasible.

12        In light of the foregoing, the Court finds that it would be

13   appropriate to require Defendants to procure and deploy body-worn

14   cameras at LAC, COR, SATF, CIW, and KVSP in the time frame that

15   Plaintiffs have proposed.

16            3.    Processes for complaints, investigations,
                   discipline, and oversight
17

18        Plaintiffs request that Defendants be required to develop a

19   plan to reform the staff misconduct complaint, investigation, and

20   discipline process to ensure (1) that CDCR completes unbiased,

21   comprehensive investigations into all allegations of staff

22   misconduct in which the victim was a disabled inmate; (2) that

23   CDCR imposes appropriate and consistent discipline against

24   employees who engage in misconduct against disabled inmates; and

25   (3) that employees who engage in criminal misconduct against

26   disabled inmates are appropriately investigated and, if

27   warranted, referred for prosecution or reassigned.  Plaintiffs

28   also request that CDCR headquarters be required to exercise

United States District Court
Northern District of California

1  oversight over all staff misconduct complaints, use of force

2  reviews, and related staff disciplinary proceedings at the

3  prisons at issue in which an employee is accused of engaging in

4  misconduct against an incarcerated person, and to conduct

5  quarterly interviews of randomly-selected incarcerated people at

6  the prisons at issue using the methodology and interview

7  questionnaire utilized by the December 2018 investigators who

8  interviewed inmates at RJD for the Bishop Report.

9      Defendants oppose these requests, arguing that CDCR already

10 has existing processes, policies, and oversight systems in place

11 to investigate misconduct and discipline employees who commit it,

12 which they contend, based on the opinions of their expert,

13 Matthew Cate, are effective mechanisms.  Cate Decl. ¶¶ 79-96, 98.

14     As discussed above, the Court gives little weight to Cate's

15 opinions that the current systems for investigating and

16 disciplining violations of the ARP and ADA are effective, because

17 such opinions do not take into account the OIG's findings that

18 the statewide system (with AIMS included) is prone to generating

19 unreliable investigation results with respect to staff misconduct

20 allegations because of the reviewers' lack of independence and

21 the poor quality of the investigations.

22     The Court has found that it is necessary to stop ongoing

23 violations of the ARP and disabled inmates' ADA rights at LAC,

24 COR, SATF, CIW, and KVSP, and that the current policies and

25 procedures are incapable of achieving that.  Accordingly, the

26 Court finds that requiring Defendants to craft a plan to modify

27 the current policies, procedures, and oversight of staff

28

1    complaints to achieve compliance with the ARP and ADA at LAC,

2    COR, SATF, CIW, and KVSP is necessary and appropriate.

3            4.    Third-party monitoring

4        Plaintiffs request that the additional remedial measures

5    include the appointment of an expert pursuant to Federal Rule of

6    Evidence 706 to monitor Defendants' implementation of their plan

7    to reform the staff misconduct complaint, investigation, and

8    discipline policies and procedures, and that the expert have

9    access to documents necessary to conduct its monitoring.

10       Defendants oppose this request because their expert, Matthew

11   Cate, opines that the OIG already has oversight of staff

12   misconduct investigations and that the modification of the

13   current system is unnecessary and would be burdensome.  Cate

14   Decl. ¶¶ 104-05.

15       The Court is not persuaded by Cate's opinions.  As discussed

16   above, the current system, although subject to OIG oversight, has

17   been ineffective in ending the ongoing violations of the ARP and

18   ADA at LAC, COR, SATF, CIW, and KVSP, and for that reason,

19   modifying it with the goal of improving its effectiveness is

20   necessary.  Accordingly, the Court finds that the appointment of

21   an expert is necessary and appropriate.

22            5.    Information-sharing with Plaintiffs' counsel and
                   the Court Expert
23

24       Plaintiffs request that Defendants share with Plaintiffs'

25   counsel and the Court's expert all documents related to staff

26   misconduct complaints at the prisons at issue in which the

27   alleged victim is a disabled inmate, as well as monthly written

28

United States District Court
Northern District of California

updates regarding the implementation of any additional remedial measures.

Defendants have not raised an objection in their briefs to this request.  In the absence of a showing to the contrary, the Court finds that requiring the sharing of documents as described above is necessary for the effective monitoring of Defendants' implementation of the additional remedial measures at LAC, COR, SATF, CIW, and KVSP and is appropriate.

### 6.   Supervisory staffing

Plaintiffs request that CDCR significantly increase supervisory staff on all watches on all yards at the prisons at issue and create non-uniformed supervisory positions in each housing unit.

Defendants oppose this request on the grounds that (1) it is unnecessary, as some housing units do not house disabled inmates, and (2) existing staff could provide additional supervision in areas where disabled inmates are housed.

The current level of staffing has not been effective at stopping the ongoing violations of the ARP and ADA at LAC, COR, SATF, CIW, and KVSP.  Accordingly, the Court finds that requiring CDCR to increase managerial presence at LAC, COR, SATF, CIW, and KVSP in the form of additional sergeants is necessary.

The Court declines at this time to require CDCR to create non-uniformed supervisory positions at LAC, COR, SATF, CIW, and KVSP.  The parties' experts disagree about the effectiveness of such non-uniformed positions, and the Court finds that there is insufficient evidence in the record outside of the experts'

United States District Court
Northern District of California

1  conflicting declarations to make a determination as to whether

2  non-uniformed supervisory positions are needed.

3          7.   Training

4      Plaintiffs request that CDCR develop and implement human

5  rights, de-escalation, and cultural training for all custody,

6  mental health, and medical staff at the prisons at issue to

7  include discussion of reporting requirements, whistleblowing,

8  non-retaliation, and treatment of incarcerated people as

9  patients.

10     Defendants object to requiring them to provide staff with

11  additional training beyond what they already provide on the

12  ground that doing so would be unnecessary and intrusive.

13     In light of the evidence discussed above showing that the

14  measures that CDCR has implemented to date, including the

15  training that CDCR current provides to its staff, have proven to

16  be ineffective at stopping violations of the ARP and disabled

17  inmates' ADA rights, the Court finds that it is necessary to

18  require Defendants to develop additional training programs for

19  staff and supervisors at LAC, COR, SATF, CIW, and KVSP that are

20  tailored to achieving staff compliance with the ARP and ADA.

21          8.   Data collection and early-warning system

22     Plaintiffs request that CDCR develop an electronic system

23  for tracking all incidents at the prisons at issue by date, time,

24  location, staff involved, and incarcerated people involved, that

25  includes information about whether inmates are disabled, any

26  injuries they suffered, and related medical records.

27     Defendants oppose this request, on the grounds that their

28  current systems are capable of serving as an early-warning

United States District Court
Northern District of California

system.  During the hearing on December 8, 2020, the Court asked Defendants to identify and describe the current processes that could be used as an early-warning system, and Defendants failed to do so.  Tr. at 35-36, Docket No. 3184.  Further, as discussed above, the OIG has found, and Defendants do not dispute, that Defendants' tracking systems are deficient and incapable of generating reports that could help Defendants identify critical information necessary to track past staff misconduct incidents and prevent future ones.  See OIG Report at 1, Docket No. 3205.

Accordingly, the Court finds that requiring Defendants to develop the electronic tracking system that Plaintiffs propose is necessary.

9.   Pepper spray

Plaintiffs request a policy requiring that all pepper spray canisters at the prisons at issue be weighed before and after use.

Defendants oppose this request because their expert opines that it would be unnecessarily burdensome and would not help Defendants determine whether pepper spray was overused, as cannisters are not reused and the amount of pepper spray required varies depending on the weather and the distance from the target.  See Cate Decl. ¶¶ 31-32.

The Court is persuaded by Defendants' argument that the weighing of pepper spray cans would not be conducive to reducing its overuse.  However, in light of the evidence discussed above, which shows that pepper spray was used against disabled inmates where there was no evidence that the inmates posed an imminent threat to staff or other inmates, or that the use of pepper spray

1    served a legitimate penological interest, the Court finds that it

2    is necessary to require CDCR to craft a plan to modify its

3    policies to more effectively monitor and control the use of

4    pepper spray by staff with respect to disabled inmates at LAC,

5    COR, SATF, CIW, and KVSP.

6         10.  Anti-retaliation

7         Plaintiffs request that CDCR be required to put an end to

8    retaliation against disabled inmates at the prisons at issue who

9    report staff misconduct and to ensure complainants' safety.

10        Defendants did not object to this request in their briefs.

11        The Court finds that requiring CDCR to take steps to stop

12   retaliation in violation of the ADA at LAC, COR, SATF, CIW, and

13   KVSP is necessary.

14                           LEGAL STANDARD

15        "It is well established that the district court has the

16   inherent authority to enforce compliance with a consent decree

17   that it has entered in an order, to hold parties in contempt for

18   violating the terms therein, and to modify a decree."  Nehmer v.

19   U.S. Dep't of Veterans Affairs, 494 F.3d 846, 860 (9th Cir.

20   2007); Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 441 (2004)

21   ("Federal courts are not reduced to approving consent decrees and

22   hoping for compliance.  Once entered, a consent decree may be

23   enforced.").  Further, a district court has "wide discretion" to

24   modify its own injunctions "if the circumstances, whether of law

25   or fact, obtaining at the time of its issuance have changed, or

26   new ones have since arisen."  Sys. Fed'n No. 91, Ry. Emp. Dep't,

27   AFL-CIO v. Wright, 364 U.S. 642, 647 (1961); see also United

28   States v. Swift & Co., 286 U.S. 206, 114 (1932) ("A continuing

United States District Court
Northern District of California

decree of injunction directed to events to come is subject always to adaptation as events may shape the need").

The interpretation of a consent decree is for the court, and not the parties subject to the decree. Nehmer, 494 F.3d at 860 ("Although a party may ask the district court to issue an order clarifying, enforcing, or modifying a decree and suggest a favored interpretation, a party—whether a private or public entity—cannot dictate the meaning of the decree to the court or relieve itself of its obligations under the decree without the district court's approval."). The court's discretion in interpreting a consent decree is particularly wide where the court has been overseeing a remedial decree for many years. Id.; Armstrong v. Schwarzenegger, 622 F.3d at 1073 (holding that a court that has been "overseeing complex institutional reform litigation for a long period of time" is entitled to "heightened deference").

Any prospective injunctive relief granted or approved by the Court affecting prison conditions must comply with the Prison Litigation Reform Act (PLRA). 18 U.S.C. § 3626(a)(1)(A) (providing that courts "shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right").

United States District Court
Northern District of California

1    CONCLUSIONS OF LAW

2    I.   Plaintiffs have shown that Defendants violated the ARP, the
3         ADA, and the Court's prior orders and injunctions

4         A.   Coleman class members designated as EOP are qualified
               inmates with a disability under the ARP and ADA

5         Section I of the ARP requires Defendants to comply with the

6    ADA's anti-discrimination and access provisions, 42 U.S.C. §

7    12132[27], with respect to any "qualified inmate or parolee with a

8    disability as defined in Title 42 of the United States Code,

9    Section 12102[.]"  As discussed above, Section II.A of the ARP

10   defines a "qualified inmate or parolee" as "one with a permanent

11   physical or mental impairment which substantially limits the

12   inmate/parolee's ability to perform a major life activity," ARP

13   at 1, Docket No. 681, and Section II.B. of the ARP defines a

14   "permanent disability or impairment" as one that is not expected

15   to improve within six months, id. at 2.  The ARP does not define

16   or limit the conditions that may constitute a covered "mental

17   impairment."  Accordingly, the Court interprets the term "mental

18   impairment" based on the ADA's provisions, which are incorporated

19   by reference into the ARP.

20        Under the ADA, a disability is a "physical or mental

21   impairment that substantially limits one or more major life

22   activities of such individual[.]"  42 U.S.C § 12012(1)(A).  The

23   ADA provides that the term disability "shall be construed in

24

25   _____

26        [27] The language in Section 1 of the ARP mirrors the language
     of Title II of the ADA, 42 U.S.C. § 12132, which provides, "No
27   qualified individual with a disability shall, by reason of such
     disability, be excluded from participation in or be denied the
28   benefits of the services, programs, or activities of a public
     entity, or be subjected to discrimination by any such entity."

United States District Court
Northern District of California

1  favor of broad coverage of individuals[.]"  42 U.S.C §

2  12012(4)(A).

3      The mental disorders from which EOP Coleman class members

4  suffer include depression, anxiety and panic attacks, bipolar

5  disorder, and post-traumatic stress disorder.  As discussed in

6  more detail in the Findings of Fact, above, these disorders cause

7  EOP Coleman class members to suffer from acute symptoms that

8  prevent them from functioning in the general prison population

9  and to require special extensive mental-health treatment.  See

10  CDCR Mental Health Services Delivery System Program Guide, 2018

11  Revision, at 7-8, Docket No. 5864-1, Coleman v. Newsom, Case No.

12  90-cv-00520 (E.D. Cal.); see also Order at 5, Docket No. 5131,

13  Coleman v. Newsom, Case No. 90-cv-00520 (E.D. Cal.) (noting that

14  Coleman class members designated as EOP suffer from serious

15  mental disorders that render them "unable to function in the

16  general prison population").  As such, the mental disorders from

17  which EOP Coleman class members suffer substantially limit one or

18  more of their major life activities and, therefore, fall within

19  the scope of "disability" under the ADA.  See, e.g., Snead v.

20  Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1088 (9th Cir. 2001)

21  (noting that "stress and depression can be considered mental

22  impairments" under the ADA); Mustafa v. Clark County Sch. Dist.,

23  157 F.3d 1169, 1174-75 (9th Cir. 1998) (per curiam) (holding that

24  plaintiff could be substantially limited in a major life activity

25  because he suffered from depression, post-traumatic stress

26  disorder, and panic attacks); Mattice v. Mem'l Hosp. of S. Bend,

27  Inc., 249 F.3d 682, 684 (7th Cir. 2001) (holding that plaintiff

28  stated a claim under the ADA based on allegations that major life

57

United States District Court
Northern District of California

activities were significantly impaired by "the existence of and care and treatment for panic disorder, severe depression and suicidal ideation"). That some <u>Coleman</u> class members designated as EOP suffer from symptoms that are episodic does not preclude a finding that they suffer from a disability within the meaning of the ADA. <u>See</u> 42 U.S.C § 12012(4)(D) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.").

Accordingly, <u>Coleman</u> class members who are designated as EOP are qualified inmates with disabilities under the ARP and ADA.

> B. Staff denied qualified inmates with disabilities reasonable accommodations

As discussed above, the Court retained jurisdiction to enforce Defendants' compliance with the ARP. Remedial Order and Injunction at 5, Docket No. 158. Section I of the ARP requires Defendants to comply with the ADA's anti-discrimination and access provisions, 42 U.S.C. § 12132.

To prove that a public program or service violated § 12132, a plaintiff must show: (1) that he or she is a "qualified individual with a disability"; (2) that he or she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the disability. <u>Duvall v. Cty. of Kitsap</u>, 260 F.3d 1124, 1135 (9th Cir. 2001), <u>as amended on denial of reh'g</u> (Oct. 11, 2001).

The Ninth Circuit has held that the second element of this test can be satisfied where a law enforcement officer could have

58

used less force or no force during the performance of his law-enforcement duties with respect to a disabled person.  See Sheehan v. City & Cty. of San Francisco, 743 F.3d 1211, 1232-33 (9th Cir. 2014), rev'd on other grounds sub nom., City & Cty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015) (holding that a failure to reasonably accommodate a person's disability in the course of an investigation or arrest by using unnecessary force, causing the person to suffer "greater injury or indignity in that process than other arrestees," gives rise to a claim under § 12132, and that a reasonable jury could conclude that a police officer's failure to use less force or no force during an arrest of a person with mental illness could constitute a failure to provide a reasonable accommodation in violation of § 12132); Vos v. City of Newport Beach, 892 F.3d 1024, 1037 (9th Cir. 2018), cert. denied sub nom. City of Newport Beach, Cal. v. Vos, 139 S. Ct. 2613 (2019) (same).  When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person.[28]

_____

[28] The OIG's interpretation of CDCR's use-of-force policy is consistent with the notion that correctional officers have an obligation under the ADA to reasonably accommodate an inmate's disabilities when considering the use of force in the performance of their penological duties.  See OIG Report, Monitoring the Use-of-Force Review Process of the California Department of Corrections and Rehabilitation (July 13, 2020) at 5, Grunfeld Decl., Ex. VV ("According to departmental policy, when determining the best course of action to resolve a particular situation, staff must evaluate the totality of the circumstances, including an inmate's demeanor, mental health status and medical concerns (if known), and the inmate's ability to understand and

Defendants did not distinguish these authorities in their briefs, nor did they dispute that the second element of a § 12132 claim can be satisfied in the manner just described.

Here, the first element is met with respect to members of the Armstrong class and members of the Coleman class who are designated as EOP, as these inmates are qualified individuals with a disability within the meaning of the ARP and ADA by virtue of having a physical or mental impairment that substantially limits their ability to perform a major life activity and that is not expected to improve within six months.  At issue is whether Plaintiffs have shown, as required by the second and third elements of a claim under § 12132, that staff denied disabled inmates the benefits of their prison's services, programs, or activities, or otherwise discriminated against them, by reason of their disabilities.

As discussed in more detail in the Findings of Fact, the Court has found that staff failed on numerous occasions to reasonably accommodate the disabilities of disabled inmates.  For example, staff refused disabled inmates' requests for alternative methods for communication (in the case of deaf inmates); for ADA showers (for inmates with incontinence problems); for accommodations in light of manifestations or symptoms of a severe mental disorder (for Coleman class members designated as EOP); and for adequate transportation methods (for mobility-impaired

comply with orders.  Policy further states that staff should attempt to verbally persuade, whenever possible, to mitigate the need for force.").

1   inmates).  Accordingly, the second element is met as to these

2   incidents.

3        The Court also has found that staff failed to provide

4   reasonable accommodations for disabled inmates' disabilities when

5   staff failed to use less force or no force when performing their

6   penological duties, such as throwing disabled inmates out of

7   wheelchairs, punching them, kicking them, or using pepper spray

8   where the undisputed evidence shows that the disabled inmates

9   posed no threat to staff that would warrant the use of such

10  force.  The second element also is met as to these incidents.

11       As to the third element, whether these failures to provide

12  reasonable accommodations were due to the disabled inmates'

13  disabilities, the Court found that this element is met based on

14  the totality of the evidence.  Inmates state in their

15  declarations that they believe, based on their own experiences

16  and observations, that staff target inmates with disabilities and

17  other vulnerable inmates for mistreatment.  These beliefs are

18  consistent with the other evidence discussed in more detail

19  above, including the opinions of Plaintiffs' experts.  Defendants

20  have not proffered any evidence from which the Court could infer

21  an alternative cause for the incidents in question, such as a

22  legitimate penological interest or the lack of a reasonable

23  accommodation that staff could have provided to disabled inmates.

24       Accordingly, the Court finds that Defendants have violated

25  Section I of the ARP and the Court's prior orders by violating

26  § 12132.

27

28

United States District Court
Northern District of California

C.   Staff interfered with the ADA rights of qualified
     inmates with disabilities

Plaintiffs contend that staff have interfered with disabled inmates' exercise of their rights under the ARP and ADA in violation of the ADA's anti-interference provision, 42 U.S.C. § 12203(b), which provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

Section 12203(b) was not expressly incorporated into the ARP.  Nevertheless, the Court concludes that Defendants are required to comply with § 12203(b), which is a part of the ADA. The stipulated order that the Court entered at the outset of the remedial phase of this litigation makes clear that "the intent" of the parties was "to require defendants to operate programs, activities, services and facilities of the California Department of Corrections in accordance with the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973[.]"  Stipulation and Order ¶ 12, Docket No. 148.  The purpose of the ARP was to set forth specific actions that Defendants would take to bring their programs, activities, services, and facilities into compliance with the ADA and the RA.  One such action was to set up a system to facilitate disabled inmates' requests for reasonable accommodations and ADA-related grievances.  When staff frustrate the effectiveness of that system by threatening, coercing, or intimidating disabled inmates into foregoing their rights to request reasonable accommodations or file ADA-related

United States District Court
Northern District of California

1  grievances, that constitutes a violation of the ARP and the

2  Court's prior orders and injunctions regarding the same.

3      The Ninth Circuit has not specifically described the

4  elements required to establish a violation of § 12203(b), nor has

5  it defined what "intimidation" or "coercion" mean in the context

6  of § 12203(b).  The Court finds <u>Brown v. City of Tucson</u> to be

7  instructive.  336 F.3d 1181, 1191-93 (9th Cir. 2003).  There, the

8  Ninth Circuit held that the plaintiff had stated a claim for a

9  violation of § 12203(b) by alleging facts showing that (1) her

10 employer threatened her with an adverse action; (2) the threat

11 had a nexus to her exercise or enjoyment of an ADA right; and (3)

12 she suffered "distinct and palpable" injury as a result of the

13 threat.  <u>Id.</u>  The Ninth Circuit held that the requisite injury

14 "could consist of either the giving up of her ADA rights, or some

15 other injury which resulted from her refusal to give up her

16 rights, or from the threat itself."  <u>Id.</u>

17     As discussed in more detail in the Findings of Fact, the

18 Court has found that staff members have interfered with certain

19 disabled inmates' enjoyment of their rights under the ADA and ARP

20 in violation of § 12203(b) by intimidating, threatening, or

21 coercing them into abstaining from making requests for reasonable

22 accommodations or filing ADA grievances.  As a result of the

23 intimidation, threats, and coercion, these disabled inmates

24 suffered injury in the form of giving up their rights to make

25 requests for reasonable accommodations or to file ADA grievances,

26 or in the form of severe emotional distress.  <u>See</u> <u>Brown</u>, 336 F.3d

27 at 1193 (holding that the plaintiff alleged an injury within the

28 meaning of § 12203(b) by alleging that she "suffered short-term

United States District Court
Northern District of California

1   memory problems and felt extremely stressed, harassed, and

2   pressured" by her employer's threats).

3        These violations of § 12203(b) constitute violations of the

4   ARP and the Court's prior orders and injunctions regarding the

5   same.

6        D.   Defendants failed to comply with their Court-ordered
             accountability obligations

7

8        As discussed above, Plaintiffs have also shown that

9   Defendants have violated their Court-ordered accountability

10  obligations by failing to track alleged violations of the ARP and

11  ADA; failing to promptly and properly investigate alleged

12  violations of the ARP and ADA; failing to provide Plaintiffs'

13  counsel with information about the status and results of their

14  investigations; and failing to implement an effective system for

15  holding wardens and other staff accountable for non-compliance

16  with the ARP and ADA.  Plaintiffs also have shown that

17  Defendants' failure to comply with their accountability

18  obligations has led to the violations of disabled inmates' rights

19  under the ARP and ADA by perpetuating a staff culture that

20  condones staff abuse against disabled inmates.

21  II.  The implementation of additional remedial measures at LAC,
         COR, SATF, CIW, and KVSP is necessary to ensure Defendants'
22       compliance with the ARP and ADA

23       The Court retained jurisdiction to enforce the terms of the

24  Remedial Order and Injunction, as well as to issue "any order

25  permitted by law, including contempt, necessary to ensure that

26  defendants comply with the guidelines, policies, procedures,

27  plans and evaluations" required by the Remedial Order and

28  Injunction.  Remedial Order and Injunction at 5, Docket No. 158.

United States District Court
Northern District of California

1  The Court has found that the additional remedial measures

2  discussed above are necessary to ensure that Defendants comply

3  with their obligation under the ARP and ADA to provide reasonable

4  accommodations for qualified inmates with disabilities and to

5  otherwise refrain from discriminating against qualified inmates

6  with disabilities by reason of their disabilities.  They also are

7  necessary to effectuate the parties' and the Court's intent "to

8  require defendants to operate programs, activities, services and

9  facilities of the California Department of Corrections in

10 accordance with the Americans with Disabilities Act and § 504 of

11 the Rehabilitation Act of 1973[.]"  Stipulation and Order ¶ 12,

12 Docket No. 148.  Accordingly, the Court will modify its prior

13 orders and injunctions to require Defendants to develop a plan to

14 implement the additional remedial measures that the Court has

15 found to be necessary to bring Defendants into compliance with

16 the ARP and ADA.

17 III.  The additional remedial measures ordered herein are
              consistent with the PLRA

18

19      As noted, the PLRA provides that courts "shall not grant or

20 approve any prospective relief [with respect to prison

21 conditions] unless the court finds that such relief is narrowly

22 drawn, extends no further than necessary to correct the violation

23 of the Federal right, and is the least intrusive means necessary

24 to correct the violation of the Federal right."  18 U.S.C. §

25 3626(a)(1)(A).  The Court is required to give substantial weight

26 to "any adverse impact on public safety or the operation of a

27 criminal justice system caused by" the prospective relief.  Id.

28 Whether prospective relief is appropriate in light of the PLRA

depends on whether the Court finds, in light of the "order as a whole," "that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures."[29] <u>Armstrong v. Schwarzenegger</u>, 622 F.3d at 1071.

A.   Narrowly tailored

The Court concludes that the additional remedial measures discussed above meet the requirements of the PLRA.  They are narrowly tailored because they require action only with respect to the prisons at which Plaintiffs have shown that Defendants have violated disabled inmates' rights under the ARP and ADA, namely LAC, COR, SATF, CIW, and KVSP, and because they are the least that can be done to protect disabled inmates from further violations of their rights under the ARP and ADA.  <u>Id.</u> at 1072 (holding that the scope of permissible injunctive relief "is dictated by the extent of the violation established") (citation and internal quotation marks omitted).  As discussed above, the substantial evidence that Plaintiffs have presented shows that the violations of disabled inmates' rights are not limited to isolated incidents.  The ARP and ADA violations described in the inmates' declarations were widespread in every sense of the word; they affected inmates who suffer from a wide range of

---

[29] The PLRA, 18 U.S.C. § 3626(a)(1)(B), also requires that the Court make certain findings to the extent that any prospective relief requires a government official to exceed his or her authority under state or local law.  Defendants have not identified any state or local law that they must violate to implement the additional remedial measures ordered herein. Accordingly, the Court need not make any findings under 18 U.S.C. § 3626(a)(1)(B).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  disabilities; they were caused or observed by many identified

2  staff members; and they took place at a variety of locations at a

3  variety of prisons.

4      As discussed, the incidents appear to be the result of the

5  ineffectiveness of Defendants' system for investigating and

6  disciplining violations of the ARP and ADA.  It remains possible,

7  under the current policies and procedures, for staff members to

8  continue to violate disabled inmates' ARP and ADA rights while

9  potentially avoiding accountability for their actions.  The

10  additional remedial measures in question are specifically

11  designed to remedy this, and they are therefore necessary to

12  prevent further violations of disabled inmates' rights under the

13  ARP and ADA.  See, e.g., Armstrong v. Brown, 768 F.3d at 984

14  (affirming order requiring CDCR Defendants to implement remedial

15  measures intended to enhance CDCR's accountability); Armstrong v.

16  Schwarzenegger, 622 F.3d at 1073-74 (noting the importance of

17  accountability measures in ensuring ADA compliance); Morales

18  Feliciano v. Rullan, 378 F.3d 42, 55-56 (1st Cir. 2004) (noting

19  the importance of accountability in ensuring the long-term

20  success of the health care system in Puerto Rico's prisons).

21      Defendants rely on Lewis v. Casey, 518 U.S. 343, 357 (1996),

22  for the proposition that the relief that Plaintiffs seek is

23  unjustified in light of number of violations of the ARP and ADA

24  that they have shown.  In Lewis, the Supreme Court reversed an

25  injunction that granted systemwide relief across all of Arizona's

26  correctional facilities on the ground that the only evidence in

27  the record that supported such relief was evidence that two

28  inmates at two different prisons were unable to receive

United States District Court
Northern District of California

assistance they needed to litigate a claim in court.  The Supreme

Court held that the "two instances were a patently inadequate

basis for a conclusion of systemwide violation and imposition of

systemwide relief."  Id. at 359.  Lewis is distinguishable

because, here, the Court has not ordered systemwide relief;

instead, the Court has found that, commensurate with the

violations of the ARP and ADA that Plaintiffs have shown at LAC,

COR, SATF, CIW, and KVSP, the implementation of additional

remedial measures at these prisons is warranted.  Thus, the scope

of the additional remedies is tailored to the scope of the ARP

and ADA violations shown.

　　　　B.   Least Intrusive

　　　　The additional remedial measures ordered herein are not

impermissibly intrusive because they do not micromanage

Defendants' operations.  Defendants have the discretion to craft

policies and procedures to implement the additional remedial

measures.  Armstrong v. Schwarzenegger, 622 F.3d at 1071

("Intrusiveness is a particularly difficult issue for defendants

to argue, as by ordering them to draft and promulgate a plan, the

district court left to defendants' discretion as many of the

particulars regarding how to deliver the relief as it deemed

possible.  Allowing defendants to develop policies and procedures

to meet the ADA's requirements is precisely the type of process

that the Supreme Court has indicated is appropriate for devising

a suitable remedial plan in a prison litigation case.").  That

the Court describes the additional remedial measures with some

specificity does not change this conclusion.  See Armstrong v.

Brown, 768 F.3d at 986 (holding that "[a] court may, as the

United States District Court
Northern District of California

1  district court did here, provide specific instructions to the

2  State without running afoul of the PLRA").

3       Defendants' expert, Matthew Cate, opines that a less

4  intrusive means of ending the ongoing violations exists, namely

5  "ensur[ing] that inmates have better access to accommodation

6  requests, by, for example placing the request forms in a location

7  available to all inmates, and having ADA and Grievance

8  Coordinators walk the buildings to ensure disabled inmates can

9  make requests."  Cate Decl. ¶ 6, Docket No. 3160-60.

10      The Court finds that such a proposal is not a viable

11  alternative to the additional remedial measures ordered herein,

12  because the record shows that the root cause of the ongoing

13  violations of the ARP and ADA is not the lack of access to forms

14  or other methods for requesting accommodations, but rather the

15  ineffectiveness of the current system for investigating and

16  disciplining violations of the ARP and ADA and the resulting

17  staff culture that condones abuse and retaliation against

18  disabled inmates.

19      The goal and intent of the parties and the Court's Remedial

20  Order and Injunction at the outset of the remedial phase of this

21  litigation was to bring all of CDCR's prisons into compliance

22  with the ADA and the RA.  Almost twenty-four years after the

23  issuance of that order and injunction, Defendants are not yet in

24  compliance.  This is so even though the parties and the Court

25  have attempted various iterations of remedial measures that are

26  narrower and less intrusive than the ones now ordered.  The Court

27  has found, as discussed in more detail above, that the policies

28  and system currently in place, which are the product of the

United States District Court
Northern District of California

parties' and the Court's prior efforts to bring Defendants into full compliance, are insufficient to end the ongoing violations of disabled inmates' rights.  Accordingly, the Court's implementation of additional and broader remedial measures is warranted.  <u>Armstrong v. Brown</u>, 768 F.3d at 986 (noting that, where "the district court has attempted narrower, less intrusive alternatives—and those alternatives have failed," the court has discretion to order relief that might have raised concerns about breadth and intrusiveness under the PLRA in the first instance) (citation and internal quotation marks omitted).

The Court has carefully considered and weighed the arguments and evidence presented by Defendants, and it has found that Defendants have not shown that the additional remedial measures would have any adverse impact on public safety or the operation of a criminal justice system.  Defendants object to the additional remedial measures on the ground that they are unnecessary.  The Court disagrees with Defendants on this point based on the evidence discussed at length above.  Defendants also object to the additional measures on the ground that they would be burdensome to implement in the time frame that Plaintiffs have proposed.  Even if it were the case that implementing the additional remedial measures in the time frame that Plaintiffs have proposed would be burdensome for Defendants, "[a] demonstration that an order is burdensome does nothing to prove that it was overly intrusive" or otherwise inconsistent with the requirements of the PLRA.  <u>Armstrong v. Schwarzenegger</u>, 622 F.3d at 1071.  Where, as here, the Court has found that the additional remedial measures are necessary to ensure Defendants' compliance

with the ARP and ADA, and that no viable less restrictive alternative exists, the question of whether the additional remedial measures require some expenditure of resources by Defendants is not determinative.  See id. ("With Congress having made the decision to recognize the rights of disabled persons, the question is not whether the relief the court ordered to vindicate those rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations.").

In light of the foregoing, the Court finds that the additional remedial measures ordered here are necessary and consistent with the PLRA.

CONCLUSION

The Court GRANTS IN PART Plaintiffs' motion to modify its prior orders and injunctions to require Defendants to design, and then implement, a plan that requires additional remedial measures at LAC, COR, SATF, CIW, and KVSP.  The Court will issue a separate order describing the additional remedial measures that Defendants' plan must include.

IT IS SO ORDERED.

Dated: March 11, 2021

CLAUDIA WILKEN
United States District Judge