1   DONALD SPECTER – 083925
    RITA K. LOMIO – 254501
2   MARGOT MENDELSON – 268583
    PRISON LAW OFFICE
3   1917 Fifth Street
    Berkeley, California  94710-1916
4   Telephone:   (510) 280-2621
    Facsimile:    (510) 280-2704
5
6   MICHAEL W. BIEN – 096891
    GAY C. GRUNFELD – 121944
7   THOMAS NOLAN – 169692
    PENNY GODBOLD – 226925
8   MICHAEL FREEDMAN – 262850
    ROSEN BIEN
9   GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
10  San Francisco, California  94105-1738
    Telephone:   (415) 433-6830
11  Facsimile:    (415) 433-7104
12
13  LINDA D. KILB – 136101
    DISABILITY RIGHTS
14  EDUCATION & DEFENSE FUND,
    INC.
15  3075 Adeline Street, Suite 201
    Berkeley, California  94703
16  Telephone:   (510) 644-2555
    Facsimile:    (510) 841-8645
17
18  Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102-7004
Telephone: (415) 510-3594
Fax: (415) 703-5843
E-mail: Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

19              UNITED STATES DISTRICT COURT

20              NORTHERN DISTRICT OF CALIFORNIA

21

22  JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW

23          Plaintiffs,                  **STIPULATION AND ORDER
                                         REGARDING RJD REMEDIAL**
24      v.                               **PLAN AND FIVE PRISONS
                                         REMEDIAL PLAN**
25  GAVIN NEWSOM, et al.,
                                         Judge:   Hon. Claudia Wilken
26          Defendants.

27

28

Defendants have finalized the Richard J. Donovan Remedial Plan ("RJD Remedial Plan") and Five Prisons Remedial Plan (collectively, the "Remedial Plans") required to comply with the Court's Order Granting in Part Motion to Modify Remedial Orders and Injunctions ("RJD Order"), Dkt. 3059; Order for Additional Remedial Measures ("RJD Injunction"), Dkt. 3060; Order Granting in Part Motion to Modify Remedial Orders and Injunctions ("Five Prisons Order"), Dkt. 3217; and Order for Additional Remedial Measures at LAC, COR, SATF, CIW, and KVSP ("Five Prisons Injunction," and collectively, with R.J. Donovan Correctional Facility ("RJD"), the "Six Prisons"), Dkt. 3218 (collectively, "Orders").  Section II of the Remedial Plans will be implemented under the Court's January 21, 2022 Stipulation and Order Regarding Roll-out of Paragraph 5.c Reforms at Six Prisons, Dkt. 3371 ("January 21, 2022 Stipulation and Order").

NOW THEREFORE, it is hereby stipulated and agreed, by and between the parties to the above captioned litigation, through their counsel of record, as follows:

1.      In compliance with the Orders, Defendants have finalized the Remedial Plans, attached hereto as **Exhibit A** and **Exhibit B**, and shall implement the Remedial Plans as set forth in the Plans and applicable orders of this Court.

IT IS SO STIPULATED.

DATED:  March 21, 2022                Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Penny Godbold*
        Penny Godbold

Attorneys for Plaintiffs

/ / /
/ / /
/ / /
/ / /

STIPULATION AND ORDER REGARDING RJD REMEDIAL PLAN AND FIVE PRISONS REMEDIAL PLAN

1

DATED:  March 21, 2022

ROB BONTA
Attorney General of the State of California

2

3

By:  */s/ Trace O. Maiorino*
Trace O. Maiorino
Deputy Attorney General

4

Attorneys for Defendants

5

6

7

**FILER'S ATTESTATION**

8

As required by Local Rule 5-1, I attest that I obtained concurrence in the filing of

9

this document by all signatories, and that I have maintained records to support this

10

concurrence.

11

DATED:  March 21, 2022

*/s/ Penny Godbold*
Penny Godbold

12

13

**ORDER**

14

Having reviewed the above Stipulation of the parties, and good cause appearing, it

15

is ORDERED that:

16

In compliance with the Orders, Defendants have finalized the Remedial Plans,

17

attached hereto as **Exhibit A** and **Exhibit B**, and shall implement the Remedial Plans as

18

set forth in the Plans and applicable orders of this Court.

19

IT IS SO ORDERED.

20

21

DATED:  March 23 , 2022

22

Honorable Claudia Wilken
United States District Judge

23

24

25

26

27

28

*ARMSTRONG v. NEWSOM*

RICHARD J. DONOVAN CORRECTIONAL FACILITY
COURT ORDERED REMEDIAL PLAN

March 7, 2022

# RJD REMEDIAL PLAN (*ARMSTRONG*)

On September 8, 2020, the United States District Court for the Northern District of California ordered the California Department of Corrections and Rehabilitation (CDCR) to implement remedial measures to achieve compliance with the *Armstrong* Remedial Plan (ARP) and the Americans with Disabilities Act (ADA) at the Richard J. Donovan Correctional Facility (RJD). This order will be referred to herein as the "RJD Remedial Order." CDCR provides the following to comply with the required remedial components of the Court's RJD Remedial Order:

I. **VIDEO SURVEILLANCE CAMERAS AND BODY-WORN CAMERAS [RJD REMEDIAL ORDER §§ 5(a), 5(b)]**

The Court ordered:

> Within ninety days of the finalization of the RJD Remedial Plan, CDCR shall install operational surveillance cameras that cover all areas of RJD to which class members have access, including, but not limited to, all exercise yards, housing units, sally-ports, dining halls, program areas, and gyms. Within sixty days of the finalization of the RJD Remedial Plan, CDCR must begin using body-worn cameras for all correctional officers at RJD who may have any interactions with class members. The RJD Remedial Plan shall describe the steps that Defendants will take to achieve these deadlines.

(Dkt. 3060 at 3.)

CDCR implemented the Audio/Video Surveillance System (AVSS) at RJD in all areas in which *Armstrong* class members ("class members") have access. Additionally, CDCR implemented Body-Worn Camera (BWC) technology at RJD for all correctional officers and sergeants who may interact with class members.

Further, the Court ordered:

> The RJD Remedial Plan must contain policies and procedures regarding the use of body-worn cameras and the use of camera footage at RJD from any type of camera, including requirements that all footage be retained for a minimum of ninety days, that footage of use of force and other triggering events involving class members at RJD be retained indefinitely, and that footage, when available, be reviewed and considered as part of the investigation of any incident. The RJD Remedial Plan also must contain policies and procedures for training RJD staff regarding how and when to use a body-worn camera and how to ensure that footage is retained and reviewed.

(*Id.*)

CDCR drafted policies and procedures regarding the use of AVSS/BWC at RJD as well as policies and procedures for the use of footage obtained from these cameras. Footage will be retained for

# RJD REMEDIAL PLAN (*ARMSTRONG*)

90 days, at a minimum. For triggering events involving a class member, the footage will be retained for five years per the parties' agreement. CDCR is promulgating policies and training regarding the review and consideration of such footage during investigations of triggering events. Incarcerated persons will be permitted to review and present audio-video footage at Rules Violation Report (RVR) hearings.

## A. <u>AVSS</u>

AVSS implementation at RJD included replacing the existing equipment and installing approximately 964 additional AVSS cameras with varying scopes of view depending upon the location deployed (100 degree, 180 degree, 360 degree, etc.). Audio capture is provided by external stand-alone microphones in locations consistent with AVSS deployments.

In the event the AVSS or any individual component becomes inoperable, RJD staff are required to notify the AVSS Coordinator for resolution or the Watch Commander if the malfunction occurs after normal business hours.

## B. <u>BWC</u>

Approximately 735 BWCs were deployed at RJD. Correctional officers and sergeants who may have interaction with class members during the regular course of their duties wear the BWCs.

The BWC Pilot Program at RJD operates under the authority of Penal Code section 5058.1.

## C. <u>Training</u>

CDCR implemented a specialized instruction/training for AVSS and BWC implementation at RJD. All correctional staff members responsible for operating the AVSS and BWC system have received this training.

## D. <u>Policies</u>

Copies of the policies related to the AVSS and BWC implementation at RJD are included in the Remedial Plan as Attachments A and B.

## II. <u>PROCESS FOR STAFF COMPLAINT, INVESTIGATION, DISCIPLINE, AND OVERSIGHT [RJD REMEDIAL ORDER § 5(c)]</u>

The Court ordered:

> CDCR must develop measures to reform the staff complaint, investigation, and discipline process (Investigation and Discipline Section of the RJD Remedial Plan), which shall be included in the RJD Remedial Plan, to ensure (1) that CDCR

## RJD REMEDIAL PLAN (*ARMSTRONG*)

completes unbiased, comprehensive investigations into all allegations of staff misconduct violative of the rights of any class member under the ARP or the ADA; (2) that CDCR imposes appropriate and consistent discipline against employees who engage in violations of the ARP or ADA with respect to class members at RJD; and (3) that employees who engage in criminal misconduct against class members at RJD in violation of the ARP or ADA are appropriately investigated and, if warranted, referred for prosecution. The Investigation and Discipline Section of the RJD Remedial Plan also shall ensure that officers accused of serial violations of the ARP or ADA with respect to class members at RJD are reassigned. The Investigation and Discipline Section of the RJD Remedial Plan also shall provide for effective mechanisms for oversight over all staff complaints, use-of-force reviews, and related staff disciplinary proceedings at RJD that involve alleged violations of class members' rights under the ARP or ADA. The Investigation and Discipline Section of the RJD Remedial Plan shall require quarterly interviews of randomly selected class members at RJD using the methodology and interview questionnaire utilized by the December 2018 investigators.

(*Id.* at 3-4.) The reforms described in this section of the Remedial Plan represent Defendants' plan to comply with Paragraph 5(c) of the Court's order.

### A. <u>Investigations of Staff Misconduct Complaints</u>

CDCR promulgated emergency regulations that were phased in beginning January 1, 2022, that described the organizational changes regarding the processing of staff misconduct allegations toward an incarcerated person or parolee. These regulations adopted a new definition of "staff misconduct" statewide: Staff misconduct is defined as behavior that resulted in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard.

#### i.   *Overview of Organizational Changes*

Under CDCR's new process for investigations, CDCR will restructure the Allegation Inquiry Management Section (AIMS) of the Office of Internal Affairs (OIA) and will eliminate the reasonable belief standard for investigations into staff misconduct involving inmates and parolees.

This process is designed to ensure that complaints alleging serious staff misconduct, regardless of the source of the complaint, are investigated by OIA. Any person can submit a complaint of staff misconduct when they believe departmental staff have engaged in behavior that resulted in a violation of law, policy, regulation, or procedure, or an ethical or professional standard.

#### ii.   *Centralized Screening*

CDCR is building a Centralized Screening Team (CST) within OIA to evaluate whether complaints received by CDCR include an allegation(s) of staff misconduct and whether that misconduct is toward an incarcerated person or parolee.

## RJD REMEDIAL PLAN (*ARMSTRONG*)

All grievances submitted by an incarcerated person or parolee shall be reviewed by CST. In addition, if departmental staff receive a written complaint outside the grievance process that alleges staff misconduct toward an incarcerated person or parolee, staff will immediately refer the complaint to CST, as well as forward a copy of the complaint to their hiring authority. If departmental staff receive a verbal complaint involving unnecessary or excessive use of force, staff-on-offender sexual misconduct, or sexual harassment, staff must refer the complaint to CST.

Assigned CST staff will also review each document received to determine if it contains information constituting an imminent risk to personal safety, institutional security, or involves sexual abuse or acts of sexual misconduct as defined by the federal Prison Rape Elimination Act (PREA) and the California Sexual Abuse in Detention Elimination Act. In those instances, CST shall immediately notify the hiring authority of the affected institution or program for appropriate action.

CST will utilize an Allegation Decision Index (ADI) to determine whether a complaint should be referred to OIA for investigation or returned to the local hiring authority for inquiry. The ADI addresses allegations of serious misconduct, which include, but are not limited to: use of force, staff sexual misconduct, dishonesty to include allegations of false and retaliatory Rules Violation Reports, discrimination/harassment, retaliation, code of silence, and integrity.

CST will route all allegations in the complaint that are on the ADI, as well any allegations directly related in time and scope that are not on the ADI, to OIA for investigation. CST may refer any allegation not listed on the ADI to OIA if it determines an OIA investigation is warranted. CST shall conduct an interview with the complainant if necessary to make a screening decision. CST shall route all complaints within five business days of receipt.

The hiring authority will be notified of CST's screening decision so they can determine whether a staff member should be redirected to a different position or placed on Administrative Time Off (ATO) as a result of the allegation or on-going investigation. Also, as is currently done, if at any point in the process a new subject is added or information comes to light that could impact the hiring authority's decision to redirect an employee or put them on ATO, the investigator will contact the hiring authority (or designee) with the pertinent information.

### iii.  OIA Investigation Processing

Upon receipt of a complaint from CST, OIA staff will analyze the complaint and identify any initial information or documentation that needs to be obtained or preserved for the investigation file. OIA staff will gather the initial information or documentation not included with the complaint. OIA staff may need to request and obtain the information or documentation from the Division of Adult Institutions (DAI) or the Division of Adult Parole Operations (DAPO).

OIA will review the investigation file and determine the level of investigation that will be conducted in consultation with the Employment Advocacy and Prosecution Team (EAPT) for designated cases. OIA will determine whether to assign the investigation to a custody supervisor or special agent

## RJD REMEDIAL PLAN (*ARMSTRONG*)

within OIA depending on a variety of criteria to be determined including the complexity and seriousness of the staff misconduct allegations and the potential level of discipline. If an investigation is initially assigned to a custody supervisor, a special agent may later be assigned if facts that are more complex or serious are discovered.

1. Involvement of EAPT

EAPT will have the opportunity to designate cases early in this process and will designate cases consistent with policies and practices. Designated cases include, but are not limited to: matters involving staff integrity, dishonesty, or the code of silence, sexual misconduct, use of force in which an inmate suffers any serious injury, use of deadly force, serious allegations made against supervisors, and high profile or dismissal cases assigned to the vertical advocate by EAPT.

2. Timeframes for Investigations

Under Government Code section 3304(d) (2021), CDCR has one year from the date of discovery of an allegation against a peace officer staff member to complete an investigation if it seeks to impose punitive action (with some exceptions codified in Government Code section 3304(d), (g)). Under Government Code section 19635, CDCR has three years from the date of discovery of an allegation against a non-peace officer staff member to serve a notice of adverse action if it seeks to impose punitive action. Despite the applicable statute of limitations set forth in California law, OIA investigations of complaints from *Armstrong* class members at RJD conducted by custody supervisors shall be completed within 120 days of receipt by OIA and investigations of complaints from *Armstrong* class members at RJD assigned to special agents shall be completed within six months. These timeframes can be extended for extenuating circumstances. Any request for an extension must be approved by a supervisor and documented in writing. The six-month timeframe is specific to those matters assigned to a special agent via the new CST process and assigned to the new Allegation Investigation Unit (AIU). This does not include investigations that are processed through Central Intake as part of discipline processes outside the staff misconduct process involving incarcerated persons.

B. **Unbiased, Comprehensive Investigations**

OIA investigators shall conduct an investigation for all allegations of staff misconduct toward incarcerated persons or parolees listed in the ADI. OIA investigators shall conduct comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed.

If, during the course of the investigation, the OIA investigator discovers additional misconduct, they shall investigate the additional misconduct if it is directly related in time and scope to the incident being investigated. If the additional misconduct is not directly related to the incident, the OIA investigator shall refer the additional misconduct to CST.

If incarcerated persons or parolees report unrelated allegations of misconduct and the allegations do not involve staff use of force, staff-on-offender sexual misconduct, or sexual

## RJD REMEDIAL PLAN (*ARMSTRONG*)

harassment, the investigator shall provide the incarcerated person or parolee with information on how to submit their complaint in writing.

Upon completion of an OIA staff misconduct investigation, the investigator(s) will draft an investigation report in accordance with the requirements of Penal Code section 6065(c) (2021). An investigation manager will review the draft investigation report, and supporting exhibits and recordings, to determine whether the investigation and the investigation report are comprehensive and unbiased. For designated cases, the vertical advocate shall review the draft investigation report and all supporting exhibits and recordings, and provide feedback to OIA.

CDCR will identify specific criteria to be considered when reviewing whether investigations were comprehensive and unbiased. CDCR will develop a tool for investigation managers, vertical advocates for designated cases, and hiring authorities to use to determine whether investigations are comprehensive and unbiased. The investigation manager will confirm that the Investigation Report is comprehensive and unbiased before forwarding to the hiring authority.

After the Investigation Report is finalized, the confidential final Investigation Report and all supporting exhibits and recordings, will be provided to the hiring authority and the vertical advocate for designated cases. If the hiring authority finds the investigation biased or not comprehensive the hiring authority can request further investigation. The hiring authority will confirm that the Investigation Report is comprehensive and unbiased before making any disciplinary decision.

Investigation managers will monitor work performance of investigators, and if warranted provide training and feedback, and take other appropriate steps consistent with existing policy.

CDCR will use available information to monitor work performance of vertical advocates and hiring authorities in the investigation and disciplinary process, and if warranted provide training and feedback, and take other appropriate steps consistent with existing policy.

The Office of the Inspector General (OIG) monitors CDCR's investigative and disciplinary process.

> i.   *Hiring Authority Findings*

Upon receipt and review of the final confidential Investigation Report, exhibits, and recordings concerning an allegation of Staff Misconduct, and if sufficient, the hiring authority shall render a determination on each allegation and each subject identified in the allegation as follows:

1. NOT SUSTAINED: The investigation or inquiry failed to disclose a preponderance of evidence to prove or disprove the allegation made in the complaint.
2. UNFOUNDED: The investigation or inquiry conclusively proved that the act(s) alleged did not occur, or the act(s) may have, or in fact, occurred but the individual employee(s) named in the complaint(s) was not involved.

3. EXONERATED: The facts, which provided the basis for the complaint or allegation, did in fact occur; however, the investigation or inquiry revealed that the actions were justified, lawful, and proper.
4. SUSTAINED: The investigation or inquiry disclosed a preponderance of evidence to prove the allegation(s) made in the complaint.
5. NO FINDING: The complainant failed to disclose promised information to further the investigation; the investigation revealed that another agency was involved and the complainant has been referred to that agency; the complainant wishes to withdraw the complaint; the complainant refuses to cooperate with the investigation; or the complainant is no longer available for clarification of facts/issues.

During the 402/403 process the hiring authority will consult with the vertical advocate regarding the appropriate disciplinary findings and penalty decisions. If the OIG or EAPT believes that the hiring authority's decision does not comply with Departmental policy, OIG or EAPT can invoke executive review of the hiring authority's decision. CDCR will track data regarding the frequency with which a hiring authority's decisions have been subject to executive review.

      *ii.*  *Training*

CDCR will develop on-going training requirements for CST staff, locally designated investigator (LDIs, discussed below), OIA investigators, vertical advocates, and hiring authorities to ensure comprehensive and unbiased investigations.

In addition, CDCR believes that investigators, vertical advocates, and hiring authorities would benefit from implicit bias training. CDCR will work to modify the implicit bias training provided to managers through California State University, Sacramento to address implicit bias related to peace officers and incarcerated persons and parolees. CDCR will also develop an implicit bias training module that will be provided annually to investigators, vertical advocates, and hiring authorities.

For training purposes, investigators will attend one State Personnel Board hearing biennially.

Vertical advocates will also receive trial training.

      *iii.*  *Post-Investigation Review*

Beginning in quarter three of calendar year 2022, CDCR will establish a regional post-investigation review process that is designed to examine investigations both for comprehensiveness and to determine whether they were conducted in an unbiased manner. Part of the review process will also include the review of hiring authorities' disciplinary decisions to ensure consistent and appropriate discipline. The review process will occur quarterly and help identify both the strengths and the weaknesses of the selected investigations. The regions are established as follows: Southern Region includes RJD, California Institution for Women (CIW), and California State Prison, Los Angeles County (LAC), and the Central Region includes California State Prison,

## RJD REMEDIAL PLAN (*ARMSTRONG*)

Corcoran (COR), California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), and Kern Valley State Prison (KVSP).

The Review Panel will be comprised of the following members:

- OIA representative(s) at the level of Chief or above, or designee.
- Office of Legal Affairs (OLA) representative(s) at the level of EAPT Chief Counsel or above, or designee.
- DAI representative(s) at the level of Associate Director or above, or designee.
- California Correctional Health Care Services (CCHCS) representative(s) if case(s) reviewed involve CCHCS staff.
- A staff member assigned by OIA Deputy Director to organize and facilitate the meetings and record any recommendations made by review members or participants.
- For at least the first quarterly meeting in each region during the first two years of implementation, an expert retained by CDCR to provide assistance with reviewing cases for bias and comprehensiveness and with setting any necessary procedures for the panel to ensure that it is meeting the goals articulated by CDCR. CDCR intends to retain a subject matter expert from an outside law enforcement organization with an expertise in investigations.

Twelve cases will be reviewed each quarter with six cases per region representing custody and CCHCS staff. The Office of Research will randomly select cases including those involving disabled incarcerated persons, as defined in the *Armstrong* Five Prisons Remedial Order and Injunction. The selection will include the following criteria for each region: one completed by a sergeant, three completed by lieutenants, and two completed by special agents. The panel will review investigations after the disciplinary matter is resolved.

The goal should be to determine what individual investigators did well or poorly in the specific investigation under review, as well as to identify trends in the investigation and discipline processes at institutions, within regions, or among types of cases. The panel will also evaluate if there are any regulation or policy issues that created a limitation or problem during the course of the investigation. The panel will maintain meeting agendas and minutes to capture discussions and recommendations and these will be provided to OIA Deputy Director, Division of Correctional Policy Research and Internal Oversight (CPRIO) Director, DAI Director, EAPT Chief Deputy General Counsel, and any other applicable Director depending on the cases selected for review.

The review panel should determine, in each review, which cases to incorporate into quarterly training for vertical advocates, investigators, and hiring authorities. The selected cases will be presented to vertical advocates, investigators, and hiring authorities as a group with the goal of facilitating an open discussion of both deficiencies and aspects of investigations that were done well.

///

RJD REMEDIAL PLAN (*ARMSTRONG*)

C. **Allegation Inquiry Process**

If CST determines that a complaint contains allegation(s) of staff misconduct toward incarcerated persons or parolees not listed in the ADI, those allegations will be referred to the hiring authority for an allegation inquiry. The hiring authority will have an allegation inquiry conducted by an LDI trained by OIA. The LDI assigned to conduct the allegation inquiry shall be at least one rank higher than the highest-ranked subject of the allegation inquiry.

If at any point in the local investigative process any decision-maker (including LDIs, hiring authorities, or OIA Manager) learns of any evidence of staff misconduct listed in the ADI, the LDI will cease further inquiry, document the evidence in an Allegation Inquiry Report, and refer the allegation inquiry to OIA for a complete investigation with notification to the hiring authority.

If the LDI finds evidence of staff misconduct not listed in the ADI that the LDI believes may result in adverse action, the LDI shall cease further inquiry, document the evidence in the Allegation Inquiry Report, and refer the allegation inquiry to the hiring authority for review. If the hiring authority agrees that adverse action may result, the allegation inquiry shall be referred to OIA for investigation.

Inquiries conducted by LDIs are expected to be completed within 60 days of receipt. This timeframe can be extended for extenuating circumstances. Upon completion of the allegation inquiry, the LDI will prepare a draft Allegation Inquiry Report with all supporting exhibits, and submit it to an OIA manager to review and approve. The OIA manager will review the report to ensure the inquiry was comprehensive and unbiased and request further inquiry if necessary. Once approved, the OIA manager will provide the approved Allegation Inquiry Report to the hiring authority. The hiring authority will review the approved Allegation Inquiry Report and determine whether the allegation inquiry is comprehensive and unbiased, or whether additional inquiry or an OIA investigation is necessary. If additional inquiry or an investigation is deemed necessary, the hiring authority can refer the matter to OIA for investigation.

If the hiring authority believes the allegation inquiry contains a preponderance of evidence to sustain the allegations and impose adverse action, the hiring authority may request approval from OIA for direct adverse action. If approval for direct adverse action is requested, OIA in consultation with EAPT will determine whether to conduct an OIA investigation or to approve direct adverse action.

Upon completion of the OIA investigation or approval of direct action, the hiring authority will review the OIA investigation report or direct action materials, and make investigative findings set forth in California Code of Regulations, title 15 section 3488.2, subdivisions (d)-(e), in consultation with EAPT on designated cases.

///

///

9

RJD REMEDIAL PLAN (*ARMSTRONG*)

D. **Appropriate & Consistent Discipline**

    *i.* *Disciplinary Matrix Revisions*

CDCR will promulgate regulations that will update the Department's Employee Disciplinary Matrix, utilized by all hiring authorities to identify misconduct allegations and determine the appropriate penalty to be imposed when an allegation(s) of misconduct is sustained.

    *ii.* *Imposition of Discipline*

Hiring authorities should not take into account the likelihood that a particular decision might be reversed on appeal in determining what level of discipline to impose. As for staff accused of multiple violations, the current process takes into consideration the allegation with the highest penalty for assessing mitigating and aggravating factors. The lower offenses are included as aggravating the allegation with the higher penalty range.

Before vertical advocates advise a hiring authority to reduce a previously imposed penalty, they will consult with a supervisor to obtain authorization. CDCR will document the reason penalties are reduced for all cases. The OIG monitors this process for both designated and non-designated cases.

CDCR will provide additional annual training to hiring authorities on how to impose discipline, including how to review investigative reports and 402/403 memorandums, when to request additional investigation, how to weigh aggravating and mitigating factors, and how to consider past allegations or sustained findings.

E. **Criminal Misconduct Referrals**

The Department shall ensure that all complaints of staff misconduct are properly documented, objectively reviewed, and thoroughly investigated, and that discipline is imposed and the complaint is referred for criminal prosecution, when warranted.

As it relates to allegations of staff misconduct toward incarcerated persons or parolees arising out of the CST process, CDCR will eliminate the process whereby investigations are opened as either criminal or administrative investigations at inception. Instead, OIA will open an investigation and proceed as if criminal prosecution is possible. If during the course of the investigation CDCR makes a determination that it must interview the subject(s) of the investigation, OIA will engage in a case conference with EAPT for legal analysis before proceeding. If OIA and EAPT determine that the conduct violated a criminal law, CDCR will classify the investigation as criminal and proceed accordingly. If the conduct does not violate a criminal law, the investigation will proceed as administrative. If probable cause of criminal conduct is discovered during the course of the investigation, OIA will refer the case to the district attorney for prosecution.

## RJD REMEDIAL PLAN (*ARMSTRONG*)

F. **Reassignment of Serially Accused Officers**

    *i.*  *Administrative Time Off*

When an employee is under investigation, or subject to discipline, the employee may be placed on ATO by the hiring authority for one or more of the following reasons:

1. The employee has been convicted of a felony;
2. The employee is suspected of smuggling contraband;
3. The employee has, or their continued presence will, jeopardize the safety and security of the workplace, or the health and welfare of other employees, inmates, wards, or parolees;
4. The employee's continued presence in the workplace during the investigation or discipline process would undermine the Department's ability to conduct a fair and thorough investigation or discipline process;
5. Information is discovered during the investigative process that would likely lead to dismissal;
6. The hiring authority elects to dismiss the employee.

    *ii.*  *Temporary Involuntary Transfer*

A hiring authority may temporarily involuntarily transfer an employee to another institution or reassign the employee within the same institution or program while the employee is under investigation when ATO is not appropriate.

Hiring authorities should consider the question of ATO or transfer not just after discipline is imposed but during the investigation as well. This is already included in CDCR's existing policies, and the expectation is that this evaluation is continued throughout the investigation. If during the course of the investigation the investigator discovers information implicating any of the above ATO categories, the investigator will provide this information to the HA for consideration of ATO or transfer.

The hiring authority should consider the nature of the allegation, the apparent strength of the evidence, and whether the staff member has previously been found to have committed misconduct similar to the current allegation.

The hiring authority's decision to apply ATO or transfer, and the justification for that decision, is documented and sent to HQ on a weekly basis for review by the associate and deputy directors. Hiring authorities have the authority to transfer staff without prior approval from their supervisor.

///

///

## RJD REMEDIAL PLAN (*ARMSTRONG*)

G.  **Oversight – Early Warning System**

The Enterprise Risk Management Unit will lead the effort to, based on data, identify trends related to staff misconduct and other indicators of potential operational problems and to suggest steps that might prevent misconduct. Data will be gathered from multiple CDCR databases, including the Strategic Offender Management System (SOMS), Case Management System (CMS), the Allegations Against Staff Tracking System, and others and compiled to create automated Early Warning System dashboards, with red flag and alert systems which can be viewed by institution leadership and CDCR executives. In addition, the Early Warning System dashboards will be programmed to send automated alerts and warnings to impacted locations when alarming trends surface. Enterprise Risk Management will also facilitate meetings to discuss the identified concerns, help the program area create a corrective action plan, and then continue to monitor trends after corrective actions are implemented to determine if the implemented measures are resulting in the desired outcome. Director-level sign-off will be required to determine whether implemented measures have resulted in desired outcomes.

The system will allow for comparison of institutions, facilities, and employees to other institutions, facilities, and employees who are similarly situated. The system will take into consideration factors such as civil service classification, work location, shift, and institutional security level in arriving at red flag indicators.

H.  **Quarterly Interviews**

CDCR is conducting quarterly interviews of randomly selected class members at RJD. The interviewing teams are comprised of ombudsmen, associate wardens, captains, and sergeants from other institutions. The Office of Research randomly selects class members to interview. Five percent of the total class members housed at RJD are selected each quarter. The selected class members are interviewed independently, utilizing the questions used by investigators in December 2018.

At the conclusion of the interviews, the team compiles all interview documents and provides a written report summarizing the findings. The report is presented to the Director of DAI within 30 days of the conclusion of interviews. Any allegations of staff misconduct will be referred to the CST for processing in accordance with the policies set forth above. If a Corrective Action Plan (CAP) is required following the analysis of the interviews, an associate warden or captain will create the CAP and monitor its completion. The interview documentation, any resulting CAPs, and written summary report will be provided to Plaintiffs' counsel within 45 days of the conclusion of the interviews.

///

///

///

## RJD REMEDIAL PLAN (*ARMSTRONG*)

### III.  THIRD-PARTY MONITORING [RJD REMEDIAL ORDER § 5(d)]

The Court ordered:

> The Court delegates to Edward Swanson, its court expert, pursuant to Federal Rule of Evidence 706, the additional duties of monitoring Defendants' implementation of their Investigation and Discipline Section of the RJD Remedial Plan. Mr. Swanson shall have access to all documents reasonably necessary for monitoring Defendants' implementation of their Investigation and Discipline Section of the RJD Remedial Plan. Mr. Swanson shall issue quarterly reports regarding Defendants' implementation of the Investigation and Discipline Section of the RJD Remedial Plan. Prior to the issuance of each quarterly report, the parties and Mr. Swanson shall meet and confer regarding his findings for the quarter.

(*Id.* at 4-5.)

CDCR shall ensure that the court expert has access to the documentation and data necessary to effectively monitor CDCR's implementation of their staff complaint, investigation, and discipline processes as provided in the RJD Remedial Order.

### IV.  INFORMATION-SHARING WITH PLAINTIFFS' COUNSEL AND THE COURT EXPERT [RJD REMEDIAL ORDER § 5(e)]

The Court ordered:

> CDCR must produce to Plaintiffs' counsel and the court expert, Mr. Swanson, on a quarterly basis, all documents related to RJD staff complaints in which the alleged victim is a class member and alleges violations of his or her rights under the ARP or ADA, including, but not limited to, grievances, incident reports, documents from staff misconduct inquiries, documents from Institutional Executive Review Committee inquiries in which the class member alleges excessive use of force or other staff misconduct in violation of his or her rights under the ARP or ADA, 989 forms and all supporting documents, responses of the Central Intake Unit of OIA to 989 forms, investigation reports produced by the OIA, and 402 and 403 forms issued by the hiring authority. CDCR must also provide Plaintiffs' counsel with monthly, written updates regarding progress on the implementation of the RJD Remedial Plan at RJD, including data regarding staff complaints and use of force involving a class member where there is a possible violation of the class member's rights under the ARP or ADA.

(*Id.* at 5.)

///

## RJD REMEDIAL PLAN (*ARMSTRONG*)

CDCR will provide Plaintiffs' counsel and the court expert with all documents related to RJD staff misconduct complaints in which the alleged victim is a class member. CDCR will provide these documents subject to the protective order in place in this matter and will produce documents on a quarterly basis, based on the calendar year, starting with the first quarter of 2021. Quarterly production will be provided to Plaintiffs' counsel and the court expert within 30 days of the end of the quarter and will include the following:

- All completed staff complaints;

- All completed grievances and the responses to the class members regarding those grievances; and

- All allegations of unnecessary or excessive uses of force against class members.

The following investigations and disciplinary documents will be considered closed 30 days from the date the adverse action becomes effective.

- All CDCR Form 989s and supporting documents;

- All responses to CDCR Form 989s from the OIA's Central Intake Unit;

- All investigative reports produced by the OIA;

- All CDCR Form 402/403s issued by RJD; and

- All settlement agreements and State Personnel Board decisions in the quarter the institution receives them.

This substantial document production along with any documents associated with the quarterly interviews will constitute CDCR's monthly updates regarding the implementation of the RJD Remedial Plan.

### V.   SUPERVISORY STAFFING [RJD REMEDIAL ORDER § 5(f)]

The Court ordered: "CDCR must significantly increase supervisory staff by posting additional sergeants on all watches on all yards at RJD." (*Id.*)

CDCR has significantly increased supervisory staff by posting nine additional correctional sergeants at RJD for coverage seven (7) days a week. CDCR has hired and trained the additional correctional sergeants. These positions are focused on ADA issues and are expected to regularly walk the facilities and establish positive relationships with both the ADA population and RJD staff. The additional sergeants are expected to maintain frequent contact with class members and report observations concerning any incident that is persistent or egregious.

# RJD REMEDIAL PLAN (*ARMSTRONG*)

These nine additional sergeants will further ensure staff are trained in the ARP as well as the RJD Remedial Plan and are acting in accordance with directives contained therein. The additional sergeants will review the Daily Movement Sheet and all relevant reports in SOMS relating to class members in order to provide training to staff regarding the class members' disabilities and ensure the class members' disabilities are appropriately addressed. In addition, the additional sergeants will provide meaningful training to staff for issues of non-compliance with the ARP and RJD Remedial Plan. The sergeants will also conduct a minimum of one check-in with any *Armstrong* class member who has filed a staff complaint within the preceding 30 days.

Finally, these additional sergeants will also be able to address staff issues at the lowest level through mentoring, coaching of officers, and identification of non-compliance issues as well as ensuring non-compliance issues are captured on the *Armstrong* accountability log by reporting to the ADAC. Post Orders make these duties clear and clarify the role the additional sergeants will play in addressing retaliation concerns by Armstrong class members.

## VI.  TRAINING [RJD REMEDIAL ORDER § 5(g)]

The Court ordered:

> CDCR must develop and implement training intended to eliminate violations of the ARP and ADA at RJD, such as human rights, de-escalation, and cultural training, for all custody, mental health, and medical staff at RJD who interact with class members. The training must include discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people with disabilities.

(*Id.* at 6.)

CDCR has developed training to eliminate violations of class members' rights under the ARP and ADA. The training includes discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of class members in addition to topics such as human rights, de-escalation, cultural concerns, and aspects of the existing code-of-silence training.

The Class Action Management Unit (CAMU) delivered this training in person to select RJD managers and staff. Those pre-selected staff members are now subject matter experts and will be responsible for training all RJD staff members that interact with class members. This enhanced training will be provided annually to all custody, mental health, and medical staff at RJD who interact with class members.

## VII.  ANTI-RETALIATION MECHANISMS [RJD REMEDIAL ORDER § 5(h)]

The Court ordered: "CDCR shall develop mechanisms to end and prevent any retaliation against class members who report violations of their rights under the ARP or ADA and to ensure their

## RJD REMEDIAL PLAN (*ARMSTRONG*)

safety. These mechanisms shall be described in the RJD Remedial Plan." (*Id.*)

CDCR has developed additional mechanisms to prevent and end any retaliation against class members who report violations of their rights under the ARP or ADA and to ensure their safety. CDCR is utilizing a multi-pronged approach that includes training, town hall meetings, and the display of educational posters.

CAMU also provided direction to RJD staff about how to create content for monthly town hall meetings with class members by working with the IAC to develop content that is relevant to the specific concerns of the class members.

Additionally, anti-retaliation posters have been posted in all housing areas at RJD where class members have access. The poster includes references to anti-retaliation policies and provides contact information for the internal and external reporting of retaliation allegations.

### VIII.   USE OF FORCE – PEPPER SPRAY [RJD REMEDIAL ORDER § 5(i)]

The Court ordered: "CDCR shall develop a plan to modify its policies to more effectively monitor and control the use of pepper spray by RJD staff with respect to class members. This plan shall be described in the RJD Remedial Plan." (*Id.*)

CDCR revised its policies to more effectively monitor and control the use of pepper spray by RJD staff with respect to class members. Additionally, the deployment of AVSS and BWCs present a substantial modification to RJD's ability to monitor and control the use of chemical agents.

A copy of the revised policy for the use of chemical agents is included as Attachment C.

ATTACHMENT A

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
# RICHARD J. DONOVAN CORRECTIONAL FACILITY

## LOCAL OPERATIONS PROCEDURE
## AUDIO/VIDEO SURVEILLANCE SYSTEM

### I.    PURPOSE AND OBJECTIVE

The purpose of this procedure is to provide Richard J. Donovan Correctional Facility with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

### II.    REFERENCES

1.  Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems.

2.  California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

3.  Memorandum – dated May 10, 2019 – Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report, signed by Connie Gipson, Director, Division of adult Institutions (DAI).

4.  Memorandum – dated January 26, 2018 – Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Deputy Director, Facility Operations, DAI.

5.  Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

6.  Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

7.  California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

### III.    REVIEW AND APPROVAL

This procedure will be reviewed annually in the month of October by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

Richard J. Donovan Correctional Facility
OP# 131 – Audio/Video Surveillance System
Page 2 of 7

IV.    **RESPONSIBILITY**

The Warden has the overall responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

V.    **PROCEDURE**

A.   The Richard J. Donovan Correctional Facility AVSS is capable of being monitored from designated areas within the institution.  Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.
    1.   Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.
    2.   Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from Richard J. Donovan Correctional Facility will receive specialized instruction/training on the AVSS.  Those T4T instructors will then train all of the staff responsible for operating within the AVSS.
    3.   Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.
    4.   In the event the AVSS becomes inoperable, Richard J. Donovan Correctional Facility staff will revert back to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander after hours, for resolution.

VI.    **REQUIREMENTS**

A.   Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records.  Recorded audio, video, or both forms of recording technology is generally used for the investigation of safety and security incidents.  Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium.  The video evidence shall be managed by the prison's Investigative Services Unit (ISU) or as directed by the Hiring Authority for a period of not less than 90 days.  Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B.   The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:
    1.   Any use of force incident.
    2.   Riots.
    3.   Suspected felonious criminal activity.
    4.   Any incident resulting in serious bodily injury, great bodily injury, and all deaths.
    5.   All PREA allegations.

Richard J. Donovan Correctional Facility
OP# 131– Audio/Video Surveillance System
Page 3 of 7

      6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports [RVRs]) by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.)
      7. Allegations of staff misconduct by an inmate, employee, visitor, or other person.
      8. Incidents that may be potentially referred to the District Attorney's Office.
      9. An employee report to supervisor of on-the-job injury.
      10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the Armstrong Class Members at Richard J. Donovan Correctional Facility shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles. Public notice that recording technology may be in use shall be placed at the gatehouse, front entrance, and vehicle sally ports of all correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E. Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services (EIS) and the designated coordinator.

Richard J. Donovan Correctional Facility
OP# 131– Audio/Video Surveillance System
Page 4 of 7

F. Preserving Recorded Data
   When an event occurs that requires staff to preserve recorded data the following process shall be utilized:
   1. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
   2. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) will be submitted to ISU.
   3. The signed request will be scanned and emailed to the Richard J. Donovan Correctional Facility ISU at CDCRRJDISUAVSS-BWCRequest@cdcr.ca.gov. This will ensure that all ISU staff receives the signed CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) for timely processing.
   4. When the ISU receives a request to review audio and/or video recordings via CDCR Form 1027, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as Armstrong Class Members. All audio and/or video recordings determined to include Armstrong Class Members will be identified to be stored for five years, and copied to a digital medium. The ISU AVSS Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
   5. ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
   6. ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
   7. ISU will save and keep on file a hard copy of the CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A).
   8. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
   9. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G. Audio/Video Monitoring Stations
   1. Audio/Video Monitoring Stations are positioned in several locations throughout the institution. These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning. Monitoring stations will be located in the following areas:

      a. Facility A/D Visiting Control Booth
      b. Facility B/C Visiting Control Booth

     c.  Facility E Visiting Control Booth
     d.  Visiting Sergeant Office
     e.  Warden's Office
     f.  CDWs Office
     g.  ISU Office
     h.  Towers 1 and 4
     i.  Central Control
     j.  Complex Control
     k.  Lieutenant's Office – Facility A, B, C, D and E

H. Review Criteria
1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:
   a. Reviewing the circumstances of a crime or suspected crime.
   b. Reviewing the circumstances of an accident or near accident.
   c. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty.  The CDCR 837 Crime/Incident Report forms are used for reporting uses of force.  Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."
   d. Routine matters (See Section G below).
   e. The review/viewing of live or recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view.  Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.
   f. The review/viewing of live or recorded video will not be used for routine supervision of staff.  For example, audio and/or video surveillance will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of audio and/or video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process.  Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.
   g. The AVSS provisioning will be broken down into user groups.  The Hiring Authority will establish what provisioning the individual users will be able to accomplish in the system.
   h. Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment.  Those staff members will be able to watch live feed video only.  If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data.  The monitoring stations are located in the following areas:

Richard J. Donovan Correctional Facility
OP# 131– Audio/Video Surveillance System
Page **6** of **7**

        a.  Facility A/D Visiting Control Booth
        b.  Facility B/C Visiting Control Booth
        c.  Facility E Visiting Control Booth
        d.  Towers 1 and 4
        e.  Complex Control

I.   Review For Purpose of Report Writing

    1.  For routine matters that do not involve an allegation of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

    2.  If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) signed by the supervisor denying the request. A second copy of the CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) will be made and forwarded to the Labor Relations Analyst.

    3.  For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

        a.  Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.

        b.  After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

        c.  When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.

        d.  If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

        e.  The viewing of all audio/video recordings may be done in the presence of a supervisor.

J.   Use of Video Footage in the Rules Violation Report Process

    1.  Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the

Richard J. Donovan Correctional Facility
OP# 131 – Audio/Video Surveillance System
Page 7 of 7

video evidence.  At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K.  ALARM ACTIVATION
   1.  The AVSS will not be continuously monitored; therefore, staff is still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, per DOM 55090.

L.  AVSS MEDIA/PUBLIC INFORMATION REQUESTS
   1.  All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Public Information Officer.  These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.
   2.  All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information.  CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

L.  Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

   1.  On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).
   2.  The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

**VII.   ATTACHMENTS**

Attachment A – CDCR Form 1027, Audio/Video Surveillance System Evidence Request
Attachment B – CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial

**VIII.   APPROVAL**

_____          10-11-21
Warden                              Date

ATTACHMENT B

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
# RICHARD J. DONOVAN CORRECTIONAL FACILITY

## LOCAL OPERATIONS PROCEDURE
## BODY-WORN CAMERA TECHNOLOGY

**I.     PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide Richard J. Donovan Correctional Facility with written procedures and guidelines for the use of body-worn cameras, the directive on where and how to store body-worn cameras, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

The primary objective of the body-worn camera technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology. The use of body-worn camera technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

**II.    REFERENCES**

1. California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315.

2. Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

3. Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

4. California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

**III.   REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of January by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

**IV.    RESPONSIBILITY**

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of Body-Worn Camera Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 2 of 12

**V.     TRAINING**

Supervisors shall provide training on this OP as necessary to all Correctional Officers and Correctional Sergeants.  In-Service-Training documents will be retained as proof of practice.

If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their body-worn camera until they have received the CPOST Body-Worn Camera Power Point Training. Training is to be provided to the staff member by a T-4-T instructor by the end of the shift.

In the event the training is not provided to the staff member by the end of their shift, the Administrator of the Day will be notified and a Notice of Unusual Occurrence will be completed documenting the reason why the training was not completed.

**VI.    PROCEDURE**

A.  Storage of Body-Worn Cameras
   1.  Body-worn cameras will be kept in a secure location, such as Central Control, Complex Control, or the Facility Program Office.
   2.  At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all body-worn cameras to ensure they are accounted for and have not been damaged or are inoperable. Damaged and inoperable equipment shall be documented and reported to the supervisor and Body-Worn Camera Coordinator as soon as possible.
   3.  The Body-Worn Camera Coordinator shall ensure staff submit a Remedy ticket to local Information Technology (IT) staff for camera replacement if the cause is due to a technical issue.
   4.  Body-worn cameras will be kept on the specified charging device and recorded footage will be uploaded to the designated server.  Staff shall notify their supervisor and Body-Worn Camera Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.
   5.  Body-worn cameras require approximately three hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.
   6.  Each body-worn camera is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors.  Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity.  Activities include, but are not limited to, charging, uploading content, and device or system recognition.
   7.  The Body-Worn Camera Coordinator will identify and designate supervisors who will be tasked with ensuring all body-worn cameras are being charged and docked appropriately at the end of each shift.  Through the course of their duties, staff

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 3 of 12

       assigned to Central Control, Complex Control, or the Facility Program Office shall notify their supervisor immediately if they observe a data uploading problem, or if the body-worn camera will not charge.

8. Any discrepancies shall be reported to the Body-Worn Camera Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed

B. Staff Guidelines

1. All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to Central Control, Complex Control, or the Facility Program Office at the beginning of their assigned shift and chit out a body-worn camera and all other required safety equipment.

2. All body-worn cameras shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the body-worn camera given to them is assigned to the post they will be working during the shift.

3. If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the body-worn camera to the Central Control, Complex Control, or the Facility Program Office where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a body-worn camera assigned to the new post number.

4. Staff assigned to an inmate transport shall don the body-worn camera and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.

5. Upon the arrival to an institution that does not require the use of body-worn cameras, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to Richard J. Donovan Correctional Facility without any inmates in the vehicle, body-worn cameras will be reactivated upon arrival to Richard J. Donovan Correctional Facility. If the transportation unit is departing the institution with inmates, the body-worn cameras will be reactivated once in the vehicle sally port.

6. It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the body-worn camera is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning body-worn camera as soon as possible.

7. Dependent on the type of body-worn camera mount the staff member wears to support the body-worn camera, staff shall ensure they wear the body-worn camera outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.

8. Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 4 of 12

9. Staff shall ensure the body-worn camera is worn and is turned on during the entire course of their shift.  Staff who fail to wear the body-worn camera as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10. With the exception of specific and identified circumstances, the body-worn camera shall remain on throughout the entire shift.  Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off.  The body-worn camera shall only be deactivated under the following circumstances:

   - During a restroom break;
   - While providing or receiving peer support under the Peer Support Program;
   - While making an approved emergency phone call;
   - If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues;
   - During a probation or performance review;
   - During discussions with personnel relative to possible corrective/disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance);
   - During consultations with the Deputy Attorney General regarding his or her defense (i.e. attorney-client privileged conversations);
   - During a departmental meeting, and during training or while performing an activity deemed confidential in nature, (i.e., fence safety check);
   - While interviewing a current or potential confidential informant;
   - While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent;
   - While present in court;
   - While conducting an unclothed search of a visitor;
   - During Board of Parole hearings;
   - During Crisis Intervention Team and Interdisciplinary Treatment Team;
   - During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed;
   - During employee COVID testing, vaccination, or contact tracing;
   - After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers;
   - During an unclothed body search. In the course of the unclothed body search of an inmate. In the course of the unclothed body search, if an inmate becomes assaultive or disruptive, the staff member shall reactivate their body-worn camera when reasonable to do so.

not be exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 5 of 12

- Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their body-worn camera off. In the course of the medical visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their body-worn camera on when reasonable to do so. At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the body-worn camera on and ensure the camera is activated before beginning the transport to their next destination.
- When the staff member is directed to participate in an Office of Internal Affairs (OIA), Allegation Inquiry Management Section (AIMS), or locally designated investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the body-worn camera, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the body-worn camera recording.

11. Staff shall ensure the body-worn camera is reactivated immediately following one of the aforementioned events. Staff will make an audible statement when the body-worn camera has been reactivated. Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix. Applicable categories of the matrix include base penalties up to and including termination.

12. If during the course of their assigned shift, the battery in the body-worn camera becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the body-worn camera at Central Control, Complex Control, or the Facility Program Office for one that is fully charged.

13. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log (Attachment 1). The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.

14. The supervisor shall ensure the Watch Commander is notified there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

15. At the end of their assigned shift, staff shall return the body-worn camera to Central Control, Complex Control, or the Facility Program Office so it will be charged and the

recorded data uploaded to the server. Failure to return the body-worn camera to Central Control, Complex Control, or the Facility Program Office upon the conclusion of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the body-worn camera becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement body-worn camera.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a body-worn camera, employees found responsible for the deliberate destruction of a body-worn camera or any supporting body-worn camera equipment, shall be subject to the progressive discipline process in accordance with departmental policy.

20. If an employee's body-worn camera is subjected to a liquid substance following a "gassing," it will be retained in evidence. When preparing to extract the body-worn camera footage, the Body-Worn Camera ISU Officer will remove the body-worn camera from evidence, and utilizing a data cable, will plug one end into the body-worn camera, and one end into the server to extract body-worn camera footage. Upon completion, the body-worn camera will be returned to evidence. Each participating institution will receive a data cable to be maintained in ISU.

## VII.   REQUIREMENTS

A. Any information collected through the use of the body-worn cameras is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Body-worn camera equipment and all data files are for official use only, and shall not be utilized for personal use. Body-worn camera data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy. Only authorized employees shall use or be in possession of a body-worn camera device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 7 of 12

     1. Any use of force incident;
     2. Riots;
     3. Suspected felonious criminal activity;
     4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths;
     5. All PREA allegations;
     6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports by staff);
     7. Allegations of staff misconduct by an inmate, employee, visitor, or other person;
     8. Incidents that may potentially be referred to the District Attorney's Office;
     9. An employee report to supervisor of on-the-job injury; or
   10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted appeal.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. Body-worn camera footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the Armstrong Class Members at Richard J. Donovan Correctional Facility shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. Identifying Camera and Audio Footage for Preservation Beyond 90 Days
     1. The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted inmate grievance or staff misconduct.

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 8 of 12

2. Any request to review audio and or/video recordings shall be made via CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request (Attachment 2).

3. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.

4. Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as Armstrong Class Members.

5. All audio and/or video recordings determined to include Armstrong Class Members will be identified to be stored for five years, and copied to a digital medium.

6. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

E. Reviewing Recorded Data

1. For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own body-worn camera recording(s) of an incident they were involved in only after writing and submitting their initial report.

2. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

3. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118 will be submitted to ISU.

4. The signed request will be scanned and emailed to ISU. This will ensure that all ISU staff receives the signed CDCR 1118 for timely processing.

5. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as Armstrong Class Members. All audio and/or video recordings determined to include Armstrong Class Members will be identified and stored for five years, and copied to a digital medium. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

6. The ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.

7. The ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

8. The ISU will save and keep on file a hard copy of the CDCR 1118.

9. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.

10. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F. Redaction and Deletion of Body-Worn Camera Recordings, Data, and Files
   1. In the event of an accidental activation of a body-worn camera where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the body-worn camera data be redacted or the entire body-worn camera data be deleted via CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form (Attachment 3).
   2. The requesting employee shall complete the Requestor Information portion of the CDCR 1120 and forward the form to their direct supervisor for signature.
   3. Upon the completion of their portion of the CDCR 1120, the supervisor shall forward the form to the Body-Worn Camera Coordinator, who shall complete and forward the CDCR 1120 to the Warden or Chief Deputy Warden requesting the deletion and/or redaction.
   4. If approved, the Warden or Chief Deputy Warden will forward the CDCR 1120 to the ISU requesting the deletion or redaction.
   5. Prior to deletion and/or redaction, the Body-Worn Camera Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.
   6. The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.
   7. ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, and submit the completed form to the Body-Worn Camera Coordinator for distribution.
   8. The requesting employee and ISU will retain a copy of the completed form.

G. Audio/Video Monitoring Stations
   1. EIS will be responsible for establishing viewing workstations at designated locations, to include Richard J. Donovan Correctional Facility and Headquarters.

H. Review Criteria
   1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:
      a. Any use of force incident the staff member was directly involved in.
      b. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page **10** of **12**

        supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

    c. The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

    d. Body-worn camera recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations. For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

    e. The body-worn camera technology provisioning will be broken down into user groups. The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I. Review For Purpose of Report Writing

    1. For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

    2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form (Attachment 4) signed by the supervisor denying the request. A second copy of the CDCR 1119 will be made and forwarded to the Labor Relations Advocate.

    3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

        a. Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

        b. Staff shall continue to wear their body-worn camera for the duration of their shift.

        c. After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

d. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

e. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

f. The viewing of all video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

1. Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K. Alarm Activation

1. Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a body-worn camera. If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L. Body-Worn Camera Technology Media/Public Information Requests

1. All requests for video from the media and or the public that has been captured by the body-worn camera technology will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

2. All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. Richard J. Donovan Correctional Facility /CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

Richard J. Donovan Correctional Facility
OP# 28 – Body-Worn Camera Technology
Page 12 of 12

> 2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

## VIII.   ATTACHMENTS

Attachment 1 – Body-Worn Camera Replacement/Exchange Log
Attachment 2 – CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request
Attachment 3 – CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form
Attachment 4 – CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form

## IX.   APPROVAL

_____        _10 - 11- 21_____
Warden                                                    Date

ATTACHMENT C

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:

To:        Associate Directors, Division of Adult Institutions
           Wardens

Subject:   **CHEMICAL AGENTS POLICY CHANGE**

The California Department of Corrections and Rehabilitation (CDCR) was ordered by the United States District Court for the Northern District of California, to develop a plan to modify its policies to more effectively monitor and control the use of chemical agents by Richard J. Donovan Correctional Facility (RJD) staff with respect to *Armstrong* class members and at California State Prison, Los Angeles County (LAC); California State Prison, Corcoran (COR); Substance Abuse Treatment Facility (SATF); California Institute for Women (CIW); and Kern Valley State Prison (KVSP) with respect to disabled inmates. The Division of Adult Institutions will be updating the statewide policy for the use of chemical agents in immediate use of force situations.

The Department Operations Manual (DOM) Section 51020.15 currently states in part, *"Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the lawful objective."* The section will be updated to be consistent with new DOM Section 51020.15.7 that will state, in part:

*"…Employees shall give a verbal warning, whenever possible, prior to any use of chemical agents (streamer, fogger, or foam). Employees shall target the facial area and utilize a burst of approximately 3 seconds. Following the deployment, employees shall assess the need for additional deployment while allowing the chemical agent to work and providing verbal commands to the inmate(s). If the inmate(s) does/do not comply with orders or commands and additional use of force is necessary, further deployment of additional chemical agent is authorized following the same instructions as above or the employee may transition to another use-of-force option until compliance is gained. In addition to all existing requirements for reporting the use of chemical agents, employees who deploy more than one burst of chemical agent against the same inmate in the same incident shall articulate the need to utilize a second and any subsequent bursts of chemical agents or any other force option in their written report.*

DOM Sections 51020.15 and 51020.15.7 will be updated to reflect the policy changes. Additionally, chemical agent training shall reflect the changes to the policy.

Associate Directors, Division of Adult Institutions
Wardens
Page 2


Wardens shall ensure that custody staff are following policy as instructed in DOM section 51020.17.1 with regard to reporting requirements for staff utilizing force.  This includes, but is not limited to, staff articulating the actions of the inmate(s) and circumstances leading to the use-of-force; description of the specific force used; why force was used and description of the threat; and, if chemical agents were used: identify the projector used, from what distance, any specific conditions affecting the use of chemical agents (weather conditions, number of involved inmates, etc.), justification for any use of chemical agents after the first burst, etc.

Wardens shall also ensure that custody staff are following the current policy as instructed in DOM section 51020.15.3 titled "Use of Chemical Agents for Inmates with Mental Health Issues" under which "the use of chemical agents is prohibited" "in controlled use of force situations for inmates who are housed in Mental Health Crisis Bed, PIP, OHU, PSU, EOP, or an ASU-EOP Hub, or[, even if housed outside those units, who] do not possess the ability to understand orders, have difficulty complying with orders due to mental health issues, or are at increased risk of substantial decompensation from the use of force," "unless the Warden, Chief Deputy Warden, or AOD authorize the use."  Use of chemical agents "against an inmate who may not possess the ability to understand orders" is permitted only when the "circumstances are serious in nature and involve an imminent threat," or is necessary "to gain control of a disturbance involving inmates who may have mental health issues."

Furthermore, wardens shall ensure all custody staff is trained on these policy changes within 60 days of the date of this memorandum.  The BET code XXX shall be utilized for the training.

If you have any questions, please contact Tracy Snyder, Associate Warden (A), Reception Centers Mission, at (916) 324-6808.



CONNIE GIPSON
Director
Division of Adult Institutions


cc: Kimberly Seibel
      Charles W. Callahan

## *ARMSTRONG v. NEWSOM*

FIVE PRISONS COURT ORDERED REMEDIAL
PLAN (LAC, COR, SATF, CIW, and KVSP)

March 7, 2022

# FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

On March 11, 2021, the United States District Court for the Northern District of California ordered the California Department of Corrections and Rehabilitation (CDCR) to implement remedial measures to achieve compliance with the *Armstrong* Remedial Plan (ARP) and the Americans with Disabilities Act (ADA) at California State Prison, Los Angeles County (LAC); California State Prison, Corcoran (COR); California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF); California Institution for Women (CIW); and Kern Valley State Prison (KVSP). This order will be referred to herein as the "Five Prisons Remedial Order" and LAC, COR, SATF, CIW, and KVSP will be referred to collectively as the "Five Prisons." For the purpose of this plan, the term "disabled inmate" as defined in the Five Prisons Remedial Order and Injunction, is a qualified inmate with a permanent physical or mental impairment that substantially limits a major life activity. CDCR provides the following to comply with the required remedial components of the Court's Five Prisons Remedial Order:

## I.    <u>VIDEO SURVEILLANCE CAMERAS AND BODY-WORN CAMERAS [FIVE PRISONS REMEDIAL ORDER §§ 5(a), 5(b)]</u>

The Court ordered:

> Within ninety days of the finalization of the Five Prisons Remedial Plan, CDCR shall install operational surveillance cameras that cover all areas of LAC, COR, SATF, CIW, and KVSP to which disabled inmates have access, including, but not limited to, all exercise yards, housing units, sally-ports, dining halls, program areas, and gyms. Within sixty days of the finalization of the Five Prisons Remedial Plan, CDCR must begin using body-worn cameras for all correctional officers at LAC, COR, SATF, CIW, and KVSP who may have any interactions with disabled inmates. The Five Prisons Remedial Plan shall describe the steps that Defendants will take to achieve these deadlines.

(Dkt. 3218 at 3.)

CDCR implemented the Audio/Video Surveillance System (AVSS) at the Five Prisons in all areas to which disabled inmates have access. Additionally, CDCR implemented Body-Worn Camera (BWC) technology at the Five Prisons for all correctional officers and sergeants who may interact with disabled inmates.

Further, the Court ordered:

> The Five Prisons Remedial Plan must contain policies and procedures regarding the use of body-worn cameras and the use of camera footage at LAC, COR, SATF, CIW, and KVSP from any type of camera, including requirements that all footage be retained for a minimum of ninety days, that footage of use of force and other triggering events involving disabled inmates at LAC, COR, SATF, CIW, and KVSP be retained indefinitely, and that footage, when available, be reviewed and

# FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

considered as part of the investigation of any incident. The Five Prisons Remedial Plan also must contain policies and procedures for training staff at LAC, COR, SATF, CIW, and KVSP regarding how and when to use a body-worn camera and how to ensure that footage is retained and reviewed.

(*Id.* at 3-4.)

CDCR drafted policies and procedures regarding the use of AVSS/BWC at the Five Prisons as well as policies and procedures for the use of footage obtained from these cameras. Footage will be retained for 90 days, at a minimum. For triggering events involving a disabled inmate, the footage will be retained for five years per the parties' agreement. CDCR is promulgating policies and training regarding the review and consideration of such footage during investigations of triggering events. Incarcerated persons will be permitted to review and present audio-video footage at Rules Violation Report (RVR) hearings.

## A.  AVSS

AVSS implementation at the Five Prisons included replacing the existing equipment (if applicable) and installing additional video cameras with varying scopes of view depending upon the location deployed (100 degree, 180 degree, 360 degree, etc.). Audio capture is provided by external, stand-alone microphones in locations consistent with AVSS deployments.

In the event the AVSS or any individual component becomes inoperable, Five Prison staff are required to notify the AVSS Coordinator for resolution or the Watch Commander if the malfunction occurs after normal business hours.

## B.  BWC

Correctional officers and sergeants who may have interaction with disabled inmates during the regular course of their duties wear the BWCs. The approximate number of BWCs deployed at each of the Five Prisons is: LAC – 618; COR – 826; SATF – 681; CIW – 342; KVSP – 705.

## C.  Training

CDCR implemented a specialized instruction/training for AVSS and BWC implementation at the Five Prisons. All correctional staff members responsible for operating the AVSS and BWC system have received this training.

## D.  Policies

Copies of the policies related to the AVSS and BWC implementation at the Five Prisons are included in the Remedial Plan as Attachments A and B.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

II.   **PROCESS FOR STAFF COMPLAINT, INVESTIGATION, DISCIPLINE, AND OVERSIGHT [FIVE PRISONS REMEDIAL ORDER § 5(c)]**

The Court ordered:

> CDCR must develop measures to reform the staff misconduct complaint, investigation, and discipline process (Investigation and Discipline Section of the Five Prisons Remedial Plan), which shall be included in the Five Prisons Remedial Plan, to ensure (1) that CDCR completes unbiased, comprehensive investigations into all allegations of staff misconduct violative of the rights of any qualified inmate with a disability under the ARP or the ADA; (2) that CDCR imposes appropriate and consistent discipline against employees who engage in violations of the ARP or ADA with respect to disabled inmates at LAC, COR, SATF, CIW, and KVSP; and (3) that employees who engage in criminal misconduct against disabled inmates at LAC, COR, SATF, CIW, and KVSP in violation of the ARP or ADA are appropriately investigated and, if warranted, referred for prosecution or reassignment. The Investigation and Discipline Section of the Five Prisons Remedial Plan also shall ensure that officers accused of serial violations of the ARP or ADA with respect to disabled inmates at LAC, COR, SATF, CIW, and KVSP are reassigned. The Investigation and Discipline Section of the Five Prisons Remedial Plan also shall provide for effective mechanisms for oversight over all staff misconduct complaints, use-of-force reviews, and related staff disciplinary proceedings at LAC, COR, SATF, CIW, and KVSP that involve alleged violations of disabled inmates' rights under the ARP or ADA. The Investigation and Discipline Section of the Five Prisons Remedial Plan shall require quarterly interviews of randomly-selected disabled inmates at LAC, COR, SATF, CIW, and KVSP using the methodology and interview questionnaire utilized by the December 2018 investigators in connection with the Bishop Report at Richard J. Donovan Correctional Facility.

(*Id.* at 4-5.) The reforms described in this section of the Remedial Plan represent Defendants' plan to comply with Paragraph 5(c) of the Court's order.

A.   **Investigations of Staff Misconduct Complaints**

CDCR promulgated emergency regulations that were phased in beginning January 1, 2022, and described the organizational changes regarding the processing of staff misconduct allegations toward an incarcerated person or parolee. These regulations adopted a new definition of "staff misconduct" statewide: Staff misconduct is defined as behavior that resulted in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard.

///

# FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

### i.   *Overview of Organizational Changes*

Under CDCR's new process for investigations, CDCR will restructure the Allegation Inquiry Management Section (AIMS) of the Office of Internal Affairs (OIA) and will eliminate the reasonable belief standard for investigations into staff misconduct involving inmates and parolees.

This process is designed to ensure that complaints alleging serious staff misconduct, regardless of the source of the complaint, are investigated by OIA. Any person can submit a complaint of staff misconduct when they believe departmental staff have engaged in behavior that resulted in a violation of law, policy, regulation, or procedure, or an ethical or professional standard.

### ii.   *Centralized Screening*

CDCR is building a Centralized Screening Team (CST) within OIA to evaluate whether complaints received by CDCR include an allegation(s) of staff misconduct and whether that misconduct is toward an incarcerated person or parolee.

All grievances submitted by an incarcerated person or parolee shall be reviewed by CST. In addition, if departmental staff receive a written complaint outside the grievance process that alleges staff misconduct toward an incarcerated person or parolee, staff will immediately refer the complaint to CST, as well as forward a copy of the complaint to their hiring authority. If departmental staff receive a verbal complaint involving unnecessary or excessive use of force, staff-on offender sexual misconduct, or sexual harassment, staff must refer the complaint to CST.

Assigned CST staff will also review each document received to determine if it contains information constituting an imminent risk to personal safety, institutional security, or involves sexual abuse or acts of sexual misconduct as defined by the federal Prison Rape Elimination Act (PREA) and the California Sexual Abuse in Detention Elimination Act. In those instances, CST shall immediately notify the hiring authority of the affected institution or program for appropriate action.

CST will utilize an Allegation Decision Index (ADI) to determine whether a complaint should be referred to OIA for investigation or returned to the local hiring authority for inquiry. The ADI addresses allegations of serious misconduct, which include, but are not limited to: use of force, staff sexual misconduct, dishonesty to include allegations of false and retaliatory Rules Violation Reports, discrimination/harassment, retaliation, code of silence, and integrity.

CST will route all allegations in the complaint that are on the ADI, as well any allegations directly related in time and scope that are not on the ADI, to OIA for investigation. CST may refer any allegation not listed on the ADI to OIA if it determines an OIA investigation is warranted. CST shall conduct an interview with the complainant if necessary to make a screening decision. CST shall route all complaints within five business days of receipt.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

The hiring authority will be notified of CST's screening decision so they can determine whether a staff member should be redirected to a different position or placed on Administrative Time Off (ATO) as a result of the allegation or on-going investigation. Also, as is currently done, if at any point in the process a new subject is added or information comes to light that could impact the hiring authority's decision to redirect an employee or put them on ATO the investigator will contact the hiring authority (or designee) with the pertinent information.

### iii.   OIA Investigation Processing

Upon receipt of a complaint from CST, OIA staff will analyze the complaint and identify any initial information or documentation that needs to be obtained or preserved for the investigation file. OIA staff will gather the initial information or documentation not included with the complaint. OIA staff may need to request and obtain the information or documentation from the Division of Adult Institutions (DAI) or the Division of Adult Parole Operations (DAPO).

OIA will review the investigation file and determine the level of investigation that will be conducted in consultation with the Employment Advocacy and Prosecution Team (EAPT) for designated cases. OIA will determine whether to assign the investigation to a custody supervisor or special agent within OIA depending on a variety of criteria to be determined including the complexity and seriousness of the staff misconduct allegations and the potential level of discipline. If an investigation is initially assigned to a custody supervisor, a special agent may later be assigned if facts that are more complex or serious are discovered.

### 1.   Involvement of EAPT

EAPT will have the opportunity to designate cases early in this process and will designate cases consistent with policies and practices. Designated cases include, but are not limited to: matters involving staff integrity, dishonesty, or the code of silence, sexual misconduct, use of force in which an inmate suffers any serious injury, use of deadly force, serious allegations made against supervisors, and high profile or dismissal cases assigned to the vertical advocate by EAPT.

### 2.   Timeframes for Investigations

Under Government Code section 3304(d) (2021), CDCR has one year from the date of discovery of an allegation against a peace officer staff member to complete an investigation if it seeks to impose punitive action (with some exceptions codified in Government Code section 3304(d), (g)). Under Government Code section 19635, CDCR has three years from the date of discovery of an allegation against a non-peace officer staff member to serve a notice of adverse action if it seeks to impose punitive action. Despite the applicable statute of limitations set forth in California law, OIA investigations of complaints from disabled incarcerated persons at the Five Prisons conducted by custody supervisors shall be completed within 120 days of receipt by OIA and investigations of complaints from disabled incarcerated persons class members at the Five Prisons assigned to special agents shall be completed within six months. These timeframes can

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

be extended for extenuating circumstances. Any request for an extension must be approved by a supervisor and documented in writing. The six-month timeframe is specific to those matters assigned to a special agent via the new CST process and assigned to the new Allegation Investigation Unit (AIU). This does not include investigations that are processed through Central Intake as part of discipline processes outside the staff misconduct process involving incarcerated persons.

### B.  Unbiased, Comprehensive Investigations

OIA investigators shall conduct an investigation for all allegations of staff misconduct toward incarcerated persons or parolees listed in the ADI. OIA investigators shall conduct comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed.

If, during the course of the investigation, the OIA investigator discovers additional misconduct, they shall investigate the additional misconduct if it is directly related in time and scope to the incident being investigated. If the additional misconduct is not directly related to the incident, the OIA investigator shall refer the additional misconduct to CST.

If incarcerated persons or parolees report unrelated allegations of misconduct and the allegations do not involve staff use of force, staff-on-offender sexual misconduct, or sexual harassment, the investigator shall provide the incarcerated person or parolee with information on how to submit their complaint in writing.

Upon completion of an OIA staff misconduct investigation, the investigator(s) will draft an investigation report in accordance with the requirements of Penal Code section 6065(c) (2021). An investigation manager will review the draft investigation report, and supporting exhibits and recordings, to determine whether the investigation and the investigation report are comprehensive and unbiased. For designated cases, the vertical advocate shall review the draft investigation report and all supporting exhibits and recordings, and provide feedback to OIA.

CDCR will identify specific criteria to be considered when reviewing whether investigations were comprehensive and unbiased. CDCR will develop a tool for investigation managers, vertical advocates for designated cases, and hiring authorities to use to determine whether investigations are comprehensive and unbiased. The investigation manager will confirm that the Investigation Report is comprehensive and unbiased before forwarding to the hiring authority.

After the Investigation Report is finalized, the confidential final Investigation Report and all supporting exhibits and recordings, will be provided to the hiring authority and the vertical advocate for designated cases. If the hiring authority finds the investigation biased or not comprehensive the hiring authority can request further investigation. The hiring authority will confirm that the Investigation Report is comprehensive and unbiased before making any disciplinary decision.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

Investigation managers will monitor work performance of investigators, and if warranted provide training and feedback, and take other appropriate steps consistent with existing policy.

CDCR will use available information to monitor work performance of vertical advocates and hiring authorities in the investigation and disciplinary process, and if warranted provide training and feedback, and take other appropriate steps consistent with existing policy.

The Office of the Inspector General (OIG) monitors CDCR's investigative and disciplinary process.

      *i.   Hiring Authority Findings*

Upon receipt and review of the final confidential Investigation Report, exhibits, and recordings concerning an allegation of Staff Misconduct, and if sufficient, the hiring authority shall render a determination on each allegation and each subject identified in the allegation as follows:

1. NOT SUSTAINED: The investigation or inquiry failed to disclose a preponderance of evidence to prove or disprove the allegation made in the complaint.
2. UNFOUNDED: The investigation or inquiry conclusively proved that the act(s) alleged did not occur, or the act(s) may have, or in fact, occurred but the individual employee(s) named in the complaint(s) was not involved.
3. EXONERATED: The facts, which provided the basis for the complaint or allegation, did in fact occur; however, the investigation or inquiry revealed that the actions were justified, lawful, and proper.
4. SUSTAINED: The investigation or inquiry disclosed a preponderance of evidence to prove the allegation(s) made in the complaint.
5. NO FINDING: The complainant failed to disclose promised information to further the investigation; the investigation revealed that another agency was involved and the complainant has been referred to that agency; the complainant wishes to withdraw the complaint; the complainant refuses to cooperate with the investigation; or the complainant is no longer available for clarification of facts/issues.

During the 402/403 process the hiring authority will consult with the vertical advocate regarding the appropriate disciplinary findings and penalty decisions. If the OIG or EAPT believes that the hiring authority's decision does not comply with Departmental policy, OIG or EAPT can invoke executive review of the hiring authority's decision. CDCR will track data regarding the frequency with which a hiring authority's decisions have been subject to executive review.

      *ii.   Training*

CDCR will develop on-going training requirements for CST staff, locally designated investigator (LDIs, discussed below), OIA investigators, vertical advocates, and hiring authorities to ensure

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

comprehensive and unbiased investigations.

In addition, CDCR believes that investigators, vertical advocates, and hiring authorities would benefit from implicit bias training. CDCR will work to modify the implicit bias training provided to managers through California State University, Sacramento to address implicit bias related to peace officers and incarcerated persons and parolees. CDCR will also develop an implicit bias training module that will be provided annually to investigators, vertical advocates, and hiring authorities.

For training purposes, investigators will attend one State Personnel Board hearing biennially.

Vertical advocates will also receive trial training.

### iii.  Post-Investigation Review

Beginning in quarter three of calendar year 2022, CDCR will establish a regional post-investigation review process that is designed to examine investigations both for comprehensiveness and to determine whether they were conducted in an unbiased manner. Part of the review process will also include the review of hiring authorities' disciplinary decisions to ensure consistent and appropriate discipline. The review process will occur quarterly and help identify both the strengths and the weaknesses of the selected investigations. The regions are established as follows: Southern Region includes Richard J. Donovan Correctional Facility (RJD), CIW, and LAC, and the Central Region includes COR, SATF, and KVSP.

The Review Panel will be comprised of the following members:

- OIA representative(s) at the level of Chief or above, or designee.
- Office of Legal Affairs (OLA) representative(s) at the level of EAPT Chief Counsel or above, or designee.
- DAI representative(s) at the level of Associate Director or above, or designee.
- California Correctional Health Care Services (CCHCS) representative(s) if case(s) reviewed involve CCHCS staff.
- A staff member assigned by OIA Deputy Director to organize and facilitate the meetings and record any recommendations made by review members or participants.
- For at least the first quarterly meeting in each region during the first two years of implementation, an expert retained by CDCR to provide assistance with reviewing cases for bias and comprehensiveness and with setting any necessary procedures for the panel to ensure that it is meeting the goals articulated by CDCR. CDCR intends to retain a subject matter expert from an outside law enforcement organization with an expertise in investigations.

Twelve cases will be reviewed each quarter with six cases per region representing custody and CCHCS staff. The Office of Research will randomly select cases including those involving disabled

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

incarcerated persons, as defined by the *Armstrong* Five Prison Remedial Plan. The selection will include the following criteria for each region: one completed by a sergeant, three completed by lieutenants, and two completed by special agents. The panel will review investigations after the disciplinary matter is resolved.

The goal should be to determine what individual investigators did well or poorly in the specific investigation under review, as well as to identify trends in the investigation and discipline processes at institutions, within regions, or among types of cases. The panel will also evaluate if there are any regulation or policy issues that created a limitation or problem during the course of the investigation. The panel will maintain meeting agendas and minutes to capture discussions and recommendations and these will be provided to OIA Deputy Director, Division of Correctional Policy Research and Internal Oversight (CPRIO) Director, DAI Director, EAPT Chief Deputy General Counsel, and any other applicable Director depending on the cases selected for review.

The review panel should determine, in each review, which cases to incorporate into quarterly training for vertical advocates, investigators, and hiring authorities. The selected cases will be presented to vertical advocates, investigators, and hiring authorities as a group with the goal of facilitating an open discussion of both deficiencies and aspects of investigations that were done well.

###### C. Allegation Inquiry Process

If CST determines that a complaint contains allegation(s) of staff misconduct toward incarcerated persons or parolees not listed in the ADI, those allegations will be referred to the hiring authority for an allegation inquiry. The hiring authority will have an allegation inquiry conducted by an LDI trained by OIA. The LDI assigned to conduct the allegation inquiry shall be at least one rank higher than the highest-ranked subject of the allegation inquiry.

If at any point in the local investigative process any decision-maker (including LDIs, hiring authorities, or OIA Manager) learns of any evidence of staff misconduct listed in the ADI, the LDI will cease further inquiry, document the evidence in an Allegation Inquiry Report, and refer the allegation inquiry to OIA for a complete investigation with notification to the hiring authority.

If the LDI finds evidence of staff misconduct not listed in the ADI that the LDI believes may result in adverse action, the LDI shall cease further inquiry, document the evidence in the Allegation Inquiry Report, and refer the allegation inquiry to the hiring authority for review. If the hiring authority agrees that adverse action may result, the allegation inquiry shall be referred to OIA for investigation.

Inquiries conducted by LDIs are expected to be completed within 60 days of receipt. This timeframe can be extended for extenuating circumstances. Upon completion of the allegation inquiry, the LDI will prepare a draft Allegation Inquiry Report with all supporting exhibits, and submit it to an OIA manager to review and approve. The OIA manager will review the report to

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

ensure the inquiry was comprehensive and unbiased and request further inquiry if necessary. Once approved, the OIA manager will provide the approved Allegation Inquiry Report to the hiring authority. The hiring authority will review the approved Allegation Inquiry Report and determine whether the allegation inquiry is comprehensive and unbiased, or whether additional inquiry or an OIA investigation is necessary. If additional inquiry or an investigation is deemed necessary, the hiring authority can refer the matter to OIA for investigation.

If the hiring authority believes the allegation inquiry contains a preponderance of evidence to sustain the allegations and impose adverse action, the hiring authority may request approval from OIA for direct adverse action. If approval for direct adverse action is requested, OIA in consultation with EAPT will determine whether to conduct an OIA investigation or to approve direct adverse action.

Upon completion of the OIA investigation or approval of direct action, the hiring authority will review the OIA investigation report or direct action materials, and make investigative findings set forth in California Code of Regulations, title 15 section 3488.2, subdivisions (d)-(e), in consultation with EAPT on designated cases.

### D.  **Appropriate & Consistent Discipline**

#### i.  *Disciplinary Matrix Revisions*

CDCR will promulgate regulations that will update the Department's Employee Disciplinary Matrix, utilized by all hiring authorities to identify misconduct allegations and determine the appropriate penalty to be imposed when an allegation(s) of misconduct is sustained.

#### ii.  *Imposition of Discipline*

Hiring authorities should not take into account the likelihood that a particular decision might be reversed on appeal in determining what level of discipline to impose. As for staff accused of multiple violations, the current process takes into consideration the allegation with the highest penalty for assessing mitigating and aggravating factors. The lower offenses are included as aggravating the allegation with the higher penalty range.

Before vertical advocates advise a hiring authority to reduce a previously imposed penalty, they will consult with a supervisor to obtain authorization. CDCR will document the reason penalties are reduced for all cases. The OIG monitors this process for both designated and non-designated cases.

CDCR will provide additional annual training to hiring authorities on how to impose discipline, including how to review investigative reports and 402/403 memorandums, when to request additional investigation, how to weigh aggravating and mitigating factors, and how to consider past allegations or sustained findings.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

**E.  Criminal Misconduct Referrals**

The Department shall ensure that all complaints of staff misconduct are properly documented, objectively reviewed, and thoroughly investigated, and that discipline is imposed and the complaint is referred for criminal prosecution, when warranted.

As it relates to allegations of staff misconduct toward incarcerated persons or parolees arising out of the CST process, CDCR will eliminate the process whereby investigations are opened as either criminal or administrative investigations at inception. Instead, OIA will open an investigation and proceed as if criminal prosecution is possible. If during the course of the investigation CDCR makes a determination that it must interview the subject(s) of the investigation, OIA will engage in a case conference with EAPT for legal analysis before proceeding. If OIA and EAPT determine that the conduct violated a criminal law, CDCR will classify the investigation as criminal and proceed accordingly. If the conduct does not violate a criminal law, the investigation will proceed as administrative. If probable cause of criminal conduct is discovered during the course of the investigation, OIA will refer the case to the district attorney for prosecution.

**F.  Reassignment of Serially Accused Officers**

**i.  *Administrative Time Off***

When an employee is under investigation, or subject to discipline, the employee may be placed on ATO by the hiring authority for one or more of the following reasons:

1.  The employee has been convicted of a felony;
2.  The employee is suspected of smuggling contraband;
3.  The employee has, or their continued presence will, jeopardize the safety and security of the workplace, or the health and welfare of other employees, inmates, wards, or parolees;
4.  The employee's continued presence in the workplace during the investigation or discipline process would undermine the Department's ability to conduct a fair and thorough investigation or discipline process;
5.  Information is discovered during the investigative process that would likely lead to dismissal;
6.  The hiring authority elects to dismiss the employee.

**ii.  *Temporary Involuntary Transfer***

A hiring authority may temporarily involuntarily transfer an employee to another institution or reassign the employee within the same institution or program while the employee is under investigation when ATO is not appropriate.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

Hiring authorities should consider the question of ATO or transfer not just after discipline is imposed but during the investigation as well. This is already included in CDCR's existing policies, and the expectation is that this evaluation is continued throughout the investigation. If during the course of the investigation the investigator discovers information implicating any of the above ATO categories, the investigator will provide this information to the HA for consideration of ATO or transfer.

The hiring authority should consider the nature of the allegation, the apparent strength of the evidence, and whether the staff member has previously been found to have committed misconduct similar to the current allegation.

The hiring authority's decision to apply ATO or transfer, and the justification for that decision, is documented and sent to HQ on a weekly basis for review by the associate and deputy directors. Hiring authorities have the authority to transfer staff without prior approval from their supervisor.

### G.  Quarterly Interviews

CDCR is conducting quarterly interviews of randomly selected disabled inmates at the Five Prisons. The interviewing teams are comprised of ombudsmen, associate wardens, captains, and sergeants from other institutions. The Office of Research randomly selects disabled inmates to interview. Five percent of the total disabled inmates housed at the Five Prisons are selected each quarter. The selected disabled inmates are interviewed independently, utilizing the questions used by investigators in December 2018.

At the conclusion of the interviews, the team compiles all interview documents and provides a written report summarizing the findings. The report is presented to the Director of DAI within 30 days of the conclusion of interviews. Any allegations of staff misconduct will be referred to the CST for processing in accordance with the policies set forth above. If a Corrective Action Plan (CAP) is required following the analysis of the interviews, an associate warden or captain will create the CAP and monitor its completion. The interview documentation, any resulting CAPs, and written summary report will be provided to Plaintiffs' counsel within 45 days of the conclusion of the interviews.

### III.   THIRD-PARTY MONITORING [FIVE PRISONS REMEDIAL ORDER § 5(d)]

The Court ordered:

> The Court delegates to Edward Swanson, its expert, pursuant to Federal Rule of Evidence 706, the additional duties of monitoring Defendants' implementation of their Investigation and Discipline Section of the Five Prisons Remedial Plan. Mr. Swanson shall have access to all documents reasonably necessary for monitoring Defendants' implementation of their Investigation and Discipline

# FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

Section of the Five Prisons Remedial Plan. Mr. Swanson shall issue quarterly reports regarding Defendants' implementation of the Investigation and Discipline Section of the Five Prisons Remedial Plan. Prior to the issuance of each quarterly report, the parties and Mr. Swanson shall meet and confer regarding his findings for the quarter.

(*Id.* at 5.)

CDCR shall ensure that the court expert has access to the documentation and data necessary to effectively monitor CDCR's implementation of their staff complaint, investigation, and discipline processes as provided in the Five Prisons Remedial Order.

## IV.   EARLY WARNING SYSTEM [FIVE PRISONS REMEDIAL ORDER § 5(e)]

The Court ordered:

> CDCR shall develop an electronic system for tracking all staff misconduct incidents involving disabled inmates at LAC, COR, SATF, CIW, and KVSP by date, time, location, staff involved, and disabled inmates involved, that includes information about the nature of the disabled inmates' disabilities, any injuries they suffered, and related medical records.

(*Id.* at 5-6.)

The Enterprise Risk Management Unit will lead the effort to, based on data, identify trends related to staff misconduct and other indicators of potential operational problems and to suggest steps that might prevent misconduct. Data will be gathered from multiple CDCR databases, including the Strategic Offender Management System (SOMS), Case Management System, the Allegations Against Staff Tracking System, and others and compiled to create automated Early Warning System dashboards, with red flag and alert systems that can be viewed by institution leadership and CDCR executives. In addition, the Early Warning System dashboards will be programmed to send automated alerts and warnings to impacted locations when alarming trends surface. Enterprise Risk Management will also facilitate meetings to discuss the identified concerns, help the program area create a corrective action plan, and then continue to monitor trends after corrective actions are implemented to determine if the implemented measures are resulting in the desired outcome. Director-level sign-off will be required to determine whether implemented measures have resulted in desired outcomes.

The system will allow for comparison of institutions, facilities, and employees to other institutions, facilities, and employees who are similarly situated. The system will take into consideration factors such as civil service classification, work location, shift, and institutional security level in arriving at red flag indicators.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

**V.      INFORMATION-SHARING WITH PLAINTIFFS' COUNSEL AND THE COURT EXPERT [FIVE PRISONS REMEDIAL ORDER § 5(f)]**

The Court ordered:

> CDCR must produce to Plaintiffs' counsel and the Court's expert, Mr. Swanson, on a quarterly basis, all documents related to LAC, COR, SATF, CIW, and KVSP staff misconduct complaints in which the alleged victim is a qualified inmate with a disability and alleges violations of his or her rights under the ARP or ADA, including, but not limited to, grievances, incident reports, documents from staff misconduct inquiries, documents from Institutional Executive Review Committee inquiries in which the qualified inmate with a disability alleges excessive use of force or other staff misconduct in violation of his or her rights under the ARP or ADA, 989 forms and all supporting documents, responses of the Central Intake Unit of OIA to 989 forms, investigation reports produced by the OIA, and 989 and 402 forms issued by the hiring authority. CDCR must also provide Plaintiffs' counsel with monthly, written updates regarding progress on the implementation of the Five Prisons Remedial Plan at LAC, COR, SATF, CIW, and KVSP, including data regarding staff misconduct complaints and use of force involving a qualified inmate with a disability where there is a possible violation of the disabled inmate's rights under the ARP or ADA.

(*Id.* at 6.)

CDCR will provide Plaintiffs' counsel and the court expert with all documents related to Five Prison staff misconduct complaints in which the alleged victim is a disabled inmate. CDCR will provide these documents subject to the protective order in place in this matter and will produce documents on a quarterly basis, based on the following schedule:

SATF:          Based on the calendar year quarters with quarterly production due within 30 days of the end of March, June, September, and December.

COR/KVSP:   Yearly production period beginning in February with quarterly production due within 30 days of the end of April, July, October, and January. To transition to this staggered schedule, COR and KVSP produced 2021 3rd quarter documents on October 30, 2021, produced documents for the month of October 2021 on November 30, 2021, and will produce on a quarterly basis thereafter.

CIW/LAC:     Yearly production period beginning in March with quarterly production due within 30 days of the end of May, August, November, and February. To transition to this staggered schedule, CIW and LAC produced 2021 3rd quarter documents on October 30, 2021, produced documents for the months of October and November 2021 on December 30, 2021, and will produce on a quarterly basis thereafter.

///

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

Quarterly production will be provided to Plaintiffs' counsel and the court expert within 30 days of the end of the institution's specified quarter and will include the following:

- All completed staff complaints;

- All completed grievances and the responses to the disabled inmates regarding those grievances; and

- All allegations of unnecessary or excessive uses of force against disabled inmates.

The following investigations and disciplinary documents will be considered closed thirty days from the date the adverse action becomes effective.

- All CDCR Form 989s and supporting documents;

- All responses to CDCR Form 989s from the OIA's Central Intake Unit;

- All investigative reports produced by the OIA;

- All CDCR Form 402/403s issued by the Five Prisons; and

- All settlement agreements and State Personnel Board decisions in the quarter the institution receives them.

This substantial document production along with any documents associated with the quarterly interviews will constitute CDCR's monthly updates regarding the implementation of the Five Prison Remedial Plan.

## VI.   SUPERVISORY STAFFING [FIVE PRISONS REMEDIAL ORDER § 5(g)]

The Court ordered: "CDCR must significantly increase supervisory staff by posting additional sergeants on all watches on all yards at LAC, COR, SATF, CIW, and KVSP." (*Id.*)

CDCR has significantly increased supervisory staff by posting 38 additional correctional sergeants across the Five Prisons for coverage seven (7) days a week. CDCR has hired and trained the additional correctional sergeants. The 38 correctional sergeants are distributed amongst the Five Prisons as follows:

| | |
|---|---|
| CIW (One Facility): | Two (2) additional sergeants: one (1) on second watch and one (1) on third watch. |
| KVSP (Four Facilities): | Seven (7) additional sergeants: four (4) on second watch and three (3) on third watch. Facility A sergeant will cross cover Facility B on third watch. |

## FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

LAC (Four Facilities):    Seven (7) additional sergeants: four (4) on second watch and three (3) on third watch. Facility A sergeant will cross cover Facility B on third watch.

COR (Five Facilities):    Eight (8) additional sergeants: five (5) on second watch and three (3) on third watch. Facility 3C sergeant will cross cover Facility M on second and third watch. For third watch, one (1) sergeant assigned to Facility 3A, one (1) sergeant assigned to cross-cover Facility 3B and 3C, and one (1) sergeant assigned to cross-cover Facility 4A and 4B.

SATF (Seven Facilities):    Fourteen (14) additional sergeants at SATF: seven (7) on second watch and seven (7) on third watch.

These positions are focused on ADA issues and are expected to regularly walk the facilities and establish positive relationships with both the ADA population and Five Prison staff. The additional sergeants are expected to maintain frequent contact with disabled inmates and report observations concerning any incident that is persistent or egregious.

These 38 additional sergeants will further ensure staff are trained in the ARP as well as the Five Prison Remedial Plan and are acting in accordance with directives contained therein. The additional sergeants will review the Daily Movement Sheet and all relevant reports in SOMS relating to disabled inmates in order to provide training to staff regarding the disabled inmates' disabilities and ensure the disabled inmates' disabilities are appropriately addressed. In addition, the additional sergeants will provide meaningful training to staff for issues of non-compliance with the ARP and Five Prison Remedial Plan. The sergeants will also conduct a minimum of one check-in with any disabled inmate who has filed a staff complaint within the preceding 30 days.

Finally, these additional sergeants will also be able to address staff issues at the lowest level through mentoring, coaching of officers, and identification of non-compliance issues as well as ensuring non-compliance issues are captured on the *Armstrong* accountability log by reporting to the ADAC. Post Orders make these duties clear and clarify the role the additional sergeants will play in addressing retaliation concerns by disabled inmates.

### VII.    TRAINING [FIVE PRISONS REMEDIAL ORDER § 5(h)]

The Court ordered:

> CDCR must develop and implement training intended to eliminate violations of the ARP and ADA at LAC, COR, SATF, CIW, and KVSP, such as human rights, de-escalation, and cultural training, for all custody, mental health, and medical staff at LAC, COR, SATF, CIW, and KVSP who interact with disabled inmates. The training must include discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people with disabilities.

FIVE PRISON REMEDIAL PLAN (*ARMSTRONG*)

(*Id.* at 7.)

CDCR has developed training to eliminate violations of disabled inmates' rights under the ARP and ADA. The training includes discussion of reporting requirements, whistleblowing, non-retaliation, and treatment of disabled inmates in addition to topics such as human rights, de-escalation, cultural concerns, and aspects of the existing code-of-silence training.

The Class Action Management Unit (CAMU) delivered this training in person to select Five Prisons managers and staff. Those pre-selected staff members are now subject matter experts and will be responsible for training all Five Prison staff members that interact with disabled inmates. This enhanced training will be provided annually to all custody, mental health, and medical staff at the Five Prisons who interact with disabled inmates.

### VIII.   ANTI-RETALIATION MECHANISMS [FIVE PRISONS REMEDIAL ORDER § 5(i)]

The Court ordered: "CDCR shall develop mechanisms to end and prevent any retaliation against disabled inmates who report violations of their rights under the ARP or ADA and to ensure their safety. These mechanisms shall be described in the Five Prisons Remedial Plan." (*Id.*)

CDCR has developed additional mechanisms to prevent and end any retaliation against disabled inmates who report violations of their rights under the ARP or ADA and to ensure their safety. CDCR is utilizing a multi-pronged approach that includes training, town hall meetings, and the display of educational posters.

CAMU also provided direction to Five Prisons staff about how to create content for monthly town hall meetings with disabled inmates by working with the IAC to develop content that is relevant to the specific concerns of the disabled inmates.

Additionally, anti-retaliation posters have been posted in all housing areas of the Five Prisons where disabled inmates have access. The poster includes references to anti-retaliation policies and provides contact information for the internal and external reporting of retaliation allegations.

### IX.   USE OF FORCE – PEPPER SPRAY [FIVE PRISONS REMEDIAL ORDER § 5(j)]

The Court ordered: "CDCR shall develop a plan to modify its policies to more effectively monitor and control the use of pepper spray by staff at LAC, COR, SATF, CIW, and KVSP with respect to disabled inmates. This plan shall be described in the Five Prisons Remedial Plan." (*Id.*)

CDCR revised its policies to more effectively monitor and control the use of pepper spray by Five Prisons staff with respect to disabled inmates. Additionally, the deployment of AVSS and BWCs present a substantial modification to the ability of the Five Prisons to monitor and control the use of chemical agents.

A copy of the revised policy for the use of chemical agents is included as Attachment C.

ATTACHMENT A

# CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
## CALIFORNIA INSTITUTIN FOR WOMEN
## LOCAL OPERATIONS PROCEDURE 210
## AUDIO/VIDEO SURVEILLANCE SYSTEM

**I.   PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide California Institution for Women (CIW) with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

**II.   REFERENCES**

1.   Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems.

2.   California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

3.   Memorandum – dated May 10, 2019 – Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report, signed by Connie Gipson, Director, Division of adult Institutions (DAI).

4.   Memorandum – dated January 26, 2018 – Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Deputy Director, Facility Operations, DAI.

5.   Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

6.   Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

7.   California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

**III.   REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of February by the Associate Warden, Custody, Housing and Program Services (AWCHPS), and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

## IV.    RESPONSIBILITY

The Warden has the overall responsibility for this procedure with delegated responsibility to the AWCHPS, who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

## V.    PROCEDURE

A. The CIW AVSS is capable of being monitored from designated areas within the institution. Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.
   1. Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.
   2. Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from CIW will receive specialized instruction/training on the AVSS.  Those T4T instructors will then train all of the staff responsible for operating within the AVSS.
   3. Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.
   4. In the event the AVSS becomes inoperable, s CIW staff will revert back to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander after hours, for resolution.

## VI.    REQUIREMENTS

A. Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Recorded audio, video, or both forms of recording technology is generally used for the investigation of safety and security incidents.  Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium.  The video evidence shall be managed by the prison's Investigative Services Unit (ISU) or as directed by the Hiring Authority for a period of not less than 90 days.  Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B. The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:
   1. Any use of force incident.
   2. Riots.
   3. Suspected felonious criminal activity.
   4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths.
   5. All PREA allegations.

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports [RVRs]) by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.)
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person.
8. Incidents that may be potentially referred to the District Attorney's Office.
9. An employee report to supervisor of on-the-job injury.
10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at CIW shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles. Public notice that recording technology may be in use shall be placed at the gatehouse, front entrance, and vehicle sally ports of all correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E. Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services (EIS) and the designated coordinator.

F.  Preserving Recorded Data
When an event occurs that requires staff to preserve recorded data the following process shall be utilized:
1. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
2. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) will be submitted to ISU.
3. The signed request will be scanned and emailed to the CIW ISU.  This will ensure that all ISU staff receives the signed CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) for timely processing.
4. When the ISU receives a request to review audio and/or video recordings via CDCR Form 1027, ISU staff will refer to the Incident, RVR or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates.  All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.  The ISU AVSS Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
5. ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
6. ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
7. ISU will save and keep on file a hard copy of the CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A).
8. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
9. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G.  Audio/Video Monitoring Stations
1. Audio/Video Monitoring Stations are positioned in several locations throughout the institution.  These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning.  Monitoring stations will be located in the following areas:
   a. Warden's Office
   b. CDW's Office
   c. ISU Office
   d. Facility A Program Office
   e. Healthcare Lieutenant's Office

      f.   Central Control
      g.  Special Programs Housing Unit Control
      h.  AWCHPS
      i.   Associate Warden Healthcare Operations
      j.   Visiting Sergeants Office

H.  Review Criteria

1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:

   a. Reviewing the circumstances of a crime or suspected crime.

   b. Reviewing the circumstances of an accident or near accident.

   c. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

   d. Routine matters (See Section G below).

   e. The review/viewing of live or recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

   f. The review/viewing of live or recorded video will not be used for routine supervision of staff. For example, audio and/or video surveillance will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of audio and/or video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

   g. The AVSS provisioning will be broken down into user groups. The Hiring Authority will establish what provisioning the individual users will be able to accomplish in the system.

   h. Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment. Those staff members will be able to watch live feed video only. If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data.

      i. Towers 1 and 6

      ii. Visiting Officers

      iii. Short Term Restricted Housing Control Booth Officer

I.  Review For Purpose of Report Writing
    1. For routine matters that do not involve an allegation of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.
    2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) signed by the supervisor denying the request. A second copy of the CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) will be made and forwarded to the Labor Relations Analyst.
    3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:
        a. Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.
        b. After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."
        c. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.
        d. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.
        e. The viewing of all audio/video recordings may be done in the presence of a supervisor.

J.  Use of Video Footage in the Rules Violation Report Process
    1. Inmates shall be provided the opportunity to view any video footage related to a RVR with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the RVR.

K. ALARM ACTIVATION
    1. The AVSS will not be continuously monitored; therefore, staff is still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, per DOM 55090.

L. AVSS MEDIA/PUBLIC INFORMATION REQUESTS
    1. All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at DAI.
    2. All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

L. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

    1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).
    2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

### VII.   ATTACHMENTS

Attachment A – CDCR Form 1027, Audio/Video Surveillance System Evidence Request
Attachment B – CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial

### VIII.   APPROVAL

_signature_     10/8/21

MONA D. HOUSTON
Warden (A)                                    Date
California Institution for Women

| | |
|---|---|
| New: | |
| Revised: | October 2021 |
| Annual Revision Month: | February |

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON-CORCORAN**
**CORCORAN, CALIFORNIA 93212**

Operational Procedure (OP)

I.   **PLAN NUMBER AND TITLE**

    A.   OP No.:  243

    B.   OP Title: Audio/Video Surveillance System

II.   **PURPOSE AND OBJECTIVES**

    A.   The purpose of this procedure is to provide California State Prison-Corcoran (CSP-Corcoran) with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

    B.   The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

III.   **REFERENCE**

    A.   Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems

    B.   California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

    C.   Memorandum authored by Connie Gipson, Director, Division of Adult Institutions (DAI), dated May 10, 2019, titled "Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report"

    D.   Memorandum authored by Connie Gipson, Deputy Director, Facility Operations, DAI, dated January 26, 2018, titled "Institutional Audio/Video Surveillance Systems"

    E.   Memorandum authored by Connie Gipson, Director, DAI, dated June 2, 2021, titled "Implementation Plan for the Body-Worn Camera Technology Expansion"

F.   Memorandum authored by Connie Gipson, Director, DAI, dated July 19, 2021, titled "Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems"

G.   California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording

## IV.   APPROVAL AND REVIEW

This procedure will be reviewed annually in the month of February by the Associate Warden (AW)-Central Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

## V.   RESPONSIBILITY

The Warden has the overall responsibility for this procedure with delegated responsibility to the AW-Central Operations, who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

## VI.   PROCEDURE

The CSP-Corcoran AVSS is capable of being monitored from designated areas within the institution.  Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.

A.   Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.

B.   Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from CSP-Corcoran will receive specialized instruction/training on the AVSS.  Those T4T instructors will then train all of the staff responsible for operating within the AVSS.

C.   Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.

D.   In the event the AVSS becomes inoperable, CSP-Corcoran staff will revert to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander, after hours, for resolution.

## VII.   REQUIREMENTS

A.   Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or

records. Recorded audio, video, or both forms of recording technology are generally used for the investigation of safety and security incidents. Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium. The video evidence shall be managed by the prison's Investigative Services Unit (ISU), or as directed by the Hiring Authority, for a period of no less than 90 days. Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B. The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1. Any use of force incident

2. Riots

3. Suspected felonious criminal activity

4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths

5. All Prison Rape Elimination Act (PREA) allegations

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Report [RVR]) by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.)

7. Allegations of staff misconduct by an inmate, employee, visitor, or other person

8. Incidents that may be potentially referred to the District Attorney's Office

9. An employee report to supervisor of on-the-job injury

10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head

when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C.      All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at CSP-Corcoran shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, OLA, Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil, or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D.      To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles. Public notice that recording technology may be in use shall be placed at the Gatehouse, Front Entrance, and Vehicle Sally Ports of all correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E.      Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services and the designated coordinator.

F.      Preserving Recorded Data

        When an event occurs that requires staff to preserve recorded data the following process shall be utilized:

        1.      During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

        2.      Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1027, Audio/Video Surveillance System Evidence Request **(Attachment A)**, will be submitted to ISU.

        3.      The signed request will be scanned and emailed to the CSP-Corcoran ISU. This will ensure that all ISU staff receives the signed CDCR 1027, Audio/Video Surveillance System Evidence Request, for timely processing.

4.      When the ISU receives a request to review audio and/or video recordings via CDCR 1027, Audio/Video Surveillance System Evidence Request, ISU staff will refer to the Incident, RVR, or Grievance Log Number provided on the form, and identify all inmate participants.  Utilizing Strategic Offender Management System (SOMS), ISU staff will determine if any inmate participants are identified as disabled inmates.  All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.  The ISU AVSS Officer will provide the Information Technology (IT) support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

5.      ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.

6.      ISU will make two copies of the event.  One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

7.      ISU will save and keep on file a hard copy of the CDCR 1027, Audio/Video Surveillance System Evidence Request.

8.      All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD), Read Only Memory (ROM) drive, or Universal Serial Bus (USB) portable drive.

9.      In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G.      Audio/Video Monitoring Stations

Audio/Video Monitoring Stations are positioned in several locations throughout the Institution.  These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning. Monitoring stations will be located in the following areas:

1.      Warden's Office

2.      CDW's Office

3.      Central Control

4.    3A Visiting

5.    3B Visiting

6.    3C Visiting

7.    IT Office

8.    AW-American Disabilities Act's Office

9.    3A Lieutenant Office

10.    3B Lieutenant Office

11.    3C Lieutenant Office

12.    I5U Lieutenant Office

13.    Institutional Gang Investigations Lieutenant Office

14.    Body-Worn Camera Officer's Station

15.    AVSS Officer's 5tation

16.    Correctional Treatment Center Control

17.    Complex Control

18.    4A Visiting

19.    4B Visiting

20.    4A Lieutenant #1 Office

21.    4A Lieutenant #2 Office

22.    4B Lieutenant's Office

23.    Tower 1

24.    Tower 4

25.    Tower 5

H.     Review Criteria

       Criteria for the review/viewing of video shall constitute a legitimate need, which
       includes:

       1.     Reviewing the circumstances of a crime or suspected crime.

       2.     Reviewing the circumstances of an accident or near accident.

       3.     Staff report writing for use of force incidents, pursuant to the DOM,
              Section 51020.17, Uses of Force-Reporting Requirements, states in part,
              "Any employee who uses force or observes a staff use of force shall
              report it to a supervisor as soon as practical and follow up with
              appropriate documentation prior to being relieved from duty. The CDCR
              837 Crime/Incident Report forms are used for reporting uses of force.
              Written reports regarding both immediate and controlled use of force
              shall be documented on a CDCR 837."

       4.     Routine matters (see section 7 below)

       5.     The review/viewing of live or recorded video shall be limited to those
              that have appropriate provisioning and have a legitimate reason and/or
              need to view. Those with appropriate provisioning that do not have a
              legitimate need to view shall not access the system for unauthorized
              reasons.

       6.     The review/viewing of live or recorded video will not be used for routine
              supervision of staff. For example, audio and/or video surveillance will
              not be used to monitor staff arrivals/departures from job site. However,
              if during the legitimate review of audio and/or video, staff misconduct is
              identified, the video recording can be used as part of the corrective
              action and/or disciplinary process. Supervisors/Managers shall not use
              stored audio and/or video to identify previous similar behavior.

       7.     The AVS5 provisioning will be broken down into user groups. The Hiring
              Authority will establish what provisioning the individual users will be able
              to accomplish in the system.

       8.     Officers in these assignments will have access to the Video Monitoring
              Stations in their area of assignment. Those staff members will be able to
              watch live feed video only. If those staff members have a need or reason
              to review recorded, video they may request for a supervisor with
              appropriate provisioning to access the recorded data.

              a.     Towers 1, 4, and 11

       b.      Visiting Officers

       c.      Short Term Restricted Housing Control Booth Officer

I.     Review For Purpose of Report Writing

    1.     For routine matters that do not involve an allegation of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

    2.     If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1028, Audio/Video Surveillance System Evidence Request Denial **(Attachment B)**, signed by the supervisor denying the request. A second copy of the CDCR 1028, Audio/Video Surveillance System Evidence Request Denial, will be made and forwarded to the Labor Relations Analyst.

    3.     For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

       a.      Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.

       b.      After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

       c.      When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.

       d.      If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

       e.      The viewing of all audio/video recordings may be done in the presence of a supervisor.

J.   Use of Video Footage in the Rules Violation Report Process

Inmates shall be provided the opportunity to view any video footage related to a RVR with which they have been charged, even if the Hearing Officer is not using the video footage as evidence.  The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence.  At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense.  This shall be addressed in the Disposition portion of the RVR.

K.   Alarm Activation

The AVSS will not be continuously monitored; therefore, staff are still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, pursuant to DOM, Section 55090.

L.   AVSS Media/Public Information Requests

1.   All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Administrative Assistant/Public Information Officer.  These requests will be routed via the Hiring Authority through the chain of command at the DAI.

2.   All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information.  CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

L.   Metrics reporting in the DAI 13-Month Report (COMPSTAT)

1.   On the last day of each month, designated staff in the ISU and OOG shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT Coordinator (Use of Force Coordinator).

2.   The COMPSTAT Coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e., February for January, March for February, etc.)

## VIII.   ATTACHMENTS

A.   CDCR 1027, Audio/Video Surveillance System Evidence Request

B.   CDCR 1028, Audio/Video Surveillance System Evidence Request Denial

_____                    _10 - 11 - 21_

KEN CLARK                                    Date
Warden
California State Prison-Corcoran

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #620**
**Audio-Video Surveillance System**

## I. PLAN NUMBER AND TITLE:

Operational Procedure (OP) Number: 620

OP Title: Audio-Video Surveillance System (AVSS)

## II. PURPOSE AND OBJECTIVES:

A. The purpose of this procedure is to provide Kern Valley State Prison (KVSP) with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

B. The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

## III. REFERENCES:

A. Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems.

B. California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

C. Memorandum – dated May 10, 2019 – Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report, signed by Connie Gipson, Director, Division of adult Institutions (DAI).

D. Memorandum – dated January 26, 2018 – Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Deputy Director, Facility Operations, DAI.

E. Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

F. Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

G. California Correctional Peace Officers Association, Memorandum of

Understanding/Contract, Section 9.16, Video Recording.

## IV. APPROVAL AND REVIEW:

This procedure will be reviewed annually in the month of October by the Associate Warden-Central Operation (AWCO), and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

**ANNUAL REVIEW/REVISED: October 2021**

## V. RESPONSIBILITY:

The Warden has the overall responsibility for this procedure with delegated responsibility to the Associate Warden-Central Operations (AWCO), who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

## VI. PROCEDURES:

A. The KVSP AVSS is capable of being monitored from designated areas within the institution. Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.

1. Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.

2. Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from KVSP will receive specialized instruction/training on the AVSS. Those T4T instructors will then train all of the staff responsible for operating within the AVSS.

3. Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.

4. When an event occurs that requires the preservation of recorded data; Managers, Supervisors, and the Correctional Counselor Supervisor from the Appeals Office shall be responsible for filling out and submitting a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (**Attachment A**).

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #620**
**Audio-Video Surveillance System**

5.  In the event the AVSS becomes inoperable, KVSP staff will revert back to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander after hours, for resolution.

## VII.  REQUIREMENTS

A.  Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Recorded audio, video, or both forms of recording technology is generally used for the investigation of safety and security incidents. Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium. The video evidence shall be managed by the prison's Investigative Services Unit (ISU) or as directed by the Hiring Authority for a period of not less than 90 days. Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B.  The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1.  Any use of force incident.

2.  Riots.

3.  Suspected felonious criminal activity.

4.  Any incident resulting in serious bodily injury, great bodily injury, and all deaths.

5.  All PREA allegations.

6.  Allegations of inmate misconduct (i.e., Serious Rules Violation Reports [RVRs] by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.).

7.  Allegations of staff misconduct by an inmate, employee, visitor, or other person.

8.  Incidents that may potentially be referred to the District Attorney's Office.

9.  An employee report to supervisor of on-the-job injury.

10.  Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

C.  The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

D.  The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

E.  All footage shall be retained for a minimum of 90-days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at KVSP shall be retained for five (5) years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D.  To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles. Public notice that recording technology may be in use shall be placed at the gatehouse, front entrance, and vehicle sally ports of all

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #620**
**Audio-Video Surveillance System**

correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E.  Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services (EIS) and the designated coordinator.

F.  Preserving Recorded Data

When an event occurs that requires staff to preserve recorded data the following process shall be utilized:

1.  During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

2.  Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (**Attachment A**) will be submitted to ISU.

3.  The signed request will be scanned and emailed to the KVSP ISU. This will ensure that all ISU staff receives the signed CDCR Form 1027, Audio/Video Surveillance System Evidence Request (**Attachment A**) for timely processing.

4.  When the ISU receives a request to review audio and/or video recordings via CDCR Form 1027, ISU staff will refer to the Incident, Rules Violation report,or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium. The ISU AVSS Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

5.  ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.

6.  ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

7.  ISU will save and keep on file a hard copy of the CDCR Form 1027, Audio/Video Surveillance System Evidence Request (**Attachment A**).

8.  All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.

9.  In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G.  Audio/Video Monitoring Stations

1.  Audio/Video Monitoring Stations are positioned in several locations throughout the institution.  These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning.  Monitoring stations will be located in the following areas:

a.  Facility A Lieutenant's Office

b.  Facility B Lieutenant's Office

c.  Facility C Lieutenant's Office

d.  Facility D Lieutenant's Office

e.  Ad-Seg Lieutenant's Office

f.  ISU Office

g.  Information Technology (IT) Office

h.  Chief Deputy's Office

i.  Warden's Office

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #620**
**Audio-Video Surveillance System**

H. Review Criteria

1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:

   a. Reviewing the circumstances of a crime or suspected crime.

   b. Reviewing the circumstances of an accident or near accident.

   c. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

   d. Routine matters (See Section G below).

   e. The review/viewing of live or recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

   f. The review/viewing of live or recorded video will not be used for routine supervision of staff. For example, audio and/or video surveillance will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of audio and/or video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

   g. The AVSS provisioning will be broken down into user groups. The Hiring Authority will establish what provisioning the individual users will be able to accomplish in the system.

   h. Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment. Those staff members will be able to watch live feed video only. If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data. Examples shown below:

      i. <u>Example</u>: Towers 1 and 7

      ii. <u>Example</u>: Visiting

      iii. <u>Example</u>: Short Term Restricted Housing Control Booth

I. Review For Purpose of Report Writing

1. For routine matters that do not involve an allegations of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (**Attachment B**) signed by the supervisor denying the request. A second copy of the CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (**Attachment B**) will be made and forwarded to the Labor Relations Analyst.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

   a. Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #620**
**Audio-Video Surveillance System**

b. After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

c. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.

d. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

e. The viewing of all audio/video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

1. Inmates shall be provided the opportunity to view any video footage related to a RVR with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24-hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the RVR.

K. Alarm Activation

1. The AVSS will not be continuously monitored; therefore, staff is still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, per DOM 55090.

L. AVSS Media/Public Information Requests

1. All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

2. All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

1. On the last day of each month, designated staff in the ISU and OOG shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

**ATTACHMENTS**

**Attachment A** – CDCR Form 1027, Audio/Video Surveillance System Evidence Request
**Attachment B** – CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial

Approved: _____
CHRISTIAN PFEIFFER
Warden
Kern Valley State Prison

Date: _____

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON, LOS ANGELES COUNTY**

**LOCAL OPERATIONS PROCEDURE**
**AUDIO/VIDEO SURVEILLANCE SYSTEM**

**I.      PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide California State Prison, Los Angeles County (LAC) with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

**II.     REFERENCES**

1.  Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems.

2.  California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

3.  Memorandum – dated May 10, 2019 – Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report, signed by Connie Gipson, Director, Division of adult Institutions (DAI).

4.  Memorandum – dated January 26, 2018 – Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Deputy Director, Facility Operations, DAI.

5.  Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

6.  Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

7.  California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

**III.    REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of September by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page **2** of **7**

**IV.     RESPONSIBILITY**

The Warden has the overall responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

**V.      PROCEDURE**

A. The LAC AVSS is capable of being monitored from designated areas within the institution. Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.
   1. Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.
   2. Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from LAC will receive specialized instruction/training on the AVSS. Those T4T instructors will then train all of the staff responsible for operating within the AVSS.
   3. Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.
   4. In the event the AVSS becomes inoperable, LAC staff will revert back to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander after hours, for resolution.

**VI.     REQUIREMENTS**

A. Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Recorded audio, video, or both forms of recording technology is generally used for the investigation of safety and security incidents. Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium. The video evidence shall be managed by the prison's Investigative Services Unit (ISU) or as directed by the Hiring Authority for a period of not less than 90 days. Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B. The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:
   1. Any use of force incident.
   2. Riots.
   3. Suspected felonious criminal activity.
   4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths.
   5. All PREA allegations.

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page **3** of **7**

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports [RVRs]) by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.)
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person.
8. Incidents that may be potentially referred to the District Attorney's Office.
9. An employee report to supervisor of on-the-job injury.
10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested.  The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.  The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C.  All footage shall be retained for a minimum of 90 days.  All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at LAC shall be retained for five years.  Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA.  Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D.  To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles.  Public notice that recording technology may be in use shall be placed at the gatehouse, front entrance, and vehicle sally ports of all correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E.  Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services (EIS) and the designated coordinator.

F.  Preserving Recorded Data

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page **4** of **7**

When an event occurs that requires staff to preserve recorded data the following process shall be utilized:

1. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
2. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) will be submitted to ISU.
3. The signed request will be scanned and emailed to the LAC ISU.  This will ensure that all ISU staff receives the signed CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) for timely processing.
4. When the ISU receives a request to review audio and/or video recordings via CDCR Form 1027, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates.  All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium. The ISU AVSS Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
5. ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
6. ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
7. ISU will save and keep on file a hard copy of the CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A).
8. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
9. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G. Audio/Video Monitoring Stations
   1. Audio/Video Monitoring Stations are positioned in several locations throughout the institution.  These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning.  Monitoring stations will be located in the following areas:

      a.  Warden's Conference Room
      b.  Chief Deputy Warden's Office
      c.  AW Central Operation's Office
      d.  Captain, Central Operation's Office

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page **5** of 7

      e. Internal Affairs Lieutenant's Office
      f. ISU Squad Office
      g. Lieutenant's Office (Facility A, B, C, D, Health Care, Short Term Restricted Housing, Visiting)
      h. MSF Visiting
      i. Central Control

H. Review Criteria
  1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:
    a. Reviewing the circumstances of a crime or suspected crime.
    b. Reviewing the circumstances of an accident or near accident.
    c. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."
    d. Routine matters (See Section G below).
    e. The review/viewing of live or recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.
    f. The review/viewing of live or recorded video will not be used for routine supervision of staff. For example, audio and/or video surveillance will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of audio and/or video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.
    g. The AVSS provisioning will be broken down into user groups. The Hiring Authority will establish what provisioning the individual users will be able to accomplish in the system.
    h. Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment. Those staff members will be able to watch live feed video only. If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data.

I. Review For Purpose of Report Writing
  1. For routine matters that do not involve an allegation of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page **6** of **7**

or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) signed by the supervisor denying the request. A second copy of the CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) will be made and forwarded to the Labor Relations Analyst.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

   a. Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.

   b. After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

   c. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.

   d. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

   e. The viewing of all audio/video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

   1. Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K. ALARM ACTIVATION

   1. The AVSS will not be continuously monitored; therefore, staff is still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, per DOM 55090.

California State Prison, Los Angeles County
OP# 604– Audio/Video Surveillance System
Page 7 of 7

L.  AVSS MEDIA/PUBLIC INFORMATION REQUESTS
1.  All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Public Information Officer.  These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.
2.  All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information.  CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

L.  Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

1.  On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).
2.  The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

VII.  **ATTACHMENTS**

Attachment A – CDCR Form 1027, Audio/Video Surveillance System Evidence Request
Attachment B – CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial

VIII.  **APPROVAL**

_____                    10 /1. 21
R. C. Johnson                                                          Date
Warden
California State Prison-Los Angeles County

Attachment A

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**AUDIO/VIDEO SURVEILLANCE SYSTEM EVIDENCE REQUEST**
CDCR 1027 (08/18)                                                                    Page 1 of 1

I am requesting a Digital Versatile Disc (DVD) of audio/video data from the Audio Visual Surveillance System. By signing below, I acknowledge I am approved to collect the data and will be responsible for the inclusion of the evidence to the incident package, appeal, or Rules Violation Report (RVR). Additionally, I understand I can be subjected to adverse action and/or criminal prosecution for mishandling the information contained in the DVD or for violating the conditions of this request.

| | |
|---|---|
| Incident Log Number: | |
| Appeal Log Number: | |
| RVR Log Number: | |
| Date, Time, and Specific Location: | |

## ITEM DESCRIPTION

| | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |

## REASON FOR REQUESTING VIDEO EVIDENCE

Requesting Person: _____   _____
                   Print Name                    Signature

Agency Requesting: _____
                   Other than CDCR Staff

Approved By: _____
             ISU Supervisor Only

| *To Be Completed By Person Receiving Evidence* | |
|---|---|
| Date Received: | Received By (Print Name): |
| Time Received: | Signature: |
| Date Requested: | Date Completed: |
| Date/Time Contacted For Pickup: | Evidence Officer: |
| Additional Information: | |
| | |

**DISTRIBUTION:   White:** DAI - ISU   **Canary:** Requester

Attachment B

**AUDIO/VIDEO SURVEILLANCE SYSTEM EVIDENCE REQUEST DENIAL**
CDCR 1028 (08/18)                                                                                             Page 1 of 1

| | |
|---|---|
| Name of Requesting Staff Member: | |
| Incident Log Number: | |
| Date, Time, and Specific Location: | |

## REASON FOR DENIAL

Per the Memorandum of Understanding, Section 9.16 Video recordings (B)(1)(2), Bargaining Unit 6 employees will be allowed to review the video, unless at any point, a California Department of Corrections and Rehabilitation video relates to an incident involving allegation of misconduct, administration action is contemplated, or criminal or deadly force investigation is contemplated.

| REASON: |
|---|
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |
| |

Supervisor: _____          _____
                  Print Name                                                          Signature

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**California Substance Abuse Treatment Facility and State Prison at Corcoran**

## LOCAL OPERATIONS PROCEDURE
## AUDIO/VIDEO SURVEILLANCE SYSTEM

I.  **PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide California Substance Abuse Treatment Facility and State Prison at Corcoran (CSATF/SP) with written procedures and guidelines for the use of the Audio/Video Surveillance System (AVSS), the events that require staff to preserve recorded data, the process to request copies of captured audio/video footage, and the parameters for viewing live images and/or recorded media.

The primary objective of the AVSS is to enhance public safety and facility security by providing the ability for real-time monitoring and recording in order to conduct investigations and after-the-fact reviews by utilizing audio/video recording technology.

II.  **REFERENCES**

1.  Department Operations Manual (DOM), Section 47040.1, Audio/Video Surveillance Systems.

2.  California Code of Regulations, Title 15, Sections 3270.2, 3084.7, 3288, 3314, and 3315.

3.  Memorandum – dated May 10, 2019 – Audio/Video Surveillance Systems Metric Revisions for the Division of Adult Institutions 13-Month Report, signed by Connie Gipson, Director, Division of adult Institutions (DAI).

4.  Memorandum – dated January 26, 2018 – Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Deputy Director, Facility Operations, DAI.

5.  Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

6.  Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

7.  California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

III.  **REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of October by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON
OP# 522– Audio/Video Surveillance System
Page 2 of 8

IV.  **RESPONSIBILITY**

The Warden has the overall responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of AVSS Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

V.  **PROCEDURE**

A.  The CSATF/SP AVSS is capable of being monitored from designated areas within the institution.  Staff with specific access will generally monitor the system on a periodic basis or in response to a specific incident.

1.  Only individuals having a legitimate need to view the live images or recorded media may be permitted to do so.
2.  Prior to implementation of the AVSS, Training-for-Trainers (T4T) instructors from CSATF/SP will receive specialized instruction/training on the AVSS.  Those T4T instructors will then train all of the staff responsible for operating within the AVSS.
3.  Only personnel who have successfully completed official On-the-Job Training by an AVSS T4T instructor, documented within the In-Service Training Department, shall operate the AVSS.
4.  In the event the AVSS becomes inoperable, CSATF/SP staff will revert back to their standard operating procedures and will notify the AVSS Coordinator or the Watch Commander after hours, for resolution.

VI.  **REQUIREMENTS**

A.  Any information collected through the use of the AVSS is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records.  Recorded audio, video, or both forms of recording technology is generally used for the investigation of safety and security incidents.  Any available audio, video, or both forms of recording technology associated with a specific retention trigger shall be exported from the AVSS and stored on a digital medium.  The video evidence shall be managed by the prison's Investigative Services Unit (ISU) or as directed by the Hiring Authority for a period of not less than 90 days.  Data may be preserved for a longer period upon notification by the Office of Legal Affairs (OLA), Office of Internal Affairs (OIA), and/or Office of the Attorney General.

B.  The following events shall require staff to preserve the recorded data for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1.  Any use of force incident.
2.  Riots.
3.  Suspected felonious criminal activity.
4.  Any incident resulting in serious bodily injury, great bodily injury, and all deaths.
5.  All PREA allegations.

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports [RVRs]) by staff associated with the list of events/triggers (i.e., any use of force, riot, suspected felonious criminal activity, etc.)
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person.
8. Incidents that may be potentially referred to the District Attorney's Office.
9. An employee report to supervisor of on-the-job injury.
10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at CSATF/SP shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. To promote safety and enhance security, the department may use audio, video, or both forms of recording technology within and surrounding any of its facilities, perimeter fencing, or vehicles. Public notice that recording technology may be in use shall be placed at the gatehouse, front entrance, and vehicle sally ports of all correctional institutions and include the following minimum text: "This area is subject to audio and video surveillance."

E. Plant Operations staff shall be responsible for the removal and replacement of cameras in the event that the equipment malfunctions in conjunction with Enterprise Information Services (EIS) and the designated coordinator.

F. Preserving Recorded Data

When an event occurs that requires staff to preserve recorded data the following process shall be utilized:

1. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
2. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) will be submitted to ISU.
3. The signed request will be scanned and emailed to the CSATF/SP ISU. This will ensure that all ISU staff receives the signed CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A) for timely processing.
4. When the ISU receives a request to review audio and/or video recordings via CDCR Form 1027, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium. The ISU AVSS Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
5. ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
6. ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
7. ISU will save and keep on file a hard copy of the CDCR Form 1027, Audio/Video Surveillance System Evidence Request (Attachment A).
8. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
9. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

G. Audio/Video Monitoring Stations
   1. Audio/Video Monitoring Stations are positioned in several locations throughout the institution. These monitoring stations provide staff the capability to view live feed(s) and/or previously recorded video depending on provisioning. Monitoring stations will be located in the following areas:

      a. Facility A, B, C, D, E, F, and G Lieutenant's Offices
      b. Complex I, II, III, and IV
      c. Watch Commanders Office
      d. Transportation Lieutenant's Office

   e.  Internal Affairs Lieutenant's Office
   f.  ISU Headquarters
   g.  Warden's Office
   h.  Chief Deputy Warden's Office
   i.  Visiting Lieutenant's Office
   j.  Towers 1, 5, and 15
   k.  Facility A Visiting
   l.  Facility B Visiting
   m. Facility C Visiting
   n.  Facility D Visiting
   o.  Facility E Visiting
   p.  Facility F Visiting
   q.  Facility G Visiting
   r.  Facility E1 Control
   s.  5TRH Control

H.  Review Criteria
   1.  Criteria for the review/viewing of video shall constitute a legitimate need which includes:
       a.  Reviewing the circumstances of a crime or suspected crime.
       b.  Reviewing the circumstances of an accident or near accident.
       c.  Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty.  The CDCR 837 Crime/Incident Report forms are used for reporting uses of force.  Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."
       d.  Routine matters (See Section G below).
       e.  The review/viewing of live or recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.
       f.  The review/viewing of live or recorded video will not be used for routine supervision of staff.  For example, audio and/or video surveillance will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of audio and/or video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.
       g.  The AVSS provisioning will be broken down into user groups. The Hiring Authority will establish what provisioning the individual users will be able to accomplish in the system.

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON
OP# 522– Audio/Video Surveillance System
Page 6 of 8

      h. Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment. Those staff members will be able to watch live feed video only. If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data.

         i. Towers 1, 5, 15, Complex Control Officers, and STRH Control Officers -- Officers in these assignments will have access to the Video Monitoring Stations in their area of assignment. Those staff members will be able to watch live feed video only. If those staff members have a need or reason to review recorded video they may request for a supervisor with appropriate provisioning to access the recorded data.

        ii. Visiting Officers – Officers in these assignments will be able to view live and recorded video on specific cameras relative to their area of assignment, flag specific segments of video for ISU staff to preserve and have control on designated cameras.

       iii. Facility Lieutenants - Staff in these assignments will be able to view live and recorded video on all active fixed cameras, flag specific segments of video for ISU to preserve, and have control of cameras.

       iv. ISU - Staff in these assignments will be able to view live and recorded video on all active fixed cameras, flag specific segments of video for ISU to preserve, and have control of cameras. In addition ISU will be able to export and archive recorded footage.

       v. Administration (Executive) - Staff in these assignments will be able to view live and recorded video on all active fixed cameras, flag specific segments of video for ISU to preserve.

       vi. Administration (Local IT) - Staff in these assignments will be able to perform configuration updates to the AVSS system as well as name/group/geo-map updates as needed.

I. Review For Purpose of Report Writing

    1. For routine matters that do not involve an allegation of misconduct, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

    2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) signed by the supervisor denying the request. A second copy of the CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial (Attachment B) will be made and forwarded to the Labor Relations Analyst.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:
   a. Staff may be granted an opportunity to review audio/video recordings of an incident in which they were involved only after writing and submitting their initial report.
   b. After reviewing the audio/video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."
   c. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the audio/video recording at the discretion of the CDW or above.
   d. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.
   e. The viewing of all audio/video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process
   1. Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K. ALARM ACTIVATION
   1. The AVSS will not be continuously monitored; therefore, staff is still required to utilize their personal alarm device, radio, whistle, and/or off-hook alarm system to summon additional staff, per DOM 55090.

L. AVSS MEDIA/PUBLIC INFORMATION REQUESTS
   1. All requests for video from the media and or the public that has been captured by the AVSS will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.
   2. All requests for video from the AVSS from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. CDCR will notify employees prior to the release of any and all audio and video recordings to the General Public, which potentially identifies state employees.

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON
OP# 522– Audio/Video Surveillance System
Page **8** of **8**

    M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

        1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

        2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

**VII.**    **ATTACHMENTS**

    Attachment A – CDCR Form 1027, Audio/Video Surveillance System Evidence Request
    Attachment B – CDCR Form 1028, Audio/Video Surveillance System Evidence Request Denial

**VIII.**    **APPROVAL**

    10/8/21

    Warden             Date

ATTACHMENT B

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**California Institution for Women**

**LOCAL OPERATIONS PROCEDURE 944**
**BODY-WORN CAMERA TECHNOLOGY**

**I.    PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide **California Institution for Women (CIW)** with written procedures and guidelines for the use of body-worn cameras, the directive on where and how to store body-worn cameras, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

The primary objective of the body-worn camera technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology.  The use of body-worn camera technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

**II.    REFERENCES**

1.  California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315.

2.  Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, Division of Adult Institutions (DAI).

3.  Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

4.  California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

**III.    REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of January by the Associate Warden (AW), Custody, Housing and Program Services, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

**IV.    RESPONSIBILITY**

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AW, of Custody, Housing and Program Services, who will assume the role of Body-Worn Camera Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

**California Institution for Women**
OP# **944** – Body-Worn Camera Technology
Page **2** of **12**

## V.    TRAINING

Supervisors shall provide training on this Operational Procedures as necessary to all Correctional Officers and Correctional Sergeants.   In-Service-Training documents will be retained as proof of practice.

If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their body-worn camera until they have received the CPOST Body-Worn Camera Power Point Training. Training is to be provided to the staff member by a T-4-T instructor by the end of the shift.

In the event the training is not provided to the staff member by the end of their shift, the Administrator of the Day will be notified and a Notice of Unusual Occurrence will be completed documenting the reason why the training was not completed.

## VI.    PROCEDURE

A.  Storage of Body-Worn Cameras
   1.  Body-worn cameras will be kept in a secure location, such as Central Control, Auditorium Office, Equipment areas, Custody Offices and Sub Armories.
   2.  At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all body-worn cameras to ensure they are accounted for and have not been damaged or are inoperable.  Damaged and inoperable equipment shall be documented and reported to the supervisor and Body-Worn Camera Coordinator as soon as possible.
   3.  The Body-Worn Camera Coordinator shall ensure staff submit a Remedy ticket to local Information Technology (IT) staff for camera replacement if the cause is due to a technical issue.
   4.  Body-worn cameras will be kept on the specified charging device and recorded footage will be uploaded to the designated server.  Staff shall notify their supervisor and Body-Worn Camera Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.
   5.  Body-worn cameras require approximately three hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.
   6.  Each body-worn camera is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors.  Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity.  Activities include, but are not limited to, charging, uploading content, and device or system recognition.
   7.  The Body-Worn Camera Coordinator will identify and designate supervisors who will be tasked with ensuring all body-worn cameras are being charged and docked

appropriately at the end of each shift. Through the course of their duties, staff assigned to distribute and collect BWCs shall notify their supervisor immediately if they observe a data uploading problem, or if the body-worn camera will not charge.

8. Any discrepancies shall be reported to the Body-Worn Camera Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed

B. Staff Guidelines

1. All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to designated docking/charging station at the beginning of their assigned shift and chit out a body-worn camera and all other required safety equipment.

2. All body-worn cameras shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the body-worn camera given to them is assigned to the post they will be working during the shift.

3. If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the body-worn camera to the designated docking/charging station where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a body-worn camera assigned to the new post number.

4. Staff assigned to an inmate transport shall don the body-worn camera and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.

5. Upon the arrival to an institution that does not require the use of body-worn cameras, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to **CIW** without any inmates in the vehicle, body-worn cameras will be reactivated upon arrival to **CIW**. If the transportation unit is departing the institution with inmates, the body-worn cameras will be reactivated once in the vehicle sallyport.

6. It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the body-worn camera is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning body-worn camera as soon as possible.

7. Dependent on the type of body-worn camera mount the staff member wears to support the body-worn camera, staff shall ensure they wear the body-worn camera outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.

8. Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer

not be exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

9. Staff shall ensure the body-worn camera is worn and is turned on during the entire course of their shift.  Staff who fail to wear the body-worn camera as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10. With the exception of specific and identified circumstances, the body-worn camera shall remain on throughout the entire shift.  Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off.  The body-worn camera shall only be deactivated under the following circumstances:

    - During a restroom break;
    - While providing or receiving peer support under the Peer Support Program;
    - While making an approved emergency phone call;
    - If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues;
    - During a probation or performance review;
    - During discussions with personnel relative to possible corrective/disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance);
    - During consultations with the Deputy Attorney General regarding his or her defense (i.e., attorney-client privileged conversations);
    - During a departmental meeting, and during training or while performing an activity deemed confidential in nature, (i.e., fence safety check);
    - While interviewing a current or potential confidential informant;
    - While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent;
    - While present in court;
    - While conducting an unclothed search of a visitor;
    - During Board of Parole Hearings;
    - During Crisis Intervention Team and Interdisciplinary Treatment Team;
    - During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed;
    - During employee COVID testing, vaccination, or contact tracing;
    - After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers;
    - During an unclothed body search.  In the course of the unclothed body search of an inmate.  In the course of the unclothed body search, if an inmate becomes assaultive or disruptive, the staff member shall reactivate their body-worn camera when reasonable to do so.

- Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their body-worn camera off.  In the course of the medical visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their body-worn camera on when reasonable to do so.  At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the body-worn camera on and ensure the camera is activated before beginning the transport to their next destination.
- When the staff member is directed to participate in an Office of Internal Affairs (OIA), Allegation Inquiry Management Section (AIMS), or Locally Designated Investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the body-worn camera, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the body-worn camera recording.

11. Staff shall ensure the body-worn camera is reactivated immediately following one of the aforementioned events.  Staff will make an audible statement when the body-worn camera has been reactivated.  Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix.  Applicable categories of the matrix include base penalties up to and including termination.
12. If during the course of their assigned shift, the battery in the body-worn camera becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the body-worn camera at designated docking/charging station for one that is fully charged.
13. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log (Attachment A).  The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.
14. The supervisor shall ensure the Watch Commander is notified there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera.  The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.
15. At the end of their assigned shift, staff shall return the body-worn camera to designated docking/charging station so it will be charged and the recorded data

uploaded to the server.  Failure to return the body-worn camera to designated docking/charging station upon the conclusion of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the body-worn camera becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement body-worn camera.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log.  The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera.  The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a body-worn camera, employees found responsible for the deliberate destruction of a body-worn camera or any supporting body-worn camera equipment, shall be subject to the progressive discipline process in accordance with departmental policy.

20. If an employee's body-worn camera is subjected to a liquid substance following a "gassing," it will be retained in evidence.  When preparing to extract the body-worn camera footage, the Body-Worn Camera Investigative Services Unit (ISU) Officer will remove the body-worn camera from evidence, and utilizing a data cable, will plug one end into the body-worn camera, and one end into the server to extract body-worn camera footage.  Upon completion, the body-worn camera will be returned to evidence.  Each participating institution will receive a data cable to be maintained in ISU.

## VII.   REQUIREMENTS

A. Any information collected through the use of the body-worn cameras is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Body-worn camera equipment and all data files are for official use only, and shall not be utilized for personal use.  Body-worn camera data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy.  Only authorized employees shall use or be in possession of a body-worn camera device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1. Any use of force incident;
2. Riots;
3. Suspected felonious criminal activity;
4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths;
5. All PREA allegations;
6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports (RVRs) by staff);
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person;
8. Incidents that may potentially be referred to the District Attorney's Office;
9. An employee report to supervisor of on-the-job injury; or
10. Inmate claims with the Department of General Services (DGS), Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted appeal.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's LDI following a PREA allegation or with the Division Head when inmates or employees file claims with the DGS, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. Body-worn camera footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at **CIW** shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

**California Institution for Women**
OP# **944** – Body-Worn Camera Technology
Page **8** of **12**

D. Identifying Camera and Audio Footage for Preservation Beyond 90 Days

1. The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted inmate grievance or staff misconduct.

2. Any request to review audio and or/video recordings shall be made via CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request (Attachment B).

3. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.

4. Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as disabled inmates.

5. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.

6. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

E. Reviewing Recorded Data

1. For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own body-worn camera recording(s) of an incident they were involved in only after writing and submitting their initial report.

2. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

3. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118 will be submitted to ISU.

4. The signed request will be scanned and emailed to ISU. This will ensure that all ISU staff receives the signed CDCR 1118 for timely processing.

5. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident RVR, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

6. The ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.

7. The ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

8. The ISU will save and keep on file a hard copy of the CDCR 1118.

9. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
10. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F. Redaction and Deletion of Body-Worn Camera Recordings, Data, and Files
1. In the event of an accidental activation of a body-worn camera where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the body-worn camera data be redacted or the entire body-worn camera data be deleted  via CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form (Attachment C).
2. The requesting employee shall complete the Requestor Information portion of the CDCR 1120 and forward the form to their direct supervisor for signature.
3. Upon the completion of their portion of the CDCR 1120, the supervisor shall forward the form to the Body-Worn Camera Coordinator, who shall complete and forward the CDCR 1120 to the Warden or CDW requesting the deletion and/or redaction.
4. If approved, the Warden or CDW will forward the CDCR 1120 to the ISU requesting the deletion or redaction.
5. Prior to deletion and/or redaction, the Body-Worn Camera Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.
6. The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.
7. ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, and submit the completed form to the Body-Worn Camera Coordinator for distribution.
8. The requesting employee and ISU will retain a copy of the completed form.

G. Audio/Video Monitoring Stations
1. EIS will be responsible for establishing viewing workstations at designated locations, to include **CIW** and Headquarters.

H. Review Criteria
1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:
   a. Any use of force incident the staff member was directly involved in.
   b. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part,

"Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

c. The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

d. Body-worn camera recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations. For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

e. The body-worn camera technology provisioning will be broken down into user groups. The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I. Review For Purpose of Report Writing

1. For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form (Attachment D) signed by the supervisor denying the request. A second copy of the CDCR 1119 will be made and forwarded to the Labor Relations Analyst.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

a. Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

b. Staff shall continue to wear their body-worn camera for the duration of their shift.

c. After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall

be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

d. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

e. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

f. The viewing of all video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

1. Inmates shall be provided the opportunity to view any video footage related to a RVR with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the RVR.

K. Alarm Activation

1. Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a body-worn camera. If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L. Body-Worn Camera Technology Media/Public Information Requests

1. All requests for video from the media and or the public that has been captured by the body-worn camera technology will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the DAI.

2. All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. **CIW** /CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

**California Institution for Women**
OP# **944** – Body-Worn Camera Technology
Page **12** of **12**

> 2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

**VIII.   ATTACHMENTS**

Attachment A – Body-Worn Camera Replacement/Exchange Log
Attachment B – CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request
Attachment C – CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion
      or Redaction Form
Attachment D – CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form

**IX.   APPROVAL**

_(signature)_                    10/8/21

MONA D. HOUSTON                  Date
Warden (A)
California Institution for Women

| | |
|---|---|
| New: | |
| Revised: | October 2021 |
| Annual Revision Month: | January |

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON-CORCORAN**
**CORCORAN, CALIFORNIA  93212**

Operational Procedure (OP)

**I.   PLAN NUMBER AND TITLE**

    A.   OP No.:  277

    B.   OP Title: Body-Worn Camera Technology

**II.   PURPOSE AND OBJECTIVES**

    A.   The purpose of this procedure is to provide California State Prison-Corcoran (CSP-Corcoran) with written procedures and guidelines for the use of body-worn cameras, the directive on where and how to store body-worn cameras, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

    B.   The primary objective of the body-worn camera technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology.  The use of body-worn camera technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

**III.   REFERENCE**

    A.   California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315

    B.   Memorandum authored by Connie Gipson, Director, Division of Adult Institutions (DAI), dated June 2, 2021, titled "Implementation Plan for the Body-Worn Camera Technology Expansion"

    C.   Memorandum authored by Connie Gipson, Director, DAI, dated July 19, 2021, titled "Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems"

    D.   California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording

IV.   **APPROVAL AND REVIEW**

This procedure will be reviewed annually in the month of January by the Associate Warden (AW)-Central Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

V.   **RESPONSIBILITY**

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AW-Central Operations, who will assume the role of Body-Worn Camera Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

VI.   **TRAINING**

A.   Supervisors shall provide training on this OP as necessary to all Correctional Officers and Correctional Sergeants.   In-Service-Training documents will be retained as proof of practice.

B.   If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their body-worn camera until they have received the CPOST Body-Worn Camera Power Point Training.   Training is to be provided to the staff member by a Training-for-Trainers instructor by the end of the shift.

C.   In the event the training is not provided to the staff member by the end of their shift, the Administrative Office of the Day will be notified and a Notice of Unusual Occurrence will be completed documenting the reason why the training was not completed.

VII.   **PROCEDURE**

A.   Storage of Body-Worn Cameras

1.   Body-worn cameras will be kept in a secure location such as Central Control, Complex Control, or the Facility Program Office.

2.   At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all body-worn cameras to ensure they are accounted for and have not been damaged or are inoperable.   Damaged and inoperable equipment shall be documented and reported to the supervisor and Body-Worn Camera Coordinator as soon as possible.

3.   The Body-Worn Camera Coordinator shall ensure staff submit a Remedy ticket to local Information Technology staff for camera replacement if the cause is due to a technical issue.

4.  Body-worn cameras will be kept on the specified charging device and recorded footage will be uploaded to the designated server. Staff shall notify their supervisor and Body-Worn Camera Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.

5.  Body-worn cameras require approximately three hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.

6.  Each body-worn camera is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors. Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity. Activities include, but are not limited to, charging, uploading content, and device or system recognition.

7.  The Body-Worn Camera Coordinator will identify and designate supervisors who will be tasked with ensuring all body-worn cameras are being charged and docked appropriately at the end of each shift. Through the course of their duties, staff assigned to Central Control, Complex Control, or the Facility Program Office shall notify their supervisor immediately if they observe a data uploading problem, or if the body-worn camera will not charge.

8.  Any discrepancies shall be reported to the Body-Worn Camera Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed.

B.  Staff Guidelines

1.  All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to Central Control, Complex Control, or the Facility Program Office at the beginning of their assigned shift and chit out a body-worn camera and all other required safety equipment.

2.  All body-worn cameras shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the body-worn camera given to them is assigned to the post they will be working during the shift.

3.  If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the

body-worn camera to the Central Control, Complex Control, or the Facility Program Office where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a body-worn camera assigned to the new post number.

4.    Staff assigned to an inmate transport shall don the body-worn camera and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.

5.    Upon the arrival to an institution that does not require the use of body-worn cameras, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to CSP-Corcoran without any inmates in the vehicle, body-worn cameras will be reactivated upon arrival to CSP-Corcoran. If the transportation unit is departing the institution with inmates, the body-worn cameras will be reactivated once in the vehicle sally port.

6.    It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the body-worn camera is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning body-worn camera as soon as possible.

7.    Dependent on the type of body-worn camera mount the staff member wears to support the body-worn camera; staff shall ensure they wear the body-worn camera outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.

8.    Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer not be exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

9.    Staff shall ensure the body-worn camera is worn and is turned on during the entire course of their shift. Staff who fail to wear the body-worn camera as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10.   With the exception of specific and identified circumstances, the body-worn camera shall remain on throughout the entire shift. Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off. The body-worn camera shall only be deactivated under the following circumstances:

a.   During a restroom break.

b.   While providing or receiving peer support under the Peer Support Program.

c.   While making an approved emergency phone call.

d.   If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues.

e.   During a probation or performance review.

f.   During discussions with personnel relative to possible corrective/disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance).

g.   During consultations with the Deputy Attorney General regarding his or her defense (i.e. attorney-client privileged conversations)

h.   During a departmental meeting, and during training or while performing an activity deemed confidential in nature (i.e., fence safety check).

i.   While interviewing a current or potential confidential informant.

j.   While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent.

k.   While present in court.

l.   While conducting an unclothed search of a visitor.

m.   During Board of Parole hearings.

n.   During Crisis Intervention Team and Interdisciplinary Treatment Team.

o.   During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed.

p.   During employee COVID testing, vaccination, or contact tracing.

q. After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers.

r. During an unclothed body search. If an inmate becomes assaultive or disruptive in the course of the unclothed body search, the staff member shall reactivate their body-worn camera when reasonable to do so.

s. Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their body-worn camera off. In the course of the medical visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their body-worn camera on when reasonable to do so. At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the body-worn camera on and ensure the camera is activated before beginning the transport to their next destination.

t. When the staff member is directed to participate in an Office of Internal Affairs (OIA), Allegation Inquiry Management Section (AIMS), or locally designated investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the body-worn camera, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the body-worn camera recording.

11. Staff shall ensure the body-worn camera is reactivated immediately following one of the aforementioned events. Staff will make an audible statement when the body-worn camera has been reactivated. Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix. Applicable categories of the matrix include base penalties up to and including termination.

12. If during the course of their assigned shift, the battery in the body-worn camera becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the body-worn camera at Central Control, Complex Control, or the Facility Program Office for one that is fully charged.

13. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's

name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log **(Attachment A)**. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.

14. The supervisor shall ensure the Watch Commander is notified there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

15. At the end of their assigned shift, staff shall return the body-worn camera to Central Control, Complex Control, or the Facility Program Office so it will be charged and the recorded data uploaded to the server. Failure to return the body-worn camera to Central Control, Complex Control, or the Facility Program Office upon the conclusion of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the body-worn camera becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement body-worn camera.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time, the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a body-worn camera, employees found responsible for the deliberate destruction of a body-worn camera or any supporting body-worn camera equipment, shall be subject to the progressive discipline process in accordance with departmental policy.

20. If an employee's body-worn camera is subjected to a liquid substance following a "gassing," it will be retained in evidence. When preparing to extract the body-worn camera footage, the Body-Worn Camera ISU Officer will remove the body-worn camera from evidence, and utilizing a data cable; will plug one end into the body-worn camera, and one end into the server to extract body-worn camera footage. Upon completion, the body-worn camera will be returned to evidence. Each participating institution will receive a data cable to be maintained in ISU.

## VIII. REQUIREMENTS

A. Any information collected through the use of the body-worn cameras is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Body-worn camera equipment and all data files are for official use only, and shall not be utilized for personal use. Body-worn camera data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy. Only authorized employees shall use or be in possession of a body-worn camera device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1. Any use of force incident

2. Riots

3. Suspected felonious criminal activity

4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths

5. All Prison Rape Elimination Act (PREA) allegations

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports by staff)

7. Allegations of staff misconduct by an inmate, employee, visitor, or other person

8. Incidents that may potentially be referred to the District Attorney's Office

9. An employee report to supervisor of on-the-job injury

10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted appeal.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C.      Body-worn camera footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at CSP-Corcoran shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D.      Identifying Camera and Audio Footage for Preservation Beyond 90 Days

        1.      The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted inmate grievance or staff misconduct.

        2.      Any request to review audio and or/video recordings shall be made via CDCR 1118, Body-Worn Camera Video Evidence Request **(Attachment B)**.

        3.      When the ISU receives a request to review audio and/or video recordings via CDCR 1118, Body-Worn Camera Video Evidence Request, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.

        4.      Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as disabled inmates.

5.     All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.

6.     The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

E.     Reviewing Recorded Data

1.     For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own body-worn camera recording(s) of an incident they were involved in only after writing and submitting their initial report.

2.     During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

3.     Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118, Body-Worn Camera Video Evidence Request, will be submitted to ISU.

4.     The signed request will be scanned and emailed to ISU.  This will ensure that all ISU staff receives the signed CDCR 1118, Body-Worn Camera Video Evidence Request, for timely processing.

5.     When the ISU receives a request to review audio and/or video recordings via CDCR 1118, Body-Worn Camera Video Evidence Request, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants.  Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates.  All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.  The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

6.     The ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.

7.     The ISU will make two copies of the event.  One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

8.   The ISU will save and keep on file a hard copy of the CDCR 1118, Body-Worn Camera Video Evidence Request.

9.   All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.

10.  In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F.   Redaction and Deletion of Body-Worn Camera Recordings, Data, and Files

1.   In the event of an accidental activation of a body-worn camera where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the body-worn camera data be redacted or the entire body-worn camera data be deleted   via CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction (**Attachment C**).

2.   The requesting employee shall complete the Requestor Information portion of the CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction, and forward the form to their direct supervisor for signature.

3.   Upon the completion of their portion of the CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction, the supervisor shall forward the form to the Body-Worn Camera Coordinator, who shall complete and forward the CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction, to the Warden or Chief Deputy Warden requesting the deletion and/or redaction.

4.   If approved, the Warden or Chief Deputy Warden will forward the CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction, to the ISU requesting the deletion or redaction.

5.   Prior to deletion and/or redaction, the Body-Worn Camera Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.

6.   The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.

7.    ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction, and submit the completed form to the Body-Worn Camera Coordinator for distribution.

8.    The requesting employee and ISU will retain a copy of the completed form.

G.    Audio/Video Monitoring Stations

EIS will be responsible for establishing viewing workstations at designated locations, to include CSP-Corcoran and Headquarters.

H.    Review Criteria

Criteria for the review/viewing of video shall constitute a legitimate need, which includes:

1.    Any use of force incident the staff member was directly involved in.

2.    Staff report writing for use of force incidents, pursuant to DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty.   The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

3.    The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view.  Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

4.    Body-worn camera recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations.   For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process.  Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

5.     The body-worn camera technology provisioning will be broken down into user groups. The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I.     Review For Purpose of Report Writing

1.     For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2.     If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119, Body-Worn Camera Evidence Request Denial **(Attachment D)**, signed by the supervisor denying the request. A second copy of the CDCR 1119, Body-Worn Camera Evidence Request Denial, will be made and forwarded to the Labor Relations Advocate.

3.     For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

a.     Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

b.     Staff shall continue to wear their body-worn camera for the duration of their shift.

c.     After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

d.     When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

e.     If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

      f.     The viewing of all video recordings may be done in the presence of a supervisor.

J.     Use of Video Footage in the Rules Violation Report Process

Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence. At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K.     Alarm Activation

Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a body-worn camera. If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L.     Body-Worn Camera Technology Media/Public Information Requests

1.     All requests for video from the media and or the public that has been captured by the body-worn camera technology will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

2.     All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. CSP-Corcoran /CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M.     Metrics reporting in the DAI 13-Month Report (COMPSTAT)

1.     On the last day of each month, designated staff in the ISU and OOG shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

2.     The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the

20th day of the following month (i.e. February for January, March for February, etc.)

IV.    **ATTACHMENTS**

A.    Body-Worn Camera Replacement/Exchange Log

B.    CDCR 1118, Body-Worn Camera Video Evidence Request

C.    CDCR 1120, Body-Worn Camera Video Evidence Request for Deletion or Redaction

D.    CDCR 1119, Body-Worn Camera Evidence Request Denial

_____                    _10-11-21_____

KEN CLARK                                                   Date
Warden
California State Prison-Corcoran

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

## I. PLAN NUMBER AND TITLE:

Operational Procedure (OP) Number: 217

OP Title: Body-Worn Camera (BWC) Technology

## II. PURPOSE AND OBJECTIVES:

A. The purpose of this procedure is to provide Kern Valley State Prison (KVSP) with written procedures and guidelines for the use of body-worn cameras (BWC), the directive on where and how to store BWCs, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

B. The primary objective of the BWC technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology. The use of BWC technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

## III. REFERENCES:

A. California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315.

B. Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

C. Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

D. California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

## IV. APPROVAL AND REVIEW:

This procedure will be reviewed annually in the month of July by the Associate Warden-Central Operation (AWCO), and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

**REVISED: September 2021**

## V. RESPONSIBILITY:

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AWCO, who will assume the role of BWC Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

## VI. TRAINING:

A. Supervisors shall provide training on this OP as necessary to all Correctional Officers and Correctional Sergeants. In-Service-Training documents will be retained as proof of practice.

B. If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their BWC until they have received the CPOST Body-Worn Camera Power Point Training. Training is to be provided to the staff member by a T-4-T instructor by the end of the shift.

C. In the event the training is not provided to the staff member by the end of their shift, the Administrator of the Day (AOD) will be notified and a Notice of Unusual Occurrence (NOU) will be completed documenting the reason why the training was not completed.

## VII. PROCEDURES:

A. Storage of BWC:

1. BWCs will be kept in a secure location, such as Central Control, Complex Control, or the Facility Program Office.

2. At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all BWCs to ensure they are accounted for and have not been damaged or are inoperable. Damaged and inoperable equipment shall be documented and reported to the supervisor and BWC Coordinator as soon as possible.

3. The BWC Coordinator shall ensure staff submit a Remedy ticket to local Information Technology (IT) staff for camera

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

replacement if the cause is due to a technical issue.

4. BWCs will be kept on the specified charging device and recorded footage will be uploaded to the designated server. Staff shall notify their supervisor and BWC Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.

5. BWCs require approximately three (3) hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.

6. Each BWC is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors. Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity. Activities include, but are not limited to, charging, uploading content, and device or system recognition.

7. The BWC Coordinator will identify and designate supervisors who will be tasked with ensuring all BWCs are being charged and docked appropriately at the end of each shift. Through the course of their duties, staff assigned to Central Control, Complex Control, or the Facility Program Office shall notify their supervisor immediately if they observe a data uploading problem, or if the BWC will not charge.

8. Any discrepancies shall be reported to the BWC Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed

B. Staff Guidelines:

1. All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to Central Control, Complex Control, or the Facility Program Office at the beginning of their assigned shift and chit out a BWC and all other required safety equipment.

2. All BWCs shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the BWC given to them is assigned to the post they will be working during the shift.

3. If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the BWC to the Central Control, Complex Control, or the Facility Program Office where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a BWC assigned to the new post number.

4. Staff assigned to an inmate transport shall don the BWC and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.

5. Upon the arrival to an institution that does not require the use of BWCs, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to KVSP without any inmates in the vehicle, BWCs will be reactivated upon arrival to KVSP. If the transportation unit is departing the institution with inmates, the BWCs will be reactivated once in the vehicle sally port.

6. It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the BWC is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning BWC as soon as possible.

7. Dependent on the type of BWC mount the staff member wears to support the BWC, staff shall ensure they wear the BWC outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.

8. Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer not be

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

9. Staff shall ensure the BWC is worn and is turned on during the entire course of their shift. Staff who fail to wear the BWC as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10. With the exception of specific and identified circumstances, the BWC shall remain on throughout the entire shift. Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off. The BWC shall only be deactivated under the following circumstances:

   a. During a restroom break;

   b. While providing or receiving peer support under the Peer Support Program;

   c. While making an approved emergency phone call;

   d. If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues;

   e. During a probation or performance review;

   f. During discussions with personnel relative to possible corrective / disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance);

   g. During consultations with the Deputy Attorney General regarding his or her defense (i.e. attorney-client privileged conversations);

   h. During a departmental meeting, and during training or while performing an

activity deemed confidential in nature, (i.e., fence safety check);

   i. While interviewing a current or potential confidential informant.

   j. While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent;

   k. While present in court;

   l. While conducting an unclothed search of a visitor;

   m. During Board of Parole hearings;

   n. During Crisis Intervention Team and Interdisciplinary Treatment Team;

   o. During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed;

   p. During employee COVID testing, vaccination, or contact tracing;

   q. After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers;

   r. During an unclothed body search. In the course of the unclothed body search of an inmate. In the course of the unclothed body search, if an inmate becomes assaultive or disruptive, the staff member shall reactivate their BWC when reasonable to do so;

   s. Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their BWC off. In the course of the medical visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their BWC on when reasonable to do so. At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the BWC on and ensure the camera is activated before beginning the transport to their next destination;

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

t.  When the staff member is directed to participate in an Office of Internal Affairs (OIA) or Allegation Inquiry Management Section (AIMS) interview, or locally designated investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the BWC, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the BWC recording.

11. Staff shall ensure the BWC is reactivated immediately following one of the aforementioned events. Staff will make an audible statement when the BWC has been reactivated. Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix. Applicable categories of the matrix include base penalties up to and including termination.

12. If during the course of their assigned shift, the battery in the BWC becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the BWC at Central Control, Complex Control, or the Facility Program Office for one that is fully charged.

13. In the event it is not possible for the replacement BWC to be assigned to the staff's post number, staff will annotate the replacement BWC's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log (**Attachment A**). The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.

14. The supervisor shall ensure the Watch Commander is notified there is a need to

replace or exchange the BWC, and the Watch Commander shall give final approval for the replacement of the BWC. The Watch Commander shall document the replacement of the BWC, to include the BWC's post number, in the Watch Commander's log.

15. At the end of their assigned shift, staff shall return the BWC to Central Control, Complex Control, or the Facility Program Office so it will be charged and the recorded data uploaded to the server. Failure to return the BWC to Central Control, Complex Control, or the Facility Program Office upon the conclusion of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the BWC becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement BWC.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a BWC, employees found responsible for the deliberate destruction of a BWC or any supporting BWC equipment, shall be subject to the

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

progressive discipline process in accordance with departmental policy.

20. If an employee's BWC is subjected to a liquid substance following a "gassing," it will be retained in evidence. When preparing to extract the BWC footage, the BWC Investigative Services Unit (ISU) Officer will remove the BWC from evidence, and utilizing a data cable, will plug one end into the BWC, and one end into the server to extract BWC footage. Upon completion, the BWC will be returned to evidence. Each participating institution will receive a data cable to be maintained in ISU.

## VIII. REQUIREMENTS

A. Any information collected through the use of the BWCs is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. BWC equipment and all data files are for official use only, and shall not be utilized for personal use. BWC data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy. Only authorized employees shall use or be in possession of a BWC device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1. Any use of force incident.

2. Riots.

3. Suspected felonious criminal activity.

4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths.

5. All PREA allegations.

6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports by staff).

7. Allegations of staff misconduct by an inmate, employee, visitor, or other person.

8. Incidents that may potentially be referred to the District Attorney's Office.

9. An employee report to supervisor of on-the-job injury.

10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted grievance.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. BWC footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90-days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at KVSP shall be retained for five (5) years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. Identifying Camera and Audio Footage for Preservation Beyond 90-Days

1. The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

submitted inmate grievance or staff misconduct.

2. Any request to review audio and or/video recordings shall be made via CDCR 1118 (11/20) BWC Video Evidence Request **(Attachment B)**.

3. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.

4. Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as disabled inmates.

5. All audio and/or video recordings determined to include the disabled inmate population will be identified to be stored for five (5) years, and copied to a digital medium.

6. The ISU BWC Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five (5) years.

E. Reviewing Recorded Data

1. For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own BWC recording(s) of an incident they were involved in only after writing and submitting their initial report.

2. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.

3. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118 will be submitted to ISU.

4. The signed request will be scanned and emailed to the KVSP ISU. This will ensure that all ISU staff receives the signed CDCR 1118 for timely processing.

5. When the ISU receives a request to review audio and/or video recordings via

CDCR 1118, ISU staff will refer to the Incident Rules Violation Report (RVR) or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five (5) years, and copied to a digital medium. The ISU BWC Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five (5) years.

6. The ISU will process the request and capture the requested event on a Digital Medium within 24-hours of the occurrence or request.

7. The ISU will make two (2) copies of the event. One (1) copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.

8. The ISU will save and keep on file a hard copy of the CDCR 1118.

9. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.

10. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F. Redaction and Deletion of BWC Recordings, Data, and Files

1. In the event of an accidental activation of a BWC where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the BWC data be redacted or the entire BWC data be deleted via CDCR 1120 (11/20) BWC Video Evidence Request for Deletion or Redaction Form **(Attachment C)**.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

2.  The requesting employee shall complete the Requestor Information portion of the CDCR 1120 and forward the form to their direct supervisor for signature.

3.  Upon the completion of their portion of the CDCR 1120, the supervisor shall forward the form to the BWC Coordinator, who shall complete and forward the CDCR 1120 to the Warden or Chief Deputy Warden requesting the deletion and/or redaction.

4.  If approved, the Warden or Chief Deputy Warden will forward the CDCR 1120 to the ISU requesting the deletion or redaction.

5.  Prior to deletion and/or redaction, the BWC Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.

6.  The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.

7.  ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, and submit the completed form to the BWC Coordinator for distribution.

8.  The requesting employee and ISU will retain a copy of the completed form.

G.  Audio/Video Monitoring Stations

EIS will be responsible for establishing viewing workstations at designated locations, to include KVSP and Headquarters.

H.  Review Criteria

1.  Criteria for the review/viewing of video shall constitute a legitimate need which includes:

a.  Any use of force incident the staff member was directly involved in.

b.  Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical

and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

c.  The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

d.  BWC recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations. For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

e.  The BWC technology provisioning will be broken down into user groups. The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I.  Review For Purpose of Report Writing

1.  For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

2.  If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form (**Attachment D**) signed by the supervisor denying the request. A second copy of the CDCR 1119 will be made and forwarded to the Labor Relations Advocate.

3.  For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

    a.  Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

    b.  Staff shall continue to wear their BWC for the duration of their shift.

    c.  After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

    d.  When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

    e.  If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

    f.  The viewing of all video recordings may be done in the presence of a supervisor.

J.  Use of Video Footage in the RVR Process

    1.  Inmates shall be provided the opportunity to view any video footage related to a RVR with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24-hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right

to review and present the video evidence. At the Hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the RVR.

K.  Alarm Activation

    1.  Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a BWC. If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L.  BWC Technology Media/Public Information Requests

    1.  All requests for video from the media and or the public that has been captured by the BWC technology will be routed to the Public Information Officer. These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

    2.  All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. KVSP/CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M.  Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

    1.  On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

    2.  The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.).

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**KERN VALLEY STATE PRISON**
**Operational Procedure #217**
**Body-Worn Camera Technology**

## ATTACHMENTS

**Attachment A** – BWC Replacement/Exchange Log
**Attachment B** – CDCR 1118 (11/20) BWC Video
Evidence Request
**Attachment C** – CDCR 1120 (11/20) BWC Video
Evidence Request for Deletion or
Redaction Form
**Attachment D** – CDCR 1119 (11/20) BWC
Evidence Request Denial Form

Approved:

CHRISTIAN PFEIFFER
Warden
Kern Valley State Prison

Date:

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**CALIFORNIA STATE PRISON, LOS ANGELES COUNTY**

**LOCAL OPERATIONS PROCEDURE**
**BODY-WORN CAMERA TECHNOLOGY**

**I.     PURPOSE AND OBJECTIVE**

The purpose of this procedure is to provide California State Prison, Los Angeles County (LAC) with written procedures and guidelines for the use of body-worn cameras, the directive on where and how to store body-worn cameras, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

The primary objective of the body-worn camera technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology.  The use of body-worn camera technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

**II.    REFERENCES**

1.  California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315.

2.  Memorandum – dated June 2, 2021 – Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

3.  Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

4.  California    Correctional    Peace    Officers    Association,    Memorandum    of Understanding/Contract, Section 9.16, Video Recording.

**III.   REVIEW AND APPROVAL**

This procedure will be reviewed annually in the month of January by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

**IV.   RESPONSIBILITY**

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of Body-Worn Camera Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

**V.    TRAINING**

California State Prison, Los Angeles County
OP# 308 – Body-Worn Camera Technology
Page 2 of 12

Supervisors shall provide training on this OP as necessary to all Correctional Officers and Correctional Sergeants.  In-Service-Training documents will be retained as proof of practice.

If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their body-worn camera until they have received the CPOST Body-Worn Camera Power Point Training. Training is to be provided to the staff member by a T-4-T instructor by the end of the shift.

In the event the training is not provided to the staff member by the end of their shift, the Administrator of the Day will be notified and a Notice of Unusual Occurrence will be completed documenting the reason why the training was not completed.

## VI.    PROCEDURE

A.  Storage of Body-Worn Cameras
1.  Body-worn cameras will be kept in a secure location, such as Central Control, Complex Control, or the Facility Program Office.
2.  At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all body-worn cameras to ensure they are accounted for and have not been damaged or are inoperable.  Damaged and inoperable equipment shall be documented and reported to the supervisor and Body-Worn Camera Coordinator as soon as possible.
3.  The Body-Worn Camera Coordinator shall ensure staff submit a Remedy ticket to local Information Technology (IT) staff for camera replacement if the cause is due to a technical issue.
4.  Body-worn cameras will be kept on the specified charging device and recorded footage will be uploaded to the designated server.  Staff shall notify their supervisor and Body-Worn Camera Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.
5.  Body-worn cameras require approximately three hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.
6.  Each body-worn camera is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors. Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity.  Activities include, but are not limited to, charging, uploading content, and device or system recognition.
7.  The Body-Worn Camera Coordinator will identify and designate supervisors who will be tasked with ensuring all body-worn cameras are being charged and docked appropriately at the end of each shift.  Through the course of their duties, staff assigned to Central Control, Complex Control, or the Facility Program Office shall notify

their supervisor immediately if they observe a data uploading problem, or if the body-worn camera will not charge.

8. Any discrepancies shall be reported to the Body-Worn Camera Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed

B. Staff Guidelines

1. All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to Central Control, Complex Control, or the Facility Program Office at the beginning of their assigned shift and chit out a body-worn camera and all other required safety equipment.

2. All body-worn cameras shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the body-worn camera given to them is assigned to the post they will be working during the shift.

3. If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the body-worn camera to the Central Control, Complex Control, or the Facility Program Office where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a body-worn camera assigned to the new post number.

4. Staff assigned to an inmate transport shall don the body-worn camera and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.

5. Upon the arrival to an institution that does not require the use of body-worn cameras, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to LAC without any inmates in the vehicle, body-worn cameras will be reactivated upon arrival to LAC. If the transportation unit is departing the institution with inmates, the body-worn cameras will be reactivated once in the vehicle sally port.

6. It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the body-worn camera is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning body-worn camera as soon as possible.

7. Dependent on the type of body-worn camera mount the staff member wears to support the body-worn camera, staff shall ensure they wear the body-worn camera outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.

8. Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer not be exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

9. Staff shall ensure the body-worn camera is worn and is turned on during the entire course of their shift.  Staff who fail to wear the body-worn camera as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10. With the exception of specific and identified circumstances, the body-worn camera shall remain on throughout the entire shift.  Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off.  The body-worn camera shall only be deactivated under the following circumstances:

   - During a restroom break;
   - While providing or receiving peer support under the Peer Support Program;
   - While making an approved emergency phone call;
   - If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues;
   - During a probation or performance review;
   - During discussions with personnel relative to possible corrective/disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance);
   - During consultations with the Deputy Attorney General regarding his or her defense (i.e. attorney-client privileged conversations);
   - During a departmental meeting, and during training or while performing an activity deemed confidential in nature, (i.e., fence safety check);
   - While interviewing a current or potential confidential informant;
   - While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent;
   - While present in court;
   - While conducting an unclothed search of a visitor;
   - During Board of Parole hearings;
   - During Crisis Intervention Team and Interdisciplinary Treatment Team;
   - During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed;
   - During employee COVID testing, vaccination, or contact tracing;
   - After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers;
   - During an unclothed body search. In the course of the unclothed body search of an inmate. In the course of the unclothed body search, if an inmate becomes assaultive or disruptive, the staff member shall reactivate their body-worn camera when reasonable to do so.
   - Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their body-worn camera off.  In the course of the medical

> visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their body-worn camera on when reasonable to do so. At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the body-worn camera on and ensure the camera is activated before beginning the transport to their next destination.

- When the staff member is directed to participate in an Office of Internal Affairs (OIA), Allegation Inquiry Management Section (AIMS), or locally designated investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the body-worn camera, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the body-worn camera recording.

11. Staff shall ensure the body-worn camera is reactivated immediately following one of the aforementioned events. Staff will make an audible statement when the body-worn camera has been reactivated. Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix. Applicable categories of the matrix include base penalties up to and including termination.

12. If during the course of their assigned shift, the battery in the body-worn camera becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the body-worn camera at Central Control, Complex Control, or the Facility Program Office for one that is fully charged.

13. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log (Attachment 1). The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.

14. The supervisor shall ensure the Watch Commander is notified there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

15. At the end of their assigned shift, staff shall return the body-worn camera to Central Control, Complex Control, or the Facility Program Office so it will be charged and the recorded data uploaded to the server. Failure to return the body-worn camera to Central Control, Complex Control, or the Facility Program Office upon the conclusion

of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the body-worn camera becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement body-worn camera.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a body-worn camera, employees found responsible for the deliberate destruction of a body-worn camera or any supporting body-worn camera equipment, shall be subject to the progressive discipline process in accordance with departmental policy.

20. If an employee's body-worn camera is subjected to a liquid substance following a "gassing," it will be retained in evidence. When preparing to extract the body-worn camera footage, the Body-Worn Camera ISU Officer will remove the body-worn camera from evidence, and utilizing a data cable, will plug one end into the body-worn camera, and one end into the server to extract body-worn camera footage. Upon completion, the body-worn camera will be returned to evidence. Each participating institution will receive a data cable to be maintained in ISU.

## VII.   REQUIREMENTS

A. Any information collected through the use of the body-worn cameras is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Body-worn camera equipment and all data files are for official use only, and shall not be utilized for personal use. Body-worn camera data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy. Only authorized employees shall use or be in possession of a body-worn camera device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

1. Any use of force incident;

California State Prison, Los Angeles County
OP# 308 – Body-Worn Camera Technology
Page **7** of **12**

2. Riots;
3. Suspected felonious criminal activity;
4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths;
5. All PREA allegations;
6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports by staff);
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person;
8. Incidents that may potentially be referred to the District Attorney's Office;
9. An employee report to supervisor of on-the-job injury; or
10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted appeal.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. Body-worn camera footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at LAC shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. Identifying Camera and Audio Footage for Preservation Beyond 90 Days
1. The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted inmate grievance or staff misconduct.
2. Any request to review audio and or/video recordings shall be made via CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request (Attachment 2).

California State Prison, Los Angeles County
OP# 308 – Body-Worn Camera Technology
Page **8** of **12**

3. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.
4. Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as disabled inmates.
5. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.
6. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

E. Reviewing Recorded Data
1. For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own body-worn camera recording(s) of an incident they were involved in only after writing and submitting their initial report.
2. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
3. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118 will be submitted to ISU.
4. The signed request will be scanned and emailed to ISU.  This will ensure that all ISU staff receives the signed CDCR 1118 for timely processing.
5. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants.  Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates.  All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.  The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
6. The ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
7. The ISU will make two copies of the event.  One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
8. The ISU will save and keep on file a hard copy of the CDCR 1118.
9. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.
10. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured.  In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent

footing following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F.  Redaction and Deletion of Body-Worn Camera Recordings, Data, and Files
    1.  In the event of an accidental activation of a body-worn camera where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the body-worn camera data be redacted or the entire body-worn camera data be deleted via CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form (Attachment 3).
    2.  The requesting employee shall complete the Requestor Information portion of the CDCR 1120 and forward the form to their direct supervisor for signature.
    3.  Upon the completion of their portion of the CDCR 1120, the supervisor shall forward the form to the Body-Worn Camera Coordinator, who shall complete and forward the CDCR 1120 to the Warden or Chief Deputy Warden requesting the deletion and/or redaction.
    4.  If approved, the Warden or Chief Deputy Warden will forward the CDCR 1120 to the ISU requesting the deletion or redaction.
    5.  Prior to deletion and/or redaction, the Body-Worn Camera Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.
    6.  The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.
    7.  ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, and submit the completed form to the Body-Worn Camera Coordinator for distribution.
    8.  The requesting employee and ISU will retain a copy of the completed form.

G.  Audio/Video Monitoring Stations
    1.  EIS will be responsible for establishing viewing workstations at designated locations, to include LAC and Headquarters.

H.  Review Criteria
    1.  Criteria for the review/viewing of video shall constitute a legitimate need which includes:
        a.  Any use of force incident the staff member was directly involved in.
        b.  Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty. The CDCR 837 Crime/Incident Report forms are used

for reporting uses of force. Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."

c. The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view. Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.

d. Body-worn camera recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations. For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.

e. The body-worn camera technology provisioning will be broken down into user groups. The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I. Review For Purpose of Report Writing

1. For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report. After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form (Attachment 4) signed by the supervisor denying the request. A second copy of the CDCR 1119 will be made and forwarded to the Labor Relations Advocate.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

    a. Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

    b. Staff shall continue to wear their body-worn camera for the duration of their shift.

    c. After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift. Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

California State Prison, Los Angeles County
OP# 308 – Body-Worn Camera Technology
Page **11** of **12**

     d. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

     e. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

     f. The viewing of all video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

    1. Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence.  At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K. Alarm Activation

    1. Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a body-worn camera.  If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L. Body-Worn Camera Technology Media/Public Information Requests

    1. All requests for video from the media and or the public that has been captured by the body-worn camera technology will be routed to the Public Information Officer.  These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

    2. All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information.  LAC /CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

    1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

California State Prison, Los Angeles County
OP# 308 – Body-Worn Camera Technology
Page **12** of **12**

2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

**VIII.   ATTACHMENTS**

Attachment 1 – Body-Worn Camera Replacement/Exchange Log
Attachment 2 – CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request
Attachment 3 – CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form
Attachment 4 – CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form

**IX.   APPROVAL**

R. C. Johnson                                                          10-11-21
Warden                                                                    Date
California State Prison-Los Angeles County

## Body-Worn Camera Replacement/Exchange Log

| Employee Name/PERNR | Employee Position Number | Body-Worn Camera Assigned Position Number | Date of Replacement or Exchange | Time of Replacement or Exchange | Reason for Replacement or Exchange | Employee Signature | Supervisor Printed Name | Supervisor Signature |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Body-Worn Camera Replacement/Exchange Log
Version 1.0

### BODY-WORN CAMERA VIDEO EVIDENCE REQUEST

I am requesting a Digital Versatile Disc (DVD) of audio/video data from the Body-Worn Camera server. By signing below, I acknowledge I am approved to collect the data and will be responsible for the inclusion of the evidence to the incident package, appeal, or Rules Violation Report (RVR). Additionally, I understand I can be subjected to adverse action and/or criminal prosecution for mishandling the information contained in the DVD or for violating the conditions of this request.

| | |
|---|---|
| Incident Log Number: | |
| Appeal Log Number: | |
| RVR Log Number: | |
| Date, Time, and Specific Location: | |
| Post Number(s): | |

### ITEM DESCRIPTION

| | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |

### REASON FOR REQUESTING VIDEO EVIDENCE

Requesting Person: _____     _____
                    Print Name                           Signature

Agency Requesting: _____
                    Other than CDCR Staff

Approved By: _____
             ISU Supervisor Only

| To Be Completed By Person Receiving Evidence | |
|---|---|
| Date Received: | Received By (Print Name): |
| Time Received: | Signature: |
| Date Requested: | Date Completed: |
| Date/Time Contacted For Pickup: | Evidence Officer: |
| Additional Information: | |

*ADA Accessible*

Attachment 3

### BODY-WORN CAMERA VIDEO EVIDENCE REQUEST FOR DELETION OR REDACTION

#### Requestor Information

| Name: | PERNR: |
|---|---|
| Date: | Time Started:          Time Stopped: |

| Brief Description of Incident Requiring Deletion or Redaction: |
|---|

| Post Number: | Signature: |
|---|---|

#### Supervisor Review

| Name: | PERNR: |
|---|---|
| Date of Review: | Signature: |

| Comments: |
|---|

#### Body-Worn Camera Coordinator

| Date of Review: | Signature: |
|---|---|

| Comments: |
|---|

#### Warden

| Date of Review: | Signature: |
|---|---|

| Comments: |
|---|

#### Investigative Services Unit

| Date Deletion Completed: | Printed Name and Signature: |
|---|---|

| Comments: |
|---|

*ADA Accessible*

**DISTRIBUTION: White:** DAI - ISU **Canary:** Requester

Attachment 4

## BODY-WORN CAMERA VIDEO EVIDENCE REQUEST DENIAL

| | |
|---|---|
| Name of Requesting Staff Member: | |
| Incident Log Number: | |
| Date, Time, and Specific Location: | |
| Post Number: | |

### REASON FOR DENIAL

Per the Memorandum of Understanding, Section 9.16 Video recordings (B)(1)(2), Bargaining Unit 6 employees will be allowed to review the video, unless at any point, a California Department of Corrections and Rehabilitation video relates to an incident involving allegation of misconduct, administration action is contemplated, or criminal or deadly force investigation is contemplated.

REASON:



Supervisor: _____     _____

Print Name                                          Signature

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**California Substance Abuse Treatment Facility and State Prison at Corcoran**

## LOCAL OPERATIONS PROCEDURE
## BODY-WORN CAMERA TECHNOLOGY

### I.   PURPOSE AND OBJECTIVE

The purpose of this procedure is to provide California Substance Abuse Treatment Facility and State Prison at Corcoran (CSATF/SP) with written procedures and guidelines for the use of body-worn cameras, the directive on where and how to store body-worn cameras, the process to request copies of captured audio and/or video, and the parameters for viewing live images and/or recorded media.

The primary objective of the body-worn camera technology is to have the ability to conduct after-the-fact reviews by utilizing body-worn camera technology. The use of body-worn camera technology will assist staff complete use of force reviews, decrease staff allegations of excessive or unnecessary force, and help to identify nefarious inmate activities (e.g., inmate on inmate violence, inmate on staff violence, etc.).

### II.   REFERENCES

1. California Code of Regulations, Title 15, Sections 3270.2, 3270.3, 3084.7, 3288, 3314, and 3315.

2. Memorandum – dated June 2, 2021 -- Implementation Plan for the Body-Worn Camera Technology Expansion, signed by Connie Gipson, Director, DAI.

3. Memorandum – dated July 19, 2021 – Reiteration of Departmental Expectations Regarding Institutional Audio/Video Surveillance Systems, signed by Connie Gipson, Director, DAI.

4. California Correctional Peace Officers Association, Memorandum of Understanding/Contract, Section 9.16, Video Recording.

### III.   REVIEW AND APPROVAL

This procedure will be reviewed annually in the month of January by the Associate Warden (AW), Operations, and submitted via the Chief Deputy Warden (CDW) to the Warden for final approval.

### IV.   RESPONSIBILITY

The Warden has the overall managerial responsibility for this procedure with delegated responsibility to the AW, of Operations, who will assume the role of Body-Worn Camera Coordinator and is responsible for the operation of this procedure under the direction of the CDW.

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 2 of 12

## V.   TRAINING

Supervisors shall provide training on this OP as necessary to all Correctional Officers and Correctional Sergeants.  In-Service-Training documents will be retained as proof of practice.

If a staff member has not received the Correctional Peace Officer Standards and Training (CPOST) approved Body-Worn Camera training, the staff member may not activate their body-worn camera until they have received the CPOST Body-Worn Camera Power Point Training. Training is to be provided to the staff member by a T-4-T instructor by the end of the shift.

In the event the training is not provided to the staff member by the end of their shift, the Administrator of the Day will be notified and a Notice of Unusual Occurrence will be completed documenting the reason why the training was not completed.

## VI.   PROCEDURE

A. Storage of Body-Worn Cameras
1. Body-worn cameras will be kept in a secure location, such as Central Control, Complex Control, or the Facility Program Office.
2. At the beginning and end of each watch, staff assigned to these posts will inventory and inspect all body-worn cameras to ensure they are accounted for and have not been damaged or are inoperable. Damaged and inoperable equipment shall be documented and reported to the supervisor and Body-Worn Camera Coordinator as soon as possible.
3. The Body-Worn Camera Coordinator shall ensure staff submit a Remedy ticket to local Information Technology (IT) staff for camera replacement if the cause is due to a technical issue.
4. Body-worn cameras will be kept on the specified charging device and recorded footage will be uploaded to the designated server.  Staff shall notify their supervisor and Body-Worn Camera Coordinator immediately if they observe a data uploading problem, or if the body- worn camera will not charge.
5. Body-worn cameras require approximately three hours for the data to be uploaded from the body-worn camera, and travel through the system controller and on to the server.
6. Each body-worn camera is equipped with Light-Emitting Diode (LED) lights to indicate the device's activities, as well as any errors. Amber LED lights indicate the device activity is in progress, green LED lights indicate the activity has completed, and red LED lights indicate an error or failure of activity.  Activities include, but are not limited to, charging, uploading content, and device or system recognition.
7. The Body-Worn Camera Coordinator will identify and designate supervisors who will be tasked with ensuring all body-worn cameras are being charged and docked appropriately at the end of each shift.  Through the course of their duties, staff

Case 4:94-cv-02307-CW   Document 3393   Filed 03/23/22   Page 158 of 170

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 3 of 12

assigned to Central Control, Complex Control, or the Facility Program Office shall notify their supervisor immediately if they observe a data uploading problem, or if the body-worn camera will not charge.

8. Any discrepancies shall be reported to the Body-Worn Camera Coordinator immediately. IT support staff with access to the System Manager will be contacted to assist with troubleshooting issues as needed

B. Staff Guidelines
   1. All Correctional Officers and Correctional Sergeants having interactions in the course of their duties with the inmate population, will report to Central Control, Complex Control, or the Facility Program Office at the beginning of their assigned shift and chit out a body-worn camera and all other required safety equipment.
   2. All body-worn cameras shall be assigned a specific post number. It shall be the responsibility of the employee to ensure the body-worn camera given to them is assigned to the post they will be working during the shift.
   3. If the staff member is redirected to a different post during the course of their shift, it shall be the responsibility of the staff member to return the body-worn camera to the Central Control, Complex Control, or the Facility Program Office where it was picked up. When the staff member arrives to their redirected position, the staff member will chit out a body-worn camera assigned to the new post number.
   4. Staff assigned to an inmate transport shall don the body-worn camera and accompanying mount assigned to the transportation kit. The transportation kit number assigned to the transportation team shall be documented in the logbook by Central Control staff.
   5. Upon the arrival to an institution that does not require the use of body-worn cameras, transportation staff will deactivate their cameras once they have arrived to the vehicle sally port and been given clearance to proceed to their destination. If returning to CSATF/SP without any inmates in the vehicle, body-worn cameras will be reactivated upon arrival to CSATF/SP. If the transportation unit is departing the institution with inmates, the body-worn cameras will be reactivated once in the vehicle sally port.
   6. It is the responsibility of the assigned Correctional Officer and Correctional Sergeant to ensure the body-worn camera is functioning properly. Damaged or inoperable equipment shall be reported to a supervisor and exchanged for a functioning body-worn camera as soon as possible.
   7. Dependent on the type of body-worn camera mount the staff member wears to support the body-worn camera, staff shall ensure they wear the body-worn camera outside of the uniform and on the upper chest area, facing forward, in a location that will facilitate an optimum recording field of view.
   8. Magnets may interfere with the operation of pacemakers and implantable cardioverter defibrillators. If a medical condition exists that would suggest the wearer

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 4 of 12

       not be exposed to magnets, please contact the Return to Work Coordinator for an alternate mount.

9. Staff shall ensure the body-worn camera is worn and is turned on during the entire course of their shift. Staff who fail to wear the body-worn camera as specifically trained shall be subject to the progressive discipline process in accordance with departmental policy.

10. With the exception of specific and identified circumstances, the body-worn camera shall remain on throughout the entire shift. Staff will make an audible statement providing a reason for the deactivation prior to turning the body-worn camera off. The body-worn camera shall only be deactivated under the following circumstances:

- During a restroom break;
- While providing or receiving peer support under the Peer Support Program;
- While making an approved emergency phone call;
- If a Union Representative is in an official union capacity and is providing representation/consulting with an employee regarding union related issues;
- During a probation or performance review;
- During discussions with personnel relative to possible corrective/disciplinary action (i.e., Equal Employment Opportunity, Employee Relations Office, Litigation Coordinator, requests to provide a random urinalysis sample, subpoena issuance);
- During consultations with the Deputy Attorney General regarding his or her defense (i.e. attorney-client privileged conversations);
- During a departmental meeting, and during training or while performing an activity deemed confidential in nature, (i.e., fence safety check);
- While interviewing a current or potential confidential informant;
- While interviewing the victim of a Prison Rape Elimination Act (PREA) allegation, as soon as the nature of the offense becomes apparent;
- While present in court;
- While conducting an unclothed search of a visitor;
- During Board of Parole hearings;
- During Crisis Intervention Team and Interdisciplinary Treatment Team;
- During a medical assessment, appointment, or consultation wherein the expectation for confidentiality is assumed;
- During employee COVID testing, vaccination, or contact tracing;
- After completing the transportation of an inmate(s), and the vehicle is empty of all inmate passengers;
- During an unclothed body search. In the course of the unclothed body search of an inmate. In the course of the unclothed body search, if an inmate becomes assaultive or disruptive, the staff member shall reactivate their body-worn camera when reasonable to do so.

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 5 of 12

- Upon arrival to an outside hospital, private doctor's office, or medical clinic, staff shall turn/power their body-worn camera off. In the course of the medical visit, if an inmate becomes assaultive or disruptive, the staff member shall turn/power their body-worn camera on when reasonable to do so. At the conclusion of the medical visit, and once in the vehicle, staff shall turn/power the body-worn camera on and ensure the camera is activated before beginning the transport to their next destination.
- When the staff member is directed to participate in an Office of Internal Affairs (OIA), Allegation Inquiry Management Section (AIMS), or locally designated investigator (LDI) interview, the OIA, AIMS, or LDI staff conducting the interview will instruct the interviewee to remove the body-worn camera, turn the device off, and place it on the table during the interview, confirming that the LED lights indicate the camera is not recording. When the OIA, AIMS, or LDI staff confirm the interview has concluded, and the interviewee has finished consulting with their representative/attorney (if present), the staff member shall reactivate the body-worn camera recording.

11. Staff shall ensure the body-worn camera is reactivated immediately following one of the aforementioned events. Staff will make an audible statement when the body-worn camera has been reactivated. Staff who fail to comply with the activation/de-activation policy will be subject to progressive discipline penalties according to the current disciplinary matrix. Applicable categories of the matrix include base penalties up to and including termination.

12. If during the course of their assigned shift, the battery in the body-worn camera becomes depleted, the Correctional Officer or Correctional Sergeant shall notify their supervisor immediately and exchange the body-worn camera at Central Control, Complex Control, or the Facility Program Office for one that is fully charged.

13. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log (Attachment 1). The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided by the staff member is correct.

14. The supervisor shall ensure the Watch Commander is notified there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

15. At the end of their assigned shift, staff shall return the body-worn camera to Central Control, Complex Control, or the Facility Program Office so it will be charged and the

Case 4:94-cv-02307-CW   Document 3393   Filed 03/23/22   Page 161 of 170

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 6 of 12

recorded data uploaded to the server. Failure to return the body-worn camera to Central Control, Complex Control, or the Facility Program Office upon the conclusion of an assigned shift to charge and upload the data to the server shall be subject to the progressive discipline process in accordance with departmental policy.

16. In the event the body-worn camera becomes damaged or inoperable, staff shall report the issue to their supervisor immediately and retrieve a replacement body-worn camera.

17. In the event it is not possible for the replacement body-worn camera to be assigned to the staff's post number, staff will annotate the replacement body-worn camera's assigned number, the staff member's name, assigned post number, and the date and time the body-worn camera was replaced on the Body-Worn Camera Replacement/Exchange Log. The staff member's supervisor shall sign the Body-Worn Camera Replacement/Exchange Log confirming the information provided is correct.

18. The supervisor shall ensure the Watch Commander is notified when there is a need to replace or exchange the body-worn camera, and the Watch Commander shall give final approval for the replacement of the body-worn camera. The Watch Commander shall document the replacement of the body-worn camera, to include the body-worn camera's post number, in the Watch Commander's log.

19. Outside of unintentional events that could result in the damage of a body-worn camera, employees found responsible for the deliberate destruction of a body-worn camera or any supporting body-worn camera equipment, shall be subject to the progressive discipline process in accordance with departmental policy.

20. If an employee's body-worn camera is subjected to a liquid substance following a "gassing," it will be retained in evidence. When preparing to extract the body-worn camera footage, the Body-Worn Camera ISU Officer will remove the body-worn camera from evidence, and utilizing a data cable, will plug one end into the body-worn camera, and one end into the server to extract body-worn camera footage. Upon completion, the body-worn camera will be returned to evidence. Each participating institution will receive a data cable to be maintained in ISU.

VII.   **REQUIREMENTS**

A. Any information collected through the use of the body-worn cameras is considered the California Department of Corrections and Rehabilitation (CDCR) property and/or records. Body-worn camera equipment and all data files are for official use only, and shall not be utilized for personal use. Body-worn camera data shall not be copied, released, or disseminated in any form or manner outside the requirements of this policy. Only authorized employees shall use or be in possession of a body-worn camera device, data, or files.

B. The following events shall require the recorded data be preserved for a longer period as potential evidence in an investigation, or an administrative, civil, or criminal proceeding:

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 7 of 12

1. Any use of force incident;
2. Riots;
3. Suspected felonious criminal activity;
4. Any incident resulting in serious bodily injury, great bodily injury, and all deaths;
5. All PREA allegations;
6. Allegations of inmate misconduct (i.e., Serious Rules Violation Reports by staff);
7. Allegations of staff misconduct by an inmate, employee, visitor, or other person;
8. Incidents that may potentially be referred to the District Attorney's Office;
9. An employee report to supervisor of on-the-job injury; or
10. Inmate claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program.

The Office of Grievances (OOG) may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted appeal.

The Correctional Lieutenant or Division Head of an area where a triggering event took place shall have the primary responsibility for ensuring all footage is requested. The Lieutenant or Division Head may need to work with ISU's Locally Designated Investigator following a PREA allegation or with the Division Head when inmates or employees file claims with the Department of General Services, Office of Risk and Insurance Management, Government Claims Program. The Lieutenant or Division Head may delegate this responsibility as necessary to ensure the footage is requested as required; however, it is the ultimate responsibility of the Lieutenant or Division Head to ensure the footage of the triggering event is captured within time constraints.

C. Body-worn camera footage will be downloaded and retained in an appropriate data server at the conclusion of every shift. All footage shall be retained for a minimum of 90 days. All camera and audio footage of use of force incidents and other aforementioned triggering events involving the disabled inmate population at CSATF/SP shall be retained for five years. Footage that becomes evidence in an OIA investigation shall be stored until resolution of any investigation and written release by the OIA, Office of Legal Affairs (OLA), Office of the Attorney General, and the Employment Advocacy and Prosecution Team of the OLA. Footage that CDCR has reason to believe may become evidence in an administrative, civil or criminal proceeding shall be stored indefinitely unless other direction is given by the OIA, OLA or, in the event of a criminal proceeding, the Office of the District Attorney.

D. Identifying Camera and Audio Footage for Preservation Beyond 90 Days
   1. The OOG and the OIA may request to review audio and/or video recordings when conducting an inquiry as it relates to a submitted inmate grievance or staff misconduct.

2. Any request to review audio and or/video recordings shall be made via CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request (Attachment 2).
3. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident or Appeal Log Number provided on the form, and identify all inmate participants.
4. Utilizing the Strategic Offender Management System (SOMS), the ISU staff will determine if any inmate participants are identified as disabled inmates.
5. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium.
6. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.

E. Reviewing Recorded Data
1. For routine matters, that do not involve an allegation of misconduct or an investigation by the OIA, employees may be granted an opportunity to review his or her own body-worn camera recording(s) of an incident they were involved in only after writing and submitting their initial report.
2. During business hours, a telephone call or verbal request will be made to the ISU immediately following a mandatory event.
3. Following the verbal notification to ISU, or if the event occurs after business hours, a CDCR 1118 will be submitted to ISU.
4. The signed request will be scanned and emailed to ISU. This will ensure that all ISU staff receives the signed CDCR 1118 for timely processing.
5. When the ISU receives a request to review audio and/or video recordings via CDCR 1118, ISU staff will refer to the Incident, Rules Violation Report, or Grievance Log Number provided on the form, and identify all inmate participants. Utilizing SOMS, the ISU staff will determine if any inmate participants are identified as disabled inmates. All audio and/or video recordings determined to include disabled inmates will be identified to be stored for five years, and copied to a digital medium. The ISU Body-Worn Camera Officer will provide the IT support staff with the digital medium containing the identified audio and/or video recordings for transfer to the Cloud to be stored for five years.
6. The ISU will process the request and capture the requested event on a Digital Medium within 24 hours of the occurrence or request.
7. The ISU will make two copies of the event. One copy will be sent to the approved requestor and the second copy will be stored as evidence in ISU.
8. The ISU will save and keep on file a hard copy of the CDCR 1118.
9. All audio/video evidence retrieved shall be procured via Digital Versatile Disk (DVD) Read Only Memory (ROM) drive or Universal Serial Bus (USB) portable drive.

Case 4:94-cv-02307-CW   Document 3393   Filed 03/23/22   Page 164 of 170

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 9 of 12

10. In the event that staff is required to preserve recorded data on a Digital Medium, they will ensure that all camera angles are captured. In addition, not only the footage of the actual incident, but footage of the events leading up to the event or subsequent footage following the event, should be reviewed and copied to the extent that such footage provides a more thorough picture of the entirety of the incident.

F. Redaction and Deletion of Body-Worn Camera Recordings, Data, and Files
1. In the event of an accidental activation of a body-worn camera where the resulting recording has no investigative or evidentiary value, the employee may request a portion of the body-worn camera data be redacted or the entire body-worn camera data be deleted via CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form (Attachment 3).
2. The requesting employee shall complete the Requestor Information portion of the CDCR 1120 and forward the form to their direct supervisor for signature.
3. Upon the completion of their portion of the CDCR 1120, the supervisor shall forward the form to the Body-Worn Camera Coordinator, who shall complete and forward the CDCR 1120 to the Warden or Chief Deputy Warden requesting the deletion and/or redaction.
4. If approved, the Warden or Chief Deputy Warden will forward the CDCR 1120 to the ISU requesting the deletion or redaction.
5. Prior to deletion and/or redaction, the Body-Worn Camera Coordinator shall ensure the recording is reviewed in the presence of the requesting staff by a supervisor of the same gender.
6. The supervisor will identify the portion and length of the recorded footage to be deleted or redacted, and provide this information to ISU.
7. ISU will document who has viewed the recording and what has been deleted or redacted in the comments portion of the CDCR 1120, and submit the completed form to the Body-Worn Camera Coordinator for distribution.
8. The requesting employee and ISU will retain a copy of the completed form.

G. Audio/Video Monitoring Stations
1. EIS will be responsible for establishing viewing workstations at designated locations, to include CSATF/SP and Headquarters.

H. Review Criteria
1. Criteria for the review/viewing of video shall constitute a legitimate need which includes:
   a. Any use of force incident the staff member was directly involved in.
   b. Staff report writing for use of force incidents, pursuant to the DOM, Section 51020.17, Uses of Force-Reporting Requirements, states in part, "Any employee who uses force or observes a staff use of force shall report it to a

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 10 of 12

>   supervisor as soon as practical and follow up with appropriate documentation prior to being relieved from duty.  The CDCR 837 Crime/Incident Report forms are used for reporting uses of force.  Written reports regarding both immediate and controlled use of force shall be documented on a CDCR 837."
>
>   c. The review/viewing of recorded video shall be limited to those that have appropriate provisioning and have a legitimate reason and/or need to view.  Those with appropriate provisioning that do not have a legitimate need to view shall not access the system for unauthorized reasons.
>
>   d. Body-worn camera recordings shall not be reviewed solely for the purpose of general performance review, routine preparation of performance reports, or to discover policy violations.  For example, recorded footage will not be used to monitor staff arrivals/departures from job site. However, if during the legitimate review of recorded video, staff misconduct is identified, the video recording can be used as part of the corrective action and/or disciplinary process. Supervisors/Managers shall not use stored audio and/or video to identify previous similar behavior.
>
>   e. The body-worn camera technology provisioning will be broken down into user groups.  The user groups will establish what provisioning the individual users will be able to accomplish in the system.

I.  Review For Purpose of Report Writing

1. For routine matters that do not involve an allegation of misconduct, any allegation inquiry, an administrative action is contemplated, an investigation by the OIA, or an investigation where criminal or Deadly Force Investigation is contemplated, employees may be granted an opportunity to review audio/video recordings of an incident they were involved in only after writing and submitting their initial report.  After reviewing such video recordings, staff will be given the opportunity to write a supplemental report prior to the end of their shift.

2. If staff are denied approval to review video for any of the reasons noted above, they will be provided with a CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form (Attachment 4) signed by the supervisor denying the request.  A second copy of the CDCR 1119 will be made and forwarded to the Labor Relations Advocate.

3. For viewing of incidents for the purpose of report writing involving use of force, the following processes shall be adhered to:

   a. Staff may be granted an opportunity to review video recordings of an incident in which they were involved only after writing and submitting their report.

   b. Staff shall continue to wear their body-worn camera for the duration of their shift.

   c. After reviewing the video recording, staff will be given the opportunity to write a supplemental report prior to the end of their shift.  Any additional information shall be added with transitional language such as, "After reviewing video of the incident, additional details are noted as follows."

Case 4:94-cv-02307-CW   Document 3393   Filed 03/23/22   Page 166 of 170

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 11 of 12

 

    d. When an incident involves allegations of misconduct or administrative action is contemplated, staff shall only be granted the opportunity to review the video recording at the discretion of the CDW or above.

    e. If the employee is denied the opportunity to review any video as indicated in the above paragraph, no further questions/clarifications may be requested by the Hiring Authority.

    f. The viewing of all video recordings may be done in the presence of a supervisor.

J. Use of Video Footage in the Rules Violation Report Process

    1. Inmates shall be provided the opportunity to view any video footage related to a Rules Violation Report with which they have been charged, even if the Hearing Officer is not using the video footage as evidence. The inmate shall be allowed to view the video footage at least 24 hours prior to the disciplinary hearing. At the disciplinary hearing, the Hearing Officer shall notify the inmate of their right to review and present the video evidence.  At the hearing, the inmate may also request and be granted the opportunity to present the video footage in their defense. This shall be addressed in the Disposition portion of the Rules Violation Report.

K. Alarm Activation

    1. Staff shall not have the expectation that they are under continuous observation due to them being in the vicinity of a staff member wearing a body-worn camera.  If assistance is needed, staff shall utilize their personal alarm device or radio to summon additional staff, per Departmental procedure.

L. Body-Worn Camera Technology Media/Public Information Requests

    1. All requests for video from the media and or the public that has been captured by the body-worn camera technology will be routed to the Public Information Officer.  These requests will be routed via the Hiring Authority through the chain of command at the Division of Adult Institutions.

    2. All requests for video from the body-worn camera technology from outside entities will be in compliance with DOM, Section 13010, Public/Media Information. CSATF/SP /CDCR will notify employees prior to the release of any and all audio and video to the General Public, which potentially identifies state employees.

M. Metrics reporting in the Division of Adult Institutions (DAI) 13-Month Report (COMPSTAT).

    1. On the last day of each month, designated staff in the ISU and OOG, shall conduct a count of all AVSS requests based on the appropriate counting rule as shown on the COMPSTAT DAI 13-Month Report and forward their findings to the institutional COMPSTAT coordinator (Use of Force Coordinator).

California Substance Abuse Treatment Facility and State Prison at Corcoran
OP# 519 – Body-Worn Camera Technology
Page 12 of 12

2. The COMPSTAT coordinator will add the AVSS data to the monthly COMPSTAT Data Collection Instrument and forward to COMPSTAT on the 20th day of the following month (i.e. February for January, March for February, etc.)

## VIII.   ATTACHMENTS

Attachment 1 – Body-Worn Camera Replacement/Exchange Log
Attachment 2 – CDCR 1118 (11/20) Body-Worn Camera Video Evidence Request
Attachment 3 – CDCR 1120 (11/20) Body-Worn Camera Video Evidence Request for Deletion or Redaction Form
Attachment 4 – CDCR 1119 (11/20) Body-Worn Camera Evidence Request Denial Form

## IX.   APPROVAL

_____          10/8/21
Warden                                          Date

ATTACHMENT C

State of California                                                      Department of Corrections and Rehabilitation

# Memorandum

Date:

To:      Associate Directors, Division of Adult Institutions
         Wardens

Subject:  **CHEMICAL AGENTS POLICY CHANGE**

The California Department of Corrections and Rehabilitation (CDCR) was ordered by the United States District Court for the Northern District of California, to develop a plan to modify its policies to more effectively monitor and control the use of chemical agents by Richard J. Donovan Correctional Facility (RJD) staff with respect to *Armstrong* class members and at California State Prison, Los Angeles County (LAC); California State Prison, Corcoran (COR); Substance Abuse Treatment Facility (SATF); California Institute for Women (CIW); and Kern Valley State Prison (KVSP) with respect to disabled inmates. The Division of Adult Institutions will be updating the statewide policy for the use of chemical agents in immediate use of force situations.

The Department Operations Manual (DOM) Section 51020.15 currently states in part, *"Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the lawful objective."* The section will be updated to be consistent with new DOM Section 51020.15.7 that will state, in part:

 *"…Employees shall give a verbal warning, whenever possible, prior to any use of chemical agents (streamer, fogger, or foam). Employees shall target the facial area and utilize a burst of approximately 3 seconds. Following the deployment, employees shall assess the need for additional deployment while allowing the chemical agent to work and providing verbal commands to the inmate(s). If the inmate(s) does/do not comply with orders or commands and additional use of force is necessary, further deployment of additional chemical agent is authorized following the same instructions as above or the employee may transition to another use-of-force option until compliance is gained. In addition to all existing requirements for reporting the use of chemical agents, employees who deploy more than one burst of chemical agent against the same inmate in the same incident shall articulate the need to utilize a second and any subsequent bursts of chemical agents or any other force option in their written report.*

DOM Sections 51020.15 and 51020.15.7 will be updated to reflect the policy changes. Additionally, chemical agent training shall reflect the changes to the policy.

Associate Directors, Division of Adult Institutions
Wardens
Page 2

Wardens shall ensure that custody staff are following policy as instructed in DOM section 51020.17.1 with regard to reporting requirements for staff utilizing force. This includes, but is not limited to, staff articulating the actions of the inmate(s) and circumstances leading to the use-of-force; description of the specific force used; why force was used and description of the threat; and, if chemical agents were used: identify the projector used, from what distance, any specific conditions affecting the use of chemical agents (weather conditions, number of involved inmates, etc.), justification for any use of chemical agents after the first burst, etc.

Wardens shall also ensure that custody staff are following the current policy as instructed in DOM section 51020.15.3 titled "Use of Chemical Agents for Inmates with Mental Health Issues" under which "the use of chemical agents is prohibited" "in controlled use of force situations for inmates who are housed in Mental Health Crisis Bed, PIP, OHU, PSU, EOP, or an ASU-EOP Hub, or[, even if housed outside those units, who] do not possess the ability to understand orders, have difficulty complying with orders due to mental health issues, or are at increased risk of substantial decompensation from the use of force," "unless the Warden, Chief Deputy Warden, or AOD authorize the use." Use of chemical agents "against an inmate who may not possess the ability to understand orders" is permitted only when the "circumstances are serious in nature and involve an imminent threat," or is necessary "to gain control of a disturbance involving inmates who may have mental health issues."

Furthermore, wardens shall ensure all custody staff is trained on these policy changes within 60 days of the date of this memorandum. The BET code XXX shall be utilized for the training.

If you have any questions, please contact Tracy Snyder, Associate Warden (A), Reception Centers Mission, at (916) 324-6808.

CONNIE GIPSON
Director
Division of Adult Institutions

cc: Kimberly Seibel
    Charles W. Callahan