DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:            (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

[4155344.2]

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

### A.    Effect of the COVID-19 Pandemic on the *Armstrong* Class

#### 1.    Plaintiffs' Statement

COVID-19 continues to spread throughout California prisons.  To date, 85,425 cases of the novel coronavirus have been detected among people incarcerated in California prisons.  A total of 256 people have died after being infected while in prison in California.  Of those, approximately half were *Armstrong* class members, even though they make up only about 12% of the total incarcerated population.  This is a tragic but predictable result of Defendants' systemic failures to safely and accessibly house class members during the pandemic, which contributed to countless class members becoming infected with COVID-19.  Yet, Defendants continue to resist vaccination efforts that would better protect *Armstrong* class members despite the rise of new and possibly more dangerous COVID variants on the horizon.

The pandemic continues to impact the transfer of *Armstrong* class members to ADA accessible placements.  Defendants have unfortunately been unable to find a way to address the backlog of class members housed inaccessibly in prisons not designed to safely house individuals with their disabilities, even after COVID-19-related movement restrictions were relaxed in April 2022.  As of September 2, 2022, there are 128 class members with impacting placement codes housed inaccessibly in non-designated placements, in violation of the *Armstrong* Remedial Plan (this does not include an additional 87 class members with impacting placement codes awaiting transfer to

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

[4155344.2]

1    designated mainline prisons from reception centers).

2        On August 11, 2022, the parties met with the Court Expert on expedited transfers.

3    Defendants reported that the continuing delays are due to a combination of the lack of

4    available lower bunk, lower tier beds at the receiving prisons, and COVID-19 outbreaks at

5    either the sending or receiving prisons (a class member's expedited transfer will be

6    delayed if their housing unit or yard at their current prison goes on quarantine, or if the

7    housing unit or yard at the receiving prison with an accessible bed for them goes on

8    quarantine).  Plaintiffs appreciate the efforts that Defendants have been making to try to

9    prioritize expedited transfers for class members with DPW or DPV codes while housed

10   inaccessibly, and that there is not an easy solution to resolving this serious problem.

11       As Defendants acknowledge, however, their current efforts are not going to be

12   enough to bring the number of mis-housed class members down to anywhere near pre-

13   pandemic levels, so long as it remains necessary for CDCR to employ COVID-19-related

14   risk reduction measures.  Given that there is reason to believe that there will continue to be

15   outbreaks in CDCR for the foreseeable future, more needs to be done.  Plaintiffs are

16   committed to working with Defendants on solutions to prevent the creation of the "new

17   normal" we have been warning about, where there are always more than 100 class

18   members mis-housed at prisons not designed to safely house individuals with their

19   disabilities, a significantly higher number than the pre-pandemic levels, when (according

20   to Defendants) there were only several dozen class members mis-housed statewide at any

21   given time.

22       At the August 11 meeting, Defendants stated that they are planning to audit the

23   amount of set-aside quarantine and isolation space at each prison, as if some prisons are

24   setting aside too much space, those prisons may be able to make available more lower

25   bunk, lower tier housing for class members awaiting expedited transfer.  Plaintiffs look

26   forward to the results of this audit, and urge Defendants to consider any other ways that

27   more accessible beds can be made available at prisons designated to house class members

28   with disabilities impacting their housing placement.  While Defendants state they do not

[4155344.2]

believe that the availability of bus seats or coordination between headquarters and the institutions on arranging for transfers are currently contributing factors to the expedited transfer delays, Plaintiffs recommend that Defendants continue to monitor whether class members' expedited transfers are delayed due to either of these factors, which are more easily resolved through improved communication and coordination than lack of accessible bed space.

Plaintiffs' counsel are also concerned that the data on expedited transfers may not tell the whole story. Some class members report that, as a result of pandemic related transfer delays, they are housed in accessible placements, but on higher security level prison yards. These class members are not counted in data currently produced by Defendants because they are housed in ADA accessible housing placements, just reportedly at higher security levels than they should be because of their disabilities. Plaintiffs have requested to meet with Defendants in order to gather more information about whether class members are being overridden to housing placements that are not consistent with their security level and, if so, the scope of this issue.

### 2.    Defendants' Statement

Defendants continue to make significant and comprehensive efforts to contain and minimize the effects of an unparalleled, global pandemic on the people housed in its institutions, staff, and visitors by continuing with a robust vaccination process, maintaining a stringent testing process, enforcing appropriate mitigation measures, working with Plaintiffs to address individual concerns, and many other proactive efforts to address an unprecedented, challenging, and ever-changing landscape. Defendants' efforts to provide safe and accessible housing and to provide detailed daily or weekly reports to Plaintiffs during this global pandemic have been memorialized in previous Joint Case Status Statements. *See*, e.g., ECF Nos. 3369, 3391, 3412. Moreover, for more than two years, CDCR has provided to the public detailed tracking information concerning COVID-19 to include active cases, resolved cases, deaths, vaccination rates of inmate and staff

[4155344.2]

populations, tests completed, and other important information.[2]   Plaintiffs' contention that "Defendants continue to resist vaccination," is false.  Recent data shows that 81% of all inmates and 73% of staff members are fully vaccinated.  The Ninth Circuit Court of Appeals held that "CDCR's COVID-19 vaccination policy was not deliberately indifferent because [CDCR] took significant action to address the health risks posed by COVID-19…".[3]  Neither party sought review of that decision.

Defendants continue to prioritize the reduction of the number of non-reception-center class members on the expedited transfer list, notwithstanding unavoidable obstacles to do so that have arisen as a result of the global pandemic, as detailed in previously filed Joint Case Status Statements.  *See*, e.g., ECF Nos. 3369, 3391, 3412.  The updated COVID-19 Screening and Testing Matrix for Patient Movement relaxes many of the movement restrictions and should further facilitate the reduction of class members on the expedited transfer list.  CDCR continues to monitor and report requirements for all class members housed in non-designated spaces and provide timely documentation to Plaintiffs and the Court Expert.  Defendants will continue to meet with Plaintiffs to share additional information and garner their input to resolve this issue.

**B.      Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

       **1.      Plaintiffs' Statement**

             **a.      RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against

---

[2] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ for updated information.

[3] On April 25, 2022, in an unpublished decision, the Ninth Circuit Court of Appeals vacated the lower court's vaccine mandate and held that "CDCR's COVID-19 vaccination policy was not deliberately indifferent because [CDCR] took significant action to address the health risks posed by COVID-19, including making vaccines and booster doses available to prisoners and correctional staff, enacting policies to encourage and facilitate staff and prisoner vaccination, requiring staff to wear personal protective equipment, and ensuring unvaccinated staff members regularly test for COVID-19."  Memorandum, *Plata v. Newsom*, No. 21-16696, ECF No. 71-1.

[4155344.2]

1   incarcerated people on the basis of their disabilities who request accommodations and face

2   discrimination, on September 8, 2020, the Court issued orders finding remedial efforts

3   were necessary in order to "prevent further violations of the ARP and class members'

4   ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further

5   orders finding remedial efforts were necessary to prevent ongoing violations of the ADA

6   and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

7        After over a year of negotiations, the parties reached agreement on the vast majority

8   of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").

9   ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF

10  No. 3393, Exs. A, B.

11       Following a year of negotiations, the changes to the staff misconduct complaint

12  process were incorporated in to new regulations and the Notice of Change to Regulations,

13  22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received

14  written notice that Defendants unilaterally decided that changes to the proposed

15  regulations stemming from the negotiations were necessary.  Plaintiffs were blindsided by

16  the notice and submitted public comments on August 31, 2022.  Plaintiffs' counsel

17  forwarded comments directly to CDCR Office of Legal Affairs, putting Defendants on

18  notice of conflicts between the proposed regulatory changes and stipulations, party

19  agreements and the staff misconduct remedial plans.  *See* August 31, 2022 Letter from

20  Penny Godbold to Tamiya Davis and Jennifer Neill, attached hereto as Exhibit A (without

21  attachments).  The parties are meeting on September 15, 2022, to discuss Plaintiffs'

22  concerns.

23       Plaintiffs have consistently raised concerns that the number of complaints routed

24  through the new staff misconduct process will exceed the volume anticipated by CDCR.

25  Plaintiffs' counsel is extremely concerned that Defendants have not adequately allocated

26  enough resources to meet the demand for complaints, despite Plaintiffs' advocacy.  To

27  address the shortfall, Defendants propose recategorizing certain allegations of staff

28  misconduct that involve harassment, discrimination and retaliation which Defendants

[4155344.2]

believe do not have a "causal connection" to a protected class or which contain material misrepresentations.  These recategorized staff complaints will not be routed to OIA for investigation but will instead remain at the prison.  Plaintiffs are evaluating the staff misconduct complaints that underlie Defendants' proposal and which Defendants propose eliminating from the new process.  We will continue to meet with Defendants about this important issue.

Defendants have also begun quarterly production of documents in compliance with the Court's Orders.  Plaintiffs continue to identify problems in the production of documents required pursuant to the court orders and will work with Defendants to resolve this issue.

In documents already received through the quarterly production process, Plaintiffs have identified failures to comply with court-ordered remedies including problems with BWC compliance among staff at SATF.  Plaintiffs continue to object to implementation of a system to audit only cameras that are turned off for over 1.5 hours during a shift and caution Defendants that they will fail to discover serious BWC non-compliance if they audit with such a standard.  Defendants will undermine the intent of the BWC policy which is to ensure that cameras are on at all times, except in limited circumstances, by sending a signal that cameras will not be monitored unless deactivated for more than 19% of a shift.

In response to concerns over the deaths of five class members, allegations of blatant disability discrimination and denial of ADA accommodations by staff, and reports of retaliatory RVRs issued by certain health care staff members, the Court ordered Court Expert Ed Swanson to conduct an investigation and to produce a report regarding staff misconduct allegations at SATF.  ECF No. 3338.  The investigation is ongoing.

CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP found thus far at six prisons exist system-wide.  Plaintiffs are committed to bringing such evidence before the Court until all class members are protected.

[4155344.2]

**b.     False, Retaliatory and Discriminatory RVRs**

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, Defendants have failed to address the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

As in the staff complaint context, reviewers discount or ignore the testimony of incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers fail to discover evidence that staff have issued reports that appear plagiarized or otherwise replicate conduct and charges that are improbably attributed to multiple people at the same time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322 at 11-12 & Ex. E.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs' continue to raise outstanding problems.  *See* June 27, 2022, Letter from Plaintiffs' Counsel, attached hereto as Exhibit B (with exhibits omitted).  Defendants are in the process of revising the Chief Disciplinary Officer training to include the requirements for reviewing camera evidence, reviewing cases for bias, and the obligation to report staff misconduct when it is evident in the disciplinary process.  To the extent feasible, Defendants agree to record audio for serious RVR hearings.  Defendants have also agreed to implement a headquarters-level

[4155344.2]

audit of RVRs at 10 prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues, identification of discrimination, retaliation and bias in the RVR process.

Defendants have agreed to evaluate whether to include "red flags" in their EWS to identify when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and instances when an incarcerated person receives an RVR within a certain period time after having filed a staff complaint.

Defendants are still considering problems identified by Plaintiffs' counsel regarding the issuance of counseling only chronos which provide no due process but can have negative consequences.  Defendants also agreed to discuss with Plaintiffs' counsel the inappropriate use of dismissed and voided RVRs which are currently relied on in risk assessments conducted during the Board of Parole Hearings process and the related problem of which CDCR staff have access to view voided and dismissed RVRs that are retained in electronic SOMS files.

The parties are scheduled to meet again on October 20, 2022, to continue negotiations.  Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

### 2.   Defendants' Statement

#### a.   RJD and Five Prisons Orders

In compliance with the Court's September 8, 2020 and March 11, 2021 orders, Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF No. 3393.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at p. 2.  Further, the Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations," of staff-misconduct allegations."

ECF No. 3356 at p. 15.  As previously reported to the Court, within months of the Court's orders, Defendants executed significant components of the remedial plans that included increased staffing to specifically address disability-related issues of class members, body-worn-camera deployment, fixed camera installation (AVSS), document production, training, and other remedies.  ECF Nos. 3177, 3183, 3412.  Moreover, although not required by the Court's orders, Defendants have deployed statewide the processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  The statewide deployment of the new staff misconduct investigation and staff discipline processes necessitates extensive resources that includes the hiring and training of new staff and the development of technological tools.  Plaintiffs' concerns related to the number of complaints routed through the new staff misconduct process are well taken, but such concerns are not entirely addressed by increasing monetary resources.  Rather, hiring, training, and retaining qualified staff is more challenging in today's environment of widespread labor shortages that is affecting most hiring entities, including CDCR.  Notwithstanding the current circumstances, CDCR is committed to staffing current allocated positions to ensure successful deployment of the new processes.  The proposed revisions to the regulations are intended to further ensure success of these processes by efficiently routing all staff misconduct complaints to the most appropriate entity for investigation.  Defendants have collected and shared data to support Defendants' proposed revisions to the regulations.  Defendants will continue to evaluate all information received to monitor compliance with the Court's orders and to provide adequate resources to ensure the successful transition to these new processes.

Further, Defendants remain committed to the successful deployment of all remedial measures ordered by this Court including monitoring compliance with Defendants' Body-Worn Camera (BWC) technology.  Defendants' commitment is further evidenced by agreeing to deploy BWC technology at four prisons by September 2022, to include SAC, CCI, SVSP, and CCWF, in addition to the six institutions ordered by this Court.  Over the course of several months, Plaintiffs have expressed concern that the current auditing

[4155344.2]

1    standards permit staff to turn off the BWC technology's recording feature for up to 1.5

2    hours.  This assertion mischaracterizes Defendants' current policy.  Under CDCR policy,

3    the expectation is that all staff who are required to wear BWCs may only deactivate the

4    BWC for reasons dictated by policy.  CDCR is auditing the BWC footage and one item

5    they are reviewing is when BWC footage is off for more than 1.5 hours during a shift to

6    determine the causes for the cameras being off.  The comprehensive and extensive

7    deployment of the fixed-camera technology at the multiple institutions was designed, in

8    part, to create a web of camera coverage to capture staff misconduct independent from the

9    functionality of individual body-worn cameras.  Moreover, all audio and video footage is

10   time stamped to permit staff to pull fixed and body-worn camera footage with the same

11   time stamp.  Irwin Decl. ¶ 7, ECF No. 3339-4 at p. 4.  Practically speaking, even if a body-

12   worn camera is disengaged, staff are able to identify all staff members assigned to a

13   particular post at a particular time and retrieve all existing body-worn camera footage, as

14   well as all corresponding fixed-camera footage, for review and preservation.  *Id.*  This

15   feature provides staff with an additional tool to use during staff-misconduct investigations

16   or witness interviews if, for example, the allegation of staff misconduct was not captured

17   by the BWC worn by the staff member accused of misconduct.  Finally, as negotiated by

18   Plaintiffs, staff face penalties for improperly disengaging BWC technology including

19   progressive discipline up to termination.  *See,* e.g., Freedman Decl. Attach. B, ECF Nos.

20   3336-1 at pp. 120, 133, 146, 156, 172.

21        Defendants continue to facilitate the Court Expert's investigation of enumerated

22   issues at SATF identified in the Court's November 8, 2021 order.  *See* ECF No. 3391 at

23   pp. 16, 17.  Defendants will continue to provide information on a rolling basis, coordinate

24   site inspections or interviews as requested by the Court Expert, and facilitate his

25   investigation in accordance with the Court's order to do so.

26                    **b.    Defendants' Response to Demands for RVR Reform**

27        As detailed above by Plaintiffs, Defendants have made significant progress and

28   commitments to address Plaintiffs' allegations that "CDCR has failed to address the

[4155344.2]

1    endemic use of false and retaliatory Rules Violations Reports."  Defendants have

2    committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer

3    trainings, to implement a headquarters-level audit of RVRs at ten institutions, to audio

4    record serious RVR hearings, revisions to the Department Operations Manual,

5    memorandum addressing discriminatory RVRs, development of EWS red flags, and other

6    remedial measures.  Defendants have previously detailed in past Joint Case Status

7    Statements, that recent developments will effectively address most of Plaintiffs' concerns

8    related to the RVR process.  *See* ECF No. 3412 at pp. 14-16.  This includes the statewide

9    deployment of the new staff misconduct investigation and discipline processes and the new

10   pepper-spray policy, Defendants' commitment to deploy fixed-camera technology at

11   fourteen institutions in addition to the Court-ordered deployment of such technology at six

12   institutions (20 institutions total), and Defendants' commitment to deploy BWC

13   technology at four institutions in addition to the Court-ordered deployment of such

14   technology at six institutions (10 institutions total).  Further, under the new staff

15   misconduct process, allegations of false and retaliatory RVRs will be subject to an

16   investigation by the Office of Internal Affairs.  Notwithstanding the significant progress

17   made, there remains some disagreement between the parties.  For example, Defendants

18   disagree with Plaintiffs' contention that the counseling-only chronos and informational

19   chronos deny due process because, in part, inmates receive a copy of the counseling-only

20   chrono and may contest such chronos in the grievance process.  Nevertheless, Defendants

21   have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further

22   address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed

23   revisions.

24   **C.     Accommodations for Deaf and Hard-of-Hearing Class Members**

25             **1.     Plaintiffs' Statement**

26            The parties continue to meet in a workgroup to address the provision of

27   accommodations for deaf and hard of hearing class members.  While progress has been

28   made in some areas, there are significant, longstanding issues that result in the denial of

1   equal access to prison programs and services for people with disabilities.

2        First, Defendants provide poor quality hearing aids to class members.  Plaintiffs

3   have retained an expert on hearing aids and hearing technology who evaluated the two

4   hearing aid models provided in CDCR, interviewed deaf and hard of hearing class

5   members about their hearing aids, and toured a large portion of a prison to better

6   understand the listening conditions faced by class members in the prison environment.

7   Plaintiffs' expert concluded that the hearing aids that Defendants provide are of such poor

8   quality that they may not be considered hearing aids at all, but rather "Personal Sound

9   Amplification Products."  Most notably, they are not capable of being programmed to

10  conform to a hearing aid prescription.  Plaintiffs shared the expert's report with Defendants

11  on July 13, 2022; urgent action is needed to provide hearing aids to class members to

12  ensure the hard-of-hearing class receives effective communication in prison programs,

13  services and activities.

14       Second, for decades, Defendants have failed to comply with their ADA obligations

15  by refusing to provide Computer-Aided Real-time Transcription (CART) to deaf and hard

16  of hearing class members who do not know sign language and who, without CART, are

17  excluded from meaningful participation in prison programs, services, and activities.  *See*

18  Dkt. No. 3341 at 17; Dkt. No. 2936 at 45-53, 65-76.  Rather than providing CART to this

19  small, marginalized population, Defendants announced in September 2021, a three-month

20  "proof-of-concept" period in three prisons, testing various automatic captioning services

21  that are not as accurate as CART.  *See* Dkt. No. 3341 at 17.  Plaintiffs strongly object to

22  Defendants' steadfast refusal to provide CART while they test alternative accommodations

23  that are not designed to meet ADA requirements for effective communication, and which

24  are being tested in prisons that do not house class members known to have an urgent need

25  for this accommodation (such as SATF, which is designated for and currently houses

26  people who require CART).  In addition, almost a year after Defendants announced their

27  intent to run a "proof-of-concept" test, two of the three selected prisons remain indefinitely

28  delayed due to the pandemic.

[4155344.2]

1   In the meantime, deaf people who do not know sign language remain isolated and

2   forgotten, unable to participate in prison life, and unable to access programs needed to

3   improve themselves and be found suitable for parole.

4       **2.    Defendants' Statement**

5   Defendants remain committed to providing class members equal access to

6   programs, services, and activities in accordance with the ADA and will continue to meet

7   with Plaintiffs to discuss the issues that pertain to their clients as part of the parties'

8   ongoing workgroups.

9   As previously reported, Defendants have provided Plaintiffs with detailed

10  information related to the types of hearing aids available to class members.  *See* ECF No.

11  3412 at pp. 17, 18, ECF No. 3422 at p. 13.  Nevertheless, Defendants have internally

12  reviewed Plaintiffs' retained audiologist's July 13 report, will continue to confer with

13  Plaintiffs, and share information with them until these issues are resolved.  Similarly,

14  Defendants will continue to confer with Plaintiffs concerning the proposed pocket-talker

15  memorandum that provides for, in part, a case-by-case analysis of class-member needs.

16  *See* ECF No. 3412 at p. 18.  Defendants provide class members with equal access to

17  education programs by accommodating their disabilities in compliance with CDCR's

18  obligation to do so under the ADA and the ARP, with, for example, SLI (both remote and

19  in-person).  There is also an ASL channel on DRP-TV that airs programming in ASL.

20  Defendants disagree with Plaintiffs' assertion that "deaf people who do not know sign

21  language remain isolated and forgotten, unable to participate in prison life, and unable to

22  access programs needed to improve themselves and be found suitable for parole," solely

23  because CART may not currently be available to class members participating in CDCR's

24  education programs, but CART is one of the captioning services included in the Proof of

25  Concept trial at CMF.

26  Finally, CCHCS has agreed to hire a hearing consultant to look at the current

27  hearing aids, review the reports by Plaintiffs, and provide feedback.

28

**D.      Accommodations for Blind and Low-Vision Class Members**

      **1.      Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covers, among other things, reading and writing accommodations, orientation and mobility training for visually impaired class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021 demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.   Changes in access to auxiliary aids has not resulted in equal access to reading and writing for blind and low-vision class members who are still required to request approval to access time-limited accommodations, which, aside from the Amigo pilot program at SATF, are available in only class rooms and libraries, while other incarcerated people are able to read and write privately and independently at any time, from any location, and at any pace without notice or approval.  As Plaintiffs explained in the demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reviewing written information—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

Plaintiffs are encouraged that Defendants have indicated that they are developing a plan to identify and track large print and braille for class members who need these formats. But Plaintiffs remain concerned that—nearly a year and a half after Plaintiffs raised this issue in March 2021 with Defendants—there is still no clear plan or timeline for implementing this plan, and that Defendants have still not identified specific categories of documents that they will produce for class members in accessible formats.  Moreover,

[4155344.2]

1   Defendants' forthcoming accessible formats plan, discussed below in Defendants'

2   statement, critically omits any reference to audio recording as a format for blind class

3   members who cannot see and cannot read braille.

4           With respect to electronic auxiliary aids for reading and writing, Plaintiffs have

5   provided Defendants with examples of other state correctional departments (Maryland and

6   Colorado) that permit incarcerated people with vision disabilities to use electronic

7   auxiliary aids, such as video magnifiers, in their cells.  Defendants continue to speculate

8   that blind and low-vision people would pose a security threat if allowed to use electronic

9   auxiliary aids in their cells, but have provided no evidence to support this claim.

10  Plaintiffs' security expert and former CDCR Director Richard Subia visited California

11  Medical Facility (CMF) and California State Prison – Solano (SOL) in August 2022 to

12  evaluate Defendants' security claims.  Plaintiffs are hopeful that Defendants will promptly

13  develop a plan for remedying these longstanding ADA violations, and that litigation will

14  not be necessary.  The parties continue to meet and confer with the guidance of the Court

15  Expert to discuss these issues.

16          Additionally, the parties have discussed how to ensure that blind and low-vision

17  class members have prompt access to white canes. Plaintiffs were surprised to learn on

18  July 14, 2022 that Defendants issued the memo to the field on June 24, 2022, without first

19  responding to Plaintiffs' concerns raised in the January 21, 2022 comments or providing

20  Plaintiffs an opportunity to review any revisions or updates made after the initial January 6

21  draft.  On July 29, 2022, Plaintiffs wrote to Defendants outlining concerns with the latest

22  version of the memorandum and have not yet received a response.

23          The parties continue to meet to resolve accessibility problems for blind and low-

24  vision users of CDCR's new ViaPath tablets.  Unfortunately, Defendants did not accept

25  Plaintiffs' repeated requests in the summer of 2021, prior to the distribution of these

26  tablets, to develop a robust training program for class members on the use of the tablets.

27  However, Plaintiffs are pleased that Defendants have recognized problems with the tablets'

28  accessibility features and the available training on how to use these features, and are

[4155344.2]

1  developing a plan to resolve these issues.  Both CDCR and BPH have testified that key

2  CDCR and BPH forms, form responses, and other documents are not available on the

3  tablets, so at least in its current form, Defendants' tablet program does not solve the

4  accessibility barriers that blind and low-vision class members face regarding access to

5  essential forms.

6      **2.      Defendants' Statement**

7      Defendants continuously work to accommodate the needs of blind and low-vision

8  class members in all areas including their reading and writing needs, have collaborated

9  with Plaintiffs and the Court Expert, and have made significant progress to resolve

10 disputes between the parties to ensure class-member access and mitigate associated

11 litigation risks.

12     As previously reported, Defendants are reviewing different processes by which they

13 can identify, track, and accommodate blind and low-vision class members during intake of

14 inmates into the correctional system by including additional fields in the Strategic

15 Offender Management System (SOMS) to identify class-members who require reading and

16 writing accommodations in large-print, or braille, and provide a means to track class

17 member needs while in Defendants' custody.  *See* ECF No. 3422 at p. 16.  These proposed

18 new processes would also be accomplished through the 1824 process or triggered when an

19 inmate is designated as DPV while in custody.  Defendants continue to explore a variety of

20 options to provide large-print and braille versions of written materials including

21 contracting with third-party vendors and improving institution resources.

22     Additionally, Defendants deployed a statewide survey to gather pertinent

23 information including the type of reading and writing assistance needed by the class

24 members, the types of auxiliary-aid devices preferred by class members, the number of

25 hours class members anticipated using auxiliary-aid devices, and the number of class

26 members who needed braille, large-print format, or audio accommodations for reading and

27 writing activities.  The results were tabulated and shared with the Court Expert and

28 Plaintiffs.

[4155344.2]

In June, Defendants launched a ninety-day trial program at SATF, expected to be completed this month, to test the statewide feasibility and usefulness of two different electronic auxiliary aids including the Amigo and a pen-reader. *See* ECF No. 3422 at p. 17. As stated in an August 16, 2022 memorandum, the trial was expanded to permit in-cell use of these auxiliary aids. Mindful of CDCR's diverse, and sometimes vulnerable, population, the trial, and testing of various aids, will provide Defendants with additional information related to the potential security risks associated with introducing a device with image-capturing capabilities into a large correctional system.

Moreover, as previously reported, Defendants are deploying its tablet program statewide for all inmates as part of a $1 billion dollar contract with a third-party vendor who is contractually obligated to apply all accessibility standards to any documentation posted to or provided on the tablet, so anything created for the tablet must be developed with accessibility in place to serve class members. *See* ECF No. 3422 at p. 17. These tablets include a variety of assistive features including, but not limited to, text enlargement, video calling, and text to speech. CDCR took input from Plaintiffs and shared their comments with the contractor and continues to work with the contractor to enhance capabilities to include voice to text, increased recreational options, different formats for imparting information, and more to enable independent use by blind and low-vision class members.

Finally, after receiving and incorporating most of Plaintiffs' comments, CDCR issued the white-cane memo to the field on June 24, 2022.

**E.      Problems Regarding Access to Assignments for Class Members**

The program access workgroup has been meeting regularly since April 2021 to discuss credit earning for class members and other incarcerated individuals with disabilities, and to discuss the assignment process, under Proposition 57 and disparities in the program access assignment data, in response to Plaintiffs' allegations of discrimination against class members. *See* ECF No. 2680 at 13-14. Defendants produce comprehensive program access data every month and the parties are attempting to develop a standard for

1   analyzing program access disparities.  Plaintiffs believe that the data continues to show

2   troubling disparities in assignments for people with disabilities.  *See* ECF No. 3369, Ex. H

3   (November 12, 2021, Letter from Tom Nolan to Katie Riley and Dawn

4   Lorey).  Defendants, however, disagree with Plaintiffs' assessment but have agreed to

5   continue to participate in future discussions.  The parties will meet again in the near future

6   to discuss next steps in this process.

7   **F.    Statewide Durable Medical Equipment Reconciliation and Accuracy of
        Disability Tracking Information**

8

9          **1.    Plaintiffs' Statement**

10         Following Defendants' statewide durable medical equipment ("DME") reconcilia-

11  tion in early January 2019 that revealed 7,346 class members were missing one or more

12  items of DME and that 2,349 class members' DME records had errors, CCHCS imple-

13  mented the DME Discrepancy Report Tool in January 2020.  Defendants have agreed to a

14  process to ensure reconciliation of what records indicate a class member should have and

15  what they actually have.  Unfortunately, during the most recent meeting on this issue,

16  Defendants reported that they were going back on their plan to ensure that class members

17  are seen annually for reconciliation and instead planned to encourage class members to

18  self-advocate if they are missing required DME.  Unfortunately, as was shown by

19  Defendants' audit, relying on class members to self-advocate is not enough.  Class

20  members continue to face retaliation for asking for disability related help.  Further, the fact

21  that some class members are seen by health care staff multiple times over the course of a

22  year will not resolve problems for some class members who are not seen.  Also,

23  Defendants found thousands of class members without DME despite the fact that some

24  class members are seen regularly by health care staff.  A dedicated process for ensuring

25  that staff reconcile DME – even if only for people who are not already seen by health care

26  staff -- is necessary to prevent widespread problems.

27         Relatedly, Defendants acknowledged problems with identification of some class

28  members who utilize DME but who have not been assigned any disability code.

[4155344.2]

1    Defendants reported that they have identified 535 new class members by screening for

2    such cases and identifying people who had medical equipment but did not have any

3    accompanying DPP code.  Plaintiffs are encouraged by this effort, but would like more

4    information about how the screening was done, and whether there will be routine screening

5    of this type for missing DPP codes in the future.  Defendants also have developed a system

6    to reconcile anyone who has received DME but does not appear to have a corresponding

7    DPP code annually during health-care encounters and will identify and ducat for

8    reconciliation anyone who has not been seen by a health-care provider in a year.

9    Plaintiffs' counsel provided comments on Defendants' proposed reconciliation rules on

10    May 23, 2022 and are awaiting any changes.

11         Defendants' disability tracking system also fails to identify and track class members

12    with upper-extremity disabilities.  Plaintiffs requested that Defendants create a new

13    disability code for this population.  *See* ECF No. 3322 at Exs. G and H.  CCHCS does have

14    a system to identify upper-extremity disabilities, and, on September 28, 2021, shared a

15    report with Plaintiffs that showed all patients with upper-extremity disabilities and

16    accommodations.  This list contains thousands of names, so it is difficult to understand

17    exactly how it functions as a tool for staff to identify who requires what accommodations.

18    Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate

19    class members as well as statements from CDCR staff who require assistance in properly

20    identifying who must be accommodated.  Plaintiffs are committed to resolving this

21    ongoing problem.

22         **2.      Defendants' Statement**

23         Collaboration between the parties continues to develop a sustainable DME

24    accountability process.  On September 2, 2022, CCHCS and DAI met with Plaintiffs to

25    discuss the DME accountability.  After researching how often class members are seen by

26    their primary clinicians and/or nursing, (median 12 times per year) it was determined there

27    is ample opportunity for class members to discuss concerns related to missing DME or

28    broken DME.  Currently at seven institutions (RJD, CIW, LAC, COR, KVSP, SATF and

SAC), Field Training Sergeants (FTS) on both second and third watch query class members regarding their DME.  Specifically, they ask if the class member is in possession of their DME and if they are able to retain their DME regardless of their housing location. FTS also query staff members to determine if they are knowledgeable about the DME process.  Effective September 12, 2022, DAI will deploy additional FTS to SVSP, CHCF, CCWF and CMF.  DAI and CCHCS will work on educating the population on what to do if they have missing or broken DME.  A one-time annual appointment will not remedy the concerns addressed by Plaintiffs.  For example, the day after an annual appointment the DME may go missing and patients will be expected to independently address via the processes outline above.

CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity, require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code.  Inmates who require any accommodation under the ADA shall be accommodated, whether they have a DPP code or not.  Staff rely on the SOMS, "CHSS035C-DPP/Accommodation Summary" screen to identify inmates who require accommodation under the ADA and for any other physical limitation.  Moreover, the 1845/7410 power form in Electronic Health Record System (EHRS) is linked to SOMS, noting the appropriate accommodation to staff. The addition of a new DPP code to this system will not provide any enhancements to this process.  In fact, it will deter current efforts into multiple directions and processes, convoluting our established procedure.  CDCR and CCHCS continuously revisit the DPP/Accommodation Summary screen in SOMS/Cerner systems to see if improvements can be made to ensure all needed accommodations are included.  CDCR and CCHCS will continue to meet with Plaintiffs and the Court Expert to further discuss individuals with upper-extremity disabilities.

**G.     Parole Planning and Working with Class Members Preparing for Release**

For more than a year, the parties have negotiated alleged discrimination detailed in Plaintiffs' May 4, 2021 letter, supported by fourteen class member declarations.

[4155344.2]

1  Specifically, Plaintiffs contend that Defendants fail to provide class members with the

2  minimum supports necessary for them to succeed on parole, by failing to adequately

3  prepare them for parole, and by failing to ensure adequate accommodations and fully

4  accessible CDCR-funded transitional housing programs are available to class

5  members.  *See* ECF 3266, Ex. F.[4]

6       Plaintiffs contend that CDCR fails to ensure that class members are accommodated

7  on parole and during the transition to parole by not consistently providing adequate

8  planning for parole, adequate transitional housing, transportation, benefits application

9  assistance, assistance obtaining identification cards, and other transitional services that are

10 critical for these individuals to succeed on parole.  *See* ECF 2680 at 11-12; ECF 2655

11 at 11-13.  As a result, Plaintiffs contend class members needlessly struggle to comply with

12 parole conditions, to transition to life outside of prison, and are denied equal access to

13 parole success.

14      Although Defendants deny class-member discrimination and disputed Plaintiffs'

15 allegations, Defendants agreed to participate in extensive negotiations with Plaintiffs to

16 address their demands for reform that have resulted in substantive changes detailed below

17 and in previously filed Joint Case Status Statements.  *See*, e.g., ECF Nos. 3369, 3391,

18 3412.  The parties met on parole reforms on August 30, 2022, and are scheduled to meet

19 again on September 30, 2022.  The parties have agreed in principle to revise the portions of

20 the *Armstrong* Remedial Plan (ARP) to address parole services and incorporate the new

21 policies required under the ADA or ARP.  Plaintiffs shared proposed revisions to the 2006

22 Parole Section of the ARP with Defendants on February 25, 2022, and since July 1, the

23 parties have been meeting regularly to negotiate the changes to the ARP.

24      During the parties' negotiations, Defendants have agreed to some promising policy

25 changes, for example:

26

27 [4] Plaintiffs have subsequently shared additional class member declarations with Defendants that provide further evidence that remedial measures are needed to address

28 discrimination against parolees with disabilities.

1    Parole agents can now provide an audible low battery warning on GPS tracking

2 devices to accommodate parolees who have difficulty feeling the standard vibrating low

3 battery warning because of a disability, and Defendants have agreed to develop training for

4 parole agents concerning reasonable accommodations for parolees with disabilities who

5 are subject to GPS monitoring and agreed to share the proposed training with Plaintiffs for

6 comment.

7    CCHCS will now provide incarcerated people releasing from CDCR with a 60-day

8 supply of prescription medications, with some minor exceptions, which should ensure that

9 class members do not run out of their medications before they are able to get their

10 California identification cards and Medi-Cal health insurance benefits set up, both of

11 which are generally needed to obtain medication renewals in the community.

12    Defendants agreed to add requirements that Transitional Case Management

13 Program (TCMP) benefits workers in the prisons submit benefits applications—including

14 Supplemental Security Income and Social Security Disability Income, Veterans benefits,

15 Medi-Cal and Cal-Fresh food stamps, for all incarcerated people, not just class members,

16 at 90 days before their expected release date.  Defendants agreed to track the data

17 regarding when TCMP benefits workers submit the benefits applications for each releasing

18 class member, and whether the applications are approved, rejected, or remain pending at

19 the time of release, or if the TCMP services were refused by the incarcerated

20 person.  CCHCS issued a February 3, 2022 memorandum, "Providing Relevant Health

21 Information for Benefits Applications," that clarifies prison health-care providers'

22 responsibility to provide accurate and timely medical information to support benefits

23 applications, sets a five calendar day deadline for health care staff to respond to requests

24 from benefits providers for follow-up information needed to make a final determination on

25 pending benefits applications, and provides that each prison will designate medical and

26 mental health staff with whom the TCMP benefits workers can coordinate on applications

27 to improve collaboration between benefits workers and health-care staff.

28    Defendants report that they have now drafted a policy to ensure class members

[4155344.2]

released to parole supervision are released with all their prescribed DME and health care appliances (e.g., canes, hearing aids, and wheelchairs), and to provide a mechanism for DAPO to replace lost or broken non-customizable DME (*e.g.*, simple wheelchairs and walkers) during a thirty-day transitional period between release and the commencement of health-care coverage.  Plaintiffs look forward to the opportunity to review and comment on the draft policy.

Defendants also agreed to work with Plaintiffs to ensure that CDCR-funded transitional housing programs no longer have categorical exclusions for people with disabilities.  Defendants educated contractors on the requirements of the ADA and the ARP, during a three-week period beginning on February 15, 2022.  Defendants have made 1824 forms available to class members living in CDCR-funded transitional housing programs and will now include ADA compliance in their annual inspections.

Defendants are developing a transportation policy with a goal of ensuring accessible transportation to all parolees released from prisons and are revising DAPO's policy on providing financial assistance, and some other immediate needs of parolees, including those parolees who require such assistance as accommodations for their disabilities.  Plaintiffs have raised concerns that the current policy lacks clear guidance on when to provide such assistance to parolees, including consideration of disability-related factors.  Plaintiffs were disheartened to learn that Defendants' draft revision to this policy provides too much discretion and inadequate guidance to parole agents, prohibits parole agents from ever providing cash assistance for emergency temporary housing to parolees with disabilities, and significantly reduces the amount of short-term financial assistance parolees may receive.  Plaintiffs contend that this proposed policy change will disproportionately harm class members because cash assistance for emergency temporary housing is sometimes the only way Defendants have been able to remedy their failures to secure accessible transitional housing and timely benefits application assistance to class members.  CDCR received Plaintiffs' comments to the policy on July 12, 2022, this policy is currently suspended pending further review with the stakeholders.

Notwithstanding the foregoing progress, Plaintiffs were disappointed by CCHCS's December 15, 2021 advisement that it will not make recommendations on who should be prioritized for housing based on certain disability-related factors, because Plaintiffs contend that this will place parolees with disabilities at greater risk for failure on parole and reincarceration because of their disabilities.  CCHCS will, however, provide an underlying clinical assessment regarding each parolee's disability and related medical needs that may be utilized by the Parole Service Associate (PSA) in making referrals for transitional housing placements.  The Quality Management (QM) team at CCHCS have enhanced a pre-parole report with additional health-care information related to inmates with upcoming parole dates.  CCHCS shared a draft report with Plaintiffs on June 22, 2022, is in the process of finalizing the report, and will share the report with DAPO and Plaintiffs once completed.  Defendants believe that this report will provide more complete disability and DME information to DAPO, PSAs, STOP, and DRP to assist in placing class members appropriately.  Plaintiffs will continue to work with CCHCS, DAPO and DRP to ensure that parolees they contend will be disproportionately harmed by the lack of transitional housing because of their disabilities will be prioritized for such placements. This includes working with DAPO and DRP to develop a policy or directive governing transitional housing placements, and by working with CCHCS on how to provide all of the relevant information to the PSAs so that they can be informed of class members' disabilities when making referrals for transitional housing placements.

The 2022-23 State Budget includes $10.6 million in annual funding over the next three years (or $31.8 million total) for the Returning Home Well program, which will reportedly provide post-release housing services for 1,065 at-risk parolees who may be homeless or housing insecure.  Plaintiffs are hopeful that the funding will in fact be sufficient to provide transitional housing for everyone who needs it, but remain concerned that the proposal underestimates the future housing needs of releasing individuals. Plaintiffs contend that CDCR is responsible for ensuring that parolees with disabilities are not excluded from the benefits of parole and a limited supply of transitional housing

[4155344.2]

1   placements necessitates housing-placement decisions include consideration of whether a

2   class member's disability makes them less likely to succeed on parole without housing

3   than a parolee without a disability.

4        The parties continue to discuss Plaintiffs' proposals regarding how to ensure

5   parolees' disabilities are taken into account when determining the consequences for

6   alleged parole violations.  Plaintiffs are committed to working with Defendants to achieve

7   a durable remedy to ensure they are able to meet their legal obligations under the ADA and

8   the ARP by operating their transition-to-parole and parole programs in a manner that no

9   longer systemically discriminates against parolees with disabilities.  Although disputes

10  remain, Defendants are committed to continue to work with Plaintiffs and to discuss their

11  concerns related to their demand for parole-services reform.  Further training related to the

12  applicable policies and procedures will be provided to address the consideration of a

13  parolee's disability during the parole-violation process.

14       Finally, Plaintiffs remain concerned about Defendants' failure to timely and

15  adequately log and investigate allegations of employee non-compliance on parole.

16  Plaintiffs will continue to raise concerns regarding Defendants responsibility to hold staff

17  members accountable for ongoing violations of the ADA, ARP and Court Orders in this

18  case.  As reported at the last workgroup, Defendants are committed to addressing

19  Plaintiffs' concerns and will provide additional training to ensure adequate and timely

20  compliance.

21  **H.    Joint Monitoring Tool**

22       The parties remain committed to developing a strong and effective joint monitoring

23  tool.  The parties' plan to test the tool at different types of prisons was disrupted by the

24  COVID-19 pandemic, but in-person tours commenced in 2022 with the March 2022

25  Valley State Prison tour.

26       The parties continue to meet to improve individual tool questions but many

27  outstanding policy issues—such as how to measure and report on whether discrimination is

28  occurring in the assignment of *Armstrong* class members to programs—must be resolved

[4155344.2]

1   to effectively audit.  The parties have yet to come to agreement on a format for scoring and

2   reporting compliance.  The parties have been meeting every month to resolve outstanding

3   disputes or concerns and are committed to continuing their efforts moving forward.  The

4   parties plan to meet on September 28, 2022, to discuss outstanding audit tool items.

5   (Plaintiffs' list of unresolved items is provided in Plaintiffs' September 6, 2022, letter

6   attached hereto, without exhibits, as Exhibit C.)

7   **I.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master**
8   **Planning Process**

9         Construction was halted due to COVID-19 pandemic but resumed statewide in

10  June 2020, and any significant issues impacting construction are noted in the Monthly

11  Construction Report that is provided to Plaintiffs by Defendants' Expert Mike Knowles.

12  The parties agreed to meet regularly to discuss different institutions and be joined by local

13  ADA staff with close knowledge of the institutions.  The parties also plan to tour

14  institutions together to resolve outstanding issues and address Plaintiffs' concerns.  The

15  parties addressed Master Planning issues during a tour at LAC on April 29, 2022.  The tour

16  included Plaintiffs' access experts, who will draft a report on their findings from

17  inspections done during the tour.  The tour only covered roughly one-half of the institution

18  and another tour at LAC will need to be scheduled.  Plaintiffs also toured the California

19  Correctional Institution in Tehachapi with their access expert on July 11, 2022, to review

20  some disputed Disability Program Placement Matrix issues, and to consider whether there

21  should be minimum architectural/accessibility standards for showers for DLT and DPM

22  class members.  The parties will meet with their respective experts to discuss minimum

23  standards for accessible showers for these class members.  The parties will also schedule

24  tours this year at VSP and CIM, COVID-19-related restrictions permitting.

25        The parties dispute whether Defendants have a sufficient number of emergency

26  exits that are fully accessible to prisoners with impacting placement mobility and vision

27  disabilities in units where those individuals are housed.  Plaintiffs have reviewed

28  Defendants' emergency evacuation plans and have serious concerns about whether they

[4155344.2]

1   provide the necessary direction to staff to accommodate class members and to ensure their

2   safe evacuation during an emergency.  *See* ECF No. 3412, Ex. E.  Plaintiffs' accessibility

3   expert expressed concern about the lack of accessible emergency exits in the housing units

4   at LAC, where class members are clustered, during the April 29, 2022 tour.  Plaintiffs

5   await a response to their letter addressing the emergency-exit issues and are hopeful the

6   parties can resolve these disputes.

7   **J.      Investigation of County Jails**

8          Plaintiffs continue to assert that a pattern and practice of denying disability accom-

9   modations to class members exists at multiple jails but especially the Los Angeles County

10  Jails.  *See* ECF No. 2680 at 22-24; ECF No. 2786 at 26-27; ECF No. 3322 at 25-29 &

11  Exs. I, J, K.  Defendants disagree with Plaintiffs' assertions and have been meeting with

12  county counsel for a number of counties in an effort to improve relations, information

13  sharing, and ADA compliance at the jails.  Unfortunately, Plaintiffs contend, these

14  conversations alone are not enough as evidenced by the longstanding failure of Los

15  Angeles County Jail to implement their policy to allow and provide canes to detainees.

16  Los Angeles County has informed CDCR that the "pilot" allowing detainees access to

17  canes within Los Angeles County jails has concluded and a temporary policy allowing

18  access to canes at all facilities has been implemented pending issuance of the final policy.

19  CDCR is informed that Los Angeles County jail records currently show that fifty four (54)

20  detainees across seven different facilities have access to canes. A copy of the final policy

21  will be shared with Plaintiffs' counsel upon issuance.  Plaintiffs continue to seek more

22  information from Defendants.`

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

[4155344.2]

1      Defendants will continue to meet with various county counsel in an effort to ensure

2   compliance with the ADA for *Armstrong* class members housed in county jails.

3

4                                      Respectfully submitted,

5   DATED:  September 15, 2022         ROSEN BIEN GALVAN & GRUNFELD LLP

6                                      By:  */s/Thomas Nolan*

7                                           Thomas Nolan

8                                      Attorneys for Plaintiffs

9

10  DATED:  September 15, 2022         ROB BONTA
                                       Attorney General of the State of California
11

12                                     By:  */s/Trace O. Maiorino*

13                                          Trace O. Maiorino
                                            Deputy Attorney General
14

15                                     Attorneys for Defendants

16                         **FILER'S ATTESTATION**

17      As required by Local Rule 5-1, I, Thomas Nolan, attest that I obtained concurrence

18  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

19  have maintained records to support this concurrence.

20

21  DATED:  September 15, 2022         */s/Thomas Nolan*

22                                      Thomas Nolan

23

24

25

26

27

28

[4155344.2]

# Exhibit A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

August 31, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Jennifer Neill                                    Tamiya Davis
Assistant Secretary/General Counsel               CDCR Office of Legal Affairs
CDCR Office of Legal Affairs                      Tamiya.Davis@cdcr.ca.gov
jennifer.neill@cdcr.ca.gov

        Re:     *Armstrong v. Newsom*: Request for Meeting Regarding Plaintiffs'
                Comments and Objections to Revised Staff Misconduct Regulations
                <u>Our File No. 0581-03</u>

Dear Jenn and Tamiya:

        Attached please find Plaintiffs' objections to and comments regarding proposed
changes to the staff misconduct regulations as posted on August 15, 2022, in the NCR
22-06 Corrected Renotice.[1] Notwithstanding Defendants' intent to remove the ADI from
regulation, our understanding, based on representations that were made during a meeting
with Defendants and the Court Expert on August 30, 2022, is that:

    •   Defendants intend to continue to utilize the Allegation Decision Index
        ("ADI") as agreed on by the parties, which is subject to stipulation, and
        which is filed with the emergency regulations, 22-06, published by the
        Office of Administrative Law on April 8, 2022, and;

    •   Defendants do not intend to materially alter the ADI without agreement
        from Plaintiffs' counsel.

        As the attached comments make clear, Defendants' intentions are not apparent in
the proposed regulatory changes and, as currently drafted, these and other proposed

---

[1] https://www.cdcr.ca.gov/regulations/wp-
content/uploads/sites/171/2022/08/Corrected_Renotice_for_NCR_22-
06_Staff_Misconduct_Allegations.pdf

[4149417.1]

Jennifer Neill
Tamiya Davis
August 31, 2022
Page 2

changes violate existing agreements between the parties, including the Five Prisons and
RJD Remedial Plans.

We hope that the parties can resolve these important issues without the need for
further court intervention.  We request a meeting with you and the Court Expert to
discuss these issues following the Labor Day holiday.

We look forward to hearing from you regarding your availability.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/Penny Godbold*

By:  Penny Godbold
     Of Counsel

PMG:cg
Enclosure
cc:     Ed Swanson
        August Gugelmann
        Audrey Barron
        Olena Likhachova
        Trace Maiorino
        Sean Lodholz
        Mark Jackson
        Sharon Garske
        Nicholas Meyer
        Alexander "Lex" Powell
        Patricia Ferguson
        Gannon Johnson
        Chor Thao
        Amber Lopez
        OLA Armstrong
        Amy Miller
        Dawn Lorey
        Prison Law Office

[4149417.1]

# Exhibit B



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

June 27, 2022

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND**
> **CONFIDENTIAL**
>
> **SUBJECT TO**
> **PROTECTIVE ORDERS**

Tamiya Davis
CDCR Office of Legal Affairs
Tamiya.Davis@cdcr.ca.gov

     Re:    Outstanding Issues and Next Steps in Rule Violation Report Discussions
               Our File No. 0581-03

Dear Tamiya:

     Plaintiffs appreciate steps taken by Defendants thus far to eliminate problems with false, retaliatory, discriminatory and otherwise inappropriate Rule Violation Reports ("RVRs") throughout CDCR. Specifically, we acknowledge Defendants' commitment to change in the following areas:

- Providing incarcerated people with the right to receive video footage in the RVR process, if requested

- Audio recording of RVR hearings

- Quarterly headquarters-level RVR audits at ten prisons

- Training improvements for Chief Disciplinary Officers ("CDOs"), Senior Hearing Officers ("SHOs"), and Hearing Officers to improve detection of false/retaliatory/discriminatory RVRs and to address bias against incarcerated people in the RVR process

- Expanding the scope of CDO review to include the substance of the RVR, and not just the process

[4112636.2]

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
June 27, 2022
Page 2


Below Plaintiffs outline ongoing questions or concerns that have not yet been addressed by Defendants' commitment to reforms.  We look forward to discussing these issues, as well as receiving any updates on the reforms outlined above, during our next meeting on June 29, 2022.

1.     **Counseling-only RVRs/Informational chronos:**

Counseling-only RVRs and informational chronos are problematic.  CDCR asserts that the purpose of both is merely documentation of the behavior and that such documentation is "non-disciplinary." As a result, neither counseling-only RVRs nor informational chronos are subject to the due process protections or the review process protections (such as the CDO review and the mental health review process) that are afforded to RVRs.  Despite CDCR's assertion that these chronos are non-disciplinary, they can result in serious punitive consequences. For example, they can lead to harsher penalties for future discipline, as they are the first step in the progressive discipline process.  They are also seen and relied on during Board of Parole Hearings ("BPH") proceedings and can be used in decision making that has the ultimate consequence -- denying release from prison.

The conduct that is documented in counseling-only RVRs and informational chronos is simply presumed to have occurred because staff said it was so.  Yet, Plaintiffs' counsel has identified multiple recent examples of staff issuing counseling RVRs or informational chronos that are false, retaliatory, discriminatory or otherwise inappropriate.  (*See* Plaintiffs' Written Submissions to the Court Expert Regarding SATF, December 8, 2021, January 7, 2022, and February 28, 2022.).  In one recently discovered case, custody staff accused health care staff of authoring two false informational chronos.  (*See* **Exhibit A**, email from correctional officer regarding the issuance of false chronos and requesting they be removed from the file).  Despite the best efforts of staff, false informational chronos that state that the class member threatened a nurse remain in his file.  BPH specifically cites to the chronos in concluding that the class member's ability to internalize his self-help programs is questionable, given his threatening conduct, as documented by the nurse.  (*See* **Exhibit B**, BPH Non-Violent Decision Form, at 3-4.)  Ultimately, the class member is denied release from prison.  *Id*.

CDCR must stop the practice of issuing counseling-only RVRs and informational chronos that document behavior that could be considered disciplinable (that can later be used against someone) without required due process or the protection of any review process.  This is especially urgent given the ability of staff to issue

[4112636.2]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 27, 2022
Page 3

false, retaliatory, discriminatory or otherwise inappropriate counseling-only RVRs and informational chronos and the serious harm that can result. Counseling-only RVRs must cease and, to the extent that CDCR needs to document any non-disciplinable behavior in one's file using an "informational chrono," CDCR must ensure, through supervisor review, that the content is in fact informational and not potentially disciplinable or have the potential to be used against someone. Documentation of ANY disciplinable behavior, must be afforded due process and review protections.

2.    **Detection of Discriminatory RVRs:**

Plaintiffs' counsel has requested that Defendants "screen" RVRs that are issued to *Armstrong* class members in order to detect, at the outset of the process, whether the alleged violation occurred as a result of a person's disability and, if so, to void the RVR. (The example we have discussed during meetings is the person with a documented mobility disability who is written up for causing a delay when, in actuality, were unable to move as quickly as staff directed.) Defendants agree that such RVRs are discriminatory, but have not put forward any proposal to "screen" RVRs for discrimination at the outset of the process. Plaintiffs' counsel acknowledges that Defendants have agreed to audit this standard at ten prisons. However, more should be done to prevent and eliminate discrimination in the process, before the RVR harm results.

3.    **Substantive Review of RVRs in the Grievance Process**

Currently, people who attempt to grieve an RVR decision do not receive any meaningful/substantive review of the RVR decision. Grievance responses either explicitly state that one may not challenge the substance of the RVR using grievance process (*See* May 2, 2022 Letter Regarding ▇▇▇▇▇▇) or, in practice, grievance decisions simply endorse the RVR decision without conducting any further review of the facts or substance. In theory, grievances that allege false or retaliatory RVRs will receive a substantive review because the facts will be considered during the staff misconduct investigation. However, RVRs that are not alleged to be retaliatory nor patently false (such as discriminatory RVRs where, for example, the wheelchair user is actually guilty of causing a delay but it was as a result of his disability and should not have resulted in an RVR) have no recourse to challenge the RVR if the substance is not reviewed in the grievance process.

Do Defendants agree that the grievance process should consider the substance of the RVR? If so, what steps will Defendants take to ensure a meaningful review of

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 27, 2022
Page 4

the substance of the RVR, especially challenges to discriminatory RVRs, in the grievance process.

4.     **Access to View Voided/Rescinded RVRs:**

Plaintiffs appreciate Defendants clarifying, during prior meetings, the distinction between voided and rescinded RVRs and explaining the justification for certain CDCR staff requiring access to voided/rescinded RVRs (such as to restore credits, correct records, and ensure release from Ad Seg, etc.)  CDCR maintains that rarely would a rescinded RVR be used against someone in decision making at the institution level, though acknowledged it does sometimes occur.  The parties agreed during the last meeting that affirmative language should be included in policy to prevent this from happening.  **Please provide an update on any changes that will be made to the DOM to ensure that staff do not rely on voided/rescinded RVRs in decision making.**

BPH access to and reliance on voided/rescinded RVRs remains a significant problem.  Plaintiffs' counsel will continue to raise this issue directly with BPH decision makers.  Currently, Plaintiffs' counsel can see no justification for BPH requiring access to voided/rescinded RVRs and it seems like an extreme injustice to allow BPH to rely on these documents to keep someone in prison longer, given the existence of false/retaliatory RVRs in the system.

5.     **RVR Hearing Audit Tool**

Plaintiffs appreciate the opportunity to review and provide comment on the "RVR Hearing Audit Tool" that was provided via email on May 27, 2022.  We are hopeful and optimistic that audits will aide in identifying and eliminating false/retaliatory/discriminatory or otherwise inappropriate RVRs as well as bias against incarcerated people in the RVR process.  The Tool appears comprehensive and we appreciate the inclusion of *Armstrong*, *Clark* and *Coleman* audit standards.

Regarding *Armstrong*:

- **B4**, the audit standard for the DPP program, simply asks whether the person was provided a reasonable accommodation.  However, that does not seem specific enough to direct the auditor to consider whether the RVR is discriminatory.  Instead, the standard should ask whether the disability was the cause of the behavior that resulted in the RVR (either due to a failure of staff to identify, understand or accommodate the disability).

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 27, 2022
Page 5

Regarding *Clark:*

- **B1** should read "Staff assistant (SA) assigned for DD1-DD3 and present for IE waiver, DA waiver, and hearing." (Presence for DA waiver should also be included in Section D.)

- **B3** should read "RE made I/M aware of consequences of continued behavior when circumstances permitted."

- **B2 and B3** should both add the following sentence: "If conduct corrected after adaptive supports/warning provided, no RVR should issue." (From CDCR's DDP RVR OJT Module: "If the inmate stops the misconduct, no further action is required. Only if the inmate does not stop his/her misconduct should the staff member issue a RVR-Counseling Only or a RVR.")

- **B5** should use the phrase "developmental disability/cognitive or adaptive functioning deficits" instead of "DDP." (That is the language in Title 15; using the shorthand "DDP" isn't accurate.)

- **C7** should go further than simply considering the MH-A information. The SHO must provide a reasonable explanation if choosing not to follow the clinician's recommendation. *See* DDP joint audit tool methodology for RVR Q21:

    o   The rater shall review the Hearing Official's summary for documentation that the Hearing Official considered the Mental Health Assessment when determining the outcome based on the following:

        ▪   Ø  Documentation of the opinions offered by the clinician from Question 3b on the MHA. and

        ▪   Ø  How the opinions were considered (reasoning).

    o   The SHO must articulate the evidence reviewed and the weight given to such evidence, even when it does not support the finding obtained.

Regarding *Coleman*:

- Between **B4** and **B5**  (and renumber thereafter), add:  RVR—CCR Section 3317.2/3317(e)—did I/M behavior occur in connection with cell extraction

[4112636.2]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 27, 2022
Page 6

for administration of involuntary medication, involuntary treatment, transfer to inpatient unit, or in connection with being placed in restraints or seclusion, or was the behavior an act of self-mutilation or attempted suicide?  If yes, did the Facility Captain either (a) void the CDC Form 115, Rules Violation Report and document the decision via memorandum attacked to CDCR Form 1154 per DOM 52080.5.8 or (b) determine that the exception applied for Serious Rules Violation and/or assault or battery per CCR Section 3317.2.

The audit contemplates the possible identification of retaliatory RVRs.  Should the Tool also include a field to confirm that any such RVRs are referred to the staff misconduct investigation/disciplinary process?  How will Defendants confirm this is occurring?

6.      **Creation of Early Warning System ("EWS") Indicators for RVR Problems**

During prior meetings, Defendants indicated a willingness to considering the inclusion of "red flags" in the EWS for data points which may be indicative of RVR related problems, including staff misconduct.  We are interested in receiving an update on Defendants' position regarding the inclusion of the "red flags" that were previously discussed including:

- Identification of staff who issue a high/disproportionate number of RVRs

- Identification of incarcerated people who receive a high/disproportionate number of RVRs

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4112636.2]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 27, 2022
Page 7


- Identification of incarcerated people who receive an RVR within a short period of time after filing a staff misconduct complaint

We look forward to discussing these issues on June 29, 2022.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:   Penny Godbold
Of Counsel

PMG:aa
cc:  Ed Swanson            Sean Lodholz            Trace Maiorino
     August Gugelmann      Olena Likhachova        Chor Thao
     Patricia Ferguson     Mark Jackson            Amarik Singh
     Gannon Johnson        Sharon Garske           Audrey Barron
     Co-counsel

[4112636.2]

# Exhibit C



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

September 6, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

Ed Swanson
Court Expert
ed@smllp.law

Tamiya Davis
Attorney
CDCR Department of Legal Affairs
Tamiya.Davis@cdcr.ca.gov

> Re:  *Armstrong v. Newson*
> Joint Audit Dispute Items and Next Steps
> Our File No. 0581-3

Dear Ed and Tamiya:

We write in advance of the Joint Monitoring meeting this Thursday, September 8, 2022, to discuss the status of pending work to finalize multiple outstanding issues and propose a plan of action to re-start collaborative work on reaching agreement.  Our last letter detailing the status of joint monitoring disputes and negotiations was dated April 4, 2021, and a copy (without exhibits) is attached hereto as **Exhibit A**.  The parties also met with Mr. Swanson in September of 2021 to go confirm the status of pending disputes.  Unfortunately, as a result of the pandemic and multiple completing issues requiring Defendants' attention, a number of outstanding issues raised through the joint monitoring process have yet to be resolved.

In this letter we update the categories from our April 2021 letter on joint audit disputes, and we outline some additional issues to address.

**A.**  **<u>Issues Raised By Recent Joint Tours and Need for Collaboration on an Auditor Handbook and Some Auditor Training Materials or Workshops</u>:**  In response to the parties joint tours since the Summer of 2021, plaintiffs' have raised some discrete concerns about the joint tool process and about our joint monitoring tours together in 2021 and 2022.  Attached as **Exhibit B** is a letter from me dated November 4, 2021, proposing a number of additional Joint Tool questions for managers in the prisons we jointly tour, and raising a number of concerns with the Joint Tour process.  We would like to schedule a meeting to go over our proposed additional questions and to discuss

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 2

and brainstorm additional ways to make the staff interview questions more thorough and useful to this process.

Also, in recent joint tours, plaintiffs have also had some concerns about the interview styles and level of engagement during interviews by the different monitors, particularly when interviewing our clients. We are interested in meeting to discuss universal expectations for conducting interviews. For example, we would like to discuss expectations such as not eating or looking at phones during interviews with class members, not using SOMS while interviewing people, not rushing through interviews at the expense of asking follow up questions when an answer is incomplete or does not make sense, and guidelines for engaging in active listening and asking appropriate follow up questions. We have long requested that the parties develop an auditor's handbook in this process. We would like to establish a small group of the most experienced monitors on both sides for this purpose. The parties should collaborate on best auditing practices, and on how to train auditors on both sides to be as effective as possible in asking questions and monitoring on site during our tours together. While we have a number of workgroups already, this important task may require its own smaller workgroup.

Also, one issue not covered by the list below, that plaintiffs have raised a number of times in these discussions, is how the Program Assignment Data can be used and reported in the Joint Monitoring Process.

**B.    Workgroups**:  Section C, below, provides the updated current status of disputes and action items from Plaintiffs' April 4, 2021 letter. Section C lists the need for the following workgroups that have not yet been established or started work:

- Accountability

- Timelines for Provision of DMEs

- Expedited Transfers – Timeframe for "Expeditious"

- Adequacy of the Number of ADA workers

- Tracking Accessible Transportation

- Orientation

The parties agreed to establish workgroups in these areas. However, in some cases (such as the expedited transfer process) a workgroup is not likely necessary. We simply need Defendants' proposal. During this meeting, the parties should establish priorities and set specific deadlines for moving each of these outstanding issues forward.

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 3

We consider all of the above issues important, but we are willing to discuss priorities on Thursday.

      **C.**    **<u>Issues From Prior Dispute Tracking Letters</u>**:  Set forth below using the same breakdown as in my April 4, 2021 letter, is a list of prior disputes and our best effort to provide a description of the current status.  We would appreciate any clarifications, additions, or revisions to the status updates provided below from the other parties:

## I. EFFECTIVE COMMUNICATION

### A. Policy Disputes

        **1.**    **CDCR Forms Documenting Full Three-Step EC Process**

**<u>Issue</u>:**    Whether CDCR forms must document the full three-step process for achieving effective communication.

**<u>Status</u>:**    **<u>Almost Resolved</u>**:  The parties established a work group to address these issues, and the workgroup met and addressed the disputed EC issues for many months, through early Summer 2022.  In this process, Defendants agreed to permit some individuals to have multiple primary methods, the parties agreed on a general approach to the three-step EC process, a compromise was reached about when alternative EC methods can be used (although a dispute remains over the documentation and role of the consent of the class member regarding alternative methods), and the parties reached agreement about most EC issues.  However, there were a few EC that the parties did not resolve before the EC memo was finalized, including the following:

- Defendants did not agree that DNV individuals would require documented effective communication.  Plaintiffs continue to believe such EC is critical given the difficulty these individuals may have reading written materials.

- Defendants did not agree to require tracking of alternative formats required by individual blind and low vision class members (e.g., braille, or large print of a particular font size).  The parties have made progress on this issue in the

Ed Swanson, Tamiya Davis
September 6, 2022
Page 4

> Blind/Low Vision Workgroup but this issue is not resolved yet.
>
> - Plaintiffs provided detailed specific comments about the proposed drop down menus for documenting accommodations and effective communication in SOMS. Defendants say they are adopting most of our requested changes but Plaintiffs have not yet heard back about the specific responses to our letter. Attached hereto as **Exhibit C** is a copy of my June 21, 2021 Letter providing comments on the EC memo at the time and on the SOMS Documentation Process for EC. We have never received a response to SOMS documentation concerns discussed in that letter.
>
> - Defendants refused to agree to include in the memo a requirement to documented whether the class member agreed to the alternative method when the primary method is not used. Plaintiffs continue to believe such a requirement is clearly mandated by the ADA.
>
> - Defendants agreed to require EC documentation for 1824 grievance responses but not for 602 and 602-HC grievance responses

### 2.    Auditing Pre-Parole Activities in CDCR Prisons

**Issue:**    Whether key pre-release activities related to parole that take place inside CDCR prisons will continue to be audited as part of the joint audit process.

**Status:**    **Unresolved:**  Ed Swanson proposed on February 8, 2021 that parole planning-related items be moved to a separate section of the joint audit tool. OACC responded that it does not have authority to agree to that proposal and agreed to report back. OACC also agreed to confer with DAPO with respect to the scope of its audit and whether and how it planned to review DAPO functions that take place in CDCR prisons. Plaintiffs are awaiting a response from Defendants on this issue. We still do not have a final response on this issue. At the September 2021

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 5

meeting, Defendants reported that DAPO is resistant to being included in the joint tours.  At that September 2021 meeting, Mr. Swanson affirmed his earlier opinion that it is efficient to review the institutional DAPO duties on the tour while we are there, rather than having a separate tour for those issues.

### 3.   EC Requirements for Hearing Results

**Issue:**   Whether EC is required for the results of classification hearings held in absentia only when adverse action is taken.

**Status:**   **Resolved**:  This is covered in the final EC memo Defendants have taken to labor for final approval before implementation.  Defendants agreed to document EC for delivery of Classification Committee Chronos, "regardless of the inmate's attendance or the outcome of the committee."

## B.   Other EC Policy Issues

### 1.   Documentation of EC for Non-Serious RVRs

**Issue:**   Whether EC must be documented for non-serious RVRs and counseling-only RVRs.

**Status:**   **Resolved.** This was already listed as resolved in the last status updated letter.  *See* Exhibit A.  Defendants agree that EC must be documented and will be audited for non-serious RVRs and counseling-only RVRS. We are not sure if the questions in the tool have yet been updated accordingly.  Also, this requirement could be stated more clearly in the pending EC memo.

### 2.   Checking Primary Method of Communication

**Issue:**   Whether the revised EC policy requires auditors to continue to check whether the primary method of communication was used.

**Status**:   **Mostly Resolved:**  This issue was mostly resolved in the EC workgroup.  Primary method will still be preferred, but an alternative method may be used if there is an explanation as to why the alternative method was used.  Plaintiffs would like the documentation to include

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 6

whether the class member agreed to the alternative method.  Defendants have not agreed to require this in the documentation.  Plaintiffs also sought a requirement that the primary method requested by the class member be provided, which Defendants also declined to include in the memo (except as to DPH signers whose primary method is sign language).

## II. ACCOMMODATIONS FOR INDIVIDUALS

### A.  Policy Disputes

#### 1.  Definition of unreasonable delay in providing DME

**Issue:**  How to determine whether a delay in the provision of DME was unreasonable.

**Status:**  **Unresolved But Agreement on Path Forward**. The parties agreed to establish a workgroup to discuss timelines for provision of DME, **but this has not been convened yet**. The parties need to meet, agree on timelines, establish timelines in policy, implement the policy, and revise the tool question accordingly.

### B.  Other Policy Issues

#### 1.  Policy regarding individuals with low vision and alarms

**Issue:**  Whether existing policy adequately addresses staff's obligations to people who are blind or have low vision during alarms.

**Status:**  **Resolved**:  The revised memo on alarms resolved this issue.  At the last meeting in September 2021, Defendants were going to confirm that this memo has gone to the field yet.  Please confirm.

Ed Swanson, Tamiya Davis
September 6, 2022
Page 7

## III. PHYSICAL ACCESS

### A.        Policy Disputes

#### 1.        Definition of "expeditious"

__Issue__:        What timeframes establish the meaning of "expeditious" for the
purposes of monitoring expedited transfer.

__Status__:        __Unresolved__:  We have been waiting for more than a year for a proposal
and draft memo on this issue.  We were told a memo on this issue was
in the works and was circulating internally in CDCR last September.

#### 2.        Revision of the housing matrix

__Issue__:         How to proceed in the absence of a final housing matrix.

__Status__:        __Resolved, Except for Clean Up Work__:  The new Matrix is in use, and
the parties are in ongoing institution-by-institution meetings to resolve
discrepancies and disputes related to the Matrix.  The next Matrix
meeting is on September 27, 2022.  We are waiting for word from
Defendants about whether they still want to expand the Matrix for CCI
to allow DLT-coded individuals to be housed on A-Yard and B-Yard.
There are also a number of other individual institution disputes pending
and under discussion.

#### 3.        Scope of the Administrative Segregation Order

__Issue__:        Whether the administrative segregation order applies to mental health
housing restrictive housing units, including the PSU, EOP hubs, LTRH,
and STRH units.

__Status__:        __Resolved in Principal__:  The parties agree that the administrative
segregation order applies to mental health housing restrictive units just
as it does to other restrictive housing units.  The parties have exchanged
drafts of the new memo, with Sean Lodholz sending a copy of the latest
version to plaintiffs on August 25, 2022.  The parties are scheduling a
meeting to resolve the remaining issues.

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 8

## B. Other Policy Issues

### 1.      DKD Individuals and Expedited Transfer Policy

**Issue:**      Whether people with the DKD code are subject to expedited transfer.

**Status:**      **Resolved (But Not Memorialized in a Memo)**. The parties agree that people with DKD codes will be subject to expedited transfer except where: (a) they choose to stay somewhere close to family and go out for dialysis, or (b) classification issues (such as enemies) preclude placement at the prisons with dialysis programs. At the September 2021 meeting on these issues, Defendants reported that CAMU had developed a process for this and that there are only a small number of DKD individual not in the hubs.  Defendants said they may include this group and the policy in the new expedited transfer memo.  Plaintiffs have not received the new memo.

### 2.      Interim accommodations pending expedited transfer

**Issue:**      How to document interim accommodations for people awaiting expedited transfer.

**Status:**      Defendants will continue use a revised version of the current 128b checklist for COVID-related placements to ensure appropriate interim accommodations while class members wait for an expedited transfer. The parties need to revise the audit tool to capture this change.  The parties continue to have meetings about expedited transfer issues and should be able to finalize this in that process.

### 3.      Tracking accessible transport

**Issue:**      How to document the provision of accessible transport so that it can be audited.

**Status:**      **Unresolved (Workgroup Needed):** The parties agreed to convene workgroup to discuss the development of a policy to track the provision of accessible transportation, including wheelchair belts and other measures to secure wheelchairs during transportation. The parties need to meet, agree on standards, implement those standards in policy, and

Ed Swanson, Tamiya Davis
September 6, 2022
Page 9

revise the audit tool to reflect the agreed upon standards.  This
workgroup has not yet met.

## IV.      PROGRAMS, SERVICES, AND ACTIVITIES (PSA)

### A.      Policy Disputes

#### 1.      Documentation of program assignment process

**Issue:**      How classification committees document decisions regarding program
assignments.

**Status:**      **Unresolved But Agreement on Path Forward (Existing Program
Access Workgroup)**: Defendants stated that they would discuss
internally and propose a documentation process, which the parties
would then discuss. Defendants asked Plaintiffs to provide bullet points
of what they would like to see in the process. Plaintiffs provided those
bullet points by email on February 23, 2021. Plaintiffs received no
response.  At the meeting last September, it was stated that this issue
should be addressed by the Program Access Workgroup.  That
workgroup has been meeting but has not yet discussed this issue.

#### 2.      Scope of joint audit

**Issue:**      Whether the joint audit covers programs such as the Prison Industry
Authority, Inmate/Ward Labor, or Joint Venture programs.

**Status:**      **Update Needed from Defendants:**  At the meeting in September 2021
on these issues, **Defendants seemed to agree that the audit will cover
these areas**.  However, the parties will need to agree on questions and
any needed inspections covering these programs and areas.

#### 3.      Use of TABE for program assignments

**Issue:**      Whether it is permissible to use TABE scores as criteria for program
assignments.

**Status:**      **Appears Resolved But Documentation of Policy Changes Requested
and Not Provided:**  In prior meetings in the Spring of 2021, CAMU

Ed Swanson, Tamiya Davis
September 6, 2022
Page 10

stated that there are no longer any TABE requirements for assignments. *See* **Exhibit A** hereto. CAMU also agreed to confirm this and to produce any policies demonstrating this change. We have not received any evidence of this change and look forward to reviewing the changes to policy.

### 4.    Adequacy of number of ADA workers

**Issue:**    How to determine whether there are sufficient ADA workers in a housing unit.

**Status:**    **Unresolved (Workgroup Issue):** At the September 2021 Meeting, Defendants stated that this should be a workgroup issue. Earlier updates on this issue indicated some areas of agreement. The following is from our April 4, 2021 letter attached hereto as Exhibit A, on this issue: "It was suggested that the parties start auditing this issue with a ratio of ADA workers to class members while building in flexibility to account for differences between yards and prisons. The importance of class member interviews was emphasized as an essential source of information in this process. OACC responded that they would consider the development of a ratio and how to incorporate flexibility for yard/prison differences. Plaintiffs have not heard further. The parties will need to agree on a method for auditing this standard. Once agreed on, significant changes will need to be made to the audit tool to capture these updates."

## B.  Other Policy Issues

### 1.    Accessibility and the housing matrix

**Issue:**    How to handle cases where a person claims that they are inaccessibly housed despite being housed in compliance with the matrix.

**Status:**    **Resolved (Awaiting Final of Updated DRM)**. The parties agreed that these cases should be addressed by the RAP. The parties agreed that in these instances, the RAP should conduct an individualized analysis of the person's disability needs and facilitate housing changes or additional accommodations and physical plant modifications as appropriate. The RAP should not respond by stating that the person is housed in accordance with the matrix. CAMU agreed to revise the Desk Reference

Ed Swanson, Tamiya Davis
September 6, 2022
Page 11

Manual (DRM) accordingly.  The parties have been exchanging drafts
of a revised DRM this summer.  The current draft of the draft Desk
Reference Manual includes language the parties have agreed to on this
issue.  The DRM still needs to be finalized but there does not appear to
be a dispute over this provision.

### 2.      Orientation

**Issue:**      How to determine whether inmate orientation is timely, complete, and
effectively communicated.

**Status:**      **Unresolved (Workgroup Issue):** The parties agreed to convene a
workgroup. Once this issue is resolved, policy will need to be revised
and the question in the audit tool will need to be updated to reflect this
agreement.  The parties are still waiting to start this workgroup.

### 3.      Extended stay privileges

**Issue:**      How to implement a durable process to determine whether people are
remaining in Reception Centers longer due to their disabilities and,
when they are delayed in this way, determine if they are granted
extended stay privileges within the appropriate timeframe.

**Status:**      **Unresolved But Agreement on Path Forward**. This remains
unresolved, pending further information from Defendants. Defendants
said they would talk further to stakeholders about this. The issue here is
somewhat complex but boils down to this: if extended stay privileges
will be automatic on the 31st day in RC for class members with
disabilities impacting placement, then Plaintiffs agree to the proposal.
On the other hand, if the plan is for an RC classification committee to
do an "extended stay review" of the class member's case factors and
other issues to see if his stay is extended for disability-related reasons,
then Plaintiffs believe that 31 days will be too soon to conduct a review.
**This issue has been on hold to see the impact of the new 30-day
Reception Center processing policy on this issue.  We would
appreciate a report from Defendants on the new process.**

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 12

### 4.     Minimum custody in RC

**Issue:**     How to ensure that institutions are awarding appropriate credits to people with extended placements in the Reception Centers, particularly minimum custody credits for people who would parole from the RC.

**Status:**     **Initially and in the April 4, 2021 letter we listed this as "**Resolved Pending Defendants' Demonstration of SOMS Functionality" and we explained that "Defendants say this problem has been resolved by SOMS programming, and that even if it is not solved by that, the new 30-day RC process will resolve it."  In September 2021, we discussed the fact that during the May 2021 meeting with Heidi Dixon on this issue, I wrote down that she said this could still be a problem.  Tamiya had a different memory of this and was going to check with Heidi Dixon about this.  **Plaintiffs request an update/report on this issue.**

## V.     SUSTAINABILITY

### 1.     Orientation manual

**Issue:**     Whether inmate orientation manuals should inventory the assistive equipment at the prison and indicate where each piece of equipment is located so individuals with disabilities know what is available and where they need to go to obtain it.

**Status:**     **Resolved**.  Defendants reported last September that they have a process in place to give a handout with orientation manuals at each institution listing assistive equipment and its location.  This allows the list to be updated without updating the entire manual.  **Plaintiffs would like to see a sample inventory handout.**

### 2.     EC for RAP responses

**Issue:**     Whether effective communication must be provided for RAP responses.

**Status:**     **Partly Resolved**.  This requirement for EC of RAP responses is in the final EC memo that Defendants are taking to labor.  **Plaintiffs' Counsel has reserved our objection, however, to the failure of the policy to require EC for 602 and 602-HC responses**.

[4151267.1]

Ed Swanson, Tamiya Davis
September 6, 2022
Page 13

     3.      **RAP appeal instructions**

**Issue:**      Whether the RAP must provide specific instructions about how to appeal RAP responses.

**Status:**      **Unresolved But Agreement on Path Forward (DRM Issue)**:  This was partly dependent on the issue, now resolved, of whether the 1824 process would be a two or three step process.  Defendants have agreed it will be a two-step process like other grievances.  This issue needs to be covered in the updated desk reference manual.  **However, this portion of the manual now being revised jointly by the parties does not seem to have been updated when the parties exchanged drafts this summer.**  The last draft of the DRM in August 2022 includes the following language not updated to reflect the new form names (602-1, 602-2, etc) "The response shall also advise the inmate of his right to file a grievance, and advise the inmate to file a CDCR Form 602 HC, Health Care Grievance, to grieve health care determinations made during the RAP, and/or to file a CDCR Form 602, Inmate/Parolee Grievance, to grieve other aspects of the RAP's decision**." Plaintiffs will propose language to make it clear that the 1824 grievance counts as a first level appeal, allowing the individual to go straight to the 602-2 process, and will add language to require the RAP response to indicate which issues should be appealed on a medical 602-HC and which on a regular 602**.

     4.      **Accountability logs**

**Issue:**      How to review accountability logs for the "big picture" in the joint audit process.

**Status:**      **Unresolved (Workgroup Needed)**:  This issue needs to be covered in a workgroup, which would also cover the other accountability questions drafted and set aside by Defendants over the years (some of which were scored for a while on Joint Tours).

Ed Swanson, Tamiya Davis
September 6, 2022
Page 14


# VI. OTHER DISPUTES

### 1.    Housing unit tours

**Issue:**    Whether it is necessary to tour every housing unit during an audit.

**Status:**    **Unresolved But Some Progress**:  Defendants said in the past that they were willing to be flexible about not visiting every housing unit if Plaintiffs would be flexible about the class member interview process as well.  Plaintiffs explained that the issues are not equivalent.  First, the parties sample a small portion of the class member population for interview. At prisons where there is a large DPP population, the number of class members interviewed is less than 10 percent.  The parties spent years negotiating a formula for selecting class members to interview. Second, class member are interviewed about current conditions impacting ADA compliance.  Despite these differences there has been some flexibility on these issues worked out by the parties on some joint tours.

We look forward to discussing these issues on Thursday.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

By:   Thomas Nolan
Of Counsel

TN:TN
Encls.

| cc: | |
|---|---|
| Nicholas Meyer | Mona Houston |
| Alexander "Lex" Powell | Chantel Quint |
| Patricia Ferguson | Jillian Hernandez |
| Gannon Johnson | Dawn Lorey |
| Chor Thao | Laurie Hoogland |
| Amber Lopez | Bruce Beland |
| OLA Armstrong | Robert Gaultney |
| Olena Likhachova | Tammy Foss |
| Trace Maiorino | Jason Williams |
| Sean Lodholz | Vimal Singh |
| Mark Jackson | Lois Welch |
| Sharon Garske | Steven Faris |
| | Co-Counsel |

[4151267.1]