DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:          (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

1   The parties submit this Joint Case Status Statement pursuant to the Stipulation and

2   Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file

3   periodic joint statements describing the status of the litigation" every other month,

4   beginning on May 16, 2011.

5   **CURRENT ISSUES[1]**

6   **A.   Effect of the COVID-19 Pandemic on the *Armstrong* Class**

7   **1.   Plaintiffs' Statement**

8   COVID-19 continues to spread throughout California prisons. To date, 87,099

9   cases of the novel coronavirus have been detected among people incarcerated in California

10  prisons. A total of 257 people have died after being infected while in prison in California.

11  Of those, approximately half were *Armstrong* class members, even though they make up

12  only about 12% of the total incarcerated population. This is a tragic but predictable result

13  of Defendants' systemic failures to safely and accessibly house class members during the

14  pandemic, which contributed to countless class members becoming infected with

15  COVID-19. Yet, Defendants continue to resist vaccination efforts that would better

16  protect *Armstrong* class members despite the rise of new and possibly more dangerous

17  COVID variants on the horizon.

18  The pandemic continues to impact the transfer of *Armstrong* class members to ADA

19  accessible placements. Defendants have unfortunately been unable to find a way to

20  address the backlog of class members housed inaccessibly in prisons not designed to safely

21  house individuals with their disabilities, even after COVID-19-related movement

22  restrictions were relaxed in April 2022. As of November 4, 2022, there are 107 class

23  members with impacting placement codes housed inaccessibly in non-designated

24  placements, in violation of the *Armstrong* Remedial Plan (this does not include an

25  additional 151 class members with impacting placement codes awaiting transfer to

26  designated mainline prisons from reception centers).

27  ─────────────────
[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or

28  *Defendants' Statement*.

On August 11, 2022, the parties met with the Court Expert on expedited transfers. Defendants reported that the continuing delays are due to a combination of the lack of available lower bunk, lower tier beds at the receiving prisons, and COVID-19 outbreaks at either the sending or receiving prisons (a class member's expedited transfer will be delayed if their housing unit or yard at their current prison goes on quarantine, or if the housing unit or yard at the receiving prison with an accessible bed for them goes on quarantine).  Plaintiffs appreciate the efforts that Defendants have been making to try to prioritize expedited transfers for class members with DPW or DPV codes while housed inaccessibly, and that there is not an easy solution to resolving this serious problem.

As Defendants acknowledge, however, their current efforts are not going to be enough to bring the number of mis-housed class members down to anywhere near pre-pandemic levels, so long as it remains necessary for CDCR to employ COVID-19-related risk reduction measures.  Given that there is reason to believe that there will continue to be outbreaks in CDCR for the foreseeable future, more needs to be done.  Plaintiffs are committed to working with Defendants on solutions to prevent the creation of the "new normal" we have been warning about, where there are close to 100 class members mis-housed at prisons not designed to safely house individuals with their disabilities, a significantly higher number than the pre-pandemic levels, when (according to Defendants) there were only several dozen class members mis-housed statewide at any given time.

On September 16, 2022, Defendants stated that they are in the process of auditing the amount of set-aside quarantine and isolation space at each prison, and if some prisons are setting aside too much space, those prisons may be able to make available more lower bunk, lower tier housing for class members awaiting expedited transfer.  Defendants reported that they have already identified several prisons that had set-aside more quarantine and isolation space than is required by the *Plata* Receiver; addressing these issues should open up additional accessible beds. Plaintiffs urge Defendants to consider any other ways that more accessible beds can be made available at prisons designated to house class members with disabilities impacting their housing placement.  While

1   Defendants state they do not believe that the availability of bus seats or coordination

2   between headquarters and the institutions on arranging for transfers are currently

3   contributing factors to the expedited transfer delays, Plaintiffs recommend that Defendants

4   continue to monitor whether class members' expedited transfers are delayed due to either

5   of these factors, which are more easily resolved through improved communication and

6   coordination than lack of accessible bed space.

7       Plaintiffs' counsel are also concerned that the data on expedited transfers may not

8   tell the whole story.  Some class members report that, as a result of pandemic related

9   transfer delays, they are housed in accessible placements, but on higher security level

10  prison yards.  These class members are not counted in data currently produced by

11  Defendants because they are housed in ADA accessible housing placements, just

12  reportedly at higher security levels than they should be because of their disabilities.

13  Plaintiffs have requested to meet with Defendants in order to gather more information

14  about whether class members are being overridden to housing placements that are not

15  consistent with their security level and, if so, the scope of this issue.

16      **2.    Defendants' Statement**

17      Defendants continue to make significant and comprehensive efforts to contain and

18  minimize the effects of an unparalleled, global pandemic on the people housed in its

19  institutions, staff, and visitors by continuing with a robust vaccination process, maintaining

20  a stringent testing process, enforcing appropriate mitigation measures, working with

21  Plaintiffs to address individual concerns, and many other proactive efforts to address an

22  unprecedented, challenging, and ever-changing landscape.  Defendants' efforts to provide

23  safe and accessible housing and to provide detailed daily or weekly reports to Plaintiffs

24  during this global pandemic have been memorialized in previous Joint Case Status

25  Statements.  *See, e.g.*, ECF Nos. 3369, 3391, 3412.  Moreover, for more than two years,

26  CDCR has provided to the public detailed tracking information concerning COVID-19 to

27  include active cases, resolved cases, deaths, vaccination rates of inmate and staff

28

1   populations, tests completed, and other important information.[2]  Plaintiffs' contention that

2   "Defendants continue to resist vaccination," is false.  Recent data shows that 80% of all

3   inmates and 73% of staff members are fully vaccinated.  The Ninth Circuit Court of

4   Appeals held that "CDCR's COVID-19 vaccination policy was not deliberately indifferent

5   because [CDCR] took significant action to address the health risks posed by

6   COVID-19…".[3]  Neither party sought review of that decision.

7         Defendants continue to prioritize the reduction of the number of non-reception-

8   center class members on the expedited transfer list, notwithstanding unavoidable obstacles

9   to do so that have arisen as a result of the global pandemic, as detailed in previously filed

10  Joint Case Status Statements.  *See, e.g.*, ECF Nos. 3369, 3391, 3412.  Recent data shows

11  that there are 95 non-reception center class members on this list.  The updated COVID-19

12  Screening and Testing Matrix for Patient Movement relaxes many of the movement

13  restrictions and should further facilitate the reduction of class members on the expedited

14  transfer list.  An audit of institutions' isolation-quarantine space to return space no longer

15  required for isolation-quarantine to regular housing is also ongoing and will help address

16  the limited number of lower bunk, lower tier beds.  These efforts should also address

17  Plaintiffs' concern that class members may be temporarily assigned higher-classification

18  housing.  CDCR continues to monitor and report requirements for all class members

19  housed in non-designated spaces and provide timely documentation to Plaintiffs and the

20  Court Expert.  Defendants will continue to meet with Plaintiffs to share additional

21  information and garner their input to resolve this issue.

22

23  ───────────────
    [2] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ for updated
24  information.

    [3] On April 25, 2022, in an unpublished decision, the Ninth Circuit Court of Appeals
25  vacated the lower court's vaccine mandate and held that "CDCR's COVID-19 vaccination
    policy was not deliberately indifferent because [CDCR] took significant action to address
26  the health risks posed by COVID-19, including making vaccines and booster doses
    available to prisoners and correctional staff, enacting policies to encourage and facilitate
27  staff and prisoner vaccination, requiring staff to wear personal protective equipment, and
    ensuring unvaccinated staff members regularly test for COVID-19."  (Memorandum, *Plata*
28  *v. Newsom*, No. 21-16696, ECF No. 71-1.)

1

**B.     Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class
        Members**

2

3

**1.     Plaintiffs' Statement**

**a.     RJD and Five Prisons Orders**

4

5      In response to evidence of widespread abuse, assaults and retaliation against

6    incarcerated people on the basis of their disabilities who request accommodations and face

7    discrimination, on September 8, 2020, the Court issued orders finding remedial efforts

8    were necessary in order to "prevent further violations of the ARP and class members'

9    ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further

10   orders finding remedial efforts were necessary to prevent ongoing violations of the ADA

11   and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

12     After over a year of negotiations, the parties reached agreement on the vast majority

13   of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").

14   ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF

15   No. 3393, Exs. A, B.

16     Following a year of negotiations, the changes to the staff misconduct complaint

17   process were incorporated in to new regulations and the Notice of Change to Regulations,

18   22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received

19   written notice that Defendants unilaterally decided that changes to the proposed

20   regulations stemming from the negotiations were necessary.  The parties have not yet

21   resolved how Defendants will address Plaintiffs' concerns as articulated in Exhibit A to the

22   prior Joint Case Management Statement (ECF No. 3430) and the Court Expert's Quarterly

23   Report on Investigations and Discipline (ECF No. 3433 at 4-5).

24     Plaintiffs have consistently raised concerns that the number of complaints routed

25   through the new staff misconduct process will exceed the volume anticipated by CDCR.

26   Plaintiffs' counsel is extremely concerned that Defendants have not adequately allocated

27   enough resources to meet the demand for complaints, despite Plaintiffs' advocacy.  To

28   address the shortfall, Defendants propose recategorizing certain allegations of staff

1   misconduct that involve harassment, discrimination and retaliation which Defendants

2   believe do not have a "causal connection" to a protected class or which contain material

3   misrepresentations.  These recategorized staff complaints will not be routed to OIA for

4   investigation but will instead remain at the prison.  Plaintiffs object to Defendants' "causal

5   connection" proposal.  *See* September 16, 2022, Letter from Michael Freedman to Tamiya

6   Davis attached hereto as **Exhibit A**.  The Court Expert shares some of Plaintiffs' concerns

7   including that Defendants' proposed screening standards would be difficult to apply

8   consistently and objectively.  ECF No. 3433 at 2-3.

9        Defendants, for the first time in this CMC statement, make clear that they intend to

10  implement the "causal connection" standard at prisons not currently covered by the

11  *Armstrong* court orders.  This means that staff complaints throughout the State raising

12  discrimination, retaliation and harassment against people with disabilities will now be

13  processed using a different standard depending on the prison where the complaint arises.

14  This new process is contrary to years of negotiations in which Defendants repeatedly

15  represented that their court-ordered reforms to the discipline and investigation system

16  would apply statewide.  This is also inconsistent with current staff misconduct regulations

17  and with existing drafts of departmental policies, which neither mention the "causal

18  connection" requirement nor that the standard for processing staff complaints will differ

19  depending on the prison.

20       Implementation of Defendants' two-tiered approach defies common sense.  Under

21  this new standard an allegation raised by a class member of retaliation for participation in

22  the *Armstrong* litigation at one of the six prisons who has since transferred to a prison not

23  covered by the orders will be screened using a higher standard in order to receive an

24  investigation by OIA.  Having different standards apply to the same conduct committed by

25  different staff in the system undermines the entire concept of accountability as enshrined in

26  prior orders in this case.  Further, as the Court Expert concluded, the causal connection

27  standard is difficult to apply.  ECF No. 3433 at 2-3.  Requiring screening staff to

28  implement a complex and different standard, only applicable in certain cases only arising

1   at certain prisons, will undermine the accountability for complaints as required by the court

2   orders.  Plaintiffs urge Defendants to reconsider their plan and to take all possible steps to

3   ensure statewide accountability for discrimination, harassment and retaliation against class

4   members.

5        Defendants have also begun quarterly production of documents in compliance with

6   the Court's Orders.  Plaintiffs continue to identify problems in the production of

7   documents required pursuant to the court orders and will work with Defendants to resolve

8   this issue.

9        In response to concerns over the deaths of five class members, allegations of blatant

10  disability discrimination and denial of ADA accommodations by staff, and reports of

11  retaliatory RVRs issued by certain health care staff members, the Court ordered Court

12  Expert Ed Swanson to conduct an investigation and to produce a report regarding staff

13  misconduct allegations at SATF.  ECF No. 3338.  The investigation is ongoing.

14       CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP

15  found thus far at six prisons exist system-wide.  Plaintiffs are committed to bringing such

16  evidence before the Court until all class members are protected.

17            **b.     False, Retaliatory and Discriminatory RVRs**

18       Despite significant progress made towards court-ordered improvements to the staff

19  misconduct investigation and disciplinary system, Defendants have failed to address the

20  endemic use of false and retaliatory RVRs by staff to cover up disability-related

21  misconduct and/or to retaliate against class members who report misconduct.  *See* ECF

22  No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation

23  processes also denies class members due process in disciplinary hearings, resulting in

24  longer terms of imprisonment, denials of privileges, housing at higher classification levels,

25  and an unwillingness to report future misconduct or request disability-related help.

26       As in the staff complaint context, reviewers discount or ignore the testimony of

27  incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers

28  fail to discover evidence that staff have issued reports that appear plagiarized or otherwise

replicate conduct and charges that are improbably attributed to multiple people at the same time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322 at 11-12 & Ex. E.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs continue to raise outstanding problems.  Defendants are in the process of revising the Chief Disciplinary Officer training to include the requirements for reviewing camera evidence, reviewing cases for bias, and the obligation to report staff misconduct when it is evident in the disciplinary process.  To the extent feasible, Defendants agree to record audio for serious RVR hearings.  According to Defendants, the recordings will be used for internal audits and will be available for review during investigations into allegations of false/discriminatory RVRs.  The recordings will otherwise not be available to incarcerated people.

Defendants have also agreed to implement a headquarters-level audit of RVRs at 10 prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues, identification of discrimination, retaliation and bias in the RVR process.

Defendants have agreed to evaluate whether to include "red flags" in their EWS to identify when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and instances when an incarcerated person receives an RVR within a certain period of time after having filed a staff complaint.

Defendants are still considering problems identified by Plaintiffs' counsel regarding the issuance of counseling-only chronos which provide no due process but can have

negative consequences.  Defendants also agreed to discuss with Plaintiffs' counsel the inappropriate use of dismissed and voided RVRs, which are currently relied on in risk assessments conducted during the Board of Parole Hearings process, and the related problem of which CDCR staff have access to view voided and dismissed RVRs that are retained in electronic SOMS files.

The parties are scheduled to meet again on November 18, 2022, to continue negotiations.  Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

## 2.   Defendants' Statement

### a.   RJD and Five Prisons Orders

In compliance with the Court's September 8, 2020, and March 11, 2021 orders, Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF No. 3393.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at p. 2.  Further, the Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations," of staff-misconduct allegations."  ECF No. 3356 at p. 15.  As previously reported to the Court, within months of the Court's orders, Defendants executed significant components of the remedial plans that included increased staffing to specifically address disability-related issues of class members, body-worn-camera deployment, fixed camera installation (AVSS), document production, training, and other remedies.  ECF Nos. 3177, 3183, 3412.  Moreover, although not required by the Court's orders, Defendants have deployed statewide the processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  Accordingly, further enforcement orders as to other institutions is not necessary.  The statewide deployment of the new staff misconduct investigation and staff discipline processes necessitates extensive resources that includes the hiring and

training of new staff and the development of technological tools.  Plaintiffs' concerns related to the number of complaints routed through the new staff misconduct process are well taken, but such concerns are not entirely addressed by increasing monetary resources. Rather, hiring, training, and retaining qualified staff is more challenging in today's environment of widespread labor shortages that is affecting most hiring entities, including CDCR.  Notwithstanding the current circumstances, CDCR is committed to staffing current allocated positions to ensure successful deployment of the new processes. Defendants disagree with Plaintiffs' characterization of the revised process as a "recategorization" of certain allegations.  Instead, Defendants believe that the process can be improved, in part, by providing additional training to the initial screeners so that these screeners have an improved understanding of what amounts to serious staff misconduct to ensure consistent application of the new process and these revisions seek to achieve that objective.  The revisions to the regulations are intended to further ensure success of these processes by efficiently routing all staff misconduct complaints to the most appropriate entity for investigation.  Defendants have collected and shared data to support Defendants' proposed revisions to the regulations.  Defendants will continue to evaluate all information received to monitor compliance with the Court's orders and to provide adequate resources to ensure the successful transition to these new processes.  Nonetheless, Defendants' revised process addressing certain allegations of staff misconduct that involve harassment, discrimination and retaliation that do not have a causal connection to a protected class or contain material misrepresentations, shall not be implemented for staff-misconduct allegations arising out of the six prisons subject to this Court's staff-misconduct orders. ECF Nos. 3059, 3060, 3217, 3218.  A statewide order to modify CDCR's staff misconduct investigation and discipline processes does not exist and the Court has instructed the parties that no statewide order was issued.  *See* for example, "[t]he Court's orders require Defendants to modify their systems only at the six prisons and only with respect to alleged violations of the ARP and ADA.  ECF No. 3339-0 at p. 6.  The Court did not require Defendants to modify their investigations system statewide.  Consistent with the PLRA's

1   requirements, the additional remedial measures that the Court ordered Defendants to

2   include in their proposed plans were narrowly tailored to the six prisons and to alleged

3   violations of the ARP and ADA."  ECF No. 3356 at p. 14.  "The Court limited its orders to

4   the six prisons and to the context of the ARP and ADA in recognition of the PLRA's

5   requirement that any remedies ordered be narrowly drawn."  ECF No. 3356 at p. 15.

6   Notwithstanding Plaintiffs' concerns and objections related to the recent revisions to the

7   staff-misconduct processes, CDCR's staff-misconduct investigations and discipline

8   processes are in compliance with this Court's orders applicable to the six prisons.  CDCR

9   has dramatically overhauled its processes to ensure unbiased and complete investigations

10  statewide for the six prisons and will continue to work to expand it to the remaining

11  institutions voluntarily as they are able to do so.

12      Defendants continue to facilitate the Court Expert's investigation of enumerated

13  issues at SATF identified in the Court's November 8, 2021 order.  *See* ECF No. 3391 at

14  pp. 16, 17.  Defendants will continue to provide information on a rolling basis, coordinate

15  site inspections or interviews as requested by the Court Expert, and facilitate his

16  investigation in accordance with the Court's order to do so.

17          **b.     Defendants' Response to Demands for RVR Reform**

18      As detailed above by Plaintiffs, Defendants have made significant progress and

19  commitments to address Plaintiffs' allegations that "CDCR has failed to address the

20  endemic use of false and retaliatory Rules Violations Reports."  Defendants have

21  committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer

22  trainings, to implement a headquarters-level audit of RVRs at ten institutions, to audio

23  record serious RVR hearings for internal auditing purposes, revisions to the Department

24  Operations Manuel, a memorandum addressing discriminatory RVRs, a new screening

25  process to determine whether a physical disability contributed to the underlying conduct,

26  the development of Early Warning System (EWS) red flags, and other remedial measures.

27  All three categories identified by Plaintiffs, above, have been completed and incorporated

28  into the EWS (so long as the incarcerated person who receives the RVR within a certain

period of time alleges in his grievance that the RVR was received in response to a staff complaint).  Defendants have previously detailed in past Joint Case Status Statements that recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No. 3412 at pp. 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes and the new pepper-spray policy, Defendants' commitment to deploy fixed-camera technology at fourteen institutions in addition to the Court-ordered deployment of such technology at six institutions (20 institutions total), and Defendants' commitment to deploy BWC technology at four institutions in addition to the Court-ordered deployment of such technology at six institutions (10 institutions total).  Further, under the new staff misconduct process, allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.  Notwithstanding the significant progress made, there remains some disagreement between the parties.  Defendants disagree with Plaintiffs' contention that the counseling-only chronos and informational chronos implicate a liberty interest necessitating due process.  Inmates receive a copy of the counseling-only chrono and may contest such chronos in the grievance process. Nevertheless, Defendants have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed revisions.

**C.    Accommodations for Deaf and Hard-of-Hearing Class Members**

      **1.    Plaintiffs' Statement**

      The parties continue to meet in a workgroup to address the provision of accommodations for deaf and hard of hearing class members.  While progress has been made in some areas, there are significant, longstanding issues that result in the denial of equal access to prison programs and services for people with disabilities.

      Defendants flout their ADA obligations by refusing to provide real-time captioning to deaf and hard of hearing class members who do not know sign language. "Real-time captioning (also known as computer-assisted real-time transcription, or CART), is a

service … in which a transcriber types what is being said at a meeting or event into a computer that projects the words onto a screen. This service, which can be provided on-site or remotely, is particularly useful for people who are deaf or have hearing loss but do not use sign language."  U.S. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014), https://www.ada.gov/effectivecomm.htm.

Defendants have disregarded their ADA obligation to provide CART through misleading statements regarding their commitments and inadequate and insincere half measures toward implementation. Defendants first claimed that they had requested and obtained funding for this accommodation over a year ago.  *See, e.g.*, Doc. 3266, Joint Case Status Statement at 25 (May 17, 2021) (Defendants' Statement) ("Defendants continue to request quotes to add this feature for the next fiscal year beginning July 1, 2021."); Doc. 3296, Joint Case Status Statement at 18 (July 15, 2021) (Defendants' Statement) ("now that funding has been approved, OCE continues to request quotes to add this feature for the current fiscal year").  Defendants then unilaterally announced in late July 2021 that instead of providing the accommodation, they would conduct a three-month "proof-of-concept" period in three prisons to test CART and two CART alternatives that rely on automatically generated captions.  Over a year later, the "proof-of-concept" remains unfinished, and CART has not been provided. The "proof-of-concept" itself is flawed; it tests services that are not designed to meet ADA requirements for effective communication,[4] in prisons that do not house class members known to have a need for this accommodation, and in programs where the captioning provides the least benefit (*e.g.*, Adult Basic Education I, a course for adults who are just learning to read).

In the meantime, deaf people who do not know sign language remain isolated and forgotten, unable to participate in prison life, unable to practice their faith in fellowship,

---

[4] Automatically generated captions have a number of shortcomings:  (1) they do not indicate who is speaking; (2) if they include punctuation, it is inaccurate; (3) paragraph breaks may appear in odd places, such as mid-sentence; (4) the software itself generates odd errors that are difficult to send the guy way to (the preceding phrase was dictated using the same automatic speech recognition software Defendants are testing – "to send the guy way to" should have read "disambiguate".)

1  and unable to access programs needed to improve themselves and be found suitable for

2  parole.  Defendants below highlight their provision of sign language interpreters for deaf

3  class members who do know sign language. But that ignores the relevant population: deaf

4  people who do not know sign language do not benefit from a sign language interpreter;

5  instead, they need CART now. And Defendants' provision of CART on a limited basis for

6  a subset of programming at a single prison does not change this fact.  This is simply

7  unacceptable, and judicial intervention may be required.

8       Plaintiffs' counsel also remains concerned about the poor quality of the hearing aids

9  that Defendants provide.  We are concerned that despite promises to contract with a

10  consultant to review the concerns raised by Plaintiffs' expert, Defendants have not yet

11  done so.  Defendants must address this longstanding issue immediately; hard-of-hearing

12  people in prison for too long have been excluded from programs, services, and activities

13  because Defendants do not allow them access to the same hearing aids available in the

14  community and do not provide them with other devices, including pocket talkers.  We

15  understand that Defendants' hearing aid contracts will be renewed in early 2023.  We have

16  recommended changes to the new contracts designed to ensure that hearing aids purchased

17  through these contracts will better provide equal access to Defendants' programs, services

18  and activities.  We will continue to address the important issue in the working group.

19       **2.      Defendants' Statement**

20       Defendants do not "flout" and have not "disregarded" their obligations under the

21  ADA to accommodate hearing-impaired class members.  Defendants remain committed to

22  providing class members equal access to programs, services, and activities in accordance

23  with the ADA and will continue to meet with Plaintiffs to discuss the issues that pertain to

24  their clients as part of the parties' ongoing workgroups.

25       Defendants provide class members with equal access to education programs by

26  accommodating their disabilities in compliance with CDCR's obligation to do so under the

27  ADA and the ARP, with, for example, SLI (both remote and in-person).  There is also an

28  ASL channel on DRP-TV that airs programming in ASL.  Defendants disagree with

1  Plaintiffs' assertion that "deaf people who do not know sign language remain isolated and

2  forgotten, unable to participate in prison life, unable to practice their faith in fellowship,

3  and unable to access programs needed to improve themselves and be found suitable for

4  parole," solely because CART may not currently be available to class members

5  participating in CDCR's education programs.  CART is one of the captioning services

6  included in the Proof of Concept trial at CMF.

7  　　　　As previously reported, Defendants have provided Plaintiffs with detailed

8  information related to the types of hearing aids available to class members.  *See* ECF No.

9  3412 at pp. 17, 18, ECF No. 3422 at p. 13.  Nevertheless, Defendants have internally

10  reviewed Plaintiffs' retained audiologist's July 13 report, will continue to confer with

11  Plaintiffs, and share information with them until these issues are resolved.  Similarly,

12  Defendants will continue to confer with Plaintiffs concerning the proposed pocket-talker

13  memorandum that provides for, in part, a case-by-case analysis of class-member needs.

14  *See* ECF No. 3412 at p. 18.  CCHCS has agreed to hire a hearing consultant to look at the

15  current hearing aids, review the reports by Plaintiffs, provide feedback, and anticipate

16  entering a new contract for hearing aids once the current contract expires early next year.

17  **D.     Accommodations for Blind and Low-Vision Class Members**

18  　　　　**1.     Plaintiffs' Statement**

19  　　　　The parties formed a workgroup to address issues facing blind and low-vision class

20  members.  The workgroup covers, among other things, reading and writing

21  accommodations, orientation and mobility training for blind and low-vision class

22  members, accommodations assessments and skills training, braille literacy, availability of

23  white canes, accessibility of the tablet program (including training), and photophobia

24  accommodations.

25  　　　　Plaintiffs sent a December 10, 2021 demand letter regarding the need for a

26  statewide system for identifying, documenting, and providing reading and writing

27  accommodations for blind and low-vision class members.  As Plaintiffs explained in the

28  demand letter, Defendants must (1) identify, track, and produce the accessible formats of

1   written materials (such as large print, braille, and audio) that blind and low-vision class

2   members need to read and write (a statewide request first made by letter on March 15,

3   2021) and (2) make auxiliary aids for reading and writing—such as electronic video

4   magnifiers—available to these class members outside restricted locations and hours.

5     Defendants have indicated that they are developing a plan to identify and track the

6   accessible formats needs of blind and low-vision class members. But over a year and a half

7   after Plaintiffs raised this issue in March 2021 with Defendants, Defendants have still not

8   provided Plaintiffs with a draft of such a plan, nor have Defendants provided a plan for

9   how they will *produce* printed information in accessible formats to blind and low-vision

10   class members.  Moreover, Defendants' forthcoming plan to track accessible formats in the

11   Strategic Offender Management System (SOMS), discussed below in Defendants'

12   statement, critically omits any reference to audio as a format for blind class members who

13   cannot see and cannot read braille.  Plaintiffs remain willing to seek enforcement of the

14   *Armstrong* Remedial Plan if Defendants will not promptly resolve this longstanding issue.

15     With respect to auxiliary aids, Plaintiffs are encouraged that Defendants agreed to

16   make handheld video magnifiers available to blind and low-vision class members to utilize

17   in their cells. Plaintiffs provided Defendants with a declaration from correctional expert

18   Richard Subia, which explains how these and other critical reading and writing aids do not

19   pose a safety or security threat to CDCR institutions. Plaintiffs are hopeful that Defendants

20   will, without delay, make these aids available to blind and low-vision class members for

21   unsupervised use in their housing units.

22     On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants

23   to resolve disputes between the parties regarding the need for reading and writing

24   accommodations for blind and low-vision class members.  On November 3, 2022, the

25   parties met with the Court Expert to discuss the proposed stipulation. Plaintiffs are hopeful

26   that Defendants will promptly develop a plan for remedying these longstanding ADA

27   violations, and that litigation will not be necessary.  The parties continue to meet and

28   confer to discuss these issues.

Additionally, the parties have discussed how to ensure that blind and low-vision class members have prompt access to white canes. Plaintiffs were surprised to learn on July 14, 2022 that Defendants issued the memo to the field on June 24, 2022 without first responding to Plaintiffs' concerns raised in the January 21, 2022 comments or providing Plaintiffs an opportunity to review any revisions or updates made after the initial January 6 draft.  On July 29, 2022, Plaintiffs wrote to Defendants outlining concerns with the latest version of the memorandum and are currently reviewing Defendants' response dated November 3, 2022.

The parties continue to meet to resolve accessibility problems for blind and low-vision users of CDCR's new ViaPath tablets.  Unfortunately, Defendants did not accept Plaintiffs' repeated requests in the summer of 2021, prior to the distribution of these tablets, to develop a robust training program for class members on the use of the tablets. However, Plaintiffs are encouraged that Defendants have recognized problems with the tablets' accessibility features and the available training on how to use these features, and are developing a plan to resolve these issues.  Both CDCR and BPH have testified that key CDCR and BPH forms, form responses, and other documents are not available on the tablets, so at least in its current form, Defendants' tablet program does not solve the accessibility barriers that blind and low-vision class members face regarding access to essential forms.

## 2.    Defendants' Statement

Defendants continuously work to accommodate the needs of blind and low-vision class members in all areas including their reading and writing needs, have collaborated with Plaintiffs and the Court Expert, and have made significant progress to resolve disputes between the parties to ensure class-member access and mitigate associated litigation risks.  Most recently, these efforts include a proposed stipulation addressing reading and writing accommodations that Defendants received from Plaintiffs.  Defendants are currently engaged in internal discussion concerning the issues raised by Plaintiffs about Defendants' edits to the proposed stipulation at the November 3, 2022 meet and confer

1    with Plaintiffs and the Court Expert.

2         As previously reported, Defendants are reviewing different processes by which they

3    can identify, track, and accommodate blind and low-vision class members during intake of

4    inmates into the correctional system by including additional fields in the Strategic

5    Offender Management System (SOMS) to identify class-members who require reading and

6    writing accommodations in large-print, or braille, and provide a means to track class

7    member needs while in Defendants' custody.  *See* ECF No. 3422 at p. 16.  Such a process

8    necessitates coordination with CCHCS, and Defendants have been collaborating with

9    CCHCS to develop a successful process to identify, track, and accommodate class

10   members.  These proposed new processes would also be accomplished through the 1824

11   process or triggered when an inmate is designated as DPV while in custody.  Defendants

12   continue to explore a variety of options to provide large-print and braille versions of

13   written materials including contracting with third-party vendors and improving institution

14   resources.

15        To assist DPV class members that wish to learn braille, The Hadley School for the

16   Blind correspondence braille literacy course continues to be available to eligible students,

17   applications are available in the library.  Additionally, OCE was able to whitelist the

18   Hadley online braille and independent-living-skills workshops that are now available on

19   the student network.  OCE is in the process of developing a 100-hour braille eLearning

20   course, eligible students may earn a MCC upon successful completion.  This course will be

21   available to all eligible students at all institutions.  OCE is also in the process of ordering

22   additional assistive devices, including the Da Vinci Pro and Amigo magnifiers, for

23   education programs at DPV-designated institutions.  Moreover, CDCR intends to deploy a

24   90-day pilot in-cell check-out use of text-to-speech auxiliary aids at select DPV institutions

25   to address class members' access to audio formats.

26        In June, Defendants launched a ninety-day trial program at SATF, which was

27   completed in September, to test the statewide feasibility and usefulness of two different

28   electronic auxiliary aids including the Amigo electronic magnifier and a pen-reader.  *See*

1   ECF No. 3422 at p. 17.  In August, the trial was expanded to permit in-cell check-out use

2   of these auxiliary aids.  Mindful of CDCR's diverse, and sometimes vulnerable,

3   population, the trial, and testing of various aids, provided Defendants with additional

4   information related to the potential security risks associated with introducing a device with

5   image-capturing capabilities into a large correctional system.  Following the completion of

6   the trial program, CDCR is developing a process for the purchase and implementation of

7   the Amigo Electronic Handheld magnifiers in housing units at DPV designated

8   institutions.

9          Moreover, as previously reported, Defendants are deploying its tablet program

10  statewide for all inmates as part of a $1 billion dollar contract with, ViaPath, a third-party

11  vendor who is contractually obligated to apply all accessibility standards to any

12  documentation posted to or provided on the tablet, so anything created for the tablet must

13  be developed with accessibility in place to serve class members.  *See* ECF No. 3422 at p.

14  17.  These tablets include a variety of assistive features including, but not limited to, text

15  enlargement, video calling, and text to speech.  CDCR took input from Plaintiffs and

16  shared their comments with the contractor and continues to work with the contractor to

17  enhance capabilities to include voice to text, increased recreational options, different

18  formats for imparting information, and more to enable independent use by blind and low-

19  vision class members.  ViaPath is to offer additional accessibility training to the *Armstrong*

20  class members at the institutions where tablets have been rolled out including SATF,

21  MCSP, SAC, HDSP, KVSP, ISP, CVSP, VSP, CCWF, CIW, and SOL.  This training will

22  include accessibility training, functionality, settings, use, an opportunity for questions and

23  answers, individual assistance, and other forms of training to ensure class-member

24  accessibility.

25         Finally, after receiving and incorporating most of Plaintiffs' comments, the white-

26  cane memo was issued to the field on June 24, 2022.  After receiving additional comments

27  from Plaintiffs, CCHCS provided a response on October 24, 2022.

28

1   **E.      Problems Regarding Access to Assignments for Class Members**

2           The program-access workgroup continues to meet to discuss credit earning, the

3   assignment process under Proposition 57, and disparities in the program-access assignment

4   data in response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF

5   No. 2680 at pp. 13-14.  Defendants produce comprehensive program access data every

6   month and the parties are attempting to develop a standard for analyzing program access

7   disparities.  Plaintiffs believe that the data continues to show troubling disparities in

8   assignments for people with disabilities.  *See* ECF No. 3369, Ex. H (November 12, 2021,

9   Letter from Tom Nolan to Katie Riley and Dawn Lorey.  Defendants, however, disagree

10  with Plaintiffs' assessment but have agreed to continue to participate in future discussions.

11  The parties met most recently on October 12, 2022, and will meet again soon to discuss

12  next steps in this process.

13  **F.      Statewide Durable Medical Equipment Reconciliation and Accuracy of
14          Disability Tracking Information**

15          **1.      Plaintiffs' Statement**

16          Following Defendants' statewide durable medical equipment ("DME") reconcilia-

17  tion in early January 2019 that revealed 7,346 class members were missing one or more

18  items of DME and that 2,349 class members' DME records had errors, CCHCS imple-

19  mented the DME Discrepancy Report Tool in January 2020.  Defendants have agreed to a

20  process to ensure reconciliation of what records indicate a class member should have and

21  what they actually have.  Unfortunately, during the most recent meetings on this issue,

22  including the September 16, 2022 All Parties Meet and Confer, Defendants reported that

23  they were going back on their plan to ensure that class members are seen annually by

24  medical staff for reconciliation and instead planned to encourage class members to self-

25  advocate if they are missing required DME.  Defendants also plan to have the Field

26  Training Sergeants audit this issue, but those positions exist in fewer than half the prisons.

27  Unfortunately, as was shown by Defendants' audits, relying on class members to self-

28  advocate is not enough.  Class members continue to face retaliation for asking for

disability-related help.  Further, the fact that some class members are seen by health care staff multiple times over the course of a year will not resolve problems for some class members who are not seen or whose issues do not get addressed when they meet with busy medical staff about other issues.  Also, Defendants found thousands of class members without DME despite the fact that some class members are seen regularly by health care staff.  A dedicated process for ensuring that staff reconcile DME – even if only for people who are not already seen by health care staff -- is necessary to prevent widespread problems.  Defendants and CCHCS do seem to be moving towards a model where class members might be able to obtain some of the most common accommodations without medical staff intervention, similar to how people obtain common assistive devices in the community.  Plaintiffs agree with exploring this approach, however there will still be people who need other specialized DME that must be ordered by medical.  While we appreciate the work of the Field Training Sergeants, the Sergeants' work at the six prisons where the Field Training are in place makes does not render DME reconciliation unnecessary.  That is especially true because Field Training Sergeants do not exist at 22 other CDCR prisons that are without those court-ordered positions.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code. Defendants reported that they have identified 535 new class members by screening for such cases and identifying people who had medical equipment but did not have any accompanying DPP code.  Plaintiffs are encouraged by this effort, but would like more information about how the screening was done, and whether there will be routine screening of this type for missing DPP codes in the future.  Defendants provided some information about this process at the September 16, 2022 meet and confer.  Plaintiffs' counsel previously provided comments on Defendants' proposed reconciliation rules on May 23, 2022 and will provide additional feedback on the new information.

Unfortunately, Defendants' disability tracking system also fails to identify and track class members with upper-extremity disabilities.  Plaintiffs requested that Defendants

create a new disability code for this population.  *See* ECF No. 3322 at Exs. G and H.
CCHCS does have a system to identify upper-extremity disabilities, and, on September 28,
2021, shared a report with Plaintiffs that showed all patients with upper-extremity
disabilities and accommodations.  This list contains thousands of names, so it is difficult to
understand exactly how it functions as a tool for staff to identify who requires what
accommodations.  Plaintiffs' counsel continues to share with Defendants reports of failures
to accommodate class members as well as statements from CDCR staff who require
assistance in properly identifying who must be accommodated.  Plaintiffs are committed to
resolving this ongoing problem.

      **2.**     **Defendants' Statement**

      Collaboration between the parties continues to develop a sustainable DME
accountability process. On September 2, 2022, CCHCS and DAI met with Plaintiffs to
discuss the DME accountability.  After researching how often class members are seen by
their primary clinicians and nursing, (median 12 times per year), it was determined there is
ample opportunity for class members to discuss concerns related to missing or broken
DME.  Currently, at seven institutions (RJD, CIW, LAC, COR, KVSP, SATF and SAC),
Field Training Sergeants (FTS) on both second and third watch query class members
regarding their DME.  Specifically, they ask if the class member is in possession of their
DME and if they can retain their DME regardless of their housing location.  Sergeants also
query staff members to determine if they are knowledgeable about the DME process.
Effective September 12, 2022, additional Sergeants were deployed to SVSP, CHCF,
CCWF and CMF.  DAI and CCHCS continue to work on educating the population on what
to do if they have missing or broken DME.  A one-time annual appointment will not
remedy the concerns addressed by Plaintiffs.  For example, the day after an annual
appointment the DME may go missing and patients will be expected to independently
address via the processes outline above.

      CCHCS and CDCR agree that individuals with upper-extremity disabilities that
limit a major life activity, require accommodation under the ADA, but disagree that

1   CCHCS and CDCR must create a new Disability Placement Program (DPP) code.  Inmates

2   who require any accommodation under the ADA shall be accommodated, whether they

3   have a DPP code or not, as recently reiterated in an October 28, 2022 memorandum to the

4   field.  Staff rely on the SOMS, "CHSS035C-DPP/Accommodation Summary" screen to

5   identify inmates who require accommodation under the ADA and for any other physical

6   limitation.  Moreover, the 1845/7410 power form in Electronic Health Record System

7   (EHRS) is linked to SOMS, noting the appropriate accommodation to staff.  The addition

8   of a new DPP code to this system will not provide any enhancements to this process.  In

9   fact, it will deter current efforts into multiple directions and processes, convoluting our

10  established procedure.  CDCR and CCHCS continuously revisit the DPP/Accommodation

11  Summary screen in SOMS/Cerner systems to see if improvements can be made to ensure

12  all needed accommodations are included.  CDCR and CCHCS will continue to meet with

13  Plaintiffs and the Court Expert to further discuss individuals with upper-extremity

14  disabilities.

15  **G.      Parole Planning and Working with Class Members Preparing for Release**

16          For about eighteen months, the parties have been negotiating remedial measures to

17  address alleged discrimination detailed in Plaintiffs' May 4, 2021 letter and supporting

18  class member declarations.  Plaintiffs contend that CDCR fails to ensure that class

19  members are accommodated on parole and during the transition to parole by not

20  consistently providing adequate planning for parole, adequate transitional housing,

21  transportation, benefits application assistance, assistance obtaining identification cards,

22  and other transitional services that are critical for these individuals to succeed on parole.

23  (*See* ECF 2680 at 11-12; ECF 2655 at pp. 11-13.)  As a result, Plaintiffs contend class

24  members needlessly struggle to comply with parole conditions, to transition to life outside

25  of prison, and are denied equal access to parole success.  *See* ECF 3266*,* Ex. F.[5]

26  _____

27  [5] Plaintiffs have subsequently shared additional class member declarations with
    Defendants that provide further evidence that remedial measures are needed to address
28  discrimination against parolees with disabilities.

1    Although Defendants deny class member discrimination and disputed Plaintiffs'

2 allegations, Defendants agreed to participate in extensive negotiations with Plaintiffs to

3 address their demands for reform that have resulted in substantive changes detailed below

4 and in previously filed Joint Case Status Statements.  *See, e.g.*, ECF Nos. 3369, 3391,

5 3412.  The parties have agreed in principle to revise the portions of the *Armstrong*

6 Remedial Plan (ARP) to address parole services and incorporate the new policies required

7 under the ADA or ARP.  Since July 1, the parties have been meeting regularly to negotiate

8 the changes to the 2006 Parole Section of the ARP.

9    During the parties' negotiations, Defendants have agreed to some promising policy

10 changes, for example:

11    Parole agents can now provide an audible low battery warning on GPS tracking

12 devices to accommodate parolees who have difficulty feeling the standard vibrating low

13 battery warning because of a disability.  Defendants have also agreed to develop training

14 for parole agents concerning reasonable accommodations for parolees with disabilities who

15 are subject to GPS monitoring and agreed to share the proposed training with Plaintiffs for

16 comment.

17    CCHCS will now provide incarcerated people releasing from CDCR with a 60-day

18 supply of prescription medications, with some minor exceptions, which should ensure that

19 class members do not run out of their medications before they are able to get their

20 California identification cards and Medi-Cal health insurance benefits set up, both of

21 which are generally needed to obtain medication renewals in the community.

22    Defendants agreed to add requirements (effective July 1, 2022) that Transitional

23 Case Management Program (TCMP) benefits workers in the prisons submit benefits

24 applications—including Supplemental Security Income and Social Security Disability

25 Income, Veterans benefits, Medi-Cal and Cal-Fresh food stamps—for all incarcerated

26 people, not just class members, at 90 days before their expected release date.  Defendants

27 agreed to track the data regarding when TCMP benefits workers submit the benefits

28 applications for each releasing class member, and whether the applications are approved,

rejected, or remain pending at the time of release, or if the TCMP services were refused by the incarcerated person.  CCHCS issued a February 3, 2022 memorandum, "Providing Relevant Health Information for Benefits Applications," that clarifies prison health-care providers' responsibility to provide accurate and timely medical information to support benefits applications, sets a five-calendar-day deadline for health care staff to respond to requests from benefits providers for follow-up information needed to make a final determination on pending benefits applications, and provides that each prison will designate medical and mental health staff with whom the TCMP benefits workers can coordinate on applications to improve collaboration between benefits workers and health-care staff.

Plaintiffs contend that these changes are necessary to address CDCR's systemic failure to timely and accurately complete benefits applications for class members, causing them to go without health insurance and other benefits (including Supplemental Security Income and Social Security Disability Insurance) in the critical transitional period shortly after their release from prison.[6]  Plaintiffs hope that the additional requirements negotiated for TCMP benefits workers and the CCHCS policy designed to improve communication with health care staff will address these longstanding problems.

Defendants also agreed to work with Plaintiffs to ensure that CDCR-funded transitional housing programs no longer have categorical exclusions for people with disabilities.  Defendants educated contractors on the requirements of the ADA and the

_____

[6] The California Rehabilitation Oversight Board (C-ROB) September 15, 2022 Annual Report found that 70.4% of the Social Security benefits applications and 77.6% of Veterans Affairs (VA) benefits applications submitted for releasing individuals in Fiscal Year 2021-22 were still pending at the time of release, a significant increase in the number of untimely applications compared to Fiscal Year 2020-21 (when a still unacceptable 60.8% of Social Security benefits applications and 42.6% of VA benefits applications remained pending at the time of release).  As CDCR stated in the C-ROB Annual Report, the VA and Social Security Administration "have historically taken longer to process applications due to the need to verify applicant medical or mental health disabilities," which is consistent with Plaintiffs' position that incarcerated people with disabilities are more likely to be harmed by the historic delays in submission of benefits applications than people without disabilities.  *See* 2022 Annual C-ROB Report at p. 42 and Table 19, *available at* https://crob.ca.gov/wp-content/uploads/2022/09/2022-C-ROB-Report.pdf.

ARP using materials drafted with Plaintiffs during a three-week period beginning on February 15, 2022.  Defendants have agreed to make 1824 disability grievance forms available to class members living in CDCR-funded transitional housing programs, although Plaintiffs are still awaiting confirmation that 1824s will actually be provided to the programs, and now include ADA compliance in their annual inspections.  Defendants have also developed a transportation policy with a goal of ensuring accessible transportation to all parolees released from prisons, which will go into effect on November 1, 2022.

Defendants continue to work on a policy to provide a mechanism for DAPO to replace lost or broken non-customizable DME (*e.g.*, simple wheelchairs and walkers) during a thirty-day transitional period between release and the commencement of health-care coverage.  Plaintiffs look forward to the opportunity to review and comment on the draft policy.  CCHCS has recently shared with Plaintiffs its policy to ensure medications and DME are released with the patient when paroled.  Plaintiffs are currently reviewing this policy.

Defendants are also revising DAPO's policy on providing financial assistance, and some other immediate needs of parolees, including those parolees who require such assistance as accommodations for their disabilities.  Plaintiffs have raised concerns that the current policy lacks clear guidance on when to provide such assistance to parolees, including consideration of disability-related factors.  Plaintiffs contend that Defendants' draft revision to this policy provides too much discretion and too little guidance to parole agents, prohibits parole agents from ever providing cash assistance for emergency temporary housing, and significantly reduces the amount of short-term financial assistance parolees may receive.  Plaintiffs contend that this proposed policy change will disproportionately harm class members because cash assistance for emergency temporary housing is sometimes the only way Defendants have been able to provide accessible transitional housing and timely benefits application assistance to class members.  CDCR received Plaintiffs' comments to the policy on July 12, 2022, and this policy is currently

1    pending further review with the stakeholders.

2         Plaintiffs were disappointed by CCHCS's December 15, 2021, advisement that it

3    will not make recommendations on who should be prioritized for housing based on certain

4    disability-related factors, because Plaintiffs contend that this will place parolees with

5    disabilities at greater risk for failure on parole and reincarceration because of their

6    disabilities.  CCHCS will, however, provide an underlying clinical assessment regarding

7    each parolee's disability and related medical needs that may be utilized by the Parole

8    Service Associate (PSA) in making referrals for transitional housing placements.  The

9    Quality Management (QM) team at CCHCS have enhanced a pre-parole report with

10   additional health-care information related to inmates with upcoming parole dates.  CCHCS

11   shared a draft report with Plaintiffs on June 22, 2022, is in the process of finalizing the

12   report, and will share the report with DAPO and Plaintiffs once completed.  Defendants

13   believe that this report will provide more complete disability and DME information to

14   DAPO, PSAs, STOP, and DRP to assist in placing class members appropriately.  Plaintiffs

15   will continue to work with CCHCS, DAPO and DRP to ensure that parolees they contend

16   will be disproportionately harmed by the lack of transitional housing because of their

17   disabilities will be prioritized for such placements.  This includes working with DAPO and

18   DRP to develop a policy or directive governing transitional housing placements, and by

19   working with CCHCS on how to provide all the relevant information to the PSAs so that

20   they can be informed of class members' disabilities when making referrals for transitional

21   housing placements.

22        The 2022-23 State Budget includes $10.6 million in annual funding over the next

23   three years (or $31.8 million total) for the Returning Home Well program, which will

24   reportedly provide post-release housing services for 1,065 at-risk parolees who may be

25   homeless or housing insecure.  Plaintiffs are hopeful that the funding will in fact be

26   sufficient to provide transitional housing for everyone who needs it but remain concerned

27   that the proposal underestimates the future housing needs of releasing individuals.

28   Plaintiffs contend that CDCR is responsible for ensuring that parolees with disabilities are

1  not excluded from the benefits of parole and a limited supply of transitional housing

2  placements necessitates housing-placement decisions include consideration of whether a

3  class member's disability makes them less likely to succeed on parole without housing

4  than a parolee without a disability.

5       The parties continue to discuss Plaintiffs' proposals regarding how to ensure

6  parolees' disabilities are considered when determining the consequences for alleged parole

7  violations.  Plaintiffs are committed to working with Defendants to achieve a durable

8  remedy to ensure they can meet their legal obligations under the ADA and the ARP by

9  operating their transition-to-parole and parole programs in a manner that no longer

10 systemically discriminates against parolees with disabilities.  Although disputes remain,

11 Defendants are committed to continue to work with Plaintiffs and to discuss their concerns

12 related to their demand for parole-services reform.  Further training related to the

13 applicable policies and procedures will be provided to address the consideration of a

14 parolee's disability during the parole-violation process.

15      Finally, Plaintiffs remain concerned about Defendants' failure to timely and

16 adequately log and investigate allegations of employee non-compliance on parole.

17 Plaintiffs will continue to raise concerns regarding Defendants responsibility to hold staff

18 members accountable for ongoing violations of the ADA, ARP, and Court Orders in this

19 case.  As reported at the last workgroup, Defendants are committed to addressing

20 Plaintiffs' concerns and will provide additional training to ensure adequate and timely

21 compliance.

22 **H.     Joint Monitoring Tool**

23      The parties remain committed to developing a strong and effective joint monitoring

24 tool.  The parties' plan to test the tool at different types of prisons was disrupted by the

25 COVID-19 pandemic, but in-person tours commenced in 2022 with the March 2022

26 Valley State Prison tour.

27      The parties continue to meet to improve individual tool questions but many

28 outstanding policy issues—such as how to measure and report on whether discrimination is

occurring in the assignment of *Armstrong* class members to programs—must be resolved to effectively audit.  The parties have yet to come to agreement on a format for scoring and reporting compliance.  The parties have been meeting every month to resolve outstanding disputes or concerns and are committed to continuing their efforts moving forward.  The parties met on September 28, 2022, and on October 7, 2022, to discuss outstanding audit tool items and decide on next steps to resolve the remaining disputed issues.  The parties have agreed to convene small work groups and submit informal briefing to the Court Expert to address and resolve the remaining issues.

I.    **ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

        Construction was halted due to COVID-19 pandemic but resumed statewide in June 2020, and any significant issues impacting construction are noted in the Monthly Construction Report that is provided to Plaintiffs by Defendants' Expert Mike Knowles. The parties agreed to meet regularly to discuss different institutions and be joined by local ADA staff with close knowledge of the institutions.  The parties also plan to tour institutions together to resolve outstanding issues and address Plaintiffs' concerns.  The parties addressed Master Planning issues during a tour at LAC on April 29, 2022, and returned to LAC to survey the second half of the prison on November 9, 2022.  The April tour included Plaintiffs' access expert, who is finalizing a report on her findings from inspections done during the tour.  Plaintiffs also toured the California Correctional Institution in Tehachapi with their access expert on July 11, 2022, to review some disputed Disability Program Placement Matrix issues, and to consider whether there should be minimum architectural/accessibility standards for showers for DLT and DPM class members.  The parties will meet with their respective experts to discuss minimum standards for accessible showers for these class members.  The parties will also schedule tours this year at VSP and possibly CIM, COVID-19-related restrictions permitting. Further, Defendants have recently shared with Plaintiffs the AMP Transition Plan (Attachment A) that memorializes, from Defendants' perspective, all original elements

agreed upon by the parties during settlement discussions, and all change-requests since then, for LAC, SVSP, SOL, SQ, HDSP, SAC, COR, CMF, and SATF.  The original versions of these documents were previously shared with Plaintiffs on March 7, 2017 (LAC); May 17, 2017 (SVSP); July 24, 2017 (SOL); September 26, 2017 (SQ); November 9, 2017 (HDSP); April 11,2018 (SAC); April 17, 2018 (COR); September 25, 2018 (CMF); and May 28, 2019 (SATF) following completion of the settlement discussions for each institution.  The parties have never discussed these documents, which were not produced to Plaintiffs' counsel until years after informal settlement negotiations and Plaintiffs do not agree that these documents necessarily capture the final status of those negotiations and these documents do not represent formal agreements.  Defendants, however, contend that the parties have fully executed agreements, as memorialized by Defendants for other institutions, including, CIW, RJD, MCSP, WSP, NKSP, PVSP, KVSP, CCWF, and CIM.  These agreements were signed by Plaintiffs, respectively, on August 18, 2016; December 14, 2016; February 6, 2017; August 8, 2017; August 8, 2017; August 8, 2017; February 22, 2108; and February 28, 2018.

The parties dispute whether Defendants have a sufficient number of emergency exits that are fully accessible to prisoners with impacting placement mobility and vision disabilities in units where those individuals are housed.  Plaintiffs have reviewed Defendants' emergency evacuation plans and have serious concerns about whether they provide the necessary direction to staff to accommodate class members and to ensure their safe evacuation during an emergency.  (*See* ECF No. 3412, Ex. E.)  Plaintiffs' accessibility expert expressed concern about the lack of accessible emergency exits in the housing units at LAC, where class members are clustered, during the April 29, 2022, tour.  Plaintiffs await a response to their letter addressing the emergency-exit issues and are hopeful the parties can resolve these disputes.

## J.      Investigation of County Jails

Plaintiffs continue to assert that a pattern and practice of denying disability accom-modations to class members exists at multiple jails but especially the Los Angeles County

1  Jails.  (*See* ECF No. 2680 at 22-24; ECF No. 2786 at 26-27; ECF No. 3322 at 25-29 &
2  Exs. I, J, K.)  Defendants disagree with Plaintiffs' assertions and have been meeting with
3  county counsel for several counties to improve relations, information sharing, and ADA
4  compliance at the jails.  Unfortunately, Plaintiffs contend, these conversations alone are
5  not enough as evidenced by the longstanding failure of Los Angeles County Jail to
6  implement their policy to allow and provide canes to detainees.  Los Angeles County has
7  informed CDCR that the "pilot" allowing detainees access to canes within Los Angeles
8  County jails has concluded and a temporary policy allowing access to canes at all facilities
9  has been implemented pending issuance of the final policy. CDCR is informed that Los
10  Angeles County jail records currently show that 54 detainees across seven different
11  facilities have access to canes. A copy of the final policy will be shared with Plaintiffs'
12  counsel upon issuance.  Plaintiffs continue to seek more information from Defendants.

13          Defendants will continue to meet with various county counsel in an effort to ensure
14  compliance with the ADA for *Armstrong* class members housed in county jails.

15

16                                  Respectfully submitted,

17  DATED:  November 15, 2022       ROSEN BIEN GALVAN & GRUNFELD LLP

18                                  By:  */s/ Penny Godbold*

19                                        Penny Godbold

20                                  Attorneys for Plaintiffs

21

22  DATED:  November 15, 2022       ROB BONTA
                                    Attorney General of the State of California
23

24                                  By:  */s/ Trace O. Maiorino*

25                                        Trace O. Maiorino
                                          Deputy Attorney General
26

27                                  Attorneys for Defendants

28

**FILER'S ATTESTATION**

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.

DATED:  November 15, 2022          */s/ Penny Godbold*
                                   Penny Godbold

# Exhibit A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael Freedman
Email: MFreedman@rbgg.com

September 16, 2022

VIA ELECTRONIC MAIL ONLY
Jennifer Neill
Tamiya Davis
Jennifer.Neill@cdcr.ca.gov
Tamiya.Davis@cdcr.ca.gov

Re:     *Armstrong v. Newsom*: Defendants' Proposed Causal Connection and
        Material Misrepresentation Standards
        Our File No. 0581-03

Dear Jenn and Tamiya:

    We write to continue our conversation about Defendants' proposed "causal
connection" standard for allegations of retaliation and discrimination/harassment and
Defendants' proposed "material representation" standard for allegations of dishonesty.
According to Defendants' proposal, allegations of discrimination/harassment, retaliation,
or dishonesty that do not meet the causal connection or material representation standards
would not be routed to the Allegation Investigation Unit ("AIU"), as currently
contemplated by the Allegation Decision Index ("ADI") negotiated by the parties.
Instead, Defendants would route them to a Locally Designated Investigator ("LDI") if the
allegation is an allegation of staff misconduct, or as a routine grievance if the allegation is
not an allegation of staff misconduct.  Defendants sent us proposed definitions for these
terms on August 31.  The definitions are attached as Attachment A.

    We recognize that Defendants believe that the AIU is currently receiving more
cases than the AIU can handle given the staff that Defendants have hired for the AIU.
We also recognize that the number of cases currently being routed to the AIU exceeds the
estimates Defendants compiled to generate their staffing plan and the related Budget
Change Proposal.  And, as we have stated many times previously, we are invested in
making the new investigation and discipline process work.  However, for the reasons
discussed below, we do not believe that the causal connection and material
misrepresentation standards are an acceptable solution.

Jennifer Neill
Tamiya Davis
September 16, 2022
Page 2

## I.      The Scope of Plaintiffs' and Defendants' Review

Defendants sent us 198 602s that included allegations of retaliation, discrimination/harassment, or dishonesty.  For each of the cases, Defendants applied the causal connection or material misrepresentation standards and determined whether the allegation should remain at the AIU or should be sent to the institution for a local investigation or to be processed as a routine grievance.  The results of Defendants' review are reflected in Attachment B to this letter.

Plaintiffs reviewed the first 29 allegations listed on Attachment B.  We reviewed the cases both to see whether we agreed with Defendants' application of the causal connection and material misrepresentation standards and with the overarching decision regarding whether the allegation would be investigated by the AIU.  We stopped our review after 29 cases because it had already become apparent from this limited review that there were serious problems with Defendants' proposal and that review of additional cases would not be useful.

When Defendants applied the causal connection and material misrepresentation standards to these 29 cases, they determined that 16 should be processed as routine grievances, 4 should be routed to LDIs, and 9 should remain at the AIU.

In contrast, when we applied the causal connection and material misrepresentation standards to these cases, we concluded that only two of the cases—256418 and 252124—should have been processed as routine grievances.  In both of these cases, the specifics of the allegations made clear that the incarcerated people were appealing classification decisions, not staff misconduct.  Accordingly, notwithstanding the fact that the individuals stated that the classification decisions were discriminatory, these allegations did not meet the definition of staff misconduct and should have been processed as routine.

For the remaining 27 cases, we determined that the cases should remain at the AIU, either because the allegation met Defendants' proposed causal connection or material misrepresentation standard, the allegation was sufficiently serious that it warranted AIU investigation, or the allegation was potentially serious and more information needed to be gathered.

## II.     Concerns with Defendants' Reviews of the Cases

Plaintiffs have a variety of concerns with Defendants' review and proposed routing of the cases.

Jennifer Neill
Tamiya Davis
September 16, 2022
Page 3

First, we disagreed with many of Defendants' determinations that allegations did not meet the causal connection or material misrepresentation standards. In the following examples, which are not an exhaustive list, Plaintiffs disagreed with Defendants' determination that the standards had not been met.

- 282600 - The person alleged that staff began harassing him (he provides specific harassing statements) on July 19, 2022, after he filed a staff misconduct complaint on July 17, 2022. The relation in time between the staff complaint and the harassment provides the causal connection.

- 252012 – The person alleged that staff used excessive or unnecessary force on him during an unnecessary cell extraction. This is a use of force allegation that must be investigated by AIU.

- 274475 – The person alleges that an officer conducted a search of his cell, during which the officer trashed the cell and some of his property was found in his neighbor's cell, in retaliation for a currently-pending staff complaint the person filed against the officer who searched the cell. The fact that the cell was trashed by the same officer against whom the person filed the staff complaint provides the causal connection.

- 265900 – The person, who is gay, alleges that seven days after he filed a 602 against an officer for making derogatory comments about homosexuals, the same officer conducted a retaliatory search of his cell, during which the officer spilled milk on the person's bed, improperly confiscated personal documents, and threw the person's toilet paper in the toilet. The closeness in time between the 602 and the allegedly retaliatory cell search provide the causal connection.

- 279714 – The person claims that the officer, who was supposed to be his staff assistant for an RVR, falsified documentation indicating that the person did not have any witnesses to present at his RVR, when in fact he informed the officer that he did have witnesses but needed to return to his cell to get their names. This allegation satisfies the material misrepresentation standard because the incorrect information was material (it could affect the outcome of his RVR), the substance of the allegation was very clear, and it was not based on the person's beliefs or feelings.

- 264181 – The person alleged that staff at her bi-annual committee denied her single-cell status, notwithstanding a recommendation for single-cell status by mental health staff, because the committee members discriminated against the

Jennifer Neill
Tamiya Davis
September 16, 2022
Page 4

person on the basis of her identification as transgender.  The person provided specific statements by the committee members to support the claim, including that they questioned the validity of the person's transition, referred to her by the wrong pronouns, and stated that an incident of prior in-cell victimization was not legitimate because they presumed she was in a relationship with the former cellmate who had assaulted her.  The discriminatory comments, which related directly to the committee's consideration of single-cell status, provide the causal connection.

That Defendants' Super Subject-Matter Experts agreed that these cases did not meet the standards is concerning.  Plaintiffs cannot agree to any system in which allegations like these are not investigated by the AIU.

Second, the standards are very difficult to administer.  We were unable to discern a meaningful difference between some of the allegations that Defendants determined should remain at AIU and those Defendants determined should be routed to the institution.  For example, Defendants determined that case 281286—in which the person alleged that two officers searched his cell in retaliation for a 602 staff complaint he had filed against the officers two days prior—satisfied the causal connection standard and should remain at the AIU.  Meanwhile, Defendants determined that very similar allegations in cases 282600, 274475, and 265900 (all discussed above) did not satisfy the standards and should be routed to the institutions for investigation by an LDI.

Third, we do not understand how Defendants determined most of the cases should be processed as routine grievances when nearly all of the cases alleged staff misconduct under the new, broader definition adopted by Defendants.  An allegation is a staff misconduct allegation if it alleges that an officer engaged in "behavior that resulted in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard."  As but a few, non-exhaustive examples, Defendants determined that cases 252012, 279714, and 264181 (all discussed above) should be processed as routine grievances.  But allegations that staff used excessive or unnecessary force, that a staff assistant lied about whether a person wanted to present witnesses at an RVR hearing, and that committee members discriminated against a person based on her sexual identity all meet the definition of staff misconduct.  Many of Defendants' decisions to route other complaints as routine suffered from similar problems.

Jennifer Neill
Tamiya Davis
September 16, 2022
Page 5

### III.    The Causal Connection and Material Misrepresentation Standards Are Not Consistent with the Allegation Decision Index

During the parties' meeting on September 15, 2022, Defendants suggested that it is their position that the causal connection and material misrepresentation standards are consistent with the ADI.  We disagree.

The ADI requires that the AIU investigate allegations that staff insulted, harassed, or discriminated against a person based on a protected class (discrimination) and allegations that staff retaliated against someone for reporting misconduct, filing a grievance or a lawsuit, or requesting a disability accommodation (retaliation).  Defendants' causal connection standard would require that incarcerated people, in their 602s alleging discrimination or retaliation, (1) provide details regarding "an observed relationship between the protected group/protected activity and the alleged discrimination, harassment or retaliation"; (2) establish "there is nothing else that reasonably accounts for the relationship between the protected group/protected activity and the alleged discrimination, harassment, or retaliation"; and (3) "include detail(s) to support the allegation of discrimination, harassment, or retaliation."

These requirements, especially the requirement that the person eliminate all non-discriminatory/retaliatory explanations for staff's conduct, are more onerous than the heightened pleading standard in federal court.  Imposition of these requirements would mean that many serious and potentially-meritorious allegations of discrimination and retaliation would be routed to institutional staff, who we all agree are generally less skilled investigators and more biased than staff at OIA.  The standard would therefore undermine the purpose of the AIU—to investigate serious allegations of misconduct, the list of which we agreed upon in the ADI—and discriminate against incarcerated people who are less able to explain the details of their claim in writing because of disability, language barriers, or educational level.  In addition, the issues with Defendants' application of the standard (discussed above) suggest that it is not capable of being implemented in the field by people with significantly less training and experience than Defendants' Super Subject-Matter Experts.  Accordingly, because the causal connection standard would result in some serious allegations of retaliation and discrimination not being investigated by the AIU, the causal connection standard is inconsistent with the ADI and the parties' related agreements or the Court's orders and remedial plans.

The material misrepresentation standard, as written, is less problematic.  The ADI already requires that misrepresentations by staff in official law enforcement reports or records be material or intentionally misleading.  We agree that the AIU should not be spending its time investigating immaterial false statements by staff.  It is not appropriate,

Jennifer Neill
Tamiya Davis
September 16, 2022
Page 6

however, to require that dishonesty complaints "include some information to enable the screener to clearly understand the substance of the complaint."  As you are well aware, many incarcerated people lack the ability to meet that requirement in writing.  It would be improper to route to the institutions allegations of dishonesty that lack details without, at a minimum, gathering additional information from the claimant about allegation.  For this reason, the material misrepresentation standard is also inconsistent with the ADI and the parties' agreements.

We look forward to meeting with Defendants on September 20 to discuss ways to ensure the AIU and the entire new system can succeed.  At that meeting, we would appreciate if Defendants could provide an update regarding (1) the maximum number of allegations per month each investigator can properly handle (i.e., can conduct quality, timely investigations); (2) the average number of allegations per month that are currently being routed to each investigator; (3) the current total number of investigators in the AIU (including retired annuitants), broken down by rank; (4) the anticipated schedule for adding investigators to the AIU (i.e., how many investigators will join the unit and when will they join); and (5) the potential for hiring additional retired annuitants to address any staffing shortages.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

By:   Michael Freedman
Senior Counsel

MLF:MLF
Attachments
cc:  Ed Swanson            Trace Maiorino
     August Gugelmann      Sean Lodholz
     Audrey Barron         Olena Likhachova
     Patricia Ferguson     Sean Lodholz
     Gannon Johnson        Mark Jackson
     Chor Thao             Sharon Garske
     Co-counsel

# EXHIBIT A

## CAUSAL CONNECTION & MATERIAL MISRESRESENTATION DEFINITIONS

<u>CAUSAL CONNECTION</u>

Causal Connection: when staff's behavior subjects an inmate or parolee to discrimination, harassment, or retaliation as a result of their protected group/activity or participation in the administrative remedies process (grievance and appeals), a lawsuit, or a request for disability accommodation.

- A causal connection requires more than one's belief, feeling, or suspicion;
  - o Requires the person's protected group or activity existed prior to the alleged discrimination, harassment, or retaliation, as opposed to mere conjecture or speculation.
  - o Requires an observed relationship between the protected group/protected activity and the alleged discrimination, harassment, or retaliation did not occur by chance alone
  - o Requires there is nothing else that reasonably accounts for the relationship between the protected group/protected activity and the alleged discrimination, harassment, or retaliation.

- Needs to include detail(s) to support the allegation of discrimination, harassment, or retaliation.

- It is not enough that the inmate/parolee is identified as a member of a protected group or participating in a protected activity.

<u>MATERIAL MISREPRESENTATION:</u>

Material Misrepresentation is the inclusion, omission, or falsification of critical information that would more likely than not mislead a reviewer

- The inclusion, omission, or falsification of critical information must be substantial and/or intentional, as opposed to a detail that would not substantially alter the outcome of the event/issue under review.
- The alleged staff behavior must include some information to enable the screener to clearly understand the substance of the complaint.
- The allegation requires more than one's belief, feeling, or suspicion.

# EXHIBIT B

| Grievance Number | Date Received | Grievance Claim Number | Institution | ADI Category | CAUSAL CONNECTION or MATERIAL MISREPRESENTATION (Y/N) | Final SSME Review (AIU, LDI, ROUTINE, Clarifying Interview) |
|---|---|---|---|---|---|---|
| 000000256418 | 5/16/2022 | 001 | FOL | Discrimination/Harassment | N | ROUTINE |
| 000000257330 | 5/18/2022 | 001 | MCSP | Dishonesty | N | ROUTINE |
| 000000277010 | 7/7/2022 | 001 | RJD | Discrimination/Harassment | Y | AIU |
| 000000268838 | 6/16/2022 | 001 | CTF | Retaliation | Y | AIU |
| 000000282600 | 7/20/2022 | 001 | COR | Retaliation | N | LDI |
| 000000281286 | 7/18/2022 | 001 | WSP | Retaliation | Y | AIU |
| 000000257417 | 5/17/2022 | 001 | LAC | Dishonesty | N | ROUTINE |
| 000000252012 | 5/3/2022 | 003 | CMC | Discrimination/Harassment | N | ROUTINE |
| 000000253811 | 5/9/2022 | 001 | CMC | Dishonesty | N | ROUTINE |
| 000000274899 | 7/1/2022 | 001 | PBSP | Retaliation | N | ROUTINE |
| 000000274475 | 6/30/2022 | 001 | COR | Retaliation | N | LDI |
| 000000254932 | 5/11/2022 | 001 | CCC | Dishonesty | N | ROUTINE |
| 000000276668 | 7/7/2022 | 001 | CCC | Retaliation | N | ROUTINE |
| 000000268503 | 6/16/2022 | 001 | MCSP | Discrimination/Harassment | Y | AIU |
| 000000254038 | 5/9/2022 | 001 | KVSP | Dishonesty | N | ROUTINE |
| 000000252877 | 5/5/2022 | 001 | MCSP | Dishonesty | N | ROUTINE |
| 000000284110 | 7/25/2022 | 002 | SAC | Retaliation | Y | AIU |
| 280587 | 7/15/2022 | 001 | CEN | Retaliation | Y | AIU |
| 000000265900 | 6/9/2022 | 003 | WSP | Retaliation | N | LDI |
| 000000276604 | 6/21/2022 | 001 | LAC | Retaliation | Y | AIU |
| 000000279714 | 7/13/2022 | 001 | LAC | Dishonesty | N | ROUTINE |
| 000000252719 | 5/4/2022 | 001 | RJD | Retaliation | N | LDI |
| 000000263590 | 6/3/2022 | 002 | RJD | Discrimination/Harassment | Y | AIU |
| 000000255116 | 5/11/2022 | 001 | ISP | Discrimination/Harassment | N | ROUTINE |
| 000000258838 | 5/23/2022 | 001 | MCSP | Retaliation | N | ROUTINE |
| 000000270576 | 6/21/2022 | 001 | CIM | Discrimination/Harassment | Y | AIU |
| 000000279733 | 7/13/2022 | 001 | LAC | Retaliation | N | ROUTINE |
| 000000252124 | 5/3/2022 | 001 | CTF | Dishonesty | N | ROUTINE |
| 000000264181 | 6/6/2022 | 001 | SATF | Discrimination/Harassment | N | ROUTINE |
| 000000260207 | 5/25/2022 | 001 | SAC | Retaliation | Y | AIU |
| 000000256937 | 5/17/2022 | 002 | CIW | Discrimination/Harassment | N | LDI |
| 000000270464 | 6/21/2022 | 001 | CIM | Discrimination/Harassment | Y | AIU |
| 000000278627 | 7/12/2022 | 001 | SATF | Discrimination/Harassment | N | ROUTINE |
| 000000261357 | 5/27/2022 | 001 | CCI | Dishonesty | N | ROUTINE |
| 000000261456 | 5/31/2022 | 002 | CCC | Retaliation | N | ROUTINE |
| 000000253079 | 5/5/2022 | 002 | MCSP | Discrimination/Harassment | Y | AIU |
| 000000261625 | 5/31/2022 | 001 | CMC | Retaliation | Y | AIU |
| 000000261364 | 5/27/2022 | 001 | CAL | Dishonesty | N | LDI |
| 000000277222 | 7/8/2022 | 001 | CMC | Retaliation | | Clarifying Interview |
| 000000277222 | 7/8/2022 | 003 | CMC | Discrimination/Harassment | | Clarifying Interview |
| 000000256588 | 5/16/2022 | 001 | SATF | Discrimination/Harassment | N | ROUTINE |
| 000000252212 | 5/3/2022 | 001 | CRC | Discrimination/Harassment | N | LDI |
| 000000270374 | 6/21/2022 | 001 | SATF | Discrimination/Harassment | Y | AIU |
| 000000280493 | 7/15/2022 | 001 | SOL | Discrimination/Harassment | N | LDI |
| 000000282926 | 7/21/2022 | 001 | SCC | Dishonesty | N | ROUTINE |

| | | | | | | |
|---|---|---|---|---|---|---|
| 000000279967 | 7/14/2022 | 002 | CCWF | Dishonesty | N | ROUTINE |
| 000000278767 | 7/12/2022 | 001 | NKSP | Retaliation | Y | AIU |
| 000000266840 | 6/13/2022 | 002 | NKSP | Retaliation | N | ROUTINE |
| 000000262517 | 5/31/2022 | 001 | WSP | Retaliation | Y | AIU |
| 000000278233 | 7/11/2022 | 001 | CCWF | Retaliation | Y | AIU |
| 000000270088 | 6/20/2022 | 001 | CIW | Discrimination/Harassment | | Clarifying Interview |
| 000000264178 | 6/6/2022 | 001 | FOL | Retaliation | N | ROUTINE |
| 000000253597 | 5/6/2022 | 001 | CCWF | Discrimination/Harassment | N | ROUTINE |
| 000000253819 | 5/9/2022 | 001 | CMC | Retaliation | N | LDI |
| 000000282654 | 7/15/2022 | 001 | RJD | Retaliation | N | ROUTINE |
| 000000276765 | 7/7/2022 | 001 | SVSP | Discrimination/Harassment | Y | AIU |
| 000000273333 | 6/28/2022 | 003 | SOL | Dishonesty | N | ROUTINE |
| 000000259097 | 5/23/2022 | 001 | NKSP | Discrimination/Harassment | Y | AIU |
| 000000268968 | 6/17/2022 | 001 | SATF | Retaliation | N | ROUTINE |
| 000000283160 | 7/22/2022 | 001 | MCSP | Dishonesty | N | ROUTINE |
| 000000259550 | 5/24/2022 | 001 | SVSP | Discrimination/Harassment | N | ROUTINE |
| 000000260532 | 5/26/2022 | 001 | SVSP | Retaliation | N | ROUTINE |
| 000000265679 | 6/9/2022 | 001 | SVSP | Dishonesty | N | ROUTINE |
| 000000255715 | 5/12/2022 | 001 | SOL | Discrimination/Harassment | N | ROUTINE |
| 000000251662 | 5/2/2022 | 001 | SQ | Discrimination/Harassment | N | ROUTINE |
| 000000281619 | 7/19/2022 | 002 | LAC | Dishonesty | | Clarifying Interview |
| 000000253065 | 5/5/2022 | 001 | MCSP | Retaliation | N | ROUTINE |
| 000000257790 | 5/18/2022 | 001 | CMF | Dishonesty | Y | AIU |
| 000000270035 | 6/20/2022 | 001 | RJD | Discrimination/Harassment | N | ROUTINE |
| 000000284479 | 7/25/2022 | 001 | RJD | Discrimination/Harassment | N | ROUTINE |
| 000000253365 | 5/5/2022 | 001 | CMF | Discrimination/Harassment | Y | AIU |
| 000000266042 | 6/9/2022 | 001 | CCI | Dishonesty | N | ROUTINE |
| 000000272213 | 6/24/2022 | 001 | LAC | Dishonesty | N | ROUTINE |
| 000000261236 | 5/27/2022 | 001 | KVSP | Discrimination/Harassment | Y | AIU |
| 000000265862 | 6/9/2022 | 001 | LAC | Retaliation | N | LDI |
| 000000271200 | 6/22/2022 | 001 | CAL | Retaliation | N | ROUTINE |
| 000000265591 | 6/9/2022 | 001 | CMF | Discrimination/Harassment | Y | AIU |
| 000000269723 | 6/20/2022 | 002 | CMF | Discrimination/Harassment | Y | AIU |
| 000000278899 | 7/11/2022 | 004 | CHCF | Discrimination/Harassment | Y | AIU |
| 000000279805 | 7/13/2022 | 001 | LAC | Discrimination/Harassment | N | ROUTINE |
| 000000261436 | 5/31/2022 | 001 | MCSP | Discrimination/Harassment | Y | AIU |
| 000000252390 | 5/2/2022 | 001 | SCC | Retaliation | N | Routine |
| 000000262372 | 6/1/2022 | 001 | KVSP | Retaliation | N | Routine |
| 000000284820 | 7/8/2022 | 003 | COR | Dishonesty | N | Routine |
| 000000257445 | 5/18/2022 | 002 | SQ | Dishonesty | N | Routine |
| 000000257889 | 5/19/2022 | 006 | MCSP | Discrimination/Harassment | | Clarifying Interview |
| 000000251357 | 5/2/2022 | 002 | CMC | Dishonesty | N | Routine |
| 000000262856 | 6/2/2022 | 002 | CMC | Dishonesty | N | Routine |
| 000000262587 | 5/31/2022 | 001 | RJD | Discrimination/Harassment | N | Routine |
| 000000262714 | 6/1/2022 | 001 | CMF | Discrimination/Harassment | Y | AIU |
| 000000269681 | 6/20/2022 | 001 | CVSP | Discrimination/Harassment | Y | AIU |
| 000000266279 | 6/10/2022 | 004 | CMF | Retaliation | N | LDI |
| 000000252689 | 5/4/2022 | 001 | SAC | Discrimination/Harassment | Y | AIU |
| 000000272029 | 6/24/2022 | 001 | CMF | Discrimination/Harassment | Y | AIU |
| 000000268142 | 6/14/2022 | 001 | CHCF | Retaliation | N | Routine |

| | | | | | | |
|---|---|---|---|---|---|---|
| 000000277479 | | 7/8/2022 | 001 | RJD | Discrimination/Harassment | N | LDI |
| 000000264126 | | 6/6/2022 | 001 | CEN | Retaliation | N | Routine |
| 000000256402 | | 5/16/2022 | 001 | SAC | Discrimination/Harassment | Y | AIU |
| 000000269023 | | 6/17/2022 | 001 | FOL | Retaliation | N | Routine |
| 000000251300 | | 5/2/2022 | 001 | MCSP | Retaliation | N | Routine |
| 000000262514 | | 6/1/2022 | 004 | SAC | Retaliation | Y | AIU |
| 000000282983 | | 7/21/2022 | 001 | SAC | Discrimination/Harassment | Y | AIU |
| | 268213 | 6/15/2022 | 001 | LAC | Retaliation | N | Routine |
| 000000258007 | | 5/18/2022 | 001 | LAC | Dishonesty | N | LDI |
| 000000273173 | | 6/28/2022 | 001 | SVSP | Retaliation | Y | AIU |
| 000000284138 | | 7/25/2022 | 002 | KVSP | Retaliation | N | Routine |
| 000000264829 | | 6/7/2022 | 001 | LAC | Dishonesty | N | Routine |
| 000000282173 | | 7/15/2022 | 001 | LAC | Retaliation | Y | AIU |
| 000000256027 | | 5/13/2022 | 002 | CCI | Dishonesty | N | Routine |
| 000000273872 | | 6/29/2022 | 002 | CTF | Dishonesty | Y | AIU |
| 000000257392 | | 5/16/2022 | 001 | RJD | Discrimination/Harassment | N | Routine |
| 000000266509 | | 6/10/2022 | 001 | SAC | Dishonesty | N | Routine |
| 000000251659 | | 5/2/2022 | 001 | SATF | Discrimination/Harassment | N | Routine |
| 000000254331 | | 5/9/2022 | 001 | SATF | Discrimination/Harassment | N | Routine |
| 000000255395 | | 5/11/2022 | 001 | SATF | Retaliation | N | Routine |
| 000000266794 | | 6/13/2022 | 001 | CMC | Retaliation | N | Routine |
| 000000276964 | | 7/7/2022 | 002 | HDSP | Dishonesty | N | Routine |
| 000000252559 | | 5/3/2022 | 002 | KVSP | Dishonesty | | Clarifying Interview Needed |
| 000000269243 | | 6/17/2022 | 001 | SOL | Dishonesty | N | Routine |
| 000000268023 | | 6/15/2022 | 001 | FOL | Dishonesty | N | Routine |
| 000000267951 | | 6/15/2022 | 001 | CTF | Dishonesty | N | Routine |
| 000000257414 | | 5/16/2022 | 001 | RJD | Retaliation | N | LDI |
| 000000261202 | | 5/27/2022 | 001 | HDSP | Discrimination/Harassment | Y | AIU |
| 000000274945 | | 7/1/2022 | 001 | SVSP | Discrimination/Harassment | N | Routine |
| 000000273166 | | 6/28/2022 | 001 | SVSP | Dishonesty | | Clarifying Interview Needed |
| 000000259577 | | 5/24/2022 | 001 | LAC | Discrimination/Harassment | Y | AIU |
| 000000281504 | | 7/18/2022 | 001 | COR | Retaliation | N | Routine |
| 000000271199 | | 6/22/2022 | 001 | CTF | Dishonesty | N | LDI |
| 000000254184 | | 5/9/2022 | 001 | HDSP | Discrimination/Harassment | N | Routine |
| 000000280621 | | 7/15/2022 | 001 | RJD | Dishonesty | N | Routine |
| 000000251741 | | 5/2/2022 | 001 | SATF | Retaliation | Y | AIU |
| 000000256187 | | 5/13/2022 | 001 | ASP | Retaliation | N | Routine |
| 000000255984 | | 5/13/2022 | 003 | CCI | Retaliation | Y | AIU |
| 000000273396 | | 6/28/2022 | 001 | PBSP | Dishonesty | N | AIU |
| 000000259610 | | 5/24/2022 | 003 | SVSP | Retaliation | Y | AIU |
| 000000264958 | | 6/7/2022 | 001 | ASP | Dishonesty | Y | AIU |
| 000000254342 | | 5/9/2022 | 001 | ASP | Retaliation | Y | AIU |
| 000000258774 | | 5/20/2022 | 001 | SVSP | Retaliation | N | Routine |
| 000000273174 | | 6/28/2022 | 001 | SVSP | Discrimination/Harassment | Y | AIU |
| 000000275995 | | 7/5/2022 | 002 | CCI | Discrimination/Harassment | Y | AIU |
| 000000277427 | | 7/8/2022 | 001 | VSP | Dishonesty | N | Routine |
| 000000261023 | | 5/27/2022 | 002 | CCC | Dishonesty | N | Routine |
| 000000256302 | | 5/16/2022 | 001 | SAC | Discrimination/Harassment | N | LDI |
| 000000277653 | | 7/11/2022 | 001 | SAC | Discrimination/Harassment | Y | AIU |
| 000000279393 | | 6/29/2022 | 001 | RJD | Dishonesty | N | AIU |
| 000000276166 | | 7/6/2022 | 003 | CHCF | Dishonesty | N | AIU |
| 000000279054 | | 7/13/2022 | 001 | MCSP | Dishonesty | N | AIU |

| 000000264798 | 6/7/2022 | 002 | SAC | Retaliation | N | AIU |
|---|---|---|---|---|---|---|
| 000000265622 | 6/9/2022 | 001 | CMF | Dishonesty | N | Routine |
| 000000264475 | 6/7/2022 | 002 | SVSP | Retaliation | N | LDI |
| 000000273043 | 6/27/2022 | 001 | SCC | Retaliation | N | Routine |
| 000000260579 | 5/26/2022 | 001 | CMF | Dishonesty | N | Routine |
| 000000273200 | 6/28/2022 | 001 | SATF | Discrimination/Harassment | N | LDI |
| 000000253444 | 5/6/2022 | 001 | SQ | Dishonesty | N | Routine |
| 000000258602 | 5/20/2022 | 003 | CTF | Discrimination/Harassment | N | Routine |
| 000000265771 | 6/9/2022 | 002 | CMF | Dishonesty | N | Routine |
| 000000275041 | 7/1/2022 | 002 | SVSP | Retaliation | Y | AIU |
| 000000282696 | 7/21/2022 | 001 | RJD | Retaliation | N | Routine |
| 000000277060 | 7/7/2022 | 001 | SAC | Dishonesty | N | Routine |
| 000000255170 | 5/11/2022 | 001 | SAC | Retaliation | Y | AIU |
| 000000251748 | 5/2/2022 | 001 | SATF | Retaliation | N | ROUTINE |
| 000000268513 | 6/16/2022 | 002 | SAC | Retaliation | N | LDI |
| 000000254781 | 5/10/2022 | 001 | LAC | Dishonesty | N | ROUTINE |
| 000000256850 | 5/16/2022 | 001 | LAC | Retaliation | N | ROUTINE |
| 000000274956 | 7/1/2022 | 005 | KVSP | Dishonesty | Y | AIU |
| 000000257856 | 5/18/2022 | 001 | LAC | Discrimination/Harassment | Y | AIU |
| 000000279043 | 7/11/2022 | 001 | LAC | Retaliation | N | ROUTINE |
| 000000252371 | 5/3/2022 | 001 | SVSP | Retaliation | N | ROUTINE |
| 000000263677 | 6/3/2022 | 001 | SVSP | Discrimination/Harassment | N | ROUTINE |
| 000000265652 | 6/9/2022 | 001 | SQ | Retaliation | N | ROUTINE |
| 000000273812 | 6/28/2022 | 001 | CHCF | Retaliation | | Clarifying Interview |
| 000000273649 | 6/28/2022 | 001 | KVSP | Retaliation | N | ROUTINE |
| 000000273883 | 6/29/2022 | 001 | CHCF | Retaliation | Y | AIU |
| 000000263283 | 6/3/2022 | 001 | MCSP | Discrimination/Harassment | Y | AIU |
| 000000256509 | 5/16/2022 | 001 | SVSP | Dishonesty | N | LDI |
| 000000266045 | 6/9/2022 | 001 | CCI | Discrimination/Harassment | N | ROUTINE |
| 000000277587 | 7/8/2022 | 001 | COR | Dishonesty | N | ROUTINE |
| 000000270480 | 6/21/2022 | 003 | COR | Retaliation | N | ROUTINE |
| 000000269599 | 6/20/2022 | 001 | CMF | Discrimination/Harassment | Y | AIU |
| 000000255797 | 5/4/2022 | 001 | SVSP | Retaliation | N | AIU |
| 000000253091 | 5/5/2022 | 001 | SAC | Dishonesty | Y | AIU |
| 000000256038 | 5/13/2022 | 001 | SAC | Retaliation | N | Routine |
| 000000260378 | 5/25/2022 | 005 | SAC | Dishonesty | N | LDI |
| 000000271444 | 6/23/2022 | 004 | SAC | Retaliation | Y | AIU |
| 000000267906 | 6/2/2022 | 002 | COR | Dishonesty | Y | AIU |
| 000000264158 | 6/6/2022 | 001 | SOL | Dishonesty | Y | AIU |
| 000000257648 | 5/18/2022 | 002 | SATF | Retaliation | N | AIU |
| 000000282488 | 7/20/2022 | 001 | KVSP | Retaliation | N | Routine |
| 000000257964 | 5/19/2022 | 001 | RJD | Retaliation | N | LDI |
| 000000259305 | 5/23/2022 | 001 | SAC | Discrimination/Harassment | Y | AIU |
| 000000277307 | 7/8/2022 | 001 | CVSP | Retaliation | N | ROUTINE |
| 000000270492 | 6/21/2022 | 002 | NKSP | Retaliation | N | ROUTINE |
| 000000278279 | 7/11/2022 | 001 | RJD | Retaliation | N | AIU |
| 000000270370 | 6/21/2022 | 001 | PVSP | Discrimination/Harassment | Y | AIU |
| 000000284416 | 7/25/2022 | 001 | LAC | Retaliation | Y | AIU |
| 000000281450 | 7/18/2022 | 001 | SATF | Retaliation | N | Routine |
| 000000256363 | 5/16/2022 | 001 | CMC | Retaliation | N | LDI |
| 000000273881 | 6/29/2022 | 001 | CMC | Discrimination/Harassment | Y | AIU |
| 000000261511 | 5/31/2022 | 001 | CIW | Discrimination/Harassment | Y | AIU |

| 000000284373 | 7/25/2022 | 001 | RJD | Dishonesty | N | Routine |
|---|---|---|---|---|---|---|