DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:    (415) 510-3594
Fax:            (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

[4217209.1]

Case No. C94 2307 CW

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.      Effect of the COVID-19 Pandemic on the *Armstrong* Class**

      **1.      Plaintiffs' Statement**

COVID-19 continues to spread throughout California prisons.  To date, 88,725 cases of the novel coronavirus have been detected among people incarcerated in California prisons.  A total of 260 people have died after being infected while in prison in California.  Of those, approximately half were *Armstrong* class members, even though they make up only about 12% of the total incarcerated population.

The pandemic continues to impact the transfer of *Armstrong* class members to ADA accessible placements.  Defendants have unfortunately been unable to find a way to address the backlog of class members housed inaccessibly in prisons not designed to safely accommodate their disabilities, even after COVID-19-related movement restrictions were relaxed in April 2022.  As of January 13, 2023, there are 94 class members housed inaccessibly in placements not designated to accommodate their disabilities in violation of the *Armstrong* Remedial Plan (this does not include an additional approximately 162 class members with impacting placement codes awaiting transfer, as of December 23, 2022, to designated mainline prisons from reception centers.)

On August 11, 2022, the parties met with the Court Expert regarding expedited transfers.  Defendants reported that the continuing delays are due to a combination of the lack of available lower bunk, lower tier beds as well as COVID-19 outbreaks at either the sending or receiving prisons.  As Defendants acknowledge, however, their current efforts are not going to be enough to bring the number of inaccessibly housed class members

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1  down to anywhere near pre-pandemic levels, due to the ongoing need for CDCR to employ

2  COVID-19-related risk reduction measures.  Plaintiffs are committed to working with

3  Defendants on solutions to prevent the creation of the "new normal".

4       On September 16, 2022, Defendants stated that they are in the process of auditing

5  the amount of set-aside quarantine and isolation space at each prison in response to

6  identifying prisons that had set aside more quarantine and isolation space than is required

7  by the *Plata* Receiver.  Addressing this issue should open up additional accessible beds.

8  Plaintiffs urge Defendants to consider any other ways that more accessible beds can be

9  made available at prisons designated to house class members with disabilities impacting

10  their housing placement.

11       Plaintiffs' counsel are also concerned that the data on expedited transfers may not

12  tell the whole story.  Some class members report that, as a result of pandemic related

13  transfer delays, they are housed in accessible placements, but on higher security level

14  prison yards.  These class members are not counted in data currently produced by

15  Defendants because they are housed in ADA accessible housing placements, just

16  reportedly at higher security levels than they should be because of their disabilities.

17  Plaintiffs have requested to meet with Defendants in order to gather more information

18  about whether class members are being overridden to housing placements that are not

19  consistent with their security level and, if so, the scope of this issue.

20      **2.**    **Defendants' Statement**

21       Defendants continue to make significant and comprehensive efforts to contain and

22  minimize the effects of an unparalleled, global pandemic on the people housed in its

23  institutions, staff, and visitors by continuing with a robust vaccination process, maintaining

24  a stringent testing process, enforcing appropriate mitigation measures, working with

25  Plaintiffs to address individual concerns, and many other proactive efforts to address an

26  unprecedented, challenging, and ever-changing landscape.  Defendants' efforts to provide

27  safe and accessible housing and to provide detailed daily or weekly reports to Plaintiffs

28  during this global pandemic have been memorialized in previous Joint Case Status

Statements.  *See*, e.g., ECF Nos. 3369, 3391, 3412.  Moreover, for more than two years, CDCR has provided to the public detailed tracking information concerning COVID-19 to include active cases, resolved cases, deaths, vaccination rates of inmate and staff populations, tests completed, and other important information.[2]   Recent data shows that 80% of all inmates and 72% of staff members are fully vaccinated.  Defendants' efforts continue to control the mortality rate amongst the incarcerated population.  Deaths peaked nearly two years ago with 65 deaths in January 2021 and have dramatically decreased thereafter.  There were 10 deaths in 2022.  Most class members who died from severe COVID, unfortunately, had other recognized high-risk factors for severe COVID, such as obesity or other chronic conditions.

Defendants continue to prioritize the reduction of the number of non-reception-center class members on the expedited transfer list, notwithstanding unavoidable obstacles to do so that have arisen as a result of the global pandemic, as detailed in previously filed Joint Case Status Statements.  *See*, e.g., ECF Nos. 3369, 3391, 3412.  As of January 13, 2023, there are 94 non-reception center class members on this list which includes class members in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  The updated COVID-19 Screening and Testing Matrix for Patient Movement relaxes many of the movement restrictions and should further facilitate the reduction of class members on the expedited transfer list.  An audit of institutions' isolation-quarantine space to return space no longer required for isolation-quarantine to regular housing is also ongoing and will help address the limited number of lower bunk, lower tier beds.  These efforts should also address Plaintiffs' concern that class members may be temporarily assigned higher-classification housing.  CDCR continues to monitor and report requirements for all class members housed in non-designated spaces and provide timely documentation to Plaintiffs and the Court Expert.  Defendants will continue to meet with Plaintiffs to share additional information and garner their input to resolve this issue.

---

[2] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ for updated information.

**B.      Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

     **1.      Plaintiffs' Statement**

       **a.      RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against incarcerated people on the basis of their disabilities who request accommodations and face discrimination, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD." ECF No. 3059 at 42. On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons. *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). ECF No. 3336. Updated versions of the Plans were filed on March 23, 2022. *See* ECF No. 3393, Exs. A, B.

Following a year of negotiations, the changes to the staff misconduct complaint process were incorporated in to new regulations, and the Notice of Change to Regulations, 22-06, was published on April 8, 2022. On August 11, 2022, Plaintiffs' counsel received written notice that Defendants unilaterally decided that changes to the proposed regulations stemming from the negotiations were necessary. The parties have not yet resolved how Defendants will address Plaintiffs' concerns as articulated in Exhibit A to the prior Joint Case Management Statement (ECF No. 3430) and the Court Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

Plaintiffs have consistently raised concerns that the number of complaints routed through the new staff misconduct process will exceed the volume anticipated by CDCR. Plaintiffs' counsel remains concerned that Defendants have not adequately allocated enough resources to meet the demand for complaints, despite Plaintiffs' advocacy. To address the shortfall, Defendants proposed reducing the number of complaints that would

1   be routed to OIA by increasing the threshold to require a "causal connection" between any

2   alleged harassment, discrimination or retaliation and the protected class.  OIA workload

3   would be reduced because complaints lacking a causal connection would remain at the

4   prison for local investigation and would not be routed to OIA.  Plaintiffs objected to

5   Defendants' use of the "causal connection" standard because it is difficult to administer

6   and is reminiscent of Defendants' prior reasonable belief standard which, due to similar

7   difficulties, the parties sought to eliminate in reforming the staff complaint process.  The

8   Court Expert shared some of Plaintiffs' concerns, including that Defendants' proposed

9   screening standards would be difficult to apply consistently and objectively.  ECF No.

10  3433 at 2-3.  In response, Defendants have implemented "causal connection" standard only

11  at prisons not currently covered by *Armstrong* order.  Implementation of Defendants' two-

12  tiered approach defies common sense.  Having different standards apply to the same

13  conduct committed by different staff in the system undermines the entire concept of

14  accountability as enshrined in prior orders in this case.  Further, having differing and

15  difficult-to-administer standards for processing staff misconduct complaints will impact

16  the processing of all staff complaints process and impede the court-ordered remedies.

17      Despite assurances from Defendants that they have not yet experienced staffing

18  shortfalls under the new system, data produced by Defendants on December 8, 2022 shows

19  that over half of the investigations in June 2022 – the most current month of data reflecting

20  cases that should have closed – were not completed timely per remedial plan requirements.

21      Defendants have also begun quarterly production of documents in compliance with

22  the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures

23  to hold staff accountable for misconduct.  Defendants produced a response on December 8,

24  2022, disputing nearly all criticism made by Plaintiffs' counsel regarding the investigation

25  and discipline system.  As outlined in a December 13, 2022 reply, Defendants failed to

26  present reasoned arguments for why Plaintiffs' criticisms are inaccurate and, in some

27  cases, Defendants misrepresented the facts.  Plaintiffs are becoming increasingly

28  concerned that it will be impossible to work together to resolve problems if Defendants

1   remain unwilling to acknowledge that problems exist.  Plaintiffs are continuing to work

2   with Defendants regarding problems in the production of documents required pursuant to

3   the court orders.

4          In November 2021, the Court ordered the Court Expert to investigate the treatment

5   of people with disabilities at SATF.  ECF No. 3338.  The Court Expert conducted a year-

6   long investigation and issued his report and recommendations on December 20, 2022.

7   ECF No. 3446.  He found that people with disabilities at SATF are "living diminished and

8   needlessly difficult lives," and as a result "face harsher prison conditions, and thus greater

9   punishment, than their peers." *Id.* at 4.  People were denied accommodations needed to

10  safely and independently perform a wide array of activities, including to eat, perform

11  bodily functions, write, and participate in rehabilitative programs.  The Court has set a

12  briefing schedule for the parties to respond to the Court Expert's report.  ECF No. 3448.

13         We note that the Court Expert found that "it was not management that identified

14  these problems; it was Plaintiffs' counsel."[3]  *Id.* at 5.  Plaintiffs agree with the Court

15  Expert that "much at SATF has to change" and that "SATF has not demonstrated that it is

16

17  _____

    [3] *See, e.g.*, ECF No. 3446 at 14 ("Person C, who is blind in one eye and has glaucoma in
18  the other, was denied a tapping cane for six months despite filing 7362s, an 1824, and a
    602HC, and despite a request by Plaintiffs' counsel."); *id.* at 23 ("Person B experienced
19  two separate ten-day or longer periods of receiving little to no nutrition after arriving at
    SATF, and during his second transfer, he had to go cold turkey off of an anti-depressant,
20  which was not restored for nearly a month and only after intervention by the Court
    Expert's team, CCHCS, and Plaintiffs' counsel."); *id.* at 35 ("It is difficult to understand
21  why SATF healthcare leadership resolved this issue [related to availability of pull-up
    diapers] only after Plaintiffs' counsel raised it and had engaged in advocacy about the issue
22  for over a year."); *id.* at 40 ("Understanding that he could not get CART at SATF, Person
    E told us that he gave up attempting to participate in self-help groups or other classes. He
23  had previously attempted to attend religious services and a group class for veterans, but he
    could not understand anything, and he stopped attending. He did not see a point in filing an
24  1824 to try to gain access to these programs, since his previous requests and the requests of
    Plaintiffs' counsel had been rejected."); *id.* at 45 ("Thus, after nearly three years of
25  advocating for himself, several advocacy letters from Plaintiffs' counsel, a response from
    OLA, a rejection from the Office of Appeals, numerous 7362s, several 1824s and RAP
26  responses, several 602s, and an order from a provider, Person F still had not received the
    assistive device to help him hold a pen.").
27

28

able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors.  Self-correction has to be the goal, and our investigation showed it is a long way off." *Id.* at 5-6.  Plaintiffs are committed to working with the Court Expert and Defendants to develop complete, durable solutions to the many problems at SATF.  This process will not be easy or quick, and it will require sustained dedication and strong leadership across program areas at the institution, regional, and headquarters levels.

CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP found thus far at six prisons exist system-wide.  Plaintiffs are especially concerned about ongoing reports of staff misconduct from vulnerable class members in light of confirmation that CDCR has identified dozens of potential victims of sexual misconduct by one officer who worked for over a decade at CCWF. ([https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/](https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/)).  Plaintiffs have requested information from Defendants regarding how many complaints were received against this officer and what protections are in place in the development of their early warning system to guard against such widespread abuse by one officer.  Plaintiffs are committed to bringing such evidence before the Court until all class members are protected.

### b. False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, Defendants have failed to address the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

1    As in the staff complaint context, reviewers discount or ignore the testimony of

2  incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers

3  fail to discover evidence that staff have issued reports that appear plagiarized or otherwise

4  replicate conduct and charges that are improbably attributed to multiple people at the same

5  time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct

6  charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322

7  at 11-12 & Ex. E.

8    Plaintiffs' counsel continues to identify class members who have received false,

9  retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate

10  against and discourage the filing of staff misconduct complaints will persist unless

11  Defendants take action to identify and root out problems through meaningful reforms to

12  the RVR process.

13    Defendants have agreed to multiple changes, but Plaintiffs continue to raise

14  outstanding problems.  Defendants are in the process of revising the Chief Disciplinary

15  Officer training to include the requirements for reviewing camera evidence, reviewing

16  cases for bias, and the obligation to report staff misconduct when it is evident in the

17  disciplinary process.  To the extent feasible, Defendants agree to record audio for serious

18  RVR hearings.  According to Defendants, the recordings will be used for internal audits

19  and will be available for review during investigations into allegations of

20  false/discriminatory RVRs.  The recordings will otherwise not be available to incarcerated

21  people.

22    Defendants have also agreed to implement a headquarters-level audit of RVRs at 10

23  prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues,

24  identification of discrimination, retaliation, and bias in the RVR process.

25    Defendants have agreed to evaluate whether to include "red flags" in their EWS to

26  identify when a staff member has initiated a disproportionate number of RVRs, when an

27  incarcerated person has received a disproportionate number of RVRs, and instances when

28  an incarcerated person receives an RVR within a certain period of time after having filed a

1    staff complaint.

2         Defendants are still considering problems identified by Plaintiffs' counsel regarding

3    the issuance of counseling-only chronos which provide no due process but can have

4    negative consequences.  Defendants also agreed to discuss with Plaintiffs' counsel the

5    inappropriate use of dismissed and voided RVRs, which are currently relied on in risk

6    assessments conducted during the Board of Parole Hearings process, and the related

7    problem of which CDCR staff have access to view voided and dismissed RVRs that are

8    retained in electronic SOMS files.

9         Plaintiffs are hopeful that the parties can agree to resolve problems and that

10   additional court intervention will not be necessary.

11        **2.    Defendants' Statement**

12             **a.    RJD and Five Prisons Orders**

13        In compliance with the Court's September 8, 2020, and March 11, 2021 orders,

14   Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive

15   and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF

16   No. 3393.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial

17   improvements that will go a long way to bringing Defendants into compliance with the

18   ARP and ADA at the six prisons."  ECF No. 3356 at p. 2.  Further, the Court found, the

19   "implementation of these [] remedial measures is likely to have a positive impact on…the

20   overall reliability of the outcomes of investigations," of staff-misconduct allegations."  *Id*.,

21   at p. 15.  As previously reported to the Court, within months of the Court's orders,

22   Defendants executed significant components of the remedial plans that included increased

23   staffing to specifically address disability-related issues of class members, body-worn-

24   camera deployment, fixed camera installation (AVSS), document production, training, and

25   other remedies.  ECF Nos. 3177, 3183, 3412.  Moreover, although not required by the

26   Court's orders, Defendants have deployed statewide the processes that restructure CDCR's

27   staff misconduct allegation, screening, referral, investigative, and disciplinary processes.

28   Accordingly, further enforcement orders as to other institutions is not necessary.

The statewide deployment of the new staff misconduct investigation and staff discipline processes necessitates extensive resources that includes the hiring and training of new staff and the development of technological tools.  Plaintiffs' concerns related to the number of complaints routed through the new staff misconduct process are well taken, but such concerns are not entirely addressed by increasing monetary resources.  Rather, hiring, training, and retaining qualified staff is more challenging in today's environment.  Notwithstanding the current circumstances, CDCR is committed to staffing current allocated positions to ensure successful deployment of the new processes.

Defendants disagree with Plaintiffs' characterization of the revised process as a recategorization of certain allegations.  Instead, Defendants believe that the process can be improved, in part, by providing additional training to the initial screeners so that these screeners have an improved understanding of what amounts to serious staff misconduct to ensure consistent application of the new process and these revisions seek to achieve that objective.  The revisions to the regulations are intended to further ensure success of these processes by efficiently routing all staff misconduct complaints to the most appropriate entity for investigation.  Defendants have collected and shared data to support Defendants' proposed revisions to the regulations.  Defendants will continue to evaluate all information received to monitor compliance with the Court's orders and to provide adequate resources to ensure the successful transition to these new processes.  Notwithstanding Plaintiffs' concerns and objections related to the recent revisions to the staff-misconduct processes, CDCR's staff-misconduct investigations and discipline processes are in compliance with this Court's orders applicable to the six prisons.  CDCR has dramatically overhauled its processes to ensure unbiased and complete investigations statewide for the six prisons and will continue to work to expand it to the remaining institutions voluntarily as they are able to do so.  Defendants anticipate that by the end of next month, investigations will be timely completed so that there are no cases assigned to custody supervisors over 120 days or to Special Agents over 180 days.

In accordance with the Court's November 8, 2021 order, the Court Expert filed his

Report Regarding Treatment of People with Disabilities at Substance Abuse Treatment Facility (SATF) on December 20, 2022.  *See* ECF Nos. 3391, 3446.  Following a stipulation between the parties, the Court has set a briefing schedule with Defendants' response due on January 24, 2023, Plaintiffs' response due on February 7, 2023, and Defendants' reply due on February 14, 2023.  *See* ECF No. 3448.  Although some of the issues addressed by the Court Expert in his report are referenced in this statement, Defendants will provide their detailed response to the report on January 24, 2023.

### b.     Defendants' Response to Demands for RVR Reform

As detailed above by Plaintiffs, Defendants have made significant progress and commitments to address Plaintiffs' allegations that "CDCR has failed to address the endemic use of false and retaliatory Rules Violations Reports."  Defendants have committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer trainings, to implement a headquarters-level audit of RVRs at ten institutions, to audio record serious RVR hearings for internal auditing purposes, revisions to the Department Operations Manual, a memorandum addressing discriminatory RVRs, a new screening process to determine whether a physical disability contributed to the underlying conduct, the development of Early Warning System (EWS) red flags, and other remedial measures. All three categories identified by Plaintiffs, above, have been completed and incorporated into the EWS (so long as the incarcerated person who receives the RVR within a certain period of time alleges in his grievance that the RVR was received in response to a staff complaint).  Defendants detailed in a past Joint Case Status Statement, that recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No. 3412 at pp. 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes and the new pepper-spray policy, Defendants' commitment to deploy fixed-camera technology at fourteen institutions in addition to the Court-ordered deployment of such technology at six institutions (20 institutions total), and Defendants' commitment to deploy BWC technology at four institutions in addition to the Court-ordered deployment of such

technology at six institutions (10 institutions total).  Further, under the new staff misconduct process, allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.  Defendants disagree with Plaintiffs' contention that the counseling-only chronos implicate a liberty interest necessitating due process because, in part, inmates receive a copy of the counseling-only chrono and may contest such chronos in the grievance process.  Notwithstanding the significant progress made, there remains some disagreement between the parties.  Nevertheless, Defendants have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed revisions.

## C.      Accommodations for Deaf and Hard-of-Hearing Class Members

### 1.      Plaintiffs' Statement

The parties continue to meet in a workgroup to address the provision of accommodations for deaf and hard of hearing class members.  While progress has been made in some areas, there are significant, longstanding issues that result in the denial of equal access to prison programs and services for people with disabilities.

The Court expert has twice met with the parties, on December 5, 2022 and January 6, 2023, to discuss Defendants' longstanding refusal to provide real-time captioning[4] for deaf and hard of hearing individuals who do not use sign language.  Initially, Defendants proposed providing captions solely via error-prone automated captioning software designed to for use during video calls (Microsoft Teams), and solely in due process and educational settings.  The parties appear to be making progress, although there are still outstanding questions and disputes regarding: (1) the captioning service Defendants

---

[4] "Real-time captioning (also known as computer-assisted real-time transcription, or CART), is a service … in which a transcriber types what is being said at a meeting or event into a computer that projects the words onto a screen. This service, which can be provided on-site or remotely, is particularly useful for people who are deaf or have hearing loss but do not use sign language." U.S. Dep't of Justice, ADA Requirements: Effective Communication (Jan. 2014), https://www.ada.gov/effectivecomm.htm.

1   ultimately will provide; (2) the class members who will be eligible to receive it; and (3) the

2   prisons and settings where Defendants will provide the service.  The dispute remains active

3   until these questions are resolved.  Defendants appear receptive to Plaintiffs' concerns.

4          Plaintiffs' counsel dispute Defendants' representation that they "have identified all

5   class members who may reasonably require" real-time captioning simply by identifying all

6   class members who are deaf and do not know sign language.  Plaintiffs' counsel has

7   repeatedly reported that many class members who are hard of hearing (able to understand

8   speech in some settings, with or without visual support) require real-time captioning in

9   group settings.  Defendants' proof of concept reinforces this point.  At San Quentin,

10  Defendants collected surveys from 21 class members who participated in the proof of

11  concept, all of whom have DNH codes, indicating they are hard of hearing but not deaf.

12  Seventeen of these DNH class members answered "yes" to the question "did real-time

13  captions work better for you than solely relying on staff speaking loudly?"  Eighteen of

14  these DNH class members answered "yes" to the question "do you prefer real-time

15  captions as a method of communication during committee and/or RVR hearings?"

16  Plaintiffs' counsel is optimistic that Defendants will reconsider their unnecessarily

17  restrictive position and offer captions to, at a minimum, all deaf and hard of hearing class

18  members with a visual method (written notes or lip-reading) documented as their primary

19  or secondary method of communication.

20         Plaintiffs' counsel also remain concerned about the poor quality of the hearing aids

21  that Defendants provide, which impairs deaf and hard of hearing class members' access to

22  prison programs, services and activities.  When reviewing Defendants' existing hearing aid

23  contracts, set to expire in January 2023, Plaintiffs' counsel learned that the contracts

24  contain *no specifications whatsoever* for hearing aids—not even to require FDA-approved

25  devices.  We are further concerned by the lack of meaningful progress on this issue.

26  CCHCS has merely "agreed to hire" or "is in the process of retaining" specialists and

27  consultants regarding pocket talkers and hearing aids, despite receiving our expert report

28  six months ago, and despite repeatedly discussing Plaintiffs' counsel's concerns regarding

1   hearing aid quality in the work group over a period of years.

2       **2.**      **Defendants' Statement**

3          Defendants remain committed to providing class members equal access to

4   programs, services, and activities in accordance with the ADA and will continue to meet

5   with Plaintiffs to discuss the issues that pertain to their clients as part of the parties'

6   ongoing workgroups.

7          Defendants met with Plaintiffs on December 5, 2022 and, later, facilitated a

8   December 7, 2022 meeting between the Court Expert and a member of CDCR's executive

9   staff to further discuss the class members for whom Plaintiffs have requested CART

10  services.  The parties, along with the Court Expert, met again on January 6, 2023, and

11  further progress was made concerning this issues.  A meeting is scheduled for January 18,

12  2023 to provide further updates.  CDCR is currently seeking subject-matter experts to

13  provide information for the development of a concrete plan to supplement current policy

14  and ensure access to prison programs, services, and activities for deaf class members who

15  do not know sign language.  Meanwhile, Defendants disagree with Plaintiffs' description

16  of the class-member group requiring such an accommodation.  Defendants have identified

17  all class members who may reasonably require such an accommodation and are developing

18  a policy that includes instructing the field that due-process events must include real-time

19  captioning as an accommodation for these class members.  Further, the assigned ADAC, or

20  designee, has contacted each class member to confirm upcoming events that may

21  necessitate such an accommodation to ensure access and coordinate with staff to provide

22  reasonable accommodations.  The size of this population consists of less than fifty class

23  members who have equal access to a variety of other services or devices that accommodate

24  their needs in different settings and will be incorporated into to any future plan.  For

25  example, teachers use electronic interactive whiteboards to engage all students in learning

26  and to provide written content. Although not yet fully rolled-out, every class member

27  participating in the education programs has (or will receive) a laptop for use both inside

28  and outside of the classroom.  Additionally, these class members have tablets (or will soon

1   have), TDD/TYY,[5] video phones, and other means of disability accommodation.

2   Defendants will continue to work with Plaintiffs on this issue, along with the assistance of

3   the Court Expert, to resolve this issue.

4         As previously reported, CCHCS has provided Plaintiffs with detailed information

5   related to the types of hearing aids available to class members.  *See* ECF No. 3412 at pp.

6   17, 18, ECF No. 3422 at p. 13.  Nevertheless, CCHCS has internally reviewed Plaintiffs'

7   retained audiologist's July 13 report, will continue to confer with Plaintiffs, and share

8   information with them until these issues are resolved.  Similarly, Defendants will continue

9   to confer with Plaintiffs concerning the proposed pocket-talker memorandum that provides

10  for, in part, a case-by-case analysis of class-member needs.  CCHCS reports that it is in the

11  process of retaining a specialist to provide insight on the subject who will assist parties in

12  determining the approach to pocket talkers, and other personal sound amplification devices

13  statewide.  *See* ECF No. 3412 at p. 18.  CCHCS has agreed to hire a hearing consultant to

14  look at the current hearing aids, review the reports by Plaintiffs provide feedback, and

15  anticipate entering a new contract for hearing aids, once the current contract expires, that

16  adequately addresses the needs of class members.  CCHCS disagrees with Plaintiffs'

17  characterization that there has not been "meaningful process on this issue" because it fails

18  to acknowledge that CCHCS must comply with the state's vetting process that involves

19  legal and procurement components.  CCHCS has, in fact, complete many aspects of this

20  required process and is making progress on this issue.

21  **D.    Accommodations for Blind and Low-Vision Class Members**

22        **1.    Plaintiffs' Statement**

23        The parties formed a workgroup to address issues facing blind and low-vision class

24  members.  The workgroup covers, among other things, reading and writing

25  accommodations, orientation and mobility training for blind and low-vision class

26  members, accommodations assessments and skills training, braille literacy, availability of

27

28  [5] Telecommunications Device for the Deaf/TeleTYpewriter

white canes, accessibility of the tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021 demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  As Plaintiffs explained in the demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials (such as large print, braille, and audio) that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

Defendants have indicated that they are developing a plan to identify and track the accessible formats needs of blind and low-vision class members. But over a year and a half after Plaintiffs raised this issue in March 2021 with Defendants, Defendants have still not provided Plaintiffs with a draft of such a plan, nor have Defendants provided a plan for how they will *produce* printed information in accessible formats to blind and low-vision class members.  Moreover, Defendants' proposed plans, discussed in Defendants' statement, would omit low-vision DNV class members from identification and tracking, and would fail to make electronic magnifiers available in housing units at non-DPV-designated prisons where many DNV class members live.

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes between the parties regarding the need for reading and writing accommodations for blind and low-vision class members. On November 3 and December 5, 2022, the parties met with the Court Expert to discuss the proposed stipulation. Plaintiffs are hopeful that Defendants will promptly develop a plan for remedying these longstanding ADA violations, and that litigation will not be necessary.  The parties continue to meet and confer to discuss these issues.

The parties continue to meet to resolve accessibility problems for blind and low-vision users of CDCR's new ViaPath tablets.  Unfortunately, Defendants did not accept

Plaintiffs' repeated requests in the summer of 2021, prior to the distribution of these tablets, to develop a robust training program for class members on the use of the tablets. However, Plaintiffs are encouraged that Defendants have recognized problems with the tablets' accessibility features and the available training on how to use these features, and are developing a plan to resolve these issues. Both CDCR and BPH have testified that key CDCR and BPH forms, form responses, and other documents are not available on the tablets, so at least in its current form, Defendants' tablet program does not solve the accessibility barriers that blind and low-vision class members face regarding access to essential forms.

Plaintiffs have reported that during and after a CDCR IT software change in the summer of 2022, blind and low-vision class members who could previously type on and print from library computers, as a disability accommodation, have been unable to do so. Without a reasonable writing accommodation, these class members do not have access to programs, services, and activities that require them to produce written documents, because they are unable to write by hand, or are substantially limited in doing so. Plaintiffs have requested that Defendants develop a statewide system allowing computer and printing access for class members who are unable to write by hand or are substantially limited in doing so.

### 2.     Defendants' Statement

Defendants continuously work to accommodate the needs of blind and low-vision class members in all areas including their reading and writing needs, have collaborated with Plaintiffs and the Court Expert, and have made significant progress to resolve disputes between the parties to ensure class-member access and mitigate associated litigation risks. Most recently, these efforts include a proposed stipulation addressing reading and writing accommodations that Defendants received from Plaintiffs. Defendants are currently engaged in internal discussion concerning the issues raised by Plaintiffs about Defendants' edits to the proposed stipulation at recent conferences with Plaintiffs and the Court Expert.

As previously reported, Defendants are reviewing different processes by which they can identify, track, and accommodate blind and low-vision class members during intake of inmates into the correctional system by including additional fields in the Strategic Offender Management System (SOMS) to identify class-members who require reading and writing accommodations in large-print with the use of a magnifier, or braille, and provide a means to track class member needs while in Defendants' custody.  *See* ECF No. 3422 at p. 16.  Such a process necessitates coordination with CCHCS and Defendants have been collaborating with CCHCS to develop a successful process to identify, track, and accommodate class members.  These proposed new processes would also be accomplished through the 1824 process or triggered when an inmate is designated as DPV while in custody.  Defendants continue to explore a variety of options to provide large-print and braille versions of written materials including contracting with third-party vendors and improving institution resources.

The Office of Correctional Education is in the process of ordering additional assistive devices, including the Da Vinci Pro and Amigo magnifiers, for education programs at DPV-designated institutions.  Moreover, CDCR intends to deploy a 90-day pilot in-cell check-out use of text-to-speech auxiliary aids at CMF to address class members' access to audio formats.  And CDCR is developing a policy to permit electronic handheld magnifiers in housing units at DPV-designated institutions.  Further, Defendants are deploying its tablet program statewide for all inmates as part of a $1 billion dollar contract with ViaPath, a third-party vendor who is contractually obligated to apply all accessibility standards to any documentation posted to or provided on the tablet, so anything created for the tablet must be developed with accessibility in place to serve class members.  *See* ECF No. 3422 at p. 17.  These tablets include a variety of assistive features including, but not limited to, text enlargement, video calling, and text to speech.  CDCR took input from Plaintiffs and shared their comments with the contractor and continues to work with the contractor to enhance capabilities to include increased recreational options, different formats for imparting information, and more to enable independent use by blind

and low-vision class members.  ViaPath is to offer additional accessibility training to the *Armstrong* class members at the institutions where tablets have been rolled out including SATF, MCSP, SAC, HDSP, KVSP, ISP, CVSP, VSP, CCWF, CIW, and SOL.  This training will include accessibility training, functionality, settings, use, an opportunity for questions and answers, individual assistance, and other forms of training to ensure class-member accessibility.  The "IT change" referred to by Plaintiffs was an upgrade to improve functionality and program access by consolidating all inmate computers to one network instead of the prior standalone model.  Finally, EIS continues to work on a process to permit inmates to save their items to an internet server ("the cloud") for printing at a later time.

**E.     Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  *See* ECF No. 2680 at pp. 13-14.  Defendants produce comprehensive program access data every month and the parties are attempting to develop a standard for analyzing program access disparities.  Plaintiffs believe that the data continues to show troubling disparities in assignments for people with disabilities, particularly in the areas of high value Prison Industries Authority jobs, and in assignments with higher pay.  *See* ECF No. 3369, Ex. H (November 12, 2021, Letter from Tom Nolan to Katie Riley and Dawn Lorey). Defendants, however, disagree with Plaintiffs' assessment but have agreed to continue to participate in future discussions.  The parties met most recently on December 15, 2022, 2022, and will travel to Mule Creek State Prison together at the end of March 2023 to interview staff members there about issues relevant to program access for *Armstrong* class members.

**F.      Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

**1.      Plaintiffs' Statement**

Following Defendants' statewide durable medical equipment ("DME") reconciliation in early January 2019 that revealed 7,346 class members were missing one or more items of DME and that 2,349 class members' DME records had errors, CCHCS implemented the DME Discrepancy Report Tool in January 2020. Defendants had agreed to a process to ensure reconciliation of what records indicate a class member should have and what they actually have. Unfortunately, during the most recent meetings on this issue, including the September 16, 2022 and November 17, 2022 All Parties Meet and Confers, Defendants reported that they were going back on their plan to ensure that class members are seen annually by medical staff for reconciliation and instead planned to encourage class members to self-advocate if they are missing required DME. Defendants also plan to have the Field Training Sergeants audit this issue, but those positions exist in fewer than half the prisons. Unfortunately, as was shown by Defendants' audits, relying on class members to self-advocate is not enough. Class members continue to face retaliation for asking for disability-related help. Further, the fact that some class members are seen by health care staff multiple times over the course of a year will not resolve problems for some class members who are not seen or whose issues do not get addressed when they meet with busy medical staff about other issues. Also, Defendants found thousands of class members without needed DME despite the fact that some class members are seen regularly by health care staff. A dedicated process for ensuring that staff reconcile DME – even if only for people who are not already seen by health care staff -- is necessary to prevent widespread problems. Defendants and CCHCS do seem to be moving towards a model where class members might be able to obtain some of the most common accommodations without medical staff intervention, similar to how people obtain common assistive devices in the community. Plaintiffs agree with exploring this approach, however, there will still be people who need specialized DME that must be ordered by

medical.  While we appreciate the work of the Field Training Sergeants, the Sergeants' work at the six prisons where they are in place does not render DME reconciliation unnecessary.  That is especially true because Field Training Sergeants do not exist at 22 other CDCR prisons that are without those court-ordered positions.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code. Defendants reported that they have identified 535 new class members by screening for such cases and identifying people who had medical equipment but did not have any accompanying DPP code.  Plaintiffs are encouraged by this effort, but would like more information about how the screening was done, and whether there will be routine screening of this type for missing DPP codes in the future.  We would like Defendants to show us how they do this reconciliation.  Defendants provided some information about this at the September 16, 2022 and November 17, 2022 meet and confers.  Plaintiffs' counsel previously provided comments on Defendants' proposed reconciliation rules on May 23, 2022 and will provide additional feedback on any new information Defendants provide.

Unfortunately, Defendants' disability tracking system also fails to identify and track class members with upper-extremity disabilities.  Plaintiffs requested that Defendants create a new disability code for this population.  *See* ECF No. 3322 at Exs. G and H. CCHCS does have a system to identify upper-extremity disabilities, and, on September 28, 2021, shared a report with Plaintiffs that showed all patients with upper-extremity disabilities and accommodations.  This list contains thousands of names, so it is difficult to understand exactly how it functions as a tool for staff to identify who requires what accommodations.  Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated.  Plaintiffs are committed to resolving this ongoing problem.

### 2.     Defendants' Statement

Collaboration between the parties continues to develop a sustainable DME

accountability process.  But Plaintiffs' statement that CCHCS is "going back on their plan to ensure that class members are seen annually by medical staff for reconciliation and instead planned to encourage class members to self-advocate if they are missing required DME," is a misleading mischaracterization that fails to recognize the frequency class members meet with medical staff members—a median of 12 times per year.  Following several conferences with Plaintiffs and after researching how often class members are seen by their primary clinicians and nursing, it was determined there is ample opportunity for class members to discuss concerns related to missing or broken DME with medical staff.  Additionally, CCHCS is pulling a list of patients who have not seen a healthcare provider in the last year to address the concerns raised by Plaintiffs.

In response to Plaintiffs' request for reconciliation information, CCHCS performs its reconciliation by a two set parameter in which Corrections Services reports identified patients are those without a Disability Placement Program (DPP) code and has an active order for select durable medical equipment.  The DME items reviewed are those assigned as permanent Canes, Crutches, Hearing Aids, Prosthetic Lower Limb, Walkers, Wheelchairs, Hearing/Mobility/Vision Impaired Disability Vests.  Corrections Services continues to work on an automated report and to ensure validation of this report.

Further, at seven institutions (RJD, CIW, LAC, COR, KVSP, SATF and SAC), Field Training Sergeants (FTS) on both second and third watch ask class members about their DME.  Specifically, they ask if the class member is in possession of their DME and if they can retain their DME regardless of their housing location.  Sergeants also ask staff members to determine if they are knowledgeable about the DME process.  Effective September 12, 2022, additional Sergeants were deployed to SVSP, CHCF, CCWF and CMF.  DAI and CCHCS continue to work on educating the population on what to do if they have missing or broken DME.  A one-time annual appointment will not remedy the concerns addressed by Plaintiffs.  For example, the day after an annual appointment the DME may go missing and patients will be expected to independently address via the processes outline above.

1    CCHCS and CDCR agree that individuals with upper-extremity disabilities that

2  limit a major life activity require accommodation under the ADA, but disagree that

3  CCHCS and CDCR must create a new Disability Placement Program (DPP) code.  Inmates

4  who require any accommodation under the ADA shall be accommodated, whether they

5  have a DPP code or not, as recently reiterated in an October 28, 2022 memorandum to the

6  field.  Staff rely on the SOMS, "CHSS035C-DPP/Accommodation Summary" screen to

7  identify inmates who require accommodation under the ADA and for any other physical

8  limitation.  Moreover, the 1845/7410 power form in Electronic Health Record System

9  (EHRS) is linked to SOMS, noting the appropriate accommodation to staff.  The addition

10 of a new DPP code to this system will not provide any enhancements to this process.  In

11 fact, it will deter current efforts into multiple directions and processes, convoluting

12 established procedure.  CDCR and CCHCS continuously revisit the DPP/Accommodation

13 Summary screen in SOMS/Cerner systems to see if improvements can be made to ensure

14 all needed accommodations are included.  CDCR and CCHCS will continue to meet with

15 Plaintiffs and the Court Expert to further discuss individuals with upper-extremity

16 disabilities.

17 **G.    Parole Planning and Working with Class Members Preparing for Release**

18     The parties have been negotiating remedial measures to address alleged

19 discrimination detailed in Plaintiffs' May 4, 2021 letter and supporting class member

20 declarations.  Plaintiffs contend that CDCR fails to ensure that class members are

21 accommodated on parole and during the transition to parole by not consistently providing

22 adequate planning for parole, adequate transitional housing, transportation, benefits

23 application assistance, assistance obtaining identification cards, and other transitional

24 services that are critical for these individuals to succeed on parole.  *See* ECF 2680 at

25 11-12; ECF 2655 at pp. 11-13.  As a result, Plaintiffs contend class members needlessly

26 struggle to comply with parole conditions, to transition to life outside of prison, and are

27

28

denied equal access to parole success.  *See* ECF 3266*, Ex. F.*[6]  Although Defendants deny

class member discrimination and disputed Plaintiffs' allegations, Defendants agreed to

participate in extensive negotiations with Plaintiffs to address their demands for reform

that have resulted in substantive changes detailed below and in previously filed Joint Case

Status Statements.  *See* ECF Nos. 3369, 3391, 3412.

     The parties have agreed in principle to revise the portions of the *Armstrong*

Remedial Plan (ARP) to address parole services and incorporate the new policies required

under the ADA or ARP.  Since July 1, 2022, the parties have been meeting regularly to

negotiate the changes to the 2006 Parole Section of the ARP.

     During the parties' negotiations, Defendants have agreed to some promising policy

changes, for example:

     Parole agents can now provide an audible low battery warning on GPS tracking

devices to accommodate parolees who have difficulty feeling the standard vibrating low

battery warning because of a disability.  Defendants will develop related training for parole

agents and agreed to share the proposed training with Plaintiffs for comment.

     CCHCS will now provide incarcerated people releasing from CDCR with a 60-day

supply of prescription medications, with some minor exceptions, which should ensure

enough medication before they are able to obtain a their California identification cards and

secure Medi-Cal health insurance benefits for future prescriptions.

     Defendants agreed to add requirements (effective July 1, 2022) that Transitional

Case Management Program (TCMP) benefits workers in the prisons submit benefits[7]

applications—including Supplemental Security Income and Social Security Disability

Income for all incarcerated people at 90 days before their expected release date.

Defendants will track the data regarding when TCMP benefits workers submit the

---

[6] Plaintiffs have subsequently shared additional class member declarations with
Defendants that provide further evidence that remedial measures are needed to address
discrimination against parolees with disabilities.

[7] These benefits include those provided by Supplemental Security Income, Social Security
Disability, Veterans Administration, Medi-Cal, and Cal Fresh Food.

applications, whether the applications are approved, rejected, or remain pending at the time

of release, or if the TCMP services were refused by the incarcerated person.  CCHCS

issued a February 3, 2022 memorandum, "Providing Relevant Health Information for

Benefits Applications," that clarifies prison health-care providers' responsibility to provide

accurate and timely medical information to support benefits applications.  Plaintiffs

contend that these changes are necessary to timely and accurately complete benefits

applications for class members to ensure consistent health insurance and other benefits

upon release from prison.[8]

Defendants also agreed to work with Plaintiffs to ensure that CDCR-funded

transitional housing programs no longer have categorical exclusions for people with

disabilities, have educated contractors on the requirements of the ADA and the ARP using

materials approved by Plaintiffs, have agreed to make 1824-B disability grievance forms

available to class members living in CDCR-funded transitional housing programs, and now

include ADA compliance in their annual inspections.  Defendants have also developed a

transportation policy with a goal of ensuring accessible transportation to all parolees

released from prisons.  The new transportation policy was scheduled to go into effect on

November 1, 2022, but is now delayed.

Defendants agree in principle to include in the ARP the requirement that they have

sufficient DPW-wheelchair-accessible beds in transitional housing placements in every

STOP region, with some conditional exceptions.  For example, this not-yet-decided non-

exhaustive list may include people with arson convictions, with certain sex offenses that

---

[8] The California Rehabilitation Oversight Board (C-ROB) September 15, 2022 Annual Report found that 70.4% of the Social Security benefits applications and 77.6% of Veterans Affairs (VA) benefits applications submitted for releasing individuals in Fiscal Year 2021-22 were still pending at the time of release  CDCR stated in the C-ROB Annual Report, the VA and Social Security Administration "have historically taken longer to process applications due to the need to verify applicant medical or mental health disabilities," which is consistent with Plaintiffs' position that incarcerated people with disabilities are more likely to be harmed by the historic delays in submission of benefits applications than people without disabilities.  *See* 2022 Annual C-ROB Report at p. 42 and Table 19, *available at* https://crob.ca.gov/wp-content/uploads/2022/09/2022-C-ROB-Report.pdf.

limit where they can reside, or with extra-wide wheelchairs that cannot fit into some program doors that are otherwise ADA compliant. Defendants will however, make every effort to place these class members in transitional housing as close as possible to their county of parole.

Defendants continue to work on a policy to provide a mechanism for DAPO to replace lost or broken non-customizable DME (*e.g.*, simple wheelchairs and walkers) during a thirty-day transitional period between release and the commencement of health-care coverage. Plaintiffs have reviewed and commented on the draft policy. In addition, Defendants previously represented that they would develop a new statewide policy to ensure that individuals are released with all their prescribed DME and prescription medications, but Plaintiffs were disappointed to learn on September 30, 2022 that Defendants backtracked from this commitment and no longer plan to create such a policy. Plaintiffs believe it is critical for Defendants to develop a simple, responsive process and urge Defendants to reconsider.

Defendants are also revising DAPO's policy on providing financial assistance or other resources to accommodate other immediate needs of parolees with disabilities. Plaintiffs contend that Defendants' draft revision to this policy provides too much discretion and too little guidance to parole agents, prohibits parole agents from ever providing cash assistance for emergency temporary housing, fails to adequately consider disability-related factors, and significantly reduces the amount of short-term financial assistance parolees may receive. Plaintiffs contend that this proposed policy change will disproportionately harm class members because cash assistance for emergency temporary housing is sometimes the only means to provide accessible transitional housing and timely benefits application assistance to class members. CDCR received Plaintiffs' comments to the policy on July 12, 2022, and this policy is currently pending further review with the stakeholders.

Plaintiffs contend certain class members face a greater risk of parole failure because of their disabilities and that they should be prioritized for housing based on certain

disability-related factors.  In response, CCHCS will provide an underlying clinical assessment regarding each parolee's disability and related medical needs that may be utilized by the Parole Service Associate (PSA) in making referrals for transitional housing placements.  The Quality Management (QM) team at CCHCS have enhanced a pre-parole report with additional health-care information related to inmates with upcoming parole dates.  CCHCS shared a draft report with Plaintiffs on June 22, 2022, is in the process of finalizing the report, and will share the report with DAPO and Plaintiffs once completed. Defendants contend the report will provide more complete disability and DME information to DAPO, PSAs, STOP, and DRP to assist in placing class members appropriately. Although Defendants have not agreed to prioritization of class members, Plaintiffs will continue to work with CCHCS, DAPO and DRP to ensure that these parolees that Plaintiffs contend will be disproportionately harmed by the lack of transitional housing because of their disabilities will be prioritized, as Plaintiffs assert they should be, for such placements.  This includes working with DAPO and DRP to develop a policy or directive governing transitional housing placements, and by working with CCHCS on how to provide all the relevant information to the PSAs so that they can be informed of class members' disabilities when making referrals for transitional housing placements.

The 2022-23 State Budget includes $10.6 million in annual funding over the next three years (or $31.8 million total) for the Returning Home Well program, which will reportedly provide post-release housing services for 1,065 at-risk parolees who may be homeless or housing insecure.  Plaintiffs remain concerned that the proposal underestimates the future housing needs of releasing individuals.  Plaintiffs contend that CDCR is responsible for ensuring that parolees with disabilities are not excluded from the benefits of parole, and a limited supply of transitional housing placements necessitates housing-placement decisions to consider if a class member's disability makes them less likely to succeed on parole without housing than others.

The parties continue to discuss Plaintiffs' proposals that parolees' disabilities are considered when determining the consequences for alleged parole violations.  Although

disputes remain, Defendants are committed to continue to work with Plaintiffs and to address their demands for parole-services reform.  Further, training related to the applicable policies and procedures will be provided to address the consideration of a parolee's disability during the parole-violation process.

Finally, Plaintiffs remain concerned about Defendants' failure to timely and adequately log and investigate allegations of employees' violations of the ADA, ARP, or Court Orders in this case.  Defendants are committed to addressing Plaintiffs' concerns and will provide additional training to ensure adequate and timely compliance.

**H.      Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties' plan to test the tool at different types of prisons was disrupted by the COVID-19 pandemic, but in-person tours commenced in 2022 with the March 2022 Valley State Prison tour and have continued at a steady pace throughout this year.

The parties have been meeting regularly to improve individual tool questions and negotiate many outstanding policy issues—such as how to measure and report on whether discrimination is occurring in the assignment of *Armstrong* class members to programs— that must be resolved to effectively audit.  The parties have yet to come to agreement on a format for scoring and reporting compliance.  The parties will convene small work groups starting in January 2023, and submitted informal briefing to the Court Expert in December to address and resolve some of the remaining disputes between the parties.

**I.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

Construction was halted due to the COVID-19 pandemic but resumed statewide in June 2020, and any significant issues impacting construction are noted in the Monthly Construction Report that is provided to Plaintiffs by Defendants' Expert Mike Knowles. The parties agreed to meet regularly to discuss different institutions and be joined by local ADA staff with close knowledge of the institutions.  The parties also have begun to tour institutions together to resolve outstanding issues and address Plaintiffs' concerns.  The

parties addressed *Armstrong* Master Plan (AMP) issues during a tour at LAC on April 29, 2022, and returned to LAC to survey the second half of the prison on November 9, 2022. The parties also toured the California Medical Facility with Plaintiffs' access expert on December 16, 2022.  The April and November LAC tours included Plaintiffs' access expert, who will finalize a report on her findings from inspections done during the tour. Plaintiffs also toured the California Correctional Institution in Tehachapi with their access expert on July 11, 2022 to review some disputed Disability Program Placement Matrix issues, and to consider whether there should be minimum architectural/accessibility standards for showers for DLT and DPM class members.  The parties will meet with their respective experts to discuss minimum standards for accessible showers for these class members.  The parties have also scheduled a tour with experts at VSP for March 2023. Further, Defendants have shared with Plaintiffs the individual AMP Transition Plan (Attachment A), for each institution that memorializes, from Defendants' perspective, all original elements Defendants contend were agreed upon by the parties during settlement discussions, and all change requests since then, for LAC, SVSP, SOL, SQ, HDSP, SAC, COR, CMF, and SATF.  The original versions of these documents (the Transition Plans including Attachment A's providing some information about planned construction) were first shared with Plaintiffs before each initial settlement discussion commencing on September 5, 2013 (SQ and SAC), October 30, 2014 (CMF and SOL), August 8, 2014 (SVSP), September 16, 2014 (COR), October 9, 2014 (SATF), November 14, 2014 (LAC), and November 17, 2014 (HDSP), respectively.  Later, revised versions of these documents were sent to Plaintiffs on March 7, 2017 (LAC); May 17, 2017 (SVSP); July 24, 2017 (SOL); September 26, 2017 (SQ); November 9, 2017 (HDSP); April 11,2018 (SAC); April 17, 2018 (COR); September 25, 2018 (CMF); and May 28, 2019 (SATF) following completion of the settlement discussions for each institution.  Defendants assert that these revised documents incorporated negotiated terms from the settlement discussions. Plaintiffs assert that the parties have never discussed the 2017-2019 documents, which were not produced to Plaintiffs' counsel until years after informal settlement negotiations,

1   and Plaintiffs do not believe the relevant documents contain sufficient information about

2   the specifics of planned ADA construction on which to base any agreement.  Plaintiffs also

3   do not agree that these documents capture the final status of those negotiations and note

4   that these documents do not represent formal agreements.  Indeed, Plaintiffs declined to

5   sign the proposed agreements for these nine prisons when revised documents were sent in

6   2017, 2018 and 2019 because of concerns about the adequacy of the plans.

7          The parties have fully executed agreements for other institutions including CIW,

8   RJD, MCSP, WSP, NKSP, PVSP, KVSP, CCWF, and CIM.  These agreements were

9   signed by Plaintiffs, respectively, on August 18, 2016; December 14, 2016; February 6,

10  2017; August 8, 2017; August 8, 2017; August 8, 2017; February 22, 2108; and

11  February 28, 2018.  Plaintiffs assert that it is important to note that the new infill facilities

12  at RJD and MCSP were never toured by Plaintiffs' expert and are not covered by the

13  signed agreements.  Defendants, however, note that neither were the main facilities at RJD

14  or MCSP toured by Plaintiffs' then-expert, yet Plaintiffs signed off on both of Transition

15  Plans on December 14, 2016 (RJD) and February 16, 2017 (MCSP).  Moreover, the infill

16  facilities were new construction (and not part of the AMP) and were built to existing ADA

17  standards.  Further, the DPW beds at both infill facilities were included in all AMP bed

18  inventories that were passed between the parties since they were both activated.  While

19  they were separate projects from the AMP, the new DPW beds were added to the AMP

20  inventory in the same manner as CHCF.  Plaintiffs believe the CHCF beds also need to be

21  reviewed by the parties since they were not previously part of these agreements, and since

22  Plaintiffs have learned that many newer beds in health care settings were never inspected

23  by Defendants' CASp inspectors for ADA compliance.

24         The parties dispute whether Defendants have a sufficient number of emergency

25  exits that are fully accessible to prisoners with impacting placement mobility and vision

26  disabilities in units where those individuals are housed.  Plaintiffs have reviewed

27  Defendants' emergency evacuation plans and have serious concerns about whether they

28  provide the necessary direction to staff to accommodate class members and to ensure their

1  safe evacuation during an emergency.  *See* ECF No. 3412, Ex. E.  Plaintiffs' accessibility

2  expert expressed concern about the lack of accessible emergency exits in the housing units

3  at LAC, where class members are clustered, during the April 29, 2022 and the November

4  9, 2022 LAC tours.  Plaintiffs await a response to their letter addressing the emergency-

5  exit issues and are hopeful the parties can resolve these disputes.

6  **J.**      **Investigation of County Jails**

7              Plaintiffs continue to assert that a pattern and practice of denying disability accom-

8  modations to class members exists at multiple jails, but especially the Los Angeles County

9  Jails.  *See* ECF No. 2680 at pp. 22-24; ECF No. 2786 at pp. 26-27; ECF No. 3322 at pp.

10  25-29 & Exs. I, J, K.  Defendants disagree with Plaintiffs' assertions and have been

11  meeting with county counsel for several counties to improve relations, information

12  sharing, and ADA compliance at the jails.  Unfortunately, Plaintiffs contend, these

13  conversations alone are not enough, as evidenced by the longstanding failure of Los

14  Angeles County Jail to implement their policy to allow and provide canes to detainees.

15  Los Angeles County has informed CDCR that the "pilot" allowing detainees access to

16  canes within Los Angeles County jails has concluded and a temporary policy allowing

17  access to canes at all facilities has been implemented pending issuance of the final policy.

18  CDCR is informed that Los Angeles County jail records currently show that 54 detainees

19  across seven different facilities have access to canes.  A copy of the final policy will be

20  shared with Plaintiffs' counsel upon issuance.  Plaintiffs continue to seek more information

21  from Defendants.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    Defendants will continue to meet with various county counsel in an effort to ensure

2    compliance with the ADA for *Armstrong* class members housed in county jails.

3

4                                  Respectfully submitted,

5    DATED:  January 17, 2022        ROSEN BIEN GALVAN & GRUNFELD LLP

6                                    By: */s/Penny Godbold*

7                                        Penny Godbold

8                                    Attorneys for Plaintiffs

9

10   DATED:  January 17, 2022        ROB BONTA
                                     Attorney General of the State of California
11

12                                   By: */s/Trace O. Maiorino*

13                                       Trace O. Maiorino
                                         Deputy Attorney General
14

15                                   Attorneys for Defendants

16                          **FILER'S ATTESTATION**

17       As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

18   in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

19   have maintained records to support this concurrence.

20

21   DATED:  January 17, 2022              */s/Penny Godbold*

22                                         Penny Godbold

23

24

25

26

27

28