DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:   (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

Plaintiffs,

v.

GAVIN NEWSOM, et al.,

Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge:   Hon. Claudia Wilken

[4252928.2]

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

    **1.    Plaintiffs' Statement**

        **a.    RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against incarcerated people on the basis of their disabilities who request accommodations and face discrimination, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans"). ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF No. 3393, Exs. A, B.

Following a year of negotiations, the changes to the staff misconduct complaint process were incorporated into new regulations, and the Notice of Change to Regulations, 22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received written notice that Defendants unilaterally decided that changes to the proposed regulations stemming from the negotiations were necessary.  Plaintiffs are increasingly frustrated that, despite multiple attempts to reach agreement over the last six months,

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement.*

1   Defendants have yet to respond to how they will address Plaintiffs' concerns as articulated

2   in Exhibit A to the prior Joint Case Management Statement (ECF No. 3430) and the Court

3   Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

4         Plaintiffs are also concerned that, over Plaintiffs' objection, Defendants are

5   requiring—at prisons not currently covered by court order—a "causal connection" between

6   any alleged harassment, discrimination or retaliation and the protected class.  Plaintiffs

7   objected to Defendants' use of the "causal connection" standard because it is difficult to

8   administer and is reminiscent of Defendants' prior reasonable belief standard, which was

9   eliminated because it was also difficult to administer.  The Court Expert shared some of

10  Plaintiffs' concerns, including that Defendants' proposed screening standards would be

11  difficult to apply consistently and objectively.  ECF No. 3433 at 2-3.  Implementation of

12  differing standards for processing staff misconduct complaints depending on the prison

13  where the complaint arises defies logic and undermines the entire concept of accountability

14  as enshrined in prior orders in this case.  Further, having differing and difficult-to-

15  administer standards for processing staff misconduct complaints will impact the processing

16  of all staff complaints and impede the court-ordered remedies.

17        Defendants have also begun quarterly production of documents in compliance with

18  the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures

19  to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and

20  biased investigations that thwart the discovery of misconduct and, even when misconduct

21  is apparent during the investigation, poor decision-making on the part of Hiring

22  Authorities prevents accountability.  Thus far, Defendants have failed to respond to

23  Plaintiffs' reports with reasoned arguments for why Plaintiffs' criticisms are inaccurate.

24  Plaintiffs are becoming increasingly concerned that it will be impossible to work together

25  to resolve problems if Defendants remain unwilling to acknowledge that problems exist.

26  Plaintiffs issued their most recent report on February 10, 2023.  Defendants' response is

27  due by March 17, 2023.  Plaintiffs are continuing to work with Defendants regarding

28  problems in the production of documents required pursuant to the Court Orders.

1    In November 2021, the Court ordered the Court Expert to investigate the treatment

2 of people with disabilities at SATF, the state's largest prison  ECF No. 3338.  The Court

3 Expert conducted a year-long investigation and issued his report and recommendations on

4 December 20, 2022.  ECF No. 3446.  He found that people with disabilities at SATF are

5 "living diminished and needlessly difficult lives," and as a result "face harsher prison

6 conditions, and thus greater punishment, than their peers." *Id.* at 4.  People were denied

7 accommodations needed to safely and independently perform a wide array of activities,

8 including to eat, perform bodily functions, write, and participate in rehabilitative programs.

9 The Court Expert found that "it was not management that identified these problems; it was

10 Plaintiffs' counsel."  *Id.* at 5.  Plaintiffs agree with the Court Expert that "much at SATF

11 has to change" and that "SATF has not demonstrated that it is able to self-monitor and self-

12 correct in the manner that would justify a lesser level of scrutiny by the Court and other

13 outside monitors.  Self-correction has to be the goal, and our investigation showed it is a

14 long way off."  *Id.* at 5-6.  Secretary Macomber has said that "[a]ddressing staff attitudes

15 toward inmates with disabilities is an overarching issue that must be addressed with all

16 staff at SATF be they custody, medical, or administrative."  ECF No. 3463-1 at 3.

17 Plaintiffs agree.  But the process will not be easy or quick.  Changes in personnel, policy,

18 and training simply are not enough.  On February 24, 2023, the Court ordered additional

19 review and action by the Court Expert.  ECF No. 3467.  Plaintiffs look forward to working

20 with the Court Expert and Defendants to identify and develop durable, meaningful, and

21 complete solutions.

22    The problems identified by the Court Expert are not limited to SATF.  Sufficient

23 ADA staffing, extreme ADA Coordinator turnover, provision of accommodations for deaf

24 class members who do not know sign language, and adequate policies and procedures

25 related to disability accommodations and durable medical equipment, for example, are

26 statewide issues that affect class members wherever they are housed.  It is incumbent on

27 Defendants to address these issues statewide, and to not continue the reactive, piece-meal

28 approach that has typified their response their obligations under the Americans with

Disabilities Act and *Armstrong* for so long.

CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP found thus far at six prisons exist system-wide and are committed to bringing such evidence before the Court until all class members are protected..  Plaintiffs are especially concerned about ongoing reports of staff misconduct from vulnerable class members in light of confirmation that CDCR has identified dozens of potential victims of sexual misconduct by one officer who worked for over a decade at CCWF.  (https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/).  Plaintiffs continue to discuss with Defendants the implementation of their Early Warning System (EWS) to guard against such widespread abuse by one officer.  Plaintiffs were discouraged during the last meeting, on January 26, 2023, to learn that Defendants do not intend to use their system to alert Hiring Authorities regarding patterns of complaints against certain officers, except when complaints result in sustained findings of misconduct (which rarely happens).  Plaintiffs are concerned because the purpose of the system to is to warn Defendants of potential problems and not to simply serve as a repository of problems that have already been confirmed.  By doing so, Defendants continue to miss out on opportunities to correct themselves and to prevent harms before they occur.

### b.      False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, Defendants have failed to address the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

As in the staff complaint context, reviewers discount or ignore the testimony of

incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers fail to discover evidence that staff have issued reports that appear plagiarized or otherwise replicate conduct and charges that are improbably attributed to multiple people at the same time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322 at 11-12 & Ex. E.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs continue to raise outstanding problems.  Defendants are in the process of revising the Chief Disciplinary Officer training to include the requirements for reviewing camera evidence, reviewing cases for bias, and the obligation to report staff misconduct when it is evident in the disciplinary process.  To the extent feasible, Defendants agree to record audio for serious RVR hearings.  According to Defendants, the recordings will be used for internal audits and will be available for review during investigations into allegations of false/discriminatory RVRs.  The recordings will otherwise not be available to incarcerated people.

Defendants have also agreed to implement a headquarters-level audit of RVRs at 10 prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues, identification of discrimination, retaliation, and bias in the RVR process.

Defendants have agreed to evaluate whether to include "red flags" in their EWS to identify when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and instances when an incarcerated person receives an RVR within a certain period of time after having filed a staff complaint.

[4252928.2]
6
Case No. C94 2307 CW
JOINT CASE STATUS STATEMENT

Defendants are still considering problems identified by Plaintiffs' counsel regarding the issuance of counseling-only chronos which provide no due process but can have negative consequences.  Defendants also agreed to discuss with Plaintiffs' counsel the inappropriate use of dismissed and voided RVRs, which are currently relied on in risk assessments conducted during the Board of Parole Hearings process, and the related problem of which CDCR staff have access to view voided and dismissed RVRs that are retained in electronic SOMS files.

Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

**2.       Defendants' Statement**

**a.       RJD and Five Prisons Orders**

In compliance with the Court's September 8, 2020, and March 11, 2021 orders, Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive and effective remedial plans that the parties filed with the Court on March 21, 2022.  (ECF No. 3393.)  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  (ECF No. 3356 at 2.)  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations," of staff-misconduct allegations." (*Id.*, at 15.)  As previously reported to the Court, within months of the Court's orders, Defendants executed significant components of the remedial plans that included increased staffing to specifically address disability-related issues of class members, body-worn-camera (BWC) deployment, fixed camera installation (AVSS), document production, training, and other remedies.  (ECF Nos. 3177, 3183, 3412.)  Moreover, although not required by the Court's orders, Defendants have deployed statewide the processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  Accordingly, further enforcement orders as to other institutions is not necessary.

1    The statewide deployment of the new staff misconduct investigation and staff

2    discipline processes necessitates extensive resources that includes the hiring and training

3    of new staff and the development of technological tools.  Plaintiffs' concerns related to the

4    number of complaints routed through the new staff misconduct process are well taken, but

5    such concerns are not entirely addressed by increasing monetary resources.  Rather, hiring,

6    training, and retaining qualified staff is more challenging in today's environment.

7    Notwithstanding the current circumstances, CDCR is committed to staffing current

8    allocated positions to ensure successful deployment of the new processes.

9    The revisions to the regulations are intended to further ensure success of these

10   processes by efficiently routing all staff misconduct complaints to the most appropriate

11   entity for investigation.  Defendants believe that the process can be improved, in part, by

12   providing additional training to the initial screeners so that these screeners have an

13   improved understanding of what amounts to serious staff misconduct to ensure consistent

14   application of the new process and these revisions seek to achieve that objective.

15   Defendants have collected and shared data to support Defendants' proposed revisions to

16   the regulations.  Defendants will continue to evaluate all information received to monitor

17   compliance with the Court's orders and to provide adequate resources to ensure the

18   successful transition to these new processes.  Notwithstanding Plaintiffs' concerns and

19   objections related to the recent revisions to the staff-misconduct processes, CDCR's staff-

20   misconduct investigations and discipline processes are in compliance with this Court's

21   orders applicable to the six prisons.  CDCR has dramatically overhauled its processes to

22   ensure unbiased and complete investigations statewide for the six prisons and will continue

23   to work to expand it to the remaining institutions voluntarily as they are able to do so.

24   In response to the court-ordered Court Expert's report following his nearly year-

25   long investigation of various issues at Substance Abuse Treatment Facility (SATF), and

26   following the parties briefing, this Court issued its order addressing ADA staffing,

27   sustainable ADA and ARP compliance, safe housing, deaf class-member accommodations,

28   assistive devices for sight-impaired class members, and responses to advocacy letters. *See*

ECF Nos. 3391, 3446. 3453, 3459, 3463.  The Court found that "[i]n light of the steps that Defendants have taken to date in response to the Court Expert's report," it is "appropriate to allow Defendants to continue to devise and implement any policies, procedures, or reforms that are necessary for them to achieve compliance with the ADA and ARP at SATF.  ECF No. 3467.  To further monitor "Defendants' progress in curing the violations of the ADA and ARP that he found in his report of December 20, 2022," this Court has ordered a second report from the Court Expert six months from the February 24, 2023 order and ordered further briefing from the parties.  (*Id.*)  Defendants will continue to coordinate with the Court Expert to facilitate his investigating and reporting duties and to further address the issues raised in his initial report.

CDCR maintains a zero-tolerance policy for all forms of sexual misconduct and thoroughly investigates each allegation.  CDCR's Office of Internal Affairs (OIA) and Central California Women's Facility (CCWF) Investigative Services Unit (ISU) immediately began investigating after discovering information that suggested sexual misconduct was occurring between a staff member and incarcerated women at CCWF and continues to work with the local district attorney's office.[2]  In support of its zero-tolerance policy, CDCR continues to educate volunteers, contractor's, staff, and incarcerated people; comply with the federal Prison Rape Elimination Act (PREA); task each institution's PREA Compliance Manager with specific duties; inform incarcerated people of options and resources to report PREA allegations; inform and educate incarcerated people of their right to be free from such conduct; provide incarcerated people with toll-free, non-monitored, non-recorded telephone access to victim advocates at community rape crisis centers; and other measures.  Additionally, CCWF has more than 650 fixed cameras throughout the institution and deployed body-worn cameras on schedule as part of CDCR's AVSS program.

---

[2] https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/

### b.      Defendants' Response to Demands for RVR Reform

As detailed above by Plaintiffs, Defendants have made significant progress and commitments to address Plaintiffs' allegations that "CDCR has failed to address the endemic use of false and retaliatory Rules Violations Reports."  Defendants have committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer trainings, to implement a headquarters-level audit of RVRs at ten institutions, to audio record serious RVR hearings for internal auditing purposes, revisions to the Department Operations Manual, a memorandum addressing discriminatory RVRs, a new screening process to determine whether a physical disability contributed to the underlying conduct, the development of Early Warning System (EWS) alerts, and other remedial measures.  All three categories identified by Plaintiffs, above, have been completed and incorporated into the EWS (so long as the incarcerated person who receives the RVR within a certain period of time alleges in his grievance that the RVR was received in response to a staff complaint).  Defendants detailed in a past Joint Case Status Statement, that recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No. 3412 at 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes and the new pepper-spray policy, Defendants' commitment to deploy fixed-camera technology at fourteen institutions in addition to the Court-ordered deployment of such technology at six institutions (20 institutions total), and Defendants' commitment to deploy BWC technology at four institutions in addition to the Court-ordered deployment of such technology at six institutions (10 institutions total).  Further, under the new staff misconduct process, allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.

Defendants disagree with Plaintiffs' contention that the counseling-only chronos implicate a liberty interest necessitating due process because, in part, inmates receive a copy of the counseling-only chrono and may contest such chronos in the grievance process.  Notwithstanding the significant progress made, there remains some disagreement

1   between the parties.  Nevertheless, Defendants have agreed to continue discussions with

2   Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the

3   RVR process and CDCR's extensive proposed revisions.

4   **B.      Accommodations for Deaf and Hard-of-Hearing Class Members**

5         **1.      Computer-Assisted Real-Time Transcription and Automated
               Captioning**

6

7               **a.      Plaintiffs' Statement**

8         Defendants have for decades discriminated against deaf and hard-of-hearing class

9   members who do not know sign language by failing to provide computer assisted, real-

10  time captioning (CART).  In response to the Court Expert's year-long investigation of

11  SATF and the Court's order, Defendants finally are taking steps to provide it and have

12  announced an anticipated implementation date of June 2023.

13        Plaintiffs have met several times with Defendants and the Court Expert regarding

14  implementation of CART.  But the most critical issues still remain unresolved, and

15  Defendants continue to say only that they will take Plaintiffs' views into consideration.

16  These issues must be resolved immediately so that implementation can proceed without the

17  need for additional litigation and further delay.

18  •     Defendants have yet to take position on which class members will be able to request

19        and receive CART.  Plaintiffs' counsel has proposed that any deaf or hard-of-

20        hearing class member may request CART for a program, service, or activity by

21        filing an 1824, and CDCR must provide CART unless CDCR can demonstrate that

22        another equally effective means of communication is available, and Defendants

23        should educate all deaf and hard-of-hearing class members on what CART is and

24        how to request it.[3]  Plaintiffs are awaiting a response to their proposal.

25

---

26  [3] Regulations implementing title II of the ADA note that "[t]he type of auxiliary aid or
    service necessary to ensure effective communication will vary in accordance with ... the
27  context in which the communication is taking place," 28 C.F.R. § 35.160(b)(2), and
    require public entities to "give primary consideration to the requests of individuals with
28  disabilities."  *See id.*  In its Technical Assistance Manual for state and local governments
    (footnote continued)

- Defendants have yet to identify which institutions will offer CART services. Plaintiffs have urged Defendants to offer CART services at all institutions and on all yards, to avoid discriminating against deaf and hard-of-hearing class members by restricting their access to certain prisons, which may have certain programs or be closer to loved ones, simply due to their need for a disability accommodation.

- Defendants have stated that they currently intend to provide CART for all due process encounters, programming, and education.  But Defendants have not explained whether and how they will provide captioning services in medical and mental health encounters, including mental health groups.

- Defendants have stated that they intend to provide CART during all "program operational hours," but have not clearly defined what that means.

The parties have yet to begin negotiating how Defendants will remedy the historic denial of access to programs, services and activities to class members who require CART for equal participation.

Defendants also have begun the process of implementing a system for providing automated captioning during certain types of due process events as an immediate stop-gap measure until implementation of CART.  Plaintiffs have raised serious concerns with the scope and implementation of this automated captioning program.  For example, at RJD, staff educated only the segment of the deaf and hard-of-hearing population least likely to request captioning services: deaf sign language users, who already have access to sign language interpreters, and not deaf and hard-of-hearing people who do not know sign language and therefore may need captioning or another accommodation.  In addition, Defendants inexplicably have restricted access to this free service to at most a few dozen

---

regarding this provision, the DOJ explains: "It is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective."  DOJ, ADA Technical Assistance Manual § II-7.1100.  Education is necessary in this instance, in addition to consultation, to ensure that the lack of a request for CART is not due solely to the class member being unfamiliar with the service, as most deaf and hard of hearing class members have said they are.

1   class members and do not allow other deaf and hard-of-hearing people to request it.

2   Plaintiffs are disappointed by Defendants' apparent unwillingness to work collaboratively

3   on policies and training on automated captioning to address well-documented issues and

4   hope that recent discussions between counsel on how to improve the Deaf and Hard-of-

5   Hearing Workgroup will result in better and more timely channels of communication and

6   cooperation.

7                    **b.    Defendants' Statement**

8         Plaintiffs' statement fails to recognize the many areas on which there is agreement

9   and overstates the relatively few areas that remain unresolved or disputed, suggesting there

10  are controversies that should be litigated.  Defendants contend the opposite is true.

11  Defendants remain committed to providing class members equal access to programs,

12  services, and activities in accordance with the ADA and the ARP and will continue to meet

13  with Plaintiffs as part of the parties' ongoing workgroups, to ensure the successful

14  deployment of these services.  With the assistance of the Court Expert, the parties have

15  met, as recently as March 10, 2023, to ensure the successful deployment of CART by the

16  anticipated target of June 2023.  During the most recent meeting, CAMU provided

17  Plaintiffs with information in response to their concerns listed above, including the status

18  of the state-contracting process.  As shared during the meeting with Plaintiffs and the

19  Court Expert, Defendants anticipate providing services to class members during a variety

20  of activities including due-process encounters, various programing activities, and medical

21  or mental-health encounters.  Defendants are committed to providing these services to

22  class members as a reasonable accommodation, but have not yet specifically defined the

23  population of class members who will receive it.  The parties seemingly agree that a strict

24  definition of the population may not be defined at this time, but Defendants are amenable

25  to input from Plaintiffs to ensure class members who need this service are reasonably

26  accommodated.  Defendants anticipate that the services will be available during program

27  operational hours, but have not yet identified the institutions at which the services will be

28  deployed.  Defendants are cognizant of Plaintiffs' concerns that overly restrictive

deployment of CART could result in loss of program opportunities or contact with families.  Defendants agree that access to necessary accommodations should not result in loss of programming or access to family and will consider these issues in their deployment of CART statewide.  As the state-contracting process proceeds, Defendants will provide updates to Plaintiffs and to the Court Expert.

Significant progress has been made toward the provision of the real-time translation to class members who reasonably need it to access services, programs, and activities.  To the extent that there may be a need for resolution about the description of the class-member group requiring such an accommodation, Defendants will continue to address this issues with the Plaintiffs and the Court Expert in future workgroups.  Meanwhile, Defendants have identified class members who may reasonably require such an accommodation and are developing a policy that includes instructing the field that due-process events must include real-time captioning as an accommodation for these class members.  The assigned ADAC, or designee, has contacted each class member to confirm upcoming events that may necessitate such an accommodation to ensure access and coordinate with staff to provide reasonable accommodations.  Based on references made by Plaintiffs in past correspondence and CDCR's own review, the size of this population consists of approximately fifty or less class members who have equal access to a variety of other services or devices that accommodate their needs in different settings and will be incorporated into to any future plan.  Defendants remain receptive to input from Plaintiffs to ensure the successful deployment of these services and will continue to keep them, along with the Court Expert, apprised of the progress towards the common goal of accommodating class members in accordance with the ADA and the ARP.

## 2.    Hearing Aids and Other Issues

### a.    Plaintiffs' Statement

Plaintiffs' counsel remain concerned about the poor quality of the hearing aids available to class members.  The two hearing aid models currently issued to class members are so poor that many class members report they do not bother to wear them at all.  In

July 2022, Plaintiffs provided Defendants with a report by a state-licensed audiologist with over 25 years of clinical experience with the Veterans Health Administration.  The expert found "the quality of the CDCR issued hearing aids to be very poor" and concluded that the hearing aid models CDCR currently provides are "Personal Sound Amplification Products (PSAP) rather than hearing aids by today's standards."  She made a number of recommendations, including regarding provision of digitally programmable hearing aids that have adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression, tele-coil, and for class members with tinnitus (ringing in the ears), tinnitus sound generators. She also recommended that pocket talkers be made available immediately.  More recently, the Court Expert, in his SATF report, found that "hard of hearing people who use hearing aids at SATF consistently reported, in surveys and in interviews, that the hearing aids they received were of poor quality and did not work well." ECF 3446 at 37.

        Defendants have made little progress in addressing these concerns over the last eight months.  Defendants recently identified an expert that CCHCS has contracted with to advise them on hearing aids, pocket talkers, "equivalents" to CART, and other undefined accommodations for deaf and hard-of-hearing individuals.  Plaintiffs, however, have been unable to get sufficient information regarding the background of the expert, the scope of his planned review, and the timeline of his review.  And Plaintiffs' counsel has concerns based on the limited information available: Defendants' expert is an ENT—a doctor who may specialize in surgeries or medications that treat hearing loss, but who typically refers patients to an audiologist for expert knowledge of hearing aids, pocket talkers or other needed accommodations under the ADA.  Further, Defendants' chosen expert appears to specialize in throat conditions, not hearing loss.  Plaintiffs remain committed to working with CDCR and CCHCS to ensure that appropriate hearing aids are provided to class members, but any review by CDCR or CCHCS must be conducted expeditiously and by someone with the requisite expertise.  In the meantime, Defendants must begin issuing pocket talkers as a reasonable accommodation immediately.

1

**b.   Defendants' Statement**

2   CCHCS hired a hearing consultant to look at the current hearing aids, review the

3   reports by Plaintiffs and provide feedback, and assist with the requirements and scope of

4   work for the new contract that will be entered into in the future, for hearing aids, to ensure

5   it adequately addresses the needs of class members.  CCHCS's retained specialist will

6   provide further insight on the hearing aids and pocket-talkers to assist the Defendants in

7   determining the approach to accommodating current and future class members with

8   hearing aids, pocket talkers, and other personal sound amplification devices statewide.

9   ECF No. 3412 at 18.  Plaintiffs' characterizations of the progress made to date fails to

10   appreciate that CCHCS must comply with the state's vetting process that involves legal

11   and procurement components.  CCHCS has, in fact, completed many aspects of this

12   required process and is making progress on this issue.  Defendants will continue to confer

13   with Plaintiffs concerning the proposed pocket-talker memorandum that provides for, in

14   part, a case-by-case analysis of class-member needs.  Notwithstanding these efforts,

15   Defendants continue to accommodate class members in a variety of ways to ensure access.

16   For example, teachers use electronic interactive whiteboards to engage all students in

17   learning and to provide written content to them.  Further, although not yet fully rolled-out,

18   every class member participating in the education programs has, or will receive, a laptop

19   for use both inside and outside of the classroom.  Additionally, these class members have

20   access to TDD/TTY,[4] have access to tablets (or will soon have access), and have video

21   phones, video visiting, and other means of disability accommodation available to them

22   including caption phones.[5]  CDCR has rolled out caption phones at all institutions with

23   CDCR-managed lines and on March 7, 2023, DAI directed all institutions with ViaPath-

24   management lines to obtain caption phones for deployment.  CDCR anticipates that all

25

26   _____
[4] Telecommunications Device for the Deaf/TeleTYpewriter.

27   [5] "Caption phones" are phones that display word-for-word captions of what the other
person is saying during a telephone conversation and are intended for people who are deaf,
28   hard of hearing, or late-deafened.

institutions will have caption phones prior to the end of the year.

**C.      Accommodations for Blind and Low-Vision Class Members**

      **1.      Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covers, among other things, reading and writing accommodations, orientation and mobility training for blind and low-vision class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of the ViaPath tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021, demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  As Plaintiffs explained in the demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials (such as large print, braille, and audio) that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes between the parties regarding the need for reading and writing accommodations for blind and low-vision class members.  Negotiations regarding Plaintiffs' proposed stipulation are ongoing.  Plaintiffs are hopeful that Defendants will promptly develop a plan for remedying these longstanding ADA violations, and that litigation will not be necessary.

The parties continue to meet to resolve accessibility problems for blind and low-vision users of CDCR's new ViaPath tablets.  Key CDCR and BPH forms, form responses, and other documents are not available on the tablets, so at least in its current form, Defendants' tablet program does not solve the accessibility barriers that blind and low-vision class members face regarding access to essential forms.

The parties are also meeting regarding word processing accommodations for blind and low-vision class members.  Without such accommodations, these class members do not have access to programs, services, and activities that require them to produce written documents, because they are unable to write by hand, or are substantially limited in doing so.

## 2.       Defendants' Statement

Defendants continuously work to accommodate the needs of blind and low-vision class members in all areas including their reading and writing needs, have collaborated with Plaintiffs and the Court Expert, and have made significant progress to resolve disputes between the parties to ensure class-member access and mitigate associated litigation risks.  Most recently, these efforts include a proposed stipulation addressing reading and writing accommodations that Defendants received from Plaintiffs.  Defendants are currently engaged in internal discussion concerning the issues raised in Plaintiffs' February 13, 2023 letter accompanying Plaintiffs' additional proposed edits to the draft stipulation, and the survey of DNV-designated prisoners conducted by Plaintiffs' counsel.

As previously reported, Defendants are reviewing different processes by which they can identify, track, and accommodate blind and low-vision class members by including additional fields in the Strategic Offender Management System (SOMS) to identify class-members who require reading and writing accommodations such as large-print, use of a magnifier, braille, or having printed documents read out loud with the use of an assistive technology, and provide a means to track class member needs while in Defendants' custody.  ECF No. 3422 at 16.  Such a process necessitates coordination with CCHCS and Defendants have been collaborating with CCHCS to develop a successful process to identify, track, and accommodate class members.  The proposed new processes for identifying, tracking and accommodating blind and low-vision class members would also be accomplished through the 1824 process or triggered when an inmate is designated as DPV while in custody.  Defendants continue to explore a variety of options to provide large-print and braille versions of written materials including contracting with third-party vendors and improving institution resources.

The Office of Correctional Education is in the process of ordering additional assistive devices, including the Da Vinci Pro and Amigo magnifiers, for education programs at DPV-designated institutions.  Moreover, CDCR intends to deploy a 90-day trial in-cell check-out use of text-to-speech auxiliary aids at CMF to address class members' access to audio formats.  And CDCR is developing a policy to permit electronic handheld magnifiers in housing units at DPV-designated institutions.  Further, Defendants are deploying its tablet program statewide for all inmates as part of a $1 billion dollar contract with ViaPath, a third-party vendor who is contractually obligated to apply all accessibility standards to any documentation posted to or provided on the tablet, so anything created for the tablet must be developed with accessibility in place to serve class members.  ECF No. 3422 at 17.  These tablets include a variety of assistive features including, but not limited to, text enlargement, video calling, and text to speech.  CDCR took input from Plaintiffs and shared their comments with the contractor and continues to work with the contractor to enhance capabilities to include increased recreational options, different formats for imparting information, and more to enable independent use by blind and low-vision class members.  ViaPath is to offer additional accessibility training to the class members at the institutions where tablets have been rolled out including SATF, MCSP, SAC, HDSP, KVSP, ISP, CVSP, VSP, CCWF, CIW, and SOL.  This training will include accessibility training, functionality, settings, use, an opportunity for questions and answers, individual assistance, and other forms of training to ensure class-member accessibility.  The "IT change" referred to by Plaintiffs was an upgrade to improve functionality and program access by consolidating all inmate computers to one network instead of the prior standalone model.  Finally, EIS, collaboratively with DRP, continues to work on a process to permit inmates to save their items to an internet server ("the cloud") for printing at a later time or at another institution.

**D.      Effect of the COVID-19 Pandemic on the *Armstrong* Class**

**1.      Plaintiffs' Statement**

COVID-19 continues to spread throughout California prisons.  To date, 92,619

1   cases of the novel coronavirus have been detected among people incarcerated in California

2   prisons.  A total of 260 people have died after being infected while in prison in California.

3   Of those, approximately half were *Armstrong* class members, even though they make up

4   only about 12% of the total incarcerated population.

5        The pandemic continues to impact the transfer of *Armstrong* class members to ADA

6   accessible placements.  Defendants have unfortunately been unable to find a way to

7   address the backlog of class members housed inaccessibly in prisons not designed to safely

8   accommodate their disabilities, even after COVID-19-related movement restrictions were

9   relaxed in April 2022.  As of March 3, 2023, there are 119 class members housed

10  inaccessibly in placements not designated to accommodate their disabilities in violation of

11  the *Armstrong* Remedial Plan (this does not include an additional approximately 180 class

12  members with impacting placement codes awaiting transfer, as of March 3, 2023, to

13  designated mainline prisons from reception centers.)

14       On August 11, 2022, the parties met with the Court Expert regarding expedited

15  transfers.  Defendants reported that the continuing delays are due to a combination of the

16  lack of available lower bunk, lower tier beds as well as COVID-19 outbreaks at either the

17  sending or receiving prisons.  As Defendants acknowledge, however, their current efforts

18  are not going to be enough to bring the number of inaccessibly housed class members

19  down to anywhere near pre-pandemic levels, due to the ongoing need for CDCR to employ

20  COVID-19-related risk reduction measures.  Plaintiffs are committed to working with

21  Defendants on solutions to prevent the creation of the "new normal".

22       On September 16, 2022, Defendants stated that they are in the process of auditing

23  the amount of set-aside quarantine and isolation space at each prison in response to

24  identifying prisons that had set aside more quarantine and isolation space than is required

25  by the *Plata* Receiver.  Addressing this issue should open up additional accessible beds.

26  Plaintiffs urge Defendants to consider any other ways that more accessible beds can be

27  made available at prisons designated to house class members with disabilities impacting

28  their housing placement.

1    Plaintiffs' counsel are also concerned that the data on expedited transfers may not

2  tell the whole story.  Some class members report that, as a result of pandemic related

3  transfer delays, they are housed in accessible placements, but on higher security level

4  prison yards.  These class members are not counted in data currently produced by

5  Defendants because they are housed in ADA accessible housing placements, just

6  reportedly at higher security levels than they should be because of their disabilities.

7  Plaintiffs have requested to meet with Defendants in order to gather more information

8  about whether class members are being overridden to housing placements that are not

9  consistent with their security level and, if so, the scope of this issue.

10    **2.    Defendants' Statement**

11    Defendants continue to make significant and comprehensive efforts to contain and

12  minimize the effects of an unparalleled, global pandemic on the people housed in its

13  institutions, staff, and visitors by continuing with a robust vaccination process, maintaining

14  a stringent testing process, enforcing appropriate mitigation measures, working with

15  Plaintiffs to address individual concerns, and many other proactive efforts to address an

16  unprecedented, challenging, and ever-changing landscape.  Defendants' efforts to provide

17  safe and accessible housing to incarcerated people, to provide detailed tracking

18  information to the public,[6] to provide detailed daily or weekly reports to Plaintiffs, and to

19  control the mortality rate (which peaked in January 2021) during this global pandemic

20  have been memorialized in previous Joint Case Status Statements.  ECF Nos. 3369, 3391,

21  3412, 3452.

22    Defendants continue to prioritize the reduction of the number of non-reception-

23  center class members on the expedited transfer list, notwithstanding unavoidable obstacles

24  to do so that have arisen as a result of the global pandemic, as detailed in previously filed

25  Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452.  As of March 10, 2023,

26  there are 120 non-reception center class members on this list, but 28 of these class

27  ─────────────────

28  [6] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ for updated
information.

members are ineligible for transfer at this time due to several factors, including placement in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  The updated COVID-19 Screening and Testing Matrix for Patient Movement relaxes many of the movement restrictions and should further facilitate the reduction of class members on the expedited transfer list.  An audit of institutions' isolation-quarantine space to return space no longer required for isolation-quarantine to regular housing is also ongoing and will help address the limited number of lower bunk, lower tier beds.  These efforts should also address Plaintiffs' concern that class members may be temporarily assigned higher-classification housing.  CDCR continues to monitor and report requirements for all class members housed in non-designated spaces and provide timely documentation to Plaintiffs and the Court Expert.  Defendants will continue to meet with Plaintiffs to share additional information and garner their input to resolve this issue.

**E.      Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.  Defendants produce comprehensive program access data every month and the parties are attempting to develop a standard for analyzing program access disparities.  Plaintiffs believe that the data continues to show troubling disparities in assignments for people with disabilities, particularly in the areas of high value Prison Industries Authority jobs, and in assignments with higher pay.  *See* ECF No. 3369, Ex. H (November 12, 2021, Letter from Tom Nolan to Katie Riley and Dawn Lorey).  Defendants, however, disagree with Plaintiffs' assessment but have agreed to continue to participate in future discussions.  The parties met on March 13, 2023, to prepare for their visit to Mule Creek State Prison on March 29, 2023 to interview staff members.

1
2

**F.**     **Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

3

     **1.**     **Plaintiffs' Statement**

4          Following Defendants' statewide durable medical equipment ("DME") reconcilia-

5  tion in early January 2019 that revealed 7,346 class members were missing one or more

6  items of DME and that 2,349 class members' DME records had errors, CCHCS imple-

7  mented the DME Discrepancy Report Tool in January 2020.  Defendants had agreed to a

8  process to ensure reconciliation of what records indicate a class member should have and

9  what they actually have.  Unfortunately, during the most recent All Parties Meet and

10  Confers, Defendants reported that they were going back on their plan to ensure that class

11  members are seen annually by medical staff for reconciliation and instead planned to

12  encourage class members to self-advocate if they are missing required DME.  Defendants

13  also plan to have the Field Training Sergeants audit this issue, but those positions exist in

14  fewer than half the prisons.  Unfortunately, as was shown by Defendants' audits, relying

15  on class members to self-advocate is not enough.  Class members continue to face

16  retaliation for asking for disability-related help.  Further, the fact that some class members

17  are seen by health care staff multiple times over the course of a year will not resolve

18  problems for some class members who are not seen or whose issues do not get addressed

19  when they meet with busy medical staff about other issues.  Also, Defendants found

20  thousands of class members without needed DME despite the fact that some class

21  members are seen regularly by health care staff.  A dedicated process for ensuring that

22  staff reconcile DME—even if only for people who are not already seen by health care

23  staff—is necessary to prevent widespread problems.  *See* January 17, 2023. letter from

24  Hannah Chartoff attached hereto as **Exhibit A**.  While Plaintiffs appreciate the shift

25  towards a model where class members might be able to obtain some of the most common

26  accommodations without medical staff intervention and appreciate the work of the Field

27  Training Sergeants, the Sergeants' work at the six prisons does not render the need for

28  DME reconciliation unnecessary.  That is especially true because Field Training Sergeants

do not exist at 22 other CDCR prisons that are without those court-ordered positions.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code. Defendants reported that they have identified 535 new class members by screening for such cases. Plaintiffs are encouraged by this effort, but would like to be shown how the screening is done and learn more about whether such screening will occur regularly and, if so, by whom. Defendants provided some information about this at the September 16, 2022 and November 17, 2022 meet and confers. Plaintiffs' counsel previously provided comments on Defendants' proposed reconciliation rules on May 23, 2022 and will provide additional feedback after Defendants demonstrate their method of screening for this in person.

Unfortunately, Defendants' disability tracking system also fails to identify and track class members with upper-extremity disabilities. Plaintiffs requested that Defendants create a new disability code for this population. *See* ECF No. 3322 at Exs. G and H. CCHCS does have a system to identify upper-extremity disabilities, and, on September 28, 2021, shared a report with Plaintiffs that showed all patients with upper-extremity disabilities and accommodations. This list contains thousands of names, so it is difficult to understand exactly how it functions as a tool for staff to identify who requires what accommodations. Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated. Plaintiffs are committed to resolving this ongoing problem.

Most recently, Plaintiffs' counsel have raised the problem that without a DPP code to identify these class members, Defendants will likely fail to produce staff misconduct complaints filed by such class members pursuant to the court-ordered remedial plans. This additional problem adds to a growing list of reasons why Defendants must take steps to identify these class members using the same process that other class members are identified—through assignment of a DPP code—in order to ensure compliance with the

1  ADA, ARP and court orders.

2  **2.      Defendants' Statement**

3  Collaboration between the parties continues to develop a sustainable DME

4  accountability process.  But Plaintiffs' statement that CCHCS is "going back on their plan

5  to ensure that class members are seen annually by medical staff for reconciliation and

6  instead planned to encourage class members to self-advocate if they are missing required

7  DME," is a misleading mischaracterization that fails to recognize the frequency class

8  members meet with medical staff members—a median of 12 times per year.  Following

9  several conferences with Plaintiffs and after researching how often class members are seen

10  by their primary clinicians and nursing, it was determined there is ample opportunity for

11  class members to discuss concerns related to missing or broken DME with medical staff.

12  Additionally, CCHCS ran a report of patients who have not seen a healthcare provider in

13  the last year to address the concerns raised by Plaintiffs and the list consisted of 26

14  patients.

15  In response to Plaintiffs' request for reconciliation information, CCHCS performs

16  its reconciliation by a two-set parameter in which Corrections Services reports identified

17  patients are those without a Disability Placement Program (DPP) code and has an active

18  order for select durable medical equipment.  The DME items reviewed are those assigned

19  as permanent:  Canes, Hearing Aids, Walkers, Wheelchairs, Hearing/Vision Vests.

20  CCHCSs continues to work on an automated report and to ensure validation of this report.

21  Further, at seven institutions (RJD, CIW, LAC, COR, KVSP, SATF and SAC),

22  Field Training Sergeants (FTS) on both second and third watch ask class members about

23  their DME.  Specifically, they ask if the class member is in possession of their DME and if

24  they can retain their DME regardless of their housing location.  Sergeants also ask staff

25  members to determine if they are knowledgeable about the DME process.  DAI and

26  CCHCS continue to work on educating the population on what to do if they have missing

27  or broken DME.  A one-time annual reconciliation will not remedy the concerns addressed

28  by Plaintiffs.  For example, the day after an annual reconciliation the DME may go

missing and patients will be expected to independently address via the processes outline above.

CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity, require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code.  Inmates who require any accommodation under the ADA shall be accommodated, whether they have a DPP code or not, as recently reiterated in an October 28, 2022 memorandum to the field.  Staff rely on the SOMS, "CHSS035C-DPP/Accommodation Summary" screen to identify inmates who require accommodation under the ADA and for any other physical limitation.  Moreover, the 1845/7410 power form in Electronic Health Record System (EHRS) is linked to SOMS, noting the appropriate accommodation to staff.  The addition of a new DPP code to this system will not provide any enhancements to this process.  In fact, it will deter current efforts into multiple directions and processes, convoluting established procedure.  CDCR and CCHCS continuously revisit the DPP/Accommodation Summary screen in SOMS/Cerner systems to see if improvements can be made to ensure all needed accommodations are included.  CDCR and CCHCS will continue to meet with Plaintiffs and the Court Expert to further discuss individuals with upper-extremity disabilities.

**G.      Parole Planning and Working with Class Members Preparing for Release**

The parties have been negotiating remedial measures in response to Plaintiffs' May 4, 2021 letter, and supporting class member declarations, alleging that class members are not consistently provided adequate planning for parole, adequate transitional housing, transportation, benefits application assistance, assistance obtaining identification cards, and other transitional services that are critical for these individuals to succeed on parole.  ECF 2680 at 11-12; ECF 2655 at 11-13.  As a result, Plaintiffs contend class members are denied equal access to parole success.  *See* ECF 3266, Ex. F.[7]  Although Defendants deny

---

[7] Plaintiffs have subsequently shared additional class member declarations with (footnote continued)

class member discrimination and dispute Plaintiffs' allegations, the parties have engaged in extensive negotiations that have resulted in substantive changes detailed below and in previously filed Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412.

The parties have agreed in principle to revise the 2006 Parole Section of the *Armstrong* Remedial Plan (ARP) to incorporate the new policies required under the ADA or ARP addressing parole services and continue to negotiate these changes.  During the parties' negotiations, Defendants have agreed to some promising policy changes, for example:

Parole agents can now provide an audible low battery warning on GPS tracking devices to accommodate parolees who have disability-related difficulty feeling the standard vibrating low battery warning.  Defendants have developed and shared with Plaintiffs for comment related training for parole agents.

CCHCS will now provide incarcerated people releasing from CDCR with a 60-day supply of prescription medications, with some minor exceptions, which should ensure enough medication before they are able to obtain a their California identification cards and secure Medi-Cal health insurance benefits for future prescriptions.

Defendants agreed to add requirements (effective July 1, 2022) that Transitional Case Management Program (TCMP) benefits workers in the prisons submit benefits[8] applications for all incarcerated people at 90 days before their expected release date. Defendants will track the data regarding when TCMP benefits workers submit the applications, whether the applications are approved, rejected, or remain pending at the time of release, or if the TCMP services were refused by the incarcerated person.  CCHCS's February 3, 2022 memorandum, "Providing Relevant Health Information for Benefits Applications," clarifies prison health-care providers' responsibility to provide accurate and

---

Defendants that provide further evidence that remedial measures are needed to address discrimination against parolees with disabilities.

[8] These benefits include those provided by Supplemental Security Income, Social Security Disability, Veterans Administration, Medi-Cal, and Cal Fresh Food.

timely medical information to support benefits applications.  Plaintiffs contend that these changes are necessary to complete class members' benefits applications to ensure consistent health insurance and other benefits upon release.[9]

Defendants agreed to work with Plaintiffs to ensure that CDCR-funded transitional housing programs no longer have categorical exclusions for people with disabilities, have educated contractors on the requirements of the ADA and the ARP using materials approved by Plaintiffs, have agreed to make 1824-B disability grievance forms available to class members living in CDCR-funded transitional housing programs, and now include ADA compliance in their annual inspections.  Defendants have also developed a transportation policy with a goal of ensuring accessible transportation to all parolees released from prisons.  The new transportation policy was scheduled to go into effect on November 1, 2022, but is now delayed.

Defendants agree in principle to include in the ARP the requirement that they have sufficient DPW-wheelchair-accessible beds in transitional housing placements in every STOP region, with some conditional exceptions.  For example, this not-yet-decided non-exhaustive list may include people with arson convictions, with certain sex offenses that limit where they can reside, or with extra-wide wheelchairs that cannot fit into some program doors that are otherwise ADA compliant.  Defendants will, however, make every effort to place these class members in transitional housing as close as possible to their county of parole.

On March 8, 2023, Defendants issued to the field, Directive No. 23-01 Mobility-Related Durable Medical Equipment Program, a policy that provides a mechanism for DAPO to replace lost or broken non-customizable DME (e.g., simple wheelchairs and

---

[9] The California Rehabilitation Oversight Board (C-ROB) September 15, 2022 Annual Report found that 70.4% of the Social Security benefits applications and 77.6% of Veterans Affairs (VA) benefits applications submitted for releasing individuals in Fiscal Year 2021-22 were still pending at the time of release CDCR stated in the C-ROB Annual Report, the VA and Social Security Administration "have historically taken longer to process applications due to the need to verify applicant medical or mental health disabilities."  *See* 2022 Annual C-ROB Report at p. 42 and Table 19, *available at* https://crob.ca.gov/wp-content/uploads/2022/09/2022-C-ROB-Report.pdf.

walkers) during a thirty-day transitional period between release and the commencement of health-care coverage.  Plaintiffs reviewed and commented on the policy before it was finalized.  Defendants previously represented that they would develop a statewide policy to ensure that individuals are released with all their prescribed DME and prescription medications, but on September 30, 2022, Defendants backtracked from this commitment and stated that they no longer planned to create such a policy.  On March 3, 2023, Defendants informed Plaintiffs that CCHCS has agreed to review and update the DME policy (3.6.1) which includes language to ensure all individuals are released with their prescribed DME and prescription medications.  Plaintiffs look forward to reviewing and commenting on these updates, and are hopeful that they will ensure that there will be a statewide process in place to prevent individuals from being released from CDCR without their DME and medications.

Defendants are also revising DAPO's policy on providing casework service funds (i.e., cash assistance) or other resources to accommodate other immediate needs of parolees with disabilities.  Plaintiffs contend that Defendants' draft revision to this policy provides too much discretion and too little guidance to parole agents, prohibits parole agents from ever providing cash assistance for emergency temporary housing, fails to adequately consider disability-related factors, and significantly reduces the amount of short-term financial assistance parolees may receive.  Plaintiffs contend that this proposed policy change will disproportionately harm class members because cash assistance for emergency temporary housing is sometimes the only means to provide accessible transitional housing and timely benefits application assistance to class members.  Defendants received Plaintiffs' comments to the policy on July 12, 2022, and met with Plaintiffs about this policy on January 17, 2023.  Plaintiffs urge Defendants to revise the policy, and specifically remove the exclusion for funding temporary emergency housing.

Plaintiffs contend certain class members face a greater risk of parole failure because of their disabilities and that they should be prioritized for housing based on certain disability-related factors.  In response, CCHCS will provide an underlying clinical

assessment regarding each parolee's disability and related medical needs that may be utilized by the Parole Service Associate (PSA) in making referrals for transitional housing placements.  The Quality Management (QM) team at CCHCS have enhanced a pre-parole report with additional health-care information related to inmates with upcoming parole dates.  CCHCS shared the final report with Plaintiffs on March 3, 2023.  Defendants contend the report provides more complete disability and DME information to DAPO, PSAs, STOP, and DRP to assist in placing class members appropriately.  Although Defendants have not agreed to prioritization of class members, Plaintiffs will continue to work with CCHCS, DAPO and DRP to ensure that these parolees will be prioritized for such placements.  This includes working with DAPO and DRP to develop a policy or directive governing transitional housing placements, and by working with CCHCS on how to provide all the relevant information to the PSAs so that they can be informed of class members' disabilities when making referrals for transitional housing placements.

The 2022-23 State Budget includes $10.6 million in annual funding over the next three years (or $31.8 million total) for the Returning Home Well program, which will reportedly provide post-release housing services for 1,065 at-risk parolees who may be homeless or housing insecure.  Plaintiffs remain concerned that the proposal underestimates the future housing needs of releasing individuals.  Plaintiffs contend that CDCR is responsible for ensuring that parolees with disabilities are not excluded from the benefits of parole, and a limited supply of transitional housing placements necessitates housing-placement decisions to consider if a class member's disability makes them less likely to succeed on parole without housing than others.

The parties continue to discuss Plaintiffs' proposals that parolees' disabilities are considered when determining the consequences for alleged parole violations.  Although disputes remain, Defendants are committed to continue to work with Plaintiffs and to address their demands for parole-services reform.  Training related to the applicable policies and procedures will be provided to address the consideration of a parolee's disability during the parole-violation process.

1    Finally, Plaintiffs remain concerned about Defendants' failure to timely and

2   adequately log and investigate allegations of employees' violations of the ADA, ARP, or

3   Court Orders in this case.  Defendants are committed to addressing Plaintiffs' concerns and

4   provided additional training to DAPO staff to ensure adequate and timely compliance.

5   **H.     Joint Monitoring Tool**

6    The parties remain committed to developing a strong and effective joint monitoring

7   tool.  The parties' plan to test the tool at different types of prisons was disrupted by the

8   COVID-19 pandemic, but in-person tours commenced with the March 2022 Valley State

9   Prison tour and have continued at a steady pace thereafter.

10    The parties have been meeting regularly to improve individual tool questions and

11   negotiate many outstanding policy issues—such as how to measure and report on whether

12   discrimination is occurring in the assignment of *Armstrong* class members to programs—

13   that must be resolved to effectively audit.  The parties have yet to come to agreement on a

14   format for scoring and reporting compliance.  The parties convened small work groups in

15   January 2023, and have submitted informal briefing to the Court Expert and met to discuss

16   and resolve some of the remaining disputes between the parties.

17   **I.     ADA Structural Barriers, Emergency Evacuation Procedures, and Master
         Planning Process**

18

19    Construction was halted due to the COVID-19 pandemic but resumed statewide in

20   June 2020, and any significant issues impacting construction are noted in the Monthly

21   Construction Report that is provided to Plaintiffs by Defendants' Expert Mike Knowles.

22   The parties agreed to meet regularly to discuss different institutions and be joined by local

23   ADA staff with close knowledge of the institutions.  The parties continue to tour

24   institutions together to resolve outstanding issues and address Plaintiffs' concerns.  The

25   parties addressed *Armstrong* Master Plan (AMP) issues during a tour at LAC on April 29,

26   2022, and returned to LAC to survey the second half of the prison on November 9, 2022.

27   The parties also toured the California Medical Facility with Plaintiffs' access expert on

28   December 16, 2022.  The April and November LAC tours included Plaintiffs' access

expert, who received the photos from the November tour in January 2023 and will soon finalize a report on her findings from inspections done during the tour.  Plaintiffs also toured the California Correctional Institution in Tehachapi with their access expert on July 11, 2022.  The parties met on January 18, 2023 with their respective experts to discuss placement issues and also minimum standards for accessible showers for DLT and DPM class members.  Plaintiffs' expert has prepared some guidelines for shower improvements that Plaintiffs will be sharing shortly.  The parties also scheduled a tour with experts at VSP for early May 2023.  Further, Defendants have shared with Plaintiffs the individual AMP Transition Plan (Attachment A), for each institution that memorializes, from Defendants' perspective, all original elements Defendants contend were agreed upon by the parties during settlement discussions, and all change requests since then, for LAC, SVSP, SOL, SQ, HDSP, SAC, COR, CMF, and SATF.  The original versions of these documents (the Transition Plans including Attachment A's providing some information about planned construction) were first shared with Plaintiffs before each initial settlement discussion commencing on September 5, 2013 (SQ and SAC), October 30, 2014 (CMF and SOL), August 8, 2014 (SVSP), September 16, 2014 (COR), October 9, 2014 (SATF), November 14, 2014 (LAC), and November 17, 2014 (HDSP), respectively.  Later, revised versions of these documents were sent to Plaintiffs on March 7, 2017 (LAC); May 17, 2017 (SVSP); July 24, 2017 (SOL); September 26, 2017 (SQ); November 9, 2017 (HDSP); April 11,2018 (SAC); April 17, 2018 (COR); September 25, 2018 (CMF); and May 28, 2019 (SATF) following the settlement discussions for each institution.  Defendants assert that these revised documents incorporated negotiated terms from the settlement discussions.  Plaintiffs assert that the parties have never discussed the 2017-2019 documents, which were not produced to Plaintiffs' counsel until years after informal settlement negotiations, and Plaintiffs do not believe the relevant documents contain sufficient information about the specifics of planned ADA construction on which to base any agreement.  Plaintiffs also do not agree that these documents capture the final status of those negotiations and note that these documents do not represent formal agreements.

Indeed, Plaintiffs declined to sign the proposed agreements for these nine prisons when revised documents were sent in 2017, 2018 and 2019 because of concerns about the adequacy of the plans.  Defendants are mystified by Plaintiffs' recent objections and mischaracterization of these settlement discussions as "informal" both here and during recent workgroups.  Defendants contend that the settlement discussions were identical for these unsigned agreements as they were for the nine signed Transition Plans that are fully executed (identified below) and all stakeholders were present for these settlement negotiations including Plaintiffs, the Court Expert, DAI, CCHCS, CDCR Facilities Management, and Defense counsel.  To the extent that Plaintiffs are attempting to change things mid-stream because of a newly retained expert and undo past work completed by the parties, Defendants will seek the assistance of the Court Expert to resolve this unnecessary attempt to undo past work completed by the parties.  Plaintiffs are not trying to undo past work completed by the parties but rather are seeking to make sure Defendants bring their facilities into compliance with ADA accessibility mandates as soon as possible.

The parties have fully executed agreements for nine other institutions including CIW, RJD, MCSP, WSP, NKSP, PVSP, KVSP, CCWF, and CIM.  These agreements were signed by Plaintiffs, respectively, on August 18, 2016; December 14, 2016; February 6, 2017; August 8, 2017; August 8, 2017; August 8, 2017; February 22, 2018; and February 28, 2018.  Plaintiffs assert that it is important to note that the new infill facilities at RJD and MCSP were never toured by Plaintiffs' expert and are not covered by the signed agreements.  Defendants, however, note that the infill facilities were new construction (and not part of the AMP) and were built to existing ADA standards.  Further, the DPW beds at both infill facilities were included in all AMP bed inventories that were passed between the parties since they were both activated.  While they were separate projects from the AMP, the new DPW beds were added to the AMP inventory in the same manner as CHCF.  Plaintiffs believe the CHCF beds also need to be reviewed by the parties since they were not previously part of these agreements, and since Plaintiffs have learned that many newer beds in health care settings were never inspected by Defendants'

1  CASp inspectors for ADA compliance.

2  　　The parties dispute whether Defendants have a sufficient number of emergency

3  exits that are fully accessible to prisoners with impacting placement mobility and vision

4  disabilities in units where those individuals are housed.  Plaintiffs have reviewed

5  Defendants' emergency evacuation plans and have serious concerns about whether they

6  provide the necessary direction to staff to accommodate class members and to ensure their

7  safe evacuation during an emergency.  *See* ECF No. 3412, Ex. E.  Plaintiffs' accessibility

8  expert expressed concern about the lack of accessible emergency exits in the housing units

9  at LAC, where class members are clustered, during the April 29, 2022 and the

10  November 9, 2022 LAC tours.  Plaintiffs await a response to their letter addressing the

11  emergency-exit issues and are hopeful the parties can resolve these disputes.

12

13  　　　　　　　　　　　Respectfully submitted,

14  DATED:  March 15, 2023　　　ROSEN BIEN GALVAN & GRUNFELD LLP

15  　　　　　　　　　　　By:  */s/ Penny Godbold*

16  　　　　　　　　　　　　　Penny Godbold

17  　　　　　　　　　　　Attorneys for Plaintiffs

18

19  DATED:  March 15, 2023　　　ROB BONTA
　　　　　　　　　　　　　　Attorney General of the State of California
20

21

22  　　　　　　　　　　　By:  */s/ Trace O. Maiorino*
　　　　　　　　　　　　　Trace O. Maiorino
23  　　　　　　　　　　　　　Deputy Attorney General

24  　　　　　　　　　　　Attorneys for Defendants

25

26  / / /

27  / / /

28  / / /

**FILER'S ATTESTATION**

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.

DATED:  March 15, 2023                  _/s/ Penny Godbold_
                                                         Penny Godbold

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Hannah M. Chartoff
Email: HChartoff@rbgg.com

January 17, 2023

VIA ELECTRONIC MAIL ONLY

<table>
<tr><td>PRIVILEGED AND<br>CONFIDENTIAL</td></tr>
<tr><td>SUBJECT TO<br>PROTECTIVE ORDERS</td></tr>
</table>

Tamiya Davis
CDCR Office of Legal Affairs
Tamiya.Davis@cdcr.gov

> Re:    *Armstrong v. Newsom*:  Durable Medical Equipment Reconciliation Process
>        Our File No. 0581-03

Dear Tamiya:

I write regarding Defendants' ongoing failure to implement a reconciliation process for Durable Medical Equipment ("DME"), as well as Defendants' recent backsliding on their commitment to do so.

The *Armstrong* Remedial Plan instructs that "[n]o [incarcerated person] shall be deprived of a health care appliance that was in [his or her] possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a Department physician or dentist determines that the appliance is no longer medically necessary or appropriate."  ARP § IV.F.3.

Despite Defendants' clear obligation to provide and maintain class members' DME, Plaintiffs' counsel have consistently and repeatedly—over the course of several years—noted that class members lacked the DME assigned to them on paper.  *See* Dkt. 2773 (Sept. 17, 2018 Joint Case Status Statement) at 13 (noting that Plaintiffs have been reporting on this issue "for years").  Defendants' own investigation confirmed the scope of the problem in January 2019, when a statewide audit identified 7,346 class members who were missing at least one item of DME.  Dkt. 3322 (Sept. 15, 2021 Joint Case Status Statement) at 24.  That investigation also identified 2,349 class members whose DME records had errors.  *Id.*  Those recordkeeping errors are harmful to class members because, if a DME is not on SOMS, it may be taken away by staff as unauthorized and

[4211898.1]

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
January 17, 2023
Page 2

will not be flagged as something the individual needs, for example, if they are taken to ASU.

In September 2021, Defendants committed to creating and implementing "a sustainable system and process to determine the physical verification and condition of prescribed DME annually." *Id.*; *see also* Dkt. 3391 (Mar. 15, 2022 Joint Case Status Statement) at 27 ("CCHCS is in the process of developing a comprehensive DME accountability and reconciliation process"). As of March 2022, Plaintiffs understood that Defendants' proposed reconciliation process would include confirmation of DME "during health-care encounters," in which staff would "be required to check a box confirming DME was checked." *Id.* at 25-26. The proposed process would also electronically "flag[]" "[a]nyone who has not had a medical counter in the last nine months," to ensure that such a reconciliation would be completed annually. *Id.*

But since then, Defendants have backtracked. In a meeting with Plaintiffs on September 2, 2022, Defendants claimed they had "determined there is ample opportunity for class members to discuss concerns related to missing DME or broken DME" at existing appointments with "primary clinicians and/or nursing" or, at a subset of institutions, during rounds conducted by Field Training Sergeants. Dkt. 3430 (Sept. 15, 2022 Joint Case Status Statement) at 19-20. In other words, rather than having staff assume responsibility for conducting regular DME reconciliation check-ins with class members or even documenting that such check-ins occur, Defendants now suggest only that they will "work on educating the population on what to do if they have missing or broken DME." *Id.* at 20.

Defendants' recent proposal, which places the burden on class members to self-advocate for replacement of their DME, is not a solution to this problem. For one thing, relying on class members' self-advocacy is the status quo. Simply referring to existing health care appointments with no other accountability mechanism is the exact solution proposed by Defendants in 2018. *See* Dkt. 2773 (Sept. 17, 2018 Joint Case Status Statement) at 14 ("Defendants … believe that the issue may resolve itself as people see their providers in the normal course, during their next scheduled health care encounter."). That proposal did not solve the problem, as evidenced both by Defendants' January 2019 audit and Plaintiffs' counsel's ongoing reporting. Also, because class members are not routinely given a list of their DME as tracked on SOMS and in medical records, they may not know when a DME they possess and require for daily living is missing from CDCR's tracking system. Finally, relying exclusively on class members' self-advocacy creates the risk that some individuals, who fear retaliation from staff for requesting accommodations, may never receive the DME that they have been prescribed. *See* Dkt. 3217 (Mar. 11, 2021 Order) at 63 ("[T]he Court has found that staff members have

[4211898.1]

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
January 17, 2023
Page 3

interfered with certain disabled inmates' enjoyment of their rights under the ADA and ARP … by intimidating, threatening, or coercing them into abstaining from making requests for reasonable accommodations or filing ADA grievances.").

Plaintiffs believe that Defendants could implement a program of DME reconciliation that would neither unduly burden staff nor leave the burden on individual class members to hold the institution accountable.  In particular, Defendants are wrong that Plaintiffs seek "[a] one-time annual appointment" that is independent of other health care encounters or custody staff activities to complete a DME reconciliation.  *See* Dkt. 3430 at 20.  **Plaintiffs request only that there be mechanisms for:  (1) staff documentation (completed by either health care or custody) in each class member's records reflecting whether a DME reconciliation has occurred and on what date; and (2) prompting staff to complete a DME reconciliation for every class member for whom the process has not occurred within the last year.**  Those reconciliations need not occur in any separate appointment.  For example, if, as Defendants have suggested, Field Training Sergeants at certain institutions are already instructed to confirm with class members that they have all the DME listed in SOMS, Plaintiffs request that those conversations be documented and that staff be alerted if no such conversation with any individual class member has occurred in the last year.

Relatedly, as recently as the November 17, 2022 meet and confer, Defendants had proposed limiting the reconciliation process to certain types of DME (*e.g.*, walkers, canes, and hearing aids) and excluding class members who use only so-called "minor" DME (*e.g.*, insoles).  However, on review of SOMS, Plaintiffs do not believe that such a limitation by type of DME will have a meaningful impact on the scope of Defendants' DME reconciliation process, because the vast majority of class members are prescribed "minor" DME *in addition to* other DME such as walkers, canes, or hearing aids.  For example, of the 383 people listed in SOMS at RJD, just 1 person is prescribed only insoles ("ankle/foot orthoses"); just 3 people are prescribed only compression stockings; and just 2 people are prescribed only therapeutic shoes.  Only a further 11 people at RJD were prescribed some combination of insoles ("foot orthoses"), compression stockings, therapeutic shoes, and eyeglasses.  Defendants' narrowing proposal would therefore reduce the required number of annual reconciliations at RJD from 383 to 367.  Similarly, at SOL, of the 482 people listed in SOMS, just 1 person is prescribed only insoles; just 1 person is prescribed only compression stockings; and just 1 person is prescribed only therapeutic shoes.  Only a further 10 people at SOL were prescribed some combination of insoles ("foot orthoses" or "ankle/knee orthoses"), compression stockings, therapeutic shoes, and eyeglasses.  Defendants' narrowing proposal would therefore reduce the required number of annual reconciliations at SOL from 482 to 469.  As a result, limiting

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
January 17, 2023
Page 4


the DME reconciliation process to only certain equipment would not meaningfully reduce the burden on staff.

       A working system for tracking and providing appropriate DME is one of the essential elements of a functional system for accommodating incarcerated people with disabilities and is therefore critical to meeting Defendants' obligations under the Americans with Disabilities Act and *Armstrong* Remedial Plan. As such, **please confirm that Defendants will return to their prior proposal to ensure that there are sufficient tracking and accountability mechanisms for DME reconciliation**, even if such reconciliation meetings take place during regularly scheduled health care or custody staff interactions with class members.

       Thank you for your attention to this matter. We look forward to continued discussions on this issue.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP


By:  Hannah M. Chartoff

HMC:cg
cc:

| | | |
|---|---|---|
| Alexander Powell | Janice Lay | Tiffany Nguyen |
| Patricia Ferguson | Steven Faris | Courtney Andrade |
| Nicholas Meyer | Jason Anderson | Miguel Solis |
| Gannon Johnson | Co-Counsel | Dawn Stevens |
| Chor Thao | Mona Houston | Alexandrea Tonis |
| Ramon Ruiz | Chantel Quint | Jimmy Ly |
| Mariah Tafoya Perry | Jillian Hernandez | Jay Powell |
| OLA *Armstrong* | Dawn Lorey | Bruce Beland |
| Olena Likhachova | Laurie Hoogland | Tammy Foss |
| Trace Maiorino | Robert Gaultney | John Dovey |
| Sean Lodholz | Joseph Edwards | Robin Hart |
| Mark Jackson | Lynda Robinson | CCHCS Accountability |
| Sharon Garske | Barb Pires | Joseph Williams |
| Ngoc Vo | Lois Welch | Saundra Alvarez |
| Cathy Jefferson | Gently Armedo | Jane Moses |
| Joshua (Jay) Leon Guerrero | Aaron Perez | Olga Dobrynina |
| Gloria Fernandez | Monique Matthis | Kandie Smith |
| Claudia Williams | Yvonne Anaya | Christina Sacha |