1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   PATRICK BOOTH – 328783
3  JACOB J. HUTT – 804428 (MJP)
   PRISON LAW OFFICE
4  1917 Fifth Street
   Berkeley, California  94710-1916
5  Telephone:   (510) 280-2621
   Facsimile:   (510) 280-2704
6
   MICHAEL W. BIEN – 096891
7  GAY C. GRUNFELD – 121944
   THOMAS NOLAN – 169692
8  PENNY GODBOLD – 226925
   MICHAEL FREEDMAN – 262850
9  ROSEN BIEN
   GALVAN & GRUNFELD LLP
10 101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
11 Telephone:   (415) 433-6830
   Facsimile:   (415) 433-7104
12
   LINDA D. KILB – 136101
13 DISABILITY RIGHTS
   EDUCATION & DEFENSE FUND,
14 INC.
   3075 Adeline Street, Suite 201
15 Berkeley, California  94703
   Telephone:   (510) 644-2555
16 Facsimile:   (510) 841-8645

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:             (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

17 Attorneys for Plaintiffs

18              UNITED STATES DISTRICT COURT

19            NORTHERN DISTRICT OF CALIFORNIA

20

21 JOHN ARMSTRONG, et al.,                    Case No. C94 2307 CW

22              Plaintiffs,                   **JOINT CASE STATUS STATEMENT**

23        v.                                  Judge:  Hon. Claudia Wilken

24 GAVIN NEWSOM, et al.,

25              Defendants.

26

27

28

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

    **1.    Plaintiffs' Statement**

        **a.    RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against incarcerated people on the basis of their disabilities who request accommodations and face discrimination, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF No. 3393, Exs. A, B.

Following a year of negotiations, the changes to the staff misconduct complaint process were incorporated into new regulations, and the Notice of Change to Regulations, 22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received written notice that Defendants unilaterally changed regulations stemming from the negotiations.  Specifically, Defendants removed from regulation the Allegation Decision Index ("ADI"), the negotiated tool to be used by CDCR in deciding which staff

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

misconduct complaints were sufficiently serious to warrant referral to the Office of Internal Affairs ("OIA') for investigation.  The parties have yet to reach agreement on how they will address Plaintiffs' concerns as articulated in Exhibit A to a prior Joint Case Management Statement (ECF No. 3430) and the Court Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

Currently at issue is Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order.  Plaintiffs cannot agree. Agreeing that the ADI would only be required at six prisons undermines the guiding principles surrounding negotiated reforms—to create a simplified staff complaint process to ensure higher quality and unbiased investigations and to ensure greater accountability for staff misconduct.  Defendants represented throughout the negotiations that the reforms to the staff complaint investigation system that were being discussed would apply statewide.  Plaintiffs were already concerned that, over Plaintiffs' objection, Defendants were requiring—at prisons not currently covered by court order—a "causal connection" between any alleged harassment, discrimination or retaliation and the protected class, which will make the new reforms to the staff complaint process more difficult to administer.  The Court Expert shared some of Plaintiffs' concerns.  ECF No. 3433 at 2-3.

Having differing standards for processing staff misconduct complaints depending on the prison where the complaint arises defies logic and undermines the entire concept of accountability as enshrined in prior orders in this case.  Defendants' representations throughout negotiations, that the staff misconduct complain reforms would apply statewide, avoided the need for additional litigation to ensure that common sense prevailed and harm to class members would not be treated differently depending on the prison where it occurred.  Now that Defendants have backtracked on representations to uniformly implement accountability reforms, additional litigation may be necessary.

Defendants have also begun quarterly production of documents in compliance with the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and

3

JOINT CASE STATUS STATEMENT

biased investigations that thwart the discovery of misconduct and, even when misconduct is apparent during the investigation, poor decision-making on the part of Hiring Authorities prevents accountability.  In response to the most recent round of reporting, the Court Expert issued a report stating, "The information produced by CDCR includes instances of clear staff misconduct, including unauthorized or excessive uses of force, that were either not disciplined or not disciplined adequately."  ECF No. 3477 at 4.  Because it remains to be seen whether the current process for reporting on ongoing problems identified by Plaintiffs' counsel is actually having an impact on improving the system, "The Court Expert will be working with the parties to develop a methodology for reviewing individual cases in a manner that will allow the parties to reach agreement on shortcomings and craft solutions." *Id*.

In November 2021, the Court ordered the Court Expert to investigate the treatment of people with disabilities at SATF, the state's largest prison.  ECF No. 3338.  The Court Expert conducted a year-long investigation and issued his report and recommendations on December 20, 2022.  ECF No. 3446.  He found that people with disabilities at SATF are "living diminished and needlessly difficult lives," and as a result "face harsher prison conditions, and thus greater punishment, than their peers." *Id.* at 4.  People were denied accommodations needed to safely and independently perform a wide array of activities, including to eat, perform bodily functions, write, and participate in rehabilitative programs.  The Court Expert found that "it was not management that identified these problems; it was Plaintiffs' counsel." *Id.* at 5.  Plaintiffs agree with the Court Expert that "much at SATF has to change" and that "SATF has not demonstrated that it is able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors." *Id.* at 5-6.  Secretary Macomber has said that "[a]ddressing staff attitudes toward inmates with disabilities is an overarching issue that must be addressed with all staff at SATF be they custody, medical, or administrative."  ECF No. 3463-1 at 3.  Plaintiffs agree.  But the process will not be easy or quick.  Changes in personnel, policy, and training simply are not enough.  On

February 24, 2023, the Court ordered additional review and action by the Court Expert, including a much-needed staffing analysis.  ECF No. 3467.  Plaintiffs look forward to working with the Court Expert and Defendants to identify and develop durable, meaningful, and complete solutions.

The problems identified by the Court Expert are not limited to SATF.  Sufficient ADA staffing, extreme ADA Coordinator turnover, provision of accommodations for deaf class members who do not know sign language, and adequate policies and procedures related to disability accommodations and durable medical equipment, for example, are statewide issues that affect class members wherever they are housed.  It is incumbent on Defendants to address these issues statewide, and to not continue the reactive, piece-meal approach that has typified their response to their obligations under the Americans with Disabilities Act and *Armstrong* for so long.

CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP found thus far at six prisons exist system-wide and are committed to bringing such evidence before the Court until all class members are protected.  Plaintiffs are especially concerned about ongoing reports of staff misconduct from vulnerable class members in light of confirmation that CDCR has identified dozens of potential victims of sexual misconduct by one officer who worked for over a decade at CCWF, https://www.cdcr.ca. gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer- to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/.  Plaintiffs continue to discuss with Defendants the implementation of their Early Warning System (EWS) to guard against such widespread abuse by one officer.  Plaintiffs are discouraged that Defendants' system may not go far enough in alerting Hiring Authorities and management of problematic patterns of complaints against certain officers.

Plaintiffs remain seriously concerned that, if Defendants do not make changes to their EWS, their system will not actually warn Defendants of potential problems and not allow administrators to take necessary steps to resolve problems and prevent harm.  *See* April 18, 2023 Letter from Penny Godbold to Tamiya Davis attached hereto as

1    **Exhibit A** (exhibits omitted.)  In short, by relying on the EWS to only alert management

2    after problems have been confirmed through the staff complaint process, which can take

3    up to a year, Defendants will continue to miss out on opportunities to correct themselves

4    and to prevent harms before they occur.

5                    **b.      False, Retaliatory and Discriminatory RVRs**

6              Despite significant progress made towards court-ordered improvements to the staff

7    misconduct investigation and disciplinary system, the endemic use of false and retaliatory

8    RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

9    members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same

10   biased review that plagues the staff inquiry and investigation processes also denies class

11   members due process in disciplinary hearings, resulting in longer terms of imprisonment,

12   denials of privileges, housing at higher classification levels, and an unwillingness to report

13   future misconduct or request disability-related help.

14             As in the staff complaint context, reviewers discount or ignore the testimony of

15   incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers

16   fail to discover evidence that staff have issued reports that appear plagiarized or otherwise

17   replicate conduct and charges that are improbably attributed to multiple people at the same

18   time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct

19   charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322

20   at 11-12 & Ex. E.

21             Plaintiffs' counsel continues to identify class members who have received false,

22   retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate

23   against and discourage the filing of staff misconduct complaints will persist unless

24   Defendants take action to identify and root out problems through meaningful reforms to

25   the RVR process.

26             Defendants have agreed to multiple changes, but Plaintiffs continue to raise

27   outstanding problems.  Defendants are in the process of revising the Chief Disciplinary

28   Officer training to include the requirements for reviewing camera evidence, reviewing

1  cases for bias, and the obligation to report staff misconduct when it is evident in the

2  disciplinary process.  Defendants agree to record audio for serious RVR hearings.

3  According to Defendants, the recordings will be used for internal audits and will be

4  available for review during investigations into allegations of false/discriminatory RVRs.

5  The recordings will otherwise not be available to incarcerated people.

6          Defendants have also agreed to implement a headquarters-level audit of RVRs at 10

7  prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues,

8  identification of discrimination, retaliation, and bias in the RVR process.

9          Defendants have agreed to evaluate whether to include "red flags" in their EWS to

10  identify when a staff member has initiated a disproportionate number of RVRs, when an

11  incarcerated person has received a disproportionate number of RVRs, and instances when

12  an incarcerated person receives an RVR within a certain period of time after having filed a

13  staff complaint.

14          Defendants are still considering problems identified by Plaintiffs' counsel regarding

15  the issuance of counseling-only RVRs which provide no due process in prison but can

16  have negative consequences.  Defendants have agreed to remove from electronic files

17  RVRs that are voided or dismissed as a result of a confirmed allegation of staff

18  misconduct.  This is a significant step because those RVRs are currently relied on in risk

19  assessments conducted during the Board of Parole Hearings process and are currently

20  viewable by the Board.

21          Plaintiffs are hopeful that the parties can agree to resolve problems and that

22  additional court intervention will not be necessary.

23          **2.      Defendants' Statement**

24                  **a.      RJD and Five Prisons Orders**

25          In compliance with the Court's September 8, 2020, and March 11, 2021 orders,

26  Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive

27  and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF

28  No. 3393.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial

improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons." ECF No. 3356 at 2. The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.*, at 15. As previously reported to the Court, within months of the Court's orders, Defendants executed significant components of the remedial plans that included increased staffing to specifically address disability-related issues of class members, body-worn-camera (BWC) deployment, fixed camera installation (AVSS), document production, training, and other remedies. ECF Nos. 3177, 3183, 3412. Although not required by the Court's orders, Defendants have deployed statewide the processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.[2] Further enforcement orders as to other institutions is not necessary because this statewide overhaul of the processes remains in effect. Plaintiffs' foregoing statement that, "Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order" is "at issue," mischaracterizes the current status because there is no dispute that the negotiated ADI only applies to the six prisons. Further, the ADI remains a component of the statewide processes. Defendants have merely proposed that any agreement between the parties accurately reflect this Court's orders.

    As extensively shared with Plaintiffs, the statewide deployment of the new staff misconduct investigation and staff discipline processes necessitates extensive resources that includes the hiring and training of new staff and the development of technological tools. Plaintiffs' concerns related to the number of complaints routed through the new

---

[2] "The Court's orders require Defendants to modify their systems only at the six prisons and only with respect to alleged violations of the ARP and ADA. [ECF No. 3339-0 at 6.] The Court did not require Defendants to modify their investigations system statewide. Consistent with the PLRA's requirements, the additional remedial measures that the Court ordered Defendants to include in their proposed plans were narrowly tailored to the six prisons and to alleged violations of the ARP and ADA." ECF No. 3356 at 14. "The Court limited its orders to the six prisons and to the context of the ARP and ADA in recognition of the PLRA's requirement that any remedies ordered be narrowly drawn." ECF No. 3356 at 15.

staff misconduct process are well taken, but such concerns are not entirely addressed by increasing monetary resources.  Rather, hiring, training, and retaining qualified staff is more challenging in today's environment.  Notwithstanding the current circumstances, CDCR is committed to staffing current allocated positions to ensure successful deployment of the new processes.

The revisions to the regulations are intended to further ensure success of these processes by efficiently routing all staff misconduct complaints to the most appropriate entity for investigation.  Defendants believe that the process can be improved, in part, by providing additional training to the initial screeners so that these screeners have an improved understanding of what amounts to serious staff misconduct to ensure consistent application of the new process and these revisions seek to achieve that objective. Defendants have collected and shared data to support Defendants' proposed revisions to the regulations.  Defendants will continue to evaluate all information received to monitor compliance with the Court's orders and to provide adequate resources to ensure the successful transition to these new processes.  Notwithstanding Plaintiffs' concerns and objections related to the recent revisions to the staff-misconduct processes, CDCR's staff-misconduct investigations and discipline processes are in compliance with this Court's orders applicable to the six prisons.  CDCR has dramatically overhauled its processes to ensure unbiased and complete investigations statewide for the six prisons and will continue to work to expand it to the remaining institutions voluntarily as they are able to do so.

In response to the court-ordered Court Expert's report following his nearly year-long investigation of various issues at Substance Abuse Treatment Facility (SATF), and following the parties briefing, this Court issued its order addressing ADA staffing, sustainable ADA and ARP compliance, safe housing, deaf class-member accommodations, assistive devices for sight-impaired class members, and responses to advocacy letters.  *See* ECF Nos. 3391, 3446. 3453, 3459, 3463.  The Court found that "[i]n light of the steps that Defendants have taken to date in response to the Court Expert's report," it is "appropriate to allow Defendants to continue to devise and implement any policies, procedures, or

1   reforms that are necessary for them to achieve compliance with the ADA and ARP at

2   SATF.  ECF No. 3467.  To further monitor "Defendants' progress in curing the violations

3   of the ADA and ARP that he found in his report of December 20, 2022," this Court has

4   ordered a second report from the Court Expert six months from the February 24, 2023

5   order and ordered further briefing from the parties.  *Id.*  Defendants will continue to

6   coordinate with the Court Expert to facilitate his investigating and reporting duties and to

7   further address the issues raised in his initial report.

8          CDCR maintains a zero-tolerance policy for all forms of sexual misconduct and

9   thoroughly investigates each allegation.  CDCR's Office of Internal Affairs (OIA) and

10  Central California Women's Facility (CCWF) Investigative Services Unit (ISU)

11  immediately began investigating after discovering information that suggested sexual

12  misconduct was occurring between a staff member and incarcerated women at CCWF and

13  continues to work with the local district attorney's office.[3]  In support of its zero-tolerance

14  policy, CDCR continues to educate volunteers, contractor's, staff, and incarcerated people;

15  comply with the federal Prison Rape Elimination Act (PREA); task each institution's

16  PREA Compliance Manager with specific duties; inform incarcerated people of options

17  and resources to report PREA allegations; inform and educate incarcerated people of their

18  right to be free from such conduct; provide incarcerated people with toll-free, non-

19  monitored, non-recorded telephone access to victim advocates at community rape crisis

20  centers; and other measures.  Additionally, CCWF has more than 650 fixed cameras

21  throughout the institution in place and deployed body-worn cameras as part of CDCR's

22  AVSS program in January 2023.  Finally, this issue is a separate issue from the staff-

23  misconduct litigation and not appropriately raised in this statement or case.

### b.      Defendants' Response to Demands for RVR Reform

25         As detailed above by Plaintiffs, Defendants have made significant progress and

---

27  [3] https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-
correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-
28  women/

1    commitments to address Plaintiffs' demands that CDCR address the alleged practice of

2    issuing false and retaliatory Rules Violations Reports.  Defendants have committed to

3    revising the Chief Disciplinary Officer and the Senior Hearing Officer trainings, to

4    implement a headquarters-level audit of RVRs at ten institutions, to audio record serious

5    RVR hearings for internal auditing purposes, revisions to the Department Operations

6    Manual, a memorandum addressing discriminatory RVRs, a new screening process to

7    determine whether a physical disability contributed to the underlying conduct, the

8    development of Early Warning System (EWS) alerts, and other remedial measures.  All

9    three categories identified by Plaintiffs, above, have been completed and incorporated into

10   the EWS (so long as the incarcerated person who receives the RVR within a certain period

11   of time alleges in his grievance that the RVR was received in response to a staff

12   complaint).

13          As detailed in a past Joint Case Status Statement, recent developments will

14   effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF

15   No. 3412 at 14-16.  This includes the statewide deployment of the new staff misconduct

16   investigation and discipline processes and the new pepper-spray policy, Defendants'

17   commitment to deploy fixed-camera technology at fourteen institutions in addition to the

18   Court-ordered deployment of such technology at six institutions (20 institutions total), and

19   Defendants' commitment to deploy BWC technology at four institutions in addition to the

20   Court-ordered deployment of such technology at six institutions (10 institutions total).

21   Currently, under the new staff misconduct process, statewide allegations of false and

22   retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.

23          Defendants disagree with Plaintiffs' contention that the counseling-only chronos

24   implicate a liberty interest necessitating due process because, in part, inmates receive a

25   copy of the counseling-only chrono and may contest such chronos in the grievance

26   process.  Notwithstanding the significant progress made, there remains some disagreement

27   between the parties.  Nevertheless, Defendants have agreed to continue discussions with

28   Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the

1   RVR process and CDCR's extensive proposed revisions.

2   **B.      Accommodations for Deaf and Hard-of-Hearing Class Members**

3         **1.      Computer-Assisted Real-Time Transcription and Automated
               Captioning**

4              **a.      Plaintiffs' Statement**

5

6         Defendants discriminate against deaf and hard-of-hearing class members who do

7   not know sign language by failing to provide computer assisted, real-time captioning

8   (CART).  In response to the Court Expert's year-long investigation of SATF and the

9   Court's order, Defendants finally are taking steps to provide it and have announced a new

10  anticipated implementation date of July 2023.

11        Plaintiffs have met several times with Defendants and the Court Expert regarding

12  implementation of CART, and exchanged written positions.  On May 1, 2023, Defendants

13  took the very promising step of putting out a request for bids on a contract to provide

14  CART services, allowing the parties to begin negotiating Defendants' written policy for

15  the provision of CART services.  The parties will meet again on May 30, 2023 to discuss

16  Defendants' forthcoming draft policy.  However, critical issues remain unresolved:

17  •      Defendants have committed to providing CART to just a subset of deaf class

18         members (most of the approximately 40 class members designated with a "DPH"

19         code) who do not use sign language, and will only "consider" providing it to others.

20         This position does not comport with Title II of the Americans with Disabilities Act,

21         42 U.S.C. § 12131 *et seq.*, which requires public entities, such as CDCR, to "give

22         primary consideration to the requests of individuals with disabilities," 28 C.F.R.

23         § 35.160(b)(2), when determining which auxiliary aid or service will "ensure that

24         communications with [individuals] with disabilities are as effective as

25         communications with others," *see id.* § 35.160(a)(1).  The "primary consideration"

26         standard means "the public entity *must honor* the choice [of auxiliary aid or

27         service], unless it can demonstrate that another equally effective means of

28         communication is available, or that use of the means chosen would result in a

fundamental alteration in the service, program, or activity or in undue financial and administrative burdens." *See* ADA Title II Technical Assistance Manual ("Technical Assistance Manual") § 7.1100 (Nov. 1, 1993), *available at* https://archive.ada.gov/taman2.html (emphasis added).

Defendants intend to "initially deploy" CART at just eleven institutions, with no timeline for deploying CART at the remaining twenty-two institutions in the state. Plaintiffs have urged Defendants to offer CART services at all institutions and on all yards no later than January 1, 2024, to avoid discriminating against deaf and hard-of-hearing class members by restricting their access to certain prisons, which may have certain programs essential to their rehabilitation or mental health, or which may be closer to loved ones and support the ties critical to successful rehabilitation and reentry, simply due to their need for a disability accommodation.

- Defendants have stated that they currently intend to provide CART for all due process encounters, programming, and education.  But, because the contract released on May 1, 2023 does not include California Correctional Health Care Services ("CCHCS"), questions remain regarding whether CART will be available in medical and mental health settings.

The parties have yet to begin negotiating how Defendants will remedy the historic denial of access to programs, services and activities to class members who require CART for equal participation.

Defendants also have begun the process of implementing a system for providing automated captioning during certain types of due process events as an immediate stop-gap measure until implementation of CART.  After Defendants' initial deployment, Plaintiffs raised serious concerns with the scope and implementation of this automated captioning program.  For example, at RJD, staff educated only the segment of the deaf and hard-of-hearing population least likely to request captioning services: deaf sign language users, who already have access to sign language interpreters, and not deaf and hard-of-hearing people who do not know sign language and therefore may need captioning or another

accommodation.  In addition, Defendants inexplicably have restricted access to this free service to at most a few dozen class members and do not allow other deaf and hard-of-hearing people to request it.

In response to technical issues, Defendants chose to switch to a different automated captioning service, necessitating new direction to the field.  Despite Plaintiffs' expressed concerns, Defendants failed to include more of the class members who require captioning for effective communication in due process settings, nor clarified the instructions as to which class members should be advised that automated captioning is available.

Plaintiffs are disappointed by Defendants' apparent unwillingness to work collaboratively on policies and training on automated captioning to address well-documented issues and hope that recent discussions between counsel on how to improve the Deaf and Hard-of-Hearing Workgroup will result in better and more timely channels of communication and cooperation.

### b.     Defendants' Statement

Plaintiffs' statement fails to recognize the many areas on which there is agreement and overstates the relatively few areas that remain unresolved or disputed, suggesting there are controversies that should be litigated.  The opposite is true.  Defendants remain committed to providing class members equal access to programs, services, and activities in accordance with the ADA and the ARP and will continue to meet with Plaintiffs as part of the parties' ongoing workgroups, to ensure the successful deployment of these services. With the assistance of the Court Expert, the parties continue to meet to ensure the successful deployment of CART.  Defendants continue to provide Plaintiffs with timely updates in response to their concerns, including the status of the state-contracting process. As shared during meetings with Plaintiffs and the Court Expert, Defendants anticipate providing services to class members during a variety of activities including due-process encounters, various programing activities, and medical or mental-health encounters. Defendants are committed to providing these services to class members as a reasonable accommodation, but have not yet specifically defined the population of class members

who will receive it.  The parties seemingly agree that a strict definition of the population may not be defined at this time, but Defendants are amenable to input from Plaintiffs to ensure class members who need this service are reasonably accommodated.  Defendants anticipate that the services will be available during program operational hours, but have not yet identified the institutions at which the services will be deployed.  Defendants are cognizant of Plaintiffs' concerns that overly restrictive deployment of CART could result in loss of program opportunities or contact with families.  Defendants agree that access to necessary accommodations should not result in loss of programming or access to family and will consider these issues in their deployment of CART statewide.

Significant progress has been made toward the provision of the real-time translation to class members who reasonably need it to access services, programs, and activities.  To the extent that there may be a need for resolution about the description of the class-member group requiring such an accommodation, Defendants will continue to address this issues with the Plaintiffs and the Court Expert in future workgroups.  Meanwhile, Defendants have identified class members who may reasonably require such an accommodation and are developing a policy that includes instructing the field that due-process events must include real-time captioning as an accommodation for these class members.  The assigned ADAC, or designee, has contacted each class member to confirm upcoming events that may necessitate such an accommodation to ensure access and coordinate with staff to provide reasonable accommodations.  Based on references made by Plaintiffs in past correspondence and CDCR's own review, the size of this population consists of approximately fifty or less class members who have equal access to a variety of other services or devices that accommodate their needs in different settings and will be incorporated into to any future plan.  Defendants remain receptive to input from Plaintiffs to ensure the successful deployment of these services and will continue to keep them, along with the Court Expert, apprised of the progress towards the common goal of accommodating class members in accordance with the ADA and the ARP.  The state contracting process is underway and request for quotes went out on May 1, 2023.  As the

state-contracting process proceeds, Defendants will continue to provide updates to Plaintiffs and to the Court expert.  Meanwhile, CART will be available through the reasonable accommodation 1824 process to all incarcerated people who request and are approved through the RAP process.

    **2.**      **Hearing Aids and Other Issues**

           **a.**      **Plaintiffs' Statement**

      Plaintiffs' counsel remain concerned about the poor quality of the hearing aids available to class members.  The two hearing aid models currently issued to class members are so poor that many class members report they do not bother to wear them at all.  In July 2022, Plaintiffs provided Defendants with a report by a state-licensed audiologist with over 25 years of clinical experience with the Veterans Health Administration.  The expert found "the quality of the CDCR issued hearing aids to be very poor" and concluded that the hearing aid models CDCR currently provides are "Personal Sound Amplification Products (PSAP) rather than hearing aids by today's standards."  She made a number of recommendations, including regarding provision of digitally programmable hearing aids that have adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression, tele-coil, and for class members with tinnitus (ringing in the ears), tinnitus sound generators. She also recommended that pocket talkers be made available immediately.  More recently, the Court Expert, in his SATF report, found that "hard of hearing people who use hearing aids at SATF consistently reported, in surveys and in interviews, that the hearing aids they received were of poor quality and did not work well."  ECF 3446 at 37.

      Defendants have made little progress in addressing these concerns over the last nine months, except to promise to make pocket talkers available for check-out in certain program areas in response to class member requests.  Plaintiffs' counsel appreciates that pocket talkers will now be available, though have concerns that Defendants' approach will not result in easy access to this accommodation for class members.  Defendants have instructed ADA Coordinators to provide pocket talkers as a reasonable accommodation,

but ADA Coordinators encountered during recent prison tours appeared unaware of it.

Defendants have contracted, through CCHCS, with an "expert" to provide advice on hearing aids and other accommodations.  Plaintiffs' counsel have expressed concern that the individual selected does not appear to have the necessary expertise (he is a throat specialist and not an audiologist).  Although Defendants have no clear timeline for resolving a new hearing aid contract, Plaintiffs are optimistic, after meeting on May 12, 2023, that Defendants plan to share contract recommendations within the next few weeks.

Plaintiffs remain committed to working with CDCR and CCHCS to ensure that appropriate hearing aids are provided to class members, but any review by CDCR or CCHCS must be conducted expeditiously and by someone with the requisite expertise.

### b.    Defendants' Statement

CCHCS hired a hearing consultant to look at the current hearing aids, review the reports by Plaintiffs and provide feedback, and assist with the requirements and scope of work for the new contract that will be entered into in the future, for hearing aids, to ensure it adequately addresses the needs of class members.  CCHCS's retained specialist will provide further insight on the hearing aids and pocket-talkers to assist the Defendants in determining the approach to accommodating current and future class members with hearing aids, pocket talkers, and other personal sound amplification devices statewide.  ECF No. 3412 at 18.  Plaintiffs' characterizations of the progress made to date fails to appreciate that CCHCS must comply with the state's vetting process that involves legal and procurement components.  CCHCS has, in fact, completed many aspects of this required process and is making progress on this issue.  Defendants will continue to confer with Plaintiffs concerning the proposed pocket-talker memorandum that provides for, in part, a case-by-case analysis of class-member needs.  Notwithstanding these efforts, Defendants continue to accommodate class members in a variety of ways to ensure access.  Pocket talkers are being provided to class members on a check-out basis and staff have been repeatedly reminded that pocket talkers should be provided if the RAP determines they would be increase access as mandated by the ADA.  In fact, recent information shows

that approximately 50 DNH class members have been accommodated with pocket talkers statewide, this includes 6 class members Plaintiffs specifically identified recently as needing pocket talkers across the state.  Further, teachers use electronic interactive whiteboards to engage all students in learning and to provide written content to them. Although not yet fully rolled-out, every class member participating in the education programs has, or will receive, a laptop for use both inside and outside of the classroom. Additionally, these class members have access to TDD/TTY,[4] have access to tablets (or will soon have access), and have video phones, video visiting, and other means of disability accommodation available to them including caption phones.[5]  CDCR has rolled out caption phones at all institutions with CDCR-managed lines and on March 7, 2023, DAI directed all institutions with ViaPath-management lines to obtain caption phones for deployment.  CDCR anticipates that all institutions will have caption phones prior to the end of the year.

**C.     Accommodations for Blind and Low-Vision Class Members**

     **1.     Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covers, among other things, reading and writing accommodations, orientation and mobility training for blind and low-vision class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of the ViaPath tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021, demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  As Plaintiffs explained in the

---

[4] Telecommunications Device for the Deaf/TeleTYpewriter.

[5] "Caption phones" are phones that display word-for-word captions of what the other person is saying during a telephone conversation and are intended for people who are deaf, hard of hearing, or late-deafened.

demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials (such as large print, braille, and audio) that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes between the parties regarding the need for reading and writing accommodations for blind and low-vision class members.  Negotiations regarding Plaintiffs' proposed stipulation are ongoing.  Plaintiffs are hopeful that Defendants will promptly develop a plan for remedying these longstanding ADA violations, and that litigation will not be necessary.

The parties continue to meet to resolve accessibility problems for blind and low-vision users of CDCR's new ViaPath tablets.  Key CDCR and BPH forms, form responses, and other documents are not available on the tablets, so at least in its current form, Defendants' tablet program does not solve the accessibility barriers that blind and low-vision class members face regarding access to essential forms.

The parties are also meeting regarding word processing accommodations for blind and low-vision class members.  Without such accommodations, these class members do not have access to programs, services, and activities that require them to produce written documents, because they are unable to write by hand, or are substantially limited in doing so.

## 2.    Defendants' Statement

Defendants continuously work to accommodate the needs of blind and low-vision class members in all areas including their reading and writing needs, have collaborated with Plaintiffs and the Court Expert, and have made significant progress to resolve disputes between the parties to ensure class-member access and mitigate associated litigation risks by negotiating a proposed stipulation between the parties to resolve certain disputes.  Moreover, as previously reported in the March 15, 2023 Joint Case Status

Statement, Defendants are reviewing different processes by which they can identify, track, and provide reading and writing accommodations to blind and low-vision class members. *See* ECF No. 3473 at 18-19.  Further, CDCR continues to utilize technology to accommodate class members as detailed in the March 15, 2023 Joint Case Status Statement.  *Id.*

**D.    Effect of the COVID-19 Pandemic on the *Armstrong* Class**

**1.    Plaintiffs' Statement**

COVID-19 continues to spread in California prisons.  To date, 93,375 cases of the novel coronavirus have been detected among people incarcerated in California prisons.  A total of 260 people have died after being infected while in prison in California.  Of those, approximately half were *Armstrong* class members, even though they make up only about 12% of the total incarcerated population.

The pandemic continues to impact the transfer of *Armstrong* class members to ADA accessible placements.  Defendants have unfortunately been unable to find a way to address the backlog of class members housed inaccessibly in prisons not designed to safely accommodate their disabilities, even after COVID-19-related movement restrictions were relaxed in April 2022.  As of April 14, 2023, there are 123 class members housed inaccessibly in placements not designated to accommodate their disabilities in violation of the *Armstrong* Remedial Plan (this does not include an additional 163 class members with impacting placement codes awaiting transfer, as of April 14, 2023, to designated mainline prisons from reception centers.)  The number of inaccessibly housed class members has unfortunately remained stagnant for several years now, with only some minor and temporary reductions, without ever getting close to pre-pandemic levels of class members housed out-of-placement at any given time.  Plaintiffs are committed to working with Defendants on solutions to prevent the creation of the "new normal."

Most recently, Defendants stated that they are continuing to review the amount of set-aside quarantine and isolation space required at each prison.  Addressing this issue should open up additional accessible beds that can house *Armstrong* class members.

1    Plaintiffs' counsel are also concerned that the data on expedited transfers may not

2    tell the whole story.  Some class members report that, as a result of pandemic related

3    transfer delays, they are housed in accessible placements, but on higher security level

4    prison yards.  These class members are not counted in data currently produced by

5    Defendants because they are housed in ADA accessible housing placements, just

6    reportedly at higher security levels than they should be because of their disabilities.

7    Plaintiffs have requested to meet with Defendants in order to gather more information

8    about whether class members are being overridden to housing placements that are not

9    consistent with their security level and, if so, the scope of this issue.

10    **2.    Defendants' Statement**

11    Defendants continue to make significant and comprehensive efforts to contain and

12    minimize the effects of an unparalleled, global pandemic on the people housed in its

13    institutions, staff, and visitors by continuing with a robust vaccination process, maintaining

14    a stringent testing process, enforcing appropriate mitigation measures, working with

15    Plaintiffs to address individual concerns, and many other proactive efforts to address an

16    unprecedented, challenging, and ever-changing landscape.  As of May 15, 2023, there are

17    36 active COVID-19 cases statewide.  Defendants' efforts to provide safe and accessible

18    housing to incarcerated people, to provide detailed tracking information to the public, [6] to

19    provide detailed daily or weekly reports to Plaintiffs, and to control the mortality rate

20    (which peaked in January 2021) during this global pandemic have been memorialized in

21    previous Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452.  Defendants

22    continue to prioritize the reduction of the number of non-reception-center class members

23    on the expedited transfer list, notwithstanding unavoidable obstacles to do so that have

24    arisen as a result of the global pandemic, as detailed in previously filed Joint Case Status

25    Statements.  ECF Nos. 3369, 3391, 3412, 3452.  As of May 12, 2023, there are 116 non-

26    reception center class members on the expedited transfer list, but at least 14 of these class

27

---

28    [6] *See* https://www.cdcr.ca.gov/covid19/population-status-tracking/ for updated information.

members are ineligible for transfer at this time due to several factors, including placement in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  The updated COVID-19 Screening and Testing Matrix for Patient Movement relaxes many of the movement restrictions and should further facilitate the reduction of class members on the expedited transfer list.  An audit of institutions' isolation-quarantine space to return space no longer required for isolation-quarantine to regular housing is also ongoing and will help address the limited number of lower bunk, lower tier beds.  These efforts should also address Plaintiffs' concern that class members may be temporarily assigned higher-classification housing.  CDCR continues to monitor and report requirements for all class members housed in non-designated spaces and provide timely documentation to Plaintiffs and the Court Expert.  Defendants will continue to meet with Plaintiffs to share additional information and garner their input to resolve this issue.

**E.      Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.  The parties had a productive site visit at Mule Creek State Prison on March 29, 2023 to interview staff members and learn more about the program assignment process.  Defendants will continue to produce monthly program access data used by the parties to develop a standard for analyzing program access disparities.  Defendants disagree with Plaintiffs' allegation that the data shows troubling disparities in assignments for people with disabilities, but Defendants will continue to participate in future discussions with Plaintiffs to address this concern and others raised by Plaintiffs.  *See* ECF No. 3369, Ex. H.

**F.      Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

**1.      Plaintiffs' Statement**

Following Defendants' statewide durable medical equipment ("DME")

reconciliation in early January 2019 that revealed 7,346 class members were missing one or more items of DME and that 2,349 class members' DME records had errors, CCHCS implemented the DME Discrepancy Report Tool in January 2020. Defendants had agreed to a process to ensure reconciliation of what records indicate a class member should have and what they actually have. Unfortunately, Defendants went back on their initial reported plan to ensure reconciliation. During the last meet and confer it was reported that Defendants identified only 26 class members who had not been seen by a health care provider in the last year. Some of those were folks who were out to court or who had otherwise refused. Defendants agreed to ensure that anyone who had not been seen by a health care provider in the last year would be seen for the purpose of reconciliation. The only outstanding issue then is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually. Defendants maintain that this is already a requirement during visits with Primary Care Providers. Yet, Defendants found thousands of class members without needed DME despite the fact that the majority of class members are seen regularly by health care staff and this is an existing requirement during encounters. A process for ensuring that staff actually reconcile DME during encounters is necessary to prevent ongoing and widespread problems.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code. Defendants reported that they have identified 535 new class members by screening for such cases. Plaintiffs are encouraged by this effort, and on May 11, 2023, Defendants provided a demonstration of the new tool they have programmed to identify such individuals. Plaintiffs were very impressed by the new tool and also by additional plans for a second tool to identify people who have blatant mismatches between their disability code and their DME. Although Defendants do not currently require staff at local institutions to use this tool to eliminate discrepancies on a set timetable, such as monthly, this new program is very promising.

Unfortunately, Defendants' disability tracking system also fails to identify and track

class members with upper-extremity disabilities.  Plaintiffs requested that Defendants create a new disability code for this population.  *See* ECF No. 3322 at Exs. G and H. CCHCS does have a system to identify upper-extremity disabilities, and, on September 28, 2021, shared a report with Plaintiffs that showed all patients with upper-extremity disabilities and accommodations.  This list contains thousands of names, so it is difficult to understand exactly how it functions as a tool for staff to identify who requires what accommodations.  Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated.  Plaintiffs are committed to resolving this ongoing problem.

   2.     **Defendants' Statement**

   Collaboration between the parties continues to develop a sustainable DME accountability process.  Following several conferences with Plaintiffs and after researching how often class members are seen by their primary clinicians and nursing (*a median of 12 times per year*), it was determined there is ample opportunity for class members to discuss concerns related to missing or broken DME with medical staff.  In response to Plaintiffs concerns, CCHCS ran a report of patients who have not seen a healthcare provider in the last year to address the concerns raised by Plaintiffs and the list consisted of only 26 patients.  Further, CCHCS provided Plaintiffs with reconciliation information by creating a Corrections Services report that identified patients without a Disability Placement Program (DPP) code, but have an active order for select permanent durable medical equipment (DME) that includes canes, hearing aids, walkers, wheelchairs, and hearing or vision vests. CCHCS continues to work on an automated report and to ensure validation of this report. Moreover, at seven institutions (RJD, CIW, LAC, COR, KVSP, SATF and SAC), Field Training Sergeants (FTS) on both second and third watch ask class members about their DME, whether they possess it, whether they may retain it regardless their housing location, and other inquiries to ensure knowledge of the DME process.  DAI and CCHCS continue to work on educating the population and are committed to developing a

sustainable DME process that addresses Plaintiffs' concerns and reasonably accommodates class members.

CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity, require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code for multiple reasons including those previously noted in the March 15, 2023 Joint Case Status Statement.  *See* ECF No. 3473 at 26.  Notwithstanding these disagreements, CDCR and CCHCS will continue to meet with Plaintiffs and the Court Expert to further discuss individuals with upper-extremity disabilities.

**G.      Parole Planning and Working with Class Members Preparing for Release**

The parties have been negotiating remedial measures in response to Plaintiffs' May 4, 2021 letter, and supporting class member declarations, alleging that class members are not consistently provided adequate planning for parole, adequate transitional housing, transportation, benefits application assistance, assistance obtaining identification cards, and other transitional services that are critical for these individuals to succeed on parole. ECF No. 2680 at 11-12; ECF No. 2655 at 11-13.  As a result, Plaintiffs contend class members are denied equal access to parole success.  *See* ECF 3266, Ex. F.  Although Defendants deny class member discrimination and dispute Plaintiffs' allegations, the parties have engaged in extensive negotiations that have resulted in substantive changes detailed in previously filed Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3473.

The parties agreed to revise the 2006 Parole Section of the *Armstrong* Remedial Plan (ARP) to incorporate the new policies required under the ADA or ARP addressing parole services, and recently completed negotiations on those revisions.  The final revised Parole Section of the ARP is pending final approval by CDCR stakeholders, and the parties anticipate filing a stipulation and proposed order with the Court to amend the Parole Section of the ARP in the very near future.

The parties continue to meet regularly on the development and implementation of the new policies and directives designed to address Plaintiffs' concerns.  For example,

1   CCHCS has enhanced a pre-parole report with additional health-care and disability

2   information regarding incarcerated people with upcoming parole dates that may be used by

3   Parole Service Associates (PSA) in making referrals for transitional housing placements.

4   This CDCR Release Planning Tracker is now available for use by health care and parole

5   staff, though DAPO is still working to ensure that the PSAs are informed about this new

6   resource.  CCHCS is updating Section 3.6.1 of the Health Care Department Operations

7   Manual (HCDOM) and drafting a model Local Operating Procedure (LOP), to include

8   language to ensure all individuals are released with their prescribed DME and prescription

9   medications.  Plaintiffs look forward to reviewing and commenting on these statewide

10  processes developed to ensure individuals are released with their appropriately prescribed

11  DME and medications.

12       The 2022-23 State Budget includes $10.6 million in annual funding over the next

13  three years (or $31.8 million total) for the Returning Home Well program, which will

14  reportedly provide post-release housing services for 1,065 at-risk parolees who may be

15  homeless or housing insecure.  Plaintiffs remain concerned that this funding is insufficient

16  to meet the future housing needs of releasing individuals.  Plaintiffs contend that CDCR is

17  responsible for ensuring that parolees with disabilities are not excluded from the benefits

18  of parole and a limited supply of transitional housing placements necessitates housing-

19  placement decisions consider if a class member's disability makes them less likely to

20  succeed on parole without housing than others.

21       Defendants recently revised DAPO's policy on providing casework service funds

22  (i.e., cash assistance) to accommodate other immediate needs of parolees with disabilities.

23  Plaintiffs contend that Defendants' revision to this policy provides too much discretion and

24  too little guidance to parole agents, prohibits parole agents from ever providing cash

25  assistance for emergency temporary housing, fails to adequately consider disability-related

26  factors, and significantly reduces the amount of short-term financial assistance parolees

27  may receive.  Plaintiffs contend that this policy change will disproportionately harm class

28  members because cash assistance for emergency temporary housing is sometimes the only

means to provide accessible transitional housing and timely benefits application assistance to class members.  Defendants received Plaintiffs' comments to the policy on July 12, 2022, and met with Plaintiffs about this policy on January 17, 2023.  On April 17, 2023, Plaintiffs learned for the first time that DAPO's revised policy had already gone into effect in or around November 14, 2022.  Plaintiffs urge Defendants to revise the policy, and specifically remove the exclusion for funding temporary emergency housing.

Finally, Plaintiffs remain concerned about Defendants' failure to timely and adequately log and investigate allegations of employees' violations of the ADA, ARP, or Court Orders in this case.  Defendants are committed to addressing Plaintiffs' concerns and provided additional training to DAPO staff to ensure adequate and timely compliance.

**H.      Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool and plan to test the tool at different types of prisons.  The parties have been meeting regularly to improve individual tool questions and negotiate many outstanding policy issues—such as how to measure and report on whether discrimination is occurring in the assignment of *Armstrong* class members to programs—that must be resolved to effectively audit.  The parties convened small work groups in January 2023, have submitted informal briefing to the Court Expert, and met to discuss and resolve some of the remaining disputes between the parties such as a format for scoring and reporting compliance.  The parties met on February 14, 2023, March 22, 2023, and May 4, 2023, to discuss joint-monitoring issues and will continue to meet, with the Court Expert's assistance.

**I.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities.  At this stage in the process, the parties have agreed to tour institutions jointly to resolve any outstanding issues and concerns.  The parties, along with Plaintiffs' ADA access expert, toured LAC on

1   April 29, 2022 and November 9, 2022.  Plaintiffs' expert produced a lengthy report in

2   response to problems identified at LAC and that report was shared with Defendants on

3   April 3, 2023.  The parties, along with Plaintiffs' access expert, also toured CMF on

4   December 16, 2022 and toured VSP on May 3, 2023.  Plaintiffs' expert plans to produce

5   reports following each tour.  As outlined in the LAC report produced on April 3, 2023,

6   multiple structural issues remain at that facility despite the work that has been done thus

7   far.  Plaintiffs plan to continue working with Defendants collaboratively to address any

8   outstanding work that should be done to bring all prisons in to compliance with the

9   ADA.

10          As was set forth in the prior case management statement, ECF No. 3473, there is a

11  dispute regarding the status of finalized agreements covering the work that Defendants

12  would undertake in this process.  *See* ECF No. 3473 at 31-34.  Defendants assert that the

13  revised (Attachment A) documents, as well as any change requests, incorporated

14  negotiated terms from informal settlement discussions between the parties that took place a

15  decade ago and represent all elements that were agreed on by the parties regarding work to

16  be done.  However, the updated documents which Defendants assert capture decade old

17  agreements were not produced to Plaintiffs' counsel until years after the informal

18  settlement negotiations discussing each prison.  Further, the documents do not contain

19  sufficiently detailed information about the specifics of planned ADA construction at each

20  prison on which Plaintiffs' counsel would be able to base any construction

21  agreement.  Plaintiffs do not agree that these documents capture the final status of

22  negotiations nor do these documents represent formal agreements.  Indeed, Plaintiffs

23  declined to sign the proposed agreements for these nine prisons after receiving the revised

24  documents years after negotiations, in 2017, 2018 and 2019, due to concerns about the

25  adequacy of the work and plans.

26          Defendants are mystified by Plaintiffs' recent objections and mischaracterization of

27  these settlement discussions as "informal" both here and during recent

28  workgroups.  Defendants contend that the settlement discussions were identical for these

1  unsigned agreements as they were for the nine signed Transition Plans that are fully

2  executed and all stakeholders were present for these settlement negotiations including

3  Plaintiffs, the Court Expert, DAI, CCHCS, CDCR Facilities Management, and Defense

4  counsel.  To the extent that Plaintiffs are attempting to change things mid-stream because

5  of a newly retained expert and undo past work completed by the parties, Defendants will

6  continue to seek the assistance of the Court Expert to resolve this unnecessary attempt to

7  undo past work completed by the parties.

8         Plaintiffs are not trying to undo past work completed by the parties but rather are

9  seeking to make sure Defendants bring their facilities into compliance with ADA

10  accessibility mandates as soon as possible.  As outlined in Plaintiffs' expert's LAC report,

11  structural problems exist at that facility notwithstanding work that has been done; some

12  completed work was not done pursuant ADA guidelines or has otherwise broken down

13  since the initial construction; and some areas of the prison that were not contemplated

14  during the initial scoping of the project are now being used for programming.

15         Despite being a newly constructed prison, Plaintiffs assert that the CHCF beds also

16  need to be reviewed by the parties since Plaintiffs have learned that many newer beds in

17  health care settings were never inspected by Defendants' CASp inspectors for ADA

18  compliance.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1      Plaintiffs also dispute whether Defendants have a sufficient number of emergency

2   exits that are fully accessible to prisoners with impacting placement mobility and vision

3   disabilities in units where those individuals are housed, as detailed in previous statements

4   including the March 15, 2023 and May 16, 2022 Joint Case Status Statements.  *See* ECF

5   No. 3473 at 34; *see also* ECF No. 3412 at 35, Ex. E.

6

7                                        Respectfully submitted,

8   DATED:  May 15, 2023               ROSEN BIEN GALVAN & GRUNFELD LLP

9                                        By:  */s/ Penny Godbold*

10                                           Penny Godbold

11                                        Attorneys for Plaintiffs

12

13  DATED:  May 15, 2023               ROB BONTA
                                       Attorney General of the State of California
14

15                                        By:  */s/ Trace O. Maiorino*

16                                           Trace O. Maiorino
                                             Deputy Attorney General
17

18                                        Attorneys for Defendants

19

20                          **FILER'S ATTESTATION**

21      As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

22  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

23  have maintained records to support this concurrence.

24

25  DATED:  May 15, 2023                     */s/ Penny Godbold*

26                                           Penny Godbold

27

28

# Exhibit A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email:  pgodbold@rbgg.com

April 18, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

<div style="border:1px solid">

**PRIVILEGED AND
CONFIDENTIAL**

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Tamiya Davis
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283-0001
Tamiya.Davis@cdcr.ca.gov

Re:    *Armstrong v. Newsom*:  Plaintiffs' Objections to Current Early Warning
System ("EWS")
<u>Our File No. 0581-03</u>

Dear Tamiya:

Plaintiffs write regarding ongoing concerns and possible disputes with
Defendants' Early Warning System ("EWS").  Primary concerns include the current
failure of the system to alert administrators to patterns of staff member non-compliance
that have been alleged but not yet confirmed, and the lack of clarity regarding how
Defendants will calibrate the agreed-on key performance indicators in the EWS.

The very purpose of an early warning system is to alert or warn prison
administrators of potential problems by notifying them of various potential indicators of
problems, including reported incidents.  This allows managers to identify potential areas
of concern and take any appropriate remedial action, without waiting for confirmation of
individual violations to work their way through the staff complaint process—a process
that can take up to a year.  Yet, Defendants are undermining this purpose by only alerting
prison managers to confirmed staff misconduct violations.  Not only does this delay
implementation of possible corrective measures that could prevent harm, it also masks
the identification of potential hot spots because Defendants are still failing to confirm
allegations of staff misconduct supported by substantial evidence.  Documents produced
to Plaintiffs' counsel in the quarterly production of staff misconduct complaints reveal, in

[4267009.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 2

some cases, a troubling, consistent and credible pattern of allegations regarding the same officers engaged repeatedly in the same alleged harmful conduct.  Despite clear patterns of alleged problems, Defendants will miss such trends and the opportunity to identify and address problems, thereby preventing future harm, if Defendants fail to alert staff to concerning patterns that exist beyond violations that have been confirmed.  The EWS will not serve its intended purpose if this problem is not rectified.

Relatedly, the parties have agreed on multiple key performance indicators ("KPIs") that will feed in to the EWS including uses of force, suicides, rule violations, etc.  These indicators are broad and are designed to alert administrators to potential problems and hot spots throughout the prisons.  When a threshold number of each type of key indicator is reached (i.e.,: a threshold number of uses of force, suicides, etc.), the system should alert CDCR administrators that there is a potential problem.  The effectiveness of the EWS depends on the thresholds for each indicator.  Defendants have explained only in very general terms how they plan to calibrate all of the thresholds but have failed to provide any specific information showing how, based on their stated methodology, they will set the thresholds for each key indicator.  As a result, Plaintiffs cannot determine whether the parties are in dispute regarding the calibration of the key indicators.

The Court Expert has found "Leadership's ability to self-diagnose and address problems is critical to sustainable compliance with the ARP and ADA".  (*See* Court Expert's Report Regarding Treatment of People with Disabilities at Substance Abuse Treatment Facility (SATF); *see also* Dkt. 3467, Order re SATF Report, adopting Court Expert's findings).  A properly implemented EWS is one important tool to allow Defendants to self-diagnose and timely address certain problems.  By failing to detect and take action in response to patterns of alleged non-compliance, regardless of whether individual violations are confirmed, or by failing to set appropriate thresholds for alerting staff to potential problems, Defendants will continue to thwart *Armstrong* court orders designed to ensure that CDCR identify and address problems, hold staff accountable, and prevent future harms.

## I.    Court-Ordered Requirements

The *Armstrong* Court has for years attempted, through a series of increasingly specific court orders, to urge Defendants to develop systems that track and utilize information already available to CDCR in order to self-identify and correct problems. The Court first ordered CDCR to "track the record of each institution and the conduct of individual staff members" who are failing to comply with requirements and to "refer individuals with repeated instances of non-compliance to the Office of Internal Affairs

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
April 18, 2023
Page 3

for investigation and discipline, if appropriate."  Dkt. 1045 at 7 (Jan. 18, 2007).  After years of additional litigation and further court orders designed to ensure that Defendants discover and address problematic conduct, the Court ultimately concluded, "the policies, procedures, and monitoring mechanisms currently in place, despite recent modifications made by Defendants (including the implementation of AIMS), have proven to be ineffective at bringing Defendants into compliance with the ARP and ADA."  Dkt. 3217 at 43.  The Court ordered CDCR to develop an EWS.  Dkt. 3218 at 5-6.  The purpose of the EWS is to correct deficiencies in CDCR's systems which are "incapable of generating reports that could help Defendants identify critical information necessary to track past staff misconduct incidents and prevent future ones."  Dkt. 3217 at 53 (citing Dkt. 3205, Ex. A at 1, OIG Report regarding AIMS).

Pursuant to court order, Defendants agreed "[t]he Enterprise Risk Management Unit will lead the effort to, based on data, identify trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct.  Data will be gathered from multiple CDCR databases, including SOMS, CMS, the 2140 log, and others and compiled to create automated Early Warning System dashboards, with red flag and alert systems which can be viewed by institution leadership and CDCR executives.  In addition, the Early Warning System dashboards will be programmed to send automated alerts and warnings to impacted locations when alarming trends surface."  Dkt. 3392-2 at 14.

## II.    Current Dispute Regarding Alerts for Staff Misconduct Complaints

The primary key indicator, and the portion of the EWS that has already been implemented, involves staff complaints.  Defendants provided a helpful explanation of the staff complaint portion of the EWS to Plaintiffs' counsel on December 1, 2022.  (*See* December 1, 2022, email from Gannon Johnson attached hereto as **Exhibit A**).  After receiving information regarding the staff complaint portion of the EWS in writing, Plaintiffs requested to discuss, among other issues, how the EWS would identify patterns of complaints against the same officer and the plan for future roll out of additional, agreed-on, key performance indicators.  (*See* December 12, 2022, email from Penny Godbold to Gannon Johnson, attached hereto as **Exhibit B** (attachment omitted)).

During the most recent meeting on January 26, 2023, Defendants informed Plaintiffs' counsel for the first time that, at least as to staff misconduct complaints, the EWS will only "alert" staff after the Hiring Authority has sustained violations. According to Defendants, the system would not generate any alerts based on pending or unsustained allegations, regardless of whether there are 2 or 100 additional similar

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
April 18, 2023
Page 4

pending allegations (e.g., against the same officer or officers, in the same housing unit, on the same yard, or during the same watch).  **Plaintiffs objected.**

Alerting staff only to "sustained" findings of staff misconduct will, for multiple reasons, not serve the agreed-on purpose of identifying "trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct."  First, in order for the EWS to actually warn Defendants of potential problematic trends so as to prevent misconduct, it is necessary to monitor the complaints themselves.  Notification of this type of potential, though not yet confirmed, problem is precisely the point of a "warning" system.[1]  Such a warning allows management to take action to identify and resolve potential issues, even before or regardless of whether any staff misconduct violation is confirmed.[2]

Defendants' position—only confirmed allegations will generate alerts—would be unreasonable even if their investigation and discipline system effectively identified staff who violated policy.  Alerting staff only after misconduct has been confirmed will not assist staff in identifying concerning trends nor help staff identify potential problems in order to encourage remediation before more serious problems result.  It simply provides confirmation, after the fact, of the findings of the staff misconduct complaint investigation process, a process that remains flawed.  Further, that process, which has an entirely separate purpose and is solely focused on individual cases, not patterns or trends, can take up to a year to confirm violations after allegations are made.  Both systems are tools that should be used to assist management, but they are distinct systems, and their purposes should not be confused.  By specifically ordering Defendants to implement an EWS capable of generating alerts beyond what existing CDCR systems could already do, the Court was clear—Defendants must do more than simply repackage the results from the staff complaint process and notify administrators of those findings.  Defendants must

---

[1] Defendants previously indicated that the system can generate alerts based on complaints, standing alone, and that they intended to incorporate this indicator into the system.  (*See* December 15, 2021 email from Tamiya Davis, **Exhibit C**, stating, "*Allegations* of misconduct against a named staff member will alert when two or more non-duplicative occurrences occur involving same staff member across all institutions." (emphasis added).)

[2] It is Plaintiffs' understanding that the EWS will "flag" complaints against the same officer, and that prison administrators could elect to view this information in the EWS by searching the employee identification number to determine whether there have been other similar complaints filed against the same staff member.  Whether or not any warden chooses to do this, is up to them.  No such "alerts" notifying administrators of a potential problems are automatically generated by the current system.

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 5

"identify critical information necessary to track past staff misconduct incidents and prevent future ones." Dkt. 3217 at 53.

Plaintiffs have identified multiple examples, including during recent document productions, that illustrate why it is essential that Defendants rethink their alert system and how, if Defendants continue to generate alerts only of sustained violations, the EWS will fail to comply with Court Orders and party agreements by failing to identify "trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct." Dkt. 3392-2 at 14.

A.   **Officers** ███████ **and** ███████ **Failing to Accommodate People at RJD**

In a cluster of cases in the most recent quarterly production of documents received by Plaintiffs' counsel (RJD-20011101/RJD-20017734/RJD-20018344/RJD-20002651**)**, incarcerated people have alleged that Officers ███████ and ███████ were rude, discriminatory, and disrespectful, failed to accommodate people with mobility disabilities in walking the shortest distance around the track, and issued discriminatory RVRs. Case RJD-20011101 includes body worn camera footage confirming that the officers, in discussing the incident afterwards, do not understand their responsibility to accommodate class members in walking the shortest distance around the track. Specifically, Officer ███████ states, "Yeah he goes 'Because I'm ADA so I go the shortest route.' Mmm … no, you're gonna do what everyone else is doing." None of the alleged violations were sustained by CDCR, despite a clear problem. Furthermore, Plaintiffs' counsel similarly reported, in a recent tour report, additional complaints by multiple different class members against these same officers for the same alleged failures to accommodate in walking the shortest path of travel. (*See* Sept. 2022 RJD Monitoring Report at 5-7)[3] Despite multiple consistent and credible complaints, and video confirmation of a problem, there is no indication that CDCR is aware of or acting on the concerning pattern of problems with these officers. Plaintiffs' counsel continues to receive complaints about these two officers and, during the course of drafting this letter, received yet another credible allegation that Officer ███████ failed to accommodate a different class member's mobility disability in walking the shortest the path of travel.

B.   **Allegations of Sexual Misconduct at CIW and CCWF**

At least 22 women have come forward to report that the same officer sexually assaulted them at CCWF for over a decade. It is our understanding that the officer is

---

[3] Though the report itself redacts the officers' names, exhibits redacted for that report confirm that the alleged problematic officers were Officers ███████ and ███████

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 6

currently under criminal investigation, but only after two dozen women came forward to report harm.  These allegations underscore the importance of detecting patterns of complaints.  (*See* https://www.cdcr.ca.gov/news/2022/12/28/cdcr-refers-internal-investigation-into-former-correctional-officer-to-district-attorney-for-charges-of-sexual-misconduct-of-incarcerated-women/.)  Plaintiffs' counsel has requested, but not received, information from CDCR regarding the number of staff complaints for sexual misconduct CDCR received against this officer and whether CDCR confirmed any of the allegations.

A sadly similar pattern of alleged sexual staff misconduct surfaced at CIW in the most recent quarterly production of documents received by Plaintiffs' counsel.  Three complaints produced during this quarter (20011321, 20011324, 20012429) involve allegations that the same staff member, Dental Hygienist ████████, sexually molested multiple women during dental examinations.  Despite credible and consistent reports of a pattern of criminal behavior—Defendants did not sustain any of the allegations and the staff member apparently retired in the midst of investigations. However, because CDCR did not sustain the alleged misconduct, the alleged harm perpetrated by this staff member had the potential to persist, unabated, under Defendants' current system without any required notification to prison administrators of a clear pattern of complaints regarding criminal misconduct.

## C.    Additional Patterns Evident In Staff Misconduct Complaints

In the short period of time that Plaintiffs' counsel has received and reviewed staff misconduct complaints pursuant to quarterly productions, other trends and patterns of reported problems have emerged.

For example, Plaintiffs have identified a pattern of problems involving Officer ████████ (20002104, 20002048, 20002706, 20002695, and 20018575) at SATF.  The violations reported on by Plaintiffs' counsel regarding Officer ████ include multiple examples of unprofessional conduct including a confirmed improper use of force (20002706) and unconfirmed interference in a staff misconduct investigation, a BWC activation failure, and generally inappropriate comments.  (*See* Plaintiffs' staff misconduct reports dated June 3, 2022, November 4, 2022 and February 10, 2023). Prison administrators should be notified of a pattern of repeated complaints about this officer acting unprofessionally.  This is especially true considering that one such complaint, 20002695, was prematurely closed after the investigator concluded, based on a misspelling in the complaint, that no Officer "████████" worked at SATF.

Similarly, Officer ████ at LAC has been involved in multiple problematic use of force cases (LAC – 20003617; LAC – 20004110).  (*See* Plaintiffs' February 10, 2023

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
April 18, 2023
Page 7

Letter).  In one serious case, LAC – 20004110, Officer ███ was found to have used intentional unnecessary force—slamming a naked incarcerated person into the back of a holding cell because he was angry at the person.  While Defendants did confirm one violation against him, it is notable that more than one serious complaint for the same alleged misconduct—excessive force—exists against this officer.

By intentionally choosing to not be alerted as to patterns of complaints as described in the examples above, and to only be alerted as to confirmed violations, Defendants are failing to comply with the requirement to ensure the EWS  identifies "trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct." Dkt. 3392-2 at 14.

III.    **Possible Dispute Regarding Calibration of Key Performance Indicators**

The parties agreed that the system would include key performance indicators to assist Defendants in identifying "trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct."  (*See* list of key performance indicators included in Plaintiffs' December 22, 2021 letter, attached hereto as **Exhibit D**.)  The agreed on indicators include:

- Staff misconduct complaints (including the number and percentage of confirmed allegations and those criminally referred and accepted, the number of disciplinary actions, as well as data for processing complaints including time from submission to CST routing, submission to completion of investigation, completion of investigation to hiring authority decision making)

- Incidents, as defined by DOM Section 51030.3

- Use of Force incidents, including whether controlled or immediate

- Total Deaths

- Homicides

- Deaths by Overdose

- Deaths by Accidents

- Grievances

[4267009.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 8

- RVRs (including tracking by type of RVR, by level of RVR (counseling, administrative, serious), and by disposition of RVR (guilty or not guilty))

- Contraband discoveries

- Battery of a Prisoner Incidents

- Lockdowns

- Modified Programs

- Overdoses

- Narcan Use

- Suicide Attempts

- Suicides

- Number of Persons in Segregated Housing

- ATO/Reassignment

- OIA Cases (meaning the data fields that have already been produced by Defendants under the tab EWS Metric descriptions for Internal Affairs/EEO)

- Defendants also agreed to consider, but do not currently have, a way to electronically track cell searches such that data regarding which staff conducted the search, when, and which cell/incarcerated person was impacted, all of which should feed into the EWS.

The parties agreed that, by December 2021, Defendants would provide additional information regarding how the key indicators would be calibrated and which staff members would be receiving automated alerts and warnings from the EWS dashboards. (*See* Stipulation Regarding Dispute Resolution with the Court Expert Concerning Limited Areas of the RJD and Five Prisons Remedial Plan, ¶ 5, attached hereto as **Exhibit E**.)  On December 15, 2021, Defendants sent an email explaining in general terms how they would set the key performance indicators and threshold alerts.  (*See* email from Tamiya Davis attached hereto as **Exhibit C**.)  According to Defendants, "The starting point for the initial alerts will utilize trend data where currently available, and be based on an average of data collected for the specific institution/facility for each KPI. The alert will

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 9

be established based upon exceeding 10% of the average threshold for each KPI.  Areas where no current data is available will be set after a period of three months of data collection and based on initial average." **Exhibit C**.  Defendants' explanation was not accompanied by any data and therefore lacked clarity regarding how their stated methodology would actually work.  In other words, explaining simply that trend data would be used without showing what the trends in data revealed, meant that Plaintiffs' counsel remained, and still remains, in the dark as to how the thresholds for each key indicator will be set.

Despite the lack of clarity in Defendants' initial explanation, the parties continued negotiating in good faith and Plaintiffs continued, for the next several months, to request additional information regarding how Defendants intend to calibrate agreed-on key performance indicators.[4]

---

[4] For example, prior to our February 9, 2022 meeting, Plaintiffs requested data for Defendants' proposed starting point for setting red flags for each key performance indicator. (*See* February 1, 2022, email from Penny Godbold attached hereto as **Exhibit F**.)  Defendants did not provide the requested data.  Plaintiffs' counsel did receive a presentation that included screenshots of the staff complaint portion of Defendants' EWS on May 9, 2022. (*See* May 16, 2022, email with attached screenshots from Gannon Johnson, attached hereto as **Exhibit G**.)  During that presentation Defendants agreed to meet again only after at least six months of data populated the system.  Plaintiffs requested a meeting date in our July 19, 2022, case wide meet and confer agenda stating, "The parties continue to negotiate regarding Defendants' early warning system.  During our last meeting Defendants reported that they would like to collect six months of data in the new system in order to propose red flag standards. **Plaintiffs are anxious to solidify the standards so that the system is operating and are awaiting a date for the next meeting from Defendants.**"  Finally, Defendants reached out on September 7, 2022, to schedule the long-awaited demonstration meeting. In advance of that meeting, Plaintiffs again asked for concrete information regarding how Defendants intended to calibrate the key indicators. (*See*, September 7, 2022, email from Penny Godbold attached hereto as **Exhibit H** stating, "At issue are the red flags that will be set in the system and how they are set.  Can you produce this information for each key indicator a week prior to the meeting?  So, for example, if Use of Force incidents is the key indicator, please produce to us CDCR's proposal for how many Use of Force incidents will trigger a red flag in the early warning system?").  On October 13, 2022, prior to the presentation, Plaintiffs asked again for production of Defendants' proposed red flag standards for each of the key indicators. (*See* October 13, 2022, email from Plaintiffs' counsel attached hereto as **Exhibit I.)**  Defendants did not produce the

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 10

Despite more than a year of negotiations and multiple requests for clarification, Plaintiffs still lack sufficient information regarding how Defendants intend to set the key indicators.  Plaintiffs therefore cannot determine whether the parties have a dispute over the indicators.  Plaintiffs have also requested but never received information regarding the timeline for implementation of the additional key indicators in the EWS.

**Please produce information confirming how the alerts will be set for each of the key indicators.  For each indicator please illustrate, based on the methodology described in Defendants' December 15, 2021 email, what threshold alert will be used for each indicator based on trend data collected thus far.  Please also confirm the implementation timeline for each key indicator.**

## IV.   Corrective Action Plans

In addition to the primary sticking points, outlined in detail above, Plaintiffs' counsel seeks to better understand the corrective action plan process that will result from the EWS alerts.

The remedial plan states **"**Enterprise Risk Management will also facilitate meetings to discuss the identified concerns, help the program area create a corrective action plan, and then continue to monitor trends after corrective actions are implemented to determine if the implemented measures are resulting in the desired outcome. *See* Dkt. 3392-2 at 14.  **Is this happening?  Has Enterprise Risk Management created any corrective action plan as a result of the EWS yet?  If so, can Plaintiffs' counsel see a copy of what such a plan looks like?**

## V.   Conclusion

Plaintiffs' counsel remain hopeful that the parties will be able to resolve disagreements and that Defendants will make the changes necessary to ensure that implementation of the EWS is consistent with the parties' high-level agreements, staff misconduct Remedial Plans, and Court Orders.  That said, this process has dragged on for

---

requested information in advance of the meeting.  Plaintiffs nevertheless moved forward with the demonstration.  And as reported during the demonstration, Plaintiffs were very impressed with the sophistication of what had been developed thus far.  Plaintiffs learned for the first time that Defendants had implemented the EWS as to staff misconduct complaints, despite the parties never reaching formal agreement on the system.  The presentation raised additional questions and Plaintiffs' counsel requested an explanation of the material presented in writing.

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
April 18, 2023
Page 11


far too long.  Plaintiffs' counsel seeks to resolve EWS negotiations quickly and to determine whether or not it will be necessary to invoke the dispute resolution process outlined in stipulation.  (*See* Stipulation Regarding Dispute Resolution with the Court Expert Concerning Limited Areas of the RJD and Five Prisons Remedial Plan, ¶ 6, **Exhibit D** which provides that the parties shall, on a schedule set by the Court Expert, submit briefs to the Court Expert who shall then submit to the Court a report and recommendation regarding a proposed resolution of the dispute between the parties.)

We look forward to discussing an expeditious path forward during our next meeting on April 24, 2023.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:   Penny Godbold
Of Counsel

PMG:ln

cc:  Ed Swanson              Jennifer Neill
     August Gugelmann        Trace Maiorino
     Audrey Baron            Sean Lodholz
     Patricia Ferguson       Olena Likhachova
     Chor Thao               Mark Jackson
     Ramon Ruiz              Sharon Garske
     Co-Counsel              Amarik Singh