DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:             (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. C94 2307 CW<br><br>**JOINT CASE STATUS STATEMENT**<br><br>Judge:   Hon. Claudia Wilken |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.     Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

    **1.     Plaintiffs' Statement**

        **a.     RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against incarcerated people on the basis of their disabilities who request accommodations and face discrimination, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF No. 3393, Exs. A, B.

Following a year of negotiations, the changes to the staff misconduct complaint process were incorporated into new regulations, and the Notice of Change to Regulations, 22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received written notice that Defendants unilaterally changed regulations stemming from the negotiations.  Specifically, Defendants removed from regulation the Allegation Decision Index ("ADI"), the negotiated tool to be used by CDCR in deciding which staff

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

misconduct complaints were sufficiently serious to warrant referral to the Office of Internal Affairs ("OIA') for investigation.  The parties have yet to reach agreement on how they will address Plaintiffs' concerns as articulated in Exhibit A to a prior Joint Case Management Statement (ECF No. 3430) and the Court Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

Currently at issue is Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order.  Plaintiffs cannot agree.  *See* June 13, 2023, Letter from Plaintiffs' counsel regarding Status of Staff Misconduct Remedies, attached hereto as **Exhibit A**.  Agreeing that the ADI would only be required at six prisons undermines the guiding principles surrounding negotiated reforms—to create a simplified staff complaint process to ensure higher quality and unbiased investigations and to ensure greater accountability for staff misconduct.  Defendants represented throughout the negotiations that the reforms to the staff complaint investigation system that were being discussed would apply statewide.  Plaintiffs were already concerned that, over Plaintiffs' objection, Defendants were requiring—at prisons not currently covered by court order—a "causal connection" between any alleged harassment, discrimination or retaliation and the protected class, which will make the new reforms to the staff complaint process more difficult to administer.  The Court Expert shared some of Plaintiffs' concerns.  ECF No. 3433 at 2-3.

Having differing standards for processing staff misconduct complaints depending on the prison where the complaint arises defies logic and undermines the entire concept of accountability as enshrined in prior orders in this case.  Defendants' representations throughout negotiations, that the staff misconduct complaint reforms would apply statewide, avoided the need for additional litigation to ensure that common sense prevailed and harm to class members would not be treated differently depending on the prison where it occurred.  Now that Defendants have backtracked on representations to uniformly implement accountability reforms, additional litigation may be necessary.

Defendants have also begun quarterly production of documents in compliance with

the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and biased investigations that thwart the discovery of misconduct and, even when misconduct is apparent during the investigation, poor decision-making on the part of Hiring Authorities prevents accountability.  In response, "[t]he Court Expert will be working with the parties to develop a methodology for reviewing individual cases in a manner that will allow the parties to reach agreement on shortcomings and craft solutions."  ECF No. 3477 at 4.

CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP found thus far at six prisons exist system-wide and are committed to bringing such evidence before the Court until all class members are protected.  Plaintiffs continue to discuss with Defendants the implementation of their Early Warning System (EWS) to guard against such widespread abuse by one officer.

### b.      False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

As in the staff complaint context, reviewers discount or ignore the testimony of incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers fail to discover evidence that staff have issued reports that appear plagiarized or otherwise replicate conduct and charges that are improbably attributed to multiple people at the same time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322

at 11-12 & Ex. E.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs continue to raise outstanding problems.  Defendants are in the process of revising the Chief Disciplinary Officer training to include the requirements for reviewing camera evidence, reviewing cases for bias, and the obligation to report staff misconduct when it is evident in the disciplinary process.  Defendants agree to record audio for serious RVR hearings. According to Defendants, the recordings will be used for internal audits and will be available for review during investigations into allegations of false/discriminatory RVRs. The recordings will otherwise not be available to incarcerated people.

Defendants have also agreed to implement a headquarters-level audit of RVRs at 10 prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues, identification of discrimination, retaliation, and bias in the RVR process.

Defendants have agreed to evaluate whether to include "red flags" in their EWS to identify when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and instances when an incarcerated person receives an RVR within a certain period of time after having filed a staff complaint.

Defendants are still considering problems identified by Plaintiffs' counsel regarding the issuance of counseling-only RVRs which provide no due process in prison but can have negative consequences.  Defendants have agreed to remove from electronic files RVRs that are voided or dismissed as a result of a confirmed allegation of staff misconduct.  This is a significant step because those RVRs are currently relied on in risk assessments conducted during the Board of Parole Hearings process and are currently

1    viewable by the Board.

2        Plaintiffs are hopeful that the parties can agree to resolve problems and that

3    additional court intervention will not be necessary.

4        **2.    Defendants' Statement**

5            **a.    RJD and Five Prisons Orders**

6        In compliance with the Court's September 8, 2020, and March 11, 2021 orders,

7    Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive

8    and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF

9    No. 3393.  CDCR has dramatically overhauled its processes to ensure unbiased and

10   complete investigations and, although not required by the Court's orders, Defendants have

11   deployed statewide the processes that restructure CDCR's staff misconduct allegation,

12   screening, referral, investigative, and disciplinary processes.  As the Court has noted,

13   "[t]hese agreed-upon measures constitute substantial improvements that will go a long way

14   to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF

15   No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is

16   likely to have a positive impact on…the overall reliability of the outcomes of

17   investigations."  *Id.*, at 15.

18       The revisions to the regulations, noted above by Plaintiffs, are intended to further

19   ensure success of these processes by efficiently routing all staff misconduct complaints to

20   the most appropriate entity for investigation.  Defendants believe that the process can be

21   improved, in part, by providing additional training to the initial screeners so that these

22   screeners have an improved understanding of what amounts to serious staff misconduct to

23   ensure consistent application of the new process and these revisions seek to achieve that

24   objective.  Defendants have collected and shared data to support Defendants' proposed

25   revisions to the regulations.  Defendants will continue to evaluate all information received

26   to monitor compliance with the Court's orders and to provide adequate resources to ensure

27   the successful transition to these new processes.  Notwithstanding Plaintiffs' concerns and

28   objections related to the recent revisions to the staff-misconduct processes, CDCR's staff-

1    misconduct investigations and discipline processes are in compliance with this Court's

2    orders applicable to the six prisons.

3         Plaintiffs' foregoing statement that, "Defendants' proposal for an agreement that the

4    ADI will only apply at the six prisons currently covered by court order" is "at issue,"

5    mischaracterizes the current status because there is no dispute that the negotiated ADI only

6    applies to the six prisons.[2]  In fact, the ADI remains a significant component of the

7    complete restructuring of the statewide process that has transferred the review of staff

8    misconduct allegations from the local institutions to the Office of Internal Affairs.

9    Defendants have proposed that any stipulation between the parties concerning the ADI

10   accurately reflect this Court's orders, which only applies to the six prisons.  Plaintiffs'

11   singular focus on the ADI fails to recognize the multi-faceted overhaul of the staff

12   misconduct process and CDCR's other commitments to address staff misconduct,

13   including its commitment to deploy fixed-camera technology at fourteen institutions in

14   addition to the Court-ordered deployment of such technology at six institutions

15   (20 institutions total) and its commitment to deploy BWC technology at four institutions in

16   addition to the Court-ordered deployment of such technology at six institutions

17   (10 institutions total).  Further enforcement orders as to other institutions is not necessary

18   because this statewide overhaul of the staff misconduct process remains in effect and

19   "additional litigation," as contemplated by Plaintiffs above, would only stall productive

20   negotiations between the parties and consume limited resources that could be put to better

21   use elsewhere.

22   / / /

23

24   [2] "The Court's orders require Defendants to modify their systems only at the six prisons
     and only with respect to alleged violations of the ARP and ADA.  [ECF No. 3339-0 at 6.]
25   The Court did not require Defendants to modify their investigations system statewide.
     Consistent with the PLRA's requirements, the additional remedial measures that the Court
26   ordered Defendants to include in their proposed plans were narrowly tailored to the six
     prisons and to alleged violations of the ARP and ADA."  ECF No. 3356 at 14.  "The Court
27   limited its orders to the six prisons and to the context of the ARP and ADA in recognition
     of the PLRA's requirement that any remedies ordered be narrowly drawn."  ECF No. 3356
28   at 15.

**b.   Demands for RVR Reform**

As detailed above by Plaintiffs, Defendants have made significant progress and commitments to address Plaintiffs' demands that CDCR address the alleged practice of issuing false and retaliatory Rules Violations Reports.  Defendants have committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer trainings, to implement a headquarters-level audit of RVRs at ten institutions, to audio record serious RVR hearings for internal auditing purposes, revise the Department Operations Manual, to draft a memorandum addressing discriminatory RVRs, to create a new screening process to determine whether a physical disability contributed to the underlying conduct, to the development of Early Warning System (EWS) alerts, and to other remedial measures.

As detailed in a past Joint Case Status Statement, recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No. 3412 at 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes, the new pepper-spray policy, camera and audio technology (as noted above), and the fact that statewide allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.

Defendants disagree with Plaintiffs' contention that the counseling-only chronos implicate a liberty interest necessitating due process because, in part, inmates receive a copy of the counseling-only chrono and may contest such chronos in the grievance process.[3]  Notwithstanding the significant progress made, there remains some disagreement between the parties.  Nevertheless, Defendants have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed revisions.

/ / /

/ / /

---

[3] The fact that the Board of Parole Hearings could consider such chronos at future parole hearings is too attenuated to invoke due process protections.  *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

**B.      Court Expert Investigation Into SATF, the State's Largest Prison**

      **1.      Plaintiffs' Statement**

      In December 2022, the Court Expert filed his report and recommendations regarding the treatment of people with disabilities at SATF, the state's largest prison.  ECF No. 3446.  He found that people with disabilities at SATF are "living diminished and needlessly difficult lives," and as a result "face harsher prison conditions, and thus greater punishment, than their peers."  *Id.* at 4.  People were denied accommodations needed to safely and independently perform a wide array of activities, including to eat, perform bodily functions, write, and participate in rehabilitative programs.  The Court Expert found that "it was not management that identified these problems; it was Plaintiffs' counsel."  *Id.* at 5.  Plaintiffs agree with the Court Expert that "much at SATF has to change" and that "SATF has not demonstrated that it is able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors."  *Id.* at 5-6.

      Secretary Macomber has said that "[a]ddressing staff attitudes toward inmates with disabilities is an overarching issue that must be addressed with all staff at SATF be they custody, medical, or administrative."  ECF No. 3463-1 at 3.  Plaintiffs agree.  But the process will not be easy or quick.  Changes in personnel, policy, and training simply are not enough.  On February 24, 2023, the Court ordered additional review and action by the Court Expert, including a much-needed staffing analysis and development of policies to ensure safe housing of people with disabilities.  ECF No. 3467.  Plaintiffs look forward to working with the Court Expert, Defendants, and CCHCS to identify and develop durable, meaningful, and complete solutions.

      The problems identified by the Court Expert are not limited to SATF.  Sufficient ADA staffing, extreme ADA Coordinator turnover, provision of accommodations for deaf class members who do not know sign language, and adequate policies and procedures related to disability accommodations and durable medical equipment, for example, are statewide issues that affect class members wherever they are housed.  It is incumbent on

Defendants to address these issues statewide, and to not continue the reactive, piece-meal approach that has typified their response to their obligations under the Americans with Disabilities Act and *Armstrong* for so long.

### 2. Defendants' Statement

CDCR continues to actively work with the Receiver, CCHCS, and other stakeholders to address the issues identified by the Court Expert in his report following his investigation and to ensure the continued deployment of the proactive measures taken in response. The Receiver, CDCR leadership, and SATF leadership continue to meet regularly to further develop existing policy to ensure resolution of the issues identified in the Court Expert's report. The Court Expert and his representatives are routinely invited to these meetings. CDCR will continue to facilitate the Court Expert's efforts in anticipation of his August 24, 2023 report.

### C. Accommodations for Deaf and Hard-of-Hearing Class Members

### 1. Plaintiffs' Statement

Defendants continue to discriminate against D/deaf and hard-of-hearing class members and have failed to remedy a number of fundamental accommodation issues.

One issue—computer-assisted, real-time transcription ("CART")—currently is under Court order already. *See* ECF No. 3467 at 3-4. The parties' discussion of CART implementation and any ability to come to agreement to avoid the need for further litigation has been impeded by Defendants' continued delays in sharing information, including draft policies and operating procedures. The initial implementation will be only for due process encounters and, for this first time in this joint case status statement, Defendants state that initial implementation will only be at SATF. Although the Court ordered that CART be implemented at SATF "as soon as possible" for due process events, programming, and education, Defendants could not, during a meeting over four months later, say if or when an Internet connectivity assessment will be conducted—something Defendants assert is a necessary prerequisite for implementation of CART in programming and education spaces.

1   At least two other issues—effective communication of announcements and the poor

2   quality of hearing aids—are part of the Court Expert's pending review. *See* ECF No. 3467

3   at 2 (order requiring Court Expert to file "report on Defendants' progress in curing

4   violations of the ADA and ARP that he found in his [previous] report"); ECF No. 3446 at

5   37-42 (Court Expert report finding denial of effective communication to deaf and hard-of-

6   hearing people, including discussion of effective communication of announcements and

7   poor quality hearing aids).

8   Plaintiffs are concerned by Defendants' delays and lack of meaningful engagement

9   on both issues, which may necessitate more direct judicial involvement.  Notably, the two

10  hearing aid models currently issued to people in prison are so poor that many people report

11  they do not bother to wear them at all.  In July 2022, Plaintiffs provided Defendants with a

12  report by a state-licensed audiologist with over 25 years of clinical experience with the

13  Veterans Health Administration.  The expert found "the quality of the CDCR issued

14  hearing aids to be very poor" and concluded that the hearing aid models CDCR currently

15  provides cannot even be considered "hearing aids by today's standards."  She made a

16  number of recommendations, including regarding provision of digitally programmable

17  hearing aids that have adaptive directional microphone technology, adaptive signal

18  processing, noise reduction strategies for steady state and transient noise, active feedback

19  suppression, tele-coil, and for class members with tinnitus (ringing in the ears), tinnitus

20  sound generators.  She also recommended that pocket talkers be made available

21  immediately.

22  A year later, Defendants appear to have made little progress and implemented only

23  half-measures.  First, Defendants have contracted, through CCHCS, with an "expert" to

24  provide advice on hearing aids and other accommodations.  Plaintiffs' counsel have

25  expressed concern that the individual selected does not appear to have the necessary

26  expertise (he is a throat specialist and not an audiologist).  Defendants have no clear

27  timeline for resolving a new hearing aid contract and have not shared the recommendations

28  of their consultant, even though they previously stated that they would do so by May 26.

Defendants now claim that they will issue pocket talkers to any qualified person with a verified hearing disability on an individual basis.  That is long overdue but not a replacement for effective hearing aids.  Hard-of-hearing people have been isolated from prison life for too long and need to be able to hear in a wide variety of contexts to participate equally in prison life, including when talking with people on the yard or in the dayroom or talking in a cell with a cellmate.

Plaintiffs continue to see Reasonable Accommodation Panels across the state improperly deny requests for pocket talkers, including because someone has a disability vest (which of course does not help a class member hear), because staff can speak loudly and clearly (which does not help a class member in interactions with their peers or loved ones), and because "[i]nmate ADA workers may assist you with communicating with others" (which violates the privacy and independence of people with disabilities). Defendants must immediately re-train staff, including healthcare staff and those who sit on the Reasonable Accommodation Panels, about how to evaluate requests for pocket talkers; identify and correct previous improper denials; and educate all hard-of-hearing class members about the availability of this critical accommodation and how to request it.

Plaintiffs remain committed to working with CDCR and CCHCS to ensure that appropriate accommodations are provided to class members, but any review by CDCR or CCHCS must be conducted expeditiously and by someone with the requisite expertise, a new hearing aid contract must be entered into without further delay, and pocket talkers must be immediately made available to people at all times they may need to communicate with others.

## 2.      Defendants' Statement

Plaintiffs' statement fails to recognize the many areas on which there is agreement and overstates the relatively few areas that remain unresolved or disputed, suggesting there are controversies that should be litigated.  The opposite is true.  Defendants remain committed to providing class members equal access to programs, services, and activities in accordance with the ADA and the ARP and will continue to meet with Plaintiffs as part of

1   the parties' ongoing workgroups, to ensure the successful deployment of these services.

2   With the assistance of the Court Expert, the parties continue to meet to ensure the

3   successful deployment of CART, as detailed in the May 15, 2023 Joint Case Status

4   Statement.  *See* ECF No. 3484 at 14-16.  Recently, Defendants shared a proposed CART

5   policy memorandum with Plaintiffs.  The third-party-vendor contracting process for CART

6   is complete and the new contract was executed on June 21, 2023.  Under this new contract,

7   CDCR will deploy CART for due-process events at SATF and then roll it out to ten other

8   institutions.  CART requires internet connectivity to function and Defendants have

9   completed the necessary assessment earlier this month.  Defendants will continue to assess

10  software, security, and connectivity needs as required to successfully deploy CART at the

11  eleven institutions and to ensure functionality at the numerous end-user locales within each

12  institution.  CDCR incorporated into the policy numerous suggestions from Plaintiffs

13  during the many workgroup sessions.  This policy allows for expansion of CART to

14  institutions other than the eleven institutions already identified through various means,

15  including the 1824 process.  Defendants have shared the revised policy and draft training

16  materials with Plaintiffs.  To further demonstrate good-faith efforts to deploy CART as

17  soon as possible, Defendants have shortened the notice period, training period, and local-

18  operating-procedure revision due date to thirty days.

19        Plaintiffs' concerns related to hearing aids and pocket talkers necessitate the

20  collaboration between CDCR, CCHCS, the *Plata* receivership, and others.  CDCR is

21  committed to accommodating class members as demonstrated by its recent request for

22  purchase of 150 pocket talkers for class-member use and CDCR anticipates purchasing

23  more pocket talkers for distribution.  Pocket talkers will be provided through the 1824

24  process to any qualified person with a verified hearing disability, on an individual basis.

25  Defendants are also in the process of tracking requests for pocket talkers so that

26  Defendants know where best to deploy the newly acquired devices once they become

27  available.  CDCR will continue its coordinated efforts to reasonably accommodate class

28  members in accordance with its obligations under the ADA and ARP, along with valuable

1   input from the Court Expert and Plaintiffs, ensuring no court intervention is necessary.

2   **D.      Accommodations for Blind and Low-Vision Class Members**

3       **1.      Plaintiffs' Statement**

4         The parties formed a workgroup to address issues facing blind and low-vision class

5   members.  The workgroup covers, among other things, reading and writing

6   accommodations, orientation and mobility training for blind and low-vision class

7   members, accommodations assessments and skills training, braille literacy, availability of

8   white canes, accessibility of the ViaPath tablet program (including training), and

9   photophobia accommodations.

10        Plaintiffs sent a December 10, 2021, demand letter regarding the need for a

11  statewide system for identifying, documenting, and providing reading and writing

12  accommodations for blind and low-vision class members.  As Plaintiffs explained in the

13  demand letter, Defendants must (1) identify, track, and produce the accessible formats of

14  written materials (such as large print, braille, and audio) that blind and low-vision class

15  members need to read and write (a statewide request first made by letter on March 15,

16  2021) and (2) make auxiliary aids for reading and writing—such as electronic video

17  magnifiers—available to these class members outside restricted locations and hours.

18        On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants

19  to resolve disputes between the parties regarding the need for reading and writing

20  accommodations for blind and low-vision class members.  Negotiations regarding

21  Plaintiffs' proposed stipulation are ongoing.  Plaintiffs are hopeful that Defendants will

22  promptly develop a plan for remedying these longstanding ADA violations, and that

23  litigation will not be necessary.

24        The parties continue to meet to resolve accessibility problems for blind and low-

25  vision users of CDCR's new ViaPath tablets.  Key CDCR and BPH forms, form responses,

26  and other documents are not available on the tablets, so at least in its current form,

27  Defendants' tablet program does not solve the accessibility barriers that blind and low-

28  vision class members face regarding access to essential forms.

1    The parties are also meeting regarding word processing accommodations for blind

2  and low-vision class members.  Without such accommodations, these class members do

3  not have access to programs, services, and activities that require them to produce written

4  documents, because they are unable to write by hand, or are substantially limited in

5  doing so.

6      **2.      Defendants' Statement**

7        Defendants continuously work to accommodate the needs of blind and low-vision

8  class members in all areas including their reading and writing needs, have collaborated

9  with Plaintiffs and the Court Expert, and have made significant progress to resolve

10 disputes between the parties to ensure class-member access and mitigate associated

11 litigation risks by negotiating a proposed stipulation between the parties to resolve

12 certain disputes.  Moreover, as previously reported in the March 15, 2023 Joint Case

13 Status Statement, Defendants are reviewing different processes by which they can

14 identify, track, and provide reading and writing accommodations to blind and low-vision

15 class members.  *See* ECF No. 3473 at 18-19.  CDCR continues to utilize technology to

16 accommodate class members as detailed in the March 15, 2023 Joint Case Status

17 Statement.  *Id.*  For example, CDCR is working to expand class member access to the

18 electronic desktop magnifiers located at the prison law libraries beyond the regular

19 library hours to accommodate class members' reading and writing needs.  Finally,

20 statewide deployment of ViaPath tablets[4] at all CDCR institutions was recently

21 completed and on-line instructions are available to families of incarcerated people.[5]

22 **E.    Effect of the COVID-19 Pandemic on the *Armstrong* Class**

23    **1.    Plaintiffs' Statement**

24        The COVID-19 pandemic continues to impact the transfer of *Armstrong* class

25 members to ADA accessible placements.  Defendants have unfortunately been unable to

26

27 ─────────────────────
[4] *See* https://www.cdcr.ca.gov/family-resources/tablets/

28 [5] *See* https://web.connectnetwork.com/get-started-with-cdcr-inmate-trust-deposits/

1  find a way to address the backlog of class members housed inaccessibly in prisons not

2  designed to safely accommodate their disabilities, even after COVID-19-related movement

3  restrictions were relaxed in April 2022, and again in March 2023.  As of July 7, 2023,

4  there are 91 class members housed inaccessibly in placements not designated to

5  accommodate their disabilities in violation of the *Armstrong* Remedial Plan (this does not

6  include an additional 142 class members with impacting placement codes awaiting

7  transfer, as of July 7, 2023, to designated mainline prisons from reception centers, and 88

8  incarcerated people improperly housed on upper tiers and/or top bunks.)  The number of

9  inaccessibly housed class members has unfortunately remained stagnant for several years

10  now, with only some minor and temporary reductions, without ever getting close to pre-

11  pandemic levels of class members housed out-of-placement at any given time.  Plaintiffs

12  are committed to working with Defendants on solutions to prevent the creation of the "new

13  normal."

14        Most recently, Defendants stated that they are continuing to review the amount of

15  set-aside quarantine and isolation space required at each prison.  Addressing this issue

16  should open up additional accessible beds that can house *Armstrong* class members.

17        Plaintiffs' counsel are also concerned that the data on expedited transfers may not

18  tell the whole story.  Some class members report that, as a result of pandemic related

19  transfer delays, they are housed in accessible placements, but on higher security level

20  prison yards.  These class members are not counted in data currently produced by

21  Defendants.  Defendants have reported that they have identified hundreds of people in this

22  position but, before they disclose information to Plaintiffs' counsel, are trying to determine

23  why each person is housed out of level.  Plaintiffs' counsel will continue to attempt to

24  reach resolution of this problem.

25        **2.    Defendants' Statement**

26        Defendants continue to prioritize the reduction of the number of non-reception-

27  center class members on the expedited transfer list, notwithstanding unavoidable obstacles

28  to do so that have arisen as a result of the global pandemic, as detailed in previously filed

Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452, 3484.  As of July 7, 2023, there are 91 non-reception center class members on the expedited transfer list, but at least 19 of these class members are ineligible for transfer at this time due to several factors, including placement in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  An audit of institutions' isolation-quarantine space to return space no longer required for isolation-quarantine to regular housing is also ongoing and will help address the limited number of lower bunk, lower tier beds.  These efforts should also address Plaintiffs' concern that class members may be temporarily assigned higher-classification housing.  CDCR continues to monitor and report requirements for all class members housed in non-designated spaces and provide timely documentation to Plaintiffs and the Court Expert.  Defendants are reviewing the proposed changes to isolation-quarantine spaces from California Correctional health Care Services (CCHCS) which would return approximately 6,700 beds for use and shared the proposed plan with Plaintiffs to garner their input to resolve this issue.

**F.      Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.  The parties had a productive site visit at Mule Creek State Prison on March 29, 2023 concerning the program assignment process.  Defendants will continue to produce monthly data for the parties to develop a standard for analyzing program access disparities.  Defendants disagree with Plaintiffs' allegation that the data shows troubling disparities in assignments for people with disabilities, but Defendants will continue to participate in future discussions with Plaintiffs about this issue.  *See* ECF No. 3369, Ex. H.

**G.      Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

**1.      Plaintiffs' Statement**

Defendants have agreed to ensure that anyone who had not been seen by a health

care provider in the last year would be seen for the purpose of reconciling their DME.  The only outstanding issue then is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually.  Defendants maintain that this is already a requirement during visits with Primary Care Providers.  Yet, Defendants found thousands of class members without needed DME despite the fact that the majority of class members are seen regularly by health care staff and this is an existing requirement during encounters.  A process for ensuring that staff actually reconcile DME during encounters is necessary to prevent ongoing and widespread problems.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code.  Plaintiffs were very impressed by the new tool and also by additional plans for a second tool to identify people who have blatant mismatches between their disability code and their DME.

Unfortunately, Defendants' disability tracking system fails to identify and track class members with upper-extremity disabilities.  Plaintiffs requested that Defendants create a new disability code for this population.  *See* ECF No. 3322 at Exs. G and H. CCHCS does maintain a list of thousands of class members with upper-extremity disabilities and accommodations.  It is difficult to understand why, since Defendants know who these class members are, they will not assign them a disability code.  Without a code it is impossible for staff to easily identify who requires what accommodations.  Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated.  Plaintiffs are committed to resolving this ongoing problem.

### 2.     Defendants' Statement

Collaboration between the parties continues to develop a sustainable DME accountability process and progress has been made as noted above and as previously detailed in prior Joint Case Status Statements, including the March 15, 2023 and May 15, 2023 statements.  *See* ECF Nos. 3473 at 23-26; 3484 at 22-25.  CCHCS and CDCR agree

1  that individuals with upper-extremity disabilities that limit a major life activity, require

2  accommodation under the ADA, but disagree that CCHCS and CDCR must create a new

3  Disability Placement Program (DPP) code for multiple reasons including those previously

4  noted in the March 15, 2023 Joint Case Status Statement.  *See* ECF No. 3473 at 26.

5  Notwithstanding these disagreements, CDCR and CCHCS will continue to meet with

6  Plaintiffs and the Court Expert to further discuss individuals with upper-extremity

7  disabilities and other issues including a sustainable DME accountability process.

8  **H.      Parole Planning and Working with Class Members Preparing for Release**

9         On June 12, 2023, the Court entered a Stipulation and Order Amending the

10  September 11, 2006 Parole Field Operations Section of the *Armstrong* Remedial Plan

11  (ARP) to incorporate the new policies on transition to parole and parole services for class

12  members with disabilities negotiated by the parties.  ECF No. 3491.

13         The parties continue to meet on the development and implementation of these new

14  policies and directives designed to address Plaintiffs' concerns that class members are not

15  consistently provided adequate planning for parole, adequate transitional housing,

16  transportation, benefits application assistance, assistance obtaining identification cards, and

17  other transitional services that are critical to succeed on parole, as raised in Plaintiffs' May 4,

18  2021 letter.  ECF No. 2680 at 11-12; ECF No. 2655 at 11-13; ECF No. 3266 at 93-114,

19  Ex. F.

20  **I.      Joint Monitoring Tool**

21         The parties remain committed to developing a strong and effective joint monitoring

22  tool and plan to test the tool at different types of prisons.  The parties have been meeting

23  regularly to improve individual tool questions and negotiate many outstanding policy

24  issues that must be resolved to effectively audit.  The parties continue to convene small

25  work groups, confer with the Court Expert about informal briefing, and continue to meet to

26  discuss and resolve the few remaining disputes between the parties such as a format for

27  scoring and reporting compliance.

28

**J.     ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities.  The parties have agreed to tour institutions jointly to resolve any outstanding issues and concerns.  The parties, along with Plaintiffs' ADA access expert, toured LAC on April 29, 2022 and November 9, 2022, and Plaintiffs' expert produced to Defendants a lengthy report in response to problems identified at LAC on April 3, 2023.  Plaintiffs' expert plans to produce reports following the tour of each institution.  The parties, along with Plaintiffs' access expert, toured CMF on December 16, 2022, VSP on May 3, 2023, and CIM on June 22, 2023.  Plaintiffs plan to continue working with Defendants collaboratively to address to identify structural issues or unfinished work that should be done to bring all prisons in to compliance with the ADA.

As detailed in the March 15, 2023 and May 15, 2023 case management statements, there is a dispute regarding the status of finalized agreements covering the work that Defendants would undertake in this process.  *See* ECF Nos. 3473 at 31-34; 3484 at 28-29.  Defendants assert that the revised (Attachment A) documents, as well as any change requests, incorporated negotiated terms from informal settlement discussions between the parties that took place a decade ago and represent all elements that were agreed on by the parties regarding work to be done.  Plaintiffs contend, however, the updated documents which Defendants assert capture decade-old agreements were not produced to Plaintiffs' counsel until years after the informal settlement negotiations discussing each prison.  Further, the documents do not contain sufficiently detailed information about the specifics of planned ADA construction at each prison on which Plaintiffs' counsel would be able to base any construction agreement.  Plaintiffs do not agree that these documents capture the final status of negotiations, nor do these documents represent formal agreements.  *See* ECF Nos. 3473 at 31-34; 3484 at 28-29.  The parties will continue to seek the assistance of the Court Expert to resolve this dispute.

Plaintiffs assert that, despite being newly constructed, the CHCF beds need to be reviewed by the parties since Plaintiffs have learned that many newer beds in health care settings were never inspected by Defendants' CASp inspectors for ADA compliance. Plaintiffs also dispute whether Defendants have a sufficient number of emergency exits that are fully accessible to prisoners with impacting placement mobility and vision disabilities in their housing, as detailed in previous statements including the March 15, 2023 and May 16, 2022 Joint Case Status Statements.  *See* ECF No. 3473 at 34; *see also* ECF No. 3412 at 35, Ex. E.

Respectfully submitted,

DATED:  July 17, 2023                    ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/Penny Godbold*
Penny Godbold

Attorneys for Plaintiffs

DATED:  July 17, 2023                    ROB BONTA
Attorney General of the State of California

By:  */s/Trace O. Maiorino*
Trace O. Maiorino
Deputy Attorney General

Attorneys for Defendants

## FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.

DATED:  July 17, 2023                    */s/Penny Godbold*
Penny Godbold

# EXHIBIT A



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

June 13, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Trace Maiorino                          Jennifer Neill
Deputy Attorney General                 Tamiya Davis
Office of the Attorney General          CDCR Office of Legal Affairs
455 Golden Gate Avenue, Suite 11000     1515 "S" Street
San Francisco, CA 94102-7020            Sacramento, CA 94283
Trace.Maiorino@doj.ca.gov               Jennifer.Neill@cdcr.ca.gov
                                        Tamiya.Davis@cdcr.ca.gov

　　　　Re:　　*Armstrong v. Newsom*:  Status of Staff Misconduct Remedial Plans
　　　　　　　<u>Our File No. 0581-03</u>

Dear Trace, Jenn, and Tamiya:

　　　　As you know, the Ninth Circuit Court of Appeals largely affirmed Judge Wilken's orders for remedial measures at RJD, CIW, COR, KVSP, LAC, and SATF.  *Armstrong v. Newsom*, 58 F. 4th 1283 (9th Cir. 2023).

　　　　By this letter, Plaintiffs set forth our understanding of the status of the staff misconduct remedial measures, outline continuing concerns about implementation of those measures, and request a meeting to discuss the outstanding issues and unanswered questions outlined below.

**I.　　Stipulation Regarding the Allegation Decision Index**

　　　　Plaintiffs remain seriously concerned about the current inconsistencies that exist between the staff misconduct regulations, Remedial Plans, and party agreements that occurred after Defendants unilaterally removed the Allegation Decision Index from regulation.  Plaintiffs' counsel initially proposed a stipulation to resolve these inconsistencies on November 4, 2022 and, after speaking with Defendants, proposed revisions to that stipulation on November 30, 2022.  Defendants responded almost six months later with proposed edits on April 20, 2023, attached hereto as Exhibit A.  For the

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 2

reasons set forth below, Plaintiffs' counsel are unable to agree to any stipulation that is
limited only to the six prisons currently covered by *Armstrong* court orders.

The ADI is the cornerstone of the staff complaint process reforms.  Throughout
negotiations to reform the staff complaint investigation and discipline process,
Defendants represented that the changes they were making to the system would apply
statewide.  This was specifically stated multiple times during the negotiations and is
memorialized in multiple writings including in Defendants' portion of the July 15, 2021
joint case status statement—submitted during negotiations about the Remedial Plans—
where Defendants represented that "Defendants have agreed that important pieces of the
remedial plans will apply statewide.  For example, once the pepper-spray and staff-
misconduct investigation and discipline processes are finalized as part of the Court-
ordered remedial plans, ***these policies will be expanded to all institutions statewide***."
ECF No. 3296 at 11 (emphasis added); *see also, e.g.*, ECF No. 3341 at 13 (in
November 2021, stating that "staff-misconduct investigation and discipline processes
finalized as part of the Court-ordered remedial plans, will be simultaneously expanded to
all institutions statewide"); ECF No. 3369 at 13 (referring to "deploying unprecedented
statewide changes to the staff misconduct and discipline processes"); ECF No. 3391 at 14
(discussing "statewide deployment of the new staff misconduct and staff discipline
processes").

It is only logical that the parties would negotiate statewide reforms because the
accountability process is a statewide system.  In the order granting Plaintiffs' requests for
remedial measures at the Five Prisons, the Court found that CDCR's accountability
system—which applied statewide—was "flawed" and led to "unreliable results."  ECF
No. 3217 at 22.  The Court also relied on the Office of Inspector General's ("OIG")
"findings that the *statewide system* for investigating allegations of staff misconduct is
flawed and ineffective."  *Id.* at 28 (emphasis added); *see also id.* at 29-32 (discussing
similar OIG findings about the statewide AIMS system).

As a result of representations by Defendants that the negotiated reforms to the
staff complaint and investigation process would apply statewide, Plaintiffs chose to
forego additional litigation to ensure remedial measures would be uniformly applied
throughout the statewide system.

Now CDCR has decided that reforms will not be uniformly applied throughout the
state.  **The continued creation of an accountability process where staff misconduct
differs depending on the prison where the allegation arises will only make additional
litigation necessary.**

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 3

### A.      Unilateral Changes to Staff Misconduct Regulations

Plaintiffs first became concerned that Defendants were undermining negotiated reforms when, in August 2022, without more than a few days advance notice to Plaintiffs' counsel, Defendants unilaterally modified the negotiated regulations and removed all references to the ADI from the regulations.

This change was significant.  As described in greater detail in Plaintiffs' letter objecting to this change, the reforms to which the parties agreed depend on a greater number of cases being investigated by the Office of Internal Affairs ("OIA").  The ADI is the mechanism agreed on by the parties to ensure that cases reach OIA, if warranted.  *See* August 31, 2022, Letter and Request for Meeting Regarding Plaintiffs'  Comments and Objections to Revised Staff Misconduct Regulations.  Despite Plaintiffs' objections, Defendants adopted new, permanent regulations in October 2022 that omitted reference to the ADI.

Now that the regulations do not include reference to the ADI, it is essential that the parties agree that the language included in the regulation means the same thing as the ADI in order to square the regulations with party agreements and the Remedial Plans. Plaintiffs have attempted, since learning of the impact of the regulations changes, to reach agreement with Defendants.  *See* November 4, 2022, Letter Regarding Plaintiffs' Comments on Staff Misconduct Regulations, Stipulation and Proposed DOM Language.

As discussed below, Defendants have taken additional actions—beyond unilaterally removing the ADI from regulation—that further suggest they no longer intend to be bound by negotiations to implement a staff misconduct complaint process statewide.  This is unacceptable.  Each time Defendants carve out an exception to the statewide system allowing cases to be handled differently at prisons not currently covered by *Armstrong* court order, they jeopardize all Court-ordered reforms by unnecessarily complicating what was supposed to be a simplified system for staff accountability.

### B.      Adoption of the Causal Connection Standard

The most significant change thus far has been the implementation of additional screening requirements at the non-six prisons for routing staff misconduct complaints to the AIU.  Specifically, Defendants adopted the "causal connection" and "material representation" standards for cases alleging retaliation, discrimination, and harassment by staff.  Defendants adopted these standards in an effort to address their concerns regarding the number of complaints statewide that were being routed to the AIU for investigation instead of being routed to Locally Designated Investigators ("LDI") at the prisons.  *See* ECF No. 3433 at 2-3.  The adoption of the new standards means that now, in order for

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 4

Defendants to route a retaliation, discrimination, or harassment complaint to the AIU, the complainant must allege "that the staff member's actions were in fact connected to a protected status or activity."  ECF No. 3433 at 2.  By inserting this heightened pleading requirement, and making it more difficult for cases to reach the AIU, Defendants undermined the purpose of the ADI, which was intended as an easy to follow, objective standard to ensure that investigators outside the prisons investigate the most serious allegations of staff misconduct.  *See, e.g.*, ECF No. 3217 at 28-29 (noting OIG criticisms of local investigations affected by fact that reviewers were "frequently peers or coworkers of the staff members they were investigating" and OIG recommendation to reassign investigations to employees outside of the prison).  *See also* Remedial Plans at II.A.i (stating the revised "process is designed to ensure that complaints alleging serious staff misconduct, regardless of the source of the complaint, are investigated by OIA").

When Defendants proposed using the "causal connection" and "material misrepresentation" standards at the Six Prisons, Plaintiffs objected because they were difficult to administer, misapplied by Defendants, and inconsistent with the ADI.  *See* Letter from M. Freedman to J. Neill, T. Davis, *Re: Defendants' Proposed Causal Connection and Material Misrepresentation Standards* (Sept. 16, 2022) at 3-6.  The parties also met with the Court Expert and attempted to apply the standards, which only further illustrated how subjective and difficult the standards were to administer.  The Court Expert concluded, in his quarterly report, that the causal connection standard and other non-ADI screening mechanisms "are difficult to apply in a consistent and objective manner."  ECF No. 3433 at 2-3.[1]

In response, Defendants elected to impose the "causal connection" and "material representation" standards only at the prisons not currently covered by the *Armstrong* court order.  In so doing, Defendants are creating two different accountability systems – one that operates at the Six Prisons and one with different standards at all other prisons.  Defendants have done so despite representations throughout the negotiation process that the agreed-upon reforms would apply statewide.

---

[1] In the litigation over the remedial measures, Defendants already unsuccessfully argued that the complaints at issue in Plaintiffs' motion did not sufficiently "establish a causal link" between the misconduct and class members' disabilities—an argument the Court rejected.  ECF No. 3217 at 15-16.  The "causal connection" standard appears to be a means to prevent AIU scrutiny of these allegations by again applying Defendants' misguided assessment of whether cases show a sufficient causal link.  Such an approach is inconsistent with the ADI.  Sept. 16, 2022 Letter at 5.

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 5

### C.      Rolling Back the Review of Local Investigations

Defendants are also indicating that additional reforms to the staff complaint
investigation process will only apply at the Six Prisons.  For example, in an effort to
improve the quality of local investigations, the parties agreed that OIA would review and
approve investigations conducted at the local level.  Remedial Plans at II.C.  The purpose
of OIA's review is "to ensure the inquiry was comprehensive and unbiased and request
further inquiry if necessary."  Remedial Plans at II.C.  Only recently, in response to
Plaintiffs' February 2023 staff misconduct report, did Plaintiffs learn for the first time
that Defendants intend to limit this reform to the Six Prisons.  *See* Letter from Patricia
Ferguson to Michael Freedman, Response to Plaintiffs' February 10, 2023 Review of
CDCR's Accountability System (Mar. 17, 2023), at 1-2.  This change is especially
concerning given that the poor quality of local investigations was the basis for the court
ordered reforms and, as recently as last week, the OIG continues to report on the low
quality of LDI investigations.  *See* Office of the Inspector General, Monitoring the Staff
Misconduct Investigation and Review Process of the California Department of
Corrections and Rehabilitation: 2022 Annual Report (May 2023), at 21 (finding that
overall, CDCR's performance in LDI investigations monitored by the OIG was "poor").

Limiting OIA review of local investigations to only the six prisons currently
covered by *Armstrong* court order is just another example of how, despite representations
that the negotiated reforms would apply statewide, Defendants instead are now creating
differing standards for those prisons not currently covered by court order.

### D.      The Impact of Applying Different Standards to Different Prisons

At the outset of negotiations, the Court Expert set forth key principles to guide
negotiations for agreeing on effective reforms to the system.  *See* Email and Attachment
from Ed Swanson to Plaintiffs & Defendants, Re: Armstrong: Investigations process
proposal (March 12, 2021).  Among the key principles were "the investigative process
should be as simple and straightforward as possible" and "[i]nvestigation of all staff
misconduct complaints should follow the same process."  It is critical that the system be
uniform to achieve those principles.  A system that applies different standards for
investigating the same allegation because the complaints were filed at different prisons is
neither simple nor straightforward.  In the case of CST and AIU staff, who are now
responsible for applying differing standards of screening and review of cases depending
on the origin of the complaint, this is especially confusing and problematic.  Further, such
a system is neither fair nor consistent, hallmarks of a functioning disciplinary system
according to Plaintiffs' expert.  *See* ECF No. 3336-3, ¶ 14 (Plaintiffs' expert Joseph
Ponte discussing importance of a "fair and consistent disciplinary system").  A statewide
system with differing standards for reviewing the quality of investigations depending on

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 6

the prison where the complaint arose is inherently unfair—especially when staff can easily transfer prisons to seek lower accountability standards but class members have no control over their placement and the standard of accountability applied to their complaints.

### E.      Implications for the ADI Stipulation

Defendants' actions, trending toward the creation of different accountability systems and rolling back negotiated reforms at prisons not currently covered by *Armstrong* court orders, are now evident in Defendants' proposed edits to the stipulation. Specifically, Defendants have inserted a clause making it clear that the stipulation should be limited to the prisons covered currently by court order.  *See* Exhibit A at ¶ 4.  This is significant because the purpose of the ADI stipulation is to memorialize, in light of Defendants' removal of the ADI from regulation, the agreement that the language that was inserted in the place of the ADI is understood by the parties to mean the same thing as the ADI.  However, if the agreement that the language in the regulation means the same thing as the ADI only applies to the Six Prisons, Defendants are free at any time to abandon the ADI, and the negotiated process that is dependent on the ADI, at all but the Six Prisons.  **Plaintiffs cannot agree.**  Defendants assert that the parties can discuss whether this provision is necessary in the stipulation.  And perhaps the parties can agree to delete it from the stipulation.  But the fact that it is even proposed, especially in light of the steps taken by Defendants to roll back reforms thus far as described above, gives Plaintiffs' counsel cause for serious concern.

**It is essential, to avoid future litigation, that Defendants adhere to a uniform accountability system and cease rolling back negotiated reforms at non-Six Prisons. Plaintiffs' counsel look forward to discussing a path forward.**

## II.      Implementation of the Centralized Screening Team (CST)

### A.      Routine Grievances

As stated in Plaintiffs' May 12, 2023 Report, the CST is not properly screening grievances to identify if they raise allegations of staff misconduct.  Plaintiffs' counsel identified that for approximately 30 percent of grievances, the CST concluded that the grievance did not contain any allegations of staff misconduct when, in fact, the grievance did contain such an allegation.  Plaintiffs estimate that these errors could mean that, at just the Six Prisons, the CST may have misclassified as routine as many as 9,000 grievances that actually contained one or more allegations of misconduct.

**What steps are being taken to oversee screening and to confirm whether staff misconduct complaints are being appropriately identified?**

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 7

      **B.**      **Routing Per ADI**

As reported in Plaintiffs' May 12, 2023 Report, even where the CST correctly identifies an allegation of staff misconduct, the CST frequently does not recognize that the staff misconduct allegation is on the ADI, and thus improperly routes it for investigation by an LDI, rather than by the AIU. One concerning explanation for why this is occurring may be confusion regarding the application of the causal connection requirement which should only exist at non-six prisons but which could impact screening of complaints from the six prisons.

**What steps are being taken to oversee screening and to confirm whether staff misconduct complaints are being appropriately routed?**

**III.**    **AIU Staffing**

Defendants have not staffed the AIU with sufficient investigators to ensure Defendants comply with the Remedial Plans by conducting complete, unbiased, and timely investigations.

First, as reported in Plaintiffs' May 12, 2023 Report, AIU investigators are frequently failing to complete investigations within the timelines set forth in the Remedial Plan. These failures strongly suggest that the AIU does not have enough investigators.

Second, Defendants' data show that AIU investigations are taking longer to complete than anticipated. In the BCP seeking staffing for the AIU, Defendants estimated, after conducting a workflow analysis, that AIU investigations would on average take 24 hours of work to complete. Defendants requested funding for staffing based on that estimate. The most recent data Defendants provided to Plaintiffs (which covers the period up to April 30, 2023) show, however, that AIU investigations are taking 29 hours on average to complete, 21% longer than estimated.

Third, Defendants' data shows that the AIU is receiving many more cases than originally estimated. In the BCP, Defendants estimated that 21% of complaints would contain allegations of staff misconduct, and that the CST would route only 18% of those staff misconduct allegations to the AIU. The actual data is markedly different. Data for the Six Prisons shows that the CST is classifying a slightly smaller percentage of cases as allegations of staff misconduct than expected (18% v. 21%), but that a significantly higher percentage of those cases than anticipated are being routed to the AIU (51% v. 18%). Even assuming the CST is properly deciding which complaints contain allegations of staff misconduct and allegations that fall on the ADI (which, as discussed above, are assumptions not supported by the routine grievances and other cases reviewed by

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 8

Plaintiffs), Plaintiffs calculate that the CST is routing 2.4 times more cases to the AIU at the Six Prisons than CDCR anticipated.[2]

Lastly, all of these issues are exacerbated by the fact that CDCR underestimated the number of complaints being processed by the CST. In the BCP, Defendants estimated that the CST would receive 12,292 602-1s per month from all prisons in the system. In reality, data that Defendants provided us up through November 2022 showed that CDCR was receiving 13,821 602-1s per month, a 12% increase over the BCP estimate.

In sum, AIU investigators are not completing investigations on time; investigations are taking longer than estimated; the CST is routing 2.4 times more investigations to the CST than anticipated; and there are more complaints overall than CDCR estimated.

**In light of this evidence, do Defendants believe that the AIU has enough staff to ensure all investigations are complete, unbiased, and timely? If yes, what is Defendants' basis for that belief, especially in light of the evidence discussed above to the contrary? If no, what are Defendants doing to address the issue?**

**IV.   Training for Investigators**

Per the Remedial Plans, investigators will attend one State Personnel Board hearing biennially. Dkt. 3392-2 at 9. **Has this occurred? All investigators? When? Please provide training records.**

---

[2] We calculated this figure as follows: Through April 30, 2023, there have been a total of 38,461 complaints processed by the CST at the Six Prisons. Using Defendants' assumptions in the BCP, 8,077 of those complaints should have contained an allegation of staff misconduct (21% of 38,461) and the CST should have routed 1,454 of the complaints to the AIU (18% of 8,077). In reality, the CST has routed 3,468 cases to the AIU, which is 2.4 times more than the 1,454 complaints that would have been routed based on CDCR's estimates.

Data produced by Defendants in December 2022, which showed information for all prisons, is consistent with the data for the Six Prisons. The data from all prisons showed that Defendants anticipated that the CST would route 505 complaints to the AIU monthly. Instead, the CST was actually routing 921 complaints to the AIU monthly, 1.8 times more complaints than predicted.

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 9

### A.      Locally Designated Investigators

Plaintiffs are extremely concerned about ongoing biased and incomplete investigations conducted by LDIs.  In response to Plaintiffs' February 2023 report, Defendants reported that the LDI training schedule for 2023 includes biweekly training throughout the state conducted by senior OIA agents.  As of March 2023, 95 staff members in OIA and 3053 staff members in DAI had received LDI training.  **By when do Defendants expect that all staff currently serving as LDIs will be trained? Plaintiffs reiterate the request for a copy of the recently updated LDI training.**

Plaintiffs' counsel seek to understand whether there are other factors, such as workload or other disincentives (beyond what can be eliminated through improved training) that undermine local investigations.  For example:

- How are cases local cases assigned?

- Is there a specific investigations team at the prison who is responsible for conducting these investigations?  Or is it the case that all sergeants and lieutenants are trained to conduct investigations and may be asked to do so?

- When assigned to conduct a local investigation, is that assignment in addition to the day-to-day responsibilities of managing a prison unit?  Or are investigations the focus of LDI's such that they are only responsible for conducting investigations?

- What is the LDI investigation caseload?

### B.      Allegation Inquiry Unit

Please provide an update on the status of development of the OIA training course titled, "Preventing Bias in Investigations," which Defendants reported is being developed specifically to address and prevent bias in the investigative process.  **When will this training be completed? Who, aside from AIU investigators, will receive this training? How will this training be delivered to the field? Plaintiffs request the opportunity to comment on a draft of the training.  Is this the same training required by the Remedial Plans as "Implicit Bias" training?  (Dkt. 3392-1 at 8; 3392-2 at 9.)**

## V.      Implicit Bias Training

Per the Remedial Plans, CDCR will work to modify the implicit bias training provided to managers through California State University, Sacramento to address implicit

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 10

bias related to peace officers and incarcerated persons and parolees.  Dkt. 3392-1 at 8;
3392-2 at 9.  **Has this training been modified?  Is it being provided to managers?
Plaintiffs request a copy.**

CDCR will also develop an implicit bias training module that will be provided
annually to investigators, vertical advocates, and hiring authorities.  Dkt. 3392-1 at 8;
3392-2 at 9.  Plaintiffs assume this is the same as the "Preventing Bias in Investigations"
training mentioned in Defendants' response to Plaintiffs' February report.  **Please
confirm.  Also confirm that this training will be provided to all investigators,
including LDI's, vertical advocates and hiring authorities.**

## VI.    Quality Control of Local Investigations

### A.    Allegation Inquiry Report

According to Defendants, the Allegation Inquiry Report (AIR) review process
began in May 2022 for the Six Prisons.  This is the process whereby an additional level of
review will identify any deficiencies in inquiry reports completed at the institutional
level.  **Will this process be implemented statewide?  Are Defendants tracking this
process to determine whether any local inquiry reports are being flagged as
problematic by OIA?  For example, have Defendants identified any local
investigators whose cases were flagged as incomplete or biased?  Any who may
require additional training?  What steps have been taken in response?**

### B.    Conflict of Interest Checks

As reported in Plaintiffs' May 12, 2023 Report, the OIG recently testified about
issues related to eliminating bias from investigations during a March 6, 2023, California
State Assembly Subcommittee hearing on Public Safety.  Per the testimony of Amarik
Singh, the OIG has recommended that CDCR set up a process to check for conflicts of
interest in local inquiry cases, as there was no such procedure in place for CDCR to
identify LDIs' potential conflicts before they are assigned to investigate their colleagues.
Plaintiffs' counsel agrees with this recommendation.  Yet to Plaintiffs' counsel's
knowledge, CDCR has not yet adopted that recommendation.  **Is CDCR going to
establish a process to check for conflicts of interest in local inquiries?**

## VII.   Timeliness of Investigations

### A.    Local Inquiries

Given that data shows that nearly half of AIU investigations are closed late,
Plaintiffs' counsel has questions about the timeliness of local investigations and whether

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 11

those are completed within the required timeframes. **Please produce data, analogous to the data produced for AIU, to enable Plaintiffs' to monitor whether local inquiries are being completed within the time limits required.**

### B.   AIU

AIU staff are also failing to complete investigations by the deadlines set in the Remedial Plans: 120 days for investigations conducted by custody supervisors (Sergeants and Lieutenants) and 180 days for investigations conducted by Special Agents.  Data provided to Plaintiffs' counsel indicated that, for investigations the AIU received in June-December 2022, **the AIU closed 46% of the investigations late**.

**What is the reason, according to Defendants, that investigations are being completed late?  What is being done to remedy the problem?**

## VIII.   Hiring Authority Review of Investigations

According to data produced by Defendants on May 2, 2023, eighty percent of investigations that the AIU has completed are currently waiting for Hiring Authority action.  Hiring Authority review is the only thing standing in the way of implementing important corrective or disciplinary action that can reduce future harms to class members.

The purpose of negotiating shortened timelines to complete investigations was to ensure that CDCR could swiftly act to hold staff accountable for serious staff misconduct.  When Hiring Authorities wait until the end of the statute of limitations to review investigations, they are unable to request additional investigation, if needed, which limits their ability to hold staff accountable for misconduct.  The long delays cause a disconnect between the conduct CDCR is trying to eliminate and the action taken in response.  Also, waiting until the end of the statute of limitations to resolve cases means that investigation files are produced to Plaintiffs' counsel and the Court Expert as long as 16 months after the incident occurred.

**What action will CDCR take to ensure that Hiring Authorities timely complete their reviews?  Please report on whether CDCR is considering setting a policy requirement for how quickly Hiring Authorities must complete their review of investigation files once received.**

## IX.   Training for Hiring Authorities

Defendants reported that OIA and the Office of Legal Affairs (OLA) are working on a specific lesson plan for HAs that addresses many of the topics in Plaintiffs'

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 12

February 2023 report.  Please provide an update on the status of the development of this training.

**When will this training be completed? How will this training be delivered to the field? How often will it be provided to Hiring Authorities?  What if there is turnover?  Is this different than the Implicit Bias training required by the Remedial Plans? Dkt. 3392-1 at 8; Dkt. 3392-2 at 9? Plaintiffs request the opportunity to comment on a draft of the training.**

## X.   Vertical Advocate Training

Per Remedial Plan, Vertical Advocates were supposed to receive trial training. Dkt. 3392-1 at 8; 3392-2 at 9.

**Has Vertical Advocate Trial training occurred?  When?  Please produce training records.**

## XI.   Monitoring of Hiring Authority and Vertical Advocate Performance

Per the Remedial Plans, CDCR will use available information to monitor work performance of vertical advocates and hiring authorities in the investigation and disciplinary process, and if warranted provide training and feedback, and take other appropriate steps consistent with existing policy.  Dkt. 3392-1 at 7; 3392-2 at 8.

**Is CDCR using available information to monitor work performance of vertical advocates and hiring authorities?  If so, what information is being used? What has generally been the result of such monitoring?**

## XII.   Problems with Retention and Production of Video Evidence

Video evidence is an essential component of the staff misconduct accountability system and is necessary to ensure that staff are held accountable when violations occur and are exonerated if not.

### A.   Problems with the Retention and Review of Video Evidence

Plaintiffs have continued to report on issues with investigators failing to retain and review video footage.  Defendants have acknowledged the issue with timeliness of AVSS footage requests in their March 17, 2023 reply to Plaintiffs' Review of CDCR Accountability System Report.  Defendants have implemented an expectation that AIU investigators will request video within 10 days, and to require investigators to interview

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 13

the complainant if needed to gather information on the time, date, location and staff involved.

**How are Defendants monitoring this requirement?  Plaintiffs are especially concerned in cases where footage is requested, but it may not be discovered until later that it is not enough footage or is the wrong footage.  How will the new requirements ensure that investigators are not only requesting footage but are confirming they have the enough of and the correct footage to properly investigate the complaint?**

Additionally, DAI is creating a process for local investigators to request footage within 10 days, and have agreed to revise the 1118 form to include the video request date. **Have Defendants put this process in place?  In addition, Plaintiffs have the same questions as above about this requirement and how it will be monitored.**

**B.      Problems with the Production of Files/Video**

Plaintiffs' counsel continue to encounter gaps in the production of case files including missing documents and videos.  This issue has improved, and Plaintiffs appreciate that Defendants are responsive to email requests for missing files. Nevertheless, concerns remain that, if Plaintiffs are receiving incomplete productions, case files may be incomplete for Hiring Authorities, Executive Reviewers, and any others who are responsible for conducting case file reviews.  **What steps are being taken to address incomplete case productions?**

Further, Plaintiffs' counsel has received some audio recorded interviews with witnesses.  **Are local inquiries and AIU interviews recorded?  Please explain why a small number of cases produced to Plaintiffs' counsel contain recordings with case files.**

**C.      RJD Production**

Plaintiffs are also concerned about the low number of cases produced for RJD in recent productions.  For example, the most recent production for RJD includes only 34 cases, whereas KVSP includes 110 cases.  RJD houses hundreds more class members than KVSP.  Similarly, the most recent LAC production includes 106 cases, and also houses fewer class members than RJD.  In addition, Plaintiffs are aware of multiple 602's filed by class members for allegations of staff misconduct that are multiple months over a year old and still have not surfaced in quarterly productions.  **Please report on why the production of RJD cases appears much lower than productions for other institutions.**

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 14

## XIII.  Settlement Agreements and State Personnel Board Decisions

Per the Remedial Plans, Defendants are required to produce all settlement agreements and State Personnel Board decisions in the quarter the institution receives them.  Dkt. 3392-1 at 15; 3392-2 at 16.

**Are there settlement agreements and State Personnel Board decisions that exist and should have been produced to Plaintiffs' counsel?  If so, please produce them.**

## XIV.  BWC Compliance

Plaintiffs have continued to report on issues of BWC non-compliance in quarterly reports on CDCR's accountability system.  Plaintiffs' review of BWC footage from the productions shows that staff continue to violate BWC policies and that investigators and the Hiring Authorities are often failing to take appropriate action when BWC videos reflect intentional noncompliance.

Defendants have acknowledged there are legitimate violations of department policy.  After May 2022, CDCR implemented a new policy that requires instances of BWC non-compliance discovered during the course of an investigation to be investigated and included in the final report.  Defendants also implemented a technology that audibly alerts officers when their BWC has been deactivated for 15 minutes.  This has been implemented at the six prisons.

**Plaintiffs have requested by not yet received a copy of the May 2022 BWC non-compliance policy.**

Defendants previously reported they were implementing a BWC non-compliance auditing system.  Plaintiffs' counsel objected to Defendants' plan for auditing BWC non-compliance which would only identify instances of BWC non-compliance for cameras that were left off for over an hour and a half during an eight hour shift.[3]  Thus the audit would primarily identify accidental deactivations, not intentional deactivations, which are the most concerning.  Defendants' new system that audibly alerts staff that BWC has been deactivated for more than fifteen minutes calls in to further question the utility of Defendants' audit plan.

---

[3] *See* Dkt. 3412 at 8.

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 15

**What is the status of BWC audits?  Are they occurring?  Have Defendants taken steps to redefine the 1.5 hour standard which triggers which deactivations will be audited?  What are the results of the audits?**

Lastly, BWC and AVSS are rolling out at prisons not currently covered by *Armstrong* Court Order.  **Do the BWC and AVSS policies—including compliance with BWC and preservation, retention, and production of footage during investigations—apply statewide?  Please produce statewide video policies to Plaintiffs' counsel.**

## XV.   Post-Investigation Review Panel

Defendants were supposed to establish the Post-Investigation Review Panel in quarter three of calendar year 2022, to review whether investigations were complete and unbiased and to review hiring authorities' disciplinary decisions quarterly.  Dkt. 3392-2 at 9.  For at least the first quarter of the first two years, CDCR is supposed to retain an outside expert with law enforcement investigation experience.  *Id*.  The panel is supposed to review 12 cases quarterly and to maintain meeting minutes and recommendations of the panel.

According to Defendants' response to Plaintiffs' February report, retired Sacramento Police Chief, Daniel Hahn, has been retained to serve as the outside expert in this process.  **Please provide an update on this process.  Has the panel convened yet?  How many times?  Are there meeting minutes and recommendations stemming from this process?**

## XVI.   Anti-Retaliation Measures

Per the Remedial Plans, CDCR agreed to use a multi-pronged approach that includes training, town hall meetings, and the display of educational posters to combat ongoing retaliation.  Dkt. 3392-1 at 17; 3392-2 at 18.  CAMU was to provide direction to staff about how to create content for monthly town hall meetings with incarcerated people with disabilities by working with the IAC to develop content that is relevant to the specific concerns of these individuals.  **Has this content been created?  Are the monthly town hall meetings occurring at all six prisons?  What proof of practice is kept?**

## XVII.  Annual Training for all Custody, Mental Health and Medical Staff

Per the Remedial Plans, CDCR has developed training to eliminate violations of the rights of incarcerated people with disabilities under the ARP and ADA.  This training is required to be provided annually to all custody, mental health, and medical staff at the

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 16

Five Prisons who interact with disabled inmates and at RJD for those who interact with class members.  Dkt. 3392-1 at 17; 3392-2 at 18.

**Is this occurring annually at the six prisons for all required staff?  What proof of practice exists? Please produce training records.**

## XVIII.        Supervisory Staffing

Per the Remedial Plans, CDCR has increased supervisory staffing at all six prisons.  Dkt. 3392-1 at 15-16; 3392-2 at 16.  Correctional sergeant positions were added seven days a week at the following levels:

|       |     |
|-------|-----|
| RJD   | 9   |
| CIW   | 2   |
| KVSP  | 7   |
| LAC   | 7   |
| COR   | 8   |
| SATF  | 14  |

**Has there been any change to staffing levels for sergeant positions at the six prisons?  Has there been any change in responsibilities for the sergeant positions at the six prisons?  Have the post-orders changed since Plaintiffs' reviewed drafts? Please produce current copies of the post orders.**

The sergeants are also to conduct a minimum of one check-in with any *Armstrong* class member who has filed a staff complaint within the preceding 30 days.  Dkt. 3392-1 at 16; 3392-2 at 17.

**Is this occurring?**

## XIX.  Use of Force Policy Compliance

Plaintiffs' counsel have identified a number of violations of Use of Force policies apparent in video footage produced during quarterly productions.  Most notably, staff fail to use controlled force when required in many situations, especially when there is merely a failure to comply with an order.  Also, Plaintiffs have identified multiple situations where staff could have, but did not, act to deescalate the situation, as required by policy, and in some cases actions of staff actually fanned the flames.  In many of these cases, the Hiring Authorities failed to hold staff accountable for their policy violations.  Plaintiffs

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 17

are concerned, given that these cases span multiple prisons and multiple staff members, that existing training may not go far enough to make clear expectations regarding when controlled force is required and expectations to avoid force by deescalating tensions.

**What, if any, steps are being taken to address use of force failures evident in quarterly production cases?**

## XX.   Pepper Spray Policies

Per the Remedial Plans, CDCR revised its policies to more effectively monitor and control the use of pepper spray by staff with respect to class members.  Dkt. 3392-1 at 17; Dkt. 3392-2 at 18.

**Has there been any modification to the policy since an unsigned version was filed with the Remedial Plans?  Can you produce a signed copy?  Was the DOM modified to be consistent with the new policy?**

## XXI.  Early Warning System/False RVRs/Biannual Interview Process

The parties are currently engaged in separate workgroups regarding each of these important issues.

As always, we appreciate your courtesy and cooperation in this matter, and look forward to meeting in the near future to discuss Defendants' compliance with the Remedial Plans.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:   Penny Godbold

/ / /

/ / /

/ / /

/ / /

/ / /

[4306570.3]

Trace Maiorino, Jennifer Neill, Tamiya Davis
June 13, 2023
Page 18


PMG:cg

cc:  Ed Swanson                 Jillian Hernandez           Joshua (Jay) Leon Guerrero
     August Gugelmann            Robert Gaultney             Dawn Lorey
     Alexander "Lex" Powell      Saundra Alvarez             Diane Toche
     Nicholas Meyer              John Dovey                  Joseph Bick
     Patricia Ferguson           Robin Hart                  Cory Lo
     Chor Thao                   CCHCS Accountability        Lourdes White
     Ramon Ruiz                  Joseph Williams             Mona Houston
     OLA *Armstrong*             Cathy Jefferson             Lois Welch
     Sharon Garske               Jason Anderson              Steven Faris
     Sean Lodholz                Jane Moses                  CDCR CAMU
     Mark Jackson                Aaron Perez                 Bruce Beland
     Olena Likhachova            Alexandrea Tonis            Co-Counsel

[4306570.3]

# EXHIBIT A

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   PATRICK BOOTH – 328783
3  JACOB J. HUTT – 804428 (MJP)
   PRISON LAW OFFICE
4  1917 Fifth Street
   Berkeley, California  94710-1916
5  Telephone:   (510) 280-2621
   Facsimile:    (510) 280-2704
6
   MICHAEL W. BIEN – 096891
7  GAY C. GRUNFELD – 121944
   THOMAS NOLAN – 169692
8  PENNY GODBOLD – 226925
   MICHAEL FREEDMAN – 262850
9  ROSEN BIEN
   GALVAN & GRUNFELD LLP
10 101 Mission Street, Sixth Floor
   San Francisco, California  94105-1738
11 Telephone:   (415) 433-6830
   Facsimile:    (415) 433-7104
12
   LINDA D. KILB – 136101
13 DISABILITY RIGHTS EDUCATION &
   DEFENSE FUND, INC.
14 3075 Adeline Street, Suite 201
   Berkeley, California  94703
15 Telephone:   (510) 644-2555
   Facsimile:    (510) 841-8645
16
   Attorneys for Plaintiffs
17
18              UNITED STATES DISTRICT COURT
19             NORTHERN DISTRICT OF CALIFORNIA
20
21 JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW
22          Plaintiffs,            **STIPULATION AND [PROPOSED]**
                                   **ORDER REGARDING THE**
23      v.                         **ALLEGATION DECISION INDEX**
                                   **AND RELATED REGULATIONS**
24 GAVIN NEWSOM, et al.,
                                   Judge:  Hon. Claudia Wilken
25          Defendants.
26
27
28

[4184042.2][4946638.1]                                Case No. C94 2307 CW

STIPULATION AND [PROPOSED] ORDER REGARDING THE ALLEGATION DECISION INDEX AND
RELATED REGULATIONS

1    On October 29, 2021, the parties entered into a stipulation regarding the Allegation

2    Decision Index ("ADI").  A copy of that~~the this~~ stipulation ("ADI Stipulation") is

3    attached ~~hereto~~ as Exhibit 1_A and a copy of the ADI negotiated by the parties is attached_

4    _as Exhibit B.  As stated in the ADI Stipulation,_ ~~.~~

5    ~~The ADI Stipulation provided:~~

6    Defendants ~~shall~~ created~~reate~~ a Centralized Screening Team (CST) within the

7    Office of Internal Affairs (OIA)_, and the_ ~~.~~ CST ~~will evaluate whether a complaint~~

8    ~~received by CDCR includes an allegation(s) of staff misconduct, whether the complaint~~

9    ~~alleges misconduct toward an incarcerated person or parolee, and whether the complaint~~

10   ~~alleges serious misconduct. CST will~~ utilizes the~~utilize~~ an Allegation Decision Index

11   ~~(ADI)~~ to determine whether a complaint alleges serious staff misconduct _toward an_

12   _incarcerated person or parolee_ ~~.~~ _(See_ Ex. A, at p. 6.)~~. Allegations that are listed on the ADI~~

13   ~~will be referred to OIA for investigation. Allegations not listed on the ADI will be returned~~

14   ~~to the local hiring authority for inquiry.  The parties negotiated the ADI, which is a~~

15   ~~material component of the RJD Remedial Plan and the Five Prisons Remedial Plan. A true~~

16   ~~and correct copy of the ADI to which the parties agreed is attached as Attachment A.~~

17   ~~Plaintiffs do not have any objections to the ADI as reflected in Attachment A.  Defendants~~

18   ~~intend to seek regulatory approval of the ADI, as reflected in Attachment A, as part of its~~

19   ~~emergency regulatory package.  If Defendants make any material changes to the ADI that~~

20   ~~are inconsistent with the parties' agreement or substantially undermine the terms of~~

21   ~~agreement prior to becoming effective, Plaintiffs shall be entitled to file objections to the~~

22   ~~… Plans related to the changes to the ADI. Plaintiffs shall meet and confer with~~

23   ~~Defendants and the Court Expert prior to filing any such objections.~~

24   ~~Ex. 1, ¶ 6.~~

25   On March 23, 2022, the Court entered a stipulation and order mandating that

26   Defendants implement the R.J. Donovan Correctional Facility Remedial Plan ("RJD

27   Remedial Plan") and the Five Prisons Remedial Plan (collectively, the "Remedial Plans").

28   (ECF No_Dkt_. 3933_._)  The Five Prisons Remedial Plan applies to California State Prison-

1  Los Angeles County (LAC), Substance Abuse Treatment Facility (SATF), California State

2  Prison –Corcoran (COR), Kern Valley State Prison (KVSP), and California Institution for

3  Women (CIW).  Consistent with the ADI Stipulation, t~~T~~he Remedial Plans

4  contained~~contain~~ provisions requiring Defendants to use the ADI to screen ~~allegations~~

5  complaints received by the CST to determine if they should be investigated by OIA or

6  returned to the institution for a local inquiry.  ~~These provisions of the Remedial Plans are~~

7  ~~consistent with the ADI Stipulation.~~

8      As stated in t~~T~~he Remedial Plans, CDCR ~~further state that, as part of CDCR's~~

9  ~~reforms to the investigation and discipline process, CDCR would~~ promulgated~~promulgate~~

10  emergency regulations under the California Code of Regulations ("regulations") that were

11  ~~anticipated to be phased in~~effective on ~~beginning~~January 1, 2022.  Th~~o~~se emergency

12  regulations ~~would~~ described~~describe~~ the organizational changes to ~~regarding~~the

13  processing of allegations of staff misconduct ~~allegations~~toward an incarcerated person or

14  parolee~~.~~

15  ~~CDCR did promulgate those emergency regulations on December 8, 2021, which~~

16  ~~became effective on January 1, 2022.  O~~In April 8, 2022, Defendants promulgated ~~some~~

17  revisions to the emergency regulations.  The December 8, 2021, and April 8, 2022

18  emergency regulations (collectively, "Emergency Regulations") were consistent with the

19  ADI Stipulation and Remedial Plans.  ~~T~~he Emergency Regulations ~~also~~incorporated the

20  ADI by reference and included the ADI as an attachment.

21      On August 15, 2022, ~~Thereafter,~~Defendants ~~promulgated~~published permanent

22  regulations to replace the ~~emergency e~~Emergency R~~egulations because the emergency~~

23  E~~e~~mergency R~~egulations were set to expire.  Defendants published the proposed~~

24  ~~permanent regulations on August 15, 2022.~~

25  The proposed permanent regulations differed from the Emergency Regulations, ~~and were~~

26  ~~inconsistent with~~the ADI Stipulation, and the Remedial Plans.  ~~Rather than specify~~Instead

27  of stating that the CST would use the ADI to screen ~~cases~~complaints, the regulations, ~~they~~

28  stated that ~~grievances "shall be screened by CST, and allegations~~"[i]f the complaint

contains allegation(s) of staff misconduct toward an inmate or parolee which include complex issues requiring specialized investigative skills or resources. as described in subsection 3486(c)(21),CST shall be referredrefer the allegations to [Allegation Investigation Unit ("AIU")]AIU .... for investigation an allegation inquiry." .,Cal. Code Regs., tit. 15, § 3486(c)(21).investigation." (Emphasis added.) (The AIU is the unit within the OIA that conducts investigations into complaints alleging misconduct toward incarcerated persons and parolees). The proposed permanent regulations also did not include any reference to the ADI and did not include the ADI as an attachment.

Plaintiffs' counsel discovered the inconsistencies between the proposed permanent regulations and the ADI Stipulation/Remedial Plans when Plaintiffs' counsel reviewed the proposed permanent regulations after they had been published.

Thereafter, the parties, with the assistance of the Court Expert, met and conferred multiple times about the differences between the proposed permanent regulations, the Emergency Regulations, the ADI Stipulation, and the Remedial Plans. Because of statutory time constraints,. Defendants informed Plaintiffs and the Court Expert that if Defendants made any changes to the proposed permanent regulations would require, Defendants would be required to renotice the proposed permanent regulations. Defendants further informed Plaintiffs and the Court Expert that Further, iIf Defendants renoticed the proposed permanent regulations,. they proposed permanent regulations would not take effect until after the emergency Eemergency Rregulations had expired. Defendants further informed Plaintiffs and the Court Expert that iIif the emergency Eemergency Rregulations expired, the emergency Eemergency Rregulations would cease to exist and the regulations governing Defendants' investigation process that existed prior tobefore the emergency Eemergency Rregulations would govern. To avoid this, Defendants did not renotice the proposed permanent regulations. O.

OOnOn October 20, 2022, the Defendants' proposed permanent regulations were adopted and became effective. See Cal. Code Regs., tit. 15, 15 C.C.R. § 3486.

The regulations governing Defendants' investigation and discipline process are now

1  inconsistent with the ADI Stipulation and the Remedial Plans.   It is Plaintiffs' position

2  that Defendants must revise the regulations to make them consistent with the ADI

3  Stipulation and the Remedial Plans.  Plaintiffs requested that Defendants make such

4  revisions.  To date, Defendants have not yet agreed to do so.  To address this disagreement,

5  and

6  Accordingly, Because of Defendants' refusal to revise the regulations and in the

7  interest of avoiding litigation related to this issue at this time, the parties hereby stipulate

8  as follows:

9     1.    The CST shall use the ADI, attached as hereto as Attachment A to Exhibit

10  B1, to screen all grievances and third-party complaints received by the CST as required by

11  the Remedial Plans and the ADI Stipulation.  The parties negotiated the ADI, which is a

12  material component of the RJD Remedial Plan and the Five Prisons Remedial Plan.

13  Grievances and third-party cComplaintscomplaints that contain allegations of staff

14  misconduct toward an incarcerated person or parolee that are listed on the ADI will be

15  referred to the AIU for investigation.  CGrievances and third-party complaints that contain

16  allegations of staff misconduct toward an incarcerated person or parolee that are not listed

17  on the ADI will be returned to the local hiring authority for inquiry.:

18     2.    Defendants shall may not modify the ADI unless those modifications are

19  stipulated to by the parties or ordered by this Court(1) the parties agree to a modification or

20  (2) the Court issues an order modifying the ADI.:

21     3.    Although Plaintiffs maintain that Defendants must revise the regulations to

22  be consistent with the ADI Stipulation and Remedial Plans, tThe parties agree that to be

23  consistent with the ADI Stipulation and Remedial Plans when processing staff misconduct

24  complaints arising out of the institutions identified in the Remedial Plans the phrase

25  "allegation(s) of staff misconduct toward an inmate or parolee which include complex

26  issues requiring specialized investigative skills or resources," as used in Cal. Code Regs.,

27  tit. 15, 15 C.C.R. § 3486(c)(21), Defendants' Department Operations Manual, or any other

28  policies related to Defendants' staff misconduct investigation process, refers to allegations

[4184042.2][194638.1]



1  of staff misconduct listed on the ADI.

2      4.    This stipulation is limited to the institutions specifically identified in the

3  Remedial Plans—RJD, LAC, SATF, COR, KVSP, and CIW.

> **Commented [TM1]:** We can further discuss if we need this in this stip.

> **Formatted:** _2.0sp 0.5", Indent: First line:  0"

4      3.    Defendantsshall, as soon as possible, propose revisions to the regulations that

5  went into effect on October 20, 2022 ("proposed revisions").  The purpose of the proposed

6  revisions shall be to make the regulations consistent with the Remedial Plans, the ADI

7  Stipulation, and this Stipulation.; and

8      4.    Prior toBefore publishing proposed revisions, the parties shall meet and

9  confer with the assistance of the Court Expert to resolve any disputes regarding whether

10  Defendants' proposed revisions to the regulations are consistent with the Remedial Plans

11  and the ADI Stipulation.

12      //

13      //

14      //

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1      IT IS SO STIPULATED.:

2

3    DATED: ~~November~~ ~~December~~April     ROSEN BIEN GALVAN & GRUNFELD LLP
4    __, 2022~~3~~

5

6                              By: _____
                                  Michael Freedman
7

8                              Attorneys for Plaintiffs

9

10   DATED: ~~December~~April ~~November~~     ROB BONTA
     __, 2022~~3~~              Attorney General of the State of California
11

12                             By: _____
13                                 Trace O. Maiorino
                                   Deputy Attorney General
14

15                             Attorneys for Defendants

16

17                    **FILER'S ATTESTATION**

18       As required by Local Rule 5-1, I attest that I obtained concurrence in the filing of

19   this document by all signatories, and that I have maintained records to support this

20   concurrence.

21   DATED: ~~November~~ ~~December~~April __,
22   ~~2022~~2023            _____
                            Michael Freedman
23

24       //

25       //

26       //

27       //

28       //

Formatted: _2.0sp 0.5", Indent: First line:  0"

1  ///
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**[PROPOSED] ORDER**

     IT IS SO ORDERED.

DATED: _____, ~~2022~~2023    _____
                                Honorable Claudia Wilken
                                United States District Judge

Formatted: _2.0sp 0", Left