# Court Expert's Second Report Regarding Treatment of People with Disabilities at Substance Abuse Treatment Facility (SATF)

*Armstrong v. Newsom*

**Edward Swanson**
**Audrey Barron**
**Swanson & McNamara, LLP**

**August 24, 2023**

## TABLE OF CONTENTS

**Executive Summary** ............................................................................................................... 1

   **I.**    **Methodology** ............................................................................................................. 3

   **II.**   **Factual Findings** ...................................................................................................... 4

       **A.**  **SATF has Improved Delivery of Accommodations to Class Members** ..................... 4

          **i.**     **Denial of Accommodations During Transfer into SATF** ..................................... 4

          **ii.**    **Problems with 7362 Process** ................................................................................ 5

          **iii.**   **Failure to issue and repair DME** ......................................................................... 7

          **iv.**   **Failure to issue incontinence supplies** ................................................................ 9

          **v.**    **Denial of Accommodations and Effective Communication for Deaf and Hard of Hearing Population** ............................................................................... 10

          **vi.**   **Denial of Other Assistive Devices** ..................................................................... 12

       **B.**  **Safety of Class Members** .......................................................................................... 13

       **C.**  **RVRs** ........................................................................................................................... 14

       **D.**  **Culture and Leadership at SATF have Improved** ................................................. 14

          **i.**     **SATF Leadership** ................................................................................................ 14

          **i.**     **SATF Custody Staff** ............................................................................................ 15

          **ii.**    **SATF Healthcare Staff** ....................................................................................... 16

   **III.**  **Recommendations** ................................................................................................... 17

**Executive Summary**

Following a year-long, court-ordered investigation into the treatment of incarcerated people with disabilities at SATF, we reported our findings on December 20, 2022. Dkt. No. 3446. The parties did not dispute the findings, and the Court adopted the findings on February 24, 2023. Dkt. No, 3467. The Court then ordered the Court Expert to "monitor Defendant's efforts" to remedy the problems we had identified at SATF. Dkt. No. 3467. Specifically, the Court ordered the Court Expert to undertake the following tasks:

1) **Further Report** – The Court ordered the Court Expert to report on "Defendants' progress in curing the violations of the ADA and ARP that he found in his report of December 20, 2022" within six months of the Court's order. *Id.* The Court also ordered the Court Expert to "propose recommendations to the Court to remedy any continued violations of the ADA and ARP."
2) **ADA Staffing** – The Court ordered the Court Expert to "analyze the adequacy of Defendants' staffing with respect to positions that are intended to assist Defendants in complying with their obligations under the ADA and the ARP." *Id.* at 3.
3) **Sustainable Compliance** – The Court ordered the Court Expert to "work with the parties to develop systems at SATF to enable Defendants to identify and correct, without the assistance of Plaintiffs' counsel or other external monitors, systemic problems that prevent them from delivering reasonable accommodations to class members in a reasonably prompt and effective manner." *Id.*
4) **Safe Housing** – The Court ordered the Court Expert to discuss with the parties and the Special Master in *Coleman v. Newsom* "possible modifications to Defendants' policies and procedures for housing class members, with the goal of ensuring the safe housing of class members whose disabilities may create safety risks for them." *Id.*
5) **Accommodations for Deaf Class Members** – The Court ordered defendants to make CART or an alternative reasonable accommodation available at SATF for due process events, programming, and education, and the Court ordered the Court Expert to "report on this issue in his further report." *Id.*
6) **Assistive Devices for Vision-Impaired Class Members** – the Court ordered defendants to "repair all broken low-vision assistive devices in libraries at SATF as soon as possible and shall keep the Court Expert informed on their progress in doing so and in implementing policies and procedures designed to ensure that all such devices are functional at all times at SATF." *Id.* at 4.
7) **Responses to Advocacy Letters** – The Court ordered the Court Expert to "work with the parties to discuss modifications to Defendants' policies and procedures to ensure that Defendants respond substantively to letters by Plaintiffs' counsel in a reasonably timely manner." *Id.*

This report will discuss Defendants' efforts to address problems identified in our first report (task 1), as well as the parties' efforts regarding safe housing (task 4), an update regarding the rollout

of Computer Assisted Real Time Transcription (CART) (task 5), and assistive devices for vision-impaired class members at SATF (task 6).

A future report will address ADA staffing (task 2), sustainable compliance (task 3), and modifying the process for responding to advocacy letters (task 7). The Court Expert has retained consultants to assist in both analyzing staffing and developing systems of self-monitoring and sustainable compliance. In addition, the Court Expert has worked with the parties to design a new system for responding to Plaintiffs' advocacy letters, which CDCR recently launched. The Court Expert will review the new process in a future report, after the parties have had some experience with it.

We find that SATF has improved the delivery of accommodations to people with disabilities. As discussed below, SATF has significantly improved the process for receiving incarcerated people from other institutions and thus has reduced the likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities. SATF has also improved the process for collecting and handling 7362s (patient requests for medical care), though we continue to recommend that CCHCS devise a system for communicating with patients in response to their requests for medical care. SATF has also improved the processes for issuing, repairing, and replacing DME, including through the successful relaunch of its in-house wheelchair repair program. SATF has also significantly improved the delivery of medical supplies, such as incontinence supplies, to class members.

Unfortunately, there remain problems at SATF regarding the accommodation of deaf and hard-of-hearing individuals, although many of those problems are not unique to SATF. Deaf and hard-of-hearing people still do not consistently receive announcements, and we continue to recommend that CDCR devise a solution that is not reliant on staff or ADA workers having to personally communicate announcements to the deaf population. Deaf people who cannot sign continue not to have consistent access to TTY/TDD phones, and we recommend that CDCR ensure the deaf population is trained on using caption phones, which we understand will soon be available at SATF. Finally, while CDCR has worked diligently to implement CART at SATF, it is so far available only for due process events.

In addition, the process for accommodating people with disabilities who require non-medical assistive devices remains confusing, and CDCR will need to clarify its policies on this issue.

With regard to Rules Violation Reports (RVRs), all healthcare staff have been trained that writing RVRs is not part of their job duties. CCHCS is working on removing the ability of most healthcare staff to author RVRs and will again train staff on the policy once that occurs.

Finally, the culture at SATF seems to have improved, thanks in large part to the efforts of new leadership and the hard work of healthcare staff. Though incarcerated people were of course not uniform in their views, those who spoke with us or submitted survey responses often noted improvements in their ability to get the accommodations they needed and in the attitudes of staff.

Work remains to fix continuing deficiencies in the accommodation of persons with disabilities at SATF, but the current leaders and staff are to be given credit for the significant effort they made to address the problems we identified in our first report. Our largest concern is the issue of sustainability. While some of the changes described have been codified in LOPs, others have not. More importantly, many of the improvements at SATF have been accomplished through the use of staff whose positions are temporary. Should these positions not be made permanent, many of the problems that plagued SATF when we first visited may reemerge.

**I.     Methodology**

We took a number of steps to monitor Defendants' efforts to remedy the problems we identified in our first report. We again sent surveys to class members, this time focused on whether disability accommodations at SATF had improved, stayed the same, or gotten worse. We received approximately 60 survey responses from class members.[1]

At the invitation of the Receiver, we met bi-weekly with the Warden, the healthcare CEO, the Receiver, and members of his staff. At these meetings, custody and healthcare leadership discussed their efforts at the headquarters and institution level to address the problems we identified in our first report. The information discussed in these meetings was summarized in a document that tracked the actions that SATF and headquarters took in response to our first report, and this document was shared with Plaintiffs.

We visited SATF for three days in July, during which we toured several yards, the medical supply warehouse, the wheelchair repair program, two medical clinics, Short Term Restricted Housing (STRH), and Receiving and Release (R&R). We also shadowed a Certified Nursing Assistant (CNA) who delivered incontinence and other medical supplies. During the tour and in virtual interviews that followed the tour, we interviewed 17 class members regarding their experience during the last year at SATF. We also formally interviewed over a dozen staff members, including the CEO, the Warden, and the ADAC, and we spoke with many other staff members during our visit.

Finally, we attended, remotely, three Reasonable Accommodation Panels (RAP) at SATF. We reviewed more than 100 1824s and RAP responses from those panels.

---

[1] In our first report, we discussed that our initial surveys to class members were not handled as confidential legal mail as they should have been. Following our recommendation, SATF retrained mailroom staff to remind them of the requirements of Cal. Code Regs. tit. 15 § 3141-43. We are not aware of any interference by mailroom staff in the delivery of the second round of surveys.

## II. Factual Findings

The following findings are based on interviews of staff and incarcerated people at SATF, observations of operations at SATF, and review of documents and other evidence.

### A. SATF has Improved Delivery of Accommodations to Class Members

SATF has made significant improvements in the delivery of accommodations to class members since our first report. Below, we report on each of the issues that we identified in our first report and the efforts SATF leadership and staff have made to address them.

#### i. Denial of Accommodations During Transfer into SATF

In our first report, we noted that SATF's Local Operating Procedure (LOP) lacked clarity regarding the process for ensuring that class members maintained their DME during transfer, and the LOP lacked clear guidance on who was responsible for replacing DME lost during transfer. The result was that many incarcerated people who lost DME during transfer were left without their DME after they arrived at SATF, and often for extended periods of time.

In response to our first report, SATF amended LOP 403 and LOP 467 to clarify roles and responsibilities so that disability accommodations (such as DME and incontinence supplies) would not be improperly discontinued during transfer. The new policy states that custody staff in R&R are responsible for documenting any missing DME via the CDCR 128B form. Healthcare staff in R&R or Triage and Treatment Area (TTA) (depending on where the transferred person arrives) are then responsible for either immediately replacing missing DME or, if that is not possible, notifying the patient's health care team (on the yard where he will be living) of the need to replace the missing DME. From there, the health care team on the yard is responsible for replacing missing DME "by the next business day" with either permanent DMI, or temporary DME if the permanent DME is not yet available. LOP 467 VII.H.1.e.3.a.[2] All R&R and TTA staff, both custody and healthcare, were retrained on these amended policies.

We toured R&R and found that staff had a clear understanding of the division of responsibility. Custody staff described their process of prepopulating the 128B form with the DME that Strategic Offender Management Systems (SOMS) listed for each arriving incarcerated person. Staff reported that, after interviewing the incarcerated person, they would note if the incarcerated person was missing DME or had DME that was not listed in SOMS. The R&R RN is also required to check whether the incarcerated person is missing any DME, and custody and healthcare staff in R&R understood that it is healthcare's responsibility to replace any missing DME. This system of checking for DME and of assigning clear responsibility for replacing

---

[2] CCHCS is also evaluating whether amendment to HCDOM 3.6.1 is necessary to clarify responsibilities for replacing lost DME during the transfer process.

4

DME is a marked improvement over the processes that were in place when we first visited SATF.

In our first report, we also noted that primary care providers sometimes failed to reconcile—meaning order the continuation of—the medication, nutritional supplements, DME, and appointments of new transfers to SATF, resulting in some class members experiencing lapses in their medication or in DME being removed from their records.  Since our report, SATF healthcare leadership analyzed what happened to "Person B," as we designated an individual whose situation we addressed at length in our first report, and developed an auditing system to ensure that transfer patients would not be harmed by a failure to reconcile.  A nurse practitioner developed a system for auditing whether primary care providers on each yard properly reconciled every new arrival (whether received through R&R or TTA) within one business day, as required by policy.  When the nurse practitioner responsible for auditing finds that a patient was not timely reconciled, he messages the primary care provider to remind them of the need to reconcile, or, if that provider is out of the office or otherwise unable to promptly reconcile, he performs the reconciliation himself.  All reconciliations for new arrivals to SATF have been tracked via this auditing system since January 2023, and although providers have sometimes continued to fail to reconcile, SATF healthcare leadership believes the auditing system has caught those human errors and corrected them.  Although we spoke with only two class members who transferred to SATF in the last six months, both reported that their DME and medication flowed without interruption during their transfer, which is a positive sign, albeit a small sample size.  We also did not hear reports from Plaintiffs or learn of cases while observing the RAP of class members experiencing difficulty obtaining DME lost during transfer or having their supplements and medications interrupted by transfer.

We commend SATF for amending its LOP to clarify roles during transfer, as well as for coming up with its own tool to address the critical problem of reconciliation failures that we identified in our first report.  We understand that CCHCS will soon be rolling out a software solution statewide that will alert providers when they have not reconciled new patients within 24 hours.  It is unclear whether this new system will eliminate the need for SATF to continue with its self-developed audit system.[3]

### ii. Problems with 7362 Process

In our first report, we discussed problems with the timely collection of 7362s, reports that 7362s were lost or never entered into the electronic medical record system, delays in entering 7362s that were received, delays in providing care after 7362s were entered, and lack of communication with incarcerated people regarding their requested care.  SATF healthcare leadership has made a

---

[3] We also understand that CCHCS will be implementing changes to its electronic records system such that existing orders for DME and medication from one institution will automatically populate at the new institution, allowing providers to reconcile a new patient's orders much more efficiently.

5

concerted effort to address these issues, though we continued to hear reports from some class members that they did not receive responses to 7362s or that it took a long time to receive a response.

Regarding the collection of 7362s, we observed on tour that, unlike during our earlier visit, the lockboxes in the housing units in which incarcerated people place 7362s were operational, and we were told that all housing units had operational lockboxes. Staff also showed us logbooks in housing units which nursing staff stamped, dated, and signed to document that they collected 7362s from each housing unit each day.[4]

SATF healthcare leadership also developed a program to audit the 7362 process and monitor 7362s. As part of the audit, staff from the CEO's office submitted test 7362s at different lockboxes within the institution in order to track their progress. Staff tracked what time the 7362s were dropped, what time they were collected, what time they were scanned into the medical records system, and what time they were triaged. The audit covered all yards at SATF and ran for approximately four months. The CEO reported that SATF achieved 100% compliance with timeframes for processing 7362s for three of those months. Currently, the CEO's staff tracks all 7362s entered in the system, and the CNE and her staff perform random audits to assess whether 7362s were triaged appropriately.

We continued to hear reports from class members that their 7362s did not get a response or that it took a long time to receive a response. Given the work SATF has done to audit its 7362 collection and entry, we think it is possible that class members' complaints are due at least in part to inconsistent communication confirming that their request was received and informing them what will happen next with their care. Because incarcerated people do not always know that their request has been received and that they will be seen for their concern, some class members file 1824s or additional 7362s in order to ensure they are seen by medical staff, a process that puts additional strain on the system.

We understand that CCHCS and CDCR are evaluating whether tablets could be used to inform patients that their 7362 has been received and what action is being taken as a result (such as an appointment being made or a medication refill being ordered). We are told that CDCR expects to have additional information regarding the technological feasibility of patient communication via tablet by the end of September, and if this practice is adopted, CCHCS will then need to speak with stakeholders and devise policies regarding patient communication via tablet.

In the meantime, the Chief Nursing Executive (CNE) at SATF has encouraged nursing staff during all staff meetings to send letters to patients when they are requesting information and will

---

[4] SATF clinic supervisors monitored compliance with the requirement to collect 7362s from the housing units each day, including for those units on lockdown or modified program, and CCHCS's Health Care Access Unit also reviewed compliance for this policy in April and found SATF in compliance.

not be seen right away, such as when they are non-symptomatic but are seeking information about test results or upcoming appointments. We understand that nurses are not currently required to send letters in all circumstances, but the CNE has encouraged letters when patients will otherwise not hear from healthcare for a long period.

      iii.    **Failure to issue and repair DME**

In our initial report, we noted that many class members experienced problems with providers denying requests for DME, or delays in receiving DME even after providers claimed they ordered the DME.  We also reported on providers telling patients that certain items were "not available" at the institution, and improperly denying a disability accommodation on that basis. SATF has made improvements in this area.

The CEO has implemented several measures to meet the DME needs of class members.  The CEO identified common types of DME requests raised in 1824s that could be resolved by simply providing the supplies to class members without their having to request them.  For example, SATF provided new wheelchair accessories, such as gloves, cushions, and bags, to every wheelchair user without requiring a request for those supplies.  SATF also began distributing two pairs of eyeglasses instead of one when incarcerated people receive a prescription for eyeglasses.

In addition, all providers were retrained on the DME policy and on ordering DME, when necessary, through the nonformulary process.  SATF also updated its LOP to outline more clearly the responsibility for and the process of ordering nonformulary DME.  LOP 467 VII.E.2.[5]

In addition, after our initial report, SATF healthcare leadership met with nursing, providers, and warehouse staff to retrain them on the DME-ordering process, with an emphasis on ensuring that a provider's decision to prescribe a DME resulted in the provider's medical assistant actually placing an order with the warehouse for the DME.  Consistent with this, SATF updated LOP 467, regarding DME and medical supplies, to more clearly articulate the roles and responsibilities for DME ordering.  LOP 467 VII.A.

Members of the RAP also received focused training regarding the provision of DME as a reasonable accommodation in situations where medical staff deemed the DME was not medically necessary.  During RAPs we observed, members of the RAP appeared to have a clear command of this concept, though in general there were fewer denials of DME by providers, and thus fewer instances when the RAP was asked to issue DME as an accommodation where a provider had denied the DME as not medically necessary.

---

[5] CCHCS is also evaluating whether amendments to HCDOM 3.6.1 are necessary to clarify responsibilities for the delivery, repair, and replacement of DME.  CCHCS has received feedback and comments on the HCDOM section from a wide array of stakeholders and plans to propose amendments to the section and an LOP template based on the updated policy.

Additionally, we previously reported that the process for class members to get their DME repaired or replaced was confusing and caused delays in incarcerated people obtaining working DME. SATF has improved the process for repairing DME in several ways.

First, SATF revised LOP 467 to clarify that when a patient uses a 7362 to notify healthcare staff that that their DME needs repair or replacement, "[t]he patient shall be ducatted for an appointment where the PCT [Patient Care Team] can evaluate the condition of the DME." LOP 467 VII.Q.3.[6] By clarifying that any member of the Patient Care Team—including Medical Assistants and LVNs, and not just physicians—are able to evaluate the need to repair or replace DME, SATF has been able to more quickly replace and repair DME. SATF has also clarified the LOP to note it is the responsibility of nursing staff to provide a loaner wheelchair to a patient whose wheelchair needs repair.

Second, SATF has relaunched its in-house wheelchair repair program, to great effect. With support from the Warden and CEO, a Field Training Sergeant restarted operations of an on-site wheelchair repair program, where two incarcerated people, trained in repairing wheelchairs and walkers, fix the broken wheelchairs and walkers of class members at SATF. Though some repair jobs are sufficiently complex to require that the device be sent to an outside vendor, most wheelchairs and walkers can now be repaired on-site at SATF, drastically reducing the wait time for class members to receive their repaired devices. When we visited SATF, the average repair time for a wheelchair handled at the in-house repair workshop was approximately four days, as opposed to the weeks or months it can take to get a wheelchair back from repair at an outside vendor's shop.

In addition, incarcerated people on three yards are now being trained in the basic repair of walkers and wheelchairs, and SATF plans to begin running "clinics" on Saturdays on those yards, when class members can come to get basic wheelchair and walker repairs.

We spoke with class members who noted the improved turnaround time for wheelchair and walker repair. Other class members were not aware that the in-house repair program was once again operational, but while we toured SATF, the Chief Deputy Warden sent a message to the population to ensure they knew that the wheelchair repair program was once again running and that repair times for wheelchairs had improved.

From the RAPs we reviewed and the 1824s submitted during those RAPs, we noted very few complaints of providers denying DME, and clearer explanations for the denial when it occurred. According to data tracked by the CEO's office, issues related to repair and replacement of DME continue to account for a significant number of 1824s, but SATF healthcare leadership is hopeful

---

[6] SATF healthcare leadership also told us they were encouraging nursing staff to treat 7362s regarding DME as "symptomatic" so that patients with DME concerns are treated promptly, but we have not yet seen this instruction to staff clearly documented in LOP, memo, or training materials.

8

more of those issues will be addressed with the rollout of the Saturday clinics, increasing awareness of the in-house wheelchair repair program, and additional programs to give and replace DME proactively.

### iv. Failure to issue incontinence supplies

In our first report, we noted that many class members had significant problems obtaining needed incontinence supplies. That situation is much improved.

The improvements began when the CEO and his staff rolled out a new system for the delivery of incontinence and other medical supplies to patients. The new system is colloquially referred to as the "brown bag program," because supplies are delivered to class members in brown paper bags. SATF hired, on a temporary basis, four CNAs to operate the program. Each week, the CNAs review patients' orders for medical supplies, compile a 10-day supply of those items, and then deliver the supplies to each housing unit, at which time the class member signs a receipt for the supplies.

In addition, each housing unit is stocked with a "locker" of incontinence supplies, which custody staff can use to provide incontinence supplies to class members as an interim accommodation if they are waiting to be evaluated by a provider for incontinence, or in case a class member runs out of supplies. Housing staff in housing units we toured were knowledgeable of these lockers and their role in providing these accommodations.

Staff in clinic and pill line have reported that having the CNAs deliver supplies has reduced pressure on clinic and pill line staff. The new system has led to an increase in incontinence supplies issued by healthcare, and it appears the medical warehouse staff has done an admirable job keeping up. We note that the jump in demand may indicate that class members previously were not receiving all the supplies they needed.

The brown bag program has received overwhelmingly positive feedback from class members with whom we spoke and from those who filled out our surveys. Class members reported that the program increased their dignity because supplies were delivered discreetly, and they could be confident they would have sufficient supplies to meet their needs.[7] We also heard from class members that the CNAs running the brown bag program were helpful and doing a good job. We also noted very few complaints from class members in the 1824s we reviewed regarding incontinence supplies – a notable change from what we had seen when we first visited SATF.

We understand that CCHCS is considering using SATF's brown bag program as a model to be implemented at other institutions, a move that we fully support.

---

[7] Class members who prefer to go to clinic to collect supplies rather than have them delivered to the housing unit are permitted to do so.

We note that the CNAs operating the brown bag program are currently temporary registry positions, meaning they are not permanently funded positions, though healthcare leadership has applied for permanent funding for these positions. In our view, these positions are critical for the continued delivery of incontinence supplies and other supplies to class members at SATF, and we recommend the positions and program become permanent.

> **v.    Denial of Accommodations and Effective Communication for Deaf and Hard of Hearing Population**

In our first report, we noted several challenges that deaf or hard-of-hearing class members faced at SATF. We reported on deaf class members not receiving announcements, deaf or hard-of-hearing people not having consistent access to the TTY/TDD phones, complaints about low-quality hearing aids, and a lack of accommodations for deaf people who do not know sign language.[8] Unfortunately, many of these problems remain unresolved, though we are hopeful that planned changes will improve some of these issues.

With regard to announcements for deaf people, SATF custody staff are trained that when a deaf person receives an announcement, housing staff are to flash the lights in the deaf person's cell and send an ADA worker to communicate the announcement to the person. We heard from deaf class members that this system does not consistently result in them getting accurate or timely announcements, either because ADA workers do not come to their cell as directed, they do not accurately communicate the announcement, or they refuse to write down the announcement for the deaf person to read.[9]

This problem is not unique to SATF, and the parties have been discussing it in a separate workgroup. CDCR has reported in the workgroup that it is investigating whether tablets could be used to communicate announcements to the deaf population. We understand that custody on some yards at SATF have already begun sending messages via tablet to communicate information that pertains to all people in a housing unit, such as who is supervising that day or what programs will be running. However, some announcements are individualized (such as when a person is being called to medical), and CDCR will need to provide guidance and policy on whether and how those announcements can be communicated via tablet. In the meantime, it

---

[8] We also noted that one individual, who could speak but could not hear, was sometimes being forced to write notes to healthcare, despite his ability to speak. We recommended that healthcare staff be trained "that some deaf people can speak but cannot sign and how to correctly accommodate those class members." Dkt. No. 3446 at 64. We understand that training did occur, though we heard from the class member in question that at least one healthcare staff member has continued to make him write notes during encounters.

[9] SATF has not devised a method to audit whether deaf people consistently get announcements, though the ADAC meets monthly with the deaf population and asks whether they are getting communication of announcements. We understand that CDCR is discussing whether announcements sent via tablet could be audited for effective communication.

remains the case that deaf and hard-of-hearing class members at SATF do not reliably receive announcements.

Regarding TTY/TTD phones, we continued to hear reports that they did not work, and we witnessed that they did not work in one housing unit we visited when we toured at SATF. We also observed that staff had trained an ADA worker, rather than the deaf people themselves, in how to use the TTY/TTD phones. This is not acceptable, as it requires an ADA worker to be involved in a private phone call. It is not clear what, if any, action SATF took in response to our recommendation that SATF ensure that the phones be made available to deaf people who do not sign.

We understand that caption phones, a more modern device than the TTY/TTD phones, will soon be rolled out at SATF. Class members who may use the caption phones should be trained in how to use them independently, and we recommend that CDCR provide guidance to the institution on how to train the deaf and hard-of-hearing population on the use of these devices.

We continued to hear reports from class members that the hearing aids they receive are of low quality and do not work well. The CEO also identified this as a common concern he heard at the RAP, and he contacted headquarters to inquire about whether a better-quality hearing aid could be provided. We understand the CEO asked to be part of any pilot program for new hearing aids. The parties are discussing the quality of the hearing aids in the deaf and hard-of-hearing workgroup and have hired experts to assist in the discussion. As of the writing of this report, this issue has not been resolved.

Finally, in response to our report, CDCR instructed all institutions to use Microsoft Teams auto-captioning during due process events as a temporary accommodation while CDCR works to obtain CART.[10] The process to launch CART services has been protracted due to bidding and contracting requirements, problems with internet connectivity, and obtaining necessary technology. We understand that CART will be available at SATF, as well as 10 other institutions, for due process events beginning August 24.

SATF informed class members of the availability of CART for due process events via flyers posted in all housing units, communication to the Inmate Advisory Council (IAC), and via a town hall. At the town hall, the ADAC gave certain class members an orientation regarding what CART is and for what types of events they can receive CART. The town hall included class members whose primary or secondary form of communication is written notes as well as executive members of the IAC. The town hall itself did not use CART, which was

---

[10] CART is the instant translation of spoken language into text, transcribed by a human reporter. The text is then displayed on a computer monitor or projected on a screen for the deaf or hard of hearing person to read. *See* National Disability Resource Collective Navigator, *Computer Aided Real-Time Transcription (CART)* (2022), *available at* https://nationaldisabilitynavigator.org/ndnrc-materials/disability-guide/computer-aided-real-time-transcription-cart/

counterintuitive – at least one of the class members in attendance has no ability to hear. We understand that the SATF ADAC requested a demonstration of CART prior to the town hall, as well as use of CART at the town hall, but his request was denied. As SATF expands the use of CART for additional programming, CDCR should ensure that future town halls feature the use of CART, and SATF should send other communication (such as a tablet message or letter) to class members eligible to use CART regarding when they can receive CART and how they must request it.

CDCR is next working to bring CART to SATF and other institutions for all programs, services, and activities, and not just due process events. In order to accomplish this, the Department must survey connectivity at each institution to determine where programs utilizing CART can be hosted. They will also need to procure necessary additional equipment for operating CART in those locations.

In short, the CART roll-out at SATF is still a work in progress. We will have to see whether CART is used effectively in due process events and is expanded to other programs and services.

### vi. Denial of Other Assistive Devices

In our first report, we noted that there was confusion about who was responsible for obtaining non-medical assistive devices (such as typewriters) when those devices are reasonable accommodations. We also noted that assistive devices in some of the libraries were inoperable and that staff did not know when they would be repaired.

First, the confusion regarding whose responsibility it is to obtain non-medical assistive devices for class members appears to be a system-wide issue. Currently, CDCR supplies certain assistive devices (such as handheld LED magnifiers and pocket talkers) free of charge to class members, but other assistive devices must be purchased by class members with their own funds. Plaintiffs wrote to CDCR on April 11, 2023 to request that CDCR develop a system for CDCR to purchase and track non-medical devices as reasonable accommodations. CDCR has not responded. We understand that CDCR is discussing this issue in an internal workgroup and plans to provide additional guidance to institutions regarding the process of obtaining non-medical assistive devices through the next update to the ADA Desk Reference Manual. However, CDCR should respond to Plaintiffs' April 11, 2023 letter and state its position so that meaningful progress can be made to resolve this issue.

Regarding low-vision assistive devices in the libraries at SATF, SATF began requiring librarians to periodically check that the low-vision devices were in working order, and to document when the devices were out for repair. These checks began as quarterly and then became weekly.

Although most assistive devices in the libraries appear to be functional, the Merlin device on D yard has been non-operational since at least January 2023.[11] We understand that the institution sent the device to a vendor for repair many months ago but is waiting for CDCR to make

---

[11] We heard from one low-vision class member on D yard that the device had never worked in the two years he lived on the yard.

payment in order for the device to be returned to SATF. In the meantime, there is another assistive device on D yard, a DaVinci, that appears to be operational.

In addition, when we toured SATF we attempted to view assistive devices in two libraries but were unable to because there were no librarians staffing the library. We understand that there is a shortage of librarians at SATF, and libraries are often unavailable to class members. Currently, the assistive devices in the library are the only means that some class members with low vision have to read. The question of whether that is an acceptable arrangement is the subject of another workgroup in which we are participating. But if the only means CDCR provides to some class members to have access to written material is through library access, then the Department must ensure at a minimum that the libraries are staffed and accessible.

### B. Safety of Class Members

In our first report, we discussed class members who felt that their housing was unsafe due to their disability. We recommended that CDCR and CCHCS provide additional guidance to make clear who is responsible for responding to these concerns and what factors they should consider in determining the person's housing. We noted that some staff at SATF required class members to report a specific enemy concern to merit a housing change, and we recommended that SATF staff be trained that such requirements were improper.

First, we note that that the SATF RAP has improved its approach to assessing requests for housing changes based on safety concerns due to a disability. We observed that the RAP considered a person's circumstances holistically and went beyond simply determining if a specific enemy concern existed. On many occasions we observed the RAP grant single-cell housing as a temporary accommodation pending further review by the classification committee, and on one occasion the RAP granted single-cell housing as an accommodation despite the classification committee's determination that the person could be housed with others. Although additional guidance from headquarters is needed regarding how to handle these requests, including how to assess these requests for interim accommodations while the RAP is investigating the claims, the SATF RAP in our view has been increasingly thoughtful in considering the housing needs of class members.

As we discussed in the first report, the issue of how to respond to class members' concerns regarding their safety in their housing setting is a system-wide issue. CDCR needs to establish policies that make clear who is responsible for evaluating single-cell requests based on safety issues related to a disability, what factors they are to consider, and the process for reaching a determination. This issue affects staff in custody, healthcare, mental health, and education, and requires coordination among those disciplines. In an all-day meeting on August 16, representatives from CDCR, CCHCS, Plaintiffs, the Court Expert's office, and the *Coleman* Special Master's team met to discuss the process for evaluating requests for housing changes due to disabilities causing compatibility concerns. The parties made significant progress, and we look forward to continuing to work with the parties to agree on a system that ensures the safe housing of class members.

### C. RVRs

We previously reported on healthcare staff issuing RVRs as discipline to class members, and how that practice could damage relations between healthcare and class members. Shortly before we issued our first report, CCHCS conducted training for all healthcare staff at SATF and other institutions to make clear that their job duties did not include authoring RVRs. We recommended that changes be made such that healthcare workers could not author RVRs.

We understand that CCHCS will soon be altering SOMS so that most healthcare staff will not be able to author RVRs. CCHCS is training healthcare staff to report serious incidents (such as when they are the victim of violence or witness a crime) by authoring an incident report for their healthcare supervisor. After the healthcare supervisor reviews and approves the report, they then send the report to custody staff. The healthcare supervisor will also be required to send reports to the CEO, which will be useful in giving the CEO and his staff the ability to monitor issues at clinics.

We believe these changes will improve the relationship between healthcare and patients and help keep healthcare workers in the role of providers rather than disciplinarians.

### D. Culture and Leadership at SATF have Improved

#### i. SATF Leadership

There have been significant leadership changes at SATF since our first report, including a new Warden, a new ADAC, and a new healthcare CEO. The new leadership has clearly worked to address the issues we identified in our report and to encourage a mindset shift at SATF. From his arrival at the institution, the CEO has emphasized a message of "whole person care" to his staff, meaning that their responsibility is to address all the needs of a patient. We saw this message reiterated in training and other messaging from healthcare leadership, we heard it discussed by clinic staff, and we saw it play out at the patient level based on our conversations with class members and observation of the RAP.

The CEO comes from the private healthcare industry, but his lack of experience in the prison system does not appear to have been an obstacle. Indeed, in some cases it has resulted in openness to creative solutions. For example, the CEO and his staff came up with the idea of delivering medical supplies directly to the unit, and they went so far as to buy the brown paper bags themselves to get the program started. The CEO has also led efforts to collect and analyze data from 1824s submitted by class members to identify trending issues with the goal of addressing and resolving concerns before they result in 1824s.

The CNE, who was new to the position during our first investigation at SATF, has continued to emphasize worker well-being, and we noted a particular emphasis on regular staff appreciation efforts. In addition, the CNE has instituted a "strike force" internal audit system, using nursing

14

leadership to conduct inspections and measure for metrics that OIG and other oversight bodies measure, with the message to "stay ready so we don't have to get ready."

As medical leadership at SATF has implemented new policies for and expectations of their staff, the feedback we heard from healthcare staff regarding the changes was largely positive. Finally, we noted improved relations between healthcare and custody leadership, which is important because managing disability accommodations requires collaborative effort between custody and healthcare. One way in which SATF significantly improved in this area was by creating a position within healthcare, the Health Program Manager III (HPM III), that has responsibility for healthcare's assistance with ADA compliance. The position acts as a healthcare counterpart to the ADA Coordinator. The HPM III sits on the RAP and serves as a liaison between healthcare and custody on healthcare issues that affect ADA compliance. The HPM III has also been responsible for helping manage the CEO's disability accommodations initiatives, such as the brown brag program. We think the creation of this position has significantly aided SATF's focus on disability accommodations, and we recommend that the position be made permanent.

SATF also has a new Warden since our last report. The Warden has been actively engaged in the response to our report and meets with the ADAC and CEO regularly to discuss ADA compliance. The Warden has also engaged with staff and the incarcerated population, regularly walking the yards and speaking with class members directly. He has also led efforts to begin introducing California Model[12] concepts at SATF. When we toured SATF, we had the opportunity to take part in a California Model initiative – Peace Day – being held on a Level 2 security yard. The day was organized by incarcerated people and facilitated by staff, and featured musical performances, speeches, and games. Throughout the day, staff and incarcerated people mingled and interacted on the yard. We also heard from many staff and incarcerated people about a basketball game organized on another yard between a team of incarcerated players and a team from the community. This event was another opportunity for positive social interaction between staff and incarcerated people, a goal of the California Model. We heard positive feedback from staff and incarcerated people about both events and about the possibility that similar efforts in the future could improve relations between staff and incarcerated people.

### i.     SATF Custody Staff

In our first report, we noted complaints from healthcare staff that they were placed in a disciplinarian role because custody staff were failing to monitor pill lines. We observed several pill lines during our most recent tour and saw custody staff in place to monitor them. We also understand CCHCS's Operations Monitoring Audits are auditing whether custody staff attend and assist at pill lines.

---

[12] The California Model is a new initiative by CDCR to improve living and working conditions at California prisons, based on international best practices. *See* https://www.cdcr.ca.gov/the-california-model/

The Field Training Sergeant (FTS) program at SATF has continued, and we heard generally positive reports from class members that FTS sergeants assisted them with their disability-related needs. We also heard from incarcerated people and staff that FTS sergeants had trained housing unit staff regarding disability issues, such as the concept that people with disabilities should receive priority access to ADA showers.  We heard reports that some FTS sergeants were more helpful than others, but on the whole, feedback was generally positive.  However, we did hear both in surveys and in interviews that some class members felt that FTS sergeants were discouraging the use of the 1824 process by asking class members to first address problems with the FTS sergeants.  We think it is reasonable for FTS sergeants to remind class members that they are an available resource and that they may be able to resolve an issue faster than a class member could receive assistance from an 1824, but FTS sergeants should be cautious not to use language that could be interpreted as discouraging the filing of 1824s.

We also noted that FTS sergeants reported connectivity problems with using their tablets outside the office, which made it more difficult to assist people they visited in the housing units, as the tablets are an important tool for tracking and reporting issues with class members.  We understand that SATF recently obtained permission for their FTS sergeants to connect to CCHCS internet, which has a more stable connection in the yards, and we hope this allows FTS sergeants to make use of their tablets when visiting with class members.

### ii. SATF Healthcare Staff

Although it is hard to measure, we noted a sense of improved morale among the healthcare staff with whom we spoke at SATF.  Several factors may contribute to this, including the steep decline of COVID, which had caused significant strain on healthcare workers at the institution.  In addition, the use of CNAs to manage the delivery of medical supplies has relieved pressure from other healthcare staff in the clinics.  As mentioned, improvements to the DME delivery process have also helped patients to receive DME or repaired DME more quickly, which in turn leads to improved relations between patients and healthcare.

We noted fewer complaints in surveys and interviews with class members about hostility from or mistreatment by nursing staff.  We spoke with class members who were pleasantly surprised that when they raised an issue with a CNA handling delivery of supplies, the CNA later returned to talk to the patient and followed up on their concern.  We also spoke with class members who noted that healthcare providers were asking them at the end of appointments if they had additional concerns, and in general seemed more willing to help.  Of course, some class members shared negative experiences with healthcare staff, but overall, we noted an improvement between our first investigation and our most recent tour.

**III.     Recommendations**

1) CDCR should respond to Plaintiffs' April 11, 2023 letter regarding non-medical assistive devices and state whether it believes it is obligated to pay for non-medical assistive devices that are disability accommodations.  CDCR must also clarify how class members are to request non-medical assistive devices and whose responsibility it is to review those requests and obtain the devices.
2) CNA positions at SATF required to operate the program for delivery of incontinence and other medical supplies should be made permanent and funded.
3) The HPMIII position at SATF should be made permanent and funded.
4) CDCR should develop methods to reliably communicate announcements to deaf and hard-of-hearing people.  CDCR should provide an update on the feasibility of using tablets to convey announcements at the next deaf and hard-of-hearing workgroup meeting.
5) CDCR should provide guidance to SATF on how to train the deaf population on the use of caption phones.
6) CDCR should provide a demonstration of CART to the SATF ADAC and should provide CART at future town halls to introduce the service to the incarcerated population.  When CART is rolled out for all programs and services, SATF should send communication (such as a tablet message or letter) to class members eligible to use CART regarding when they can receive CART and how they must request it.
7) CCHCS should continue to work towards devising a system for communicating with patients in response to their requests for medical care.