DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
D. MARK JACKSON
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:            (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.     Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

      **1.     Plaintiffs' Statement**

            **a.     RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults and retaliation against incarcerated people on the basis of their disabilities who request accommodations and face discrimination, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").  ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF No. 3393, Exs. A, B.

Following a year of negotiations, the changes to the staff misconduct complaint process were incorporated into new regulations, and the Notice of Change to Regulations, 22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received written notice that Defendants unilaterally changed regulations stemming from the negotiations.  Specifically, Defendants removed from regulation the Allegation Decision Index ("ADI"), the negotiated tool to be used by CDCR in deciding which staff misconduct

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

complaints were sufficiently serious to warrant referral to the Office of Internal Affairs ("OIA") for investigation.  The parties have yet to reach agreement on how they will address Plaintiffs' concerns as articulated in Exhibit A to a prior Joint Case Management Statement (ECF No. 3430) and the Court Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

Currently at issue is Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order.  Plaintiffs cannot agree.  *See* June 13, 2023, Letter from Plaintiffs' counsel ECF No. 3494, Exhibit A.  Agreeing that the ADI would only be required at six prisons undermines the guiding principles surrounding negotiated reforms—to create a simplified staff complaint process to ensure higher quality and unbiased investigations and to ensure greater accountability for staff misconduct.  The Court Expert shared some of Plaintiffs' concerns.  ECF No. 3433 at 2-3.  Defendants assert below that the Court's Orders extend to only six prisons and that their intent is to utilize the ADI statewide.  However, Defendants have also employed a different standard for how the ADI will be used a six prisons versus non six prisons.  *See* ECF No. 3440, Exhibit A (explaining Plaintiffs' objection to the implementation of a heightened screening standard for when allegations will be routed consistent with the ADI at non-six prisons).

Having differing standards for processing staff misconduct complaints depending on the prison where the complaint arises defies logic and undermines the entire concept of accountability as enshrined in prior orders in this case.  Additional litigation may be necessary in order to ensure uniform implementation of accountability standards.

Defendants have also begun quarterly production of documents in compliance with the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and biased investigations that thwart the discovery of misconduct and, even when misconduct is apparent during the investigation, poor decision-making on the part of Hiring Authorities prevents accountability.  A redacted copy of Plaintiffs' counsel's most recent staff misconduct report, sent August 11, 2023 is attached hereto as **Exhibit A**.  In response

1   to ongoing reports of problems, "[t]he Court Expert will be working with the parties to

2   develop a methodology for reviewing individual cases in a manner that will allow the

3   parties to reach agreement on shortcomings and craft solutions."  ECF No. 3477 at 4.

4          CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP

5   found thus far at six prisons exist system-wide and are committed to bringing such

6   evidence before the Court until all class members are protected.  Plaintiffs continue to

7   discuss with Defendants the implementation of their Early Warning System (EWS) to

8   guard against such widespread abuse by one officer.  Plaintiffs remain optimistic that the

9   EWS can act as a tool to identify and root out staff misconduct, before serious problems

10  arise.  However, as currently designed, the EWS fails to alert staff to serious problems.

11  *See* September 11, 2023 letter from Plaintiffs' counsel regarding EWS Objections.  The

12  parties are scheduled to meet on September 25, 2023 to further discuss the EWS.

13              **b.      False, Retaliatory and Discriminatory RVRs**

14          Despite significant progress made towards court-ordered improvements to the staff

15  misconduct investigation and disciplinary system, the endemic use of false and retaliatory

16  RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

17  members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same

18  biased review that plagues the staff inquiry and investigation processes also denies class

19  members due process in disciplinary hearings, resulting in longer terms of imprisonment,

20  denials of privileges, housing at higher classification levels, and an unwillingness to report

21  future misconduct or request disability-related help.

22          As in the staff complaint context, reviewers discount or ignore the testimony of

23  incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers

24  fail to discover evidence that staff have issued reports that appear plagiarized or otherwise

25  replicate conduct and charges that are improbably attributed to multiple people at the same

26  time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct

27  charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322

28  at 11-12 & Ex. E.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs continue to raise outstanding problems.  Defendants are in the process of revising the Chief Disciplinary Officer training to include the requirements for reviewing camera evidence, reviewing cases for bias, and the obligation to report staff misconduct when it is evident in the disciplinary process.  Defendants agree to record audio for serious RVR hearings. According to Defendants, the recordings will be used for internal audits and will be available for review during investigations into allegations of false/discriminatory RVRs. The recordings will otherwise not be available to incarcerated people.

Defendants have also agreed to implement a headquarters-level audit of RVRs at 10 prisons, beginning in October of 2022.  Their draft audit plan includes, among other issues, identification of discrimination, retaliation, and bias in the RVR process.

Defendants have agreed to evaluate whether to include "red flags" in their EWS to identify when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and instances when an incarcerated person receives an RVR within a certain period of time after having filed a staff complaint.

Defendants are still considering problems identified by Plaintiffs' counsel regarding the issuance of counseling-only RVRs which provide no due process in prison but can have negative consequences.  Defendants have agreed to remove from electronic files RVRs that are voided or dismissed as a result of a confirmed staff misconduct.  This is a significant step because those RVRs are currently relied on in risk assessments conducted during the Board of Parole Hearings process and are currently viewable by the Board.

Plaintiffs are hopeful that the parties can agree to resolve problems and that

1   additional court intervention will not be necessary.

2       **2.**    **Defendants' Statement**

3           **a.**    **RJD and Five Prisons Orders**

4       In compliance with the Court's September 8, 2020, and March 11, 2021 orders,

5   Defendants have, along with Plaintiffs and the Court Expert, developed comprehensive

6   and effective remedial plans that the parties filed with the Court on March 21, 2022.  ECF

7   No. 3393.  CDCR has dramatically overhauled its processes to ensure unbiased and

8   complete investigations and, although not required by the Court's orders, Defendants have

9   deployed statewide the processes that restructure CDCR's staff misconduct allegation,

10   screening, referral, investigative, and disciplinary processes.  As the Court has noted,

11   "[t]hese agreed-upon measures constitute substantial improvements that will go a long way

12   to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF

13   No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is

14   likely to have a positive impact on…the overall reliability of the outcomes of

15   investigations."  *Id.*, at 15.

16       The revisions to the regulations, noted above by Plaintiffs, are intended to further

17   ensure success of these processes by efficiently routing all staff misconduct complaints to

18   the most appropriate entity for investigation.  Defendants believe that the process can be

19   improved, in part, by providing additional training to the initial screeners so that these

20   screeners have an improved understanding of what amounts to serious staff misconduct to

21   ensure consistent application of the new process and these revisions seek to achieve that

22   objective.  Defendants have collected and shared data to support Defendants' proposed

23   revisions to the regulations.  Defendants will continue to evaluate all information received

24   to monitor compliance with the Court's orders and to provide adequate resources to ensure

25   the successful transition to these new processes.  Notwithstanding Plaintiffs' concerns and

26   objections related to the recent revisions to the staff-misconduct processes, CDCR's staff-

27   misconduct investigations and discipline processes are in compliance with this Court's

28   orders applicable to the six prisons (ECF Nos. 3059, 3060, 3217, 3218).

Plaintiffs' foregoing statement that, "Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order" is "at issue," mischaracterizes the current status because there is no dispute that the negotiated ADI only applies to the six prisons because the Court's staff-misconduct orders were limited to those six prisons and CDCR's decision to deploy the process statewide does not alter this fact. Notwithstanding the current status of the proposed stipulation, the ADI remains a significant component of the complete restructuring of the statewide process that has transferred the review of staff misconduct allegations from the local institutions to the Office of Internal Affairs. Defendants have proposed that any stipulation between the parties concerning the ADI accurately reflect this Court's orders, which only applies to the six prisons.[2] Plaintiffs' singular focus on the ADI fails to recognize the multi-faceted overhaul of the staff misconduct process and CDCR's other commitments to address staff misconduct, including its commitment to deploy fixed-camera technology at 14 institutions in addition to the Court-ordered deployment of such technology at six institutions (20 institutions total), its commitment to deploy BWC technology at four institutions in addition to the Court-ordered deployment of such technology at six institutions (10 institutions total), and its development of a comprehensive EWS that exceeds the requirements of the Court's order, and other measures. Further enforcement orders as to other institutions is not necessary because this statewide overhaul of the staff misconduct process remains in effect and "additional litigation," as contemplated by Plaintiffs above, would only stall productive negotiations between the parties and consume limited resources that could be put to better use elsewhere.

---

[2] "The Court's orders require Defendants to modify their systems only at the six prisons and only with respect to alleged violations of the ARP and ADA. [ECF No. 3339-0 at 6.] The Court did not require Defendants to modify their investigations system statewide. Consistent with the PLRA's requirements, the additional remedial measures that the Court ordered Defendants to include in their proposed plans were narrowly tailored to the six prisons and to alleged violations of the ARP and ADA." ECF No. 3356 at 14. "The Court limited its orders to the six prisons and to the context of the ARP and ADA in recognition of the PLRA's requirement that any remedies ordered be narrowly drawn." ECF No. 3356 at 15.

### b.  Demands for RVR Reform

As detailed above by Plaintiffs, Defendants have made significant progress and commitments to address Plaintiffs' demands that CDCR address the alleged practice of issuing false and retaliatory Rules Violations Reports.  Defendants have committed to revising the Chief Disciplinary Officer and the Senior Hearing Officer trainings, to implement a headquarters-level audit of RVRs at 10 institutions, to audio record serious RVR hearings for internal auditing purposes, revise the Department Operations Manual, to draft a memorandum addressing discriminatory RVRs, to create a new screening process to determine whether a physical disability contributed to the underlying conduct, to the development of EWS alerts, and other remedial measures.

As detailed in a past Joint Case Status Statement, recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No. 3412 at 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes, camera and audio technology, and the fact that statewide allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.

Plaintiffs' assertion that "the issuance of counseling-only [chronos] [] provide no due process," is misplaced because long settled case law establishes counseling-only chronos do not implicate a liberty interest necessitating due process.  *See Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995).  Further, incarcerated persons receive a copy of the counseling-only chrono and may contest such chronos in the grievance process.  Notwithstanding the significant progress made, there remains some disagreement between the parties.  Nevertheless, Defendants have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed revisions.

## B.  Court Expert Investigation Into SATF, the State's Largest Prison

### 1.  Plaintiffs' Statement

In December 2022, the Court Expert filed his report and recommendations

regarding the treatment of people with disabilities at SATF, the state's largest prison.  ECF No. 3446.  He found that people with disabilities at SATF are "living diminished and needlessly difficult lives," and as a result "face harsher prison conditions, and thus greater punishment, than their peers." *Id.* at 4.  People were denied accommodations needed to safely and independently perform a wide array of activities, including to eat, perform bodily functions, write, and participate in rehabilitative programs.  The Court Expert found that "it was not management that identified these problems; it was Plaintiffs' counsel." *Id.* at 5. Plaintiffs agree with the Court Expert that "much at SATF has to change" and that "SATF has not demonstrated that it is able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors." *Id.* at 5-6.

Secretary Macomber has said that "[a]ddressing staff attitudes toward inmates with disabilities is an overarching issue that must be addressed with all staff at SATF be they custody, medical, or administrative." ECF No. 3463-1 at 3.  Plaintiffs agree.  But the process will not be easy or quick.  Changes in personnel, policy, and training simply are not enough.  On February 24, 2023, the Court ordered additional review and action by the Court Expert, including a much-needed staffing analysis and development of policies to ensure safe housing of people with disabilities.  ECF No. 3467.  The Court Expert filed his Second Report on August 24, 2023, and another report will be filed at a later time to address, among other things, ADA staffing, sustainable compliance, and responses to advocacy letters. *See* ECF No. 3500.  Plaintiffs' response to the Second Report is due on September 21, 2023.

The problems identified by the Court Expert are not limited to SATF.  Sufficient ADA staffing, extreme ADA Coordinator turnover, provision of accommodations for deaf class members who do not know sign language, and adequate policies and procedures related to disability accommodations and durable medical equipment, for example, are statewide issues that affect class members wherever they are housed.  It is incumbent on Defendants to address these issues statewide, and to not continue the reactive, piece-meal approach that has typified their response to their obligations under the Americans with

1  Disabilities Act and *Armstrong* for so long.

2  **2.      Defendants' Statement**

3      The Court Expert filed his second report concerning the treatment of people with

4  disabilities at the SATF recognized the numerous proactive measures implemented at

5  SATF to further respond to the needs of incarcerated people with disabilities.  ECF No.

6  3500.  The report demonstrates that the coordinated efforts between CDCR and the

7  California Correctional Health Care Services (CCHCS), with the Court Expert's guidance

8  and with input from Plaintiffs, are working to effectively respond to the issues raised by

9  the Court and addressed by the Court Expert following his initial investigation.  Although

10  additional work needs to be completed, the Court Expert now reports that SATF has made

11  "significant improvements in the delivery of accommodations to class members" and that

12  "the culture at SATF has improved," since his first report. (ECF No. 3500 at 4, 6.

13  Although more work needs to be done, it remains promising that class members have

14  reported to the Court Expert, through personal interviews and survey responses,

15  "improvements in their ability to get the accommodations they needed and in the attitudes

16  of staff."  ECF No. 3500 at 4.  The Court Expert reports that through these responsive

17  collaborative efforts, SATF has significantly improved the process for receiving incarcer-

18  ated people from other institutions and has reduced the likelihood that class members lose

19  access to Durable Medical Equipment (DME) or medication necessary to accommodate

20  their disabilities.  *Id.*  The Court Expert further reports that SATF has also improved the

21  process for collecting and handling patient requests for medical care (Form 7362s), has

22  improved the processes for issuing, repairing, and replacing DME (including through the

23  successful relaunch of its in-house wheelchair repair program), and has significantly

24  improved the delivery of medical supplies, such as incontinence supplies, to class

25  members.  *Id.*  Although work remains to address other deficiencies, the Court Expert

26  states that the "the current leaders and staff are to be given credit for the significant effort

27  they made to address the problems" identified in the first report.  ECF No. 3500 at 5.

28      In his report, the Court Expert made additional recommendations to CDCR and

CCHCS.  As to CDCR, the Court Expert issued recommendations concerning the clarification of policy concerning non-medical assistive devices, the further development of methods to reliably communicate announcements to deaf and hard-of-hearing people, the need for guidance to SATF on how to train the deaf population on the use of caption phones, and the successful implementation of Communication Access Real-time Translation (CART) to eligible class members.  ECF No. 3500 at 19.  CDCR continues to coordinate with the Court Expert and stakeholders on these and other issues to further respond to class-member needs as more fully detailed in Defendants' response to the Court Expert's report filed on September 7, 2023.  ECF Nos. 3504, 3504-1.  The Court Expert will issue a future report addressing ADA staffing, sustainable compliance with the ADA and the ARP, and modifying the process for responding to advocacy letters.  ECF No. 3500 at 4.  Defendants will continue to coordinate with the Court Expert to facilitate his investigation and to collaborate with him and the Plaintiffs to effectively respond to the concerns raised in his reports to fully accommodate class members in compliance with the ADA and the ARP.

## C. Accommodations for Deaf and Hard-of-Hearing Class Members

### 1. Plaintiffs' Statement

Defendants continue to discriminate against D/deaf and hard-of-hearing class members and have failed to remedy a number of fundamental accommodation issues.

One issue—CART— is currently under Court order.  *See* Order ECF No. 3467 at 3 ("Defendants shall make CART or an alternative reasonable accommodation available at SATF … as soon as possible").  The parties' discussion of CART implementation and any ability to come to agreement to avoid the need for further litigation has been impeded by Defendants' continued delays in sharing information, including draft policies and operating procedures.

The Court ordered that CART be implemented at SATF "as soon as possible" for (1) due process events, (2) programming, and (3) education. But Defendants have stated that the initial implementation will be only for select types of due process encounters, and

1    have no clear implementation timeline for extending coverage to critical education and

2    programming at SATF (or elsewhere)—two of the three categories required by the Court

3    order.  On August 10, Plaintiffs observed a "town hall" meeting at SATF, on G yard,

4    designed to educate all deaf and hard of hearing class members (those with DNH and DPH

5    codes) about the availability of CART.  Contrary to what the parties had negotiated, SATF

6    did not provide CART during the town hall, effectively excluding from the event all class

7    members who require CART; and SATF failed to invite more than 90% of the class

8    members on G yard who have DPH and DNH codes.

9        At least two other issues impacting class members—effective communication of

10   announcements and the poor quality of hearing aids—are also part of the Court Expert's

11   pending review of SATF.  *See* ECF No. 3467 at 2 (order requiring Court Expert to file

12   "report on Defendants' progress in curing violations of the ADA and ARP that he found in

13   his [previous] report"); ECF No. 3446 at 37-42 (Court Expert report finding denial of

14   effective communication to deaf and hard-of-hearing people, including discussion of

15   effective communication of announcements and poor quality hearing aids).  Plaintiffs are

16   concerned by Defendants' delays and lack of meaningful engagement on both issues,

17   which may necessitate more direct judicial involvement.

18       Lack of effective communication of announcements continues to pose significant

19   impediments to daily life for deaf and hard of hearing people statewide.  Defendants have

20   yet to implement, or even identify, a meaningful solution.  Deaf and hard of hearing people

21   cannot hear announcements made on the yard or in their housing unit, and they often miss

22   notices about medication pass, laundry, cancellations or changes to their programming,

23   medical appointments, ducats, and even meals.  For over five months, Defendants have

24   claimed to be researching a "technology-based solution" to help deliver announcements to

25   deaf and hard of hearing individuals. To date, they have provided no substantive update

26   regarding progress and have no definitive solution to address problems with the ongoing

27   lack of effective communication of announcements reported by class members.

28       Poor hearing aid quality continues to plague individuals with disabilities who rely

on auxiliary aids to hear.  Notably, the two hearing aid models currently issued to people in prison are so poor that many people report they do not bother to wear them at all.  In July 2022, Plaintiffs provided Defendants with a report that concluded that the hearing aid models CDCR currently provides were so poor in quality they cannot even be considered "hearing aids by today's standards."  She made a number of recommendations for the technical specifications of new hearing aid, including requiring provision of digitally programmable hearing aids that have adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression, tele-coil, and for class members with tinnitus (ringing in the ears), tinnitus sound generators.  She also recommended that pocket talkers be made available immediately.

A year later, Defendants have implemented only half-measures.  Defendants have contracted, through CCHCS, with an "expert" to provide advice on hearing aids and other accommodations.  On July 26, 2023, Defendants shared a one-page "summary" of conclusions from their expert.  Plaintiffs are concerned that Defendants' expert recommendations will do little to nothing to improve the quality of the hearing aids and may make problems worse.  Plaintiffs have requested additional information regarding the basis for Defendants' expert recommendations.

In June 2023, Defendants agreed to expand class members' access to pocket talkers. Plaintiffs' counsel is very pleased with this development, although we remain concerned about implementation, as class members continue to report inappropriate denials of pocket talkers.

Finally, Plaintiffs' counsel has raised concerns that a lack of accessible telephone options on tablet computers discriminates against deaf and hard of hearing individuals. Tablet computers have been provided to almost all incarcerated people, for free, enabling them to make calls from their tablets to their loved ones from the privacy of their cell during most hours of the day.  But tablet computers have no accessibility features for calls, such as captioned telephone services or videophone service.  As a result, deaf and hard of

1   hearing individuals cannot equally access phone calls with loved ones.  This disparity

2   becomes particularly pronounced during periods of lockdown or modified programming,

3   which can last for weeks, when access to the phones in the dayroom is limited or

4   nonexistent. Defendants have acknowledged that unequal phone access is an issue, and that

5   there is no uniform solution across CDCR institutions. Defendants do not currently have a

6   plan or timeline for implementing equal access to tablet-based calling, nor will they

7   commit to allowing deaf and hard of hearing people increased time out of their cell to use

8   accessible phones during lockdowns or modified programming.

9        Plaintiffs remain committed to working with CDCR and CCHCS to ensure that

10   appropriate accommodations are provided to class members, but a new hearing aid

11   contract must be entered into without further delay.  Defendants must provide a

12   meaningful and long-term solution to achieve effective communication of announcements,

13   and pocket talkers must be immediately made available to people at all times they may

14   need to communicate with others.

15        **2.    Defendants' Statement**

16        Defendants remain committed to providing class members equal access to

17   programs, services, and activities in accordance with the ADA and the ARP and will

18   continue to meet with Plaintiffs as part of the parties' ongoing workgroups, to ensure the

19   successful deployment of these services.  Plaintiffs' description is outdated and fails to

20   describe further development and implementation of CART services and other

21   accommodations for the deaf and hard of hearing population.  With the assistance of the

22   Court Expert, the parties continue to meet to ensure the successful deployment of CART,

23   as detailed in the May 15, 2023 and July 17, 2023 Joint Case Status Statements, (ECF Nos.

24   3484 at 14-16, 3494 at 12-14), and in Defendants' September 7, 2023 response to the

25   Court Expert's most recent report concerning conditions at SATF (ECF Nos. 3504, 3504-

26   1).  Similarly, as more fully detailed in Defendants' September response, Defendants will

27   continue to collaborate with the stakeholders to develop workable responses to the issues

28   raised above by Plaintiffs and, as to SATF, raised by the Court Expert in his most recent

report.  These issues not only include CART, but also reliable communication of announcements, tablet accessibility, captioned phones, and devices such as hearing aids and pocket talkers.  CDCR will continue its coordinated efforts to reasonably accommodate class members in accordance with its obligations under the ADA and ARP, along with valuable input from the Court Expert and Plaintiffs, ensuring no court intervention is necessary.

**D.     Accommodations for Blind and Low-Vision Class Members**

      **1.     Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covers, among other things, reading and writing accommodations, orientation and mobility training for blind and low-vision class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of the ViaPath tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021, demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  As Plaintiffs explained in the demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials (such as large print, braille, and audio) that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes between the parties regarding the need for reading and writing accommodations for blind and low-vision class members.  Negotiations regarding Plaintiffs' proposed stipulation are ongoing.  Plaintiffs are hopeful that Defendants will promptly develop a plan for remedying these longstanding ADA violations, and that litigation will not be necessary.

1   The parties are meeting regarding word processing accommodations for blind and

2   low-vision class members.  Without such accommodations, these class members do not

3   have access to programs, services, and activities that require them to produce written

4   documents, because they are unable to write by hand, or are substantially limited in

5   doing so.

6   **2.     Defendants' Statement**

7   Defendants continue to work to accommodate the needs of blind and low-vision

8   class members in all areas including their reading and writing needs. Defendants have

9   collaborated with Plaintiffs and the Court Expert, and have made significant progress to

10  resolve disputes between the parties to ensure class-member access and mitigate

11  associated litigation risks by negotiating a proposed stipulation between the parties to

12  resolve certain disputes.  As reported in the March 15, 2023 Joint Case Status Statement,

13  Defendants are reviewing different processes by which they can identify, track, and

14  provide reading and writing accommodations to blind and low-vision class members.

15  *See* ECF No. 3473 at 18-19.  CDCR continues to utilize technology to accommodate

16  class members as detailed in the March 15, 2023 Joint Case Status Statement.  *Id.*  For

17  example, CDCR is also working with a vision consultant to identify and deploy the

18  appropriate electronic assistive devices to accommodate blind and low vision class

19  members' reading and writing needs.  Finally, statewide deployment of ViaPath tablets[3]

20  at all CDCR institutions is complete and on-line instructions are available to families of

21  incarcerated people.[4]

22  **E.    Effect of the COVID-19 Pandemic on the *Armstrong* Class**

23  **1.     Plaintiffs' Statement**

24  The COVID-19 pandemic continues to impact the transfer of *Armstrong* class

25  members to ADA accessible placements.  For years, Defendants have been unable to find a

26  way to address the backlog of class members housed inaccessibly in prisons not designed

---

[3] *See* https://www.cdcr.ca.gov/family-resources/tablets/

[4] *See* https://web.connectnetwork.com/get-started-with-cdcr-inmate-trust-deposits/

1    to safely accommodate their disabilities, even after COVID-19-related movement

2    restrictions were relaxed in April 2022, and again in March 2023.  On July 25, 2023,

3    CCHCS issued a memorandum instructing institutions that they are no longer required to

4    keep vacant the space that was identified for quarantine and isolation housing, and that this

5    space will revert back to general population housing.  Plaintiffs are hopeful that this

6    change will open up additional accessible beds that can house *Armstrong* class members,

7    and that the number of inaccessibly housed class members will soon return to pre-

8    pandemic levels.

9         As of September 8, 2023, there are 83 class members housed inaccessibly in

10   placements not designated to accommodate their disabilities in violation of the *Armstrong*

11   Remedial Plan (this does not include an additional 129 class members with impacting

12   placement codes awaiting transfer to designated mainline prisons from reception centers,

13   and 101 incarcerated people improperly housed on upper tiers and/or top bunks.)  While

14   the number of inaccessibly housed class members is still unacceptably high, this is the

15   lowest it has been in several years.  Plaintiffs will continue to monitor the situation to see

16   whether the short-term trend continues and whether CDCR is able to sustainably reduce

17   the number of mis-housed class members.

18        Plaintiffs' counsel are also concerned that the data on expedited transfers may not

19   tell the whole story.  Some class members report that, as a result of pandemic related

20   transfer delays, they are housed in accessible placements, but on higher security level

21   prison yards.  These class members are not counted in data currently produced by

22   Defendants.  Defendants have reported that they have identified hundreds of people in this

23   position but, before they disclose information to Plaintiffs' counsel, are trying to determine

24   why each person is housed out of level.  Plaintiffs' counsel will continue to attempt to

25   reach resolution of this problem.

26        **2.    Defendants' Statement**

27        As noted above, CCHCS July 25, 2023 memorandum instructed institutions to no

28   longer maintain vacant quarantine and isolation housing and that all designated space,

approximately 6,700 beds, shall revert back to general population housing.  This should serve Defendants' efforts to reduce the number of non-reception-center class members on the expedited transfer list, notwithstanding remaining obstacles detailed in previously filed Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452, 3484.  As of September 8, 2023, there are 83 non-reception center class members on the expedited transfer list, but at least 21 of these class members are ineligible for transfer at this time due to several factors, including placement in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  Although the pandemic has ended, CDCR will continue its COVID-19 monitoring and revised reporting to Plaintiffs' Counsel and the Court Expert for class members housed in non-designated spaces until this issue is resolved.  The return of isolation-quarantine space to general population housing should also serve to address other concerns raised by Plaintiffs.

**F.      Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.

The parties met with the Court Expert on August 11, 2023, to discuss next steps for this workgroup and will meet again on September 28, 2023.  Defendants are investigating a number of issues to help understand and address program access disparities in assignment rates.  Defendants are also developing two documents to help assignment staff manage the waiting list and assignment process effectively.  The parties have also involved staff from the Prison Industries Authority in the workgroup's discussions.  Defendants will continue to produce monthly data for the parties to develop a standard for analyzing program access disparities.  Defendants disagree with Plaintiffs' allegation that the data shows troubling disparities in assignments for people with disabilities, but will continue to participate in future discussions with Plaintiffs about this issue.  *See* ECF No. 3369, Ex. H.

**G.    Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

### 1.    Plaintiffs' Statement

Defendants have agreed to ensure that anyone who had not been seen by a health care provider in the last year would be seen for the purpose of reconciling their DME. The only outstanding issue then is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually. Defendants maintain that this is already a requirement during visits with Primary Care Providers. Yet, Defendants found thousands of class members without needed DME despite the fact that the majority of class members are seen regularly by health care staff and this is an existing requirement during encounters. A process for ensuring that staff actually reconcile DME during encounters is necessary to prevent ongoing and widespread problems.

Relatedly, Defendants acknowledged problems with identification of some class members who utilize DME but who have not been assigned any disability code. Plaintiffs were very impressed by the new tool Defendants have developed to address this problem, and also by additional plans for a second tool to identify people who have blatant mismatches between their disability code and their DME.

Unfortunately, Defendants' disability tracking system fails to identify and track class members with upper-extremity disabilities. Plaintiffs requested that Defendants create a new disability code for this population. *See* ECF No. 3322 at Exs. G and H. CCHCS does maintain a list of thousands of class members with upper-extremity disabilities and accommodations. It is difficult to understand why, since Defendants know who these class members are, they will not assign them a disability code. Without a code it is impossible for staff to easily identify who requires what accommodations. Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated. Plaintiffs are committed to resolving this ongoing problem.

2. **Defendants' Statement**

Collaboration between the parties continues to develop a sustainable DME accountability process and progress has been made as noted above and as detailed in the March 15, 2023 and May 15, 2023 case management statements. *See* ECF Nos. 3473 at 23-26; 3484 at 22-25. CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity, require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code for multiple reasons communicated to Plaintiffs as noted in the March 15, 2023 Joint Case Status Statement. *See* ECF No. 3473 at 26. Notwithstanding these disagreements, CDCR and CCHCS will continue to meet with Plaintiffs and the Court Expert to further discuss individuals with upper-extremity disabilities and other issues including a sustainable DME accountability process.

**H.   Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool. The parties continue to convene small work groups, confer with the Court Expert about informal briefing, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance.

**I.   ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA. The parties most recently met on September 5, 2023, about a new process for sharing information about Master Planning projects and are close to agreeing on this new, more efficient process. The parties have agreed to tour institutions jointly to identify and resolve any ADA-non-compliance issues. The parties, along with Plaintiffs' ADA access expert, toured LAC on April 29, 2022 and November 9, 2022, CMF on December 16, 2022, VSP on May 3, 2023, and CIM on June 22, 2023. Plaintiffs' expert produced to Defendants a report in response to problems she identified at LAC on

1   April 3, 2023, and plans to produce such reports following the tour of each institution.

2   Plaintiffs plan to continue working with Defendants collaboratively to address structural

3   issues or unfinished work that should be done to bring all prisons in compliance with the

4   ADA.

5                                           Respectfully submitted,

6   DATED:  September 15, 2023             ROSEN BIEN GALVAN & GRUNFELD LLP

7                                          By:  */s/ Penny Godbold*

8                                                Penny Godbold

9                                          Attorneys for Plaintiffs

10

11  DATED:  September 15, 2023             ROB BONTA
                                           Attorney General of the State of California
12
                                           By:  */s/ Trace O. Maiorino*
13
                                                Trace O. Maiorino
14                                              Deputy Attorney General

15                                         Attorneys for Defendants

16

17                        **FILER'S ATTESTATION**

18          As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

19  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

20  have maintained records to support this concurrence.

21

22  DATED:  September 15, 2023             */s/ Penny Godbold*
                                           Penny Godbold
23

24

25

26

27

28

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com



Email:

August 11, 2023

VIA ELECTRONIC MAIL ONLY

| PRIVILEGED AND CONFIDENTIAL |
| :---: |
| SUBJECT TO PROTECTIVE ORDERS |





Re:   *Armstrong v. Newsom*:  Plaintiffs' Review of CDCR's
Accountability System
Our File No. 0581-03

Dear ▮▮▮▮▮▮▮▮▮:

    We write regarding our review of Defendants' system for investigating and holding staff accountable for misconduct.  The enclosed report is based on our review of investigation and discipline files produced from CSP-Los Angeles County ("LAC"), California Institution for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State Prison ("KVSP") (collectively "Six Prisons").[1]  As detailed below and in the accompanying Table A[2] (which is a separate Excel file), Plaintiffs found that Defendants continue to fail to comply with the *Armstrong* Court Orders, which have now

---

[1] For RJD and SATF, the production included documents for cases closed between December 2, 2022-March 1, 2023.  For KVSP and COR, the production included documents for cases closed between January 2, 2023-March 31, 2023.  For LAC and CIW, the production included documents for cases closed between November 1, 2022-January 29, 2023.

[2] This report contains links to external documents and internal sections within the report. External links are underlined; internal links are not underlined.

[4340304.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

██████

August 11, 2023
Page 2

been affirmed in relevant part by the Ninth Circuit, and with the RJD and Five Prisons Remedial Plans. *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. Feb. 2023).

Plaintiffs identified multiple failures in Defendants' accountability process.

Defendants continue to fail to identify staff misconduct complaints. As shown in Section I, the Centralized Screening Team ("CST") is routinely failing to identify when staff misconduct has been alleged. **Twenty-seven percent of the 602s reviewed by Plaintiffs' counsel were inappropriately deemed "routine" grievances instead of staff complaints and were sent back to the prison by the CST.** *See* APPENDIX A. Moreover, even when staff misconduct complaints are identified, the CST is also failing to appropriately route serious allegations to the Office of Internal Affairs ("OIA") for investigation pursuant to the Allegation Decision Index ("ADI"). These two related failures by the CST represent serious non-compliance with the Remedial Plans.

Beyond these threshold problems, the cases discussed in this report continue to show that Defendants are failing to ensure complete and unbiased investigations necessary to discover whether staff misconduct has occurred and are failing to hold staff accountable for serious staff misconduct when confirmed. Plaintiffs are increasingly concerned that busy investigators are simply not incentivized to put in the work necessary to determine whether misconduct has occurred. Investigations continue to show many of the same problems Plaintiffs have reported previously, including failures by investigators to collect essential evidence, such as video and interviews with complainants and subjects; failures to run an investigation to ground even when there is some evidence that the misconduct occurred; bias in reports that tends to minimize or ignore inculpatory evidence and emphasize exculpatory evidence; multiple wasteful investigations into the same allegation; and poorly organized and written investigation reports that make it difficult or impossible for the Hiring Authority to make a determination whether misconduct occurred. Hiring Authorities are also failing to sustain allegations when the evidence shows that misconduct occurred and imposing insufficient discipline on staff in the rare instances where they sustain allegations.

Plaintiffs are not alone in reaching these conclusions. The Office of the Inspector General ("OIG") recently concluded that, despite reform efforts, "the department largely failed to implement a seamless inquiry process by not establishing clear policies and procedures, failed to retain video-recorded evidence, and inappropriately closed

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

██████████

August 11, 2023
Page 3

investigations without conducting thorough interviews and, sometimes, without conducting any interviews at all." *See* May 24, 2023, Letter Introducing OIG Report Re: Monitoring the Staff Misconduct Investigation and Review Process at 2.

Two issues identified by Plaintiffs' counsel warrant additional highlighting and should be addressed in negotiations with the Court Expert. First, the format of the reports written by AIU investigators is impeding accountability. AIU reports generally consist of a disorganized listing of evidence gathered by the investigator, without any commentary weighting that evidence to determine whether the evidence shows that misconduct occurred. Busy Hiring Authorities must then, if they are adequately carrying out their responsibilities, spend additional time reviewing the entire case file in order to evaluate the evidence themselves. This burden on Hiring Authorities is almost certainly contributing to the unacceptable delays, discussed below, in resolving completed AIU investigations and is likely also resulting in failures to confirm allegations when the evidence supports a finding of misconduct.

Second, Defendants also lack any system for holding investigators and Hiring Authorities accountable when they fail to perform their critical duties within the accountability system. CDCR will never come into compliance with the Remedial Plans until it creates a process for ensuring that key decision makers are held responsible when they fail to meet expectations within the system.

Plaintiffs were able to identify problems with accountability despite the fact that Defendants have yet to produce many Allegation Inquiry Unit ("AIU") investigations to Plaintiffs. Even though the AIU has completed more than 2,900 investigations at the Six Prisons, 55% of those cases are sitting on the Hiring Authorities' desks, awaiting final resolution. This means that the majority of the most serious allegations of staff misconduct for all incarcerated people at the six prisons have still had no decision, despite the investigation being closed. And very few AIU cases have been produced to Plaintiffs. Of the 492 cases produced this quarter, only 49 (10%) were AIU cases. In contrast, to date, the CST has routed 51.7% of all staff misconduct cases to the AIU. The Hiring Authorities' substantial delays in resolving cases are undermining the accountability system by delaying the imposition of corrective and disciplinary action and interfering with the ability of the parties to determine the impact of negotiated reforms on the most serious cases.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



August 11, 2023
Page 4


     Plaintiffs look forward to engaging with Defendants and the Court Expert on remedies to address ongoing problems identified in this report.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/* 

By:

cc: 

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**TABLE OF CONTENTS**

Page

I.   DEFENDANTS ARE FAILING TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS...................................................1

   A.   The CST Is Inappropriately Routing Staff Misconduct Complaints as "Routine" Grievances...................................................2

   B.   The CST Is Improperly Routing Serious Staff Misconduct Complaints Back to Prisons Instead of OIA...................................4

II.  DEFENDANTS CONDUCTED BIASED AND INCOMPLETE INVESTIGATIONS AND IMPOSED INAPPROPRIATE AND INCONSISTENT DISCIPLINE...................................................5

   A.   Hiring Authorities Remain a Significant Barrier to Accountability ............6

      1.   Hiring Authorities Continue to Delay in Reviewing Investigations ...................................................6

      2.   Hiring Authorities Failed to Hold Staff Accountable When the Preponderance of Evidence Shows Misconduct .........................8

         (a)   SATF – ███ – AIU, Not Sustained ...............................8

         (b)   KVSP – ███ – AIMS, Not Sustained........................10

         (c)   LAC – ███ – AIMS, Not Sustained ...........................11

         (d)   LAC – ███ – AIMS, then OIA referred, Not Sustained ...................................................13

         (e)   COR – ███ – Local, Not Sustained...........................14

      3.   Hiring Authorities Fail to Impose Appropriate Discipline After Misconduct is Confirmed ...................................................16

         (a)   COR – ███ – OIA, Sustained....................................16

         (b)   LAC – ███ – AIU, Sustained ....................................17

         (c)   RJD-███ – Local, Sustained – LOI (but not issued) ...................................................19

   B.   Barriers to Accountability as a Result of Investigations .............................19

      1.   Investigators Conducted Incomplete and Biased Investigations that Interfered with Determining If Allegations Were True.......................................................19

         (a)   LAC – ███ – AIMS, Not Sustained ...........................21

         (b)   RJD – ███ – Local, Not Sustained .............................23

(c)    KVSP-█████ / KVSP-█████ – AIMS, Not
       Sustained ............................................................ 24

(d)    CIW – █████/CIW – █████ – AIU, Not
       Sustained; AIU, Sustained .................................... 26

2.    Investigators Routinely Fail to Retain and Review Relevant
      Video Footage of Incidents ........................................ 27

(a)    Investigators Routinely Fail to Review Relevant Video
       Footage of Incidents ........................................... 27

(b)    Investigation Delays Result in Footage Being
       Destroyed ...................................................... 28

(c)    Failure to Produce Video Footage to Plaintiffs .................... 29

C.    Inappropriate Use of New AIU "Quick-Close" Policy .............................. 29

D.    AIU Investigations Continue to Be Delayed ................................. 30

III.    OFFICERS ARE NOT COMPLYING WITH BWC POLICIES ......................... 31

A.    Officers Appear to Be Intentionally Deactivating or Obstructing the
      Use of BWCs to Promote a Code of Silence ................................. 33

B.    Additional Improper Circumstances Violations ............................ 33

IV.    INFORMATION REQUESTS ................................................. 36

V.    CONCLUSION .......................................................... 36

APPENDIX A ................................................................ A-1

APPENDIX B ................................................................ B-1

APPENDIX C ................................................................ C-1

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## I.   DEFENDANTS ARE FAILING TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS

The Centralized Screening Team ("CST") is not properly screening grievances to identify whether they raise allegations of staff misconduct and, if they do, is failing to identify whether the staff misconduct allegation is on the Allegation Decision Index ("ADI"), and thus must be routed to the OIA's Allegation Investigation Unit ("AIU").

Plaintiffs are particularly concerned that, in deciding whether a case falls on the ADI, the CST is improperly pre-judging cases on the merits, rather than routing them based on the allegations in the complaint, in violation of the Remedial Plans.  *See* RJD Remedial Plan at 3-4; Five Prisons Remedial Plan at 4 (The CST is required "to evaluate whether complaints received by CDCR include an ***allegation(s)*** of staff misconduct … [and] ***will route all allegations*** in the complaint that are on the ADI … to the OIA for investigation." [emphasis added]); RJD Remedial Plan at 9; Five Prisons Remedial Plan at 9 ("If CST determines that a complaint contains ***allegation(s)*** of staff misconduct … not listed on the ADI, ***those allegations will be referred*** … for an allegation inquiry [by an LDI]." [emphasis added]).  The CST's routing decision must be based on what is alleged on the face of the complaint; it may not pre-judge the merits of the complaint or screen out the complaint based on the CST's belief that the allegations of staff misconduct are untrue.

Plaintiffs' review of the six prisons investigation files confirms that the CST does improperly pre-judge complaints in making its routing decisions in some cases:

In COR-██████, a class member alleged that while he was being escorted in handcuffs to be seen by medical for chest pains, he slipped due to his mobility disability, and Officer ██████ allowed him to fall, causing him to suffer serious injuries.  Officer ██████ allegedly made no attempt to stop the fall or call for a stretcher, and did not corroborate the fall when the class member requested medical attention.  As a result, medical staff did not believe the class member, and it was not until two days later that his four broken ribs and punctured lung were discovered.  *See* 602 at 3.  Although the allegations of endangerment and misconduct resulting in significant injury fall on the ADI[3], the CST improperly routed the 602 to a Locally Designated Investigator ("LDI").

The investigation file for this case contains a summary of the CST's routing decision (not typically included in Defendants' productions), showing that the CST's decision was based only on its skepticism about the veracity of the class member's allegations, without any consideration as to whether they fall on the ADI:

Claimant's grievance is filled with assumptions and their belief Officer ██████ should have known the seriousness of the reported fall.  The injuries

---

[3] *See* Other Misconduct, (2), (3)

described by claimant do not coincide with the slip and fall which reportedly happened during the escort by █████.  Refer to HA/LDI.

*See* Originating Docs at 6.

The CST improperly screened the class member's allegation and, pre-judging before an investigation commenced that his injuries were not consistent with the alleged misconduct, improperly routed this serious allegation of staff misconduct resulting in significant injuries to be investigated locally, in violation of the Remedial Plans.

Similarly, the OIG's recent review of staff misconduct complaints also provides an example of the CST improperly pre-judging a complaint.  *See* Monitoring the Staff Misconduct Investigation and Review Process, 2022 Annual Report at 16 (citing CST decision that states, "Although [the incarcerated person] wrote that staff intentionally discriminated against the inmate based on their race, there could be a variety of issues such as active PSR's, temporary program disruptions, etc. that may very well be related to a group of inmates not being released.")  Defendants' June 16, 2023 Response to Plaintiffs' May 12, 2023 Review of CDCR's Accountability System ("Defendants' Response"), also indicates an awareness that the CST is pre-judging staff misconduct complaints, even though this is prohibited by the Remedial Plans.  *See* Plaintiffs' Jun 27, 2023 Reply to Defendants' Response at 4-7 (identifying cases where Defendants approved of the CST pre-judging complaints).

### A.  The CST Is Inappropriately Routing Staff Misconduct Complaints as "Routine" Grievances

The CST should only classify a grievance as "routine" if it does not include an allegation of staff misconduct.  A grievance contains a staff misconduct allegation if it alleges an employee engaged in "behavior that results in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard."  Cal. Code Regs. Tit. 15, § 3486(c)(22).

The CST continues to route as "routine" 602s that contain clear allegations of staff misconduct.  Plaintiffs reviewed the random sample of grievances for Q2 2023 from class members at the Six Prisons that the CST determined do not allege misconduct, which was produced by Defendants on July 5, 2023.  **In 27 out of 99[4] cases (or 27%)**, Plaintiffs disagree with the CST's determination that the grievance contains no staff misconduct allegation.  The CST's error rate for Q2 2023 is unfortunately consistent with the 30% error rate identified in Plaintiffs' previous report for Q1 2023 and Q3 2022.

---

[4] Defendants' random sample produced for this quarter was missing one 602, which we omit from the count.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

In nearly every case where Plaintiffs disagreed with the CST, the staff misconduct allegation was clear and unambiguous.  A number of the 602s that the CST routed as routine not only contained allegations of staff misconduct (and therefore should have at least been investigated by an LDI), but also included allegations of staff misconduct on the ADI, and therefore should have been investigated by the AIU.  The full list of 602s from the Q2 2023 sample that the CST improperly routed are described in **APPENDIX A**.

The following examples are illustrative of 602s that the CST erroneously classified as not including an allegation of staff misconduct:

- ▮▮▮ – The person alleges that a sergeant threatened him with an RVR in retaliation for filing a 602 against other officers for racism.  Although retaliation for reporting staff misconduct and for using the grievance process are both on the ADI, the CST misclassified the 602 as "routine."  *See* Retaliation (1), (2).

- ▮▮▮ – The person alleges that officers who were not wearing BWCs searched his cell and damaged and destroyed his property, and that staff are "unprofessional & abusive" toward EOP patients.  Although the 602 includes multiple allegations of staff misconduct, including the failure to comply with BWC activation requirements and harassment because of a mental health condition, both of which are on the ADI, the CST misclassified it as "routine."  *See* Dishonesty (1), Discrimination/Harassment (2).

- ▮▮▮ – The person alleges that an officer is "running a chargeing [sic] ring" by allowing incarcerated canteen workers to force people to pay for the right to use canteen.  The CST misclassified this allegation of staff misconduct as "routine," even though the use of one's position to solicit gratuities or favors from an incarcerated person is on the ADI.  *See* Other Misconduct (6).

- ▮▮▮ – The person alleges an officer always subjects him and only him to strip searches before he is seen by medical staff, and that the officer "strip[s] only me out for his own personal reasons, [and] he had this weird smile on his face when he order me to take off my boxer[s]."  The person expressly alleges that the officer is committing sexual misconduct against him, which is on the ADI, but the 602 was routed as "routine" by the CST.  *See* Staff Sexual Misconduct (1), (3).

- ▮▮▮ – The person alleges that an officer refused to allow him to go to the law library because the person has a civil lawsuit pending against the officer.  The CST routed this staff misconduct allegation as "routine," even though retaliation due to participation in a lawsuit is on the ADI.  *See* Retaliation (3).

- ▮▮▮ – The person alleges officers refused to give him his quarterly package in order to "take it out on me, because I go suicidal a lot," an allegation of

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

discrimination and/or harassment based on a mental health condition that is on the ADI.  *See* Discrimination/Harassment (2), (3).

**B.      The CST Is Improperly Routing Serious Staff Misconduct Complaints Back to Prisons Instead of OIA**

Plaintiffs conducted a non-exhaustive review of cases from this review period filed on 602s by class members at the six prisons after May 31, 2022 that the CST routed to the institution for investigation by an LDI.  This was not a comprehensive review of the CST's screening of staff misconduct allegations under CDCR's new investigation system.  But it revealed that, even where the CST correctly identifies an allegation of staff misconduct, the CST frequently does not recognize that the staff misconduct allegation is on the ADI, and thus improperly routes it for investigation by an LDI, rather than by the AIU.

As with the grievances misclassified as "routine," many of these cases clearly and unambiguously fall on the ADI.  The following examples are illustrative of cases routed for local inquiries that should have been routed to the AIU for investigation:

- CIW-████ (see 602 at 2-3) – The person alleges that during clothed full body searches of incarcerated people leaving the kitchen, an officer was "groping, touching and grabbing all body parts, including my breast and vagina," which is an allegation of sexual misconduct on the ADI.  *See* Staff Sexual Misconduct (1).

- KVSP-████ (see 602 at 11-14) – The person alleges that he is being harassed by a group of officers who use other incarcerated people to intimidate him and who solicit violence against him, putting his safety at risk.  These allegations of endangerment and intimidation of an incarcerated person are both on the ADI.  *See* Other Misconduct (2), (4).

- LAC-████ (*see* 602 at 2-3) – The person alleges an officer refused to let him send out legal mail in retaliation for filing 602s against custody staff and for reporting staff misconduct, which are both on the ADI.  *See* Retaliation (1), (2).

- SATF-████ (see 602 at 5-6) – The person alleges that he was assaulted by another incarcerated person and suffered serious injuries, and that upon his return from the hospital, custody returned him to the same housing unit as his assailant, putting his safety at risk.  This allegation of endangerment is on the ADI.  *See* Other Misconduct (2).

- KVSP-████ (see 602 at 5-6) – The person alleges that he was written up on "bogus charges" by officers, and that staff improperly colluded on their incident reports to cover up their improper response to an altercation.  Both the allegations

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

that the class member was given a false RVR and that officers cooperated to hide their misconduct are on the ADI.  *See* Dishonesty (2), Code of Silence (1).

- RJD-████████ (see 602 at 13-16) – The person alleges that the tower officer intentionally closed the cell door on his arms and body, and that "I don't feel safe w/ him working in this building" since he "tr[ied] to hurt me," an allegation of endangerment that is on the ADI.  *See* Other Misconduct (2).

The CST is essential to Defendants' accountability system.  If the CST is unable to properly identify and route staff misconduct allegations, CDCR's court-ordered accountability system will fail.

## II.   DEFENDANTS CONDUCTED BIASED AND INCOMPLETE INVESTIGATIONS AND IMPOSED INAPPROPRIATE AND INCONSISTENT DISCIPLINE

The Remedial Plans and Court's orders require that Defendants' investigators conduct "comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed" and that Hiring Authorities impose appropriate and consistent discipline.  RJD Remedial Plan, § II.B; Five Prisons Remedial Plan, § II.B; *see also* Dkt. 3060, ¶ 5.c; Dkt. 3218, ¶ 5.c.

To evaluate Defendants' compliance, Plaintiffs' counsel closely reviewed 60 cases: 12 cases from LAC, 8 cases from CIW, 15 cases from SATF; 9 cases from COR; 14 cases from KVSP; and 2 cases[5] from RJD.[6]  The complete findings from Plaintiffs' review are contained in Table A.  Note that the findings for each prison appear in separate tabs of the Excel file.

Below, Plaintiffs describe 14 cases that illustrate serious, ongoing problems regarding Defendants' accountability system.  These are cases where: (1) the Hiring Authority either failed to sustain misconduct or failed to impose appropriate discipline for sustained misconduct; or (2) an incomplete and/or biased investigation interfered with the

---

[5] Plaintiffs reviewed two cases from RJD because the total number of cases produced for that prison, only 34 cases, was extremely low.

[6] Plaintiffs selected the cases using a variety of criteria, including, but not limited to, whether: CDCR referred the case to OIA for investigation or direct adverse action; AIU investigated the case; AIMS conducted an inquiry; the case involved an allegation related to use of force or disability; the Hiring Authority sustained an allegation; and the case included video evidence.  These criteria are intended to identify cases with the most serious and credible allegations of misconduct, which we then review to determine whether Defendants are holding staff accountable when the evidence shows misconduct occurred.

ability of a decision maker to determine whether misconduct occurred.  Some cases evidence both types of problems.

### A.      Hiring Authorities Remain a Significant Barrier to Accountability

Plaintiffs' review of cases for this quarter reveals an ongoing failure of Hiring Authorities to sustain serious allegations supported by a preponderance of the evidence and a failure to impose appropriate discipline when they do sustain allegations.  As discussed in more detail in **APPENDIX B**, the productions covered by this Report included 492 unique cases.  Hiring Authorities imposed adverse action in only 2 cases (.4%).  Meanwhile, Plaintiffs reviewed only a subset of cases, but identified at least 8 cases with problematic Hiring Authority decision making.  (*See* **SATF –**



**KVSP –**          ; **LAC –**          ; **LAC –**          ; **COR –**          ; **COR –**          ; **LAC –**          ; **RJD-**          ).  In 5 of these cases, the Hiring Authority did not sustain one or more serious allegations of misconduct even though the preponderance of the evidence showed that the misconduct occurred.  (*See*   **SATF –**          ; **KVSP –**          ; **LAC –**          ; **LAC –**          ; **COR –**          ).  In 3 of these cases, the Hiring Authority sustained an allegation of misconduct, but did not impose appropriate discipline to punish the misconduct or failed to impose discipline timely.  (*See* **COR –**          ; **LAC –**          ; **RJD-**          ).

In addition, and as discussed below, Hiring Authorities are also causing significant delays in reviewing completed investigations.

**Plaintiffs remain seriously concerned that, despite the many changes to the staff misconduct investigation and disciplinary process, Defendants fail to self-identify and take concrete action in response to Hiring Authorities who are exercising poor discretion over accountability and that there is currently no requirement that Hiring Authorities take timely action on completed investigations. Defendants must address these problems to ensure the effectiveness of the accountability process.**

### 1.      Hiring Authorities Continue to Delay in Reviewing Investigations

Despite improvements to the staff complaint process to ensure the swift and timely completion of investigations, within 120 or 180 days, Hiring Authorities are undermining those reforms by delaying in reviewing and taking accountability action on completed cases.  According to Defendants' June 16, 2023 response to Plaintiffs' report, as of May 2023 cases from prisons with high cases numbers are now being routed to other Hiring Authorities at prisons with low cases numbers in order to address the backlog.  *See* June 16, 2023 Response at 10.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

According to data produced by Defendants on August 1, 2023, delays persist. 55% percent of investigations that the AIU has completed are currently waiting for Hiring Authority action.  As Defendants acknowledged at a meeting on March 28, 2023, these are investigations that the AIU has completed and signed off on.  Thus, Hiring Authority review is the only thing standing in the way of implementing important corrective or disciplinary action that can reduce future harms to class members.

As of June 30, 2023, the AIU, which began accepting cases on June 1, 2022, has completed 2,990 investigations.  **1646 (55%) of those completed investigations are pending resolution with the Hiring Authorities**.  All six prisons have more than 43% of completed cases still pending with the Hiring Authority.  The problem is particularly acute at COR (53.3% of completed investigations pending with Hiring Authority), RJD (62.9% of completed investigations pending with Hiring Authority), SATF (59.7%), and CIW (61.1%).  Some of the cases pending with the Hiring Authority are very old; CDCR received 230 of the still pending cases in June-October of 2022.

|        | Not Sustained | Sustained | Pending | Total | % Pending |
|--------|---------------|-----------|---------|-------|-----------|
| CIW    | 50            | 6         | 88      | 144   | 61.1%     |
| COR    | 309           | 14        | 368     | 691   | 53.3%     |
| KVSP   | 141           | 15        | 120     | 276   | 43.5%     |
| LAC    | 309           | 7         | 287     | 603   | 47.6%     |
| RJD    | 233           | 9         | 411     | 653   | 62.9%     |
| SATF   | 243           | 8         | 372     | 623   | 59.7%     |
| TOTAL  | 1,285         | 59        | 1,646   | 2,990 | 55.1%     |

Though this data represents an improvement from the last data set (from April 30, 2023), which showed that as many 80% of closed investigations were pending resolution with the Hiring Authority, these Hiring Authority delays continue to undermine improvements to the accountability process.

The purpose of negotiating shortened timelines to complete investigations was to ensure that CDCR could swiftly act to hold staff accountable for serious staff misconduct. The parties focused on eliminating delays in investigations because that is where delays were occurring.  Now, it appears those delays have simply been transferred to a different part of the process – Hiring Authority decision making.  **There is currently no requirement in the process to ensure that Hiring Authorities timely complete their reviews.  This problem must be addressed.**

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

2.      **Hiring Authorities Failed to Hold Staff Accountable When the Preponderance of Evidence Shows Misconduct**

(a)      SATF – ███████ – AIU, Not Sustained

In this case, the Hiring Authority did not hold any staff accountable even though camera footage shows multiple officers repeatedly using excessive force, including multiple head strikes, against █████████████████████, a seriously mentally ill *Coleman* class member, during a cell extraction from a mental health crisis bed. The footage shows Officer ███████ punching Mr. ████ in the head area twenty-three times, and Officer ██████ punching Mr. ████ in the head area three times.

At approximately 8:00 am on December 19, 2021, Mr. ████ banged his head against the cell door window, cracking, but not shattering the glass.  Medical staff requested to move Mr. ████ out of his cell.  Mr. ████, who was acutely psychotic at the time, refused to voluntarily move.  Officers initiated a controlled use of force.  *See* BWC.  Approximately eight and a half hours passed before staff actually performed the extraction.  By that time, Mr. ████ was seated calmly on a mattress in his cell.  Clinical staff and then custody staff advised him that he would be extracted from his cell against his will if he did not exit voluntarily.

When multiple officers dressed in riot gear rushed in to Mr. ████'s cell to extract him, he jumped up on his mattress as if waiting for them to strike.  Next, an officer holding a shield slammed Mr. ████ into the wall.  With his right hand, Mr. ████ grabbed one end of the leg restraints held by Officer █████████ while the officer retained control of the other end.  With one of his hands already immobilized, the officers piled on top of Mr. ████ and pinned him against the wall.  Though the officers had not yet placed Mr. ████ in restraints, they effectively had his body pinned against the wall by the weight of multiple officers.

Officer █████████ then began to repeatedly strike Mr. ████'s head with his fist.  Officer █████████ punched Mr. ████ in the head area twenty-three times.  The officers then forced Mr. ████ to lie on the ground.  Officer █████████ then struck Mr. ████ in the head area at least three times with his fist.  Meanwhile, another officer hit Mr. ████'s leg repeatedly.  The strikes caused Mr. ████ to bleed and the video shows a patch of blood on the floor as they drag him beside the bed.

The force used against Mr. ████ in this case was excessive.  Though the choice to invoke a controlled use of force rather than an immediate force was correct, the force was anything but controlled once underway.  First, the staff failed to take advantage of defusing of the situation that the eight hours of delay had brought about.  With Mr. ████ sitting calmly on his bed, and the window glass intact and only spider-cracked, time was on their side.  There was no reason to rush in at that point.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Second, once they rushed in, Officer ██████████ mishandled the leg restraints—holding them out to Mr. ████ in a manner that allowed Mr. ████ to grab one end. This error needlessly increased the danger for the officers and Mr. ████. Third, Officer ██████████ then chose to deliver approximately twenty-three blows to Mr. ████'s head, risking serious bodily injury or death for Mr. ████. Officer ████ then decided to deliver three more fist strikes. Deadly force was not authorized here because force was not necessary to "defend [an] employee or other person[] from an imminent threat of death or great bodily injury." DOM § 51020.7. The full extent of Mr. ████'s injuries in this case are not known because, according to his health care records, he consistently refused all access to medical care and treatment.

The Hiring Authority should have sustained at least an allegation of excessive force causing injury (456789) against Officers ██████████ and ██████████ for their repeated punches to Mr. ████'s head. Instead, the Hiring Authority did not sustain any allegations and found no misconduct. There is no indication that this incident raised any cause for concern in CDCR.

Moreover, given the severity of the force used, the investigator should have conducted a comprehensive investigation to inquire into the officers' justifications for the uses of force. As noted above, the officers threw away the benefit of the controlled-use-of-force cooling off period by rushing the cell when Mr. ████ was sitting calmly on the bed. The AIU should have looked at this error. Instead, the AIU investigator conducted a "Video Quick Close" report, in which the investigator did nothing but review the video from the incident, the use-of-force interview of Mr. ████, and the documentation from the incident. The investigator did not interview any of the involved officers or Mr. ████. The investigator also did not perform any independent evaluation of the reasonableness of the force, and instead relied entirely on the IERC's conclusion that the force had been reasonable.[7]

---

[7] The investigator and the Hiring Authority also missed additional policy violations related to an RVR issued to Mr. ████ for the incident. Despite confirmation that he was acutely psychotic at the time, Mr. ████ received an RVR for "Willfully Obstructing a Peace Officer" when he refused to transfer. *See* RVR at 44. Surprisingly, during the mental health review it was noted "per documentation review, at the time of the incident IP was experiencing acute, mental health symptoms; however his behavior(s) were purposeful, premeditated, and volitional…IP appears to have the ability to understand consequences of violating institutional policies and procedures, as well as understand the difference between right and wrong." *See* MH RVR Assessment (December 30, 2021). However, per the Mental Health Delivery System 2021 Program Guide, which prohibits issuing RVRs to people who are being cell extracted from one inpatient placement to another, Mr. ████ should not have received an RVR in the first place. *See Coleman v. Newsom*, No. 2:90-cv-00520-KJM-DB, Dkt. 7333-1 at 566.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

        **(b)**      **KVSP –** ███████ **– AIMS, Not Sustained**

      In this case, ████████████████████████████, alleged that he fell out of his wheelchair and was injured on two separate occasions after officers failed to properly secure his wheelchair during transport.  Although the OIA investigator confirmed Mr. ███████ was indeed hurt after falling out of his wheelchair during the two transports, the Hiring Authority took no action to ensure the officers understood the importance of properly securing wheelchairs to prevent injury in the future.  Instead, the Hiring Authority simply "exonerated" staff even though the investigation included sufficient evidence to sustain Mr. ███████' allegations.  *See* Closure Memo at 10.

      Mr. ███████ alleged that on April 22, 2022, transportation officers did not properly secure his wheelchair during transport to an outside hospital, causing him to fall out of his wheelchair and hit his head on the vehicle's lift.  Inquiry Report at 1-2.  No BWC or AVSS footage of this incident was available because the investigator delayed in commencing the investigation for more than ten months after case referral, long after the 90-day video retention period had elapsed.  The investigator did interview Officer ███████, one of the transport officers, who confirmed that Mr. ███████ fell and hit his head during the transport.[8]  Officer ███████ disclaimed responsibility for securing the wheelchair, claiming that his partner, Officer ███████, "was in charge of getting ███████ secured into the van."[9]  Inquiry Report at 3.  The investigator also reviewed Mr. ███████' medical records, which confirmed he was sent to an outside hospital due to "blunt head trauma" because he hit his head "on [a] steel ramp falling out of his wheelchair."  Exhibits at 12.

      Mr. ███████ also alleged that on September 13, 2021, Officer ███████ negligently failed to secure Mr. ███████' wheelchair in an ADA golf cart before transporting him from the CTC to his housing unit.  He told the investigator that Officer ███████ drove "as fast as the golf cart could go when he made a right turn and the railing of the golf cart swung open," causing Mr. ███████ to fall out of the wheelchair and tumble onto the ground.  Inquiry Report at 2.  The investigator obtained Officer ███████'s BWC footage for the incident, which shows Officer ███████'s lack of diligence in securing the wheelchair and Mr. ███████' fall.  The investigator also reviewed Mr. ███████' medical records and confirmed he suffered a collapsed lung and broken rib from the fall.  *See*

---

[8] Officer ███████ stated that his partner "heard a big thump," and Officer ███████ "immediately pulled over to check on ███████.  ███████ opened the side door and seen ███████ had fallen back in his wheelchair with his head resting on the lift of the van."  Inquiry Report at 3.

[9] Officer ███████ voluntarily resigned from CDCR effective August 15, 2022, and declined to participate in the investigation.  Inquiry Report at 3.  Had the investigator timely commenced the investigation after the May 20, 2022 case referral to OIA, Officer ███████ could have been interviewed before his resignation.  *Id.* at 9.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Inquiry Report at 4; Exhibits at 55-56.  The investigator quoted Officer ████'s incident report, "generated as a result of ████ returning from an outside hospital with Serious Bodily Injury," in which Officer ████ admits he did not properly secure Mr. ████' wheelchair:  "I never check the gate on the golf cart and assumed it was secured and locked … [and] I never used the wheelchair strap downs to secure the wheelchair to the golf cart."  Inquiry Report at 4.

The investigator presented sufficient evidence to the Hiring Authority to confirm Mr. ████' allegations that transport officers failed to properly secure his wheelchair, causing serious injuries.  The Disciplinary Matrix supports disciplinary action at a base penalty of 2 for "negligent endangerment" of an incarcerated person and for being inattentive or distracted on the job.  Even if the Hiring Authority had a basis to conclude that adverse action was not warranted in these cases, he nevertheless had a responsibility to acknowledge a problem and to take some action to prevent it from happening again, at a minimum confirming the allegation and providing additional training for the officers responsible.

### (c)   LAC – ████ – AIMS, Not Sustained

In this case, the Hiring Authority failed to discipline Officers ████ and ████ despite clear video evidence that they unnecessarily initiated an immediate use of force against ████████████████████████████████, after he refused to return to his cell.  This case is yet another example of CDCR failing to hold officers accountable when they resort too quickly to using force.

On May 11, 2022, Mr. ████ called "man down" to receive medical attention for chest pain.  The officers told him he would be seen by medical at his cell door, rather than being taken to a confidential medical setting.  Mr. ████ believed that being seen cell front was a violation of policy.  *See* 602 at 5.  Mr. ████ was placed in waist chains and evaluated by medical staff on a chair right outside his cell, on the second tier of the ASU.  After medical cleared Mr. ████ to return to his cell, Mr. ████ told Officers ████ and ████ that he would not go back into his cell, and that he wanted to speak with the sergeant.  Officer ████'s BWC[10] shows Mr. ████ remain calm and seated in restraints, showing no sign of aggression or any indication that he poses a threat.[11]

---

[10] Officer ████'s BWC footage begins at 19:07:00 pm, after Mr. ████ had already been cleared by medical.

[11] The investigation file does not include BWC footage from Officer ████, nor explain the absence of such footage.  It is not clear whether the investigator requested Officer ████'s BWC footage and, if they did, why it was not provided to the investigator.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

After less than 2 minutes and 30 seconds, Officers ███████ and ███████ try to pick Mr. ███████ up out of the chair and force him into his cell, without attempting further de-escalation efforts, such as allowing Mr. ███████ to speak with the sergeant, or first warning that he would be written up if he did not return to his cell.  Officers ███████ and ███████ also could have brought additional officers to the scene, to show Mr. ███████ that they would use force if he did not comply, which may have resulted in compliance with their order.  Instead, Officers ███████ and ███████ only briefly attempt to reason with Mr. ███████, and when that does not work right away, they resort to an immediate use of force.

At 19:09:24, Officer ███████ suddenly says to Mr. ███████, "I'm going to assist you to your feet, all right?"  *See* BWC (linked above).  Mr. ███████ answers, "no, don't assist me," but Officer ███████ responds, "yeah, yeah, ready," and grabs Mr. ███████' left arm while Officer ███████ grabs his right arm.  The officers try to lift Mr. ███████, who has been seated and restrained in waist chains the entire time.  Mr. ███████ appears to wrap his legs around the chair legs to make it more difficult for the officers to pull him out of the chair, but he does not move his arms or otherwise actively resist. Within seconds, Officer ███████ activates his alarm, and the officers push the chair over. Mr. ███████' chest and then his face hit the ground.  Five officers respond to the scene almost immediately, and within seconds there are more than ten officers attempting to restrain Mr. ███████, who is now actively resisting on the ground.  During the ensuing struggle, Mr. ███████ and several officers suffer minor injuries.  *See* AVSS.

Mr. ███████ was not an imminent threat to anyone.  Had Officers ███████ and ███████ attempted to further deescalate rather than suddenly resorting to an immediate use of force under unwarranted circumstances, it is possible no force would have been needed.  *See* DOM § 51020.12.  Yet the Hiring Authority did not hold them accountable.

While the video footage provides sufficient evidence for the Hiring Authority to sustain the violations, the AIMS investigation was inadequate, failing to address the key question:  whether Officers ███████ and ███████'s use of force against Mr. ███████ was unnecessary.  The investigation report instead focuses only on whether the force employed by the officers once Mr. ███████ began resisting was excessive.[12]

The IERC paperwork includes a manager's review of the use of force (not referred to by the investigator), which attempts to justify the force by concluding Mr. ███████' location on the second tier is not an area that can be controlled or isolated because the

---

[12] The investigator's summary of the BWC and AVSS footage ignores everything that happened before the officers used force against Mr. ███████, stating:  "The footage shows interactions between ███████ and Correctional Staff.  ███████ is observed resisting ███████ and ███████ as he wraps his legs around the chair he had been sitting in."  *See* Investigation Report at 3.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

location "prevented access to the surrounding cells in the event of a potential medical emergency and … would disrupt normal institutional operations to include mandatory Guard One checks and institutional count." *See* IERC at 5.  These conclusions are belied by the BWC footage, which shows that Mr. ███████' location did not block access to any surrounding cells.  In fact, an officer conducts a Guard One check without any issue while Officers █████ and ███████ are speaking with Mr. ████████ about returning to his cell.  *See* BWC (linked above) at 7:08:20 – 7:08:30.

But whether a controlled use of force would have been appropriate is a red herring.  Even assuming it was not possible to control or isolate Mr. ████████ on the upper tier while he was restrained in waist chains, with no other incarcerated people out of their cells, that is no justification for an immediate use of force here.  Mr. █████ indisputably posed no imminent threat to anyone, and there were a number of de-escalation options available to the officers.

Plaintiffs have previously reported on many other cases where officers are not held accountable for resorting to immediate uses of force where the incarcerated person poses no imminent threat.  *See, e.g.* Plaintiffs' May 12, 2023 Report at 14-20 (CIW-████████, LAC-███████, LAC-██████); Plaintiffs' February 10, 2023 Report at 8-16, 25-29, 31-37 (LAC-███████, LAC-████████, LAC-████████, LAC-███████, LAC-████████, LAC-███████, CIW-███████, COR-██████).  The OIG recently reported on the same problem, finding that officers are frequently resorting too quickly to using force.  *See* July 3, 2023 OIG Report re Monitoring the Use-of-Force Review Process of the CDCR at 1 (finding that in 44 of 113 incidents reviewed in which officers had the opportunity to deescalate prior to using force (or 39%), "officers failed to effectively communicate with the incarcerated person or did not adequately attempt de-escalation strategies").  The OIG reports that CDCR's de-escalation training course was removed from its required annual training program in 2020, and recommends that CDCR "reinstate its de-escalation course as mandated training for all custody staff." *Id.*  **Plaintiffs' counsel agree with this recommendation, as the discontinuance of this training is likely contributing to the frequency with which officers inflame rather than defuse situations, and improperly resort to force.**

(d)    **LAC – ███████ – AIMS, then OIA referred, Not Sustained**

In this case, ████████████████████, went "man down" in his cell, but Officer ████ failed to call medical after telling him she would.  The Hiring Authority did not sustain the allegation, despite the video evidence confirming the misconduct.

Officer ████'s BWC shows that during a security check, Mr. ███████ reported that he was vomiting and required medical attention.  Officer ████ says "I'll call her [medical] right now."  *See* BWC at 13:18:30.  Officer ████ then proceeded to the upper tier.  She did not call medical, in violation of the LOP requiring officers to "immediately

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

notify health care staff of a possible medical emergency ....” *See* Investigation Report at 8. The AVSS footage and investigation report confirm that Mr. ██████ was not removed from his cell or seen by medical for more than an hour, and only after another officer stopped by his cell. *See* AVSS at 2:27:55; Investigation Report at 8. Mr. ██████ tested positive for COVID-19 that same day. *See* Influenza Like Illness POC Results (Feb. 13, 2022). The investigator stopped the inquiry based on a reasonable belief that the misconduct warranted adverse action, and the case was referred to OIA for direct adverse action.[13] But the Hiring Authority did not hold Officer ███ accountable for this serious policy violation despite the clear evidence of misconduct.

While the investigator provided sufficient evidence to sustain this violation, the investigation report was incomplete in failing to investigate other reported misconduct. First, the investigator did not confront Officer ███ with the contradictory video footage after she denied Mr. ██████’s allegations, *see* Investigation Report at 8, and thus failed to assess whether Officer ███ committed additional misconduct by lying, or if there was an innocent explanation for her denial. Second, Mr. ██████ alleged that Officer ███ was laughing at him while he waited for medical, after he was finally removed from his cell by the other officer. *See* Investigation Report at 7-8. Officer ███’s video clip ends before Mr. ██████ is brought out of his cell, so the investigator was unable to confirm the allegation. The investigator should have requested additional video, but did not.

**(e)    COR – ██████ – Local, Not Sustained[14]**

In this case, three officers did nothing to stop an at-least 90-second attack on a class member in a dayroom. *See* AVSS. The BWC footage for the two floor officers shows them in their office making small talk, unaware of the ongoing incident unfolding in the dayroom. *See* BWC 1; BWC 2. Meanwhile, the control booth officer, Officer ██████, reportedly had a BWC that was not functional at the time, making it unclear where his attention was during the obvious altercation.

The Hiring Authority should have sustained the allegation.[15] The video evidence in this case confirms the officer’s failure to monitor the dayroom and all three officers admit that none observed the incident while on-duty. The officers’ lack of awareness created an opportunity for an incarcerated person to harm another incarcerated person and the alleged misconduct should have been confirmed.

The investigation had multiple problems.

---

[13] The file omits OIA’s decision, as the first two pages of the OIA report are redacted.

[14] A lesser charge of not complying with COVID mask requirements was sustained.

[15] The Hiring Authority issued corrective action for Officer ██████ and Officer ██████ for failing to wear masks appropriately. *See* Counsel Records at 1-2.

## PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

The local investigator failed to ask important questions to establish whether the officers in this case failed to meet their responsibilities.  In the interview with Sergeant ██████, he said "there is always someone monitoring the dayroom, either the floor officers or the control booth officer."  *See* Inquiry Report at 3.  The evidence in this case shows that did not occur here.  Instead of asking important follow up questions regarding the failure in this case, the investigator asked only how often each officer monitors the day room.  When the officers gave inconsistent responses, the investigator appeared to simply accept the answers, even if they were inconsistent with the evidence or Sergeant ██████'s response regarding supervision.[16]  The investigator did not reconcile the video evidence with their answers nor did they question Sergeant ██████ about the video in response to his statement that there is someone always monitoring the dayroom.

Furthermore, the investigator made a biased and speculative conclusion, which was unsupported by the facts, about why the tower officer — Officer ██████ — was not aware of the incident.  The investigator writes "the incident happened so quickly at which time Officer ██████'s [the tower officer] attention could have been in another area of the building."  *See* Inquiry Report at 3.  While the initial headbutt lasted about one second, the full incident, at least from what is shown on video, is almost 90 seconds long and possibly longer.  While it may be true that Officer ██████'s attention was elsewhere during the initial attack, it is not the investigator's job to speculate or justify the officer's actions, especially when there is no video evidence corroborating the speculation.  Further, the most relevant question in this case is whether the officer should have been aware of the events, not speculation about why he might not have been.

The investigation report concludes that there is lack of evidence to show the officers "were negligent of their duty to ensure the safety and security of inmates during dayroom activities."  *See*  Inquiry Report at 3.  The investigator drew this conclusion without reason.  There are no countervailing facts supporting any justification for the failure of three officers to observe and respond to an ongoing security threat occurring over a prolonged period of time in the dayroom.

Lastly, the case was routed locally, when it should have been routed to AIMS.  The Office of Grievances' decision identified this as staff misconduct not on the ADI.  *See* Origination Docs at 8.  However, this allegation clearly falls on the ADI under  "actions or conduct causing significant risk to institutional…safety …" or

---

[16] Officer ██████'s response suggests infrequent monitoring stating, "checks are completed at various times approximately every hour or so."  *See*  Inquiry Report at 2.  Officer ██████ stated that in the control booth he "constantly monitor[s] dayrooms."  *See* Inquiry Report at 2.  Officer ██████ stated that "we constantly do random checks of the [incarcerated people]."  *See*  Inquiry Report at 3.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

"creating an opportunity…for an incarcerated person to harm an incarcerated person …" *See* ADI.  Accordingly, AIMS, not local staff, should have investigated this incident.

### 3. Hiring Authorities Fail to Impose Appropriate Discipline After Misconduct is Confirmed

#### (a) COR – ███████ – OIA, Sustained

In this case, ████████████████ was pronounced dead after Officer ████████ failed to confirm he was alive during two consecutive security/welfare checks before he was discovered unresponsive in his cell. A Psychiatric Technician also admitted to falsifying records stating he had conducted his mental health rounds, when he had not actually done so.[17]  The Hiring Authority sustained an allegation of intentional endangerment (D3, 456789) against Officer ████████ based on the clear evidence of misconduct.  After a *Skelly* hearing, however, the Hiring Authority reduced the punishment to a Level 5 penalty.  The below-baseline penalty for this serious misconduct was not appropriate.  Given the severe consequences that actually occurred and could have resulted from the misconduct, the Hiring Authority should have imposed at least the baseline penalty and likely should have done more.

On December 11, 2021, Officer ████████ failed to confirm Mr. ████ was "living [and] breathing" during the two security/welfare checks immediately before he was found unresponsive in his cell.  *See* Corcoran Operational Procedure 226 at 29 (requiring officers to make "a visual/physical observation of a living, breathing inmate, free from obvious injury").  Officer ████████ admitted he did not "ensure he observed living, breathing flesh" during his Guard 1 Security Checks at 15:15 and 15:41 hours.[18] *See* OIA Report at 4.  Officer ████████ initially claimed that he had seen Mr. ████ move during the 15:15 hours check, but after being confronted with the video evidence showing he "was in front of the door for less than a second," he admitted that he had not properly completed either check.  *See* OIA Report at 3-4.  At 16:01 hours—46 minutes after Officer ████████ failed to properly conduct the first of two security/welfare checks—he and another officer tried to wake Mr. ████ for dinner and discovered him

---

[17] The Psychiatric Technician resigned from CDCR in February 2022, before the OIA investigation was completed.  *See* OIA Report at 4.  He cooperated with the investigation and admitted to failing to conduct mental health rounds in accordance with policy:  "He knows he made a huge mistake by not conducting a proper mental health evaluation on ████████ [and] stated when ████████' body was removed and he observed his skin color, he started to think, 'Could I have saved him?'"  *See* OIA Report at 6.

[18] The Psychiatric Technician also admitted that he did not ensure that Mr. ████████ was alive during his mental health rounds at 15:39 hours.  OIA Report at 5.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

unresponsive.  *See* Incident Report at 1.  After medical staff's resuscitation efforts failed, Mr. ███ was pronounced dead.[19]

The Hiring Authority sustained violations for intentional endangerment (D3) and failure to observe and perform within the scope of training (D25), which carries a base penalty of 6 and a potential range of discipline between 4-9.  *See* 402/403 at 3.  The Hiring Authority initially imposed a Level 6 penalty, but then reduced the penalty to a Level 5 penalty (10% salary reduction for 25 qualifying pay periods), below the baseline, following a *Skelly* hearing.  *See* 402/403 at 21-22.

The Level 5 penalty was not appropriate given the aggravating factors, particularly the "serious consequences [that] occurred or could have resulted from the misconduct." *See* 402/403 at 3.  The purpose of a security/welfare check is to prevent the ultimate harm—death—that occurred in this case.  While we cannot know if Mr. ███ could have been saved had Officer ███ not committed these serious violations, we do know that he twice violated the very policy designed to prevent such a death from occurring.  The consequences matter in assessing the penalty.  The Hiring Authority should have accounted for this aggravating factor when issuing discipline.

Instead, the Hiring Authority justified the penalty reduction on the grounds that Officer ███ accepted responsibility for his actions, was apologetic, and because of the "likelihood of occurrence."  *See* 402/403 at 21.  However, Officer ███ did not seem to take full responsibility for his actions, stating that "he was just used to how [Mr.] ███ customarily acted." *See* OIA Report  at 4.  And at the *Skelly* hearing, Officer ███ stated that "he felt he was doing his job to the best of abilities that day, and although he did violate the policy, he felt pressure from his supervisor to finish counting in a specified period of time." *See* 402/403 at 21.

Any mitigating factors here do not outweigh the aggravating factors and the gravity of the consequences of this type of misconduct.  At minimum, the Hiring Authority should have issued a baseline Level 6 penalty.  And given that this incident involved the officer's failure to confirm someone's wellbeing and an incarcerated person's death, the Hiring Authority likely should have dismissed Officer ███ .

**(b)    LAC – ███ – AIU, Sustained**

In this case, Officer ███ is captured on video threatening physical harm to class member ███ .  However, the Hiring Authority relied on mitigating factors, contradicted by video evidence that the investigator failed to report on, to improperly reduce the penalty to corrective action only.

---

[19] The investigator did not look into whether any earlier security/welfare checks on Mr. ███ were missed that day.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

As the video shows, when Officer ███████ returns Mr. ███████ to his cell, Mr. ███████ refuses to give the handcuffs back and repeatedly asks to speak with the sergeant. *See* BWC. Officer ███████ steps back, unholsters his pepper spray can, and says, "You're going to get busy with me in a minute, partner." *See* BWC (linked above) at 2:41:59. His partner, Officer ███████ tries to deescalate the situation, asking Officer ███████ to back up. Mr. ███████ then calls Officer ███████ a "bitch." Officer ███████ runs back to the cell, points his index finger toward Mr. ███████, and says, "I'll see you tomorrow, punk." *See* BWC (linked above) at 2:42:06. Officer ███████ then begins discussing what happened with other officers, and as he walks away from them across the dayroom floor, he says, "I want him. Just choke him a little bit," while miming choking someone with his hands. *See* BWC (linked above) at 2:43:47.[20] This important evidence, confirming Officer ███████'s intended threat of violence against the class member—and contradicting the purported explanation provided during investigation for what he meant—was omitted from the investigation report.

The Hiring Authority correctly sustained charges against Officer ███████ for discourtesy (D1) and failure to observe and perform within standards (D26), both of which carry base penalties of 1, but issued only corrective action based on four mitigating factors, two of which are contradicted by the record. *See* 402/403 at 3. The Hiring Authority mitigated the penalty based on findings that Officer ███████ was "forthright and truthful during the investigation" and "accepted responsibility." This finding is not supported by the evidence. Officer ███████ first falsely claimed he tried to convince Mr. ███████ to relinquish the cuffs before unholstering the pepper spray can, *see* AIR 5, and after being confronted with the contradictory video footage, he offered explanations for his threats that are not credible. Officer ███████ claimed that when he said that they would "get busy," he meant he would use the safety triangle to secure Mr. ███████, even though the video shows Officer ███████ said this immediately after unholstering his pepper spray can. *See* AIR 6. Officer ███████ also claimed that when he said, "I'll see you tomorrow, punk" while charging at Mr. ███████ and pointing his finger at him, he meant he was going to use the safety triangle on him the next day, even though he had no reason to believe it would be necessary to do so then. *Id.*

Contrary to the conclusions in this case, Officer ███████'s inconsistent testimony and incredible claims evidence a failure to accept responsibility and to be forthright during the investigation. The evidence shows that, when challenged by Mr. ███████,

---

[20] The investigator failed to acknowledge that Officer ███████ improperly deactivated his BWC without an announcement less than one minute after saying he wanted to choke Mr. ███████, while he was walking through the housing unit. *See* BWC (linked above) at 2:44:18. Officer ███████ reactivated his BWC about a minute later, while still in the dayroom, also without an announcement. *See* BWC (linked above) at 2:45:12. Officer ███████ was not held accountable for deactivating his BWC outside of a permissible deactivation circumstance.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Officer ▇▇▇▇ inappropriately escalated to threats of physical force, both verbally and by placing his pepper spray can in the tray slot.  That conclusion is supported by the comments he made about wanting to choke Mr. ▇▇▇▇ following the incident.  Escalating conflicts in this way places incarcerated people and staff at risk of harm.  The Hiring Authority issued inappropriate discipline by incorrectly finding two mitigating factors contradicted by the record.[21]

#### (c)     RJD-▇▇▇▇ – Local, Sustained – LOI (but not issued)

In this case, the Hiring Authority drafted a Letter of Instruction, dated October 21, 2022, to be issued to Officer ▇▇▇▇ for improperly wearing a face mask.  The unsigned LOI was included in the case file produced to Plaintiffs.  *See* LOI at 4-6.  However, the case file also included a Memorandum from the Chief Deputy Warden at RJD dated February 28, 2023 (about one month before Plaintiffs received the case file), stating: "The LOI was drafted and not served due to it being past the 30 day period.  The LOI was subsequently lost due to time constraints."  *See* LOI Lost on Time Memo.  This statement presumably is intended to reference DOM § 33030.8, which states that corrective action "must generally be issued within thirty (30) calendar days of discovering inappropriate behavior or poor performance." In fact, since the 30-day time period in Section 33030.8 is permissive, CDCR could still have issued the letter of instruction, but chose not to.

Plaintiffs previously reported on this exact situation in LAC-▇▇▇▇.  *See* May 12 Report at 25.  These ongoing failures undermine the progressive discipline system, in which corrective action is designed to serve as a foundation for more serious discipline if the officer later engages in similar misconduct.

### B.     Barriers to Accountability as a Result of Investigations

#### 1.     Investigators Conducted Incomplete and Biased Investigations that Interfered with Determining If Allegations Were True

In many of the cases reviewed by Plaintiffs (discussed below and in Table A), investigators failed to conduct complete and unbiased investigations.  These investigative failures, especially failures to retain and review relevant video evidence, often made it

---



[21] The investigator also incorrectly concluded Officer ▇▇▇▇ reported Officer ▇▇▇▇'s misconduct, when she told Sergeant ▇▇▇▇ that Mr. ▇▇▇▇ was mad because "▇▇▇▇ supposedly threatened him." *See* BWC at 2:44:15.  By including the word "supposedly" and withholding that she witnessed Officer ▇▇▇▇ threaten Mr. ▇▇▇▇, Officer ▇▇▇▇ presented the issue as merely an allegation by Mr. ▇▇▇▇, rather than misconduct she witnessed.  Officer ▇▇▇▇ should have been held accountable for her failure to report misconduct.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

difficult or impossible to determine whether the alleged misconduct occurred.  These cases demonstrate that Defendants are not complying with the Remedial Plans.

Plaintiffs' conclusions are corroborated by the OIG.  Regarding the locally investigated cases the OIG found that "investigators did not consistently perform all essential steps, which resulted in <u>nearly half</u> the monitored cases being deficient."  *See* Monitoring the Staff Misconduct Investigation and Review Process, 2022 Annual Report at 24 (emphasis added).  The OIG assigned an overall "poor" rating to approximately half (47%) of OIA/AIMS investigations they reviewed finding that investigators failed to obtain all available evidence, conducted poor interviews, and produced reports that did not contain all relevant facts and evidence.  *Id* at 28.  And OIA AIU investigators fared even worse with the OIG assigning an overall rating of "poor" to 70% of AIU cases reviewed.  *Id.* at 33.

Plaintiffs are optimistic that the parties have committed to working with the Court Expert to identify and eliminate ongoing investigation failures.  As reported previously, a fundamental shift in the approach towards conducting staff misconduct investigations must occur in order for this process to be successful.  There are currently no consequences for investigators who fail to put in the work necessary to complete a thorough and unbiased investigation.  To the contrary, investigators are rewarded with additional time on their hands in cases where they stop short of reviewing the additional footage or conducting the additional interviews that would be necessary to discover evidence to confirm the violation.

Many investigations reviewed by Plaintiffs' counsel, across multiple quarterly reports, appear focused on simply discovering enough evidence to dispense with the allegation, rather than uncovering the evidence necessary to determine whether staff misconduct occurred.  Multiple examples of investigators requesting and reviewing only one minute of footage exemplify this point.  (*See* SATF—███████; CIW—███████, KVSP—███████; *see also* KVSP – ███████ from Plaintiffs' May 2023 Report and Plaintiffs' November 2022 Report at 27).  Multiple cases in which investigators accept blanket denials or excuse the conduct of subject officers in the face of, and without ever reconciling, video evidence to the contrary, also demonstrate how investigations are not focused on gathering evidence relevant to confirming allegations.  (*See* **LAC –** ███████**; LAC –** ███████**; COR –** ███████; *see also* from Plaintiffs' May 2023 Report CIW – ███████; KVSP – ███████; LAC – ███████; CIW – ███████).

**The investigation process will not work if investigators disbelieve incarcerated people from the outset and if investigations focus on disproving allegations, rather than gathering the information necessary to prove the allegation true.  CDCR must actively work to eliminate bias in staff misconduct investigations.**

The following cases illustrate incomplete and biased investigations:

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**(a)   LAC – ███████ – AIMS, Not Sustained**

This case involves the serious allegation that Sergeant ███████ turned off her BWC in order to reveal to other incarcerated people the commitment offense of ████████████████████, and to recommend to them that they should assault him for being a "rapist." The OIA investigator uncovered evidence that another officer, ███████████, viewed Mr. ██████'s commitment offense on SOMS, but did not take further steps to determine whether Officer ██████—alone or in concert with Sgt. ██████—shared it with incarcerated people, putting his safety in jeopardy.

On January 7, 2022, Mr. ████████ was placed in the ASU after an altercation with another incarcerated person. On January 11, 2022, he was released from the ASU. When he returned to his housing unit, Mr. ████████ alleges he was warned by Officer ██████ "to be cautious" because people "were aware of his commitment offense of rape and were planning to assault [Mr.] ██████." *See* Investigation Report at 5. Mr. ██████ says his cellmate told him that Sgt. ████████ showed the Facility D Program clerks paperwork reflecting Mr. ████████'s commitment offense, and told them he "is the one who should have been battered for being a rapist." *See* Investigation Report at 5. Mr. ████████ told the investigator that two other incarcerated people (whom he named) told him Sgt. ████████ was responsible for his commitment offense becoming known to the incarcerated population on D Yard. *See* Investigation Report at 5. Mr. ██████ also said he was confronted by an incarcerated person about his commitment offense and heard others plotting to assault him through the vent in his cell. On January 28, 2022, he was placed in the ASU due to safety concerns. Mr. ████████ told the investigator that he "believed if SOMS was checked, it would reveal ████████████ had researched [Mr.] ████████'s information, specifically his commitment offense." *See* Investigation Report at 5.

The investigator obtained a report of Sgt. ████████'s SOMS activity and an additional report regarding whether other staff had viewed or printed anything from SOMS about Mr. ██████ from January 7 through January 11, 2022, when he was in the ASU. *See* Relevant Docs Package at 72. The report showed that Sgt. ██████ did not view or print information about Mr. ████████ during that time period. *Id.* at 75 (linked above). But it *did* show that Officer ████████ viewed Mr. ██████'s Case Summary (which includes his commitment offense) twice on January 11, 2022, the day he was released from the ASU.[22] *Id.* at 74 (linked above). The investigation report leaves out this important fact, which is consistent with the allegation that incarcerated

---

[22] CDCR prepares a Case Summary for each incarcerated person upon their arrival at a reception center to summarize information about their legal and case factors for use in case management decisions. It includes a Legal Status Sheet with information about their commitment offense and sentence, and the Probation Officer's Report prepared for the sentencing court. *See* DOM §§ 61030.1, *et seq.*

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

people in Mr. ████████'s housing unit had learned of his commitment offense because custody staff revealed it to them.

Knowing that an officer accessed Mr. ████████'s Case Summary around the time relevant to the allegation, the investigator should have conducted a thorough investigation to determine whether Officer ████████ had a legitimate reason for accessing the file. That investigation should have, at a minimum, included an interview with Officer ████████, review of his BWC (to determine if he conveyed the information to incarcerated people or Sgt. ████████), and questioning of Sgt. ████████ regarding her interactions with Officer ████. The investigator did none of those things. She did not even look into Officer ████████'s post on the day he accessed the information from SOMS, including whether he was working on the same yard or had the opportunity to interact with Sgt. ████████ and/or incarcerated people on Mr. ████████'s yard. Nor did she interview Officer ████████, who Mr. ████████ alleged told him to be cautious upon his release from the ASU because people knew about his commitment offense. The investigator also made no attempt to interview any of the three incarcerated people who told Mr. ████████ that Sgt. ████████ spread the information about his commitment offense to the incarcerated population on Facility D. The investigator interviewed only one incarcerated witness, who claimed to have known about Mr. ████████'s conviction from outside of prison, and denied learning about it from Sgt. ████████.

The investigator appears to have concluded the investigation when she determined that Sgt. ████████ had not viewed Mr. ████████'s commitment offense on SOMS, even though her investigation revealed that another officer had done so on the same day. This is another example of an investigator focusing on disproving a narrowly defined allegation rather than attempting to uncover evidence necessary to determine whether staff misconduct occurred.[23]

_____

[23] The investigator also determined that Sgt. ████████ deactivated her BWC with no announcement on January 9, 2022, a policy violation consistent with the allegation that she turned off her BWC before sharing Mr. ████████'s commitment offense with incarcerated people and recommending they assault him. *See* Investigation Report at 3. The investigator noted that Sgt. ████████'s BWC footage from January 10, 2022 ended at 8:48:51 am, indicating another potentially improper deactivation, as the investigator requested footage through 11:00 am. *Id.* at 5; Relevant Docs at 83. (The January 10, 2022 BWC footage was not produced to Plaintiffs.)

Yet the investigator did not investigate Sgt. ████████'s BWC deactivations or clearly present the evidence of these apparent policy violations to the Hiring Authority, even though they go to the heart of Mr. ████████'s allegations. The only reference to them is in the final time-stamped entry of the investigator's summary of Sgt. ████████'s January 9 BWC footage: "████████ deactivated her BWC with no announcement. End of

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

    **(b)**    **RJD –** ███████ **– Local, Not Sustained**

In this case, ██████████████████████████████ alleged that Officers ███████ and ██████████ failed to respond to his requests to contact medical staff after he fell off of his bunk and injured his left foot. The investigator failed to discover evidence confirming that Mr. ██████████ sustained a serious injury, a broken ankle, after his reported fall, and failed to reconcile that evidence with his complaint that he did not receive timely medical care. Because the investigation was so incomplete, the investigator failed to provide the Hiring Authority with the evidence necessary to determine whether the alleged misconduct occurred.

In his 602, Mr. ██████████ states that he fell from his bunk around 1:30AM on December 1, 2021. *See* 602 at 5. He further states that he began banging on his cell door and yelling "man down", but none of the officers in his unit summoned medical attention for him. Instead, Mr. ██████████ had to wait until he and others in his unit were released from their cells later that morning during morning unlock. At that time, around 7:00AM, another incarcerated person pushed him to the Facility C Medical Clinic.

The investigation report confirms that staff acknowledged that Mr. ██████████ was requesting access to health care and that he was dismissed by custody staff. In his interview with the investigator, Officer ██████ stated that he believed Mr. ██████████'s behavior was consistent with being high on drugs, and he did not believe a medical response was necessary. Officer ██████ also stated that Mr. ██████████ was making "yelping or moaning noises; at times striking the cell door." *See* Inquiry Report at 2. This corroborates Mr. ██████████'s claim that he was banging on his cell door and yelling for medical attention, and yet the investigator fails to point this out or ask any additional questions.

The investigator reviewed Officer ██████'s BWC from 1:08-1:09AM (prior to Mr. ██████████'s fall), 3:08-3:09AM, and 5:06-5:07AM, as well as Officer ██████'s BWC from 6:19-6:20AM. At each of these times, the Officers are conducting security checks.

The BWC footage from 3:08-3:09AM shows Mr. ██████████ in his cell with the light on. When Officer ██████ looks in the cell and sees Mr. ██████████, he says "What?", to which Mr. ██████████ makes a sound as if in pain, and as Officer ██████ walks away, he says "You need to get off the heroin, man." *See* BWC.

The BWC footage from 5:06-5:07AM shows that the light is still on in Mr. ██████████'s cell, and Officer ██████ does not even stop to look in. *See* BWC at 5:06:58. On the BWC footage from 6:19-6:20AM, some yelping sounds can be heard,

footage." *See* Investigation Report at 3. The Hiring Authority failed to sustain these BWC policy violations, or to request further investigation into them.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

possibly from Mr. ███████'s cell, but Officer ███████ simply conducts a quick check as usual. *See* BWC at 6:19:37. Lastly, the investigator reviewed AVSS from 6:55-6:58AM, which shows Mr. ███████ exiting his cell in his wheelchair, and ultimately being pushed out of the unit by another incarcerated person.

Even with only a very limited review of video footage, and cursory interviews with Officers ███████ and ███████, the evidence supports the allegation that Mr. ███████ attempted to get medical assistance but the officers dismissed his requests. The investigator concludes, "There is no evidence, the claimant fell off of his bunk at around 0130 hours." *See* Inquiry Report at 2. This statement is simply incorrect. Mr. ███████'s medical records confirm that his injury, a broken ankle, was severe enough to require transport to an outside hospital the following day. *See* Outside Records - Hospital dated December 4, 2021 ("patient was admitted with an acute spontaneous left ankle fracture"). Such an injury is consistent with him having fallen off the bunk. The records also indicate that Mr. ███████ underwent a surgical procedure on his ankle. The investigator did not, however, collect these records or make any inquiry to medical staff to verify Mr. ███████'s claim of a serious injury.

The investigator's failure, combined with the wholesale adoption of the explanation provided by the officers that they thought he was "high," demonstrates how bias against Mr. ███████ and in favor of staff resulted in an incomplete investigation. As a result, CDCR failed to hold officers accountable who disregarded a class member's pain and suffering during the time he was denied access to medical care for serious injuries.

**(c)    KVSP-███████ / KVSP-███████ – AIMS, Not Sustained**

These cases exemplify the ongoing problem of investigators failing to identify and investigate all serious allegations of staff misconduct raised on 602s. In each case, the OIA investigator did not recognize serious staff misconduct allegations on the face of the class members' complaints, and took no steps to investigate them.

In KVSP-███████, ███████ alleged that on February 4, 2022, he was assaulted by another incarcerated person who was directed to attack him by C Yard officers in retaliation for filing 602s and bringing a lawsuit against them. He alleged that the officers did not intervene while the assailant was attacking him until after Mr. ███████ tried to defend himself, at which point they pepper sprayed Mr. ███████. He also alleged that while the aggressor was not disciplined for the fight, Mr. ███████ was sent to the ASU on a SHU term for battery. At the bottom of the second page of the 602, Mr. ███████ notes that Control Officer ███████ "purposely smashed my fingers between the cell doors," but states that he had already turned in a 602 about this, and that he is only mentioning it again "just to show you a pattern of how K.V.S.P. officers were retaliating against me …." *See* 602.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The OIA investigator completely ignored Mr. ███████'s central allegation and instead investigated only the stale allegation that Officer ███████ intentionally closed a cell door on Mr. ███████'s fingers. *See* Inquiry Report at 1-3. It is hard to understand how the investigator could have missed that Mr. ███████'s 602 was primarily alleging that he was assaulted at the behest of custody staff in retaliation for filing 602s and a lawsuit against them, but the inquiry report does not even mention this.[24] The failure to identify Mr. ███████'s core allegation made it impossible for CDCR to determine whether this serious misconduct occurred.

In KVSP-███████, RJD declarant ███████████████████████ ███████ raised three staff misconduct allegations: (1) on March 8, 2022, Officer ███ repeatedly opened his cell door every hour to ask if Mr. ███████ wanted a shower in retaliation for Mr. ███████ filing an 1824 against Officer ███████ for refusing him incontinence showers;[25] (2) on March 5, 2022, Officer ███████, the second watch tower officer, announced on the PA system that nobody could use the phones while Mr. ███████ was being helped by an ADA worker; and (3) on March 12, 2022, during third watch, officers threatened to rescind program time for the housing unit if an ADA worker helped Mr. ███████ clean his cell. *See* 602 at 6-7.

As in KVSP-███████, the OIA investigator completely failed to identify or investigate Mr. ███████'s second and third allegations, and the inquiry report does not even acknowledge their existence.[26] *See* Inquiry Report at 1-5. Mr. ███████'s 602 provided sufficient detail about each allegation for the investigator to have requested relevant video footage and identified the subject officers and witnesses. These are serious allegations that effect the safety of class members and discourage people with

---

[24] The first sentence of Mr. ███████'s 602 spells out his central allegation: "On Feb/4/22 I was attacked by an inmate that was sent by the CO's to attacked me due to I was submitting 602s against officers at Charlie Yard as at this moment I have an active lawsuit against K.V.S.P. Charlie Yard Officers." *See* 602 at 4.

[25] Plaintiffs previously reported on an inadequate investigation into another officer at KVSP who denied Mr. ███████'s requests for incontinence showers. *See* Plaintiffs' Review of CDCR's Accountability System (May 12, 2023) at 37-39. Due to OIA's more than ten month delay in commencing the investigation here, the incident we previously reported on actually occurred more recently than this case, on September 11, 2022.

[26] While the investigator did look into Mr. ███████'s first allegation, the investigator delayed more than ten months after the case was referred to OIA before taking any action, long after the 90-day video retention period had elapsed. Without Officer ███'s BWC footage and the AVSS footage for his shift on March 8, 2022, it was impossible to resolve the conflicting witness testimony to conclusively determine whether Officer ███████ retaliated against Mr. ███████ by repeatedly opening his cell door to offer him showers.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

disabilities from asking for help.  Yet the investigator did not look into either allegation of disability-related staff misconduct.

    **(d)**    **CIW –** ████████[27]**/CIW –** ████████ **– AIU, Not Sustained; AIU, Sustained**

These cases illustrate how the failure to adequately track and manage investigations by OIA resulted in three different investigators simultaneously investigating the exact same allegation.  The outcomes regarding whether staff misconduct occurred differed between the investigations, with the Hiring Authority substantiating misconduct in one case and not the other even though the cases involved the same allegation, same people, and same set of facts.  These cases also illustrate how the format of the AIU investigation report, which, over Plaintiffs' objection, is designed to list the evidence and facts without conclusions regarding the weight or credibility of the evidence, undermines the ability of the Hiring Authority to evaluate the evidence.

████████████████ a transgender man at CIW, alleged in a 602 that Officer ██████ improperly conducted two unclothed body searches of him, ignoring Mr. ██████'s right to have a same-gender staff person conduct the search.  *See* 602 at 16-20.  The CST routed the complaint to the AIU, which opened an investigation (CIW – ██████) that was completed on September 19, 2022.  *See* Investigation Report at 3.  The closure notice indicates that Mr. ██████'s allegations were "unfounded" by the Hiring Authority.[28]

On the same day of the incident, Mr. ██████ also reported the same allegation during his Institutional Classification Committee (ICC).  The committee routed the exact same allegations through the staff misconduct investigation process, which resulted in the opening of a local PREA investigation and a second AIU investigation.  *See* PREA Log No. ████████████████████.

Sergeant ████ completed a preliminary PREA report on July 1, 2022 indicating that an interview with Mr. ██████ had been completed but no additional investigation was conducted because the allegation had been referred to the CST.  *See* ██████, Exhibit 1 at 3-4.



----

[27] This case comes from the Q4 2022 CIW production.

[28] Even though the Hiring Authority did not substantiate the allegation, Officer ██████ received employee counseling because she used inappropriate language when speaking with Mr. ██████.  *See* Employee Counseling Record, issued to Officer ██████ on September 9, 2022 (counseling Officer ████ for saying, "Keep talking shit, see if I let you out" after searching Mr. ██████ for yard release).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The AIU opened its second investigation (CIW – ████████) into this allegation on August 17, 2022.  At that moment, the AIU was already investigating the allegation in case number CIW – ████████.  The second investigator, Lieutenant ████, completed an investigation report on December 1, 2022.  This investigation attaches the first AIU investigation report as an exhibit, as well as the July 1, 2022 PREA report.  *See* Investigation Report at 1-4.  The only closure memo produced for the second investigation appears to have been completed by the local PREA investigator which includes multiple references to the second AIU investigation.  *See* PREA Closure Memo. In contrast to the conclusion reached a few months prior in CIW – ████, the Hiring Authority substantiated the allegation that Officer ████ inappropriately searched Mr. ████ when he had a male search policy preference documented in SOMS.  Officer ████ received training on the "Transgender Access Card" policy.  *See* CDCR Form 844.

Defendants' flawed processing and handling of this single allegation reflects an inefficient process where valuable investigator time and resources are not efficiently managed.  The process ultimately resulted in multiple investigators—two AIU lieutenants and a sergeant (in the PREA investigation)—investigating the exact same allegation. These duplicative investigations also created more work for the Hiring Authority, who had to review and resolve multiple reports.

Most troubling, the outcomes of the different investigations reached different conclusions about the same conduct.  It is difficult to pinpoint exactly why this outcome occurred, but it may reflect that Hiring Authorities are simply too busy to review each of these cases in much detail.  In these cases it appears the Hiring Authority relied heavily on whoever drafted the concluding closure memos.  In the latter investigation, the PREA investigator who substantiated the misconduct incorporated reference to documentation in SOMS of the class member's male search preference which was in existence at the time the incident occurred.  In contrast, the first investigator concluded that documentation of the male search preference had not been approved.  There was no mention in that report that policy requires staff to approve the request within 15 days. *See* LOP 920, Transgender Access Card Policy at 27.  Any lack of approval should not have been held against the class member but rather would have indicated a different potential compliance problem on the part of staff.   Regardless of which outcome was the right outcome, this case illustrates problems with the current accountability process.

### 2.    Investigators Routinely Fail to Retain and Review Relevant Video Footage of Incidents

#### (a)    Investigators Routinely Fail to Review Relevant Video Footage of Incidents

Plaintiffs continue to identify cases where investigators review the wrong footage or otherwise relevant video footage, including cases where too little footage is reviewed,

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

without justification. For example, in CIW-██████, the 602 specified that the misconduct occurred on March 18, 2022 and March 20, 2022. The investigator, however, reviewed footage from the wrong day, January 27, 2022, without explanation. In LAC-██████, the person alleged an officer threatened him between 12:15 to 12:30. In that case the investigator only reviewed footage up until noon, stopping short of the timeframe that the reported misconduct occurred, without explanation.

Plaintiffs' counsel continue to also identify cases where investigators fail to make a sufficient effort to identify the time, date, and locations of the alleged misconduct in order to preserve and review relevant video footage. For example, in LAC-██████, the investigator said it was not necessary to request BWC/AVSS footage because the class member "did not provide a specific time, date or location" when an officer refused to allow him to take the shorter path of travel as an accommodation for his disability, but the class member reported on his 1824 that it happened between 6:45pm and 7:10pm, and the investigator does not appear to have asked him for specific dates or even to identify the subject officer. Had the investigator asked these basic questions, the investigator could have requested the relevant BWC footage. Instead, the investigator only requested AVSS footage from August 9, 2022 (the date the 1824 was submitted) for 7 minutes at around 7:30pm and for 6 minutes at around 8:30pm, even though the incident reportedly occurred between 6:45pm and 7:10pm. *See also* CIW-██████, LAC-██████, KVSP-██████, SATF-██████, SATF-██████.

The current accountability process provides no remedy to obtain the correct footage when, as in cases above, it is later discovered that the investigator preserved and relied on the wrong footage. The OIG has therefore recommended that the timeframe for preserving footage be extended beyond 90 days to ensure that video footage that is essential to the outcome of the investigation is not lost. *See* OIG Report at 62. Plaintiffs support this recommendation.

For additional summaries of cases where investigators failed to review the relevant footage see **Appendix C**.

> **(b)      Investigation Delays Result in Footage Being Destroyed**

Plaintiffs identified a number of cases where investigators delayed in requesting footage resulting in the footage being destroyed and compromising the ability to conduct a complete investigation. Plaintiffs' acknowledge that, according to Defendants' June 16, 2023 report response, AIU and local investigators are now expected to request the footage within 10 days of being assigned a case. Plaintiffs are hopeful that the change will address this significant issue. Unfortunately, because Defendants do not produce cases until investigations are complete, it could take up to a year and a half before Plaintiffs can monitor whether this important remedial step is working. In the meantime, a number of examples identified in this production illustrate this failure: *See* KVSP-██████; KVSP-██████; KVSP-██████; LAC-██████; CIW-██████; KVSP-

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

██████, [29] KVSP-████████; KVSP-██████████;[30] *See also cases where delays in investigator assignments or referrals impacted requests for footage:* KVSP-████████; KVSP-████████; KVSP-████████; SATF-████████; CIW-████████; LAC-████████.

Lastly, Plaintiffs' counsel identified use-of-force cases where video footage was not preserved. Putting aside any delay in an investigation or in the assignment of an investigator, the notice of a use of force itself should have been a triggering event that resulted in the preservation of the footage. Examples of cases where the footage was not preserved include: KVSP-████████; KVSP-████████.

**Plaintiffs request, in order to effectively monitor whether footage is being timely requested and cases are being timely assigned, that Defendants begin producing a small sample of video request forms and corresponding case assignment information for open cases which may not yet be completed.**

### (c)      Failure to Produce Video Footage to Plaintiffs

CDCR continues to fail to produce all relevant, functional video. As described in the report write-up, in **LAC – ████████**, the investigator reviewed video on January 9, 2022 and January 10, 2022 to determine whether an officer turned off her BWC and shared an incarcerated person's conviction offense. However, the January 10, 2022 footage was not produced to Plaintiffs' counsel. *See also* SATF-████████ (video was not functioning); SATF-████████; LAC ████████; LAC-████████.

### C.      Inappropriate Use of New AIU "Quick-Close" Policy

Plaintiffs have discovered through document review that CDCR has implemented a new policy that enables investigators to "quick-close" a case that contains video if the video evidence refutes the allegation. According to the Office of the Inspector General's Staff Misconduct 2022 Annual Report, on August 3, 2022, the OIA AIU issued a memo regarding this new change entitled "Investigative Report With No Evidence of Misconduct," which is also referred to as a video quick-close report. *See* OIG report at 47. The memo included a template report for investigators. While Plaintiffs can appreciate that some cases containing video will definitively refute allegations, we are concerned by this policy development given the number of investigations reviewed by Plaintiffs' counsel where investigators conduct incomplete investigations, relying only on irrelevant footage, to dismiss allegations of staff misconduct.

---

[29] The linked case file is incomplete because Plaintiffs were unable to upload UOF interview.

[30] In some cases, the delay may have been a result of the case not being assigned to the investigator in time or a delay in the case being referred from the CST.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

For example, Plaintiffs reviewed more than one case where the AIU inappropriately relied on a quick-close report after reviewing only video, and in at least one case not necessarily the relevant video, resulting in an incomplete investigation.

In COR-███████, the class member reported that after notifying a captain that he filed a 602 about a counselor for failing to keep him safe, three officers retaliated against him by searching every cell in the unit the following day, telling people that the reason the search was occurring was because of the class member's complaint. *See* 602 at 1-2. The investigator used the AIU quick-close form (titled "Video Quick Close Report") after only reviewing video of the search itself and concluding there was no evidence of retaliation during the search. *See* AIU Quick-Close at 7-9. However, it is not clear that the alleged retaliatory comments were made during the search itself. The investigator should have interviewed the class member to discover when the alleged comments were made and  interviewed others who were searched to discover whether or not they were told by staff that the class member was the reason for the search and, if so, when. Without this information, the investigation seems incomplete. Reliance on video alone, without confirmation that the video covers the time period when the retaliatory comments were supposedly made, does not prove the misconduct did not occur.

*See also* **SATF –** ███████, discussed above, in which officers used excessive force—punching a seriously mentally-ill Coleman class member in the head twenty-three times. The investigator relied solely on video, and did not interview the class member or any of the involved officers. In addition, the investigator did not offer an independent analysis of the reasonableness of the force, relying solely on the IERC.

Consistent with Plaintiffs' concerns, the OIG found that the AIU "has used this memorandum and report template to justify some of its decisions not to conduct any investigative interviews when its review and assessment of other evidence—particularly video evidence—leads it to conclude that the allegations have been refuted." *See* OIG report at 47.

Plaintiffs seek to better understand how this policy is being used. **Please produce a copy of the policy and any direction to staff regarding the use of this new process. Is CDCR tracking the number of cases that use the video quick-close process? Please produce this data to Plaintiffs with the quarterly AIU data.**

### D.    AIU Investigations Continue to Be Delayed

Hiring Authorities are not the only cause of investigation delays. *See* **Section II.A.1**. AIU staff are also failing to complete investigations by the deadlines set in the Remedial Plans: 120 days for investigations conducted by custody supervisors (Sergeants

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

and Lieutenants)[31] and 180 days for investigations conducted by Special Agents.  **The chart below shows that, for investigations the AIU received in June 2022 to February 2023,[32] the AIU closed 41% of the investigations late.  For the most recent three months of available data, the AIU closed 31% of investigations late.**

| | On time | Late | Open not late | Open late | Total | % late | % on time/not yet late |
|---|---|---|---|---|---|---|---|
| June | 99 | 154 | 1 | 0 | 254 | 61% | 39% |
| July | 121 | 107 | 4 | 0 | 232 | 46% | 54% |
| August | 132 | 119 | 0 | 1 | 252 | 48% | 52% |
| September | 98 | 103 | 1 | 1 | 203 | 51% | 49% |
| October | 144 | 179 | 1 | 0 | 324 | 55% | 45% |
| November | 155 | 74 | 0 | 1 | 230 | 33% | 67% |
| December | 204 | 90 | 0 | 13 | 307 | 34% | 66% |
| January | 300 | 104 | 1 | 19 | 424 | 29% | 71% |
| February | 277 | 71 | 1 | 52 | 401 | 31% | 69% |
| Total | 1,530 | 1,001 | 9 | 87 | 2,627 | 41% | 59% |

Defendants' progress in this area appears to have stalled, as the late completion rate for all months from November 2022 to February 2023 was between 29% and 34%.

## III.   OFFICERS ARE NOT COMPLYING WITH BWC POLICIES

Plaintiffs' counsel reviewed BWC footage from the productions covered in this report to assess officers' compliance with BWC policies and whether CDCR is holding officers accountable for non-compliance.  Our review shows that staff continue to violate BWC policies and that investigators and Hiring Authorities often fail to take appropriate action when BWC videos reflect non-compliance. *See also* May 12, 2023 Report at 45-48 and February 10, 2023 Report at 49-52.  Defendants' BWC policies mandate that officers must keep their BWCs activated for the entirety of an officer's shift, except for specified

---

[31] The data shows that 88% of the AIU investigations to date have been assigned to custody supervisors.

[32] Plaintiffs only present the data for June 2022 to February 2023 because the vast majority of investigations from more recent months (1) are not yet complete and (2) could not possibly be late because they have not yet run up against the deadlines in the Remedial Plan.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

deactivation events.[33]  Officers must reactivate their cameras as soon as the deactivation event has concluded, and announce their reactivation.[34]

Plaintiffs' counsel reviewed each deactivation/reactivation for all unique BWC videos produced by Defendants to determine whether: (1) a deactivation may have been an intentional effort by the officer to interfere with the camera capturing misconduct ("code of silence"); and (2) a deactivation appeared to be for an inappropriate deactivation event.[35]

In addition, Plaintiffs' found that in LAC-███████, the investigator confirmed that an Officer was not wearing his BWC, but the Hiring Authority inexplicably did not sustain the violation.  The investigation report stated, based on the video evidence from Officer ████'s BWC, that Officer ████ "does not appear to be wearing a BWC."  *See* Investigation Report at 2.  BWC footage from Officer ████ at 6:58:41 confirms this.  *See* BWC.  The investigator correctly concluded that Officer ████ was not wearing his BWC on the day of the incident, but failed to interview Officer ████ to assess whether Officer ████ did so intentionally.  That evidence is material to the charge against Officer ████, as intentional disabling of a BWC (if Officer ████ intentionally removed or concealed his BWC) carries a base level penalty of 9, whereas unintentional non-use of the equipment carries a base level penalty of 1.  Regardless, the investigator did find misconduct and the Hiring Authority, without explanation, failed to sustain any allegations.  The Hiring Authority should have sustained a charge against Officer ████ for failure to properly wear BWC and issued appropriate discipline.  Such

---

[33] *See* Connie Gipson, Clarification to the Body-Worn Camera Deactivation Events or Circumstances (November 7, 2022); Connie Gipson, Update to Body-Worn Camera Deactivation Events #2 (September 1, 2022); Connie Gipson, Update to Body-Worn Camera Deactivation Events (Aug. 19, 2021); *see, e.g.*, Operational Plan No. 28 § VI.B.10; Five Prisons Remedial Plan, Attachment B (Local Operations Procedure 944) § VI.B.10.  Before deactivating their cameras, officers must announce the reason for the deactivation so that it is recorded by the BWC. Operational Plan No. 28 § VI.B.10; Local Operations Procedure § VI.B.10.

[34] Defendants' local operating procedures state, "[s]taff will make an audible statement when the body-worn camera has been reactivated." *See, e.g.*, BWC Operational Plan No. 28 § VI.B.11 (RJD); Five Prison Remedial Plan Local Operations Procedures § VI.B.11 (LAC).  Plaintiffs note that Defendants' September 1, 2022 and November 7, 2022 Memos both fail to clarify that staff are required to make an audible statement when the body-worn camera has been reactivated.  They should be revised to ensure staff understand this requirement.

[35] In some cases, the linked video pauses during the period in which the video is deactivated.  The reactivation can be viewed by playing the video starting from the reactivation, if applicable.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

a failure would constitute I2 (Failure to carry required equipment) or I3 (Misuse or non-use of issued equipment).

### A.   Officers Appear to Be Intentionally Deactivating or Obstructing the Use of BWCs to Promote a Code of Silence

In KVSP-█████████, the circumstances suggest officers used their BWCs in a way that advances a code of silence. *See* BWC at 6:03:40. Two officers are in an office setting. Officer A says to Officer B, "Did you bring phones? … Well why not?" Officer B responds, "Because it wasn't safe." Officer A then seems to relay a previous conversation, likely with another officer, who told him "it's alright … you know they'll be able to get you out of it …" The officers then discuss how CDCR does not hold staff accountable for serious violations, presumably like bringing cell phones into the prison, but does hold people accountable for less serious violations. Officer B says, "Oh yeah, but she [likely the other officer] wants to fuckin' bust people for stupid shit." Officer A says, "What? Anyways, go ahead," and pauses for fifteen seconds before announcing, "staff meeting" and deactivating the BWC for 11 minutes. The deactivation was improper, and because it directly followed a discussion about staff being held accountable (and not being held accountable) for violating policy, may indicate a code of silence. The investigator did not raise this issue in the report.

### B.   Additional Improper Circumstances Violations

In several other cases, officers deactivated or reactivated their BWCs in improper circumstances. The following is not a comprehensive accounting.

In at least two cases that Plaintiffs' review above, officers violated body-worn camera policy:

- In **LAC** – ██████████, ██████████████████████, reported that Sergeant █████████ deactivated her body worn camera in order to show other incarcerated people Mr. ███████'s commitment offense. The footage begins when Sergeant ███████ activates her camera while at a desk. Sergeant ████████ almost immediately deactivated the camera with no explanation, and did not reactivate for almost 25 minutes later while on the yard. The investigation report does acknowledge that this first deactivation occurred. Sergeant ███████ then deactivated her camera a little over fifteen minutes later, yet the only reference to this deactivation in the investigation report is: "████████ deactivated her BWC with no announcement. End of footage." *See* Investigation Report at 3. The investigator also notes that the BWC footage from the next day ends at 8:48:51, even though the investigator requested footage through 11:00 am, which suggests that another improper deactivation occurred, but the report

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

does not make that clear.[36]  The investigator reviewed footage that contains at least two improper deactivations, which is consistent with the allegation that Sergeant ███████ turned off her BWC to share Mr. ███████'s commitment offense.  However, the investigator did not clearly present these deactivations to the Hiring Authority, and the Hiring Authority did not sustain the BWC policy violations.

- In **LAC –** ███████, video showed Officer ███████ threaten a class member verbally and by pulling out his pepper spray.  About three minutes after Officer ███████ unholstered his pepper spray, he calls out, "I want him.  Just choke him a little bit," while miming choking someone with his hands.  *See* BWC at 2:43:47.  Less than one minute later, the officer walks toward a different incarcerated person's cell and, without making an announcement, deactivates the camera for nearly one minute.  When the camera is reactivated, the officer is walking through another part of the dayroom.  The investigator failed to identify this deactivation, even though it occurred less than one minute after Officer ███████ said he wanted to choke the class member.  The deactivation is not addressed by the Hiring Authority.

In several other cases, officers deactivate their cameras after providing improper reasons for deactivation. For example:

- In LAC ███████ an officer is talking to an incarcerated person after searching his cell.  The officer suggests he found something in the cell, and when the incarcerated person asks what he found, the officer deactivates the camera for approximately two and a half minutes without announcing the deactivation.  *See* BWC at 20:23:37.  When the camera reactivates at 20:26:07, the officer is still engaged in discussion with the incarcerated person, as well as another officer.  A little less than ten minutes later, after escorting the incarcerated person to the gym, the officer says, "I'm going to talk with you confidentially real quick, alright?" and once again deactivates the camera, this time for nearly two minutes.  *See* BWC at 8:31:54.  When the camera reactivates, the officer is exiting the building.  The investigator references the second deactivation in their report, calling it a "confidential interview," but it is unclear why the discussion would be confidential.  *See* Report at 3.  An officer may only deactivate to interview a "current or potential confidential informant," a person making a PREA complaint, or for staff misconduct interviews.[37]  None of those circumstances seem to

---

[36]  This footage was not produced to Plaintiffs' counsel.

[37]  *See* Five Prison Remedial Plan Local Operations Procedures § VI.B.10 (LAC); Connie Gipson, Update to Body-Worn Camera Deactivation Events #2 (September 1, 2022).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

apply here.  The Hiring Authority did not take any action to address the
BWC non-compliance.

- In LAC ████████, an officer enters the office of a staff person who is not I
  uniform.  The officer hands the staff person some papers and says, "I think
  the wrong Smith had the SNY attached to him." *See* BWC at 13:26:40.
  Less than 30 seconds later, the officer says "training" and deactivates the
  camera for nearly one minute, even though there was no indication that
  training was going to occur.  When the camera is reactivated at 13:28:00,
  the officer is walking down a hallway.

- In LAC ████████, a sergeant tells a group of officers to "dock" their
  cameras if they used initial force. An officer says, "docking for a report,"
  before deactivating the camera. *See* BWC at 11:16.  According to
  Defendants' operating procedures for LAC, BWC should be "docked
  appropriately at the end of each shift," or possibly if the battery becomes
  depleted, or the camera becomes damaged or inoperable.[38] "Docking for a
  report" is not a permissible deactivation circumstance.

- In LAC ████████, at 12:36:22, the officer walks into an office where two
  other officers are seated at desks and says, "Can you turn your guy's shit
  off?"  *See* BWC.  The officer deactivates the camera without giving a
  reason for doing so.  When the camera is reactivated over ten minutes later
  at 12:46:50, the officer is filling out a cell search form.

Officers also deactivate and reactivate in what appear to be improper
circumstances without announcement.  For example, in SATF ████████, within an hour
of officers using force during a cell extraction, the sergeant is talking with another
sergeant as they walk through a door leading outside the building.  Without announcing
why, at 21:48:19, the sergeant deactivates his camera.  *See* BWC.  The camera is re-
activated almost ten minutes later at 21:56:50.  The investigator and Hiring Authority
failed to address this improper deactivation.

Additionally, in multiple cases, footage reveals that officers do not always wear
their cameras, as required by policy.  For example, in KVSP ████████ at 6:02:15, the
camera is activated, then sits completely still looking at a wall for over twenty-five
minutes until 6:28:35, when an officer picks up the camera.[39]  See BWC.  Similarly,

---

[38] *See* Five Prison Remedial Plan Local Operations Procedures § VI.A.7; VI. B.12, 16.
(LAC).

[39] This violation was identified in the investigation report, and the Hiring Authority
issued a Level 1 Penalty to the officer.  *See* Inquiry at 3; Additional Documents 2-4.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

in KVSP ▮▮▮▮▮▮▮, a clip opens at 16:00 with the camera apparently sitting still on a desk. About twenty minutes later, at 16:20:25, the officer picks up the camera, but does not appear to put it on until 16:23:23. *See* BWC.

Plaintiffs found additional violations, not discussed in this report, in which officers failed to announce deactivations and reactivations. It is worth noting that Defendants' BWC audit system would not identify many (if any) of these instances of BWC noncompliance, as few (if any) of the videos contain deactivations exceeding 1.5 hours.

## IV.   INFORMATION REQUESTS

- **Please produce a copy of the policy and any direction to staff regarding the use of the new "quick-close" process. Please also report on whether CDCR is tracking the number of cases that use the video quick-close process? Please produce this data to Plaintiffs with the quarterly AIU data.**

- **Plaintiffs have also made a number of additional requests for documents and information in prior reports that Defendants have yet to respond to. Following Defendants' response to this report, Plaintiffs intend to compile a complete list of outstanding information requests. We hope to discuss these items further during our upcoming, September 11, 2023 meeting.**

## V.   CONCLUSION

Pursuant to the parties' agreement, we expect to receive a response to this report from Defendants by September 15, 2023. Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**APPENDIX A**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 3 | █████ | █████ | █████ | He fears staff wants him dead, and that they are going to kill him. | Maybe | Requires a clarifying interview; it is unclear from the 602 whether he is alleging retaliation and/or code of silence that is on the ADI. |
| 9 | █████ | █████ | █████ | A sergeant threatened him with an RVR in retaliation for filing a 602 against other officers for racism. | Retaliation (1), (2) | |
| 20 | ██████████ | █████ | ████ | His counselor is singling him out and refusing to do her job to assist him, including by refusing to accept his family visit form, refusing to send him to Committee so that he can be approved for the MCRP program, and refusing to put him on the support services list so he can get a job. | No | |
| 28 | █████ | █████ | █████ | Officer improperly took away his porter job assignment because of his disability. | Discrimination/ Harassment (3) | |

[4340304.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 33 | ▮ | ▮ | | Officer refused him law library access in retaliation for filing a lawsuit against officer. | Retaliation (3) | |
| 34 | ▮ | ▮ | ▮ | He is not allowed to use phone on weekends due to discrimination. | Maybe | Requires a clarifying interview; it is unclear from the 602 whether he is alleging discrimination that is on the ADI. |
| 38 | ▮ | ▮ | ▮ | Sergeant is taking over two months to approve visits and she discriminates against complainant based on race and gender. | Discrimination/ Harassment (3) | |
| 40 | ▮ | ▮ | ▮ | Staff turned off his tablet in retaliation for pursuing civil rights lawsuits. | Retaliation (3) | |
| 41 | ▮ | ▮ | ▮ | Staff refused to give him his quarterly package to "take it out on me, because I go suicidal a lot." | Discrimination/ Harassment (3) | |
| 45 | ▮ | ▮ | ▮ | Officer let other incarcerated people into his cell to steal his property while he was on suicide watch. | No | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 47 | ▇ | ▇ | ▇ | Staff refused to allow him to have a hearing on his 115 and he was not allowed to view relevant BWC video footage or present evidence in his defense. | No | No grievance number listed on the 602 or the PDF. |
| 53 | ▇ | ▇ | ▇ | An officer is committing sexual misconduct against him, as he always strip searches him before taking him to medical, but never strip searches anyone else, and "had this weird smile on his face when he order me to take off my boxer". | Staff Sexual Misconduct (1), (3) | |
| 56 | ▇ | ▇ | ▇ | Officer did not follow cell search procedures, trashing his cell and breaking his property. | No | No grievance number listed on the 602 or the PDF. |
| 61 | ▇ | ▇ | ▇ | Officers are not addressing his safety concerns. When he reports enemy concerns, staff simply ask the reported enemy if they intend him harm, and when the person denies that intent, officers do nothing. | Other Misconduct (2) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 63 | ██████ | ██████ | █████ | Staff destroyed legal mail so that it would not reach its intended recipient. | No | |
| 65 | ██████ | ██████ | █████ | Spanish-speaking staff are discriminating against non-Spanish-speaking incarcerated people, including by denying property only to non-Spanish-speakers in ASU. | Discrimination/ Harassment (3) | |
| 67 | ████ | ██████ | █████ | Officer stole property during cell search. | No | |
| 73 | ██████ | ██████ | █████ | During a search, officers without body cameras damaged and destroyed his personal property. Staff are unprofessional and abusive towards EOP patients. | Dishonesty (1); Discrimination/ Harassment (2) | |
| 75 | ██████ | ██████ | █████ | The tower officer in D4 refused to release ADA workers to perform their job duties. | Maybe | Requires a clarifying interview; it is unclear from the 602 whether he is alleging the motive is discrimination/harassment based on disability. |
| 79 | ██████ | ██████ | █████ | A lieutenant is discriminating against and punishing him solely because he has a diagnosed mental health substance use disorder. | Discrimination/ Harassment (3) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 82 | ██ | ████████ | | An officer is running a charging ring by allowing incarcerated canteen workers to force incarcerated people to pay for the right to shop at canteen. | Other Misconduct (6) | |
| 85 | ████ | ████ | ███ | The ASU property officer intentionally obstructed him from getting his property because of a previous negative encounter between him and the property officer. | No | |
| 89 | ██ | ████████ | | Officer falsified RVR, claiming she hit another incarcerated person, when she did not (as evidenced by the officer's BWC footage). | Dishonesty (2) | |
| 90 | ███ | ███ | ██ | Staff allowed other incarcerated people into his cell and they stole or destroyed his property. | No | |
| 92 | ███ | ██████ | | When she reported chest pain, officer sent her to mental health crisis bed rather than to medical, where the doctor committed sexual misconduct against her. | Staff Sexual Misconduct (1); Other Misconduct (2) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Summary of Allegation | Should have been on ADI? | Notes |
|---|---|---|---|---|---|---|
| 95 | █████ | █████ | █████ | Officers do nothing when he reports that other incarcerated people in the housing unit are smoking narcotics, even though the smoke is setting off smoke alarms. | Other Misconduct (6) | |
| 100 | █████ | █████ | █████ | Officer was rude and belligerent with him. | No | |

A-6

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**APPENDIX B**

The productions we reviewed included 492 unique and closed case files.[40]  Only 49 of these cases were investigated by the AIU (10%).[41]  In 30 of the cases (6%), Hiring Authorities sustained allegations against at least one staff member.[42]  In those cases with a sustained allegation, Hiring Authorities imposed adverse action against at least one staff member in only 2 cases.[43]  In the remaining 28 cases with a sustained allegation, Hiring Authorities imposed corrective action or took no action.[44]  The chart below breaks down the cases by institution.

|  | Cases | Sustained | Corrective Action | Adverse Action | % Sustained | % Adverse |
|---|---|---|---|---|---|---|
| **LAC** | 106 | 1 | 1 | 0 | 0.01% | 0% |
| **RJD** | 34 | 0 | 0 | 0 | 0% | 0% |
| **CIW** | 44 | 4 | 4 | 0 | 9% | 0% |
| **SATF** | 116 | 11 | 11 | 0 | 9.5% | 0% |
| **COR** | 107 | 12 | 11 | 1 | 11.2% | 0.1% |
| **KVSP** | 85 | 2 | 1 | 1 | 2.4% | 1.2% |
| **Total** | 492 | 30 | 28 | 2 | 6% | 0.4% |

---

[40] This count does not include duplicate case files or cases that involve only standard *Armstrong* non-compliance inquiries from ALTS logs that are not part of this process.

[41] Broken down by prison: LAC (16); RJD (2); CIW (5); SATF (2); COR (5); KVSP (19)

[42] In 11 additional cases, a separate policy violation was discovered in the course of the investigation and sustained against at least one staff member: RJD ▬▬▬ RJD ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬

[43] COR ▬▬▬; KVSP ▬▬▬

[44] LAC ▬▬▬; CIW ▬▬▬; CIW ▬▬▬; CIW ▬▬▬; CIW ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; SATF ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; COR ▬▬▬; KVSP ▬▬▬

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

APPENDIX C[45]

**KVSP**

| | |
|---|---|
| ▉ | The use of force occurred on March 2, 2022, and the case was received by AIMS on April 8, 2022.  While the interviews are not dated, making it difficult to know whether the delay was with AIMS or the investigator, the investigator did not request the footage until September 14, 2022 at which point footage was no longer available.  The IERC UOF interview occurred on April 6, 2022, within 48 hours of the 602 being received.  Both the 602 and use of force are triggering events and should have resulted in footage being automatically retained. |
| ▉ | This case contains IERC documents, but no video of the use of force incident.  The 602 was received on April 13, 2022, within ten days of the first use of force date reported on the 602.  The case was then received by AIMS on April 15, 2022.  While the interviews are not dated, making it difficult to know whether the delay was with AIMS or the investigator, the investigator closed the case almost a year later on March 1, 2023, almost a year later.  KVSP also did not retain video even though the UOF allegation was received within 10 days, and generated an IERC review. |
| ▉ | The investigator requested 30 minutes of BWC footage, but only reviewed one minute of video, from about 40 minutes before the officer allegedly denied the claimant's request for help from an ADA worker.  The investigator did not attempt the first interview (with Mr. ▉) until January 18, 2023, nearly ten months after the case referral on March 22, 2022.  As a result of the delay, the AVSS footage was no longer available at the time it was requested, and the subject officer was on leave and unavailable to be interviewed. |
| ▉ | The investigator did not request the correct video footage for the second allegation, which was whether an officer refused to allow the claimant out of his cell to go to canteen.  The investigator reviewed only an 18 second clip of footage from more than twenty minutes after the officer allegedly refused to let the claimant out for canteen. |
| ▉ | The investigator requested footage on July 5, 2022, within the 90 day video retention period, and did not follow-up when he was told none was available.  Without video, the investigator could not |

---

[45] Cases that are not linked in section II.B.2. are linked in Appendix C.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| | |
|---|---|
| | resolve the contradictory testimony of the claimant and the subject officers. |
| **KVSP** ▮▮▮ | See write-up. |

## COR

| | |
|---|---|
| ▮▮▮ | The investigator failed to review all video.  Additional video would have helped determine (1) whether an officer witnessed the claimant reporting he was suicidal to another officer, and (2) the conversation between the claimant and the officer when he reported his suicidality. |

## LAC

| | |
|---|---|
| ▮▮▮ | See discussion in report. |
| **LAC –** ▮▮▮ | See write-up. |
| ▮▮▮ | See discussion in report. |
| ▮▮▮ | The class member alleged an officer failed to accommodate him by allowing him to walk the shortest distance from the dining hall.  The investigator did not determine when the class member was released from the dining hall to identify the relevant time period.  While the investigator reviewed BWC and AVSS from the date of incident—including footage of the subject officer, the class member, and others discussing the incident in question—the incident itself was not captured on the footage reviewed.  Yet the investigator took no steps to determine when it had actually happened and to locate the correct footage. |

## SATF

| | |
|---|---|
| ▮▮▮ | The investigator failed to obtain and review BWC footage from any other officer besides the one officer, which could have revealed how the officers used force and the context in which they used it. BWC from the moving of the cell could have also confirmed whether, as the claimant alleged, staff hit his cell like a hurricane. |
| ▮▮▮ | The investigator failed to request and review all video.  The investigator did not request video for February 11, 2022, which would have helped determine whether the claimed comment by the officer was said. |
| ▮▮▮ | The investigator failed to review relevant video footage.  The investigator did not review sufficient footage to investigate the |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| | |
|---|---|
| | second allegation, that on August 26, 2022, the officer continued to harass the claimant.  The claimant reported the incident happened between 2:30 and 3:30 PM, and the investigator requested less than one minute of footage for this date. |
| ▇▇▇▇ | The investigator failed to review relevant footage.  The investigator inaccurately stated that there is no BWC to review based on the complainant not providing specific times when this interaction took place, however, the claimant did provide dates and times, for example, the conversation with the Sergeant happened "on 7/6/2022 some time on 3rd watch." |
| ▇▇▇▇ | An incomplete portion of the footage from 9/8/2022 was obtained, leading to an incomplete investigation. In the BWC camera footage that is provided, the clip ends at 8:13:39; however, it can be heard in the clip that the officer and the claimant are continuing to discuss whether the officer's last remark was disrespectful. The entirety of the conversation should have been reviewed for a complete investigation. |

**CIW**

| | |
|---|---|
| ▇▇▇▇ | See discussion in report. |
| ▇▇▇▇ | In this case, the investigator failed to take appropriate steps to best determine when the misconduct occurred.  The investigator determined that the subject officers were not at work and/or in the area of misconduct on the alleged date.  The investigator reviewed about one minute of BWC footage for a different officer on the day in question, but should have given the claimant the opportunity to correct the date. |