1   ROB BONTA
    Attorney General of California
2   SHARON A. GARSKE
    Supervising Deputy Attorney General
3   SEAN LODHOLZ
    D. MARK JACKSON
4   OLENA LIKHACHOVA
    TRACE O. MAIORINO
5   Deputy Attorney General
    State Bar No. 179749
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3594
     Fax:  (415) 703-5843
8    E-mail:  Trace.Maiorino@doj.ca.gov
    *Attorneys for Defendants Newsom and CDCR*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

OAKLAND DIVISION

12

13

14   **JOHN ARMSTRONG, et al.,**

| | |
|---|---|
| | 4:94-cv-02307-CW |

15                                    Plaintiffs,

16          **v.**

**DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO COURT EXPERT'S SECOND REPORT REGARDING TREATMENT OF PEOPLE WITH DISABILITIES AT SUBSTANCE ABUSE TREATMENT FACILITY [ECF NOS. 3500, 3510]**

17   **GAVIN NEWSOM, et al.,**

18                                    Defendants.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   Introduction .................................................................................................. 1

4   I.   Defendants' Further Response to the Court Expert's August 24, 2023
        Report and Recommendations. ............................................................... 2

5        A.   CDCR Continues to Clarify Policy on Providing Class Members
              with Non-Medical Assistive Devices as Reasonable
6             Accommodations and Therefore No Further Court Order Is
              Required. ...................................................................................... 2

7        B.   CDCR Continues to Work with Stakeholders to Accommodate
8             Blind and Low Vision Class Members. ....................................... 5

9        C.   CDCR Continues to Develop Policies to Accommodate Deaf and
              Hard-of-Hearing Class Members. ................................................ 7

10            1.   Announcements ................................................................ 8

11            2.   Caption Phones ................................................................ 9

              3.   CART ............................................................................... 10

12            4.   Hearing Aids ................................................................... 11

13  II.  CCHCS Continues to Work With CDCR to Address Class Members'
        Needs at SATF. ....................................................................................... 12

14  III. The Court Should Deny Plaintiffs' Request for an Order to Require CDCR
        to Seek a Court Order for the Suspension of State Law Because it is
15      Premature, Unwarranted, and Potentially Violates the PLRA. ............. 12

16  Conclusion .................................................................................................. 14

17

18

19

20

21

22

23

24

25

26

27

28

i

Defs.' Reply Pls.' Resp. Court Expert's Second Report Treatment People Disabilities SATF (4:94-cv-02307-CW)

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*Coleman v. Schwarzenegger*

5
    922 F. Supp. 2d 882 (E.D. Cal. 2009) ............................................................. 12, 13

6

STATUTES

7

United States Code, Title 18

8
    § 3626(a)(1)(B) ................................................................................................. 12
    § 3626(a)(1)(B)(iii) ........................................................................................... 13

9
    § 3626(a)(3)(E)(ii) ............................................................................................. 13

10

The Americans with Disabilities Act (ADA) ................................................................. *passim*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**INTRODUCTION**

3      Plaintiffs' requests for a "SATF Remedial Plan," court-ordered status reports, and arbitrary

4  deadlines to deploy specific programs that fail to appreciate the inherent obstacles in correctional

5  management should be denied because, it part, they far exceed and are out-of-step with the Court

6  Expert's recommendations.  The treatment of people with disabilities at Substance Abuse

7  Treatment Facility (SATF) has improved, as recognized by the Court Expert.  The Court Expert

8  recognized that the culture at SATF has improved thanks, in part, to the efforts of new leadership

9  and the hard work of health care staff.  (ECF No. 3500 at 4.)  The Court Expert also found that

10  the delivery of accommodations to people with disabilities had improved—citing the reduced

11  likelihood of lost durable medical equipment (DME) and medication, improved process for

12  collecting and handling patient requests for medical care, issuing, repairing, and replacing DME,

13  and delivery of medical supplies like incontinence supplies.  (*Id*. at 6-12.)  Defendants appreciate

14  the Court Experts' thoughtful evaluation of the issues and focused recommendations on areas that

15  still require improvement.

16      As detailed in Defendants' original response (ECF No. 3504) and in more detail below,

17  Defendants continue to make concrete improvements on providing accommodations to deaf and

18  hard-of-hearing and blind and low-vision individuals, and clarifying its policies on

19  accommodating people who require non-medical assistive devices, to address the Court Expert's

20  findings and recommendations.  Plaintiffs' mischaracterization that Defendants only have a "plan

21  to make a plan" does not fairly or accurately explain the improvements made, tangible plans in

22  place, and efforts taken by CDCR.  Defendants continue their commitment to providing class

23  members equal access to programs, services, and activities.  Because Defendants have addressed

24  the Court Expert's concerns in his second report and have concrete plans to implement further

25  changes, further Court intervention is not necessary.

26  / / /

27  / / /

28

1

1   **I.   DEFENDANTS' FURTHER RESPONSE TO THE COURT EXPERT'S AUGUST 24, 2023 REPORT AND RECOMMENDATIONS.**

2

3   **A.   CDCR Continues to Clarify Policy on Providing Class Members with Non-Medical Assistive Devices as Reasonable Accommodations and Therefore No Further Court Order Is Required.**

4

5   Great strides have been made to continue providing accommodations to class members at

6   SATF, which includes tracking of non-medical devices as reasonable accommodations.  The

7   Court Expert was clear in his factual finding, "that SATF has improved the delivery of

8   accommodations to people with disabilities."  (ECF No. 3500 at 4.)  Despite the Court Expert's

9   factual finding, Plaintiffs paint a distorted picture of the conditions by arguing that current SATF

10  policy denies reasonable accommodations, results in arbitrary distinctions, and results in

11  inconsistent applications of the policy.  (ECF No. 3510 at 19-23.)  Instead of focusing on the

12  improvements cited by the Court Expert, Plaintiffs offer hyper-critical assessments of the current

13  status at SATF, complain about accommodation-denials in a few instances, and seek an order

14  from this Court not contemplated by the Court Expert's recommendations.  (ECF No. 3500 at 12-

15  13, 17; ECF No. 3510 at 22, 21.)  If the current status at SATF were as bleak as Plaintiffs report it

16  to be, then it would be expected that the Court Expert would have made different

17  recommendations than the ones given.  Accordingly, the Court should deny Plaintiffs' request for

18  a further order.

19  The Court Expert's second report offered very narrow recommendations to the parties that

20  included Defendants responding to Plaintiffs' April 11, 2023 letter and to further clarify existing

21  policy on how class members are to request non-medical assistive devices and whose

22  responsibility it is to review those requests and obtain the devices.  (ECF No. 3500 at 12-13, 17.)

23  CDCR continues to work on both.

24  CDCR previously affirmed that it will respond to Plaintiffs' April 11, 2023 letter, in the

25  near future, while continuing to diligently work on issues raised in Plaintiffs' letter, such as an

26  electronic system to track non-medical assistive devices necessary to accommodate class

27  members' disabilities within the Strategic Offender Management System (SOMS), and other

28  issues.  (ECF No. 3504-1 at 4.)  As of September 11, 2023, the Department of Adult Institutions,

2

1   submitted a change request to SOMS to create a system for tracking devices and supplies

2   approved via the Reasonable Accommodation Panel (RAP), but not prescribed by medical

3   providers.  (Suppl. Decl. Houston ¶ 4.)  This change will occur within approximately one year

4   due to several priority change requests submitted to the SOMS team.  (*Id*.)  In the interim,

5   medical providers will continue to input DME receipts for these items to be captured within

6   SOMS.  (*Id*.)  In addition, the RAP chairperson will continue to document these approvals via a

7   CDCR 128-B form.  (*Id*.)  This system will address Plaintiffs' concerns that class members are

8   inappropriately deprived of non-medical assistive devices because of staff incorrectly identifying

9   these items as mere property and failing to recognize that these items are reasonable

10   accommodations under the ADA.

11        The Court Expert's recommendation to clarify existing policy is well taken.  (ECF No.

12   3500 at 4.)  CDCR recognizes the need for clarity concerning the process for accommodating

13   people with disabilities who require non-medical assistive devices as required under the ADA and

14   the remedial plan.  Plaintiffs exaggerate the current status at SATF by offering isolated class-

15   member experiences to create an inaccurate depiction of the conditions at SATF.  By doing so,

16   Plaintiffs seemingly ignore the fact that as part of his investigation, the Court Expert interviewed

17   17 class members, received 60 survey responses from class members that asked "whether

18   disability accommodations at SATF had improved, stayed the same, or gotten worse" and

19   concluded "that SATF has improved the delivery of accommodations to people with disabilities."

20   (*Id*. at 4-5.)  Any assertion that SATF routinely forces class members to pay out-of-pocket for

21   reasonable accommodations is not accurate because CDCR remains committed to providing

22   incarcerated people with reasonable accommodations for their disabilities to ensure equal access

23   to its programs, services, and activities, in compliance with the ADA and the remedial plan via

24   the Request for Reasonable Accommodation (CDCR Form 1824) and the RAP.  (ECF No. 3504-1

25   at 3; Suppl. Houston Decl. ¶ 5.)

26        In response to the Court Expert's recommendation that the SATF local operating procedure

27   (SATF LOP 403 (VI)(C)(4)b(4)-(5)) explain who will purchase/pay for the non-medical devices

28   that are deemed a reasonable accommodation under the ADA (ECF No. 3500 at 19) and to

1    address Plaintiffs' complaints about forcing class members to purchase some accommodations

2    (ECF No. 3510 at 19-23), CDCR has determined that effective immediately statewide, when RAP

3    approves a Reasonable Accommodation that allows access to programs, services, and activities,

4    CDCR will incur the cost associated with the reasonable accommodation when no reasonable

5    alternative exists, unless such an accommodation creates an undue burden under the ADA.

6    (Suppl. Houston Decl. ¶ 5.)  CDCR will revise the applicable local operating procedures to

7    comport with the foregoing policy.  (*Id.*)

8         As previously noted, to ensure consistent application of the process, CDCR has taken

9    several proactive steps, including, the reeducation of non-medical members of the RAP on their

10   independent duty to provide a reasonable accommodation to an incarcerated person with a

11   disability even if the accommodation is not deemed medically necessary in accordance with

12   current policy stated, in part, in the October 28, 2022 memorandum titled "Reiteration of

13   Reasonable Accommodation Requirements."  (ECF No. 3504-1 at 3-4; ECF No. 3453-1 at 9-10,

14   180-181.)  CDCR also intends on providing additional guidance to institutions regarding the

15   process of obtaining non-medical assistive devices through the next update to the ADA Desk

16   Reference Manual.  (*Id.*)  Although dismissed by Plaintiffs (ECF No. 3510 at 20), the Court

17   Expert recognized its value by noting, "members of the RAP also received focused training

18   regarding the provision of DME as a reasonable accommodation in situations where medical staff

19   deemed the DME was not medically necessary," and, based on his observations, RAP members

20   appeared to "have a clear command of this concept."  (ECF No. 3500 at 9.)  Moreover, well-

21   established and complete systems are in place to redress any inappropriate denial of any such

22   accommodation, including the inmate grievance process, individual advocacy program,

23   accountability orders, and monitoring tours, to eliminate any need for a further Court order as

24   requested by Plaintiffs.  (Suppl. Houston Decl. ¶ 5.)

25        Defendants have concrete plans to address the Court Expert's recommendations and

26   continue to work towards addressing the identified issues.  Accordingly, no further Court order is

27   required.

28

**B.    CDCR Continues to Work with Stakeholders to Accommodate Blind and Low Vision Class Members.**

Plaintiffs' hyperbole falsely asserting that Defendants have "steadfastly refused" to develop a viable plan to ensure sight-impaired class members are able to independently read and write (ECF No. 3510 at 6) is inaccurate and ignores the stakeholders' efforts to accommodate these class members with up-to-date technology.  Further, such a representation by Plaintiffs gives rise to the question of whether the blind and low-vision workgroup model is the best use of limited resources to serve this population.  Plaintiffs are aware that Defendants have been diligently working to improve access to auxiliary aids that is independent from library-related limitations and includes such devices being placed in the class-member housing units.  Plaintiffs' contention that a Court ordered remedial plan is necessary because of limited access to libraries paints an incomplete picture.

In their response to the Court Expert's Second SATF Report, Plaintiffs requested the Court to enter an order directing Defendants, "in consultation with Plaintiffs and the Court Expert, to develop a concrete plan by a date certain to comply with their obligations under the ADA, ARP, and this Court's prior orders to ensure blind and low-vision class members at SATF have equal opportunity to read and write."  (ECF No. 3510 at 10.)  As Plaintiffs are aware, Defendants have been diligently working to improve access to electronic assistive devices to accommodate class members' reading needs outside of the prison libraries, including placement of such devices in the class-member housing units.  (Suppl. Houston Decl. ¶ 7.)  To ensure that electronic assistive devices that will be made available to class members within their housing units meet class members' various needs, including variable magnification, audio via text-to-speech capability, spot-reading and reading multi-page documents, Defendants are working with vision consultants from the Western University of Health Sciences' Eye Care Institute to identify appropriate devices and determine the optimal number and location of various devices needed to accommodate class members' independent and private reading and writing needs.  (*Id.*)

The Eye Care Institute vision consultant team includes Dr. Sukhija, the Assistant Professor at the Western University of Health Sciences, College of Optometry, who has over nine years of

5

experience in Optometry and over three years as the Chief of Vision Rehabilitation at the low vision rehabilitation clinic.  (Suppl. Houston Decl. ¶ 8, Ex. A.)  The Eye Care Institute vision consultant team also includes a blind team member, Tom Olzak, who is legally blind and serves as its resource specialist.  (*Id.*, ¶ 8 and Ex. B.)  Mr. Olzak works with and trains blind and low vision patients by lending his knowledge and experience of the various low vision devices and making recommendations based on the individual's lifestyle, career, and baseline skillsets.  (*Id.*, Ex. B.)  Defendants have been working with the Eye Care Institute consultants to identify the benefits and limitations of numerous electronic assistive devices in consideration of the variety of disabilities that exist amongst class members, the restrictions inherent in a correctional setting, the ease of use of various devices or aids, the unavailability of internet access within class members' housing units, and other factors.  (Suppl. Houston Decl. ¶ 8.)

Despite Plaintiffs' claims to the contrary, Defendants already have a plan to ensure that vision impaired class members' reading and writing needs are accommodated in compliance with the ADA, the remedial plan, and this Court's prior orders.  (Suppl. Houston Decl. ¶ 9.)  In consultation with the Eye Care Institute team, CAMU has identified two electronic assistive devices that could reasonably accommodate vision impaired class members' reading and writing needs outside of the prison libraries.  (*Id.*)  On September 27, 2023, CAMU initiated a request to receive and demonstrate these assistive devices.  (*Id.*)  Upon receipt of these devices, the Office of Correctional Safety will complete all security-related testing protocols within approximately one week of receipt.  (*Id.*)  Upon approval of all security protocols, CAMU will initiate procurement of the devices and create a policy for "check-in/check-out" use of these devices as reading and writing accommodations for vision impaired class members outside of the prison libraries.  (*Id.*)  The procurement process for these devices is expected to take approximately 90 days.  (*Id.*)  Development of the policy regarding these devices is expected to take approximately two weeks, plus additional time for negotiation with Plaintiffs' counsel.  (*Id.*)  The issuance of this policy to the field will also require a 75-day labor notification period in accordance with union labor agreements.  (*Id.*)  Once this required period is complete and the policy regarding these electronic assistive devices is issued, the selected devices will be deployed at all 11 DPV-

6

1   designated CDCR institutions for use by blind and low-vision class members as reading and

2   writing accommodations outside of the prison law libraries.  (*Id.*)  In the meantime, CDCR staff

3   continue to assist with reading and writing accommodations, devices are accessible in the

4   libraries, and LED magnifiers were provided to all DPV class members and are available to all

5   DNV class members upon request and approval by CCHCS.  (*Id.*)

6        Plaintiffs also unfairly criticize the Defendants' process for repair or replacement of the

7   assistive electronic devices placed in the library and contend that it fails to "explain which

8   devices would be checked," does not "include anywhere to document which device" is

9   nonoperational, and does not "appear to explain what should be done" to repair or replace

10  devices.  (ECF No. 3510 at 6-7.)  Defendants have been diligently working to ensure that the

11  assistive electronic devices located in prison law libraries are operational and available for use by

12  the class members.  (Suppl. Houston Decl. ¶ 10.)  Office of Correctional Education has

13  implemented a process and is developing a plan to ensure regular repair or replacement of

14  malfunctioning or broken devices.  (*Id.*)  OCE expects to have all inoperable library devices

15  repaired or replaced by December 2023.  (*Id.*)  In the meantime, the Office of Correctional

16  Education shall guide librarians on the steps to follow if any of the electronic assistive devices

17  located in the libraries are found to be non-operational.  (*Id.*)

18       Defendants have concrete plans to address the Court Expert's recommendations and

19  continue to work towards addressing the identified issues.  Accordingly, no further Court order is

20  required.

21       **C.    CDCR Continues to Develop Policies to Accommodate Deaf and Hard-of-**
22            **Hearing Class Members.**

23       Plaintiffs' response to these issues is stale.  Citing outdated material, Plaintiffs paint an

24  incomplete and misleading picture, ignoring tangible progress, formulated policy, and ongoing

25  implementation of that policy.  Plaintiffs' mischaracterization of Defendants' response as

26  "nothing more than a plan to have a plan" is not just inaccurate, but it is also pays a disservice to

27  the dozens of staff members and officials who have contributed countless hours to develop and

28  implement new policies to accommodate class members.  In proper recognition of this work,

7

Defs.' Reply Pls.' Resp. Court Expert's Second Report Treatment People Disabilities SATF (4:94-cv-02307-CW)

1    Defendants request the opportunity to keep implementing their new policies, without arbitrary

2    deadlines or constraints, and in continued collaboration with the Court Expert.  As shown below,

3    Defendants are well along the path to resolving the remaining deaf and hard-of-hearing issues at

4    SATF and Court intervention is unnecessary and potentially counterproductive at this stage.

5              **1.    Announcements**

6         Reliably providing announcements to deaf and hard-of-hearing class members has been

7    challenging.  However, Defendants' new measures are neither "recycled" nor "speculative."

8    (ECF No. 3510 at 11.)  And the use of personalized notifications is not a violation of the remedial

9    plan and ensures class member's notice of their appointments.  (ECF No. 3510 at 11; *Armstrong*

10   Remedial Plan at 23.)  To the contrary, Defendants have updated efforts to improve existing

11   processes for notifications, including face-to-face communication and additional training for staff.

12   (Suppl. Decl. Houston ¶ 11.)  In addition to developing these existing processes, CDCR is

13   moving forward with two new technological processes.  (*Id*.)

14        One new process uses inmate tablets.  (Suppl. Decl. Houston ¶ 11.)  On September 29,

15   2023, SATF received approval to make individual announcements utilizing the messaging

16   features on the tablets.  (*Id*.)  CDCR is finalizing a draft policy and will implement it in the

17   coming weeks. (*Id*.)  Not only will the tablets provide another avenue for communication, they

18   will also document and provide a means to audit the notification process.  (*Id*.)  This will allow

19   Defendants to show they are successfully notifying inmates of important information.  (*Id*.)  A

20   draft of this policy will be provided to Plaintiffs in two weeks.  (*Id.*)  Once the policy is

21   negotiated and finalized, a 75-day labor notification period is required in accordance with the

22   union labor agreements.  (*Id.*)

23        Another new process involves vibrating watches.  (Suppl. Decl. Houston ¶ 12.)  Contrary to

24   Plaintiffs' characterization, Defendants continue to evaluate this option.  (*Id*.)  Although Plaintiffs

25   identify other state correctional departments use of vibrating watches, Plaintiffs fail to address

26   whether vibrating watches used by these other state correctional departments include alarms that

27   cannot be turned off or deactivated.  (*Id.*)  As detailed in Defendants' initial response, the alarm

28   creates a security risk that must be addressed to ensure the safety of staff and incarcerated

8

1   population.  (ECF No. 3504-1 at 6.)  On September 26, 2023, Defendants purchased an exemplar

2   watch that may satisfy potential security concerns.  (*Id*.)  Defendants received the device on

3   October 4, 2023, and will begin two weeks of security testing at SATF and at two other

4   institutions (Central California Women's Facility and R.J. Donovan Correctional Facility).  (*Id*.)

5   If testing is successful, Defendants will provide the vibrating watches as a reasonable

6   accommodation to deaf and hard-of-hearing individuals at SATF and elsewhere upon request and

7   approval.  (*Id*.)

8       Defendants remain open to collaborating with Plaintiffs to improve existing notification

9   processes and to implement the new processes for tablets and vibrating watches.  (Suppl. Decl.

10  Houston ¶ 13.)  To the extent the Court wishes to monitor implementation, Defendants will

11  provide Plaintiffs and the Court Expert with monthly updates.  (*Id*.)  Court intervention is

12  unnecessary and could potentially be counterproductive since these developments are in progress

13  and moving quickly.

14          **2.      Caption Phones**

15      Plaintiffs' characterization of phone services at SATF is similarly outdated in three main

16  respects.  First, Defendants have implemented a process for testing TTY/TDD phones on a

17  monthly basis.  (Suppl. Decl. Houston at ¶ 14.)  This is still a relatively new process and class

18  members are starting to see results.  (*Id*.)  Indeed, as of this writing, all TTY/TDD phones at

19  SATF are confirmed to be working and properly functioning.  (*Id.*)  Defendants will regularly test

20  the TTY/TDD phones and promptly repair nonfunctioning TTY/TDD phones to ensure continued

21  accessibility for class members.  (*Id*.)

22      Second, contrary to Plaintiffs' description, Defendants have provided training directly to

23  class members on how to operate the TTY/TDD phones.  (ECF 3510 at 13; Suppl. Decl. Houston

24  at ¶ 15.)  This training addresses the Court Expert's concern about relying on ADA workers (ECF

25  No. 3500 at 4, 12), thus allowing class members to have private calls without their involvement.

26  (Suppl. Decl. Houston at ¶ 15.)

27      Third, SATF has, in fact, rolled out caption phones.  (ECF No. 3504-1 at 7; Suppl. Decl.

28  Houston at ¶ 16.)  The roll-out was communicated to class members via a tablet notification,

9

1   which included instructions on how to access the phones.  (Suppl. Decl. Houston at ¶ 16.)  In

2   addition to these notifications, on September 21, 2023, the SATF ADA Coordinator held Inmate

3   Advisory Council meetings at every yard to advertise the new phones.  (*Id*.)  CAMU has

4   reviewed the locations of all TTY/TDD and caption phones, and concluded that the locations

5   were fully accessible to class members.  (*Id*.)  SATF leadership has also confirmed that only one

6   grievance (CDCR Form 602), and no Requests for Reasonable Accommodation (CDCR Form

7   1824) have been submitted by the incarcerated population to indicate any issues regarding access

8   to such phones.  (*Id*.)  In advance of the October 5, 2023 deaf and hard-of-hearing workgroup

9   meeting, CDCR provided the Court Expert and Plaintiffs with the results of the TTY/TDD and

10  caption phone surveys that addressed accessibility, location, functionality, and class-member

11  education.  (*Id*.)

12         Plaintiffs also comment on the lack of features on the tablets to accommodate deaf and

13  hard-of-hearing class members.  (ECF 3510 at 14.)  While Defendants would like to reconfigure

14  the tablets to allow greater access for deaf and hard-of-hearing class members, this is a longer-

15  term project, which requires third-party vendor expertise because of the statewide deployment of

16  tablets and goes beyond institutional reforms at SATF.  (Suppl. Decl. Houston at ¶ 17.)

17  Nevertheless, Defendants are committed to moving this forward at the headquarters level and as

18  they renegotiate third-party vendor contracts.  (*Id*.)  In the meantime, Defendants will

19  accommodate class members with functioning TTY/TDD phones and the new caption phones, as

20  described above.  Again, to the extent the Court wishes to monitor these measures, Defendants

21  will continue to provide timely updates to Plaintiffs and the Court Expert.

22         **3.     CART**

23         Plaintiffs again fail to accurately describe progress on CART, a new accommodation

24  offered at SATF and ten other institutions as of August 24, 2023.  (ECF No. 3510 at 16-19; ECF

25  No. 3504-1 at 7.)  Rather than applaud this achievement, Plaintiffs opt to highlight several minor

26  problems with implementation and ignore recent efforts to resolve them.  In truth, CART

27  implementation is proceeding successfully.

28

1   Defendants completed Phase One of implementation so that CART is currently available

2   for all due process events at the eleven institutions.  (Suppl. Decl. Houston at ¶ 18.)  This phase

3   included various forms of outreach and education, including flyers, tablet notifications, and

4   multiple town halls.  (*Id.*)  While Plaintiffs point out some of the challenges in a recent town hall,

5   they fail to mention that the video shown to class members was itself a recording of CART.  (ECF

6   No. 3510 at 17.)  Nevertheless, Defendants anticipate improving and expanding on these outreach

7   efforts as CART enters Phase Two.  (Suppl. Decl. Houston at ¶ 18.)

8   Phase Two will expand CART to all programming areas at SATF and at the ten other

9   institutions.  (Suppl. Decl. Houston at ¶ 19.)  Defendants completed the process of identifying

10   these programming areas and tested them for internet and Wi-Fi connectivity, both of which are

11   required for CART service, and both of which are, anticipated to be available.  (*Id.*)  Defendants

12   are testing two new devices to deploy in these areas at SATF.  (*Id.*)  Testing in the correctional

13   setting was completed by Enterprise Information Services (EIS) by October 4, 2023, and EIS will

14   conduct further testing on the actual devices to be used with CART service available in those

15   areas two weeks later.  (*Id.*)  Defendants are developing training materials to ensure a successful

16   rollout.  (*Id.*)  In compliance with CAMU's direction, ADACs conducted town halls by

17   September 15, 2023.  (*Id.*)  This included direction to utilize the recently captured demonstration

18   video specifically for the incarcerated population.  (*Id.*)  In addition, staff were provided a

19   separate video to ensure staff are also familiar with the service.  (*Id.*)  CDCR will develop training

20   for all staff who facilitate the various programming (i.e., education, religious services,

21   rehabilitative services, mental health groups) once EIS completes its required tasks.  (*Id.*)

22   ### 4.   Hearing Aids

23   On September 29, 2023, CCHCS reported to CDCR that CCHCS representatives and

24   experts, the Court Expert, and Plaintiffs, met to discuss hearing aid specifications.  (Suppl.

25   Houston Decl. at ¶ 20.)  An agreement was reached as to the hearing aid specifications and the

26   need for CCHCS to incorporate those into the scope of services and go out to bid.  (*Id.*)  On

27   October 4, 2023, Plaintiffs sent a letter to CCHCS summarizing the agreement on hearing aid

28   specifications.  (*Id.*)  Upon agreement by all parties of the specifications outlined in the summary,

11

1   it is anticipated the hearing-aid bid will be released in early November 2023, awarded in January

2   2024, and the new services will begin in February 2023.  (*Id*.)  CCHCS will continue to work

3   with Plaintiffs and the Court Expert on this matter and provide updates when available.  (*Id*.)

4   **II.     CCHCS CONTINUES TO WORK WITH CDCR TO ADDRESS CLASS MEMBERS'**
        **NEEDS AT SATF.**

5

6       CCHCS continues to work with the Court Expert, CDCR, and Plaintiffs to address items

7   identified in the Court Expert's report.  (Suppl. Houston Decl. at ¶ 21.)  CCHCS will continue to

8   monitor the processes implemented to ensure sustainability.  (*Id*.)  CCHCS has confirmed that the

9   rules violation report memorandum and training material for healthcare staff was sent to Labor

10  for review.  (*Id*.)  CCHCS will provide an update to the Court Expert when more information is

11  available.  (*Id*.)

12  **III.    THE COURT SHOULD DENY PLAINTIFFS' REQUEST FOR AN ORDER TO REQUIRE**
        **CDCR TO SEEK A COURT ORDER FOR THE SUSPENSION OF STATE LAW**
13      **BECAUSE IT IS PREMATURE, UNWARRANTED, AND POTENTIALLY VIOLATES THE**
        **PLRA.**
14

15      The PLRA prohibits an order of "any prospective relief that requires or permits a

16  government official to exceed his or her authority under State or local law or otherwise violates

17  State or local law", unless "(i) Federal law requires such relief to be ordered in violation of State

18  or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no other

19  relief will correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(B).

20      Although Plaintiffs request an order directing CDCR to "request a court order suspending"

21  "any provisions of state law" that prevent CDCR from enacting the remedies requested by

22  Plaintiffs (ECF 3510-5 at 14), they fail to establish that no other relief—other than Plaintiffs'

23  requested remedies—will correct the violations at issue in this action, as required by the PLRA.

24  18 U.S.C. § 3626(a)(1)(B).  To establish that "no other relief will correct" the violations of their

25  Federal rights, Plaintiffs must show that those constitutional deficiencies cannot be resolved in

26  the absence of the prospective relief requested by Plaintiffs.  *See Coleman v. Schwarzenegge*r,

27

28

12

1    922 F. Supp. 2d 882, 950–51 (E.D. Cal. 2009)[1].  In *Coleman*, the Court ordered prospective relief

2    that may require a waiver of state law only after finding that none of the available alternatives to a

3    prison release order, including the continued efforts of the *Plata* Receiver and the *Coleman*

4    Special Master, could bring the California prison system into constitutional compliance within a

5    reasonable time-period.  *Id.*  In *Coleman*, numerous experts testified that the prospective relief

6    ultimately ordered by the Court was a prerequisite to providing constitutionally adequate care to

7    California prisoners.  *Id.*  Here, Plaintiffs have not established that the available alternatives to the

8    relief they request—such as the remedies recommended by the Court Expert, or the remedies

9    offered by Defendants and discussed above—cannot bring SATF into compliance.  Accordingly,

10   Plaintiffs fail to satisfy their burden under the PLRA.  Therefore, the Court should not order any

11   prospective relief that requires CDCR to violate or exceed its authority under State or local law.

12   This Court should deny Plaintiffs' request to direct CDCR to request any such waiver.

13   / / /

14   / / /

15   / / /

16   / / /

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   [1] Although the *Coleman* court discussed "no other relief" requirement in the context of a "prison release order" under 18 USCA § 3626(a)(3)(E)(ii), the same analysis would apply to "no other relief" under 18 USCA § 3626(a)(1)(B)(iii).

28

13

1

**CONCLUSION**

2   Defendants have set forth concrete plans, timelines, and processes to address the Court

3   Expert's August 24, 2023, recommendations on accommodating deaf and hard-of-hearing and

4   blind and low vision class members at SATF.  Defendants have also updated related policies and

5   have concrete timelines for implementation of other appropriate policies.  Defendants continue to

6   work with CCHCS, stakeholders, Plaintiffs, and the Court Expert to address these issues and

7   ensure equal access to programs, services, and activities for class members.  Because Defendants

8   have actual plans, and not "plans to have a plan," no further Court intervention or orders are

9   required.

10   Dated:  October 5, 2023                      Respectfully submitted,

11                                                ROB BONTA
                                                  Attorney General of California
12                                                SHARON A. GARSKE
                                                  Supervising Deputy Attorney General
13

14

15                                               */s/ Trace O. Maiorino*
                                                  TRACE O. MAIORINO
16                                                Deputy Attorney General
                                                  *Attorneys for Defendants*
17                                                *Gavin Newsom and CDCR*

18

19

20

21

22

23

24

25

26

27

28

14