DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE E. JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, et al.,<br><br>Defendants. | Case No. C94 2307 CW<br><br>**EXHIBITS 1-62 TO DECLARATION OF CAROLINE E. JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION**<br><br>Judge:  Hon. Claudia Wilken<br>Date:   January 4, 2024<br>Time:   2:30 p.m.<br>Crtrm:  TBD |

**REDACTED**

[4304353.15]

Case No. C94 2307 CW

DECLARATION OF CAROLINE E. JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO
ENFORCE THE REVISED PERMANENT INJUNCTION

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| 1 | BPH webpage "Structured Decision Making Framework Worksheet for Parole Hearings Conducted by the California Board of Parole Hearings," as of August 30, 2023 | |
| 2 | BPH webpage "Information Considered at a Parole Suitability Hearing," as of November 5, 2023 | |
| 3 | BPH website, providing a timeline for the events leading up to a parole suitability hearing | |
| 4 | *Armstrong* Remedial Plan (ARP I), issued by CDCR in 2011 and amended in 2006 and 2023 to address parole issues | |
| 5 | ARP II, dated December 1, 2010 | |
| 6 | DPP roster as of October 2023 filtered for DPH SLI | Filed entirely under seal |
| 7 | DPP roster as of October 2023 filtered for DPV, DNV | Filed entirely under seal |
| 8 | BPH schedule that Defendants produced to Plaintiffs' counsel on October 2, 2023, filtered to identify all deaf signers, their institutions, their hearing dates, and their use of a sign language | Class member identifying information redacted |
| 9 | CDCR website entry showing the hearing waiver for one class member | Class member identifying information redacted |
| 10 | BPH schedule that Defendants produced to Plaintiffs' counsel on October 2, 2023, filtered to identify DPV, DNV | Class member identifying information redacted |
| 11 | Excerpts from the transcript of Daniel Moeller's deposition | |
| 12 | Blank BPH Form 1073, produced to Plaintiffs by Defendants | |
| 13 | Most recent BPH Form 1073 generated for each of the class members listed in Section II | Class member identifying |

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| | | information redacted |
| 14 | Source documents generated for each of the class members listed in Section II | Class member identifying information redacted |
| 15 | Letter dated June 16, 2023 from Caroline Jackson to BPH Counsel re requesting "All 'Special Accommodation' source document created since January 1, 2022" | Class member identifying information redacted |
| 16 | Letter dated June 30, 2023 from Defendants in response to Caroline Jackson's June 16, 2023 letter, with attached Special Source Documents | Class member identifying information redacted |
| 17 | Notice of Deposition of Dawn Lorey | |
| 18 | Excerpts from the transcript of Dawn Lorey's deposition | |
| 19 | Photograph of the video magnifier in the library at RJD, taken during a tour of RJD on September 21, 2023 and produced by Defendants following the tour | |
| 20 | Job description for the CC1 position, posted on the CDCR website as of November 3, 2023 | |
| 21 | Memorandum dated October 18, 2018, titled "Revised Correctional Counselor I Ratio Allocation Distribution Methodology and Process" | |
| 22 | Email Correspondence between co-counsel, Tom Nolan and Gay Grunfeld, PJW President Heidi Rummel, and PJW Executive Director Anna Feingold on April 27, July 6, and August 16, 2023 | |
| 23 | Letter dated September 15, 2023 from BPH attorney Roxanna Gomez to Caroline Jackson re ADA training to panel attorneys | Class member identifying information redacted |
| 24 | Panel Attorney Program Guide for the Parole Suitability Hearing Process, produced by BPH attorney George Bakerjian on August 9, 2023 to Plaintiff's counsel | |
| 25 | Release and Settlement Agreement, *Mackes v. Colorado Department of Corrections*, Case No. 1:21-cv-01100-CNS-MEH (D. Colo. Aug. 3, 2022) | |

[4389229.2]

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| 26 | Settlement Agreement, *Brown v. Department of Public Safety and Correctional Services*, Case No. 17-cv-945-RDB (D. Md., June 5, 2019) | |
| 27 | ███████████████ ) Medical Record dated ███████████████ | Filed entirely under seal |
| 28 | Board of Parole Hearings' Actions for Mr. ████ , as found on the CDCR Inmate Locator Public Inmate Locator System as of November 7, 2023 | Class member identifying information redacted |
| 29 | Email from Travis Stratton to Steven Mehler, produced to Caroline Jackson on June 30, 2023 by BPH counsel, Heather McCray | Class member identifying information redacted |
| 30 | BPH Form 1073, Notice and Request for Assistance at a Parole Proceeding, for Mr. ████ ████ hearing and Proposed Parole Consideration Decision for Mr. ████ postponed ████ hearing | Class member identifying information redacted |
| 31 | BPH Form 1073, Notice and Request for Assistance at a Parole Proceeding, for Mr. ████ ████ ████ hearing | Class member identifying information redacted |
| 32 | Declaration from *Armstrong* class member ████ ████ | Class member identifying information redacted |
| 33 | Advocacy Letter for Mr. ████ , ████ at ████ re Accessible BPH Materials, dated May 31, 2023 from Caroline Jackson to Defendants | Class member identifying information redacted |
| 34 | Chrono dated June 22, 2023, re service of Risk Assessment | Class member identifying information redacted |
| 35 | Follow Up Advocacy Letter for Mr. ████ , ████ , at ████ re Accessible BPH Materials, dated July 11, 2023 from Caroline Jackson to Defendants, without exhibits | Class member identifying information redacted |
| 36 | Letter dated July 13, 2023 from BPH attorney George Bakerjian to Caroline Jackson | Class member identifying |

[4389229.2]

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| | | information redacted |
| 37 | Declaration from *Armstrong* class member ██████ ████ | Class member identifying information redacted |
| 38 | Letter dated July 19, 2023 from Caroline Jackson to Defendants re Ms. ████ accommodations | Class member identifying information redacted |
| 39 | Email from BPH attorney George Bakerjian to Caroline Jackson, received on July 20, 2023, re Ms. ████ Risk Assessment | Class member identifying information redacted |
| 40 | Letter dated July 27, 2023 from BPH attorney George Bakerjian to Caroline Jackson re Ms. ████ accommodations | Class member identifying information redacted |
| 41 | Advocacy letter dated August 23, 2023 from Caroline Jackson to Mr. Bakerjian re Accessible Parole Preparation | Class member identifying information redacted |
| 42 | Letter dated September 12, 2023 from BPH to Caroline Jackson responding to August 23, 2023 letter | Class member identifying information redacted |
| 43 | Letter dated October 26, 2023 from Warden to Caroline Jackson re Accessible Parole Preparation | Class member identifying information redacted |
| 44 | Email thread dated August 29 through September 6, 2023 between state-appointed attorney and CDCR re audio files | Class member identifying information redacted |
| 46 | Declaration from *Armstrong* class member ████ ████ | Class member identifying information redacted |

[4389229.2]

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| 47 | Email thread between co-counsel Jacob Hutt; Nichole Miller, counsel for BPH; and Katie Riley, counsel for CDCR on February 24, 2022 and April 14, 2022 | Class member identifying information redacted |
| 48 | General Chrono CDC 128B for ▮▮▮▮▮ dated March 3, 2022, April 6, 2022, and May 12, 2022 | Class member identifying information redacted |
| 49 | BPH Form 1074, Request for Reasonable Accommodations – Grievance Process, dated October 18, 2020 and Letter from the BPH Correspondence Unit, dated November 18 2020, responding to the BPH Form 1074 | Class member identifying information redacted |
| 50 | Declaration from *Armstrong* class member ▮▮▮▮ | Class member identifying information redacted |
| 51 | BPH Form 1074 Request for Reasonable Accommodations – Grievance Process dated September 1, 2022 and Defendants' response | Class member identifying information redacted |
| 52 | Declaration form *Armstrong* class member ▮▮▮▮ | Class member identifying information redacted |
| 53 | Excerpts from the ▮▮▮▮ parole hearing for ▮▮▮▮ | Class member identifying information redacted |
| 54 | Declaration from class member ▮▮▮▮ | Class member identifying information redacted |
| 55 | Declaration from *Armstrong* class member ▮▮▮▮ | Class member identifying information redacted |
| 56 | Declaration from *Armstrong* class member ▮▮▮▮ | Class member identifying |

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
|  |  | information redacted |
| 57 | Letter dated January 14, 2022 from Caroline Jackson to BPH Counsel requests re BPH hearing for deaf class member | Class member identifying information redacted |
| 58 | Excerpt from ███████████ transcript of parole hearing for Mr. ███ | Class member identifying information redacted |
| 59 | BPH Form Grievance 1074 filed by Mr. ███ for his ██████ hearing and BPH response dated May 25, 2023 | Class member identifying information redacted |
| 60 | Declaration of *Armstrong* class member ██████ | Class member identifying information redacted |
| 61 | Letter dated July 20, 2018 from Tom Nolan to BPH | Class member identifying information redacted |
| 62 | Form 1074 Request for Reasonable Accommodation – Grievance Process dated June 28, 2018; BPH response letter dated July 31, 2019; BPH Form 1074 Request for Reasonable Accommodation – Grievance Process dated October 30, 2019; BPH response letter dated November 5, 2019; a BPH Form 1074 Request for Reasonable Accommodation – Grievance Process dated November 15, 2019; BPH response letter dated December 24, 2019 | Class member identifying information redacted |
| 63 | Declaration from *Armstrong* class member ███ ███ | Class member identifying information redacted |
| 64 | Excerpt from transcript of ██████ parole hearing | Class member identifying information redacted |

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| 65 | Declaration of *Armstrong* class member ███████ | Class member identifying information redacted |
| 66 | Declaration of *Armstrong* class member ████ ████ | Class member identifying information redacted |
| 67 | Declaration of *Armstrong* class member ████ ████ | Class member identifying information redacted |
| 68 | Letter dated August 17, 2017 from Rana Anabtawi to Deputy Attorney General Sharon Garske and Supervising Deputy Attorney General Danielle O'Bannon re Defs' Ongoing Failures to Comply with Armstrong II Plans and Orders | Class member identifying information redacted |
| 69 | Letter dated July 30, 2018 from Gay Grunfeld to Russa Boyd and Jennifer Neill re Needs for Effective Communication and Accommodations in the Consideration of Early Parole for Non-Violent Offenders | |
| 70 | Letter dated November 13, 2019 from Rita Lomio to Joanna Hood and Jessica Blonien re: Sign Language Interpreters and Parole Hearings, with Exs. A-C and F-H only | Class member identifying information redacted |
| 71 | Letter dated August 11, 2022 from BPH responding to Plaintiffs' November 13, 2019 letter | |
| 72 | Letter dated March 15, 2021 from Jacob Hutt to Tamiya Davis re Effective Communication of Written Information for Blind and Low-Vision Individuals | Class member identifying information redacted |
| 73 | Letter dated October 28, 2022 from Caroline Jackson to BPH and CDCR OLA re Accommodations for Deaf Sign Language Users Throughout the BPH Process, without exhibits | Class member identifying information redacted |
| 74 | Letter from Caroline Jackson to Defendants dated August 22, 2023 re SLI contract for BPH | |

[4389229.2]

| Ex No. | Description | Filed Under Seal/Redacted |
|---|---|---|
| 75 | Letter dated October 27, 2023 from BPH to Caroline Jackson in response to August 22, 2023 letter, with excerpt of Exhibit F | |
| 76 | Letter dated October 30, 2023 from Caroline Jackson to BPH and CDCR OLA re Request for Video Translation of CRA for Five Deaf Signers | Class member identifying information redacted |
| 77 | Email dated January 8, 2021 and letter dated May 18, 2020 from between Prison Law Office and Tamiya Davis re advocacy for DPV class member | Class member identifying information redacted |
| 78 | Letters and emails exchanged between Prison Law Office and CDCR attorneys Gannon Johnson and Patricia Ferguson dated November 3, 2020; September 22, 2021; December 6, 2021; February 28, 2022; March 3, 2022; April 13, 2022; April 14, 2022; May 26, 2022 and September 22, 2022 re advocacy for DPV class member | Class member identifying information redacted |
| 79 | Excerpts of report dated January 28, 2021 by Prison Law Office re: Issues Related to Blind and Low-Vision Class Members at ▮ | Class member identifying information redacted |
| 80 | Letter dated March 25, 2022 from Chor Thao, CDCR Office of Legal Affairs, to Jacob Hutt responding to March 15, 2021 letter | |
| 81 | Letter dated November 1, 2022 from Jacob Hutt to Chor Thao | Class member identifying information redacted |
| 82 | Letter dated May 17, 2023 from Jacob Hutt to Tamiya Davis regarding the lack of reading and writing accommodations for blind and low-vision class members in the short-term restrictive housing unit at ▮ | Class member identifying information redacted |
| 83 | Letter dated June 14, 2023 from Jacob Hutt to Tamiya Davis regarding the lack of writing accommodations for blind and low-vision class members housed at ▮, without attachments | Class member identifying information redacted |

[4389229.2]

# EXHIBIT 1

# APPENDIX D

Structured Decision-Making Framework

**Structured Decision Making Framework Worksheet**
**For Parole Hearings Conducted by the California Board of Parole Hearings**
© Ralph C. Serin, Ph.D., C.Psych., 2019
Derived in past collaboration with Renée Gobeil, Carleton University & Jean Sutton, Parole Board of Canada, 2007

This Framework guides an analysis of current risk and additional factors by Board panels in order to support a decision rationale that is consistent with the Board's governing statutes, regulations, and case law. This is a structured professional judgment model; factors are not used to provide a score. The panel retains its full discretion when determining an offender's suitability for release.

| Comprehensive Risk Assessment | Low / Moderate / High | | |
|---|---|---|---|
| **Risk Related Factors** | | | |
| Criminal & Parole History | Aggravating (-) | Neutral | Mitigating (+) |

## Rating Examples– Criminal & Parole History

- **Aggravating:** The extent to which an offender has an early onset of criminality, (i.e., age 11 or younger) multiple crimes with short intervals between, crimes that escalated in seriousness, and multiple parole violations or revocations.
- **Mitigating:** No prior criminal history, or minor infractions with long intervals between crimes.
- **Neutral:** If multiple crimes, they are minor with no escalation of severity, long intervals between.

## Long-Term Offender Considerations

Different types of long-term offenders may have different trajectories. Overall, they have lower rates of re-arrests than other violent offenders and rates of re-arrest for homicides are very low. Predictors of recidivism for long-term offenders are not markedly different than for offenders in general, despite having greater periods of incarceration.

| Offender Self-Control | Aggravating (-) | Neutral | Mitigating (+) |
|---|---|---|---|

## Rating Examples– Offender Self-Control

- **Aggravating:** The extent to which an offender reflected poor self-control at the time of the crime(s) as indicated by one or more of the self-control factors (e.g., substance abuse, poor problem solving, sexual deviance, etc.).
- **Mitigating:** At the time of the crime(s) offender did not reflect poor self-control as indicated by one or more of the self-control factors (e.g., substance abuse poor problem solving, sexual deviance, etc.).
- **Neutral:** Self-control factors present at the time of the crime(s) do not indicate either serious concern for offender lack of self-control or confidence in offender's ability to maintain self-control at the time of the crime(s).

## Long-Term Offender Considerations

There are no unique aspects of self-control based on type of offender or sentence length. Panels should be confident that any of the above disinhibitors that are related to the offender's criminal conduct or prison behavior have been addressed or are no longer relevant.

| Programming | Aggravating (-) | Neutral | Mitigating (+) |
|---|---|---|---|

- **Aggravating:** The CRA identifies risk factors that remain currently relevant. The offender has not completed correctional programs based on that risk. (Offender was not afforded the opportunity to complete such programming or offender was assigned to such programming but did not actively participate and complete assignments.)

- **Mitigating:** The CRA does not identify risk factors that remain currently relevant or the factors identified have been addressed by the offender through active participation and completion of required assignments for assigned programming; programming was based on RNR.

- **Neutral:** The CRA identifies risk factors that remain currently relevant and the offender has completed some correctional programs to address those factors, but one or more elements of the offender's RNR have not been adequately addressed.

## Long-Term Offender Considerations

Contrary to RNR, for low-risk offenders with serious commitment offenses, the intent of programming is to improve the offender's suitability for parole; programming upon release would also be preferred. Specific responsivity factors (e.g., motivation, language ability, cultural context) are relevant in that they impact offenders' participation in programming. Panels must note this as such factors impede program efficacy. For moderate and high-risk offenders, appropriate programming of sufficient dosage should be required for a positive decision, absent overriding mitigating circumstances. Alternatively, panels should require access to appropriate programming in the community upon release.

| Institutional Behavior | Aggravating (-) | Neutral | Mitigating (+) |
|---|---|---|---|

## Rating Examples– Institutional Behavior

- **Aggravating:** Serious misconduct at any point during the current period of incarceration or recent misconduct, regardless of severity.

- **Mitigating:** Absence of misconduct plus behavior that goes above and beyond rule compliance (i.e., meritorious behavior).

- **Neutral:** Absence of misconduct alone is not a predictor of release outcome; no misconduct plus basic rule compliance.

## Long-Term Offender Considerations

Long-term offenders typically have low rates of misconduct (lower than other offenders), especially after the first 18 months of adjustment. Those long-term offenders with a pattern of serious misconduct over time or recent misconduct (Rules Violation Reports) (i.e., within 5 years) would be an anomaly and viewed to be higher risk. A pattern of frequent minor misconduct (Counseling Chronos) throughout the sentence would also be a concern, if this reflects ongoing problems with self-control. An apparent relationship or pattern consistent with the dynamics of the commitment offense would also be of concern. Recent (within past year) minor misconduct (Counseling Chronos), depending on context, would not necessarily warrant an assessment of aggravating.

| Offender Change | Aggravating (-) | Neutral | Mitigating (+) |
|---|---|---|---|

## Rating Examples- Offender Change

- **Aggravating:** Offender rejects the need for change, has refused programs or been kicked out due to noncompliance, or despite programming continues to express views that demonstrate lack of change.

- **Mitigating:** Clear demonstration of change, regardless of whether the offender completed programs or not.

- **Neutral:** Some evidence offender is different since commission of crime but change is not substantial, clear, or consistent over time.

## Long-Term Offender Considerations

Meritorious reports from staff or volunteers might be a good source for indications of change. The CRA might also provide some insights regarding change over time. The panel hearing is an opportunity for panels to examine this more closely and would be time better spent than rehashing the minute details of the crime, as this is more relevant to offender outcome.

| Release Plan | Aggravating (-) | Neutral | Mitigating (+) |
| --- | --- | --- | --- |

Is the release plan realistic for this offender? Does the offender have protective factors in place in case of lapses, such as pro-social friends, employment? If the offender fails on release, what is the likely impact on the community?

**Rating Examples-Release Plan**

- **Aggravating:** The offender lacks a concrete, realistic parole plan and there is a nexus between the lack of a parole plan and current dangerousness.
- **Mitigating:** The offender has concrete, realistic parole plans addressing most of the community stability factors (e.g., stable housing, prospective employment, pro-social supports, realistic plans to manage risk factors).
- **Neutral:** The offender has concrete, realistic parole plans addressing some of the community stability factors with several factors not adequately addressed (e.g. offender has plans to live with supportive pro-social family but it is in the same crime-ridden neighborhood where his criminally involved peers live). The offender offers general statements about risk factors (e.g., "I need to avoid people, places and things I associate with my drug use") but cannot offer specific details or strategies to manage those risk factors.

## Long-Term Offender Considerations

The initial transition to assisted living is challenging as offenders decompress from long imprisonment. This initial supportive environment may buffer risk such that the increased risk of initial release (first 6 months) may be delayed. Protective factors change over time and must be considered. Finally, holistic programming (accommodation, employment, mental health, addictions support, social networks, etc.) is essential.

| Case-Specific Factors | Aggravating (-) | Neutral | Mitigating (+) |
| --- | --- | --- | --- |

Is there anything that seems salient for this particular offender that may influence/effect risk, change, release planning or risk management that has not been considered?

**Rating Examples-Case Specific Factors**

- **Aggravating:** There is a unique case-specific factor that increases the offender's current dangerousness.
- **Mitigating:** There is a unique case-specific factor that decreases the offender's current dangerousness.
- **Neutral:** There are no unique case-specific factors that affect the offender's current dangerousness.

| Additional Factors | | | |
| --- | --- | --- | --- |
| Victim/DA Considerations | Aggravating (-) | Neutral | Mitigating (+) |

Did the victim, victim's next of kin, or prosecutor provide information or argument relevant to the express issue of safety or current dangerousness and thus, the offender's suitability for parole?

**Rating Examples:-Victim/DA Considerations**

- **Aggravating:** The victim, victim's next of kin, or the prosecutor provided reliable information relevant to the express issue of safety or current dangerousness.
- **Mitigating:** The victim, victim's next of kin, or the prosecutor provided reliable information indicating the offender does not pose a current risk of dangerousness.
- **Neutral:** The victim, victim's next-of-kin, or the prosecutor did not provide information relevant to the express issue of safety or current dangerousness and thus, the offender's suitability for parole.

| Youth Offender Factors | Great Weight Applied: | Yes/No |
| --- | --- | --- |

A hearing panel shall find a youth offender suitable for parole unless the panel determines, even after giving great weight to the youth offender factors, that the youth offender remains a current, unreasonable risk to public safety. If a hearing panel finds a youth offender unsuitable for parole, the hearing panel shall articulate in its decision the youth offender factors present and how such factors are outweighed by

relevant and reliable evidence that the youth offender remains a current, unreasonable risk to public safety. The panel shall give great weight to the youth offender factors: Diminished culpability of youths as compared to adults, the hallmark features of youth, and subsequent growth and increased maturity while incarcerated.

| Elderly Parole Considerations | Consideration Given: | Yes/No |
|---|---|---|

The panel shall give special consideration to the offender's advanced age, long-term confinement, and diminished physical condition, if any, when determining the offender's suitability for parole.

| Intimate Partner Battering Considerations | Great Weight Applied: | Yes/No |
|---|---|---|

The panel shall give great weight to any information or evidence that, at the time of the commission of the crime, the offender had experienced intimate partner battering, but was convicted of an offense that occurred prior to August 29, 1996; the panel shall state on the record the information or evidence that it considered and the reason for the parole decision; the fact that an offender presented evidence of intimate partner battering cannot be used to support a finding that the offender lacks insight into his or her crime and its causes.

| Discordant Information |
|---|

Is there any discordant or incongruent information that must be considered prior to making a release decision?

| Final Analysis | Aggravating (-) | Neutral | Mitigating (+) |
|---|---|---|---|
| Recommendation | Grant/Deny | | |

# EXHIBIT 2

# Information Considered at a Parole Suitability Hearing

The purpose of a parole suitability hearing is to determine whether an incarcerated person currently poses an unreasonable risk of danger to society if released from prison. In making this determination, the hearing panel will consider all relevant, reliable information available to the panel, statements from the offender, victims, victims' family, and statements from the district attorney's office and the public.

The panel will review and ask the incarcerated person questions about their social history, past and present mental state, past and present attitude toward the crime, criminal history, and other criminal misconduct that has been reliably documented, as well as the person's commitment offense(s). The panel will also consider the person's behavior before, during, and after the crime(s). In addition, the hearing panel will consider special conditions under which the incarcerated person may safely be released to the community and any other information which bears on the person's suitability for release.

There are a number of factors the Board will consider that tend to show an person's suitability and unsuitability for parole. These factors are general guidelines and "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." Additionally, the California Supreme Court has held that "the presence or absence of insight is a significant factor in determining whether there is a rational nexus between the person's dangerous past behavior and the threat the offender currently poses to public safety." Some examples of factors the Board will consider include the following:

## Factors Tending to Show Parole Suitability

- lack of a juvenile record or significant history of violent crime
- crime was committed as a result of significant stress
- stable social history
- remorse and understanding of the nature and magnitude of the offense
- present age reduces the probability of recidivism
- realistic plans for release and marketable skills
- institutional behavior indicates an enhanced ability to function within the law upon release

## Factors Tending to Show Parole Unsuitability

- the commitment offense was committed in an especially heinous, atrocious, or cruel manner
- previous record of inflicting or attempting to inflict serious injury on a victim, particularly if serious assaultive behavior was demonstrated at an early age
- unstable social history
- prior sexual assault in a manner calculated to inflict unusual pain or fear upon the victim
- lengthy history or severe mental problems related to the offense
- serious misconduct while in prison or jail

# EXHIBIT 3

# APPENDIX A

**Pre-Hearing Procedures**

The procedures below are completed prior to a parole hearing. These procedures are intended to ensure the hearing is complete, fair, and that the rights of everyone who participates in the process are protected.

1. CDCR's Case Records Staff review all inmates for parole eligibility upon admission to state prison and calculate all applicable parole eligible dates for each inmate; the results are provided to the inmate and can be appealed through the Department's inmate appeal process.

2. Six months before an inmate's initial parole hearing is scheduled, Case Records Staff conduct an audit to verify the inmate's parole eligible date(s), shortly thereafter the Board schedule's the inmate's hearing.

3. The inmate's assigned counselor creates a summary of the inmate's historical institutional behavior and programming; when CDCR converted all inmate central files from paper to digital/electronic files in 2013, all pre-existing paper files were scanned into one voluminous electronic document; the counselor reviews this information and identifies relevant information from the inmate's admission date to 2013 and compiles the information for the parole hearing.

4. The inmate's assigned counselor produces and serves on the inmate a Notice of Rights, outlining the inmate's rights during the parole hearing process; the counselor also documents whether the inmate will be using a private attorney or would like an attorney appointed by the Board, any reasonable accommodations the inmate may need under the Americans with Disabilities Act, and whether the inmate would like to review the inmate's central file prior to the hearing.

5. Four to five months before the hearing the inmate is assigned an attorney (if the inmates does not have private counsel); Board staff create an electronic copy of the inmate's Central File, upload it to a secure, cloud-based file-sharing application, and send a link to the inmate's attorney and the district attorney; within 30 days, appointed counsel is required to consult with the inmate for at least an hour.

6. Four months before the hearing the inmate is assigned to a forensic psychologist; the psychologists reviews the inmate's central file, interviews the inmate for approximately two hours, administers the HCR-20, version 3, PCL-R, and the Static 99 (if applicable), drafts a 10 to 20 page Comprehensive Risk Assessment indicating the inmate's risk for future violence; the report is required to be reviewed and approved by a senior psychologist; also four months prior to the hearing, a supervising correctional counselor reviews the confidential portion of an inmate's central file, summarizes the information, which is then provided to the inmate, the inmate's attorney, the district attorney, and the panel.

7. Three months prior to the parole hearing Board staff provide notice of the hearing to registered victims, district attorneys, the sentencing judge, the inmate's counsel at sentencing, and the law enforcement agency that investigated the commitment offense(s); Board staff also electronically pull relevant documents from the Department's main computer system and the inmate's central file, upload them into a secure, cloud-based file-sharing application and make them available to the inmate's attorney, the district attorney, and the panel assigned to the hearing.

8. Two months prior to the hearing the inmate's counselor serves the inmate with the Comprehensive Risk Assessment and Board staff provide it to the inmate's attorney, the district attorney, and the hearing panel; the inmate's attorney is required to consult with the inmate again for an hour.

9. One month prior to the hearing an interpreter is hired for the hearing, if needed.

10. Any written objections to alleged factual errors in the Comprehensive Risk Assessment are reviewed and addressed by the Board's Chief Counsel and Chief Psychologist.

11. Any pre-hearing motions, requests to postpone or waive the hearing, or requests for substitution of counsel are addressed by a deputy commissioner.

12. Ten days prior to the hearing Board staff compile any information added to the inmate's central file and documents regarding the hearing received since the electronic documents were initially distributed and provides them to the inmate's attorney, the district attorney, and the hearing panel.

13. If an inmate has a physical or cognitive disability, a staff assistant may be assigned to assist the inmate throughout the hearing process.

# EXHIBIT 4

# ARMSTRONG

# V.

# DAVIS



## COURT ORDERED
## REMEDIAL PLAN

**Amended**
**January 3, 2001**

# ~ Table of Contents ~

*I.* POLICY .................................................................................................1
   *A.* Scope ........................................................................................1
*II.* STANDARDS .........................................................................................1
   *A.* QUALIFIED INMATE/PAROLEE ..............................................................1
   *B.* PERMANENT DISABILITY......................................................................2
   *C.* CATEGORIES AND CRITERIA FOR SPECIAL PLACEMENT .........................2
      *1.* PERMANENT MOBILITY IMPAIRMENTS.........................................2
         *a)* PERMANENT WHEELCHAIR.............................................2
         *b)* PERMANENT MOBILITY IMPAIRMENT (NONWHEELCHAIR) .....................3
      *2.* PERMANENT HEARING IMPAIRMENTS.........................................3
      *3.* PERMANENT VISION IMPAIRMENTS ...........................................3
      *4.* PERMANENT SPEECH IMPAIRMENTS ..........................................3
      *5.* OTHER ..................................................................................3
   *D.* CATEGORIES AND CRITERIA WHICH DO NOT REQUIRE SPECIAL PLACEMENT .......3
      *1.* PERMANENT MOBILITY IMPAIRMENTS.........................................4
      *2.* PERMANENT NONAMBULATORY IMPAIRMENTS ............................4
      *3.* PERMANENT HEARING IMPAIRMENTS.........................................4
      *4.* PERMANENT VISION IMPAIRMENTS ...........................................4
      *5.* PERMANENT SPEECH IMPAIRMENTS ..........................................4
   *E.* EFFECTIVE COMMUNICATION .............................................................4
      *1.* GENERAL ..............................................................................4
      *2.* COMMUNICATION IMPLICATING DUE PROCESS AND DELIVERY OF HEALTH CARE.....................................................................4
      *3.* QUALIFIED INTERPRETERS .......................................................7
   *F.* REASONABLE ACCOMMODATION/MODIFICATION...................................7
   *G.* EQUAL ACCESS ...............................................................................7
   *H.* JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION..8
      *1.* LEGITIMATE PENOLOGICAL INTEREST .......................................8
      *2.* UNDUE BURDEN AND FUNDAMENTAL ALTERATION DEFENSES ...................8
      *3.* DIRECT THREAT .....................................................................8
      *4.* EQUALLY EFFECTIVE MEANS ...................................................8
   *I.* EQUIVALENT PROGRAMMING ............................................................9
*III.* RECEPTION CENTER PROCESSING ..........................................................9
   *A.* ADJUSTMENTS DUE TO EXTENDED RECEPTION CENTER STAY .......................10
   *B.* ACCOMMODATIONS .........................................................................11
      *1.* PRIVILEGES...........................................................................11
      *2.* WORK GROUP CREDITS...........................................................11

*IV.* FIELD OPERATIONS ........................................................................................ 13

    A.  DESIGNATED DPP FACILITIES ..................................................................... 13

    B.  VERIFICATION PROCESS .............................................................................. 13

        *1.*  VERIFICATION OF A DISABILITY (CDC FORM 1845) ................................ 13

        *2.*  VERIFICATION OF A DISABILITY AS A RESULT OF A REQUEST FOR
               REASONABLE ACCOMMODATION (CDC FORM 1824) OR OTHERWISE .... 15

    C.  PLACEMENT ............................................................................................... 16

    D.  EXPEDITED TRANSFERS ............................................................................. 17

    E.  TRACKING ................................................................................................. 18

    F.  HEALTH CARE APPLIANCES ...................................................................... 18

        *1.*  DEFINITION ........................................................................................ 18

        *2.*  PRESCRIPTION AND APPROVAL ............................................................ 19

        *3.*  POSSESSION OF HEALTH CARE APPLIANCES ......................................... 19

        *4.*  PURCHASE OF HEALTH CARE APPLIANCES ........................................... 19

        *5.*  MAINTENANCE AND REPAIR OF HEALTH CARE APPLIANCES ..................... 20

        *6.*  MAINTENANCE AND REPAIR OF WHEELCHAIRS ...................................... 20

    G.  MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT ............................ 21

    H.  LIBRARY EQUIPMENT ................................................................................ 21

    I.  INSTITUTION PROCEDURES ......................................................................... 21

        *1.*  INMATE ORIENTATION PROCESS .......................................................... 21

        *2.*  NOTICES, ANNOUNCEMENTS, AND ALARMS .......................................... 22

             *a)*  WRITTEN MATERIALS .................................................................. 22

             *b)*  VERBAL ANNOUNCEMENTS AND ALARMS ..................................... 23

        *3.*  SPECIAL IDENTIFICATION ...................................................................... 23

        *4.*  YARD IDENTIFICATION .......................................................................... 24

        *5.*  EVACUATION PROCEDURES .................................................................. 24

        *6.*  COUNT ............................................................................................... 25

        *7.*  RESTRAINTS ....................................................................................... 25

        *8.*  SEARCHES ......................................................................................... 26

        *9.*  TRANSPORTATION .............................................................................. 26

        *10.*  TELECOMMUNICATION DEVICES FOR THE DEAF / TELEPHONES .................. 27

        *11.*  CLOSED CAPTIONED TELEVISION .......................................................... 28

        *12.*  VISITING ............................................................................................. 28

        *13.*  RECREATION ...................................................................................... 29

        *14.*  INMATE PROGRAMS AND WORK ASSIGNMENTS ...................................... 29

        *15.*  ESSENTIAL FUNCTIONS ....................................................................... 30

        *16.*  VOCATIONAL ASSIGNMENTS ................................................................ 30

        *17.*  ACADEMIC ASSIGNMENTS .................................................................... 31

        *18.*  CONSERVATION CAMPS ....................................................................... 31

        *19.*  HEALTH CARE STATUS DETERMINATION ................................................ 31

        *20.*  DISCIPLINARY PROCESS ...................................................................... 32

21. SPECIAL HOUSING PLACEMENT ................................................................33
    *a)* ADMINISTRATIVE SEGREGATION UNIT (ASU) ...............................33
    *b)* SECURITY HOUSING UNIT (SHU) ..................................................33
    *c)* PROTECTIVE HOUSING UNIT (PHU) ..............................................33
    *d)* CONDEMNED HOUSING ..............................................................33
    *e)* MEDICAL PLACEMENT ...............................................................34
22. REMOVAL OF HEALTH CARE APPLIANCES IN ASU/SHU/DISCIPLINARY DETENTION UNITS ...........................................................................34
23. APPEALS PROCESS FOR OBTAINING ACCOMMODATIONS .....................36
    *a)* GENERAL ..................................................................................36
    *b)* APPEAL SCREENING PROCESS .....................................................36
    *c)* MEDICAL VERIFICATION PROCESS ................................................37
    *d)* NONMEDICAL VERIFICATION PROCESS ..........................................38
    *e)* TIME FRAMES ..........................................................................40
    *f)* EXPEDITED APPEAL PROCESS ......................................................40
24. SUBSTANCE ABUSE AND CIVIL ADDICT PROGRAMS ...........................41
    *a)* SUBSTANCE ABUSE TREATMENT ...................................................41
    *b)* CIVIL ADDICT PROGRAM ...........................................................41
*J.* BOARD OF PRISON TERMS ACCOMMODATION PLAN ...................................42
*K.* COMMUNITY CORRECTIONAL REENTRY CENTERS ...................................43
*L.* DESIGNATED COMMUNITY CORRECTIONAL REENTRY CENTERS ...................44
*M.* HUB INSTITUTIONS ............................................................................44
*N.* TRANSPORTATION ...............................................................................45
*O.* FAMILY FOUNDATIONS PROGRAM ..........................................................45
*P.* COMMUNITY PRISONER MOTHER PROGRAM ..............................................46
*Q.* FACILITIES OPERATED UNDER CONTRACT ................................................46
*R.* CONSTRUCTION POLICY .......................................................................46
    1. NEW PRISON CONSTRUCTION ......................................................46
    2. ALTERATION TO EXISTING FACILITIES ..........................................47
*S.* PAROLE FIELD OPERATIONS ..................................................................47
    1. POLICY ....................................................................................47
    2. RELEASE PROGRAM STUDY ........................................................47
    3. EFFECTIVE COMMUNICATION ......................................................47
    4. WRITTEN COMMUNICATION ........................................................47
    5. FIELD SUPERVISION/OFFICE VISITS ..............................................48
    6. PURCHASE OF HEALTH CARE APPLIANCES .....................................48
    7. MAINTENANCE AND REPAIR OF WHEELCHAIRS ...............................48
    8. PAROLE OUTPATIENT CLINICS .....................................................49
    9. EVACUATION PROCEDURES .........................................................49
    10. RESTRAINTS .............................................................................49
    11. TRANSPORTATION ......................................................................49
    12. REVOCATION HEARINGS .............................................................50
*T.* TRAINING .........................................................................................50

# REMEDIAL PLAN

## I.    POLICY

It is the policy of the California Department of Corrections (CDC) to provide access to its programs and services to inmates and parolees with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No qualified inmate or parolee with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the Department or be subjected to discrimination. All institutions/facilities housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and Department policy.

### A. SCOPE

The Disability Placement Program (DPP) is the Department's set of plans, policies, and procedures to assure nondiscrimination against inmates/parolees with disabilities. The DPP applies to all of the Department's institutions/facilities, all programs that the Department provides or operates, and to all inmates who have disabilities that affect a major life activity whether or not the disabilities impact placement.

Although the program covers all inmates/parolees with disabilities, whether or not they require special placement or other accommodation, it is facilitated in part through "clustering" or designating accessible sites (designated facilities) for qualified inmates requiring special placement. Inmates with permanent mobility, hearing, vision, and speech impairments, or other disability or compound conditions severe enough to require special housing and programming, will be assigned to special placement in a designated DPP facility. Inmates with a permanent impairment of lesser severity, learning disability, or a kidney disability, may be assigned to any of the Department's institutions/facilities (designated DPP institutions or nondesignated DPP institutions) consistent with existing case factors.

## II.   STANDARDS

### A.    QUALIFIED INMATE/PAROLEE

A "qualified inmate/parolee" is one with a permanent physical or mental impairment which substantially limits the inmate/parolee's ability to perform a major life activity. Major life activities are functions such as caring for one's self, performing essential manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

*B.*  **PERMANENT DISABILITY**

A "permanent disability or impairment" is one which is not expected to improve within six months. Temporary impairments such as a broken leg or hernia operation do not constitute a permanent disability or impairment.

*C.*  **CATEGORIES AND CRITERIA FOR SPECIAL PLACEMENT**

The following categories and criteria apply to inmates with Disabilities Impacting Placement as identified via the CDC Form 1845 (Section C):

*1.*  **PERMANENT MOBILITY IMPAIRMENTS**

*a)*  **PERMANENT WHEELCHAIR**: Inmates/parolees who use wheelchairs full or part time due to a permanent disability.

**Wheelchair Category Designations**

- ❖  **DPW -- Wheelchair Dependent**: Inmates/parolees who are medically prescribed a wheelchair for full time use both within and outside the assigned cell due to a permanent disability shall be designated as DPW. All designated DPW inmates/parolees must be housed in a designated facility and require housing in a wheelchair accessible cell.

- ❖  **DPM -- Mobility Impaired**: Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a permanent lower extremity mobility impairment that substantially limits walking, shall be designated as DPM. All designated DPM inmates/parolees require housing in a designated facility but do not require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

- ❖  **DPO -- Other**: Inmates/parolees who do not require a wheelchair full time but are medically prescribed a wheelchair for use outside of the assigned cell, due to a disability other than a lower extremity mobility impairment, i.e., emphysema, serious heart condition, etc., who, due to the severity of their disability, require placement in a designated facility, shall be designated as DPO. All designated DPO inmates/parolees require housing in a designated facility but do not require housing in a wheelchair accessible cell. However, these inmates may require in-cell accommodation, e.g., grab bars or raised toilet seats as documented on a CDC Form 1845 or 128C.

The above criteria will also be applied to inmates currently undergoing RC processing and those inmates housed in dormitory settings as they may be placed in Administrative Segregation for factors as defined by the California Code of Regulations (CCR), Title 15, Section 3335 or subsequently endorsed for transfer to a celled environment as outlined in CCR, Title 15, Section 3375, et. seq.

*b)* PERMANENT MOBILITY IMPAIRMENT (NONWHEELCHAIR): Inmates/ parolees who do not require a wheelchair but who have a permanent lower extremity mobility impairment that substantially limits walking; i.e., an inmate who cannot walk 100 yards on a level surface or climb a flight of stairs without pausing with the use of aids, i.e., crutches, prosthesis, or walker, shall also be designated as DPM. These inmates may also require in-cell accommodation, e.g., grab bars or raised toilet seats, as documented on a CDC Form 1845 or 128C.

2. PERMANENT HEARING IMPAIRMENTS

Inmates/parolees who are permanently deaf or who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning shall be designated as DPH.

3. PERMANENT VISION IMPAIRMENTS

Inmates/parolees who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses, shall be designated as DPV.

4. PERMANENT SPEECH IMPAIRMENTS

Inmates/parolees who have a permanent speech impairment, such as a difficult speech pattern or no speech, and do not communicate effectively in writing shall be designated as DPS.

5. OTHER

Inmates/parolees with a disability other than those specified above, e.g., emphysema or other upper respiratory condition, which due to the severity of their disability may require special placement in a designated DPP facility. These inmates shall also be designated as DPO.

*D.* CATEGORIES AND CRITERIA WHICH DO NOT REQUIRE SPECIAL PLACEMENT

The following categories and criteria apply to inmates with disabilities that do not impact placement as identified via the CDC Form 1845 (Section D):

*1.* PERMANENT MOBILITY IMPAIRMENTS

Inmates/parolees with permanent lower extremity mobility impairments who can walk 100 yards and up a flight of stairs without pausing, with or without aids, shall be designated as DNM.

*2.* PERMANENT NONAMBULATORY IMPAIRMENTS

Inmates/parolees who have an arm or hand prosthesis, or missing digits. These inmates do not have a specific category code.

*3.* PERMANENT HEARING IMPAIRMENTS

Inmates/parolees who have residual hearing at a functional level with hearing aids shall be designated as DNH.

*4.* PERMANENT VISION IMPAIRMENTS

Inmates/parolees who have a vision impairment correctable to central vision acuity better than 20/200 with corrective lenses shall be designated as DNV.

*5.* PERMANENT SPEECH IMPAIRMENTS

Inmates/parolees who have a permanent speech impairment, such as a difficult speech pattern or no speech, and communicate effectively in writing shall be designated as DNS.

*E.* EFFECTIVE COMMUNICATION

*1.* GENERAL

Reasonable accommodation shall be afforded inmates/parolees with disabilities, e.g., vision, speech, hearing impaired, and learning disabled inmates, to ensure equally effective communication with staff, other inmates, and, where applicable, the public. Auxiliary aids which are reasonable, effective, and appropriate to the needs of the inmate/parolee shall be provided when simple written or oral communication is not effective. Such aids may include bilingual aides (inmates, parolees, or staff), qualified interpreters, readers, sound amplification devices, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audiotaped texts, Braille materials, large print materials, and signage.

*2.* COMMUNICATION IMPLICATING DUE PROCESS AND DELIVERY OF HEALTH CARE

Because of the critical importance of communication involving due process or health care, the standard for equally effective communication is higher when these interests are involved. It is the obligation of CDC staff to provide

effective communication under all circumstances, but the degree of accommodation that is required under these special circumstances shall be determined on a case-by-case basis and is subject to the following requirements:.

*a)* *Space reserved for Test of Adult Basic Education (TABE)*

*b)* *Space reserved for Test of Adult Basic Education (TABE)*

*c)* Staff shall document the determination that the inmate understood the process and shall record the basis for that determination and how the determination was made. For example, "the responsive written notes generated by a hearing impaired inmate indicated that he/she understood the process," "the sign language interpreter, e.g., American Sign Language (ASL) interpreter appeared to communicate effectively with the hearing impaired inmate as indicated by the inmate's substantive response via sign language," *Space reserved for Test of Adult Basic Education (TABE)*

*d)* Qualified sign language interpreters, as defined below, will be provided for all due process functions and medical consultations that fall within the scope of those described below when sign language is the inmate's primary or only means of effective communication, unless the inmate waives the assistance of an interpreter, reasonable attempts to obtain one are not successful, and/or

delay would pose a safety or security risk. In the event a qualified sign language interpreter is not available, or is waived by the inmate, and communication is attempted, staff shall employ the most effective form of communication available, using written notes; staff interpreters who are able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary; or any other appropriate means.

Medical consultations for which qualified sign language interpreters will be provided include those pertaining to:

- ❖ Determination of the inmate patient's medical history or description of ailment or injury;

- ❖ Provision of the inmate patient's rights, informed consent or permission for treatment;

- ❖ Diagnosis or prognosis of ailment or injury;

- ❖ Explanation of procedures, tests, treatment, treatment options, or surgery;

- ❖ Explanation of medications prescribed (such a dosage, instructions for how and when to be taken, side effects, food or drug interactions);

- ❖ Blood donations and apheresis;

- ❖ Discharge instructions;

- ❖ Provision of mental health evaluations, group and individual therapy, counseling and other therapeutic activities;

- ❖ Educational counseling.

The foregoing list is neither exhaustive nor mandatory, and shall not imply that there are no other circumstances when it may be appropriate to provide interpreters for effective communication nor that an interpreter must always be provided in these circumstances.

e) Videoconferencing is an appropriate and acceptable means of providing qualified sign language interpretive services, and may be employed when available.

f) An inmate's ability to lip read shall not be the sole source used by staff as a means of effective communication involving due process or medical consultations, unless the inmate has no other means of communication.

### 3. QUALIFIED INTERPRETERS

A qualified sign language interpreter includes a person adept at American Sign Language. To qualify as an ASL interpreter, an individual must pass a test and qualify in one of the five categories established by the National Association for the Deaf (NAD), one of the three categories established by the Registry of Interpreters for the Deaf (RID), or as a Support Services Assistant Interpreter from the California Department of Rehabilitation.

Staff who are able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary may be utilized as an interpreter, in the event a qualified sign language interpreter/ASL interpreter is not reasonably available, or is waived by the inmate.

Each institution (designated DPP, nondesignated DPP, and reception center) and Parole Region is to establish a contract or service agreement with a local signing interpreter service organization in order to provide interpretive services for hearing impaired inmates during due process functions and medical consultations.

### F. REASONABLE ACCOMMODATION/MODIFICATION

The Department shall provide reasonable accommodations or modifications for known physical or mental disabilities of qualified inmates/parolees. The Department shall consider, on a case-by-case basis, accommodations for inmates/parolees with impairments that are temporary in nature. Examples of reasonable accommodations include special equipment (such as readers, sound amplification devices, or Braille materials), inmate or staff assistance, bilingual or qualified sign language interpreters, modifying work or program schedules, or grab bars installed for mobility impaired inmates who require such (including mobility impaired inmates whose disability does not impact placement).

### G. EQUAL ACCESS

Accommodations shall be made to afford equal access to the court, to legal representation, and to health care services, for inmates/parolees with disabilities, e.g., vision, speech, hearing, and learning disabled.

Accommodations may include but are not limited to access to magnifiers, electronic readers, and sound amplification devices.

To assist in accommodating an inmate's equal access to the court, the institutions shall provide a letter to the court identifying the nature and severity of the inmate's disability and limitation(s), including a brief description of the inmate's request for accommodation by the court.

---

*H.* JUSTIFICATION FOR DENIAL OF REQUESTS FOR REASONABLE ACCOMMODATION

*1.* LEGITIMATE PENOLOGICAL INTEREST

A request for accommodation may be denied when the denial is based on legitimate penological interests. The factors to be considered in determining whether the accommodation can be denied on this basis are those four factors articulated by the Supreme Court in Turner v. Safley (1987) 482 U.S. 78. They are: 1) whether there is a valid, rational connection between the denial and a legitimate governmental interest; 2) whether there are alternative means for the inmate to exercise his rights; 3) the impact of accommodating the request on security, staff, other inmates and the allocation of prison resources generally; and 4) whether the denial represents an exaggerated response to prison concerns. In all evaluations of requests for reasonable accommodation, public safety and the health, safety, and security of all inmates and staff shall remain the overriding consideration.

*2.* UNDUE BURDEN AND FUNDAMENTAL ALTERATION DEFENSES

A request for accommodation may be denied when the requested accommodation would impose an undue financial or administrative burden on the agency, or would fundamentally alter the nature of the service, program, or activity. An accommodation is an undue financial burden when, in a cost-benefit analysis, its cost would be an unjustifiable waste of public funds. The Warden, Regional Parole Administrator, or (in the case of some medical accommodations) the Health Care Manager or designee, will make the determination that an accommodation would result in an undue burden or fundamental alteration.

*3.* DIRECT THREAT

A request for accommodation may be denied when it poses a direct threat of substantial harm to the health or safety of the inmate, parolee, or anyone else, including the public.

*4.* EQUALLY EFFECTIVE MEANS

A request for accommodation may be denied if equally effective access to a program, service, or activity may be afforded through an alternate method which is less costly or intrusive. Alternative methods, which may be less costly or intrusive to the existing operation/program, may be utilized to provide reasonable access in lieu of modifications requested by the inmate/parolee, so long as they are effective.

*I.*   EQUIVALENT PROGRAMMING

The designated DPP facilities shall offer disabled inmates a range of programming equivalent to that available to nondisabled inmates. For example, a DPP facility for women shall offer an acceptable long-term substance abuse treatment program equivalent to the Forever Free Program at the California Institution for Women.

## *III.*   RECEPTION CENTER PROCESSING

All reception center (RC) facilities are designated to provide temporary housing and processing for inmates/parolees identified as meeting DPP criteria with the exception of the following, whose responsibility for processing DPP inmates is limited:

❖   **California State Prison, San Quentin**   All inmates (except condemned cases) who arrive at California State Prison, San Quentin's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to Deuel Vocational Institution's RC for processing.

❖   **California Correctional Institution**   All inmates who arrive at California Correctional Institution's RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to North Kern State Prison's (NKSP) RC for processing. Wheelchair users may also be transferred to Wasco State Prison's (WSP) RC.

❖   **Wasco State Prison**   All inmates who arrive at WSP preliminarily identified as mobility impaired nonwheelchair, as defined in Section II, C, 1, b), hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within seven days to NKSP's RC for processing. The WSP's RC is designated with a wheelchair-only mission, as defined in Section II, C, 1, a).

❖   **California Rehabilitation Center**   Refer to Section IV, I, 24, b) of this plan, Civil Addict Program, for CDC's Policy on DPP civil addict cases.

❖   **Northern California Women's Facility**   All female parole violators/pending revocation or parole violators/return-to-custody who arrive at the Northern California Women's Facility (NCWF) RC preliminarily identified with a permanent disability that may impact placement, shall be transferred within seven days to the Central California Women's Facility (CCWF) RC. Wheelchair users may also be transferred to Valley State Prison for Women's (VSPW) RC. These cases shall be transported back to NCWF as needed for parole revocation hearings, on out-to-court/hearing status and returned the same day.

❖    **Valley State Prison for Women**  All inmates who arrive at VSPW's RC preliminarily identified as mobility impaired nonwheelchair, as defined in Section II, C, 1, b), hearing, vision, or speech impaired, the severity of which impacts placement, shall be transferred within <u>seven days</u> to CCWF's RC for processing. The VSPW's RC is designated with a wheelchair-only mission, as defined in Section II, C, 1, a).

All RC's, however, will have sufficient accessible beds to accommodate disabled inmates awaiting transfer to a DPP RC.

Generally, inmates with disabilities shall be processed out of RC's in a timely manner, no more than 60 days from the date they are received by the Department, unless detained by factors not attributable to the Department's delay; e.g., medical necessity, court appearances, disciplinary proceedings, no documented in-level bed availability systemwide, etc.

## A.    ADJUSTMENTS DUE TO EXTENDED RECEPTION CENTER STAY

Inmates with disabilities will be processed out of RC's in a timely manner, in no more than 60 days from the date they are received by the Department, unless detained due to factors not attributable to the Department's delay; e.g., medical necessity, court appearance, disciplinary proceedings, no documented in-level bed availability systemwide, etc. Any period of time beyond the initial 60 days of a disabled inmate's stay at an RC shall be referred to as the inmate's extended stay.

If a disabled inmate remains at a RC for more than 60 days, a presumption arises that the extended stay is solely due to the inmate's disability. To overcome this presumption, CDC must demonstrate that the inmate's transfer out of the RC was at no time delayed solely due to the inmate's disability. In this case, CDC need not accommodate the inmate for the extended stay. Alternatively, CDC may demonstrate that the cumulative period of all disability-related delays was shorter than the inmate's extended stay, in which case CDC need only accommodate the inmate for the cumulative period of disability-related delays.

Verification that the inmate's extended stay in the RC was not due to the disability may be demonstrated by documentation reflecting that the inmate's disability does not impact placement, i.e., CDC Forms 1845 (Section D), 128C, or 128G. This provision does not apply to inmates undergoing dialysis treatment.

When it comes to CDC's attention that a disabled inmate's RC stay has been extended beyond 60 days solely due to the inmate's disability that impacts placement (Section C inmates) or the inmate's undergoing dialysis treatment, CDC shall accommodate the inmate as described below. The below provisions for an extended RC stay are only available to inmates whose disability impacts placement and those who are undergoing dialysis treatment. Qualifying inmates may file a CDC Form 1824, Reasonable Accommodation or Modification Request, to request accommodation for an extended stay.

*B.* ACCOMMODATIONS .

*1.* PRIVILEGES

Disabled inmates with disabilities severe enough to impact placement as documented on CDC Forms 1845 (Section C), 128G, or 128C (or inmates undergoing dialysis treatment), who remain at RC's for extended stays solely due to the inmate's disability shall be granted, during their extended stays, privileges that are available at mainline institutions, as outlined in CCR, Title 15, Section 3044(d), Privilege Group A.

When it comes to the RC's attention that the RC stay of an inmate with a disability severe enough to impact placement, as documented on a CDC Form 1845 (Section C), 128G or 128C (or inmates undergoing dialysis treatment), has been extended beyond 60 days, the inmate's case will be presented to a classification committee on the 61st day for determination whether the extended stay is solely due to the disability. The determination by the classification committee shall be documented on a CDC Form 128G. If the classification committee determines that the extended stay is solely due to the disability, the corresponding CDC Form 128G granting Privilege Group A shall be forwarded to appropriate custody staff to ensure privileges are provided as required.

If the classification committee determines that the extended RC stay is not solely due to the disability, the CDC Form 128G shall document the decision and reflect that determination and the fact that the inmate is not eligible for Privilege Group A during his/her extended stay in the RC.

*2.* WORK GROUP CREDITS

*a)* Disabled inmates with disabilities severe enough to impact placement who remain at RC's for extended stays solely due to their disability and who are serving sentences of less than one year, or have less than one year remaining on their sentence while undergoing RC processing, shall, pursuant to the procedures described below, receive sentencing credits that they could have earned if they had been transferred to a mainline institution on the 61st day of RC stay.

When it comes to the RC's attention that an inmate with a disability severe enough to impact placement as documented on CDC Forms 1845 (Section C), 128G or 128C, (or inmates undergoing dialysis treatment), has an RC stay that has been extended beyond 60 days, and who are serving sentences of less than one year, or have less than one year remaining on their sentence while undergoing RC processing, the inmate's case will be presented to a classification committee on the 61st day for determination whether the extended stay is solely due to the disability. The determination by the classification committee shall be documented on a CDC Form 128G.

---

If the classification committee determines that the extended stay is solely due to the disability, the corresponding CDC Form 128G granting work time credits shall be forwarded to the Case Records manager to apply the applicable credits as outlined in CCR, Title 15, Section 3044(b)(1), Work Group A1. Inmates with disabilities, who are, by law, ineligible to earn worktime credits are exempt from this requirement.

If the classification committee determines that the extended RC stay is not solely due to the disability, the CDC Form 128G shall document the decision and reflect that determination and the fact that the inmate is not eligible for worktime credits during his extended stay in the RC.

b) The receiving program institution shall review the central file of all inmates with disabilities severe enough to impact placement and those who required dialysis treatment at the RC's to determine if their stay exceeded 60 days. If so, the inmate's extended stay shall be presumed to be solely due to the inmate's disability unless CDC can overcome this presumption as provided above, i.e., detained by factors not attributable to the Department's delay or classification committee determination that extended stay was not due to the disability. If the inmate's disability was the sole cause, adjustment to the inmate's worktime credits will be made, once the inmate is received at the program institution, to reflect credits as if the inmate were engaged in the work program on the 61st day, as outlined in CCR, Title 15, Section 3044(b)(1), Work Group A1.

Once the inmate is received by the program institution, the RC extended stay time period ends and the inmate's work/privilege group reverts to U/U (unclassified) until the date of the initial classification committee. The initial classification committee will then designate an appropriate work/privilege group for the inmate and place him/her on an assignment waiting list.

Credit relief shall be accomplished by a statement from the classification committee on the CDC Form 128G, similar to that used in a time gap chrono covering the period(s) of disability related delays. At no time shall the credit relief exceed the total period of the extended stay. Inmates with disabilities who are, by law, ineligible to earn worktime credit are exempt from this requirement.

## IV.  FIELD OPERATIONS

### A.  DESIGNATED DPP FACILITIES

The institutions identified below are designated DPP facilities:

| MALE INSTITUTIONS |
| --- |
| Avenal State Prison |
| California Institution for Men |
| California Medical Facility |
| California State Prison, Corcoran |
| California Substance Abuse Treatment Facility & State Prison Corcoran |
| High Desert State Prison |
| Pleasant Valley State Prison |
| Salinas Valley State Prison |

| FEMALE INSTITUTIONS |
| --- |
| Central California Women's Facility |
| Valley State Prison for Women |

Designated DPP institutions may be added or deleted as needed. The CDC shall notify plaintiffs 60 days in advance of any action to add or delete designated institutions.

### B.  VERIFICATION PROCESS

It is the mutual responsibility of the inmate/parolee and CDC to verify disabilities that might affect their placement in the prison system, and of verifying credible claims of disability in response to requests for accommodation or complaints about disability-based discrimination. The CDC is not required to automatically screen all inmates/parolees to identify disabilities. Inmates/parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

### 1.  VERIFICATION OF A DISABILITY (CDC FORM 1845)

Verification may be triggered by any of the following:

a)  The inmate/parolee self-identifies or claims to have a disability.

b)  Staff observe what appears to be a disability severe enough to impact placement, affect program access, or present a safety or security concern.

c)  The inmate/parolee's health care or central file contains documentation of a disability.

*d)* A third party (such as a family member) requests an evaluation of the inmate/parolee for an alleged disability.

Verification of a disability that may impact placement shall be recorded on a CDC Form 1845, Inmate/Parolee Disability Verification Form (Exhibit A).

Once completed and approved, the CDC Form 1845 shall become part of the inmate's or parolee's file and shall be effective until a change in the inmate's or parolee's condition causes it to be canceled or superseded.

Identification of disabilities affecting placement shall usually occur during RC processing; however, if an inmate/parolee appears to have a disability that might affect placement, a staff member shall refer the inmate/parolee for verification of the disability. The referral is made by directing a standard CDC Form 128B, Chrono-General, to the institution/facility's health care services. Health care staff shall verify the disability using a CDC Form 1845 with appropriate CDC Form 128C documentation listing the inmate's limitations.

Responsibility for completion of Sections A through E of the CDC Form 1845 rests with institution/facility health care services licensed clinical staff. Health care staff shall follow CDC protocols for verifying disabilities. These protocols are set forth in Exhibit B to this Remedial Plan. Sections A through E shall be completed by a physician.

If an inmate is evaluated utilizing the CDC Form 1845 and it is determined the inmate/parolee does not have one of the categories of disability specified in Section II, C or D, of this plan, the physician making the decision shall check the appropriate box indicating "Disability Not Verified" and enter an explanation in the Comments Section. The physician shall then sign and date the CDC Form 1845.

If it is determined the inmate/parolee has a permanent disability specified in Section II, D, of this plan, that does not impact placement, the physician making the decision shall check the appropriate box indicating "Disabilities Not Impacting Placement." The physician shall then sign and date the CDC Form 1845.

A check in any of the boxes in Section D and no checks in Section C indicate that the inmate may be assigned to any of the Department's institutions/facilities consistent with applicable case factors.

If it is determined that an inmate has a permanent disability specified in Section II, C, of the ARP, and the disability impacts placement, the physician making the decision shall check the appropriate box in Section C indicating "Disabilities Impacting Placement." The physician shall then sign and date the CDC Form 1845.

If it is determined that an inmate has a permanent disability specified in Section II, C, 5 (Other), and the disability is severe enough that the inmate would benefit from placement in a designated DPP facility, the physician shall specify the condition/disability in the Comments Section of the CDC Form 1845. The physician shall then complete a CDC Form 128C, Chrono-Medical, Psych, Dental, listing the inmate's limitations, special health care needs, and any other information which might be pertinent to making a placement decision. The physician shall then sign and date the CDC Form 1845.

A check in any of the boxes in Section C indicates a need for placement in one of the designated DPP institutions/facilities.

Special concerns, such as documented mental or physical health care needs, are addressed on the CDC Form 1845 by checking the appropriate box(es) and completing the requested information in Section E. Assistance with daily living activities shall also be noted on the form, with appropriate CDC Form 128C documentation noting the specific need(s). Additional notes, references, explanations, and/or information not listed elsewhere on the CDC Form 1845 are to be placed in the Comments Section of the CDC Form 1845.

Once the CDC Form 1845 is completed as referenced above, the physician shall sign and date in Section E, and forward the CDC Form 1845 to the institution/facility Correctional Counselor III (CC III) for RC's or the Classification & Parole Representative (C&PR) for general population institutions, within 72 hours.

The CC III/C&PR shall log and track the CDC Form 1845 as outlined in Section IV, E. The CC III/C&PR shall route the CDC Form 1845 to the assigned CC I who shall complete Section F and add any additional information available from the inmate's Central File, e.g., uses American Sign Language, reads Braille, etc.

The CC I, upon completion of Section F, shall sign, date, and distribute the CDC Form 1845, according to the instructions on the form.

2.  **VERIFICATION OF A DISABILITY AS A RESULT OF A REQUEST FOR REASONABLE ACCOMMODATION (CDC FORM 1824) OR OTHERWISE**

Verification of a disability may also be required for resolving requests for reasonable accommodation. Verification of a disability for this purpose may be documented on a CDC Form 1845, for disabilities that may impact placement; CDC Form 128C, for disabilities not covered by the CDC Form 1845 (i.e., mental illness, dialysis, etc.); or CDC Form 128B, for learning disabled.

If an inmate/parolee files a request for accommodation or a disability-based discrimination complaint (CDC Form 1824), but does not provide

documentation of the disability, the Appeals Coordinator shall forward all appeals requiring medical verification of the claimed disability to health care services staff as outlined in Section IV, I, 23.

## C.  PLACEMENT

All inmates verified to have a disability in Section C of the CDC Form 1845 (requiring special placement in a designated DPP facility) shall be referred to a Classification Staff Representative (CSR) for review and endorsement.

1.  In assessing appropriate placement, the CSR shall consider the inmate's prevailing case factors, status as documented on the CDC Form 1845, and any additional health care placement concerns documented thereon. The CSR shall then endorse the inmate, with reference to the CDC Form 1845, according to the following guidelines:

    a)  Where a verified DPP Section C inmate does not have any additional significant health care concerns, the inmate shall be placed in an appropriate designated DPP facility.

    b)  Where a verified DPP Section C inmate has additional significant health care concerns, the CSR, in consultation with Health Care Population Management (HCPM) staff, shall place the inmate in an appropriate designated DPP facility that has an established health care delivery system suited to the inmate's condition.

    c)  In the exceptional case where placement cannot directly meet both the health care and DPP needs of the inmate, HCPM and Classification Services Unit staff will work together to address the inmate's dual needs for an appropriate placement.

    The inmate's health care needs shall take precedence in determining placement. Overriding medical needs may dictate placement in a health care setting. When an inmate requires placement in a licensed health care facility, policies and procedures for the specific facility as noted in the CCR, Title 22, will be followed.

2.  To initiate the transfer process for inmates who have overriding health care treatment needs and require special placement, the referring clinician shall prepare a CDC Form 128C identifying the health care need(s) and related conditions necessitating the transfer, including the urgency of any required treatment.

3.  Designated DPP placement of an inmate verified to have a disability under Section C of the CDC Form 1845 requires endorsement by a CSR.

4. Once the inmate is endorsed for special placement, any verified change in DPP status requires subsequent CSR review and endorsement.

5. An inmate with a disability not impacting placement may be housed at any facility consistent with applicable case factors.

6. Case management for all DPP inmates shall comply with all established classification procedures.

7. The CSR shall not endorse cases where the central file indicates the inmate may have significant mobility, hearing, vision, and/or speech impairment(s), and there is no CDC Form 1845 in the central file.

8. Efforts shall be made to house inmates identified with disabilities impacting placement (Section C of the CDC Form 1845) in DPP designated institutions while on Out-to-Court status, consistent with legitimate safety and security concerns.

D.    EXPEDITED TRANSFERS

All nondesignated institutions are to ensure the expeditious transfer of inmates with disabilities impacting placement to appropriate DPP designated institutions/ facilities.

Once an inmate is verified as having a disability impacting placement via a CDC Form 1845 (Section C), the C&PR at nondesignated institutions shall ensure the inmate appears before an appropriate Classification Committee for referral to a CSR.    All necessary committee actions and follow-up documentation, i.e., CDC Form 128G, shall be completed and available for CSR review within 14 working days of verification of the disability.

Once the inmate has been endorsed for transfer to a designated DPP institution by the CSR, the C&PR will ensure the inmate is expeditiously transferred.

Upon endorsement by a CSR, the C&PR shall be responsible to ensure that the DPP designation is entered into the comments/purpose field on the Distributed Data Processing System/Interim Transportation Scheduling System (ITSS) during the weekly bus seat request process.    In the event the requested bus seat does not appear on the subsequent ITSS send and intake notice, the C&PR shall contact the Institution Standards and Operations Section (ISOS) at Headquarters to obtain the status of the requested transfer. The ISOS will then liaison with the Transportation Services Unit to expedite the transfer.    Reasonable accommodations shall be provided to the inmate pending transfer.

*E.*  TRACKING

*1.*  Inmates assigned to DPP categories shall be tracked in the Classification Tracking System database by utilizing the CDC Form 839, Classification Score Sheet, and CDC Form 840, Reclassification Score Sheet, consistent with current policy. The codes are as follows:

| Inmate Requires Special Placement at Designated DPP Facility | | Inmate Does Not Require Special Placement and May be Placed at any Facility According to Case Factors | |
|---|---|---|---|
| DPW | - Wheelchair Dependent | DNM | - Mobility Impaired |
| DPM | - Mobility Impaired | DNH | - Hearing Impaired |
| DPH | - Hearing Impaired | DNV | - Vision Impaired |
| DPV | - Vision Impaired | DNS | - Speech Impaired |
| DPS | - Speech Impaired | | |
| DPO | - Other | | |

*2.*  The C&PR's and RC CC III's shall develop institution procedures for tracking inmates with disabilities based on the CDC Form 1845. These procedures shall include annotating the disability and the section of the CDC Form 1845 in which it was verified on the following documents: Institutional Staff Recommendation Summary; CDC Form 816, RC Readmission Summary; CDC Form 128G; CDC Form 839; and CDC Form 840.

*3.*  It is the responsibility of the C&PR and/or CC III to maintain a census of all inmates with disabilities based on the CDC Form 1845 (Section C and D).

*4.*  Health care staff shall forward a copy of the CDC Form 1845 to the C&PR and/or CC III as expeditiously as possible, but no later than 72 hours, after completion as described in Section IV, B, 1. The C&PR will then include the inmate's name on the tracking log. The tracking log will be maintained in the C&PR/CC III's office.

*F.*  HEALTH CARE APPLIANCES

*1.*  DEFINITION

Health care appliances are assistive devices or medical support equipment which have been prescribed for the inmate and approved by the Correctional Captain and Health Care Manager, or their respective designees. Health care appliances include, but are not limited to, durable medical equipment, prosthetic and orthotic appliances, eyeglasses, prosthetic eyes, and other eye appliances as defined in CCR, Title 22, Section 51160 through 51162.

To ensure the safety of the inmates, health care appliances shall be provided to inmates with disabilities as noted on the CDC Form 1845 or CDC Form 128C.

2.  PRESCRIPTION AND APPROVAL

Health care appliances shall be prescribed and approved for eligible inmates by licensed CDC health care providers, subject to medical necessity. Inmate health care appliances, including those belonging to the inmate prior to entry into CDC's system, must be approved by custody staff for conformance with safety and security standards. If custody staff, upon inspecting the appliance, determines there is a safety or security concern, a physician, Health Care Manager, or Chief Medical Officer shall be consulted immediately to determine appropriate action to accommodate the inmate's needs. Accommodation may include modifying the appliance or substituting a different appliance at state expense.

Once a departmental physician or dentist prescribes and/or approves an appliance, custody staff will inspect and make every effort to approve the appliance. If legitimate safety and security concerns are evident, custody staff will consult with health care staff in order to modify the appliance for approval. Only under exceptional circumstances will an appliance be rejected and an alternate means provided. All such circumstances shall be appropriately documented in the inmate's C-file and/or medical file.

3.  POSSESSION OF HEALTH CARE APPLIANCES

Health care appliances shall be documented as property of the inmate and appropriately identified as such, in accord with departmental and institutional policy; however, they shall not be included in the volume limit for personal property established in CCR, Title 15, Section 3190. No inmate shall be deprived of a health care appliance that was in the inmate's possession upon entry into the CDC system or was properly obtained while in CDC custody, unless for documented safety or security reasons or a Department physician or dentist determines that the appliance is no longer medically necessary or appropriate. Possession of health care appliances in Special Placement Housing is governed by CCR, Title 15, Section 3380.20.

Health care appliances shall be retained and maintained by inmates upon release to parole.

4.  PURCHASE OF HEALTH CARE APPLIANCES

Prescribed appliances shall be purchased by the inmate through the Department or a vendor of the inmate's choosing, with the approval of the Health Care Manager, Chief Medical Officer or Chief Dental Officer. Prior to issuance of any other appliance, the inmate must sign a CDC Form 193 for the cost of the appliance. If an inmate is indigent, as defined in CCR, Title 15, Section 3000,

or does not have enough money in his/her trust account to cover the cost of the appliance, the appliance shall be provided at State expense in accordance with CDC inmate trust accounting procedures. The inmate shall be required to contribute towards the cost of the device all funds contained or received in the account from the date the appliance is ordered to the date it is received, in accordance with departmental procedure. If the inmate is not indigent, he or she shall be held financially accountable for the cost of the appliance in accordance with departmental procedure. No inmate shall be denied a health care appliance because he or she is indigent.

Health care staff shall receive health appliances ordered in accordance with a licensed CDC health care physician's prescription. The appliance shall be evaluated by health care staff to ensure it corresponds to the physician's order and that there is a current CDC Form 128C communicating the order to custody staff. The procedure to verify and identify appliances shall not cause an unreasonable delay in the delivery of prescribed health appliances. Should any unreasonable delay in delivery occur, health care staff shall clearly document the nature of the delay and communicate this information to the inmate and his/her assigned counselor.

5.   MAINTENANCE AND REPAIR OF HEALTH CARE APPLIANCES

It is the joint responsibility of CDC and the inmate/parolee to maintain all health care appliances in good repair and operation. Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the inmate shall utilize approved CDC procedures for notifying health care staff of health care needs. Health care staff shall ducat the inmate for an appointment and evaluate the condition of the appliance. Once the need for repair or replacement is verified, the inmate shall be issued an appropriate appliance or accommodation. This procedure applies to replacement of batteries for hearing aids and other appliances. The inmate shall be financially responsible for damage, repair and replacement of appliances, and parts, and shall be charged for the cost thereof through a CDC Form 193 in accordance with departmental policy and procedure.

6.   MAINTENANCE AND REPAIR OF WHEELCHAIRS

Custody staff shall conduct and log periodic safety and security inspections on all wheelchairs on at least a monthly basis. If a wheelchair needs repair, Health Care Services personnel shall be notified to secure the necessary repairs. The Health Care Services shall maintain the appropriate service contracts for wheelchair maintenance.

A State-issued wheelchair in need of repair shall be exchanged for one in good working condition. When a personal wheelchair is submitted for repair, the inmate shall be loaned a State issued wheelchair for the duration of the repair.

The inmate shall be financially responsible for damage, repair, and replacement of wheelchairs and parts, provided above.

## G. MAINTENANCE OF ACCESSIBLE FEATURES AND EQUIPMENT

The CDC has a duty to maintain in operable working condition structural features and equipment necessary to make the prison/parole system's services, programs, and activities accessible to disabled inmates/parolees. Isolated or temporary interruptions in service or access due to maintenance or repairs are not prohibited.

## H. LIBRARY EQUIPMENT

Electronic equipment is intended for use in the recreational library, education areas, and the law library. Each facility will be responsible for training staff and inmates in the proper use of the equipment to provide access for inmates with disabilities, e.g., inmates with hearing, and vision impairments and inmates with learning disabilities. Procedures and rules regarding access to the equipment will be established by each facility. Disabled inmates will not be restricted to using the equipment for legal text; however, legal users will be given priority access.

All institutions (DPP designated, nondesignated institutions, and reception centers) are to inform disabled inmates of the existence of the equipment, what equipment is available (type of equipment is dependent upon mission designation), how inmates can access the equipment, i.e., staff or inmate assistance, when the equipment can be accessed, and where the equipment is located. This information will be provided to disabled inmates during the orientation process.

Disabled inmates may request access to electronic equipment by submitting a written request to the librarian. Disabled inmates who are unable to write may verbally request such access.

## I. INSTITUTION PROCEDURES

### 1. INMATE ORIENTATION PROCESS

Comprehensive information as outlined below shall be provided to all disabled inmates in accessible format during the inmate orientation process. Vision/hearing impaired and learning disabled inmates shall be accommodated with alternate forms of communication, e.g., verbal communication, video/audio presentation, and written material (large print), in order to ensure effective communication of information.

The following information shall be effectively communicated in alternate formats whenever a vision/hearing impaired or learning disabled inmate is undergoing the orientation process:

♦ The purpose of the inmate Disability Placement Program.

◆ Availability of the CCRs, Armstrong Remedial Plan, and similar printed materials in accessible formats to inmates with disabilities.

◆ CDC Form 1824 Reasonable Accommodation or Accommodation Request process and the location of the forms.

◆ Reasonable accommodations/modifications available to qualified inmates, e.g., sign language interpreters for due process settings, e.g., CDC 115 hearings, medical consultation, Board of Prison Terms (BPT) hearings, etc.

◆ Access to inmate/staff readers or scribes and availability of specialized library equipment for qualified hearing/vision impaired, learning disabled inmates such as text magnifiers, large print materials, audiocassette tapes, etc.

◆ The process of personal notification by staff and possible use of a dry erase/chalk board for notification of announcements, visits, ducats, messages, etc., in the housing unit.

◆ Access to a telecommunication device for the deaf (TDD) and/or volume control telephone.

◆ Access to a close captioned television in the housing unit.

◆ The institution's Inmate Assistance Program (upon completion).

◆ Verified case-by-case medical exceptions to institutional count procedures.

◆ Information regarding emergency alarms/evacuations, announcements and notices.

2. NOTICES, ANNOUNCEMENTS, AND ALARMS

*a)* WRITTEN MATERIALS

Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that the CCRs, Notices, Orientation Packages, Job Announcements, and similar printed materials that it distributes to inmates are accessible to inmates with disabilities.

Each institution/facility shall ensure that accommodations such as magnifiers, photocopying machines with capability to enlarge print for vision-impaired inmates, inmate or staff assistance, computer assisted devices, audiotapes and Braille are provided when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that inmates who have difficulty reading and/or communicating in writing, e.g., learning disabled inmates, are provided reasonable access to forms, CCRs, and procedures.

The type of equipment available will vary based upon the institution's mission designation. Information regarding access to written materials will be provided to disabled inmates during the orientation process.

*b)* VERBAL ANNOUNCEMENTS AND ALARMS

Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure that effective communication is made with inmates who have hearing impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc.

All verbal announcements in housing units where inmates with hearing impairments impacting placement reside shall be done on the public address system (if applicable) and by flicking the unit lights on and off several times alerting hearing impaired inmates that an announcement is imminent.

The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc. These procedures shall be communicated to disabled inmates during the orientation process. These requirements shall also be incorporated into unit staff post orders.

Inmates with hearing impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

Local policies and procedures shall be adopted to reflect this obligation.

3. SPECIAL IDENTIFICATION

Each institution/facility (DPP designated institution, nondesignated institution, and reception center), shall ensure custody staff in housing units where an inmate with impairments that impact placement resides, maintains a copy of the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs of the inmate during count, emergency evacuation, verbal announcements, etc. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision impaired inmates in responding to ducats or emergency evacuations. These procedures shall also be incorporated into unit staff's post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

### 4. YARD IDENTIFICATION

a) Each inmate identified, per the CDC Form 1845, as having a hearing or vision impairment that impacts placement shall be issued an identifying vest by custody staff. The vest (yellow) shall identify (BLACK LETTERING printed on back of vest) the inmate's disability, i.e., vision or hearing impairment.

b) Identifying vests shall be issued to the inmate from the Department without a CDC Form 193, Trust Account Withdrawal Order. However, the inmate shall be financially responsible, except for normal wear, for damage, repair and replacement of identifying vests and shall be charged for the cost thereof through a CDC Form 193 in accordance with departmental policy and procedure.

c) All hearing or vision impaired inmates who are pending CDC Form 1845 verification or who have been verified to require placement in a designated DPP facility shall wear the vest at all times outside the inmate's assigned bed area or cell. The vest shall be worn over the inmate's outer clothing.

d) All hearing or vision impaired inmates who are able to function in a nondesignated facility with prescription lenses (acuity correctable to better than 20/200) or hearing aid shall be temporarily issued an identifying vest whenever the prescribed health care appliance is not available or working properly.

Those inmates shall wear the vest outside the inmate's assigned bed area or cell at all such times while their appliance is not available or working properly. These inmates shall not be required to wear the identifying vest when their health appliance becomes available and working properly.

### 5. EVACUATION PROCEDURES

Each institution/facility (DPP designated institutions, nondesignated institutions, and reception centers) shall ensure the safe and effective evacuation of inmates with disabilities.

Local evacuation procedures shall be adopted at each facility.

Each institution/facility (DPP designated institutions, nondesignated institutions and reception centers) shall ensure custody staff in housing units where inmates with disabilities that impact placement reside maintain a copy of

---

the identification card/picture for that inmate with the inmate roster, to alert unit staff of the special needs required for emergency evacuation of the inmate. Special needs may include personal notification for hearing impaired inmates, or assistance provided to vision or mobility impaired inmates in responding to emergency evacuations.

Evacuation procedures shall be effectively communicated to disabled inmates during the orientation process. These procedures shall also be incorporated into unit staff's post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

6. COUNT

Each institution/facility (DPP designated institution, nondesignated institution and reception center) shall ensure that inmates who have a verified disability that prevents them from standing during count shall be reasonably accommodated to provide for effective performance of count.

Each institution/facility shall develop local procedures to reasonably accommodate inmates who are unable to stand for count due to a verified disability.

All standing counts in units housing inmates with disabilities impacting placement shall be announced on the buildings PA system as outlined above in Section IV, 1, 2, (b) (Verbal Announcements and Alarms).

If there is a verified condition as reflected on a CDC Form 1845 or CDC Form 128C that prevents the inmate from standing during count, the inmate may be allowed to sit on his/her bed, or in a wheelchair next to the bed, etc. The standing count process will be communicated to disabled inmates during the orientation process. These requirements shall also be incorporated into unit staff post orders.

Inmates with impairments impacting placement who are temporarily housed at nondesignated institutions due to a change in condition or transferred in error shall be expeditiously transferred to DPP designated institutions as outlined in Section IV, D.

7. RESTRAINTS

Inmates who have a disability that prevents application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the supervisor in charge. Mechanical

restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

8.  **SEARCHES**

   *a)*  Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such searches shall be thorough and professional, with safety and security being the paramount concern.

   ❖  Inmates who use wheelchairs and who have severe mobility impairments and are unable to perform standard unclothed body search maneuvers shall be afforded reasonable accommodation to ensure a thorough search, including body cavities. If the search includes removal or disassembly of a health care appliance, it shall be conducted in a clean setting.

   ❖  If a search requires removal of the appliance, a compliant inmate shall be allowed to remove the appliance and tender it to staff. If forcible removal of an appliance from an noncompliant inmate is necessary, health care staff shall be available for consultation regarding the safe removal of the appliance.

   ❖  No inmate/parolee shall be required to lie or sit on extremely hot or cold surfaces to perform strip search maneuvers.

   ❖  Health appliances attached to the inmate's/parolee's body will be removed for inspection only during an unclothed body search.

   ❖  Complex devices (i.e., electronic medical devices, etc.) shall be disassembled for inspection only when there is reasonable cause to believe the inmate has concealed contraband inside the device. Inspection of such devices shall require approval from a Captain or above after consultation with appropriate medical staff. Only a trained professional shall disassemble such devices.

   *b)*  To ensure the safety of staff and inmates/parolees, all institutions/facilities (DPP designated institutions, nondesignated institutions, and reception centers) shall establish procedures for the routine inspection of health care appliances, i.e., inspection of a mobility impaired inmate's prosthetic device whose disability does not impact placement.

9.  **TRANSPORTATION**

   *a)*  The special needs of inmates with disabilities shall be considered in transporting them. An inmate's/parolee's special health care aids and appliances shall be transported with the inmate/parolee upon transfer.

b) Accessible vehicles shall be used to transport inmates/parolees in wheelchairs and those whose disability, i.e., mobility, necessitates specialized transportation. All other inmates/parolees shall be transported in standard vehicles.

c) Institutions/facilities/county jail facilities may contact the Transportation Services Unit (TSU) hubs directly to request transport of inmates/parolees who require transportation in accessible vehicles. When TSU does not have available resources to facilitate the required transfers, TSU shall coordinate with the sending institution/facility, who shall be responsible for arranging the transportation with local resources.

d) Request for accessible transportation must be received in advance so that the maximum number of requests can be scheduled utilizing existing resources.

e) The CDC will provide accessible transportation to mobility impaired inmates for BPT parole hearings, unless local law enforcement agencies do so themselves. The request for these transports must be received in advance by TSU so that the maximum number of requests can be scheduled utilizing existing resources If TSU resources are not available, the Regional Revocation Coordinator shall contact the nearest designated DPP institution for assistance.

f) All applicable transportation policies and procedures apply to DPP inmates.

10. TELECOMMUNICATION DEVICES FOR THE DEAF / TELEPHONES

Access and use of a Telecommunication Device for the Deaf (TDD) and telephones for inmates with disabilities shall be consistent with CCR, Title 15, Section 3282(h). Verification of an inmate's need for TDD may be confirmed with local health care services staff, the assigned Correctional Counselor, or by reviewing a copy of the CDC Form 1845. An inmate who has been approved by the institution to use the TDD and who wishes to call a party who does not have use of a TDD shall be permitted to use the California Relay Service.

If the inmate does not have a severe hearing/speech impairment but desires to call an outside party who requires the use of a TDD, the outside party shall forward a physician's statement of TDD verification to the inmate's Correctional Counselor. Upon meeting all verification requirements, the inmate may sign up for telephone calls according to his/her privilege group designation.

The TDD sign-up sheets covering seven days shall be maintained and logged weekly. Sign-up sheets shall be divided into 40-minute increments. The TDD calls shall have extended time increments due to the time delay associated with

the TDD relay process. TDD access for the hearing impaired shall be consistent and similar to telephone access provided for nondisabled inmates.

An inmate's request for use of a TDD for confidential purposes, i.e., attorney/client privilege, shall be in accordance with CCR, Title 15, Section 3282(g)(1) and (h). Any printer paper containing the text of the verbal exchange shall be relinquished to the inmate, if requested. Should the inmate not wish to retain the written text, staff shall dispose of the unread text in accordance with institutional policy and procedure regarding the disposal of confidential documents, etc. Public telephones with volume control will be accessible to inmates in all locations where inmates with hearing impairments are housed.

## 11. CLOSED CAPTIONED TELEVISION

All designated DPP institutions and RCs (with the exception of California State Prison-San Quentin, California Correctional Institution, Valley State Prison for Women, and Northern California Women's Facility) are to ensure that at least one institutional television, located in housing units where hearing impaired inmates reside, utilizes the closed captioned function at all times while the television is in use. If a housing unit has only one television, the institution is to purchase an additional television to offset any associated concerns/issues raised by hearing impaired inmates. Please note that funds were allocated to all designated DPP institutions and RCs (except those noted above) for the purchase of closed captioned televisions.

Nondesignated institutions are not required to have closed captioned television; however, may do so at the discretion of the Warden.

## 12. VISITING

a) Reasonable accommodation shall be afforded inmates with disabilities to facilitate their full participation in visiting as provided in these rules, whether contact, noncontact, or family visiting.

b) Noncontact visiting booths will be accessible for inmates with disabilities. Auxiliary aids and assistive devices, such as volume control or writing materials, shall be provided for effective communication for noncontact visits.

c) Inmates with disabilities shall be provided with the modifications necessary for them to participate in the contact visiting program. The modifications shall be provided as appropriate to assist inmates with their participation in the contact visiting program and shall be in a manner consistent with ensuring the safety and security of staff, inmates, or the public.

*d)*  Visitors shall not be permitted to bring in outside equipment for effective communication when it is available at the institution. Any equipment that visitors are permitted to bring in will be subject to search, pursuant to CCR, Title 15, Section 3173.

*e)*  Inmates with disabilities requiring accommodation for family visits shall give 72-hours notice of any request for accommodation to the institution staff responsible for setting up the family visit.

*13.* RECREATION

Reasonable accommodation for inmates with disabilities at designated facilities may include the provision of accessible recreation areas and specially fitted equipment. At nondesignated DPP institutions/facilities, requests for such accommodation may be granted on a case-by-case basis. The successful completion of a test to show proper and safe use of fitness apparatus items shall be required and documented on a CDC Form 128B.

*14.* INMATE PROGRAMS AND WORK ASSIGNMENTS

*a)*  It is the policy of CDC to ensure that all inmates, regardless of any type of disability, participate in educational/vocational, and work programs, including Prison Industry Authority and Joint Venture programs.

*b)*  Eligibility to participate in any program depends upon the inmate's ability to perform the essential functions of the program, with or without reasonable accommodations. Participation in these programs may be considered regardless of reading level if the inmate/student has the capacity to benefit from a program based on individual need and assessment. Inmates with disabilities shall be evaluated by health care services staff who will document the inmate's physical limitations and/or restrictions on a CDC Form 128C. A copy of the chrono will be forwarded to the inmate's Correctional Counselor who will schedule the inmate for classification committee review. The classification committee will determine if the inmate is able to participate in an academic/vocational, or work program based on the information provided by the health care services staff and a recommendation from the Inmate Assignment Lieutenant (IAL) or Work Incentive Coordinator (WIC).

*c)*  Reasonable accommodations shall be provided for dialysis inmates who may need to be excused from programs at times to permit dialysis treatment, including if necessary the times before and after the dialysis treatment when the inmate is not able to attend or return to the assigned programs. Such reasonable accommodations may include modified work or school schedules as long as reasonable accommodations do not prohibit the inmate from performing essential functions.

*d)* Reasonable accommodations for all other disabled inmates to access program assignments, as determined via classification committee review, may include, but are not limited to, a modified work or school schedule, early release to/from meals, or assignments for mobility/vision impaired inmates, etc.

*e)* Classification Committee actions shall be periodically monitored/audited to ensure that assignments of inmates with disabilities are nondiscriminatory.

*f)* Only when an inmate's disability, even with reasonable accommodation, renders the inmate ineligible to participate in any available academic/vocational or work program for which the inmate is otherwise qualified, will the inmate be deemed "Medical (or Psychiatric) Unassigned" or "Medically Disabled" by the Unit Classification Committee, consistent with Section IV, I, 19, b) of this plan. It will be only on the rarest of occasions that the classification committee will place an inmate on medical/psychiatric unassigned or medically disabled status.

*g)* Removal of an inmate from an academic/vocational or work program shall only be done by a classification committee, CCR, Title 15, Section 3375(c). When the work supervisor has determined that the inmate cannot perform the essential functions of the assignment, he/she must document the specific essential functions that the inmate cannot perform on a CDC 128B. The CDC 128B will be forwarded to the inmate's counselor. The counselor will schedule the inmate for a program review as soon as possible. The inmate will remain on "S" time pending the results of the program review.

*15.* ESSENTIAL FUNCTIONS

Essential functions are the basic duties/requirements of services, assignments, or programs an inmate/parolee performs, receives, or desires. This does not include the marginal duties of the position, services, assignments, or programs. Duties/requirements should be examined to determine which tasks are essential and which are nonessential.

*16.* VOCATIONAL ASSIGNMENTS

Reasonable modifications/accommodations shall be provided to ensure access when appropriate for qualified inmates with disabilities to participate in all programs, services, or activities including vocational assignments, unless affected by one of the exclusions as set forth in these rules. Participation in these programs may be considered regardless of reading level if the inmate/student has the capacity to benefit from a program based on individual need and assessment. The inmate, with or without reasonable accommodations, must meet the eligibility criteria of the vocational assignment as defined in the course description and be able to perform the essential functions of the

assignment. All inmates (including those with learning disabilities) shall be assigned on a case-by-case basis to appropriate work/academic/vocational programs by classification committee action.

## 17. ACADEMIC ASSIGNMENTS

Reasonable modifications/accommodations shall be provided to ensure access to academic programs. The individualized, self-paced learning format inherent in competency based instruction is available to inmates with disabilities who can perform the essential functions necessary for achieving the goals of the academic class. The competency based education model adopted for academic classes and vocational programs fosters individualized, self paced instruction for assigned students. Open entry and exit into and from the education programs is provided to allow inmates at all levels (including those with learning disabilities) to progress at their own speed and to begin or complete classes or programs within their own time frames.

## 18. CONSERVATION CAMPS

Inmates with disabilities shall not be precluded from assignment to a conservation camp based solely upon their disability. The CDC shall evaluate inmate disabilities in consideration of camp assignment on a case-by-case basis and shall determine if they are capable of performing essential functions of that assignment. When possible, without jeopardizing the fundamental nature of the camp program or legitimate penological interest, CDC may provide reasonable modifications for inmates with disabilities to allow participation in conservation camp assignments.

## 19. HEALTH CARE STATUS DETERMINATION

a) When an inmate's disability limits his/her ability to participate in an academic/vocational or work program, health care services staff shall document the nature, severity, and expected duration of the inmate's limitations on a CDC Form 128C and forward it to the inmate's assigned Correctional Counselor. The counselor will then schedule the inmate for classification committee review. The medical/psychiatric staff shall not make program assignment recommendations or decisions on the CDC Form 128C. The classification committee has the sole responsibility for making program assignment decisions based on information provided on the CDC Form 128C and evaluation of the inmate's ability to perform the essential functions of the assignment with/without any necessary reasonable accommodation. The classification committee, in conjunction with staff representation from the affected work area, academic/vocational program and the IAL or WIC, shall evaluate the inmate's ability to participate in work, educational and other programs. Based on the results of the classification committee's evaluation, a determination shall be made as to the inmate's program assignment and work group status.

*b)* Only when the inmate's documented limitations are such that the inmate, even with reasonable accommodation, is unable to perform the essential functions of any work, educational or other such program, will the inmate be placed in one of the two following categories by a classification committee:

❖ **TEMPORARY MEDICAL/PSYCHIATRIC UNASSIGNMENT** When a disabled inmate is unable to participate in any academic/vocational or work program, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to last for less than six months, the classification committee shall place the inmate on Temporary Medical/Psychiatric Unassignment. Inmates on Temporary Medical/Psychiatric Unassignment status shall be scheduled for classification review any time there are changes in his/her physical/mental impairment or no less often than every six months for a reevaluation of his/her status. The inmate's credit earning status shall be in accordance with CCR, Title 15, Section 3044 (b) (2), Work Group A2, upon exhaustion of any accrued ETO. If the inmate's condition lasts six months and the classification committee still cannot assign the inmate due to the impairment, his/her credit earning status shall be changed to be in accordance with CCR, Title 15, Section 3044 (b) (1), Work Group A1 and appropriate Privilege Group retroactive to the first day of the unassignment.

Note: The medical/psychiatric staff still has the authority to authorize short-term medical/psychiatric lay-in for illness as described in CCR, Title 15, Section 3043.5 (2) (A).

❖ **MEDICALLY DISABLED** When an inmate is unable to participate in any assigned work, educational or other such program activity, even with reasonable accommodation, because of a medically determinable physical or mental impairment that is expected to result in death or lasts for six months or more, the classification committee shall place the inmate on medically disabled status. The inmate credit earning status shall be in accordance with CCR, Title 15, Section 3044 (b)(1), Work Group A1 and Privilege Group A.

## 20. DISCIPLINARY PROCESS

*a)* Reasonable accommodations shall be afforded inmates with disabilities in the disciplinary process.

*b)* To assure a fair and just proceeding, the assignment of a Staff Assistant (SA) and/or an Investigative Employee (IE), as provided in CCR Sections 3315 (d)(1) and (2), may be required for the inmate. The inmate and/or SA or IE may need to be assisted by a bilingual aide or qualified interpreter in order to ensure effective communication.

Additional accommodations may be appropriate. All written notes utilized and exchanged for effective communication between the inmate and staff shall be attached and included with the disciplinary documents for placement in the inmate's central file.

*Space reserved for Test of Adult Basic Education (TABE)*

## 21. SPECIAL HOUSING PLACEMENT

The Department shall provide accessible special placement housing for inmates with disabilities as follows:

a) ADMINISTRATIVE SEGREGATION UNIT (ASU): Designated DPP facilities shall provide accessible ASU housing to accommodate inmates' disabilities. Where accessible ASU housing is unavailable, alternate placement may be made temporarily in another appropriate location consistent with CCR, Title 15, Section 3335, such as the highest security level accessible cell available. As a last resort prior to transfer to a designated DPP institution, an ASU inmate designated as "DPW" may be admitted by a physician temporarily to a medical bed when there is a medical judgment that the inmate requires nursing care consistent with that setting and/or there is a risk of possible injury to self if housed in a nonaccessible cell.

b) SECURITY HOUSING UNIT (SHU): Accessible SHU housing as provided in CCR, Title 15, Section 3341.5(c) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement. The SHU inmates unable to utilize a sports wheelchair to enter a SHU cell will be provided accommodation on a case-by-case basis.

c) PROTECTIVE HOUSING UNIT (PHU): Accessible PHU housing as provided in CCR, Title 15, Section 3341.5(a) shall be provided in at least one designated facility for inmates of each gender with disabilities affecting placement. Where accessible PHU housing is unavailable, alternate secured housing may be utilized temporarily.

d) CONDEMNED HOUSING: Condemned inmates at San Quentin with disabilities affecting placement shall be accommodated in existing condemned units. When alternate housing is necessary, a secure accessible location shall be provided. On a temporary basis, condemned inmates with disabilities affecting placement may be housed in an infirmary. Condemned inmates with disabilities are to receive access to the same type of programs as condemned inmates who are not disabled.

Any exceptions to participation must meet the exclusions outlined in Section II F of this plan.

*e)*  MEDICAL PLACEMENT: Inmates with disabilities may be admitted by a physician to a medical bed when there is a medical judgment that the inmate requires nursing care consistent with that setting and/or there is a risk of injury to self if the inmate is not so housed because no accessible cell is available.

Inmates with disabilities who are placed in medical beds because of their disability (including those placed in medical beds for the sole purpose of assistance with activities of daily living and those so placed because of a risk of injury to themselves) shall have access to equivalent programs and privileges for which they are eligible according to their privilege group and which they would be receiving if they were placed in a nonmedical setting unless the individual condition, needs, or limitations of the inmate make access to the program or privilege unreasonable. Such programs and privileges shall be provided in a manner that does not adversely impact health care operations. A program or privilege may be disallowed on a case-by-case basis if a physician determines that it would endanger the health or safety of the inmate or would impair health care.

When an inmate with a disability is housed in a medical setting because of an overriding medical need that requires nursing care, the inmate shall be afforded equivalent programs and privileges provided nondisabled inmates who are housed in that setting consistent with their medical needs.

22. REMOVAL OF HEALTH CARE APPLIANCES IN ASU/SHU/DISCIPLINARY DETENTION UNITS

Health care appliances, as defined in CCR, Title 15, Section 3358, shall be taken away from an inmate in ASU, SHU or other disciplinary detention units only to ensure the safety of persons, the security of the institution, or to assist in an investigation (which may include collecting the appliance as evidence of a crime) and only when supported by documented evidence. No inmate will be deprived of his or her appliance because of the acts of another inmate.

If the health care appliance presents a direct and immediate threat to safety and security, the appliance may be taken away immediately by any custody staff. The senior custody officer on duty may temporarily authorize the taking away of an inmate's appliance for any of the reasons listed in the foregoing paragraph; however, the process described below must be followed as soon as possible, at least by the next business day, if the appliance is to be retained. In no event shall the procedures set out herein obstruct standard protocols for crime scene preservation, evidence collection, emergency response or any other measure necessary for the safety of persons and security of the institution.

The inmate shall be deprived of the appliance for only so long as the appliance continues to pose a direct threat to safety and security.

When a health care appliance is taken away from an inmate for reasons of safety and security, the senior custody officer in charge shall consult the Health Care Manager, Chief Medical Officer or designee, regarding the inmate's need for the appliance and reasonable alternative in-cell accommodations. The senior officer in charge shall then inform the Warden or designee of the incident and the alternative means to accommodate the inmate. The Warden or designee shall decide what course to take regarding depriving the inmate of the appliance and providing alternative in-cell accommodation. If the decision is to retain the appliance, it will be stored in a designated location in the unit and provided to the inmate if needed when released from his or her cell for yard, escorts, visits, etc. During the period of alternative in-cell accommodation, health care staff shall regularly observe the health condition and document observed changes on a CDC Form 7219, Medical Report of Injury or Unusual Occurrence. If evidence of deterioration is observed, the health care staff shall immediately advise custody staff of need for medically necessary changes to the in-cell care.

The misconduct that caused removal of the appliance shall be charged against the inmate in an appropriate CDC Form 115, Rules Violation Report. The inmate shall be referred to the next scheduled classification committee hearing for confirmation of removal of the appliance, pending adjudication of the disciplinary charges. The inmate shall be deprived of the appliance as long as the appliance continues to pose a threat to the safety and security of the inmate or others. The necessity to continue the removal shall be reviewed by a classification committee at least as often as every 90 days. Review shall include a medical evaluation of the inmate's progress without the appliance.

The Health Care Manager or designee shall be consulted immediately to determine appropriate action to accommodate the inmate's needs. Accommodation may include modifying the appliance or substituting with a different appliance at CDC's expense.

A pattern of behavior involving the inappropriate use of a specific health care appliance may result in a custody decision to provide an alternate, but effective accommodation with medical consultation. In such case, the need for removal shall be approved by a classification committee.

Institution staff may replace the cane of an inmate placed in ASU/SHU/Disciplinary Detention Unit with other accommodations or useful care if there is a legitimate safety and security concern associated with allowing use of the cane.

## 23. APPEALS PROCESS FOR OBTAINING ACCOMMODATIONS

### a) GENERAL

An inmate/parolee with a disability may request an accommodation, to access programs, services, activities or grieve alleged discrimination, through the CDC Form 1824 appeal process. The CDC Form 1824 shall be readily available to inmates/paroles. Departmental staff shall provide assistance to all disabled inmates/parolees who require assistance in using the appeal.process.

The inmate/parolee shall submit the request for accommodation on a CDC Form 1824 to the Appeals Coordinator for the inmate's/parolee's facility or parole region. The inmate/parolee shall attach any relevant documentation of his or her disability that is in the inmate's/parolee's possession or is easily obtainable by the inmate/parolee. When an inmate/parolee files an accommodation or modification appeal on an inappropriate form, i.e., CDC Form 602, the Appeals Coordinator shall attach a CDC Form 1824 and process the appeal according to the timeliness in this section.

It is the mutual responsibility of the inmate/parolee and the CDC to verify a disability when a request for accommodation is made. The inmates/parolees must cooperate with staff's efforts to obtain documents or other information necessary to verify the claimed disability.

### b) APPEAL SCREENING PROCESS

Upon date of receipt, the Appeals Coordinator shall review the CDC Form 1824 to determine whether the appeal meets one or more the following guidelines:

❖ An issue covered in the Armstrong Remedial Plan.

❖ Allegation of discrimination on the basis of a disability under the ADA.

❖ A request for access to a program, service, or activity based on a disability.

❖ The appeal includes both ADA and non-ADA issues (respond to ADA issues first). Advise the inmate that he/she may file a CDC Form 602 to appeal the non-ADA issue.

❖ The appeal concerns an issue that substantially limits a major life activity.

If the Appeals Coordinator determines that the appeal meets the above criteria, it will be assigned to the appropriate Division Head for review and response.

If the inmate/parolee fails to provide documentation to verify a disability and specifically states that he/she does not have any relevant documentation in their possession and/or specifically states there is no relevant documentation contained in their files (central/medical/ education) and the request otherwise meets the eligibility criteria of CCR, Title 15, Section 3084, the Appeals Coordinator shall accept and log the appeal and assign it to the appropriate Division Head for the first level review as described below. Otherwise, the appeal shall be returned to the inmate with instructions to attach the required documentation as required in CCR, Title 15, Section 3084.3 (c)(5).

If the Appeals Coordinator determines that the appeal is not an ADA issue it shall be recategorized to the appropriate category and processed as a CDC Form 602 according to the provisions of CCR, Title 15, Section 3084. Reasons for recategorization may include, but not be limited to any of the following:

❖ The appellant complains about pain and requests medical treatment with no indication that program access is impeded.

❖ The appellant requests a transfer solely for medical treatment.

❖ The appellant requests medical treatment for a condition that does not substantially limit a major life activity as defined and verified in Section II A.

If the request is recategorized or rejected per CCR, Title 15, Section 3084.3 (exclusive of (c) (5)), a copy of the CDC Form 1824 shall be maintained on file in the Appeal Coordinator's office. Comments explaining the reason why the request was recategorized or rejected shall be entered in the comments field of the Inmate Appeals Automated Tracking System or similarly documented in the Regional Parole Reentry Unit.

c) MEDICAL VERIFICATION PROCESS

If the appeal requires medical staff verification of a disability and/or identification of associated limitation, the Appeals Coordinator shall refer the CDC Form 1824 to medical staff.

❖ Medical staff should examine the unit health record (UHR) without delay, in any event within 5 working days of the date the appeal was received by the Appeals Coordinator. If health care staff locate verification of the disability and any associated limitations within the

unit health record (UHR), health care staff shall note that such documentation exists and/or attach relevant copies of any CDC Form 128Cs or CDC Form 1845s and return the appeal to the Appeals Coordinator within 5 working days of initial receipt by the Appeals Coordinator.

The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within 15 working days of initial receipt by the Appeals Coordinator.

If verification is not available in the UHR, medical staff shall determine whether a disability exists and identify and document any associated limitations and return the appeal to the Appeals Coordinator within 15 working days of receipt by the Appeals Coordinator. The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within the required time frames as outlined in Section e).

If verification is not available in the UHR and health care staff determine that referral to an expert consultant (outside of CDC) is required to make the necessary evaluations as to whether a disability and any associated limitations exist, within 10 days of the determination, an appointment with the expert consultant shall be scheduled. Upon determination that expert consultant is required, medical staff shall inform the Appeals Coordinator of the referral and the appeal time frames shall be suspended until the expert consultants report is received by health care staff.

❖ Upon receipt of the expert consultant's report, the appeal with all required documentation shall be returned to the Appeals Coordinator within 5 working days. The Appeals Coordinator shall then assign the appeal to the appropriate Division Head responsible for responding to the request for accommodation who shall respond within the required time frames as outlined in Section e).

*d)* NONMEDICAL VERIFICATION PROCESS

If the appeal requires verification of a nonmedical disability, e.g., learning disability, the Appeals Coordinator shall refer the CDC Form 1824 to the appropriate Division Head for response within the required time as outlined in Section e).

❖ The Division Head or designee shall review the central file to determine whether the nonmedical disability can be verified from a CDC Form 128B, or other applicable records.

---

❖ If the Division Head or designee is not able to verify the nonmedical disability in the above manner, he/she shall contact education or other appropriate staff for access to additional records or information. If the Division Head or designee is able to verify the disability in this manner, he/she shall ensure that documentation of the disability is added to the inmate/parolee's central file and respond to the request for accommodation or alleged discrimination within the required time frames as outlined in Section e).

❖ If the Division Head or designee is not able to verify the disability in the above manner, he/she shall conduct a face-to-face first level interview with the inmate/parolee. If the reviewer determines that there was discrimination or that the appellant would benefit from the requested reasonable accommodation or modification, he/she shall document that finding in the inmate's central file. The reviewer shall respond to the request for accommodation or alleged discrimination within the required time frames as outlined in Section e).

❖ If the Division Head or designee is not able to verify the disability in the above manner, he/she shall either grant the requested accommodation or requested remedy for discrimination, deny the appeal based on provisions outlined in Section II, H, within the required time frames as outlined in Section e) or shall refer the inmate/parolee to appropriate staff, expert consultant, for verification of the alleged nonmedical disability.

❖ If the inmate is referred to an expert consultant (outside of institution) for verification, the assigned Division Head shall inform the Appeals Coordinator of the referral and the appeal time frames shall be suspended until the expert consultants report is received by the Division Head.

❖ An appointment with the expert consultant (outside of CDC) shall be scheduled within 10 days of the referral. The expert consultation shall be scheduled to occur at the earliest available date.

❖ Upon receipt of the expert consultant's report, the appeal with all required documentation shall be responded to by the assigned Division Head and returned to the inmate via the Appeals Coordinator within 15 working days.

In appropriate circumstances the Appeals Coordinator or the assigned Division Head may temporarily grant an accommodation pending verification of an alleged disability, on the condition that the accommodation will be withdrawn if CDC is unable to verify the disability. Such conditional grants are particularly appropriate where the lack of an accommodation may cause serious or irreparable harm.

An appeal requesting an accommodation may be denied by appropriate staff, i.e., Warden or designee, Appeals Coordinator or Division Head, based on any of the criteria outlined in ARP, Section II, H, Justification for Denial of Requests for Reasonable Accommodation.

e)  TIME FRAMES

A nonemergency CDC Form 1824 appeal is subject to three formal levels of review:

❖  FIRST LEVEL OF REVIEW:  The first level of review is made by the appropriate Division Head or designee, who shall render a decision and return it to the inmate/parolee within 15 working days of receipt of the request by the Appeals Coordinator, except for item f) below.  The decision shall be set forth on the CDC Form 1824.

❖  SECOND LEVEL OF REVIEW:  The second level of review is initiated by the inmate's/parolee's attaching the request to a CDC Form 602, Inmate/Parolee Appeal Form, completing Section F, and forwarding the document to the Appeals Coordinator within 15 working days of receipt of the decision of the Division Head.  In Section F, the inmate/parolee shall explain the nature of dissatisfaction and suggest an appropriate resolution.  The Appeals Coordinator shall forward the second level appeal to the Warden, Health Care Manager, or Regional Parole Administrator or designee, who must render a decision and return it to the inmate/parolee within 10 working days of receipt, or 20 working days of receipt if the first level of review is bypassed.

❖  THIRD LEVEL OF REVIEW:  The third level of review is initiated by the inmate/parolee's resubmitting the appeal to the Director's office within 15 working days of receipt of the decision by the Warden or Administrator.  The third level response is made by the Director or designee, who shall render a decision and return it to the inmate/parolee within 20 working days from receipt.

❖  EXTENSION OF TIME:  A nonemergency request for accommodation made through the CDC Form 1824 process is not subject to the exceptions to the appeals time limits found in CCR, Title 15, Section 3084.6(b)(5).

f)  EXPEDITED APPEAL PROCESS

If the request for accommodation involves a matter that presents an immediate threat to the inmate's/parolee's safety, health or well being, or may result in other serious or irreparable harm, the request shall be processed according to the expedited appeal process described in CCR, Title 15, Section 3084.7.  The inmate/parolee shall identify the appeal as an

emergency; however, the Appeals Coordinator shall review each appeal to ascertain those that qualify for expedited processing and shall respond accordingly. Appeals that qualify for an expedited appeal may included, but are not limited to, the following:

❖ Providing appliances or aids that are essential to performing major life activities;

❖ Providing equipment or modifications essential to safety; and

❖ Providing assistance to permit effective communications in due process settings or for health care provider communications.

Other provisions of these rules pertaining to inmate/parolee appeals not addressed herein shall apply.

24. SUBSTANCE ABUSE AND CIVIL ADDICT PROGRAMS

a) SUBSTANCE ABUSE TREATMENT: The Department shall provide accessible long-term intensive substance abuse treatment programs for male and female inmates with disabilities comparable to those programs provided to nondisabled inmates.

❖ Currently the Substance Abuse Program at the California Substance Abuse Treatment Facility and State Prison at Corcoran (SATF) is designated to provide substance abuse treatment for male inmates with disabilities.

❖ Currently the Substance Abuse Program at the Central California Women's Facility (CCWF) is designated to provide substance abuse treatment for female inmates with disabilities.

b) CIVIL ADDICT PROGRAM: The Department shall provide accessible placement for male and female civil addicts with disabilities in a Civil Addict Program (CAP) comparable to that provided to nondisabled civil addicts.

❖ Currently, SATF is the designated satellite CAP for male civil addicts with disabilities requiring designated DPP placement.

❖ Currently, CCWF is the designated satellite CAP for female civil addicts with disabilities requiring designated DPP placement.

❖ All male civil addict commitments arriving at the California Rehabilitation Center (CRC) who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred as soon as possible but no later than seven days to another institution, currently the California Institution for

---

Men's (CIM) RC, for further evaluation/verification and processing consistent with CAP policies and procedures.

❖ All female civil addict commitments arriving at CRC who are preliminarily identified with a permanent disability that may impact placement during the initial RC process, will be transferred as soon as possible but no later than seven days to another institution, currently the California Institution for Women's (CIW) RC for further evaluation/verification and processing consistent with CAP policies and procedures.

❖ Upon completion of RC processing, inmates who are suitable for the CAP will be transferred to SATF or CCWF if their disability impacts placement, or CRC if their disability does not impact placement.

## J.  BOARD OF PRISON TERMS ACCOMMODATION PLAN

It is the policy of the BPT to provide equal access to all parole proceedings to inmates/parolees with disabilities, with or without reasonable accommodation. It is the Board's objective to ensure that its communications with inmates/parolees with disabilities are as effective as communications with inmates/parolees without disabilities. Effective communication is imperative in assuring due process and equal access.

Department staff shall facilitate reasonable accommodations in parole proceedings by serving the BPT Form 1073, Reasonable Accommodation Notice and Request, with other prehearing documents. This will ensure effective communication with inmates to assist them in completing the form, and by providing to the BPT documentation pertaining to inmates/parolees' verified disabilities.

It is the responsibility of the inmate/parolee to request a reasonable accommodation in order to ensure effective communication and/or equal access by correctly completing the BPT Form 1073. When an inmate's/parolee's disability impedes his/her ability to request an accommodation, it is the responsibility of CDC and/or BPT staff who are aware of the disability, or should be reasonably aware of the disability, to request reasonable accommodation on his/her behalf.

In such cases where an inmate/parolee is unable to complete the form due to his/her disability, it is the responsibility of the BPT and/or CDC staff who are aware or should be reasonably aware of such disability to assist/complete the BPT Form 1073 for the inmate/parolee.

Effective January – March 2001, all case-carrying parole agents shall initiate the BPT Form 1073 for all parolees under their supervision. New releases not processed through the RC shall have the BPT Form 1073 initiated during their initial interview. The CDC and BPT will work to develop a tracking system, which captures central file and medical file information regarding disabilities covered by

the ADA. The BPT will provide guidelines for Unit Supervisor review of the parole violation report. Cases that are subsequently referred for revocation will follow the adopted Parole Revocation Process.

The counselor/parole agent shall review the central/field file for documentation (i.e., CDC Form 1845, CDC Form 611, CDC Form 128C) to determine whether or not the inmate has been verified with a disability. The BPT Form 1073, with all supporting documents on the issue of the disability, shall be forwarded to the BPT Americans with Disabilities Act (ADA) Coordinator at least 21 calendar days prior to the scheduled hearing. The original copy of the BPT Form 1073 shall be filed in the BPT section of the central file along with the other prehearing documents.

Inmates/parolees who elect to file a grievance based on the denial of their request for accommodation submitted on a BPT Form 1073. All complaints related to denials of requests for accommodations shall be handled by the grievance process, BPT Form 1074, Review of Reasonable Accommodation Request and Grievance Process. All BPT Form 1074 grievances will be sent directly to the Chief Deputy Commissioner along with supporting documents; i.e., BPT Form 1073, etc. The Chief Deputy Commissioner shall render a decision within five working days from the date the BPT received the copy of the BPT Form 1073 and BPT Form 1074 forms and/or other relevant information. The inmate/parolee may also pursue the denial after the BPT hearing using the BPT Form 1040 appeal with accompanying BPT Form 1073 and BPT Form 1074 forms attached.

The BPT subpoenas to witnesses and notifications to victims and/or their families will include instructions to contact the BPT ADA Coordinator 10 days prior to the hearing for any disability related accommodation request.

### K.   COMMUNITY CORRECTIONAL REENTRY CENTERS

Inmates with disabilities will not be excluded from participation in the Community Correctional Reentry Center (CCRC) program based solely on their disability. The CDC will place inmates who require special placement in designated CCRC facilities. At least one designated CCRC to accommodate inmates of each gender will be maintained to serve in each of CDC's four parole regions.

An inmate requiring accommodation, otherwise eligible for CCRC placement but without a designated facility within or servicing his/her county of last legal residence, will be endorsed for placement in an appropriate designated CCRC facility.

Inmates shall be considered for CCRC placement based on the totality of their classification criteria and medical/psychiatric needs. Overriding ongoing medical or psychiatric treatment needs may disqualify an inmate from CCRC placement.

Contracts with CCRC contractors shall require the contractor to adhere to the ADA. However, nondesignated facilities need not be fully accessible to inmates with disabilities.

### L. DESIGNATED COMMUNITY CORRECTIONAL REENTRY CENTERS

Currently, the following CCRCs have been designated for permanent placement and housing of inmates meeting the eligibility criteria. The CDC is currently seeking additional locations for placement of female inmates in Region 1 and Region 11 through the State contracting process. Designated CCRCs are subject to change to increase DPP placements or to replace designated facilities.

| NAME OF CENTER | LOCATION | GENDER | REGION |
|---|---|---|---|
| Turning Point, "G" Street | Fresno | male | I |
| Volunteers of America, Oakland West | Oakland | male | II |
| Marvin Gardens | Los Angeles | male | III |
| Volunteers of America, Long Beach | Long Beach | male | IV |
| California Mother-Infant/Project Success | San Diego | female | IV |
| Working Alternatives | Los Angeles | female | III |

Note: These designated CCRC's may change.

### M. HUB INSTITUTIONS

Identified below are the current HUB institutions and the CCRC's they serve.

| HUB INSTITUTION | CCRC'S SERVED |
|---|---|
| COR | Turning Point, G Street |
| SQ | Volunteers of America, Oakland West |
| CIM | Marvin Gardens, Los Angeles |
| CIW | Working Alternatives, Inglewood; California Mother/Infant Project Success |
| CRC | Volunteers of America, Long Beach |

The HUB institution responsibilities are:

- To provide nonroutine medical and dental care to DPP inmates.

- To enter into ambulance, medical, and dental contracts within the surrounding area of the designated CCRC for emergency and ongoing care that otherwise cannot be effectively managed at the CCRC.

- To transport inmates to complete the DPP verification process when necessary.

### N.   TRANSPORTATION

Institutions shall notify the Community Correctional Center Administration and the Regional Reentry Coordinator (RRC) at least one week prior to transferring DPP inmates endorsed for special placement at designated DPP CCRC's. The RRC shall coordinate transportation with the Transportation HUB.

The TSU shall be responsible for arrangement of DPP inmate/parolee transportation to the sending and/or receiving institution as outlined in Subsection 18, Transportation. If a DPP inmate/parolee requires staff administered medication or medical treatment during transportation from a CCRC to a HUB institution or to an established health care provider, the inmate/parolee shall be transported by ambulance or as directed by the HCM or designee. The TSU will not be responsible for coordinating such moves. The TSU responsibilities for DPP inmates/parolees at CCRC's include:

Initial transports to the facility.

Medical/dental transports.

Disciplinary roll-up transports.

Administrative roll-up transports.

The TSU shall conduct medical/dental, disciplinary, and administrative transports upon request from CDC staff at the designated CCRC. After hours emergency transportation needs for DPP inmates housed in a CCRC shall be handled through the appropriate Regional Administrative Officer of the Day (AOD). The AOD shall call TSU to arrange for immediate transport. The HUB institution's contracted ambulance service shall conduct all medical emergency transportation of DPP inmates at CCRC's.

The TSU shall transport DPP parolees held in county jails as "Our Hold Only" to CDC institutions, court proceedings, and parole revocation hearings in accordance with TSU transportation policy.

### O.   FAMILY FOUNDATIONS PROGRAM

Selected Family Foundations Program (FFP) facilities shall be designated as new facilities are approved. The FFP currently has two operational programs located in Santa Fe Springs and San Diego. The third program located in Fresno is scheduled to be operational in July 2001. Each program is designed to be appropriately accessible to inmates with disabilities. The Women and Children's Services Unit (WCSU) will place eligible women in an appropriate FFP facility in accordance with the CDC's policy.

*P.* COMMUNITY PRISONER MOTHER PROGRAM

The WCSU has identified two Community Prisoner Mother Program (CPMP) facilities as appropriately accessible to inmates with disabilities that impact placement. Eligible women identified as meeting DPP criteria will be placed into the following CPMP location:

| NAME OF CENTER | LOCATION |
|---|---|
| Prototypes Women's Center | Pomona |
| Booth Family Apartments | Oakland |

*Q.* FACILITIES OPERATED UNDER CONTRACT

The CDC shall include substantially the following language in all of its contracts for the operation of facilities that provide services, programs or activities for inmates or parolees: "By signing this contract, Contractor assures the State that it complies with the Americans with Disabilities Act of 1990, 42 United States Code, Section 12101, et seq., which prohibits discrimination on the basis of disability, and with applicable regulations and guidelines issued pursuant to the ADA."

The fact that the CDC includes this language in each contract shall not preclude the CDC from employing the "clustering approach" to providing accessible community-based facilities for inmates and parolees. The CDC will provide at least one DPP-accessible facility to serve male and female inmates/parolees in each parole region.

*R.* CONSTRUCTION POLICY

*1.* NEW PRISON CONSTRUCTION

It is the policy of CDC to provide for structural accessibility to inmates with disabilities in the construction of new prisons, consistent with this policy. In new prison construction, two percent of designed bed capacity will be designed to be structurally accessible. All program and common use areas shall be designed and built to be ADA compliant. The CDC will "cluster" accessible beds and aligned program areas within specified structures and facilities of new prisons.

During the design phase of each new prison, CDC will determine whether the prison is to be designated to house inmates requiring specialized housing under DPP. When a new prison is so designated, CDC will determine whether the two percent scoping standard is sufficient or should be increased.

2. ALTERATION TO EXISTING FACILITIES

With respect to existing DPP facilities, alterations to inmate areas that house inmates with disabilities will be designed to be accessible, pursuant to state and federal accessibility standards. With respect to nondesignated DPP facilities and areas of DPP facilities that will not house inmates with disabilities, structural alterations will be reviewed in view of budgetary and penological considerations on a case-by-case basis.

S. PAROLE FIELD OPERATIONS ⟶ This section of the remedial plan has been revised. The new Parole Field Operations section is attached to the end of this document.

1. POLICY

It is the policy of the Department to provide reasonable accommodation to parolees with disabilities consistent with established departmental policies and procedures. Parole planning and supervising is conducted on a case-by-case basis to meet the unique needs of the parolee while protecting legitimate parole interests of CDC.

2. RELEASE PROGRAM STUDY

Prior to a parolee's release from custody, a CDC Form 611, Release Program Study, shall be used to provide documentation and notice to field staff of special needs related to the parolee's disability; e.g., need for qualified interpreters, referral to the California Department of Rehabilitation, or need for TDD access. The C&PRs are responsible for notifying parole field staff, via the CDC Form 611 process, if an inmate has a verified disability and delineate the inmate's specific needs. The CDC Form 611 shall be forwarded to the appropriate parole region at least 210 days prior to the inmate's release date in order to ensure sufficient time for reentry processing.

3. EFFECTIVE COMMUNICATION

Field staff shall ensure that parolees with disabilities, upon reporting to a parole unit, are afforded effective means of communication in receiving orientation, Conditions of Parole, e.g., Penal Code, Section 290 Registration, etc. If the parolee's disability prevents the parolee from reporting to the assigned unit, reasonable accommodation shall be made to meet the parolee's needs.

4. WRITTEN COMMUNICATION

Each Parole Office shall ensure that the CCRs, Notices, Orientation Packages, Conditions of Parole, Job Announcements, and similar printed materials that are distributed to parolees are accessible to parolees with disabilities. Accommodations such as large print, computer assisted devices, audio tapes and Braille shall be provided when necessary. Parole staff shall provide the

assistance and make available equipment necessary to all parolees with disabilities on a case-by-case basis to ensure that parolees who have difficulties reading and/or communicating in writing will be provided reasonable access to forms, regulations and procedures.

5. **FIELD SUPERVISION/OFFICE VISITS**

Parole Agents shall continue to follow existing procedures as they pertain to the supervision of parolees. The main services received by parolees in a parole office are basic counseling services and supervision provided by the parole agent and mental health services, including testing, counseling and prescribed medication, provided by the Parole Outpatient Clinics. However, if a parolee has a disability, the unit supervisor, or designee, shall make reasonable modifications in procedures, if necessary, to ensure that services are provided at an accessible location; i.e., parole office or parolee's residence.

It is the mutual responsibility of the parolee and the P&CSD to verify disabilities that might affect the parolees' placement in community programs and functioning while in the community and of verifying credible claims of a disability in response to a request for reasonable accommodations. Verification of a disability shall be achieved by completing a BPT Form 1073. All case-carrying agents are required to automatically screen all active parolees under their supervision on or before January/March 2001, to identify all parolees with disabilities. New releases, not processed through an RC, shall be screened during the initial interview process. Parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

6. **PURCHASE OF HEALTH CARE APPLIANCES**

If a parolee is indigent, the Department operates under the reasonable assumption that he or she may qualify for Medi-Cal or Medicare benefits that would cover the financial responsibility of any/all health care appliances. If the parolee does not qualify for Medi-Cal or Medicare benefits, or the application process exceeds normal processing time frames, or the processing delays, hinders, or exacerbates the parolee's medical conditions, the CDC will provide financial assistance to the parolee in accordance with departmental policy and procedure. No parolee shall be denied a health care appliance solely because he/she is indigent.

7. **MAINTENANCE AND REPAIR OF WHEELCHAIRS**

Whenever an appliance, exclusive of wheelchairs, is in need of repair or replacement, the parolee shall report the repair need to their parole agent for a determination on the appropriate steps for accomplishing the repair, e.g., return to the physician/health care provider who prescribed the appliance for an appointment to evaluate the condition of the appliance or to a legitimate repair

agency or medical supply vendor. Once the need for repair or replacement is verified, the parolee shall follow the prescribed process for repair/replacement as set forth by his/her benefit provider. The parolee shall be responsible for damage, repair and replacement of appliances, parts and batteries. In the event the benefit provider does not cover the total cost of the repair or replacement and the parolee or their families are unable to absorb the difference in cost, the Department will provide financial assistance to the parolee in accordance with departmental policy and procedure.

8.  **PAROLE OUTPATIENT CLINICS**

The Parole Outpatient Clinic shall provide evaluation or mental health diagnosis, and transitional, or occasionally, sustained therapeutic intervention on an outpatient basis to parolees with disabilities who have an Axis I diagnosis. Treatment services may be supplemented by interagency agreements/contracts with other state and county agencies. All nonroutine services shall be reviewed by the Regional Parole Administrator and Mental Health Program Administrator prior to implementation.

9.  **EVACUATION PROCEDURES**

    a)  In the event of an emergency requiring building evacuation, each parole office shall ensure the safe and effective evacuation of parolees with disabilities.

    b)  Local evacuation procedures shall be adopted at each parole office.

10. **RESTRAINTS**

Parolees who have a disability that prevents the application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodation, under the direction of the Unit Supervisor or designee. Mechanical restraints shall be applied so as to assure effective application while reasonably accommodating the parolee's disability.

11. **TRANSPORTATION**

The special needs of parolees with disabilities shall be considered in transporting them. A parolee's special health care aids and appliances shall accompany the parolee upon transport. All applicable transportation policies and procedures apply to DPP parolees.

12. REVOCATION HEARINGS

If a parolee has a physical disability that impairs his/her ability to attend the hearing or communicate effectively with the hearing officer, then arrangements shall be made in advance to provide modifications for the disability. Refer to BPT, CCR, Sections 2692 and 2694 for further details.

T.    TRAINING

The CDC will provide DPP training to institution/parole staff on ADA regulations and DPP requirements. This training shall include but not limited to evacuation and emergency procedures, reasonable accommodations and effective communication.

STATE OF CALIFORNIA
INMATE/PAROLEE DISABILITY VERIFICATION (I/P DV)
CDC 1845 Provisional (Rev. 01/01)

DEPARTMENT OF CORRECTIONS

*CHECK ALL OF THE BOXES APPLICABLE*

| INMATE'S NAME: | CDC NUMBER: | INSTITUTION: | HOUSING ASSIGNMENT: | DATE FORM INITIATED: |
|---|---|---|---|---|
|  |  |  |  |  |

*Section A - E to be completed by a physician only*

### SECTION A: REASON FOR INITIATION OF FORM

☐ Inmate voluntarily self-identified to staff

☐ Observation by staff    ☐ Third party evaluation request

☐ Medical documentation or Central File information

### SECTION B: CATEGORIES OF DISABILITY

☐ Blind/Vision Impaired        ☐ Speech Impaired

☐ Deaf/Hearing Impaired       ☐ Other

☐ Mobility Impaired

### SECTION C: DISABILITIES IMPACTING PLACEMENT

1. ☐ PERMANENT WHEELCHAIR USER -DPW

2. ☐ PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-DPM
   *Cannot* walk 100 yards or up a flight of stairs without pausing *with* the use of aids (crutches, prothesis, or walker).

3. ☐ PERMANENTLY DEAF/HEARING IMPAIRED-DPH
   So severe they must rely on written communication, lip reading or signing as their residual hearing, with aids, will not enable them to hear an emergency warning, or effectively communicate.

4. ☐ PERMANENTLY BLIND/VISION IMPAIRED -DPV
   *Not* correctable to central vision acuity of less than 20/200 *with* corrective lenses.

5. ☐ PERMANENT INDISCERNIBLE/NO SPEECH-DPS
   *No* effective written communication.

6. ☐ OTHER IMPACTING PLACEMENT (See Comments below)-DPO

### SECTION D: DISABILITIES *NOT* IMPACTING PLACEMENT

A. ☐ PERMANENTLY MOBILITY IMPAIRED (Lower Extremities)-DNM
   Walks 100 yards and up a flight of stairs without pause
   ☐ *without* aids ☐ *with* aids (crutches, prothesis, or walker)

B. ☐ PERMANENT NONAMBULATORY MOBILITY IMPAIRMENT
   (e.g., arm or hand prostheses, or missing digit(s))

C. ☐ PERMANENTLY HEARING IMPAIRED-DNH
   With residual hearing at a functional level *with* hearing aid(s).

D. ☐ PERMANENTLY BLIND/VISION IMPAIRED-DNV
   *Correctable* to central vision acuity less than 20/200 with corrective lenses.

E. ☐ PERMANENT INDISCERNIBLE/NO SPEECH-DNS
   Communicates *effectively* in writing.

### SECTION E: Additional Medical Information

List assistance needed with daily living activities: *(i.e., eating, bathing, dressing, etc.)*

_____

_____

_____

Per 128C(s) dated: _____

Has the following documented health care needs:

☐ In-patient    ☐ Sun Sensitive    ☐ Out-patient

☐ Heat Risk/Alert    ☐ Cannot be exposed to particulates in the air

Refer to 128C(s) dated:

☐ DISABILITY **NOT** VERIFIED *(Explain in comments section)*

☐ VERIFIED DISABILITY IN:
   ☐ SECTION C        ☐ SECTION D

#### DOCUMENTED MENTAL HEALTH NEEDS

☐ CCCMS    ☐ EOP    ☐ MHCB    ☐ DMH

Refer to 128C(s) dated:

### SECTIONS A through E COMPLETED BY:

| Physician's Name (Print) | Physician's Signature | Date Signed |
|---|---|---|
|  |  |  |

### SECTION F: ADDITIONAL PLACEMENT FACTORS AND INFORMATION

*For completion by correctional counseling staff*

☐ Uses American Sign Language (A.S.L.)

☐ Uses Signing Exact English (S.E.E.)

☐ Communicates in writing    ☐ Reads lips

☐ Reads braille    ☐ Requires large print

☐ NO ADDITIONAL INFORMATION AVAILABLE

SECTION F COMPLETED BY:

| NAME: | TITLE: | DATE SIGNED: |
|---|---|---|
|  |  |  |

### COMMENTS

_____

_____

STATE OF CALIFORNIA                                    **GENERAL INSTRUCTIONS**                           DEPARTMENT OF CORRECTIONS
INMATE/PAROLEE DISABILITY VERIFICATION (I/P DV)
CDC 1845 Provisional (Rev. 01/01)

This process does **not** require nor is it to result in the automatic screening of all inmates/parolees to identify disabilities. This process ensures standardization of CDC policy and procedures dealing with the verification of a disability and placement of inmates/parolees with disabilities covered by the Disability Placement Program (DPP).    The use of this form will be initiated only in response to one or more of the following actions:

    a)  The inmate/parolee voluntarily self-identifies or claims to have one of the six categories of disability;
    b)  During interaction with the inmate/parolee, staff observes what appears to be a disability, severe enough to impact placement, affect program a, or present a safety/security concern;
    c)  The health or central file record contains documentation regarding one of the six categories of disability.
    d)  A third party (such as a family member) requests an evaluation of the inmate or parolee for an alleged disability.

Identification of inmates/parolees who may meet the DPP parameters will usually occur during reception center processing, but if an inmate/parolee appears to meet disability criteria indicated on the form, all of the institution/facilities will use the I/PDV. A verification referral, based on observation or interaction with the inmate/parolee, can be directed to the institution/facility health care service by a staff member via a CDC Form 128B.

Responsibility for verification of the disability through completion of Sections A-E of the I/PDV, rests with the health care services physicians. Health care staff shall follow CDC protocols for verifying disabilities. These protocols are set forth in Exhibit B (or other official CDC document that includes protocols). Upon completing Sections A through E, the physician signs in the appropriate signature block in Section E. Health care staff forwards the partially completed I/PDV to the Classification and Parole Representative or RC CC III for tracking. Counseling staff completes the form by completing Section F and signing the signature box below Section F. Appropriate education staff shall verify learning disabilities by completing Sections A, B, and D. The staff member shall complete the identifying information and explain needed accommodations (if any) in the Comments Section. Learning disabilities will be verified only to determine the need for reasonable accommodation.

*COMPLETION OF THE FORM:*
Enter identifying information about the inmate/parolee and the date the I/PDV was initiated.

**SECTION A:** Mark the reason for initiating this form in the appropriate box.
**SECTION B:** Mark the category of disability to be verified. *If it is determined during the verification process the inmate/parolee does not have one of the six categories of disability, completion of this form should stop. Place a check in the box below Section D, indicating "Disability not Verified," enter an explanation in the Comments Section, sign and date the incomplete form, and file the original in the General Chrono section of the central file and a copy in the health record.*
**SECTION C:** A mark made in any of these boxes, indicates a need for special housing or programming and will result in placement in one of the designated institutions or facilities. NOTE: The word *permanent* is defined as a condition not expected to improve within six months. Check all boxes that apply using the definitions below:
*IF THE INMATE/PAROLEE:*
--Uses a wheelchair full time due to a permanent condition and requires use of the wheelchair both within and outside the assigned cell, check box 1.
--Cannot walk 100 yards or up a flight of stairs without stopping due to a permanent lower extremity ambulatory impairment and do not require a wheelchair full time but is medically prescribed a wheelchair for use outside of the assigned cell, check box 2.
--Must rely on written communication, lip reading or signing because their residual hearing even if augmented by aids, will not enable them to hear an emergency warning or to effectively communicate, check box 3.
--Is permanently blind or has a vision impairment not correctable to central vision acuity of less than 20/200 *with* corrective lenses, check box 4.
--Has a permanent speech impairment resulting in indiscernible speech or NO speech and does not communicate effectively in writing, check box .
--Has a permanent disability other than the five identified, or do not require a wheelchair full time but is medically prescribed a wheelchair for use outside of the assigned cell, due to a disablity other than a lower extremity mobility impairment, i.e., emphysema, serious heart condition, etc., and it is severe enough the inmate would benefit from placement in a designated institution, check box 6.

**SECTION D:** A mark made in any of these boxes will not necessarily result in the placement of the inmate/parolee in special housing or programming in one of the designated institutions/facilities, unless 1) a disability in Section C exists, or 2) the severity/compound condition results in a physician recommendation for DPP placement. For this type of recommendation, a CDC Form 128C and notes in the Comments Section should be completed by the physician. Check all boxes that apply using the definitions below:
*IF THE INMATE/PAROLEE:*
--Has a lower extremity ambulatory impairment but can walk 100 yards and up a flight of stairs without pausing. Mark box "A" and with or without aids.
--Uses an upper extremity prosthesis, is missing an arm, hand or digits, check box "B."
--Has a hearing loss but follows conversation at normal speaking levels and can hear an emergency warning using a hearing aid(s), check box "C."
--Can see well enough to score better than at a 20/200 level with corrective lenses, check box "D."
--Has indecernible or no speech but communicates effectively in writing, check box "E."

**SECTION E:** If there has been CDC Form documentation, medical file review, health care staff observation or interaction with the inmate/parolee, health care staff must complete this section.
*IF THE INMATE/PAROLEE:*
--Need assistance with daily living activities, list both the needs and the date of the 128c documenting the need(s).
--Has documented health care or mental health needs, mark the appropriate box(es) and list by date the 128c(s) that note the condidtion(s).

**SECTION F:** If there has been CDC Form 128C documentation, Central File review, staff observation or interaction with the inmate/parolee, counseling staff must complete this section. If none of these factors exist, and there are no additional factors or information, mark the "NO ADDITIONAL INFORMATION AVAILABLE" box, sign, date, and insert title in the signature box.
*IF THE INMATE/PAROLEE:*
--Claims ability to communicate effectively by sign language (list years of training and years of use in the Comments Section), reading lips, Braille, reading large print, or by writing, mark the box(es) that apply.

COMMENT SECTION: For notes, references, explanations of disabilities and any information not listed elsewhere on the I/PDV.
**Verifying Staff:** Complete Sections A-E. Route this form to the assigned Correctional Counselor I.
**Counseling Staff:** Complete Section F, as appropriate. After processing, the original I/PDV is to be filed in the General Chrono Section of the Central File. The pink copy is to be forwarded to Health Care Services for filing in the Health Care Record. The yellow copy is to be given to the inmate/par

*(EXHIBIT B)*

# PROTOCOLS FOR VERIFYING DISABILITIES

## I. STANDARDIZED HEALTH SCREENING OF INMATES WITH HEARING IMPAIRMENTS

The following protocol will clarify the following:

❖ The mechanism for identifying inmates with a hearing impairment;

❖ The procedure for measuring and verifying the impairment; and

❖ The procedure for referring hearing impaired inmates to a specialist in audiology or otolaryngology for further services as needed.

### A. IDENTIFICATION OF INMATES WITH A HEARING IMPAIRMENT IN A RECEPTION CENTER

1. All inmates, within 24 hours of their arrival, go through an initial health care screening process, which includes a qualitative and functional evaluation of the inmate's hearing as part of the review of the inmate's health care needs. The process consists of at least the following:

    a) The standardized health screening process

    b) A health history and physical examination

    c) A dental screening, and

    d) A mental health screening and evaluation.

2. The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

    a) The initial assessment period in reception centers (RC) provides the inmate with the opportunity to report possible health care problems.

    b) During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes a possible hearing impairment which might impact placement and/or require referral for evaluation and treatment, possibly including the provision of assistive devices such as hearing aids.

3. Within 24 hours of the inmate's arrival, the screening begins with the standardized health screening. This is an interactive process between the inmate and the licensed health care staff. Staff interact with the inmate both in group settings and one-to-one. It includes a review of health records for previously identified health problems. Health care needs identified through this process are triaged by registered nurses (RN) or physicians who initiate referrals conforming to the urgency appropriate to the need.

4. Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment, which includes past and current health history; family history; identification of health risk factors; and medical, dental, and mental health evaluations.

5. Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functional hearing capacity, speech receptivity, and comprehension in the prison setting. This process involves a determination of functional hearing and comprehension through interactive speaking and writing, and conforms with appropriate medical practice standards for determining the inmate's hearing ability and need, if any, for additional evaluation and treatment.

   a) A visual and otoscopic examination of the ears is performed on all inmates as part of the RC physical examination, whether or not they are identified as having a possible hearing impairment.

   b) The visual and otoscopic examination of the ears allows for the determination of whether an acute condition exists that provides an etiology for the symptomatology of diminished hearing; e.g., cerumen (earwax) or foreign body occlusion of the ear canal.

   c) Inmates wearing hearing aids, even if they maintain they have no hearing problem while wearing their aids, must remove their aids for this examination. The hearing aids are inspected for visible damage.

6. On the basis of the history and physical examination, the physician may suspect a possible hearing impairment and shall at that point perform, or refer the inmate for, verification or diagnostic testing.

   a) However, if the inmate's hearing problem appears to be the result of an obvious acute condition, such as a cerumen impaction, the condition is addressed by the physician.

   b) If treatment of the condition resolves the hearing impairment, the verification and measurement process in Section B, below, is not done unless specifically determined by the physician to be medically necessary.

*B.*   VERIFICATION AND MEASUREMENT OF POSSIBLE HEARING IMPAIRMENTS

1.   Inmates who have identified themselves as having a hearing impairment, or who have otherwise been identified as having a possible hearing impairment, are further evaluated for verification of impairment.

2.   Based on results of the RC assessments, comprehensive history, and physical examination, a physician determines which of the components in Section B, Verification and Measurement, are indicated pursuant to applicable standards of care. The appropriate evaluation(s) may be ordered by the primary care physician during the time of the inmate's stay at the RC or may be obtained by referral to a specialist in audiology or otolaryngology, which referral may be done at the receiving institution.

3.   A physician can refer the inmate to a hearing specialist, whether or not all components of the screening and verification evaluation are completed, whenever there is sufficient information to indicate that the inmate has a significant hearing impairment which is an impairment that could affect the safety and security of either the hearing impaired inmate or the institution, or could affect the program and medical needs of the inmate.

4.   The RC verification and measurement process consists of quantitative standardized measurements and specialty evaluations to assess functional hearing capacity and speech receptivity and comprehension in the prison setting. The evaluation consists of one or more of the following:

   *a)*   Speech discrimination testing;

   *b)*   Conduction and lateralization testing (Rinne' and Weber);

   *c)*   Specialty referral, if indicated; and

   *d)*   Pure tone audiogram testing, if indicated.

5.   The verification and measurement of hearing impairments shall conform to the following expectations:

   *a)*   Speech discrimination and comprehension is tested by speaking in a conversational voice, at six feet from the inmate, words from a phonetically balanced word list by an RN or physician. The inmate is positioned facing away from the speaker to avoid lip reading. An accepted standard is 70 percent accuracy in repeating the spoken words.

   *b)*   Rinne' and Weber tuning fork testing for bone and air conduction and lateralization shall be performed, if indicated, by an RN or physician using a 512 or 1024 Hz tuning fork.

c) A standard pure tone air conduction screening audiogram is performed when necessary to verify and measure the degree and type of hearing impairment.

❖ Only health care staff who are trained in administering and recording pure tone audiograms perform screening audiograms.

❖ If the inmate does not demonstrate that he/she hears tones at 1000, 2000, 3000, and 4000 Hz at 30 dB, he/she shall be referred to a specialist in audiology or an otolaryngologist under contract to CDC for further evaluation and recommendation for treatment or the need for assistive devices, such as hearing aids.

6. Inmates who are verified by the screening process to have a hearing impairment, including inmates with hearing aids who report changes or have persistent uncorrected hearing impairment, shall be referred to a specialist in audiology or otolaryngology for identification of any pathologic conditions and recommendations for further care, if needed.

a) In order not to prolong the time in the RC due to a referral to complete the evaluation and obtain recommendations for treatment or the use of assistive devices such as hearing aids, the inmate may be transferred to an appropriate receiving institution and the referral made from there. This also allows the use of referral resources close to the receiving institution.

b) The CDC shall request that the recommendations from specialists specify which auxiliary aids and services may be needed by the inmate and that the recommendations take into account the context of the prison environment in order to provide for the safety and security of both the hearing impaired inmate and the institution and the program and medical needs of the inmate.

## II. STANDARDIZED HEALTH SCREENING OF INMATES WITH SPEECH, MOBILITY, VISION AND OTHER IMPAIRMENTS

The purpose of this protocol is to clarify:

❖ The mechanism for identifying inmates with impairments that might impact placement.

❖ The procedure for evaluating and verifying the impact of an impairment on placement

*A.* IDENTIFICATION OF INMATES WITH IMPAIRMENTS THAT MIGHT IMPACT PLACEMENT

1. All inmates receive an initial health care screening within 24 hours of their arrival at a Reception Center (RC), which includes a qualitative evaluation of the inmate's health care status. This includes visual acuity, evidence of mobility problems, the ability to communicate, or other potentially disabling conditions as part of a review of the inmate's health care needs. The process consist of at least the following:

   *a)* The standardized health screening process

   *b)* A health history and physical examination

   *c)* A dental screening, and

   *d)* A mental health screening and evaluation.

2. The evaluation is multidisciplinary. It includes nursing and medical assessments and dental and mental health evaluations.

3. The initial assessment period in RC's provides the inmate with the opportunity to report possible health care problems.

4. During the initial assessment, the health care team performs a functional evaluation to identify the inmate's health care needs. This includes the health care needs which might impact placement and/or require referral for further evaluation and treatment.

5. Within 24 hours of the inmate's arrival, the screening begins with the standardized health screening. This is an interactive process between the inmate and licensed health care staff. Staff interacts with the inmate both in group settings and one to one. It includes a review of health care records for previously identified health problems. Health care needs identified through this process are triaged by RN's or physicians who initiate referrals conforming to the urgency appropriate to the need.

6. Within two weeks of arrival at the RC, the inmate is given an initial comprehensive health assessment which includes past and current health history, family history, identification of health risks factors and medical, dental and mental health evaluations.

7. Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning ability to communicate about their health care history and concerns and respond to verbal directions, or written if appropriate.

---

8.  If the inmate has difficulty walking or is using crutches, or a walker or has a prosthesis for mobility purposes the mobility impairment is noted and the appropriateness of the current assistive aid is evaluated.

9.  All inmates receive a visual acuity screening with and without correction. If the inmate requires additional evaluation to determine the overall visual impairment the RC health care staff refer the inmate accordingly.

10. All inmates transferring from one general population (GP) institution to another general population institution are processed via the standardized health screening process upon arrival. Each inmate is evaluated by health care staff to identify disabilities that may impact placement.

11. If the medical screening either in the RC or on entry to a GP reveal that the inmate has a visual acuity not correctable in at least one eye to better than 20/200, "no effective written communication," or cannot walk 100 yards, or up a flight of stairs without pausing with the use of aids, the disability is determined to impact placement.

12. If the examination determines that the inmate has a visual acuity of better than 20/200 in one eye, is able to communicate in writing or, is able to walk 100 yards or up a flight of stairs without pause with or without aids, the disability does not impact placement.

Throughout the process of obtaining the inmate's health history and conducting examinations, physicians and other health care professionals qualitatively assess the inmate's functioning capacity. This process involves a review of previous medical records including information of general physical and medical needs, and performing or referring for further testing if necessary to identify disabilities other than visual, mobility, speech, and hearing that may impact placement.

On the basis of the above examinations, if an inmate has been determined to have a permanent disability corresponding to the five listed on the CDC Form 1845, (or other disability that impacts placement), the physician will complete the CDC Form 1845. The physician will indicate the impact on placement of the disability in the correct section of the CDC Form 1845 so that inmate can be recommended for placement in a designated DPP facility.

# Exhibit A

## Parole Field Operations

It is the policy of the Department of Corrections and Rehabilitation (CDCR) to provide reasonable accommodations to parolees with disabilities to access programs and services provided by the Division of Adult Parole Operations (DAPO) and programs parolees are required to attend as a condition of their parole. Parole planning and supervision is conducted on a case-by- case basis to meet the unique needs of the parolee while protecting legitimate penological interests and consistent with the Department of Corrections and Rehabilitations policy.

### Release Program Study

Prior to an inmates release to parole the Regional Re-Entry Coordinator receives CDC form 611, Release Program Study (RPS) from institutional staff. The Regional Re-Entry Coordinator or designee shall review the "Medical/Psychiatric" and "GPL" sections of the RPS to determine if the parolee has a disability or possible learning disability. If a disability is noted, the Regional Re-Entry coordinator shall ensure the necessary source documents related to the noted disability are included with the RPS. If the source documents are missing, the Regional Re-Entry Coordinator or designee shall contact the sending institution's records office to request a copy be immediately faxed.

### Accommodation of Disabilities During Parole Supervision

Parolees with disabilities must be accommodated during their supervision. The information concerning a parolee's disabilities and needed accommodations accompanying the CDC 611 shall be placed in the ADA envelope attached to the back cover on the right side of the parole field file. Documents that are to be placed in this envelope include: CDC 128 C, CDC 128 C-1, CDC 128-1A, CDC 128 C-2, CDC 128-B (TABE), CDC 128-B (Transition to Parole Document), 128-B (Learning Disability), CDC 1845, and other CDCR approved documents identifying disabilities or needed accommodations. The agent of record (AOR) shall be familiar with the contents of this envelope, the CDC 611, and BPT 1073s if present in the field file that may identify a disability in order to provide appropriate accommodations prior to pre-arranged contacts with the parolee. During contacts not arranged in advance, the AOR or Officer of the Day (OD) shall ensure instructions given to parolee with disabilities affecting communication (i.e. vision, hearing, learning, developmental) are effectively communicated. In these cases, the means of effective communication used shall be documented on the Record of Supervision (CDC 1650-D).

### Learning Disabilities/TABE Reading Level of 4.0 or Below

Parolees with learning disabilities are members of the class in the case of *Armstrong v. Schwarzenegger*. Learning disabilities are specific neurological disorders that may substantially limit one or more of the major life activities of reading, writing, spelling, performing mathematical calculations, or information processing. Certain impairments in

the ability to communicate verbally, both expressively and receptively, may be attributed to a learning disability. Learning disabilities are characterized by a significant difference in achievement in some areas, as compared to the individual's overall intelligence. Individuals with learning disabilities generally have average intelligence quotients. It is not necessary to verify a learning disability in order to accommodate the limitations associated with it.

The fact that a field file does not contain source documents verifying a learning disability does not mean the parolee has no learning disability or does not require an accommodation to access CDCR or community programs or services.

When the parolee's field file has no documentation of a learning disability, and the parolee provides verifiable evidence of a learning disability, the AOR shall notify the Unit Supervisor (US) who shall review the submitted document(s).

DAPO shall recognize and accept as legitimate learning disability verification diagnoses from any of the following:

- A licensed psychologist
- A credentialed school psychologist
- A licensed educational psychologist

DAPO will accept, as legitimate learning disability verification, a school transcript from a California public school or a non-California school, with special education requirements equivalent to California Education Code, Sections 56333-56347, that reflect the following:

- Individualized Education Plan (IEP) denoting a specific learning disability.
- Enrollment in Special Education and/or section 504 classes/services denoting specific learning disabilities.

For parolees who have received special education services unrelated to a learning disability will be accommodated on a case-by-case basis.

If accepted, a copy of the document(s) shall be placed in the ADA section or envelope of the parolee's field file and the original forwarded to case records for placement in the parolee's central file. The original shall be accompanied with a CDCR form 1502, Activity Report, which will note the nature of the document and a request for it to be placed in the parolee's central file.

**Processing of 1824's**

A parolee with a disability may request an accommodation to access CDCR authorized programs, services, and activities, or grieve alleged discrimination, through the use of the CDC Form 1824. DAPO staff shall ensure the 1824 is readily available to all parolees. Additionally, DAPO staff shall assist parolees

in completing an 1824 when the parolee is unable to complete the form on his/her own due to a disability.

When a parolee submits an 1824, DAPO staff shall retain one copy in the field file, provide the parolee with a copy of the 1824, and forward the original to the Regional ADA Coordinator. The Regional ADA Coordinator shall maintain a tracking log of all 1824s. If the parolee submits any relevant documentation with the 1824, the documentation shall be copied in the same manner and attached to the 1824.

If DAPO field staff grant or partially grant the requested accommodation or grievance, they shall document their actions on the 1824 before making copies and forwarding it to the Regional ADA Coordinator. After a response is completed DAPO staff shall retain a copy of the completed 1824 in the field file.

When a parolee files an accommodation or modification request/appeal on an inappropriate form, i.e., CDC Form 602, the Unit Supervisor shall attach an 1824 and forward the request/grievance per the normal 1824 process.

All 1824's shall be processed according to the established time limit guidelines of the California Code of Regulations, Title 15, section 3084.6.

### Effective Communication

Reasonable accommodation shall be afforded parolees with disabilities (e.g. vision, speech, hearing or learning disabilities) to ensure effective communication is achieved with staff during supervision contacts. Auxiliary aids that are reasonable, effective, and appropriate to the needs of the parolee shall be provided when standard written or oral communication is not effective. Such aids may include qualified interpreters, readers, sound amplification devices, audio taped texts, Braille materials, large print materials, and signage.

Because of the critical importance of communications involving due process, the standard for equally effective communication is higher when a due process interest is involved. Communications involving such issues as conditions of parole and requirements to report or register come under this category as well as any subsequent instruction(s) from a parole agent for which the parolee's non-compliance may result in a parole hold. The means of effective communication used shall be documented on the Record of Supervision (CDC 1650-D)

### Communication With Parolees Who Use Sign Language

For parolees who use sign language as their primary method of communication, a sign language interpreter must be provided for communication of the conditions of parole, initial interview, any notice of changes to the parole conditions, PACT orientation, and POC or medical appointments with CDCR medical staff. If written communication is used during parole supervision contacts, those writings must be retained in the field file. Any arrest based on a failure to follow instructions charge must have as a condition

precedent that the instruction was effectively communicated and understood by the parolee. An inability to prove the effective communication by a preponderance of the evidence will result in a dismissal of the charge.

### Field Supervision/Office Visits

Parole Agents shall continue to follow existing procedures as they pertain to the supervision of parolees. The services provided by parole agents for parolees at the field offices are supervision and basic counseling.

Parolees with disabilities shall be provided reasonable accommodations for equal access to DAPO services and required participation in community programs. For parolees with disabilities that limit their ability to access the parole office, due to poor or inaccessible public transportation, for instance, accommodations may include arranging for regular home visits instead of office visits.

It is the mutual responsibility of the parolee and the DAPO to verify disabilities that might affect the parolees' placement in community programs, access to parole related services and the verification of credible claims of a disability in response to a request for reasonable accommodations. Parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

If accepted, a copy of the document(s) shall be placed in the ADA section or envelope of the parolee's field file and the original forwarded to case records for placement in the parolee's central file. The original shall be accompanied with a CDCR form 1502, Activity Report, which will note the nature of the document and a request for it to be placed in the parolee's central file.

### Health Care Appliances

The CDCR is not obligated to and does not provide health care appliances to parolees except those appliances that are ordered in prison but received after release to parole. Any healthcare appliance received by the institution after the inmates release to parole shall be forwarded to the parole unit supervising the parolee. The parolee shall be responsible for maintenance and repair of health care appliances.

If a parolee is indigent, he/she may qualify for Medi-Cal, Medicare, or other benefits to pay for such appliances and repairs to appliances. However, on a case-by-case basis a parolee may require financial assistance for obtaining a health care appliance to effectively participate in a required community based or parole program. Parole Agents shall verify the need for the financial assistance. The CDCR may provide financial assistance to obtain health care appliances or repair such appliances on a case by case basis.

## Parole Outpatient Clinics

The Parole Outpatient Clinic (POC) provides mental health diagnosis, evaluations, counseling, testing (As determined necessary by the clinician) and prescribing of medication. Additionally POC provides transitional mental health care and on occasion sustained therapeutic intervention on an outpatient basis to parolees with disabilities who have an Axis I diagnosis. Due to the nature of POC sessions, all communications must be conducted at a heightened level of effective communication

POC clinicians shall review the disability status of a parolee prior to providing services and shall have access to equipment and services (e.g. qualified interpreters, sound amplification devices, large print materials, and signage) to ensure parolees participating in POC services are afforded effective means of communication.

POC clinicians shall document the accommodations provided, including the means of effective communication used. If written communication is used, those writings must be retained in the POC clinicians file.

If a parolee's primary method of communication is sign language, a sign language interpreter shall be provided for POC appointments. If a parolee chooses or requests that no Sign Language Interpreter be used during POC meetings, none will be used. This request shall be documented by the clinician. Family members shall not be used as sign language interpreters for regularly scheduled POC services. This does not preclude POC staff from utilizing family members as sign language interpreters in emergency situations.

## Evacuation Procedures

In the event of an emergency requiring building evacuation, each parole office shall ensure the safe and effective evacuation of parolees with disabilities. Local evacuation procedures shall be adopted at each parole office.

## Searches

Parolees who have disabilities that preclude the use of standard search methods shall be afforded reasonable accommodations during searches. Such searches shall be thorough and professional with safety and security being of paramount concern. Parole agents shall advise a visually impaired parolee where and how he/she will be searched before any contact takes place. It is not necessary to advise a parolee with visual impairment regarding physical contact when necessary force is applied.

All assistive and prosthetic devices should be searched for safety of parole staff and the parolee. If the search requires the removal of a prosthetic device, a compliant parolee will be allowed to remove the device and give it to staff. The parole agent shall advise the outside agency, when booking, if the parolee has not been thoroughly searched due to a disability, so that appropriate medical or security personnel are made available to conduct a thorough search.

## Restraints

Parolees who have disabilities precluding the application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodations. Mechanical restraints shall be applied to ensure staff safety while reasonably accommodating the parolee's disability. The following guidelines shall apply when applying restraints to disabled parolees:

- Mechanical restraints shall be applied to ensure security, while reasonably accommodating the parolee's disability.
- Mechanical restraints shall never be applied in a manner that restricts breathing, blood circulation, or causes undue physical discomfort.
- Disabled parolees with one arm or hand, in a wheelchair, or use a walker or cane shall be placed in waist chains, whenever possible.
- Mechanical restraints shall never be applied to a prosthetic limb.
- Mechanical restraints shall never be used to secure a person to a fixed object, except as a temporary emergency measure. A person who is being transported shall not be secured in any manner to any part of the vehicle.
- Escorting a physically disabled parolee who is in mechanical restraints shall be conducted in a careful and safe manner. Special attention will be given to the walking speed and path taken during escorts. Visually impaired parolees shall be assisted by means of guidance by the upper arm.

## Transportation

The special needs of parolees with disabilities shall be considered in transporting them. A parolee's special health care aids and appliances shall accompany the parolee upon transport. A parolee shall not be secured in any manner to any part of the vehicle with the exception of the seatbelt.

The following guidelines shall apply when transporting disabled wheelchair dependent parolees:

- A parolee being transported for non-custody reasons, who is compliant and can self-transfer from a wheelchair, can be transported in a standard vehicle by the parole agent.
- The parole agent may utilize other forms of transportation when a parolee being transported for non-custody reasons is compliant but unable to self-transfer from a wheelchair. A bus, van, para-transit van or any public vans equipped to handle the particular disability are considered as other forms of transportation. DAPO will utilize cash assistance to obtain these services when necessary.
- If the parolee is being transported for custody reasons and is compliant and can self-transfer from a wheelchair, a parole agent can transport.

If the parole agent preparing the CDC Form 1018, Transportation Request, knows that a parolee in local custody has a disability and requires assistance to enter or exit a vehicle, the agent will note that information on the 1018.

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
BENJAMIN BIEN-KAHN – 267933
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
TRACE O. MAIORINO
SEAN LODHOLZ
D. MARK JACKSON
OLENA LIKHACHOVA
Deputy Attorneys General
State Bar No. 285574
1300 I Street, Suite 125
Sacramento, CA 94244-2550
Telephone:  (916) 210-6332
Fax: (916) 324-5205
E-mail:  Olena.Likhachova@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. C94 2307 CW<br><br>**STIPULATION AND [PROPOSED] ORDER AMENDING PAROLE FIELD OPERATIONS SECTION OF ARMSTRONG REMEDIAL PLAN [ECF No. 937]** |

[4308047.1]                                                    Case No. C94 2307 CW

STIPULATION AND [PROPOSED] ORDER AMENDING PAROLE FIELD OPERATIONS SECTION OF
ARMSTRONG REMEDIAL PLAN

THE PARTIES, BY AND THROUGH THEIR COUNSEL, HEREBY STIPULATE AS FOLLOWS:

The *Armstrong v. Davis* Court Ordered Remedial Plan, as amended January 3, 2001 (the "*Armstrong* Remedial Plan"), was filed with the Court on February 27, 2001.  Section IV.S of the *Armstrong* Remedial Plan, entitled Parole Field Operations, was amended by stipulation of the parties, and order of this Court, on September 11, 2006.  (ECF No. 937.)

Following a lengthy meet-and-confer process, the parties have agreed to revise the September 11, 2006 Parole Field Operations section of the *Armstrong* Remedial Plan. Attached hereto as **Exhibit A** is the revised text of the *Armstrong* Remedial Plan section regarding Parole Field Operations agreed to by the parties.

The revised text attached hereto as **Exhibit A** shall hereby replace and supersede the September 11, 2006 Parole Field Operations section of the *Armstrong* Remedial Plan.

IT IS SO STIPULATED.


DATED:  June 9, 2023                  ROB BONTA
                                      Attorney General of the State of California


                                      By:  _____
                                           Olena Likhachova
                                           Deputy Attorney General

                                      Attorneys for Defendants


DATED:  June 9, 2023                  ROSEN BIEN GALVAN & GRUNFELD LLP


                                      By:  */s/ Benjamin Bien-Kahn*
                                           Benjamin Bien-Kahn

                                      Attorneys for Plaintiffs


[4308047.1]                           1                    Case No. C94 2307 CW
STIPULATION AND [PROPOSED] ORDER AMENDING PAROLE FIELD OPERATIONS SECTION OF
ARMSTRONG REMEDIAL PLAN

**[PROPOSED] ORDER**

Having reviewed the above Stipulation of the parties, and good cause appearing, it is ORDERED that:

The revised text attached hereto as **Exhibit A** shall hereby replace and supersede the September 11, 2006 Parole Field Operations section of the *Armstrong* Remedial Plan.

**IT IS SO ORDERED.**

DATED: _6/12/2023_____    By: _____

The Honorable Claudia Wilken
United States District Judge

[4308047.1]                                      2                              Case No. C94 2307 CW

STIPULATION AND [PROPOSED] ORDER AMENDING PAROLE FIELD OPERATIONS SECTION OF
ARMSTRONG REMEDIAL PLAN

# Exhibit A

**Parole Field Operations**

It is the policy of the Department of Corrections and Rehabilitation (CDCR) to provide reasonable accommodations to parolees with disabilities to access programs and services provided by the Division of Adult Parole Operations (DAPO) and programs parolees are required to attend as a condition of their parole. Parole planning and supervision is conducted on a case-by-case basis to meet the unique needs of the parolee while protecting legitimate penological interests and consistency with the Department of Corrections and Rehabilitations policy.

**Release Program Study**

Before an incarcerated person is released on parole supervision, the Regional Re-Entry Coordinator receives CDC form 611, Release Program Study (RPS) from institutional staff. The Regional Re-Entry Coordinator or designee shall review the "Medical/Psychiatric" and "GPL" sections of the RPS to determine if the parolee has a disability or possible learning disability. If a disability is noted, the Regional Re-Entry coordinator shall ensure the necessary source documents related to the noted disability are included with the RPS. If the source documents are missing, the Regional Re-Entry Coordinator or designee shall contact the sending institution's records office to request a copy be immediately faxed.

**Accommodation of Disabilities During Parole Supervision**

Parolees with disabilities must be accommodated during their supervision. The information concerning a parolee's disabilities and needed accommodations accompanying the CDC 611 shall be placed in the ADA envelope attached to the back cover on the right side of the parole field file. Documents that are to be placed in this envelope include: CDC 128 C, CDC 128 C-1, CDC 128-1A, CDC 128 C-2, CDC 128-B (TABE), CDC 128-B (Transition to Parole Document), 128-B (Learning Disability), CDC 1845, and other CDCR approved documents identifying disabilities or needed accommodations. Additionally, if the Agent of Record (AOR) utilized written notes as a form of effective communication, it shall be retained and placed in the ADA envelope, and uploaded into the Strategic Offender Management System (SOMS). The AOR shall be familiar with the contents of this envelope, the CDC 611, and BPH 1073s if present in the field file that may identify a disability in order to provide appropriate accommodations before pre-arranged contacts with the parolee. During contacts not arranged in advance, the AOR or Officer of the Day (OD) shall ensure instructions given to parolee with disabilities affecting communication (e.g. vision, hearing, learning, developmental) are effectively communicated. In these cases, the means of effective communication used shall be documented on the Strategic Offender Management System (SOMS) Supervision Contacts (record of supervision) entry.

1

**<u>Learning Disabilities/Reading Grade Level Score of 4.0 or Below</u>**

Parolees with learning disabilities are members of the class in the case of *Armstrong v. Newsom.*

Learning Disabilities (LD), sometimes referred to as "Specific Learning Disorders," are life-long neurological disabilities that affect information processing.  They may affect how a person learns, understands, communicates, and remembers information.  Individuals with Learning Disabilities have average intelligence, and are not to be confused with individuals with developmental disabilities, intellectual disabilities, attention, hyperactive, and emotional disorders, or cognitive dysfunctions.  Examples of Learning Disabilities include Dyslexia and Dyscalculia.  A reading grade level score of 4.0 and under may also be, but is not always, an indicator than a person may have a Learning Disability.

Adults who have Learning Disabilities can experience great success in all aspects of life when using their strengths in conjunction with the strategies, accommodations, and technology that are most appropriate and effective for their individual needs in the educational environment.

A parolee's verified or unverified learning disability may be documented in SOMS, DECS, and on the CDCR Form 128-B.  An individual with a learning disability may have a reading grade level score above 4.0, and not all individuals with a reading grade level score under 4.0 have a learning disability.  Depending on the documentation available to institution staff, a parolee may be listed with a "verified" or "unverified" LD status.  All individuals with a verified or unverified LD status shall have appropriate accommodations, including accommodations listed in the CDCR Form 128-B, provided regardless of reading grade level score.

A reading grade level score for the purposes of this plan shall be determined by a reading test approved by the National Reporting System (NRS) Adult Education.

If an incarcerated person or parolee has a reading grade level score under 4.0, the staff person should have the incarcerated person or parolee repeat or explain in his or her words, an understanding of the conditions and special conditions of parole during the initial interview and after any changes in the parolee's special conditions of parole.  This shall be documented in the Supervision Contacts in SOMS/DECS.

The fact that a field file does not contain source documents verifying a learning disability does not mean the parolee has no learning disability or does not require an accommodation to access CDCR or community programs or services.

When the parolee's field file has no documentation of a learning disability, and the parolee provides verifiable evidence of a learning disability, the AOR shall notify the Unit Supervisor (US) who shall review the submitted document(s).

DAPO shall recognize and accept as legitimate learning disability verification diagnoses from any of the following:

- A licensed psychologist

- A credentialed school psychologist

- A licensed educational psychologist

DAPO will accept as legitimate learning disability verification, a school transcript from a California public school or a non-California school, with special education "requirements equivalent to California Education Code, Sections 56333-56347, that reflect the following:

- Individualized Education Plan (IEP) denoting a specific learning disability.

- Enrollment in Special Education or section 504 classes/services denoting specific learning disabilities.

Parolees who have received special education services unrelated to a learning disability will be accommodated on a case-by-case basis.

If accepted, a copy of the document(s) shall be placed in the ADA section or envelope of the parolee's field file or scanned into the Electronic Record Management Systems (ERMS)/SOMS and the original forwarded to Parole Case Records (PCR) for placement in the parolee's field file.  The original shall be accompanied with a CDCR form 1502, Activity Report, which will note the nature of the document and a request for it to be placed in the parolee's field file.

## Processing of 1824-B's

A parolee with a disability may request an accommodation to access CDCR authorized programs, services, and activities, or grieve alleged discrimination, through the use of the CDC Form 1824-B.  The 1824-B process shall be explained to all parolees and an 1824-B shall be provided to all parolees with disabilities during the Initial Interview.  DAPO staff shall ensure the 1824-B forms are readily available to all parolees.  Parolees shall be able to obtain an 1824-B by requesting one from DAPO staff, and from a publicly accessible location at all parole offices.  This location will either be at an accessible place in the parole office lobby or will be available upon request from the DAPO staff member at the window in the lobby.  At the Initial Interview, the parolee shall be informed where they can obtain an 1824-B in the parole office.  If a parole office is closed for any reason, e.g.

3

pandemic, the 1824-B shall be available from parole offices when open to the public, or parolees can contact their AOR to obtain an 1824-B. Additionally, DAPO staff shall assist parolees in completing and submitting an 1824-B when the parolee is unable to complete the form on his/her own due to a disability.

When a parolee submits an 1824-B, DAPO staff shall retain one copy in the field file, provide the parolee with a copy of the 1824-B, and forward the original to the Parole Litigation Management Unit (PLMU). PLMU shall maintain a tracking log of all 1824-Bs. If the parolee submits any relevant documentation with the 1824-B, the documentation shall be copied in the same manner and attached to the 1824-B.

If DAPO field staff grant or partially grant the requested accommodation or grievance, they shall document their actions on the 1824-B before making copies and forwarding it to the PLMU. After a response is completed DAPO staff shall retain a copy of the completed 1824-B in the field file.

When a parolee files an accommodation or modification request/appeal on an inappropriate form, i.e., CDC Form 602, the Unit Supervisor shall attach an 1824-B and forward the request/grievance per the normal 1824-B process.

All 1824-B's shall be processed according to the established time limit guidelines of the California Code of Regulations, Title 15, section 3084.6.

## **Effective Communication**

Reasonable accommodation shall be afforded to parolees with disabilities affecting communication (e.g. vision, speech, hearing, developmental, or learning disabilities) to ensure effective communication is achieved with staff during supervision contacts. Auxiliary aids that are reasonable, effective, and appropriate to the needs of the parolee shall be provided when standard written or oral communication is not effective. Such aids may include qualified interpreters, readers, sound amplification devices, audio taped texts, Braille materials, large print materials, and signage. DAPO staff shall also use communication techniques to achieve effective communication where appropriate, such as using short sentences and simple language, rephrasing and repeating as needed, giving extra time for questions, and asking the individual to repeat back what was said in his/her own words. A parolee's request for reasonable auxiliary aids or other reasonable accommodations for effective communication during parole proceedings shall be given primary consideration and provided unless there is a specific articulated justification for a denial of the request that is permitted under Section II.H. of the ARP. This section does not require DAPO to provide customizable aids such as hearing aids.

DAPO staff shall attempt to establish effective communication with parolees with disabilities to ensure equal access and full participation in DAPO programs services and activities. In cases where effective communication cannot be achieved, staff shall

document attempts made.  Appropriate effective communication techniques must be used during all interactions with parolees.  Because of the critical importance of communications involving due process or mental health care, the standard for equally effective communication is higher when a due process interest is involved, during a mental health care encounter or any parole proceeding.  Communications involving such issues as conditions of parole and requirements to report or register come under this category, as well as any subsequent instruction(s) from a parole agent for which the parolee's non-compliance may result in a parole violation.  The means of effective communication used shall be documented on the Supervision Contacts in SOMS using the four-step process detailed below.

When a parolee has a communication disability requiring accommodations to achieve simple oral and written communication, staff shall attempt to establish effective communication using appropriate effective communication techniques with the parolee during all contacts, including routine supervision contacts and processes, and shall document in the field file or SOMS/DECS the reasonable accommodations/modifications provided and effective communications used.

The process of providing effective communication and reasonable accommodations during these parole proceedings and supervision processes includes four critical steps:

**Step 1:** Staff shall check DECS or the SOMS to determine if the parolee has disability or communication-related needs prior to the parole proceeding or supervision process.

**Step 2:** Staff shall provide effective communication accommodations consistent with identified disability needs and primary methods of communication identified in DECS or SOMS, or chosen by the parolee.  Furthermore, accommodation methods shall be appropriate to overcome disability related or other communication barrier(s).

If the parolee, using his or her primary method of communication or previously established preferred method of communication, requests, or previously requested to use another method of communication, that method may be used in place of the individual's primary method of communication.  This request shall be documented in DECS/SOMS.

A parolee's alternative method of communication shall only be used during interactions not involving due process or the provision of mental health care.  Even for these interactions, the parolee's alternative method of communication shall only be used if their primary method of communication is unavailable.  In such circumstances, staff shall document the use of the alternative method of communication and the reason the parolee's primary method of communication was not used during the encounter.  Notwithstanding the preceding, parolees who have sign language interpretation as their primary method of communication shall be accommodated using sign language for all interactions with staff, unless otherwise stated in the next section.

5

**Step 3:** Staff shall determine if effective communication has been achieved through an interactive process with the parolee.  For example, the parolee might be asked to summarize their understanding of the discussion or material conveyed in their own words.

**Step 4:** Staff shall be thorough and accurate when documenting disabilities, accommodations, how effective communication was confirmed, and other effective communication information in DECS, SOMS, and on all relative forms utilized during parole proceedings and supervision processes.

There are situations in which effective communication may not be achieved due to the parolee's disability-related limitations.  Staff shall document all reasonable efforts made to achieve effective communication in these cases, and that the parolee did not appear to understand the communication despite those efforts.

When an alternative effective communication method is provided to a parolee, or when the parolee waives an accommodation or self-identifies a preference for an alternative but equally effective method of communication not listed in DECS or SOMS during parole proceeding or supervision process, the effective communication method must be entered into DECS or SOMS via the electronic CDCR Form 2289, and the documentation must indicate it is an alternative method preferred by the parolee.

**Communication With Parolees Who Use Sign Language**

A parolee who uses sign language as his or her primary method of communication shall not have their hands restrained in a manner that interferes with his or her ability to communicate using sign language unless required to protect the safety of DAPO staff, the general public, or the parolee.  When DAPO staff determine the safety threat is no longer present, staff shall change the manner in which the parolee's hands are restrained so that they are able to communicate using sign language without interference.

If a parolee uses sign language as their primary method of communication, DAPO shall provide a Sign Language Interpreter (SLI) for all parole proceedings, including but not limited to communication of the conditions of parole, Initial Interview, any notice of changes to the parole conditions, PACT orientation, BHR, Notice Serves, Notice of MDO, NIC or SVP Hearings, and conversations with the parolee about parole violations which may lead to revocation or remedial sanctions and the possible sanctions for that violation.  Sign language interpreters must also be provided for supervision processes with due process implications including but not limited to the Case Conference Review, Discharge Consideration Committee, and any Sex Offender Containment Team Meeting. If a parolee has indicated that he will not be attending these meetings an SLI appointment will not be made.

6

Any arrest based on a Failure to Follow Instructions charge must have as a condition precedent that the instruction was effectively communicated and understood by the parolee.  An inability to prove the effective communication by a preponderance of the evidence will result in a dismissal of the charge.

Video Remote Interpreting (VRI) services should not be used in lieu of in-person sign language interpretation for parole proceedings or supervision processes with the following exceptions:

(1)    A GPS device needs to be placed on the parolee.

(2)    To communicate times and places for rescheduling.

(3)    To convey housing or program information.

(4)    To provide any other information that must be conveyed immediately.

In these circumstances, an in-person SLI shall be scheduled to complete the parole proceeding or supervision process, for the first available appointment where both the parolee and agent are available.

When staff are conducting supervision contacts outside of the parole unit without an in-person SLI such as home visits, field contacts, or employment contacts for parolees whose primary method for communication is SLI, VRI services shall be used as long as an appropriate wireless connection and clear video image can be obtained.  If staff are unable to use VRI services due to safety concerns, the reason shall be documented in the automated ROS.

When VRI services are used, staff shall utilize a state-issued laptop or other device with a screen large enough to display the interpreter's and parolee's face, arms, hands, and fingers.  If staff are unable to obtain a clear video image or the VRI system malfunctions, the parole proceeding or supervision process shall cease until an in-person SLI can be obtained or the VRI functionality is resolved, and staff shall document the failure and the method used to achieve effective communication in the supervision contact entry in SOMS.

VRI services are not appropriate for parolees with vision disabilities who cannot clearly see the interpreter on the screen due to low vision, or when a parolee is participating in a group setting, such as a PACT meeting. In these instances, only in-person SLI services shall be utilized.  For all other parolees with hearing disabilities, their individual needs and disabilities shall be considered on a case-by-case basis when evaluating the appropriateness of VRI services.

If a SLI or VRI services are unavailable, written notes may be an appropriate accommodation in certain circumstances.  Written notes may not be used as an alternate

7

method of communication for parolees who use sign language and do not have written notes documented as an alternate method of effective communication, unless using the process below for when a parolee requests to use written notes. If a parolee who uses SLI as a primary method of communication has a Reading Grade Level Score under 4.0, written notes may not be used as an alternate method of communication unless the parolee confirms that they can understand written notes. If a parolee with a Reading Grade Level Score under 4.0 confirms he can use written notes this shall be documented in supervision contact entry in SOMS. This verification need only occur once during the parolee's period of supervision, and an in-person SLI shall be present during this interaction. Written notes shall not be used without this verification. Notwithstanding, if both in-person SLI or VRI are unavailable, written notes may be used to communicate a future appointment to a parolee if SLI services are unavailable.

If a parolee requests that written notes be used as an accommodation, this shall be documented as an acceptable method of communication using the process described in the paragraph above, in Step 2 of Effective Communication above, and in this paragraph. If the parolee is willing to use written notes but prefers to use SLI or VRI services when they are available, then written notes shall be documented as a secondary method. SLI shall remain the primary method and shall be required for interactions in the future. In the rare occurrence in which a parolee never wants to use SLI services and prefers written notes instead, written notes shall be documented as the primary method. Some parolees may request to use SLI or VRI services solely in group settings, and written notes in other interactions; if so, this should be indicated using the comments section.

If written communication is used during parole supervision contacts, those writings must be retained in the field file.

**Field Supervision/Office Visits**

Parole Agents shall continue to follow existing procedures as they pertain to the supervision of parolees. The services provided by parole agents for parolees at the field offices are supervision and basic counseling.

Parolees with disabilities shall be provided reasonable accommodations for equal access to DAPO services and required participation in community programs. For parolees with disabilities that limit their ability to access the parole office, due to poor or inaccessible public transportation, for instance, accommodations may include arranging for regular home visits instead of office visits. A parolee's requested reasonable accommodations shall be given primary consideration and provided unless there is a specific articulated justification for a denial of the request that is permitted under Section II.H. of the ARP. CDCR is not required to provide health care appliances or Durable Medical Equipment (DME) except as described in the "Health Care Appliances, DME, and Prescriptions" section below.

8

It is the mutual responsibility of the parolee and the DAPO to verify disabilities that might affect the parolee's placement in community programs, access to parole related services and the verification of credible claims of a disability in response to a request for reasonable accommodations.  Parolees must cooperate with staff in the staff's efforts to obtain documents or other information necessary to verify a disability.

If accepted, a copy of the document(s) shall be placed in the ADA section or envelope of the parolee's field file and the original forwarded to case records for placement in the parolee's central file.  The original shall be accompanied with a CDCR form 1502, Activity Report, which will note the nature of the document and a request for it to be placed in the parolee's central file.

**Health Care Appliances, DME, and Prescription Medications**

The CDCR is not obligated to provide health care appliances to parolees except those appliances that are ordered in prison but received after release to parole.  Any healthcare appliance received by the institution after the incarcerated person's release to parole shall be forwarded to the parole unit supervising the parolee.  The parolee shall be responsible for maintenance and repair of health care appliances.

In addition, individuals requiring DME replacement of a cane, walker, or wheelchair issued by CDCR or CCHCS while the individuals were in prison are eligible for a one-time replacement of each item for up to 30 days following release to parole.  This provision of the ARP and policies of CDCR and CCHCS may be changed, after notification to Plaintiffs' Counsel, if CDCR determines that the general circumstances surrounding parolee access to health care services has changed in a way that allows parolees to readily obtain replacement DME in the community during the first 30 days after release.

CDCR shall implement a process to ensure that individuals released to parole from CDCR institutions are released with their prescribed health care appliances and durable medical equipment (DME), and with a supply of their authorized medications, as discussed further below in the Medication Supply Upon Release section.

If a parolee is indigent, he/she may qualify for Medi-Cal, Medicare, or other benefits to pay for such appliances and repairs to appliances.  However, on a case-by-case basis a parolee may require financial assistance for obtaining a health care appliance to effectively participate in a required community based or parole program.  Parole Agents shall verify the need for the financial assistance.  The CDCR may provide financial assistance to obtain health care appliances or repair such appliances on a case-by-case basis.

**Behavioral Health Reintegration Program**

The Behavioral Health Reintegration (BHR) Program provides mental health diagnosis, evaluations, counseling, testing (as determined necessary by the clinician) and prescribing of medication.  Additionally, BHR provides transitional mental health care and on occasion sustained therapeutic intervention on an outpatient basis to parolees with disabilities who have an Axis I diagnosis.  Due to the nature of BHR sessions, all communications must be conducted at a heightened level of effective communication.

BHR clinicians shall review the disability status of a parolee prior to providing services and shall have access to equipment and services (e.g. qualified interpreters, sound amplification devices, large print materials, and signage) to ensure parolees participating in BHR services are afforded effective means of communication.

BHR clinicians shall document the accommodations provided, including the methods of effective communication used.  If written communication is used, those writings must be retained in the BHR clinicians' file.

If a parolee's primary method of communication is sign language, a sign language interpreter shall be provided for all BHR appointments.  If a parolee chooses or requests that no Sign Language Interpreter be used during BHR meetings, none will be used.  This request shall be documented by the clinician.  Family members shall not be used as sign language interpreters for regularly scheduled BHR services.  This does not preclude BHR staff from utilizing family members as sign language interpreters in emergency situations.

BHR clinicians shall provide reasonable accommodations to parolees with documented disabilities to ensure effective communication occurs during BHR clinical case management services.

BHR clinicians account for parolee's disabilities when developing individualized needs assessments and in providing case management support such as navigating applications, referrals and linkages to associated resources and programs.  This includes, but is not limited to, BHR clinicians assisting parolees with disabilities in filling out benefit applications (e.g.  Medi-Cal, Social Security Disability, Supplemental Security Income, Veterans Affairs Benefits, CalFresh, and paratransit).

**Evacuation Procedures**

In the event of an emergency requiring building evacuation, each parole office shall ensure the safe and effective evacuation of parolees with disabilities.  Local evacuation procedures shall be adopted at each parole office.

**Searches**

Parolees who have disabilities that preclude the use of standard search methods shall be afforded reasonable accommodations during searches.  Such searches shall be thorough and professional with safety and security being of paramount concern.  Parole agents shall advise a visually impaired parolee where and how he/she will be searched before any contact takes place.  It is not necessary to advise a parolee with visual impairment regarding physical contact when necessary force is applied.

All assistive and prosthetic devices should be searched for safety of parole staff and the parolee.  If the search requires the removal of a prosthetic device, a compliant parolee will be allowed to remove the device and give it to staff.  The parole agent shall advise the outside agency, when booking, if the parolee has not been thoroughly searched due to a disability, so that appropriate medical or security personnel are made available to conduct a thorough search.

**Restraints**

Parolees who have disabilities precluding the application of restraint equipment in the ordinarily prescribed manner shall be afforded reasonable accommodations.  Mechanical restraints shall be applied to ensure staff safety while reasonably accommodating the parolee's disability.  The following guidelines shall apply when applying restraints to disabled parolees:

- Mechanical restraints shall be applied to ensure security, while reasonably accommodating the parolee's disability.

- Mechanical restraints shall never be applied in a manner that restricts breathing, blood circulation, or causes undue physical discomfort.

- Disabled parolees with one arm or hand, in a wheelchair, or use a walker or cane shall be placed in waist chains, whenever possible.

- As noted above, a parolee who uses sign language as his or her primary method of communication shall not have their hands restrained in a manner that interferes with his or her ability to communicate using sign language unless required to protect the safety of DAPO staff, the general public, or the parolee.  When DAPO staff determine the safety threat is no longer present, staff shall change the manner in which the parolee's hands are restrained so that they are able to communicate using sign language without interference.

- Mechanical restraints shall never be applied to a prosthetic limb.

11

- Mechanical restraints shall never be used to secure a person to a fixed object, except as a temporary emergency measure.  A person who is being transported shall not be secured in any manner to any part of the vehicle.

- Escorting a physically disabled parolee who is in mechanical restraints shall be conducted in a careful and safe manner.  Special attention will be given to the walking speed and path taken during escorts.  Visually impaired parolees shall be assisted by means of guidance by the upper arm.

**Transportation**

The special needs of parolees with disabilities shall be considered in transporting them. A parolee's special health care aids and appliances shall accompany the parolee upon transport.  A parolee shall not be secured in any manner to any part of the vehicle with the exception of the seatbelt.

The following guidelines shall apply when transporting parolees who use wheelchairs:

- A parolee being transported for non-custody reasons, who is compliant and can self-transfer from a wheelchair, can be transported in a standard vehicle by the parole agent.

- If a parolee has disabilities requiring a special mode of transportation (i.e., boarding ramps, wheelchair lifts, handrails, etc), parole agent shall coordinate transportation services (e.g., with CDCR institution transportation for Alternative Custody Program releases; paratransit services, etc.).

- If the parolee is being transported for custody reasons and is compliant and can self-transfer from a wheelchair, a parole agent can transport.

If the parole agent preparing the CDC Form 1018, Transportation Request, knows that a parolee in local custody has a disability and requires assistance to enter or exit a vehicle, the agent will note that information on the 1018.

Class members releasing from CDCR to parole whose disabilities make it impractical for them to use public transportation to travel from the releasing prison to their county of parole supervision shall be transported to their county of parole by CDCR, unless the class member has other means of transportation, such as family, friends, or program staff.

DAPO will attempt to coordinate with local county jails to allow parole agents to pick up parolees upon release from county jail.  In counties where DAPO has an agreement, DAPO shall attempt to coordinate with county jail when class members whose disabilities make it impractical for them to use public transportation for transportation/pickup of parolees upon release from county jails.  Parties understand that

12

DAPO does not have control over county jail releases.  In some cases, the county jails may refuse to coordinate with DAPO.  In other cases, specific circumstances may lead to an individual being released without coordination outside the control of DAPO.  Additionally, in some cases, parties understand that even with an agreement, it may be impractical to pick up a parolee, for example, if insufficient notice of the release is provided by the county jail.

Once individuals with disabilities are in the community under supervision, Parole Agents shall also provide transportation assistance to DAPO required meetings and programs whenever possible to parolees whose disabilities make other means of transportation impractical, and, on case-by-case basis as a reasonable accommodation for a disability, may consider providing parolees transportation assistance to non-mandatory meetings and appointments that are in furtherance of the transition to parole (such as with benefits providers, health care providers, reentry service providers, and government agencies), particularly in the initial phase of parole, when relationships with service providers like paratransit organizations may not yet be established.

Parole Agents shall also assist parolees by sharing information about local paratransit organizations and independent living organizations, and shall assist parolees in requesting assistance from BHR social workers.

**Transition to Parole**

   a. **Tracking of Class Members in CDCR Funded Transitional Housing Programs and on Waitlists for Such Programs**

A tracking log shall be maintained for parolees with disabilities in CDCR-funded transitional housing programs, including the Specialized Treatment for Optimized Programming (STOP) programs, as well as other CDCR-funded transitional housing programs that do not go through the STOP network, including the Transitional Housing Program (THP) for lifers who parole, the Parolee Service Centers (PSCs), and all other CDCR-funded transitional housing programs.  The tracking log shall identify the disability codes that the individuals had while housed in the CDCR, including DPP codes, DDP codes, and mental health level of care information, and shall indicate whether someone has a verified learning disability or a 128-B chrono for an unverified learning disability.

The tracking system will also document the names and disabilities of all parolees with disabilities on the waiting list for CDCR-funded transitional housing programs, including STOP programs.

CDCR shall provide Plaintiffs' Counsel with a monthly production of the tracking logs described above.

13

### b.    Placement of 1824-B Appeal Forms in Transitional Housing Programs

Blank 1824-B Reasonable Accommodation Request forms and stamped pre-addressed envelopes for mailing them to DAPO shall be maintained in all STOP programs and all other CDCR-funded transitional housing programs for CDCR parolees.  A readily available supply of the forms and pre-addressed stamped envelopes shall be placed in an accessible public location that parolees can freely access without asking staff for the forms or envelopes.

### c.    Annual Inspection of ADA Features of STOP Programs

As part of its contract with each STOP Regional Organization, there is currently a required annual inspection of each facility by the quality assurance managers in each Regional STOP program administrator.  That inspection will be expanded to cover ADA assets and features in each individual transitional housing program.  This inspection will be for assets and features that can be inspected by an individual without special expertise in accessible architectural features.  The inspection shall also include checking to see if 1824-B forms and stamped pre-addressed envelopes are readily available in each STOP program, and checking whether the *Armstrong* informational poster is properly posted in an accessible location in each program.

### d.    Non-Discrimination and Accommodations in CDCR-Contracted Programs Including Transitional Housing

In its contracts with STOP Regional Contractors and other transitional housing providers, CDCR shall maintain the current requirement that contractors comply with the ADA.  DRP shall regularly provide information and education to STOP contractors on their obligations to provide reasonable accommodations to parolees with disabilities and on the resources available from CDCR and in the community to comply with those obligations.

When it comes to CDCR's attention that a STOP program is improperly refusing to accept or refusing to continue to house class members based on their disability, or that the program is refusing to provide reasonable accommodations to a class member on parole, CDCR shall demand that the STOP program comply with its contractual obligations and promptly engage with the program to determine whether it is appropriate to provide any education, training, counseling, or other resources, not including nursing or medical care, to bring the STOP program into compliance.  If CDCR is unable to promptly resolve the issue in this manner, CDCR shall take any and all available steps to address the program's failure to follow its contractual obligations to comply with the ADA up to termination of the contract if necessary.

Plaintiffs agree that not every STOP program or other transitional housing program is required to have DPW-accessible housing, so long as there are sufficient wheelchair-accessible beds in each STOP region and in each type of CDCR-funded transitional

14

housing program to serve the DPW parole population.  If a particular type of CDCR-funded housing program is only offered in certain geographic areas, CDCR is only required to ensure that this type of housing program has sufficient wheelchair-accessible beds to serve the DPW parole population on a statewide basis, but if a particular type of CDCR-funded housing program has sites in both Northern and Southern California, CDCR shall ensure that said program has sufficient wheelchair-accessible beds in both DAPO's Northern Region and Southern Region.

Parties agree that even with a sufficient number DPW beds, there may be some rare cases where an appropriate bed cannot be located for an individual class member in the STOP region.  If a DPW parolee requests transitional housing, but there is no suitable wheelchair accessible bed available in their STOP region in a transitional housing program that is able to accept them, Defendants shall make every effort to place them in a wheelchair accessible bed in their county of preference or else in a transitional housing program that is as close as possible to the county of parole taking into account the preferred location of the parolee or the location of their family members.

Parole Agents shall collaborate with CDCR-contracted program providers to ensure parolees with disabilities are reasonably accommodated and that effective communication is established with parolees with disabilities affecting communication in all CDCR-funded programs.  Examples of reasonable accommodations include special equipment such as:

1.      Magnifying devices

2.      Sound amplification devices

3.      Braille materials

4.      Bilingual interpreter services

5.      Sign Language Interpretation services

6.      Modifying work or program schedules

7.      Grab bars installed for parolees with mobility disabilities

Parole agents shall immediately notify PLMU in writing upon becoming aware of any problems with the provision of reasonable accommodations by a contractor, or that any contractor is refusing to accept or refusing to continue to house class members because of their disability.  The preceding notification requirement does not apply to a contractor that is unable to accept a class member who uses a wheelchair because the contractor has no wheelchair-accessible beds, or because all of the contractor's wheelchair-accessible beds are not available because they are currently housing other persons who use wheelchairs.  Parole agents shall also immediately notify PLMU in writing if a parolee

15

cannot be placed into a CDCR-contracted program due to the parolee's disability and make reasonable attempts to place the parolee in any other CDCR program within the state and notify PLMU via email.

### f.      CCHCS Clinical Assessment for Releasing Class Members

CCHCS will provide a clinical assessment (dashboard) regarding each parolee's disability and related medical needs that may be utilized by the Parole Service Associate (PSA) in making referrals for transitional housing placements and other post-release programs and services.  This information shall be continuously shared with the PSA in each CDCR institution, and to the Parole Agent and BHR Social Worker, assigned to the parolee.

### g.      Parole Violation Standard Review Process Augmentation and Training

Whenever a parole agent is considering a possible parole violation, the agent must check SOMS and DECS to identify whether the parolee has a disability, and take into account whether a failure to accommodate the disability or the disability itself impacted the parolee's ability to understand and/or comply with the condition or conditions of parole the parolee is alleged to have violated.  The agent shall also take any such disability-related difficulties in complying with a condition or conditions of parole into account when determining the appropriate penalty for a parole violation.

The parole agent shall case conference with a supervisor after any suspected parole violation and determine if the parolee's disability impacted their ability to understand and/or comply with the condition of parole.  If DAPO staff determine, under a totality of the circumstances, that absent the parolee's disability, the violation may not have occurred, the parolee may be continued on parole or the case may be dismissed.  For example, if a parolee is required by law to participate in GPS monitoring but has a disability that may impact their ability to remember to charge their GPS device, DAPO staff shall consider whether the parolee's disability prevented them from charging the GPS device and whether the parolee did not knowingly allow the GPS device to run out of batteries.  If this is determined to be the case, the charge may be dismissed or the parolee may be continued on parole.

Training and policies and procedures shall be provided to Agents, Supervisors and Administrators requiring that, in instances where a disability has played a role in the non-compliance of a parolee with conditions of parole, they must evaluate whether to decline to revoke parole, to mitigate the recommended sentence for a revocation, or to pursue remedial sanctions.

16

### h.   Accommodations for Parolees With Disabilities When Employing GPS Monitoring

Parole agents shall have access to GPS devices which have an option for an audible low battery warnings as an accommodation for parolees with mobility disabilities who cannot feel the low battery warnings using vibrations due to lower extremity paralysis or nerve damage, and to other reasonable accommodations, including wrist GPS monitors for parolees with disabilities.  In certain cases, a battery pack may be a reasonable accommodation.  The Annual ADA Training for Parole Agents shall address the importance of hardware-related accommodations for parolees with disabilities who may struggle to keep their GPS devices changed without such accommodations, and the importance of effective communication—including frequent reminders and prompts—for class members with developmental and other cognitive/intellectual or psychiatric disabilities that may affect their ability to consistently remember to charge their GPS devices.

### j.   Medication Supply Upon Release

Parolees and individuals released to Post Release Community Supervision shall be provided a 60-day supply of their authorized medications upon release from CDCR, except for exceptions provided in current policy.  (See CCHCS policy, "60-Day Supply of Release Medications," issued February 15, 2022, or updated versions thereafter.)  This provision of the ARP and CCHCS policy may be changed, after notification to Plaintiffs' Counsel, if CCHCS determines that the general circumstances surrounding parolee access to health care services has changed in a way that makes supplying the full 60 days of medication unnecessary to avoid medication gaps as individuals transition to parole.  With respect to medication needs upon release, parolee needs will continue to be assessed individually.

### k.   Benefits Assistance Prior to Release

The contract for the Transitional Case Management Program (TCMP) to assist individuals leaving prison with benefit applications shall mandate that TCMP workers file completed benefit applications as soon as possible, and no later than 90 days before the individual is scheduled to be released from prison unless TCMP is provided the parolee's release date less than 120 days prior to release.  The contract will also require the collection and annual evaluation of data regarding (1) whether benefit applications are approved, rejected, or remain pending at the time of release, and (2) the time frame prior to release when TCMP benefits workers submit applications for releasing individuals.

17

# EXHIBIT 5

**California Department of Corrections and Rehabilitations**

# Armstrong v. Brown
## Board of Parole Hearings
## Remedial Plan



## *REMEDIAL PLAN*

**Amended
December 1, 2010**

# ~ Table of Contents ~

I.     POLICY ----------------------------------------------------------------------------1

II.    PURPOSE ---------------------------------------------------------------------------1

III.   SCOPE -------------------------------------------------------------------------------1

IV.    RIGHT TO A REASONABLE ACCOMODATION -------------------------------2

V.     IDENTIFICATION -----------------------------------------------------------------2

VI.    ACCOMODATIONS ----------------------------------------------------------------4

    A.   ACCESS--------------------------------------------------------------------------- 4
    B.   EFFECTIVE COMMUNICATION--------------------------------------------------- 4
    C.   ATTORNEY ASSISTANCE -------------------------------------------------------5
    D.   AUXILIARY AIDS/EQUIPMENT ------------------------------------------------ 6
        1.   Mobility Impaired ------------------------------------------------ 6
        2.   Hearing Impaired ------------------------------------------------ 6
        3.   Vision Impaired -------------------------------------------------- 7
        4.   Speech Impairments --------------------------------------------- 8
        5.   Mental/Psychological/Developmental Disorders --------------- 8
        6.   Learning Disabilities -------------------------------------------- 8

VII.   COORDINATION OF SERVICES AND ACCOMODATIONS ------------------9

    A.   BPH ADA COMPLIANCE UNIT ------------------------------------------------ 9
    B.   BPH SCHEDULING UNIT ------------------------------------------------------ 10
        1.   Real Time Captioning------------------------------------------- 10
        2.   Sign Language Interpreter -------------------------------------- 10
        3.   Oral Interpreter------------------------------------------------- 10
        4.   Tactile ----------------------------------------------------------- 11
        5.   Intermediary Interpreting -------------------------------------- 11
    C.   INSITUTION/PAROLE FIELD UNITS ----------------------------------------- 11

VIII.  BPT FORM 1073 - NOTICE AND REQUEST FOR ASSISTANCE AT PAROLE
       PROCEEDING ------------------------------------------------------------------ 11

    A.   SECTION I: PRE-INTERVIEW FILE AND DECS REVIEW (STAFF ONLY)------ 11
        a)   Mental Health Concerns ---------------------------------------- 12
        b)   Developmental Disability--------------------------------------- 12
        c)   Physical Disability---------------------------------------------- 12
        d)   Other Disability ------------------------------------------------ 12
        e)   Learning Disability --------------------------------------------- 12
        f)   No Disabilities Indentified from the file review--------------- 12
        5.   Reading Level --------------------------------------------------- 12
        6.   Non-English Speaking ------------------------------------------ 12
    B.   SECTION II: INMATE/PAROLEE ADA RIGHTS & SELF IDENTIFICATION ---------------- 13
    C.   SECTION III: INITIAL SERVICE OF RIGHTS (STAFF ONLY) --------------------- 13
    D.   SECTION IV: BPH REVIEW FOR INTERNAL USE (NON-LIFER ONLY) - SCEDULING --- 13
    E.   SECTION V: BPH REVIEW FOR INTERNAL USE - DECS VERSION - DCS----------------- 13
    F.   DISTRIBUTIOM OF THE BPT FORM 1073------------------------------------------------ 14

IX.    DISABILITY AND EFFECTIVE COMMUNICATION SYSTEM (DECS):
       OVERVIEW OF BPH PROCEDURES --------------------------------------------- 14

X.     INSTITUTIONS – PAROLE PROCEEDINGS ----------------------------------- 15

   A.   LIFE PRISONER HEARINGS ------------------------------------------------------ 16
        1.    BPT Form 1073 Packet Proccess ------------------------------------- 16
        2.    Reasonable Accomodations ------------------------------------------- 20
        3.    Attorney Assistance ------------------------------------------------- 21
        4.    Board Report ----------------------------------------------------------- 24
        5.    Psychiatric Report -------------------------------------------------- 24
   B.   MENTALLY DISORDERED OFFENDER HEARINGS ----------------------------- 23
        1.    Coordination---------------------------------------------------------- 23
        2.    Evaluations ----------------------------------------------------------- 23
        3.    BPT Form 1073 and Rights Packet Process --------------------- 24
        4.    Process When Inmate Signs Notice and Conditions of Parole ----------------------- 25
        5.    Certification Hearings-------------------------------------------- 26
        6.    Placement Hearings ------------------------------------------------ 27
        7.    Annual Reviews------------------------------------------------------- 27
        8.    Attorney Assistance ------------------------------------------------ 28
        9.    Process When Inmate Does Not Sign Notice and Conitions of Parole -------------- 29
   C.   REVOCATION EXTENTION PROCEDURES: DAI AND BPH---------------------- 31
        1.    Revocation Extention Defined--------------------------------------- 31
        2.    Responsibility ------------------------------------------------------- 32
        3.    Timeline Summary --------------------------------------------------- 33
        4.    Acts of Reportable In-Custody Misconduct Pending Imminent Release ----------- 33
        5.    Discovery Date-------------------------------------------------------- 34
        6.    Case Records Recipet of Rules Violation Report and the CDC 804 ---------------- 34
        7.    Case Records Processes The Rules Violation Report and CDC 804 and the C&PR
              Reviews for Referral -------------------------------------------------- 35
        8.    C&PR Reviews for Referral-------------------------------------------- 36
        9.    Notice of Rights/Charges-------------------------------------------- 36
        10.   Referral to the BPH------------------------------------------------- 38
        11.   BPH Special Processing Unit Receives Packets -------------------- 40
        12.   Attorney Assignment (Attorney Receives Packet)------------------- 41
        13.   Revocation Extention Assessment --------------------------------- 41
        14.   Attorney Consultation--------------------------------------------- 43
        15.   Expedited Probable Cause Hearing With Offer of Proof ----------- 44
        16.   Probable Cause Hearing ------------------------------------------- 45
        17.   Revocation Extention Hearing------------------------------------- 48
        18.   Revocation Extention Hearing Guidelines ------------------------ 51

XII.   TRANSITION TO DIVISION OF ADULT PAROLE OPERATIONS------------------ 51

   A.   CDC FORM 611 – RELEASE PROGRAM STUDY ---------------------------- 52
   B.   CDC FORM 128-B-ADA DOCUMENTATION FOR TRANSITION TO PAROLE------- 52
   C.   CDCR FORM 1515 – NOTICE AND CONDITIONS OF PAROLE ---------------- 53
        1.    Review of the CDC 611 --------------------------------------------- 53
        2.    Document Parole Period -------------------------------------------- 53
        3.    Determine if Special Conitions of Parole apply to Inmate/Parolee------------- 53
        4.    Determine if Mandatory Special Conditions of Parole apply to Inmate/Parolee --- 54
        5.    Review General Conditions of Parole with the Inmate ------------- 54
        6.    Review the Special Conditions of Parole with the inmate/parolee ---------------- 54

7.   Review the Mandatory Special Conditions of Parole apply to Inmate/Parolee ----- 55
8.   Attorney Assistance ------------------------------------------------------------------------- 55
9.   Process When Inmate Does Not Sign Notice and Conitions of Parole with the Inmate/Parolee------------------------------------------------------------------------------ 56
10.  Appeal ------------------------------------------------------------------------------------------ 56
11.  Staff Issuance/Observation -------------------------------------------------------------- 56

XII.  DIVISION OF ADULT PAROLE OPERATIONS (DAPO) AND BOARD OF PAROLE HEARINGS (BPH) – PAROLE PROCEEDINGS ----------------------------- 57

A.  CONDITIONS OF PAROLE (COP)----------------------------------------------------------- 57
B.  PAROLE REVOCATION PROCESS------------------------------------------------------------ 57
1.   Hold is Placed ---------------------------------------------------------------------------------- 58
2.   Probable Cause Determination (PCD)---------------------------------------------------- 58
3.   Notice of Rights/Charges (NOR)----------------------------------------------------------- 59
4.   Violation Report Submitted by Parole Agent------------------------------------------- 61
5.   Violation Report Reviewed by Unit Supervisor--------------------------------------- 62
6.   Decentralized Revocation Unit – Revocation Packet Received --------------------- 62
7.   Return to Custody Assessment (RTCA)-------------------------------------------------- 63
8.   Attorney Consults With Parolee ---------------------------------------------------------- 64
9.   Expedited Probable Cause Hearing ------------------------------------------------------- 65
10.  Probable Cause Hearing (PCH)------------------------------------------------------------ 65
11.  Revocation Hearing --------------------------------------------------------------------------- 68
12.  Not In Custody (NIC) Hearing-------------------------------------------------------------- 69
C.  REVOCATION EXTENTION PROCEDURES: DAPO AND BPH------------------------ 69
1.   Revocation Extention Defined------------------------------------------------------------- 69
2.   Responsibility ---------------------------------------------------------------------------------- 70
3.   Timeline Summary ---------------------------------------------------------------------------- 71
4.   Discovery Date--------------------------------------------------------------------------------- 71
5.   Unit Supervisor Review for Referral ----------------------------------------------------- 71
6.   Notice of Rights/Charges -------------------------------------------------------------------- 72
7.   In-Custody Misconduct Report Submitted By Agent of Record--------------------- 74
8.   In-Custody Misconduct Report Review By Unit Supervisor------------------------- 75
9.   Referral To The BPH-------------------------------------------------------------------------- 75
10.  BPH Special Processing Unit Receives Packets --------------------------------------- 76
11.  Attorney Assignment (Attorney Receives Packet)------------------------------------ 77
12.  Revocation Extention Assessment -------------------------------------------------------- 78
13.  Attorney Consultation------------------------------------------------------------------------ 79
14.  Expedited Probable Cause Hearing With Offer of Proof ----------------------------- 80
15.  Probable Cause Hearing --------------------------------------------------------------------- 81
16.  Revocation Extention Hearing-------------------------------------------------------------- 85
17.  Revocation Extension Hearing Guidelines----------------------------------------------- 88

XIII. CDCR GRIEVANCE PROCEDURES ----------------------------------------------------- 88

A.  REVOCATION AND REVOCATION EXTENTION PROCESS------------------------------ 89
1.   First Level Review: BPH ADA Coordinator -------------------------------------------- 89
2.   Second Level Review: Associate Chief Deputy Commisioner ---------------------- 91
B.  LIFE INMATE, MDO, AND SVP PAROLE PROCEEDINGS--------------------------- 91
1.   Second Level Review: Associate Chief Deputy Commisioner ---------------------- 91

XIV. APPEALS PROCEDURES --------------------------------------------------------------------- 93

A.  DISABILITY-RELATED APPEALS-------------------------------------------------------------- 93

**XV.   COUNTY JAIL ACCOMMODATIONS PROCESS**-------------------------------------------- 94
    A.   DAPO RESPONSIBILITIES ----------------------------------------------------------- 94
    B.   BPH RESPONSIBILITIES------------------------------------------------------------- 95
    C.   CDCR RESPONSIBILITIES ----------------------------------------------------------- 95

**XVI.  TRAINING** ------------------------------------------------------------------------------- 96

**GLOSSARY** --------------------------------------------------------------------------------------- 96

## *I.*    POLICY

It is the policy of the California Department of Corrections and Rehabilitation (CDCR) to provide equal access to all parole proceedings to inmates/parolees with disabilities and to comply with the Americans with Disabilities Act (ADA) and the *Armstrong* remedial plan.

No qualified inmate/parolee with a disability as defined in Title 42 of the United States Code, Sections 12101 - 12213 shall, because of that disability, be excluded from equal and effective participation, to the best of his or her ability, in parole proceedings.

## *II.*    PURPOSE

Pursuant to the *Armstrong v. Schwarzenegger* Injunction, CDCR is mandated to ensure that inmates and parolees with disabilities are able to participate in parole proceedings to the same extent as non-disabled inmates and parolees. It is the purpose of this Remedial Plan to establish procedures for the implementation of the Injunction.

## *III.*    SCOPE

The policy contained within this *Armstrong v. Schwarzenegger* CDCR Parole Proceedings Remedial Plan specifically applies to *parole proceedings and staff involved in those proceedings.*

Parole proceedings by definition include:  Service of Hearing Rights, Return to Custody Assessments, Revocation Hearings, Revocation Extension Hearings, Life Prisoner Hearings (Documentation Hearings, Initial Parole Consideration Hearings, Subsequent Parole Consideration Hearings, Progress Hearings, Rescission Hearings and In Re *Stanworth* Hearings), and Mentally Disordered Offender (MDO) Hearings.  Parole proceedings also include any event related to the hearing that occurs before or after the hearing,  These events include preparations for the hearing, psychiatric evaluations, Central File (C-File) reviews, obtaining letters of support, developing lifer parole plans, and administrative reviews (i.e. BPT Forms 1074).  The Remedial Plan applies to all of the Department's adult institutions, adult parole facilities, and to all inmates/parolees who have disabilities under the Americans with Disabilities Act (ADA) whether or not the disability impacts placement.

Additionally, the court determined that following are parole proceedings:

- Notice of conditions of parole
- Inclusion in the Lifer Prisoner's Board Report information regarding the prisoner's ability to access programs previously recommended by the Board of Parole Hearings (BPH)
- Communication of special conditions of parole for parolees released to Not in Custody (NIC) status pending revocation of parole

- Consideration of Remedial Sanctions in lieu of returns to custody for parolees pending revocation of parole
- Other events deemed parole proceedings.

CDCR may modify the Remedial Plan to provide a more effective remedy. However, CDCR is required to notice Plaintiffs' counsel regarding any changes to this Remedial Plan and comply with the Ralph C. Dills Act.

## *IV.* **RIGHT TO A REASONABLE ACCOMODATION**

All inmates/parolees who have a disability under the ADA have the right to a reasonable accommodation at a parole proceeding, as defined in Section III of this Remedial Plan. The CDCR staff is responsible to ensure that: (1) the inmate/parolee is made aware of this right and informed how to request a reasonable accommodation, and (2) that the inmate/parolee has equal access to all parole proceedings.

The BPT Form 1073, Notice and Request for Assistance at Parole Proceeding, provides written notice to the BPH ADA Coordinator of an inmate's/parolee's need and/or request for reasonable accommodation related to a documented or claimed disability for a parole proceeding. A BPT Form 1073 shall be completed at the initial parole proceeding contact for every inmate/parolee, whether or not he/she has a disability, and the information from the 1073 should be entered into the Disability and Effective Communication System (DECS).

The Division of Adult Institutions (DAI), Division of Parole Operations (DAPO), Division of Correctional Health Care Services (DCHCS) and the BPH share responsibilities in various parole proceedings, which have significantly different processes. As such, the requirements of these staff vary in responsibility depending on the type of proceeding. To ensure this plan is appropriately implemented and adhered to, it has been organized to separately identify the processes in both the institution and the parole arenas as they relate to the various parole proceedings.

## *V.* **IDENTIFICATION**

The CDCR staff will identify, through review of the Disability and Effective Communication System (DECS) and completion of the BPT Form 1073, those inmates/parolees who require and/or request a reasonable accommodation at a parole proceeding. Completion of the BPT Form 1073 includes a review of all documents in DECS and the C-File or field file which may identify a disability or need for an accommodation and an interview with the inmate/parolee. DECS must be checked prior to completion of Section 1 of BPT Form 1073.

All inmates received and parolees returned to CDCR are screened and evaluated for disabilities, as well as medical and mental health needs during their Reception Center (RC) processing. In addition, the evaluation process is ongoing at mainline institutions. Documentation of these screenings/evaluations should be recorded in the inmate/parolee's C-File and DECS. Therefore, the review of the file will assist the staff in identifying inmates with a potential need for a reasonable accommodation.

*Armstrong/ Parole Proceedings*
*Remedial Plan Amended 12/1/10*

*Page 2*

Most recent pertinent source documents that may provide information for identifying inmates/parolees with disabilities include the following:

**BPT Form 1073**
**Revised (10/04)**

Notice and Request for Assistance at Parole Proceeding
Identifies an inmate's/parolee's need and/or request for a reasonable accommodation at a parole proceeding.

**CDC Form 128B**

Chrono-General
May be used to document results of the Test of Adult Basic Education (TABE)[1] Complete Battery Reading Score or the Grade Point Level (GPL), which identifies inmates/parolees who have tested at GPL level of 4.0 or lower. If no TABE score is available a GPL of 4.0 or lower may be used.

**CDC Form 128C**

Chrono-Medical-Psychiatric-Dental
Documents special concerns such as mental/physical limitations and/or health care needs related to the inmate's/parolee's disability. Documents the inmate's/parolee's level of care in the Mental Health Services Delivery System (MHSDS).

**CDC Form 128C-1**
**or**
**CDC Form 128C-1A**

Chrono-Reception Center Medical Clearance/Restriction Information
Addresses special medical/dental/psychological condition(s) identified while in the RC.

**CDC Form 128C-2**

Chrono-Recommendation for Adaptive Support
Identifies inmate's/parolee's cognitive functioning level and, if necessary, the level of adaptive services required under the Clark Remedial Plan.

**CDC Form 1845**

Inmate/Parolee Disability Verification
Establishes whether an inmate/parolee has a physical disability. It is limited to mobility, vision, hearing and speech disabilities.

**CDCR Form 7410**

Chrono-Comprehensive Accommodation
Identifies accommodations and appliances prescribed for inmates.

**CDC Form 611**
**Revised (5/01)**

Release Program Study
Contains medical/psychiatric and other disability information obtained as a result of a C-File review.

**Other**

Any other documentation in the C-File that verifies a learning disability.

---

[1] The TABE reading score of four or less means the Complete Battery as a specific type of test being used as described in the TABE Examiner's Manual. The 4.0 grade-range equivalent, as described in the manual, leaves less room for interpretation as to what "four" means. When "TABE reading score of four or less" is used, the meaning therefore is: the TABE Complete Battery reading score of four (4.0) grade-range equivalent or less.

---

## VI.  ACCOMMODATIONS

### A.  ACCESS

Equal access to parole proceedings shall be made available to inmates/parolees with qualified disabilities, which include, but are not limited to, the following:

- Verified physical disabilities, whether or not the disability impacts placement consistent with the Disability Placement Program (DPP).  This includes permanent disabilities related to mobility, vision, hearing, and speech.
- Identified developmental disabilities consistent with the Developmental Disability Program (DDP).
- Mental health needs, which require participation in the MHSDS, regardless of the level of care.
- Learning disabilities.  While CDCR is not required to verify learning disabilities, CDCR does recognize documentation in the C-File that verifies a learning disability. In addition, a reading score of 4.0 or lower may be reflective of a learning disability.

Equal access shall be achieved by use of accommodations such as auxiliary aids, sign language interpreter, staff assistance, or trained attorneys.  For inmates/parolees with mobility and vision impairments, the CDCR will ensure accessible hearing sites

### B.  EFFECTIVE COMMUNICATION

Reasonable accommodation for effective communication in parole proceedings shall be afforded inmates/parolees with disabilities, e.g., vision, speech, hearing, developmentally disabled, and learning disabled inmates.  Auxiliary aids, which are reasonable, effective, and appropriate to the needs of the inmate/parolee, shall be provided when simple written or oral communication is not effective.

The standard for equally effective communication is higher in parole proceedings and other due process functions.  It is the responsibility of CDCR staff to provide effective communication to qualified disabled inmates/parolees in parole proceedings.  The degree of accommodation that is required under these circumstances shall be determined on a case-by-case basis in keeping with the inmate's/parolee's needs.

If the staff member is required to use an alternate method of communication, including simple English, to effectively communicate with the inmate/parolee, he/she shall document on the related form (e.g., BPT Form 1073, CDC Form 128B documenting an Olson Review for life prisoner hearings, etc.) and in DECS how he/she communicated with the inmate/parolee.  The information shall also include the method used, the determination that the inmate/parolee understood the process, the basis for that determination and how the determination was made.  The recommended method of determining whether an inmate/parolee understands the communication is to have him/her repeat the communication in their own words.

DAPO Form 1515 – Notice and Conditions of Parole – has been revised to include an "Effective Communication" section. Staff completing the 1515 Form with the inmate/parolee shall indicate on the form what effective communication method was provided as a result of the file review and DECS review, and shall indicate whether and how the inmate/parolee understood what was communicated.

## C. ATTORNEY ASSISTANCE

1. Attorneys Assigned: Attorneys will be provided for Revocation and Revocation Extension Proceedings and MDO Hearings. The BPH will continue to provide attorneys to indigent inmates during Life Prisoner Hearings wherein the inmate is being considered for parole pursuant to current policy. These include Initial, Subsequent, Progress, and Rescission Parole Consideration Hearings, and In Re *Stanworth* hearings. These inmates/parolees will be allowed to waive representation if it is determined by the BPH Commissioner that they are able to make a knowing, voluntary, and intelligent waiver, unless they meet the mandatory criteria for attorney assignment, and in MDO cases.

2. Mandatory Attorney Cases – the following inmates/parolees shall be assigned attorneys and shall not be allowed to waive their pre-hearing and hearing rights, including waivers of appearance, stipulations to unsuitability, waivers of hearings, and waivers of representation:

   - All inmates presently receiving treatment at the Department of Mental Health (DMH), Enhanced Outpatient Program (EOP), or Mental Health Crisis Bed (MHCB) level of care in the MHSDS.
   - All parolees who suffer from a mental disorder, and if incarcerated would require treatment at the DMH, EOP, or MHCB level of care in CDCR's MHSDS.
   - All inmates/parolees who have been identified by CDCR as being included in the DDP.
   - All inmates with a learning disability including inmates with a TABE score of 4.0 or below.

3. Presumptive Attorney Cases – staff will presume that the following inmates/parolees need an attorney, unless there is documentation, or other reliable information that indicates that an attorney is not needed:

   - All inmates participating in the Correctional Clinical Case Management System (CCCMS) level of care in the MHSDS.
   - All parolees who presently suffer from a mental disorder, and if incarcerated would require treatment at the CCCMS level of care in the MHSDS.
   - All inmates/parolees with a learning disability including those with a TABE score of 4.0 or below.

4. No Attorney Assigned: Documentation Hearings When requested by the BPH, the DAI will assign a staff assistant to assist the inmate during the documentation hearings. The BPH shall assign staff assistants for hearings when:

- The inmate/parolee requests one;
- The Commissioner or Deputy Commissioner determines that the inmate/parolee is having difficulty understanding or communicating and the difficulty does not involve some other form of disability.
- Correctional or other staff notifies the Commissioner or Deputy Commissioner of any such difficulty they suspect.
- The Inmate/parolee is a participant in CDCR mental health programs, such as CCCMS and EOP; has been identified with a developmental disability; has a learning disability; or has a TABE score of 4.0 or below.

### D. AUXILIARY AIDS/EQUIPMENT

Below are the accommodations identified for specific disabilities. This is merely a guide and is not all-inclusive as to the means by which a disabled inmate/parolee can be accommodated. The inmate's/parolee's request for a particular type of accommodation shall be given primary consideration and shall be granted unless the request is unreasonable for specific, articulated reasons allowable under ADA, or unless other effective accommodations are available.

### 1. MOBILITY IMPAIRMENTS

The BPH ADA Coordinator, working in conjunction with the Classification and Parole Representative (C&PR), Reception Center Correctional Counselor III (RC CC-III), Institution's ADA Coordinator and/or DAPO Regional ADA Coordinator , is responsible to ensure that parole proceedings are held in an accessible CDCR facility and to provide accessible transportation to parole proceedings (vehicle, wheelchair, etc.) The BPH ADA Coordinator is responsible to ensure that parole proceedings in non-CDCR facilities are accessible and to provide accessible transportation to parole proceedings (vehicle, wheelchair, etc.).

### 2. HEARING IMPAIRMENTS

The auxiliary aid or service necessary to ensure effective communication with a hearing impaired inmate/parolee will depend on the degree of the hearing impairment.

For hearing impaired inmates/parolees whose primary communication method is by sign language, BPH will provide a certified sign language interpreter via a cooperative effort with the C&PR/RC CC-III/DAPO Regional ADA Coordinator/Institution's ADA Coordinator. **No other CDCR personnel will serve this function.**

In deciding what accommodation to provide, primary consideration shall be given to the method requested by the inmate/parolee and shall be granted unless the request is unreasonable for specific, articulated reasons allowable under ADA, or unless other

---

effective accommodations are available. An inmate's/parolee's ability to lip-read or read written notes shall not be the sole source used as a means of effective communication in parole proceedings, unless the inmate/parolee has no other means of communication, or it is the inmate's/parolee's preferred means of communication. If written notes are used by staff to assist in effective communication, they shall be attached to the related document. When staff are required to use an alternate method of communication to effectively communicate with the inmate/parolee, they shall document the method used, the determination that the inmate/parolee understood the process, the basis for that determination and how the determination was made on the related form applicable to the particular hearing.).

Accommodations available for inmates/parolees with hearing impairments to ensure effective communication to the best of his/her ability shall include:

- Assistive listening devices
- Computer terminals
- Real time captioning
- ADA trained panel attorney*
- Sign language interpreters
- Oral and intermediary interpreters
- Written communication
- Telecommunication Device for the Deaf (TDD) machines
- A combination of the any of the above

## 3. VISION IMPAIRMENTS

Vision impairments range from partial loss to total loss of vision. The auxiliary aid or service necessary for the inmate/parolee will depend on the degree of vision impairment. In deciding what accommodation to provide, primary consideration shall be given to the method requested by the inmate/parolee and shall be granted unless the request is unreasonable for specific, articulated reasons allowable under ADA, or unless other effective accommodations are available.

The following auxiliary aids and services may be made available for inmates/parolees with vision impairments to ensure effective communication to the best of his/her ability:

- Audio-tape
- Braille
- Electronic equipment (reading machines)
- Large print
- Magnifying devices
- Qualified Reader
- Staff assistance
- ADA trained panel attorney

4. **SPEECH IMPAIRMENTS**

Speech impairments range from mild to severe and are characterized by stuttering and/or difficulty in producing sounds and/or difficulty in producing or understanding language.

The following auxiliary aids may be available to speech impaired inmates/parolees to ensure participation in parole proceedings to the best of the individual's ability:

- Communication books or boards
- Computer terminals
- Speech synthesizers
- TDD machines
- ADA trained panel attorney

5. **MENTAL/PSYCHOLOGICAL/DEVELOPMENTAL DISORDERS**

Qualified individuals with mental, psychological, or developmental disabilities may require one or more of the following accommodations:

- ADA trained panel attorney
- Forms revised into simple English
- Impartial advocates (Regional Centers)
- Sign language interpreters
- Staff assistance
- Staff clinicians

Effective communication with inmates/parolees with mental/psychological disorders may require using basic communication skills and avoiding complex words or complicated concepts.

6. **LEARNING DISABILITIES**

A learning disability is a lifelong disorder in one or more basic psychological processes involved in understanding or using language. It may interfere with one's ability to listen, think, speak, read, write, spell, or do mathematical calculations. School based definitions may specify a significant discrepancy between the individual's intelligence and his/her academic achievement.

Effective communication with inmates/parolees with learning disabilities may require basic communication skills in a patient, respectful, dignified manner and avoiding complex words or complicated concepts.

**CDCR is not required to test inmates/parolees for learning disabilities. However, for the purpose of this remedial plan , a Test of the Adult Basic Education (TABE) Complete Battery Reading Score of 4.0 or lower (or, in its absence, a GPL of 4.0 or lower), and/or an inmate/parolee's claim of a learning**

**disability shall be used as a trigger to alert CDCR to the possible presence of a learning disability and possible need for accommodation.**

In the event an inmate/parolee with a reading score of 4.0 or less cannot read and comprehend documents in parole proceedings and has not yet been assigned an attorney, staff shall provide reasonable accommodations to ensure effective communication (e.g., staff assistance, electronic readers, and sign language interpreter, etc.). Staff shall also provide such reasonable accommodations to inmates/parolees who have TABE scores higher than 4.0 if required to ensure effective communication.

**The following accommodations may be available to inmates/parolees with learning disabilities to ensure equal participation in any parole proceedings to the best of the individual's ability:**

- ADA trained panel attorney
- Additional time
- Audio taped materials
- Electronic equipment
- Highlighter pens and markers
- Staff Assistance
- Forms revised in simple English
- Large print

## VII.  COORDINATION OF SERVICES AND ACCOMODATIONS

The CDCR shall ensure that inmates/parolees with disabilities have equal access to parole proceedings. Maintaining, providing and coordinating the reasonable accommodations noted herein are the responsibility of the following:

### A.  BPH ADA COMPLIANCE UNIT

The responsibilities of the BPH ADA Compliance Unit (ADACU), as they relate to this Remedial Plan, include the following:

1.  Maintain a list of sources that have auxiliary aids that are available on short notice.

2.  Maintain the assistive listening devices, and magnifying devices at BPH Headquarters that are available upon request.

3.  Ensure auxiliary aids and/or needed equipment is forwarded by overnight mail to the appropriate RHC or C&PR/RC CC-III.

4.  Maintain a system to track the type of equipment requested and the location of the auxiliary aids/equipment.

---

5. Test auxiliary aids and equipment regularly to ensure it is operable. The ADACU will make all efforts to avoid postponements of parole proceedings due to maintenance or repair of equipment.

6. Maintain a supply of BPH forms in the following alternative formats:

   - Audio-cassettes
   - Braille
   - Large print
   - Simple English

7. Review and make determinations on requests for reasonable accommodations via the BPT Form 1073(a).

8. Maintain the Disability and Effective Communication System (DECS).

9. Ensure that parole proceedings are held in locations that are physically accessible to inmates/parolees with mobility and/or vision impairments.

10. Respond to 1074 Forms submitted by inmates/parolees.

11. Track reports of non-compliance at county jails.

## B. BPH Scheduling Unit

The BPH Scheduling Unit shall coordinate the hiring of communication services for BPH proceedings. Communication services will be provided through a professional agency that provides the services necessary to ensure effective communication with deaf, hard of hearing, or deaf-blind people.

Communication services provided by the BPH may include:

1. **REAL TIME CAPTIONING:** This service provides simultaneous written text of spoken language either on a computer screen or overhead projector by professional court reporters.

2. **SIGN LANGUAGE INTERPRETER:** A qualified sign language interpreter is a person who is able to sign to the individual who is deaf what is being said, and who can voice what is being signed by the individual who is deaf. This communication must be conveyed effectively, accurately, and impartially, through the use of any specialized vocabulary. The requirement of "impartial" interpreting services means that the sign language interpreter must not have a personal relationship with the individual with a disability or otherwise be biased for or against that person.

3. **ORAL INTERPRETER:** This service involves transliteration and interpretation by use of facial expression, lip/mouth movement, and hand gestures, for deaf and hard-of-hearing individuals who do not rely on sign language for communication.

4. **TACTILE:** This service is a form of sign language interpretation specifically for deaf-blind individuals.

5. **INTERMEDIARY INTERPRETING:** An intermediary interpreter may be needed when the communication mode of a deaf person is so unique that interpreters who are not deaf cannot adequately access it. A deaf intermediary with specialized communication skills communicates using the unique method with the inmate/parolee and signs to the hearing interpreter, who then voices what has been signed.

## C. INSTITUTIONS/PAROLE FIELD UNITS

1. The CC-I/Field Unit Notice Agent (FUNA)/Decentralized Revocation Unit Notice Agent (DRUNA) shall identify the reasonable accommodation needs of the inmate/parolee.

2. The C&PR/RC CC-III shall provide the services and/or equipment deemed appropriate to reasonably accommodate a disabled inmate/parolee at a parole proceeding.

3. If the CDCR institution/facility does not have the recommended equipment, the C&PR/RC CC-III shall immediately notify the BPH ADA Coordinator. The BPH ADA Coordinator will ensure the requested equipment is provided, or provide another equally effective means that will accommodate the inmate/parolee and ensure his/her access and/or effective communication at the parole proceeding.

## VIII. BPT FORM 1073 – NOTICE AND REQUEST FOR ASSISTANCE AT PAROLE PROCEEDING

A revised BPT Form 1073, Notice and Request for Assistance at Parole Proceeding, is included in this Remedial Plan. The following are instructions on how to complete the form. These instructions are also contained on the back of the original BPT Form 1073 for easy reference.

### A. SECTION I: PRE-INTERVIEW FILE AND DECS REVIEW (STAFF ONLY)

1. This section requires completion of a file and DECS review to determine whether or not the inmate/parolee needs assistance with effective communication or has a disability which needs to be accommodated at the parole proceeding. The staff member shall print his/her name, sign and date the form in this Section to acknowledge completion of the file review. (In revocation proceedings, the Agent must ensure either the CDC Form 611 (05/01 or later) OR a Parolee Disability Review Sheet is in the field file.

2. When initiating the form, it is important for the staff member to first write the inmate's/parolee's name, CDCR number, the type of parole proceeding, and the institution/region/county jail where the inmate/parolee is located at the bottom of the form.

3. When completing this form, the staff member shall review the file for the corresponding source documents as indicated below and designated staff shall attach a copy when a verified/identified disability is noted.

4. The appropriate boxes shall be checked for items that identify a disability by staff prior to initial Service.

   a) **Mental Health Concerns** – check this box if a CDC Form 128C indicates the inmate/parolee is included in the Mental Health Services Delivery System. Circle the Level of Care and write the date of the chrono.

   b) **Developmental Disability** – check this box if a CDC Form 128C2 indicates the inmate/parolee is included in the developmental disability program. He/she must be categorized in one of the following DDP categories: DD1, D1A, DD2, or DD3. Circle the appropriate code and write the date of the chrono. (If the code is NDD or DDO, do not check this box.).

   c) **Physical Disability** – check this box if there is a CDC Form 1845, which identifies a verified disability. Circle the appropriate disability (there may be more than one) and write the date of the CDC Form 1845.

   d) **Other Disability** – check this box if there is a document which states the inmate/parolee has a disability other than those identified on the forms indicated above. Write the name of the document and its date.

   e) **Learning Disability** – check this box if there is a document which states the inmate/parolee has a learning disability. Write the name of the document and its date.

   f) **No Disabilities Identified from the file review.** If all of the above boxes are unchecked, check this box.

5. **Reading Level** – check the box and write the inmate/parolee reading level (if available) and his/her total grade point level (GPL). (If neither the reading level nor the GPL are in the file, do not check the box and write N/A.)

6. **Non-English Speaking** – if the inmate's/parolee's primary language is not English, check this box and write the language he/she speaks as identified in the file review.

**NOTE:** If it has been determined in Section I that an accommodation and/or interpreter is required, the employee shall provide that accommodation to the inmate/parolee prior to completing Section II.

**B. SECTION II: INMATE/PAROLEE ADA RIGHTS & SELF IDENTIFICATION**

1. The staff member shall advise the inmate/parolee that he/she has a parole proceeding pending and the reason for the proceeding. The staff member shall read or ask the inmate/parolee to read out loud the rights statement at the beginning of this section.

2. The remaining portion of this section is for the inmate/parolee to disclose assistance he/she needs for the proceedings. If the parolee cannot complete this section, the staff member shall provide assistance by recording the responses given by the inmate/parolee

**C. SECTION III: INITIAL SERVICE OF RIGHTS (STAFF ONLY)**

1. In this section, the staff member shall document his/her observations. The staff member shall document whether the inmate/parolee appeared to understand his/her rights (described on the form handed out with the BPT Form 1073) and charges, if any. If after providing assistance for effective communication and the inmate/parolee still appears to have difficulty understanding, the staff member shall check the appropriate box. If an alternate method of communication is used, the staff member shall check the appropriate box and indicate the type of accommodation.

2. If the parolee is housed in a county jail facility, and requests an accommodation or the CDCR staff member identifies the need based on observations during the serve process, the staff member will notify the county jail staff member supervising the parolee in the location where the serve process is conducted. Notification should occur prior to the CDCR staff member departing the county jail facility, but no later than two business days after completing the serve.

3. Any observations from the interview the staff member believes are pertinent should be written in the "Additional Comments" portion of this Section. This includes the name of any county jail staff that has been notified of a parolee's ADA needs, and any response provided by the county jail staff.

4. The staff member shall print his/her name, sign and date the form.

**D. SECTION IV: BPH REVIEW FOR INTERNAL USE (NON-LIFER ONLY) – SCHEDULING**

In revocation and revocation extension cases where a Decentralized Revocation Unit (DRU) is involved, DRU staff will complete this section prior to attorney assignment and review it after the attorney consultation. In cases where a DRU is not involved, the DC will complete this section as part of their review.

**E. SECTION V: BPH REVIEW FOR INTERNAL USE – DECS VERSION – DCs**

In the DECS electronic version of BPT Form 1073, the paper form's Section IV is separated into two sections, Sections IV and V. With the exception of these separate sections, the printed version of the electronic form is identical to the traditional paper form. Deputy Commissioners shall use the "View ADA/EC History" function in DECS

to enter accommodations provided at a hearing. This must be completed at the hearing or immediately after the hearing

## *F.* DISTRIBUTION OF THE BPT FORM 1073

The staff member conducting the interview shall provide the inmate/parolee with his/her copy and return the original to the appropriate Case Records staff. Case Records staff shall make copies (if necessary) and complete distribution as indicated below:

1. The **original** BPT Form 1073 shall be filed in the BPH Section of the inmate's/parolee's C-File.

2. The **second page** shall be provided to the BPH ADA Coordinator.

3. The **third page** shall be provided to the inmate/parolee by the staff member conducting the interview, upon its completion.

4. The **fourth page** will be forwarded by the DRU or the institution Case Records staff to the parole unit for placement in the parolee's field file upon completion of the revocation process, and should be included in the lifer packet.

5. For Life Prisoner and MDO cases where a disability is claimed or identified, the C&PR/RC CC-III shall mail the BPT Form 1073 with supporting documents to the BPH ADACU on a weekly basis to Board of Parole Hearings, Attention: BPH ADACU 1515 K Street, Suite 600, Sacramento, CA 95814.

6. For Life Prisoner and MDO In all cases where the BPT Form 1073 does not reflect a claimed or identified disability, a copy of the BPT Form 1073 shall not be forwarded to BPH ADACU. The original BPT Form 1073 shall be maintained in the C-file.

7. For Life Prisoner cases a copy of the original BPT Form 1073 shall be provided to the attorney prior to the life parole consideration hearing. The copy shall be included in the preparatory file that is sent to the attorney prior to the parole consideration hearing.

## *IX.* DISABILITY AND EFFECTIVE COMMUNCIATION SYSTEM (DECS): OVERVIEW OF BPH PROCEDURES

The Disability Effective Communication System (DECS) is a statewide, computerized networked disability/effective communication database that can be utilized by CDCR staff to view disability information and necessary accommodations for inmates and parolees in parole proceedings. The purpose of DECS is to provide historical information relative to an inmate/parolee's disability and accommodation needs, to use as a tool for planning accommodations for the parolee/inmate during the imminent parole proceeding, and, by updating, to maintain a real time tracking of individual parole/inmate disability data. CDCR staff **must** view DECS prior to meeting with the inmate/parolee for a parole proceeding or scheduling a parole proceeding and then enter into the DECS updated ADA information.

Prior to meeting with the inmate/parolee for a parole proceeding, a review of the DEC is required. DECS will provide information that will assist staff in identifying needed accommodations for the face-to-face interview with the inmate. Staff shall update DECS by transposing the information from the paper BPT Form 1073 to the appropriate sections of the electronic BPT Form 1073.

BPH staff involved in scheduling a hearing shall review DECS for the purpose of identifying needed accommodations for hearing. BPH scheduling staff shall update Section IV of the electronic BPT Form 1073 documenting the accommodations to be provided for the hearing.

The following is an overview of the procedures regarding how CDCR staff will utilize DECS when performing their job duties in all four types of proceedings. Detailed BPH and DAPO procedures on staff responsibilities and utilization of DECS are contained in this document elsewhere and can be found in the sections addressing different parole proceedings.

In completing Sections I through III of the BPT Form 1073, staff will review DECS prior to meeting with the inmate/parolee or for the scheduling of a BPH proceeding. The staff shall review any previous disability-related documents, including electronic 1073 Forms, and should check the DEC DAI Summary page. The staff shall ensure that accommodations previously provided shall be considered to ensure equal access and effective communication. For example, if a previous BPT Form 1073 or the DECS DAI Summary page indicated that documents were read aloud to the inmate/parolee, this information shall be considered in that the staff person meeting with the inmate/parolee for the parole proceeding may have to read documents to the inmate/parolee. After meeting with the inmate/parolee and completing the paper BPT Form 1073, staff shall update DECS by transposing the information to the appropriate sections of the electronic BPT Form 1073 as soon as possible but within 24 hours (one business day) of completing the interview. Disability-related documents and DECS must also be reviewed prior to staff completing Section IV of the 1074 Form in advance of a BPH proceeding.

When conducting parole proceedings that do not require completing a BPT Form 1073 such as developing lifer parole plans, psychiatric evaluation, letters of support, etc., staff shall review DECS and document accommodations provided by completing the electronic form, "BPH Parole Proceeding Accommodations Provided" in DECS.

For Lifer Prisoner parole proceedings, CDCR will provide DECS access to attorneys and mental health clinicians via the internet and at terminals in institutions (clinicians only) which will allow a review of inmate/parolee disability and effective communication information prior to meeting with the inmate/parolee. The clinicians must also update DECS by documenting accommodations provided.

## X.   INSTITUTIONS – PAROLE PROCEEDINGS

**The C&PR, RC CC-III, CC-I and the ADA Coordinator within the institutions are the essential personnel relative to ensuring the implementation of this Remedial Plan. Responsibilities for Division of Adult Institutions (DAI) staff and procedures related to parole proceedings (as defined in Section III of this Plan) within the institutions are set forth below.**

## *A.* LIFE PRISONER HEARINGS

The CDCR coordinates the scheduling of Life Prisoner Hearings with the BPH Scheduling Unit. The BPT Form 1073 must be completed in accordance with Section VIII and instructions on the back page of the BPT Form 1073.

### 1. BPT FORM 1073 AND RIGHTS PACKET PROCESS

The institution Lifer Desk will prepare the Life Prisoner Hearing Rights packet and submit it to the CC-I for Service. The Life Prisoner Hearing Rights packet will include the following documents:

- BPT Form 1002      Life Prisoner Notice of Hearing Rights
- BPT Form 1003      Request for Attorney/Waiver of Attorney or **Withdrawal Request**
- BPT Form 1073      Notice and Request for Assistance at Parole Proceeding
- BPT Form 1001(a)   Life Prisoner Hearing-Extraordinary Action and Decision

a) At least 180 days prior to the hearing, the institution Lifer Desk staff shall notify and provide a BPT Form 1073 and Rights packet with the notice advising the CC-I that a Board Report is required on a life prisoner.

b) Form 1073:   The CC-I shall complete the BPT Form 1073 and Rights packet 150 days prior to the hearing.

1) The CC-I shall initiate the BPT Form 1073, review the C-File and DECS, and complete Section I, as described in Section VIII of this Remedial Plan and instructions on the back page of the BPT Form 1073.

2) The CC-I shall also ensure that copies of any ADA source documents in the C-File that are identified in Section I of the BPT Form 1073 are attached for inclusion in the packet.

3) The CC-I shall review DECS prior to interviewing the inmate or serving any hearing related documents.

4) The CC-I shall ensure that all reasonable accommodations are provided including the need of a sign language interpreter. If a sign language interpreter is needed to effectively communicate with the inmate, the CC-I shall contact the institution ADA Coordinator to coordinate the date and time for the services of a sign language interpreter.

5) If during the interview process, the inmate requests a sign language interpreter, or it otherwise becomes apparent that the inmate requires a sign language interpreter to effectively communicate, then the CC-I shall not complete noticing the inmate without the assistance of a sign language interpreter. The CC-I shall stop the Serve and coordinate the services of a sign language interpreter as indicated above.

6) If a review of DECS or the BPT Form 1073 indicated a request for a reasonable accommodation including a sign language interpreter, the CC-I shall ensure that necessary accommodations are provided by contacting the Institution ADA Coordinator.

7) The BPH ADA Coordinator and C&PR will be responsible for ensuring that the accommodation is provided to the inmate for completion of all parole proceedings, including the hearing. The BPH ADA Coordinator shall assist institutions in arranging accommodations that are not available at the institutions.

c) The inmate shall complete Section II of the BPT Form 1073 with the help of the CCI if necessary.

**CDCR staff must always ensure effective communication in any situation involving an inmate's waiver of a hearing or attorney appointment. Forms used for waivers of rights to hearings or attorneys shall not be presented to inmates requiring mandatory or presumptive attorney appointment as described in Section VI.C., above.**

d) Form 1002:    The CC-I shall:

1) Review the BPT Form 1002 with the inmate and ask if he/she has any questions regarding his/her rights.

2) Have the inmate sign, write his/her CDCR number, and date the bottom of BPT Form 1002 stating he/she has been read/told his/her rights and provided the opportunity to ask questions.

3) Sign and date the BPT Form 1002 acknowledging that the rights have been explained to the inmate and that you provided him/her an opportunity to ask questions and provided the answers. The CC-I shall also identify his /her title.

e) Form 1003:    The CC-1 shall:

1) Review the BPT Form 1003 with the inmate explaining the Request for Attorney, Waiver of Attorney and Withdrawal of Request for an Attorney sections with the inmate and advise the inmate to complete as soon as possible and returned by the no later than date.    Advise inmates with learning or developmental disabilities of any additional resources available in helping them understand and complete the form.

f) Requesting/Waiving an Attorney:    The CC-I shall:

1) Inform the inmate if he/she is requesting the assistance of an attorney at the hearing, he/she shall check the box in the Request for Attorney Section.

2) If the inmate is retaining his/her own attorney, inform the inmate to check the box that states, "I have or can retain my own attorney" and have the inmate write his/her attorney's name, address and telephone number.

3) Have the inmate sign, write his/her CDCR number and date Request for Attorney section of the form.

4) If the inmate is requesting the assistance of a state appointed panel attorney to assist him/her, advise the inmate that both boxes, the "I request the assistance of an attorney at my hearing" and the "I wish to have the state provide an attorney" must be checked.

5) Have the inmate sign, write his/her CDCR number and date the form in this section declaring under penalty of perjury that he/she is indigent (explain indigent prior to the inmate signing).

6) If the inmate is requesting to waive the right to have an attorney, advise the inmate to check the box that states, "I waive my right to have an attorney" in the Waiver of the Attorney section.

7) If the inmate does not want the assistance of an attorney at the hearing, advise the inmate to write the date of the interview on the line, ensure that the inmate understands that he is scheduled to appear before the Board of Parole Hearings formerly referred to as Board of Prison Terms, inform him of his right to be represented by an attorney at the hearing including a state appointed attorney if he is indigent; however, by checking the box indicating that he is declining attorney assistance.

8) Have the inmate sign, write his CDCR number and date the form in the Waiver of Attorney section.

9) If the inmate is requesting to withdraw his or her request for an attorney, advise the inmate to check the box that states, "I withdraw my request for an attorney."

10) Explain to the inmate that his/her signature acknowledges that his/her decision to withdraw the request for an attorney is not being made as a result of any promises or duress and explain that as a result of this request, he/she will not be able to request an attorney again for this hearing.

11) Have the inmate sign, write his/her CDCR number and date the form in the Withdrawal of Request for an Attorney section.

g) Form 1001:   The CC-I shall review the BPT Form 1001 (a), Life Prisoner Hearing-Extraordinary Action and Decision with the inmate, and shall:

1) Explain to the inmate that there are three actions identified in the top portion of the BPT 1001 (a); "Do not want to attend", "Ask to postpone" and "Do not

---

want hearing, not ready for parole." If the inmate is requesting one of the three options, check the appropriate box.

2) Advise the inmate of the type of hearing and mark the appropriate box.

3) Explain the "Give up the Right to Attend Hearing" section to the inmate. If the inmate does not want to attend the hearing, ensure the appropriate box is checked identifying whether or not he/she would like someone to attend the hearing for him/her. For example, if the inmate is requesting to send his/her attorney, mark the box that states, "I will send my own attorney.

4) Explain the "Postpone the Hearing" section to the inmate. If the inmate is requesting to postpone the hearing, the inmate must acknowledge that he/she understands the type of hearing that is planned and identifying the month and year that he/she is requesting the BPH to re-schedule the hearing.

5) Explain the "Not Ready for Parole" section to the inmate. If the inmate is requesting to postpone the hearing because he/she is not ready for parole, then the inmate must acknowledge that he/she understands the type of hearing that is planned, identify the length of time he/she will be ready for the hearing (i.e., one year) and identify the reasons he/she is not ready under the "Reasons" section.

6) Have the inmate sign and date the bottom section of the form.

7) Witness the signature and date the form.

h) Upon completion of the service of the rights and charges with the inmate, the CC-I shall complete Section III of the BPT Form 1073.

i) Upon completing the BPT Form 1073 in accordance with Section VIII of this Remedial plan, the CC-I shall update DECS in accordance with Section IX as soon as possible but within 24 hours of completing the interview and return the BPT Form 1073 and Rights Packet to the institution Lifer Desk staff.

j) In every parole proceeding as defined in Section III of this Remedial Plan, which includes but not limited to Service of the Rights packet, the interview for Board Report, assistance with Lifer Parole Plans, letters of support, review of Board Report, conducting an *Olson* Review, and assistance with appeals relating to ADA accommodations, the CC-I shall review DECS prior to meeting with the inmate. This includes parole proceedings that do not require the completion of the BPT Form 1073. The CC I shall update DECS in accordance with Section IX as soon as possible but within 24 hours of completing the interview.

k) If DECS or the BPT Form 1073 indicates a request for a reasonable accommodation, the BPH ADA Coordinator and C&PR are responsible for providing the necessary accommodations to ensure that the inmate has equal access to the Life Prisoner Hearing. If the reasonable accommodation is not

available, the C&PR will contact the BPH ADA Coordinator for assistance in acquiring a reasonable accommodation and forward the BPT Form 1073 and all disability related documents, if applicable to the BPH ADA Coordinator.

l) BPH ADA Coordinator will document his/her decision regarding the request on the BPT Form 1073(a), enter this information into DECS in accordance to Section IX and coordinate the accommodation with the C&PR.

m) If the Life Prisoner hearing requires a psychiatric evaluation, the institution Lifer Desk staff shall notify the BPH at 180 days prior to the hearing that a Psychiatric Report is required on a life prisoner and that the final Psychiatric Report is due 90 days prior to the hearing.

2. **REASONABLE ACCOMMODATIONS**

a) CDCR staff shall access DECS prior to contacting an inmate undergoing a parole proceeding and prior to scheduling a parole proceeding, to determine whether the inmate has a disability or requires a reasonable accommodation. After review of the BPT 1073 and DECS, if it is determined that the inmate requires a reasonable accommodation, it is the responsibility of BPH or institution staff to ensure that the accommodation is provided. Parole proceeding contacts include, but are not limited to Service of Rights Packet, Attorney consultations, interviewing the inmate for Board Report and for psychiatric report, reviewing Board Reports and psychological reports with the inmate, assisting the inmate with Lifer Parole Plans, conducting an *Olson* Review, and assisting with appeals related to ADA accommodations.

b) Reasonable accommodations to ensure effective communication, as described below, can be for cognitive or physical disabilities. Regardless of the type of disability, if the inmate has been identified as requiring a reasonable accommodation to ensure effective communication, at each contact the institution and BPH staff must ensure the following is adhered to:

1) If an inmate **requires any reasonable accommodation including the use of a sign language interpreter to effectively communicate**, the CC-I and BPH clinician shall conduct their interviews with the inmate regarding the parole proceeding with the assistance of whatever is needed to effectively communicate, including a include a sign language interpreter if necessary. If the BPH or institution staff member arrives at the interview and discovers that additional accommodations and or assistance are needed in order for the prisoner to understand and participate in the proceedings, the staff member shall stop the interview and contact the institution's ADA Coordinator to arrange for those accommodations.

i   The CC-I shall document on the related parole proceeding document, e.g., Service of Rights Packet, Board Report, CDC Form 128B for Olson Review, (BPH Clinician for Psychiatric Report), etc., how the information was communicated and if the inmate appeared to understand the process.

---

> ii **If the CC-I or BPH clinician believes that even with their assistance the inmate does not appear to understand the process,** they shall document that opinion on the related forms, and return them to the C&PR. The C&PR shall contact the BPH ADA Coordinator via telephone to advise him/her of the concerns regarding the inmate's ability to understand. The C&PR shall fax the BPT Form 1073 to the BPH ADA Coordinator during this process for review. The BPH ADA Coordinator shall advise the C&PR on the telephone how to proceed, as well as document his/her decision on a BPT Form 1073(a). The BPT Form 1073(a) shall be faxed to the C&PR and then mailed to the institution for inclusion in the C-File.

c) The BPH Commissioners and Deputy Commissioners are responsible for reviewing DECS and the BPT Form 1073 to ensure effective communication with the inmate during the hearing. In addition, the BPH Commissioner chairing the hearing shall document any assistance provided to achieve effective communication, whether effective communication was achieved and how the determination was made on the hearing results provided to the inmate. If a needed accommodation has not been provided for the hearing, the Deputy Commissioner/Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date. After the hearing, the BPH Deputy Commissioner will update DECS in accordance with Section IX as soon as possible but no later than 24 hours of the hearing.

d) When requested by the BPH, the Division of Adult Institutions shall assign a staff assistant to assist the inmate during BPH hearings. The staff assistant shall check and update DECS prior to assisting the inmate.

3. **ATTORNEY ASSISTANCE**

a) As described in Section VI, C, of this Remedial Plan, the BPH will provide attorneys to indigent inmates during Life Prisoner Hearings, including Initial, Subsequent, Progress, Rescission, and In Re *Stanworth* Hearings. When requested by the BPH, the institution will assign a staff assistant to assist the inmate during hearings where the inmate requires an accommodation, but an attorney is not assigned, as described in Section VI.C.4. The staff assistant will review DECS prior to meeting with the inmate.

b) Attorneys assigned to inmates with disabilities shall be required to complete ADA training.

c) Section VI, C, delineates the inmates with disabilities who shall not be allowed to waive attorney representation when assigned.

---

d) CDCR will provide DECS access to the attorneys via the internet which will allow a review of inmate disability and effective communication information and prior to the meeting with their client. The attorney shall update DECS by documenting accommodations provided.

e) The BPH Lifer Desk staff shall arrange any needed accommodations that may be required for Life Prisoner attorney consults or Life Prisoner hearings. In doing so, they may consult with the institution's ADA Coordinator.

## 4. BOARD REPORT

a) At Life Prisoner parole consideration hearings, the BPH Panel should not instruct an inmate to participate in programs in which he or she is unable to participate due to his or her disability.

b) If the BPH Panel, at the previous hearing, directed the inmate to participate in a program in which the inmate was unable to participate due to his/her disability, the CC-I shall include in the current Board Report information regarding the type of disability the inmate has and how it may have affected the inmate's ability to participate in the recommended program.

c) The C&PR shall ensure that this information is in the Life Prisoner Board Report for inmates with disabilities.

## 5. PSYCHIATRIC REPORT

a) The BPH Forensic Assessment Division (FAD) Lifer Unit Chief Psychologist is responsible to ensure that the assigned BPH clinician has reviewed DECS and is aware of the reasonable accommodations required for the contacts with the inmate relative to the Psychiatric Report.

b) If an inmate requires a reasonable accommodation, the BPH clinician shall ensure the accommodation is provided in each contact and complete the necessary documentation. If during the interview, a BPH Clinician becomes aware that the inmate needs a reasonable accommodation, the BPH clinician shall take all reasonable steps to arrange that accommodation, including contacting the BPH FAD Lifer Unit for the accommodation needed. If the accommodation cannot be provided during the interview, the interview will be rescheduled with the necessary accommodation. The BPH clinician is responsible for updating the information in DECS. Upon completion of the Psychiatric Report, the BPH clinician shall forward the original to the Records Office.

c) Records staff will provide a copy of the Board Report with a copy of the Psychiatric Report and a CDC Form 128B to the CC-I for issuance to the inmate. The CC-I shall provide a copy of the Board Report and Psychiatric Report to the inmate and have the inmate sign a CDC Form 128B acknowledging receipt.

d) If the inmate requires a reasonable accommodation to effectively communicate, other than an auxiliary aide (eyeglasses, hearing aid, etc), the assigned attorney shall be responsible to review the Psychiatric Report with the inmate.

All other procedures relative to the Life Prisoner Hearing process not addressed in this Remedial Plan shall remain consistent with the mandates of the Penal Code, the applicable regulations, and BPH policy.

## *B.* MENTALLY DISORDERED OFFENDER HEARINGS

### 1. COORDINATION

The policies and procedures for pre-screening of potential MDO remain in effect. The issues pertinent to this Remedial Plan begin with the psychiatric evaluation reports pursuant to Penal Code (PC) Section 2962. All MDO candidates are automatically afforded ADA trained legal representation for the MDO Certification, Placement, and Annual Review Hearings. The MDO Coordinator at each institution shall liaison with the institution's Health Care Services or the Division of Correctional Health Care Services (DCHCS) MDO Unit, as current process provides, and the Department of Mental Health (DMH) to coordinate all cases requiring an evaluation.

### 2. EVALUATIONS

Each inmate referred must have evaluations completed by both CDCR and DMH clinicians. In the event of a Difference of Opinion, the institution's MDO Coordinator shall liaison with the BPH MDO Coordinator to schedule two independent evaluators.

a) The CDCR and DMH clinicians will be responsible to access the Disability and Effective Communication System (DECS) or obtain a printout of the DECS DAI Summary page from the MDO Coordinator. The clinicians will use this information to ensure they provide reasonable accommodations and use effective communication (simple language and/or any other means of effective communication) during the interview. The clinician shall document any reasonable accommodation(s) and whether effective communication was provided. The clinician will also indicate within the body of the report how the determination was made that the inmate understood the process. The clinician shall ensure DECS is updated to indicate what accommodation(s), if any, were provided. The Facility Captain of the DCHCS MDO Unit shall liaison with DMH and the institution's MDO Coordinator to ensure that this process is completed.

b) The institution MDO Coordinator shall assist in the scheduling of CDCR, DMH and BPH clinicians for evaluations, liaison with medical and custody staff for clinician escorts, inmate ducats and prepare gate pass clearances for the C&PR/RC CC-III or designee signature as needed.

---

*Armstrong/ Parole Proceedings*
*Remedial Plan Amended 12/1/10*

*Page 23*

c) Copies of the CDCR and DMH reports shall be forwarded to the DCHCS MDO Unit. In those cases where CDCR contracts for the evaluation, copies of the evaluation shall be forwarded to the DCHCS MDO Unit by the institution. When cases are found to be positive by both CDCR and DMH, or there is a Difference of Opinion, the DCHCS MDO Unit will contact the institution MDO Coordinator and request supporting documentation for preparation of the certification package. The certification package will be forwarded by the DCHCS MDO Unit to the BPH Forensic Assessment Division (FAD)-MDO Unit for review and certification or assignment of independent evaluators.

d) If the inmate is certified as MDO, the BPH FAD-MDO Unit will fax the BPT Form 1400, Certification Order, to the C&PR/RC CC-III, DCHCS MDO Unit, Agent in Charge, at Atascadero Sub Unit, Parole Agent II at Patton, and the State Hospital Coordinator.

3. **BPT FORM 1073 AND RIGHTS PACKET PROCESS**

a) Upon receipt of the BPT Form 1400, the institution MDO Coordinator shall complete Section I of the BPT Form 1073. Completion of the BPT Form 1073 shall be consistent with instructions in Section VIII of this Remedial Plan and the instructions on the back page of the BPT Form 1073. The institution MDO Coordinator shall also review DECS prior to interviewing the inmate. The MDO Coordinator shall also attach to the BPT Form 1073 copies of any ADA source documents in the C-File that are identified in Section I of the BPT Form 1073.

b) The institution MDO Coordinator shall serve the following packet to the inmate:

| | | |
|---|---|---|
| • BPT Form 1073 | Notice and Request for Assistance at Parole Proceeding (with attached disability-related documents) | |
| • BPT Form 1400 | Certification Review | |
| • BPT Form 1401 | Information for Persons Certified as Mentally Disordered Offenders | |
| • BPT Form 1410 | Notice of Rights to Certification Hearing | |
| • BPT Form 1410(A) | Notice of Rights to Certification Hearing-Acknowledgment | |
| • CDCR Form 1515 | Notice and Conditions of Parole | |

c) Prior to meeting with the inmate, the institution MDO Coordinator shall ensure that all reasonable accommodations are provided to complete the Service, including the need for a sign language interpreter. The MDO Coordinator shall contact the institution ADA Coordinator for assistance.

d) If a review of DECS or the file reflects that the inmate requires the assistance of a sign language interpreter, the institution MDO Coordinator shall contact the institution ADA Coordinator to arrange the date and time for the interpreter to complete the Service.

e) If during the interview the institution MDO Coordinator determines while completing the BPT Form 1073, that the inmate requires assignment of a sign language interpreter or any other necessary effective communication accommodation, the institution MDO Coordinator shall stop the Service and contact the institution ADA Coordinator following the steps outlined in paragraph (c) above.

f) If DECS or the BPT Form 1073 indicates a request for a reasonable accommodation that is not available at the institution, the MDO Coordinator shall contact the C&PR/RC CC-III who shall fax the BPT Form 1073 to the BPH ADA Coordinator. The BPH ADA Coordinator will document his/her decision regarding the request on a BPT Form 1073(a) and fax it to the C&PR/RC CC-III. The BPH ADA Coordinator and C&PR/RC CC-III will be responsible to ensure the accommodation is provided to the inmate for completion of all parole proceedings, including the hearing.

g) The institution MDO Coordinator shall complete Section II of the BPT Form 1073 in accordance with Section VIII of this Remedial Plan; review the packet and the MDO process with the inmate.

h) The inmate shall be advised of his/her special condition for treatment at a State Hospital pursuant to PC 2962, and that failure to sign the CDCR Form 1515, Notice and Conditions of Parole, shall result in a Rules Violation Report (RVR) being generated and referred to the BPH for a Parole Revocation Hearing.

i) The institution MDO Coordinator shall serve and review with the inmate the inmate's CDCR Form 1515, BPT Form 1410, and BPT Form 1410(A) and complete Sections III of the BPT Form 1073 in accordance with Section VIII and the instructions on the back page of the BPT Form 1073. The MDO Coordinator shall update DECS in accordance with Section IX as soon as possible but within 24 hours of completing the interview.

4. **PROCESS WHEN INMATE SIGNS NOTICE AND CONDITIONS OF PAROLE**

a) If the inmate signs his/her Conditions of Parole, the C&PR/RC CC-III shall liaison with personnel at Atascadero State Hospital (ASH) for male inmates and Patton State Hospital (PSH) for female inmates to facilitate transfer.

b) If not previously submitted, the C&PR/RC CC-III shall fax a completed copy of the BPT Form 1073 and supporting documents to the BPH ADA Coordinator.

c) The C&PR/RC CC-III shall fax the following documents to the designated Parole Region, Agent of Record (AOR), and Parole Agent II at ASH/PSH:

- BPT Form 1073
- BPT Form 1400
- BPT Form 1410(A)
- CDCR Form 1515

d) The C&PR/RC CC-III shall arrange for the transfer of the inmate to the appropriate State Hospital. The following documents shall be faxed to ASH for male inmates and PSH for females:

- BPT Form 1073
- BPT Form 1400
- BPT Form 1410(A)
- CDC Form 801, Notice of Detainer (if inmate is received at ASH or PSH prior to date of parole)
- CDCR Form 1515
- CDC Form 7371, Confidential Medical/Mental Health Information Transfer (ASH/PSH only - fax 24 to 48 hours prior to admission)

## 5. CERTIFICATION HEARINGS

a) Upon admission to the State Hospital, the assigned Parole Agent shall review DECS and the BPT Form 1073 for the presence of a disability. If a disability is indicated and the reasonable accommodation is not available, the Parole Agent shall contact the BPH ADA Coordinator. The Parole Agent shall prepare and fax a BPT Form 1430, Mentally Disordered Offender Scheduling Request, to the BPH FAD-MDO Unit for scheduling of the Certification Hearing. The Parole Agent shall note the unavailability of an accommodation on the form.

b) Upon receipt of the BPT Form 1430, the BPH FAD-MDO Unit shall review that form, DECS, and BPT Form 1073 and arrange reasonable accommodations as needed prior to scheduling a Certification Hearing. The BPH ADA Coordinator will be responsible to ensure the accommodation is provided to the inmate at the hearing.

c) The BPH Deputy Commissioner is responsible for reviewing DECS and the BPT Form 1073 to ensure effective communication with the inmate during the Certification Hearing and all other MDO hearings where a BPH Deputy Commissioner acts as a decision-maker or communicates with an MDO inmate/parolee. In addition, the BPH Deputy Commissioner chairing the hearing shall document any assistance provided to achieve effective communication, whether effective communication was achieved, and how the determination was made on the hearing results provided to the inmate. If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

d) After the hearing, the BPH Deputy Commissioner will update DECS as outlined in Section IX as soon as possible but no later than 24 hours of the hearing.

6. **PLACEMENT HEARINGS**

a) If the MDO (inmate/parolee) has not been placed in outpatient treatment within 60 calendar days of admission to the State Hospital, the assigned Parole Agent shall review the DEC and complete Section I of the BPT Form 1073 as indicated in Section VIII of this Remedial Plan and the instructions on the back page of the BPT Form 1073.

b) The Parole Agent shall meet with the inmate/parolee, review the BPT Form 1073 and complete Sections II. The Parole Agent shall serve the inmate/parolee with a BPT Form 1420, Notice of Right to Placement Hearing, and BPT Form 1420(A), Notice of Right to Placement Hearing-Acknowledgment.

c) The Parole Agent shall complete Section III of the BPT Form 1073. The Parole Agent shall update DECS in accordance with Section IX as soon as possible but **within 24 hours of completing the interview.**

d) If a disability is indicated (other than severe mental disorder) and the reasonable accommodation is not available, the Parole Agent shall contact the BPH ADA Coordinator. The Parole Agent shall prepare and fax a BPT Form 1430 and BPT Form 1073 to the BPH FAD-MDO Unit for scheduling of the Placement Hearing. The Parole Agent shall note the unavailability of an accommodation on the form.

e) Upon receipt of the BPT Form 1430, the BPH FAD-MDO Unit shall review that form, DECS, and BPT Form 1073 and arrange reasonable accommodations as needed prior to scheduling a Placement Hearing. The BPH ADA Coordinator will be responsible to ensure the accommodation is provided to the inmate at the hearing.

7. **ANNUAL REVIEWS**

a) One year after admission to the State Hospital, and annually thereafter, the assigned Parole Agent shall review DECS and complete Section I of the BPT Form 1073 as indicated in Section VIII of this Remedial Plan and the instructions on the back page of the BPT Form 1073 in preparation for giving the inmate/parolee notice of the annual hearing.

b) The Parole Agent shall meet with the inmate/parolee, review the BPT Form 1073 and complete Sections II.

c) The Parole Agent shall serve the inmate/parolee with a BPT Form 1460, Notice of Right to Annual Review Hearing, and a BPT Form 1460(A), Notice of Right to Annual Review Hearing-Acknowledgment.

d) The Parole Agent shall complete Section III of the BPT Form 1073. The Parole Agent shall update DECS in accordance with Section IX as soon as possible but within 24 hours of completing the interview. If a disability (other than severe mental disorder) and the reasonable accommodation is not available, the Parole

Agent shall contact the BPH ADA Coordinator. The Parole Agent shall prepare and fax a BPT Form 1430 to the BPH FAD- MDO Unit for scheduling of an Annual Review Hearing. The Parole Agent shall note the unavailability of an accommodation on the form. This process applies to all parolees with MDO special conditions of parole being treated on an inpatient or outpatient basis.

e) Upon receipt of the BPT Form 1430, the BPH FAD- MDO Unit shall check that form, DECS, and BPT Form 1073 and arrange reasonable accommodations as needed prior to scheduling an Annual Review Hearing. The BPH ADA Coordinator will be responsible for ensuring the accommodation is provided to the inmate at the hearing.

f) The BPH Deputy Commissioner is responsible for reviewing DECS and the BPT Form 1073 to ensure effective communication with the inmate during the Placement Hearing and all other MDO hearings where a BPH Deputy Commissioner acts as a decision-maker or communicates with an MDO inmate/parolee. In addition, the BPH Deputy Commissioner chairing the hearing shall document any assistance provided to achieve effective communication, whether effective communication was achieved, and how the determination was made on the hearing results provided to the inmate. If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

g) After the hearing, the BPH Deputy Commissioner will update DECS as outlined in Section IX as soon as possible but no later than 24 hours of the hearing.

8. ATTORNEY ASSISTANCE

a) The BPH FAD-MDO Unit is responsible for assigning attorney representation for the Certification, Placement and Annual Review hearings) Attorneys assigned to inmates with disabilities shall be required to complete ADA training.

b) CDCR will provide DECS access to the attorneys via the internet which will allow a review of inmate disability and effective communication information and prior to the meeting with their client. The attorney will also have the ability to update the DEC by documenting accommodations provided.

9.  **PROCESS WHEN INMATE DOES NOT SIGN NOTICE AND CONDITIONS OF PAROLE**

When an MDO is located at a prison and refuses to sign his/her special condition for MDO treatment, institution staff, as identified below, shall do the following:

a)  The institution MDO Coordinator shall immediately write the RVR if the inmate refuses to sign the CDCR Form 1515. The C&PR/RC CC-III or designee shall notify the BPH MDO Coordinator and DCHCS MDO Unit of the inmate's refusal upon receipt of the CDC Form 804, Notice of Pending CDC Form 115.

b)  The C&PR/RC CC-III shall complete and fax a BPT Form 1135 to the BPH FAD-MDO Unit requesting placement of a parole hold pursuant to PC Section 3060.5. The C&PR/RC CC-III will notify the BPH SPU to schedule a Parole Revocation Hearing in accordance with current revocation extension procedures.

c)  Within two weeks of notification of the inmate's refusal to sign MDO special condition, the BPH SPU Scheduler shall review DECS and appoint an attorney to consult with the inmate.

d)  The BPH SPU Scheduler shall advise the appointed attorney of any accommodations needed. The attorney is responsible for reviewing DECS and assisting the inmate in deciding whether to accept or refuse the special condition for MDO treatment. The attorney will enter any updated ADA information from the attorney consultation into DECS (Parole Proceeding Accommodation Provided Form).

e)  The institution shall be responsible for arranging gate clearance and escorts consistent with current institution procedures.

f)  The BPH MDO Coordinator shall confirm, in writing, the attorney's appointment to the C&PR/RC CC-III and provide the attorney with a copy of the BPH certification package, including the clinical evaluations.

g)  It is the responsibility of the attorney to review DECS before he/she consults with the inmate and present the following information:

1)  An explanation of the MDO special condition.

2)  The nature of treatment provided under the MDO special condition.

3)  The State Hospital environment.

4)  The rights of State Hospital patients.

5)  The ability of treatment to reduce future offenses.

6) The consequences of refusing to sign MDO special conditions are:

   i   Revocation and remaining in prison.

   ii  Extension of the parole term.

   iii Reevaluation, which may still result in the MDO special conditions at the end of the revocation period.

h) If after the attorney consultation the inmate decides to sign the special condition for MDO treatment:

1) The attorney shall deliver the packet to the C&PR/RC CC-III.

2) The C&PR/RC CC-III shall prepare a BPT Form 1135, recommending that the BPH's action to schedule a Revocation Hearing be rescinded.

3) The C&PR/RC CC-III shall fax the BPT Form 1135 to the FAD-MDO Unit for review and approval.

4) Upon receipt of the approved BPT Form 1135, the C&PR/RC CC-III shall arrange the transfer of the inmate to the appropriate State Hospital.

5) Upon admission to the State Hospital, the processes outlined in Section D.4 above shall be followed.

i) If after attorney consultation the inmate continues to refuse to sign his/her special condition for MDO treatment:

1) The attorney shall deliver the packet to the C&PR/RC CC-III.

2) The C&PR/RC CC-III shall notify the BPH MDO Coordinator.

3) The BPH MDO Coordinator will arrange for a clinician (licensed psychologist or psychiatrist) to assess whether the inmate's severe mental disorder has impaired his/her ability to make a knowing and intelligent decision to accept or refuse the MDO special condition of parole. The clinician shall review DECS or be provided with a DECS DAI Summary page printout (76556) by the FAD-MDO Unit staff. Any accommodation provided by the clinician will be entered into DECS by the BPH FAD-MDO Unit staff.

4) The clinician will prepare and forward a written report to the BPH MDO Coordinator. The BPH MDO Coordinator will send a copy of the report to the C&PR/RC CC-III for filing in the BPH section of the C-File.

j) If the clinical evaluation determines that the inmate's severe mental disorder has impaired his/her ability to make a knowing and intelligent decision, it shall be the responsibility of staff to provide the following services:

---

1) The BPH MDO Coordinator will prepare a BPT Form 1135 recommending that BPH's action to schedule a Revocation Hearing be rescinded.

2) The BPH MDO Coordinator will submit the BPT Form 1135 to FAD-MDO Unit for review and approval.

3) The BPH MDO Coordinator will arrange for a clinician (licensed psychologist or psychiatrist) to assess whether the inmate's severe mental disorder has impaired his/her ability to make a knowing and intelligent decision to accept or refuse the MDO special condition of parole. The clinician shall review DECS or be provided with a DECS DAI Summary page printout (76556) by the FAD-MDO Unit staff. Any accommodation provided by the clinician will be entered into DECS by the BPH FAD-MDO Unit staff.

4) Once a decision is made, a copy of the BPT Form 1135 shall be faxed and mailed by the staff at FAD-MDO Unit to the C&PR/RC CC-III.

5) The C&PR/RC CC-III shall arrange for transfer of the inmate to the appropriate State Hospital.

k) If the clinical evaluation determines the inmate has the ability to make a knowing and intelligent decision, the revocation process will proceed in accordance with Parole Revocation Hearing processing as outlined in Section X.

### C. REVOCATION EXTENSION PROCEDURES: DAI AND BPH

These procedures are to be followed in parole revocation cases arising from acts of reportable misconduct committed by inmates/parolees in Return-to-Custody status in a **CDCR Institution.**

### 1. REVOCATION EXTENSIONS DEFINED:

a) An inmate/parolee who commits an act of reportable misconduct, while in revoked status, is subject to Revocation Extension proceedings.

b) An inmate/parolee subject to the Revocation Extension process is defined as any Parole Violator-Return to Custody (PVRTC) and/or Parole Violator-with New Term (PVWNT), who has not reached his/her Revocation Release Date[2].

c) An inmate/parolee is deemed to be in revoked status once he/she either unconditionally or optionally waives his/her right to a hearing with a return to custody assessed or is ordered returned to custody at a revocation hearing.

d) If the discovery date is beyond the revocation release date and the inmate/parolee has not been release (i.e. a hold from another agency) the misconduct is a

---

[2] Revocation Release Date includes RRDs, PRRDs and MRRDs.

---

revocation offense,. DAI shall refer all instances of misconduct (Division A, B, C, D, E, F) to DAPO.

e) Acts of Reportable Misconduct subject to the Revocation Extension process are defined as:

1) The misconduct consists of an act initially identified as a Division A, B or C offense pursuant to CCR Section 3323.

2) The misconduct consists of an act that was initially identified as other than a Division A, B, or C offense and is subsequently classified as either a Division A, B, C offense.

3) The misconduct consists of a violation of a special condition of parole prohibiting contact with a specific person, or class of persons, such as minors. This does not include the general class of individuals specified as "gang members."

4) The inmate/parolee refuses to sign his/her general and/or special conditions of parole, or[3],

5) The inmate/parolee refuses to sign any form required by the Department of Justice explaining his/her responsibility to register per Penal Code Section 290[4].

## 2. RESPONSIBILITY:

a) Institutional staff will handle acts of reportable misconduct committed by inmates/parolees in Return-to-Custody status in an Institution.

b) DAPO will handle acts of reportable misconduct committed by inmates/parolees in Return-to Custody status in a non-CDCR location.

c) When an act of reportable misconduct occurs at a non-CDCR location and the inmate/parolee is transferred to a CDCR Institution with a Decentralized Revocation Unit (DRU) prior to the completion of the Revocation Extension process, the case will continue to be processed by BPH field staff (e.g. DRU staff).

d) When an act of reportable misconduct occurs at a non-CDCR location and the inmate/parolee is transferred to a CDCR Institution which does not have a DRU prior to the completion of the Revocation Extension process, the case will be processed by DAI Revocation Extension desk staff per DAPO Revocation Extension policies and procedures (see DAPO Revocation Extension policy and procedure).

---

[3] The BPH processes these parole revocation cases using the parole revocation extension process established herein. Note: this offense not only applies to PVRTC and PVWNT, but also to new commitments.

[4] Same as footnote #2.

---

e) If the inmate/parolee is transferred to another CDCR institution prior to completion of the Notice of Rights/Charges, the C&PR shall contact the C&PR at the receiving institution to coordinate the completion of the Notice of Rights/Charges.

f) If the inmate is transferred to a non-CDCR location prior to completion of the Notice of Rights/Charges, the C&PR shall contact the appropriate DAPO Supervising Notice Agent via the DAPO Regional Headquarters to coordinate the completion of Notice of Rights/Charges and return of the documents.

3. **TIMELINE SUMMARY:** See flow chart for details. Good cause delay is any circumstance causing a delay not within the control of the State.

4. **ACTS OF REPORTABLE IN-CUSTODY MISCONDUCT PENDING IMMINENT RELEASE:**

a) *Time line:* To retain jurisdiction, the BPH must act prior to midnight of the scheduled revocation release date in order to retain the offender. For PVRTC and/or PVWNT inmates/parolees who commit an act of reportable misconduct immediately prior to release when the BPH is closed (holidays, weekends, evenings, etc), the Institution will initiate, and when appropriate, the BPH will take an emergency hold action to retain the inmate/parolee.

b) *Definition:* When the PVRTC and/or PVWNT commits a reportable act of misconduct and is pending imminent release, the Institution contacts Warrants to request a hold, and the BPH takes the appropriate action on the requested hold. The next business day, the Institution faxes a Miscellaneous Decision report (BPT 1135) to the BPH Special Processing Unit to document the afterhours decision.

c) *Procedure:*

*DAI Process:* For any PVRTC and/or PVWNT inmates/parolees where an act of reportable misconduct occurs immediately prior to the revocation release date, and during such time as the BPH is closed (holidays, weekends, evenings, etc.), the Supervisor of the area/facility where the misconduct occurred shall do the following:

1) Contact the Watch Commander regarding the reportable misconduct and impending Rules Violation Report (RVR).

Upon notification from the Watch Commander, the C&PR will do the following:

1) Contact Warrants Unit telephonically at (916) 324-2981 and request that the BPH Administrative Officer of the day place a hold on the inmate/parolee pending the revocation extension process, and;

2) KL Inform the Classification & Parole Representative / Reception Center Correctional Counselor III (C&PR) the next business day of the afterhours action.

Upon notification from the Watch Commander, the C&PR will do the following:

1) Complete a BPT 1135 to document the afterhours decision and fax a copy to the BPH, Special Processing Unit,(916) 324-6966,

2) Ensure that Case Records contacts the Special Processing Unit telephonically at (916) 324-1941 to confirm receipt of the fax,

3) Obtain the BPT 1135 documenting the BPH action from BPH Special Processing Unit, and

4) Provide the completed BPT 1135 to Case Records for processing.

b) ***BPH Process:*** Upon notification from the Watch Commander, the BPH Associate Chief Deputy Commissioner, Administrative Officer of the Day will do the following:

1) Evaluate the verbal information provided and place a hold, if appropriate. The BPH may extend the hold beyond the release date, but no later than 35 calendar days from the discovery date. For example: If the discovery date is 2 calendar days before the release date, then the hold will be placed for up to 33 calendars days after the release date.

5. DISCOVERY DATE

The discovery date is the date the Institution's staff receives the information and/or evidence amounting to reportable misconduct. All Institutional time lines are calculated from one (1) calendar day after the discovery date (discovery date is day zero).

6. CASE RECORDS RECEIPT OF RULES VIOLATION REPORT AND CDC 804

a) *Time line:* The RVR[5] along with a copy of the Notice of Pending CDC 115 (CDC 804) shall be submitted to Case Records no later than 1 business day from the discovery date.

b) *Definition:* Case Records receives the RVR along with a copy of the CDC 804.

c) *Procedure:*
***DAI Process:*** The reporting employee completes a RVR. Additionally, the CDC 804 is completed. The documents are forwarded to Case Records for processing.

---

[5] If the completed (typed) RVR is not available then the "rough draft" can be utilized.

---

7. **CASE RECORDS PROCESS THE RULES VIOLATION REPORT AND CDC 804 AND THE C&PR REVIEWS FOR REFERRAL**

a) *Time line:* Case Records will process the RVR and the CDC 804, and the C&PR completes the review for referral to BPH, no later than two (2) business days after the discovery date.

b) *Definition:* To complete this step Case Records places the RVR and the CDC 804 in the Central File (C-File), and provides the file to the C&PR. The C&PR reviews the documents to determine if the in-custody misconduct meets the BPH referral criteria. When the inmate/parolee **is within 35 calendar days** of their revocation release date, Case Records also contacts the BPH Special Processing Unit regarding the impending release date.

c) *Procedure:*

*DAI Process (Case Records):* Upon receipt of the RVR and the CDC 804, the Case Records staff immediately:

1) Date stamps the front of the CDC 804 and RVR.

2) Files the documents in the Disciplinary Section of the C-File.

3) Confirms that the inmate/parolee is a PVRTC or a PVWNT who has not reached his/her revocation release date.

4) Provides the C-file to the C&PR and a Parole Revocation Hearing Notice, the Witness Determination form (CDCR 1654), or designee for review.

5) The Revocation Extension Desk staff will ensure that the correct CDC number and Name is recorded on all documents prior to faxing or mailing them to the Special Processing Unit at BPH.

d) *DAI Process (C&PR):* The C&PR reviews the RVR and CDC 804 to determine if they meet the BPH referral criteria.

1) The misconduct consists of an act initially identified as a Division A, B or C offense pursuant to CCR Section 3323,

2) The misconduct consists of an act that was initially identified as other than a Division A, B, or C offense and is subsequently classified as either a Division A, B, C offense,

3) The misconduct consists of a violation of a special condition of parole prohibiting contact with a specific person, or class of persons, such as minors. This does not include the general class of individuals specified as "gang members."

4) The inmate/parolee refuses to sign his/her general and/or special conditions of parole[6], or

5) The inmate/parolee refuses to sign any form required by the Department of Justice explaining his/her responsibility to register per Penal Code Section 290[7].

8. **C&PR REVIEWS FOR REFERRAL**

a) If the misconduct is referable, the C&PR will immediately:

1) Indicate the qualifying reason for the referral (e.g. division of offense or mandatory referral) on the CDC 804.

2) Complete Section II of the CDCR 1654 listing the witnesses the state will subpoena for the Revocation Extension Hearing.

3) Hand-deliver the C-File and the CDCR 1654 to the Revocation Extension Desk staff for processing.

b) If the misconduct is not referable, then the process ends and the case are closed.

c) If the act of reportable misconduct occurs **within 35 calendar days** of the inmate/parolee's revocation release date, the C&PR shall:

1) Complete a Report of In-Custody Misconduct (BPT 1135A) requesting the BPH retain the inmate/parolee in custody pending the revocation extension proceedings;

2) Fax the BPT 1135A to the BPH Special Processing Unit (916) 324-6966, and;

3) Contact the BPH telephonically at (916) 324-1941 to confirm receipt of the fax and advise them of the impending release date or unavailable status.

9. **NOTICE OF RIGHTS/CHARGES**

a) *Time line:* The Institution will complete the Notice of Rights/Charges no later than three (3) business days after the discovery date.

b) *Definition:* The institution accomplishes this step when the Revocation Extension Desk staff receives and prepares the documents for the Correctional Counselor to serve on the inmate/parolee. First, the Correctional Counsel conducts and ADA and effective communication review, documenting the result. The Correctional Counselor then meets with the inmate/parolee to provide the relevant documents, and to explain the revocation extension process to the

---

[6] Same as footnote #2.

[7] Same as footnote #2.

inmate/parolee including the nature of the charges alleged, and his/her rights. Finally, the Correctional Counselor completes the Notice of Rights/Charges documentation and returns the packet to Case Records.

c) ***Procedure:***

**<u>DAI Process (Case Records):</u>** Upon receipt of the C-file and completed CDCR 1654 from the C&PR, and/or designee, the Revocation Extension Desk staff:

1) Completes a BPT 1135A (including C&PR signature), if not already complete,

2) Prepares the Notice of Rights/Charges packet, with the inmate/parolee's Name and CDC number on each form, to include 3 copies of all non-NCR documents:

  i    the RVR,

  ii   the BPT 1135A-1 – Notice of Rights/Acknowledgement for Revocation Extension Proceedings,

  iii  a blank BPT 1100(b) – Request for Witnesses.

The Revocation Extension Desk staff shall contact the assigned Correctional Counselor and advise him/her that the inmate/parolee requires notification of his/her Rights/Charges for the revocation extension process. After advising the Correctional Counselor, the Revocation Extension Desk staff shall retain one (1) copy of the Notice of Rights/Charges documents at the desk and provide the Correctional Counselor with the original and a copy of the Notice documents. If the assigned Correctional Counselor is not available on this date, the Revocation Extension staff shall contact the Correctional Counselor Supervisor and advise him/her of the need to conduct a Notice of Rights/Charges.

d) **<u>*DAI Process (Correctional Counselor):*</u>** Upon receipt of the Notice of Rights/Charges documents (original and a copy), the Correctional Counselor shall, prior to the 3rd business day from the discovery date:

1) Review the Disability and Effective Communication (DEC) system.

2) Review the C-file.

3) Complete Section I of the BPT 1073.

4) Attach copies of any ADA source documents that are identified in Section I, BPT 1073.

5) If the inmate/parolee needs reasonable accommodation(s) the Correctional Counselor shall make the accommodation(s) available during the meeting with the inmate/parolee. When the Correctional Counselor does not have a

necessary accommodation, he/she shall contact the ADA Coordinator at the Institution for assistance. If the inmate/parolee requires a foreign language interpreter, the Correctional Counselor shall use only an independent contracted interpretation service provider.

6) After the ADA and effective communication review, the Correctional Counselor shall meet with the inmate/parolee to effectuate the service.

7) During the meeting, the Correctional Counselor shall complete Section II, BPT 1073, including obtaining the inmate/parolee's signature.

8) Next the Correctional Counselor shall advise the inmate/parolee of the charges indicated on the RVR and of his/her rights indicated on the BPT 1135A-1, and complete Section III, BPT 1073.

9) The Correctional Counselor will ask the inmate/parolee to read, complete the name and date sections, and sign the BPT 1135A-1. The Correctional Counselor will provide a copy of the Notice of Rights/Charges documents, the signed BPT 1135A-1, and a blank copy of the Request for Witnesses (BPT 1100(b)), with an explanation of the 1100b's use, to the inmate/parolee.

Upon completion of the Notice of Rights/Charges, the Correctional Counselor shall immediately return the original documents to the Revocation Extension Desk staff for processing. The Correctional Counselor will update the DEC system by transposing the paper BPT 1073 to the electronic BPT 1073. Note: The Correctional Counselor shall make the DEC entries as soon as possible but within 24 hours of completing the interview.

If the inmate/parolee is transferred to another CDCR institution prior to completion of the Notice of Rights/Charges, the C&PR shall contact the C&PR at the receiving institution to coordinate the completion of the Notice of Rights/Charges.

If the inmate is transferred to a non-CDCR location prior to completion of the Notice of Rights/Charges, the C&PR shall contact the appropriate DAPO Supervising Notice Agent via the DAPO Regional Headquarters to coordinate the completion of Notice of Rights/Charges and return of the documents.

10. **REFERRAL TO THE BPH**

a) *Time line:* The referral to the BPH will be completed no later than seven (7) business days after the discovery date.

b) *Definition:* The Institution completes this step when the Revocation Extension Desk staff provides the BPH with the Revocation Extension packet.

c) *Procedure:*

***DAI Process:***  Upon the receipt of the Notice of Rights/Charges documents, the Revocation Extension Desk staff provides the following documents to the BPH Special Processing Unit:

1) BPT 1135A, Report of In-custody Misconduct,

2) BPT 1135A-1, Notice of Rights and Acknowledgement of the Revocation Extension Proceedings,

3) BPT 1073, Notice and Request for Assistance at Parole Proceeding and any ADA source documents that are identified by the Correctional Counselor,

4) CDC 112, Chronological Inmate History,

5) CDC 115, Rules Violation Report,

6) CDC 115-MH, Rules Violation Reports: Mental Health Assessment Request. The Revocation Extension desk staff will check the C-File for this document for all inmates/parolees with an EOP, DMH, or MHCB classification, and for any CCCMS classification who's CDC 115 involved unusual or bizarre behavior. Additionally, when a CDC 115-MH is received by Case Records, a copy shall be faxed immediately to the BPH SPU for distribution to the panel attorney.

7) CDC 188, Legal Status Summary,

8) CDCR 1654, Parole Revocation Hearing Notice and Witness Determination, and

9) Any other related documents.

The Revocation Extension Desk staff faxes[8] or overnight mails the following documents and other related documents to the Special Processing Unit at the BPH. The documents can be faxed to (916) 324-6966 or sent via overnight mail service to the attention of the Special Processing Unit: Tracking Desk, 1515 K Street, Ste 600, Sacramento, CA 95814.

Submitting incomplete packets can result in dismissal of charges due to violating *Valdivia* time frames and/or providing inadequate documentation. Institutions must make every effort to timely provide additional information, or to properly complete documentation, when requested by the Special Processing Unit to ensure the inmate/parolee is held accountable for the misconduct.

---

[8] When providing information to the BPH Special Processing Unit faxing should always be the primary method of sending information. However, if the fax machine is not functional then overnight mail may be considered as an alternative method to provide the documents.

---

***Armstrong/ Parole Proceedings***
***Remedial Plan Amended 12/1/10***

***Page 39***

**11. BPH SPECIAL PROCESSING UNIT RECEIVES PACKETS**

a) *Time line:* The BPH Special Processing Unit receives the Revocation Extension packet no later than nine (9) business days after the discovery date.

b) *Definition:* The BPH completes this step when the BPH Special Processing Unit receives the revocation extension packet, reviews the documents for completeness and logs the case for tracking, conducts a review pursuant to ADA to assess ADA accommodations and effective communication needs, notifies the panel attorney office of the case, and provides a copy of the packet to the Deputy Commissioner.

c) *Procedure:*

**<u>BPH Process:</u>** Upon receipt of the Revocation Extension DAI packet, the Special Processing unit reviews the packet for completeness by ensuring it contains all the required forms (see complete list under "Referral to BPH") and correct completion of all the forms.

If the packet is incomplete, the Special Processing Unit shall contact the DAI sender to request the missing documents. BPH will continue to process the packet after one business day, regardless if the requested documents are received, but failure to respond to the BPH may ultimately result in the BPH being forced to dismiss the case.

After reviewing the packet, the BPH Special Processing Unit will:

1) Determine and update the current location of inmate/parolee.

2) Check the DEC system and enter any anticipated accommodation(s), during the Attorney Consultation, PCH, and Revocation Extension Hearing.

3) Based on the inmate/parolee's custody location, the BPH will forward the revocation extension packet to the appropriate panel attorney satellite office.

4) Complete the informational portions of a BPT 1104, Revocation/Revocation Extension Return to Custody Assessment form, and attach it to the packet.

5) Forward packet to the Deputy Commissioner assigned to the Special Processing Unit to determine if a Return to Custody Assessment is appropriate.

6) Schedule a PCH **<u>no later than thirteen (13) business days</u>** after the discovery date.

7) Advise the attorney of the PCH date.

8) When the Inmate/Parolee is **<u>within 35 calendar days</u>** of the revocation release date, the DC, where appropriate, will take an action to hold the inmate/parolee pending the completion of the Revocation Extension

---

proceedings.. The BPH may extend the hold beyond the release date, but no later than 35 calendar days from the discovery date. For example:  If the discovery date is 10 calendars days before the release date, then the hold will be placed for up to 25 calendar days after the release date.

9) Schedule a Deputy Commissioner for the PCH.

## 12. ATTORNEY ASSIGNMENT (ATTORNEY RECEIVES PACKET)

a) *Time line:*  The Attorney Assignment will be completed no later than nine (9) business days after the discovery date.

b) *Definition:*  The BPH Special Processing Unit completes this step by providing the panel attorney a copy of the Revocation Extension packet, and by providing a copy of the relevant documents to the Institution Revocation Extension Desk staff.

c) *Procedure:*
*BPH Process:*  Upon receiving the Revocation Extension packet, the Special Processing Unit staff will:

*For Panel Attorney:*

1) Provide the appropriate panel attorney office with a copy of the revocation extension.

2) Advise the panel attorney to inform the assigned attorney to contact the Special Processing Unit to schedule a telephonic PCH prior to the PCH no later than date.

3) Inform the panel attorney that failure of counsel to contact the Special Processing Unit.

*For Institutions Revocation Extension Desk (for cases originating from the Institution):*

1) Provide the Revocation Extension Desk with a copy of the BPT 1104 (including the no later than dates).

2) Provide the Revocation Extension Desk with the name of the attorney and the scheduled PCH date.

## 13. REVOCATION EXTENSION ASSESSMENT

a) *Time line:*  The Revocation Extension Assessment (REA) will be completed no later than ten (10) business days after the discovery date.

b) **Definition:** The BPH completes this step by completing and documenting an ADA and effective communication review to determine if the inmate/parolee needs accommodation(s), and assesses the case factors to determine an appropriate proposed disposition.

c) **Procedure:**

   **BPH Process:** The Deputy Commissioner assigned to the Special Processing Unit shall first establish if the BPH has jurisdiction. There is no jurisdiction if the revocation release date expired. The Deputy Commissioner will review the DEC system and document the ADA review on the BPT 1104 – Return to Custody/Revocation Extension Form. If jurisdiction is established then the Deputy Commissioner assesses the case factors to determine the appropriate proposed disposition and completes the documents as follows:

   1) If the Deputy Commissioner determines that a revocation extension is unwarranted, the Deputy Commissioner will note BPHs decision not to proceed by re-affirming the release date in the decision section of the BPT 1135A - Report of In-Custody Misconduct and will not complete the BPT 1104 – Return to Custody/Revocation Extension Form.

   2) If the Deputy Commissioner determines that a revocation extension is warranted, the Deputy Commissioner shall complete the BPT 1135A - Report of In-Custody Misconduct and the BPT 1104 – Return to Custody/Revocation Extension Form using the guidelines listed in BPH Regulations, CCR, Title 15, Division 2, Section 2742.

   3) If the Deputy Commissioner determines that a revocation extension is warranted and the inmate/parolee **is within 35 calendar days** from his/her revocation release date, the Deputy Commissioner shall retain the inmate/parolee in custody for a period not to exceed 35 calendar days the discovery date. Prior to taking the action to maintain the hold pending the revocation extension hearing, the BPH Deputy Commissioner shall consider the timeliness of the submission of the misconduct report as one factor in maintaining the hold. The Deputy Commissioner shall take this action in the decision section of the BPT 1135A - Report of In-Custody Misconduct. The Deputy Commissioner will complete the BPT 1104 – Return to Custody/Revocation Extension Form using the attached assessment guidelines.

If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

After the Deputy Commissioner completes the Report of In-Custody Misconduct and Assessment Offer, the Deputy Commissioner returns the documents to the Special Processing Unit staff member to process and provide the REA to panel attorney and the institution. Where the BPH identifies ADA accommodation(s), or effective communication needs, to be provided at the Attorney Consultation, PCH, and

Revocation Extension Hearing, the BPH staff will communicate these accommodation(s) to the DAI Revocation Extension Desk on the fax cover in bold type.

d) ***DAI Process (Revocation Extension Desk):***

1) When the BPH's decision reaffirms the Revocation Release date, Case Records shall provide a copy to the inmate/parolee through the institutional mail.

2) When the case is closed, ensure the Revocation Extension paperwork is given to the Correctional Case Records Analyst for posting and release date calculation as required through established procedures.

14. ATTORNEY CONSULTATION

a) *Time line:* The attorney will complete a consultation with the inmate/parolee no later than eleven (11) business days after the discovery date.

b) *Definition:* Panel attorney completes this step when the attorney calls the institution to initiate the ducat process, conducts a face-to-face meeting with the inmate/parolee, returns the appropriate documents to Case Records, and enters any ADA accommodation and/or effective communication methods used into the DEC system.

c) *Procedure:*
   *Panel Attorney Process:*

1) For institutional cases, the attorney contacts the C&PR, or designee at least 24 hours prior to the "Attorney Consultation" no later than date via telephone, and schedules a visit with the inmate/parolee, advising the C&PR of any ADA accommodations and/or effective communication methods that may be needed to conduct the consultation. Prior to the scheduled visit, the Revocation Extension Desk staff will ducat the inmate/parolee for the visit, and ensure the appropriate clearances are obtained for the attorney's entrance into the institution.

2) For DAPO cases transferred to an institution (prior to the completion of the Revocation Extension process) where there is a DRU, the attorney will contact the DRU staff to schedule the visit. Prior to the scheduled visit, the DRU staff will ducat the inmate/parolee for the visit and ensure appropriate clearances are obtained for the attorney's entrance into the institution.

3) The attorney shall meet with the inmate/parolee at the scheduled time and date to discuss the REA, explain the hearing rights, and assist the inmate/parolee in making a determination as to how to proceed with the case. In addition, the attorney will assess whether or not the inmate/parolee needs further accommodation(s) to proceed. During the consultation, the attorney shall use

effective communication to explain the REA and that parolees are not required to accept or reject a RTC until the PCH. Attorneys must allow 72 hours for their *Armstrong* class member clients to make a decision about the REA.

4) If the inmate/parolee and attorney decide to accept the REA, the attorney and inmate/parolee will complete the BPT 1104-B, and leave it with the Revocation Extension Desk. Additionally, will enter into the DEC system on the BPH Accommodation Chrono any ADA accommodation and/or effective communication methods provided to the inmate/parolee at the attorney consultation. Any DEC entry shall be made as soon as possible but within 24 hours of completing the interview.

5) In the rare event that the parolee chooses to accept the REA without a PCH, the assigned attorney shall consult with the DC to ensure the parolee's waiver is knowing, voluntary, and intelligent. The attorney should be particularly aware of *Armstrong* class members with disabilities affecting their ability to understand (i.e. developmental, hearing, learning) when counseling their clients regarding attending the PCH.

d) ***DAI Process:*** The Revocation Extension Desk staff will do the following if the REA is accepted at the REA attorney consultation:

1) Review the documents for completeness,

2) fax a copy of the completed documents to the BPH Special Processing Unit at (916) 324-6966,

3) cancel any tentatively scheduled hearing on the case, and

4) provide the Revocation Extension paperwork to the Correctional Case Records Analyst for posting and release date calculation as required through established procedures.

15. **EXPEDITED PROBABLE CAUSE HEARING WITH OFFER OF PROOF**

a) *Time line:* The BPH will conduct an expedited probable cause hearing with offer of proof no later than twelve (12) business days after the discovery date. The expedited PCH is only applicable to inmates/parolees whose acts of in-custody misconduct are **within 35 calendar days** of their revocation release date.

b) *Definition:* The BPH accomplishes this step only after the attorney provides a written request for an expedited PCH with an offer of proof to justify the request. The BPH reviews the offer of proof and, if appropriate, schedules and conducts the hearing.

c) *Procedure:*

___Panel Attorney Process:___    The attorney requests an expedited probable cause hearing, if the inmate/parolee's act(s) of in-custody misconduct are **within 35 calendar days** of his/her revocation release date, and there is substantial evidence that the inmate/parolee is not culpable of the alleged misconduct. The attorney makes a written request for the expedited hearing to the DAI Revocation Extension desk staff, or faxes the request directly to Special Processing Unit at (916) 324-6966.  If the attorney faxes the offer of proof directly to the Special Processing Unit then the original must be delivered to the DAI Revocation Extension desk also, the attorney should note that the information has been faxed to the Special Processing Unit.  The attorney substantiates the request with an offer of proof.

d) ___DAI Process:___  When an attorney requests an expedited PCH with an offer of proof, the Revocation Extension Desk staff will:

1) make a copy of the request and  retain it in the revocation extension packet, and

2) fax the request with the offer of proof  to the BPH Special Processing Unit at (916) 324-6966.

e) ___BPH Process:___  Upon request of an expedited PCH, the BPH will:

1) review the request and the offer of proof.

2) Determine whether the request is appropriate, and advise the attorney and the DAI Revocation Extension desk staff of the decision.

3) If **approved**, the BPH will schedule the expedited probable cause hearing and advise the attorney and the DAI Revocation Extension desk staff of the date.

## 16. PROBABLE CAUSE HEARING

a) *Time line:*  The PCH will be completed no later than thirteen (13) business days after the discovery date.

b) *Definition:*  The BPH accomplishes this step by conducting a hearing that includes an ADA and effective communication review, including providing accommodations if necessary, making a probable cause determination based on the evidence in the packet and the evidence presented by the parolee and his attorney; and, where the DC makes a probable cause finding, the DC will offer a negotiated disposition based on the case factors. The DC will document the results of the PCH and the Special Processing Unit will forward the documentation to Case Records.

c) *Procedure:*
___DAI Process:___  Revocation Extension Desk staff will reserve a hearing room on the appropriate date.  The Revocation Extension Desk staff will inform the

___Armstrong/ Parole Proceedings___                                                            ___Page 45___
___Remedial Plan Amended 12/1/10___

C&PR, or designee, of required ADA accommodations by using the BPT 1073. The C&PR, or designee, will make the accommodation(s) available. If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the C&PR, or designee, will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation. In instances where the inmate/parolee requires the use of a sign language interpreter, the C&PR will coordinate the BPH ADACU. The BPH ADACU staff will notify the Institution's C&PR /Revocation Ext. Desk at least two days prior to the hearing, to allow the Institution to prepare gate clearances. The Revocation Extension Desk will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation were made.

d) ***Panel Attorney Process:*** The attorney shall meet with the inmate/parolee at the scheduled time and date and contact the Deputy Commissioner at the Special Processing Unit for the PCH.

e) ***BPH Process:*** The Deputy Commissioner shall be available to conduct a PCH, in person, or by telephone with the attorney and inmate/parolee present.

At the PCH, the Deputy Commissioner will:

1) Conduct an ADA review prior to conducting the PCH. This includes reviewing the DEC system, BPT 1073, and interaction with the parolee. The DC will provide the inmate/parolee with the appropriate accommodation(s). If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

2) The REA remains open for 72 hours for *Armstrong* class members from the attorney consult.

3) Determine if the BPH has jurisdiction based on the revocation release dates, and controlling discharge date.

4) Determine if there is sufficient evidence to conclude that a reasonable person would have a strong suspicion that the inmate/parolee committed the alleged misconduct so as to constitute probable cause.

5) In the rare event that the parolee chooses to accept the REA without a PCH, the DC shall consult with the assigned attorney to ensure the parolee's waiver is knowing, voluntary, and intelligent. The DC should be particularly aware of *Armstrong* class members with disabilities affecting their ability to understand (i.e. developmental, hearing, learning) when accepting waivers.

6) Determine if the conduct warrants extended incarceration based on the case factors, and if so, will offer a negotiated disposition to resolve the case.

7) Provide the attorney and inmate/parolee with an opportunity to present evidence to dispute the charges and/or mitigate the disposition prior to making a probable cause determination, and prior to making the offer to resolve the case. Such evidence shall be presented through documentary evidence or the charged inmate/parolee's testimony, either or both of which may include hearsay testimony.

8) Document his/her decision on the appropriate form, including the reason for the determination including the evidence relied on.

9) Provide the inmate/parolee with a summary of the results including a copy of the BPT 1104-B(provided by the attorney).

10) Enter into the DEC system the accommodations, if any, provided. The Deputy Commissioner shall make the DEC entries as soon as possible but within 24 hours of completing the hearing.

If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

f) **"ACCEPT" PROCESS:**
If the inmate/parolee, after consulting with counsel decides to accept the negotiated disposition the attorney will provide all documents, including a BPT 1104 signed by the inmate/parolee (BPT 1104, Summary of Revocation Decision: Return to Custody Assessment and the BPT 1104-B, Parolee-Attorney Decision form) to the Revocation Extension Desk.

The Revocation Extension Desk staff will:

1) Review the documents for completeness,

2) Fax a copy of the completed documents to the BPH Special Processing Unit at (916) 324-6966, and

3) Provide the Revocation Extension paperwork to the Correctional Case Records Analyst for posting and release date calculation as required through established procedures.

g) **"REJECT PROCESS:**
If the inmate/parolee rejects the offer at the PCH, the attorney and Deputy Commissioner shall do the following:

1) The inmate/parolee will sign the BPT 1104 and the attorney will fax it to the Special Processing Unit.

2) The attorney will assist the inmate/parolee's completion of the Request for Witnesses form (BPH 1100(b) and present it to the DC for approval of requested witnesses.

3) The Deputy Commissioner will allow counsel to justify the request for witnesses, and either approve or disapprove each witness providing written justification for each decision in the DC report (refer to BPH Source document #3).

4) will provide the signed BPH 1104-B and BPH 1100(b) to the Revocation Extension or DRU staff for faxing to the Special Processing Unit.

5) The Deputy Commissioner will determine the hearing location.

After the appropriate documents are completed, the Special Processing Unit will:

1) Schedule a Revocation Extension hearing **no later than 35 calendar days** after discovery date. If the timeline expires during a weekend or on a holiday, this step will occur no later than the next business day after the weekend or holiday.

2) Complete the CDCR 1654 and advise the Revocation Extension Desk staff and panel attorney of the witnesses.

3) Fax a copy of the completed CDCR 1654 to the Revocation Extension Desk.

4) Subpoena all State witnesses (Note: the Institution is responsible for notifying employee witnesses that do not require a subpoena).

5) Advise panel attorney of the date of the Revocation Extension Hearing.

6) Schedule a Deputy Commissioner to conduct the Revocation Extension Hearing.

After the appropriate documents are completed, the Panel Attorney will:

- Subpoena all of the parolee's approved witness.

## 17. REVOCATION EXTENSION HEARING

a) *Time line:* The Revocation Hearing will occur no later than thirty five (35) calendar days after the discovery date. If the timeline expires during a weekend or on a holiday, this step will occur no later than the next business day after the weekend or holiday.

b) *Definition:* The BPH and the Institution accomplishes this step through completion of a Revocation Extension hearing where the DC completes an ADA

and effective communication review, and provides the appropriate accommodation(s), and then conducts an evidentiary hearing to determine if there is good cause to sustain the alleged misconduct. The DC documents the decision and the completed documents are sent to Case Records.

c) *Procedure:*

   *DAI Process:* The Revocation Extension Desk staff reserves a hearing room on the appropriate date and ensures that the proper gate clearances are obtained for witnesses. The Revocation Desk informs the C&PR of required accommodations using the BPT 1073. If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the C&PR, or designee, will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation. In instances where the inmate/parolee requires the use of a sign language interpreter, the C&PR will coordinate the BPH ADACU. The BPH ADACU staff will notify the Institution's C&PR /Revocation Ext. Desk at least two days prior to the hearing, to allow the Institution to prepare gate clearances. The Revocation Extension Desk will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation were made.

   The Institution will notify state witnesses located at the institution of the date and time of the hearing, and will process all witnesses into the hearings. The Revocation Extension Desk staff will ducat the inmate/parolee for the Revocation Extension Hearing. Additionally, the Revocation Extension staff will ensure that the Revocation Extension packet will be available in the hearing room on the date of the Revocation Extension hearing. If the DC determines that the C-File is necessary in order to conduct the hearing, he/she shall make a request to the Revocation Extension desk staff that, in turn, will provide the C-file. Custody staff will provide security and escorts for the hearings.

d) *BPH Process:* The BPH will schedule a Deputy Commissioner to conduct the hearing. At the hearing, the Deputy Commissioner will:

   1) Tape record the Revocation Extension Hearing. It is the Deputy Commissioner's responsibility to ensure that they have the proper tape recording equipment, including a blank cassette tape, available at the hearing.

   2) Conduct an ADA review prior to conducting the Revocation Hearing. This includes reviewing the DEC system, BPT 1073, and interaction with parolee. The DC will provide any required ADA and/or effective communication accommodations during the hearing. If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

3) The Deputy Commissioner shall establish the BPH's jurisdiction based on the RRD and the CDD.

4) Determine, based on the evidence presented by the State and by the parolee, if a preponderance of the evidence exists to substantiate the alleged misconduct.

5) Prior to making a good cause determination, provide an opportunity for the inmate/parolee to present evidence through documents, witnesses, and the inmate/parolee's own testimony, all of which may include hearsay.

6) Determine, when good cause is found, if the conduct warrants an extended incarceration and, if so, the length of the extended incarceration.

7) Document the decision on the BPT 1103-REV by indicating the evidence relied on to support the finding, and if extending the incarceration, the reasons relied on to extend.

8) Provide the inmate/parolee with a copy of the summary of the hearing.

9) Enter into the DEC system the accommodations, if any, provided. The Deputy Commissioner shall make the DEC entries as soon as possible but within 24 hours of completing the hearing.

   If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

e) **Post Hearing Processing**
   *For Institutions Revocation Extension Desk (for cases originating from the Institution):*

   Upon completion of the Revocation Extension hearings, the Deputy Commissioner will provide the original documents from the hearing to the CDCR Revocation Extension Desk, including the recorded tape(s). The Revocation Desk staff will fax a copy of the documents to the BPH at (916) 324-6966 and will process the original documents, including audio tapes, consistent with current procedure.

f) **Tracking**

   1) ***DAI Process:*** Throughout the Revocation Extension process, for reportable misconduct originating at the Institution, the Revocation Extension desk staff will track the handling of the documents, and the revocation extension process, in the designated tracking system.

      If the inmate is transferred to CDCR institution prior to the completion of the case, the C&PR at the original Institution shall contact the C&PR at the receiving Institution to advise of the pending revocation extension action. The

originating Institution shall continue to be responsible for tracking the case and for providing information to HQ.

Upon completion of the Revocation Extension process, a report should be generated from the designated tracking system and sent to designated *Valdivia* representative at Headquarters.

2) ***BPH Process:*** The tracking desk will electronically track the receipt and handling of all revocation extension referrals by entering the Inmate's/Parolee's name, number, date received, date of the Notice of Rights/Charges, and, the PCH and Hearing no later than dates.

## 18. REVOCATION EXTENSION HEARING GUIDELINES

a) **Multiple Misconduct Charges.** Multiple misconduct charges shall be assessed consecutively to each other, and shall not exceed 12 months (time served) for all misconduct during one parole revocation period, whether submitted at the same time or separately.

b) **Disciplinary Rule Violation Schedule.** When a Deputy Commissioner makes a finding that a prisoner has committed an act of misconduct which is ineligible for work time credits pursuant to PC 3057, or if the inmate's/parolee's active commitment case(s) are ineligible for work time credits, then the revocation extension period is also ineligible.

c) **Assessments.** If probable cause is established on the revocation extension charge(s), the Deputy Commissioner may assess an extension of the revocation period based on the schedule listed in BPH Regulations, CCR, Title 15, Division 2, Section 2742.

## *XI.* TRANSITION TO DIVISION OF ADULT PAROLE OPERATIONS

The transition from the institution to DAPO involves the use of the following forms: CDC Form 611 (Rev 5/01) or later version, Release Program Study (RPS), CDC Form 128 B, ADA Documents for Transition to Parole and the CDCR Form 1515, Notice and Conditions of Parole. It is through the use of these documents, along with the review of DECS as outlined in Section IX, that institution staff will relay pertinent information to parole region staff regarding the identification of potential disabilities and the possible special needs the inmate/parolee may have due to those disabilities. Parole region staff shall retain the documentation provided in the field file for use in their contacts with the parolee.

The following outlines the requirements for institution staff in ensuring an efficient and effective transition process. Case Records shall notify the CC-I that the CDC Form 611 and CDCR Form 1515 The CDC Forms 611 and CDCR 1515 shall be completed by the CC-I at the same time.

*A.* CDC FORM 611 – RELEASE PROGRAM STUDY

1. The CDC Form 611 (Rev 5/01) was issued on May 21, 2001. Among the changes to the CDC Form 611 (Rev 5/01) process was the requirement to identify and attach source documents that verify disabilities. In completing the CDC Form 611 (Rev 5/01) or later version, the CC-I shall conduct a thorough review of the C-File for documentation, which may identify a disability, check the appropriate box on the form, and complete the remainder of the CDC Form 611 (Rev 5/01) or later version, consistent with current directives. The CCI shall also review DECS.

2. Records staff shall review the CDC Form 611 (Rev 5/01) or later version, attach the RPS packet including the CDC Form 128 B reading score is 4.0 or lower, and provide it to the C&PR/RC CC-III. The C&PR/RC CC-III shall review the CDC Form 611 and RPS packet and ensure the verification documents are attached prior to his/her approval. Upon approval, the Records staff will send it to the appropriate parole region consistent with current procedures.

*B.* CDC FORM 128-B-ADA DOCUMENTATION FOR TRANSITION TO PAROLE

1. The CDC Form 128-B, ADA Documentation for Transition to Parole, is used for inmates who are released on parole and subsequently returned on a parole violation as a Parole Violator Returned to Custody (PVRTC) whose disability status has changed. It is also used when the CDC Form 611 has been completed and there is a change in the inmate's disability status.

2. The CC I shall complete the 128-B in the following instances:

   a) Any new commitments or Parole Violators with a New Term whose disability changed after the CDC Form 611 has been completed and sent to DAPO.

   b) Any new commitments or Parole Violators with a New Term whose disability changed after the CDC Form 611 has been completed, but prior to being sent to DAPO.

   c) For PVRTC whose disability status has changed while in custody.

3. Some examples of a change in disability status include inmates being removed from the Mental Health Services Delivery System, or any other disability program, level of care changes, or changes in developmental or physical disabilities status. Upon notification via verification documents such as the CDC Form 128-C, Mental Health Placement Chrono, and the CDC Form 128-C2, Recommendation for Adaptive Support, the CC-I shall review the C-File and DECS to determine if there is a change in the inmate's disability status requiring him/her to initiate the CDC Form 128-B.

4. The CC I shall also review the C-File to determine if a CDC Form 128-B is required based on a change in disability status through routine reviews such as the initial and program reviews.

---

5. If verification documents are generated which result in a change in the inmate's disability status (e.g. CCCMS to EOP, change on CDC Form 1845, etc.) after the CC-I has submitted the CDC Form 611 (Rev 5/01) or later version to the C&PR/RC CC-III, or the inmate is a PVRTC, the CC-I shall generate a CDC 128-B, ADA Documentation for Transition to Parole. The CC-I shall submit the completed CDC 128-B to the C&PR/RC CC III or designee. The C&PR/RC CC III shall ensure that a copy of the 128-B and copies of the source documents are forwarded to the appropriate parole region immediately for inclusion in the ADA folder of the field file. This information shall also be entered into DECS.

## C. CDCR FORM 1515 – NOTICE AND CONDITIONS OF PAROLE

The CDCR Form 1515 is used to advise all inmates/parolees of the general conditions and their special conditions of parole. The following are instructions for the CC-I, Parole Agent, or other staff who issues the Notice of Conditions of Parole to the inmate/parolee. Prior to noticing the inmate of his/her condition of parole, the staff person will ensure that any necessary accommodation identified through the file review process or DECS are available and utilized, if necessary, when noticing the inmate of his/her conditions of parole.

**Instructions for completing page 1 of the CDCR Form 1515.**

1. **Review the CDC 611:** The staff person will complete the CDCR Form 1515, Notice and Conditions of Parole, in conjunction with the CDC Form 611, Release Program Study. The staff person will utilize the documentation on the CDC Form 611 to determine what accommodations may be needed to effectively communicate the CDCR Form 1515 information to the inmate. The staff person will initiate the form by clearly printing the inmate's CDCR Number and Name in the appropriate boxes.

2. **Document Parole Period**

   a) The staff person will write in the appropriate number of years for the inmate's parole period as indicated on the CDC Form 188, Legal Status Summary (LSS).

3. **Determine if Special Conditions of Parole apply to the Inmate/Parolee**

   The staff person will review the C-File to determine whether or not these special conditions apply to the inmate:

   a) Gang Restriction-Review the CDC Form 812 and/or 812-A. If the inmate is a member or associate of any street gang or prison gang check the box.

   b) Mentally Disordered Offender-Check the box if the inmate has been certified by the BPH as a MDO pursuant to PC Section 2962.

   c) Contact with Victims(s) or Victims(s) Family-Review the Legal Status Summary (LSS), Probation Officer's Report (POR), CI&I, or Confidential Folder to determine whether there is a specific crime victim. If there is, check the first box.

(This does not include personal or public property crimes.) If the crime was committed against a person under the age of 18, check the second box.

4. **Determine if Mandatory Special Conditions of Parole apply to the Inmate/Parolee**

Review the C-File to determine whether or not these mandatory special conditions of parole apply to the inmate:

a) Box #1-Review the LSS, 112, CI&I to determine whether or not the inmate is required to register pursuant to PC 290. If he/she is required to register, check this box.

b) Box #2-Review the LSS, 112, CI&I to determine whether or not the inmate is required to register pursuant to PC 290.

c) Box #3- -Review the LSS, CI&I Rap Sheet to determine whether or not the inmate has a current or prior conviction for PC 288 or 288.5. If he/she was previously convicted, or is currently committed for these offenses and is designated a High Risk Sex Offender per PC 3003 (g), check the box.

d) Box #4- Review the LSS and POR to determine whether the inmate's current commitment includes a sex offense that was committed while the inmate was under the influence of alcohol. If he /she was, check this box.

e) Box #5-Review the confidential folder to determine whether the inmate has a restriction order. If he/she does, check this box.

5. **Review General Conditions of Parole with the Inmate**

a) The staff person will advise the inmate of the required length of his/her parole period and then review the conditions of parole with the inmate as follows:

1) The staff person will advise the inmate that the General Conditions apply to every person on parole.

2) The staff person will either read to or have the inmate read each condition to ensure it was effectively communicated. If the inmate has a disability affecting effective communication and/or a TABE score of 4.0 or below, the staff person should have the inmate repeat or explain or his or her understanding of the conditions of parole.

**Instructions for Noticing the inmate on page 2 of the CDCR Form 1515**

6. **Review the Special Conditions of Parole with the inmate/parolee**

a) The staff person will advise he inmate that based upon his/her specific case factors; they must comply with these special conditions.

---

b) The staff person will either read to or have the inmate read each applicable special condition, which is identified by a check mark in the corresponding box. After each condition is read, the staff person will ask the inmate what he/she understands about the condition to ensure effective communication.

7. **Review the Mandatory Special Conditions of Parole with the inmate/parolee**

a) The staff person will advise the inmate that based upon his/her specific case factors; they must comply with these conditions of parole, which are mandated by law.

b) The staff person will either read to or have the inmate read each applicable special condition which is identified by a check mark in the corresponding box. After each condition is read, the staff person will ask the inmate what he/she understands about the condition to ensure effective communication.

8. **Document Observations**

a) After reviewing the condition of parole with the inmate, the staff person will instruct the inmate to sign and date page 1 and 2 in the appropriate boxes.

Note: If the inmate refuses to sign the form, the staff person shall remind the inmate that Condition #7 on page 1 stated that failure to sign the form will result in his/her being retained in custody. If the inmate still refuses to sign the form, after completing the form, the staff person shall write a Rules Violation Report for Failure to Sign Conditions of Parole.

b) The staff person will check the box indicating they have reviewed DECS and the Field file (Parole Staff) or C-File (Institution Staff) for disability and effective communication needs. This review is mandatory.

c) Based upon the staff person's observation during the issuance of the conditions of parole, the staff person will check the appropriate box indicating whether the inmate appeared to understand.

d) If the staff person had to provide assistance with effective communication, he/she shall check the appropriate box and then circle what assistance was provided. The staff person shall then check the appropriate box indicating whether after assistance was provided, the inmate was (1) able to explain in his/her own words, or (2) still did not understand.

e) The staff person shall then legibly print his/her name and title, and sign and date the form.

f) Staff shall provide the inmate a copy of the CDCR Form 1515.

g) The staff person shall update DECS in accordance to Section IX.

**Instructions for completing Page 3 of the CDCR Form 1515**

The following instructions are for the staff person who issues the Notice and Conditions of Paroles to the parolee.

a) A special condition of parole must have a relation to the commitment offense, and be    conduct which is in itself criminal, or, where the prohibited conduct is not criminal, the restriction must be reasonably calculated to prevent future criminality.

b) Prior to discussion with the parolee, the staff person shall conduct a field file review   and the DEC to determine whether the parolee needs assistance and/or accommodations.   If needed, issuing staff shall ensure assistance and/or accommodations are provided to ensure effective communication.

c) The staff person shall review the prior condition on page 1 and 2 with the parolee and initial and date all previous signatures, respectively.

d) The staff person shall have the parolee explain in his/her own words what the condition mean.

9. **Additional Special Conditions of Parole**

a) The staff person shall add special conditions of parole by checking the appropriate box and/or print in the special condition and enter the reasons for the condition(s).

10. **Appeal**

a) The staff person shall explain to the parolee the right to appeal and right to request a reasonable accommodation and if requested, provide a CDC Form 602, Inmate/Parolee Appeal CDC Form 1824, Request For Reasonable ccommodation.

11. **Staff Issuance/Observation**

a) The staff person shall enter the CDCR number and print the parolee's name in the appropriate box.

b) The staff person shall have the parolee sign and date the conditions in the appropriate section.

c) The staff person will check the box indicating a review of the DEC and the Field File (Parole staff) or C-File (Institutional Staff) for disabilities and effective communication source documents. This review is mandatory.

d) The staff person shall check the appropriate box regarding his/her observation of the understanding of the conditions by the parolee.   If the assistance was

---

provided, the staff person will check the appropriate box and circle what assistance was provided or enter under "Other" what assistance was provided.

e) The staff person shall print their name, sign and date where indicated and record this task in the parolee's record of supervision. The staff shall update the DEC in accordance to Section IX.

f) A copy of the conditions shall be given to the parolee.

## XII. DIVISION OF ADULT PAROLE OPERATIONS (DAPO) AND BOARD OF PAROLE HEARINGS (BPH) - PAROLE PROCEEDINGS

All parolees shall be provided the opportunity to request a reasonable accommodation via a BPT Form 1073 to ensure effective communication and/or equal access to all parole proceedings. Agents shall review the BPT Form 1073 and the DEC prior to all parole proceedings, make plans to provide reasonable accommodations for any known disabilities, review the parolee's need for accommodation as the first step of any interaction with the parolee during parole proceeding, provide reasonable accommodations during parole proceedings, and update the DEC to document observed and self-reported disabilities, and any accommodations provided.

### A. CONDITIONS OF PAROLE (COP)

1. The issuance of COP (including special conditions) is considered an event related to a parole proceeding and thus requires the same level of effective communication that would be required for any other due process related event.

2. The parole agent completing and issuing either the original or amended COP shall review the Disability and Effective Communication System (DECS) and conduct a field file review to identify any disabilities. If the parolee needs reasonable accommodation(s), the parole agent shall make the accommodation(s) available during the meeting with the parolee. When the parole agent does not have a necessary accommodation or does not already have a contact number for a local service provider (e.g. Sign Language Interpreter), he/she shall contact the ADA Coordinator at the Regional HQ for assistance. If the parolee requires a foreign language interpreter, the parole agent shall use an independent contracted interpretation service provider or a bilingual CDCR employee currently certified by the State of California as capable of providing interpretation for their designated language(s).

3. In the event of effective communication concerns due to a parolee's disability, the parole agent shall document in DECS how the COP was effectively communicated to the parolee.

### *B.* PAROLE REVOCATION PROCESS

### 1. HOLD IS PLACED

a) When a parolee commits an alleged violation of law and/or parole conditions, a PC 3056 hold is placed. All time lines are calculated from one (1) calendar day after the hold date (hold date is day zero). Upon notification of an alleged violation, the Agent of Record (AOR) completes a charge report (CDCR1502-B).

b) **Not-In-Custody (NIC):** If a hold is not placed but the decision is made to refer the case to BPH for review, then it is considered a Not-in-Custody (NIC) proceeding. In NIC cases all time lines are calculated from discovery date. The discovery date is when DAPO staff receives the information and/or evidence. All NIC time lines are calculated from one (1) calendar day after the discovery date (discovery date is day zero). Prior to servicing notice to the parolee of the date and time of the hearing, the agent shall review DECS.

c) The AOR shall:

1) Consider the use of remedial sanctions and identify any disabilities after reviewing DECS. Considering remedial sanctions is done as part of the case conference process. Identifying disabilities is meant as an aid in placement of the parolee, but determining whether remedial sanctions are appropriate shall be done without regard to a parolee's disability or perceived disability.

2) Complete the CDCR Form 1502-B:

i   List each charge known at the time of the placement of the hold, which will require the parole agent to review the field file.

ii   A detailed statement of fact for each charge shall be documented. The statement of fact may be based on a credible witness, e.g. officer, observer, victim or information from a law enforcement database. Information ascertained from a law enforcement database must include the arrest date, arresting agency and charges.

iii   Make a recommendation.

3) Once completed, the CDCR Form 1502-B along with the field file shall be forwarded to the Unit Supervisor (US) for case conferencing.

### 2. PROBABLE CAUSE DETERMINATION (PCD)

a) While the Unit Supervisor (US) and parole agent conference the case, the US reviews the documents to determine if there is probable cause to properly refer the case to BPH. The PCD shall be completed no later than two (2) business days after the hold date.

---

b) The US shall, upon receipt of the CDCR Form 1502-B, the field file, and relevant reports:

   1) Review the CDCR Form 1502-B

   2) Evaluate the charge(s).

   3) Make a determination.

      When making a determination the US shall:

      i   Consider the use of remedial sanctions. This shall be done without regard to a parolee's disability or perceived disability. Disability information can be used when considering a particular placement of the parolee when identifying a program location that can accommodate the parolee's needs to participate in the program;

      ii  Complete and indicate such in the decision box on the CDCR Form 1502-B;

      iii Sign and date the CDCR Form 1502-B;

      iv Complete RSTS PCD screen;

      v   Forward the CDCR Form 1502-B along with the field file to the Field Unit Notification Agent (FUNA) for the Notice of Rights/Charges (NOR).

3. **NOTICE OF RIGHTS/CHARGES (NOR)**

The Notice Agent, upon receipt of the CDCR Form 1502-B and field file but, no later than three (3) business days after the hold date, shall:

a) Review the Disability and Effective Communication System (DECS).

b) Review the field file.

c) Complete Section I of the BPT Form 1073 in accordance with Section VIII of this Remedial Plan and the back page of the form.

    Note:  All requirements for completion of this form are the same as described in Section VIII of this Remedial Plan.

d) Copy and attach any ADA source documents identified from the field file and noted in Section I of the BPT Form 1073.

    Note:  If the parolee needs reasonable accommodation(s) the Notice Agent shall make the accommodation(s) available during the meeting with the parolee. When the Notice Agent does not have a necessary accommodation (e.g. sign language interpreter), he/she shall contact the ADA Coordinator at

the Regional HQ for assistance. If the parolee requires a foreign language interpreter, the Notice Agent shall use an independent contracted interpretation service provider or a bilingual CDCR employee currently certified by the State of California as capable of providing interpretation for their designated language(s).

e) After the ADA and effective communication paper review is completed, the Notice Agent shall meet with the parolee to complete the NOR.

f) During the meeting, the Notice Agent shall have the parolee complete Section II of the BPT Form 1073, allowing the parolee to self-identify any needed accommodations, and obtain the parolee's signature. If the need for an accommodation is identified at the meeting, the Notice Agent shall obtain the accommodation prior to continuing with the notice.

g) The Notice Agent shall effectively communicate to the parolee the charges indicated on the CDCR Form 1502-B and his/her rights indicated on the BPT Form 1100, and complete Section III of the BPT Form 1073, documenting how the information was effectively communicated.

h) The Notice Agent will ask the parolee to read, complete the name and date sections, and sign the BPT Form 1100. The Notice Agent will provide a copy of the Notice of Rights/Charges documents, the BPT Form 1073, the signed BPT Form 1100, and a blank copy of the Request for Witnesses (BPT Form 1100(b)), with an explanation of the 1100(b)'s purpose, to the parolee.

i) If the parolee is housed in a county jail facility, and requests an accommodation or the Notice Agent identifies the need based on observations during the serve process, the Notice Agent will notify the county jail staff member supervising the parolee in the location where the serve process is conducted. Notification should occur prior to the Notice Agent departing the county jail facility, but no later than two business days after completing the serve.

j) Any observations from the interview the staff member believes are pertinent should be written in the "Additional Comments" portion of this Section. This includes the name of any county jail staff that has been notified of a parolee's ADA needs, and any response provided by the county jail staff.

k) The Notice Agent shall return the completed NOR documents (i.e. BPT 1073, and BPT 1100) to the AOR or US.

l) Update DECS in accordance to Section IX as soon as possible but no later than 24 hours after the interview.

FUNA/DRUNA Reporting County Jail Non-Compliance

If a FUNA/DRUNA becomes aware of a "pattern" of non-compliance at a County Jail, they will report the issue to their Supervising Notice Agent (SNA) immediately.

The SNA will be responsible for notifying the DAPO Parole Litigation Compliance Unit (PLCU), Parole Administrator, or designee, within one business day of receipt of information.

The PLCU Parole Administrator will be responsible for initiating a telephonic case conference with the Board of Parole Hearings and the Corrections Standards Authority to determine if the incident warrants immediate transfer of the parolee, telephonic notification to the Jail Commander, or a meeting with county jail management.

The PLCU will be responsible for tracking complaints received by the FUNA/DRUNA for the purposes of identifying patterns of non-compliance at county jails. If the PLCU identifies a pattern, they will notify Office of Court Compliance, Corrections Standards Authority, and the administrators at the county jail.

## 4. VIOLATION REPORT SUBMITTED BY PAROLE AGENT

The parole agent investigates the behavior that may be in violation of parole; secures supporting documents, considers whether remedial sanctions are appropriate (and takes into consideration the disability information learned from the DECS review, and makes a decision regarding referral to the BPH, and if appropriate submits the Violation Report no later than six (6) business days after the hold date.

The parole agent shall:

a) Review all appropriate information;

b) Complete a violation report

The violation report includes the following:

| | |
|---|---|
| BPT Form 1073: | Notice and Request for Assistance at Parole Proceedings |
| BPT Form 1100: | Notice of Rights and Acknowledgement |
| CDCR Form 1502-B: | Charge Report |
| CDC Form 1676: | Charge Sheet/Revocation Tracking/Scheduling |
| CDC Form 1521-B: | Summary of Parole Adjustment |
| CDC Form 1521-D: | Recommendation, Review and Signature Sheet |
| CDC Form 188: | Legal Status Summary |
| CDC Form 1244: | Parole Violation Disposition |
| CDCR Form 1654: | Parole Revocation Hearing Notice and Witness Determination of Scheduled Hearing. |

Police Reports, lab results, or any other supporting evidence, and any other related documents.

5. **VIOLATION REPORT REVIEWED BY UNIT SUPERVISOR**

   a) The US shall:

      1) Review the report and ensure that the appropriate documentation is included;

      2) Determine if there is sufficient basis for the revocation to go forward;

      3) Determine if the report is accurate, complete; and

      4) Review the report and consider whether or not remedial sanctions are appropriate in lieu of forwarding the referral to the BPH for revocation proceedings.

      5) Complete RSTS US referral screen and the Parole Agent III (PA III) signature screen.

   b) The field unit support staff shall:

      1) Compile each revocation packet.

      The revocation packet shall include (at minimum) all documents listed in section 5 (b) above, as well as, any relevant documents that verify/identify a disability.

      2) Send packet via overnight mail to the appropriate Decentralized Revocation Unit (DRU).

     Note: Submitting incomplete packets can result in dismissal of charges due to violating time frames and/or providing inadequate documentation. Staff must make every effort to provide additional information and properly complete documentation in a timely manner to ensure the parolee is held accountable for the misconduct.

6. **DECENTRALIZED REVOCATION UNIT – REVOCATION PACKET RECEIVED**

The DRU receives the packet no later than nine (9) business days after the hold date, a copy is forwarded to the attorney, and Parole Administer completes the review.

   a) The DRU staff shall:

      1) Reviews the packet for completeness by ensuring it contains all the required forms.

      2) If the packet is incomplete, the DRU shall contact the DAPO sender to request the missing documents. BPH will continue to process the packet after one business day, regardless if the requested documents are received, but failure to

respond to the BPH may ultimately result in the BPH being forced to dismiss the case.

    3) After reviewing the packet, the DRU will do the following:

        i   Determine and update the current location of parolee.

        ii  Forward the revocation packet to the appropriate attorney panel.

        iii Forward packet to the Parole Administrator assigned to the DRU to determine if a Return to Custody Assessment is appropriate.

b) The contracted panel shall, upon receipt of the Revocation packet, assign an attorney.

c) The Parole Administrator (ParAd) shall:

    1) Review the revocation packet for completeness,

    2) Review for accuracy of the charges,

    3) Determine whether there is a sufficient basis for the case to move forward, or

    4) Determine whether or not remedial sanctions are appropriate,

    Note:  If a decision is made to refer to remedial sanctions then DECS or the BPT 1073 included in the revocation packet shall be reviewed for information concerning appropriate placement, and

    5) Complete RSTS entries.

d) After ParAd review, the DRU staff shall complete the charge RSTS entry and forward the packet to the Deputy Commissioner (DC) for continued processing.

7. **RETURN TO CUSTODY ASSESSMENT (RTCA)**

The BPH DC assesses the case factors to determine an appropriate proposed disposition of the case no later than ten (10) business days after the hold placement. This assessment will include the consideration of remedial sanctions if appropriate.

Parolees whose disabilities might prevent them from accessing or participating in particular programs shall not be excluded from consideration of remedial sanctions on account of their disabilities. If a parolee with a disability may be eligible for a remedial sanction placement, the DC shall contact the Parole Administrator or such other DAPO or OSATS staff who may facilitate the placement of the parolee in a remedial sanction program. Parolees with disabilities shall not be returned to custody in lieu of remedial sanctions solely on account of their disabilities.

a) The Deputy Commissioner assigned to the DRU shall:

1) Establish if the BPH has jurisdiction.

2) Review DECS in accordance with Section IX of this Remedial Plan and document the DECS and ADA review on the BPT Form 1104.

3) Review the revocation packet including the parole agent, US and ParAd. recommendations,

4) Consider the appropriateness of remedial sanctions,

5) Determine an appropriate proposed disposition and enter it into RSTS.

6) After the Deputy Commissioner completes the RSTS, he/she returns the documents to the DRU staff member to process.

b) The Attorney shall access RSTS in order to review the RTCA offer.

8. **ATTORNEY CONSULTS WITH PAROLEE**

The attorney consults with parolee no later than eleven (11) business days after the hold placement.

a) The attorney shall:

1) Review the RTCA offer via RSTS.

2) Review the BPT Form 1073 (including any attached source documents) and the DECS for any documented disabilities and/or barriers to effective communication.

3) Ensure any needed accommodations are identified and made available for the consultation. This would include communicating any such need (e.g. Sign Language Interpreter) to the assigned DRU to ensure it is available at the time of the consultation.

4) Meet with the parolee at the scheduled time and date.

5) Provide the parolee with a copy of the revocation packet.

6) Effectively communicate any offer or offers made by the DC.

7) Explain the hearing rights.

8) Discuss litigation strategy regarding the case and assist the parolee in making a determination as to how to proceed with the case.

9) Assess whether or not the parolee needs further accommodation(s) to proceed.

10) Determine if there is a sufficient offer of proof for a complete defense to all the charges.

11) Identify potential witnesses to be called should the case proceed to a revocation hearing.

12) The attorney will update the DEC in accordance to Section IX on any ADA accommodation and/or effective communication methods provided to the parolee at the attorney consultation, as soon as possible but no later than 24 hours after the consultation.

9. **EXPEDITED PROBABLE CAUSE HEARING**

An expedited PCH with documentary and/or live testimony shall be scheduled if the parolee through counsel can make a sufficient offer of proof for a complete defense to all the charges

The Expedited Probable Cause Hearing will be held no later than twelve (12) business days after the hold placement.

a) The attorney shall communicate the request for an expedited PCH to the assigned DRU as soon as possible following the consultation.

b) The DRU Support Staff shall arrange for an expedited PCH upon request from attorney and follow all procedures as described below (under "PCH" section).

c) The DC at an expedited PCH shall consider any offer of proof in determining probable cause and follow all procedures as described below (under "PCH" section).

10. **PROBABLE CAUSE HEARING (PCH)**

The PCH will be held with the DC, the parolee, and parolee's attorney no later than thirteen (13) business days after the hold date.

a) If a PCH occurs at a DRU, the DRU staff shall:

1) Reserve a hearing room on the appropriate date.

2) Review the BPT Form 1073 (including any attached source documents) and check DECS for any documented disabilities and/or barriers to effective communication.

3) Ensure that accommodation(s) are available for the hearing. If the parolee requires an auxiliary aid to effectively communicate and the aid is not available, the DRU will contact the BPH ADA Compliance Unit (ADACU) at

---

*Armstrong/ Parole Proceedings*
*Remedial Plan Amended 12/1/10*

(916) 324-7604, to obtain the appropriate accommodation. In instances where the parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter. Two days prior to the hearing, the DRU will confirm with the BPH that an interpreter is scheduled to attend the hearing.

b) If a PCH occurs at a non-DRU location, the Board Revocation Representative (BRR) will:

1) Review the BPT Form 1073 (including any attached source documents) and check DECS for any documented disabilities and/or barriers to effective communication.

2) Ensure that accommodation(s) are available for the hearing. If the parolee requires an auxiliary aid to effectively communicate and the aid is not available, the BRR will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation. In instances where the parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter. Two days prior to the hearing, the BRR will confirm with the BPH that an interpreter is scheduled to attend the hearing.

3) If BRRs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then BRRs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, BRRs shall notify the BPH Quality Control Unit of the noncompliance.

c) The assigned attorney shall arrive at the PCH hearing location at the scheduled time and date prepared to represent the parolee's interests.

d) The Deputy Commissioner shall:

1) Be available to conduct a PCH.

2) Conduct an ADA review prior to conducting the PCH. This includes reviewing the DECS and BPT Form 1073 and briefly interviewing the parolee to ensure there will be no barriers to effective communication. The DC will ensure that the appropriate accommodation(s) are provided. If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

3) Determine whether the BPH has jurisdiction.

4) Provide the attorney and parolee with an opportunity to present evidence to dispute the charges and/or mitigate the disposition.

5) Determine if there is sufficient evidence to conclude that a reasonable person would have a strong suspicion that the parolee committed the alleged misconduct so as to constitute probable cause.

6) If probable cause is found, determine if the conduct warrants incarceration or a remedial sanction (if appropriate) and offer a negotiated disposition to resolve the case.

7) Document the parolee's decision on the BPT Form 1103 PCH, including the reason for the determination and the evidence relied upon, and document the fact that the DC reviewed DECS.

8) Provide the parolee with a summary of the results including a copy of the BPT 1104.

9) Enter any accommodations provided into the DEC.

10) If DCs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then DCs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, DCs shall notify the BPH ADA Unit of the noncompliance.

e) Accept Process:

If the parolee, after consulting with counsel decides to accept the negotiated disposition the attorney and parolee will complete the BPT 1104-B, , Parolee-Attorney Decision form and provide a copy to the DC. The DC will provide the packet to the DRU staff who will review the documents for completeness prior to forwarding to Records.

f) Reject Process:

If the parolee rejects the offer at the PCH,

1) The attorney and Deputy Commissioner shall:

   i   Complete the BPT Form 1104-B.

---

    ii  The attorney will assist the parolee's completion of the Request for Witnesses form (BPT Form 1100(b) and present it to the DC for approval of requested witnesses.

    iii  The Deputy Commissioner will allow counsel to justify the request for witnesses, and either approve or disapprove each witness providing written justification for each decision in his/her report/worksheet.

2) After the appropriate documents are completed, the DRU will:

    i  Schedule a Revocation hearing **no later than 35 calendar days** after hold date. If the timeline expires during a weekend or on a holiday, this step will occur no later than the next business day after the weekend or holiday.

    ii  Subpoena all State witnesses.

## 11. REVOCATION HEARING

The BPH shall schedule a Deputy Commissioner to conduct the Revocation Hearing. The hearing will occur no later than thirty-five (35) calendar days after the hold date.

Note:   If the thirty-fifth (35th) calendar day falls on a weekend or holiday, the hearing will occur no later than the next business day after the weekend or holiday.

a) The Deputy Commissioner shall:

1) Tape record the Revocation Hearing. It is the Deputy Commissioner's responsibility to ensure that they have the proper tape recording equipment, including a blank cassette tape, available at the hearing.

2) The Deputy Commissioner shall establish the BPH's jurisdiction.

3) Determine, based on the evidence presented by the State and by the parolee, if a preponderance of the evidence exists to substantiate the charges.

4) Prior to making a good cause determination, provide an opportunity for the parolee to present evidence through documents, witnesses, and the parolee's own testimony, all of which may include hearsay.

5) Determine, when good cause is found, if the conduct warrants a RTC and, if so, the length of the RTC.

6) Document the decision on the BPT Form 1103-REV by indicating the evidence relied on to support the finding, and if extending the incarceration, the reasons relied on to extend, and document the fact that the DC reviewed DECS.

---

7) Provide the parolee with a copy of the summary of the hearing.

8) Enter into the DEC system the accommodations, if any, provided.

9) If DCs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then DCs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, DCs shall notify the BPH ADA Unit of the noncompliance.

## 12. NOT IN CUSTODY (NIC) HEARING

The notice of the date and time of a NIC hearing is considered an event related to a parole proceeding and thus requires the same level of effective communication that would be required for any other due process related event.

The parole agent completing and issuing the notice of the date and time of a NIC hearing shall review the Disability and Effective Communication System (DECS) and conduct a field file review to identify any disabilities. If the parolee needs reasonable accommodation(s), the parole agent shall make the accommodation(s) available during the meeting with the parolee. When the parole agent does not have a necessary accommodation or does not already have a contact number for a local service provider (e.g. Sign Language Interpreter), he/she shall contact the ADA Coordinator at the Regional HQ for assistance. If the parolee requires a foreign language interpreter, the parole agent shall use an independent contracted interpretation service provider or a bilingual CDCR employee currently certified by the State of California as capable of providing interpretation for their designated language(s).

The parole agent shall then document how the notice of the date and time of a NIC hearing was effectively communicated with the parolee.

## C. REVOCATION EXTENSION PROCEDURES: DAPO AND BPH

These procedures are to be followed in parole revocation extension cases arising from reportable misconduct committed by inmates/parolees in Return-to-Custody status **non-CDCR locations.**

## 1. REVOCATION EXTENSIONS DEFINED:

a) B An inmate/parolee who commits an act of reportable misconduct, while in revoked status, is subject to Revocation Extension proceedings.

b) An inmate/parolee subject to the Revocation Extension process is defined as any Parole Violator-Return to Custody (PVRTC) and/or Parole Violator-with New Term (PVWNT), who has not reached his/her Revocation Release Date.

c) An inmate/parolee is deemed to be in revoked status once he/she either unconditionally or optionally waives his/her right to a hearing with a return to custody assessed or is ordered returned to custody at a revocation hearing.

d) If the discovery date is beyond the revocation release date and the inmate/parolee has not been release (i.e. a hold from another agency) the misconduct is a revocation offense, but shall be processed through the revocation extension procedures. DAI shall refer all instances of misconduct (Division A, B, C, D, E, F).

e) Acts of Reportable Misconduct subject to the Revocation Extension process are defined as:

    1) The misconduct consists of an act initially identified as a Division A, B or C offense pursuant to CCR Section 3323,

    2) The misconduct consists of an act that was initially identified as other than a Division A, B, or C offense and is subsequently classified as either a Division A, B, C offense,

    3) The misconduct consists of a violation of a special condition of parole prohibiting contact with a specific person, or class of persons, such as minors. This does not include the general class of individuals specified as "gang members."

    4) The inmate/parolee refuses to sign his/her general and/or special conditions of parole, or [9]

    5) The inmate/parolee refuses to sign any form required by the Department of Justice explaining his/her responsibility to register per Penal Code Section 290. [10]

2. **RESPONSIBILITY:**

a) Institutional staff will handle acts of reportable misconduct committed by inmates/parolees in Return-to-Custody status in an Institution.

b) DAPO will handle acts of reportable misconduct committed by inmates/parolees in Return-to Custody status in a non-CDCR location.

---

[9] This specific act is a "Revocation" should be processed through the normal revocation violation referral process.

[10] Same as footnote #1.

---

c) When an act of reportable misconduct occurs at a non-CDCR location and the inmate/parolee is transferred to a CDCR Institution with a Decentralized Revocation Unit (DRU) prior to the completion of the Revocation Extension process, the case will continue to be processed by BPH field staff (e.g. DRU staff).

d) When an act of reportable misconduct occurs at a non-CDCR location and the inmate/parolee is transferred to a CDCR Institution which does not have a DRU prior to the completion of the Revocation Extension process, the case will be processed by DAI Revocation Extension desk staff per DAPO Revocation Extension policies and procedures (see DAPO Revocation Extension policy and procedure).

e) In cases where a inmate/parolee has been transferred from an Institution to a non-CDCR location prior to the completion of the Notice of Rights/Charges, the C&PR from the sending Institution shall forward the Notice of Rights/Charges documents to the appropriate Supervising Notice Agent who will coordinate completion of the Notice of Rights/Charges. The Notice Agent shall return the completed Notice of Rights/Charges documents the C&PR at the sending Institution.

f) In cases where an inmate/parolee has been transferred from a non-CDCR location to an Institution with a Decentralized Revocation Unit, the FUNA shall forward the Notice of Rights/Charges documents to the appropriate DRUNA. The Notice Agent will return the completed Notice of Rights/Charges documents to the FUNA.

g) In cases where an inmate/parolee is transferred from a non-CDCR location to an Institution without a Decentralized Revocation Unit, the FUNA shall forward the Notice of Rights/Charges documents to the C&PR to coordinate completion of the Notice of Rights/Charges. The Notice Agent will return completed Notice of Rights/Charges documents to the FUNA.

3. **TIMELINE SUMMARY:**  See flow chart for details.  Good cause delay is any circumstance causing a delay not within the control of the State.

4. **DISCOVERY DATE:** The discovery date is the date the DAPO's staff receives the information and/or evidence amounting to reportable misconduct. All DAPO time lines are calculated from one (1) calendar day after the discovery date (discovery date is day zero).

5. **UNIT SUPERVISOR REVIEW FOR REFERRAL:**

a) *Timeline:*  The Unit Supervisor (US) will complete the referral review no later than two (2) business days after the discovery date.

b) *Definition*: The US and parole agent complete this step when the parole agent receives the information, conferences the case with the US, completes the

---

appropriate paperwork and the US reviews the documents to determine if there is probable cause to properly refer the case to BPH including whether the reportable act of in-custody misconduct meets the BPH referral criteria.

c) **Procedure:**
**DAPO Process-AOR:** Upon notification of an act of a reportable misconduct, the Agent of Record shall complete a Miscellaneous Decision report (BPT 1135), which shall serve as both the Notice of Charges and the Violation Report for the Revocation Extension process.

After the AOR completes the BPT 1135, the Agent of Record will forward the BPT 1135 and the field file to the US for case conferencing.

d) **DAPO Process-US:** Upon receipt of the BPT 1135, the field file, and relevant reports, the US reviews the BPT 1135, evaluates the act(s) of reportable misconduct and determines if there is probable cause to properly refer the case to BPH including if it meets the BPH referral criteria (listed on the first page).

e) If the criteria are met, the Unit Supervisor shall:

1) Sign the BPT 1135,

2) Forward the BPT 1135 along and field file to the Field Unit Notification Agent (FUNA) for Notice of Rights/Charges.

f) If the misconduct is not referable, then the process ends and the case is closed.

g) If the act of reportable misconduct occurs **within 35 calendar days** of the inmate/parolee's revocation release date, the Unit Supervisor shall:

1) Complete a Report of In-Custody Misconduct (BPT 1135A) requesting the BPH retain the inmate/parolee in custody pending the revocation extension proceedings,

2) Fax the BPT 1135A to the BPH Special Processing Unit (916) 324-6966, and

3) Contact the BPH telephonically at (916) 324-1941 to confirm receipt of the fax and advise them of the impending release date or unavailable status.

6. **NOTICE OF RIGHTS/CHARGES**

a) **Time line:** DAPO will complete the Notice of Rights/Charges no later than three (3) business days after the discovery date.

b) **Definition:** DAPO accomplishes this step when the Notice Agent receives and prepares the documents to serve on the inmate/parolee. First, the Notice Agent conducts and ADA and effective communication review, documenting the result. The Notice Agent then meets with the inmate/parolee to provide the relevant

---

documents, and to explain the revocation extension process to the inmate/parolee including the nature of the charges alleged, and his/her rights. Finally, the Notice Agent completes the Notice of Rights/Charges documentation and returns the packet to the Field Unit.

c) **Procedure:**
**DAPO Process-Notice Agent:** Upon receipt of the BPT 1135 and field file, the Notice Agent shall, prior to the 3rd business day from the discovery date:

1) Review the Disability and Effective Communication (DEC) system.

2) Review the field file.

3) Complete Section I of the BPT 1073. Note: All requirements for completion of this form are the same as described in the Revocation process.

4) Copy and attach any ADA source documents identified from the field file and noted in Section I of the BPT 1073. Note: If the inmate/parolee needs reasonable accommodation(s) the Notice Agent shall make the accommodation(s) available during the meeting with the inmate/parolee. When the Notice Agent does not have a necessary accommodation, he/she shall contact the ADA Coordinator at the Regional HQ for assistance. If the inmate/parolee requires a foreign language interpreter, the Notice Agent shall use an independent contracted interpretation service provider or a bilingual CDCR employee currently certified by the State of California as capable of providing interpretation for their designated language(s).

5) After the ADA and effective communication review, the Notice Agent shall meet with the inmate/parolee to effectuate the service.

6) During the meeting, the Notice Agent shall complete Section II, BPT 1073, including obtaining the inmate/parolee's signature.

7) Next the Notice Agent shall advise the inmate/parolee of the charges indicated on the BPT 1135 and of his/her rights indicated on the BPT 1135A-1, and complete Section III, BPT 1073.

8) The Notice Agent will ask the inmate/parolee to read, complete the name and date sections, and sign the BPT 1135A-1. The Notice Agent will provide a copy of the Notice of Rights/Charges documents, the signed BPT 1135A-1, and a blank copy of the Request for Witnesses (BPT 1100(b)), with an explanation of the 1100b's use, to the inmate/parolee.

9) If the parolee is housed in a county jail facility, and requests an accommodation or the Notice Agent identifies the need based on observations during the serve process, the Notice Agent will notify the county jail staff member supervising the parolee in the location where the serve process is conducted. Notification should occur prior to the Notice Agent departing the

county jail facility, but no later than two business days after completing the serve.

10) Any observations from the interview the staff member believes are pertinent should be written in the "Additional Comments" portion of this Section. This includes the name of any county jail staff that has been notified of a parolee's ADA needs, and any response provided by the county jail staff.

11) The Notice Agent will enter information from the BPT 1073 into the DEC system.-The Notice Agent will return the completed Notice and Request for Reasonable Accommodations and the Notice of Rights/Charges documents (i.e. BPT 1073, and BPT 1135A-1) to the field unit support staff.

12) In cases where a inmate/parolee has been transferred from an Institution to a non-CDCR location prior to the completion of the Notice of Rights/Charges, the C&PR from the sending Institution shall forward the Notice of Rights/Charges documents to the appropriate Supervising Notice Agent who will coordinate completion of the Notice of Rights/Charges. The Notice Agent shall return the completed Notice of Rights/Charges documents the C&PR at the sending Institution.

13) In cases where an inmate/parolee has been transferred from a non-CDCR location to an Institution with a Decentralized Revocation Unit, the FUNA shall forward the Notice of Rights/Charges documents to the appropriate DRUNA. The Notice Agent will return the completed Notice of Rights/Charges documents to the FUNA.

14) In cases where an inmate/parolee is transferred from a non-CDCR location to an Institution without a Decentralized Revocation Unit, the FUNA shall forward the Notice of Rights/Charges documents to the C&PR to coordinate completion of the Notice of Rights/Charges. The Notice Agent will return completed Notice of Rights/Charges documents to the FUNA.

7. **IN-CUSTODY MISCONDUCT REPORT SUBMITTED BY AGENT OF RECORD**

a) *Time line:* The Agent of Record submits the Report of In-Custody Misconduct (BPT 1135A) to the Unit Supervisor for review no later than six (6) business days after the discovery date.

b) *Definition:* DAPO completes this step when the Agent of Record completes the BPT 1135A.

c) *Procedure:*
   *DAPO Process-AOR:* The Agent of Record does the following:

   1) Completes a BPH 1135A, Report of In-custody Misconduct.

2) If appropriate updates BPH 1135, Miscellaneous Decision report to reflect additional information learned during follow-up investigation.

3) Completes a CDCR 1654, Parole Revocation Hearing Notice and Witness Determination.

## 8. IN-CUSTODY MISCONDUCT REPORT REVIEW BY UNIT SUPERVISOR

a) *Time line:* The BPT 1135A review by the Unit Supervisor will be completed no later than seven (7) business days after the discovery date.

b) *Definition:* The US completes this step by reviewing the BPT 1135A and updated BPT 1135 if applicable.

c) *Procedure:*
*DAPO Process-US:* The Unit Supervisor does the following:

1) Reviews the BPH 1135A for accuracy.

2) Reviews the supporting evidence/documents.

3) Hand delivers the documents along with the field file to the field unit support staff for processing.

## 9. REFERRAL TO THE BPH

a) *Time line:* The referral to the BPH will be completed no later than seven (7) business days after the discovery date.

b) *Definition:* DAPO completes this step when the Field Unit support staff provides the BPH with the Revocation Extension packet.

c) *Procedure:*
*DAPO Process-Field Unit Support Staff:* Upon receiving the revocation extension packet, the field unit support staff provides the following documents to the Special Processing Unit at the BPH, fax number (916) 324-6966.

Revocation Extension packets generated from DAPO shall include (at minimum) the following documents:

- BPT 1135:       Miscellaneous Decision,
- BPT 1135A:      Report of In-custody Misconduct,
- BPT 1135A-1:    Notice of Rights and Acknowledgement of the Revocation Extension Proceedings,
- BPT 1073:       Notice and Request for Assistance at Parole Proceeding,
- CDC 112:        Chronological Inmate History,
- CDC 188:        Legal Status Summary,
- CDCR 1654:      Parole Revocation Hearing Notice and Witness

Determination, and any other related documents.

The field unit support staff faxes[11] or overnight mails the following documents and other related documents to the Special Processing Unit at the BPH. The documents can be faxed to (916) 324-6966 or sent via overnight mail service to the attention of the Special Processing Unit: Tracking Desk, 1515 K Street, Ste 600, Sacramento, CA 95814.

Submitting incomplete packets can result in dismissal of charges due to violating *Valdivia* time frames and/or providing inadequate documentation. Institutions must make every effort to timely provide additional information, or to properly complete documentation, when requested by the Special Processing Unit to ensure the inmate/parolee is held accountable for the misconduct

## 10. BPH SPECIAL PROCESSING UNIT RECEIVES PACKETS

a) *Time line:* The BPH Special Processing Unit receives the revocation extension packet no later than nine (9) business days after the discovery date.

b) *Definition:* The BPH completes this step when the BPH Special Processing Unit receives the revocation extension packet, reviews the documents for completeness and logs the case for tracking, conducts a review pursuant to ADA to assess ADA accommodations and effective communication needs, notifies the panel attorney office of the case, and provides a copy of the packet to the Deputy Commissioner.

c) *Procedure:*
**BPH Process:** Upon receipt of the Revocation Extension DAPO packet, the Special Processing Unit reviews the packet for completeness by ensuring it contains all the required forms (see complete list under "Referral to BPH") and correct completion of all the form.

If the packet is incomplete, the Special Processing Unit shall contact the DAPO sender to request the missing documents. BPH will continue to process the packet after one business day, regardless if the requested documents are received, but failure to respond to the BPH may ultimately result in the BPH being forced to dismiss the case.

After reviewing the packet, the Special Processing Unit will do the following:

- Determine and update the current location of inmate/parolee.

- Check the DEC system and enter any anticipated accommodation(s), during the Attorney Consultation, PCH, and Revocation Extension Hearing.

---

[11] When providing information to the BPH Special Processing Unit faxing should always be the primary method of sending information. However, if the fax machine is not functional then overnight mail may be considered as an alternative method to provide the documents.

- Based on the inmate/parolee's custody location, the BPH will forward the revocation extension packet to the appropriate panel attorney satellite office.

- Complete the informational portion of a BPT 1104, Revocation/Revocation Extension Return to Custody Assessment form, and attach it to the packet.

- Forward packet to the Deputy Commissioner assigned to the Special Processing Unit to determine if a Return to Custody Assessment is appropriate.

- Schedule a PCH **no later than thirteen (13) business days** after the discovery date.

- Advise the attorney of the PCH date.

- When the Inmate/Parolee is **within 35 calendar days** of the revocation release date, the DC, where appropriate, will take an action to hold the inmate/parolee pending the completion of the Revocation Extension proceedings.. The BPH may extend the hold beyond the release date, but no later than 35 calendar days from the discovery date. For example: If the discovery date is 2 calendars days before the release date then the hold will be placed for up to 33 calendars days after the release date.

- Schedule a Deputy Commissioner for the PCH.

11. **ATTORNEY ASSIGNMENT (ATTORNEY RECEIVES PACKET)**

a) *Time line:* The Attorney Assignment will be completed no later than nine (9) business days after the discovery date.

b) *Definition:* The BPH Special Processing Unit completes this step by providing attorney a copy of the Revocation Extension packet, and by providing a copy of the relevant documents to the Institution Revocation Extension Desk staff.

c) *Procedure:*
   *BPH Process:* Upon receiving the Revocation Extension packet, the Special Processing Unit staff will:

   1) *For Panel Attorney:*

   i   Provide the appropriate panel attorney office with a copy of the revocation extension Packet (including any no later than dates) and request the name of the assigned attorney.

ii    Advise panel attorney to inform the assigned attorney to contact the Special Processing Unit to schedule a telephonic PCH prior to the PCH no later than date.

iii   Inform panel attorney that failure of counsel to contact the Special Processing Unit within the prescribed time lines will result in the case being postponed based upon a good cause finding for failure to appear and rescheduled for a new PCH.

2) *For Decentralized Revocation Unit (for cases originating from DAPO):*

i    Provide the appropriate DRU/Board Revocation Representative with a copy of the revocation extension packet (including no later than dates).

ii   Provide the DRU/Board Revocation Representative with the name of the attorney and the PCH scheduled date.

## 12. REVOCATION EXTENSION ASSESSMENT

a) ***Time line:***  The Revocation Extension Assessment (REA) will be completed no later than ten (10) business days after the discovery date.

b) ***Definition:***  The BPH completes this step by completing and documenting an ADA and effective communication review to determine if the inmate/parolee needs accommodation(s), and assesses the case factors to determine an appropriate proposed disposition.

c) ***Procedure:***
***BPH Process:***  The Deputy Commissioner assigned to the Special Processing Unit shall first establish if the BPH has jurisdiction. There is no jurisdiction if the revocation release date expired, unless there is good cause for delay.  The Deputy Commissioner will review the DEC system and document the ADA review on the BPT 1104 – Return to Custody/Revocation Extension Form.  If jurisdiction is established then the Deputy Commissioner assesses the case factors to determine the appropriate proposed disposition and completes the documents as follows:

d) If the Deputy Commissioner determines that a revocation extension is unwarranted, the Deputy Commissioner will note BPHs decision not to proceed by re-affirming the release date in the decision section of the BPT 1135A - Report of In-Custody Misconduct and will not complete the BPT 1104 – Return to Custody/Revocation Extension Form.

e) If the Deputy Commissioner determines that a revocation extension is warranted, the Deputy Commissioner shall complete the BPT 1135A - Report of In-Custody Misconduct and the BPT 1104 – Return to Custody/Revocation Extension Form using the guidelines listed in BPH Regulations, CCR, Title 15, Division 2, Section 2742.

f) If the Deputy Commissioner determines that a revocation extension is warranted and the inmate/parolee **is within 35 calendar days** from his/her revocation release date, the Deputy Commissioner shall retain the inmate/parolee in custody for a period not to exceed 35 calendar days from the discovery date. Prior to taking the action to maintain the hold pending the revocation extension hearing, the BPH Deputy Commissioner shall consider the timeliness of the submission of the misconduct report as one factor in maintaining the hold. The Deputy Commissioner shall take this action in the decision section of the BPT 1135A - Report of In-Custody Misconduct. The Deputy Commissioner will complete the BPT 1104 – Return to Custody/Revocation Extension Form using the attached assessment guidelines.

If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

After the Deputy Commissioner completes the Report of In-Custody Misconduct and Assessment Offer, the Deputy Commissioner returns the documents to the Special Processing Unit staff member to process and provide the REA to panel attorney and the appropriate staff (i.e. Institution, DRU, BRR). Where the BPH identifies ADA accommodation(s), or effective communication needs, to be provided at the Attorney Consultation, PCH, and Revocation Extension Hearing, the BPH staff will communicate these accommodation(s) to the appropriate staff on the fax cover in bold type.

13. ATTORNEY CONSULTATION

a) **Time line:** The attorney will complete a consultation with the inmate/parolee no later than eleven (11) business days after the discovery date.

b) **Definition:** Panel attorney completes this step when the attorney calls the non-CDCR location to initiate the visit process, conducts a face-to-face meeting with the inmate/parolee, returns the appropriate documents, and enters any ADA accommodation and/or effective communication methods used into the DEC system.

c) **Procedure:**
   **Panel Attorney Process:**
   For DAPO initiated cases, the attorney contacts the Board Revocation Representative or County jail (whichever is applicable for the location) at least 24 hours prior to the "Attorney Consultation" no later than date, via telephone and schedules a visit with the inmate/parolee, advising the appropriate BPH staff (i.e. SPU )of any ADA accommodations and/or effective communication methods that may be needed to conduct the consultation. Prior to the scheduled visit, the appropriate staff will ensure the inmate/parolee is escorted for the visit and ensure appropriate clearances for the attorney's entrance into the location. The attorney meets with the inmate/parolee.

---

For DAPO cases transferred to an institution (prior to the completion of the Revocation Extension process) where there is a DRU, the attorney will contact the DRU staff to schedule the visit. Prior to the scheduled visit, the DRU staff will ducat the inmate/parolee for the visit and ensure appropriate clearances for the attorney's entrance into the institution.

The attorney shall meet with the inmate/parolee at the scheduled time and date to discuss the REA, explain the hearing rights, and assist the inmate/parolee in making a determination as to how to proceed with the case. In addition, the attorney will assess whether or not the inmate/parolee needs further accommodation(s) to proceed. During the consultation, the attorney shall use effective communication to explain the REA and that parolees are not required to accept or reject a RTC until the PCH. Attorneys must allow 72 hours for their *Armstrong* class member clients to make a decision about the REA.

If the inmate/parolee and attorney decide to accept the REA, the attorney and inmate/parolee will complete the BPT 1104, and leave it with the DRU/Board Revocation Representative. Additionally, attorney will enter into the DEC system on the BPH Accommodation Chrono any ADA accommodation and/or effective communication methods provided to the inmate/parolee at the attorney consultation. Any DEC entry shall be made as soon as possible but within 24 hours of completing the interview.

In the rare event that the parolee chooses to accept the REA without a PCH, the assigned attorney shall consult with the DC to ensure the parolee's waiver is knowing, voluntary, and intelligent. The attorney should be particularly aware of *Armstrong* class members with disabilities affecting their ability to understand (i.e. developmental, hearing, learning) when counseling their clients regarding attending the PCH.

d) **_BPH Process:_** The DRU/Board Revocation Representative staff will do the following if the REA is accepted at the REA attorney consultation:

1) Review the documents for completeness,

2) Fax a copy of the completed documents to the BPH Special Processing Unit at (916) 324-6966,

3) Cancel any tentatively scheduled hearing on the case, and

4) provide the Revocation Extension paperwork is given to the DRU to be forwarded to Case Records North or South for posting and release date calculation as required through established procedures.

14. EXPEDITED PROBABLE CAUSE HEARING WITH OFFER OF PROOF

a) *Time line:* The BPH will conduct an expedited probable cause hearing with offer of proof no later than twelve (12) business days after the discovery date. The

expedited PCH is only applicable to inmates/parolees whose acts of in-custody misconduct are **within 35 calendar days** of their revocation release date.

b) *Definition:* The BPH accomplishes this step only after the attorney provides a written request for an expedited PCH with an offer of proof to justify the request. The BPH reviews the offer of proof and, if appropriate, schedules and conducts the hearing.

c) *Procedure:*

*Panel Attorney Process:*    The attorney requests an expedited probable cause hearing, if the inmate/parolee's act(s) of in-custody misconduct are **within 35 calendar days** of his/her revocation release date, and there is substantial evidence that the inmate/parolee is not culpable of the alleged misconduct. The attorney makes a written request for the expedited hearing to the BRR or DRU staff, or faxes the request directly to Special Processing Unit at (916) 324-6966. The attorney substantiates the request with an offer of proof.

d) ***BPH Process (DRU/BRR):*** When an attorney requests an expedited PCH with an offer of proof, the DRU/BRR:

1) Make a copy of the request and retain it in the revocation extension packet, and

2) Fax request with the offer of proof to the BPH Special Processing Unit for review at (916) 324-6966.

e) ***BPH Process (Special Processing Unit):*** Upon request of an expedited PCH, the BPH will:

1) Review the request and offer of proof.

2) Determine whether the request is appropriate, and advise the attorney and the DRU/BRR of the decision.

3) If **approved**, the BPH will schedule the expedited probable cause hearing and advise the attorney and the DRU/BRR of the date.

4) If **not approved**, the BPH will confirm the date of the PCH with all relevant parties.

15. **PROBABLE CAUSE HEARING:**

a) *Time line:* The PCH will be completed no later than thirteen (13) business days after the discovery date.

b) *Definition:* The BPH accomplishes this step by conducting a hearing that includes an ADA and effective communication review, including providing accommodations if necessary, making a probable cause determination based on the evidence in the packet and the evidence presented by the parolee and his

---

attorney; and, where the DC makes a probable cause finding, the DC will offer a negotiated disposition based on the case factors. The DC will document the results of the PCH and the Special Processing Unit will forward the documentation to DRU/Board Revocation Representative.

c) ***Procedure:***

***BPH Process-DRU/BRR:***  When DAPO initiates a case that is transferred to an institution (prior to the completion of the Revocation Extension Process) with a DRU, the DRU staff will reserve a hearing room on the appropriate date.  The DRU will ensure that accommodation(s) are available for the hearing.  If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the DRU will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter.  The DRU will also confirm that an interpreter will attend with the BPH two days prior to the hearing.

When DAPO initiates a case that is transferred to an institution (prior to the completion of the Revocation Extension Process) where there is NO DRU, the BPH staff processing the case will contact the Revocation Extension Desk staff who will inform the C&PR, or designee, of required ADA accommodations by using the BPT 1073.  The C&PR, or designee, will make the accommodation(s) available.    If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the C&PR, or designee, will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires the use of a sign language interpreter, the C&PR will coordinate the BPH ADACU. The BPH ADACU staff will notify the Institution's C&PR /Revocation Ext. Desk at least two days prior to the hearing, to allow the Institution to prepare gate clearances. The Revocation Extension Desk will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation were made.

When DAPO initiates a case for an inmate/parolee housed at a non-CDCR location, the Board Revocation Representative staff will reserve the hearing room on the appropriate date. The Board Revocation Representative will provide appropriate the accommodation(s) for the hearing. If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the Board Revocation Representative will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter.  In addition, the Board Revocation Representative will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation have been made.

If BRRs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then BRRs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class

---

members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, BRRs shall notify the BPH ADA Unit of the noncompliance.

If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

d) ***Panel Attorney Process:*** The attorney shall meet with the inmate/parolee at the scheduled time and date and contact the Deputy Commissioner at the Special Processing Unit for the PCH.

e) ***BPH Process:*** The Deputy Commissioner shall be available to conduct a PCH, in person, or by telephone with the attorney and inmate/parolee present.

At the PCH, the Deputy Commissioner will:

1) Conduct an ADA review prior to conducting the PCH. This includes reviewing DECS, BPT 1073, and interaction with the parolee. The DC will provide the inmate/parolee with the appropriate accommodation(s). If a needed accommodation has not been provided for the hearing, the Deputy Commissioner shall take all reasonable steps to arrange for that accommodation. The failure to provide a needed accommodation shall not constitute good cause for postponement unless the failure was beyond the control of the state. Any hearing postponed whether designated good cause or not for failure to provide an accommodation shall be rescheduled at the earliest possible date.

2) Determine if the BPH has jurisdiction based on the revocation release date, and controlling discharge date.

3) Determine if there is sufficient evidence to conclude that a reasonable person would have a strong suspicion that the inmate/parolee committed the alleged misconduct so as to constitute probable cause.

4) In the rare event that the parolee chooses to accept the REA without a PCH, the DC shall consult with the assigned attorney to ensure the parolee's waiver is knowing, voluntary, and intelligent. DC should be particularly aware of *Armstrong* class members with disabilities affecting their ability to understand (i.e. developmental, hearing, learning) when accepting waivers.

5) Determine if the conduct warrants extended incarceration based on the case factors, and if so, will offer a negotiated disposition to resolve the case.

6) Provide the attorney and inmate/parolee with an opportunity to present evidence to dispute the charges and/or mitigate the disposition prior to making a probable cause determination, and prior to making the offer to resolve the case. Such evidence shall be presented through documentary evidence or the

---

charged inmate/parolee's testimony, either or both of which may include hearsay testimony,

7) Document his/her decision on the appropriate form, including the reason for the determination including the evidence relied on.

8) Provide the inmate/parolee with a summary of the results including a copy of the BPT 1104-B(provided by the attorney,

9) Enter into the DEC system the accommodations, if any, provided. The Deputy Commissioner shall make the DEC entries as soon as possible but within 24 hours of completing the hearing.

10) If DCs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then DCs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, DCs shall notify the BPH ADA Unit of the noncompliance.

f) *"Accept" Process:*
If the inmate/parolee, after consulting with counsel decides to accept the negotiated disposition the attorney will provide all documents, including a BPT 1104 signed by the inmate/parolee (BPT 1104, Summary of Revocation Decision: Return to Custody Assessment and the BPT 1104-B, Parolee-Attorney Decision form) to the DRU.

The DRU staff will:

1) Review the documents for completeness,
2) Fax a copy of the completed documents to the BPH Special Processing Unit at (916) 324-6966, and
3) Provide the Revocation Extension paperwork to the appropriate Correctional Case Records Analyst for posting and release date calculation as required through established procedures.

g) *"Reject" Process:*
If the inmate/parolee rejects the offer at the PCH, the attorney and Deputy Commissioner shall do the following:

1) The inmate/parolee will sign the BPT 1104 and the attorney will fax it to the Special Processing Unit.

2) The attorney will assist the inmate/parolee's completion of the Request for Witnesses form (BPH 1100(b) and present it to the DC for approval of requested witnesses.

3) The Deputy Commissioner will allow counsel to justify the request for witnesses, and either approve or disapprove each witness providing written justification for each decision in the DC's report (refer to BPH Source document #3).

4) The attorney will provide the signed BPH 1104-B and BPH 1100(b) to the Revocation Extension or DRU/BRR staff for faxing to the Special Processing Unit.

5) The Deputy Commissioner will determine the hearing location.

6) After the appropriate documents are completed, the Special Processing Unit will:

7) Schedule a Revocation Extension hearing **no later than 35 calendar days** after discovery date. If the timeline expires during a weekend or on a holiday, this step will occur no later than the next business day after the weekend or holiday.

8) Complete the CDCR 1654 and advise the DRU/Board Revocation Representative staff and panel attorney of the witnesses.

9) Subpoena all State witnesses

10) Advise the attorney and DRU/Board Revocation Representative of the date of the Revocation Extension Hearing.

11) Schedule a Deputy Commissioner to conduct the Revocation Extension Hearing.

After the appropriate documents are completed, the Panel Attorney will:

a) Subpoena all of the parolee's approved witnesses.

## 16. REVOCATION EXTENSION HEARING

a) *Time line:* The Revocation Hearing will occur no later than thirty-five (35) calendar days after the discovery date. If the time line expires during a weekend or on a holiday, it will occur no later than the next business day after the weekend or holiday.

b) *Definition:* The BPH and the Institution accomplishes this step through completion of a Revocation Extension hearing where the DC completes an ADA and effective communication review, and provides the appropriate accommodation(s), and then conducts an evidentiary hearing to determine if there is good cause to sustain the alleged misconduct. The DC documents the decision and the completed documents are sent to Case Records.

c) ***Procedure:***

***BPH Process-DRU/BRR:***  When DAPO initiates a case that is transferred to an institution (prior to the completion of the Revocation Extension Process) with a DRU, the DRU staff will reserve a hearing room on the appropriate date.  The DRU will ensure that accommodation(s) are available for the hearing.  If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the DRU will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter.  The DRU will also confirm that an interpreter will attend with the BPH two days prior to the hearing.

When DAPO initiates a case is transferred to an institution (prior to the completion of the Revocation Extension Process) where there is NO DRU, the BPH staff processing the case will contact the Revocation Extension Desk staff who will inform the C&PR, or designee, of required ADA accommodations by using the BPT 1073.  The C&PR, or designee, will make the accommodation(s) available.   If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the C&PR, or designee, will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires the use of a sign language interpreter, the C&PR will coordinate the BPH ADACU.  The BPH ADACU staff will notify the Institution's C&PR /Revocation Ext. Desk at least two days prior to the hearing, to allow the Institution to prepare gate clearances. The Revocation Extension Desk will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation were made.

When DAPO initiates a case for an inmate/parolee housed at a non-CDCR location, the Board Revocation Representative staff will reserve the hearing room on the appropriate date. The Board Revocation Representative will provide appropriate the accommodation(s) for the hearing. If the inmate/parolee requires an auxiliary aid to effectively communicate and the aid is not available, the Board Revocation Representative will contact the BPH ADA Compliance Unit (ADACU) at (916) 324-7604, to obtain the appropriate accommodation.  In instances where the inmate/parolee requires use of a sign language interpreter, the BPH ADACU unit will coordinate the interpreter.  In addition, the Board Revocation Representative will confirm with the BPH two days prior to the hearing that the arrangements for the accommodation have been made.

If BRRs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then BRRs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, BRRs shall notify the BPH ADA Unit of the noncompliance.

---

d) ***BPH Process:*** The BPH will schedule a Deputy Commissioner to conduct the hearing. At the hearing, the Deputy Commissioner will:

1) Tape record the Revocation Extension Hearing. It is the Deputy Commissioner's responsibility to ensure that they have the proper tape recording equipment, including a blank cassette tape, available at the hearing.

2) Conduct an ADA review prior to conducting the Revocation Hearing. This includes reviewing the DEC system, BPT 1073, and interaction with the parolee. The DC will provide any required ADA and/or effective communication accommodations during the hearing,

3) The Deputy Commissioner shall establish the BPH's jurisdiction based on the RRD and the CDD.

4) Determine, based on the evidence presented by the State and by the parolee, if a preponderance of the evidence exists to substantiate the alleged misconduct,

5) Prior to making a good cause determination, provide an opportunity for the inmate/parolee to present evidence through documents, witnesses, and the inmate/parolee's own testimony, all of which may include hearsay,

6) Determine, when good cause is found, if the conduct warrants an extended incarceration and, if so, the length of the extended incarceration,

7) Document the decision on the BPT 1103-REV by indicating the evidence relied on to support the finding, and if extending the incarceration, the reasons relied on to extend.

8) Provide the inmate/parolee with a copy of the summary of the hearing.

9) Enter into the DEC system the accommodations, if any, provided. The Deputy Commissioner shall make the DEC entries as soon as possible but within 24 hours of completing the hearing.

10) If DCs become aware an Armstrong class member on a parole hold who is housed in a county jail and is not receiving needed accommodations, then DCs shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer class members to a facility that is able to provide accommodations. If county jails fail to provide reasonable accommodations and are deemed noncompliant with CDCR requests, DCs shall notify the BPH ADA Unit of the noncompliance.

11) If the misconduct occurred a significant time prior to the submission of the report to the BPH, the Deputy Commissioner may choose to dismiss and reaffirm the revocation release date.

e) **Post Hearing Processing**
*For Decentralized Revocation Unit (for cases originating from DAPO):*
Upon completion of the Revocation Extension hearings, the Deputy Commissioner will provide the original documents from the hearing to the DRU Staff who will ensure the packet is complete and forward it to case records, north or south.

---

f) **Tracking**

1) ***DAPO Process:***
Throughout the above process for acts of reportable misconduct originating at non-CDCR locations, the DAPO staff will track the handling of the documents and the revocation extension process in the designated tracking system.

Upon completion of the DAPO process, a report should be generated from the designated tracking system and sent to Headquarters designated *Valdivia* representative.

2) ***BPH Process:***
The tracking desk will electronically track the receipt and handling of all revocation extension referrals` by entering the Inmate's/Parolee's name, number, date received, date of the Notice of Rights/Charges, and, the PCH and Hearing no later than date.

17. **REVOCATION EXTENSION HEARING GUIDELINES**

a) **Multiple Misconduct Charges.** Multiple misconduct charges shall be assessed consecutively to each other, and shall not exceed 12 months (time served) for all misconduct during one parole revocation period, whether submitted at the same time or separately.

b) **Disciplinary Rule Violation Schedule.** When a Deputy Commissioner makes a finding that a prisoner has committed an act of misconduct which is ineligible for work time credits pursuant to PC 3057, or if the inmate's/parolee's active commitment case(s) are ineligible for work time credits, then the revocation extension period is also ineligible.

c) **Assessments.** If probable cause is established on the revocation extension charge(s), the Deputy Commissioner may assess an extension of the revocation period based on the schedule listed in BPH Regulations, CCR, Title 15, Division 2, Section 2742.

## *XIII.* <u>CDCR GRIEVANCE PROCEDURES</u>

Any inmate's/parolee's request for accommodation via the BPT Form 1073 may be grieved by filing a BPT Form 1074, Request for Reasonable Accommodation – Grievance Process. Any grievance requesting reasonable accommodation shall be decided at the hearing or within five working days, whichever is sooner.

Inmates/parolees with disabilities in a parole proceeding who cannot use or understand the grievance process or prepare a grievance themselves by reason of their disability shall be provided with assistance (staff, attorney, or other accommodation) in preparing a BPH grievance.

The C&PR/RC CC-III shall maintain a log of all BPT Forms 1074 received indicating name of inmate/parolee, CDCR number, date received, the grievance issue, date(s) faxed to the BPH ADA Coordinator/Associate Chief Deputy Commissioner, date(s) returned from the BPH ADA Coordinator/Associate Chief Deputy Commissioner, and the decision(s) rendered for all BPT 1074 Forms filed at an institution.

The BPH ADA Coordinator shall maintain a log of all BPT Forms 1074 received indicating name of inmate/parolee, CDCR number, date received, the grievance issue, date(s) faxed to the BPH ADA Coordinator/Associate Chief Deputy Commissioner, date(s) returned to the C&PR/RC CC III and the decision(s) rendered for all BPT Forms 1074 filed with the BPH ADA Coordinator.

## A. REVOCATION AND REVOCATION EXTENSION PROCESS

There are two levels of review and disposition:

- First Level Review:       BPH ADA Coordinator
- Second Level Review:     Associate Chief Deputy Commissioner

### 1. FIRST LEVEL REVIEW: BPH ADA COORDINATOR

a) If the inmate/parolee is not satisfied with an accommodation, the inmate/parolee may obtain a BPT Form 1074 from the institutional ADA Coordinator, BPH CCI/BRR or FUNA-DRUNA. , or if the BPH ADA Coordinator denies a prior request for reasonable accommodation, the ADA Coordinator will provide the inmate/parolee with a BPT Form 1074. The inmate/parolee shall complete Section A.

b) If the inmate/parolee submits the BPT Form 1074 to the institutional ADA Coordinator prior to a hearing, the institutional ADA Coordinator shall ensure that the BPT Form 1074 is thoroughly completed and faxed to the BPH ADA Coordinator at (916) 324-7603. Any relevant supporting documents with the BPT Form 1073 shall also be faxed. The parolee/ inmate may also mail the form to the BPH ADA Coordinator at P.O. Box 4036, Sacramento, CA 95812-4036.

c) If the inmate/parolee wishes to file the BPT Form 1074 after a hearing, the BPT Form 1074 Section C may be completed and submitted to a CC-I/FUNADRUNA or mailed directly to: Board of Parole Hearings, Attention: BPH ADACU, P.O. Box 4036, Sacramento, CA 95812-4036. Should an inmate/parolee give a completed BPT Form 1074 to either the CC-I/FUNA/DRUNA, that staff member shall be responsible for forwarding the completed BPT Form 1074 to the C&PR/RC CC-III or appropriate staff. The BPH ADA COORDINATOR is the appropriate staff member to provide assistance to FUNA/DRUNAS or BRRs in county facilities. If the BPT Form 1074 is filed at an institution, the staff member receiving the grievance shall immediately forward it to the C&PR/RC CC-III. The C&PR/RC CC-III shall ensure that staff assistance is provided, if necessary, to complete the BPT

Form 1074 and shall be responsible for faxing the grievance to the BPH ADA Coordinator within 24 hours of receipt. The inmate/parolee must submit the BPT Form 1074 within five days from the date the request was denied (date of BPH Due Process Review).

d) The BPH ADA Coordinator will ensure that DECS is updated upon receipt of the BPT Form 1073, BPT Form 1074, and any other relevant documents.

e) The BPH ADA Coordinator will review the BPH forms along with all relevant documentation (e.g., CDC Form 1845, CDC Form 128C series, etc.) if available to either verify or refute the existence of an ADA defined disability. The BPH ADA Coordinator will review the parolee's request for accommodation and determine whether the prisoner/parolee is a qualified person with a disability as defined under ADA.

f) the request for accommodation is necessary for the inmate/parolee to overcome any barriers for effective communication and/or equal access to any parole proceeding.

g) The BPH ADA Coordinator will document the decision to Grant, Grant with Changes, or Deny the request on Section B of the BPT Form 1074. In deciding what accommodation to provide, primary consideration shall be given to the method requested by the inmate/parolee.

h) A decision to deny a request for reasonable accommodation may be made if there is no documentation to verify the disability.

i) The BPT Form 1074 shall be returned via fax to the C&PR/RC CC-III/RHC within five working days from date the BPH received the BPT Form 1074 for inclusion into the revocation/revocation extension packet.

j) If the documentation indicates mobility impairment that would require an accessible facility, the BPH ADA Coordinator must ensure that the parole proceedings are held in an accessible facility.

k) The BPH ADA Coordinator will coordinate the accommodation(s) with the C&PR/RC CC- III, CC-I, Institutional ADA Coordinator, RHC, FUNA, DRUNA, or BRR in cases where local staff cannot arrange accommodations.

l) The C&PR/RC CC-III/RHC will ensure that the BPT Form 1074 is delivered to the inmate/parolee via institutional mail/regular mail. However, if the inmate/parolee has been identified with a specific need for assistance with effective communication, the CC-I will be required to deliver and effectively communicate the BPH ADA Coordinator's decision to the inmate/parolee.

m) If the inmate/parolee is not satisfied with the BPH ADA Coordinator's decision, the inmate/parolee may seek review of that decision by completing Section C of the BPT Form 1074 and submitting it to a BPH Associate Chief

Deputy Commissioner for the second level review and disposition. The BPT Form 1074 may be submitted to a CC-I/FUNA/DRUNA/BRR or mailed directly to: Board of Prison Terms, Attention: BPH ADACU, P.O. Box 4036, Sacramento, CA 95812-4036.

2.  **SECOND LEVEL REVIEW: ASSOCIATE CHIEF DEPUTY COMMISSIONER**

    a)  Upon receipt of the BPT Form 1074 and any supporting documents, if necessary, the Associate Chief Deputy Commissioner will ensure that the information from the BPT Form 1074 is entered into the DECS for tracking purposes.

    b)  The Associate Chief Deputy Commissioner may deny, without review, any grievance received less than five days prior to the hearing.

    c)  The Associate Chief Deputy Commissioner will review all pertinent documents and document his/her decision in Section D of the BPT Form 1074 prior to the hearing.

    d)  The BPT Form 1074 shall be returned via fax to the C&PR/RC CC-III/RHC within five working days from date the BPH received the BPT Form 1074, or the date of the parole proceedings, whichever comes first.) The C&PR/RC CC-III/RHC will coordinate providing the approved accommodation with the BPH ADA Coordinator, if applicable.

    e)  The C&PR/RC CC-III/RHC will ensure that the BPH Associate Chief Deputy Commissioner's decision is delivered and effectively communicated to all inmates/parolees identified with a specific need for assistance with effective communication, and inform the inmate/parolee that the grievance process via the BPT Form 1074 has been exhausted.

B.  **LIFE INMATE, MDO, AND SVP PAROLE PROCEEDINGS**

The decision to grant or deny an inmate's request for a reasonable accommodation via the BPT Form 1073 will be rendered by the BPH ADA Coordinator. For this reason, if an inmate wishes to file a grievance, the grievance will bypass the first level of review.

1.  **SECOND LEVEL REVIEW: ASSOCIATE CHIEF DEPUTY COMMISSIONER**

    a)  The CC-I (or MDO/SVP Coordinator in MDO/SVP process) will provide the BPT Form 1073 to the inmate using effective communication, at the beginning of the Service of Rights and notice of a hearing, and explain the grievance process via the BPT Form 1074. The inmate will be given the opportunity to request a reasonable accommodation. The C&PR/RC CC-III shall fax the BPT Form 1073 requesting an accommodation along with supporting documents to the BPH ADA Coordinator at (916) 324-7603.

---

b) Upon receipt of the BPT Form 1073 along with supporting documents, the BPH ADA Coordinator will review and document the decision to Grant, Grant with Changes, or Deny the request on a BPT Form 1073. The completed BPT Form 1073 and relevant documents shall be returned to the C&PR/RC CC-III for action within five working days from date the BPT Form 1073 was received.

c) The C&PR/RC CC-III will ensure that the BPT Form 1073 is delivered to the inmate via institutional mail. However, if the inmate has been identified with a specific need for assistance with effective communication, the C&PR/RC CC-III will provide the BPT Form 1073 to the CC-I (or MDO/SVP Coordinator in the MDO/SVP process) who will effectively communicate and deliver the BPH ADA Coordinator's decision to the inmate/parolee.

d) If the inmate is not satisfied with the BPH ADA Coordinator's decision, the CC-I (or MDO/SVP Coordinator) will provide the inmate with a BPT Form 1074 with Sections A and B marked "bypassed." The inmate shall complete Section C of the BPT Form 1074. The CC-I (or MDO/SVP Coordinator) shall immediately forward the BPT Form 1074 to the C&PR/RC CC-III. The C&PR/RC CC-III shall be responsible for faxing the grievance to the BPH ADA Associate Chief Deputy Commissioner within 24 hours of receipt.

e) Upon receipt of the BPT Form 1074 and any relevant supporting documents, the Associate Chief Deputy Commissioner will ensure that the information from the BPT Form 1074 is entered into the DECS for tracking purposes.

f) The Associate Chief Deputy Commissioner will review DECS and all pertinent documents then complete Section D of the BPT Form 1074 and fax it to the C&PR/RC CC-III within five working days from date the BPH received the BPT Form 1074, or the date of the parole proceedings, whichever comes first.

g) The C&PR/RC CC-III will coordinate with the BPH ADA Coordinator in providing the approved accommodation, if applicable.

h) The BPH ADA Coordinator will ensure that the BPT Form 1074 is delivered to the inmate via institutional mail. However, if the inmate has been identified with a specific need for assistance with effective communication, the C&PR/RC CC-III will provide a copy of the BPT Form 1074 to the CC-I or MDO/SVP Coordinator who will effectively communicate and deliver the BPH Associate Chief Deputy Commissioner's decision to the inmate. The C&PR shall ensure that a copy of the BPT Form 1074 is provided to the DC for the life prisoner hearing. For MDO and SVP hearings, the C&PR/RC CC-III shall ensure the BPH Form is provided with the BPH hearing documents.

## XIV. *APPEALS PROCEDURES*

Effective May 1, 2004, the Board of Prison Terms Appeals section (15 CCR sections 2050-2056) was repealed by Administrative Directive No. 04/01. The Board of Prison Terms (now the Board of Parole Hearings) no longer has an Appeals Unit; therefore, the decisions or actions regarding the issues listed below **cannot be appealed** and will no longer be addressed by the Board, regardless of whether the issues are written on a BPT 1040, a CDC 602, or in letter format:

- Due process (including hearing scheduling)
- Parole revocation process (including hearing panel issues)
- Early discharge requests (prior to discharge review)
- Good cause findings for hearings
- CDCR clerical errors regarding date/time/credit calculations/day for day
- CDCR/DAPO staff-related issues
- Appeals submitted prior to a Board action
- Attorney issues
- Witness issues
- Time assessed at the revocation hearings

An inmate/parolee may appeal directly to the courts per CCR 15 Section 3160. Forms are available at the institutions law libraries. If the inmate/parolee is being housed at a county jail, he/she can obtain a copy of the forms at the jail's housing unit.

Issues concerning clerical errors on BPT Forms 1103 and 1104 related to Board decisions, mandatory discharge, credit eligibility during revocation terms, BPH mandated special conditions of parole, retain on parole actions, and other rules of law, can be reviewed by the Board. Inmates/parolees can submit these concerns via correspondence to the Board of Parole Hearings, Quality Control Unit, P. O. Box 4036, Sacramento, California, 95812-4036.

### A. DISABILITY-RELATED APPEALS

All administrative appeals alleging violations of the ADA or its implementing regulations shall be treated as ADA grievances (refer to Section XIII, for grievance procedures to be used if a grievance is filed prior to a parole proceeding), and any successive appeal on the non-ADA merits of a decision shall not be deemed barred due to the filing of the ADA-related grievance or grievances.

1. All ADA-related appeals filed following a parole proceeding are to be decided within 30 days of the BPH's receipt of the appeal form:

   a) The appeal shall be submitted using the BPT Form 1074.

2. Inmates and parolees with disabilities who cannot use or understand the appeal process or prepare an appeal themselves by reason of their disability shall be

---

provided with effective assistance (staff, attorney, or other accommodation) in preparing a BPH appeal.

3.  If an inmate/parolee files an ADA issue on a BPH form and the issue is not under the jurisdiction of the BPH, the BPH is to forward the appeal to the appropriate institution or parole region. The Appeals Coordinator will ensure the appeal is attached to the proper form. The appeal shall then be answered accordingly in a timely manner. **Under no circumstances shall an ADA appeal be returned to an inmate/parolee because it is not on the correct form.**

## XV.  COUNTY JAIL ACCOMMODATIONS PROCESS

### A.  DAPO Responsibilities

#### Informing Parolee of Grievance Availability

The FUNA/DRUNA currently reviews the Disability and Effective Communication System (DECS), available BPT 1073s and source documents as part of the Valdivia serve process. Within three business days of a PC 3056 hold, the FUNA/DRUNA is required to serve the parolee with their Notice of Rights/Notice of Charges.

The FUNA/DRUNA will use this same face-to-face meeting that occurs for the NOR/NOC serve process to ensure the parolee is aware that the county jail has a grievance process.

#### Initial Notification to County Jail Staff of Parolee's Accommodation Needs

If the prisoner requests an accommodation, or if the FUNA/DRUNA identifies a need based on observations during the serve process, the FUNA/DRUNA will notify the county jail staff member supervising the parolee in the location where the serve process is conducted. Notification should occur prior to the FUNA/DRUNA departing the county jail facility, but no later than two-business days after completing serve process.

The FUNA/DRUNA will note in Section III of the BPT 1073, and enter into DECS:

- Accommodation requested by parolee/or based on observations by FUNA/DRUNA during serve process.
- Name (Last Name, First Initial) of County Jail Staff reported information to and any response provided by County Jail Staff.
- Time of notification

#### FUNA/DRUNA Reporting of Non-Compliance

If a FUNA/DRUNA becomes aware of a "pattern" of non-compliance at a County Jail, they will report the issue to their Supervising Notice Agent immediately. The SNA will be responsible for notifying the DAPO Parole Litigation Compliance Unit

(PLCU), Parole Administrator, or designee, within one-business day of receipt of information.

The PLCU Parole Administrator will be responsible for initiating telephonic case conference with the Board of Parole Hearings, Office of Legal Affairs and the California Standards Authority to determine if incident warrants immediate transfer of parolee, telephonic notification to Jail Commander, or meeting with county jail management.

The PLCU will be responsible for tracking complaints received by FUNA/DRUNAs for the purposes of identifying patterns of non-compliance at county jails. If PLCU identifies a pattern, they will notify OCC, CSA, and administrators of the county jail.

## B. BPH Responsibilities

If BPH staff becomes aware of an Armstrong class member on a parole hold who is housed in a county jail and not receiving needed accommodations, that staff shall immediately take steps with county jail staff to ensure that necessary and reasonable accommodations are provided or make arrangements to transfer the Armstrong class member to a facility that is able to provide accommodations

If the county jail fails to provide accommodations and is deemed noncompliance, the BPH staff shall notify the BPH Quality Control Unit. The Quality Control Unit will be responsible for tracking complaints in order to identify patterns of non-compliance. If a pattern is identified, the Quality Control Unit will notify the OACC.

## C. CDCR Responsibilities

### County Jail Inability to Accommodate Parolee

If either the DAPO or BPH become aware of a parolee with an accommodation that cannot be accommodated by the County Jail facility, they will take steps to promptly transfer the class member to a facility that is able to provide the accommodations.

### Identifying or Investigating a Pattern of Non-Compliance

If a pattern of non-compliance is identified at any county jail facility, the CDCR will request a meeting with the following units/divisions to collaboratively address patterns of non-compliance at a county jail and to determine if the conduct warrants the assignment of CDCR staff to conduct an investigation.

- Office of Audits and Court Compliance (OACC)
- Board of Parole Hearings (BPH)
- Division of Adult Parole Operations (DAPO)
- Corrections Standards Authority (CSA)

CDCR will notify the county jail administration, including specific points of contact identified by CSA, of any requests by CDCR for (1) the county jail to conduct a local

inquiry, (2) request for CDCR to conduct an investigation, or (3) a meeting between CDCR and the county jail administration to discuss any issues of concern as it relates to noncompliance with the Court's orders and any related courses of action.

CDCR will be responsible for providing required documentation to Plaintiff's counsel.

*Correctional Standards Authority Biennial Inspection Reports*

The CSA conducts biennial inspections of county jails and produces a public report on its findings. CDCR will review these reports for any indication of problems that the CSA has uncovered as part of its monitoring of this matter.

## XVI. TRAINING

CDCR divisions will provide regular training to its respective staff on an annual basis. DAPO and BPH will provide updated information to its staff in accordance with normal methods. This training shall include all relevant sections of the Remedial Plan.

## GLOSSARY

| | |
|---|---|
| *ACDC* | Associate Chief Deputy Commissioner |
| *ADA* | Americans with Disabilities Act |
| *ADACU* | Americans with Disabilities Act Compliance Unit |
| *AOR* | Agent of Record |
| *ASH* | Atascadero State Hospital |
| *BPH* | Board of Prison Hearings |
| *BPT* | Board of Prison Terms |
| *BRR* | Board Revocation Representative |
| *CALPAP* | California Parole Advocate Program |
| *C&PR* | Classification and Parole Representative |
| *CCCMS* | Correctional Clinical Case Management System |
| *CC-I* | Correctional Counselor I |
| *CCRM* | Correctional Case Records Manager |
| *CCT* | Court Compliance Team |
| *CDCR* | California Department of Corrections and Rehabilitation |
| *CLETS* | California Law Enforcement Telecommunications System |
| *COP* | Continue On Parole |
| *C-File* | Central File |
| *CRN* | Case Records North |
| *CRS* | Case Records South |
| *DAPO* | Division of Adult Parole and Operations |
| *DC* | Deputy Commissioner |
| *DDP* | Developmental Disability Program |
| *DAI* | Division of Adult Institutions |
| *DCHCS* | Division of Correctional Health Care Services |
| *DMH* | Department of Mental Health |

| | |
|---|---|
| *DOP* | Difference of Opinion |
| *DRU* | Decentralized Revocation Unit |
| *DRUNA* | Decentralized Revocation Unit Notice Agent |
| *DPP* | Disability Placement Program |
| *EID* | Electronic Monitoring |
| *EOP* | Enhanced Outpatient Program |
| *FUNA* | Field Unit Notice Agent |
| *GPL* | Grade Point Level |
| *DCHSD* | Division of Correctional Health Care Services |
| *MDO* | Mentally Disordered Offender |
| *MHCB* | Mental Health Crisis Bed |
| *MHSDS* | Mental Health Services Delivery System |
| *NIC* | Not in Custody |
| *PC* | Penal Code |
| *PSH* | Patton State Hospital |
| *PV-RTC* | Parole Violator Return to Custody |
| *RC* | Reception Center |
| *RC CC-III* | Reception Center Correctional Counselor III |
| *RHC* | Regional Hearing Coordinator |
| *RSTS* | Revocation Scheduling and Tracking System |
| *RU* | Revocation Unit |
| *RVR* | Rules Violation Report |
| *SVP* | Sexually Violent Predator |
| *TABE* | Test of Adult Basic Education |
| *TDD* | Telecommunications Device for the Deaf |
| *US* | Unit Supervisor |

# EXHIBIT 6
# FILED UNDER SEAL

# EXHIBIT 7
# FILED UNDER SEAL

# EXHIBIT 8

| OFFENDER NAME | CDC NUM | SENTENCE TYP | HEARING TYPE | SCHEDULE LOCATION | SCHEDULED DATE | ACTION DATE | RESULT | CurrentPOP.DPP _Hear | CurrentPOP.DPP_SLI | CurrentPOP.Demo_PrimaryLanguage | CurrentPOP.Demo_UnderstandEnglish |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ███████ | ███ | ISL | Sub | ████ | 10/13/23 | 8/29/2023 | Waive 1 yr | DPH | | English | Yes |
| | | ISL | Sub Recon | | 12/14/23 | | | DPH | | English | Yes |
| | | ISL | Sub | | 01/03/24 | | | DPH | Yes | Sign Language | Yes |
| | | ISL | Initial | | 01/03/24 | 9/13/2023 | Waive 1 yr | DPH | | English | Yes |
| | | ISL | Sub | | 01/10/24 | 9/13/2023 | Waive 1 yr | DPH | | English | Yes |
| | | DSL | Sub | | 02/27/24 | | | DPH | Yes | Sign Language | Sign Language |
| | | ISL | Sub | | 03/05/24 | | | DPH | Yes | | |
| | | ISL | Initial | | 04/03/24 | | | DPH | Yes | English | Sign Language |
| | | ISL | Initial | | 04/03/24 | | | DPH | Yes | Sign Language | Yes |

# EXHIBIT 9



**< RETURN TO SEARCH RESULT**

The information displayed below is subject to change and may update daily.

**Name**

██████████████████

**CDCR Number**

███████

**Age**

██

**Current Location**

████████████████████████

[ LOCATE ON MAP ]

**Admission Date**

███████████

**Commitment County**

Sacramento

---

**Parole Eligible Date**

## May, 2020

**The Parole Eligible Date displayed above is subject to change.**
The parole eligible date shown above is the first date the incarcerated person is (or was) eligible for a parole suitability hearing by the Board of Parole Hearings to determine if the incarcerated person should be released. Incarcerated persons may earn credits for participating in rehabilitative programming, which may move their parole eligible dates to an earlier date. Incarcerated persons could also be found guilty of an institutional rules violation, which could result in a loss of credits that may move their parole eligible dates further into the future. Parole eligible dates may also change based on a variety of other reasons, including court orders, changes in law, and routine audits. Parole eligible dates displayed on this website are updated regularly.

  **CDCR** California Incarcerated Records and Information Search (CIRIS)

**Board of Parole Hearing's Actions**

| Date ↓ | Action | Status | Outcome |
|---|---|---|---|
| January 2025 | Parole Suitability Hearing | Pending | Tentative date for parole suitability hearing |
| October 06, 2023 | Parole Suitability Hearing | Past | Incarcerated person voluntarily waived the right to a hearing for 1 year |
| February 04, 2021 | Parole Suitability Hearing | Past | Incarcerated person stipulated to unsuitability for 3 years |
| May 05, 2020 | Parole Suitability Hearing | Past | Parole suitability hearing was postponed |
| April 28, 2016 | Consultation | Past | Incarcerated person's consultation was conducted |

**Victim Notification**

Victims who would like to request notice and an opportunity to attend this incarcerated person's parole suitability hearing or who would like to request notice of this incarcerated person's release must register with CDCR's Office of Victim and Survivor Rights and Services. For further information, or to inquire about court ordered restitution, please visit CDCR's Office of Victim and Survivor Rights and Services website, email victimservices@cdcr.ca.gov, or call **toll-free 1-877-256-6877**

**BOARD OF PAROLE HEARINGS:** For more information about the Board of Parole Hearings, please visit the Board of Parole Hearings' website



Rehabilitative Programs

Family and Friends

Victim Services

**Accessibility**



**© Copyright 2023 California Department of Corrections & Rehabilitation**

# EXHIBIT 10

| OFFENDER NAME | CDC NUM | SENTENCE TYPE | HEARING TYPE | SCHEDULE LOCATION | SCHEDULED DATE | ACTION DATE | RESULT | CurrentPOP.DPP_Vision |
|---|---|---|---|---|---|---|---|---|
| | | ISL | Sub | | 10/03/23 | | | DPV |
| | | ISL | Sub | | 10/04/23 | | | DPV |
| | | ISL | Initial | | 10/10/23 | | | DNV |
| | | ISL | Con | | 10/10/23 | | | DPV |
| | | DSL | Cert | | 10/11/23 | | | DNV |
| | | ISL | Initial | | 10/12/23 | | | DNV |
| | | ISL | Sub | | 10/25/23 | 6/11/2023 | Waive 1 yr | DNV |
| | | ISL | Sub | | 10/26/23 | | | DNV |
| | | DSL | Sub | | 10/26/23 | | | DPV |
| | | ISL | Sub | | 10/31/23 | | | DPV |
| | | ISL | Sub | | 11/01/23 | | | DNV |
| | | ISL | Initial | | 11/03/23 | 8/29/2023 | Postpone 0 mo | DNV |
| | | ISL | Initial | | 11/03/23 | | | DNV |
| | | ISL | Initial | | 11/08/23 | | | DNV |
| | | ISL | Initial | | 11/09/23 | 8/9/2023 | Postpone 0 mo | DNV |
| | | ISL | Initial | | 11/09/23 | | | DNV |
| | | ISL | Initial | | 11/16/23 | | | DNV |
| | | ISL | Sub | | 11/16/23 | | | DPV |
| | | ISL | Sub | | 11/17/23 | | | DNV |
| | | ISL | Initial | | 11/29/23 | | | DNV |
| | | ISL | Sub | | 12/01/23 | | | DNV |
| | | ISL | Sub | | 12/05/23 | | | DNV |
| | | ISL | Sub | | 12/05/23 | | | DPV |
| | | ISL | Initial | | 12/06/23 | 9/12/2023 | Waive 1 yr | DNV |
| | | ISL | Sub | | 12/07/23 | | | DNV |
| | | ISL | Initial | | 12/07/23 | | | DPV |
| | | DSL | Initial | | 12/08/23 | | | DNV |
| | | ISL | Sub | | 12/08/23 | | | DNV |
| | | ISL | Sub | | 12/22/23 | | | DNV |
| | | ISL | Sub | | 12/27/23 | 8/24/2023 | Waive 1 yr | DNV |
| | | ISL | Initial | | 12/28/23 | 9/5/2023 | Waive 1 yr | DPV |
| | | ISL | Initial | | 01/03/24 | 9/13/2023 | Waive 1 yr | DPV |
| | | DSL | Sub | | 01/05/24 | | | DNV |
| | | ISL | Sub | | 01/09/24 | | | DNV |
| | | ISL | Sub | | 01/10/24 | 9/13/2023 | Waive 1 yr | DPV |
| | | ISL | Sub | | 01/23/24 | | | DPV |
| | | ISL | Sub | | 01/23/24 | | | DPV |
| | | ISL | Sub | | 01/23/24 | | | DNV |
| | | ISL | Initial | | 01/23/24 | | | DNV |
| | | ISL | Initial | | 01/23/24 | | | DNV |
| | | DSL | Sub | | 01/25/24 | | | DPV |
| | | ISL | Sub | | 01/31/24 | | | DPV |
| | | ISL | Sub | | 02/01/24 | | | DPV |
| | | ISL | Sub | | 02/01/24 | | | DPV |
| | | ISL | Sub | | 02/08/24 | | | DNV |
| | | ISL | Sub | | 02/08/24 | 9/14/2023 | Waive 1 yr | DNV |
| | | ISL | Sub | | 02/27/24 | | | DNV |
| | | ISL | Sub | | 02/27/24 | | | DNV |
| | | DSL | Initial | | 02/28/24 | | | DPV |

| | | | | | | |
|---|---|---|---|---|---|---|
| ▓▓▓ | | ▓ | ISL | Initial | ▓ | 03/01/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Initial | ▓ | 03/06/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 03/12/24 | DNV |
| ▓▓▓ | | ▓ | ISL | Initial | ▓ | 03/21/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 03/21/24 | DPV |
| ▓▓▓ | | ▓ | DSL | Sub | ▓ | 03/27/24 | DNV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/03/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/03/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/04/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Initial | ▓ | 04/09/24 | DNV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/09/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/10/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Sub | ▓ | 04/12/24 | DPV |
| ▓▓▓ | | ▓ | ISL | Initial | ▓ | 04/24/24 | DNV |

# EXHIBIT 11

# Deposition Transcript

Case Number: C94 2307 CW

Date: July 7, 2022

In the matter of:

# ARMSTRONG, et al. v NEWSOM, et al.

Daniel Moeller



CERTIFIED COPY

**Reported by:**

Donna St. Clair
CSR No. 14252

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,          )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )     Case No. C94 2307 CW
                                 )
GAVIN NEWSOM, et al.,            )
                                 )
          Defendants.            )
                                 )
_____)

DEPOSITION OF DANIEL MOELLER

Via Videoconference

Thursday, July 7, 2022

Reported by:

Donna St. Clair

CSR No. 14252

Job No.: 284760

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,          )
                                 )
            Plaintiffs,          )
                                 )
       vs.                       )    Case No. C94 2307 CW
                                 )
GAVIN NEWSOM, et al.,            )
                                 )
            Defendants.          )
_____)

        DEPOSITION OF DANIEL MOELLER, taken on behalf of
the Plaintiffs via videoconference, beginning at
9:04 a.m. and ending at 5:49 p.m., on Thursday, July 7,
2022, before Donna St. Clair, Certified Shorthand
Reporter No. 14252.

APPEARANCES:


FOR THE PLAINTIFFS:

        ROSEN BIEN GALVAN & GRUNFELD, LLP
        BY:  MICHAEL NUNEZ, ESQ.
        101 Mission Street
        6th Floor
        San Francisco, California 94105
        (415) 433-6830
        mnunez@rbgg.com


FOR THE DEFENDANTS:

        OFFICE OF THE ATTORNEY GENERAL
        BY:  MARK JACKSON, ESQ.
        455 Golden Gate Avenue
        Suite 11000
        San Francisco, California 94102
        (415) 510-4441
        mark.jackson@doj.ca.gov


ALSO PRESENT:    Trace Maiorino, Esq.

                 Olena Likhachova, Esq.

                 Chor Thao, Esq.

                 Jessica Blonien, Esq.

                 Rita Lomio, Esq.

                 Nicole Miller, Esq.

                 Tom Nolan

                 Karen Stilber

Via Videoconference; Thursday, July 7, 2022

9:04 a.m.


DANIEL MOELLER,

called as a witness and having been first duly sworn by

the certified shorthand reporter, was examined and

testified as follows:

THE WITNESS:  I do, yes.


EXAMINATION

BY MR. NUNEZ:

Q   Good morning.  Would you please state your

full name for the record as well as spell it?

A   Daniel Moeller.  D-A-N-I-E-L, M-O-E-L-L-E-R.

Q   Thank you, Mr. Moeller.  My name is Michael

Nunez.  I'm an attorney with Rosen Bien Galvan &

Grunfeld.  I'm one of plaintiff's counsel in Armstrong

versus Newsom, and I will be taking this deposition

today.

Have you ever been deposed before,

Mr. Moeller?

A   Yes, I have.

Q   How many times?

A   Twice before.

Q   Okay.  When was the first time?

accommodations that the inmate has previously been given as well as the opportunity for the inmate to request any sort of accommodations that are not noted in the file at that time.

BY MR. NUNEZ:

Q   So then is the identification of accommodations in the 1073 process done by the inmate sort of voicing the accommodations they need, or is it done by the counselor asking the inmate about whether specific accommodations are needed, such as braille or large print?

MR. JACKSON:  Objection.  Ambiguous.

THE WITNESS:  Well, Mr. Nunez, so the 1073 process -- the first section of the 1073 is completed by the correctional counselor, and it notes any sort of accommodation that an inmate might need for the hearing or that they currently are using or have.

And in Section 2 of the 1073 is when the correctional counselor meets with the inmate.  And the inmate has the opportunity to request any sort of accommodation that is not listed in Section 1.

BY MR. NUNEZ:

Q   Does the counselor -- can the C-File be provided to blind and low-vision class members in braille?  And C-File -- when I say C-File, I'm referring

those source documents that our ADA unit would put in

DECS.

BY MR. NUNEZ:

Q   What do you mean when you say a source

document?

A   Source documents are created by -- they're

available in DECS and can be seen by anybody who has

access to DECS.  And these documents are put in there

usually by attorneys.  Attorneys actually are required

to place a source document into DECS.

And a source document notes what

accommodations were provided during the meeting with the

inmate.  So, for instance, when an attorney meets with

the inmate, they would note in the source document what

accommodations were provided.  Our psychologists, when

they conduct a comprehensive risk assessment, also have

to place a source document into DECS.

So what we are going to add is the ability for

our own ADA unit to put in a source document.  And it's

going to be marked with -- it will be marked with

special -- certain language, and I forget what that

language is, so it will be noticeable for these -- for

these accommodations that were -- that are used more

infrequently, I guess.

Q   And so has that process already been

blind or low-vision class member can make an affirmative

request. But how would BPH educate the class member

about the range of accommodations, the range of

accessible formats that they are able to request in the

first place?

MR. JACKSON: Objection. Overbroad.

THE WITNESS: Well, the inmates are also provided

an attorney. And the attorneys are ADA trained, so they

would be aware of what formats are available for the

inmates.

BY MR. NUNEZ:

Q Okay. Aside from the class member's attorney,

is there any other practice or process that's used to

educate the blind or low-vision class members about

available accommodations?

MR. JACKSON: Objection. Asked and answered.

THE WITNESS: Yeah. I'm not sure what processes

the institutions have, but I believe the correctional

counselors are also trained on what formats or auxiliary

aids are available for the inmates.

BY MR. NUNEZ:

Q Okay. So aside from the attorney and the

correctional counselors that we just -- that you just

described, are there any other BPH processes for

educating class members about the accessible formats

DANIEL MOELLER                                                    JOB NO. 284760
JULY 07, 2022

accessible format, we would provide it.  We would do

that for them.

Q   So I just want to make sure I understand what

you -- you just said.  So if a blind or low-vision class

member asked their parole attorney for documents in

accessible format, you said then BPH would provide those

documents in accessible formats to the class member?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  If requested by the attorney or the

inmate, yes.

BY MR. NUNEZ:

Q   Are you aware of any required training for

appointed parole attorneys on providing documents in

accessible formats to blind or low-vision class members?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  I can't recall if the training

involved specifically discussing -- accessible formats

for blind --

THE REPORTER:  I'm sorry.  You cut out a little bit

for me.  Can you start over for me, please?

THE WITNESS:  Of course.  But I'm not -- I'm not

sure -- I'm not aware -- I'm unsure if the -- the

training provided to the attorneys specifically goes to

the -- to the accommodation provided to -- the specific

accommodation provided to the vision impaired or blind

inmates, but I do know that the expectation -- the

training does state that the expectation is that

effective communication would be achieved.  And if those

are the accommodations that are required, the

expectation is that those are the accommodations that

would be given.

BY MR. NUNEZ:

Q   Does BPH provide any assistance to parole

attorneys seeking to provide documents to blind or

low-vision class members in accessible formats?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  We would if requested.

BY MR. NUNEZ:

Q   What type of assistance?

MR. JACKSON:  Objection.  Vague.  Overbroad.

THE WITNESS:  Like I said -- or I'm pretty sure,

Mr. Nunez, I don't think we've received a request.  But

if we did, we would evaluate the request.  And if it's

reasonable, we would provide it.

BY MR. NUNEZ:

Q   How would BPH determine whether that request

is reasonable?

MR. JACKSON:  Objection.  Overbroad.  Incomplete

hypothetical.

THE WITNESS:  It would be on a case-by-case basis.

MR. JACKSON:  Okay.  Almost there.  I think there's another tab.

THE WITNESS:  All right.  Mr. Nunez, yes, I have that document available.

BY MR. NUNEZ:

Q   Great.  What is this document?

A   Well, it's titled "Correctional Counselor Role in Board of Parole Hearing Processes For Inmates With Disabilities."  So this is a memo to the correctional counselors regarding what their role is in our hearing process.

Q   And have you reviewed this document before today?

A   I have, yes.

Q   And when did you first review it?

A   I was cc'd on the memo.  So it would have been whenever it was delivered.

Q   Have all Correctional Counselor I's been trained on the policies, practices, and procedures that this memo adopts?

MR. JACKSON:  Objection.  It's overbroad.  Compound and beyond the scope.

THE WITNESS:  I have no authority whatsoever over the training of the correctional counselors, Mr. Nunez. So I don't know the answer to that question.

BY MR. NUNEZ:

Q   Do you know anything regarding what that training consists of?

MR. JACKSON:  Objection.  Overbroad.

THE WITNESS:  Yeah.  Again, Mr. Nunez, I don't have any authority or any -- anything to do with the correctional counselors?

BY MR. NUNEZ:

Q   CDCR is responsible for that training; correct?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  From my understanding, yes.

BY MR. NUNEZ:

Q   And BPH relies on CDCR to train its Correctional Counselor I's to implement the practices and procedures in this memo; is that correct?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  That's correct.

BY MR. NUNEZ:

Q   Is there a system that BPH has to monitor overall implementation of the policies, practices, and procedures that this memo adopts?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  Did -- did you say is there a -- can you repeat the question again, Mr. Nunez?  I'm sorry.

Q   And screen-magnification technology is not listed as an available accommodation on the form; isn't that correct?

MR. JACKSON:  Objection.  Argumentative.  Misstates the document.

THE WITNESS:  No.  Again, it's not listed on there, but there is -- there is a section in Section 2 where the inmates can request it.  The correctional counselor would handwrite it in.

BY MR. NUNEZ:

Q   Is provision of documents in large print listed as an available accommodation anywhere on this form?

MR. JACKSON:  Objection.  Misstates the document.  Argumentative.

THE WITNESS:  Again, it's not listed on this blank form, but it would be -- it would be on the electronic version which is the version that is completed and then provided to the inmate.

BY MR. NUNEZ:

Q   Do you mean it would be on all electronic 1073 forms provided to any class member who had a 1073 form filled out?

A   If completed in Sections 4 and 5, there is a -- it would be noted that large print was provided to

the inmate.

Q   You're saying if it was filled in, then somebody could fill in large print on the form; is that right?

A   That's correct.  Yes.

Q   Original documents in braille is not listed as an available accommodation on this form; is that correct?

MR. JACKSON:  Objection.  Misstates the form.
Argumentative.

THE WITNESS:  It's not listed on this blank form.
That's correct.  But, again, it would be noted in both Sections 2, 4, and 5.  2 if the inmate requests it.  4 and 5 -- if the inmate had requested it, and the accommodation had been provided previously, it would be noted in Section 4.  And if it was supplied or given at the hearing, it would be noted in Section 5.
BY MR. NUNEZ:

Q   Provision of documents in audio formats is not listed as an available accommodation on this 1073 form; is that correct?

MR. JACKSON:  Objection.  It misstates the form.
Argumentative.  I think the other objection to this line of questioning is that it's just misleading.

///

BY MR. NUNEZ:

Q    Mr. Moeller, please answer the question.

A    Again, it's not listed on here, but it would be listed on the version -- the electronic version, which is the 1073 that is used at the hearing.

Q    And when you say it would be listed, you mean only if it were filled in by someone; correct?

A    Well, there -- I'm sorry.

MR. JACKSON:  Objection.  Overbroad.

THE WITNESS:  There is a -- you can't tell from this paper version of the 1073, but there is a pull-down bar in Sections 4 and 5.  And many of those accommodations that you've listed off, I believe are specifically enumerated in the pull-down bar.

BY MR. NUNEZ:

Q    Do you know which of the accommodations we just discussed are enumerated in the pull-down that you're talking about?

MR. JACKSON:  Objection.  Asked and answered.

THE WITNESS:  No, I can't recall all the accommodations listed in the pull-down bar, but there's several.

BY MR. NUNEZ:

Q    When a counselor goes over the 1073 form with a class member, do they use a paper copy, or are they

going over the form with a class member using an electronic version that has that pull-down that you're talking about?

MR. JACKSON:  I'll just object to the extent it's beyond the scope.  Overbroad.

THE WITNESS:  I'm not sure.  That's a -- that's -- the correctional counselor has to complete the form in DECS, the electronic form.  So all of those -- all of those accommodations would be available for the correctional counselor.  But I don't know if they do a paper copy when they serve the inmate or if they do the electronic copy with the inmate.  I don't know.  I don't know if they do that.

BY MR. NUNEZ:

Q   Qualified readers are not listed as an available accommodation on the form; correct?

MR. JACKSON:  I'm sorry.  What is that?

BY MR. NUNEZ:

Q   Qualified readers.

MR. JACKSON:  Okay.  Objection.  Misstates the form.  Argumentative.  Misleading.

THE WITNESS:  It's not listed on the form that you've provided.

BY MR. NUNEZ:

Q   Is it listed on any other paper copies of the

1073 -- blank paper copies of the 1073, as far as you know?

A    Not on the paper copy.  As far as I know, it's not.

Q    How do blind and low-vision class members learn about the range of available accommodations if they are not listed -- all listed on the 1073 form?

MR. JACKSON:  Objection.  Overbroad.  Beyond the scope.

THE WITNESS:  Well, the correctional counselors would be trained in what accommodations are available for the inmate.  So they would inform the inmate of what accommodations would be available to them.

Further, for a hearing, the inmate is provided an attorney -- ADA attorney who would be aware of the accommodations available to the inmate.

Further, they do meet with a psychologist prior to the hearing for their comprehensive risk assessment.  And ADA issues are discussed.  And any sort of accommodations would be provided at that time by the psychologist.

And then, of course, at the hearing, the inmate's disability is discussed, and any sort of accommodations would be made -- would be made available to the inmate.

(Recess.)

MR. NUNEZ:  Okay.  Let's go back on the record.

BY MR. NUNEZ:

Q   Mr. Moeller, are there any improvements currently being made to the ability to document disability accommodations in DECS?

MR. JACKSON:  Objection.  Vague.

THE WITNESS:  Improvements in the documenting of accommodations?

BY MR. NUNEZ:

Q   In the ability to document accommodations in the DECS system, yes.

A   As I mentioned earlier, Mr. Nunez, we just recently implemented -- which we haven't trained our two analysts on, but we will shortly -- their ability to put a source document into DECS that would be specific for more infrequent type of accommodations provided.

Q   Is that the only improvement that's currently being developed for documenting disabilities in DECS?

MR. JACKSON:  Objection.  Vague.

THE WITNESS:  As far as I'm aware, yes.

BY MR. NUNEZ:

Q   Okay.  And then the less frequent accommodations, what would that include?  The less frequent accommodations that you referenced that would

be able to be input by the ADA staff into the DECS system, what less frequent accommodations would those include?

A    Those accommodations would include braille, any of the other accommodations that you noted that the -- you had asked, for instance, if an electronic magnifier would be available.  We would note that if that would be requested just because that's not an accommodation that we would normally have available at the hearing.  So that would be one, those kind of instances.

I think you had said if there's a request for an accomodation, and I forgot which one you had mentioned earlier, a screen with large print or something like that that would provide the magnifying, if that was requested, so those kinds of accommodations would be put into the new source documents.

Q    And is BPH updating DECS in this manner because CDCR does not record this type of information regarding accommodations in SOMS?

MR. JACKSON:  Objection.  Vague.  Argumentative.

THE WITNESS:  No.  It's more so -- excuse me -- it's more so -- it's more so just to let everybody know to use DECS as a resource to check the source documents because then they would see that.

And that would refer to not only our hearing panel members but, more importantly, to our ADA units since they are reviewing DECS when completing Section 4 of 1073.

And if that accommodation wasn't listed for some reason in Section 1, 2, or 3, our ADA unit would then see that accommodation and then inquire whether or not -- the accommodation that was provided at a previous hearing in that source document, then they would inquire whether or not that accommodation is needed at the upcoming hearing, if it hasn't already been noted in Sections 1, 2, or 3 of the 1073.

BY MR. NUNEZ:

Q   Has BPH discussed making these modifications to DECS with the EIS department?

A   Yes.  Specifically with the EIS people who are in charge of DECS.

Q   And when did those conversations begin?

A   Just a rough estimate, I would say 60 days ago.

Q   And do you know when the changes will be implemented to DECS?

A   Well, I believe we already have the ability to do those source documents.  So at this point, it's just a matter of the ADA unit beginning to use those source

documents.

Q   So I'm not sure that I fully understand this change, what it actually breaks down to, the nuts and bolts.  Is the change a change in the practices that the ADA staff will follow in order to enter in source documents, or was there a change made to the DECS computer system or both?

A   There wasn't a change in the BPH process, per se, as in when they're preparing, say, a BPH 1073 Section 4.  When they're completing Section 4, the requirements are still the same, to review all the available documents, which would include, you know, Section 3 of this 1073, any sort of prior 1073s, any source documents that were available, prior comprehensive risk amendments, even prior transcripts.

The ADA unit is expected to review all those documents when they complete Section 4, and they're still expected to review all those documents.

However, this new source document -- the new availability of the source document will just make it easier on them to see these cases that have these more infrequent type of accommodations.

BY MR. NUNEZ:

Q   So then the change to the actual DECS system that's being made is that there are source documents

that now can be inputted into DECS that previously could not be inputted into DECS; is that right?

A   Yes.  Yes.  Again, it gives our ADA unit the ability to input these types of source documents.  And they're different than the other source documents, in that most source documents have check boxes with a small comment box.

This newer source document it's mostly going to be free form for the ADA unit to fill in in text, so they can explain what's the scenario and what's the accommodation.

Q   And when you use the term source document, is that essentially in electronic form?

MR. JACKSON:  Objection.  Vague.

THE WITNESS:  Yeah.  The source document that's currently in -- that we use in DECS is electronic form. And like I said earlier, it's completed by the attorney when they meet with the inmates, as well as the FAD psychologist when they conduct the CRA interview.

BY MR. NUNEZ:

Q   But those source documents, the ones completed by the attorneys and the ones completed by the FAD psychologist, those are not new; is that correct?  Those haven't changed in the last few months?

A   They have not, that's correct.

Q   Okay.  So then what's new is the source document that the ADA staff can enter?

A   Correct.

Q   Is there a summary document for each class member with a disability that would have a summary of the class member's accommodation needs in DECS?

MR. JACKSON:  Objection.  Vague and ambiguous.

THE WITNESS:  Could you repeat that one more time, Mr. Nunez?  I'm sorry.

MR. NUNEZ:  Yes.  Would the court reporter please read the question that I just stated.

(Record read.)

THE WITNESS:  So DECS listed out the accommodations that have been provided to the inmates as well as any sort of accommodations or disabilities that the inmate has.  And then, the 1073s, of course, list out any sort of accommodations that have been provided or will be provided at a hearing.  I don't know if that answers your question, though.

BY MR. NUNEZ:

Q   So to find the new information about a specialized accommodation need that you described as being currently in the implementation process, would someone need to look through all of the source documents for an individual that's in DECS?

DocuSign Envelope ID: B9DE3B92-551C-4929-B897-580E4B840D10

DECLARATION UNDER PENALTY OF PERJURY

I, the undersigned, have read or had interpreted to me the foregoing deposition and declare under penalty of perjury that the foregoing is true and correct.

Executed this __22nd__ day of __August_____,

20_22_, at _1515 K St., Suite 600_____, _Sacramento, CA_____.

DocuSigned by:

*Daniel Moeller*

B9D7AA230362413...

DANIEL MOELLER

DocuSign Envelope ID: B9DF3B92-551C-4929-B897-580E4B840D10

STATE OF CALIFORNIA)
                    )SS
COUNTY OF ORANGE    )


        I, DONNA ST. CLAIR, CSR No. 14252, a Certified

Shorthand Reporter within and for the State of

California, do hereby certify:

        That prior to being examined, the witness

named in the foregoing deposition was duly sworn by me

to testify to the truth, the whole truth, and nothing

but the truth;

        That the foregoing deposition was taken before

me at the time and place set forth;

        That the foregoing transcript is a true and

correct transcription of my original stenographic notes;

        I further declare that I am neither counsel

for nor related to any of the parties to said action nor

in any way interested in the outcome thereof.


        IN WITNESS HERETO I have hereunto subscribed

my name on July 21, 2022.




_____
        DONNA ST. CLAIR, CSR NO. 14252

```
                    ERRATA SHEET
                    CHANGES IN TESTIMONY
                    ARMSTRONG, et al. v NEWSOM, et al.
                    Daniel Moeller
                    July 07, 2022
       Page     Line     From              To
       45       21       search            source

       71       18       RBR               RVR

       73       12       RBR               RVR

       73       18       RBR               RVR

       73       20       RBR               RVR

       74       3        RBR               RVR

       102      4        RBR               RVR
```

SIGNATURE: _____ DATE:_____

DocuSigned by:

Daniel Moeller

8/22/2022

Daniel Moeller

D. Moeller - PMK - 09/07/2022

**EXHIBIT**

**1**

Donna St. Clair

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF DEPOSITION** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

Case No. C94 2307 CW

[3576536.3]

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiffs, by their attorneys, will take the deposition of the person(s) most knowledgeable at the California Department of Corrections and Rehabilitation ("CDCR") with respect to the matters identified in Schedule A of this Notice of Deposition at the Prison Law Office, 1917 Fifth Street, Berkeley, CA 94710 on June 3, 2022, at 9:00 AM, or at such other date, time, and location as the parties agree upon in writing.  If not completed on the specified date, the deposition will continue from day to day, excluding Sundays and holidays, until such date as is necessary to complete the deposition. The deposition will proceed before a notary public or other officer duly authorized to administer oaths. The deposition shall be recorded by stenographic means.

PLEASE TAKE FURTHER NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(2) and 34, CDCR is required to produce documents described in Schedule B of this Notice of Deposition no later than 30 days from the service of this Notice.

Dated:  April 11, 2022

PRISON LAW OFFICE

By: */s/_Jacob J. Hutt*
Jacob J. Hutt
Attorneys for Plaintiffs

**DEFINITIONS AND INSTRUCTIONS**

In addition to the definitions set forth in the Federal Rules of Civil Procedure, the following definitions and instructions apply to all topics and requests in Schedules A and B:

1. "ACCESSIBLE FORMAT" means large print, braille, audio recording, or any other format that allows a blind or low-vision person to independently review written information.

2. "ARMSTRONG CLASS MEMBER" means any member of the Plaintiff class in the case, including all present and future California state prisoners and parolees with mobility, sight, hearing, speech, learning and kidney disabilities that substantially limit one or more of their major life activities.

3. "AUXILIARY AIDS" means electronic and non-electronic handheld magnifiers, desktop magnifiers, sheet magnifiers, page magnifiers, card magnifiers, ADA computers, magnifying glasses, screen reader technology, Braille writers, electronic Braille displays, and any other technology or equipment that assists a blind or low-vision person in reviewing or producing written information.

4. "BLIND AND LOW-VISION CLASS MEMBERS" means *Armstrong* class members who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

5. "CDCR" means the California Department of Corrections and Rehabilitation.

6. "DEAF AND HARD-OF-HEARING CLASS MEMBERS" means *Armstrong* class members who are permanently deaf, who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning, or who have residual hearing at a functional level with hearing aids.

7. "DOCUMENTS" means all writings, whether fixed in a tangible medium or

electronically stored.  DOCUMENTS includes, but is not limited to, all of the following: papers, correspondence, emails, MS Excel files, MS Word files, MS PowerPoint files, text files, instant messages, postings on internet websites or blogs including Twitter and Facebook, training manuals, employee manuals, policy statements, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings and transcriptions thereof, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, maps, plans, graphs, computer programs, photographs, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, orders, resolutions, agendas, memorials or notes of oral communications, whether by telephone or face-to-face, contracts, agreements, memoranda of understanding, and letters of intent.  DOCUMENTS includes any writings recorded or stored in any medium or location, including desktop computers, laptops, PDAs, cell phones, home computers used for work, calendars, computer tapes, computer drives or memories, computer diskettes or disks, email, CD-ROMs, DVDs, BlackBerrys, iPhones, or other similar handheld devices used to send and receive electronic mail, instant messaging ("IM"), blogs or other internet or intranet postings, text messages, Twitter postings, Facebook postings, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced.  DOCUMENTS also includes all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions or drafts thereof, whether used or not, and all metadata. DOCUMENT has the broadest possible meaning and includes anything coming within the definition of "writings" and "recordings" as set forth in Rule 1001 (1) of the Federal Rules of Evidence.

    8.    "COMMUNICATIONS" means any exchange of information by any means of transmission, including, face-to-face conversations, mail, electronic mail, IM, blog or other internet or intranet posting, telegram, text messages, overnight delivery, telephone,

[3576536.3]

facsimile or telex.

9.     "ANY" and "ALL," as used herein, shall include "each" and "every" and is not to be construed to limit a request.

10.     "OR" shall be construed as disjunctive and conjunctive and, as used herein, shall include "and" and is not to be construed to limit a request.

## SCHEDULE A

**I.    TOPICS**

1.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for identifying <u>and</u> documenting the ACCESSIBLE FORMATS that would accommodate specific BLIND AND LOW-VISION CLASS MEMBERS.

2.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for providing written information to BLIND AND LOW-VISION CLASS MEMBERS in ACCESSIBLE FORMATS, including but not limited to:

A) The categories of DOCUMENTS that CDCR Headquarters, Board of Parole Hearings, and prisons currently make available in ACCESSIBLE FORMATS to BLIND AND LOW-VISION CLASS MEMBERS;

B) The provision of written information by CDCR on Global Tel*Link electronic tablets, including but not limited to steps that CDCR has taken OR will take to ensure that Portable Document Format ("PDF") DOCUMENTS provided on these tablets are accessible to BLIND AND LOW-VISION CLASS MEMBERS; and

C) Other past, present, and anticipated efforts by CDCR to expand access to written information in ACCESSIBLE FORMATS to BLIND AND LOW-VISION CLASS MEMBERS.

3.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices regarding the purchasing, placement, maintenance, use, and supervision of AUXILIARY AIDS in CDCR prisons, including but not limited to:

A) Locations at CDCR prisons where AUXILIARY AIDS may be placed;

B) Access by incarcerated people to the locations in which AUXILIARY AIDS are located, such as time limitations on using AUXILIARY AIDS

Case No. C94 2307 CW

[3576536.3]

located in CDCR prison law libraries and pandemic-related movement restrictions on accessing locations where AUXILIARY AIDS are generally available;

C) The number of electronic magnifiers and text-to-speech devices available at each CDCR prison, including the brand names and models of these devices and technology, where they are located in the prisons, when they were purchased, how they are maintained and updated, who is eligible to use them, how an *Armstrong* class member requests and is granted OR denied access to use them, and ANY current issues with their functionality OR condition;

D) Security evaluations conducted by CDCR, OR an agent of CDCR, regarding the use of AUXILIARY AIDS for BLIND AND LOW-VISION CLASS MEMBERS in CDCR prisons, including but not limited to the placement of AUXILIARY AIDS in housing units, recreational areas, educational areas, recreational libraries, and law libraries;

E) Cost evaluations OR estimates for each AUXILIARY AID considered by CDCR; and

F) Past, present, and anticipated efforts by CDCR Headquarters, Board of Parole Hearings, and prisons to consider via pilot program OR otherwise the placement of AUXILIARY AIDS in additional locations and the purchasing of additional AUXILIARY AIDS.

4. ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices regarding the use of ADA workers in assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing tasks, including but not limited to ANY policies, practices, and procedures used to document OR evaluate the efficacy of the ADA Worker program at assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing.

5. ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local

[3576536.3]

prison policies, procedures, and practices regarding the use of CDCR staff in assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing tasks, including but not limited to ANY policies, practices, and procedures used to document OR evaluate the efficacy of staff assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing.

6. ANY and ALL past, present, and anticipated efforts by CDCR Headquarters, the Board of Parole Hearings, and local prisons to identify OR track the needs of BLIND AND LOW-VISION CLASS MEMBERS with respect to reading and writing accommodations, including but not limited to surveying and interviewing BLIND AND LOW-VISION CLASS MEMBERS regarding these needs.

7. ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for identifying and documenting the effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to:

A) Who interviews DEAF AND HARD-OF-HEARING CLASS MEMBERS regarding their effective communication needs at each prison, and when such interviewing occurs; and

B) How each prison documents the effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to whether and how this information can be updated.

C) How the Board of Parole Hearings documents the specific effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to whether and how this information can be stored for use in connection with future hearings and updated.

**SCHEDULE B**

Pursuant to Federal Rules of Civil Procedure 30(b)(2) and 34, CDCR is required to produce the following DOCUMENTS for inspection and copying at Prison Law Office, 1917 Fifth Street, Berkeley, CA 94710, no later than 30 days from the service of this Notice.

## I.    INSTRUCTIONS

1.    You are required to furnish ALL DOCUMENTS in your possession, custody, OR control, including those DOCUMENTS that are in your possession, custody, OR control in the normal course of your employment obligations, and those in the possession, custody OR control of your (1) employer; (2) consultants; (3) attorneys; (4) representatives; (5) agents; OR (6) ANY other person acting OR purporting to act on your behalf OR at your direction, whether doing so directly OR at the direction of your subordinates.  Possession, custody, OR control includes DOCUMENTS stored in electronic form by third party service providers but accessible to the Defendant, including but not limited to email accounts, FTP servers, portable storage media such as USB drives, cloud storage services such as Dropbox OR SharePoint, and online workspaces such as WebEx.

2.    ALL non-identical copies of every DOCUMENT whose production is sought shall be separately produced.

3.    Each request herein constitutes a request for DOCUMENTS in their entirety, with ALL enclosures and attachments, and without abbreviation, redaction, OR expurgation.  DOCUMENTS attached to each other, including but not limited to, by staple, clip, tape, email attachment, OR "Post-It" note, should not be separated, although ANY page on which a Post-It note covers OR obscures text on the DOCUMENT should be produced both with and without the Post-It note.  The production must also include, where applicable, ANY index tabs, file dividers, designations, binder spine labels, OR other similar information as to the source and/OR location of the DOCUMENTS.

4.    Each request includes ANY and ALL drafts and copies of each

[3576536.3]

DOCUMENTS that are responsive to ANY request, including but not limited to copies containing handwritten notes, markings, stamps, OR interlineations.  The author(s) of ALL hand-written notes should be identified.

5.      You shall produce ALL responsive DOCUMENTS as they have been kept in the ordinary course of business.

6.      Pursuant to Federal Rule of Civil Procedure 34(b), ALL responsive DOCUMENTS are required to be produced either: (a) as they are kept in the usual course of business (together with copies of ANY file labels OR binder covers for the files OR binders in which they are maintained); OR (b) organized and labeled to correspond with the categories of the requests to which they respond.

7.      If ANY responsive DOCUMENT is maintained electronically, the DOCUMENT shall be produced on disc in native format and with metadata intact.

8.      If with respect to ANY request there are no responsive DOCUMENTS, so state in writing.

10.      If you object to a portion OR an aspect of a request, state the grounds for your objection with specificity and respond to the remainder of the DOCUMENT request. If ANY DOCUMENTS, OR portion thereof, are withheld because you claim that such information is protected under the attorney-client privilege, work product doctrine, OR other privilege OR doctrine, you are required to provide a privilege log setting forth the specific basis for the claim of privilege OR protection and for each DOCUMENT provide the following:

A) the subject matter of the DOCUMENT;

B) the title, heading OR caption of the DOCUMENT, if ANY;

C) the date appearing on the DOCUMENT OR, if no date appears thereon, the date OR approximate date on which the DOCUMENT was prepared;

D) the type of DOCUMENT (e.g., whether it is a letter, memorandum, minutes of meeting, etc.) and the number of pages;

E) the identity of the person who signed the DOCUMENT OR, if it was not

[3576536.3]

signed, the person who prepared it;

F) the identity of each person to whom the DOCUMENT was addressed and the identity of each person to whom a copy thereof was sent; and

G) the identity of each person who has custody of a copy of each such DOCUMENT.

11.    If you claim that a portion of a DOCUMENT is protected from disclosure for ANY reason, produce such DOCUMENT with redaction of only the portion claimed to be protected.  When such redactions for privilege OR protection are made, you shall place a legend similar to "REDACTION – PRIVILEGE" on the copy of the DOCUMENT produced.  ALL redactions shall also be included on the privilege log described above.

12.    If you object that a request is vague OR ambiguous, identify the objectionable aspect of the request.

13.    If a request cannot be responded to in full, you shall respond to the extent possible, specify the reason for your inability to respond to the remainder, and state whatever information OR knowledge you have regarding the portion to which you have not responded.

14.    If ANY DOCUMENT called for by these requests has been destroyed, lost, discarded, OR is otherwise no longer in your possession, custody, OR control, identify such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the person authorizing disposal, and the person disposing of the DOCUMENT.

15.    Unless otherwise specified, the relevant time period, and the period for which you are required to provide responsive DOCUMENTS, is from and including January 1, 2017 up to and including the date of the Rule 30(b)(6) deposition.

## II.    DOCUMENTS REQUESTED

1.    ALL DOCUMENTS that the deponent(s) used OR may need to use to refresh their recollection as to ANY of the topics in Schedule A.I.

2.    ALL DOCUMENTS that the deponent(s) consulted OR relied upon to learn

the information known OR reasonably available to the CDCR on the topics in Schedule A.I.

3.      ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices for identifying and documenting the specific ACCESSIBLE FORMATS in which individual BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS are able to review written information.

4.      ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices for providing written information to BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS in ACCESSIBLE FORMATS.

5.      ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the purchasing and placement of AUXILIARY AIDS in CDCR prisons.

6.      ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the role of ADA workers in assisting BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS with reading and writing tasks.

7.      ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the role of CDCR or Board of Parole Hearings staff in assisting BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS with reading and writing tasks.

8.      ALL DOCUMENTS that refer OR relate to ANY and ALL past, present, and anticipated efforts by CDCR Headquarters, Board of Parole Hearings, and local prisons to survey the needs of BLIND AND LOW-VISION CLASS MEMBERS with respect to reading and writing accommodations.

[3576536.3]

# EXHIBIT 12

BOARD OF PAROLE HEARINGS
**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**
BPH 1073

| | |
|---|---|
| D. Moeller - PMK    07/07/2022 | |
| **EXHIBIT** **5** | |
| Donna St. Clair | |

## I.   PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name:                          Sign Name:                          Date:

| Mental Health Concerns | | Source | Dated |
|---|---|---|---|
| Identified Disabilities | Note: | Source | Dated |

**Other Potential Assistance Needs**

**Reading Level:**          Total GPL:

**Speaks English**  ☐ Yes   ☐ No

**Languages Spoken**

## II.   INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

☐ I need help reading my documents.                    ☐ I need the following help to hear
☐ I need help understanding the procedures and forms.  ☐ I need the following help to see
☐ I need a sign language interpreter.                  ☐ I need to communicate in writing.
☐ I need a wheelchair and I ☐ do have one. ☐ do not have one.
☐ I need a Durable Medical Equipment to get around :

Have Durable Medical Equipment : _____

Do not have Durable Medical Equipment : _____

☐ I do not speak English and need an interpreter in

☐ I need a housing accommodation :

☐ I have a health problem, I need   ☐ A medical evaluation   ☐ A mental health evaluation   ☐ Medication

☐ Other

☐ **I do not need any help for my parole hearing.**

Name:                                                              CDC Number:
Proceeding:                        Type of Hearing:
Location:

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

BOARD OF PAROLE HEARINGS
**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**
BPH 1073

STATE OF CALIFORNIA

| III.  INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

☐ Appears to understand    ☐ Appears to have difficulty understanding

Effective Communication Method Used:

Comment:

_____    _____    _____

Staff Name and Title (please print)                          Staff Signature                          Date

| IV.  ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s):

Summary:

Comment:

_____    _____    _____

Staff Name and Title (please print)                          Staff Signature                          Date

| V.  SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):

Private Durable Medical Equipment(Inmate/Parolee Provided):

Comment:

_____    _____    _____

Staff Name and Title (please print)                          Staff Signature                          Date

Name:                                                                                      CDC Number:

Proceeding:                                         Type of Hearing:

Location:

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

BOARD OF PAROLE HEARINGS                                               STATE OF CALIFORNIA

## REASONABLE ACCOMMODATION NOTICE AND REQUEST

DATE RECEIVED BY ADA COORDINATOR:
DATE OF BPH PAROLE PROCEEDING:

## INMATE REQUESTED ACCOMMODATION:

☐ I need help reading my documents.                    ☐ I need the following help to hear

☐ I need help understanding the procedures and forms.  ☐ I need the following help to see

☐ I need a sign language interpreter.                  ☐ I need to communicate in writing.

☐ I need a wheelchair and I ☐ do have one. ☐ do not have one.

☐ I need a appliance / equipment to get around :

Have Appliance : _____

Do not have Appliance : _____

☐ I do not speak English and need an interpreter in

☐ I need a housing accommodation :

☐ I have a health problem, I need  ☐ A medical evaluation  ☐ A mental health evaluation  ☐ Medication

☐ Other

☐ **I do not need any help for my parole hearing.**

## DOCUMENTED DISABILITY:

## ACCOMMODATIONS PLANNED:

BPH 1073(a)(Rev. 06/16)

BOARD OF PAROLE HEARINGS                                                STATE OF CALIFORNIA

## REASONABLE ACCOMMODATION NOTICE AND REQUEST

**ADA COORDINATOR SIGNATURE**                                          **DATE SIGNED**

**Consultation**

BPH 1073(a)(Rev. 06/16)

# EXHIBIT 13

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                                    **STATE OF CALIFORNIA**
BPH 1073

## I.   PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▮▮▮▮▮▮                    Sign Name: _____            Date: 0▮▮▮▮▮

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|
| EOP | Enhanced Out-Patient | CDC 128C | 08/30/2021 |

| **Identified Disabilities** | **Note:** | **Source** | **Dated** |
|---|---|---|---|
| NCF | Received passing score on cognitive test | CDC 128C2 | 09/16/2002 |

**Other Potential Assistance Needs**

**Reading Level:** 6.2          **Total GPL:** 6.2

**Speaks English**   [X] Yes   [ ] No

**Languages Spoken**

## II.   INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                         [ ] I need the following help to hear
[X] I need help understanding the procedures and forms.       [X] I need the following help to see   **EYEGLASSES**
[ ] I need a sign language interpreter.                       [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [X] do have one.  [ ] do not have one.
[X] I need a Durable Medical Equipment to get around :   **Vision Vest**

    Have Durable Medical Equipment :   Vision Vest _____
    Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need   [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

Name: ▮▮▮▮ , ▮▮▮▮▮                                                  CDC Number: ▮▮▮▮▮
Proceeding: Lifer                          Type of Hearing:  Initial Hearing
Location: ▮▮▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

BOARD OF PAROLE HEARINGS                                                                STATE OF CALIFORNIA
**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**
BPH 1073

| III.   INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand          [ ]  Appears to have difficulty understanding

Effective Communication Method Used:    "**Have Inmate Describe In Own Words What Was Stated To Him**"

"**Repeat/Rephrase as Necessary**"   "**Speak Loudly/Clearly**"

███████████ / Correctional Counselor                                              ████████

Staff Name and Title (please print)                    Staff Signature                    Date

| IV.   ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s):  "**Attorney**"   "**Magnifying Device**"

"**Personal Durable Medical Equipment**"

Summary:      Accommodations Planned

Comment:        EOP/DPO/DPV-wheelchair, foot orthoses, mobility vest, tapping cane, vision vest, glasses

THERESA BARKER / BPH Staff                                                            ████████

Staff Name and Title (please print)                    Staff Signature                    Date

| V.   SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):    "**Attorney**" "**Magnifying Device**"

"**Personal Durable Medical Equipment**"

Private Durable Medical Equipment(Inmate/Parolee Provided):    "**Cane**"   "**Glasses**"   "**Wheelchair**"

Comment: EOP / DPO / DPV - Wheelchair; Foot Orthoses; mobility Vest; tapping Cane; Vision Vest; Glasses

TROY TAIRA / Commissioner                                                            ████████

Staff Name and Title (please print)                    Staff Signature                    Date

Name: ████ , ████                                                           CDC Number: ██████
Proceeding: Lifer                              Type of Hearing:  Initial Hearing
Location:    ███████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

# ADA/Effective Communication Patient Summary

**As of:** 03/13/2023 15:28

## Patient Information

**NAME:** ▮▮▮ , ▮▮▮
**CDCR:** ▮▮▮

## Disability Placement Program

**Current DPP Code(s):**
 * DPO
 * DPV

**DPP Verification/Accommodation Date:** 04/08/21 10:39:43 PDT

**Current Housing Restrictions/Accomodations:**
 * No Rooftop Work/Hazardous Restriction
 * Special Cuffing
 * Transport Vehicle With Lift
 * Limited Wheelchair User
 * Inmate Attendant/ Assistant
 * Bottom Bunk
 * Ground Floor- No Stairs

## Methods of Communication

**SLI:**

**Primary Method:**

**Secondary Method:**

**Interview Date:**

## Developmental Disability Program

**Current DDP Code:**

**Effective Date:**

**Adaptive Support Needs:**

## Testing of Adult Basic Education (TABE)

**TABE Score:** 06.2

**TABE Date:** 11/06/2015 00:00

## Learning Disabilities

**Learning Disabilities:**

## English Proficiency

**LEP:** No

**Primary Language:** English

## Durable Medical Equipment

**Current ISSUED DME:**
 * Eyeglass Frames Permanent
 * Foot Orthoses Permanent
 * Incontinence Supplies Permanent
 * Mobility Impaired Disability Vest Permanent
 * Vision Impaired Disability Vest Permanent
 * Wheelchair Permanent
 * Other Permanent:tapping cane, wheelchair cushion, wheelchair gloves

**Dental Prosthetic:**

**Dental Prosthetic Date:**

## MHSDS

**MHLOC:**   EOP

3/13/2023

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                     **STATE OF CALIFORNIA**
BPH 1073

| I.   PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY) |
|---|

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▮▮▮▮▮          Sign Name: ▮▮▮▮▮          Date: ▮▮▮▮▮

**Mental Health Concerns**

|  |  | Source | Dated |
|---|---|---|---|
| ACUTE | DMH Acute Care | CDC 128C2 | 02/11/2021 |

**Identified Disabilities**                    Note:          Source          Dated

| | | | Source | Dated |
|---|---|---|---|---|
| DPV | Blind or Low Vision | | CDC 128C2 | 03/18/2003 |
| DNH | Requires Auditory Aids | | CDC 128C2 | 03/18/2003 |
| DLT | Mobility impaired level terrain | | CDC 128C2 | 03/18/2003 |

**Other Potential Assistance Needs**

**Reading Level:** 5.8          **Total GPL:** 5.8

**Speaks English**   [X] Yes   [ ] No

**Languages Spoken**

| II.   INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION |
|---|

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                    [X] I need the following help to hear **HEARING AIDS**

[ ] I need help understanding the procedures and forms.   [X] I need the following help to see  **MAGNAFIER W/LIGHT,**

[ ] I need a sign language interpreter.                   [ ] I need to communicate in writing.

[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.

[X] I need a Durable Medical Equipment to get around :   **Tapping Cane**

     Have Durable Medical Equipment :   Tapping Cane

     Do not have Durable Medical Equipment :

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need   [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[X] Other  Hearing aids were lost while transfering facilities.

[ ] **I do not need any help for my parole hearing.**

Name: ▮▮▮▮, ▮▮▮▮▮          CDC Number: ▮▮▮▮
Proceeding: Lifer                Type of Hearing:  Subsequent Hearing
Location: ▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**
BPH 1073

<div align="right"><strong>STATE OF CALIFORNIA</strong></div>

---

### III.   INITIAL SERVICE OF RIGHTS (STAFF ONLY)

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand   [ ]  Appears to have difficulty understanding

Effective Communication Method Used:   "**Magnifying Device**"  "**Speak Loudly/Clearly**"

Comment:  Hearing Aids were lost. 1824 was completed to get new hearing aids.

▮▮▮▮▮ / Correctional Counselor

| Staff Name and Title (please print) | Staff Signature | Date |
|---|---|---|

---

### IV.   ACCOMMODATIONS PLANNED

Accommodation(s)/Assistance to be provided at hearing(s):  "**Assistive Hearing Devices**"   "**Attorney**"
"**Level Terrain/Path of Travel**"  "**Magnifying Device**"
"**Personal Durable Medical Equipment**"

Summary:     Accommodations Planned

Comment:     DLT/DNH/DPV-back brace, mobility, hearing and vision vests, hearing aids, tapping cane, glasses, magnifier

THERESA BARKER / BPH Staff

| Staff Name and Title (please print) | Staff Signature | Date |
|---|---|---|

---

### V.   SUMMARY OF ACCOMMODATIONS

Accommodation(s)/Assistance provided at hearing(s):

Private Durable Medical Equipment(Inmate/Parolee Provided):

| Staff Name and Title (please print) | Staff Signature | Date |
|---|---|---|

---

Name: ▮▮▮▮ , ▮▮▮▮▮▮▮                                         CDC Number: ▮▮▮▮▮
Proceeding: Lifer                          Type of Hearing:  Subsequent Hearing
Location:   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                    **STATE OF CALIFORNIA**
BPH 1073

| **I. PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)** |
|---|
| I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding. |

Print Name: ▇▇▇▇▇▇        Sign Name: _____        Date:0▇▇▇▇▇

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|

| **Identified Disabilities** | | **Note:** | **Source** | **Dated** |
|---|---|---|---|---|
| DNV | Requires Visual Aids | No glasses; subject has a magnifying glass | DEC REVIEW | 05/30/2023 |
| DPM | Unable to walk | Subject stated he utilizes his cane/walker | DEC REVIEW | 05/30/2023 |
| DNH | Requires Auditory Aids | | DEC REVIEW | 05/30/2023 |

**Other Potential Assistance Needs**

**Reading Level:** 9.9        Total GPL: 9.9

**Speaks English**  [X] Yes  [ ] No

**Languages Spoken**

| **II. INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION** |
|---|

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                    [X] I need the following help to hear **SPEAK LOUDLY**
[ ] I need help understanding the procedures and forms.    [ ] I need the following help to see
[ ] I need a sign language interpreter.                    [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.
[X] I need a Durable Medical Equipment to get around :    **Cane, Walker**

    Have Durable Medical Equipment :    Cane, Walker _____

    Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need  [ ] A medical evaluation  [ ] A mental health evaluation  [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

Name: ▇▇▇▇▇, ▇▇▇▇▇▇▇                                    CDC Number: ▇▇▇▇▇
Proceeding: Lifer                        Type of Hearing:  Subsequent Hearing
Location: ▇▇▇▇▇▇▇▇▇▇▇▇

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING
BPH 1073

## III. INITIAL SERVICE OF RIGHTS (STAFF ONLY)

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[ ] Appears to understand    [X] Appears to have difficulty understanding

Effective Communication Method Used:    " **Large Print Material**"    " **Magnifying Device**"
                                        " **Read/Speak Slowly/Use Simple Language**"    " **Speak Loudly/Clearly**"

Comment:  Spoke Loudly and Clearly; rephrase sentences if necessary.

_____ / Correctional Counselor    _____    _____
Staff Name and Title (please print)    Staff Signature    Date

## IV. ACCOMMODATIONS PLANNED

Accommodation(s)/Assistance to be provided at hearing(s):  " **Assistive Hearing Devices**"    " **Attorney**"    " **Magnifying Device**"
                                                          " **Personal Durable Medical Equipment**"

Summary:    Accommodations Planned

Comment:    DPM/DNH/DNV-walker, cane, compression stocking, knee braces, mobility vest, orthotics, hearing aids,
            vision vest, glasses

THERESA BARKER / BPH Staff    _____    0_____
Staff Name and Title (please print)    Staff Signature    Date

## V. SUMMARY OF ACCOMMODATIONS

Accommodation(s)/Assistance provided at hearing(s):    " **Additional Time**"    " **Assistive Hearing Devices**"    " **Attorney**"
                                                       " **Magnifying Device**"    " **Personal Durable Medical Equipment**"

Private Durable Medical Equipment(Inmate/Parolee Provided):    " **Read/S**"    " **Cane** "    " **Glasses** "    " **Hearing Aids** "
                                                                " **Repeat/Rephrase as Necessary**"    " **Speak Loudly/Clearly**"

Comment: The inmate also brought his own magnifier, had knee brace and mobility vest on. Has but did not use or need
         compression stockings.

EDWARD TAYLOR / Deputy Commissioner    _____    _____
Staff Name and Title (please print)    Staff Signature    Date

Name: _____, _____    CDC Number: _____
Proceeding: Lifer    Type of Hearing:  Subsequent Hearing
Location: _____

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

# ADA/Effective Communication Patient Summary

**As of:** 06/05/2023 09:34

## Patient Information

**NAME:** ██████, ██████
**CDCR:** ██████

## Disability Placement Program

**Current DPP Code(s):**
 * DNV
 * DNH
 * DPM

**DPP Verification/Accommodation Date:** 08/03/22 11:16:19 PDT

**Current Housing Restrictions/Accomodations:**
 * Lifting Restriction
 * Special Cuffing
 * Bottom Bunk
 * Ground Floor- No Stairs

## Methods of Communication

**SLI:** No

**Primary Method:** Hearing Aids

**Secondary Method:** Need Staff to Speak Loudly and Clearly

**Interview Date:** 04/01/2020 00:00

## Developmental Disability Program

**Current DDP Code:**

**Effective Date:**

**Adaptive Support Needs:**

## Testing of Adult Basic Education (TABE)

**TABE Score:** 09.9

**TABE Date:** 05/16/2003 00:00

## Learning Disabilities

**Learning Disabilities:**

## English Proficiency

**LEP:** No

**Primary Language:** English

## Durable Medical Equipment

**Current ISSUED DME:**
 * Cane Permanent
 * Compression Stocking Permanent
 * Eyeglass Frames Permanent
 * Hearing Aid Permanent
 * Incontinence Supplies Temporary
 * Knee Braces Permanent
 * Mobility Impaired Disability Vest Permanent
 * Therapeutic Shoes/Orthotics Permanent
 * Vision Impaired Disability Vest Permanent
 * Walkers Permanent
 * Other Permanent:Wedge Pillow, Cervical Pillow, large magnifier

**Dental Prosthetic:**
 * Upper Denture Type: Full
 * Lower Denture Type: Partial
 * Night Guard: No

**Dental Prosthetic Date:** 12/16/20 13:33:00 PST

## MHSDS

**MHLOC:** GP

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING
BPH 1073

## I.    PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▮▮▮▮▮▮          Sign Name:                    Date: 10/18/2022

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|

| **Identified Disabilities** | **Note:** | **Source** | **Dated** |
|---|---|---|---|
| DPV     Blind or Low Vision | | CDC 128C | 09/30/2021 |

**Other Potential Assistance Needs**

**Reading Level:** 4.8          **Total GPL:** 4.8

**Speaks English**  [X] Yes   [ ] No

**Languages Spoken**

## II.    INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                    [ ] I need the following help to hear
[ ] I need help understanding the procedures and forms.  [ ] I need the following help to see
[ ] I need a sign language interpreter.                  [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.
[ ] I need a Durable Medical Equipment to get around :

   Have Durable Medical Equipment : _____

   Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need   [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

***requesting audio of hearing****

Name: ▮▮▮▮ , ▮▮▮▮▮▮▮▮                    CDC Number: ▮▮▮▮▮
Proceeding: Lifer                    Type of Hearing:  Initial Hearing
Location: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING **STATE OF CALIFORNIA**
BPH 1073

| III.    INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand    [ ]  Appears to have difficulty understanding

Effective Communication Method Used:    " **Read/Speak Slowly/Use Simple Language**"

█████████ / Correctional Counselor _____    ███████

Staff Name and Title (please print)            Staff Signature            Date

| IV.    ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s): " **Attorney**"    " **Magnifying Device** "
" **Personal Durable Medical Equipment** "

Summary:        Accommodations Planned

Comment:        DPV-cane, compression stocking, knee braces, vision vest, glasses

THERESA BARKER / BPH Staff _____    ███████

Staff Name and Title (please print)            Staff Signature            Date

| V.    SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):    " **Attorney**"  " **Magnifying Device**"
" **Personal Durable Medical Equipment**"

Private Durable Medical Equipment(Inmate/Parolee Provided):    " **Cane** "  " **Glasses** "  " **Other** "  compression stocking, knee braces, vision vest

Comment: DPV

JACK WEISS / Commissioner _____    ███████

Staff Name and Title (please print)            Staff Signature            Date

Name: █████ , █████████            CDC Number: ███████
Proceeding: Lifer                Type of Hearing:  Initial Hearing
Location:    ████████████████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

# ADA/Effective Communication Patient Summary

**As of:** 10/26/2022 10:12

## Patient Information

**NAME:** ▮▮▮▮, ▮▮▮▮
**CDCR:** ▮▮▮▮

## Disability Placement Program

**Current DPP Code(s):**
 * DPV

**DPP Verification/Accommodation Date:** 09/30/21 12:20:46 PDT

**Current Housing Restrictions/Accomodations:**
 * Bottom Bunk
 * Ground Floor- Limited Stairs

## Methods of Communication

**SLI:**

**Primary Method:**

**Secondary Method:**

**Interview Date:**

## Developmental Disability Program

**Current DDP Code:**

**Effective Date:**

**Adaptive Support Needs:**

## Testing of Adult Basic Education (TABE)

**TABE Score:** 04.8

**TABE Date:** 09/23/2010 00:00

## Learning Disabilities

**Learning Disabilities:**

## English Proficiency

**LEP:** No

**Primary Language:** English

## Durable Medical Equipment

**Current ISSUED DME:**
 * Cane Permanent
 * Compression Stocking Permanent
 * Eyeglass Frames Permanent
 * Knee Braces Permanent
 * Vision Impaired Disability Vest Permanent
 * Other Permanent:Bausch and Lomb 2x4 magnifier & 1 small line reminder card

**Dental Prosthetic:**

**Dental Prosthetic Date:**

## MHSDS

**MHLOC:**   GP

10/26/2022

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                    **STATE OF CALIFORNIA**
BPH 1073

## I.  PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: [redacted]                    Sign Name:                    Date: [redacted]

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|
| EOP | Enhanced Out-Patient | CDC 128C | 12/07/2009 |

| **Identified Disabilities** | **Note:** | **Source** | **Dated** |
|---|---|---|---|
| DPV | Blind or Low Vision | CDC 1845 | 08/25/2017 |

**Other Potential Assistance Needs**

**Reading Level:** 9          **Total GPL:** 12

**Speaks English** [X] Yes  [ ] No

**Languages Spoken**

## II.  INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.              [ ] I need the following help to hear
[X] I need help understanding the procedures and forms.     [ ] I need the following help to see
[ ] I need a sign language interpreter.              [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.
[X] I need a Durable Medical Equipment to get around :   **Tapping Cane**

Have Durable Medical Equipment :     Tapping Cane
Do not have Durable Medical Equipment :

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need  [ ] A medical evaluation  [ ] A mental health evaluation  [ ] Medication

[X] Other NEEDS ASSISTANCE WITH DIRECTIONS/HOW TO GET TO PLACES-ADA WORKER

[ ] **I do not need any help for my parole hearing.**

Name: [redacted], [redacted]                                         CDC Number: [redacted]
Proceeding: Lifer                          Type of Hearing:  Subsequent Hearing
Location: [redacted]

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                                    **STATE OF CALIFORNIA**
BPH 1073

| III.   INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

☐ Appears to understand    ☐ Appears to have difficulty understanding

Effective Communication Method Used:

_____    _____    _____
Staff Name and Title (please print)              Staff Signature                        Date

| IV.   ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s):  "**Attorney**"   "**Magnifying Device**"
                                                           "**Personal Durable Medical Equipment**"

Summary:        Accommodations Planned

Comment:        EOP/DPV-Tapping cane, foot orthoses, vision vest, glasses

THERESA BARKER / BPH Staff _____    _____    ████████
Staff Name and Title (please print)              Staff Signature                        Date

| V.   SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):    "**Attorney**" "**Cane**" "**Eye Glasses**" "**Magnifying Device**"

Private Durable Medical Equipment(Inmate/Parolee Provided):

DIANNE DOBBS / Commissioner _____    _____    ████████
Staff Name and Title (please print)              Staff Signature                        Date

Name: ████████, ████████                                                          CDC Number: ██████
Proceeding: Lifer                          Type of Hearing:  Subsequent Hearing
Location: ████████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

## ADA/Effective Communication Patient Summary

**As of:** 01/06/2022 11:26

### Patient Information

**NAME:** ██████, ██████
**CDCR:** ██████

### Disability Placement Program

**Current DPP Code(s):**
 * DPV

**DPP Verification/Accommodation Date:** 08/30/17 18:39:53 PDT

**Current Housing Restrictions/Accomodations:**
 * Inmate Attendant/ Assistant
 * Bottom Bunk

### Methods of Communication

**SLI:**

**Primary Method:**

**Secondary Method:**

**Interview Date:**

### Developmental Disability Program

**Current DDP Code:** NDD

**Effective Date:** 02/05/2003 00:00

**Adaptive Support Needs:**

### Testing of Adult Basic Education (TABE)

**TABE Score:** 09.0

**TABE Date:** 03/27/2003 00:00

### Learning Disabilities

**Learning Disabilities:**

### English Proficiency

**LEP:** No

**Primary Language:** English

### Durable Medical Equipment

**Current ISSUED DME:**
 * Cane Permanent
 * Eyeglass Frames Permanent
 * Foot Orthoses Permanent
 * Therapeutic Shoes/Orthotics Permanent
 * Vision Impaired Disability Vest Permanent

**Dental Prosthetic:**

**Dental Prosthetic Date:**

### MHSDS

**MHLOC:**   EOP

1/6/2022

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                    **STATE OF CALIFORNIA**
BPH 1073

## I.  PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▮▮▮▮▮          Sign Name:                    Date: ▮▮▮▮▮

| **Mental Health Concerns** | | | **Source** | **Dated** |
|---|---|---|---|---|
| EOP-M | EOP Modified (Modified Treatment) | | CDC 128C | 02/20/2020 |

| **Identified Disabilities** | | **Note:** | **Source** | **Dated** |
|---|---|---|---|---|
| DNH | Requires Auditory Aids | | DEC REVIEW | 07/25/2023 |
| DPV | Blind or Low Vision | | DEC REVIEW | 07/25/2023 |

**Other Potential Assistance Needs**

**Reading Level:** 3.5          **Total GPL:** N/A

**Speaks English**   [X] Yes   [ ] No

**Languages Spoken**

## II.  INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.               [X] I need the following help to hear  **HEARING AIDS**
[X] I need help understanding the procedures and forms.   [X] I need the following help to see  **MAGNIFYING GLASS**
[ ] I need a sign language interpreter.             [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.
[X] I need a Durable Medical Equipment to get around :  **Tapping Cane**

   Have Durable Medical Equipment :  Tapping Cane
   Do not have Durable Medical Equipment :

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need  [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

Name: ▮▮▮▮, ▮▮▮▮▮▮▮▮                         CDC Number: ▮▮▮▮
Proceeding: Lifer                    Type of Hearing:  Initial Hearing
Location: ▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                                          **STATE OF CALIFORNIA**
BPH 1073

| III.  INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand          [ ]  Appears to have difficulty understanding

Effective Communication Method Used:    "**Additional Time**"    "**Assistive Hearing Devices**"
"**Read/Speak Slowly/Use Simple Language**"    "**Repeat/Rephrase as Necessary**"
"**Speak Loudly/Clearly**"

Comment:  Subject was wearing hearing aids and stated she could hear me.

███████ / Correctional Counselor _____    _____    ████████
Staff Name and Title (please print)                        Staff Signature              Date

| IV.  ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s):  "**Attorney**"    "**Magnifying Device**"
"**Personal Durable Medical Equipment**"    "**Pocket Talker**"

Summary:       Accommodations Planned

Comment:       EOP/DNH/DPV-hearing aids, hearing vest, tapping cane, magnifier, contact lenses, orthotics, vision
               vest, glasses /female pronouns

THERESA BARKER / BPH Staff _____    _____    ████████
Staff Name and Title (please print)                        Staff Signature              Date

| V.  SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):   "**Additional Time**" "**Attorney**" "**Magnifying Device**"
"**Personal Durable Medical Equipment**" "**Pocket Talker**"
Private Durable Medical Equipment(Inmate/Parolee Provided):  "**Read/S** "**Glasses**" **y/Use Simple Language**"
"**Repeat/Rephrase as Necessary**" "**Staff Assistance**"

Comment: EOP/DNH/DPV-hearing aids; hearing vest; tapping cane; contact lenses; orthotics; vision vest; glasses; Female
         Pronouns. IP said didn't need pocket talker or contact lenses or Staff Assistant.

LETIZIA PINGITORE / Deputy Commissioner _____    _____    ████████
Staff Name and Title (please print)                        Staff Signature              Date

Name: ████,████████████        CDC Number: ██████
Proceeding: Lifer                          Type of Hearing:  Initial Hearing
Location:  ████████████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

## ADA/Effective Communication Patient Summary

**As of:** 08/08/2023 09:58

### Patient Information

**NAME:** ▮▮▮▮, ▮▮▮▮
**CDCR:** ▮▮▮▮

### Disability Placement Program

**Current DPP Code(s):**
  * DNH
  * DPV

**DPP Verification/Accommodation Date:** 12/20/19 13:03:33 PST

**Current Housing Restrictions/Accomodations:**
  * No Rooftop Work/Hazardous Restriction
  * Special Cuffing
  * Transport Vehicle With Lift
  * Inmate Attendant/ Assistant
  * Bottom Bunk
  * Ground Floor- Limited Stairs

### Methods of Communication

**SLI:** No

**Hearing Primary:** Hearing Aids

**Hearing Secondary:**

**Speech Primary:**

**Speech Secondary:**

**Vision Primary:** Read Documents Aloud

**Vision Secondary:**

**Interview Date:** 12/24/2019 00:00

### Developmental Disability Program

**Current DDP Code:**

**Effective Date:**

**Adaptive Support Needs:**

### Testing of Adult Basic Education (TABE)

**TABE Score:** 03.5

**TABE Date:** 03/24/2015 00:00

### Learning Disabilities

**Learning Disabilities:** No

### English Proficiency

**LEP:** No

**Primary Language:** English

### Durable Medical Equipment

**Current ISSUED DME:**
  * Cane Permanent
  * Eyeglass Frames Permanent
  * Hearing Aid Permanent
  * Hearing Impaired Disability Vest Permanent
  * Magnifier Permanent
  * Therapeutic Contact Lenses Permanent
  * Therapeutic Shoes/Orthotics Permanent
  * Vision Impaired Disability Vest Permanent
  * Other Permanent:sunsheild glasses

**Dental Prosthetic:**

**Dental Prosthetic Date:**

### MHSDS

**MHLOC:**   EOP

8/8/2023

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING        **STATE OF CALIFORNIA**
BPH 1073

| I.    PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY) |
| --- |

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ███████       Sign Name: _____       Date: ██████

**Mental Health Concerns**                 **Source**     **Dated**

**Identified Disabilities**          **Note:**          **Source**     **Dated**

| | | | Source | Dated |
|---|---|---|---|---|
| DPM | Unable to walk | | DEC REVIEW | 05/10/2022 |
| DPV | Blind or Low Vision | | DEC REVIEW | 05/10/2022 |
| NCF | Received passing score on cognitive test | | DEC REVIEW | 09/24/2002 |

**Other Potential Assistance Needs**

**Reading Level:** 6.8       **Total GPL:** 6.8

**Speaks English**   [X] Yes    [ ] No

**Languages Spoken**

| II.    INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION |
| --- |

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.        [ ] I need the following help to hear

[X] I need help understanding the procedures and forms.    [ ] I need the following help to see

[ ] I need a sign language interpreter.        [ ] I need to communicate in writing.

[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.

[X] I need a Durable Medical Equipment to get around :   **Brace-Wrist Support, Eye Glasses, Full Upper Denture, Mobility Vest, Partial Lower Denture - Acrylic, Shoes, Truss/Hernia Support, Vision Vest, Walker**

      Have Durable Medical Equipment :    Brace-Wrist Support, Eye Glasses, Full Upper Denture, Mobility Vest, Partial Lower Denture - Acrylic, Shoes, Truss/Hernia Support, Vision Vest, Walker

      Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need   [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

A/I - cannot sit or stand for extended periods of time

Name: ███, ███████                 CDC Number: ██████
Proceeding: Lifer             Type of Hearing: Initial Hearing
Location: ████████████████

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                                    **STATE OF CALIFORNIA**
BPH 1073

| III.  INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand          [ ]  Appears to have difficulty understanding

Effective Communication Method Used:    "**Additional Time**"   " **Eye Glasses**"   " **Read/Speak Slowly/Use Simple Language**"

███████████ / Correctional Counselor _____    ███████████

Staff Name and Title (please print)                          Staff Signature                        Date

| IV.  ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s): "**Attorney**"   "**Magnifying Device** "
"**Personal Durable Medical Equipment** "

Summary:        Accommodations Planned

Comment:        DPM/DPV-walker, mobility vest, orthotics, wrist support brace, vision and mobility vests, glasses/may
need to take a break to stand

THERESA BARKER / BPH Staff _____    ███████████

Staff Name and Title (please print)                          Staff Signature                        Date

| V.  SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):      "**Attorney**" "**Eye Glasses**" "**Magnifying Device**"

Private Durable Medical Equipment(Inmate/Parolee Provided):

Comment: DPM/DPV - ██████ used his walker, glasses, and orthotics, but did not wear his wrist support, vision and mobility vest
to the hearing room. The panel took breaks as needed.

MARY DANG / Deputy Commissioner _____    ███████████

Staff Name and Title (please print)                          Staff Signature                        Date

Name: ██████, ██████                                                      CDC Number: ██████
Proceeding: Lifer                                          Type of Hearing:  Initial Hearing
Location: ████████████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

## ADA/Effective Communication Patient Summary

**As of:** 03/13/2023 15:15

### Patient Information

**NAME:** ███, ███████
**CDCR:** ██████

### Disability Placement Program

**Current DPP Code(s):**
 * DPV
 * DPM

**DPP Verification/Accommodation Date:** 05/10/22 13:14:08 PDT

**Current Housing Restrictions/Accomodations:**
 * No Rooftop Work/Hazardous Restriction
 * Lifting Restriction
 * Bottom Bunk
 * Ground Floor- No Stairs

### Methods of Communication

**SLI:**

**Primary Method:**

**Secondary Method:**

**Interview Date:**

### Developmental Disability Program

**Current DDP Code:**

**Effective Date:**

**Adaptive Support Needs:**

### Testing of Adult Basic Education (TABE)

**TABE Score:** 06.8

**TABE Date:** 03/14/2018 00:00

### Learning Disabilities

**Learning Disabilities:**

### English Proficiency

**LEP:** Unknown

**Primary Language:** English

### Durable Medical Equipment

**Current ISSUED DME:**
 * Eyeglass Frames Permanent
 * Mobility Impaired Disability Vest Permanent
 * Therapeutic Shoes/Orthotics Permanent
 * Truss Hernia Support Permanent
 * Vision Impaired Disability Vest Permanent
 * Walkers Permanent
 * Wrist Support Brace Permanent

**Dental Prosthetic:**
 * Upper Denture Type: Full
 * Lower Denture Type: Partial
 * Night Guard: No

**Dental Prosthetic Date:** 03/07/19 9:30:00 PST

### MHSDS

**MHLOC:**   GP

3/13/2023

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                           **STATE OF CALIFORNIA**
BPH 1073

### I.  PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▇▇▇▇▇▇    Sign Name: _____    Date: 0▇▇▇▇▇

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|

| **Identified Disabilities** | **Note:** | **Source** | **Dated** |
|---|---|---|---|
| DPV  Blind or Low Vision | | CDC 128C | 05/04/2004 |

**Other Potential Assistance Needs**

**Reading Level:** 3.9    **Total GPL:** 3.9

**Speaks English**  [X] Yes   [ ] No

**Languages Spoken**

### II.  INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.              [ ] I need the following help to hear
[X] I need help understanding the procedures and forms.   [ ] I need the following help to see
[ ] I need a sign language interpreter.            [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.
[X] I need a Durable Medical Equipment to get around : **Cane, Magnifying Device Needed, Vision Vest**

Have Durable Medical Equipment : Cane, Vision Vest
Do not have Durable Medical Equipment : Magnifying Device Needed

[ ] I do not speak English and need an interpreter in
[X] I need a housing accommodation : **Ground Floor-Limited Stairs, Lower/Bottom Bunk Only**
[ ] I have a health problem, I need [ ] A medical evaluation [ ] A mental health evaluation [ ] Medication
[ ] Other

[ ] **I do not need any help for my parole hearing.**

Name: ▇▇▇▇▇, ▇▇▇▇▇                                        CDC Number: ▇▇▇▇▇
Proceeding: Lifer                    Type of Hearing:  Subsequent Hearing
Location: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

Case 4:94-cv-02307-CW    Document 3525-3    Filed 11/14/23    Page 291 of 778

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING    **STATE OF CALIFORNIA**
BPH 1073

| III.  INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand    [ ]  Appears to have difficulty understanding

Effective Communication Method Used:    "  **Additional Time**"  "  **Assistive Visual Devices**"  "  **Attorney**"  "  **Cane**"
"  **Read/Speak Slowly/Use Simple Language**"  "  **Staff Assistance**"

Comment:    ▉▉▉▉▉  stated his attorney will serve as his staff assistant.

▉▉▉▉▉  / Correctional Counselor                                                           ▉▉▉▉
Staff Name and Title (please print)                    Staff Signature                    Date

| IV.  ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s):  "**Attorney**"    "**Magnifying Device**"
"**Personal Durable Medical Equipment**"

Summary:    Accommodations Planned

Comment:    3.9 RL/DPV-vision vest, tapping cane, magnifier, glasses
THERESA BARKER / BPH Staff                                                           ▉▉▉▉
Staff Name and Title (please print)                    Staff Signature                    Date

| V.  SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):    "**Attorney**" "**Level Terrain/Path of Travel**" "**Magnifying Device**"
"**Personal Durable Medical Equipment**"

Private Durable Medical Equipment(Inmate/Parolee Provided):    "**Glasses** "

Comment: IP is vision impaired: dark glasses, vison vest, tapping cane provided. TABE is under 4.0: Attorney provided.

PATRICK REARDON / Deputy Commissioner                                            ▉▉▉▉
Staff Name and Title (please print)                    Staff Signature                    Date

Name: ▉▉▉▉, ▉▉▉▉                                                    CDC Number: ▉▉▉▉
Proceeding: Lifer                              Type of Hearing:  Subsequent Hearing
Location: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

## ADA/Effective Communication Patient Summary

**As of:** 08/15/2023 15:46

### Patient Information

**NAME:** ██████, ████
**CDCR:** ████████

### Disability Placement Program

**Current DPP Code(s):**
 * DPV

**DPP Verification/Accommodation Date:** 10/26/21 14:56:23 PDT

**Current Housing Restrictions/Accomodations:**
 * No Rooftop Work/Hazardous Restriction
 * Inmate Attendant/ Assistant
 * Bottom Bunk
 * Ground Floor- Limited Stairs

### Methods of Communication

**SLI:**

**Hearing Primary:**

**Hearing Secondary:**

**Speech Primary:**

**Speech Secondary:**

**Vision Primary:**

**Vision Secondary:**

**Interview Date:**

### Developmental Disability Program

**Current DDP Code:** NDD

**Effective Date:** 05/04/2004 00:00

**Adaptive Support Needs:**

### Testing of Adult Basic Education (TABE)

**TABE Score:** 03.9

**TABE Date:** 03/27/2002 00:00

### Learning Disabilities

**Learning Disabilities:** No

### English Proficiency

**LEP:** No

**Primary Language:** English

### Durable Medical Equipment

**Current ISSUED DME:**
 * Cane Permanent
 * Magnifier Permanent
 * Vision Impaired Disability Vest Permanent

**Dental Prosthetic:**

**Dental Prosthetic Date:**

### MHSDS

**MHLOC:**   GP

.. 8/15/2023

# EXHIBIT 14

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████████████ |

### Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other

### Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [X] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[X] Braille                             [ ] Regional Center Advocates
[X] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services   [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [ ] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[ ] Magnifying Device                   [ ] Other
[ ] Materials on Videotape

### Additional Comments

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███ , ███ | ███ | ███ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

### Additional Comments

Inmate's second attorney interview(in-person) held using simple English language spoken Slowly,
clearly and loud to achieve and maintain effective communication all through the interview. Inmate was encourage to ask clarifying questions.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ███ | ███ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**     **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | |

### Parole Proceeding

[X] Attorney Consult
[ ] Administrative Appeal
[ ] Central File Review
[ ] Clinician Interview
[ ] Document Review
[ ] Other

[ ] Initial Interview-Issue Conditions of Parole
[ ] Notice of Amended Conditions of Parole
[ ] Psychologist Evaluation
[ ] Review of Letter of Support
[ ] Review of Parole Plans

### Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility
[ ] Accessible Transportation
[ ] Assistive Hearing Devices
[X] Attorney
[ ] Audio Taped Materials
[ ] Audiocassettes
[ ] Braille
[ ] Cane
[ ] Closed Caption
[ ] Communication Books or Boards
[ ] Computer Aided Transcription Services
[ ] Computer Terminals
[ ] Foreign Language Interpreter
[ ] Highlighter Pens and Markers
[ ] Large Print Material
[ ] Magnifying Device
[ ] Materials on Videotape

[ ] Note Taker
[ ] Open and Closed Captioning
[ ] Phone Handset Amplifiers
[ ] Qualified Readers
[ ] Reading
[ ] Reading Machines
[ ] Regional Center Advocates
[ ] Sign Language Interpreter
[ ] Speech Synthesizers
[ ] Staff Assistance
[ ] TDD Machines
[ ] Tele Typewriters
[ ] Videotext Displays
[X] Wheelchair
[ ] Written Materials
[ ] Other

### Additional Comments

Read CRA and 115's to him thoroughly since he cannot read them due to blindness in both eyes.  He held a letter he received up to the camera during video visit, and I read the contents to him

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███, ███ | ███ | ███ |

## Parole Proceeding

[X] Attorney Consult
[ ] Administrative Appeal
[ ] Central File Review
[ ] Clinician Interview
[ ] Document Review
[ ] Other

[ ] Initial Interview-Issue Conditions of Parole
[ ] Notice of Amended Conditions of Parole
[ ] Psychologist Evaluation
[ ] Review of Letter of Support
[ ] Review of Parole Plans

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility
[ ] Accessible Transportation
[ ] Assistive Hearing Devices
[X] Attorney
[ ] Audio Taped Materials
[ ] Audiocassettes
[ ] Braille
[ ] Cane
[ ] Closed Caption
[ ] Communication Books or Boards
[ ] Computer Aided Transcription Services
[ ] Computer Terminals
[ ] Foreign Language Interpreter
[ ] Highlighter Pens and Markers
[ ] Large Print Material
[ ] Magnifying Device
[ ] Materials on Videotape

[ ] Note Taker
[ ] Open and Closed Captioning
[ ] Phone Handset Amplifiers
[ ] Qualified Readers
[ ] Reading
[ ] Reading Machines
[ ] Regional Center Advocates
[ ] Sign Language Interpreter
[ ] Speech Synthesizers
[ ] Staff Assistance
[ ] TDD Machines
[ ] Tele Typewriters
[ ] Videotext Displays
[ ] Wheelchair
[ ] Written Materials
[ ] Other

## Additional Comments

Inmate's first attorney interview held using simple English language spoken slowly, clearly and loud to establish and maintain effective communication all through the interview. Inmate's blind, having lost his vision in 2016 after a cataract operation. Inmate was encouraged to ask clarifying questions.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ███ | ███ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███ , ██████ | ████ | ████████████████ |

## Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other        | Initial Hearing Preparation Meeting |

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[X] Braille                             [ ] Regional Center Advocates
[X] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [ ] Wheelchair
[X] Large Print Material                [X] Written Materials
[X] Magnifying Device                   [X] Other
[ ] Materials on Videotape

| Cane = tapping cane |

### Additional Comments

Vision - legally blind (due to Usher Syndrome) - vest - Braille
Hearing disability (due to Usher Syndrome) - no background noise - only one person
can speak at a time - waiting to get his hearing aids back - single cell (due to
background noise issue)
Mobility - due to Usher Syndrome - vertigo - bone spurs in back
NCF - TABE 5.8 - has H.S. Diploma (through Hadley Institute for Blind & Visually
Impaired)

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ███████ | ██████ | ████████████████ |

## Parole Proceeding

[X] Attorney Consult
[ ] Administrative Appeal
[ ] Central File Review
[ ] Clinician Interview
[ ] Document Review
[ ] Other

[ ] Initial Interview-Issue Conditions of Parole
[ ] Notice of Amended Conditions of Parole
[ ] Psychologist Evaluation
[ ] Review of Letter of Support
[ ] Review of Parole Plans

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility
[ ] Accessible Transportation
[X] Assistive Hearing Devices
[X] Attorney
[ ] Audio Taped Materials
[ ] Audiocassettes
[ ] Braille
[X] Cane
[ ] Closed Caption
[ ] Communication Books or Boards
[ ] Computer Aided Transcription Services
[ ] Computer Terminals
[ ] Foreign Language Interpreter
[ ] Highlighter Pens and Markers
[ ] Large Print Material
[ ] Magnifying Device
[ ] Materials on Videotape

[ ] Note Taker
[ ] Open and Closed Captioning
[ ] Phone Handset Amplifiers
[ ] Qualified Readers
[ ] Reading
[ ] Reading Machines
[ ] Regional Center Advocates
[ ] Sign Language Interpreter
[ ] Speech Synthesizers
[ ] Staff Assistance
[ ] TDD Machines
[ ] Tele Typewriters
[ ] Videotext Displays
[ ] Wheelchair
[ ] Written Materials
[X] Other

back brace

## Additional Comments

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▓▓▓ , ▓▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓▓▓▓▓▓▓▓ |

**Parole Proceeding**

[X] Attorney Consult                      [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal                 [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                   [ ] Psychologist Evaluation
[ ] Clinician Interview                   [ ] Review of Letter of Support
[ ] Document Review                       [ ] Review of Parole Plans
[ ] Other

**Accommodation(s) Provided**

[ ] No Accommodation
[ ] Accessibility                         [ ] Note Taker
[ ] Accessible Transportation             [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices             [ ] Phone Handset Amplifiers
[X] Attorney                              [ ] Qualified Readers
[ ] Audio Taped Materials                 [ ] Reading
[ ] Audiocassettes                        [ ] Reading Machines
[ ] Braille                               [ ] Regional Center Advocates
[ ] Cane                                  [ ] Sign Language Interpreter
[ ] Closed Caption                        [ ] Speech Synthesizers
[ ] Communication Books or Boards         [ ] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                    [ ] Tele Typewriters
[ ] Foreign Language Interpreter          [ ] Videotext Displays
[ ] Highlighter Pens and Markers          [ ] Wheelchair
[ ] Large Print Material                  [ ] Written Materials
[ ] Magnifying Device                     [ ] Other
[ ] Materials on Videotape

**Additional Comments**

IM came to the ACI with a cane, he wore his vision vest, and prescription braces

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▓▓▓▓▓▓▓▓ | ▓▓▓▓▓ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ██████ | ██████ | ██████████████████ |

## Parole Proceeding

| | |
|---|---|
| [X] Attorney Consult | [ ] Initial Interview-Issue Conditions of Parole |
| [ ] Administrative Appeal | [ ] Notice of Amended Conditions of Parole |
| [ ] Central File Review | [ ] Psychologist Evaluation |
| [ ] Clinician Interview | [ ] Review of Letter of Support |
| [ ] Document Review | [ ] Review of Parole Plans |
| [ ] Other | |

## Accommodation(s) Provided

| | |
|---|---|
| [ ] No Accommodation | |
| [ ] Accessibility | [ ] Note Taker |
| [ ] Accessible Transportation | [ ] Open and Closed Captioning |
| [ ] Assistive Hearing Devices | [ ] Phone Handset Amplifiers |
| [X] Attorney | [ ] Qualified Readers |
| [ ] Audio Taped Materials | [ ] Reading |
| [ ] Audiocassettes | [ ] Reading Machines |
| [ ] Braille | [ ] Regional Center Advocates |
| [ ] Cane | [ ] Sign Language Interpreter |
| [ ] Closed Caption | [ ] Speech Synthesizers |
| [ ] Communication Books or Boards | [ ] Staff Assistance |
| [ ] Computer Aided Transcription Services | [ ] TDD Machines |
| [ ] Computer Terminals | [ ] Tele Typewriters |
| [ ] Foreign Language Interpreter | [ ] Videotext Displays |
| [ ] Highlighter Pens and Markers | [ ] Wheelchair |
| [ ] Large Print Material | [ ] Written Materials |
| [ ] Magnifying Device | [ ] Other |
| [ ] Materials on Videotape | |

## Additional Comments

IM did not bring his cane to the ACI; however, he wore his vision/mobility vest. IM wore his knee brace. IM did not bring his prescription glasses to the ACI. He said he did not need it.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▮ , ▮ | ▮ | ▮ |

**Parole Proceeding**

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other _____
- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

**Accommodation(s) Provided**

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape
- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other _____

**Additional Comments**

IM came to the ACI with his cane and he wore vision vest. IM did not bring his prescription glasses. He said he did not need it.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▮ | ▮ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**　　　　　　　　**STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ██████ | ██████ | ██████ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

Additional Hearing Preparation Meeting

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [X] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [X] Other

Tapping cane. Vision impaired vest.

## Additional Comments

Video. EOP. Per email from the ADA Unit, audio CD of CRA and last panel's decision were mailed on 1/19/22 but he has not received them as of this date. I read key portions of these and other documents at prior meetings but that was not adequate for his preparation. He is completely blind and EOP needs all important documents transcribed and presented to him in a timely manner. A postponement has been requested based on untimeliness of documents.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████ | ██████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**  **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████, ███████ | ████ | ████████████████ |

## Parole Proceeding

[X] Attorney Consult  
[ ] Administrative Appeal  
[ ] Central File Review  
[ ] Clinician Interview  
[ ] Document Review  
[ ] Other  

[ ] Initial Interview-Issue Conditions of Parole  
[ ] Notice of Amended Conditions of Parole  
[ ] Psychologist Evaluation  
[ ] Review of Letter of Support  
[ ] Review of Parole Plans  

## Accommodation(s) Provided

[ ] No Accommodation  
[ ] Accessibility  
[ ] Accessible Transportation  
[ ] Assistive Hearing Devices  
[X] Attorney  
[ ] Audio Taped Materials  
[ ] Audiocassettes  
[ ] Braille  
[X] Cane  
[ ] Closed Caption  
[ ] Communication Books or Boards  
[ ] Computer Aided Transcription Services  
[ ] Computer Terminals  
[ ] Foreign Language Interpreter  
[ ] Highlighter Pens and Markers  
[ ] Large Print Material  
[X] Magnifying Device  
[ ] Materials on Videotape  

[ ] Note Taker  
[ ] Open and Closed Captioning  
[ ] Phone Handset Amplifiers  
[ ] Qualified Readers  
[ ] Reading  
[ ] Reading Machines  
[ ] Regional Center Advocates  
[ ] Sign Language Interpreter  
[ ] Speech Synthesizers  
[ ] Staff Assistance  
[ ] TDD Machines  
[ ] Tele Typewriters  
[ ] Videotext Displays  
[ ] Wheelchair  
[ ] Written Materials  
[X] Other  

vision vest/shoe orthotic/Bilateral

### Additional Comments

9.0 TABE confirmed. EOP status confirmed. IM indicated he needs additional time to process and comprehend questions asked of him.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**　　　　　　　　　**STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

blindness/spk loud&clear

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████, ████ | ████ | ████ |

**Parole Proceeding**

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

**Accommodation(s) Provided**

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [ ] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

**Additional Comments**

Tapping cane (blind), vision vest, help with reading and understanding

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ███████ | █████ | ████████████████ |

**Parole Proceeding**

[X] Attorney Consult                          [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal                      [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                        [ ] Psychologist Evaluation
[ ] Clinician Interview                        [ ] Review of Letter of Support
[ ] Document Review                            [ ] Review of Parole Plans
[ ] Other

**Accommodation(s) Provided**

[ ] No Accommodation
[ ] Accessibility                              [ ] Note Taker
[ ] Accessible Transportation                  [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices                  [ ] Phone Handset Amplifiers
[ ] Attorney                                   [ ] Qualified Readers
[ ] Audio Taped Materials                      [ ] Reading
[ ] Audiocassettes                             [ ] Reading Machines
[ ] Braille                                    [ ] Regional Center Advocates
[X] Cane                                       [ ] Sign Language Interpreter
[ ] Closed Caption                             [ ] Speech Synthesizers
[ ] Communication Books or Boards              [ ] Staff Assistance
[ ] Computer Aided Transcription Services      [ ] TDD Machines
[ ] Computer Terminals                         [ ] Tele Typewriters
[ ] Foreign Language Interpreter               [ ] Videotext Displays
[ ] Highlighter Pens and Markers               [ ] Wheelchair
[ ] Large Print Material                       [ ] Written Materials
[ ] Magnifying Device                          [X] Other
[ ] Materials on Videotape

vest/foot orthotic/speak loud & clear

**Additional Comments**

EOP and 9.0 TABE confirmed. Bilateral blindness.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

## Parole Proceeding

[X] Attorney Consult
[ ] Administrative Appeal
[ ] Central File Review
[ ] Clinician Interview
[ ] Document Review
[ ] Other

[ ] Initial Interview-Issue Conditions of Parole
[ ] Notice of Amended Conditions of Parole
[ ] Psychologist Evaluation
[ ] Review of Letter of Support
[ ] Review of Parole Plans

Initial Hearing Preparation Meeting

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility
[ ] Accessible Transportation
[ ] Assistive Hearing Devices
[X] Attorney
[ ] Audio Taped Materials
[ ] Audiocassettes
[ ] Braille
[X] Cane
[ ] Closed Caption
[ ] Communication Books or Boards
[ ] Computer Aided Transcription Services
[ ] Computer Terminals
[ ] Foreign Language Interpreter
[ ] Highlighter Pens and Markers
[ ] Large Print Material
[ ] Magnifying Device
[ ] Materials on Videotape

[ ] Note Taker
[ ] Open and Closed Captioning
[ ] Phone Handset Amplifiers
[ ] Qualified Readers
[ ] Reading
[ ] Reading Machines
[ ] Regional Center Advocates
[ ] Sign Language Interpreter
[ ] Speech Synthesizers
[ ] Staff Assistance
[ ] TDD Machines
[ ] Tele Typewriters
[ ] Videotext Displays
[ ] Wheelchair
[ ] Written Materials
[X] Other

Tapping cane. Vision impaired vest.

### Additional Comments

**Video. EOP. Spoke in clear, simple language, redirected to important concepts on occasion.**

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ███████ | ██████ | ████████████████████ |

## Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other

Additional Hearing Preparation Meeting

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[X] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services  [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [ ] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[ ] Magnifying Device                   [X] Other
[ ] Materials on Videotape

Tapping cane. Vision impaired vest.

## Additional Comments

In-person. EOP. Spoke in clear, simple language, redirected to important concepts on
occasion. Blind. Important docs need to be transcribed to audio and/or braille.
Request in process.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**　　　　　　　　**STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ███████ | ███████ | ███████████████ |

## Parole Proceeding

[X] Attorney Consult　　　　　　　　[ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal　　　　　　[ ] Notice of Amended Conditions of Parole
[ ] Central File Review　　　　　　　[ ] Psychologist Evaluation
[ ] Clinician Interview　　　　　　　[ ] Review of Letter of Support
[ ] Document Review　　　　　　　　　[ ] Review of Parole Plans
[ ] Other　　PRE-INITIAL HEARING PREPARATION   INTERVIEW DECS REVIEW

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility　　　　　　　　　　　　　　　[ ] Note Taker
[ ] Accessible Transportation　　　　　　[ ] Open and Closed Captioning
[X] Assistive Hearing Devices　　　　　　[ ] Phone Handset Amplifiers
[X] Attorney　　　　　　　　　　　　　　　　[ ] Qualified Readers
[ ] Audio Taped Materials　　　　　　　　[ ] Reading
[ ] Audiocassettes　　　　　　　　　　　　[ ] Reading Machines
[ ] Braille　　　　　　　　　　　　　　　　[ ] Regional Center Advocates
[X] Cane　　　　　　　　　　　　　　　　　[ ] Sign Language Interpreter
[ ] Closed Caption　　　　　　　　　　　　[ ] Speech Synthesizers
[ ] Communication Books or Boards　　　[ ] Staff Assistance
[ ] Computer Aided Transcription Services　[ ] TDD Machines
[ ] Computer Terminals　　　　　　　　　[ ] Tele Typewriters
[ ] Foreign Language Interpreter　　　　[ ] Videotext Displays
[ ] Highlighter Pens and Markers　　　　[ ] Wheelchair
[ ] Large Print Material　　　　　　　　　[ ] Written Materials
[X] Magnifying Device　　　　　　　　　　[X] Other
[ ] Materials on Videotape　　　　　　　SEE BELOW

## Additional Comments

PRE-INITIAL INTERVIEW DECS REVIEW:  REVIEWED 1073.  INDICATES CLIENT IS CCCMS READING LEVEL/GPL AT A N/A. CLIENT IS EOP. INDICATES CLIENT HAS MOBILITY ISSUE. GLASSES/MAG. CLIENT UTILIZES CONTACT LENSES. A HEARING AID. READING GLASSES, SUNSHIELD GLASSES,  HEARING AND VISION VEST AND A TAPPING CANE, COULD UTILIZE STAFF ASSISTANCE. CLIENT REQUESTED THE USE OF FEMININE PRONOUNS AND TO BE ADDRESSED THAT WAY.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

attorney client interview

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [X] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [X] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [X] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

## Additional Comments

PRE-INITIAL INTERVIEW DECS REVIEW: REVIEWED 1073. INDICATES CLIENT IS CCCMS READING LEVEL/GPL AT A N/A. CLIENT IS EOP. INDICATES CLIENT HAS MOBILITY ISSUE. GLASSES/MAG. CLIENT UTILIZES CONTACT LENSES. A HEARING AID. READING GLASSES, SUNSHIELD GLASSES, HEARING AND VISION VEST AND A TAPPING CANE, COULD UTILIZE STAFF ASSISTANCE. CLIENT REQUESTED THE USE OF FEMININE PRONOUNS AND TO BE ADDRESSED THAT WAY.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

## Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other          attorney client interview

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[X] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services  [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [ ] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[X] Magnifying Device                   [X] Other
[ ] Materials on Videotape              see notes

## Additional Comments

DECS from 7/28/23: Client has severe vision issues entire life.  Client is EOP with meds.  Client has tapping cane, vision and hearing vest.  Vision issues congenital, cataracts, glaucoma, amblyopia, aphakia, vision issues her entire life.  She/her pronouns.  Legally blind.  Lenses have been taken out, has implant in one eye.  Cannot read fingers.  Uses a reading machine.  Hearing aids in both eyes.  Assisted hearing devices.  Intellectual disabilities - needs extra time and clarification.  Atty

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ███████ | ██████ | ████████████████████ |

## Parole Proceeding

☒ Attorney Consult                              ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal                      ☐ Notice of Amended Conditions of Parole
☐ Central File Review                           ☐ Psychologist Evaluation
☐ Clinician Interview                            ☐ Review of Letter of Support
☐ Document Review                             ☐ Review of Parole Plans
☐ Other          attorney client interview

## Accommodation(s) Provided

☐ No Accommodation
☐ Accessibility                                         ☐ Note Taker
☐ Accessible Transportation                  ☐ Open and Closed Captioning
☒ Assistive Hearing Devices                  ☒ Phone Handset Amplifiers
☒ Attorney                                              ☐ Qualified Readers
☐ Audio Taped Materials                        ☐ Reading
☐ Audiocassettes                                   ☐ Reading Machines
☐ Braille                                                  ☐ Regional Center Advocates
☒ Cane                                                    ☐ Sign Language Interpreter
☐ Closed Caption                                   ☐ Speech Synthesizers
☐ Communication Books or Boards         ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                           ☐ Tele Typewriters
☐ Foreign Language Interpreter              ☐ Videotext Displays
☐ Highlighter Pens and Markers              ☐ Wheelchair
☐ Large Print Material                            ☐ Written Materials
☒ Magnifying Device                              ☒ Other
☐ Materials on Videotape

see notes

## Additional Comments

DECS 8/7/23: Spoke with client for 2.00 hours. No issues walking, but utilizes a tapping cane. EOP with meds. Vision issues entire life, cataracts, glaucoma, aphakia, amblylopia. Eye lenses have been taken out, implant in one eye. Legally blind. Cannot read fingers. Uses a reading machine. Utilizes hearing aids in both ears. Attorney. Reading machine. Intellectual disabilities. Learning issues. Needs more time when answering questions.  Clarification needed often.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ███████ | ██████ | ████████████████████ |

## Parole Proceeding

☒ Attorney Consult           ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal       ☐ Notice of Amended Conditions of Parole
☐ Central File Review         ☐ Psychologist Evaluation
☐ Clinician Interview         ☐ Review of Letter of Support
☐ Document Review             ☐ Review of Parole Plans
☐ Other     | attorney client interview |

## Accommodation(s) Provided

☐ No Accommodation
☐ Accessibility                              ☐ Note Taker
☐ Accessible Transportation                  ☐ Open and Closed Captioning
☒ Assistive Hearing Devices                  ☐ Phone Handset Amplifiers
☒ Attorney                                   ☐ Qualified Readers
☐ Audio Taped Materials                      ☐ Reading
☐ Audiocassettes                             ☐ Reading Machines
☐ Braille                                    ☐ Regional Center Advocates
☒ Cane                                       ☐ Sign Language Interpreter
☐ Closed Caption                             ☐ Speech Synthesizers
☐ Communication Books or Boards              ☐ Staff Assistance
☐ Computer Aided Transcription Services      ☐ TDD Machines
☐ Computer Terminals                         ☐ Tele Typewriters
☐ Foreign Language Interpreter               ☐ Videotext Displays
☐ Highlighter Pens and Markers               ☐ Wheelchair
☐ Large Print Material                       ☐ Written Materials
☒ Magnifying Device                          ☒ Other
☐ Materials on Videotape                     | SEE NOTES |

## Additional Comments

States organic learning disability. Utilizes a tapping cane, states no issues walking. EOP with meds. Vision issues entire life, cataracts, glaucoma,aphakia, amblylopia. Eye lenses removed, implant in one eye. Legally blind. Cannot read fingers. Uses a reading machine for audio. Utilizes hearing aids in both ears. Attorney. Intellectual disabilities. Learning issues. Needs more time when answering questions. Clarification needed often. Staff Assistant needed at hearing. ADA unit notified.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████████████████ |

## Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other _____

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[ ] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [X] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [X] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[X] Magnifying Device                   [X] Other
[ ] Materials on Videotape              medication as needed, mobility vest,

## Additional Comments



| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**          **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

walker, orthotics,

DEPARTMENT OF CORRECTIONS AND REHABILITATION                          STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

**Parole Proceeding**

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other

#1:   PRE-INITIAL HEARING PREPARATION  INTERVIEW DECS REVIEW

**Accommodation(s) Provided**

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[ ] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [X] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[ ] Magnifying Device                   [ ] Other
[ ] Materials on Videotape

**Additional Comments**

PRE-INITIAL INTERVIEW DECS REVIEW:  REVIEWED 1073. READING LEVEL/GPL AT A 6.8.
NEEDS HELP READING AND UNDERSTANDING.  MAY UTILIZE STAFF ASSISTANT. Client requires
Wheelchair and assisted visual devise

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**　　　　　**STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ████████ | ████████ | ████████████████████████████ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

#2:  INITIAL HEARING PREPARATION   INTERVIEW DECS

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [X] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [X] Wheelchair
- [ ] Written Materials
- [ ] Other

## Additional Comments

CLIENT IS BLIND IN LEFT EYE. RIGHT EYE IS BLURRY. DUE TO CATRACT SURGERY.  GOT VALLEY FEVER WHILE INCARCERATED IN ██████████████ .  HAS HAD PRIOR SPLEEN OPERATION (REMOVAL) HAS ASTHMA AND PNEUMONIA IN LUNGS.  USES A WALKER.  IS ON PAIN MEDS FOR EYE CONDITION.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████████████████ |

## Parole Proceeding

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [ ] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[X] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [ ] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [ ] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[X] Magnifying Device                   [X] Other
[ ] Materials on Videotape

walker, medication as needed, inhaler

### Additional Comments

Inmate, due to botched surgery, is blind in left eye, losing vision in right eye, he cannot sit or stand for extended periods of time

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

**Parole Proceeding**

[X] Attorney Consult                    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal               [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                 [ ] Psychologist Evaluation
[ ] Clinician Interview                 [ ] Review of Letter of Support
[ ] Document Review                     [ ] Review of Parole Plans
[ ] Other _____

**Accommodation(s) Provided**

[ ] No Accommodation
[ ] Accessibility                       [ ] Note Taker
[ ] Accessible Transportation           [ ] Open and Closed Captioning
[X] Assistive Hearing Devices           [ ] Phone Handset Amplifiers
[X] Attorney                            [X] Qualified Readers
[ ] Audio Taped Materials               [ ] Reading
[ ] Audiocassettes                      [ ] Reading Machines
[ ] Braille                             [ ] Regional Center Advocates
[ ] Cane                                [ ] Sign Language Interpreter
[ ] Closed Caption                      [ ] Speech Synthesizers
[ ] Communication Books or Boards       [X] Staff Assistance
[ ] Computer Aided Transcription Services [ ] TDD Machines
[ ] Computer Terminals                  [ ] Tele Typewriters
[ ] Foreign Language Interpreter        [ ] Videotext Displays
[ ] Highlighter Pens and Markers        [X] Wheelchair
[ ] Large Print Material                [ ] Written Materials
[ ] Magnifying Device                   [X] Other
[ ] Materials on Videotape              medication as needed, mobility vest,

**Additional Comments**

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                                **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

walker,

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████ , ████ | ████ | ████ |

## Parole Proceeding

☒ Attorney Consult                   ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal              ☐ Notice of Amended Conditions of Parole
☐ Central File Review                ☐ Psychologist Evaluation
☐ Clinician Interview                ☐ Review of Letter of Support
☐ Document Review                    ☐ Review of Parole Plans
☐ Other

## Accommodation(s) Provided

☐ No Accommodation
☐ Accessibility                      ☐ Note Taker
☐ Accessible Transportation          ☐ Open and Closed Captioning
☐ Assistive Hearing Devices          ☐ Phone Handset Amplifiers
☐ Attorney                           ☐ Qualified Readers
☐ Audio Taped Materials              ☐ Reading
☐ Audiocassettes                     ☐ Reading Machines
☐ Braille                            ☐ Regional Center Advocates
☐ Cane                               ☐ Sign Language Interpreter
☐ Closed Caption                     ☐ Speech Synthesizers
☐ Communication Books or Boards      ☐ Staff Assistance
☐ Computer Aided Transcription Services  ☐ TDD Machines
☐ Computer Terminals                 ☐ Tele Typewriters
☐ Foreign Language Interpreter       ☐ Videotext Displays
☐ Highlighter Pens and Markers       ☒ Wheelchair
☐ Large Print Material               ☐ Written Materials
☒ Magnifying Device                  ☒ Other
☐ Materials on Videotape             Dentures

## Additional Comments

GPL 6.8, IM needs glasses

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████ | ████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ , ████ | ██████ | ██████████████████ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [X] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [X] Other

Glasses,vision vest

## Additional Comments

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ██████ | ██████ | ██████████████████ |

## Parole Proceeding

[X] Attorney Consult
[ ] Administrative Appeal
[ ] Central File Review
[ ] Clinician Interview
[ ] Document Review
[ ] Other

[ ] Initial Interview-Issue Conditions of Parole
[ ] Notice of Amended Conditions of Parole
[ ] Psychologist Evaluation
[ ] Review of Letter of Support
[ ] Review of Parole Plans

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility
[ ] Accessible Transportation
[ ] Assistive Hearing Devices
[ ] Attorney
[ ] Audio Taped Materials
[ ] Audiocassettes
[ ] Braille
[X] Cane
[ ] Closed Caption
[ ] Communication Books or Boards
[ ] Computer Aided Transcription Services
[ ] Computer Terminals
[ ] Foreign Language Interpreter
[ ] Highlighter Pens and Markers
[ ] Large Print Material
[ ] Magnifying Device
[ ] Materials on Videotape

[ ] Note Taker
[ ] Open and Closed Captioning
[ ] Phone Handset Amplifiers
[ ] Qualified Readers
[ ] Reading
[ ] Reading Machines
[ ] Regional Center Advocates
[ ] Sign Language Interpreter
[ ] Speech Synthesizers
[ ] Staff Assistance
[ ] TDD Machines
[ ] Tele Typewriters
[ ] Videotext Displays
[ ] Wheelchair
[ ] Written Materials
[X] Other

Glasses,vision vest,magnifier

## Additional Comments

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**  **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▮▮▮▮▮ , ▮▮▮ | ▮▮▮ | ▮▮▮▮▮▮▮▮ |

**Parole Proceeding**

[X] Attorney Consult    [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal    [ ] Notice of Amended Conditions of Parole
[ ] Central File Review    [ ] Psychologist Evaluation
[ ] Clinician Interview    [ ] Review of Letter of Support
[ ] Document Review    [ ] Review of Parole Plans
[ ] Other

Initial Hearing Preparation Meeting

**Accommodation(s) Provided**

[ ] No Accommodation
[ ] Accessibility    [ ] Note Taker
[ ] Accessible Transportation    [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices    [ ] Phone Handset Amplifiers
[X] Attorney    [ ] Qualified Readers
[ ] Audio Taped Materials    [ ] Reading
[ ] Audiocassettes    [ ] Reading Machines
[ ] Braille    [ ] Regional Center Advocates
[ ] Cane    [ ] Sign Language Interpreter
[ ] Closed Caption    [ ] Speech Synthesizers
[ ] Communication Books or Boards    [ ] Staff Assistance
[ ] Computer Aided Transcription Services    [ ] TDD Machines
[ ] Computer Terminals    [ ] Tele Typewriters
[ ] Foreign Language Interpreter    [ ] Videotext Displays
[ ] Highlighter Pens and Markers    [ ] Wheelchair
[ ] Large Print Material    [X] Written Materials
[ ] Magnifying Device    [ ] Other
[ ] Materials on Videotape

**Additional Comments**

Vision - blind since 2017 - tapping cane - vest
Medical - prostate issues
NDD - TABE 3.9

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▮▮▮▮▮ | ▮▮▮ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ██████ | ██████ | ███████████████████ |

## Parole Proceeding

[X] Attorney Consult                        [ ] Initial Interview-Issue Conditions of Parole
[ ] Administrative Appeal                    [ ] Notice of Amended Conditions of Parole
[ ] Central File Review                      [ ] Psychologist Evaluation
[ ] Clinician Interview                      [ ] Review of Letter of Support
[ ] Document Review                          [ ] Review of Parole Plans
[ ] Other _____

## Accommodation(s) Provided

[ ] No Accommodation
[ ] Accessibility                            [ ] Note Taker
[ ] Accessible Transportation                [ ] Open and Closed Captioning
[ ] Assistive Hearing Devices                [ ] Phone Handset Amplifiers
[ ] Attorney                                 [ ] Qualified Readers
[ ] Audio Taped Materials                    [ ] Reading
[ ] Audiocassettes                           [ ] Reading Machines
[ ] Braille                                  [ ] Regional Center Advocates
[ ] Cane                                     [ ] Sign Language Interpreter
[ ] Closed Caption                           [ ] Speech Synthesizers
[ ] Communication Books or Boards            [ ] Staff Assistance
[ ] Computer Aided Transcription Services    [ ] TDD Machines
[ ] Computer Terminals                       [ ] Tele Typewriters
[ ] Foreign Language Interpreter             [ ] Videotext Displays
[ ] Highlighter Pens and Markers             [ ] Wheelchair
[ ] Large Print Material                     [ ] Written Materials
[ ] Magnifying Device                        [ ] Other
[ ] Materials on Videotape                   _____

## Additional Comments

██████ is blind in his right eye and only has about 3% vision in left eye. I did not have to provide any accommodation for his visual impairment during our interview, but it seemed as if ██████ might have a slight hearing impairment although he said he thought his hearing was fine.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ , ██████ | ████ | ████████████████ |

## Parole Proceeding

- [X] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [ ] Other
- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

Subsequent Hearing Preparation Meeting

## Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [X] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [X] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape
- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

## Additional Comments

Vision disability - blind - tapping - escorted to the meeting room via inmate ADA accommodation - inmate ADA accommodation assisted us with the meeting to help ██████ prepare exhibits for his hearing

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | ████████ |

# EXHIBIT 15



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

June 16, 2023

VIA ELECTRONIC MAIL ONLY

<div style="border:1px solid black; display:inline-block;">

**PRIVILEGED AND CONFIDENTIAL**

**SUBJECT TO PRIVILEGED ORDERS**
</div>

| | |
|---|---|
| Jessica Blonien | Heather McCray |
| Chief Counsel | Assistant Chief Counsel |
| Board of Parole Hearings | Board of Parole Hearings |
| jessica.blonien@cdcr.ca.gov | heather.mccray@cdcr.ca.gov |

Re:    *Armstrong v. Newsom*: Document Requests
       Our File No. 0581-04

Dear Ms. Blonien and Ms. McCray:

Thank you for responding to our April 13, 2023 letter regarding accommodations for deaf, blind and low-vision class members in preparing for and participating in parole proceedings.

In light of the representations made in your letter we request the following documents and information no later than July 1, 2023:

1.    All documents reflecting the production of audio materials to ███████ ██████, ██████.

2.    All "Special Accommodation" source documents created since January 1, 2022 (you produced two in response to our April letter, we would like any additional documents that have been created).

3.    All documents reflecting the procedures the Board has in place to provide documents in audio format, large-print format and Braille.

4.    The 2023 Panel Attorney Guide.

[4311211.1]

**PRIVILEGED AND CONFIDENTIAL**

Jessica Blonien
June 16, 2023
Page 2

      In addition, we understand that individuals who use foreign language interpreters for their parole suitability hearings may receive an audio recording of the hearing.  Please produce any policies or directives reflecting this practice.

      We appreciate your producing these documents within two weeks of today.

             Sincerely,

             ROSEN BIEN
             GALVAN & GRUNFELD LLP

             */s/ Caroline E. Jackson*

      By:  Caroline E. Jackson

CEJ:cg

[4311211.1]

# EXHIBIT 16

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



June 30, 2023

Caroline Jackson
101 Mission Street 6th Floor
San Francisco,CA 94105-1738

Dear Ms. Jackson:

This is in response to your letter dated June 16, 2023, to the Board of Parole Hearings. In your letter, you requested the board to produce the following five items: (1) all documents reflecting production of audio materials of ▮▮▮▮▮▮▮▮ (▮▮▮▮▮); (2) all "special accommodation" source documents created since January 1, 2022; (3) all documents reflecting the Board's procedures to provide documents in audio, large-print, or braille format; (4) the 2023 panel attorney guide; and (5) any policies or directives demonstrating that an individual who uses a foreign language interpreter for their hearing may receive an audio recording of the hearing.

In response to the first request, attached please find both the special accommodation source document for ▮▮▮▮▮ (▮▮▮▮) capturing ▮▮▮▮▮▮ special accommodation needs, as well as the September 14, 2022 email from CMF to BPH confirming receipt of the audio materials for ▮▮▮▮.

In response to the second request, please find 16 special accommodation source documents created since January 1, 2022. These document special accommodation requirements for the following 14 individuals: ▮▮▮▮ (▮▮▮), ▮▮▮ (▮▮▮▮), ▮▮ (▮▮▮), ▮▮▮▮ (▮▮▮), ▮▮▮ (▮▮▮▮), ▮▮▮ (▮▮▮), ▮▮ (▮▮▮), ▮▮ (▮▮▮), ▮ (▮▮▮), ▮▮ (▮▮▮), ▮▮ (▮▮▮), ▮▮ (▮▮▮), ▮ (▮▮▮), and ▮▮ (▮▮▮).

In response to the third request, when the Board identifies an individual's need to review board documents in an alternative format, the Board's procedure is to take the following steps: (1) the board's ADA Compliance Unit will capture that information in a special accommodation source document that is retained and available in that individual's record; (2) if the Board is capable of creating and submitting the document in the necessary alternative format, such as creating a large print or special font document, submitting an audio CD of a hearing, or recording and submitting an audio format of the CRA, board staff will produce the alternative format document and submit it to the institution where the individual is housed; (3) if the board is not capable of producing the document in the necessary alternative format, the board follows the CDCR Direct Pay Procedures to retain a contracted provider for the purpose of creating the alternative format document, then will provide the completed document to the institution where the individual is housed. Attached please find a copy of CDCR's Direct Pay Procedures that the Board uses when retaining contracted providers.

In response to the fourth request, as explained in my email to you dated July 20, 2023, the 2023 guide is presently undergoing finalization. Additionally, as stated in my subsequent email on July 22, 2023, the current panel attorney fee rate is $900 per case; however, the Board requested in the budget on-going funding for future fiscal years for the rate to be $945 per case. I have been informed that this request was approved. Therefore, the Board is currently in the process of updating the 2023 Panel Attorney Program Guide to incorporate this change as well as some additional clarifications. It is currently expected to publish in July. If you have any suggestions for additions or clarifications you would like to see in the 2023 Guide, please provide them to BPHADALegalTeam@cdcr.ca.gov by no later than Friday, July 7, 2023, so that we can consider them prior to finalizing the 2023 Guide. We will then

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



provide you a copy of that guide once it is published.

In response to the fifth request, the Board does not automatically provide an audio recording of the hearing to any individual who uses a foreign language interpreter during the hearing. However, any such individual may request a copy of the audio recording under the Public Records Act. Upon receipt of such a request, the board would follow the procedure outlined above in response to the third request. Please note that, while there are times that a foreign language interpreter can be heard on the audio recording, this is not always the case. We do not endeavor to record the foreign language translator, instead the audio recording is recorded so we can prepare a transcript of the English used at the hearing, as required by Penal Code section 3042, subdivision (b).

Sincerely

HEATHER L. MCCRAY
Assistant Chief Counsel

Enclosures:
(1) September 14, 2022 email confirmation of CMF receiving audio format materials for ▮▮▮▮▮▮ (▮▮▮▮▮▮)
(2) 16 special accommodation source documents for the 14 listed individuals
(3) CDCR Direct Pay Procedures rev. Sept 2021

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ ███████ | ███████ | ████████████████████ |

## Parole Proceeding

- ☐ Attorney Consult
- ☐ Administrative Appeal
- ☐ Central File Review
- ☐ Clinician Interview
- ☐ Document Review
- ☒ Other  SPECIAL ACCOMMODATIONS NEEDED – SEE COMMENTS

- ☐ Initial Interview-Issue Conditions of Parole
- ☐ Notice of Amended Conditions of Parole
- ☐ Psychologist Evaluation
- ☐ Review of Letter of Support
- ☐ Review of Parole Plans

## Accommodation(s) Provided

- ☐ No Accommodation
- ☐ Accessibility
- ☐ Accessible Transportation
- ☐ Assistive Hearing Devices
- ☐ Attorney
- ☐ Audio Taped Materials
- ☐ Audiocassettes
- ☐ Braille
- ☐ Cane
- ☐ Closed Caption
- ☐ Communication Books or Boards
- ☒ Computer Aided Transcription Services
- ☐ Computer Terminals
- ☐ Foreign Language Interpreter
- ☐ Highlighter Pens and Markers
- ☐ Large Print Material
- ☐ Magnifying Device
- ☐ Materials on Videotape

- ☐ Note Taker
- ☐ Open and Closed Captioning
- ☐ Phone Handset Amplifiers
- ☐ Qualified Readers
- ☐ Reading
- ☐ Reading Machines
- ☐ Regional Center Advocates
- ☐ Sign Language Interpreter
- ☐ Speech Synthesizers
- ☐ Staff Assistance
- ☐ TDD Machines
- ☐ Tele Typewriters
- ☐ Videotext Displays
- ☐ Wheelchair
- ☐ Written Materials
- ☐ Other

## Additional Comments

███████ is hard of hearing. ███████ is assigned hearing aids but reports they do not work for him. Other assistive listening devices, such as a pocket talker, do not work. ███████ normally communicates by reading written notes and verbally responding. Effective communication can be achieved by providing closed captioning.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ███████████ | ███████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▬ | ▬ | |

**Parole Proceeding**

☐ Attorney Consult            ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal       ☐ Notice of Amended Conditions of Parole
☐ Central File Review         ☐ Psychologist Evaluation
☐ Clinician Interview         ☐ Review of Letter of Support
☐ Document Review             ☐ Review of Parole Plans
☒ Other        | SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DPV |

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                          ☐ Note Taker
☐ Accessible Transportation             ☐ Open and Closed Captioning
☐ Assistive Hearing Devices             ☐ Phone Handset Amplifiers
☐ Attorney                              ☐ Qualified Readers
☐ Audio Taped Materials                 ☐ Reading
☐ Audiocassettes                        ☐ Reading Machines
☐ Braille                               ☐ Regional Center Advocates
☐ Cane                                  ☐ Sign Language Interpreter
☐ Closed Caption                        ☐ Speech Synthesizers
☐ Communication Books or Boards         ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                    ☐ Tele Typewriters
☐ Foreign Language Interpreter          ☐ Videotext Displays
☐ Highlighter Pens and Markers          ☐ Wheelchair
☒ Large Print Material                  ☐ Written Materials
☐ Magnifying Device                     ☐ Other
☐ Materials on Videotape

**Additional Comments**

**LARGE PRINT SIZE 24 FONT REQUIRED**

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▬ | ▬ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███ ███ | ███ | ███ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other     SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DNV

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☒ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☐ Other
☐ Materials on Videotape

**Additional Comments**

LARGE PRINT SIZE 22 FONT REQUIRED

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ███ | ███ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ ████████ | █████ | ████████████████████ |

## Parole Proceeding

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other

SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT-DPV

## Accommodation(s) Provided

☐ No Accommodation
☐ Accessibility                          ☐ Note Taker
☐ Accessible Transportation             ☐ Open and Closed Captioning
☐ Assistive Hearing Devices             ☐ Phone Handset Amplifiers
☐ Attorney                              ☐ Qualified Readers
☐ Audio Taped Materials                 ☐ Reading
☐ Audiocassettes                        ☐ Reading Machines
☐ Braille                               ☐ Regional Center Advocates
☐ Cane                                  ☐ Sign Language Interpreter
☐ Closed Caption                        ☐ Speech Synthesizers
☐ Communication Books or Boards         ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                    ☐ Tele Typewriters
☐ Foreign Language Interpreter          ☐ Videotext Displays
☐ Highlighter Pens and Markers          ☐ Wheelchair
☐ Large Print Material                  ☐ Written Materials
☐ Magnifying Device                     ☒ Other
☐ Materials on Videotape

AUDIO RECORDING REQUIRED

## Additional Comments

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████████ | █████████ |

**DEPARTMENT OF CORRECTIONS AND REHABILITATION**     **STATE OF CALIFORNIA**
**PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED**

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████ | ██ | ██████ |

### Parole Proceeding

- [ ] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [x] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

SPECIAL ACCOMMODATION DUE TO VISION DISABILITY; DPV

### Accommodation(s) Provided

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [ ] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [x] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

### Additional Comments

LARGE PRINT SIZE 18 FONT REQUIRED

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████ | ██████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ ████ | ██████ | ████████████████████ |

**Parole Proceeding**

- [ ] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [x] Other

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DPV

**Accommodation(s) Provided**

- [ ] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [ ] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [x] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

**Additional Comments**

LARGE PRINT SIZE 30 FONT REQUIRED

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████████ | ██████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███ ████ | ███ | ████████████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other         SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DPV

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☐ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☒ Other
☐ Materials on Videotape
                                      AUDIO RECORDING REQUIRED

**Additional Comments**

| | |
|---|---|
| **Parole Proceeding Conducted By** | **Date of Parole Proceeding** |
| ████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████████ | ██████ | ████████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other          SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DPV

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☒ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☐ Other
☐ Materials on Videotape

**Additional Comments**

LARGE PRINT SIZE 18 ARIAL FONT REQUIRED

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ██████████ | ███ | ████████████ |

**Parole Proceeding**

☐ Attorney Consult                      ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal                 ☐ Notice of Amended Conditions of Parole
☐ Central File Review                   ☐ Psychologist Evaluation
☐ Clinician Interview                   ☐ Review of Letter of Support
☐ Document Review                       ☐ Review of Parole Plans
☒ Other      SPECIAL ACCOMMODATION DUE TO VISION IMPAIRMENT; DPV

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                         ☐ Note Taker
☐ Accessible Transportation             ☐ Open and Closed Captioning
☐ Assistive Hearing Devices             ☐ Phone Handset Amplifiers
☐ Attorney                              ☐ Qualified Readers
☐ Audio Taped Materials                 ☐ Reading
☐ Audiocassettes                        ☐ Reading Machines
☐ Braille                               ☐ Regional Center Advocates
☐ Cane                                  ☐ Sign Language Interpreter
☐ Closed Caption                        ☐ Speech Synthesizers
☐ Communication Books or Boards         ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                    ☐ Tele Typewriters
☐ Foreign Language Interpreter          ☐ Videotext Displays
☐ Highlighter Pens and Markers          ☐ Wheelchair
☒ Large Print Material                  ☐ Written Materials
☐ Magnifying Device                     ☐ Other
☐ Materials on Videotape

**Additional Comments**

LARGE PRINT SIZE 14 FONT REQUIRED

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████ | ██████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████████ | ██████ | ███████████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other          ***DPV – REQUIRES AUDIO RECORDING***

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                            ☐ Note Taker
☐ Accessible Transportation                ☐ Open and Closed Captioning
☐ Assistive Hearing Devices                ☐ Phone Handset Amplifiers
☐ Attorney                                 ☐ Qualified Readers
☐ Audio Taped Materials                    ☐ Reading
☐ Audiocassettes                           ☐ Reading Machines
☐ Braille                                  ☐ Regional Center Advocates
☐ Cane                                     ☐ Sign Language Interpreter
☐ Closed Caption                           ☐ Speech Synthesizers
☐ Communication Books or Boards            ☐ Staff Assistance
☐ Computer Aided Transcription Services    ☐ TDD Machines
☐ Computer Terminals                       ☐ Tele Typewriters
☐ Foreign Language Interpreter             ☐ Videotext Displays
☐ Highlighter Pens and Markers             ☐ Wheelchair
☐ Large Print Material                     ☐ Written Materials
☐ Magnifying Device                        ☒ Other
☐ Materials on Videotape

***DPV – REQUIRES AUDIO RECORDING***

**Additional Comments**

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ███████████ | ███████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ | ███ | ████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other        \*\*REQUIRES REAL TIME CAPTIONING\*\*

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☐ Computer Aided Transcription Services ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☐ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☒ Other
☐ Materials on Videotape

REAL TIME CAPTIONING

**Additional Comments**

\*\*REQUIRES REAL TIME CAPTIONING\*\*

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ██████ | ██████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ████████ | ███ | ████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other

    BPH Proceedings

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                            ☐ Note Taker
☐ Accessible Transportation                ☐ Open and Closed Captioning
☐ Assistive Hearing Devices                ☐ Phone Handset Amplifiers
☐ Attorney                                 ☐ Qualified Readers
☐ Audio Taped Materials                    ☐ Reading
☐ Audiocassettes                           ☐ Reading Machines
☐ Braille                                  ☐ Regional Center Advocates
☐ Cane                                     ☐ Sign Language Interpreter
☐ Closed Caption                           ☐ Speech Synthesizers
☐ Communication Books or Boards            ☐ Staff Assistance
☐ Computer Aided Transcription Services    ☐ TDD Machines
☐ Computer Terminals                       ☐ Tele Typewriters
☐ Foreign Language Interpreter             ☐ Videotext Displays
☐ Highlighter Pens and Markers             ☐ Wheelchair
☐ Large Print Material                     ☐ Written Materials
☐ Magnifying Device                        ☒ Other
☐ Materials on Videotape

                                           **CART Services Required***

**Additional Comments**

At the ████████ the Hearing Panel noted they could not establish effective
communication.  He is pretty much completely deaf and does not know ASL. He needs
someone in the room to actually type the questions onto a computer screen so he can
read the questions.

CART Services are required to establish effective communication.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████ | ████ | ████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other

BPH HEARING

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☒ Staff Assistance
☐ Computer Aided Transcription Services  ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☐ Large Print Material                ☒ Written Materials
☐ Magnifying Device                   ☐ Other
☐ Materials on Videotape

**Additional Comments**

**WRITING MATERIALS AND STAFF ASSISTANT REQUIRED AT BPH HEARING**

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                    STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▉▉▉▉▉▉ | ▉▉▉ | ▉▉▉▉▉▉ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other

Legal Department

**Accommodation(s) Provided**

☐ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☒ Computer Aided Transcription Services  ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☐ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☒ Other
☐ Materials on Videotape

see additional comments section

**Additional Comments**

According to notes in the medical record, ▉▉▉▉▉▉ uses written notes to
communicate with institutional staff. Captioning should be provided.

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▉▉▉▉▉▉ | ▉▉▉▉▉▉ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION            STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ▇▇▇▇▇ | ▇▇ | ▇▇▇▇▇▇▇▇ |

**Parole Proceeding**

- [ ] Attorney Consult
- [ ] Administrative Appeal
- [ ] Central File Review
- [ ] Clinician Interview
- [ ] Document Review
- [x] Other    accommodation for upcoming hearing

- [ ] Initial Interview-Issue Conditions of Parole
- [ ] Notice of Amended Conditions of Parole
- [ ] Psychologist Evaluation
- [ ] Review of Letter of Support
- [ ] Review of Parole Plans

**Accommodation(s) Provided**

- [x] No Accommodation
- [ ] Accessibility
- [ ] Accessible Transportation
- [ ] Assistive Hearing Devices
- [ ] Attorney
- [ ] Audio Taped Materials
- [ ] Audiocassettes
- [ ] Braille
- [ ] Cane
- [ ] Closed Caption
- [ ] Communication Books or Boards
- [ ] Computer Aided Transcription Services
- [ ] Computer Terminals
- [ ] Foreign Language Interpreter
- [ ] Highlighter Pens and Markers
- [ ] Large Print Material
- [ ] Magnifying Device
- [ ] Materials on Videotape

- [ ] Note Taker
- [ ] Open and Closed Captioning
- [ ] Phone Handset Amplifiers
- [ ] Qualified Readers
- [ ] Reading
- [ ] Reading Machines
- [ ] Regional Center Advocates
- [ ] Sign Language Interpreter
- [ ] Speech Synthesizers
- [ ] Staff Assistance
- [ ] TDD Machines
- [ ] Tele Typewriters
- [ ] Videotext Displays
- [ ] Wheelchair
- [ ] Written Materials
- [ ] Other

**Additional Comments**

▇▇▇ will need audio version of transcript for upcoming hearing

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ▇▇▇▇▇ | ▇▇▇▇ |

DEPARTMENT OF CORRECTIONS AND REHABILITATION                        STATE OF CALIFORNIA
PAROLE PROCEEDING ACCOMMODATION(S) PROVIDED

| Inmate Name | CDC Number | Institution |
|---|---|---|
| ███████████ | ████ | ███████████ |

**Parole Proceeding**

☐ Attorney Consult                    ☐ Initial Interview-Issue Conditions of Parole
☐ Administrative Appeal               ☐ Notice of Amended Conditions of Parole
☐ Central File Review                 ☐ Psychologist Evaluation
☐ Clinician Interview                 ☐ Review of Letter of Support
☐ Document Review                     ☐ Review of Parole Plans
☒ Other

accommodation for upcoming hearing

**Accommodation(s) Provided**

☒ No Accommodation
☐ Accessibility                       ☐ Note Taker
☐ Accessible Transportation           ☐ Open and Closed Captioning
☐ Assistive Hearing Devices           ☐ Phone Handset Amplifiers
☐ Attorney                            ☐ Qualified Readers
☐ Audio Taped Materials               ☐ Reading
☐ Audiocassettes                      ☐ Reading Machines
☐ Braille                             ☐ Regional Center Advocates
☐ Cane                                ☐ Sign Language Interpreter
☐ Closed Caption                      ☐ Speech Synthesizers
☐ Communication Books or Boards       ☐ Staff Assistance
☐ Computer Aided Transcription Services  ☐ TDD Machines
☐ Computer Terminals                  ☐ Tele Typewriters
☐ Foreign Language Interpreter        ☐ Videotext Displays
☐ Highlighter Pens and Markers        ☐ Wheelchair
☐ Large Print Material                ☐ Written Materials
☐ Magnifying Device                   ☐ Other
☐ Materials on Videotape

**Additional Comments**

STAFF ASSISTANCE WILL BE NEEDED AT FUTURE HEARINGS

| Parole Proceeding Conducted By | Date of Parole Proceeding |
|---|---|
| ████████ | ████████ |

# EXHIBIT 17

EXHIBIT
0001
Dawn Lorey
06.17.2022

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. C94 2307 CW <br><br> **PLAINTIFFS' NOTICE OF DEPOSITION** <br><br> Judge:   Hon. Claudia Wilken |

Case No. C94 2307 CW

[3576536.3]

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiffs, by their attorneys, will take the deposition of the person(s) most knowledgeable at the California Department of Corrections and Rehabilitation ("CDCR") with respect to the matters identified in Schedule A of this Notice of Deposition at the Prison Law Office, 1917 Fifth Street, Berkeley, CA 94710 on June 3, 2022, at 9:00 AM, or at such other date, time, and location as the parties agree upon in writing.  If not completed on the specified date, the deposition will continue from day to day, excluding Sundays and holidays, until such date as is necessary to complete the deposition. The deposition will proceed before a notary public or other officer duly authorized to administer oaths. The deposition shall be recorded by stenographic means.

PLEASE TAKE FURTHER NOTICE that pursuant to Federal Rules of Civil Procedure 30(b)(2) and 34, CDCR is required to produce documents described in Schedule B of this Notice of Deposition no later than 30 days from the service of this Notice.

Dated:  April 11, 2022

PRISON LAW OFFICE

By: */s/_Jacob J. Hutt*
Jacob J. Hutt
Attorneys for Plaintiffs

[3576536.3]

2

Case No. C94 2307 CW

PLAINTIFFS' NOTICE OF DEPOSITION

## DEFINITIONS AND INSTRUCTIONS

In addition to the definitions set forth in the Federal Rules of Civil Procedure, the following definitions and instructions apply to all topics and requests in Schedules A and B:

1. "ACCESSIBLE FORMAT" means large print, braille, audio recording, or any other format that allows a blind or low-vision person to independently review written information.

2. "ARMSTRONG CLASS MEMBER" means any member of the Plaintiff class in the case, including all present and future California state prisoners and parolees with mobility, sight, hearing, speech, learning and kidney disabilities that substantially limit one or more of their major life activities.

3. "AUXILIARY AIDS" means electronic and non-electronic handheld magnifiers, desktop magnifiers, sheet magnifiers, page magnifiers, card magnifiers, ADA computers, magnifying glasses, screen reader technology, Braille writers, electronic Braille displays, and any other technology or equipment that assists a blind or low-vision person in reviewing or producing written information.

4. "BLIND AND LOW-VISION CLASS MEMBERS" means *Armstrong* class members who are permanently blind or who have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses.

5. "CDCR" means the California Department of Corrections and Rehabilitation.

6. "DEAF AND HARD-OF-HEARING CLASS MEMBERS" means *Armstrong* class members who are permanently deaf, who have a permanent hearing impairment so severe that they must rely on written communication, lip reading, or signing because their residual hearing, with aids, does not enable them either to communicate effectively or hear an emergency warning, or who have residual hearing at a functional level with hearing aids.

7. "DOCUMENTS" means all writings, whether fixed in a tangible medium or

[3576536.3]

electronically stored.  DOCUMENTS includes, but is not limited to, all of the following: papers, correspondence, emails, MS Excel files, MS Word files, MS PowerPoint files, text files, instant messages, postings on internet websites or blogs including Twitter and Facebook, training manuals, employee manuals, policy statements, trade letters, envelopes, memoranda, telegrams, cables, notes, messages, reports, studies, press releases, comparisons, books, accounts, checks, audio and video recordings and transcriptions thereof, pleadings, testimony, articles, bulletins, pamphlets, brochures, magazines, questionnaires, surveys, charts, maps, plans, graphs, computer programs, photographs, newspapers, calendars, desk calendars, pocket calendars, lists, logs, publications, notices, diagrams, instructions, diaries, minutes of meetings, orders, resolutions, agendas, memorials or notes of oral communications, whether by telephone or face-to-face, contracts, agreements, memoranda of understanding, and letters of intent.  DOCUMENTS includes any writings recorded or stored in any medium or location, including desktop computers, laptops, PDAs, cell phones, home computers used for work, calendars, computer tapes, computer drives or memories, computer diskettes or disks, email, CD-ROMs, DVDs, BlackBerrys, iPhones, or other similar handheld devices used to send and receive electronic mail, instant messaging ("IM"), blogs or other internet or intranet postings, text messages, Twitter postings, Facebook postings, or any other tangible thing on which any handwriting, typing, printing, photostatic, electronic or other form of communication or information is recorded or reproduced.  DOCUMENTS also includes all notations on any of the foregoing, all originals, file copies or other unique copies of the foregoing and all versions or drafts thereof, whether used or not, and all metadata. DOCUMENT has the broadest possible meaning and includes anything coming within the definition of "writings" and "recordings" as set forth in Rule 1001 (1) of the Federal Rules of Evidence.

8.	"COMMUNICATIONS" means any exchange of information by any means of transmission, including, face-to-face conversations, mail, electronic mail, IM, blog or other internet or intranet posting, telegram, text messages, overnight delivery, telephone,

facsimile or telex.

9.      "ANY" and "ALL," as used herein, shall include "each" and "every" and is not to be construed to limit a request.

10.     "OR" shall be construed as disjunctive and conjunctive and, as used herein, shall include "and" and is not to be construed to limit a request.

[3576536.3]

**SCHEDULE A**

**I.    TOPICS**

1.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for identifying <u>and</u> documenting the ACCESSIBLE FORMATS that would accommodate specific BLIND AND LOW-VISION CLASS MEMBERS.

2.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for providing written information to BLIND AND LOW-VISION CLASS MEMBERS in ACCESSIBLE FORMATS, including but not limited to:

    A) The categories of DOCUMENTS that CDCR Headquarters, Board of Parole Hearings, and prisons currently make available in ACCESSIBLE FORMATS to BLIND AND LOW-VISION CLASS MEMBERS;

    B) The provision of written information by CDCR on Global Tel*Link electronic tablets, including but not limited to steps that CDCR has taken OR will take to ensure that Portable Document Format ("PDF") DOCUMENTS provided on these tablets are accessible to BLIND AND LOW-VISION CLASS MEMBERS; and

    C) Other past, present, and anticipated efforts by CDCR to expand access to written information in ACCESSIBLE FORMATS to BLIND AND LOW-VISION CLASS MEMBERS.

3.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices regarding the purchasing, placement, maintenance, use, and supervision of AUXILIARY AIDS in CDCR prisons, including but not limited to:

    A) Locations at CDCR prisons where AUXILIARY AIDS may be placed;

    B) Access by incarcerated people to the locations in which AUXILIARY AIDS are located, such as time limitations on using AUXILIARY AIDS

located in CDCR prison law libraries and pandemic-related movement restrictions on accessing locations where AUXILIARY AIDS are generally available;

C) The number of electronic magnifiers and text-to-speech devices available at each CDCR prison, including the brand names and models of these devices and technology, where they are located in the prisons, when they were purchased, how they are maintained and updated, who is eligible to use them, how an *Armstrong* class member requests and is granted OR denied access to use them, and ANY current issues with their functionality OR condition;

D) Security evaluations conducted by CDCR, OR an agent of CDCR, regarding the use of AUXILIARY AIDS for BLIND AND LOW-VISION CLASS MEMBERS in CDCR prisons, including but not limited to the placement of AUXILIARY AIDS in housing units, recreational areas, educational areas, recreational libraries, and law libraries;

E) Cost evaluations OR estimates for each AUXILIARY AID considered by CDCR; and

F) Past, present, and anticipated efforts by CDCR Headquarters, Board of Parole Hearings, and prisons to consider via pilot program OR otherwise the placement of AUXILIARY AIDS in additional locations and the purchasing of additional AUXILIARY AIDS.

4.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices regarding the use of ADA workers in assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing tasks, including but not limited to ANY policies, practices, and procedures used to document OR evaluate the efficacy of the ADA Worker program at assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing.

5.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local

Case No. C94 2307 CW

[3576536.3]

prison policies, procedures, and practices regarding the use of CDCR staff in assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing tasks, including but not limited to ANY policies, practices, and procedures used to document OR evaluate the efficacy of staff assisting BLIND AND LOW-VISION CLASS MEMBERS with reading and writing.

6.    ANY and ALL past, present, and anticipated efforts by CDCR Headquarters, the Board of Parole Hearings, and local prisons to identify OR track the needs of BLIND AND LOW-VISION CLASS MEMBERS with respect to reading and writing accommodations, including but not limited to surveying and interviewing BLIND AND LOW-VISION CLASS MEMBERS regarding these needs.

7.    ANY and ALL CDCR Headquarters, Board of Parole Hearings, and local prison policies, procedures, and practices for identifying and documenting the effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to:

    A) Who interviews DEAF AND HARD-OF-HEARING CLASS MEMBERS regarding their effective communication needs at each prison, and when such interviewing occurs; and

    B) How each prison documents the effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to whether and how this information can be updated.

    C) How the Board of Parole Hearings documents the specific effective communication needs of DEAF AND HARD-OF-HEARING CLASS MEMBERS, including but not limited to whether and how this information can be stored for use in connection with future hearings and updated.

## SCHEDULE B

Pursuant to Federal Rules of Civil Procedure 30(b)(2) and 34, CDCR is required to produce the following DOCUMENTS for inspection and copying at Prison Law Office, 1917 Fifth Street, Berkeley, CA 94710, no later than 30 days from the service of this Notice.

### I.    INSTRUCTIONS

1.    You are required to furnish ALL DOCUMENTS in your possession, custody, OR control, including those DOCUMENTS that are in your possession, custody, OR control in the normal course of your employment obligations, and those in the possession, custody OR control of your (1) employer; (2) consultants; (3) attorneys; (4) representatives; (5) agents; OR (6) ANY other person acting OR purporting to act on your behalf OR at your direction, whether doing so directly OR at the direction of your subordinates.  Possession, custody, OR control includes DOCUMENTS stored in electronic form by third party service providers but accessible to the Defendant, including but not limited to email accounts, FTP servers, portable storage media such as USB drives, cloud storage services such as Dropbox OR SharePoint, and online workspaces such as WebEx.

2.    ALL non-identical copies of every DOCUMENT whose production is sought shall be separately produced.

3.    Each request herein constitutes a request for DOCUMENTS in their entirety, with ALL enclosures and attachments, and without abbreviation, redaction, OR expurgation.  DOCUMENTS attached to each other, including but not limited to, by staple, clip, tape, email attachment, OR "Post-It" note, should not be separated, although ANY page on which a Post-It note covers OR obscures text on the DOCUMENT should be produced both with and without the Post-It note.  The production must also include, where applicable, ANY index tabs, file dividers, designations, binder spine labels, OR other similar information as to the source and/OR location of the DOCUMENTS.

4.    Each request includes ANY and ALL drafts and copies of each

Case No. C94 2307 CW

[3576536.3]

DOCUMENTS that are responsive to ANY request, including but not limited to copies containing handwritten notes, markings, stamps, OR interlineations. The author(s) of ALL hand-written notes should be identified.

5. You shall produce ALL responsive DOCUMENTS as they have been kept in the ordinary course of business.

6. Pursuant to Federal Rule of Civil Procedure 34(b), ALL responsive DOCUMENTS are required to be produced either: (a) as they are kept in the usual course of business (together with copies of ANY file labels OR binder covers for the files OR binders in which they are maintained); OR (b) organized and labeled to correspond with the categories of the requests to which they respond.

7. If ANY responsive DOCUMENT is maintained electronically, the DOCUMENT shall be produced on disc in native format and with metadata intact.

8. If with respect to ANY request there are no responsive DOCUMENTS, so state in writing.

10. If you object to a portion OR an aspect of a request, state the grounds for your objection with specificity and respond to the remainder of the DOCUMENT request. If ANY DOCUMENTS, OR portion thereof, are withheld because you claim that such information is protected under the attorney-client privilege, work product doctrine, OR other privilege OR doctrine, you are required to provide a privilege log setting forth the specific basis for the claim of privilege OR protection and for each DOCUMENT provide the following:

      A) the subject matter of the DOCUMENT;

      B) the title, heading OR caption of the DOCUMENT, if ANY;

      C) the date appearing on the DOCUMENT OR, if no date appears thereon, the date OR approximate date on which the DOCUMENT was prepared;

      D) the type of DOCUMENT (e.g., whether it is a letter, memorandum, minutes of meeting, etc.) and the number of pages;

      E) the identity of the person who signed the DOCUMENT OR, if it was not

signed, the person who prepared it;

F) the identity of each person to whom the DOCUMENT was addressed and the identity of each person to whom a copy thereof was sent; and

G) the identity of each person who has custody of a copy of each such DOCUMENT.

11. If you claim that a portion of a DOCUMENT is protected from disclosure for ANY reason, produce such DOCUMENT with redaction of only the portion claimed to be protected. When such redactions for privilege OR protection are made, you shall place a legend similar to "REDACTION – PRIVILEGE" on the copy of the DOCUMENT produced. ALL redactions shall also be included on the privilege log described above.

12. If you object that a request is vague OR ambiguous, identify the objectionable aspect of the request.

13. If a request cannot be responded to in full, you shall respond to the extent possible, specify the reason for your inability to respond to the remainder, and state whatever information OR knowledge you have regarding the portion to which you have not responded.

14. If ANY DOCUMENT called for by these requests has been destroyed, lost, discarded, OR is otherwise no longer in your possession, custody, OR control, identify such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the person authorizing disposal, and the person disposing of the DOCUMENT.

15. Unless otherwise specified, the relevant time period, and the period for which you are required to provide responsive DOCUMENTS, is from and including January 1, 2017 up to and including the date of the Rule 30(b)(6) deposition.

## II.    DOCUMENTS REQUESTED

1. ALL DOCUMENTS that the deponent(s) used OR may need to use to refresh their recollection as to ANY of the topics in Schedule A.I.

2. ALL DOCUMENTS that the deponent(s) consulted OR relied upon to learn

the information known OR reasonably available to the CDCR on the topics in Schedule A.I.

3.     ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices for identifying and documenting the specific ACCESSIBLE FORMATS in which individual BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS are able to review written information.

4.     ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices for providing written information to BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS in ACCESSIBLE FORMATS.

5.     ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the purchasing and placement of AUXILIARY AIDS in CDCR prisons.

6.     ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the role of ADA workers in assisting BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS with reading and writing tasks.

7.     ALL DOCUMENTS that refer OR relate to policies, procedures, OR practices regarding the role of CDCR or Board of Parole Hearings staff in assisting BLIND AND LOW-VISION ARMSTRONG CLASS MEMBERS with reading and writing tasks.

8.     ALL DOCUMENTS that refer OR relate to ANY and ALL past, present, and anticipated efforts by CDCR Headquarters, Board of Parole Hearings, and local prisons to survey the needs of BLIND AND LOW-VISION CLASS MEMBERS with respect to reading and writing accommodations.

[3576536.3]

# EXHIBIT 18

Dawn Lorey  REVISED
June 17, 2022

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

```
JOHN ARMSTRONG, et al,        )
        Plaintiff(s),         )
                              )CASE NO.:  C94 2307 CW
v.                            )
                              )
                              )Judge: Hon Claudia Wilken
GAVIN NEWSOM, et al,          )
        Defendant(s).         )
```

-----------------------------------------------------------

THE REMOTE DEPOSITION OF

DAWN LOREY

DATE: June 17, 2022

-----------------------------------------------------------

REMOTE DEPOSITION of DAWN LOREY, having been duly sworn, was taken in the above-styled and numbered cause on June 17, 2022, from 9:05 a.m. until 5:36 p.m., before LATONIA C. LEWIS, CSR, License Number 14446 in and for the State of California, reported by machine shorthand, via Zoom, pursuant to Notice.

A P P E A R A N C E S:

Dawn Lorey  REVISED
June 17, 2022

FOR THE PLAINTIFF(S):


      BY: JACOB HUTT, ESQ.
      PRISON LAW OFFICE
      1917 Fifth Street
      Berkeley, California 94710



FOR THE DEFENDANT(S):

      BY: OLENA LIKHACHOVA, ESQ.
      DEPUTY ATTORNEY GENERAL
      OFFICE OF THE ATTORNEY GENERAL
      1300 I Street, 10th Floor
      Sacramento, California 95814
      (916)500-1463
      Olena.likhachova@doj.ca.gov


                *        *         *


                        I N D E X

Dawn Lorey  REVISED
June 17, 2022

|                           |                      | PAGE |
| Appearances.............................. |  |  |
| Ms. Lorey                 |                      | 5    |
| Examination by......................... |  |  |
| Mr. Hutt                  |                      | 5    |

E X H I B I T S

| NO. | DESCRIPTION          | PAGE |
|-----|----------------------|------|
| 1   | Notice of deposition | 13   |
| 2   | CC1 memo             | 83   |
| 3   | Letter               | 157  |
| 4   | Memorandum           | 174  |
| 5   | Document             | 182  |
| 6   | Memorandum           | 188  |
| 7   | DPV survey           | 236  |
| 8   | Document             | 236  |

THE COURT REPORTER:  Today's date is June 17, 2022.  And the time is approximately 9:05 a.m.  this is the deposition of DAWN LOREY, being taken in the matter of JOHN ARMSTRONG, et al v. GAVIN NEWSOM, et al.  This case is venued in Northern District of California.

My name is LaTonia Lewis.  I am a RMR and CRR in the State of California.  I am the deposition officer for today's deposition.

All parties in today's deposition are appearing remotely to comply with the guidance of the Centers for Disease Control in response to the COVID-19 pandemic occurring in our country at this time.  I have collected everyone's appearance off the record and they will appear on the appearance page of the transcript.

Before we proceed, I will ask counsel to stipulate on the record that we are proceeding according to the United States District Court and that I, as the deposition officer, may swear in the deponent even though I am not in the physical presence of the deponent, and that there is no objection to that at this time, nor will there be an objection to it at a future date.  Let's start with the noticing attorney.

MR. HUTT:  Yes.

MS. LIKHACHOVA:  Yes.

D A W N   L O R E Y, having been duly

Dawn Lorey   REVISED
June 17, 2022

sworn, testified as follows:

EXAMINATION

BY MR. HUTT:

Q.   Please state your name for the record.

A.   Dawn Lorey.

Q.   Please state your address for the record.

A.   1515 S Street, Sacaramento, California 95811.

Q.   Good morning, Ms. Lorey.  I know we have already been introduced before, but my name is Jacob Hutt.  I am counsel for plaintiffs at the Prison Law Office.  I use he him pronouns.  And once more, can you please state your name for the record?

A.   Dawn Lorey, D-A-W-N L-O-R-E-Y.

Q.   Thanks so much.

Have you ever been deposed before?

A.   I have not.

Q.   Okay.  In that case, I'm just going to review a few ground rules before we begin today just so we're on the same page.  Do you understand that you're sworn to tell the truth under penalty of perjury today?

A.   I do.

Q.   So that means that the testimony that you give today will have the same force and effect as though you were in court in front of a judge.  Do you understand that?

Dawn Lorey   REVISED
June 17, 2022

A.  Yes, I do.

Q.  Okay.  I'll be asking you questions today. From time to time, your attorney may be objecting or instructing you not to answer.  Unless your attorney instructs you not to answer, you will need to answer my questions after any objections are made.  Everything that's said while we're on the record will be taken down by the court reporter Ms. Lewis.

And even if you know where I'm going with a given question, please try to let me finish the question before you respond.  And I will wait until you're done answering before I ask another question.  Please do your best to answer with yes or no instead of a nod or gesture.

Again, this is just so that we have a clear record of everything that's said today.  If I ask you a question and you don't understand some part of it or you forget it or for whatever reason you need me to repeat the question or restate the question, please tell me and I'll be happy to do that.  If you need to take a break at any time for any reason, just let me know.  If there is a question pending when you request a break, I will ask you to answer that before we take the break.

We are doing this remotely via a video conferencing service, so I just have a few questions

Dawn Lorey   REVISED
June 17, 2022

ensure connected communication with all these interactions and in many cases document.  So in the course of duties, interacting with blind and low vision individuals went through staff's questioning and if they determine that the person does need assistance, that assistance is provided.  Reading documents to class members is the one accommodation we have the ability to document.  Healthcare has the ability to document using a magnifier, again, which all of our staff are trained to do and to provide, so that is a very common accommodation we use to ensure that our blind and low vision individuals can read.

Q.   Okay.  During the intake process, does CDCR ask blind and low vision people about whether they need to be provided with documents in large print?

A.   No.

Q.   During the intake process, does CDCR ask blind and low vision people about whether they need to be provided with documents in braille?

A.   No.

Q.   During the intake process, does CDCR ask blind and low vision people about whether they need to be provided with documents in audio recording?

A.   No.

Q.   Can you describe the process by which CDCR

Dawn Lorey   REVISED
June 17, 2022

else, one of our ADA workers assist that person.  They would also help that person fill out a request for that accommodation.  The RAP would then review that person's request and make an appropriate accommodation.

Currently, as I stated we do provide DME and auxiliary and aids, to be sure that printed material can be read in a large print format.  We are all -- the department is also working with outside stakeholders, specifically our SOMS developers, to look at ways to have those forms printed out in large print.  So we have made that request and we are working through that process.  In the meantime, we are ensuring that our class members are accommodated.

Q.  So that process, the last one you were just describing does not currently exists to have all documentation produced in large print?

A.  Correct.

Q.  Does the manner in which CDCR tracks effective communication needs differ depending on the disability of the class member?

A.  Can you clarify what you mean by differ.

Q.  Sure.  I can give you an example.  Does the manner in which CDCR tracks effective communication needs for deaf and hard of hearing class members -- is that process different from the manner in which CDCR

there is a program status report that is developed and sent out and shared with all staff and inmates.  And so that is also signed by the warden or designee.  And basically, it would determine where -- what programs would be put into place, what programs are accessible etcetera.  So would say it would be the warden, designee or the ADAC that arranged that.

Q.  Both of those situations you're describing at High Desert and CMF, those are the only two examples you know of?

A.  Yes, but --

Q.  And both of --

A.  It doesn't mean that there weren't others because once CDCR, DAI, once we give out that directive in the policy memo, we did not require proof of practice every single time that happened, that was their directive.  And it is up to the administrators to then manage their programs.

Q.  Okay.  At High Desert, CMF or any other prison are video magnifiers currently available for regular use in housing units?

MS. LIKHACHOVA:  Objection.  Compound. Vague and ambiguous as to term regular.

Go ahead.

BY MR. HUTT:

A.  No, currently, there are no video handheld magnifiers, electronic magnifiers available on a regular basis for use in the housing unit.

Q.  Do any CDCR prions permit the video magnifiers to be used by incarcerated people in their cells?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to term "video magnifiers".

Go ahead.

BY MR. HUTT:

A.  No.  The that is not current policy.

Q.  Is there a statewide CDCR policy that prohibits the placement of video magnifiers in housing units permanently?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to term "video magnifiers" and term "prohibits".

Go ahead.

BY MR. HUTT:

A.  No, there is no such policy.

Q.  Is there a statewide CDCR policy that prohibits the placement of the video magnifiers in cells for class member use?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to term "video magnifiers" and term "prohibited".

being enough video magnifiers.

Q.  I'll ask again, this is just a yes or no question.  In response to reports from class members about inadequate access to video magnifiers, did CDCR increase the total statewide number of video magnifiers at the prisons?

MS. LIKHACHOVA:  Objection.  Lacks foundation.  Vague and ambiguous as to the term "inadequate access".

Go ahead.

BY MR. HUTT:

A.  Since the purchase of the additional electronic magnifiers in 2019, the department has not purchased any other devices, electronic magnifiers.

Q.  Okay.  Are there any locations at CDCR prisons other than libraries and education rooms where class members permanently have access to video magnifiers?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to term permanent access.  Go ahead.

A.  And can you clarify what you mean by permanent access?

Q.  Are there any prisons in which video magnifiers are regularly available for class member use without a class member needing to request a specialized accommodation outside of the libraries and educational

classrooms?

MS. LIKHACHOVA:  Vague and ambiguous as to terms "video magnifier" and "special accommodation".

Go ahead.

BY MR. HUTT:

A.  No, there would be no other locations.  Our video magnifiers are available for use in library, in education permanently with your definition.  Handheld electronic portable devices are able to be brought into those non-traditional housing, those isolated quarantine spaces, in accordance with that COVID-19 policy that we developed.

Q.  Is there a statewide CDCR policy regarding the times and hours of day that libraries must be opened and closed?

A.  No.

Q.  Are there any CDCR prisons where libraries containing video magnifiers or electronic text to speech device are open after 3:00 p.m.?

A.  I would have to refer to the library schedule. I believe that was one of the documents that we provided as well in preparation for this deposition.  And that is because each individual institution sets their own hours so we have 34 locations, I'm not able to memorize all of their hours, but we have that reference document

Dawn Lorey  REVISED
June 17, 2022

A.   No.

Q.   Are there any prisons in which currently, class members can visit the library at any time they wish?

A.   The ability to visit the library would be dependent on when the library was open.

Q.   So I need either just a yes or no?

A.   So because of that, if the library was not open, then, no, the inmate could not visit it.

Q.   Okay.  So my question is are there any prisons that allow blind and low vision class members to visit libraries at any time of the day?

A.   No.

Q.   Okay.  Have the CDCR's prison libraries during the pandemic been shut down due to short staffing?

A.   Yes.

Q.   Do any CDCR prisons currently have local procedures in place for transporting video magnifiers from cell to cell for blind and low vision class members?

A.   No.

Q.   Are class members who are not enrolled in education permitted to use the video magnifiers in education areas in CDCR prisons?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to time.

Go ahead.

BY MR. HUTT:

A.   Can you just restate that question, please.

Q.   Sure.  You mentioned that video magnifiers are in some prisons available in education areas, right?

A.   Correct.

Q.   So are class members who are not enrolled in educational curricula permitted to go to those areas and use those video magnifiers?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to time.

BY MR. HUTT:

A.   The policy and practice for CDCR for inmate movement is created in a way that we control movement and when you are assigned to education that occurs with a ducat, so you would only be in that area if you had a ducat and were enrolled in that class.

Q.   Okay.  So --

A.   They do have the video handheld in their library currently, CMS has that bra so that would be -- that would be the only location at CMF that could go to use the Amigo.

Q.   Okay.  So if you don't have a ducat to go to education, you can't use the video magnifiers in education, right?

Dawn Lorey  REVISED
June 17, 2022

A.  Correct.

Q.  And the only way you can get a ducat to go to education is if you're enrolled in education?

MS. LIKHACHOVA:  Objection.  Misstates prior testimony.

Go ahead.

BY MR. HUTT:

A.  That is one-way you can go to education, another way would be if the teacher wanted to interview you for any reason, you could be ducated then to go, but it is not the same access as the libraries, where the libraries are free to come and go during their open hours.

Q.  Are there any other ways to be ducated into education besides going for classroom use for a teacher who is teaching your class pulling you out to interview you.

A.  The only other way would if you were assigned a job there.  Say you were a porter in education and assigned that area and you would be ducated for that.

Q.  Those are the three ways to be ducated into education?

A.  Or to be able to go there, correct.

Q.  Just so I'm clear, those are the three ways in which you can go to education?

Dawn Lorey  REVISED
June 17, 2022

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to term.

Go ahead.

BY MR. HUTT:

Q.  You want me to clarify?

A.  Yes.

Q.  Just so I'm clear, the three ways in which a class member can go to education number one, to attend the class.  Number two, to be pulled out and interviewed by a teacher.  And number three to go for a job if they're a porter, for example.  Is that correct?

A.  Correct.

Q.  Okay.  And the only way to use a video magnifier in education is if you have been ducted to go to education?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to in education.

Go ahead.

BY MR. HUTT:

A.  Yes, that would be correct.

Q.  Thank you.

Has CDCR or any agents of CDCR conducted an investigation as to whether CDCR's current video magnifiers statewide recently accommodate blind and low vision class members reading and writing needs?

Dawn Lorey    REVISED
June 17, 2022

ambiguous as to Bio-Path tablet program.

A.   Yes, CDCR has established a contract with the vendor Bio-Path to provide and the basis of the contract of the service would be to provide a tablet to every inmate at every institution.  And this is occurring over, approximately, a three-year timeline and the purpose of the tablets is to provide increased communications with family and loved ones through the ability to send e-mails and text as well as to have video phone calls on the tablets as well as to enjoy extra entertainment devices that the tablet has such as movies, games, music, and books.

Q.   Thank you.

Can blind and low vision class members review grievance responses on these tablets?

A.   Currently that function is not available.  The department has shared with Bio-Path that that would be an eventual function that we want on the tablets and they're well aware of that and we will continue those conversations and working towards that.  I'm going to have a series of questions about what is available on the tablets.  I'm hoping we'll have some time to get into future plans.  Right now I'm wondering currently what is available.  So next category, blind and low vision class members currently review appeal responses

Dawn Lorey  REVISED
June 17, 2022

on these tablets.

MS. LIKHACHOVA:  Currently, no inmates can review appeal responses on their tablets.

BY MR. HUTT:

Q.  Thank you.

Can blind and low vision class members review responses to requests forms on their tablets?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to the term request form.

BY MR. HUTT:

A.  No.

Q.  Can blind and low vision class members review disciplinary documents like rule violation reports on these tablets?

A.  No inmate has the ability to review disciplinary documents or rule violation reports on the tablet.

Q.  Can class members review classifications materials on these tablets?

A.  No, that is not available to any inmate.

Q.  Can class members review and complete educational materials for milestone credits on these tablets?

MS. LIKHACHOVA:  Objection.  Compound.

Go ahead.

Dawn Lorey   REVISED
June 17, 2022

BY MR. HUTT:

A.  No, that feature is not available to any inmate.

Q.  Can class members review their personal medical written information on these tablets from CCHCS?

A.  No, that is not available for any inmate.

Q.  Can class members review mental health written information on these tablets?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to mental health records.

Go ahead.

BY MR. HUTT:

A.  No, this is not available to any inmates.

Q.  Can class members review program status information on these tablets?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous as to "program status".

A.  No, that is not available to any inmates.

Q.  Can class members review ducats, D-U-C-A-T-S, on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that is not available to any inmate.

Dawn Lorey   REVISED
June 17, 2022

Q.  Can class members review their comprehensive risk assessment on these tablets in preparation for parole hearings?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that is not available to any inmate.

Q.  Can class members review their parole transcripts on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that's not available to any inmate.

Q.  Can class members receive their notice of hearing rights in anticipation of their parole hearings on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that is not available to any inmate.

Q.  Can class members fill out a sick call slip on these tablets?

Dawn Lorey   REVISED
June 17, 2022

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that service is not available to the inmate on their tablet.

Q.  Can class members fill out request for disability accommodations via these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that's not currently available on the tablet.

Q.  Can class members file staff complaints on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that function is not available to any inmate on the tablet.

Q.  Can staff members -- strike that.

Can class members appeal grievance responses on these tablets?

Dawn Lorey   REVISED
June 17, 2022

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that function is not available on any inmate's tablet.

Q.  Can class members communicate with legal counsel confidentially on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that function is not available on these tablets.

Q.  Can class members receive an administrative segregated unit placement notice on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that is not available currently on these tablets to any inmate.

Q.  If a class member requests their own medical records apart from information their provider sent to them, can they receive their medical records on these

Dawn Lorey   REVISED
June 17, 2022

tablets?

MS. LIKHACHOVA:  Objection.  Incomplete hypothetical.  Calls for speculation.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that function is currently not available to any inmate on the tablet.

Q.  Is there any documentation that a class member can fill out related to a parole application that can be done on a tablet?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that is not a function currently on the tablet for any inmate.

Q.  Can class members receive a notice of change in earliest possibly release date via a legal status summary on these tablets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  No, that function is not currently available on the tablets for any inmate.

Dawn Lorey   REVISED
June 17, 2022

Q.   Can class members receive a notice of condition of parole on these tablets?

MS. LIKHACHOVA:   Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.   No, that function is currently not available to any inmate on the tablet.

Q.   Can class members receive notices of time, date, and place of computational review hearing on these tablets?

MS. LIKHACHOVA:   Objection.  Lacks foundation.  Go ahead.

A.   No, that function is currently not available in the tablet for any inmate.

Q.   Can class members receive a computational review hearing decision on these tablets?

MS. LIKHACHOVA:   Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.   No, that function is currently not available on the tablets for any inmate.

Q.   Can class members conduct legal research on these tablets?

Dawn Lorey  REVISED
June 17, 2022

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  Can you clarify legal research?

Q.  Why don't I take a step back.  What search engine do class members use to construct legal research in the law libraries?

MS. LIKHACHOVA:  Objection.  To the extent this question calls for information beyond the scope of 30(b)(6) designation.

Go ahead.

BY MR. HUTT:

A.  That would be the LexisNexis system in the law libraries.

Q.  Is LexisNexis available to class members on their tablet?

MS. LIKHACHOVA:  Objection.  Lacks foundation.

Go ahead.

BY MR. HUTT:

A.  I don't think LexisNexis is on there yet.

Q.  Is there another system that is similar to LexisNexis that is on the tablet?

MS. LIKHACHOVA:  Objection.  Vague and

Dawn Lorey  REVISED
June 17, 2022

ambiguous as to "similar to".

Go ahead.

BY MR. HUTT:

A.  I would have to refer to the contract to confirm.  I do know that the tablets have the dom and the healthcare dom and the title 15 currently.

Q.  Has CDCR developed a written agreement with vie I can't past to make any of the documents that we just discussed available on the to be lets?

MS. LIKHACHOVA:  Objection.  Lacks foundation.  Compound, vague and ambiguous.

Go ahead.

BY MR. HUTT:

A.  There currently is no written plan that involves a timeline for providing those documents on the tablet.

Q.  Is there any agreement at all?

MS. LIKHACHOVA:  Objection.  Vague and ambiguous.

Go ahead.

BY MR. HUTT:

A.  I would have to refer to the contract language to confirm.  I can -- I can say that BioPath is amenable to providing these services, but it would not be until we have ruled out the tablets to all 34 institutions and

Dawn Lorey  REVISED
June 17, 2022

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al,          )
          Plaintiff(s),         )
                                )CASE NO.:  C94 2307 CW
v.                              )
                                )
                                )Judge: Hon Claudia Wilken
GAVIN NEWSOM, et al,            )
          Defendant(s).         )


REPORTER'S CERTIFICATION
ORAL AND VIDEOTAPED DEPOSITION OF
DAWN LOREY
DATE: June 17, 2022


          I, LATONIA C. LEWIS, Certified shorthand

Reporter in and for the State of California, hereby

certify to the following:


          That the witness, DAWN LOREY, was duly sworn

by the office and that the transcript of the Oral and

Videotaped Deposition is a true record of the testimony

given by the witness;


          That the deposition transcript was submitted

on_____ to the attorney for the witness

for examination, signature, and return to me

by_____;

Dawn Lorey   REVISED
June 17, 2022

That the amount of time used by each party at the deposition is as follows:

JACOB HUTT - 6HRS: 47MINS

OLENA LIKHACHOVA - 0HRS: 0MINS

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

JACOB HUTT, for Plaintiff;

OLENA LIKHACHOVA, for Defendant.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was waken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 30th of June, 2022

LaTonia Lewis, CSR, RMR, CRR

California CSR 14446

Expiration date: 10/31/2022

# EXHIBIT 19

**Armstrong et al., Monitoring Tour**
**Richard J. Donovan Correctional Facility**
**September 21, 2023**



CENTRAL LIBRARY MAGELLEN.jpg

**Armstrong et al., Monitoring Tour**
**Richard J. Donovan Correctional Facility**
**September 21, 2023**



CENTRAL LIBRARY MEGELLEN (2).jpg

# EXHIBIT 20

# JOB ANALYSIS: CORRECTIONAL COUNSELOR 1

**OCTOBER 4, 2023**

## BACKGROUND INFORMATION

**Date of Study:** September 11, 2023 – September 14, 2023

**Collective Bargaining Identification:** R06

**Job Analysis Conducted By:** Cheryl McKinzie, Selection Analyst, Talent Acquisition and Career Services, Department of Corrections and Rehabilitation

**Number of Incumbents:** There are 820 budgeted positions and 103 vacancies in this classification per the State Controller's Office Filled/Vacant Position Report dated September 2023.

## EDITED TASK LISTING

*NOTE: Each position within this classification may perform some or all of these tasks.*

## Task Statements:

1.  Interview inmates to develop or modify the inmate's classification, in a correctional setting, utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, Departmental Operations Manual (DOM), Title 15, etc.) as required.

2. Gather information from inmates to develop or modify the inmate's classification in a correctional setting utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

**3. Conduct individual interviews and provide regularly scheduled "open line" utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, Departmental Operations Manual (DOM), Title 15, etc.) as required.**

4.  Read reports from a variety of sources to assist in classification of an inmate, in development or modification of the inmate's program utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

5. Evaluate reports from a variety of sources to assist in classification of an inmate, in development or modification of the inmate's program utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

6. Summarize reports from a variety of sources to assist in classification of an inmate, in development or modification of the inmate's program utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

7. Present findings from a variety of sources to a classification committee to assist in classification of an inmate, in development or modification of the inmate's program utilizing the inmate electronic central file,

analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

Case 4:94-cv-02307-CW    Document 3525-3    Filed 11/14/23    Page 397 of 778

8. Make recommendations to a classification committee for program eligibility and to consider the inmate's interest and make recommendations to a classification committee for program eligibility and to consider the inmate's interest and potential for available programs utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

9. Prepare Post Conviction Progress Report for the Board of Parole Hearings (BPH) summarizing all data on the inmate's incarceration history utilizing the inmate electronic central file, Board Information Technology System (BITS), analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as needed.

10. Gather and document information to identify enemy/safety concerns (confidential and non-confidential) between inmates in order to create a separation alert utilizing the inmate electronic central file as required.

11. Evaluate and document information to identify enemy/safety concerns (confidential and non-confidential) between inmates in order to create a separation alert utilizing the inmate electronic central file as required.

12. Gather and document information to identify Security Threat Groups (STG) in order to maintain the safety and security of the institution utilizing the inmate electronic central file as required.

13. Prepare diagnostic evaluation reports on inmates for departmental and court review regarding recommendations for either retention or placement on probation for the inmate utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code 1170(d)/1203.03, DOM, Title 15, etc.) as mandated.

14. Recommend security level of institution to which the inmate will be housed utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

15. Determine custody requirements of inmates for proper housing and assignments utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) on an ongoing basis.

16. Conduct counseling with individual inmates utilizing Motivational Interviewing (MI) techniques to resolve conflicts/crisis intervention, as needed.

17. Document pertinent information based on observations or contacts with inmates, families and outside agencies, in order to maintain the safety and security of the institution, staff, inmates, and public utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

18. Respond to written or verbal interview requests from inmates within the required timeframe, informal grievances, services or items being requested utilizing the inmate electronic central file, communication skills, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

19. Promote positive inmate behavior to ensure safety and security of the institution utilizing MI techniques, the inmate electronic central file, communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as needed.

20. Provide a staff assistant or interpreter to ensure effective communication for the inmate at a disciplinary, classification, clinical encounters or parole hearing utilizing the inmate electronic central file, communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as needed.

21. Perform peace officer duties (e.g. escort, search, etc.) in order to maintain the safety and security of the institution, staff, inmates and public utilizing the inmate electronic central file, analytical skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

22. Replace and/or assist custody staff during emergency situations such as escapes, riots or disturbances in order to maintain the safety and security of the institution, staff, inmates, and public utilizing rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as needed.

23. Maintain order of inmates to ensure the safety and security of the institution, staff, inmates, and public utilizing rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as needed.

24. Supervise inmates in order to ensure job performance utilizing laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

25. Perform visual security check, of the premises and search inmates for contraband for accountability, safety and security in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as directed.

26. Maintain confidentiality of sensitive information e.g., medical information, investigation, inmate criminal history to maintain safety and security, by not disclosing to unauthorized persons in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

27. Perform equipment inventory e.g., keys, tools, weapons for accountability and proper working condition utilizing inventory sheet, inspection log, in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

28 Recognize mental health behavioral characteristics of inmate's emotional or unusual behavior to maintain safety and security of the institution in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

29. Initiate steps to prevent suicides and harming self, other inmates or staff to maintain safety and security of the institution in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

30. Provide orientation to inmates regarding facility expectations, rules, policies, procedures and available programs to ensure consistency and in order to maintain safety and security for the institution in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

31. Acts as an immediate resource to assist new counseling staff in the performance of their duties in compliance with laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

32. Attend training regarding policy, procedures, court mandates, etc., to ensure compliance with current policy utilizing laws, rules and regulations (e.g., Penal Code, DOM, Title 15, etc.) as mandated.

33. Complete an inmate's emergency notification and Social Factor Sheet which includes information regarding the inmate's parents, children, siblings, marriages, common law relationships, etc., to ensure contact information is current utilizing inmate electronic central file, communication skills, laws, rules and regulations (e.g. DOM, Title 15, etc.) as required.

34. Review court documents for an inmate's commitment offense, Probation Officer Reports, Abstract of Judgment, etc. to prepare Institution Staff Recommendation Summary (ISRS) or Reception Center Readmission Summary (RCRS) for the custody level and initial housing placement, utilizing laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

35. Process and complete request for Temporary Community Leave (TCL), by verifying eligibility criteria for inmate temporary leave utilizing communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

36. Ensure all due process mandates surrounding inmate classification are met to ensure compliance with court and Departmental procedures utilizing communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

37. Verify an inmate's eligibility to marry and processes marriage application through the county clerk's office (e.g. divorce decrees, statement of intent from a prospective bride/groom) utilizing rules and regulations (e.g. DOM, Title 15, etc.) as required.

38. Process an inmate's application for family visits and necessary documents (proof of marriage, birth certificates, etc.) in order to ensure compliance with departmental policy utilizing laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

39. Identify inmates who have active holds, warrants, and detainers requiring immediate action to ensure safety and security of the institution in compliance with departmental policy utilizing laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

40. Maintain all mandatory peace officer qualifications (e.g. firearms, chemical agents, etc.) to ensure compliance with departmental policy utilizing rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

41. Participate as a member of various classification committees (e.g. STG, Institution Classification Committee (ICC), Unit Classification Committee (UCC), Camp Classification Committee), and Inter Disciplinary Treatment Team (IDTT) committee in compliance with departmental policy utilizing inmate electronic central file, communication skills, laws, rules and regulations as mandated.

42 Identify and Document inmates that meet criteria for Offenders with a Mental Health Disorder (OMHD) and SVP to ensure proper screening prior to release utilizing inmate electronic central file, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

43. Act as a process server of court and legal documents (e.g. detainers, child custody, notice to appear, etc.) for the inmate to ensure proper legal notification utilizing inmate electronic central file, communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

44. Operate various office machines/equipment to complete assigned duties utilizing state computer, scanner, photocopier, fax, calculator, etc. as directed.

45. Interview inmate to develop and/or modify the Rehabilitative Case Plan Study (RCPS) to ensure appropriate placement within rehabilitative or vocational programs utilizing inmate electronic central file and inmate self-assessment guide, as required.

46. Complete Prison Rape Elimination Act (PREA) reassessment as required by federal law utilizing inmate electronic central file, PREA screening tool, and inmate interview as required.

**47. Interview/Complete transgender bi-annual reassessment for safety, programing, and housing needs, utilizing inmate electronic central file, communication skills, laws, rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.**

**48. Complete Gender Identity Questionnaire (GIQ) assessment as required by state law utilizing inmate electronic central file, and inmate interview as required.**

49. Review and process inmates for placement in Male Community Release Program (MCRP) facilities utilizing inmate electronic central file, CDCR form 2226 (MCRP eligibility screening form) and CDCR form 2234 (MCRP application and voluntary agreement), communication skills, laws, and rules and regulations (e.g. Penal Code, DOM, Title 15, etc.) as required.

**50. Complete the electronic version of the Application for Identification Card/Driver License (eDL 44) for eligible California Identification Card Program participants as required.**

*Tasks highlighted in bold text are not currently on the SPB classification specification*

# EDITED KSAPC LISTING

*NOTE: Each position within this classification may perform some or all of these KSAPCs.*

# *Knowledge of:*

K1.  Comprehensive knowledge of grammar, spelling and correct usage of written and oral communication to perform essential functions.

K2. Basic knowledge of correctional casework procedures to maintain an ongoing caseload.

K3. Basic knowledge of the range of normal and abnormal human behavior to identify unusual behavior.

K4. Basic knowledge of policies and procedures of custody to maintain safety and security of the institution.

K5. Basic knowledge of problems involving inmate adjustment to an institutional setting.

K6. Basic knowledge of various gangs, including gang memberships, interaction between gangs, special housing considerations and the associated potential dangers to staff and inmates to prevent criminal behavior.

K7. Basic knowledge of cultural differences and perspectives of the inmates to effectively evaluate program needs in regards to housing, religion, ethnicity, etc.

K8. Basic knowledge of contributing factors related to criminal patterns and behavior to evaluate program needs.

K9. Basic knowledge of group processes and dynamics to be used in group settings.

K10. Basic knowledge of simple arithmetic to perform job duties.

K11. Basic knowledge of interviewing to gather information.

K12. Basic knowledge of purposes and methods of discipline as applied to persons in custody.

K13. Basic knowledge of proper use and care of firearms/weapons to safely operate equipment.

K14. Basic knowledge of computer operation to perform essential functions of assignments.

K15. Basic knowledge of conflict management technique to defuse threats.

K16. Basic knowledge of self-defense to preserve personal safety.

K17. Basic knowledge of effective listening technique to gather information.

K18. Basic knowledge of the behavioral characteristics of a violent offender to prevent injury and preserve safety.

K19. Basic knowledge of time management to effectively perform essential functions.

*KSAPCs highlighted in bold text are not currently on the SPB classification specification*

# Ability to:

A1. Write comprehensive, complete, clear and concise reports to efficiently perform essential duties.

A2. Utilize oral and written language to communicate effectively with inmates, staff and the public.

A3. Establish a rapport with inmates and staff to maintain safety and security of the institution.

A4. Organize and prioritize work to efficiently perform essential duties.

A5. Meet deadlines to ensure compliance with departmental expectations.

A6. Deal tactfully/diplomatically with sensitive issues to maintain safety and security of the institution.

A7. Evaluate situations accurately and take effective action to maintain safety and security of the institution.

A8. Deal effectively with a high volume of work to efficiently perform essential duties.

A9. Obtain specific information from an inmate during an interview to efficiently perform essential duties

A10. Work under pressure to efficiently perform essential duties.

A11. Respond effectively to emergency situations to maintain safety and security of the institution.

A12. Work independently to efficiently perform essential duties.

A13. Maintain control of the interview process with an inmate to efficiently perform essential duties.

A14. Interpret institutional and departmental policies, rules and regulations to ensure proper classification of inmate.

A15. Adjust to changes in assignments to efficiently perform essential duties.

A16. Work with a team of people from a variety of occupations and professions to achieve departmental goals.

A17. Motivate an inmate toward specific goals to prepare for reintegration into society.

A18. Recognize and handle dangerous situations for inmates and staff to maintain safety and security of the institution.

A19. Follow the rules and regulations of the Department and institution to maintain safety and security of the institution.

A20. Follow the chain of command accordingly to ensure proper channels of communication.

A21. Operate departmental personal safety equipment and firearms safely and effectively to maintain safety and security of the institution.

A22. Make sound decisions in high stress situations effectively to maintain safety and security of the institution.

A23. Multitask in various situations effectively to ensure productivity.

A24. Organize workload on a daily basis to ensure deadlines are met.

*KSAPCs highlighted in bold text are not currently on the SPB classification specification*

## *Personal Characteristics to:*

PC1. **Demonstrate courage, emotional maturity, and stability to provide effective leadership in dangerous and stressful situations.**

PC2. **Satisfactory record as a law abiding citizen to maintain a positive public image.**

PC3. **Good personal and social adjustment for correctional work to maintain professionalism within the workplace.**

PC4. **Neat personal appearance to demonstrate professionalism within the workplace.**

PC5. **Demonstrate tact with others.**

PC6. **Ability to positively accept constructive criticism.**

PC7. **Alertness to be aware of your environment and be able to respond to emergency situations.**

PC8. **Self-motivated to perform tasks with limited supervision.**

*KSAPCs highlighted in bold text are not currently on the SPB classification specification*

# EXHIBIT 21

State of California                                      Department of Corrections and Rehabilitation

# Memorandum

Date:    October 8, 2018

To:      Associate Directors, Division of Adult Institutions
         Wardens
         Associate Wardens, Business Services
         Classification & Parole Representatives

Subject: **REVISED CORRECTIONAL COUNSELOR I RATIO ALLOCATION DISTRIBUTION METHODOLOGY AND PROCESS**

The purpose of this memorandum is to outline the newly established budgeted authority for Correctional Counselor (CC) I positions; provide information for the newly established internal ratio distribution; establish the process for the distribution of ratio positions; and outline other significant information relevant to CC I workload. This memorandum supersedes all previously established CC I ratio allocations, ratio processes, and memoranda.

The California Department of Corrections and Rehabilitation (CDCR) submitted a Budget Change Proposal (BCP) for Fiscal Year 2018-19 to adjust the budgeted ratio formula for CC I positions. With the approval of this BCP, CDCR successfully reduced the budgeted position formula from a ratio of 150:1 to 135:1. The new ratio allows internal CDCR ratio distribution rates to better align with the various inmate populations and corresponding CC I workloads while remaining within budget authority statewide.

<u>**CC I Workload Information & Training:**</u>

CC Is have a significant role in the overall progression of the CDCR's mission of providing increased rehabilitative strategies to successfully reintegrate offenders into California communities. Attachment A contains a listing of the increases in CC I responsibilities to assist in achieving this mission. This information should be utilized when preparing revised duty statements, as appropriate. A significant focus of the responsibilities includes increased rehabilitative services to the inmate population.

The Classification Services Unit (CSU) will be providing focused training regarding these expectations in the coming months to address this information and provide clarification on the topic.

To assist CC Is in providing available self-help programs at the institution to the inmates on their caseload, each institution shall establish a practice whereas the Community Resources Managers provide a listing of all available self-help programs. Such listings should be provided on a monthly basis at minimum, or more frequent, as changes occur.

Associate Directors, Division of Adult Institutions
Wardens
Associate Wardens, Business Services
Classification & Parole Representatives
Page 2

**New Internal Ratio Distribution Rates & Process:**

The internal ratio distribution rates have been adjusted to reflect the workloads associated with the various inmate population classifications, align with CDCR's missions and policies, as well as to ensure compliance with legal mandates. Attachment B outlines the updated rates within the CC I Ratio process.

Please note: it is recognized that due to the ebb and flow of the inmate population, a CC I may have five (5) more or five (5) less inmates on their caseload than the established internal ratios. Such ebbs and flows may or may not require the need for a reasonable accommodation or a redistribution of caseload.

**Distribution Implementation & Documents:**

The following attachments provides specific detailed information and next steps:

- Attachment C - *CC I Ratio Position Distribution October 2018*
- Attachment C1 - *CC I Ratio Position Distribution Summary of Changes October 2018*
- Attachment D - *CC I 607 Position Action Matrix*
- Attachment E - *607 Processing Instructions*
- Attachment F - *Notification of Staffing Adjustments*

It is recognized with the new internal ratios, there will be circumstances where CC Is have a blend of inmate population types on their assigned caseload. For example, an institution receives 20.8 CC I PY for General Population (GP) and 0.2 PY for Restricted. A total of 21.0 PY will be distributed; however, there will be one (1) CC I who will have a blend of GP and Restricted cases assigned. Therefore, institutions must revise current duty statements to address this matter.

With consideration to the implementation of the above outlined processes, it is necessary for supervisors to continue to practice equitable distribution of casework and conduct caseload monitoring, as explained in Attachment B. Additional training on this matter and how to address reasonable accommodation requests is forthcoming for classification supervising staff.

Finally, institutions are prohibited from reclassifying CC I ratio positions, except to accommodate a Training and Development assignment. Institutions are required to continue to maintain two (2) CCI positions Limited Term, in order to account for ratio fluctuation.

Associate Directors, Division of Adult Institutions
Wardens
Associate Wardens, Business Services
Classification & Parole Representatives
Page 3

If there are any questions regarding these revised processes, please contact Justi Caraballo, Chief, PSU, at (916) 327-6387. For technical questions, please contact De Vaughn Zachary, Staff Services Manager I, PSU, at (916) 322-8729.

JENNIFER BARRETTO
Assistant Deputy Director
Facility Support
Division of Adult Institutions

Attachment(s)

cc:  Connie Gipson
     Jeff Macomber
     Sandra Alfaro
     Candace Murch
     Jennifer Barretto
     Justi Caraballo
     Brian Moak
     Natalie Fransham
     Renee Pettis
     Lee Scott
     Correctional Business Managers
     Institution Personnel Officers
     ATM Lieutenants
     Community Resources Manager
     Labor Relations Analysts

# CORRECTIONAL COUNSELOR I
# INCREASE IN RESPONSIBILITIES

The below outlines the duties the California Department of Corrections and Rehabilitation (CDCR) intends to incorporate into the role of a Correctional Counselor I (CC I) in an effort to provide increased rehabilitative services to the inmate population:

- Ensure attendance to Interdisciplinary Treatment Teams (IDTTs) as mandated to provide input relative to the program best suited for the inmate.

- Increase open line access/time for inmates to seek guidance from four (4) hours to six (6) hours, serving as an advocate.

  - Recommend specific self-help and other programs provided by the Division of Rehabilitative Programs (DRP), based on the inmate's criminogenic needs. Maintain a listing from the Community Resources Manager of religious and self-help programs available. Assign inmates to an appropriate waiting list. Assist with family reunification, when needed, to improve post release outcomes.
  *A CC I would use available resources to provide assistance to inmates based on their individual case factors and needs. For example, an inmate may express the desire to reconnect with their children upon release. Based on that inmate's case factors and a review of available resources, a CC I may discuss the available self-help programs at that institution, which would assist them with the tools necessary to reconnect with their children.*

  - Assist with connecting the inmate with appropriate entities in programs such as Community Prisoner Mother Program, Custody to Community Transitional Reentry Program, Male Community Reentry Program, Cognitive Behavioral Treatment, etc., as needed throughout the year.
  *A CC I would work with an inmate who may express interest and/or is available for the abovementioned programs. The CC I would connect the inmate with the appropriate entities and provide explanation of available programs.*

  - Review available education or vocational programs and support service jobs with a mindset of equipping inmates with the skills needed for a job when they are released, including Youthful Offender Program inmates. Assist with the facilitation of the Prison to Employment plan by pairing inmates with job assignments or education classes which will provide for practical skill sets to help them gain employment upon release.
  *A CC I would assist in pairing an inmate to available education classes or vocational programs based on their skill sets and/or previous experience, with consideration to case factors. For example, an inmate who has expressed previous experience and/or a desire in welding could be put on a waitlist for a job or vocational program which would strengthen that skill set and afford them opportunities upon release. This is in consideration to jobs/programs available at the institution.*

  - Facilitate the inmate's communication with the necessary staff within DRP, Division of Adult Parole Operations, or Post Release Community Supervision, to ensure effective assistance on transitional planning, housing, resources in the community, and assist in the initial advocacy programs/benefits for veterans.
  *A CC I would assist in facilitating communication with the appropriate entities to ensure an inmate who is ready to parole is prepared for reentry into the community. This could include making contact with those entities on behalf of the inmate for a collaborative transition to parole.*

Attachment A

# CORRECTIONAL COUNSELOR I
# INCREASE IN RESPONSIBILITIES

o  Provide additional accommodation for disabled inmates to ensure equal access to programs, services, and activities, to include preparation for Board Suitability hearings.

•  Ensure case work for fire camp inmates is completed expeditiously for referral and appropriate placement. Also ensure inmates who are not cleared for fire camp are expeditiously processed for transfer to proper housing (i.e., MCCF, MSF), and not delayed to the next annual. This is in compliance with the timelines outlined in the October 1, 2015, memorandum entitled, *Minimum Support Facility and Camp Pipeline Process.*

•  Utilize the Rehabilitative Case Plan (RCP) System designed in Strategic Offender Management System to identify the current programs the inmate is participating in and what they need for their own rehabilitative case plan. *Additional training on the RCP is forthcoming in the coming months.*

Focused training on the specifics of the increased responsibilities detailed in this document will be provided within the coming months.

Supplement to Attachment A_CC I Increased Responsibilities October 2018

State of California                                            Department of Corrections and Rehabilitation

# Memorandum

Date  :   October 1, 2015

To    :   Associate Directors, Division of Adult Institutions
          Wardens
          Classification and Parole Representatives
          Classification Staff Representatives

Subject:  **MINIMUM SUPPORT FACILITY AND CAMP PIPELINE PROCESS**

The purpose of this memorandum is to reiterate the importance of expediting the resolution of casework and placement of inmates endorsed to a Minimum Support Facility (MSF) or Camp, and to ensure these inmates are appropriately housed pending placement. An inmate endorsed to an MSF or Camp must have pending casework resolved and either have been granted Minimum B Custody and be placed at the MSF or Camp facility within 60 days of arrival, or be referred to the Classification Staff Representative (CSR), pursuant to California Code of Regulations, Title 15, Section 3379(b), Inmate Transfers. The Classification and Parole Representative (C&PR) shall provide training and a copy of this memorandum to all Correctional Counselors (CCs) and staff who participate in the classification process. A copy of California Department of Corrections and Rehabilitation Form 844, Training Participation Sign-in Sheet, with the title, "Minimum Support Facility and Camp Pipeline Process," and BET ID 11053084 (training code) shall be provided to the Classification Staff Unit (CSU) contact staff by the close of business on October 2, 2015.

## Processing MSF of Endorsed Cases

The institution shall attempt to place inmates endorsed for MSF placement within 30 days of arrival at the institution, consistent with direction first provided in the March 26, 1999, memorandum titled, "Procedures to Expedite Placement of Inmates into Minimum Support Facilities." In all cases with pending issues, such as potential holds, "R" suffix evaluations, violence (VIO), escape (ESC), arson (ARS), or other pending casework, staff shall request information/assistance by utilizing the telephone, facsimile, or email to correspond with the outside agency in an effort to expedite the exchange of information.

## Non-Traditional Pipeline Prior to MSF Placement

Where an institution has an MSF, but does not have a traditional pipeline facility (i.e., Level II, able to accommodate inmates endorsed for MSF) and does not have an existing agreement with another institution to house their MSF pipeline, staff shall ensure the process described below is adhered to.

Supplement to Attachment A_CC I Increased Responsibilities October 2018

Associate Directors, Division of Adult Institutions
Wardens
Classification and Parole Representatives
Classification Staff Representatives
Page 2

An inmate endorsed to the MSF who is temporarily housed within a Level III or Level IV facility:

- Shall be housed in existing dormitory housing where possible.
- Where there is no existing dormitory housing available, the institution shall designate an area (such as a cell block, tier, section, or certain cells) to cluster the MSF pipeline inmates to facilitate tracking.
- The inmate SHALL NOT be celled with a Level III or Level IV inmate.
  o Single Cell housing may be considered, where appropriate/necessary.
- MSF endorsed inmates should be housed in the lowest level housing available, pending clearance for MSF placement.

## Temporary Return from MSF

An inmate who is returned from MSF to the main institution shall be carefully reviewed prior to placement in the general population, Administrative Segregation, or other specialized housing. An inmate who does not require placement in Administrative Segregation or other specialized housing should be housed within the institution's MSF pipeline, consistent with the prior direction in this memorandum, if appropriate.

## Inmates Determined Ineligible for Camp or MSF

When an inmate has been determined ineligible for MSF or Camp placement, the inmate shall be referred to the appropriate level of classification committee for review and referral to the CSR for placement. This referral should occur no later than 60 days after arrival at the institution, or at the earliest opportunity, for an inmate returned to the mainline from MSF/Camp for disciplinary issues or other concerns. In all cases, especially for those inmates housed in a Level III or Level IV MSF pipeline, the referral process **shall be expedited** and the CSR shall be notified of the need to review the case on a priority basis. The transfer from the institution shall also be expedited when the inmate is housed in a Level III or Level IV facility, or is occupying a Camp pipeline bed.

## Application and Removal of the CAM (Camp) Administrative Determinant

An inmate who appears eligible for Camp placement should have the CAM Administrative Determinant applied in "Pending" status within the Strategic Offender Management System (SOMS) by the assigned CC.

Supplement to Attachment A_CC I Increased Responsibilities October 2018

Associate Directors, Division of Adult Institutions
Wardens
Classification and Parole Representatives
Classification Staff Representatives
Page 3

- . This should occur prior to referral to the CSR during the reception center process, or in advance of other referrals to the CSR or C&PR for endorsement.
- The CAM Administrative Determinant represents the inmate is either eligible for Camp currently or is only temporarily excluded from Camp placement.
- Examples of this include, but are not limited to, inmate currently has Level III points, but sufficient time remaining to serve on this term to their placement score, or the inmate is temporarily excluded by time.

This process allows SOMS to compile reports identifying inmate's determined Camp eligible by Classification staff. Equally important, to ensure the information in this report is accurate, once an inmate is determined permanently ineligible for Camp, the CAM shall be placed in "Pending Removal" status by the assigned CC. The CSR will confirm the removal of the CAM at the time of endorsement. Where an inmate is not available for Camp placement, but is eligible for MSF placement, to include placement on a Sensitive Needs Yard MSF, staff shall refer the inmate for MSF placement. Camp and MSF remain departmental priorities.

This memorandum and the related attachments will be available on the CSU web page within the Mini Manual webpage, http://intranet/ops/AO/ins/Pages/Minimanual.aspx, under the "Minimum" and "Transfer" topics. If you have any questions or require additional information regarding classification processes, please contact Jeff McDonald, CC II, CSU, at (916) 445-0224 or via email at Jeff.McDonald@cdcr.ca.gov, or Jonathan Stubbs, CC III, CSU, at (916) 322-0561 or via email at Jonathan.Stubbs@cdcr.ca.gov.

KELLY HARRINGTON
Director
Division of Adult Institutions

Attachments

cc:  Kathleen Allison        Cindy Burris
     Ralph M. Diaz           Mike Masters
     Vincent S. Cullen       Jorge Santana
     James Robertson         Jonathan Stubbs
     Dennis Halverson        Jeff McDonald

Supplement to Attachment A_CC I Increased Responsibilities October 2018

State of California                                            Department of Corrections

# Memorandum

Date  :   March 26, 1999

To    :   Wardens
          Classification and Parole Representatives
          Classification Staff Representatives
          Correctional Counselor IIIs

Subject:   **PROCEDURES TO EXPEDITE PLACEMENT OF INMATES INTO MINIMUM SUPPORT FACILITIES**

This memorandum establishes procedures to expedite placement of eligible inmates into Minimum Support Facilities (MSFs) in order to free up higher level beds for more serious offenders. The following actions will be implemented immediately to increase the number of MSF placements:

1) Expedite placement of endorsed inmates between General Population (GP) facilities into the minimum custody housing.

   - Classification Staff Representatives (CSRs) will state "<u>direct placement</u>" to the institution's MSF on the California Department of Corrections (CDC) Form 128-G endorsement chrono when:

     - The endorsed inmate has at least one continuous year in CDC custody immediately preceding the time of review; and

     - There is sufficient information upon which to make a placement determination; and

     - There are no outstanding issues (potential holds, "R" suffix evaluation, etc.) pending.

   - The receiving institution shall immediately place those inmates designated for "<u>direct placement</u>" into their MSF setting.

2) The receiving institution shall classify and place in the MSF all inmates endorsed for MSF placement that are <u>not designated</u> "direct placement" within 30 days of arrival. This will include eligible inmates transferred from Reception Centers, inmates received from a GP institution with less than one continuous year GP custody, and inmates with issues which must be resolved prior to placement.

* CDC 1617 (8/89)

Supplement to Attachment A_CC I Increased Responsibilities October 2018

Wardens
Classification and Parole Representatives
Classification Staff Representatives
Correctional Counselor IIIs
Page 2

- Resolution of cases with issues, such as potential holds or pending "R" suffix evaluations, shall be expedited using telephonic and/or facsimile communication. If the inmate cannot be moved into the MSF within the 30-day period, the case will be referred to the CSR for alternative placement.

3) Effective April 15, 1999, all MSF endorsed inmates received into Level III or IV facilities who cannot immediately be placed into the MSF upon arrival, shall be housed in dormitory or gymnasium housing with the exception of Calipatria State Prison (CAL). The CAL is excluded from this requirement due to its having neither dormitory housing nor an enclosed gymnasium.

All institutions are directed to eliminate any local restrictions on placement of inmates meeting minimum custody guidelines, as dictated by Administrative Bulletin (AB) 91/27 (amended), into any given institution's MSF. Cases meeting MSF criteria, but not approved for MSF placement by the Classification Committee, will continue to require documentation for the minimum custody denial on the CDC Form 128 G specific to that inmate's circumstances.

All Level III and IV facilities are required to notify the Classification Services Unit (CSU), no later than May 1, 1999, of the number of inmates moved as a result of this direction. You may accomplish this by sending a facsimile to Jan Nordyke, Facility Captain, at (916) 445-0864. Your facsimile shall state the number of celled housing beds this direction opened for higher level inmates and the number of inmates you moved to MSF beds from celled housing beds. Also provide the number of inmates moved to gymnasium housing and indicate to which gymnasium in your facility you moved them.

If you have questions or require additional information, please contact Ruth S. Melrose, Chief, Institution Operations, Institutions Division, at (916) 323-4108. Institution staff may contact Jan Nordyke, Facility Captain, CSU, at (916) 324-7812, for technical information.

**ORIGINAL SIGNED BY**

DAVID TRISTAN
Deputy Director
Institutions Division

cc:  M. T. Pickett          K. W. Prunty          Lewis N. Jones
     Ruth S. Melrose        Jesse Edwards         Jan Nordyke
     Maria Lucy Armendariz  L'Tanya Eddings       Ken Hurdle
     Chris Weaver           Bill Dunkak

Supplement to Attachment A_CC I Increased Responsibilities October 2018

Wardens
Classification and Parole Representatives
Classification Staff Representatives
Correctional Counselor IIIs
Page 3

bcc:   Steven Cambra, Jr., Chief Deputy Director, Field Operations
       Bill Dieball, Assistant Deputy Director, Institutions Division
       John R. Depue, Chief (A), Institution Programs, Institutions Division
       Judith L. Metz, Chief, Correctional Case Records Services
       Marilyn Kalvelage, Chief, Classification Services Unit
       Tom Goughnour, Chief, Transportation Unit
       Jim L'Etoile, Facility Captain, Classification Services Unit
       Jeff Macomber, Staff Services Manager, Program Support Unit
       Merrie Koshell, Correctional Counselor III, Classification Services Unit

KOSHELL:lw:ss:inprocess(MMK0209M)CH99-106
COMPLETE:C032699M

Attachment B

# SUMMARY OF CORRECTIONAL COUNSELOR I
# RATIO POSITION DISTRIBUTION & CASELOAD MONITORING

The following information outlines various processes associated with the Correctional Counselor I (CC I) ratio position distribution by the Program Support Unit (PSU), as well as caseload monitoring by supervisory and managerial staff at institutions.

## *CC I INTERNAL RATIO DISTRIBUTION RATES*

The updated internal ratio allocation rates are as follows:

| Inmate Population | November 2016 | October 2018 |
|---|---|---|
| General Population (GP) | 160:1 | 148:1 |
| Long Term Restricted Housing (LTRH)* | 160:1 | 160:1 |
| Security Housing Unit (SHU) | 100:1 | 160:1 |
| Camp Pipeline | 160:1 | 130:1 |
| Short Term Restricted Housing (STRH) | 160:1 | 140:1 |
| Administrative Segregation Unit (ASU) | 160:1 | 140:1 |
| Enhanced Outpatient Program (EOP) | 100:1 | 120:1 |
| Reception Center (RC) | 100:1 | 100:1 |
| Psychiatric Security Unit (PSU) | 100:1 | 100:1 |
| Department of State Hospitals (DSH) | 100:1 | 85:1 |
| Intermediate Care Facility (ICF) | 100:1 | 85:1 |
| Psychiatric Inpatient Program (PIP) | 100:1 | 85:1 |
| Mental Health Crisis Beds (MHCB) | 100:1 | 85:1 |

*LTRH was previously categorized with ASU & STRH. It is now being considered with the SHU population per the Classification Services Unit, due to being similar in classification type.*

## *CC I RATIO POSITION DISTRIBUTION PROCESS*

The following processes are with consideration to the above-listed internal ratio distribution rates:

### I.    BI-ANNUAL CC I RATIO POSITION DISTRIBUTION

- Formal redistribution of CC I position authority by PSU occurs twice per year (January & July).
  - o Distribution is based on the point-in-time (PIT) inmate population of the preceding months (December & June).
- CC I positions will only be distributed in 1.0 permanent, full-time authority. There will no longer be .5 position authority distributed.
  - o When the ratio formula results in .50 or higher, a 1.0 position will be allocated; when it results in .49 or lower, no additional position will be allocated.
- Formal reallocation processes via 607s will occur to establish, abolish, or redirect position authority at institutions.

Page 1 of 3

# SUMMARY OF CORRECTIONAL COUNSELOR I
# RATIO POSITION DISTRIBUTION & CASELOAD MONITORING

- Institutions are required to maintain two (2) positions Limited-Term (LT). This is consistent with the Division of Adult Institutions Spending Plan directive, in order to account for ratio fluctuations.

  **NOTE:** In instances of population increases tied to bed activations, the applicable ratio position authority will be issued to correspond with activation.

## II.    QUARTERLY REVIEW OF INMATE POPULATION v. RATIO POSITION AUTHORITY

- PSU will review ratio position authority in comparison to the inmate population at quarterly intervals (April & October).
  - Review will be based on PIT inmate population of the preceding months (March & September).
- Determination will be made if interim measures are warranted, pending the next formal distribution. Options will be as follows:
  - If the inmate population has increased, PSU may allocate temporary position authority, via authorized Out-of-Class (OOC) assignments or LT appointments.
  - If the inmate population has decreased, PSU may give direction for an institution to terminate OOC assignments or LT appointments.
- No permanent position authority will be associated with this process; as such, no reallocation processes via 607s will occur during this quarterly review.

## *LOCAL INSTITUTIONAL CASELOAD MONITORING*\*

Supervisors and Managers are responsible for equitable distribution of workload, pursuant to Bargaining Unit (BU) 6 Memorandum of Understanding (MOU), Section 20.02, at the local institutional levels.

- Institutions are expected to pull the Strategic Offender Management System (SOMS) *Correctional Counselor Caseload Per Institution* (ICCR220-15) report weekly to determine the amount of cases per CC I (ratio positions only) to ensure the amount is within the established ratio, respective to each inmate population type.
  - It is critical to ensure the appropriate CC Is are assigned to each inmate in SOMS.
    **NOTE:** Please contact the Classification Policy and Training section, Classification Services Unit if there are questions regarding the assignment of a CC Is in SOMS.
- When it is determined there is a significant imbalance, or levels are imbalanced for a long duration of time, redistribute cases as necessary.

## *REVIEW OF REASONABLE WORKLOAD ACCOMODATION REQUESTS*\*

Pursuant to BU 6 MOU (Section 20.02), a CC I can request a reasonable workload accommodation to their supervisor to address their workload. When this occurs, supervisors should have a discussion with the affected CC I to gain a full understanding of the workload concerns. The following should then be considered:

- Review the CC I's schedule to see if any non-mandatory scheduling, such as training, can be rescheduled.

# SUMMARY OF CORRECTIONAL COUNSELOR I
# RATIO POSITION DISTRIBUTION & CASELOAD MONITORING

- Ensure CC Is are utilizing available tools and resources to ensure they are appropriately evaluating their caseloads.
- Consider caseload timelines to assist in prioritizing workload.
- Assess all CC I's caseloads with consideration to ratio and redirect caseload, if applicable.
- Review upcoming scheduled evaluations/reviews (annuals, post board reviews, etc.) to determine if they can be postponed within the regulatory timeframes.
- Flex employee's schedule (mutually agreed upon).
- Authorize overtime (follow local overtime processes).
- If a CC I is pulled for a special assignment, their caseload should be appropriately redistributed and/or a reasonable accommodation should occur.

*Additional training will be provided by the Classification Services Unit (CSU) regarding this information and associated processes.*

The California Department of Corrections and Rehabilitation
Correctional Counselor I
Ratio Position Distribution Fiscal Year 2018-19
Effective date: October 15, 2018

ATTACHMENT C

| Institution | CCI Ratio | Inmate Population (PIT as of 9/28/18) | New Authorized Ratio's | Previous Authorized Ratio Positions November 2016 | ASU Adjustment | Clark | Armstrong | Coleman | AB 1276 - Youthful Offenders | Mentally Disordered Offender | Mental Health Crisis Beds/PIP | Total Authorized Exempt Positions | Previous Authorized Exempt Positions November 2016 | Total Position Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP - (GP) | 148 | 4,376 | 29.6 | | | | | | | | | | | |
| **ASP TOTAL** | | 4,376 | 30.0 | 20 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 1.0 | 1.0 | 10.0 |
| CAC - (GP) | 148 | 2,431 | 16.4 | | | | | | | | | | | |
| CAC - (ASU) | 140 | 41 | 0.3 | | | | | | | | | | | |
| **CAC TOTAL** | | 2,472 | 17.0 | 12.5 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.5 |
| CAL - (GP) | 148 | 3,332 | 22.5 | | | | | | | | | | | |
| CAL - (ASU) | 140 | 116 | 0.8 | | | | | | | | | | | |
| **CAL TOTAL** | | 3,448 | 23.0 | 24 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (1.0) |
| CCC - (GP) | 148 | 2,796 | 18.9 | | | | | | | | | | | |
| CCC - (CAMP Pipeline) | 130 | 1,995 | 15.3 | | | | | | | | | | | |
| CCC - (ASU) | 140 | 110 | 0.8 | | | | | | | | | | | |
| **CCC TOTAL** | | 4,901 | 35.0 | 25 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10.0 |
| CCI - (GP) | 148 | 3,506 | 23.7 | | | | | | | | | | | |
| CCI - (ASU) | 140 | 79 | 0.6 | | | | | | | | | | | |
| **CCI TOTAL** | | 3,585 | 24.0 | 22.5 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 1.0 | 1.0 | 1.5 |
| CCWF - (ASU) | 140 | 111 | 0.8 | | | | | | | | | | | |
| CCWF - (EOP) | 120 | 91 | 0.8 | | | | | | | | | | | |
| CCWF - (GP) | 148 | 2,027 | 13.7 | | | | | | | | | | | |
| CCWF - (MCB) | 85 | 12 | 0.1 | | | | | | | | | | | |
| CCWF - (RC) | 100 | 648 | 6.5 | | | | | | | | | | | |
| **²&³CCWF TOTAL** | | 2,889 | 22.0 | 20 | 0 | 1.0 | 0.0 | 2.0 | 0.0 | 1.0 | 0.0 | 4.0 | 4.0 | 2.0 |
| CEN - (GP) | 148 | 3,268 | 22.1 | | | | | | | | | | | |
| CEN - (ASU) | 140 | 131 | 0.9 | | | | | | | | | | | |
| **CEN TOTAL** | | 3,399 | 23.0 | 22.5 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.5 |
| CHCF - (EOP) | 120 | 418 | 3.5 | | | | | | | | | | | |
| CHCF - (GP) | 148 | 1,841 | 12.4 | | | | | | | | | | | |
| CHCF - (PIP) | 85 | 134 | 1.6 | | | | | | | | | | | |
| CHCF - (ASU) | 140 | 36 | 0.3 | | | | | | | | | | | |
| CHCF - (ICF) | 85 | 226 | 2.7 | | | | | | | | | | | |
| CHCF - (MCB) | 85 | 98 | 1.2 | | | | | | | | | | | |
| **²CHCF TOTAL** | | 2,753 | 22.0 | 19 | 0 | 2.0 | 1.0 | 1.0 | 0.0 | 1.0 | 0.0 | 5.0 | 5.0 | 3.0 |
| CIM - (GP) | 148 | 3,254 | 22.0 | | | | | | | | | | | |
| CIM - (ASU) | 140 | 45 | 0.3 | | | | | | | | | | | |
| CIM - (MCB) | 85 | 51 | 0.6 | | | | | | | | | | | |
| CIM - (RC) | 100 | 428 | 4.3 | | | | | | | | | | | |
| **¹²³CIM TOTAL** | | 3,778 | 27.0 | 24.5 | (0.5) | 1.0 | 1.0 | 2.0 | 1.0 | 1.0 | 0.0 | 6.0 | 6.0 | 3.0 |
| CIW - (ASU) | 140 | 57 | 0.4 | | | | | | | | | | | |
| CIW - (GP) | 148 | 1,525 | 10.3 | | | | | | | | | | | |
| CIW - (CAMP Pipeline) | 130 | 138 | 1.1 | | | | | | | | | | | |
| CIW - (MCB) | 85 | 10 | 0.1 | | | | | | | | | | | |
| CIW - (PIP) | 85 | 43 | 0.5 | | | | | | | | | | | |
| CIW - (PSU) | 100 | 5 | 0.1 | | | | | | | | | | | |
| CIW - (SHU) | 160 | 35 | 0.2 | | | | | | | | | | | |
| **¹CIW TOTAL** | | 1,813 | 13.0 | 12 | 0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 1.0 |
| CMC - (GP) | 148 | 3,330 | 22.5 | | | | | | | | | | | |
| CMC - (EOP) | 120 | 524 | 4.4 | | | | | | | | | | | |
| CMC - (ASU) | 140 | 134 | 1.0 | | | | | | | | | | | |
| CMC - (MCB) | 85 | 50 | 0.6 | | | | | | | | | | | |
| CMC - (DSH) | 85 | 50 | 0.6 | | | | | | | | | | | |
| **²CMC TOTAL** | | 4,088 | 29.0 | 29 | 0 | 2.0 | 1.0 | 1.0 | 0.0 | 1.0 | 1.0 | 6.0 | 6.0 | 0.0 |
| CMF - (EOP) | 120 | 417 | 3.5 | | | | | | | | | | | |
| CMF - (GP) | 148 | 1,508 | 10.2 | | | | | | | | | | | |
| CMF - (ASU) | 140 | 96 | 0.7 | | | | | | | | | | | |
| CMF - (ICF) | 85 | 138 | 1.6 | | | | | | | | | | | |
| CMF - (PIP) | 85 | 196 | 2.3 | | | | | | | | | | | |
| CMF - (MCB) | 85 | 50 | 0.6 | | | | | | | | | | | |
| **²CMF TOTAL** | | 2,405 | 19.0 | 19 | 0 | 2.0 | 1.0 | 1.0 | 0.0 | 1.0 | 1.0 | 6.0 | 6.0 | 0.0 |

Revision Date: 10/5/2018

The California Department of Corrections and Rehabilitation
Correctional Counselor I
Ratio Position Distribution Fiscal Year 2018-19
Effective date: October 15, 2018

ATTACHMENT C

| Institution | CCI Ratio | Inmate Population (PIT as of 9/26/18) | New Authorized Ratio's | Previous Authorized Ratio Positions November 2016 | ASU Adjustment | Clark | Armstrong | Coleman | AB 1276 - Youthful Offenders | Mentally Disordered Offender | Mental Health Crisis Beds/PIP | Total Authorized Exempt Positions | Previous Authorized Exempt Positions November 2016 | Total Position Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COR - (EOP) | 120 | 392 | 3.3 | | | | | | | | | | | |
| COR - (GP) | 148 | 2,182 | 14.7 | | | | | | | | | | | |
| COR - (ASU) | 140 | 310 | 2.2 | | | | | | | | | | | |
| COR - (LRH) | 160 | 119 | 0.7 | | | | | | | | | | | |
| COR - (MCB) | 85 | 24 | 0.3 | | | | | | | | | | | |
| COR - (SHU) | 160 | 72 | 0.5 | | | | | | | | | | | |
| COR - (SRH) | 140 | 106 | 0.8 | | | | | | | | | | | |
| [2]COR TOTAL | | 3,205 | 23.0 | 23 | 0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 0.0 |
| CRC - (GP) | 148 | 2,440 | 16.5 | | | | | | | | | | | |
| CRC - (ASU) | 140 | 52 | 0.4 | | | | | | | | | | | |
| [1]CRC TOTAL | | 2,440 | 17.0 | 17.5 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 1.0 | 1.0 | (1.0) |
| CTF - (GP) | 148 | 5,229 | 35.3 | | | | | | | | | | | |
| CTF - (ASU) | 140 | 78 | 0.6 | | | | | | | | | | | |
| CTF TOTAL | | 5,307 | 36.0 | 32.5 | 0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 | 0.0 | 2.0 | 2.0 | 3.5 |
| CVSP - (ASU) | 140 | 103 | 0.7 | | | | | | | | | | | |
| CVSP - (GP) | 148 | 2809 | 19.0 | | | | | | | | | | | |
| CVSP TOTAL | | 2,912 | 20.0 | 15 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 5.0 |
| DVI - (GP) | 148 | 878 | 5.9 | | | | | | | | | | | |
| DVI - (ASU) | 140 | 46 | 0.3 | | | | | | | | | | | |
| DVI - (RC) | 100 | 948 | 9.5 | | | | | | | | | | | |
| [3]DVI TOTAL | | 1,872 | 16.0 | 18 | 0 | 0.0 | 0.0 | 2.0 | 1.0 | 0.0 | 0.0 | 3.0 | 3.0 | (2.0) |
| FSP - (GP) | 148 | 2,433 | 16.4 | | | | | | | | | | | |
| FSP - (ASU) | 140 | 107 | 0.8 | | | | | | | | | | | |
| FSP-FWF - (GP) | 148 | 402 | 2.7 | | | | | | | | | | | |
| FSP TOTAL | | 2,942 | 20.0 | 17.5 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 1.0 | 1.0 | 2.5 |
| HDSP - (GP) | 148 | 3,243 | 21.9 | | | | | | | | | | | |
| HDSP - (MCB) | 85 | 10 | 0.1 | | | | | | | | | | | |
| HDSP - (SRH) | 140 | 103 | 0.7 | | | | | | | | | | | |
| [2]HDSP TOTAL | | 3,356 | 23.0 | 23 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| ISP - (GP) | 148 | 3,050 | 20.6 | | | | | | | | | | | |
| ISP TOTAL | | 3,050 | 21.0 | 20 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 |
| KVSP - (EOP) | 120 | 182 | 1.5 | | | | | | | | | | | |
| KVSP - (GP) | 148 | 3,236 | 21.9 | | | | | | | | | | | |
| KVSP - (ASU) | 140 | 115 | 0.8 | | | | | | | | | | | |
| KVSP - (MCB) | 85 | 12 | 0.1 | | | | | | | | | | | |
| KVSP - (SRH) | 140 | 112 | 0.8 | | | | | | | | | | | |
| [2]KVSP TOTAL | | 3,657 | 25.0 | 24.5 | 0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 0.5 |
| LAC - (GP) | 148 | 2,354 | 15.9 | | | | | | | | | | | |
| LAC - (EOP) | 120 | 569 | 4.7 | | | | | | | | | | | |
| LAC - (ASU) | 140 | 102 | 0.7 | | | | | | | | | | | |
| LAC - (MCB) | 85 | 12 | 0.1 | | | | | | | | | | | |
| LAC - (SRH) | 140 | 115 | 0.8 | | | | | | | | | | | |
| [2]LAC TOTAL | | 3,152 | 22.0 | 21.5 | 0 | 1.0 | 1.0 | 1.0 | 0.0 | 0.0 | 0.0 | 3.0 | 2.0 | 0.5 |
| MCSP - (EOP) | 120 | 660 | 5.5 | | | | | | | | | | | |
| MCSP - (ASU) | 140 | 98 | 0.7 | | | | | | | | | | | |
| MCSP - (GP) | 148 | 3328 | 22.5 | | | | | | | | | | | |
| MCSP - (MCB) | 85 | 8 | 0.1 | | | | | | | | | | | |
| [2]MCSP TOTAL | | 4,094 | 29.0 | 24.5 | 0 | 1.0 | 1.0 | 1.0 | 0.0 | 0.0 | 0.0 | 3.0 | 3.0 | 4.5 |
| NKSP - (GP) | 148 | 944 | 6.4 | | | | | | | | | | | |
| NKSP - (ASU) | 140 | 97 | 0.7 | | | | | | | | | | | |
| NKSP - (MCB) | 85 | 10 | 0.1 | | | | | | | | | | | |
| NKSP - (RC) | 100 | 2996 | 30.0 | | | | | | | | | | | |
| [2][3]NKSP TOTAL | | 4,047 | 37.0 | 40 | 0 | 0.0 | 0.0 | 5.0 | 2.0 | 1.0 | 0.0 | 8.0 | 8.0 | (3.0) |
| PBSP - (GP) | 148 | 2,023 | 13.7 | | | | | | | | | | | |
| PBSP - (MCB) | 85 | 10 | 0.1 | | | | | | | | | | | |
| PBSP - (SHU) | 160 | 444 | 2.8 | | | | | | | | | | | |
| PBSP - (SRH) | 140 | 106 | 0.8 | | | | | | | | | | | |
| [2]PBSP TOTAL | | 2,583 | 17.0 | 15.5 | 0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 1.0 | 1.0 | 1.5 |

Revision Date: 10/5/2018

The California Department of Corrections and Rehabilitation
Correctional Counselor I
Ratio Position Distribution Fiscal Year 2018-19
Effective date: October 15, 2018

ATTACHMENT C

| Institution | CCI Ratio | Inmate Population (PIT as of 9/28/18) | New Authorized Ratio's | Previous Authorized Ratio Positions November 2016 | ASU Adjustment | Clark | Armstrong | Coleman | AB 1276 - Youthful Offenders | Mentally Disordered Offender | Mental Health Crisis Beds/PIP | Total Authorized Exempt Positions | Previous Authorized Exempt Positions November 2016 | Total Position Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PVSP - (GP) | 148 | 3,044 | 20.6 | | | | | | | | | | | |
| PVSP - (MCB) | 85 | 6 | 0.1 | | | | | | | | | | | |
| PVSP - (SRH) | 140 | 133 | 1.0 | | | | | | | | | | | |
| PVSP - (DSH) | 85 | 50 | 0.6 | | | | | | | | | | | |
| ²PVSP TOTAL | | 3,233 | 22.0 | 20 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 |
| RJD - (EOP) | 120 | 769 | 6.4 | | | | | | | | | | | |
| RJD - (GP) | 148 | 2,987 | 20.2 | | | | | | | | | | | |
| RJD - (ASU) | 140 | 181 | 1.3 | | | | | | | | | | | |
| RJD - (MCB) | 85 | 14 | 0.2 | | | | | | | | | | | |
| ²RJD TOTAL | | 3,951 | 28.0 | 21 | 0 | 1.0 | 1.0 | 1.0 | 0.0 | 1.0 | 0.0 | 4.0 | 4.0 | 7.0 |
| SAC - (EOP) | 120 | 575 | 4.8 | | | | | | | | | | | |
| SAC - (GP) | 148 | 1,153 | 7.8 | | | | | | | | | | | |
| SAC - (ASU) | 140 | 50 | 0.4 | | | | | | | | | | | |
| SAC - (MCB) | 85 | 20 | 0.2 | | | | | | | | | | | |
| SAC - (PSU) | 100 | 193 | 1.9 | | | | | | | | | | | |
| SAC - (SRH) | 140 | 85 | 0.6 | | | | | | | | | | | |
| ²SAC TOTAL | | 2,076 | 16.0 | 17.5 | 0 | 1.0 | 0.0 | 1.0 | 0.0 | 0.0 | 0.0 | 2.0 | 2.0 | (1.5) |
| SATF - (EOP) | 120 | 622 | 5.2 | | | | | | | | | | | |
| SATF - (GP) | 148 | 5,104 | 34.5 | | | | | | | | | | | |
| SATF - (MCB) | 85 | 20 | 0.2 | | | | | | | | | | | |
| SATF - (SRH) | 140 | 82 | 0.6 | | | | | | | | | | | |
| ²SATF TOTAL | | 5,828 | 41.0 | 34.5 | 0 | 3.0 | 1.0 | 1.0 | 0.0 | 1.0 | 0.0 | 6.0 | 6.0 | 6.5 |
| SCC - (GP) | 148 | 2,687 | 18.2 | | | | | | | | | | | |
| SCC - (CAMP Pipeline) | 130 | 1,446 | 11.1 | | | | | | | | | | | |
| SCC - (ASU) | 140 | 147 | 1.1 | | | | | | | | | | | |
| SCC TOTAL | | 4,280 | 30.0 | 26 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4.0 |
| SOL - (GP) | 148 | 3,975 | 26.9 | | | | | | | | | | | |
| SOL - (ASU) | 140 | 126 | 0.9 | | | | | | | | | | | |
| SOL - (MCB) | 85 | 9 | 0.1 | | | | | | | | | | | |
| ²SOL TOTAL | | 4,110 | 28.0 | 26 | 0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 | 0.0 | 2.0 | 2.0 | 2.0 |
| SQ - (EOP) | 120 | 96 | 0.8 | | | | | | | | | | | |
| SQ - (GP) | 148 | 3,070 | 20.7 | | | | | | | | | | | |
| SQ - (ASU) | 140 | 147 | 1.1 | | | | | | | | | | | |
| SQ - (PIP) | 85 | 30 | 0.4 | | | | | | | | | | | |
| SQ - (RC) | 100 | 1099 | 11.0 | | | | | | | | | | | |
| ³SQ TOTAL | | 4,442 | 34.0 | 27 | 0 | 0.0 | 0.0 | 2.0 | 1.0 | 0.0 | 1.0 | 4.0 | 4.0 | 7.0 |
| SVSP - (EOP) | 120 | 390 | 3.3 | | | | | | | | | | | |
| SVSP - (GP) | 148 | 2,537 | 17.1 | | | | | | | | | | | |
| SVSP - (ASU) | 140 | 74 | 0.5 | | | | | | | | | | | |
| SVSP - (ICF) | 65 | 192 | 2.3 | | | | | | | | | | | |
| SVSP - (MCB) | 85 | 10 | 0.1 | | | | | | | | | | | |
| SVSP - (SRH) | 140 | 101 | 0.7 | | | | | | | | | | | |
| ²SVSP TOTAL | | 3,304 | 24.0 | 26 | 0 | 1.0 | 1.0 | 1.0 | 0.0 | 0.0 | 0.0 | 3.0 | 4.0 | (2.0) |
| VSP - (EOP) | 120 | 358 | 3.0 | | | | | | | | | | | |
| VSP - (GP) | 148 | 3198 | 21.6 | | | | | | | | | | | |
| VSP - (ASU) | 140 | 24 | 0.2 | | | | | | | | | | | |
| VSP TOTAL | | 3,580 | 25.0 | 23 | 0 | 0.0 | 1.0 | 2.0 | 0.0 | 1.0 | 0.0 | 4.0 | 4.0 | 2.0 |
| WSP - (GP) | 148 | 1,008 | 6.8 | | | | | | | | | | | |
| WSP - (ASU) | 140 | 60 | 0.4 | | | | | | | | | | | |
| WSP - (MCB) | 85 | 6 | 0.1 | | | | | | | | | | | |
| WSP - (RC) | 100 | 3728 | 37.3 | | | | | | | | | | | |
| ²&³WSP TOTAL | | 4,802 | 45.0 | 44.5 | 0 | 0.0 | 0.0 | 5.0 | 2.0 | 1.0 | 0.0 | 8.0 | 8.0 | 0.5 |
| TOTAL LINE | | 122,130 | 883 | 808 | | 16 | 12 | 33 | 7 | 16 | 3 | 87 | 87 | 75 |

¹ Note: Between the November 2016 & October 2018 Distributions 0.5PY was redirected from CIM to CRC as reflected in the ASU Adjustment. This is due to CRC providing casework support to CRC inmates located at CIM.

² Note: Mental Health Crisis Beds will staff based on bed capacity vs. PIT due to the constant fluxation and IDTT mandate.

³ Note: RC Institutions population is accounting for the highest daily population within a two week period.

Revision Date: 10/5/2018

**California Department of Corrections and Rehabilitation**          **ATTACHMENT C1**
**Correctional Counselor I**
**Ratio Position Distribution Summary of Changes Fiscal Year: 2018-19**

| Institution | NOV 2016 RATIO DISTRIBUTION November 2016 Allocation | OCT 2018 RATIO DISTRIBUTION October 2018 Allocation | Adjustment |
|---|---|---|---|
| ASP | 20.0 | 30.0 | 10.0 |
| CAC | 12.5 | 17.0 | 4.5 |
| CAL | 24.0 | 23.0 | -1.0 |
| CCC | 25.0 | 35.0 | 10.0 |
| CCI | 22.5 | 24.0 | 1.5 |
| CCWF | 20.0 | 22.0 | 2.0 |
| CEN | 22.5 | 23.0 | 0.5 |
| CHCF | 19.0 | 22.0 | 3.0 |
| CIM | 24.0 | 27.0 | 3.0 |
| CIW | 12.0 | 13.0 | 1.0 |
| CMC | 29.0 | 29.0 | 0.0 |
| CMF | 19.0 | 19.0 | 0.0 |
| COR | 23.0 | 23.0 | 0.0 |
| CRC | 18.0 | 17.0 | -1.0 |
| CTF | 32.5 | 36.0 | 3.5 |
| CVSP | 15.0 | 20.0 | 5.0 |
| DVI | 18.0 | 16.0 | -2.0 |
| FSP | 17.5 | 20.0 | 2.5 |
| HDSP | 23.0 | 23.0 | 0.0 |
| ISP | 20.0 | 21.0 | 1.0 |
| KVSP | 24.5 | 25.0 | 0.5 |
| LAC | 21.5 | 22.0 | 0.5 |
| MCSP | 24.5 | 29.0 | 4.5 |
| NKSP | 40.0 | 37.0 | -3.0 |
| PBSP | 15.5 | 17.0 | 1.5 |
| PVSP | 20.0 | 22.0 | 2.0 |
| RJD | 21.0 | 28.0 | 7.0 |
| SAC | 17.5 | 16.0 | -1.5 |
| SATF | 34.5 | 41.0 | 6.5 |
| SCC | 26.0 | 30.0 | 4.0 |
| SOL | 26.0 | 28.0 | 2.0 |
| SQ | 27.0 | 34.0 | 7.0 |
| SVSP | 26.0 | 24.0 | -2.0 |
| VSP | 23.0 | 25.0 | 2.0 |
| WSP | 44.5 | 45.0 | 0.5 |
| **Total PY** | 808.0 | 883.0 | 75.0 |

PIT Population 9/28/2018                    Revision Date: 10/5/2018

**The California Department of Corrections and Rehabilitation**
**Correctional Counselor I 607 Position Action Matrix**

ATTACHMENT D

| INST | Adjustment | CAL* | CRC* | DVI* | NKSP* | SAC* | SVSP* | FY 18/19 BCP ALLOCATION** |
|---|---|---|---|---|---|---|---|---|
| | | **-1.0** | **-1.0** | **-2.0** | **-3.0** | **-1.5** | **-2.0** | |
| ASP | 10.0 | | | | | | | 10.0 |
| CAC | 4.5 | | | | | | | 4.5 |
| CCC | 10.0 | | | | | | | 10.0 |
| CCI | 1.5 | | | | | 1.5 | | 0.0 |
| CCWF | 2.0 | | | | | | 2.0 | 0.0 |
| CEN | 0.5 | | | | | | | 0.5 |
| CHCF | 3.0 | | 1.0 | 2.0 | | | | 0.0 |
| CIM | 3.0 | | | | 3.0 | | | 0.0 |
| CIW | 1.0 | | | | | | | 1.0 |
| CTF | 3.5 | | | | | | | 3.5 |
| CVSP | 5.0 | | | | | | | 5.0 |
| FSP | 2.5 | | | | | | | 2.5 |
| ISP | 1.0 | 1.0 | | | | | | 0.0 |
| KVSP | 0.5 | | | | | | | 0.5 |
| LAC | 0.5 | | | | | | | 0.5 |
| MCSP | 4.5 | | | | | | | 4.5 |
| PBSP | 1.5 | | | | | | | 1.5 |
| PVSP | 2.0 | | | | | | | 2.0 |
| RJD | 7.0 | | | | | | | 7.0 |
| SATF | 6.5 | | | | | | | 6.5 |
| SCC | 4.0 | | | | | | | 4.0 |
| SOL | 2.0 | | | | | | | 2.0 |
| SQ | 7.0 | | | | | | | 7.0 |
| VSP | 2.0 | | | | | | | 2.0 |
| WSP | 0.5 | | | | | | | 0.5 |

SENDING INSTITUTIONS (CAL*, CRC*, DVI*, NKSP*, SAC*, SVSP*)
RECEIVING INSTITUTIONS

*Redirected PY - sending institutions will redirect PY to receiving institutions
**New PY - receiving institutions will establish position(s)

Revision Date: 10/5/2018

Attachment E

## CORRECTIONAL COUNSELOR I POSITION DISTRIBUTION
## 607 PROCESSING INSTRUCTIONS

The effective date of all 607s shall be October 1, 2018. All 607s are due to De Vaughn Zachary, Program Support Unit (PSU), by **November 30, 2018**. All 607s submitted shall notate in the explanations section that the position authority was received via Budget Change Proposal (BCP) "5225-417-BCP-2018-MR CC I Ratio Adjustment." For any questions regarding the below information, please contact De Vaughn Zachary at (916) 322-8729.

### 607s to Redirect PY Between Institutions

Institutions *redirecting authority to another institution,* as outlined in Revised Correctional Counselor I Ratio Allocation and Distribution Methodology and Process memorandum:

Send an email to the Request for Personnel Action (RPA) Workflow email address:

- CDCR BIS RPA Workflow Help Desk at *m_BISRPA-WHD@cdcr.ca.gov*

In the email, cc: the receiving institution's Institutional Personnel Officer (IPO) or designee and the PSU Ratio Coordinator. The following information shall be included:
- Request to redirect per ratio reallocation (refer to appropriate Distribution Memorandum)
- State Controller's Office (SCO) position number(s)
- SAP position number
- The receiving institution's Agency Code and Payroll Reporting Unit
- Effective date of the redirect (as outlined in the Distribution Memorandum)

The RPA Workflow Help Desk team will move the position from the sending personnel area to the receiving personnel area in SAP, and will then send a confirmation email to both facilities and PSU, notifying the change has occurred.

The receiving institution will complete a 607 action (ZSRD) in RPA Workflow to redirect the position, ensuring it is in the correct organizational structure in SAP/BIS and updating the SCO position number. If the redirect requires a position to be split, a 607 must be submitted to the PSU Ratio Coordinator to process the split, noting in the 607 (Box 10) which position will be redirected.

The 607 will be routed through RPA Workflow for all necessary approvals and must be forwarded to PSU Ratio Coordinator for approval as noted in the CCI Ratio Distribution memorandum.

PSU will ensure the 607 is forwarded to the Budget Management Branch (BMB) analyst/manager for final approval and processing.

### 607s to Establish PY at Institutions

Institutions *establishing CC I position authority without redirect from another institution* are directed to:

Create a hard copy 607 outside of RPA workflow and forward the hard copy to the PSU Ratio Coordinator via mail. The PSU Ratio Coordinator will ensure the 607 is consistent with the October 2018 CC I Ratio Distribution. Upon review and approval, PSU will forward to the hard copy RPA to BMB, who will review and approve prior to sending to SCO. When the hardcopy 607 has been sent to SCO, the respective institution shall receive a copy from BMB, notifying establishment of the position.

Attachment F

| October 2018 | [NOTIFICATION OF STAFFING ADJUSTMENTS] |
|---|---|

### SENT ON BEHALF OF JENNIFER BARRETTO
### ASSISTANT DEPUTY DIRECTOR, FACILITY SUPPORT

This staffing adjustment is related to the October 2018 Ratio Position Distribution for Correctional Counselor I (CC I) positions and associated posts statewide. The changes are to be effective October 15, 2018.

Posts associated to the attached positions (refer to Attachment B of the October 2018 CC I Ratio Position Distribution) will be created in TeleStaff and assigned to Institution 1, Budgeted. These new posts will be activated in Telestaff on October 15, 2018, at which time institutions may fill when the appropriate Personnel and Labor Relations process (as applicable) have concluded.

Additionally, effective October 14, 2018, any current approved event posts/non-budgeted positions in Telestaff will be deactivated. Therefore, incumbents in those temporary event posts/non-budgeted positions may be moved into the newly created posts in Telestaff to continue their limited term/OOC assignments if warranted and with consideration to the applicable hiring processes.

The CC I ratio positions will be closely monitored at quarterly intervals. The Program Support Unit (PSU) will work with the Population Management Unit on forecasted population changes and will advise if post should be activated or deactivated pending the next formal distribution.

The custody changes will be reflected in your next PAS and MAR reconciliation. If you have any questions regarding the adjustment please contact your assigned PSU Lieutenant, or Leithen Engellenner, Captain, PSU.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient/s. unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.

## Gaines, Thomas@CDCR

| | |
|---|---|
| **Subject:** | FW: Revised Correctional Counselor I Ratio Allocation Distribution Methodology & Process - October 2018 |
| **Attachments:** | Revised CC I Ratio Allocation Distribution Methodology & Process.pdf; Attachment A - CC I Increased Responsibilities.pdf; Attachment B - Summary of CC I Ratio Position Distribution & Caseload Monitoring.pdf; Attachment C - CC I Ratio Position Distribution October 2018.pdf; Attachment C1 - CC I Ratio Position Distribution Summary of Changes October 2018.pdf; Attachment D - CC I 607 Position Action Matrix.pdf; Attachment E - 607 Processing Instructions.pdf; Attachment F - Notification of Staffing Adjustments.pdf |

**From:** "Heinitz, Whitney@CDCR" <Whitney.Heinitz2@cdcr.ca.gov>
**To:** "CDCR Institutions DAI Associate Directors" <InstitutionsDAIAssociateDirectors@cdcr.ca.gov>, "CDCR Institutions Wardens" <InstitutionsWardens@cdcr.ca.gov>, "CDCR AssocWardens-BusinessServices-Statewide" <AssocWardens-BusinessServices-Statewide@cdcr.ca.gov>, "CDCR Institutions DAI CSU C and PRs" <InstitutionsDAICSUCandPRs@cdcr.ca.gov>, "Bell, Rodney K.@CDCR" <Rodney.Bell@cdcr.ca.gov>, "Binkele, Rudolph@CDCR" <Rudolph.Binkele@cdcr.ca.gov>, "Bird, Landon@CDCR" <Landon.Bird@cdcr.ca.gov>, "Biter, Martin@CDCR" <Martin.Biter@cdcr.ca.gov>, "Broomfield, Ronald A.@CDCR" <Ronald.Broomfield@cdcr.ca.gov>, "Browder, James@CDCR" <James.Browder@cdcr.ca.gov>, "Buckley, Jonathan@CDCR" <Jonathan.Buckley@cdcr.ca.gov>, "Cagle, Steve@CDCR" <Steve.Cagle@cdcr.ca.gov>, "Cates, Brian@CDCR" <Brian.Cates@cdcr.ca.gov>, "Cisneros, Theresa(SATF)@CDCR" <Theresa.Cisneros@cdcr.ca.gov>, "Covello, Patrick@CDCR" <Patrick.Covello@cdcr.ca.gov>, "Cueva, Daniel E.@CDCR" <Daniel.Cueva@cdcr.ca.gov>, "Eldridge, Laura@CDCR" <Laura.Eldridge@cdcr.ca.gov>, "Favila, Armando@CDCR" <Armando.Favila@cdcr.ca.gov>, "Foss, Tammy@CDCR" <Tammy.Foss@cdcr.ca.gov>, "Hedrick, Belinda@CDCR" <Belinda.Hedrick@cdcr.ca.gov>, "Holbrook, David@CDCR" <David.Holbrook@cdcr.ca.gov>, "Holmes, Bryan (MCSP)@CDCR" <Bryan.Holmes@cdcr.ca.gov>, "Houston, Mona D@CDCR" <Mona.Houston2@cdcr.ca.gov>, "Johnson, Raybon@CDCR" <Raybon.Johnson@cdcr.ca.gov>, "Jones, Ronald@CDCR" <Ronald.Jones@cdcr.ca.gov>, "Kesterson, Kathryn J.@CDCR" <Kathryn.Kesterson@cdcr.ca.gov>, "Kibler, Brian@CDCR" <Brian.Kibler@cdcr.ca.gov>, "Lozano, Jared D.@CDCR" <Jared.Lozano@cdcr.ca.gov>, "Lynch, Jeff@CDCR" <Jeffrey.Lynch@cdcr.ca.gov>, "Matteson, Gigi@CDCR" <Gigi.Matteson@cdcr.ca.gov>, "Nash, Kent R.@CDCR" <Kent.Nash@cdcr.ca.gov>, "Pallares, Mike@CDCR" <Mike.Pallares@cdcr.ca.gov>, "Pickett, Jason@CDCR" <Jason.Pickett@cdcr.ca.gov>, "Pollard, Marcus@CDCR" <Marcus.Pollard2@cdcr.ca.gov>, "Pratt, Glen@CDCR" <Glen.Pratt@cdcr.ca.gov>, "Samuel, Danny@CDCR" <Danny.Samuel@cdcr.ca.gov>, "Sexton, Michael@CDCR" <Michael.Sexton@cdcr.ca.gov>, "Shirley, Heather@CDCR" <Heather.Shirley@cdcr.ca.gov>, "Smith, Richard W. (ISP)@CDCR" <Richard.Smith2@cdcr.ca.gov>, "Vasconcellos, Edward@CDCR" <Edward.Vasconcellos@cdcr.ca.gov>, "Vera, Paul D@CDCR" <Paul.Vera@cdcr.ca.gov>
**Cc:** "Gipson, Connie@CDCR" <Connie.Gipson@cdcr.ca.gov>, "Macomber, Jeff@CDCR" <Jeffrey.Macomber@cdcr.ca.gov>, "Alfaro, Sandra@CDCR" <Sandra.Alfaro@cdcr.ca.gov>, "Murch, Candace@CDCR" <Candace.Murch@cdcr.ca.gov>, "Barretto, Jennifer@CDCR" <Jennifer.Barretto@cdcr.ca.gov>, "Caraballo, Justi@CDCR" <Justi.Caraballo@cdcr.ca.gov>, "Moak, Brian@CDCR" <Brian.Moak@cdcr.ca.gov>, "Fransham, Natalie@CDCR" <Natalie.Fransham@cdcr.ca.gov>, "Pettis, Renee@CDCR" <Renee.Pettis@cdcr.ca.gov>, "Engellenner, Leithen@CDCR" <Leithen.Engellenner@cdcr.ca.gov>, "Thomas, Edina@CDCR" <Edina.Thomas@cdcr.ca.gov>, "MacDonald, Chris@CDCR" <Chris.MacDonald@cdcr.ca.gov>, "Scott, Lee@CDCR" <Lee.Scott@cdcr.ca.gov>, "McCune, Margie@CDCR" <Margie.McCune@cdcr.ca.gov>, "CDCR Correctional Business Mgrs" <CorrectionalBusinessMgrs@cdcr.ca.gov>, "CDCR HR Personnel Officers" <HRPersonnelOfficers@cdcr.ca.gov>, "Schanz, Cassandra@CDCR" <Cassandra.Schanz@cdcr.ca.gov>, "Zachary, De Vaughn@CDCR" <DeVaughn.Zachary@cdcr.ca.gov>, "Russell, Jessica@CDCR" <Jessica.Russell@cdcr.ca.gov>, "Baird, Hannah" <Hannah.Baird@cdcr.ca.gov>, "Berry, Karah A.@CDCR" <Karah.Berry@cdcr.ca.gov>, "Brown, Barbara@CDCR" <Barbara.Brown@cdcr.ca.gov>, "Cardenas, Maria@CDCR" <Maria.Cardenas2@cdcr.ca.gov>, "CDCR Office of Labor Relations" <OfficeofLaborRelations@cdcr.ca.gov>, "Collura, Julia@CDCR" <Julia.Collura@cdcr.ca.gov>, "Costa, Tracy@CDCR" <Tracy.Costa@cdcr.ca.gov>, "Crates, Melissa A.@CDCR" <Melissa.Crates@cdcr.ca.gov>, "Dales, Sarah@CDCR" <Sarah.Dales@cdcr.ca.gov>, "Dean, Adam@CDCR"

1

<Adam.Dean@cdcr.ca.gov>, "Dickerson, Sharon(SATF)@CDCR" <Sharon.Dickerson@cdcr.ca.gov>, "Esau, Elizabeth (CMF)@CDCR" <Elizabeth.Esau@cdcr.ca.gov>, "Evans, Karem@CDCR" <Karem.Evans@cdcr.ca.gov>, "Fassler, Layla K.@CDCR" <Layla.Fassler@cdcr.ca.gov>, "Feehan, Donna@CDCR" <Donna.Feehan@cdcr.ca.gov>, "Garza, Rafaela@CDCR" <Rafaela.Garza@cdcr.ca.gov>, "Gil, Veronica I.@CDCR" <Veronica.Gil@cdcr.ca.gov>, "Jalil, Elane L@CDCR" <Elane.Jalil@cdcr.ca.gov>, "Jauregui, Ruben@CDCR" <Ruben.Jauregui@cdcr.ca.gov>, "Kotey, Anissa@CDCR" <Anissa.Kotey@cdcr.ca.gov>, "McCormick, Tori@CDCR" <Tori.McCormick@cdcr.ca.gov>, "Miller-Hadrava, Alicia@CDCR" <Alicia.Miller-Hadrava@cdcr.ca.gov>, "Morgan, Carlyn D@CDCR" <Carlyn.Morgan@cdcr.ca.gov>, "Najarro, Linsey@CDCR" <Linsey.Najarro@cdcr.ca.gov>, "Nelson, Deborah A.@CDCR" <Deborah.Nelson2@cdcr.ca.gov>, "Newborg, William@CDCR" <William.Newborg@cdcr.ca.gov>, "Olusegun, Oluwatoyin@CDCR" <Oluwatoyin.Olusegun@cdcr.ca.gov>, "Paulino, Nathan@CDCR" <Nathan.Paulino@cdcr.ca.gov>, "Quezada, Thomas@CDCR" <Thomas.Quezada@cdcr.ca.gov>, "Rocamora, Corey@CDCR" <Corey.Rocamora@cdcr.ca.gov>, "Rodriguez, Bobbie@CDCR" <Bobbie.Rodriguez@cdcr.ca.gov>, "Rosales, Kristin@CDCR" <Kristin.Rosales@cdcr.ca.gov>, "Sherman, Macy@CDCR" <Macy.Sherman@cdcr.ca.gov>, "Simpson, Mayme I@CDCR" <Mayme.Simpson@cdcr.ca.gov>, "Tellechea, Teresa@CDCR" <Teresa.Tellechea@cdcr.ca.gov>, "Tello, Martha@CDCR" <Martha.Tello@cdcr.ca.gov>, "Truman, Cherry@CDCR" <Cherry.Truman@cdcr.ca.gov>, "Velasco, Christina@CDCR" <Christina.Velasco@cdcr.ca.gov>, "Wynd, Nicole E.@CDCR" <Nicole.Wynd@cdcr.ca.gov>

**Subject: Revised Correctional Counselor I Ratio Allocation Distribution Methodology & Process - October 2018**

**<u>SENT ON BEHALF OF:</u>**
JENNIFER BARRETTO
Assistant Deputy Director
Facility Support
Division of Adult Institutions

I am pleased to share with you the attached is the Revised Correctional Counselor I Ratio Allocation Distribution Methodology and Process.

This memorandum and associated attachments outline information on our newly established internal ratio distribution; provides the process for distributing CC I ratio positions; and details the CC I duties as it relates to increased rehabilitative duties of our CC I's.

There are a number of changes and expectations covered in these attachments. The following provides some of the highlights with recommendations to consider:

- Custody management will need to determine how to realign CC I duties to correspond to the changes and determine the post and bid changes/implementations.
- IPO's will need to work closely with custody management on the duty statements and org chart changes. IPO's will ensure proper hiring processes as outlined in the Hiring Guide are followed. As a reminder, institutions must maintain at least 2.0 CC I limited term to allow for ratio realignments as population changes.
- The ATM Institution Reps who are currently in Sacramento working with PSU staff on building TeleStaff for Standardized Staffing will also build in the new CC I posts this week.
- Business Managers will need to work with custody management on identifying office spaces for new positions and secure the approval of the Hiring Authority.
- LRA's will need to work with all necessary parties in coordinating communication with the Union. We recommend an early engagement process to discuss post and bid, duty statement/post order changes, office space ideas, etc.

2

- Community Resource Managers will need to communicate with Custody Managers on the best methods to share the available self-help programs with CC I's so they are able to provide the information to inmates.

As the memo explains, CSU will be providing training to CC I's and their supervisors/managers specific to the expectations of rehabilitative duties as found in Attachment A. Training will also be provided to CC II, Supervisors and Managers specific to best practices of equitable distribution of casework and caseload monitoring. Additional information will be forthcoming.

This information will also be covered at the Wardens meeting as well.

Any questions concerning the revised process should be forwarded to Justi Caraballo, Chief, Program Support Unit.

Thank you, Jenn

*Whitney Heinitz*

Assoc. Governmental Prog. Analyst
Special Assistant to
Jennifer Barretto, Assistant Deputy Director
Facility Support
Division of Adult Institutions
☎ 916.324.0762
✉ whitney.heinitz2@cdcr.ca.gov

3

# EXHIBIT 22

| | |
|---|---|
| **From:** | Anna Feingold |
| **To:** | Gay C. Grunfeld |
| **Subject:** | PJW Query |
| **Date:** | Wednesday, August 16, 2023 10:50:19 AM |

[EXTERNAL MESSAGE NOTICE]

Hello Ms. Grunfeld,

I saw that you inquired about our trainings through the PJW website.  Thank you for your interest and for reaching out.

Unfortunately, we currently only provide our trainings to attorneys who maintain a regular practice representing clients in parole hearings.  Let us know if we can help with something else.

Take care,

Anna



**Anna Faircloth Feingold**

Executive Director

PAROLEJUSTICE.ORG

| | |
|---|---|
| **From:** | Thomas Nolan |
| **To:** | Heidi Rummel; Anna Feingold; Caroline Jackson |
| **Cc:** | Caroline Jackson; Amit Rao; Gay C. Grunfeld; Michael W. Bien |
| **Bcc:** | 0581_04_ Armstrong v_ Brown_Armstrong BPH Issues ___ Emails _0581_04_ |
| **Subject:** | Armstrong -- Request to View ADA Training Provided to Panel Attorneys [IMAN-DMS.FID36718] |
| **Date:** | Thursday, July 6, 2023 8:27:54 PM |
| **Attachments:** | image001.jpg |

Hi Heidi and Anna –

I wanted to follow up on my requests below and when we spoke on the phone in April to be able to review the ADA training provided to panel attorneys.  When we spoke you told me you would think about the request and get back to me.  Please let me know whether you are willing to provide us with access to the trainings that are provided in order to help panel attorneys better represent people with disabilities.

Thanks and regards,

Tom


Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.


**From:** Thomas Nolan
**Sent:** Thursday, April 27, 2023 11:47 AM
**To:** Heidi Rummel <heidi@parolejustice.org>; 'Anna Feingold' <anna@parolejustice.org>; Caroline Jackson <CJackson@rbgg.com>
**Cc:** Caroline Jackson <CJackson@rbgg.com>; Amit Rao <ARao@rbgg.com>; Thomas Nolan <TNolan@rbgg.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>

**Subject:** Connecting Parole Justice Works and RBGG Attorney Caroline Jackson [IMAN-DMS.FID5932]

Hi Heidi –

It was nice talking to you just now.   I am writing to follow up by connecting you with our attorney Caroline Jackson, who used to work for the National Association of the Deaf (NAD) and who is fluent in ASL.  It would be great if you can connect her to the panel attorney you mentioned who knows sign language and will be representing deaf signers in the future.

Also if you can share a current list of trainings and give us access to any actual ADA trainings we would appreciate it.  We would be happy to discuss any concerns you have about providing us with access to trainings as well.

I would also be very interested in doing some training of panel attorney at one of your regular trainings on Monday afternoons, possibly in late July or August of this year.

Thanks,

Tom


Thomas Nolan
*Of Counsel*



101 Mission Street, 6th Floor
San Francisco, CA 94105
(415) 310-2097 (cell)
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
tnolan@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at tnolan@rbgg.com.

# EXHIBIT 23

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**

P.O. Box 4036
Sacramento, CA 95812-4036



**SENT VIA EMAIL ONLY**

September 15, 2023

Caroline Jackson
Rosen Bien Galvan & Grunfeld LLP
Email: cjackson@rbgg.com

Re:  *Armstrong* II, Board of Parole Hearings' Response to Plaintiffs' September 7, 2023
     Consolidated Request for Document Production

Dear Ms. Jackson,

I write on behalf of the Board of Parole Hearings (Board) in response to your September 7, 2023
request for additional documentation under *Armstrong*. Your letter serves to consolidate three
recent requests, specifically made in an August 16, 2023 letter and in emails dated August 17,
2023 and August 21, 2023. The responses below are numbered to reflect the numbering used
in your September 7, 2023 written demand.

## A.    Plaintiffs' Requests

In your September 7, 2023 letter, you make the following requests: (1) any and all BPH
contracts for panel attorneys for the past three years; (2) any and all documents showing
instances in the past three years where the Board has paid a panel attorney more than the
standard amount and the reason for the additional payment; (3) any and all letters or complaints
in the past three years from BPH panel attorneys to the Board regarding reasonable
accommodations for *Armstrong* class members; (4) any and all letters or complaints in the past
three years from BPH panel attorneys stating attorney compensation is insufficient for the type
of work required to adequately represent individuals at parole proceedings; (5) a copy of a BPH
Form1073 showing the content of any and all "pull-down bars" in any electronic form that has
been used in the past three years; (6) any and all grievances filed with the Board by ▓▓▓▓▓▓▓
(▓▓▓▓▓▓▓) and any responses issued by the Board; (7) any and all documents reflecting service
of BPH-related documents, including the CRA and custody-file documents, to ▓▓▓▓▓▓▓▓▓
(▓▓▓▓▓▓▓); (8) all attorney DECS source documents for specific *Armstrong* class members; (9) a
copy of any documents reflecting the ADA training that Parole Justice Works provides to panel
attorneys; (10) all CRAs and C-file mash-ups for specific *Armstrong* class members; and (11) a
blank copy of the BPH Notice of Rights, or confirmation that the August 30, 2023 version
submitted by Plaintiffs is the current version.

**B.**     <u>**Board's Responses**</u>

**1.**     <u>**Any and All BPH Contracts for Panel Attorneys for the Past Three Years**</u>

While panel attorneys serve at the discretion of the Board, they are not Board employees. Each panel attorney, as an independent contractor, is required to read, review, and return a signed copy of the Board's Panel Attorney Program Guide, which includes the Panel Attorney Information and Certification Form. The Certification represents the formal agreement, i.e. contract, between each panel attorney and the Board. Attached please find the Panel Attorney Program Guides for the past three years, which include the Certification Form as the final page of each guide. (Attachment A)

**2.**     <u>**Any and All Documents Showing Instances in the Past Three Years Where the Board Has Paid More than the Standard Amount and Reasons for Additional Payments**</u>

The Board's Administrative Services division, which processes panel attorney invoices, has no record of any panel attorney receiving a payment of more than the contracted amount in the past three years. Thus, there is no documentation to produce in relation to this request.

**3.**     <u>**Any and All Letters or Complaints in the Past Three Years From Panel Attorneys to the Board Regarding Reasonable Accommodations for *Armstrong* Class Members**</u>

The Board determined this request to be overly broad. Specifically, the request for "any and all letters or complaints in the past three years from BPH panel attorneys to the BPH regarding reasonable accommodations for *Armstrong* class members" would require letters or complaints from panel attorneys to be specified in relation to the representation of a particular class member(s). This is because Board documents are maintained in relation to the impacted incarcerated individual, and not by topic area.

**4.**     <u>**Any and All Letters or Complaints in the Past Three Years From Panel Attorneys Stating Attorney Compensation is Insufficient for the Type of Work Required to Adequately Represent Individuals at Parole Hearings**</u>

The Board's Administrative Services division, which processes panel attorney invoices, has no record of any panel attorney reporting to the Board that compensation is inadequate for representation of *Armstrong* class members. Thus, there is no documentation of any complaint from a panel attorney, made directly to the Board, to produce in relation to this request.

**5.**     **A Copy of a BPH Form 1073 Showing the Content of Any and All "Pull-Down Bars" in any Electronic Form Used in the Past Three Years**

Attached please find a copy of screenshots reflecting all "pull down bars" for use in the DECS system when a BPH Form 1073 is completed. (Attachment B)

**6.**     **Any and All Grievances filed with the Board by ██████████ (████████) and Board Responses**

Attached please find all requests and grievances submitted to the Board by ██████████ (████████) and the responses provided to Mr. ████ by the Board. (Attachment C)

**7.**     **Any and All Documents Reflecting Service of BPH-related Documents, Including CRA and Custody-File Documents, to ██████████ (████████)**

The Board defers this request to the California Department of Corrections and Rehabilitation, Office of Legal Affairs, who will provide any documents reflecting service of Board documents to ██████████ (████████).

**8.**     **All Attorney DECS Entries, Known as "Source Documents" for Listed *Armstrong* Class Members**

In Plaintiff's August 16, 2023 letter, a list of twenty-eight *Armstrong* class members, identified by name and CDC number, was submitted and a request made for any and all attorney source documents contained in DECS.  After review, the Board determined the names and/or CDC numbers were incorrect for three class members. The Board identified the following as the correct CDC numbers for ██████████ (████████), ██████████ (████████), and ██████████ (████████). On August 21, 2023, Ms. Jackson confirmed the correct CDC numbers as identified by the Board. Ms. Jackson also made an additional request for attorney DECS entries for ██████████ (████████). All attorney source documents recorded in DECS for the identified *Armstrong* class members are attached. (Attachment D)

**9.**     **A Copy of Any and All Documents Reflecting the ADA Training that Parole Justice Works Provides to Panel Attorneys**

The Board has requested, and is in the process of, requiring Parole Justice Works (PJW) provide the Board with any, and all, training materials for which PJW provides ADA training to panel attorneys. Once provided, the Board will forwarded these documents, and or video links, to Plaintiffs.

The Board has provided ADA training directly to panel attorneys in the past. The training materials used by the Board, i.e. "DECS-Training for Panel Attorneys", "Overview of Disabilities", and "Representing ADA Inmates", are attached. (Attachment E)

Please note, these materials have, and continue to be, updated to include developments in effective communication and representation of *Armstrong* class members, any may not reflect the current direction and/or training provided by PJW to panel attorneys.

### 10.    All CRAs and C-file mash-ups for four identified Armstrong class members

Attached please find all Comprehensive Risk Assessments (CRAs) and "C-file mash-ups for the following class members: ████████ (████████), ████████ (████████), ████████ (████████) and ████████ (████████). (Attachment F)

### 11.    A Blank Copy of the BPH Notice of Rights Form

The "Notice of Rights Form" sent by Plaintiffs is the current version and was last updated August 22, 2023.

Sincerely,

*Roxanna Gomez*
Senior Staff Attorney
Board of Parole Hearings

**Enclosures:**
Attachment A: BPH Panel Attorney Program Guides, 2021, 2022, 2023
Attachment B: BPH Form 1073 Screen Printouts- Pull Down Menu Options
Attachment C: Objections Filed with the Board by ████████ (████████) and Board Responses
Attachment D: Source Documents for Identified *Armstrong* Class Members
Attachment E: ADA Attorney Training Materials Provided by the Board and PJW
Attachment F: CRAs and C-file Mash-Ups for Identified *Armstrong* Class Members

**Cc: (Via Email Only)**
Ed Swanson
Katie Riley
Jennifer Shaffer
Sharon Garske
Trace Maiorino
Eric Chang
Sean Lodholz
Mark Jackson

Patricia Ferguson
Tamiya Davis
Nicholas Meyer
Alexander Powell
Chor Thao
Ramon Ruiz
Jennifer Neill
Olena Likhachova
Prison Law Office
BPH ADA Legal Team

# EXHIBIT 24

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| Purpose | The purpose of this program is to comply with California Code of Regulations Title 15, section 2256, which requires the Board of Parole Hearings (Board) to provide incarcerated individuals with attorney representation at state expense if they cannot afford to retain a private attorney for a hearing before the Board. |
| --- | --- |
| | Panel attorneys serve at the discretion of the Board; they are not employees of the Board. |
| | Upon approval as an active attorney by the Board, panel attorneys shall provide competent and professional legal services to their client. The Panel Attorney Program is designed to provide, on average, up to 13 clients who will be scheduled for a parole hearing during a one-week period. |
| **Attorney Panels** | The Board has grouped the 33 existing adult prisons located throughout California including incarcerated individuals assigned to the Sacramento Central Office (SACCO) into 16 attorney panels based on their geographic proximity (i.e., the prisons in each panel are generally within a one-hour drive of each other). The 16 attorney panels are identified on pages 9 and 10. |
| | Within each panel, two lists of attorneys will be maintained by the Board – a list of "active" attorneys and a list of "standby" attorneys. The active attorney list is for attorneys who are currently being assigned clients. The standby list is for attorneys who have applied to be on the active attorney list and who meet the minimum qualifications of a standby panel attorney, but who are not currently being assigned clients because the panel is full.  There may be incidences where a stand by attorney is offered an assignment on that panel. |
| | The Board shall periodically re-calculate the number of active attorneys needed for the panels based on the average number of hearings scheduled for each panel. The Board will adjust the number of active attorneys for each panel accordingly. If the average number of scheduled hearings decreases such that fewer active attorneys are needed for a particular panel, an active attorney will be moved to the standby list. If additional panel attorneys are needed, an attorney from the standby list will be moved to the active list. |
| | Attorneys may apply for as many panels as they choose, but will only be approved to serve on one active panel at a time; with some limited exceptions at the discretion of the Board. An attorney may at any time request to be removed or added to another panel by writing the Board. An attorney on a standby list may at any time be moved to the active list. |

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| | |
|---|---|
| **Active Panel Attorney Minimum Qualifications** | Active attorneys must meet the following minimum qualifications at all times:<br><br>A1. Maintain a current and active license to practice law in California;<br>A2. Be in good standing with the California State Bar, including compliance with Rule 9.9.5 of the California Rules of Court;<br>A3. Maintain malpractice insurance;<br>A4. Have documentation of a symptom-free tuberculin skin test and evaluation within the past year;<br>A5. Be able to pass the security screening necessary for entrance into each of the prisons on the attorney's panel;<br>A6. Meet the dress code requirements for entrance into each prison during every visit;<br>A7. Sign and submit the Panel Attorney Information and Certification Form annually (see page 11);<br>A8. Open and maintain an account with the Board's Disability and Effective Communication System (DECS). DECS is a comprehensive repository of information related to each incarcerated individual's disabilities and effective communication needs;<br>A9. Acquire and maintain (at the attorney's expense) all hardware/software necessary to access DECS;<br>A10. Acquire and maintain (at the attorney's expense) webcam capabilities for video visits/hearings;<br>A11. Open and maintain a Blackberry Workspaces (previously known as "WatchDox") account (or equivalent secure, file-sharing software used by the Board) by registering an email address for access to electronic hearing files; panel attorneys are to provide at their own expense all hardware/software necessary to maintain access to the secure, file-sharing software used by the Board, and<br>A12. Have recent experience representing incarcerated individuals in the parole suitability hearing process or have observed at least three parole hearings before accepting an assignment to represent clients as an active panel attorney. |
| **Standby Panel Attorney Minimum Qualifications** | Standby attorneys must meet the following minimum qualifications at all times:<br><br>B1.   Maintain a current and active license to practice law in California; and<br>B2.   Be in good standing with the California State Bar, including compliance with Rule 9.9.5 of the California Rules of Court.<br><br>Standby attorneys who are approved to move to an active panel attorney list will have one month to demonstrate compliance with the active panel attorney minimum qualifications listed above and complete required training. |
| **Panel Attorney Training Requirements** | C1. In addition to the minimum qualifications or active attorneys listed above, active panel attorneys must complete all required training session(s) conducted by the Board's designee. |

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| Panel Attorney Expectations | The following are minimum expectations for adequately representing a client as an active panel attorney: |
|---|---|
| | D1. The panel attorney is required to conduct a minimum of three legal visits with their client, and comply with the timing requirements listed below. The panel attorney should make every effort to conduct the first or second legal visit in person, and any other visit(s) may be conducted in person, via confidential legal telephone call, or via confidential videoconference. The Board will make a client's central file available to the panel attorney at the time of case assignment, so the panel attorney has access prior to any and all client meetings; |
| | D2. The panel attorney shall review their client's central file and have an initial legal visit with their client within 30 calendar days of accepting the case; the average length of the initial legal visit shall be one to two hours; if the client is expected to receive a Comprehensive Risk Assessment (CRA) prior to their scheduled hearing, the attorney shall prepare their client for the CRA interview by explaining what a CRA is, its purpose, its importance, and how it is used in the parole hearing process; explaining the process, how the interview will be conducted, and topics that will likely be covered; discussing any prior risk assessments or psychological evaluations; and preparing the client to address potential topics of discussion during the interview; |
| | D3.  The panel attorney shall conduct a second legal visit with each client either (1) at least 60 days prior to the client's scheduled hearing date or (2) within two weeks of the Comprehensive Risk Assessment (CRA) being finalized under section 2240 of title 15 of the California Code of Regulations, whichever date is later; the average length of the second legal visit shall be one to two hours; in the unusual event a panel attorney is assigned a case less than 60 days before the hearing, the panel attorney shall conduct this second legal visit before the hearing; |
| | D4.  The panel attorney shall have a third legal visit with their client prior to the scheduled hearing date; the length of this legal visit and the timing of the visit shall be at the panel attorney's discretion; in the unusual event that a panel attorney is assigned a case less than 60 days before the hearing, the panel attorney shall review the client's central file and conduct a legal visit before the hearing; |
| | D5. If the client/attorney submit a pre-hearing action to the BPH, the panel attorney is required to meet with their client at least once prior to the pre-hearing action submission and review their client's central file; |
| | D6.  The panel attorney must be familiar with each client's rights under the Americans with Disabilities Act (ADA) and their needs for reasonable accommodations under the ADA in DECS in advance of each legal visit; |
| | D7. Panel attorneys shall timely enter Source Documents with detailed notes of the client's ADA accommodation needs and use of accommodations to achieve effective communication. These documents are required to be uploaded into the Disability and Effective Communication System, or DECS, no later than one week following any meeting with the client. |
| | D8.  If the panel attorney's client is identified in DECS as needing a sign language interpreter, the panel attorney shall use a sign language interpreter when |

3

Case 4:94-cv-02307-CW    Document 3525-3    Filed 11/14/23    Page 442 of 778
**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

communicating with the client during all legal visits and at the hearing; panel attorney shall notify the Scheduling Unit at BPHLiferAnalyst@cdcr.ca.gov to make arrangements to secure a sign language interpreter if their client is in need of a sign language interpreter;

D9.  The panel attorney shall use the Board's telephonic foreign language interpreter service to communicate with a client during all legal visits when needed to establish effective communication;

D10.  The panel attorney shall not rely on written communications with a client (a) who is under CDCR's Developmental Disability Program with a designation in DECS as DD1, DD2, or DD3, (b) under CDCR's Mental Health Services Delivery System at the Enhanced Outpatient Program, Mental Health Crisis Bed, or Intermediate Care Facility level of care; (c) in a licensed Psychiatric Inpatient Program under the care of CDCR or the Department of State Hospitals; (d) designated as having a learning disability or vision impairment in DECS, or (e) has a Test of Adult Basic Education of 4.0 or lower;

D11.  The panel attorney shall raise appropriate and timely objections through the BPH ADA Compliance Unit prior to a hearing or to the hearing panel at the time of the hearing regarding the client's need for reasonable accommodation under the ADA; the panel attorney may submit a timely grievance to the Board if the attorney believes the client did not receive reasonable accommodation as required under the ADA during the client's hearing;

D12.  If the panel attorney encounters logistical problems meeting and communicating with a client or obtaining access to relevant documents, including the CRA, the panel attorney shall immediately notify Board staff at BPHLiferAnalyst@cdcr.ca.gov and shall make all reasonable efforts to resolve the problem in advance of the hearing;

D13.  The panel attorney shall physically appear in person with their client for all scheduled hearings unless any of the exceptions in D14 apply, and arrive a minimum of thirty minutes to one hour prior to the hearing, allow sufficient time for parking, entry into the institution, walking to the hearing room; and, making prearrangements with the institution to meet with your client prior to the start time of the hearing, this provision does not apply if the panel attorney's client knowingly, intelligently and voluntarily waives the physical appearance of the panel attorney;

D14.  For all hearings, the panel attorney is required to be physically present with the incarcerated individual at the institution unless any of the following apply: (1) the incarcerated individuals waives physical presence of the attorney, (2) the incarcerated individual waives their own right to attend the hearing, (3) the incarcerated individual refuses to attend the hearing, or circumstances beyond the control of the incarcerated individual's attorney. Per the *Armstrong* Remedial Plan II, the following incarcerated individuals are not allowed to waive the physical presence of their attorney:

- All incarcerated individuals presently receiving treatment at CDCR's Mental Health Services Delivery System at the Enhanced Outpatient Program,
  Mental Health Crisis Bed, Intermediate Care Facility, or Acute Care

4

Case 4:94-cv-02307-CW    Document 3525-3    Filed 11/14/23    Page 443 of 778
**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

Facility levels of care;

- All incarcerated individuals identified by CDCR as part of the department's Developmental Disability Program; and
- All incarcerated individuals with a learning disability, including incarcerated individuals with a Test of Adult Base Education (TABE) score of 4.0 or below.

D15. Per BPH RN 21-05E Proceedings Conducted in Person and by Videoconference Emergency Regulations, the Board shall determine whether a proceeding is conducted in person or by video conference. (Cal. Code of Regs, tit. 15, §§ 2050-2063.) For hearings that the board has pre-determined to require an in-person hearing under section 2054, the panel attorney, acting on behalf of the incarcerated individuals, may submit a written request for a videoconference hearing at least 100 days prior to the hearing. The request shall explain why an in-person hearing is not necessary and affirm that, to the best knowledge of the panel attorney, an in-person proceeding is not necessary for the hearing officers to establish effective communication with the incarcerated individuals. (Cal. Code of Regs, tit. 15, § 2055.) If the Board approves the request, the hearing will be conducted by videoconference, and no participants will attend the hearing in person with the hearing panel. The panel attorney is still required to be physically present with the incarcerated individual at the institution for the hearing unless any of the exceptions in D14 apply;

D16. The panel attorney shall remain available for the entire hearing day;

D17. If there is an emergency that delays or prevents a panel attorney from appearing timely for a hearing, the panel attorney shall immediately notify Board staff via email at BPHLiferAnalyst@cdcr.ca.gov or by phone at (916) 445-4072;

D18. The panel attorney shall have valid state or federal government-issued identification and a current California State Bar card upon arrival to the institution; if the panel attorney experiences problems entering an institution on the day of a hearing, the attorney shall immediately notify Board staff via email at BPHLiferAnalyst@cdcr.ca.gov or by phone at (916) 445-4072;

D19. The panel attorney may be assigned a client currently housed outside a CDCR institution, (example: county jail, medical or out-of-state facility, etc.) but scheduled for a parole hearing. The panel attorney is required to contact the client and provide the client information regarding the parole hearing process and options for moving forward with the scheduled hearing. The Board may ask the panel attorney for such communication for invoicing confirmation.

D20. If, after the client's scheduled hearing, the client's case is referred for en banc review by the full Board at a monthly executive Board meeting, the panel attorney shall provide a written statement on behalf of their client and/or representation at such proceedings, including appearance at those proceedings, whether in person or via telephone or videoconference.

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| | |
|---|---|
| **Additional Panel Attorney Expectations** | The following are additional expectations for panel attorneys:<br><br>E1. The panel attorney shall behave in a competent and professional manner at all times with Board staff, institution staff, and all hearing participants;<br>E2. The panel attorney shall wear professional attire at parole hearings;<br>E3. The email address listed on the Panel Attorney Information and Certification Form (page 11) is the email of record for the attorney that will be used for all written communications from the Board, including panel and client assignments; it is the panel attorney's responsibility to notify the Board of a change in the panel attorney's email address;<br>E4. The panel attorney shall respond to an offer of a panel assignment from the Board within three business days; if the panel attorney declines the assignment or fails to respond within three business days, the Board will consider it a request for a voluntary suspension (see below).<br>E5. The panel attorney shall cooperate with the Board or its designee to verify compliance with panel attorney minimum qualifications, expectations, and training requirements;<br>E6. The panel attorney shall not permit another attorney, including other panel attorneys, to represent a client assigned by the Board to the panel attorney;<br>E7. The panel attorney shall promptly notify the Board if the panel attorney is arrested, charged, or convicted of a misdemeanor or felony in any jurisdiction;<br>E8. The panel attorney shall submit invoices as required for all clients assigned by the Board. |
| **Confidentiality Agreement** | A panel attorney is legally and ethically bound to use the information contained in any documents provided by the Board for the sole purpose of representing their client through the parole suitability hearing process. A panel attorney is prohibited from distributing the documents or disclosing their contents to anyone who is not directly involved in representing the panel attorney's client in the parole suitability hearing process. Failure to protect the confidentiality of documents received from the Board will result in the panel attorney being referred to the Executive Officer to determine whether the panel attorney will continue to be assigned cases as an active panel attorney. |
| **Referrals to the Executive Officer** | Failure to meet any of the minimum panel attorney qualifications, expectations, or training requirements shall result in referral to the Executive Officer to determine whether the panel attorney will continue to be assigned cases.<br><br>The Board and/or its designee may collect data concerning the outcome of scheduled hearings, use surveys, interview incarcerated individuals and others, observe hearings, and review hearing transcripts to determine the level and quality of representation provided by a panel attorney.<br><br>A panel attorney who is (a) referred to the California State Bar for alleged misconduct by any state or federal judge or the Board's Chief Counsel or (b) arrested, charged or convicted of a misdemeanor or felony shall be referred to the |

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| | |
|---|---|
| | Executive Officer to determine whether the panel attorney will continue to be assigned cases. |
| **Voluntary Suspension** | A voluntary suspension is a request by an active panel attorney to not be assigned cases for a period of one to four weeks. A panel attorney may request a voluntary suspension no more than three times during a calendar year (January 1 through December 31). Requests for a voluntary suspension from a panel attorney must be submitted in writing, and include a specific start and end date. In addition, if a panel attorney declines the assignment of a panel or fails to respond within three business days to a panel assignment, the Board will consider it a request for a one-week voluntary suspension (see E4 above). |
| **Payment** | All panel attorney payments must be requested using the Board's Panel Attorney Invoice, available on the Board's website at https://www.cdcr.ca.gov/bph/attorney-overview/ (see BPH form 1076). Panel attorneys shall scan and submit one invoice per assigned client via email to BPHAccountingLiaison@cdcr.ca.gov. <br><br> Incomplete or disputed invoices will prompt communication from Accounting to resolve the invoice issue and may delay payment processing. <br><br> Panel attorneys shall certify the services they rendered to each assigned client by placing their initials next to the appropriate "Description of Services Performed." Panel attorneys shall also identify dates of completion and duration of interviews. <br><br> Panel attorneys will be paid a flat rate of $945 for each client assigned by the Board and accepted by panel attorney after July 1, 2023 whose case they complete. For all hearings assigned by the Board and accepted by the panel attorney prior to June 30, 2023, panel attorneys will be paid a flat rate of $900 for each client assigned to them whose case they complete. <br><br> A case is completed when a scheduled hearing results in a waiver, stipulation, postponement, continuance, grant of parole, or denial of parole, and, when necessary, the full Board reviews the case en banc at a monthly executive board meeting, if applicable. <br><br> If the client submits a pre-hearing action and the BPH approves, in order for the panel attorney to receive full payment, they must attest they met with their client at least once prior to the pre-hearing action and reviewed their client's central file. <br><br> Panel attorneys who are unable to represent their assigned client through completion of the case may receive a pro-rated fee for services at the discretion of the Executive Officer or designee.  The pro-rated amounts are as such: <br> • $25 for Assignment <br> • $175 for Central-File Review <br><br> Invoices shall not be submitted until the client's case is completed. |

Case 4:94-cv-02307-CW    Document 3525-3    Filed 11/14/23    Page 446 of 778
**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

| | |
|---|---|
| | In order to ensure timely payment, invoices shall be submitted within 30 days of completing all hearing-related work for a client.  Invoices are processed for payment by the State within 45 days from the date the invoice is received provided the invoice is undisputed. |

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

## Panel Listing with Cities

### Panel #1

- Pelican Bay State Prison (PBSP): Crescent City, CA

### Panel #2

- High Desert State Prison (HDSP): Susanville, CA

### Panel #3

- California Medical Facility (CMF): Vacaville, CA
- California State Prison, Solano (SOL): Vacaville, CA

### Panel #4

- San Quentin State Prison (SQ): San Quentin, CA

### Panel #5

- Folsom State Prison (FSP): Represa, CA
- California State Prison, Sacramento (SAC): Represa, CA
- Mule Creek State Prison (MCSP): Ione, CA
- Sacramento Central Office (SACCO): Rancho Cordova, CA

### Panel #6

- California Health Care Facility (CHCF): Stockton, CA
- Sierra Conservation Center (SCC): Jamestown, CA

### Panel #7

- Valley State Prison (VSP): Chowchilla, CA
- Central California Women's Facility (CCWF): Chowchilla, CA

### Panel #8

- Correctional Training Facility (CTF): Soledad, CA
- Salinas Valley State Prison (SVSP): Soledad, CA

### Panel #9

- Avenal State Prison (ASP): Avenal, CA
- California Substance Abuse Treatment Facility (SATF): Corcoran, CA
- California State Prison, Corcoran (COR): Corcoran, CA
- Pleasant Valley State Prison (PVSP): Coalinga, CA

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

### Panel #10

- North Kern State Prison (NKSP): Delano, CA
- Kern Valley State Prison (KVSP): Delano, CA
- Wasco State Prison (WSP): Wasco, CA
- California Correctional Institution (CCI): Tehachapi, CA

### Panel #11

- California Men's Colony (CMC): San Luis Obispo, CA

### Panel #12

- California State Prison, Los Angeles County (LAC): Lancaster, CA

### Panel #13

- California Institution for Men (CIM): Chino, CA
- California Institution for Women (CIW): Corona, CA
- California Rehabilitation Center (CRC): Norco, CA

### Panel #14

- Ironwood State Prison (ISP): Blythe, CA
- Chuckawalla Valley State Prison (CVSP): Blythe, CA

### Panel #15

- Calipatria State Prison (CAL): Calipatria, CA
- California State Prison, Centinela (CEN): Imperial, CA

### Panel #16

- Richard J. Donovan Correctional Facility (RJD): San Diego, CA

**Board of Parole Hearings**
**Panel Attorney Program Guide for the Parole Suitability Hearing Process**

**Panel Attorney Information and Certification Form**

PLEASE TYPE OR PRINT LEGIBLY

I agree to all of the terms described in the Panel Attorney Appointment Program Guide (consisting of 8 pages) as well as the reimbursement rates described therein. I acknowledge the Board of Parole Hearings has not made an offer of employment or a guarantee of appointment and failure to meet or maintain the terms described in the Program may result in removal from one or all panels.

_____                    _____
Printed Name                                        CA State Bar Number

_____                    _____
Signature                                           Date

_____                    _____
Driver's License Number                             Date of Birth

_____                    _____
Office Telephone Number                             Cellular Number

_____
E-mail Address

Business Address (available to clients and the Board of Parole Hearings):

_____

_____

_____

Please indicate below which panel groupings you are interested in applying:

| Panel # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---------|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|----|
| Check all that apply | | | | | | | | | | | | | | | | |

*Note: If currently active on a panel and do not wish to make any changes, please leave above blank.*

# EXHIBIT 25

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement is made as of the _____ day of _____ 2022 (notwithstanding the actual date of execution) by and between the Colorado Department of Corrections ("CDOC"), Dean Williams in his official capacity as the Executive Director of CDOC, and the Office of Risk Management for the State of Colorado (collectively, the "State") and Brian Mackes, Adrian Chávez, and the National Federation of the Blind of Colorado (collectively, "Plaintiffs;" Messrs. Mackes and Chávez will be referred to as the "Individual Plaintiffs").

WHEREAS, Plaintiffs filed a civil lawsuit entitled BRIAN MACKES, ADRIAN CHÁVEZ AND THE NATIONAL FEDERATION OF THE BLIND OF COLORADO v. COLORADO DEPARTMENT OF CORRECTIONS and DEAN WILLIAMS in his capacity as Executive Director of the Colorado Department of Corrections, United States District Court for the District of Colorado, Civil Action No. 21-cv-1100 (the "Litigation"), alleging that the Colorado Department of Corrections failed to abide by Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the accommodations it provides to blind and low vision individuals in its custody (the "Allegations"); and

WHEREAS, the Parties wish to avoid the uncertainties and expense of litigation and to settle and compromise, on the terms set forth below, all claims for declaratory and injunctive relief that are or could be asserted in any litigation or any claim otherwise arising from or relating to the Allegations; and

WHEREAS, the Parties acknowledge that the promises and covenants contained herein are good and valuable consideration for all Parties to execute this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, the Parties hereby agree and covenant as follows:

1.　　Goal: That Blind Prisoners will have private and independent access to information, processes, programs, and facilities available to sighted Prisoners on an equal basis with sighted prisoners, consistent with legitimate security concerns.

2.　　Definitions

a.　　Providing materials in an "Accessible Format" includes but is not limited to the following options based on the needs of the individual:

# EXHIBIT 1

     i.     Providing materials so as to be screen-readable with Assistive Technology (*e.g.* screen reader, screen magnification) that is available to and usable by the Prisoner; or

     ii.     Audible (*e.g.,* CD); or

     iii.     In large print; or

     iv.     In Braille.

b.     "AIC" means ADA Inmate Coordinator.

c.     "AR" means Administrative Regulation.

d.     "Agents" includes any entity providing services to CDOC whether by contractual, licensing or other arrangements.

e.     "Assistive Technology" means any item, piece of equipment, software program, or product system that is used to increase, maintain, or improve the functional capabilities of persons with disabilities. Assistive Technology shall be provided to Blind Prisoners without charge to the Prisoner.

f.     "Auxiliary Aids and Services" has the meaning assigned to it in 28 C.F.R. § 35.104.

g.     "Blindness Skills" means mobility and orientation, computer and assistive technology use (including typing, use of screen readers, low vision alternatives, and other assistive technology), Braille literacy, and vocational and independent living/environment management skills.

h.     "Blind" means a person whose best corrected visual acuity is 20/200 or worse in the better eye; or whose visual field limitation is such that the widest diameter of his visual field, in the better eye, is 20 degrees or less; or someone who cannot read standard print without magnification beyond that provided by regular glasses.

i.     "Blind/Print-Disabled" means that subset of Blind individuals who are not able to visually read Print Materials with maximum feasible magnification.

j.     "Day Hall" means an area of a housing unit in a CDOC facility within which a Prisoner can circulate at will without permission within the time frames permitted by prison staff for that housing unit.

k.      "Education" or "Educational" includes Academic Education, Adult Basic Education, Career and Technical Education, Cognitive Education, and Post-Secondary Education and any other programs under the Correctional Education Program as those terms are used in AR 500-01.

l.      "Health Care Appliance" means an assistive device or medical support equipment which has been prescribed for an inmate and/or approved by a licensed health care provider. Health Care Appliances include canes, prescription eyeglasses, protective eyewear, and artificial eyes.

m.      "Independent" or "Independently" means without assistance from others.

n.      "Key Print Materials" mean printed materials provided by CDOC for regular or repeated use among CDOC Prisoners or all Prisoners at a particular facility, including:

    i.      Prisoner Handbooks;

    ii.      Prisoner Orientation materials;

    iii.      Publicly available Administrative Regulations and Institution Adjustments;

    iv.      Materials available to Prisoners to prepare for or request parole, community corrections, or release to the extent these exist;

    v.      All materials posted for Prisoners to review or intended to convey information to Prisoners;

    vi.      Templates of procedures for and information required to be provided in:

        (1)      Grievance and discipline processes;

        (2)      Kites, sick calls, and other Print methods for communicating with CDOC officials;

        (3)      Requests for accommodation;

        (4)      Medical forms;

3

        (5)    Canteen and other purchase and expenditure requests;

        (6)    Inmate banking;

        (7)    Telephone approvals.

vii.    Any forms that that are provided to the Prisoner as a response (i.e. disposition of contraband, rejection of mail, grievance response).

o.    "Large Print" means at least 16-point font Arial or equivalent.

p.    Qualified Offender Care Aide ("OCA") means an OCA I or II who has a GED or high school diploma, is able to read and write effectively, accurately, and impartially, and has received training as set forth in Paragraph 15.

q.    "Print," "Printed" and "Print Materials" means information conveyed visually whether printed on paper or available in an electronic or other medium.

r.    "Prisoner" means an individual incarcerated in the custody of CDOC.

s.    "Reasonable Modification" means one or more changes to policies, practices, or procedures necessary to avoid discrimination on the basis of disability where such changes constitute neither an undue burden nor fundamental alteration. Reasonable Modifications include but are not limited to provision of Auxiliary Aids and Services, Assistive Technology, and/or materials in an Accessible Format. With respect to work assignments, Reasonable Modifications include but are not limited to changes to the method of accomplishing tasks that allow a Blind Prisoner to effectively complete the essential functions of a work assignment, restructuring positions (e.g., reassigning marginal functions of the job), providing accessible equipment, Assistive Technology, accessible materials, magnification, adjustments to time limits, and increased or modified training.

3.    Ensuring Equal Access

a.    CDOC will continue to evaluate and accommodate each incoming Prisoner at intake to establish whether they are Blind as defined herein. For Prisoners who become Blind or for other reasons are not

identified as Blind at intake, upon reasonable request, CDOC will continue to timely evaluate Prisoners to determine whether they are Blind as defined herein.

b.    CDOC shall give primary consideration to the preferred Accessible Format and other Auxiliary Aids and Services of the Blind Prisoner, meaning it will honor their expressed choice unless it can demonstrate that another equally effective means of communication is available or that the Blind Prisoner's expressed choice presents an undue burden, fundamentally alters the program or activity in question, or poses a threat to safety and security.

c.    Any Accessible Formats, Assistive Technology, or Reasonable Modifications determined to be appropriate for a Blind Prisoner shall be provided to them at any facility at which they are housed, consistent with security. Accommodations approved for one facility remain approved at all facilities, subject to security considerations. If a Blind Prisoner is transferred to a facility of equivalent security, it shall not be an excuse to providing Reasonable Modifications that the new facility does not yet have the necessary materials, technology, or equipment. CDOC will start the process of implementing Accessible Formats, Assistive Technology, Health Care Appliances, or other Auxiliary Aids and Services or Reasonable Modifications previously approved for a Blind Prisoner at the new facility at the time it decides to transfer the Blind Prisoner, and the same shall be implemented within seven days of the Blind Prisoner's arrival at the new facility, and available interim accommodations will be provided.

d.    CDOC shall ensure that its telephone system permits Blind Prisoners to place phone calls Independently.

e.    CDOC shall ensure that its canteen program and processes for other purchase and expenditure requests permit Blind Prisoners to make purchases Independently.

f.    CDOC shall ensure that its inmate banking program permits Blind Prisoners to engage in bank transactions Independently.

g.    CDOC's process shall ensure that CDOC denies requests for Reasonable Modifications and Auxiliary Aids and Services only when CDOC documents that the denial meets the requirements of 28 C.F.R. § 35.164.

h.    The parties will designate one or more mutually agreed upon expert consultants in blindness issues and adaptation, with whom CDOC

5

can confer with periodically throughout the Agreement to undertake the following tasks:

      i.     recommend to CDOC Assistive Technology and other measures to implement this agreement;

      ii.    recommend to CDOC Reasonable Modifications and Auxiliary Aids and Services to make facility recreational, educational, vocational, and other programs and facilities accessible to Blind Prisoners;

      iii.   report annually on any newly-available Assistive Technology and improvements to existing Assistive Technology that it recommends CDOC adopt;

      iv.   evaluate Blind Prisoners to assess their Basic Blindness Skills, appropriate Accessible Formats, Assistive Technology, Auxiliary Aids and Services, and other Reasonable Modifications, and training in the same that each Blind Prisoner requires;

      v.    provide to Blind Prisoners and Qualified Escorts/Readers/Scribes the training required by Paragraph 15;

      vi.   consult with the AIC regarding work assignment Reasonable Modifications pursuant to Paragraph 7; and

      vii.  consult with CDOC regarding the trainings required by Paragraph 15.

    i.    The Expert referenced above shall also conduct the evaluations referenced in Paragraph 3(h)(iv):

      i.    once for each Blind Prisoner within 30 days of execution of this Agreement;

      ii.    for each incoming Blind Prisoner, within 30 days of intake; and

      iii.   for any Blind Prisoner, upon reasonable request.

4.    Accessible Materials Made Available by CDOC

    a.    CDOC shall provide each Blind/Print Disabled Prisoner with access to a laptop or equally effective device which will be loaded with Key

Print Materials to permit independent access to these items in a screen readable format. Materials on the laptop will be updated as necessary and will be available for use within the cell or Day Hall consistent with security protocols. The laptops will also be equipped with an accessible ebook reader program, a typing tutorial program, and screen reader software.

      i.     CDOC will order devices currently required within five business days of execution of this Agreement and will provide them to Blind/Print Disabled Prisoners within 30 calendar days of receipt.

      ii.     Following this initial period, when a Blind/Print-Disabled Prisoner enters CDOC custody or becomes Blind/Print-Disabled while in CDOC custody after execution of this Agreement, a laptop as described in paragraph 4.a will be ordered within 5 business days of the Prisoner's arrival or request and provided within 30 calendar days of receipt.

      iii.     CDOC will provide laptops for checkout at the Denver Reception and Diagnostic Center for Blind/Print-Disabled Prisoners to use pending assignment to a facility.

b.     CDOC will provide, in the Prisoner's Day Hall, a printer and a scanner that is compatible with, and networked to, the laptops provided to Blind/Print-Disabled Prisoners and that is equipped with the Assistive Technology necessary to permit such Prisoner to Independently scan and print Key Print Materials, incoming and outgoing personal and legal correspondence, and internal communications such as grievances and kites.

c.     CDOC shall allow Blind/Print Disabled Prisoners to submit any CDOC forms (e.g., grievance forms, kites, requests for accommodation) in a word processing format without regard to the usual formatting of the form. CDOC will provide templates of all such forms stating the required components of the original document and any space requirements or limitations noted in the applicable AR. If such components and space requirements or limitations are clearly stated in the template, Blind/Print Disabled Prisoners must abide by them.

d.     Once an Accessible Format is noted in a Blind Prisoner's ADA accommodation file, that Prisoner will not be required to specifically request that format for future Key Print Materials.

e.     If Key Print Materials are revised or newly issued during the

7

term of this Agreement, CDOC shall create and make available such Key Print Materials to Blind/Print-Disabled Prisoners' laptops and in Large Print (for Prisoners whose ADA accommodations call for Large Print) within 1 business day of the corresponding Print Materials being made available to sighted Prisoners. Other Accessible Formats (audio, Large Print) will be provided within 10 days of a request from a Prisoner for the alternate format.

f.      All bulletin board and other general postings for the benefit of the Prisoner population shall be posted in Large Print and shall be made available on the laptops of Blind/Print-Disabled Prisoners. Upon request, such bulletin board and other general postings will be provided to such Prisoner in a larger font, audio, or Braille as appropriate for the individual.

g.      If legal research or other Print Materials are provided to sighted Prisoners during lockdown or while in segregation or other restricted housing, Blind/Print-Disabled Prisoners shall be provided Assistive Technology sufficient to access the same materials in their cells. If approved Assistive Technology is not available for use in a Blind Prisoner's cell, they will be permitted a reasonable time out of their cell to use a computer equipped with Assistive Technology.

h.      If providing a Print Material in an Accessible Format would be an undue burden or fundamental alteration, CDOC shall assign a case manager or a Qualified OCA I or OCA II to assist the Blind Prisoner, consistent with the choice of the Blind Prisoner.

5.      Assistive Technology

a.      CDOC shall provide the Assistive Technology and other Auxiliary Aids and Services necessary for Blind Prisoners to Independently access CDOC programs, activities, technology, and Accessible Format Materials. The AIC shall maintain a list of pre-approved Assistive Technology available to Blind Prisoners and shall provide the list to Blind Prisoners upon intake or upon request. Blind Prisoners will not be limited to choosing Assistive Technology from the list.

b.      Within 60 days of Execution of this Agreement, CDOC shall make at least the following Assistive Technology available to Blind Prisoners to use in their cells upon request:

i.      At least one type of portable scanner/reader or pen

8

scanner/reader;

    ii.    Digital magnifiers;

    iii.    Digital recorders;

    iv.    Talking calculators;

    v.    Talking or Braille watches; and

    vi.    Headphones compatible with any devices provided that offer audio capability.

    c.    If CDOC provides tablets or any other technology to Prisoners, those tablets or technologies shall be accessible to and usable by Blind Prisoners including Blind/Print-Disabled Prisoners.

    d.    CDOC will ensure Blind Prisoners have access to talking books and ebooks similar to sighted Prisoners' access to books (e.g., through interlibrary loan, library checkout, gifts from family and friends, etc.).

    e.    If audio description is available on the television equipment in any housing unit in which a Blind Prisoner is housed, CDOC shall ensure the common television is operated with audio description enabled at all times.

    f.    If a Blind Prisoner is transferred to a facility that does not have the technology required by this Agreement and will be at the facility for more than 2 weeks, CDOC will provide such technology within 30 days of the Prisoner's arrival at the facility.

    g.    CDOC shall maintain any materials in Accessible Formats, Assistive Technology, Auxiliary Aids and Services, and any equipment required by Reasonable Modifications in good condition and working order.

    h.    Within 30 days of execution of this Agreement, CDOC shall install a screen reader and screen magnification technology on an existing computer or laptop that can be accessed and used by Blind Prisoners, in facility intake areas, infirmaries/clinics, and any other location in which prisoners are asked to provide or review Printed medical information. If a new laptop is needed, CDOC will order the laptop and will provide it within 30 calendar days of receipt.

6.    Orientation

a.    Starting within 60 days of the Execution of this Agreement, as part of intake and orientation, CDOC will provide Blind Prisoners comprehensive information in Accessible Formats on the following subjects:

i.    Their rights as individuals with disabilities and the contact information and responsibilities of the CDOC ADA Inmate Coordinator;

ii.    The Accessible Formats, Assistive Technology, Health Care Appliances (such as white canes), and Reasonable Modifications available to them, the processes for accessing them, and the Blind Prisoner's knowledge and preferences regarding them;

iii.    The availability of the Blindness Skills course, screen reader training, and orientation and mobility trainings; and

iv.    A physical orientation to the facility in which the Blind Prisoner will be housed, conducted by a qualified orientation and mobility instructor.

7.    Work Assignments

a.    CDOC shall ensure that all processes related to work assignments, including but not limited to lists of available assignments, referral and application processes, selection, hiring, evaluation, pay, and good time credit are accessible to Blind prisoners. Specifically, CDOC shall ensure that the Master Program Schedule and all job and program descriptions are available in an Accessible Format and are accessible on the laptops or equally effective device provided to Blind/Print Disabled Prisoners.

b.    CDOC shall provide a method and instructions (available in an Accessible Format) for Blind Prisoners to search for work assignments and other programs for which they meet the eligibility requirements such as location, sentence, or nature of underlying offense.

c.    CDOC shall provide a method (available in an Accessible Format) for Blind Prisoners to apply for work assignments. If the Blind Prisoner is rejected for the position, CDOC shall inform them in writing (in an Accessible Format), stating all reasons for the rejection and all

10

Reasonable Modifications that CDOC considered before reaching the decision to reject.

      d.      A Blind Prisoner shall not be disqualified from any position on the basis of their blindness unless no Reasonable Modification is available that would make it possible for the Blind Prisoner to perform the essential duties of the position without posing a direct threat to the health, safety, or security of the Blind Prisoner, other prisoners or staff, or the facility.

      e.      If it is determined that no Reasonable Modification is available to make it possible for the Blind Prisoner to perform the essential functions of the assignment, the Blind Prisoner shall be referred for selection to the next available assignment for which they meet the general qualifications.

8.      Education and Other Programming

      a.      CDOC shall ensure that all processes, assessments and tasks related to all voluntary and required educational, counseling and other programming are accessible to Blind Prisoners in the format most suitable for the individual Blind Prisoner.

      b.      If an Educational course or other programming involves use of a computer by participating Prisoners, CDOC shall ensure that a computer with any necessary Assistive Technology is available to any Blind Prisoner seeking to enroll in the course.

      c.      CDOC shall provide the opportunity for each Blind Prisoner to take Educational courses and other programming that are equivalent to the Educational courses and programming available to sighted Prisoners in their facility.

      d.      CDOC shall continue to make available a course in Braille literacy to Blind Prisoners.

9.      CDOC will work with the Expert to consider, and if practicable, implement the provision of accessible sports/recreation equipment and accessible board games at each facility.

10.      Medical Privacy: CDOC shall make such Reasonable Modifications as are necessary to ensure that Blind Prisoners can communicate with medical personnel orally and in writing without the need for assistance from a third party whenever possible, and absent emergent situations.

11. Housing

    a.    To the extent a Blind Prisoner is confined in a facility that has access to single cells or single occupancy double cells for prisoners, CDOC shall, upon request, consider the Prisoner's Blindness or other disabilities as a weighted factor in determining whether to house them in a single cell.

    b.    Blind Prisoners will maintain all privileges for which they are eligible in any facility or unit in which they may be housed, regardless of the privileges available generally in that location.

12. Inmate or Staff Assistance: For tasks that cannot be accomplished through the Reasonable Modifications, Assistive Technology or Auxiliary Aids herein, or during any periods when Assistive Technology and/or other Auxiliary Aids and Services are unavailable or out of service, or if a Blind Prisoner prefers human assistance, a Qualified OCA I or OCA II or case manager will provide assistance, consistent with the choice of the Prisoner.

13. Navigation

    a.    To the extent consistent with proper security and inmate safety, CDOC shall permit Blind Prisoners the opportunity to navigate facilities independently or, if a Blind Prisoner prefers assistance, the assignment of a Qualified OCA I or OCA II as appropriate for escort.

    b.    CDOC shall ensure that Blind Prisoners have priority access to recreation, gym, and meals.

    c.    CDOC shall require OCAs assigned to assist Blind Prisoners to remain with the Blind Prisoner and provide navigation services during recreation periods. In addition, CDOC shall require recreation porters to assist Blind Prisoners with using gym equipment.

14. Documentation (in addition to any documentation called for elsewhere in the Agreement)

    a.    In the event CDOC decides that any measure requested by a Blind Prisoner or otherwise called for by this Agreement, including but not limited to those recommended by the Expert, would constitute a fundamental alteration, undue burden, or threat to security, such decision shall be documented in writing, with supporting rationale, and communicated to the Blind Prisoner and to the NFB-CO. Any determination that a measure would constitute an undue financial burden

must take into consideration all resources available to CDOC.

    b.    Documentation of any determination covered by Paragraph 14(a), must specify any alternative actions to be taken that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, Blind Prisoners receive the benefits or services provided by CDOC.

    c.    CDOC will provide a report from the Accommodation Tracking System (ATS) to NFB-CO and its counsel on a quarterly basis showing who has requested modifications for their blindness/low vision and what has been approved or denied.

    d.    CDOC will provide a quarterly report to NFB-CO and its counsel regarding the employment and educational programming of the named plaintiffs showing assignments that they have participated in, been waitlisted for, or been rejected from (and all reasons for such rejection).

    e.    Quarterly during the term of this Agreement CDOC shall provide NFB-CO and its counsel a lists of grievance summaries for each Blind Prisoner, and lists of any new accommodations that are pre-approved.

    f.    CDOC will also quarterly provide NFB-CO and its counsel all grievances and accommodation requests and responses raised by the named Plaintiffs in *Mackes et al. v. CDOC*.

15.    Training

    a.    CDOC shall provide all Blind Prisoners, OCAs, and CDOC staff who work with Blind Prisoners (*e.g.* librarians, teachers, case managers) the training necessary to use any Assistive Technology called for by this Agreement, training on guiding and assisting Blind Prisoners from a certified mobility and orientation instructor, and training on acting as a reader or scribe.

    b.    CDOC shall provide Blind Prisoners and OCAs any Blindness Skills training necessitated by blindness to use and benefit from the programs, services, activities, and facilities of the CDOC, including orientation and mobility training.

    c.    CDOC shall provide appropriate training to all CDOC employees and Agents who have contact with Blind prisoners concerning

13

the requirements of this Agreement and the ADA with respect to Blind people.

      d.    Trainings called for by Paragraph 15 will be provided:

         i.    Within 60 days of the Effective Date to current Blind Prisoners, current employees and Agents, and current OCAs who work with Blind Prisoners;

         ii.    Within 60 days of intake to new Blind Prisoners;

         iii.    Within 10 days of assignment as an OCA I or OCA II assisting a Blind Prisoner;

         iv.    Periodically, including at least annually, as a refresher.

16.    Implementation

      a.    Within 30 days of execution of this Agreement, CDOC will provide a notice (in Accessible Formats) to all Prisoners of the contents of this Agreement and the opportunity to be evaluated.

      b.    Representatives of CDOC, NFB-CO, and the expert shall meet monthly for the first three months of this agreement, quarterly for the following year, every six months for the following two years, and annually going forward to discuss the implementation of this Agreement and the needs of Blind Prisoners.

17.    Dispute Resolution

      a.    Informal Dispute Resolution:

         i.    If a Plaintiff or CDOC believes that a dispute exists relating to the performance or interpretation of this Agreement, they shall notify the other Party in writing, describing the dispute and clearly identifying that they are invoking the dispute resolution process.

         ii.    The other Party shall respond in writing to such notice within 10 business days of receipt of the notice.

         iii.    Within 10 business days of receipt of the response described in the previous subparagraph, counsel for both Parties shall meet and confer by telephone or in person and attempt to resolve the issue informally.

iv.    Only if the Parties are unable to resolve the dispute through the informal process described in this Paragraph 17(a) within 30 days, may the dispute be submitted for judicial resolution.

b.    Resolution by the Court:

i.    If, after completing the Informal Dispute Resolution process described in Paragraph 17(a), either party believes that the other has breached this Agreement, that party may submit the dispute for resolution by Magistrate Judge Michael E. Hegarty or, if Judge Hegarty is unavailable, to another judge in the United States District Court for the District of Colorado.

ii.    In resolving the dispute, the Court will apply the standards of Title II and Section 504.

iii.    The prevailing party in any court proceeding shall be entitled to their attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and the cases interpreting that provision including the fee-shifting standards in *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 422 (1978).

18.    Enforcement

a.    The Parties agree that the United States District Court for the District of Colorado (the "U.S. District Court") shall retain continuing jurisdiction over any attempt to enforce this Agreement by any of the Parties. The Parties agree to jointly file this Agreement with the Court, together with a joint motion to conditionally dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a), with the Court retaining jurisdiction to enforce the Agreement in the event of any disputes that may arise between the Parties until the Agreement terminates.

b.    Upon an alleged breach of the Agreement, Plaintiffs may move the U.S. District Court to enforce the Agreement, subject to subparagraph 17 of this Agreement.

19.    Damages and Attorneys' Fees: This Settlement Agreement is conditioned upon the execution of separately-negotiated agreements providing for payment of damages to Plaintiffs and attorneys' fees to Plaintiffs' counsel.

20.    Prison Litigation Reform Act

    a.    This Settlement is subject to the provisions of the Prison Litigation Reform Act.

    b.    For purposes of this Agreement only and in order to settle this matter, the parties agree and represent that this Agreement complies in all respects with the provisions of 18 U.S.C. § 3626(a).

    c.    The parties agree and represent that the prospective relief specifically contained in this Agreement is narrowly drawn, extends no further than necessary, is the least intrusive means necessary to address the Plaintiffs' allegations, and is not intended to have an adverse impact on public safety or the operation of a criminal justice system.

21.    Communications:

Any notice or communication required or permitted to be given to Plaintiffs or Plaintiffs' Counsel or CDOC under this Consent Decree shall be given in writing by email or U.S. Mail, addressed as follows:

To CDOC:

Kathleen Spalding
Nicole Gellar
Colorado Department of Law
Civil Litigation and Employment Law Section
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor Denver, Colorado 80203
Nicole.gellar@coag.gov
kit.spalding@coag.gov

To Plaintiffs:

Amy Robertson
Fox & Robertson
1 Broadway
Suite B205
Denver, CO 80203
arob@foxrob.com

Eve Hill
Brown Goldstein & Levy
120 E. Baltimore Street
Suite 2500

16

Baltimore, MD 21202
ehill@browngold.com

If the above addresses or the appropriate contacts change, it is the responsibility of the Party whose address is changing to give written notice of said change to all other Parties within 30 business days following the effective date of said change.

22.     Release: Plaintiffs, for themselves and their heirs, successors, assigns, agents, and representatives, including legal representatives, hereby release, acquit, and forever discharge the State of Colorado, the State's departments, agencies, and instrumentalities, and the State's current and former officers, employees, agents, and successors from any and all claims, demands, causes of action, and obligations, whether asserted or unasserted, whether matured, unmatured, or wholly inchoate, and whether known or unknown, including but not limited to all claims pursuant to Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the Allegations concerning conduct occurring before or during the Term of this Agreement, provided that nothing in this Agreement releases the following: 1) claims set forth in *Chávez v. Polis*, No. 20-cv-03798-LTB-GPG or any appeal thereof, except for any claims by Plaintiff Chavez that he has been denied reasonable accommodation for his blindness or limited vision, which claims are released hereby; 2) any claim relating to the conviction or sentence of either Individual Plaintiff.

23.     Stipulation to Dismiss and Covenant Not to Sue: The Parties agree to jointly file this Agreement with the Court, together with a stipulation to conditionally dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a), with the Court retaining jurisdiction to enforce this Agreement in the event of any disputes that may arise between the Parties until the Agreement terminates. Plaintiffs expressly agree and covenant that it will not sue or assert any cause of action, at law or equity, and whether before a court of law or an administrative agency, on their behalf, or on behalf of their members, against the State or any of the State's current or former officers, officials, employees, departments, or agencies for any claims for damages or injunctive relief that Plaintiff has or may have in the future arising from the Allegations. Notwithstanding the above, nothing in this Agreement prevents: 1) Plaintiff Chavez from asserting claims set forth in *Chávez v. Polis*, No. 20-cv-03798-LTB-GPG or any appeal thereof, except for any claims that Plaintiff Chavez was denied reasonable accommodations for his blindness or limited vision, which claims are released hereby; 2) either Individual Plaintiff from asserting any claim relating to their convictions or sentences.

17

24.    Intended Third Party Beneficiaries: The Parties agree and acknowledge that all agencies, officers and employees of the State, although they are not signatory Parties hereto, are intended third-party beneficiaries of this Release and Settlement Agreement, and each and all of them shall have the right to rely upon and enforce this Release and Settlement Agreement in any court of competent jurisdiction in the event that any action or proceeding based upon claims or causes of action released hereby may be threatened or commenced.

25.    No Admission of Liability: This Agreement is entered into for the purposes of avoiding litigation and does not constitute an admission of liability or evidence of any wrongdoing or omission of any kind.  This Agreement shall not be offered or received into evidence or otherwise filed or lodged in any proceeding against any party except as may be necessary to prove or enforce its terms.

26.    Open Records Requirements: This Release and Settlement Agreement is not confidential.  Plaintiffs understand and agree that the State of Colorado and its agencies and departments are bound by applicable public disclosure laws including, without limitation, the provisions of C.R.S. §24-72-101, et seq. (Colorado Open Records Act), as presently or subsequently amended, and that the State of Colorado may be required to disclose this Release and Settlement Agreement in its entirety if requested to do so under such statutes. Plaintiffs understand that this Release and Settlement Agreement are public records and further agree that they will not hold the State of Colorado, or its administrators, officers, agents, or employees, liable for release of information contained in public records under such statutes.

27.    Warranties and Representations: Plaintiffs represent and warrant that they have not assigned or transferred any claim arising from or related to the Allegations to any third party and that no third party has been subrogated to their interest in claims purported to be released hereby, or, if any third party has been subrogated to Plaintiffs' interest, the interest of any subrogee has been settled, compromised, and extinguished.  Plaintiffs agree to defend and indemnify the State, its departments, agencies, officers, and employees, and to hold them harmless against the claims of any assignee or subrogee to claims purported to be released hereby that may hereafter be asserted.

28.    Binding Effect: This Release and Settlement Agreement shall take effect to the benefit of, and be binding upon, the heirs, successors, assigns and legal representatives of the Parties and any third-party beneficiaries.

29.    Governing Law: This Release and Settlement Agreement is entered

18

into in Colorado and shall be governed by the laws of the State of Colorado, except as provided in § 17.

30.    Headings: The headings used in this Release and Settlement Agreement are for the convenience of the Parties only. As such, these headings shall not have any legal effect whatsoever or, in any other way alter or modify the meaning or interpretation of this Release and Settlement Agreement.

31.    Severability: If any provision of this Release and Settlement Agreement should be declared to be unenforceable, the remainder of this Release and Settlement Agreement shall continue to be binding upon the Parties.

32.    Advice of Counsel: Plaintiffs represent that (a) they have relied upon the advice of attorneys and/or other consultants of their own choice concerning the legal and federal, state and local tax consequences of this Release and Settlement Agreement, (b) this Release and Settlement Agreement has been thoroughly read by Plaintiffs or to them, and its terms have been explained to their satisfaction by an attorney or attorneys of its choice, and (c) the terms of this Release and Settlement Agreement, including its release of unasserted and unknown claims, are fully understood and voluntarily accepted by Plaintiffs. Plaintiffs further understand and agree that this Release and Settlement Agreement shall be forever binding and that no cancellation, rescission, or modification of, or release from the terms of, this Release and Settlement Agreement shall be made based upon any mistake of fact or of law.

33.    Execution in Counterparts: This Release and Settlement Agreement may be executed in counterparts, each of which shall have full force and effect upon execution by all Parties to this Release and Settlement Agreement, but which together shall constitute a single instrument.

34.    Execution by Electronic Signatures: This Release and Settlement Agreement may be executive by electronic signatures, which shall have full force and effect as if they were wet ink signatures.

**CAUTION: Read this before signing.  This is a release of your claims for attorneys' fees and costs, including attorneys' fees and costs for the future monitoring of the Settlement Agreement.**

FOR PLAINTIFFS:


Brian Mackes


Adrian Chávez


National Federation of the Blind of Colorado

By:   Scott C. LaBarre

Its:   First Vice President

FOR THE COLORADO DEPARTMENT OF CORRECTIONS

BY: _____          Date: ___06/28/2022___

    DEAN WILLIAMS (or designee)
    Executive Director

21

APPROVED AS TO FORM ONLY:

PHILIP J. WEISER
Attorney General

KATHLEEN SPALDING
Attorney for Defendants

FOX & ROBERTSON. PC

AMY F. ROBERTSON

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales

BROWN. GOLDSTEIN & LEVY. LLP
Eve L. Hill

Attorneys for Plaintiffs

# EXHIBIT 26

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement Agreement ("Agreement") is entered this 5th day of June, 2019, between Steven Brown, Wilbert Delano, Gregory Hammond, Sedric Holley, Russell Hopkins, Johnny James, Tyrell Polley, Maynard Snead and Robert Wilson (collectively, "PLAINTIFFS" or "RELEASORS") on the one hand, and the Maryland Department of Public Safety and Correctional Services ("DPSCS"), Stephen T. Moyer, Dayena M. Corcoran and Richard Miller, former officers and/or employees of the State of Maryland in both their official and personal capacities, and Robert L. Green, Secretary of Public Safety and Correctional Services, in his official capacity only (collectively, "DEFENDANTS" or "RELEASEES") on the other hand. PLAINTIFFS and DEFENDANTS are sometimes collectively referred to herein as the "Parties" or individually referred to as a "Party."

## RECITALS

**WHEREAS**, on or about March 30, 2016, PLAINTIFFS filed civil actions in the United States District Court for the District of Maryland against DPSCS;

**WHEREAS**, the civil actions filed by PLAINTIFFS were consolidated and styled as *Brown et al. v. DPSCS et al.*, Case No. 17-cv-945-RDB (the "Lawsuit") against DEFENDANTS, in both their official and personal capacities, asserting claims for alleged violations of the federal Americans With Disabilities Act ("ADA"), Section 504 of the federal Rehabilitation Act and the Eighth and Fourteenth Amendments to the United States Constitution;

**WHEREAS**, DEFENDANTS deny any and all liability for the claims asserted in the Lawsuit by PLAINTIFFS but enter into this Agreement to avoid the continued expense of litigation;

**WHEREAS**, PLAINTIFFS and DEFENDANTS have agreed to a full and final settlement of all claims asserted in the Lawsuit on the terms provided in this Agreement;

**WHEREAS**, PLAINTIFFS and DEFENDANTS wish to resolve all matters in dispute between them in a mutually satisfactory manner and to terminate all past and present controversies between them; and

**NOW, THEREFORE**, based on the above Recitals and in consideration of the mutual covenants stated below and other good and valuable consideration, the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Incorporation of Recitals**

The Recitals to this Agreement are incorporated by reference herein.

2. **Settlement Terms**

A. Subject to the approval of the Maryland Board of Public Works and identification of available appropriated funds, as provided in sub-paragraphs (C) and (D), within fourteen  14) days after the approval by the Maryland Board of Public Works, the State of Maryland shall pay the sum of Forty Two Thousand Five Hundred Dollars  $42,500.00)  the "Settlement Amount") to each PLAINTIFF in a one-time payment by delivering a check made payable to each PLAINTIFF to PLAINTIFFS' counsel, Brown, Goldstein & Levy, LLP.

B. Subject to the approval of the Maryland Board of Public Works and identification of available appropriated funds, as provided in sub-paragraphs (C) and (D), within fourteen  14) days after the approval by the Maryland Board of Public Works, the State of Maryland shall pay the sum of One Million, Sixty-Two Thousand, Five Hundred Dollars ($1,062,500.00) (the "Attorneys' Fees Payment") in a one-time payment to PLAINTIFFS' counsel, Brown, Goldstein   Levy, LLP, by delivering a check to Brown Goldstein & Levy.

C. DPSCS shall promptly submit this Agreement for approval to the Maryland Board of Public Works under the policies of the Board of Public Works.

D. The obligation to make the lump sum payments set forth in this Paragraph 2 is subject to approval by the Board of Public Works of Maryland.  If the Board of Public Works rejects the payment of the Settlement Amount by the State of Maryland under this Agreement, or if the State provides notice to the PLAINTIFFS that it has been unable to identify funds to satisfy the Settlement Amount, this settlement Agreement between PLAINTIFFS and DEFENDANTS will immediately become null and void, and those parties will maintain all other rights, obligations and duties as though the Agreement between the PLAINTIFFS and DEFENDANTS had never been entered.

E. Upon approval of this Agreement by the Board of Public Works, DEFENDANTS shall be obligated to comply with the non-monetary terms set forth in the attached Exhibit 1 (the "Non-Monetary Term Sheet"), which is incorporated by reference herein.

F.    Within five (5) days of approval of this Agreement by the Board of Public Works, PLAINTIFFS and DEFENDANTS shall file a stipulation of dismissal, with prejudice, of the Lawsuit.

## 3.    Release by PLAINTIFFS

Except for the obligations set forth in this Agreement and the Non-Monetary Term Sheet, each of PLAINTIFFS, in consideration of the aforesaid recitals and agreements, and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby release and forever discharge for himself, and any claiming through him, the RELEASEES, in both their official and personal capacities, and all of the RELEASEES' agents, employees, agencies, departments, directors, officers, and members, from any and all claims, contracts, complaints, demands, damages, lawsuits, obligations, promises, administrative actions, charges, and causes of action, both known and unknown, of any kind whatsoever, that PLAINTIFFS, collectively and/or individually, ever had, have now, or may have in the future, based on or relating to any act, omission or occurrence that took place prior to the date of this Agreement, alleged in, related to or arising from the Lawsuit; and all claims asserted in, or that could have been asserted in, the Lawsuit, including claims for attorneys' fees and costs. The parties agree, however, that this release does not preclude the PLAINTIFFS from filing a petition for writ of habeas corpus challenging DPSCS's assignment of diminution credits for job assignments they performed, and/or asserting their claims in a habeas proceeding that they should have been afforded additional diminution credits as a result of actions complained of in the Amended Complaint filed in the Lawsuit.

## 4.    No Admission of Liability

The Parties agree that the provision and receipt of the above-mentioned consideration, the releases provided herein, and the execution of this Agreement are not to be construed as admissions of liability on the part of any Party, but instead are in full settlement of the above-referenced matters for which liability is denied and for which DEFENDANTS wish to avoid the continued expense of litigation. DEFENDANTS have denied and continue to deny all charges of wrongdoing arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Lawsuit, including without limitation the claim that DEFENDANTS violated the United States Constitution. This Agreement shall in no event be construed or deemed to be evidence of an admission or concession on the part of DEFENDANTS with respect to any claim or of any fault, liability, wrongdoing, or damage whatsoever.

## 5.     Acknowledgment

PLAINTIFFS acknowledge that no representation of fact or opinion has been made by RELEASEES to induce this compromise with respect to the extent or nature of any injuries or damages or as to the likelihood of future complications, or recovery therefrom, and that the consideration set forth herein is solely by way of compromise of the disputed claim, and to foreclose all possibility of any future claim based upon acts, errors or omissions which occurred prior to the date of these presents, whether known or unknown, and that in determining said consideration, there has been taken into consideration the fact that unexpected consequences may result, known or unknown, and it is therefore, specifically agreed that this Agreement shall be a complete bar to all claims or suits for injuries or damages of whatsoever nature relating to, resulting, or to result, from the matters and claims related to the Lawsuit.

## 6.     Covenant Not to Sue

PLAINTIFFS hereby covenant and agree not to sue the RELEASEES, their predecessors, successors, executors, assigns, agents, servants, employees, agencies, past and present for any claims, demands, damages, actions, causes of action or suit at law or in equity, of whatever kind or nature, whether known or unknown, suspected or unsuspected, arising out of or relating to the matters and/or claims alleged, or that could have been alleged, in the Lawsuit. The Parties agree, however, that nothing in this Settlement Agreement shall prohibit PLAINTIFFS from: a) initiating any appropriate legal proceeding in federal or Maryland state court to enforce this Agreement as set forth in the Non-Monetary Term Sheet; or (b) filing petitions for writs of habeas corpus challenging DPSCS's assignment of diminution credits for job assignments they performed, and/or asserting their claims in habeas corpus proceedings that they should have been afforded additional diminution credits as a result of actions complained of in the Amended Complaint filed in the Lawsuit.

## 7.     Indemnification

Each PLAINTIFF covenants and agrees for himself, herself, or itself, and his, her, or its successors, administrators and assigns, to indemnify and save RELEASEES harmless if they are found to be liable to pay anyone as a result of any suit initiated by or through PLAINTIFFS, or on their behalf, demanding the same or similar damages claimed by PLAINTIFFS against RELEASEES in the Lawsuit, and to pay on behalf of RELEASEES, reasonable attorney's fees, court costs, or other reasonable costs of litigation which it may incur in any case, cross claim, or third party claim filed against it as a consequence of PLAINTIFFS filing suit against any person or entity not released herein demanding the same or similar damages claimed against RELEASEES in the Lawsuit.

Each PLAINTIFF, for himself, herself, or itself, and his, hers, or its successors, administrators and assigns, covenants and agrees to execute such instruments, documents or further assurances as may be necessary to carry out PLAINTIFFS' obligations hereunder, including the waiver or release of any verdict or judgment entered in favor of PLAINTIFFS and against someone other than RELEASEES by the amount of any verdict or judgment said person or entity obtains against RELEASEES for indemnification.

## 8.    Entire Agreement

This Agreement, including Exhibit 1 hereto, constitutes the complete, final and entire understanding of the Parties hereto, and they shall not be bound by any terms, conditions, covenants or representations not expressly herein contained.

## 9.    Modification

This Agreement may not be modified or changed orally, but only by an agreement in writing signed by all Parties.

## 10.    Consultation with Counsel

The Parties represent that prior to signing this Agreement, each has read it, understood its terms and conditions, consulted with counsel, and voluntarily signed it.

## 11.    Choice of Law

This Agreement shall be governed by, and interpreted according to, the laws of the State of Maryland without regard to conflict of laws principles.

## 12.    Construction

This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing the Agreement to be drafted.

## 13.    Authority

Each individual signing this Agreement on behalf of a Party warrants that he or she has been duly authorized by said person or entity to execute this Agreement and bind said person or entity thereto.

## 14.    Counterparts

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same agreement.

**IN WITNESS THEREOF**, and intending to be legally bound, the Parties have caused this Agreement as of the date stated above.

PLAINTIFFS

_____
Steven Brown

_____05/21/2019_____
Date

_____
Wilbert Delano

_____05/21/2019_____
Date

_____
Gregory Hammond

_____05/21/2019_____
Date

_____
Russell Hopkins

_____05/21/2019_____
Date

_____
Sedric Holley

_____05/21/2019_____
Date

_____
Johnnie James

_____05/21/2019_____
Date

_____
Tyrell Polley

_____05/21/2019_____
Date

_____
Maynard Snead

_____05/21/2019_____
Date

Release and Settlement Agreement                                    Page 6 of 7

_____          _____05/21/2019_____
Robert Wilson                            Date


APPROVED AS TO FORM AND LEGALITY:


_____          _____05/21/2019_____
Jessica P. Weber, Esq.                    Date
Attorneys for Plaintiffs
Brown Goldstein & Levy, LLP
120 E. Baltimore. St., Suite 1700
Baltimore, MD 21201


DEFENDANTS:


_____          ___5.22/19_____
Secretary, Maryland Department of         Date
Public Safety and Correctional Services


_____          ___5/24/19_____
Stephen T. Moyer                          Date


_____          _____
Dayena M. Corcoran                        Date


_____          _____
Richard Miller                            Date


APPROVED AS TO FORM AND LEGALITY:

Attorney for the DEFENDANTS - RELEASEES


_____          _____
Assistant Attorney General                Date
Attorney for RELEASEES


Release and Settlement Agreement                              Page 7 of 7

_Robert Wilson_                 05/21/2019
Robert Wilson                            Date

**APPROVED AS TO FORM AND LEGALITY:**

                                     05/21/2019

Jessica P. Weber, Esq.                     Date
Attorneys for Plaintiffs
Brown Goldstein & Levy, LLP
120 E. Baltimore. St., Suite 1700
Baltimore, MD 21201

**DEFENDANTS:**

_____        5-22-69
Secretary, Maryland Department of      Date
Public Safety and Correctional Services

_____        _____
Stephen T. Moyer                        Date

_____        5/31/19
Dayena M. Corcoran                 Date

_____        _____
Richard Miller                          Date

**APPROVED AS TO FORM AND LEGALITY:**

**Attorney for the DEFENDANTS - RELEASEES**

_____        6/6/19
Assistant Attorney General            Date
Attorney for RELEASEES

Release and Settlement Agreement                    Page 7 of 7

*Steven Brown, et al. v. Department of Public Safety and Correctional Services, et al.*

Exhibit 1 to Release and Settlement Agreement
<u>Non-Monetary Term Sheet</u>

**All of the following terms apply to currently incarcerated Plaintiffs in *Brown v. Department of Public Safety and Correctional Services*, Case No. 17-cv-945-RDB, and any Plaintiff who returns to Department of Public Safety and Correctional Services ("DPSCS") custody while the Agreement remains in effect:**

1.  Within 60 days of the Effective Date, which shall be the date on which the settlement is approved by the Board of Public Works, DPSCS shall implement an accessible and timely process (separate from the ARP and grievance processes) for Plaintiffs to request reasonable modifications and auxiliary aids and services with timely (i.e., within 14 days of when request was made) determinations and documentation of provision or denial. The process will give primary consideration to the request of the blind inmate and result in approval of modifications, aids, or services whenever doing so is necessary because of a disability, would not constitute an undue burden in light of DPSCS' resources, would not constitute a direct threat within the meaning of the ADA, and would not fundamentally alter the DPSCS program, service, or activity. Any denial, including but not limited to a determination of undue burden, fundamental alteration, or direct threat must be documented in writing by the Warden of the facility and the Commissioner of Correction, and approved by the Secretary's designee (ADA Coordinator).  That final determination shall be communicated to the requesting individual, and maintained centrally and in the base file of the requesting individual. A copy of the initial request and final determination shall be sent to Inmate Civil Rights Legal Services Provider pursuant to DPSCS Solicitation No. Q0015009 ("Legal Services Provider").  DPSCS shall provide Plaintiffs with a draft of the process described in this Paragraph before implementing it. Plaintiffs may provide feedback on the draft process, to which DPSCS will give due consideration.

2.  Within  90 days of the Effective Date, DPSCS shall provide equally effective access to all print materials offered to Plaintiffs by DPSCS and its agents, including but not limited to inmate handbooks/directives, orientation materials, bulletin board notices, informal and formal grievance process forms and responses, commissary forms, request slips, sick call slips, and educational, vocational, and self-help materials, by making them available to Plaintiffs in an accessible format (options include: large print, electronic, including accessible electronic fillable forms, Braille, and audio), along with any assistive technology needed to use the accessible format (*e.g.*, computer with text-to-speech software, CD player, printer attached to computer with assistive technology). These accessible materials and/or assistive technology shall be available to Plaintiffs in the library, classrooms, job locations, or inmate cells, as appropriate to the function of the print material.  DPSCS shall maintain the assistive technology currently available to Plaintiffs (including, but not limited to: Job Access With Speech (JAWS), Talking Typer, Book Wizard Reader, SARA CE, Kurzweil

1000, slate/stylus, RUBY, DaVinci Pro HD/OCR, Perkins Brailler, talking calculators, Magnalite 3X LED Lighted Magnifier, Optelec ClearReader+) for the term of this Agreement, shall ensure that such assistive technology is used only by Plaintiffs and other inmates with disabilities that affect their ability to read, write, and comprehend standard print, and shall not require Plaintiffs to pay for assistive technology. DPSCS may offer Plaintiffs a qualified reader and/or scribe where necessary to provide equally effective communication given the particular document or circumstance. DPSCS shall permit Plaintiffs to create documents privately and independently to the same extent allowed to other inmates by allowing Plaintiffs to use a word processing program on computers in the RCI Library with assistive technology and to print documents from these computers.

3.  Within 90 days of the Effective Date, DPSCS shall provide equally effective access to all print materials provided to Plaintiffs through DPSCS and its agents, including library materials (including legal research materials and career and housing information), mail (personal and legal), and newspapers and periodicals, by making appropriate assistive technology and auxiliary services (options include: scanner, computer with assistive technology, qualified reader and scribe) available to Plaintiffs in the library, classrooms, job locations, or inmate cells as appropriate to the function of the print material.

4.  DPSCS shall ensure any tablets implemented at any facility at which a Plaintiff is in custody have accessibility features suitable for use by Plaintiffs.

5.  For Plaintiffs who prefer to have all or some documents read and/or scribed for them, DPSCS shall provide Plaintiffs the opportunity to select a fellow inmate who is designated as a qualified reader and/or scribe, who has been trained, is not affiliated with a security threat group; has not been convicted of a sex offense or a crime involving abuse of a vulnerable person; and has been infraction free for one year.  For documents with information that is confidential or that may contain sensitive personal information or contact information for Plaintiffs' friends or families (including, but not limited to: sick call slips, medical documents, personal mail, request slips, grievances, legal documents, including legal mail, ARP forms and responses, and IGO documents, commissary forms, forms related to visitors or family day, and Prison Rape Elimination Act documents), DPSCS shall ensure that  Plaintiffs' assigned Case Managers or, if a Case Manager is unavailable, an assigned correctional officer, are reasonably available (no longer than 48 hours from when an oral request is made) to spend a maximum of 15 minutes per day per Plaintiff to read or scribe such documents for Plaintiffs.  DPSCS shall ensure that Plaintiffs' assigned Case Managers or, if a Case Manager is unavailable, an assigned correctional officer, are reasonably available (within three (3) business days (excluding holidays and weekends) from when an oral request is made) to spend an hour per day per Plaintiff to write for Plaintiffs.  For any documents concerning the assigned Case Manager or correctional officer, DPSCS shall make an impartial staff member reasonably available (no longer than three (3) business days (excluding holidays and weekends) from when an oral request is made) to read or scribe for Plaintiffs. Staff acting as a reader and/or scribe

shall maintain the Plaintiff's confidentiality.  DPSCS also agrees that it will honor oral requests for medical attention from Plaintiffs. DPSCS agrees that any deadlines internal to DPSCS shall be extended by the number of days between when the Plaintiff requested a reader or scribe and when such assistance was provided.

6. Within 30 days of the Effective Date, in consultation with Blind Industries & Services of Maryland ("BISM"), the RCI ADA Coordinator shall identify what auxiliary aids and services each Plaintiff requires and shall document such information in Plaintiffs' base file and in a file maintained by the RCI ADA Coordinator. To the extent not already provided, the RCI ADA Coordinator shall implement required auxiliary aids and services within 90 days from the ADA Coordinator's evaluation.  In addition, also in consultation with BISM, the RCI ADA Coordinator shall conduct an individual assessment of each Plaintiff to determine an appropriate training protocol for Plaintiffs to learn skills for independent living as blind individuals from qualified instructors, including independent navigation skills, cleaning, any vocational skills appropriate to the job assigned to Plaintiff, and training on access technology. The ADA Coordinator shall implement an appropriate training protocol for each Plaintiff within 90 days of the ADA Coordinator's evaluation. The parties agree that the recommendations of BISM are not binding upon the Department, but shall be taken into consideration by the RCI ADA Coordinator and Case Management in determining appropriate services, auxiliary aids and independent living skills, including vocational skills, training for each Plaintiff.

7. To the extent consistent with proper security and inmate safety, DPSCS shall permit Plaintiffs the opportunity to navigate facilities independently or, if Plaintiffs prefer assistance, the opportunity to help select a qualified escort who has been trained, is not affiliated with a security threat group; has not been convicted of a sex offense or a crime involving abuse of a vulnerable person; and has been infraction free for one year.  In the event DPSCS decides that a Plaintiff shall not be permitted to navigate independently, such decision shall be documented in writing, with supporting rationale, and communicated to the Plaintiff.  A copy of the determination shall be forwarded to the Legal Services Provider.

8. To the extent that each Plaintiffs remains confined in a facility that houses inmates in cells, DPSCS shall continue to single cell that Plaintiff for the duration of his incarceration to the extent that single celling is indicated as medically required by the Department's medical provider's Ophthalmology Specialist.

9. DPSCS shall determine security classifications for Plaintiffs without regard to blindness. For those with minimum or prerelease security levels, DPSCS shall offer such Plaintiffs the opportunity to be housed at facilities commensurate with their classification security level and ensure that all required modifications and auxiliary aids and services are provided to these Plaintiffs at these other facilities. For Plaintiffs eligible for evaluation for or participation in programs and services offered at Patuxent Institution, DPSCS, upon notifying and receiving consent for a transfer to Patuxent from each eligible Plaintiff, shall transfer such Plaintiffs to Patuxent and ensure that

all required modifications and auxiliary aids and services are provided to these Plaintiffs at Patuxent. When Plaintiffs are transferred to different facilities for short-term stays, such as for court visits, DPSCS shall ensure that all required modifications and auxiliary aids and services are provided to Plaintiffs at these other facilities.

10. DPSCS shall provide Plaintiffs modifications and auxiliary aids and services necessary to enable their equal participation in any DPSCS program, service, or activity for which they are otherwise qualified or eligible but for their disability, unless to do so would pose a direct threat to the health and safety of others, constitute an undue burden in light of DPSCS' resources, or fundamentally alter the program, service or activity. Any denial of a request for a modification, auxiliary aid or service, including but not limited to a determination of undue burden, fundamental alteration, or direct threat must be documented in writing by the Warden of the facility and the Commissioner of Correction, and approved by the Secretary's designee (ADA Coordinator). That final determination shall be communicated to the requesting individual, and maintained centrally and in the base file of the requesting individual. A copy of the initial request and final determination shall be sent to the Legal Services Provider.

11. DPSCS shall offer Plaintiff Maynard Snead the next available position for which he is qualified in Maryland Correctional Enterprises. DPSCS shall offer Plaintiff Robert Wilson the next available position in Food Service in which he can perform the essential functions of the job with or without reasonable modifications and auxiliary aids and services, regardless of whether he is housed at RCI or a different DPSCS facility.

12. DPSCS shall provide Plaintiffs a head start to recreation, gym, and meals by opening their cells at least 10 minutes before the general population is permitted to leave their cells for these activities.

13. Within 60 days of the Effective Date, the Warden of RCI shall meet with the Plaintiffs and shall continue to do so on a quarterly basis throughout the term of this Agreement.

14. Within  90  days of the Effective Date, responsible staff, including job supervisors, education providers, case managers, and correctional officers who work with Plaintiffs, will be trained on the requirements of this Agreement and of the ADA and Section 504, their duty not to retaliate against Plaintiffs for filing this lawsuit or raising concerns about violations of the ADA or Section 504, the process for requesting reasonable modifications and auxiliary aids and services, including reasonable modifications in job and vocational programs, and the availability and function of assistive technology for the blind.

15. DPSCS shall ensure all contractual arrangements with third-party entities require those entities to comply with Plaintiffs' rights under the ADA and Section 504.

4

16. This Agreement shall be effective for a period of five (5) years from the date on which it is executed by all parties.

17. DPSCS shall provide Plaintiffs, in accessible formats, the name, office address, and telephone number of RCI's and DPSCS's ADA Coordinators.

18. This is a private settlement agreement as contemplated by 18 U.S.C. 3626(c)(2). This is not a consent decree pursuant to 19 U.S.C. 3626(c)(1).

19. **Enforcement of Settlement Agreement**.

   a. Pursuant to 18 U.S.C. § 3626(c)(2), upon an alleged breach of the Release and Settlement Agreement, including this Exhibit 1, Plaintiffs may move the United States District Court for the District of Maryland (the "U.S. District Court") to enforce the Settlement Agreement, subject to subparagraph b of this paragraph. The parties agree that the Settlement Agreement complies with 18 U.S.C. § 3626(a) and, accordingly, any action by Plaintiffs to enforce this Settlement Agreement in the U.S. District Court shall not result in the reinstatement of the litigation pursuant to 18 U.S.C. § 3626(c)(2)(A). In the event that the U.S. District Court finds that the Settlement Agreement does not comply with 18 U.S.C. § 3626(a), the parties stipulate and agree that the litigation shall not be reinstated in the U.S. District Court. Instead, Plaintiffs will have the right to file an action in Maryland state court seeking specific performance of the Settlement Agreement, subject to subparagraph b of this paragraph. The right to seek enforcement pursuant to this paragraph shall expire five (5) years from the Effective Date of the Settlement Agreement. In any action to enforce the Settlement Agreement under this paragraph, Plaintiffs shall not be entitled to any damages except those damages allowable under 42 U.S.C. § 1997e(e).

   b. Prior to taking any action under subparagraph a of this paragraph, counsel for Plaintiffs shall notify counsel for DPSCS of the alleged non-compliance in writing and give DPSCS thirty (30) days to investigate and cure the alleged breach. If the alleged breach is cured by DPSCS within the thirty (30) day period, the Plaintiffs may not seek relief under subparagraph a of this paragraph.

# EXHIBIT 27
# FILED UNDER SEAL

# EXHIBIT 28

# Inmate Board Actions

| Inmate Name | ███████████████ |
|---|---|
| CDCR Number | |
| Parole Eligible Date (Month/Year) | |

## Pending Board Actions

| Date | Action | Status |
|---|---|---|
| ██████████ | Parole Suitability Hearing | Tentative date for parole suitability hearing |
| | | |

## Past Board Actions

| Date | Action | Outcome |
|---|---|---|
| ███████████ | Administrative Review | The administrative review to advance the inmate's next parole suitability hearing date was denied |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 3 years |
| █████████████2 | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 5 years |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 5 years |
| ███████████ | Parole Suitability Hearing | Inmate voluntarily waived the right to a hearing for 2 years |
| █████████████ | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Inmate stipulated to unsuitability for 1 year |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 2 years |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 1 year |
| █████████████ | Parole Suitability Hearing | Inmate stipulated to unsuitability for 2 years |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 2 years |
| █████████████ | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Parole suitability hearing was postponed |
| █████████████ | Parole Suitability Hearing | Inmate was denied parole for 2 years |
| | | |

Print    Close

**Information current as of: 09/03/2023**

# EXHIBIT 29

| | |
|---|---|
| **From:** | Stratton, Travis@CDCR |
| **To:** | Mehler, Steven@CDCR |
| **Subject:** | FW: Received - ▮▮▮▮▮▮▮▮▮▮ (Hearing Compact Discs) |
| **Date:** | Monday, June 26, 2023 12:22:05 PM |
| **Attachments:** | image003.jpg |
| | image001.png |

See below

---

**From:** Stratton, Travis@CDCR
**Sent:** Wednesday, September 14, 2022 12:13 PM
**To:** Roberts, Jonathan <Jonathan.Roberts@cdcr.ca.gov>
**Cc:** Sands, Arminthia@CDCR <Arminthia.Sands@cdcr.ca.gov>; Alidon, Christiane@CDCR <Christiane.Alidon@cdcr.ca.gov>; Oseguera, Sabrina@CDCR <Sabrina.Oseguera@cdcr.ca.gov>; Stratton, Travis@CDCR <Travis.Stratton@cdcr.ca.gov>
**Subject:** RE: Received - ▮▮▮▮▮▮▮▮▮▮ (Hearing Compact Discs)

Hi Jonathan,

My apologies. I meant to add a letter to the package. Mr. ▮▮▮▮ attorney requested he be provided an audio recording of his ▮▮ transcript and current CRA. I think he has vision issues.

We tried to send audio recording for him in the past, but the CDs we sent would not play on the institution devices. These CDs should play the audio on the devices.

**Travis Stratton**
**Board of Parole Hearings**
**Program Operations**
**Staff Services Manager I**
**Cell:** ▮▮▮▮▮▮▮▮▮

**BPHLogo**



**Common Links:** BPH Home  |  Hearing Calendars  |  Lifer Analyst Group


*Confidentiality Notice:  This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message.  Thank you.*

**From:** Roberts, Jonathan <Jonathan.Roberts@cdcr.ca.gov>
**Sent:** Wednesday, September 14, 2022 11:28 AM
**To:** Stratton, Travis@CDCR <Travis.Stratton@cdcr.ca.gov>
**Cc:** Sands, Arminthia@CDCR <Arminthia.Sands@cdcr.ca.gov>; Alidon, Christiane@CDCR
<Christiane.Alidon@cdcr.ca.gov>; Oseguera, Sabrina@CDCR <Sabrina.Oseguera@cdcr.ca.gov>
**Subject:** Received - ██████████████ (Hearing Compact Discs)

Good Morning Travis,

I just received the Compact Discs from ██████ for ██████████ . I just wanted to reach
out for specifics regarding what to do with these Compact Discs.

Thank you,



*Jonathan Roberts*

*Case Records Technician*
*Board of Parole Hearings*

# EXHIBIT 30

BOARD OF PAROLE HEARINGS
**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**                    **STATE OF CALIFORNIA**
BPH 1073

| **I.    PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)** |
|---|

I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding.

Print Name: ▮▮▮▮▮▮             Sign Name:                      Date: ▮▮▮▮▮▮

| **Mental Health Concerns** | | **Source** | **Dated** |
|---|---|---|---|
| EOP | Enhanced Out-Patient | CDC 128C | 12/07/2009 |

| **Identified Disabilities** | **Note:** | **Source** | **Dated** |
|---|---|---|---|
| DPV | Blind or Low Vision | | CDC 1845 | 08/25/2017 |

**Other Potential Assistance Needs**

**Reading Level:**  9          **Total GPL:**  12

**Speaks English**  [X] Yes   [ ] No

**Languages Spoken**

| **II.    INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION** |
|---|

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                    [ ] I need the following help to hear
[X] I need help understanding the procedures and forms.  [ ] I need the following help to see
[ ] I need a sign language interpreter.                  [ ] I need to communicate in writing.
[ ] I need a wheelchair and I [ ] do have one.  [ ] do not have one.
[X] I need a Durable Medical Equipment to get around :   **Tapping Cane**

   Have Durable Medical Equipment :   Tapping Cane _____

   Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need  [ ] A medical evaluation  [ ] A mental health evaluation  [ ] Medication

[X] Other  NEEDS ASSISTANCE WITH DIRECTIONS/HOW TO GET TO PLACES-ADA WORKER

[ ] **I do not need any help for my parole hearing.**

Name: ▮▮▮▮▮▮ , ▮▮▮▮▮▮                                        CDC Number: ▮▮▮▮
Proceeding: Lifer                        Type of Hearing:  Subsequent Hearing
Location: ▮▮▮▮▮▮▮▮▮▮

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

Jackson Ex. 30, p. 1

BOARD OF PAROLE HEARINGS
**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**                    **STATE OF CALIFORNIA**
BPH 1073

| III.   INITIAL SERVICE OF RIGHTS (STAFF ONLY) |
|---|

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

☐ Appears to understand     ☐ Appears to have difficulty understanding

Effective Communication Method Used:

_____     _____     _____
Staff Name and Title (please print)                Staff Signature                 Date

| IV.   ACCOMMODATIONS PLANNED |
|---|

Accommodation(s)/Assistance to be provided at hearing(s): "**Attorney**"    "**Magnifying Device**"
"**Personal Durable Medical Equipment**"

Summary:        Accommodations Planned

Comment:        EOP/DPV-Tapping cane, foot orthoses, vision vest, glasses
THERESA BARKER / BPH Staff
_____     _____     ████████
Staff Name and Title (please print)                Staff Signature                 Date

| V.   SUMMARY OF ACCOMMODATIONS |
|---|

Accommodation(s)/Assistance provided at hearing(s):        "**Attorney**" "**Cane**" "**Eye Glasses**" "**Magnifying Device**"

Private Durable Medical Equipment(Inmate/Parolee Provided):

DIANNE DOBBS / Commissioner
_____     _____     ████████
Staff Name and Title (please print)                Staff Signature                 Date

Name: ████████ , ████████                                        CDC Number: ████████
Proceeding: Lifer                          Type of Hearing: Subsequent Hearing
Location: ████████████████

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

Jackson Ex. 30, p. 2

## ADA/Effective Communication Patient Summary

**As of:** 01/06/2022 11:26

### Patient Information

**NAME:** ███████ , █████
**CDCR:** ██████

### Disability Placement Program

**Current DPP Code(s):**
 * DPV

**DPP Verification/Accommodation Date:** 08/30/17 18:39:53 PDT

**Current Housing Restrictions/Accomodations:**
 * Inmate Attendant/ Assistant
 * Bottom Bunk

### Methods of Communication

**SLI:**

**Primary Method:**

**Secondary Method:**

**Interview Date:**

### Developmental Disability Program

**Current DDP Code:** NDD

**Effective Date:** 02/05/2003 00:00

**Adaptive Support Needs:**

### Testing of Adult Basic Education (TABE)

**TABE Score:** 09.0

**TABE Date:** 03/27/2003 00:00

### Learning Disabilities

**Learning Disabilities:**

### English Proficiency

**LEP:** No

**Primary Language:** English

### Durable Medical Equipment

**Current ISSUED DME:**
 * Cane Permanent
 * Eyeglass Frames Permanent
 * Foot Orthoses Permanent
 * Therapeutic Shoes/Orthotics Permanent
 * Vision Impaired Disability Vest Permanent

**Dental Prosthetic:**

**Dental Prosthetic Date:**

### MHSDS

**MHLOC:**  EOP

BOARD OF PAROLE HEARINGS                                    STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

## DECISION - SUBSEQUENT HEARING #8

- [ ] Parole Granted - (Yes)
      CDCR:  Do not release inmate before Governor's review.
- [ ] Parole Denied - (No)  ____  Year(s)
- [ ] Inmate Signed Stipulation of Unsuitability for  ____  Year(s)
- [ ] Inmate Signed Voluntary Waiver for  ____  Year(s)
- [ ] Split Decision
- [ ] Term Calculation Only -
- [ ] Continue  ____  Month(s)
- [X] Hearing Postponed    Length:  Next Avail Calendar

Reason(s):
   Prisoner Postponement Approved
      Information:

Unavailability of Transcription Material; Effective communication

## PANEL RECOMMENDATIONS

The Board Recommends:
- [ ] No more 115's or 128A's
- [ ] Work to reduce custody level
- [ ] Stay discipline free
- [ ] Earn positive chronos
- [ ] Recommend transfer to
- [ ] Other

As Available
- [ ] Get self-help
- [ ] Learn a trade
- [ ] Get therapy
- [ ] Get a GED

## PRESENT AT HEARING

| District Attorney | ALAMEDA COUNTY DISTRICT ATTORNEY |
|---|---|
| Inmate Attorney | ███████████ |

## HEARING PANEL

| DOBBS, DIANNE - Commissioner | *Dianne R Dobbs* | Date: ████████ |
| NDUDIM, DAVID - Deputy Commissioner | *David Ndudim* | Date: ████████ |

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

BOARD OF PAROLE HEARINGS                                                    STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

| BPH INVESTIGATION REQUESTS |
|---|
| No Requests |

| HEARING COMMENTS |
|---|
| The youth offender factors found in Penal Code Section 4801 shall be applied at this hearing. |

| HEARING OBJECTIONS |
|---|
| No Objections |

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME              CDC # :        INST:         SCHEDULED DATE :
BPH 1001                                                                        Page 2 of 7

Jackson Ex. 30, p. 5

BOARD OF PAROLE HEARINGS                                                                    STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

| DECISION / ORDER |
|---|

**CHOOSE TO WAIVE HEARING**

☐ Granted - Yes, the waiver is approved for the time requested ____ Year(s)

☐ Denied - No

    ☐ The request is on time, but it is not a reasonable request

    ☐ The reason for the request should have been known 45 days before the hearing

    ☐ The request is late, and the reason for the request is not good enough

Reasons / Comments:

---

**NOT SUITABLE FOR PAROLE (STIPULATION)**

☐ Granted - Yes, there is a good reason to not hold the hearing for the time requested ____ Year(s)

☐ Denied - No, the request is not reasona

Reasons / Comments:

---

**POSTPONE HEARING**

☐ Granted - Yes, there is a good reason to postpone ____ Month(s)

    ☐ Essential Document/Information

    ☒ Inmate's Private Attorney Not Available i.e. Needs Time To Prepare, Sick, Scheduling Conflict

☒ Denied - No

    ☐ Prisoner did not make his or her best effort to get the information, or information not essential

    ☒ Prisoner should have made the request sooner

**Reasons / Comments:**

Per ADA Unit email, audio cd of CRA and prior hearing decision was mailed on ▮▮▮▮▮. Client has yet to receive it and requests a postponement based on untimeliness of documents so that he can thoroughly listen to and understand them. He is completel

The board may grant a postponement only upon the affirmative showing of good cause on the part of the prisoner and only if the prisoner did not and could not have known about the need for the postponement any earlier than when he or she made the postponement request (Title 15 CCR §2253(d)(2)).

In this instance, the reason for the postponement is listed as, "Per ADA Unit email, audio CD of CRA and prior hearing decision was mailed on ▮▮▮▮▮. Client has yet to receive it and requests a postponement based on untimeliness of documents so that he can thoroughly listen to and understand them. He is completely blind and EOP and reading them to him on legal visits was not sufficient for comprehension, retention and discussion."

The requested audio recordings were given to the inmate as soon as possible. It should be noted that the CRA was given to the inmate in August ▮▮▮ and the transcript of his last hearing was served on him in ▮▮▮▮. However, the request for the audio recordings were not made until December ▮▮▮ As a result, it is deemed untimely to request a postponement for this reason as the request for the audio recordings should have been made earlier.

---

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME ▮▮▮▮     CDC # : ▮▮▮     INST: ▮▮▮     SCHEDULED DATE : ▮▮▮▮

BPH 1001(a)                                                                                    Page 3 of 7

BOARD OF PAROLE HEARINGS                                          STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

| BPH OFFICIAL(S) |
|---|
| MOELLER, DANIEL - Assoc. Chief Deputy |

Date:

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME: ███    CDC # : ███    INST: ███    SCHEDULED DATE : ███
BPH 1001                                                              Page 4 of 7

Jackson Ex. 30, p. 7

BOARD OF PAROLE HEARINGS                                            STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

| What Happens After My Parole Hearing? |
| --- |

The decision at your hearing to grant or deny you parole is a recommended decision. The recommended decision goes through the "decision review" process. If the decision is to grant you parole, then the Board of Parole Hearings and the Governor automatically review the decision. If the decision is to deny you parole, then the Board and the Governor can choose to review the decision. You may also request review of a parole denial.

If you get a grant of parole and make it through the decision review process (including Governor's review), you will not get out of prison until you meet one of the following dates:

- Minimum Eligible Parole Date (MEPD),
- Youth Parole Eligible Date (YPED),
- Elderly Parole Eligible Date (EPED), or
- Nonviolent Parole Eligible Date (NPED).

En Banc Referrals at Executive Board Meetings
The Board holds an Executive Board Meeting every month. At this meeting, the Board votes on cases that have been referred "en banc" for the full board. This means all the commissioners review your case together and decide if the parole decision should be vacated, upheld, or sent for a rescission hearing. The Board will vote on cases sent en banc by the chief counsel, the Governor, and the hearing panel. The Board will also vote on tie cases, where one panel member voted to grant parole and another voted to deny parole.

What Happens Immediately After Your Parole Hearing?
After your parole hearing, the Board has the audio recording of your hearing typed up and will send you a copy of the transcript. Generally, you will receive your transcript within 30 days of your hearing. If you received a parole grant, the Board's investigations unit will look through the transcript for information about your parole plans to start finding you a place to parole when you get out of prison.

Decision Review by the Legal Division
The Board has 120 days from your hearing date to finalize the decision to grant or deny you parole. During this time, the legal unit will look at the transcript of your hearing and your central file. The legal unit looks to see:

- if the panel made a mistake or error of law
- if the panel made a mistake or error of fact
- if there is new information about your case that the Board should look at

If the legal office finds a mistake or new information, the chief counsel, who is in charge of the legal office, can send the case "en banc" at the monthly Executive Board Meeting. You will be notified if your case is sent "en banc." You can send a letter for the commissioners to consider when deciding your case en banc. All the commissioners present at the monthly Executive Board Meeting will look at your case.

At the Executive Board Meeting

- the public can say what they think about the case, and
- people, including you, can write to the Board before the Executive Board Meeting to let the Board know their thoughts on your case. The Board must receive all letters the day before the meeting for the commissioners to look at the letter before making their decision.

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME: ███████     CDC # : ██████     INST: ████     SCHEDULED DATE : ████████

BPH 1001                                                                Page 5 of 7

BOARD OF PAROLE HEARINGS                                                STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

| What Happens After My Parole Hearing? |
|---|

The full Board looks over your case, the letters it received about your case, and the comments made by the public during the Executive Board Meeting. After looking over everything, the full Board can

- vote not to change the hearing panel's decision, or
- vote to take away the decision and order a new hearing in 4 to 6 months, or
- send the case for a rescission hearing, which will be scheduled 4 to 6 months from the date of the Executive Board Meeting.

If the chief counsel does not send the case to the full Board to go over the decision, the decision by the panel is final by the 120th day from the date of your hearing. If you received a grant, the Governor will have 30 days to look at the decision to grant you parole after the Board finalizes the decision

The Governor's Review of a Parole Decision

The Governor can look at all parole hearing decisions, but must review all grants.

If you were convicted of murder, the Governor

- has 30 days after the Board's final decision to look at your case
- can reverse the parole decision, or
- can send your case en banc for the full board to look at during an Executive Board Meeting

If you were not convicted of murder, the Governor

- may ask the Board to review the parole grant any time before your release
- can send your case en banc for the full board to look at during an Executive Board Meeting

No matter what you were convicted of, the Governor can choose to take no action. This means the Governor

- does not reverse the decision, and
- does not send your case en banc for the full board to look at during an Executive Board Meeting

If the Governor takes no action, you will be released from your life term. This means you will get out of prison, unless you have additional time to serve for an in-prison offense. If you are a youth offender or a nonviolent offender, you might not have to serve your additional sentence.

If the Governor reverses your grant of parole, you will have a new hearing scheduled about 18 months from the date of your last parole hearing.

If the Governor sends your case en banc, the full Board can vote to

- keep or not change the hearing panel's decision, or
- order a rescission hearing, which will be scheduled in 4 to 6 months from the date of the Executive Board meeting

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME ▮        CDC # : ▮        INST: ▮        SCHEDULED DATE : ▮
BPH 1001                                                                Page 6 of 7

Jackson Ex. 30, p. 9

BOARD OF PAROLE HEARINGS                                        STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION
═══════════════════════════════════════════════════════════════════════════════

| What Happens After My Parole Hearing? |
|---|

Tie Votes: If there was a tie vote at your hearing, the tie will be broken at the Executive Board Meeting. All of the commissioners present will look at the transcript from your hearing and the documents that were available to the hearing panel. The commissioner who was part of the tie vote is not allowed to vote on your case.

The Board does not allow any comments about tie votes at the Executive Board Meeting. This means that the public cannot speak and the Board will not consider any new letters from you or other people before making the decision at the Executive Board Meeting. Please do not send a letter to the Board if there was a tie vote at your hearing. The decision the full Board makes after a tie vote is a recommendation. It is not final. The recommended decision is then looked over by the Board's legal office and goes through the decision review process. The legal office has 120 days to look it over from the day of the Executive Board Meeting when the tie was broken.

What is a Rescission Hearing?
The full Board can vote to send a grant of parole for a rescission hearing based on a mistake or new information. At the rescission hearing, the hearing panel will vote to see if your grant of parole should be taken away or if you should get out of prison. The hearing panel looks at the new information or mistake to see if your grant of parole should be taken away. There is usually a panel of two commissioners and one deputy commissioner at a rescission hearing. These hearings are held 4 to 6 months after the en banc decision at the Executive Board Meeting.

You will get an attorney. Other people who can attend include:

- Someone from the district attorney's office who prosecuted the crime or crimes that sent you to prison
- Victims and their family

If the hearing panel finds a good reason to take away your grant, you will not get out of prison and you will get a new parole hearing. If the hearing panel does not find a good reason to take away your grant, then the Department of Corrections gets you ready to get out of prison.

Actions After a Decision is Final: After the Board and the Governor have reviewed the decision; the Board will issue a release memorandum to release you from your life term. You will not get out of prison before you reach one of your eligibility dates. You also will not get out of prison if you committed an in-prison crime and received an additional sentence that you must serve after you finish your life term. A release memo will list all of the special conditions of parole the hearing panel imposed at your hearing and may recommend additional special conditions of parole. These conditions of parole are in addition to any general conditions of parole ordered by the Division of Adult Parole Operations (DAPO). The Board will also confirm your parole placement. Once the Board completes the release memoorandum, the institution will begin processing your release from prison.

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME: _____    CDC # : _____    INST: _____    SCHEDULED DATE : _____
BPH 1001                                                                    Page 7 of 7

# EXHIBIT 31

NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING                    **STATE OF CALIFORNIA**
BPH 1073

| **I.    PRE-INTERVIEW FILE/DEC REVIEW (STAFF ONLY)** |
|---|
| I acknowledge that I have reviewed all relevant and reasonably available central file and/or field file and Disability and Effective Communication System (DECS) information prior to first contact with the inmate/parolee involved in this parole proceeding. |

Print Name: ▓▓▓▓▓▓          Sign Name: _____          Date: ▓▓▓▓▓▓

**Mental Health Concerns**                                    Source          Dated

EOP        Enhanced Out-Patient                               CDC 128C        ▓▓▓▓▓

**Identified Disabilities**                    Note:          Source          Dated

NDD        No substantial adaptive support needs from                CDC 128C        ▓▓▓▓▓
           cognitive deficit

DPV        Blind or Low Vision                                CDC 128C        ▓▓▓▓▓

**Other Potential Assistance Needs**

**Reading Level:** 9          **Total GPL:** 9

**Speaks English**   [X] Yes   [ ] No

**Languages Spoken**

| **II.    INMATE/PAROLEE RIGHTS & SELF IDENTIFICATION** |
|---|

You have a right to receive help for your hearing. If you need help talking, reading, hearing, seeing, understanding, or getting to your hearing, you have a right to that help. You have a right to receive help in meeting with your attorney. If you do not speak English, you have a right to an interpreter. If you are deaf and use sign language, you have a right to a sign language interpreter. If you cannot read, the BPH or CDCR must provide you with help to read the forms and papers. If you need special transportation, the BPH or CDCR must provide it for you. If you do not get help, or you do not think you got the kind of help you need, ask for a BPH 1074 Grievance Form.

Check all that apply:

[X] I need help reading my documents.                    [ ] I need the following help to hear

[ ] I need help understanding the procedures and forms.   [X] I need the following help to see   **SPEAK LOUD&CLEAR**

[ ] I need a sign language interpreter.                   [ ] I need to communicate in writing.

[ ] I need a wheelchair and I [ ] do have one. [ ] do not have one.

[ ] I need a Durable Medical Equipment to get around :

Have Durable Medical Equipment : _____

Do not have Durable Medical Equipment : _____

[ ] I do not speak English and need an interpreter in

[ ] I need a housing accommodation :

[ ] I have a health problem, I need   [ ] A medical evaluation   [ ] A mental health evaluation   [ ] Medication

[ ] Other

[ ] **I do not need any help for my parole hearing.**

Name: ▓▓▓▓▓▓▓▓▓▓                                    CDC Number: ▓▓▓▓▓
Proceeding: Lifer                          Type of Hearing:  Subsequent Hearing
Location: ▓▓▓▓▓▓▓

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

**NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING**
BPH 1073

---

### III.  INITIAL SERVICE OF RIGHTS (STAFF ONLY)

I have informed inmate/parolee of his/her rights and charges, if any, and have determined that he/she:

[X]  Appears to understand      [ ]  Appears to have difficulty understanding

Effective Communication Method Used:   " **Read/Speak Slowly/Use Simple Language**"   " **Speak Loudly/Clearly**"

▓▓▓▓▓▓ / Correctional Counselor                                                                              ▓▓▓▓▓▓
Staff Name and Title (please print)                          Staff Signature                          Date

---

### IV.  ACCOMMODATIONS PLANNED

Accommodation(s)/Assistance to be provided at hearing(s):  " **Assistive Hearing Devices**"   " **Attorney**"   " **Magnifying Device**"
" **Personal Durable Medical Equipment**"   " **Speak Loudly/Clearly**"

Summary:       Accommodations Planned

Comment:       EOP/DPV-cane, foot orthoses, orthotics, vision vest, glasses

THERESA BARKER / BPH Staff                                                                              ▓▓▓▓▓▓
Staff Name and Title (please print)                          Staff Signature                          Date

---

### V.  SUMMARY OF ACCOMMODATIONS

Accommodation(s)/Assistance provided at hearing(s):    " **Attorney**"  " **Magnifying Device**"
" **Personal Durable Medical Equipment**"  " **Speak Loudly/Clearly**"

Private Durable Medical Equipment (Inmate/Parolee Provided):        " **Other** "   EOP/DPV-cane, foot orthoses, orthotics, vision vest, glasses

Comment: Never issued assistive hearing devices/can hear clearly; panel will speak loudly and clearly

ANGELIQUE SCOTT / Deputy Commissioner                                                           ▓▓▓▓▓▓
Staff Name and Title (please print)                          Staff Signature                          Date

---

Name: ▓▓▓▓▓▓▓▓▓▓                                                            CDC Number: ▓▓▓▓▓▓
Proceeding: Lifer                              Type of Hearing: Subsequent Hearing
Location: ▓▓▓▓▓▓▓▓▓▓

BPH 1073, NOTICE AND REQUEST FOR ASSISTANCE AT A PAROLE PROCEEDING

# EXHIBIT 32

[4388762.1]

DECLARATION OF ██████████████

I, ███████████████ declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ██████. I am currently housed at the ████████████████████ ████████████████████ on Facility ██. I am housed on a ~~"Sensitive Needs Yard" because I have a vision disability that makes me vulnerable to attacks from other incarcerated people.~~ *non-designated* ~~Programming~~ *facility ("NDPF"), which includes both people who are sensitive needs and general population.* I am ██ years old. I have been incarcerated in CDCR since █████████.

3.    I am an *Armstrong* class member. I have a DPV code, meaning that I have a severe vision disability.

4.    I was born with Retinitis Pigmentosa, which has caused my eyesight to deteriorate over time. I have been legally blind since ~~2002~~ *1990*. I used to be able to see a little bit while outside if there was a lot of sunlight, but since 2020, I have been unable to see anything at all.

5.    I am completely unable to read any paperwork. I do not know Braille. I was recently given a lighted magnifier, but this device does not help me read at all since I have no vision. I do not have any other assistive devices to help me with reading and writing.

6.    To help me with daily activities related to paperwork, I have to ask other people to read text out loud for me. To write paperwork, I have to ask other people to write down what I dictate. It is sometimes difficult to find people who are available and willing to help me with reading and writing. Even if I do find people to help, this process is time-consuming and can be frustrating. It is also embarrassing to constantly have to ask people for help. I would like to be independent, but am forced to rely on other people to read and write.

7.    I was originally sentenced determinately. I was not a lifer and my earliest possible release date was in ████. Under the new Elderly Parole law, I became eligible for

[4295027.2]

parole earlier, and I had my first Board hearing in ▮▮▮▮▮▮. I appeared for my initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") on ▮▮▮▮▮▮. At that hearing, I was denied parole for seven years. My next hearing is tentatively scheduled for ▮▮▮▮▮▮.

8.      I have been assigned a Correctional Counselor I ("Counselor"), who is responsible for assisting me in securing accommodations for parole proceedings. My counselor changes numerous times over the past few years, generally every few months, making it difficult to create trust. Some counselors don't even last a month. I have been assigned my current counselor for a few months, and I see him around once a month. I trust him a little bit, but I don't know him enough to fully trust him.

9.      Unfortunately, neither CDCR nor the Board gives me documents in the format that I need to access them independently, nor do they provide access to and training on equipment that I could use to access these documents. I have tried some of the equipment that is in the law library, such as the different types of magnifying glasses, but they do not help me read since I have such no vision. I have also tried using a talking book in the past, but I was not allowed to control the content that it played, so returned it. No other devices help me read or write.

10.     **Access To The Transcript Of My Last Parole Hearing**

11.     About a month after my first parole hearing, my counselor at the time gave me a packet full of paperwork. I could not read any of the paperwork, and nobody helped me read it. My counselor did not offer to read it to me. I asked an incarcerated friend to help me read the paperwork, but he was moved to another yard shortly after and never got a chance to help me. He was the only person I trusted with this information, since the transcript contained personal details about my crime. Since I have a sex offense conviction, it is dangerous for people to know because people with sex offense convictions often get beat up in prison. I was nervous to ask anybody else for help with reading my transcript because if I told the wrong person, news of my crime would be all over the yard,

///

and I would have safety issues. I did not want to ask my counselor for help, since I did not feel comfortable with them.

12.    During a meeting with my attorney on ▮▮▮▮▮, my attorney reviewed the transcript with me. This was the first time that I had ever read the transcript before, nearly seven years after the original hearing in ▮▮▮▮▮ and just ▮▮ months before my next hearing in ▮▮▮▮▮. Until reviewing the transcript, I had no idea why I had been denied parole. I also did not know why I was given a seven year denial as opposed to a 15, 10, five, or three year denial.

13.    I wish that I was able to read the transcript right away after my first hearing. I wanted to know why I had been denied. I also did not know that I could appeal the result of the hearing. I would have liked to review the transcript earlier to see the questions that I had been asked and the answers that I gave so that I could better prepare for my next hearing. After finally reading the transcript, I realized that many of my answers could have been better. If I was sitting there as the commissioner listening to my answers, I would have denied me too! I wish that I could have spent the last several years practicing better answers for my upcoming hearing.

14.    The best way for me to have received this transcript would have been an audio file. I have a CD player in my cell that I could have used to listen to the transcript whenever I wanted. While I'm grateful that my attorney read my transcript to me, I wish that I did not have to use my limited lawyer time to read my transcript. Having an audio transcript on my CD player would have allowed me to fast forward and start over the hearing, so that I could review specific portions that were more important. It would have also allowed me to review the transcript fully independently, without relying on anybody else. An audio transcript would also have been better than asking another incarcerated person to read it to me, since the transcript contains information on my crime, and that would cause safety issues.

///

///

15. **Access to my Criminal Risk Assessment**

16.    Before my first hearing, I participated in a psychological evaluation called the Comprehensive Risk Assessment, or "CRA." I did not know the contents of the CRA until my first parole hearing, when the commissioner asked me questions about it. I had no idea what they were talking about. I only found out that the CRA gave me a score of "moderate" about five weeks ago, when my attorney discussed it with me.

17.    I feel that I should have been aware of the CRA prior to my first hearing. While it is possible that the CRA was included in the packet that my counselor originally gave me, I could not read it and nobody offered to help. I feel entitled to read what the psychologist wrote about me. I also wanted to make sure that they were accurately representing what I was saying, and so that I could have a chance to object to what the psychologist wrote down about my statements before turning it into the Board. Once I was asked about the CRA in the Board hearing, it was too late to object. Prior to the hearing, nobody talked to me about how to file objections. It also would have been helpful to study the CRA before the hearing so that I could prepare to answer questions about it.

18.    Similar to the hearing transcript, I would have liked an audio recording of the CRA to play on my CD player. This way, I could review my statements and ensure that the psychologist accurately portrayed my statements. I also could have privately reviewed the CRA, which contains lots of personal information about my childhood, family, and the victim of my crime. I did not feel comfortable asking anybody for help with reading the CRA to me since I was afraid of being attacked if news of my conviction spread among incarcerated people .

19.    I recently participated in a new CRA evaluation in preparation for my second hearing. I have not received a score yet, but my counselor told me that they would talk to me about the score and the packet when it was completed. Again, I will need to have my counselor read the CRA packet out loud to me. I don't feel comfortable sharing my personal information with them, but I do not have another way to review the CRA.

///

[4298027 2]                                                        4

20.   **Preparation of Parole Packet**

21.   I have an attorney who is assisting me with preparing for my upcoming hearing. Last month, she told me that it was important for me to prepare victim impact letters and remorse letters to present to the Board.

22.   Like so much else related to the board, these documents are very personal. My attorney told me I had to write about my crime, the trauma that I have caused my victim, and what steps I will take to make sure that I do not commit a crime like this again.

23.   It is very difficult for me to prepare these letters due to my vision disability. Since I have not been provided with equipment that would allow me to read and write on my own with my vision disability, I have to rely on an incarcerated person to help me prepare these letters. To write these letters, I have to meet with this incarcerated person and tell him what to write for me. This process is slow and frustrating, and it would be much faster and easier if I prepare these letters on my own.

24.   Also, these letters contain personal information that I don't want to share with anybody else, but I have no other way to prepare these letters. While I trust my friend, it is still embarrassing to me, and I wish that I could work independently. I also am worried about being overheard by other people, since there is very little privacy in prison. I am fortunate that my friend is ████████ and has access to a ████ room where we can sometimes meet privately. If he did not have access to this room, I don't know if we would be able to find a private space, and I would risk being overheard to have him help me write these letters.

25.   **Access To Letters Of Support**

26.   My attorney also told me to ~~prepare~~ provide letters of support for the upcoming hearing. Since the rest of my immediate family has already passed away, I am considering reaching out to extended family and friends to provide letters of support for the Board. ~~I am planning on presenting letters of support to the Board from family members who are on the outside.~~ I will not be able to read the letters myself, though, and will again have to rely on another incarcerated person to read these letters to me so that I can properly review them. I do not want to rely on someone else, but I have no other way to review these letters and present them to the Board.

[4296027 2]

5

27.    **Program Access**

28.    I have faced a number of barriers in accessing the kind of programming I need to access to be prepared to go before the Board.

29.    At my first Board hearing in ▮, the panel told me that I needed to enroll in more self-help programming to prepare better for my next hearing. However, the panel and my counselor also told me that I should not randomly enroll in programming that doesn't apply to my case, such as Alcoholics Anonymous, or Narcotics Anonymous, or gang-related programming since it will look like I'm trying to manipulate the system just to be granted parole. ~~This~~ I was told by the Board that they had no programs that I could take ~~confused me, since I was not sure if they wanted me to take programming or not.~~ that Would apply to my case at that time.

30.    I have attempted to enroll in programming. However, due to my vision disability, I faced many barriers to accessing programming. I took a class in Conflict Resolution and received a certificate. Even though I completed the class, it was very difficult for me to properly participate due to my vision. Since I cannot read and write on my own, I had to have someone sit next to me and read and write for me. I also had to have someone sit with me and complete my homework with me. It can be frustrating and embarrassing to constantly have to ask people for help with paperwork. It can be especially embarrassing and dangerous to ask people for help when the paperwork discusses my crime, since that can put me at risk of an attack.

31.    I also tried to enroll in a self-help class that was at night. I do not remember the name of the class. Since I am blind, I had to have someone escort me to and from the class. I was unable to find someone to take me ~~to the class~~ home from the class, so after two days of ~~the class~~ being left outside the class without an escort home, ~~permission~~ I had to stop going.

32.    My experiences in these two classes were very difficult. I have not completed any programming since then due to how hard it is because of my vision.

33.    Recently, my attorney told me to prepare a book report on a book called *Road to Freedom* for my next board hearing. ~~This~~ I believe that this book is part of the sex offender treatment program, and is strongly recommended to read by the Board. I am not able to complete this book report since I cannot read. I believe the book is over 300 pages long, and I will have to ask someone to read it to me.

This is uncomfortable, since the book is widely known as part of the sex offender treatment program, and I do not want people to know that I am a sex offender. While my friend has offered to help, he does not have enough time to read 300 pages to me over the next few weeks. I am also unable to complete the worksheets that are part of the book report since I cannot see to write. I will again have to ask my friend to help me write.

34.    To complete the book report, I need an audio version of the book so that I can listen to it independently. An audio version would be much faster than having my friend read it to me. It would also help me maintain my privacy and avoid the embarrassment of constantly asking people for help.

35.    It would make a tremendous difference to me if I could have audio access to the hearing transcript, the CRA, and *Road to Freedom*. Having these documents in audio form would allow me to better prepare for my upcoming hearing. It would also help me stay safe since I would not have to ask for as much help with reading my personal information about my conviction.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

7

[4Z95027.2]

36.    This declaration was taken and written for me by Paralegal Clerk Amit Rao. Due to my vision disability, Mr. Rao accommodated me by typing this document and reading it to me aloud.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ███████, California this 23rd day of May, 2023.

In order to accommodate Mr. ████████'s vision disability, on May 23, 2023, I read this declaration sentence by sentence for Mr. ████████ to review. The substance of what I read, which Mr. ████████ confirmed was true and correct, is identical to the substance of this printed version.

_____
Amit Rao

8

# EXHIBIT 33

[4388762.1]



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email:  cjackson@rbgg.com

May 31, 2023

VIA ELECTRONIC MAIL ONLY

<div style="border:1px solid">**SUBJECT TO PROTECTIVE ORDERS**</div>

Jessica Blonien
Heather McCray
California Board of Parole Hearings
PO Box 4036
Sacramento, CA 95812-4036
*Jessica.Blonien@cdcr.ca.gov*
*Heather.McCray@cdcr.ca.gov*

Tamiya Davis
Katie Riley
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283-0001
*Tamiya.Davis@cdcr.ca.gov*
*Katie.Riley@cdcr.ca.gov*

Re:    *Armstrong v. Newsom*: Advocacy Letter for Mr. ██████ ██████
       ████, at ████ re Accessible BPH Materials
       <u>Our File No. 0581-04</u>

Dear Counsel:

We write on behalf of ████████████ ████████, who is currently housed at the ██████████████████████████████████████. Mr. ████████ has a DPP code of DPV, and is completely blind.  Due to his vision disability, Mr. ████████ is unable to read and write using printed material of any font size and he does not read Braille.  **We are writing to request that Mr. ████████ receive the transcript of his last parole hearing from ████████, his Comprehensive Risk Assessment (CRA), and the book *Road to Freedom* in audio formats so he may use these materials to prepare for his upcoming parole suitability hearing on ████████ ████.**  These accommodations are required by the *Armstrong* Remedial Plan (ARP), the *Armstrong* Remedial Plan II (ARP II), and title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.*

Mr. ████████ last parole suitability hearing occurred in ████████ ████.  Following the hearing, he received a written transcript but not an audio recording.  Due to his vision disability, he could not read the transcript he received and has had no access to the transcript at all until a recent meeting with his attorney, where the attorney read excerpts of the transcript to him.  At present, Mr. ████████ still does not have access to

[4301734.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
May 31, 2023
Page 2

the transcript unless someone reads the transcript to him.  This dependence on others prevents Mr. ███████ from reviewing his transcript as frequently and as thoroughly as he would like to prepare for Board.

Mr. ███████ is also concerned about how he will access his CRA.  Prior to his last hearing, he never received an accessible version of his CRA and was unable to access the document at all before his hearing.  He recently underwent a second CRA in preparation for his upcoming hearing in ███████.  While he has not yet received a copy of his CRA, we are not aware of any process in place to ensure that what he receives will be accessible (that is, that it will be in audio format).  However, without an audio version that he can review independently, Mr. ███████ will not have the opportunity to study his CRA in the manner he would like in order to prepare to go before the Board.

Mr. ███████ has also been advised to read the book *Road to Freedom*, by John Baker, which is widely considered to be required reading for any individual convicted of a sex offense, due to the lack of sex offender programming in prison.  Mr. ███████ cannot read this book independently due to his vision disability, nor do others have enough time to assist Mr. ███████ in studying the entire 224-page book.  According to Plaintiffs' counsel's research, *Road to Freedom* exists in audio format.  It is only a matter of ensuring Mr. ███████ can access the book either by eBook or by CD.

The ADA, ARP, and ARP II require Defendants to provide the auxiliary aids and services necessary to afford Mr. ███████ the opportunity to access parole preparation materials independently and to the same extent as others can, as is only possible for him through audio recordings.  The ADA requires public entities such as Defendants to "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities ... an equal opportunity to" participate in and benefit from programs, services and activities.  *See* 28 C.F.R. § 35.160(b)(1).  "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to *protect the privacy and independence* of the individual with a disability."  *Id.* § 35.160(b)(2).  Pursuant to the ARP, institutions "shall ensure that accommodations such as ... computer assisted devices [and] audiotapes ... are provided when necessary."  ARP § IV.2.a.  The ARP II requires defendants to provide "[a]udio-tape," among other accommodations, as necessary to ensure access to "parole proceedings," which "include[s] preparations for the hearing" and "psychiatric evaluations."  *See* ARP II §§ III, VI.D.3.

Obtaining these materials in audio formats is the only way to satisfy the requirements of the ADA, the ARP and the ARP II.  Mr. ███████ does not have

[4301734.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
May 31, 2023
Page 3

sufficient access to his attorney or Correctional Counselor to study these documents solely by having these individuals read them aloud.  Both his attorney and Correctional Counselor are available only during business hours and have heavy caseloads that limit the time they can spend with Mr. █████████    Further, the time they spend simply reading documents to him is time they cannot spend assisting him in other important parole-related tasks, such as developing testimony or preparing written submissions.

Nor does the accessibility equipment in the law library provide sufficient support. First, these devices (the Davinci and the Merlin) display documents in large text that is visible to the entire library, eliminating whatever privacy Mr. █████████ may require when reviewing these highly personal materials.  Second, his opportunity to go to the law library is limited to a few hours a week, during which time he must share the equipment with others that require access, as well as use the same time to prepare written materials, develop a parole transition plan, and engage in correspondence with friends and loved ones.

Finally, as an individual with a sex offense conviction living on a non-designated yard, he faces significant safety risks when using any non-private methods to access these documents.  Using the devices in the law library is dangerous, asking the wrong person for help is dangerous, and even having a trusted friend read documents to him is dangerous, due to the risk of being overheard.

Accordingly, we have the following requests:

1.     **Please ensure that Mr. █████████ receives the transcript of his █████████ hearing in audio format, which may consist of an audio recording of the hearing or other audio file.**

2.     **Please ensure that Mr. █████████ receives a copy of his CRA in audio format.**

3.     **Please provide Mr. █████████ an audio version of *Road to Freedom*, by John Baker, or assist him in obtaining one.**

4.     **Please provide all forthcoming parole-related materials to Mr. █████████ in audio format, including the transcript of his upcoming hearing, once available.**

/ / /

/ / /

[4301734.1]

**PRIVILEGED AND CONFIDENTIAL**

Tamiya Davis
May 31, 2023
Page 4


Thank you for your attention to this important matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:  Caroline E. Jackson

CEJ:AR

cc:  Jennifer Shaffer        Olena Likhachova
     Sharon Garske          Ed Swanson
     Trace Maiorino         August Gugelmann
     Eric Chang             Audrey Barron
     Sean Lodholz           ADA General Email
     Mark Jackson           Co-Counsel
     Patricia Ferguson
     Jennifer Neill

[4301734.1]

# EXHIBIT 34

[4388762.1]

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS & REHABILITATION
                                                                        CDC-128 B (Rev 03/2016)

**NAME:** ▉▉▉▉▉        **CDC #: H** ▉▉▉    **HOUSING:** ▉▉▉▉▉

▉▉▉▉▉ was provided a copy of his or her Comprehensive Risk ▉▉▉▉▉ eparation for the upcoming hearing with the Board of Parole Hearings (BPH).

_____          _____          _____
Inmate Signature            CDCR Number        Date

**Effective Communication Needs**

☐ No disabilities or issues requiring equally effective communication

☐ Subject has been identified with a disability / communication issue

**Subject was identified with (check one):**

☐ Hearing              ☑ Vision                    ☐ Speech

☐ Learning Disability  ☑ TABE 4.0 or lower / no TABE   ☐ Developmental Disability

☐ EOP                  ☐ Foreign Language Speaking

**Assistance provided to ensure effective communication (check one):**

☐ Use of Text Magnifier    ☐ Large Print Material        ☐ Read Documents to Subject

☐ Sign Language Interpreter  ☐ Lip Reading                ☐ Written Notes (see attached notes)

☐ Language Interpreter     ☑ Simple English Spoken Slowly & Clearly

☐ Subject was wearing hearing aid(s)

☐ Subject stated they did not need any assistance for Effective Communication

☐ Other: _____

**Method used to determine communication was effective (check one):**

☐ Subject reiterated in their own words, what was explained

☑ Subject provided appropriate responses to questions asked

☐ Subject asked appropriate questions regarding the information provided

☐ Subject did not appear to understand the communication, even though the primary method of communication was used

☐ Other: _____

Signature: ▉▉▉▉▉                          Date: ▉▉▉▉▉

CCI: ▉▉▉▉▉

ORIG  : C-file

cc    : I/M

**CDC 128B, General Chrono - Comprehensive Risk Assessment**

# EXHIBIT 35



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email:  cjackson@rbgg.com

July 11, 2023

VIA ELECTRONIC MAIL ONLY

<div style="text-align:right;border:1px solid;">

**PRIVILEGED AND
CONFIDENTIAL**

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Jessica Blonien
California Board of Parole Hearings
PO Box 4036
Sacramento, CA 95812-4036
Jessica.Blonien@cdcr.ca.gov

Tamiya Davis
Katie Riley
CDCR Office of Legal Affairs
PO Box 942883
Sacramento, CA 94283-0001
Tamiya.Davis@cdcr.ca.gov
Katie.Riley@cdcr.ca.gov

Re:    *Armstrong v. Newsom*:  Follow Up Advocacy Letter for Mr. █████, ████, at ████ re Accessible BPH Materials
Our File No. 0581-04

Dear Counsel:

We write follow up to our previous letter dated May 31, ████, attached as **Exhibit A** ("May 31 Letter"), on behalf of Mr. ██████████, ████. Mr. █████ is currently housed at ██████████████████████████████████ ("█████"). Mr. ██████████ has a DPP code of DPV and is completely blind.  Due to his vision disability, Mr. █████████ can only access printed material in audio form.

**We are writing to request that Mr. █████████ receive an audio recording of his last parole hearing from █████████, and an audio version of his Comprehensive Risk Assessment ("CRA") so that he may use these materials to prepare for his upcoming parole suitability hearing on ██████████████.**  These accommodations are required by the *Armstrong* Remedial Plan (ARP), the *Armstrong* Remedial Plan II (ARP II), and title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.*  Given that we first made this request over one month ago, *see* May 31 Letter, **we request that Mr. ████████ receive these accommodations no later than Friday, ████████████.**

[4321789.1]

**PRIVILEGED AND CONFIDENTIAL**

Jessica Blonien
Tamiya Davis
July 11, 2023
Page 2

Mr. ███████ reports that he has not received any of the accommodations we requested on his behalf in the May 31 Letter, nor have we received a response to this letter.  We understand that Mr. ███████ received a printed copy of his most recent CRA after we sent the May 31 Letter, but despite our advocacy he has yet to receive this document in an accessible, audio format.  As a result, he has been unable to prepare for attorney meetings.  Instead he must spend his limited attorney time simply finding out what his CRA and ████ transcript say, as opposed to being able to come to the meetings prepared to discuss the documents with his attorney, and is unable to continue to review the documents after the meeting ends.

Mr. ███████ inability to study his CRA and prior transcript, due to Defendants' failure to provide these documents in an accessible format and a timely manner, has and continues to discriminatorily impair his ability to prepare for his upcoming parole hearing.

**Given that Mr. ███████'s next hearing is on ███████████, we request that the following accommodations be provided no later than ███████:**

- **Please ensure that Mr. ███████ receives the transcript of his ███████ hearing in audio format, which may consist of an audio recording of the hearing or other audio file.**

- **Please ensure that Mr. ███████ receives a copy of his CRA in audio format.**

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4321789.1]

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien
Tamiya Davis
July 11, 2023
Page 3


- **Please provide all forthcoming parole-related materials to Mr. ███████ in audio format, including the transcript of his upcoming hearing, once available.**

<div align="right">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

</div>

CEJ:AR
cc:  Jennifer Shaffer      Olena Likhachova
    Sharon Garske       Ed Swanson
    Trace Maiorino      August Gugelmann
    Eric Chang          Audrey Barron
    Sean Lodholz        ADA General Email
    Mark Jackson        Co-Counsel
    Patricia Ferguson
    Jennifer Neill

[4321789.1]

# EXHIBIT 36

[4388762.1]

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                        GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



July 13, 2023

RECEIVED

JUL 2 0 2023

Caroline Jackson
101 Mission Street 6th Floor
San Francisco, CA 94105

osen Bien Galvac & Grat

Dear Caroline Jackson:

This is in response to your May 31, 2023 and July 11, 2023 letters, regarding your request for accessible BPH materials for ██████████ (█████). Specifically, you requested that Mr. ██████ receive his ██████ ▮▮ ████ parole consideration hearing transcript and his ██ ▮ ██ Comprehensive Risk Assessment in audio format.

Mr. ████████ hearing transcript and CRA were successfully recorded and burned onto compact discs (CDs). The board mailed the CDs to the ██████ █████████ █████ (█████) today via GLS (Tracking number 559759495). The board notified institutional staff about the shipment and informed staff to provide the CDs to Mr. ███████ upon delivery along with a CD player and operational instructions.

Sincerely,

George Bakerjian
Senior Staff Attorney

# EXHIBIT 37

[4388762.1]

**DECLARATION OF** ████████████████████

I, ████████████████████ declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation ("CDCR") number is ███████. I am currently housed at the ████████████████████. I am ███ years old. I have been incarcerated in CDCR since ████████. I am serving a sentence of 17 years to life in prison.

3. I am an *Armstrong* class member. I have a DPV code, meaning that I have a severe vision disability. I also have a DNH code, meaning that I have a less severe hearing disability. I am a participant in the Mental Health Services Delivery System and receive services at the Enhanced Outpatient Program ("EOP") level of care. I have been diagnosed with ██████████████.

4. My vision disability is due to glaucoma, which I have had for several decades. I have some light perception and motion detection, but have very little vision. I can see a hand waving right in front of my face, but I cannot see how many fingers there are. My vision has gradually gotten worse and worse, and it has been this poor for the last four to five years. I use a tapping cane to move around, but I often also need someone to escort me to ensure my safety.

5. Due to my vision disability, I am completely unable to read any paperwork. Even if the font is large and bolded, I am unable to see well enough to read. I do not know Braille. I can handwrite a few words and simple notes, but I am unable to read what I write. I was recently given a lighted magnifier, but this device does not help me read at all since my vision is so poor. I have a digital audio book player, which I use to listen to audiobooks and audio magazines. I also have limited access to a device called a Merlin, which I can use in the library. This device reads aloud paper documents that are in certain formats to me through my headphones. To help me with daily activities related to paperwork, I sometimes rely on the Merlin to read to me. But my access to this device is ████████████████

[4343795.1]

limited, as I discuss below. I also sometimes pay other incarcerated people to help me with reading and writing, but I do not feel comfortable doing this with parole-related documents since my safety would be at risk if information about my arrest and conviction got out. I do not have any other assistive devices to help me with reading. I do not have any assistive devices at all to help me with writing.

6. My initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") is tentatively scheduled for ████████████ .

7. Unfortunately, neither CDCR nor the Board consistently gives me documents in an accessible format nor access to equipment that I need to review these documents independently. In addition, I have experienced retaliation when I ask for help, and I do not have access to staff support to help me perform the reading and writing tasks necessary for me to prepare for my parole hearing.

8. **Experience with Correctional Counselors**

9. I have been assigned a Correctional Counselor I ("Counselor"). I am not sure what exactly my Counselor is supposed to help me with, or what her responsibilities cover, as I have been told many different things about my Counselor's role. I have been assigned to my current Counselor for a few months. Before this Counselor, I was assigned to a temporary Counselor who was just filling in for a few months. She wasn't very helpful because she was just filling in, and there was no long-term relationship. I have had many different Counselors over the past several years, and they change often. I don't ask for much help from my Counselors because they are often busy and there is a long wait to meet with them. Also, it is hard to build trust with Counselors since they change so often.

10. It is necessary for me to build trust with my Counselor before asking for help, because I have experienced refusals and even retaliation in the past when I have requested assistance from staff. The retaliation has come from corrections officers specifically in response for requesting disability-related assistance with my parole preparation. Around four years ago, I asked staff for an *Olson* review to begin my BPH preparation. I informed my Counselor that I would require help from her due to my vision

[4343795.1]                                    2

disability. She responded that I should ask the corrections officers in my housing unit for help with the *Olson* review. I asked several officers for assistance with this, but they consistently either refused or re-directed me back to my Counselor, who would direct me back to them.

11.    After my continued requests to corrections officers, I began to experience retaliation. I would be subjected to random cell searches for bogus reasons. During the searches, they would scatter all my property, which is especially upsetting for me as a blind person, because my vision disability makes it extremely difficult for me to find my items and put them back in order. On other occasions, staff refused to provide escorts for me and threatened ADA workers (incarcerated people whose job it is to assist people with disabilities) for escorting me. This resulted in me being late for or missing programming such as education or domestic violence groups. Missing my programs was especially harmful for my parole preparation since completion of these groups was important to demonstrate my suitability to the Board. Also, without escorts, I was generally late or missing when trying to move around the institution, which caused staff, even if I did not interact with them regularly, to be adversarial to me.

12.    The retaliation culminated in a brutal attack in ██████. On my way back to my housing unit one day, three officers took me to an area that is commonly known in the institution not to have any cameras and physically beat me. That night, I was taken to Ad-seg. A few days later, four different officers entered my cell, beat me, made transphobic comments, and sexually assaulted me. I reported this incident by filing a PREA complaint.

13.    As a result of this incident, I received a false Rules Violation Report ("RVR") for assaulting a peace officer, when what really happened was that I raised my hands and feet out to feel for the wheelchair they were directing me to. I did not make contact with anybody. This RVR is especially problematic, because the Board could use it as a reason to deny me parole. I view this false RVR as a way to cover up the attack.

14.    Since this attack, I have been very scared of asking staff for help with

[4343795.1]

3

anything related to my vision disability or my parole preparation. I have limited my activity around the institution to a bare minimum to avoid as much contact with staff as possible, and I tend to try to figure things out myself if I ever need any help with my disability or with my parole preparation. I am very fearful of further retaliation or attack.

15. Requesting assistance even from Counselors is difficult for me, due to these attacks. This Counselor was not the only one to refuse to help me. Three different Counselors have told me to find another incarcerated person to help me with reading and writing tasks. I am worried that if I keep asking, sooner or later, one of the Counselors or other staff members will retaliate.

16. I would very much like a way to access written documents independently, without needing to ask others for help. This would require CDCR and the Board to document the format that I need and to ensure that documents are provided to me in that format every time, so I am not put in the position of having to keep asking for various kinds of help.

17. **Preparation for the** ████████████ **Hearing**

18. Around ████████, several months before my ████████ hearing, I was told that I had been assigned an attorney to represent me during my parole proceedings. I was given a piece of paper with this attorney's name on it, but nobody read the paper to me, so I did not know the attorney's name or how to contact them. Around ██████, I paid an incarcerated person to help me write a letter to the attorney, but I did not hear back from the attorney. I sent a second letter around a month later, and still did not receive a response. Around July 20, I tried to contact my attorney again, and still did not receive any response. I never met this attorney. I understand that the *Armstrong* attorneys advocated for the Board to either set up a meeting with this attorney or to assign a new attorney.

19. After the date when *Armstrong* attorneys told me they had advocated for me, the Board assigned a new attorney to represent me. My newly assigned attorney spoke with me for the first time on ████████. While I am glad to have finally made contact

[4343795.1]                                             4

with an assigned attorney, I am nervous that I have too little time to properly prepare for my hearing on ████████████.

20. Nobody from CDCR or BPH met with me to ask me what format I need for documents until it was too late to help. A few months ago, I participated in a Comprehensive Risk Assessment ("CRA") with a psychologist. On ████ ██, I received a written report of my CRA, but was unable to read it. My Counselor offered to set up a time to read it to me, but we never followed up on scheduling a time. My CRA contains deeply private information that I do not want anybody else to know, ████████ ████████ I would have preferred to receive an audio version of my CRA, so that I could review it privately and independently, but she did not offer that option. *my Counselor never*

21. Since I was not able to read the CRA on my own and *followed up on scheduling a time* ████████ ████████████████ to read it to me, I had to ask another incarcerated person to read my CRA. I felt very uncomfortable and unsafe sharing such sensitive information with this person, but I did not have another way to read my CRA.

22. I understand that the *Armstrong* attorneys requested for me to receive an audio version of my CRA. After they sent out their request on my behalf, I received an audio version of my CRA on a CD disc on July 25, 2023 and received a CD player to take to my cell and listen to my CRA independently on July 26, 2023. Staff told me that I would have the CD player in my cell for 7 days. If I wanted to extend how long I could have the CD player, I was told that I could request to extend this time, but staff did not tell me how long I could extend my CD player access for. I will need to have this CD player in my cell *indefinitely* ████████████ so that I can adequately review my CRA independently.

23. Having my CRA on an audio disc that I can access independently makes a tremendous difference to my preparation. It is a world of difference to be able to listen to my CRA multiple times a day in an independent, private manner, and I feel that this will help me prepare better for my hearing.

24. Even after the *Armstrong* attorneys advocated for me to receive all future documents in audio format, I still recently received paper documents in formats that I

could not read independently.

25.    My newly assigned attorney requested for my Counselor to provide documents from my C-file to me for my review.  On ▮▮▮▮▮▮, my Counselor offered these documents in paper format and instructed me to utilize the Merlin in the library to read them.  The Merlin is an inadequate accommodation since it does not allow me to review my documents privately, independently, or regularly enough, as I will describe in the next section.  I understand that my attorney also tried to obtain these documents for me in audio format.  On ▮▮▮▮▮▮ my Counselor offered me these documents either in paper or to have a paralegal help me read them.  I responded that I would prefer an audio document, but my Counselor stated that an audio document would likely not be possible, and that I should decide between paper documents and having a paralegal helper.  I asked for more information about who the paralegal would be and how that meeting would go, but my Counselor did not know and stated that she would get back to me.

26.    The lack of access to documents in audio format has created other embarrassing events for me.  On ~~or about~~ August 17, I was served a collection of BPH documents during one of my group programs for individuals at the EOP level of care.  Because I could not access the documents, I did not know how private they were and I felt anxious that I had been served highly confidential documents, such as certain mental health records I had requested, in front of a room full of people.  With no other way of finding out even what the documents were, I had to ask ~~▮▮▮▮▮▮▮▮~~ the person serving the documents to tell me.  It felt deeply embarrassing to risk such a significant invasion of my privacy just to find out what a document was, much less what it said.

27.    I have been having a difficult time advocating for myself to the Counselor about receiving these documents in accessible format.  My Counselor initially told me that I can only have paper documents (which I cannot read) or have the paralegal review them with me, but not both.  Even after saying this, my Counselor is refusing to provide me these documents on paper.  As some of them ~~▮▮▮▮▮▮~~ are medically related, she  has

directed me to visit medical staff to ask them for these documents. Upon her instruction, I went to medical staff, but they refused to provide these documents. After going back to my Counselor and again asking for her help, she told me something to the effect of "we don't have a procedure for helping blind inmates," and that she is unable to help me get these documents in accessible format. This frustrated me, since I need CDCR's help with accommodations for my vision as I prepare for the Board hearing.

28.    I am feeling anxious about these interactions with my Counselor because they are similar to the events leading up to my attack in ███████. Back then, my Counselor continually directed my requests to other staff members, which eventually lead to the attacks. It makes me anxious that my current Counselor is again directing me elsewhere to medical staff and saying that she is unable to help me, and I am nervous to continue asking her for help with receiving my documents. I feel very scared that I will experience retaliation as a result of my continued self-advocacy. However, the alternative seems equally untenable, because it means going to my parole hearing unprepared.

29.    My appointed attorney seems to be doing her best to help me get access to these documents. On ███████ and ███████, my attorney's paralegal held two different two-hour calls with me just to read documents aloud to me. These documents included several Rules Violations Reports ("RVRs") that I had received while incarcerated. It is important for me to review these RVRs since the parole Board will likely ask me about them during my hearing.

30.    While I appreciate the time that the paralegal spent with me to review these documents, it was very inefficient and difficult to do so over the phone. The phone was cutting in and out, and I would often miss chunks of the text that the paralegal was reading to me. We did not get through all of the documents that the paralegal told me we would, and we need much more time together to read through all of the documents necessary for my parole preparation. Further, it was very difficult for me to pay attention to two straight hours of listening to someone read documents to me, and I left each call feeling like I could not remember some of the important information she shared. Without an audio

version of the documents, I have no way of re-reviewing them. I need to be very familiar with these documents to properly address them during my hearing, and it is simply not possible to become familiar through having each document read aloud once during a two-hour call. I need to be able to review these documents independently and as much as necessary to properly prepare. I need audio versions of all of these documents that I can listen to in my cell on the CD player I received.

31.    **Access to Library Equipment**

32.    Right now, I sometimes use the Merlin device in the library to read out loud documents for me. Unfortunately, I do not receive enough access to this device to properly accommodate my vision and prepare for parole.

33.    Typically, I only have the opportunity to access ~~the~~ the Merlin on Fridays for an hour and a half. To receive access, I need to submit a slip requesting access prior to the Friday session. Because the slip is a paper document, I need to get help from someone else to complete and submit it, and it sometimes takes weeks for me to receive a ducat to actually use the library. For example, I submitted a request to use the Merlin around July 6. On ██████████, after the *Armstrong* attorneys advocated for me to receive increased library access, my Counselor informed me that I would receive access to the law library four times per week to use the Merlin. ~~Finally, during the~~ ~~████~~ ~~week of~~ August 14, I received 3 hours of access to the library to use the Merlin.

34.    Also, there are times when I cannot use the library due to circumstances outside of my control. For example, around June 2023, my housing unit was placed on quarantine due to COVID-19, and we were not allowed out of our unit for several weeks. Thus, for several weeks, I was not able to access the library to read my mail or any other documents. Having a general ability to go to the library several times per week would not have helped while I was on quarantine.

35.    Even if they had increased my law library access to four times per week, it would still not be enough to adequately read all of my documents, nor would I have a way of writing documents. I need near-constant access to the Merlin, or another device that can

also read paper documents aloud for me, to adequately prepare for my parole hearing.

36.    In addition, I do not feel comfortable using the Merlin since I do not have privacy. The Merlin displays the document's texts on the monitor, which means that other incarcerated people can read my paperwork. This can be dangerous, since information about my arrest or my conviction could get me killed if it spreads throughout incarcerated people.

37.    It would make a huge difference to my parole preparation if I could have, in my cell, a device that I could use privately and independently to read me paperwork. This way, I could review documents whenever I need to, without waiting sometimes for several weeks for access to the Merlin. I also would be able to review documents without fear of other incarcerated people reading them, too.

38.    **Preparation of Parole Packet**

39.    To prepare for my upcoming parole hearing, I would like to put together a parole packet to present to the Board. Ideally, this packet will include documents such as my re-entry housing and work plans and certificates from programming that I have completed while incarcerated.

40.    Due to my lack of access to necessary accommodations for my vision disability, and since I am unable to read and write without accommodations, it is extremely difficult for me to prepare this packet on my own. I have a limited ability to locate the documents I need to just put in the packet, such as programming certificates. Due to the lack of accommodations of any kind that are designed to assist me with writing tasks, I also have nearly no ability to draft the documents that go into the packet, nor to draft letters to help me get the documents that go into the packet, such as letters of acceptance into re-entry programs. I don't feel safe asking anybody to help me with preparing this packet. I don't trust other incarcerated people with the sensitive information that will go into the packet, since my safety may be at risk. I also don't feel comfortable asking staff or my Counselor to help with this packet since I fear retaliation.  As of now, I do not know how I will put together this packet.

[4343795.1]                                             9

41. As part of release planning, I also think it would be helpful for me to show the panel that I have gotten connected to organizations in the community that serve blind people. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. I asked the *Armstrong* attorneys for help and they were able to send me information on ▇▇▇▇ organizations in the community that help blind people. However, because I did not have access to the law library to use the Merlin, and because they have no way of sending me documents in audio format, I had to ask ▇▇ another incarcerated person to read their letter to me. I am still trying to reach the organization they pointed me toward.

42. It would make a huge difference to me to have equipment that would let me listen to and dictate written words, or produce written documents in another accessible manner, independently and privately. I could spend more time reviewing my materials that the Board provides and more time preparing my parole packet. As it stands, preparing parole materials is a slow, painful, and often impossible process.

43. It would also make a huge difference to me if I had a trustworthy person outside of CDCR to help me with my parole preparation and paperwork. As discussed above, I cannot rely on staff or incarcerated people for help with paperwork out of fear for my safety, and I have limited time with my assigned attorney and cannot afford to use our time on completing mundane paperwork tasks. While the Merlin device and other equipment in the library is helpful when I do get access to them, it is still quite cumbersome and difficult for me to complete writing tasks this way. The most effective way for me to draft documents would be for a ▇▇▇▇ human to write down what I ask them to write and read it back so I can revise accordingly.

44. All of these barriers are even more challenging because of my mental illness. Between suffering from depression and suffering the effects of trauma, it has been extremely difficult for me to get up the energy and optimism to engage in parole preparation, and intensely nerve-wracking for me to ask for help the ways that I have. Each time I have a call with my appointed attorney, her paralegal, or the *Armstrong* attorneys—all of which are necessary for me to get the assistance I need preparing for

[4343795.1]                                                10

parole—I have to get assistance from custody staff. ~~████████████~~ Getting assistance from staff ~~████████████████████~~ is stressful due to my previous experience with retaliation.

45. To add hopelessness to the anxiety, I know I am not doing enough. I have less than ███████ to go before my hearing and I still haven't even read all my documents once through. We have not even begun drafting all the documents I want to put in my packet. I have made no meaningful steps toward release planning. I started years ago trying to prepare for this hearing, and here I am at the last minute trying to scrape together some semblance of a presentation. It is difficult not to despair.

46. ~~████████████████████████████████████~~ I am desperate for some kind of assistance that will let me prepare adequately for my parole hearing. The accommodations that I understand the *Armstrong* attorneys are requesting— documentation of the accessible format I need, production of all documents in that accessible format, in-cell access to a scan-and-read device, extra attorney time, and access to a safe person to help with writing tasks—would finally let me properly prepare for my parole hearing with the privacy, independence, and dignity that all humans deserve. I needed these accommodations years ago if I were to prepare properly for my Board hearing.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

[4343795.1]

11

47.     This declaration was taken and written for me by paralegal Amit Rao.  Due to my vision disability,  and the lack of accommodations for me to read or write independently, Mr. Rao accommodated me by typing this document and reading it to me aloud.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ████████ , California this 24 day of August, 2023.

I declare under penalty of perjury under the laws of the State of California that, in order to accommodate ████████ I read each paragraph of this declaration verbatim to ████████ The substance of what I read, which ████████ confirmed was true and correct, is identical to the substance of this printed version.

_____
Amit Rao

[4343795.1]                                    12

# EXHIBIT 38

[4388762.1]



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

July 19, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

> **PRIVILEGED AND
> CONFIDENTIAL**
>
> **SUBJECT TO
> PROTECTIVE ORDER**

Jessica Blonien
California Board of Parole Hearings
PO Box 4036
Sacramento, CA 95812-4036
Jessica.Blonien@cdcr.ca.gov

Tamiya Davis
Katie Riley
CDCR Office of Legal Affairs
PO Box 942883
Sacramento, CA 94283-0001
Tamiya.Davis@cdcr.ca.gov
Katie.Riley@cdcr.ca.gov

Re:  *Armstrong v. Newsom*: Advocacy Letter for Ms. ███████ ███████,
DPV at ██████ re Accessible Parole Preparation
<u>Our File No. 0581-04</u>

Dear Counsel:

We write on behalf of Ms. ████████████ ████████ (DPV), who is currently housed at █████████████████████████████████████ ("██████"). Ms. ███████ who is transgender and completely blind, has an upcoming parole suitability hearing on ██████████████████. We are writing with several time-sensitive requests regarding preparations for her upcoming hearing:

Pursuant to the *Armstrong II* Revised Permanent Injunction, Dkt. No. 788 ¶ 30, Defendants may appoint attorneys as a reasonable accommodation provided that attorneys receive the additional time necessary to provide accommodations. Ms. ██████ reports that she received a slip of paper from her Counselor in ████████████ with her state-appointed attorney's name and contact information. She could not read the paper, and reports that her Counselor did not assist with reading the paper to her. It took Ms. ██████ several weeks before she was able to pay an incarcerated person to help her read the slip and scribe a letter to the attorney in April. She did not receive any response from the attorney. She sent a second letter to the attorney in June, again using another

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien, Tamiya Davis, Katie Riley
July 19, 2023
Page 2

incarcerated person's help, and again did not receive a response.  She reports that she then asked the Counselor for assistance with contacting the attorney, but the Counselor just handed her the same slip of paper that Ms. ▇▇▇ was unable to read.  Ms. ▇▇▇ has still not had any contact with her attorney, denying her the additional attorney time the *Armstrong* Court requires, *see* Dkt. No. 788 ¶ 30, and putting her parole preparation for her upcoming ▇▇▇▇▇ hearing in serious jeopardy.

**REQUEST #1:  We request that the Board ensure that Ms. ▇▇▇ state-appointed attorney sets up a meeting with Ms. ▇▇▇ as soon as possible.  If the attorney cannot, we request that the Board assigns Ms. ▇▇▇ a new attorney who can meet with her as soon as possible.**

Ms. ▇▇▇ is also concerned about how to access her CRA to adequately prepare for her ▇▇▇▇▇ hearing.  Pursuant to the ARP II, the Board must provide reasonable accommodations for individuals to prepare for parole proceedings, including providing "audio-tape" for individuals with vision disabilities.  ARP II §§ III, VI.D.3.  She reports that she received a hard copy of her CRA on ▇▇▇▇▇ and that she was unable to read it due to her vision.  Her Counselor offered to set up a time to read it to her, but has not done so yet.  Ms. ▇▇▇ only options to review the CRA are to have another incarcerated person read the document to her, violating her privacy and risking her safety, or to wait weeks for access to the law library (discussed in the next section).

**REQUEST #2:  We request that Defendants provide Ms. ▇▇▇ a copy of her CRA in audio format within five (5) business days of receiving this letter.  This request is time-sensitive since the deadline to object to her CRA is ▇▇▇▇▇, thirty days prior to her scheduled hearing.**

**REQUEST #3:  We further request that Defendants note Ms. ▇▇▇ need for documents in audio format and ensure that she receives all future documents in audio format, to include the transcript of her upcoming parole hearing.**

Under the ARP II, Defendants must also accommodate vision disabilities by ensuring access to "electronic equipment (reading machines)" as necessary for class members to prepare for parole proceedings.  *See* ARP II §§ III, VI.D.3.  At present, the only way Ms. ▇▇▇ can access printed material is by using the Merlin device located in the law library.  This device can read aloud documents to her.  However, her current level of access to the law library severely inhibits her preparation for her upcoming hearing.  She reports that she has to submit a written slip requesting access to the Merlin.  This itself is difficult and time consuming, since due to her vision, she has to pay an incarcerated person to help her write the slip.  Even after submitting the slip, it takes

[4326053.1]

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien, Tamiya Davis, Katie Riley
July 19, 2023
Page 3

weeks before she receives a ducat to actually access the law library.  For example, she reports that she submitted a slip to use the law library nearly two weeks ago, after receiving her CRA.  As of July 18th, she still had not received a ducat to use the library.  Even when she does receive access to the library, Ms. ███████ only has one and a half hours of Merlin access, once per week.  This is not nearly enough time for her to review her CRA and any other parole related documents as frequently or thoroughly as she requires to prepare for her hearing.

> **REQUEST #4: We request that Ms. ███████ be designated as a priority legal user of the library and receive access multiple times per week.**

In summary, our requests are as follows:

1.    Please ensure that Ms. ███████ state-appointed attorney sets up a meeting with Ms. ███████ as soon as possible.  If the attorney cannot, we request that the Board assigns Ms. ███████ a new attorney who can meet with her as soon as possible.

2.    Please ensure that Ms. ███████ receives a copy of her CRA in audio format, no later than five (5) business days after receipt of this letter, so she may review the CRA in time to file objections by the August 8 deadline.

3.    Please provide all forthcoming parole-related materials to Ms. ███████ in audio format, including the transcript of her upcoming hearing, once available.

4.    Please provide Ms. ███████ with priority legal access to the law library.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4326053.1]

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien, Tamiya Davis, Katie Riley
July 19, 2023
Page 4

Thank you for your attention to this matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:AR:cg

cc:  Jennifer Shaffer      Jennifer Neill
     Sharon Garske        Olena Likhachova
     Trace Maiorino       Ed Swanson
     Eric Chang           August Gugelmann
     Sean Lodholz         Audrey Barron
     Mark Jackson         ADA General Email
     Patricia Ferguson    Co-Counsel

[4326053.1]

# EXHIBIT 39

[4388762.1]

| | |
|---|---|
| **From:** | Bakerjian, George@CDCR |
| **To:** | Caroline Jackson |
| **Cc:** | BPH ADA Legal Team; Katie Riley; Davis, Tamiya@CDCR; Amit Rao |
| **Subject:** | RE: Armstrong: Advocacy for ██████████████, DPV at ████ re Accessible Parole Prep, 581-4 |
| **Date:** | Thursday, July 20, 2023 2:37:03 PM |
| **Attachments:** | image003.png image001.png image006.png |

[EXTERNAL MESSAGE NOTICE]

Dear Caroline,

The board is in receipt of your July 19, 2023 advocacy letter on behalf of ████████████████████). As for your request to provide ████████ a copy of her ████████ CRA in audio format (Request #2), an audio recording of the CRA was created and copied onto CDs. The CDs were shipped to CHCF today via GLS, and are expected to be delivered tomorrow, June 21, 2023. I have provided the GLS tracking information below.

The board will provide a letter response to your remaining requests by July 31, 2023.

**Parcel | Express | Freight**



## Shipment Notification

**A GLS label has been created for a shipment to you. When the shipment arrives at our hub, the tracking details will be updated.**

| | |
|---|---|
| **Ship From:** | Aaron Lee, BOARD OF PAROLE HEARING |
| **Ship To:** | ATTN LIFER DESK, CALIFORNIA HEALTH CARE FACILITY P.O. Box 213040 Stockton, CA 95213 |
| **Tracking Number(s):** | 559801066 |
| **Estimated Delivery Date:** | 07/21/2023 |

Track your package

Sincerely,

**George P. Bakerjian**
Senior Staff Counsel
Board of Parole Hearings
Mobile: ████████████

CONFIDENTIALITY NOTICE:
Attorney / Client Communication. Attorney Work Product. Do not distribute.

**From:** Amit Rao <ARao@rbgg.com>
**Sent:** Wednesday, July 19, 2023 5:23 PM
**To:** Blonien, Jessica@CDCR <Jessica.Blonien@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Cc:** Shaffer, Jennifer@CDCR <Jennifer.Shaffer@cdcr.ca.gov>; 'sharon.garske@doj.ca.gov' <Sharon.Garske@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Eric Chang

<Eric.chang@doj.ca.gov>; Sean Lodholz <Sean.Lodholz@doj.ca.gov>; Mark Jackson <mark.jackson@doj.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Neill, Jennifer@CDCR <Jennifer.Neill@cdcr.ca.gov>; Olena.Likhachova@doj.ca.gov; ed@smllp.law; August Gugelmann <august@smllp.law>; audrey@smllp.law; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Armstrong Team <arm-plo@prisonlaw.com>

**Subject:** Armstrong: Advocacy for ███████████████████, DPV at █████ re Accessible Parole Prep, 581-4

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Counsel,

Attached, please see advocacy letter from Attorney Caroline Jackson on behalf of ██████████████, ██████████████. ██████████ has a BPH hearing on ████████████████ and needs accommodations to prepare for her hearing.

Sincerely,

Amit

Amit Rao

Paralegal Clerk

He/him

**101 Mission Street, 6th Floor**
**San Francisco, CA 94105**

(415) 433-6830 (telephone)

(415) 433-7104 (fax)

arao@rbgg.com

# EXHIBIT 40

[4388762.1]

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



July 27, 2023


Caroline Jackson
101 Mission Street, Sixth Floor
San Francisco, CA 94105



Dear Caroline Jackson:

This is in response to your correspondence, dated July 19, 2023, regarding accessible parole preparations for Ms. ███████ (████). Specifically, you requested: (1) the board ensure that Ms. ████ state-appointed attorney set up a meeting with her as soon as possible, or for the board to assign Ms. ████ a new attorney; (2) the board provide Ms. ████ with an audio version of her Comprehensive Risk Assessment (CRA); (3) the board note Ms. ████ need for all future documents in audio format; and (4) Ms. ████ be designated as a priority legal user of the library with access multiple times per week.

A response to each of your requests is provided in turn below.


**Attorney-Client Pre-Hearing Consultation**

Following the receipt of your correspondence, the board conducted a review of Ms. ████ record to determine if and when Ms. ████ state-appointed counsel, Mr. ███████, conducted pre-hearing interviews. The board confirmed that Mr. ████ had not yet met with Ms. ████ in person, by telephone, or by videoconference. The board takes state-appointed counsel duties and responsibilities seriously. Accordingly, upon discovering that no pre-hearing consultation had taken place to date, and pursuant to Ms. ████ request, the board immediately relieved Mr. ████ of his duties, and assigned Ms. ████ new state-appointed counsel. The board's scheduling unit made arrangements with the ████████████████████ (████) to ensure a pre-hearing consultation between Ms. ████ and her newly assigned state-appointed counsel, ████████, occurs no later than ████ ████.

Additionally, as a result of Mr. ████ failure to timely meet with Ms. ████ this case has been referred to the board's attorney complaint team for further investigation.

**Comprehensive Risk Assessment Provided in Audio Format**

The board converted Ms. ████ CRA to audio format via compact disk (CD). The board sent the CD containing the CRA in audio format to ████ via GLS, and confirmed Ms. ████ personally received the CD on July 25, 2023. The chrono documenting Ms. ████ receipt of the CD is attached to this letter.

**Request to Receive Future Board Documents in Audio Format**

Ms. ████ request to receive future board documents in audio format was forwarded to the board's ADA Compliance Unit. The special accommodation has been noted and the board will provide all future CRAs and hearing transcripts to Ms. ████ in audio format, including the hearing transcript of her upcoming ████ ████ parole hearing.

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



### Priority Designation as Legal User of the Library

The board has no jurisdiction over an incarcerated individual's access to CDCR facilities. Accordingly, this request has been forwarded to CDCR.


Sincerely,

*George P. Bakerjian*

GEORGE P. BAKERJIAN
Senior Staff Counsel


Enclosures: CDC-128B (July 25, 2023)
CDC-128B (July 25, 2023)

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS & REHABILITATION
CDC-128B (REV. 10/07)

Name and Number   ████    ████    ████

On ████████ I met with Ms. ████ and Informed her that I had an audio CD that the Board created of Ms. ████
Comprehensive Risk Assessment. I handed over the audio CD to Ms. ████ and Informed her, that this CD is for her to keep. By
signing below Ms. ████ acknowledges receipt that this CD is now on her possession.

Original:   Records
Cc:   ERMS

CORRECTIONAL COUNSELOR I
████

DATE: ████

INFORMATIONAL CHRONO

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS & REHABILITATION
                                                       CDC-128B (REV. 10/07)

**Name and Number**    ████████    █████████    ████████

On ███ ████████ met with Ms. ██████ (██████) at Old Visiting and informed her that I had an audio
CD that the Board created of Ms. ██████ Comprehensive Risk Assessment. Officer ████████
assisted Ms. ████████ in connecting her headphones into the computer. Officer ██████████ inserted the CD
into the computer and waited for the disc to load. In the process of the disc loading Ms. ████████ removed
her hearing aids. I asked ████████ why she removed her hearing aid, she stated that she could hear without
them and proceeded to put her headphones over her ear. At approximately 1130, the CD was played for Ms.
████████ and I double checked with her that she could hear, she stated "Yes I can hear". I could clearly hear
talking coming from Ms. ████████ headphones. At approximately 1240hrs the CD had finished playing.
Ms. ████████ was given the CD and was informed that it was hers to keep.

Original:    Records
    Cc:      ERMS

                                                       ████████████████
                                                       ████████████████

                                                       CORRECTIONAL COUNSELOR I

DATE: ████████████                                     **INFORMATIONAL CHRONO**

# EXHIBIT 41

[4388762.1]



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

August 23, 2023

<table>
<tr><td></td><td>PRIVILEGED AND<br>CONFIDENTIAL<br><br>SUBJECT TO<br>PROTECTIVE ORDERS</td></tr>
</table>

<u>VIA ELECTRONIC MAIL ONLY</u>

Jessica Blonien
George Bakerjian
California Board of Parole Hearings
PO Box 4036
Sacramento, CA 95812-4036
Jessica.Blonien@cdcr.ca.gov
George.Bakerjian@cdcr.ca.gov

Tamiya Davis
Katie Riley
CDCR Office of Legal Affairs
PO Box 942883
Sacramento, CA 95812-4036
Tamiya.Davis@cdcr.ca.gov
Katie.Riley@cdcr.ca.gov

> Re: *Armstrong v. Newsom:* Advocacy Letter for Ms. █████████, █████,
> DPV, DNH at ████ re Accessible Parole Preparation
> <u>Our File No. 0581-04</u>

Dear Counsel:

We write on behalf of Ms. █████████, █████ (████), who is currently housed at █████████████████████████ (█████). Ms. █████, who is ██████████ and completely blind, has an upcoming parole suitability hearing on ████████████. We are writing with several time-sensitive requests regarding preparations for her upcoming hearing.

Ms. █████ is concerned about how to access several documents from her C-file to adequately prepare for her ████████ hearing. Pursuant to the ARP II, the Board must provide reasonable accommodations for individuals to prepare for parole proceedings, including providing "audio-tape" for individuals with vision disabilities. ARP II §§ III, VI.D.3.

Ms. █████ reports that her Counselor offered her paper-form documents from her C-file at her attorney's request on █████████ and instructed her to use the Merlin device in the library to read them. Ms. █████ reports that she requested instead to be

[4340602.1]

**PRIVILEGED AND CONFIDENTIAL**

Jessica Blonien
Tamiya Davis
August 23, 2023
Page 2

provided with documents in audio format, which the only format that allows her to access records independently and at will.  Plaintiffs' counsel previously advocated on behalf of Ms. ███ on July 19, 2023 (attached as **Exhibit A)**, requesting that she receive all future documents for her parole preparation in audio format.  Defendants responded to our letter on July 27, 2023 (attached as **Exhibit B)**, stating that Ms. ███ would receive all future Board documents in audio format.

We understand that Ms. ███ attorney has tried to provide Ms. ███ access by having a paralegal read her documents over the telephone during sessions that last two hours at a time.  However, Ms. ███ reports that this access has not been sufficient because the audio quality of the calls has been poor, because she has difficulty retaining two hours' worth of information, and because she does not have the opportunity to review these documents on additional occasions if she believes it is necessary.  We further understand that the paralegal is trying to create audio versions of these documents, but the process is moving slowly, and Ms. ███ is running out of time before her ███ hearing.

**REQUEST #1:  We request that Defendants provide Ms. ███ a copy with the requested documents in audio format within five (5) business days of receiving this letter.**  Any such files should be created in consultation with Ms. ███ and her panel attorney, ███, to ensure the correct documents or portions of documents are converted to audio format.  This request is time-sensitive since Ms. ███ hearing is rapidly approaching on ███.

Ms. ███ reports that she subsequently requested to receive the C-file documents in paper form, in addition to certain medical and mental health records relevant to her CRA.  Her Counselor refused the request, stating that she could only have the documents read aloud and, given that some of the documents pertained to medical and mental health records, recommended that she contact medical with the request.  However, when Ms. ███ requested paper copies of these records from medical, they refused her request.

Ms. ███ would like to review these documents as soon as possible.  Although an imperfect option, for the reasons stated in the next section, Ms. ███ believes that she can receive the quickest access to these documents by reviewing them in the law library using the Merlin.

**REQUEST #2:  We request that Defendants provide Ms. ███ with a paper version of all requested documents as soon as possible so that Ms. ███ can begin**

[4340602.1]

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien
Tamiya Davis
August 23, 2023
Page 3

**reviewing them on any available assistive devices prior to receiving the audio version.**

On July 19, we sent a letter requesting that Ms. ███ receive priority legal user status for the law library so that she can have greater access to the Merlin. Ms. ███ reports that she was informed that she would be able to access the law library several days per week, however she has yet to receive a schedule or a ducat advising her when she can go.

**REQUEST #3: We request that Defendants provide Ms. ███ with immediate access to the law library as a priority legal user and whatever documents necessary to ensure she receives such access.**

Ms. ███ is also concerned that the Merlin device in the library is an insufficient accommodation due to a lack of privacy and limited access to the library. Under the ARP II, Defendants must also accommodate vision disabilities by ensuring access to "electronic equipment (reading machines)" as necessary for class members to prepare for parole proceedings. *See* ARP II §§ III, VI.D.3.

At present, Ms. ███ can review and work with paper documents only by using the Merlin device located in the law library. This device scans documents and reads them aloud. Plaintiffs' counsel has previously advocated for Ms. ███ to receive increased access to the law library in order to use the device, see Ex. A, which Defendants promised to provide, see Ex. B; however, it does not appear that Ms. ███ has received the level of access that Defendants promised. Even if Defendants provide Ms. ███ with the promised level of library access, it will not be sufficient because she will not be able to review the documents during the many hours of the day and multiple days of the week that she does not have access to the law library. To adequately prepare, Ms. ███ must be able to review documents and work with them in her cell.

In addition to lack of access, the Merlin device in the library does not afford Ms. ███ adequate privacy when reviewing these documents. The Merlin device displays a document's text onto the monitor in very large print, and can easily be seen by other library users. Further, the Merlin is not designed to be used independently by people who are completely blind, such as Ms. ███, and she must request assistance each time she uses the device. Ms. ███ mental health, medical, and other parole documents are highly sensitive and disclosure of this information could result in safety risks for Ms. ███ if the information spreads across the institution.

[4340602.1]

**PRIVILEGED AND CONFIDENTIAL**
Jessica Blonien
Tamiya Davis
August 23, 2023
Page 4

A personally issued scan-and-read device, such as the Omnireader, Smart Reader HD, ClearReader+ or LyriQ, would provide  Ms. ███ with more meaningful access to the documents she needs to work with to prepare for her BPH hearing.  These devices function similarly to the Merlin, in that they scan documents and read them aloud, and would allow her to access documents from the privacy of her cell as often as she needs to prepare for her hearing.  We understand that these devices should be easy to use, but may require brief training to allow Ms. ███ to use them independently.

**REQUEST #4:  We request that Defendants provide Ms. ███ with an Omnireader, or other similar text-to-speech device, such as the Smart Reader HD, ClearReader+ or LyriQ, for personal use in her cell as soon as possible.**

The January 18, 2022 Memorandum titled Correctional Counselor Role in Board of Parole Hearing Processes for Inmates with Disabilities ("CC I Memo") states that individuals in the DPP with a DPV code and individuals in the MHSDS at the EOP level of care higher, among others, "shall receive assistance with pre-release planning when scheduled for a BPH hearing."  CC I Memo at 4.  Despite this apparent requirement, however, Ms. ███ reports has not received any assistance with pre-release planning from any source, including outreach to potential sources of support in the community.  The lack of such assistance has already affected her chances of release, as her Comprehensive Risk Assessment rated her as having a "Moderate Risk" of future violence, in part due to having "no support system," *see* CRA, p. 14, despite her statements that she "has several long term friends who still support her," *see id.*, p. 9.

It is likely too late to do this kind of parole planning assistance, and assistance seeking letters of support at this time, in advance of her hearing.  Ideally this assistance should have been provided prior to the Comprehensive Risk Assessment interview.  We ask that this issue be added to the CDCR accountability log and addressed so that she and similarly situated CHCF class members are provided with parole planning assistance in the future.

**REQUEST #5:  We request that Defendants assist Ms. ███ with pre-release planning and add to the CDCR Accountability Log that Defendants failed to assist Ms. ███ with pre-release planning.**

In summary, Plaintiffs request the following:

**REQUEST #1:  We request that Defendants provide Ms. ███ a copy with the requested documents in audio format within five (5) business days of**

[4340602.1]

**PRIVILEGED AND CONFIDENTIAL**

Jessica Blonien
Tamiya Davis
August 23, 2023
Page 5

receiving this letter.  Any such files should be created in consultation with Ms. ▮▮▮▮ and her panel attorney, ▮▮▮▮▮▮, to ensure the correct documents or portions of documents are converted to audio format.

**REQUEST #2:**  We request that Defendants provide Ms. ▮▮▮▮ with a paper version of all requested documents as soon as possible so that Ms. ▮▮▮▮ can begin reviewing them on any available assistive devices prior to receiving the audio version.

**REQUEST #3:**  We request that Defendants provide Ms. ▮▮▮▮ with immediate access to the law library as a priority legal user and whatever documents necessary to ensure she receives such access.

**REQUEST #4:**  We request that Defendants provide Ms. ▮▮▮▮ with an Omnireader, or other similar text-to-speech device, such as the Smart Reader HD, ClearReader+ or LyriQ, for personal use in her cell as soon as possible.

**REQUEST #5:**  We request that Defendants assist Ms. ▮▮▮▮ with pre-release planning and add to the CDCR Accountability Log that Defendants failed to assist Ms. ▮▮▮▮ with pre-release planning.

All requests are time-sensitive, as Ms. ▮▮▮▮ ▮▮▮▮▮▮ hearing date is rapidly approaching.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4340602.1]

**PRIVILEGED AND CONFIDENTIAL**

Jessica Blonien
Tamiya Davis
August 23, 2023
Page 6

Thank you for your attention to this matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:ar

cc:

| | | |
|---|---|---|
| Jennifer Shaffer | Nicholas Meyer | Jason Anderson |
| Sharon Garske | Chor Thao | Dawn Lorey |
| Trace Maiorino | Ramon Ruiz | Jane Moses |
| Eric Chang | OLA *Armstrong* | Alexandrea Tonis |
| Sean Lodholz | Mono Houston | Joshua (Jay) Leon Guerrero |
| Mark Jackson | Lourdes White | Aaron Perez |
| Patricia Ferguson | Jillian Hernandez | Lois Welch |
| Jennifer Neill | Cory Lo | Steven Faris |
| Olena Likhachova | Brianne Burkart | ADA General Email |
| Ed Swanson | Diana Toche | CDCR CAMU Mailbox |
| August Gugelmann | Joseph Bick | CCHCS Accountability |
| Audrey Barron | John Dovey | Co-Counsel |
| Patricia Ferguson | Robin Hard | Sara Norman |
| Alexander Powell | Joseph (Jason) Williams | Rana Antabtawi |

[4340602.1]

# EXHIBIT 42

[4388762.1]

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**

P.O. Box 4036
Sacramento, CA 95812-4036



September 12, 2023


Caroline E. Jackson                                        *VIA ELECTRONIC MAIL ONLY*
cjackson@rbgg.com
Rosen, Bien, Galvan & Grunfeld, LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738


RE:   *Armstrong v. Newsom*: Advocacy Letter for Ms. ███████ (████), DPV,
      DNH at ████ (Your File No. 0581-04)

Dear Caroline:

This is in response to your above referenced correspondence, dated August 23, 2023, to
the Board of Parole Hearings regarding the pre-hearing preparations for Ms. ████
████ (███████). In your correspondence, you requested (Request #1) a copy of
requested documents be provided to Ms. ████ in audio format.

The Board consulted with Ms. ████ attorney to attempt to provide the use of the
Merlin machine in the law library to allow Ms. ████ to review her central file.
However, Ms. ████ counsel advised the Board that the Merlin machine's location in
the law library did not provide adequate confidentiality necessary for the central file
review. Accordingly, Ms. ████ counsel and her staff offered to audio record several
hours of specific portions of Ms. ████ central file. Following several attempts from
Ms. ████ counsel and Board staff to convert these audio files to a portable format for
Ms. ████ use, Board staff ultimately coordinated with institutional staff to provide the
audio recordings in a file format, which Ms. ████ was able to listen to prior to her
hearing.

In your letter, you claim that the Board stated in its July 27, 2023 response letter that
"Ms. ████ would receive all future Board documents in audio format." This claim does
not accurately represent the statements made by the Board. In the Board's July 27, 2023
response, the Board specifically noted that it would forward Plaintiffs' request for Ms.
████ to receive all future Board documents in audio format to the ADA Compliance
Unit. However, the Board did commit to prepare and deliver all future CRAs and hearing
transcripts to Ms. ████ in audio format.

All other requests included in your letter for Ms. ██████████ relate directly to the California Department of Corrections and Rehabilitation, and are outside of the Board's jurisdiction.

Sincerely,

SARA PURICELLI
Board Counsel

# EXHIBIT 43

[4388762.1]

**STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **GAVIN NEWSOM, GOVERNOR**





██████████

<u>VIA EMAIL ONLY</u>

Caroline E. Jackson
Rosen Bien Glavan & Grunfeld LLP
CJackson@rbgg.com

**RE:** *Armstrong v. Newsom*: **Advocacy Letter for Ms. ██████████, █████, DPV, DNH at █████ re Accessible Parole Preparation**

Dear Ms. Jackson:

I write in response to your email dated ███████████, regarding ████████████, ██████ (DPV, DNH) housed at the ████████████████████████████████. You requested that the California Department of Corrections and Rehabilitation (CDCR): (1) Provide Ms. █████ a copy with the requested documents in audio format within five (5) business days of receiving this letter. (2) Provide Ms. █████ with a paper version of all requested documents as soon as possible so that Ms. █████ can begin reviewing them on any available assistive devices prior to receiving the audio version. (3) Provide Ms. █████ with immediate access to the law library as a priority legal user and whatever documents necessary to ensure she receives such access. (4) Provide Ms. █████ with an Omnireader, or other similar text-to-speech device, such as a Smart Reader HD, ClearReader+ or LyriQ, for personal use in her cell as soon as possible. (5) Assist Ms. █████ with pre-release planning and add to the CDCR Accountability Log that Defendants failed to assist Ms. █████ with pre-release planning.

I.     <u>**We request that Defendants provide Ms. █████ a copy with the requested documents in audio format within five (5) business days of receiving this letter.**</u>

At the suggestion of Ms. █████ appointed attorney, Ms. █████ paralegal read a large majority of Ms. █████ Central File (C File) documents to Ms. █████ over the phone. These attorney-client phone calls were held over multiple days, over several hours. █████ was notified on Tuesday, █████████████ two (2) days prior to Ms. █████ Board of Parole Hearing scheduled for Thursday, ████████████, that the paralegal was not going to be able to finish reading the documents to Ms. █████. CDCR worked with BPH and Ms. █████ attorney on efforts to convert the paralegal's additional recordings of the C File documents into a usable format to provide to Ms. █████. Unable to burn the files onto CD, █████ was asked to facilitate Ms. █████ listening to the remainder of █████ C File via audio recording, recorded by Ms. █████ paralegal, by accessing a file sharing program on a state laptop. Although there was very little time to coordinate this request, Ms. █████ Correctional Counselor I (CCI) agreed to

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

*Armstrong V. Newsom*: ███████████████ – DNH, DPV (█████)
Page 2

facilitate Ms. ██████ ability to listen to the remaining audio files on Wednesday, ███████████████. CC██████ stated that she started playing the audio files at approximately 0913 hours and ended at approximately 1800 hours with a break from 1234-1305 hours. Multiple additional breaks for restroom, water and food were offered to Ms. █████; however, █████ denied the additional breaks and stated she was good.

II.      <u>**We request that Defendants provide Ms. █████ with a paper version of all requested documents as soon as possible so that Ms. █████ can begin reviewing them on any available assistive devices prior to receiving the audio version.**</u>

On ████████████ CCI ██████ met with Ms. █████ cell side and informed █████ that the CDCR can provide copies of all 115/Rules Violations Reports (RVRs), the Probation Officer's Report (POR) and/or the arrest report at no cost to █████ so she can review the documents at the law library on the Merlin machine. Ms. █████ informed CCI █████ that she would rather have her lawyer's paralegal assist her in reviewing her file. Ms. █████ stated that she did not want to waste any time in case the Merlin was not able to read certain files.

Thereafter, Ms. ██████ changed her mind and requested printed documents from her C File. On ████████████, CCI ██████ provided Ms. █████ copies of all of her RVRs, CDC-128Bs, certificates, informational chronos and a printout of all jobs and programs to which █████ had been assigned. Ms. █████ stated that her lawyer requested a copy of the CDC-128G where her 'R' suffix was placed. On ████████████, CCI █████ provided █████ a copy of the CDC-128G noting the 'R' suffix and the POR.

III.     <u>**We request that Defendants provide Ms. █████ with immediate access to the law library as a priority legal user and whatever documents necessary to ensure she receives such access.**</u>

Ms. █████ is currently housed in housing unit ████ Per the 2023 █ Yard Library Schedule Ms. █████ has eight (8) hours of Law Library access per week. A Priority Library User (PLU) receives four (4) hours of library access per week. Currently Ms. █████ is receiving double the amount of hours of PLU status with the eight (8) hours she has available to her on a weekly basis. █ Facility Library staff stated that Ms. █████ uses the █ Facility Library on an almost daily basis and usually remains in the library for the entire allotted two (2) hour shift. The library staff also stated that Ms. █████ is their most consistent Merlin user. Ms. █████ went to the █ Facility Library on ████████████████████, at 1400 hours for approximately one (1) hour each time. Ms. █████ received copies, was provided with a library schedule and orientation on the availability and use of the Merlin Magnifier. Additionally, Ms. █████ was informed that their building has an open line access to the library, which is at least four (4) times a week, and one does not need a ducat to visit the library.

<div align="center">

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
</div>

In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

*Armstrong V. Newsom*: ███████████████ – DNH, DPV (███)
Page 3

Additionally, on ████████████, Ms. █████ was scheduled for a one-on-one appointment with law library staff. The Library Technical Assistant (LTA) met with Ms. █████ in a confidential office room and offered to assist with any writing Ms. █████ wanted to do in preparation for the hearing.

IV.    **Provide Ms. █████ with an Omnireader, or other similar text-to-speech device, such as a Smart Reader HD, ClearReader+ or LyriQ, for personal use in her cell as soon as possible.**

The visual accommodation assisted devices are currently being negotiated in the Blind Low Vision workgroup. CDCR is currently working on a policy to allow similar devices available to the blind low vision incarcerated persons.

Notably, Ms. █████ received an audio recording of the Comprehensive Risk Assessment on ██████████, along with portable CD player so she could review it on her own time. Ms. █████ was also provided an audio recording of the ████████████ hearing on ████████████████, less than a week after the hearing.

V.    **Assist Ms. █████ with pre-release planning and add to the CDCR Accountability Log that Defendants failed to assist Ms. █████ with pre-release planning.**

█████ has been informed that the parties are currently discussing assisting inmates with disabilities with release plans prior to a Board hearing. As this is a pending issue, an allegation was not added to the CDCR Accountability Log.

Sincerely,



Warden

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

# EXHIBIT 44

[4388762.1]

| | |
|---|---|
| **From:** | ▮▮▮▮▮ <▮▮▮▮▮aol.com> |
| **Sent:** | Friday, September 1, 2023 1:17 PM |
| **To:** | Mehler, Steven@CDCR; Puricelli, Sara@CDCR; Katie Riley |
| **Cc:** | Bakerjian, George@CDCR; Doetsch, Tara@CDCR; BPH Correspondence Unit |
| **Subject:** | Re: ▮▮▮ ▮▮▮ audio challenge 3:  09012023 |

[EXTERNAL MESSAGE NOTICE]

Hi Katie -

No.

I scheduled the meetings with Ms ▮▮▮▮ for an hour each morning from 7 am to 8 am on ▮▮▮▮ and ▮▮▮▮▮. ▮▮▮▮▮ hearing is on ▮▮▮▮. I met with ▮▮▮▮ for 1.5 hours t▮ ▮▮▮▮ as well.

We did not schedule Sydney - as we spent that time making the recordings this week, and I switched things on Sydney's calendar so that we could get those two extra recordings done - ▮▮▮▮ and ▮▮▮▮.

When the concept comes up as institutional write ups, or even the issues around ADA issues and the prevalent narrative within CDCR and the documentation associated with them - those are spread over a number of documents.

The reason why Olson reviews are effective is because they can be review, think about, address -- and they are not simply done on the fly IF the panel references a document by page number.

I am frustrated by this process and trying to get ▮▮▮▮ to be able to be on the same level as other offenders going before the Board.

It would not be acceptable for all offenders to NOT be given an Olson review - and just address the pages referenced on the fly, let alone to tie their hands and NOT allow them the ability to submit their written documents - here CDCR cannot and will not give ▮▮▮▮ the accommodations for a writer to help write down words and generate documents, let alone figure out a way earnestly to get these recordings to ▮▮▮▮ They were recorded on an iPhone.

And despite buying a CD burner, and disks, and a zip drive, and utilizing my legal clerks hours - we still are unable to get ▮▮▮▮ those recordings.

Those recordings should be given to ▮▮▮▮ because those are the contents of her c-file so that she can understand and review those documents.

I know you have done your diligence and everyone involved - but come on, at this point - I don't understand why we are now on September 1, 2023 -- and it feels like we are still back in the *Armstrong* days when people were exiting their wheelchairs and crawling up the stairs to their parole revocation hearings.  Let alone now - we have a blind individual who still does not know a portion of the contents of her c-file, does not have someone to help her write documents, and literally

1

Jackson Ex. 44, p. 1

is going into her parole suitability hearing bound and restrained by her ADA issues that CDCR has been aware of.  I have written down parole plans for ██████████ - but this is one item of 20+ items and that took an enormous portion of our 1.5 conversation ████.  There are inherent issues with someone who doesn't write things down when asked to discuss any topic - as I know you all know.

I wish you all a nice weekend.

-████

On Friday, September 1, 2023 at 11:46:16 AM PDT, Riley, Katie <katie.riley@cdcr.ca.gov> wrote:

████

Were you able to book all of the meetings you need for you and your paralegal to meet with ████████ next week?

My current thinking is that if the CD situation cannot be resolved, we rely on your meetings with ████████ Then, during the hearing, if there are any times that ████████ is unfamiliar with a document being discussed or wants a break to meet with her attorney to discuss a document, you would ask the hearing panel to give you a short break for an attorney-client meeting.

What do you think?

*Katie Riley*

Attorney IV

CA Dept. of Corrections & Rehabilitation

cell: ██████████

---

**From:** Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Sent:** Friday, September 1, 2023 8:25 AM
**To:** ████████ <████████aol.com>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** RE: ████ ██████ audio challenge 3: 09012023

What I was able to research is it can be converted to a wav file so we can burn to a CD, however, we are unable to download any software to convert it. I know there are free software programs that can do that, we just can't do it with our CDCR computers.

**Steven Mehler**

Board of Parole Hearings

Program Operations

Email: Steven.Mehler@cdcr.ca.gov

Telephone: (916) 956-2433



*Confidentiality Notice:  This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message.*

**From:** ████████ <████████aol.com>
**Sent:** Friday, September 1, 2023 8:19 AM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** ████ █████ audio challenge 3: 09012023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning all --

The format is m4a. MPEG-4 Audio, or M4A for short, is an audio file format from Apple that can store several audio content types, including songs, audiobooks, and podcasts. It saves audio data in a MPEG-4 file, encoding it with the Apple Lossless Audio Codec (ALAC) or the Advanced Audio Coding codec (AAC).

I am able to play it in Windows Media on my computer and I can hear it.

Are you able to play the recording on your end?   If so, are you able to record the audio as you would the recording of Adobe speaking the CRA for ███████

I can try and convert it on my end, if you are unable to play it via audio.  I can try and record it again on my end, play it via Windows media -- but I have an iPhone too.  I can try and record it a different way.

What else can we do?

Thanks,

██████

████████████████████████████████████████████████

On Friday, September 1, 2023 at 03:10:42 AM PDT, Mehler, Steven@CDCR <steven.mehler@cdcr.ca.gov> wrote:

Hello Everyone,

4
Jackson Ex. 44, p. 4

We tried to move these recordings on to a CD. However, the recordings seem to be in an mp4 format, which is a video format. Unfortunately, we do not have the software required to convert them into an audio format , such as a wav file.

This may be why you were also having issues

**Steven Mehler**

Board of Parole Hearings

Program Operations

Email: Steven.Mehler@cdcr.ca.gov

Telephone: (916) 956-2433



*Confidentiality Notice:  This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message.*

**From:** Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Sent:** Wednesday, August 30, 2023 9:42 AM
**To:** ▇▇▇▇▇ <▇▇▇▇▇aol.com>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Subject:** RE: ▇▇▇ ▇▇▇ audio upload success: 08302023

▇▇▇

You and your staff have done an amazing job! Thank you for everything!

Katie Riley

**From:** ████████ <████████aol.com>
**Sent:** Wednesday, August 30, 2023 9:23 AM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Subject:** Re: ████ ████ audio upload success: 08302023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I just finished uploading the additional two recordings. ████ 3 and ████ 4.

You now have all of the recordings for ████████

I am genuinely thankful for each of you and your efforts to help effectuate getting ████████ these necessary recordings.

Best regards to each of you,

████

On Wednesday, August 30, 2023 at 08:18:58 AM PDT, Doetsch, Tara@CDCR <tara.doetsch@cdcr.ca.gov> wrote:

Hello!

I will have staff check inventory of CDs and see if we can get what audio is in the folder tomorrow to CDs. I have cc:d Steve to have his team handle this when Aaron gets to the office tomorrow.

Thank you,

Tara M. Doetsch

Board of Parole Hearings

Program Operations

Cellular █████████████

---

**From:** ████████ <████████████aol.com>
**Sent:** Wednesday, August 30, 2023 7:48 AM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** ████ ███████ audio upload success: 08302023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning to you all - success!!

I just uploaded the two files to the folder - and confirmed they are up there.

Also - I have Sydney working on the remaining recording of pages - which is a span of 200 + pages - Sydney did approximately 2.75 hours yesterday and she has another recording session set today - and I will work on getting that uploaded as well.

So I will have additional recordings for upload later.

Thanks,

████

On Tuesday, August 29, 2023 at 07:23:26 PM PDT, Doetsch, Tara@CDCR <tara.doetsch@cdcr.ca.gov> wrote:

Hello all,

The folder has been created in the 2022 folder (not to confuse staff).  Please upload the audio to the below folder path:

Thank you,

Tara M. Doetsch

Board of Parole Hearings

Program Operations

Cellular ███████████

---

**From:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Sent:** Tuesday, August 29, 2023 6:28 PM
**To:** ████████ <████████aol.com>
**Cc:** Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>; Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>
**Subject:** Re: ████ ████ audio challenge part two: 08292023

Hi, ████

I spoke to Tara Doetsch and she will set up a one time folder to deposit the audio files. We will then burn the CD-es and have them sent out to ████████

Thank you so much for bearing with me on getting a pathway for the files.


Thank you,


Sara K. Puricelli
Staff Attorney
Board of Parole Hearings
(916) 869-8921
sara.puricelli@cdcr.ca.gov


Attorney / Client Communication.  Attorney Work Product.  Do not distribute.

---

**From:** ▮▮▮▮▮ <▮▮▮▮▮aol.com>
**Sent:** Tuesday, August 29, 2023 4:52:47 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** Re: ▮▮▮ ▮▮▮ audio challenge part two: 08292023


> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.


I am willing to try breaking up the files - what size would you like me to break them up in?


And will your CDCR computers allow the audio files?


Thanks,


▮▮▮

On Tuesday, August 29, 2023 at 04:16:09 PM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Hey, ███

Ok – so Watchdox can't be utilized to receive files. Is there any way we can maybe break up the audio files to email them?

Thank you and I apologize for the difficulty of all of this,

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ███████ <███████aol.com>
**Sent:** Tuesday, August 29, 2023 3:29 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>
**Subject:** Re: ████ ███████  audio challenge part two: 08292023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Josh has been super helpful, but we are not able to transfer the files via Teams.  You are correct - he is wonderful.

Jackson Ex. 44, p. 10

Josh is working on seeing if we can try and facilitate it through Watchdox/Workspaces.

I am standing by.

Thanks,

███

On Tuesday, August 29, 2023 at 11:09:27 AM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Good morning, ████

I reached out to one of our wonderful managers, Josh Ludwig. He will be contacting you regarding a possible way to file share through teams so that we can get those CD-es burned.

Please do not hesitate to let me know if you have any questions or concerns.

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

---

**From:** ████████ <████████aol.com>
**Sent:** Tuesday, August 29, 2023 3:59 AM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>
**Subject:** ████ ██████ audio challenge part two: 08292023

---

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sara and Katie,

Okay, I have been working on trying to burn this CD and I think I hit an obstacle that I am not sure that I can navigate around -- I spent time earlier trying to get the correct burning software, then I had an issue with the computer recognizing one drive vs another drive, and now this -- and I am truly at my wits end right now with this latest issue.  I think it is a burn rights issue because I can play the audio files - so there is nothing wrong with the files themselves.

I am happy to send anyone the CD burner I bought from Amazon, the CD-R and DVD-Rs I bought, and the zip drive which now has the two audio files that are 48909 KB and 155298 KB in M4A format.

I don't know what else to do and now it's 3:50 AM and after reading the manual, and trying to figure out a solution to this - I hit the latest error which I pasted below - and truly I think I hit my proverbial wall.

Is there someone I can send these M4A audio files to that are on the zip drive for someone to burn onto a CD?  I will also send you the equipment if you need that - I just don't think I am tech savvy enough to figure this part out.

Thoughts?  Do you have a tech person I can talk to in order to see what else I can do?

Also - I have not heard from the institution and am trying to get another few hours with ████████ - can someone help me with that, because I have not heard back from the e-mail I sent last week to the scheduler at ████

Thanks in advance,



On Monday, August 28, 2023 at 10:10:04 AM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Good morning, █████

Wow! And yes, Amazon saves the day.

Ok - so, I reached out to CDCR tech division because we have computer policies in place that don't allow us to utilize non-CDCR hardware. In addition, I was trying to see if they might have an option for us regarding file sharing. I have not heard back yet, but I will give them a call after lunch, if I hear nothing by then.

I will get back to you once I hear back from the tech people.

Thank you,

Sara K. Puricelli
Staff Attorney
Board of Parole Hearings
(916) 869-8921
sara.puricelli@cdcr.ca.gov

Attorney / Client Communication.  Attorney Work Product.  Do not distribute.

---

**From:** ▮▮▮▮▮▮ <▮▮▮▮▮▮▮▮aol.com>
**Sent:** Sunday, August 27, 2023 10:50:39 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>
**Subject:** ▮▮▮▮ ▮▮▮▮▮ audio challenge 08272023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good evening to all of you --

Okay - this afternoon, I spent some time researching how to burn a CD and I purchased a CD burner and the disks.

Amazon is amazing for this specific situation.

I got the stuff - and I spent the last hour trying to figure out why this was not working - first issue was I was using a USB hub vs directly into the computer.  Solved that issue, but the disk said it could not be burned.  Then I figured out I bought the wrong disks - apparently DVD-R is a problem since it's not CD-R.  I have no idea.  I am frustrated, but now have ordered that hopefully for delivery tomorrow.

Tomorrow I am serving as a judge pro tem for both the morning and afternoon calendars in Placer County in traffic court.  I do not think I will be able to make it to BPH HQ during my lunch break, but if I do get that break -- can I drop off the zip drive with the 2 days of recordings for someone at BPH HQ to burn CDS for ▮▮▮▮▮▮

If that does not work out - I will try and burn the CDS here.

Next issue is getting the CDS to

Does someone have a contact at ▮▮▮▮ that I can send the CDs to via overnight?  Or can I drop off the CDs for you to courier to ▮▮▮▮

How will we get the CDS to ▮▮▮▮▮▮▮

There has got to be an easier way to navigate this moving forward.

Have a good evening,

▮▮▮

On Thursday, August 24, 2023 at 05:23:43 PM PDT, ▮▮▮▮▮▮  <▮▮▮▮▮▮▮aol.com> wrote:

Hi Sara,

What if I drop off a zip drive with the files  at BPH HQ in Sacramento?

I am in observations all day tomorrow - how late could I drop it off --- I might be able to swing by on Monday if these hearings go long███████.

▬███

On Thursday, August 24, 2023 at 05:11:56 PM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Hi, ████

I'm having trouble trying to figure out how to get the files to the board in order to create CD-es for ████████  The permissions on CDCR computers will not allow us to view the We Transfer site. I, personally, do not have a way to burn CD-es at home. We do have the capacity at the office, but because of the size of the files, we're trying to come up with a solution.

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ████████ <████████aol.com>
**Sent:** Thursday, August 24, 2023 2:37 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>
**Subject:** Re: Ms ████ audio

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sara,

Thanks for letting me know about that text to speech feature in Adobe - I have listened to hearing transcripts that was as well.

Okay - the audio is in M4A format - the recording was taken from Sydney's call with ▮▮▮▮▮▮ where she recorded her side of her reading the documents. I have not listened to the audio but for the first few minutes and I was able to hear the audio and I was able to play it on my desktop through the Media Player.

I am not sure about emailing the size of these files - Sydney used a file transfer that allows for large files called WeTransfer.

Would you like me to send you the files?

Thanks,

▮▮▮▮

On Thursday, August 24, 2023 at 02:13:28 PM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Hi, ▮▮▮▮

Jackson Ex. 44, p. 17

So, we can burn the CD-es from your audio files so long as they are in mp3 format. If not in mp3 format, we would have to try to figure out how to convert them to mp3 format.

For the CRA conversion to audio, one member of our staff turned on the text-to-speech feature in adobe and recorded that transcription with a microphone, then burned that file to CD. That will not work for the C-File, as most of the C-file cannot utilize the text-to-speech feature.

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ████████ <████████aol.com>
**Sent:** Thursday, August 24, 2023 1:45 PM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** Re: Ms ████ audio

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Katie,

Sydney did 2 hours on Monday and Tuesday and was able to get to page 396 and we still have pages 400 to 630.

I met with ████████ for 2.5 hours ████████ to go over things, and I read and re-read things to her.  So there is merit in having ████████ listen to the documents again.

I am working on trying to get another appointment for Sydney and myself.

We do have those two recordings, and ████████ is good about listening to her CRA on audio.

I can get Sydney to record the remaining pages.

We are trying to figure out logistically how to take these recordings now and get them to ▮▮▮▮▮▮ in a format that she can listen to them on.

Yes - it is helpful for ▮▮▮▮▮▮ to hear them again, to review them.

Am I able to send the audio files to the BPH for them to burn onto CD?  How did the Board or CDCR get the CRA on audio for ▮▮▮▮▮▮   Because once we know that - I can send them the audio files.

Thanks for your help,

▮▮▮▮

On Thursday, August 24, 2023 at 01:15:04 PM PDT, Riley, Katie <katie.riley@cdcr.ca.gov> wrote:

Hi ▮▮▮▮

Thanks again for all of your extra effort to have Sydney meet with ▮▮▮▮▮▮ and now record the materials. Can I ask, was Sydney able to read the entire c-file for ▮▮▮▮▮▮ during the phone calls? For these extra efforts to have Sydney read and record the materials, are these materials that Sydney and ▮▮▮▮▮▮ weren't able to go through during the phone calls, or materials that ▮▮▮▮▮▮ wanted to hear again on her own time? And yes, if you or BPH can figure out how to burn a CD with the recordings, the institution can loan ▮▮▮▮▮▮ a CD player to listen to the materials at her leisure.

Thanks,

*Katie Riley*

Attorney IV

CA Dept. of Corrections & Rehabilitation

cell: ██████████

---

**From:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Sent:** Thursday, August 24, 2023 12:18 PM
**To:** ██████████ <██████████aol.com>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** RE: Ms ████ audio

Hi, ████

Do you have a computer with the ability to burn CD-es? Do you use windows?

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

---

**From:** ██████████ <██████████aol.com>
**Sent:** Thursday, August 24, 2023 12:02 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Subject:** Ms ████ audio

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I have the audio recordings ready of Sydney reading the material to ███████

Do you have a mechanism now to transfer them on CD to ███████

████ (1) is 155,298 KB

████ (2) is 48,909 KB

Much thanks,

████

Jackson Ex. 44, p. 21

**From:**　　　█████████ <█████████ aol.com>
**Sent:**　　　Tuesday, August 29, 2023 8:49 AM
**To:**　　　Caroline Jackson
**Subject:**　　　Fw: ████ ████

[EXTERNAL MESSAGE NOTICE]

----- Forwarded Message -----
**From:** CDCR BPH ADA UNIT@CDCR <bph.adaunit@cdcr.ca.gov>
**To:** █████████ <█████████ aol.com>
**Sent:** Tuesday, August 29, 2023 at 07:22:43 AM PDT
**Subject:** RE: ████ ████

Good morning,

I looked into the staff assistant to help her with writing up the documents and was told that institutional staff are currently not providing this type of specific assistance.

Sorry I couldn't help in that matter but he will have the staff assistant at his hearing.

*Thank you,*

*Theresa Barker*

*Board Of Parole Hearings*

*ADA Compliance Unit*

**(279) 300-5720**

**Bph.ADAUnit@cdcr.ca.gov**

**From:** ██████████ <██████████aol.com>
**Sent:** Monday, August 28, 2023 8:06 AM
**To:** CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>
**Subject:** Re: ████ ████

---

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

She needs assistance with parole board documents - relapse prevention plans, written parole plans, written statements that address insight and other written documents.

A writer would be extremely helpful for preparation of documents and thoughts she would like to convey to the Board.

Is that possible?

Thanks so much, and I am currently working on burning CDs for her to listen to - do you have a contact at ████ that I can overnight the CDs to, in order to ensure they are delivered to ██████████

I appreciate all the effort everyone has made with Me. ████ I got assigned this case last minute so I am trying to get this all done and getting ██████████ prepped.

Thanks again,

████

Sent from my iPhone

> On Aug 28, 2023, at 07:24, CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov> wrote:
>
> Good morning,
>
> Yes we have a staff assistant lined up for the hearing.

2
Jackson Ex. 44, p. 23

I can ask for someone to assist her.  However, the institution states staff and ADA workers are not able to assist with legal documents.  What documents does she need assistance with?

---

**From:** ██████████ <██████████aol.com>
**Sent:** Thursday, August 24, 2023 3:00 PM
**To:** CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>
**Subject:** ████ ██████

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good afternoon,

I wanted to check in to make sure we have a staff assistant for ██████████ hearing scheduled on ██████████ at ██████ at 10:30 am.

██████████ and I met ██████████ for 2.5 hours and I am working on getting some more hours to read to her the other documents.

Also, do you have someone at the institution who can help ██████████ write some of her documents?

Thanks,

██████

**From:** ████████ <████████aol.com>
**Sent:** Wednesday, September 6, 2023 2:00 AM
**To:** Caroline Jackson
**Subject:** Fwd: ████ ████ audio challenge 3:  09012023_response 09032023

[EXTERNAL MESSAGE NOTICE]

Sent from my iPhone

Begin forwarded message:

> **From:** ████████ <████████aol.com>
> **Date:** September 6, 2023 at 01:58:16 PDT
> **To:** "Riley, Katie" <Katie.Riley@cdcr.ca.gov>
> **Cc:** "Mehler, Steven@CDCR" <Steven.Mehler@cdcr.ca.gov>, "Puricelli, Sara@CDCR" <SARA.PURICELLI@cdcr.ca.gov>, "Blonien, Jessica@CDCR" <Jessica.Blonien@cdcr.ca.gov>, "Bakerjian, George@CDCR" <George.Bakerjian@cdcr.ca.gov>, "Doetsch, Tara@CDCR" <Tara.Doetsch@cdcr.ca.gov>, "CDCR BPH Correspondence Unit@CDCR" <BPH.CorrespondenceUnit@cdcr.ca.gov>, "Ferguson, Patricia@CDCR" <Patricia.Ferguson@cdcr.ca.gov>, "Davis, Tamiya@CDCR" <Tamiya.Davis@cdcr.ca.gov>, "Thao, Chor@CDCR" <Chor.Thao@cdcr.ca.gov>, CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>
> **Subject: Re:** ████ ████ audio challenge 3:  09012023_response 09032023

Thanks Katie for your follow through with getting those accommodations set up at the institution.

I have a meeting later ████████ with ████████ starting at 7 am.

I am happy to hear she will have the ability to listen again to the documents and listen for a first time to the remaining documents.

Thank you for utilizing staff and the scribe / writer.  Huge accommodation for ████████

████████ hearing is scheduled for 10:30 am on ████████ via video.

Will a CD be sent to ████████ with the audio recordings for her to have for reference should she be denied?  I am happy to send the blank CDs onward to the Board for future use as well.  I also can create a procedure sheet for other attorneys who may need to do the same thing to accommodate their clients and the things that worked for us to get the audio recordings successfully over to BPH and formatted correctly.

The scribe is helpful and I can include for future attorneys a list of documents they can ask their clients to work on with the scribe/ writer.

Glad the audio format came across after the conversion.

Much thanks again to all,



Sent from my iPhone

On Sep 5, 2023, at 15:47, Riley, Katie <Katie.Riley@cdcr.ca.gov> wrote:

▮▮▮▮

I want to provide you with an update. With a lot of help from the BPH team, we've figured out how to get your paralegal's audio files to the institution over the Internet. ▮▮▮▮ CCI will meet with ▮▮▮▮ tomorrow morning for approximately four hours to allow ▮▮▮ to listen to the audio recordings. We weren't able to burn CDs to get to ▮▮▮ in a timely manner, so listening to the audio files online is the best solution.

The institution is also speaking to ▮▮▮ today to get her to the law library and give her an opportunity to sit with law library staff so that staff can write/scribe any notes ▮▮▮ may want to make to prepare for the hearing.

Thank you,

Katie Riley

**From:** ▮▮▮▮ <▮▮▮▮aol.com>
**Sent:** Sunday, September 3, 2023 12:49 PM
**To:** Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Blonien, Jessica@CDCR <Jessica.Blonien@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>
**Subject:** Re: ▮▮▮ ▮▮▮ audio challenge 3: 09012023_response 09032023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Katie -

Thanks for the thoughtful email and I appreciate your words and certainly the effort of everyone involved.

I have now converted the audio format to wav file and it has been uploaded. Recordings 3 and 4 are the following highlighted pages which had not been read yet - but are on the recordings now - which should be

able to be burned since they are now in WAV format and they do play on my Windows Player.

Our recordings encompass the following outline I gave to Sydney - my legal clerk:

1.

2.

3.

4.

5.

6.

7.

8.

9.



I completely agree that most incarcerated individuals do not read every document in their file.  That certainly wasn't out plan either as we skipped over a number of documents.  Some incarcerated individuals do not even do their Olson review - and often to their own peril especially at their initial suitability hearing.  Here, if ▮▮▮▮▮▮▮ doesn't listen to her documents - then that would be to her detriment but she **_should_** be afforded the opportunity to have them available and given the sensitivity of the issues involved - broadcasting them could have consequences to Ms.

███    She is already at an increased risk because of her gender identity, her physical limitations and her experience within CDCR.

Thank you for availing ████████ of a scribe - I had reached out to the ADA Unit and was told specifically that this was not available - my request was never to get legal advice for ████████ - just to put pen to paper. I appreciate the offer, and I think it would be of tremendous service to ██ ████.

I am hoping the 4 wav files I have uploaded to the ████ ████ folder work and that CDs can be burned and given to ████████ There are an additional approximately 4 hours of audio and moving forward this would be extremely beneficial for ████████ I have already incurred the expenses, so she might as well benefit from the labor and hours if possible.

As of my last conversation with ████████ on ████████████████████ she still intends to move forward with the hearing.  I am prepared to accommodate the issues as they come up, and if need be - raise appropriate objections,  and arguments in my closing statement.

With that - I hope you all had a nice holiday weekend.

Best regards,

████

On Friday, September 1, 2023 at 02:01:18 PM PDT, Riley, Katie <katie.riley@cdcr.ca.gov> wrote:

████

I apologize for the confusion as I did not fully understand that you had changed plans to have your paralegal record the documents for ████████ instead of meeting with ██ ████ to go over the documents. I think I had assumed the recordings were being made to supplement the meetings your paralegal had already had with ████████ Please confirm which pages of the c-file still need to be reviewed with ████████ and I work to have institutional staff read them to ████████ before the hearing in order to finish the Olson Review.

CDCR greatly appreciates all of your effort to meet with and prepare ████████ for her hearing. When I first spoke with you about ████████ desire to review her c-file on ████████, we discussed that the options were for ████████ to have CDCR staff meet with her to read the c-file, or to have the c-file printed out for ████████ (free of charge) for

4

Jackson Ex. 44, p. 28

her to review using the assistive technology in the law library. You generously volunteered to have your paralegal meet with ██████ to read the c-file. We also discussed which portions of the c-file you wanted your client to review, and you expressed that you wanted ██████ to review her disciplinary records and her legal summary documents (POR, police reports, etc.). CDCR worked with you to set up multiple meetings for you and your paralegal to meet with ██████ CDCR also went ahead and produced printed copies of the disciplinary records and legal summary documents to ██████ free of charge so that she could review them on her own. CDCR is eternally grateful that your paralegal was willing to read the relevant documents with ██████ as we anticipated ██████ would be more comfortable and better able to ask questions of your paralegal than she might be with having CDCR staff read the documents.

I did not realize until now that these efforts were insufficient to communicate the information you want ██████ to review in her c-file. As you can appreciate, most inmates do not read every page of every document in their c-file when conducting an Olson Review, so I hadn't realized your intent to have what I presume is a large portion of the c-file read to ██████ I have copied BPH Chief Counsel Blonien and the BPH Legal team should you have concerns about proceeding with ██████ hearing as scheduled on ██████. My email below with suggestions on taking breaks during the hearing to review documents was not intended to circumvent your client's rights. Instead, I was suggesting a way to allow ██████ the benefit of your advice on relevant documents while maintaining a timely hearing.

Again, please let me know what documents still need to be read to ██████ and I will work with the institution to have those read prior to the hearing. I also note you mentioned that ██████ needs help writing to prepare for the hearing. We can make arrangements for a law library staff person to write any notes ██████ would like to write in preparation for the hearing. Staff would be scribing what ██████ wants written, but not providing legal advice.

*Katie Riley*

Attorney IV

CA Dept. of Corrections & Rehabilitation

cell: ██████

---

**From:** ██████ <██████aol.com>
**Sent:** Friday, September 1, 2023 1:17 PM
**To:** Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>
**Subject:** Re: ██████ ██████ audio challenge 3: 09012023

Jackson Ex. 44, p. 29

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Katie -

No.

I scheduled the meetings with Ms ██████ for an hour each morning from 7 am to 8 am on ████████████████. ████████ hearing is on ████████. I met with ████████ for 1.5 hours ████████ as well.

We did not schedule Sydney - as we spent that time making the recordings this week, and I switched things on Sydney's calendar so that we could get those two extra recordings done - ██████ and ██████

When the concept comes up as institutional write ups, or even the issues around ADA issues and the prevalent narrative within CDCR and the documentation associated with them - those are spread over a number of documents.

The reason why Olson reviews are effective is because they can be review, think about, address -- and they are not simply done on the fly IF the panel references a document by page number.

I am frustrated by this process and trying to get ██████ to be able to be on the same level as other offenders going before the Board.

It would not be acceptable for all offenders to NOT be given an Olson review - and just address the pages referenced on the fly, let alone to tie their hands and NOT allow them the ability to submit their written documents - here CDCR cannot and will not give ██████ the accommodations for a writer to help write down words and generate

6

Jackson Ex. 44, p. 30

documents, let alone figure out a way earnestly to get these recordings to ███████ They were recorded on an iPhone.

And despite buying a CD burner, and disks, and a zip drive, and utilizing my legal clerks hours - we still are unable to get ████████ those recordings.

Those recordings should be given to ████████ because those are the contents of her c-file so that she can understand and review those documents.

I know you have done your diligence and everyone involved - but come on, at this point - I don't understand why we are now on September 1, 2023 -- and it feels like we are still back in the *Armstrong* days when people were exiting their wheelchairs and crawling up the stairs to their parole revocation hearings.  Let alone now - we have a blind individual who still does not know a portion of the contents of her c-file, does not have someone to help her write documents, and literally is going into her parole suitability hearing bound and restrained by her ADA issues that CDCR has been aware of.  I have written down parole plans for ██ ████ - but this is one item of 20+ items and that took an enormous portion of our 1.5 conversation ████.  There are inherent issues with someone who doesn't write things down when asked to discuss any topic - as I know you all know.

I wish you all a nice weekend.

-████

On Friday, September 1, 2023 at 11:46:16 AM PDT, Riley, Katie <katie.riley@cdcr.ca.gov> wrote:

7

Jackson Ex. 44, p. 31



Were you able to book all of the meetings you need for you and your paralegal to meet with ███████ next week?

My current thinking is that if the CD situation cannot be resolved, we rely on your meetings with ███████ Then, during the hearing, if there are any times that ███████ is unfamiliar with a document being discussed or wants a break to meet with her attorney to discuss a document, you would ask the hearing panel to give you a short break for an attorney-client meeting.

What do you think?

*Katie Riley*

Attorney IV

CA Dept. of Corrections & Rehabilitation

cell: ███████

---

**From:** Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Sent:** Friday, September 1, 2023 8:25 AM
**To:** ███████ <███████aol.com>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** RE: ██████ ██████ audio challenge 3: 09012023

What I was able to research is it can be converted to a wav file so we can burn to a CD, however, we are unable to download any software to convert it. I know there are free software programs that can do that, we just can't do it with our CDCR computers.

**Steven Mehler**

Board of Parole Hearings

Program Operations

Email: Steven.Mehler@cdcr.ca.gov

Telephone: (916) 956-2433



*Confidentiality Notice:  This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message.*

**From:** ▓▓▓▓▓ <▓▓▓▓▓▓aol.com>
**Sent:** Friday, September 1, 2023 8:19 AM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** ▓▓▓▓ ▓▓▓▓ audio challenge 3: 09012023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning all --

The format is m4a. MPEG-4 Audio, or M4A for short, is an audio file format from Apple that can store several audio content types, including songs, audiobooks, and podcasts. It saves audio data in a MPEG-4 file, encoding it with the Apple Lossless Audio Codec (ALAC) or the Advanced Audio Coding codec (AAC).

I am able to play it in Windows Media on my computer and I can hear it.

Are you able to play the recording on your end?   If so, are you able to record the audio as you would the recording of Adobe speaking the CRA for ███████

I can try and convert it on my end, if you are unable to play it via audio.  I can try and record it again on my end, play it via Windows media -- but I have an iPhone too.  I can try and record it a different way.

What else can we do?

Thanks,

███



On Friday, September 1, 2023 at 03:10:42 AM PDT, Mehler, Steven@CDCR <steven.mehler@cdcr.ca.gov> wrote:

Hello Everyone,

We tried to move these recordings on to a CD. However, the recordings seem to be in an mp4 format, which is a video format. Unfortunately, we do not have the software required to convert them into an audio format , such as a wav file.

This may be why you were also having issues ██████

**Steven Mehler**

Board of Parole Hearings

Program Operations

Email: Steven.Mehler@cdcr.ca.gov

Telephone: (916) 956-2433

<image001.png>

*__Confidentiality Notice:  This e-mail message, including any attachments, is for the sole use of the intended recipient and may contain confidential and privileged information.  Any unauthorized review, use, disclosure, or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply and destroy all copies of the original message.__*

**From:** Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Sent:** Wednesday, August 30, 2023 9:42 AM
**To:** ████████ <████████aol.com>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Subject:** RE: ██████ ██████ audio upload success: 08302023

██████

You and your staff have done an amazing job! Thank you for everything!

Katie Riley

**From:** ████████ <██████████aol.com>
**Sent:** Wednesday, August 30, 2023 9:23 AM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>; Mehler, Steven@CDCR <Steven.Mehler@cdcr.ca.gov>
**Subject:** Re: ████ ████ audio upload success: 08302023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I just finished uploading the additional two recordings. ████ 3 and ████ 4.

You now have all of the recordings for ████████

I am genuinely thankful for each of you and your efforts to help effectuate getting ██ ████ these necessary recordings.

Best regards to each of you,

████

On Wednesday, August 30, 2023 at 08:18:58 AM PDT, Doetsch, Tara@CDCR <tara.doetsch@cdcr.ca.gov> wrote:

Hello!

12

Jackson Ex. 44, p. 36

I will have staff check inventory of CDs and see if we can get what audio is in the folder tomorrow to CDs.  I have cc:d Steve to have his team handle this when Aaron gets to the office tomorrow.

Thank you,

Tara M. Doetsch

Board of Parole Hearings

Program Operations

Cellular ███████████

---

**From:** ████████ <████████aol.com>
**Sent:** Wednesday, August 30, 2023 7:48 AM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** ████ ██████ audio upload success: 08302023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning to you all - success!!

I just uploaded the two files to the folder - and confirmed they are up there.

Also - I have Sydney working on the remaining recording of pages - which is a span of 200 + pages - Sydney did approximately 2.75 hours yesterday and she has another recording session set today - and I will work on getting that uploaded as well.

So I will have additional recordings for upload later.

Thanks,

██████

On Tuesday, August 29, 2023 at 07:23:26 PM PDT, Doetsch, Tara@CDCR <tara.doetsch@cdcr.ca.gov> wrote:

Hello all,

The folder has been created in the ████ folder (not to confuse staff). Please upload the audio to the below folder path:

████████████████████████████████████████████████

Thank you,

Tara M. Doetsch

Board of Parole Hearings

Program Operations

Cellular (████████████

**From:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Sent:** Tuesday, August 29, 2023 6:28 PM
**To:** ████████ <████████aol.com>
**Cc:** Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>; Bakerjian, George@CDCR

14
Jackson Ex. 44, p. 38

<George.Bakerjian@cdcr.ca.gov>
**Subject:** Re: ▉▉▉▉ ▉▉▉▉ audio challenge part two: 08292023

Hi, ▉▉▉▉

I spoke to Tara Doetsch and she will set up a one time folder to deposit the audio files. We will then burn the CD-es and have them sent out to ▉▉▉▉▉▉

Thank you so much for bearing with me on getting a pathway for the files.

Thank you,

Sara K. Puricelli
Staff Attorney
Board of Parole Hearings
(916) 869-8921
sara.puricelli@cdcr.ca.gov

Attorney / Client Communication.  Attorney Work Product.  Do not distribute.

---

**From:** ▉▉▉▉▉▉ <▉▉▉▉▉▉aol.com>
**Sent:** Tuesday, August 29, 2023 4:52:47 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>; Doetsch, Tara@CDCR <Tara.Doetsch@cdcr.ca.gov>
**Subject:** Re: ▉▉▉▉ ▉▉▉▉ audio challenge part two: 08292023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I am willing to try breaking up the files - what size would you like me to break them up in?

And will your CDCR computers allow the audio files?

Thanks,

███

On Tuesday, August 29, 2023 at 04:16:09 PM PDT, Puricelli, Sara@CDCR
<sara.puricelli@cdcr.ca.gov> wrote:

Hey, ████

Ok – so Watchdox can't be utilized to receive files. Is there any way we can maybe break
up the audio files to email them?

Thank you and I apologize for the difficulty of all of this,

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ███████ <███████aol.com>
**Sent:** Tuesday, August 29, 2023 3:29 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>
**Subject:** Re: ████ ██████ audio challenge part two: 08292023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Josh has been super helpful, but we are not able to transfer the files via Teams.  You are correct - he is wonderful.

Josh is working on seeing if we can try and facilitate it through Watchdox/Workspaces.

I am standing by.

Thanks,

███

On Tuesday, August 29, 2023 at 11:09:27 AM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Good morning, ████

17
Jackson Ex. 44, p. 41

I reached out to one of our wonderful managers, Josh Ludwig. He will be contacting you regarding a possible way to file share through teams so that we can get those CD-es burned.

Please do not hesitate to let me know if you have any questions or concerns.

-Sara

## Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ████████ <████████aol.com>
**Sent:** Tuesday, August 29, 2023 3:59 AM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>; Ludwig, Joshua <joshua.ludwig@cdcr.ca.gov>; CDCR BPH Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; Caroline Jackson <cjackson@rbgg.com>
**Subject:** ████ ██████ audio challenge part two: 08292023

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sara and Katie,

Okay, I have been working on trying to burn this CD and I think I hit an obstacle that I am not sure that I can navigate around -- I spent time earlier trying to get the correct burning software, then I had an issue with the computer recognizing one drive vs another drive, and now this -- and I am truly at my wits end right now with this latest issue.  I think it is a burn rights issue because I can play the audio files - so there is nothing wrong with the files themselves.

I am happy to send anyone the CD burner I bought from Amazon, the CD-R and DVD-Rs I bought, and the zip drive which now has the two audio files that are 48909 KB and 155298 KB in M4A format.

I don't know what else to do and now it's 3:50 AM and after reading the manual, and trying to figure out a solution to this - I hit the latest error which I pasted below - and truly I think I hit my proverbial wall.

Is there someone I can send these M4A audio files to that are on the zip drive for someone to burn onto a CD?  I will also send you the equipment if you need that - I just don't think I am tech savvy enough to figure this part out.

Thoughts?  Do you have a tech person I can talk to in order to see what else I can do?

Also - I have not heard from the institution and am trying to get another few hours with ███████ - can someone help me with that, because I have not heard back from the e-mail I sent last week to the scheduler at ████

Thanks in advance,

████

I am happy to send anyone the CD burner I bought from Amazon, the CD-R and DVD-Rs I bought, and the zip drive which now has the two audio files that are 48909 KB and 155298 KB in M4A format.



On Monday, August 28, 2023 at 10:10:04 AM PDT, Puricelli, Sara@CDCR
<sara.puricelli@cdcr.ca.gov> wrote:

Good morning, ▇

Wow! And yes, Amazon saves the day.

Ok - so, I reached out to CDCR tech division because we have computer policies in place
that don't allow us to utilize non-CDCR hardware. In addition, I was trying to see if they
might have an option for us regarding file sharing. I have not heard back yet, but I will
give them a call after lunch, if I hear nothing by then.

I will get back to you once I hear back from the tech people.

Thank you,

Sara K. Puricelli

Staff Attorney
Board of Parole Hearings
(916) 869-8921
sara.puricelli@cdcr.ca.gov

Attorney / Client Communication.  Attorney Work Product.  Do not distribute.

---

**From:** ███████ < ███████████ aol.com>
**Sent:** Sunday, August 27, 2023 10:50:39 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR
<SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>; CDCR BPH
Correspondence Unit@CDCR <BPH.CorrespondenceUnit@cdcr.ca.gov>; CDCR BPH
ADA UNIT@CDCR <Bph.ADAUnit@cdcr.ca.gov>
**Subject:** ████ █████  audio challenge 08272023

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good evening to all of you --

Okay - this afternoon, I spent some time researching how to burn a CD and I purchased a CD burner and the disks.

Amazon is amazing for this specific situation.

I got the stuff - and I spent the last hour trying to figure out why this was not working - first issue was I was using a USB hub vs directly into the computer.  Solved that issue, but the disk said it could not be burned.  Then I figured out I bought the wrong disks - apparently DVD-R is a problem since it's not CD-R.  I have no idea.  I am frustrated, but now have ordered that hopefully for delivery tomorrow.

Tomorrow I am serving as a judge pro tem for both the morning and afternoon calendars in Placer County in traffic court.  I do not think I will be able to make it to BPH HQ during my lunch break, but if I do get that break -- can I drop off the zip drive with the 2 days of recordings for someone at BPH HQ to burn CDS for ██████████

If that does not work out - I will try and burn the CDS here.

Next issue is getting the CDS to █████████

Does someone have a contact at ██████ that I can send the CDs to via overnight?  Or can I drop off the CDs for you to courier to ███████

How will we get the CDS to █████████

There has got to be an easier way to navigate this moving forward.

Have a good evening,

████

On Thursday, August 24, 2023 at 05:23:43 PM PDT, ████████ <██████████aol.com> wrote:

Hi Sara,

What if I drop off a zip drive with the files  at BPH HQ in Sacramento?

22

I am in observations all day tomorrow - how late could I drop it off --- I might be able to swing by on Monday if these hearings go long ███████.

-██

On Thursday, August 24, 2023 at 05:11:56 PM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Hi, ████

I'm having trouble trying to figure out how to get the files to the board in order to create CD-es for ████████ The permissions on CDCR computers will not allow us to view the We Transfer site. I, personally, do not have a way to burn CD-es at home. We do have the capacity at the office, but because of the size of the files, we're trying to come up with a solution.

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

---

**From:** ████████ <████████aol.com>
**Sent:** Thursday, August 24, 2023 2:37 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Cc:** Bakerjian, George@CDCR <George.Bakerjian@cdcr.ca.gov>
**Subject:** Re: Ms ████ audio

23

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Sara,

Thanks for letting me know about that text to speech feature in Adobe - I have listened to hearing transcripts that was as well.

Okay - the audio is in M4A format - the recording was taken from Sydney's call with ██ ████ where she recorded her side of her reading the documents.  I have not listened to the audio but for the first few minutes and I was able to hear the audio and I was able to play it on my desktop through the Media Player.

I am not sure about emailing the size of these files - Sydney used a file transfer that allows for large files called WeTransfer.

Would you like me to send you the files?

Thanks,

██████

On Thursday, August 24, 2023 at 02:13:28 PM PDT, Puricelli, Sara@CDCR <sara.puricelli@cdcr.ca.gov> wrote:

Hi, ██████

24

Jackson Ex. 44, p. 48

So, we can burn the CD-es from your audio files so long as they are in mp3 format. If not in mp3 format, we would have to try to figure out how to convert them to mp3 format.

For the CRA conversion to audio, one member of our staff turned on the text-to-speech feature in adobe and recorded that transcription with a microphone, then burned that file to CD. That will not work for the C-File, as most of the C-file cannot utilize the text-to-speech feature.

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

---

**From:** ▮▮▮▮▮▮▮ <▮▮▮▮▮▮▮▮aol.com>
**Sent:** Thursday, August 24, 2023 1:45 PM
**To:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** Re: Ms ▮▮▮▮ audio

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Katie,

Sydney did 2 hours on Monday and Tuesday and was able to get to page 396 and we still have pages 400 to 630.

I met with ▮▮▮▮▮▮ for 2.5 hours ▮▮▮▮▮▮ to go over things, and I read and re-read things to her.  So there is merit in having ▮▮▮▮▮ listen to the documents again.

I am working on trying to get another appointment for Sydney and myself.

We do have those two recordings, and ▮▮▮▮▮▮ is good about listening to her CRA on audio.

I can get Sydney to record the remaining pages.

We are trying to figure out logistically how to take these recordings now and get them to ▮▮▮▮▮▮ in a format that she can listen to them on.

Yes - it is helpful for ▮▮▮▮▮▮ to hear them again, to review them.

Am I able to send the audio files to the BPH for them to burn onto CD?  How did the Board or CDCR get the CRA on audio for ▮▮▮▮▮▮  Because once we know that - I can send them the audio files.

Thanks for your help,

▮▮▮

On Thursday, August 24, 2023 at 01:15:04 PM PDT, Riley, Katie <katie.riley@cdcr.ca.gov> wrote:

Hi ▮▮▮

Thanks again for all of your extra effort to have Sydney meet with ███████ and now record the materials. Can I ask, was Sydney able to read the entire c-file for █████ during the phone calls? For these extra efforts to have Sydney read and record the materials, are these materials that Sydney and ████████ weren't able to go through during the phone calls, or materials that ████████ wanted to hear again on her own time? And yes, if you or BPH can figure out how to burn a CD with the recordings, the institution can loan ████████ a CD player to listen to the materials at her leisure.

Thanks,

**_Katie Riley_**

Attorney IV

CA Dept. of Corrections & Rehabilitation

cell: ████████

**From:** Puricelli, Sara@CDCR <SARA.PURICELLI@cdcr.ca.gov>
**Sent:** Thursday, August 24, 2023 12:18 PM
**To:** ████████ <██████████aol.com>; Riley, Katie <Katie.Riley@cdcr.ca.gov>
**Subject:** RE: Ms █████ audio

Hi, █████

Do you have a computer with the ability to burn CD-es? Do you use windows?

-Sara

Sara K. Puricelli

Staff Counsel

Board of Parole Hearings, Legal Division

Phone: (916) 869-8921

**From:** ███████ <████████aol.com>
**Sent:** Thursday, August 24, 2023 12:02 PM
**To:** Riley, Katie <Katie.Riley@cdcr.ca.gov>; Puricelli, Sara@CDCR
<SARA.PURICELLI@cdcr.ca.gov>
**Subject:** Ms ████ audio

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I have the audio recordings ready of Sydney reading the material to

Do you have a mechanism now to transfer them on CD to

████ (1) is 155,298 KB

████ (2) is 48,909 KB

Much thanks,

████

# EXHIBIT 45

[4388762.1]

PAROLE SUITABILITY HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Parole   CDCR Number: ████
Consideration Hearing of:

████████████

████████████████████

████████████

████████

████ PM

PANEL PRESENT:
DIANE DOBBS, Presiding Commissioner
LETIZIA PINGITORE, Deputy Commissioner

OTHERS PRESENT:
████████████████, Inmate
KIBBE DAY, Deputy District Attorney
████████, Attorney for Inmate
████████, Staff Assistant
GEORGE BAKERJIAN, Observer
SARA PURICELLI, Observer
CHO THAO, Observer
CAROLINE JACKSON, Observer
████████, Victim
UNIDENTIFIED, Correctional Officers

Transcribed by:

Mathivanan Alagurajan

2

INDEX

| | Page |
|---|---|
| Proceedings | 03 |
| Case Factors | 32 |
| Pre-Commitment Factors | 48 |
| Post-Commitment Factors | 89 |
| Parole Plans | 110 |
| Closing Statements | 131 |
| Recess | 142 |
| Decision | 143 |
| Adjournment | 154 |
| Transcript Certification | 155 |

Dictate Express Transcription

133

highly relevant to her violent risk. Ms. ███ does not acknowledge these issues and minimizes and dismisses her volatile interpersonal history as a result of, "drama" from multiple substance abusing partners. The extent of her record and the evidence presented the jury are inconsistent with her perspectives about her history, as a result of her worldview despite taking numerous groups, she has made minimal progress in the areas that are most directly related to her violence risk history". It doesn't take programs, it doesn't take anything but a simple look within for the Inmate to start by taking responsibility. Instead, we see a complete lack of remorse, a total complete lack of remorse for what he put, uh, the victims through in this case. Lack of change means she's not ready for life on the outside. She remains a risk for re-offense and we ask that she not be given a parole date, um, at this time. Thank you.

**PRESIDING COMMISSIONER DOBBS:** Thank you Ms. Day. Uh, Ms. ███ closing please, 4:20.

**ATTORNEY ███:** Thank you very much Commissioner. I've got my timer on. All right, so let's begin here. And that is, I want to respond briefly to the DA's remarks about my client, uh, Ms. ███ uh, not having, um, release plans. What I will tell you unequivocally since, uh, being, uh, appointed to this case 45 days ago, 44 days ago I reached

134

out to Francisco Homes, Geo, West Care and Freedom through education. I sent them personally letters out there because one of the things that we've been having a problem with is getting Ms. ███ a scribe. We weren't afforded a scribe until two days ago. And even then only nine lines. So when you talk about that and when you think about things in context, one of the things that I have been really, really adamant about is getting Ms. ███ accommodation so that we can bring her up to the level of every other, um, incarcerated person that appears before the parole board. And one of the challenges has absolutely been getting a scribe, you know, getting documents in. And I will, what I will tell you unequivocally is that CDCR, um, through the bureaucracy, there have been, um, Staff Attorneys who have been willing and engaging in conversations with me to, to do this. But burning a CD or trying to burn a CD at 3 o'clock in the morning as an Attorney. I mean, that's the type of hoops that we need to bring in 2023. And one of the things I liken this to into an, into a general email to everybody involved was that this was really reminiscent of Armstrong. And when I first came in and started appearing before the parole board in 2004, at that time it was, it was inconceivable to me, fresh out of law school that somebody would have to take themselves out of a wheelchair and climb up themselves up

the stairs to get to a revocation hearing. And what I can see in this and trying to get Ms. ███ those resources is that there's this willingness, there is, but there's not a process in place or there's a challenge or there's an obstacle or whatever it is. I do want to thank everybody at CDCR and, um, through the board who have helped facilitate this. I will tell you, um, it's not for lack of trying. So one of the things that I've also been challenged with also is what kind of roadmap do we give Ms. ███ moving forward because one of the things is, you can see by all the notes that I have here, the things that I've typed up there's, there's writing after writing, after writing and then I need these things. And so when you talk about Ms. ███ and her evolution into her criminality and her understanding this, where is it that she's going to seek this knowledge? How is she going to unravel her criminality? How is she going to understand these things? One of them is because she can't write it down to reference it later when there's a thought, whatever there is, right? Write it down, look at it, go back, process it, and it would be interesting to see if all of our hands were tied behind our backs today and if you would be able to do the job that you were assigned to do. So what I want to do next is I want to go into the fact that she does have, um, Parole Plans. Those Parole

Plans, we didn't spend time talking about those, but that involves the LGBTQ Community. She, Ms. ███ is, is a savant so to speak with navigating through, um, government programs that help visually impaired people. So I would proffer that to you. One of the things that Jennifer Schafer, executive officer of the parole board, uh, came and, and, and, and spoke to PJW and the Attorneys about was that Parole Plans, um, that, you know, it's not a, it's well that and also, um, Howard Mosley, that this isn't a bar to a finding of suitability. So I would leave that to you and your own devices. But one of the reasons that I bring up the ADA issues in this case is because if you don't find Ms. ███ suitable today you're going to have to come up with a denial period and that denial period there's a case called In re Fein. In re Fein says that the panel is vested with a lot of discretion. The exercise of this discretion involves the deliberate assessment of a wide array of Ms. ███ individualized factors on a case by case basis. And I really need you to think about this and that is that another Attorney needs to come in and advocate for Ms. ███ because Ms. ███ has been seeking her Olson review back in ███, █ years ago. We just got that to her last night as far as the whole recording of it all two weeks ago, three weeks ago, when Sydney met with her hour after hour after hour, an

137

Attorney needs to be assigned to this case to walk her through these things. The 908 hours of the EOP, um, refusal for the 908 hours I would hope that you, you, um, you look at that, it's not for lack of trying. You also heard the challenges that are faced. And what I say is I say this, I say this because I know that the board has, um, resources, investigate what Ms. ███ has said to you, investigate it, investigate this, uh, the, uh, the, uh, the chess incident. Because what I will tell you is that there's a lot of inherent parts of this, 64 squares on a board and somebody who has missing lenses and you see this systematic approach to, to the ADA issues and the challenges. If, uh, Ms. ███████ um, if Ms. ██████ interactions with CDCR were anything like my initial phone call, uh, to the ███████████████████ to try and get accommodations I will tell you that I understand Ms. ████████ uh, frustration. Uh, I don't think I've ever been, uh, treated so poorly and questioned and everything else only to get a phone call 10, 15 minutes later from, um, uh, Staff Attorney for, uh, Katie Riley who I've known for a decade for us to start working this out. But the other person that I was in contact with that was not a pleasant experience. So I understand that and I understand that CDCR certainly has had investigations after investigation, after investigation, certainly within the

purview of the Board of Parole hearings to investigate these things, these assertions as well. I would, I would do that because part of all of this is where Ms. ███ credibility lies. And again when we go back to where smoke is fire you're going to have to figure that out as well. So I'm going to go into the legal argument very, very quickly, structured decision making. We're coming in with a moderate risk assessment. Uh, there's elderly offender consideration to be given. Criminal and parole history, I would argue to you is mitigating it's one of the reasons for my initial objection, which was sustained. Offender self-control, if you take the crime as it is aggravating programming is really where we get into the nuances thereof. I would offer to you certainly, um, for your consideration again I would hope that you consider the, um, Ms. ███ um, ADA issues. Institutional behavior I would offer to you is neutral to mitigating. She is rule compliant. Offender change is where the crux of all this goes and it really is contingent on Ms. ███ understanding and, and of the life crime and plausible deniability. Penal Code section 5011 and CDCR section 2236, uh, prohibits, uh, uh, a requiring of admission of guilt as a condition for release, citation to Kevin Jackson. And that really ties into credibility, it ties into insight and it ties into remorse. One of the things

139

that you can do is open up that investigation so that we can, uh, go further with, um, Ms. ████ credibility. Anger management classes, she's been taking all those coping skills, mental health groups, uh, Ms. ████ has been participating, has not been kicked out. And I would offer to you that as well the admission that there, she does have a, an addictive mindset programming within her, her realm of criminality that deals with domestic violence, certainly the aspects to, uh, toxic relationships, substance abuse and then her psychological issues as well. I would offer to you again, um, that, um, you know, Ms. ████ has answered your questions, answered them, um, earnestly and has taken this process very, very, very seriously. And when you go to a door and the door doesn't open and you knock because your freedom is contingent on it and your development of insight and that door isn't open because of ADA issues, I hope that you take that all in consideration. Um, if you don't find her suitable, we believe that the only denial period should be a three year denial. She really does need to be stepped through this process. She needs somebody to advocate to be up at 3 o'clock in the morning to send people emails. Again I want to thank CDCR, um, BPH and all the Staff Attorneys who have helped me get Ms. ████ the accommodations that she rightfully deserves. And with that

140

under time, thank you.

PRESIDING COMMISSIONER DOBBS: Thank you Ms. ███. Um, Ms. ███ would you like to give a closing statement today?

INMATE ███ Just thank you for your time and consideration.

PRESIDING COMMISSIONER DOBBS: Thank you Ms. ███ All right, so we're at the point in the hearing where we take victim impact statements. Um, um, Sandra, would you need a break before we take your victim impact statement or are you ready to give it?

DEPUTY DISTRICT ATTORNRY DAY: Commissioner, I'm prepared to give it, um, uh, on the request of the victim.

PRESIDING COMMISSIONER DOBBS: Okay. All right.

DEPUTY DISTRICT ATTORNRY DAY: When I checked with her a few hours ago she didn't need a break but I'd like for her to confirm that one more time. It's been some time.

VICTIM SANDRA: No, I don't need a break. Go ahead.

DEPUTY DISTRICT ATTORNRY DAY: I'll take it.

PRESIDING COMMISSIONER DOBBS: All right.

DEPUTY DISTRICT ATTORNRY DAY: Okay.

PRESIDING COMMISSIONER DOBBS: All right, go right ahead. Thank you.

DEPUTY DISTRICT ATTORNRY DAY: Thank you. Commissioners I'm going to read this in the first person

# EXHIBIT 46

[4388762.1]

DECLARATION OF ████ ████

I, ████ ████ declare:

1.    My California Department of Corrections and Rehabilitation ("CDCR") number is ████ I am currently housed at the ████████████ ████████ (" ████ on Facility █. I am █ years old.

2.    I have been incarcerated in CDCR since ████████.

3.    I am an *Armstrong* class member. I have DLT, DNH, and DPV codes, meaning that I have vision, hearing, and mobility disabilities.

4.    My hearing and vision disabilities are due to a condition known as "Usher's syndrome," which causes both hearing and vision loss that progress over time. I am completely deaf in my right ear and wear a hearing aid in my left ear, but with a hearing aid, I can hear well enough to understand speech in quiet settings. My eyesight, which has always been somewhat impaired, has deteriorated over time and gets worse each year.

5.    Things that are farther than five feet away are just too blurry to see. And I have no peripheral vision. The reason I started to learn Braille with the Hadley School for the Blind is that my vision is getting to the point where I can't even use a magnifier to read things anymore. If it's under a size 30 font, it's just very difficult—I may be able to make out the words, but I have to do a lot of guessing. Even when the font size is over 30, with my vision worsening, it's difficult for me to read large print. It feels like I'm looking through rice paper. The letters may be bigger, but they're still blurry big letters. Large print just makes it a bit easier to guess what the word is.

6.    To help me with daily activities, I have special LED light called a "mighty bright light." I can clamp this onto what I am trying to read so I can see it better. I use this together with a magnifier. Even with these devices, it is still quite difficult for me to make out printed words.

7.    I can read Braille fluently. I graduated from the highest level Braille class for Hadley School for the Blind over a year ago. I consistently tell CDCR staff that I would like documents provided to me in Braille, including my assigned Corrections

Counselor I ("Counselor"), who is responsible for assisting me in securing accommodations for parole proceedings.

8. I was previously housed at ███████████████████████ While there, I served as the ADA representative to the Men's Advisory Council, and had the title "ADA Coordinator." This position brought me into frequent contact with the leadership at ██████ that was responsible for ensuring ADA accommodations were provided, included ADA Associate Warden ██████; the ADA liaison with headquarters named ██████ and the DDP teacher named ██████. I served as a liaison between leadership and the incarcerated population at ██████ to ensure that incarcerated people were aware of the accommodations they could receive, and that they received them.

9. I appeared for my initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") on ██████, while housed at ██████ At that hearing, I was denied parole for three years. My next hearing is the ████████████████, ██████.

10. Unfortunately, neither CDCR nor the Board gives me documents in the format that I need.

11. **Access to the Transcript of my Last Parole Hearing**

12. Around the time of my last parole hearing in ██████, staff at ██████ denied my request to receive my parole hearing transcript in Braille. It's important that I'm able to read my parole hearing transcript because if they deny you parole, that transcript is the only tool that you have to understand why they denied parole and how you can fix things that they want you to fix in order to get parole at your next hearing. If I can't read that document, I can't get prepared for release. And if I want to challenge the parole denial with a *habeas* petition, the parole hearing transcript is the main thing I need to review and focus on.

13. Before my ██████, hearing, I met with a gentleman named ██████ whom I understood to have a rank similar to Captain and to work with CDCR headquarters on ADA issues, to request a Braille transcript of the hearing. About a week

2

later, Captain ████ told me the official response: I could not get documents in Braille because CDCR does not have a contract with a vendor to make Braille documents, and my only option was large print. I told him that if this was the only option, I would make do with that as best I could. Captain ████ told me that he would document that I needed a large print transcript; he didn't say I had to do anything else to get this accommodation. But then, they just gave me a normal print transcript of the parole hearing.

14.    The only way I could access the normal-print transcript of the parole hearing was to go to the law library and use special equipment available to me there, which can read the transcript aloud. I was only able to access the law library about once per week for an hour or two each time. This limited time in the library was my only opportunity to read anything using that equipment—parole transcripts, letters from family, any materials from my rehabilitative programs, etc.—making it difficult for me to read through my transcript that way. I was also worried because I know the machine has a screen that displays whatever I am reading in large text that anybody in the room can view. This meant that, not only did I have limited access to my transcript, I did not have privacy while reviewing the very personal information contained in that transcript. Between the limited time and the lack of privacy, the library equipment did not provide the access I needed to my parole hearing transcript.

15.    Months later, when I saw ADA Associate Warden ████ before a legal call with the Prison Law Office, she told me she had forgotten about my request and she would look into it.

16.    I explained my situation to the Prison Law Office attorney, and we discussed both that I might be able to get a Braille transcript and that I might be able to get an audio recording of the hearing. Before that meeting, I was not aware that I could request an audio recording.

17.    After the meeting with the Prison Law Office attorney, I met again with Captain ████ and I received a large-print transcript.

///

3

18.    A few months later, I also received an audio recording of the hearing. The first set of CDs I received that were supposed to have the hearing were completely blank. I had to make a second request before I got CDs with an audio recording of my parole hearing.

19.    There are no tracks within the CD, so my only option to access the hearing through the audio-recording is to listen to it from start to finish. I am not able to fast-forward through parts I don't need to hear or rewind to parts that I missed. Despite these limitations, once I received this audio recording, I stopped trying to read the large-print transcript because the audio recording was so much easier for me to access. Since receiving the audio recording, I have been listening to the entire 90-minute recording of my last parole hearing every morning.

20.    I have also been telling my assigned Counselor that I need an audio recording of my next parole hearing. I wanted to get an early start with the request, because it had taken so long to get the audio recording the first time around. I first told my Counselor about six months ago, and she said she would look into it. Then my Counselor retired. In early May ███ I met with my new Counselor and told him I would need an audio recording of my parole hearing. He said the same thing: he would have to look into it. I do not know how many more times I am going to have to ask to get this audio recording, even though it is the same accommodation I got for the transcript from my last parole hearing.

21.    I have been requesting an audio recording instead of Braille because it is the most effective accommodation that I know that CDCR will provide. Even though audio recordings are cumbersome to use, now that I know I can have an audio recording, I trust it more than I trust a Braille transcript because I know that transcripts contain omissions, and that Braille transcripts will contain additional mistakes. I want the most accurate version possible of my hearing transcript, and that it is what the audio recording provides.

22.    However, my preference would be to get a transcript that I can navigate more easily than the audio recording. Ideally, I would like to get a written transcript in digital

4

talking book format. In this format, I can jump around in the document as much as I want: I can jump straight to the section I want to review, and re-review any part of the transcript as much as I want. I have a talking book player already that provides me this kind of access to other documents. I would like to have this kind of access to my parole transcript as well.

23.    **Access to my Criminal Risk Assessment**

24.    The first time I ever received a copy of my CRA, it was in normal-size print. I could not read it independently. I had to have a friend read it to me. Due to what was in my CRA, I asked for it to be redone, and I asked to receive the new CRA in an accessible format: Braille, large print or talking book format.

25.    Despite these requests, I received my second CRA in normal-size print, and I had to insist on an accessible copy. Due to the job I had at █████████ I frequently interacted with the ADA AW █████ and with Captain █████ Almost every time I saw them, I would request an accessible version of my second CRA as politely as I could. Even so, it took at least a month for me to receive the second CRA in large print. I never received a copy of it in Braille or talking book format.

26.    I need to use the equipment in the library to access large print. I did not want to review my CRA in the law library because it contains information about my childhood and other private information that I do not want to be displayed to everyone else who is in the library at the time. I was fortunate that I had a friend who was also housed on Facility █ whom I trusted to help me access my CRA.

27.    Because I knew I wanted to be able to review the CRA as much as possible in preparation for my hearing, I had my friend help me memorize the risk management recommendations, which is a few pages long. My friend went through these recommendations with me sentence by sentence. He read each sentence to me ten times and I recited it back ten times. We went through the recommendations like that until I could recite them in their entirety. Since then, I recite these recommendations every morning so I do not forget them—in fact, I memorized them so effectively that when I

recited them at my last hearing, the district attorney who was present asked if I was reading them from a page. This is the only way I have found that I can have my CRA available to review as much as I need to in order to prepare for Board.

28.    **Access to BPH Forms**

29.    I do not have the access I need to BPH Forms. Even though I am highly proficient in Braille, and I have requested Braille documents on many occasions, I have never been told how I can access Braille versions of BPH forms. Even if I could access Braille versions of the forms, however, I do not know how I would complete the form to submit it.

30.    I cannot read or complete BPH Forms independently in the format they are provided. Each time I receive a form from BPH, I have to wait until Monday when my Counselor is available, and then go have my Counselor read the form to me and tell me where to sign.

31.    It has been a problem that I cannot read BPH notices. The ▮▮▮ date of my parole suitability hearing is the third date I have been given in ▮▮▮. My hearing date was postponed several times. Each time, however, I did not find out about the postponement from the Board. I had to get a family member on the outside to look up the information and tell me.

32.    It has also been a problem that I cannot complete BPH forms independently. For example, the Board has begun conducting parole hearings remotely as a matter of course. The only way I can get an in-person hearing is to complete a form requesting one. I knew I wanted an in-person hearing because my hearing disability makes it difficult for me to understand what people are saying when there is any background noise or degradation in sound quality. An in-person hearing is the best way to ensure I can understand what people say.

33.    I could not fill out the form to request an in-person hearing because it was not available to me in an accessible format. Instead, I asked a family member on the outside to send me an envelope with the Board's address printed on it. I used my Braille

6

typewriter to type out a letter explaining that I wanted an in-person hearing and the reasons for it. My request was granted.

34.     If I did not have family on the outside to help me, I would not be able to communicate with the Board the way I need to.

35.     **Preparation of Parole Packet**

36.     I need to prepare a packet for every parole hearing. However, I cannot do so independently. Even with my Braille typewriter, I cannot read what I have written without significant effort. I also am not comfortable requesting assistance from another incarcerated person, because the information is far too personal to share.

37.     When I was at ███████ the head social worker for the mental health program helped me assemble it. My understanding is that this task was not in the social worker's job description, and I was very fortunate that he agreed to help me. However, now that I am at ████, he cannot help me.

38.     For the ██████ hearing, I had to rely heavily on my wife to help me prepare the packet. I would call her, and while we are on the phone, I would describe to her exactly what I want to create. She prepares the document and reads it back to me. Without her help, I would not be able to prepare the type of packet for the Board that I want to – either, the entire packet would have to be in Braille (which the Board cannot read), or it would be riddled with mistakes. But it is important to note that all the calls to my wife were monitored and recorded.

39.     **Access to Letters of Support**

40.     I was also told that it was important for me to have letters of support from friends and family members to present to the Board.

41.     I need to use special equipment to have these documents read to me. Right now, however, the only equipment available are the machines in the law library that will display these letters in large text for everyone in the library to read. I am not comfortable having my private letters from family and friends broadcast in that manner, so I was not able to gather written letters of support from family or friends.

7

42.     What I originally chose to do was to have my family and friends send in videos stating their support, so I can review and organize them. I had planned to bring the correctionally approved tablet computer that we have been issued at ▮▮▮ to my parole suitability hearing so I could play these videos for the Board. My Counselor told me that I could bring the tablet with the videos to the Board room, but when I tested it, I could not play the videos in the Board facility because there was no wireless internet, and I cannot operate the tablet without wireless internet.

43.     To work around this, I sent the videos to my wife and she used dictation software to have them transcribed and sent to my attorney. But again, without my wife's help, I would have no way of presenting these materials to the Board, and even though I have strong support from family and friends, the Board would not have this information.

44.     Without being able to show this strong family support, I know the Board would deny me. I know this because the last time I went before the Board, I gave extensive documentation of various programs in the community that had agreed to support me as a blind person transitioning to parole. But even with all of those programs, the Board stated that this was not enough and that my lack of parole plans was an aggravating factor and a basis to deny me parole. It is my understanding that I need to clearly establish that I have family support in order to have any chance of being granted parole.

45.     **Program Access**

46.     I have faced a number of barriers in accessing the kind of programming I need to access to be prepared to go before the Board. I sign up for every program available at my institution, but I am often denied because the program facilitator does not know how they can accommodate someone who is mostly blind.

47.     Very little of CDCR's in-person rehabilitative programming is accessible to me. The so-called "self-help" programming, which consists of Alcoholics Anonymous, Narcotics Anonymous and courses such as Anger Management and Criminal Thinking, relies heavily on workbooks. These workbooks are written in normal-sized print. Large

/ / /

8

print versions and Braille versions are not available. And the workbooks have blank lines to write answers that expect the writer to use normal size print.

48. Even when I am able to read these books using the special equipment in the law library, I still face barriers. First, I am not comfortable with the entire library being able to read my workbook on the large text display. Second, I cannot see well enough to hand-write my answers in the book, and because the answers have to be written in a physical book, I cannot type them on my Braille typewriter. And even if I could use my typewriter to type the answers, I would not be able to read what I had written because I would have to set the typewriter to type in normal-size print, not Braille.

49. I also face barriers because of where I can be housed. For much of my time in CDCR, I have been at the Level 4 security classification, on a "Sensitive Needs Yard" ("SNY") because I dropped out of a gang. From what I know, in all of CDCR, there are only two institutions that can accommodate class members with a DPV code on a Level 4 SNY yard. I have now progressed to a Level 3 classification. From what I know, there are only two Level 3 SNY yards in all of CDCR that are designated for individuals with DPV codes: ███████████████████████████████████████████. Further, I cannot transfer to a different prison unless they have a bed that can accommodate me. As a blind person, I must be housed on a lower tier and in a lower bunk, meaning that there are limited beds in these prisons where I can be placed.

50. My current prison ████████ does not have any in-person self-help programming on my yard because there are no volunteers to run the programs. As stated above, due to my disability, I am severely limited in the prisons where I can be housed and it is extremely difficult for me to transfer to a prison that has more programming.

51. Because of these barriers to accessing in-person programming, I have had to do almost all my self-help programming through correspondence courses. Fortunately, I developed a strong relationship with a person in the community who runs a program called Getting Out by Going In ("GOGI"). She will send me large-print versions of all their materials, and I have someone I trust help me write my responses. It is only because of

this woman's help that I have been able to complete self-help programming in prison. I have completed all of the courses available through GOGI multiple times.

52.    I do not believe I have benefitted from these correspondence courses nearly as much as I would benefit from the in-person programming that CDCR offers. CDCR's programming occurs in discussion groups. I get much more out of discussion groups than out of just reading books, because it gives me the chance to bounce my ideas off other people and learn from their different point of view. It's like how two heads are better than one.

53.    I have also faced significant barriers accessing vocational programs. Only one of the institutions where I can be housed has a high-quality vocational program accessible to blind people: ███. That program allows me to work as a Braille transcriber for a community-based organization. I have been trying to transfer to that prison, without success, for five years straight. Therefore, due solely to my disability, I have been denied access to the type of vocational programming that would put me in a good position to secure employment upon my release, which would improve my chances of being granted parole.

54.    I think it is particularly important for me as a blind person to show the Board that there is a job I can have in the community when I get out. The Board expects us to have realistic parole plans. There are many jobs I cannot get, due to being blind, so it would not be realistic for me to tell the Board that I can have one of these jobs. However, it would be helpful for me to show the Board that I have experience and an employment relationship with a job that I can actually hold.

55.    **Barriers to the Tablet**

56.    One final barrier I will mention is my access to the tablet computers. The tablet computers were introduced to me in my current prison, ███ in ███. However, I still am not able to access them.

57.    Due to my disability, I need a Braille keyboard to operate the tablet computer. But every time I switch the tablet to the Braille keyboard, it shuts down. I have

10

told the technical support providers about this, and escalated to the ADA Assistant Warden █████, who contacted CDCR headquarters on my behalf. The answer I get is that this is a security feature that is built into the tablet. There is nothing they can do to remove it. No matter what I or they do, the tablet will keep shutting down every time I try to operate it.

58.    Because I do not have access to a tablet computer, I am disadvantaged in preparing for parole. The tablets have educational podcasts on them specific to parole preparation, but I cannot listen to the podcasts because my tablet shuts down before I can navigate to the podcast. The tablets also have a number of audiobooks on them, which I also cannot access due to the tablet shutting down.

59.    Finally, the tablets have ways to place phone calls and to email with family and friends, which I could use to communicate with my attorney or family members. But again, I cannot use these services that are available to everybody else. While everybody else can call or email with family, friends, and attorneys any time they want, I can only place calls when dayroom is running, and dayroom is frequently cancelled due to staffing shortages or other issues. For any correspondence I want to write independently, I am limited to writing letters to people who can understand Braille: My wife, for example, reads a little of Braille but not much. My lawyer does not read Braille, so I cannot write to him at all. Nor can I write to outside programs to ask if they have accessible materials so I can take their course. If I had access to email, I could write to all of these people independently and easily.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

11

60.     This declaration was taken for me by my attorney Caroline Jackson. Due to my vision disability, Ms. Jackson accommodated me by typing this document and reading it to me aloud.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ███████, California this 23rd day of May, 2023.



I declare under penalty of perjury under the laws of the State of California that I accommodated ██████ ██████ disability by typing this declaration and reading each paragraph to ████ verbatim. The substance of what I read, which ████ confirmed was true and correct, is identical to the substance of this printed version.

Caroline E. Jackson

# EXHIBIT 47

[4388762.1]

Subject: Re: Armstrong | Lack of accessible parole hearing transcript for ███ ███ ███ DLT, DNH, DPV, ███

Date: 4/14/2022 9:09 AM

From: "Jacob Hutt" <jacob@prisonlaw.com>

To: "Riley, Katie@CDCR" <Katie.Riley@cdcr.ca.gov>

Cc: "Miller, Nichole" <Nichole.Miller@cdcr.ca.gov>, "Ed Swanson" <ed@smllp.law>, "Davis, Tamiya@CDCR" <Tamiya.Davis@cdcr.ca.gov>, "Powell, Alexander@CDCR" <Alexander.Powell@cdcr.ca.gov>, "Ferguson, Patricia@CDCR" <Patricia.Ferguson@cdcr.ca.gov>, "Lopez, Amber@CDCR" <Amber.Lopez@cdcr.ca.gov>, "CDCR OLA Armstrong CAT Mailbox" <OLAArmstrongCAT@cdcr.ca.gov>, "Namrata Kotwani" <Namrata.Kotwani@doj.ca.gov>, "Trace Maiorino" <Trace.Maiorino@doj.ca.gov>, "Anthony Tartaglio" <Anthony.Tartaglio@doj.ca.gov>, "Adriano.Hrvatin@doj.ca.gov" <Adriano.Hrvatin@doj.ca.gov>, "Lorey, Dawn@CDCR" <Dawn.Lorey@cdcr.ca.gov>, "Hoogland, Laurie@CDCR" <Laurie.hoogland@cdcr.ca.gov>, "Hernandez, Jillian@CDCR" <Jillian.Hernandez@cdcr.ca.gov>, "Quint, Chantel@CDCR" <Chantel.Quint@cdcr.ca.gov>, "Armstrong Team" <arm-plo@prisonlaw.com>, "Armstrong Team - RBG only" <ArmstrongTeam@rbgg.com>, "McCray, Heather@CDCR" <Heather.McCray@cdcr.ca.gov>, "Blonien, Jessica@CDCR" <Jessica.Blonien@cdcr.ca.gov>, "Rana Anabtawi" <rana@prisonlaw.com>, "Thomas Nolan" <tnolan@rbgg.com>, "Michael Nunez" <mnunez@rbgg.com>, "Thao, Chor@CDCR" <Chor.Thao@cdcr.ca.gov>, "Meyer, Nicholas@CDCR" <Nicholas.meyer@cdcr.ca.gov>, "Logsdon, Jim@CDCR" <Jim.Logsdon@cdcr.ca.gov>, "Sharon Garske" <Sharon.Garske@doj.ca.gov>

Katie,

Thank you for the response, and for notifying us that Ms. ███ has completed a gender identity questionnaire indicating that she uses she/her pronouns. We have a few concerns and follow-up questions.

First, we wish to emphasize that Ms. ███ experience--being repeatedly denied the ability to read important documents because CDCR/BPH did not have a system in place for tracking the accessible formats she needed or even timely producing these documents to her in an accessible format after she'd explicitly asked for such accommodations--highlights the need for CDCR to develop a robust system for producing accessibly formatted printed information to class members based on their documented needs. **The lack of such a system had predictable results in this case**: (1) No system was in place to identify Ms. ███ need for braille, so her need was never screened at intake or otherwise affirmatively identified by ███ or BPH; (2) even once Ms. ███ told staff she needed braille--or, as an inferior alternative, large print--no system was in place to store that information in a location that would trigger the institutional ADA office providing her with documents in these accessible formats, so her stated needs went undocumented; and (3) no system was in place for physically producing documents in her initially-requested format (braille), so, as CDCR acknowledges, she was left unaccommodated. And it was not until Plaintiffs' counsel wrote to CDCR on February 24th that staff provided Ms. ███ with a large-print transcript of the parole hearing. Put simply, BPH and ███ staff were destined to fail in accommodating Ms. ███ disability when they could not draw on an existing system for identifying, tracking, and making use of important information about her accessibility needs.

CDCR notes that ███ ADA office "frequently check-in with class members and reminds them to reach out to the ADA office if they need anything." But the ADA requires more of prison officials than

conducting random check-ins or addressing individual requests for accommodations. *See Pierce v. D.C.,* 128 F. Supp. 3d 250, 272 (D.D.C. 2015) ("[P]rison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation."). It is also worth nothing that Ms. ▇▇▇▇ <u>did</u> reach out to the ADA office to tell staff exactly what she needed, and still she was left unaccommodated.

With these concerns in mind, a few follow-up questions.

**First,** the response does not say whether ▇▇▇▇ or BPH were or are able to provide Ms. ▇▇▇▇ with a copy of these documents in braille (apart from whether braille transcription of the CRA could be arranged quickly). Can you please confirm whether she has or will be provided with these documents in braille? If ▇▇▇▇ and BPH were not or are not able to provide these documents in braille, please explain why not.

**Second,** what information did institutional ADA staff or BPH receive from Headquarters at the time that Ms. ▇▇▇▇ first requested these parole documents in braille?

**Third,** has the prison documented that, going forward, Ms. ▇▇▇▇ needs printed information provided to her either in braille or in 30-point font? If not, why not?

**Fourth,** the response states that after Plaintiffs' advocacy, ▇▇▇▇ "will keep this issue in mind for future similar situations, when an inmate may need a large-font transcript." Can you elaborate on this? Is ▇▇▇▇ or BPH developing a system for (1) keeping track of which individuals need large-font transcripts and (2) producing large-print transcripts to those individuals?

Thank you for your attention to these issues.

Best,
Jacob

On Tue, Apr 5, 2022 at 6:40 PM Riley, Katie@CDCR <<u>Katie.Riley@cdcr.ca.gov</u>> wrote:

> Jacob,
>
>
> I'm writing in response to this advocacy email regarding ▇▇▇▇ ▇▇▇▇ (▇▇▇▇ at ▇▇▇▇ Ms. ▇▇▇▇ has been provided a large-font (30-point) copy of the transcript from her most recent BPH hearing on ▇▇▇▇. The large-print transcript was provided on ▇▇▇▇, as demonstrated by the attached chrono.
>
>
> In researching your questions about Ms. ▇▇▇▇ prior requests for a Braille or large-print transcript, CDCR suspects there may have been a misunderstanding between Ms. ▇▇▇▇ and the institutional ADA office at ▇▇▇▇ or else some confusion with Ms. ▇▇▇▇ pre-hearing request for a Braille version of the Comprehensive Risk Assessment (CRA). According to our records, when the Board's FAD

psychologist met with Ms. ███ to interview her for the CRA, Ms. ███ asked the FAD psychologist for a copy of the CRA in Braille. Around the same time, the CAMU CCII met with Ms. ███ about her upcoming BPH hearing and she also asked for a copy of the CRA in Braille. Transcribing the CRA into Braille was not something that could be arranged quickly; the CCII met with Ms. ███ to discuss a large-font transcript instead, and Ms. ███ agreed that a document in 30-point font would work. BPH and the institutional ADA office then coordinated the delivery of a large-font copy of the CRA to Ms. ███ on ███.

After the hearing, the institutional ADA office did not know that Ms. ███ was wanting a large-print transcript of the hearing. The institutional ADA Office had understood the conversations with Ms. ███ to be regarding the CRA. Notably, the institutional ADA office wasn't familiar with the way transcripts are provided to inmates after a BPH hearing and wasn't involved in the delivery of the transcript to Ms. ███ However, after this advocacy the institutional ADA office will keep this issue in mind for future similar situations, when an inmate may need a large-font transcript.

As for the allegation that Ms. ███ was told by the ADA Coordinator that she needed to submit an 1824 for ADA assistance, CDCR suspects this also may have been a misunderstanding. Again, the institutional ADA office does not have any recollection of Ms. ███ asking for a large-font transcript. However, the institutional ADA office does frequently check-in with class members and reminds them to reach out to the ADA office if they need anything. Inmates are told they can make informal contact, submit a Form 22, or submit an 1824 request for assistance.

Thank you for bringing this issue to CDCR's attention. I'm glad we were able to quickly get a large-font copy of the hearing transcript to Ms. ███ for her review.

**Katie Riley**

Attorney IV

California Dept. of Corrections & Rehabilitation

Cell: ███

---

**From:** Jacob Hutt <jacob@prisonlaw.com>
**Sent:** Thursday, February 24, 2022 5:58 PM
**To:** Miller, Nichole <Nichole.Miller@cdcr.ca.gov>
**Cc:** Ed Swanson <ed@smllp.law>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Powell,

Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Lopez, Amber@CDCR <amber.lopez@cdcr.ca.gov>; Anderson, Erin@CDCR <Erin.Anderson@cdcr.ca.gov>; Stringer, Robin@CDCR <Robin.Stringer@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Namrata Kotwani <Namrata.Kotwani@doj.ca.gov>; Leon Guerrero, Joshua@CDCR <Joshua.LeonGuerrero@cdcr.ca.gov>; Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Anthony Tartaglio <Anthony.Tartaglio@doj.ca.gov>; andrea.moon@doj.ca.gov; Adriano.Hrvatin@doj.ca.gov; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Hoogland, Laurie@CDCR <Laurie.Hoogland@cdcr.ca.gov>; Beland, Bruce@CDCR <Bruce.Beland@cdcr.ca.gov>; Foss, Tammy@CDCR <Tammy.Foss@cdcr.ca.gov>; Dovey, John@CDCR <John.Dovey@cdcr.ca.gov>; Anderson, Jason@CDCR <Jason.Anderson@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; Singh, Vimal@CDCR <Vimal.Singh@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Padilla, Amy@CDCR <Amy.Padilla@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Hernandez, Jillian@CDCR <Jillian.Hernandez@cdcr.ca.gov>; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Quint, Chantel@CDCR <Chantel.Quint@cdcr.ca.gov>; Edwards, Joseph.K@CDCR <Joseph.K.Edwards@cdcr.ca.gov>; Andrade, Courtney@CDCR <Courtney.Andrade@cdcr.ca.gov>; Powell, Jay@CDCR <Jay.Powell@cdcr.ca.gov>; Ly, Jimmy@CDCR <Jimmy.Ly@cdcr.ca.gov>; Solis, Miguel@CDCR <Miguel.Solis2@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Tonis, Alexandrea@CDCR <Alexandrea.Tonis@cdcr.ca.gov>; Armedo, Gently@CDCR <Gently.Armedo@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Pires, Barbara@CDCR <Barbara.Pires@cdcr.ca.gov>; Robinson, Lynda@CDCR <Lynda.Robinson@cdcr.ca.gov>; Armstrong Team <arm-plo@prisonlaw.com>; Gaultney, Robert@CDCR <Robert.Gaultney@cdcr.ca.gov>; Llamas, Peggy@CDCR <PEGGY.LLAMAS@cdcr.ca.gov>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Riley, Katie@CDCR <Katie.Riley@cdcr.ca.gov>; McCray, Heather@CDCR <Heather.McCray@cdcr.ca.gov>; Blonien, Jessica@CDCR <Jessica.Blonien@cdcr.ca.gov>; Rana Anabtawi <rana@prisonlaw.com>; Thomas Nolan <tnolan@rbgg.com>; Michael Nunez <mnunez@rbgg.com>

**Subject:** Armstrong | Lack of accessible parole hearing transcript for ███ ███ ███ DLT, DNH, DPV, ███

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Nichole,

I hope you're well. I write on behalf of ███ ███ ███ DLT, DNH, DPV, who is housed at ███ . I am concerned that, despite Mr. ███ formally requesting an accessible parole hearing transcript, staff have been unable to provide Mr. ███ who cannot read small or standard print documents, with an accessible transcript of his ███ , parole proceeding. **I ask that BPH and/or CDCR promptly provide Mr. ███ with a Braille transcript of the parole hearing and/or expanded access to a text-to-speech device, and explain why he was denied a Braille transcript when he requested one and never given a large-print transcript as an**

**alternative, despite receiving confirmation that he would receive one.**

Mr. █████ reports that in early █████████████, he requested a meeting with ADA staff to ensure that he would receive an accessible transcript of his upcoming parole proceeding after it occurred. He reports that he sat down with ADA CCII ██████ and requested that staff provide him with the transcript in Braille, which he reads fluently. According to Mr. █████ at this meeting he took out his CDCR-issued card magnifier and demonstrated to the CCII that this magnifier is useless to him, given the severity of his visual impairment.

Mr. █████ reports that, approximately one week later, the CCII informed him that CDCR did not have a contract with a third party to provide documents in Braille, so he would not be issued the transcript in Braille. Mr. █████ reports that the CCII acknowledged that BPH and CDCR are required to provide documents in accessible formats for DPV-designated class members, but that there was nothing he could do. At this second meeting, although even large print has become considerably difficult for Mr. █████ to read, Mr. █████ requested that as an alternative to Braille, staff provide him with the transcript in large print (he is able to read, with difficulty, font larger than size 30). He reports that the CCII confirmed at this second meeting that he had documented Mr. █████ need for an accessible format and that Mr. █████ would be provided with the transcript in large print.

Unfortunately, after he was denied parole on ██████████, Mr. █████ was provided with a standard-print transcript of the hearing, which he is unable to read. He does not wish to ask an ADA worker or another incarcerated person to read the parole hearing transcript out loud to him, as it contains sensitive information about events from Mr. █████ childhood, among other sensitive topics. Instead, he has been forced to rely on the Merlin text-to-speech device in the law library to read the transcript out loud to him, but Mr. █████ is permitted to go to the library only once a week for a two-hour timeslot (and can use the single Merlin device only if someone else isn't already using it--if this occurs, then he splits his time on the Merlin with other DPV class members who need to use it). Mr. █████ reports that if his housing unit had a Merlin device that he could use freely, he would be happy to use this device to read his parole transcript, but once a week for two hours in the library (at most) is not often enough for him to read and study this parole hearing transcript, as he considers challenging his parole denial. Mr. █████ reports that shortly before he spoke with me, he asked ██████████ ADA Coordinator why he had not been provided with a large-print transcript, and the ADAC informed him that he'd need to submit an 1824 about this, despite the fact that Mr. █████ already raised the issue at least twice with ADA staff and received an assurance from the CCII that he would receive the transcript in large print.

While I understand that the CCI memo--laying out correctional counselor duties in assisting Armstrong class members before, during, and after parole proceedings--was issued only recently, on January 18, 2022, this does not explain why staff failed to accommodate Mr. █████ visual impairment. Over two decades have passed since the *Armstrong II* Court determined that "although many class members cannot read printed documents because of their disabilities, the BPT does not provide any written material in alternative formats." *Armstrong v. Davis*, No. C 94-02307 CW, 1999 WL 35799705, at *2 (N.D. Cal. Dec. 22, 1999). Since that time, we have repeatedly raised this

problem with CDCR--including, most recently, in an unanswered demand letter--to no avail.

**Please promptly provide Mr.** ██████ **with a Braille transcript of the parole hearing and/or expanded access to a text-to-speech device, and explain why he was (1) denied a Braille transcript when he requested one and (2) never given a large-print transcript, despite receiving confirmation that he would receive one.**

Thank you,

Jacob

# EXHIBIT 48

[4388762.1]

**NAME:** ▆    **NUMBER:** ▆                    CDC 128-B (Rev. 02-97)

Subject has a Test of Adult Basic Education (TABE) score of 5.8.  Subject is not a participant in the Mental Health Services Delivery System. It is noted that Subject is in the Disability Placement Program and is noted as DPV, DNH. SOMS (DPP verification dated ▆▆▆) notes that his primary method of effective communication is through the use of Hearing Aide(s), with a secondary method Need Staff to Speak Loudly and Clearly.

On ▆▆▆, at approximately 0800 hours, I served inmate ▆ his BPH Hearing Transcripts dated ▆▆▆. The Transcripts were printed in large font (30-point). ▆ stated he could see and read the large font "just fine". I offered to read the transcript to ▆, he declined to have the transcripts read aloud again reiterating he could see the document. Additionally, he stated he was going to use the "Galileo Reader in the Law Library" to assist him reading the document at his pace. ▆ stated he did not need any additional assistance reviewing the document. I informed ▆ if at any point he finds he does need assistance, to ask me by knocking on the CCI door or altering any staff to the issue.  He stated he would ask for assistance in the future if need be.

Subject stated that he did not need any assistance for Effective Communication.  Effective communication was established by speaking loudly and clearly. Subject reiterated in his own words what was explained; provided appropriate, substantive responses to questions asked; and asked appropriate questions regarding the information provided. Subject stated he understood. The manner and detail in which subject repeated the information given to him indicated to this writer he understood.

**DATE:** ▆    ▆ –FACILITY ▆                    GENERAL CHRONO

Date Sent: ▮▮▮
CCI Name: ▮▮▮

Housing: ▮▮▮

General Chrono CDC 128B

## BPH PAROLE CONSIDERATION PROCESS

Name: ▮▮▮                                   CDC #: ▮▮▮

I have received a copy of my:

- [ ] BPH 1002, Notice of Consultation Rights
- [ ] BPH 1003, Consultation Rights
- [ ] BPH 1002, Notice of Hearing Rights
- [ ] BPH 1003, Hearing Rights
- [ ] BPH 1004, Post-Conviction Report
- [ ] Comprehensive Risk Assessment
- [ ] BPH 1080, Notice, Date, Time, and Place
- [ ] Non-Confidential Documents (10-day documents)
- [ ] Support Letter(s)
- [ ] Opposition Letter(s)
- [x] Hearing Transcript, dated ▮▮▮
- [x] Other: Audio CD of Hearing Transcripts

_____         _____
Inmate Signature                       Date

CDC 128B Chrono BPH Proceedings

Date Sent: ████ ◎◎
. CCI Nar████

Housing: ████    General Chrono CDC 128B

## BPH PAROLE CONSIDERATION PROCESS

Name: ████████    CDC #: ████████

I have received a copy of my:

☐ BPH 1002, Notice of Consultation Rights
☐ BPH 1003, Consultation Rights
☐ BPH 1002, Notice of Hearing Rights
☐ BPH 1003, Hearing Rights
☐ BPH 1004, Post-Conviction Report
☐ Comprehensive Risk Assessment
☐ BPH 1080, Notice, Date, Time, and Place
☐ Non-Confidential Documents (10-day documents)
☐ Support Letter(s)
☐ Opposition Letter(s)
☐ Hearing Transcript, dated _____
☑ Other: Audio CD of Hearing transcript for ████

████                                    ████
_____          _____
Inmate Signature                        Date

CDC 128B Chrono BPH Proceedings

# EXHIBIT 49

[4388762.1]

BOARD OF PAROLE HEARINGS                                              STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATIONS – GRIEVANCE PROCESS
BPH 1074                                            Log Number:_____

| A. | INMATE OR PAROLEE TO COMPLETE BEFORE THE HEARING |
|----|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only If you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form.
If you need more space attach another sheet of paper.

1. Your complaint Sir, I'm Blind/Deaf and a review of my file will show that my physical limitations are that I'm legally blind, unable to read, unable to hear normal speech. For my board transcript, my disability prevents me from being able to read the decision portion, information considered, and the reason for the decision.

2. What you want done: The following provided in Braille & Digital Book format: My Board transcript that includes the decision portion of the hearing, the information considered, and the reasons for the decision.

Before the hearing, you should send this form as soon as possible to the BPH ADA Coordinator at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (whichever comes first).

X___ L_____        _____        _____        _____
(Print name)          (Inmate or parolee sign here)    CDCR Number    Date

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|----|---|

Date received by BPH: _____

Decision
☐Granted        ☐Granted with Changes        ☐Denied        ☐No Action Required

DISCUSSION OF FINDINGS:_____

_____

_____

BASIS FOR DECISION:_____

_____

_____

_____

_____              _____
BPH ADA Coordinator/Designee Signature                    Date Completed

| INSTRUCTIONS TO INMATE OR PAROLEE |
|---|

If you have already had your hearing, did not like the decision made about the kind of help given, and want a new hearing, then fill out Section C, on page 2.

BPH 1074 (Rev 01/06)                    Page 1 of 2
Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

BOARD OF PAROLE HEARINGS                                                    STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATIONS – GRIEVANCE PROCESS
BPH 1074                                              Log Number:_____

| C. | INMATE OR PAROLEE TO COMPLETE **AFTER** THE HEARING |
|---|---|

☐     I did not get all the help with my disability that I needed during the hearing. Earlier, I requested that help on the BPH Form 1073, or a new disability problem came up at the hearing. I need a new hearing with more help, because:_____

_____

_____

_____

| Inmate/Parolee Print Name | Inmate/Parolee Sign Here | CDCR Number | Date |
|---|---|---|---|

| D. | RESPONSE TO A GRIEVANCE FILED AFTER THE HEARING |
|---|---|

Date Received by Quality Control Unit:_____        Type of Parole Proceeding:_____

Decision

☐ Granted          ☐ Granted with Changes          ☐ Denied          ☐ No Action Required

_____

_____

_____

_____

| Chief Deputy Commissioner/Designee Signature | Date Completed |
|---|---|

| E. | TO INMATE OR PAROLEE |
|---|---|

1.  After the hearing the inmate, parolee, or their attorney may file the grievance, concerning denial of disability accommodations at the hearing, by mailing this form to:

Board of Parole Hearings
Quality Control Unit
1515 K Street, Suite 600
Sacramento, CA 95814

2.  All ADA grievances related to parole revocations shall be answered within 10 days from the time they were received at BPH.

3.  All ADA grievances for the life prisoners shall be answered within 30 days from the time they were received at BPH.

NAME                    CDCR NUMBER                    TYPE OF PROCEEDING                    LOCATION

BPH 1074 (Rev 01/06)                    **Page 2 of 2**
Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

**STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **GAVIN NEWSOM, GOVERNOR**

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉ #▉▉▉▉
▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉ :

This is in response to your correspondence received by the Board of Parole Hearings (BPH) on ▉▉▉▉ ▉▉▉▉ in which you are inquiring about receiving the transcript for your upcoming hearing in Braille and digital book format.

You will be provided an audio and Braille version of your transcript after your ▉▉▉▉▉▉▉ hearing.

Sincerely,



CORRESPONDENCE UNIT
Board of Parole Hearings

# EXHIBIT 50

[4388762.1]

DECLARATION OF ██████ ██████

I, ██████ ██████ declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at the ███████████████ ████ ████████████████████ on Facility ██. I am ██ years old. I have been incarcerated in CDCR since ██████████.

3.    I am an *Armstrong* class member. I have a DPV code, meaning that I have a severe vision disability.

4.    My vision disability is due to glaucoma, which I have had since 1990. I am completely blind in my right eye and have very little vision in my left eye. If the lighting is good, I can see just enough to vaguely see my surroundings. I use a tapping cane to get around.

5.    My vision gets worse each year. I see an eye specialist every few months about my glaucoma. The specialist has told me that there is no cure for glaucoma, and my vision will never recover. The only thing I can do is take eyedrops which slow the disease down.

6.    For the last ten years, I have been completely unable to read or write due to my vision. I do not know Braille. The only way I can read is if the letters are extremely large, around six inches tall. There is no paperwork in prison that is that large. I have only ever seen print that large on street signs in the free world. I was recently given a lighted magnifier, but this device does not help me read at all since I require such large print. I do not have any other assistive devices to help me with reading and writing.

7.    To help me with daily activities related to paperwork, I have to ask other people to read text out loud for me. To write paperwork, I have to ask other people to write down what I dictate. It is sometimes difficult to find people who are available and willing to help me with reading and writing. Even if I do find people to help, they often do

[4297500.1]

not have a lot of empathy and compassion, and are not happy to help me. This process is time-consuming and frustrating. It is also embarrassing to constantly have to ask people for help with paperwork.

8.      I have access to a device called an Amigo, which is an electronic magnifier, in my housing unit. I cannot read with it, though, because I find it very hard to use.

9.      I appeared for my initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") on ███████████. At that hearing, I was denied parole for three years. My next hearing is tentatively scheduled for ████████ .

10.      I have been assigned a Correctional Counselor I ("Counselor"), who is supposed to help all of us here get accommodations for parole proceedings. It is often difficult to find time to meet with my Counselor, since he has so many other people who he sees. Sometimes, I am able to see him during his weekly open line, but it depends on where I am in line and how many other people want to see him. Most of the people in the Counselor role used to be a Correctional Officer, so they do not have much training on how to be counselors. Because a lot of them are former Correctional Officers, I do not trust them to know sensitive information about me, because they are likely to treat me poorly because of that information.

11.      I have tried to get help from the Counselors to prepare for Board, but they do not have nearly enough time to help me prepare the lengthy documents I need. I have to write up my personal history, many details about my crime, information about my crime partners and my victims, how I will avoid re-offending, what I will do upon release, where I will live, and so forth. Developing this information takes hours, and they simply do not have hours and hours to help one person.

12.      Unfortunately, neither CDCR nor the Board gives me documents in the format that I need to be able to access them.

///

///

[1297500.1]

2

15.    **Access to the Transcript of my Last Parole Hearing**

16.    I received the transcript of my last parole hearing shortly after the hearing. I was unable to read it due to my vision. My counselor put an audio recording of the transcript on a CD so that I can listen to the transcript on my own. For the most part, this works okay because the hearing was brief, but there are some sections of the CD where the audio is not loud enough and I am unable to understand what is being said.

17.    **Access to my Criminal Risk Assessment**

18.    Before my first hearing, in ▮▮▮▮▮▮▮▮, I participated in a ~~psychological~~ ~~evaluation called the Comprehensive Risk Assessment, or CRA. I received a~~ psychological evaluation, which included very sensitive information about my crime. I received a write-up of the evaluation but was unable to read it on my own. I had to have a friend read it out loud to me. I do not like having to have someone read it to me, because we do not have a private place to read the sensitive information. There are eight people assigned to my cell, so inside my cell, my friend would read this sensitive information out loud in front of several other people. In the dayroom, we cannot read together without being constantly interrupted. It is dangerous for other people to know the sensitive information in my evaluation; they might hurt me if they found it out. I would rather have the evaluation on a talking book player so I can review it privately on my own, using headphones.

19.    Recently, my friend was released and went home, so he cannot help me prepare for my next hearing. I will have to find someone else.

20.    **Preparation of Parole Packet**

21.    To prepare for my first parole hearing, I put together a packet of documents to present to the Board. In this packet, I included documents such as victim awareness, letters of remorse, and a relapse prevention plan. These documents are very important to show my suitability for parole.

22.    Since I am unable to read and write on my own due to my disability, it was very difficult to put together this packet of documents. I was forced to ask my cellmate for

help with preparing these documents. I would sit down with him for hours and dictate what I wanted to include in the documents, and he would write down my words. This process was very slow and frustrating, since we had to make sure that he was accurately writing my words. It was embarrassing for me to have his help, because I do not like having other people in my business. But I had no other choice.

23.     It was also difficult to work with my cellmate on this packet because he had his own work to do and did not have much time to help me. He would help me when he had extra time, but that was only once or twice a week. I would have preferred to work on these materials every day, like other people do who are preparing for Board. All in all, it took several months to prepare this packet due to the difficulties of dictation and scheduling.

24.     Having my cellmate help me with the packet was also uncomfortable because the packet contained personal information about my conviction. In particular, the victim awareness document and letters of remorse were very private, and I did not want to share them with other people. My cellmate and I tried to find private spaces in the library or on the yard to work on these documents without other people hearing the private information that I was saying, but it was sometimes hard to find privacy. Other people would often be around and hear my personal information, which made preparing these documents risky for me, because I was worried someone would attack me based on what they heard, and I am too old to defend myself.

25.     I wish that I was able to prepare this packet on my own. It would have been much easier and faster, and I would not have to share this personal information with anybody else. I would prefer to have a machine that could read to me, and that would write down what I told it to write. This way, I could prepare these materials on my own.

26.     **Program Access**

27.     I have faced a number of barriers in accessing the kind of programming I need to access to be prepared to go before the Board. I have taken numerous self-help classes since I have been incarcerated, including domestic violence, CBI life skills, and

anger management. I am currently enrolled in DRP (I do not know what "DRP" stands for).

26. In every class that I am in, I am unable to read and write the homework. I am forced to ask other people to sit next to me and read everything to me. Sometimes, people are kind enough to help me. Other times, people are impatient and unwilling to help me since they have their own work to do. It can be hard to get people to help me, but I have to find someone since that is the only way I can learn in the class. I also have to ask people to sit with me and help me read and write on the homework for these classes. It is embarrassing and frustrating to constantly have to ask for help, and it makes it harder for me to properly learn in the classes.

27. I also take self-help classes through the mail. I am currently taking a domestic violence class through the mail. These mail classes are even more difficult for me, since there is no in-person instruction. All of the learning happens from reading and writing, and I cannot learn from sitting and listening in class.

28. I understand that I am supposed to ~~At my last parole hearing, the Board told me to~~ read a specific book so I ~~could~~ can have some sex offender programming under my belt before my next hearing. I cannot read this book on my own, and I don't know where I will find someone who has the time to help me. I did find a friend who read some of the book to me, but this friend has a new job that has made him very busy and he does not have time to read to me anymore.

29. It would help me a lot to have this book in talking book form so I could listen to it on my own.

30. At my first Board hearing in ████, the panel told me that I need to enroll in more self-help programming ~~more~~ to prepare better for my next hearing. I would like to enroll in as many classes as I can to prepare better, and I am currently enrolled in DRP. I am nervous that it will be difficult for me to take these classes since I will have to rely on other people for help.

31. ████ has very few programs compared to other prisons where I have been housed. I was here for three years before I got into a program, which is a much longer

wait than I experienced at other prisons. There are also fewer programs to choose from. I used to be at a prison we call ███████████ and I've been at ███████████████, but they transferred me here once an officer noticed that I was blind. I have tried to transfer out of ███ without success. I tried to transfer out before the COVID-19 pandemic, but they refused to transfer me, and then transfers shut down due to the pandemic. I have been stuck here ever since.

32.     It would make a huge difference to me to have equipment that would let me listen to and dictate written words. I could spend more time developing materials for the Board and I could take more programs that would improve my chances to be granted parole. As it stands, preparing parole materials is a slow and painful process and all I can do during programs is listen and pick up what I can.

33.     This declaration was taken and written for me by attorney Caroline Jackson. Due to my vision disability, Ms. Jackson accommodated me by typing this document and reading it to me aloud.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ██████, California this 23rd day of May, 2023.

I declare under penalty of perjury under the laws of the State of California that, in order to accommodate Mr. ████ disability, I read each paragraph of this declaration verbatim to Mr. ████ The substance of what I read, which Mr. ████ confirmed was true and correct, is identical to the substance of this printed version.

Caroline B. Jackson

[4297600 1]

6

# EXHIBIT 51

[4388762.1]

BOARD OF PAROLE HEARINGS                                   STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATIONS – GRIEVANCE PROCESS
BPH 1074                                          Log Number:_____

| A. | INMATE OR PAROLEE TO COMPLETE BEFORE THE HEARING |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only If you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1.  Your complaint I am a Legally Blind Inmate, age ███. I can not read nor can I write. I need assistance in preparing my Parole Plan. How can I prepare my plans? I need assistance to just prepare this.

2.  What you want done: I need Staff Assistance in writing my Parole Plans and I need assistance in Reading and Writing all the documents that I have to submit. I would like a device that could record what I need to say that way it can be on record. A device to record is cheap and I would not use it in cell but in staff presense ONLY!

Before the hearing, you should send this form as soon as possible to the BPH ADA Coordinator at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (whichever comes first).

X_███████████    ████████████████    ██████████    ███████████
    (Print name)       (Inmate or parolee sign here)    CDCR Number         Date

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|---|---|

Date received by BPH: _____

Decision
☐ Granted        ☐ Granted with Changes        ☐ Denied        ☐ No Action Required

DISCUSSION OF FINDINGS:_____
_____
_____
_____

BASIS FOR DECISION:_____
_____
_____
_____

_____          _____
BPH ADA Coordinator/Designee Signature                        Date Completed

| INSTRUCTIONS TO INMATE OR PAROLEE |
|---|

If you have already had your hearing, did not like the decision made about the kind of help given, and want a new hearing, then fill out Section C, on page 2.

BPH 1074 (Rev 01/06)                      Page 1 of 2
        Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

BOARD OF PAROLE HEARINGS                                                    STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATIONS – GRIEVANCE PROCESS
BPH 1074                                              Log Number:_____

| C. | INMATE OR PAROLEE TO COMPLETE AFTER THE HEARING |
|---|---|

☐    I did not get all the help with my disability that I needed during the hearing. Earlier, I requested that help on the BPH Form 1073, or a new disability problem came up at the hearing. I need a new hearing with more help, because:_____

_____

_____

_____

_____     _____     _____     _____
Inmate/Parolee Print Name        Inmate/Parolee Sign Here        CDCR Number        Date

| D. | RESPONSE TO A GRIEVANCE FILED AFTER THE HEARING |
|---|---|

Date Received by Quality Control Unit:_____      Type of Parole Proceeding:_____

Decision
☐Granted          ☐Granted with Changes              ☐Denied          ☐No Action Required

_____

_____

_____

_____

_____                          _____
Chief Deputy Commissioner/Designee Signature                       Date Completed

| E. | TO INMATE OR PAROLEE |
|---|---|

1.  After the hearing the inmate, parolee, or their attorney may file the grievance, concerning denial of disability accommodations at the hearing, by mailing this form to:

Board of Parole Hearings
Quality Control Unit
1515 K Street, Suite 600
Sacramento, CA 95814

2.  All ADA grievances related to parole revocations shall be answered within 10 days from the time they were received at BPH.

3.  All ADA grievances for the life prisoners shall be answered within 30 days from the time they were received at BPH.

NAME                    CDCR NUMBER              TYPE OF PROCEEDING              LOCATION

BPH 1074 (Rev 01/06)                       Page 2 of 2
Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

**STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **GAVIN NEWSOM, GOVERNOR**

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



September 21, 2022


████████████████████  #█████
██████████



████████████ :


This is in response to your correspondence received by the Board of Parole Hearings (BPH) on ████████████████ , in which you are inquiring about receiving staff assistance in preparing your parole plans. You are requesting a device that could record what you need to say.


I am forwarding your request for staff assistance in preparing your parole plans to the institution. Someone will will be contacting you regarding this. You will have a state appointed attorney who will assist you with preparing for your parole hearing.

Sincerely,



CORRESPONDENCE UNIT
Board of Parole Hearings

# EXHIBIT 52

[4388762.1]

DECLARATION OF ███████████

I, ███████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ████. I am currently housed at the ███████████████ I am ██ years old. I have been incarcerated in CDCR since ███████. I am currently serving a sentence of ██ years to life.

3.    I am an *Armstrong* class member. I have a DPV code, meaning that I have a severe vision disability. I also have a DPO code, meaning that I have a severe mobility disability and need to use a wheelchair part of the time.

4.    My vision disability is due to being ███████████████. The bullet hit my optic nerve and I have been completely blind in my left eye since then. In my right eye, I had two cataracts and underwent a surgery in ████. The surgery was unsuccessful, and my vision in my right eye is not correctable. Since the surgery, I have only had slight light detection in my right eye. My eyes are sensitive to light, so I wear dark glasses for light protection. I am essentially completely blind. I use a tapping cane to move around in my cell, but I need someone to escort me to ensure my safety outside of the cell since I cannot use my tapping cane and my wheelchair at the same time.

5.    Due to my vision, I have been completely unable to read and write any paperwork since 2012. Even if the font is large and bolded, I am unable to see well enough to read. I recently received a lighted magnifier, but since my vision is so bad, it does not help me. I cannot handwrite at all, and can only scribble on the paper.

6.    I joined a Braille class when I first got to ████ around one and a half years ago, but the class closed down about three months later and has not restarted since. I learned the Braille alphabet, but that's about it. I do not know nearly enough Braille to complete any paperwork in it. I have access to a device called a Merlin, which I can use in the library. This device reads aloud paperwork that is in certain formats to me through my

[4316822.2]

headphones. To help me with daily activities related to paperwork, I sometimes rely on the Merlin to read to me. The Merlin works okay, but it was difficult for me to learn how to use it and I still need either another incarcerated person or library staff to help me use it because it does not seem to be designed for fully blind people to use independently. The Merlin also does not afford me any privacy when reading documents, for reasons I will explain later.

7. I also have access to a device called a talking book player. This device reads aloud text that is in certain formats to me. My understanding is that it cannot convert printed text into speech. It works by playing audio files on cartridges with books, magazines, or anything else that has been read aloud and recorded. I have to order the talking book cartridges from a vendor, but once I receive a cartridge with material on it, I can review the material privately and independently any time I like, and I can navigate within the material to different pages or sections fairly easily. I can keep these cartridges for around two to three months, but I must return them to the vendor after. I do not have any other assistive devices to help me with reading. I do not have any assistive devices whatsoever that help me with writing.

8. My mobility disability is due to nerve damage in my back and spine from a ███████████████. The nerve damage causes pain in my lower body, and I cannot stand for more than a few minutes before my legs give out. I need a wheelchair to move around outside of my cell. Due to my vision and mobility disabilities, I require someone to escort me around the institution to ensure my safety.

9. Although I am supposed to be able to ask any CDCR staff for help with accommodations for my disabilities, I do not feel comfortable doing this, especially with staff who are Corrections Officers and former Corrections Officers. I experience a lot of conflict from staff when I ask for help. I have had a lot of issues with getting staff to escort me around the institution. Since I also use a wheelchair, I am unable to wheel myself and use my tapping cane at the same time, and I need someone to push me. Staff often refuse to assist, or they assign someone else to assist, and the person just walks away

[4316822.2]                                    2

before I get to where I'm going. Staff also often refuse to assist me with completing paperwork such as 602 staff complaints or 1824 reasonable accommodation requests, which makes me hesitant to ask them for help. I have also experienced issues with staff disclosing my personal information to other incarcerated people, which makes me feel very unsafe. Generally speaking, I try to avoid asking staff for help with things as much as possible.

10. My initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") was on ██████████. I received a denial of three years. My next parole hearing is tentatively scheduled for ██████████.

11. I have been assigned a Correctional Counselor I ("Counselor"). I do not really know what my Counselor's role is. He does not really help me with much. I have been assigned to my current Counselor for around four months. I don't see him often. It is typical for my assigned Counselor to change every few months.

12. I do not have a good relationship with my current Counselor. It seems to me that my Counselor keeps doubting my disabilities, and continually asks questions suggesting that my disabilities are not real. For example, he keeps telling me to sign documents, knowing that I cannot do so without assistance, but he refuses to help me sign the document. These questions make me uncomfortable with him and uncomfortable about asking for help. Thus, I rarely request to see him and I don't ask for help. This is similar to my relationships with previous Counselors. All Counselors seem to not have a lot of time to help nor be willing to help, and I don't see any reason to go see them since they do not help.

13. I also feel uncomfortable asking my Counselor for help because he is a former Corrections Officer. From what I have seen, most Counselors are former Corrections Officers, who can have hostile attitudes toward incarcerated people. It is very important to me to have a way to perform reading and writing tasks privately and independently, so I have options other than my Counselor that I can turn to while preparing for my parole hearing.

[4316822.2]                                              3

14. I was assigned an attorney to represent me during my parole proceedings for my first hearing. Since I had such limited time with this person—only two meetings before the hearing—I did not think there was enough time to ask for help accommodating my disability. We needed that time to focus on preparing my testimony and making sure I knew what to expect.

15. Based on my experience preparing for and participating in my ███ hearing, I am not comfortable being made to rely on other people for reading and writing tasks. I would like to perform these tasks as independently as possible.

16. **Access To The Transcript Of My Parole Hearing**

17. Unfortunately, neither CDCR nor the Board gives me documents in the format that I need to be able to access them, nor do they tell me what formats are available, nor do they give me adequate access to equipment that I could use to access these documents privately and independently.

18. Around the start of ███████, about six weeks after my hearing in ████ ███ I received a packet containing the transcript from my hearing. I was unable to read it, and my Counselor did not offer to read it to me nor tell me that I could request the transcript in another format. I have not asked my Counselor for help reading it, since I did not feel comfortable with them knowing all of the personal details regarding my life and conviction that the hearing transcript contains. After receiving my hearing transcript, I asked an incarcerated friend to assist me with writing and submitting a request to use the Merlin in the library. It was not until around two months later that I received a ducat to go to the library to actually use the Merlin. This happens very regularly, and it often takes several weeks after I submit a request until when I actually get to use the Merlin. In early July, I finally reviewed my hearing transcript, over three months after my hearing date and nearly two months after receiving my paper transcript that I could not read.

19. I wish that I was able to read the transcript right away after my hearing. I have been wanting to review my transcript for why I was denied, so that I could start preparing better for my next hearing. Although they explained these reasons to me during

[4316822.2]

4

the hearing, I had so many emotions running through me from the hearing itself and finding out that I was denied, that I couldn't really pay close attention to what they were saying. Also, I did not know that I could appeal the result of the hearing. To appeal the result, it is important that I review the transcript right away since there is a deadline to submit an appeal.

20. The best way for me to have received this transcript would have been an audio file that I could listen to on my talking book player. This way, I could review the transcript whenever I want and in a private setting. I would not have to wait for several weeks to receive a ducat to use the Merlin, and I would be able to review it in my cell. I did not know that receiving an audio version of the hearing transcript was a possibility. I wish that my Counselor discussed this with me, especially since both BPH and CDCR knows that I have a severe vision disability and am unable to read. CDCR knows this because they have my medical records and have been dealing with me every day since I became blind in ██. BPH knows this because I told them several times during my parole hearing that I am totally blind and cannot see well enough to read any printed words. I should never have received a paper transcript in the first place.

21. **Access to my Comprehensive Risk Assessment**

22. I participated in a psychological evaluation called the Comprehensive Risk Assessment, or "CRA," in ██, shortly before my first hearing was initially scheduled and prior to the postponement. I received a written report of my CRA shortly after from my Counselor, but I could not read it and my Counselor did not offer to read it to me. At the time, I was not aware of the Merlin device in the library, so I had to ask another incarcerated person to help read it to me. I felt uncomfortable about this, since the CRA contains personal information on my childhood trauma, my convictions, and my family history. Not only is it confidential information, but certain things can get you killed in prison if word spreads to the wrong person. I did not want to rely on anybody else, but I had no other way to read the CRA. I had to know what they wrote about me to prepare for my hearing.

23.    The incarcerated person who read the CRA to me did not have the time to help me review it in detail to prepare. They read it to me once and that was it. It's frustrating when you have to depend on other people to help you, especially because other incarcerated people are busy and do not have time to help me as much as I need to adequately prepare for my hearing.

24.    I participated in a second CRA evaluation a few months before my ▮▮ ▮▮ hearing. I received a hard copy in early February, and due to my vision, I could not read it. Again, I had to submit a request to use the Merlin and wait for several weeks before actually using the Merlin. Even when I used the Merlin to read this CRA, it was not good enough to help me prepare, as I will describe later. It would have been helpful to study the CRA more before the hearing so that I could prepare to answer questions about it.

25.    Similar to the hearing transcript, I would have liked an audio recording of the CRA to play on my talking book player. This way, I could properly review the contents of the evaluation and ensure that the psychologist accurately documented my statements. I also could have privately reviewed the CRA without relying on my Counselor or the Merlin, since it takes many weeks to receive access to the library equipment. The CRA contains lots of personal information about my childhood, family, and trauma, and I want to be able to review it privately and independently.

26.    **Access to Library Equipment**

27.    Currently, due to my vision disability and my discomfort relying on my Counselor or other incarcerated people for assistance with reading, I am reliant on the Merlin device in the law library to read paperwork. This device automatically recognizes text in certain formats, reads it out loud and lets me listen through my headphones. This device is better than nothing, but I cannot use it on my own because it is not designed for totally blind people like me. Furthermore, I do not receive enough access to the device to properly read all of the paperwork required for my parole preparation, nor can I access paperwork privately and independently this way.

[4316822.2]                                6

28. To get access to the Merlin, I need to fill out a request form and submit to the library. This itself is difficult since I am unable to write and need to ask another incarcerated person to help me complete the form. There are supposed to be other incarcerated people whose job it is to help me with something like this, called ADA workers. But it is still hard to get help filling out the request form since ADA workers often refuse to help with paperwork or show bad attitude when I ask for help, making them difficult to work with. They also have their own issues going on and are often too busy to help. In addition, staff sometimes refuse to allow ADA workers to help me. I also am hesitant to ask staff for help, since I have experienced refusals from staff when I have asked for writing assistance in the past.

29. Once I submit the request slip, I receive a ducat from staff to visit the library and use the Merlin. Unfortunately, it takes a long time for me to receive the ducat after submitting the request. At times, it takes over three weeks for me to receive the ducat. This means that sometimes, I receive a document that I am unable to read, and even if I submit a request to use the Merlin the same day that I receive the document, I am forced to wait for several weeks before I can read the document. This delay is very harmful to my preparation since it causes me to work very slowly. It is also harmful because there are certain documents such as the CRA or hearing transcript that have limited periods of time after receiving in which I can object. If I am unable to read a document for several weeks after receiving it, there is a chance that I miss the time window to submit an objection. I need to receive access to the Merlin on the same day I receive documents, so that I can read them in a timely manner. I have been told about the priority legal user program that the library has, which may provide additional access. However, I have been told that you have to have an active court case to be a priority user, and I have not received priority access.

30. When I can access the Merlin, it works okay. However, the device is kind of difficult to use and cumbersome due to my vision disability. I am unable to operate the device independently since I cannot see which buttons to press to get it started. Each time

[4316822.2]

7

I use the device, I need the lady who runs the law library to assist me. Sometimes, the lady running the law library is busy helping other incarcerated people and is unable to help. She also sometimes directs me to use ADA workers for help, which makes me feel uncomfortable since my information is sensitive. I also feel uncomfortable since the Merlin is not in a private location, and there are other incarcerated people who are often in the same space. Especially since I cannot see who is around me, I am not always aware of who is nearby. While the Merlin can be routed through my headphones so that only I can listen to the text, I understand that the device projects the text onto a monitor, and anybody who is nearby can see. When I use the Merlin, I am nervous that the private information that is contained in documents such as my CRA and hearing transcript will be overseen by other incarcerated people, which may compromise my safety.

31.    **Access to Writing Accommodations for Parole Proceedings**

32.    I prepared a parole packet for my ▮ hearing to demonstrate my rehabilitation and suitability for parole. In this packet, I included documents such as my re-entry plans, victim impact statements, letters of remorse, and other personal documents that contain confidential information. At that time, I was housed at ▮▮▮ ▮▮ I was unable to write anything at that time as well, since I lost my vision in my right eye in ▮, and it was very difficult to put together these written materials. It was also hard to get the help that I needed to write, since I did not feel comfortable asking staff for help with paperwork. Also, these documents are very personal and I felt that my safety would be compromised if I asked other incarcerated people or staff for help with writing.

33.    I was fortunate that I had a trusted incarcerated friend named ▮ at ▮ who I felt safe asking for help with my parole packet. ▮ was very reliable and trustworthy, and put in lots of effort to help me. He would always come to my cell and help me read and write, and he helped me tremendously with putting together my parole packet. If it hadn't been for ▮, I do not know how I would have produced these written materials.

34. Ever since I transferred to ████████████, I have not trusted any incarcerated person here enough to ask for help with my parole packet. Sometimes, other incarcerated people take advantage of my vision disability here by stealing my belongings. I have experienced issues with people taking my purchased items at canteen. This makes me uncomfortable asking people for help with accommodations for my vision, including help with reading and writing. Because there was nobody at ███ that I trusted to help me, I could not update my relapse prevention plan or many of the other documents in my packet for my ███ hearing.

35. Because of the lack of accommodations, I was also not able to complete release planning for my ███ hearing. After waiving my ███ hearing, my appointed lawyer had told me that I need to contact transitional housing providers. I was able to get a list of transitional housing providers from my Counselor but she did not offer me assistance in reaching out to these providers. I asked custody staff to help me in writing to these providers. The officers refused to help and refused to assign an ADA worker to help me. The lawyer for my ███ hearing was not helping me either. Not knowing what else to do, I went to the law library to see if someone there would help me. The law librarian assigned another incarcerated person to help me write letters. Working with this incarcerated person, I was only able to write to three providers. (I was limited to three providers because I cannot afford to buy stamps or envelopes. While I am entitled to free stamped envelopes each month due to my indigent status, I cannot get them because I am required to sign for the envelopes and nobody will assist me in signing the paper for the envelopes. The person who was helping me had to give me stamps and envelopes from his own personal supply.) Of the three providers I wrote to, only one wrote back, and the response stated they did not provide transitional housing any more. Since that time, I have not been able to write to additional providers because I do not have the accommodations I need to write independently, and I cannot find anyone willing to assist me.

36. I also understand that it would be helpful for me to identify organizations in the community that can provide me with services, such as support for my vision and

[4316822.2]

9

mobility disabilities or support with maintaining my sobriety. Nobody has helped me identify organizations in the community where I can receive services once I am released. Even if I had contact information for these types of organizations, I would have no way to write to them.

37. My attorney never presented this parole packet to the Board at my hearing in ███████. I am planning on preparing an updated packet for my scheduled hearing in ███, including updated information regarding my release plans. I am not sure how I will put together this packet, since there is no equipment that will help me write independently and I do not have access to anybody trustworthy who can help with writing these documents. I have worn myself out trying to self-advocate and get the assistance I need. I have filed grievances and appeals, and I have spoken with the dedicated ADA staff in the facility. None of this has gotten me the support I need to adequately prepare for parole or to participate in prison life.

38. It would make a huge difference in my ability to properly prepare for my upcoming hearing if I have access to a device that can take dictation and write for me. This device will also need to read back the text for me to review, since I cannot read what I write. It is also important that I can access this device privately and independently in my cell so that I am not sharing this personal information to a room full of people.

39. **Program Access**

40. I have faced a number of barriers in accessing the kind of programming I need to access to be prepared to go before the Board.

41. At my first Board hearing in ████████, the Board told me to participate in additional Alcoholics Anonymous and Narcotics Anonymous programming to prepare for my upcoming hearing. Since then, I have attempted to enroll, and have been to five AA group sessions. They have a lot of paperwork in this program and I am unable to read any of it. I told the instructor that I cannot read and he said that I should drop out of the class if I can't read the paperwork. I am not sure how I will complete NA/AA programs before my next hearing unless I receive accommodations for reading and writing in these groups.

[4316822.2]                                    10

Thus far, I am attending the class but not fully participating since I cannot read any of the paperwork. Not being able to read the paperwork really hinders my growth in this program.

42.    This experience is consistent with much of my programming experience since I lost vision in my right eye in ███. Since I've been totally blind, I have been unable to work. I also have been unable to take college classes since I do not have any way to complete any of the reading and writing necessary to participate. Due to my inability to do paperwork, I have been limited to primarily participating in mental health groups since ███, and even in these groups, I am unable to participate fully in any reading materials. My lack of programming was an aggravating factor in my ███ denial, and the Board stated that even though I had been attending mental health groups, they did not see enough programming that addressed criminality or substance abuse. This is unfair, since I was unable to participate in those self-help programs due to my vision. They recommended that I participate more in self-help programming before my next hearing, but am not sure how I will participate due to my vision, and am nervous that my inability to program will be a factor again in my upcoming Board hearing in ███.

///
///
///
///
///
///
///
///
///
///
///
///

[4316822.2]                                11

43. This declaration was taken and written for me by Paralegal Clerk Amit Rao. Due to my vision disability, and my total lack of access to writing accommodations for people who are blind, Mr. Rao accommodated me by typing this document and reading it to me aloud, as did Paralegal Karen Stilber.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ▮▮▮, California this 12th day of ~~August,~~ September, 2023.

In order to accommodate Mr. ▮▮▮ vision disability, I read this declaration sentence by sentence for Mr. ▮▮▮ to review. The substance of what I read, which Mr. ▮▮▮ confirmed was true and correct, is identical to the substance of this printed version.

_Karen Stilber_
Karen Stilber

(4316822.2)                                12

# EXHIBIT 53

[4388762.1]

PAROLE SUITABILITY HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Parole Consideration Hearing of:

CDC Number: [redacted]

[redacted]

[redacted]

[redacted] CALIFORNIA

[redacted]

9:47 AM

PANEL PRESENT:

TROY TAIRA, Presiding Commissioner
MATTHEW BRUECKNER, Deputy Commissioner

OTHERS PRESENT:

[redacted] Inmate
[redacted], Attorney for Inmate
UNIDENTIFIED, Correctional Officers

Transcribed by:

KATRINA FLOYD

2

INDEX

|  |  | Page |
|---|---|---|
| Proceedings | | 3 |
| Case Factors | | 5 |
| Pre-Commitment Factors | | 13 |
| Post-Commitment Factors | | 26 |
| Parole Plans | | 37 |
| Closing Statements | | 41 |
| Recess | | 27,46 |
| Decision | | 47 |
| Adjournment | | 54 |
| Transcript Certification | | 53 |

Dictate Express Transcription

**CALIFORNIA BOARD OF PAROLE HEARINGS**

**DECISION**

**DEPUTY COMMISIONER BRUECKNER:** We're back on the record.

**PRESIDING COMMISSIONER TAIRA:** Today's date, ▮▮▮. The time is 11:10 a.m. We are reconvening this hearing for pronouncement of the panel's decision. All parties present when we recessed are again present. Uh, Mr. ▮▮▮ The panel is finding you unsuitable for parole. So we're denying parole. This is a three-year denial and I will explain how we came to our decision today. The fundamental consideration in making a parole decision is whether the inmate continues to pose an unreasonable risk of public safety. Denial is based on current dangerousness. This panel must not act arbitrarily or capriciously. Uh, we've read the record including the central file, the Comprehensive Risk Assessment, the documents, and watch docs. Uh, we reviewed, uh, the confidential file. We did not use anything in the confidential file in our decision today. Uh, we considered, uh, Mr. ▮▮▮ testimony at this hearing. Uh, we noted input from counsel. We noted the opposition from the Pasadena Police Department with these legal standards. And considering the evidence, uh, we find Mr. ▮▮▮ does

▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮                              DECISION PAGE 1

Dictate Express Transcription

**PRESIDING COMMISSIONER TAIRA:** That's [redacted] Dr. [redacted] is a forensic psychologist from of the parole board who interviewed you [redacted] And we'll talk about this report during the hearing today. Uh, you indicated you disagree with, uh, the report. So we'll -- we we'll --, uh, we'll address that as we go. Uh, we have reviewed documents and watch docs. This is the program the board uses to send out documents to the panel members and the attorneys. It's, uh, primarily C file material, uh, but things that are sent in from the public are also contained in, uh, watch docs. For example, we do have opposition letters from the Pasadena Police Department opposing a release. Those are in the --, uh, in the record. We also reviewed your confidential file. That's part of your central file. And if we use anything in your confidential file, we are required to tell you. Now, we are here today doing a parole hearing, uh, because --, uh, well, let me just summarize the history. Uh, you are currently serving a life term out of Los Angeles County. I see that you were sentenced under the three strikes, uh, sentencing laws, burglary, second degree committed on or about August 7, 1995. I also see a, uh, petty theft with a prior also, this is also a felony conviction. I see the 25-year life sentence. But with the prior prison terms as enhancements, those sentences were stayed. You are

members.  So, you know, I made a conscious choice to try to better my life and try to get myself together.  But, you know, it's a process.

**PRESIDING COMMISSIONER TAIRA:** Hang on.  Okay.  And -- ▓, uh, and what about alcohol?  Any alcohol in prison?

**INMATE** ▓:  No, sir.  Well, I had he -- ▓ ▓, and I -- I can't afford to drink anymore either.  Cause the doctor told that would re --, uh, uh, ▓ And I can't afford to lose my liver either.  Cause you know, that'll kill you.

**PRESIDING COMMISSIONER TAIRA:** I don't see, uh, that you've done any programs to, uh, understand substance abuse?

**INMATE** ▓:  Well, sir, the reason for that is I'm -- I'm totally blind I can't read any type of information or whatever.  I've signed up at ▓ for those type of groups, and they told me of the long waiting list.  But before I left there, I never got put on that list.  And I did, uh, uh, sign up for those classes.  And since I've been here, I -- I've been in the blind group from reading braille called Foreseeable Future, which they closed down.  But like I said, they was trying to teach me braille, and I have to in order to read some, it helped to be in braille.

**PRESIDING COMMISSIONER TAIRA:** Do you know braille?

pose an unreasonable risk of public safety and is not eligible for parole at this time. In our review, we did consider the historic factors. Now these are static factors, but we did consider them to be aggravating. He's got a -- a -- a significant and extensive history of criminality. He's a three striker, sentenced him into the three strike sentencing provisions, very poor performance on supervision, uh, prior prison terms, uh, three of them. Um, his --, uh, the history also includes, uh, violent behavior. Uh, those were aggravating factors for the panel. His self-control at the time of the crime, again, with the -- the criminality associated with the substance abuse, which he has not, uh, sufficiently addressed in -- in prison, uh, also reflects the lack of self-control, the, uh, criminal thinking, which we still see, uh, continuing on presently and after a long period of time. Those static factors, uh, may no longer indicate a risk in light of a lengthy period of positive rehabilitation. The -- ultimately the panel does not, uh, see that in Mr. ███████ uh, rehabilitation. We see very little effort at program participation. He's gotten some from 2014. He attends his EOP groups, but we don't see the targeted programming to address the criminality, the substance abuse. And also, we see the, uh, sexual misconduct in

**DECISION PAGE  2**

prison. The, uh, compulsive behavior. Uh, also, uh, not addressed the, uh, institutional adjustment, also aggravating with the recency of the rule violations, the, uh, mis -- sexual misconduct, the pattern of non-compliance and defiant behavior. Uh, Mr. ███ uh, continues to minimize his behavior, shifts blame, and, uh, we've reviewed these rule up violations very inconsistent with what he says. He refused to comply with the rules. He has shown appellant and disregard. We see victimization in his behavior. He directs his misconduct boards. The -- the staff members, uh, victimizing them. And with this continued criminal thinking, we don't find him to be credible in his denials today. Uh, we don't see the sufficient offender change as a result, uh, with this continued, uh, criminal thinking pattern, not recognizing the, uh, sexual behavior. Um, as, uh, Mr. ███ is unwilling to address his criminality and recognize his criminal conduct with the lack of efforts in the programming, uh, we find that he is still at risk for the, uh, behaving -- unstable behavior, unpredictable behavior is what we currently see based on his conduct in prison. And that he is still capable of the crime and ultimately the violence. Now the violence is mitigated because of the elderly parole and his medical condition, uh, is

███ ███ ███ ███   **DECISION PAGE 3**

physical limitations, uh, but the risk assessment, which we found to be, uh, relevant, reliable, and consistent with our decision recently done, incorporated all of this, and yet found Mr. ███ to be at a moderate risk, which is elevated also disturbing for the panel. Concerning for the panel at the upper end -- higher end of the elevated risk rating. Uh, we found the report, uh, consistent with our decision today. Uh, parole plans. Uh, we found, uh, that he has thought about parole plans. Doesn't have a whole lot of support, but we gave him credit for having some family support. We did not deny a grant parole on the basis of parole plans alone. Uh, we encouraged Mr. ███ to continue to, uh, develop his parole plans. Uh, elderly parole. Again, we did consider the mitigation of the elderly parole factors, but with his current, uh, criminal thinking and current, uh, minimization, uh, victimization and victim blaming, uh, we find the factors indicative of unsuitability outweighed the factors showing suitability. This, uh, goes more towards a denial period. We gave Mr. uh, ███ a minimal denial period of three years. We did consider the 15- and 10-year denial period as required by law determined that neither one is appropriate. Uh, we've considered his, uh, age his lack of overt violence in prison. We gave him credit for that.

███ ███ ███ ███            **DECISION PAGE   4**

51

And, uh, his, uh, physical limitations. So this is a three-year denial. Mr. ███ can petition to advance by submitting the BPH form 1045. If there's a change of circumstances or new information, if he wishes to move up his hearing date. And I will ask Commissioner Brueckner for, uh, his comments at this time.

**DEPUTY COMMISSIONER BRUECKNER:** Uh, nothing to add, Commissioner, I concur in the decision. Thank you.

**PRESIDING COMMISSIONER TAIRA:** This decision is not final. There is a review period up to 120 days. If there are any changes to our decision, Mr. ███ will be notified in writing. Panel recommends, uh, no rule violations, important to become and remain discipline free, uh, and continue efforts in the self-help, uh, programming -- continue, I would say make an effort at the self-help programming. We recognize Mr. ███ is limited by what he can do, but, uh, we just don't see any effort to learn about the character defects and the causative factors for his, uh, criminality and his, uh, compulsive behavior. The time is 11:17 a.m. Uh, the officer will show you out, uh, Mr. ███ Good luck to you, sir. And we are adjourn.

**DECISION PAGE 5**

Dictate Express Transcription

52

**ADJOURNMENT**

THIS TRANSCRIPT CONTAINS THE PROPOSED DECISION OF THE BOARD OF PAROLE HEARINGS (BOARD) ANNOUNCED AT YOUR RECENT BOARD HEARING AND IS PROVIDED TO YOU IN COMPLIANCE WITH PENAL CODE SECTION 3041.5, SUBDIVISION (A)(4), AND CALIFORNIA CODE OF REGULATIONS, TITLE 15, SECTION 2254. THIS PROPOSED DECISION WILL BECOME FINAL WITHIN 120 DAYS OF THE DATE OF THE HEARING AS REQUIRED BY PENAL CODE SECTION 3041, SUBDIVISION (B), UNLESS THE BOARD NOTIFIES YOU IN WRITING BEFORE THEN THAT THE PROPOSED DECISION HAS BEEN MODIFIED, VACATED OR REFERRED TO THE FULL BOARD, SITTING EN BANC, DUE TO AN ERROR OF LAW, ERROR OF FACT OR NEW INFORMATION PURSUANT TO CALIFORNIA CODE OF REGULATIONS, TITLE 15, SECTION 2042. THEREAFTER, THE GOVERNOR HAS AUTHORITY TO REVIEW THE BOARD'S DECISION AND AFFIRM, MODIFY, OR REVERSE IT PURSUANT TO PENAL CODE SECTIONS 3041.1 AND 3041.2.

**DECISION PAGE  6**

Dictate Express Transcription

# EXHIBIT 54

[4388762.1]

DECLARATION OF ▆▆▆▆▆▆

I, ▆▆▆▆▆▆, declare:

1.    I have personal knowledge of the facts set forth herein, and if called as a witness I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") identification number is ▆▆▆. I was incarcerated in the CDCR from ▆▆▆ through ▆▆▆▆, when I was released on parole. I had my third parole consideration hearing on ▆▆▆ at the ▆▆▆▆▆ ("▆▆") in ▆▆▆, California, where I was incarcerated at the time. I was granted parole at the hearing. I am ▆ years old.

3.    I served a third-strike sentence of 25-years to life for selling heroin to an undercover police officer.

4.    I am an *Armstrong* class member. I have hearing, vision, and mobility disabilities. I have several disability tracking codes, including DPM, which means I require ground floor housing with no stairs, and can only be housed in a limited number of institutions "designated" to house people with such disabilities. I also have codes of DNV and DNH, which are CDCR tracking codes for vision and hearing disabilities that do not require any special placement by themselves. I normally wear hearing aids in both ears. However, at the time of my hearing on ▆▆▆, my left hearing aid was broken. However, I was able to hear the Commissioners well enough during my hearing. Since the hearing, I was given a replacement hearing aid that works.

5.    I use a cane to ambulate, and in CDCR I was supposed to be housed and to program in a manner that did not require me to go up any flights of stairs. However, on the morning of my hearing on ▆▆▆, the elevator was broken, so I had to go up a full flight of stairs to get to the hearing room. I had a friend helping me, but it was awkward and hard to go up a flight stairs in this way given my mobility and vision disabilities, and I was worried about falling and getting injured. After the hearing I had to go down the same set of stairs. I do not know why they did not take me using a different

elevator.

6.    My second parole hearing was on ███████ when I was █years old. At that hearing, the Commissioners denied me parole because they felt I had not adequately addressed substance abuse issues, did not do enough self-help programming, and had some recent rules violations (RVRs). The ███ hearing panel also denied me because they felt that I did not have adequate parole plans. In my ███ hearing, BPH Commissioner San Juan told me:

> Your parole plans need work. I would have liked to see a letter from your cousin or your relative that's up in Northern California. Um, I do see you as someone who could be homeless on the streets. Once your time in transitional housing runs out, you won't make enough money on SSI . . . to be able to rent your own place.

███████ Hearing Transcript at 87 (Decision p. 5).

7.    For my ███ hearing, and again for my ███ hearing, I did not write to my family because it is very hard for me to write due to my disabilities. Because of my vision disability, I need other people to scribe letters for me, and to read mail to me. If I am making calls, I need someone to help me dial the right phone number. When I was preparing for my ███ hearing, no staff offered to provide or provided help with contacting my family to obtain letters of support. I would have been particularly interested in doing this because in my last hearing in ███, the Commissioner specifically told me, as quoted above, to get letters of support from relatives.

8.    My CDCR Counselor before the hearing in ███ tried to help me get ready for my parole hearing. He served my Comprehensive Risk Assessment on me. I can read short documents by using my glasses and a hand magnifier, but it takes a very long time to read anything in this manner. My understanding is that the Comprehensive Risk Assessment is a critical part of the process for getting ready for parole hearings. For that reason, I wanted to work with my Comprehensive Risk Assessment in getting ready for my recent hearing. I wanted to be able to work with it on my own, and go over it several

2

times.  However, the Comprehensive Risk Assessment is simply too long and complicated for me to review and understand using a magnifying glass and my glasses.

9.    My Counselor tried to help me by trying to print out the risk assessment in large print.  However, when he tried to do this, the result was a document where the printing went off the edges of the page and it was not readable.  He read the document to me once, but I was unable to review it independently and work with it in the manner I wanted.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

3

10.    I am informed that the CRA for my hearing indicated that my risk would be lower if I had relapse prevention plans and better parole plans. However, because of my vision disability, it is very hard for me to write this kind of plan without assistance. I tried to get assistance, and I did get help to write four letters to housing programs in Northern California. I had a friend who provided this help. However, if my counselor had helped me I would have been able to seek additional placements to write to about housing. I kept asking my counselor for a list of housing options. He did give me a few names of placements, but none of them could take me. Two of the four programs I wrote to wrote me back to say they were not equipped to help me because of my vision disability. A third one wrote that they could not accommodate my mobility disability, and the fourth program never responded. I was not provided with help in identifying additional parole programs that would accept people with my disabilities.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct to the best of my knowledge and that this declaration was executed at ██████, California this 1st day of November, 2023.

11/2/23

I declare under penalty of perjury under the laws of the State of California that I accommodated Mr. ██████ disability by typing this declaration and reading the entirety of each paragraph to Mr. ██████. The substance of what I read, which Mr. ██████ confirmed was true and correct, is identical to the substance of this printed version. In addition, I provided Mr. ██████ a copy of this declaration for his review in size 22 font. The substance of the large-print document that I sent to Mr. ██████ is identical to the substance of this regular-print document.

Thomas Nolan
Thomas Nolan

11/2/23
WITNESS

# EXHIBIT 55

[4388762.1]

DECLARATION OF ██████████

I, ██████████, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation ("CDCR") number is ██████ I am currently housed at the ██████████████████████ in ██████████ I am ██ years old. I have been incarcerated in CDCR since ██████ ██████.

3. I am an *Armstrong* class member. I have a DPV code, meaning that I have a severe vision disability.

4. My vision disability is due to uveitis, which I have had for several decades. I am completely blind in my right eye, and have very little light perception and motion detection in my left eye. I started going blind around ████, and my vision has gradually gotten worse and worse each year. It is still getting worse. My vision has been this poor for the last two years. I use a tapping cane to move around the institution.

5. Due to my vision, I am completely unable to read and write any paperwork. Even if the font is large and bolded, I am unable to see well enough to read. I do not know Braille. I cannot see well enough to handwrite at all. I cannot see if the pen is making any mark on the paper. I was recently given a lighted magnifier, but this device does not help me read at all since my vision is so poor. I have a device called a talking book player in my cell. This device reads aloud books and magazines to me through my headphones but it does not have any features to help me with writing. To use the talking book player, I need to order material on cassettes to be mailed in to me from a public library as part of a program operated by the Library of Congress. I have had many issues with receiving the actual cassettes that I wanted, and I would receive random material that I was not interested in. I mostly stopped using the device as a result, and do not really use the device very much anymore these days. I also know about a device in the library called the Merlin, which reads the text on paper documents out loud through headphones. The

[4329144.1]

Merlin is not a practical option for me, since I cannot see well enough to operate it on my own. As far as I know, the Merlin is not designed for someone who is nearly completely blind like me, but rather someone who has low vision and can see the buttons and positioning of the device. I would have to use the help of a library staff member or another incarcerated person, and I do not want other people to know about my personal information. If certain information about my conviction spreads to incarcerated people, my safety could be at risk. Also, the Merlin does not have any features to help me with writing. I do not have access to any other assistive devices to help me with reading, and I am not aware of any assistive device that would help me with writing.

6.      For most paperwork, I have to ask another incarcerated person to read aloud and scribe for me. This includes confidential information such as my legal mail or other sensitive documents. I do not feel comfortable sharing this information with other incarcerated people, since certain information could get me killed if it gets out on the yard, but I do not have another option. I need to read my documents.

7.      I have been assigned a Correctional Counselor I ("Counselor"). I do not really know exactly what my Counselor is responsible for. I know that my Counselor takes me to classification committee meetings each year and assigns my housing based on security levels, but I do not really know what else the Counselors are responsible for and what help they are supposed to give to me. I rarely see my Counselor other than for classification committee meetings, and have very rarely received any sort of help from any Counselor.

8.      **Inaccessible Parole Consultation Recommendations**

9.      My initial parole suitability hearing ("parole hearing") before the Board of Parole Hearings ("Board" or "BPH") is tentatively scheduled for ███████. I had a consultation for my parole hearing on ███████. At this consultation, I met with a Board Commissioner by video conference. He provided some general information about the parole process and asked me about some of my causative factors. He also asked me about whether I could see at all, and even after I said no, he did not follow up or address

this. I even told him that I could not read and write due to my vision, and he ignored this and did not address it at all. There was no other discussion of my vision or what accommodations I needed during this consultation process. I found this strange, since it was so obvious based on my presentation and my statements about my vision that I would need accommodations throughout the parole process.

10. A few weeks later, I received a packet in the mail from the Board. I could not read it at all due to my vision, so I had to ask another incarcerated person to read it to me. The incarcerated person told me that he only read me some parts of the packet, since other parts contained more personal information about my conviction and case factors and he felt uncomfortable invading my privacy. It made me very nervous that I had to have another incarcerated person read me my consultation recommendations, since information about my conviction and case factors could get me killed if it spread across the yard.

11. I do not understand why the Board Commissioner sent me paper documents, when I told him that I could not read at all due to my vision disability. It would have been much more useful for the Board Commissioner to send me the packet in an audio format, such as a cassette for my talking book player or a CD (with the option for me to borrow a CD player to listen). It also would have been useful for me to receive the packet in an electronic format that I could read independently using the accessibility features of my tablet computer. While the tablet is sometimes difficult to use due to my vision, staff trained me on using the talk-back features that read text to me, and I can typically operate the tablet and review documents independently. Providing the information in either of these formats would let me review the entire document, not just the portions that someone else felt comfortable reading to me, and would let me re-read it as much as I need between the consultation and my parole hearing in ██.

12. The person who read the packet to me read the section of the packet that contained recommendations on how I should begin preparing for my parole hearing. These recommendations included that I should look for a trade to learn, complete book reports, find a work assignment, participate in correspondence classes, complete

programming in anger management and domestic violence, and prepare a written parole packet with letters of remorse, re-entry plans, letters of support, and other documents. I was able to request a new copy of the Board Commissioner's recommendations, which my Counselor read to me. This was helpful, but I still do not have a way to refer to the document when I want to remember what was in it. I also still do not know what the rest of the packet said.

13. Due to my vision, many of these recommendations are completely inaccessible to me without adequate accommodations, which CDCR does not provide. I am unable to learn most trades due to being blind, and I do not know how I would go about finding vocational programs that are accessible to me. ██ does not even currently offer a course to help me learn Braille so I can at least have a skill that is useful to me as a blind person. I am unable to read and write on my own to complete book reports, and I do not know how I would get accessible versions of books that the Board recommended.

14. ██ has many programs on my yard that the Board recommended that I enroll in. However, I have experienced lots of challenges while attempting to participate in programming at ██ due to my vision. Many programs involve lots of reading and writing, and there are not typically many accommodations for this paperwork. For one program I enrolled in, I was able to rely on an ADA worker to sit in and help me with paperwork. This worked okay, since the content of that program was not too personal and did not put my safety at risk. However, I have tried to ask ADA workers for help with other programming, and ADA workers are rarely available to help with programming on a regular basis. I am not able to consistently rely on ADA workers, and without someone designated with the task of helping me with the paperwork, I am unable to fully participate. I am able to sit and listen in programs, but without the paperwork, I cannot learn as much as I otherwise would.

15. The only option left is to take correspondence courses. I have tried participating in correspondence courses in the past, and I even completed an anger management course through the help of another incarcerated person. However, it was very

difficult to complete this program, since I needed to be working with the other person a lot, and he did not always have time to help me. We also needed private areas to work, and it was very difficult to find a confidential space. I do not think I will be able to complete another correspondence course since I will be very unlikely to find another incarcerated person to spend enough private time with me to complete the course.

16. I also do not know how I will prepare the written documents for my parole packet, like written parole plans, relapse prevention plans, letter of apology, and letters to parole programs seeking support letters. I am unable to handwrite on my own and cannot read what I write. My vision is so bad that I cannot even tell if a pen is working when it moves across the paper. I am not aware of any assistive devices available to me that would let me write independently. I don't have anybody who can help me with preparing this packet. I cannot ask other incarcerated people, since I feel uncomfortable about my private information spreading, and I do not trust my Counselor enough to ask him to help me. As of now, I do not know how I can prepare this packet, and I feel very anxious that I will not be able to prepare one before I go to Board.

17. I wish the Board Commissioner had at least tried to find out what accommodations I need and discussed how I can accomplish all the various reading and writing tasks the Commissioner recommended for me. This would be very helpful as I prepare for my hearing, since I work slowly due to my vision disability and need lots of time to adequately prepare. I need CDCR and the Board to be aware of my accommodations now so that when my hearing gets closer, there are no issues with receiving documents in accessible formats. Also, if the Board was aware of my vision disability and that I could not read or write at all on my own, they would be better able to provide accommodations to the recommendations that they gave me to prepare. As of now, I do not know how I will complete any of these recommendations, and I wish that the Board was able to modify their recommendations or provide accommodations to make my parole preparation possible.

/ / /

[4329144.1]

5

18.     This declaration was taken and written for me by paralegal Amit Rao.  Due to my vision disability, and the fact that I do not have adequate access to accommodations that would allow me to read or write independently, Mr. Rao accommodated me by typing this document and reading it to me aloud.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ████████, California this __30__ day of August, 2023



I declare under penalty of perjury under the laws of the State of California that, in order to accommodate Mr. ██████, I read each paragraph of this declaration verbatim to Mr. ██████. The substance of what I read, which Mr. ██████ confirmed was true and correct, is identical to the substance of this printed version.

_____
Amit Rao

(4329144.1)                                            6

# EXHIBIT 56

[4388762.1]

DECLARATION OF █████████████

I, █████████, declare:

1.    I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitations ("CDCR") number is ██████. I was incarcerated in CDCR from ███████████, until my release on ██████████ From ████ until my release, I was housed at the ██████████ ███████████████████████████. I now report to the ███████████████████████ and currently living with my sister in ███████████. I am ██ years old.

3.    Due to a █████████████ incident in █████ I was given a sentence of 25 years to life under California's Three Strikes Law. I was granted parole at a parole consideration hearing held by videoconference on ██████████. When granting me parole, the Commissioner noted that the evidence supporting my conviction was so unreliable that "had it not been for the strikes, a prison sentence may not necessarily be the just sentence." The Commissioner also noted that my second strike was for ███████████ █████ from inside a home, while the victim pretended to be asleep.

4.    I am an *Armstrong* class member. I have been designated with DPV and DPM codes, meaning I have severe vison and mobility disabilities. I am legally blind, with some blurry vision in my right eye and no sight in my left eye. I also use a walker.

5.    My vision disability is caused by having severe glaucoma and cataracts in both eyes. I had two surgeries on my eyes in █████████, but they were botched and my vision ended up getting worse as a result.

6.    I can read using my good eye, but only very large type. I cannot handwrite properly because I cannot see. While in prison I had no accommodations to help me read or write independently, and no accommodations to help me prepare for my parole hearing. I did not get any meaningful help from my assigned Correctional Counselor I ("Counselor"), nor from any person who works for the prison, such as a law librarian, a custody officer, or an ADA worker. I had an appointed attorney who I believe helped me a

[4336329.3]

lot, but not with the reading and writing tasks I needed to perform to prepare for my hearing.

7.    While I was incarcerated, due to the lack of reading and writing accommodations, I had to ask my cellmate to help me with all my paperwork. He read to me any documents that were too small for me to read and would help me fill out forms. He helped me a lot with the bookwork for my programming classes. He would read me the material and I would tell him my answers to write. I also had a Talking Book Player which would let me order audiobooks and other materials and listen to them. While I am grateful for my cellmate's help, it was hard for me to learn this way because I have always learned better by reading things instead of just hearing them. I would have much preferred having the independence to be able to read my documents on my own, and would have learned more that way.

8.    While in prison, I did not leave my cell very often because I did not have the accommodations I needed to walk around the prison safely and independently. I feared tripping and falling on something I could not see. Also, the light outside my cell burned and hurt my eyes so I did not go out very much. I very rarely went to the law library for these reasons and also because I feared being around a lot of people I could not see. I also did not go to the law library because I did not know what they had to offer me there that I could use. No one let me know there might be equipment or other devices in the law library to help me read and write documents to get ready for my hearing. No one mentioned that the law librarians might be available to help with reading or writing tasks. Having access to those types of accommodations would have made a big difference in helping me prepare for my hearing, but it still would have been extremely difficult for me to take advantage of the accommodations because of the difficulty getting to the library to use them.

9.    I had the same assigned Counselor for my last few years at ███. I do not recall his name. I saw him about once every month, but he did nothing to help me to get ready for my hearing besides bring me the BPH forms I needed to sign. We mostly just

[4336329.3]                                                2

focused on institutional issues during those meetings. My Counselor was aware of my vision problems and that I needed accommodations to read and write independently, but did not offer me any accommodations and did not offer to help me write letters for support or to help me write out a parole plan.

10. My Comprehensive Risk Assessment ("CRA") was done in ███ but I received a new copy of it a few months before my hearing. I knew that it was important to read closely before my hearing because it would have given me an idea of what issues they wanted to talk about. My Counselor gave me the new copy of my CRA in regular-size print so I was not able to read it. I had my Counselor read it to me once, which made me very uncomfortable because the information in it is quite personal. I would have liked to be able to read it on my own, which I could have done if they had given it to me in large print.

11. Because I was given a regular-print CRA and no device to enlarge the text, I was not able to review my CRA again or refer to it as I was preparing for my parole hearing, nor during my hearing when it was being talked about. I did not know that I could ask for the CRA to be converted to large print and no one ever offered to do that for me. I also did not know that I could have asked to receive my CRA on audio CD, which might not have been as helpful as a large-print version, but still would have helped getting ready for my hearing.

12. Before my hearing, I asked my Counselor for an *Olson* Review so I could present my information to the Board in a meaningful way, but I have no recollection of participating in the review. I was not able to recollect or apply to my hearing anything I might have learned during the review because I do not recall it.

13. My Counselor went over the BPH 1073 form with me sometime after my ████████████████ and ██████████████. My vision was almost completely gone by then and I could not read it so he read it to me. My Counselor knew I was almost blind but did not offer me any accommodations that would help me. So, I asked for a magnifier and documents in large print. I was not aware that I could request to

receive documents in audio format, so I did not ask for that.

14. I did not get any of the accommodations that I needed and requested to help prepare for my hearing, including the large print documents and the a magnifying glass so I could read my paperwork. When I asked my Counselor for the magnifying glass, he said I would get the magnifying glass but it never came. I even put in a medical slip for a magnifying glass but the doctor told me they do not prescribe them anymore and I would have to ask to borrow one from a custody officer when I needed to use it. I never got a magnifier to use.

15. I had a state-appointed attorney to represent me at the hearing. We met three times before the hearing. The attorney helped me by trying to request disability accommodations for my hearing, but the attorney did not get any accommodations to help me prepare for my hearing. The attorney did not get me a large-print copy of my CRA. And I don't recall the attorney doing anything to help me put together my parole plan: I have no memory of the attorney helping me write letters to transitional housing providers or to other service providers in the community who could help me transition successfully. I also have no memory of the attorney helping me write relapse prevention plans or letters of remorse or any other documents that I might want to submit for my hearing.

16. I had to ask my cellmate for help to put together a parole plan for me, but it was pretty short and did not have all the letters of support the Board was looking for. I did not have any relapse prevention plans, written plans for how I would support myself and stay out of trouble, or even a letter of support from the sister that I told them I planned to live with. All I had was one letter of support from a transitional housing facility, but I am not sure who contacted them on my behalf. Maybe my cellmate got the letter for me, or maybe my attorney.

17. At my hearing, the only vision accommodation I was offered was a staff assistant, which is a CDCR staff member. At the start of my hearing, the Board asked about the dark glasses I was wearing. I let them know I was blind in one eye and could not really see out of the other. They thanked me for letting them know, but did not ask any

more questions about whether I would need a magnifier or anything like that. I declined the staff assistant because but I did not feel comfortable with CDCR staff helping me with such a personal matter. Also, the staff assistant would have only been able to help me during the hearing, not beforehand.

18. Because I could not read or refer to any of the documents, I went into my hearing feeling very unprepared. I wanted to have a good parole plan together. Even though my cellie did the best he could to help me get my parole plan together, the Board still said it was inadequate. Worse still, I could not refer to it during the hearing, because I did not have it in large print nor did I have the magnifying glass I had asked for. I wanted to familiarize myself with my custody records, my CRA and other documents. I did not have much of an opportunity to think ahead about what the Commissioners might ask, because I only got to review my CRA once.

19. During the hearing, the Commissioners asked about all my prior arrests and convictions. Because I did not have a chance to review my records before the hearing, I did not remember many of the arrests and had a hard time answering questions about them. The Commissioners also asked about programs I had taken while incarcerated. Because I had to do my classes by having someone else read to me and write for me, and had no way of reviewing my paperwork from those programs before the hearing, I could not answer their questions very well.

20. Overall, I could not really engage as much as I wanted to during my parole consideration. All I could do was just answered the BPH Commissioners' questions as best as I could and represent myself the best I could without being able to refer to anything. I was also not provided the accommodations I needed to write out and deliver a closing statement, but I did speak for myself at the end.

21. After my hearing was over, I started getting BPH documents in large print because my attorney asked for documents to be provided that way so I could read them. My attorney was the only one who made any effort to make sure that I had any accommodations for my hearing, and my cellmate was the only one to really help me. I

[4336329.3]                                                5

am very thankful that I was able to still gain my parole, but it does not change the fact that I was left on my own as a visually disabled man who cannot read or write unless I have assistance—assistance they did not provide.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ▮▮▮▮▮, California this _11_ day of September, 2023.

In order to accommodate Mr. ▮ vision disability, on September 8, 2023 I created a large-print version of his declaration for Mr. ▮ to review. ~~I declare under penalty of perjury under the laws of the State of California that I accommodated Mr. ▮▮▮'s disability by typing this declaration and reading the entirety of each paragraph to Mr. ▮.~~ The substance ~~of what I read~~ of that large print version, which Mr. ▮ confirmed was true and correct, is identical to the substance of this printed version.

_Nathalie Welch_
Nathalie Welch

[4336329.3]                                    6

# EXHIBIT 57

[4388762.1]



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

January 14, 2022

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND**
> **CONFIDENTIAL**
>
> **SUBJECT TO**
> **PROTECTIVE ORDERS**

Jessica Blonien
Chief Counsel
Board of Parole Hearings
jessica.blonien@cdcr.ca.gov

Heather McCray
Assistant Chief Counsel
Board of Parole Hearings
heather.mccray@cdcr.ca.gov

Nichole Miller
Attorney
Board of Parole Hearings
nichole.miller@cdcr.ca.gov

    Re:   *Armstrong v. Newsom*: Hearing for ███████, █████ (DPH, DPS, low TABE), Scheduled for ███████████
          Our File No. 0581-04

Dear Counsel:

    We write with two requests related to the upcoming BPH Hearing for deaf class member ███████, █████ (DPH, DPS), a sign language user who has a TABE score of 2.0.

    First, we ask that Defendants video record the hearing, using the recording feature on the video-conferencing software used by Defendants, retain a copy for recordkeeping purposes for as long as audio recordings are typically kept, and provide us with a copy. In the past, Plaintiffs' counsel have repeatedly requested that Defendants record the BPH hearings for deaf signers and provide sufficient levels of sign language interpretation to ensure effective communication. *See* Ltr from R. Lomio to J. Blonien and J. Hood, Sign Language Interpreters and Parole Hearings (November 13, 2019) ("Lomio Letter") at 2-4, 9; Q4 2020 Life Prisoner Monitoring Report (February 19, 2021) ("Q4 2020 Report") at

[3849475.2]

**PRIVILEGED AND CONFIDENTIAL**

Heather McCray
Jessica Blonien
Nichole Miller
January 14, 2022
Page 2


6; Q2 2021 Life Prisoner Monitoring Report (August 10, 2021) ("Q2 2021 Report") at 7, 12-14. The Lomio Letter has been attached for your convenience.

Second, we also request that Defendants provide a two sets of sign language interpreters for the hearing. In recent hearings for deaf individuals who use sign language, Defendant have been providing both a CDI and an SLI, which has been of great benefit. However, both the CDI and the SLI work at the same time. Since using two sets of interpreters is time consuming, these hearings can be quite long, and it is critical to have two full sets of interpreters so the interpreters can take breaks without stopping the hearing, and also check each other's work. Mr. ▅▅ hearing currently is set for ▅▅▅▅▅▅.

**A.    Recording the Hearing**

Mr. ▅▅ requires a video recording of his BPH hearing in order to have an accessible transcript, and in order to have a complete and accurate record of what transpired.

With a TABE score of just 2.0, it is extremely unlikely Mr. ▅▅ can understand a written transcript. This is his sixth subsequent board hearing. Without an accessible transcript, he will have little or no ability to fully assess and implement the panel's feedback and review the detailed hearing discussions in order to understand how he can improve his chances of parole in the future.

In addition, we have observed and documented a number of concerning interpreter errors in recent hearings. *See* Q4 2020 Report at 6-10; Q2 2021 Report at 9-14; Q1 2021 Life Prisoner Monitoring Report (June 30, 2021) at 4-7; Q3 2021 Life Prisoner Monitoring Report (November 30, 2021) at 7-8; Ltr. from C. Jackson to Defendants, Follow-up re Advocacy for ▅▅▅▅, ▅▅▅, DPH, DPS (December 23, 2020) at 4-8. Having a video record of the hearing is the only way we can definitively document and prove any such errors took place. More importantly, it is the only means by which Mr. ▅▅, or others in his situation, can challenge the interpretation of what it allegedly said if there is disagreement with any part of the hearing transcript. As such, a video recording is critical to protect the due process rights of our deaf clients who use sign language.

[3849475.2]

**PRIVILEGED AND CONFIDENTIAL**
Heather McCray
Jessica Blonien
Nichole Miller
January 14, 2022
Page 3


> **B.      Need for Two Interpreter Teams**

Mr. ▌ also requires a full team of two qualified sign language interpreters and two certified deaf interpreters to have effective communication during the hearing.  Of the last three deaf signers to go forward with their BPH hearing, two ▌,▌ and ▌, ▌) have had hearings that lasted eight hours or longer.  This is much too long for a single interpreter to work, especially in a legal setting.  *See* Lomio Letter at 2-3.  As Plaintiffs' counsel has previously explained, a hearing sign language interpreter and CDI must work simultaneously to ensure effective communication and cannot rest while the other is working.  *See* Q4 2020 Report at 10-11; Q2 2021 Report at 13-14.

Two sets of interpreters are necessary for the interpreters to have sufficient rest to interpret accurately and to monitor the translation for accuracy.  *See* Lomio Letter at 2-4; Q4 2020 Report at 10-11; Q2 2021 Report at 13-14.  Studies have shown that the accuracy of an interpreter's translation declines after just thirty minutes of continuous translation.  *See* Lomio letter at 2-3.  Taking breaks lessens this risk, but cannot guarantee complete accuracy.  Having a second team of interpreters to monitor the first team for accuracy ensures that errors are corrected in real time.

We appreciate your attention to this important matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:    Caroline E. Jackson

CEJ:aa
Encls.: Lomio Letter
cc:    ADA General email          Mina Choi
       Nichole Miller             Brian Lutz
       Jim Logsdon                Sara Puricelli
       Heather McCray
       Marcus Bole

[3849475.2]

# EXHIBIT 58

[4388762.1]

PAROLE SUITABILITY HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Parole    CDC Number:
Consideration Hearing of:

████████████



████ AM

PANEL PRESENT:
DIANNE DOBBS, Presiding Commissioner
EDWARD TAYLOR, Deputy Commissioner

OTHERS PRESENT:
████████████  Inmate
████████████, Inmate Attorney
MARTIN DOYLE, Deputy District Attorney
CHANCELLOR VEAL, Observer
SUSANNA MURADYA, Observer
CAROLINE JACKSON, Observer
MARK JACKSON, Observer
RACHEL KLEIST, Certified Deaf Interpreter
TROY WILLIAMS, Sign Language Interpreter
UNIDENTIFIED, Correctional Officer

Transcribed by:

Carl Balba

2

INDEX

| | Page |
|---|---|
| Proceedings | 3 |
| Case Factors | -- |
| Pre- Commitment Factors | -- |
| Post-Commitment Factors | -- |
| Parole Plans | -- |
| Closing Statements | -- |
| Recess | -- |
| Decision | -- |
| Adjournment | 12 |
| Transcript Certification | 13 |

Conduit Transcriptions

3

**PROCEEDINGS**

**PRESIDING COMMISSIONER DOBBS:** Let's go on the record.

**DEPUTY COMMISSIONER TAYLOR:** We're on the record.

**PRESIDING COMMISSIONER DOBBS:** We're on the record. Today's date is ████████████, and the time is now ████ AM. We are conducting this hearing by video conference, uh, with Mr. ████ present at the ████████ ████████████ Um, he has a sign language interpreter, as his staff assistant present with him. He also has a, American Sign Language interpreter on the screen, um, and he has a Certified Deaf Interpreter also on the screen who is pinned. This is a sixth subsequent parole suitability hearing for ████ ████ Uh, he is present in the hearing room again, like I said, with, uh, a staff assistant who is also a sign language interpreter. All other participants are appearing by video conference and we'll identify themselves shortly. So, I do want to swear in, um, each sign language interpreter, um, for you, Ms. Kleist.

**DEPUTY COMMISSIONER TAYLOR:** She is muted. Uh, I'm not sure if she even talks.

**PRESIDING COMMISSIONER DOBBS:** Hang on. I'm not speaking right now.

**DEPUTY COMMISSIONER TAYLOR:** Oh.

**PRESIDING COMMISSIONER DOBBS:** Um, I, I'm typing right

4

now, so just give me a moment please. All right. So, I'm asking Ms. Kleist. Do you solemnly swear that you will well and truly interpret sign language to the best of your ability?

**STAFF ASSISTANT UNIDENTIFIED:** And Ms. Kleist is saying yes, I will to the best of my ability.

**PRESIDING COMMISSIONER DOBBS:** Thank you. And to you, to you, Mr. Williams, do you also solemnly swear that you will interpret American Sign Language into English and English into American Sign Language to the best of your ability?

**SIGN LANGUAGE INTERPRETER WILLIAMS:** Yes, I promise, I will.

**PRESIDING COMMISSIONER DOBBS:** Thank you. All right. Uh, Mr., Mr. ████ excuse me, is qualified for elder parole consideration. And so, where we going forward with the hearing today, um, we would give special consideration to the elder parole factors. This hearing is being audio recorded. So, for purposes of voice identification, I will call on each participant. And in some cases, I will just state the names. Um, and when I do, please give me your first name and spell your last name. I will go ahead and state Ms. Kleist's appearance for the record her name is Rachel Kleist, K-L-E-I-S-T. And she is a Certified Deaf Interpreter. Mr. Williams, go ahead and state your

5

appearance, please.

**SIGN LANGUAGE INTERPRETER WILLIAMS:** My name is Troy Williams, W-I-L-L-I-A-M-S and I am a Sign Language Interpreter.

**PRESIDING COMMISSIONER DOBBS:** Thank you. All right. We'll have, um, Mr. ████, your first name and spell your last name, please. And also give us your CDCR number.

**INMATE ████ THROUGH INTERPRETER:** My name is <inaudible> — ████ My CDC number is ████

**PRESIDING COMMISSIONER DOBBS:** Thank you. My name is Dianne Dobbs, D-O-B-B-S. I'm the Presiding Commissioner, Board of Parole Hearing. Commissioner, um, Taylor?

**DEPUTY COMMISSIONER TAYLOR:** Yes, I am Edward Taylor, T-A-Y-L-O-R, Deputy Commissioner, appearing by Teams.

**PRESIDING COMMISSIONER DOBBS:** Mr. ████

**ATTORNEY ████** Good morning, everybody. My name is ████ ████ Attorney for Mr. ████

**PRESIDING COMMISSIONER DOBBS:** Um, Mr. Doyle?

**DEPUTY DISTRICT ATTORNEY DOYLE:** Good morning. Uh, Deputy District Attorney Martin Doyle, D-O-Y-L-E, with the San Diego District Attorney's Office.

**PRESIDING COMMISSIONER DOBBS:** Uh, Mr. Veal?

**OBSERVER VEAL:** <inaudible> —

**PRESIDING COMMISSIONER DOBBS:** Can't hear you.

6

**OBSERVER VEAL:** Chancellor Veal, V-E-A-L, —

**DEPUTY COMMISSIONER TAYLOR:** His voice was real— his voice was really muted. Maybe if he could say it a little louder.

**PRESIDING COMMISSIONER DOBBS:** That's fine. I will say it. It's Chancellor Veal, Veal is spelled V-E-A-L, and he is an Attorney with the Board of Parole Hearings and observing today.

**DEPUTY COMMISSIONER TAYLOR:** Okay. Thanks.

**PRESIDING COMMISSIONER DOBBS:** Um, Ms. Muradyan?

**OBSERVER MURADYAN:** Hi, uh, Susanna Muradyan, M-U-R-A-D-Y-A-N. Uh, and I'm an Attorney with the Board of Parole Hearings.

**PRESIDING COMMISSIONER DOBBS:** Uh, and then let's see, Ms. Jackson?

**OBSERVER C. JACKSON:** Hi, my name is Caroline Jackson. The last name is spelled J-A-C-K-S-O-N. I'm an Attorney with Rosen bien Galvin in Grunsfeld. Um, and so I'm an Armstrong Attorney.

**PRESIDING COMMISSIONER DOBBS:** Thank you. Mr. Jackson?

**OBSERVER M. JACKSON:** Good morning, everyone. My name is Mark Jackson, spelled J-A-C-K-S-O-N. I'm a Deputy Attorney General with the California Department of Justice, Office of the Attorney General. And I'm observing today. Thank you.

**PRESIDING COMMISSIONER DOBBS:** Thank you, everyone. Now, before we, uh, take your request, Mr. ████ I just want to note for the record, the, um, accommodations that are required for this hearing today, uh, for Mr., um, Mr. ████ So, I reviewed the DECS database system, that's D-E-C-S, database system and the form 1073. It notes that Mr. ████ has a 2.0 TABE score. That's T-A-B-E, score, it notes that he does not have a high school diploma or a GED. So, I noticed that there is no interpreting going on, um, by those on the screen.

**SIGN LANGUAGE INTERPRETER WILLIAMS:** Okay. Um, I can start, that's why I can interpret, uh, —

**PRESIDING COMMISSIONER DOBBS:** Yes, please.

**SIGN LANGUAGE INTERPRETER WILLIAMS:** — but I thought he has interpreted they're sitting with him.

**PRESIDING COMMISSIONER DOBBS:** No, no, —

**SIGN LANGUAGE INTERPRETER WILLIAMS:** <inaudible> —

**PRESIDING COMMISSIONER DOBBS:** — I need, I need you to interpret so that Ms. Kleist can interpret as well, okay?

**SIGN LANGUAGE INTERPRETER WILLIAMS:** Okay. Okay.

**PRESIDING COMMISSIONER DOBBS:** All right. So, um, what I said is he has a 2.0 TABE score. That's T-A-B-E score. He does not have a high school diploma or a GED or accommodations. We have provided him with a staff assistant who is present in the room with him and who also

signs. I am told that he also uses a hearing vest and I see him wearing one. He requires a knee brace. And, um, Mr. ██████ do you have your knee braces on today?

**INMATE ██████ THROUGH INTERPRETER:** It's broken <inaudible>. No.

**PRESIDING COMMISSIONER DOBBS:** All right. So, it's important that you see someone to make sure that you can get another one, okay? I also see from the record that you have some orthotics, um, is that special shoes or insoles in your shoes?

**INMATE ██████ THROUGH INTERPRETER:** That's correct.

**PRESIDING COMMISSIONER DOBBS:** All right. Very good. And you have those shoes on today?

**INMATE CARLE THROUGH INTERPRETER:** Yes.

**STAFF ASSISTANT UNIDENTIFIED:** Ms. Kleist is explaining, Ms. Kleist is explaining right now that Mr. ██████ does not have a current prescription for his knee brace, but that he can get a new knee brace by going to his doctor and requesting one.

**INMATE CARLE THROUGH INTERPRETER:** Correct, correct.

**PRESIDING COMMISSIONER DOBBS:** Okay. Very good. Thank you. I also note that as an accommodation. We have pinned Ms. Kleist, uh, to Mr., uh, ██████ screen. We have also made provisions, uh, to minimize the background noise in the room where Mr. ██████ is sitting. And that arrangement

is to mute as necessary, um, to avoid any unnecessary background noises. Mr. ▮ are you on any medications today that either make you sleepy or make it hard for you to concentrate?

**SIGN LANGUAGE INTERPRETER WILLIAMS:** I can't see, his, his, his hands are in his lap, so I can't see.

**PRESIDING COMMISSIONER DOBBS:** Um, Mr. ▮ can you, can you sign that again, please? So that Mr. Williams can interpret.

**SIGN LANGUAGE INTERPRETER WILLIAMS:** So, what was the question again? He said he missed the questions.

**PRESIDING COMMISSIONER DOBBS:** Okay. So, the question is, are you on any medications today that make you either sleepy or make it hard for you to concentrate?

**INMATE ▮ THROUGH INTERPRETER:** I'm on I'm on, uh, for the, uh, blood pressure medicine <inaudible> high, high cholesterol, correct? High cholesterol?

**PRESIDING COMMISSIONER DOBBS:** Okay. So, does that make you sleepy or make your, make it hard for you to stay awake or concentrates?

**INMATE ▮ THROUGH INTERPRETER:** Nope.

**PRESIDING COMMISSIONER DOBBS:** Okay. Very good. All right. So, those are the accommodations that, um, we had provided today. Um, Mr. ▮ do you believe that your client's ADA rights have been met?

10

**ATTORNEY** ███████   Up to this point, yes.

**PRESIDING COMMISSIONER DOBBS:** All right. Very good. So, we did have some off the record discussions and you have made a request for a postponement. Uh, —

**ATTORNEY** ███████   Yes.

**PRESIDING COMMISSIONER DOBBS:** — in, in those off the record discussions. I did, uh, take the position of both Attorneys, but just to state it on the record, if you just go ahead and state your request for the record, please.

**ATTORNEY** ███████   We need to establish effective communication; we'd like the hearing to be in-person. Believe, I believe that fusion should be alleviated as much as possible. And I think it will be less bewildering in the same room as the Commissioners, his Attorney, and his interpreter. And I, I do want to say on the record right now, and I know there's a contract and that's important, but I think communication would be added to most effective if he were in the same room with an interpreter that he knows trusts and understands in the institution.

**PRESIDING COMMISSIONER DOBBS:** Thank you. All right. And, um, Mr. Doyle, you indicated off the record that, um, you're not opposed to a postponement based on the requests? Is that still your position, sir?

**DEPUTY DISTRICT ATTORNEY DOYLE:**   That's correct,

11

Commissioner.

**PRESIDING COMMISSIONER DOBBS:** All right. Very good. So, as I indicated off the record, we are prepared to grant your request for postponements to the next available in-person hearing for the reasons stated, anything further today? Mr. ▮▮▮▮▮▮ anything further?

**SIGN LANGUAGE INTERPRETER WILLIAMS:**   He said, I'm fine. He's, he, he's satisfied.

**ATTORNEY▮▮▮▮▮▮:**   No, Commissioner.

**PRESIDING COMMISSIONER DOBBS:** All right. Very good. All right. This concludes this hearing. The time is now 9:14 AM. Thank you, everyone.

**DEPUTY COMMISSIONER TAYLOR:**   Off the record.

12

**ADJOURNMENT**

THIS TRANSCRIPT CONTAINS THE PROPOSED DECISION OF THE BOARD OF PAROLE HEARINGS (BOARD) ANNOUNCED AT YOUR RECENT BOARD HEARING AND IS PROVIDED TO YOU IN COMPLIANCE WITH PENAL CODE SECTION 3041.5, SUBDIVISION (A)(4), AND CALIFORNIA CODE OF REGULATIONS, TITLE 15, SECTION 2254. THIS PROPOSED DECISION WILL BECOME FINAL WITHIN 120 DAYS OF THE DATE OF THE HEARING AS REQUIRED BY PENAL CODE SECTION 3041, SUBDIVISION (B), UNLESS THE BOARD NOTIFIES YOU IN WRITING BEFORE THEN THAT THE PROPOSED DECISION HAS BEEN MODIFIED, VACATED OR REFERRED TO THE FULL BOARD, SITTING EN BANC, DUE TO AN ERROR OF LAW, ERROR OF FACT OR NEW INFORMATION PURSUANT TO CALIFORNIA CODE OF REGULATIONS, TITLE 15, SECTION 2042. THEREAFTER, THE GOVERNOR HAS AUTHORITY TO REVIEW THE BOARD'S DECISION AND AFFIRM, MODIFY, OR REVERSE IT PURSUANT TO PENAL CODE SECTIONS 3041.1 AND 3041.2.

13

## CERTIFICATE AND DECLARATION OF TRANSCRIBER

I, Carl Balba, am a disinterested party, and have no interest in the outcome of the hearing. Further, I certify this transcript is a true, complete, and accurate record, to the best of my ability, of the recorded material provided for transcription of proceeding for:

In the matter of the Parole   CDC Number: ███████
Consideration Hearing of:

████████████

Signed: *Carl Balba*

Transcribed by: Carl Balba

Conduit Transcriptions

Copyright 2022 / All Rights Reserved by BPH

# EXHIBIT 59

[4388762.1]

Board of Parole Hearing
Quality Control Unit
1515 K Street, Suite 600
Sacramento, CA 95814

January 3, 2023

To whom it may concern:

I am resending this completed form to you. I have not received a reply from your office, so I am enclosing a copy for your convenience.

I will be waiting for your reply.

Sincerely,

████████████

████████, ████████

████████

P.O. Box ████████

████████████████,

BOARD OF PAROLE HEARINGS                                                STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATIONS – GRIEVANCE PROCESS
BPH 1074                                              Log Number:_____

| C. | INMATE OR PAROLEE TO COMPLETE **AFTER** THE HEARING |

☐    I did not get all the help with my disability that I needed during the hearing. Earlier, I requested that help on the BPH Form 1073, or a new disability problem came up at the hearing. I need a new hearing with more help, because: I requested a Certified Deaf Interpreter. There was no CDI provided. The Hearing interpreters provided were remote Interpreters and there were numerous problem with the internet connection. I was continuously interrupted when I was answering their questions "SEE attached"

▆▆▆▆▆▆▆▆▆            ▆▆▆▆▆▆▆▆▆▆▆            ▆▆▆▆▆▆▆            ▆▆▆▆▆▆▆

Inmate/Parolee Print Name        Inmate/Parolee Sign Here        CDCR Number        Date

| D. | RESPONSE TO A GRIEVANCE FILED AFTER THE HEARING |

Date Received by Quality Control Unit:_____        Type of Parole Proceeding:_____

Decision

☐ Granted        ☐ Granted with Changes        ☐ Denied        ☐ No Action Required

_____

_____

_____

_____

Chief Deputy Commissioner/Designee Signature            Date Completed

| E. | TO INMATE OR PAROLEE |

1. After the hearing the inmate, parolee, or their attorney may file the grievance, concerning denial of disability accommodations at the hearing, by mailing this form to:

> Board of Parole Hearings
> Quality Control Unit
> 1515 K Street, Suite 600
> Sacramento, CA 95814

2. All ADA grievances related to parole revocations shall be answered within 10 days from the time they were received at BPH.

3. All ADA grievances for the life prisoners shall be answered within 30 days from the time they were received at BPH.

NAME ▆▆▆▆▆▆▆▆        CDCR NUMBER ▆▆▆▆▆▆        TYPE OF PROCEEDING        LOCATION

BPH 1074 (Rev 01/06)                        Page 2 of 2

Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

Lastly, my hearing was postponed from ███████████ to ███████████ to have in-person Board Hearing with in-person Interpreters, including an in-person CDI.

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



May 25, 2023



▮▮▮▮▮▮▮▮▮ :

This is in response to your October ▮▮▮▮ Grievance (BPH 1074) and January ▮▮▮▮ letter regarding your ▮▮▮▮▮▮▮▮▮ parole consideration hearing, which resulted in a denial of parole for three years. Specifically, you allege: a Certified Deaf Interpreter (CDI) was requested but not provided; the hearing interpreters that were provided were remote, i.e. the hearing was not held in person; there were numerous problems with the internet connection during the hearing; and you were continuously interrupted when you were answering questions.

As an initial matter, the board has completed a review of your hearing transcript, central file, and Comprehensive Risk Assessment, and has determined that the panel members fully considered all of the information before them, including the factors that indicate suitability, and properly exercised their judgment in making their findings.

After reviewing all relevant information before it, the panel denied parole based primarily on your lack of insight into the causative factors and triggers for your pedophilic disorder. The panel found your insufficient progress in addressing your pedophilic disorder had a direct nexus to the risk factors from your commitment offense and continues to demonstrate evidence of current dangerousness. For these reasons, the panel concluded that you remain an unreasonable risk of danger to the public. Consequently, no grounds appear to overturn the panel's decision.

As to your specific allegations, first, records indicate you did not request a CDI for either your ▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮▮ hearings. Rather, you requested, and were provided with, an American Sign Language interpreter. (BPH 1073, Notice and Request for Assistance at Hearing, dated January ▮ ▮▮▮ and August ▮▮▮▮ .) While it does not appear you have requested a CDI in the past, the Board will note your request and provide a CDI as an accommodation for future hearings.

Second, as to your allegation that your hearing was postponed to be held in person, and was not held in person, is incorrect. The hearing panel, your attorney, Staff Assistant/ASL interpreter, and observers all attended in person. Only the team of two additional ASL interpreters appeared by video. The board attempted, but ultimately was unable, to secure an in-person ASL interpreter. In accordance with the board's regulations allowing interpreters by video when necessary to retain a provider, the board retained the two ASL interpreters for video interpretation. It also appears an additional accommodation was provide as you were assisted in person by Staff Assistant ▮▮▮▮▮ , with whom you are familiar as she is an ASL at the institution. The record indicates Staff Assistant ▮▮▮▮▮ assisted several times during the hearing to clarify and expand on your responses to the hearing panel's questions. (p. 44, 58, 83.) In addition, you were advised several times by your attorney and the hearing panel that if you did not understand, questions could be rephrased and repeated. (p. 39-40.)

Lastly, as to videoconference connectivity issues and interruptions, at several points it does appear the video screens were "frozen", but quickly resolved and any questions repeated or your answer clarified by the Staff Assistant. (p. 11, 17, 19, and 32.) In addition, the hearing panel asked you to remove your

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                              GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



hearing vest to help with signing, repositioned the video camera for a more direct, frontal view, and had you remove your mask for the importance of facial expressions. (p. 39). The board finds effective communication was achieved with the use of the Staff Assistant, your attorney, and two ASL interpreters.

You may petition the board to advance your next hearing date if there has been a change in circumstance or new information that establishes "a reasonable likelihood that consideration of the public safety does not require the additional period of incarceration." (Pen. Code, § 3041.5, subd. (d).) You may do so by letter or by filling out a BPH 1045-A Petition to Advance (PTA) form. Please note, once you submit a petition to advance, you may not submit another petition for three years from the date of the board's decision on your last petition.

If you do not submit a petition to advance, the board will review your case approximately one year after your parole consideration hearing to determine whether to advance your next parole consideration hearing to an earlier date. (Pen. Code, § 3041.5, subd. (b)(4).)

Sincerely,

R. GOMEZ
Senior Staff Attorney

# EXHIBIT 60

[4388762.1]

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF** ▮▮▮▮ **IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PRIOR INJUNCTIONS REGARDING DEAF AND VISION IMPAIRED CLASS MEMBERS** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:  Hon. Claudia Wilken |
| | Crtrm.: 4 |

[4289783.4]

Case No. C94 2307 CW

DECLARATION OF ▮▮▮▮ IN SUPPORT OF PLAINTIFFS MOTION TO ENFORCE

I, ████████████ do hereby declare:

1. I live in Sacramento, California. I am ██ years old. I was previously incarcerated in the California Department of Corrections and Rehabilitation ("CDCR") between ████ and ████. For most of that time, I was housed at the ███████████ ████████████████████████████████████ in ████████ California. My CDCR identification number is ██████.

2. I am deaf. I rely on American Sign Language ("ASL") as my primary method of communication. In the CDCR system of classifying disabilities, my disabilities have codes of DPH and DPS, meaning that I am deaf and also do not speak. According to CDCR, my "secondary" method of effective communication is "written notes." However, written notes does not work well for me as a communication method because of my limited reading abilities.

3. I have been deaf from childhood. I suffered a high fever when I was two years old, and maybe that caused it. I do not know for sure. No one in my family knew sign language. My mom tried to communicate with me through gestures and "home signs." My dad didn't really try to use home signs. I tried to read lips. It was very hard to understand what was happening around me. I was very isolated and had few friends when I was a child because I could not hear or speak.

4. When I got to high school, I was in a special needs class that had three deaf people. There was a sign language interpreter. But it was hard for me to understand the interpreter because I did not know much ASL yet. I was able to learn a little more ASL in high school, but not nearly enough to be fluent. I did not fully learn ASL until I got to prison and had a large community of other deaf signers around me.

5. Because of the lack of communication and language when I was younger, I need extra support when someone explains new concepts to me, even in ASL. If someone just uses a surface-level way of explaining things, I will not understand. I need the person to give examples that relate to my life, or act things out. I have noticed that most people,

including ASL interpreters, do not use these types of communication techniques. Usually only other deaf people communicate this way.

6.    I also do not have a good understanding of English vocabulary and grammar. I still don't. In prison, I took the "Test of Adult Basic Education," ("TABE"), to document how well I could read, write and do math. I guessed on a lot of it. I received a score of 5.0. I can identify words in a sentence but I do not know the meaning of what they are trying to say. For example, if the sentence is: "The boy is awaiting support." I recognize the words "the," "boy," and "is," but I do not know what "awaiting" or "support" mean. Because I do not know those words, I do not know what the sentence means. That happens a lot. I can identify some words in a sentence but cannot understand the message. Reading printed material takes a lot of time and I need support to get the main points. I do not know what the sentences in most books mean because some of the vocabulary is too big and unfamiliar.

7.    I went to prison in ▌. After a few months at a Reception Center, I was sent to ▌ I was told ▌ was the only place I could be because of my disability and criminal charges. I stayed at ▌ until I was released from prison last year.

8.    I asked to be put in education when I got to prison. I wanted to be in school because I knew my education was not up to par – I could not read and write well. But I was told I was not allowed to be in school because I already had a high school diploma.

9.    Prison was overwhelming. Interpreters were rare, and before 2016 there were no interpreters for self-help classes. I was given written materials, and I could tell that people around me were talking, but I am not a skilled lip reader. I was assigned to a dry cleaning vocational programming but then was told I could not do it because I was deaf. They told me it would be too dangerous for me because I could not hear a car driving or the machine, or someone yelling, "Watch out!" There was no interpreter for the dry cleaning class. I was briefly assigned to an autobody vocational program, which did have an interpreter, but then I was transferred to a different yard that did not have that program.

10. Even when interpreters were provided for self-help programs after 2016, it was hard to understand what was being said. The interpreters did not explain clearly what the other people were saying. It was just a word-for-word translation with no examples and I could not understand the meaning of what was being said. It was even worse when interpretation was provided on a computer through Video Remote Interpretation, which is a system for providing a sign language interpreter through a computer and camera, kind of like Zoom. Since the interpreter was not in the room with me, and I often was not told what the others were saying although I would see several people talking at the same time. The interpreter also could not see what is going on, including whether the teacher is using the whiteboard to convey information, and so the interpreter would not be able to understand the teacher when the teacher was referring to something on the whiteboard. If I were to ask the interpreter a question to clarify what they interpreted, I would delay the class. Other people in the class would complain that the deaf person (me) is holding up the class. But if the interpreter explains what is happening just to me and the rest of the class continues, then the interpreter is behind the presenter and misses what was said while they (the interpreter) were explaining something to me.

11. Most self-help groups gave homework that I was supposed to fill out. But it was all in written English. You don't get an interpreter to help you with your homework. Interpreters are only available for limited classroom time. So if you don't understand what the homework is about, you have no one who can support you. You can "pass" easily by copying other people's answers, but then you do not learn the concepts and are not prepared to explain at a parole hearing what you learned. So while I was given homework and was able to turn it in, I was completely lost, couldn't understand, and felt frustrated. I did not understand what the group was trying to teach me or how it applied to me. I got a certificate that said I completed a class, but I did not learn what I needed to better myself and be able to clearly explain at my parole hearing what I had learned.

12. I really wanted to learn from these programs while I was in prison. I wanted to improve my life. I wanted to be able to clearly explain to the parole board what I had

DECLARATION OF ███████████ IN SUPPORT OF PLAINTIFFS MOTION TO ENFORCE

learned, and that I now understood my crime and why I was punished, and I wanted to be able to show the families of the victims, my own family, and others how I have improved and how I am now a changed person. Those programs also would have help me develop an understanding and skills to help me be more successful once I was out of prison.

13. I got better at ASL while in prison. That is because a deaf pastor volunteered at the prison. The deaf pastor communicated with me directly in ASL. There was clarity; concepts were more understandable and with him we could talk about something by using more than gestures. It was my own language. He inspired me. He was able to explain in ASL the meaning of vocabulary words in the Bible, and explain the concepts to me. I wish I had been able to go to school in prison with someone like the deaf pastor to teach me. He explained things so clearly in ASL. When I look at the words in the Bible, I do not understand them. When non-deaf people try to explain the Bible to me, I do not understand it. I would wait for the deaf pastor to come visit. I would say, "Tell me, what does this mean?" And then he would explain what it meant by incorporating movement, facial expressions, using examples, ways of acting out the story that made it come alive – ASL features that made it visually understandable. The deaf pastor gave me a new sense of life.

14. I had a parole hearing in ▆. Before my hearing, I was interviewed by a psychologist for my "Comprehensive Risk Assessment" ("CRA"). The interpreter for the interview was one of the staff interpreters at ▆ I was not comfortable with a staff member being the interpreter for this interview. The interview covered a lot of personal and difficult topics about me, my personality, my background, and my crimes. I could tell the staff interpreter was surprised by his facial expressions. I did not feel that I was able to express myself freely because the staff interpreter was there. I could not go into depth because of the staff interpreter's presence. An outside interpreter would have been better. I would have been able to express myself comfortably without worrying about whether they would talk with other ▆ staff and interpreters and spread rumors, particularly about the sexual nature of my criminal offense.

15.    It is very dangerous in prison for someone who has a criminal offense like mine. I could be in danger if other incarcerated people knew about it. I have learned that if a person shares why they are in prison, they could be hurt or killed. They could get a bad reputation and be taken advantage of. Prison is very dangerous for people who have sexual abuse charges.

16.    After the interview, I received a written CRA report, but nobody interpreted the report to me in my language. There was no one I could ask to read it in ASL to me. It would be a risk to ask anyone for help. If I asked a staff interpreter who worked at ███ to read it, they would know too much about me and my crime. Asking a Correctional Counselor was no better, because they would have to use the staff interpreter to read it to me. The Counselor is also a ███ staff person and also might tell other staff about the personal topics and details of my crime in the CRA report. The same problem would happen if I asked another incarcerated person for help. If I let them read my background they might misunderstand something I said and then go spread rumors about me or twist the words in whatever way they want.

17.    I did not understand the words used in the written CRA report. The words confused me. I could not tell if what was written in the report is correct. From what I did understand from the report, it seemed like there were a lot of misunderstandings in the interpretation. I don't think I understood what the psychologist was asking me. Maybe it was a problem with how the staff interpreter interpreted the questions. It's hard to tell. Rita Lomio, an attorney for plaintiffs in *Armstrong*, told me recently that my CRA report says that I said "I became fluent [in ASL] at 15 or 16." That is not correct. I never said that. I was not fluent in ASL then.

18.    I did not know I could challenge what the CRA said before I went to my parole hearing.

19.    I had a hard time preparing for my parole hearing. My assigned attorney, ███ only met with me once. The staff interpreter was there when I met with Mr. ███ Mr. ███ gave me a stack of papers. I asked Mr. ███ if he was going to help

me, and Mr. ▆ said no. He said I needed to learn it all on my own. I felt so unprepared. I did not know what to expect at my parole hearing.

20.    I asked Mr. ▆ to help me write a letter of remorse and to help me review my insight. Mr. ▆ refused to help and told me to write the letters on my own and to send him copies of them. I asked if he could make sure my writing is clear, because I cannot write well in English. Mr. ▆ told me that he did not do that and would not help me. I asked Mr. ▆ if he could help me with a relapse prevention plan. He told me it wasn't his problem, and to just put it in my own words. I again told him that I need help with writing, but he said it wasn't his problem. I tried to explain to Mr. ▆ that I had a hard time getting in programs at ▆ because there was no interpreter present, but Mr. ▆ just ended the interview. I felt so hopeless. There was no one to support me. Everyone was saying that it wasn't their responsibility to help me. Even my own lawyer said that.

21.    Other incarcerated people who had parole hearings soon would meet to help each other prepare for their hearings. I tried to join them, but there wasn't an interpreter for those meetings, so I could not understand what was being said. There were no other deaf people in the group. Sometimes someone would write simple sentences to me about what was being shared, and I would try to identify the words and understand what was written. Mostly I would just sit and wait, and try to read whatever people shared as best I could. I would try to copy sentences for my own written work, because I do not know how to write well enough on my own, and did not know what I was supposed to write.

22.    Rita Lomio, an attorney for plaintiffs in *Armstrong*, told me recently that my CRA report said I "presented with the context of the current interview a written document titled, 'Relapse Prevention Plan for Sexual Offending.' The document was brief, undeveloped and listed four sources of support." That is a document I tried to create on my own without really understanding what it should include, based on what other incarcerated people shared with me, and that Mr. ▆ would not help me with.

23. My parole hearing was on ███████. I was denied parole. There was only one interpreter at the hearing. I could tell right away that the interpreter did not seem to understand how I explained and expressed myself. Usually, a deaf person and an interpreter do a "warm-up" with each other before the actual meeting starts, to get familiar with each other's signs. During that warm-up, I asked the interpreter a few simple questions, and her responses clearly told me that she did not understand me. I tried to tell my attorney that something was wrong, that the interpreter and I could not understand each other, but my attorney said I'd have to postpone for a year if I wanted another interpreter. I didn't want to wait a year, so I went ahead with the hearing.

24. I noticed problems throughout the hearing. Normally, interpreters ask me for clarification to make sure they understand the signs I am using and what I mean. A lot of ASL signs can look similar, and the meaning of a sign can change based on expression, so it is important that the interpreter clearly understand what the deaf person is trying to say before they interpret it into English. Interpreters should ask things like, "Are you saying this or that?" But this interpreter never asked me anything. She didn't ask for any clarification of what I was saying. I do not trust that she was accurately conveying what I was saying to the commissioners. The interpreter also seemed to get tired throughout my parole hearing, which went from ██████ until ██████. There was no other interpreter present to help correct her or to take turns with her. I felt hopeless; I felt like I was not able to communicate clearly with the commissioners.

25. After my hearing, prison officials gave me a written English transcript of my hearing. I cannot read well enough to understand it fully on my own. What I did understand told me that there were interpretation problems. For example, the interpreter told the commissioners I said I was a "follower." That is not correct. I never used that word. I said the opposite – that other people looked up to me. I was trying to explain how I now recognize and feel remorse that I had abused my power over people who looked up to me and viewed me as a role model because I was a popular person. So the exact opposite of what I meant was relayed to the commissioners.

26.   I was not given a video recording of the parole hearing. If there was a recording, it would be easier to see if the interpreter made mistakes, including whether the commissioners said more information than was conveyed to me, or if what I said was not conveyed accurately to the commissioners. A video recording along with captioning would help me learn vocabulary and see what is being said by all the people in the room and would help me prepare for my next parole hearing.

27.   The BPH commissioners told me when they denied me parole that I needed to get a better understanding of why I committed my crime. After the hearing, I asked mental health staff if I could have help, but they said I was not eligible for individual counseling services and to ask my assigned Correctional Counselor for help. My Counselor told me to ask mental health for help. I could not do book reports because I can't understand written English well enough to read books or write down how what is in the books applies to me. If I were to try to write down my thoughts in English, the commissioner would think, "This doesn't make any sense." The commissioner is used to how non-deaf people express themselves. But there's no way a deaf person like me can express themselves in a written language that is not theirs – ASL cannot be written.

28.   In ███, I got a written document called, "Administrative Review Decision Form." It was dated ████████, and said that my next parole hearing would not be moved earlier. It said that I had not "sufficiently addressed the prior panel's particular concerns," which were my "lack of understanding of the causative factors of the commitment offenses," and my "lack of programming to resolve the causative factors that led to the crimes." I got out of prison last year because my sentence was completed, not because I was granted parole. I only ever had that ███ parole hearing.

29.   Although I am no longer in prison, I am submitting this declaration because I want to do whatever I can to ensure that other deaf people do not face the barriers I faced. Deaf people face a lot of obstacles in prison. Things that may be easy for hearing people – like writing apology letters and going to self-help classes to help develop insight and understanding of one's crime – are hard for deaf people. Hearing people are able to

communicate directly with commissioners, expressing themselves beautifully and clearly, but deaf people are limited in their ability to express themselves. It is not fair.

30. This declaration was communicated to me by a team of certified sign language interpreters before I signed it. An attorney was also present. This process let me ask clarifying question and make corrections to ensure that I understood the entire document and its content was correct.

I do so declare, under the penalty of perjury, that the foregoing is true and correct and that this declaration was executed this _9_ day of August, 2023, at ███████████, California.

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF ETIENNE HARVEY** |
| v. | |
| GAVIN NEWSOM, et al., | Judge:  Hon. Claudia Wilken<br>Crtrm.:  4 |
| Defendants. | |

[4289783.4]

Case No. C94 2307 CW

DECLARATION OF ETIENNE HARVEY

I, Etienne Harvey, do hereby declare:

1. I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. I am a certified sign language interpreter and fluent in American Sign Language.

3. On ▮▮▮▮▮, and ▮▮▮▮▮, I provided sign language interpretation services for ▮▮▮▮▮ who communicates using American Sign Language, when he met with Rita Lomio, an attorney with the Prison Law Office. Another sign language interpreter assisted me.

4. On ▮▮▮▮▮, I communicated the contents of Mr. ▮▮▮'s declaration to Mr. ▮▮▮ by translating the declaration from English into American Sign Language.

5. I affirm that I interpreted the declaration accurately, completely, and impartially.

I declare, under the penalty of perjury, that the foregoing is true and correct and that this declaration was executed this 23 day of August, 2023, at Fresno, California.

Etienne Harvey

Etienne Harvey

# EXHIBIT 61

[4388762.1]



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

July 20, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

<table>
<tr><td>CONFIDENTIAL</td></tr>
<tr><td>SUBJECT TO<br>PROTECTIVE ORDERS</td></tr>
</table>

Heather McCray
Assistant Chief Counsel
Board of Parole Hearings
Heather.McCray@cdcr.ca.gov

Jennifer Neill
Chief Counsel
Board of Parole Hearings
Jennifer.Neill@cdcr.ca.gov

Re:   *Armstrong v. Brown:* BPH Issues
      Request for Decision Review, Administrative Review, New CRA, and New
      Board Hearing for DPH Class Member ███████, ██████, at ████
      <u>Our File No. 581-4</u>

Dear Heather and Jennifer:

I am writing regarding the ████████ Hearing at ████ for ████████, █████, a DPH, DPS class member who has no TABE reading score listed, and an overall TABE score of 5.0.  You may recall that the parties discussed Mr. ████ hearing at our meeting on ████████.  At the meeting, based on my description of the problems with appointed attorney ██████, Jennifer Neill indicated that Defendants would strongly consider not hiring Mr. ████ in the future to represent class members.  Mr. █████ has also submitted a bar complaint against Mr. ████.

We are requesting that Mr. █████ be given a new hearing because of the inadequacies in the representation he was provided in preparing for the hearing by Attorney ████, and because of other problems with the hearing and with the assistance

[3279792.2]

Heather McCray
Jennifer Neill
July 20, 2018
Page 2

given to Mr. ███████ in preparing for the hearing.  We are requesting both decision review and administrative review.

We also request that the failure of Mr. ██████ and CDCR staff to assist Mr. ██████ in understanding the Comprehensive Risk Assessment (the "CRA"), and his failure to assist Mr. ██████ in writing and reviewing his letter of remorse and apology letters, and his failure to assist Mr. ██████ by reviewing his central file, be investigated and added to the accountability log.  Given Mr. ███████ concerns about the CRA interview process, he probably should also have assisted Mr. ███████ in submitting an appeal challenging the CRA.

We are also requesting that Mr. ██████ be given a new Comprehensive Risk Assessment, given that he asserts he was not given enough time during his meeting with the Forensic Assessment Division psychologist to communicate effectively about the issues discussed during the meeting.  *See* **Exhibit A** hereto, ███████████ Hearing Transcript for ████████████████, ████████, at 60-61 ("I wanted to have more time to explain things but [the CRA clinician] had limited time and he needed to leave") and 65-66 (indicating needed more time to discuss his insight with the Board Psychologist).  To the best of our knowledge, Mr. ██████ was not made aware of and did not utilize the Comprehensive Risk Assessment appeal process.

The poor representation provided to Mr. ██████ in preparing for his hearing was pronounced.  Even before the hearing itself, the Prison Law Office brought some of these issues to your attention in an e-mail dated ████████████.  A copy of the Prison Law Office e-mail is attached hereto as **Exhibit B**.

We are concerned that in light of these problems, the hearing should have been postponed.  However, in the past, we have often experienced with our clients a difficult tension between postponing a hearing and going ahead despite poor preparations or disability-related problems with the CRA, because re-scheduling a hearing generally takes 9 months or a year.  If the class member in question has a real chance at getting released, this delay is very prejudicial.  During our upcoming meet and confer on August 16, 2018, we would like to discuss whether there is any way to re-schedule hearings more quickly in such cases to minimize any prejudice to our clients and to provide a viable remedy to our clients when they have not been accommodated in the hearing preparation process.  This need for a faster remedy is particularly important in Mr. ██████ case, since he will be released from his fixed term in a few years anyway (he is not a lifer -- he appeared before the Board as a youth parole case), so the next Board hearing scheduled for 3 years from now will come too late to make any meaningful difference in his release date.

[3279792.2]

Heather McCray
Jennifer Neill
July 20, 2018
Page 3



During my visit to ▮▮▮ for Mr. ▮▮▮ Parole Consideration Hearing on ▮▮▮ ▮▮▮, I interviewed Mr. ▮▮▮ about the assistance he was given preparing for the hearing. I also interviewed his appointed attorney ▮▮▮ about his hearing preparations with Mr. ▮▮▮ I also interviewed SATF staff about the hearing preparation done with Mr. ▮▮▮

*Attorney* ▮▮▮ *Failure to Provide Appropriate Accommodations:* Mr. ▮▮▮ has several serious complaints about his attorney's work in preparing him for the hearing. Overall, he said his attorney repeatedly said "I can't help you" when they met a few weeks before the hearing. For example, Mr. ▮▮▮ explained that he wanted to tell Mr. ▮▮▮ about his job as an ADA helper, but Mr. ▮▮▮ just said "I can't help you" when he raised this positive fact in his record. He says he also tried to show Mr. ▮▮▮ all his positive staff reports and certificates for completing programs and Mr. ▮▮▮ told him "I have nothing to do with that."

First, he indicated that Mr. ▮▮▮ refused to go over his Comprehensive Risk Assessment with him. ▮▮▮ reportedly told him that was not his job. When I interviewed Mr. ▮▮▮ during the tour, he confirmed that he does not believe it is his job to go over the CRAs with his clients.

Second, Mr. ▮▮▮ also reports that Mr. ▮▮▮ refused to assist him in reviewing letters of apology and a letter expressing remorse for his crimes. Given the fact that English is often a second language for individuals who communicate using American Sign Language, such assistance was critical for Mr. ▮▮▮ in making the best case that he is remorseful and should be allowed to parole. (Mr. ▮▮▮ said he did not recall Mr. ▮▮▮ asking for help with these letters.)

We note that in some respects attorney ▮▮▮ also failed to meet his duty of loyalty to his client by suggesting several times during the hearing that the likely outcome for Mr. ▮▮▮ was continued incarceration. *See* Exhibit A at 63. ("Attorney ▮▮▮ My recommendation would just be with his continued potential incarceration, I mean he needs to basically avail himself to some sort of medical service, you know, provision, inside the institution for some one-on-one counseling or some therapy to basically talk to someone like that who could better explain those little unique terms that [the Board Psychologists] use as part of their job."); *id.* at 103 (in his closing, ▮▮▮ discussed Mr. ▮▮▮ "moving towards suitability at some point in the future.")

When plaintiffs' counsel interviewed Mr. ▮▮▮ during the visit to ▮▮▮ he indicated he does not go over the CRA with his clients because "I am a not a counselor, I am an attorney." Mr. ▮▮▮ also indicated he does not go through the 602 history or

[3279792.2]

Heather McCray
Jennifer Neill
July 20, 2018
Page 4

review all the files regarding each client sent to him.  He indicated he met with Mr. ███████ a single time three weeks before the hearing, using the SATF staff interpreter. He said he was too busy to meet the mandated 45-days before the hearing deadline for meeting with his client.

    *Panel Accommodations for Mr.* ███████ *Low TABE:*  One problem with the hearing panel's efforts to address Mr. ███████ disabilities during the hearing is that they seemed to rely on Mr. ███████ 5.0 overall TABE score in assessing his reading ability. Since Mr. ███████ has no listed TABE for reading, his TABE should have been treated a below 4.0, and the panel should have questioned Mr. ███████ about his ability to read documents.  Mr. ███████ does have a high school diploma and some skill in reading when he has adequate time.  However, the panel should have asked him about his reading ability and offered to read documents to him if necessary.

    *Complaints About the Interpretation Provided In the Hearing:*  Mr. ███████ reviewed the transcript and noted substantial inaccuracies in the manner in which the ASL interpreter translated his statements into English.  For example, on page 69, during the translation of Mr. ███████ explaining what he can do to make amends for his crimes, the interpreter used the word "follower."  See Exhibit A at 69:13 ("I was a follower"). Mr. ███████ says that he told the interpreter the opposite – that people looked up to him and followed him, and that he was apologizing essentially for abusing his power over people who looked up to him.  That does not come through in the translation.

    We request that in the future, to have a clear record of what was said, the Board videotape hearings for prisoners who communicate using a sign language interpreter. This is done by law enforcement, for example, when taking *Miranda* waivers. According to the National Association for the Deaf (the NAD), "Many law enforcement agencies videotape all communication with deaf or hard of hearing defendants to substantiate the effectiveness of the communication and the quality of the interpretation."  https://www.nad.org/resources/justice/police-and-law-enforcement/communication-access-with-police-and-law-enforcement/

    //

    //

    //

    //

[3279792.2]

Heather McCray
Jennifer Neill
July 20, 2018
Page 5


Please feel free to contact me with any questions about these issues.


Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

Thomas Nolan
By:   Of Counsel


TN
Encl.  (Exhibits A and B.)

cc:    Co-counsel
       Marcus Bole
       Sharon Garske
       Janet Chen
       Jim Logsdon
       Norma Loza
       Erick Rhoan
       Joanne Chen
       Russa Boyd
       OLA Armstrong
       Patricia Ferguson
       Tamiya Davis
       Erin Anderson

[3279792.2]

# EXHIBIT 62

[4388762.1]

Hrg Date: **DSL**

Inst: _____

**BOARD OF PAROLE HEARINGS**
**STATE OF CALIFORNIA**
**REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS**
**BPH 1074**                                      Log Number: _____

| A. | **INMATE OR PAROLEE TO COMPLETE BEFORE THE HEARING** |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only if you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1. Your complaint: _____
( SEE ATTACHMENT )
_____

2. What you want done: _____
( SEE ATTACHMENT )
_____

Before the hearing, you should send this form as soon as possible to the <u>BPH ADA Coordinator</u> at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be ~~sent to you~~ within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (which ever comes first).

X _____        _____        _____        _____
(Print name)         (Inmate or parolee sign here)        CDCR Number        Date

| B. | **RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING** |
|---|---|

Date received by BPH: _____

**Decision**
☐ Granted        ☐ Granted with Changes        ☐ Denied        ☐ No Action Required

DISCUSSION OF FINDINGS: _____
_____
_____
_____

BASIS FOR DECISION: _____
_____
_____
_____

_____                                      _____
BPH ADA Coordinator/Designee Signature                Date Completed

**INSTRUCTIONS TO INMATE OR PAROLEE**

If you have already had your hearing, did not like the decision made about the kind of help given, and want a new hearing, then fill out Section C, on page 2.


FID0000339

BPH 1074 (Rev 01/06)          Page 1 of 2

Distribution   White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

**BPH 1074 Attachment**

████████████
███████████

June 28, 2019

Specifically, I was not even informed of various A.D.A. rights that I had. I did not even know I had such rights until approximately two weeks ago. These A.D.A. rights I was denied at my █████████ Initial suitability hearings were the following:

❖ Computer terminal
❖ Real time captioning
❖ Assistive listening devices
❖ ADA training panel attorney*
❖ Oral and Intermediary interpreter
❖ Written communication
❖ Telecommunication Device for deaf (TDD) machine

Accordingly, my next parole suitability hearing should be advanced for two reason: (1) because my ██████████ denial of advancement was based upon the determination made on ████████████ through a legally invalid hearing; and (2) because I have never had a valid hearing in the first place so this hearing should be the ADA-compliant hearing that I never had.

    * The attorney I had, ██████████████ was subsequently removed from the BPH panel for numerous deficiencies in the adequacy of his training and representation.



( 1 of 1 )

BOARD OF PAROLE HEARINGS                                                    STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS
BPH 1074                                                        Log Number:

| C. | INMATE OR PAROLEE TO COMPLETE AFTER THE HEARING |
|---|---|

☑️      I did not get all the help with my disability that I needed during the hearing. Earlier, I requested that help on the BPH Form 1073, or a new disability problem came up at the hearing. I need a new hearing with more help, because: ON ▮▮▮▮▮▮▮▮ THE Board denied advancing my Next parole suitability hearing. THis denial was based on the decision to deny my parole at my Initial Suitability hearing on ▮▮▮▮▮▮ However, that IS.H. was invalid because I was denied multiple ADA rights. (Ctd on Attachment page.)

Inmate/Parolee Print Name      Inmate/Parolee Sign Here      CDCR Number      Date

| D. | RESPONSE TO A GRIEVANCE FILED AFTER THE HEARING |
|---|---|

Date Received by Quality Control Unit: _____      Type of Parole Proceeding: _____

**Decision**
☐ Granted      ☐ Granted with Changes      ☐ Denied      ☐ Dismissed

_____
_____
_____
_____

Chief Deputy Commissioner/Designee Signature      Date Completed

| E. | TO INMATE OR PAROLEE |
|---|---|

1. After the hearing the inmate, parolee, or their attorney may file the grievance, concerning denial of disability accommodations at the hearing, by mailing this form to:

    Board of Parole Hearings
    Quality Control Unit
    1515 K Street, Suite 600
    Sacramento, CA 95814

2. All ADA grievances related to parole revocations shall be answered within 10 days from the time they were received at BPH.

3. All ADA grievances for life prisoners shall be answered within 30 days from the time they were received at BPH.

NAME      CDC NUMBER      TYPE OF PROCEEDING      DATE OF PROCEEDING      LOCATION

BPH 1074 (Rev 01/06)      Page 2 of 2

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



July 31, 2019



████████████████ :

This letter is in response to your July 9, 2019 correspondence, which was submitted on a BPH 1074 grievance form. In your letter, you are requesting the Board advance your next hearing because you claim you were denied your Americans with Disabilities Act (ADA) rights at your ███████████ hearing, which resulted in a three year denial.

As an initial matter, please note the Board received a letter from Armstrong plaintiffs' attorney Tom Nolan of Rosen Bien Galvan & Grunfeld requesting decision review of your ███████████ parole consideration hearing. After a thorough review of your case, the Board found no cause to disturb the panel's decision. I have enclosed the Board's letter dated October 31, 2018, in response to Mr. Nolan's correspondence.

With regard to your request for advancement, under Penal Code section 3051(b)(4), the Board may, in its discretion, after considering the views and interests of any victims, advance a hearing to an earlier date if new information or a change in circumstances demonstrates a reasonable likelihood that the inmate does not require the additional period of incarceration. On ███████████, the Board reviewed your case and determined that you did not meet the standard to advance your next hearing. I have also enclosed the Board's decision for your information.

With regard to your allegations that your ADA rights were violated at your ███████████ hearing, the Board conducted a review of your requested accommodations for that hearing. According to your BPH 1073 form, you requested a sign language interpreter. The sign language interpreter was provided at the hearing. Moreover, at the beginning of your hearing, the panel conducted an ADA review. During that review, Commissioner Long specifically noted that you required a sign language interpreter and no other accommodation and then asked you if that information was correct. In response to that question, you answered, "Yes." In addition, after the preliminary ADA review and hearing rights were covered by the panel, you acknowledged that all of your hearing rights had been met.

As a final matter, in your letter, you listed every accommodation available for hearing-impaired inmates under the Armstrong Remedial Plan and you appear to argue that the Board's failure to provide all of those accommodations violated your ADA rights. According to the remedial plan, that list of accommodations was intended as "merely a guide," meaning there is no requirement for the Board provide you with every accommodation. Instead, the Board is required to ensure that at least one of the available accommodations is provided to assist the hearing-impaired inmate at the hearing. The plan requires that primary consideration shall be given to the method requested by the inmate. In this instance, as noted above, you requested a sign language interpreter and the Board provided that accommodation.

**STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION**                    **GAVIN NEWSOM, GOVERNOR**

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



After a review of your specific ADA complaints, the Board has concluded that no ADA violation occurred because the Board gave primary consideration to the type of accommodation you requested and provided that specific accommodation.

Sincerely,

Norma Loza

Senior Staff Attorney
Board of Parole Hearings

Enclosures

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



November 05, 2019

██████████████████████
██████████

█████████████ :

This is in response to your October ███████ letter, received by the Board of Parole Hearings (Board) on November ████████ .

Enclosed are the documents you requested.

Sincerely,



CORRESPONDENCE UNIT
Board of Parole Hearings

Enclosure

BOARD OF PRISON TERMS                                          STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS
BPT 1074                                              Log Number:_____

| A. | INMATE OR PAROLEE TO COMPLETE **BEFORE** THE HEARING |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only if you did not get the other kinds of help for your disability that you asked for on your BPT Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1. Your complaint: I have still waiting for my original Form 1073 Back to me Because I want to move to second level review. It's Been since July 2019 I don't Know what Log number is.

2. What you want done: Please return my original Form 1073 to me, So I can submit with second level review THANK-you

Before the hearing, you should send this form as soon as possible to the BPT ADA Coordinator at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPT ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (which ever comes first). Grievances received by BPT less than forty-eight (48) hours before the proceeding might not be accommodated at the parole proceeding.

X _____        _____        _____    _____
   (Print name)               (Inmate or parolee sign here)      CDC Number              Date

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|---|---|

Date received by BPT: _____

**Decision**
☐ Granted          ☐ Granted with Changes          ☐ Denied          ☐ No Action Required

DISCUSSION OF FINDINGS: _____

CDCR

Hrg Date:  DSL

BASIS FOR DECISION: _____

Inst:_____

RECEIVED
NOV 05 2019

_____                    _____
BPT ADA Coordinator/Designee Signature              Date Completed

BPT 1074 (Rev 12/04)              Page 1 of 2

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036





December 24, 2019

Dear ███████████████ :

This letter is in response to the BPH Form 1074 – Request for Reasonable Accommodation – Grievance Process (1074) the Board of Parole Hearings (Board) received from you on November 19, 2019. In the 1074, you write that you disagree with the Board's July 31, 2019 response (July response) to your July 9, 2019 letter (July letter) to the Board.

In your July letter, you asserted you did not receive reasonable accommodations for your hearing impairment at your ███████ suitability hearing. Specifically, you argued you were entitled to multiple accommodations, including a computer terminal, real-time captioning, assistive listening devices, an ADA trained panel attorney, an oral and intermediary interpreter, written communication, and a TDD machine.

In response to your July letter and another letter received from Armstrong plaintiffs' counsel, the Board reviewed the panel's decision at your ████ hearing. After conducting this review, the Board determined there was no cause to disturb the panel's decision. The Board further determined you received a reasonable accommodation at your hearing because, among other things: (1) you requested a sign language interpreter in your BPH 1073 form and one was provided at the hearing; and (2) after the ADA review during your hearing, you acknowledged that all of your hearing rights had been met. The Board described these and other determinations in the July response.

In the current 1074, you reassert you should have received real-time captioning at your ███████ hearing and request a rehearing conducted with real-time captioning. You also assert that your interpreter should have been a CDI, which you define as a "California Deaf Interpreter." Specifically, you assert your most effective communication is by CDI because CDI matches your access communication.

With respect to real-time captioning, the Board previously reviewed your assertion that you should have received real-time captioning in connection with your July letter and Board's July response. As previously noted, the Board provided you with the appropriate accommodation at your ███████ hearing based on records of your impairment as well as your specific accommodation requests. Moreover, as previously explained, you confirmed at your hearing that the accommodations provided for you fully met your hearing rights. Therefore, the Board considers the matter of real-time captioning at your ███████ hearing to be closed. However, you are free to request real-time captioning for your next scheduled hearing.

With respect to a CDI, the Board's investigation revealed that a CDI is a "Certified Deaf Interpreter," not a "California Deaf Interpreter." CDI is merely a different kind of certification. Holders of CDI certification are deaf or hard of hearing and have demonstrated knowledge and understanding of interpreting, deafness, the Deaf community, and Deaf culture. After reviewing information regarding your hearing disability as well as your accommodation needs documented throughout your record, the Board determined that the sign language interpreter provided at your hearing provided reasonable accommodation, and that a CDI is not a necessary accommodation. This is particularly true given that

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



you acknowledged that all of your hearing rights had been met, as discussed above. Therefore, the Board also considers the matter of the interpreter accommodation at your ▓▓▓▓▓ hearing to be closed. Again, you are free to request an interpreter for your next scheduled hearing.

As a brief reminder, as explained in the Board's July response, the Board is not required to provide a disabled inmate with every possible accommodation. Rather, the Board is obligated to review the records of the inmate's disability and accommodation needs and determine the most appropriate accommodation to provide for each identified disability. Therefore, when your next hearing is scheduled, the Board will again review the records of your disability and accommodation needs, including your requests on the BPH Form 1073 "Notice and Request for Assistance at a Parole Proceeding," and the Board will determine the most appropriate accommodation or accommodations to provide for each of your identified disabilities.

Sincerely,

Brian Nelson

Brian Nelson
Senior Staff Attorney
Board of Parole Hearings

GDCR:

Hrg Date: DSL

Inst:

BOARD OF PAROLE HEARINGS
REQUEST FOR REASONABLE ACCOMMODATION – GRIEVANCE PROCESS
BPH 1074

STATE OF CALIFORNIA

Log Number:

| A. | INMATE OR PAROLEE TO COMPLETE BEFORE THE HEARING |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only if you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1. Your complaint: *(SEE ATTACHMENT) (1 OF 2) - (2 OF 2)*

2. What you want done: *(SEE ATTACHMENT) (1 OF 2) - (2 OF 2)*

Before the hearing, you should send this form as soon as possible to the BPH ADA Coordinator at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (which ever comes first).

| (Print name) | (Inmate or parolee sign here) | CDCR Number | Date |

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|---|---|

Date received by BPH: _____

**Decision**
☐ Granted          ☐ Granted with Changes          ☐ Denied          ☐ No Action Required

DISCUSSION OF FINDINGS: _____

BASIS FOR DECISION: _____

BPH ADA Coordinator/Designee Signature                              Date Completed

| INSTRUCTIONS TO INMATE OR PAROLEE |

BPH 1074 (Rev 01/06)                    Page 1 of 2

Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

1. Your Complaint:

I disagree with Level one response because the interpreter who were at my BPH on ████████████ is not actually match my communication access. Whenever I said I don't know what does the interpreter said because the interpreter misunderstood what I was saying in the hearing. Its a ineffective communication I didn't know that they have real time captioning for BPH because it's important for me to make sure interpreter said correct whenever I am sign language. My most effective communication By C.D.I (California Deaf interpreter) Because it's always match my access communication.

2. What you want Done:

I would like to re-hearing. Because of ineffective communication

(1 of 2)

through Interpreter who were at my BpH. I would like to have an Interpreter, REAL time Captioning, and C.O.I. at my BpH in Future.

Also, please excuse the late filing of this second Level review because I didn't get the original Form 1074 until I received it BACK on Nov. 8, 2019 (SEE enclosed).



Nov. 15, 2019

(2 OF 2)

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



July 31, 2019

███████████████████████████

██████████████

This letter is in response to your July 9, 2019 correspondence, which was submitted on a BPH 1074 grievance form. In your letter, you are requesting the Board advance your next hearing because you claim you were denied your Americans with Disabilities Act (ADA) rights at your ████████ hearing, which resulted in a three year denial.

As an initial matter, please note the Board received a letter from Armstrong plaintiffs' attorney Tom Nolan of Rosen Bien Galvan & Grunfeld requesting decision review of your ████████ parole consideration hearing. After a thorough review of your case, the Board found no cause to disturb the panel's decision. I have enclosed the Board's letter dated October 31, 2018, in response to Mr. Nolan's correspondence.

With regard to your request for advancement, under Penal Code section 3051(b)(4), the Board may, in its discretion, after considering the views and interests of any victims, advance a hearing to an earlier date if new information or a change in circumstances demonstrates a reasonable likelihood that the inmate does not require the additional period of incarceration. On ████████ the Board reviewed your case and determined that you did not meet the standard to advance your next hearing. I have also enclosed the Board's decision for your information.

With regard to your allegations that your ADA rights were violated at your ████████ hearing, the Board conducted a review of your requested accommodations for that hearing. According to your BPH 1073 form, you requested a sign language interpreter. The sign language interpreter was provided at the hearing. Moreover, at the beginning of your hearing, the panel conducted an ADA review. During that review, Commissioner Long specifically noted that you required a sign language interpreter and no other accommodation and then asked you if that information was correct. In response to that question, you answered, "Yes." In addition, after the preliminary ADA review and hearing rights were covered by the panel, you acknowledged that all of your hearing rights had been met.

As a final matter, in your letter, you listed every accommodation available for hearing-impaired inmates under the Armstrong Remedial Plan and you appear to argue that the Board's failure to provide all of those accommodations violated your ADA rights. According to the remedial plan, that list of accommodations was intended as "merely a guide," meaning there is no requirement for the Board provide you with every accommodation. Instead, the Board is required to ensure that at least one of the available accommodations is provided to assist the hearing-impaired inmate at the hearing. The plan requires that primary consideration shall be given to the method requested by the inmate. In this instance, as noted above, you requested a sign language interpreter and the Board provided that accommodation.

*[handwritten in left margin: Need a CDI. and Real time Captioning]*

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



After a review of your specific ADA complaints, the Board has concluded that no ADA violation occurred because the Board gave primary consideration to the type of accommodation you requested and provided that specific accommodation.

Sincerely,

*Norma Lira*

Senior Staff Attorney
Board of Parole Hearings

Enclosures

STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



November 05, 2019

███████████████████████

██████████████

This is in response to your October 30, 2019 letter, received by the Board of Parole Hearings (Board) on November 05, 2019.

Enclosed are the documents you requested.

Sincerely,

CORRESPONDENCE UNIT
Board of Parole Hearings

Enclosure

CDCR: ███████

Hrg Date: **DSL**

Inst: ████████

RECEIVED

JUL 09 2019

**BOARD OF PAROLE HEARINGS**
**REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS**
**BPH 1074**                                                    STATE OF CALIFORNIA

Log Number: _____

| A. | INMATE OR PAROLEE TO COMPLETE **BEFORE** THE HEARING |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only if you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1. Your complaint: _____

   ( *SEE ATTACHMENT* )

2. What you want done: _____

   ( *SEE ATTACHMENT* )

Before the hearing, you should send this form as soon as possible to the <u>BPH ADA Coordinator</u> at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (which ever comes first).

X ████████████████████████████████████████

(Print name)       (Inmate or parolee sign here)       CDCR Number       Date

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|---|---|

Date received by BPH: _____

**Decision**

☐ Granted      ☐ Granted with Changes      ☐ Denied      ☐ No Action Required

DISCUSSION OF FINDINGS: _____

_____

_____

BASIS FOR DECISION: _____

_____

_____

_____

BPH ADA Coordinator/Designee Signature                    Date Completed

INSTRUCTIONS TO INMATE OR PAROLEE

If you have already had your hearing, did not like the decision made about the kind of help given, and want a new hearing, then fill out Section C, on page 2.

FID0000339

BPH 1074 (Rev 01/06)                    Page 1 of 2

Distribution  White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

**BPH 1074 Attachment**

████████████████

June 28, 2019

1) Specifically, I was not even informed of various A.D.A. rights that I had. I did not even know I had such rights until approximately two weeks ago. These A.D.A. rights I was denied at my ████████ Initial suitability hearings were the following:

❖ Computer terminal
❖ Real time captioning
❖ Assistive listening devices
❖ ADA training panel attorney*
❖ Oral and Intermediary interpreter
❖ Written communication
❖ Telecommunication Device for deaf (TDD) machine

2) Accordingly, my next parole suitability hearing should be advanced for two reason: (1) because my ████████ denial of advancement was based upon the determination made on ████████ through a legally invalid hearing; and (2) because I have never had a valid hearing in the first place so this hearing should be the ADA-compliant hearing that I never had.

   * The attorney I had, ████████ was subsequently removed from the BPH panel for numerous deficiencies in the adequacy of his training and representation.



( 1 of 1 )

BOARD OF PAROLE HEARINGS                                          STATE OF CALIFORNIA
REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS
BPH 1074                                                    Log Number:

| C. | INMATE OR PAROLEE TO COMPLETE **AFTER** THE HEARING |
|---|---|

☑      I did not get all the help with my disability that I needed during the hearing. Earlier, I requested that help on the BPH Form 1073, or a new disability problem came up at the hearing. I need a new hearing with more help, because: ON ████████ THE Board denied advancing my next parole suitability hearing. This denial was based on the decision to deny my parole at my Initial Suitability hearing on ████. However, that I.S.H. was invalid because I was denied multiple ADA rights. (ctd on attachment page.)

| Inmate/Parolee Print Name | Inmate/Parolee Sign Here | CDCR Number | Date |

| D. | RESPONSE TO A GRIEVANCE FILED AFTER THE HEARING |
|---|---|

Date Received by Quality Control Unit: _____      Type of Parole Proceeding: _____

**Decision**
☐ Granted      ☐ Granted with Changes      ☐ Denied      ☐ Dismissed

_____
_____
_____
_____

Chief Deputy Commissioner/Designee Signature      Date Completed

| E. | TO INMATE OR PAROLEE |
|---|---|

1. After the hearing the inmate, parolee, or their attorney may file the grievance, concerning denial of disability accommodations at the hearing, by mailing this form to:

   Board of Parole Hearings
   **Quality Control Unit**
   1515 K Street, Suite 600
   Sacramento, CA 95814

2. All ADA grievances related to parole revocations shall be answered within 10 days from the time they were received at BPH.

3. All ADA grievances for life prisoners shall be answered within 30 days from the time they were received at BPH.

| NAME | CDC NUMBER | TYPE OF PROCEEDING | DATE OF PROCEEDING | LOCATION |

BPH 1074 (Rev 01/06)      Page 2 of 2

Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

CDCR:
Hrg Date: DSL
Inst:

BOARD OF PAROLE HEARINGS
REQUEST FOR REASONABLE ACCOMMODATION - GRIEVANCE PROCESS
BPH 1074

STATE OF CALIFORNIA
RECEIVED
JAN 3 1 2020
BPH CORRESPONDENCE UNIT

Log Number: _____

| A. | INMATE OR PAROLEE TO COMPLETE BEFORE THE HEARING |
|---|---|

You have been given a state attorney to help you in preparation for and during your hearing. Fill out this form only if you did not get the other kinds of help for your disability that you asked for on your BPH Form 1073 or if new problems came up. You can ask your attorney or staff for help in filling out this form. If you need more space attach another sheet of paper.

1. Your complaint: I disagree with Board's Dec 24 2019 Response (Level 2) Because I want a CDI since Armstrong/Parole don't have CDI Accommodations available for Deaf. It's still that I have right to have CDI. I have problem understanding the "insight."

2. What you want done: I want my parole hearing should be Advanced for Two reason: (1) should have CDI for my communication access; and (2) Because I have problem with my effectively communicate may be interfering with my understanding of the crime.

Before the hearing, you should send this form as soon as possible to the BPH ADA Coordinator at 1515 K Street, Suite 600, Sacramento CA 95814, or give this form to a staff person, or your Attorney to send to the BPH ADA Coordinator. The decision will be sent to you within five (5) days from the date it was received by the ADA Coordinator, or before your parole proceeding (which ever comes first).

_____    _____    _____    Jan. 26, 2020
(Print name)         (inmate or parolee sign here)    CDCR Number    Date

| B. | RESPONSE TO A GRIEVANCE FILED BEFORE THE HEARING |
|---|---|

Date received by BPH: _____

Decision
☐ Granted        ☐ Granted with Changes        ☐ Denied        ☐ No Action Required

DISCUSSION OF FINDINGS: _____
_____
_____
_____

BASIS FOR DECISION: _____
_____
_____
_____

_____            _____
BPH ADA Coordinator/Designee Signature              Date Completed

INSTRUCTIONS TO INMATE OR PAROLEE

Distribution: White – C-file, Canary – ADA Coordinator, Pink – BPH ADACU, Goldenrod – Inmate/Parolee

**STATE OF CALIFORNIA - DEPARTMENT OF CORRECTIONS AND REHABILITATION**    **GAVIN NEWSOM, GOVERNOR**

**BOARD OF PAROLE HEARINGS**
P.O. BOX 4036
SACRAMENTO, CA 95812-4036



February 10, 2020



███████████ :

This is in response to your correspondence received by the Board of Parole Hearings (BPH) on January 31, 2020.  Enclosed is a previous response from BPH dated December 24, 2019.

As noted in that letter, there were no violations of your ADA rights during your ████ hearing.  If you would like to file a Petition to Advance, please contact your assigned correctional counselor to obtain a BPH form 1045-A.

Sincerely,

*Hanna Gillam*

ADA Compliance Unit
Board of Parole Hearings