DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE E. JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>GAVIN NEWSOM, et al.,<br><br>          Defendants. | Case No. C94 2307 CW<br><br>**EXHIBITS 63 -83 TO DECLARATION OF CAROLINE E. JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION**<br><br>Judge:   Hon. Claudia Wilken<br>Date:    January 4, 2024<br>Time:    2:30 p.m.<br>Crtrm:   TBD |

**REDACTED**

[4304353.15]

Case No. C94 2307 CW

DECLARATION OF CAROLINE E. JACKSON IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

# EXHIBIT 63

DECLARATION OF ███████████

I, ████████████, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation ("CDCR") number is ████████. I am currently housed at the ███████████████ ████████ on Facility ██. I am ██ years old. I have been incarcerated in CDCR since ████.

3.      I am an *Armstrong* class member. I am designated DPH, meaning that I have a permanent hearing disability (I am deaf), and DNM, meaning that I have a mobility disability. I also have a learning disability and I went to a specialized school for deaf adults with learning disabilities, but CDCR has not documented my learning disability.

4.      My primary method of communication is American Sign Language ("ASL"). CDCR has documented an "alternate" method of communication for me as written notes, which for me is effective only for basic communication about everyday things. I also speak a few words and can recognize some words by reading lips, but that is not a reliable way for me to communicate.

5.      While in prison, I have taken the Test of Adult Basic Education ("TABE") several times. Even though I have been in Adult Basic Education courses for several years and try hard in school, my score has stayed largely the same. According to CDCR's records, my current TABE score is ~~███~~ 9.0, ~~meaning that~~ but my ability to read and write is ~~quite~~ limited.

6.      I have tried to tell CDCR about my learning disability, and at one point in the past, I believe I was designated and tracked by CDCR as having a learning disability or LD. However, several years ago I had a meeting with my Correctional Counselor and with the staff sign language interpreter (the same one who currently works on my yard.) The SLI told me I did not have a learning disability because I could read and write. The two of them had a conversation that did not include me because they spoke and she did not interpret it. Then they removed the LD designation.

[4269781.3]

7. I have noticed that, for me to understand what someone is trying to explain to me, I need a lot of context, I need the information broken down into small chunks, and I need to be able to have a back-and-forth conversation where I react to the information and get additional responses. I tend to have difficulty understanding people who are not used to me or are not used to working with deaf people, because even if we are using the staff interpreter that I have known for over 10 years, they do not use these communication techniques and they do not understand the ways that ASL is different from English.

8. All of Facility █ is served by a single staff sign language interpreter. She has worked at RJD since I arrived here in ████. I do not trust her at all, and based on conversations with the other deaf men on my yard, they do not trust her either. She seems to have a very close relationship with the corrections officers and, based on her body language and conduct, she seems to dislike incarcerated people. I do not trust her to keep confidential any of the information she learns about me when she interprets. I do not trust her to be impartial toward me. She often has what appears to be side conversations with staff members when she is supposed to be interpreting, and never signs what she is saying, so we are left out. I and others on my yard are afraid even to file complaints about her, although we have many, because we are worried that she and the corrections officers will retaliate against us if we do.

9. I also do not trust this interpreter to interpret accurately. There have been many times when I have gotten a very different type of response from a staff member than I expected. I think this is because the interpreter did not care enough to get the message correct, leading to miscommunications.

10. I am currently serving two concurrent prison terms of █████ to life after being convicted of █████████████████.

11. I first became eligible for parole in ████. I had an initial parole suitability hearing on ████████. At that hearing, I was denied parole for seven years; however, I hope to be able to petition to move my next hearing sooner.

12. I faced a number of barriers in my efforts to prepare for my initial ▮ hearing, and I continue to face the same barriers as I try to prepare for my next hearing that is tentatively scheduled for ▮.

13. **Comprehensive Risk Assessment**

14. Prior to my initial hearing, I participated in a Comprehensive Risk Assessment ("CRA"). A couple months later, I was given a copy of my CRA. It is nineteen pages long and written out in English.

15. My understanding and my experience in ▮ is that the CRA is a very important part of the hearing process and that BPH Commissioners rely on this document at BPH hearings. It was important for me to read this document thoroughly before my ▮ hearing to ensure it is accurate, and it is important for me to continue to re-read it as I prepare for my next hearing.

16. When I got the CRA, I tried to read it myself, and I have continued to try to read it since, but I cannot understand it very well because it contains so many words and phrases that I do not understand. For example, the document references the "DSM-5" and descriptions of various disorders, including " ▮ At that time, I had no idea what those words meant. There appears to be a lengthy section at the end of my CRA that explains the psychologist's perspective on why I committed my commitment offense and why the psychologist decided to rate me as "moderate risk" (but I'm not entirely sure what I'm at moderate risk of). I recognize many of the words in this section, but I cannot piece together the complete meaning—I estimate I understand only a small percentage of the whole CRA. I need someone to explain this entire document to me before I will be able to understand it, and work with it to prepare for my hearing.

17. I tried to get help reading the document, but I did not have any good options. I did not want to ask the sign language interpreter to read it to me because the CRA contains very sensitive information about my childhood, including sexual abuse that I lived through, and about my commitment offense, which also included child sexual abuse. I was worried that the sign language interpreter would spread this information to other people who ~~within the prison~~ know me. ▮

[4289781.3]                                3

~~and also within the community outside the prison, where she knows a number of people~~ ~~and knows me.~~ So I did not ask her to read it to me.

18.    I have an assigned Correctional Counselor I ("Counselor"), but I do not see this person as helpful. Every time in the past that I or one of my friends has asked a Counselor for help, their support would be minimal – they may share simple information with me, but never take the time to break down information, provide context, and engage in a the kind of back-and-forth that I need to understand what they are sharing. (Also, as discussed below, in order to get meaningful help from my Counselor, I would need to use the staff interpreter to translate.)

19.    I also do not have the opportunity to develop a relationship with my Counselor. There seems to be very high turnover in these positions, so I get a new Counselor what seems like every few months, and there is never time for the Counselor to get to know me well enough to understand my communication needs, or to develop trust. ~~There also does not seem to be much of a difference between a Counselor and a Correctional Officer. When a new Counselor comes into my building, I frequently learn that the person used to be Correctional Officer on a different yard. And when Counselors leave their positions it is not uncommon for me to learn that they went back to being a Correctional Officer.~~

20.    The final reason that I do not find Counselors helpful is that we cannot communicate without using the staff sign language interpreter that I do not trust. She is the only staff interpreter assigned to my Facility, so even if the Counselor was willing to read my CRA to me and help me understand, the Counselor would be highly likely to use this staff interpreter, defeating the purpose of requesting help from somebody other than her.

21.    I also had an assigned attorney, but she seemed to have never represented a deaf person before and we did not spend enough time together to get to know each other well enough for her to understand my needs. We only met twice before the hearing for about 30 minutes each time, and we had a lot to discuss. I was very worried about my hearing. I had a lot of questions and a lot to express, in addition to whatever else she

about how to p▓▓▓▓ ▓▓r my hearing

wanted to discuss with me. When she would try to explain things, though, her explanations were very cursory. She did not break down what she was explaining or provide the extra context I needed to understand new information. All I recall her telling me about my CRA is that I had been rated as "moderate risk." I don't think she understood how to explain the document to me providing the context I needed, and we certainly did not have enough time for her to do so. She definitely did not read the entire CRA document to me. That would have taken a long time to sign, and to explain. Further, they used the untrustworthy staff sign language interpreter for my first meeting with my appointed attorney, so I did not believe I was having a confidential meeting where I would feel safe enough to ask the attorney to read my CRA.

22.     Instead, I made the risky decision to ask two other incarcerated people whom I trust to read the document and explain it to me. They did not know sign language, so we communicated through writing notes and gesturing. One person that I asked did not want anything to do with reading the document, because it discussed a sex offense. Another, one of my cellmates, leafed through it and told me it was good. I asked him to explain it in more depth. He said he would do so later, but kept avoiding me after that so he never did.

23.     Because of what my cellmate said, I believed that the CRA was positive and I was likely to get granted parole and my hearing.

24.     I would prefer to have an outside interpreter (not the staff sign language interpreter or one of her friends) translate the CRA for me and for the translation to be videotaped. I would want to sit down with the interpreter while he or she translated the document, so that I could have the back-and-forth I need to process the information and so that I have the opportunity to indicate when there is something I do not understand. I would also want a videotape of the translation so that I could review it later for reference. Without a video of the translation, having the outside interpreter would still be a big help, but would only give me a chance to read the document once, and I would not have an opportunity to review it again later.

25. Without the opportunity to study this document, I felt unprepared for my hearing. Many people had advised me to study my CRA in depth prior to my hearing so I would know better how to communicate with the Commissioners. Because I did not receive the accommodations necessary to read my CRA, I did not have that chance. At my hearing, the Commissioners confronted me with some of the information from my CRA, and since I had not had the opportunity to understand what was in it, I was unprepared to answer their questions.

26. Even though I know I will get a new CRA before my next hearing, I still want to study this one because I believe it contains information that is crucial to my preparation. From what I understand, in this document, the psychologist describes my character defects and the underlying issues that I need to resolve before I am safe to release. I also believe this document will help me understand my victim's experience and the way that other people were impacted by what I did. I am hungry for this information. I want to study this CRA to improve my self-awareness and help me become a better man, who is safe for release, and who is capable of successfully reintegrating into society.

27. The CRA is particularly valuable due to the lack of sex offender programming here. Because there is no formal program available for me to process sex offender rehabilitation coursework as a group with a facilitator and other sex offenders, the CRA is my *only* opportunity to get another person's perspective on my issues and on my victims' experience. I will be at a big disadvantage if my only access to this information comes a few months prior to my next hearing, where someone reads this document to me once. That is too little too late. The kind of self-improvement I need to make takes years, and I would like to start now.

28. **Access to Hearing and Hearing Transcript**

29. I also had a lot of trouble accessing my hearing and the transcript of my hearing.

30. At my hearing, the Board provided two interpreters: a standard sign language interpreter (who was not the staff interpreter) and a Certified Deaf Interpreter ("CDI").

The two of them worked together throughout my hearing. When the Board asked a question, the sign language interpreter would translate from spoken English into sign language, then the CDI would break down the question into clearer ASL that I could understand better. After I would respond, the CDI would interpret my response into a form of sign language that is similar to spoken English, so the standard sign language interpreter could say exactly that to the Board.

31.    The first problem with this is that the Board did not provide a second set of interpreters to work as a team with the first set. My hearing lasted for ▮ *hours*. Even though there were breaks, I could tell from pretty early on that the interpreters were very tired, and I was worried they were not able to interpret as well as they could have.

32.    The second problem is that the standard sign language interpreter seemed to be making a lot of mistakes both when she translated the Commissioners' questions to me and when she translated my testimony to the Commissioners. Throughout my hearing, the standard sign language interpreter performed so poorly I assumed she did not even have a valid license to be an interpreter. For example, when I signed at a normal pace, she would instantly look confused, as though she had no idea what I was saying, then I would be asked to repeat. As the hearing wore on, she also started leaning to one side in obvious exhaustion. I have no way of knowing if she actually made mistakes, because I could not hear what she or anyone else was saying, but her body language left me very worried. At one point, I asked the CDI how good the other interpreter was, and she gave a facial expression that made me think she could tell the other interpreter was pretty bad.

33.    Third, there was a big problem with how the interpreters were displayed on the videoconference monitor. Because my hearing took place during the COVID-19 pandemic, everybody participated remotely. I was watching a screen with two Commissioners, two interpreters, my attorney, and the district attorney displayed. The images kept moving around and changing location during the hearing, so it was difficult to keep focused on the interpreters. Also, because both interpreters were working at the same time translating the same message, it was confusing for me to know which one to look at.

34.    I wanted to appeal my hearing because the interpreters were so bad and because of all the distractions from the images moving around. But I did not do so because I did not have any proof of what the interpreters and I were signing, nor could I prove the images had moved. I would need a video of the hearing to have proof of what happened. Without one, I felt powerless to do anything about this problem.

35.    I would like to have a video made of my subsequent parole suitability hearings, that captures both the interpreters and my own signing. This video would be useful for a few different reasons.

36.    First, the video would give me the opportunity to appeal based on translation errors, because I would have evidence of what I actually testified (that the interpreters messed up) or what the interpreters actually signed to me, if different from what the Board said. I could watch the video on my own and document all the different red flags of how the interpreters were behaving that interfered with effective communication during my hearing.

37.    Second, the video would give me the opportunity to review my transcript and prepare for the next hearing. Right now, I don't know what I did wrong during my hearing that led to my denial – did I simply lack insight into my commitment offense? Did I not explain myself in sufficient detail? Did I not express myself clearly? Did I misunderstand what the question was asking? Was there a way in which the interpreters' errors affected the outcome? Or was it all of the above? I felt utterly demoralized by the seven-year length of my denial, and extremely frustrated that I still do not know why I was denied.

38.    I would love to be able to study my transcript and find out where the problem was, but I have no way of reading the document. Since my hearing lasted for ▮ hours, the transcript is extremely long—▮ pages. I do not read English well enough to read through the document on my own, and I have no idea who will have the patience to read it to me. I cannot ask the staff interpreter on my facility to read transcript to me because she has made it clear that she interprets for classes and programs and that is it. But it is far too long for me to ask a friend to read and explain it.

39.    It makes me deeply frustrated to know that I could be sitting in prison for seven years, working as hard as I can to take every program I can get myself into, but without access to the key for figuring out how I can do better at my next hearing

40.    **Access to Programs and Need for Accommodations to Help With Written Submissions and Parole Planning**

41.    I am also facing a lot of barriers to accessing the type of programming I need to earn my freedom and in preparing the kind of documents to submit to the Board that help people secure release. When denying me parole, the Board told me I needed to take more sex offender programming. That is the very type of programming that I cannot seem to access.

42.    I have been trying to gain access to sex offender programming since I first got to prison in ███. When I got to prison, I asked about sex offender programming, and I was told there was none. At that time, I was housed on a maximum security (Level 4) yard where there was not much programming at all. Soon after, I transferred to a lower security (Level 3) yard, but there was still not much programming. I was assigned to work in the kitchen instead.

43.    In ███ I finally got transferred to a Level 2 security yard where there is a large amount of programming. Right away, I started asking about programming for sex offenders. I asked the staff sign language interpreter, my Counselor, the corrections officers, my cellmates – I asked everybody I could and from everyone I got the same answer: there is no live sex offender programming in prison.

44.    The best opportunity I found was a correspondence course on sex offenses. Unfortunately, the course was writing-based, making it very difficult for me to benefit from the course due to my limited ability to read and write in English due to my learning disability and my hearing disability.

45.    I was only able to get through the course because I found a friend who knew some sign language and was willing to help. This friend, who I'll call "█", was taking sign language classes. These classes were offered on my yard for about 2 years, and then

[4289781 3]                                  9

stopped when COVID hit. From what I know, the prison yard we are on is the only place in all of CDCR with professionally conducted sign language classes. ▉ was still very much a beginning signer, but we agreed that I would help teach him more sign language and in exchange he would help me with my correspondence course. At first, ▉ did not want to help me with the course because of the subject matter. He did not want to be involved with someone with a sex offense conviction. I had to emphasize that I have changed and that I will not engage in that kind of behavior any more. We built trust slowly over time. But it was always clear that he hated the subject matter of the course. Ultimately, with G's help, I was able to complete the course and get a certificate. But because my access was so limited, I do not feel like I benefitted as much as I would have if I had had access to an ASL-fluent person to help me with the correspondence course, or access to peers and an instructor to help me learn the material.

46. About two months before my hearing, my appointed attorney finally told me of something else I could do as a form of sex offender programming: I could read the book *Road to Freedom* and write a report. The book is long – well over 200 pages. Between my learning disability and my general difficulty understanding what I read, I had no idea how I could really benefit from reading this book, especially over such a short period of time. But I did my level best to read as much as I could and write the report she recommended. I got through four chapters out of eight.

47. At my hearing, I was disheartened to learn that my efforts were not enough. The Commissioners wanted me to work through the book again. I had no idea how I was going to do that. Their only recommendation was to find a psychologist to help.

48. I spent years looking for help to get more sex offender programming. First, I had to find a way to meet with the psychologist to ask for help. One of the staff psychologists here said that he could find a student to come work through the book with me. The problem, however, was that the student does not know sign language, so we would need an interpreter. The only interpreter I have access to in prison is the staff sign language interpreter, whom I absolutely flatly would not trust to interpret for these kinds of

sensitive appointments. Based on how I have seen her behave in the past, I would expect her to appear disgusted with me the entire time she was interpreting, and then carry that disgust with her during the many other appointments and programs where she is the only interpreter available to me. That kind of disgust would interfere with my ability to open up and truly benefit from the psychologist's help, so I knew I had to find another way.

49.    The next thing I did was to ask for help from the person who facilitates my substance abuse and life skills programming. We were fortunate to have a substance abuse class that was only deaf signers, making communication easier and allowing us to benefit more from the conversations because we could communicate with one another directly, instead of always working through a sign language interpreter. It also let the instructor become more familiar with our learning needs and to use the kind of simple explanations, rich context, and opportunities for processing that we need as deaf people. After class one day, and after the interpreters had left the room, I used lipreading and ~~gesture~~ speaking to explain my predicament to the facilitator and ask her to help find programming for me. She ultimately gave me a list of sex offender programs in the community. But I cannot access those programs due to being in prison. I continued to press. Her next idea was to set up a Board preparation course for me and other deaf lifers. She said that she would set up a group just for deaf signers that was similar to the groups that hearing people form among themselves to study and prepare for Board. But she never did.

50.    Finally, in early 2023, I was able to find someone to help me read *Road to Freedom*. It was my friend ■ He had continued studying ASL and I had continued mentoring him and helping him improve his ASL. After several years of him studying ASL quite seriously, he seemed to have learned ASL well enough to help me read *Road to Freedom*. When I asked for his help, he agreed.

51.    It has been difficult to find time for us to meet, because we are both very busy. But we have been doing everything we can. We meet about once a week. He will read to me from the book. There are also exercises. He will help me understand the exercises and then I will try to work through the exercise on my own, and he will give

feedback. He keeps telling me I need to write more, but it is nearly impossible for me to due to the disabilities that interfere with my ability to write.

52. It has been very slow going. After six months of this, we were able to get through one chapter. Part of the problem is that the concepts are very hard for me to understand. ■ is very patient with me, but he has noticed that I seem to have a lot of difficulty understanding. The first chapter is about denial. Even after studying this concept for six months, I still don't think I understand what denial is.

53. After finishing the first chapter, I made an appointment with a psychologist to make sure that I was understanding the book. ■ agreed to help with communication. Even with G's help, communication was a struggle. He seemed to struggle to phrase what I was saying in a way the psychologist could understand. I have some ability to speak, so I also tried to speak what I was trying to say, but I did not know how to put the concepts in the right order to make my meaning clear. Even after both of us tried, the psychologist did not seem to understand was I was trying to express and gave me feedback that seemed completely beside the point. More recently, I found a volunteer from the community to meet with me and another deaf person, with G's help. We met last week for a hour and plan to meet every week. But communication, with G's help, is still a struggle.

54. What I really need more than anything is a group for sex offenders with a professional interpreter. I learn best from watching multiple other people grapple with material and ask questions, and also from getting feedback from a facilitator and others about my own thoughts and feelings, like AA and NA groups have. I worry that without this type of program, I will never gain enough insight to earn my freedom.

55. ■ is also helping me participate in a Board preparation group. This group meets on Sundays. It is an informal group of just incarcerated people who are preparing for the Board. ■ has been willing to help me communicate during that group because, due to the fact that the group meets when no staff interpreters are available and the fact it meets

on Sundays, I expected that it would be a long wait before I could get a professional interpreter to let me access the group.

56.    I am very grateful to █ for his help, but there are limitations. I have much more access to the group than I would have without his assistance, but he is not as good as a professional interpreter. There is also always the possibility that he or I will get transferred to a different yard or a different prison, and then he will not be able to help me anymore. For example, just a few months ago, a number of people from my yard were transferred to a different yard in the same prison. None of them had asked for this transfer, it just happened. Because the populations of the different yards at my prison are not supposed to interact, if one of us transfers to a different yard, it will mean the end to his assistance. There have also been times when some of my friends have had to transfer to a different yard quickly due to "enemy concerns," which usually means that they were attacked or targeted in some way. Any of this could happen without warning, and I would be back to square one without access to sex offender programming or a Board preparation group.

57.    Although I am doing everything I can, I am very worried that I will never be able to develop the level of insight the Board is looking for. The Board seems to want me to have a high level of self-awareness and advance ability to articulate my understanding of myself. My whole life, I have struggled because I do not seem to be able to learn as much or to explain myself as well as people can when they are not deaf. At my last hearing, neither the Board nor my attorney seemed to understand the limitations I face due to my disabilities. I do not want to die in prison, but if the bar is set higher than I am capable of achieving, I worry that no matter how hard I work on myself there will be nothing I can do to avoid that fate.

58.    In addition to accessing *Road to Freedom*, I would like to write a book report about it when done. I tried to get █ to help me, but he said that I needed to do the writing myself. With all the difficulty I have writing, due to my disabilities, I do not expect that I will be able to write the kind of long, comprehensive report that the Board

expects to see. I think I would do much better if I could study in a group setting where I can share my ideas with others and get feedback.

59.    In addition, there are a number of other Board preparation tasks that are difficult for me because I cannot write well enough to explain myself clearly on most topics. First, people who do well in front of the Board, I am told, often prepare a written Relapse Prevention Plan. Because of my difficulties with writing, that stem from my learning and hearing disabilities, I could only write surface-level relapse prevention plans. My lack of sufficiently detailed relapse prevent plans, and my lack of a relapse prevention plan specific to sex offenses, was part of why the Board issued me a seven-year denial at my last hearing. Beyond help with writing, this is another area where having a group-based program would help me tremendously.

60.    I also tried to reach out to transitional programs before my ▮▮▮ hearing. I understood that that was important to do, and to get a letter back accepting me to the program, so I could show the Board that I had a strong release plan. I tried calling the housing providers through the Video Relay Service, which is a free service I can use to place calls using ASL and a sign language interpreter to communicate with anybody that I need to call, but the providers either hung up on me or responded simply by sending an informational brochure. I tried my best to write letters to several housing providers, but I kept getting letters back rejecting me from their program on the basis that they do not accept deaf people. While I did as much as I could on my own, I think it would be very helpful if I had assistance from someone who can hear, speak, and write well in English to reach out to these transitional programs on my behalf and help me collect the letters of support.

61.    I tried to write remorse letters to my victims to show the Board that I have remorse for my crime, but I could not do that very well because of my difficulty with reading and writing. This is something I will need to redo before my next hearing, but with all my difficulty writing, I do not know how I can improve them.

62.    I would need help from someone who is fluent in both ASL and English, like a certified and skillful sign language interpreter, before I could put all my thoughts into words that the Board will understand.

63.    This declaration was taken and written for me by my attorney Caroline Jackson. Due to my learning disability and difficulty with reading and writing due to being deaf, Ms. Jackson typed this document for me. She reviewed it with me in ASL, giving me the opportunity to ask questions and make corrections. I made a number of corrections and asked questions throughout. Ms. Jackson signs very well and I had no difficulty understanding what she was explaining.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ▆▆▆▆▆, California this 20th day of ~~August~~ September, 2023.

▆▆▆▆▆▆▆▆▆▆▆▆

I am fluent in American Sign Language. I am a former nationally certified sign language interpreter and I have worked as an attorney, representing deaf sign language users, for over a decade. I read this entire document to Mr. ▆▆▆ in ASL, allowing him the opportunity to ask questions and make corrections. Mr. ▆▆▆ gave appropriate, substantive feedback throughout. Subsequently, I gave him a copy of this document to review before he signed. The substance of what I signed to him is identical to the substance of this declaration.

Caroline E. Jackson, Esq.

15

# EXHIBIT 64

PAROLE SUITABILITY HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Parole Consideration Hearing of:

CDC Number: [redacted]

[redacted]

[redacted]

[redacted] CALIFORNIA

[redacted]

8:42 AM

PANEL PRESENT:
RANDOLF GROUNDS, Presiding Commissioner
NGA LAM, Deputy Commissioner

OTHERS PRESENT:
[redacted] Inmate
[redacted] Attorney for Inmate
CAROLINE JACKSON, Attorney
ALMA HERNANDEZ, District Attorney
AMY PETERSON, Certified Deaf Interpreter
DAWN DARE, Interpreter
UNIDENTIFIED, Correctional Officers

Transcribed by:

Celina Thyra

161

give warnings, verbal warnings, what the expectation is.

**INTERPRETER DARE:**    Okay.

**PRESIDING COMMISSIONER GROUNDS:**    Also find that insight is lacking within you, thereby making you more vulnerable to relapse if released.

**INTERPRETER DARE:**    Could you say that briefly again? Could you back up again? The interpreter back up short. Um...

**PRESIDING COMMISSIONER GROUNDS:**    Sure, I can do that. Um, your insight into the life crimes is lacking.

**INTERPRETER DARE:**    Okay.

**PRESIDING COMMISSIONER GROUNDS:**    And if you don't fully understand why you did what you did, we think that if released to the free public, you'd have  a greater chance of repeating that kind of behavior.

**INTERPRETER DARE:**    Okay.

**PRESIDING COMMISSIONER GROUNDS:**    You minimized and lied about the life crime.

**INTERPRETER DARE:**    The life?

**PRESIDING COMMISSIONER GROUNDS:**    The life crimes. Yes.

**INTERPRETER DARE:**    Okay.

**PRESIDING COMMISSIONER GROUNDS:**    And there was a direct nexus to the life crime and your behavior and

██████████      ██████████      ██████████      DECISION PAGE 11

189

**PRESIDING COMMISSIONER GROUNDS:**    Today we're acting to assess a seven-year denial. Okay. I want you to understand one thing.

**INTERPRETER DARE:**    Please. Okay.

**PRESIDING COMMISSIONER GROUNDS:**    Mr. ███ what do you understand the denial length to be that we just assessed?

**INMATE ███ THROUGH INTERPRETER:** I think so a little bit, a little bit kind of part of it. Yeah. I understand three and five and seven years.

**PRESIDING COMMISSIONER GROUNDS:**    Okay. Do you understand that we assess the seven-year denial today?

**INTERPRETER DARE:**    Okay. Is that the past seven years? I'm not, Amy's saying, I'm not really clear. So, the past seven years you've been looking at, or will we be looking at this again in seven years?

**PRESIDING COMMISSIONER GROUNDS:**    We'll be looking at this again in seven years, but I've got something to add.

**INTERPRETER DARE:**    Okay. Amy, Amy understands now.

**PRESIDING COMMISSIONER GROUNDS:**    Okay.

**INTERPRETER DARE:**    Okay, go ahead.

**PRESIDING COMMISSIONER GROUNDS:**    All right. Mr. ███ you've got a lot of work to do, but I want you to

███   ███   ███        **DECISION PAGE 39**

# EXHIBIT 65

DECLARATION OF ▮▮▮▮ ▮▮▮▮

I, ▮▮▮▮ declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation ("CDCR") number is ▮▮▮. I am currently on parole. I am ▮▮ years old. I was incarcerated in CDCR from ▮▮ until ▮▮. I was housed at the ▮▮▮▮▮▮ from approximately ▮▮▮▮ until my release on ▮▮▮, 2023.

3. I am an *Armstrong* class member. I am designated DPH and DLT, which means that I am deaf and I have a mobility disability.

4. My primary method of communication is American Sign Language. I do not read or write English well. I have some ability to read lips, but only if the person speaks slowly and enunciates.

5. While in CDCR, I took the Test of Adult Basic Education ("TABE") which assesses my ability to read and write in English. My scores on this test show that my ability to read and write has deteriorated significantly since I got to prison. Most recently, I got a score of 1.0, which means that usually have difficulty understanding what people write and have to ask for clarification.

6. I have participated in two full parole suitability hearings. My first complete hearing was held in ▮▮. My most recent parole suitability hearing was held on ▮▮▮ ▮,▮▮. I was granted parole at my recent hearing. Even though I was granted parole, I encountered a number of barriers in my ability to prepare for that hearing and to benefit from the proceeding after the fact. There was ~~I also received~~ one accommodation ~~for the first time at~~ that I received for a full parole hearing for the first time ~~my recent hearing~~, and I believe that helped me to obtain parole. For the first time at a full parole suitability hearing, I was given help from a special type of sign language interpreter known as a Certified Deaf Interpreter ("CDI"). This interpreter has the training and expertise necessary to improve the clarity of what most interpreters convey and tailor it to my unique language and communication needs. In my opinion this assistance made a big

difference in my ability to understand the Commissioners and to express myself at the recent hearing. I did not have this help for my ████ hearing, and I did not have this help for my meetings with my counselor and with my attorney in preparing for my hearing.

7. Prior to each of my parole hearings, I participated in a Comprehensive Risk Assessment ("CRA") interview and received a written report from the Board psychologist discussing my social history and my risk of reoffending. Both times, I could not read the CRA.

8. In 2013, when I received my CRA, I tried to read through it on my own. I could not do so because the vocabulary was too complicated for me to understand. I was able to make out a general idea of what it said, and it seemed to contain a lot of errors. But I did not know how to get someone to fix them. ~~without anyone to explain the full document to me in language that I understood, I could not identify these errors with any certainty~~.

9. In 2020, I received another CRA, which was the CRA that was used for my 2023 hearing. In May 2022, I began preparing in earnest for my ████████ hearing. My plan was to study my CRA to make sure it was correct this time and to study the transcript from my ████ hearing and from my ████ appearance when I waived the hearing. I decided to do this because a friend of mine was granted parole after having twice been denied. When I asked him how he did it, he said he did it by reading through the CRA to make sure it was correct and by studying the transcript of his prior hearing and practicing how to give better answers.

10. I have an assigned Correctional Counselor I ("Counselor") who is supposed to be able to help me access documents like the CRA and my hearing transcript by reading them to me. I tried to get help from my Counselor to review my CRA, but I was not able to. The only way I know of to get help from this person is to attend something called "open line." Counselors have "open line" once per week, and this is the opportunity for anyone who is assigned to them to have a walk-in appointment to discuss whatever they need. Often, the Counselor would cancel open line or the open line hours would conflict with something else I needed to do, such as attending work or programs. But I still tried to

go. I remember one time that I waited in line for an hour to see the Counselor. When he finally got to me, he said he could not meet with me because there was no interpreter and we would need to set up an appointment for Friday. Friday came and went with no appointment; when I reminded him, he said he would set it up for the following Monday. Monday came and went with no appointment, and he again committed to rescheduling. Sometimes we were able to meet, but only briefly, and never for long enough to review my entire CRA. I tried again following my annual Classification Committee review ("Committee"). After Committee, I told the ~~Counselor~~ Captain I needed an appointment to discuss something important. The Captain directed me to my Counselor. The Counselor again promised to set up an appointment to meet with me using an interpreter. I had to follow up repeatedly and wait a very long time before we were finally able to meet. When we did, the Counselor said he couldn't help with what I needed.

11.    I have tried to ask the staff sign language interpreters at ▮ to help me access these documents. When I asked for their help, they would say that they were willing and would sit down with me, but maybe 30 minutes later, they would claim to have an appointment and need to leave immediately. They would say we can try again the next day, but it never would never happen. When they did things like that, it caused me to lose trust in them. ~~I also saw that they seemed to be extremely close with one of the other deaf people at ▮, and I worried that if they learned bad things about me from reading the CRA, they would tell him all about it.~~

12.    Without access to a trustworthy person who could translate these documents for me, I tried my best to read them on my own. I have access to a dictionary that will give different definitions for words. I would use the dictionary to try to go through these documents and understand them. But this did not work either because it was a college dictionary and used words I didn't understand.

13.    When I reviewed the transcript from my ▮ hearing, with assistance from a friend, I was shocked to find a large number of errors. It seemed to me that the interpreter added a lot of additional information that I never said. I think that might have been the reason why I was denied parole at that hearing, because there was so much that got put on the record that

seemed to be completely made up, most likely because the interpreter did not understand what I was saying. As noted above, I was not provided with a CDI for my hearing in ▮. I believe that if I had been provided a CDI, I would have been able to communicate more effectively with the panel.

14. Because of my experiences in ▮, it was very important to me to make sure that my new CRA did not have any errors in it. I did my best to understand my CRA by using my dictionary to help. I studied every day. Some nights I stayed up until 1:00a.m. or 2:00a.m. studying and then got up at 6:00a.m. to go to work. This is how badly I wanted to understand that document. Even with all that hard work, I understood very little of what was in my new CRA.

15. Fortunately, I had an easier time understanding the part of my ▮ transcript where the BPH Commissioners asked me questions. When I met with my attorney about 3 months before my hearing, I learned that I needed to practice making my answers shorter and more to the point, and that I could use my hearing transcript to practice. The first thing I had to do was to figure out what the questions in the transcript were. I would use my dictionary to help me. Most times, I would have to read the same question, looking up the words I did not understand, at least three times before I could remember what the question meant by reading it. But I was determined, so I practiced with my transcript this way for three months. Finally, at the end of three months, my hard work paid off because I was granted parole.

16. Having access to video ASL translations of both the CRA and the hearing transcript would have helped me tremendously while preparing for parole. If I had had ASL translations of these documents, I would not have had to work so incredibly hard just to find out what the documents said. I could use the interpreter to understand the document, and focus on engaging with the document the way I wanted to, such as by making sure the content was accurate or by using the questions to practice for my next hearing.

17. For the CRA, it would be very important for me to have an outside sign

language interpreter translate the document for me. As I explained before, I did not trust the staff interpreters at ▇▇▇. I would trust an outside interpreter, though. I would need the interpreter to be good at putting the CRA into language that I understand, *like a CDI can* because it is written at a very advanced level that I know I would need simplified to understand. I would also want for the translation to be recorded by video, because I am old an forgetful, and I would want to be able to watch the translation again to remember what the CRA says.

18. For my hearing transcript, I would prefer to have a video of truly qualified interpreters at the hearing. As mentioned before, at my ▇▇▇ hearing, I had a CDI. ~~I had never used this type of interpreter before.~~ She did a great job of phrasing questions in ways that I understood easily, and in putting exactly what I had meant into advanced English suitable for the Board. I noticed that even though my ▇▇▇ hearing was much shorter than my previous hearing, I was granted parole, and I think that had a lot to do with the CDI making sure that the Board and I understood each other. Instead of a written English transcript, which I have a lot of trouble reading, I would want to have a video of my hearing that recorded my own testimony and the CDI's interpretation of the Board's questions.

///
///
///
///
///
///
///
///
///
///
///

19.    This declaration was taken and written for me by my attorney Caroline Jackson. Due to my disability and low TABE score, a Certified Deaf Interpreter translated this entire document for me. Ms. Jackson was present during this process to note any corrections and to answer any questions that I had.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ███████, California this 8 day of August, 2023.

I declare that I am fluent in American Sign Language. I observed the Certified Deaf Interpreter translate this declaration in American Sign Language and ensured that the substance of what the Certified Deaf Interpreter conveyed to Mr. ██████ is identical to the substance of this written declaration. I gave Mr. ██████ the opportunity to ask questions, to make corrections, and to confirm the entire declaration was correct before he signed it.

Caroline E. Jackson, Esq.

I declare that I am a qualified interpreter. I am certified by the Registry of Interpreters for the Deaf as a Certified Deaf Interpreter. I translated the entire document into American Sign Language accurately, completely and impartially, using my best skill and judgment.

James R. Brune

# EXHIBIT 66

DECLARATION OF ███████ ████

I, ███████████ declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation ("CDCR") number is ███████ I am currently housed at the ███████████████ ███████ ███████████████████ I am housed on a "Sensitive Needs Yard" because I committed a crime that puts me at risk of getting beaten up if other incarcerated people find out what I did. I have been sentenced to 40 years to in prison; my current release date is ███████████, although I could be released earlier if I am granted parole. I am █ years old. I have been incarcerated in CDCR since █████████. Because of my age at the time I committed my crime, I am considered a "youth offender."

3.    I am an *Armstrong* class member. I am designated with a DPH code, which means that I am deaf.

4.    My primary method of communication is American Sign Language ("ASL"). I have a limited ability to read lips and I can speak some words, but not enough to carry on a conversation. My ability to read and write is limited to basic communication. I do not know fancy words. When reading a book, I often do not know what words mean; and when writing, I often do not know the words for what I want to express. In prison, I took a test of a my reading level and received a 4.0, which means I do not read very well.

5.    I can communicate much better using ASL than through any other method. Even so, I can have trouble understanding. If explaining new or complex information, I need people to use easy words not advanced ones. I need pictures so I can see what they mean. And I need people to use examples to illustrate what they mean. Even then, it is best if the person explaining the information is familiar to me. When a familiar person explains things using examples, I understand easily and clearly. When a stranger explains things to me using examples, I only sort of understand. Without these tools to help me understand, even if the person is using ASL, I get completely lost.

[2891901]

6.    In addition to being deaf, I think I might have a learning disability. I have noticed that I have trouble remembering things. Like, when someone explains new information to me, I will think I am understanding them the entire time, but afterward, I forget what they explained.

7.    Because of my primary communication method and my low reading level, CDCR is supposed to use a sign language interpreter to communicate with me, especially when discussing medical or legal information. For example, if I get a disciplinary write-up (called a "115"), an interpreter is supposed to explain to me what the write-up says.

8.    My first parole suitability hearing was scheduled for ███████. At the hearing, I decided to waive my right to hearing for one year, so we did not have a full hearing.

9.    My first full hearing occurred on ███████. At the hearing, I was denied parole for three years. I was very upset by the denial because I had worked hard to prepare. My next hearing date is tentatively set for ███████, but I plan to ask the Board to move the hearing earlier. I am working as hard as I can to prepare for my next hearing.

10.    Before my first hearing, I participated in a psychological evaluation, known as the Criminal Risk Assessment or "CRA," but I did not have full access to this process. I was not comfortable with the interpreter for the CRA interview, because I knew she had revealed confidential information about a different deaf person in the past, and I did not want her to reveal information about me.

11.    After the interview, I was given a written CRA report but nobody used an interpreter to explain it to me, even though it is a psychological evaluation. I was told I had to review it on my own. I had no way of doing that and I did not know who I could ask for help. I remember sitting in my cell, feeling very embarrassed and frustrated that I couldn't understand almost any of the words on the page. I could tell the report had all sorts of personal information about me, but I did not understand almost any of it. The only part I understood was the description of my crime. The experience was so upsetting, I felt like I was about to cry.

///

12.    I saw some information in that there I thought was inaccurate, but I could not tell whether it was actually inaccurate, or whether the psychologist had just put my statements in formal language that I did not understand. I also had no idea what to do about mistakes in the CRA. The *Armstrong* attorney told me I could object, but none of my other attorneys said anything about that. I also was never told that the Board might ask me questions about what was in the CRA.

13.    I really wish that an interpreter had explained the CRA to me, so I could know what it said. Also, now that I have been to a hearing, I would want an interpreter to explain that CRA to me so that I can be ready for the Board's questions. I would want the interpreter to sit down with me to interpret it, so I could ask questions and make sure the interpreter used the kind of vocabulary and examples that I would understand. I would also really like to have a video of this translation so that I could review it later if I wanted to remember something in it.

14.    During my full hearing in ███, the Board provided both a standard sign language interpreter and a "Certified Deaf Interpreter," which is a type of interpreter who is deaf like me. Despite these accommodations, I did not feel like I understood what happened. Several times during the hearing, I told the Commissioners that I did not understand their questions. The communication bad enough that I wanted to appeal my denial based on the poor quality of the interpreters. But I chose not to because I had no way of proving what happened, and I don't read or write well enough to use the legal system effectively. I did not want to appeal and just get denied again.

15.    After the hearing, I received a copy of the written English transcript of the hearing. I really wanted to read the transcript right away, because I remembered that the Commissioners had told me what I needed to do to prepare for my next hearing, but I didn't remember what they said. But even though the transcript is a legal document, nobody used an interpreter to explain it to me.

///

///

3

16.     I had no way of understanding the transcript. I tried to read it, but I noticed that I only understood a few words here and there. I did not even understand full sentences in the transcript, much less entire paragraphs.

17.     I asked one of the staff sign language interpreters at SATF to read the transcript to me. She said no, because she was not allowed to, and suggested I ask my counselor. This counselor is the same person who was supposed to help me review my central file before my hearing. That counselor really didn't help at all, and kind of left me alone to muddle through. I expected the counselor wouldn't be any better about explaining my transcript to me, so I did not ask the counselor to read it until nearly one year later.

18.     As of the day I signed this declaration, I have asked my Counselor to read the transcript to me with an interpreter, and my Counselor agreed. But I do not know when this will happen. And I do not know if my Counselor will explain the transcript in a way I can understand.

19.     Fortunately, at the end of my parole hearing when the Commissioners told me what to do, my attorney took notes and gave them to me. Without any way of reading the transcript, these notes are all I have to go on to figure out how to prepare for my next hearing. The notes are hard to read because they are hand-written and might only use a few words to summarize something that the Commissioners used several sentences to explain. For example, they say to write down my "causative factors," but I don't know what causative factors are. Without access to what the Commissioners told me to do, I am trying to guess based on my own common sense.

20.     I would like to have a video of the hearing that shows the interpreters and myself signing, so I can review it to prepare for my next hearing. Even though I did not understand the interpreters very well at my hearing, I understood them better than I understand the written transcript, so having the video would help.

21.     With the video, I would be able to find out what they had told me to do to prepare for the next hearing. I would also be able to see what questions the Board had asked and how I answered the Board's questions, so I can practice giving better answers

///

4

next time. If I had this video, I also think I would have a better chance of winning an appeal based on the interpreters' mistakes.

22. Without being able to read the transcript, I have no way to prepare for my next hearing. I remember that the hearing was not at all what I expected, but I don't remember much about what I was asked nor how I answered those questions. I am scared that, because I could not practice, I won't understand their questions and I will be denied again.

23. At the end of my first hearing in ███, the Commissioners told me to prepare for my next hearing by reading a book called *Road to Freedom* and writing a report, even though they knew I could not read or write. The book is thick. My attorney for that hearing told me I could call him and he would read the book to me. I never did, because in the meetings we had had before my hearing, he was not very good at breaking down information and explaining it in a way I could understand. I did not think it was worth calling him, because even if he read the book to me through interpreter (there is a free service that interprets phone calls for deaf people), I would not be able to understand what he was saying. I was also worried because I did not have a confidential location to place the call.

24. Even I could not read *Road to Freedom*, I really wanted to show the Commissioners I had tried to take their advice. I have a friend named ███ that I trust enough to let him know my crime. He doesn't know any ASL, so we communicated as best we could through my reading his lips and him writing notes. He is very patient. He sat down with me for an hour to explain the thick book to me. I understood some of what he explained, but not much.

25. When I was denied parole in ███, the Commissioners told me to re-read *Road to Freedom*, even though they know I cannot read well. But I don't know anything more about what they want me to do — do they want me to explain the book in my own words? Summarize it? I don't know, and without access to what the Commissioners said, I cannot find out. Also, I cannot ask ███ for help this time because he is busy with other

things. I do not know who else I can ask for help, because the nature of my crime makes it dangerous for me to let other people know what it is. I have tried reading the book on my own, but it is so full of high-level words I don't know that I get very little out of it. I cannot picture in my mind what it is explaining. I do not know how I am going to do what the Commissioners want. This is the most embarrassed I have ever felt.

26. After my second hearing, the Commissioners also told me to join "Sex Addicts Anonymous" and get a sponsor. I have done that, but I really do not see how I will be able to get much out of it. My sponsor and I can only write letters to each other. I do not read well enough to understand most of what the sponsor writes to me. And even though I want to open up to my sponsor, I am not sure that I can because my writing is not very good and he did not seem to understand the last letter I wrote. I did try to ask to set up a way we could email each other, so the computer could correct my spelling and grammatical errors, but he said no. I am also worried about opening up to him because I know the staff read whatever I write. I do not want to have calls because they will not be confidential. I also don't know how much he can understand my life because he is not deaf like I am. I am not sure what I will do.

27. The other thing I know about preparing for Board is that it is helpful to take a lot of different rehabilitative programs, like Alcoholics Anonymous and Criminal Gangs Anonymous.

28. I have faced a lot of barriers to taking programming because I am deaf. First, as a deaf person, I cannot be housed in most of the prisons in California. In about 2007 I came to understand that ▮▮▮ was the only prison in the entire state where I could be housed as a deaf person. (My attorney told me this is not true and that deaf men can be housed in about 8 of the prisons in the state). ▮▮▮ does not have a lot of programs and the wait lists to get into those programs are very long.

29. Shortly before the COVID-19 pandemic, it became possible for deaf people to transfer to ▮▮▮▮▮▮▮. I tried to transfer and was put on the wait list. By the time a spot opened up in 2023, I decided not to transfer because I had finally gotten to

start taking programs at ▮. I wanted to take programs to prepare for Board, and I did not want to have to start over at the bottom of the long wait lists.

30. For a long time, while housed at ▮, I was told I could not take any rehabilitative programs because I had a job that conflicted with the time that the rehabilitative programming was offered and I could not find someone to switch shifts with me.

31. When I was finally able switch shifts and sign up for programs, I could not understand them. Rather than hiring a sign language interpreter to come to the prison and interpret these groups, ▮ provided an interpreter through a large computer or TV. The internet connection was terrible – the image of the interpreter froze and blurred all the time. Even when the picture was clear, I could not understand the interpreter because the interpreter did not use the simple language or examples that I need to be able to understand.

32. When the COVID-19 pandemic hit, I had to drop out of my programs. All of the in-person programming at the prison was shut down ~~and they switched to using only~~ and I ~~written materials for programs. I could not understand the written materials and~~ could not participate in programming until after in-person programming fully resumed.

33. I did not get full access to programming until after I was denied parole. I finally enrolled in a program with an on-site interpreter for the first time in approximately ▮ 2022. The interpreters for these programs were the staff interpreters at my facility. They knew me and took the time to interpret information in a way I could understand, like by using examples that were familiar to me and drawing connections between the subject of the class and my crime. I can also check with the interpreter to make sure I am understanding the class correctly. With their help, I raised my hand and commented in class for the very first time since getting to prison over twenty years ago, and the program facilitator responded positively to my comment. This experience was transformative. I exploded in confidence afterward, because I finally realized that I am not dumb. I am capable of learning.

7

34. With my new-found confidence, I am doing new things. I used to think I could not communicate with non-deaf people, so I would avoid the officers, counselors and other incarcerated people. Now I have started teaching ASL to the other people in prison with me. I teach them ASL, in part, in so they can help other deaf people in prison and have a better chance at a career when they get out.

35. Even with interpreters, I am still limited in the programs I can take because I am limited in the prisons where I can be housed. I am aware of special programs like the Youth Offender Program at ▮▮▮▮▮▮ and ▮▮▮▮▮▮. I am particularly interested this program because I am a youth offender and I think the program would help me a lot. But I cannot transfer to those prisons to take that program because I am deaf, and CDCR will not house deaf sign language users at those prisons.

36. I have faced other barriers to parole preparation because I am deaf. One of the preparatory steps for a parole hearing involves reviewing your central file. My counselor was supposed to helped me, but he didn't seem to know how to operate a computer. I had to do it on my own. The only way I had any idea what to look for was because my friend ▮▮▮ had explained what to look for.

37. I had an attorney assigned to me for both my parole hearings, but we each only met at most three times before the hearings, including meeting on the day of the hearing. This was not nearly enough for me to learn much, so the attorney did not really help. ▮▮▮ helped me much more than either of my attorneys did.

///
///
///
///
///
///
///
///

8

38.     This declaration was taken and written for me by my attorney Caroline Jackson, who is fluent in ASL and who knows how to explain information to me in a way that I understand. Ms. Jackson typed the declaration and then used ASL to read each paragraph to me, had me repeat back or correct the information to show I understood it, then confirm that she had accurately typed out my testimony.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at ▮▮▮▮▮, California this 23rd day of May, 2023.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I declare under penalty of perjury under the laws of the State of California that I accommodated Mr. ▮▮▮▮ disability by typing this declaration and reading the entirety of each paragraph to ▮▮▮▮ in ASL. I am fluent in ASL and have used ASL to communicate with my deaf clients for over a decade. The substance of what I read in ASL, which Mr. ▮▮▮▮ confirmed was true and correct, is identical to the substance of this printed version.

Caroline E. Jackson

[4289790.1]                                    9

# EXHIBIT 67

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | DECLARATION OF ███████ IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PRIOR INJUNCTIONS REGARDING DEAF AND VISION IMPAIRED CLASS MEMBERS |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:  Hon. Claudia Wilken |
| | Crtrm.:  4 |

[4293891.3]

I, ██████████, do hereby declare:

1.    I am currently incarcerated in the California Department of Corrections (CDCR), at the ██████████████████████████████, California. My CDCR identification number is ████. I am currently █ years old.

2.    I am deaf. I rely on American Sign Language as my primary method of communication. In the CDCR system of classifying disabilities, my disabilities have codes of DPH and DPS, meaning that I am deaf and also do not speak. According to CDCR, my "secondary" method of effective communication is "written notes." However, written notes does not work well for me as a communication method because of my trouble reading and understanding English. Even when I am communicating in sign language, my skills are on the lower level, because I have spent a lot of time alone in my life and have not had the chance to fully develop my sign language.

3.    I was born deaf. I grew up in a family where none of my immediate family members ever learned American Sign Language ("ASL"). I am not completely sure about the timing, but I believe that I did not learn any language until I started attending a school for the deaf when I was around 3 or 4 years old. The language I learned was ASL. My native language is ASL, not English. My command of English is extremely poor. English is a very different language than ASL, in terms of vocabulary and grammar, and I struggle to read and write in English. I am able to understand some words in English, but I usually need help from other people to help me understand English. Documents of any length or complexity—and especially documents like hearing transcripts and the Comprehensive Risk Assessment (CRA)—I need someone to translate the document into ASL to fully understand it.

4.    While in CDCR, I have taken the Test of Adult Basic Education or "TABE," which tests my proficiency in reading and mathematics. The last time I took the test, I got a score of 2.0, which means I cannot understand written information unless it is very simple. I got a 2.0, even though I have been taking adult education classes for years. I simply cannot seem to improve my English.

[4293891.3]

2

Case No. C94 2307 CW

DECLARATION OF ██████████ IN SUPPORT OF PLAINTIFFS MOTION TO ENFORCE

5.    I have some other disabilities. I was born with fetal alcohol syndrome, which is what caused me to be deaf, and also left me with trouble understanding and remembering things. I have noticed that I have what I call a "low mind," meaning that I have more trouble understanding and remembering information than most other deaf signers I know. Even when people use ASL to communicate with me, I need information broken down and made simple so that I can understand it. I also need people to use examples to illustrate what they mean, and it's best if the examples are already familiar to me, like using examples based on what they know about my life. If someone explains new information to me without using examples, I usually cannot understand what they're trying to explain.

6.    The BPH does not seem to care about my difficulty communicating, and I believe that has contributed to my denials of parole. I have tried to explain to them my difficulty learning information, understanding programs, and expressing myself, but they still seem to want me to do things I cannot do. I find it frustrating and depressing.

7.    I am currently serving a sentence of 25 years to life for murder. I have been in prison since ███. I have been eligible for parole since ███, but I stipulated to unsuitability in ████████. My first full parole suitability hearing took place in ███, and I was denied parole for five years at that hearing.

8.    My most recent Board of Parole Hearings (BPH) Parole Consideration Hearing took place on ████████. That hearing was my second time appearing at a BPH Parole Consideration Hearing. I was denied parole for five years at the hearing. My attorney filed a petition to advance my next hearing, which was granted, and so my next hearing will be in ████████.

9.    My most recent hearing on ████████ lasted nearly ██ hours. I had the assistance of a single Sign Language Interpreter (SLI) (a non-deaf person who interprets between spoken English and standard sign language) and a Certified Deaf Interpreter (CDI) (a deaf person who has special skills to interpret sign language in a way that could meet my unique communication needs). The two interpreters worked together

to help me participate in the hearing: when anyone at the hearing spoke, first the SLI would interpret the information into sign language, then the CDI would break down what the SLI signed into simple language and use examples to help me understand. When I responded, the CDI would interpret what I said into sign language that was easier for the SLI to understand, and then the SLI would translate the information into spoken English. I remember that the interpreters at the hearing expressed that they were getting tired by the end of the long hearing. The Board did not give enough breaks to the interpreters. Each of the interpreters should have had another interpreter to switch off with them during the hearing, and to assist them if they were having any trouble.

10.     During my hearing, I recall that the SLI signed numerous words that I did not understand. The CDI also need clarification about these words and concepts, but the SLI never explained anything – she just kept signing in a way that neither of us understood. As a result there were numerous portions of the hearing where I did not understand the panel's questions or the statements that any participant made. It would have helped me to have more breaks and a better SLI.

11.     I also worried about whether the Board was understanding what I was saying. I believe I expressed myself to the CDI and that she understood. But I worried about whether my words were being clearly communicated by the SLI. I have no way to know what she was saying to the Board as my testimony. If there had been two teams of interpreters at the hearing, I would feel more confident because the interpreters could check each other's work to make sure it was accurate.

12.     Also the ███ hearing was not in person – it took place over video with many participants remote. There was a laptop with the two interpreters for me to look at, and also a larger screen with everyone on it including the interpreters and the Commissioners and others. I thought that there were too many people on the video screens. There were about eight people on the bigger screen, but sometimes they would move around or freeze. It made it harder to see the interpreters and the Board Members, and made it harder for me to understand the questions and see who was talking to me. It

was also hard for the CDI to know who was speaking. The laptop screen had just the two interpreters on it, but it was sometimes confusing for me to know who to watch.

13.    After my hearing, prison officials gave me a written English transcript of my hearing. I cannot read well enough to understand it on my own. I tried looked at the transcript but could not understand it. I did not ask the staff interpreters to interpret it because I do not trust them to keep my information confidential. I believe the state interpreters are like the officers -- they are not on my side. I wish I could access the transcript, because I know it is very important and it contains recommendations for what I can do to improve my chances of getting parole, and I'd like easy access to that information.

14.    When I looked over the English language transcript, I wondered if there were mistakes in it, because the transcript seemed to show more of the Commissioners words than my words, and I recall the hearing being more balanced. But since I cannot understand the transcript, I have no way of knowing. I also worry that I may express myself well in a future hearing, but that it might be mistranslated. Video recording would create a record of this, and I might be able to use it to work with an attorney to file an appeal if there are a lot of mistakes.

15.    I am aware that other people prepare for parole suitability hearings by reading their transcripts and forming study groups. I think I was at a big disadvantage in preparing for my ███ hearing, because I could not study any documents to prepare. I had been given the written English transcript of my ███ hearing, but I had no way of understanding what it said on my own, and I did not know anyone that I trusted who knew both English and ASL well enough to read it to me. Having a video recording of my ███ hearing that showed the sign language interpreter and me signing would have helped me prepare, because I would have had the opportunity to remember what the Commissioners had asked and how I had responded. I could practice answering their questions better this time. I also I would have known what the Commissioners told me I had to do to improve my chances of getting parole in ███.

16. If there was a video recording of my ▮ hearing, that would be helpful in order to prepare for my next hearing in ▮, for the same reason. I do not remember everything the Commissioners told me I had to do to improve my chances next time, and without access to any record of the hearing itself, it is very hard for me to find out what they said.

17. I believe I should have the same opportunity as hearing individuals who are able to read the English transcripts to prepare for subsequent hearings. Since I do not have this resource, I do not know how I will practice, and I am worried I will get denied again. This is especially important for me because of all my cognitive and language deficits that make it much harder for me to learn to concepts and to explain myself well. Also, the hearing people can also learn by just overhearing other people's conversations. That is not something I can do because I am deaf. I also noticed that I haven't been sent home even though I am staying out of trouble – I have had no write-ups in a decade. Since I cannot prove I am safe through my conduct, I have to prove through my words, and this is a nearly impossible task.

18. I also noticed that hearing people help each other. When they are prepared for Board, they form study groups and practice. I wish I had access to group like that, but I do not because I am deaf. The least I could have is access to my transcript, so I have the opportunity to practice.

19. Prior to both my ▮ hearing and my ▮ hearing, I was interviewed by a psychologist for my "Comprehensive Risk Assessment" ("CRA"). After the interview, I received a written CRA report, but nobody told me what the report said, even my attorney and my CC-I. All I could see was that I had been assessed as "high risk," but I have no idea how the CRA reached that conclusion. Usually, when I am served a medical or legal document in prison, the person serving the document uses a sign language interpreter to tell me what the document says, but nobody did that for the CRA. With each CRA, I tried to read it on my own. I understood some portions about my family, and some details of the report, but most of the language was too advanced for me. The different reports used the

phrase "high risk" in one place and "low risk" in another, which I thought was confusing. I wanted to know what the report said, but there was nobody I could ask. I did not want to ask the staff interpreters at █████ to interpret the report because it is so private. I did not want the staff interpreters to know my personal business. Other than the staff interpreters, I did not know anybody who knew both English and ASL well enough to tell me what the report said. I also could not ask my attorney because the prison always used a CDCR interpreter for those calls and meetings.

20. I wish that I could have had access to an outside interpreter to tell me what the CRA said, especially because I was asked questions about the CRA during my █████ hearing. Ideally, there would be a video of the interpreter translating the CRA and I would be present while the interpreter was working, so I could ask questions and make sure the interpreter translated the document in a way I could understand. With a video, I would also be able to re-watch the translation if I wanted to remember something that was in the document. Without any translation of the CRA, I struggled a lot to figure out how to answer the questions I was asked about my CRA.

21. At the end of my █████ hearing, I learned I was supposed to draft a "relapse prevention plan." This was the first time anybody told me to draft a document like that. I am told that the transcript from my █████ hearing also says I need to draft a relapse prevention plan, as does my █████ CRA, but I never knew what these documents said, so I did not know to try to write a relapse prevention plan. I want to draft a relapse prevention plan before my next hearing, but I do not know how to do this without a lot of help.

22. I also struggled during my █████ hearing when they spoke about relapse prevention. There were five important words and concepts I struggled with in the hearing and in reviewing the transcript with a friend – "relapse" "responsibility," "impact," "victim" and "apologize." I was overwhelmed by those words in my hearing. I was able to understand these better after the hearing with help from a friend, but I feel I still need to learn more about these concepts before my next hearing.

23. In my history, I am aware of some issues in documents related to my

hearings with mis-translation of sign language. For example, in my most recent CRA interview, the psychologist told me that in the prior CRA, I said I had a deaf brother. However, as I explained in the recent CRA interview, that information was certainly due to mis-translation. None of my siblings are deaf. I did not have a CDI assisting me in the interview in connection with the CRA in ███, and the hearing interpreter clearly mistranslated this information. I was very lonely and isolated growing up, in large part because my family never learned ASL. This is an example of how words get put in my mouth every time an interpreter makes a mistake.

24. My understanding of the BPH parole consideration process is that completing lots of rehabilitative programming is generally helpful to someone trying to obtain parole. But at my last hearing, the Commissioner told me they were denying me because I had not taken enough programs. I have tried to take as many programs as possible, but it has been hard because my ability to access and complete programming has been limited because I am deaf.

25. First, I have been at ███ since ███. ███ does not have very many programs and they are often canceled for various reasons. I have tried to transfer to other prisons but I have not been able to. I tried to transfer to █████████████ ███████████████████████████, but I was told I could not because I have an enemy there. I also tried to transfer to ███████████████████████████ which I know has a lot of programs, but my request to transfer was first postponed and ultimately denied for reasons they never explained.

26. I have had a lot of trouble accessing programs at ███, due to being deaf. There is form that you need to fill out to ask for programming, but the form is hard for me to read and to fill out to sign up for rehabilitative classes with the Community Resources Manual, because I do not understand what is written in the book. I also think it takes me longer to learn about the CRM classes because I am deaf and no one tells me about those classes.

27. ███ usually provides an interpreter of some kind for the programs I take,

but it is still very hard for me to learn that way. For many years, ██ provided programs using an interpreter on a computer. The computer screen was located far away from the other students, so I could not both watch the interpreter and look at the other students in the class. Sometimes the computer would freeze, the picture would blur, or the interpreter would say they could not understand what the other students were saying. I could never understand the class when this happened. Also, even when the interpreter attended in person, the interpreters would not sign in a way that I could understand. They would explain things in complex ways without using any examples, when I need information put simply using examples. To illustrate the difficulty I was having, I am told that terms like "relapse," "responsibility," "impact," "victim" and "apologize" are commonly used in the self-help programming in prison. Even though I have taken what I think is a lot of self-help programs, including Alcoholics Anonymous, Narcotics Anonymous and Anger Management, I still do not understand those terms. I think I need a CDI to understand my programs.

28. A number of programs are also available by correspondence, and I am trying my best to take them. I am enrolled correspondence classes in victim impact and domestic violence, and I took a course on sexual abuse. The sexual abuse teaching and the victim impact class are both through an organization called PREP. Although they try to communicate with me in simple written English, I feel overwhelmed working on these issues at times. I try very hard to understand the material, and I use a dictionary to look up any words I don't understand. However, it is still really difficult for me to understand, because often the dictionary lists several different definitions for the same word, and I don't know which definition applies. I don't know how much I can actually learn this way.

29. Some of my classes have books, like AA and NA. But I cannot read these books. It is no use or me even to try. I have to just watch the class.

30. I am doing my very best to prepare for my next parole hearing in ██. I remember the Commissioners told me to take specific types of programs, like programs for

anger management and sexual abuse. I have taken some in person programs to address these issues, including programs here at ██████, including one called "understanding insight" where people share their life stories, and a Friday Church group. I get services from a staff interpreter for these groups, but still because of my difficulties with language and learning, I believe that I have some understanding of the groups but not a full understanding.

31.    This Declaration was communicated to me by a certified deaf interpreter and a hearing interpreter, working together with an ASL-fluent attorney, before I signed it.

I do so declare, under the penalty of perjury, that the foregoing is true and correct and that this Declaration was executed this 10 day of July, 2023, at ██████, California.

████████████████

I declare that I am fluent in American Sign Language. I read this declaration to Mr. ██████ with the assistance of a Certified Deaf Interpreter. The substance of what I and the interpreter signed to Mr. ██████ is identical to the substance of this written declaration. I gave Mr. ██████ the opportunity to ask questions and make corrections, and to confirm the entire declaration is correct before he signed it.

_Caroline E. Jackson_
Caroline E. Jackson, Esq.

I declare that I am a qualified Certified Deaf Interpreter. I assisted Ms. Jackson to the best of my ability as she and I worked together to interpret this declaration to Mr. ██████.

_[signature]_
Christopher Tester

# EXHIBIT 68



PRISON LAW OFFICE
General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Corene Kendrick
Millard Murphy
Lynn Wu

August 17, 2017


Sharon Garske                          Danielle O'Bannon
Deputy Attorney General                Supervising Deputy Attorney General
1515 Clay Street, 20th Floor           455 Golden Gate Ave Suite 11000
Oakland, CA 94612                      San Francisco, CA 94102
Sharon.Garske@doj.ca.gov               Danielle.OBannon@doj.ca.gov


Re:    *Defendants' Ongoing Failures to Comply with Armstrong II Plans and Orders*


Dear Danielle and Sharon:

We write to request a meet and confer with Defendants to discuss various areas of concern that remain under the *Armstrong II* litigation. There remain significant deficiencies and violations of the *Armstrong II* Remedial Plan which seriously harm our clients. We believe most, if not all, of the below cited deficiencies and areas of concern can be best addressed if Defendants and Plaintiffs work collaboratively to come up with appropriate solutions.

Our concerns can be broken up into four overarching categories. First, the attorneys appointed to represent class members in BPH hearings as an ADA accommodation are often inadequate. We have raised this issue numerous times over the years and continue to do so in our quarterly reports with little improvement. Second, the Board's Comprehensive Risk Assessments often fail to account for a class member's disabilities and the impact those disabilities have on the expectations placed upon each client. The risk assessments need to clearly account for an individual's disabilities and limitations, and the forensic psychologist must keep such limitations at the forefront of his/her analysis in determining whether the individual poses an unreasonable risk to society. The risk assessments also need to document more comprehensively how effective communication was achieved during the interview process. Third, there are a number of practices that have been adopted by the Board informally that have never been put into formal policy or regulations. In order for the remedies put into place in this case to be sustainable, they must be incorporated into policy/regulations. Finally, we have a number of other concerns we would like to discuss with Defendants, including Proposition 57 issues, the BPH accountability process, and some procedures that were required by the 2002 injunction that appear to have lapsed.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Honorable John Burton • Felecia Gaston • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 2

### I.    *Appointed Attorneys*

Under the *Armstrong II* Remedial Plan (ARP II), each class member is given a state appointed attorney as an ADA accommodation.  ARP II at page 5.  The attorney is supposed to ensure that each client's ADA needs are met.  However, the preparation required to ensure that a DDP or LD client, or those involved in the Mental Health Services Delivery System (MHSDS), are fully able to participate in the hearing is extensive.  The pay for such attorneys is insufficient to cover these needs;[1] thus, it is not surprising that many of the attorneys fail to adequately prepare their clients for their hearings.   According to the 2002 Permanent Injunction, attorneys appointed to serve as ADA accommodations "must receive adequate additional time" to provide the necessary services.  *See Armstrong v. Davis*, Revised Permanent Injunction, No. C94-02307,  February 11, 2002, at page 11.  This is not the case.  Rather, the attorney is compensated the same amount no matter the particulars of the case in question.  The appointed attorneys cannot be expected to provide the "additional time" required to prepare DDP or LD or MHSDS clients for their hearings with no additional compensation, and in practice, most of them do not provide additional time for these cases.  As monitors, we regularly encounter problems related to the provision of individuals' ADA needs.  Below are just a few examples:

➔ The attorney usually only meets with the client once prior to the hearing and informs the client about what he/she needs to do in order to prepare for the hearing. This is inappropriate as an individual with mental health issues, developmental or cognitive limitations, or a learning disability, will often need more assistance preparing for the hearing. It is not sufficient to just tell the client what he/she needs to do to prepare on their own as they will not likely be able to do the requested tasks, e.g. obtain parole plans, review the risk assessment, etc.  Also, depending on the client, a single visit prior to the hearing may not be sufficient to build rapport with the client and to understand his/her communication needs and cognitive limitations. *See, e.g.*, ▇▇▇▇▇▇ Life Prisoner Monitoring Report at page ▇ (▇▇▇▇▇▇▇▇▇▇); ▇▇▇▇▇▇ Life Prisoner Monitoring Report at page ▇ (▇▇▇▇▇▇▇▇).

➔ The meeting between the client and attorney is usually short and does not provide sufficient time to review all relevant documentation and the hearing process with the client.  At a minimum, the attorney is expected per his/her contractual duty to "meaningfully consult with the client….and shall discuss, at a minimum, any relevant risk assessments,[2] the client's parole plans, and the client's disciplinary history." *See* Board of Parole Hearings, Panel Attorney Appointment

---

[1] Per the Board of Parole Hearings, Panel Attorney Appointment Program, January 1, 2017 contract, the general pay per hearing if completed in its totality is approximately $400.  This includes: the attorney appointment; review of Board Packet, DECS and legal research; central file review; client interview; and appearance at the hearing.

[2] It should also be noted that there are circumstances in which the Comprehensive Risk Assessment (CRA) only becomes available after the attorney has met with the client and thus the CRA is either not reviewed with the client or reviewed on a very short basis the morning of the hearing.  See, e.g., ▇▇▇▇▇▇ Life Prisoner Monitoring Report at ▇ (▇▇▇, ▇▇▇, ▇▇▇ hearing attorney did not review the CRA with him). This is problematic on many levels, but even more so given that many CDCR institutions have taken the position that they will not review the CRA with any individuals.  If the correctional counselors who often provide clients with a copy of the CRA will not review it with him/her, and the attorney does not do so, it is unclear who is tasked with the responsibility to help each person make any written objections to the CRA as established via the *Johnson v. Shaffer* settlement.

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 3

Program, January 1, 2017, at page ▮. Even if an EOP, DDP or LD client has already had hearings in the past, he/she may not recall the process or what types of questions are asked of him/her. This information needs to be carefully reviewed with the client. *See, e.g.,* ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮▮▮▮, ▮▮▮ hearing (attorney and institutional staff did not review CRA with the client)); ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮▮▮▮▮, ▮▮▮▮ (same)).

➔ Often the DDP clients appear at their hearings with no parole plans. In discussion with the appointed attorneys, they generally do not assist with the development of any plans despite being trained to do so in the ADA annual training. *See, e.g.,* ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮, V▮▮▮▮, ▮▮▮ hearing (attorney did not provide assistance with parole plans)).

➔ Often during the hearings, the attorneys use complex language and/or fail at ensuring effective communication. This raises concerns around whether effective communication was achieved during other attorney-client interactions. *See, e.g.,* ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮▮, ▮▮▮▮, ▮▮▮▮▮▮).

➔ In addition, often during the hearings, the attorneys are not engaged with the clients. They do not interject to ensure effective communication even when the client appears to be confused or disoriented. Even when the client is going on a tangent, which can be harmful to his/her chances of release, the attorney often does not intervene to redirect their client. *See, e.g.,* ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮); ▮▮▮▮▮ Life Prisoner Monitoring Report at page ▮ (▮▮▮▮▮ ▮▮▮ ▮▮▮▮).

➔ The attorneys do not always advocate on behalf of their client by drawing a nexus between their disability and the expectations the Board places on the client. The client's disability should be explored in relation to the client's ability to develop remorse, to recall events in their past, or to explain why they received 115s in the past.

These failures can and must be remedied. Although we commend the Board for conducting ADA training on an annual basis and for inviting us to help develop and to participate in the training, the training has not proven to be a sufficient tool to address the above cited concerns, among others. As we have suggested in the past, assigning a special panel of specialized and qualified attorneys to represent DDP clients may be one solution. Higher pay for the representation of DDP clients may also allow the attorneys to commit extra time to preparing their client for the hearings. The accountability process related to the quality of representation provided to disabled clients must be made more robust as well. We are open to discussing these approaches and any other ways defendants have identified to improve attorney representation so that it truly serves the role as an ADA accommodation.

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 4

### II.    *Comprehensive Risk Assessments*

The Comprehensive Risk Assessments are completed by the Forensic Assessment Division (FAD), which is supervised and employed by BPH.  The Commissioners often heavily rely on the findings of the risk assessments in determining whether an individual will pose an unreasonable risk to society if released.  This is problematic, particularly for DDP, LD and MHSDS class members, whose disabilities are often not accounted for within the risk assessment.  As acknowledged by various forensic psychologists, the tools provided to them to evaluate individuals are not validated for those with lower IQs, an underlying mental illness or other disabilities.  Despite this acknowledgement, often the risk assessments do not pay particular attention to an individual's disabilities and related cognitive limitations in assessing their risk.

Below are examples of problematic risk assessments as they relate to reasonably accommodating an individual's disabilities:

➔  An individual diagnosed with dementia whose cognitive abilities and memory are on the decline cannot reasonably be expected to discuss his/her crime or upbringing with the evaluator.  This inability is then held against the individual and considered to be an unwillingness to participate or engage with the psychologist. *See, e.g.,* ███████ Life Prisoner Monitoring Report at page █ (███████████, █████).

➔  An individual who cannot read or write cannot be expected to provide the forensic psychologist with parole plans.  The lack of such plans is then cited as a reason why the individual is a risk to society. *See, e.g.,* ███████ Life Prisoner Monitoring Report at page █  (████, █████████); ███████████ Life Prisoner Monitoring Report at page █ (██████████, █████); ██████████ Life Prisoner Monitoring Report at █ (████, █ ████, ████).

➔  An individual who is diagnosed with a developmental disability cannot reasonably be expected to develop further insight when it is clear that they have plateaued in that area.  *See, e.g,* ██████████ Life Prisoner Monitoring Report at page █ (████, █████, ████████  Life Prisoner Monitoring Report at page █ (██████████████████

➔  An evaluator cannot rely on a 115 given to a developmentally disabled client which was either dismissed, or which is clearly related to his/her disability without first commenting on whether it is reliable.

➔  A misunderstanding by the forensic psychologist about what prison life is really like for a person with a cognitive or developmental disability.  *See, e.g.,* ██████████ Life Prisoner Monitoring Report at page █ (████████ ████████ ████ hearing (evaluator assumed severely  cognitively impaired DD3 prisoner who reported late to their interview must be accompanied by an ADA worker at all times and seemed to hold it against him when he told her he got lost

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 5

coming to the evaluation)); ███████ Life Prisoner Monitoring Report at page █ (████  █████  ██████ hearing (evaluator criticized DDP class member for not achieving vocational training when a GED is a prerequisite that he was still struggling to attain)).

We propose the following as possible solutions to the identified deficiencies:

➔ Extensive annual training to the forensic psychologist on the various class member disabilities. Just because the individual is a psychologist does not make him/her adept at dealing or understanding disabilities such as developmental disabilities or dementia. In addition, the assessing psychologists would greatly benefit from training directly related to the disciplinary process in CDCR.

➔ A separate portion of the risk assessment should be dedicated to elaborating on an individual's disabilities and the limitations such disabilities may put on their ability to achieve the standard expectations of the Board, e.g. insight, parole plans, self-help, etc. Such a section could also include more complete documentation of how effective communication was achieved in the interview with the Board Psychologist and specifically follow the 128-C2 EC factors for Clark class members.

➔ A specially trained supervisor with a background in developmental and cognitive disabilities should be assigned to review each risk assessment completed for DDP clients or those diagnosed with dementia.

### III.    *Policy/Regulations*

Although the Board has informally adopted certain practices as reasonable accommodations to class members, these practices need to be put into regulations/policy in order for the solutions to be durable and sustainable. Below is a list of practices that are often followed by the Board but which are not yet incorporated into policy and/or regulations:

➔ Review 128C-2 adaptive support needs on the record and query each individual as to what method of communication works best for him/her.

➔ Provide a proficient staff assistant at the hearing

➔ Inquire with the individual as to whether he/she has been offered an Olsen review and a review of the risk assessments with the assistance of staff.

➔ DAPO finding suitable parole plans for a DDP class member post-hearing if he/she is granted parole. In other words, a lack of parole plans is not a reason to deny a DDP class member parole and this needs to be clearly established in policy.

➔ A consideration of the 115s in light of the individual's disabilities. Document impact – if any – of the disability on the client's disciplinary history.

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 6

> ➔ A policy mandating CDCR staff to assist DDP, LD and mentally ill class members in establishing parole plans in anticipation of their hearing.

## IV.   *Other Issues and Concerns*

Aside from the issues above that have been raised repeatedly with CDCR/BPH as concerns that affect our clients, there are some areas we would like to discuss with Defendants in order to gain a better understanding of Defendants' plans.  There are also some requirements from the 2002 injunction that we believe Defendants need to remain compliant with in order to effectively protect our clients' rights to be free from discrimination on the basis of disability.  In addition, there are suggestions we have which we would like to discuss with Defendants in the hopes of improving the ADA lifer hearing process.

> ➔ Issues to explore:
>   o We would like to know more about Proposition 57 paper reviews and how any written processes will impact individuals categorized as DDP, LD, DPV, and those with low TABE scores or who are part of the MHSDS.  How will assistance be provided to these individuals in order to enable them to participate fully in the new review process? In addition, under the new regulations established as a result of Proposition 57, there are references to "written statements" that the Board may review, e.g., Title 15, Section  2449.4(b)(2) and 2449.5,  yet it is unclear who, if anyone, will assist class members to complete such statements.
>   o Who will be responsible for assisting DDP, LD, DPV, EOP, and those with low TABE scores in submitting written objections to their CRA under the new process established in response to the *Johnson v. Shaffer* settlement.
>   o We would like to discuss the BPH accountability process and its current status.  We began discussions on this issue in the past to make it a more robust process but we have received no recent information about this issue or any efforts to reform the process.
>
> ➔ Improving the provision of ADA accommodations to lifers:
>   o If they have not done so already, Defendants should assign a headquarters level ADA coordinator at BPH who is responsible for conducting the same essential functions that ADA coordinators complete at the institutional level, such as auditing, compliance, appeal responses, etc.  This is required by the 2002 Armstrong injunction.  *See* 2/11/2002 Injunction at ¶ 18. If Defendants have assigned someone to this position, who is that person and what are their job duties?
>   o We also request that Defendants generate for the Panel members a list of CDCR programs/vocations that DDPs/DPPs and mentally ill prisoners are excluded from participating in due to their disabilities.   For example, we are aware that some programs/vocations remain inaccessible to DPP class members based on our monitoring in *Armstrong*.  Examples of such inaccessible programs include AA/NA for DPH class members who require a sign language interpreter at SATF, and PIA/Vocational programs located "behind the wall" on C-yard and B-yard for DPW individuals at RJD.  This list is required by the 2002 injunction to be issued every six months, and our understanding is that defendants used to provide such lists.. *See* 2/11/2002 Injunction at ¶ 36 ("The BPT shall provide to all Commissioners and Deputy

Sharon Garske
Danielle O'Bannon
August 17, 2017
Page 7

> Commissioners who participate in life prisoner parole consideration hearings a list of CDC programs in which prisoners with disabilities can meaningfully participate, either without accommodation or with appropriate and readily available accommodation. This list shall specify the types of programs available, the particular disabilities the programs can accommodate and the prisons in which they are offered. This list shall be updated every six months.").

Please contact us with any questions or concerns.  We look forward to discussing the above-cited concerns/issues with you.

<div style="text-align:right">

Sincerely,
*/s/*
Rana Anabtawi

</div>

cc:
Wendy Locke, OLA
Gay Grunfeld, Thomas Nolan, Rosen Bien Galvan & Grunfeld
Erick Rhoan, Byran Kao, Janet Chen, DOJ

# EXHIBIT 69



50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Gay Crosthwait Grunfeld
Email:  ggrunfeld@rbgg.com

July 30, 2018

<u>VIA E-MAIL</u>

Russa Boyd
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA  94283
Russa.Boyd@cdcr.ca.gov

Jennifer Neill
Chief Counsel
Board of Parole Hearings
P.O. Box 4036
Sacramento, CA  95812-4036
jennifer.neill@cdcr.ca.gov

Re:    *Armstrong v. Brown*;
       Need for Effective Communication and Accommodations in the
       Consideration of Early Parole for Non-violent Offenders
       <u>Our File Nos. 0581-03; 0581-04</u>

Dear Russa and Jennifer:

I write to request that we place on the next meet and confer agenda the issue of whether CDCR and BPH are accommodating individuals with disabilities that affect communication (vision, hearing, learning, and developmental) in implementing Proposition 57's authorization of earlier parole consideration for individuals convicted of nonviolent felony offenses.  *See* Cal. Const., art. I, § 32; 15 Cal. Code Regs. §§ 2449.1-2449.7, 3490-3493.

It is our understanding that CDCR and BPH have established the following multi-step process governing the consideration of early parole for non-violent offenders.

1.    CDCR staff conduct an eligibility review, in which they determine (i) whether the individual is a "nonviolent offender," as defined in 15 Cal. Code Regs. § 3490(a) and (b), and (ii) whether the individual is otherwise ineligible under 15 Cal. Code Regs. § 3491(b).  If the review determines that the individual is eligible, CDCR staff calculate the individual's non-violent parole eligibility date ("NVPED"), as set forth in 15 Cal. Code Regs. § 3490(g).

[3262156.2]

Russa Boyd
Jennifer Neill
July 30, 2018
Page 2

2.      At least 35 days prior to the individual's NVPED, CDCR staff screens the individual's record and behavior in prison to determine whether to refer him or her to the Board of Parole Hearings ("BPH").  15 Cal. Code Regs. § 3492.  Certain in-prison misconduct—for example, serving a SHU term in the last five years or having two serious Rules Violations Reports in the past year—preclude a referral to BPH.  *Id.*, § 3492(c).

3.      If CDCR refers the individual to BPH, a BPH hearing officer conducts a jurisdictional review to determine (i) whether the CDCR referral was proper under 15 Cal. Code Regs. §§ 3491 and 3492(c), and (ii) whether the individual's earliest possible release date ("EPRD[1]") is at least 210 days after the referral from CDCR and at least 180 days after the individual's NVPED.  15 Cal. Code Regs. § 2449.2.

4.      If the hearing officer finds that BPH has jurisdiction, the hearing officer proceeds to review the case on the merits to determine whether "the inmate poses a current, unreasonable risk of violence or a current, unreasonable risk of significant criminal activity."  15 Cal. Code Regs. § 2449.4(c).  In making this decision, hearing officers must consider a number of factors set forth in 15 Cal. Code Regs. § 2449.5.  At this stage, the individual (as well as the victim, if any, and the prosecuting agency) has the right to submit his or her own written statement and supporting statements from others in the community.  15 Cal. Code Regs. § 2449.5(h).  If the hearing officer finds that the individual does pose a "current, unreasonable risk," the hearing officer must deny release.  If the hearing officer finds that the individual does not pose a "current, unreasonable risk," the hearing officer must approve release.[2]

5.      If BPH finds that the individual should be released, CDCR must release the individual 60 calendar days from the date of the BPH decision, unless the individual has an additional term to serve for an in-prison offense, 15 Cal. Code Regs. § 3493, or, before his or her release date, becomes ineligible for early release under to 15 Cal. Code Regs. §§ 3491 or 3492(c).

---

[1] The EPRD is that date that the individual would be eligible for parole had CDCR not implemented Proposition 57.

[2] If a hearing officer approves release but the release would result in the individual being released two or more years prior to his or her EPRD, the hearing officer's decision is reviewed by an associate chief deputy commissioner or the Chief Hearing Officer.  These higher officer can reverse the hearing officer's decision to release the individual.

[3262156.2]

Russa Boyd
Jennifer Neill
July 30, 2018
Page 3

Within this process, there are a number of elements that require effective communication for individuals with vision, hearing, learning, and developmental disabilities.  At each step, the reviewing agency (either CDCR or BPH) provides written notice to the individual of the agency's decision.  *See* 15 Cal. Code Regs. §§ 3491(f), 3492(f), 2449.2(c), 2449.4(d), 2449.6(b).  Furthermore, at each step, if the individual disagrees with the agency's decision, the individual is entitled to appeal the decision, either by filing a 602 to challenge decisions made by CDCR at steps 1 and 2 of the process or by writing to BPH to request a "review of decision" for decisions made at steps 3, 4, and 5.  *See* 15 Cal. Code Regs. §§ 3491(g), 3492(g), 2449.2(e), 2449.4(g), 2449.6(d).  If CDCR decides to refer an individual to BPH for consideration of early parole at step 2, CDCR is required to provide the individual "information about the nonviolent offender parole process, including the opportunity to submit a written statement to the Board of Parole Hearings."  15 Cal. Code Regs. § 3492(f).  And as discussed above, at step 4, the individual has the right to submit a written statement setting forth the reasons he or she believes BPH should approve early parole.  15 Cal Code Regs. § 2449.4(b)(2).

In addition, at step 2, an individual may be excluded from consideration for early parole release if he or she has a certain number or types of RVRs.  We note that the DDP joint audits consistently identify RVRs that violate the CDCR's own rules.  For example, in many RVRs, the reporting employee fails to provide adaptive supports or warn the person in the DDP of the consequences of his or her continued action.  The failure to provide an opportunity to change the problematic behavior violates the DDP, and the RVR should not be used as part of the eligibility review.  Similarly, many RVRs are heard by hearing officers who fail to take the need for adaptive supports into account, and on occasion issue a guilty finding in violation of the DDP.  RVRs that violate the DDP should not be used to invalidate eligibility.

We are concerned that individuals with learning, hearing, seeing, and developmental disabilities may not be receiving the accommodations and assistance they need from CDCR and BPH to participate fully and protect their rights in this complex, multi-step process.  Accordingly, we would like to know:

- What, if any, training and instructions regarding effective communication have been given to CDCR and BPH staff who are involved in the process?

- How is CDCR ensuring that prisoners whose cases are referred to BPH at step 2 are receiving effective communication when CDCR staff provide the prisoner with "information about the nonviolent offender parole process, including the opportunity to submit a written statement to the Board of Parole Hearings"?

[3262156.2]

Russa Boyd
Jennifer Neill
July 30, 2018
Page 4

- At step 2, what policies and procedures are in place to ensure the RVRs used as part of this process have undergone a review for validity under the DDP?

- What, if any, assistance do CDCR or BPH staff provide to prisoners who seek to challenge adverse decisions made by CDCR and/or BPH?

- What, if any, assistance do CDCR or BPH staff provide to prisoners with communication and learning disabilities to assist them in completing written statements to submit to BPH at step 4?

- What, if any, assistance do CDCR or BPH staff provide to prisoners to help them to contact their family, friends, potential employers, or others to obtain statements and information to support the early grant of parole?

We look forward to learning more about CDCR and BPH's role in the early consideration of parole for nonviolent offenders at our upcoming all parties meetings on August 16 and August 22, 2018.

Thank you for your assistance.

Very truly yours,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Gay Crosthwait Grunfeld*

By:   Gay Crosthwait Grunfeld

GCG:fgl

cc:  Co-counsel         Sharon Garske          Kelli Abernathy
     Marcus Bole        Annakarina             Laurene Payne
     Janet Chen           De La Torre-Fennell  Ceasar Aguila
     Jim Logsdon        Jay Russell            CCHCS Accountability
     Norma Loza         Adriano Hrvatin        Joseph Williams
     Heather McCray     Pam Cantelmi           Alma Underwood
     Erick Rhoan        Steven Blum            Davies Sasere
     Joanne Chen        Bruce Beland           Amenthia Tisdale
     Patricia Ferguson  John Dovey             Rachelle Velasquez
     Tamiya Davis       Vincent Cullen         John Carbone
     Erin Anderson      Donald Meier           OLA Armstrong

[3262156.2]

# EXHIBIT 70



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah
Camille Woods

VIA EMAIL ONLY

November 13, 2019

Joanna Hood
Deputy Attorney General
Office of the Attorney General
Joanna.Hood@doj.ca.gov

Jessica Blonien
Chief Counsel
Board of Parole Hearings
Jessica.Blonien@cdcr.ca.gov

     RE:   *Armstrong v. Newsom*
            Sign Language Interpreters and Parole Hearings

Dear Ms. Hood and Ms. Blonien:

I am writing to follow-up on the parties' meet and confer on August 28, 2019, regarding sign language interpretation during parole hearings. Below and attached please find information in support of the following requests:

1.    The Board should assign at least two sign language interpreters to each parole hearing.

2.    The Board should establish clear standards, guidance, and training regarding different types of interpretation.

3.    The Board should ensure that the assigned sign language interpreters have the appropriate qualifications.

4.    The Board should provide sign language interpreters with relevant background information in advance of the parole hearing.

5.    The Board should video record hearings for people who communicate using sign language.

After you have reviewed this letter and the supporting documentation, we would be happy to discuss these issues with you further. In addition, we have reviewed parole hearing transcripts and comprehensive risk assessments of d/Deaf class members whose primary form of communication is sign language. We have several concerns related to effective communication and cultural awareness, which we think can be addressed through improved training. We will outline those concerns in a separate letter.

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris

**1.    The Board should assign at least two sign language interpreters to each parole hearing.**

At least two sign language interpreters should be assigned to each parole hearing.  This is the industry standard.  This is because interpreter accuracy declines significantly after approximately 30 minutes of sign language interpretation.  *See* Jo Anne Simon, The Use of Interpreters for the Deaf and the Legal Community's Obligation to Comply with the A.D.A., 8 J.L. & Health 155, 191 (1994) ("Research shows that interpreter competence begins to diminish after one-half hour of interpreting. For this reason, team interpreters switch off at appropriate breaks in the flow of communication every 20-30 minutes.").  In addition, team interpretation allows one interpreter to assist the other in real-time. *Id.* ("Team members are able to assist each other by feeding each other unclear phrases or words when environmental conditions or foreign accents impede understanding.").

I have attached some literature that provides more information about this issue (excerpts below).

> Team interpreting is the quality control mechanism, implemented to preserve the accuracy of the interpretation process in any circumstances. Within the field of sign language interpreting, it generally refers to the industry standard of hiring two hearing interpreters to work together to accurately and effectively interpret a communication exchange.  Team interpreters are necessary for the purposes of turn-taking to reduce mental fatigue, reducing the potential for errors in the interpretation, monitoring the accuracy of the interpretation, assisting with note-taking, and monitoring the environment and logistics of the setting while the interpreting is produced.

> Studies from the fields of spoken and sign language interpreting have shown that mental fatigue sets in after approximately 30 minutes of sustained simultaneous interpretation, resulting in a marked loss in the accuracy of the interpretation. . . .

> Unrecognized errors in legal interpreting constitute a risk, both to the deaf party and the administration of justice.  Thus, to maintain the accuracy and effectiveness of the interpretation, team interpreting is necessary to reduce the rate of error within the interpretation due to mental fatigue.

**Attachment A**, Nat'l Consortium of Interpreter Education Centers, Best Practices:  American Sign Language and English Interpretation within Court and Legal Settings 18-19 (Mar. 2009) (internal quotation marks and citation omitted).

. . . .
. . . .
. . . .
. . . .

Ms. Hood and Ms. Blonien
Re: Sign Language Interpreters and Parole Hearings
November 13, 2019
Page 3

At a minimum, two interpreters are typically required for most legal assignments.  Because legal assignments are generally more complex, interpreters often work in teams and relieve each other at predetermined periods.  One interpreter actively interprets while the other interpreter watches to ensure accuracy of the interpretation.  The process is alternated at appropriate intervals between the two interpreters.

**Attachment B**, Registry of Interpreters for the Deaf, Standard Practice Paper:  Interpreting in Legal Settings 2 (2007); *see also* **Attachment C**, Registry of Interpreters for the Deaf, Standard Practice Paper:  Team Interpreting (2007).

Currently, the Board typically assigns one sign language interpreter to a parole hearing.

| Date | Deaf Class Member | CDCR Number | Hearing Length | Number of Interpreters | Interpreter(s) |
|---|---|---|---|---|---|
| 11/16/2016 | | | 2:00 | 1 | Mr. ▮▮▮ (CDCR staff interpreter) |
| 11/17/2016 | | | 2:00 | 1 | Mr. ▮▮▮ (CDCR staff interpreter) |
| 12/7/2016 | | | 2:40 | 1 | Ms. ▮▮▮ (CDCR staff interpreter) |
| 1/4/2017 | | | 2:18 | 1 | Mr. McMannis |
| 5/31/2017 | | | 3:04 | 1 | Ms. ▮▮▮ (CDCR staff interpreter) |
| 1/11/2018 | | | >3:51 | 2 | Ms. ▮▮▮ (CDCR staff interpreter) Mr. Hensley |
| 3/13/2018 | | | 2:40 | 1 | Mr. Hensley |
| 5/1/2018 | | | 4:20 | 1 | Mr. Hensley |
| 5/8/2018 | | | 2:05 | 1 | Mr. Hensley |
| 5/18/2018 | | | 3:40 | 1 | Ms. Borso |
| 12/11/2018 | | | 3:33 | 1* | Mr. Hensley |
| 7/9/2019 | | | 2:56 | 2** | Mr. Hensley Ms. Espinoza |
| 8/15/2019 | | | 2:30 | 1 | Mr. Hensley |
| 10/1/2019 | | | <1:00 (Stipulation) | 2 | Mr. Hensley Ms. Crozat |

\* Ms. ▮▮▮ the CDCR staff interpreter, was present in the role of staff assistant.
\*\* Mr. ▮▮▮ was represented by the Prison Law Office.

Ms. Hood and Ms. Blonien
Re: Sign Language Interpreters and Parole Hearings
November 13, 2019
Page 4

Notably, two sign language interpreters were provided for Mr. ███████  Governor Brown had requested *en banc* review of the Board's denial of parole to Mr. ██████ in 2018, when only one sign language interpreter was provided, in light of effective communication concerns.  *See* Governor Edmund G. Brown Jr., Indeterminate Sentence Parole Release Review, Request for *En Banc* Review (Dec. 28, 2018) ("I am troubled that Mr. ███████ inability to better hear, see, or effectively communicate may be interfering with his ability to articulate his understanding of the crime."); **Attachment D**, Letter from Rita Lomio, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, and New Board Hearing for Class Member ████████████████ DPH, DPV, at SATF (July 31, 2018) (outlining concerns with 2018 hearing and requesting real-time captioning).  The *en banc* Board ordered a new hearing and provided, at my office's request, two sign language interpreters and real-time captioning.  At the new hearing, the panel found Mr. ██████ suitable for parole.

At Mr. █████ hearing on August 15, 2019, only one interpreter, Mr. Hensley, was provided.  Before the hearing began, Mr. ██████ attorney requested that Mr. Hensley assist her in communicating with her client.  The hearing itself lasted two and a half hours.  Other than the recess for deliberations, there was only one break, which lasted eight minutes and which the Presiding Commissioner said was to allow, among other things, Mr. █████ to speak with his attorney (which would of course require the services of Mr. Hensley).  Tr. at 42:2-6.  Because the Board did not videotape the hearing and would not allow our sign language interpreter to observe the hearing, we cannot provide detailed feedback on Mr. Hensley's performance throughout the hearing.  Mr. █████ however, reported that Mr. Hensley had trouble interpreting the panel attorney toward the end of the hearing.  If another interpreter had been present, she could have assisted Mr. Hensley.  When I asked Mr. Hensley about Mr. ███████ 2019 hearing, where he was one of the two interpreters assigned, he said, "It was awesome" and "much easier" than interpreting Mr. ██████ hearing by himself.

We also note that d/Deaf class members have reported significant errors in interpretation after they have reviewed the written transcript of their parole hearing.  *See, e.g.*, Letter from Rita Lomio, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, and New Board Hearing for Class Member ████ █████ ██████ DPH, DPV, at SATF at 4 (July 31, 2018) (noting that Mr. ██████ stated, among other things, "I read transcript from my last Board and there's a lot of miscommunications on the question" and "you guys ask difficult questions where the interpreter does not basically say to what I understand"); **Attachment E**, Letter from Thomas Nolan, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, New CRA, and New Board Hearing for DPH Class Member ██████████ ██████ at SATF at 4 (July 20, 2018) ("Mr. ██████ reviewed the transcript and noted substantial inaccuracies in the manner in which the ASL interpreter translated his statements into English.  For example, on page 69, during the translation of Mr. █████ explaining what he can do to make amends for his crimes, the interpreter used the word 'follower.'  Mr. ██████ says that he told the interpreter the opposite—that people looked up to him and followed him, and that he was apologizing essentially for abusing his power over people who looked up to him.  That does not come through in the translation." (citation omitted)).  With team interpretation, these errors are more likely to be identified and addressed in real-time.

> **2. The Board should establish clear standards, guidance, and training regarding different types of interpretation.**

Deaf and hard of hearing people, including those born and raised in the United States, have widely different communication needs. In particular, some deaf and hard of hearing people grew up with limited or no access to any language, which has life-long consequences for their ability to understand and communicate in a standard sign language. *See, e.g.*, Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and Due Process 2003 Wis. L. Rev. 843, 867 (2003) ("Experts in the field of deafness estimate that up to fifteen percent of the profoundly deaf population have been so deprived of language that they would be categorized as having minimal language skills or minimal language competency. These people may have picked up individual words or signs, but they have developed little or no language base." (internal alterations and quotation marks removed)). Foreign-born deaf people may communicate using the sign language of their native country, which will be completely different from American Sign Language. For example, Mr. ███ largely grew up in New Zealand, where he began to learn New Zealand Sign Language, which is completely different from American Sign Language. In fact, American Sign Language and New Zealand Sign Language are mutually unintelligible. *See* Letter from Rita Lomio, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, and New Board Hearing for Class Member ███ ███ ███ DPH, DPV, at SATF at 2 n.1 (July 31, 2018). Other people who are deaf have limited or no vision, and communicate using a form of sign language (a visual language) that has been adapted for their needs. *See* Am. Ass'n of the Deaf-Blind, How Do Deaf-Blind People Communicate?, *available at* http://www.aadb.org/factsheets/db_communications.html (last updated Feb. 11, 2009).

The BPH Remedial Plan recognizes that deaf and hard of hearing people require different types of interpretation and other auxiliary aids or services to meet their different communication needs. *See* BPH Remedial Plan § VII.B (listing real-time captioning, sign language interpretation, oral interpretation, tactile interpretation, and intermediary interpretation as potential accommodations).

Each form of interpretation serves a different function; selecting the correct type of interpreter—especially providing intermediary interpreters or tactile interpreters—is essential to ensuring effective communication during the proceedings. Nat'l Consortium of Interpreter Education Centers, Best Practices: American Sign Language and English Interpretation within Court and Legal Settings 26 (Mar. 2009) ("Most court, legal, and law enforcement personnel are unaware of the communication diversity that exists among deaf people. As a result, when courts, attorneys, and law enforcement personnel attempt to hire legal interpreter or request legal interpreters from a referral service, little information is known about how the deaf person communicates. Thus, one important component of determining the interpreting needs of a deaf party is first understanding how the deaf person communicates. . . . Many factors can have a profound effect on whether or not an interpreter is qualified and sufficiently able to provide an accurate, meaningful, and effective interpretation for a deaf individual or party involved in a court case or legal matter. Just because an interpreter is nationally certified and may have experience interpreting in court and legal settings does not ensure that the interpreter will be successful interpreting for a specific deaf individual involved in a specific court or legal proceedings, deposition or law enforcement interview."); Registry of Interpreters for the Deaf,

Standard Practice Paper:  Interpreting in Legal Settings 2 (2007) ("The Deaf community is diverse, and different deaf people will have different communicative needs which dictate the credentials of the interpreter.  Some deaf people have been deaf all their lives and use the natural language of deaf people referred to as American Sign Language (ASL).  Other deaf people may have lost their ability to hear after acquiring spoken English and therefore use a system of sign that approximates English.  Other deaf people may not have received a formal education and as a result, have only limited capacity in using sign.  Long years of experience have demonstrated that native deaf users of ASL are more effective at communicating with this segment of the population than the general practitioner interpreter who can hear.").

It does not appear that the Board, at least in the last few years, has provided an intermediary interpreter (also called a certified deaf interpreter or CDI).  *See* BPH Remedial Plan § VII.B.5 ("An intermediary interpreter may be needed when the communication mode of a deaf person is so unique that interpreters who are not deaf cannot adequately access it.  A deaf intermediary with specialized communication skills communicates using the unique method with the inmate/parole and signs to the hearing interpreter, who then voices what has been signed.").  Intermediary interpreters "are individuals who are deaf or hard of hearing and have been certified as interpreters by RID.  They have excellent communication skills in both ASL and English, as well as extensive knowledge and understanding of being deaf, the Deaf community, and/or Deaf culture.  [They] may also have specialized training and/or experience in the use of gesture, mime, props, drawings, and other tools to enhance communication." Am. Bar Ass'n, Court Access for Individuals Who Are Deaf and Hard of Hearing 16 (2017).

This omission is particularly concerning, as intermediary interpreters ensure effective communication for those deaf individuals who are least likely to understand a standard sign language interpreter.  *See* Robert Q. Pollard, Jr. & Meghan L. Fox, Forensic Evaluation of Deaf Adults, *in* Neil S. Glickman & Wyatte C. Hall, eds., Language Deprivation and Deaf Mental Health 101-135, 106 (2019) ("CDIs can bring tremendous value to the process given their native sign language fluency, ability to foster communication through a variety of visual and/or gestural methods, and cultural world knowledge.  Skilled CDIs also tend to foster increased trust when working with a deaf client while improving information exchange and, accordingly, service outcomes."); **Attachment F**, Registry of Interpreters for the Deaf, Standard Practice Paper:  Use of a Certified Deaf Interpreter 1 (1997) ("A Certified Deaf Interpreter may be needed when the communication mode of a deaf consumer is so unique that it cannot be adequately accessed by interpreters who are hearing.  Some such situations may involve individuals who:  use idiosyncratic non-standard signs or gestures such as those commonly referred to as 'home signs' which are unique to a family[,] use a foreign sign language[,] have minimal or limited communication skills[,] are deaf-blind or deaf with limited vision[,] use signs particular to a given region, ethnic or age group[,] have characteristics reflective of Deaf Culture not familiar to hearing interpreters."); Am. Bar Ass'n, Court Access for Individuals Who Are Deaf and Hard of Hearing 16 (2017) (certified deaf interpreters may be appropriate where the deaf person has "delayed language acquisition, minimal or limited communication skills, mental health conditions, substance abuse, learning disabilities, developmental disabilities, cognitive impairments, blindness or limited vision, or limited education").

<div align="right">
Ms. Hood and Ms. Blonien<br>
Re: Sign Language Interpreters and Parole Hearings<br>
November 13, 2019<br>
Page 7
</div>

We note that several class members, including Mr. ███████ and Mr. ████ seem to meet the profile of a person who may benefit from an intermediary interpreter.  *See* Comprehensive Risk Assessment, ████████ ████████ at 7 (Jan. 11, 2017) ("Mr. ████ spoke in simple, short sentences, often giving one word answers to questions making it difficult to determine the degree to which he understood the questions being asked.  When asked to elaborate on his answers, Mr. ████ indicated by facial expression and his answers that he did not understand what was being asked of him."); Comprehensive Risk Assessment, ████████ ████████ at 8 (July 5, 2013) ("The quantity of Mr. ████ speech (via ASL) was generally succinct and poorly elaborated upon further query, plausibly because of his limited vocabulary usage."); Comprehensive Risk Assessment, ████ ████████████████ at 2, 8, 9 (Aug. 30, 2016) ("According to the record, he was profoundly deaf from birth. . . .  He meets the DSM-5 diagnostic criteria for Borderline Intellectual Functioning. . . .  An accurate diagnosis of this inmate is hampered by chronicity of his developmental disabilities, [and] cognitive deficits," among other things).

It does not appear, however, that the Board has developed clear standards, guidance, or training regarding different types of interpretation.  On January 14, 2019, I attended a presentation to the Commissioners entitled "Accommodations Available for Hearing-Impaired Inmates at Parole Hearings."  The presentation lasted only a few minutes.  An Associate Chief Deputy Commissioner spoke briefly about the 1073/1074 process.  Then Theresa Barker from the BPH ADA Compliance Unit spoke on "Hearing Impairments."  Her presentation consisted of four PowerPoint slides (not counting the ClipArt title card), of which she covered only the first three.  *See* **Attachment G**, Hearing Impairments PowerPoint Presentation.

For the first slide, "Hearing Impairment Definition," Ms. Barker partially read the information on the slide.  But she did not distinguish between the definitions for hard of hearing and deaf, so no clear distinction was made between the terms.  For the second slide, "Hearing Impairments and Reasonable Accommodations," she simply read the list on the slide, and added the following information, which was confusing:

- "Usually they have hearing aids provided by the institution.  All the deputy commissioners have assistive hearing devices that they have in their kit that they have those in case the hearing aids don't work in the [could not understand word].  Also institutions usually have a hearing device where they can have that as well."

- "Lip reading usually is in a combination with written language so that everybody is able to understand effectively."

- "Sign language interpreters obviously that's somebody that comes in that we contract and we are able to communicate that way."

For the third slide, "Accommodations for Hearing Impairments," she again simply read down the list and did not explain what the different accommodations are, including those that are not intuitive, including real-time captioning, tactile interpreting, and intermediary interpreting.  In fact, the only thing she said while going through the list was:  "We now are doing real-time captioning if

needed."  After reading the list, she said, "I'll go back real quick."  Then she said, "Most likely we're just going to be using the sign language interpreter or the hearing aids, hearing devices, but if need be we can always find services to help with the oral interpreting and tactile interpreting and also the real-time captioning, which we'll be using soon I believe.  That's basically it.  Does anyone have any questions?  [Silence.]  Thank you."  She skipped the "Conclusion" slide altogether.

The Board should develop more robust standards, guidance, and training regarding different types of accommodations for people who are deaf or hard of hearing.  We would be happy to work with you to develop the standards, guidance, and training.

3.      **The Board should ensure that the assigned sign language interpreters have the appropriate qualifications.**

In addition, it is important that sign language interpreters assigned to parole hearings have the requisite knowledge, skill, and experience to interpret complex legal matters.  *See* BPH Remedial Plan § V.B ("The standard for equally effective communication is higher in parole proceedings"); Nat'l Consortium of Interpreter Education Centers, Best Practices:  American Sign Language and English Interpretation within Court and Legal Settings 23 (Mar. 2009) ("It is best practice of legal interpreters to have received specialized training, which includes the knowledge, skills, and experiences necessary to provide an accurate, meaningful, and effective interpretation in court and legal proceedings."); Registry of Interpreters for the Deaf, Standard Practice Paper:  Interpreting in Legal Settings 1 (2007) ("Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication."); **Attachment H**, Am. Bar Ass'n, Court Access for Individuals Who Are Deaf and Hard of Hearing 15 (2017) ("For all court proceedings, efforts should be made to secure interpreters . . . [who have] proficiency not only in generalist interpreting skills, but also in legal interpreting.").  Where possible, interpreters with legal certification should be assigned to the hearings.[1]  Unfortunately, that is not a durable solution, because the pool of interpreters with that certification is small and will become smaller over time, as the certification no longer is given.  We would like to work with the Board to establish concrete standards for interpreters at parole hearings.

4.      **The Board should provide sign language interpreters background information in advance of the parole hearing.**

When I attended Mr. ████ parole hearing in August, Mr. Hensley arrived at the security gate shortly after me.  He asked if I knew what he would be interpreting that day because he had not been given any information.  "It is important," however, "for legal interpreters to review case files, as well as other pertinent legal documents prior to interpreting an interview, court proceeding, deposition, or trial.  Legal interpreters must be familiar with the case-related details in order to provide accurate, meaningful, and effective interpretation."  Nat'l Consortium of Interpreter Education Centers, Best

---

[1]     You can identify these interpreters by searching for people with SC:L certification on the Registry of Interpreters for the Deaf, Inc., website:  https://myaccount.rid.org/Public/Search/Member.aspx.  As of November 13, 2019, there are 41 people with that certification in California.

Practices:  American Sign Language and English Interpretation within Court and Legal Settings 30 (Mar. 2009).  As a result, interpreters should be given relevant case-related information in advance of the parole hearing.  This includes lists of common words and phrases during parole hearings (including "insight," "parole suitability," "comprehensive risk assessment," "GOGI," and "AVP").  It also would be useful for the interpreters to have some background information about the commitment offense and other offenses that may be discussed during the hearing.  We would like to discuss further what documents might provide that information.

**5.    The Board should video record hearings for people who communicate using sign language.**

Finally, as we have requested before, the Board should video record hearings for people who communicate using a sign language interpreter.  *See* Letter from Rita Lomio, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, and New Board Hearing for Class Member ███ ████ █████ DPH, DPV, at SATF at 11 (July 31, 2018) (citing Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough:  Deafness, Language, and Due Process 2003 Wis. L. Rev. 843, 923 (2003) ("Without a videotaped recording of the proceedings, there is no record of what the deaf person has been told")); Letter from Thomas Nolan, Plaintiffs' Counsel, to Heather McCray, Assistant Chief Counsel, and Jennifer Neill, Chief Counsel, Request for Decision Review, Administrative Review, New CRA, and New Board Hearing for DPH Class Member ████ █████ ██████ at SATF at 4 (July 20, 2018) ("We request that in the future, to have a clear record of what was said, the Board videotape hearings for prisoners who communicate using a sign language interpreter.  This is done by law enforcement, for example, when taking *Miranda* waivers.  According to the National Association for the Deaf (the NAD), 'Many law enforcement agencies videotape all communication with deaf or hard of hearing defendants to substantiate the effectiveness of the communication and the quality of interpretation.'" (citation omitted)).

Any video recording must be done with two cameras, one of which documents the deaf participant, and the other of which documents the interpreters.  The camera angle and frame must show the entirety of the signer's body from the waist up, including approximately six inches of space above their head, and extending approximately twelve inches on either side of their body.  Such a frame is necessary to create a record of all statements made in sign language.  In addition, the camera must pick up all audio in the room, including both the auditory statements by the parole board hearing officers and by the interpreter.  "Creating a visual recording through the use of VHS or digital technology is the only way to preserve a statement made by a deaf person using sign language.  Without a record of the deaf person's statement, the interpretation of the deaf person's statement is all that remains.  Although legal interpreters take precautions to reduce the potential risk of error in an interpretation that risk does persist.  Capturing the original statement of the deaf person on video is essential for preserving any evidence for a legal challenge that might arise during a court or legal proceeding."  Nat'l Consortium of Interpreter Education Centers, Best Practices:  American Sign Language and English Interpretation within Court and Legal Settings 22 (Mar. 2009).

Ms. Hood and Ms. Blonien
Re: Sign Language Interpreters and Parole Hearings
November 13, 2019
Page 10

Thank you for your consideration of the above requests.  We look forward to discussing them with you.  Please do not hesitate to reach out to me or my colleague Caroline Jackson, who is a certified sign language interpreter and previously worked for the National Association for the Deaf, if you would like any additional information.


Sincerely yours,

Rita Lomio
Staff Attorney


cc:     Co-counsel
        Russa Boyd, CDCR Office of Legal Affairs
        Heather McCray, Brian Nelson, Jim Logsdon, Marcus Bole, Board of Parole Hearings Legal

# EXHIBIT A

2009



# Best Practices

## American Sign Language and English Interpretation Within Legal Settings

This document sets forth the Best Practices and Protocols for American Sign Language interpreters working within legal settings.

SUBMITTED ON BEHALF OF THE NATIONAL CONSORTIUM OF INTERPRETER EDUCATION CENTERS (#H160A&B) BY Kellie Stewart, Anna Witter-Merithew and Margaret Cobb, Legal Interpreting Workgroup Members

March 2009



Official Publication of the National Consortium of Interpreter Education Centers © 2009

The National Consortium of Interpreter Education Centers is funded from 2005 – 2010 by the U.S. Department of Education, Rehabilitation Services CFDA #84.160A and B, Training of Interpreters for Individuals Who Are Deaf and Individuals Who Are Deaf-Blind. This project was led by the Mid America Regional Interpreter Education Center (MARIE) (#H160A050006).

Permission is granted to copy the materials enclosed herein, provided that National Consortium of Interpreter Education Centers is credited as the source and referenced appropriately on any such copies.

## *Table of Contents***:**

*Introduction* _____ *7*

*Acknowledgements* _____ *7*

*Purpose of Best Practices* _____ *9*

*Overview of the Best Practices Document* _____ *9*

*Definitions* _____ *10*

*Section A:  Best Practices in Producing Effective Interpretation in Legal Settings* _____ *13*

   *Best Practice A1:   Best Practice in Producing an Accurate, Meaningful, and Effective Interpretation* _____ *13*

      *1.1   Due Process and Effective Interpretation*

      *1.2   Achieving a Meaningful and Effective Interpretation*

      *1.3   Time is Necessary to Produce a Meaningful and Effective Interpretation*

   *Best Practice A2:   Best Practice in Consecutive Interpretation During Testimony* _____ *14*

      *2.1   Evidence Supports Increased Accuracy and Error Reduction*

      *2.2   Consecutive Interpretation During Testimony of Deaf Witnesses*

      *2.3    Consecutive Interpretation Essential in Other Legal Settings*

   *Best Practice A3:   Best Practice is Note-Taking During Consecutive Interpretation* _____ *16*

      *3.1   Note-taking Enhances Accuracy in Consecutive Interpreting*

   *Best Practice A4:   Best Practice for Simultaneous Interpretation* _____ *16*

      *4.1   Evidence of the Limitation of Simultaneous Interpretation*

      *4.2   Factors Influencing the Accuracy of Simultaneous Interpreting*

      *4.3   Cautions in the Use of Simultaneous Interpretation*

*Section B:   Best Practice in Team Interpreting* _____ *18*

   *Best Practice B5:   Team Interpreting is the Best Practice for Legal Interpreting* _____ *18*

      *5.1   Purpose of Effective Team Interpreting*

      *5.2   Evidence Supporting the Best Practice of Team Interpreting*

*Section C:   Best Practices in Collaborating With Deaf Interpreter Specialists* _____ *19*

   *Best Practice C6:   Deaf Interpreters Enhance Effectiveness of Interpretation* _____ *19*

      *6.1   Appropriate and Reasonable Accommodation*

      *6.2   Evidence Supporting Effectiveness of Deaf Interpreters*

© 2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup

*Best Practice C7:   Deaf Interpreters Present and Interpreting Throughout a Case*        **21**

   *7.1  Effectiveness of the Deaf Interpreter Requires Consistency*

*Best Practice C8:   Deaf Interpreters Effective When Interpreting for Deaf Children*        **21**

   *8.1   Effectiveness of the Deaf Interpreter When Working With Deaf Children*


*Section D: Best Practice of Visually Recording a Statement or Interpretation in ASL*        **22**

   *Best Practice D9:   Creating a  Record of the Statement and Interpretation*        **22**

      *9.1   Video Recording Statements in American Sign Language*

      *9.2   Video Recording the ASL/English Interpretation*

      *9.3   Recommended Video Recording Protocol*

      *9.4   Providing Effective Guidance to Court, Legal, and Law Enforcement Personnel*


*Section E:   Best Practices for the Training, Experience and Credentials of Highly Qualified Legal Interpreters*        **23**

   *Best Practice E10:    Legal Interpreters as Specialist Practitioners*        **23**

      *10.1   Legal Interpreting Requires Specialized Expertise*

      *10.2   Specialist Legal Certification*

   *Best Practice E11:    Mentoring and Supervision for Newly Trained Legal Interpreters*        **24**

      *11.1   Mentoring and Supervision*


*Section F:   Best Practices for Staffing Legal Assignments*        **24**

   *Best Practice F12:    Distinct and Specialized Roles for Legal Interpreters in Court*        **24**

      *12.1   Distinct and Specialized Functions of Legal Interpreters in Court*

      *12.2   Proceedings Interpreter (PI) – Officer of the Court*

      *12.3   Table Interpreter (TI)*

      *12.4   Monitoring Interpretations*

   *Best Practice F13:    Staffing for Effective Interpreting Outcomes*        **26**

      *13.1   Assessing the Interpreting Needs of Deaf Party*

      *13.2   Evaluating the Interpreter's Qualifications Prior to Staffing*

      *13.3   Assessing the Need for Multiple Teams of Legal Interpreters*

      *13.4   Assessing the Need for a Deaf Interpreter Specialist*

      *13.5   Identifying External Factors Affecting Successful Interpreting Interactions*

      *13.6   Identifying Conflicts of Interest When Staffing Cases*

   *Best Practice F14:    Staffing for Interpreter Consistency and Continuity*        **28**

*14.1*    **Consistency and Continuity When Staffing Legal Interpreters**

*14.2*    **Maintaining Consistent Interpreters for Deaf Jurors and Witness Testimony**

*Section G:*    **Best Practices for Legal Interpreter Preparation in Court and Legal Matters**                                                                                   30

*Best Practice G15:   Case Preparation Essential for Effective Interpreting*                 30

*15.1*    **Reviewing Case Files, Motions and Other Court Documents**

*15.2*    **Researching Additional Relevant Information**

*Best Practice G16:   Best Practice for Prior Preparation With the Judge and Attorneys*     30

*16.1*    **Preparing for Meetings With the Presiding Judge and Attorneys**

*16.2*    **Resolving Seating, Sightline, Lighting, and Auditory/Visual Needs**

*16.3*    **Assessing the Communication Needs of the Deaf Party or Witnesses**

*16.4*    **Requesting Clarification of Ambiguous Questions or Statements**

*16.5*    **Procedure for Correcting Interpretation Errors**

*16.6*    **Identifying Procedural and Logistical Differences Between Bench and Jury Trials**

*Best Practice G17:   Best Practice for Qualifying the Court Interpreter*                     32

*17.1*    **Creating a Portfolio for the Qualifying Process**

*17.2*    **Preparing for the Qualifying Process**

*17.3*    **Taking the Oath Prior to the Qualifying Process**

*Section H:*    **Best Practice for Interpreting Depositions**                                   33

*Best Practice H18:   Best Practice for Staffing Depositions*                                 34

*18.1*    **Justification for Staffing Legal Interpreters for Depositions**

*Section I:*    **Best Practice for Interpreting Attorney–Client Interactions**                  34

*Best Practice I19:   Best Practice for Protecting the Attorney-Client Privilege*             35

*19.1*    **Maintaining the Privilege**

*Section J:*    **Best Practices for Effectively Interpreting Law Enforcement Interactions**    35

*Best Practice J20:   Best Practices for Staffing Legal Interpreters for Law Enforcement*     36

*20.1*    **Legal Interpreters for Law Enforcement Interactions**

*20.2*    **Legal Interpreters for Law Enforcement Investigations**

*Best Practice J21:   Best Practice in Team Interpreting for Law Enforcement*                 36

© 2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup

*21.1    Effective Team Interpreting in Law Enforcement Interactions*

**Best Practice J22:  Deaf Interpreters Enhance Effectiveness of Interpretation**            **37**

*22.1    Effective Interpreting With Deaf Interpreters*

**Best Practice J23:   Visually Recording the Interpretation of the Miranda Warning**            **37**

*23.1    Video Recording the Interpretation of the Miranda Warning*

**Best Practice J24:   Creating a Record of the Statement and Interpretation**            **38**

*24.1    Video Recording Statements in American Sign Language*

*24.2    Video Recording ASL/English Interpretation*

**References**            **39**

**Other Resources**            **41**

**Appendix A**            **43**

**Appendix B**            **49**

## Introduction:

The mission of the National Consortium of Interpreter Education Centers (NCIEC) is to build and promote effective practices in interpreting education. The NCIEC draws upon the wisdom and energy of experts, consumers and other stakeholders to advance the field. The NCIEC is dedicated to challenging the status quo by promoting innovation, strong partner networks and multiculturalism throughout its programming. As responsible stewards of public funding, NCIEC is committed to products, programs and services that maximize resources and are replicable, measurable, sustainable and non-proprietary.

Towards the goal of increasing the number of qualified interpreters and advance the field of interpreting education, the NCIEC has established a number of work teams dedicated to a specific area of specialization.  One such workgroup is the NCIEC Legal Interpreting Workgroup, comprised of a group of core and expert members focused on defining the best and effective practices associated with legal interpreting.

Interpreting in the legal setting is a long-recognized area of specialization in the field of ASL-English interpreting. Tradition from the field of spoken language interpreting and legal community contribute to the conventional way legal interpreting work is performed.  As well, practices have been conceived by ASL-English interpreter practitioners over time through a process of application of theory drawn from the profession's scholarship.  As more scholarship and research emerge, practices evolve, improve, and change.

The NCIEC Legal Interpreting Workgroup has sought to further this process by building a series of expert, practitioner, educator and consumer partnerships that deepen our understanding of the work of interpreters in the legal setting. Through a series of focus groups and expert consultations with Deaf and non-deaf interpreter practitioners specializing in legal interpreting, and with consultation from members of the judiciary, the NCIEC Legal Interpreting Workgroup has developed this document of current *Best Practice* that addresses some of the most critical and essential elements of legal interpreting work.

As the work of the NCIEC Legal Interpreting Workgroup continues, and the practices discussed within this document are applied more consistently by legal interpreting practitioners, these *Best Practices* are likely to be improved and to evolve further.  As well, additional practices—particularly those relating to unique settings within the legal system such as immigration, custodial interrogation, video remote interpreting and juvenile matters—will be considered, examined, and documented. Therefore, this document is viewed as an evolving one that will continue to improve over time and application.

## Acknowledgements

There are a number of individuals and entities that must be recognized as a part of this document.  First, sincere appreciation and gratitude is extended to Drs. Linda Stauffer and Leilani Johnson, Co-Directors for the Mid-America Regional Interpreter Education Center

(MARIE) who both provided the administrative leadership and majority of funding for the Legal Interpreting Workgroup since its inception in 2005.  MARIE is one of the six centers that comprises the National Consortium and from the beginning of the 2005-2010 RSA grant funding cycle, MARIE committed to legal interpreting as one of its project priorities.

Sincere appreciation and gratitude is also extended to all the other Directors who make up the NCIEC and administer one of the remaining five (5) Centers—Ms. Pauline Annarino (WRIEC), Dr. Laurie Swabey (CATIE Center), Ms. Cathy Cogen (NURIEC), Ms. Bev Hollrah (GURIEC), Dr. Betsy Winston (NIEC)—who offered guidance and direction throughout the development of the Workgroup's scope of work and provided additional funding to support the Workgroup's various activities.

The core Workgroup for this initiative is comprised of Anna Witter-Merithew, Team Leader (MARIE Center), Jimmy Beldon (MN), Margaret Ransom Cobb (CA), Jan DeLap (MD), Richard Laurion (CATIE), Carla Mathers (MD) and Kellie Stewart (MA).  During 2005-2009, these individuals have provided countless hours to the discussion, organization and documentation of these *Best Practices*.  Their contributions are significant and herein acknowledged with heartfelt appreciation.  The writing intensive phase of this current iteration of the *Best Practices* is the result of extensive contributions made by three specific members of the core workgroup: Kellie Stewart (lead author), Margaret Ransom Cobb, and Anna Witter-Merithew.

The original source for much of the practice defined in this document is the expert opinions provided by a group of national experts in Legal Interpreting brought together in June 2007 for the purpose of examining various aspects of the work of legal interpreters.  The individuals participating in that expert group follow.

| Name | State |
| --- | --- |
| Keri Brewer | Oregon |
| Jan DeLap | Maryland |
| John Folker | Arizona |
| Jo Linda Greenfield | Colorado |
| Lisa Gonzales | California |
| Lorrie Kosinski | Colorado |
| Richard Laurion | Minnesota |
| Carla Mathers | Maryland |
| Priscilla Moyers | California |
| Rachel Naiman | Colorado |
| Cynthia Napier | New Mexico |
| Sharon Neumann Solow | California |
| Lynda Remmel | Colorado |
| June Prusak | Illinois |
| Kellie Stewart | Massachusetts |
| Anna Witter-Merithew | North Carolina |

The contributions of each of these individuals, as well as the many other practitioners and stakeholders who will offer insight and feedback through survey and focus group are greatly appreciated.  As a result of their efforts, the field of legal interpreting will be advanced.

## Purpose of Best Practices:

For the purpose of this document, a *Best Practice* is defined as the most efficient (least amount of effort) and effective (best results) way of accomplishing some element of work associated with a particular discipline—in this instance, interpreting in court and legal settings (*Tileston, 2000).* These practices have been applied by expert practitioners in the field, over time and in a wide range of legal situations. Consensus around these practices has been sought and will continue to be sought through survey and focus groups with a broad base of legal interpreting practitioners. Several of the practices within this document have been researched and found to result in the desired outcome, and where applicable, that research is cited.  Scholarly works from the fields of interpreting and interpreter education that have contributed to these *Best Practices* are cited throughout the document.

The purpose of this *Best Practices* document is to offer an explanation and rationale for a series of practices that are deemed by expert practitioners to result in a desired outcome with fewer problems and unforeseen complications.  It is anticipated that application of these *Best Practices* by interpreter practitioners and interpreter educators will result in more standardized, reliable and effective outcomes.  It is also anticipated that as part of the evolving process associated with these *Best Practices*, more and more of these standards will be researched in an effort to determine if they are in fact the most effective practices for interpreting in the legal setting.

## Overview of the *Best Practices* Document

These *Best Practices* are divided into ten (10) separate sections, each of which addresses a particular aspect of the work of legal interpreters.  They are:

A.  *Best Practices in Producing Effective Interpretation in Court and Legal Settings*

B.  *Best Practice in Team Interpreting for Court and Legal Settings*

C.  *Best Practices in Collaborating With the Deaf Interpreter Specialists in Court and Legal Settings*

D.  *Best Practice of Visually Recording a Statement or Interpretation in American Sign Language*

E.  *Best Practices for Obtaining Training, Experience, and Credentials of Highly Qualified Legal Interpreters*

F.  *Best Practices for Staffing Legal Assignments*

G.  *Best Practices for Legal Interpreter Preparation in Court and Legal Matters*

H.  *Best Practice for Interpreting Depositions*

I.  *Best Practice for Interpreting Attorney-Client Interactions*

J.  *Best Practices for Interpreting Law Enforcement Interactions*

Each section includes a best practice topic statement, followed by individual numbered practices describing the elements essential to the delivery of high quality legal interpreting services. These elements include explanations and/or rationales designed to assist in determining the relevance and value of those practices to the experiences of legal interpreting practitioners. Existing research and scholarship supporting the practice is cited when available and appropriate.

## Definitions:

Throughout this document the following terms will be used.  The definitions are provided to establish the meaning of the terms as used within this document.

1.  **American Sign Language** – A visual-gestural language created by deaf people. It is not English. ASL has all of the elements of any spoken language. Its grammar and conversational rules are very different from spoken English, but like all languages, it comprises a set of abstract symbols agreed upon by those who "speak" it.  *(Handbook for Ohio Judges)*

2.  **Best Practice** – A best practice is a technique or methodology that, through experience through application by practitioners and/or research, has proven to lead reliably to a desired result. A commitment to using the best practices in any field is a commitment to using all the knowledge and technology at one's disposal to ensure success. *http://www.bitpipe.com/tlist/Best-Practices.html*

3.  **Conflict of Interest** – Any condition that interferes with the objectivity of an interpreter constitutes a conflict of interest.  Interpreters shall be impartial and unbiased and shall refrain from conduct that may give the appearance of bias.  Interpreters shall disclose any real or perceived conflict of interest.  *(National Center for State Courts Model Code, p. 202).*

4.  **Consecutive Interpreting** – The process whereby an interpreter waits until a complete thought or group of thoughts has been spoken or signed, in order to understand the entire segment before beginning the interpretation, resulting in a very high standard of accuracy in the interpretation.  *(Russell, p. 52)*

5.  **Court Interpreter:** The generic term used to refer to the interpreter who performs the proceedings function.  The term "court interpreter" is used both by ASL interpreters and in the spoken language interpreting community.  *(Mathers, p. 221)*

6.  **Deaf Interpreter** – A specialized, professional sign language interpreter who is deaf, trained, and certified in communicating with semi-lingual deaf individuals.  *(Mathers, C. and Witter-Merithew, A., 2008).*

7.  **Direct Speech** – The most important standard technique an interpreter uses. While interpreting, the interpreter assumes the same grammatical voice as the original speaker and never interjects himself into the communication by using the third person *("He says that...").* The use of direct speech lessens confusion, keeps the written record clear by making it plain that is speaking, and enables the parties to communicate directly with each other as though no language barrier were present. *(NAJIT position paper, www.najit.org.)*

8.  **Discourse** – a verbal, signed or written exchange; a conversation or communication. (*http://www.thefreedictionary.com/discourse*)

9.  **Effective Interpretation** – The production of an interpretation from one spoken or signed language into another that is functionally equivalent and meaningful for all participants.

10. **Effective Practice** – Those practices that have been established through scientific research, case law, or other verifiable authority to be most successful for the purpose of achieving a desired outcome, for this discussion, effective interpretation.

11. **Hearing** – The term used to refer to an individual who is not deaf.

12. **Interpretation** – The unrehearsed, transfer of meaning from a spoken or signed message within one language into another language.

13. **Interpreter's Oath** – The oath used to officially swear in a signed or spoken language interpreter prior to both the swearing in of witnesses and the commencement of an official court or legal proceeding. *(Federal Rules of Evidence 604, 2004)*

    **Example**: *"Do you solemnly swear or affirm under the penalties of perjury to interpret accurately, completely and impartially using your best skill and judgment in accordance with the Code of Professional Responsibility for Court Interpreters?"*

14. **Legal Interpreter**: A highly skilled generalist interpreter who has had extensive training, experience and supervision working in a variety of legal settings and has demonstrated the requisite knowledge and skills to work in such settings through testing and certification as a legal interpreting specialist. *(www.rid.org)*

15. **Legal Interpreting:**  A broad category of specialized interpreting work which is practiced in a variety of legal settings including, but not limited to: administrative hearings of governmental agencies; law enforcement and investigation interviews; depositions; attorney-client interactions; and courtroom proceedings.

16. **Limited English Proficiency** – The federal term for people who do not speak English as their primary language and have a limited or basic ability to communicate within or understand the English language. *(Executive Order 13166, 2004)*

17. **National Association of Judiciary Interpreters and Translators (NAJIT)** – A non-profit organization of judiciary-interpreting and legal-interpreting professionals with a mission of promoting quality interpretation and translation services in the judicial system. *(www.najit.org)*

18. **Privileged Communication**:  Communication that occurs in a setting of legal professional confidentiality.  Attorney-Client Privilege is an evidentiary privilege protecting the confidential communications between a client and his or her attorney from disclosure to another party; this can be waived by the client but not by the attorney. *(The Dictionary of Legal Terms, 2nd Edition, by Steven H. Gifis).*

19. **Registry of Interpreters for the Deaf (RID)** – The national association and certifying body for sign language interpreters in the U.S. *(www.rid.org)*

20. **RID Generalist Interpreting Certification** – National certification classified as generalist signifies that the practitioner has demonstrated interpreting knowledge and skills that have the potential to meet the needs of consumers in a broad range of general interpreting/transliterating assignments.  ***(Refer to Appendix A for a more detailed delineation of National RID Generalist certification.*** www.rid.org**)**

21. **RID Specialist Interpreting Certification** – National certification classified as specialist signifies that the practitioner has demonstrated interpreting knowledge and skills within a specific domain or specialty of interpretation that goes above and beyond the knowledge and skills of generalist certified interpreter. ***(Refer to Appendix A for a more detailed delineation of National RID Specialist certification.*** www.rid.org**)**

22. **Sight Translation** – The unrehearsed interpretation of written documents from text into a spoken or signed language   *(Adapted from the Handbook for Ohio Judges)*

23. **Simultaneous Interpretation** – The process whereby an interpreter begins the interpretation while another person is still speaking or signing overlapping the original message or source with the interpretation simultaneously. *(Russell, p 52)*

24. **Summary Interpretation** – A summarized paraphrase of a message from one language into another.  Summary interpretations, by their very nature, are not dynamically equivalent to the original message nor can they be construed to be accurate and complete.  *(Emerson Crooker, p 27)*

25. **Team Interpreting** – The practice of using two hearing interpreters who rotate to provide simultaneous or consecutive interpretation for one or more deaf or hard of hearing individuals.  *(2007 - NAJIT Position Paper, Team Interpreting)*

26. **Translation** – The rehearsed conversion of a written text from one language into a written text in another language.   *(Handbook for Ohio Judges)*

# The Best Practices and Protocols

The *Best Practices* set forth in this document are critical in ensuring that professional interpreters specializing within court and legal proceedings perform their interpreting duties in the most effective, accurate and ethical manner.

## Section A:    Best Practices in Producing Effective Interpretation in Court and Legal Settings

*Best Practice:  A.1*

> ***The best practice for producing an effective interpretation in court and other legal settings is to achieve an accurate, meaningful, and effective interpretation that meets the cultural and linguistic needs of the deaf individual or party.***

### 1.1   Due Process and Effective Interpretation

The U.S. Constitution guarantees individuals the right to due process and the right to meaningful participation in court and/or legal proceedings in which they are involved. Providing Limited English Proficient (LEP) and/or are deaf or hard-of-hearing individuals with legal interpreters who possess the knowledge, skills and ability to provide a meaningful and effective interpretation is essential to upholding these individual rights.

### 1.2   Achieving a Meaningful and Effective Interpretation

Court and legal settings constitute a "high risk" venue for deaf and hard of hearing individuals. Miscommunication can have devastating consequences for those who find themselves involved in legal matters. Russell notes, "There is widespread agreement among experts in the field of interpretation that the principle of accuracy of courtroom interpretation is extremely important to the integrity of the legal system and to ensuring non-English speakers have equitable access to justice" (p. 57).  An interpretation is functional and effective when conveying meaning from one language into another in a manner that meets the communication needs of the deaf individual or party.

### 1.3   Producing an Accurate, Meaningful, and Effective Interpretation Requires Time

It is not uncommon for the general public to assume that interpreting between two languages occurs almost instantaneously. It may appear that while one speaks or signs an interpreter instantly and effectively formulates an accurate interpretation into the target language. In reality, interpreting between two languages is a highly

complex process requiring time, even from the most highly skilled, expert legal interpreters.

To achieve an accurate, meaningful, and effective interpretation, it is necessary for legal interpreters to put the fidelity of the interpretation above any pressure to produce a speedy, pseudo-efficient interpretation.

### Best Practice A.2

> **When interpreting in court and legal settings, consecutive interpretation is the best practice for achieving an accurate, meaningful, and effective interpretation.**

#### 2.1   Evidence for the Increased Accuracy When Using Consecutive Interpretation Verses Simultaneous Interpretation

Spoken language interpreters have primarily interpreted consecutively, waiting for an utterance to come to a logical conclusion or stopping point before speaking the interpretation of that intact segment. They have done so for both pragmatic and technical reasons. Listening to a spoken interpretation at the same time a foreign speaker is speaking creates difficulty hearing the message, as well as monitoring the fidelity of the interpretation. Literature and research within the field of spoken language interpreting states that "consecutive interpreting is used whenever a high degree of accuracy is needed (*Gonzalez, Vasquez and Mikkelson, 1991, p. 379*) Research from the field of sign language interpreter reinforces  that *"consecutive interpretation allows for a greater degree of accuracy than simultaneous interpreting." (Russell, p. 2)*  In its position paper titled, *Modes of Interpretation: Simultaneous, Consecutive and Sight Translation*, NAJIT states, *"Consecutive interpreting is a true and accurate interpretation of one language to another…"* (*www.najit.org*)

American Sign Language (ASL) is a distinct and separate language from spoken English. It is a highly visual language with its own grammar, syntax and cultural complexities that affect the way the language is used among Deaf people for whom ASL is a native or near native language.  Interpretation between two languages requires an interpreter who is bi-lingual and bi-cultural in ASL and English in order for the interpretation to be effective.  Because ASL/English interpreters are working between two distinct languages, experience and research demonstrate that consecutive interpreting substantially increases the accuracy, meaning, and effectiveness of ASL/English interpretation.

Dr. Debra Russell conducted a research study comparing the differences in the effectiveness of sign language interpretation using simultaneous and consecutive approaches. Russell found that when court interpreters used consecutive interpreting, a higher degree of interpreting accuracy was achieved (*Russell, 2002, p. 159).*

This study lends support to the experiences of highly qualified legal interpreters in the use of consecutive interpreting in court and legal proceedings to improve the accuracy and effectiveness of the interpretation *(Russell, p. 53).*

## 2.2  Consecutive Interpretation Essential during Expert Testimony, Direct and Cross Examination of Deaf Witnesses

In Russell's research (2002), evidence showed fewer error rates during expert witness testimony and in the direct and cross-examination of a deaf witness when compared to simultaneous interpreting. Russell notes that, *"While all aspects of a trial are important, the area of giving direct evidence and the subsequent cross-examination is critical" (p., 160).*  Given that these discourse types play an evidentiary role in courtroom interactions and depositions, increasing accuracy and reducing errors in testimony is essential to the fidelity of the evidence and trial process *(Russell, p. 160).*

Although Russell's research study focused on courtroom interactions, it is recognized that depositions are legal proceedings that involve the taking of testimony under oath.  Therefore, the same best practices of consecutive interpreting apply to depositions as they do to interpreting courtroom testimony.

## 2.3  Consecutive Interpretation Essential in Other Legal Settings

When interpreting in legal settings involving interactions other than taking a statement or testimony, the use of consecutive interpreting continues to be the most effective method for achieving a higher degree of accuracy when interpreting between two languages.  These interactions may involve investigations, attorney-client interviews, interviews of witnesses, mediation, court ordered meetings, etc.

*Best Practice A.3*

> ***When engaged in consecutive interpreting, note-taking is a best practice that significantly improves the interpreter's ability to recall details, organize ideas for deep processing and increase the accuracy, meaning, and effectiveness of an interpretation in court and legal settings.***

### 3.1 Practice Shows Significant Benefits to Memory and Effective Interpreting When Note-taking During Consecutive Interpreting

Interpreting between two or more languages engages both short-term and long-term cognitive memory *(Cokely, 1992).* When interpreting consecutively, interpreters rely heavily on recalling details to ensure an accurate and effective interpretation. The high stakes nature of legal interpreting emphasizes the critical need for interpreters to take measures that will assist in the accurate recall of a message, particularly when interpreting witness testimony.

Both spoken language and sign language interpreting professions have identified significant benefits to the use of note-taking in consecutive interpreting. Note-taking is a skill that must be developed. According to Hanh *(2006),* note-taking helps improve the interpreter's concentration, relieves the pressure placed on an interpreter's working memory and helps to ensure that details are not lost in the interpretation *(p. 13).* This is critically important for consecutive interpretation within the court and legal proceedings where testimony becomes or has the potential to become evidence in a court case.

*Best Practice A.4*

> ***Legal interpreters engage the use of simultaneous interpreting when it achieves accuracy, meaning, and effectiveness in the interpretation and meets the cultural and linguistic needs of the deaf party.***

### 4.1 Evidence of the Limitation of Simultaneous Interpretation

Historically, simultaneous interpretation has become most prominent method of interpreting within the field of American Sign Language and English interpretation. This occurred, in part, because interpreting between a spoken language and a visual language does not create overlapping or competing sound between a message and the interpretation. Simultaneous interpretation has allowed for greater efficiency in the production of the interpretation because the interpreter is signing while listening to spoken English or listening to spoken English while producing the interpretation into ASL *(Russell, p. 52).*

© 2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup

While simultaneous interpretation is perhaps more efficient, it is not a guarantee of accuracy and effectiveness, particularly when interpreting between two languages such as ASL and English. In Russell's research, she indicates that interpreters were aware that simultaneous interpretation was less accurate, but that there often remained tremendous pressure on interpreters to "keep up with the volume" *(p. 155)*. In particular, she found that there were increased errors during simultaneous interpretations of expert witness testimony, direct examination and cross examination. *(p. 160)*

Thus, it is critical for legal interpreters to always remain cognizant of the limitations of simultaneous interpretation.  It is not uncommon for interpreters to experience mental interference while attempting to simultaneously process incoming and outgoing messages. This interference causes, not only increases the risk of errors in the interpretation, but also makes it increasingly more difficult for legal interpreters to catch interpreting errors as they occur.

### 4.2    Factors Affecting the Accuracy of Simultaneous Interpretation

There are situations in which simultaneous interpretation can be meaningful and effective, such as when interpreting for a deaf person fluent in the English language. Not all deaf people are fluent in American Sign Language (ASL). Some may be bi-lingual in both sign English and ASL.  Others may only be fluent in sign English. When interpreting from spoken English to sign-based English, simultaneous interpreting can be both effective and efficient. It is important to keep in mind, however, that an efficient interpretation is not more important than an effective one, and the more dense or technical the material, the longer the interpretation process.

Whether or not simultaneous interpretation is effective can also be influenced by a number of other factors, such as the interpreter's familiarity with the subject matter, the predictability of communication, the amount of prior preparation, the speed at which the interpreter is expected to keep pace, mental and/or physical fatigue, the specific language needs of the deaf party, etc. *(Russell, pp. 154 – 168).* Thus, legal interpreters should evaluate all the interpreting-related demands of the situation to determine the most appropriate method of interpreting.

### 4.3    Cautions in the Use of Simultaneous Interpretation in Court

While simultaneous interpretation does have its application in court and other legal proceedings, and with particular deaf parties, legal interpreters must examine the assumption that it is the status quo approach.  They must be able to assess the pragmatics of each situation, and determine whether or not the use of simultaneous interpretation meets the best practice of meaningful and effective interpretation.

Proceedings interpreters frequently use simultaneous interpretation while interpreting open court or legal proceedings in which the deaf party is *"playing a passive role in court" (NAJIT Position Paper: Modes of Interpretation: Simultaneous, Consecutive and Sight*

*Translation, www.najit.org).* Given the research on simultaneous interpretation, it is important to consider that for a deaf person who is fluent in ASL, effectiveness of the interpretation might be compromised when interpreting simultaneously. This can adversely affect whether a deaf person has sufficient understanding of the proceedings to assist counsel in his or her defense.

## Section B:   Best Practices in Team Interpreting for Court and Legal Settings

### *Best Practice B.5*

*Legal interpreters recognize that working in teams is the best practice for achieving an accurate, meaningful, and effective interpretation in court and legal settings.*

### 5.1   *Purpose of Effective Team Interpreting*

"Team interpreting is the quality control mechanism, implemented to preserve the accuracy of the interpretation process in any circumstances" *(www.najit.org).* Within the field of sign language interpreting, it generally refers to the industry standard of hiring two hearing interpreters to work together to accurately and effectively interpret a communication exchange. Team interpreters are necessary for the purposes of turn-taking to reduce mental fatigue, reducing the potential for errors in the interpretation, monitoring the accuracy of the interpretation, assisting with note-taking, and monitoring the environment and logistics of the setting while the interpreting is produced.

### 5.2   *Evidence Supporting the Best Practice of Team Interpreting*

Studies from the fields of spoken and sign language interpreting have shown that mental fatigue sets in after approximately 30 minutes of sustained simultaneous interpretation, resulting in a marked loss in the accuracy of the interpretation *(Cokely, 1992; Moser-Mercer, 1998).* This is the case regardless of the level of experience or skill on the part of the court or legal interpreter *(NAJIT Position Paper: Team Interpreting, www.najit.org).* A study by Barbara Moser-Mercer and her colleagues at the University of Geneva's École de Traduction et d'Interprétation on the affects of stress and fatigue on conference interpreting, showed that the interpreters not only exhibited an increase in errors after 30 minutes, but also "appeared to be unaware of this decline in quality" *(Vidal, p. 1).*

Broadly speaking, the need for team interpreting is determined by a variety of factors including, the length of the assignment, the number of deaf consumers, the varieties of communication modalities and language used by multiple deaf and hard of hearing

---

parties in a given case or legal setting, as well as the complexity of the subject matter and situation. "The subject matter of court hearings varies, but may include legal arguments in a motion to suppress evidence; cross-examination of experts; syntactically dense jury instructions; nervous witness testimony; or a complex or under-articulated recitation of facts. There is a limit to the focused concentration needed to comprehend complex language at high speed and render it accurately in another language. Inattention, distraction or mental exhaustion on the part of the interpreter can have adverse consequences for defendants, litigants, witnesses, victims, and the judicial process in general" *(www.najit.org)*.

As Vidal *(1997)* points out, "Fatigue for interpreters is not primarily physical, as in the case of athletes, whose muscles become strained after sustained exertion: it is mental fatigue. It results from complex mental processing and the high degree of concentration the interpreter must have to hear, then understand, analyze and finally express ideas coherently in another language."  She quotes Patricia Michelson who reported in *The Court Management and Administration Report,* "Most people do not realize that an interpreter uses at least 22 cognitive skills when interpreting," and goes on to state "other studies of simultaneous interpretation have shown that fatigue is exacerbated by environmental factors that interfere with various aspects of the cognitive process" *(The Ohio Handbook for Judges, p. 107)*.

Unrecognized errors in legal interpreting constitute a risk, both to the deaf party and the administration of justice. Thus, to maintain the accuracy and effectiveness of the interpretation, team interpreting is necessary to reduce the rate of error within the interpretation due to mental fatigue.

## Section C:   Best Practice in Collaborating With Deaf Interpreter Specialists in Court and Legal Settings

### Best Practice C.6

**It is best practice to collaborate with deaf interpreter specialists in court and legal settings because deaf interpreters are able to enhance the accuracy, meaning, and effectiveness of the interpretation.**

#### 6.1   Appropriate and Reasonable Accommodation

"A significant population of deaf people exists in this country which research has demonstrated will be able to participate in the justice system to the level required by due process with the provision of a deaf interpreter" *(March 2009, NCIEC Brief – The Deaf Interpreter in Court, p.102).*  When deaf parties who could benefit from working

with a deaf interpreter are not provided one, the meaning and effectiveness of the interpretation will be adversely affected.

### 6.2   Evidence Supporting the Effectiveness of Deaf Interpreters

Legal interpreters recognize that working with deaf interpreters enhances the accuracy, meaning, and effectiveness of court and legal interpreting.

The National Consortium of Interpreter Education Centers (NCIEC), funded by the United States Department of Education, has undertaken two endeavors examining the benefits of working with deaf interpreters and the growing field of Deaf Interpreting. First, the NCIEC Work Team "surveyed the profession and concluded that deaf individuals with certain characteristics benefited from receiving interpretation services provided by a deaf interpreter" *(March 2009, NCIEC Brief – The Deaf Interpreter in Court, p.9).* These characteristics include:

- Underdeveloped ASL skills
- Limited socialization in the Deaf Community
- Limited education
- Cognitive challenges
- Delayed language
- Organic issues causing affect deficiencies
- Mental illness
- Problems caused by drug abuse
- Other physical challenges

Second, the NCIEC commissioned a lengthy document now completed in final draft form titled, "The Deaf Interpreter in Court: An Accommodation that is More than Reasonable," prepared for the NCIEC by Carla M. Mathers, Esq., SC:L, CSC. This document outlines the numerous rationales in support of the best practice of hiring deaf interpreters in court and legal settings.

These recent NCIEC endeavors have laid out in explicit detail characteristics of deaf individuals who will benefit from working with a deaf interpreter, as well as evidence of situations in which hearing interpreters should insist a deaf interpreter be appointed to the team.  The document further supports the findings of the NCIEC Deaf Interpreter Expert Work Team and takes the initiative a step beyond by examining benefits of hiring deaf interpreters in court and legal settings. This document also identifies statutory and common law authority for appointing deaf interpreters in court.

The document drafted for the NCIEC provides the detailed evidence for the best practice of working with deaf interpreters in court and legal settings. Court and legal interpreters should be familiar with this NCIEC document and adhere to its recommendations when working in court and legal settings.

*Best Practice C.7*

> **Because deaf interpreters improve the accuracy, meaningfulness, and effectiveness of an interpretation for a deaf individual or party, it is best practice for the deaf interpreter to be present and interpreting for the deaf party at all times during the court case, court or legal proceeding, deposition, legal interview, etc.**

### 7.1    Effectiveness of the Deaf Interpreter Requires Consistency

When deaf interpreters are working with a particular deaf party or individual, those deaf interpreters should always be used for any communication that occurs with that individual, no matter how insignificant the communication may seem. If the deaf interpreter is not present at any time, interpreting for that deaf party should be suspended until the deaf interpreter has returned or is available.  To do otherwise can be detrimental to the accuracy, meaningfulness, and effectiveness of the interpretation. In addition, it can undermine the relationship between the deaf party and the deaf interpreter. It can also perpetuate the false impression that the deaf party can received an accurate, meaningful, and effective interpretation in the absence of the deaf interpreter—an impression that is counter to the very reason the deaf interpreters were used.

*Best Practice C.8*

> **It is best practice for deaf interpreters to interpret for deaf minors involved in court and legal matters.**

### 8.1    Effectiveness of the Deaf Interpreter When Interpreting for Deaf Minors

The communication and interpreting needs of deaf minors involved in court and legal matters present unique and precarious challenges for interpreters. Many factors such as age of the minor, life experience, whether or not the minor has a secondary disability, level of education, type of education, exposure to American Sign Language, experience communicating through an interpreter, emotional state, etc., affect whether or not a deaf minor has the linguistic, developmental and cognitive abilities to effectively engage in communication via an interpreter, or even understand an interpreted message. As specialists, deaf interpreters are in a position to more accurately assess the interpreting needs of a deaf minor and to provide an accurate, meaningful, and effective interpretation.

## Section D:  Best Practice of Visually Recording a Statement or Interpretation in American Sign Language

### Best Practice D.9

> **It is best practice to create a video recording of a deaf person's statement, interview, deposition, testimony, etc., and the interpretation of that interaction, when the deaf person's statement and/or the interpretation has the potential to become evidence or necessitate future analysis in a court  or legal matter.**

#### 9.1    Video Recording Statements in American Sign Language

Creating a visual recording through the use of VHS or digital technology is the only way to preserve a statement made by a deaf person using sign language.  Without a record of the deaf person's statement, the interpretation of the deaf person's statement is all that remains. Although legal interpreters take precautions to reduce the potential risk of error in an interpretation that risk does persist. Capturing the original statement of the deaf person on video is essential for preserving any evidence for a legal challenge that might arise during a court or legal proceeding. NOTE:  It is assumed that when creating a video recording, all sound is also simultaneously recorded.

#### 9.2    Video Recording the ASL/English Interpretation

Using technology to visually record an ASL/English Interpretation is the only way to preserve an accurate video record of the interpretation a deaf person received in the course of making a statement. Recording the interpretation is essential for preserving any evidence or future need for analysis of the interpretation that might arise during a court or legal proceeding.  NOTE: It is assumed that a video recording includes all signed and spoken information.

#### 9.3    Recommended Video Recording Protocol

When visually recording a deaf person's statement and an ASL/English interpretation, it is important that the technology capture a simultaneous, full, and clear view of both the statement and the interpretation for later analysis—this means both the video and audio recorded simultaneously.  If logistics prohibit obtaining a full and clear view of both the deaf person and the interpreter simultaneously on the screen, separate video cameras – one of the deaf person's statement and one of the interpretation – will be necessary to produce a clear video with audio recording of each.

©  2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup      22

### 9.4    Providing Effective Guidance to Court, Legal, and Law Enforcement Personnel

It is still routine procedure for many court, legal, and law enforcement personnel to audiotape statements by individuals who can hear, particularly in small towns and rural areas.  Since producing audiotapes of statements is, the most familiar recording protocol, court, legal and law enforcement personnel may assume that audio recording the interpreter's verbal interpretation is sufficient for recording a deaf person's statement.  Audio-recording the interpreter only preserves the voiced interpretation, not the original statement from the deaf person, or the non-verbal information conveyed by the interpreter which could be linguistically relevant to the exchange.. Thus, it is important that court, legal, and law enforcement personnel fully understand the options for preserving a deaf individual's statement on video and the ramifications of only preserving the spoken interpretation.

## Section E:   Best Practices for Obtaining Training, Experience, and Credentials for Legal Interpreters

### Best Practice E.10

> It is best practice for legal interpreters to have received specialized training, which includes the knowledge, skills, and experiences necessary to provide an accurate, meaningful, and effective interpretation in court and legal proceedings.

### 10.1    Legal Interpreting Requires Specialized Expertise

"High-level proficiencies in the source and target languages and cultures, including knowledge of geographic variations, an understanding of the legal process and related terminology, the ability to manipulate the various discourse styles used in the courtroom, along with interpreting skills and adherence to standards of ethics and professional conduct [which are] essential in protecting a non-English speaker's right to due process" *(de Jongh, 2008, pg. 21).*

The knowledge and skills required to provide a meaningful and effective interpretation in court and legal settings is vast and highly complex.  ASL/English interpreters begin as generalist practitioners with a broad level of experiences and skills. Beyond a general practice, interpreters may pursue specialized training in legal interpreting in an effort to gain the knowledge, skills, and experience necessary to practice as a specialist in legal interpreting.

### 10.2    Specialist Legal Certification

Nationally certified generalist interpreters who meet the testing criteria may sit for the Specialist Certificate: Legal (SC:L) exam. Interpreters who hold this credential have

demonstrated specialized knowledge of legal interpreting, and greater familiarity with procedure and protocol followed within the court and legal system. These interpreters have also demonstrated the necessary skills in being able to interpret complex legal discourse *(www.rid.org)*. A full explanation of all generalist and specialist certification through RID is outlined in Appendix A of this document.

### *Best Practice E.11*

> *It is best practice for newly trained legal interpreters to be mentored and supervised by highly qualified and experienced legal interpreters while gaining the necessary hands-on experiences interpreting in court and legal settings.*

#### *11.1   Mentoring and Supervision of Legal Interpreters*

Interpreters who have completed specialized training in legal interpreting need to gain supervised experience interpreting within court and legal settings prior to becoming eligible to sit for the SC:L exam.  These intern practitioners require mentoring and supervision by highly qualified legal interpreters during this process. Being mentored and supervised are important parts of the specialized training process.  Such oversight also provides a critical level of support and supervision for developing legal interpreters as they gain experience providing interpreting services in court and legal settings, while maintaining best practice for accuracy.

## Section F:   Best Practice for Staffing Legal Assignments

### *Best Practice F.12*

> *It is best practice for legal interpreters to be placed according to distinct and specialized functions when interpreting within court or administrative proceedings.*

#### *12.1   Distinct and Specialized Functions of Legal Interpreters in Court*

Court and legal personnel are generally under the assumption that one interpreter is sufficient to interpret any and all parts of a court or legal proceeding involving a deaf person *(Mathers, p. 82)*.  Yet, depending on the number of deaf people involved in the court case and the role of each deaf person in the case, one interpreter will most likely not be sufficient.  Ethical, procedural, and legal conflicts can occur that will adversely affect the integrity of the interpreting process when interpreters do not maintain distinct roles for the various functions of court interpreting.  When the

integrity of the interpreting process is compromised, communication from that point on is open to greater scrutiny.

### 12.2   Proceedings Interpreter (PI) – Officer of the Court

Interpreters functioning within the role of Proceedings Interpreter (PI) are officers of the court. They swear an oath to interpret accurately and to protect the integrity of the interpreted proceedings. As such, they interpret all aspects of the open court process such as all open court dialogue and witness testimony from both sides of the case. For example, in a civil case with adversarial deaf parties, Proceedings Interpreters interpret the open court process for opposing deaf parties, including witness testimony for both sides of the case. In criminal cases where there may be a deaf witness for the prosecution in addition to a deaf defendant, Proceedings Interpreters provide the interpretation for the open court process and witness testimony. Proceedings Interpreters do not engage in interpreting between a deaf party and counsel *(Mathers, p. 86).*

Normally the Proceedings Interpreters can effectively interpret for more than one deaf party during the open court process or witness testimony.  When multiple deaf parties use different types of language or communication methods, one set of Proceedings Interpreters will not be able to provide an interpretation which is accurate, meaningful, effective, and accessible for all of them.

Considerations must also be given for creating effective sight lines when the Proceedings Interpreters must be visible to both a deaf party or parties and a deaf witness in a case.  Interpreters must be able to face the deaf person when interpreting Proceedings Interpreters should not be positioned where they block the jury's view of the witness.  The configuration of some courtrooms may prevent a deaf person at counsel table from seeing the Proceedings Interpreters who are interpreting while facing a deaf witness, and with their backs to the counsel table. In such a configuration, the deaf person at counsel table cannot view the interpretation of what is being said to and from the witness.  In that case, sight line considerations will have to be resolved prior to witness testimony.

### 12.3   Counsel or Table Interpreter (TI)

Interpreters functioning within the role of Counsel or Table Interpreter (TI) provide a deaf defendant access to counsel prior to, during, and following a court proceeding. Table Interpreters sit at counsel table next to the deaf defendant and interpret privileged communications that may arise between the deaf party and his or her attorney.  Table Interpreters do not take an oath in court and do not interpret open court proceedings (*Mathers, p.91, 131*).  Ethically, a conflict of interest exists when an interpreter works confidentially between a party and his or her attorney, and then proceeds to interpret open court proceedings as an officer of the court (*Mathers, p.92).* When there are multiple deaf defendants or parties involved in a court case, unless each defendant or party has access to a separate Table Interpreter, he or she would

not have an effective means of communicating with his or her attorney prior to, during, or following the proceeding (*Mathers, p.96*).

### 12.4    Monitoring of Interpretations

Interpreters functioning within the role of Table Interpreter observe the interpretation provided by the Proceedings Interpreters to monitor the accuracy and effectiveness of the interpretation.  This function is normally handled by the interpreter hired by counsel for the deaf party.  However, the court or any party, even one without a deaf client may hire an interpreter simply to monitor the Proceedings Interpreters for accuracy and to advise accordingly.

## Best Practice F.13

> *It is best practice for legal interpreters to consider all of the complex factors that carry the potential to influence achieving effective interpreting outcomes prior to accepting and/or interpreting a court or legal assignment.*

### 13.1    Assessing the Interpreting Needs of the Deaf Party

Deaf people communicate in diverse ways.  American Sign Language (ASL) is the native language of many deaf people. Other deaf people may use English-based sign language, but may and may not also be fluent in ASL. Others may not know sign language at all, instead communicating in a number of other ways depending on when, where, and how they were educated as children. In addition to the communication diversity among American deaf individuals, some foreign born deaf individuals may be fluent in languages other than ASL and English, or may not possess standard language skills in any signed or spoken language.

Most court, legal, and law enforcement personnel are unaware of the communication diversity that exists among deaf people. As a result, when courts, attorneys, and law enforcement personnel attempt to hire legal interpreters or request legal interpreters from a referral service, little information is known about how the deaf person communicates.  Thus, one important component of determining the interpreting needs of a deaf party is first understanding how the deaf person communicates.

### 13.2    Evaluating the Interpreter's Qualifications Prior to Staffing

Many factors can have a profound effect on whether or not an interpreter is qualified and sufficiently able to provide an accurate, meaningful, and effective interpretation for a deaf individual or party involved in a court case or legal matter.  Just because an interpreter is nationally certified and may have experience interpreting in court and legal settings does not ensure that the interpreter will be successful interpreting for a specific deaf individual involved in a specific court or legal proceeding,

deposition or law enforcement interview. Interpreters must consider factors such as the interpreting needs of the deaf party, the role of the deaf party in the court or legal matter, the training and qualifications of the interpreter, whether or not the interpreter has sufficient experience within the particular legal domain or court jurisdiction, whether or not a more qualified interpreter is available, how many interpreting teams might be necessary, whether or not the court is prepared to hire the requisite number of interpreting teams, whether or not the interpreter has any real or potential conflicts of interest, etc.

The considerations that are important when determining whether or not an interpreter is able to provide an accurate, meaningful and effective interpretation are numerous and will change depending on the factors that arise within any specific case. While this Best Practices document cannot provide an inclusive prescription for all of possible considerations, interpreters, and those who staff interpreters for court cases, should be intimately familiar with the factors that can affect the accuracy and effectiveness of the interpretation in court.

### 13.3    Assessing the Need for Multiple Teams of Legal Interpreters

The number of deaf parties, the similarities or differences in their methods of communication, their roles in the case, their individual interpreting needs, and the length of the court proceeding, hearing, or deposition, will affect the number of interpreters required for a court case.  Other unique factors may arise within specific cases which can also affect the need for additional teams of interpreters, such as interpreter availability, whether or not there are multiple deaf witnesses, and the ability of the Proceedings Interpreters (PI) to effectively interpret for every party present with a single interpretation. It is important that an accurate assessment of the number of interpreters needed for a case occurs prior to the start of the trial or proceeding. Court, legal, and law enforcement personnel will typically assume that only one interpreter is necessary for any number of deaf parties.  Court interpreters must ask the right questions and gather sufficient information to best determine if a sufficient number of teams, and types of teams, have been hired for a case.  Also refer to *Section B* of this document for guidance on Team Interpreting.

### 13.4    Assessing the Need for a Deaf Interpreter Specialist

Section C of this document discusses the effectiveness of working with Deaf Interpreter Specialists. When assessing the communication needs of deaf parties involved in a court proceeding, hearing, deposition, interview, etc., it is critical to assess whether or not a Deaf Interpreter Specialist will be necessary for one or more deaf parties or witnesses.  The interpreter will analyze the case to ascertain a) if the interpretation to be provided may be unsatisfactory, and b) if a deaf interpreter would improve or enhance the accuracy of the interpretation.  If the answer is in the affirmative, the interpreter's duty is triggered to inform the court as early as possible that a deaf interpreter is indicated.  Once the determination is made that a Deaf Interpreter will be necessary for a deaf party or witness to

receive an accurate, meaningful, and effective interpretation, the Deaf Interpreter becomes a critical part of the staffing needs for a case or proceeding *(March 2009, NCIEC Brief – The Deaf Interpreter in Court, p.102)*.

### 13.5    Identifying External Factors Affecting Successful Interpreting Interactions

Various factors can affect the success of an interpreting interaction.  These factors include whether or not the deaf individual has a mental illness, is under the influence of drugs or alcohol, takes prescription medication that affects cognitive abilities or vision, or any other factor that may alter a deaf individual's ability to perceived and understand communication interactions.

### 13.6    Identifying Conflicts of Interest when Staffing Cases

The National Association of Judiciary Interpreters (NAJIT), the Registry of Interpreters for the Deaf (RID), and the National Center for State Courts ethically require interpreters to avoid and disclose conflicts of interest prior to accepting an interpreting assignment or case.  Conflicts of interest can be subtle and difficult to identify at times. Conflicts affecting legal interpreters are generally of two types: *rehearsal conflicts*, which are implicated when an interpreter prepares a witness privately prior to interpreting the witness' testimony, and *appearance conflicts* in which the interpreter's relationship with the parties raises the specter of bias.  Legal interpreters must be cautious when accepting the role of Proceedings Interpreter in court cases.  Prior personal or professional involvement of the interpreter with any of the parties that may interfere with the objectivity of the interpreter can create a conflict of interest, or appearance of impropriety.  Interpreting during any previous investigatory processes prior to a court case can also create a conflict of interest for an interpreter when accepting the role of Proceedings Interpreter.

## Best Practice F.14

> *It is best practice to staff legal interpreters for court cases, hearings, depositions, and interviews in ways that promotes consistency and continuity in the interpreting team.*

### 14.1    Consistency and Continuity When Staffing Legal Interpreters

Maintaining interpreter consistency refers to having the same team of legal interpreters remain consistent throughout a proceeding or part of a proceeding, rather than bringing in a new interpreter or team of interpreters to take over midstream. Interpreter consistency can mean that the same interpreter provides the interpretation from beginning to end. It can also mean that the same team of interpreters remains consistent, switching interpreters within the team when necessary and appropriate.

---

© 2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup    28

Maintaining consistent interpreters for lengthy court trials or proceedings plays a critical role in maintaining the accuracy, meaningfulness and effectiveness of the interpretation.  Legal interpreters engage in extensive preparation prior to interpreting a trial, court or legal proceeding, or deposition. This preparation, along with the detailed knowledge of the case gained as the proceedings unfold has a positive effect on the interpreter's ability to interpret accurately and effectively for a deaf individual or party to a case. Legal interpreters appointed to lengthy cases should consider their availability to interpret the entirety of the trial or proceeding when accepting the appointment.

### 14.2    Maintaining Consistent Interpreters for Deaf Jurors and Witness Testimony

Assuming that the interpretation is accurate, meaningful, and effective from the start, maintaining interpreter consistency is an important consideration for all court and legal situations. Two specific situations, however, warrant additional guidance. Legal interpreters hired to interpret a trial for a deaf juror should remain the same interpreting team who interprets jury deliberations. After having interpreted trial evidence, arguments, and jury instructions, maintaining the continuity of the legal interpreters for jury deliberations is critical to maintaining the accuracy, meaningfulness, and effectiveness of the interpretation.

Likewise, when interpreting the testimony of a deaf witness, maintaining interpreter consistency is also critical to the accuracy, meaningfulness and effectiveness of the interpretation.  Direct and cross examination discourse can often be linguistically complex.  Questions and answers unfold in ways that can impact subsequent questions, as well as, connect to questions that have been previously asked of the witness.  Thus, when interpreting teams remain consistent for witness testimony, the interpreters are informed by the same frame of reference as the participants.  This provides a higher level of continuity within the interpretation thereby retaining the accuracy, meaningfulness, and effectiveness of the interpretation.

Although depositions are legal proceedings that take place outside a courtroom, the function of a deposition is to take testimony from an individual under oath. This testimony can be used as future evidence in a case. It can also lead to the discovery of other evidence or be used to impeach the testimony of a witness. Thus, depositions are considered witness testimony with the same need for interpreter consistency as courtroom testimony.

## Section G:   Best Practice for Interpreter Preparation in Court and Legal Matters

### *Best Practice G.15*

> *It is best practice for legal interpreters to engage in preparation prior to interpreting for a deaf party or witness involved in a legal matter in order to become familiar with information that will assist the interpreter in providing an accurate, meaningful, and effective interpretation.*

#### 15.1    *Reviewing Case Files, Motions and Other Court Documents*

According to the RID Standard Practice Paper on Legal Interpreting, "The interpreter is ethically obligated to prepare for all assignments, particularly legal and court assignments" *(p. 2).*  It is important for legal interpreters to review case files, as well as other pertinent legal documents prior to interpreting an interview, court proceeding, deposition, or trial. Legal interpreters must be familiar with the case-related details in order to provide an accurate, meaningful, and effective interpretation.

#### 15.2    *Researching Additional Relevant  Information*

In the course of preparing to interpret a court or legal proceeding or non-court situation, legal interpreters may need to engage in researching other relevant information, such as criminal charges, penal codes, vehicle codes, anatomy and physiology, specific medical or psychological conditions, medical or psychological tests or procedures, the various names and descriptions of illegal drugs, prescription medication, etc. This type of research and preparation will assist legal interpreters in being able to consider possible ways to interpret legal, medical, psychological or other information in an accurate, meaningful, and effective way.

### *Best Practice G.16*

> *It is best practice for legal interpreters to meet with the presiding judge and all attorneys to resolve procedural and logistic questions prior to interpreting complicated court or legal proceedings.*

#### 16.1    *Preparing for Meetings with the Presiding Judge and Attorneys*

Certain legal proceedings call for a formal meeting with the presiding judge and attorneys. For example, most often, meeting with the judge and attorneys is prudent prior to the start of a jury trial.  It might be necessary to request a meeting prior to a

bench trial when circumstances exist that give rise to the potential for complications involving the interpretation procedures, logistics, etc. Legal interpreters should use discretion when deciding whether or not a meeting is necessary.

When meeting with the presiding judge and attorneys, legal interpreters should arrive prepared to discuss all of the issues that pertain to the specific court case or legal proceeding. Interpreters should bring up procedural and logistic questions and offer recommendations and justifications that are reasonable and meet the interpreting needs of the deaf individual or party.

In the case of depositions, there is no presiding judge to oversee and help resolve conflicts with interpreting protocol and logistics.  This creates a unique situation where legal interpreters must negotiate procedural and logistic issues with the opposing counsel at the deposition.  Negotiating and resolving issues prior to the start of a deposition is just as important as it is to resolve prior to trial.

### 16.2    *Resolving Seating, Sightlines, Lighting and Auditory/Visual Needs*

Particularly in the case of trials (and in other instances as well), legal interpreters must be familiar with the courtroom seating protocol and determine whether the logistics of the room will meet the visual, lighting, and auditory needs of the deaf party and interpreter.  For cases involving more than one deaf party and more than one interpreting team, these logistical issues can become quite complex.  Taking the time to consider the various ways to resolve these issues in advance will benefit everyone in the long run.

In addition, other logistical needs may require discussion such as the need to switch interpreters, the need for breaks, protocol for administering of the Interpreter's Oath, where Proceedings Interpreters should wait when court is in recess, etc.

### 16.3    *Assessing the Communication Needs of the Deaf Party or Parties and Deaf Witnesses*

It is important for legal interpreters to meet the deaf party or parties and/or deaf witnesses prior to interpreting a hearing, trial, or deposition for the purpose of assessing the communication and interpreting needs of those deaf individuals. Without an opportunity to assess the communication of deaf individuals involved in a court or legal proceeding prior to interpreting, the potential for misunderstandings and errors in the interpretation increases.

### 16.4    *Requesting  Clarification of Ambiguous Questions or Statements*

There will be times during a legal proceeding or trial when the interpreters will need to request clarification of ambiguous questions or statements from the judge or attorney prior to delivering the interpretation. Standard protocol expected by courts is that legal interpreters use third person, and break from reported speech, when there is a need to communicate directly with the witness.

In the case of jury trials, the court may request that interpreters ask to approach the bench prior to attempting to clarify ambiguous questions or statements.

In the case of depositions, a presiding judge will not be present to oversee the protocol for interpreters requesting clarification.  These negotiations will need to occur between the interpreter and attorneys prior to the start of the deposition.

### 16.5    Procedure for Correcting Interpretation Errors

When an interpreter recognizes that there has been an error in the interpretation, the interpreter should, first, request to be recognized by the presiding judge. In the case of a bench trial, once the interpreter is recognized by the court, the interpreter can usually indicate that an error was made and state the correct interpretation for the record.  When a jury is present, the interpreter must request to approach the bench prior to explaining that an error has occurred. Once the court is informed of the error, the interpreter then uses third person to clarify the record.  The use of third person indicates that the communication came from the interpreter rather than the deaf person.

Again, in the case of depositions, negotiating the procedure for correcting the deposition record will need to take place between the interpreter and attorneys since no there is no presiding judge to assist.

### 16.6    Identifying Procedural and Logistical Differences Between a Bench and Jury Trial

Resolving procedural and logistical issues when interpreting for bench trials can be different than they are when juries are present in the courtroom.  For example, during a jury trial, the presiding judge may require an interpreter to approach the bench to discuss the interpreter's needs at side bar rather than allowing the jury to hear the request in open court.  Court interpreters should be aware of these types of differences and include them in the planning discussion with the presiding judge and attorneys when necessary.

## Best Practice G.17

> *It is best practice for legal interpreters to be prepared to undergo the qualifying or voir dire process prior to the start of a trial, court proceeding, legal proceeding, or deposition.*

### 17.1    Creating a Portfolio for the Qualifying Process

Creating a portfolio which includes copies of information regarding a legal interpreter's generalist certification, legal interpreting training, and specialist certification, among other things, is beneficial when undergoing the qualification or

voir dire process.  In some instances, the court or attorneys may want to see copies of the documentation.

### 17.2  Preparing for the Qualifying Process

Even for legal interpreters who have experienced the qualifying process numerous times, preparing to be qualified in open court can help to ensure the qualifying process goes smoothly.

### 17.3  Taking the Oath Prior to the Qualifying Process

Courts will administer the typical witness oath to the court interpreter prior to the qualifying process.  When a deaf interpreter is being qualified, the hearing interpreter will take the Interpreter's Oath prior to interpreting the witness oath to the deaf interpreter. This same process occurs during a deposition.

## Section H:   Best Practices for Interpreting Depositions

The purpose and final product of a deposition is to generate evidence from the person being deposed that may be used for future legal purposes. Testimony placed on the record during a deposition is used for the discovery of additional evidence. Depositions often become the basis for impeachment of witness testimony. Although depositions are not interactions that take place in a courtroom, they are, nonetheless, complex legal proceedings that function in similar ways to interactions that occur in a court of law.

Thus, all previous sections of this Best Practice Document also apply to interpreting depositions.  Legal interpreters should consider all of these best practices prior to accepting this type of legal work.

*Section A:   Best Practices in Producing an Accurate, Meaningful, and Effective Interpretation in Court and Legal Settings*
*Section B:   Best Practice in Team Interpreting for Court and Legal Settings*
*Section C:   Best Practices in Collaborating With Deaf Interpreter Specialists in Court and Legal Settings*
*Section D:   Best Practice of Visually Recording a Statement or Interpretation in American Sign Language*
*Section E:   Best Practices for Obtaining Training, Experience, and Credentials for Highly Qualified Legal Interpreters*
*Section F:   Best Practices for Staffing Legal Interpreters*
*Section G:   Best Practices for Legal Interpreter Preparation in Court and Legal Matters*

**Best Practice H.18**

> **It is best practice for legal interpreters to possess the training, credentials, experience, and skill sets for interpreting depositions as are best practice for interpreting courtroom interactions.**

### 18.1   Staffing Legal Interpreters for Depositions

Although they most often take place in a law office and can have a less formal atmosphere than a courtroom, depositions create a written statement in the form of answers to questions in the same way witness testimony creates a written record. Therefore, best practice considerations for staffing legal interpreters for depositions are the same as staffing considerations for interpreting in a courtroom.

## Section I:   Best Practice for Interpreting Attorney–Client Interviews

Attorney – client interactions are legal situations which often have direct connection to broader court and legal proceedings.  These interactions typically occur because an individual is a defendant or plaintiff in an active court case, is engaged in signing legal documents, or is involved in a legal matter that has the potential for involving a court of law.

Thus, all previous sections of this Best Practice Document also apply to interpreting attorney-client interviews.  Legal interpreters should consider all of these best practices prior to accepting this type of legal work.

Section A:   Best Practices in Producing an Accurate, Meaningful, and Effective Interpretation in Court and Legal Settings
Section B:   Best Practice in Team Interpreting for Court and Legal Settings
Section C:   Best Practices in Collaborating With Deaf Interpreter Specialists in Court and Legal Settings
Section D:   Best Practice of Visually Recording a Statement or Interpretation in American Sign Language
Section E:   Best Practices for Obtaining Training, Experience, and Credentials for Highly Qualified Legal Interpreters
Section F:   Best Practices for Staffing Legal Interpreters
Section G:   Best Practices for Legal Interpreter Preparation in Court and Legal Matters

*Best Practice I.19*

> ***In order to maintain of the attorney-client privilege while interpreting attorney-client interviews, it is best practice for legal interpreters to be present in the room with the deaf defendant only when the attorney is present.***

### 19.1   Maintaining the Privilege

Legal interpreters are cognizant of the importance of privilege that exists between an attorney and his or her client during confidential communications. For the protection of that privilege, legal interpreters are aware of circumstances that can waive the privilege that covers the confidentially of communications in the presence of the interpreter while interpreting between an attorney and deaf client. It is best practice to take steps to ensure that the interpreter does not by their conduct compromise the privilege.

## Section J:   Best Practices for Effectively Interpreting Law Enforcement Interactions

Interactions with law enforcement personnel often mark the beginning stage of a potential court or legal action.  When law enforcement personnel conduct interviews of suspects, individuals in custody, victims of a crime, or witnesses in an ongoing investigation, statements made to a police officer become evidence whether or not legal action has been initiated in a court.

Interpreting interactions between deaf individuals and law enforcement personnel are always a potential source for appeals. Interpretations conducted during these interactions, especially when a suspect or detainee is read the Miranda warning, are subject to analysis and review. In addition, whether or not an interpretation of the Miranda warning and subsequent statements given by a deaf individual are admitted as evidence in a court matter can depend on the interpretation's credibility as being accurate, meaningful, and effective.  Given that law enforcement interactions carry a high risk for legal review and for involved parties being called to testify about the law enforcement interpretation, and that statements made during these interactions become evidence in court, all previous sections of this Best Practice Document also apply to interpreting law enforcement interactions.  Legal interpreters must consider all of these best practices when accepting this type of legal work.

*Section A:   Best Practices in Producing an Accurate, Meaningful, and Effective Interpretation in Court and Legal Settings*
*Section B:   Best Practice in Team Interpreting for Court and Legal Settings*
*Section C:   Best Practices in Collaborating With Deaf Interpreter Specialists in Court and Legal Settings*

*Section D:   Best Practice of Visually Recording a Statement or Interpretation in American Sign Language*

*Section E:   Best Practices for Obtaining Training, Experience, and Credentials for Highly Qualified Legal Interpreters*

*Section F:   Best Practices for Staffing Legal Interpreters*

*Section G:   Best Practices for Legal Interpreter Preparation in Court and Legal Matters*

## Best Practice J20

> **It is best practice for legal interpreters who possess the specialized training, credentials, experience, and skill sets to interpret law enforcement interactions.**

### 20.1   Legal Interpreters for Law Enforcement Interactions

Legal interpreters understand the implications that interpreting law enforcement interactions have in a future court case or proceeding. Interactions with law enforcement are high stakes legal assignments even though they do not take place in a courtroom. Therefore, it is best practice for those interpreters who provide services in law enforcement interactions to hold the same training, credentials, experience, and skill sets as are necessary for interpreters working in other court and legal settings.

### 20.2   Legal Interpreters for Law Enforcement Investigations

There are times when law enforcement officers must conduct interviews in specific settings where generalist interpreters may already be hired to interpret, such as in a K-12 school environment, at a hospital or medical setting, psychiatric facility, college or university, social service agency, etc. Given that legal interpreters are trained to understand the implications that interpreting law enforcement interactions have in a future court case or proceeding, legal interpreters should be employed to provide interpreting services in these instances where law enforcement investigations are taking place.

## Best Practice J.21

> **Legal interpreters recognize that working within teams is the best practice for achieving an accurate, meaningful, and effective interpretation in law enforcement settings.**

### 21.1   Effective Team Interpreting in Law Enforcement Settings

All Best Practices listed in Section B of this document also apply to this section. Due to the potential for scrutiny of interpretations of the Miranda warning and custodial

interviews, legal interpreters working in teams is essential to provide an accurate, meaningful, and effective interpretation.

### Best Practice J.22

> **It is best practice to collaborate with deaf interpreter specialists in law enforcement settings because deaf interpreters are able to enhance the accuracy, meaning, and effectiveness of the interpretation.**

#### 22.1 Effective Interpreting Using Deaf Interpreter Specialists

In addition to the Best Practices written in Section C of this document, legal interpreters recognize that working with deaf interpreter specialists enhances the accuracy, meaning, and effectiveness of interpreting in law enforcement settings.

The potential for encountering deaf individuals who meet the characteristics of those who would benefit from working with a deaf interpreter specialist is high in law enforcement interactions. Legal interpreters recognize the factors that exist when a deaf interpreter is necessary and ensures that a deaf interpreter is present when the interaction with law enforcement personnel begins.

### Best Practice J23

> **It is best practice to video record the interpretation of the Miranda Warning given to a deaf individual prior to being questioned by law enforcement personnel.**

#### 23.1 Video Recording the Interpretation of the Miranda Warning Prior to Questioning

Recording the entire interaction through the use of VHS or digital technology is the only way to preserve the actual interpretation of the advice of rights including the Miranda Warnings provided to a deaf individual prior to being questioned by law enforcement personnel. Recording the interpretation preserves the evidence of whether or not the constitutional rights of the deaf individual were understood and allows for future analysis related to any legal challenge that might arise during a court or legal proceeding.

*Best Practice J24*

*It is best practice to video record interactions between deaf individuals and law enforcement personnel, such as interviews, taking statements, and other interactions that have the potential to become evidence in a court or legal matter.*

### 24.1    Video Recording Statements in American Sign Language

As is the case with video recording the interpretation of the advice of rights, it is also important to video record interactions between law enforcement personnel and deaf individuals when the deaf individual is communicating in ASL or other form of sign language.  Without a video record of the deaf person's statement or answers in ASL, the recorded interpretation of the deaf person's responses is all that remains. Although legal interpreters take precautions to reduce the potential risk of error in an interpretation that risk does persist. Capturing the original statement of the deaf person on video is essential for preserving any evidence that might arise during a future court or legal proceeding.

### 24.2    Video Recording the ASL/English Interpretation

Creating a video recording of an ASL/English Interpretation during law enforcement interactions is the only way to preserve an accurate record of the entire interpretation the deaf person and law enforcement personnel each received in the course of the exchange of questions and answers, or making a statement. Recording the interpretation is essential for preserving any evidence or future need for analysis of the interpretation that might arise during a court or legal proceeding.

**References**

Anderson, L. (1994). Simultaneous interpretation: Contextual and translation aspects. In S. Lambert & B. Moser-Mercer (Eds.), *Bridging the gap: Empirical studies in simultaneous interpretation.* Philadelphia, PA: John Benjamin.

BitPipe.Com: The TechTarget Library of White Papers, Product Literature, Webcasts and Case Studies. Available at http://www.bitpipe.com/tlist/Best-Practices.html

De Jongh, E. M. (2008, July/August). Court interpreting: Linguistic presence v. linguistic absence. *Florida Bar Journal, 2-32*.

Emerson Crooker, C. (1996). *The art of legal interpretation: A guide for court interpreters.* Portland State University: Continuing Education Press.

Executive Order 13166 Limited English Proficiency Resource Document: Tips and Tools From the Field, (2004). Retrieved March 26, 2009, from http://www.usdoj.gov/crt/cor/lep/Final%20Tips%20and%20Tools%20Document.%209%2021%2004.pdf

Federal Rules of Evidence, (2004). Retrieved March 26, 2009, from http://www.lectlaw.com/files/crf13.htm

Gifis, Steven H. (1998). Dictionary of legal terms: a simplified guide to the language of law. Hauppauge, New York: Barron's Educational Series, Inc.

Gonzalez, R., Vasquez, V., & Mikkelson, H. (1991). *Fundamentals of court interpretation: Theory, policy and practice.* Durham, NC: Carolina Academic Press.

Hanh, Pham Hong. (2006). Note-taking in consecutive interpreting. Retrieved March 15, 2009, from: http://web.hanu.vn/en/file.php/1/moddata/forum/70/393/NOTE-TAKING_IN_CONSECUTIVE_INTERPRETING_.pdf.

Hewitt, Williams. (1995). *Model Code of Professional Responsibility for Interpreters in the Judiciary.* In Court Interpretation: Model Guides for Interpretation and Practice in the State Courts. Retrieved March 26, 2009, from http://www.ncsconline.org/WC/CourTopics/pubs.asp?topic=JudEth

Interpreters in the judicial system: A handbook for Ohio judges. Available at http://www.sconet.state.oh.us/publications/interpreter_services/IShandbook.pdf.

Mathers, C. M. (2007). *Sign language interpreters in court: Understanding best practices.* Bloomington, Indiana: Author House.

Mathers, C. M. (2009, March). The deaf interpreter in court: An accommodation that is more than reasonable. *Document Prepared for the National Consortium of Interpreter Education Centers.*

Mathers, C and Witter-Merithew, A. (2008). NCIEC-RID Amicus Brief Filed in the Matter of *Linton v. State*, No. PD-0413-08, Tex. Crim. Court of Appeals. *Document Prepared for the National Consortium of Interpreter Education Centers and the Registry of Interpreters for the Deaf.*

Moser-Mercer, B., Kunzli, B., & Korac, M. (1998). Prolonged turns in interpreting: Effects on quality, physiological and psychological stress.  University of Geneva, École de Traduction et d'Interprétation. *Interpreting, 3*(1), p. 47-64. John Benjamins Publishing Co.

NAJIT. (2006). *Position paper: Modes of interpreting. Available at www.najit.org*

NAJIT. (2007). *Position paper: Team interpreting in the courtroom.* Available at www.najit.org

NCIEC (2007). Legal expert workgroup, draft document of best practices workgroup.

Registry of Interpreters for the Deaf (RID) Standard Practice Papers:  www.rid.org *Interpreting in Legal Settings (2000), Team Interpreting (1997), Use of a Certified Deaf Interpreter (1997).*

Russell, D. (2002). *Interpreting in legal contexts: Consecutive and simultaneous interpretation.* Sign Language Dissertation Series. Burtonsville, MD: Linstok Press.

The Free Dictionary.Com Website. Available at http://www.thefreedictionary.com/discourse

Tileston, D. E. (2000). *Best Teaching Practices: How Brain Research, Learning Styles and Standards Define Teaching Competencies*. Thousand Oaks, CA: Corwin Press, Inc. 23-25.

University of Rochester. (2004). Short term memory's effectiveness influenced by sight, sound.  *Science Daily*. Retrieved March 15, 2009, from http://www.sciencedaily.com/releases/2004/09/040901092240.htm.

Vidal, M. (1997, Winter). New study on fatigue confirms need for working in teams. *Proteus, (6)*1.

©  2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup          40

## Other Resources

Andrews, J. F., Vernon, M., & LaVigne, M. (2007). The Bill of Rights, due process and the deaf suspect/defendant. Registry of Interpreters for the Deaf *Journal of Interpretation*.

Berk-Seligson, *S.* (1990). *The bilingual courtroom: Court interpreters in the judicial process.* Chicago, IL: University of Chicago Press. (KF8725 B47 1990).

Boudreault, P. (2005). Deaf interpreters. In T. Janzen (Ed.), *Topics in Signed Language Interpreting* (pp. 323-355). Philadelphia, PA: John Benjamins.

Cokely, D. (1992). *Interpretation: A sociolinguistic model.* Burtonsville, MD: Linstok Press.

Collin, J., & Morris, R., (1996). *Interpreters and the legal process.* Winchester: Waterside Press.

Conley, J. M., & O'Barr, W. M. (1998). *Just words: Law, language and power*. University of Chicago Press.

Gerver, D. (1974). Simultaneous listening and speaking and retention of prose. *Quarterly Journal of Experimental Psychology, 26*(3), 337 – 341.

Gile, D. (1995). Fidelity assessment in consecutive interpretation: An experiment. *Target, 7*(1), 151-164.

Gile, D. (2002). Conference interpreting as a cognitive management problem.  In Franz Pöchhacker & Miriam Shlesinger (Eds.), *The interpreting studies reader.* New York: Routledge.

Hewitt, W. (1995).  Model code of professional responsibility for interpreters in the judiciary. In *Court interpretation: Model guides for policy and practice in the state courts.* Richmond, Virginia: National Center for State Courts.

Janzen,T.  (2005). *Topics in signed language interpreting: Theory and practice.* Amsterdam:  John Benjamins Co.

Miller, K. R., & Vernon, M.  (2001).  Linguistic diversity in deaf defendants and due process rights. *Journal of Deaf Studies and Deaf Education, 6*(3), 226, 226-27.

Mikkelson, H. (1995.). On the horns of a dilemma: Accuracy vs. brevity in the use of legal terms by court interpreters. *Translation and the Law*, ATA Monograph Series, Vol. 8, Marshall Morris, (Ed.).  Philadelphia: John Benjamins Publishing Co.

O'Barr, W. M. (1982). *Linguistic evidence: Language, power, and strategy in the courtroom.* San Diego, CA: Academic Press.

Parasnis, Ila, (Ed.). (1996). *Cultural and language diversity and the deaf experience.* New York, NY: Cambridge University Press.

Rozan, J. F.- (n.d.) *7 Principles of note-taking.*  Interpreter Training Resources.
Retrieved March 15, 2009 from
http://interpreters.free.fr/consecnotes/rozan7principles.doc .

Seleskovitch, D. (1978a). *Interpreting for international conferences.* Washington, DC:
Pen & Booth.

Seleskovitch, D. (1978b). Language and cognition.  in D. Gerver & H. Sinaiko (Eds.),
*Language interpretation and communication.* New York: Plenum, 333-342.

©  2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup

# Appendices

Appendix A:  National Certification System for Professional Interpreters

***National Registry of Interpreters for the Deaf (RID) Certification***

RID, Inc., is the national organization of professional sign language interpreters in the United States. Since 1975, RID has played a leading role in establishing a national standard of quality for interpreters and transliterators by providing education and certification through RID's National Testing System. The process of becoming a high-level quality interpreter starts with attaining credentials through certifications offered by RID and maintaining qualifications and membership through continued skill development.  www.rid.org

***A. RID Generalist (Sign Language) Certifications***

Certificates classified as generalist signify skills in a broad range of general interpreting/transliterating assignments. Holders of generalist certificates have met or exceeded a nationally recognized standard of minimum competence in interpreting and/or transliterating. Individual certificates vary in their scope so it is important to know what each credential means.

**1. Valid RID Generalist Certifications**

**a. NIC (National Interpreter Certification)**

Individuals achieving the generalist certification at the NIC, NIC Advanced, or NIC Master level are all professionally certified (Generalist) interpreters.

- **NIC** - Individuals who achieve the NIC level have passed the NIC Knowledge exam. They have also scored within the standard range of a professional interpreter on the interview and performance portions of the test.

- **NIC Advanced -** Individuals who achieved the NIC Advanced level have passed the NIC Knowledge exam; scored within the standard range of a professional interpreter on the interview portion; and scored within the high range on the performance portion of the test.

- **NIC Master -** Individuals who achieved the NIC Master level have passed the NIC Knowledge exam. They have scored within the high range of a professional interpreter on both the interview and performance portions of the test.

**b. CDI (Certified Deaf Interpreter)**

Holders of this certification are interpreters who are deaf or hard-of-hearing, and who have completed at least eight hours of training on the NAD-RID Code of Professional Conduct; eight hours of training on the role and function of an interpreter who is deaf

or hard-of-hearing; and have passed a comprehensive combination of written and performance tests. Holders of this certificate are recommended for a broad range of assignments where an interpreter who is deaf or hard-of-hearing would be beneficial.

**c. OTC (Oral Transliteration Certificate)**

Holders of this generalist certificate have demonstrated, using silent oral techniques and natural gestures, the ability to transliterate a spoken message from a person who hears to a person who is deaf or hard-of-hearing. They have also demonstrated the ability to understand and repeat the message and intent of the speech and mouth movements of the person who is deaf or hard-of-hearing.

**2. Valid RID <u>Generalist</u> Certifications**

➢ *Exams for these generalist certifications are NO LONGER offered by the RID, however the certifications are still valid and recognized by the RID.*

- **CI (Certificate of Interpretation) -** Holders of this certificate are recognized as fully certified in *interpretation* and have demonstrated the ability to interpret between American Sign Language (ASL) and spoken English for both sign-to-voice and voice-to-sign tasks. The interpreter's ability to transliterate is not considered in this certification. Holders of the CI are recommended for a broad range of interpretation assignments.

- **CT (Certificate of Transliteration) -** Holders of this certificate are recognized as fully certified in *transliteration* and have demonstrated the ability to transliterate between English-based sign language and spoken English for both sign-to-voice and voice-to-sign tasks. The transliterator's ability to interpret is not considered in this certification. Holders of the CT are recommended for a broad range of transliteration assignments.

- **CI and CT (Certificate of Interpretation and Certificate of Transliteration) -** Holders of both full certificates (as listed above) have demonstrated competence in both interpretation and transliteration. Holders of the CI and CT are recommended for a broad range of generalist interpretation and transliteration assignments.

**3. Valid RID <u>Generalist</u> Certifications**

➢ *Exams for these generalist certifications are NO LONGER offered by the RID, however the certifications are still valid and recognized by the RID.*

- **CSC (Comprehensive Skills Certificate) -** Holders of this full certificate have demonstrated the ability to interpret between American Sign Language (ASL) and spoken English, and to transliterate between spoken English and an English-based sign language. Holders of this certificate are recommended for a broad range of interpreting and transliterating assignments. *The CSC examination was offered until 1987.*

---

© 2009 – National Consortium of Interpreter Education Centers – Legal Interpreting Workgroup

- **MCSC (Master Comprehensive Skills Certificate) -** The MCSC examination was designed with the intent of testing for a higher standard of performance than the CSC. Holders of this certificate were required to hold the CSC prior to taking this exam. Holders of this certificate are recommended for a broad range of interpreting and transliterating assignments.

- **RSC (Reverse Skills Certificate) -** Holders of this full certificate have demonstrated the ability to interpret between American Sign Language (ASL) and English-based sign language or transliterate between spoken English and a signed code for English. Holders of this certificate are deaf or hard-of-hearing and interpretation/transliteration is rendered in ASL, spoken English and a signed code for English or written English. Holders of the RSC are recommended for a broad range of interpreting assignments where the use of an interpreter who is deaf or hard-of-hearing would be beneficial.

- **CDI-P (Certified Deaf Interpreter-Provisional) -** Holders of this provisional certification are interpreters who are deaf or hard-of-hearing, and who have demonstrated a minimum of one year experience working as an interpreter; completion of at least eight hours of training on the *NAD-RID Code of Professional Conduct*; and eight hours of training in general interpretation as it relates to the interpreter who is deaf or hard-of-hearing. Holders of this certificate are recommended for a broad range of assignments where an interpreter who is deaf or hard-of-hearing would be beneficial.

- **OIC:C (Oral Interpreting Certificate: Comprehensive) -** Holders of this generalist certificate demonstrated both the ability to transliterate a spoken message from a person who hears to a person who is deaf or hard-of-hearing and the ability to understand and repeat the message and intent of the speech and mouth movements of the person who is deaf or hard-of-hearing.

- **OIC:V/S (Oral Interpreting Certificate: Visible to Spoken) -** Holders of this partial certificate demonstrated the ability to understand the speech and silent mouth movements of a person who is deaf or hard-of-hearing and to repeat the message for a hearing person. This individual received scores on the OIC:C examination which prevented the awarding of full OIC:C certification. *This test is no longer offered.*

- **OIC:S/V (Oral Interpreting Certificate: Spoken to Visible) -** Holders of this partial certificate demonstrated the ability to transliterate a spoken message from a person who hears to a person who is deaf or hard-of-hearing. This individual received scores on the OIC:C examination which prevented the awarding of full OIC:C certification.

4. *Valid Partial (Sign Language) <u>Generalist</u> RID Certifications*

  ➢ *Exams for these generalist certifications are NO LONGER offered by the RID, however the certifications are still valid and recognized by the RID.*

---

- **IC/TC (Interpretation Certificate/Transliteration Certificate) -** Holders of this partial certificate demonstrated the ability to transliterate between English and a signed code for English and the ability to interpret between American Sign Language (ASL) and spoken English. This individual received scores on the CSC examination which prevented the awarding of full CSC certification.

- **IC (Interpretation Certificate) -** Holder of this partial certificate demonstrated the ability to interpret between American Sign Language (ASL) and spoken English. This individual received scores on the CSC examination which prevented the awarding of full CSC certification or IC/TC certification. The IC was formerly known as the Expressive Interpreting Certificate (EIC).

- **TC (Transliteration Certificate) -** Holders of this partial certificate demonstrated the ability to transliterate between spoken English and a signed code for English. This individual received scores on the CSC examination which prevented the awarding of full CSC certification or IC/TC certification. The TC was formerly known as the Expressive Transliterating Certificate (ETC).

*B. National Association of the Deaf (NAD) Generalist Certifications* www.rid.org

  ➢ *Exams for these generalist certifications are NO LONGER offered by the NAD, however the certifications are still valid and recognized by the RID.*

The RID accepts NAD Generalist Certifications as a credential granting holders the option of membership in and recognition of NAD certification under the RID.  These exams are no longer available through NAD, however the certifications are still considered valid by the RID for those who hold the credential.

- **NAD III (Generalist) - Average Performance**
  Holders of this certificate possess above average voice-to-sign skills and good sign-to-voice skills or vice versa. This individual has demonstrated the minimum competence needed to meet generally accepted interpreter standards. Occasional words or phrases may be deleted but the expressed concept is accurate. The individual displays good control of the grammar of the second language and is generally accurate and consistent, but is not qualified for all situations.

- **NAD IV (Advanced) - Above Average Performance**
  Holders of this certificate possess excellent voice-to-sign skills and above average sign-to-voice skills or vice versa. This individual has demonstrated above average skill in any given area. Performance is consistent and accurate. Fluency is smooth, with little deleted, and the viewer has no question to the candidate's competency. With this certificate, an individual should be able to interpret in most situations.

- **NAD V (Master) - Superior Performance**
  Holders of this certificate possess superior voice-to-sign skills and excellent sign-to-voice skills. This individual has demonstrated excellent to outstanding

ability in any given area. There are minimum flaws in their performance, and they have demonstrated interpreting skills necessary to serve in almost all situations.

### C.  RID Specialist Certifications   www.rid.org

Certificates classified as *specialist* signify skills in a particular area or specialty of interpretation. Holders of specialty certificates have demonstrated specialized knowledge in a specific area of interpreting. Individual certificates vary in their scope so it is important to know what each credential means.

- **SC:L (Specialist Certificate: Legal) -** Holders of this specialist certificate have demonstrated specialized knowledge of legal settings and greater familiarity with language used in the legal system. Certification recognized by RID, documented training, and legal interpreting experience are required prior to sitting for this exam. Holders of the SC:L are recommended for a broad range of assignments in the legal setting. ***This test is currently available.***

- **Eligibility to Take the SC:L Exam -** An individual interested in taking the SC:L exam must either currently possess a valid legal interpreting certificate issued prior to 1987 or satisfy all of the eligibility criteria in at least one of the following categories:

    **Category #1** - Be a current certified member of RID, successful completion of a bachelor's degree in any field, or an associate's degree in interpreting and documentation of at least 50 hours of legal interpreting/mentoring experience and 30 hours of formal legal training. In addition, five years of general interpreting experience (post certified member of RID status) is strongly recommended.

    **Category #2** - Be a current certified member of RID, successful completion of an associate's degree in any field and documentation of at least 75 hours of legal interpreting/mentoring experience and 50 hours of formal legal training. In addition, five years of general interpreting experience (post certified member of RID status) is strongly recommended.

    **Category #3** - Be a current certified member of RID and documentation of at least 100 hours of legal interpreting/mentoring experience and 70 hours of legal training. In addition, five years of general interpreting experience (post certified member of RID status) is strongly recommended.

    **Category #4** – Possess a current SC:L.

    Documentation of training may be in the form of college transcripts, signature(s) of individual(s) offering the training workshop, certificate of completion, etc. Documentation of legal interpreting/mentoring experience

should be in the form of an official letter stating hours and time from the interpreting service coordinator, court official, or mentor.

- **SC:PA (Specialist Certificate: Performing Arts) -** Holders of this certificate were required to hold RID generalist certification (CSC) prior to sitting for this examination and have demonstrated specialized knowledge in performing arts interpretation. Holders of this certificate are recommended for a broad range of assignments in the performing arts setting. *This test is no longer available.*

## Appendix B: Citation of Important Cases

**Appellate Cases**

**Sixth Amendment Rights to Confrontation and Effective Assistance of Counsel**

**Federal**

*Ake v. Oklahoma*, 470 U.S. 68, 76 (1985).

*United States v. Sanchez,* 928 F.2d 1450, 1455 (6th Cir. 1991).

*U.S. ex rel. Negron v. New York*, 310 F. Supp. 1304 (E.D.N.Y. 1970).

*United States v. Carrion,* 488 F.2d 12 (1st Cir. 1974).

*United States ex rel. Navarro v. Johnson,* 365 F.Supp. 676 (E.D. Pa. 1973).

*United States v. Desist,* 384 F.2d 889 (2d Cir.), *aff'd,* 394 U.S. 244 (1969).

**States**

*State v. Lopez*, 114 Ohio St. 3d 1411 (Ohio 2007).

*State v. Roldan,* 855 A.2d 455, 448 (N.H. 2004).

*State v. Razo*, 157 Ohio App. 3d 578 (Ohio Ct. App. 2004).

*People v. Rivera,* 480 N.Y.S.2d 426 (1984).

*Salazar v. State,* 93 S.W.3d 339 (Tex App. Texarkana 2002).

*People v. Resendes,* 210 Cal. Rptr. 609 (Cal. App. 5 Dist. 1985).

*Bednarski v. Bednarski,* 366 N.W.2d 69 (Mich. App. 1985).

*State v. Van Pham,* 675 P.2d 848, 856 (Kan. 1984).

*State v. Gonzalez-Gongora,* 673 S.W.22d 811, 816 (Mo. App. 1984).

*People v. Carreon,* 198 Cal. Rptr. 843 (Cal. App. 5 Dist. 1984).

*People v. Aguilar,* 35 Cal. 3d 785, 787, 677 P.2d 1198 (Cal. 1984).

*People v. Rioz,* 161 Cal. App. 3d 905 (1984).

*People v. Mata Aguilar,* 35 Cal. 3d 785, 677 P.2d 1198 (Cal. 1984).

*People v. Rivera,* 390 N.E.2d 1259 (1st Dist. Ill. 1979)

**Standard of Interpretation**

*Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir. 1989).

*United States v. Cirrincione,* 780  F.2d 620, 633 (7th Cir. 1985).

*State v. Negash*, 170 Ohio App. 3d 86 (Ohio Ct. App. 2007).

*State v. Lopez,* 2007 Ohio 202 (Ohio Ct. App. 2007).

*State v. Rodriguez*, 2001 Ohio 2179 (Ohio Ct. App. 2001).

*State v. Mendoza*, 2001 Ohio 2178 (Ohio Ct. App. 2001).

*Denton v. State,* 945 S.W.2d 793 (Tenn. Crim. App. 1996).

*State v. Her,* 510 N.W.2d  218, 222 (Minn. 1994).
- *Objections based on plea **not knowingly and voluntarily entered***

*State v. Alvarez,* 797 N.E.2d 1043, 1044-45 (Ohio 2003).

*Tamayo-Reyes v. Keeney,* 926 F.2d 1492, 1495 (9th Cir. 1991)

*State v. Nieves*, No. 90-L-14-003, 1990 WL 208821 (Ct. App. Ohio Dec. 14, 1990).

## Interpreter's Oath/ Qualification as an Expert on the Record

*State v. Newcomb*, 2004 Ohio 4099, P17 (Ohio Ct. App. 2004).

*State v. Alvarez,* 797 N.E.2d 1043, 1046 (Ohio 2003).

*Ledezma v. State,* 626 N.W.2d 134, 149 (IA 2001).

*State v. Gonzales-Morales,* 979 P.2d 826 (Wash. 1999).

*Choi v. State,* 497 S.E.2d 563 (Ga. 1998).

*Denton v. State,* 945 S.W.2d 793 (Tenn. Crim. App. 1996).

*State v. Rodriguez,* 682 A.2d 764 (N.J. Super. Law 1996).

*State v. Mendoza,* 891 P.2d 939 (Ariz. App. Div. 1 1995).

*Manbeck Nurseries v. Ohio Civil Rights Comm'n*, 639 N.E.2d 1247 (Ct. App. Ohio, 1994).

*People v. Bradley,* 879 P.2d 410 (Colo. 1993).

*State v. Burris*, 643 P.2d 8, 14 (Ariz. App. 1988).

*State v. Rosa*, 547 N.E.2d 1232 (Ct. App. Ohio 1988).

*Paucher v. Enterprise Coal Mining Co,*183 Iowa 86, 87 (1918).

*Kley v. Abell,* 483 S.W.2d 625, 628 (Mo. App. 1972).

# EXHIBIT B

# INTERPRETING IN LEGAL SETTINGS

STANDARD PRACTICE PAPER

*The Registry of Interpreters for the Deaf, Inc., (RID) Standard Practice Paper (SPP) provides a framework of basic, respectable standards for RID members' professional work and conduct with consumers. This paper also provides specific information about the practice setting. This document is intended to raise awareness, educate, guide and encourage sound basic methods of professional practice. The SPP should be considered by members in arriving at an appropriate course of action with respect to their practice and professional conduct.*

*It is hoped that the standards will promote commitment to the pursuit of excellence in the practice of interpreting and be used for public distribution and advocacy.*

## About Legal Interpreting

Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney-client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication. Deaf people have a legal right to a qualified interpreter, and in legal settings, a qualified legal interpreter will have a specific skill set to ensure that the deaf person's right to be present and participate is not compromised.

This standard practice paper discusses legal interpreting globally; however, within the broader spectrum of legal interpreting, practice may vary depending on the nature of the assignment. For example, when interpreting for the police, the interpreter is governed by a different set of legal rules than when interpreting privileged attorney-client conferences.  At all times, however, the interpreter is governed by ethical standards established by RID which require accurate interpreting and maintenance of confidentiality, absent a court order, regardless of setting. The legal interpreter will explain to participants, prior to engaging in interpreting, the applicable guidelines for working with the interpreter in the specific setting.

## Qualified Legal Interpreter

The Americans with Disabilities Act of 1990 (ADA) requires the use of "qualified interpreters."  The implementing regulations define a qualified interpreter as one "who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary."  Additionally, legal interpreters are governed by the NAD-RID Code of Professional Conduct. The Code requires that interpreters "possess the professional skills and knowledge required for the specific interpreting situation."  In the context of legal interpreting, "necessary specialized vocabulary" and "professional skills and knowledge" are obtained through specialized interpreter training.

As with other professions, the field of sign language interpretation has developed specific credentials that indicate minimum levels of competency to interpret in legal settings. RID awards the Specialist Certificate: Legal ("SC: L") to interpreters who meet specific criteria regarding prior certification, education and experience.  While the number of interpreters holding the SC: L has increased, not enough interpreters hold this credential to fully satisfy the demand for legal interpreters. As a result, much legal interpreting is done by individuals certified as generalist practitioners to interpret in the language used by the deaf person and who also have successfully completed legal interpreter training in order to understand and use the necessary specialized vocabulary associated with legal settings.

Because qualified interpreters are in great demand, hiring parties are advised to start early to locate the appropriate complement of interpreters once the need is known.  Many courts have a liaison for court interpreting who maintains a roster of trained interpreters. In addition, most cities have

333 Commerce Street  ■  Alexandria, VA 22314

PH: 703.838.0030  ■  FAX: 703.838.0454  ■  TTY: 703.838.0459

www.rid.org

education  ■  standards  ■  excellence

RID
Registry of Interpreters for the Deaf, Inc.

private practice interpreters who are listed by certification on RID's Web site. Additionally, the Web site lists businesses and organizations that provide interpreters and will have information on the quality, skills and availability of local interpreters.

## Standard Practices – Generally Applicable

Upon accepting a legal assignment, the legal interpreter will conduct an analysis with respect to the communication needs that exist and make recommendations accordingly. These recommendations will focus on a number of factors that impact communication between deaf and non-deaf individuals. These factors may impact the number of interpreters required, positioning of the interpreters and turn-taking. Recommendations will be based upon principles developed by the profession, the courts, legislators, administrators and a rich body of case law regarding language interpreting in legal settings.

## Staffing a Legal Matter

At a minimum, two interpreters are typically required for most legal assignments. Because legal assignments are generally more complex, interpreters often work in teams and relieve each other at predetermined periods.  One interpreter actively interprets while the other interpreter watches to ensure accuracy of the interpretation. The process is alternated at appropriate intervals between the two interpreters.

The Deaf community is diverse, and different deaf people will have different communicative needs which dictate the credentials of the interpreter. Some deaf people have been deaf all their lives and use the natural language of deaf people referred to as American Sign Language (ASL). Other deaf people may have lost their ability to hear after acquiring spoken English and therefore use a system of sign that approximates English. Other deaf people may not have received a formal education and as a result, have only limited capacity in using sign. Long years of experience have demonstrated that native deaf users of ASL are more effective at communicating with this segment of the population than the general practitioner interpreter who can hear. RID awards a generalist certificate for deaf interpreters who have demonstrated proficiency in working with this population. For Certified Deaf Interpreters (CDI), a conditional permit to work in legal settings is also awarded by RID. As a part of the legal interpreter's practice, the interpreter will need time to make an accurate assessment of the communication needs. If specialized communication services are required, the interpreter will inform the hiring party and assist in locating the specialized services.

## Potential Risks

Certain legal assignments, such as law enforcement interpreting, pose great risk for the interpreter who may be called as a witness later to defend their work in the interpreted assignment. As such, additional protections are typically instituted such as video taping the session, using consecutive interpreting principles and providing for the assistance of a credentialed deaf interpreter.

## Preparation

The interpreter is ethically obligated to prepare for all assignments, particularly legal and court assignments. To that end, interpreters will contact counsel or the hiring party and request to review pertinent documents to prepare to interpret accurately. Because interpreters are necessary for communication, sharing preparatory materials with them does not breach the attorney-client privilege. Interpreters are governed by strict rules regarding confidentiality and will not reveal information learned on an assignment, absent a court order or other legal mandate.

## Conflicts & Ethics

Based upon the preparation, the interpreter will analyze his or her compatibility with the assignment and determine the existence of any conflicts of interest. A variety of conflicts might prohibit the interpreter from accepting an assignment. The interpreter might have personal knowledge about the matter or the parties; may have previously interpreted in a phase of the case such as the interrogation, which would prohibit the interpreter from accepting the proceedings work; or because of the topic of the mat-

STANDARD PRACTICE PAPER

STANDARD PRACTICE PAPER

ter, the interpreter may be ethically inclined not to accept the work.

Ethically, interpreters are not permitted to take an active role in any assignment; however, prior to or after interpreting, legal interpreters may provide guidance and referrals on relevant issues.   Interpreters do not add, omit, edit or participate in the substance of an interpreted conversation outside necessary communications to manage the interpreting process.

### Standard Practices – Court Interpreting

In addition to many of the issues just discussed, court interpreters have additional constraints on their work. Characterized by on-the-record proceedings, court interpreting is a highly specialized subset of legal interpreting. As officers of the court, interpreters are experts who assist the court in defining its interpreting needs.  Court interpreters have specific duties prior to interpreting the official proceedings. Court interpreters may participate in limited ways in a legal proceeding, for example to take the oath to interpret accurately, to present their qualifications for the record, to respond to a challenge to the accuracy of the interpretation, to inform the court of an error and to seek permission to ask the witness for repetition or clarification.

In a typical court setting, the bulk of the communication is handled by two sworn proceedings interpreters who work together. These interpreters interpret all of the proceedings including all witness testimony. If one of the parties is deaf, a third interpreter will sit at counsel table as a member of the litigation team, interpret privileged communications between counsel and client and monitor the two proceedings interpreters for accuracy. This monitoring function enables counsel to interpose objections to the interpretation immediately to preserve the right to appeal based on a faulty interpretation.

The roles of the interpreter at the table and the proceedings interpreters are not adversarial. The interpreter at the table is a member of the team and an agent of the attorney. The proceedings interpreters are officers of the court. Both sets of interpreters are governed by the NAD-RID Code of Professional Conduct. In addition, the interpreters interpreting the proceedings are generally governed by the court interpreter's code of conduct in the respective state.

This configuration is typical, though in certain cases more interpreters might be required.  For example, both sides and even the court may decide to retain separate interpreters to prepare their deaf witnesses and to monitor the work of the proceedings interpreters. As mentioned, the parties might not be fluent in ASL or use a non-standard variety of sign language necessitating a specialist interpreting team of credentialed deaf interpreters. As a result, no one rule can be set forth regarding the number of interpreters required for a court assignment. The court interpreter will assess the particular assignment and provide advice and direction regarding the proper working conditions.

---

### RESOURCES:

[1]Many states have statutes defining legal interpreting and listing the settings which are considered legal assignments under the statute. Typically, those statutes will also list the qualifications required by the state to be qualified to work in those settings. The reader is referred to their specific state statutes and to a list compiled by the National Association of the Deaf and available at http://www.nad.org/site/pp.asp?c=foINKQMBF&b=180366.

[2]The interpreter in a law enforcement setting may be required to later testify about the interpreting assignment; whereas, the interpreter working in an attorney-client conference cannot, absent waiver of the privilege, be forced to testify about the interpreting assignment.

[3]Attorneys and courts have independent obligations to locate and pay for qualified interpreters under the ADA.  For specific information on these obligations, the reader is referred to http://www.nad.org/legalservices and to http://www.nad.org/government.

[4]29 C.F.R. Part 25.104 (1992).

[5]The NAD-RID Code of Professional Conduct is available online at the RID Web site: www.rid.org.

[6]The RID Web site (www.rid.org) lists the variety of certifications available currently and historically. The site also explains the various combinations of credentials and experience that qualify an interpreter to sit for each examination.

[7]See "New Study on Fatigue Confirms Need for Interpreting in Teams," available at http://www.najit.proteus/back_issues/vidal2.htm.

[8]See National Center for State Courts, Code of Professional Responsibility for Interpreters in the Judiciary available online at www.ncsconline.org.

[9]Court interpreters are often referred to as proceedings interpreters.

[10]See National Center for State Courts, Code of Professional Responsibility for Interpreters in the Judiciary available online at www.ncsconline.org.

© Copyright 2000 Registry of Interpreters for the Deaf, Inc.  Written by the Professional Standards Committee, 1993-1995.  REV 5/00, Updated 2007.

# EXHIBIT C

# TEAM INTERPRETING

**STANDARD PRACTICE PAPER**

> *The Registry of Interpreters for the Deaf, Inc., (RID) Standard Practice Paper (SPP) provides a framework of basic, respectable standards for RID members' professional work and conduct with consumers. This paper also provides specific information about the practice setting. This document is intended to raise awareness, educate, guide and encourage sound basic methods of professional practice. The SPP should be considered by members in arriving at an appropriate course of action with respect to their practice and professional conduct.*
>
> *It is hoped that the standards will promote commitment to the pursuit of excellence in the practice of interpreting and be used for public distribution and advocacy.*

## About Team Interpreting

Team interpreting is the utilization of two or more interpreters who support each other to meet the needs of a particular communication situation. Depending on both the needs of the participants and agreement between the interpreters, responsibilities of the individual team members can be rotated and feedback may be exchanged.

The decision to use a team rather than an individual interpreter is based on a number of factors, including, but not limited to:
- length and/or complexity of the assignment,
- unique needs of the persons being served,
- physical and emotional dynamics of the setting,
- avoidance of repetitive stress injuries (RSIs) for interpreters.

An interpreter who is hearing may sometimes team with an interpreter who is deaf, called a certified deaf interpreter (CDI). (See CDI Standard Practice Paper for additional information.)

## The Team Process

All team members are actively engaged in the process. They may be providing direct interpretation services, actively working between the two languages or functioning in a supporting role. This support is necessary to enhance the team's performance and assure accurate communication takes place and may include:
- monitoring the overall setting
- assuring appropriate and timely transitions
- supporting/cueing other team members as needed.

At times, more than one team of interpreters may be needed. Some factors determining the number of interpreters needed are:
- size of the audience
- setting
- communication preferences of presenter(s) and audience type and interactivity of presentation
- special communication needs of those in attendance (including, but not limited to, the need for tactile, oral or close visual range interpretation)
- dynamics of the scheduled events (concurrent sessions, off site tours, etc.)

---

education ■ standards ■ excellence

333 Commerce Street  ■  Alexandria, VA 22314

PH: 703.838.0030  ■  FAX: 703.838.0454  ■  TTY: 703.838.0459

www.rid.org

**RID**
Registry of Interpreters for the Deaf, Inc.

STANDARD PRACTICE PAPER

When two or more interpreters are working together, the team will need a sufficient amount of time prior to the assignment to determine placement, roles and how to provide support to each other. Settings where teams work can include, but are not limited to, post-secondary education, ceremonies, lectures, workshops, staff meetings and employee orientations, adversarial hearings and performing arts.

RID believes that through teaming, all consumers can receive optimum communication because each team member can function at their best.

RESOURCE:

www.dlr-consulting.ca/team.htm

© Copyright 1997 the Registry of Interpreters for the Deaf.  Written by the Professional Standards Committee, 1993-1995.  REV 8/97, Updated 2007.

# EXHIBIT F



**STANDARD
PRACTICE
PAPER**

**USE OF A CERTIFIED
DEAF INTERPRETER**

RID encourages use of
these papers for public
distribution and advo-
cacy.

Registry of Interpreters
for the Deaf
333 Commerce Street
Alexandria, VA 22314
703/838-0030 (V)
703/838-0459 (TTY)
703/838-0454 (Fax)
www.rid.org

# USE OF A CERTIFIED DEAF INTERPRETER

**About the CDI**
A Certified Deaf Interpreter (CDI) is an individual who is deaf or hard of hearing and has been
certified by the Registry of Interpreters for the Deaf as an interpreter.

**Specialized training and/or experience**
In addition to excellent general communication skills and general interpreter training, the CDI
may also have specialized training and/or experience in use of gesture, mime, props, drawings
and other tools to enhance communication.The CDI has an extensive knowledge and under-
standing of deafness, the deaf community, and/or Deaf culture which combined with excellent
communication skills, can bring added expertise into both routine and uniquely difficult inter-
preting situations.

**Meeting special communication challenges**
A Certified Deaf Interpreter may be needed when the communication mode of a deaf consumer
is so unique that it cannot be adequately accessed by interpreters who are hearing. Some such
situations may involve individuals who:

- ■ use idiosyncratic non-standard signs or gestures such as those commonly referred to as
  "home signs" which are unique to a family

- ■ use a foreign sign language

- ■ have minimal or limited communication skills

- ■ are deaf-blind or deaf with limited vision

- ■ use signs particular to a given region, ethnic or age group

- ■ have characteristics reflective of Deaf Culture not familiar to hearing interpreters.

## The CDI at Work
**As a team member**
Often a Certified Deaf Interpreter works as a team member with a certified interpreter who is
hearing. In some situations, a CDI/hearing interpreter team can communicate more effectively
than a hearing interpreter alone or a team of two hearing interpreters or a CDI alone. In the
CDI/hearing interpreter team situation, the CDI transmits message content between a deaf con-
sumer and a hearing interpreter; the hearing interpreter transmits message content between the
CDI and a hearing consumer. While this process resembles a message relay, it is more than that.
Each interpreter receives the message in one communication mode (or language), processes it
linguistically and culturally, then passes it on in the appropriate communication mode. In even
more challenging situations, the CDI and hearing interpreter may work together to understand a
deaf individual's message, confer with each other to arrive at their best interpretation, then con-
vey that interpretation to the hearing party.

**For Deaf-Blind individuals**
When a consumer who is deaf-blind is involved, the CDI may receive a speaker's message visual-
ly, then relay it to the deaf-blind individual through the sense of touch or at close visual range.
This process is not a simple relay in which the CDI sees the signs and copies them for the per-
son who is deaf-blind. The CDI processes the message, then transmits it in the mode most easily
understood by the individual who is deaf-blind.

**Solo**
The CDI sometimes works as the sole interpreter in a situation. In these instances, the CDI may
use sign language or other communication modes that are effective with a particular deaf indi-
vidual; and may use, with the hearing consumer, a combination of speech, speech reading, resid-
ual hearing, and written communication.

**On the platform**
The CDI sometimes functions as interpreter before an audience. This may involve the CDI watch-
ing a hearing interpreter and restating the message to the audience in a different sign mode. At

other times, the CDI may be in front of the audience to "mirror" comments or questions from a signing member of the audience so that the rest of the audience can see them.

**Benefits** of using a Certified Deaf Interpreter are:

- optimal understanding by all parties

- efficient use of time and resources

- clarification of linguistic and/or cultural confusion and misunderstanding(s)

- arrival at a clear conclusion in the interpreting situation.

**The Association believes** that when use of a Certified Deaf Interpreter (CDI) is appropriate, the CDI and a certified interpreter who is hearing can function as a highly effective team to provide quality communication access for everyone involved.

© Copyright 1997 the Registry of Interpreters for the Deaf. Written by the Professional Standards Committee, 1995-1997.    REV8/97

# EXHIBIT G

## Hearing Impairments

## Hearing Impairment Definition

- Persons with hearing impairments include people who are either hard of hearing or deaf.
- Hard of hearing refers to a hearing loss, from mild to severe.
- Deaf refers to a profound hearing loss. Persons are considered "deaf" if their hearing loss is such that they are unable to understand speech and must rely on vision for communication.

## Hearing Impairments and Reasonable Accommodations

There are four main ways of communicating with the hearing impaired.

1) Hearing Aids
2) Lip reading
3) Exchange of written notes
4) Sign Language Interpreter

## Accommodations for Hearing Impairments

- Sign language interpreters
- ADA trained Panel attorney
- Assistive hearing device
- Real time captioning
- Exchange of written notes
- Oral interpreting
- Tactile interpreting
- Intermediary interpreting

## CONCLUSION

Goals:
- To provide equal access for qualified disabled inmates for all BPH Parole Proceedings.
- To provide and ensure effective communication for each inmate for all BPH Parole Proceedings.
- Protect the due process rights of all inmates.

# EXHIBIT H

# COURT ACCESS
## for Individuals Who Are Deaf and Hard of Hearing

A GUIDE





AMERICAN BAR ASSOCIATION

**Commission on Disability Rights**

# ACKNOWLEDGEMENTS

The Commission conveys its gratitude to the American Bar Association (ABA) for funding this guide with a grant from the ABA Enterprise Fund, and to the many individuals who contributed to the development of the guide. We express our deepest appreciation to the National Association of the Deaf (NAD), in particular Howard A. Rosenblum, Esq., NAD's Chief Executive Officer, for his counsel, support, and expertise, as well as members of NAD's legal team—Marc Charmatz, Debra Patkin, Andrew Phillips, and Caroline Jackson.

We also express our appreciation to the members of the Advisory Committee and Roundtable identified below. Their comprehensive review of the guide, comments, and contributions were invaluable.

# ADVISORY COMMITTEE

**Karen Aguilar, MJ**
*Director*
Chicago Hearing Society
Chicago, IL

**Honorable Richard S. Brown**
State of Wisconsin Court
of Appeals, District II
Waukesha, WI

**Carmel A. Capati, J.D.**
*Manager*
Wisconsin Court Interpreter
Program
Director of State Courts
Office of Court Operations
Madison, WI

**Andrea L. Ciobanu, MPA, J.D.**
Ciobanu Law, P.C.
Indianapolis, IN

**Kristi Cruz**
*Staff Attorney–ASL Specialist*
Northwest Justice Project
Seattle, WA

**Ervin Dimeny, J.D.**
*Manager*
Court Interpreting Services
Administrative Office of
the Courts
Frankfort, KY

**Joan M. Durocher, Esq.**
*General Counsel & Director
of Policy*
National Council on
Disability
Washington, DC

**Alexis A. Kashar, Esq.**
*General Counsel*
Krown Manufacturing
Scarsdale, NY

**Bob Lichtenberg, J.D.**
*Language Access Program
Coordinator*
Office of Court Innovation
Washington State
Administrative Office of the
Courts
Olympia, WA

**Paul M. Lurie, Esq.**
*Partner*
Schiff Hardin LLP
Chicago, IL

**Kelly Mills**
*Program Manager*
Court Interpreter Services
Oregon Judicial Department
Salem, OR

**Deborah Perluss, Esq.**
*Director of Advocacy/
General Counsel*
Northwest Justice Project
Seattle, WA

**James W. Plunkett, III**
*Coordinator*
Office of Court Interpreting
Services & Language Access
Program
District of Columbia Courts
Washington, DC

**Jeff Rosen, J.D.**
*General Counsel*
CSDVRS, LLC
Clearwater, FL

**Mara Simmons**
*Court Interpreter Services
Director*
Administrative Office of
the Courts
Arkansas Judiciary
Little Rock, AR

ii

# ROUNDTABLE

**Administrative Office of United States Court (AOUSC)**
Jane MacCracken
Javier Soler

**American Bar Association (ABA) Judicial Division**
Honorable Judge Judith S. Boggs
Honorable Judge Mary E. Henry

**American Speech-Language-Hearing Association (ASHA)**
Karen Beverly Ducker
Pam Mason

**Conference of Court Public Information Officers (CCPIO)**
Leah Gurowitz

**Conference of State Court Administrators (COSCA)**
Steven D. Canterbury

**Federal Judicial Center (FJC)**
Deena Smith

**National Association of ADA Coordinators (NAADAC)**
L. Irene Bowen

**National Association of Judiciary Interpreters and Translators (NAJIT)**
Esther M. Navarro-Hall

**National Association of State Judicial Educators (NASJE)**
Kelly Tait

**National Association of Women Judges (NAWJ)**
Honorable Judge Toni E. Clarke

**National Center for State Courts (NCSC)**
Konstantina (Tina) Vagenas

**National Conference of Bar Presidents (NCBP)**
Darrell G. Mottley

**National Court Reporters Association (NCRA)**
Adam Finkel

**National Judicial College (NJC)**
Honorable Judge Toni E. Clarke

**Registry of Interpreters for the Deaf (RID)**
Matthew O'Hara
Julie Anne Schafer
Carla Mathers

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II.    DEAF AND HARD OF HEARING INDIVIDUALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Identification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III.   THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.   Effective Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

IV.   AUXILIARY AIDS AND SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

     A.   The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

         1.   Primary Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

         2.   Federal Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

     B.   Categories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

         1.   Interpreters & Transliterators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

             a.   Types. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

                i.   Sign Language Interpreters/Transliterators . . . . . . . . . . . . . . . . . . . .14

                ii.   Certified Deaf Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

                iii.   Tactile and Close-Vision Interpreters . . . . . . . . . . . . . . . . . . . . . . . .16

                iv.   Oral Transliterators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

                v.   Cued Speech Transliterators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

             b.   Modes of Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

             c.   Video Remote Interpreting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

             d.   Legal Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

             e.   In Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

         2.   Communication Access Realtime Translation (CART) . . . . . . . . . . . . . . . . .24

         3.   Assistive Listening Systems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

             a.   Types. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

                i.   FM Systems. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

                ii.   Infrared Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

                iii.   Induction Loops . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

         4.   Telephone and Video Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

V.   INDIVIDUALS WHO ARE DEAF OR HARD OF HEARING IN COURT . . . . . . . . . . . . . . 31
     A.  The Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31
     B.  Participants & Auxiliary Aids and Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

VI.  BEST PRACTICES CHECKLISTS FOR ENSURING EFFECTIVE COMMUNICATION . . 35
     A.  State Court Administrative Office (SCAO) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .35
     B.  Local Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
     C.  Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
          1.  Before the Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
          2.  At the Start of the Hearing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38
          3.  During the Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39
     D.  ADA/Section 504 Coordinators. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41
     E.  Parties, Witness, Jurors Who Are Deaf or Hard of Hearing. . . . . . . . . . . . . . . . . .42
     F.  Lawyers Representing Individuals Who Are Deaf or Hard of Hearing . . . . . . . . . .43
     G.  Service Providers (Interpreters, CART captioner, etc.) . . . . . . . . . . . . . . . . . . . . . .44

VII. APPENDICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
     A.  Appendix A
         Understanding the Needs of the Person Who Is Deaf or Hard of Hearing . . . . . . . .47
     B.  Appendix B
         General Principles to Keep in Mind Regarding Persons Who Are Deaf or
         Hard of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .48
     C.  Appendix C
         Sample Interpreter's Oath. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .49
     D.  Appendix D
         Assessing Court Interpreter Qualifications: Sample Voir Dire . . . . . . . . . . . . . . . . .50
     E.  Appendix E
         Sample Judge's Instruction: Interpreter's Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52
     F.  Appendix F
         Sample Judge's Instruction to Witness: Interpreter's Role . . . . . . . . . . . . . . . . . . . .53
     G.  Appendix G
         Sample Judge's Instruction to Jurors When Juror Is Deaf or Hard of Hearing:
         Interpreter's Role . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54



I.

# INTRODUCTION

Full and equal access to the courts is a fundamental right under the U.S. Constitution.[1] To effectuate that right, each participant in a court proceeding must be able to effectively communicate, that is to understand what is being communicated, to respond, and to be understood when responding. This includes criminal defendants, civil litigants, witnesses, jurors, prospective jurors, lawyers, judges, and spectators, among others. Yet individuals who are deaf or hard of hearing continue to encounter communication barriers that deny them an opportunity to participate fully in the judical process.

This guide has been developed to serve as a resource for courts, court administrators and other personnel, judges, lawyers, and auxiliary aids and services providers to help ensure that individuals who are deaf or hard of hearing receive equal access to all that occurs in federal, state, and local courts across the country. The guide begins with a discussion of the terms deaf or hard of hearing individuals use to identify themselves. This is followed by an overview of the legal rights of deaf and hard of hearing court participants under the Americans with Disabilities Act (ADA), the Rehabilitation Act Section 504, and the Court Interpreters Act. An examination of the various types of auxiliary aids and services that enable deaf and hard of hearing court participants to communicate effectively follows. The guide concludes with recommended best practices for state court administrative offices, local courts, judges, ADA/Section 504 coordinators, deaf and hard of hearing court participants, lawyers, and service providers to ensure effective communication.

The American Bar Association (ABA) has policy that addresses accessibility of courthouses and court proceeding for persons with disabilities. In 1997, the ABA House of Delegates adopted a resolution recommending that "all courts be provided with qualified language interpreters, including sign language interpreters, in order that parties and witnesses with no or limited command of English and those who are deaf or hearing-impaired may fully and fairly participate in court proceedings."[2] In 2002, the House adopted a resolution urging "all federal, state, territorial, and municipal courts to help ensure equal justice by making courthouses and court proceedings accessible to individuals with disabilities, including lawyers, judges, jurors, litigants, court employees, witnesses, and observers."[3]

---

[1]    *Tennessee v. Lane*, 541 U.S. 509 (2004).
[2]    AMERICAN BAR ASSOCIATION, RESOLUTION 109 (Aug. 1997), http://www.americanbar.org/content/dam/aba/directories/policy/1997_am_109.authcheckdam.pdf.
[3]    American Bar Association, Resolution 112 (Feb. 2002), http://www.americanbar.org/content/dam/aba/directories/policy/2002_my_112.authcheckdam.pdf.



II.

# DEAF AND HARD OF HEARING INDIVIDUALS

It is estimated that between 22 and 48 million Americans are deaf or hard of hearing.[1] Yet fewer than 20 percent of individuals with hearing loss seek professional help due to a variety of reasons, including denial or stigma. In fact, adults with mild to moderate hearing loss are least likely to seek treatment.

Individuals who are deaf or hard of hearing make up a very diverse community with varying levels of hearing, age of onset, cultural identities, and communication methods. Some are born deaf or hard of hearing, while others become deaf or hard of hearing later in life. Some communicate using American Sign Language (ASL), while others speak, speechread (also referred to as lip-read), use cued speech, and/or hear with hearing aids or cochlear implants. Others attempt to "get by" with what hearing they have.

## IDENTIFICATION

Persons who are deaf or hard of hearing identify themselves by different terms that may reflect the degree to which they hear, the age of onset, or the community to which they belong. These terms include "deaf," "hard of hearing," "late-deafened," "oral deaf," or "deaf-blind." For purposes of this guide, all such individuals will be collectively referred to as deaf or hard of hearing.

Deafness can be defined either audiologically or culturally. Every person, regardless of his or her specific level of hearing, has multiple means of communication rather than one specific mode. For purposes of access to the courts, it is critical to identify the optimal means of communication to ensure that justice is served.

> "It is estimated that between 22 and 48 million Americans are deaf or hard of hearing."

The term "deaf" (with the lowercase "d") refers to the audiologic condition of not being able to hear. Onset can occur at birth or at any time in one's life. The term typically signifies a person who has moderately severe to profound or total hearing loss. A deaf person may or may not use sign language such as ASL, and may speak, speechread, use cued speech, or use written/typed communication.

---

[1] Jamie Berke, Hearing Loss – Demographics – Deafness Statistics, http://deafness.about.com/cs/earbasics/a/demographics.htm (June 18, 2014). *See also* Frank R. Lin, John K. Niparko & Luigi Ferrucci, *Hearing Loss Prevalence in the United States*, 171(20) Jama Arch. Intern. Med. 1851-53 (Nov. 14, 2011) (estimating for 2001-08 that more than 48 million Americans over the age of twelve are deaf or hard of hearing).

By contrast, the term "Deaf" (with the uppercase "D") refers to individuals who are part of the culturally Deaf community, and use sign language as the primary means of communication. That community has its own history, values, social beliefs, behavioral norms, and practices. Many Deaf individuals' first or primary language is ASL, not English. ASL has its own vocabulary and grammar that differs from English.

"Hard of hearing" typically describes a person who has mild-to-moderate hearing loss. He or she may not have sought treatment for the hearing loss. The onset of this level of hearing loss can occur early or later in life.

A number of factors contribute to hearing loss in adults. These include age, genetics, exposure to noise, and chronic diseases such as diabetes, kidney, and heart disease. One of the first indications of hearing loss is an inability to hear and understand speech in noisy or acoustically poor environments. Hearing loss becomes more common as we age. Age-related hearing loss is generally a slow progressive process that affects both ears equally.

> **Persons who are deaf or hard of hearing identify themselves by different terms that may reflect the degree to which they hear, the age of onset, or the community to which they belong.**

Because many individuals who are hard of hearing individuals grew up in the hearing world and are or were able to speak, they often depend on spoken and/or written language. They typically speak and may use speechreading to supplement their hearing. Many use hearing aids. Some use additional hearing assistive technology systems (HATS), such as hearing loops and FM and infrared systems, to help with understanding speech. Some learn and use ASL or signed English, a form of sign language based on English that uses English syntax. Others use cued speech—a visual communication system that uses handshapes in combination with mouth movements of speech—as a method to reduce variability with speechreading alone.

"Late-deafened" generally describes individuals who grew up with a standard level of hearing and acquired language and speech skills before becoming deaf in adolescence or beyond. Late-deafened may occur suddenly or gradually as a result of genetics, an accident, illness, medication, surgery, or other factors. These individuals usually understand written language and rely on visual representations of English to communicate. They may learn to sign, typically in signed English, and possibly in ASL as well. Many use speechreading, hearing aids or cochlear implants, HATS, written/typed communication, and other forms of communication.

"Oral deaf" describes a deaf person whose preferred mode of communication is verbal and auditory. Many of these individuals are taught to speechread. Those who grew up in the United States typically use English as their first language. Oral deaf individuals may use hearing aids when possible and/or HATS.

"Deaf-Blind" individuals vary in the type, degree, and age of onset of vision and hearing loss they experience. There are between 70,000 and 100,000 deaf-blind individuals in the United States.[2] Their modes of communications depend on their level of vision and hearing. For instance, a deaf individual who has low vision may use ASL or signed English, but may need to see the signing at close range. A blind individual who is hard of hearing may rely more on hearing aids or cochlear implants to hear what is being said. Persons who are deaf and blind may use their hands to read braille or to "feel sign language" by resting their hands on the signing person's hands and tracking their handshapes and movements (referred to as tactile signing).

---

2    Letter from National Association of Regulatory Utility Commissions (NARUC) to the Honorable John D. Rockefeller, Chairman, Senate Committee on Commerce, Science and Transportation and to the Honorable Kay Bailey Huchison, Ranking Member, Senate Committee on Commerce, Science and Transportation (July 13, 2010).



III.

# THE LAW

Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[1] A "public entity" includes "any . . . instrumentality of a State or States or local government."[2] Because courts are components of either a state or local government, they are public entities, and therefore must ensure that their services, programs, and activities are accessible to people with disabilities.

Section 504 of the Rehabilitation Act (Section 504) prohibits any program or activity receiving federal financial assistance, or conducted by any Executive agency or the U.S. Postal Service, from excluding participation by, denying benefits to, or discriminating against a qualified individual with a disability solely because of a disability.[3] A "program or activity" covers all the operations of "a department, agency, special purpose district, or other instrumentality of a State or of a local government."[4] The Act applies to state and local courts that receive federal financial assistance and requires those recipients to ensure communications access for persons with disabilities.

Both the ADA and Section 504 apply to any type of state or local court proceeding, including civil, criminal, traffic, small claims, domestic relations, probate, juvenile, family, and other specialized courts. The application of these federal laws extends to programs and services conducted or offered by court systems, including interactions with court personnel, educational activities, and marriage ceremonies performed by court personnel or magistrates acting in their capacity as government officials. Neither the ADA nor Section 504 apply to federal courts.[5]

Federal courts are governed by the Court Interpreters Act of 1978 and judicial poli-

> "Both the ADA and Section 504 apply to any type of state or local court proceeding, including civil, criminal, traffic, small claims, domestic relations, probate, juvenile, family, and other specialized courts."

---

1    42 U.S.C. § 12132.
2    *Id.* § 12131(1)(B).
3    29 U.S.C. § 794(a).
4    *Id.* § 794(b)(1)(A).
5    42 U.S.C. § 12131(1)(B); 29 U.S.C. § 794(b)(1)(A).

cy. Under the Act, a certified interpreter (or otherwise qualified interpreter if no certified interpreter is available) must be appointed at court expense in judicial proceedings instituted by the United States if the presiding judicial officer determines that a hearing impairment inhibits a party's (includes a defendant in a criminal case) comprehension of the proceedings or communications with counsel or the presiding judicial officer, or a witness's comprehension of questions and presentation of testimony.[6] A "presiding judicial officer" is any judge of a U.S. district court and includes bankruptcy judges, magistrate judges, and U.S. attorneys with respect to grand jury proceedings.[7] If the presiding judicial officer determines that a party, witness, or other participant in a judicial proceeding has a hearing impairment, the Act permits the appointment, at court expense, of a certified or otherwise qualified sign language interpreter—whether or not the proceeding is instituted by the United States.[8] As adopted in September 1995, the official federal policy of the Judicial Conference of the Administrative Office of the United States Courts requires all federal courts to "provide reasonable accommodations to persons with communications disabilities."[9]

Many states have laws, regulations, and court rules that specifically require the provision of services to enable access for qualified persons with disabilities who are participating in court activities. For example, the California Rules of Court state: "It is the policy of the courts of this state to ensure that persons with disabilities have equal and full access to the judicial system."[10] Florida's Rule of Judicial Administration 2.540 provides: "Qualified individuals with a disability will be provided, at the court's expense, with accommodations, reasonable modifications to rules, policies, or practices, or the provision of auxiliary aids and services, in order to participate in programs or activities provided by the courts of this state."[11] The court may deny a request only if it determines that the "requested accommodation would create an undue financial or administrative burden on the court or would fundamentally alter the nature of the service, program, or activity.[12]

## EFFECTIVE COMMUNICATION

The U.S. Department of Justice (DOJ) has issued regulations to enforce Title II of the ADA.[13] State and local governments must "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others,"[14] unless doing so would fundamentally alter the nature of the service, program, or activity or result in undue financial and administrative burdens.[15] In other words, "whatever is written or spoken must be as clear and understandable to people with disabilities as it is for people who do not have disabilities."[16] This

---

6    28 U.S.C. § 1827(d)(1)(A), (B) (2006).

7    *Id.* § 1827(i).

8    *Id.* § 1827(l).

9    Report of the Proceedings of the Judicial Conference of the United States 13-14 (Mar. 12, 1996).

10   Cal. Rules of Court, Rule 1.100(b) (2007).

11   Fla. R. Jud. Admin., Rule 2.540(a) (2010).

12   *Id.* at Rule 2.540(e)(3).

13   28 C.F.R. pt. 35.

14   28 C.F.R. § 35.160(a)(1) (2005).

15   *Id.* § 35.164.

16   Department of Justice, Civil Rights Division, ADA Best Practices Tool Kit for State and Local Governments Under Title II of the ADA, Ch. 3, General Effective Communication Requirements Under Title II of the ADA 1 (2007), *available at* www.ada.gov/pcatoolkit/chap3toolkit.htm.

requirement is referred to as "effective communication." Its purpose is to ensure that individuals with disabilities can receive information from, and convey information to, the public entity. Courts must ensure that a person who is deaf or hard of hearing can both understand what is being said in the proceeding and make himself or herself understood. Providing summaries of what happened during or after the proceeding is not sufficient under the ADA.

Under Title II, deferral programs that are intended as an alternative to incarceration, as well as other court-ordered treatment programs, must provide effective communication. Accordingly, state and local courts should only refer individuals with disabilities to programs that provide effective communication and must ensure that they have the same access to all programs offered to non-disabled individuals.[17]

> *Courts must ensure that a person who is deaf or hard of hearing can both understand what is being said in the proceeding and make himself or herself understood.*

Many state laws, regulations, and court rules contain provisions requiring communications access in the courts for persons who have hearing impairments as well as those who cannot readily understand or communicate using the spoken English language.[18] For example, in its statute on the appointment of interpreters for individuals who are deaf or hard of hearing individuals, the Colorado General Assembly declared:

> [I]t is the policy of this state to secure the rights of persons who are deaf or hard of hearing and cannot readily hear or understand or communicate in spoken language and who consequently cannot equally participate in or benefit from proceedings of the courts or any board, commission, agency, or licensing or law enforcement authority of the state unless qualified interpreters or auxiliary services are available to assist them.[19]

Alabama requires courts to appoint a qualified interpreter for a deaf or hard of hearing person who is a complainant, defendant, or witness to interpret the proceeding and his or her testimony or statements and to assist in preparation with counsel.[20] Many of the same underlying issues that apply to create accommodations for deaf and hard of hearing persons also apply to persons with Limited English Proficiency.[21]

---

17  28 C.F.R. pt. 35, Section-by-Section Analysis, *Subpart E—Communications.*
18  *See, e.g.,* Ky. Rev. Stat. § 30A.410 (2015); Md. Code, Courts and Judicial Proceedings, § 9-114 (2012); Wis. Stat. Ann. § 885.38 (2007).
19  Colo. Rev. Stat. Ann. § 13-90-201 (2009).
20  Ala. Code 1975 § 12-21-131(c) (2013).
21  *See ABA Standards for Language Access in Courts* (Feb. 2012), *available at* http://www.americanbar.org/groups/legal_aid_indigent_defendants/initiatives/language_access.html.



IV.

# AUXILIARY AIDS AND SERVICES

Auxiliary aids and services for persons who are deaf or hard of hearing are effective methods of making aurally delivered information available to them, and include but are not limited to:

- Qualified interpreters (on-site or through video remote interpreting services)
- Notetakers
- Communication Access Realtime Translation (CART)
- Written materials
- Assistive listening devices
- Assistive listening systems
- Text telephones (TTY)
- Telecommunications relay services (TRS) or video relay services (VRS)[1]

The type of aids and/or services that are necessary to ensure effective communication will vary based on "the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."[2] For example, a participant who uses sign language and reads well may request CART, a service that converts speech to text in realtime, during most court hearings, but would require a sign language interpreter for any proceedings where the participant must communicate in court, such as when testifying. For persons who use sign language, qualified sign language interpreters trained in legal procedure and terminology are typically the most effective auxiliary aid or service. For other persons, an oral interpreter may be needed to facilitate speechreading. Amplified or modified sound equipment, a courtroom with appropriate acoustic properties, and/or assistive listening systems may be appropriate auxiliary aids for persons who rely on what hearing they have, aided or unaided by hearing aids or cochlear implants.

## THE LAW

Auxiliary aids and services are devices or services that may assist in the provision of effective communication for individuals with disabilities.[3] Under Section 504, recipients of federal financial assistance that employ 15 or more persons must "provide appropriate auxiliary aids and services to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons in a program or activity receiving Federal financial assistance."[4] Under Section 504, courts must provide qualified interpreters for persons with hearing or speaking impairments, including witnesses for their testimony, in both civil and criminal

---

1   28 C.F.R. § 35.104(1). *See also* 28 C.F.R. pt. 42, subpt. G, § 42.503(f) (Section 504).
2   *Id.* § 35.160(b)(2).
3   28 C.F.R. §§ 35.104, 35.160.
4   28 C.F.R. pt. 42, subpt. G, § 42.503(f).

court proceedings and must pay for those services.[5] Further, where courts appoint counsel for indigent defendants, they must assign qualified interpreters (certified, where possible by recognized certification bodies) to aid communication between the defendant and the attorney for all phases of the preparation and presentation of the case.[6] Some states require interpreters to possess appropriate licensure of certification by recognized bodies.[7] Even where not required, certified interpreters are recommended.

Similarly, pursuant to Title II of the ADA, state and local courts are required to furnish appropriate auxiliary aids and services "where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity,"[8] unless courts can demonstrate that doing so "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."[9] Courts that can so demonstrate "shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the benefits or services provided by the public entity."[10]

An "undue burden" means "significant difficulty or expense relative to the operation of a public entity's program."[11] Only the head of the public entity or his or her designee (no lower than a Department head)—after considering all resources available for use in the funding and operation of the service, program, or activity—can make the decision that the particular aid or service would result in a fundamental alteration or undue burdens.[12] That decision must be accompanied by a written statement of the reasons for reaching that conclusion.[13] Information about the existence and location of accessible services, activities, and facilities must also be provided.[14] "In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability."[15] State and local courts may not charge individuals who are deaf or hard of hearing for the use of an auxiliary aid or service.[16]

## Primary Consideration

A common barrier to communications access is a failure to provide the appropriate type of auxiliary aid or service needed by the particular person who is deaf or hard of hearing. These individuals are most familiar with their disability, and therefore in the best position to determine what type of auxiliary aid or service will be effective. The DOJ regulations require public entities to give "primary consideration" to the request of the individual with

5    45 Fed. Reg. 37,630, 37,631 (June 3, 1980).
6    *Id.* at 37,630.
7    *See, e.g.,* Cal. Evid. Code § 754(f); 32 Me. Rev. Stat. Ann. § 1524-B.
8    28 C.F.R. § 35.160(b)(1).
9    *Id.* § 35.164.
10   *Id.*
11   U.S. Dep't of Justice, ADA Title II Technical Assistance Manual Covering State and Local Government Programs and Services II-4.3200, *available at* http://www.ada.gov/taman2.html#II-4.3200.
12   *Id.*
13   *Id.*
14   *Id.* § 35.163(a).
15   *Id.* § 35.160(b)(2).
16   *Id.* § 35.130(f).

the disability when deciding what auxiliary aid or service is necessary to ensure effective communication.[17] This means that the public entity must honor the person's choice unless it can demonstrate that (1) another equally effective means of communication is available, or (2) use of the chosen means would result in a fundamental alteration in the service, program, or activity or an undue financial and administrative burden.[18] If the person's choice would result in a fundamental alteration or an undue burden, the public entity still must provide an alternative aid or service that provides effective communication if one is available.[19]

> **Public entities are required to give "primary consideration" to the request of the individual with the disability when deciding what auxiliary aid or service is necessary to ensure effective communication.**

Giving "primary consideration" may include taking into account a request for specific interpreters with whom the deaf or hard of hearing participant is comfortable and able to communicate with effectively. Courts should be prepared to consider and contact such interpreters. This is particularly true for individuals who are deaf-blind or deaf with other disabilities, as they have unique communication needs.

The modality of delivering interpreter services is also a factor in the "primary consideration" and "equally effective communication" framework. With the increasing use of video remote interpreting (VRI) services, where the interpreter is in a remote location outside of the courtroom and viewable to the deaf litigant, witness, or juror by way of video screen, courts must consider the deaf individual's ability to effectively communicate through this service and should not require its use where the individual has indicated its ineffectiveness. If a deaf person requests an in-person interpreter, the court should provide one unless it is an undue burden to do so. (*See infra* for discussion of VRI in the courtroom).

## Federal Courts

With regard to federal courts, the Administrative Office of the United States Courts has prepared written guidelines—at the direction of and adopted by the Judicial Conference of the United States in March 1996—requiring each federal court "to provide, at judiciary expense, sign language interpreters or other appropriate auxiliary aids or services to participants in federal court proceedings who are deaf, hearing-impaired, or have other communications

---

17  *Id.;* U.S. Dep't of Justice, ADA Title II Technical Assistance Manual II-7.1100.

18  U.S. Dep't of Justice, ADA Title II Technical Assistance Manual II-7.1100.

19  U.S. Dep't of Justice, Civil Rights Division, Disability Rights Section, Effective Communication 6 (Jan. 2014), *available at* http://www.ada.gov/effective-comm.htm.

disabilities."[20] Court proceedings "include trials, hearings, ceremonies and other public programs or activities conducted by a court."[21]

Federal courts must give primary consideration to a participant's choice of auxiliary aid or service unless another equally effective means of communication is available, or the participant's choice would result in a fundamental alteration in the nature of the court proceeding or an undue financial or administrative burden.[22]

# CATEGORIES

## Interpreters & Transliterators

An interpreter conveys spoken or signed communications from one language to another. In the context of working with individuals who are deaf or hard of hearing, ASL interpreters render information between spoken English and ASL. Trilingual interpreters communicate using ASL, English and a third language, such as Spanish.

A transliterator facilitates communication between spoken language and other methods of communication, including signed English or cued speech or oral English. Transliterators differ from interpreters, who generally receive information in one language and interpret the information into a different language. Cued speech and oral English transliterators are further explained in the section below.

### TYPES

There are different types of interpreters and transliterators to meet the varied needs of deaf and hard of hearing persons.

#### Sign Language Interpreters/Transliterators

Sign language is a visually interactive language that conveys meaning by simultaneously combining shape, orientation and movement of the hands, arms and/or body, and facial expressions. Because sign language interpreting involves using facial expressions and other body movements, judges should not restrict the use of facial grammar and body movements by interpreters or participants who are deaf or hard of hearing. A sign conveys not only a word, but also the equivalent of a tone both contextually and acoustically. There is no one universal sign language throughout the world. Accordingly, a person who is deaf or hard of hearing for whom English is not their native language will need to have an interpreter who is knowledgeable in the sign language he or she uses.

In the United States, most deaf and hard of hearing people who use sign language use either

---

20  Judicial Conference of the U.S., Guide to Judiciary Policies and Procedures, vol. 1, ch. III, pt. H, at 37-39 (Guidelines for Providing Services to the Hearing-Impaired and Other Persons with Communications Disabilities), *available at* http://nad.org/issues/justice/courts/communication-access-federal-courts.
21  *Id.*
22  *Id.*

ASL or a signed variant that more closely tracks the English language. ASL is a visual-gestural language created by the Deaf community that is distinct from English in that it features its own vocabulary, grammar, idioms, and syntax. For example, the ASL version of "Tonight, I ate dinner" is Now+Evening +Dinner+Eat+Finish. Signed forms of English are made up of arbitrary signs and symbols that represent English words. These include Signed Exact English (SEE) and Pidgin Signed English (PSE). SEE involves a virtually verbatim translation of English words and phrases by signs, including signs for letters to fingerspell words for which there are no signs. PSE combines many signs from ASL with a sentence structure closer to English. Highly trained interpreters should be able to effectively provide interpreting services in ASL, SEE, or PSE. Interpreters vary in their skills and ability to match the signing style and level of understanding of each individual who is deaf or hard of hearing.

> *There are different types of interpreters and transliterators to meet the varied needs of deaf and hard of hearing persons.*

The Registry of Interpreters for the Deaf (RID) is the certifying entity for ASL interpreters and offers a number of certifications for interpreters and transliterators, including National Interpreter Certification (NIC) Advanced or Master, Oral Skills Certification, and Specialist Certificate: Legal (SC:L) for legal settings. Some states also use a performance-based interpreter exam to determine which interpreters are qualified to work in legal settings. Texas, for example, requires licensed court interpreters to take a written exam that measures candidates' English comprehension and knowledge of court-related terms, as well as an oral exam that measures interpreting skills and is administered in three parts.[23]

For all court proceedings, effort should be made to secure interpreters possessing SC:L, which demonstrates proficiency not only in generalist interpreting skills, but also in legal interpreting. If an interpreter possessing SC:L is not available, courts should secure interpreters who have professional certification or licensure (e.g., NIC Advanced or Master, Comprehensive Skills Cerificate (CSC), Certification of Interpretation and Certification of Transliteration (CI/CT), National Association of the Deaf Certification: Level V); 80 hours of training for interpreting in legal settings; and experience interpreting in legal settings (particularly where such experience is supervised). RID operates a search function to enable courts to find qualified interpreters in the local area.[24]

Some deaf and hard of hearing people have special needs that a conventional sign language interpreter cannot meet. The two dominant kinds of specialized sign language interpreters are Certified Deaf Interpreters and tactile and close-vision interpreters, which are explained below.

---

23 http://www.txcourts.gov/jbcc/licensed-court-interpreters/exams.aspx.
24 https://myaccount.rid.org/Public/Search/Interpreter.aspx.

## Certified Deaf Interpreters

Some individuals who are deaf or hard of hearing lack fluency in a standard ASL dialect, or have limited familiarity with ASL due to any number of reasons. They may use a foreign sign language, idiosyncratic non-standard signs or gestures recognized by only those who communicate with the individual regularly ("home signs"), or signs particular to a given region, ethnic or age group. Other factors may affect these individuals' ability to communicate in ASL such as delayed language acquisition, minimal or limited communication skills, mental health conditions, substance abuse, learning disabilities, developmental disabilities, cognitive impairments, blindness or limited vision, or limited education.

These individuals may require both a conventional sign language interpreter and a Certified Deaf Interpreter (CDI), sometimes called "relay or intermediary interpreters." CDIs are individuals who are deaf or hard of hearing and have been certified as interpreters by RID. They have excellent communication skills in both ASL and English, as well as extensive knowledge and understanding of being deaf, the Deaf community, and/or Deaf culture. CDIs may also have specialized training and/or experience in the use of gesture, mime, props, drawings, and other tools to enhance communication. They are recommended in situations involving deaf children and victims of crimes, including sexual assault, where there is a need for increased sensitivity.

CDIs work in partnership with a sign language interpreter, who can hear to facilitate communication. "Each interpreter receives the message in one communication mode (or language), processes it linguistically and culturally, then passes it on in the appropriate communication mode."[25] The hearing sign language interpreter typically interprets from spoken English to ASL, and from there, the CDI interprets the ASL message linguistically and culturally in the language or communication mode most readily understood by the individual who is deaf or hard of hearing. That individual communicates information to the CDI, who relays that information in ASL to the hearing sign interpreter, who renders the message into spoken English. This team approach provides the individual who is deaf or hard of hearing with linguistic and cultural access that is as accurate as possible. CDIs who receive a speaker's message visually relay it to the deaf-blind individual through touch or at close visual range.

When using CDIs in a court proceeding, each interpreter should be sworn in separately by the court because CDIs will require the use of a conventional sign language interpreter to convey the oath administered by the court.

Technically, providing CDI services through video remote interpreting (VRI) is not recommended due to the gestural nature of CDI work and the need for exceptionally clear visual communication. However, utilizing a CDI in the courtroom who teams up with a sign language interpreter who is available through VRI may be feasible, as long as the VRI system is functioning reliably and clearly enough to ensure effective communication between the interpreters.

---

25  REGISTRY OF INTERPRETERS FOR THE DEAF, STANDARD PRACTICE PAPER: USE OF A CERTIFIED DEAF INTERPRETER 1 (1997), *available at* https://drive.google.com/file/d/0B3DKvZMfIFLdbXFLVVFsbmRzTVU/view.

## Tactile and Close-Vision Interpreters

Individuals who are deaf or hard of hearing and have little or no functional vision often communicate through a tactile form of sign language, in which information is conveyed through touch. For this mode of communication, the deaf-blind participant and the interpreter must be able to touch hands at all times. The deaf-blind individual's hand is placed lightly on the interpreter's hand to feel the signs or finger spelling. When able to do so (or with the assistance of another interpreter), the interpreter conveys information about the surroundings (e.g., how many people are in the room, where they are seated, what certain people are doing) along with the interpreted message. While tactile forms of ASL, PSE, SEE, and other sign languages tend not to differ substantially from the standard forms, the interpreter must have additional training to convey the information in tactile form.

Individuals who are deaf or hard of hearing with limited vision or a limited visual field may be able to see signs only at a close distance, and therefore require a "close-vision" interpreter. Like a tactile interpreter, a close-vision interpreter uses a standard sign language communication method, but adapts it to fit within the deaf or hard of hearing participant's field of vision. As part of the adaptation, a close-vision interpreter must sit a short distance from the deaf or hard of hearing participant. This distance varies widely based on the individual needs of the participant. Communication will not be effective if the interpreter is positioned incorrectly. VRI is not recommended for close-vision interpreting.

Tracking is another form of close-vision interpreting. It is similar to "tactile" interpreting, but is used with the deaf-blind participant cradling the wrist of the interpreter's dominant signing hand. Tracking allows the deaf-blind participant to focus more on the dominant signing hand. Both tracking and tactile signing require extensive training. Neither can be accomplished through VRI, the nature of which makes it impossible for the interpreter and participant to touch hands.

## Oral Transliterators

Some individuals who are deaf or hard of hearing, including those who have been so since birth, do not know sign language and use spoken language as their primary mode of communication. They can understand verbal communications based on reading the movement of the speaker's lips, a technique called "speechreading" or "lip-reading," and may respond orally. These individuals may supplement speechreading with the use of what hearing they have, with or without hearing aids, cochlear implants, assistive listening systems, or other such devices. However, simply because an individual uses a hearing aid, cochlear implant, or other listening devices does not mean that he or she prefers oral communications.

Certain communication settings do not lend themselves to speechreading. For instance, in a courtroom it is impractical for a person who is deaf or hard of hearing person to speechread due to the many speakers involved, including the attorneys on both sides, witnesses, the judge, the bailiff, and the court clerk. These settings often require the use of an oral transliterator, also called an oral interpreter, who is positioned directly in front of the person who is deaf or hard of hearing and moves his or her lips "to silently replicate what speakers say in an

easy, speechreadable, clear and consistently-visible manner."[26]

Oral transliterators are also used when the speech of a person who is deaf or hard of hearing is difficult to understand or unintelligible to the average listener. Transliterators are specially trained to understand such speech and convey the content, intent, and emotion of the participant's verbal communications to others. This requires strong speechreading skills.[27] Oral transliterators do not edit the content or meaning of the message.[28] They remain true to the individual's intent, integrating facial expressions, body movements, and natural gestures that match the message's intent and support its meaning.[29]

RID offers an oral transliteration certificate, as well as a Specialist Certificate: Legal (SC:L) for legal settings. An oral transliterator is a trained professional. For court purposes, the oral transliterator must be qualified to perform such interpreting functions in a courtroom, which includes being familiar with legal terminology. Oral transliteration can be provided through the same equipment as VRI, provided that it is appropriately positioned and has clear video transmissions.

### Cued Speech Transliterators

Cued speech is a visual mode of communication that uses eight hand shapes in different positions in close proximity to the face, combined with mouth movements of speech, to represent the phonemes (the smallest sound unit in a language that is capable of conveying a distinct meaning), of spoken English. Only five to 26 percent of what is spoken can be speechread. To assist in addressing this challenge, cued speech can be used to signal all sounds in conjunction with speechreading. Users of cued speech are able to both read lips and observe the handshape representing each phoneme.

The national certifying body for cued speech transliterators is the Testing, Evaluation & Certification Unit, Inc. (TECUnit).[30] It establishes and maintains national standards for the profession of cued language transliteration. Becoming a qualified cued speech transliterator requires years of experience, and must be combined with legal training to be qualified to transliterate in a legal setting. Fluency in sign language does not mean that a person is fluent in cued speech or vice versa. This is why specific certification is integral to determining the qualifications of an interpreter or /transliterator.

Cued speech transliteration can be provided through the same equipment as VRI, provided it is appropriately positioned and has clear video transmissions.

### MODES OF INTERPRETATION

It is important to understand that there are different modes of interpretation, including consecutive interpretation, simultaneous interpretation, and sight translation. These modes

---

26  REGISTRY OF INTERPRETERS FOR THE DEAF, STANDARD PRACTICE PAPER, ORAL TRANSLITERATION 1 (2007), *available at* https://drive.google.com/file/d/0B3DKvZMfIFLdRjdralozSG1iSG8/view.
27  *Id.*
28  *Id.* at 2.
29  *Id.*
30  http://www.tecunit.org.

vary according to the role of the deaf individual in a legal proceeding and the pace of the proceeding.

Consecutive interpretation is recommended when a deaf individual is actively engaged in communications during a legal proceeding. With this mode of interpretation, the interpreter renders an interpretation only after the individual finishes communicating. Interpreters often take notes to aid in recollection. However, when the individual's communication is too long for the interpreter to recall, the interpreter will signal the speaker to pause to permit a consecutive interpretation up to that point. Consecutive interpretation is the primary method used by Certified Deaf Interpreters (CDIs) in circumstances where a deaf party is participating in the legal proceeding as a witness or as part of a conversation.

> *There are different modes of interpretation, including consecutive interpretation, simultaneous interpretation, and sight translation.*

Simultaneous interpretation is recommended for most situations where the deaf individual is observing what is occuring in the legal proceeding and not actively engaged as a witness or in a conversation. This interpretation mode involves interpreting continuously at the same time the individual is communicating. The individual does not pause or stop communicating for the intepreter. The majority of court interpreting is simultaneous. Everything communicated by the judge, counsel, jurors, and witnesses during the proceeding is interpreted simultaneously. When a deaf individual in a legal proceeding requires a CDI, simultaneous intepreting may only be appropriate for those portions where the deaf individual is not expected to participate as a witness.

Sight translation is recommended where a deaf individual is testifying or otherwise responding to questions and is expected to respond on a matter regarding a document but may not be fluent in the written language of the document. In such situations, translation of the document into ASL may be necessary. Sight translation is a hybrid form of interpreting and translating. The interpreter provides an oral translation of a document. The interpreter may not have advance notice of the document and need only be given a brief time to examine it.

## VIDEO REMOTE INTERPRETING

Intepeter services can be delivered in person or remotely. As previously mentioned, the DOJ regulations implementing Title II include qualified interpreters through video remote interpreting (VRI) in its listing of auxiliary aids and services.[31] With VRI, the interpreter or transliterator works from a location outside the courtroom while everyone else is in the courtroom. The interpreter hears the voices of the people speaking in the courtroom through

---

31  28 C.F.R. § 35.104(1).

a microphone or a telephone and then renders the message into sign language via a video camera, which transmits the visual message to the deaf or hard of hearing participant on a video display. When the participant signs to the camera, the interpreter views it on a video screen at the location outside the courtroom and then speaks the aural interpretation into a microphone or telephone, which transmits the audible message to the courtroom.

Prior to the start of a proceeding, the judge will inform everyone that an interpreter will be at a remote location and will appear in court via video-conference. The judge should ask whether the parties and counsel consent to having the interpreter participate by VRI, and should allow an opportunity for the interpreter and deaf or hard of hearing person to communicate in order to ensure an appropriate match, meaning that they can understand each other, and therefore can communicate effectively.

> " *VRI can be particularly useful in rural areas or in situations where there is an immediate need for interpreters.* "

Public entities that choose to use VRI must ensure that they provide: "[r]eal-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images"; sharply delineated images that are large enough to display the interpreter's face, arms, hands and fingers and the participant's face, arms, hands, and fingers, regardless of his or her body position; a clear, audible transmission of voices; and adequate training for staff using the equipment in court or elsewhere on how to quickly and efficiently set up and operate the VRI.[32] The images cannot be choppy, blurry, or grainy. There can be no lags or irregular pauses in communication. Any deficits in the technology will adversely affect communications in the courtroom, in violation of federal laws.

VRI can be particularly useful in rural areas, where qualified onsite interpreters are not readily available, or in situations where there is an immediate need for interpreters, such as arraignments for defendants in custody or for temporary restraining orders. VRI can reduce expenses by eliminating travel and mileage costs.

However, VRI is not effective in all circumstances, such as for lengthy or complex proceedings or those that involve substantive rights, testimony, cross-examination, production of evidence, multiple or pro se deaf or hard of hearing participants, or children who are deaf or hard of hearing. Legal settings that require onsite interpreters include trials, contested hearings, guilty pleas, mental commitment evaluations and/or proceedings, depositions, preliminary and evidentiary hearings, and witness testimony.[33]

---

32  *Id.* § 35.160(d)(1)–(4).

33  Registry of Interpreters for the Deaf, Standard Practice Paper: Video Remote Interpreting 10 (2010), *available at* https://drive.google.

VRI is also not effective if the deaf or hard of hearing participant has vision loss that impedes his or her ability to see the screen. Further, some individuals who are deaf or hard of hearing may experience difficulty following ASL on a two-dimensional flat screen. ASL is a three-dimensional language. The space surrounding the signer is incorporated to describe places and persons not present. Some states such as California have created guidelines on the appropriate use of VRI in the courtroom.[34]

## LEGAL REQUIREMENTS

State and local courts cannot require persons who are deaf or hard of hearing to bring an interpreter with them, but rather must provide an impartial and qualified interpreter when necessary for effective communication.[35] Nor can courts require an individual who is accompanying the deaf or hard of hearing person in court to interpret or facilitate communication for that person, except in an emergency involving an imminent threat to an individual's or the public's safety or welfare where no interpreter is available, or where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees, and reliance on that adult is appropriate.[36]

> *State and local courts must provide an impartial and qualified interpreter when necessary for effective communication.*

The ADA and Section 504 require that individuals needing interpreting or transliterating services receive them from "qualified" interpreters. The U.S. Department of Justice (DOJ) defines a "qualified interpreter" as one who, via a VRI service or an on-site appearance, "is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary."[37] "Receptively" means understanding what the person with the disability is saying, while "expressively" means having the skill needed to convey the information back to the person.

Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued speech transliterators. A qualified interpreter must: be fully fluent in the communication method used by the participant; be understood by the participant; interpret impartially, expressing the speaker's voice, tone, and emotion; and render any specialized vocabulary accurately so that the meaning of the communication is clear and conceptually correct.

---

com/file/d/0B3DKvZMfIFLdTkk4QnM3T1JRR1U/view.

34  RECOMMENDED GUIDELINES FOR VIDEO REMOTE INTERPRETING (VRI) FOR ASL-INTERPRETED EVENTS, ADMINISTRATIVE OFFICE OF THE COURTS: COURT INTERPRETERS PROGRAM, JUDICIAL COUNCIL OF CALIFORNIA, *available at* http://www.courts.ca.gov/documents/CIP-ASL-VRI-Guidelines.pdf.

35  28 C.F.R. § 35.160(c)(1).

36  *Id.* § 35.160(c)(2)(i)–(ii).

37  *Id.* § 35.104.

By contrast, family members typically lack the techniques, skills, training, and experience needed to effectively and accurately interpret a court proceeding, and are not familiar with court terminology and protocols. Even if otherwise skilled, family members have a personal relationship to the individual with a disability, are not neutral, and therefore would not be able to interpret impartially.[38] The same reasoning applies to friends.

The DOJ requires interpreters to be qualified, but not necessarily certified.[39] Any interpreter or transliterator in high risk situations, such as during medical appointments or emergencies, legal meetings and judicial appearances, should hold professional certification. The Registry of Interpreters for the Deaf (RID) is a national membership organization that promotes excellence in the delivery of interpreting services among diverse users of signed and spoken languages through professional development, networking, advocacy, and standards.[40] RID has state chapters of professionals who provide interpreting and transliterating services for people who are deaf or hard of hearing.[41] As previously discussed, RID offers a variety of national certifications in interpreting and transliterating.[42]

State laws and regulations may impose additional requirements in the form of mandatory licensure and/or specific court interpreter standards. For instance, California defines a "qualified interpreter" in court settings as one who "has been certified as competent to interpret court proceedings by a testing organization, agency, or educational institution approved by the Judicial Council as qualified to administer tests to court interpreters for individuals who are deaf or hearing impaired."[43] Some states defer issues of interpreter qualifications to a state agency or entity for the deaf and hard of hearing. For example, in Colorado the Commission for the Deaf determines qualifications.[44]

## IN COURT

For court proceedings, interpreters and transliterators should be fluent in and conversant with the requisite legal terminology to ensure effective communication. Accordingly, courts should first seek out interpreters who hold the RID Specialist Certificate: Legal (SC:L) certification, as this is strongly recommended to ensure the interpreter is qualified to interpret in legal proceedings. Persons who hold SC:L have demonstrated specialized knowledge of legal settings and greater familiarity with language used in the legal system. Some states, such as California,[45] set forth specific qualifications for interpreters in legal settings.

In most court hearings or proceedings, the services of several qualified interpreters are necessary to ensure effective communication. Interpreting requires a high level of concentration and complex mental processing. As a general rule, for any hearing or proceeding exceeding one hour at least two interpreters need to work as a team, switching places at regular intervals (20-30 minutes) to reduce fatigue and monitoring the other interpreter's work for

---

38  U.S. Dep't of Justice, ADA Title II Technical Assistance Manual II-7.1200.
39  Id.
40  http://www.rid.org.
41  http://rid.org/membership/affiliate-chapters/.
42  For a full list of the national certifications available for interpreters and transliterators, visit http://rid.org/rid-certification-overview/.
43  Cal. Evid. Code § 754(f).
44  Colo. Rev. Stat. § 13-90-202(8).
45  Cal. Gov. Code § 68566.

accuracy. Doing so helps ensure the accuracy of the interpretation and reduces the potential for errors in the interpretation.

Several interpreters may also be necessary if there are multiple deaf or hard of hearing persons in the courtroom. Each interpreter may take on a specific role. The role of the interpreter and who he or she is interpreting for must be clear, consistent, and maintained throughout the proceeding. Other factors that affect the number of interpreters in court include the role of the deaf or hard of hearing person in court, as well as his or her mode of communicating and interpreting needs.

The first tenet of the National Association of the Deaf-RID Code of Professional Conduct is: "Interpreters adhere to the standards of confidential communication."[46] They hold a position of trust in their role as linguistic and cultural facilitators of communication. Information related to an assignment can be shared only on a confidential and "as-needed" basis.[47] Interpreters must maintain data, invoices, records, and other information associated with a party who is deaf or hard of hearing in a manner that protects confidentiality.[48] They must inform the party if a federal or state laws require disclosure of confidential information.[49]

> *Interpreters and transliterators should be fluent in and conversant with the requisite legal terminology to ensure effective communication.*

Proceedings interpreters interpret all aspects of the open court process, including witness testimony and all open court dialogue.[50] As officers of the court, they swear an oath to interpret accurately and protect the integrity of the interpreted proceedings.[51] The proceeding interpreter should not be affiliated with one side of the case or the other, and should be provided with case information necessary to prepare for the proceeding.

Counsel or table interpreters sit at the counsel table next to the party who is deaf or hard of hearing to facilitate privileged communications that may arise between the party and his or her attorney.[52] These interpreters also monitor the interpretations of the proceedings interpreters for accuracy, alerting counsel to any errors and enabling counsel to object to preserve the right to appeal based on a faulty interpretation.[53] Because table interpreters do not inter-

---

46  http://student.gtc.edu/silent/images/rid-nad_codeofethics.pdf.

47  *Id.*

48  *Id.*

49  *Id.*

50  National Consortium of Interpreter Education Centers, Best Practices: American Sign Language and English Interpretation Within Legal Settings 25 (Mar. 2009), *available at* http://www.interpretereducation.org/wp-content/uploads/2011/06/LegalBestPractices_NCIEC2009.pdf.

51  *Id.*

52  *Id.*

53  *Id.* at 26.

pret open court proceedings, they do not need to take an oath in court.[54]

Interpreters and participants who are deaf or hard of hearing should always be consulted about positioning in the courtroom. Interpreters must be able to hear the proceedings and see the participant. However, they should not block the view of the judge, jury, or counsel. Where multiple participants will be using one interpreter, the interpreter must be able to see and be visible to all participants. If this is not possible, such as when both the judge and an attorney use sign language, the court must provide additional interpreters. Interpreters must be in the participant's line of sight, so that he or she can view both the interpreter and the rest of the proceedings.

## Communication Access Realtime Translation (CART)

Communication Access Realtime Transcription (CART) is a service that converts speech to text (word-for-word) in real time. It is beneficial to individuals who are deaf or hard of hearing, particularly those who do not sign, can read, and are fluent in English. The National Court Reporters Association provides certifications in realtime reporting or CART services.[55]

A CART captioner types everything that is said into a stenotype machine, using machine shorthand. Computer software converts the shorthand into realtime captions instantaneously, which can be displayed on laptops, computers, tablets, mobile devices, and screens. For certain individuals who are deaf-blind and communicate primarily through braille, it may be necessary to connect CART services to a braille device that allows them to receive the same information in tactile form.

CART technology relies on a specially prepared dictionary of words so that the shorthand can be translated into written English. Words that are not in this dictionary will not be readily captured and displayed, but will require additional work from the CART captioner to render. For court proceedings, CART captioners should be given the opportunity to review the case file and other relevant documents in order to identify and input in their CART dictionary words that will be used during the proceeding, such as technical or legal terms, the proper names of the parties and experts, and any unusual or slang terms.

> *CART is a service that converts speech to text (word-for-word) in real time.*

The role of the CART captioner is to facilitate communication, as opposed to the role of the official court reporter to provide a verbatim record of the proceeding. CART captioners must stay in that role and refrain from "counseling, advising, or interjecting personal opinions except

54  *Id.* at 25.
55  http://www.ncra.org/Certifications.

as required to accomplish the task at hand."[56] They must also refrain from working in the dual capacity of official court reporter and CART captioner. However, when no other option exists, the National Court Reporters Association's Code of Professional Ethics states that the role to be performed is that of the official reporter, with all present being entitled to read the display screen.[57] Note that CART captioners must be fair and impartial and disclose any potential conflicts of interest, such as assignments involving a participant who is a friend, relative or business associate, or inability to be impartial.[58]

Individuals who use CART services in court proceedings rely on the realtime translation to follow what is happening. Accordingly, the text must be as intelligible and accurate as possible at all times. Judges should monitor the translation to determine whether effective communication is occurring.

To function effectively, the CART captioner must be positioned so he or she can hear the entire proceeding. Furthermore, the translation must be displayed so that all participants can see it. Multiple laptops or screens or a single large screen may be necessary. Because CART captioners typically bring specialized equipment for one participant, the court will need to inform the captioner if there will be multiple participants. Confidential information, such as a private sidebar, must be displayed only to the intended participant(s). The court may need to arrange for more than one CART captioner in a one-captioner-to-one-participant scenario if confidential proceedings are anticipated.

CART services can be provided remotely. From a remote location, the captioner listens to what is being said in court by speakers using microphones—through a telephone line or via the Internet—and provides realtime captioning through an Internet feed that is connected to a computer monitor in the coutroom. Courts will need a dedicated high-speed Internet access line or a strong and consistent wireless (wifi) signal. The audio telephone connection between the CART captioner and the courtroom must have excellent sound quality.

Pursuant to federal court policy, CART is to be used "solely to assist in communication" and not "in lieu of conventional means of producing the official record."[59] The policy states that CART "should be provided for only as long as and for the specific purposes required by the participant: for example, only for the duration of the deaf witness's testimony.[60]

## Assistive Listening Systems

Individuals who have some residual hearing and experience difficulty hearing speech without amplification may use assistive listening systems to facilitate effective communication. These systems are designed to amplify and make clearer what is being said. They do this through use of microphones, transmitters, receivers, and headsets, making what is said sound

---

56  National Court Reporters Association, Code of Professional Ethics, Section III - Communication Access Realtime Translation (CART) Provider in a Legal Setting, *available at* http://www.ncra.org/About/content.cfm?ItemNumber=8645.

57  *Id.*

58  National Court Reporters Association, CART Providers Manual, *available at* http://www.ncra.org/files/MCMS/94406E4B-BC9B-402B-A534-7D970D31DCE8.pdf.

59  Judicial Conference of the U.S., *supra* note 20, at 37-39.

60  *Id.*

closer to the listener. Assistive listening systems are used to minimize background noise and reduce the effect of distance between the speaker and the listener.

Each individual responds differently to the various types of assistive listening systems depending on his or her level of hearing (unaided or aided), as well as on the particular technological device he or she is accustomed to using. Before any proceeding begins, the court must ensure that the system used is compatible with the deaf or hard of hearing participant's hearing aid or cochlear implant. The system must provide a clear, uninterrupted signal for the duration of the proceeding. Static or signal interruption sounds, such as those coming from a cell phone or radio, can impede the system's effectiveness. Courts should adhere closely to the system's guidelines for operation to ensure effective use.

> *Assistive listening systems typically fall into three main types: FM systems; infrared systems; and induction loops.*

When video and/or audio recordings will be used in the proceeding, the court should ask participants whether they can understand them with the use of their assistive listening system or device. If the answer is "no," the court should either obtain a transcript in advance or require that captions be provided.

## TYPES

Assistive listening systems typically fall into three main types: FM systems; infrared systems; and induction loops. Each type is explained below.

### FM Systems

Frequency modulation (FM) systems use radio waves to transmit sound and are portable. Audio input from a microphone, a television, an audio player, or any electronic sound source is fed into an FM transmitter, which broadcasts the audio input through radio signals that are received by pocket-sized receivers. The receivers are tuned to the specific frequency used in the transmission. Persons who use hearing aids with telecoils (T-Coils) can plug a neckloop or silhouette inductor directly into the receiver. Persons who use hearing aids without T-Coils, as well as those who do not use hearing aids, can use headphones or earbuds that are connected to the receiver. Cochlear implant users can connect a patch cord from the FM receiver to the external processor for the implant.

The FM system can be picked up outside the room in which the system is located. Systems can run in adjacent rooms if they are transmitting on different frequencies. Signals from nearby radio sources that use the same or similar frequencies can interfere with the signal transmission. Confidentiality is an issue because anyone who knows the frequency the transmitter is broadcasting on can tune in to listen.

When using microphones with FM systems, they must be placed a specific distance from the speaker's mouth to produce a clear, consistent signal. Every speaker should have his or her own microphone—the judge, attorneys, and witnesses—instead of passing one microphone from speaker to speaker. FM microphones pick up and amplify the rustle of papers and other surrounding noises, which is distracting for the FM system user.

### Infrared Systems

Infrared systems (IR) work by using infrared light waves that are beamed from one or several IR transmitters to small specialized receivers. They do not work in direct sunlight. To function, there must be a direct line of sight between the transmitter and the receiver. Receivers include stethophones that hang from the ears, a headset type that fits over the ears, and a small pocket-size type. Stethophones and headsets can receive the IR signal directly. Users and non-users of hearing aids (with or without T-Coils) or cochlear implants can use the pocket-size receivers. Cochlear implants can connect to the IR receiver through a DAI patch cord.

Unlike FM systems, IR systems do not broadcast beyond the room in which the transmitter is located. Thus, confidentiality is not an issue. Adjacent rooms can operate IR systems simultaneously without any interference.

### Induction Loops

Induction loops are typically installed in the ceiling or floor of the particular room, although portable systems are available. Electricity flows through a wire or cable connected to a power amplifier that works with a microphone. The microphone picks up the speaker's voice and converts it to electric energy, which is strengthened by the amplifier. The energy is processed through the wire or cable and creates an electromagnetic field. The electromagnetic signals are picked up by a receiver with (T-Coils) and sent directly to personal hearing aids equipped with T-Coils or cochlear implants, or to pocket-sized induction receivers connected to a headset or earpiece.

To receive the signal, the receiving units must be within the loop. Because there is some "spill over" of the signal, rooms next to or directly above or below the loop system cannot use the same system because they would work at cross-purposes. This "spill over" can result in someone outside the room with a receiving unit being able to listen in, which raises confidentiality issues.

## Telephone and Video Communications

Any public entity that communicates by telephone must provide effective communication to persons with disabilities.[61] A public entity must use text telephones (TTYs) or equally effective telecommunications systems to communicate with persons who are deaf or hard of hearing.[62] Public entities that use an automated-attendant system (e.g., voicemail and messaging) or an interactive voice response system for receiving and directing incoming tele-

---

61   28 C.F.R. § 35.161.
62   *Id.* § 35.161(a).

phone calls must provide effective realtime communication using auxiliary aids and services (e.g., TTYs and all forms of Federal Communications Center-approved telecommunications relay systems).[63]

To place telephone calls, people who are deaf or hard of hearing may use a variety of equipment such as videophones (VPs), text telephones (TTYs), amplified telephones, or captioned telephones. While many of these devices are used by individuals who are deaf or hard of hearing to call one another, they can also be used to call any person using the conventional telephone. VPs can be used by individuals who are deaf or hard of hearing to communicate with hearing people through a sign language interpreter acting as the relay operator. Individuals using VPs can communicate directly only with those who have a VP.

A TTY is a telephone that has a small screen and a keyboard on which a message can be typed to be received by another TTY. A TTY or a computer with TTY capability is required at both ends of the conversation in order to communicate. Amplified telephones are used by hard of hearing persons who are able to use their residual hearing to carry on conversations on regular telephone calls. Users can turn up the volume as necessary to hear speech clearly.

> " *A public entity must use text telephones (TTYs) or equally effective telecommunications systems to communicate with persons who are deaf or hard of hearing.* "

Captioned telephones are a form of relay assisted telephone system where the person who is deaf or hard of hearing is able to speak directly to the hearing person by telephone, but relies on the captioning to understand what the hearing person is saying. When a person with a captioned telephone dials, the phone calls the hearing person and automatically connects to a captioning service that transcribes everything the hearing person says into captions, which appear on the captioned telephone display screen.

Individuals who are deaf or hard of hearing may also use telecommunications relay services (TRS) or video relay services (VRS). A public entity must respond to telephone calls from a TRS in the same manner that it responds to other telephone calls.[64] With TTY relay services (one form of TRS), the relay operator uses both a standard telephone and a TTY.[65] The operator types what the telephone user says on a TTY, the TTY user reads the message

---

63  *Id.* § 35.161(b).
64  *Id.* § 35.161(c).
65  *Id.*

and types a response, and the the operator reads the response to the telephone user.[66] For persons with speech disabilities, TRS provides speech-to-speech transliteration. Captioned telephones inherently utilize a form of TRS. With VRS, the relay operator communicates the voice message in sign language to the computer video terminal user and voices the sign language messages to the standard telephone user.[67]

Where public telephones are provided in a courthouse or a building in which a court service, program, or activity is provided, there should be equivalent telecommunications access for individuals who are deaf or hard of hearing. This necessarily requires the provision of different devices that are accessible to different people, including a VP, TTY, and a telephone with amplication or volume control. Court staff should expect to receive relay calls from persons who are deaf and are using such devices, and should be trained on these issues

---

66  *Id.*
67  *Id.*



V.

# INDIVIDUALS WHO ARE DEAF OR HARD OF HEARING IN COURT

## THE LAW

As previously discussed, under the ADA Title II regulations the effective communication requirement extends to applicants, participants, members of the public, and companions with disabilities.[1] Individuals who are deaf or hard of hearing and participate in the judicial process include parties before the court (criminal defendants and civil litigants), witnesses, jurors, prospective jurors, and companions of persons with business in the court,[2] as well as attorneys[3] and judges.

A companion with a disability is "a family member, friend, or associate of an individual seeking access to a service, program, or activity of a public entity, who, along with such individual, is an appropriate person with whom the public entity should communicate."[4] For instance, a deaf parent of a minor in a juvenile proceeding is a companion. The duty to provide auxiliary aids and services extends to companions with disabilities, whether or not the individual accompanied has a disability.[5]

> *Courtroom spectators with disabilities are entitled to appropriate auxiliary aids and services.*

Note that the legal duty of public entities to provide necessary auxiliary aids and services is not limited to individuals with a direct interest in the proceedings or outcome.[6] Courtroom spectators with disabilities are entitled to appropriate auxiliary aids or services that will afford them an equal opportunity to follow the court proceedings, unless a fundamental alteration in the service, program, or activity or undue financial and administrative burdens would result.[7] If an auxiliary aid or service would result in a fundamental alteration or undue burdens, the court must take any other action that would not result in such an alteration or such burdens but would ensure, to the maximum extent possible, that individuals with disabilities receive the benefits or services provided by the public entity.[8] As with any other individual who requires effective communication in the courtroom, the court should have information available for any person seeking to be a spectator to make the request for effective communication.

---

1   28 C.F.R. § 35.160(a)(1).
2   28 C.F.R. pt. 35, Appendix A to Part 35 - Guidance to Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services, Subpart E–Communications.
3   *Mosier v. Kentucky*, 675 F. Supp. 2d 693, 700 (E.D. Ky. 2009).
4   28 C.F.R. § 35.160(a)(2).
5   *Id.* § 35.160(b)(1).
6   *See* U.S. Dep't of Justice, ADA Title II Technical Assistance Manual Supp. II-7.1000 (1994), *available at* http://www.ada.gov/taman2up.html.
7   *Id.*
8   28 C.F.R. § 35.164.

In *Prakel v. Indiana*,[9] an Indiana federal court was asked to decide if a deaf spectator was entitled to reimbursement for the cost of interpreter services at his mother's pretrial criminal proceedings in county court. The court determined that Mr. Prakel was a qualified individual with a disability because he was a member of the public who wished to attend court proceedings that were open to the public, rejecting defendants' argument that, as a spectator rather than a party or witness, he was not covered by Title II.[10] The court relied on Title II regulations providing that a "public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public and companions with disabilities are as effective as communications with others."[11]

The court also noted that the U.S. Supreme Court has recognized that members of the public have constitutional rights to attend public criminal proceedings, as well as a right to access such proceedings.[12] Each of the criminal proceedings Mr. Prakel sought to attend were open to the public. The court concluded that defendants violated Title II by failing to provide interpreter services for Mr. Prakel, or to propose another auxiliary aid or service, in an effort to ensure effective communication to enable him to access the proceedings.[13] The court declined to allow plaintiffs to expand the scope of the litigation to address whether all deaf spectators in every court in Indiana are entitled to interpereters upon request, based on plaintiffs' failure to timely file a motion to amend their complaint, as this would involve "vastly greater financial and administrative burdens."[14]

The duty of federal courts to provide appropriate auxiliary aids and services extends to parties, attorneys, and witnesses who are deaf, hearing-impaired, or have other communications disabilities.[15] This duty does not cover spectators.[16] However, courts can elect to provide auxiliary aids or services in situations where they determine such aids or services to be appropriate. For example, a court may provide an interpreter to the deaf spouse of a criminal defendant during the trial.[17] Jurors with a communications disability who are determined by the trial court to be qualified to serve under the Jury Selection and Service Act should be provided with appropriate auxiliary aids or services.[18]

# PARTICIPANTS & AUXILIARY AIDS AND SERVICES

This section provides some general rules concerning auxiliary aids and services for the different roles that participants who are deaf or hard of hearing may play.

**Civil litigants** may require auxiliary aids and services for the entire time that court is in ses-

---

9    100 F.Supp.3d 661 (S.D. Ind. 2015).

10   *Id.* at 681.

11   *Id.* (citing 28 C.F.R. § 35.160(a)(1).

12   *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 527 (2004), and *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-15 (1986).

13   *Id.* at 684.

14   *Id.* at 671.

15   Judicial Conference of the U.S., Guide to Judiciary Policies and Procedures, vol. 1, ch. III, pt. H, at 37-39 (Guidelines for Providing Services to the Hearing-Impaired and Other Persons with Communications Disabilities), *available at* http://nad.org/issues/justice/courts/communication-access-federal-courts.

16   *Id.*

17   *Id.*

18   *Id.*

sion, including voir dire, opening and closing arguments, and any discussions with the judge outside the presence of the jury, as well as when the attorneys and parties are interacting with court personnel, even if the judge is not present. However, the court is not responsible for providing auxiliary aids and services when the deaf or hard of hearing party is not present for the proceeding, whether in person or remotely. If the court has appointed an attorney or a guardian ad litem for the deaf or hard of hearing party, it may be necessary for the court to provide auxiliary aids or services to effectuate communications between the court-appointed attorney or guardian ad litem and the deaf or hard of hearing party.

**Criminal defendants** may require auxiliary aids and services for the entire time that court is in session, including all hearings, all portions of a trial, and any time that a defendant has a constitutional or otherwise legally protected right to appear and/or participate. As with parties in civil cases, the court does not have to provide auxiliary aids and services when the defendant is not in court. Courts must assign qualified interpreters to aid communication between the defendant and the attorney for all phases of the preparation and presentation of the case, particularly when the defendant is represented by a court-appointed attorney.[19]

**Witnesses** may require auxiliary aids and services for all testimony they provide in court, as well as any other communications or interactions they have with the court before or after their testimony, such as grand jury testimony or court services for victims. Care should be taken to ensure communications access is provided at all times to witnesses who are victims of crimes and their families who wish to remain present throughout the proceeding.

**Spectators** are entitled to auxiliary aids and services during court proceedings open to the public unless a fundamental alteration in the service, program, or activity or undue financial and administrative burdens would result.[20] However, the court is not required to provide auxiliary aids and services for personal interactions between spectators and others, nor when spectators are not in court.

**Jurors and prospective jurors** may require auxiliary aids and services for all interactions with the court and with other jurors. This includes any time that the jury is expected to be in the courthouse, including during voir dire, court proceedings, and deliberations, as well as interactions with the bailiff.

**Lawyers** may require auxiliary aids and services for all interactions with the judge and any court personnel. Attorneys will require auxiliary aids and services not only for all hearings and trials, but also for discussions in chambers and for sidebars. This entitlement to court-provided auxiliary aids and services extends to lawyers' staff when they are participating in court proceedings.

**Judges** may require auxiliary aids and services for all court proceedings, including interactions with attorneys, parties, jurors, and court personnel.

**Court personnel** may require auxiliary aids and services for all interactions in the court.

---

19  45 Fed. Reg. 37,630 (June 3, 1980).

20  *See* U.S. Dep't of Justice, ADA Title II Technical Assistance Manual Supp. II-7.1000 (1994), *available at* http://www.ada.gov/taman2up.html. *See Prakel v. Indiana*, 100 F.Supp.3d 661 (S.D. Ind. 2015).



VI.

# BEST PRACTICES CHECKLISTS FOR ENSURING EFFECTIVE COMMUNICATION

Every participant plays a critical role in ensuring effective communication. This section provides recommendations, in the form of checklists, as to what each participant can do.

## STATE COURT ADMINISTRATIVE OFFICE (SCAO)

- ✓ Create a statewide court rule or other uniform policy appropriate for the state's court system for providing auxiliary aids and services to deaf or hard of hearing court participants throughout the court system.[1]

- ✓ Post the rule or policy on the agency's public website in an easy-to-find location.

- ✓ Designate a court ADA/504 coordinator to handle requests for accommodations, including auxiliary aids and services.[2]

- ✓ Offer trainings and provide educational materials to judges, magistrates, commissioners, court administrators, and court personnel regarding communication access.[3]

---

[1] The rule or policy should include the following information: what the law requires; who is entitled to aids and services; what types of proceedings are covered; what types of aids and services are offered; what the procedure is for requesting aids and services; what to do when an aid or service is not working; what the procedure is for appealing the accommodation provided; and how to file a grievance or complaint to address problems and concerns. In states where each county manages accommodations and auxiliary aids and services, a statewide court rule or policy should provide general requirements clearly setting forth each county's responsibility.

[2] 28 C.F.R. § 35.107(a) (requiring a public entity that employs more than 50 people to: designate "at least one employee to coordinate its efforts to comply with and carry out its responsibilities" and make available to all interested individuals the name, office address, and telephone number of this coordinator of accessibility). *See also* 45 C.F.R. §84.7(b) (Section 504); Judicial Conference of the U.S., Guide to Judiciary Policies and Procedures, vol. 1, ch. III, pt. H, at 37-39 (Guidelines for Providing Services to the Hearing-Impaired and Other Persons with Communications Disabilities), *available at* http://nad.org/issues/justice/courts/communication-access-federal-courts (requiring each federal court to identify a specific office or individual(s) to serve as access coordinator from whom participants in court proceedings may request auxiliary aids or services).

[3] Topics to cover include what the law and court rules and policies require; what constitutes effective communication; how to obtain and use various types of auxiliary aids and services; and the proper etiquette for interacting with persons who are deaf or hard of hearing.

# LOCAL COURTS

✓ Develop procedures to implement the SCAO rule or policy.[4]

✓ Post the procedures on the court's website in an easy-to-find location, in prominent places throughout the courthouse, and in all notices posted in the courthouse.

✓ Include the rule/policy and procedures in all mailed communications from the court, as well as in all court documents that compel or instruct individuals to appear before the court (e.g., warrants, subpoenas, traffic tickets, jury summons).

✓ Ensure that all interpreters, transliterators, and captioners are qualified.

✓ Create a directory of qualified providers of auxiliary aids and services and update it every six months to ensure that requests can be granted in a timely manner.[5]

✓ Collaborate with individuals who are deaf or hard of hearing and advocacy and consumer groups to advise on communication access issues.

✓ Offer local training to judges, arbitrators, mediators, courthouse and courtroom personnel, court-appointed attorneys and other professionals regarding communication access.

✓ Designate a court ADA/504 coordinator to handle requests for accommodations, including auxiliary aids and services.

✓ Adopt, publish and implement a grievance procedure to address complaints and concerns.[6]

✓ Make every effort to provide the auxiliary aid or service requested by the participant who is deaf or hard of hearing without substitution.[7]

✓ Assess courtrooms to remove any barriers that would impede effective communication such as noise, lighting, sightlines, and positioning.

✓ Install visual alarms in hallways, restrooms, lobbies, courtrooms, and deliberation rooms.

---

4  In the event local courts set their own policies, develop policies and procedures that are consistent with the SCAO directive for providing auxiliary aids and services to participants who are deaf or hard of hearing.

5  *See, e.g.*, MINN. GEN. R. PRAC., RULE 8.01 (1997) (requiring State Court Administrator to publish and maintain a statewide roster of interpreters). *See, e.g.*, North Carolina's directory of sign language interpreters/transliterators at http://www.ncdhhs.gov/dsdhh; N.C. Gen. Stat. Ann. § 8B-6 (2015) (requiring that copies of directory be sent to all 100 clerks' offices). Your state may have a commission for the deaf and hard of hearing or a state association of the deaf that may be able to assist. In addition, every state has a protection and advocacy organization (often called "Disability Rights [your State name]"), which may have information on how to secure various appropriate auxiliary aids and services, and which service providers are better than others. Note that in some states the Commission for the Deaf and Hard of Hearing is responsible for certifying and qualifying interpreters, and creates a statewide database of interpreters.

6  28 C.F.R. § 35.107(b) (requiring a public entity that employs 50 or more persons to adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action prohibited by Title II). *See also* 45 C.F.R. § 84.7(b) (Section 504).

7  *Id.* § 35.160(b)(2) (requires public entities to give "primary consideration" to the request of the individual with the disability in deciding what auxiliary aid or service is necessary to ensure effective communication); U.S. DEP'T OF JUSTICE, ADA TITLE II TECHNICAL ASSISTANCE MANUAL II-7.1100 (provides that a public entity must honor the person's choice unless it can demonstrate that (1) another equally effective means of communication is available, or (2) use of the chosen means would result in a fundamental alteration in the service, program, or activity or an undue financial and administrative burden).

✔ Provide a visual method of calling individuals who are deaf or hard of hearing in the courthouse/courtroom.

✔ Ensure that auxiliary aids and services are provided at the first court appearance.

✔ Coordinate with law enforcement to ensure that custodial facilities will provide advance notice to courts of the need for auxiliary aids and services before a party who is deaf or hard of hearing appears in court.

✔ Ensure that all court-mandated programs, trainings, classes, and services are accessible to individuals who are deaf or hard of hearing.[8]

✔ Maintain an adequate supply of readily available interpreters capable of appearing in an expedited manner with little advance notice.

✔ Ensure that all interpreters adhere to a code of professional conduct. Some states have requirements for the conduct of all court interpreters,[9] and those standards should be applied where appropriate. For instance, some states have used the *Model Code of Professional Responsibility for Interpreters in the Judiciary*[10] as guidance when drafting their own codes. Other states have sign language interpreter licensure with relevant professional and ethical conduct requirements. Even when no such state requirements exist, at a minimum, sign language interpreters should comply with the NAD-RID Code of Professional Conduct for interpreters, coauthored by the Registry of Interpreters for the Deaf and the National Association of the Deaf,[11] or the National Association of Judiciary Interpreters and Translator's (NAJIT) Code of Ethics and Professional Responsibilities.[12]

✔ Ensure that text telephones (TTY), telecommunications relay services (TRS), video relay services (VRS), or equally effective telecommunication systems are used to communicate by telephone with individuals who are deaf or hard of hearing and persons with speech impairments.

✔ Train court personnel who handle incoming calls on how to communicate using TTY, TRS, VRS, or other telecommunication systems.

---

8   Courts that receive federal funds have a responsibility under Section 504 to ensure that the court-mandated program entity to which a party is referred fulfills its obligation to provide effective auxiliary aids and services. *See* Wash. Rev. Code § 2.42.120(3) (2008) (stating: "If a hearing impaired person participates in a program or activity ordered by a court as part of the sentence or order of disposition, required as part of a diversion agreement or deferred prosecution program, or required as a condition of probation or parole, the appointing authority shall appoint and pay for a qualified interpreter to interpret exchange of information during the program or activity.").

9   *See, e.g.*, Kentucky Professional Code of Responsibility for Interpreters, http://courts.ky.gov/courtprograms/CIS/Documents/CodeofProfessionalResponsibility.pdf; Karen L. Richards, *Vermont Court Interpreter Manual* 46 (2009), *available at* http://www.ncsc.org/~/media/Files/PDF/Services%20and%20Experts/Areas%20of%20expertise/Language%20Access/LEP%20Resources/Vermont%20Court%20Interpreter%20Manual%20Final.ashx; Wash. Rev. Code Ann. Rules Gen. Rule 11.2(d) (1987).

10  William E. Hewitt, *Court Interpretation: Model Guides for Policy and Practice in State Courts* (1995).

11  http://student.gtc.edu/silent/images/rid-nad_codeofethics.pdf (The Code contains seven core tenets:
    1. Adhere to standards of confidential communication.
    2. Possess the professional skills and knowledge required for the specific interpreting situation.
    3. Conduct yourself in a manner appropriate to the specific interpreting situation.
    4. Demonstrate respect for consumers.
    5. Demonstrate respect for colleagues, interns, and students of the profession.
    6. Maintain ethical business practices.
    7. Engage in professional development).

12  http://ethics.iit.edu/ecodes/node/3570.

# JUDGES

## Before the Hearing

✓ To the extent feasible and within the discretion of the judge, allow interpreters, transliterators, and captioners to view case files and exhibits, photos, or other records that will be introduced into evidence before the proceeding.[13]

✓ Allow interpreters to meet with the participant who is deaf or hard of hearing, preferably in the presence of the attorney whenever possible, before the proceeding to ensure that they can effectively communicate with one another.[14]

✓ Meet with interpreters and other service providers before the proceeding to address communication needs of persons who are deaf or hard of hearing, logistics (e.g., seating, sightlines, lighting, sound systems, number of interpreters, breaks), ground rules, and any concerns.

✓ Develop an understanding of the interpreter's code of professional conduct to identify and correct any deviations.

## At the Start of the Hearing

✓ Inform participants who are deaf or hard of hearing of their right to participate in and understand the proceedings.

✓ Ask participants who are deaf or hard of hearing whether they are able to understand and communicate with the requested auxiliary aids and services and to inform you if they are having difficulty.

✓ Ask participants who are deaf or hard of hearing if they need an interpreter if you observe they are having difficulty understanding or communicating.

✓ Advise everyone in the courtroom of the presence of interpreters and clarify their role in your introductory comments.[15]

✓ Instruct the jury as to the interpreter's or CART captioner's role.

✓ Instruct jurors that they must rely on the interpretation rather than on what they believe they heard the witness say in his/her own language.

✓ Advise everyone to speak clearly, at a moderate speed that the interpreter or other providers can accommodate, and at a volume that can be heard. Give reminders as necessary.

---

13  Doing so allows them to become familiar with names, parties, and technical, legal or specialized vocabulary. The more information providers have about the case in advance the better they can do their jobs and avoid misinterpretations.

14  Doing so allows interpreters to identify the needs of the participant, as well as any possible signing differences and other concerns.

15  Instruct everyone in the courtroom that interpreters are neutral and impartial, and have a duty to interpret everything that is being said without editing, adding, omitting, explaining, summarizing, or providing personal input. *See* Appendix E (sample instruction).

✓ Instruct everyone that only one person may speak at a time.

✓ Inform everyone that only the judge may respond to requests for repetition or re-phrasing.

✓ Qualify interpreters or CART captioners for the record and administer an oath.[16]

✓ Ask all parties to stipulate that the interpreter's or CART captioner's qualifications are satisfactory.

✓ Administer an oath calling upon interpreters for jurors who are deaf or hard of hearing to swear that they will not interfere with the jury's deliberations or reveal its confidences.

✓ Ask interpreters and/or translitorators whether they are able to communicate effectively with the participant who is deaf or hard of hearing.

✓ Ask interpreters and/or transliterators whether they are aware of any conflicts of interest they may have.[17]

✓ Advise interpeters and/or transliterators of their obligation to any impediments to performance and any errors they have made.

## During the Hearing

✓ Schedule breaks during the proceeding on an as-needed basis for interpreters, transliterators, and captioners. Instruct providers to notify the court when they need breaks.

✓ Be flexible regarding the positioning of interpreters, transliterators, captioners, and participants.[18]

✓ Never ask interpreters to explain or restate what the participant who is deaf or hard of hearing says.

✓ Advise each witness of the interpreter's role immediately after the witness is sworn and before questioning begins.[19]

---

16  *See* Appendix C (sample oath). Qualifying interpreters should be done through voir dire inquiry on the record as to their education, training, certifications, skills, and experience. *See* Appendix D.

17  For instance, do interpreters/transliterators: know the parties involved in the proceeding personally or professionally; have personal knowledge about the proceeding; have interpreted/transliterated in preparation or a phase of the proceeding; have served in an investigative capacity for any party; or have a financial interest or stake in the outcome of the proceeding. *See, e.g.,* WASH. REV. CODE ANN. RULES GEN. RULE 11.2(d) (1987) (Code of Conduct for Interpreters) ("No language interpreter shall render services in any matter in which the interpreter is a potential witness, associate, friend, or relative of a contending party, unless a specific exception is allowed by the appointing authority for good cause noted on the record. Neither shall the interpreter serve in any matter in which the interpreter has an interest, financial or otherwise, in the outcome. Nor shall any language interpreter serve in a matter where the interpreter has participated in the choice of counsel.").

18  Positioning is critical to ensure effective communication. Interpreters, transliterators, and captioners must be able to hear the proceeding and see and be seen by the participant who is deaf or hard of hearing.

19  *See* Appendix F.

- ✓ Instruct jurors that they must treat as evidence only what is provided by the interpreter in English.[20]

- ✓ Instruct jurors not to accord less weight to the testimony of witnesses who are deaf or hard of hearing merely because their testimony is provided by an interpreter.[21]

- ✓ Speak directly to the participant who is deaf or hard of hearing and not to the interpreter.[22] Speak naturally and avoid shouting or distorting normal mouth movements.

- ✓ Use first-person, not third-person, references when addressing a participant who is deaf or hard of hearing.

- ✓ Anticipate that the participant who is deaf or hard of hearing may not look at you.[23]

- ✓ Treat prospective or chosen jurors who are deaf or hard of hearing as equally competent and able.[24]

- ✓ Monitor the efficacy and functioning of the auxiliary aid or service provided.[25]

- ✓ Be prepared to pause the proceedings if the auxiliary aid or service is unavailable or ineffective until the situation can be resolved.

---

20  Even if a juror believes that the interpreter may have made a mistake, the juror must ignore the error and make deliberations on the basis of the official interpretation. The only evidence is what the interpreter renders. Jurors cannot rely on their own interpretation of what the witness who is deaf or hard of hearing says.

21  Some states have special jury instructions to this effect. *See*, e.g., Alaska Civil Pattern Jury Instructions, Art. 1, Rule 1.06A Credibility of Witnesses - Witness Who Testifies Through Interpreter (2013), *available at* http://courts.alaska.gov/rules/juryins.htm. *See also* Rule 1.06B Credibility of Witnesses - Witness Who Testifies Using American Sign Language (instructing jurors to avoid attempting to interpret the signs of a deaf person or an interpreter, as guessing about what is intended to be communicated by a sign, gesture, or facial expression may be inaccurate).

22  This is referred to as "direct speech."

23  Interpreters, translators, and captioners relay information visually. To benefit from having any of these services in the courtroom, the participant must look at them, rather than at the speaker.

24  There should be no presumptions as to such jurors' ability or inability to serve in this capacity based solely on their being deaf or hard of hearing.

25  Among the indications that the interpreter or transliterator may not be providing effective communication are when the deaf or hard of hearing participant appears confused, appears to be asking questions of the interpreter or transliterator, has a blank expression, or does not respond appropriately to questions or other situations. You can test the participant's understanding by asking open-ended questions rather than "yes"/"no" questions.

# ADA/SECTION 504 COORDINATORS

✓ Know what the ADA, Section 504, and court rules and policies require with regard to communication access for participants who are deaf or hard of hearing.

✓ Evaluate the current state of accessibility for deaf and hard of hearing persons.

✓ Familiarize yourself with the different types of auxiliary aids and services for participants who are deaf or hard of hearing.

✓ Attend trainings on how to properly interact with individuals who are deaf or hard of hearing.

✓ Collaborate with participants who are deaf or hard of hearing and advocacy groups to develop and improve policies and procedures.

✓ Ask comprehensive questions to make sure you understand clearly what kind of auxiliary aid or service participants who are deaf or hard of hearing need.[26]

✓ Appoint multiple interpreters for proceedings that last longer than one hour, are complex, or involve multiple particpants who deaf or hard of hearing.

✓ Ensure the judge is aware that there will be auxiliary aids and services in the courtroom, and review best practices.

✓ Provide the interpreter, transliterator, or captioner with a point of contact on the day of the proceeding.

✓ Test all assistive listening systems and devices before the proceeding.

✓ Learn about new technologies for individuals who are deaf or hard of hearing.

✓ Retain qualified interpreters, transliterators, and captioners.[27]

✓ Perform an audit of the courts' compliance with the effective communication duty.

✓ Survey participants who are deaf or hard of hearing after the proceeding about whether they were provided with effective communication.

✓ Be prepared to provide auxiliary aids and services on short notice.

---

26  Deaf and hard of hearing individuals vary in their communication needs. Courts have an obligation to match the particular needs of the participant. While some participants may specify the auxiliary aid or service they require, others may not. For specific questions, see Appendix A.

27  The best providers will have professional certification in their field specific to legal settings and many years of experience providing services in legal settings. For a full list of the national certifications available for interpreters and transliterators, visit http://rid.org/rid-certification-overview/. CART providers achieve national certification through the National Court Reporters Association (NCRA). In particular, the Certified CART Provider (CCP) designation is awarded upon passing a written knowledge test and a realtime dictation test. See http://www.ncra.org/Certifications/content.cfm?ItemNumber=16006&navItemNumber=16007.

# PARTIES, WITNESS, JURORS WHO ARE DEAF OR HARD OF HEARING

✓ Understand your legal rights to full and equal access to the courts.

✓ Inform your attorney, if any, of your need for auxiliary aids and services.

✓ If you are not represented by an attorney, request from the court auxiliary aids and services as far in advance as possible and be specific.[28]

✓ Confirm in advance of the proceeding that the court will be providing the auxiliary aids and services.

✓ Arrive early to make sure the auxiliary aids and services are in place and functioning.

✓ Meet with the service provider before the proceeding to get used to each other's communication styles and identify possible concerns.

✓ Inform the judge or court staff immediately if the auxiliary aid or service is not effective or not functioning.

✓ Direct any questions you may have to the court or an attorney through the interpreter. The interpreter cannot answer questions, but can only interpret them.

---

28  It may take some time for the court to identify and secure appropriate auxiliary aids and services for a proceeding. Many service providers request two weeks' advance notice. Making your request far in advance broadens the pool of available providers, increasing the likelihood that the court will find the best qualified service provider or the most effective devices.

# LAWYERS REPRESENTING INDIVIDUALS WHO ARE DEAF OR HARD OF HEARING

✓ Consult with your client and/or your witnesses to determine which auxiliary aid or service is appropriate to ensure effective communication.

✓ Inform the court as to the type of auxiliary aid or service your client and/or witnesses need to ensure effective communication, and request such aid or service as early as possible (at least two weeks in advance).

✓ Provide information in advance to an interpreter, transliterator, or captioner about the facts of the case, the length and nature of the proceeding, the role of the participant who is deaf or hard of hearing, and the participant's stated or inferred communication needs, and any concerns you may have.

✓ Permit intepreters, transliterators, or captioners to view case files and exhibits, photos, or other records that will be introduced into evidence before the proceeding.[29]

✓ Monitor whether your client and/or witnesses respond to the proceedings as anticipated and inform the court immediately if it appears that an auxiliary aid or service may be ineffective or not functioning.

✓ Make timely objections as to the quality of the auxiliary aid or service as soon as you are aware of any problem.

✓ Provide auxiliary aids and services for confidential communications with clients.[30]

✓ Speak directly to your client who is deaf or hard of hearing and not to the interpreter.

✓ Attend trainings to ensure cultural competence when representing deaf and hard of hearing clients.

✓ Inform the court well in advance if you will need a continuance so the service providers can be canceled in a timely manner.

---

29  Doing so allows them to become familiar with names and technical vocabulary. The more information they have about the case in advance the better they can do their jobs.

30  The court is not required to provide auxiliary aids and services for communicating with your client outside of court. Attorneys have a duty to ensure effective communication with their clients and to zealously advocate for their clients' best interests.

# SERVICE PROVIDERS (INTERPRETERS, CART CAPTIONER, ETC.)

✓ Request to review case files and exhibits, photos, or other records that will be introduced into evidence to help ensure an accurate and effective interpretation.[31]

✓ Contact the court early for information about the nature and length of the proceeding, number and roles of participants who are deaf or hard of hearing, participants' communication needs, and point of contact.

✓ Prepare for the qualifying or voir dire process by bringing copies of relevant documentation such as certifications and trainings.

✓ Arrive at the court or other designated location early so as to check in with the appropriate officer and set up necessary equipment (e.g., CART).

✓ Meet with the participant who is deaf or hard of hearing before the proceeding to assess the participant's communication needs, confirm that you understand one another, and explain your neutral role.

✓ Request a meeting with the judge and attorneys before the proceedings to clarify your role, discuss interpretation procedures and logistics (e.g., seating, sightlines, lighting), address potential problems, and provide any recommendations on how to ensure effective communication for participants who are deaf or hard of hearing.

✓ Decline assignments that you are not qualified for or that pose a conflict of interest.[32]

✓ Inform the court immediately if you think the communication is not effective.[33]

✓ Inform the court immediately of any impediments to performance (e.g., background noise, poor lines of sight, people speaking at once, equipment failure, high rate of speech).

✓ Inform the court immediately of any error you have made in interpreting and correct the error. If you become aware of an error after the testimony has been completed, request a bench or side bar conference with the court and lawyers.

✓ When necessary, ask permission from the judge to have questions or testimony repeated or to use a dictionary or other aid when uncertain how to intepret a term.

---

31  NATIONAL CONSORTIUM OF INTERPRETER EDUCATION CENTERS, BEST PRACTICES: AMERICAN SIGN LANGUAGE AND ENGLISH INTERPRETATION WITHIN LEGAL SETTINGS 25 (Mar. 2009), *available at* http://www.interpretereducation.org/wp-content/uploads/2011/06/LegalBestPractices_NCIEC2009.pdf.

32  Given the risk and potential consequences of error, a first-time service provider should never be assigned to criminal proceedings or to a full civil trial. Service providers who wish to gain experience in legal settings should start with simple, brief hearings where the participant will not have a strong influence on the outcome.

33  Some states have court rules that require interpreters who have any reservation about their ability to satisfy an assignment competently to immediately convey that reservation to the parties and to the court. *See, e.g.*, WASH. REV. CODE ANN. RULES GEN. RULE 11.2(c) (1987).

✓ Refer to yourself (an interpreter) in the third person (i.e., "the interpreter" or "this interpreter") when you need to speak directly to the judge on your own behalf.

✓ Attend educational programs, seek mentoring opportunities, and engage in independent study to further develop knowledge and skills and keep abreast of trends in the profession.

✓ Keep informed about alternative providers in your area and how to contact them in the event you are unavailable or not qualified for the assignment.

✓ Maintain confidentiality of assignment-related information.



VII.

# APPENDICES

## APPENDIX A

### Understanding the Needs of the Person Who Is Deaf or Hard of Hearing

#### 1. WHAT TYPE OF AUXILIARY AIDS OR SERVICES DO YOU NEED?

*Interpreters & Transliterators*

ASL Interpreters

- Signed English Interpreters
- Certified Deaf Interpreters
- Tactile Interpreters
- Tracking Interpreters
- Close-Vision Interpreters
- Oral Transliterators
- Cued Speech Transliterators

*Communication Access Realtime Translation (CART)*

*Assistive Listening Systems*

- Induction Loops
- FM Broadcast
- Infrared System

#### 2. WHAT KIND OF PROCEEDING ARE YOU PARTICIPATING IN?

- Civil
- Criminal
- Family
- Traffic
- Court-mandated programs, services, or trainings
- Other settings

How long is the proceeding expected to last?

#### 3. WHAT WILL YOUR ROLE BE IN THE PROCEEDING?

- Party
- Defendant
- Juror/Prospective Juror
- Witness
- Family Member
- Spectator
- Lawyer
- Legal Staff
- Judge
- Courtroom Personnel
- Other Capacity as Court Participant

47

# APPENDIX B

## General Principles to Keep in Mind Regarding Persons Who Are Deaf or Hard of Hearing

1. How well a person speaks is *not* a reliable indicator of how well he or she hears. A person with clear speech may still be profoundly deaf, as he or she may have become deaf after learning to speak or learned to speak while being deaf.

2. How well a person communicates one-on-one is *not* a reliable indicator of how well he or she communicates in a group setting or in a courtroom.

3. Each person who is deaf or hard of hearing has different communication needs, and no two persons are the same.

4. The same person may request a different auxiliary aid or service for different types of proceedings.

5. Respect the specific auxiliary aid or service requested by the individual who is deaf or hard of hearing.

6. The efficacy of a given auxiliary aid or service varies based on the nature, length, or complexity of the proceeding, as well as the participant's role in it.

# APPENDIX C

## Sample Interpreter's Oath

"Do you solemnly swear or affirm that you will interpret accurately, completely, and impartially, using your best skill and judgment in accordance with the standards prescribed by the code of ethics for interpreters, and follow all official guidelines established by this court for legal interpreting or translating and the discharge of all of the solemn duties and obligations of legal interpretation and translation?[1]"

---

1   Karen L. Richards, *Vermont Court Interpreter Manual* 11 (2009), *available at* http://www.ncsc.org/~/media/Files/PDF/Services%20and%20Experts/Areas%20of%20expertise/Language%20Access/LEP%20Resources/Vermont%20Court%20Interpreter%20Manual%20Final.ashx.

# APPENDIX D

## Assessing Court Interpreter Qualifications: Sample Voir Dire[1]

1.  What credentials do you hold?

2.  What certifications do you hold?

3.  How long have you been an interpreter?

4.  What specialized training have you had?

5.  Describe your formal legal training

6.  How many times have you interpreted in court?

7.  For what types of proceedings?
    i.   Civil
    ii.  Criminal
    iii. Family
    iv.  Traffic
    v.   Other settings

8.  Have you interpreted for this type of proceeding before? When? How many times? To what extent?

9.  Have you ever been disqualified from interpreting in any court proceeding?

10. Do you understand your duties under the Code of Ethics (RID-NAD Code of Professional Conduct *and* National Association of Judiciary Interpreters & Translator's (NAJIT) Code of Ethics and Professional Responsibility) as it applies to legal interpreters?

11. Do you have any potential conflicts of interest with respect to this proceeding?
    i.   Are you familiar with, related to, or close aquaintances with anyone in this proceeding?
    ii.  Have you worked for anyone in this proceeding?
    iii. Have you ever interpreted for anyone in this proceeding?
    iv.  Are you a potential witness in this proceeding?
    v.   Are there any professional or personal issues that may influence your interpretation?
    vi.  Do you have a stake in the outcome of the proceeding?

---

[1]  *See* The Supreme Court of Ohio, *Working with Interpreters for Deaf or Hard of Hearing Persons in the Courtroom: A Bench Card for Judges* (2007), http://www.supremecourt.ohio.gov/Publications/interpreter_services/DeafHOHbenchcard.pdf; Karen L. Richards, *Vermont Court Interpreter Manual* 39 (2009), *available at* http://www.ncsc.org/~/media/Files/PDF/Services%20and%20Experts/Areas%20of%20expertise/Language%20Access/LEP%20Resources/Vermont%20Court%20Interpreter%20Manual%20Final.ashx.

12. Should interpreting errors occur, how do you intend to inform the court?

13. Have you had an opportunity to meet with the participant who is deaf or hard of hearing?

14. Did you and the participant agree that you can effectively communicate with one another?

15. Are there any dialect or idiomatic differences that will hinder communication?

# APPENDIX E

## Sample Judge's Instruction: Interpreter's Role

An interpreter will be present during the proceedings to facilitate communication between the individual who is deaf or hard of hearing and the court, the attorneys, and other parties. His/her role is to accurately, completely, and impartially interpret questions and statements directed to the deaf or hard of hearing party, defendant, or witness by counsel or the judge. The interpreter has a duty to interpret everything that is being said without editing, adding, omitting, summarizing, or providing explanations or personal opinion. He/she is not a party in the proceeding, does not work for either party, has no interest in the case, and is completely neutral.

Interpreters speak in the first person to ensure that the court record accurately reflects that the deaf or hard of hearing person's statements are voluntary and of his/her own free will and not the interpreters' conclusion.

The interpreter cannot answer questions, give advice, express personal opinions, communicate conclusions, engage in conversations with the parties, the attorneys, the witnesses or participants who are deaf or hard of hearing, or provide assistance in any other way except to facilitate communication. The interpreter should always address the judge if an intervention is necessary, such as to ask for clarification when he or she did not hear or understand what the speaker has said or to consult a dictionary. If the person who is deaf or hard of hearing cannot communicate effectively with the interpreter, he/she should let the judge know.

Does anyone have any question about the role or responsibilities of the interpreter?

# APPENDIX F

## Sample Judge's Instruction to Witness: Interpreter's Role

I want you to understand the role of the interpreter. The interpreter is here only to interpret the questions that you are asked and to interpret your answers. The interpreter will say only what we or you say and will not edit, add, omit, or summarize anything.

The interpreter will say in English everything you say in your language, so do not say anything you do not want everyone to hear.

If you do not understand a question that was asked, request clarification from the person who asked it. Do not ask the interpreter.

Remember that you are giving testimony to this court, not to the interpreter. Therefore, please speak directly to the attorney or me, not to the interpreter. Do not ask the interpreter for advice.

Please speak in a loud, clear voice so that everyone and not just the interpreter can hear.

If you do not understand the interpreter, please tell me. If you need the interpreter to repeat something you missed, you may ask for it to be repeated, but please make your request to the person speaking, not to the interpreter.

Finally, please wait until the entire question has been interpreted in your language before you answer.

Do you have any questions about the role of the interpreter? Do you understand the interpreter?

# APPENDIX G

## Sample Judge's Instruction to Jurors When Juror Is Deaf or Hard of Hearing: Interpreter's Role

A juror who is deaf or hard of hearing will be using an interpreter. The interpreter's role is to enable the juror who is deaf or hard of hearing to participate fully as a juror by giving him or her full access to everything being said. The interpreter's sole function is to make possible full communication between the deaf or hard-of-hearing juror and the other jurors. Jurors should talk directly to the juror who is deaf or hard of hearing as if no interpreter were present.

The interpreter is required to:

- Interpret everything accurately and never leave out, add, or change anything being said.
- Keep confidential everything that is ever said during the jury's conversations and deliberations, so that anything can be discussed openly in the presence of the interpreter.
- Be unbiased and free of conflicts of interest.

When you are talking among yourselves outside the courtroom, do not talk to or try to involve the interpreter directly. The interpreter is not allowed to participate in your conversations or subsequent deliberations in any way.

The interpreter is not a member of the jury and should not offer personal opinions, legal advice, or play any other active role in the deliberation process.

The interpreter is not a party in this case, and has no interest in it and therefore is completely neutral.

Jurors should speak one at a time.

Does anyone have any questions about the role of the interpreter?





AMERICAN BAR ASSOCIATION
Commission on
Disability Rights

# EXHIBIT 71

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**

P.O. Box 4036
Sacramento, CA 95812-4036



*Sent via Email Only*

August 11, 2022

Rita Lomio                                    Caroline Jackson
Prison Law Office                             Rosen, Bien, Galvan & Grunfeld
Email: RLomio@prisonlaw.com                   Email: CJackson@RBGG.com


Re: Sign Language Interpreters and Parole Hearings (*Armstrong v. Newsom*)


Dear Ms. Lomio and Ms. Jackson:

Thank you for the patience you have extended while the Board of Parole Hearings has worked to research and address the concerns of your initial advocacy letter of November 13, 2019, and the additional information, suggestions, and requests that have followed as part of our ongoing meetings and discussions. This letter explains the board's position on several of the matters we have discussed, with an understanding that the parties continue to meet and discuss additional matters.

As you are aware, many of the board's practices have changed since your original letter. As the result of a global pandemic, the board's hearing process was modified and most hearings are now held virtually instead of in-person. During the beginning stages of the COVID pandemic, you provided insight and opinions on what you felt the hearing process should look like for disabled individuals. For incarcerated people who communicate using sign language, you asked the board to provide in-person hearings and the board agreed. This was primarily due to the nature of sign language and the nuances of whole body visual communication that could potentially be lost in videoconference. With your input, the board promulgated regulations that provide in-person hearings for those who communicate using sign language.

Unfortunately, as COVID continues and mitigation and safety remains a priority, the ability to conduct in-person hearings remains limited. The parties

have worked diligently and with flexibility to ensure a fair and accessible hearing process for all incarcerated individuals. We have learned much during this process, and the board now has regulations in effect and can provide a formal response.

**Additional sign language interpreters at hearings**

The board, like many government entities, hires interpreters through a contract service. The current contract expires June 30, 2023, and calls for the provision of one interpreter per hearing. The board recognizes changes are needed for the next contract, and intends to use the recommendations of the California Judicial Council (discussed later) and information received from you as guidance for the next contract. In addition to reviewing the Judicial Council recommendations, the board contacted several interpreter services to survey current industry practices. The providers explained that jobs of a legal nature are generally divided into half day and whole day assignments. For a job that is a half day, meaning four hours or less, normally only one interpreter is scheduled. For jobs in excess of four hours, two interpreters are scheduled.

In May of 2020, the Judicial Council of California shared the 2020 Language Need and Interpreter Use Study (hereinafter "the study") with the public (located online here: https://www.courts.ca.gov/documents/2020-Language-Need-and-Interpreter-Use-Study-Report-to-the-Legislature.pdf). The study, which analyzes four fiscal years of recent data pursuant to Government Code section 68563, provides a summary and recommendations to the California Legislature and Governor regarding best practices for interpreter use in the California courts. The study finds that American Sign Language is the third language most frequently interpreted in the California courts[1]. The study acknowledges that the provision of interpretation services is made difficult by an "…insufficient number of qualified interpreters." (Page 4 of the study.) The study endorses the use of video remote interpreting to address the want for services in situations where in-person interpreter services cannot be procured.

The board's current practice is to provide an interpreter team of one Certified Deaf Interpreter and one American Sign Language Interpreter at suitability

---

[1] For context, Spanish was the most commonly interpreted language and accounted for 91.36 of interpreter needs from Fiscal Year 2014 – 2015 through Fiscal Year 2017 – 2018. Vietnamese ranked second, with a demand of 1.47% of interpretation needs.

hearings. The board's hearing officers are instructed to routinely provide breaks approximately every thirty minutes and to not require any services from the interpreters during the break. However, the board recognizes the concerns for potential interpreter fatigue and, as such, is adopting the following policy, which is supported by the Judicial Council's study and recognition of an interpreter shortage in California:

- The board will consult with the incarcerated person prior to a board-related event to determine whether an intermediary interpreter is needed (modeling Evid. Code § 754, subd. (g)). If an intermediary interpreter is needed, the board will retain a CDI and ASL team or appropriate equivalent based on the individual's needs;
- If interpreter services are needed for an estimated duration less than four hours, one interpreter or interpreter team (when an intermediary interpreter is needed) will be provided;
- If interpreter services are needed for an estimated duration in excess of four hours, two interpreters or two teams of interpreters (when an intermediary is needed) will be provided. For purposes of interpreter scheduling, the board will presume that a parole suitability hearing will require more than four hours of interpreter services unless it is known to the board with a reasonable certainty that the services will only be needed for less than four hours. For example, the board knows prior to the hearing that an incarcerated person intends to request and the board intends to grant a stipulation, waiver, postponement, or continuance at the hearing;
- When two interpreters or interpreter teams are assigned, the interpreter(s) will switch every hour or when an interpreter reports a need to switch (whichever event occurs first);
- Routine breaks will be provided approximately every half hour. No services will be requested from the interpreter during the break;
- For suitability hearings scheduled in-person pursuant to the board's regulations, the board's priority will be for in-person interpreters;
- If in-person interpretation is not possible due to interpreter unavailability, institutional limitations, or other exigent circumstances, the board's next priority will be to have one interpreter onsite and one interpreter appearing virtually;

- If no interpreters can be secured for in-person services, the board will consult with the incarcerated person to determine whether a hearing with virtual interpreter services meets the incarcerated person's needs;
- If virtual interpreter services will not meet the needs for the incarcerated person, the board will reschedule the hearing for the next available calendar and work with the contracted provider to retain interpreter services; and
- If in-person interpretation cannot be procured for the postponed hearing, the board will attempt to conduct the hearing with interpreters appearing virtually. If effective communication cannot be achieved, the board will continue the hearing to the next available calendar so the board can seek other interpreters for the assignment.

Guidance for board personnel reflecting the above policy will be shared with you prior to our next meeting, currently scheduled for Septemeber 7, 2022.

**Standards, guidance, and training regarding different types of interpretation**

Since the time of your letter, the board has provided education to the board's ADA Compliance Unit and the individuals responsible for hiring interpreters about the different types of interpreters that a person who communicates by sign language may need. The board is also amending the training materials provided to the hearing officers and board clinicians regarding this subject matter. Additionally, the board is drafting a "best practices guide" for all staff regarding certain disability-related matters, including information about the different types of interpreters. Drafts of the training materials and guide are forthcoming, and the board is receptive to feedback on these documents. Once finalized, in addition to providing internal training and distribution, the board also intends to share these materials with Parole Justice Works, the organization that oversees the panel attorneys representing incarcerated persons.

**Appropriate qualifications for retained interpreters**

The California Legislature has contemplated certification requirements for interpreters for the board. Qualifications for language services is addressed in the Government Code. Government Code section 11435.30 requires the State

Personnel Board to maintain a list of certified interpreters for administrative hearing. This list is only for eight languages and there is no mandate for the board to provide a certified sign language interpreter. (Gov. Code §11435.40 subd. (a).)

When contracting, the board has relied on the Judicial Council's policy for certification of sign language interpreters and contracted for interpreters who are certified by the Registry of Interpreters for the Deaf (RID). The Judicial Council acknowledges in the 2020 study that there is an outstanding need for certification practices as RID discontinued certain certification programs. The board is tracking the Judicial Council's efforts to develop training and standards for sign language interpreters. The board is committed to adopting the Judicial Council's guidance as appropriate and will include the recommendations where applicable when negotiating the next contract. The Judicial Council's Request for Proposals, which identifies many proposed goals is available online here: https://www.courts.ca.gov/documents/CFCC-2021-91RB-Request-For-Proposal.pdf.

In the interim, concerns of potential interpreter error should decrease as there will be more individuals who can communicate by sign present at most suitability hearings. The board is also forming a policy modeled after the system created by the Judicial Council for the provisional qualification of interpreters. The board's executive team will use discretion to decide whether an interpreter's qualifications are sufficient to merit appointment, similar to how the Judicial Council has given discretion to the courts. (See Judicial Council Forms INT-110 and INT-140, copies of which are included with this correspondence.)

**Provision of background information in advance of suitability hearings**

In researching current industry practices, the board contacted national and California-specific interpreter services and asked what information interpreters would like to receive prior to the hearings. The response was consistent—interpreter services did not want the central file, risk assessment, or other case-related information prior to the hearing. The board specifically discussed this issue with agencies that provide interpreters for criminal trials, and the agencies reported that pre-trial information generally consists of the identities of the parties and general summary of the expectations of the assignment.

The board appreciates that the parole hearing process and institutional setting are unique. To orient the interpreter to the setting, the board is preparing a brief summary of the parole suitability hearing process and will provide this information in advance of an assignment. This document is intended to help the interpreter understand the type of setting they are working in by defining the goals of a consultation, attorney-client meeting, forensic interview, and hearing. In addition, the board will provide the attached glossary of common terms that might be used in the suitability consideration process. To prepare this supplement, the board is working with institution interpreters, forensic clinicians, hearing officers, and other board staff to compile frequently used terms that may be unknown or infrequently used by a sign language interpreter. The board will provide a copy of the glossary to you as soon as it is complete. After your review, please advise if there are additional terms you believe merit inclusion.

**Video recording of hearings for people who communicate using sign**

The Judicial Council has not recommended videotaping of proceedings where interpreter services are used. It is the responsibility of Judicial Council to ensure the fair and impartial administration of justice. In 2015, the Judicial Council voted to adopt the Strategic Plan for Language Access in the California Courts (hereinafter referred to as "the plan", a copy of which can be found here: https://www.courts.ca.gov/documents/jc-20150122-itemK.pdf). To create the plan, the Judicial Council formed work groups whose membership included, amongst others, members of the judiciary, interpreters, and advocates. (Committee and Subcommittees Rosters are here: https://www.courts.ca.gov/LAP.htm#panel28824).    The    committees conducted public hearings, received comments, and worked with stakeholders including "…interpreters, legal aid attorneys, court users, judicial officers, and educators." (Information from the January 22, 2015 Press Release here: https://www.courts.ca.gov/28476.htm.) The membership reflects a thoughtful effort by the Judicial Council to provide representation for the needs of as many individuals as possible, including those who communicate using sign language.

One of the articulated goals of the plan is the "thoughtful and responsible deployment of technological solutions, such as appropriate use of video remote technology and multilingual audiovisual tools, which provide

language access while ensuring due process and high quality language services." (Page 8 of the plan; similar sentiments at 23.) The plan discusses the courts' ability to record materials and even recommends recorded materials in certain circumstances (i.e., employing video recordings for outreach efforts and to answer frequently asked questions). However, the plan does not recommend video recording of hearings.

The Judicial Council again chose not to recommend the video recording of hearings in the previously discussed 2020 study. This remains true despite the California courts increased use of Video Remote Interpreting.  (See "Language Access Services Updates February 2021" here: https://www.courts.ca.gov/documents/LAS-Updates-Spring-2021.pdf#:~:text=Strategic%20Plan%20for%20Language%20Access%20in%20the%20California,LEP%20court%20users%20in%20all%2058%20superior%20courts, wherein the Judicial Council reports on an expanded budget to add VRI services to 15 courthouses and over $1.5 million was invested in technology-related initiatives.) Even with this expansion, the Judicial Council does not recommend the video recording of hearings.

Moreover, the California Legislature has contemplated the use of interpreters at suitability hearings and declined to extend an obligation to video record the hearings. Specifically, Government Code section 11435.15, subdivision (5), specifically requires the board provide interpreter services for suitability hearings. The board is mandated to provide interpreter services, but there is no directive for state entities such as the board to video record hearings. Additionally, the provision of sign language interpreter services for criminal and civil proceedings is outlined in Evidence Code section 754. Similar to the Government Code, Evidence Code section 754 also does not include a recommendation for the video recording of proceedings where sign language interpretation is used. Lastly, there is also no recommendation in the Court Interpreters Act (28 U.S.C § 1827) to video record hearings despite the courts receiving discretionary permission to audio record proceedings.

Sign Language Interpreters and Parole Hearings
Page 8

Following the guidance outlined above and as prescribed by Penal Code section 3042, subdivision (b), a written transcript will remain the official record of the board's hearings. All individuals who have a parole suitability hearing will receive a copy of the written transcript of their hearing. Any concerns about interpretation at the hearing can be raised through the board's 1074 grievance process or through a request for decision review.

Very Truly Yours,

s/ Jessica Blonien

Jessica Blonien
Chief Counsel
Board of Parole Hearings

Attachments:
- Judicial Council Language Access Plan
- Judicial Council Langauge Need and Interpreter Use Study
- Judicial Council Request for Proposal
- Judicial Council Language Access Study Spring 2021 Update
- Form INT 110
- Form INT 140

# EXHIBIT 72



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Laura Bixby
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

March 15, 2021

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:    Effective Communication of Written Information for Blind and Low-Vision Individuals

Dear Ms. Davis:

I write regarding Defendants' obligation to ensure that blind and low-vision individuals incarcerated in CDCR prisons receive effective communication of written information.[1] This letter gives an overview of this issue, describes the three main formats (large-print, audio, and braille) that should be used to communicate this information to individuals who cannot read regular-print text, offers initial proposals regarding how these accessible formats should be produced and provided to these individuals; asks several follow-up questions for Defendants, and provides an appendix setting forth a non-exhaustive list of the types of written information that Defendants must effectively communicate to blind and low-vision people. We hope this letter will help guide Working Group discussions.

## I.  Overview

As we stated at the initiation of this working group over a year ago, Defendants must identify the ways in which each blind or low-vision individual in CDCR custody can receive effective communication of written information, and ensure that every institution can deliver this such information in these ways. *See* Letter from Rita Lomio, Plaintiffs' Counsel, to Tamiya Davis, CDCR Office of Legal Affairs, Topics for Blind/Low Vision Working Group (Dec. 12, 2019) ("Defendants should document what reading accommodations blind and low vision class members prefer, including braille, large print (of various font sizes), and audio formats, and should provide materials in the appropriate format."). Blind and low-vision individuals must be permitted to review written information as effectively as their sighted peers, whether via regular- or large-print text,[2] audio recording, or braille. *See* ARP §§ II.E.1 & IV.I.2.a.

---

[1] The Blind/Low-Vision Working Group is separately addressing effective communication of non-written visual information, including through audio description of television programming.

[2] These decisions must be made on an individual basis, and cannot be based on DPP code alone. For example, some individuals classified DPV—including those with impaired limited peripheral visual function and a narrowed central field—may prefer regular-print text and would not benefit from large-print text, audio recordings, or braille. *See* Letter from Rita Lomio to Tamiya Davis (Dec. 12, 2019) (describing class members whose impaired peripheral visual function gives them a form of tunnel vision, and makes large-print text less readable).

[3703596.3]

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

As a result, Defendants must ensure that each institution has a reliable system to provide written information to blind and low-vision individuals in accessible formats. *See* ARP § IV.I.2.a (noting, in "WRITTEN MATERIALS" section, that "[e]ach institution/facility shall ensure that accommodations" including large print, "audiotapes and Braille are provided when necessary").

CDCR must maximize the independence of these individuals by providing written information in alternative formats that blind and low-vision individuals can review, study, and reference at any time, in the same way regular-text written materials can be reviewed by their sighted peers at any time. *See, e.g.*, *Am. Council of Blind v. Astrue*, No. C-05-04696 WHA, 2009 WL 3400686, at *7 (N.D. Cal. Oct. 20, 2009) ("Having someone read over the telephone does not compare to being able to absorb the information independently in order to study it, review it, and comprehend at one's own speed and mode of 'reading.' . . . Everyone who receives an important notice needs to be able to store it and retrieve it for later use. The blind and visually impaired need to do so as well."). Put differently, an incarcerated person's ability to review written information cannot be dependent on whether they have access to auxiliary aids, *see, e.g.*, HDSP Tour Report, Attach. D ¶ 4 (Jan. 2020) (noting that due to limited library access, low-vision class member has to choose between using auxiliary aids to conduct legal work or for personal matters, including reading and writing letters to his family); whether there is room in an existing general budget to create those formats, *see, e.g.*, SATF DPV Tour Report at 30 (April-June 2019) (Community Resource Manager reporting that he cannot provide written material in accessible formats "because his annual budget for printing material is only $115"); whether a staff member has the time to provide an accommodation, *see, e.g.*, *id.* at 24 (low-vision class member reporting that his counselor said he did not have time to provide forms in large print); or whether another person is willing to read written material aloud to them, *see, e.g.*, *id.* at 14 (noting need for blind class member to maintain privacy of written materials, including related to his conviction and any rule violations); CHCF AMT Tour Report at 4 (July 2019) (blind class member reporting that ADA workers have refused to help with reading and writing); SVSP AMT Tour Report at 3 (May 2019) (blind class member reporting that ADA workers and staff will not help him read and fill out forms). It is critical that CDCR maximize the independence of these individuals by providing written information in alternative formats that blind and low vision individuals can take with them to their cells, in the same way that regular-text written materials can be taken with sighted individuals to their cells and referenced later.

In particular, Defendants must develop a system to (1) identify and document an individual's primary and secondary method for reviewing written information and (2) provide written information in the appropriate accessible format.

The first issue—how to *identify and document* the appropriate accessible format for a given class member—should be coordinated with the pending discussions related to effective communication documentation as a general matter, which have been spun out from the joint audit policy disputes negotiations and which implicate other disabilities (including deaf and hard-of-hearing class members), to ensure consistency. We note that in the outside community, institutions solicit and record preferences from people to ensure that written material is provided in accessible formats.

[3703596.3]

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 3

Similarly, we occasionally have seen staff attempt to repurpose the existing effective communication documentation system to indicate necessary accessible formats for written information, although this is rare and not consistent between or within prisons. For example:

(ADA/Effective Communication Patient Summary for ████████, ██████, DPV)

This system should draw on or mirror how primary and secondary methods of communication are identified and documented for deaf and hard of hearing people. **Plaintiffs wish to begin discussion of how to identify the appropriate accessible format for blind or low-vision class members, such as through interviews of DPV- and DNV-designated individuals, at the next meeting of the Blind/Low-Vision Working Group.**

Separate from the issue of *identifying* the methods in which an individual can receive effective communication of written information, the focus of this letter is on the second issue listed above. That is, this letter lays out specific types of accessible formats that must be available within the California prison system—large-print, audio recording, and braille; seeks to provide structure for a system to ensure that institutions are able to produce or procure accessible formats for blind and low-vision class members; solicits further information from Defendants to help inform discussions; and provides a non-exhaustive list of the types of information that must be produced in accessible formats for these individuals. **Plaintiffs ask that Defendants, without delay, supplement the list provided in the Appendix with other instances of written information that are regularly provided to incarcerated individuals in CDCR custody.**

[3703596.3]

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 4

## II.   Accessible formats for blind and low-vision individuals

The following are the three main accessible formats in which written information must be made available to blind and low-vision class members who cannot read regular- or small-print text.

### A.   Large print

Many blind and low-vision individuals are able to read written information that is provided in large print, which is required by the ADA and *Armstrong* Remedial Plan. ARP § II.E.1. Unfortunately, at present we are unaware of any system that Defendants have for ensuring that individuals who require large-print text receive written documentation in large print. We are glad that Defendants appear to be taking steps to deploy additional electronic video magnifiers, such as DaVinci and Merlin machines, at select prisons, but this will not serve as a substitute for providing large-print written information to blind and low-vision individuals as a matter of course. Blind and low-vision individuals will not be receiving equal access to written information if they are able to review such information only at limited times of the day, at select locations, and when no other low-vision individual is already using a desired magnifier. *See* CMF AMT Tour Report at 2 (Aug. 2020) (noting that blind class member could not access auxiliary aids because library had been closed); SATF DPV Tour Report at 21 (April-June 2019) (describing a DPV class member's inability to read materials "independently in his cell" because magnifiers were located elsewhere). Furthermore, when blind or low-vision individuals review documents with sensitive information on them, electronic magnifiers may prominently display this information so that others can see what the individual is reading, as we have previously reported. *See* SATF DPV Tour Report at 17, 19, and 32 (June-Sept. 2018); SATF DPV Tour Report at 19 (April-June 2019). Plaintiffs look forward to the addition of these magnifiers at certain CDCR prisons, but Defendants must ensure that all prisons have structures in place to produce large-print documentation for individuals who rely on this accommodation.

It is crucial that in developing large-print materials for low-vision individuals, Defendants follow specific guidelines. "Large print," in this context, does not mean using a copy machine to zoom in on and reproduce text from an already-printed document or simply enlarging the text of a document on Microsoft Word before printing a document.[3] In the context of producing written materials for low-vision individuals, large print has a meaning that reflects the specific needs of low-vision people. This more detailed meaning of "large print" has been laid out by several expert groups. *See* Best Practices and Guidelines for Large Print Documents Used by the Low Vision Community, Council of Citizens with Low Vision International, American Council of the Blind (July 12, 2011), https://acb.org/best-practices-and-guidelines-large-print-documents-used-low-vision-community-authored-council; *see also* APH Guidelines for Print Document Design, American Printing House for the Blind, https://www.aph.org/aph-guidelines-for-print-document-design/ (setting forth a "standard of optimal usability" for large-print text).

---

[3] *See* Best Practices and Guidelines for Large Print Documents Used by the Low Vision Community, Council of Citizens with Low Vision International, American Council of the Blind (July 12, 2011), https://acb.org/best-practices-and-guidelines-large-print-documents-used-low-vision-community-authored-council ("Copy machines create fuzzy text, which is often on oversized pages, making the document cumbersome.").

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 5

We recently corresponded with a representative from the American Council of the Blind, who distilled the foregoing guidance into the following principles for how to create large print documents:

- Typeface – sans serif fonts, such as Arial, Helvetica, and Verdana are preferred. The representative noted that for the Council's magazine, "The ACB Braille Forum," they use Verdana 20-point bold for text, 24-point bold for headlines, and 22-point bold for sub-headlines.
- Line spacing – 1.5-line spacing is preferred, as it gives readers the space between lines to clearly read each line.
- Modifications – Do not use italics or underlining; they are very hard for readers with vision disabilities to read.

**CDCR Headquarters should promptly draft and circulate a memorandum setting forth a standard based on these principles, as well as those cited above, for how written documentation should be provided in large-print to blind and low-vision individuals, and clarifying who specifically at Headquarters and/or each institution will be responsible for this process. Plaintiffs wish to review and provide comment on this memorandum prior to its circulation.**

### B. Audio recording

Some individuals—particularly blind people who do not know braille—require access to audio formats. We are not aware of any system in place to provide audio formats of written materials to people in California prisons. Instead, blind and low-vision people who are unable to read written information often are forced to ask other incarcerated people or staff to read to them, out loud, each time they want to know what any written information says—be it RVR paperwork, homework, a textbook, or appeal response. *See* CMF AMT Tour Report at 2 (Aug. 2020) (describing a class member who, due to his vision disability, "has to rely upon his cellmate for help reading"). This is not adequate for a number of reasons. First, and foremost, it contravenes the principle of independence that is fundamental to the ADA and governing regulations. *See* 28 CFR § 35.130(b)(1)(iii) & § 36.303(c)(ii); *see also Am. Council of Blind v. Astrue*, No. C-05-04696 WHA, 2009 WL 3400686, at *7 (N.D. Cal. Oct. 20, 2009) ("Having someone read over the telephone does not compare to being able to absorb the information independently in order to study it, review it, and comprehend at one's own speed and mode of 'reading.' . . . Everyone who receives an important notice needs to be able to store it and retrieve it for later use. The blind and visually impaired need to do so as well."). Unlike possessing an audio file that one may review at one's own pace, asking for someone to read a document out loud makes the requestor heavily dependent on another person. We have repeatedly have reported across the prison system that staff and ADA workers do not always provide assistance when requested.[4]

---

[4] *See* CHCF AMT Tour Report at 6-7 (July 2020) (describing class members' reports that "there were very few staff who were willing or able to help them, especially with reading and writing"); CMF AMT Tour Report at 2 (July 2020) ("████████, ██████, *DPV, DPM,* ██, reported that he has had a difficult time finding somebody to help him read and write to accommodate his vision disability."); *id.* at

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 6

Second, blind and low-vision individuals should not be forced to give up their privacy to access written information, including information related to medical and mental health conditions, criminal convictions, parole preparation, and RVRs. *See, e.g.*, SATF DPV Tour Report at 10-11 (Oct. 2019 and Feb. 2020) (describing how a DPV class member's reliance on other individuals to read him materials out loud "do[es] not allow him to maintain privacy of certain matters, including related to his case or any rule violations"). This not only contradicts another purpose of the ADA, which is to secure individuals with disabilities' right to privacy, *see* 28 CFR § 36.303(c)(1)(ii), but also subjects blind and low-vision individuals to inferior treatment, giving them a diminished ability to review sensitive information in private in comparison with sighted incarcerated people, *see* 28 CFR § 35.130(a).

In short, requiring blind people to seek assistance from incarcerated people or staff each time they want to review information is inappropriate and no substitute for audio recordings. Defendants must implement a system to produce and provide audio recordings of written information to blind and low-vision individuals. *See* ARP § II.E.1 (listing "audiotaped texts" as an "[a]uxiliary aid"). As described in more detail below, *infra* Part II.D, some of these materials can be expeditiously recorded and made available to blind and low-vision individuals throughout CDCR due to their standardized format. For example, each institution could develop an audio recording of its orientation handbook and make this recording available upon request to blind and low-vision class members who cannot read. Other more individualized materials may require case-by-case translation into audio recording, which Defendants could produce either internally or externally through a contractor. *See* Braille, Text, and Other Media, LightHouse for the Blind and Visually Impaired ("The LightHouse offers Braille translation, audio recording, and large print production, including conversion to DAISY formats for audio."), https://lighthouse-sf.org/design/braille-accessible-media/. **Plaintiffs wish to discuss these and other potential ways of providing written information via audio recording to blind and low-vision individuals with Defendants at the next Blind/Low-Vision Working Group meeting.**

### C. Braille

A very small handful of people in CDCR custody can read braille. *See* SATF AMT Tour Report at 14 (April-June 2019). Individuals who are able to read braille and for whom braille is their preferred format for receiving communication of written information should be provided materials in braille. *See* ARP § II.E.1. Given that the braille-reading population in CDCR custody is small, developing a plan to provide these individuals with materials in braille should not pose an undue financial or administrative burden to CDCR. Possible methods of providing written materials in braille may include contracting with an outside organization such as LightHouse, utilizing in-house braille transcription services through the Blind Project at CMF, and hiring full- or part-time employees to perform this service internally. **Plaintiffs**

---

3-4 (describing blind and low-vision individuals' difficulty in receiving ADA worker assistance in reading materials out loud to them); SATF DPV Tour Report at 21 (April-June 2019) (describing a DPV class member's difficulty in "getting ADA workers to help him . . . read" because officers would not let ADA workers help him); *id.* ("Mr. ███████, ████████, DPV, ████, reported that officers in the ASU do not assist him with reading.").

**wish to discuss these and other potential ways of providing braille materials to blind and low-vision individuals with Defendants at the next Blind/Low-Vision Working Group meeting.**

### D.  Standardized vs. individualized Information

For each of the three formats described above, the system that Defendants establish to provide written materials should take into account whether a given piece of information being communicated to a blind or low-vision person is based on a standardized document, an individualized document, or some combination of the two. Many of the materials described in the Appendix attached to this letter, such as orientation handbooks and copies of CDCR regulations, are standardized—that is, they will not need to be modified depending on who receives and/or reviews them. This should expedite making them available to blind and low-vision people in CDCR institutions. For example, independent of what any particular individual requires, a certain number of copies of institutional OPs could be immediately produced in large-print and in braille, as well as audio-recorded, and then made available in the law library. Neither how this information is provided, what is contained in the information, nor how it is provided will need updating based on an individual's circumstances. **Plaintiffs request that Defendants, without delay, identify standardized written information that is regularly provided and/or available to incarcerated people, such as from the sample list provided in the attached Appendix, that can be expeditiously produced in large print, audio recording, and braille.**

Other materials, such as certain educational documents and health records, might be wholly individualized, with institutions producing them on a case-by-case basis, not based on a preexisting template. Finally, other materials, such as RAP responses and RVRs, are more akin to a hybrid of standardized and individualized information. These sorts of materials include some standard language as well as some individualized language. For these hybrid materials, CDCR might retain standard templates of them in each of the forms described *supra* Part II.A-C, and would input individualized information into these templates on a case-by-case basis. For example, a standard large-print RVR template could be developed, and an individualized large-print RVR would be produced based on this template when an individual is accused of a rules violation. **For materials that are at least somewhat individualized, Defendants must develop a system for ensuring that when such materials are provided to blind and low-vision people who cannot read regular-print text, these materials are first directed, at each institution, to the proper channel for translating them into large print, audio recording, or braille. Plaintiffs wish to discuss how to develop this system at the next meeting of the Blind/Low-Vision Working Group.**

For certain individualized and hybridized information, situations may arise in which an institution is unable to timely provide the information to an individual via their preferred method of communication. To avoid prolonged delays in providing effective communication, Defendants should develop contingency plans to anticipate (1) what alternative, interim methods of communication they will utilize in such instances (for example, by documenting that an individual who most effectively comprehends materials via audio recording is also able to read—even if with some difficulty—large-print text), and (2) how to ensure that the appropriate method is provided as soon as possible (for example, by requiring that the

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 8

appropriate method is provided within a certain amount of time, such as 24 hours). **Plaintiffs would like to discuss what kind of contingency plans Defendants will develop to address these potential delays.**

### III. Questions and concerns

In addition to the foregoing items that we have flagged for discussion at the next meeting of the Blind/Low-Vision Working Group, we have a series of questions that we hope Defendants are able to answer at the next meeting or shortly thereafter:

1. What existing, CDCR-wide processes facilitate the provision of written information in each of the three formats describe above, *supra* Part II.A-C? Is there any Headquarters-level guidance for how institutions should provide information in these formats?
2. How and when are large-print texts, audio recordings, and braille materials typically provided at CMF, CHCF, and SATF, the institutions with the largest numbers of DPV-designated individuals?[5]
3. What potential mechanisms for internally producing large-print text, audio recordings, and braille materials currently exist within CDCR? For example, could the Blind Project at CMF transcribe written information, as described above, into braille?
4. How do Defendants anticipate the comprehensive accommodations assessment intersecting with this effort to develop institutional systems of providing effective communication to blind and low-vision class members? Will this assessment identify what sort of effective communication methods an individual can utilize?

**In sum, in addition to answers to these questions, we request the following:**

1. That the parties discuss, at the next meeting of the Blind/Low-Vision Working Group and thereafter, implementing a CDCR-wide system for identifying, such as through screening interviews of DPV- and DNV-designated individuals, blind and low-vision individuals' primary and secondary methods for reviewing written information.
2. That Defendants, without delay, supplement the list provided in the Appendix below with other instances of written information that are regularly provided to incarcerated individuals in CDCR custody.
3. That Defendants, without delay, identify standardized written information that is regularly provided and/or available to incarcerated people, such as from the list provided in the Appendix below, that can be expeditiously produced in large print, audio recording, and braille.
4. That CDCR Headquarters promptly draft and circulate a memorandum to all CDCR prisons setting forth a standard based on the large-print principles set forth *supra* Part II.A for how written

---

[5] As of the issuance of the February 2021 DPP Roster, there were 276 DPV-designated individuals and 223 DNV-designated individuals in CDCR custody. Most DPV individuals are housed at CHCF (55), CMF (52), or SATF (74), and a handful are housed at CIM (8), CCWF (9), HDSP (11), MCSP (12), RJD (16), and SVSP (1).

documentation should be provided in large-print to blind and low-vision individuals. Plaintiffs wish to review and provide comment on this memorandum prior to its circulation.

5.  That the parties discuss, at the next meeting of the Blind/Low-Vision Working Group and thereafter, how Defendants will systematically provide written information via large print, audio recording, and braille to blind and low-vision individuals. These discussions should address how Defendants will ensure that when individualized materials are provided to blind and low-vision people who cannot read regular-print text, they are first directed, at each institution, to the proper channel for translating them into large print, audio recording, or braille.

6.  That the parties discuss, at the next meeting of the Blind/Low-Vision Working Group and thereafter, what contingency plans Defendants will develop to address potential delays in delivering information in accessible forms to blind and low-vision people.

We look forward to discussing these issues at our next meeting on March 18, 2021. Thank you.

Sincerely,

Jacob J. Hutt

cc:     Blind/Low Vision Working Group

[3703596.3]

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 10

## APPENDIX

**Information that must be provided in accessible formats to blind and low-vision people**

Below is a non-exhaustive list of categories of written information that Defendants regularly provide to incarcerated people, which should be provided to blind and low-vision individuals in braille, large print, and/or audio recording, depending on the individual's documented disability and preference.

- Administrative materials in the law libraries
  - CDCR regulations
  - Institutional operational procedures (OPs)
  - Department Operations Manual (DOM)
  - Armstrong Remedial Plan
- Orientation[6]
  - Institutional orientation handbooks
  - Informational materials regarding available accommodations for individuals with disabilities
- Disciplinary
  - Rules Violation Reports (RVRs)[7]
    - Notices of Referral for Criminal Prosecution
    - Reports of the Investigative Employee (IE)
    - Form CDCR 115-MH-A
  - Counseling Only Rules Violation Reports (128As)
  - CDCR 114-A Administrative Segregation Unit Placement Notice
- Unit Classification Committee (UCC), Facility Classification Committee (FCC), and Institution Classification Committee (ICC)
  - Form 128-G Classification Chrono
  - Initial Classification Score Sheet
  - CDCR Form 128-B2 Security Threat Group Validation/Rejection Review
  - CDCR Form 128-B3 Security Threat Group Identification Score Sheet
  - CDCR Form 128-B4 Evidence Disclosure and Interview Notification
  - CDCR Form 128-B5 Security Threat Group Validation Chrono
  - CDCR Form 1030 Confidential Information Disclosure Form
- Appeals and reasonable accommodation requests
  - Documentation related to the CDCR Form 22, 602, and 1824 processes

---

[6] The parties agreed, during the last round of negotiations regarding joint audit policy disputes, to form a working group to address, among other things, effective communication of orientation materials. That working group will need to coordinate with the Blind/Low-Vision Working Group on cross-over issues.

[7] *See* SATF DPV Tour Report at 25 (April-June 2019) (report of blind class member that he cannot read the regular-print RVR paperwork that he is given and that he signed paperwork without knowing what it said).

[3703596.3]

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 11

- o   CDCR Form 128-C2
- Educational materials[8]
  - o   Institutional educational materials
  - o   Written materials for self-help and rehabilitative groups and religious services
- Medical and mental health documentation
  - o   1845 and 7410 documentation
  - o   Responses to CDCR Forms 7362 and 602HC
  - o   Information given by individual providers to patients[9]
  - o   CDCR Form 128-C3
  - o   Materials distributed or watched during recreational therapy groups
  - o   Standard COVID-19 information
  - o   Information related to requests for health care records, including CDCR Form 7385 Authorization for Release of Protected Health Information
  - o   Mental Health Services Delivery System Program Guide
- Program information, including Program Status Reports (PSRs), activity sign-ups, television schedules, IAC minutes, and other material posted on bulletin boards in-unit
- Ducats[10]
- BPH Hearing Preparation[11]
  - o   Notice of Rights
  - o   BPH Form 1073 copies
  - o   Olson Review Service Chronos
  - o   Chronos on Notice of Time and Date of BPH Hearings
  - o   Comprehensive Risk Assessments
  - o   Master Packet and Ten-Day Packet
  - o   NVPP Process Overview and Forms for Determinately Sentenced NVPP Individuals to Submit a Written Statement
  - o   Petitions to Advance Next Hearing
  - o   Notice of Appointed Attorney
- Parole

---

[8] *See* SATF DPV Tour Report at 29 (April-June 2019) (blind class member reporting that he cannot complete written assignments for Alcoholics Anonymous and Getting Out by Going In (GOGI) because the print is too small for him to read).

[9] For example, a blind class member informed us that he was issued a Prisoner Diabetic Handbook, but cannot read it at all or refer to it when he has concerning symptoms due to his vision disability. *See also* SATF DPV Tour Report at 25 (April-June 2019) ("A class member on D yard reported that he has signed things he has not understood because they have not been provided in large enough print or were not read out loud to him. On the day of the interview, for example, he reported that he had signed a form related to his dental care that he had not read.").

[10] *See* SATF DPV Tour Report at 25 (April-June 2019) ("Mr. ███████, ███████, DPV, ██, reported that whenever he receives a ducat, he cannot read it because the font size is too small.")

[11] The parties will need to coordinate discussions of these materials with parallel discussions in *Armstrong II*.

[3703596.3]

Ms. Tamiya Davis
Re: Effective Communication of Written Information for Blind and Low-Vision
Individuals
March 15, 2021
Page 12

- o BPH Hearing Transcript
- o CDCR Form 1515 Notice of Conditions of Parole
- o CDCR Form 1032 Notice of Time, Date, and Place of Computational Review Hearing
- o CDCR Form 1033 Computation Review Hearing Decision
- o Notice of a change in EPRD via an updated Legal Status Summary (LSS)

[3703596.3]

# EXHIBIT 73



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

October 28, 2022

VIA ELECTRONIC MAIL ONLY

PRIVILEGED AND
CONFIDENTIAL

SUBJECT TO
PROTECTIVE ORDERS

Jessica Blonien
Heather McCray
Nichole Miller
California Board of Parole Hearings
P.O. Box 4036
Sacramento, CA 95812-4036
Jessica Blonien@cdcr.ca.gov
Heather.McCray@cdcr.ca.gov
Nichole.Miller@cdcr.ca.gov

Katie Riley
CDCR Office of Legal Affairs
Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283-0001
Katie.Riley@cdcr.ca.gov

Re:   *Armstrong v. Newsom*: Accommodations for Deaf Sign Language Users
      Throughout the BPH Process
      Our File No. 0581-04

Dear Counsel:

We write to respond to the BPH request that Plaintiffs' counsel provide a complete list of all of the accommodations we contend are necessary for deaf and hard of hearing class members to have equal access in BPH proceedings.

This letter focuses exclusively on deaf individuals who use sign language, referred to as "deaf signers." We will write separately regarding the needs of deaf and hard of hearing individuals who do not use sign language. The letter begins with a brief description of the unique needs of deaf signers, and their historic barriers to accessing CDCR programming and BPH proceedings. The majority of the letter focuses on recommendations for training Commissioners, Forensic Assessment Division ("FAD") Clinicians and panel attorneys, and other steps to ensure effective communication during BPH proceedings, including the Comprehensive Risk Assessment ("CRA"). We have attempted to distill the information as much as possible in this letter, providing additional

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 2

information to expand on and clarify our requests in an appendix ("Training Appendix"). We urge you to review the Training Appendix for context as to why certain training is necessary, and what form it should take.

We note that what the ADA requires covered entities to do to accommodate deaf individuals varies based on a number of factors unique to the individual, as well as developments in technology. *See* 28 C.F.R. § 35.160(b)(2). Thus, some accommodations that currently are not common or do not exist will become common in the future, and accordingly, will become requirements of the ADA. This letter addresses only those accommodations necessary for ADA compliance at this time. We look forward to answering any questions you may have and further discussing this matter during upcoming BPH-only and all parties' meetings.

## I.  A Profile Of The Deaf Signers Who Come Before The Board

Deaf signers have a host of unique needs and experiences that require special consideration at every step of the BPH process, from initial consultation to transcript review. They further have faced historic exclusion from the rehabilitative programming that other CDCR prisoners have accessed, both due to absent or ineffective interpreting services and due to other barriers that an interpreter alone will not remedy. Finally, BPH itself historically has provided unqualified interpreters for BPH proceedings, rendering past transcripts and CRAs unreliable and affecting how Commissioners should treat these materials going forward. Taken together, these barriers mean that deaf signers face a much steeper learning curve in preparing for parole suitability and that they have received much less assistance than others in preparing for parole.

We briefly address each item in turn and refer Defendants to the Training Appendix for more information.

### A.  Deaf Signers Have Unique Needs Beyond Using Sign Language

Many deaf signers have unique needs stemming from a condition that is largely exclusive to deaf individuals: language deprivation, the result of having limited or no language access in early childhood. Language deprivation "interferes with the development of neurolinguistic structures in the brain," making it far more difficult for the person to learn new information, to learn language, and especially to learn information that can only be learned through language, a category that includes most social and emotional learning. *See* Tom Humphries et al., "Avoiding Linguistic Neglect

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 3

of Deaf Children," SOCIAL SERVICE REVIEW 589-619, 593 (Dec. 2016) (citations omitted).

Nearly every deaf signer in CDCR has reported in their CRA the type of early life experience that results in language deprivation: their families did not know sign language.[1]  This lack of early exposure to language (through sign language) in early childhood makes it difficult or impossible to learn any language at a fluent, adult level.  It further interferes with important aspects of learning and memory.  *See* Hall, et al., "Deaf Children Need Language, Not (Just) Speech," 39 FIRST LANGUAGE 4, at 376 (2019).  These deficits have cascading effects impairing our class members' ability to benefit from CDCR's rehabilitative programming and to articulate their insight in BPH hearings.[2]  It also significantly impairs their acquisition of written English, making it nearly impossible to learn new information through reading, and exacerbating barriers to developing relationships with non-signing individuals that they could capitalize on to prepare for Board.

> **B.    Deaf Signers Lack Access To Informal Programming Support From Other Incarcerated People And From Staff.**

Within prisons, deaf signers are typically one of only a handful of deaf signers on their prison yard.  They do not have access to sign language interpreters except for formal encounters with staff, such as during medical and due process encounters, or during educational or rehabilitative courses.  Accordingly, they face significant barriers to developing the kinds of relationships with staff that can lead to laudatory chronos, and

---

[1] *See, e.g.*, ██████████, CRA at 3 (parents never learned to sign and communicated through gestures; only one sibling could sign); ██████████, CRA at 2 ("None of his relatives learned sign language"); ██████████ CRA at 2 (parents "were unable to communicate with him"); ██████████, CRA dated 1/29/15 at 2 (mother knew minimal sign language, father and siblings knew none); ██████████, CRA at 2 (father did not know sign language; mother did not start learning sign language until he was in 6th grade).

[2] *Cf.* Edmund G. Brown, Jr., Governor, Indeterminate Sentences Parole Release Review Request for En Banc Review (Dec. 28, 2018) (referring decision to deny deaf class member with language deprivation parole for *en banc* consideration under Penal Code Section 3041.1, noting that "I am troubled that Mr. ██████s inability to better hear, see, or effectively communicate may be interfering with his ability to articulate his understanding of the crime").

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 4

they do not have a community of peers with whom they can communicate easily for help preparing for Board.  Further, even if they find peers willing to help them study, CDCR will not provide sign language interpreters for this type of encounter, leaving the deaf signer limited to whatever they can glean from writing notes – usually very little, given their low reading levels.

> **C.    CDCR Has Historically Excluded Deaf Signers From Rehabilitative Programming**

Historically, CDCR has clustered deaf signers at a handful of institutions with few programming opportunities and a staff culture of hostility toward people with disabilities.[3]  Deaf signers finally gained the opportunity to transfer to San Quentin, a program-rich institution, in 2020 and arrived just weeks before the pandemic delayed their access to in-person programs by more than a year.  Beyond these limitations, deaf signers face ongoing barriers because the programs themselves are not accessible.

> **1.    Until Recently, CDCR Did Not Provide Sign Language Interpreters For Rehabilitative Programming In Many Prisons.**

Plaintiffs' counsel have established that on-site sign language interpreters are the only accommodation (other than direct instruction in ASL) likely to result in effective communication for deaf signers.  *See* May 3, 2019 Ltr from D. Specter to R. Diaz and K. Allison, Discrimination Against Deaf People in California Prisons ("Specter Letter") at 4.  Due in part to the pandemic, CDCR did not begin consistently providing on-site interpreters for rehabilitative programming at all prisons with deaf signers **until 2022**.  Prior to 2022, in many prisons Defendants either did not provide sign language interpreters for this programming (at times due to in-person programming being cancelled due to the pandemic) or provided interpreting services solely through remote interpreting services, which were prone to technical problems that rendered the service ineffective.

---

[3] These institutions include SATF and RJD, both of which are under court orders due to officers subjecting individuals with disabilities to horrific acts of abuse.  Dkt. No. 3059 (Court Order addressing staff abuse of *Armstrong* class members at RJD); Dkt. No. 3217 (Court Order addressing staff abuse of *Armstrong* class members at SATF and four other prisons); *see also* Dkt. No. 3338 (Court Order addressing staff mistreatment of *Armstrong* class members at SATF).

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 5


### 2.    Even With Interpreters Present, Deaf Signers Do Not Have Full Access To Programming In CDCR

Sign language interpreters alone are not enough for deaf signers to have equal access to CDCR programming.  First, the *Armstrong* Remedial Plan allows CDCR to use low-quality interpreters,[4] meaning that a large share of interpreters' translations are inaccurate or indecipherable, effectively excluding deaf signers from rehabilitative programming even when interpreters are provided.  *Cf.* Transcript of Hearing for ███████████████ at 43:15-17, 25 (███████████: "AA and NA had an interpreter, but I didn't really understand them very well…").  Second, due to their history of language deprivation, many deaf signers are not fully fluent in ASL and require a specialized interpreter with additional training in how to re-phrase information in light of their language-related barriers to learning.  This type of interpreter is known as a Certified Deaf Interpreter (CDI).  CDCR does not provide CDIs.

Third, due to the cognitive deficits resulting from language deprivation, many deaf signers cannot learn at the same pace as non-deaf individuals, regardless of the quality of the interpreter.  They need specialized instruction tailored to their unique learning style.  Plaintiffs' counsel has advocated for CDCR to provide this kind of instruction, without success.  *See* Letter from C. Jackson to Defendants, Equal Educational Opportunities for Deaf Class Members (July 1, 2019) ("Jackson Letter") at 4-8.

Taken together, these factors mean that deaf signers typically are limited to programs that are too advanced for them to begin with, that move too quickly for them to have any hope of catching up, that are taught in a language they do not fully understand (sign language), as conveyed by a person who may or may not be conveying the material in an accurate or even intelligible fashion.  This is not program access; it is exclusion.  *See* Jackson Letter at 4-8; Specter Letter at 7-8.  Commissioners need to take this

---

[4] The *Armstrong* Remedial Plan allows CDCR to use "Support Service Assistant Interpreter[s] from the California Department of Rehabilitation."  *See Armstrong* Remedial Plan at II.E.3.  Interpreters can obtain this credential by scoring just 70% on an exam.  *See* DOR, Support Service Assistant: Interpreter, *available at* https://www.jobs.ca.gov/JOBSGEN/2RHAB.PDF (last accessed Oct. 19, 2022).  The scoring criteria suggest that individuals can achieve a passing score despite crucial weaknesses in interpretation that render them unsuitable for many interpreting tasks.  *See id.*

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 6

exclusion into account with respect to deaf signers, as it may be necessary to set lower expectations for the level of insight these individuals may achieve while incarcerated.

### D.  BPH Has Historically Provided Unqualified Interpreters That Cause Errors In CRAs And Hearing Transcripts

Historically, BPH has not provided effective communication during its own proceedings.  Until recently, BPH consistently engaged sign language interpreters who were not qualified and made any number of errors.  Plaintiffs' counsel has extensively documented these errors during BPH hearings and has reason to believe they have also occurred during the CRA.[5]  Accordingly, any time BPH Commissioners rely on a deaf signers' testimony during a prior hearing or their statement during a CRA, the Commissioner may be relying on inaccurate information about what the deaf signer stated or which question the deaf signer was responding to when making that statement.

### II.  Train Commissioners, FAD Clinicians And Panel Attorneys On Deaf Signers' Unique Needs

In light of the many factors unique to deaf signers that impact their performance in parole suitability hearings, BPH should provide Commissioners, FAD clinicians and attorneys ("officials") with comprehensive training to ensure these officials do not deny parole to individuals who would be found suitable but for being deaf.  Indeed, BPH is required to provide such training.  *See* Dkt. No. 1124-2 at ¶ 14.  Such training should cover the topics listed below.  The Training Appendix contains a longer explanation of what the training should cover and why training on the topic is necessary.

1. <u>Using an interpreter.</u>  Officials should receive training on helping interpreters prepare, to include a brief consultation between the interpreter and both the official and the deaf participant prior to beginning the encounter.  The training should also include tips on etiquette and on speaking in way that is easy for the interpreter to effectively translate.

---

[5] *See* Q4 2020 Life Prisoner Monitoring Report (February 19, 2021) at 6-10; Q1 2021 Life Prisoner Monitoring Report (June 30, 2021) at 4-7; Q3 2021 Life Prisoner Monitoring Report (November 30, 2021) at 7-8; Q1 2022 Life Prisoner Monitoring Report (June 7, 2022) at 10-11; Q2 2022 Life Prisoner Monitoring Report (September 12, 2022) at 9-14; Ltr. from C. Jackson to Defendants, Follow-up re Advocacy for ███ ███████ DPH, DPS (December 23, 2020) at 4-8.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 7

2.    <u>Cultural aspects of communicating with deaf signers to ensure successful communication.</u>  Of particular importance, two common behaviors for deaf signers—nodding while someone is addressing them (not an indication that they understand), and providing long-winded answers to questions (a sincere effort to answer the question, not to evade it)—carry different significance for deaf signers than for others.  Officials need to understand the different meaning of these behaviors to avoid making incorrect assumptions about the deaf person's comprehension of information or motives in supplying information.

3.    <u>Deaf signers' need for more basic explanations and more repetition than most others.</u>  On average, deaf signers have a lower fund of world knowledge and more difficulty remembering new information than others.  Attorneys in particular need to know how to engage with their clients in a way that allows for these traits.

4.    <u>Certain effects of language deprivation and how to identify these effects.</u>  Due to the effects of language deprivation, most deaf signers start out farther behind their peers in social and emotional skills, and have much greater difficulty explaining themselves, especially in formal settings.  Commissioners in particular need to understand these effects to avoid setting unreasonable expectations that will prevent many deaf signers from ever demonstrating suitability for parole.  Training should include how to tailor the hearing to allow deaf signers to demonstrate suitability in a way that their disability does not impair.

5.    <u>Implications of low reading levels for deaf signers.</u>  Because of how heavily deaf signers must rely on writing for communication, having a low reading level poses far more barriers for deaf signers than for others, interfering with program access, the development of relationships, and preparation for parole.  Officials—including CCIs—should be aware that even deaf signers with high reading levels can face barriers accessing written communication because English is a second language.

6.    <u>Historic and ongoing barriers to programming for deaf signers.</u>  To this day, many deaf signers lack full access to programming.  In the past access was even more limited.  Officials need to be aware of these barriers to appropriately gauge deaf signers' program access and to set reasonable expectations for the progress they should have made.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 8

7.    <u>The availability of resources in the community for deaf signers.</u>  Some of the ongoing barriers to program access for deaf signers may never be removed.  As a result many deaf signers, despite their best efforts to rehabilitate, will never be deemed suitable for parole.  Officials should be aware of the programs available in the community for deaf signers and consider the option of granting parole to deaf signers who have shown consistent and significant effort to rehabilitate, but are hampered by these barriers to program access.  The grant may be conditioned on the deaf signer participating in fully accessible programs in the community (which may involve ordering their release to communities that have these options) to continue their rehabilitative progress.

8.    <u>Interpreters' potential translation errors during the proceeding and the inability of the deaf person alone to catch them.</u>  Currently, neither Commissioners nor attorneys seem able to identify or appropriately address the errors that interpreters have made during proceedings.  Further, deaf signers have not been able to self-advocate effectively for a variety of reasons.  Officials should receive training on how to identify and address in real time when communication is not effective.

9.    <u>Mistranslations in CRAs and transcripts of past hearings.</u>  Plaintiffs' counsel has identified extensive translation errors in parole suitability hearings that otherwise went unnoticed.  Officials must be aware that these translation errors almost certainly occurred during all past CRAs and parole suitability hearings.  They should receive training on how to appropriately engage with these documents in light of their potential unreliability, including believing deaf signers when they deny making previous statements and attribute the statement to a translation error.

10.    <u>The uniquely stressful and isolating nature of prison for deaf signers.</u>  Officials should be aware of the high levels of stress and isolation that deaf signers face in prison, over and above what others face.  With this knowledge, officials can give deaf signers appropriate credit for how they have coped with these stressors, as well as use the information to pose effective questions regarding the skills they have developed to do so and to overcome these barriers as well.

Plaintiffs' counsel would welcome the opportunity to work with BPH and with Parole Justice Works on developing this training.  In addition, two of the staff interpreters

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 9

at California Medical Facility have indicated they are willing to assist in developing the training.

Further, BPH may consider designating a small pool of Commissioners, FAD clinicians, and attorneys to specialize in working with deaf signers. This approach allows these officials to deepen their knowledge and understanding of the factors unique to this population, resulting in a more equitable process for determining parole suitability.

## III.   Ensure Effective Communication By Providing Qualified Interpreters And Video Transcripts/Translations

In November 2019, Plaintiffs sent a letter to BPH urging the adoption of certain procedures to ensure effective communication during hearings. *See* Letter from R. Lomio to J. Hood, et al., Sign Language Interpreters and Parole Hearings (November 13, 2019) ("Lomio Letter"). BPH responded almost two years later, in a letter dated August 11, 2022 ("BPH Letter"), agreeing to (1) provide intermediary interpreters pursuant to Evidence Code § 754(g); (2) provide two interpreters or two sets of interpreters for all BPH hearings, unless the hearing was likely to last fewer than four hours; (3) establish a procedure for approving interpreters who are not registered or certified to work in California courts; (4) provide sign language interpreters with information about the process but not the content of BPH proceedings; and (5) provide a glossary of terms to sign language interpreters. The BPH declined Plaintiffs' request to video record hearings with sign language interpreters.

As a threshold matter, we note that BPH proceedings rely far more on the deaf individual's communication with the panel and others than any court proceeding, while being equally high stakes: (1) unlike court proceedings, the deaf participant's attorney plays a minimal role in the proceeding; (2) unlike most court proceedings, the deaf person's own testimony constitutes a central and mandatory component of the proceeding; (3) unlike most court proceedings, the communication tends to center on complex questions about the deaf person's insight into various incidents, as opposed to simpler questions about what happened when; and (4) like court proceedings, an unfavorable outcome can relegate the deaf participant to life in prison. Accordingly, we believe that BPH must take more steps to ensure equal access to BPH proceedings than are necessary to ensure equal access to court proceedings. Title II of the ADA requires this kind of flexibility. *See* 28 C.F.R. § 35.160(b)(2).

We respond to the BPH letter below.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 10

     **1.**     **Have A CDI Evaluate Deaf Signers' Need For A CDI And Past Access To Programming In CDCR**

The BPH letter states the Board will "consult with the incarcerated person prior to a board-related event to determine whether an intermediary interpreter is needed." *See* BPH Letter at 3. We urge BPH to use a CDI to conduct this consultation. Many deaf individuals who need intermediary interpreters are not familiar with them, and may not know to request one. As intermediary interpreters, CDIs are in the best position to identify the need for their particular skill set. Members of this profession are also the best equipped to identify past and future barriers to program access that deaf signers face. The CDI can offer an opinion on the extent of the deaf individual's program access while incarcerated, so Commissioners do not impermissibly "rely on the failure of prisoners to participate in programs not available to them by reason of their disabilities as a factor," as well as how Commissioners can ensure they do not recommend that the deaf prisoner "participate in programs that are unavailable to them by reason of their disabilities." *See* Dkt. No. 1124-2, ¶¶ 36-37.

     **2.**     **Provide A Team Of Qualified Interpreters For All Proceedings Longer Than 30 Minutes**

We are pleased that BPH has agreed to provide two interpreters, or two sets of interpreters, for all parole suitability hearings over four hours. *See* BPH Letter at 3. However, the limitation of four hours is not acceptable. BPH based this decision on a study of how local courts use spoken language interpreters[6]—a practice not governed by the ADA. BPH should instead follow the guidance of the National Association of Judiciary Interpreters and Translators (NAJIT), which has developed the following recommendations based on empirical research and the necessities of ADA compliance:

> Team interpreting is recommended for all legal proceedings that may extend over a period of thirty minutes and fall outside the category of formulaic proceedings that generally follow a set and scripted order such as arraignments, initial appearances, sentencings, and pleas ….

---

[6] The 2020 Language Need and Interpreter Use Study the BPH letter relies on states that American Sign Language accounted for *less than one percent* of the "interpretations for the study period." *See* 2020 Language Need and Interpreter Use Study at 17. All other "interpretations" mentioned were for spoken languages.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 11

> Team interpreting should be used in all in-court proceedings, grand jury hearings, proffers/plea offer negotiations, as well as depositions and jail visits. It is an indispensable tool that protects the accuracy and faithfulness of the interpretation.

NAJIT, "Position Paper: Team Interpreting in Court-Related Proceedings" at 1-2 (May 2020) (emphasis added). Accordingly, BPH may need to provide a team of two or four interpreters for CRA evaluations and, in some cases, for consultations and attorney meetings. We ask that Defendants reconsider their position.

> ### 3.     Select Interpreters From California's List Of Court-Certified ASL Interpreters

We encourage BPH to hire sign language interpreters from the California court system's list of Court-certified interpreters, available online at https://www.courts.ca.gov/35273.htm. The separate process BPH envisions, *see* BPH Letter at 5, is necessary only to secure CDIs, as the aforementioned website does not maintain a list of Court-certified CDIs. In addition to selecting from this list, BPH should retain an interpreter to observe each interpreter's first BPH hearing to ensure the proceedings interpreter is qualified for the assignment. This additional step is necessary because certification does not definitively establish that an interpreter is qualified. *Cf.* Q3 2022 Report (CDI woefully unqualified despite appropriate certification).

Note that the recommendation that BPH provide an observing interpreter for an interpreter's first hearing represents a compromise by Plaintiffs' counsel. The National Consortium of Interpreter Education Centers ("NCIEC") recommends that any attorney representing a deaf person retain an interpreter to assist the attorney during any proceeding, both to object to the translation of the proceedings interpreter and to translate confidential information between the attorney and client. *See* NCIEC, Fact Sheet: Working with Sign Language Interpreters in Contested Matters, *available at* http://www.interpretereducation.org/wp-content/uploads/2012/10/Fact_sheet_Working_with_Sign_Language_Interpreters_in_Court_proceedings_and_party_interpreters.pdf (last accessed Oct. 17, 2022). This additional interpreter is particularly necessary for deaf individuals who require a staff assistant and do not feel comfortable using their institution's staff interpreter.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 12

### 4.    Provide Comprehensive Background Information To Interpreters Prior To The Hearing

We appreciate BPH's willingness to provide sign language interpreters with a glossary of terms and a summary of the board suitability hearing process.  *See* BPH Letter at 6.  However, BPH's assertion that interpreters prefer *not* to receive case-related information prior to interpreting proceedings, *see id.* at 5, runs contrary to best practices.  According to the NCIEC, an "interpreter is ethically obligated to prepare for all assignments" and "must be familiar with the case-related details in order to provide an accurate, meaningful, and effective interpretation."  NCIEC, "Best Practices: American Sign Language and English Interpretation Within Legal Settings" at 30 (March 2009).  Additionally, when Plaintiffs' counsel interviewed the sign language interpreters that BPH provided for the September 15, 2022 hearing for ███████████████, the interpreters stated they wanted to review as much information as possible before the hearing.

Plaintiffs' counsel urges BPH to provide all sign language interpreters with case-specific preparation materials.  We expect that any qualified interpreter will review the materials closely.  BPH should provide interpreters with the deaf person's 10-day packet and CRA, in addition to any materials describing the version of the crime that Commissioners regard as true.  With respect to the CRA, BPH should advise interpreters that Commissioners rely heavily on the content of the CRA, as many interpreters will not expect the panel to question a deaf participant about the content of the CRA.

We further suggest that BPH provide sign language interpreters with the opportunity to consult with someone familiar with the deaf person's language needs and preferred vocabulary.  If BPH provides a CDI for the proceeding, the proceedings CDI should also have the opportunity to consult with the CDI who conducted the initial language assessment.

Finally, we strongly recommend that BPH provide all sign language interpreters with a period of 5-10 minutes to confer with the deaf signer before the hearing begins.  This can be done informally; however, this conference is essential to allow the deaf person and the interpreters to gather information about the other person's communication styles and will greatly improve the efficacy of the interpreters during the proceeding.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 13

### 5.    Provide Deaf Participants With Video Transcripts

We were disappointed to learn that BPH declines to create video transcripts of hearings using sign language interpreters.  *See* BPH Letter at 6-8.  Best practices established by the NCIEC require video-recording hearings with ASL interpreters, because this is the only way "to preserve a statement made by a deaf person using sign language" and to preserve "the interpretation a deaf person received in the course of making a statement."  NCIEC, "Best Practices: American Sign Language and English Interpretation Within Legal Settings" at 22 (March 2009).  Capturing the deaf person's original statement, or the interpretation of the question that elicited the deaf person's statement, "is essential for preserving any evidence for a legal challenge."  *See id.*

Further, creating a video recording is the only way to make the transcript accessible to deaf signers who need to review it to prepare for subsequent hearings.  More than half of the deaf signers in the *Armstrong* class have TABE scores of 4.0 or lower.  They cannot understand a transcript presented in written English.  However, they can rely on a video of the sign language interpreter and of their own testimony to access the transcript in ASL.

Defendants' solution—directing deaf class members to use the institution's staff sign language interpreter to review their transcript—is inconsistent with the ADA.  First, this arrangement forces deaf class members to reveal sensitive information about themselves and their crimes to an interpreter they may not trust, which will deter many from requesting help.  Second, only a video transcript gives deaf class members the opportunity to review their hearing transcript at night and on weekends with the same frequency as others do who are preparing for parole.

Unlike most court proceedings, individuals preparing for subsequent parole suitability hearings rely heavily on the transcript of their previous proceedings to prepare.  And they do not have the benefit of an attorney to assist: BPH pays its panel attorneys less than $1,000 per hearing and requires them to hold only two, one-hour client meetings before the hearing.  This is not nearly enough time for the attorney to walk a deaf client through the transcript of a BPH hearing that may have lasted for several hours.  Our class members have to prepare on their own, and unless BPH provides a transcript in a language they can understand—namely a video transcript in ASL—BPH is depriving deaf signing class members of an equal opportunity to earn their freedom.

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 14

**IV.    Additional Considerations For The Comprehensive Risk Assessment**

In addition to using the measures set forth in part III, we offer the following recommendations to ensure effective communication during the CRA:

**A.    Conduct The CRA Either Directly in ASL Or By Using A CDI**

Ideally, the CRA would be conducted directly in ASL by a fluent signer. Studies have shown that an interpreter alone does not ensure effective communication in mental health settings.[7]  Alternatively, the BPH should provide a CDI whenever possible, even for class members who do not require a CDI in other contexts, due to the complexity and nuance of psychological assessments.

**B.    Provide An ASL Translation Of The Written CRA In Person And By Video**

On January 18, 2022, Defendants promulgated a new Memo regarding the Correctional Counselor Role in Board of Parole Hearing Processes for Inmates with Disabilities ("CC-I Memo"). The CC-I memo requires that CRAs be read to individuals who struggle to read and understand documents. *See* CC-I Memo, Attachment B at 2. It does not indicate the threshold for a TABE score that triggers this requirement. *See id.* This provision will need to be applied broadly and flexibly with respect to deaf signers, as many deaf individuals with TABE scores greater than 4.0 still will not know the specialized vocabulary necessary to read and fully understand their CRAs, and may not read English well enough to understand an explanation of the vocabulary, either.

We suggest Defendants train CC-Is to recognize that many deaf signers will have difficulty understanding their CRA, to offer to read it with a sign language interpreter as a matter of course, and to videotape the encounter for the deaf person to review later. It may also be appropriate to have a CDI translate the document, which can be done without the CC-I. The video is necessary to allow the deaf person to re-read their CRA in the

---

[7] *See* Robert Pollard, "Integrating primary care and behavioral health with four special populations: Children with special needs, people with serious mental illness, refugees, and deaf people," AMERICAN PSYCHOLOGIST 69(4): 385 (2014) ("Direct communication between Deaf patients and ASL-fluent providers would enhance quality of care."); *cf. Tugg v. Towey*, 864 F. Supp. 1201, 1208 (S.D. Fla. 1994) (direct communication in ASL necessary to satisfy ADA Title II requirements to provide deaf patients with equal access to mental health services).

[4159453.7]

**PRIVILEGED AND CONFIDENTIAL**
California Board of Parole Hearings
CDCR Office of Legal Affairs
October 28, 2022
Page 15


same manner that others do.  It is helpful to have the deaf person and the interpreter present together for the initial translation, even if by video, so the interpreter can tailor the translation to the deaf person's linguistic needs.  This process also allows the deaf person to identify in real-time any aspects of the translation that he does not understand.

\*   \*   \*

We appreciate your attention to this important matter.  We look forward to discussing Defendants' response at the meeting currently scheduled for November 4, 2022.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:cg
Encls.: Specter Letter; Lomio Letter; Jackson Letter; Training Appendix
cc:     BPH ADA Legal Team
        *Armstrong* Plaintiffs' counsel

[4159453.7]

# EXHIBIT 74



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email:  cjackson@rbgg.com

August 22, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>
Jessica Blonien
George Bakerjian
California Board of Parole Hearings
PO Box 4036
Sacramento, CA 95812-4036
Jessica.Blonien@cdcr.ca.gov
George.Bakerjian@cdcr.ca.gov

      Re:    *Armstrong v. Newsom*: Follow up to Defendants' Letter of August 11, 2022
             and the 2023 Contract for Sign Language Interpreters
             <u>Our File No. 0581-04</u>

Dear Counsel:

We write regarding the BPH's policies with respect to sign language interpretation.  We reviewed and were pleased to see that the new 2023 Contract includes provisions for providing Certified Deaf Interpreters (CDIs), for providing in-person services, and for providing two interpreters or two teams of interpreters for hearings.  We were disappointed, however, to see that the 2023 Contract did not appear to include the requirements for interpreter qualifications that the Board had committed to previously. *See* Letter from J. Blonien to C. Jackson and R. Lomio, August 11, 2022 ("August 2022 Letter"), attached as **Exhibit A**, at 4-5.  In that letter, Defendants stated that "the Board is committed to adopting the Judicial Counsel's guidance as appropriate, and will include the recommendations where, applicable when negotiating the next contract." *Id*. at 5.[1]

---

[1] Since 2019, to ensure the Board meets the ARP II standards on sign language interpretation and the ADA, we have urged the Board to ensure sign language interpreters have appropriate qualifications for legal proceedings, including legal certification "[w]here possible."  *See* Ltr. from R. Lomio to J. Hood & J. Blonien re Sign Language Interpreters and Parole Hearings (November 13, 2019) ("2019 Letter") at 8.  We have submitted numerous letters and reports documenting the errors that BPH's contracted

[4335186.2]

Jessica Blonien
George Bakerjian
August 22, 2023
Page 2

For sign language interpreters who are not Certified Deaf Interpreters (CDIs), "California courts still uphold the SC:L [(Specialist Certificate in Legal Interpreting)], formerly administered by the Registry of Interpreters for the Deaf (RID) as the only certification recognized in the California state courts in order to serve as an American Sign Language Interpreter (ASL)." *See* Cal. Courts, Information packet on becoming a California Court Interpreter, https://www.courts.ca.gov/documents/CIP-Info-Packet_1-11-23.pdf (last accessed Aug. 21, 2023), attached as **Exhibit B**, at 10; *see also* Evid. Code § 754(f).

This credentialing requirement is not limited to the courts. It is required of all sign language interpreters in "a civil or criminal action ... or in an administrative hearing, where a party or witness is an individual who is deaf or hard of hearing and ... is present and participating," *see* Evid. Code § 754(b), including parole suitability hearings, *see Quiros v. Mendoza-Powers*, No. CV066159RGK(JWJ), 2009 WL 1519411, at *3 (C.D. Cal. May 29, 2009) (characterizing "decisions of the California Board of Parole Hearings" as "state administrative decisions").

As we previously informed you, BPH should hire sign language interpreters from the California court system's list of Court-certified interpreters, available online at https://www.courts.ca.gov/35273.htm." *See* Ltr. from C. Jackson to J. Blonien, et al., re Accommodations for Deaf Sign Language Users Throughout BPH Process (October 28, 2022) at 11.

We last discussed interpreter quality during the All-Parties Meeting on February 13, 2023. During this meeting, Heather McCray stated that "so long as it does not unduly restrict us, we will be able to make that commitment [to hire only Court-certified interpreters] in the next contract." However, without providing any notice to Plaintiffs,

---

interpreters – almost none of whom have held legal certification – have committed during lifer parole consideration hearings, establishing that the interpreters were *not* able to convey information effectively or accurately, and did not know specialized vocabulary, preventing effective communication during these hearings. *See, e.g.*, Ltr. from C. Jackson to Defendants, Follow-up re Advocacy for ███████████████, DPH, DPS (December 23, 2020) at 4-8; Q4 2020 Life Prisoner Monitoring Report (February 19, 2021) at 6-10; Q1 2021 Life Prisoner Monitoring Report (June 30, 2021) at 4-7; Q3 2021 Life Prisoner Monitoring Report (November 30, 2021) at 7-8; Q1 2022 Life Prisoner Monitoring Report (June 7, 2022) at 10-11; Q2 2022 Life Prisoner Monitoring Report (September 12, 2022) at 9-14; Q3-Q4 2022 Life Prisoner Monitoring Report (February 6, 2023) at 39-43; C. Jackson, Observation of Parole Hearing of ███████████████ ███████ (May 1, 2023) at 7-8.

[4335186.2]

Jessica Blonien
George Bakerjian
August 22, 2023
Page 3

Defendants failed to include this provision in the 2023 Contract.  The contract states, in pertinent part:

**5. QUALIFICATIONS**

**Required:** All ASL, CDI, or other SLI interpreters provided by the Contractor during the term of this Agreement shall be certified by the Registry of Interpreters for the Deaf (RID), the National Association for the Deaf (NAD); or Certified only California Department of Rehabilitation (DOR) Support Services Assistant Interpreters.

**Desired:** Having general knowledge of the criminal justice system or court interpretation would aid any sign language interpreters to communicate the discussions more accurately and effectively during any pre-hearing proceedings or hearings.

*See* 2023 Contract at 6.

These requirements are not enough.  The 2023 Contract provides no standards for what constitutes "general knowledge of the criminal justice system or court interpretation."  A person could satisfy this provision by watching a handful of YouTube videos.  A proper standard would articulate a certification, such as the SC:L, or appearance on the list published by the California court system's list of Court Certified and Registered Interpreters.  Accordingly, **we request that Defendants amend the 2023 Contract to require sign language interpreter to appear on the California court system's list of Court Certified and Registered Interpreters or to hold the SC:L**.

**We also request that Defendants produce the documents the August 2022 letter states are being or have been developed**, including: (1) guidance for Board personnel reflecting the policies articulated on pages 3-4 of the August 2022 Letter, *see* Ex. A; and (2) any policies the Board has developed regarding the provisional qualification of interpreters, as stated on page 5 of the August 2022 Letter, *see id*.

/ / /

/ / /

/ / /

/ / /

[4335186.2]

Jessica Blonien
George Bakerjian
August 22, 2023
Page 4

Thank you as always for your ongoing courtesy and cooperation in this matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:CEJ
Enclosures: Exhibit A (w/o original attachments), Exhibit B

cc:  Ed Swanson                      Tamiya Davis
     Katie Riley                     Nicholas Meyer
     Jennifer Shaffer                Alexander "Lex" Powell
     Jim Logsdon                     Chor Thao
     BPH ADA General Email           Ramon Ruiz
     Sharon Garske                   OLA Armstrong
     Trace Maiorino                  Jennifer Neill
     Eric Chang                      Olena Likhachova
     Sean Lodholz                    August Gugelmann
     Mark Jackson                    Audrey Barron
     Patricia Ferguson               Co-Counsel
                                     Armstrong Case Team

[4335186.2]

# Exhibit A

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**

P.O. Box 4036
Sacramento, CA 95812-4036



*Sent via Email Only*

August 11, 2022

Rita Lomio                              Caroline Jackson
Prison Law Office                       Rosen, Bien, Galvan & Grunfeld
Email: RLomio@prisonlaw.com             Email: CJackson@RBGG.com


Re: Sign Language Interpreters and Parole Hearings (*Armstrong v. Newsom*)


Dear Ms. Lomio and Ms. Jackson:

Thank you for the patience you have extended while the Board of Parole Hearings has worked to research and address the concerns of your initial advocacy letter of November 13, 2019, and the additional information, suggestions, and requests that have followed as part of our ongoing meetings and discussions. This letter explains the board's position on several of the matters we have discussed, with an understanding that the parties continue to meet and discuss additional matters.

As you are aware, many of the board's practices have changed since your original letter. As the result of a global pandemic, the board's hearing process was modified and most hearings are now held virtually instead of in-person. During the beginning stages of the COVID pandemic, you provided insight and opinions on what you felt the hearing process should look like for disabled individuals. For incarcerated people who communicate using sign language, you asked the board to provide in-person hearings and the board agreed. This was primarily due to the nature of sign language and the nuances of whole body visual communication that could potentially be lost in videoconference. With your input, the board promulgated regulations that provide in-person hearings for those who communicate using sign language.

Unfortunately, as COVID continues and mitigation and safety remains a priority, the ability to conduct in-person hearings remains limited. The parties

have worked diligently and with flexibility to ensure a fair and accessible hearing process for all incarcerated individuals. We have learned much during this process, and the board now has regulations in effect and can provide a formal response.

**Additional sign language interpreters at hearings**

The board, like many government entities, hires interpreters through a contract service. The current contract expires June 30, 2023, and calls for the provision of one interpreter per hearing. The board recognizes changes are needed for the next contract, and intends to use the recommendations of the California Judicial Council (discussed later) and information received from you as guidance for the next contract. In addition to reviewing the Judicial Council recommendations, the board contacted several interpreter services to survey current industry practices. The providers explained that jobs of a legal nature are generally divided into half day and whole day assignments. For a job that is a half day, meaning four hours or less, normally only one interpreter is scheduled. For jobs in excess of four hours, two interpreters are scheduled.

In May of 2020, the Judicial Council of California shared the 2020 Language Need and Interpreter Use Study (hereinafter "the study") with the public (located online here: https://www.courts.ca.gov/documents/2020-Language-Need-and-Interpreter-Use-Study-Report-to-the-Legislature.pdf). The study, which analyzes four fiscal years of recent data pursuant to Government Code section 68563, provides a summary and recommendations to the California Legislature and Governor regarding best practices for interpreter use in the California courts. The study finds that American Sign Language is the third language most frequently interpreted in the California courts[1]. The study acknowledges that the provision of interpretation services is made difficult by an "…insufficient number of qualified interpreters." (Page 4 of the study.) The study endorses the use of video remote interpreting to address the want for services in situations where in-person interpreter services cannot be procured.

The board's current practice is to provide an interpreter team of one Certified Deaf Interpreter and one American Sign Language Interpreter at suitability

---

[1] For context, Spanish was the most commonly interpreted language and accounted for 91.36 of interpreter needs from Fiscal Year 2014 – 2015 through Fiscal Year 2017 – 2018. Vietnamese ranked second, with a demand of 1.47% of interpretation needs.

hearings. The board's hearing officers are instructed to routinely provide breaks approximately every thirty minutes and to not require any services from the interpreters during the break. However, the board recognizes the concerns for potential interpreter fatigue and, as such, is adopting the following policy, which is supported by the Judicial Council's study and recognition of an interpreter shortage in California:

- The board will consult with the incarcerated person prior to a board-related event to determine whether an intermediary interpreter is needed (modeling Evid. Code § 754, subd. (g)). If an intermediary interpreter is needed, the board will retain a CDI and ASL team or appropriate equivalent based on the individual's needs;
- If interpreter services are needed for an estimated duration less than four hours, one interpreter or interpreter team (when an intermediary interpreter is needed) will be provided;
- If interpreter services are needed for an estimated duration in excess of four hours, two interpreters or two teams of interpreters (when an intermediary is needed) will be provided. For purposes of interpreter scheduling, the board will presume that a parole suitability hearing will require more than four hours of interpreter services unless it is known to the board with a reasonable certainty that the services will only be needed for less than four hours. For example, the board knows prior to the hearing that an incarcerated person intends to request and the board intends to grant a stipulation, waiver, postponement, or continuance at the hearing;
- When two interpreters or interpreter teams are assigned, the interpreter(s) will switch every hour or when an interpreter reports a need to switch (whichever event occurs first);
- Routine breaks will be provided approximately every half hour. No services will be requested from the interpreter during the break;
- For suitability hearings scheduled in-person pursuant to the board's regulations, the board's priority will be for in-person interpreters;
- If in-person interpretation is not possible due to interpreter unavailability, institutional limitations, or other exigent circumstances, the board's next priority will be to have one interpreter onsite and one interpreter appearing virtually;

- If no interpreters can be secured for in-person services, the board will consult with the incarcerated person to determine whether a hearing with virtual interpreter services meets the incarcerated person's needs;
- If virtual interpreter services will not meet the needs for the incarcerated person, the board will reschedule the hearing for the next available calendar and work with the contracted provider to retain interpreter services; and
- If in-person interpretation cannot be procured for the postponed hearing, the board will attempt to conduct the hearing with interpreters appearing virtually. If effective communication cannot be achieved, the board will continue the hearing to the next available calendar so the board can seek other interpreters for the assignment.

Guidance for board personnel reflecting the above policy will be shared with you prior to our next meeting, currently scheduled for Septemeber 7, 2022.

**Standards, guidance, and training regarding different types of interpretation**

Since the time of your letter, the board has provided education to the board's ADA Compliance Unit and the individuals responsible for hiring interpreters about the different types of interpreters that a person who communicates by sign language may need. The board is also amending the training materials provided to the hearing officers and board clinicians regarding this subject matter. Additionally, the board is drafting a "best practices guide" for all staff regarding certain disability-related matters, including information about the different types of interpreters. Drafts of the training materials and guide are forthcoming, and the board is receptive to feedback on these documents. Once finalized, in addition to providing internal training and distribution, the board also intends to share these materials with Parole Justice Works, the organization that oversees the panel attorneys representing incarcerated persons.

**Appropriate qualifications for retained interpreters**

The California Legislature has contemplated certification requirements for interpreters for the board. Qualifications for language services is addressed in the Government Code. Government Code section 11435.30 requires the State

4

Personnel Board to maintain a list of certified interpreters for administrative hearing. This list is only for eight languages and there is no mandate for the board to provide a certified sign language interpreter. (Gov. Code §11435.40 subd. (a).)

When contracting, the board has relied on the Judicial Council's policy for certification of sign language interpreters and contracted for interpreters who are certified by the Registry of Interpreters for the Deaf (RID). The Judicial Council acknowledges in the 2020 study that there is an outstanding need for certification practices as RID discontinued certain certification programs. The board is tracking the Judicial Council's efforts to develop training and standards for sign language interpreters. The board is committed to adopting the Judicial Council's guidance as appropriate and will include the recommendations where applicable when negotiating the next contract. The Judicial Council's Request for Proposals, which identifies many proposed goals is available online here: https://www.courts.ca.gov/documents/CFCC-2021-91RB-Request-For-Proposal.pdf.

In the interim, concerns of potential interpreter error should decrease as there will be more individuals who can communicate by sign present at most suitability hearings. The board is also forming a policy modeled after the system created by the Judicial Council for the provisional qualification of interpreters. The board's executive team will use discretion to decide whether an interpreter's qualifications are sufficient to merit appointment, similar to how the Judicial Council has given discretion to the courts. (See Judicial Council Forms INT-110 and INT-140, copies of which are included with this correspondence.)

**Provision of background information in advance of suitability hearings**

In researching current industry practices, the board contacted national and California-specific interpreter services and asked what information interpreters would like to receive prior to the hearings. The response was consistent—interpreter services did not want the central file, risk assessment, or other case-related information prior to the hearing. The board specifically discussed this issue with agencies that provide interpreters for criminal trials, and the agencies reported that pre-trial information generally consists of the identities of the parties and general summary of the expectations of the assignment.

The board appreciates that the parole hearing process and institutional setting are unique. To orient the interpreter to the setting, the board is preparing a brief summary of the parole suitability hearing process and will provide this information in advance of an assignment. This document is intended to help the interpreter understand the type of setting they are working in by defining the goals of a consultation, attorney-client meeting, forensic interview, and hearing. In addition, the board will provide the attached glossary of common terms that might be used in the suitability consideration process. To prepare this supplement, the board is working with institution interpreters, forensic clinicians, hearing officers, and other board staff to compile frequently used terms that may be unknown or infrequently used by a sign language interpreter. The board will provide a copy of the glossary to you as soon as it is complete. After your review, please advise if there are additional terms you believe merit inclusion.

**Video recording of hearings for people who communicate using sign**

The Judicial Council has not recommended videotaping of proceedings where interpreter services are used. It is the responsibility of Judicial Council to ensure the fair and impartial administration of justice. In 2015, the Judicial Council voted to adopt the Strategic Plan for Language Access in the California Courts (hereinafter referred to as "the plan", a copy of which can be found here: https://www.courts.ca.gov/documents/jc-20150122-itemK.pdf). To create the plan, the Judicial Council formed work groups whose membership included, amongst others, members of the judiciary, interpreters, and advocates. (Committee and Subcommittees Rosters are here: https://www.courts.ca.gov/LAP.htm#panel28824). The committees conducted public hearings, received comments, and worked with stakeholders including "…interpreters, legal aid attorneys, court users, judicial officers, and educators." (Information from the January 22, 2015 Press Release here: https://www.courts.ca.gov/28476.htm.) The membership reflects a thoughtful effort by the Judicial Council to provide representation for the needs of as many individuals as possible, including those who communicate using sign language.

One of the articulated goals of the plan is the "thoughtful and responsible deployment of technological solutions, such as appropriate use of video remote technology and multilingual audiovisual tools, which provide

language access while ensuring due process and high quality language services." (Page 8 of the plan; similar sentiments at 23.) The plan discusses the courts' ability to record materials and even recommends recorded materials in certain circumstances (i.e., employing video recordings for outreach efforts and to answer frequently asked questions). However, the plan does not recommend video recording of hearings.

The Judicial Council again chose not to recommend the video recording of hearings in the previously discussed 2020 study. This remains true despite the California courts increased use of Video Remote Interpreting. (See "Language Access Services Updates February 2021" here: https://www.courts.ca.gov/documents/LAS-Updates-Spring-2021.pdf#:~:text=Strategic%20Plan%20for%20Language%20Access%20in%20the%20California,LEP%20court%20users%20in%20all%2058%20superior%20courts, wherein the Judicial Council reports on an expanded budget to add VRI services to 15 courthouses and over $1.5 million was invested in technology-related initiatives.) Even with this expansion, the Judicial Council does not recommend the video recording of hearings.

Moreover, the California Legislature has contemplated the use of interpreters at suitability hearings and declined to extend an obligation to video record the hearings. Specifically, Government Code section 11435.15, subdivision (5), specifically requires the board provide interpreter services for suitability hearings. The board is mandated to provide interpreter services, but there is no directive for state entities such as the board to video record hearings. Additionally, the provision of sign language interpreter services for criminal and civil proceedings is outlined in Evidence Code section 754. Similar to the Government Code, Evidence Code section 754 also does not include a recommendation for the video recording of proceedings where sign language interpretation is used. Lastly, there is also no recommendation in the Court Interpreters Act (28 U.S.C § 1827) to video record hearings despite the courts receiving discretionary permission to audio record proceedings.

Following the guidance outlined above and as prescribed by Penal Code section 3042, subdivision (b), a written transcript will remain the official record of the board's hearings. All individuals who have a parole suitability hearing will receive a copy of the written transcript of their hearing. Any concerns about interpretation at the hearing can be raised through the board's 1074 grievance process or through a request for decision review.

Very Truly Yours,

s/Jessica Blonien

Jessica Blonien
Chief Counsel
Board of Parole Hearings

Attachments:
- Judicial Council Language Access Plan
- Judicial Council Langauge Need and Interpreter Use Study
- Judicial Council Request for Proposal
- Judicial Council Language Access Study Spring 2021 Update
- Form INT 110
- Form INT 140

# Exhibit B



# Judicial Council of California

455 Golden Gate Avenue · San Francisco, California 94102-3688
Telephone 415-865-4200 · Fax 415-865-4205

PATRICIA GUERRERO
*Chief Justice of California*
*Chair of the Judicial Council*

MILLICENT TIDWELL
*Acting Administrative Director*

Dear Aspiring Interpreter,

Thank you for your interest in becoming a California certified court or registered interpreter. Please find the following information to learn about the profession and steps required for becoming a credentialed interpreter.

As a court interpreter, you will play a key role in our trial courts by interpreting for defendants, litigants and witnesses, thereby helping to ensure access to justice for thousands of Californians with limited English proficiency.

In a state where over 200 languages are spoken, there is a significant need for court interpreters. You will have the opportunity to experience California's cultural diversity firsthand. You will also be part of a group of trained professionals who have merged their language skills and their public service ideals into the rewarding career of court interpreting.

This information is a guide that includes the step-by-step process for becoming a court interpreter. We look forward to working with you as you take the first steps towards this new exciting profession.

Court Interpreters Program
courtinterpreters@jud.ca.gov

# Contents

I.    Steps to Becoming a Certified Court Interpreter.................................................... 1

II.   Steps to Becoming a Registered Court Interpreter...................................... 3

III.  Next Steps After Passing Your Examinations ................................... 5

IV.   You passed the examinations, what's next?................................... 5

V.    Frequently Asked Questions ................................................. 6

VI.   Association and Resources................................................. 10

VII.  Interpreter Training Programs:........................................... 10

VIII. Suggested Skills—Enhancing Exercises for All Languages ..................... 14

      BIBLIOGRAHY.......................................................... 22

File: G:\LGL_SVCS\CHILDREN.CTR\CrtInterp\Recruitment Campaigns

## *I.    Steps to Becoming a Certified Court Interpreter*

In California, candidates choosing to become court interpreters must be certified if their language of choice for conducting interpreting business is listed below.  If your language is not listed, proceed to section II—Registered Court Interpreters.

**Languages that require certification:**

American Sign Language (ASL)
Arabic
Eastern Armenian
Western Armenian*
Cantonese
Farsi (Persian)
Japanese*
Khmer
Korean

Mandarin
Portuguese
Punjabi
Russian
Spanish
Tagalog

Vietnamese

*The certification exam (the Bilingual Interpreting Exam) is not available for this language.

**Step 1:  Review the Candidate Information Bulletin.**

    **The bulletin provides information on:**
- ✓ The court interpreter profession;
- ✓ Existing requirements for certified interpreters;
- ✓ How to prepare for the Bilingual Interpreting Exam (BIE); and
- ✓ The certified court interpreter testing processes.

**Step 2:  Review the court interpreter's information on the Judicial Council's Court Interpreters Program website.**

**Step 3: Take the Qualifications for Court Interpreting and Self-Assessment (Click here)**

**Ready to move forward in becoming a certified court interpreter?**
If so, follow these next steps.

**Step 5: Create a Prometric Account**
    This step only applies if you are: (1) a new candidate; (2) you do not have a Prometric online account; and (3) don't have a dedicated Prometric ID number.

**Note:** All candidates must create and maintain a Prometric online account. The Prometric online account serves as the gateway for scheduling future exams.

**Step 6:  How do I create a Prometric Account?**

    To create a Prometric account, please click on this link: **Create a Prometric Account**.

**Step 7: How do I obtain the Prometric ID number?**

If you **do not have a Prometric ID number,** you will need to contact Prometric Candidate Care staff directly by calling **1-866-241-3118**. Candidate Care will review your online Prometric account information, and upon validation, they will provide you with the dedicated ID number. This ID number will be your identifier through the testing process, so keep this number (when you receive it) confidential.

**Important:** Before you contact Prometric Candidate Care to obtain your Prometric ID number, you must first create a Prometric online account.

**Step 8: How do I schedule my next examination?**

Before you can schedule your next exam, you are encouraged to review the Court Interpreter Written Examination handbook. Candidates must first take and pass the written examination to be eligible to take other exams. To schedule the written exam, please visit the CALIFORNIA COURT INTERPRETER WRITTEN EXAM INFORMATION page on the Prometric website.

**Step 9: Scheduling the exam**

Click here to schedule your exam: "Schedule my Exam" If you prefer to schedule your exam(s) by phone, please contact:

**Prometric Candidate Care** at **1-866-241-3118**.

**Step 10: What do I do next?**

Once you have scheduled, taken, and passed the written exam, you are now eligible to schedule the Bilingual Interpreting Exam (BIE). You are required to take and pass this exam in one session.

**Please note**: the BIE examination is offered twice a year during March, and in September, dates are subject to change. For information about the BIE and examination testing dates, please visit the **Prometric website** and select the **Certified Interpreters column**.

## II.    Steps to Becoming a Registered Court Interpreter

To become a registered court interpreter, candidates must first complete and pass a written exam and complete and pass two Oral Proficiency Exams, including one in the language in which the candidate is proficient and will practice as a registered court interpreter. *

*With over 200 languages spoken in California, testing is limited to approximately 70 languages. Testing may not be available for your language; if this is the case, you must only complete and pass the writing and the English Oral Proficiency Exam. Please consult with Prometric candidate care for additional information on the availability of a test for the language you want to practice as a registered court interpreter.*

**Step 1:  Review the Candidate Information Bulletin.**

> **The bulletin provides information on:**
> - ✓ The court interpreter profession;
> - ✓ Existing requirements for registered interpreters;
> - ✓ How to prepare for the writing examination;
> - ✓ How to prepare for the Oral Proficiency Examination (OPE); and
> - ✓ The registered court interpreter testing processes.

**Step 2:  Review the Court Interpreter Information on the Judicial Council's Court Interpreters Program Website.**

**Step 3: Take the Qualifications for Court Interpreting and Self-Assessment (Click here.)**

**Ready to move forward in becoming a certified court interpreter?**
If so, follow these next steps.

**Step 4:  Create a Prometric Account**

This step applies if you are: (1) a new candidate and (2) you do not have a Prometric online account, or (3) a dedicated Prometric ID number.

**All candidates must create and maintain a Prometric online account. The Prometric online account serves as the gateway for scheduling future exams.**

**Step 5:  How do I create a Prometric Account?**

> To create a Prometric account, please click on this link: ***Create a Prometric Account.***

**Step 6:  How do I obtain the Prometric ID number?**

> If you **do not have a Prometric ID number,** you will need to contact Prometric Candidate Care staff directly by calling **1-866-241-3118**.  Candidate Care will review your online Prometric account information, and upon validation, they will provide you with the dedicated ID number. This ID number will be your identifier through the testing process, so keep this number (when you receive it) confidential.

**Important:** Before you contact Prometric Candidate Care to obtain your Prometric ID number, you must first create a Prometric online account.

### Step 8: How do I schedule my next examination?

Before you can schedule your [next] exam, you are encouraged to review the Court Interpreter Written Examination handbook.

Candidates must first take and pass the written examination to be eligible to take other exams. To schedule the written exam, please visit the CALIFORNIA COURT INTERPRETER WRITTEN EXAM INFORMATION page on the Prometric website.

### Step 9: Scheduling the exam

Click here to schedule your exam: "Schedule my Exam"    If you prefer to schedule your exam(s) by phone, please contact:

**Prometric Candidate Care** at **1-866-241-3118**.

### Step 10: What do I do next?

Once you have scheduled, taken, and passed the written exam, you are now eligible to schedule the Oral Proficiency Exam. These two exams can be scheduled and taken anytime. For information on how to schedule your next exam, please contact **Prometric Candidate Care** at **1-866-241-3118**.

**Required:** Candidates must identify the language they want to practice as a registered court interpreter. Prometric Candidate Care must receive and document the correct language the registered interpreter will practice in a court setting. Without a language on file, Judicial Council of California, Court Interpreters Program staff will not be able to process the candidate's registered court interpreter credentials.

### III.    Next Steps After Passing Your Examinations

**Checklist**—Did you complete and pass your examination requirements? Use this checklist to track your progress.

| Type: | For Certified Court Interpreters | For Registered Court Interpreters |
|---|---|---|
| **Written Examination** | ☐ Yes  ☐ No | ☐ Yes  ☐ No |
| **Oral Proficiency Examination (OPE)** | Certified court interpreters may choose to take an OPE exam in any language if seeking to enhance their interpreting language skills or want to also become a registered court interpreter in a non-certified language. | ☐ Yes  ☐ No |
| **Bilingual Interpreting Examination (BIE)** | ☐ Yes  ☐ No | Registered court interpreters may choose to take the BIE only if seeking to become certified in one of the listed certified languages* |

*Please refer to section I—For becoming a Certified Court Interpreter.

### IV.    You passed the examinations, what's next?

Passing the examinations alone do not make you a recognized certified or registered court interpreter. You must first enroll as a credentialed court interpreter with the Judicial Council. Enrolling includes completing an enrollment packet and doing the following:

- ✓ Take the on-line course "Interpreter Orientation: Working in the California Courts"; a link will be provided with your enrollment materials;

- ✓ Submit the enrollment application to the Judicial Council to become a certified court or registered interpreter (including certificate of completion from the on-line orientation and the enrollment fee);

- ✓ Abide by Rule of court 2.890, professional conduct for interpreters;

- ✓ Attend a Judicial Council Code of Ethics Workshop within the first two-year compliance period; and

- ✓ Read and abide by the Compliance Requirements for California Certified Court and Registered Interpreters.

## *V.   Frequently Asked Questions*

### What is a court interpreter?

A court interpreter is someone who interprets in a criminal, civil or any legal court proceeding (e.g., arraignment, motion, pretrial conference, preliminary hearing, deposition, trial) for a witness or defendant who speaks or understands little or no English.

Court interpreters must accurately interpret for individuals who possess an advanced level of education and/or linguistic ability, as well as for individuals with limited education and/or language skills, without changing the level of the language spoken ("register") by the speaker. Interpreters are also responsible for orally translating written documents from English into the foreign language and from the foreign language into English. It is also necessary to have exceptional memory skills and an extensive legal vocabulary in both languages to be a successful interpreter.

### Is it necessary to have a degree to be a court interpreter?

Although there are no minimum requirements that must be met to take the state certification exams, candidates are encouraged to complete formal, college-level course work and training in both languages, as well as in all three modes of interpreting before applying for the examination. There are several colleges and universities throughout the State of California that offer introductory courses and certificate programs in interpretation or translation. We encourage you to research these programs and others that may be available.

### Is special training recommended to become a court interpreter?

Yes.  Specialized training is recommended as court interpreting is a demanding occupation that requires **impeccable** fluency in both English and the foreign language. The level of expertise required is far greater than the fluency level required for everyday bilingual conversation. The interpreter must be able to handle the broadest range of language terms that may be presented in the courts, ranging from specialized legal and technical terminology to street slang and idioms. Most people do not have full command of all registers of both English and the foreign language required for court interpreters and need special training to acquire it.

Interpreter training programs are widely available in English and Spanish; training in other languages, with limited exceptions, is not as readily available. We encourage you to contact the programs listed at the end of this packet and request their current information.

For languages where no formal training is available, the following self-study techniques are suggested: (1) expand your vocabulary, (2) develop your own glossaries, and (3) develop and practice interpreting techniques. Suggested skills-enhancing exercises are available to help you develop in the three modes of interpreting: (1) consecutive interpretation, (2) simultaneous interpretation, and (3) sight translation.  These self-study techniques are also recommended even if formal training is available.

**What is the difference between a certified and a registered interpreter?**

A certified court interpreter is a spoken language interpreter who has passed the Bilingual Interpreting Exam in one of California's certified spoken languages, and subsequently enrolls with the Judicial Council. The certified languages for which bilingual interpreting exams are available are: Arabic, Eastern Armenian, Cantonese, Farsi, Khmer, Korean, Mandarin, Portuguese, Punjabi, Russian, Spanish, Tagalog, and Vietnamese.[1] The spoken language certification process consists of a Written Exam and a Bilingual Interpreting Exam.

A registered interpreter is an interpreter of a spoken language other than the certified languages who has passed all the required exams and enrolled with the Judicial Council. Registered interpreters are required to pass the Written Exam, and the Oral Proficiency Exam in English, and the Oral Proficiency Exam in the non-English language to become registered.

**Please note**: Only someone who has enrolled with the Judicial Council of California may refer to themselves as a certified court or registered interpreter, even if they have passed the required exams.

**If I do not pass on the first attempt, how many times may I retake the Written Exam or the Oral Proficiency Exam in order to become a registered interpreter?**

You must wait a minimum of 90 days before retaking either the Written Exam and/or the Oral Proficieny Exam and pay the full fee each time an exam is taken.  For more information please visit: www.Prometric.com/California.

**Once I pass the Written Exam, how many times may I take a Bilingual Interpreting Exam to become a certified court interpreter?**

Once you pass the Written Exam, you are permitted four attempts to take and pass the Bilingual Interpreting Exam for certified languages. There is no time limit to take or to complete the four attempts. You can take the oral exam in a language only once during any week-long exam cycle.

If you do not pass the Bilingual Interpreting Exam within four attempts, you must begin the testing process again by retaking and passing the Written Exam before taking the Bilingual Interpreting Exam again. For more information see the steps below to prepare you for becoming a certified court interpreter.

---

[1] Western Armenian and Japanese are certified languages, but there is no certification exam available.

**What is the job market like for court interpreters?**

The job market for court interpreters varies by region, but demand for interpreters is growing. However, certified court or registered interpreters are often used in administrative, conference, mediation or other areas where interpreting skills are required. We encourage you to research those courts and or agencies where your services may be needed and check the employment opportunities available.

**Is U.S. citizenship required to be employed as a court interpreter?**

U.S. citizenship is not required to work for the courts, however a court interpreter must be able to prove that he or she can work legally in the United States (possess a valid permanent resident card, or work permit issued by the USCIS authorities).

Is there an age requirement for becoming a court interpreter?

**Is there a minimum age requirement to take the written and/or the oral exam?**

There is no minimum age requirement; however, candidate test takers must be of legal working age as required by the California Courts.

**Does the Judicial Council of California provide sponsorship for green card, H-1 B visa, or permanent resident status?**

No, the Judicial Council of California does not provide sponsorship for green card, H-1B visa, or permanent resident status.

**Is certification required to become a sign language interpreter?**

Under California Evidence Code §754(f) a qualified sign language interpreter is an interpreter who has been certified as competent to interpret court proceedings by an organization approved by the Judicial Council.

The California courts still uphold the SC:L, formerly administered by the Registry of Interpreters for the Deaf (RID) as the only certification recognized in the California state courts in order to serve as an American Sign Language Interpreter (ASL). The Judicial Council of California is aware that RID is no longer awarding this certification and is in communication with professional members of the ASL community and other stakeholders regarding the need for alternatives which may be viable or under development.

In the past, an ASL interpreter had to hold a valid generalist certification for ASL/English interpretation and obtain both formal legal interpreter training and mentoring before they could stand for the SC:L. These prior pre-requisites may help you prepare. If you would like to leave your name and contact information, we are keeping a list of interpreters, like you, who are interested in court interpreting, and will inform you of any decisions regarding ASL interpreters in the California Courts.

**Does California offer certification reciprocity with other states?**

The Judicial Council **currently** offers reciprocity for only those languages that are certified in the state of California and includes:

- Federally certified court interpreters;
- ASL (American Sign Language) interpreters who hold the Specialist Certificate: Legal issued by the Registry of Interpreters for the Deaf (RID); and
- To individuals who have successfully passed the Bilingual Oral Interpreting Exams offered in Consortium for Language Access in the Courts member states, *if all criteria for reciprocity are satisfied*. **Please note** that the Court Interpreters Program will only recognize bilingual oral interpreting exam standards and scores that meet or exceed the requirements in California and only offers reciprocity for those seeking reciprocity as Certified Court Interpreters.

Reciprocity is **not** offered for languages that are designated as registered.

**How do I become a certified translator?**

While interpreters provide oral-to-oral or written-to-oral interpretation, translators work exclusively with written documents, providing written-to-written translation. The Judicial Council of California does not certify translators. For information about translator certification, contact the American Translators Association at 703-683-6100 or visit http://atanet.org

**How do I contact  the Court Interpreters Program?**

Please direct your questions to CourtInterpreters@jud.ca.gov. You will also find information and a suite of videos on our public website: http://www.courts.ca.gov/ programs-interpreters.htm

## VI.    Association and Resources

### National Center for State Courts

https://www.ncsc.org/

Provides information and resources regarding court interpretation and language access
https://www.ncsc.org/Services-and-Experts/Areas-of-expertise/Language-access.aspx

https://courses.ncsc.org/ (Online courses, at cost or no cost)

https://courses.ncsc.org/course/lep (This is a free online course on Domestic Violence Interpretation)

https://www.ncsc.org/Education-and-Careers/State-Interpreter-Certification/Self-Assessment-Tools.aspx (Self-assessment tools)

https://www.ncsc.org/Education-and-Careers/State-Interpreter-Certification/Legal-Glossaries-and-Dictionaries.aspx (Dictionary & Glossary)

### For candidates seeking to become certified in the Arabic:

https://www.ncsc.org/~/media/Files/PDF/Education%20and%20Careers/State%20Interpreter%20Certification%202/Becoming_an_Arabic_Court_Interpreter_May_2010.ashx

### United States Courts: Federal Court Interpreter Certification

https://www.uscourts.gov/services-forms/federal-court-interpreters/federal-court-interpreter-certification-examination

### The National Association of Judiciary Interpreters and Translators

https://najit.org/

### American Translators Association

https://www.atanet.org/

### Registry of Interpreters for the Deaf

https://rid.org/


## VII.    Interpreter Training Programs:

The following is a list of some of the colleges and universities that offer court interpreter training programs. This is not a complete list. You are encouraged to conduct your own research into educational opportunities available.  This list does not constitute an endorsement of these programs but is provided for information only.

**San Francisco State University**

College of Extended Learning
SFSU Downtown Center
835 Market Street, 6th floor
San Francisco, CA 94103
415-817-4223

*www.cel.sfsu.edu/interpretation*
Spanish/English Legal & Court Interpretation Certificate Program. This is on online program.

**University of California San Diego Extension**

9500 Gilman Drive, 0170-A
La Jolla, CA 92093-0170
858-964-1046

https://extension.ucsd.edu/courses-and-programs/translation-and-interpretation
(Main page for sublevel courses)
*https://extension.ucsd.edu/about-extension/locations-maps-and-transportation*

https://extension.ucsd.edu/courses-and-programs/introduction-to-court-interpretation

https://extension.ucsd.edu/courses-and-programs/translation-and-interpretation-program-information-session

Translation and Interpretation Certificate Program Spanish/English–Spanish/English Professional Certificate in Translation and Interpretation CIMCE credits available for select classes for California certified court or registered interpreters. This is a one to two-year program.

**University of Arizona- National Center for Interpretation**

National Center for Interpretation
PO BOX 210432
Tucson, AZ 85721
520-621-3615

https://nci.arizona.edu/

Spanish/English Court Interpreting course offered through the Agnese Haury Institute for Interpretation. Hybrid courses online courses and onsite.

**New Mexico Judiciary - Center for Language Access in the Courts**

Partnership with the Consortium for Language Access in the Courts
505-270-0206

http://www.nmcenterforlanguageaccess.org/index.php

https://nmcourts.gov/Language-Access-Services/language-access-specialist-interpreter-training.aspx

https://www.nmcenterforlanguageaccess.org/cms/images/pdf/certification-resources-1.0.pdf

https://www.nmcenterforlanguageaccess.org/cms/images/pdf/certification-resources-2.0.pdf

Offers certificate in Justice System Interpreting and certificate as a Language Access Specialist. The interpreting course is 20 weeks and includes an internship. Online courses are combined with a face-face internship.  Professional development courses available for current interpreters.

### Middlebury Institute of International Studies

Graduate School of Translation and Interpretation Non-Degree Programs
460 Pierce Street
Monterey, CA 93940
Phone and FAX: 831-647-4100
*http://translate.miis.edu/ndp/index.html*
Master's degree in Translation, Translation/Interpretation, Conference Interpretation, and Translation/Localization Management; Two-year program or one-year advanced program

### Northridge Institute of Interpretation

P.O. Box 920160
Sylmar, CA 91392-0160
818-644-0407
http://niiedu.com/Welcome.html
Spanish/English Court Interpreter Certificate Program; *(18-month program)*
Home Study course also available.

### Southern California School of Interpretation

10012 Norwalk Blvd., Suite 120
Santa Fe Springs, CA 90670
562-906-9787 FAX 562- 906-9780

*http://www.interpreting.com/*
E-mail: SCSINTER@ix.netcom.com
Branch locations: San Diego, Corona and Las Vegas, Nevada. Online program available. Spanish/English court translation and interpretation courses for interpreters at precertification and continuing education stages. This is a six-month program.

### Boston University – Center for Professional Education

808 Commonwealth Avenue, Suite 270
Boston, MA 02215
Phone: 1-866-633-9370 or 617-353-4497

https://cpe.bu.edu/search/publicCourseSearchDetails.do?method=load&courseId=37604&selectedProgramAreaId=21297&selectedProgramStreamId=21468
Offers certificate in Spanish, Mandarin or Portuguese interpreting.

## AMERICAN SIGN LANGUAGE

**American River College**

4700 College Oak Drive
Sacramento, CA 95841
916-484-8011

*https://arc.losrios.edu/academics/programs-and-majors/asl-english-interpreter-preparation*A.A. degree in Sign Language Studies/Interpreter Preparation Program
Part of the Humanities Division of the college.

**College of the Sequoias**
915 S. Mooney Blvd
Visalia, CA 93277
559-730-3700
*https://www.cos.edu/en-us/academics/language-communication*

**San Diego Mesa College Interpreter Training Program**
7250 Mesa College Drive
San Diego, CA 92111
619-388-2604
http://www.sdmesa.edu/academics/academic-programs/american-sign-language.shtml
Certificate and A.A. in ASL Interpretation

**Gallaudet University**
800 Florida Avenue, NE
Washington, DC 20002
202-651-5149
http://www.gallaudet.edu/interpretation.html
B.A. and M.A. in ASL-English Interpretation

**National Technical Institute for the Deaf**

52 Lomb Memorial Drive
Rochester, NY 14623
585-475-6713
https://www.rit.edu/ntid/academics/interpreting
BA in ASL-English Interpretation
AAS in ASL-English Interpretation

## VIII.    Suggested Skills—Enhancing Exercises for All Languages

With limited interpreter training classes in languages other than English/Spanish available it is often difficult to obtain feedback on interpreting performance. The exercises described below will provide both the novice and the experienced interpreter with methods to improve skills in consecutive and simultaneous interpreting and in sight translation.

### Effective Listening

1.  Observe conversations conducted outside of earshot, (e.g., across a room, with the volume turned down on the television, or in a crowded area, such as a shopping center or an airport). Note how facial expressions, gestures, body movements, posture, and eye contact (or lack of it) reveal what the speakers may be saying. What are they talking about? Which, nonverbal cues suggest the nature of a conversation? What language are the participants speaking? How do you know? Do this exercise in all your working languages. How do the cues differ in each language?

2.  Listen closely to someone you cannot see, such as a telephone caller or radio broadcaster, and analyze the person's manner of speaking: voice pitch, tone, and volume as well as other sounds, such as sighs, hesitations, stutters, and tongue clicking. Do this exercise in all your working languages and compare the differences among them.

3.  Analyze words and their meanings by asking others what they mean when they use a particular word or phrase. How does their word usage differ from yours?

4.  Ask someone for directions to a place you know how to get to, and then ask for directions to an unfamiliar place. What happens in your mind in each situation? Do you lose your train of thought or do you jump ahead?

5.  The next time you have a conversation with someone and miss part of what was said, analyze what went wrong. How did you lose your concentration? Were you daydreaming? Were you distracted by an unfamiliar word or a physical interference? Did a previous, unresolved conversation or thought intervene?

6.  While listening to a speaker, try to determine the speaker's point early in the presentation. At the conclusion of the speech make another evaluation. Were your evaluations the same? Why or why not?

7.  How and why are "linkage" words ("however", "but", "unless", "therefore", etc.) used? How do they establish the relationships of ideas? Make a list of these words and analyze their usage. Do this in all your working languages.

**<u>Memorization Techniques for Consecutive Interpreting</u>**

1. How do you remember? Are you a visual or a verbal learner, neither, or both? If you forget something you have heard, try to understand what prevented you from storing or retrieving the information.

2. Your short-term memory capacity is normally limited to between five and nine bits of information (units of memory), and your ability to recall depends on how well you can organize what you have heard by finding patterns. Have someone read a series of seven unrelated numbers to you.  Once you are able to repeat the series accurately, try to repeat it backwards. To do this, you must be able to retain the series in your short-term memory.

3. Increase your analytical skills by reading a newspaper or magazine. After finishing each story, try to <u>summarize</u> what you read in a single sentence. Do this in all your working languages. Try this after listening to a news report or a radio or television talk show. Summarize the main idea in a single sentence.

4. For the exercises below, have someone read a newspaper or magazine article into a recorder, or record talk or interview programs from the radio or television.

5. Limit yourself to non-technical material. Do not record the news, because the newscaster reads from a prepared script. Record increasingly longer texts as your skills improve. You will only repeat the information you hear in the same language and will not interpret it.
   o Listen to the passage without taking notes and try to repeat as much as possible.

   o Listen to the passage and write down key words to help you remember the content. Then repeat as much information as possible. Compare the results you achieved with and without notes. Which worked best for you?

   o As you listen to the passage, try to condense it into a few meaningful units. Organize the information into groups. For example, if a person were to list the schools she had attended and the subjects she studied, you could group the schools by location and the subjects studied by topic. Numbers can be grouped the way people recite phone or social security numbers, in groups of two, three, or four numbers, rather than as a string of unrelated numbers. Please note that when interpreting testimony, you should maintain the speaker's word sequence as spoken, except to accommodate the syntax of the target language.

   o Do not allow your opinions to color your rendition of a speaker's words. Pay close attention to your reaction to the text while listening and maintain the same level of language (register) as the speaker.

***Note*** *that improving your listening and memory skills is an ongoing and lifelong endeavor. As you gain experience and confidence your skills will improve.*

## EXERCISES FOR SIGHT TRANSLATION

The exercises outlined below will help you develop skills in Sight Translation. Practice them in all your working languages.

**Exercises in Public Speaking**

1. **Reading Aloud**: Stand in front of a mirror and read passages aloud from any book, newspaper, or magazine. A legal textbook, code book, or other legal text is useful for familiarizing yourself with legal language. Record or videotape yourself and analyze the outcome critically. Pay attention to your voice, pitch, tone, hesitations, signs, projection, enunciation, and posture.

2. **Controlling Emotions**: Practice controlling your emotions while reading aloud texts with high emotional content, such as fear, anger, humor, etc. Make sure you convey the author's intended emotions and not your personal reaction to the subject matter.

3. **Public Speaking**: Practice speaking before a group of people at every opportunity. People you know will constitute a less threatening audience and will allow you to ease your way into public speaking and build your confidence. Court interpreting is an ongoing exercise in public speaking.

**Reading Ahead in Text**

1. **Extensive Reading**: Build up your reading speed and, as a bonus, your vocabulary by reading as much as possible in many different fields.

2. **Analyzing**: Analyze the content of each text and practice picking out the subject and verb to determine the core meaning.
   a. Example: Although less influential than in Argentina, migration from Europe in the late nineteenth and early twentieth century affected the development of Chilean political culture. Subject: migration; Verb: affected.

3. **Identifying Sentences and Embedded Sentences**: While reading a text aloud, break up long sentences into smaller, more manageable units.
   a. Example: Juvenile delinquency, which is seen most often among minority youths in urban ghettoes, cannot be attributed to the urban environment alone, as it plagues the suburbs as well.
   b. Three separate sentences are embedded in this complex sentence:
   c. Juvenile delinquency is seen most often among minority youths in urban ghettoes.
   d. It cannot be attributed to the urban environment alone.
   e. It plagues the suburbs as well.

4. **Deciphering Handwriting**: Obtain texts written by hand (e.g., letters) and practice deciphering the handwriting on the first oral reading.

**<u>Analytical Skills</u>**

1. **Reading for Content**: Read a text aloud to a friend and then have the person ask you questions about its content.

2. **Chunking**: Choose a text and mark off the units of meaning in it.
    a. Example: I was getting ready/ to go out to lunch with/ my mother-in-law/ when/ suddenly/ I felt sick to my stomach. / It occurred to me that/ it might be/ something psychosomatic, / but I later found out that/ I was simply allergic to/ the perfume she always wore.

3. **Using Transcripts**: Perform chunking with transcripts of court proceedings (or any document with a question-and-answer format). Try to establish a hierarchy of importance of the units of meaning.
    a. Example: Now, Mr. Jones, in your earlier testimony you mentioned that you had seen the defendant in that bar prior to the date of the incident. Can you tell us or give us an approximation of how long before the incident it was that you first saw the defendant in the El Camino bar?
       Hierarchy of importance:
    b. How long before the incident
    c. You first saw the defendant
    d. In the El Camino bar
    e. Tell us, or give approximation
    f. Had seen defendant prior to date of incident
    g. Mentioned in earlier testimony
    h. Mr. Jones
    i. Now

4. **Completing Phrases**: Have a friend write a series of incomplete phrases. Complete the phrases and determine whether the resulting sentences convey the same idea the friend originally had in mind.

    **Examples:**
    a. After being reprimanded unfairly by her boss in front of her coworker, the secretary tendered
    b. The judge determined that the defendant had strong ties to the community and therefore released him
    c. As you do this exercise, note the errors you make and be aware of how susceptible we are to reach false conclusions based on partial information.

5. **Paraphrasing**: Read a text aloud and rephrase it as you go along, taking care not to change the meaning.

    a. Example: Since political parties are found almost everywhere in Latin America, they would seem to be a common denominator in the region's political life. Yet, this is not the case. Cultural, environmental, and historical influences on party

development are so varied, they challenge conventional notions. Most nations hold periodic elections, but, like political parties; the implications of elections may differ profoundly from those of our own culture.

b. Rephrased: Because political parties can be found in just about every Latin American country, one might conclude that they are a common thread in the political life of this region. This is not so, however. There is such a great variety of cultural, environmental, and historical influences on the development of parties that commonly held ideas are contradicted. Elections are held periodically in most countries, but the implications of these proceedings, like those of parties, are very different from the assumptions we can make in our own culture.

6. **Expanding**: Read a text aloud and expand it (i.e., say the same thing in more words) as you are going along, again taking care not to change the meaning.

a. Example: Despite what you may have heard, scientists are just like other people. A scientist walking down the street may look just like an insurance agent or a car salesman: no wild mane of hair, no white lab coat.

b. Expanded: Although you may have heard assertions to the contrary, there are no differences between scientists and people who are not in that profession. As a matter of fact, if you saw a scientist out for a stroll on the sidewalk, you might mistake him for a person who sells insurance, or an automobile dealer. Scientists don't all have wild manes of hair and they don't always wear white laboratory coats.

7. **Condensing**: Read a text aloud and condense it (i.e., say the same thing in fewer words) as you go along, retaining the same meaning.

a. Example: The multiplicity of cues which are utilized in the categorizing and sorting of the environment into significant classes are reconstructed from the strategies and modes of coping with the problems presented to the subjects. In many situations, no certainty can be achieved; the varying trustworthiness and merely statistical validity of the cues frequently make inferences only probable.

b. Condensed: Many cues are used to classify the environment. They are reconstructed from the subject problem-solving strategies. Often, because the cues are not uniformly reliable and are valid only statistically, the results are not certain.

8. **Manipulating the Register**: Read a text aloud and alter the register or language level as you go along, being careful not to stray from the original meaning.

a. Example: As I was driving to work in the morning, I noticed that the stop sign which used to be on the corner of Main and 1st had been removed.

b.  Higher level: Upon transporting myself to my place of employment in a motor vehicle at some point in time prior to noon, I observed that the insignia to cause motorists to bring their vehicles to a stationary position, which had formerly been stationed at the intersection of the thoroughfares known as Main and 1st, had been displaced.

c.  Lower level: On my way to work in the morning, I saw that they took out the stop sign that used to be at Main and 1st.

Note: These are learning exercises designed to build mental agility, linguistic flexibility, and analytical skills and to heighten awareness of language usage. In actual sight translation, the interpreter does not paraphrase, summarize, or change the register of the original text.

## EXERCISES TO DEVELOP AND IMPROVE SIMULTANEOUS INTERPRETING SKILLS

The suggested exercises listed here are based on experiences gained in the training of both conference and court interpreters. Since the various modes of interpretation involve many of the same mental tasks, the exercises recommended in the sight translation and consecutive interpreting sections will contribute to the development of simultaneous interpreting (SI) skills as well. The exercises in the sight translation section that are designed to develop analytical techniques are particularly applicable to SI, as are the memory-building exercises outlined in the consecutive interpreting section.

The following exercises, designed specifically to build the skills involved in simultaneous interpreting, are divided into those that emphasize dual-tasking and those that emphasize input analysis. These exercises should be done in all the interpreter's working languages, beginning with the native or more dominant language. They should be practiced daily for about a half hour at a time, as SI skills must be acquired and developed over time to insure for continued competency.

**Dual-Tasking Exercises**

1.  Have someone record passages from magazines or newspapers or record radio or television talk shows or interview programs (news broadcasts are not suitable for these exercises because the pace is too fast, and the content is too dense). The subject matter of these passages is irrelevant, but it should not be too technical or contain too many statistics and proper names. Essays and opinion columns are good sources of texts for recording. As you play back the tape, "shadow" the speaker: repeat everything the speaker says verbatim. Try to stay further and further behind the speaker, until you are lagging at least one unit of meaning behind.

2.  Once you feel comfortable talking and listening at the same time and are not leaving out too much, begin performing other tasks while shadowing. First, write the numerals 1 to 100 on a piece of paper as you repeat what the speaker says

(make sure you are writing and speaking at the same time, not just writing during pauses). When you can do that, write the numerals in reverse order, from 100 to 1. Then write them counting by 5's, by 3's, and so on. Note what happens whenever numbers are mentioned in the text you are shadowing.

3.  When you can do exercise 2 with minimal errors, begin writing out words while shadowing. Begin with your name and address, written repeatedly. Then move on to a favorite poem or a passage such as the preamble to the US Constitution (always choose a passage in the same language as that which you are shadowing). When writing this text, you should copy from a piece of paper placed in front of you. Do not try to write the passage from memory while shadowing the recording.

4.  While shadowing the recording as in the previous exercises, write down all the numbers and proper names you hear. Then play the recording back and check to see if you wrote them correctly.

The purpose of the above exercises is to train your brain to operate on two "channels" at once, and to force you to lag behind the speaker. If you find yourself breezing through the exercise with no problem, move on to the next one. You should always be fully taxing your mental capacities. On the other hand, if you are having difficulty keeping up with the speaker and are barely able to mumble a few words at a time, go back to the previous exercise until you are comfortable doing it. These exercises should be repeated as many times as necessary over a long period of time.

## Analysis Exercises

1.  Using the same recordings you prepared for the above exercises (or new ones, if you have grown tired of those), rephrase what the speaker says rather than simply repeating it (see the paraphrasing exercise in the sight translation section). Stating a message in different words forces you to lag behind the speaker, waiting until he or she has said something meaningful for you to work with. To change the wording of the message without altering the meaning, you must thoroughly analyze and understand the original message. This exercise also develops your vocabulary because you are constantly searching for synonyms and alternative phrasing. It is perfectly acceptable, and even advisable, to look up words and phrases in a dictionary or thesaurus before attempting to rephrase a passage. It does not matter how many times you go over the recording. Even if you have memorized the passages, you are still deriving benefit from the exercise. Rephrasing simulates mental processes required in SI in that you must abandon the original wording and put the message into a different external form while retaining all its meaning.

2.  To develop your ability to predict the outcome of a message based on your knowledge of the source language syntax and style and on your common sense and experience, do the following exercises with written passages from a magazine or newspaper:

    a.   Cover up the latter half of a sentence and try to predict what it says. Do certain key words in the first half provide important clues?

    b.   Read the title of an entire article or essay and try to predict the content. Confirm or reject your conclusion as you read the article.

    c.   Read the article, paragraph by paragraph, predicting what will come next. Again, pick out key words that contain hints about the direction in which the author is heading.

    d.   Repeat exercises a and b with oral input, having someone read the passages to you.

    e.   As you increase your awareness of key words, learn to look for pitfalls that can lead you astray, such as embedded clauses and dangling participles. Develop your ability to skip over those distractions and get to the heart of a sentence or passage.

3.   Using all the techniques you have developed in the preceding exercises, begin interpreting from the source language to the target language. At first, use the recordings you have already recorded and worked on in the other exercises, then make new recordings specifically for interpreting practice. You may want to choose texts related to law and the courts for this purpose, but do not make them too technical at first. When you feel you are ready, record some actual court proceedings for practice. Court reporting schools are a good source of professionally recordings of law-related texts.

## *BIBLIOGRAHY*

*This list is not comprehensive, nor does it constitute an endorsement of these resources; it is provided for informational purposes only.*

Berk-Seligson, Susan. The Bilingual Courtroom: Court Interpreters in the Judicial Process. Chicago: University of Chicago Press, Paperback, 2002.

Conley, John M., and William M. O'Barr. Rules Versus Relationships: The Ethnography of Legal Discourse. University of Chicago Press, 1990.

De Jongh, Elena. An Introduction to Court Interpreting: Theory and Practice. Lanham, MD: University Press of America, 1992.

Edwards, Alicia. The Practice of Court Interpreting. Philadelphia: John Benjamins,1995.

Frankenthales, Marilyn, et al. Skills for Bilingual Legal Personnel. Cincinnati: South-Western Publishing Co., 2007.

Gonzalez, R. D., V.F. Vasquez, and H. Mikkelson. Fundamentals of Court Interpretation: Theory, Policy and Practice. Durham, NC: Carolina Academic Press, 1992.

Harding, Edith, and Philip Riley. The Bilingual Family: A Handbook for Parents. 2nd Edition. Cambridge: Cambridge University Press, 2003.

Lederer, Richard. The Miracle of Language. New York: Pocket Books, Simon & Schuster, 1991.

Loftus, Elizabeth, and Katherine Ketcham. Witness for the Defense: The Accused, the Eyewitness and the Expert Who Puts Memory on Trial. New York: St. Martin's Press, 1991.

Macrone, Michael. It's Greek to Me! New York: Harper Collins, 2001.
Marquex, Alex. The New Interpreters Handbook: A Step-by-Step Guide to Becoming a Professional Interpreter. Anaheim: Iberia Language Press, 1987.

Moore, Joann, and Margaret Fisher. eds. Immigrants in Courts. Seattle: University of Washington Press,. 1999.

O'Barr, William M. Linguistic Evidence: Language, Power, and Strategy in the Courtroom. New York: Academic Press, Paperback, 1995.

Solan, Lawrence M. The Language of Judges. Chicago: University of Chicago Press, 1993.

Tannen, Deborah. That's Not What I Meant! New York: Ballentine Books, 1987, reprinted 1992.

**SLANG/IDIOMS**

Chapman, Robert L. Thesaurus of American Slang. New York: Harper & Row, 1991.

Dalzell, Tom, and Terry Victor, eds. The Concise New Partridge Dictionary of Slang and Unconventional English. New York: Routledge, 2008.

Makkai, Adam, Maxine Boatner, and John Gates. Handbook of Commonly Used American Idioms. 4th Edition.New York: Barron's Educational Series, 2004.

Spears, Richard A. NTC's Dictionary of American Slang and Colloquial Expressions. New York: McGraw Hill, 2000.

## ENGLISH LANGUAGE DICTIONARIES AND GLOSSARIES

Benson, Morton, Evelyn Benson, and Robert Ilson. The BBI Combinatory Dictionary of English: A Guide to Word Combinations, revised ed. Philadelphia: John Benjamin's Publishing Co., 1997.

Garner, Bryan A. Black's Law Dictionary, 8th ed. Eagan, MN: West, 2004.
Glazier, Stephen. Random House Webster's Word Menu. Revised Sub Edition. New York: Ballantine Books, 1997.

Benson, Morton, Evelyn Benson, Robert Ilson, and Richard Young. Using the BBI: A Workbook with Exercises for the BBI Combinatory Dictionary of English. Philadelphia: John Benjamin's Publishing Co., 1991.

## INTERPRETING SKILLS/BILINGUAL RESOURCES

McKenna, Dennis. Criminal Court Dictionary: English-Spanish Español-Inglés Western Addition. Pasadena, CA: Adelfa Books, 2006.

McKenna, Dennis. Dictionary of Mexicanismos, Second Edition: Slang, Colloquialisms and Expressions Used in Mexico. Pasadena, CA: Adelfa Books, 2006.

Mikkelson, H. The Interpreter's Companion, 4th Edition. Spreckels, CA: Acebo Press.

Mikkelson, H. The Interpreter's Edge, Generic Edition. Self-Study Package. Spreckels, CA: Acebo Press.

Mikkelson, H. The Interpreter's Edge (multiple languages available). Self-Study Package. Spreckels, CA: Acebo Press.

ACEBO Press
P.O. Box 7485
Spreckels, CA 93962
www.acebo.com

Alicia Ernand Productions
P.O. Box 802382
Santa Clarita, CA 91380-2382
email: alinick@sbcglobal.net
www.aliciaernand.com

# EXHIBIT 75

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**

P.O. Box 4036
Sacramento, CA 95812-4036



October 27, 2023

VIA ELECTRONIC MAIL

Caroline Jackson
Rosen Bien Galvan & Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
cjackson@rbgg.com

RE:    *Armstrong v. Newsom* – **Response to Plaintiffs' August 22, 2023 Follow-up to the Board's August 11, 2022 Letter and the 2023 SLI Contract**

Dear Ms. Jackson,

This is in response to your August 22, 2023 follow-up correspondence to the board's August 11, 2022 letter and the 2023 Contract for sign language interpreters ("2023 Contract"). In your letter, you request the board to "amend the 2023 Contract to require sign language interpreter [*sic*] to appear on the California court system's list of Court Certified and Registered Interpreters or to hold the SC:L." Due to the severe shortage of American Sign Language (ASL) certified court interpreters statewide and the Judicial Council's ongoing efforts to revamp California court credentialing requirements for ASL interpreters, Plaintiffs' request is currently unfeasible and unduly restrictive. As acknowledged by Plaintiffs' counsel, requiring sign language interpreters to hold legal certification (SC:L) is "not a durable solution." (Letter from Rita Lomio, Plaintiffs' Counsel, to Jessica Blonien, Chief Counsel, and Joanna Hood, Deputy Attorney General, Sign Language Interpreters and Parole Hearings (Nov. 13, 2019) p. 8, attached as Exhibit A.) Finally, neither Title II of the Americans with Disabilities Act (ADA), section 504 of the Rehabilitation Act, nor the 2010 *Armstrong* Remedial Plan (ARP II) requires certified court interpreters to accommodate deaf and hearing-impaired individuals in parole proceedings. Consequently, Plaintiffs' request is denied. However, the board will reconsider Plaintiffs' request when negotiating its next sign language interpreter contract, provided that the Judicial Council has issued its updated guidance for credentialing ASL court interpreters by that time.

## I.    California ASL Court Interpreter Qualification Requirements

Guidelines for ASL California court interpreters are enumerated under California Evidence Code § 754. A "qualified interpreter" is an interpreter "who has been certified as competent to interpret court proceedings by a testing organization, agency, or educational institution approved by the Judicial Council." (Evid. Code, § 754, subd. (f).)

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 2

The Specialist Certificate: Legal (SC:L) credential, which was offered from 1998–2015, is "currently the only credential recognized by the Judicial Council of California for ASL court interpreter certification." (Jud. Council of Cal., Advisory Com. Rep., Testing and Certif. of American Sign Language (ASL) Ct. Interpreters (2023) p. 3 (hereafter Testing and Certif.).) The SC:L certification was specifically designed for interpreters within the court setting, as the performance exam was composed of the following four vignettes: (1) Miranda Warning, (2) Courtroom Scene, (3) Interpreter Qualification, and (4) Jury Instructions. (*Id.*, attachment 2.) Since the SC:L is the only credential currently recognized by the Judicial Council, an ASL interpreter who does not possess the SC:L certification cannot be placed on the Judicial Council's Master List of Court Certified and Registered Court Interpreters ("Master List").

### A.    SC:L Certification Moratorium

On January 1, 2016, the Registry of Interpreters for the Deaf (RID) "imposed a moratorium on SC:L certification and RID ceased its testing program for the specialist legal certificate." (Jud. Council of Cal., Advisory Com. Rep., Language Access: New Requirements for American Sign Language (ASL) Ct. Interpreters (2023) p. 3 (hereafter Language Access); see also Registry of Interpreters for the Deaf, Inc., Certifs. Under Moratorium <https://rid.org/about/certifications-under-moratorium/> [as of Oct. 27, 2023].) The moratorium has remained in effect since 2016 and the RID is no longer awarding the SC:L credential for ASL court interpreters. (Language Access, at p. 3.) While the SC:L exam is no longer administered anywhere nationally, the SC:L credential remains the only credential currently recognized by the Judicial Council for ASL court interpreter certification. (Testing and Certif., at p. 3.)  As a result of the retirement of the SC:L certification, California has been unable to add additional ASL court interpreters to the Master List since 2016, resulting in a substantial shortage of ASL certified court interpreters statewide. (Language Access, at p. 3.)

### B.    ASL Certified Court Interpreter Shortage

Due to the retirement of the SC:L certification, "California, like many other states, has a statewide need for more qualified ASL court interpreters." (Testing and Certif., at p. 3.) The Judicial Council's 2020 Language Need and Interpreter Use Study acknowledged, "all states are experiencing challenges in providing adequate sign language interpreter service because there is currently no nationally recognized credentialing process for the certification of American Sign Language (ASL) court interpreters." (Jud. Council of Cal., 2020 Language Need and Interpreter Use Study (2020) p. 39.) As a result, the study recommended for the Judicial Council to "explore and develop a recommended credentialing process for certification as a California American Sign Language interpreter." (*Id.* at p. 54.)

ASL is the "third most frequently interpreted language in court proceedings in the state, with 38,460 interpreted events reported in a span of three years between FY 2014–15 and FY 2017–18." (Language Access, at p. 3.) However, there are currently only 39 ASL certified court interpreters on the Judicial Council's Master List statewide, and the total continues to decrease.[1] (See Cal. Courts, Ct. Interpreters Program, Search for an Interpreter <https://www.courts.ca.gov/35273.htm> [as of Oct. 27, 2023].) Of the 39 interpreters on the Master List, 8 are identified as court employees.

---

[1] The number of ASL certified court interpreters on the Judicial Council's Master List decreased to 48 from 55 on September 1, 2023, and decreased to 39 from 48 on October 1, 2023.

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 3

(*Ibid.*) Additionally, recent outreach by the Court Interpreters Program (CIP) determined that only 31 ASL court interpreters on the council's Master List are self-reported as active. (Language Access, at p. 3.) To address the overwhelming need for "a new credentialing solution for ASL court interpreters in California and the current shortage of active interpreters," the council contracted with the National Center for State Courts (NCSC) to provide research and findings on additional credentialing options that may be considered by the council for use in California to qualify ASL court interpreters. (*Ibid.*)

Although credentialing requirements for ASL interpreters vary across the country, research findings by the NCSC indicated that "many states, like California, continue to recognize the SC:L as a valid certification for ASL court interpreters." (*Id.* at p. 4.) However, in response to the elimination of the SC:L, numerous states have implemented alternative testing and non-testing options to certify ASL interpreters for court assignments within their respective jurisdictions. (*Ibid.*) A common element shared by the majority of state models reviewed by NCSC included lower classification tiers for ASL court interpreters with ASL generalist (not-court-interpreter-specific) credentials.[2] (*Ibid.*)

### C. CIAP Recommendations - Pathway in California for Interpreters with a Generalist ASL Credential to Receive Court-Qualified Status

Following the findings and recommendations of the NCSC, the Court Interpreter Advisory Panel (CIAP) determined that California may address the current shortage of ASL court interpreters by developing a two-prong approach. The panel could first address the immediate needs of the state to expand the number of available ASL court interpreters by "allowing recognition of the SC:L and holders of the Texas Board for Evaluation of Interpreters (BEI) certification through reciprocity." (*Ibid.*) Second, the panel would continue further development to "create a pathway in California for interpreters with a generalist ASL credential … to receive a court-qualified status." (*Ibid.*)

As a result, the CIAP specifically recommended for the Judicial Council to: (1) "Direct CIAP to develop a proposal for the council to certify persons with ASL generalist credentials to perform work in the courts;" and (2) "Direct CIAP to develop a recommendation for a process for approving ASL court interpreter certification programs that is more responsive to the current interpreter marketplace and testing and certification landscape." (*Id.* at p. 2.) These recommendations are currently pending approval by the Judicial Council.

### II. Plaintiffs' Request is Currently Unduly Restrictive

Due to the inability to add ASL interpreters to the Master List since 2016, California courts have been grappling with the severe shortage of ASL certified court interpreters for almost a decade. According to the results of recent outreach by the CIP, only 31 certified court interpreters on the Master List are active. (Language Access, at p. 3.)  The number of active ASL certified court interpreters identified as independent contractors is even smaller, as eight interpreters on the Master List are classified as court employees. As for the SC:L, there are currently only 34 interpreters

---

[2] See Nat. Center for State Cts., Review of American Sign Language (ASL) Ct. Interpreter Requirements and Qualifications <https://www.courts.ca.gov/documents/032922_ILAS_Open_Mtg_Materials.pdf> [as of Oct. 27, 2023].)

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 4

holding the certification statewide.[3] Of the 34 current SC:L holders, just 23 are identified as "freelance status."

Plaintiffs' counsel have acknowledged that requiring sign language interpreters retained by the board to hold legal certification would be impractical, specifically providing, "[w]here possible, interpreters with legal certification should be assigned to the hearings. *Unfortunately, that is not a durable solution, because the pool of interpreters with that certification is small and will become smaller over time, as the certification no longer is given*." (Exhibit A, at p. 8, italics added.) Plaintiffs were correct in reasoning that the number of SC:L holders will only decrease over time, as the total has declined from 41 to 34 interpreters since the date of Plaintiffs' letter. (*Id*. at p. 8, fn. 1.) Consequently, imposing a requirement of legal certification for the board's ASL interpreters is even more restrictive today than it was when Plaintiffs' counsel first acknowledged its impracticability.

In essence, Plaintiffs request the board to drastically limit its potential pool of sign language interpreters to a class of up to 34 members statewide, a group that is currently unable to sufficiently service the interpreting needs of the courts alone. Given the scarcity of certified court interpreters and holders of the SC:L statewide, imposing such a requirement for the board's sign language interpreters at this time would exacerbate the shortage and likely lead to significant delays and disruptions in parole proceedings. Consequently, Plaintiffs' request to require sign language interpreters to appear on the Master List (requiring the SC:L), or to hold the SC:L, is currently unduly restrictive.

### III.   **Plaintiffs' Request is Currently Unfeasible**

Due to the substantial shortage of ASL certified court interpreters, the CIAP is exploring potential pathways to certifying new ASL court interpreters. This shortage has highlighted the pressing need for the Judicial Council to reassess the existing certification process and make necessary adjustments to address the challenges currently faced by California courts. For the short-term, the council concluded that California requires a timely solution to expand the ASL court interpreter pool. (Language Access, at p. 8.)  This overhaul of court certification requirements includes creating a pathway in California for interpreters with a generalist ASL credential to receive a court-qualified status. (*Ibid*.)

Plaintiffs contend that the 2023 Contract fails to include "the requirements for interpreter qualifications that the Board had committed to previously." Plaintiffs selectively cite to the board's August 11, 2022 letter, wherein the board stated it is committed to adopting the Judicial Council's guidance "*as appropriate*," and to include its recommendations "*where applicable*," when negotiating the next contract. (Letter from Jessica Blonien, Chief Counsel, to Caroline Jackson and Rita Lomio, Plaintiffs' Counsel (Aug. 11, 2022) p. 5, italics added.)  However, the board prefaced its commitments by providing that it is "tracking the Judicial Council's efforts to develop training and standards for sign language interpreters." (*Ibid*.) The Judicial Council has failed to issue its updated guidance regarding court certification requirements for ASL interpreters since the time of the board's letter, as the council's court-credentialing revamping efforts remain ongoing. As a result, the board maintained its commitment to Plaintiffs when negotiating the 2023 contract,

---

[3] ASL interpreters currently holding the SC:L can be identified on the Registry of Interpreters for the Deaf, Inc. website: <https://myaccount.rid.org/Public/Search/Member.aspx.> As of October 27, 2023, there are 34 active interpreters holding the SC:L in California. Of the 34 individuals, only 23 interpreters are identified as "freelance status."

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 5

finding the adoption of the council's current guidance to be inappropriate and inapplicable due to the overwhelming shortage of certified court interpreters and the council's ongoing efforts to overhaul its court-credentialing requirements.

The Judicial Council's credentialing overhaul has been ongoing since at least 2020 and remains pending for the foreseeable future. If and when the CIAP's aforementioned recommendations are approved by the Judicial Council, the CIAP would only then begin to develop a proposal for the council to certify persons with ASL generalist credentials to perform work in the courts. Due to this ongoing revamp of court credentialing requirements for ASL interpreters, and the resulting uncertainty regarding the council's future guidance regarding court certification, Plaintiffs' request is currently unfeasible.

## IV.    California Evidence Code § 754 Does Not Apply to Parole Hearings

In seeking to enforce the credentialing requirement set forth in Cal. Evid. Code § 754(b), Plaintiffs assert that the code section "is not limited to the courts," and applies to parole hearings. (Letter from Caroline Jackson, Plaintiffs' Counsel, to Jessica Blonien and George Bakerjian, California Board of Parole Hearings, Follow up to Defendants' Letter of August 11, 2022 and the 2023 Contract for Sign Language Interpreters (Aug. 22, 2023) p. 2 [quoting § 754(b) and citing *Quiros v. Mendoza-Powers*, 2009 WL 1519411, at *3 (C.D. Cal. May 29, 2009)].) Plaintiffs provide scant authority in support of this incorrect assertion.

Qualified interpreters must be appointed to assist deaf or hearing-impaired persons participating in "a civil or criminal action," and related proceedings. (Cal. Evid. Code § 754, subd. (b).) "A 'qualified interpreter' means an interpreter who has been certified as competent to interpret court proceedings by a testing organization, agency, or educational institution approved by the Judicial Council as qualified to administer tests to court interpreters for individuals who are deaf or hard of hearing." (Cal. Evid. Code § 754, subd. (f).) However, by its plain terms, the California Code of Evidence applies only to an "action before the Supreme Court or a court of appeal or superior court, including proceedings in such actions conducted by a referee, court commissioner, or similar officer." (Cal. Evid. Code § 300; see also Cal. Evid. Code § 105 [defining "action" as a "civil or criminal action"].) The provisions of the Evidence Code apply to "proceedings conducted by California courts," and "do not apply in administrative proceedings, legislative hearings, or any other proceedings unless some statute so provides or the agency concerned chooses to apply them."[4] (7 Cal. L. Rev. Comm. Reports 1 (1965).) Indeed, Plaintiffs' counsel have correctly acknowledged that "the rules of evidence for criminal and civil proceedings do not apply to parole hearings." (Prison Law Office, The Cal. Prison and Parole Law Handbook (2019) § 9.23, attached as Exhibit B.) Rather, the rules of evidence applicable to administrative hearings are set forth in the Government Code. (See *Lake v. Reed* (1997) 16 Cal.4th 448, 458; Cal. Gov. Code § 11513, subd. (c).) Finally, neither federal law nor the ARP II require qualified sign language interpreters to be

---

[4] Plaintiffs selectively quote Cal. Evid. Code § 754(b) to support their assertion regarding its application in parole hearings. (See Letter from Caroline Jackson, Plaintiffs' Counsel, to Jessica Blonien and George Bakerjian, Board of Parole Hearings, Follow up to Defendants' Letter of August 11, 2022 and the 2023 Contract for Sign Language Interpreters (Aug. 22, 2023) at p. 2 ["It is required of all sign language interpreters in 'a civil or criminal action . . . or in an administrative hearing'"] [quoting § 754, subd. (b)].) However, the complete text of § 754(b), statutory context and rules of construction, relevant legislative history, and well-established case law do not support Plaintiffs' position. To the extent § 754(b) refers to "administrative hearings," it is necessarily to those related to "civil or criminal actions" (i.e., juvenile traffic hearings, mental health hearings, pro tem hearings).

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 6

court certified, and therefore are unsupportive of Plaintiffs' assertion that the credentialing requirement set forth in Cal. Evid. Code § 754(b) applies to parole hearings.[5]

## V.    Court-Certified Interpreters Are Not Mandated Under Federal Law or the ARP II

Contrary to Plaintiffs' request, neither the federal regulations implementing the ADA and Rehabilitation Act nor the ARP II requires certified court interpreters or holders of the SC:L to accommodate deaf and hearing-impaired individuals in parole proceedings. The U.S. Department of Justice Title II implementing regulations define "qualified interpreter" as follows:

> Qualified interpreter means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.

(28 C.F.R. § 35.104.) Pursuant to Appendix A to part 35 of the implementing regulations, the Department "decided against imposing a certification requirement" and concluded that an interpreter need only be "qualified." (28 C.F.R. § 35, appen. A at 566 (2009); see also *Duffy v. Riveland* (9th Cir. 1996) 98 F.3d 447, 455-56 [holding that the ADA's implementing regulations do not require certified sign language interpreters].) Meanwhile, the ARP II defines a "qualified sign language interpreter," in pertinent part, as "a person who is able to sign to the individual who is deaf what is being said, and who can voice what is being signed by the individual who is deaf. This communication must be conveyed effectively, accurately, and impartially, through the use of any specialized vocabulary." (*Armstrong* Board of Parole Hearings Remedial Plan (Dec. 1, 2010) § VII.B.2.) The ARP II makes passing reference to a "certified sign language interpreter," but does not include certification within the definition above.[6] (*Id*. at § IV.D.2.)

Finally, the board has furthered its objective of providing effective and accurate sign language interpretation services by producing an information and acronym sheet, which is provided to all contracted sign language interpreters upon initial assignment. (See Board of Parole Hearings Information and Acronym Sheet for Sign Language Interpreters, last rev. 08/23, attached as Exhibit F.) This supplement provides retained sign language interpreters with general information about different types of parole proceedings and explanations of commonly used specialized vocabulary and acronyms. In addition, the supplement notifies sign language interpreters that they may request

---

[5] The board surveyed other state agencies responsible for conducting administrative hearings regarding qualification requirements for ASL interpreters. Of significance, none of the adjudicative agencies surveyed, including the Office of Administrative Hearings, requires ASL interpreters to be court certified. (See Standard Agreement No. 20-72684, Department of General Services, Office of Administrative Hearings, Ex. A, p. 2, attached as Exhibit C; Standard Agreement No. 20NS0706, California Public Utilities Commission, Ex. A, p. 2, attached as Exhibit D; Standard Agreement No. 21-101, Department of Motor Vehicles, Ex. A, p. 3, attached as Exhibit E.)

[6] While the ARP II does not include certification requirements for sign language interpreters, the ARP I, which applies to CDCR, requires ASL interpreters to "pass a test and qualify in one of the five categories established by the National Association for the Deaf (NAD), one of the three categories established by the Registry of Interpreters for the Deaf (RID), or as a Support Services Assistant Interpreter from the California Department of Rehabilitation." (*Armstrong* Court Ordered Remedial Plan (Jan. 3, 2001) § II.E.3.) The certification requirements provided in the board's 2023 Contract model the certification requirements listed in the ARP I.

Response to Plaintiffs' August 22, 2023 Letter
October 27, 2023
Page 7

to meet with the incarcerated individual or consult the institutional sign language interpreter prior to any parole proceeding and provides directions for each. The board is committed to continue providing accurate and effective sign language interpretation services to facilitate equal access and effective communication during parole proceedings. The board maintains its current standards and qualification requirements for sign language interpreters contributes to this objective.

## CONCLUSION

In light of the retirement of the SC:L certification in 2016 and the substantial shortage of ASL certified court interpreters statewide, Plaintiffs' request is unduly restrictive at this time as it would lead to significant delays and disruptions in parole proceedings. In addition, Plaintiffs' request is currently unfeasible due to the Judicial Council's ongoing efforts to revamp California court credentialing requirements for ASL interpreters. Finally, Plaintiffs' request is not mandated under federal law or the ARP II's requirements for sign language interpreters. For the aforementioned reasons, Plaintiffs' request is denied. However, the board will reconsider Plaintiffs' request when negotiating its next sign language interpreter contract, provided that the Judicial Council has issued its updated guidance for credentialing ASL court interpreters by that time.

Sincerely,

*s/ George P. Bakerjian*

**George P. Bakerjian**
Senior Staff Counsel

Enclosures:
- Exhibit A - Letter from Rita Lomio, Plaintiffs' Counsel, to Jessica Blonien, Chief Counsel, and Joanna Hood, Deputy Attorney General, Sign Language Interpreters and Parole Hearings (Nov. 13, 2019)
- Exhibit B - Prison Law Office, The Cal. Prison and Parole Law Handbook (2019)
- Exhibit C - Standard Agreement No. 20-72684, Department of General Services, Office of Administrative Hearings
- Exhibit D - Standard Agreement No. 20NS0706, California Public Utilities Commission
- Exhibit E - Standard Agreement No. 21-101, Department of Motor Vehicles
- Exhibit F - Board of Parole Hearings Information and Acronym Sheet for Sign Language Interpreters

# EXHIBIT F

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

## BOARD OF PAROLE HEARINGS

P.O. Box 4036
Sacramento, CA 95812-4036



### Board of Parole Hearings Information and Acronym Sheet
### For Sign Language Interpreters

You have been retained to assist with an upcoming proceeding before the Board of Parole Hearings (Board). This sheet is intended as a resource to provide you with information about the parole process, including words, acronyms, or terms you may encounter, to assist you in interpreting the upcoming parole proceeding. "Parole proceedings" may include Consultations, Attorney – Client Meetings, Comprehensive Risk Assessment (CRA) Interviews, and Hearings.

### Consultations

Consultations are meetings between an incarcerated person and a Board hearing officer approximately five years before the person is eligible to begin receiving parole hearings.  The hearing officer provides the person with information about the parole hearing process and recommendations relating to work assignments, behavior, and programs.

### Attorney-Client Meetings

Attorney-Client meetings are conversations between a person and their state-appointed attorney representing them for their upcoming parole hearing. In these meetings, the attorney will generally ask their client about information in their record, gather evidence to support their arguments for why their client should be found suitable for parole, and may advise their client about other available options.

### Comprehensive Risk Assessment Interviews

Comprehensive Risk Assessment or "CRA" interviews are meetings between a person and a Board psychologist, during which the psychologist gathers information to assess the person's risk of committing future violence. The psychologist will generally ask questions about the person's social and criminal history, the person's positive and negative institutional conduct, the person's programming, education, or work, and the person's plans or options for a successful transition back into the community. The CRA interview results in a written report that is normally reviewed by the hearing panel and may be discussed during the hearing.

### Hearings

Board hearings are primarily parole consideration hearings, but may include parole reconsideration hearings, rescission hearings, or offender with mental health disorder hearings.

### Parole Consideration Hearings

A parole consideration hearing, also known as a "suitability hearing," is a hearing the Board conducts to determine if a person should be released from prison. Hearings are generally conducted by videoconference; however, if effective communication requires it, hearings may be conducted in-person at the prison where the person is located. In-person hearings are conducted in a safe environment, typically located in an administrative room that is inaccessible to the general prison population.

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes. (REV. 08/23)

BPH Information and Acronym Sheet
Sign Language Interpreters

<u>Persons Present</u>: Hearings are generally conducted by a two-person hearing panel comprised of a commissioner and a deputy commissioner. A correctional officer will be present inside the hearing room for security purposes. The person's attorney, and a representative from the District Attorney's office, may be present either in-person or by video. The following parties may be present at some parole hearings in person or by video: the direct victim(s) or members of a victim's family; a staff assistant or interpreter to aid with effective communication; media or other observers (these persons do not participate).

Additionally, for all hearings where sign language is needed, the Board may schedule multiple interpreters of each kind to provide the opportunity to switch and take breaks. Thus, for a hearing that requires only an American Sign Language (ASL) interpreter, two or more ASL interpreters may be assigned for that hearing.

<u>Requesting a Meeting with Incarcerated Person Prior to a Hearing</u>: Interpreters may request a meeting with the incarcerated person via videoconference prior to the hearing to assist the interpreter with determining how best to communicate with the person. Interpreters may submit the request to the Board's ADA Compliance Unit via email at <u>BPH.ADAUnit@cdcr.ca.gov</u>.

Interpreters are required to be available thirty (30) minutes prior to the start time of the proceeding. During this time, the interpreter may consult with the incarcerated person and their attorney to determine the most effective way to communicate. Interpreters may also request a brief conversation with members of the hearing panel to discuss hearing logistics, such as which interpreter will interpret first (if more than one interpreter is assigned), how to signal the panel when a break is needed, or how to signal the panel if the interpreter has concerns about whether effective communication is being achieved.

<u>Consulting Institutional Sign Language Interpreter Prior to a Hearing</u>: Interpreters may consult the staff sign language interpreter at the institution prior to the hearing via phone or email to learn more about the incarcerated person's known interpretive needs or any sign language vocabulary unique to the incarcerated person or the institution. (*see attached* Sign Language Interpreter Contact List.)

<u>Procedures of a Parole Consideration Hearing</u>: A parole consideration hearing will generally begin with each party stating and spelling their name for the record, including any interpreters. Next, the panel will conduct an Americans with Disability Act review to identify specific disability-related needs or accommodations an incarcerated person may require for the hearing.

During the hearing, the panel may discuss with the person their social history, substance abuse history, and past criminal activity that led to their commitment offense. The panel may also discuss the person's positive and negative institutional behavior, programming, and release planning.

The state-appointed attorney and prosecutor may ask clarifying questions, and may each provide a closing statement. The person may provide closing remarks, followed by the victims, if any, who have the right to speak last before the panel renders their decision. The panel will then recess to deliberate on their decision.

Once the hearing reconvenes, the panel states the decision on the record, and concludes the hearing. During this time, no others may speak. Following the hearing, the incarcerated person may speak with their attorney to discuss the hearing result, which may also require interpretation.

**<u>Please Note: if the interpreter needs clarification of any term at any time during the hearing, the interpreter is encouraged to interrupt the hearing and request clarification from the hearing panel</u>.**

\*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

BPH Information and Acronym Sheet
Sign Language Interpreters

**Other Hearings:**

Parole Reconsideration Hearing: These hearings are similar to a parole suitability hearing, but are for a person who was previously granted parole, but was returned to prison, and is now required to demonstrate suitability for parole again to be released.

Rescission Hearing: These hearings are held in circumstances where a person was granted parole, but prior to release, the grant decision was referred back for review, which may result in the parole grant being rescinded.

Offender with a Mental Health Disorder Hearing: Also known as "OMHD" hearings, these hearings determine whether a paroling person meets the statutory criteria to be placed and treated in a psychiatric facility for a mental health disorder that contributed to the commission of their crime(s).

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

BPH Information and Acronym Sheet
Sign Language Interpreters

## **Common Terms Explained**

During proceedings, some common terms may be used to assess the person's understanding of their crimes and conduct in prison:

"**Master Packet**" and "**10-Day Packet**" are packets of information that are sent to the hearing panel, district attorney, and panel-attorney. These packets contain documents relevant to the hearing.

"**Institution**" refers to the prison facility.

"**Risk factors**" refers to circumstances present in the person's life that motivated them to commit their crimes in the community or violations in prison. External circumstances may include rejection, loss of a relationship, or infidelity of a partner; loss of funds or source of income; neglect or abuse during childhood; or growing up with criminal-minded peers or family members. Internal struggles may include feelings of rejection, jealousy, anger, feeling disrespected, or betrayed; susceptibility to peer pressure and negative influence of criminal peers; learned hatred of a group of persons; victimization in childhood; or inability to overcome an addiction.

"**Character defects**" is another term interpreters may hear in reference to negative aspects of the person's character at the time of their crime(s) that allowed them to violate social rules and commit criminal conduct to harm others. These are often the person's inability or lack of skills at that time to cope with one or multiple external circumstances or internal struggles listed above in "risk factors."

"**Causative Factors**" refers to the factors that were responsible for causing something. Generally, the panel will explore a person's causative factors of their commitment offense or criminal history.

"**Triggers**" refers to a stimulus that elicits a reaction. Panels may explore a person's triggers that have led to negative outcomes in the past or triggers that may lead to negative outcomes in the future.

"**Offender change**" refers to a person's demonstration of change since the commission of their crime.

"**Institutional behavior**" refers to the incarcerated person's disciplinary record while in prison.

"**Life crime**" or "**Commitment offense**" refers to the crime that led to the person's current incarceration term.

"**RVR**," "**115**," or "**Counseling Only RVR**" refers to a report of misconduct in prison. Serious prison misconduct generally results in a Rules Violation Report (RVR) or "115." Less serious misconduct may be noted on a "Counseling Only Rules Violation Report."

"**Programming**" refers to courses the person has completed or is currently completing, or groups the person currently or previously participated in, where the person learns skills and techniques to decrease or overcome risk factors. Some institutional programs are commonly listed as acronyms. Examples include GOGI: (Getting Out by Going In) and CGA: (Criminals and Gangmembers Anonymous). If it is unclear what a program acronym means, please interrupt the panel for clarification.

"**Youth offender**" refers to offenders that committed their controlling offense prior to the age of 26. In considering a youth offender's suitability for parole, the hearing panel will give great weight to youth factors, as defined by law.

"**Elderly parole**" refers to elderly offenders that have reached a certain age and have served a certain amount

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

BPH Information and Acronym Sheet
Sign Language Interpreters

of time in prison. In determining an elderly offender's suitability for parole, the hearing panel considers their age, time served, and diminished physical condition, if any.

"**Suitable for parole**" or "**suitability**" refers to when a person is deemed to no longer pose a current unreasonable risk of danger to the community if released, and who will be granted parole.

"**Unsuitable for parole**" or "**unsuitability**" refers to when a person is deemed to still pose a current, unreasonable risk of danger to the community if released, and who will be denied parole.

"**Stipulation of unsuitability**" refers to a person's request to agree to a denial of parole for a set period.

"**Postponement**" refers to a person's request to postpone their current scheduled hearing for a period of time less than one year, generally due to unexpected circumstances.

"**Waiver**" refers to a person's request to waive their rights to their current scheduled hearing for a specified number of years. When waiving a hearing, the person must understand they are waiving all hearing rights.

"**Continuation**" refers to situations where a hearing has been partially conducted, but due to unexpected circumstances (such as the sudden illness of a hearing participant) or new information that requires investigation, the hearing must be paused and concluded at a later date.

"**Keyhea**" order or "2602 order" refers to the process for getting an order to administer involuntary psychotropic medication in the prison system (previously known as "Keyhea" orders, pronounced keh-HEE-ya).

"**De-brief**" refers to the formal process through which a previously validated "security threat group" or "gang" member may officially renounce their membership from the gang and be re-validated as a non-member of that gang.

"**Step-down**" refers to the process through which a previously validated "security threat group" or "gang" associate may formally dissociate from the group or gang through demonstrating an absence of gang-related activity.

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

BPH Information and Acronym Sheet
Sign Language Interpreters

## Common Acronyms Explained

During the proceeding, interpreters may encounter some or many of the following acronyms. These are often best communicated through spelling out the acronym:

**CDCR**: The California Department of Corrections and Rehabilitation.

**BPH** or **Board**: The Board of Parole Hearings.

**ADA**: Americans with Disabilities Act

**DDP**: Developmental Disability Program. This program identifies incarcerated people with developmental disabilities and the adaptive supports they require. Levels within this program include the following:

- <u>DD1</u>: lowest level of intervention and adaptive supports required.
- <u>DD2</u>: mid-level of intervention and adaptive supports required.
- <u>DD3</u>: highest level of intervention and adaptive supports required.

**MHSDS**: Mental Health Services Delivery System. This system identifies people who are diagnosed with mental illnesses and provides therapeutic support they require. Levels within this program include the following:

- <u>CCCMS</u>: Correctional Clinical Case Management System (may also be pronounced "triple CMS," "triple C,"). This is the lowest level of outpatient mental health treatment.
- <u>EOP</u>: Enhanced Outpatient Program. This is the highest level of outpatient mental health treatment.
- <u>MHCB</u>: Mental Health Crisis Bed. This refers to intensive short-term inpatient mental health treatment to assess whether a person can be stabilized or requires longer-term inpatient admission.
- <u>ICF</u>: Intermediate Care Facility. This refers to intensive and often longer-term inpatient mental health treatment for people.
- <u>ACUTE</u>: This refers to intensive inpatient mental health treatment for people.

**TABE**: Test of Adult Basic Education. The TABE reading score corresponds with an individual's reading grade level. For instance, a 6.0 score means the person reads at a sixth-grade level.

**CASAS**: Comprehensive Adult Student Assessment Systems.

**TDD**: Telecommunications Device for the Deaf.

**DSL**: Determinate Sentence Law (may be pronounced "DEE-sel"). This refers to inmates whose sentences have a set length of incarceration that may be decreased through credits or eligibility for earlier parole consideration by the Board.

**ISL**: Indeterminate Sentence Law (may be pronounced "EYE-sel"). This refers to inmates whose sentences do not have a defined length and they may only obtain parole through parole consideration by the Board.

**FAD**: Forensic Assessment Division. This is the division of psychologists at the Board who conduct the comprehensive risk assessments.

**IPB** or **BWS**: Intimate Partner Battery (previously known as "Battered Woman Syndrome"). This refers to violence within a domestic relationship.

**MEPD**: Minimum Eligible Parole Date. This refers to the earliest date on which a person sentenced to a life sentence with the possibility of parole is eligible for parole consideration.

---

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.*

BPH Information and Acronym Sheet
Sign Language Interpreters

**YPED**: Youth Parole Eligible Date. This refers to the earliest date on which a person who qualifies as a youth offender is eligible for parole consideration.

**EPED**: Elderly Parole Eligible Date. This refers to the earliest date on which a person who qualifies as an elderly offender is eligible for parole consideration.

**NPED**: Nonviolent Parole Eligible Date. This refers to the earliest date on which a person who qualifies as a nonviolent offender is eligible for parole consideration.

**EPRD**: Earliest Possible Release Date. This refers to the earliest date on which a person sentenced to a determinate sentence is eligible for release.

**GP or "Gen Pop":** General Population. This refers to the general population of incarcerated persons who have not been segregated into special housing for disciplinary or protective measures.

**SNY**: Sensitive Needs Yard. This refers to a designation for incarcerated people who have safety concerns regarding living on a GP yard.

**NDPF**: Non-Designated Programming Facilities. This refers to a designation that houses incarcerated people together regardless of their GP or SNY status to afford incarcerated people greater access to rehabilitative programs.

**ASU** or **AD-SEG**: Administrative Segregation Unit (may be pronounced "ADD-seg"). This refers to a temporary separation within an institution from the general population.

**SHU**: Security Housing Unit (may be pronounced "shoe"). This refers to separation within an institution from the general population for a specified period of time.

**PHU**: Protective Housing Unit. This refers to separation within an institution from the general population for safety reasons.

**PSU**: Psychiatric Services Unit. This refers to an outpatient mental health housing unit for people who require a higher custody level.

**PIP**: Psychiatric Inpatient Program. This refers to inpatient mental health housing units.

**ISU**: Investigative Services Unit. This refers to the unit of CDCR officers who investigate for the prisons..

**LTOP**: Long Term Offender Program (may be pronounced as individual letters or more commonly as "EL-topp"). This refers to a program during parole containing multiple courses to address a person's identified risk factors.

**STG**: Security Threat Group. This refers to prison gangs or community street gangs.

**TCMP**: Transitional Case Management Program is an institutional program that assists people with the transition to parole in the community.

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

BPH Information and Acronym Sheet
Sign Language Interpreters

## Institution Acronyms

During the proceeding, interpreters may encounter one or some of the following acronyms for the different CDCR-managed institutions or DSH-managed hospitals where the person may be housed. These are often best communicated through spelling out the acronym, then providing the name of the institution if the person does not appear to understand the acronym:

| | |
|---|---|
| **ASH**: Atascadero State Hospital | **ISP**: Ironwood State Prison |
| **ASP**: Avenal State Prison | **KVSP**: Kern Valley State Prison |
| **CAL**: Calipatria State Prison | **LAC**: California State Prison – Los Angeles County |
| **CCI**: California Correctional Institution | **MCSP**: Mule Creek State Prison |
| **CCWF**: Central California Women's Facility | **NKSP**: North Kern State Prison |
| **CEN**: Centinela State Prison | **PBSP**: Pelican Bay State Prison |
| **CHCF**: California Health Care Facility | **PSH**: Patton State Hospital |
| **CIM**: California Institution for Men | **PVSP**: Pleasant Valley State Prison |
| **CIW**: California Institution for Women | **RJD**: Richard J. Donovan Correctional Facility |
| **CMC**: California Men's Colony | **SAC**: California State Prison - Sacramento |
| **CMF**: California Medical Facility | **SATF**: Substance Abuse Treatment Facility |
| **COR**: California State Prison - Corcoran | **SCC**: Sierra Conservation Center |
| **CRC**: California Rehabilitation Center | **SOL**: California State Prison - Solano |
| **CTF**: Correctional Training Facility | **SQ** or **SQSP**: San Quentin State Prison |
| **CVSP**: Chuckawalla Valley State Prison | **SVSP**: Salinas Valley State Prison |
| **FSP**: Folsom State Prison | **VSP**: Valley State Prison |
| **HDSP**: High Desert State Prison | **WSP**: Wasco State Prison |

## Additional Location Acronyms

**SACCO**: Sacramento Control Office. This refers to the office who tracks and monitors any person who is housed in institutions located outside of California.

**MCCF**: Modified Community Correctional Facilities. This refers to additional institutions, not listed above that are under the direct management of CDCR.

*The *Board of Parole Hearings Information and Acronym Sheet* provides only general information about certain parole proceedings that has been simplified and condensed to provide a brief overview. The explanation of common terms and acronyms provided are intended solely for informational purposes.

# EXHIBIT 76



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Caroline E. Jackson
Email: cjackson@rbgg.com

October 30, 2023

VIA ELECTRONIC MAIL ONLY

<div style="border:1px solid black; float:right;">

**SUBJECT TO
PROTECTIVE ORDERS**

</div>

Jessica Blonien
George Bakerjian
California Board of Parole Hearings
P.O. Box 4036
Sacramento, CA 95812-4036
Jessica.Blonien@cdcr.ca.gov
George.Bakerjian@cdcr.ca.gov

Katie Riley
CDCR Office of Legal Affairs
Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283-0001
Katie.Riley@cdcr.ca.gov

Re:    *Armstrong v. Newsom*:  Request for Video Translation of CRA for Five
       Deaf Signers
       Our File No. 0581-04

Dear Counsel:

We write on behalf of five deaf signers who are scheduled for a parole suitability hearing in the first few months of 2024: ███████████████████████████████ , ███████████████████████████████████████████████████████████ .

We request that Defendants immediately take steps to provide these individuals with a video-recorded ASL translation of their CRA, as Plaintiffs' counsel has previously requested on behalf of all deaf signers.  *See* Letter from C. Jackson to J. Blonien et al., Accommodations for Deaf Sign Language Users Throughout the BPH Process (October 28, 2022) at 14-15.

████████ has a reading score of 1.0.  Her primary method of communication is ASL and she has no alternate method.  According to her last CRA, she grew up in Mexico and did not immigrate to the United States until she was an adult.  *See* Q1 2021 Life Prisoner Monitoring Report at 4.  A letter she wrote to the Board in 2019 indicates she has no meaningful command of English vocabulary or grammar.  *See id.* at 3.  There is no reasonable expectation that she can understand her CRA without a highly skilled interpreter to break down the document into language she can understand.

[4379963.1]

**SUBJECT TO PROTECTIVE ORDERS**
George Bakerjian
Katie Riley
October 30, 2023
Page 2



Mr. ███████ and Mr. ██████ each has a reading score of 4.0, indicating their reading abilities are nowhere near high enough to read the CRA.  Both men appear before the Board on a petition to advance and are unlikely to receive a new CRA prior to their scheduled hearing.  However, for both men, their access to their existing CRA was limited by their inability to read and their limited access to individuals willing to read the CRA to them.  Mr. ████████, for example, reports that he never found out what his CRA said, despite concerns that it contains inaccuracies.

Mr. ███████ and Mr. ███████ each has a reading score of 12.9.  While it is possible they each read well enough to understand their CRA, this is not guaranteed, especially given the technical, psychological terms used throughout the document.  Indeed, both men face additional barriers: Although Mr. ██████'s CRA was last completed in 2022, he reports he has no memory of receiving the document, suggesting he did not read well enough to understand his CRA at the time it was served.  Mr. ███████ is a second language learner of ASL, yet will need to rely on ASL to access his hearing, where his CRA will be discussed.  In order to use the CRA to adequately prepare for his hearing, Mr. ███████ needs access to the document in ASL to learn the vocabulary necessary to participate in a discussion of the document during his hearing.

As previously explained, a one-time opportunity to have a Correctional Counselor or state-appointed attorney read aloud the CRA, while a sign language interpreter frantically tries to translate the densely worded document on the fly, does not provide a level of access equivalent to what other, non-disabled individuals enjoy.

**Therefore, we request that Defendants provide to each of these individuals the opportunity to sit down with a Certified Deaf Interpreter, who can translate the document for them at an appropriate pace, providing clarification as necessary to ensure effective communication.  We further request that Defendants record this meeting by video and ensure that deaf parole candidate can access this recording as often as they would like, as non-deaf individuals can do while preparing for Board hearings.**

Further, when these individuals have their Board hearings, we request that Defendants record the proceeding by video—capturing both the parole candidate and the sign language interpreters—and make the video available to the deaf signer for review with the same duration and frequency that non-deaf individuals can review English transcripts.

/ / /

[4379963.1]

**SUBJECT TO PROTECTIVE ORDERS**

George Bakerjian
Katie Riley
October 30, 2023
Page 3


We appreciate your attention to this important matter.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Caroline E. Jackson*

By:   Caroline E. Jackson

CEJ:CEJ

cc:  BPH ADA   Trace Maiorino   Joseph Bick
  Jennifer Shaffer   Sean Lodholz   John Dovey
  Jim Logsdon   Olena Likhachova   Robin Hart
  Patricia Ferguson   Anne Kammer   CCHCS Accountability
  Tamiya Davis   Gurpreet Sandhu   Joseph Williams
  Nicholas Meyer   Mona Houston   Cathy Jefferson
  Chor Thao   Lourdes White   Jason Anderson
  Ramon Ruiz   Jillian Hernandez   Dawn Lorey
  Ursula Stuter   Cory Lo   Jane Moses
  OLA *Armstrong*   CDCR CAMU   Alexandrea Tonis
  Ed Swanson   Brianne Burkart   Joshua (Jay) Leon Guerrero
  Audrey Barron   Lois Welch   Aaron Perez
  August Gugelmann   Steven Faris   Co-Counsel
  Sharon Garske   Diana Toche

[4379963.1]

# EXHIBIT 77

| | |
|---|---|
| **From:** | Tania Amarillas |
| **To:** | Davis, Tamiya@CDCR |
| **Cc:** | Ed Swanson; Rita Lomio; Margot Mendelson; Juliette Mueller; Armstrong Team; Gay C. Grunfeld; Penny Godbold; Thomas Nolan; Nathalie Welch; Armstrong Team - RBG only; Patrick Booth; Ben Bien-Kahn; Michael Freedman; Jenny Yelin; Powell, Alexander@CDCR; Meyer, Nicholas@CDCR; Ferguson, Patricia@CDCR; Johnson, Gannon@CDCR; Lopez, Amber@CDCR; Stringer, Robin@CDCR; CDCR OLA Armstrong CAT Mailbox; Adriano.Hrvatin@doj.ca.gov; Trace Maiorino; Sean Lodholz; Anthony Tartaglio; Namrata Kotwani; Andrea.Moon@doj.ca.gov; Fouch, Adam@CDCR; Quint, Chantel@CDCR; Hernandez, Jillian@CDCR; Bravo, Landon@CDCR; Hoogland, Laurie@CDCR; Beland, Bruce; Gaultney, Robert@CDCR; Foss, Tammy@CDCR; John D@CDCR Dovey; Hart, Robin@CDCR; CCHCS Accountability Log@CDCR; Joseph@CDCR Williams; Amy.Padilla@cdcr.ca.gov; Anderson, Jason@CDCR; Edwards, Joseph.K@CDCR; Robinson, Lynda@CDCR; Pires, Barbara@CDCR; Andrade, Courtney@CDCR; Solis, Miguel@CDCR; Dobrynina, Olga@CDCR; Stevens, Dawn@CDCR; Tonis, Alexandrea@CDCR; Ly, Jimmy@CDCR; Powell, Jay@CDCR; Armedo, Gently@CDCR; Lois@CDCR Welch; Faris, Steven@CDCR |
| **Subject:** | Re: Armstrong Advocacy \| ▮▮▮▮▮▮ , ▮▮▮▮▮▮ |
| **Date:** | Friday, January 8, 2021 11:45:19 AM |

Dear Tamiya:

We write to follow-up on our ▮▮▮▮▮▮▮▮▮ , and ▮▮▮▮▮▮▮ , advocacy letters regarding Mr. ▮▮▮ need for a lighted magnifier. We have yet to receive a response to our May letter, sent 235 days ago.

We spoke to Mr. ▮▮▮ on December 17, 2020, about his vision following a cornea transplant on ▮▮▮▮▮▮▮▮ . Mr. ▮▮▮ informed us that his vision began to improve immediately following the surgery, however, it began to revert in late November. According to Mr. ▮▮▮ medical records, he submitted a 7362 on November 30, 2020, stating, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ " See 7362 - Nursing (Nov. 30, 2020). Due to this decline in his vision, Mr. ▮▮▮ has to use a makeshift magnifier to help him read and write. As we detailed in our letters from December ▮▮▮ , and ▮▮▮▮▮ , the card magnifiers and full-page magnifiers currently available at ▮▮▮ are an not an adequate accommodation because (1) the magnification is not adjustable for the individual user; and (2) they do not provide the necessary contrast that some low vision class members like Mr. ▮▮▮ require. See Letter from Patrick Booth, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, Armstrong Advocacy Letter, ▮▮▮ ▮▮ ▮▮ ▮▮ at 1 ( ▮▮▮▮▮▮ ).

Additionally, because law libraries have been operating on very limited schedules or closed altogether throughout the pandemic, Mr. ▮▮▮ reported that he has not been able to use the Merlin or Davinci as needed to write letters to his loved ones and prepare for his board hearing later this year. As such, we renew our request that Mr. ▮▮▮ be issued a lighted magnifier so that he may be able to independently read and write, particularly during this time when his access to the law library and out-of-cell activities are limited.

Additionally, Mr. ▮▮▮ reported that his cell, ▮▮▮▮ has been leaking when it rains and gets very damp other days because it is right by the showers. Mr. ▮▮▮ reported he has to use an extra blanket and towels to keep water from pooling in the back of his cell. We ask that Mr. ▮▮▮ be offered a move to a cell that does not leak.

Thank you for your prompt attention to this matter.

Tania

On Mon, ▮▮▮▮▮▮▮ at 3:37 PM Juliette Mueller <juliette@prisonlaw.com> wrote:

Dear Tamiya:

Please find attached an advocacy letter regarding Mr. ██████████. Please send the response to Patrick Booth (patrick@prisonlaw.com) and Skye Lovett (skye@prisonlaw.com).

Thank you,

Juliette Mueller
Pronouns: she/her/hers
Litigation Assistant
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621


--
Tania Amarillas
Investigator
Prison Law Office
tania@prisonlaw.com
(510) 280-2621
Preferred pronouns: she/her

ATTENTION:  The State of California has ordered all residents to shelter in place until further notice, in response to COVID-19.  PLO staff are working remotely.  There may be a delay in processing and responding to U.S. mail, phone calls, and emails.  We apologize for any inconvenience, and we appreciate your patience.

*This email may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient. Any review, reliance, or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.*



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

█████████

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:     *Armstrong* Advocacy Letter
███████████, ████

Dear Ms. Davis:

I write regarding ███ ██ █████, DPV, an *Armstrong* class member housed at the █████ ████████████████████ ("█████. ).  I previously wrote to you about Mr. ████ in a letter dated ████████████.  *See* Exhibit A.  In that letter, I noted that Mr. ████ is blind in his right eye and has 20/400 vision in his left eye, and that "he is unable to complete all tasks associated with reading and writing, like reading and responding to his letters, preparing parole plans, and filling out CDCR paperwork, in the time allotted for him on the Merlin machine." *Id*. at 1.  I wrote that Mr. ████ as well as other low-vision class members, reported that card readers and full-page magnifiers are ineffective accommodations because (1) the magnification is not adjustable for the individual user; and (2) they do not provide the necessary contrast that some low vision class members like Mr. ████ require.  *Id*. at 2-3.  I also expressed my concerns that █████ RAP is over-reliant on ADA workers to read and write for low vision class members, thereby sacrificing the independence of the class members.  Accordingly, I requested that Mr. ████ be provided with a magnifier that will allow him to read independently in his prison environment, namely a lighted magnifier.  *Id*. at 3.

The ADA Coordinator at ████ denied the request in a three-paragraph memorandum dated December 30, 2019.  *See* Exhibit B.  In his brief response, however, the ADA Coordinator does not properly address the concerns raised in my previous advocacy letter.  Specifically, the ADA Coordinator suggests that Mr. ████ has received several alternative accommodations – reading glasses, a full page magnifier, and the assistance of ADA workers – inaccurately implying that Mr. ████ can access prison programs and services without a lighted magnifier.  Importantly, the Armstrong Remedial Plan ("ARP") states, "A request for accommodation may be denied if *equally effective access* to a program, service, or activity may be afforded through an alternative method."  ARP § II(H) (emphasis added).  As detailed below, none of the alternative accommodations that the ADA Coordinator lists allow Mr. ████ to access prison programs or services in an equally effective manner, as required by the ARP.

**First**, the ADA Coordinator's memorandum states that Mr. ████ has been issued reading glasses, which is not particularly relevant to Mr. ████ request for a lighted magnifier.  The ADA Coordinator's response states, "On August 13, 2019, the optometrist recommended prescription glasses (readers) based upon the examination conducted with Mr. ████  On November 12, 2019, Mr. ████ was issued

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Ms. Tamiya Davis
Re: ███████████████
May 18, 2020
Page 2

prescription glasses as an accommodation which would allow him to read independently in his prison ..... onment." *Id.* Notably, Mr. ████ was issued his prescription reading glasses nearly one month prior to my previous advocacy letter. I sent the advocacy letter on behalf of Mr. ████ because his prescription glasses, though helpful, do not provide the contrast necessary to allow him to read independently. Mr. ████ said in December 2019, and maintains now, that his reading glasses are not an adequate substitute for a lighted magnifier, for the reasons listed in the original advocacy letter:

- Illuminated magnifiers "are especially useful in low-light conditions and for people requiring more light to read." Peggy R. Wolfe, Vision Loss: Strategies for Living with Hope and Independence (Park Publishing, Inc. ed., Third Edition, 2014)] at p. 48.

- "To see better, most people with low vision need more light than typical readers viewers. ... [W]hen it comes to reading with low vision, it is more important to get the light closer to the page." Marshall Flax *et al.*, Coping with Low Vision (Singular Publishing Group, Inc. ed., 1993) at p. 86.

*See* Exhibit A at 2.

**Second**, the ADA Coordinator's response inappropriately implies that the full page magnifier in Mr. ████ housing unit and the Merlin machine in the law library are effective alternatives to the lighted magnifier. The ADA Coordinator's response merely rephrases the RAP's inadequate June 19, 2019 response, which was the basis of my previous advocacy letter. Specifically, the ADA Coordinator's responses states, "Full page magnifiers are available in each housing unit for use by all inmates with vision impairments. Assistive devices are also available in the Law Libraries."[1] Exhibit B. In my previous letter, I noted:

> Mr. ████ reports that neither the card magnifier that he was issued nor the full-page magnifier referenced in the RAP response are effective in light of his significant vision disability. He said that the prison-issued magnifiers do not provide the necessary contrast to allow him to see the words on the page.

Exhibit A at 2.

Mr. ████ says that he continues to have issues using the full page magnifiers in his housing unit. He reports that he "always finds [him]self adjusting the magnifier to see correctly" because he needs more light directly on the page. Additionally, he says that he is not allowed to take the magnifier to his cell or read overnight, and that at least four other individuals in his housing unit use the same magnifier. As a result, Mr. ████ reports that he has limited access to his legal work, mail from friends and family, and all CDCR paperwork. Under normal circumstances, then, Mr. ████ does not have equal access to prison

---

[1] The RAP's ███████ response to Mr. █████████ CDCR Form 1824 states in part: "To assist with your vision issues, you were issued a card reader on 6/12/2019. You were notified of a full page magnifier that is available for use through custody staff in your housing unit. There are also ADA Workers available to provide assistance. The RAP determined you may utilize the Special Purchase Order Process to request approval to purchase an assistive device such as a magnifier with attached light." Exhibit A at 1.

services and programs because the full page magnifier does not allow him to communicate with family, friends, or legal counsel in the same manner that sighted people can.  *See* 1824 Desk Reference Manual (October 2, 2017) at 4 ("The term .access' also includes the ability to communicate with family, friends, legal counsel, the courts").  In the midst of a global pandemic, requiring Mr. ███ to share a full page magnifier with other people in his housing unit also poses serious health risks.  And Mr. ███ no longer has access to auxiliary aids in the law library in light of Defendants' COVID-19 restrictions.

**Third**, I am troubled by the ADA Coordinator's suggestion that the existence of ADA workers is an effective alternative to Mr. ███ request for a lighted magnifier.  Specifically, the ADA Coordinator's response states, "It should be noted that the institution has ADA worker positions to provide assistance, when needed, to inmates with disabilities.  ADA workers are only utilized when the DPP inmate expresses the desire to obtain assistance."  Exhibit B.  In my previous letter, I noted that "[i]t is unreasonable to require Mr. ███ to rely on ADA workers to read his private, personal mail aloud to him or to read recreational books to him every evening when he is able to perform those functions himself with an auxiliary aid."  Exhibit A at 3.  I also stated that "Mr. ███ is entitled to communicate confidentially with his legal counsel, something he cannot do if he needs ADA workers to read his legal mail aloud to him."  *Id.*  Mr. ███ personal paperwork might contain sensitive information, such as case factors, medical information, or names and addresses of family members.  Accordingly, Mr. ███ has the right to read his paperwork independently, without the assistance of an ADA worker.  He cannot do that, however, because he has not been reasonably accommodated with a lighted magnifier.  Therefore, it is inaccurate for the ADA Coordinator to suggest that Mr. ███ can use an ADA worker if he "express[es] the desire to obtain assistance."  Exhibit B.  Mr. ███ often does not have a choice in the matter – if he wants to read his legal documents, correspond with his loved ones, or submit CDCR documents, Mr. ███ often must rely on ADA workers to do so.  If Mr. ███ had an auxiliary aid – like a lighted magnifier – that allowed him to read independently in his own environment, he would not need to rely on ADA worker assistance.

Moreover, ADA workers are not available at all hours, including the evening hours when Mr. ███ corresponds with his family or reads his legal paperwork.  Given the current pandemic, Mr. ███ must also abide by social distancing restrictions.  If he needs to request an ADA worker's help with reading and writing, they must loudly relay private messages from a distance of least six feet.  This arrangement is not acceptable.  Mr. ███ is entitled to privacy in his communications with his family and legal counsel.  *See* 28 C.F.R. § 35.160(b)(1) ("In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities.  In order to be effective, auxiliary aids and services must be provided . . . *in such a way as to protect the privacy and independence of the individual with a disability*.") (emphasis added); *see also* Cal. Penal Code § 2601(b) (providing that people in prison "shall have the following civil rights: . . . To correspond, confidentially, with any member of the State Bar or holder of public office").

**Finally**, the response does not discuss whether a lighted magnifier can be provided to Mr. ███ and if not, what the basis for that decision is.  The ADA Coordinator's memorandum makes no mention of penological interests that weigh against a lighted magnifier.  *See* ARP § II(H) (stating that a request for reasonable accommodation may be denied only based on legitimate penological interests, undue financial or administrative burden, when granting the request poses a direct threat to safety, or when an equally

effective alternative accommodation can be provided). In my letter, I noted "that CHCF provides some class members with lighted magnifiers of varying strengths at no cost to the class member." Exhibit A at 3. I also now highlight that San Quentin State Prison has lighted magnifiers that are provided to class members. *See* Exhibit C. It appears that CDCR has lighted magnifiers, and they can safely be distributed to class members. In that case, it is still unclear why Mr. ███ is not permitted to have a lighted magnifier.

<div align="center">*****</div>

We previously have raised concerns that "DPV class members statewide have higher rates of serious mental health concerns, including depression and anxiety. It is important that Defendants take all appropriate steps to mitigate the impact of increased isolation on people with disabilities during the COVID-19 pandemic.. Letter from R. Lomio and M. Lynch, Plaintiffs' Counsel, to T. Davis, CDCR Office of Legal Affairs, ████████████, ███████, ████ (██████████████). In light of these concerns, I request that Defendants provide Mr. ████ with a lighted magnifier that will allow him to read independently in his prison environment without further delay. If Defendants decline to do so, I request a detailed explanation why under the framework set forth in Section § II(H) of the *Armstrong* Remedial Plan.

Thank you for your prompt attention to this matter.

Sincerely,

Patrick Booth
Legal Fellow

cc:    Mr. ████ (redacted)
       Co-Counsel
       Ed Swanson, Court Expert
       Nicholas Meyer, Erin Anderson, Alexander Powell, Amber Lopez,
       OLAArmstrongCAT@cdcr.ca.gov, Patricia Ferguson (OLA)
       Lois Welch, Steven Faris (OACC)
       Adam Fouch, Teauna Miranda, Laurie Hoogland, Landon Bravo (DAI)
       John Dovey, Vince Cullen, Don Meier, Laurene Payne, Ceasar Aguila, Samantha Lawrence-Chastain, Olga Dobrynina, m_CCHCSAccntLog@cdcr.ca.gov, Alexandrea Tonis, Barbara Pires, Bruce Beland, Cathy Jefferson, Ceasar Aguila, Cindy Flores, Dawn Malone-Stevens, Desiree Collum, Donald Meier, Gently Armedo, Laurene Payne, Lynda Robinson, Ngoc Vo, Robin Hart, Steven Blum, Joseph Williams (CCHCS)
       Adriano Hrvatin, Joanna Hood, Damon McClain, Sean Lodholz (DOJ)



**Director:**
Donald Specter

**Managing Attorney:**
Sara Norman

**Staff Attorneys:**
Rana Anabtawi
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson
Thomas Nosewicz
Shira Tevah

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

████████████

Ms. Russa Bo. d
CDCR Office of Legal Affairs

> RE: *Armstrong* Advocacy Letter
> ████████████ █████

Dear Ms. Boyd:

    I write regarding ████████, ██████ DPV, an *Armstrong* class member housed at ████ Mr. Gray is blind in his right eye and has 20/400 vision in his left eye. *See* Outpatient Progress Note (Dec. 4, 2019) ("█████████████████████████████████ ███████████████████████████████"). He reports that, because of his vision impairment, he has trouble reading paperwork, including books, letters, and his legal mail. Mr. ████ reports that he uses the Merlin machine in the law library to read. However, the law library has limited hours, so Mr. ████ has only a small window of time to complete his reading and writing. *See* June-September 2018 SATF Tour Report at p. 17 ("Class members . . . continue to report that long wait times and unpredictable library schedules prevent them from accessing auxiliary aids available in the law libraries."); Letter from P. Godbold, Plaintiffs' Counsel, to R. Boyd, CDCR Office of Legal Affairs, *Armstrong v. Newsom*, Request for DPV Equipment (Mar. 22, 2019) (summarizing Plaintiffs' recent tour reports and letters that document "multiple examples of restricted library use and insufficient access for class members"). Mr. ████ reports that he is unable to complete all tasks associated with reading and writing, like reading and responding to his letters, preparing parole plans, and filling out CDCR paperwork, in the time allotted for him on the Merlin machine. He says that if he had a magnifier with a light attached, or an "illuminated magnifier," he would be able to read independently and outside of the law library.

    On May 25, 2019, Mr. ████ submitted a Form 1824 requesting, among other things, a "magnifying lens with a light attached to it." Attachment A, Log No. SATF-D-19-03385. Mr. ████ reported that he wanted to "[r]ead and write without needing to be in a bright lighted area with a strong magnifying lens." *Id.* The RAP response, dated June 19, 2019, states in part:

> To assist with your vision issues, you were issued a card reader on 6/12/2019. You were notified of a full page magnifier that is available for use through custody staff in your housing unit. There are also ADA Workers available to provide assistance. The RAP determined you may utilize the Special Purchase Order Process to request approval to purchase an assistive device such as a magnifier with attached light.

*Id.*

[3474553.1]

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

We have several concerns with the way the RAP handled this request for a disability accommodation.  **F....** , the RAP response inappropriately suggests that Mr. ███ "purchase an assistive device such as a magnifier with attached light."  Defendants are responsible for providing auxiliary aids to people with disabilities, including magnifiers.  *See* ARP § II(G) ("Accommodations shall be made to afford equal access to the court, to legal representation, and to health care services… Accommodations may include … *access to magnifiers*") (emphasis added); *id.* at § IV(I)(2)(a) ("Institutional staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that inmates who have difficulty reading and/or communicating in writing … are provided reasonable access to forms, CCRs, and procedures.").  Such devices should be provided at no charge.  *See* 28 C.F.R. § 35.130 (f) ("A public entity may not place a surcharge on a particular individual with a disability or any group of individuals with disabilities to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the Act or this part").

**Second**, the RAP response inappropriately suggests that a card or full-page magnifier is an equally effective alternative to an illuminated magnifier.  *See* ARP § II(H) (noting that "[a] request for accommodation may be denied if equally effective access to a program, service, or activity may be afforded through an alternative method").  It is not clear how the RAP made this determination.  Mr. ███ reports that neither the card magnifier that he was issued nor the full-page magnifier referenced in the RAP response are effective in light of his significant vision disability.  He said that the prison-issued magnifiers do not provide the necessary contrast to allow him to see the words on the page.  "The greater the contrast, the easier it is to see things from print on a page to peas on a plate.  Adequate lighting is essential to provide the contrast required to distinguish items from their background."  Peggy R. Wolfe, Vision Loss:  Strategies for Living with Hope and Independence (Park Publishing, Inc. ed., Third Edition, 2014) at p. 43; *see also id.* at p. 33 ("Sometimes, being able to see better is simply a matter of properly placed, adequate lighting").  For that reason, illuminated magnifiers "are especially useful in low-light conditions and for people requiring more light to read."  *Id.* at p. 48; *see also* Marshall Flax *et al.*, Coping with Low Vision (Singular Publishing Group, Inc. ed., 1993) at p. 86 ("To see better, most people with low vision need more light than typical readers viewers. … [W]hen it comes to reading with low vision, it is more important to get the light closer to the page.").

The RAP's recommendation of a one-size-fits-all disability accommodation does not reflect an individualized assessment in light of Mr. ███ particular disability.[*]  Outside of prison, magnifiers are available "at several magnification levels, from the lowest level, 2x, up to 15x."  Wolfe, *supra*, at pp. 47-48, 194-95.  Similarly, magnifiers can be found with or without light, in hand-held or stand style, battery-operated or rechargeable, or with different style lights.  *See* Flax, *supra*, at p. 71.  Individuals with low vision should try a variety of magnifiers to determine which style is most helpful.  Each person's "own

---

[*]    In addition to the requirements of the *Armstrong* Remedial Plan, the Americans with Disabilities Act also requires an individualized determination for a reasonable accommodation.  *See Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004) ("[I]t is clear that the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it.").

needs and … intended use for the magnifier will help determine which type is best" for the individual. Wolfe, *supra*, at pp. 47-48, 194-95.  The prison-issued magnifiers, which apparently are available at ████ at only two levels of magnification and without illumination, do not necessarily accommodate all low vision class members.  We understand that CHCF provides some class members with lighted magnifiers of varying strengths at no cost to the class member.  The magnifiers are provided through consultation with medical staff.  Class members at CHCF described the immense benefit of having access to magnifiers that are lighted and of a strength that is specific to their needs.  The illuminated magnifiers allow class members to complete reading and writing activities independently, outside of the library, and without use of an ADA worker.

**Third**, we are concerned by the RAP's overreliance on ADA workers, at the expense of the independence of people who are blind or have low vision.  *See* Letter from R. Lomio, Plaintiffs' Counsel, to R. Boyd, CDCR Office of Legal Affairs, *Armstrong v. Newsom*, ████████████, ████, ████, (Nov. 19, 2019) ("[I]t is inappropriate for the RAP to instruct Mr. ████████ to rely on ADA workers or, if they are not available, staff to help him walk every day in his housing unit.  The Rehabilitation Act's 'stated purpose is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society."'  *Am. Council of Blind v. Paulson*, 463 F. Supp. 2d 51 (D.D.C. Dec. 1, 2006) (quoting 29 U.S.C. § 701(b) (emphasis by court)) ('There was a time when disabled people had no choice but to ask for help—to rely on the "kindness of strangers."  It was thought to be their lot.  Blind people had to ask strangers to push elevator buttons for them. . . .  It can no longer be successfully argued that a blind person has "meaningful access" to currency if she cannot accurately identify paper money without assistance.'"), *aff'd*, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (noting that 'dependence' on others 'is anathema to the stated purpose of the Rehabilitation Act').").  People in prison have a "right to read."  *In re Martinez*, 216 Cal. App. 4th 1141, 1152 (2013).  It is unreasonable to require Mr. ████ to rely on ADA workers to read his private, personal mail aloud to him or to read recreational books to him every evening when he is able to perform those functions himself with an auxiliary aid.  *See* 28 C.F.R. § 35.160(b)(1) ("[i]n determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities. In order to be effective, auxiliary aids and services must be provided . . . in such a way as to protect the privacy and independence of the individual with a disability.").  In addition, Mr. ████ is entitled to communicate confidentially with his legal counsel, something he cannot do if he needs ADA workers to read his legal mail aloud to him.  *See* Cal. Penal Code § 2601(b) (providing that people in prison "shall have the following civil rights: . . .  To correspond, *confidentially*, with any member of the State Bar or holder of public office") (emphasis added).

* * * * *

We request that Defendants provide Mr. ████ with a magnifier that will allow him to read independently in his prison environment.

In addition, we note that some low vision class members at other institutions have raised similar concerns about the ineffectiveness of the card reader and full-page magnifiers and have reported that they need stronger magnification.  Plaintiffs by separate letter will request that Defendants provide comprehensive accommodations assessments to blind and low vision class members, which would

[3474553.1]

Ms. Russa Bo. d
Re:
December 12, 2019
Page 4

include evaluation of appropriate types and levels of magnifiers. We look forward to discussing this issue with Defendants at the blind and low vision working group in January 2020.

Thank you for your prompt attention to this matter.

Sincerely,



Patrick Booth
Legal Fellow
*Admission to California Bar pending*

cc:    Mr. ▮▮▮ (redacted)
Co-Counsel
Ed Swanson, Court Expert
Nicholas Meyer, Erin Anderson, Alexander Powell, Amber Lopez, OLAArmstrongCAT@cdcr.ca.gov, Tamiya Davis, Patricia Ferguson (OLA)
Lois Welch, Matt Espenshade, Steven Faris (OACC)
Kelly Mitchell, Teauna Miranda, Laurie Hoogland, Landon Bravo (DAI)
John Dovey, Vince Cullen, Don Meier, Laurene Payne, Ceasar Aguila, Samantha Lawrence-Chastain, Olga Dobrynina, m_CCHCSAccntLog@cdcr.ca.gov, Alexandrea Tonis, Barbara Pires, Bruce Beland, Bryan McCloughan, Cathy Jefferson, Ceasar Aguila, Cindy Flores, Dawn Malone-Stevens, Desiree Collum, Donald Meier, Gently Armedo, John Dovey, Laurene Payne, Lynda Robinson, Ngoc Vo, Robin Hart, Steven Blum, Joseph Williams (CCHCS)
Adriano Hrvatin, Joanna Hood, Damon McClain, Sean Lodholz (DOJ)
Annakarina De La Torre-Fennell (OAG)

[3474553.1]

# EXHIBIT 78



**Director:**
Donald Specter

**Managing Attorney:**
Sara Norman

**Staff Attorneys:**
Rana Anabtawi
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Corene Kendrick
Rita Lomio
Margot Mendelson

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

November 3, 2020

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:    *Armstrong* Advocacy Letter
       ███████████████████, DPV, ████

Dear Ms. Davis:

We write on behalf of ████ ████ an *Armstrong* class member at the ████ ████████████████████████ ████████████ ("████"). He is designated DPV, has end-stage glaucoma, and requires significant magnification to read and write independently.

On July 24, 2019, Mr. ████ was seen by Dr. ██████, a low-vision specialist. Dr. ████ recommended that Mr. ████ be issued 8x microscopic glasses and a Ruby XL HD portable video magnifier, among other things. *See* Optometry Consultation (July 24, 2019). Following this appointment, Mr. ████ met with NP ████, on August 6. *See* Outpatient Progress Note (Aug. 6, 2019). It does not appear, however, that NP ████ ordered the glasses or portable video magnifier. Mr. ████ saw NP ████ again on November 22, and raised concerns that he had not yet received his 8x microscopic glasses and Ruby XL HD portable video magnifier, but again, it appears that nothing was done. *See* Outpatient Progress Note (Nov. 22, 2019).

After several months, Mr. ████ again raised concerns with NP ████ about the recommended disability accommodations. On June 1, 2020, NP ████t noted that Mr. ████ was "████████████████████████████████████████████████ ████████████████████████████████████████████████" *See* Outpatient Progress Note (June 1, 2020). We have reviewed the electronic medical record and see no pending order or referral.

Ms. Amarillas spoke with Mr. ████ on October 20, 2020, **454 days after the low-vision specialist recommended specific disability accommodations**. Mr. ████ reported that he still has not received 8x microscopic glasses or a Ruby XL HD portable video magnifier. Mr. ████ explained that without these accommodations, he cannot read or write independently. Currently, Mr. ████ has to rely on other people to read and write letters, complete his schoolwork, participate in self-help correspondence groups, and prepare for his upcoming Board hearing.

**Board of Directors**
Penelope Cooper, President • Margaret Johns, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Cesar Lagleva • Jean Lu • Laura Magnani • Michael Marcum
Ruth Morgan • Seth Morris • Vishal Shah • Michele WalkinHawk

Exhibit 94 - p. 1

Ms. Tamiya Davis

Re: ███████████████ DPV, ████

November 3, 2020

Page 2

Mr. ██████ reported that he uses the Merlin in the law library to read, but his access has been limited due to the COVID-19 pandemic. Having 8x microscopic glasses and a Ruby XL HD portable video magnifier would allow Mr. ██████ to read and write as much as similarly situated sighted individuals, without having to rely on others or on the limited availability of the law library. Mr. ██████ added that while he appreciates help from others, he does not feel completely comfortable with other people reading his personal correspondence and case documents. As Mr. ██████ put it, "I want to be in the driver seat in my life."

We request that Mr. ██████ be issued 8x microscopic glasses and a Ruby XL HD portable video magnifier without further delay.

Thank you for your prompt attention to this matter.

Sincerely yours,

Rita Lomio                    Tania Amarillas
Staff Attorney                Investigator

cc:    Mr. ██████
       Ed Swanson, Court Expert
       Alexander Powell, Nicholas Meyer, Patricia Ferguson, Erin Anderson, Amber Lopez,
       Robin Stringer, Patricia Ferguson, OLAArmstrongCAT@cdcr.ca.gov (OLA)
       Lois Welch, Steven Faris (OACC)
       Adam Fouch, Chance Andres, Landon Bravo, Laurie Hoogland (DAI)
       Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford, John Dovey, Robin
       Hart, Cindy Flores, Joseph (Jason) Williams, Kelly Allen, Cathy Jefferson, Vincent
       Cullen, Joseph Edwards, Lynda Robinson, Barb Pires, Ngoc Vo, Miguel Solis, Olga
       Dobrynina, Dawn Stevens, Alexandrea Tonis, Gently Armedo (CCHCS)
       Jeremy Duggan, Damon McClain, Joanne Hood, Sean Lodholz, Anthony Tartaglio, Trace
       Maiorino (OAG)
       Brantley Choate, Hillary Iserman, Shannon Swain, Rod Braly, Jennifer Wynn, Martin
       Griffin, Brandy Buenafe, Alicia Legarda (OCE)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                          GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**

Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



September 22, 2021

<u>VIA EMAIL ONLY</u>

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

**RE:**   ***ARMSTRONG V. NEWSOM***: ██████████ (████) – DPV (███)

Dear Ms. Lomio:

I write in response to your letter of November 3, 2020, regarding ██████████ (████) at the ████████████████████████████████████████████████). You requested that the California Department of Corrections and Rehabilitation (CDCR): (1) issue Mr. ████ "8x microscopic glasses" and (2) issue Mr. ████ "a Ruby XL HD portable video magnifier . . . ."

### I.    MICROSCOPIC GLASSES

This request was forwarded to the California Correctional Health Care Services (CCHCS). CCHCS responded:

> The Primary Care Provider (PCP) submitted a Request for Services (RFS) on October 28, 2020, in regard to 8x Microscopic Glasses for ████ however, the request was returned for additional information. Clarification has been obtained and the PCP generated a Durable Medical Equipment (DME) Non-Formulary order on November 17, 2020, indicating a routine delivery timeframe of 90 days. Upon receipt of the item at the Institution, the order will be processed by Medical Warehouse staff to ensure accurate delivery to the facility medical clinic. ████ will be issued the appliance within the aforementioned timeframe and a CDCR 7536 DME/Medical Supply Receipt shall be generated as verification of issuance.

### II.    RUBY XL HD PORTABLE VIDEO MAGNIFIER

This request was also forwarded to CCHCS. CCHCS responded:

> [Mr. ████ had additional eye surgery in July 2021. He had a repeat assessment of his vision post-surgery by the ophthalmologist. The ophthalmologist recommends reassessment by the low vision specialist. He needs reassessment by the low vision specialist to determine and write a new prescription of magnifier if appropriate following this latest surgery. A new referral has been placed to the low vision specialist. It will be scheduled as soon as our utilization management

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Exhibit 04 p. 3

) – Vision Accommodations ( )
Page 2

team can secure an appointment. We will work with the low vision specialist to source the prescription that may be written. The current order is no longer applicable following his recent surgery and will not be processed further.

Please let me know if you have any questions.

Sincerely,

*/s/ Gannon E. Johnson*

GANNON ELIZABETH JOHNSON
Attorney, Class Action Team
Office of Legal Affairs

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS
Exhibit 94 - p. 4

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**

Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



February 28, 2021

<u>VIA EMAIL ONLY</u>

Jacob Hutt
Prison Law Office
rlomio@prisonlaw.com

    **RE:**    ***ARMSTRONG V. NEWSOM***: ▆▆▆▆▆▆▆ (▆▆▆▆ **FOLLOW-UP – DPV** (▆▆

Dear Mr. Hutt:

I write in response to your email of December 6, 2021, regarding ▆▆▆▆▆▆ (▆▆▆ at the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ You requested that the California Department of Corrections and Rehabilitation (CDCR): (1) "explain why Mr. ▆▆▆ still has not received the microscopic glasses, and ensure that Mr. ▆▆▆ promptly receives these glasses" and (2) "explain why Mr. ▆▆▆ consult to the low-vision clinic was canceled, ensure that Mr. ▆▆▆ is scheduled for a consult with a low-vision specialist on a high-priority timeframe, and ensure that Mr. ▆▆▆ promptly receives an electronic video magnifier that is appropriate for his needs."

These requests were forwarded to the California Correctional Health Care Services (CCHCS). CCHCS responded:

> The order for 8x microscopic glasses and a Ruby XL HD portable video magnifier was placed on hold, pending a re-evaluation of the outcome of the Yag Laser surgery performed on July 22, 2021. Per ophthalmology notes on July 22, 2021, recommendations were for ▆▆▆ to return the following week to determine if any eyeglasses correction can improve his vision. Due to the doctor (who performed the surgery) closing her practice, ▆▆▆ was unable to go back for his follow up. An RFS was then placed for an ophthalmology consultation in order to establish care with a new provider who specializes in low vision. ▆▆▆ is scheduled for a low vision consult on March 16, 2022 with California Retina. The status of the 8x microscopic glasses and Ruby XL HD video magnifier is still pending awaiting the results of the Low Vision consult. ▆▆▆ is currently accommodated with a tapping cane and received COMS training for the tapping cane on February 18, 2020. ADA workers are also available to provide additional assistance when needed.

///

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

████████ 7) – Vision Accommodations Follow-Up (███

Page 2

Please let me know if you have any questions.

Sincerely,

GANNON ELIZABETH JOHNSON
Attorney, Class Action Team
Office of Legal Affairs

| From: | arm-plo@prisonlaw.com on behalf of Johnson, Gannon@CDCR |
|---|---|
| To: | Jacob Hutt |
| Cc: | ed@smllp.law; Rita Lomio; Juliette Mueller; Davis, Tamiya@CDCR; Margot Mendelson; Patrick Booth; Armstrong Team; Gay C. Grunfeld; Penny Godbold; Thomas Nolan; Nathalie Welch; Armstrong Team - RBG only; Ben Bien-Kahn; Michael Freedman; Jenny Yelin; Powell, Alexander@CDCR; Meyer, Nicholas@CDCR; Ferguson, Patricia@CDCR; Lopez, Amber@CDCR; Anderson, Erin@CDCR; Stringer, Robin@CDCR; CDCR OLA Armstrong CAT Mailbox; Sean.Lodholz@doj.ca.gov; Trace.Maoirino@doj.ca.gov; Hoogland, Laurie@CDCR; Beland, Bruce@CDCR; Gaultney, Robert@CDCR; Meier, Donald@CDCR; Hart, Robin@CDCR; CCHCS Accountability Log@CDCR; Jefferson, Cathy@cdcr; Edwards, Joseph.K@CDCR; Robinson, Lynda@CDCR; Pires, Barbara@CDCR; Vo, Ngoc@CDCR; Solis, Miguel@CDCR; Dobrynina, Olga@CDCR; Stevens, Dawn@CDCR; Tonis, Alexandrea@CDCR; Armedo, Gently@CDCR; Welch, Lois@CDCR; Faris, Steven@CDCR; Chuidian, Saundra; Wynn, Jennifer@CDCR; mnunez@rbgg.com; Choate, Brantley@CDCR; Iserman, Hillary@CDCR; Swain, Shannon@CDCR; Braly, Rodney@CDCR; Griffin, Martin@CDCR; Legarda, Alicia@CDCR; Buenafe, Brandy@CDCR; Thao, Chor@CDCR; m_OLA Armstrong Response; Lorey, Dawn@CDCR; Quint, Chantel@CDCR; Sharon.Garske@doj.ca.gov; CDCR OLA Armstrong CAT Mailbox |
| Subject: | RE: Armstrong Advocacy \| ███████████████ |
| Date: | Thursday, April 14, 2022 10:56:10 AM |

Jacob,

Per the last paragraph on page 1 of my letter yesterday, Mr. ██████ *is* in possession of a "CCHCS-issued handheld magnifier." Yes, it is equipped with a light.

Per my letters of September 22, 2021, and February 28, 2022, Mr. ██████ underwent eye surgery in July 2021. As stated, the continuing necessity for the ""8x microscopic glasses" and "a Ruby XL HD portable video magnifier" allegedly recommended (not ordered) by Dr. ██████ on July 24, 2019, was to be re-evaluated following that surgery. "Due to the doctor (who performed the surgery) closing her practice, ██████ was unable to go back for his follow up." This was a complication completely outside the control of CDCR.

As you are aware, there have been long delays due to COVID in safely procuring appointments with outside medical service providers. A new low-vision specialist referral was eventually secured with California Retina. My February 28, 2022, letter stated that this appointment was scheduled for March 16, 2022. In the interim, and among other things, Mr. ██████ was "accommodated with a tapping cane and received COMS training for the tapping cane on February 18, 2020," and access to ADA workers.

Unfortunately, and – again outside of CDCR's control – California Retina "misinformed" ██████ of the specialty of the provider Mr. ██████ was to see on March 16, 2022. ██████ was able to secure an appointment for an initial low-vision specialist evaluation appointment on April 8, 2022. This was conveyed to you in my April 13, 2022, letter.

CDCR has not ignored these issues for 994 days, as implied. Interim accommodations have been provided while this process unfolds. The mere fact that those interim accommodations are not the exact same items referenced by Dr. ██████ does not automatically equate to a failure to comply with the Americans with Disabilities Act.

Best,
Gannon

---

**From:** Jacob Hutt <jacob@prisonlaw.com>

Exhibit 94 - p. 25

**Sent:** Wednesday, April 13, 2022 5:48 PM

**To:** Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov>

**Cc:** ed@smllp.law; Rita Lomio <rlomio@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Thomas Nolan <tnolan@rbgg.com>; Nathalie Welch <nwelch@rbgg.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Ben Bien-Kahn <bbien-kahn@rbgg.com>; Michael Freedman <MFreedman@rbgg.com>; Jenny Yelin <jyelin@rbgg.com>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Lopez, Amber@CDCR <amber.lopez@cdcr.ca.gov>; Anderson, Erin@CDCR <Erin.Anderson@cdcr.ca.gov>; Stringer, Robin@CDCR <Robin.Stringer@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Sean.Lodholz@doj.ca.gov; Trace.Maoirino@doj.ca.gov; Hoogland, Laurie@CDCR <Laurie.Hoogland@cdcr.ca.gov>; Beland, Bruce@CDCR <Bruce.Beland@cdcr.ca.gov>; Gaultney, Robert@CDCR <Robert.Gaultney@cdcr.ca.gov>; Meier, Donald@CDCR <Donald.Meier@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Edwards, Joseph.K@CDCR <Joseph.K.Edwards@cdcr.ca.gov>; Robinson, Lynda@CDCR <Lynda.Robinson@cdcr.ca.gov>; Pires, Barbara@CDCR <Barbara.Pires@cdcr.ca.gov>; Vo, Ngoc@CDCR <Ngoc.Vo@cdcr.ca.gov>; Solis, Miguel@CDCR <Miguel.Solis2@cdcr.ca.gov>; Dobrynina, Olga@CDCR <Olga.Dobrynina@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Tonis, Alexandrea@CDCR <Alexandrea.Tonis@cdcr.ca.gov>; Armedo, Gently@CDCR <Gently.Armedo@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Chuidian, Saundra <Saundra.Chuidian@cdcr.ca.gov>; Wynn, Jennifer@CDCR <Jennifer.Wynn@cdcr.ca.gov>; mnunez@rbgg.com; Choate, Brantley@CDCR <Brantley.Choate@cdcr.ca.gov>; Iserman, Hillary@CDCR <Hillary.Iserman@cdcr.ca.gov>; Swain, Shannon@CDCR <Shannon.Swain@cdcr.ca.gov>; Braly, Rodney@CDCR <Rodney.Braly@cdcr.ca.gov>; Griffin, Martin@CDCR <Martin.Griffin@cdcr.ca.gov>; Legarda, Alicia@CDCR <Alicia.Legarda@cdcr.ca.gov>; Buenafe, Brandy@CDCR <Brandy.Buenafe@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; m_OLA Armstrong Response <OLAArmstrongResponse@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Quint, Chantel@CDCR <Chantel.Quint@cdcr.ca.gov>; Sharon.Garske@doj.ca.gov

**Subject:** Re: Armstrong Advocacy | █████████████████

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Gannon,

Thank you for the response. We are disappointed that, 994 days since a low-vision specialist prescribed specific reading and writing accommodations for Mr. █████ CDCR and CCHCS have still not provided them to him, despite Mr. █████ and Plaintiffs' counsel repeatedly raising his ongoing need for them. We will respond in greater length soon to CDCR's

response.

For now, our understanding is that ███ now has lighted, non-electronic magnifiers available as DME for low-vision class members. **If this is correct, as an interim accommodation, will ███ staff please promptly provide him with one?** Please confirm whether this is possible.

Thank you,
Jacob

On Wed, Apr 13, 2022 at 4:25 PM Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov> wrote:

> Good afternoon, Jacob. Attached is CDCR's response to your March 3, 2022, advocacy email on behalf of Mr. ███
>
> Please let me know if you have any questions.
>
> Best,
> Gannon
>
> ---
>
> **From:** Jacob Hutt <jacob@prisonlaw.com>
> **Sent:** Thursday, March 3, 2022 3:11 PM
> **To:** Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov>
> **Cc:** Rita Lomio <rlomio@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Davis, Tamiya@CDCR <TAMIYA.DAVIS@cdcr.ca.gov>; ed@smllp.law; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Thomas Nolan <tnolan@rbgg.com>; Nathalie Welch <nwelch@rbgg.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Ben Bien-Kahn <bbien-kahn@rbgg.com>; Michael Freedman <MFreedman@rbgg.com>; Jenny Yelin <jyelin@rbgg.com>; Powell, Alexander@CDCR <ALEXANDER.POWELL@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Lopez, Amber@CDCR <AMBER.LOPEZ@cdcr.ca.gov>; Anderson, Erin@CDCR <Erin.Anderson@cdcr.ca.gov>; Stringer, Robin@CDCR <Robin.Stringer@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Sean.Lodholz@doj.ca.gov; Trace.Maoirino@doj.ca.gov; Hoogland, Laurie@CDCR <Laurie.Hoogland@cdcr.ca.gov>; Beland, Bruce@CDCR <Bruce.Beland@cdcr.ca.gov>; Gaultney, Robert@CDCR <Robert.Gaultney@cdcr.ca.gov>; Meier, Donald@CDCR <Donald.Meier@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Edwards, Joseph.K@CDCR <Joseph.K.Edwards@cdcr.ca.gov>; Robinson, Lynda@CDCR <Lynda.Robinson@cdcr.ca.gov>; Pires, Barbara@CDCR <Barbara.Pires@cdcr.ca.gov>; Vo, Ngoc@CDCR <Ngoc.Vo@cdcr.ca.gov>; Solis, Miguel@CDCR <Miguel.Solis2@cdcr.ca.gov>; Dobrynina, Olga@CDCR <Olga.Dobrynina@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Tonis, Alexandrea@CDCR <Alexandrea.Tonis@cdcr.ca.gov>; Armedo, Gently@CDCR <Gently.Armedo@cdcr.ca.gov>; Welch, Lois@CDCR

Exhibit 94 - p. 27

<Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Chuidian, Saundra <Saundra.Chuidian@cdcr.ca.gov>; Wynn, Jennifer@CDCR <Jennifer.Wynn@cdcr.ca.gov>; Trace.Maiorino@doj.ca.gov; mnunez@rbgg.com; Choate, Brantley@CDCR <Brantley.Choate@cdcr.ca.gov>; Iserman, Hillary@CDCR <Hillary.Iserman@cdcr.ca.gov>; Swain, Shannon@CDCR <Shannon.Swain@cdcr.ca.gov>; Braly, Rodney@CDCR <Rodney.Braly@cdcr.ca.gov>; Griffin, Martin@CDCR <Martin.Griffin@cdcr.ca.gov>; Legarda, Alicia@CDCR <Alicia.Legarda@cdcr.ca.gov>; Buenafe, Brandy@CDCR <Brandy.Buenafe@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; m_OLA Armstrong Response <OLAArmstrongResponse@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Quint, Chantel@CDCR <Chantel.Quint@cdcr.ca.gov>

**Subject:** Re: Armstrong Advocacy | ███████████████████

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Gannon,

Thank you for the response. First, given the time-sensitive nature of Mr. ██████ request, we requested in our December 6, 2021, advocacy email that CDCR respond by December 10, 2021. We were disappointed that the response did not come until February 28, 2022.

Moreover, as to CDCR's response, it appears from Mr. ██████ medical records that medical staff knew as early as September 14, 2021, that Mr. ██████ ophthalmologist had retired. CDCR's response states that "[a]n RFS was then placed for an ophthalmology consultation in order to establish care with a new provider who specializes in low vision," but there is no explanation for why--nearly six months later--Mr. ██████ still has not been seen by a low-vision specialist. Similarly, we are concerned that, despite Plaintiffs' counsel (1) repeatedly raising this problem with CDCR (going back to November 2020, when we first raised this issue) and (2) explicitly requesting in our December 6th email that Mr. ██████ "promptly" receive his disability accommodations and that he be scheduled for a low-vision consult on a "high-priority" timeframe, the current order for Mr. ██████ low-vision consult was not placed until February 8, 2022, and was placed on a "routine priority" timeframe. **We ask that any magnification devices prescribed by the specialist at Mr. ██████ March 16, 2022, appointment be ordered on a high-priority basis, in light of the extreme delay in accommodating Mr. ██████ reading needs.**

Finally, as we already reported on December 6th, Mr. ██████ has reported that <u>even after the July 2021 surgery</u>, he is unable to independently read and write without the requested accommodations given his vision disability. While Mr. ██████ awaits the results of his appointment with the low-vision specialist, we ask that ADA staff meet with Mr. ██████ and determine what sort of interim accommodation would enable him to read independently, and that Mr. ██████ be promptly provided with such accommodation.

Thank you,
Jacob

On Mon, Feb 28, 2022 at 1:44 PM Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov> wrote:

Good afternoon, Jacob. Attached is CDCR's response to your email of 12/6/21 concerning Mr. ███████ Please let me know if you have any questions.

Best,
Gannon

---

**From:** Jacob Hutt <jacob@prisonlaw.com>
**Sent:** Monday, December 6, 2021 3:09 PM
**To:** Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov>
**Cc:** Rita Lomio <rlomio@prisonlaw.com>; Juliette Mueller <juliette@prisonlaw.com>; Davis, Tamiya@CDCR <TAMIYA.DAVIS@cdcr.ca.gov>; ed@smllp.law; Margot Mendelson <mmendelson@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Gay C. Grunfeld <GGrunfeld@rbgg.com>; Penny Godbold <PGodbold@rbgg.com>; Thomas Nolan <tnolan@rbgg.com>; Nathalie Welch <nwelch@rbgg.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Ben Bien-Kahn <bbien-kahn@rbgg.com>; Michael Freedman <MFreedman@rbgg.com>; Jenny Yelin <jyelin@rbgg.com>; Powell, Alexander@CDCR <ALEXANDER.POWELL@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Lopez, Amber@CDCR <AMBER.LOPEZ@cdcr.ca.gov>; Anderson, Erin@CDCR <Erin.Anderson@cdcr.ca.gov>; Stringer, Robin@CDCR <Robin.Stringer@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Sean.Lodholz@doj.ca.gov; Trace.Maoirino@doj.ca.gov; Hoogland, Laurie@CDCR <Laurie.Hoogland@cdcr.ca.gov>; Beland, Bruce@CDCR <Bruce.Beland@cdcr.ca.gov>; Gaultney, Robert@CDCR <Robert.Gaultney@cdcr.ca.gov>; Meier, Donald@CDCR <Donald.Meier@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Edwards, Joseph.K@CDCR <Joseph.K.Edwards@cdcr.ca.gov>; Robinson, Lynda@CDCR <Lynda.Robinson@cdcr.ca.gov>; Pires, Barbara@CDCR <Barbara.Pires@cdcr.ca.gov>; Vo, Ngoc@CDCR <Ngoc.Vo@cdcr.ca.gov>; Solis, Miguel@CDCR <Miguel.Solis2@cdcr.ca.gov>; Dobrynina, Olga@CDCR <Olga.Dobrynina@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Tonis, Alexandrea@CDCR <Alexandrea.Tonis@cdcr.ca.gov>; Armedo, Gently@CDCR <Gently.Armedo@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Chuidian, Saundra <Saundra.Chuidian@cdcr.ca.gov>; Wynn, Jennifer@CDCR <Jennifer.Wynn@cdcr.ca.gov>; Trace.Maiorino@doj.ca.gov; mnunez@rbgg.com; Choate, Brantley@CDCR <Brantley.Choate@cdcr.ca.gov>; Iserman, Hillary@CDCR <Hillary.Iserman@cdcr.ca.gov>; Swain, Shannon@CDCR <Shannon.Swain@cdcr.ca.gov>; Braly, Rodney@CDCR <Rodney.Braly@cdcr.ca.gov>; Griffin, Martin@CDCR <Martin.Griffin@cdcr.ca.gov>; Legarda, Alicia@CDCR <Alicia.Legarda@cdcr.ca.gov>; Buenafe, Brandy@CDCR <Brandy.Buenafe@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; m_OLA Armstrong Response <OLAArmstrongResponse@cdcr.ca.gov>
**Subject:** Re: Armstrong Advocacy | ████████████████████

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Gannon:

Thank you for sending us CDCR's September 22, 2021 response to our November 3, 2020 advocacy letter on behalf of Mr. ██████ We write to follow up on CDCR's response, as it appears that neither of the low-vision accommodations that a specialist recommended for Mr. ██████ has been provided to him.

**8x microscopic glasses**
With respect to the 8x microscopic glasses, CCHCS responded that a DME non-formulary order had been generated on November 17, 2020 with a 90-day delivery timeframe, and that "██████ will be issued the appliance within the aforementioned timeframe." This did not occur, nor had Mr. ██████ received the glasses as of our conversation with him on December 2, 2021. A review of Mr. ██████ medical records indicates that the order for these glasses is still open:

Mr. ██████ has been waiting for over a year since the order was placed, and well over two years since a low-vision specialist first recommended this item in July 2019. **Please explain why Mr. ██████ still has not received the microscopic glasses, and ensure that Mr. ██████ promptly receives these glasses.**

**Ruby XL HD portable video magnifier**
With respect to an outstanding order for the video magnifier, CCHCS responded that because of Mr. ██████ July 2021 eye surgery, "[t]he current order is no longer applicable following his recent surgery and will not be processed further." CCHCS stated that "[t]he ophthalmologist recommends reassessment by the low vision specialist . . . to determine and write a new prescription of magnifier if appropriate following this latest surgery." The response stated that "[a] new referral has been placed to the low vision specialist."

Unfortunately, medical staff canceled this referral. NP ██████ had initiated the referral request on August 25, 2021, writing:

But an RN subsequently wrote to NP ██████ on October 14, 2021 directing NP ██████ to cancel Mr. ██████ consult to a low-vision clinic, stating: ████████████ ████████████████████████████████████ " (Mr. ██████ has a pending ophthalmology consult with a due date of December 15, 2021, but this appears to be separate from the low-vision clinic consult, which was canceled.) It is unclear why medical staff canceled a referral for Mr. ██████ to the low-vision clinic, after CCHCS informed us that Mr. ██████ needed to be reassessed by a low-vision specialist before he could receive the video magnifier (one that a low-vision specialist recommended for him over two years ago). **Please explain why Mr. ██████ consult to the low-vision clinic was canceled, ensure that Mr. ██████ is scheduled for a consult with a low-vision specialist on a high-priority**

**timeframe, and ensure that Mr. ███ promptly receives an electronic video magnifier that is appropriate for his needs.**

We wish to emphasize that CDCR's failure to promptly provide Mr. ███ with these accommodations, which a specialist recommended for him in July 2019, is interfering with his preparation for a ███████ parole hearing. Mr. ███ reports that he needs to demonstrate his participation in groups at this parole hearing, but the groups involve a significant amount of reading and writing, neither of which he can do effectively with the small, non-electronic, handheld magnifier that he currently has. Mr. ███ reports that the July 2021 surgery "took away some of the fogginness" in his right eye, but he is still unable to read and write using this eye (the other eye, his left, is completely blind) without the aforementioned accommodations.

**We ask that you respond with an update on the acquisition and provision of these accommodations to Mr. ███ no later than this Friday, December 10.**

Thank you,
Jacob

On Wed, Sep 22, 2021 at 11:51 AM Johnson, Gannon@CDCR <Gannon.Johnson@cdcr.ca.gov> wrote:

> Good morning, Rita. Attached is CDCR's response to the November 3, 2020, advocacy letter on behalf of Mr. ███
>
> Please let me know if you have any questions.
>
> Best,
> Gannon
>
> ---
>
> **From:** Juliette Mueller <juliette@prisonlaw.com>
> **Sent:** Tuesday, November 3, 2020 11:50 AM
> **To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; ed@smllp.law; Rita Lomio <rlomio@prisonlaw.com>; Margot Mendelson <mmendelson@prisonlaw.com>; Corene Kendrick <ckendrick@prisonlaw.com>; Patrick Booth <patrick@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Gay C. Grunfeld <ggrunfeld@rbgg.com>; Penny Godbold <pgodbold@rbgg.com>; Thomas Nolan <tnolan@rbgg.com>; Nathalie Welch <nwelch@rbgg.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Ben Bien-Kahn <bbien-kahn@rbgg.com>; Michael Freedman <mfreedman@rbgg.com>; Jenny Yelin <jyelin@rbgg.com>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Lopez, Amber@CDCR <amber.lopez@cdcr.ca.gov>; Anderson, Erin@CDCR <Erin.Anderson@cdcr.ca.gov>; Stringer, Robin@CDCR <Robin.Stringer@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Damon McClain <Damon.McClain@doj.ca.gov>; Joanna.Hood@doj.ca.gov; Sean.Lodholz@doj.ca.gov; Anthony.Tartaglio@doj.ca.gov; Trace.Maoirino@doj.ca.gov; Fouch, Adam@CDCR <Adam.Fouch@cdcr.ca.gov>; Bravo, Landon@CDCR <Landon.Bravo@cdcr.ca.gov>; Hoogland, Laurie@CDCR

<Laurie.Hoogland@cdcr.ca.gov>; Beland, Bruce@CDCR <Bruce.Beland@cdcr.ca.gov>; Gaultney, Robert@CDCR <Robert.Gaultney@cdcr.ca.gov>; Dovey, John@CDCR <John.Dovey@cdcr.ca.gov>; Meier, Donald@CDCR <Donald.Meier@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Flores, Cindy@CDCR <Cindy.Flores@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Allen, Kelly@CDCR <Kelly.Allen@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Cullen, Vincent@CDCR <Vincent.Cullen@cdcr.ca.gov>; Edwards, Joseph.K@CDCR <Joseph.K.Edwards@cdcr.ca.gov>; Robinson, Lynda@CDCR <Lynda.Robinson@cdcr.ca.gov>; Pires, Barbara@CDCR <Barbara.Pires@cdcr.ca.gov>; Vo, Ngoc@CDCR <Ngoc.Vo@cdcr.ca.gov>; Solis, Miguel@CDCR <Miguel.Solis2@cdcr.ca.gov>; Dobrynina, Olga@CDCR <Olga.Dobrynina@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Tonis, Alexandrea@CDCR <Alexandrea.Tonis@cdcr.ca.gov>; Armedo, Gently@CDCR <Gently.Armedo@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Alvarez, Saundra@CDCR <Saundra.Alvarez@cdcr.ca.gov>; Wynn, Jennifer@CDCR <Jennifer.Wynn@cdcr.ca.gov>; Trace.Maiorino@doj.ca.gov; Jacob Hutt <jacob@prisonlaw.com>; mnunez@rbgg.com; Choate, Brantley@CDCR <Brantley.Choate@cdcr.ca.gov>; Iserman, Hillary@CDCR <Hillary.Iserman@cdcr.ca.gov>; Swain, Shannon@CDCR <Shannon.Swain@cdcr.ca.gov>; Braly, Rodney@CDCR <Rodney.Braly@cdcr.ca.gov>; Griffin, Martin@CDCR <Martin.Griffin@cdcr.ca.gov>; Legarda, Alicia@CDCR <Alicia.Legarda@cdcr.ca.gov>; Buenafe, Brandy@CDCR <Brandy.Buenafe@cdcr.ca.gov>

**Subject:** Armstrong Advocacy | ███████████████████

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Tamiya:

Please find attached an advocacy letter regarding Mr. ██████ at ██████ Please send the response to Rita Lomio (rlomio@prisonlaw.com), Tania Amarillas (tania@prisonlaw.com), and Skye Lovett (skye@prisonlaw.com).

Thank you,

Juliette Mueller
Pronouns: she/her/hers
Litigation Assistant
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

May 26, 2022

Ms. Gannon Johnson
CDCR Office of Legal Affairs

RE:     *Armstrong* Advocacy Letter
            ███████████████, DPM, DNH, DPV, ██████

Dear Ms. Johnson:

We write to express our ongoing concern with the adequacy of accommodations provided to *Armstrong* class member ███████████, currently housed at the ███████████ ███████████████████████). As you know, Mr. ██████ is totally blind in his left eye and has severely low vision in his right eye as a result of end-stage glaucoma. He requires significant magnification to read and write. We first wrote to Defendants in November 2020 regarding long delays in provision of aids recommended by a low vision specialist in July 2019. *See* Letter from R. Lomio and T. Amarillas, Plaintiffs' Counsel, to T. Davis, CDCR Office of Legal Affairs (Nov. 3, 2020). **Although we have corresponded many times regarding Mr. ██████ unmet access needs in the intervening eighteen months, he remains without accommodation to read and write independently, limiting his access to programs and his ability to prepare for his upcoming parole suitability hearing.**

When we last wrote to you regarding Mr. ██████ need for accommodation on April 13, 2022, we expressed our disappointment that, in the 994 days since the low-vision specialist first recommended specific reading and writing accommodations for Mr. ██████ in 2019, Defendants still had not provided these or other meaningful accommodations to him. Defendants responded that the delay in getting Mr. ██████ permanent accommodations is attributable to forces outside CDCR's control (scheduling complications and mistakes by third parties, and COVID-19-related specialty care delays), and that he has received interim accommodations. These responses are misleading and do not acknowledge that Defendants—not another entity—continue to fail to provide Mr. ██████ with effective accommodations to read and write. Defendants have not provided Mr. ██████ with the low-vision aids recommended to him by a specialist in July 2019, nor have they provided him with effective interim accommodations.

## I.     Low-Vision Aids

Defendants state that because Mr. ██████ underwent eye surgery in July 2021, he must be re-evaluated for the 8x microscopic glasses and Ruby XL HD portable video magnifier

**Board of Directors**
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Harlan Grossman • Christiane Hipps • Margaret Johns • Cesar Lagleva • Jean Lu
Laura Magnani • Michael Marcum • Ruth Morgan • Seth Morris • Vishal Shah

Ms. Gannon Johnson
Re: ▮▮▮▮▮▮▮▮▮▮▮▮
May 26, 2022

recommended by the low-vision specialist in July 2019.[1] Letter from G. Johnson, OLA, to J. Hutt, PLO (Feb. 28, 2022). As we have written in prior letters, Mr. ▮▮▮▮ reports that his vision has not improved since his July 2021 surgery; he reports that the surgery only increased the contrast in his right, low-vision eye. **Ophthalmologists who have seen Mr. ▮▮▮▮ since his July 2021 surgery confirm that he continues to have very low vision in his right eye.** *See* Ophthalmology Consultation (Aug. 2, 2021) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.”); *see also* Ophthalmology Consultation (Jan. 11, 2022) (“▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮”).

Still, Defendants appear skeptical of the July 2019 recommendations made by the low-vision specialist, Dr. ▮▮▮▮. *See* Email from G. Johnson, OLA, to J. Hutt, PLO (Apr. 14, 2022) (“the continuing necessity for the ““8x microscopic glasses” and “a Ruby XL HD portable video magnifier” *allegedly* recommended (***not ordered***) by Dr. ▮▮▮▮ on July 24, 2019, was to be re-evaluated following that surgery.”) (emphasis added). It is unclear why Defendants continue to disregard the low-vision specialist's recommendations. First, despite Defendants' statement that Dr. ▮▮▮▮ “allegedly” recommended these items, his recommendations were unambiguous:



**Text: “Recommend 8x microscopic glasses over right eye for reading;” “Recommend Ruby XL HD portable video magnifier for improved magnification and contrast of reading materials.”**

---

[1] We note that Defendants' position inexplicably changed regarding whether Mr. ▮▮▮▮ needs to be re-evaluated before he can receive the microscopic glasses that the low-vision specialist recommended. In Defendants' September 2021 response to our November 2020 letter requesting these accommodations, Defendants stated that “▮▮▮▮ will be issued the appliance [microscopic glasses] within the aforementioned timeframe [90 days of November 17, 2020] and a CDCR 7536 DME/Medical Supply Receipt shall be generated as verification of issuance.” Only after Plaintiffs followed up to inquire why Mr. ▮▮▮▮ still had not been provided these microscopic glasses did CCHCS change its position and write on February 28, 2022, that the order for Mr. ▮▮▮▮ microscopic glasses had been placed on hold pending a reevaluation of the outcome of his July 2021 surgery.

Second, Defendants state that these devices were allegedly recommended, "not ordered." To the extent this statement implies that the specialist could have ordered the devices and did not, this is incorrect and misleading. The low-vision specialist was only able to recommend, and not order, these devices according to CCHCS policy. *See* HCDOM § 3.1.11.C.5.E ("Specialty providers may not directly order follow-up consultations, diagnostic studies or treatments. The specialty provider shall make recommendations and the PCP shall review these recommendations to determine the need based on clinical guidelines, if applicable, and medical necessity.").

Mr. ▮▮▮▮ disability accommodations have since been delayed repeatedly without adequate justification. While some delays may have been due to COVID-19 or complications outside the control of CDCR, as Defendants suggest, many delays are unequivocally the result of Defendants' error or inaction. *See* Letter from R. Lomio and T. Amarillas, PLO, to T. Davis, OLA (Nov. 3, 2020) (describing the provider's failure to place a referral for the requested low-vision aids); Email from J. Hutt, PLO, to G. Johnson, OLA (Dec. 6, 2021) (noting a referral to a low-vision specialist that was canceled due to a prior optometry appointment and COMS training, both unrelated forms of care). Most recently, on March 3, 2022, we inquired why Mr. ▮▮▮ had still not been scheduled to see a new ophthalmologist six months after ▮▮▮ medical staff became aware that his previous ophthalmologist had retired. Defendants did not address this concern in their April 13th response.

These delays have resulted in disability discrimination against Mr. ▮▮▮ We have urged Defendants to expedite the process of Mr. ▮▮▮ receiving these needed accommodations, including ordering an ophthalmology consult on a high-priority basis, yet Defendants have repeatedly ignored our requests. Indeed, the most recent relevant order in Mr. ▮▮▮ medical records, from April 21, 2022, again requests an evaluation by a low-vision specialist on a routine priority basis.

**More fundamentally, even if pandemic-related healthcare delays and third-party complications have made it more difficult for CCHCS to secure an ophthalmology or low-vision specialist appointment for Mr. ▮▮▮ this does not explain why CDCR will not issue him an auxiliary aid that enables him to read and write.** It is clear that Mr. ▮▮▮ has a severe vision disability that is not being accommodated. As recently as last month, the ophthalmologist who evaluated Mr. ▮▮▮ at California Retina Associates wrote:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Text:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Ophthalmology Consultation (Apr. 8, 2022). Particularly in light of the unacceptably long period in which Mr. ▮▮▮ severely low vision has gone unaccommodated, it is wasteful,

3

discriminatory, and cruel to force Mr. ▮▮▮▮ to wait for yet another consultation, without meaningful ability to read and write independently. **Please immediately order 8x microscopic glasses and Ruby XL HD portable video magnifier for Mr. ▮▮▮▮ on a high-priority basis.**

## II. Equally Effective Alternate Accommodation

In the interim, Defendants must provide an equally effective alternative to the recommended low-vision aids. *See* ARP § II.H.4. The devices that Mr. ▮▮▮▮ currently possess do not adequately accommodate his reading and writing needs. When we spoke with Mr. ▮▮▮▮ on April 11, 2022, he reported possessing two magnifiers, neither issued by custody or medical staff: first, a golf ball-sized spot magnifier of 28 diopters (or 8x magnification) designed to read small labels, as on medication or seasoning, and second, a lower-power, 10 diopter (or 3.5x magnification) card-sized magnifier, which is not sufficiently strong for him to read. He reported that he uses only the spot magnifier, with which he can only see a few words at a time. Even with this stronger spot magnifier, he reported needing to strain his eyes and hold his face almost touching the page in order to read. Mr. ▮▮▮▮ described enormous difficulty reading the long assignments that he must complete for a sociology correspondence course through Bakersfield College in 2021 when attempting to use the spot magnifier. He reported that in reading these assignments, he often lost his place when he needed to go back to re-read significant passages. He reported that when offered the opportunity to re-enroll in additional classes the following semester, he declined because he felt he could not continue to succeed with existing accommodations.

The accommodations that Defendants reference providing to Mr. ▮▮▮▮ to accommodate his reading and writing needs are ineffective or irrelevant, as follows:

| Defendants' Statement | Plaintiffs' Response |
|---|---|
| "ADA workers are also available to provide additional assistance when needed"<br><br>Letter from G. Johnson, OLA, to J. Hutt, PLO (Feb. 28, 2022). | Forcing a blind person to be dependent on another incarcerated person when a specifically-recommended and requested device would maximize their independence is a straightforward violation of the ADA. *See* 28 C.F.R. § 35.130(d); 28 C.F.R. § 35.160(b)(2). |
| "ADA staff advised him of the availability of other products that might assist him (such as text-to-speech pens and tablets) that can be found in catalogs like MaxiAids."<br><br>Letter from G. Johnson, OLA, to J. Hutt, PLO (Apr. 13, 2022). | It is inappropriate for ADA staff to suggest that Mr. ▮▮▮▮ purchase his disability accommodations from MaxiAids. Defendants must provide disability accommodations to class members at no cost. *See* 28 C.F.R. § 35.130(f); ARP § II.F. |

Ms. Gannon Johnson
Re:
May 26, 2022

| | |
|---|---|
| "Further, he can utilize the Merlin or DaVinci machines in the library."<br><br>*Id.* | Mr. ▮▮▮ reported that while electronic magnifiers, like the Amigo, are very useful for reading, they do not allow him to write independently; he either struggles to read his own handwriting, or requires assistance typing at the ADA computer because he cannot see the keys. Furthermore, as Plaintiffs have repeatedly explained, restrictions on access to the auxiliary aids in the law library make them an inadequate reading or writing accommodation.[2] |
| "Moreover, ▮▮▮ also has . . . card magnifiers that may be able to assist with any review."<br><br>*Id.* | Plaintiffs have long reported the insufficiency of these card magnifiers. *See, e.g.,* Letter from T. Amarillas, J. Hutt, and S. Lovett, PLO, to T. Davis, OLA, Blind and Low Vision Class Member Concerns at ▮▮▮ at 8-10 (Nov. 16, 2021). Mr. ▮▮▮ echoed these concerns, explaining that he cannot read a "single word" with a card magnifier because it is not strong enough. |
| "▮▮▮ is currently accommodated with a tapping cane and received COMS training for the tapping cane on February 18, 2020."<br><br>Letter from G. Johnson, OLA, to J. Hutt, PLO (Feb. 28, 2022) | A tapping cane does not accommodate Mr. ▮▮▮ reading and writing needs. |

Defendants also write that Mr. ▮▮▮ has a "CCHCS-issued handheld magnifier" with a light. Letter from G. Johnson, OLA, to J. Hutt, PLO (Apr. 13, 2022); Email from G. Johnson, OLA, to J. Hutt, PLO (Apr. 14, 2022). Mr. ▮▮▮ may benefit from such a magnifier, but we see no documentation in Mr. ▮▮▮ medical records of the magnifier issued by CCHCS. **Please provide us with a record of Mr. ▮▮▮ being issued a handheld lighted magnifier, including the date on which this occurred, and the power of the magnifier.**

---

[2]    Mr. ▮▮▮ reported that his yard time, which has recently been limited, does not always overlap with the hours that the law library is open. He believes this issue is exacerbated by staffing shortages at the institution, as officers in his building sometimes announce that staff have been rerouted due to shortages and that programming will be modified as a result. Mr. ▮▮▮ reported receiving similar information from two program office clerks who live in his building. He reported that even prior to profound staffing shortages, however, law library staff sometimes did not report to work, limiting law library hours. He is concerned that, since he no longer has Priority Legal User status, his access to the law library will be limited; he reported going to the law library only around four times, three of those times as a Priority Legal User, between February and April 2022.

Ms. Gannon Johnson

Re: ███████████████████

May 26, 2022

Finally, Mr. ██████ reported that he has a JPay tablet that he may be able to use to prepare written material for Board, but he was not familiar with the tablet's text-to-speech function. He reported instead using the tablet's magnification feature in tandem with his spot magnifier, which proves difficult because of the glare from both the magnifier and the screen. **Please immediately provide Mr. ████████ with training on the text-to-speech function of his current tablet, and prioritize training Mr. ████████ on the accessibility features of the ViaPath tablets scheduled for deployment at ████████ on June 20, 2022.**

\* \* \* \* \*

Mr. ██████ has been incarcerated in CDCR since ██████. His first parole suitability hearing is currently scheduled for ██████████████, four months from now, and according to his counselor may be advanced to ████████. He is concerned that the Board may find his limited programming compared to his sighted peers an aggravating factor in denying his suitability. As such, Mr. ████████ is eager to prepare as much as possible in the months leading up to his hearing to show evidence of suitability for parole. But drafting documents, like a relapse prevention plan, is laborious without adequate accommodations to read and write. To develop his relapse prevention plan, Mr. ██████ reported that he had to first work with another incarcerated person to hand-write, then type it on the ADA computer in the law library, where he cannot see the keys. He was reliant at every point in this process on another incarcerated person. Mr. ██████ explained that some of the materials related to his upcoming hearing are too personal for him to feel comfortable seeking the same assistance again.

Defendants cannot continue to delay providing Mr. ██████ with accommodations, which has resulted in years of disability discrimination. In sum, we ask that Defendants:

1.  **Immediately order 8x microscopic glasses and Ruby XL HD portable video magnifier for Mr. ██████ on a high-priority basis;**

2.  **Provide us with a record of Mr. ██████ being issued a handheld lighted magnifier, including the date on which this occurred, and the power of the magnifier;**

3.  **Immediately provide Mr. ██████ with training on the text-to-speech function of his current tablet, and confirm that he receives training on the accessibility features of the ViaPath tablets scheduled for deployment at ██████ on June 20, 2022.**

/ /

/ /

/ /

6

Ms. Gannon Johnson

Re: ▮▮▮▮▮▮▮▮▮▮▮▮▮

May 26, 2022

Thank you for your prompt attention to this matter.

Sincerely,

Jacob Hutt
Staff Attorney

Skye Lovett
Investigator

cc:     Mr. ▮▮▮▮▮
        Ed Swanson, Court Expert
        Tamiya Davis, Alexander Powell, Nicholas Meyer, Patricia Ferguson, Erin Anderson,
        Amber Lopez, Robin Stringer, Patricia Ferguson, OLAArmstrongCAT@cdcr.ca.gov
        (OLA)
        Lois Welch, Steven Faris (OACC)
        Adam Fouch, Chance Andres, Landon Bravo, Laurie Hoogland (DAI)
        Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford, John Dovey, Robin
        Hart, Cindy Flores, Joseph (Jason) Williams, Kelly Allen, Cathy Jefferson, Vincent
        Cullen, Joseph Edwards, Lynda Robinson, Barb Pires, Ngoc Vo, Miguel Solis, Olga
        Dobrynina, Dawn Stevens, Alexandrea Tonis, Gently Armedo (CCHCS)
        Jeremy Duggan, Damon McClain, Joanne Hood, Sean Lodholz, Anthony Tartaglio, Trace
        Maiorino (OAG)
        Brantley Choate, Hillary Iserman, Shannon Swain, Rod Braly, Jennifer Wynn, Martin
        Griffin, Brandy Buenafe, Alicia Legarda (OCE)

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



June 12, 2023

<u>VIA EMAIL ONLY</u>

Jacob Hutt
Prison Law Office
jacob@prisonlaw.com

RE:    ***ARMSTRONG V. NEWSOM***: ███████████ (██████) – DPV (████

Dear Mr. Hutt:

I write in response to your letter of May 26, 2022, regarding ██████████ (████████) at the
███████████████████████████████████████████████████). You requested
that the California Department of Corrections and Rehabilitation (CDCR): (1) "[i]mmediately
order 8x microscopic glasses and Ruby XL HD portable video magnifier for Mr. ████ on a high-
priority basis"; (2) "[p]rovide . . . a record of Mr. ████ being issued a handheld lighted magnifier,
including the date on which this occurred, and the power of the magnifier"; and (3)
"[i]mmediately provide Mr. ████ with training on the text-to-speech function of his current
tablet, and confirm that he receives training on the accessibility features of the ViaPath tablets
scheduled for deployment at ███ on June 20, 2022."

**I.    8X MICROSCOPIC GLASSES & RUBY XL HD MAGNIFIER ORDER**

These requests were forwarded to the California Correctional Health Care Services (CCHCS).
CCHCS responded:

> ████ was fortunate to contact a low vision specialist who is new to the area. ████
> spoke with the specialist in early June regarding ████ and the existing
> recommendation from a low vision specialist who has since retired. ████ old
> prescriptions were sent to the new low vision provider to review and endorse.
> Orders were placed for the Ruby XL HD portable video magnifier and 8x
> microscopic glasses on June 9, 2022. There was no timeframe given as to when
> both orders would be delivered.

**II.    ISSUANCE OF LIGHTED, HANDHELD MAGNIFIER**

Mr. ████ was provided a 8x Schweizer illuminated handheld magnifier at an off-site
appointment at the Valley Center for the Blind on July 24, 2019.  This was a donation from an
outside facility, so CDCR does not have a record of its "issuance."

///

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Exhibit 24 - 40

R. ████████████████████████████████████

Page 2

### III.    <u>TABLET TRAINING</u>

ViaPath (formerly Global Tel Link, or GTL) has issued tablets to all inmates at ████ ViaPath indicates the tablets have accessibility features for the hearing and vision disabled. ViaPath has confirmed they will visit ████ during the week of October 10-17, 2022, to provide training on these features to the inmates seeking to utilize those accessibility features.

Please let me know if you have any questions.

Sincerely,

*Patricia Ferguson*

Patricia Ferguson
Assistant Chief Counsel, Class Action Team
Office of Legal Affairs

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Exhibit 94 - p. 41

# EXHIBIT 79



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Laura Bixby
Patrick Booth
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
Rita Lomio
Margot Mendelson

VIA EMAIL ONLY

January 28, 2021

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:     *Armstrong v. Newsom*
          Issues Related to Blind and Low-Vision Class Members at SATF

Dear Ms. Davis:

Last week, Plaintiffs' counsel interviewed nine blind and low-vision class members at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), regarding access to disability accommodations during the pandemic. We ask that the institution address the individual concerns listed below. Several of the issues in this letter also relate to the parties' continued negotiations in the Blind/Low-Vision Workgroup. We look forward to working with you to address these issues on a system-wide basis.

**Board of Directors**
Harlan Grossman, President • Christiane Hipps, Vice President • Marshall Krause, Treasurer
Vanita Gaonkar • Nick Gregoratos • Margaret Johns • Jean Lu
Michael Marcum • Claire McDonnel • Ruth Morgan • Seth Morris • Michele WalkinHawk

███ █████ ██████ DLT, DPV, ██

Mr. ████ reported that he is unable to read and write without the assistance of a magnifier or ADA worker. Mr. ████ reported that he has schoolwork to complete and is also working on several written documents following his recent parole hearing. Because of his disability, Mr. ████ can work on his written assignments only during his one-hour slot in the education classroom when he is allowed to use the Davinci. Unfortunately, Mr. ████ reported that this one-hour slot is not enough time for him to do his schoolwork and parole work. He explained that the card and full-page magnifiers available in the housing unit are not strong enough for him to read and write effectively. While he can get assistance from others, he would prefer to be able to do his work on his own, particularly when it comes to his parole work because it includes sensitive information about his life and crime. We ask that Mr. ████ be afforded additional time on the Davinci to complete his schoolwork and parole work.

Additionally, Mr. ████ stated that when he returned to his building after recovering form COVID-19, he was placed in the back of his pod. This placement makes it difficult for him to safely access the restrooms, dayroom, and front of the building, which he needs to exit to get to chow. Mr. ████ requested a bed move from officers, but they told him that he could not be moved at the time because people were being brought back to the building, so they were busy. We ask that Mr. ████ be assigned to a bed that is at the front of the pod where he can more easily access the restrooms, dayroom, and front of the building.



. . . .
. . . .

Ms. Tamiya Davis
Re: Issues Related to Blind and Low-Vision Class Members at SATF
January 28, 2021
Page 4



Thank you for your attention to this matter.

Sincerely yours,

Tania Amarillas
Investigator

Rita Lomio
Staff Attorney

cc:   Ed Swanson, Court Expert
      Co-counsel
      Alexander Powell, Nicholas Meyer, Patricia Ferguson, Gannon Johnson, Erin Anderson,
      Amber Lopez, Robin Stringer, OLAArmstrongCAT@cdcr.ca.gov (OLA)
      Lois Welch, Steven Faris (OACC)
      Adam Fouch, Chantel Quint, Jillian Hernandez, Landon Bravo, Laurie Hoogland (DAI)
      Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford, John Dovey, Robin
      Hart, Joseph (Jason) Williams, Kelly Allen, Cathy Jefferson, Tammy Foss, Jason
      Anderson, Joseph Edwards, Lynda Robinson, Barb Pires, Courtney Andrade, Miguel Solis,
      Olga Dobrynina, Dawn Stevens, Alexandrea Tonis, Gently Armedo, Dawn Stevens,
      Jimmy Ly, Jay Powell (CCHCS)

Ms. Tamiya Davis
Re: Issues Related to Blind and Low-Vision Class Members at SATF
January 28, 2021
Page 5

Adrian Hrvatin, Sean Lodholz, Namrata Kotwani, Anthony Tartaglio, Trace Maiorino, Andrea Moon (OAG)
Brantley Choate, Hillary Iserman, Shannon Swain, Rod Braly, Jennifer Wynn, Martin Griffin, Brandy Buenafe, Alicia Legarda (OCE)

# EXHIBIT 80

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                GAVIN NEWSOM, GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Jennifer Neill
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



March 25, 2022

<u>VIA EMAIL ONLY</u>

Jacob Hutt
Prison Law Office
jacob@prisonlaw.com

RE:    **Reading and Writing Accommodations for Blind and Low-Vision *Armstrong* Class Members**

Dear Mr. Hutt:

We write in response to your letter of March 15, 2021, and your subsequent letter of December 10, 2021, demanding that the California Department of Corrections and Rehabilitation (CDCR) provide blind and low-vision *Armstrong* class members with equal access to reading and writing by: (1) providing state-issued written information in accessible formats, including large print, audio recording, and braille; and (2) providing class members with access to auxiliary aids, such as electronic magnifiers, within their respective housing units.

CDCR recognizes the importance of ensuring that the blind and low-vision *Armstrong* class members are provided access to reading and writing in compliance with the Americans with Disability Act (ADA) and the *Armstrong* Remedial Plan, while in CDCR custody. Although Plaintiffs contend, "no apparent progress has been made," the opposite is true. CDCR has diligently worked on several fronts to further accommodate blind and low-vision class members. As detailed below, these improved accommodations will provide blind and low-vision class members "the option to read and write privately and independently at any time, from any location, and at any pace without notice or approval," as demanded in your letters and obviate any need for court intervention.

1.    *E-Tablets Provide Class Members with Independent and Private Access to Reading and Writing*

CDCR is in the process of deploying E-Tablets[1], which include a host of assistive features designed to facilitate access for blind and low-vision class members. These features include, but are not limited to text enlargement, text-to-speech, high contrast text, color

---

[1] https://www.cdcr.ca.gov/family-resources/gtl-tablets/

1

inversion, color correction for color blindness[2], screen reader[3] and select-to-speak[4] accessibility tools. CDCR is working with its contractor to enhance these capabilities to include a voice-to-text feature, to incorporate the existing CDCR forms for independent use by the blind and low-vision population, and other features to facilitate access.

The E-Tablets also come pre-loaded with content that includes, but is not limited to a library of facility-approved audiobooks and eBooks, Department Operations Manual, Healthcare Department Operations Manual, CCR Title 15, Prison Rape Elimination Act, Policies and Regulations, and ADA-compliance materials. Each of the above-referenced state-issued materials are accessible to blind and low-vision class members through the text enlargement and text-to-speech features available on these tablets. The CDCR is working to ensure the E-Tablets will also include applications that allow users to submit grievances and inmate requests electronically in the future, and CDCR is working with Enterprise Information Systems to add to the E-Tablet CDCR forms and responses for inmate due-process interactions.

E-Tablets are expected to begin deployment in accordance with the following tentative schedule:

- Chuckawalla Valley State Prison (CVSP) – Completed
- Valley State Prison (VSP) – Completed
- Mule Creek State Prison (MCSP) - Completed
- California State Prison – Solano (SOL) – 03/28/22
- California State Prison – Los Angeles County (LAC) – 04/26/22
- Centinela State Prison (CEN) – 05/16/22
- Avenal State Prison (ASP) – 05/31/22
- Central California Women's Facility (CCWF) – 06/07/22
- Sierra Conservation Center (SCC) – 06/07/22
- Kern Valley State Prison (KVSP) – 06/07/22
- High Desert State Prison (HDSP) – 06/13/22
- California Institution for Women (CIW) – 06/13/22
- California Substance Abuse Treatment Facility (SATF) – 06/20/22
- California Medical Facility (CMF) – 7/19/22
- Richard J. Donovan (RJD) – 11/1/22
- California Health Care Facility (CHCF) – 11/11/22

---

[2] Color Correction tool includes three correction modes: (1) Deuteranomaly (red-green color blindness); (2) Protanomaly (red-green color blindness); and (3) Tritanomaly (blue-yellow color blindness).

[3] TalkBack Screen Reader tool speaks text and image content on the screen and includes an "Explore by Touch" feature that allows the user to slowly drag one finger around the screen with TalkBack announcing icons, buttons, and other items.

[4] Select to Speak tool allows the user to select items on the tablet screen and hear them read or described aloud with adjustment to the speed of the reading.

2

**2.**      ***LED Magnifiers Will Be Added to the DME Formulary***

In addition to deploying the E-Tablets, CDCR is working with the California Correctional Health Care Services (CCHCS) durable medical equipment (DME) committee to identify and add a LED-lighted hand-held non-electronic magnifier to the DME formulary. CCHCS has begun the process and has submitted three models to the Office of Policy Standardization for review and approval. Once a model is approved, the local ADA staff will advise the DPV/DNV inmate population about the magnifiers so that the class member can submit a CDCR 1824 request.  Medical staff would issue the magnifier as DME to the DPV/DNV class members.  The 1824 process will include the Disability Verification Process and documentation process in SOMS.

**3.**      ***Class Members' Access to Auxiliary Aids in the Law Libraries and Education Classes as the Institutions Return to Increased Programming***

Amigo devices are currently available in some law libraries and education classes where DPV class members are assigned.  Equally effective electronic magnification devices such as the Merlins and DaVincis are available in all libraries where DPV class members are housed and access is available per the attached memorandum.  Most ADA Coordinators and Librarians at the DPV institutions report there is ample access to these auxiliary aids for blind and low-vision class members.  When requested, DPV institutions are making special accommodations for their class members to access these devices (e.g., Merlin), including transporting the devices to the housing units when requested and scheduled with the Education staff.  CDCR is committed to working with the Office of Correctional Education and the DPV institutions to increase the class members' access to the auxiliary aids available in the libraries upon request.  CDCR is continuing to work collaboratively with CCHCS to revamp the Roadmap to Reopening plan which would allow for those unaffected housing units to return to normal programming and ensure increased access to the libraries.

**4.**      ***CDCR will conduct a trial on the use of the Amigo hand held electronic magnifiers at SATF***

The Class Action Management Unit (CAMU) and SATF ADA staff will work together to identify housing units where DPV class members are housed and implement a "check-out" system for the inmates to have access to an Amigo hand held electronic magnifier during dayroom hours. This proposed trial will take approximately 60 days to implement.  Updates on the trial will be shared with Plaintiffs during the Blind and Low-Vision workgroups.

**5.**      ***Class Members Will Have Access to Large Print Due-Process Materials***

CDCR will direct the CDCR Forms Coordinators to re-format the inmate due-process forms in large print through the ADA function and have the Prison Industry Authority print those forms in large print for use at the DPV institutions.  Large print will be added as a "visual accommodation" that can be requested through the 1824 process.  This visual accommodation will be tracked in SOMS under primary and alternate methods of communication  Much like with the hand-held LED magnifiers, the local ADA staff will advise the DPV/DNV inmate population of the new accommodation and advise class members to submit a CDCR 1824 request.

3

In the long-term, CDCR is exploring submission of a Budget Change Proposal, in fiscal year 2022-23[5], for acquisition of advanced printers or copiers to produce inmate due-process responses in large print automatically.  In the meantime, CDCR will draft and issue a memorandum to the DPV institutions requesting production of responses to inmate due-process forms in large print, which can be accomplished manually with the current copiers.  CDCR will share the memorandum with Plaintiffs for their comment before it is finalized.  The establishment of this interim manual process is expected to take approximately ninety days.

**6.      *CDCR has Developed a Plan to Provide Braille Access if a Class Member Requests Such an Accommodation***

CDCR is working to establish a new vendor contract for producing inmate due-process response forms in braille when the class member makes the request   Establishing the contract for braille services is estimated to take six months to complete.

Braille-format copies of CDCR 1824 Form, CDCR Form 22, CDCR 602 Form and Visiting Questionnaire are currently available at the ADA offices at LAC, CMF and SATF, which currently house the only three inmates in CDCR's custody that currently read braille.  CDCR is working to refine the process with Prison Industry Authority to produce blank inmate due-process forms and orientation manuals in braille if such an accommodation is requested.  As previously advised, CDCR has reached out to the only three class members who read braille and they have requested that they <u>not</u> be provided access to documents in braille.

CDCR is committed to ensuring that the blind and low-vision class members are provided ADA-compliant access to reading and writing, while maintaining the safety and security of each CDCR institution, staff and inmate population.  We look forward to sharing additional information regarding accessible formats and auxiliary aids with Plaintiffs once such information becomes available.

Please let me know if you have any questions.

Sincerely,

/s/

CHOR THAO
ATTORNEY
Office of Legal Affairs

---

[5] Please note, that even if this proposal is approved for submission and submitted in fiscal year 2022-23, the funding would not be approved until fiscal year 2023-24.

4

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date:    August 13, 2020

To:      Associate Directors, Division of Adult Institutions
         Wardens
         Americans with Disabilities Act Coordinators

Subject: **ACCESS TO AUXILIARY DEVICES IN LIBRARIES FOR INMATES WITH VISION IMPAIRMENT IMPACTING PLACEMENT DURING COVID-19 PANDEMIC**

The purpose of this memorandum is to provide direction to staff regarding access to libraries for vision-impaired inmates during the modified programming caused by the COVID-19 pandemic.

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide access to its programs, services, and activities for all inmates and parolees with disabilities, as required by Federal Law, the Americans with Disabilities Act (ADA), and the Armstrong and Clark Remedial Plans. The ADA guarantees equal opportunity and provides basic civil rights protections for individuals with disabilities in public and private sector services and employment. The Disability Placement Program (DPP) was established to provide inmates and parolees access to activities, services, and programs offered by the Department.

Due to the modified programs caused by the COVID-19 pandemic, inmates in the DPP with a designation of Vision Impaired, Impacting Placement (DPV), may be unable to access necessary auxiliary devices (Merlin, Optelec, etc.) located in the libraries. Lack of access to auxiliary devices may impair the ability of DPV inmates to read legal mail, court transcripts, and complete personal correspondence, CDCR forms, and other documentation.

All institutions housing DPV inmates shall develop a schedule to allow DPV inmates access to auxiliary devices located in libraries for up to two hours per week for general recreation library users, and up to four hours per week for priority legal users, during the modified programs caused by the COVID-19 pandemic in accordance with the California Code of Regulations, Title 15, Section 3123 *Access to Law Libraries*. Alternative locations, such as classrooms and gyms, may be utilized to allow for more flexible schedules and increased access to auxiliary devices. Auxiliary devices shall be sanitized by inmate workers or staff before and after each use.

Once a schedule has been developed for DPV inmates to access auxiliary devices in libraries or alternative locations, please submit proof of practice to Landon Bravo, Correctional Administrator, Class Action Management Unit (CAMU) by Friday, August 28, 2020.

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

If you have any questions, please contact Landon Bravo, Correctional Administrator, CAMU, at (916) 322-6522, or Landon.Bravo@cdcr.ca.gov.

BRANT R. CHOATE, Ed.D.
Director
Division of Rehabilitative Programs

CONNIE GIPSON
Director
Division of Adult Institutions

Attachment

cc:  Kimberly Seibel
     Charles W. Callahan
     Shannon Swain
     Adam Fouch
     Landon Bravo
     Chance Andes

# EXHIBIT 81



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Tess Borden
Patrick Booth
Claudia Ceseña
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
A.D. Lewis
Rita Lomio

BY EMAIL ONLY

November 1, 2022

Chor Thao
CDCR Office of Legal Affairs

Re:     *Armstrong v. Newsom*
        Electronic Auxiliary Aid Pilot Programs for Blind and Low-Vision Class
        Members

Dear Chor:

We write regarding Defendants' pilot programs for providing blind and low-vision class members with in-cell access to electronic auxiliary aids. Blind and low-vision class members at Substance Abuse Treatment Facility (SATF)—where Defendants recently concluded their Amigo pilot program[1]—have reported three main problems with this pilot program, which we ask Defendants to address while developing the forthcoming omniReader pilot program.

**Problem #1:   The tracking logs state that Facility E class members did not request auxiliary aids, but members in Facility E were not informed that the pilot program existed. We are concerned with similar problems on Facility A.**

We are concerned that Defendants apparently failed to inform blind and low-vision class members in Facility E that the Amigo pilot program existed, despite representing on tracking logs that class members simply had not requested these aids. None of the class members on Facility E with whom we have corresponded since the program concluded were aware that Amigo magnifiers are available to them in their housing unit; they first learned of this pilot program from Prison Law Office monitors.

This explains why Defendants' tracking sheets for this unit indicate that class members were not requesting access to auxiliary aids—class members did not know that such access was available to them. For instance:

---

[1] In this letter we do not discuss the pen reader component of this pilot program, given our understanding from workgroup meetings that Defendants will not utilize pen readers as visual accommodations going forward. We ask that Defendants confirm that this is accurate.

[4178721.1]
**Board of Directors**
Harlan Grossman, President and Treasurer • Christiane Hipps, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum  •  Jean Lu
Claire McDonnel • Ruth Morgan • Seth Morris • Adrienne Yandell

Chor Thao
Re: Electronic Auxiliary Aid Pilot Programs for Blind and Low-Vision Class Members
Page 2

**Image 1:**  **Image 2:**

**Image 3:**  **Image 4:**



**Images #1-4 Description: Housing Unit Auxiliary Aids Tracking Sheets for Facility E on July 18, July 21, July 29, and August 29, 2022, indicating no requests for Amigo HD or ReaderPen**

It is concerning that housing unit officers on Facility E consistently reported—for months—that there were "no requests" for auxiliary aids in their unit, when blind and low-vision class members have reported to us that they were not informed about these aids. Furthermore, class members on Facility E report that if Defendants had notified them about this program, they would have utilized these aids extensively. For example, ███████████, ███████, DNM, DPV, ███, reported that he would have made regular use of the Amigo to complete day-to-day reading and writing tasks had Defendants notified him about the Amigo trial program.

In addition to these problems on Facility E, we are concerned that Defendants erroneously reported to Plaintiffs' counsel in the Blind/Low-Vision Workgroup that Facility A did not have anyone who used the Amigo, and that Facility A's Amigo would accordingly be moved to MCSP. To the contrary, ███████████, ██████, DNH, DPV, ███, reported that—although the Amigo would have been more accommodating if it had a text-to-speech function, *see infra*—he significantly benefited from using the Amigo magnifier for his reading needs. He

[4178721.1]

was therefore disappointed when Defendants removed the Amigo magnifier from Facility A approximately two-and-a-half months ago.

As Defendants roll out the forthcoming omniReader pilot program, they must ensure that there is a clear, written plan for informing blind and low-vision class members in all designated housing units that this program is active. Defendants should also develop remedial education about the Amigo pilot program at SATF for Facility E class members, and should ensure that class members on Facility A have effective video magnifiers to utilize in their cells.

**Request #1:** **Develop and produce to Plaintiffs' counsel a written plan for ensuring that, for the forthcoming omniReader pilot program, blind and low-vision class members in all relevant housing units will be made aware of the existence of this program. Provide remedial education to blind and low-vision class members in SATF Facility E that Amigo magnifiers are available for in-cell use, and investigate Facility E officers' practices of completing the tracking sheets in the manner shown above. Ensure that class members on Facility A have effective video magnifiers to utilize in their cells.**

**Problem #2:** **The amount of training offered to class members varied widely across housing units, and for some units was insufficient. Sign-up processes, too, vary across units and leave class members unsure of whether these devices are available in their units.**

Based on reports from blind and low-vision class members across SATF, it appears that the amount of training that class members received on how to use the Amigo magnifier varied widely across housing units, and in some cases was insufficient. We appreciate that in some units—for example, F2—training was reportedly comprehensive and class members greatly appreciated the level of orientation that they received on how to use these devices. In other units, such as G3, class members reported receiving minimal training and relying on blind and low-vision class members who had experience with these devices to attempt to teach them. For class members who lack familiarity with these new technologies, it is insufficient to simply provide them with an "instruction guide," particularly in light of their severe vision disabilities and difficulty in reading such an instruction guide by sight. *See* CDCR Memo RE Auxiliary Aids in Housing Units Trial at SATF, May 5, 2022 ("Instruction guides for the devices will be provided to both staff and inmates.").

In similar fashion, housing units lacked a uniform system for having class members sign up to use the devices, and several class members with whom we corresponded reported not knowing how they were supposed to do so. For example, ███████, ███████, DLT, DPV, ██, who was housed on G3 during the pilot program, reported that in G3, staff apparently delegated the responsibility for passing around a sign-up sheet to class member ███████. When Mr. ████ was moved to another unit, Mr. ████ stopped using the devices, because no one had informed him that he was able to sign up for the devices with the unit officers directly. And now that Mr. ████ himself has been moved to ██, he reports that he does not know whether the Amigos are available, because no one comes around the unit with a sign-up sheet, as

Mr. ▮▮▮▮ used to do in G3. The memorandum establishing the pilot program does not make clear precisely how class members are supposed to sign up for access to these devices, which Defendants should clarify at SATF and should address as they develop the forthcoming omniReader pilot program.

Looking forward, on the topic of training in particular, it is imperative that Defendants develop a concrete plan for training blind and low-vision class members on how to utilize the omniReader during the forthcoming pilot program. While the omniReader is a relatively intuitive device, many users of this device will be totally blind and thus unable to see the device as they attempt to use it for the first time. Moreover, it contains numerous operations—such as speeding up the narrator's voice and scrolling to different sections of text—that most blind and low-vision users will have never encountered before in other technologies. Defendants must ensure that blind and low-vision class members using the omniReader in the pilot program can request and receive training from a person who is knowledgeable about this device.

**Request #2:** **Develop and produce to Plaintiffs' counsel written plans for training blind and low-vision class members on how to use the omniReader for the forthcoming pilot program. Develop and produce to Plaintiffs' counsel a uniform sign-up system for class members to check out electronic auxiliary aids for in-cell use. Provide clear, uniform guidance to staff and class members at SATF regarding how to sign up for and check out the available electronic auxiliary aids for in-cell use.**

**Problem #3:** **The Amigo—unlike the Ruby 10—lacks OCR and is difficult to use for long periods of time for low-vision class members.**

As the parties have discussed at length, the Amigo is a spot magnifier. *See, e.g.*, American Foundation for the Blind, Lee Huffman, *Magnification Is Going Places: A Review of the STRIX and Amigo Portable CCTVs*, January 2007 ("The Amigo is suited more to spot reading on the go than it is to longer reading or handwriting sessions."), https://www.afb.org/aw/8/1/14400; Draft Declaration of Richard Subia, ¶ 33. On its small screen, it enables low-vision class members to read a few words or sentences, but it is not designed for longer reading and writing tasks. It also lacks OCR, unlike other spot magnifiers such as the Ruby 10, so it cannot read text aloud to users who rely wholly or in part on this function. In other words, the Amigo is a valuable visual accommodation, but there are superior devices for accommodating the specific needs of low-vision users.

Low-vision pilot program participants at SATF reported that they were unable to use the Amigo for longer reading and writing tasks due to its small screen and lack of OCR capability. For example, ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮, DPV, ▮▮, reported that he was able to use the Amigo for approximately one hour before he needed to take a break because of the strain that reading had on his eyes. He reported that, although the Amigo's magnification was powerful, he was not able to read quickly with the small device, causing him headaches after reading for a long period of time. He reported that if he had access to a device with OCR, he would be able to complete his

reading more quickly, relying alternatively on text-to-speech and magnification without having to stop for breaks.

There are straightforward, technological solutions to this problem: Defendants can make handheld, OCR-capable magnifiers (such as the Ruby 10) and large, portable video magnifiers (such as the Topaz) available to low-vision class members in their housing units so that they can complete longer reading and writing tasks. Low-vision class members at SATF appreciated their expanded access to Amigo magnifiers, but they still lack reasonable accommodations for completing a wide range of reading and writing tasks, such as reading a chapter of the Bible, writing a letter home to a family member, reading a lengthy parole transcript, or writing a legal document to the court.

**Request #3:**   **Make OCR-capable magnifiers (such as the Ruby 10) and larger, portable video magnifiers (such as the Topaz) available for low-vision class members to use in their housing units, to ensure that these class members can complete longer reading and writing tasks.**

<div align="center">***</div>

For years, we have reported to Defendants that blind and low-vision class members at SATF and other DPV-designated prisons do not have anywhere near sufficient access to critical auxiliary aids for reading and writing. We urge Defendants to expand these pilot programs to all DPV-designated prisons and to incorporate the aforementioned requests into these expanded programs. We look forward to discussing this feedback and these requests with you soon.

Sincerely,

*/s/ Jacob J. Hutt & Tania Amarillas*
Jacob J. Hutt & Tania Amarillas
Prison Law Office

cc:    Ed Swanson, Court Expert
Tamiya Davis, Alexander Powell, Nick Meyer, Patricia Ferguson, Gannon Johnson, Chor Thao, OLAArmstrongCAT@cdcr.ca.gov (OLA)
Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford (CCHCS Legal)
Lois Welch, Steven Faris (OACC)
Chantel Quint, Jillian Hernandez, Dawn Lorey, Laurie Hoogland (DAI)
Tammy Foss, John Dovey, Robin Hart, CCHCS Accountability, Jason Williams, Cathy Jefferson, Amy Padilla, Jason Anderson, Vimal Singh, Joseph Edwards, Lynda Robinson, Barb Pires, Courtney Andrade, Miguel Solis, Dawn Stevens, Alexandrea Tonis, Gently Armedo, Jimmy Ly, Jay Powell, Jay Leon Guerrero, Aaron Perez, Olga Dobrynina, Kandie Smith, Monique Matthis, Gloria Fernandez, Yvonne Anaya, Christina Sachao, Claudia Williams, Ngoc Vo (CCHCS)
Adriano Hrvatin, Sean Lodholz, Trace Maiorino, Andrea Moon, Mark Jackson (OAG)

[4178721.1]

# EXHIBIT 82



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Tess Borden
Patrick Booth
Claudia Ceseña
Steven Fama
Alison Hardy
Sophie Hart
Jacob Hutt
A.D. Lewis
Rita Lomio

BY EMAIL ONLY

May 17, 2023

Chor Thao
CDCR Office of Legal Affairs

Re:    *Armstrong v. Newsom*
       Lack of Reading and Writing Accommodations for Blind and Low-
       Vision Class Members in Short Term Restricted Housing Unit at ██████

Dear Chor:

We are extremely concerned with the lack of reading and writing accommodations available to blind and low-vision class members in the Short-Term Restricted Housing Unit (STRH) at the ████████████████████████████████████████████ ran (████). Even the minimal accommodations that are occasionally available to other blind and low-vision class members in the general population law libraries, such as desktop magnifiers, are unavailable to such class members housed in the STRH. We are also concerned that the ADA office and other ██████ staff have inaccurately informed class members and Plaintiffs' counsel about the availability of accommodations to blind and low-vision class members housed in the STRH, suggesting a continued inability to identify and remedy problems even after they are raised through the 1824 process and by Plaintiffs' counsel.

**We ask that, without delay, ██████ (1) determine where in the STRH to make the auxiliary aids discussed herein available to blind and low-vision class members, (2) work with Headquarters to obtain these auxiliary aids if necessary, (3) develop policies and procedures related to access to these devices, including how blind and low-vision class members will be informed of their availability, and (4) report the results of this plan to Plaintiffs' counsel.**

\*\*\*

Regardless of why someone is housed in administrative segregation, they are entitled to send and receive personal mail and access reading materials and library services. *See* 15 C.C.R. § 3343(e) (personal mail), § 3343(i) (reading material). This is critically important because of the length of time people may be housed in administrative segregation and the isolation and sensory deprivation posed by such placement. People routinely are housed in administrative segregation for months or years. Administrative segregation units are a "high risk environment"

**Board of Directors**
Harlan Grossman, President and Treasurer • Christiane Hipps, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Seth Morris • Adrienne Yandell

Lack of Reading and Writing Accommodations for Blind and Low-Vision Class Members in
Short Term Restricted Housing Unit at SATF
May 17, 2023
Page 2

for "all inmates housed in those units." *Coleman*, Dkt. 5131, Order at 45 (Apr. 14, 2014) (discussing "disproportion in the number of inmate suicides in administrative segregation"); *cf. id.* at 45-46 (noting the "overwhelming weight of evidence in the record . . . that placement of seriously mentally ill inmates in California's segregated housing units can and does cause serious psychological harm including decompensation, exacerbation of mental illness, inducement of psychosis, and increased risk of suicide"). To mitigate that risk, Defendants are supposed to provide a variety of recreational material, including nonfiction and fiction books, current events materials, puzzles, crosswords, games, and access to personal property, including photographs and notebooks. *See Coleman*, Dkt. 5211-1, Defendants' Plan at 6 (Aug. 29, 2014).

Blind and low-vision class members housed in the STRH at ███ are unable to access auxiliary aids that would allow them to read and write independently. The only electronic auxiliary aid that is available to these class members in the STRH is the "law library" kiosk—a small cage containing a LexisNexis machine that has in-screen magnification but no text-to-speech function and is limited to looking up legal cases for users. The kiosk cannot type, save, or print documents; it does not contain any recreational reading materials; it has no attached magnifier to magnify printed documents; and it cannot read printed documents or on-screen text out loud to the user. Class members housed in the STRH at ███ are not permitted to access the general population law libraries, which are occasionally available for some visually impaired class members to visit and use the desktop magnifiers inside to read and handwrite documents. By contrast, class members housed in the STRH have access only to two of these caged, inaccessible "kiosks."

**Apart from these two inaccessible, limited-function kiosks, there are no electronic auxiliary aids available to blind and low-vision class members in the STRH.**[1] There are no meaningful reading accommodations, such as desktop magnifiers that can magnify at high power the text of printed documents and read printed text out loud to the user. And there are no meaningful writing accommodations, such as a JAWS-compatible desktop or laptop computer with a corresponding printer for class members to write legal documents or letters to third parties, including loved ones. The STRH lacks these accommodations despite its staff identifying specific, physical locations in the STRH to Plaintiffs' counsel during the April 12,

---

[1] On the day of our arrival to ███ for the April 10-12, 2023, monitoring tour, Defendants passed out 4x, non-electronic lighted magnifying glasses to DPV class members, but these low-tech devices lack critical accessibility features that most blind and severely low-vision class members need. Unlike the electronic auxiliary aids in the general population libraries, for example, these magnifying glasses only magnify up to 4x (compare to the DaVinci desktop magnifier, which magnifies up to 77x, and the Ruby 10, which magnifies up to 24x). *See* DaVinci Pro HD/OCR, https://www.enhancedvision.com/low-vision-product-line/davinci-pro.html; Ruby 10, https://www.freedomscientific.com/products/lowvision/ruby10/.  These magnifying glasses also do not have a text-to-speech function for blind users who cannot see, and cannot change the contrast, brightness, or color of the displayed text, features available on the aforementioned devices that many severely low-vision class members need to read documents.

2023, walking tour where blind and low-vision class members could securely use larger devices—such as a desktop magnifier—under the supervision of custody staff. Smaller devices, such as handheld video magnifiers, could be made available to blind and low-vision class members in the STRH on a case-by-case basis, consistent with legitimate safety and security concerns.[2]

Without appropriate reading and writing accommodations, blind and low-vision class members in the ████ STRH are subjected to extreme isolation on the basis of their disability. As ███████, ██████, DPV, STRH, who has a prosthetic left eye and decreased vision in his right eye, reported to Plaintiffs' counsel, without the ability to read or write in the STRH, he is **"just sitting in my cell, waiting to go mad."** Mr. ██████ has been confined to the STRH for nearly three months. Before being housed in the STRH, he relied on desktop magnifiers to significantly magnify the text of education textbooks, for example, but there are no such magnifiers available—either in-cell or out-of-cell—in the STRH.

Another DPV class member housed in the STRH at the time of our tour, ████████, ████████, DLT, DPV, now at ██████, similarly had no access to critical auxiliary aids during the **five-and-a-half months** he was confined to the STRH. Mr. ██████ reported that the main 4x lens on the non-electronic lighted magnifier that Defendants issued to him on ██████████, was too weak for him to use, given the severity of his low vision. (He also reported that because the smaller lens, which is 30x, is about the size of a quarter, it is too small for him to read anything of moderate to significant length.) And even with an adequate magnifier, according to Mr. ██████, his vision begins to double and he gets headaches when he relies on the vision in his left eye (he is blind in his right eye). In order to read, Mr. ██████ needed access to a device that could read out loud to him, but no such device existed for him to use when he was housed in the STRH. Thus, on the basis of his disability, Mr. ██████ was subjected to extreme isolation in the nearly six months that he sat in the ██████ STRH awaiting transfer.

We are particularly concerned that even after class members raised this clear disability access issue, institution staff failed to identify and remedy the problem. For example, ██████ ████████ ████████ DPV, now at ██████ was housed in the ████ STRH in ████████ ████ and requested via a CDCR 1824 "access to ADA computer while housed in STRH unit and to use a reading machine," noting that the STRH's law library is inaccessible. *See* Log No. ██████ ████████. The RAP response inaccurately states that "there are both ADA and non-ADA computers available in the STRH." It makes no mention of the availability of a machine that would help someone read. The RAP decision appears to be based on a cursory DVP, conducted by the Vice Principal, which states, "Regarding STRH, both non-ADA and ADA computers are available." But it is not clear who, if anyone, the Vice Principal contacted to receive that information, whether she met with Mr. ██████ to understand what accommodations he needed, or whether she visited the STRH to confirm what auxiliary aids are available.

---

[2] *See* Declaration of Richard Subia at ¶¶ 25-45, submitted to Defendants on Sept. 22, 2022 (discussing, *inter alia*, absence of safety or security issues with class members using various handheld auxiliary aids (omniReader, Amigo, Ruby 10) in their cells).

Similarly, when we interviewed the ADA Coordinator on site on ████████████ and inquired about the availability of accommodations in the STRH, we were inaccurately informed that there was an ADA computer—the CDCR term for a desktop computer with standard word processing functions, which has accessibility features such as magnification and screen-reading software (e.g. JAWS) to accommodate blind and low-vision users—in the STRH. We visited the STRH twice during our monitoring tour last month and confirmed by speaking with staff assigned to the STRH and inspecting the unit that there is no ADA computer in the STRH and no way to access other auxiliary aids available in the law libraries at the institution to help a blind or low-vision person read independently. When we interviewed the ADA Coordintaor again on ████████ he acknowledged that blind and low-vision class members housed in the STRH cannot access a DaVinci or Amigo device. He again said that there is an ADA computer in the STRH, although given his workload, he had not had a chance to see it himself and was relying on what other staff told him.

To the extent these leadership staff are mistakenly assuming that the aforementioned law library kiosks are the same as an ADA computer, this is very concerning given the repeated reports from class members and Plaintiffs' counsel about the lack of STRH accommodations. It suggests they are not familiar with the different types of accommodations that blind and low-vision people may need.

<p style="text-align:center">***</p>

We appreciated STRH staff's openness to discussing how to make electronic visual accommodations available for blind and low-vision residents during our face-to-face conversations with them while on site. These staff were creative in generating ideas for where auxiliary aids could be made available in the STRH. It is now up to ██████ leadership and Headquarters to promptly develop and implement plans for such accommodations.

**We ask that, without delay, ██████ (1) determine where in the STRH to make desktop magnifiers, handheld magnifiers, text-to-speech devices (scanner/readers), and electronic word processors with corresponding printing equipment available to blind and low-vision class members, (2) work with Headquarters to obtain these auxiliary aids if necessary, (3) develop policies and procedures related to access to these devices, including how blind and low-vision class members will be informed of their availability, and (4) report the results of this plan to Plaintiffs' counsel.**

//

//

//

//

Lack of Reading and Writing Accommodations for Blind and Low-Vision Class Members in
Short Term Restricted Housing Unit at ▮▮▮
May 17, 2023
Page 5

We request a response by May 31, 2023. We look forward to discussing these matters with you soon.

Sincerely,

Jacob J. Hutt
Staff Attorney
Prison Law Office

cc:   Ed Swanson, Audrey Barron, Court Expert
Tamiya Davis, Alexander Powell, Nick Meyer, Patricia Ferguson, Gannon Johnson,
OLAArmstrongCAT@cdcr.ca.gov (OLA)
Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford (CCHCS Legal)
Lois Welch, Steven Faris (OACC)
Chantel Quint, Jillian Hernandez, Dawn Lorey, Laurie Hoogland (DAI)
Tammy Foss, John Dovey, Robin Hart, CCHCS Accountability, Jason Williams, Cathy
Jefferson, Amy Padilla, Jason Anderson, Vimal Singh, Joseph Edwards, Lynda Robinson, Barb
Pires, Courtney Andrade, Miguel Solis, Dawn Stevens, Alexandrea Tonis, Gently Armedo,
Jimmy Ly, Jay Powell, Jay Leon Guerrero, Aaron Perez, Olga Dobrynina, Kandie Smith,
Monique Matthis, Gloria Fernandez, Yvonne Anaya, Christina Sachao, Claudia Williams, Ngoc
Vo (CCHCS)
Adriano Hrvatin, Sean Lodholz, Trace Maiorino, Andrea Moon, Mark Jackson (OAG)

# EXHIBIT 83



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Deputy Director:*
Sara Norman

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Alison Hardy
Mackenzie Halter
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio

BY EMAIL ONLY

June 14, 2023

Tamiya Davis
CDCR Office of Legal Affairs

Ed Swanson
*Armstrong* Court Expert

Re:   *Armstrong v. Newsom*
        Lack of Writing Accommodations and Programming for Blind and Low-Vision
        Class Members at SATF

Dear Tamiya and Ed:

 We write regarding the lack of writing accommodations and programming for blind and low-vision *Armstrong* class members at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), which we observed during our recent monitoring tour at SATF from April 10-12, 2023.

 In the Court Expert's report on SATF last year, "[t]he Court Expert found that vision-impaired class members are being denied reasonable accommodations for their disabilities because low-vision assistive devices are broken in multiple libraries at SATF. He recommended that Defendants ensure that broken assistive devices are promptly repaired at SATF and that ADA staff at SATF conduct regular audits to determine whether low-vision assistive devices are functional." Dkt. No. 3467 at 4. The Court issued an order to that effect. *Id.*

 SATF's failure to accommodate blind and low-vision class members, however, stretches well beyond the issue of the functionality of library auxiliary aids. Despite housing the largest number of blind and severely low-vision class members in the state, SATF does not permit its blind and low-vision residents to write independently in their housing units, despite permitting sighted people to do so. Nor does SATF offer its blind and low-vision population any on-site programs, such as braille education and life skills training, to allow this population to participate equally in CDCR programs, services, and activities.

 At Defendants' request, the draft blind/low-vision stipulation, currently under negotiation by the parties, does not address the availability of accessible word processing devices for blind and low-vision class members who cannot handwrite with a pen or pencil due to the severity of

[4288113.2]

**Board of Directors**
Harlan Grossman, President and Treasurer • Christiane Hipps, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Seth Morris • Adrienne Yandell

their disability.[1] The draft stipulation also does not address related programming to ensure that these class members can learn how to write in braille or on a computer and have equal opportunity to participate in prison programs.

**In this letter, we ask Defendants to develop and implement a plan without further delay to address this gap.** We ask that the Court Expert consider the issues below and Defendants' response in developing "recommendations to the Court to remedy any continued violations of the ADA and ARP that he observes at SATF during the monitoring period." Doc 3467 at 2.

**I.      SATF provides extremely limited access to auxiliary aids that blind and low-vision people need to write.**

Modern accessibility technology makes independent writing for blind and low-vision people straightforward with proper training. Computers with screen-reading software (such as JAWS) and electronic braille displays facilitate independent writing for blind and low-vision people who are unable to write by hand.

For the eighty-two blind and severely low-vision class members currently housed at SATF, however, access to these critical auxiliary aids is either extremely limited or, in some cases, nonexistent. *See* June 2, 2023 DPP Roster. At SATF, the only place where blind and severely low-vision people can write independently is in the general population law libraries, where the aforementioned auxiliary aids—such as the "ADA computer," a desktop computer with screen-reading software, which class members can use to type and print documents—may be available. As ▆▆▆▆▆▆▆▆▆▆, ▆▆▆▆▆, **DPV,** who recently paroled from SATF, explained succinctly, "Because I need the ADA computer in the library, the only time I can access the courts is when I'm in the library." Similarly, the only place where blind and severely low-vision class members can save and print documents is in the libraries. *See* Brandy Buenafe, Library Services Administrators, Memorandum: Americans With Disabilities Act Printing in the Libraries (May 26, 2023).

Accordingly, when a blind or severely low-vision SATF resident wishes to write independently, they typically must—at minimum—(1) obtain permission from custody staff to leave their housing unit, (2) ambulate to the library, (3) determine whether the library is open, (4) enter the library if it is not at capacity (often capped at 10-12 people) or wait in line until there is space, (5) determine, once inside, whether the desired auxiliary aid is not in use by another

---

[1] Plaintiffs proposed that the stipulation include writing accommodations for all blind and low-vision class members, and Defendants rejected this proposal. *See* Defs.' Redline of Stipulation Resolving Disputed Issues Regarding Reading and Writing Accommodations for Blind and Low-Vision Class Members (Nov. 2, 2022) (striking the following language from the stipulation: "13. Defendants, in consultation with Plaintiffs' counsel, shall timely develop a plan for increasing blind and low-vision class members' access to writing aids, such as ADA computers, that are currently located in restricted locations such as libraries.").

[4288113.2]

incarcerated person, (6) sign up to use the aid, and, finally, (7) use it for a limited amount of time before their allotted time has elapsed.[2] In restricted housing units, such as the STRH, blind and low-vision class members cannot visit the library at all and the aforementioned auxiliary aids are unavailable, so it is difficult or impossible for these class members to write independently. *See* Letter from Jacob Hutt, PLO, to Chor Thao, CDCR OLA, Re: Lack of Reading and Writing Accommodations for Blind and Low-Vision Class Members in Short Term Restricted Housing Unit at SATF (May 17, 2023).

Practically speaking, it is even more complicated to get into the law library than as described above, for several reasons that we have reported extensively. *See* Letter from Jacob Hutt to Tamiya Davis, Reading and Writing Accommodations for Blind and Low-Vision Armstrong Class Members at 7-9 (Dec. 10, 2021). In brief, law libraries frequently shut down due to reported shortstaffing; class members may not be able to access the law library during modified programming or inclement weather or fog conditions;[3] class members on movement restrictions—whether discipline-based or quarantine/isolation-based—are not permitted to enter the libraries; the libraries are open only for limited hours of the day, during which class members often are assigned to other programs or have appointments; and when the prison is on COVID-19 outbreak status, as SATF staff reported to us on April 12, 2023, class members are permitted to enter the library for only 2-4 hours in an entire week, even if they need more time than that to use the auxiliary aids to write independently. We attach a schedule for the library shared by F and G yards (the "neutral zone" or "N/Z" library), with an F yard class member's annotations clarifying that for the entire month of March 2023, the library—with all its critical auxiliary aids—was open to F yard for **only ten days**. *See* Exhibit 1, March 2023 N/Z – Library Schedule.

Furthermore, even when a blind or low-vision SATF resident receives this limited access to type documents on the ADA computer in the library, they cannot use the computer privately. As the parties jointly observed during the April 12, 2023, walking tour, the screens on the auxiliary aids in the SATF law libraries are displayed for all library users to see. SATF's failure to provide writing accommodations that "protect the privacy . . . of the individual with a disability" is especially alarming given the sensitive information that incarcerated people need to write for court cases, grievances, parole suitability hearings, and other critical encounters. 28 C.F.R. § 35.160(b)(2). We include several images of this nonprivate set-up below.

---

[2] There are often additional steps that an incarcerated person must take before being granted access to write independently in the library. For example, ██████████, ██████, **DPV,** ██, reported that before C yard residents may visit the law library, they must handwrite and submit a slip to request a library visit, wait at least one day (usually two) for the library to respond and issue them a ducat, and then wait to be called by housing unit staff to visit the library at the appointed time.

[3] SATF OP 112 (Daily Activity Schedule) specifies that during inclement weather on all yards, there shall be no yard activities, and all movement outside of the housing units shall be under escort.

[4288113.2]

Writing Accommodations & Programming for Blind/Low-Vision Class Members at SATF
Tamiya Davis & Ed Swanson
June 14, 2023
Page 4



Image description: SATF Facility B Library – Large screen on Merlin facing other library patrons



Image description: SATF Facility D library – ADA computer screen and large screen on Davinci facing other library patrons

[4288113.2]



Image description: SATF Neutral Zone (F/G) library – ADA computer screen and large
screens on Davinci and Merlin facing other library patrons

We have raised the equal-access problem of restricting independent writing to the
libraries at SATF for years.[4] Still the problem remains unaddressed by SATF, as class members
shared with us during our recent monitoring tour:

- ███████████, ████████, **DPV**, ██, reported that he is triply-assigned (DRP
  program, GED education, and porter work) and seeks GED tutoring whenever the
  tutor is available, leaving him with little to no time to access the auxiliary aids in the
  library during its limited hours (three days per week, 9am to 3pm). He reported that
  he would like to use the auxiliary aids in the library as much as possible, but does not

---

[4] *See, e.g.*, Letter from Tania Amarillas *et al.* to Alexander Powell and Bruce Beland, Blind and Low
Vision Class Member Concerns at SATF (Nov. 16, 2021) (Section IV. LAW LIBRARY ACCESS); June-
September 2018 SATF DPV Tour Report at 17; October 2017 SATF Tour Report at 13; March 2017
SATF Tour Report at 13; Plaintiffs' October 2016 SATF Tour Report at 8 (discussing class member who
"requested additional access to the law library because he uses the braille writing machine, which takes
nearly a half hour to set up, leaving him only 10-15 minutes to use the machine before the library
closes").

[4288113.2]

Case 4:94-cv-02307-CW    Document 3525-4    Filed 11/14/23    Page 366 of 371

Writing Accommodations & Programming for Blind/Low-Vision Class Members at SATF
Tamiya Davis & Ed Swanson
June 14, 2023
Page 6

have enough time to get there; he reported that he has not visited the law library in approximately four months.

- ███████████, ███████, **DPV,** ██, reported that even when he uses the desktop magnifier in the law library, handwriting is difficult for him due to his low vision in one eye and blindness in the other. The only device available for him to typewrite documents is the ADA computer in the law library, which he cannot access regularly. Mr. █████ explained that the library is frequently shut down on his yard; staff explain that they are "shortstaffed" so the library cannot open. He reported that at least three days per month, the yard experiences "down days," when staff attend required training and programming is accordingly limited.

- ███████████, ███████, **DPV,** ██, reported that, like many incarcerated people, he likes to keep a personal journal, but it has become very difficult for him to write by hand due to his severe vision disability (blind in his left eye, limited vision in his right eye). He reported that given his participation in daytime programming, he has time to write in the evenings, but the library is closed then, so he cannot access the ADA computer at that time. He reported great interest in obtaining an independent writing accommodation, such as a laptop equipped with screen-access software, to be able to write in the evening in his cell.

- ███████████, ███████, **DPV,** ██, reported that two to three times per week, an alarm will sound in either G or F yard that requires staff from one yard to respond to another, which shuts down movement, including access to the library. He also reported frequent announcements on the loudspeaker in his housing unit announcing "total program shutdown" due to "shortstaffing."

Because of Defendants' severe restrictions on access to critical writing aids in the library, blind and low-vision class members are forced to try and obtain help with writing from third parties, an unreliable and sometimes unsafe arrangement in prison. *Cf.* 28 C.F.R. § 35.160(b)(2) ("In order to be effective, auxiliary aids and services must be provided . . . in such a way as to protect the privacy and independence of the individual with a disability."). For example, █████ ███████, ███████, **DPV,** ███████, reported that his severe vision disability makes it impossible for him to handwrite letters to his family or handwrite legal cases. According to Mr. ███████, Defendants' failure to provide him with an accessible word processing device to write has forced him to rely on other incarcerated person to scribe for him. Unfortunately, the last time Mr. ███████ dictated letters to his wife through another incarcerated person, he learned from his wife over the phone that this person had been making advances toward his wife in the letters, which Mr. ███████ did not know because he could not see the words on the page. Mr. ███████ reluctantly stopped requesting help from this person, and as a result of this experience, he no longer relies on other incarcerated people for writing assistance. He also reports that custody staff tell him that they do not have time to help him with writing letters—nor would he trust them with sensitive information that he would like to communicate to his family.

[4288113.2]

To provide blind and low-vision class members with equal access to writing, SATF must:

- **Issue electronic word processors with screen-reading software to blind and low-vision residents.** SATF must make laptops or similar technologies with screen-reading software, such as JAWS, available to blind and low-vision residents for word processing purposes <u>in their housing units</u>. Other correctional jurisdictions already accommodate blind and low-vision incarcerated people in this manner. *See, e.g.*, Exhibit 2, Mackes v. Colorado Department of Corrections (CDOC) Settlement at ¶ 4.a (requiring CDOC to provide "each Blind/Print Disabled Prisoner" with access to a laptop or equally effective device). We note that the current Viapath tablets do not accommodate the independent writing needs of blind and low-vision class members because they lack word processing software with compatible screen-reading software; class members cannot use them, for example, to draft letters to third parties, write legal briefs, complete written assignments for classes, prepare parole plans or statements for their parole suitability hearings, or write in a diary.[5]

- **Issue braille displays and braillewriters to blind and low-vision braille-proficient users and students**. For blind and low-vision SATF residents who prefer to—or who are learning to—write in braille, SATF must issue braille displays,[6] which are lightweight devices that produce braille while connected to another device, such as a laptop, for use <u>in their housing units</u>. The prison could also issue braillewriters, which allow the user to type and print brailled documents, to these residents.[7]

SATF should make printing from these devices available in a regularly accessible location, and should develop a robust plan to train blind and low-vision people on how to use the aforementioned technologies.

---

[5] We note further that, according to Defendants, in light of ongoing litigation against CDCR regarding the Viapath tablets, no new features are being added to the Viapath tablets at this time.

[6] For an overview of different types of braille displays, see Perkins School for the Blind, *An overview of Braille Devices* (last visited Apr. 25, 2023) https://www.perkins.org/resource/overview-braille-devices/.

[7] SATF provides braillewriters in its law libraries, but access to these devices is limited by the same factors affecting class members' access to ADA computers. Furthermore, braille-proficient users and students report that library staff are unfamiliar with how to use these devices, or lack the appropriate supplies. For example, ███████████, ██████, **DNH, DPV, DPM, CCCMS, ██,** reported that staff in the Facility D law library do not know how to load paper into the braillewriter and were unable to train him on the device, which he hopes to use to translate the curriculum for Getting Out By Going In (GOGI), a popular rehabilitative group, into braille and complete the requirements to become a GOGI coach. When Plaintiffs' counsel visited the law library, staff confirmed that they were not aware of how to use the device, and rely on a proficient clerk who was not at the library when Mr. ████████ asked to use the device. Library staff also reported that they initially did not have paper compatible with the braillewriter for Mr. ████████ to use (which must be thicker than standard printer paper), and that they still were unsure that they were using the correct supplies. They reported that they had been waiting on an order for the correct paper for several weeks; ordering that paper is the responsibility of the SATF ADA office.

Case 4:94-cv-02307-CW   Document 3525-4   Filed 11/14/23   Page 368 of 371

Writing Accommodations & Programming for Blind/Low-Vision Class Members at SATF
Tamiya Davis & Ed Swanson
June 14, 2023
Page 8

These are viable, reasonable solutions. CDCR has already demonstrated that it is capable of much broader technological endeavors—the Department reported in August 2022 that it is "rolling out about 30,000 secure laptops to incarcerated students attending face-to-face college programs,"[8] and the Department is providing Viapath tablets to the entire incarcerated population.[9] The scale of a writing accommodation program for blind and low-vision class members would be far smaller. Moreover, CDCR has announced that it is considering issuing tablet computers to DPV class members, though the extent to which the Department has explored providing accessible word processing software and equipment to class members on these devices is unclear. In other words, there is no technological or logistical barrier that prevents CDCR from remedying this longstanding ADA violation. SATF must ensure that blind and low-vision residents—like their sighted co-residents—can write independently at all hours of the day and night, including inside their housing units.

## II.      SATF does not offer accessible, on-site programs for blind and low-vision residents to learn braille and other critical life skills.

Despite housing the largest number of blind and severely low-vision class members in the state, SATF does not offer this population accessible, on-site programming to learn critical life skills. The prison fails both to provide programming specific to blind and low-vision residents, such as an on-site braille course or a skills training course, and general programming that is accessible to blind and low-vision residents.

First, SATF fails to provide on-site programming specific to the needs of blind and low-vision people. SATF does not offer braille education to this population, despite widespread, documented interest among the blind and low-vision population in learning braille. The Department's own survey of blind and low-vision class members revealed that over half of survey respondents expressed an interest in learning or becoming more proficient in braille. *See* CDCR Blind Braille Survey, Produced to Plaintiffs on May 25, 2021 (20 out of 38 DPV and DNV survey respondents stated that they would like to learn or become more proficient in braille). At SATF, blind and low-vision class members with whom we spoke during our recent monitoring tour are similarly interested in learning braille but expressed frustration that despite years of requesting on-site braille education from the ADA office, there is still no such programming at the prison.

To make matters worse, SATF has also prohibited residents from obtaining the necessary tools to learn braille via remote, correspondence courses. For example, ███████████████, ██████, **DNH, DPV, DPM,** ██, previously completed Braille Literacy I and II through the Hadley correspondence course at a different prison, and he was almost done with Braille Literacy III. He has submitted the paperwork to begin the course again since arriving. An ADA

---

[8] CDCR, *Secure laptops transform correctional education: CDCR to deploy 30,000 devices in coming years* (Aug. 18, 2022), https://www.cdcr.ca.gov/insidecdcr/2022/08/18/secure-laptops-transform-correctional-education/.

[9] CDCR, *Tablets and Telephone Calls* (April 2023), https://www.cdcr.ca.gov/family-resources/tablets/.

sergeant, however, reportedly told him that the slate and stylus needed to complete the course is not allowed because it could be used as a weapon, even though it is necessary to complete the coursework. When Plaintiffs' counsel spoke with the SATF ADA Coordinator, he reported that he had heard of security concerns related to the braille slate and stylus, but had not yet had an opportunity to see the device himself. Even if certain slates or styluses could reasonably be considered a security concern, SATF does not appear to have explored any alternative accommodation, such as a Perkins Braille writer.

SATF also fails to offer any life skills programming for blind and low-vision people. Such programs educate newly blind and low-vision people on techniques for independent daily living, such as medication and health management, time management, cleaning skills, clothing skills, and meal skills. Well established programs in the community provide these skills trainings to blind and low-vision. *See, e.g.*, Lighthouse for the Blind and Visually Impaired, Immersion Training: Changing Vision, Changing Life, https://lighthouse-sf.org/programs/skills/; World Services for the Blind, Techniques of Daily Living, https://www.wsblind.org/life-skills-programs. Without such blind and low-vision specific programming, as ███████████, ████████, **DPV, ██,** explained, "a lot of visually impaired people at SATF don't come out of their cells because there's no programs for us. Or we just sit on the yard while sighted people play basketball or handball." Mr. ████████ explained that apart from the lack of educational and skills programming, there is also no accessible recreational programming on the yard or in the dayroom for blind and low-vision class members at SATF.

Second, besides failing to offer blind and low-vision-specific programs, SATF also fails to accommodate the needs of the blind and low-vision population in general programming. For example, ██████████████, ████████, **DPV, ██,** is enrolled in the "Voc Computer & Related Technology" course, which teaches incarcerated students how to use a computer. Mr. ████████, who is blind, reported that upon enrollment in the course, he met with education staff and requested computer screen-reading software, such as JAWS, and a braille keyboard so that he could learn how to use the computer independently as a blind person. Neither of these accommodations were provided to him. Instead, he was forced to be dependent on an ADA clerk throughout the course, in plainly unequal fashion. For example, rather than using JAWS and a braille keyboard to practice—in a hands-on, independent manner—typing, customizing a desktop background, and drafting a resume, Mr. ████████ was segregated into a physically separate room where the ADA clerk would read him questions about computers out loud and he would say the answers out loud back to the clerk. Whereas all the other students learned how to navigate a computer, according to Mr. ████████, he was usually "not even turning the computer on and just doing bookwork about computers."

Similarly, Plaintiffs' counsel observed firsthand during evening programming how ████████, ████████, **DNH, DPV, LD,** does not have equal access to the F yard Narcotics Anonymous (NA) group. The full-page magnifier and LED magnifier provided to Mr. ████████ are not strong enough to accommodate his severe vision loss; Mr. ████████ struggled throughout the class to follow along with the group in the NA workbook by trying to use the aforementioned magnifiers. We appreciated that both the incarcerated group facilitator and an incarcerated group

Case 4:94-cv-02307-CW   Document 3525-4   Filed 11/14/23   Page 370 of 371

Writing Accommodations & Programming for Blind/Low-Vision Class Members at SATF
Tamiya Davis & Ed Swanson
June 14, 2023
Page 10

participant attempted to help Mr. ▇▇▇ follow along, but Mr. ▇▇▇ would like to participate in both reading and writing tasks in the group independently. He should be provided with a laptop with screen-reading software to review group materials at his own pace and to complete any written work product associated with the group.

SATF should take concrete steps to (1) establish blind and low-vision specific programming, such as on-site braille education, after surveying the blind and low-vision population regarding which types of programming would be most valuable, and (2) conduct an investigation into barriers to access in existing general programming at the prison.

***

SATF's failure to accommodate blind and low-vision class members stretches well beyond the issue of the functionality of library auxiliary aids. SATF does not permit its blind and severely low-vision residents to write independently in their housing units, despite permitting sighted people to do so. Nor does SATF offer its blind and low-vision population any on-site programs, such as braille education and life skills training, to allow this population to participate equally in CDCR programs, services, and activities.

These broader failures will not be resolved by the pending stipulation under negotiation between the parties. **SATF must take prompt, concrete action to allow blind and low-vision class members to write independently in their housing units, and must provide accessible, on-site programming to afford blind and low-vision class members equal access to programs, services, and activities. Please produce a copy of the plan to do so, and provide Plaintiffs' counsel with an opportunity to review a draft of the plan before it is final.**

We ask, too, that the Court Expert incorporate the observations above and Defendants' response in his "recommendations to the Court to remedy any continued violations of the ADA and ARP that he observes at SATF during the monitoring period." Doc 3467 at 2.

Sincerely,

Jacob J. Hutt
Staff Attorney
Prison Law Office

Encl:   Exhibit 1, March 2023 N/Z – Library Schedule
        Exhibit 2, Mackes v. Colorado Department of Corrections (CDOC) Settlement
cc:     Audrey Barron
        Alexander Powell, Chor Thao, Nick Meyer, Patricia Ferguson, OLAArmstrongCAT@cdcr.ca.gov
        (OLA)

[4288113.2]

Writing Accommodations & Programming for Blind/Low-Vision Class Members at SATF
Tamiya Davis & Ed Swanson
June 14, 2023
Page 11

Bruce Beland, Robert Gaultney, Saundra Alvarez, Tabitha Bradford (CCHCS Legal)
Lois Welch, Steven Faris (OACC)
Chantel Quint, Jillian Hernandez, Dawn Lorey, Laurie Hoogland (DAI)
Tammy Foss, John Dovey, Robin Hart, CCHCS Accountability, Jason Williams, Cathy Jefferson, Amy Padilla, Jason Anderson, Vimal Singh, Joseph Edwards, Lynda Robinson, Barb Pires, Courtney Andrade, Miguel Solis, Dawn Stevens, Alexandrea Tonis, Gently Armedo, Jimmy Ly, Jay Powell, Jay Leon Guerrero, Aaron Perez, Olga Dobrynina, Kandie Smith, Monique Matthis, Gloria Fernandez, Yvonne Anaya, Christina Sachao, Claudia Williams, Ngoc Vo (CCHCS)
Adriano Hrvatin, Sean Lodholz, Trace Maiorino, Andrea Moon, Mark Jackson (OAG)

[4288113.2]