DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. C94 2307 CW <br><br> **DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION** <br><br> Judge:   Hon. Claudia Wilken <br><br> Date: January 4, 2024 <br> Time: 2:30 PM <br> Crtrm: TBD |

[4341013.5]

Case No. C94 2307 CW

DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO
ENFORCE THE REVISED PERMANENT INJUNCTION

I, Michael Parker, declare:

1.    I have more than 20 years of experience working in the assistive technology field.  I am the Director of Access Ingenuity, which provides accessibility services and solutions for people with disabilities and organizations that serve them.  The assistive technology solutions we offer include low vision magnification systems for the visually impaired, braille displays, screen reading and screen magnification software, scan and read solutions, as well as voice recognition and learning disability software.  A true and correct copy of my *curriculum vitae* is attached hereto as **Exhibit A**.

2.    I have been retained by Plaintiffs' counsel to offer expert opinions regarding the assistive technology necessary for blind and low-vision incarcerated people to read and write independently, through the use of assistive technology to prepare for hearings before the Board of Parole Hearings.  I am informed that this is a highly consequential proceeding that requires years of preparation.  I am further informed that the BPH expects individuals to review lengthy materials as part of their preparation and to submit several written documents to the BPH.  It is best practice and most preferred for individuals to be able to prepare for the Board independently, especially if aspects of their past are sensitive and might endanger them if shared with others.

3.    I understand that CDCR evaluates its custodial population for vision disabilities according to the standards outlined in a Memo titled "Expansion of Vision-Impaired Patient Definition," ("Vision Disability Memo") issued on July 17, 2018.  A true and correct copy of this Memo is attached hereto as **Exhibit B**.  In the community, individuals who meet the criteria outlined in the Vision Disability Memo are considered either blind or low-vision.  For the purposes of reading and writing, the needs of this population vary from requiring moderate enlargement of text to requiring text in audio form.  The reading and writing needs of a given blind or low-vision individual can only be determined effectively by an individualized assessment of that person's needs.

4.    Attached hereto as **Exhibit C** is a true and correct copy of a report I previously submitted evaluating the reading and writing accommodations that the

DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

California Department of Corrections and Rehabilitation (CDCR) offers to blind and low-vision individuals for in-cell use, and evaluating CDCR's proposal to use tablet computers to meet the additional needs of this population. The report concludes that CDCR currently offers in-cell accommodations that are suitable for some low-vision class members to perform reading and writing tasks, but not for other low-vision individuals nor for totally blind individuals. The report also concludes that tablet computers are unlikely to enable many blind and low-vision class members to perform reading and writing tasks independently.

5.    Some individuals who are considered low-vision can read and write with moderate enlargement of text. In CDCR, these individuals typically would be assigned a "DNV" code. These individuals can be accommodated in reading tasks by receiving documents in large print, which is usually a font size of 18 points or larger in a sans serif font. These individuals can be accommodated in writing tasks by using bolded pens and lined paper with extra-wide rule and thick lines. Here is what this type of paper and pen looks like:



These items can be purchased for less than $6 each. I do not know if CDCR provides the special paper or pens that are needed but this should be easy to do.

6.    Simple magnification, such as a magnifying glass equipped with an LED light, which can enlarge images up to eight times their real-world size, may also be effective for these individuals to perform reading and writing tasks. It is my understanding

that CDCR already provides magnifiers suitable to meet the needs of this population.

7.    To accomplish reading and writing tasks, some individuals who are considered low-vision require magnification that can only be accomplished using a video magnifier or computer screen magnification software.  In CDCR, these individuals typically would be assigned a "DPV" code.  Video magnifiers appropriate for this population must have the following functions:  (i) variable magnification, allowing the user to adjust the magnification to a range of levels up to 60 times the original size of the image; (ii) color change (including variation of text color and background color); and (iii) contrast change.  The Optelec ClearView GO 17, shown here:



is one example of a device that is suitable for almost any low-vision user to perform paper-based reading and writing tasks.  This device is slightly larger than a large laptop computer, making it small enough for easy transport and in-cell use.  It is commonly used in educational settings, including both K-12 and post-secondary settings.  The Optelec ClearView GO 17 costs approximately $3,850 and can be obtained within 1-2 weeks of purchase.  It is my understanding that CDCR currently does not offer video magnifiers like the Optelec ClearView GO 17 for in-cell use.

8.    Low-vision individuals who require video magnification will require computer screen magnification software to perform typing (writing) tasks.  Screen magnification software appropriate for this population must have the following functions: (i) variable magnification, allowing the user to adjust the magnification to a range of levels up to 60 times the original size of the image; (ii) color change (including variation of text color and background color); (iii) contrast change; and (iv) the ability to enlarge all text

[4341013.5]

3

Case No. C94 2307 CW

DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

and images displayed on the computer monitor.  One computer magnification software, ZoomText Magnifier/Screen Reader is widely available commercially and can run on standard Windows laptop computers.  It is widely used in educational, workplace, and home settings.  The software license for ZoomText Magnifier/Screen Reader, which is the license I would recommend, costs $800.  It is my understanding that CDCR currently does not offer laptops equipped with screen magnification software like ZoomText Magnifier/ Screen Reader for in-cell use.

9.    For individuals who cannot see well enough to read or write at any font size, they can use a computer to read and write if it has screen reading software.  Screen reading software automatically recognizes and reads aloud what is displayed on a computer screen. It also reads aloud as the user types.  To be suitable for this population, screen reading software must have the following functions: (i) the ability to adjust speed of speech; (ii) the ability to detect and communicate typographical errors; (iii) the ability to convey the formatting of the document being composed; and (iv) the ability to toggle on and off formatting information with relative ease.  One example of such software is Job Access With Speech (JAWS).  JAWS and other screen-reading software are widely available commercially and can run on standard laptop computers.  This software is widely used in educational, workplace, and home settings.  A software license for JAWS costs $1475.

10.    Alternatively, CDCR may consider purchasing a single software program suitable for both low-vision and blind individuals.  One example of such software is - Fusion, which is a single product that combines the ZoomText Magnifier/Screen Reader described in paragraph 8 above, and the JAWS screen reading software described in paragraph 9 above.  A perpetual software license for Fusion costs $2080.

11.    For each software license listed above, CDCR may be able to obtain a license for a lower price than I have estimated, due to purchasing a large number of licenses at one time.

12.    Consideration should also be given for computer-users to print typed materials, both for personal review using a video magnifier and for submission to others

including their counsel and the Board of Parole Hearings.  Any standard printer should be suitable for this purpose.

13.     Some individuals who are considered low-vision or blind cannot see well enough to read or write, regardless of the size of the image.  These individuals require a scan-and-read device to perform paper-based reading tasks, or screen reading software to perform computer-based reading and writing tasks.  Scan-and-read devices automatically recognize printed text and read it aloud for the user.  To be suitable for this population, a scan-and-read device must have the following functions:  (i) the ability to adjust speed of speech; (ii) optical character recognition; (iii) audio output through a headphone jack; and (iv) features such as full tactile controls and a tactile document alignment guide, which ensure the device can be operated independently without sight.  Suitable scan-and-read devices, such as the LyriQ Assistive Reader, shown here:



are widely available.  The LyriQ is sufficiently compact for in-cell use and is compatible with standard headphones.  It costs approximately $1,960 and can be obtained within 1-2 weeks of purchase.  No devices exist that will allow this population to perform handwriting tasks, unless the person can write Braille.

14.     Some blind and low-vision individuals will not be able to read or write independently even with the tools I describe here.  Those individuals will need access to a trust worthy scribe who can review and revise dictated material.  Dictation could occur on a digital tape recorder.  This process is time consuming because the scribe will need to

DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

read the dictated material to the individual and then make necessary changes prior to submitting it to the individual's attorney or the Board of Parole Hearings.

15.    I have reviewed the declaration of Richard Subia, a true and correct copy of which is attached here to as **Exhibit D**. Mr. Subia describes a comprehensive method he used for analyzing potential security risks posed by a portable desktop magnifier called the Topaz Ultra. Mr. Subia concluded that "[t]here are no security concerns for use of this device in desktop mode[.] …" Mr. Subia further concluded that "there are no security concerns for use of this device in self view mode …." *Id.* at 13. The Optelec ClearView GO 17 that I recommend is identical to the Topaz Ultra. The Topaz Ultra is no longer available for purchase from the manufacturer.

16.    Mr. Subia also concluded that "with respect to the OmniReader … there is no legitimate security or safety concern with permitting blind and low-vision class members to possess these devices while they move around an institution." *Id.* at 16. The LyriQ that I recommend is very similar to the OmniReader and similarly should not pose a security risk.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at San Francisco, California this 28th day of September, 2023.

Michael Parker

DECLARATION OF MICHAEL PARKER IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO
ENFORCE THE REVISED PERMANENT INJUNCTION

# Exhibit A

# MICHAEL PARKER, M.S.

4751 Hoen Avenue, Santa Rosa, CA 95405    707-579-4380
michaelp@accessingenuity.com

## SUMMARY OF QUALIFICATIONS

Director of Access Ingenuity and Senior Accessibility Consultant with a background in engineering design and a thorough knowledge of assistive technology, mainstream technology, the needs of people with disabilities, accessibility evaluation techniques, research, and training.  My background includes a M.S. in Mechanical Engineering (with an emphasis in design) from Stanford University as well as extensive experience both in Web Accessibility testing and remediation, document accessibility testing and remediation (PDF, MS Office products, EPUB, etc.), advanced alternate image description creation for STEM content, as well as designing products for people with disabilities and performing systems integration and training on a wide-range of products to serve the needs of people with disabilities.

## WORK EXPERIENCE
### Senior Accessibility Consultant and Director

2002 - Current.  Access Ingenuity, Santa Rosa, California

- Director of Access Ingenuity
- Lead Access Ingenuity's Document Accessibility Services including:
  - Web Accessibility Testing and Remediation Services:  Collaboratively working with web development and design teams to ensure their websites and applications meet WCAG 2.0 Level AA and Section 508 requirements.
  - Document Remediation Services (PDF, MS Office, EPUB) and Alternate Text Production services:  Working with healthcare, educational institutions, and government agencies to ensure that the documents they produce are fully accessible to people with disabilities.
  - Conducted training seminars on web accessibility and document accessibility.
  - Conducted training seminars for employees, IT professionals, low vision specialists, and members of the community how to use access technology including screen readers (JAWS), screen magnifiers, optical character recognition software, speech recognition software, electronic Braille displays, and Braille embossers.
- Worked directly with people with disabilities as well as support organizations who need to meet the needs of people with disabilities, including: Kaiser Permanente, many California Colleges and Universities, Employment Centers, and Libraries.
- Conducted on-site assessments (involving task/needs analysis, heuristic evaluations, and data collections) and implement accommodations to enable employees with disabilities to be productive and competitive in their jobs.

### Director, Clarity Solutions

1995 - 2002.  Clarity Solutions, Santa Rosa, California

- Co-founded Clarity Solutions and worked as the Director from 1995 – 2002. Clarity Solutions designed, manufactured and marketed video magnifiers for people with visual impairments.  During the 7 years I was with Clarity Solutions, we built the company from the ground up – culminating in annual sales of $2M.  Roles included marketing and business management as well as product design.  My 50% interest in the company was sold in 2002.

### Manufacturing Development Engineer, Ergonomics Engineer

1990 - 1999.  Hewlett Packard Company, Microwave Instruments Division, Rohnert Park, California

- 1995 – 1999:  Led the Ergonomics Engineering Team to implement solutions to work place injuries as well as conduct comprehensive ergonomic assessments to proactively minimize workplace injuries.
- Worked with other manufacturing engineers and designers to develop "Design for Ergonomics" guidelines and review processes for all new products.
- 1990 – 1995:  Worked as a manufacturing development engineer to support the production of a variety of electronic test equipment and shipping processes.

### EDUCATION
### Stanford University, Stanford, California

1990 -1992. Master of Science, Mechanical Engineering (Design Emphasis)

### University of California at Davis, Davis, California

1985 – 1989. Bachelors of Science, Mechanical Engineering.  Graduated with Highest Honors

### PROFESSIONAL AFFILIATIONS

- IAAP (International Association of Accessibility Professionals): Certified Web Accessibility Specialist
- DHS Trusted Tester Certificate Number TT-2009-01297

# Exhibit B

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES**

# MEMORANDUM

| Date | : | JUL 1 7 2018 |
|---|---|---|

| To | : | CHIEF EXECUTIVE OFFICERS |
|---|---|---|
| | | CHIEF MEDICAL EXECUTIVES |

**From**  :

R. STEVEN THARRATT, M.D., M.P.V.M, F.A.C.P
Director
Health Care Operations
California Correctional Health Care Services

VINCENT S. CULLEN
Director
Corrections Services
California Correctional Health Care Services

**Subject**  :  **EXPANSION OF VISION-IMPAIRED PATIENT DEFINITION**

Effective July 23, 2018, the California Correctional Health Care Services (CCHCS) and Division of Adult Institutions is enhancing the Electronic Health Record System (EHRS) and the Strategic Offender Management System (SOMS) to address the needs of vision-impaired patients. CCHCS is making two changes to the currently existing definitions of vision-impaired patients in the Disability Placement Program (DPP).

1. DPV - The current DPV DPP definition will be enhanced via the following bolded language: The DPV code shall be applied to individuals who have a severe vision impairment which is NOT correctable to 20/200 with corrective lenses in at least one eye **and/or has a visual field of 20 degrees or less**. Criteria: Vision Impaired Vest is required while outside of cell/bed area.

2. DNV - CCHCS is reinstating the DNV DPP definition in totality as follows: The DNV code shall be applied to individual whose vision is between 20/70 and 20/200 AND is determined by the PCP to be substantially impaired in a major life activity. Criteria: Vision Impaired Vest is required while outside of cell/bed area. **Note: The issuance of Reading Glasses alone does not meet DNV criteria.**

Providers will note the following changes to the Dual 1845/7410 Powerform:

- Dual 1845/7410 Powerform - Under the Disability Type: Vision, a DPP code of DNV with definition and criteria has been added.

- Dual 1845/7410 Powerform - Under the Disability Type: Vision, the DPV code definition has been enhanced to include the **"and/or has a visual field of 20 degrees or less"**.

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

- 7410 Accommodation Section - No changes/additions to the 7410 with the DNV code.

Note: The New DNV code <u>does not</u> have any auto assigned Housing Restrictions/Accommodations associated with it.

Documentation of Effective Communication: While all patients, including those who are designated DNV, shall be provided accommodation and effective communication, the reinstatement of the DNV code does not carry with it a requirement to document that effective communication is achieved during medical or due process encounters.

If you have any questions or concerns regarding this memorandum, please contact Joseph (Jason) Williams, Deputy Director, Field Operations, Corrections Services at (916) 691-2109 or via email at Joseph.Williams@cdcr.ca.gov.

cc:     Richard Kirkland
        Diana Toche
        Roscoe Barrow
        Kathleen Allison
        Renee Kanan, M.D.
        Regional Healthcare Executives
        Bruce Beland
        Steven Blum
        Russa Boyd
        Kelly Mitchell
        Jane Robinson
        John Dovey
        Don Meier
        Joseph (Jason) Williams

# Exhibit C



<br>

# Review of Proposed Reading Accommodations for *Armstrong* Class Members With Severe Vision Disabilities

Prepared by:

Michael Parker, M.S.
Web Accessibility Specialist, DHS Trusted Tester
Director, Access Ingenuity
[michaelp@accessingenuity.com](mailto:michaelp@accessingenuity.com)

August 3, 2023

[4330240.14]

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members
With Severe Vision Disabilities

# TABLE OF CONTENTS

1. Executive Summary..................................................................................................2

2. Qualifications........................................................................................................3

3. Summary of Devices Currently Available for In Cell Use.....................................5

4. Summary and Analysis of Proposed Tablet Computers for DPV Class
Members as a Reading Accommodation.....................................................................9

   4.1 Tablet Computers for Magnification.................................................................9

   4.2 Tablet Computers for Scanning and Reading................................................17

5. Periodic Accommodations Reassessments............................................................21

6. Conclusion............................................................................................................22

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

# 1. Executive Summary

Current reading accommodations available for *Armstrong* class members with severe vision disabilities—class members' whose vision disabilities qualify them for the DPV designation—to use in their cells, including various non-electronic magnifiers such as sheet magnifiers and handheld or headband magnifiers, do not adequately accommodate this population. They are either marginally effective or not effective at all for individuals with severe visual disabilities. These devices can be effective accommodations for only certain types of reading tasks only for individuals with moderate visual disabilities (DNV).

CDCR has proposed offering tablet computers as a reading accommodation for class members with severe vision disabilities (DPV) both for video magnification and scan and read capabilities. The tablets under consideration include the Apple iPad Air 5, Samsung Tablet S8, and Microsoft Surface Go 3.

My professional opinion, which is based on my experience supporting and training visually impaired individuals in the use of tablet computers for both general access as well as for reading and writing, is that the proposed tablets cannot meet the print document reading needs of class members with severe vision disabilities. First, the tablets are inadequate replacements for dedicated video magnifiers to enable many low-vision class members to read visually. In comparison to both dedicated handheld and desktop video magnifiers, using the proposed tablet computers as video magnification devices would not effectively accommodate most low-vision class members because the tablets provide only a limited range of magnification, provide poor image quality at higher levels of magnification, lack image enhancement features that many people with low vision need to read visually, lack the ability to adjust the screen independent of the camera, and lack tactile controls. The tablets also have much smaller screens than are available on desktop video magnifiers, and the tablets lack adjustable reading tables, called XY reading tables, which many dedicated desktop video magnifiers have, that help track text and mitigate hand and arm fatigue so that users can read effectively for extended periods. The proposed tablets can be used for video magnification-based reading of relatively short amounts of text only by individuals who do not require significant levels of magnification, who have good manual dexterity, and who have sufficient technology experience and training to use these devices effectively.

Additionally, for several reasons, in comparison to dedicated scan and read devices, the tablets are inadequate print document reading accommodations for many blind and severely low-vision class members who need to use scan-and-read technology to read printed documents. First, many blind and severely low-vision class members will be unable to successfully photograph documents using the tablets because the tablets, unlike dedicated scan and read devices, lack tactile controls and mechanical aids to help users consistently and successfully take pictures of documents to be read aloud. Second, many class members will be unable to use the tablets to scan and read documents because the controls on tablets, unlike the controls on dedicated scan and read devices, are relatively complex, requiring that users learn to use the screen reading and/or screen magnification software on the tablet, learn the tablet's operating system well enough to launch the scan and read app, and learn the controls in the scan and read app.  Third, many blind and severely low-vision class members, especially those class members with additional upper body mobility disabilities, will be unable to use the tablets to scan and read documents because using the tablets' touchscreen controls can be difficult or impossible to use for people with hand or upper body mobility disabilities.

Use of tablet computers, including the three proposed tablet computers, as reading accommodations will not provide effective access to reading activities for the majority of the severely visually impaired (DPV) class members and will prolong their marginalized access to reading activities. My understanding from *Armstrong* Plaintiffs' Counsel is that the parties were negotiating a new accommodation system to provide DPV class members with access to dedicated handheld video magnifiers, desktop video magnifiers, and standalone scan and read devices inside their housing units. The placement of these dedicated blind and low-vision assistive devices, as opposed to general-use tablets, in the housing units is what is necessary to provide blind and severely low-vision class members with effective access to reading activities. Finally, as discussed in section 5 below, the reading and writing accommodations needs of blind and low-vision class members should be periodically assessed to ensure that class members continue to be properly accommodated as their circumstances change.

## 2. Qualifications

My professional experience and training over the past 27 years provide me with the expertise to testify in this matter as an expert witness. In 1995 I

founded Clarity Solutions LLC to manufacture and distribute video magnifiers for people with vision disabilities. During this time, I worked as the director and product development engineer. This required me to work closely with individuals with vision disabilities to understand their key needs for low vision devices and update our designs to reflect these needs. We learned that ease of use, tactile controls, image quality, and effectiveness of low vision devices at reading tasks are critical.

In 2002 I founded Access Ingenuity where I am currently the Director and Senior Accessibility Consultant. In this role, I have used my background in engineering design and a thorough knowledge of assistive technology, mainstream technology, the needs of people with disabilities, accessibility evaluation techniques, research, and training. I have led our team and provided assistive technology solutions and training throughout California. Most of the work has been provided for clients of the California Department of Rehabilitation. We have also collaborated extensively with many school districts, libraries, and employment centers in the state where the focus has been on developing both individual solutions for visually impaired clients as well as effective public access solutions. Our work has included one-on-one training of individuals with their assistive technology – from video magnifiers to screen reading and screen magnification software to working with libraries, hospitals, and other organizations to develop and implement effective public access accommodations. In addition, I have led teams to evaluate the accessibility of digital content and hardware for accessibility compliance with digital accessibility guidelines. I also conducted a site visit at Mule Creek State Prison in May 2022 and interviewed DPV class members on their experience using the assistive technology access solutions provided by CDCR.

My educational background includes an M.S. degree in Mechanical Engineering with an emphasis in design from Stanford University and a B.S. in Mechanical Engineering from the University of California at Davis. I am a certified Web Accessibility Specialist with the International Association of Accessibility Professionals (IAAP) as well as a certified Department of Homeland Security Trusted Tester for Accessibility. A summary of some of the work I have done in the most recent past includes:

- Accessibility Training Services:

    o Led our assistive technology training team of 5 AT Specialists and conducted both individual and group training seminars on general accessibility, web accessibility and document accessibility.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

- o Conducted training seminars for employees, IT professionals, low vision specialists, and members of the community on how to use access technology including screen readers (JAWS), screen magnifiers, optical character recognition software, speech recognition software, electronic Braille displays, and Braille embossers.

- o Collaborated with people with disabilities as well as support organizations who need to meet the needs of people with disabilities to develop effective public access accommodations in various settings, including: health care facilities throughout California, California Colleges and Universities, Employment Centers, and Libraries.

- o Conducted on-site assessments and implement accommodations to enable employees with disabilities to be productive and competitive in their jobs.

- o Worked with web development and design teams to ensure their websites, digital content, and mobile applications meet applicable digital accessibility requirements.

- • Worked with healthcare, educational institutions, and government agencies to ensure that the digital documents they produce are fully accessible to people with disabilities.

## 3. Summary of Devices Currently Available for In Cell Use

Current CDCR policy expects all vision impaired (DPV) incarcerated persons (IP) be offered either a handheld or headband magnifier as an accommodation for assistance with reading and writing. According to the policy, IPs may be in possession of only one handheld magnifier or one headband magnifier. There are also sheet magnifiers and credit card sized magnifiers available.

My review of the current reading and writing accommodations available for in cell use found that the devices were designed to help individuals with mild to moderate visual disabilities and that they were either not effective or only marginally effective for individuals with severe visual disabilities.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members
With Severe Vision Disabilities

Additionally, none of the devices were specifically designed for writing tasks.

Below is a list of each magnification device available, its typical use, as well as notes on the typical low vision individuals for whom it is effective.

**Handi-Lens HL-1P credit-card-sized magnifier:**  Credit card sized hand magnifier that offers approximately 2X magnification. It is designed to be used by individuals with mild visual disabilities (e.g., visual acuity 20/60) for spot reading (i.e., reading mail, notes, etc.). Due to its low magnification power this is not an effective aid for individuals with severe vision disabilities. Even for people with mild vision disabilities, it is not efficient for reading longer documents because the lens is so small that only a few words can be magnified at a time. It is also not an effective writing accommodation because users would need to use one hand to hold the magnifier and would have only one hand available to write, and in most cases, a person needs to use both hands to handwrite effectively.



Image description: Handi-Lens HL-1P credit-card-sized magnifier

**Full-paged sheet magnifier:**  8 ½ by 11-inch sheet magnifier that offers approximately 2X (or in some cases 3X) magnification. Due to its low magnification power this is not an effective reading and writing aid for individuals with severe vision disabilities. It is ineffective for reading longer print documents because users need to hunch over the surface on which the document and sheet magnifier are placed in order to read, which is uncomfortable and difficult to sustain for long periods of time. It is also not an effective writing accommodation for individuals with a vision disability, even a mild vision disability, because users would need to use one hand to hold the magnifier and would have only one hand available to write, and in most cases, a person needs to use both hands to handwrite effectively.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities



Image description: Full-page sheet magnifier

**Handheld LED Magnifier with 4 Inch Magnifying Glass:**  Offers 4x and 30x magnification options. The 4x magnification option is provided by the large 4.25-inch diameter lens on the magnifier with a 9.8" focal length[1] and the 30x magnification option is provided by the 1" lens and has a 1" focal length. It can be used by individuals with moderate visual impairments (DNV) and rarely severe visual impairments (DPV) for spot reading short amounts of text (i.e., reading mail, notes, etc.). Reading longer documents with it is not practical. At the higher level of magnification (30x), since there is only 1" between the object (i.e., paper) and the lens, there is no room to use a pen and write. At lower levels of magnification, limited writing tasks can be completed but users will need to hold the device in one hand while writing with the other hand which makes writing with this device extremely difficult.



Image description: Handheld LED Magnifier with 4 Inch Magnifying Glass:

---

[1] Focal length is the distance between the lens of the magnifying glass and the object in focus. Larger focal lengths allow room for writing or other manual tasks. Very short focal lengths can only support viewing an object.

**Magnifier Glasses with LED Light:** Jewelers loupe headband style magnifier designed for working on small assembly tasks and hobbies. It offers 8x, 15x, and 23x magnification options with a focal length of less than 1 inch. The magnifier glasses can be used by individuals with moderate visual impairments (DNV) and in some cases severe visual impairments due to conditions like retinitis pigmentosa where the individual has good central vision but limited peripheral vision. In these cases, the glasses can be used for spot reading short amounts of text (i.e., reading mail, notes, etc.). Since the image is centralized in these glasses, they are not effective for individuals with only peripheral vision due to conditions such as macular degeneration or diabetic retinopathy. Additionally, when using this magnifier, items must be so close to be in focus that this magnifier is not effective for reading longer documents or handwriting.



Image description: Magnifier Glasses with LED Light

# 4. Summary and Analysis of Proposed Tablet Computers for DPV Class Members as a Reading Accommodation

CDCR has proposed offering tablet computers as a reading accommodation for class members with severe vision disabilities both for magnification and scan and read capabilities. The tablets under consideration include the Apple iPad Air 5, Samsung Tablet S8, and Microsoft Surface Go 3. This proposal would replace CDCR's previous proposal to provide dedicated video magnifiers and dedicated scan and read devices to the DPV population and would instead rely on the tablet computers' cameras for magnification and on specialized scan and read applications for read-aloud function.

I have seen and operated all three of the tablets that CDCR is considering using to accommodate blind and low-vision *Armstrong* class members. My analysis below is based on my direct observations and testing of these tablets and my review of publicly available information about the technical specifications and capabilities of these tablets.

### 4.1 Tablet Computers for Magnification

The proposed tablet computers cannot provide the video magnification necessary for people who are severely low vision to read effectively. Compared against dedicated video magnifiers, tablet computers offer limited magnification capabilities that can be helpful only to some individuals with mild to moderate vision loss. I have outlined below the reasons that the proposed tablets cannot provide effective access to print document reading for severely low-vision class members.

1.  **The proposed tablet computers provide only a limited range of magnification.**

The proposed tablet computers offer a magnification range of between approximately 0.5X to 10X, depending on the device. This means that the many people with low vision who need magnification greater than 10x would be unable to read using the proposed tablets. In contrast, dedicated video magnifiers offer a much larger range of magnification. For example, the Amigo HD 7", the handheld video magnifier that CDCR previously considered making available to DPV class members, offers a magnification range of approximately 1.4X to 25X. This larger magnification range is essential to provide effective access to reading for individuals with a wide range of vision disabilities.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

### 2.  Tablet computers provide low-quality magnification as the user zooms in.

Tablet computers are primarily designed for general-purpose use rather than being optimized for low vision users. As a result, tablet computer camera images quickly blur when tablets are moved across text while reading, forcing users to significantly slow down their reading speed so as to minimize image blurring. Thus, by preventing low-vision users from reading at their natural and preferred reading speed, this image blurring problem impairs many low-vision individuals from using the tablet to read print documents effectively. Furthermore, on tablets, images pixelate when using higher levels of magnification. This pixelation occurs because the cameras use digital zoom for higher magnification levels and do not use optical compensation techniques such as "Dynamic Contrast" on the Amigo HD to enhance the contrast of similar colors and provide sharper, clearer, and more defined images. Image pixelation on tablets prevents low-vision users who need higher levels of magnification, even within the range of magnification that the tablet can provide, from using the tablet to read print documents effectively.

In contrast, the cameras on handheld video magnifiers like the Amigo HD 7" are designed to provide high-quality magnification without sacrificing image clarity or resolution – especially for text. They also include enhanced modes that sharpen the text being displayed. This is true when both reading static text or when moving the handheld video magnifier over text such as when reading a document. This greater image clarity enables low-vision individuals with a wide range of vision disabilities to read effectively using dedicated portable video magnifiers.

### 3.  Tablet computers, unlike handheld video magnifiers, do not offer hands-free positions to allow users to read and handwrite without holding the tablet.

The proposed tablets do not have built-in stands that angle the tablet camera downward appropriately to be used for viewing items on the reading surface.  To use a tablet computer for reading printed documents, users either need to hold the tablet with one hand and move the paper underneath it with the other or use a separate tablet stand[2] that raises the tablet approximately 12 inches above the desk. There are also stands such as the

---

[2] There are a wide variety of document stands available for tablets such as the Dewey the Document Camera Stand.

"ScanJig" that hold the tablet in a fixed location angled at the user with the paper behind the camera that the user can move from left to right allowing users to read at a comfortable viewing angle. Although the Surface Go 3 has a "kickstand" that props up the tablet on flat surface such as a table, when the kickstand is used, the Surface Go 3's camera displays the surface below at an oblique angle that does not allow a user to read a document on the surface effectively.

Using a tablet for reading and writing tasks without a stand designed for low-vision magnification is impractical. Without such a stand, users will need to position themselves at an awkward and physically uncomfortable angle to use the tablet as a video magnifier to read printed documents. This awkward positioning makes the tablets ineffective reading accommodations to read for extended periods, even for low-vision individuals who can read printed documents visually using the tablets' relatively limited magnification capabilities. Furthermore, absent such a stand, reading printed documents for extended periods with a tablet is impractical because individuals will experience hand and arm fatigue from holding the tablet over the documents in addition to needing to bend forward to view the tablet's screen.

Even using a tablet with one of the commercially available tablet stands does not provide effective access to reading and handwriting. First, stands do not and cannot resolve the tablets' image quality or magnification limitation problems discussed above. With respect to handwriting, when a user attempts to write, the autofocus feature on the tablets causes the tablet to focus on the user's hand rather than the surface on which the user is writing and, as a result, the text becomes blurry. A stand cannot fix this problem. In addition to the aforementioned problems, a user cannot effectively handwrite using a tablet with the ScanJig because the design of the ScanJig forces the user to extend his or her arm in an awkward manner that can cause hand and arm fatigue. Also, the physical act of writing using the ScanJig can cause the stand and the tablet to vibrate and/or bounce in a manner that impairs the quality of the handwriting that one can create. Furthermore, because they are not built in, all tablet stands can be lost or stolen.

In contrast, handheld video magnifiers such as the Amigo HD 7" offer hands free modes. They also angle the display towards the individual while maintaining the camera's focus downward on the document and include an ability to turn off the camera's autofocus feature so that a user can write under the device while the paper stays in focus and the pen does not

become the object in focus. In addition, because dedicated video magnifiers have built in stands, the stands cannot be lost or stolen as can happen with a tablet stand.



Image Description: A user of the Amigo HD writes with one hand, while the Amigo sits on its internal stand angled toward the user's hand.

4. **Tablet computers have complicated touchscreen controls that make learning to use them time consuming and operating them difficult for many low-vision individuals.**

To use magnification on any tablet computer, including the proposed tablet computers, the user must learn how to use the screen reader and/or screen magnifier on the tablet and must understand the tablet's operating system in order to operate the tablet well enough to launch and operate the video magnification application. In my experience, training low-individuals to learn to use tablets well enough so that they can operate video magnification apps on tablets would require extensive one-on-one training and would take much longer than training these individuals to effectively use a dedicated portable video magnifier. Unfortunately, many low-vision incarcerated individuals who have limited exposure to modern computer technology may be unable to learn to proficiently operate a tablet well enough to use it as a dedicated video magnifier. The tablets also lack tactile controls and instead use a system of gestures and taps. In addition to the problems discussed above, low-vision individuals with limited hand or arm dexterity and/or limited sensitivity in their hands – such as individuals with diabetic retinopathy who often also have peripheral neuropathy impacting their hands and arms – cannot effectively use tablets as video magnifiers because they cannot effectively use the virtual controls on tablets.

The controls on dedicated video magnifiers are much easier to use. Dedicated handheld video magnifiers have large tactile buttons and intuitive controls, making it easy for all low-vision users to navigate and adjust settings. In addition, in general, low-vision individuals with hand and arm

mobility impairments can more effectively use the tactile controls on dedicated portable video magnifiers because operating these tactile controls requires less fine motor control and sensitivity than is required to operate tablets' virtual controls.

5. **Tablets lack video image enhancement features that many low-vision individuals need to read visually.**

Image enhancement features, which can change the contrast, brightness, and color of a screen displaying written text, are critical for low-vision users who may have a reduced ability to see and distinguish between different colors and between light and dark areas. Color inversion, for instance, switches the foreground and background colors of text to enhance the contrast for individuals with vision disabilities. For example, black text on a white background can be inverted to white text on a black background.

While some tablet apps may provide a limited number of selectable colors, and tablets allow users to adjust brightness, the level of customization and fine-tuning of image enhancement features available on dedicated handheld video magnifiers is much more extensive. For example, the Amigo HD 7" has 31 selectable view modes vs. 6 that are available in the See It magnification app on the iPad Air 5. The Magnifying Glass app on the Samsung S8 only has the ability to invert the color and control the brightness and contrast and the Surface Go 3 does not allow for any color inversion and only brightness control. Dedicated handheld video magnifiers which offer adjustable color inversion, customizable text and background colors, and the ability to adjust the LCD brightness enable a wider swath of people with low-vision to read effectively.

6. **Tablet computers lack other reading-assistive features that can be extremely helpful to low-vision individuals, which dedicated video magnifiers have.**

Besides video magnifiers' superior ability to enhance the image for low-vision users, as discussed above, video magnifiers also contain features that make the process of reading more accessible for low-vision users. For example, some dedicated video magnifiers include line markers and masking features, as depicted in the image below, to improve visual tracking of words while reading as well as live image panning which allows users to pan through a live image without moving the product and better track the text being read. Tablet computers lack these features that are designed to accommodate low-vision users.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities



Image description: Video magnifier displays masking feature to focus low-vision reader on specific lines of text

### 7. Tablet computers lack critical features needed for longer reading and handwriting tasks, which desktop video magnifiers have.

Tablet computers are also inadequate to accommodate severely low-vision individuals with performing longer document reading and handwriting tasks. In contrast, as discussed below, desktop video magnifiers are highly effective at accommodating low-vision individuals with a wide variety of visual disabilities at longer reading and handwriting tasks.

### A. For many low-vision individuals, tablet computers do not offer large enough screens or sufficiently high magnification for longer reading tasks.

Large screens and higher levels of magnification are necessary for individuals with low vision who require significant magnification to read text or view images and for low-vision individuals with eccentric viewing[3] needs, which involves looking slightly away from the subject in order to view it peripherally. Eccentric viewing is particularly common in people with vision loss due to macular degeneration and diabetic retinopathy, two of the leading causes of age-related vision loss. As a result, many low-vision

---

[3] Jon Howe, *Eccentric Viewing Training and Its Effect on the Reading Rates of Individuals with Absolute Central Scotomas: A Meta-Analysis*, M.A. JOURNAL OF VISUAL IMPAIRMENT & BLINDNESS, Volume 6, Issue 9 (Jan. 2019) https://journals.sagepub.com/doi/10.1177/0145482X1210600904.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

individuals are unable to read print documents visually on tablets because they will be unable to see the text on the tablet well enough.

Desktop video magnifiers offer larger screens and higher levels of magnification, which enables individuals with a larger range of vision disabilities to read longer print documents visually. Desktop video magnifiers feature larger screens (typically 24") compared with tablets (10" – 11"). Desktop video magnifiers also feature much larger magnification ranges than tablets. Desktop video magnifiers feature magnification ranges of approximately 2X to 80X while tablets' feature magnification ranges from approximately 0.5X to 10X. The larger display size on desktop video magnifiers allows for more content to be visible at once, reducing the need for frequent scrolling or panning which often leads to fatigue.[4]  The larger display size also allows users to use higher levels of magnification effectively.

### B. Tablets do not offer flexible positioning of the screen independent of the camera or movable document trays.

Because the tablet's camera is mounted on the back of its screen, the user cannot adjust the position of the tablet's screen without changing the view. Further, absent a stand, the user must hold the tablet up, which prevents the user from using one of their hands to write or manipulate the document being read and causes the user to experience hand and arm fatigue. Tablets also do not include moveable document trays (called XY tables on desktop video magnifiers) for tracking lines or columns of text while reading. Even if a low-vision user sees well enough to read print documents visually using the tablets' limited video magnification capabilities, the absence of the XY table and flexible monitor positioning make it more difficult for low-vision individuals to use these tablets to read or handwrite at all, much less for extended periods.

In contrast, dedicated desktop video magnifiers have both adjustable positioning and movable trays to facilitate reading documents for long durations. Desktop video magnifiers are designed with adjustable stands and arms, allowing users to position the monitor at a comfortable viewing distance and angle without impacting the position of the video camera.

---

[4] When viewing 18-point Calibri font on a 24" Desktop Video Magnifier at 8X zoom, approximately 27 characters or 7 words at a time can be displayed vs. on a tablet at 8X zoom only approximately 8 characters or 2 words can be displayed.

This adjustability allows desktop video magnifiers to accommodate the needs of people with a variety of visual disabilities.

Some desktop video magnifiers also offer XY reading tables designed to allow visually impaired individuals to more easily read text that is magnified on the screen. The XY reading tables move smoothly in a straight line from left to right as well as and forward and backward and can also lock into place along one or both axes. XY tables provide access to reading in several ways. By allowing the user to move from left to right without moving forward or backward, they help individuals read straight across each line of text and efficiently move from one line of text to the next. Similarly, by allowing the user to move forward and backward without moving from left to right, XY tables allow users to read columns in tables efficiently. XY tables also minimize the hand and arm fatigue that users would experience if they needed to hold and repeatedly move a book or document back and forth under the video magnifier's camera.



Image Description: Photograph of the Merlin 24" CCTV showing that the monitor is fully adjustable up or down and right to left on the monitor swing arm. The XY reading table is also shown in both the closed and extended positions.

Accordingly, tablet computers are significantly inferior to handheld video magnifiers that are designed for low-vision users for their reading and handwriting tasks.

## 4.2 Tablet Computers for Scanning and Reading

The three tablet computers under evaluation by CDCR will be ineffective for scanning and reading documents aloud for most of the DPV population. While these tablet computers can be used for reading physical (paper) documents with the installation of third-party scan and read applications such as the VoiceDream Scanner on the iPad, Legere Scanner on the Samsung S8, and OpenBook or Kurzweil 1000 on the Surface Go 3, they will only be effective for technologically sophisticated blind users with good manual dexterity, and even then dedicated scan and read devices still provide more efficient access to scanning and reading. As a result, the CDCR proposal to use tablet computers to replace CDCR's previous proposal to provide dedicated scan and read devices will be ineffective for most DPV class members. The key issues with the use of tablet computers as compared to dedicated scan and read devices include:

1. **Tablet computers, unlike dedicated scan and read devices, do not have tactile controls.**

Regardless of which scan and read app is used, tablet controls are much more complex than the controls on dedicated scan and read devices. Scan and read devices can be used with the press of a single button and offer tactile controls with speech feedback for all controls on the devices.

Tablet computers, in contrast, do not offer tactile controls unless connected to an external keyboard. Instead, they rely on touch controls with speech feedback via the device's screen reader. As a result, to use any scan and read app on a tablet, the user must not only understand how to use the scan and read app but must also learn how to use the screen reading software on the tablet. Although this can be navigated by more technologically sophisticated blind and low-vision users who also have good manual dexterity, aging blind and low-vision users often do not have good manual dexterity. Indeed, diabetic retinopathy, one of the leading causes of age-related vision loss, has been shown to have a strong correlation to peripheral neuropathy, a condition negatively affecting individuals' upper extremities.[5]

---

[5] Rehna Rasheed et al., *Relationship Between Diabetic Retinopathy and Diabetic Peripheral Neuropathy - Neurodegenerative and Microvascular changes*, INDIAN JOURNAL OF OPHTHALMOLOGY, Volume 69, Issue 11 (Nov. 2021) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8725091/.

Using a tablet with an external physical keyboard does not solve all of these problems and introduces other challenges.  First, pairing and reconnecting Bluetooth keyboards with tablets requires additional training and computer literacy and can be especially challenging for many blind and low-vision users because many Bluetooth keyboards do not provide a non-visual method of confirming that the keyboard is powered on and connected. Second, controlling a tablet with an external keyboard is generally more complex than controlling the tablet using the touchscreen in that the user must know more keystrokes than touch screen gestures in order to perform the same tasks.  Third, many external physical keyboards designed to be used with tablets have small, tightly packed keys that are still difficult for many people with upper mobility disabilities to use.  Fourth, because external physical keyboards are not built into the tablets, they can be lost or stolen.

Finally, many external physical keyboards are battery powered, so if blind and low-vision class members are issued external keyboards, both class members and CDCR would need to ensure that the keyboards' batteries are promptly replaced when they die.  This can be particularly challenging for blind and low-vision people because many Bluetooth keyboards do not provide a non-visual low-battery notification or non-visual method of determining the battery level.  As a result, many blind and low-vision users will not know that the battery in their keyboard needs to be replaced until after the battery dies and the keyboard becomes unusable.

2. **Tablet computers do not offer mechanical document alignment guides, unlike dedicated scan and read devices.**

Many blind individuals will be unable to effectively use tablets to scan and read documents due to the absence of mechanical document alignment guides, regardless of which scan and read app is used. Aligning documents and setting the height of the camera above the document to be scanned is one of the most challenging tasks when scanning documents with a tablet computer. Some tablet-based scan and read applications have an "edge detection" feature that can be used to help in this process. However, the alignment process still requires trial and error to get consistently accurate scans. Dedicated scan and read devices address these issues by keeping the camera at a fixed height and providing mechanical guides to help align documents. As a result, a much wider range of individuals with severe vision disabilities are able to use these devices effectively.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

3. **Most tablet computers with scan and read applications offer limited visual tailoring and word highlighting capabilities, unlike dedicated scan and read devices.**

In addition to blind individuals, many low-vision individuals use scan and read devices because these individuals find reading visually extremely slow and difficult without audible assistance, yet they still benefit from seeing the material they are reading. These individuals rely on having the text magnified and highlighted as the text is read back to them aloud. Dedicated scan and read devices with screens scan the document and then read it back aloud while also applying the user's preferred visual settings and word highlighting options, for example yellow text on a blue background with inverse highlighting. This allows for a multimodal[6] approach to reading which has been found to reinforce a user's understanding of the material that is being read. Multimodal instruction involves having the learner engage simultaneously with the material using two or more of their sensory "modalities," for example seeing and hearing the material or for Braille users, feeling and hearing the material.[7]

By contrast, scan and read apps such as the VoiceDream Scanner on iOS and the Legere Scanner on Android offer only limited visual tailoring capabilities. It is possible that the developers of these scan and read apps could modify them in the future to add greater text enhancement capabilities or that other scan and read apps with greater image enhancement capabilities are available or will become available. However, even if a tablet scan and read app with more robust text image enhancement features is or becomes available, the proposed tablets would remain ineffective scan and read accommodations because they lack mechanical document alignment guides and tactile controls.

---

[6] New London Group, *A Pedagogy of Multiliteracies: Designing Social Futures*, HARVARD EDUCATIONAL REVIEW, Volume 66, Issue 1 (1996), https://doi.org/10.17763/haer.66.1.17370n67v22j160u.

[7] For blind and low-vision individuals who need to read in braille, the appropriate accommodation is either (1) a dedicated scan and read device that supports Braille output and a refreshable electronic braille display, or (2) a laptop computer equipped with a screen reading software and/or screen magnification software, scan and read software, a compatible scanner or document camera, and a refreshable electronic braille display.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members
With Severe Vision Disabilities

The Surface Go 3 is the exception as this is a Windows based computer and there are a number of scan and read applications designed for the visually impaired available on this tablet computer. The top two are the OpenBook and Kurzweil 1000. However, both programs require a dedicated scanning camera such as the PEARL or a flatbed scanner. Once configured, both OpenBook and Kurzweil 1000 offer similar capabilities to dedicated scan and read systems. Still, as discussed above, it would be vastly more difficult for a blind or severely low-vision incarcerated person to learn how to use the Surface Go in combination with these software programs compared to learning how to use a standalone scan and read device that is designed for users with vision disabilities.

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members With Severe Vision Disabilities

## 5. Periodic Accommodations Reassessments

The reading and writing accommodations needs of blind and low-vision class members need to be periodically reassessed.   Blind and low-vision individuals' remaining vision often changes over time, the reading and writing tasks that blind and low-vision individuals need to complete may change over time, and blind and low-vision individuals should be assessed with new auxiliary aids that become available in the future to determine whether the new auxiliary aids better accommodate these individuals. Other entities, including the California Department of Rehabilitation, conduct accommodations reassessments under similar circumstances. The California Department of Rehabilitation reassesses the accommodations needs of blind and low-vision consumers when there is an educational or job-based goal change or significant change in their vision. As discussed below, there is good reason to reassess the accommodations needs of blind and low vision individuals when circumstances change.

First, many vision disabilities such as diabetic retinopathy, retinitis pigmentosa, and macular degeneration are degenerative, meaning that the patient's eyesight declines over time.  As such, the auxiliary aids and accommodations needed to effectively read and write will also change over time. For example, someone with diabetic retinopathy may initially be able to read documents visually using a handheld and desktop video magnifier but, due to declining eyesight, will eventually need to use scan and read technology to read documents.

The reading and writing tasks that an individual needs to perform may also change over time, which could change the auxiliary aids and accommodations that the individual needs for reading and writing. For example, a low-vision individual may initially only need to complete short spot reading tasks such as reviewing ducats and labels on packages and bottles, so the individual may request to be accommodated with standard font-sized documents and a portable video magnifier. However, this individual's reading and writing tasks may change due to enrollment in education, a pending Parole Board hearing, or a new legal case. Given the new longer reading tasks, the individual may need different reading and handwriting accommodations, such as access to a desktop video magnifier and provision of documents in large print.

Finally, blind and low-vision individuals should receive the opportunity to test relevant new auxiliary aids and accommodations as they become available to determine whether the new auxiliary aid or accommodation better accommodates their reading and writing needs. For example, if a new

faster, more accurate, and clearer sounding scan and read device becomes available, individuals with vision disabilities who read using standalone scan and read devices should receive an opportunity to test the new device to determine whether it better enables them to read, even if they are already being accommodated with an older standalone scan and read device.

## 6. Conclusion

The current reading accommodations available for *Armstrong* class members in cell use are at best mostly ineffective and typically *entirely* ineffective for class members with severe vision disabilities. They are designed for, and only effective for, individuals with mild to moderate vision disabilities.

CDCR's current proposal to provide tablet computers to the DPV population as reading accommodations will be ineffective for the vast majority of this population. First, using the proposed tablet computers as video magnifiers is an ineffective accommodation to read printed documents for individuals with severe low vision. This is because these devices provide only limited magnification, provide low-quality images at higher magnification levels, lack image enhancement features that some low-vision individuals need to read, and lack XY reading tables, which help low-vision people efficiently align the text for magnified viewing and mitigate hand and arm fatigue to allow reading for extended periods.  Using tablets as video magnifiers can only be effective for people with mild to moderate vision loss. Additionally, the complexity of tablets and their lack of tactile controls will also prevent some low-vision individuals with only mild or moderate vision loss from being able to effectively use the tablets to read printed documents.

Second, using the proposed tablets to scan and read documents also will not provide effective access to print documents for many blind and severely low-vision class members. Many blind and severely low-vision class members will be unable to learn to use tablets to scan and read documents due to the complexity of tablet controls. Many blind and severely low-vision class members will be unable to use tablets to scan and read documents due to difficulty taking photos of the documents to be read. Due to secondary mobility disabilities, many blind and severely low-vision class members will be unable to use tablets' touchscreen controls to operate scan and read apps on tablets.

A small portion of DPV class members—those DPV class members with the highest visual acuity permitted within the DPV designation who are also skilled with using touchscreen technology—may benefit from using these

Access Ingenuity – Review of Proposed Reading Accommodations for Armstrong Class Members
With Severe Vision Disabilities

tablet computers as a reading accommodation. However, tablet computers will not be an effective one-size-fits-all solution for accommodating most DPV class members' print document reading needs. By contrast, a solution that relies on dedicated handheld and desktop video magnifiers and dedicated scan and read devices will reasonably accommodate blind DPV class members for reading and low-vision class members for both reading and handwriting. Finally, the reading and writing accommodations needs of blind and low-vision class members should be periodically assessed to ensure that class members continue to be properly accommodated as their circumstances change.

# Exhibit D

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF RICHARD SUBIA** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

**DECLARATION OF RICHARD SUBIA**

I, Richard Subia, declare:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. I am over 18 years of age, and I am competent to testify in any court of law.

3. On April 5, 2022, Plaintiffs' counsel in *Armstrong v. Newsom* retained me to evaluate potential safety or security concerns with blind and low-vision people using electronic auxiliary aids in a prison setting.

4. I reserve the right to modify or supplement the facts and opinions expressed herein as well as the basis for the same.

**Experience and Qualifications**

5. The following is a brief review of my experience and qualifications. Additional details regarding my qualifications are described in my Curriculum Vitae, a copy of which is attached hereto as Exhibit A.

6. My experience and training over the past 36 years provide me with the expertise to testify in this matter as an expert witness. Since 1986, I have been assigned to work in four different California prisons and by the end of my career I was responsible for administering the housing, programs, and operation of over 162,000 incarcerated people in all 33 California adult prisons state-wide, as well as all out of state contract facilities housing over 9,500 California offenders in private prisons. In addition, I was responsible for the management of over 20,000 employees. My knowledge and experience include all policy and procedure areas for institution programs, new prison activations, and headquarters operations. In various administrative, managerial, and supervisory capacities, I held responsibility for making policy development, implementation, and modification decisions including but not limited to rule violations and discipline, appeals, investigations, access to health care services, safety, security, escape, access to religious services, gang management, program/housing placements, and classification. I was also responsible for making and managing decisions involving employees including, but not limited to training,

1

performance, investigations, discipline, labor negotiations and evaluating uses of force.  In these capacities, moreover, I have been responsible for managing and covering every aspect of incarcerated person programming.  Specifically, I have had over ten years of experience heading Classification Committees where the behavior, propensity for violence, central file review, and risk of incarcerated persons were reviewed to determine appropriate housing and program placement.  In most cases, this assessment was made on incarcerated people who had violated specific Departmental Rules and Regulations leading to their placement in segregated housing.  In addition, I oversaw programs regarding the employment and development of peace officer and non-peace officer employees.

7.    For over 11 years I was assigned to supervisory and management positions at a prison responsible for the housing of gang drop-outs.  For approximately one year, I held the position of Warden at the same prison with the responsibility of the management and program of over 3400 incarcerated people.  Many of these incarcerated people were housed on Sensitive Needs Yards (SNY).

8.    I have been deemed an expert in both prison gangs and criminal street gangs, Corrections Policies and Procedures, Risk Assessment both in-custody and community based, Use of Force, and Critical Incident Review in both State and Federal Court requiring detailed expert testimony on the above-mentioned areas of expertise.

9.    I have also been closely involved in conducting compliance assessments at county jails, including in California, including assessments to ensure compliance with applicable regulations relating to the operation of jail facilities. Based on my extensive experience in all these positions I am intimately familiar with the applicable standards of care for jails and prisons.

10.    More specifically as it relates to issues present in this case, I have been intimately involved in working with and supervising incarcerated people with disabilities, directly responsible for ensuring compliance with  the Americans with Disabilities Act ("ADA") and the Constitution are adhered to in the treatment of incarcerated people in California correctional facilities.

11. I have previously participated as a joint party's expert and Plaintiff's expert in cases requiring a detailed review of ADA compliance related to mobility issues in correctional facilities and the providing of auxiliary aids to blind or low vision incarcerated people.[1]

12. I am being compensated for my time spent consulting with Plaintiffs' counsel, completing an expert report or declaration, and testifying at a rate of $200.00 per hour. I am being compensated for my time spent conducting on-site inspections of CDCR institutions at a rate of $1500.00 per day. I am also reimbursed for my expenses incurred in relation to the services I provide. No part of my compensation is contingent upon the results of my analysis, the outcome of this case, or any issue in it.

**Methodology**

13. I base my opinions in this declaration on my experience and qualifications described above; my research into the technical features of four specific auxiliary aids identified by Plaintiffs' counsel's assistive technology expert, Michael Parker (Topaz Ultra, Amigo HD, Ruby 10, and omniReader, hereinafter "the four devices"); and my on-site evaluation of electronic auxiliary aids at California Medical Facility ("CMF") and California State Prison – Solano ("SOL") in Vacaville, California on August 16, 2022.

14. *Technical research.* My research into the technical features of the four devices included reviewing the User Manuals of each device,[2] reviewing the technical

---

[1] *Langford v. Schweitzer*, CV93-46-H-DXM-JCL (Montana), *Brown v. Maryland Department of Corrections*, Case No. RDB-16-945 (Maryland).

[2] These User Manuals of the four devices are available online at the following links as of September 22, 2022:

- Topaz Ultra: https://www.freedomscientific.com/wp-content/uploads/2020/06/TOPAZ-Ultra-Users-Guide.pdf

- Ruby 10: https://www.freedomscientific.com/wp-content/uploads/2021/12/RUBY_10_-and_RUBY_10_Speech_Advanced_Features_and_Functions-2.pdf

- Amigo HD: https://www.enhancedvision.com/downloads/product/amigo-hd/amigo-

3

specifications of these devices as listed on the manufacturers' webpages, and reviewing tutorials online showing general utilization of each item.

15.    My research also included review of information about these devices that Vispero, the manufacturer of these devices, communicated to Plaintiffs' counsel via a letter attached hereto as Exhibit B.  Based on this information, it is my opinion that the four designated items can be successfully, and safely, utilized within a correctional facility.

16.    As part of my research for this particular case, as well as previous litigation, I have communicated directly with the Maryland Department of Corrections, the Colorado Department of Corrections, and the Sacramento County Sheriff's Department and discussed security issues relative to the utilization of similar items within their respective facilities.

17.    *On-site Evaluation.* I visited CMF and SOL for the purpose of evaluating potential security concerns with using electronic auxiliary aids in a variety of prison settings. In general, my methodology for evaluating potential security and safety issues at the aforementioned locations was to operate the devices in an attempt to magnify and capture images of sensitive visual information, just as a hypothetical incarcerated person could attempt to do. This included, but was not limited to, standing inside cells and looking through exterior-facing cell windows attempting to capture images of license plates on cars in the parking lot; standing inside cells and looking through front, cell-door windows attempting to capture images of the inside of control officers' booths; standing inside cells and looking through front, cell-door windows attempting to capture images of numbers on officers' keypads; sitting in the dayroom or standing inside a cell attempting to capture

---

hd-user-manual-english.pdf

- omniReader: https://support.freedomscientific.com/content/Documents/Manuals/omniReader/omniReader_UserGuide.pdf

I have also downloaded each user manual and retained a copy in my personal files.

4

images of people using the toilet or shower; sitting at yard tables attempting to capture images of the inside of observation towers; and standing outside officers' stations attempting to capture images of the stations' interior through the stations' windows.[3]

18. I selected CMF and SOL for my site evaluation due to their unique physical layouts and security classification levels. CMF is a lower-security prison that has housing units within sight of the staff parking lot. SOL is a higher-security prison that has 270-design housing units, which give staff the ability to monitor incarcerated people more closely than in CMF's long-tier or dorm housing units. Both prisons provide similar lay-outs and structural design to the majority of prisons utilized by the CDCR.

19. My on-site evaluation of the use of electronic auxiliary aids in a prison setting took place at CMF and SOL on August 16, 2022, from approximately 8:30 AM to 3:00 PM. Plaintiffs' counsel brought the Topaz Ultra, Ruby 10, and omniReader to my site visit; CDCR provided an Amigo HD for me to evaluate. Throughout my evaluation, I was accompanied by Plaintiffs' counsel, Defendants' counsel, the ADA Coordinators for each prison, Investigative Services Unit staff, Correctional Counselors in the prisons' ADA offices, CDCR Class Action Management Unit staff, and other captains, lieutenants, sergeants, and correctional officers who worked at each prison. At both CMF and SOL, I began my evaluation by attending a meeting with CDCR staff, in which I introduced myself and provided a background on my qualifications, had Plaintiffs' counsel demonstrate to the CDCR meeting attendees how the four devices worked, and answered questions from these meeting attendees about how the devices worked.

20. At these roundtable meetings, I also asked institution staff to identify potential security concerns. In response, staff raised concerns of incarcerated people (i) making inappropriate use of the magnification features of these devices, such as viewing

---

[3] In my attempts to evaluate whether the devices could zoom in through cell-door windows and capture images of people using the toilet or shower, I had Plaintiffs' counsel and various CDCR staff volunteers—not incarcerated people—stand in relevant locations to model where an incarcerated person could be standing or sitting. I then pointed the device toward this model to determine what the device would depict on its screen.

license plate numbers from cells or other rooms facing parking lots; (ii) capturing and storing photographs of staff or other incarcerated people (in particular, unclothed incarcerated people using the shower) on these devices and then masturbating while looking at a stored image; (iii) using the devices to connect to the Internet without authorization and transmitting information to—or receiving information from—third parties; and (iv) transferring the devices to unauthorized locations if incarcerated people were permitted to carry the devices on their person. Finally, a general, underlying concern among staff was that fully sighted incarcerated people could steal or otherwise obtain the electronic auxiliary aids from blind and low-vision class members, and misuse them in the ways described above. I had identified these same potential concerns from my own research and planned to evaluate them.

21. At both CMF and SOL, I proceeded from these roundtable meetings with CDCR staff to evaluate the four devices in (a) areas at each prison that institutional staff had identified in the roundtable meeting as areas where an incarcerated person's use of an electronic auxiliary could pose security and safety issues and (b) areas at each prison that I identified based on my professional experience working at each of these prisons as a Sergeant and Lieutenant, operating as the supervisor of the Investigative Services Unit, the unit specifically designated to identify critical security issues within the prison. With this information, I was able to specifically evaluate areas which I knew were in close physical proximity to sensitive locations in the prisons, such as gun towers, officer control booths, and staff parking lots.

22. At CMF, I evaluated the four devices at the parking lot-facing, fenced window at the end of the hallway of the third tier of U wing, a Level III celled housing unit; the parking lot-facing, fenced window inside third-tier cell U-330, the front and back windows inside third-tier cell U-325; the shower-facing front window inside third-tier cell U-302; various locations in the U-wing dayroom; the officer station at Y dorm, a Level III dorm housing unit; the shower and toilet area of Y dorm; bed areas in Y dorm; the West Sally Port facing Tower 7; and the program area in O wing.

6

23.     At SOL, I evaluated the four devices at various locations in the dayroom of Facility A, Building 6 ("B-6"), a 270-design, Level III, celled housing unit; the front and back windows inside upper-tier cells 221 and 227 in B-6; the hallway of the upper tier of B-6; the inside and outside of the correctional officers' office in B-6; various locations in the dayroom of Facility C, Building 13 ("B-13"), a 270-design, Level II, dorm housing unit; the hallway of the upper tier of B-13; the officer podium of B-13; the shower and toilet area of B-13; the Facility A yard facing the Observation Tower; and the vehicle sallyport adjacent to PIA Industries Education Side and Tower 9.

24.     My observations regarding security and safety issues for each of the devices that I evaluated are as follows.

**omniReader**

25.     The omniReader is a scanner/reader that reads printed text underneath its lens out loud by the user pressing a single button. It is designed to assist blind users with reading tasks of any length. Users can follow the magnified text in high-contrast colors on the built-in screen, or simply listen as the text is read out loud. The omniReader can convert recognized text into Braille if a compatible Braille display, such as the Focus 40 Blue Braille Display, is connected. A headset jack is provided to listen to content privately.

26.     The omniReader does not pose any meaningful security or safety issues in a prison setting. With respect to potential security concerns about image magnification and capture, the device cannot be used to significantly magnify or capture raw images. The omniReader snaps an image of a document underneath it; immediately and automatically converts that image into a text-only file, if the device recognizes any text on the document; and reads any recognized text out loud. It cannot store a raw image itself, only text that appears on an image.

27.     Apart from image capture, the omniReader has a low-power electronic magnifier to zoom in on a document, but this magnifying feature cannot be used to display an image of someone or something standing more than a few feet away from the user. According to Vispero, the manufacturer of this device, the magnification power of the

7

omniReader is approximately 6x. *See* Exhibit B at 1. I operated the omniReader in an attempt to magnify and capture images of people and objects during my tour at CMF and was never able to do so successfully—the displayed image on the omniReader's screen was always too blurry.

28.    Similarly, with respect to its ability to transmit information, the omniReader is not a security concern. The device cannot receive or transmit raw images or video. It can receive and transmit only text-only files, as well as a brief "audio tag" file name that a user can use to label the names of these text-only files. These text-only files can be transmitted either via USB or through WiFi, neither of which an incarcerated person will have access to.

29.    If an incarcerated person did manage to utilize a USB or WiFi connection in conjunction with the omniReader, they would be subject to discipline. In my experience, the disciplinary process is an effective means to stop ongoing misconduct and to deter future misconduct from occurring.

30.    CDCR utilizes a progressive discipline system when taking action based on the behavior of incarcerated persons who violate CDCR Rules and Regulations.  This system is broken down in the following fashion as stated in the California Code of Regulations, Title 15:

Disciplinary Methods

Verbal Counseling.  Staff may respond to minor misconduct by verbal counseling.

Custodial Counseling Chrono.  When similar minor misconduct recurs after verbal counseling or if documentation of minor misconduct is needed, a description of the misconduct and counseling provided shall be documented on a CDC Form 128-A, Custodial Counseling Chrono.

Rules Violation Report.  When misconduct is believed to be a violation of law or is

8

not minor in nature, it shall be reported on a CDC Form 115 (Rev. 7/88), Rules Violation Report.

Each CDC Form 115 shall be classified by designated staff not below the level required to conduct serious disciplinary hearings.  Reports shall be classified as administrative or serious.

31.     Periodic custodial monitoring of class members' usage of the omniReaders could be another means of ensuring that the devices have not fallen into the wrong hands and are not being used for improper reasons.  This monitoring can be completed randomly or during random and/or scheduled cell searches.

32.     Finally, with respect to its physical design, the omniReader is not a safety or security concern.  It is made of hard plastic, similar to that of the NLS Talking Book Players that incarcerated people are permitted to use in CDCR custody.  The omniReader has no sharp edges that could be easily used as a weapon.  Additionally, the CDCR currently allows similar items such as televisions, music players, typewriters, and musical instruments to be maintained by prisoners within their respective cells.

**Amigo HD**

33.     The Amigo HD is a handheld video magnifier with a 7-inch viewing area used by individuals with moderate visual impairments to severe blindness for spot reading (i.e., reading short mail, notes, etc.). It offers 1.4x to 25x magnification, as well as 28 selectable color modes (i.e. yellow on blue, white on black, etc.). It can be used for short writing tasks but requires the user to use the built-in writing stand or hold the device while writing.

34.     The Amigo HD does not pose any meaningful security or safety issues in a prison setting.  With respect to potential security concerns about image magnification and capture, the Amigo offers a tablet-sized, 7-inch viewing area and 1.4x to 25x magnification options.  Even when used at maximum magnification, it cannot be used to enlarge and clearly display on its screen images of objects more than a few feet away.  I repeatedly

attempted to utilize maximum magnification on the Amigo HD while at CMF and SOL to zoom in on license plates in staff parking lots, keys on officers' waistbands (even when standing less than three feet from me), people standing in the toilet and shower area, and other sensitive things, and was never able to do so successfully.  Although the Amigo HD's magnification feature can magnify documents placed in front of it very well, it cannot be used like a pair of binoculars.  The image that appears on the Amigo HD's small viewing screen is simply too blurry to recognize what the user is looking at.

35.    With respect to its ability to transmit information, according to its User Manual and according to Vispero, the manufacturer, the Amigo HD does not have WiFi, so this is not a security or safety concern. *See* Exhibit B at 2. Per Vispero, the Amigo HD does have the USB port feature which is utilized for charging purposes. The presence or absence of a USB port, however, is not a considerable security or safety concern. Both the disciplinary process and periodic monitoring of these devices, as discussed at length in paragraphs 29-31, would be an adequate safeguard of ensuring that the devices are not used for improper reasons.

36.    According to Vispero, the newest model of the Amigo—the Amigo 8—has Bluetooth but can be used only to connect to an audio headset, not to transfer information on to or off of the device. *See* Exhibit B at 2.

37.    During my CMF and SOL tour, staff raised concerns that even if the Amigo HD cannot be used to capture faraway images, a sighted incarcerated person could steal the device from a low-vision *Armstrong* class member, walk up to a shower area, and capture an image of an undressed incarcerated person. Similarly, staff mentioned that incarcerated people could use the Amigo HD to capture an image of a custody officer and then masturbate while looking at this image.

38.    These hypothetical scenarios do not represent meaningful safety or security concerns in a prison setting, and should not stand in the way of issuing these devices to *Armstrong* class members. First, because the Amigo HD cannot be used to zoom in on a person standing more than a few feet away and successfully capture a clear image of them,

10

as discussed above, the only way of capturing such a clear image with the Amigo HD would be at very close range. It would be extremely difficult to perform this action discreetly. Observation of this action—by either another incarcerated person or staff— could be promptly reported and addressed through disciplinary channels. Second, there are existing CDCR policies and procedures in place that disallow and impose discipline for possession of a USB device, and such a device is necessary to transmit an image off the Amigo HD. Third, even if an incarcerated person managed to capture a close-range image on the Amigo HD of an officer or another incarcerated person and subsequently masturbate while viewing that image, a highly unlikely scenario, CDCR can deter and prevent such conduct through disciplinary policies. Furthermore, periodic monitoring of class members' uses of these devices would enable custody staff to ensure that there were no inappropriate images stored on the devices.

39. With respect to its physical design, the Amigo HD is not a security or security concern. It is made of hard plastic and has no sharp edges that could be easily used as a weapon.

40. Ultimately, the Amigo HD is safer and more secure than many devices that people in CDCR custody are currently permitted to use, such as baseball bats, lawn equipment such as shovels and picks, and various sharp objects as part of a work assignment. There are no safety and security concerns related to the Amigo HD that would warrant disallowing class members from using this device in cells or dorms, in the dayroom, during medical and mental health encounters, in program areas, at work, or on the yard.

### Ruby 10

41. The Ruby 10 is a handheld video magnifier with a 10-inch viewing area used by individuals with severe visual impairments for reading and writing. It offers 2x to 24x magnification, a wide array of selectable color modes, and—unlike the Amigo HD—a swing-out arm that both enables low-vision users to handwrite on documents that are

11

placed next to the device and under the swing-out lens and enables full-page Optical Character Recognition ("OCR"), meaning that it can read text out loud to a user.

42. The Ruby 10 does not pose any meaningful security or safety issues in a prison setting. From a safety and security perspective, it is nearly identical to the Amigo HD, discussed above. As with my operation of the Amigo HD, when I repeatedly attempted at CMF and SOL to zoom in on any object more than a few feet away from me, the resulting image on the small screen was too blurry to recognize. The only relevant difference between the Ruby 10 and the Amigo HD from a safety and security perspective is that the Ruby 10 has slightly weaker maximum magnification (24x) than the Amigo HD (25x).

43. All other differences between the Ruby 10 and the Amigo HD are irrelevant from a safety and security perspective. For example, one of the most significant functional differences is that the Ruby 10 has the ability to recognize text and read it out loud to the user, which makes it far superior to the Amigo HD for users with severe visual impairments. For another example, the Ruby 10 has a ten-inch viewing screen, enabling a low-vision user to read more text on the screen at one time than with the Amigo HD, which has a seven-inch screen. Neither of these differences relates to the Ruby 10's safety or security. The Ruby 10 is superior to the Amigo HD for both blind and low-vision users in terms of functionality, while remaining as safe and secure as the Amigo HD.

44. The Ruby 10 has a "Bluetooth" feature that is not a safety or security concern. According to Vispero, the manufacturer of this device, this feature can be used only to connect the Ruby 10 to headphones or a speaker; it cannot be used, for example, to transfer image files from the Ruby 10 to an external device or as an Internet hotspot. *See* Exhibit B at 1.

45. The Ruby 10 also has a "Miracast" feature that is not a safety or security concern. Miracast is a technology that allows users to stream multimedia content between two devices that both have this technology on it, without using WiFi. The Miracast feature enables the Ruby 10 to stream audio and visual content to another, Miracast-supported

12

device in close proximity to the Ruby 10. An incarcerated user of the Ruby 10 would not be physically close enough to a third party positioned outside a prison to use Miracast to stream content to that third party. According to Vispero, Miracast will generally not work more than one floor away from an external device. *See* Exhibit B at 2.

**Topaz Ultra**

46.    The Topaz Ultra is a portable, indoor use only, desktop magnifier that is designed for low-vision users to complete reading tasks of any length, including lengthy documents or books. It comes in models of various viewing screen sizes; the model I evaluated had a 17.3-inch viewing screen, which allows the user to see a significant amount of text on the screen at a given time. The Topaz Ultra has three modes: desktop mode, self-view mode, and distance-view mode. In desktop mode, the camera lens is fixed downward and faces a black panel, upon which the user can place a document and zoom in up to 70x. In self-view mode, the camera lens faces the user and acts like a close-range mirror. In distance-view mode, the camera lens swings in front of the user, the user pulls a cap off the camera lens to enable distance-viewing, and the user is able to read information at a distance, such as a chalkboard in a classroom. The Topaz Ultra offers numerous color and contrast modes, as well as optional, superimposed horizontal and vertical lines that can appear on the screen to help the user keep track of where they are while reading a block of text.

47.    There are no security concerns for use of this device in desktop mode, because in this mode the camera lens is fixed downward and faces a black panel. Similarly, there are no security concerns for use of this device in self-view mode because, per the User Manual and per my own physical evaluation of the device, magnification range is minimized in this mode. *See* Topaz Ultra Manual at 13.

48.    If distance-viewing mode is enabled, the Topaz Ultra could pose a security or safety concern. Specifically, if used unsupervised in locations with a direct line of sight to sensitive locations, such as CDCR staff parking lots, the interior of custody control booths, and the interior of staff bathrooms or incarcerated persons' showers, it could

13

capture images of these sensitive locations. (It cannot save or transmit these images, though, as discussed below.) I successfully utilized the Topaz Ultra to zoom in on objects approximately 200 feet away from me during my tour at CMF and SOL. This concern with the Topaz Ultra's distance-viewer, however, is limited to usage in locations with a direct line of sight to sensitive information. In multiple scenarios during my tour of CMF and SOL, I attempted unsuccessfully to capture both close and faraway images on the Topaz Ultra due to height differences between where I stood (or sat) with the Topaz Ultra and where the sensitive information was located. For example, when sitting on a bench at ground level in the Facility A yard of SOL, although I was able to utilize the Topaz Ultra's distance-viewer to zoom in on the windows of the observation tower, which is approximately 100 feet off the ground, I could not see the interior of the tower because I had to point the device's lens at an upward angle.

49.    Similarly, in SOL Facility A, Building 6, I attempted to use the Topaz Ultra from the lower tier to zoom in on the control panel of the custody officers' upper-tier station, which is approximately 50 feet higher than the lower tier where I stood. This control panel displays green lights next to wallet-size images of incarcerated people whose cells are open. Because of the height difference between where I stood and where this sensitive information was located, the image of the control panel on the Topaz Ultra's display screen was skewed and blurry. I was thus unable to use the Topaz Ultra to zoom in on the control panel and see whose cells were open.

50.    More generally, the Topaz Ultra would not pose a security or safety concern if CDCR made it available with the distance viewer permanently disabled. According to Vispero, the manufacturer of this device, the distance viewer can be permanently disabled by permanently attaching the close-up lens onto the camera so that it cannot be removed, thus rendering distance-viewer unworkable. Exhibit B at 1. According to Vispero: "[W]e plan to disable distance view." *Id.*

51.    The Topaz Ultra does not have the ability to receive or transmit information. It can only freeze an image, which is stored on the device until it is turned off. Users of the

14

Topaz Ultra cannot send these frozen images to an external device. The Topaz Ultra does not have the ability to connect to WiFi or Bluetooth. This inability of the Topaz Ultra to receive or send information increases its security and safety for use in a prison setting.

52. With respect to its physical design, the Topaz Ultra is not a security or safety concern. It is made of hard plastic and has no sharp edges that could be easily used as a weapon.

53. Because the Topaz Ultra's distance viewer can be permanently disabled, I recommend that blind and low-vision people be permitted to use this device indoors with the distance-viewer permanently disabled throughout the prison setting, including in their housing units and—space permitting—in their cells. *See* Exhibit B at 1.

54. If the distance viewer is enabled, I recommend that unsupervised use of this device be restricted to locations in which incarcerated people are not within line of sight of sensitive locations. Just as CDCR currently does with designating locations for where their electronic auxiliary aids can be used, CDCR institutions could designate specific locations in the prison—including within housing units—where the Topaz Ultra could be used. A blanket rule prohibiting the use of the Topaz Ultra or a similar device inside cells or dayrooms would not be supported by legitimate safety and security concerns. At both CMF and SOL, I stood inside of several cells in which, due to the cells' locations and the viewing angles of their windows, incarcerated people would not be able to use the Topaz Ultra for inappropriate purposes. CDCR could also permit incarcerated people to use these devices in housing unit dayrooms under supervision. And again, these concerns can be effectively mitigated by permanently disabled the distance-viewing function on the Topaz Ultra.

### Options for Secure Expansion of Auxiliary Aid Access

55. With respect to these four devices and to electronic auxiliary aids more generally, CDCR has at least three options for safely and securely making such devices available to blind and low-vision *Armstrong* class members.

15

56.     First, CDCR could permanently issue electronic auxiliary aids to class members as Durable Medical Equipment ("DME") based on the class members' specific disabilities and allow class members to move freely around the prison with these aids. Just as custody staff routinely inspect class members' possessions at designated locations around the prison (e.g. work change), they would be able to verify easily that a class member's possession of an electronic auxiliary aid was approved by consulting that class member's property list. In addition, housing unit staff would be able to periodically monitor whether class members who had been issued specific electronic auxiliary aids were still in possession of these aids, whether the aids were in good working order, etc. With respect to the omniReader, the Ruby 10, and the Amigo HD, there is no legitimate security or safety concern with permitting blind and low-vision class members to possess these devices while they move around an institution. The Topaz Ultra is the only device on which—if distance-viewing mode is enabled—certain locational restrictions should be placed regarding where a class member is authorized to use it.

57.     During my tour of CMF and SOL, staff expressed concern that if handheld devices could be carried around prisons freely by incarcerated persons, then an incarcerated person in one location could capture an image on a device and then physically transfer possession of this device—and the image on the device—to another incarcerated person on the yard who may live in a different unit. But custody staff would have the ability to periodically monitor whether class members had possession of their issued devices, as discussed in paragraph 31. And if class members were found to have inappropriately relinquished possession of their devices—or if other incarcerated people had inappropriately taken these devices from blind and low-vision class members—this conduct would be subject to discipline, as discussed in paragraphs 29-30.

58.     Second, CDCR could permanently make a sufficient number of electronic auxiliary aids available for check-out at various locations around CDCR institutions. Housing units, program areas, medical units, mental health units, and work stations, for example, could all maintain a stock of various electronic auxiliary aids in a secure location.

16

The quantity and type of auxiliary aid would be calibrated to the typical blind and low-vision population at the unit or prison. Staff at these locations would be able to periodically monitor whether class members who had checked out the electronic auxiliary aids were still in possession of these aids, whether the aids were in good working order, etc.

59.    Third, CDCR could implement a combination of the first and second options. For instance, certain devices could be issued permanently as DME to blind and low-vision class members, and other devices could be maintained permanently at fixed locations at designated locations around the prison.

60.    Any denial by CDCR of a reasonable disability accommodation based on purported safety or security concerns must be supported by a detailed evaluation of specific threats. *See* Armstrong Remedial Plan §§ II.H.1, IV.F.2-3, IV.I.22. In developing these threat evaluations, prison officials are required to, at a minimum, conduct comprehensive on-site evaluations of specific devices and their potentially threatening uses in a given setting; consult with manufacturers and/or supplies of the relevant devices; determine whether any specific threats can be mitigated by modifying or disabling the threatening feature of the devices; research the technical specifications of the devices; and evaluate whether other correctional entities make the same or similar devices available to incarcerated people with disabilities. I performed each of these inquiries as part of my comprehensive evaluation, and determined that all four of the devices described above can be used safely and securely within a prison environment, including within housing units and, in most cases, within cells.

61.    It is noted by this expert that while CDCR security officials first noted specific security concerns regarding the use of the Amigo within the secure perimeter of a facility, they have since agreed that this item can successfully be implemented with minimal security protocols.

62.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at

New Braunfels, Texas, on this 22 day of September, 2022.

/s/
Richard Subia