DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | Date: January 4, 2024<br>Time: 2:30 p.m.<br>Crtrm.: TBD |
| | Judge:   Hon. Claudia Wilken |

[4304335.10]

Case No. C94 2307 CW

I, Keith Wattley, declare:

1.     I have worked as an attorney representing people in prison or on parole since 1999.  I am the Founder and Executive Director of UnCommon Law, a non-profit organization whose primary mission is to assist individuals in navigating California's discretionary parole process, through direct representation in parole proceedings, written consultations for those seeking parole, and litigation to reduce the unfairness of the parole process.  I founded UnCommon Law in 2006.  I have appeared in hundreds of parole proceedings before the Board of Parole Hearings (BPH) representing incarcerated people seeking parole.  I have also testified numerous times before the Legislature.

2.     A significant part of my work also includes supervising and training attorneys, law students and advocates on how to provide representation at parole suitability hearings.  In addition to my work leading UnCommon Law, I teach a course titled "California Prisons and Discretionary Parole" at the University of California, Berkeley School of Law, where I have also supervised the Post-Conviction Advocacy Project, a student-initiated legal services project whose primary purpose is to train law students to prepare their clients for parole board hearings and represent them at these hearings.  Five of our current staff attorneys at UnCommon Law are former law students I trained.  Since 2011, UnCommon Law has conducted "Lifer School," an annual workshop designed to educate lawyers, students and advocates about California's parole process and how to successfully navigate the parole hearing process in order to be released.

3.     I have participated in and supervised the development of written materials designed to educate those appearing before the Board and their loved ones.  These materials include an Overview of California's Parole Consideration Process and How to Prepare for It; how-to guides for necessary parole materials such as a parole plan, a letter of support, a relapse prevention plan, a letter of remorse and a closing statement; how-to guides for preparing for and challenging a Comprehensive Risk Assessment; and many other topics.  A complete list of these materials is available online at our resources page at

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE
THE REVISED PERMANENT INJUNCTION

https://www.uncommonlaw.org/resources. A printout of our resources page has been attached as **Exhibit A**

4. On March 27, 2023, I testified before the California Senate Subcommittee #5 on Public Safety. I was invited to testify in response to a January 2023 report by the Legislative Analyst's Office titled "Promoting Equity in the Parole Hearing Process." Following my oral testimony, I submitted a letter that provided statistical and other information highlighting the low grant rate overall and how inequities in access to counsel affect these outcomes. A true and correct copy of my post-hearing submission is attached as **Exhibit B.**

5. As part of my testimony, I described the inequitable results that occur based on the type of attorney that represents the parole candidate. Candidates who are represented by private counsel at parole suitability hearings are more than twice as likely to be granted parole as candidates who are represented by state-appointed attorneys. In my letter, I explained that this appears to be due to the fact that state-appointed attorneys do not receive sufficient training or compensation to adequately represent candidates at parole suitability hearings. Nor do they spend enough time working with and assisting their clients in preparation for their hearings.

6. During my career I have worked with hundreds of clients who were preparing for parole suitability hearings, including a number of individuals who have disabilities that make it difficult or impossible for them to draft or access written documents. Through this work, I have become familiar with both the steps an attorney must take to provide adequate representation and the steps that a person in prison must take to adequately prepare themselves for these hearings. I have also become familiar with the various documents involved in parole preparation. I have represented a number of individuals with disabilities in their parole hearings, including individuals with mental health, developmental, learning, vision, mobility and hearing disabilities. I have also represented a number of people with language barriers and who cannot read and write in English because it is a second language.

[4304335.10]

2

Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

**Preparation For Parole Proceedings**

7. In my experience working with parole candidates and supervising others who do this work, preparation for parole proceedings is time-consuming and document-intensive. Parole candidates must review lengthy official documents and records to ensure they are accurate and prepare to answer questions about them, study certain documents to develop their testimony, draft a number of documents that require significant introspection and written self-advocacy skills, and obtain and compile letters of support from a variety of sources. Each of these documents plays a role in demonstrating how the candidate has developed "insight" into their crime, which over the past fifteen years has become the single most important factor BPH commissioners rely on when determining whether to grant parole. These documents also cover parole plans, community support, family ties, and self-awareness in general. These written materials, including relapse prevention plans, letters of remorse and parole plans, are critical in obtaining a successful outcome from the parole board. Preparing them requires reading and writing ability, or else significant assistance from others. In my opinion, candidates who do not or cannot engage meaningfully in the process of reviewing and preparing documents for their parole hearings have a much lower likelihood of being granted parole than candidates who do.

8. One of the most important components of the parole process is the Comprehensive Risk Assessment ("CRA"). The CRA is a psychological evaluation, prepared by the State's Forensic Assessment Division (FAD) psychologist, which purports to assess the risk of future violence by the candidate. The State-employed clinician reviews the candidate's institutional file, mental health records and criminal history, and any documents the candidate submits, and interviews the candidate regarding the same topics typically covered during a parole hearing: the candidate's life prior to their commitment offense, the details of their commitment offense, their conduct in prison, and their plans for release. This interview usually occurs up to 4 to 6 months before the candidate's parole suitability hearing, unless a CRA has already been completed within the past three years. Following the interview, the clinician drafts a report summarizing their

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

findings, rating the candidate's risk for future violence as Low, Low Moderate, Moderate, Moderate High, or High.  The CRA is supposed to be served on the candidate approximately 60 days prior to their hearing; however, at times the document is served much closer to the hearing date.  Once candidates receive their CRA, they have the opportunity to object to any factual errors in the document.  These objections are due 30 days before the hearing and are resolved by the FAD in conjunction with the Board's Chief Counsel.  If a CRA is served too close in time to the hearing date to allow advance processing of any objections, the hearing panel may consider and resolve objections to the CRA at the hearing; they may also postpone the scheduled hearing for six months or so in order to resolve issues with the CRA.

9.      In my experience, the Commissioners rely heavily on the CRA during hearings while determining a candidate's suitability for release, making preparation for the CRA as important as preparation for the hearing itself.  My office has a policy of only representing clients if we have at least eight months to work with them prior to their scheduled parole hearings in order to allow sufficient time for them to prepare for the CRA interview with our assistance.  We sometimes engage with clients for years prior to their CRA interviews, but we generally try to meet with clients at least twice and work with them in drafting or revising their written materials prior to the CRA interview; this helps them respond to the clinician's questions.  I advise my clients to draft as many of their materials as possible, compile relevant letters of support, and review relevant documents to the extent possible **prior** to their CRA interview.  These materials will help them present themselves in their best light to the reviewing clinician, and give them the best chance of obtaining a low-risk rating.

10.     After they receive the CRA prior to their hearing, I advise my clients to review the CRA closely and note any factual errors to which we should object.  After that, we review the CRA together and discuss any apparent errors and how to respond.  I advise my clients to take particular note of the clinician's analysis of their risk factors and to study this portion of the document, so they come to their hearing prepared to address any

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

concerns the clinician noted.  For candidates who have been denied parole in a hearing with me, or in a past hearing, I also advise them to study the CRA closely so they can understand the areas they need to focus on to prepare for subsequent hearings.

11.    Over the course of my career, and in connection with the work outlined above, I have reviewed hundreds of CRAs.  These CRAs routinely discuss highly sensitive aspects of my clients' lives, including recounting any abuse or trauma they suffered as a child, including sexual abuse, and how those experiences may have impacted the clients and contributed to the crimes for which they are incarcerated.  The CRAs also routinely include a discussion of any abusive or criminal conduct my clients have committed in the past, including accounts of domestic violence and sexual assault, even when this conduct is unrelated to their commitment offense.

12.    Another crucial document that I advise my clients to study in preparation for their hearing is the transcript of their past parole hearings, if they have had any.  Parole hearings follow a structured format and BPH commissioners ask about similar topics at each hearing.  Because of that, it is very important for my clients to review the transcript of their prior hearing to get a better sense of what questions the Board will ask, why their answers at their previous hearing were inadequate, and how to improve their responses in the future.  Just as important as their responses to the Board's questions are the types of programmatic or behavioral changes that are most responsive to the Board's concerns from previous hearings.  Parole candidates need to be familiar with their hearing transcript so they can identify and make these programmatic and behavioral changes.  I also routinely review portions of the transcripts with my clients during our meetings.  When we discuss the document, it is very helpful if my client has reviewed the transcript ahead of time and is also familiar with the transcript, so they can better understand what I am explaining.

13.    Over the course of my career, and in connection with the work outlined above, I estimate I have attended and reviewed the transcripts of hundreds of parole suitability hearings.  These hearings routinely include discussions of the same information contained in CRAs: family background, social history, institutional history, performance

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

on prior supervised releases from prison or jail, psychiatric factors, substance abuse history, past physical and sexual abuse that the parole candidate has lived through, and allegations of prior acts of sexual violence or domestic violence made against the candidate. Commissioners expect candidates to be vulnerable during their hearings, and to speak candidly about their feelings and about difficult abstract psychological concepts, such as their triggers for substance abuse, triggers for mental health relapses, and triggers for anger. Expressing their feelings and explaining these concepts often requires a level of vulnerability that is particularly hard for people who are incarcerated in a system that is not always safe and that requires them to be vigilant and guarded for their own safety.

14. I often advise my clients, and educate others to advise clients, to draft the following documents in preparation for their BPH hearing: (a) a timeline – a type of brief autobiography, describing their life from childhood onward, and explaining any connections they see between their past experiences and any prior convictions; (b) a relapse prevention plan for any problematic past behaviors or thought patterns, including drug or alcohol abuse, sexual misconduct, gang involvement, criminal thinking, anger leading to violence and domestic violence; (c) one or more letters of remorse, addressed to any direct or indirect victims of their crime, that focus on the candidate's remorse for their conduct and empathy for those impacted by it; (d) a detailed plan for release, including where they will live, how they will support themselves financially, and who they can turn to for support; and (e) a closing statement, which takes accountability for their actions, demonstrates a deep understanding of how their conduct has affected others, and expresses genuine remorse for the harm the candidate has caused. Especially for candidates who may have a difficult time answering the BPH commissioners' questions, these documents can help demonstrate insight and take pressure off the candidate's ability to perform during their hearing. The process of preparing and fine-tuning these documents also helps prepare clients to speak about these critical issues during the BPH hearing itself.

15. I further advise clients that it is ideal to prepare these documents in advance of the CRA interview and to submit them to the clinician conducting the CRA. Doing so

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

allows the clinician to incorporate references to the documents into the CRA, which may result in a more favorable outcome for the CRA. The CRA process considers parole plans, insight, relapse prevention plans, and community ties in assessing how risky it is to release a given individual to the community.

16.    Another set of critical documents I help my clients compile consists of letters of support from friends and family both in the community and in prison, and letters of acceptance from post-release housing and job programs. These letters should address my client's parole plan, which may include where my client would be living and with whom; any job opportunity the letter-writer can offer; any financial support the letter-writer can offer; and any other kind of support such as mentorship, counseling, or support in maintaining sobriety. Other letters might offer general support, such as the emotional or spiritual support a layperson can offer, or connections to resources in the community. Letters of support can also serve to illustrate the ways a client has grown or changed over the course of their incarceration, or during their rehabilitative programming. This type of letter is particularly helpful for candidates being considered for youth parole[1] because documentation of their growth and maturity while incarcerated is an enumerated statutory factor in determining their suitability for release.

17.    I consider these materials essential to my clients' parole preparation because they can corroborate my clients' plans following their release and can corroborate my clients' testimony regarding how they have grown or changed since beginning their incarceration.

18.    Finally, the *Olson* review constitutes a crucial piece of parole preparation. The *Olson* review provides the person seeking parole the opportunity to review their

---

[1] In California, a person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger receives a Youth Offender Parole Hearing, regardless of their age at the time of the hearing. Youth Offender Parole Hearings are the same as traditional Parole Consideration Hearings in all relevant respects, except that the Board is required to give great weight to factors specific to youth offenders: the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the inmate.

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

central file to ensure the file is accurate and to refresh their recollection about what is in it. Key documents in the central file include the probation officer's report describing the commitment offense. BPH commissioners expect parole candidates to have detailed memories of their commitment offense, no matter how many decades ago the crime took place. Commissioners themselves appear to rely on the probation report to establish what happened in the commitment offense, and they often penalize candidates for testimony that deviates from what is in the report. Other key documents clients and attorneys should review include any disciplinary write-ups the candidate has received, both to ensure the file accurately reflects any write-ups that were voided or dismissed, and to refresh the candidate's recollection of the incident in preparation for questions from the BPH commissioners.

19. I am aware that it can be very difficult and risky for a parole candidate to get help from other incarcerated people with their parole preparation. In my extensive experience working with incarcerated and formerly incarcerated people, I have received countless reports describing how individuals who are believed to have committed sex offenses of any kind or crimes against children – and especially those convicted of sex crimes involving children – are targeted for abuse and violence in the prison system. These reports range from social ostracization to extreme physical assault, including stabbings and murder. Any time I know that my client has a sex offense conviction, or that accusations of similar conduct appear in their CRA or in their parole hearing transcript, I consider this to be among the most confidential information I have about them, due to the safety risk if other incarcerated people find out about it.

20. In my experience, individuals with sex offense or domestic violence convictions often have a particularly hard time preparing for parole. The Board wants such individuals to have taken programs directed to these issues, and wants them to demonstrate growth and understanding of the factors that led them to commit sex offenses or acts of domestic violence. However, there are not many programs addressing these issues in CDCR prisons, and at many prisons there are no formal programs to address the

[4304335.10]                                   8                        Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

needs of people convicted of sex offenses.  When there is no program at someone's prison, or when the individual is unable to gain admission to a needed program, the Board generally advises or expects parole candidates to read a book on the subject, to write a book report on what they have learned about the issue, and be prepared to discuss those learnings in a hearing with the Board.  The Board also sometimes advises or expects parole candidates to take a correspondence course covering the same material.

21.     This process can be particularly hard for people with disabilities that impair their ability to communicate through reading and writing, such as vision and hearing disabilities.  There are many people in CDCR who cannot read or write well enough on their own to read a book and write a book report of this kind, or to fully engage with a correspondence course, which in CDCR is conducted exclusively through reading and writing.  There are also no formal assistance programs where someone who cannot read and write on their own gets the kind of one-on-one assistance for the substantial time periods needed to read a book and write a book report or to participate fully in a correspondence course.  Moreover, because the topics of these reports or courses often reflect crimes that are disfavored and can result in abuse or attacks from other incarcerated people, it is often unsafe for these individuals to seek help from other incarcerated people to read these books or take these courses.

**The Parole Attorney's Work**

22.     Representation for a parole suitability hearing begins long before the hearing and does not end at the conclusion of the hearing.  Once the hearing has concluded, the attorney still must meet to discuss the outcome with their client, and the attorney may also need to continue to represent the client in an *en banc* review by the entire Board of Parole Hearings or in defending a grant of parole at an *en banc* review.

23.     In my experience, parole suitability hearings differ significantly from other legal proceedings because, although the attorney has an important role to play, the attorney plays a relatively minor role during the hearing itself, as compared to other legal proceedings.  Hearings last, on average, about two to three hours, but they can last twice

[4304335.10]                                        9                        Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE
THE REVISED PERMANENT INJUNCTION

that long or longer.  During this time, an attorney may speak for only 10 or 15 minutes, for the most part in delivering a closing argument.  The bulk of the hearing consists of the parole candidate answering questions from the BPH commissioners, those posed by the district attorney, and those from their retained or appointed attorney.  The attorney's role is not to prepare to speak during the hearing, but to ensure their client is prepared.

24.     Parole hearings also differ from other legal proceedings because the purpose is not to establish the facts or the law.  The purpose is for BPH commissioners to determine whether someone poses an "unreasonable risk to society."  Although California's parole statute lists a number of different factors to consider, in my experience, BPH commissioners focus during the hearing on subjective factors such as the candidate's perceived degree of "insight" into their crime or other misconduct and their level of "remorse."  Preparing a client to make this type of presentation takes much more time than preparing them to testify to events at a trial.  It requires a high degree of trust because the client needs to share intimate details about their early life, their thoughts and feelings, and their commitment offense – which is sometimes the most difficult topic of all for them to discuss.  Only after the client has become comfortable enough to share this information can the attorney's work begin in earnest, by using what the client has shared to help develop their testimony and craft their submissions to the Board.

25.     I understand that parole candidates spend hundreds of hours over the course of months or years preparing for their hearings, working in the evenings and on weekends, as well as during the day.  Many candidates begin preparing for their next suitability hearing almost immediately after being denied parole.  The documents they draft go through many, many revisions before being submitted to the Board.  And candidates pour over any documents that can help them prepare, often reviewing their transcripts or CRAs many times as they prepare.

26.     Candidates also benefit from taking rehabilitative programming.  In general, people who have completed a higher number of work and educational programs while in the CDCR are viewed more favorably and are more likely to be granted parole by the

[4304335.10]                                                                    10                                    Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

Board. However, people can struggle to access this kind of programming for many reasons, including reasons related to disabilities. For example, people with mental health challenges who are at the Enhanced Out-Patient ("EOP") level of care need permission from their treatment team in order to be able to attend other programming outside of their 10 weekly hours of treatment. Historically, there has been less programming that helps with parole preparation on yards that house people receiving EOP services, because these yards must also offer mental health programming. In fact, when UnCommon Law investigated launching parole preparation programs on two different Level IV yards that house people receiving EOP services, the institutions discouraged us from launching programs on those yards due to competition for program space and scheduling conflicts with mental health programming.

27.    The parole attorney's role is to guide candidates through the parole consideration process. The attorney must work closely with the candidate to advise them on how to craft documents and to provide feedback. The attorneys should be familiar with the candidate's central file and be able to bring the candidate's attention to the most important documents within it. Attorneys also need to be familiar with the candidate's CRAs and past hearing transcripts to be able to work intelligently with their client in improving their insight into their crime and their ability to articulate this insight to the Board.

28.    In my experience, providing representation in the most straightforward case for a client who is well prepared and does not have any disabilities requires a minimum of approximately 20 hours of work, including three or four client meetings that last 1-2 hours each. To be clear, attorneys at UnCommon Law typically spend much more time than this; however, I would consider this the absolute minimum any competent attorney would need to spend on the most straightforward case with no complications.

29.    For clients who have any sort of disability that interferes with their ability to read and write independently, I believe the consequences of limiting legal services to 20 hours or less, and having four or fewer attorney-client meetings are much more severe than

[4304335.10]

11

Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE
THE REVISED PERMANENT INJUNCTION

for others.  For clients who cannot independently review documents, attorneys would need to take time during a client meeting to read the document aloud in its entirety and ensure the client digests the material.  If attorneys did not take this time, clients would not be able to have a productive discussion about the document.  This is different from clients who can read documents independently, because they can read and digest the material ahead of time.  For clients who cannot write independently, attorneys or possibly their staff or CDCR counselors would need to perform all the writing tasks the client needs to do, even the simple ones that others can do on their own, such as contacting transitional housing providers.  Otherwise, the client would have no remorse letters, relapse prevention plans or transition plans at all.  This is different from clients who can write independently, because they could develop these materials without our help, and they would only be missing the benefit of the attorney's feedback.

30.    For clients who require an interpreter, attorneys need to allow for extra meeting time to wait for the interpretation process to complete each time the attorneys says something and the client responds.  This is different from clients who are fluent in spoken English, because attorneys can cover more ground in a 1- or 2-hour meeting.  And in all of these circumstances, attorneys would need to allow extra time to have meetings or phone calls with the client because the client cannot simply write the attorney a letter.

31.    Parole attorneys must also have special considerations for clients who have barriers to expressing themselves during the hearing itself, whether due to an intellectual disability, a psychiatric disability, a language barrier, or other issues.  For these clients, we need to take extra time to work with them to develop written materials in advance of the hearing and we need to address written materials covering a wider range of topics.  This is because, for those who may not be able to explain themselves well in a live hearing, the written materials are the most reliable way for them to demonstrate their growth, change and readiness for parole.

32.    When an attorney does not take all the time that is needed to adequately prepare a client for their parole hearing, the consequences for people with disabilities

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

appears to be more significant.  In my experience, Board Commissioners often do not adjust their expectations to allow for limitations on the candidate's ability to prepare materials for the hearing, to express themselves during the hearing, or even to complete the types of programs that Commissioners expect them to take.  I believe that Commissioners feel constrained by the structure they are required to follow and the degree of subjectivity that is baked into the process.  Because there often is no additional allowance for the parole candidate's limitations, the consequences for the candidate are all the more severe when the attorney does not do what it takes to ensure that the parole candidate overcomes these limitations and comes to the hearing equipped to make a presentation that is as strong as the candidate would make if they had no disability.  For individuals who cannot read or write well due to disability, based on my experience, it would not be possible for them to meet this standard unless they have the accommodations necessary to read and write independently, substantial support from family and friends, or substantial assistance from their parole attorney above and beyond the assistance that the attorney typically provides.

**Post-Hearing Procedures**

33.     Parole suitability proceedings are not finished at the end of the hearing. After each hearing, regardless of the outcome, there is a 120-day period of review, which might result in an *en banc* review during one of the Board's monthly executive meetings in Sacramento.  It is important for parole candidates to review their transcript as early as possible in this 120-day period, so they can work with their attorney to identify legal or factual errors that may justify *en banc* review.  During an *en banc* review, the Board may decide to vacate the outcome of the proceeding and order a new hearing, or the Board may order a rescission hearing, which is yet another hearing conducted by a panel of commissioners at the prison.  Rescission hearings likewise require extensive review of the transcript from the most recent parole consideration hearing to develop testimony that better addresses the concerns of the *en banc* panel.

34.     Although there is no formal process for a BPH appeal, the attorney or candidate may submit an informal appeal in the form of a "decision review letter,"

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

documenting issues that arose during the hearing and requesting review. If the Board grants the request to review, attorneys may appear at the Board's monthly executive meeting to argue their client's case. Access to the hearing transcript is necessary for candidates to file this type of informal appeal, as it provides the best evidence of any problems that arose during the hearing. And for parole candidates with disabilities that impair their ability to read and write independently, it is especially necessary to have assistance from an attorney to ensure they can effectively present the informal appeal.

35. The *en banc* review process is a crucial avenue for relief, due to the difficulty of receiving a reversal under *habeas corpus* review. *Habeas* petitions filed concerning parole denials are reviewed to determine whether there is "some evidence" to support the Board's decision. This is an extremely deferential standard.

**State-Appointed Attorneys**

36. As I have stated in testimony to the California Senate and the Alameda County Superior Court, I do not believe that state-appointed attorneys receive adequate compensation, training or oversight to adequately prepare their clients even for the most straightforward proceedings. The resources they receive are in no way sufficient for these attorneys to adequately represent, much less accommodate, individuals with disabilities that affect their ability to communicate with counsel and the Board.

37. I have previously researched the compensation and guidance that state-appointed attorneys receive, including by filing Public Records Act requests for related documents. From what I understand, attorneys are compensated just $945 per client for parole proceedings, an amount that was even lower prior to July 2023. This is not nearly enough, given the minimum of 20 hours of attorney time required to provide adequate representation in a straight-forward case for a client with no barriers to personally preparing for the hearing. If the amount is $945, the state is paying an attorney who spends the minimum 20 hours to prepare just $47.25 an hour. This is a fraction of market rate for a competent California attorney. Further, this compensation does not appear to cover the additional time that attorneys may require to provide disability accommodations.

[4304335.10]                                                      14                                Case No. C94 2307 CW

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

38.     In the Spring of 2020, BPH amended the policies for state-appointed attorneys to increase their compensation and to increase the expectation for the number and duration of attorney-client meetings.  In response to these changes, my organization surveyed parole candidates about the quality of the representation they received.  We sent out a survey to a random sample of 800 individuals who had participated in parole hearings between January 1, 2020, and April 16, 2021.  One of my employees, Katy Dybwad, analyzed the survey responses and prepared a declaration setting forth her findings, which we submitted to the California Court of Appeal, First Appellate District, in support of a petition we filed for a writ of *habeas corpus* entitled *In re Poole*.  A true and correct copy of this declaration and supporting tables is attached as **Exhibit C.**  Just 7.7% of the respondents affirmed that their appointed attorney had met the expectations outlined in the 2020 policy: having two client meetings, one for over an hour and one other; reviewing the central file prior to the first meeting; and meeting once prior to the client's CRA interview.  **Exhibit C.**  Further, of the 77 survey respondents who reported having a disability, only 20.8% reported that their appointed attorney provided reasonable accommodations in parole preparation meetings.  *Id.*

39.     Based on this information, it is also my opinion that state-appointed attorneys do not receive the training, supervision or compensation necessary to constitute an adequate accommodation for parole candidates with disabilities.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Oakland, California this 14th day of September, 2023.



DocuSigned by:

Keith Wattley

55E1DD3F04AC499...

Keith Wattley

DECLARATION OF KEITH WATTLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION

# Exhibit A



# Resources

Our legal team is available to respond to resource/intake inquiries over the phone on Tuesdays, Thursdays, and Fridays.

**COVID-19 RESOURCES AND INFORMATION**

Click here.

**UNCOMMON LAW MATERIALS**

Overview of California's Parole Consideration Process + How to Prepare for It



What to Expect at Your Virtual Parole Hearing

How to Write a Parole Plan

How to Write a Parole Plan If You Have an ICE Hold

How to Write a Letter of Support

How to Write a Relapse Prevention Plan

How to Write a Letter of Remorse

Book Report Guide + Suggested Book List

How to Write a Decision Review Letter

Advocating for a Loved One During the En Banc Review Process

How to Challenge a Comprehensive Risk Assessment

How to Prepare for a Comprehensive Risk Assessment

How to Write A Closing Statement

How to Write a Petition To Advance

Overview of California's Medical Parole Process

Post-Hearing Guide: Grant

Tools for Emotional Support

How to Work with Your Parole Attorney

Annotated Case List



UnCommon Law Quick Facts

*Why Language Matters* Language Guide

Bay Area and Los Angeles Transitional Housing List

How To Navigate Your Innocence Claim In A Parole Consideration Hearing

## UNCOMMON LAW MATERIALS (ESPAÑOL)

Como Se Escribe Una Carta De Remordimiento

Como Se Escribe Una Carta De Apoyo

Reseña del Proceso de Libertad Condicional (Parole) en el Estado de California y Cómo Prepararse

Como Escribir un Plan de Prevención de Recaídas

Preguntas de Preparación Para su Audiencia con la Junta de Libertad Condicional

## THE LOS ANGELES COUNTY DISTRICT ATTORNEY POLICY CHANGES ON RESENTENCING, PAROLE, AND ENHANCEMENTS

What do They Mean for Me or My Loved One?

Senate Bill 1437

## UNCOMMON LAW TRAINING VIDEOS

Lifer School (2018)

Lifer School 2019 (Part 1) (Part 2)

Parole After SHU (LAAC Training)

## BOARD OF PAROLE HEARINGS RESOURCES

Parole Hearing Schedule
Click to see the schedule of upcoming parole hearings at any California prison.

Board of Parole Hearings Report of Significant Events (2018)

CDCR Inmate Locator
Click to access CDCR's Inmate Locator, which includes hearing information.

## PARTNER ORGANIZATIONS

Prison Law Office (PLO)
Our Founder and Executive Director, Keith Wattley, began his legal career at the Prison Law Office , which litigates prison conditions. PLO provides free resources on topics ranging from filing an administrative appeal (602) to suing prison officials for money damages.



member of the Board of Directors for PUP — a nonprofit that provides opportunities for San Quentin prisoners to earn a college education.

Legal Services for Prisoners with Children (LSPC)

Our Founder and Executive Director, Keith Wattley, is a former member of the Board of Directors for LSPC — a nonprofit that provides direct advocacy and legal representation for women incarcerated in California.

**RE-ENTRY RESOURCES**

FindHelp.org (powered by Aunt Bertha)

Find food assistance, help paying bills, and other free or reduced cost programs, including new programs for the COVID-19 pandemic:

**TO FIND AND ACCESS A BROAD RANGE OF ADDITIONAL PRO BONO LEGAL SERVICES ACROSS CALIFORNIA, VISIT LAWHELPCA.ORG**

TAKE ACTION

We provide pro bono legal representation and advocacy to clients who are changing

CONTACT

**Tel:** (510) 271-0310

**Fax:** (510) 817-4918



To support our work with a tax deductible donation, click below.

*Tuesdays, Thursdays, and Fridays.*

**Address:** 318 Harrison Street, Suite 103, Oakland, CA 94607

**Donate**

SOCIAL

© 2020 UnCommon Law. All rights reserved.

# Exhibit B



April 4, 2023


Assemblymember Mia Bonta, Chair
Assembly Subcommittee #5 on Public Safety
BudgetSub5@asm.ca.gov

### RE: Legislative Analyst Office's Report on the Parole Hearing Process

Dear Assemblymember Bonta:

Thank you for the opportunity to appear before you last week to discuss the Legislative Analyst Office's (LAO) report, *Promoting Equity in the Parole Hearing Process*. As an attorney who has appeared in hundreds of parole hearings and now leads the largest team ever assembled of attorneys, counselors and advocates focused on supporting people who are serving life sentences, I write to follow up my verbal remarks. Particularly when viewed in their historical context, the LAO's recommendations point the way toward realizing the state's nearly 50-year-old promise of a more automatic and equitable process for releasing people from prison.[1]

During Board of Parole Hearings Executive Officer Jennifer Shaffer's testimony last week, she made representations regarding allegations of bias, training for parole commissioners and new standards for state-appointed attorneys. Unfortunately, just as prior legislative reforms have been insufficient, the changes Ms. Shaffer named have either not actually occurred or they have also been ineffective in overcoming the inherent biases that keep the parole grant rate impermissibly low. The data and the numerous individual stories of people directly harmed by this process require more meaningful legislative intervention.

> *"Neither psychiatrists nor other behavioral scientists are able to predict the occurrence of violent behavior with sufficient reliability to justify the restriction of freedom of persons on the basis of the label of potential dangerousness."*

### Historical Background

The quote above applies just as readily today as it did when Professor Bernard Diamond wrote it in December 1974.[2]  In other words, California knew that its system of discretionary parole leads to arbitrary and biased outcomes long before the publication of the LAO report this year. In fact, by 1975, the California Supreme Court had already ruled that the parole board's arbitrary practices were unconstitutional because they kept certain people in prison beyond a term of confinement that was

---

[1] As discussed below, the Legislature mandated in Senate Bill 42 (Nejedly, 1976) that the Board "shall normally" grant parole when people become eligible.
[2] Diamond, B., The Psychiatric Prediction of Dangerousness, 123 University of Pennsylvania Law Review 439, 447 (1974).

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 2 of 12

proportionate to the crimes they committed.[3] The next year, in 1976, California passed Senate Bill 42, replacing indeterminate sentences with *determinate* sentences for everyone except those convicted of murder and kidnapping. At the time, the legislative record was replete with testimony and other evidence condemning the parole board's virtually unlimited discretion to deny parole to people they did not like. For example, the author of SB 42, Senator John Nejedly (R), observed:

> "*We began to find that there was a substantial disparity simply on the basis of racial backgrounds, ethnic backgrounds generally, educational backgrounds, personal appearances, and a number of other factors which led to a very serious discrimination....in the sentencing process determined by characteristics of the person, not the crime.*"[4]

In one legislative hearing, a parole commissioner admitted acting on "gut feelings as to how long this person should do." By the mid-1970s, California understood that neither the parole board nor mental health professionals can predict future violence in a population already incarcerated for committing serious crimes. Professor Diamond, quoted above, reviewed all the available literature, including one study involving the release of nearly 1,000 people who had been convicted of serious crimes and were found to be both "mentally ill and dangerous."[5] Only a handful of them later assaulted another person. Professor Diamond's conclusion was that "psychiatrists who make such judgments tended to over-predict dangerousness greatly, by a factor somewhere between ten and a hundred times the actual incidence of dangerous behavior."[6]

From his exhaustive review of other studies and his own research and professional practice, Professor Diamond declared one of the most inconvenient truths facing the parole board: "Neither psychiatrists nor other behavioral scientists are able to predict the occurrence of violent behavior with sufficient reliability to justify the restriction of freedom of persons on the basis of the label of potential dangerousness."[7] In other words, California has known for nearly five decades that its parole board cannot do what it pretends to do – predict dangerousness.[8] Absent any real test for predicting violence risk, the only thing left is the subjective judgment of parole commissioners, which is just as biased now as it was in 1974.

Through Senate Bill 42, the determinate sentence law was intended to address the bias that plagued the parole board by placing all the discretion for setting the length of confinement with the trial court; however, the Legislature was not yet prepared to protect those convicted of murder or

---

[3] *In re Rodriguez* (1975) 14 Cal.3d 639.

[4] Hearing on Determinate and Indeterminate Sentencing, Joint Committee for Revision of the Penal Code. https://digitalcommons.law.ggu.edu/cgi/viewcontent.cgi?referer=https://www.google.com/&httpsredir=1&article=1069&context=caldocs_joint_committees

[5] Diamond, B., The Psychiatric Prediction of Dangerousness, 123 University of Pennsylvania Law Review 439, 447 (1974).

[6] *Id*.

[7] *Id*. at 452.

[8] He also presciently observed a version of what could be called the "Willie Horton effect": "In general, if the psychiatrist predicts that there is no danger, the feed-back from an erroneous prediction is real and immediate. If he predicts that there is danger, there may be no feed-back, or, if there is, it may not be possible to interpret it in ways which would improve the predictive ability of the psychiatrist. Inevitably, this will result in all concerned doing the 'safe' thing: predicting dangerousness, if there are even the most minimal reasons to justify it." (*Id*. At 447.) Substituting "parole board" or "governor" for "psychiatrist" captures today's political conundrum in a nutshell.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 3 of 12

kidnapping from the Board's bias in the same way.[9] Instead, SB 42 should be viewed as the beginning of a long series of reforms that has yet to fulfill the promise of a fair process.

The clearest sign that SB 42 was intended to overcome the bias cited by its author and by the California Supreme Court in *Rodriguez* was its use of imperative language, mandating that the Board "shall normally" grant parole when a person first becomes eligible.[10] The ensuing 40 years have seen numerous other legislative and judicial efforts to force the Board to follow that original mandate. Those include: the appointment of counsel to represent parole candidates[11]; the right to participate in a hearing and receive a transcript and statement of reasons why parole is denied[12]; and the right to review the material being considered in making a parole determination.[13] These remedial efforts also include the California Supreme Court's prohibition against the Board using a person's crime as the sole basis for denying them parole. [14] More recently, the Legislature has enacted landmark reforms such as Youth Offender Parole, Special Consideration for Intimate Partner Battering and its Effects, Elderly Parole, and Medical Parole, all of which have resulted in more people than ever being eligible for parole consideration. The image below highlights the significant increase in the number of hearings scheduled annually, compared to the actual number of parole grants given each year since 1981:

**Total Number of Scheduled Parole Hearings and Parole Grants from 1981 - 2022.[15]**



---

[9] This was not because people convicted of such crimes were less susceptible to biased decisions, but because of some high-profile cases that were becoming due for parole consideration (e.g., Manson Family members, Sirhan Sirhan, Juan Corona, etc.), and conservative politicians wanted a way to keep them in prison for forever. Since then, the number of cases subject to indeterminate sentences has grown to many other crimes and enhancements.

[10] Penal Code, § 3041, subd. (b).

[11] Penal Code, § 3041.7.

[12] Penal Code, § 3041.5, subds. (a)(2), (a)(4), and (b)(2).

[13] Penal Code, § 3041, subd. (a)(1).

[14] *In re Lawrence* (2008) 44 Cal.4th 1181 [striking down the only statutory exception to the "shall normally" language, which had allowed the denial of parole if the Board "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration."].

[15] https://www.cdcr.ca.gov/bph/2020/01/09/suitability-hearing-summary-cy-1978-through-cy-2018/, Date accessed: March 21, 2023.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 4 of 12

Despite nearly 50 years of legislative and judicial efforts to get the Board to "normally" grant parole, the Board's subjective decision making has consistently produced a parole grant rate below 20%.[16] The image below shows the parole grant rate out of hearings scheduled every year since 1981. In 1981, the grant rate was just 10%; forty years later in 2022, it was just four percentage points higher.

**Grant Rate as a Percentage of Scheduled Hearings (1981-2022)[17]**



The figure below further evidences that the trend is currently moving in the wrong direction: last year, the grant rate was at a five-year low of just 14%.[18]

**Grant Rates for Hearings Held and Hearings Scheduled between 2018 – 2022[19]**



---

[16] The percentage of scheduled parole hearings resulting in parole grants since 1981 has only exceeded 20% once (in 2018) and was only 14% in 2022 – the lowest in five years (see Appendix of Data)

[17] https://www.cdcr.ca.gov/bph/2020/01/09/suitability-hearing-summary-cy-1978-through-cy-2018/, Date accessed: March 21, 2023.

[18] https://www.cdcr.ca.gov/bph/2022/03/16/calendar-year-2022-suitability-results/. Furthermore, nearly fifty percent of parole hearings were not completed because they were canceled or postponed, or because parole candidates "waived" their right to a hearing or stipulated to being unsuitable because they knew the Board would deny them.

[19] https://www.cdcr.ca.gov/bph/statistical-data/, Date accessed: Feb. 2023.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 5 of 12

It is also important to note that about half the scheduled parole hearings in any given year are not completed. In addition to hearings that are postponed, canceled or continued to another date, parole candidates sometimes voluntarily waive their right to a hearing or stipulate to being denied parole. These latter outcomes may occur when something about the candidate's disciplinary record, the programs they have completed in prison, or their post-release plans indicate that the Board is likely to deny them parole and may defer further consideration for up to five, seven, ten or even fifteen years. In those circumstances, a parole candidate may voluntarily delay parole consideration until they are more confident in a better outcome from a full hearing. As Ms. Shaffer has noted during her remarks in the Assembly Sub5 hearing, calculating parole grant rates based on hearings that are completed and decided by commissioners yields different results than calculating grant rates based on all the hearings that are scheduled, even if many are not completed. The figure above demonstrates this. However, even if you focus only on hearings that get completed, it is still true that a person who attended their hearing back in 2018 had less than a 39% chance of being found suitable. Just four years later, that rate had dropped to barely 28%. The Board should not be defending a parole grant rate that is below 30% when this Legislature has been telling them for nearly 50 years to grant parole most of the time.

## Subjectivity Breeds Bias

Unable to rely on a parole candidate's crime, and without any objective basis for denying parole, the Board has resorted for the past 15 years to citing overwhelmingly subjective factors such as "insight" (the ability to articulate all the circumstances and contributing factors surrounding a crime) and "remorse" to justify denying people parole. These factors are vague and impossible to reliably assess. Indeed, they are in the eye of the beholder. Quite notably, the term "insight" appears nowhere in the governing parole statute or regulations; the Board simply made it up to justify denying parole.[20]

During last week's hearing, Ms. Shaffer asserted that advances have taken place in risk prediction since Professor Diamond's study in 1974. However, the Board remains unable to point to any scientific evidence demonstrating that the presence or absence of insight or remorse correlates to a person's risk of violence. This is because there is none. In fact, the Board's own Chief Psychologist has admitted that, although lack of insight is neither as predictive of risk as other dynamic factors, nor directly correlated with recidivism at all, it is the risk factor most predictive of a decision to deny parole.[21] Indeed, the Chief Psychologist presented the following unequivocal statements directly to the Board and all of its commissioners:

- "Insight is not causally related to the onset of crime and violence."
- "Insight is not a 'causal' risk factor."
- "People do not commit violence because they lack insight."[22]

In other words, the *one* factor on which the Board relies the most is not even relevant in predicting violence risk. Furthermore, all their commissioners now know this. But remember, we

---

[20] This practice was made easier when the Supreme Court applied an overly deferential standard of judicial review and concluded without analysis that, under certain circumstances, a lack of insight could constitute "some evidence" linking a person's original crime to current dangerousness. (*Id.*)
[21] Kusaj, Cliff. (October 21, 2020.) Analysis of Comprehensive Risk Assessments Administered in 2019, p. 19, 39. Powerpoint presented at Board of Parole Hearings Executive Meeting. Slides available upon request.
[22] Kusaj, Cliff. (April 20, 2021.) Conceptualizing Insight and Self-Awareness in Risk Assessment, p. 3. Powerpoint presented at Board of Parole Hearings Executive Meeting. Slides available upon request.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 6 of 12

*already* knew this in 1974: "Neither psychiatrists nor other behavioral scientists are able to predict…"[23]

Considering the fact that subjective factors like insight and remorse are uniquely expressed and interpreted based on characteristics such as race, cultural background, education, cognitive functioning, language and other communication styles, it is no surprise that this subjectivity has directly fueled the Board's bias:  perceived *differences* among parole candidates' appearances or presentations have been used as proxies for *dangerousness*. A closer look at recent patterns in the Board's decision-making reveals that the same biases that existed back when the Board was prohibited from determining parole suitability for most people sentenced to prison still exists for roughly half of California's prison population, which remains subject to its jurisdiction.

### Current Evidence of Bias[24]
The Board's practice continues to produce unfair and highly disparate outcomes for the Black parole candidates; transgender people; people with disabilities; people with mental health classifications; people with cognitive difference, including memory impairments (age-related or otherwise); those for whom English is a second language; and for those unable to retain private counsel for their hearings. Implicit and explicit bias against people with these identifiers consistently override the legislative intention that parole "normally" be granted.

*Race*
An overwhelming body of research shows that Black people face clear disadvantages while navigating the parole hearing process. In her 2019 study of youth parole hearings, Dr. Kristen Bell found that the odds of being granted parole were 2.7 times lower for a Black person compared to a non-Black person, even when controlling for over fifteen other variables.[25] An earlier study of nearly 700 randomly sampled hearings between October 2007 and January 2010 found that Black parole candidates were half as likely to be granted parole as their white counterparts, even when controlling for rehabilitative efforts, educational attainment, crime of conviction, and age.[26] More recently, a study by Michael Brodheim of parole hearings between July 1, 2018, and June 30, 2020, found that Black candidates were the group most likely to have hearings, yet the least likely to be granted parole.[27] Lastly, a current comprehensive study of 25,000 parole hearings between 2010 and 2019 has preliminarily found that Black parole candidates are less likely to be granted parole than applicants of all other races.[28] This latest study, the most comprehensive one to date, unequivocally confirms that the 4% difference in grant rates between Black and non-Black candidates "is statistically significant."[29]

In total, **at least five different studies have confirmed that Black parole applicants have the lowest parole grant rates.** The differences between grant rates for Black applicants and those for

---

[23] Diamond, B., *supra*, at 452.
[24] Please see the Appendix of Select Cases for additional examples of parole applicants who have faced disadvantages due to their differences, not necessarily their dangerousness.
[25] Bell, Kristen. *A Stone of Hope: Legal and Empirical Analysis of California Juvenile Lifer Parole Decisions*. Harvard Civil Rights-Civil Liberties Law Review, 2019, harvardcrcl.org/wp-content/uploads/sites/10/2019/07/54.2-K-Bell.pdf.
[26] Young, Kathryne M. and Jessica Pearlman. "Racial Disparities in Lifer Parole Outcomes: The Hidden Role of Professional Evaluations." *Law & Social Inquiry*, 2021.
[27] Brodheim, M. Letter to Assembly Subcommittee #5 on Public Safety, March 17, 2023.
[28] K. Bell. Memo about LAO Parole Report for committee hearing on 3/27.
[29] K. Bell memo at page 3.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 7 of 12

White applicants in each data set were 2% (Committee for Revision of the Penal Code), 3% (Kristen Bell's preliminary analysis of 2010 to 2019), 3.5% (Michael Brodheim), 8% (Young and Perlman) and 21% (Stone of Hope). **Not a single study has ever shown White parole applicants to have the lowest grant rates in any year.** It is important to note that even the one study to which the Board of Parole Hearings consistently points –the Committee for the Revision of the Penal Code's (CRPC) review of 2019-2020 data – found that Black parole candidates had the lowest parole grants, two percent lower than the grant rate for Whites. While *the CRPC* did not definitively conclude that the single year of data they reviewed demonstrated racial bias,[30] the consistency of these findings over a nearly 15-year period from five different sets of researchers is overwhelming. As Mr. Brodheim, who served a life sentence himself, concluded in his analysis, "Race is a statistically significant factor in parole outcomes."[31]

**Grant Rates by Racial Group Across Five Studies and Multiple Time Periods**



*Disabilities and Cognitive Impairments*

Parole candidates with disabilities and cognitive impairments – including age-related declines in memory and mental processing – often struggle with articulating and understanding abstract concepts, emotional expression, and memory recall – i.e., the things the Board considers "insight." People who are unable to repeat exact details of their life crime (as laid out in reports from police, prosecutors, coroners, etc.) may be seen to lack insight *and* remorse. For example, one commissioner claimed a parole candidate with a faulty memory as to the number of shots he fired was unsuitable for parole because the candidate "couldn't wrap his head around the fact that he had shot the victim twice in the head."[32]

Candidates are expected to have a perfect memory of their life crime no matter how many years have passed or how advanced their age. If they have any non-visible disabilities or cognitive

---

[30] In fact, as Ms. Shaffer noted, Black candidates appearing for their hearings with recent rule violations were slightly more likely to be granted parole than similarly situated White candidates; however, Black candidates were substantially (20%) less likely to be in the "zero rule violations" category, which enjoyed the highest grant rates.

[31] Brodheim letter at 2. Out of the ten years represented in Dr. Bell's current study, Black parole candidates had the lowest parole grant rates every year except two, and they had the second lowest rates for those two years. Whites never had the lowest parole grant rates in any year.

[32] Young, Kathryne M., and Hannah Chimowitz. "How Parole Boards Judge Remorse: Relational Legal Consciousness and the Reproduction of Carceral Logic." *Law and Society Review*, 2021, p. 244. This is a quotation from a BPH commissioner who agreed to be interviewed by Young and Chimowitz on the promise of anonymity.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 8 of 12

impairments, they are treated with skepticism. Consider what a commissioner had to say about one parole candidate whose documented learning disability prevented him from learning to read and write and participating in vocational programs:

> "*But I don't care if you have a disability. I really, really don't. Because you make no effort to do anything else around it. I mean, with a disability, there are things you can do instead of sit around here and b\*tch about having a disability.*"[33]

Parole candidates with disabilities can be penalized at their parole hearings if they are unable to hold work assignments or participate in other programming. Data shows that people with mobility-related disabilities who are members of the Disability Placement Program (DPP) within the *Armstrong Remedial Plan* are less likely to be granted parole than those without such disabilities.[34]

**Comparative grant rate for candidates with Disability Placement Program (DPP) classifications and those without (both hearings scheduled and hearings completed) between 2018-2021.[35]**



| | Hearings completed | | Hearings scheduled | |
| --- | --- | --- | --- | --- |
| | DPP | Non-DPP | DPP | Non-DPP |
| Total | 31.1% | 36.2% | 15.1% | 18.5% |

Full-time wheelchair users – like UnCommon Law client Janet Carter – are penalized harshly, with only about 11 percent found suitable each year.[36]  In 2022, Ms. Carter – a 69-year-old woman suffering from the effects of Parkinson's disease, early dementia, a neurocognitive disorder, chemotherapy, and a head injury – was denied parole for the third time. Thankfully, the Board later

---

[33] Young, Kathryne M., and Hannah Chimowitz. "How Parole Boards Judge Remorse: Relational Legal Consciousness and the Reproduction of Carceral Logic." *Law and Society Review*, 2021, p. 247-248. This is a quotation from a BPH commissioner who agreed to be interviewed by Young and Chimowitz on the promise of anonymity.

[34] This data on parole hearing outcomes for people in the DPP program with hearings between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

[35] This data on parole hearing outcomes for people in the DPP program with hearings between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

[36] https://www.theguardian.com/us-news/2022/dec/19/california-elderly-prison-losing-memory-release

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 9 of 12

granted attorney Lilli Paratore's request to vacate this decision and then found Ms. Carter suitable at a subsequent hearing, but only after *The Guardian* newspaper published an article about her experience. She was released in March 2023. The Appendix of Select Cases (at pages 1-2) recounts the experiences of two other parole candidates whom the Board apparently denied parole due to their cognitive disabilities.[37]

> *"They left me feeling so helpless, destroyed, and hopeless…I felt like dying."*
> – A nearly 80-year-old woman with dementia following a recent parole denial

*Mental Health Classifications*
  Parole applicants with mental health classifications are significantly less likely to be granted parole than those not receiving treatment. As evidenced in the figure below, the grant rate in parole hearings scheduled for parole candidates receiving the lowest treatment level, Correctional Clinical Case Management Services (more commonly known as CCCMS or "Triple CMS"), was approximately *half* of the rate for those not receiving mental health treatment.[38] The grant rate for hearings scheduled for parole candidates in the Enhanced Outpatient Program (EOP), the highest level of outpatient mental care, was roughly a *quarter* of the grant rate for people with no mental health classification.[39]

**Grant rates for candidates with mental health classifications vs. those without for both hearings scheduled and hearings completed between 2018-2021.[40]**



---

[37] The attached **Appendix of Select Cases** contains accounts of twelve different parole candidates whose cases exemplify the kinds of biases inherent in the parole hearing process.

[38] This data on parole hearing outcomes for people receiving mental health treatment between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

[39] *Id.*

[40] *Id.*

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 10 of 12



*Gender-based Violence*

Survivors of gender-based violence, which includes a disproportionate number of women and/or gender non-conforming people, face bias in parole hearings when they speak about being victims of violence themselves. Many survivors feel coerced into retracting their legitimate claims of abuse in order to demonstrate insight and personal responsibility. Further, transgender people often face a pattern of bias and discrimination in parole hearings, often leading to parole denials.[41] The committee heard first-hand testimony of this cruelty from Zy'aire at last week's hearing.

*Inability to Retain Private Counsel*

> *"I have had two appointed attorneys, and each time, I felt like I was alone. I felt like it was me against everyone else, including my attorney."*
> – Parole candidate following multiple hearings with state-appointed representation

In nearly 90 percent of hearings, parole candidates are represented by attorneys hired by BPH because they are unable to retain private counsel at their own expense.[42] Despite recent investments in the Board's attorney training and compensation structure, parole outcomes remain abysmal. The parole grant rate for state-appointed attorneys is less than half the rate for private attorneys.[43] Furthermore, parole candidates with state-appointed attorneys in 2021 were more than twice as likely to waive their right to a parole hearing and four times as likely to stipulate to unsuitability.[44]

---

[41] See Appendix of Select Cases, page 2, Parole Candidate 3.
[42] UnCommon Law's attorneys can be privately retained at no cost to our clients; however, due to the length of our waiting lists, we are unable to assist many people who reach out to us.
[43]
https://static1.squarespace.com/static/5b5f9d4be7494070b92d76f3/t/6137d47ba635c2657215d86b/1631048827307/21.08.3 0+Poole+Press+Release.pdf
[44] Legislative Analyst's Office, "Promoting Equity in the Parole Hearing Process," January 2023, https://lao.ca.gov/Publications/Report/4658.

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 11 of 12

> *"I wish I had known that my attorney was working for the Board. He did not help me at all, and I felt like he never really wanted to in the first place."*
> – Parole candidate regarding Board-appointed representation

As discussed during last week's hearing, private counsel typically spends considerably more time with our clients, providing the type of trauma-informed support and counseling that fills huge gaps in the programs available in our state prisons. We also build trusting client relationships that help us individualize and humanize them for parole commissioners, which helps to mitigate the cognitive biases in the parole process. Unfortunately, parole candidates do not receive the same assistance from state-appointed attorneys.

In the period after the Board implemented changes in training state-appointed attorneys (which Ms. Shaffer mentioned last week), we sent a randomized survey to 800 parole applicants who had hearings between January 1, 2020, and April 16, 2021, to gain information about their experiences with appointed attorneys. After analyzing hundreds of surveys sent back, we learned that:
- Only about 24 percent of respondents met with their attorney for more than one hour;
- Of all the respondents who wrote to their attorney, only approximately 30 percent received a response;
- Of all the participants who sent their attorney parole documents to review, only approximately 36 percent received feedback from their attorney; and
- Approximately 60 percent of participants ranked their attorney representation as below adequate or completely inadequate.[45]

**Data Must be Accessible to Independent Researchers**

During her testimony last week, Ms. Shaffer expressed her intention to select her own researchers to conduct an analysis of the data from parole hearing outcomes. While we appreciate the Board's willingness to share data with their hand-picked researchers, the Board has a longstanding and disturbing track record of illegally withholding data from *independent* researchers and institutions. For this reason, the legislature must insist on meaningful transparency and access to data for independent analysis.

Professor Kristen Bell and other researchers from the University of Oregon and Stanford University requested 17 years (2002 through 2019) of parole hearing transcripts, including race and ethnicity data for parole candidates. The Board and CDCR released the hearing transcripts but refused to disclose data on race and ethnicity. It was also reported that Ms. Shaffer refused to cooperate because she disagreed with Professor Bell's prior research (which found racial bias in youth parole hearings) and would not provide the requested data as long as Professor Bell was involved in the research.[46] Similarly, researcher Michael Brodheim submitted a Public Records Act request for 16 categories of information regarding parole hearings conducted from July 1, 2018, to June 30, 2019. The Board refused to disclose the race and ethnicity data. At the time, Ms. Shaffer also reportedly asserted that race and ethnicity are "not relevant" to research on parole decisions.

---

[45] Please see the Appendix of Select Cases, pages 6-8 (Parole Candidates 7-12) for several examples of these responses.
[46] https://www.courthousenews.com/california-parole-board-accused-of-withholding-data-from-researchers/

Re. UCL Assembly Sub 5 Letter
April 4, 2023
Page 12 of 12

Both sets of researchers had to sue the Board, seeking a court order requiring the Board to produce the requested data. Over the Board's objections – spanning nearly two years – the court found in July 2020 that the public's interest in disclosure of the requested information outweighed any interest in withholding the information. The court ultimately issued a peremptory writ of mandate, compelling the Board to disclose the requested information.

This record instills no confidence in the integrity of the Board's current intended approach. As evidenced in last week's hearing, there is much disagreement over interpretations of the very limited data that has become publicly accessible in recent years. Therefore, it is critical that raw, pre-aggregated parole outcome data be made publicly available for diverse and robust analysis by multiple researchers who can form independent conclusions, as well as verify, reproduce, and build upon each other's findings.[47] It is also critical that this information be made available on an ongoing basis, to allow researchers, the legislature, and the general public to more readily assess trends over time. Anything that falls short of this is a failure to provide true transparency into this taxpayer-funded process.

**<u>Recommendations</u>**

The LAO's report made the following recommendations of actions the legislature should take to promote equity in the parole hearing process: (1) Limit the discretion of parole commissioners; (2) require data sharing on parole outcomes, allowing independent researchers the opportunity to conduct quantitative and qualitative studies; and (3) evaluate the effectiveness of legal and hearing preparation services, expanding those that are effective. Considering the compelling history and current evidence set forth in this letter and appendices, these recommendations do not go far enough. The Board should be expressly prohibited from discriminating against parole candidates on the basis of race, gender, age, disability, mental health classification, cognitive ability, language, and other groupings that are typically stereotyped and stigmatized.

There should also be a stronger requirement that, when denying parole, the Board must explain why the factors cited in its decision correlate directly to a demonstrable risk of violence rather than a vague, gut feeling about a generalized risk. Lastly, the Board's decisions should be subjected to meaningful judicial oversight, which would involve a heightened standard of judicial review; the judicially-created and overly deferential "some evidence" standard has proven ineffective in curbing the Board's longstanding refusal to comply with the statutory mandate to normally grant parole.

I appreciate this committee's consideration of these important issues. If you have any questions about this submission, please do not hesitate to contact me at <u>kwattley@uncommonlaw.org</u> or at 510-271-0310.

Sincerely,

Keith Wattley
Executive Director

---

[47] https://news.fiu.edu/2020/researchers-choices-could-draw-different-conclusions; https://www.sciencedirect.com/science/article/pii/S0749597821000200

## APPENDIX OF DATA

**TABLE 1: 1981-2022 Scheduled Hearing Outcomes Data**

| Year | Number of Parole Grants | Hearings scheduled | Grant rate |
|---|---|---|---|
| 1981 | 31 | 321 | 10% |
| 1982 | 29 | 776 | 4% |
| 1983 | 45 | 839 | 5% |
| 1984 | 59 | 707 | 8% |
| 1985 | 64 | 823 | 8% |
| 1986 | 49 | 942 | 5% |
| 1987 | 40 | 877 | 5% |
| 1988 | 28 | 1,017 | 3% |
| 1989 | 24 | 1,138 | 2% |
| 1990 | 74 | 1,817 | 4% |
| 1991 | 49 | 1,729 | 3% |
| 1992 | 16 | 1,743 | 1% |
| 1993 | 19 | 1,613 | 1% |
| 1994 | 12 | 1,970 | 1% |
| 1995 | 8 | 2,128 | 0% |
| 1996 | 10 | 2,287 | 0% |
| 1997 | 16 | 2,274 | 1% |
| 1998 | 27 | 2,172 | 1% |
| 1999 | 13 | 1,950 | 1% |
| 2000 | 52 | 2,164 | 2% |
| 2001 | 83 | 3,630 | 2% |
| 2002 | 168 | 4,807 | 4% |
| 2003 | 168 | 4,479 | 4% |
| 2004 | 214 | 4,542 | 5% |
| 2005 | 161 | 4,933 | 3% |
| 2006 | 241 | 6,928 | 4% |
| 2007 | 119 | 6,177 | 2% |

| | | | |
|---|---|---|---|
| 2008 | 293 | 6,883 | 4% |
| 2009 | 543 | 6,223 | 9% |
| 2010 | 495 | 5,639 | 9% |
| 2011 | 466 | 4,015 | 12% |
| 2012 | 675 | 4,760 | 14% |
| 2013 | 592 | 4,168 | 14% |
| 2014 | 905 | 4,703 | 19% |
| 2015 | 906 | 5,300 | 17% |
| 2016 | 817 | 5,065 | 16% |
| 2017 | 915 | 5,334 | 17% |
| 2018 | 1,136 | 5,226 | 22% |
| 2019 | 1,184 | 6,061 | 20% |
| 2020 | 1,234 | 7,684 | 16% |
| 2021 | 1,424 | 8,722 | 16% |
| 2022 | 1,259 | 9,017 | 14% |

https://www.cdcr.ca.gov/bph/2020/01/09/suitability-hearing-summary-cy-1978-through-cy-2018/, Date accessed: March 21, 2023

**TABLE 2: Comparative Outcomes Data for Candidates with Varying Levels of Mental Health Classifications (Hearings Scheduled and Hearings Completed between 2018 – 2021)**

| Hearings Scheduled | Total | Grant | | Denial | | Other Results | |
|---|---|---|---|---|---|---|---|
| **No MH LOC** | 19,821 | 4226 | 21.3% | 6580 | 33.2% | 9015 | 45.5% |
| **Acute** | 83 | 0 | 0.0% | 11 | 13.3% | 72 | 86.7% |
| **CCCMS** | 5519 | 649 | 11.8% | 1848 | 33.5% | 3022 | 54.8% |
| **DSH** | 5 | 0 | 0.0% | 1 | 20.0% | 4 | 80.0% |
| **EOP** | 1927 | 101 | 5.2% | 534 | 27.7% | 1292 | 67.0% |
| **ICF** | 288 | 2 | 0.7% | 58 | 20.1% | 228 | 79.2% |
| **MHCB** | 50 | 0 | 0.0% | 9 | 18.0% | 41 | 82.0% |
| **Total** | 27,693 | 4978 | 18.0% | 9041 | 32.6% | 13674 | 49.4% |
| | | | | | | | |
| **Total for MH Classification** | 7872 | 752 | 9.55% | 2461 | 31.26% | 4659 | 59.2% |

| Hearings Completed | Total | Grant | | Denial | |
|---|---|---|---|---|---|
| **No MH LOC** | 10806 | 4226 | 39.1% | 6580 | 60.9% |
| **Acute** | 11 | 0 | 0.0% | 11 | 100.0% |
| **CCCMS** | 2497 | 649 | 26.0% | 1848 | 74.0% |
| **DSH** | 1 | 0 | 0.0% | 1 | 100.0% |
| **EOP** | 635 | 101 | 15.9% | 534 | 84.1% |
| **ICF** | 60 | 2 | 3.3% | 58 | 96.7% |
| **MHCB** | 9 | 0 | 0.0% | 9 | 100.0% |
| **Total** | 14019 | 4978 | 35.5% | 9041 | 64.5% |
| | | | | | |
| **Total for MH Classification** | 3213 | 752 | 23.4% | 2461 | 76.60% |

This data on parole hearing outcomes for people receiving mental health treatment between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

**TABLE 3: Comparative Outcomes Data for Candidates with Disability Placement Program (DPP) Status (Hearings Scheduled and Hearings Completed between 2018 – 2021)**

| Hearings Scheduled | Total | Grant | | Deny | | Other Results | |
|---|---|---|---|---|---|---|---|
| Not DPP | 23618 | 4364 | 18.5% | 7682 | 32.5% | 11572 | 49.0% |
| DPP | 4075 | 614 | 15.1% | 1359 | 33.3% | 2102 | 51.6% |
| Total | 27693 | 4978 | 18.0% | 9041 | 32.6% | 13674 | 49.4% |

| Hearings Completed | Total | Grant | | Denial | |
|---|---|---|---|---|---|
| Not DPP | 12046 | 4364 | 36.2% | 7682 | 63.8% |
| DPP | 1973 | 614 | 31.1% | 1359 | 68.9% |
| Total | 14019 | 4978 | 35.5% | 9041 | 64.5% |

This data on parole hearing outcomes for people in the DPP program with hearings between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

**TABLE 4: Comparative Outcomes Data for Candidates by DPP Type (Hearings Scheduled and Hearings Completed between 2018 - 2021)**

| DPP Classification | % | Total | Grant | | Deny | | Other Results | |
|---|---|---|---|---|---|---|---|---|
| DPP Learn | 1.4% | 62 | 18 | 29.0% | 19 | 30.6% | 25 | 40.3% |
| DPP Speech | 2.3% | 101 | 18 | 17.8% | 26 | 25.7% | 57 | 56.4% |
| DPP Vision | 6.4% | 279 | 43 | 15.4% | 98 | 35.1% | 138 | 49.5% |
| DPP Hearing | 2.0% | 88 | 12 | 13.6% | 17 | 19.3% | 59 | 67.0% |
| DPP Mobile | 87.9% | 3844 | 575 | 15.0% | 1277 | 33.2% | 1992 | 51.8% |
| Total | 100.0% | 4374 | 666 | 15.2% | 1437 | 32.9% | 2271 | 51.9% |

| DPP Classification | % | Total | Grant | | Deny | |
|---|---|---|---|---|---|---|
| DPP Learn | 1.8% | 37 | 18 | 48.6% | 19 | 51% |
| DPP Speech | 2.1% | 44 | 18 | 40.9% | 26 | 59% |
| DPP Vision | 6.7% | 141 | 43 | 30.5% | 98 | 70% |
| DPP Hearing | 1.4% | 29 | 12 | 41.4% | 17 | 59% |
| DPP Mobile | 88.1% | 1852 | 575 | 31.0% | 1277 | 69% |
| Total | 100.0% | 2103 | 666 | 31.7% | 1437 | 68% |

This data on parole hearing outcomes for people in the DPP program with hearings between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

**TABLE 5: Comparative Outcomes Data for Candidates with DPP Mobility Status by Specific Classification (Hearings Scheduled and Hearings Completed between 2018 - 2021)**

| DPP Classification | % | Total | Grant | | Deny | | Other Results | |
|---|---|---|---|---|---|---|---|---|
| DPP Mobile - DLT (req. level terrain) | 40.6% | 1561 | 268 | 17.2% | 533 | 34.1% | 760 | 48.7% |
| DPP Mobile - DPM (mobility impaired) | 29.6% | 1137 | 164 | 14.4% | 379 | 33.3% | 594 | 52.2% |
| DPP Mobile - DPO (partial wheelchair use) | 17.1% | 656 | 88 | 13.4% | 222 | 33.8% | 346 | 52.7% |
| DPP Mobile - DPW (full time wheelchair) | 12.7% | 490 | 55 | 11.2% | 143 | 29.2% | 292 | 59.6% |
| Total | 100.0% | 3844 | 575 | 15.0% | 1277 | 33.2% | 1992 | 51.8% |

| DPP Classification | % | Total | Grant | | Deny | |
|---|---|---|---|---|---|---|
| DPP Mobile - DLT (req. level terrain) | 43.3% | 801 | 268 | 33.5% | 533 | 66.5% |
| DPP Mobile - DPM (mobility impaired) | 29.3% | 543 | 164 | 30.2% | 379 | 69.8% |
| DPP Mobile - DPO (partial wheelchair use) | 16.7% | 310 | 88 | 28.4% | 222 | 71.6% |
| DPP Mobile - DPW (fulltime wheelchair) | 10.7% | 198 | 55 | 27.8% | 143 | 72.2% |
| Total | 100.0% | 1852 | 575 | 31.0% | 1277 | 69.0% |

This data on parole hearing outcomes for people in the DPP program with hearings between January 1, 2018 and December 31, 2021 was received through a Public Records Act Request on January 13, 2023.

**APPENDIX OF SELECT CASES**

*The names of the parole candidates described below can be provided to the committee upon request. In some cases, quotes have been pulled from multiple sections of a hearing transcript or a legal declaration and condensed for readability. In addition, stutters and fillers have been removed for clarity. These editorial choices were conducted in good faith, in an attempt to provide a clear narrative picture of conversations that, in many cases, unfolded over the course of several hours.*

### Parole Candidate 1

Parole Candidate 1 is a veteran with dementia who has been incarcerated for 40 years and had 12 parole hearings. He is currently the oldest person incarcerated in CDCR. At his last hearing, he was 94 years and had been discipline-free for 34 years. It was clear he was unable to meaningfully participate in his hearing; he did not remember his recent interview with the Board's psychologist and was unable to name the President of the United States. As his attorney summed it up:

> *"I find it a really hard stretch of the imagination that he could be physically capable of harming someone on parole . . . how can we ask someone to have insight or remorse or go to a program, what benefit would that possibly have for someone with dementia? . . . what is the value of having him in prison and giving him these nonsensical recommendations?"*

The Board denied him parole for three years, stating, *"just because you've been in prison for a long time, doesn't mean you get the free pass."* They told him to *"put in three years worth of rehabilitation."* He will then be 97 years old.

### Parole Candidate 2

Parole Candidate 2 is a nearly 80-year-old woman with dementia, a learning disability, and various documented medical illnesses. She has been incarcerated for approximately 20 years and relied on mobility devices and hearing aids during her recent hearings. Due to her memory and cognitive issues, she could not answer many basic questions, frequently expressed confusion, needed to have questions reworded various times, and had trouble recalling simple facts and words. She could not even remember her last psychological evaluation, nor how many previous parole hearings she had.

> *[Candidate] "I'm just having a hard time remembering. Little things I could…God knows I'm doing my best I can. The best I can…"*

> *[District Attorney] "So what is the cycle of violence? [Candidate] "Okay. Let me try to put it together. . . I can't put it. It is so long. And I took so many classes. I, I, I, my mind is – God, please."*

> [Attorney] *"You read [the closing statement] to me." [Candidate] "I don't know. Okay. Are you talking about this one, Lawyer?" [Attorney] "You read it to me. The one you read to the Lawyer." [Candidate] "I just can't remember. Huh?" [Attorney] "You just read it to me over the phone before the hearing." [Candidate] "I did?...Please, God have mercy. Could you help me?"*

Despite her participation in relevant programming and lack of recent discipline, the Board denied parole because they did not believe her innocence claim (despite its plausibility) and indicated she was feigning memory loss and disabilities to evade responsibility.

> [Deputy Commissioner] *"She has a good grasp of what's going on and articulates whenever she wants to, but when it comes to a crucial point, she be blaming something else, or memory loss."*

In his closing statement, her attorney stated: *"Her ability to internalize the things she's learning in programs is only going to get worse as time goes on, right? I think it is unfair and unrealistic to expect [her] at 78 years old to become an expert in these programs or become someone that's able to articulate these perfectly clearly."* Regarding the impact of her previous parole hearings, the candidate wrote, *"They left me feeling so helpless, destroyed, and hopeless...I felt like dying. I do everything they tell me and now I can't because I'm housed in the outpatient housing unit. After BPH hearings I end up in the hospital."*

### Parole Candidate 3

Parole Candidate 3 is a Native American, transgender man who maintained his innocence throughout his 37 years of incarceration. He earned over 300 chronos attesting to his positive behavior in prison, and remained discipline-free for over 20 years at the time of his release. He faced significant gender-based discrimination throughout his parole hearings, including being repeatedly misgendered and accused of deceitfulness for not disclosing his sex assigned at birth:

> [Commissioner] *"Did they know that you were a woman biologically?...[Candidate] "Well, I had a driver's license that said I was male." [Commissioner] "So you were living under a false identity, so to speak...there was also the deception and the deceit with your own nephews, leading them to believe you were their uncle when in fact technically you were their aunt."*

Commissioners asked invasive and insensitive questions about his sexuality and gender.

> [Candidate] *I'm too little to go to a men's prison, but –" [Deputy Commissioner] "You're too little? What – are you afraid that you're going to get beat up?" [Candidate] "I'd likely get beat up because there's great big guys there or, uh, or worse." [Presiding Commissioner] "Some of the most powerful guys in prison are about your size." [Deputy Commissioner] "Are you afraid of being raped in prison, is that what you mean?"*

The District Attorney also linked the candidate's transgender identity with his "denial" in regards to the life crime. Commissioners failed to intervene as the District Attorney made discriminatory statements.

> [District Attorney] "*I understand homosexuals and lesbians to have attraction to the same-sex just like heterosexuals have of the opposite sex. That's not an issue. It becomes an issue when the denial is so strong that a person doesn't want to be called a female at all. . . Deny it or not. That is what you are. But that strong denial, that refusal to accept what she is, a female, is equivalent to the refusal to accept that she was guilty of a heinous crime.*" [Commissioner] "*Thank you.*"

At age 75 and after 6 parole denials, Parole Candidate 3 was finally granted clemency by the Governor and released from prison.

### Parole Candidate 4

Parole Candidate 4 is a survivor of intimate partner abuse and had her first parole hearing when she was 73 years old after the Governor commuted her sentence of Life Without the Possibility of Parole (LWOP). She had no disciplinary write-ups throughout more than three decades of incarceration and was involved in extensive programming, despite not being parole eligible for most of her time in prison.

Throughout her hearing in 2018, the panel demonstrated a complete lack of understanding of and sensitivity towards Intimate Partner Battering (IPB). Commissioners expressed incredulity and judgment about her decision to stay with her husband despite his escalating abuse (including sexual abuse of her children), and chastised her for not reporting the abuse to law enforcement or going to a shelter.

> [Commissioner] "*So again, it didn't occur to you then to go to the police after he made these threats?. . .Or after he had molested your daughters. . . I mean, the most natural thing is to call the cops. Most people would do that . . . Now, he's got a threat against your parents and the whole family.*" [Candidate] "*His cousin was a sergeant in LAPD, and I knew he would never believe me against [my husband]. . .*
>
> [Commissioner] "*This is the 1980s we're talking about. . . these battered women's shelters were popping up left and right. There were crisis lines you could call, it was on the television. . .  You had options. You just chose the one choice.*"

They repeatedly expressed skepticism about her fear towards her husband despite his repeated threats to kill her and her children, and suggested that the murder of her husband was premeditated and motivated by selfish intentions rather than to protect her children.

> [Commissioner] *"You were really focused on all about you. That's how we ended up here."* [Candidate] *"I was focused on my children and keeping them safe. I didn't want them to be hurt anymore. He was going to kill us."*
>
> [Presiding Commissioner] *"You painted a picture of [your husband] as this just horrible human being, horrible excuse for a husband, who was controlling, demeaning, isolating, never said a nice word, never did a kind thing for you. . . Talk about stretching [credulity]. I hate to mention his name in this hearing, but even Charlie Manson I'm sure had a good day at one point."*

After a lengthy and hostile parole hearing, the Board denied Parole Candidate 4 for an alleged lack of credibility and insight. She was found suitable by a subsequent panel of commissioners.

### Parole Candidate 5

The Governor commuted the Life Without Possibility of Parole (LWOP) sentence of Parole Candidate 5, making her eligible for parole even though she has a claim of innocence. PC 5 is a Spanish speaker from Mexico who required English interpretation in her parole hearing. At the time of her first hearing, she was 53 years old and had spent almost 19 years incarcerated, during which she had not received a single write-up. This parole candidate provided a written statement, describing the impact of her language barriers.

> *"Even with Spanish translator, I didn't understand the commissioners, they confuse me with their words and talking at the same time. When they talk I cannot understand because they talk in English, Spanish, English I can't keep up or focus on too many languages at once. I didn't feel like I could express myself. . . There's no chance for Mexicans who don't understand English… I was scared, nervous because the white men and women speak a language I don't know."*

Many of her responses throughout the hearing – including her responses through the interpreter – were very short and simple, often single words like "mhm" or "no." The candidate repeatedly indicated that she was having trouble keeping up with the hearing, despite translator support:

> [Commissioner] *"And a lot of it starts inside the mind – the thought process. So can you share your thought process with me?* [Candidate via Interpreter: *"I don't really understand what –"*
> [Commissioner] *"Well… you think you were convicted because you were being unfaithful to your husband?"* [Candidate via interpreter] *"I don't understand."*

Additionally, there were multiple indications of bias towards this candidate based on her national origin. For example, the presiding commissioner confused her hometown in Mexico with a different city in an entirely different region, and the deputy commissioner accused her of working under a fake name in Arizona, unaware that he was actually referring to her

co-defendant, who was also Mexican.  The candidate was denied for five years at this parole hearing.

**Parole Candidate 6**

Parole Candidate 6 is an elderly Black woman who was discriminated against based her socioeconomic background and her experience as a survivor of sexual violence. In her 36 years of incarceration, she was denied parole 5 times, waived one hearing, and stipulated to unsuitability four consecutive times because she had lost all hope. She was incarcerated for killing a man in self-defense after he had raped her and threatened to kill her, and was consistently met with hostility and skepticism by the Board up until her final hearing.

Her socioeconomic background was raised in various ways to diminish her credibility. She was questioned repeatedly about her children who were placed in the foster care system – how many she had, how young she had them, whether they had the same father, and whether she abused them. On multiple occasions, she was outright accused of being a prostitute to discredit her experience as a victim of rape who killed her assailant.

> *[Commissioner] "Did you sell sex for five dollars?" [Candidate] "No."*
> *[Commissioner] "Did you sell sex for any amount of money?"  [Candidate] "No."*
>
> *[Commissioner] "Well what was you doing out at 1:30 in the morning? Were you a hooker?" [Candidate] "No." [Commissioner] "You never prostituted yourself?" [Candidate] "Never." [Commissioner] "How were you getting money then? Were you on welfare?"*

She was interrogated about her rape, including about how much clothing she had on. For example, Commissioners asked questions like: *"But you had your top on or whatever?", "Did he tear your clothes? What did he tear?", "Did you take off your clothes?"*

Commissioners asked many questions that conveyed their disbelief that PC 6 survived rape, as well as their complete lack of sensitivity for the trauma she endured: *"Why didn't you pull the knife out once he put the rope around your neck?"; "Once you got tired of what you described as humping on you, why didn't you pull out the knife when he was on top of you?"; "Where was that switchblade knife when you say Mr. Edwards attempted to rape you in the garage?"; "Well if you're afraid of him, why would you go after him with a knife?"*

Despite the many hearing panels who dismissed PC 6's account of her life crime, a panel of commissioners in 2021 finally granted parole and concluded, *"We both found your version very plausible. It's not the same version as the official record, but it's very plausible and it makes perfect sense to me that you go from a position of being scared and sexually assaulted to overwhelming anger."* They even questioned the integrity of the criminal investigation that

originally led to her prosecution. Now free, PC 6 finds healing and purpose in using her story to advocate for other survivors who are stuck in prison.

### Parole Candidate  7

Parole Candidate 7 has been incarcerated for approximately 35 years and was represented by Board-appointed attorneys during his two prior parole hearings. The attorney who was assigned to his hearing in 2020 met with him twice. The first meeting lasted approximately 30 minutes and took place after PC 7's Comprehensive Risk Assessment (CRA). During this meeting, the attorney could not answer any specific questions, such as how to address negative comments in his CRA, and even admitted that she had not read his Central File. His second meeting with his attorney took place the day of the hearing, and lasted only 15 minutes. During the hearing, the attorney did not highlight any of the parole applicant's positive accomplishments, including two A.A. degrees, extensive self help programming, and over 30 years of non-violent behavior. The attorney asked the panel for a 3-year denial instead of advocating for her client's release.

In PC 7's own words, *"I have had two appointed attorneys, and each time, I felt like I was alone. I felt like it was me against everyone else, including my attorney. I left my hearings feeling inadequate, and that no matter what I accomplish, it will never be good enough."*

### Parole Candidate 8

Parole Candidate 8 has been incarcerated for approximately 35 years, and has been represented by Board-appointed attorneys in multiple parole hearings.  Despite being found suitable for parole at his initial hearing, he reported having no idea what to expect, how to prepare for his hearing, or what documents to bring. During his only meeting with his attorney before the hearing, the attorney told him that he would not be surprised if he was denied parole for 10 years. He was granted parole, but when Governor Brown reversed the parole grant, the attorney did not contact him.

His next Board-appointed attorney spoke to him for about 30 minutes prior to his 2017 hearing, and failed to inform him about what documents to prepare for his hearing. The parole candidate was denied for five years. His next Board-appointed attorney spoke to him on the phone for less than 30 minutes before his parole hearing, and only spoke to him on the phone for a few minutes on the day of the hearing. This attorney did not respond to his written communications nor provide him with any advice tailored to his case, and refused to submit any of his supportive documentation to the Board. At his last parole hearing in 2021, his Board-appointed attorney spoke to him once on the phone for 15 minutes, and advised him against discussing how his COVID-related medical issues were impacting his ability to participate in his hearing. He was denied parole again.

### Parole Candidate 9

Parole Candidate 9 has been incarcerated for over 25 years. His Board-appointed attorney met with him only once for 5 minutes before his initial parole hearing, during which PC 9 explained

that he wanted to waive his right to a hearing due to pending litigation that could impact his case. The attorney told him that he did not have the proper paperwork with him and that he would bring the paperwork to their next meeting. However, the attorney never scheduled a subsequent meeting, nor wrote to him to explain the waiver process.

On the day of his hearing, the parole applicant expressed confusion about why the hearing was still taking place. The attorney denied ever discussing the desire to waive and stated that PC 9's only option was to stipulate to unsuitability. In PC 9's own words, *"I was shocked and felt sick to my stomach. I was completely unprepared for a hearing and had not put together any documents that may have been helpful to me. I know that when you stipulate, you can usually say a few things to show the good work that you have been doing. But I was not prepared to do any of that."* **The parole candidate ended up stipulating to unsuitability for 10 years.** He will not be eligible for another parole hearing until 2031 unless he can file a successful Petition to Advance his hearing (PTA).

### Parole Candidate 10

Parole Candidate 10 is a 66 year old native Spanish speaker. He has a well-documented learning disability and has not been able to learn English. He had no contact with his Board-appointed attorney until the day of his parole hearing in 2021. The attorney never wrote to PC 10, spoke to him by phone, nor advised him on how to prepare for his Comprehensive Risk Assessment (CRA) interview. PC 10 was unaware that he could bring mitigating documents to his CRA interview to lower his risk score.

His first meeting with his attorney was for a total of 5 minutes on the day of the hearing. It was clear that the attorney was not aware of his well-documented learning disability, nor familiar with the applicant's case. The attorney even told him that he should postpone his hearing because they had not met. The hearing proceeded as scheduled and lasted for six and a half hours. The attorney did not speak until the closing statement when he told the hearing panel that PC 10 was at fault because he chose not to follow the attorney's advice to postpone the hearing, which was a blatant lie. PC 10 required a translator during his hearing and had to communicate with both his translator and attorney using remote technology.

### Parole Candidate 11

Parole Candidate 11 has been incarcerated for approximately 25 years. He was assigned a Board-appointed attorney at his initial parole hearing in 2021, but was not afforded an opportunity to meet with his attorney before his CRA interview. He did not know what to expect or what to bring to the interview, and was surprised when the clinician told him that he could have received a lower risk score if he came with concrete parole plans. Because his first meeting with his attorney was a phone call that was not conducted in a private or confidential setting, PC 11 did not feel comfortable discussing the details of his case. During the meeting, the attorney scolded him for not having taken enough programs or groups, read from his CRA for the first time, and demonstrated a lack of familiarity with his case.

Before PC 11's second call with his attorney, he sent her copies of all his supporting documents. She never responded, provided comments, or sent them back. When he met with her for a few minutes right before the hearing, he reported that it felt like she had given up on him: *"When she told me I wasn't ready, I felt depressed. I felt like I was going into the hearing just to be denied. I did not want to feel that way going into my first hearing when I was already nervous."* Additionally, the attorney only informed the candidate that he would need to make a closing statement on the day of the hearing, forcing him to scramble to create one on short notice.

### Parole Candidate 12

Parole Candidate 12 is non-binary and has been incarcerated for nearly 20 years. A Board-appointed attorney was assigned to them at their last hearing in 2021. The parole candidate spoke to the attorney only once before the hearing, and at that meeting, the attorney told them to waive their hearing because there was no chance that they would be going home anyway. The attorney seemed to be interested in discussing the applicant's lifestyle, not their parole readiness. The attorney even refused to review the applicant's parole plans because he was certain that they would be shot down by the Board anyway. In the parole applicant's own words, *"I feel that my attorney was biased against me because of my gender identity and sexual preference. I wish I had known that my attorney was working for the Board. He did not help me at all and I feel like he never really wanted to in the first place."*

# Exhibit C

**DECLARATION OF KATY DYBWAD**

I, KATY DYBWAD, am over the age of twenty-one and am competent to make this declaration. I declare as follows:

1. My name is Katy Dybwad. I am currently employed as the Director of Operations at UnCommon Law.

2. I hold a Master of Business Administration from Massachusetts Institute of Technology Sloan School of Management and a Bachelor of Arts from Naropa University. I worked as an Associate and a Manager at McKinsey & Company consulting from 2014-2018. In my employment and education, I have developed expertise in data analysis and interpretation.

3. One of my recent job duties at UnCommon Law has included analyzing data received from the Board of Parole Hearings (Board) through a California Public Records Act request and from incarcerated people responding to a survey distributed by UnCommon Law to gather the experiences of people directly impacted by the Board's practices. In analyzing both sets of data, I have consulted with a data scientist to ensure the integrity and reliability of my analysis.

4. On July 23, 2021, UnCommon Law received an excel spreadsheet from the Board containing information about parole hearing outcomes, including the type of hearing, location of the parole applicant's incarceration, date of scheduled hearing, and type of representation (appointed versus privately retained). There were 19,437 rows of data and the time period was from January 2018 through January 2021. I used April 1, 2020 as the date to determine the impact of the 2020 policies because attorneys are appointed by the Board

approximately 120 days prior to the hearing. Thus, an attorney representing a client in April

likely was appointed after January 1, 2020. I analyzed this data to make the following

conclusions:

    a.  <u>Grant rates</u>:

          i.  In total, grant rates (grants divided by total scheduled hearings) for scheduled hearings with private attorneys are over two times higher than hearings with appointed attorneys (36.3% vs. 17.8%). Between January 2018 and March 2020, the grant rates were 38.8% and 19.0%. Between April 2020 and January 2021, they were 30.0% and 15.2%. (Table 1a.).

         ii.  Grant rates of hearings held (grants divided by the sum of grants and denials) for scheduled hearings with private attorneys are 1.7 times higher than for hearings with appointed attorneys (56.3% vs. 33.2%). (Table 2.)

        iii.  Grant rates for hearings with appointed attorneys did not meaningfully change after the Board's 2020 changes were in place. Comparing the pre and post periods of January 2018-March 2020 with April 2020-January 2021, there was almost no change in the grant rates of hearings held with private attorneys (33.3% vs. 33.0%). (Table 2.) For hearings scheduled, the grant rate dropped from 17.8% to 15.2% during this same period. (Table 1a.)

iv. Scheduled hearings with private attorneys had higher grant rates than hearings with appointed attorneys even when controlling for institution or institution level.

1. At the 32 institutions where each attorney type had at least 10 hearings, hearings with private attorneys had higher grant rates than hearings with appointed attorneys at 30 of the 32 institutions (94% of institutions). (Chart 1.)

2. I grouped Level IV institutions based on a methodology used by Stanford researchers. A Level IV institution refers to a prison where more than half of the population is classified as Level IV, based on https://www.cdcr.ca.gov/research/compstat. Using these groupings, I found that regardless of institution level, hearings with private attorneys have higher grant rates than hearings with appointed attorneys.

   a. At higher level institutions (majority Level IV), the difference in grant rates for hearings scheduled was 18.0% vs. 5.5% for hearings with private attorneys compared with appointed attorneys. The grant rate for hearings

held at higher level institutions was 38.0% vs.

14.6%. (Tables 6a-c, Table 10.)

b. Stipulation and Waivers

i. The stipulation rate decreased for all parole hearings, no matter the type of attorney representation during the April 2020-January 2021 period. The rate of stipulations for hearings with appointed attorneys decreased from 11.1% to 4.0% from January 2018-March 2020 to April 2020-January 2021. The rate of stipulations for hearings with private attorneys decreased to nearly zero, from 4.2% to 0.5% from January 2018-March 2020 to April 2020-January 2021. (Table 1a.)

ii. During the same comparison time period, waivers increased from 8.2% to 14.5% for hearings with appointed attorneys, and from 7.9% to 10.2% for hearings with private attorneys. (Table 1a.)

iii. Between April 2020 and January 2021, 85.0% of hearings with private attorneys were waived for the minimum waiver length of one year (as compared to 77.8% between January 2018 and April 2020). (Table 5a.)

iv. Between April 2020 and January 2021, 61.3% of hearings with appointed attorneys were waived for one year (as

compared to 64.1% between January 2018 and April 2020).
(Table 5a.)

v. Out of all hearings that were waived, those with appointed attorneys were waived for two years 20.2% of the time, compared to 13.0% of the time with private attorneys. (Table 5a.)

vi. Out of all hearings that were waived, those with appointed attorneys were waived for three years 14.6% of the time, compared to 6% of the time with private attorneys. (Table 5a.)

vii. On average, hearings that were waived with appointed attorneys averaged three months longer waiver periods than with private attorneys. Based on a difference in differences analysis, there was no statistically significant change in the gap between waiver lengths for people represented by appointed and private attorneys after the Board implemented the 2020 policies.

c. Denials:

i. 38.1% of scheduled hearings with an appointed attorney resulted in a denial between 2018 and 2020 versus 29.4% with private attorneys. The denial rate decreased for people

represented by appointed and private attorneys during the April 2020-January 2021 period. (Table 1a.)

ii. 60.2% of all denials for hearings with an appointed attorney were 3-year denials. However, the rate slightly increased from 59.4% to 62.4% from the January 2018-March 2020 time period to April 2020-January 2021 time period. (Table 3a.)

iii. 72.9% of all denials for hearings with a private attorney were 3-year denials. However, the rate slightly decreased from 73.2% to 71.8% from the January 2018-March 2020 time period to April 2020-January 2021 time period. (Table 3a.)

iv. On average, hearings with an appointed attorney that resulted in a denial had an average length six months longer than denials in hearings with private attorneys. Based on a difference in differences analysis, there was no statistically significant change in the gap between denial lengths for people represented by appointed and private attorneys after the Board implemented the 2020 policies.

5. Beginning in around November 2020 through May 2021, UnCommon Law sent approximately 800 surveys to randomly selected incarcerated people to solicit information about their experiences with attorneys appointed by the Board. Surveys were sent to people who had hearings between January 1, 2020 and April 16, 2020 that ended in a

PA8            Appendices Supporting In Re Poole Case No. A161030

denial, stipulation, or waiver. For each category of the hearing result, UnCommon Law created a sample proportionate to how many hearings overall resulted in the particular hearing outcome. To date, UnCommon Law has received a total of 210 survey responses. From this total pool, UnCommon Law analyzed 142 responses from eligible respondents who had an appointed attorney and were notified that they were appointed an attorney on or after January 1, 2020. In some cases, there are relatively high rates of no response or an unclear response, which I have catalogued as such in my tables. This may be a result of people's limited time, reading and writing ability, ability to answer all questions within an extensive survey, the lack of incentives to complete the survey, the randomized nature of the survey, and the logistical and financial challenges of using the mail system within prisons. I analyzed this data to make the following conclusions:

    a. <u>Proportion of appointed attorneys meeting updated requirements as reported by survey respondents</u>:

        i. *Meeting with the attorney[1] for at least one hour*: Only 23.9% (34) of respondents reported that they met with their attorney for at least one hour. 55.6% (79) of respondents said they met for less than an hour, and 20.4% (29) did not respond. (Table 11.)

        ii. *Meeting with the attorney for at least one hour and having a second meeting*: Only 23.9% (34) respondents met with their

---

[1]    All references to "attorney" in this section are appointed attorneys because the respondent sample only included those who were represented by an appointed attorney.

attorney for at least an hour and had a second meeting. (Table 12.)

iii. *Meeting with the attorney prior to the client's CRA interview*: Only 40.8% (58) of respondents indicated that they met with their attorney prior to their CRA interview. 54.9% (78) responded that they did not meet, and 4.2% (6) did not respond. (Table 13.)

iv. *Attorney reviewing the central file prior to the first meeting*: 46.5% (66) of respondents believed that their attorney had reviewed their central file prior to the meeting. 47.9% (68) of respondents responded that they did not believe it was reviewed and 5.6% (8) did not respond. (Table 14.)

v. *Met all criteria of new policies*: Only 7.7% (11) of respondents affirmed that their attorney met all of the requirements outlined the Board's 2020 policies, meaning they responded yes to meeting for more than one hour, having a second meeting, meeting with their attorney prior to their CRA interview, and believing their attorney had reviewed their C-File prior to their first meeting. 11.3% (16) responded no to all of the questions and 81.0% (115) did not respond or responded "unsure" to one or more of the questions. (Table 15.)

  vi. *Summary*: While there were multiple blank responses that add some noise to this analysis, I can see that there was no requirement that was met by more than 50% of appointed attorneys.

b. <u>Correspondence with attorneys</u>:

  i. 74 respondents, more than half of the sample of respondents, indicated that they wrote to their attorney. Of those 74, only 29.7% (22) reported receiving a response from their attorney. 66.2% (49) reported that they did not receive a response and 4.1% (3) did not answer the survey question. (Table 16.)

  ii. 77 respondents, more than half of the sample of respondents, indicated that they sent documents to their attorney. Only 36.4% (28) reported receiving feedback from their attorney. 62.3% (48) reported they did not receive feedback from their attorney. 1.3% (1) did not respond to the question. (Table 17.)

c. <u>Preparing for the hearing</u>:

  i. *Discussing closing statements*: Only 26.8% (38) of respondents reported discussing a closing statement with their attorney. 66.9% (95) reported they did not and 6.3% (9) did not respond to the question. (Table 18.)

  ii. *Reasonable accommodations*: 77 respondents indicated that they had a disability. Of those, only 20.8% (16) reported that

they were provided reasonable accommodations in meetings. 55.8% (43) reported that they were not provided reasonable accommodations and 23.4% (18) did not respond. (Table 24.)

    iii. *Virtual hearings*: 38% (54) of respondents reported that they were advised on what to expect in a virtual hearing. 47.9% (68) respondents were not advised on what to expect in a virtual hearing. 14.1% (20) did not respond. (Table 22.)

        1. 52.8% (75) of respondents reported that COVID-19 has an impact on their ability to submit evidence to the Board. (Table 23.)

d. <u>Advising on procedural rights</u>:

    i. *Waiving the hearing*: 46.5% (66) of respondents reported that they were advised of their right to waive their hearing. 49.3% (70) responded that they were not advised of their right to waive, and 4.2% (6) did not respond. (Table 19.)

    ii. *Stipulating to unsuitability*: 31.0% (44) of respondents stated that their attorney advised them of their right to stipulate to unsuitability. 62.0% (88) of respondents said that their attorney did not advise them of the right, and 7.0% (10) did not know or did not respond. (Table 20.)

       iii.  *Virtual hearing*: 37.3% (53) of respondents reported that they were informed of their legal rights for virtual parole hearings. (Table 21.)

   e.  <u>Quality of representation</u>:

       i.  Survey respondents were asked to rank the quality of their representation on a 1-5 scale, where 1 was completely inadequate, 2 was below adequate, 3 was adequate, 4 was good, and 5 was excellent.

       ii.  More than half of respondents reported that their representation was below adequate or completely inadequate (55.6% total, or 79 respondents). Only 2.1% (3) described the support as excellent and 12.7% (18) described the support as good, while 11.3% (16) did not respond. (Chart 2.)

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2021, in Berkeley, California.

                           <u>/s/ Katy Dybwad</u>

                           Katy Dybwad

Appendix 2                                                                 Page 1

**Table 1a. Scheduled hearing results by attorney type for the pre and post periods (%)**

n=18,139

Excludes hearings with attorney type: "blank" and "state/private"

| Attorney type | Hearing outcome ( % total hearings) | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| Private | 1.6% | 28.2% | 36.3% | 22.2% | 3.2% | 8.6% | 100.0% |
| April 2020-Jan 2021 | 1.2% | 25.3% | 30.0% | 32.9% | 0.5% | 10.2% | 100.0% |
| Jan 2018-March 2020 | 1.7% | 29.4% | 38.8% | 17.9% | 4.2% | 7.9% | 100.0% |
| State | 0.7% | 35.7% | 17.8% | 26.7% | 8.8% | 10.3% | 100.0% |
| April 2020-Jan 2021 | 0.5% | 30.9% | 15.2% | 34.8% | 4.0% | 14.5% | 100.0% |
| Jan 2018-March 2020 | 0.8% | 38.1% | 19.0% | 22.6% | 11.1% | 8.2% | 100.0% |
| Grand Total | 0.8% | 34.9% | 19.9% | 26.2% | 8.1% | 10.1% | 100.0% |

**Table 1b. Scheduled hearing results by attorney type for the pre and post periods (#)**

Excludes hearings with attorney type: "blank" and "state/private"

| Attorney type | Hearing outcome | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| Private | 32 | 582 | 749 | 458 | 65 | 177 | 2,063 |
| April 2020-Jan 2021 | 7 | 149 | 177 | 194 | 3 | 60 | 590 |
| Jan 2018-March 2020 | 25 | 433 | 572 | 264 | 62 | 117 | 1,473 |
| State | 116 | 5,743 | 2,854 | 4,293 | 1,409 | 1,661 | 16,076 |
| April 2020-Jan 2021 | 26 | 1,651 | 815 | 1,863 | 216 | 776 | 5,347 |
| Jan 2018-March 2020 | 90 | 4,092 | 2,039 | 2,430 | 1,193 | 885 | 10,729 |
| Grand Total | 148 | 6,325 | 3,603 | 4,751 | 1,474 | 1,838 | 18,139 |

**Table 2. Grant rate for hearings held by attorney type for the pre and post periods (%)**

n=9,928

| Attorney type | Grant rate for hearings held |
|---|---|
| Private | 56.3% |
| April 2020-Jan 2021 | 54.3% |
| Jan 2018-March 2020 | 56.9% |
| State | 33.2% |
| April 2020-Jan 2021 | 33.0% |
| Jan 2018-March 2020 | 33.3% |
| Grand Total | 36.3% |

PA14          Appendices Supporting In Re Poole Case No. A161030

Appendix 2

**Table 3a. Denial length by attorney type for the pre and post periods (%)**

n=6,325

| Attorney type | Denial length | | | | | Grand Total |
| --- | --- | --- | --- | --- | --- | --- |
| | 3 yr | 5 yr | 7 yr | 10 yr | 15 yr | |
| **Private** | 72.9% | 22.9% | 3.8% | 0.5% | 0.0% | 100.0% |
| April 2020-Jan 2021 | 71.8% | 24.2% | 3.4% | 0.7% | 0.0% | 100.0% |
| Jan 2018-March 2020 | 73.2% | 22.4% | 3.9% | 0.5% | 0.0% | 100.0% |
| **State** | 60.2% | 29.3% | 8.4% | 1.8% | 0.2% | 100.0% |
| April 2020-Jan 2021 | 62.4% | 28.1% | 7.6% | 1.8% | 0.1% | 100.0% |
| Jan 2018-March 2020 | 59.4% | 29.8% | 8.7% | 1.8% | 0.2% | 100.0% |
| **Grand Total** | 61.4% | 28.7% | 8.0% | 1.7% | 0.2% | 100.0% |

**Table 3b. Denial length by attorney type for the pre and post periods (#)**

n=6,325

| Attorney type | Denial length | | | | | Grand Total |
| --- | --- | --- | --- | --- | --- | --- |
| | 3 yr | 5 yr | 7 yr | 10 yr | 15 yr | |
| **Private** | 424 | 133 | 22 | 3 | | 582 |
| April 2020-Jan 2021 | 107 | 36 | 5 | 1 | | 149 |
| Jan 2018-March 2020 | 317 | 97 | 17 | 2 | | 433 |
| **State** | 3,460 | 1,685 | 484 | 104 | 10 | 5,743 |
| April 2020-Jan 2021 | 1,031 | 464 | 126 | 29 | 1 | 1,651 |
| Jan 2018-March 2020 | 2,429 | 1,221 | 358 | 75 | 9 | 4,092 |
| **Grand Total** | 3,884 | 1,818 | 506 | 107 | 10 | 6,325 |

Appendices Supporting In Re Poole Case No. A161030

**Table 4a. Stipulation length by attorney type for the pre and post periods (%)**

n=1,474

| Attorney type | Stipulation length | | | | | Grand Total |
| | 1 yr | 3 yr | 5 yr | 7 yr | 10 yr | |
|---|---|---|---|---|---|---|
| Private | 0.0% | 75.4% | 23.1% | 1.5% | 0.0% | 100.0% |
| April 2020-Jan 2021 | 0.0% | 66.7% | 33.3% | 0.0% | 0.0% | 100.0% |
| Jan 2018-March 2020 | 0.0% | 75.8% | 22.6% | 1.6% | 0.0% | 100.0% |
| State | 0.3% | 74.2% | 23.8% | 1.6% | 0.1% | 100.0% |
| April 2020-Jan 2021 | 0.0% | 80.1% | 19.9% | 0.0% | 0.0% | 100.0% |
| Jan 2018-March 2020 | 0.3% | 73.2% | 24.6% | 1.8% | 0.1% | 100.0% |
| Grand Total | 0.3% | 74.3% | 23.8% | 1.6% | 0.1% | 100.0% |

**Table 4b. Stipulation length by attorney type for the pre and post periods (#)**

n=1,474

| Attorney type | Stipulation length | | | | | Grand Total |
| | 1 yr | 3 yr | 5 yr | 7 yr | 10 yr | |
|---|---|---|---|---|---|---|
| Private | | | 49 | 15 | 1 | | 65 |
| April 2020-Jan 2021 | | | 2 | 1 | | | 3 |
| Jan 2018-March 2020 | | | 47 | 14 | 1 | | 62 |
| State | 4 | 1,046 | 336 | 22 | 1 | 1,409 |
| April 2020-Jan 2021 | | 173 | 43 | | | 216 |
| Jan 2018-March 2020 | 4 | 873 | 293 | 22 | 1 | 1,193 |
| Grand Total | 4 | 1,095 | 351 | 23 | 1 | 1,474 |

## Table 5a. Waiver length by attorney type for the pre and post periods (%)
n=1,838

| Attorney type | Waiver length | | | | | Grand Total |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 yr | 2 yr | 3 yr | 4 yr | 5 yr | |
| **Private** | 80.2% | 13.0% | 5.6% | 0.6% | 0.6% | 100.0% |
| April 2020-Jan 2021 | 85.0% | 10.0% | 3.3% | 0.0% | 1.7% | 100.0% |
| Jan 2018-March 2020 | 77.8% | 14.5% | 6.8% | 0.9% | 0.0% | 100.0% |
| **State** | 62.8% | 20.2% | 14.6% | 0.5% | 1.9% | 100.0% |
| April 2020-Jan 2021 | 61.3% | 21.8% | 14.4% | 0.5% | 1.9% | 100.0% |
| Jan 2018-March 2020 | 64.1% | 18.8% | 14.7% | 0.6% | 1.9% | 100.0% |
| **Grand Total** | 64.5% | 19.5% | 13.7% | 0.5% | 1.8% | 100.0% |

## Table 5b. Waiver length by attorney type for the pre and post periods (#)
n=1,838

| Attorney type | Waiver length | | | | | Grand Total |
| --- | --- | --- | --- | --- | --- | --- |
| | 1 yr | 2 yr | 3 yr | 4 yr | 5 yr | |
| **Private** | 142 | 23 | 10 | 1 | 1 | 177 |
| April 2020-Jan 2021 | 51 | 6 | 2 | | 1 | 60 |
| Jan 2018-March 2020 | 91 | 17 | 8 | 1 | | 117 |
| **State** | 1,043 | 335 | 242 | 9 | 32 | 1,661 |
| April 2020-Jan 2021 | 476 | 169 | 112 | 4 | 15 | 776 |
| Jan 2018-March 2020 | 567 | 166 | 130 | 5 | 17 | 885 |
| **Grand Total** | 1,185 | 358 | 252 | 10 | 33 | 1,838 |

**Table 6a. Hearing outcome by attorney type for the pre and post periods for Level 4 prisons (%)**

n=3,107

| Attorney type | Hearing outcome | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| **Private** | 2.0% | 29.4% | 18.0% | 24.3% | 7.5% | 18.8% | 100.0% |
| April 2020-Jan 2021 | 0.0% | 23.5% | 19.8% | 32.1% | 1.2% | 23.5% | 100.0% |
| Jan 2018-March 2020 | 2.9% | 32.2% | 17.2% | 20.7% | 10.3% | 16.7% | 100.0% |
| **State** | 0.4% | 32.3% | 5.5% | 31.5% | 13.5% | 16.8% | 100.0% |
| April 2020-Jan 2021 | 0.2% | 28.1% | 6.3% | 35.6% | 5.9% | 23.9% | 100.0% |
| Jan 2018-March 2020 | 0.4% | 34.4% | 5.1% | 29.5% | 17.3% | 13.2% | 100.0% |
| **Grand Total** | 0.5% | 32.1% | 6.5% | 30.9% | 13.0% | 16.9% | 100.0% |

**Table 6b. Hearing outcome by attorney type for the pre and post periods for Level 4 prisons (#)**

n=3,107

| Attorney type | Hearing outcome | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| **Private** | 5 | 75 | 46 | 62 | 19 | 48 | 255 |
| April 2020-Jan 2021 | | 19 | 16 | 26 | 1 | 19 | 81 |
| Jan 2018-March 2020 | 5 | 56 | 30 | 36 | 18 | 29 | 174 |
| **State** | 10 | 922 | 157 | 899 | 386 | 478 | 2,852 |
| April 2020-Jan 2021 | 2 | 265 | 59 | 336 | 56 | 226 | 944 |
| Jan 2018-March 2020 | 8 | 657 | 98 | 563 | 330 | 252 | 1,908 |
| **Grand Total** | 15 | 997 | 203 | 961 | 405 | 526 | 3,107 |

**Table 6c. Grant rate for hearings held by attorney type for pre and post periods for Level 4 prisons (%**

n=3,107

Grants / Grants + Denials

| Attorney type | Grant rate for hearings held |
|---|---|
| **Private** | 38.0% |
| April 2020-Jan 2021 | 45.7% |
| Jan 2018-March 2020 | 34.9% |
| **State** | 14.6% |
| April 2020-Jan 2021 | 18.2% |
| Jan 2018-March 2020 | 13.0% |
| **Grand Total** | 16.9% |

**Table 7a. Hearing outcome by attorney type for the pre and post periods for lower level prisons (%)**

n=15,032

| Attorney type | Hearing outcome | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| **Private** | 1.5% | 28.0% | 38.9% | 21.9% | 2.5% | 7.1% | 100.0% |
| April 2020-Jan 2021 | 1.4% | 25.5% | 31.6% | 33.0% | 0.4% | 8.1% | 100.0% |
| Jan 2018-March 2020 | 1.5% | 29.0% | 41.7% | 17.6% | 3.4% | 6.8% | 100.0% |
| **State** | 0.8% | 36.5% | 20.4% | 25.7% | 7.7% | 8.9% | 100.0% |
| April 2020-Jan 2021 | 0.5% | 31.5% | 17.2% | 34.7% | 3.6% | 12.5% | 100.0% |
| Jan 2018-March 2020 | 0.9% | 38.9% | 22.0% | 21.2% | 9.8% | 7.2% | 100.0% |
| **Grand Total** | 0.9% | 35.4% | 22.6% | 25.2% | 7.1% | 8.7% | 100.0% |

**Table 7b. Hearing outcome by attorney type for the pre and post periods for lower level prisons (#)**

n=15,032

| Attorney type | Hearing Outcome | | | | | | Grand Total |
|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | |
| **Private** | 27 | 507 | 703 | 396 | 46 | 129 | 1,808 |
| April 2020-Jan 2021 | 7 | 130 | 161 | 168 | 2 | 41 | 509 |
| Jan 2018-March 2020 | 20 | 377 | 542 | 228 | 44 | 88 | 1,299 |
| **State** | 106 | 4,821 | 2,697 | 3,394 | 1,023 | 1,183 | 13,224 |
| April 2020-Jan 2021 | 24 | 1,386 | 756 | 1,527 | 160 | 550 | 4,403 |
| Jan 2018-March 2020 | 82 | 3,435 | 1,941 | 1,867 | 863 | 633 | 8,821 |
| **Grand Total** | 133 | 5,328 | 3,400 | 3,790 | 1,069 | 1,312 | 15,032 |

**Table 7c. Grant rate for hearings held by attorney type for pre and post periods for lower level prison**

n=15,032

Grants / Grants + Denials

| Attorney type | Grant rate for hearings held |
|---|---|
| **Private** | 58.1% |
| April 2020-Jan 2021 | 55.3% |
| Jan 2018-March 2020 | 59.0% |
| **State** | 35.9% |
| April 2020-Jan 2021 | 35.3% |
| Jan 2018-March 2020 | 36.1% |
| **Grand Total** | 39.0% |

PA19        Appendices Supporting In Re Poole Case No. A161030

Appendix 2

**Table 8. Hearing outcomes and outcome rates by institution and attorney type (#, %)**
n=18,139

| Institution and attorney type | Hearing outcome | | | | | | | Hearing outcome rate | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Continue | Deny | Grant | Postpon | Stip | Waive | Grand Total | Grant rate | Denial rate | Stip rate | Waiver rate | hearings held |
| **Avenal State Prison** | 5 | 235 | 167 | 153 | 31 | 36 | 627 | 27% | 37% | 5% | 6% | 42% |
| Private | 1 | 18 | 30 | 13 | 1 | 6 | 69 | 43% | 26% | 1% | 9% | 63% |
| State | 4 | 217 | 137 | 140 | 30 | 30 | 558 | 25% | 39% | 5% | 5% | 39% |
| **California City Correctional Center** | | 16 | 6 | 9 | 6 | 7 | 44 | 14% | 36% | 14% | 16% | 27% |
| Private | | 1 | 1 | 1 | | | 3 | 33% | 33% | 0% | 0% | 50% |
| State | | 15 | 5 | 8 | 6 | 7 | 41 | 12% | 37% | 15% | 17% | 25% |
| **California Correctional Center** | | 11 | 12 | 7 | 4 | 9 | 43 | 28% | 26% | 9% | 21% | 52% |
| Private | | 3 | 1 | | | | 4 | 25% | 75% | 0% | 0% | 25% |
| State | | 8 | 11 | 7 | 4 | 9 | 39 | 28% | 21% | 10% | 23% | 58% |
| **California Correctional Institution** | | 102 | 95 | 77 | 60 | 59 | 393 | 24% | 26% | 15% | 15% | 48% |
| Private | | 8 | 10 | 6 | 1 | 2 | 27 | 37% | 30% | 4% | 7% | 56% |
| State | | 94 | 85 | 71 | 59 | 57 | 366 | 23% | 26% | 16% | 16% | 47% |
| **California Health Care Facility** | 15 | 313 | 150 | 299 | 65 | 92 | 934 | 16% | 34% | 7% | 10% | 32% |
| Private | 4 | 20 | 23 | 19 | 2 | 9 | 77 | 30% | 26% | 3% | 12% | 53% |
| State | 11 | 293 | 127 | 280 | 63 | 83 | 857 | 15% | 34% | 7% | 10% | 30% |
| **California Institution for Men** | 2 | 159 | 66 | 166 | 32 | 48 | 473 | 14% | 34% | 7% | 10% | 29% |
| Private | 1 | 17 | 18 | 10 | | 9 | 55 | 33% | 31% | 0% | 16% | 51% |
| State | 1 | 142 | 48 | 156 | 32 | 39 | 418 | 11% | 34% | 8% | 9% | 25% |
| **California Institution for Women** | 3 | 104 | 88 | 55 | 19 | 22 | 291 | 30% | 36% | 7% | 8% | 46% |
| Private | 2 | 22 | 39 | 10 | | 3 | 76 | 51% | 29% | 0% | 4% | 64% |
| State | 1 | 82 | 49 | 45 | 19 | 19 | 215 | 23% | 38% | 9% | 9% | 37% |
| **California Medical Facility** | 13 | 307 | 149 | 237 | 45 | 54 | 805 | 19% | 38% | 6% | 7% | 33% |
| Private | 2 | 27 | 25 | 26 | 2 | 1 | 83 | 30% | 33% | 2% | 1% | 48% |
| State | 11 | 280 | 124 | 211 | 43 | 53 | 722 | 17% | 39% | 6% | 7% | 31% |
| **California Men's Colony** | 8 | 433 | 362 | 311 | 80 | 70 | 1264 | 29% | 34% | 6% | 6% | 46% |
| Private | | 55 | 72 | 34 | 1 | 13 | 175 | 41% | 31% | 1% | 7% | 57% |
| State | 8 | 378 | 290 | 277 | 79 | 57 | 1089 | 27% | 35% | 7% | 5% | 43% |
| **California Rehabilitation Center** | | 14 | 10 | 41 | 4 | 8 | 77 | 13% | 18% | 5% | 10% | 42% |
| Private | | | | 2 | | | 2 | 0% | 0% | 0% | 0% | N/A |
| State | | 14 | 10 | 39 | 4 | 8 | 75 | 13% | 19% | 5% | 11% | 42% |
| **California State Prison, Corcoran** | 2 | 121 | 24 | 137 | 50 | 69 | 403 | 6% | 30% | 12% | 17% | 17% |
| Private | | 7 | 2 | 3 | 2 | 5 | 19 | 11% | 37% | 11% | 26% | 22% |
| State | 2 | 114 | 22 | 134 | 48 | 64 | 384 | 6% | 30% | 13% | 17% | 16% |
| **California State Prison, Los Angeles Cour** | 5 | 220 | 101 | 164 | 62 | 78 | 630 | 16% | 35% | 10% | 12% | 31% |
| Private | 3 | 27 | 32 | 16 | 6 | 4 | 88 | 36% | 31% | 7% | 5% | 54% |
| State | 2 | 193 | 69 | 148 | 56 | 74 | 542 | 13% | 36% | 10% | 14% | 26% |
| **California State Prison, Sacramento** | 4 | 102 | 5 | 116 | 34 | 77 | 338 | 1% | 30% | 10% | 23% | 5% |
| Private | 2 | 7 | 1 | 4 | 2 | 9 | 25 | 4% | 28% | 8% | 36% | 13% |
| State | 2 | 95 | 4 | 112 | 32 | 68 | 313 | 1% | 30% | 10% | 22% | 4% |
| **California State Prison, San Quentin** | 8 | 374 | 289 | 183 | 41 | 57 | 952 | 30% | 39% | 4% | 6% | 44% |
| Private | 3 | 45 | 88 | 27 | | 8 | 171 | 51% | 26% | 0% | 5% | 66% |
| State | 5 | 329 | 201 | 156 | 41 | 49 | 781 | 26% | 42% | 5% | 6% | 38% |
| **California State Prison, Solano** | 12 | 532 | 322 | 251 | 40 | 66 | 1223 | 26% | 43% | 3% | 5% | 38% |
| Private | 2 | 43 | 45 | 33 | 3 | 2 | 128 | 35% | 34% | 2% | 2% | 51% |
| State | 10 | 489 | 277 | 218 | 37 | 64 | 1095 | 25% | 45% | 3% | 6% | 36% |
| **Calipatria State Prison** | 1 | 141 | 22 | 119 | 48 | 42 | 373 | 6% | 38% | 13% | 11% | 13% |
| Private | | 10 | 1 | 15 | 3 | 7 | 36 | 3% | 28% | 8% | 19% | 9% |
| State | 1 | 131 | 21 | 104 | 45 | 35 | 337 | 6% | 39% | 13% | 10% | 14% |
| **Centinela State Prison** | 3 | 97 | 22 | 98 | 51 | 44 | 315 | 7% | 31% | 16% | 14% | 18% |
| Private | | 9 | 6 | 15 | 3 | 5 | 38 | 16% | 24% | 8% | 13% | 40% |
| State | 3 | 88 | 16 | 83 | 48 | 39 | 277 | 6% | 32% | 17% | 14% | 15% |
| **Central California Women's Facility** | 8 | 125 | 113 | 97 | 22 | 37 | 402 | 28% | 31% | 5% | 9% | 47% |
| Private | 3 | 23 | 28 | 18 | 2 | 8 | 82 | 34% | 28% | 2% | 10% | 55% |
| State | 5 | 102 | 85 | 79 | 20 | 29 | 320 | 27% | 32% | 6% | 9% | 45% |
| **Chuckawalla Valley State Prison** | | 132 | 127 | 82 | 21 | 27 | 389 | 33% | 34% | 5% | 7% | 49% |
| Private | | 9 | 23 | 13 | | | 45 | 51% | 20% | 0% | 0% | 72% |
| State | | 123 | 104 | 69 | 21 | 27 | 344 | 30% | 36% | 6% | 8% | 46% |

PA20        Appendices Supporting In Re Poole Case No. A161030

**Table 8. Hearing outcomes and outcome rates by institution and attorney type (#, %) CONTINUED**
n=18,139

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COCF - La Palma Correctional Center | | | | | 1 | | 1 | 0% | 0% | 100% | 0% | N/A |
| State | | | | | 1 | | 1 | 0% | 0% | 100% | 0% | N/A |
| COCF - Tallahatchie County Correctional Facility | | | | 1 | | | 1 | 0% | 0% | 0% | 0% | N/A |
| State | | | | 1 | | | 1 | 0% | 0% | 0% | 0% | N/A |
| Correctional Training Facility | 16 | 622 | 432 | 412 | 90 | 117 | 1689 | 26% | 37% | 5% | 7% | 41% |
| Private | 2 | 47 | 85 | 42 | 4 | 9 | 189 | 45% | 25% | 2% | 5% | 64% |
| State | 14 | 575 | 347 | 370 | 86 | 108 | 1500 | 23% | 38% | 6% | 7% | 38% |
| Deuel Vocational Institution | 1 | 66 | 43 | 52 | 13 | 24 | 199 | 22% | 33% | 7% | 12% | 39% |
| Private | | 11 | 7 | 4 | 2 | | 24 | 29% | 46% | 8% | 0% | 39% |
| State | 1 | 55 | 36 | 48 | 11 | 24 | 175 | 21% | 31% | 6% | 14% | 40% |
| Folsom State Prison | 4 | 300 | 177 | 181 | 67 | 78 | 807 | 22% | 37% | 8% | 10% | 37% |
| Private | 2 | 29 | 34 | 20 | 5 | 8 | 98 | 35% | 30% | 5% | 8% | 54% |
| State | 2 | 271 | 143 | 161 | 62 | 70 | 709 | 20% | 38% | 9% | 10% | 35% |
| High Desert State Prison | 1 | 55 | 6 | 85 | 43 | 75 | 265 | 2% | 21% | 16% | 28% | 10% |
| Private | | 5 | | 4 | 2 | 5 | 16 | 0% | 31% | 13% | 31% | 0% |
| State | 1 | 50 | 6 | 81 | 41 | 70 | 249 | 2% | 20% | 16% | 28% | 11% |
| Ironwood State Prison | 3 | 123 | 106 | 74 | 23 | 36 | 365 | 29% | 34% | 6% | 10% | 46% |
| Private | 1 | 11 | 27 | 10 | 1 | 3 | 53 | 51% | 21% | 2% | 6% | 71% |
| State | 2 | 112 | 79 | 64 | 22 | 33 | 312 | 25% | 36% | 7% | 11% | 41% |
| Kern Valley State Prison | 1 | 138 | 10 | 82 | 71 | 95 | 397 | 3% | 35% | 18% | 24% | 7% |
| Private | | 11 | 5 | 6 | 2 | 6 | 30 | 17% | 37% | 7% | 20% | 31% |
| State | 1 | 127 | 5 | 76 | 69 | 89 | 367 | 1% | 35% | 19% | 24% | 4% |
| Mule Creek State Prison | 7 | 272 | 109 | 186 | 78 | 75 | 727 | 15% | 37% | 11% | 10% | 29% |
| Private | 2 | 17 | 22 | 16 | 2 | 5 | 64 | 34% | 27% | 3% | 8% | 56% |
| State | 5 | 255 | 87 | 170 | 76 | 70 | 663 | 13% | 38% | 11% | 11% | 25% |
| North Kern State Prison | | 27 | 4 | 40 | 14 | 11 | 96 | 4% | 28% | 15% | 11% | 13% |
| Private | | 4 | | 2 | | 3 | 9 | 0% | 44% | 0% | 33% | 0% |
| State | | 23 | 4 | 38 | 14 | 8 | 87 | 5% | 26% | 16% | 9% | 15% |
| Pelican Bay State Prison | | 84 | 21 | 111 | 33 | 35 | 284 | 7% | 30% | 12% | 12% | 20% |
| Private | | 4 | 4 | 8 | 1 | 8 | 25 | 16% | 16% | 4% | 32% | 50% |
| State | | 80 | 17 | 103 | 32 | 27 | 259 | 7% | 31% | 12% | 10% | 18% |
| Pleasant Valley State Prison | 1 | 61 | 23 | 73 | 18 | 56 | 232 | 10% | 26% | 8% | 24% | 27% |
| Private | | 6 | 4 | 7 | 2 | 7 | 26 | 15% | 23% | 8% | 27% | 40% |
| State | 1 | 55 | 19 | 66 | 16 | 49 | 206 | 9% | 27% | 8% | 24% | 26% |
| PRCCF - Central Valley | | | | | | 1 | 1 | 0% | 0% | 0% | 100% | N/A |
| State | | | | | | 1 | 1 | 0% | 0% | 0% | 100% | N/A |
| PRCCF - Golden State | | 1 | | | | 1 | 2 | 0% | 50% | 0% | 50% | 0% |
| State | | 1 | | | | 1 | 2 | 0% | 50% | 0% | 50% | 0% |
| PUCCF - Taft | | 1 | | 1 | | | 2 | 0% | 50% | 0% | 0% | 0% |
| State | | 1 | | 1 | | | 2 | 0% | 50% | 0% | 0% | 0% |
| Richard J. Donovan Correctional Facility | 9 | 261 | 107 | 213 | 102 | 87 | 779 | 14% | 34% | 13% | 11% | 29% |
| Private | | 19 | 29 | 15 | 4 | 5 | 72 | 40% | 26% | 6% | 7% | 60% |
| State | 9 | 242 | 78 | 198 | 98 | 82 | 707 | 11% | 34% | 14% | 12% | 24% |
| Sacramento Central Office | 3 | 18 | 16 | 20 | 6 | 7 | 70 | 23% | 26% | 9% | 10% | 47% |
| Private | 1 | 3 | 3 | 2 | 1 | | 10 | 30% | 30% | 10% | 0% | 50% |
| State | 2 | 15 | 13 | 18 | 5 | 7 | 60 | 22% | 25% | 8% | 12% | 46% |
| Salinas Valley State Prison | 1 | 136 | 14 | 147 | 64 | 55 | 417 | 3% | 33% | 15% | 13% | 9% |
| Private | | 4 | 1 | 6 | 1 | 4 | 16 | 6% | 25% | 6% | 25% | 20% |
| State | 1 | 132 | 13 | 141 | 63 | 51 | 401 | 3% | 33% | 16% | 13% | 9% |
| Sierra Conservation Center | 3 | 73 | 69 | 70 | 5 | 17 | 237 | 29% | 31% | 2% | 7% | 49% |
| Private | 1 | 7 | 15 | 4 | 1 | 2 | 30 | 50% | 23% | 3% | 7% | 68% |
| State | 2 | 66 | 54 | 66 | 4 | 15 | 207 | 26% | 32% | 2% | 7% | 45% |
| State Hospitals - Atascadero | | 6 | | 6 | 2 | 5 | 19 | 0% | 32% | 11% | 26% | 0% |
| Private | | | | | | 1 | 1 | 0% | 0% | 0% | 100% | N/A |
| State | | 6 | | 6 | 2 | 4 | 18 | 0% | 33% | 11% | 22% | 0% |
| State Hospitals - Coalinga | | 1 | | 1 | 1 | | 3 | 0% | 33% | 33% | 0% | 0% |
| State | | 1 | | 1 | 1 | | 3 | 0% | 33% | 33% | 0% | 0% |
| State Hospitals - Patton | | 1 | | 2 | | 1 | 4 | 0% | 25% | 0% | 25% | 0% |
| State | | 1 | | 2 | | 1 | 4 | 0% | 25% | 0% | 25% | 0% |
| Substance Abuse Treatment Facility and State Prison | 1 | 275 | 141 | 198 | 78 | 94 | 787 | 18% | 35% | 10% | 12% | 34% |
| Private | | 20 | 31 | 19 | 6 | 5 | 81 | 38% | 25% | 7% | 6% | 61% |
| State | 1 | 255 | 110 | 179 | 72 | 89 | 706 | 16% | 36% | 10% | 13% | 30% |
| Valley State Prison | 8 | 250 | 189 | 178 | 41 | 60 | 726 | 26% | 34% | 6% | 8% | 43% |
| Private | | 31 | 34 | 28 | 2 | 13 | 108 | 31% | 29% | 2% | 12% | 52% |
| State | 8 | 219 | 155 | 150 | 39 | 47 | 618 | 25% | 35% | 6% | 8% | 41% |
| Wasco State Prison | | 16 | 6 | 16 | 9 | 6 | 53 | 11% | 30% | 17% | 11% | 27% |
| Private | | 2 | 3 | | 1 | 2 | 8 | 38% | 25% | 13% | 25% | 60% |
| State | | 14 | 3 | 16 | 8 | 4 | 45 | 7% | 31% | 18% | 9% | 18% |
| Grand Total | 148 | 6325 | 3603 | 4751 | 1474 | 1838 | 18139 | 20% | 35% | 8% | 10% | 36% |

**Chart 1. Grant rates by institution and attorney type**



**Table 9. Hearing outcomes and outcome rates by state attorney (#, %)**

n=18,139

| Attorney | Hearing outcome | | | | | | | Hearing outcome rate | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Continue | Deny | Grant | Postpone | Stip | Waive | Grand Total | Grant rate-scheduled | Grant rate-held | Stipulation rate | Waiver rate |
| ADANNA UKAH | 3 | 159 | 55 | 106 | 54 | 45 | 422 | 13.0% | 25.7% | 12.8% | 10.7% |
| ADAURE EGU | | 46 | 19 | 46 | 19 | 26 | 156 | 12.2% | 29.2% | 12.2% | 16.7% |
| ALFRED J. WISEMAN | 1 | 110 | 62 | 116 | 45 | 99 | 433 | 14.3% | 36.0% | 10.4% | 22.9% |
| ANTHONY HALL | | 102 | 37 | 42 | 22 | 41 | 244 | 15.2% | 26.6% | 9.0% | 16.8% |
| ARTHUR RICHMOND | | 8 | 2 | 4 | | 4 | 18 | 11.1% | 20.0% | 0.0% | 22.2% |
| Attorney Waived | 1 | 74 | 26 | 18 | 14 | 60 | 193 | 13.5% | 26.0% | 7.3% | 31.1% |
| BENJAMIN SCHIFF | | 4 | 3 | | | 2 | 9 | 33.3% | 42.9% | 0.0% | 22.2% |
| CANDICE L. CHRISTENSEN | 5 | 319 | 126 | 162 | 42 | 20 | 674 | 18.7% | 28.3% | 6.2% | 3.0% |
| CHERYL HARBOTTLE | 1 | 19 | 13 | 29 | 3 | 6 | 71 | 18.3% | 40.6% | 4.2% | 8.5% |
| CRAIG MURDOCK | | 76 | 27 | 28 | 16 | 1 | 148 | 18.2% | 26.2% | 10.8% | 0.7% |
| CURTIS HOWARD | 2 | 19 | 11 | 30 | | 8 | 70 | 15.7% | 36.7% | 0.0% | 11.4% |
| DAN MOSELEY | | 20 | 12 | 15 | 1 | 3 | 51 | 23.5% | 37.5% | 2.0% | 5.9% |
| DANIEL IYAYI | 2 | 269 | 120 | 236 | 81 | 77 | 785 | 15.3% | 30.8% | 10.3% | 9.8% |
| DAVID RAMIREZ | 4 | 154 | 83 | 195 | 42 | 83 | 561 | 14.8% | 35.0% | 7.5% | 14.8% |
| DEJON LEWIS | 1 | 105 | 82 | 36 | 36 | 18 | 278 | 29.5% | 43.9% | 12.9% | 6.5% |
| DENNIS CUSICK | 4 | 86 | 49 | 77 | 4 | 9 | 229 | 21.4% | 36.3% | 1.7% | 3.9% |
| DERMOT GIVENS | | | | 1 | | | 1 | 0.0% | N/A | 0.0% | 0.0% |
| DIANE LETARTE | | | | 4 | | | 4 | 0.0% | N/A | 0.0% | 0.0% |
| DONNA JONES | 1 | 17 | 9 | 30 | 5 | 5 | 67 | 13.4% | 34.6% | 7.5% | 7.5% |
| ELIZABETH COMEAU | 1 | 156 | 79 | 120 | 14 | 89 | 459 | 17.2% | 33.6% | 3.1% | 19.4% |
| ENID PEREZ | | | | 1 | | | 1 | 0.0% | N/A | 0.0% | 0.0% |
| ESTREYA KAPUYA | | 14 | 6 | 31 | 3 | 9 | 63 | 9.5% | 30.0% | 4.8% | 14.3% |
| GAIL HUMMEL | 1 | 51 | 28 | 41 | 3 | 32 | 156 | 17.9% | 35.4% | 1.9% | 20.5% |
| GERTRUDE AKPENYI | 6 | 289 | 116 | 169 | 77 | 46 | 703 | 16.5% | 28.6% | 11.0% | 6.5% |
| IFEOMA ONUOHA | 3 | 202 | 110 | 153 | 25 | 85 | 578 | 19.0% | 35.3% | 4.3% | 14.7% |
| JARED EISENSTAT | 4 | 168 | 138 | 180 | 39 | 130 | 659 | 20.9% | 45.1% | 5.9% | 19.7% |
| JEFF CHAMPLIN | | 18 | 9 | 12 | 1 | 25 | 65 | 13.8% | 33.3% | 1.5% | 38.5% |
| JEFFREY HALL | 1 | 38 | 14 | 10 | 3 | 6 | 72 | 19.4% | 26.9% | 4.2% | 8.3% |
| JERRY LOWE | | 24 | 17 | 19 | 4 | 5 | 69 | 24.6% | 41.5% | 5.8% | 7.2% |
| JESSE HOFFS | 1 | 177 | 65 | 112 | 23 | 32 | 410 | 15.9% | 26.9% | 5.6% | 7.8% |
| JOHN E. STRINGER | 4 | 166 | 91 | 115 | 29 | 14 | 419 | 21.7% | 35.4% | 6.9% | 3.3% |
| JOHNWILLY OSUJI | 4 | 153 | 60 | 145 | 132 | 17 | 511 | 11.7% | 28.2% | 25.8% | 3.3% |
| JOSEPH HAYTAS | 1 | 145 | 66 | 91 | 11 | 58 | 372 | 17.7% | 31.3% | 3.0% | 15.6% |
| KAREN FLEMING | | 13 | 6 | 26 | 1 | 15 | 61 | 9.8% | 31.6% | 1.6% | 24.6% |
| KATERA RUTLEDGE | | 25 | 12 | 43 | 4 | 5 | 89 | 13.5% | 32.4% | 4.5% | 5.6% |
| KATEY GILBERT | 1 | 29 | 15 | 31 | 2 | 9 | 87 | 17.2% | 34.1% | 2.3% | 10.3% |
| KATHLEEN RICHARDS | | 26 | 24 | 37 | | 8 | 95 | 25.3% | 48.0% | 0.0% | 8.4% |
| LAURA SHEPPARD | 1 | 21 | 16 | 12 | 2 | 4 | 56 | 28.6% | 43.2% | 3.6% | 7.1% |
| LAURIE SAUNDERS | 2 | 68 | 28 | 20 | 5 | 10 | 133 | 21.1% | 29.2% | 3.8% | 7.5% |
| LAWRENCE STRAUSS | 2 | 71 | 37 | 49 | 8 | 9 | 176 | 21.0% | 34.3% | 4.5% | 5.1% |
| LEON R HARRIS, III | 2 | 68 | 40 | 38 | 21 | 2 | 171 | 23.4% | 37.0% | 12.3% | 1.2% |
| LIZ BUMER | 3 | 109 | 47 | 74 | 8 | 30 | 271 | 17.3% | 30.1% | 3.0% | 11.1% |
| LORI KELLEY | 2 | 160 | 112 | 101 | 13 | 34 | 422 | 26.5% | 41.2% | 3.1% | 8.1% |
| MARC GARDNER | 3 | 202 | 100 | 94 | 23 | 40 | 462 | 21.6% | 33.1% | 5.0% | 8.7% |
| MARTIN CARR | | 9 | 3 | 11 | | 2 | 25 | 12.0% | 25.0% | 0.0% | 8.0% |
| MAYA EMIG | 6 | 290 | 162 | 154 | 72 | 100 | 784 | 20.7% | 35.8% | 9.2% | 12.8% |
| MICHAEL DYKSTRA | | 18 | 3 | 24 | | 10 | 55 | 5.5% | 14.3% | 0.0% | 18.2% |
| MICHAEL KERN | | 17 | 8 | 16 | | 23 | 64 | 12.5% | 32.0% | 0.0% | 35.9% |
| MICHAEL RIESE | | 13 | 4 | 21 | 1 | 13 | 52 | 7.7% | 23.5% | 1.9% | 25.0% |
| MICHELE GARFINKEL | 9 | 205 | 114 | 169 | 83 | 71 | 651 | 17.5% | 35.7% | 12.7% | 10.9% |
| MICHELE SHADDOW | 3 | 80 | 58 | 49 | 11 | 37 | 238 | 24.4% | 42.0% | 4.6% | 15.5% |
| MONY CHIM | 2 | 24 | 9 | 24 | 4 | 13 | 76 | 11.8% | 27.3% | 5.3% | 17.1% |
| PATRICK SPARKS | 4 | 154 | 106 | 143 | 51 | 19 | 477 | 22.2% | 40.8% | 10.7% | 4.0% |
| PERAYA SIRIWONG | | 1 | | | | 1 | 2 | 0.0% | 0.0% | 0.0% | 50.0% |
| PETER FERGUSON | 4 | 111 | 64 | 76 | 36 | 8 | 299 | 21.4% | 36.6% | 12.0% | 2.7% |
| PHILIP OSULA | 2 | 186 | 78 | 137 | 121 | 16 | 540 | 14.4% | 29.5% | 22.4% | 3.0% |
| RICHARD RUTLEDGE | 1 | 168 | 55 | 178 | 50 | 20 | 472 | 11.7% | 24.7% | 10.6% | 4.2% |
| ROBERT DUITSMAN | | | | 1 | | | 1 | 0.0% | N/A | 0.0% | 0.0% |
| ROSEMARY MBELU | 10 | 237 | 86 | 160 | 37 | 31 | 561 | 15.3% | 26.6% | 6.6% | 5.5% |
| SAM JUDD | | 13 | 2 | 15 | 5 | 12 | 47 | 4.3% | 13.3% | 10.6% | 25.5% |
| STEVE NAPOLITANO | | 16 | 18 | 41 | 17 | 6 | 98 | 18.4% | 52.9% | 17.3% | 6.1% |
| UZOMA OGAN | 8 | 222 | 114 | 163 | 91 | 54 | 652 | 17.5% | 33.9% | 14.0% | 8.3% |
| WRAYMOND PLUMMER | 1 | 84 | 34 | 67 | 12 | 65 | 263 | 12.9% | 28.8% | 4.6% | 24.7% |
| Grand Total | 116 | 5743 | 2854 | 4293 | 1409 | 1661 | 16076 | 17.8% | 33.2% | 8.8% | 10.3% |

## Table 10. Stanford Level IV institution assignment

| Institution | Level IV |
|---|---|
| Avenal State Prison | No |
| California City Correctional Center | No |
| California Correctional Center | No |
| California Correctional Institution | No |
| California Health Care Facility | No |
| California Institution for Men | No |
| California Institution for Women | No |
| California Medical Facility | No |
| California Men's Colony | No |
| California Rehabilitation Center | No |
| California State Prison, Corcoran | Yes |
| California State Prison, Los Angeles County | Yes |
| California State Prison, Sacramento | Yes |
| California State Prison, San Quentin | No |
| California State Prison, Solano | No |
| Calipatria State Prison | Yes |
| Centinela State Prison | No |
| Central California Women's Facility | No |
| Chuckawalla Valley State Prison | No |
| COCF - La Palma Correctional Center | No |
| COCF - Tallahatchie County Correctional Facility | No |
| Correctional Training Facility | No |
| Deuel Vocational Institution | No |
| Folsom State Prison | No |
| High Desert State Prison | Yes |
| Ironwood State Prison | No |
| Kern Valley State Prison | Yes |
| Mule Creek State Prison | No |
| North Kern State Prison | No |
| Pelican Bay State Prison | Yes |
| Pleasant Valley State Prison | No |
| PRCCF - Central Valley | No |
| PRCCF - Golden State | No |
| PUCCF - Taft | No |
| Richard J. Donovan Correctional Facility | No |
| Sacramento Central Office | No |
| Salinas Valley State Prison | Yes |
| Sierra Conservation Center | No |
| State Hospitals - Atascadero | No |
| State Hospitals - Coalinga | No |
| State Hospitals - Patton | No |
| Substance Abuse Treatment Facility and State Prison | No |
| Valley State Prison | No |
| Wasco State Prison | No |

PA24            Appendices Supporting In Re Poole Case No. A161030

**Table 11. Proportion of survey respondents who met with their attorney for at least one hour**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 34 | 23.9% |
| No | 79 | 55.6% |
| Did not respond | 29 | 20.4% |
| Total | 142 | 100.0% |

**Table 12. Proportion of survey respondents who met with their attorney for at least one hour and had a second meeting**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 34 | 23.9% |
| No | 74 | 52.1% |
| Did not respond | 34 | 23.9% |
| Total | 142 | 100.0% |

**Table 13. Proportion of survey respondents who met with their attorney prior to their CRA**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 58 | 40.8% |
| No | 78 | 54.9% |
| Did not respond | 6 | 4.2% |
| Total | 142 | 100.0% |

**Table 14. Proportion of survey respondents who felt that their attorney had reviewed their C-File prior to their first meeting**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 66 | 46.5% |
| No | 68 | 47.9% |
| Did not respond | 8 | 5.6% |
| Total | 142 | 100.0% |

**Table 15. Proportion of survey respondents who felt that their attorney had reviewed their C-File prior to their first meeting, the meeting was at least one hour, met with their attorney prior to their CRA, and had a second meeting**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 11 | 7.7% |
| No | 16 | 11.3% |
| Did not respond *or* responded with "unsure" to any of the above survey areas | 115 | 81.0% |
| Total | 142 | 100.0% |

**Table 16. Proportion of survey respondents who wrote to their attorney and received responses**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020 and who wrote to their attorney*

n=74

|  | # | % |
|---|---|---|
| Yes | 22 | 29.7% |
| No | 49 | 66.2% |
| Did not respond | 3 | 4.1% |
| Total | 74 | 100.0% |

**Table 17. Proportion of survey respondents who sent documents to their attorney and received feedback**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020 and who sent documents to their attorney*

n=77

|  | # | % |
|---|---|---|
| Yes | 28 | 36.4% |
| No | 48 | 62.3% |
| Did not respond | 1 | 1.3% |
| Total | 77 | 100.0% |

**Table 18. Proportion of survey respondents who discussed a closing statement with their attorney**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 38 | 26.8% |
| No | 95 | 66.9% |
| Did not respond or unclear response | 9 | 6.3% |
| Total | 142 | 100.0% |

**Table 19. Proportion of survey respondents who were advised of their right to waive their hearing**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 66 | 46.5% |
| No | 70 | 49.3% |
| Did not respond or unsure | 6 | 4.2% |
| Total | 142 | 100.0% |

**Table 20. Proportion of survey respondents who were advised of their right to stipulate to unsuitability**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 44 | 31.0% |
| No | 88 | 62.0% |
| Did not respond or unsure | 10 | 7.0% |
| Total | 142 | 100.0% |

**Table 21. Proportion of survey respondents who were advised of their rights in a video hearing**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 53 | 37.3% |
| No | 68 | 47.9% |
| Did not respond or unsure | 21 | 14.8% |
| Total | 142 | 100.0% |

**Table 22. Proportion of survey respondents who were advised on what to expect in a video hearing**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 54 | 38.0% |
| No | 68 | 47.9% |
| Did not respond or unsure | 20 | 14.1% |
| Total | 142 | 100.0% |

**Table 23. Proportion of survey respondents who believed COVID-19 had an impact on their ability to submit evidence  to the Board**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Yes | 75 | 52.8% |
| No | 64 | 45.1% |
| Did not respond or unsure | 3 | 2.1% |
| Total | 142 | 100.0% |

**Table 24. Proportion of survey respondents who had disabilities and were provided reasonable accommodations in the meetings**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020 , and indicated they have disabilities*

n=77

|  | # | % |
|---|---|---|
| Yes | 16 | 20.8% |
| No | 43 | 55.8% |
| Did not respond or unsure | 18 | 23.4% |
| Total | 77 | 100.0% |

**Table 25. Breakdown of respondents assessments of the quality of the representation**

*Includes eligible respondents who had a state appointed attorney and were notified on or after Jan 1, 2020*

n=142

|  | # | % |
|---|---|---|
| Completely inadeqate | 41 | 28.9% |
| Below adequate | 38 | 26.8% |
| Adequate | 26 | 18.3% |
| Good | 18 | 12.7% |
| Excellent | 3 | 2.1% |
| Did not respond | 16 | 11.3% |
| Total | 142 | 100.0% |

**Chart 2. Breakdown of respondents' assessments of the quality of the representation**
n=142



Appendices Supporting In Re Poole Case No. A161030