DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GAVIN NEWSOM, et al., <br><br> Defendants. | Case No. C94 2307 CW <br><br> **DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION** <br><br> Judge:   Hon. Claudia Wilken <br> Date:   January 4, 2024 <br> Time:   2:30 p.m. <br> Crtrm:   TBD <br><br> **REDACTED VERSION** |

[4383791.2]

Case No. C94 2307 CW

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

I, Roger C. Williams, MSW (Master of Social Work), LISW-CP/S (South Carolina Licensed Independent Social Worker – Clinical Practice/Supervisor), QMHI-S (Qualified Mental Health Interpreter – Supervisor), CT (Registry of Interpreters for the Deaf Certificate of Transliteration), NAD 5 (National Association of the Deaf Interpreter Assessment Program Level 5), declare:

1.      I am Plaintiffs' retained expert. I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently so testify. I make this declaration in support of Plaintiffs' Motion for Order to Enforce the Revised Permanent Injunction.

## Assignment and Qualifications

2.      I have been asked by the attorneys for the Plaintiffs to offer an opinion on regarding in what format incarcerated individuals who use some form of sign language as their primary method of communication should be provided with the results of their Comprehensive Risk Assessment (CRA), the transcript of their Parole Board hearings, and other complex documents related to their hearings, and what kind of additional assistance deaf signers require to fully understand and learn from these documents.

3.      My qualifications, which are set forth at greater length in the my *curriculum vitae*, attached hereto as **Exhibit A**, include employment in the field of deafness since 1979 starting as a social worker at a residential school for the deaf, then as a therapist at a community mental health center, the regional supervisor at a state agency serving the deaf, and a unit director at a psychiatric hospital.

4.      In that time, and in those multiple roles, I have trained and supervised interpreters in a variety of settings and have worked as a sign language interpreter in legal settings. As a clinician, a frequent challenge that arose was written documents sent to my clients which they did not understand. In my role as a social worker, I often had to provide both translation of documents and mediation with senders of those documents about how to make their information more accessible. I also had to assist my deaf clients in comprehending new information for which they did not have the fund of knowledge to

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

understand.

5.    I reviewed a variety of documents in preparing this report, many of which are cited herein. A list of the additional materials I reviewed is attached to this report as **Exhibit B**. I also observed via Zoom technology a Board of Parole Hearings hearing on June 14, 2023.

## Opinion

6.    As is described in the remainder of this declaration, it is my professional opinion that the CRA and similar documents should be provided to individuals who use some form of sign language as a primary language in a video-recorded format. This video recording should involve a live translation of the document, performed by an interpreter experienced in document translation, and in the presence of the deaf individual. It is also my opinion that deaf signers should be provided with a video copy of their hearing, including the interpretations. In formulating this opinion, I relied on my own professional and personal experiences, and reviewed a variety of other materials, listed throughout this report and in **Exhibit B**, some of which were provided to me by Plaintiffs' counsel.

7.    Among deaf signers in the United States, there is significant variation in grammar, vocabulary, and the type of phrasing used in signed communication—far more so than with spoken languages. Widely used forms of signed communication include American Sign Language (ASL), Pidgin Signed English (PSE), several artificial communication systems designed to represent spoken language in a visual form, and tactile forms of signed communication developed to meet the needs of individuals who are both deaf and blind. Those who are foreign-born may use the sign language of their native country, which will differ substantially from any of the forms of signed communication mentioned above. For simplicity, I will refer to all of the above as "sign language."

8.    A substantial number of deaf people in the U.S. grow up with native or near-native competency in sign language and do not have fluency in English—written or spoken. In addition to variations in educational experiences, deaf individuals have varying degrees of hearing loss, varying etiologies and age of onset of deafness, varying family

communication backgrounds, and varying other disabling conditions such as traumatic brain injury, mental illness, or neurological disorders. The incarcerated deaf population is a microcosm of the general deaf population, but language challenges are even more prevalent in the incarcerated population.[1,2]

9.      These language challenges are developmental in nature: they start in early childhood as a result of linguistic isolation and linguistic deprivation in the critical period of language development.[3] Virtually all (92%) of deaf children are born to parents who have normal hearing,[4] and the vast majority of those normally hearing parents do not have the sign language needed to communicate with their children when they are born.[5] Teachers, including teachers of the deaf, and other early interventionists, often lack knowledge of ASL or about deafness. This lack of language exposure, and subsequent lack of language development in the deaf child, can lead to the now-evolving diagnosis of Language Deprivation Syndrome,[6] a mental disorder characterized by emotional dysregulation and difficulty with relationships, in addition to the functional delays in

[1] Vernon, M., & Miller, K. (2005). Obstacles Faced by Deaf People in the Criminal Justice System. American Annals of the Deaf, 150, 283-291. https://doi.org/10.1353/aad.2005.0036.

[2] Glickman, N. S. (2019). Appendix: Language Deprivation Syndrome, Antisocial Personality, and Criminal Behaviors. In N. Glickman & W. C. Hall (Eds.), Language deprivation and deaf mental health (pp. 47 - 51). Routledge.

[3] Hall, W. C., Levin, L. L., & Anderson, M. L. (2017). Language deprivation syndrome: a possible neurodevelopmental disorder with sociocultural origins. Social psychiatry and psychiatric epidemiology, 52(6), 761-776. https://doi.org/10.1007/s00127-017-1351-7

[4] Mitchell, R., & Karchmer, M. (2004). Chasing the Mythical Ten Percent: Parental Hearing Status of Deaf and Hard of Hearing Students in the United States. Sign Language Studies, 4, 138-163. https://doi.org/10.1353/sls.2004.0005

[5] Mitchell, R. E., & Karchmer, M. A. (2005). Parental Hearing Status and Signing among Deaf and Hard of Hearing Students. Sign Language Studies, 5(2), 231-244. http://www.jstor.org/stable/26190612.

[6] Glickman, N. S., & Hall, W. C. (2019). Language deprivation and deaf mental health. Routledge.

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

language and comprehension.[7,8,9] For individuals in the correctional and justice system, particular areas of concern are the difficulties in understanding cause-and-effect, processing abstract content, and developing "theory of mind", the concept that what you know and feel is different than what others know and feel.[10] An estimated 15% of the deaf signing population has Language Deprivation Syndrome, and the proportion of deaf individuals with this Syndrome in correctional settings is likely to be even higher.[11] Additionally, language is intimately connected with fund of knowledge—the strategies, adaptions and knowledge we use to function, the majority of which is learned incidentally. Even deaf individuals who do not have Language Deprivation Syndrome tend to have a lower fund of knowledge than non-deaf individuals, due to a reduced opportunity for incidental learning through overhearing information, and corresponding lack of context to understand new and complex information.[12]

10.    At a practical level, this means that for the overwhelming majority of deaf individuals, the type of complex and abstract information that American adults are routinely expected to process needs to be simplified, concretized, and repeated, even if it is provided in sign language. Given the variety of language needs seen by individuals who have experienced language deprivation, this will also require that interpreters, or

[7] Gulati, S. (2019). Language Deprivation Syndrome. In N. Glickman & W. C. Hall (Eds.), Language deprivation and deaf mental health (pp. 25 - 46). Routledge.

[8] Pénicaud, S., Klein, D., Zatorre, R. J., Chen, J. K., Witcher, P., Hyde, K., & Mayberry, R. I. (2013). Structural brain changes linked to delayed first language acquisition in congenitally deaf individuals. Neuroimage, 66, 42-49. https://doi.org/10.1016/j.neuroimage.2012.09.076

[9] Simon, M., Campbell, E., Genest, F., MacLean, M. W., Champoux, F., & Lepore, F. (2020). The Impact of Early Deafness on Brain Plasticity: A Systematic Review of the White and Gray Matter Changes. Front Neurosci, 14, 206. https://doi.org/10.3389/fnins.2020.00206

[10] Gulati, S. (2019). Language Deprivation Syndrome. In N. Glickman & W. C. Hall (Eds.), Language deprivation and deaf mental health (pp. 25 - 46). Routledge.

[11] Miller, K. (2004). Linguistic diversity in a deaf prison population: Implications for due process. Journal of Deaf Studies & Deaf Education, 9(1), 112-119.

[12] Convertino, C., Borgna, G., Marschark, M., & Durkin, A. (2014). Word and world knowledge among deaf learners with and without cochlear implants. J Deaf Stud Deaf Educ, 19(4), 471-483. doi:10.1093/deafed/enu024

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

interpreter teams, make linguistic adjustments before and during an assignment to match the needs of this population.[13]

11. As noted above, developmental language delays are endemic in the deaf community. This is reflected in the finding that the average deaf high school graduate reads below a 6th grade level[14] and that the median reading level for a deaf adult is at or below 4th grade.[15,16] Written communication for anything beyond basic interactions is not likely to be effective for approximately half the American population of deaf adults, and is likely to be ineffective for a much larger percentage of the incarcerated deaf population.[17]

12. Beyond just grade-level comprehension of vocabulary and grammar, there are other hurdles which can make a written English transcription a challenge for individuals who are pre-lingually deaf or severely hard of hearing (onset before the age of three). Because of their hearing loss, they can only learn the English that they can see written down or signed to them. Many individuals who can hear may be functionally illiterate but can have a spoken conversation conducted at a high school level, or greater,[18] aiding their comprehension of written English with respect to grammar and the ability to sound out unfamiliar words. For prelingually deaf individuals, who have never had access

[13] Smith, T. B. (2021). Discourse, sign language interpreters, and the justice system. In D. Guthmann, G. I. Lomas, D. Goff Paris, & G. A. T. Martin (Eds.), Deaf People in the Criminal Justice System. Gallaudet University Press.

[14] Allen, T. E. (1986). Patterns of academic achievement among hearing impaired students. In A. Schildroth & M. Krachmer (Eds.), Deaf Children in America. College Hill Press.

[15] Traxler, C. B. (2000). Measuring up to performance standards in reading and mathematics: Achievement of selected deaf and hard-of-hearing students in the national norming of the 9th Edition Stanford Achievement Test. Journal of Deaf Studies and Deaf Education., 5, 337-348.

[16] McKee, M. M., Paasche-Orlow, M. K., Winters, P. C., Fiscella, K., Zazove, P., Sen, A., & Pearson, T. (2015). Assessing Health Literacy in Deaf American Sign Language Users. Journal of health communication, 20 Suppl 2(0 2), 92-100. doi:10.1080/10810730.2015.1066468

[17] Miller, K. (2004). Linguistic diversity in a deaf prison population: Implications for due process. Journal of Deaf Studies & Deaf Education, 9(1), 112-119.

[18] Massaro, D. W. (2012). Speech Perception and Reading: Two Parallel Modes of Understanding Language and Implications for Acquiring Literacy Naturally. The American Journal of Psychology, 125(3), 307-320. https://doi.org/10.5406/amerjpsyc.125.3.0307

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

to spoken English, questions presented with complex structures or dependent clauses can cause significant confusion, and they have no hope of sounding out unfamiliar words because they do not know what English sounds like.

13.     There can also be challenges with English words that have multiple meanings and are dependent on context clues to provide the right definition. ASL and English are very different languages. While English is replete with words with multiple meanings (think of the word "right" with over 20 different definitions), ASL is a conceptual language where only one meaning is possible per sign. For example, we know which meaning of the word "take" is intended in a sentence such as "You have to take your medicine." In ASL, the sign for "take" (to ingest the medicine) is very different from the sign for "take" (to remove from someone). If a person who uses ASL only knows the "take (away)" meaning of the word "take" they might misunderstand the sentence "You have to take your medicine" to mean that they have to take away the medicine. They would never make that mistake when seeing the same sentence communicated in ASL. Deaf individuals who use other forms of signed communication tend to experience similar difficulties.

14.     The strategies that many deaf adults use to understand written material may be particularly ineffective in a correctional setting. Some deaf adults may use a dictionary or other reference material to look up individual words and determine their meaning. As described in the above paragraph, this may lead to an individual selecting the wrong meaning for a word (words can have over 100 different meanings, with the extreme example of "set" having 223 different possibilities in the Oxford English Dictionary[19]). Using this technique, it is possible to cobble together a sentence with multiple misattributed words, completely changing the meaning of the sentence. Another technique is to depend on someone else to explain what the written information means. In the free world, an array of others may fill this role, including social workers and other

---

[19] Oxford English Dictionary. (2023). set, v.¹. In *Oxford English Dictionary*.

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

professionals who are fully bilingual in English and one or more forms of sign language. Such individuals are rarely found in correctional settings.

15. Finally, there are the challenges that arise for all deaf individuals who learned English as a second language, regardless of their reading level, in comprehending technical terminology, or any words reserved to a narrow context, such as psychological terms or jargon. Because deaf individuals learn new English words by reading them, or having explicit instruction in sign language, as opposed to learning them through casual conversations or passive listening (overheard conversations or media), they tend not to know English vocabulary for topics that they have not read about. I would not expect even very strong readers who are deaf to know many of the terms that appear in their CRA, and possibly many of the terms that appear in their hearing transcript.

16. A review of the norm-tested reading scores for the deaf signers in the *Armstrong* class, provided to me by Plaintiffs' counsel, reveals that their median reading achievement is 3rd grade, which is consistent with the literature cited above.

17. Now contrast this median reading level with the reading level required to comprehend the written information provided to parole candidates. In preparation for this report, two CRA's were reviewed (for Mr. ███████████, ██████, and Mr. ████ ██████████, ████████). I have been told that these documents provide crucial guidance for hearing preparation, and I have personally observed BPH Commissioners describe this document as a "roadmap for release." These documents were scored for reading level using Flesch-Kincaid Readability Index.[20] These two sample documents were written at a 10th and 12th grade level, respectively. To be clear, these two documents would not be readable by the overwhelming majority of incarcerated individuals who use sign language as their primary method of communication, and would certainly not be readable by Mr. ████████ or Mr. ██████████, who read at a fourth-grade and second-grade level,

---

[20] Kouame, J. B. (2010). Using readability tests to improve the accuracy of evaluation documents intended for low-literate participants. Journal of MultiDisciplinary Evaluation, 6(14), 132-139.

respectively. Using the same data cited above, only 12% of the individuals who identify sign language as their primary language would be able to independently read the CRA. As a result, I would not expect either Mr. ███████ or Mr. ███████ to be able to identify errors or omissions in the CRA, even where the CRA directly quoted what they had stated or described information already familiar to them. I also would not expect either Mr. ███████ or Mr. ███████ to understand the CRA well enough to use it to guide further rehabilitative efforts. For Mr. ███████, for example, the CRA lists "three (3) areas of concern," exemplified by Mr. ███████ "minimiz[ing] his intent and participation in the offense," his "sexually deviant thoughts," and his "limited self-awareness into his areas of deficit." Due to Mr. ███████ language background and borderline intellectual functioning, I would expect that Mr. ███████ would understand this information only if explained in simple, concrete terms specific to his situation.

18.    In their declarations, Mr. ███████ and Mr. ███████ confirmed my impressions, as each man described being completely unable to understand their Risk Assessment. Mr. ███████, the stronger reader of the two, described being nearly reduced to tears by the experience of trying to read it.

19.    The same standard is also true for the transcript of the parole suitability hearing. I reviewed the transcripts of the hearings for Mr. ███████ and Mr. ███████. The grade level needed to understand the transcripts was significantly lower than that of the CRA. These hearings were conducted at a vocabulary level of 6th and 5th grade, respectively. However, this reading level is still beyond the reading competence of both Mr. ███████ and Mr. ███████. Less than 25% of the individuals in CDCR who identify sign language as their primary language would be able to independently read these transcripts.

20.    I have been told that the transcript of the parole board hearings provides the parole candidate with valuable information about the concerns of the Commissioners and guidance as to how to address those concerns in future hearings. In reviewing this specific section of the transcripts for both Mr. ███████ and Mr. ███████, several items stood

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

out to me that would make the transcript difficult to understand either by reading or by having the transcript read to them.

21.    For Mr. ███████, the transcript reflects that the interpreters repeatedly interrupted the Commissioners while the Commissioners were reciting the decision, in an apparent effort to control the pace of the statement. An example passage is below:[21]

COMMISSIONER: The panel gave great weight to the youthful offender factors we found to be present.

INTERPRETER: Go ahead.

COMMISSIONER: First, looking at the diminished culpability of youths as compared to adults, we saw at the time of your crime, parts of your brain were not fully mature...

INTERPRETER: Go ahead.

COMMISSIONER: Resulting in a lack of impulse control, inability to plan ahead, and...

INTERPRETER: Okay.

COMMISSIONER: And inability to avoid risks....

22.    For Mr. ███████ hearing, I noted that this portion of the transcript consisted of a single paragraph spanning eight pages, followed by another unbroken paragraph spanning three pages. For both individuals, the interpretation at their hearings likely included a number of non-verbal cues designed to make the information easy for the listener or viewer to parse. These cues are not present in the written English transcript, which would make it quite difficult for either individual to read, and also quite difficult for anyone to understand the document when read aloud and then interpreted.

23.    It is my understanding that there is an expectation that a prison employee will review the CRA and hearing transcript with the deaf individual using a staff interpreter, although this may or may not occur in practice. However, that one-time review is not equivalent to the frequent review which an individual who reads English fluently

---

[21] In The Matter of The Parole Consideration Hearing of Scott Stonebreaker, State of California Board of Parole Hearings (2022) pp 78 - 79.

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

may achieve by reading the document, or that others who do not have the necessary reading ability but who can hear may achieve by reviewing the CRA or hearing transcript in audio form. And due to their difficulty understanding new information and greater need for repetition of information, I would expect most deaf sign language users to derive even less benefit from a single read-through of their CRA or hearing transcript than would be derived by others who are not deaf. Only by providing it in their primary language (sign language) in a format that can be accessed repeatedly, and at will, such as video, are deaf individuals able to access the information in a similar way as others are able.

24.    Due to the significant variation in grammar, vocabulary, and phrasing among deaf signers, explained previously, effective interpretation requires the interpreter to make grammar, vocabulary, and phrasing selections that are tailored to their specific deaf audience. For this reason "frozen" sign language translations, that is, translations that are done on video with no particular deaf person in mind, tend to be much less effective for deaf individuals than what I will refer to as "live" translations, which are done in the presence of the deaf person and with the deaf person having the opportunity to ask questions or note when they do not understand something, even if these translations are also recorded. The process of creating the translation in the presence of the deaf individual gives the interpreter the opportunity to briefly interview the deaf individual about their language background and communication needs, and to gauge the efficacy of their translation throughout the translation process, by checking in with their audience to ensure the information is being understood.

25.    The level of trust or distrust between the deaf person and the interpreter can also be essential to the interpreting process, as it dictates how willing the deaf person will be to share information in the presence of the interpreter, or to seek clarification when he does not understand. The relationship between a sign language interpreter and the deaf person for whom they are interpreting has sometimes been described as one of "hostile

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

dependency",[22] where the need for an interpreter produces ambivalent feelings. This ambivalence is heightened by the adversarial nature of the relationship in the justice and correctional systems, very different from the more common interpreting settings where the interests of both parties are aligned.[23] These complex relationship dynamics make trust in an interpreter difficult, especially when the interpreter has dual roles, as is true for interpreters who are working as staff interpreters in correctional facilities. The desired level of trust will be even more difficult to establish when dealing with information of a highly confidential nature, such as a charge of child sexual abuse, or where an individual's communication needs are complex, as is often true of individuals who have experienced language deprivation. I reviewed a signed declaration submitted by Mr. ▮▮▮▮▮▮▮, which illustrated this challenge. In his declaration, Mr. ▮▮▮▮▮▮▮ repeatedly noted that he did not want to reach out to the staff interpreters at his prison for assistance understanding his CRA, even though he could not understand the document without this assistance, because he did not trust these interpreters and did not want them knowing this information about him.

26. With respect to translating CRA or other documents, special considerations must be made to ensure that the interpreter has skill and experience in document translation, and that there is trust—or at least no existing distrust—between the deaf person and the interpreter. To ensure an adequate level of trust in the interpreter, it may be necessary to use an outside interpreter. Due to the high reading level of the CRA, the interpreter will need to use a variety of techniques such as rephrasing and providing examples to produce a translation that is effective in communicating the document to the deaf person. The type of interpreter best suited to this task is known as a "Deaf Interpreter"

---

[22] Forestal, E. (2014). Understanding the Dynamics of Deaf Consumer Interpreter Relations Washington, DC, Gallaudet University Regional Interpreter Education Center.

[23] Smith, T. B. (2021). Discourse, sign language interpreters, and the justice system. In D. Guthmann, G. I. Lomas, D. Goff Paris, & G. A. T. Martin (Eds.), Deaf People in the Criminal Justice System. Gallaudet University Press.

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

or a "Certified Deaf Interpreter."[24]

27.     With respect to the parole hearing, it is likely best to record the proceeding by video, using measures to ensure the video clearly captures all sign language users, and to provide the video to the deaf individual. This will afford deaf individuals direct access to their own testimony, instead of accessing an interpretation of the interpreter's interpretation of their testimony, which is what occurs when the written transcript is translated into sign language. This method will also ensure that the deaf person receives a translation that preserves the tone and subtext that was present in the original hearing. Having an interpreter translate the written English transcript is likely to cause significant confusion, in part because the interpreter may inadvertently change the meaning of some of the questions and statements made during the hearing because the interpreter will not have access to the original tone and prosody (the rhythm of the speech).

28.     Recording the proceeding by video is also necessary to preserve the original form of both sign language and English to allow for any possible challenges to the accuracy of the translation. This process is necessary because sign language is an exclusively visual language and no part of the deaf person's testimony or the interpreter's sign language translation of the other utterances made during the hearing will be captured on a written transcript or in an audio recording. I have reviewed reports sent to me by Plaintiffs' counsel that document translation errors which occurred during the parole suitability hearings for Mr. _____, Mr. _____, Mr. _____ (_____), and Mr. _____ (_____). In my opinion the type of errors documented in these reports are not unusual when interpreters are not qualified or when the conditions for the interpretation are sub-par. However, neither I nor anyone else can confirm that any of the documented errors actually occurred because the only way to do so would be to either

---

[24] A Deaf Interpreter is an individual who is themselves deaf, has native or near-native proficiency in ASL, has a high level of proficiency in English, and has extensive experience and special training in how to tailor signed interpretations and translations to other deaf people's unique communication needs.

[4383791.2]

12

Case No. C94 2307 CW

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

observe the hearing directly or to review a video recording of the hearing that captured both the deaf person's testimony and the interpretations.

29.    Even with access to video translations of these documents, deaf signers likely will need more help than most others to synthesize and apply the information they have learned. In my experience as a social worker, my clients who were deaf signers required significantly more repetition of information and more detailed explanations to reach the same level of comprehension as others. In addition, based on my experience both as a sign language interpreter and as a social worker, I observed that encounters with deaf signing individuals take approximately twice as much time when a sign language interpreter was used for communication as when the same type of encounter was conducted directly in sign language by a professional with native or near-native proficiency in the language. I further observed that deaf signers often came away with a fairly limited understanding of interpreted encounters. This often required me to review the information again, which often involved providing more examples, connecting the information to their life experiences, and visual metaphors, to assist them in filling in those gaps in their fund of knowledge needed to fully understand.

30.    It is for these reasons that it is my opinion that a video recording of the hearing, and a video-recorded sign language translation of the CRA and other documents, would be needed for individuals who use sign language as their primary method of communication to access the information in a manner equal to individuals who are not deaf. In today's world, video recording is a commonplace and inexpensive technology. Where possible, translations should be performed by a Certified Deaf Interpreter who is not a prison employee. Such interpreters can be hired for an hourly fee. My understanding

/ / /

/ / /

/ / /

/ / /

/ / /

is that this would be necessary at most a few times per year. This visual documentation should include a clear record of the interpreter(s), and be provided in a format and with a viewing device that will be available anytime the deaf person wants to review the recordings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at Lyman, South Carolina this 3rd day of November, 2023.

Roger C. Williams, MSW, LISW-CP/S, QMHI-S, CT, NAD 5

[4383791.2]

14

Case No. C94 2307 CW

DECLARATION OF ROGER C. WILLIAMS IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION—

# Exhibit A

*ROGER C. WILLIAMS*
*HANDS ON INTERPRETING, LLC*
*30 Wild Cherry Circle, Lyman, SC 29365*
*www.mentalhealthinterpreting.net*
*864.979.5988 Voice/Text • 864.214.0632 Fax • 803.807.2701 VideoPhone*
*mhinterp@gmail.com*

## EDUCATION

8/75 - 8/79    Rochester Institute of Technology, Rochester, NY
Bachelor's Degree in Social Work
Graduated with High Honors, GPA 3.53

8/83 - 1/86    University of Illinois, School of Social Work, Champaign-Urbana, IL
Master of Social Work
GPA 4.9; Concentration in Community Mental Health

8/07 - 7/17    University of South Carolina, College of Social Work, Columbia, SC
PhD Candidate, Dissertation *"Communication and Attachment in Deaf Children with Hearing Parents"*

## EXPERIENCE

2/23 –    Owner, *Hands On Interpreting, LLC, Lyman, SC*
A private practice specializing in consulting, ASL interpreting, and training related to the needs of deaf adults in the mental health system. Providing communication assessments and analysis of communication access including expert witness testimony and reports.

2/18 – 2/23    Executive Director, *Spartanburg Area Mental Health Center, South Carolina Department of Mental Health, Spartanburg, SC*
Responsible for the operation of a multi-county community mental health center with a $16M budget, serving 7,000 clients with 160 staff. Services included outpatient counseling to children and adults, statewide Deaf Services, crisis response to three counties, support for residential care facilities and disaster response services.

5/06 - 2/18    Director, *Deaf Services, South Carolina Department of Mental Health, Columbia, SC.*
Responsible for the delivery of services by the Department of Mental Health to the Deaf and Hard of Hearing citizens of South Carolina. Advise the Director and key stakeholders on how to best design and develop the provision of a comprehensive statewide program. Provided overall coordination and direction to program implementation to inpatient, outpatient, and residential settings.

5/93 – 5/06    Program Manager, *Piedmont Center for Mental Health Services, Deaf Services Program, Simpsonville, SC.*
Developed and supervised comprehensive statewide community-based services for mentally ill Deaf adults and emotionally disturbed

ROGER C. WILLIAMS
Page 2

children. Programs included inpatient services, outpatient counseling, residential programming and psychosocial rehabilitation. Supervised 34 employees and $1,250,000 budget.

6/90 - 5/93    Social Worker IV, *Patrick Harris Psychiatric Hospital, Anderson, SC.*
Established Deaf Services Program at hospital and served as Program Coordinator. Developed programs, policies, and procedures for 22 bed in-patient psychiatric unit for Deaf patients.

8/87 - 5/90    Community Services Consultant, *Division of Services for the Deaf and Hard of Hearing, Wilmington, NC.*
Supervised Regional Office of the Division, providing comprehensive services for Deaf and Hard of Hearing clients. Conducted workshops and in-services training for public and private agencies on topics related to deafness and providing counseling, skills development, and advocacy.

9/84 - 7/87    Coordinator, Hearing Impaired Services, *Community Counseling Services, Jacksonville, IL.*
Provided range of mental health services including counseling, case management and crisis intervention within a Deaf Services program.

1/80 -5/84    School Social Worker, *Illinois School for the Deaf, Jacksonville, IL.*

## OTHER EXPERIENCE

1/76 -    Sign Language Interpreter, *Community settings including area hospitals, medical practices, state, local, and federal courts, attorneys, and social service agencies. Regional and national conferences including NAD, RID, ADARA, SERID, EHDI, and DeaFestival*

11/89 -    Consultant and Presenter, *Center for Mental Health Services, NASMHPD, Mental Health Interpreter Training, Various State Mental Health Authorities, Professional Organizations*

8/91 – 2/23    Designated Court Examiner, *States of South Carolina, Georgia, Illinois*

9/93 – 6/01    Lecturer and Instructor, *Interpreter Training Program, Spartanburg Technical College, Spartanburg, SC.*

8/94 – 8/97    State Block Grant Reviewer, *Center for Mental Health Services, Mental Health Services Administration, Washington, DC.*

6/10 – 8/10    Adjunct Faculty, *University of South Carolina, School of Social Work, Columbia, SC.*

2/13 -    Court-appointed monitor, *Belton v. Georgia, Federal District Court for Northern Georgia, Atlanta, GA.*

*ROGER C. WILLIAMS*
*Page 3*

**COMMUNITY/PROFESSIONAL INVOLVEMENT**

| | |
|---|---|
| 6/85 - Present | *National Association of the Deaf*<br>    - *S. C. Association for the Deaf*, 1990 -<br>    - NAD/SCAD Language Proficiency Interview; Rater, 1994 – 2004<br>    - NAD/SCAD Interpreter Assessment Program; Rater, 1995 – 2004 |
| 6/88 - Present | *National Registry of Interpreters for the Deaf*<br>    - Mental Health Special Interest Group; Chair, 1994 – 1999<br>    - *South Carolina Registry of Interpreters for the Deaf*<br>        - President, 1990 - 1994<br>        - Chair, Certification Maintenance Program, 1993 – 2000<br>        - Member-at-Large, 2000 – 2002 |
| 8/00 - Present | *American Society for Deaf Children*<br>    - Web Committee Chair, 2001 – 2008<br>    - Vice-President, 2004 – 2005<br>    - Co-President, 2005 – 2007 |
| 4/03 - Present | *American Red Cross*,<br>    *Upstate SC Chapter*, Greenville, SC<br>        - Disaster Mental Health Responder, 2003 – 2018<br>        - Chair, Disaster Mental Health Committee, 2005 – 2009<br>        - Instructor, Disaster Services, 2003 – 2018 |
| 6/08 – 3/18 | *National Coalition on Mental Health and Deaf Individuals*<br>    - Member, Board of Directors, 2008 – 2018 |
| 9/08 – 2/23 | *International Institute for Mental Health Leadership*, Task Force on Deafness<br>    - Appointed Representative from the United States, 2008 – 2023 |
| 8/12 – 6/20 | *Beginnings-SC*<br>    - President, 2012 – 2018 |
| 07/16 – Present | *American Deafness and Rehabilitation Association*<br>    *Journal of American Deafness and Rehabilitation Association*<br>    - Member, Editorial Board, 2023 – |
| 09/17 – 10/19 | *Camp Wonderhands*<br>    - Executive Board Member, 2017 – 2019 |
| 10/18 – 10/23 | Quill School – South Carolina<br>    - Founding Board Member, 2018 – 2023 |

*ROGER C. WILLIAMS*
*Page 4*

## CERTIFICATES & AWARDS

| | |
|---|---|
| 5/79 | Robert D. Frisina Award for deaf/hearing integration – National Technical Institute for the Deaf |
| 6/89 | RID Certificate of Transliteration, #17594 |
| 3/90 | Distinguished Service Award – N. C. Governors Advocacy Council for Persons with Disabilities: |
| 10/90 | South Carolina Licensed Master Social Worker #4487 |
| 12/94 | SCAD/NAD Interpreter Assessment Program Level 5 |
| 7/95 | Assessor, SCAD/NAD Interpreter Assessment Program |
| 8/96 | Outstanding Transition to Community Award – South Carolina Mental Health Association |
| 3/01 | LPCC Supervisor – Minnesota Board of Behavioral Health and Therapy |
| 7/01 | Interpreter of the Year – South Carolina Registry of Interpreters for the Deaf |
| 6/09 | Service to Mankind Award – South Carolina Sertoma Club |
| 8/09 | Community Disaster Responder Certification FEMA IS – 100, 200, 300, 400, 700, 704 & 800 Certified |
| 10/10 | Human Service Professional of the Year – Barbara Stone Foundation |
| 3/12 | Certified Coder – Adult Attachment Interview |
| 5/12 | Employee of the Year – South Carolina Department of Mental Health |
| 3/13 | Qualified Mental Health Interpreter – #0057 – Alabama Department of Mental Health |
| 4/13 | Qualified Mental Health Interpreter Supervisor – #0057 – Alabama Department of Mental Health |
| 2/18 | Carolyn Biles Central Office Employee of the Year – South Carolina Department of Mental Health |
| 10/18 | South Carolina Licensed Independent Social Worker – Clinical Practice #4487 |

*ROGER C. WILLIAMS*
*Page 5*

| | |
|---|---|
| 10/18 | Licensed Clinical Social Work Supervisor – North Carolina Social Work Certification and Licensure Board |
| 4/22 | South Carolina Licensed Independent Social Worker – Clinical Practice – Supervisor #4487 |
| 10/22 | Tom Barnett Volunteer of the Year – United Way of the Piedmont |
| 2/23 | Mental Health Champion, Behavioral Health Task Force, Spartanburg, SC |
| 4/23 | Licensed Interpreter, Alabama Board of Licensure for Interpreters and Transliterators #L00864 |

## PUBLICATIONS

Crump, C. & Williams, R. C. (2015). Communication Skills Assessment. Montgomery, AL. Mental Health Interpreter Training.

Fram, M. S., Frongillo, E. A., Jones, S. J., Williams, R. C., Burke, M. P., DeLoach, K. P., et al. (2011). Children are aware of food insecurity and take responsibility for managing food resources. *Journal of Nutrition, 42*(5).

Gournaris, M. J., Hamerdinger, S., & Williams, R. C. (2010). Promising practices of statewide mental health models serving consumers who are deaf: How to advocate for your model in your home state. *JADARA, 43*(3), 152-182.

Gournaris, M. J., Hamerdinger, S., & Williams, R. C. (2012). Creating a culturally affirmative continuum of mental health services: The experience of three states. In N. Glickman (Ed.) *Deaf Mental Health Care*. New York, NY. Routledge.

Williams, R.C. (1986). Social support networks in rural deaf communities. Unpublished master's thesis, University of Illinois.

Williams, R.C. (1993). What is Mental Health Interpreting? *RID VIEWS, 10(5),* 1-2.

Williams, R. C. (2011). Effective use of peer crisis counseling in the wake of hurricanes Andrew and Floyd. *The Dialogue, 7*(4), 2-3.

Williams, R. C. (2018). Communication is the key: Before, during, and after disasters. *The Dialogue, 14*(3-4), 18-20. https://www.samhsa.gov/sites/default/files/dtac/dialoguevol14i3and4compliant-508c.pdf

Williams, R.C. (2021). Assessing linguistic incompetence in the criminal justice and mental health systems. In Guthmann, D. (Ed.) *Deaf People in the Criminal Justice System*. Washington, DC. Gallaudet University Press.

*ROGER C. WILLIAMS*
*Page 6*

Williams, R. C & Crump, C. (2018). Communication skills assessment for individuals who are deaf in mental health settings. In Glickman, N. & Hall, W. (Eds.) *Language Deprivation and Deaf Mental Health*. (pp. 136-158). New York, NY. Routledge.

Williams, R.C., Williams, S.L., Roberson, L., Roberson, M., Moore, M.B., & Moore, C. (2005). Adoption of deaf children. Paper presented at the meeting of the American Society for Deaf Children.

Williams, R. C., & Williams, S. L. (2014). Maintaining High Expectations. *Odyssey, 15*, 66-69.

## WORKSHOPS/PRESENTATIONS

*Adoption and Deafness:* An overview of adoption, the adoption process and potential problems, including Reactive Attachment Disorder.

*Collision or Cooperation: Interpreting at the Intersection of Legal and Mental Health:* An analysis of the issues inherent in forensic interpreting for competency, insanity and sexual predation assessments. Presentations at varying conferences including the Institute for Legal Interpreting.

*Communication Assessments:* Co-developer of the Communication Skills Assessment (CSA). Presentations and trainings at national and regional conferences on deafness and mental health, as well as skill development workshops.

*Coping with Chaos; Stress Management and Vicarious Trauma:* Numerous events including state and regional conferences for interpreters of signed and spoken languages.

*Dining Alone; The Deaf Child in the Hearing Family*: Regional NASW conference and state conferences in the Southeast U.S., Grand Rounds presentations at various hospital systems.

*Disaster Response in the Deaf Community:* Workshops given for several states, under sponsorship of FEMA and/or HRSA.

*Dysfluency:* An assessment of the importance of understanding dysfluency while interpreting with individuals with restricted linguistic fluency. Various conferences including the keynote address for the National Healthcare Interpreting Symposium.

*Ethical Decision Making:* An introduction to Demand-Control Schema and its application to ethical decision making, for interpreters and clinicians.

*The Future of Interpreting:* A workshop looking at technological innovations and developments and their impact on the future of the interpreting profession; at state and national conventions.

*ROGER C. WILLIAMS*
*Page 7*

*HIPAA:* An overview of the Health Insurance Portability and Accountability Act and its implication for the practice of interpreting, including both ethical and business perspectives.

*Implementing the CLAS Standards in Low Incidence Populations:* A review of the new Culturally and Linguistically Appropriate Services standards. Various state and regional conferences.

*Interpreting for Child Abuse Investigations:* A workshop for experienced interpreters reviewing the specific demands inherent in child abuse investigations.

*Access to Managed Care and Specialty Mental Health:* State mental health conferences in Alabama, Kentucky, Missouri, Ohio, Texas, Washington, DC and South Carolina.

*Normal: Just a Setting on the Dryer:* Parent-focused presentation about the challenges and opportunities involved in raising multiple children with unique needs.

*Orientation to Deafness*: Numerous events including standard training for SCDMH, SCDAODAS, NASHMPD, court and law enforcement personnel, in addition to preconference workshops.

*Sign-To-Voice Interpreting*: Workshops series for varied educational institutions as well as state and national conventions.

*Swimming with the Sharks & Dancing with Dolphins; Mental Health Interpreting*: An overview of the issues and challenges present for interpreters working in mental health settings. Numerous events including state and regional and national conferences focusing on interpreters and mental health professionals.

*Supervision: Best practices for interpreter supervisors.* An overview of Demand Control Schema and its application to supervision

*Towards Consistency; Developing Standards Signs in Substance Abuse*: Building Bridges Conference on Substance Abuse and Deafness, Kansas City, KS.

*Trauma Informed Care for the Deaf Community* – State and regional conferences.

*VRI and Mental Health:* Presentations at various conferences including the National Symposium on Video Interpreting.

*ROGER C. WILLIAMS*
*Page 8*

**CASE LIST**

+Arkansas v. Candace Marie Williams; Ark., 11th Div. 60CR-16-1674 (2020)

Battle, *et al* v. State of Tennessee, *et al*; M.D., Tenn., 3:22-cv-00022 (ongoing)

+Belton v. Georgia; N.D., Ga., 1:10-cv-0583-RWS (2014)

Buttrum et al v. Cookeville Regional Medical Center Authority; M.D., Tenn., 2:14-cv-00107 (2015)

*Cantrell v. Mountain States Health Alliance; E.D., Tenn., 2:15-cv-00324 (2016)

Crockett v. Chase; N.D., Texas, 3:16-cv-00377-B (2016)

Disability Law Center v. Colorado Dept. of Corrections; Colo.,1:21-cv-00792-NRN (2021)

Deloach v. Walmart, Inc; S.C., 5:23-cv-01622-JFA-PJG (ongoing)

Felix v. Hartford Health Corp.; Conn, 3:18-cv-00405 (2019)

Fry v. City of North Glenn, Colorado; Colo., 16-cv-02318-PAB-KLM (2018)

*Gaina v. Dignity Health; C.D., Calif., 2:18-cv-00177 (2019)

*Gerken v. Marcus Carey D/B/A Marcus S. Carey & Associates; Ky. 4th Cir., 13-CI-458 (2016)

*Godbey v. Iredell Memorial; W.D., N.C., 5:12-cv-4 (2012)

Goodman and George v. Las Animas County, *et al*, Colo., 1:22-cv-01499 (2022)

Gordon v. City of New York; S.D., N.Y., 15-cv-9716 (2016)

*Harris, *et al* v. Georgia Dept. Of Corrections, *et al*; M.D. Ga. 5:18-cv-00365-TES (ongoing)

Hollingsworth, *et a*l v. City of North Las Vegas, Nev. 2:21-cv-02239-JAD-NJK (ongoing)

*Inman and Dykman v. Jacksonville Transportation Authority; M.D., Fla., 3:16-cv-1107-TJC-MCR (2017)

Katz v. Nazareth Hospital; E.D., Pa., 2 :11-cv-2335-LDD (2012)

*King v. Walker Baptist Medical Center; M.D., Ala. (2010)

*Kinney v. Jacksonville Sheriff's Office; M.D., Fla., 3:17-cv-419-J-32-JRK (2018)

*ROGER C. WILLIAMS*
*Page 9*

Liuzza v. Martin General Hospital; E.D., N.C., 7:12-cv-39 (2012)

Lorshbaugh v. Community Health Systems, Inc.; E.D., Tenn. 3:18-cv-394 (2019)

McCrary v. Interstate Truck Driving School; Minn., 20-cv-0695 (2019)

*Mistic v. Nicholas Hanning, *et al*, Colo, 1:21-cv-02545-STV (ongoing)

*Mullen v. Gene Claps; Colo., 1:21-cv-02398-CNS-MDB (ongoing)

*Mullen v. Orchard Park; Colo., 1:18-cv-01522-MEH (2019)

*Murphy v. United Parcel Service, E.D., Wisc. 19-CV-1728-PP (ongoing)

Nease v. Marshall Medical; M.D., Ala., 4:10-cv-01839-KOB (2010)

Newman and Newman, v. St. Johns County Welfare Federation d/b/a Bayview Healthcare, M.D., Fla., 3:21-cv-01096-HES-LLL (2022)

*Sheffield et al v. Chattanooga-Hamilton County Hospital Authority, d/b/a Erlanger Health System; E.D., Tenn., 1:14-cv-00226 (2017)

Stein v. Jamestown, et al; E.D., N. Dakota, 3:16-cv-00176-RRE-ARS (2017)

+S.C. v. Persaud; S.C., 1st Cir. (2013)

*Trivette, *et al* v. Tennessee Dept of Correction; M.D., Tenn., 3:20-cv-00276 (ongoing)

*Yelapi v. DeSantis, N.D., Fla., 4:20-cv-351-AW-MAF (ongoing)

*Deposed
+Testified

## ROGER C. WILLIAMS
BIO



Mr. Williams is the owner of Hands On Interpreting, LLC, a private practice specializing in consulting and training related to the needs of deaf adults in the mental health system. Until his retirement in 2023, he was employed by the South Carolina Department as the Executive Director of the Spartanburg Area Mental Health Center. He was previously the Director for Deaf Services and before that, the Program Manager at the Piedmont Center for Mental Health Services and the Social Worker IV and Program Coordinator at the Deaf Services Program at Patrick Harris Psychiatric Hospital. He received his B.S.W. from the Rochester Institute of Technology and his M.S.W., specializing in community mental health, from the University of Illinois. He has interpreted in a wide variety of settings, including the NAD and RID conferences and in forensic and court settings. He is one of the developers of the Communication Skills Assessment, now being used across the country.

Mr. Williams is a S.C. Licensed Independent Social Worker – Clinical Practice/Supervisor and holds an RID Certificate of Transliteration, an SCAD/NAD IAP Level 5 Interpreting Certificate and is a Qualified Mental Health Interpreter-Supervisor. He is the 2012 "Employee of the Year" for the South Carolina Department of Mental Health, the 1979 winner of the Robert D. Frisina Award for deaf/hearing integration, the 1989 winner of the N.C. Governor's Advocacy Council for Persons with Disabilities Distinguished Service Award, the 1996 winner of the "Outstanding Transition to the Community" from the South Carolina Mental Health Association and the 2001 "Interpreter of the Year" for the South Carolina Registry of Interpreters for the Deaf.

As the parent of four deaf children and two hearing children, and the spouse of a deaf adult, Mr. Williams is active in a number of local, state-wide, regional and national advocacy and social organizations, including the past President of the American Society for Deaf Children.

## ROGER C. WILLIAMS

*BIO*

*SHORT BIO*

Mr. Williams is the owner of Hands On Interpreting, LLC, a private practice specializing in consulting and training related to the needs of deaf adults in the mental health system. Until his retirement in 2023, he was employed as the Executive Director of the Spartanburg Area Mental Health Center with the South Carolina Department of Mental Health. He received his B.S.W. from the Rochester Institute of Technology, his M.S.W., specializing in community mental health, from the University of Illinois and completed coursework towards a doctorate at the University of South Carolina, College of Social Work. Mr. Williams is a S.C. Licensed Independent Social Worker – Clinical Practice/Supervisor and holds an RID Certificate of Transliteration and an SCAD/NAD IAP Level 5 and has been recognized at the state and national level for his leadership in mental health services within the Deaf community.

Mr. Williams has an M.S.W., specializing in community mental health, and has worked. as a social worker with deaf clients in inpatient, outpatient, residential, and educational settings for over 40 years. He is now retired and works as an interpreter, consultant, expert witness, and trainer, primarily in mental health interpreting. He is a Licensed Independent Social Worker – Clinical Practice/Supervisor, holds RID/NAD certification and is a Qualified Mental Health Interpreter-Supervisor.

# Exhibit B

List Documents of Reviewed by Retained Expert, Roger Williams

- Comprehensive Risk Assessment for ███████████
- Hearing transcript for ███████████
- Declaration of ███████████
- Comprehensive Risk Assessment for ███████████
- Hearing transcript for ███████████
- Declaration of ███████████
- Plaintiffs' Q4 2020 Life Prisoner Monitoring Report
- Plaintiffs' Q4 2021 Life Prisoner Monitoring Report
- Plaintiffs' Q2 2022 Life Prisoner Monitoring Report
- Plaintiffs' Q3-4 2022 Life Prisoner Monitoring Report
- July 7, 2023 DPP Roster of DPH Class Members With a Primary Communication Method of Sign Language
- Letter from C. Jackson to J. Blonien, et al., re: Demand Letter re Accommodations for Deaf Signers, and Blind and Low-Vision Individuals (April 13, 2023)