DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:    (415) 510-3594
Fax:              (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

    Plaintiffs,

    v.

GAVIN NEWSOM, et al.,

    Defendants.

Case No. C94 2307 CW

**JOINT CASE STATUS STATEMENT**

Judge:   Hon. Claudia Wilken

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.   Plaintiffs' Enforcement Motion Regarding Accommodations for Deaf, Blind, and Low-Vision Class Members in the BPH Process**

On November 14, 2023, Plaintiffs filed a Motion to Enforce the Court's prior orders in this case related to providing accommodations for deaf, blind and low-vision class members to prepare for and follow-up from parole hearings.  ECF Nos. 3525, 3525-1, 3525-2, 3525-3, 3525-4, 3525-5, 3525-6, 3525-7, 3525-8.  The parties agreed to the following briefing schedule for which they will be filing a joint stipulated request to the Court for approval: Defendants' opposition will be filed by December 12, 2023 and Plaintiffs' reply will be filed by December 27, 2023.

**B.   Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members**

**1.   Plaintiffs' Statement**

**a.   RJD and Five Prisons Orders**

In response to evidence of widespread abuse, assaults, and retaliation against incarcerated people who request accommodations and face discrimination on the basis of their disabilities, on September 8, 2020, the Court issued orders finding remedial efforts were necessary in order to "prevent further violations of the ARP and class members' ADA rights at RJD."  ECF No. 3059 at 42.  On March 11, 2021, the Court issued further orders finding remedial efforts were necessary to prevent ongoing violations of the ADA and ARP at five additional prisons.  *See* ECF Nos. 3217 and 3218.

After over a year of negotiations, the parties reached agreement on the vast majority

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1   of provisions included in Defendants' RJD and Five Prisons Remedial Plans ("Plans").

2   ECF No. 3336.  Updated versions of the Plans were filed on March 23, 2022.  *See* ECF

3   No. 3393, Exs. A, B.

4   　　　Following a year of negotiations, the changes to the staff misconduct complaint

5   process were incorporated into new regulations, and the Notice of Change to Regulations,

6   22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received

7   written notice that Defendants unilaterally changed regulations stemming from the negotia-

8   tions.  Specifically, Defendants removed from regulations the Allegation Decision Index

9   ("ADI"), the negotiated tool to be used by CDCR in deciding which staff misconduct

10  complaints were sufficiently serious to warrant referral to the Office of Internal Affairs

11  ("OIA') for investigation.  Currently at issue is Defendants' proposal for an agreement that

12  the ADI will only apply at the six prisons currently covered by court order.  The parties

13  have yet to reach agreement on how they will address Plaintiffs' concerns as articulated in

14  Exhibit A to a prior Joint Case Management Statement (ECF No. 3430) and the Court

15  Expert's Quarterly Report on Investigations and Discipline (ECF No. 3433 at 4-5).

16  　　　Defendants have also begun quarterly production of documents in compliance with

17  the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures

18  to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and

19  biased investigations that thwart the discovery of misconduct and, even when misconduct

20  is apparent during the investigation, poor decision-making on the part of Hiring

21  Authorities prevents accountability.  A redacted copy of Plaintiffs' counsel's most recent

22  staff misconduct report, sent November 6, 2023, is attached hereto as **Exhibit A**.  In

23  response to ongoing reports of problems, "[t]he Court Expert will be working with the

24  parties to develop a methodology for reviewing individual cases in a manner that will

25  allow the parties to reach agreement on shortcomings and craft solutions."  ECF No. 3477

26  at 4.

27  　　　CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP

28  found thus far at six prisons exist system-wide and are committed to bringing such

1   evidence before the Court until all class members are protected.  Plaintiffs continue to

2   discuss with Defendants the implementation of their Early Warning System (EWS) to

3   guard against such widespread abuse by one officer.  Plaintiffs remain optimistic that the

4   EWS can act as a tool to identify and root out staff misconduct, before serious problems

5   arise.  However, as currently designed, the EWS fails to alert staff to serious problems.

6   *See* September 11, 2023 and November 10, 2023, letters from Plaintiffs' counsel regarding

7   EWS Objections attached hereto, without exhibits, as **Exhibit B and C**.  The parties are

8   continuing negotiations.

9                  **b.       False, Retaliatory and Discriminatory RVRs**

10          Despite significant progress made towards court-ordered improvements to the staff

11   misconduct investigation and disciplinary system, the endemic use of false and retaliatory

12   RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

13   members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same

14   biased review that plagues the staff inquiry and investigation processes also denies class

15   members due process in disciplinary hearings, resulting in longer terms of imprisonment,

16   denials of privileges, housing at higher classification levels, and an unwillingness to report

17   future misconduct or request disability-related help.

18          As in the staff complaint context, reviewers discount or ignore the testimony of

19   incarcerated people during disciplinary hearings.  *See* ECF No. 3322, Ex. A.  Reviewers

20   fail to discover evidence that staff have issued reports that appear plagiarized or otherwise

21   replicate conduct and charges that are improbably attributed to multiple people at the same

22   time.  ECF No. 3296 at Ex. C.  Reviewers also fail to identify cases where the conduct

23   charged is the result of staff failing to accommodate someone's disability.  ECF No. 3322

24   at 11-12 & Ex. E.

25          Plaintiffs' counsel continues to identify class members who have received false,

26   retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate

27   against and discourage the filing of staff misconduct complaints will persist unless

28   Defendants take action to identify and root out problems through meaningful reforms to

1    the RVR process.

2         Defendants have agreed to multiple changes, but Plaintiffs continue to raise

3    outstanding problems.  Most concerning, Defendants have notified Plaintiffs that after

4    further consideration they will not be implementing a "red flag" in their EWS to identify

5    when an incarcerated person receives an RVR within a certain period of time after having

6    filed a staff complaint.  Such cases will only be identified if the person files a complaint.

7    Allegations that staff members retaliate against class members by issuing RVRs for filing

8    staff complaints are rampant in the system.  *See* **Exhibit A** at 20-21, 32-33, 42-43.

9    Defendants assert that, when that happens, incarcerated people can simply file an

10   additional staff complaint.  But incarcerated people are reluctant to file additional

11   complaints for many reasons including that the RVR may have eventually been dropped or

12   that they are afraid of further retaliation.  The onus is on CDCR to discover and root out

13   this pervasive form of retaliation if they are serious about ensuring the effectiveness of the

14   staff complaint process.

15        Further, the issuance of RVRs to incarcerated people for filing staff complaints after

16   the complaint is not confirmed remains a significant problem.

17        Plaintiffs are hopeful that the parties can agree to resolve problems and that

18   additional court intervention will not be necessary.

19        **2.      Defendants' Statement**

20             **a.      RJD and Five Prisons Orders**

21        Notwithstanding Plaintiffs' concerns and objections related to the recent revisions

22   to the staff-misconduct processes, CDCR's staff-misconduct investigations and discipline

23   processes are in compliance with this Court's orders applicable to the six prisons (ECF

24   Nos. 3059, 3060, 3217, and 3218).  In compliance with the Court's September 8, 2020, and

25   March 11, 2021 orders, Defendants have, along with Plaintiffs and the Court Expert,

26   developed comprehensive and effective remedial plans that the parties filed with the Court

27   on March 21, 2022.  ECF No. 3393.  CDCR has dramatically overhauled its processes to

28   ensure unbiased and complete investigations and, although not required by the Court's

orders, Defendants have deployed statewide the processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations."  *Id.*, at 15.

The revisions to the regulations, noted above by Plaintiffs, are intended to further ensure success of these processes by efficiently routing all staff misconduct complaints to the most appropriate entity for investigation.  Defendants believe that the process can be improved, in part, by providing additional training to the initial screeners so that these screeners have an improved understanding of what amounts to serious staff misconduct to ensure consistent application of the new process and these revisions seek to achieve that objective.   Defendants have collected and shared data to support Defendants' proposed revisions to the regulations.  Defendants will continue to evaluate all information received to monitor compliance with the Court's orders and to provide adequate resources to ensure the successful transition to these new processes.

Plaintiffs' foregoing statement that, "Defendants' proposal for an agreement that the ADI will only apply at the six prisons currently covered by court order" is "at issue," mischaracterizes the current status because there is no dispute that the negotiated ADI only applies to the six prisons because the Court's staff-misconduct orders were limited to those six prisons and CDCR's decision to deploy the process statewide does not alter this fact. Notwithstanding the current status of the proposed stipulation, the ADI remains a significant component of the complete restructuring of the statewide process that has transferred the review of staff misconduct allegations from the local institutions to the Office of Internal Affairs.   Defendants have proposed that any stipulation between the parties concerning the ADI accurately reflect this Court's orders, which only applies to the six prisons.  Plaintiffs' singular focus on the ADI fails to recognize the multi-faceted

overhaul of the staff misconduct process and CDCR's other commitments to address staff misconduct, including its commitment to deploy fixed-camera technology at 14 institutions in addition to the Court-ordered deployment of such technology at six institutions (20 institutions total), its commitment to deploy BWC technology at four institutions in addition to the Court-ordered deployment of such technology at six institutions (10 institutions total), and its development of a comprehensive EWS that exceeds the requirements of the Court's order, and other measures.  Further enforcement orders as to other institutions is not necessary because this statewide overhaul of the staff misconduct process remains in effect and "additional litigation," as contemplated by Plaintiffs above, would only stall productive negotiations between the parties and consume limited resources that could be put to better use elsewhere.

### b.   Demands for RVR Reform

Defendants have made significant progress and commitments to address Plaintiffs' demands that CDCR address the alleged practice of issuing false and retaliatory Rules Violations Reports (RVRs).  Defendants have committed to and implemented a revised Chief Disciplinary Officer (CDO) and Officer RVR trainings in the Learning Management System, and have implemented a headquarters-level audit of RVRs at 10 institutions. Defendants have completed four quarters of audits and have shared some of the audit results with Plaintiffs. The Senior Hearing Officer Manual was updated to include more details as it relates to CDO responsibilities. Defendants have also committed to audio record serious RVR hearings for internal auditing purposes, and to revise specific sections of the Department Operations Manual that pertain to discipline, including the process for voiding RVRs and roles and responsibilities of CDOs. Defendants have created a new screening process to determine whether a physical disability contributed to the underlying conduct, which was released November 1, 2023, and has begun tracking data related to RVRs in the EWS.

As detailed in a past Joint Case Status Statement, recent developments will effectively address most of Plaintiffs' concerns related to the RVR process.  *See* ECF No.

3412 at 14-16.  This includes the statewide deployment of the new staff misconduct investigation and discipline processes, camera and audio technology, and the fact that statewide allegations of false and retaliatory RVRs will be subject to an investigation by the Office of Internal Affairs.

Defendants have agreed to continue discussions with Plaintiffs, along with the Court Expert, to further address Plaintiffs' concerns related to the RVR process and CDCR's extensive proposed revisions.

**C.     Court Expert Investigation Into SATF, the State's Largest Prison**

**1.     Plaintiffs' Statement**

In December 2022, the Court Expert filed his report and recommendations regarding the treatment of people with disabilities at SATF, the state's largest prison.  ECF No. 3446.  He found that people with disabilities at SATF are "living diminished and needlessly difficult lives," and as a result "face harsher prison conditions, and thus greater punishment, than their peers."  *Id.* at 4.  People were denied accommodations needed to safely and independently perform a wide array of activities, including to eat, perform bodily functions, write, and participate in rehabilitative programs.  The Court Expert found that "it was not management that identified these problems; it was Plaintiffs' counsel."  *Id.* at 5.  Plaintiffs agree with the Court Expert that "much at SATF has to change" and that "SATF has not demonstrated that it is able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors."  *Id.* at 5-6.

On February 24, 2023, the Court ordered additional review and action by the Court Expert, including a much-needed staffing analysis and development of policies to ensure safe housing of people with disabilities.  ECF No. 3467.  The Court Expert filed his Second Report on August 24, 2023, and another report will be filed at a later time to address, among other things, ADA staffing, sustainable compliance, and responses to advocacy letters.  *See* ECF No. 3500.  As evidenced by the Court Expert's second report, there is a significant difference in progress between efforts led by California Correctional Health Care Services ("CCHCS") and those led by the California Department of

1   Corrections and Rehabilitation ("CDCR"). CCHCS and the Receiver have developed

2   several promising measures to address problems identified in the Court Expert's first

3   report. There is, however, a lack of discernible progress by CDCR, including on statewide

4   issues that require action by headquarters.

5      The problems identified by the Court Expert are not limited to SATF.  Sufficient

6   ADA staffing, extreme ADA Coordinator turnover, provision of accommodations for deaf

7   class members who do not know sign language, and adequate policies and procedures

8   related to disability accommodations and durable medical equipment, for example, are

9   statewide issues that affect class members wherever they are housed.  It is incumbent on

10  Defendants to address these issues statewide, and to not continue the reactive, piece-meal

11  approach that has typified their response to their obligations under the Americans with

12  Disabilities Act and *Armstrong* for so long.

13     **2.**  **Defendants' Statement**

14     The Court Expert filed his second report concerning the treatment of people with

15  disabilities at  SATF, and recognized the numerous proactive measures implemented at

16  SATF to further respond to the needs of incarcerated people with disabilities.  ECF No.

17  3500.  The report demonstrates that the coordinated efforts between CDCR and the

18  California Correctional Health Care Services (CCHCS), with the Court Expert's guidance

19  and with input from Plaintiffs, are working to effectively respond to the issues raised by

20  the Court and addressed by the Court Expert following his initial investigation. The Court

21  Expert now reports that SATF has made "significant improvements in the delivery of

22  accommodations to class members" and that "the culture at SATF has improved," since his

23  first report.  ECF No. 3500 at 4, 6.  Although more work needs to be done, it remains

24  promising that class members have reported to the Court Expert, through personal

25  interviews and survey responses, "improvements in their ability to get the accommodations

26  they needed and in the attitudes of staff."  ECF No. 3500 at 4.  The Court Expert reports

27  that through these responsive collaborative efforts, SATF has significantly improved the

28  process for receiving incarcerated people from other institutions and has reduced the

[4389750.3]             9          Case No. C94 2307 CW

JOINT CASE STATUS STATEMENT

likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities. *Id*. The Court Expert further reports that SATF has also improved the process for collecting and handling patient requests for medical care (Form 7362s), has improved the processes for issuing, repairing, and replacing DME (including through the successful relaunch of its in-house wheelchair repair program), and has significantly improved the delivery of medical supplies, such as incontinence supplies, to class members. *Id*. Although work remains to address other deficiencies, the Court Expert states that the "the current leaders and staff are to be given credit for the significant effort they made to address the problems" identified in the first report. ECF No. 3500 at 5.

In his report, the Court Expert made additional recommendations to CDCR and CCHCS. As to CDCR, the Court Expert issued recommendations concerning the clarification of policy concerning non-medical assistive devices, the further development of methods to reliably communicate announcements to deaf and hard-of-hearing people, the need for guidance to SATF on how to train the deaf population on the use of caption phones, and the successful implementation of Communication Access Real-time Translation (CART) to eligible class members. ECF No. 3500 at 19. CDCR continues to coordinate with the Court Expert and stakeholders on these and other issues to further respond to class-member needs as more fully detailed in Defendants' response to the Court Expert's report filed on September 7, 2023. ECF Nos. 3504, 3504-1. The Court Expert will issue a future report addressing ADA staffing, sustainable compliance with the ADA and the ARP, and modifying the process for responding to advocacy letters. ECF No. 3500 at 4. Defendants will continue to coordinate with the Court Expert to facilitate his investigation and to collaborate with him and the Plaintiffs to effectively respond to the concerns raised in his reports to fully accommodate class members in compliance with the ADA and the ARP.

On November 7, 2023, the Court issued an order indicating that the parties had reported different views on how CDCR was doing with respect to accommodating SATF

1   class members.  ECF No. 3521. The Court ordered the Court Expert to issue an addendum

2   to his report by November 28, 2023, responding to the parties' assertions with respect to

3   the progress, or lack thereof, that CDCR has made in curing the ADA and remedial plan

4   violations found in the Court Expert's first and second SATF reports.  To the extent that

5   the Court Expert believes that Court action is necessary to ensure CDCR's timely

6   compliance with the ADA and remedial plan at SATF, either in the form that Plaintiffs

7   propose or otherwise, he shall (1) state so in his report; (2) specify the Court action he

8   recommends; and (3) explain why the Court action he recommends is, in his view,

9   necessary to achieve compliance with the ADA and remedial plan at SATF.  *Id.*  The

10  parties will have an opportunity to file responses to the supplemental report.  *Id.*

11  **D.      Accommodations for Deaf and Hard-of-Hearing Class Members**

12           **1.      Plaintiffs' Statement**

13                    **a.      Hearing Aid Quality**

14           Plaintiffs met with CCHCS representatives and the Court Expert on September 29,

15  2023, and are pleased to report that the parties agreed that CCHCS shall place the

16  following requirements in future contracts for hearing aids, the first of which they expect

17  to award in January 2024:

18  (1)      All hearing aid vendors shall be registered with the FDA.

19  (2)      All hearing aids shall be fully digitally programmable using digital processing.

20  (3)      All hearing aids must meet the following technical requirements: (a) Five or more
         channels; (b) Three or more programs; (c) Adaptive directional microphone
21       technology, unless not technologically feasible due to the size of the instrument; (d)
         Adaptive signal processing; (e) Noise reduction strategies for steady state and
22       transient noise; (f) Programs the user can select; (g) Active feedback suppression;
         (h) Harmonic distortion at 500 Hz, 800 Hz, and 1600 Hz according to the
23       procedures specified in ANSI/ASA S3.22-2014 shall be less than 8%; (i) Equivalent
         input noise level measured according to the procedures specified in ANSI/ASA
24       S3.22-2014 shall not exceed 29 dB. (For power instruments, the equivalent input
         noise level measured according to these procedures shall not exceed 32 dB); and (j)
25       T-coil capability, except when not commercially available or not technically
         feasible.

26
27  (4)      Behind-the-ear (BTE) instruments: Ear tips, domes, and sleeves shall be available in
         varying sizes and include both occluded and open non-occluding designs. Earmolds
28       must include both standard and half shell styles, and include various venting
         options. Custom ear molds shall be available and provided if clinically indicated.

CCHCS will ensure that, taken together, the contracts provide a range of models appropriate for mild, moderate, severe, and profound hearing losses.  At least one contract must include at least one "power" hearing aid model, defined as "a hearing aid which has a matrix at or above a maximum power output of 125 dB SPL and maximum gain of 60 dB SPL."  CCHCS will carry models appropriate for each type of hearing loss that include tinnitus sound generators.  However, CCHCS may also carry models that do not include a tinnitus sound generator.  CCHCS shall ensure an effective process exists for incarcerated individuals to obtain non-formulary hearing aids as necessary to meet their unique hearing needs.  This process may include specialist referrals.

CCHCS will develop a care guide or other guidance that provides timelines and best practices for hearing aid fittings, follow-up appointments, and non-formulary referrals for both hearing aid devices and other otology care.  The parties will negotiate the content of the document, with the goal that it allow for adequate availability of hearing aids as well as adequate measures to ensure proper fitting, which is an essential component of hearing aid quality.

Plaintiffs hope that this will remedy longstanding problems with hearing aid quality recognized by both the Court Expert, *see* ECF No. 3500 at p. 11 (noting continued reports that hearing aids are "low quality and do not work well") and by CCHCS staff. *See id.* ("The CEO also identified this [low-quality hearing aids] as a common concern he heard at the RAP").

**b.      Other Accommodations**

CDCR continues to discriminate against D/deaf and hard-of-hearing class members by failing to resolve fundamental access barriers that Plaintiffs and the Court Expert have identified for years, notwithstanding dozens of meetings between the parties.

**Accessible Phones**. The lack of accessible telephone options on (1) tablet computers and (2) physical phones throughout prison facilities, including in housing units, continues to cause discrimination against deaf and hard of hearing individuals.  Tablet

computers have been offered to all incarcerated people, for free, enabling hearing people to make calls from their tablets to their loved ones from the privacy of their cell or on the yard during most hours of the day, including during lockdown or modified programming, and also to make video calls in the dayroom.  Deaf and hard of hearing people have no such access.  Tablet computers have no accessibility features for calls, such as captioned telephone services or videophone service.  And Defendants report that no captioned telephone or videophone services will be made available as a result of litigation pausing their contract with the tablet provider.  As a result, deaf and hard of hearing individuals cannot equally access phone calls with loved ones.  This disparity becomes particularly pronounced during periods of lockdown or modified programming, which can last for weeks, when access to traditional phones in common areas—the only phones that have the potential to be accessible to D/deaf and hard of hearing individuals— is limited or nonexistent.  Even with regard to traditional phones, a significant number of prisons do not offer *any* form of accessible phones in housing units at any time, as described below.

Defendants have acknowledged that unequal phone access is an issue, and that there is no uniform solution across CDCR institutions. Defendants do not currently have a plan or timeline for implementing equal access to tablet-based audio and video calls.  And while Defendants reported that they have directed that deaf people be provided increased time out of their cell to use accessible phones, they have declined to produce any written verification of such direction, have declined to implement a formal policy requiring it, and have not created any way for deaf and hard-of-hearing people to get video calls so they can see their loved ones, which hearing people get through their tablets.

Furthermore, accessible phones like captioned phones and TTY/TDDs are not located in accessible locations in many prisons, unduly restricting deaf and hard-of-hearing people's access to them.  Based on a survey done by CDCR this year, at least twelve prisons have no captioned phones in their housing units. Instead, captioned phones are limited to program offices, sergeants' offices, or lieutenants' offices, subjecting D/deaf and hard of hearing people to physical barriers, waiting lists, and custody officers' availability

that hearing people do not encounter when using the phones in their housing units. Other prisons have captioned phones only in a select few housing units, but not all. *See* Exhibit D, November 2, 2023 Letter from Claudia Ceseña & Rita Lomio re  Captioned Phone Implementation.

At this time, it is unclear to Plaintiffs why institutions have severely restricted captioned phone availability or whether CDCR intends to make phones equally available to class members as they are to hearing people. CDCR has also provided no indication that it intends to make tablet phone and video calling accessible to D/deaf and hard of hearing individuals.

**Effective Communication of Announcements.** CDCR continues to lack a comprehensive system for providing and auditing effective communication of announcements. D/deaf and hard-of-hearing people cannot hear announcements made on the yard or in their housing unit, and they often miss notices about medication pass, laundry, cancellations or changes to their programming, medical appointments, ducats, and even meals.  For over five months, Defendants claimed to be researching a "technology-based solution" to help deliver announcements to deaf and hard of hearing individuals. Defendants announced in October that this "technology-based solution" is a messaging feature of the ViaPath tablets that has been available on the tablets since being implemented.  The messages will communicate only housing-unit wide—and not individual—information twice a day, and it is unclear whether and how it will communicate changes to program schedules such as cancellations, postponements, or rescheduling, which happen frequently in the prisons, and will not be accessible to class members in locations where they cannot bring their tablets, including work assignments, the dining hall, and medical appointments.  Defendants shared a draft tablet notification policy with Plaintiffs which the parties will discuss, but it will not be a complete solution. Plaintiffs remain concerned that almost a year after the Court Expert's first report, there remains no robust and durable system to audit announcements communicated by tablet or otherwise.

1   **CART**.  Over eight months after this Court's Order regarding Computer-Assisted,

2   Real-Time Transcription (CART), Defendants have failed to provide information on

3   whether they will expand CART to education services, have provided conflicting

4   information about their intentions to expand CART to other programming, and have

5   provided no information on an expected timeframe for either.

6        On February 24, 2023, this Court issued an Order directing Defendants to make

7   CART or a reasonable alternative available for "due process events, programming, and

8   education" at SATF "as soon as possible and shall keep the Court Expert informed on their

9   progress." ECF No. 3467 at p. 3.  Despite their obligation to implement CART as soon as

10  possible and to keep the Court Expert informed, as of August 24, 2023—six months after

11  the injunction was issued—the Court Expert could not say definitively whether Defendants

12  were (or intended to be) compliant with the Court's Order. The Court Expert, lacking even

13  the most basic information from Defendants about implementation of CART, indicated

14  that compliance with the Court's Order was an outstanding question. *See* ECF No. 3500 at

15  p. 12 ("We will have to see whether CART is used effectively in due process events and is

16  expanded to other programs and services."). Since then, Defendants have made conflicting

17  statements about what programs and services CART will be used for, and have refused to

18  provide any information regarding a timeline for moving forward to comply with the

19  February Order, despite repeated attempts by Plaintiffs' counsel to gain information.

20       In September, Defendants indicated that CART would be "expanded to

21  rehabilitative sponsor led programs, religious services, mental health treatment groups, and

22  substance use abuse treatment," *see* ECF No. 3504 at 11-12, and in early October they

23  represented that "Phase Two will expand CART to *all* programming areas at SATF and at

24  the ten other institutions.[2]" ECF No. 3515 at p. 14 (emphasis added).  However, on

25  October 19, 2023, Defendants indicated to Plaintiffs' counsel—in a seeming reversal of

26  position—that they intended to withhold CART from any program that was not credit-

27  _____

28  [2] Plaintiffs understand these to be CCWF, CHCF, CIM, CMF, COR, RJD, SATF, SQ,
    SVSP, WSP and NKSP.

1   earning; CART would be withheld from religious services, numerous rehabilitative groups

2   and courses, and potentially from individuals serving life without parole sentences. On

3   November 2, 2023, Defendants again reversed and represented that they no longer

4   intended to limit CART to credit-earning programs, but did not indicate what programs

5   would be included, or when. To date, Plaintiffs have not been provided with Defendants'

6   positions on (1) whether CART will be expanded to education, (2) whether CART will be

7   expanded to programs, and if so, which ones, and (3) when "Phase II" of CART can be

8   expected to begin.

9       The Parties have scheduled a meeting on November 17, 2023 to address these and

10  other outstanding questions about CART. If at that time Defendants still have no plan to

11  provide CART to programming and education in compliance with the Court's February 24,

12  2023 Order, judicial intervention will be necessary.

13      **2.      Defendants' Statement**

14      Defendants remain committed to providing class members equal access to

15  programs, services, and activities in accordance with the ADA and the ARP and will

16  continue to meet with Plaintiffs as part of the parties' ongoing workgroups, to ensure the

17  successful deployment of these services.  Plaintiffs' outdated and backward-looking

18  description fails to describe current developments and implementation of CART services

19  or other reasonable alternative accommodations for the deaf and hard of hearing

20  population.  It also fails to capture the tremendous internal effort and attention being put

21  forward to accommodate this population.  As stated in the February 24, 2023 Order,

22  Defendants are required to offer CART *or a reasonable alternative* for due process events,

23  programming, and education.  Plaintiffs' false and misleading depiction infers that CDCR

24  has simply chosen not to expeditiously implement CART—this is not true.  CART requires

25  WiFi and an unrestricted telephone line to properly function which may not be possible in

26  every area of a correctional facility—designed to restrict a person's access to the outside

27  world—where a qualifying program, service, or activity may occur.  Further, CART

28  requires a staff member to initiate CART by accessing a link via a laptop, thereby creating

safety, security, and staffing issues because prisoners cannot be left unattended with

unfettered access to a laptop with an internet connection or an unrestricted phone line.

Because of the challenges presented by the correctional setting, the legitimate security

concerns related to CART, and the technical requirements of CART, Defendants are

actively seeking the most suitable reasonable alternative accommodation for the numerous

environments encountered by class members in a correctional setting.  Nonetheless,

CDCR's EIS continues to work on WiFi connectivity issues throughout the identified

prison.  While significant resources are being expended to make CART available in the

foregoing events, CDCR is simultaneously identifying alternative accommodations to

ensure access.  CDCR has strived to develop both short-term and long-term remedies to

accommodate class members and anticipate sharing this information with Plaintiffs in the

near future to further demonstrate compliance with the ADA and the remedial plans and

that litigation related to CART is not only unnecessary, but would result in a waste of

limited resources that could be put to better use elsewhere.  Nonetheless, Defendants will

continue to collaborate with the stakeholders to develop workable responses to the issues

raised above by Plaintiffs and, as to SATF, raised by the Court Expert in his most recent

report.  These issues not only include CART, but also reliable communication of

announcements, tablet accessibility, captioned phones, and devices such as hearing aids

and pocket talkers.  As to phone accessibility, on October 27, 2023, a headquarters

directive was sent via email to all ADACs expanding access to VRS/TTY/TDD.  All

institutions were directed to provide deaf class members with additional out-of-cell time to

use accessible phones.  Institutions were instructed to incorporate this directive into their

existing local operating procedure by November 3, 2023.  As to effective communication

of announcements, on November 2, 2023, Defendants shared with Plaintiffs and the Court

Expert the new tablet notification policy that will be further discussed by the parties. The

new tablet notification process does not replace current requirements, and DPH and DNH

members will continue to receive personal notification of announcements, in addition to

other  methods required by the remedial plan that include the public address system, the

flickering of housing-unit lights, written messages, and other methods, depending on individual needs for effective communication of announcements.  As noted above, the parties have negotiated a resolution to address Plaintiffs' concerns related to class members' access to effective hearing aids.

Defendants' policy will allow for hearing aids to be provided on the basis of provider discretion. Defendants, in collaboration with provider(s) will ensure all hearing aids are fitted according to the American Speech Hearing Association's Preferred Practice Patterns for Hearing Aid Selection and Fitting.  The provider(s) will conduct a follow-up examination with recipients of new hearing aids, according to the American Speech Hearing Association Preferred Practice Patterns for Outcome Evaluation and Follow-up Measures, approximately thirty (30) to ninety (90) days after fitting the hearing aid and every twelve (12) months thereafter.

This result demonstrates Defendants continued efforts to accommodate class members with Plaintiffs' collaborative input without the need for judicial intervention. CDCR will continue its coordinated efforts to reasonably accommodate class members in accordance with its obligations under the ADA and ARP, along with valuable input from the Court Expert and Plaintiffs, ensuring no court intervention is necessary.

**E.    Accommodations for Blind and Low-Vision Class Members**

**1.    Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covers, among other things, reading and writing accommodations, orientation and mobility training for blind and low-vision class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of the ViaPath tablet program (including training), and photophobia accommodations.

Plaintiffs sent a December 10, 2021, demand letter regarding the need for a statewide system for identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  As Plaintiffs explained in the

demand letter, Defendants must (1) identify, track, and produce the accessible formats of written materials (such as large print, braille, and audio) that blind and low-vision class members need to read and write (a statewide request first made by letter on March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic video magnifiers—available to these class members outside restricted locations and hours.

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes between the parties regarding the need for reading and writing accommodations for blind and low-vision class members.  Negotiations regarding Plaintiffs' proposed stipulation are ongoing.  Plaintiffs are hopeful that Defendants will promptly develop a plan for remedying these longstanding ADA violations, and that litigation will not be necessary.

The parties are meeting regarding word processing accommodations for blind and low-vision class members.  Without such accommodations, these class members do not have access to programs, services, and activities that require them to produce written documents, because they are unable to write by hand, or are substantially limited in doing so.

### 2.    Defendants' Statement

Defendants continue to work to accommodate the needs of blind and low-vision class members in all areas including their reading and writing needs. Defendants have collaborated with Plaintiffs and the Court Expert, and have made significant progress to resolve disputes between the parties to ensure class-member access and mitigate associated litigation risks by negotiating a proposed stipulation between the parties to resolve certain disputes.  As reported in the March 15, 2023 Joint Case Status Statement, Defendants are reviewing different processes by which they can identify, track, and provide reading and writing accommodations to blind and low-vision class members. *See* ECF No. 3473 at 18-19.  Defendants have developed a plan to identify and track DPV class members' visual accommodations, including braille, large print, and audio. Defendants have also prepared guidelines for producing due process-related written

1  materials in large print and in braille.  The plan and guidelines developed by Defendants

2  are currently pending Plaintiffs' review.  CDCR continues to utilize technology to

3  accommodate class members as detailed in the March 15, 2023 Joint Case Status

4  Statement. *Id.*  For example, CDCR is also working with a vision consultant to identify

5  and deploy the appropriate electronic assistive devices to accommodate blind and low

6  vision class members' reading and writing needs.  *See* ECF Nos. 3515-1 at 4, 3515-2 at 2-

7  5, 3515-3 at 2.  In fact, on November 6 and 13, 2023, CDCR and CCHCS met with

8  Plaintiffs, the Court Expert and the vision consultant to discuss individualize assessments

9  for DPV class members to determine the appropriate accommodation.  Further, on

10  November 2, 2023, CCHCS issued a memo notifying designated DPV institutions to

11  update their existing Local Operating Procedures and incorporate a Periodic Automatic

12  Replenishment (PAR) value for temporarily issued (*i.e.*, loaner) white tapping canes.

13  Finally, statewide deployment of ViaPath tablets[3] at all CDCR institutions is complete

14  and on-line instructions are available to families of incarcerated people.[4]

15  **F.     Effect of the COVID-19 Pandemic on the *Armstrong* Class**

16          **1.     Plaintiffs' Statement**

17          The COVID-19 pandemic continues to impact the transfer of *Armstrong* class

18  members to ADA accessible placements.  For years, Defendants have been unable to find a

19  way to address the backlog of class members housed inaccessibly in prisons not designed

20  to safely accommodate their disabilities, even after COVID-19-related movement

21  restrictions were relaxed in April 2022, and again in March 2023.  On July 25, 2023,

22  CCHCS issued a memorandum instructing institutions that they are no longer required to

23  keep vacant the space that was identified for quarantine and isolation housing, and that this

24  space will revert back to general population housing.  Plaintiffs are hopeful that this

25  change will open up additional accessible beds that can house *Armstrong* class members,

26

27  _____
   [3] *See* https://www.cdcr.ca.gov/family-resources/tablets/

28  [4] *See* https://web.connectnetwork.com/get-started-with-cdcr-inmate-trust-deposits/

1  and that the number of inaccessibly housed class members will soon return to pre-

2  pandemic levels.  Unfortunately, this has not happened so far.

3      As of October 20, 2023, there were 88 class members housed inaccessibly in

4  placements not designated to accommodate their disabilities in violation of the *Armstrong*

5  Remedial Plan (this does not include an additional 163 class members with impacting

6  placement codes awaiting transfer to designated mainline prisons from reception centers,

7  and 120 incarcerated people improperly housed on upper tiers and/or top bunks.)  All of

8  these numbers represent increases in mis-housed class members since the last Joint Case

9  Status Statement, and until three weeks ago, the number of mis-housed class members has

10  been consistently higher than it was in the immediate aftermath of the policy change.  As

11  of November 9, 2023, the most recent data available to Plaintiffs, there are 77 class

12  members housed out-of-placement and awaiting expedited transfer.  While we hope that

13  this most recent reduction of inaccessibly housed class members will be more lasting than

14  similar temporary decreases over the past several years, the data so far shows that CDCR

15  has been unable to sustainably bring down the number of mis-housed class members, even

16  after opening up additional accessible beds that had been set aside for quarantine and

17  isolation housing.

18      Plaintiffs' counsel are also concerned that the data on expedited transfers may not

19  tell the whole story.  Some class members report that, as a result of pandemic related

20  transfer delays, they are housed in accessible placements, but on higher security level

21  prison yards.  These class members are not counted in data currently produced by

22  Defendants.  Defendants have reported that they have identified hundreds of people in this

23  position but, before they disclose information to Plaintiffs' counsel, are trying to determine

24  why each person is housed out of level.  Plaintiffs' counsel will continue to attempt to

25  reach resolution of this problem.

26      **2.      Defendants' Statement**

27      As noted above, CCHCS July 25, 2023 memorandum instructed institutions to no

28  longer maintain vacant quarantine and isolation housing and that all designated space,

approximately 6,700 beds, shall revert back to general population housing.  This should serve Defendants' efforts to reduce the number of class members on the expedited transfer list, notwithstanding remaining obstacles detailed in previously filed Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452, 3484.  As of November 3, 2023, there are 73 non-reception center class members on the expedited transfer list, but at least 33 of these class members are ineligible for transfer at this time due to several factors, including placement in medical beds controlled by Healthcare Placement Oversight Program (HCPOP).  Although the pandemic has ended, CDCR will continue its COVID-19 monitoring and revised reporting to Plaintiffs' Counsel and the Court Expert for class members housed in non-designated spaces until this issue is resolved.

**G.     Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process under Proposition 57, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.  The parties met with the Court Expert on August 11, 2023 and on October 26, 2023.   Defendants are investigating a number of issues to address program access disparities in assignment rates and are developing an Inmate Assignment Office Reference Guide to help assignment staff manage the waiting list and assignment process effectively.  The parties have also involved staff from the Prison Industries Authority in the workgroup's discussions.  Defendants will continue to produce monthly data for the parties to develop a standard for analyzing program access disparities.  Defendants disagree with Plaintiffs' allegation that the data shows troubling disparities in assignments for people with disabilities, but will continue to participate in future discussions with Plaintiffs about this issue.  *See* ECF No. 3369, Ex. H.

**H.     Statewide Durable Medical Equipment Reconciliation and Accuracy of Disability Tracking Information**

**1.     Plaintiffs' Statement**

Defendants have agreed to ensure that anyone who had not been seen by a health

care provider in the last year would be seen for the purpose of reconciling their DME.  The only outstanding issue then is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually.  Defendants maintain that this is already a requirement during visits with Primary Care Providers.  Yet, Defendants found thousands of class members without needed DME, despite the fact that the majority of class members are seen regularly by health care staff and this is an existing requirement during encounters.  A process for ensuring that staff actually reconcile DME during encounters is necessary to prevent ongoing and widespread problems.

Unfortunately, Defendants' disability tracking system fails to identify and track class members with upper-extremity disabilities.  Plaintiffs' counsel continues to share with Defendants reports of failures to accommodate class members as well as statements from CDCR staff who require assistance in properly identifying who must be accommodated.  Plaintiffs are committed to resolving this ongoing problem.

## 2.  Defendants' Statement

Collaboration between the parties continues to develop a sustainable DME accountability process and progress has been made as noted above and as detailed in the March 15, 2023 and May 15, 2023 case management statements.  *See* ECF Nos. 3473 at 23-26; 3484 at 22-25.  CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity, require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code for multiple reasons communicated to Plaintiffs as noted in the March 15, 2023 Joint Case Status Statement.  *See* ECF No. 3473 at 26.  Notwithstanding these disagreements, CDCR and CCHCS will continue to meet with Plaintiffs and the Court Expert to further discuss these issues.

## I.  Joint Monitoring Tool

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert about informal briefing, and continue to meet to discuss and resolve the few remaining

1   disputes between the parties such as a format for scoring and reporting compliance.

2   **J.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master
        Planning Process**

3

4            The parties continue to engage in the Master Planning Process aimed at ensuring

5   that CDCR prisons are accessible to people with disabilities in compliance with the

6   ADA.  The parties most recently met on October 13, 2023, and October 27, 2023 and are

7   close to finalizing a written document outlining a new Master Planning process for

8   sharing information and plans related to about Master Planning projects, and touring

9   completed projects together.  The parties have agreed as part of the process to tour

10  institutions jointly with our respective experts before and after ADA accessibility

11  construction projects to identify and resolve any ADA-non-compliance issues.  The

12  parties, along with Plaintiffs' ADA access expert, toured LAC on April 29, 2022 and

13  November 9, 2022, CMF on December 16, 2022, VSP on May 3, 2023, and CIM on

14  June 22, 2023.  On April 3, 2023, Plaintiffs produced a report identifying problems their

15  expert identified at LAC.  Defendants have responded to some of the expert's opinions in

16  the report and are planning to respond more fully in the near future.  Plaintiffs plan to

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1  continue working with Defendants to address structural issues or unfinished work that

2  should be done to bring all prisons in compliance with the ADA.

3

4                                          Respectfully submitted,

5  DATED:  November 15, 2023          ROSEN BIEN GALVAN & GRUNFELD LLP

6                                     By:  */s/Penny Godbold*

7                                          Penny Godbold

8                                     Attorneys for Plaintiffs

9

10 DATED:  November 15, 2023          ROB BONTA
                                      Attorney General of the State of California
11
                                      By:  *Trace O. Maiorino*
12
                                           Trace O. Maiorino
13                                         Deputy Attorney General

14                                    Attorneys for Defendants

15

16                           **FILER'S ATTESTATION**

17         As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

18 in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

19 have maintained records to support this concurrence.

20

21 DATED:  November 15, 2023              */s/Penny Godbold*

22                                        Penny Godbold

23

24

25

26

27

28

# EXHIBIT A



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Email: 

November 6, 2023

VIA ELECTRONIC MAIL ONLY

┌─────────────────────────┐
│  **PRIVILEGED AND**     │
│   **CONFIDENTIAL**      │
│─────────────────────────│
│   **SUBJECT TO**        │
│ **PROTECTIVE ORDERS**   │
└─────────────────────────┘

          

Re:    *Armstrong v. Newsom*:  Plaintiffs' November 2023 Review of CDCR's
       Accountability System at the Six Prisons
       Our File No. 0581-03

Dear ███████████████:

We write regarding our review of Defendants' system for holding staff account-
able for misconduct.  The enclosed report is based on our review of investigation and
discipline files produced from CSP-Los Angeles County ("LAC"), California Institution
for Women ("CIW"), R.J. Donovan Correctional Facility ("RJD"), California Substance
Abuse Treatment Facility ("SATF"), CSP-Corcoran ("COR"), and Kern Valley State
Prison ("KVSP") (collectively "Six Prisons").[1]  As detailed below and in the accompany-
ing Table A[2] (which is a separate Excel file), Plaintiffs found that Defendants continue to
fail to comply with the *Armstrong* Court Orders, as affirmed in relevant part by the Ninth

---

[1] For RJD and SATF, the production included documents for cases closed between
March 2-May 31, 2023.  For KVSP and COR, the production included documents for
cases closed between April 1-July 1, 2023.  For LAC and CIW, the production included
documents for cases closed between January 30-May 1, 2023.

[2] This report contains links to external documents and internal sections within the report.
External links are underlined; internal links are not underlined.

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

███████████

November 6, 2023
Page 2

Circuit, and with the RJD and Five Prisons Remedial Plans.  *See* Dkts. 3059, 3060, 3217, 3218, 3393; *Armstrong v. Newsom*, 58 F.4th 1283, 1288 (9th Cir. 2023).

Plaintiffs identified multiple failures in Defendants' accountability process.  Most of these failures occurred in cases processed under Defendants' new investigation and discipline system, which Defendants implemented to attempt to comply with the Remedial Plans and Court orders.

## I.    Repeat Offenders with No or Inadequate Accountability

Plaintiffs have now identified a number of cases involving repeated complaints (and, in some cases, repeated sustained findings) of staff misconduct involving the same officers for the same types of behavior where the Hiring Authorities fail to impose appropriate discipline.  These examples, two of which we highlight below, represent colossal failures of Defendants' accountability system.  The first set of cases—**LAC –** ██████, **LAC –**██████, and **LAC –**██████—all involve Officer ██████. Plaintiffs first wrote about Officer ████ and a retaliatory search that she conducted with another officer in the May 2023 Report.  *See* May 2023 Report at 27-31.  New documents produced since then show that the Hiring Authority did nothing to hold her accountable for the egregious search.  Other cases involving Officer ████ include clear video evidence of her engaging in significant and repeated abuses of her authority to harm incarcerated people.  In the face of this evidence, she has received little more than a slap on the wrist from the Hiring Authority.  Despite finding her "discourteous" twice within a two-month period, the Hiring Authority did not impose progressive discipline.

The second set of cases—**RJD –** ██████ (discussed in this report) and RJD-██████, RJD-██████, RJD-██████, and RJD-██████ (all discussed in the May 2023 Report)—all involve Officer ██████.  This officer has repeatedly been shown on camera denying class members the ability to walk the shortest path around the track to access programs, despite policy permitting this as a reasonable accommodation.  In all four cases, the Hiring Authority took no action to address these ADA violations.  In the case included in this report, RJD-██████, Officer ████ prevented a class member from taking the shortest path, threatened to place him in restraints, and then issued the class member an RVR, even after the class member showed him a granted 1824 permitting him to take the shortest path.  The Hiring Authority failed to recognize the ADA violation and hold Officer ████ accountable, despite his well-documented history of failing to accommodate class members.  Plaintiffs continue to receive

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

November 6, 2023
Page 3

complaints about this officer and his failures to accommodate people with mobility disabilities.

## II.   Hiring Authorities Continue to Fail to Impose Appropriate Discipline

Hiring Authorities are failing in other respects as well.  In particular, Hiring Authorities frequently fail to sustain allegations of misconduct even where video evidence shows officers violating use-of-force and other policies and fail to impose appropriate discipline when they find misconduct has occurred.  These problem extend beyond one prison and one warden.  In addition to the repeat-offender cases discussed above, the Hiring Authorities at the Six Prisons failed to impose appropriate discipline in the following cases:

- **CIW –** ▮▮▮▮▮ – No sustained allegations against an officer shown on video slamming a class member, who is handcuffed behind her back, to the ground when the officer had multiple options available that could have avoided this excessive and dangerous use of force.

- **KVSP –** ▮▮▮▮▮ – No sustained allegations against a Sergeant and a Lieutenant shown on video using unnecessary immediate force against an elderly class member who was in waist-chains in his wheelchair and who was peacefully refusing to accept a housing assignment.

- **COR –** ▮▮▮▮▮ – No sustained allegations against an officer shown on video gratuitously punching a mentally-ill class member in the abdomen while trying to restrain the class member on a hospital bed.

- **COR –** ▮▮▮▮▮**; COR –** ▮▮▮▮▮ – No sustained allegations against officers and health care staff in the Correctional Treatment Center ("CTC") who are shown on video (1) repeatedly refusing to assist a class member to sit up in his bed so he could transfer to his wheelchair to attend outside medical appointments, (2) referring to the class member as "a whiny little bitch" and "a crybaby," and (3) when the class member was unable to get out of his bed, falsely documenting that he refused the appointments.

- **RJD –** ▮▮▮▮▮ – No sustained allegations against an officer who is shown on video (1) refusing to obtain wheelchair-accessible transportation

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
Edward Swanson
Jennifer Neill
Tamiya Davis
November 6, 2023
Page 4

for a DPO class member for an outside medical appointment, (2) falsely asserting that the class member refused to sign an appointment refusal form when the officer never asked the class member to do so, and (3) then issuing the class member a false RVR for delaying a peace officer on which the officer lied that the class member refused to sign the form.

- **LAC –** ▮▮▮▮▮ – Failing to even consider whether a Lieutenant—who admitted to signing a form certifying that she completed a review of a class member's placement in Administrative Segregation ("ASU") even though she had not performed the review—had violated the Disciplinary Matrix category for falsifying material facts in reports or official records (E10), which carries a baseline punishment of termination, and instead imposing only corrective action for failure to observe and perform within training or policy (D26).

- **KVSP –** ▮▮▮▮▮ – Failing to sustain an allegation that an officer—who challenged a class member lying in a bed in the CTC to fight—had intimidated or threatened the class member (D15), which carries a baseline Level 5 penalty, and instead imposing only corrective action for discourtesy (D1).

In Defendants' existing accountability system, Hiring Authorities are responsible for reviewing investigation reports and supporting evidence to reach the ultimate conclusion regarding whether staff misconduct has occurred. The cases discussed in this report and in prior reports make clear that Hiring Authorities are failing at this essential responsibility. This conclusion is bolstered by the fact that the Hiring Authorities currently have a backlog of hundreds of completed AIU investigations sitting on their desks, awaiting resolution. Their inability to adequately perform this time-consuming function in a timely manner is unsurprising given their substantial other duties running the prisons. It is unrealistic to expect Wardens to have the capacity to review all of the relevant evidence, including video footage, in these cases. The situation is made worse by the fact that Defendants have no required process to review whether Hiring Authorities are adequately performing their accountability responsibilities and to take action if they are not.

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

███████████

November 6, 2023
Page 5

### III.   Investigators Continue to Conduct Incomplete and Biased Investigations

Though the buck stops with the Hiring Authorities, the poor quality and bias evident in staff misconduct investigations contribute substantially to the failures of Defendants' accountability system.  Because Hiring Authorities do not have time to adequately review investigations and impose discipline, it appears that they frequently rely on what is written in the investigation reports, without conducting their own analysis. As discussed in more detail below, investigators often mischaracterize evidence, provide incomplete descriptions of evidence, and entirely omit references to crucial and relevant evidence.  In addition, some investigators offer conclusions that staff misconduct did not occur, in violation of their duty to "refrain from conjecture and opinion."  *See* Cal. Penal Code § 6065(c).  Even in cases where investigators do not improperly opine, the titles of the reports, such as a "quick close report" and "Investigative Report with No Evidence of Misconduct," signal to the Hiring Authority that investigators believe no staff misconduct occurred.

The failures by investigators discussed below include the following:

- **KVSP –** ███████ – Though the class member clearly explained that the alleged use of force—an officer unnecessarily shoving his wheelchair, causing his feet to get caught underneath and injuring his ankles—occurred as he was leaving the mental health building, the investigator obtained footage showing him arriving at and inside, but not leaving, the building. When the video covering the wrong time period did not show the alleged incident, the investigator concluded that no misconduct occurred.

- **KVSP –** ███████ – Though two incarcerated people provided consistent reports that a Sergeant had forged one of their signatures on a compatibility chrono following a fight, the investigator failed to take steps to determine if the signature had been forged, such as comparing the signature to verified signatures for the incarcerated people and the Sergeant.

- **SATF –** ███████ – The investigator concluded that video evidence did not support the allegation—that the control officer had denied the class member access to an incontinence shower, requiring him to sit for hours in a soiled diaper—because it did not show the class member asking for a shower.  But the class member had specifically alleged that he had someone

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

███████

November 6, 2023
Page 6

> in the building request a shower for him, not that he personally requested the shower.

- **KVSP –** ██████ (discussed above regarding Hiring Authority issues) – Even though video showed that the use of force against a class member in a wheelchair was unnecessary, the investigator's biased report did not even include a description of the video and instead included only the investigator's conclusion that the force complied with policy.

- **COR –** ██████ (discussed above regarding Hiring Authority issues) – The investigator failed to note in the investigation report that the officer made false statements in his incident report and AIU interview that he punched the class member in the abdomen to stop the class member from trying to head butt staff, as video showed that any attempted head butt occurred after the officer punched him.

- Multiple additional cases where investigators failed to retain and review relevant video footage critical to determining whether misconduct occurred. *See* **I.B.2**.

## IV.   The CST Continues to Fail to Appropriately Route Allegations of Staff Misconduct

Beyond the challenges of improving disciplinary decision making, Defendants continue to fail to identify staff misconduct complaints.  As shown in **II**, the Centralized Screening Team ("CST") is routinely failing to identify when staff misconduct has been alleged.  Twenty percent of the grievances reviewed by Plaintiffs, including many grievances raising serious allegations of misconduct, were inappropriately deemed "routine" grievances instead of staff complaints.  *See* **APPENDIX A**.  Moreover, even when a grievance is identified as containing a staff misconduct allegation, the CST is failing to correctly apply the Allegation Decision Index ("ADI").  As a result, many serious allegations of misconduct are being routed to Locally Designated Investigators ("LDI") rather than to the Allegation Investigation Unit ("AIU") within the Office of Internal Affairs ("OIA").  These two related failures by the CST represent serious non-compliance with the Remedial Plans.

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

████████

November 6, 2023
Page 7

## V.   Defendants Must Immediately Take the Following Steps to Come Into Compliance with the Remedial Plans and Court Orders

In order for Defendants to operate a meaningful accountability system and to comply with the Court's orders and the Remedial Plans, Defendants must take the following steps:

1.   Defendants must implement safeguards to ensure that investigators complete thorough and unbiased investigations.  Benchmarks should be created for what constitutes a complete and unbiased investigation.  Prior to even starting an investigation, investigators should be required to first describe all sources of evidence needed to evaluate the allegation and then all such evidence should appear in the report.  Defendants should also require that investigators explain why they could not obtain any such evidence .

2.   Investigative supervisors must perform meaningful and critical reviews of all investigation reports and evidence to determine whether the investigation was complete and unbiased and whether the report accurately describes the evidence.  This review should also ensure that investigators refrain from offering inappropriate conclusions about whether staff misconduct has occurred.

3.   Defendants must stop the practice of using any report formats—such as quick close reports or "Investigative Report with No Evidence of Misconduct"—that convey that the investigators have concluded no misconduct occurred.

4.   Defendants must provide Hiring Authorities with help or else should move the responsibility for administering the accountability system to others within CDCR (e.g., headquarters).  Hiring Authorities do not have the time or ability to review the evidence in all cases to make meaningful decisions about whether staff misconduct occurred or to impose appropriate discipline.

5.   Defendants must mandate that Hiring Authorities resolve cases within a certain time period after the close of an investigation.  This requirement is

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

███████

November 6, 2023
Page 8

      necessary even if Defendants eliminate the current backlog of cases.  The swift and consistent resolution of complaints and imposition of discipline, if warranted, is necessary in any accountability system.

6.     Defendants must develop a system for reviewing Hiring Authority decision making and holding Hiring Authorities accountable if they are doing a poor job deciding whether misconduct occurred or imposing discipline (i.e., by misapplying the Disciplinary Matrix).

7.     Defendants must address the repeated failures of its accountability system to identify use-of-force violations.  In these cases, investigators are routinely failing to identify and report on evidence accurately, Institutional Executive Review Committees ("IERCs") are failing to identify policy violations, and Hiring Authorities are failing to confirm and punish misconduct.  CDCR should take immediate action to retain and utilize experts in use-of-force case reviews.

    These and other steps discussed at the October 18 and 23, 2023 meetings are needed to bring Defendants into compliance with the Remedial Plans and Court orders. It is imperative that CDCR re-commit to ending all staff misconduct, including misconduct directed at people with disabilities.  Plaintiffs look forward to continuing our discussions with Defendants and the Court Expert on remedies to address ongoing problems identified in this report.

                    Sincerely,

                    ROSEN BIEN
                    GALVAN & GRUNFELD LLP

                    */s/* ███████

By:   ███████

███████

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



November 6, 2023
Page 9

cc:   

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## TABLE OF CONTENTS

Page

I. DEFENDANTS CONDUCTED BIASED AND INCOMPLETE INVESTIGATIONS AND IMPOSED INAPPROPRIATE AND INCONSISTENT DISCIPLINE ................................................................................. 11

    A. Hiring Authorities Remain a Significant Barrier to Accountability .......... 11

        1. Hiring Authorities Failed to Hold Staff Accountable When the Preponderance of Evidence Established Misconduct Occurred ............................................................................................... 11

            (a) Cases Involving Officer ███ (LAC) ................................. 11

            (b) RJD – ███ – Local, Not Sustained ................................ 20

            (c) CIW – ███ – AIU, Not Sustained .................................. 21

            (d) KVSP – ███ – AIMS, Not Sustained ........................... 24

            (e) COR – ███ – AIU, Not Sustained ................................. 26

            (f) COR – ███; COR – ███ – Local, Not Sustained; Local, Not Sustained ............................................ 28

            (g) RJD – ███ – AIU, Not Sustained ................................... 32

        2. Hiring Authorities Failed to Impose Appropriate Discipline After Misconduct Was Confirmed ..................................................... 33

            (a) LAC – ███ – OIA, Sustained (for failure to perform within training) – LOI, Training ............................. 33

            (b) KVSP – ███ – AIU, Sustained (for discourtesy) – LOI ................................................................................. 34

        3. Hiring Authorities Continue to Delay in Reviewing Investigations ................................................................................... 36

        4. Imposition of Post-Hiring Authority Discipline at LAC ................. 37

    B. Barriers to Accountability as a Result of Investigations ............................. 37

        1. Investigators Conducted Incomplete and Biased Investigations that Interfered with Determining If Allegations Were True ...................................................................................... 37

            (a) KVSP – ███ – AIU, Not Sustained ............................... 37

            (b) KVSP – ███ – AIU, Not Sustained ............................... 39

            (c) SATF – ███ – AIU, Not Sustained ............................... 40

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

2.      Investigators Routinely Fail to Review Relevant Video Footage of Incidents ........................................................................ 41

3.      Inappropriate Use of AIU "Quick-Close" Policy............................ 42

4.      AIU Investigations Continue to Be Delayed.................................... 43

II.    DEFENDANTS ARE FAILING TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS................................................. 44

A.      The CST Is Inappropriately Routing Staff Misconduct Complaints as "Routine" Grievances.................................................................... 44

B.      The CST Is Improperly Routing Serious Staff Misconduct Complaints Back to Prisons Instead of the OIA .......................................... 48

III.   OFFICERS ARE NOT COMPLYING WITH BWC POLICIES ........................ 50

IV.    CONCLUSION ............................................................................................... 52

APPENDIX A................................................................................................................. A-1

APPENDIX B................................................................................................................. B-1

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

## I. DEFENDANTS CONDUCTED BIASED AND INCOMPLETE INVESTIGATIONS AND IMPOSED INAPPROPRIATE AND INCONSISTENT DISCIPLINE

The Remedial Plans and Court's orders require that Defendants' investigators conduct "comprehensive and unbiased investigations and ensure all relevant evidence is gathered and reviewed" and that Hiring Authorities impose appropriate and consistent discipline.  RJD Remedial Plan, § II.B; Five Prisons Remedial Plan, § II.B; *see also* Dkt. 3060, ¶ 5.c; Dkt. 3218, ¶ 5.c.

To evaluate Defendants' compliance, Plaintiffs reviewed all of the cases produced by Defendants.  Plaintiffs then selected a subset of those cases for closer review, including: 11 cases from LAC, 9 cases from CIW, 15 cases from SATF; 13 cases from COR; 9 cases from KVSP; and 10 cases from RJD.[3]  The complete findings from Plaintiffs' review are contained in Table A.  Note that the findings for each prison appear in separate tabs of the Excel file.

Below, Plaintiffs describe a number of cases that illustrate serious, ongoing problems regarding Defendants' accountability system.  Though Plaintiffs have categorized each case by whether it primarily reflects problems with investigations or with Hiring Authority decision-making, many cases evidence both types of problems.

### A. Hiring Authorities Remain a Significant Barrier to Accountability

#### 1. Hiring Authorities Failed to Hold Staff Accountable When the Preponderance of Evidence Established Misconduct Occurred

##### (a) Cases Involving Officer ██████ (LAC)

Over the course of several months, Officer ████ at LAC engaged in multiple, serious instances of intentional misconduct toward class members.  First, in December 2021, Officer ████ abandoned her post in the control booth to conduct an improper and

---

[3] Plaintiffs selected the cases using a variety of criteria, including, but not limited to, whether: CDCR referred the case to the OIA for investigation or direct adverse action; the AIU investigated the case; the AIMS conducted an inquiry; the case involved an allegation related to use of force or disability; the Hiring Authority sustained an allegation; and the case included video evidence.  These criteria are intended to identify cases with the most serious and credible allegations of misconduct, which we then review to determine whether Defendants are holding staff accountable when the evidence shows misconduct occurred.  While Defendants have mischaracterized this approach as "cherry-picking" in the past, there can be no reasonable dispute that it is necessary to focus on cases with serious and credible allegations of misconduct to evaluate whether the accountability system is working.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

discourteous search of a class member's cell.  Second, in February 2022, when a different class member threatened to light a fire in his cell after becoming angry that Officer ███ had not released him for his medications, she told the class member to "blaze it up" and still refused to release him.  The class member ultimately did set a fire in his cell.  Third, as discussed at length in Plaintiffs' May 2023 report, in June 2022, Officer ███ and Officer ███ conducted a retaliatory cell search against a class member who had previously insulted Officer ███.

Despite clear video evidence of each of Officer ███'s acts of misconduct, the Hiring Authority failed to impose adequate discipline.  In the first case, the Hiring Authority sustained an allegation of discourtesy, but failed to sustain additional misconduct regarding search violations and dishonesty.  In the second case, the Hiring Authority again found Officer ███ discourteous but failed to impose progressive discipline even though discourtesy was the exact same violation sustained in the first case only two months earlier.  And in the third case, the Hiring Authority did not sustain any allegations against Officer ███, even though she bragged on video about her retaliatory intent and then lied to investigators.

Individually and collectively, these cases show that Defendants' accountability system is not working.  Officer ███ has repeatedly abused her power to intentionally harm class members and then lied about her actions when investigated.  CDCR should have fired her for her repeated misconduct and dishonesty.  Yet, as far as Plaintiffs are aware, she remains employed by CDCR, able to continue violating class members' rights.

      (i)    **LAC – ███ – *Incident: December 7, 2021; 402/403: November 21, 2022;* OIA, Sustained (partial) – Level 3**

In this case, ███ alleged in a 602 that on December 7, 2021, Officer ███ conducted a retaliatory cell search that damaged his property.  *See* 602 at 77.[4]  The BWC evidence confirms that Officer ███ conducted an improper, harassing cell search and violated other CDCR policies.  Moreover, Officer ███ claimed during her OIA interview that she was searching for contraband, but the contemporaneous BWC evidence shows that Officer ███ repeatedly said she was searching Mr. ███'s cell because he was not listening to her orders.  The Hiring Authority failed to discipline Officer ███ for the improper cell search and for her dishonesty during the OIA interview.

Officer ███'s BWC footage shows her at her assigned post in the control booth in Building ███, which houses class members with serious mental illness.  Officer ███

---

[4] Throughout this report, all citations to page numbers of documents refer to the page of the PDF, not to any internal pagination in the document.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

orders everyone in the housing unit to get down due to a medical issue in another building. *See* BWC at 18:37 (linked above). She then yells "go to your cell" to an unspecified person. *See* BWC at 18:37:45 (linked above). Two minutes later, she asks an officer on the floor, Officer ███, "Do you wanna come up here real quick?" *See* BWC at 18:39:09 (linked above). Officer ███ says she is about to "go hit this dude's cell." *See* BWC at 18:39:40 (linked above). She then states the cell is 125 (Mr. ███'s cell) and that she is conducting the search because "he is not trying to go in." Officer ███ tells Officer ███ that she "told him [Mr. ███] to go in" to his cell.

In violation of policy, Officer ███ then leaves the control booth without obtaining approval from a supervisor and walks down to the floor. She tells Mr. ███, "you act like you don't fucking hear me" and that he was the "only one who wasn't going in." BWC at 18:43:20 (linked above). Mr. ███ replies that he still had duties to perform as a porter. Officer ███ says, "From now on, no phone calls for you," and "I have a program that needs to be fucking ran." Officer ███ then escorts Mr. ███ toward his cell and enters the cell to search it. Officer ███ concludes her search, exits the cell, and then prepares to write a cell search receipt. BWC at 18:57:52 (linked above).

Officer ███'s statements on the video footage demonstrate that she inspected Mr. ███'s cell because she was frustrated with Mr. ███ for not returning to his cell. That is not a proper basis for a search. Officers can conduct "infrequent" and "unannounced" cell and body searches or can conduct targeted searches if they have reasonable suspicion that a person is committing a crime or holding contraband. *See* 15 C.C.R. §§ 3287(a)(2), (b); DOM §§ 52050.16, 52050.16.2, 52050.16.3. But they may not engage in a targeted search as a punitive measure nor to harass the incarcerated person, as was clearly done here. *See* 15 C.C.R. § 3287(a)(2) (stating that cell searches "will not be used as a punitive measure nor to harass an inmate").

During an October 2022 interview with the OIA investigator, Officer ███ tried to explain that the search complied with policy, stating that she searched Mr. ███'s cell because she had seen Mr. ███ "passing and receiving items from other inmates" throughout that day. *See* OIA Report at 5. Officer ███ claimed that she left her post to search Mr. ███ based on that supposed earlier behavior and Mr. ███'s refusal to comply with her orders. *Id.* But this explanation is not credible. Throughout the video interactions described above, Officer ███ never mentions that she suspected he possessed contraband or that she witnessed him pass or receive contraband. Instead, the video consists of repeated statements regarding her admitted annoyance with his failure to comply with her orders. Also, the fact that she left her control booth post without supervisor approval to conduct the search further suggests an improper, harassing, and punitive intent. If the purpose of the search was to address contraband, she could have asked one of the floor officers to conduct it.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The Hiring Authority failed to impose adequate discipline. The Hiring Authority sustained allegations that Officer ███ (1) left her post without supervisory approval; (2) was discourteous; and (3) failed to wear her protective vest, and issued a Level 3 penalty (5% salary reduction for 12 pay periods), which was the baseline penalty for the controlling category (i.e., the misconduct carrying the highest baseline penalty). *See* 402/403 at 1-4. The Hiring Authority did not, however, sustain an allegation that the search was retaliatory or improper, even though the video establishes so by a preponderance of the evidence. In addition, the Hiring Authority did not even consider an allegation that Officer ███ lied to the OIA investigator. Such a charge was warranted, as (1) there is no evidence to support Officer ███'s self-serving statement that she had seen Mr. ███ passing items to other incarcerated people; and (2) her repeated contemporaneous statements on video contradict her assertion that she searched the cell because she thought he was passing contraband. Incredibly, the Hiring Authority found as a mitigating factor that Officer ███ had been "forthright and truthful during the investigation." *See* 402/403 at 4.

The OIA investigation into the propriety of the search did the Hiring Authority no favors. Most egregiously, the investigation report omitted all of Officer ███'s repeated statements that the reason she searched the cell was because Mr. ███ had not complied with her order to return to the cell. Those statements were essential to the investigation, as they directly contradicted Officer ███'s months-later justification for the search. The investigator's interview of Officer ███ was also deficient. The investigator did not question Officer ███ about her on-camera statements, which contradict the purported basis for the search she provided during her interview. Nor did the investigator ask Officer ███ whether there was any evidence corroborating her claim that she suspected Mr. ███ had been passing items to other incarcerated people or why, if she saw Mr. ███ passing items throughout the day, she waited until later to conduct the search.

    **(ii)**    **LAC –** ███ **–** *Incident:  February 1, 2022; 402/403: January 20, 2023;* **OIA-DAA, Sustained (partial) – Level 4**

On February 1, 2022, Officer ███ rejected ███████ ███ request to be released from his cell to receive his diabetic medication and, after he became upset and threatened to set a fire, encouraged him to "blaze it up." Mr. ███ then started a fire, endangering himself and others. The Hiring Authority sustained an allegation that Officer ███ was discourteous and imposed a Level 4 penalty (a 10% salary reduction for 8 pay periods). The penalty in this case was inadequate because the Hiring Authority failed to impose progressive discipline based on the prior adverse action against Officer ███ for the same misconduct—discourtesy—two months earlier.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Officer ██████'s BWC footage shows either staff or incarcerated people yelling to Officer ████ about Mr. ████ needing his diabetes medication.[5]  *See* BWC at 4:41:45; 989 at 1.  Officer ████ responds, "He didn't come out" and "leave it alone."  Officer ████ opens the window of the control booth to talk to an officer on the floor.  *See* BWC at 4:43:30 (linked above).  Officer ████ says to the officer, "Bro, shut up, fuck.  I open the door, he stands there…he'll get it when I'm done with chow, shit."  Mr. ████ asks if Officer ████ is denying him medical treatment and she responds "I didn't say that, you'll get there."  Mr. ████ then yells that he is going to start a fire and Officer ████ responds, "Blaze it up!  The fuck!"  Officer ████ then closes the window and walks away.  *See* BWC at 4:44:15 (linked above).  A few minutes later, officers on the floor respond to cell 131 and talk with Mr. ████, who says that Officer ████ opened the door for only three seconds for his diabetic shot.  Shortly after that, Officer ████ reports a cell fire in cell 131 over the radio and officers respond to Mr. ████'s cell.  *See* BWC at 4:51:00 (linked above).  Officer ████ then calls a different officer to complain about Mr. ████ and Officer ████.[6]  A supervisor reported the incident and LAC requested OIA authorization for direct adverse action, which the OIA provided.  *See* 989 at 1, 4.[7]

The Hiring Authority sustained charges that Officer ████ was discourteous to incarcerated people and other staff.  *See* 402 at 1.  However, the Hiring Authority did not sustain a charge that Officer ████ endangered incarcerated people and staff and "failed to appropriately take action when given the threat of arson, when she stated 'Blaze it up, the fuck,' or words to that effect and closed the window to the control booth."  *See* 402 at 1.  The video evidence shows that Officer ████ did exactly what the allegation stated, with little apparent regard for the safety of staff or incarcerated people.  The Hiring Authority should have sustained that allegation.

For the charges that were sustained, the Hiring Authority imposed a Level 4 penalty of 10% salary reduction for 8 pay periods.  *See* 402/403 at 3.  Were this the only sustained adverse action against Officer ████, that penalty may have been adequate, as it was one level above the baseline penalty for the category that carried the highest

---

[5] A supervisor's memorandum states that at 4:38, Officer ████ opens Mr. ████'s cell (Cell 131) without announcement, and that ████ "is observed coming to the threshold in shorts and a t-shirt and retreating from the door at which time the cell door is closed."  *See* Memo at 5.  Plaintiffs did not see this in the provided BWC.

[6] Defendants did not produce video from all officers involved, including from Officer ████.  It is unclear whether LAC pulled video from all officers.

[7] The record suggests that the OIA simply authorized adverse action, even though the case notification indicates the OIA accepted it for a subject-only interview.  *See* Case Notification at 1.  No OIA report or OIA interview of Officer ████ appears in the case file.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

baseline penalty (D14, 2**3**456, Disruptive, offensive, or vulgar conduct which discredits the department).[8]  But this was not the only adverse action against Officer ███.  As discussed above in case LAC – ███████, just two months earlier, the Hiring Authority had imposed adverse action against Officer ███ for the exact same type of misconduct—discourtesy.  Yet the Hiring Authority failed to recognize that this case warranted progressive discipline.  On the 402/403, the Hiring Authority did not identify the prior misconduct as an aggravating factor.  *See* 402/403 at 4; Disciplinary Matrix, 15 C.C.R. § 3392.5(c)(11)(L) (providing that it is an aggravating factor if "[t]he employee has committed repeated acts of misconduct resulting in prior sustained adverse action").  Similarly, in the Notice of Adverse Action for Officer ███, the Hiring Authority wrongly states that Officer ███ had "no prior disciplinary misconduct with CDCR." *See* NOAA at 13.

CDCR claims that it operates a progressive discipline system, in which Hiring Authorities must take into account "whether or not progressive discipline has been taken in the past" when determining what penalty to impose.  *See* DOM § 33030.20.  These cases involving Officer ███, where she was found to have engaged in the exact same type of misconduct only two months apart but the Hiring Authority did not impose progressive discipline, serve as strong evidence that CDCR's system is not working.

> **(iii)** **LAC – ███████[9] – Incident:  June 16, 2022; 402/403: December 2, 2022; AIU, Not Sustained (Officer ███, Officer ███), Sustained (Officer ███) – Level 3**

In this case, class member ███████████████ accused Officer ███ and Officer ███ of conducting a retaliatory cell search and accused Officer ███ of excessive force.  Plaintiffs' May 2023 Report documented the extensive on-camera evidence that Officer ███ and Officer ███ conducted a retaliatory cell search because Mr. ███ had insulted Officer ███ the day before. *See* May 2023 Report at 27-31 (discussing case LAC-███).  CDCR inexplicably split that allegation into multiple separate cases and assigned different investigators to look at separate but related claims involving the same set of underlying facts.  CDCR has, in this quarterly production, now produced the additional investigation that includes even more evidence (footage not provided with the investigation produced last quarter) which further supports that the search was retaliatory.  Notwithstanding this evidence, the

---

[8] Given how egregious Officer ███'s conduct was, as well as the quantity and quality of the aggravating versus mitigating factors, the Hiring Authority could have imposed a higher penalty.

[9] Unlike the other LAC cases discussed in this report, which Defendants produced on June 27, 2023, Defendants produced this case as part of their September 28, 2023 production.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Hiring Authority failed to appropriately hold the officers accountable.  The Hiring Authority did not even consider any allegations against Officer ██████ for her role in the search.  The Hiring Authority failed to consider dishonesty charges against both officers for lying during their AIU interviews.  And though the Hiring Authority did find that Officer ██████ threatened and conducted a retaliatory search, he then imposed inadequate discipline.

As described in detail in the May 2023 Report, footage from June 16, 2022 shows that Officers ██████ and ██████ repeatedly stated on video that they were searching Mr. ██████'s cell because he had called Officer ██████ a "house n-----" the prior day. *See* May 2023 Report at 27-29.  Additional evidence produced during the more recent production includes footage from June 15, 2022, the day before the search, that further confirms the search was retaliatory.  For example, after being insulted by Mr. ██████, Officer ██████ announced the following over the PA system in the housing unit:

> ██████, I'll tell you this.  **Soon as you leave your cell tomorrow, I'm in your cell, taking everything that doesn't have your name on it**.  You better stay in your cell all day, sir.…  Everything that don't got your name on it, I'm taking.  That TV, CD player, that watch, that hat.  I'm going to be in there and you're going to be mad.  Then you're going to have some reason to be mad....  You have a good night, ██████.

*See* BWC at 20:43:30 (emphasis added).  Mr. ██████ can also be heard on the video calling Officer ██████ a "house n-----."  BWC at 20:44:28,  Later, Officer ██████ talks to Officer ██████, who was working as a floor officer in the building, about how Mr. ██████ had used a racial slur toward him and his plan to search Mr. ██████'s cell.  *See* BWC at 20:54:30; AIU Report at 14.  The AIU investigation documents other statements by Officer ██████ on June 15 provoking Mr. ██████ and promising retaliation.  *See* AIU Report at 4.

Confronted with the overwhelming evidence that Officers ██████ and ██████ conspired to conduct a retaliatory search of Mr. ██████'s cell, the Hiring Authority made a series of inexplicable decisions regarding discipline.

First, though the Hiring Authority sustained allegations that Officer ██████ threatened and then conducted a retaliatory search against Mr. ██████, *see* 402/403 at 9, the Hiring Authority did not even consider any allegations against Officer ██████ related to the search.  Instead, the Hiring Authority only considered whether Officer ██████ used excessive force against Mr. ██████ in an incident that occurred after the retaliatory search.  *See* 402/403 at 5.  Given that Officers ██████ and ██████ were equal participants in the search and that Officer ██████ repeatedly admitted on camera that the search was retaliatory, *see* May 2023 Report at 27-29, the Hiring Authority's failure to hold Officer ██████ accountable is inexcusable.  This failure is especially troubling because, as discussed above, at the time the Hiring Authority resolved this case, the

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Hiring Authority had already found that Officer ███ had engaged in misconduct in
**LAC –** ███.

Second, the Hiring Authority should have considered (and likely sustained)
dishonesty charges, which carry a baseline penalty of termination (E6, 78**9**), against
Officer ███ and Officer ███. With respect to Officer ███, in her interview with the
AIU investigator, she denied that the search was retaliatory. Instead, she asserted—just
as she did in **LAC –** ███—that she was searching the cell "due to [Mr. ███'s]
elevated bizarre behavior and from observations of ███ passing items around to
other cells." *See* AIU Report at 12. There is, however, no evidence to support this claim
and substantial evidence that contradicts it. Most importantly, the BWC footage includes
many repeated statements that the officers searched Mr. ███'s cell for retaliatory
reasons and no statements regarding searching because of his supposed suspicious
behavior. In addition, Officer ███ conceded that she did not document her suspicion
or inform a supervisor. *See* AIU Report at 13. Furthermore, though Officer ███
claimed that she and Officer ███ discussed their suspicion the night before the search,
none of the video evidence supports that claim and, in his own interview, Officer ███
did not mention discussing the issue with Officer ███. *See* AIU Report at 15 (stating
he had suspicions, but not indicating that he spoke with Officer ███ about them).[10]

Officer ███ was also dishonest during his interview. He claimed that he was not
threatening Mr. ███ on June 15 when he said he was going to search
Mr. ███'s cell and take his property, but was instead just "talking out of his ass."
*See* AIU Report at 15. But, of course, Officer ███ was not "talking out of his ass," as
the next day he and Officer ███ did exactly as he had threatened and searched
Mr. ███'s cell and took his property, including his television[11]. Like Officer
███, he claimed that he conducted the search because of Mr. ███'s bizarre
behavior and suspicion that he might have possessed drugs or contraband. *See* AIU
Report at 16. But just as with Officer ███, he did not document those suspicions and
his BWC footage contains no evidence to support this purported justification for the
search and ample evidence that the search was retaliatory.[12] The video from June 15,

---

[10] Officer ███ also likely lied to the investigator about why she searched a different
cell, Cell 144, for such a short period. Officer ███ claimed that "she realized she was
by herself and cell searches are conducted with a partner for safety reasons." *See* AIU
Report at 12. As far as Plaintiffs are aware, there is no such requirement in the DOM.
And, in LAC-███ (discussed above), Officer ███ searched Mr. ███'s cell
by herself, further undermining the purported excuse in this case.

[11] Officer ███ admitted in his AIU interview that he knew that the "television was
important to ███." *See* AIU Report at 15-16.

[12] Officer ███ also was dishonest about other issues. As highlighted by the investigator,
Officer ███ claimed during his interview that he searched cells 142 (Mr. ███'s

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

2023, where Officer ███ tells Mr. ████████ that he's going to search his cell and take his property in order to make Mr. ████ "mad," is particularly damning. The Hiring Authority also found, by a preponderance of the evidence, that the search was retaliatory. Such a finding compelled the Hiring Authority to also find that Officer ███ was dishonest when Officer ███ swore to the investigator that the search was not retaliatory.

Lastly, the punishment for Officer ███ was also inappropriate because the Hiring Authority misapplied the Disciplinary Matrix. As discussed above, the Hiring Authority sustained allegations that Officer ███ threatened and then conducted a retaliatory search. The Hiring Authority initially issued a Level 3 penalty (5% salary reduction for 6 pay periods), *see* 402/403 at 9-11, which the Hiring Authority later agreed to reduce to a 5% reduction for only 3 pay periods, at the very low end of Level 3, *see* ███ Stipulation-NOAA at 1.[13] The Hiring Authority only identified two Matrix categories implicated by Officer ███'s misconduct: discourtesy (D1, **1**23456) and failure to observe and perform (D26, **1**2345). *See* 402/403 at 11. The Hiring Authority did impose a punishment above the baseline for those categories, likely because the Hiring Authority identified seven aggravating factors and one mitigating factor.[14] The Hiring Authority failed, however, to identify a host of other relevant Matrix categories that carried more serious penalties: Intimidation, threat, or assault without the intent to inflict serious injury toward an inmate (D15, 34**5**678); Disruptive, offensive, or vulgar conduct which discredits the department (D14, 2**3**456); Failure to observe and perform within professional standards (D25, **3**456789); Intentional failure to report misconduct by another employee (B1, 2**3**45); and Unauthorized use of department position (D8, 1**2**3). Had the Hiring Authority identified these other relevant Matrix categories, the punishment likely would have been higher than the Hiring Authority imposed. The Hiring Authority would have started at a Level 5 penalty (the highest of the relevant categories) and then should have increased the penalty from there based on the aggravating factors.

Officers like Officer ███ and Officer ███, who intentionally abuse their power to punish disfavored incarcerated people, should not work in CDCR prisons, let alone

---

cell), 143, and 144 because of suspicions related to contraband. But Officer ███ only searched cell 143 for 10 seconds. Officer ███ claimed "he did not remain in cell 143 because it had a lot of stuff and he did not feel like diving into it." *See* AIU Report at 16. But if he truly believed there was potentially contraband in that cell, his explanation makes no sense.

[13] That the Hiring Authority, in a case with such clear and intentional misconduct, agreed to reduce the discipline by settlement is problematic in its own right.

[14] The Hiring Authority also erred in identifying the single mitigating factor—"[t]he employee accepts responsibility." Nothing in the file suggests that Officer ███, who denied that the search was retaliatory, actually accepted responsibility for his misconduct.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

work around people with disabilities.  And yet, in this case, despite clear video evidence of very serious retaliation, Officer ██████ received little more than a slap on the wrist and Officer ██████ was not punished at all.

        **(b)**    **RJD –** ██████ **– Local, Not Sustained**

       This case represents yet another instance in which Officer ██████ at RJD failed to provide reasonable accommodations to people with disabilities on Facility A.  Yet, as in prior reports where Plaintiffs have identified the same behavior by this officer, CDCR did nothing to hold him accountable.

       ██████████████, is a class member with a mobility disability who also works as an ADA Worker.  In June 2022, Mr. ██████ submitted an 1824 specifically complaining that Officers ██████ and ██████ prohibited him and other class members with mobility disabilities from taking the short route from their housing units to the dining hall.  The RAP granted the 1824, stating "Inmate ██████, staff will allow you to take the shortest distance to the chow hall to accommodate your mobility disability."  *See* June 9, 2022, RAP Response at 3.

       On June 28, 2022, after Mr. ██████ received the RAP response, he attempted to take the shorter route to the dining hall while pushing ██████████, who was in a wheelchair.  *See* BWC.  As shown on video, Officer ██████ refuses to allow Mr. ██████ and Mr. ██████ to pass.  Mr. ██████ shows Officer ██████ the RAP response.  Officer ██████ becomes agitated, saying he is going to provide them notice in writing that "future violations will result in progressive discipline."  When Mr. ██████ tries to reference the statewide CDCR policy allowing individuals with mobility disabilities to take the shortest path of travel (*see* Revised Durable Medical Equipment policy (May 12, 2020) at 3), Officer ██████ explicitly contradicts both the policy and the RAP response: "When yard is open and you're on a ducat, sir, you feel free to take the shortest route.  During chow, movement is controlled."  Officer ██████ then gets more threatening, stating "You know what, this is the last time I'm gonna have a sentence cut off so what I'm gonna do right now is give you a lawful order to turn around and go back with the flow of traffic.  Are you gonna comply or am I gonna have to place you both in restraints?"  *See* BWC (linked above).  Mr. ██████ and Mr. ██████ turn around and walk away from Officer ██████.  Officer ██████ issued a counseling-only RVR to Mr. ██████ related to this incident.  *See* Inquiry Report at 2.

       The LDI investigating Mr. ██████'s 602 stopped the inquiry based on a reasonable belief that misconduct likely to result in adverse action had occurred and submitted a Request for Further Administrative Review to the OIA.  The OIA, however, rejected the case, concluding that no misconduct had occurred.  The Hiring Authority accepted this decision and closed the case with no further action.  *See* Closures at 2-3.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The lack of accountability in this case is, for multiple reasons, deeply concerning.

First, the misconduct is captured on video, yet resulted in no accountability.

Second, Mr. ██████ had done everything possible to ensure he received the accommodation he needed, including by obtaining confirmation of his rights in a RAP response, yet nothing was done to address Officer ██████'s failure to follow policy. The conduct of the officer in this case represents not just a failure to accommodate Mr. ██████ and Mr. ██████████, but also a failure to comply with attempts by a superior (the Associate Warden who granted the 1824 and instructed that Mr. ██████ could take the shortest path) to ensure accommodations for class members on Facility A.

Third, Plaintiffs' have repeatedly reported on Officer ██████'s and another officer's (Officer ████████) failures to accommodate people with mobility disabilities—including cases where BWC footage similarly confirms the failure to accommodate and the violation was also not sustained. *See* Sept. 2022 RJD Monitoring Report at 10-12; *see also* Plaintiffs' May 2023 Report at 21-23. In this case, as in prior cases, the class member also received inappropriate and discriminatory discipline (in this case a counseling-only RVR) that should be voided and expunged from his file immediately. And in all of the cases, the Hiring Authority failed to hold the officers accountable for their failures to follow ADA policies.

This case should have been simple. And yet the failed history of attempts by class members, Plaintiffs' counsel, and ADA staff at the prison to bring officers on Facility A into compliance regarding "short walk" accommodations suggests that CDCR has made little progress towards identifying and addressing even the most basic of ADA violations. Despite the new investigation system, multiple complaints about the same officers engaging in the same misconduct, and multiple examples of video evidence confirming the violation, CDCR still has not taken any steps to hold staff accountable or to ensure that class members receive the accommodations to which they are entitled under the ADA.

**(c)    CIW – ██████████ – AIU, Not Sustained**

In this case, video shows that, without adequate justification, Officer ██████ slammed ████████████████████████████████████ to the ground while she was handcuffed behind her back. Notwithstanding clear video evidence that the force used by Officer ██████ was excessive and unnecessary, the Hiring Authority did not find any misconduct. Moreover, the investigation report was biased and incomplete, as the investigator improperly concluded that the use of force complied with policy without even interviewing Officer ██████.

On April 26, 2022, Ms. ██████ got into an altercation inside of her housing unit with another incarcerated person. Ms. ██████ was escorted outside of the unit and placed

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

in handcuffs. As shown on the video, Sergeant ███ orders Officer ███ to escort Ms. ███ to the CTC to complete a 7219. *See* BWC at 17:27:45. Officer ███ uses his left hand to guide Ms. ███ by her right elbow. As they begin walking, Sergeant ███ orders ███, who was sitting on the ground as instructed by officers, to get up so officers can search him. As she is walking away, Ms. ███ speaks up to defend Mr. ███ by explaining that he was not involved in the incident. Ms. ███ stops walking to speak up for Mr. ███. Officer ███ then tugs on Ms. ███'s right arm and says, "Let's go." *See* BWC at 17:27:56 (linked above). He tugs on her arm again. *See* BWC at 17:28:00 (linked above). About two seconds later, Officer ███ again says, "Let's go," and yanks on Ms. ███'s arm forcefully, dragging her to her right. *See* BWC at 17:28:02 (linked above). This yank spins Ms. ███ around, causing Officer ███ to lose some control over Ms. ███. Even though Officer ███ briefly loses his grip on her arm, Ms. ███ does not appear to pose any imminent threat as she is in handcuffs, there are multiple officers nearby, and Ms. ███ is simply trying to make her point to the nearby officers. She is not otherwise moving toward or threatening anyone.

Officer ███ then grabs Ms. ███ by her left arm and slams her forcefully to the ground. *See* BWC at 17:28:05. Ms. ███ is unable to brace her fall because she is handcuffed behind her back. She hits the concrete pavement on her left shoulder very hard. Multiple officers pile on top of her. Officer ███ and another officer then escort her to the CTC.

Officer ███ caused substantial injuries to Ms. ███. On October 14, 2022, an MRI documented a "rotator cuff tear." *See* MRI dated October 14, 2022. Ms. ███ reported in her 602 and her use-of-force interview that the rotator cuff tear was due to Officer ███'s use of force.

The force used by Officer ███ was both unnecessary and excessive. Officer ███ did have a lawful purpose—escorting Ms. ███ to the CTC. But at the moment Ms. ███ stopped the escort to turn around and advocate for Mr. ███, Officer ███ had a host of non-force options for obtaining compliance and continuing the escort, including, most notably, (1) de-escalating the situation by attempting to calm her down and gain compliance, (2) threatening an RVR if she did not comply with orders to continue, and/or (3) requesting that another officer assist with the escort. Instead, as so often happens in CDCR, he immediately resorted to force by yanking Ms. ███'s arm, which set the entire incident in motion. Had Officer ███ engaged in the non-force options available to him, as required by policy, it is likely that no force would have been necessary.

The amount of force used in this case —slamming to the ground a person handcuffed behind her back—also far exceeded the objectively reasonable amount of force needed to regain control over Ms. ███ during the escort. Ms. ███ had already

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

complied when initially being restrained.  Her reaction to being yanked by Officer ███ did not provide him with license to slam her to the ground.

Notwithstanding the video evidence showing that the force was unnecessary and excessive, the Hiring Authority did not sustain any allegations of misconduct.  Moreover, the IERC in the Incident Commander Review (a Lieutenant.), First Level Manager's Review (a Captain), and Second Level Manager's Review (an Associate Warden) wrongly and repeatedly concluded that the use of force complied with policy.  This case therefore represents yet another instance where staff at all levels within Division of Adult Institutions have failed to recognize a clear use-of-force violation.

In addition, the investigation report for the case was substantially biased in favor of justifying the force.  Most troublingly, the report mischaracterizes the video in the following ways, which all tend to exonerate Officer ███:

- The investigator states that at 17:27:54, Ms. ███ "raised her right arm up," suggesting that she was resisting the escort.  *See* AIU Report at 4.  The video shows, however, that Officer ███ pulled on her arm, causing it to lift up.

- The investigator states that at 17:28:03, "███ pulled her right arm away from ███ and broke ███' grip on ███'s arm."  *See* AIU Report at 4.  The investigator fails to mention that Ms. ███ only pulls away from Officer ███ after he forcefully yanked on her arm.  It is significant in determining whether there is an immediate threat that her action is a reaction to the force used against her, and not an overt act.

- The investigator mischaracterizes the encounter by stating that at 17:28:05, "███ repositioned himself on ███'s left side, placed both hands on ███'s left arm, bent down on his left knee and pulled ███ down to the ground.  As ███ landed on her left side, ███ used his right hand to roll ███ onto her stomach.  ███ gently placed his right hand on ███'s left wrist and gently placed his left hand on ███'s right shoulder."  *See* AIU Report at 4-5.  This description—which used the word "gently" twice and describes Officer ███ as "pull[ing]" Ms. ███ to the ground—is not an accurate description of the force used by Officer ███.  Someone reading the report without viewing the video would not understand that Officer ███ used his entire body weight to forcefully slam Ms. ███ to the concrete while she was already handcuffed behind her back.

The investigation report is incomplete as well.  The investigator did nothing to gather evidence about Ms. ███'s injuries, which is relevant to the reasonableness of the force used.  The investigator also did not interview Officer ███ to inquire about his intent throughout the incident.

[4389848.1] 23

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Lastly, the investigator offers an improper conclusion in the report that Officer ███ did not violate the use-of-force policy.  The investigator wrote that "[b]ased on evidence reviewed from BWC ... misconduct did not occur."  *See* AIU Report at 5.  Not only is this conclusion wrong (as discussed above), but it violates Penal Code § 6065(c), which provides that "[a]ll [investigation] reports prepared by an [OIA] investigator shall provide the appointing authority with a complete recitation of the facts and shall refrain from conjecture or opinion."  Defendants have repeatedly asserted that Section 6065(c) prohibits investigators from offering opinions regarding whether misconduct has occurred.  But in this case, the investigator offered exactly such an opinion.  As Plaintiffs have seen time and time again, investigators often violate Section 6065(c), nearly always doing so to exonerate officers and rarely doing so to opine that staff violated policy.

**(d)      KVSP – ███████ – AIMS, Not Sustained**

In this case, a Lieutenant and a Sergeant at KVSP initiated an inappropriate immediate use of force against ██████████████████████, an elderly class member who uses a wheelchair.  Mr. ████ had just been transferred to KVSP and was refusing to accept what he believed was a Sensitive Needs Yard ("SNY") housing assignment to which he had not consented.  The investigation was horrifically incomplete and biased, most notably because it did not contain any description of the BWC footage, which shows the use of force was improper.  In addition, the Hiring Authority did not sustain any allegations, even though (1) the video shows that Mr. ████ did not pose any imminent threat, (2) policy requires that staff take disciplinary action rather than use force under these circumstances, and (3) supervisors easily could have avoided force by taking him to the ASU.

On April 18, 2022, Mr. ████ arrived at KVSP and refused to be housed on what he believed was SNY (Mr. ████ was, in fact, being sent to a non-designated EOP unit, not an SNY).  Sergeant ████████████ and Lieutenant ████████ push him onto Facility C, where the EOP unit is located, in his wheelchair.  Mr. ████ is in waist-chains.  The BWC footage that was produced begins on the track on Facility C.  Mr. ████ informs the supervisors that he is refusing to go to the assigned housing unit.  Lieutenant ████ then states "I'm going to use force if I have to."  *See* BWC at 21:22:39 (linked above).  At that same time, Lieutenant ████ grabs Mr. ████'s waist-chain and begins pulling backward.  Lieutenant ████ repeatedly states, "We're going to go to building 7..... You're going to go to Building 7."  Mr. ████ asks to be taken to ASU instead and again refuses to go to Building 7.  Lieutenant ████ insists that they are going to force him to go to Building 7.  Mr. ████ again refuses.  *See* BWC at 9:23:18 (linked above).

Mr. ████ then asks if they are going to throw him to the ground and "give him a case."  He also complains that the supervisors are cutting off his air supply by pulling backward on the waist-chains.  Mr. ████ begins slowly using his feet to move his wheelchair forward.  *See* BWC at 9:23:27 (linked above).  Both supervisors then start dragging Mr. ████ backward in his wheelchair, against his will, while pulling firmly

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

backward on the waist-chain.  Mr. ███ leans forward, complaining that he cannot breathe because of the pressure from the waist-chain.  Mr. ███ then slowly slides forward out of the front of his chair, all while still being pulled backward by the supervisors.  *See* BWC at 9:24:00 (linked above).  The supervisors force him to the ground.  One of the supervisors sounds an alarm over the radio and additional officers respond.  From the ground, Mr. ███ states that his back, neck, and legs are injured.  After a little over a minute and despite Mr. ███'s requests that the supervisors not move him, they lift him from the ground and place him back in his wheelchair.

The video establishes that the supervisors violated CDCR's use-of-force policy.  First, though Mr. ███ was not complying with an order to go to his assigned housing, he did not pose any imminent threat justifying an immediate use of force.  Mr. ███ is an elderly class member in a wheelchair, and he was in waist-chains.  He was simply stating that he was not going to accept the housing.  Had the supervisors decided that force was necessary to gain compliance with their order, they were required to initiate a controlled use of force.

Second, the supervisors had a number of non-force options available to them that might have (and likely would have) avoided the need for force.  They could have taken Mr. ███ to the ASU, as he requested, and then sorted out the issue with his housing.  They could have threatened to issue him an RVR if he continued to refuse housing, which might have gained Mr. ███'s compliance.  In fact, CDCR policy specifies that the proper consequence for an individual refusing housing is an RVR.  *See* 15 C.C.R. §§ 3005, 3269.1, 3315.  They could have, as required by policy, tried to deescalate the situation by discussing Mr. ███'s concerns more fully, including by clarifying that he was not actually being placed in SNY housing.  Instead, the supervisors ratcheted up the tension almost immediately.  Within seconds of the start of the dispute, Lieutenant ███ threatens to use force.  And rather than try to deescalate, both supervisors simply repeat over-and-over again that Mr. ███ will accept his housing.  Through their actions, the supervisors made force, and therefore the resultant risk of injury, far more likely.

Despite this clear evidence of misconduct, the Hiring Authority did not sustain any allegations against the supervisors.

Though the buck stops with the Hiring Authority and Hiring Authorities have an obligation to independently review the evidence, the failure in this case to find that the supervisors violated policy was likely caused, at least in part, by the biased and incomplete AIMS inquiry report, which wrongly signaled that the use of force complied with policy.  Initially, the investigator appears to have submitted a report that did not even discuss the video footage of the incident.  The investigator then submitted an amendment to the report "to reflect ... BWC ... documentation in the note section of this inquiry."  *See* Inquiry at 1.  The amendment, however, ignores that the video shows that the immediate use-of-force was improper.  The investigator's note states *"[a] review of BWC ... footage, [sic] showed no evidentiary value.  At no time during my review of the*

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

aforementioned video footage, [sic] did the subjects commit the allegations made by ███. *There were sufficient facts and or [sic] evidence discovered during [sic] to reasonably determine the staff misconduct did not occur.*" *See* Inquiry Report at 2 (emphasis added). Even after the amendment, the investigation report contains no information about what is shown on the video. The report thus not only fails to describe what can be seen on the video footage, but suggests to the Hiring Authority that the video is not even worth reviewing.[15]

Lastly, the improper use of force in this case is particularly troubling as it involved two supervisors. It is essential that supervisors understand and model the obligation to deescalate, as required by policy, rather than quickly resorting to force.

### (e)   COR – ███ – AIU, Not Sustained

In this case, camera footage shows Officer ███ punching ███ ███ with a closed fist in the abdomen while Officer ███ and other officers attempt to restrain Mr. ███ in the CTC. Despite clear evidence that the punch was gratuitous, unnecessary, and therefore excessive, the Hiring Authority did not sustain any use-of-force allegation against Officer ███. Moreover, the investigator and the Hiring Authority both failed to recognize that Officer ███ was dishonest in his incident reports and AIU interview. Officer ███ tried to justify the punch by stating that Mr. ███ attempted to head butt him before the punch, when, in fact, any attempted head butt occurred *after* the punch.

On November 16, 2022, Mr. ███ reported being suicidal. Officers ███ and ███ escorted him to the CTC, where staff placed Mr. ███ in suicide resistant clothing and placed him on a bed, handcuffed behind his back. As shown on Officer ███'s BWC, at some point Mr. ███ attempted to get up from the bed. *See* BWC at 23:39:42. The officers appropriately use physical force to put Mr. ███ back on the bed in a sitting position and then use their arms to push him back so that he is lying on the bed. They continue to use their hands to restrain him against the bed. Mr. ███ thrashes his legs around a bit. A third officer enters the room and controls Mr. ███'s legs, followed by additional officers, who also help restrain him. Sergeant ███ then enters the room, but cannot be seen on camera, and asks Mr. ███ "What is the issue?" Mr. ███ responds, while gesturing with his head toward Officer ███, "This jackass searched my

---

[15] The investigation was also incomplete and biased in other respects. The investigator did not interview either of the subjects, claiming that he "did not have any clarifying questions and the force utilized was clearly articulated in the" incident reports. *See* Inquiry Report at 2. That statement is contradicted by the video, which shows the officers did not have a legitimate reason to use force. As a result, asking the officers about their justification was critical. Moreover, the investigation was very delayed. The investigator did not interview Mr. ███ until more than 11 months after the incident.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

cell and ... fucked up a lot of my legal work.  That's what started the [unintelligible]."
*See* BWC at 23:41:08 (linked above).

    Mr. ▮▮▮ begins moving his legs again, causing the officers to increase their
force in restraining him.  Officer ▮▮▮ then uses his right hand to deliver a very hard
closed-fist punch to Mr. ▮▮▮'s abdomen.  *See* BWC at 23:41:45 (linked above).  The
punch is sufficiently hard that the impact can be heard on Officer ▮▮▮'s BWC.
Mr. ▮▮▮ says, "You're going to sock me?  You're going to sock me?  You sock me?
That's unnecessary use of force."  While he is talking, Mr. ▮▮▮ twice moves his head
toward Officer ▮▮▮ in what might have been attempts to head butt Officer ▮▮▮.  *See*
BWC at 23:41:49, 23:41:55 (linked above).  Over the next approximately six minutes,
officers continue to try to attempt to gain control over Mr. ▮▮▮, including two efforts to
place a spit mask on him.

    It is unclear how, but Mr. ▮▮▮ made an allegation of unnecessary use of force on
the same day as the incident.  The allegation was not referred for an AIU investigation
until January 26, 2023.

    The investigation and investigation report were biased and incomplete.  First, the
investigator does not identify in the report that Officer ▮▮▮'s version of events—that he
punched Mr. ▮▮▮ *after* Mr. ▮▮▮ attempted to head butt him—was false.  The video
shows that the punch occurred *before* any attempted head butt.  This discrepancy between
the video and Officer ▮▮▮'s incident report[16] and interview testimony[17] is significant
and should have been highlighted in the report because it undermines Officer ▮▮▮'s
reported justification for punching Mr. ▮▮▮.  Instead, the investigator recounts Officer
▮▮▮'s interview testimony that the attempted head butt occurred before the punch,
without providing any Investigator Note to emphasize that the video showed that the

---

[16] Officer ▮▮▮ wrote: "Inmate ▮▮▮ maintained his resistive behavior by continuing
to try to kick his feet up, and thrust his upper body towards me. … At this time Inmate
▮▮▮ *was continuously attempting to strike me with his head* and throw his body
weight into me.  I gave Inmate ▮▮▮ another direct order to 'STOP RESISTING'
which he did not comply.  Inmate ▮▮▮ violently thrusted his body weight at me once
again; with a closed fist, I used my right hand to strike Inmate ▮▮▮ on the right side
of his upper abdomen.  My strike did not have its desired affects, and Inmate ▮▮▮
continued his resistive behavior."  *See* DE Exhibits at 79 (emphasis added).

[17] Officer ▮▮▮ in his interview reported that: "Fields attempted to kick his feet up and
*then attempted to head butt staff*.  ▮▮▮ stated at that time with his right hand he struck
▮▮▮ in the abdomen area in hopes to have him stop trying to head butt them."  *See* AIU
Report at 4 (emphasis added).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

attempted head butt occurred after the punch.[18]  Moreover, the investigator did not ask Officer ███ any questions during the interview about this important discrepancy.  *See* COR–███, Subject interview – Officer ███.[19]

Second, the investigator failed to include in the report that Officer ███ punched Mr. ███ approximately thirty seconds after Mr. ███ accused Officer ███ of destroying Mr. ███'s legal property.  This information is crucial to put the punch in context as potential retaliation against Mr. ███ for making the allegation to Sergeant ███.[20]

Even though the report was biased, misleading, and incomplete, the Hiring Authority should have sustained an allegation of excessive force based on the video.  Though Mr. ███ was resisting at the time, the punch was gratuitous and unnecessary to the officers' attempts to gain control of Mr. ███.  Mr. ███ was hand-cuffed behind his back.  There were multiple officers in the room.  Officers ███ and ███ appeared to have been able to maintain control over Mr. ███'s upper body using holds.  Nothing on the video suggests that the officers were in danger such that a punch was an objectively reasonable use of force.  A finding that the strike was excessive was especially warranted given Officer ███'s potential retaliatory intent.  And yet, even when the video showed use-of-force violations, the Hiring Authority failed to hold Officer ███ accountable.[21]

      **(f)**      **COR – ███; COR – ███ – Local, Not Sustained; Local, Not Sustained**

In these two cases, custody and health care staff at COR's CTC would not help an elderly class member transfer from his infirmary bed to his wheelchair so that he could be escorted to health care appointments, and then falsely documented that he had "refused" the appointments.  In each case, the BWC footage shows that the class member did not refuse the appointments, but simply asked that the escorting officers help pull him into a

---

[18] The investigator did include a note in the report that he did not see any attempted head butt on the video.  *See* AIU Report at 3.  But the investigator does nothing to draw attention to the inconsistency between Officer ███'s report and the video.

[19] Plaintiffs could not link this file.  The native file is included as part of Defendants' production, which can be accessed using the link in the heading of this case.

[20] In addition, the investigation file only includes Officer ███'s BWC footage.  The file should have included many other officers' BWCs, especially Officer ███'s.  The investigation report contains no explanation for why the other BWC footage was not included.

[21] The IERC, including the Associate Warden who conducted the Manager's Review, also failed to identify the policy violation in this case.  DE Exhibits at 31.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

seated position on his bed so that he could transfer to his wheelchair. In each case, the officers declined this basic request for an accommodation—a literal request for a helping hand that would have only taken seconds of minimal effort to provide—and instead asked nursing staff whether the class member actually required this assistance. In each case, nursing staff told the officers that they should not help the class member. And in each case, the officers and nurses treated the class member's failure to independently transfer into his wheelchair as a "refusal," which has real consequences on access to future health care appointments and puts the class member at risk of being disciplined for refusing ducats. Although the relevant facts were clearly presented in the inquiry reports, the Hiring Authority failed to identify or address these obvious ADA violations.

███████████████████████████████████, is a 75-year-old full-time wheelchair user with urinary and fecal incontinence, hearing aids, and low vision. Mr. ██████ cannot walk, as he has diagnosed diabetic neuropathy, chronic lower back pain, and bilateral knee contractures (which make him unable to fully straighten or extend his knees). He has consistently reported to health care staff and physical therapy that he has difficulty sitting up in his bed. *See* Outpatient Progress Note (dated Jan. 18, 2023); Physical Therapy Progress Note (dated Feb. 1, 2023). He was transferred from RJD to COR's CTC on January 26, 2023, after being admitted to an outside hospital for four days for assistance with activities of daily living, as his chronic pain syndrome was causing him "pain in knees, hips, back and shoulders, spending 23hrs/day in bed, unable to move." *See* UM Discharge Planning (dated January 23, 2023); *see also* Admission History and Physical (dated Jan. 26, 2023).

In the first case, COR-███████, Officers ██████ and ██████ tell Mr. ██████ that he has a ducat for chest x-rays on the morning of February 2, 2023. The video footage confirms that Mr. ██████ tells the officers he "definitely" wants his x-rays, but the officers refuse to help him sit up so he can transfer to his wheelchair. *See* ██████ BWC #1. Officer ██████ enters the room to pick up Mr. ██████'s breakfast tray, but retreats when Mr. ██████ asks, "Let me just get one hand to get up," and refuses to enter the room again. Officer ██████ then walks over to the nurse station and asks whether Mr. ██████ is able to transfer to his wheelchair on his own. Registered Nurse ██████ responds: "Yes, he can, he acts like he can't but you need to enforce it, be like 'no, you can do this on your own, transfer.'" *See* ██████ BWC #1. As Officer ██████ is leaving the nurse station, RN ██████ states (referring to Mr. ██████), "He's just a whiny little bitch."[22] *Id.* Officer ██████ returns to the doorway to Mr. ██████'s room and tells Officer ██████ that "he can move himself." Beginning at 8:05:32, Mr. ██████ says, "I need help getting up" and asks

---

[22] The investigator referred Nurse ██████'s inappropriate comment to the CCHCS hiring authority for review as possible staff misconduct. *See* Unrelated Staff Misconduct Memorandum (dated Feb. 22, 2023). **Please ensure that the full investigation file for the inquiry or investigation into Registered Nurse ████████████'s inappropriate comment toward Mr. ██████ is produced to Plaintiffs once it is closed.**

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

for assistance multiple times.  Officer ████ responds, "We're custody, we don't help medical."  *See* ████ BWC #1 (linked above); *see also* ████ BWC #1 (linked above).  The officers tell Mr. ████ that the "nurses say you can move," and tell him to get onto his wheelchair, and they will be back later to escort him to his ducat.[23]  *Id.*

At 8:07:05, Officer ████ walks to the officer's podium and states, "I'm not helping him, that's not my responsibility."  A second female nurse responds, "He can do it, he's just a crybaby."  *See* ████ BWC #1 (linked above).  At 8:11:55, Officer ████ and Officer ████ walk from the officer's podium towards Mr. ████'s room.  As they are walking away, Officer ████ tells a third officer at the podium:  "Hey, if this guy's not in his chair, the nurse says he's a 'refusal' then, so we're going to check one more time."  *See* ████ BWC #2.  Officer ████ tells Officer ████, "Just look in there, don't talk to him," and as soon as Officer ████ reaches the door, Officer ████ says, "That's a refusal."  *Id.*  Officer ████'s BWC footage shows him glance through Mr. ████'s window for approximately one second (at 8:11:26) to say "are you ready," and then immediately turn around and walk back to the podium.  *See* ████ BWC #2.  Officer ████ tells the female nurse "refusal," and says, "He's just kicking back, he just wants a pity party."  *Id.*  Officer ████ walks to the nurse station and, at 8:11:42, tells Nurse ████ that Mr. ████ "is not getting in his chair."  *See* ████ BWC #2 (linked above).  Nurse ████ responds, "Then that's a refusal," and implies to Officer ████ that she will take care of the refusal paperwork.  *Id.*

The local investigator's inquiry report summarizes and quotes from BWC footage confirming Mr. ████'s allegations on the 1824 that officers "refused to give me a hand to pull me up to a sitting position" and that medical and custody staff were "falsifying my medical file" by stating he "refused to go for my chest x-ray."  *See* 1824 (Inquiry File at 3).  The report contains more than enough evidence to confirm the allegations against both the officers and the nursing staff.  *See* Allegation Inquiry Report (Inquiry File at 9-11).

The Hiring Authority, however, failed to identify these blatant ADA violations, and instead "exonerated" the officers, concluding that while the facts "did in fact occur,"

---

[23] According to Mr. ████'s medical file, nursing staff at the CTC entered notes and told other health care staff that Mr. ████ has sometimes been able to transfer to and from his wheelchair without assistance.  *See, e.g.* Nursing Note (dated Jan. 31, 2023).  However, it is very common for individuals with disabilities to have their need for accommodations fluctuate based on factors such as temperature, weather, time of day, or the individual's fatigue level.  *See* 28 C.F.R. § 108(d)(iv) ("An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.").  That Mr. ████ may sometimes be able to transfer independently does not excuse refusing to provide him reasonable accommodations when he reports that he is in significant pain and that it is difficult for him to sit up and/or transfer to his wheelchair.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

the "inquiry revealed that the actions were justified, lawful, and proper." *See* June 5, 2023 Memorandum (Inquiry File at 21).[24]  Moreover, the local inquiry and the Hiring Authority did not refer the nursing staff, who were shown on video refusing to accommodate Mr. ███, to the CCHCS Hiring Authority so that they could be held accountable (with the exception of Nurse ███ for her inappropriate comment).  As such, neither the officers nor the nursing staff were held accountable for denying basic accommodations to Mr. ███ and for falsifying his medical records by stating that he "refused" his x-ray appointment.

The production included a second case, COR-███, which also involves an escort officer refusing to help Mr. ███ sit up and transfer to his wheelchair for a health care appointment, and asking nursing staff whether he had to help Mr. ███, only to have nursing staff tell the officer not to assist Mr. ███ and document that he "refused" the appointment.  *See* 1824 (Originating Docs at 4).

The BWC footage shows Officer ███ asking Mr. ███ if he wants to go to the dentist on the morning of February 28, 2023, and Mr. ███ saying that he does want to go and is ready.  *See* ███ BWC #1.  When Mr. ███ asks for help getting up, Officer ███ responds, "The doctor says you can get up on your own," but Mr. ███ explains, "that's not true."  Officer ███ declines to help and instead goes to the nurse station and asks whether Mr. ███ needs help transferring.  The nurses all start to chuckle, and one female nurse states that Mr. ███ "will need assistance to the wheelchair," and Officer ███ asks, "OK, so who is going to help him, medical-wise?"  The nurses again all laugh, and Officer ███ asks, "Or can he get up on his own?"  The nursing staff continue laughing, and one says, "No comment."  Another female nurse says, "He's a big problem, oh gosh."

Officer ███ returns to Mr. ███'s room with two female nurses and tells Mr. ███ that the nurses will help him transfer.  Mr. ███ asks the nurses to pull him up to a seated position, but they tell him to get himself into a seated position independently.  *See* ███ BWC #2.  The nurses and Mr. ███ become argumentative with each other, with the nurses repeatedly insisting that they will not use their physical strength to help pull him up into a seated position, and Mr. ███ stating he cannot sit up without help.  At 10:34:26, one of the nurses tells Mr. ███ that she and the other nurse cannot hold Mr. ███'s body weight, but when he asks why the nurse cannot simply give him a hand (as he originally asked), the nurse insists that the officers "are not going to touch you."  Officer ███ leaves the area to call the dentist's office.  The dental

---

[24] To the extent that the Hiring Authority exonerated the officers for their refusal to accommodate Mr. ███ due to their reliance on the nursing staff's statements to them, this is not appropriate as the officers are required to provide reasonable accommodations to class members, and should have done so here without first asking the nursing staff whether they had to accommodate Mr. ███.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

staff tell Officer ███████ that Mr. ██████ would not need to transfer from his wheelchair to receive dental care, but at 10:38:48, one of the female nurses tells Officer ███████, "the thing is, he wants us to pull his whole body up, no!"  *See* ████████ BWC #3.  Officer ███████ responds, "So it's a refusal then, we're going to go with that," and the nurse agrees.  *Id.*

As with the first case, the local investigator's inquiry report summarizes and quotes from the BWC footage that confirms Mr. ██████'s allegations.  *See* Allegation Inquiry Report at 3-5.[25]  Yet the Hiring Authority failed to identify the ADA violations and again "exonerated" the officers.  *See* June 12, 2023 Closure Memorandum.  And once again, the investigator and the Hiring Authority did not refer the misconduct by the nurses to the CCHCS Hiring Authority, ensuring that neither Officer ██████ nor the nurses involved were held accountable.

### (g)   RJD – ██████████ – AIU, Not Sustained

In this case, the investigation confirmed that staff denied class member ██████ ████████████████████ access to an ADA accessible vehicle to transport her to a medical appointment, falsely documented that she "refused" to attend the appointment, and then issued her a false RVR for delaying a peace officer.  Notwithstanding this evidence, the Hiring Authority failed to sustain the allegations of staff misconduct.  Upon reviewing Officer ██████'s BWC footage, the investigator confirmed that Ms. ██████ could not attend her appointment because a wheelchair-accessible vehicle was not provided, stating, "██████ requested a wheelchair vehicle with a lift.  ██████ did not refuse the transport."  *See* Investigation Report at 3.  The investigator also confirmed Officer ██████ lied on the RVR issued to Ms. ██████.  Officer ██████ wrote in the RVR that, "Wilson also refused to sign the necessary CDCR 7225 REFUSAL OF EXAMINATION AND/OR TREATMENT, therefore, causing an overall delay of approximately thirty (30) to forty-five (45) minutes in our scheduled assignment."  *See* Investigation Report at 3.  The 7225 Form completed by Officer ██████ also states, *"I/P is refusing to attend, states is permanent disability.  Refused to sign."  See* Investigation Report at 4.  However, the investigator found that "[a]t no time during the footage did I

---

[25] The investigator even highlights one of the key questions for the Hiring Authority, with an inquiry note stating that "*Upon review of Operational Procedure 1076, Refusal of Medical Treatment (**Exhibit 8**), it should be noted there is nothing specific to what constitutes as a refusal of medical treatment.*"  *See* Allegation Inquiry Report at 5 (emphasis in original).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

observe ████████ attempt to have ████████ sign a CDCR 7225 Refusal of Examination and/or Treatment."[26]

The evidence cited in the investigation report confirms, as alleged by Ms. ████████, that Officer ████ lied in reports and issued her a false and discriminatory RVR. Such misconduct presents grounds for termination. *See* Investigation Report at 3; Disciplinary Matrix (E10, 78**9**). Yet staff misconduct was "not sustained" by the Hiring Authority in this case involving the denial of a basic disability accommodation.[27] Most concerning, in response to Plaintiffs' advocacy regarding the RVR, CDCR Office of Legal Affairs also responded that Ms. ████████'s conduct "warranted the issuance of an RVR." *See* October 11, 2023 Letter from ████████ Regarding Discriminatory RVRs Issued to Class Members (RJD) at 5.

### 2. Hiring Authorities Failed to Impose Appropriate Discipline After Misconduct Was Confirmed

In the cases discussed in this section, Hiring Authorities sustained allegations of misconduct, but imposed inappropriate discipline. Cases discussed in other sections also reflect this serious problem. *See* LAC – ████████; LAC – ████████.

#### (a) LAC – ████████ – OIA, Sustained (for failure to perform within training) – LOI, Training

In this case, the Hiring Authority failed to impose appropriate discipline on Lieutenant Sears who admitted to falsifying documents extending a class member's stay in administrative segregation. Even though the conduct merits a violation with a base level penalty of 9, the Hiring Authority imposed only corrective action.

On December 28, 2021, Lieutenant ████████ placed class member ████████ ████████ in administrative segregation after an altercation between Mr. ████ and another incarcerated person. Because placing someone in segregation is considered a significant deprivation of their liberty, a captain must conduct an "administrative review" of the person's placement in the ASU within one business day. 15 C.C.R. § 3336; DOM § 54046.5.1. This review must involve an interview with the incarcerated person and a C-File review, examining the circumstances of the ASU

---

[26] The RVR Hearing Officer found Ms. ████ "not guilty" of the RVR, which is consistent with the investigator's finding that Officer ████ was not truthful on the RVR.

[27] It should not matter but is nevertheless worth noting that the Hiring Authority who reviewed this case was a Warden from a different prison who presumably inherited this case due to the backlog of cases at RJD.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

placement, and, if applicable, medical or mental health staff input. *Id.* The administrative review is documented on a CDCR 114-D.

Mr. ▮▮▮ alleged that no administrative review ever occurred in his case. The evidence gathered by the investigator included a 114-D signed by Lieutenant ▮▮▮, indicating that she, acting as a captain, completed the administrative review. *See* OIA Exhibits at 18-21. In interviews with AIMS and OIA investigators, however, Lieutenant ▮▮▮ admitted that she signed the 114-D, but did not actually conduct the required elements of an administrative review. *See* OIA Report at 6. Lieutenant ▮▮▮ thus made a false statement on the 114-D—that she had conducted the administrative review when she had not.

Given the significance of Lieutenant ▮▮▮ admitting to falsifying documents regarding compliance with a process designed to prevent deprivations of due process, the discipline the Hiring Authority imposed in this case (corrective action) was inappropriate. *See* 402 at 1.[28] The Hiring Authority considered only a charge of D26 (1**2**345), for failure to observe and perform within the scope of training and department policy. The Hiring Authority then mitigated the discipline to corrective action. However, Lieutenant ▮▮▮'s conduct violated E10 (78**9**), which prohibits "[f]alsification of material facts in reports or official records," and carries a base penalty of 9. Lieutenant ▮▮▮'s signature represented that an administrative hearing occurred, when, as the Hiring Authority found, it did not. Accordingly, Lieutenant ▮▮▮ falsified a material fact on an official record. The Disciplinary Matrix recognizes that such conduct is very serious. Though it is possible that termination would not have been an appropriate result in this case, imposing only corrective action was clearly inappropriate. The Hiring Authority's failure to consider the more serious Disciplinary Matrix category was improper.

      **(b)**    **KVSP – ▮▮▮ – AIU, Sustained (for discourtesy) – LOI**

In this case, video evidence confirms that, as alleged by ▮▮▮▮▮, Officer ▮▮▮ walked into Mr. ▮▮▮'s cell in the CTC where Mr. ▮▮▮ was lying in his medical bed, threatened him, and challenged him to fight. Despite this clear evidence, the Hiring Authority only sustained a violation of discourtesy and issued Officer ▮▮▮ corrective action (Letter of Instruction). This penalty was not appropriate for Officer ▮▮▮'s serious misconduct.

As shown on the video, after Officer ▮▮▮ walks into Mr. ▮▮▮'s CTC cell, the following conversation occurs. *See* BWC at 7:14:23.

---

[28] There is no evidence that the administrative review in fact occurred. The CCI listed as the staff assistant on the 114-D denied participating in the administrative review, OIA Report at 3-4, and Mr. ▮▮▮ stated it never occurred. *Id.* at 2.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Mr. ▊▊▊: I don't understand why you gotta walk all the way in here when the nurse isn't here.

Officer ▊▊▊: Cause I can.

Mr. ▊▊: What you mean cause you can?

Officer ▊▊▊: **I don't know what your issue is today man, whatever you need to do, you need to do.** I don't know who the hell you think you're talking to man.

Mr. ▊▊: Who you think you're talking to?

Officer ▊▊▊: **We can find out real quick man.**

Mr. ▊▊ (looking startled): What's up?

Officer ▊▊▊: **Handle it. You're the one talking shit bro.** All I did was walk in, ask how you're doing.

The bolded statements above represent threats by Officer ▊▊▊ to Mr. ▊▊▊ and challenges for Mr. ▊▊▊ to physically fight Officer ▊▊▊. Based on this evidence, the Hiring Authority should have, at a minimum, found that Officer ▊▊▊ intimidated and/or threatened Mr. ▊▊▊ without an intent to inflict serious injury (D15, 34**5**678). Instead, the Hiring Authority did not sustain an allegation under D15 that Officer ▊▊▊ "tried to provoke violence" and only sustained an allegation under D1 (**1**23456) that Officer ▊▊▊ was discourteous. *See* 402 at 2.

Further compounding the problem, the Hiring Authority then misapplied the Disciplinary Matrix for the discourtesy finding. The Hiring Authority found no mitigating factors and a host of aggravating factors (that the misconduct was intentional and willful; the employee knew or should have known that their actions were inappropriate; and sworn staff shall be held to a higher standard of conduct, among others). And yet the Hiring Authority went below the base level and issued Officer ▊▊▊ only corrective action (a Letter of Instruction). Officer ▊▊▊'s discourteous behavior is significantly more serious than other types of discourtesy (e.g., cursing at an incarcerated person). The Hiring Authority's decision to impose only corrective action was not appropriate.[29]

---

[29] The Hiring Authority also should have considered a dishonesty allegation against Officer ▊▊▊. According to the AIU investigation report, during his AIU interview, Officer ▊▊▊ stated "he was not provoking ▊▊▊ to violence." *See* AIU Report at 4. Based on the video of the incident, that statement is false and material.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

### 3. Hiring Authorities Continue to Delay in Reviewing Investigations

Despite improvements to the staff complaint process to ensure the swift and timely completion of investigations, within 120 or 180 days, Hiring Authorities are undermining those reforms by delaying in reviewing and taking action on completed investigations. According to data produced by Defendants on October 17, 2023, 43% percent (1,561 of 3,662) of the investigations that the AIU (a) received between August 2022 and September 2023 and (b) has completed are currently waiting for Hiring Authority action. In these cases, Hiring Authority review is the only thing standing in the way of imposing important corrective or adverse action that can reduce future harm to class members, or exonerating officers who have not violated policy.

The problem is particularly acute at LAC (58% of completed investigations pending with Hiring Authority), RJD (54%), SATF (40%), and CIW (38%). Since the last report, Defendants have made some progress at COR and KVSP. Some of the cases pending with the Hiring Authority are very old; more than 120 of the still pending cases were received by the AIU in August-October of 2022.[30]

|  | RESOLVED BY HA | PENDING | TOTAL | % PENDING |
|---|---|---|---|---|
| CIW | 109 | 67 | 175 | 38% |
| COR | 613 | 192 | 804 | 24% |
| KVSP | 211 | 63 | 273 | 23% |
| LAC | 342 | 482 | 824 | 58% |
| RJD | 389 | 460 | 849 | 54% |
| SATF | 441 | 297 | 737 | 40% |

The purpose of negotiating shortened timelines to complete investigations was to ensure that CDCR could swiftly act to hold staff accountable for serious staff misconduct. The parties focused on eliminating delays in investigations because that is where delays were occurring. Now, those delays have simply been transferred to a different part of the process—Hiring Authority decision making. **In Plaintiffs' June 13, 2023 letter, Plaintiffs requested that Defendants impose a deadline for Hiring Authorities to timely act on completed investigations. In Defendants' October 13, 2023 letter, Defendants stated that "they are not currently considering setting a policy**

---

[30] At the October 18, 2023 meeting, Defendants indicated that the older cases may be showing as pending if they have been appealed to the State Personnel Board. Defendants indicated they were looking into fixing the system so that it can track when the Hiring Authority closes the case at the prison by issuing the 402/403 or Notice of Adverse Action.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

requirement for how quickly Hiring Authorities must complete their review of investigation files once received but may consider doing so in the future." **The time to make this change is now.  This problem must be addressed.**

### 4.    Imposition of Post-Hiring Authority Discipline at LAC

In multiple cases in this production, Defendants produced memoranda indicating that CDCR imposed discipline *after* the Hiring Authority determined that no discipline was warranted.  For example, in LAC-████████, the Hiring Authority did not sustain the charges that Officer ████ damaged Mr. ████████'s property or failed to provide him a cell search receipt.  Yet the file contains a June 15, 2023 memorandum (four months after the 402/403 conference) from the LAC chief deputy warden to DAI stating that LAC uncovered misconduct while reviewing video footage in the case, and that the misconduct "will be addressed and corrective action will be issued."  *See* June 15, 2023 Memo at 1.  The memorandum does not describe the specific misconduct or the corrective action issued, although the AIU report notes, correctly, that Officer ████ called Mr. ████ an "asshole" to another incarcerated person.  *See* AIU Report at 4.  The production includes at least two other cases with memoranda showing that LAC imposed discipline after the Hiring Authority's initial decision and outside of the 402/403 process.  *See also* LAC-████████; LAC-████████.

### Questions:

1.    Please describe the basis for the post-402/403 video review process.  What policy is it derived from?  Who is involved?  Does this occur in every case?  If not, how are cases selected for review?

2.    Does the Hiring Authority receive training or feedback if the review finds misconduct after the Hiring Authority failed to sustain an allegation?

### B.    Barriers to Accountability as a Result of Investigations

### 1.    Investigators Conducted Incomplete and Biased Investigations that Interfered with Determining If Allegations Were True

Biased and incomplete investigations lie at the heart of the problem in almost all cases reviewed by Plaintiffs, including many of the cases discussed in the Hiring Authority decision-making section above.  *See* **LAC** – ████████; **KVSP** – ████████; **COR** – ████████.  The cases included in this section illustrate additional examples of the types of investigation failures identified by Plaintiffs.

### (a)    KVSP – ████████ – AIU, Not Sustained

In this case, ████████████████████████ alleged that Officer ████████ used unnecessary force when, without any justification, she forcefully shoved his

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

wheelchair by the handles, injuring his ankles when they were caught underneath the chair.  The investigation and resultant report are incomplete and biased in a variety of ways that make it impossible to determine whether the misconduct occurred.

The biggest problem with the investigation is that the investigator appears to have intentionally not obtained all of the relevant video, but then relied on the absence of video of the incident to conclude it did not occur.  Throughout the investigator's interview with Mr. ███, Mr. ███ is clear that the incident occurred between 10:00 or 10:30 AM and 1:00 or 1:30 PM, when he was leaving the mental health building.  *See* KVSP-███, Interview ███ at 7:35-12:20.[31]  At various points, the investigator asks Mr. ███ to narrow that timeframe, but Mr. ███ is unable to do so.  The investigator, however, mischaracterized Mr. ███'s interview testimony in the investigation report, stating that "███ believed the incident took place between either 1000 to 1020 hours or 1300 to 1320 hours."  *See* AIU Report at 1.  That is not what Mr. ███ said.  Then, in what can only be presumed to be an intentional act, the investigator only requested and reviewed video from 10:00-10:20 and from 1:00-1:20.

A review of the brief, 10:00-10:20 video clip, does show some interactions between Officer ███ and Mr. ███.  At 10:00:00, Mr. ███ enters the mental health building while Officer ███ is sitting behind a desk.  At 10:01:00, he goes into his IDTT meeting.  At 10:06:30, he exits the IDTT and goes into a waiting room.  Then at 10:07:45, he goes from the waiting room to a 1:1 meeting with a clinician.  The video ends at 10:20:00 without showing Mr. ███ leaving the 1:1 appointment.  *See* BWC.  The investigator reviewed this video and concluded that "[a]t no time did ███ grabbed [sic] ███ [sic] wheelchair and shove him."  *See* AIU Report at 2.  However, Mr. ███ made clear during his interview that the incident occurred when he was leaving the mental health building.  The investigator was therefore on notice that the video he requested stopped prior to the reported timing of the incident, and yet still relied on the video to conclude that the incident did not occur.

The investigation was also incomplete.  The investigator did nothing to attempt to confirm Mr. ███'s claimed injuries to his ankles, which could have corroborated his allegation.  In fact, Mr. ███'s medical file contains such evidence, including a 7362 dated September 15, 2022 in which he requests a 7219; a nursing note from September 19, 2022, which shows that a nurse gave him ibuprofen for his ankles; and a nursing note from September 23, 2022, that states that he had swelling in both ankles caused when "Officer ███ became upset with him and pushed/shoved his wheelchair, causing his feet to drag underneath the wheelchair."  *See* 7362 dated September 15, 2022; Progress Note dated September 23, 2022.

---

[31] Plaintiffs could not link this file.  The native file is included as part of Defendants' production, which can be accessed using the link in the heading of this case.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Lastly, the investigation report is drafted on a form entitled "Investigative Report with No Evidence of Misconduct." *See* AIU Report at 1. Like the Quick Close Reports, discussed *infra*, the use of this form by CDCR violates Penal Code § 6065(c), which provides that investigators "refrain from conjecture or opinion." Defendants have repeatedly indicated that Section 6065(c) prohibits investigators from opining on whether misconduct occurred. The title of the form itself communicates exactly what CDCR states the statute prohibits its investigators from doing.

**(b)    KVSP – ███████ – AIU, Not Sustained**

In this case, ███████████████ alleged that Sergeant █████ forged his former cellmate's ████████████ signature on a compatibility chrono following a fight between the two of them. Mr. █████ later assaulted Mr. █████ a second time. Though the incident occurred before camera deployment at KVSP, the investigator uncovered significant evidence that someone had, in fact, forged Mr. █████'s signature. Mr. █████, in his interview with the investigator, stated that he observed Sergeant █████ sign the chrono for Mr. █████. Mr. █████ provided corroborating testimony during his interview, stating that the signature on the chrono was not his and that he did not sign any compatibility chrono after fighting with Mr. █████. *See* Investigation Report at 3. Thereafter, however, the investigator failed to adequately follow up on that evidence, which prevented the Hiring Authority from being able to hold staff accountable for what may have been very serious misconduct that later resulted in injury to a class member.

Given Mr. █████'s and Mr. █████'s consistent reports, the investigator should have taken all available investigative steps to determine if the signature was forged and, if yes, by whom. The investigator did interview Sergeant █████, who reported that it was actually Sergeant █████ who interviewed Mr. █████ and Mr. █████ after the fight. The investigator also interviewed Sergeant █████, who admitted to interviewing Mr. █████. Both Sergeants denied forging the signature. *See* Investigation Report at 3-4.

At that point, even without video evidence, the investigator could and should have taken a number of straightforward additional steps to determine whether the signature was forged and by whom. The investigator could have compared the signature on the chrono to Mr. █████'s verified signature, as well as to Sergeant █████ and Sergeant █████'s verified signatures to determine if they had signed the document for Mr. █████. Given the seriousness of the allegation—that staff forged a document endangering incarcerated people who were not safely housed together, which could have resulted in serious harm or even death—the investigator could also have brought in a forensic handwriting expert to conduct those comparisons. If the comparisons suggested that one of the Sergeants signed the document for Mr. █████, the investigator could have interrogated the Sergeant about that fact. The investigator also could have re-interviewed Mr. █████ and Mr. █████ to determine if it was actually Sergeant █████

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

who interviewed them and forged the signature, rather than Sergeant ████. Instead, the investigator did nothing and simply ended the investigation. By conducting such an incomplete investigation, the investigator deprived the Hiring Authority of the evidence needed to conclusively determine whether misconduct occurred.

    **(c)**    **SATF – ████ – AIU, Not Sustained**

    In this case, ████████████ alleges he was denied access to an incontinence shower on June 27, 2022, and made to wait for hours in a soiled diaper by Officer ████ while others were allowed to use the phones and showers, in retaliation for writing staff misconduct complaints. During his interview, Mr. ████ provided additional details, including that he had an ADA Worker inform Officer ████ at around 1:00 pm that he needed a shower, that he could see Officer ████ in the tower letting other people out to use the phones and showers during that same time, and that the ADA shower was open but he was still made to wait. *See* SATF-████, audio file, Claimant ████████.[32] Although the investigation uncovered some corroborating evidence, the investigator stopped short.

    Officer ████'s BWC footage shows him in the control tower while an incarcerated person can be heard below attempting to get his attention. Officer ████ chuckles to himself and appears to be ignoring the person attempting to get his attention, and then walks away. *See* BWC. It is unclear from the video alone whether this is the ADA Worker reportedly sent to notify Officer ████ of Mr. ████'s need for a shower. The BWC and AVSS footage confirms, as alleged, that multiple other people were out in the dayroom, and that Mr. ████ was not released from his cell during this time. *See* AVSS. Despite evidence corroborating the allegation, the investigator closed the case with a Quick Close Report, on the basis that Officer ████'s BWC footage "captures no interaction with ████ from 1300 to 1320 hours," and the AVSS "demonstrates no interaction with ████." *See* AIU Report at 2. But Mr. ████ never alleged that he directly interacted with Officer ████. Consistent with his allegation, Mr. ████ appears to be stuck in his cell.

    The report fails to accurately characterize Mr. ████'s allegations and does not mention that someone can be seen attempting to get Officer ████'s attention at 1 pm. At the very least, the ADA Worker should have been interviewed to see whether Mr. ████ asked him to request a shower for him, and whether he was the person in the video trying to get Officer ████' attention. If the ADA Worker corroborated the allegations, Officer ████ should have also been interviewed.

---

[32] Plaintiffs could not link this file. The native file is included as part of Defendants' production, which can be accessed using the link in the heading of this case.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Mr. ███████ also makes additional allegations against Officer ███████ during his audio interview that are not mentioned anywhere in the Quick Close Report. He alleges that Officer ███████ obstructed his access to the complaint process later that day by threatening him with an RVR for being out of bounds if he dropped his complaint in the appeals box. He also alleges that Officer ███████ was off work for a few days after Mr. ███████ filed his complaint on June 27, 2022, but that on his first day back, July 1, 2022, Officer ███████ issued him a retaliatory RVR. Mr. ███████ claims that he was written up for having his window partially covered, which he reports is common place in the unit and which he does for privacy while changing his diaper. He reports that video will show many people with their windows covered, but that he was singled out for an RVR. Mr. ███████ also claims that he was written up again by Officer ███████ the very next day, July 2, 2022. None of these allegations are mentioned anywhere in the Quick Close Report, and it is unclear whether they are being investigated. These allegations are closely related to the allegation that Mr. ███████ was denied an incontinence shower, and should have all been investigated together. Instead, the allegations were never investigated.

## 2. Investigators Routinely Fail to Review Relevant Video Footage of Incidents

Defendants' investigators continue to fail to retain and review appropriate video footage.[33] *See* RJD Remedial Plan, § IV; Five Prisons Remedial Plan, § V; *see also* August 2023 Report at 33-34; May 2023 Report at 41-44; Feb. 2023 Report at 45-49.

For example, in LAC-███████, the class member alleged that, on the morning of July 20, 2022, Officer ███████ disregarded the fact that he was suicidal and abandoned the class member's cell while the class member was on suicide watch. The class member reported attempting suicide later that same afternoon. The investigator obtained and reviewed video from the class member's July 20 afternoon suicide attempt. However, the investigator failed to even attempt to obtain any video evidence related to the July 20 *morning* incident, which was crucial to determining whether and why Officer ███████ abandoned the class member, potentially contributing to his later suicide attempt. The investigator gave no justification for failing to obtain video from the morning incident. Notwithstanding this failure to obtain video of the morning incident, the investigator concluded that video footage could not corroborate the class member's allegation.

---

[33] Under the Remedial Plans and Defendants' BWC policy, Defendants must retain video footage for all triggering events, including, but not limited to, any allegation of staff misconduct, any PREA allegation, any allegation of misconduct by an incarcerated person, any suspected felonious criminal activity, and any use of force incident. *See, e.g.*, RJD Remedial Plan, § I; Operational Plan No. 28, § VII.B; Five Prisons Remedial Plan, Attachment A ("Operational Plan No. 131"), § VI.B.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

In COR – █████████, the class member filed a 602 reporting that Officer ██████████ and multiple other unnamed officers ignored his requests to be seen by medical because he was having severe chest pains. *See* 602 at 1-2. The investigator only requested footage beginning at 9 am, and the incarcerated person reported that he spoke with Officer █████ and the two other officers at "8:30 am or 9:00 in the morning." *See* 602 at 2. Additionally, the investigator reviewed footage from Officer ████████, but should have investigated the identities of the two unnamed officers referenced in the grievance and requested their BWC. Without this additional BWC footage, the investigation was incomplete.

In **KVSP** – ████████, discussed above, the investigator failed to obtain footage from the time period the class member alleged an officer used unnecessary force. There are other examples of investigators failing to obtain video footage necessary to resolve staff misconduct allegations. *See also* COR-█████████, LAC-████████, SATF-████████, SATF-█████████, RJD-█████████, RJD-████████.

In other cases, investigators regularly fail to request video within the 90-day retention period, causing the destruction of relevant video footage that is crucial to resolving serious staff misconduct allegations. For example, in COR-█████████, the class member alleged that staff were disclosing information about the class member that endangered him. Video was critical to resolving this allegation and determining what actually occurred, but the AIU investigator did not begin investigating until three months after the class member filed a timely grievance—and by that time, CDCR had destroyed the video. In other cases, such as SATF-█████████, investigators fail to request video even when timely assigned to the case. *See also* SATF-█████████, RJD-█████████, RJD-█████████, RJD-████████.

### 3. Inappropriate Use of AIU "Quick-Close" Policy

Plaintiffs continues to identify cases where investigators use the "Video Quick Close Report" to summarily close cases even where further investigation was required. During the October 18, 2023 meeting, Defendants reported that they have done additional training to clarify when it is appropriate to use a "Video Quick Close Report." However, Plaintiffs agree with the OIG that the "Video Quick Close" process is itself improper. *See* Office of the Inspector General's Staff Misconduct 2022 Annual Report ("OIG Annual Report"), at 47-49, August 3, 2022. **Defendants should cease use of the "Video Quick Close" process.** The very nature of the "Video Quick Close Report" form signals to Hiring Authorities "nothing to see here." As identified by the OIG, the result is an improper conclusion, at the investigation stage, "that no staff misconduct occurred; however, only a hiring authority can reach such a conclusion." *See id.* at 49. The following improper use is illustrative:

In SATF – ████████, ███████████████████ reported that Officer ████ issued Mr. ████████ a retaliatory RVR after he filed a staff misconduct

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

complaint against Officer ███.[34]  Mr. ████████ reported that on August 15, 2022, a floor officer allowed him to sit outside during medication time when he was dizzy and felt sick.  Days later, Officer ███ issued him an RVR for being out-of-bounds.  The AIU investigator only reviewed AVSS and BWC, and stated on a "Video Quick Close Report," that "based on the review of AVSS and BWC, the allegation made by the claimant did not occur."  *See* AIU Report at 3.  Given the allegation that the RVR was retaliatory, it was impossible for the investigator to close the case after viewing only video.  It was necessary to determine whether it was true that Mr. ████████ filed a recent staff complaint against Officer ███ and, if so, to at the very least interview that officer about the RVR, his intent, and whether he knew about the 602.  The investigator instead relied on a statement in the RVR that the officer had "ordered and informed [████████] numerous time(sic) not to sit on his walker in an Out Of Bounds marked area."  *See* RVR at 26.  The investigator failed to determine whether, as Mr. ████████ asserted in this case, the floor officer granted him permission to sit there and why the conduct resulted in an RVR days later.  Despite the improper use of the video quick-close report, and an incomplete investigation, an AIU Caption signed off on the investigation report.  *See* AIU Report at 4.  Furthermore, the Hiring Authority closed the case without a request for further investigation, and did not sustain the allegation.

Plaintiffs have reported on additional examples where investigators improperly relied on the use of the "Video Quick Close Report."  *See* **KVSP – ████████**; **SATF – ████████**; August 2023 Report at 35-36.

### 4.    AIU Investigations Continue to Be Delayed

Hiring Authorities are not the only cause of investigation delays.  *See* **I.B.4**.  AIU staff are also failing to complete investigations by the deadlines set in the Remedial Plans: 120 days for investigations conducted by custody supervisors (Sergeants and Lieutenants)[35] and 180 days for investigations conducted by Special Agents.  **The chart below shows that, for investigations the AIU received in August 2022 to May 2023,[36]**

---

[34] Mr. ████████ also reported that he filed the initial staff complaint due to an RVR that was issued by the officer in retaliation for a lawsuit he filed against the officer.

[35] The data shows that for cases received by the AIU between August 2022 and September 2023, 93% of the AIU investigations were assigned to custody supervisors.  This represents a significant increase from the period covering cases received by the AIU between June 2022 to June 2023, during which 88% of the AIU investigations were assigned to custody supervisors.  In August and September of 2023, only 9 of 448 (2%) investigations received by the AIU were assigned to Special Agents.

[36] Plaintiffs only present the data for August 2022 to May 2023 because the vast majority of investigations from more recent months (1) are not yet complete and (2) could not

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

the AIU closed 36% of the investigations late.  For the most recent three months of available data, the AIU closed 30% of investigations late.

| | MONTH RECEIVED | CLOSED-ON TIME | CLOSED-PAST DUE | OPEN | OPEN-PAST DUE | TOTAL | % LATE | % ON TIME/NOT YET LATE |
|---|---|---|---|---|---|---|---|---|
| **2022** | August | 131 | 121 | 0 | 0 | 252 | 48% | 52% |
| | September | 97 | 104 | 1 | 1 | 203 | 52% | 48% |
| | October | 143 | 180 | 1 | 0 | 324 | 56% | 44% |
| | November | 155 | 75 | 0 | 0 | 230 | 33% | 67% |
| | December | 204 | 104 | 0 | 0 | 308 | 34% | 66% |
| **2023** | January | 300 | 126 | 0 | 0 | 426 | 30% | 70% |
| | February | 277 | 131 | 0 | 1 | 409 | 32% | 68% |
| | March | 277 | 129 | 0 | 7 | 413 | 33% | 67% |
| | April | 214 | 90 | 1 | 14 | 319 | 33% | 67% |
| | May | 313 | 53 | 1 | 46 | 413 | 24% | 76% |
| **TOTAL** | | 2,111 | 1,113 | 4 | 69 | 3,297 | 36% | 64% |

## II.   DEFENDANTS ARE FAILING TO PROPERLY IDENTIFY AND ROUTE STAFF MISCONDUCT COMPLAINTS

### A.   The CST Is Inappropriately Routing Staff Misconduct Complaints as "Routine" Grievances

The CST continues to route as "routine" far too many grievances that contain clear allegations of staff misconduct.  The CST should only classify a grievance as "routine" if it does not include an allegation of staff misconduct.[37]  A grievance contains a staff misconduct allegation if it alleges an employee engaged in "behavior that results in a violation of law, regulation, policy, or procedure, or actions contrary to an ethical or professional standard."  15 C.C.R. § 3486(c)(22).

Plaintiffs reviewed the random sample of grievances for Q3 2023 from class members at the Six Prisons that the CST determined do not allege misconduct, which

---

possibly be late because they have not yet run up against the deadlines in the Remedial Plan.

[37] In an October 17, 2023 email, Defendants explained that they have instructed the CST to route as routine "factually impossible" or "factually implausible" complaints, even when the complaint contains allegations of staff misconduct.  Plaintiffs are not opposed to this concept in principle.  However, Defendants have not yet provided Plaintiffs with sufficient information regarding the timing of this change or the nature of the instructions provided to CST staff.  Plaintiffs requested at the October 18, 2023 meeting that Defendants produce all CST training materials.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Defendants produced on October 5, 2023.  **In 19 out of 96[38] cases (or 20%), Plaintiffs disagree with the CST's determination that the grievance contains no staff misconduct allegation.**[39]  According to data produced by Defendants, the CST determined that 14,076 grievances did not include an allegation of staff misconduct in Q3 2023.  If the CST's 20% error rate for this quarter applied across these decisions, that would mean CDCR failed to route more than 2,800 complaints into the staff misconduct investigation process during this three-month period.  **This would mean that the CST missed far more staff misconduct complaints than they actually identified in Q3 2023, as the CST routed a combined total of 1,617 complaints to LDIs and the OIA during that time period.**[40]

Once again, in nearly every case where Plaintiffs disagreed with the CST, the staff misconduct allegation was clear and unambiguous.  A number of the 602s that the CST routed as routine not only contained allegations of staff misconduct (and therefore should have at least been investigated by an LDI), but also included allegations of staff misconduct on the ADI, and therefore should have been investigated by the AIU.  The full list of 602s from the Q3 2023 sample that the CST improperly routed as routine are described in **APPENDIX A**.  **Plaintiffs request that Defendants provide their position on whether the CST improperly routed each of the 19 grievances described in APPENDIX A, and if not, the basis for their disagreement with Plaintiffs' position.**

The following examples are illustrative of 602s that the CST erroneously classified as not including an allegation of staff misconduct:

- ███████ – The person alleges that a Lieutenant denied his request for single cell housing due to his disability-related safety concerns, and forced him to house with a cellmate, even though they each stated they were not compatible with each other. He also alleges that staff are retaliating against him for seeking assistance "against this abuse of authority" by blocking phone calls from his daughter.  *See* Other Misconduct (2); Retaliation (1), (4).

---

[38] Defendants' random sample produced for this quarter was missing three 602s and included one duplicate copy of a 602, which we omit from the count.

[39] Plaintiffs are counting two grievances from the Q3 2023 sample as correctly screened as "routine" by the CST that allege staff misconduct on their face, but where the allegations are factually impossible and/or factually implausible.

[40] While this is a slight decrease in the CST's error rate compared to the last two quarters (27% and 30%, respectively), it is still far too high.  Further, multiple factors likely account for the decrease including the influx of 1824s into the system that naturally contain "routine" complaints and likely decrease the rate of error regarding the identification of staff complaints.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

- ███████ – The person alleges that an officer sexually assaulted him in his cell.  *See* Staff Sexual Misconduct (2).

- ███████ – The person alleges that an officer is targeting and harassing him because of his race, including by denying him access to yard and threatening to write a false RVR against him.  *See* Discrimination/Harassment (2), (3).

- ███████ – The person alleges that a Sergeant conducted a biased interview of him regarding an assault by staff in order to protect the officers involved, and tried to file a false report on the incident.  *See* Code of Silence (4).

- ███████ – The person alleges that a Sergeant ordered him to the back of the chow line and then tried to handcuff him in retaliation for filing a 602 against him, and that the Sergeant is disrespectful and threatens incarcerated people.  *See* Retaliation (2); Other Misconduct (4).

- ███████ – The person alleges that the prison's sign language interpreter is often very late for appointments or does not show up at all, causing his appointments to be canceled, and that she retaliates against any Deaf person who goes against her. *See* Retaliation (1), (4).

- ███████ – The person alleges that staff disregarded his safety concerns by sending him back to the yard where incarcerated people were demanding that he pay his former cellmate's debt, even though the staff knew his life was in danger because he had disclosed the names of the people who were threatening him.  *See* Integrity (1); Other Misconduct (2).

Our findings that Defendants are erroneously classifying many complaints as routine is consistent with data produced by Defendants that show a marked increase in the number of complaints that the CST is classifying as routine.  As shown in the chart below, in August and September 2023 (the two most recent months for which Defendants have produced data), the CST processed more complaints than in any of the other months.  But in those two months, the CST also categorized the highest percentage of complaints as routine and the lowest percentage of complaints as alleging staff misconduct.  Perhaps most troublingly, in September 2023, the CST processed the most complaints of any month (5,665) but also classified, by a very large margin, the fewest complaints as alleging staff misconduct of any month (325).  (September 2022 had the second fewest staff misconduct complaints, with 435.)  September 2023 had only 37% of the number of staff misconduct complaints in June 2023 (868 staff misconduct complaints).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| T | Month received | Initial CST Routing Decision | | | TOTAL | % STAFF SM (LDI+OIA) | % LDI | % AIU | % ROUTINE |
|---|---|---|---|---|---|---|---|---|---|
| | | HA/LDI | OIA | ROUTINE | | | | | |
| **2022** | **August** | 309 | 284 | 3,077 | 3,670 | 16% | 8% | 8% | 84% |
| | **September** | 220 | 215 | 2,877 | 3,312 | 13% | 7% | 6% | 87% |
| | **October** | 322 | 299 | 2,889 | 3,510 | 18% | 9% | 9% | 82% |
| | **November** | 386 | 255 | 2,682 | 3,323 | 19% | 12% | 8% | 81% |
| | **December** | 338 | 354 | 2,912 | 3,604 | 19% | 9% | 10% | 81% |
| **2023** | **January** | 429 | 434 | 3,141 | 4,004 | 22% | 11% | 11% | 78% |
| | **February** | 323 | 426 | 2,452 | 3,201 | 23% | 10% | 13% | 77% |
| | **March** | 327 | 392 | 3,034 | 3,753 | 19% | 9% | 10% | 81% |
| | **April** | 311 | 314 | 2,942 | 3,567 | 18% | 9% | 9% | 82% |
| | **May** | 438 | 415 | 3,142 | 3,995 | 21% | 11% | 10% | 79% |
| | **June** | 370 | 498 | 3,805 | 4,673 | 19% | 8% | 11% | 81% |
| | **July** | 327 | 355 | 3,846 | 4,528 | 15% | 7% | 8% | 85% |
| | **August** | 313 | 297 | 4,890 | 5,500 | 11% | 6% | 5% | 89% |
| | **September** | 159 | 166 | 5,340 | 5,665 | 6% | 3% | 3% | 94% |
| | **TOTAL** | 4,572 | 4,704 | 47,029 | 56,305 | 16% | 8% | 8% | 84% |

At the October 18, 2023 meeting, Defendants suggested that the increase in routine complaints and the decrease in staff misconduct complaints was possibly the result of additional and ongoing training provided to the CST. Plaintiffs are skeptical that training alone can explain the dramatic changes in the data. Plaintiffs will continue to closely monitor this critical issue, which is essential to ensure that appropriate staff investigate staff misconduct allegations.

Plaintiffs' findings that the CST is erroneously screening staff complaints as "routine" is also consistent with a recent OIG report describing in detail CST screening and routing problems in four cases reviewed in August 2023. *See* OIG CST Monitoring Report. In two of the four cases, the OIG determined that the CST inappropriately screened staff complaints as routine, and in all four cases, the OIG rated CST screening as "poor." *Id.*

Plaintiffs remain seriously concerned about the ability of the CST to identify staff complaints. In order to effectively monitor CST decision making, and to account for the influx of 1824's and complaints from other sources into the staff complaint screening process, **Plaintiffs request that, moving forward, CDCR produce a sample of 150 grievances screened routine by the CST and that at least 100 of those grievances be 602s.[41]**

---

[41] Plaintiffs also note that the random sample of "routine" grievances for Q3 2023 did not include any 602-HCs, even though we understand that they were phased into the CST

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

B.    **The CST Is Improperly Routing Serious Staff Misconduct Complaints Back to Prisons Instead of the OIA**

Plaintiffs conducted a non-exhaustive review of cases from this review period filed on 602s by class members at the Six Prisons after May 31, 2022 that the CST routed to the institution for investigation by an LDI.  This non-comprehensive review revealed that, even where the CST correctly identifies an allegation of staff misconduct, the CST frequently does not recognize that the staff misconduct allegation is on the ADI, and thus improperly routes it for investigation by an LDI, rather than by the AIU.  **Plaintiffs request that Defendants provide their position on whether the CST improperly routed each of the grievances described in this section, and if not, the basis for their disagreement with Plaintiffs' position.**

Plaintiffs are particularly concerned that, in deciding whether a case falls on the ADI, the CST is improperly pre-judging cases on the merits, rather than routing them based on the allegations in the complaint, as required by the Remedial Plans.[42]  The CST's routing decision must be based on what is alleged on the face of the complaint.  The CST may not pre-judge the merits of the complaint or screen out the complaint based on its belief that the allegations of staff misconduct are untrue.

For example, in COR-███████, a class member alleged that two Sergeants were verbally aggressive and hostile to him when he asked them about his gate pass, and threatened to take away 190 days of good behavior time.  The class member perceived that he was being discriminated against because of his race "by these two white authority figures," and asked if they were racist.  One responded, "I told him to write you up."  *See* 602.  Although this allegation is on the ADI, *see* Discrimination/Harassment (3), the CST improperly routed the 602 to an LDI.  The investigation file for this case includes a summary of the CST's routing decision showing it improperly pre-judged the allegation before an investigation commenced, rather than applying the ADI:  "HA LDI **no substantiation for discrimination, just discourteous treatment."  Originating Docs at 6.

In another case, COR-███████, a class member alleged that officers denied him phone calls and threatened him with cell extraction in retaliation for filing 602s against

---

screening system on May 31, 2023.  **Please ensure that 602-HCs screened by the CST are also included in the quarterly productions.**

[42] *See* RJD Remedial Plan at 3-4; Five Prisons Remedial Plan at 4 (The CST is required "to evaluate whether complaints received by CDCR include an *allegation(s)* of staff misconduct … [and] *will route all allegations* in the complaint that are on the ADI … to the OIA for investigation." [emphasis added]); RJD Remedial Plan at 9; Five Prisons Remedial Plan at 9 ("If CST determines that a complaint contains *allegation(s)* of staff misconduct … not listed on the ADI, *those allegations will be referred* … for an allegation inquiry [by an LDI]." (emphasis added)).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

the officers. *See* 602 at 4-5. Although this retaliation allegation is on the ADI, *see* Retaliation (2), the CST improperly routed the 602 to an LDI. The investigation file for this case also includes a summary of the CST's routing decision, which once again shows improper pre-judging of the merits of the complaint: "Claimant alleges on 3/2/23 that Lt. ████, Sgt. ████, Lt. ████, and C/O's harassed and retaliated on the claimant; however, no retaliation in the claim identified." *See* Originating Docs at 3; *see also* COR-20032809 (CST routed allegation to LDI that transferring incarcerated people get their property immediately unless they are Black; summary of CST's routing decision states, "Claimant did not describe personal observations to support a claim of racial discrimination…. Refer to HA/LDI," *see* Originating Docs at 3; 15).

Below, we provide additional examples of cases routed for local inquiries that should have been routed to the AIU for investigation:

- KVSP-████ (*see* 602 at 8-9) – The person alleges that an officer directs other incarcerated people to "incite altercations" during pill call, in order to "facilitate brutality or a fight intentionally to stop, delay, and prevent current investigations" into staff misconduct. These allegations fall under multiple ADI categories, including endangerment, code of silence, and creating an opportunity or motive for incarcerated people to harm others. *See* Other Misconduct (2); Code of Silence (1), (3), (4); Integrity (1).

- CIW-████ (*see* Inquiry Report at 3) – The person alleges that a correctional counselor tried to return her to the general population yard despite her reported safety and enemy concerns, and threatened her with an RVR if she refused the housing move. The allegations of endangerment and creating an opportunity for incarcerated people to harm her are both on the ADI. *See* Other Misconduct (2); Integrity (1).

- RJD-████ (*see* 602 at 8-9) – The person alleges that officers conducted a retaliatory cell search because of a 602 she filed, causing some of her property to be damaged or go missing. She also alleges that one of the officers called her racial slurs during the cell search. The allegations of retaliation and racial insults are on the ADI. *See* Discrimination/Harassment (1); Retaliation (2).

- LAC-████ (*see* 602 at 2-3) – The person alleges that the Control Officer delayed in opening his cell door and then closed the cell door on his body in retaliation for filing a 602 against the officer. The person also alleges that the Control Officer refused to call for medical when he told the officer that another incarcerated person was having a medical emergency, saying that he would not do so unless he saw the person fall onto the ground. These allegations of retaliation and endangerment are both on the ADI. *See* Retaliation (2); Other Misconduct (1).

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

- SATF-████████ (*see* 602 at 1-2) – The person alleges that while she was being interviewed about a staff complaint, the Sergeant misgendered her and then issued her a false and retaliatory RVR. She also alleges that the next day, an officer told her she would not be able to use "that transgender card," referring to prior complaints she had filed against staff for misgendering her. This grievance includes multiple allegations on the ADI, including repeated misuse of pronouns or honorifics, dishonesty and retaliation. *See* Discrimination/Harassment (4); Dishonesty (1); Retaliation (1), (2).

- COR-████████ (*see* 602 at 4-5) – The person alleges that an officer searched his cell in retaliation for yelling loudly out of his cell door that he was having chest pains, even though he explained to the officer at the time that he does not always realize how loudly he is speaking because he is deaf in one ear. The allegation of harassment because of a disability is on the ADI. *See* Discrimination/Harassment (2).

## III.    OFFICERS ARE NOT COMPLYING WITH BWC POLICIES

Plaintiffs' counsel reviewed BWC footage from the productions covered in this report to assess officers' compliance with BWC policies and whether CDCR is holding officers accountable for non-compliance. Our review shows that staff continue to violate BWC policies and that investigators and Hiring Authorities sometimes fail to take appropriate action when BWC videos reflect non-compliance. *See also* August 2023 Report at 37-39; May 2023 Report at 45-48; February 2023 Report at 49-52. Defendants' BWC policies mandate that officers must keep their BWCs activated for the entirety of an officer's shift, except for specified deactivation events. *See, e.g.* Connie Gipson, Clarification to the Body-Worn Camera Deactivation Events or Circumstances (November 7, 2022). Officers must reactivate their cameras as soon as the deactivation event has concluded, and announce their reactivation. *See, e.g.*, BWC Operational Plan No. 28 § VI.B.11 (RJD); Five Prison Remedial Plan Local Operations Procedures § VI.B.11 (LAC).

In multiple cases, footage reveals that officers do not always wear their cameras, as required by policy. For example, in RJD-████████, Officer ████████ is working in the control booth. From the start of the footage, he is clearly not wearing his body worn camera, and instead has it mounted on a fixed location. Midway through the footage at 1:39:56, Officer ████████ picks up his body worn camera and moves it to a different fixed location, where it stays for the remainder of the footage. *See* BWC. The investigator failed to identify this policy violation. Similarly, in KVSP-████████, Sergeant ████████ removes his body worn camera twice, from 9:17:45 to 9:23:26 and again from 9:26:06 to the end of the footage. Sergeant ████████ places the camera on

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

the desk next to him while he works on the computer.  *See* BWC.  Again, the investigator failed to identify this policy violation.[43]

In several other cases, the officer reactivated his BWC in an improper circumstance.  In LAC-██████, reviewed above, the footage begins with the officer speaking to other officers in the housing unit office about issues he is facing with incarcerated people during his shift.  *See* BWC.  Before deactivating his BWC, between 4:39:36- 4:40:25, he starts talking about an incarcerated person by the name ██████. He states, "I got another issue...so I have ██████, he's been in this building before. I don't know if it's signed off by a clinician or not but he's always been in 1 or 2.  He went over there to Charlie 5 and then came back into my building.  They gave him fucking 241 Jcat ██████ so they're not meshing right now….  He says they fought and threw down and I'm just like you don't have any marks on you dude so how about you just be real with me and be like hey we're not meshing you know....  No we really do, we just fought and I'm just like I don't care.  You know what, put it on the camera, I don't really don't care anymore.  This is fucking stupid." Then at 4:40:35, the officer proceeds to deactivate his BWC after another officer tells him she needs to speak with him and walk towards the yard.  After approximately 12 minutes, the officer reactivates his BWC, with no mention of the reason why his BWC was deactivated, while he is cell side engaged in a conversation with other officers and an incarcerated person.  In SATF-████████, the footage begins when Officer ██████ reactivates his camera while speaking to an unknown incarcerated person about grievances, among other issues.  *See* BWC at 11:12:42.  The investigator should have presented these improper reactivation, which occurs only a minute before the incident at the center of the investigation, to the Hiring Authority, but did not do so.[44]

Plaintiffs found additional violations, not discussed in this report, in which officers failed to announce deactivations and reactivations.  It is worth noting that Defendants' BWC audit system would not identify many (if any) of these instances of BWC noncompliance, as few (if any) of the videos contain deactivations exceeding 1.5 hours.

---

[43] It is unclear whether then one page AIU video quick-close report is the entire investigation report, but the report does not note the policy violation.

[44] A memorandum dated April 14, 2023 was issued "to clarify corrective action was issued outside the scope of the inquiry."  *See* Memo at 1.  However, it is unclear whether this refers to the improper reactivation.  In the original Memorandum issued by the Hiring Authority, additional findings were that staff "use[d] profanity when speaking to an inmate and other inmates [and] … not wearing mandated mask [sic] as required."  *See* Memorandum at 31.  The case file is unclear regarding whether the corrective action was related to those violations or to the BWC non-compliance.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## IV.    CONCLUSION

Pursuant to the parties' agreement, we expect to receive a response to this report from Defendants by December 11, 2023.  Plaintiffs will continue to work with Defendants and the Court Expert to attempt to bring Defendants into compliance with the Court's Orders and the Remedial Plans.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**APPENDIX A**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 1 | ███ | ███ | ███ | 9/13/23 | Officers are making false reports on her in retaliation for filing 602s, causing her to be wrongly placed in the PIP, and gave her false RVRs. Her 602s have been denied because officers cover up evidence for each other. | Retaliation (2); Code of Silence (1) | |
| 9 | ███ | ███ | ███ | 8/2/23 | Officer refused him access to the law library based on racial animus. | Discrimination / Harassment (3) | |
| 10 | ███ | ███ | ███ | 7/31/23 | Officer refused to provide him cleaning supplies, and falsely accused him of stealing cleaning supplies from staff bathroom. | No | |
| 17 | ███ | ███ | ███ | 8/21/23 | An officer told him he could not shower, even though his neighbor ("a white guy") had just showered. | Maybe | Yes, as it is unclear whether he is alleging the motive is discrimination based on race. |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 20 | ■■■■ | ■■■■ | ■■■■ | 9/14/23 | Committee staff disregarded safety concerns by sending him back to the yard where incarcerated people were demanding he pay his former cellmate's debt, despite knowing his life was in danger as he had disclosed the names of the people who were threatening him to staff. | Integrity (1); Other Misconduct (2) | |
| 23 | ■■■■ | ■■■■ | ■■■■ | 9/15/23 | Two officers routinely bark and yell at him and other incarcerated people in an unprofessional manner. | No | |
| 25 | ■■■■ | ■■■■ | ■■■■ | 8/31/23 | The CDCR sign language interpreter is often very late and sometimes does not show up at all for his appointments, causing them to be canceled. She retaliates against Deaf people who go against her. | Retaliation (1), (4) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 26 | ▮ | ▮ | ▮ | 7/25/23 | Lieutenant denied his request for single-cell status due to his disability-related safety concerns, and forced him to house with a cellmate even though they each stated they were not compatible with each other.  Staff are also blocking phone calls from his daughter in retaliation for seeking assistance "against this abuse of authority." | Other Misconduct (2); Retaliation (1), (4) | |
| 34 | ▮ | ▮ | ▮ | 9/18/23 | Staff are responsible for his legal paperwork and other property going missing. | No | |
| 35 | ▮ | ▮ | ▮ | 1/25/23 | Sergeant lied on the response to his prior 602 (alleging an incarcerated clerk is stealing indigent envelopes), to cover up officers' role in the scheme.  He stopped getting his indigent envelopes in retaliation for the prior 602. | Retaliation (2); Code of Silence (1), (4); Other Misconduct (6) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 37 | ■■■■ | ■■■■ | ■■■ | 9/6/23 | Staff forced incarcerated people to eat dinner with sewage and feces on the floor, and refused to give them cleaning supplies to clean it up.  This is the fourth time this has happened. | No | |
| 46 | ■■■ | ■■■ | ■■■ | 9/22/23 | Staff failed to ducat him for a telephonic court hearing, even though the Litigation Coordinator was served with the Order requiring them to do so, causing him to miss the hearing. | No | |
| 60 | ■■■ | ■■■ | ■■■ | 9/13/23 | Officer is targeting him and harassing him because of his race, including by denying him access to yard to exercise and threatening to write a false RVR against him. | Discrimination / Harassment (2), (3) | |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 62 | ■■ | ■■ | ■■ | 7/6/23 | Sergeant conducted a biased interview of him regarding an assault by staff in order to protect the officers involved, and tried to file a false report on the incident. | Code of Silence (4) | |
| 74 | ■■ | ■■ | ■■ | 5/23/23 | Staff improperly refused to deliver books he ordered by mail and returned them to the vendor without notice to him while he was in the ASU for non-disciplinary reasons. | No | |
| 77 | ■■ | ■■ | ■■ | 8/28/23 | Mail room staff stole artwork he sent to a friend, part of a pattern of tampering with his mail, including legal mail. | No | |
| 78 | ■■ | ■■ | ■■ | 8/29/23 | Mail room staff improperly returning indigent envelopes and refusing to send personal mail to his family and legal mail to the courts. | No | |

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| Prod. No. | Last Name | CDCR No. | Grievance No. | Date Rec'd | Summary of Allegation | Should have been on ADI? | Clarifying Interview Required? |
|---|---|---|---|---|---|---|---|
| 85 | ███ | ███ | ███ | 8/4/23 | A Sergeant ordered him to get to the back of the chow line and then tried to handcuff him in retaliation for filing a 602. The Sergeant is disrespectful and threatens incarcerated people. | Retaliation (2); Other Misconduct (4) | |
| 97 | ███ | ███ | ███ | 9/21/23 | An officer sexually assaulted him. The 602 names the officer and describes the circumstances in sufficient detail to investigate. | Staff Sexual Misconduct (2) | |

[4389848.1]

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## APPENDIX B

**KVSP**

| | |
|---|---|
| ███ | See discussion in report. |

**COR**

| | |
|---|---|
| ███ | Due to the AIU investigator's delay in beginning the investigation, the investigator could not obtain BWC and fixed camera footage to investigate the allegations. This video footage, particularly BWC footage, was necessary to meaningfully investigate the allegation that staff were making statements that endangered the class member. |
| ███ | A central issue in this case is whether an LVN examined the class member, which medical staff and the class member disputed. Despite the BWC footage failing to show either way whether medical staff examined the class member, the AIU investigator failed to obtain fixed camera footage from the program office that could have confirmed whether the LVN examined the class member. |
| ███ | The investigation report references video footage, including a conversation between a nurse and officers about the class member's disability, that Defendants did not produce to Plaintiffs. |

**LAC**

| | |
|---|---|
| ███ | In this case, the investigator failed to account for BWC footage that potentially contradicted the investigator's conclusions. The issue was whether the subject officer was instructed to intentionally deactivate her BWC during an RVR hearing. The investigator concluded based on one set of BWC footage that the subject officer had her BWC deactivated for almost two hours, and well before the RVR hearing, which precluded any video evidence of a deactivation right before the RVR hearing. However, the investigator failed to account for the *other* BWC footage in the case file, which showed that the subject officer's BWC was not deactivated for that entire two-hour stretch, and which therefore indicated that additional footage immediately preceding the RVR hearing may have existed. |
| ███ | See discussion in report. |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| | |
|---|---|
| ████████ | See discussion in report. |

**SATF**

| | |
|---|---|
| ████████ | CDCR did not produce complete footage of the class member's interaction with three officers.  At the beginning of the footage, the class member is already speaking to the officers, which leaves it unclear what the officers already said to the class member or said to the librarian who refused to let the class member use the toilet. |
| ████████ | The class member alleged that an officer directed the tower to open the class member's door while she was naked and drying off from a bird bath.  Regarding the subject officer, BWC was apparently unavailable, as SATF ISU stated that the "server showed no footage was recorded on that date for that BWC."  The investigator did not further inquire into this issue.<br><br>The investigator also conducted only minimal investigation into whether the subject officer allowed other incarcerated people to cover up their windows, as the investigator reviewed only one hour of AVSS footage from only one angle (and apparently did so only to view the interaction between the class member and subject officer).  Further video could have helped the investigator determine whether the subject officer singled out the class member for their window coverings. |
| ████████ | As the investigator acknowledged in the report, video footage was unavailable due to CDCR's delays in the investigation:  "I did not request AVSS as I did not receive the case till approximately 11 months 2 weeks after the date of the event, and the typical AVSS retention period is 90 days."  Video footage could have helped identify potential witnesses to the incident, and thus whether officers instructed other incarcerated people to attack the class member. |
| ████████ | The investigator received the referral within 90 days of the incident, but failed to preserve BWC or AVSS of the incident, or to provide any justification for doing so in his report.  In fact, the report omits any discussion of video altogether.  SATF ultimately sustained the allegation based on the officer's admission that he failed to strap down the class member in a transport van, but reviewing video was necessary to ascertain the degree of the officer's culpability and harm to the class member. |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| | |
|---|---|
| | The class member alleged that two officers denied him transport in an ADA van with a lift, contributing to a fall.  An officer denied doing so in an interview.  Video was thus necessary to resolve the class member's and the officer's differing accounts.  Yet the investigator failed to obtain BWC footage of the two officers in question to verify whether the class member requested an ADA van with a lift before departing from the hospital. |
| | In this case, the class member alleged that staff forced him to wait in a soiled diaper after he requested an incontinence shower.  The investigator reviewed video from a Sergeant who interacted with the class member after the alleged incident, but failed to review video from the tower officer—who claimed in his interview that he immediately called for assistance once the class member reported an incontinence accident. |

**RJD**

| | |
|---|---|
| | The investigator failed to initiate their investigation until well after the 90-day retention period lapsed, despite being assigned the case within the retention period and obtaining information from the class member regarding a time range for when staff were ignoring man-down calls in the unit. |
| | The class member alleged that for two months, an officer had been tampering with his food tray, and that the same officer conducted an improper cell search on November 14, 2022.  The investigator reviewed video from only November 14 related to the food tray allegation (apparently because it was retained due to an incident report), but could not review any video of the cell search because the investigator was not assigned to the case until after the 90-day retention period ran.  The class member had promptly filed his grievance well within the 90-day retention period. |
| | A class member alleged officers had encouraged incarcerated people to attack the class member, had permitted incarcerated people to enter the class member's housing unit even though they did not live in that unit, and spoke with incarcerated people who later attacked the class member.  The investigator failed to review BWC footage from all officers who responded to the incident. The investigator also failed to review any AVSS footage from inside the housing unit, which would have shown whether officers allowed the incarcerated people to enter the unit or spoke with the attackers.  Instead, the investigator reviewed only footage from the |

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

| | |
|---|---|
| | attack itself, which was insufficient to address the full scope of the class member's allegations. |
| ███████ | The class member alleged that they reported safety concerns about their cellmate to a named officer, but the officer ignored the safety concerns, and the class member was housed with the cellmate for another week.  The class member promptly filed a grievance within 10 days of the incident.  Yet by the time CDCR assigned an investigator, 90 days had elapsed since the incident, and the AIU Lieutenant was unable to request or review any video footage. |

**CIW**

| | |
|---|---|
| ███████ | The investigator, without any explanation, failed to request video to investigate this allegation that staff were aware that a group of incarcerated people had surrounded and threatened the class member and her roommate, but did nothing to address the situation. |
| ███████ | Because of a nine-month delay in starting the investigation, video evidence was unavailable to investigate this allegation that an officer retaliated against a class member for filing a 602 against the officer. |
| ███████ | The investigator, without any explanation, failed to request AVSS video to investigate the allegation that a supervising cook had falsely issued an RVR to the claimant for attempting to obtain a special diet meal and a general population meal. |
| ███████ | Though the claimant filed a 602 within a few weeks of the incident, CIW did not process the claim for nearly four months, meaning that video was unavailable to investigate the allegations that an officer had failed to lock the claimant's door, resulting in other incarcerated people stealing claimant's property; that the officer laughed when informed of the theft; and then the officer filed false RVRs against the claimant. |
| ███████ | BWC footage was not available to investigate multiple allegations that a Lieutenant was harassing the claimant because the investigator delayed almost nine months in requesting it. |

# EXHIBIT B



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

September 11, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

| **PRIVILEGED AND CONFIDENTIAL** |
| :---: |
| **SUBJECT TO PROTECTIVE ORDERS** |

Tamiya Davis
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento, CA 94283-0001
Tamiya.Davis@cdcr.ca.gov

Re:     *Armstrong v. Newsom*:  Plaintiffs' Objections to Early Warning System
          ("EWS")
          <u>Our File No. 0581-03</u>

Dear Tamiya:

Thank you for producing Defendants' explanation of the current status of the Early Warning System ("EWS") on August 21, 2023.  A copy of that document, Defendants' "EWS Alert Process," is attached hereto as **Exhibit A**.

CDCR should be commended for creating a system with the level of detail, complexity, and comprehensiveness of the current iteration of the EWS.  With few exceptions, the EWS already includes the data that is critical and necessary to track past staff misconduct and to prevent future incidents from occurring, as required by the *Armstrong* Court.  However, because the EWS fails to send alerts regarding the most critical and relevant data, and because existing alerts fall short of warning staff of staff misconduct related problems, the EWS currently fails to accomplish Court Ordered and Remedial Plan objectives.

In granting Plaintiffs' request for remedial measures at the Six Prisons, the Court ordered CDCR to develop an EWS to correct deficiencies in systems "incapable of generating reports that could help Defendants identify critical information necessary to

[4355343.3]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 2

track past staff misconduct incidents and prevent future ones." Dkt. 3217 at 53 (citing Dkt. 3205, Ex. A at 1, OIG Report regarding AIMS).

To achieve the court-ordered purpose of generating reports to identify past and prevent future misconduct, Defendants agreed in the Remedial Plans to "identify trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct. Data will be gathered from multiple CDCR databases, including SOMS, CMS, the 2140 log, and others and compiled to create automated Early Warning System dashboards, with red flag and alert systems which can be viewed by institution leadership and CDCR executives. In addition, the Early Warning System dashboards will be programmed to send automated alerts and warnings to impacted locations when alarming trends surface." Dkt. 3392-2 at 14.

The EWS, as currently designed, fails to generate reports that "alert" Hiring Authorities and management staff of the most critical information contained within the system as required to help them "track past staff misconduct incidents and prevent future ones," Dkt. 3217. The vast majority of the critical information is buried within confusing and complex sub-layers of the system and, without any clear requirement or guidance for accessing that information, the onus is on busy Hiring Authorities and executives to find it. The system does currently generate three different types of "alerts" but, as explained in more detail below, the existing alerts do not contain the most relevant information necessary to alert staff to potential problems. Most significantly, those alerts are threshold based and lack context; they therefore fail to provide Hiring Authorities with information about how the data regarding significant indicators is trending at their prisons.

CDCR stands at the precipice of opportunity. Much of the data necessary to create a meaningful "warning" system that generates reports and alerts to Hiring Authorities and executives to potential smoke, before a fire, appears to already exist within the system. **To fully achieve its Court-Ordered purpose, the EWS must do more than leave to chance the discovery of the most critical information contained within. By revising and expanding on existing alerts, and by including crucial, institution-specific, trend data in such email alerts, the EWS will comply with Court Order and accomplish Remedial Plan goals of providing Hiring Authorities and other executives with the reports necessary to identify potential problems. If left unchanged, the system will fall far short.**

On July 5, 2023, Defendants provided a demonstration of the current EWS. On August 21, 2023, Defendants provided a written explanation of the EWS, including screenshots from the system. Based on the demonstration, explanation, and Defendants'

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 3

other statements about the EWS over the course of negotiations, Plaintiffs respectfully object to Defendants' EWS as not compliant with the Remedial Plans.

I.     **The EWS Alerts All Fail to Provide Useful, Actionable Information for Hiring Authorities to Identify Trends and Prevent Staff Misconduct**

As explained in **Exhibit A**, the EWS sends "executive staff"[1], including Hiring Authorities, email alerts on a monthly basis.  That alert is sent only if the institution passes certain thresholds, with those thresholds discussed in more detail below.  The EWS also consists of a dashboard, with several sub-levels within, which executive staff can access if they receive an EWS alert email by clicking through links included in that alert email.[2]  If an institution does not pass certain thresholds, no email alert is sent.  Alerts are currently only sent based on an institution passing any of three different thresholds.  Below, Plaintiffs discuss the shortcomings of the current alerts and the opportunities for expansion to achieve Court-Ordered requirements.

A.     **The Alerts Regarding Staff Complaints Exceeding Specified Thresholds Fail to Capture Important Trend Data**

Two of the three alerts are calibrated based on the institution crossing a certain threshold regarding the number of staff complaints filed.  These alerts, based on total number of complaints which are devoid of context regarding trends in the number of complaints over time, and devoid of information regarding the type of misconduct alleged, fail to provide Hiring Authorities and executives with helpful and actionable information about past and future misconduct.  **Instead of generating alerts based only on a prison passing an arbitrary threshold number of complaints, to achieve compliance with the Court Order and Remedial Plans, the EWS should automatically send a monthly report to all Hiring Authorities and executive staff alerting them to trends in monthly staff misconduct complaints by all ADI categories.**

Defendants' first alert, **Total Staff Misconduct Complaints, By Facility**, currently falls short of providing Hiring Authorities with helpful information to prevent future misconduct.  Per this alert, if staff misconduct complaints exceed more than 10 complaints per 100 incarcerated people on any facility within the prison, the EWS will

---

[1] Based on the July 5 meeting with Defendants, Plaintiffs understand that wardens, associate wardens, and the DAI leadership team receive the alerts.

[2] It is unclear if or how executive staff can reach the EWS dashboard if they receive no email alert in a given month.

[4355343.3]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 4

alert executive staff that a given facility (or facilities) has exceeded the threshold.  If the total number of complaints does not exceed the threshold, no alert is sent.  However, to learn more and see the actual rate of complaints on any facilities that exceed this threshold, the Hiring Authority must open an attachment to the alert email that includes the complaint rate.  To access the most helpful information about the complaints filed on that facility, the Hiring Authority must then click the buttons included in the email and voluntarily seek out that additional information by clicking through multiple pages in the EWS dashboard.

Simply alerting staff to the **Total Staff Misconduct Complaints, by Facility**, is of little value.  For one, the total number of complaints on a facility is only relevant if you consider the trends regarding staff misconduct complaints on that facility over time.  The fact that there has been an increase in complaints over time will help staff identify when there is a potential "hot spot" even if complaints do not surpass a magic threshold.  Similarly, providing trend data will also help staff identify when complaints are decreasing over time which may signify that reform efforts are working.

Second, a high number of complaints on a Facility is a somewhat arbitrary and incomplete measure of whether there is a problem with staff misconduct.  A disproportionately high number of complaints (when compared to other Facilities with a similar population) could be indicative of one type of problem.  At the same time, the opposite situation—a disproportionally low number of staff complaints—could be equally indicative of a serious problem (if complaints were low due to fear of retaliation for filing complaints).  The current alert will never identify such a problem.

The second type of alert, **Staff Misconduct Complaints Regarding Use of Force or PREA, By Institution,** goes slightly further in providing some measure of trend data regarding complaints at the prison.  If staff misconduct complaints regarding either use of force ("UOF") or staff sexual misconduct ("PREA") exceed more than 1.5 complaints per 100 incarcerated people, the Hiring Authority will receive a monthly alert notification.

However, this alert also falls far short.  First, to comply with the Court Order, it should alert staff as to complaints regarding all categories of serious staff misconduct on the ADI, not just UOF and PREA.  Having a comprehensive view of trends concerning complaints regarding all types of serious staff misconduct is necessary to effectively manage the prison, understand past and ongoing problems, and prevent future misconduct.  The Court's Order is not limited to staff misconduct involving PREA or UOF incidents.

PRIVILEGED AND CONFIDENTIAL
Tamiya Davis
September 11, 2023
Page 5

The Hiring Authority must again click an attachment to compare the total number of PREA (or UOF) complaints from the prior month and the current month. That attachment also includes three buttons that can lead to further information in the EWS dashboard. Here again, critical information regarding staff misconduct trends in ADI categories is embedded in sub-levels of the EWS dashboard. From the alert email attachment, staff can click through to a "Flagged Facility Alert" button. This button takes the user to a dashboard that shows all flagged facilities at the institution over the course of the last six months, with trends in the total number of complaints and the top ADI categories by facility and institution-wide. Helpfully, this page also includes a summary with information about dominant ADI categories on specific facilities. This page may inform executive staff, for example, that UOF is the dominant issue on a specific yard. The page, however, lacks trend information with respect to each of the ADI categories listed. This trend data is critical to enabling executive staff to understand if UOF is an increasing issue as compared to prior months. Without such trend information, it is nearly impossible for executive staff to put complaints in context and understand if and how to address UOF issues on a particular facility.

To further identify which staff members correspond with staff complaints in a given ADI category, executives must click through to another sub-layer accessed by a button on the "Flagged Facility" page to reach the "More Information about Staff Identified on ADI" page. Then executive staff must click yet another page to view complaints by ADI sub-category, and then yet another to reach AASTS to compare the specifics of allegations. The EWS brief suggests that in AASTS, executive staff can only review a single complaint at a time, rather than comparing multiple complaints against an officer in a single view.[3] It seems highly unlikely that any Hiring Authority or their designee, with many demands on their time, will click all the way through to AASTS to compare UOF allegations against a specific officer and potentially identify troubling patterns.

The purpose of the EWS is to correct deficiencies in CDCR's systems which are "incapable of generating reports that could help Defendants identify critical information necessary to track past staff misconduct incidents and prevent future ones." Dkt. 3217 at 53 (citing Dkt. 3205, Ex. A at 1, OIG Report regarding AIMS). The EWS dashboard appears to contain a trove of useful information. However, for the reasons set forth above, it clearly fails to generate reports that will be helpful to Hiring Authorities. To be helpful, the content of the email alerts is critical, especially for busy executives who may

---

[3] The brief also lacks information about other pages in the EWS dashboard, such as the "ADI Info" page. Without that information, Plaintiffs cannot evaluate the usefulness of that page.

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 6

go no further than the email, and thus should contain all information necessary to understand whether or not there is problem regarding staff misconduct complaint trends, the Facility where the problem exists, and the type of complaint that is trending in the wrong direction.

    <u>**Recommendation**</u>:  Every month, Hiring Authorities and executive staff should receive an alert with trend data for all categories of staff complaints on the ADI categories for their prison.  Specifically, the EWS should automatically send a monthly alert to executive staff showing trends in monthly staff misconduct complaints by all ADI categories by facility.  The alert should **capture trend data from at least the prior six months** to provide context to executive staff regarding the current month's staff complaint data.  The alert should include complaints in ADI categories by facility to enable Hiring Authorities to identify potential "hot spots" at the institution.

    Beyond the email alert, CDCR must require Hiring Authorities, if the alert contains an alarming trend, to spend time additional time in the EWS necessary to better understand what might be occurring and to work with CDCR leadership on a response. The use of the EWS should be an iterative process.  To determine whether and how Hiring Authorities and leadership are engaging with the EWS, whether it is useful and how to access other information within the EWS that might be useful for specific Hiring Authorities purposes, CDCR must engage the institutions regularly to determine needs. CDCR should also track use of the EWS to ensure Hiring Authorities and their designees are actually engaging with this important management tool and, if not, should reach out to those institutions to provide additional support.

**B.**    **The Top 10 Statewide Staff Alert Fails to Highlight Potential Problem Staff at the Institution Level**

    The third and final alert included in the current EWS, as explained in **Exhibit A**, indicates that—regarding complaints that allege a specific staff member engaged in misconduct—executive staff will be alerted only when a staff member at the institution winds up on the "top ten list" of staff members statewide with the most staff complaints filed against them, either within the last month or over the last thirteen (13) months.  Like the other alerts, this alert fails to provide Hiring Authorities with useful, actionable information about potential problems at their institution.

    Since 2007, the *Armstrong* Court has attempted to get institution management to utilize information about repeated complaints against the same staff members. Defendants were ordered to "track the record of each institution and the conduct of individual staff members" who are failing to comply with requirements and to "refer

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 7

individuals with repeated instances of non-compliance to the Office of Internal Affairs for investigation and discipline, if appropriate." Dkt. 1045 at 7 (Jan. 18, 2007).

The Court clearly understood that the record of what was occurring at each prison was relevant for management of disability compliance at that prison. However, with this alert, if no staff member at the institution winds up in the <u>statewide</u> Top 10, the executive staff will not be alerted about any potentially problematic staff at the prison. To comply with Court-Ordered requirements to "track the record of each institution and the conduct of individual staff members" as well as to "identify critical information necessary to track past staff misconduct incidents and prevent future ones" the system must alert Hiring Authorities to problematic trends in complaints against staff **at their prisons**, not complaints against staff at other prisons who have reached the threshold of being in the Top Ten statewide. Dkt. 1045 at 8; Dkt. 3217 at 53.

As CDCR's own explanation of their EWS shows, one incarcerated individual filing multiple (potentially duplicative) complaints against the same staff members (even with the top five statewide complainants removed) can skew the list of the Top 10 staff members by complaint statewide. *See* Ex. A, page 7, indicating that a single complainant is primarily responsible for the allegations leading three staff members to end up on the Top 10 statewide list. It is also possible that certain staff members, such as those responsible for strip-outs, may face the highest raw number of complaints in a given period.

Again, even if the Top 10 alert does trigger a warning to a Hiring Authority, the email itself simply states the number of staff members who appear in the Top 10 without their names or further information that is critical to understanding the problem. That additional information is again available only to the executive who takes the time to click the button included in the email attachment and to hunt further.

The EWS dashboard appears to contain some of the critical information about potential problem staff that is necessary to track past misconduct and prevent future harm. For example, the "Top Staff Alert" button reachable via the alert attachment includes a summary with more detail about the ADI category of claims against the top staff. The "More Information About Staff Identified on ADI" button also lists staff by the ADI category of individual claims, which is useful to identify patterns—if executive staff reaches it. However, to actually compare the factual allegations across specific complaints—such as to determine whether the same staff member is alleged to have used similar force against multiple incarcerated people—a Hiring Authority needs to copy the AASTS number of each individual allegation and navigate to AASTS to look at each allegation individually.

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 8

Having this information buried in the current EWS falls short of the intended purpose of an EWS.  The current system does not actually "warn" staff of problems.  It simply provides access to that information if someone is inclined to look for it.

**Recommendation**:  The EWS should alert the Hiring Authority and executive staff about potentially problematic staff at *their institution* each month.  Specifically, Defendants could include a Top 10 alert, but it should be the 10 staff at their institution each month who receive the highest number of staff complaints.  To weed out potential repeat complaints by a single individual against the same staff members, the alert should distinguish complaints filed by different incarcerated people.  The alert should also identify the top ADI category of complaints against the given staff members, so that executive staff can quickly and easily understand, as has been the concern of the Court for years, whether repeated complaints of non-compliance are being alleged against the same potentially problematic staff at their institution.

## II.     Other Deficiencies and Problems in EWS

### A.     Defendants Have Not Provided Information About the Thresholds for Most Key Performance Indicators

The parties agreed that the system would include key performance indicators ("KPIs") to assist Defendants in identifying "trends related to staff misconduct and other indicators of potential operational issues and to suggest steps that might prevent misconduct."  (*See* list of key performance indicators included in Plaintiffs' December 22, 2021 letter, attached hereto as **Exhibit B**.)

The spreadsheet Defendants provided on August 21, 2023 includes no information about the thresholds for several KPIs, including total grievances, unexpected deaths, homicides, suicides, Narcan use, overdoses, outcome on sustained[4], and RVRs/# of disciplinary actions.  The spreadsheet simply says "Available in EWS."  Defendants must explain when each of these categories will flag in EWS and demonstrate how the flag will appear in EWS.

Regarding the RVR category specifically, Defendants have already agreed to evaluate whether the EWS could flag when a staff member has initiated a disproportionate number of RVRs, when an incarcerated person has received a disproportionate number of RVRs, and when an incarcerated person receives an RVR

---

[4] Plaintiffs' counsel seek clarification on what "outcome on sustained" refers to in Defendants written explanation of the EWS.

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 9

within a certain period time after having filed a staff complaint.  *See* Dkt. 3412 at 9-10.
Providing this information to Hiring Authorities about these critical indicators of
potential retaliation against incarcerated people is necessary to meet the Court-Ordered
objective of tracking past staff misconduct and preventing future harm.  Defendants'
spreadsheet lacks any information on this long-discussed KPI.

      **B.**      **EWS Does Not Appear to Track All Information the Court Ordered**

      Based on the demonstration and brief Defendants provided, it is unclear to
Plaintiffs if EWS tracks, as is required, information about the "date," "time," and
"location" of staff misconduct complaints, as well as class members' disabilities and any
injuries suffered in connection with the incident, as required by the Court's order.  *See*
Dkt. 3218 at 5-6.  The EWS alerts and dashboard, as presented by Defendants, do not
appear to include this information about staff misconduct complaints or permit Hiring
Authorities to sort complaints by a given date, time, location, or disability.  Please report
on whether EWS includes this information.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4355343.3]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
September 11, 2023
Page 10


### III.     Conclusion

      Plaintiffs' counsel looks forward to meeting on September 25, 2023.  We seek to resolve EWS negotiations quickly and to determine whether or not it will be necessary to invoke the dispute resolution process outlined in stipulation.  (*See* Stipulation Regarding Dispute Resolution with the Court Expert Concerning Limited Areas of the RJD and Five Prisons Remedial Plan, ¶ 6, **Exhibit C.)**   As stated there, the parties shall, on a schedule set by the Court Expert, submit briefs to the Court Expert who shall then submit to the Court a report and recommendation regarding a proposed resolution of the dispute between the parties.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
     Of Counsel

PMG:ln

cc:   Alexander "Lex" Powell

| | | |
|---|---|---|
| Alexander "Lex" Powell | August Gugelmann | Amarik Singh |
| Nicholas Meyer | Audrey Barron | Joshua (Jay) Leon Guerrero |
| Patricia Ferguson | Jillian Hernandez | Dawn Lorey |
| Chor Thao | Brianne Burkart | Diane Toche |
| Ramon Ruiz | John Dovey | Joseph Bick |
| OLA *Armstrong* | Robin Hart | Cory Lo |
| Sharon Garske | CCHCS Accountability | Lourdes White |
| Trace Maiorino | Joseph Williams | Mona Houston |
| Sean Lodholz | Cathy Jefferson | Lois Welch |
| Olena Likhachova | Jason Anderson | Steven Faris |
| Mark Jackson | Jane Moses | CDCR CAMU |
| Ed Swanson | Aaron Perez | Alexandrea Tonis |
| | | Co-Counsel |

[4355343.3]

# EXHIBIT C



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email: pgodbold@rbgg.com

November 10, 2023

VIA ELECTRONIC MAIL ONLY

Tamiya Davis
CDCR Office of Legal Affairs
Tamiya.Daivs@cdcr.gc.gov

Re:   *Armstrong v. Newsom*: Plaintiffs' Comments on October 2023 DAI
      Executive Monthly Report and Early Warning System
      Our File No. 0581-03

Dear Tamiya:

Thank you for producing the Division of Adult Institution Executive Monthly Summary Report, on October 30, 2023, attached hereto as **Exhibit A**. Plaintiffs' counsel have reviewed this document in conjunction with the explanation of Defendants' Early Warning System ("EWS Alert Process"), attached hereto as **Exhibit B**.

As stated previously, there is an impressive amount of data collected and contained within Defendants' new Early Warning System ("EWS") that can certainly "help Defendants identify critical information necessary to track past staff misconduct incidents and prevent future ones" from occurring, as required by Court Order. Dkt. 3217 at 53. But the Court also sought to have Defendants correct deficiencies in their existing system, which was found to be "incapable of generating reports" necessary to meet court-ordered objectives. *Id.* As explained below and in our prior letters, the reports that are generated for DAI executives (**Exhibit A**) and alerts that are sent to Hiring Authorities under limited circumstances (**Exhibit B**) fall short of notifying Hiring Authorities of staff misconduct trends and problematic staff within their prison, and therefore continue to fail to accomplish these court-ordered objectives.

In order to comply, Defendants must generate reports that are institution-specific. Since the inception of the *Armstrong* Court's efforts to eliminate violations of the Americans with Disabilities Act ("ADA") by holding staff accountable in 2007, the Court has tried to get Defendants to create a system that works—at the institution level—to "track the record of each institution and the conduct of individual staff members who are not complying with these [ADA] requirements." Dkt. 1045 at 7. Defendants have

Tamiya Davis
November 10, 2023
Page 2

created multiple systems over the years but have resisted efforts to create a useful tool for Wardens and prison administrators to actually identify and address local trends.

Staff misconduct varies by prison and prison yard.  In order to be able to "track past staff misconduct incidents and prevent future ones" from occurring, Wardens must understand what is happening at the local level, on each prison yard, and among the individual staff working there.  The Court's original accountability order makes abundantly clear that to stem the tide of problems, Wardens must know and be held responsible for what is happening at their prison.  *See* Dkt. 1045 at 7.  **The EWS must therefore serve Wardens by generating reports that are specific to their institutions.** The reports should be sent regularly to each Warden as well as prison administrators. The current EWS, which sends limited alerts to Hiring Authorities when thresholds are met and sends regular reports only to DAI executives about statewide trends, does not provide Wardens with critical information necessary to "track past staff misconduct incidents and prevent future ones." Dkt. 3217 at 53.

One has to look no further than Plaintiffs' November 6, 2023 report on Defendants' accountability system to see two cases that illustrate the need for Hiring Authorities to be alerted to problems occurring in their prisons and the failure of the current EWS to serve this purpose.  Plaintiffs' report describes two examples of problematic staff members at two different prisons who were the subject of multiple complaints regarding consistent types of problematic behavior.  (*See* November 6, 2023 Report at PDF 12-22 ).  In one case, the officer was the subject of multiple findings of staff misconduct for the same behavior.  The Hiring Authorities at each prison, RJD and LAC, were seemingly unaware of persistent complaints against—and confirmed misconduct involving—these staff members, and failed to impose progressive discipline. A functioning EWS should, at the very least, generate reports (or alerts) that assist Hiring Authorities and prison administrators in recognizing when multiple similar complaints are being filed against one staff member.  The purpose is to detect smoke before there is a full-scale fire.

As explained below, and as set forth in more detail in Plaintiffs September 11, 2023, letter, Defendants' EWS currently fails to <u>notify</u> Wardens of the most critical information necessary to track staff misconduct and prevent future harm.  At a minimum the EWS should:

Tamiya Davis
November 10, 2023
Page 3

**1. Generate and send a monthly report to every Warden that includes data regarding staff misconduct complaint trends, including for each ADI category, for their prison.**

Defendants' system currently only generates monthly reports for DAI executives, and those reports are primarily focused on statewide data trends. (*See* Ex. A at 2-4, 6-9, 11-16). Only two of the pages in the report—routing of CST claims by prison, *id.* at 5 and staff complaints per 100 incarcerated people by prison, *id.* at 10, provide any data on a prison-specific level. The statewide data provide helpful information regarding whether the number of complaints is trending up or down for certain prisons and whether any prisons have crossed a threshold. But they do not provide Hiring Authorities or administrators at headquarters who supervise the Hiring Authorities with any clarity regarding what is happening at specific institutions, which should be the primary purpose of the system. Currently, Hiring Authorities do not receive any institution specific trend reports. Hiring Authorities only receive an alert from the system regarding staff complaints when complaints pass a threshold number per 100 incarcerated people.

As detailed in Plaintiffs' September 11, 2023 letter, data regarding trends in staff complaints, the type of complaints by ADI category, and location of complaints being filed appear to be captured in the EWS system. But Hiring Authorities have to navigate multiple levels of the system to seek this information out. There is no requirement regarding how often, nor what information about their prison, they should be accessing in the EWS.

The limited information that is sent to Hiring Authorities, currently only a threshold alert email if, for example, complaints exceed a threshold number per 100 people on a prison yard, fails to provide information to Wardens about what is actually happening at their prison. If there is a sharp decrease in complaints, either because reforms are working or because fear of retaliation has increased and people are afraid to file complaints, Wardens should know. Yet this would not trigger an alert. If multiple people on one yard complain about a particular officer engaged in disrespect or denying disability accommodations (as documented in Plaintiffs' November 2023 Report) that information should be presented to Hiring Authorities. Yet that would not trigger an alert.

**Hiring Authorities should automatically receive a monthly, institution-specific, trend report that clearly identifies complaints by ADI category, yard, and staff member.** Slide 12 of the DAI Monthly Summary Report, for example, shows a breakdown of the top ADI categories reported in the EWS statewide over the past calendar year. *See* Ex. A at 12. While this is a useful report to provide CDCR headquarters with a bird's-eye view of statewide staff misconduct trends, a statewide

Tamiya Davis
November 10, 2023
Page 4

report like this provides little utility to Hiring Authorities.  By contrast, a monthly report to each Hiring Authority—breaking down the staff misconduct claims by ADI category and sub-category *at their institutions*—would have immense value and would actually further the court-ordered requirements that CDCR  "track past staff misconduct incidents and prevent future ones."  Dkt. 3217 at 53.

2.   **Alert the Hiring Authority and executive staff about potentially problematic staff at *their institution* each month.**

The trend report that each Hiring Authority should receive monthly, described above, should also include trend information regarding individual staff members at the prison who receive multiple complaints.  Hiring Authorities are not currently notified when multiple complaints are filed against a specific staff member.  A Hiring Authority might receive an alert if a staff member rises to the level of having the Top 10 most complaints filed against them statewide.  And, even then, the Top 10 alert does not include the staff member's name or further information that is critical to understanding the nature of the problem (such as the nature of the complaints against them).  It is unclear what purpose the statewide Top 10 alert is intended to accomplish; it provides no useful information to Hiring Authorities and can in fact lead Hiring Authorities to believe that because none of their staff appear on that report, no problems exist.

The current alert would not detect the problems reported in Plaintiffs' November 6, 2023 report discussed above, since despite multiple consistent staff misconduct allegations against the officers in question, they would not likely rise to the level of a statewide Top 10 list.  If the EWS cannot provide alerts in these cases, which are precisely the type of problem that the Court has been trying to root out of CDCR since 2007, the EWS' usefulness is limited at best.

**To correct current deficiencies, Hiring Authorities should receive monthly reports identifying staff members who have received multiple complaints against them over time.**

Finally, it is worth noting that Defendants' EWS contains additional information that could be helpful to Hiring Authorities and prison administrators, especially in better understanding whether and how people with certain disabilities are struggling.  For example, Slide 6 of the DAI Monthly Summary Report, shows the system is capable of reporting on the number of staff misconduct complaints by disability code. Ex. A at 6.  The current report shows only the statewide totals, however.  This data, provided to Hiring Authorities about complaints filed at their prisons could be probative of potential problems.  As it stands, the Report shows the raw number of staff misconduct claims by disability code, and the percentage of the total staff misconduct claims submitted by

Tamiya Davis
November 10, 2023
Page 5

persons with each disability code (e.g., that there were 1837 staff misconduct claims submitted statewide by DNH class members, or 10.1% of the total number of staff misconduct complaints). Ex. A at 6. To put that data into perspective, it would be useful to show the percentage in relation to the percentage of the population they represent so one could determine whether people with certain disability codes are submitting a higher (or lower) number of staff misconduct claims than you would expect given their percentage of the overall population. By currently omitting the denominator—the percentage of the total population that is a member of each class—this slide includes no information that would allow someone to determine whether *Armstrong*, *Clark* or *Coleman* class members are submitting a disproportionately high or low number of staff complaints.

If such data for each prison were provided monthly to Hiring Authorities, it could be useful in determining whether certain class members were being targeted or were otherwise having a difficult time as a result of their disabilities at particular prisons or yards. Such information would provide Hiring Authorities with the tools necessary to address the problems, particularly if these data presentation errors are corrected.

In conclusion, if Defendants generate automatic monthly reports for each Warden regarding data for their individual prison, including trends in staff complaints broken out by yard, ADI category, and identifying staff members with multiple complaints against them over time, they will be able to identify "critical information necessary to track past

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Tamiya Davis
November 10, 2023
Page 6

staff misconduct incidents and prevent future ones" from occurring as required by Court Order.  Dkt. 3217 at 53.  We hope Defendants will take this important step and look forward to hearing back from you.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
Of Counsel

PMG:LN:cg

cc:  Ed Swanson
    August Gugelmann
    Audrey Baron
    Patricia Ferguson
    Nicholas Meyer
    Chor Thao
    Ramon Ruiz
    OLA *Armstrong*
    Olena Likhachova
    Trace Maiorino
    Sean Lodholz
    Sharon Garske
    Anne Kammer

Gurpreet Sandhu
Ava Lau-Silviera
Mona Houston
Lourdes White
Jillian Hernandez
Cory Lo
CDCR CAMU
Brianne Burkart
Lois Welch
Steven Faris
Diana Toche
Joseph Bick
Ursula Stuter

John Dovey
Robin Hart
CCHCS Accountability
Joseph Williams
Cathy Jefferson
Jason Anderson
Dawn Lorey
Jane Moses
Joshua (Jay) Leon Guerrero
Aaron Perez
Amarik Singh
Co-Counsel

# EXHIBIT D



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Sara Norman

VIA EMAIL ONLY

November 2, 2023

Ramon Ruiz
CDCR Office of Legal Affairs

RE:   Captioned Phone Implementation

Dear Mr. Ruiz:

We write with mounting concerns regarding Defendants' delayed and ineffective implementation of captioned phones statewide. The issue of accessible phones has been on the Deaf/Hard-of-Hearing workgroup agenda at least 22 times over the last three years, yet Defendants still have not meaningfully addressed clear barriers to phone access for people with hearing disabilities.

At the May 2023 workgroup meeting, Defendants announced that they planned to survey the field to ascertain if captioned phones were available and accessible to class members. If they were not, Defendants said they would address the issues and ask that Local Operating Procedures (LOPs) be updated. We are very disappointed that after months of being told that the survey would spur action to ensure that class members have knowledge of and access to captioned phones, that is not the case. Instead, five months later, on October 5, 2023, we received survey results that on their face showed clear implementation issues that Defendants had not identified nor acted to correct.

We shared our initial concerns during a workgroup meeting last month, and write now to memorialize our concerns. In particular, we detail continued failures regarding class member outreach and education, placement of phones, and installation – all issues we raised with Defendants last year without any apparent action. We ask that you respond in writing with what Defendants are doing to address these concerns in advance of our next workgroup meeting. Our specific requests are numbered and listed in bold throughout the letter.

Before addressing the survey results, we summarize the recent experience of ██████ ████ ██████ DPH, who arrived to San Quentin last month. His experience illustrates the human impact of Defendants' lack of action regarding inappropriate placement of captioned phones and lack of staff and class member education on the use of the phones.

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Adrienne Yandell

Mr. Ramon Ruiz
Captioned Phone Implementation
November 2, 2023
Page 2 of 8

**First**, there is no clear process for signing up for and accessing the captioned phones at San Quentin. Mr. ▮▮▮▮ was initially housed in North Block and now is housed in South Block. Neither has captioned phones. Mr. ▮▮▮▮ asked the housing officers how to sign up for captioned phones, and they told him there is no sign-up sheet and that he should go to Four Post, a small yard office near the medical building and chapel some distance from the housing units (see layout below, where Four Post is marked with an **X**), to use the captioned phones. When he arrived at Four Post, officers there first told him he should go back and ask housing officers. When Mr. ▮▮▮▮ explained that the housing officers had sent him there, the Four Post officers told him they were busy and he should come back later, between 11 am and noon. When he came back later, Four Post officers told him to come back the next day instead. It took Mr. ▮▮▮▮ several days before he was able to try to use the captioned phone, and even then, only through the intervention of another incarcerated person.

As Mr. ▮▮▮▮ explained, he thus is not able to schedule phone time when he needs to use the phone, and instead is limited to when Four Post officers allow him to use the phone, "I have to do it when [the officers] are not busy, on their time." During a monitoring tour in May 2023, Plaintiffs' counsel confirmed the same; we asked Four Post officers if people are able to use the captioned phone during their yard time, and the officers responded with an emphatic "No."



    **Second**, the location of the captioned phone at Four Post requires people with disabilities to stand outside in the elements, including in the rain and cold weather, to use the phone. (When representatives from the Prison Law Office visited San Quentin on October 31 to meet with Mr. ███████ it was 42 degrees at 8 am.) Mr. ███████ is 65 years old and has significant medical concerns, including being hypotensive and suffering acute illness a few days before his transfer to San Quentin. Nonetheless, Mr. ███████ was made to use the captioned phone while standing outside. The captioned phone was passed through a window in Four Post and placed on a garbage can with a lid on it that was pulled up outside the window: "They pull trash can around with lid on it, put it by window, prop window open after pull screen out, hook it up, hand you the phone, sit it [the phone] on the trash can." An officer sat inside, very close to the window, and could see and hear everything Mr. ███████ was saying – a level of direct, in-person surveillance hearing people do not have when speaking with loved ones on the phone. Mr. ███████ explained that this placement limits his ability to access the phone: "If bad weather, too cold, outside the house, don't have the privacy everyone else got. I won't be making very many phone calls, especially with bad weather."

    **Third**, neither Mr. ███████ nor staff appear to have been educated on how to use the captioned phone. When Mr. ███████ first tried to use the captioned phone at San Quentin, it did not work. He asked the Four Post officer if there was anyone trained to help him use the captioned phone. He reported that the officer "shrugged his shoulder and said, 'No.'" Mr. ███████ was able to make a phone call using the captioned phone only with the assistance of another incarcerated person. *See* Court Expert's Second SATF Report, ECF 3500 at 13 ("Class members who may use the caption phones should be trained in how to use them independently, and we recommend that CDCR provide guidance to the institution on how to train the deaf and hard-of-hearing population on the use of these devices.").

    **Please explain:**

1. **How does someone sign up to use the captioned phones at San Quentin? Please produce all relevant documentation, including LOPs, flyers, and class member education.**

2. **Whether and when officers assigned to Four Post were educated on how to use captioned phones and when and how people may access captioned phones. Please produce all relevant training material.**

3. **Whether, where, and how captioned phones are available at San Quentin for confidential legal calls.**

4. **What San Quentin is doing to ensure that captioned phones are available in housing units, including timelines for any new installations of outlets.**

5.      **How San Quentin will ensure that people have sufficient access to the captioned phone at Four Post, including how people will be allowed to use the phone while inside and be protected from the elements.**

6.      **What Defendants, at the headquarters level, will do to ensure that other prisons do not have problems similar to those at San Quentin.**

* * * * *

## I.    INADEQUATE OUTREACH TO AND EDUCATION OF CLASS MEMBERS

A captioned phone is a phone that has a built-in screen that displays in text what the receiving person on a call is saying. Captioned phones may be used by people who are deaf or hard of hearing and who communicate by speaking (those who cannot speak will need to use a videophone or TTY). This means that people with a hearing disability code of both DNH and DPH may benefit from using captioned phones. (For example, someone designated DNH may be able to use hearing aids to hear in closed-door, one-on-one medical encounters, but require an accessible phone to hear loved ones in a noisy dayroom.)

Robust education of this population to new assistive devices is critical. *See, e.g.*, Marylyn Howe, Meeting the Needs of Late-Deafened Adults, 19 Am. Rehabilitation 25, *3 (Winter 1993) ("[I]t often takes late-deafened adults years to learn about coping strategies, assistive technology, and their basic rights to communication access.").

The survey results show that institutions' outreach and education efforts were inadequate.

**First**, ADA staff in at least two prisons – ASP and CCI – apparently do not understand that people designated DNH may benefit from captioned phones. Both responded to the survey: "N/A, no Deaf/HoH population." But ASP has 60 people designated DNH and CCI has 44 people designated DNH. Similarly, CEN responded to a different question with: "CEN is not designated, but when there is a need [a captioned phone] will be accessible via the watch office," which suggests that CEN incorrectly assumed that captioned phones are only for people designated DPH (and not DNH).

**Second**, at least ten prisons (CAL, CCWF, CEN, CIM, CMF, COR, ISP, SATF, SOL, PBSP) relied solely on outreach to Inmate Advisory Council (IAC) members. That is insufficient. As an initial matter, it is not clear how the IAC members were expected to identify people who might benefit from the device and train them – many people with disabilities are not comfortable having their disability and disability needs known by other incarcerated people. In any event, Defendants must directly inform and educate people with disabilities as to assistive technology that might help them.

**Third**, at least three institutions – CVSP, LAC, and VSP – updated or created written policies or procedures but apparently made no effort to communicate the policies or procedures with deaf and hard-of-hearing people.

| | Prison's Response to: "Please provide a brief statement on how will the Caption Phone info be communicated to your Deaf/HoH populations. i.e. how it works?" | Plaintiffs' Comments |
|---|---|---|
| CVSP | "We have an operational procedure that is available to all inmates in each facility Library. Should an inmate need additional assistance with effective communication a staff assistant would assist them, commiserate [sic] with their individual needs." | This response does not explain how people will be educated about the availability of captioned phones. People should not be expected to constantly monitor the Operational Procedures in each library. |
| LAC | "A detailed card will be with the captioned phone with written, simple instructions as to how they work." | This response does not explain how people will be educated about the availability of captioned phones. |
| VSP | "Caption Phone information was added to the ADA Orientation as well as the CDCR 128 B orientation chrono." | This method does not explain how people currently housed at VSP will be educated about captioned phones. |

**Fourth**, several prisons stated that they would post flyers or send messages to people through the tablet or institutional mail (SQ, SVSP, PVSP, CHCF). We cannot opine on the adequacy of that without seeing what was sent to people.

It therefore is clear that institutions require additional direction on how to directly and accessibly communicate the availability of captioned phones and how they work to people who are deaf or hard of hearing.

. . . .
. . . .
. . . .

**Please produce:**

**7.      All direction to institutions regarding how they should directly and accessibly communicate the availability of captioned phones to all people designated DPH or DNH.**

**8.      All written information provided to deaf and hard-of-hearing people at each institution about captioned phones at each institution, and provide the date that information was posted or shared with such people, the manner of distribution, and the people to whom it was distributed.**

**9.      All LOPs for all institutions related to captioned phones.**

## II.      INAPPROPRIATE CAPTIONED PHONE LOCATIONS

Plaintiffs' counsel has, for years, raised concerns about the inappropriate placement of captioned phones in the program offices and/or sergeants' offices, both in writing and during numerous workgroup meetings. We also reviewed each CDCR-line LOP and on May 2, 2023, we provided Defendants with a list of issues related to the locations where captioned phones were installed. We are deeply concerned that five months later, CDCR's survey yielded similar results with no apparent corrective action based on the information we provided months ago.

Based on the prisons' survey responses, it seems that at least twelve prisons (ASP, CAL, CEN, CIM, COR, CRC, CVSP, FSP, PBSP, SCC, VSP, WSP) have captioned phones available **only** in program, sergeants', or lieutenants' offices. Others, like CMF, NKSP, SAC, SATF, SVSP, and SQ, have captioned phones in several housing units but not all of them. This is inappropriate. These locations are inconvenient, not available at all hours that hearing people can make phone calls, and potentially puts people with disabilities at risk because their presence at the program office can cause others to think they are "snitching" on other people. As in Mr. ███████ case at San Quentin, the only captioned phone available to him is in an area where he must stand outside, exposed to the elements.

It is particularly inappropriate to locate captioned phones in inconvenient locations when Defendants still have not ensured equal access to voice and video calls made through tablets. That is, hearing people can call their loved ones from their cells, during lockdowns and modified programming. Not only can deaf and hard-of-hearing people not do that, they also apparently cannot access captioned phones during those times.

It is unclear why institutions have severely restricted captioned phone availability and whether headquarters has directed them to ensure that phones are available at the same times and in the same locations as "regular" phones are available for hearing people. At San Quentin, for

example, we were told that West Block does not have an outlet for a captioned phone. It is not clear that San Quentin, or headquarters, have taken any action to address that by, for example, installing an outlet.

It also is unclear whether captioned phones are in fact available in the locations listed. Although San Quentin lists a captioned phone in H-unit, when we visited in October 2023, the regular housing officer did not know what a captioned phone was or that it was supposed to be available at the prison. After the ADA Coordinator made a few calls, we were told the phone was in the program office, but we went to the program office and we and on-duty supervisory staff were unable to locate it.

We also are disappointed that Defendants' survey did not address another issue we have raised repeatedly over the past few years – whether and how captioned phones will be made available in confidential, private settings for legal calls.

**We request:**

10.    **That Defendants direct all institutions to make captioned phones available in all housing units and other locations where phones are available to hearing people. Please provide a copy of such direction. If institutions cannot make captioned phones available in all housing units at all prisons, please explain why not and explain what alternative will be made to ensure equal access to phones, including when and how people can access them.**

11.    **Please explain, for all institutions, whether and how captioned phones are available for confidential legal calls.**

## III.    INSTALLATION ISSUES

Since the captioned phone implementation memorandum was issued in December 2021, Plaintiffs' counsel has tried to work with Defendants to resolve installation issues. However, during the October 2023 workgroup meeting, Defendants stated that thirteen prisons still do not have working captioned phones because of installation or technical issues. (We are not sure which these prisons are; only six prisons noted installation issues in their survey responses.)

The COR survey response, for example, states: "Phone line is not compatible with caption phones. Captioned phones are only able to run on an analog line." This shows that headquarters staff need to work closer with prisons to troubleshoot and provide resources to address installation issues. Plaintiffs' counsel understood that the specific model CDCR purchased was supposed to be able to run on either digital or analog lines, CapTel offers models for both analog and for digital lines.

Mr. Ramon Ruiz
Captioned Phone Implementation
November 2, 2023
Page 8 of 8

**Please explain:**

12.     **Who from headquarters has been assigned to work with prisons to make sure they purchase the right captioned phone model and to troubleshoot any technical issues?**

13.     **Which 13 prisons still do not have functional captioned phones, what specifically is the problem, what is the plan to ensure they have functional captioned phones, and what is the timeline for implementation?**

Thank you for your immediate attention to this matter. We look forward to your written response to this letter and to further discussions in the workgroup. Please contact us if you have any questions or concerns.

Sincerely yours,

Claudia Ceseña
Legal Fellow

Rita Lomio
Senior Staff Attorney

cc:     Co-counsel
        Ed Swanson, Audrey Barron (Court Expert)
        Tamiya Davis, Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava
        Lau-Silveira, Ursula Stuter, OLA Armstrong (OLA)
        Lois Welch, Steven Faris (OACC)
        Brianne Burkart (CCHCS Legal)
        Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy
        Jefferson, Jason Andreson, Dawn Lorey, Jane Moses, Joshua (Jay) leon Guerrero, Aaron
        Perez, CCHCS Accountability (CCHCS)
        Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer,
        Gurpreet Sandhu (OAG)