ROB BONTA
Attorney General of California
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorney General
State Bar No. 179749
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3594
  Fax:  (415) 703-5843
  E-mail:  Trace.Maiorino@doj.ca.gov
*Attorneys for Defendants*
*Gavin Newsom, Board of Parole Hearings,*
*and CDCR*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **JOHN ARMSTRONG, et al.,** | 4:94-cv-02307-CW |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]** |
| v. | |
| **GAVIN NEWSOM, et al.,** | |
| Defendants. | |

**TABLE OF CONTENTS**

**Page**

Introduction ................................................................................................................. 1

Background ................................................................................................................. 2

I.    Panel Attorneys Reasonably Accommodate and Competently Assist Class Members with Vision and Hearing Disabilities in Preparation for and Participation in Parole Suitability Hearings. ............................................................ 2

II.   Defendants Reasonably Accommodate Deaf Sign Language Users with Preparation for, Participation in, and Follow up from Parole Suitability Hearings. ....................................................................................................... 5

III.  Defendants Reasonably Accommodate Blind and Low-Vision Class Members with Preparation for and Follow Up from Parole Suitability Hearings. ....................................................................................................... 8

Argument ................................................................................................................. 9

I.    Additional Injunctive Relief Is Unwarranted. ............................................... 9

II.   Panel Attorneys Reasonably Accommodate and Competently Represent Deaf, Blind, and Low-Vision Class Members. ............................................. 9

A.    Panel Attorneys Receive Comprehensive ADA Training. ..................... 10

B.    Panel Attorneys Are a Reasonable Accommodation for Deaf, Blind, and Low-Visions Class Members. ............................................ 11

C.    Panel Attorneys Are Compensated Fairly and Adequately for Their Service. .................................................................................... 13

III.  Defendants Provide Deaf Signers with Reasonable Accommodations to Prepare for, Participate in, and Follow Up from Parole Suitability Hearings. ...... 15

IV.   Defendants Provide Blind and Low-Vision Class Members with Reasonable Accommodations to Prepare for and Follow Up from Parole Suitability Hearings. ................................................................................... 17

A.    Defendants Have a Process for Identifying and Providing Reasonable Accommodations for Blind and Low-Vision Class Members. ............................................................................................ 17

B.    Standard Board Forms and Notices Are Available to All Blind and Low-Vision Class Members in Accessible Formats at All Institutions. ......................................................................................... 19

C.    Defendants Will Provide Blind and Low-Vision Class Members In-Cell Access to Electronic Assistive Devices for Independent Reading and Writing. ............................................................................ 20

V.    No Interference with CDCR's Personnel Decisions Is Warranted Because CDCR Is Appropriately Accommodating Class Members. ............................ 22

Conclusion ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Unites for Kids v. Rousseau*
   985 F.3d 1075 (9th Cir. 2021) .............................................................................................. 9

*Armstrong v. Schwarzenegger*
   622 F.3d 1058 (9th Cir. 2010) ....................................................................................... *passim*

*Bell v. Wolfish*
   441 U.S. 520 (1979) ................................................................................................... 16, 23

*Copeland v. Marshall*
   641 F.2d 880 (D.C. Cir. 1980) ............................................................................................ 13

*Gomez v. Vernon*
   255 F.3d 1118 (9th Cir. 2001) ............................................................................................... 9

*In re Criscione*
   (2009) 173 Cal.App.4th 60 .................................................................................................. 24

*In re Holocaust Victim Assets Litigation*
   No. CV 06-0983 (FB) (JO), 2007 WL 805768 (E.D.N.Y. Mar. 15, 2007), 528
   F. Supp. 2d 109 (E.D.N.Y.) ................................................................................................. 14

*Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger*
   387 F. Supp. 991 (D.D.C. 1974) ......................................................................................... 14

*Oregon Advoc. Ctr. v. Mink*
   322 F.3d 1101 (9th Cir. 2003) ............................................................................................. 15

*Rizzo v. Goode*
   423 U.S. 362 (1976) .............................................................................................................. 9

**STATUTES**

18 United States Code § 3626(a)(1)(A) ...................................................................................... 9

Americans with Disabilities Act (ADA) ............................................................................. *passim*

California Code of Regulations Title15
   § 2281(b) ............................................................................................................................ 24
   § 2281(c) ............................................................................................................................ 24
   § 2281(d) ............................................................................................................................ 24

Prison Litigation Reform Act ....................................................................................................... 9

ii

Defs.' Opp'n. to Pl.'s Motion for Order to Enforce the RPI (4:94-cv-02307-CW)

# TABLE OF AUTHORITIES
## (continued)

**Page**

**COURT RULES**

Federal Rules of Civil Procedure § 602 .................................................................... 12

Federal Rules Evidence § 702 .................................................................................. 12

**OTHER AUTHORITIES**

28 Code of Federal Regulations § 35.160(b)(2) .......................................................... 16

*Nonresponse Bias,* available at *https://www.sciencedirect.com/topics/nursing-and-health-professions/nonresponse-bias* (last accessed December 8, 2023) ............................... 12

**INTRODUCTION**

The California Department of Corrections and Rehabilitation (CDCR) and the Board of Parole Hearings (Board) reasonably accommodate parole candidates with disabilities, providing them with competent attorney representation in advance of their parole suitability hearings and access to reasonable accommodations throughout the process. The panel attorneys who provide representation receive extensive training on accommodations their clients may require under the Americans with Disabilities Act (ADA), as well as resources for identifying and obtaining such accommodations. Defendants further accommodate parole candidates with disabilities by providing needed accommodations to assist with preparing for and following up from parole proceedings by having staff assist with reading and writing, providing auxiliary devices in law libraries and in their cells, and providing documents in alternative formats. Furthermore, a vision specialist is currently evaluating DPV[1] class members to identify their personal reading and writing needs.

This Court's precedent dictates that injunctive relief be used sparingly, and only in a clear and plain case. Plaintiffs have not shown that modification of the remedial plans is warranted, and the relief they request would effect a broad intrusion into institutional operations. Further, Plaintiffs' citation to isolated reports from a smattering of class members fails to demonstrate the substantial, systemic deficiency needed to impose class-wide relief, and their conclusions regarding the panel attorneys who represent disabled class members in parole proceedings are based on speculative submissions that lack proper foundation or fail to control for unrelated variables. Plaintiffs' survey evidence also falls short because only a small portion of class members surveyed bothered to respond and, of those, just a few completed the questions.

Thus, Court intervention is unwarranted, and Plaintiffs' motion should be denied.

///

---

[1] DPV class members include individuals who are either permanently blind or have a vision impairment not correctable to central vision acuity of 20/200 or better, even with corrective lenses. (*Armstrong* Remedial Plan (2001) at 3.)

# BACKGROUND

**I.    PANEL ATTORNEYS REASONABLY ACCOMMODATE AND COMPETENTLY ASSIST CLASS MEMBERS WITH VISION AND HEARING DISABILITIES IN PREPARATION FOR AND PARTICIPATION IN PAROLE SUITABILITY HEARINGS.**

As the Court's Findings of Fact and Conclusions of Law acknowledge, the Board has a long history of accommodating incarcerated individuals with disabilities by appointing attorneys to represent them during parole suitability hearings. (ECF No. 523 at 52.) However, two decades ago, attorneys were not routinely appointed to represent disabled class members, who the Court found were often hindered by their disabilities in their ability to secure an attorney. (*Id*. at 53.) Further, appointed attorneys were not always sufficient to establish effective accommodations for disabled class members. (*Id*. at 54.) A prior policy no longer in effect allotted just four to eight hours for representation, including travel and hearing time, and no training was provided to help appointed attorneys identify and accommodate particular disabilities. (*Id*.)

The Court sought to remedy these issues in its December 1999 Permanent Injunction and February 2002 Revised Permanent Injunction, providing that during the screening process and for hearings:

> At its discretion, BPT may appoint attorneys as an accommodation. In order to suffice as an accommodation, the attorneys must be adequately trained to provide accommodations to persons with disabilities and must receive adequate additional time for providing those services. Attorneys appointed to represent individuals with disabilities shall be informed of their clients' disabilities. If the BPT is aware that a prisoner or parolee requires certain specific accommodations, the BPT shall either instruct an attorney appointed to represent that prisoner or parolee to provide those specific accommodations, or shall provide the prisoner or parolee with those specific accommodations by some other means.

(ECF Nos. 524 and 788 ¶¶ 27, 30.) The December 2010 Remedial Plan (ARP II) provided significant additional accommodations, ensuring that ADA-trained panel attorneys would be appointed for class members with vision and hearing impairments. (*See* ARP II at 5-8, 21, 28.)

Since 2014, the Board has met its obligations under the Revised Permanent Injunction and ARP II through the Panel Attorney Program. (Doetsch Decl. ¶ 4.) Although appointed through the Board's process, panel attorneys are not Board employees. (*Id*.) Attorneys apply with the Board for panel assignment, and are not approved unless they meet the minimum qualifications set forth in the Panel Attorney Program Guide for the Parole Suitability Hearing Process (Guide).

(*Id.*, Ex. A.)  The Guide sets forth representation guidelines and minimum expectations for attorneys in the program.  (*Id.* at ¶ 5.)  And the Board closely monitors panel attorneys for compliance with the requirements outlined in the Guide.  (*Id.*)

The Board contracts with Parole Justice Works (PJW), a nonprofit organization that trains, mentors, and advises panel attorneys.  (Doetsch Decl. ¶ 6; Rummel Decl. ¶ 4.)  Active panel attorneys must complete nearly 20 hours of required training sessions through numerous interactive educational videos that provide Minimum Continuing Legal Education (MCLE) credit for the State Bar.  (*Id.*)  This training includes comprehensive ADA training addressing, *inter alia*, how to provide ADA accommodations during client communications and how to represent clients who require the assistance of an interpreter or who have cognitive disabilities.  (Rummel Decl. ¶¶ 6-8.)  Panel attorneys also are required to attend the regular, live MCLE trainings PJW conducts on a variety of topics, including the ADA.  (*Id.* at ¶ 9.)  Panel attorneys also can consult the Board's ADA Compliance Unit to assist with obtaining specific accommodations (*e.g.*, large print materials, sign language interpreters for meetings and hearings, and others) when representing clients with disabilities.  (Doetsch Decl. ¶ 6, Ex. A.)

Panel attorneys are assigned approximately six months before their clients' hearings.  (*Id.* at ¶ 8.)  As explained more fully in the Doetsch declaration, the Board has 16 panels for parole proceedings, and panel attorneys generally participate on only one panel at any given time.  (*Id.* at ¶ 7.)  Each attorney is assigned one week's worth of hearings per month.  (*Id.*)  The program is designed to provide between 7 and 13 clients who will be scheduled for a parole suitability hearing over the course of the one-week period.  (*Id.*)  Panel attorneys are compensated for being available to represent clients during their assigned week.  (*Id.* at ¶ 10.)  During any given week, not all scheduled hearings are held; for example, some hearings are continued and others are waived.  (*Id.*)

For cases assigned and accepted after July 1, 2023, panel attorneys receive $945 for each completed case.  (*Id.* at ¶ 13.)  This amount is set by the California legislature, based in part on the Board's comparative analyses of local attorney rates and the presumption that a panel attorney will expend approximately eight hours on average per client.  (*Id.* at ¶¶ 13-14.)  Although the time

3

required to complete each case varies significantly, panel attorneys are paid the same flat rate, whether the hearing is waived at the outset or held as scheduled. (*Id.* at ¶ 14.) Under the Board's current fee schedule, a panel attorney earns, on average, up to $12,285 per panel. (*Id.* at ¶ 17.)

Panel attorneys are required to conduct a minimum of three legal visits with each client. (*Id.* at ¶ 19.) They must also be familiar with their client's rights and needs for reasonable accommodations under the ADA. (*Id.*) To facilitate this requirement, panel attorneys must maintain an account with the Board's Disability and Effective Communication System (DECS), which identifies and tracks accommodation needs. (*Id.*) When DECS identifies a specific accommodation, such as a sign language interpreter, the panel attorney must employ that accommodation during all parole proceedings, whether during a legal visit or at the parole suitability hearing. (*Id.*)

Panel attorneys must review their client's central file and meet with them within 30 days of accepting the case. (*Id.* at ¶ 20.) This initial meeting lasts one to two hours on average, but varies based on the individual characteristics of each case, and attorneys can meet with the client for longer periods as needed. (*Id.*) If the client is expected to receive a Comprehensive Risk Assessment (CRA) before their scheduled hearing, the panel attorney must prepare them for the CRA interview during the initial meeting by explaining the CRA, its purpose and importance, and how it is used in the parole hearing process. (*Id.*) If a pre-hearing action is submitted to the Board, the panel attorney must document the client's disabilities in DECS, review the client's central file, and meet with the client before that action is submitted. (*Id.*) Panel attorneys must also explain the parole process, how the CRA interview will be conducted, and topics that will likely be covered; discuss prior risk assessments or psychological evaluations; and prepare the client to address potential discussion topics. (*Id.* at ¶ 21.) No later than one week after a legal visit, panel attorneys must enter and upload a Source Document into DECS with notes of the client's need for and use of accommodations to achieve effective communication. (*Id.* at ¶ 20.)

Panel attorneys must conduct a second legal visit either 60 days before the scheduled hearing date or within two weeks of the CRA being finalized, whichever is later. (*Id.* at ¶ 22.) The average length of this visit is one to two hours. (*Id.*) However, panel attorneys can meet

4

with their clients for longer, if needed, based on the individualized characteristics of a case. (*Id*.) Panel attorneys must make every effort to conduct the first or second legal visit in person. (*Id*.) A third legal visit is also required before the hearing, with the length and the timing up to the attorney's discretion. (*Id*. at ¶ 23.) Additional legal visits are permitted, but not required. (*Id*.)

The Board monitors panel attorneys' compliance with the program requirements, regularly auditing their DECS submissions and independently verifying that the three minimum client meetings have been held. (*Id.* at ¶¶ 25-26.) PJW conducts additional monitoring of panel attorneys, and, as detailed in the Doetsch Declaration, the Board's Attorney Complaint Team investigates complaints brought against panel attorneys. (*Id.* at ¶¶ 27-28.)

## II. DEFENDANTS REASONABLY ACCOMMODATE DEAF SIGN LANGUAGE USERS WITH PREPARATION FOR, PARTICIPATION IN, AND FOLLOW UP FROM PAROLE SUITABILITY HEARINGS.

In addition to providing attorney representation, Defendants reasonably accommodate class members with hearing impairments, including those whose primary method of communication is American Sign Language (ASL), by identifying the class member's requested accommodations for the parole suitability hearing, such as a sign language interpreter (SLI), certified deaf interpreter (CDI), real time captioning, written communications, and additional time. (Moeller Decl. ¶ 4.) The Board's Source Documents track accommodations provided during all parole proceedings other than parole suitability and reconsideration hearings, including encounters such as attorney-client consultations and CRA interviews. (*Id.*) The Board provides accurate and effective interpretation services to facilitate equal access and effective communication for deaf signers during all parole proceedings. (*Id.* at ¶ 26.) The Board also provides an information and acronym sheet to all contracted SLIs upon initial assignment. (*Id.* at ¶ 27.) This supplement provides retained SLIs with general information about the different types of parole proceedings, explains the specialized vocabulary and acronyms commonly used during parole proceedings, and notifies SLIs that they can meet with the class member or consult the institutional SLI before any parole hearing to learn more about the class member's known interpretive needs or any sign language vocabulary unique to the class member or the institution. (*Id.*) Additionally, the Board provides CDIs on an as-needed basis or upon request by a class member. (*Id.* at ¶ 28.) The ADA

Compliance Unit contacts the class member's institution to determine whether a CDI is needed whenever a SLI is requested for any parole proceeding. (*Id.*) If a CDI is requested or determined to be necessary, the Board creates a special Source Document noting the need for a CDI at all future parole hearings and documents this accommodation in its special accommodation log. (*Id.*)

Class members who wish to prepare for their parole suitability hearing are reasonably accommodated so they can do so. (Lozano Decl. ¶¶ 28-32.) All standard BPH forms and notices are available to class members at each CDCR institution, and, for deaf signers, the SLIs at the institutions are available to translate the Board's forms and notices into ASL. (Moeller Decl. ¶¶ 6, 8; Lozano Decl. ¶ 29; Strean Decl. ¶ 9.) The Board's contracted SLIs will translate a deaf signer's CRA and hearing transcript into ASL and videotape the translation, if determined necessary based on an individualized assessment of the class member's unique disabilities and needed accommodations. (Moeller Decl. ¶ 8.)[2] Before a hearing, CDCR staff serve various pre-hearing documents and engage with the class member to complete the necessary forms. (Lozano Decl. ¶ 29.) Under CDCR's Effective Communication policy, when staff serve deaf signers with these documents, an institutional SLI is present to interpret. (Lozano Decl. ¶ 29.) As noted above, CDCR SLIs are available to translate documents other than CRAs and hearing transcripts into ASL as needed and upon request. (Lozano Decl. ¶ 29; Strean Decl. ¶ 9.)

Post-hearing, all parole candidates receive a copy of the written hearing transcript. (Moeller Decl. ¶ 9.) When CDCR staff serve the class member with the transcript, an SLI is present to communicate the service. (Lozano Decl. ¶ 29.) Upon request, and based on an individualized assessment of a deaf signer's unique disabilities and needed accommodations, hearing transcripts can be translated into ASL by a Board-contracted SLI, and the translation will be videotaped to provide the class member an opportunity to review the translation for hearing preparation and appeal. (Moeller Decl. ¶ 8.) Any concerns about the quality of interpretation

---

[2] While the Board declines to video record parole hearings, this process allows incarcerated people to have a video transcript of the hearing. Similar to the United States District Court for the Northern District, the limitation on recording is to promote security, and protect the integrity of the Board's proceedings. (USDC ND General Order 58; *see also* Fed. R. Crim. P. 53.)

6

during a parole suitability hearing can be raised by the class member or their attorney through the Board's 1074 grievance process, or via a request for decision review. (*Id.* at ¶ 30.)

Despite the availability of these accommodations, Plaintiffs allege that six deaf signers whose primary method of communication is ASL encountered "disability-based barriers . . . as they attempted to prepare for or participate in parole suitability hearings." (*See* Jackson Decl. ¶ 61.) However, each class member was adequately accommodated. (*Id.* at ¶¶ 99, 102, 108, 112, 114-16, Exs. 63-67.) In fact, four of them were provided both a CDI and a SLI at their parole suitability hearing. (Moeller Decl. ¶¶ 34-37.) While only one class member was found suitable for parole, evidence shows that the remaining class members were denied parole based on factors independent of the asserted disability-based communication barrier. (*Id.* at ¶¶ 32-37.)

For example, DPH[3] class member 1 was represented by a panel attorney and provided two SLIs during his parole suitability hearing. (Jackson Decl. ¶ 99; Moeller Decl. ¶ 32, Ex. L.) DPH class member 1's BPH Form 1073 indicates he did not request a CDI to assist him. (Moeller Decl. ¶ 32, Ex. M.) At his hearing, DPH class member 1 represented, through his appointed counsel, that his ADA concerns had been adequately met such that the hearing could proceed. (*Id.*, Ex. L at 5.) Ultimately, DPH class member 1 was denied parole because of his prior criminal history, lack of self-control at the time of the crime, insufficient self-help efforts, lack of insight into the causative factors of his criminality, and minimization of his criminality—not because he encountered any disability-based barrier to preparing for or participating in his hearing. (*Id.*, Ex. L at 105-09.) Similarly, as set forth in detail in the Moeller Declaration, the other deaf signers identified in the Jackson Declaration received multiple ADA accommodations, acknowledged the adequacy of these accommodations on the record at their hearings, and were denied parole based on the consideration of the requisite statutory factors, not because of ADA violations. (*Id.* at ¶¶ 33-37.)

---

[3] DPH is a designation indicating deaf or severe hearing impairment and requiring written notes, sign language, or lip reading accommodations to achieve effective communication. (*See* ARP I at 3.)

7

**III.    DEFENDANTS REASONABLY ACCOMMODATE BLIND AND LOW-VISION CLASS MEMBERS WITH PREPARATION FOR AND FOLLOW UP FROM PAROLE SUITABILITY HEARINGS.**

Defendants reasonably accommodate blind and low-vision class members to prepare for, and follow up from, parole suitability hearings.  CDCR identifies and tracks blind and low-vision class members through disability placement program designations of "DPV" and "DNV." (*See* ARP I at 3-4; Lozano Decl. ¶ 5.)  DPV class members include individuals who are either permanently blind, or who have a vision impairment not correctable to central visual acuity of 20/200 or better, even with corrective lenses.  (*See* ARP I at 3; Lozano Decl. ¶ 5.)  Individuals who have vision impairment correctable to central vision acuity better than 20/200, and no better than 20/70, with corrective lenses are designated as DNV.  (*See* ARP I at 4; Lozano Decl. ¶ 5, Ex. A.)

CDCR tracks DPV class members' primary form of visual accommodation for written materials, including large print, Braille, magnifier and audio[4] in its Strategic Offender Management System (SOMS).  (Lozano Decl. ¶ 6.)  This data syncs into DECS nightly.  (*Id.*)  The information is accessible in SOMS to authorized CDCR and Board staff; and in DECS to CDCR Correctional Counselors and supervisors, Board staff, and Board-appointed panel attorneys.  (*Id.*)  Board-appointed panel attorneys, and authorized CDCR and Board staff, can review DECS to determine what visual accommodations (*e.g.*, magnifier, large print, audio, or Braille formats) a DPV class member may need to prepare for a parole suitability hearing or complete post-hearing tasks.  (*Id.*)  DPV class members can also submit a written request to the Board for individualized parole-related documents to be generated in a specific format.  (Moeller Decl. ¶ 5.)  The Board's special accommodation log and special Source Documents entered into DECS track these requests and related information.  (*Id.* at ¶¶ 4-5.)

The reading and writing needs of the DPV population are currently accommodated through the use of electronic desktop magnifiers (*e.g.*, Merlin and DaVinci), located within the law libraries at each DPV-designated institution.  (Buenafe Decl. ¶¶ 7, 9.)  These devices enlarge

---

[4] Audio format is referred to as "Read Documents Aloud" in SOMS.  (Lozano Decl. ¶ 6 fn. 1.)

printed text, allow the user to convert printed text into audio format, and allow low-vision individuals to hand-write documents by providing real-time magnification on an electronic display. (*Id.* at ¶ 7.) Accordingly, individuals who require enlarged print and audio accommodations can review printed materials related to their parole suitability hearing preparation using these existing electronic auxiliary aids. (*Id.*) Additionally, DPV class members have access to headphones to ensure privacy of the audio translation of printed text. (*Id.*)

## ARGUMENT

### I.    ADDITIONAL INJUNCTIVE RELIEF IS UNWARRANTED.

Injunctive relief "should be used sparingly, and only in a clear and plain case." (*Gomez v. Vernon*, 255 F.3d 1118, 1128 (9th Cir. 2001) (citing *Rizzo v. Goode*, 423 U.S. 362, 378 (1976)).) A party seeking to modify an injunction must show "a significant change either in factual conditions or in the law warranting modification." (*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1097 (9th Cir. 2021).) And, when enjoining the conduct of a government agency, courts should observe the established rule granting the Government "the widest latitude in the dispatch of its own internal affairs." (*Rizzo*, 423 U.S. at 378-79; *see Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) (observing that any relief ordered should correct "the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures.").) The Prison Litigation Reform Act imposes additional requirements for injunctions, limiting relief to that which is "necessary to correct the violation of the Federal right," is "narrowly drawn," and extends no further than necessary to correct the federal violation and is the least intrusive means necessary. (18 U.S.C. § 3626(a)(1)(A).)

Here, as explained further below, the requested injunction is unnecessary because Defendants reasonably accommodate deaf, blind, and low-vision class members under the ADA.

### II.    PANEL ATTORNEYS REASONABLY ACCOMMODATE AND COMPETENTLY REPRESENT DEAF, BLIND, AND LOW-VISION CLASS MEMBERS.

Board-appointed panel attorneys reasonably accommodate and competently represent their deaf, blind, and low-vision clients. The Court should reject Plaintiffs' counsel's attempt to impugn the professionalism and experience of these attorneys, as well as Plaintiffs' inappropriate

9

request for expansive and unnecessary injunctive relief.

### A.    Panel Attorneys Receive Comprehensive ADA Training.

As an initial matter, Plaintiffs' counsel misrepresent that panel attorneys do not receive "the training necessary to . . . advocate for accessible formats and other accommodations" for their disabled clients (ECF No. 3525 at 27), despite admitting they do not know what the ADA training provided entails (ECF No. 3522 at 27).  As explained, panel attorneys undergo comprehensive, mandatory ADA training.  (Doetsch Decl. ¶ 6; Rummel Decl. ¶ 4.)  This training is ongoing; in addition to hosting mandatory regular Zoom trainings, PJW also hosts Zoom Roundtable discussions every three weeks, during which panel attorneys can ask questions, collaborate, and raise issues they are facing.  (Rummel Decl. ¶ 10.)  PJW has created an extensive database of practice-friendly resources to assist panel attorneys that includes both resources for attorney use and resources attorneys can provide to their clients to assist in client rehabilitation and hearing preparation.  (*Id.* at ¶ 11.)  The database includes resources related to the ADA—some resources created by PJW—and resources created and provided by the Board, which PJW has compiled and made easily accessible in one place.  (*Id.*)

With respect to deaf class members, PJW's trainings inform attorneys how to identify, based on client records and client interaction, that the client may need an accommodation.  (*Id.* at ¶ 12.)  PJW's trainings inform attorneys that not all hearing-impaired clients speak ASL, and interpretation is available for alternative forms of sign language (like alternative sign language dialects or sign-exact language).  (*Id.*)  The trainings also discuss other accommodations and means of establishing communication available in addition to interpreters, including hearing devices, lip reading, and real-time captioning.  (*Id.*)  Additionally, an attorney with sign language expertise is generally appointed to represent deaf class members in all relevant parole proceedings.  (*Id.* at ¶ 13.)  PJW also is in the process of consulting with parole attorneys experienced in representing blind and low-vision clients to design written resources specific to those demographics.  (*Id.* at ¶ 14.)

In sum, training for panel attorneys is comprehensive, ongoing, current, and evolutionary.  (*See id.* (detailing PJW's training program).)  Panel attorneys have access to the resources and

10

information needed to competently accommodate and represent their clients. (Doetsch Decl. ¶ 24).

### B.     Panel Attorneys Are a Reasonable Accommodation for Deaf, Blind, and Low-Visions Class Members.

Plaintiffs' attempt to impugn the ability of panel attorneys to act as a reasonable accommodation for deaf, blind, and low-vision class members (ECF No. 3525 at 27) lacks merit because it is not supported by credible facts or data.

Plaintiffs rely solely upon the mostly irrelevant and entirely speculative testimony of Keith Wattley.[5] (*Id*. at 19-20, 27.) Wattley describes his experience in private practice representing parole candidates, as well as his ideal preparation process, and opines without any factual support that panel attorneys provide less effective representation than private attorneys. (*See generally* Wattley Decl.) Wattley avers that his office "only" represents parole candidates when there are "at least eight months to work with" the candidate before their suitability hearing. (*Id*. ¶ 9.) This is a mere preference, however—not evidence that panel attorneys need additional time to competently represent their clients, and Defendants are not aware of any such evidence. (*See* Doetsch Decl. ¶¶ 8-9 (explaining the timing of attorney appointments).) Wattley's additional opinions are grounded in data compiled about panel attorneys (*Id*. at ¶¶ 38-39, Ex. C), but lack the private-sector control group necessary to draw any meaningful comparison. Thus, Wattley's extrapolations lack adequate foundation, fail to account for significant variables, and render his opinion unreliable. (*See, e.g.*, Wattley Decl. ¶¶ 5, 6, 32, 38.) Nor has Wattley served as a panel counsel or reviewed the training provided to panel attorneys, so his opinions are entirely speculative.

Additionally, the surveys Wattley relies on, produced by his own nonprofit organization, lack foundation and are comprised of skewed data. For example, Wattley states that "[j]ust 7.7% of the [survey] respondents affirmed that their appointed attorney had met the expectations

---

[5] Defendants object to the Wattley Declaration on the grounds that it is an improper use of expert testimony, lacks foundation, uses unreliable methodology, relies upon hearsay, is largely irrelevant to the issues in dispute, and is otherwise inadmissible under Federal Rules of Evidence 401, 402, 403, 702, and 802. (*See also* Civil L. R. 7-3(a) (any evidentiary objection must be contained within a party's opposition brief).)

outlined in the 2020 policy." (*Id.* at ¶ 38.)  But the referenced documents show the survey was sent to 800 "randomly selected incarcerated people," only 201 people responded, and surveyors used unidentified means to filter the response pool down to 142 incarcerated persons — resulting in a 25% response rate and 18% analysis rate.  (*Id.*, Ex. C at 8-9.)  "Non-response becomes a critical issue when response rates fall below 70%," a number much more substantial than the 25% response rate here.  *See* ScienceDirect.com, *Nonresponse Bias,* available at https://www.sciencedirect.com/topics/nursing-and-health-professions/nonresponse-bias (last accessed December 8, 2023)).  Thus, the study is inherently unreliable even without considering that an additional 81% of the survey respondents "did not respond or responded 'unsure'" to some of the questions, further lowering the response rate for individual questions.  (*Id.*)  Yet rather than address this significant deficiency, Plaintiffs simply disregard it as "multiple blank responses that add some noise to this analysis."  (*Id.*, Ex. C at 10-11.)  And critically, the survey reports inadmissible opinion and speculation—about what documents "respondents believed" their attorney had reviewed—as fact to conclude that "just 7.7%" of panel attorneys "met the expectations outlined in the 2020 policy."  (*Id.* ¶ 38, Ex. C at 8-9; *see* Fed. R. Civ. P. 602 (requiring personal knowledge).)  A survey with such minimal data cannot establish the type of substantial deficiency needed to impose systemic relief.  (*See Armstrong*, 622 F.3d at 1071 (system-wide relief was not justified when there was no "substantial" evidence of ADA violations and the evidence was "composed largely of single incidents that could be isolated").)

Since Wattley fails to address or account for these deficiencies, his opinion must be disregarded.  (*See* Fed. R. Evid. 702.)  Plaintiffs proffer no other persuasive evidence to suggest that panel attorneys secure less favorable outcomes for class members, much less that any differences were grounded in accommodation deficits.  Plaintiffs point to a recent legislative report that raised purported concerns regarding representation of parole candidates by state-appointed attorneys.  (*See* Grunfeld Decl. ¶ 12, Ex. E.)  However, the report does not focus on the issue currently before he Court—the representation of parole candidates with disabilities.  (*See id.*)  Nor does it adequately account for the fact that less than 10% of incarcerated persons are represented by private counsel, and these attorneys are significantly less likely to represent parole

12

candidates with significant risk factors.  (*Id.*)

Nor does any evidence support Plaintiffs' claim that panel attorneys spend less time with class members than privately-retained attorneys, or do not adequately protect the procedural rights of their clients during parole hearings.  (*See generally* ECF No. 3525.)  The Board's hearing officers have observed little distinction in the quality of legal representation by private and panel attorneys. (Doetsch Decl. ¶ 18.)  Moreover, the Board has observed that panel attorneys are often more up-to-date on the law, hearing procedures, and prison policies because they represent clients before the Board more often.  (*Id.*)

There is no evidence that panel attorneys provide systemically inadequate assistance to class members by failing to expend sufficient time or by providing less assistance because of their disabilities.  (*Id.* at ¶ 29.)  As explained, the Board sets *minimum* requirements and expectations for panel attorneys that many exceed, and provides training and accommodation resources to assure that panel attorneys competently assist these clients.  (*Id.* at ¶¶ 5-6.)  Panel attorneys also have standards of professional responsibility and ethics as members of the California State Bar in good standing.  (*Id.* at ¶ 5.)

**C.    Panel Attorneys Are Compensated Fairly and Adequately for Their Service.**

The average panel attorney earned $121,362 in 2022 under the Board's current fee schedule.  (*Id.* at ¶ 17.)  Plaintiffs' argument that panel attorneys must be paid more to effectively represent disabled clients is plainly meritless.  (*See* ECF No. 3525 at 28.)

Once again, Plaintiffs rely solely on the speculative and unsupported Wattley Declaration, and disregard the longstanding reality that government-appointed attorneys "simply have never been compensated at the same scale as in private practice." (*Copeland v. Marshall*, 641 F.2d 880, 912 (D.C. Cir. 1980).)  Nevertheless, panel attorneys can reasonably expect to earn on average up to $12,285 per panel.  (Doetsch Decl. ¶ 17.)  Since the 2020 fee-structure increase, no panel attorney has complained to the Board about the rate.  (*Id.* at ¶ 16.)  Nor have Plaintiffs' counsel in this action raised the compensation issue through either their general monitoring of Board processes or individual advocacy letters.  (*Id.*)

13

Regardless, Plaintiffs submit no evidence that panel attorneys provide less competent representation to class members because of their compensation rate, and the mere suggestion they do ignores the thousands of government-appointed attorneys who willingly "accept a lower level of monetary compensation" because they "value other inchoate benefits enough to accept the trade-off," such as "the satisfaction of performing a service to a needy or deserving client or the community, the lucrative goodwill generated by public recognition of that service, and the accretion of knowledge and experience that makes the lawyer better able to charge a higher fee to wealthier clients." (*In re Holocaust Victim Assets Litigation*, No. CV 06-0983 (FB) (JO), 2007 WL 805768, at *34 (E.D.N.Y. Mar. 15, 2007), *report and recommendation adopted*, 528 F. Supp. 2d 109 (E.D.N.Y.), *as amended* (Dec. 14, 2007); *see also Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger*, 387 F. Supp. 991, 997 (D.D.C. 1974) (acknowledging that the thousands of "lawyers who choose the commendable course of serving the public interest rather than building a more remunerative commercial practice cannot expect the same financial awards as such practitioners sometimes achieve.").)

Moreover, Plaintiffs' own evidence undermines their position. (*Compare* Wattley Decl. ¶ 34 (commentary regarding pay differential) *with* Wattley Decl. ¶ 34 n.43 (citing a press release conceding that prior increases that nearly doubled the flat rate fee "did not improve" parole outcomes).) The Board adopted the current fee structure only after conducting extensive research into court-appointed compensation schemes, and analyzing fee structures for similar work at the local level. (Doetsch Decl. ¶ 15.) Plaintiffs fail to show that the current flat rate fee actually creates a disincentive to provide competent, quality representation, much less that it causes panel attorneys to disregard their ethical duties to their clients. (*Id.*) To the contrary, after an extensive evidentiary hearing in 2019-2020, a state superior court concluded there was "no persuasive evidence that the Board's past or present fee structures are inadequate, nor did [petitioner] present any evidence that the Board's past fee structure in fact resulted in representation falling below a reasonable professional standard." (*Id.* (quoting *In re Poole*, No. A154517 (Cal. Ct. App.); No. 96274 (Alameda County Ct.) (Jul. 30, 2020).)

Simply put, Plaintiffs' claim that panel attorneys must be paid more to adequately

14

accommodate and competently represent deaf, blind, and low-vision class members is plainly flawed, and their accompanying request for injunctive relief must be denied.

### III. DEFENDANTS PROVIDE DEAF SIGNERS WITH REASONABLE ACCOMMODATIONS TO PREPARE FOR, PARTICIPATE IN, AND FOLLOW UP FROM PAROLE SUITABILITY HEARINGS.

To justify state-wide relief with respect to the accommodations provided to deaf signers, Plaintiffs must establish a pervasive, systemic, and consistent pattern of injury. (*See Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1122 (9th Cir. 2003).) They have not met this burden. While Plaintiffs argue a lack of video translations of the CRAs, hearing transcripts, and other BPH-related documents render them unable to effectively prepare for and participate in parole proceedings, this conclusion is not supported by competent evidence. (ECF No. 3525 at 24.) Nor have Plaintiffs established that all deaf signers require such an accommodation, or that it is necessary to provide such services automatically, without the class member requesting it.

Defendants reasonably accommodate deaf class members before, during, and after their parole hearings. With respect to hearing preparation, CDCR SLIs are available to translate documents other than the CRA or hearing transcript into ASL for deaf class members who need and request such an accommodation, and perform this service regularly. (Lozano Decl. ¶ 29; Moeller Decl. ¶ 6; Strean Decl. ¶ 9.) This includes translating documents, or portions thereof, multiple times if necessary. (Strean Decl. ¶ 9.) Upon request, and based on a class member's unique disabilities and needed accommodations, hearing transcripts and CRAs can be translated into ASL by Board-contracted SLIs, which the Board will videotape. (Moeller Decl. ¶ 10.) But whether a class member requires such an accommodation requires an *individualized* assessment of the class member's unique disabilities and needs. (Strean ¶¶ 8-10.) For deaf class members who cannot read English, or read English at a low grade level, translation into ASL is a necessary accommodation; class members who can read English fluently, or at a sufficient grade level, may not need ASL translations to access the information in an equal manner, depending upon their unique language needs. (*Id.* at ¶ 8.) Similarly, the need for a CDI to translate complex documents can and should be determined on a case-by-case basis, as some class members have limited experience with CDIs and may not obtain any benefit from them. (*Id.* at ¶ 9.)

15

Additionally, SLIs are present during all panel attorney consultations with class members who require such an accommodation, and can provide further interpretation of a document on an as-needed basis. (Moeller Decl. ¶ 4.)

The Board provides accurate and effective sign language interpretation services to facilitate equal access and effective communication for deaf signers in parole suitability hearings. (*Id.* at ¶ 26.) In addition to SLIs and accommodations such as assistive listening devices, the Board provides CDIs upon request or a finding that a CDI is necessary to accommodate a deaf class member during any parole proceeding to ensure effective communication. (*Id.* at ¶ 28.) Post-hearing, the Board provides written transcripts on an equal basis to all parole candidates, regardless of disability. (*Id.* at ¶ 9.) As described above, Board-contracted SLIs are available to translate hearing transcripts into ASL based upon a class member's individualized needs and request, which the Board will videotape, ensuring class members can review their hearing transcript in an accessible format multiple times. (Moeller Decl. ¶ 30; *see also* 28 C.F.R. § 35.160(b)(2).)

Meanwhile, the Court should reject Plaintiffs' request for an order requiring the Board to videotape parole suitability hearings. (*See* ECF No. 3525 at 24-25.) No controlling legal authority requires an agency to video record testimony provided during a parole hearing as a necessary accommodation. (*Id.*) Moreover, the decision regarding how to preserve a record of parole hearings is a matter of policy and regulation, and must be left to the discretion of the responsible state officials. (*See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) ("[T]he Court's function is not to sit in judgment of the policy choices of state officials.").) And the Board will provide videotaped translations of hearing transcripts to deaf class members upon request, as needed, to ensure equally effective communication. (Moeller Decl. ¶ 30.)

No precedent establishes videotaping as a necessary accommodation in similar contexts, and class members have available accommodations. As noted above, upon request and as needed, a class member will receive a videotaped translation of the hearing transcript, which they can rely upon to support any claim of error during the hearing. (*Id.*) Thus, Plaintiffs' request that all hearings with a SLI be video recorded is not narrowly tailored and is overly broad and intrusive.

16

(*See Armstrong*, 622 F.3d at 1074 ("Injunctions, whether controlled by the PLRA or otherwise, require evidence of rights violations commensurate with the scope of the relief being ordered.").)  Therefore, the relief requested by Plaintiffs must be denied.

**IV.    DEFENDANTS PROVIDE BLIND AND LOW-VISION CLASS MEMBERS WITH REASONABLE ACCOMMODATIONS TO PREPARE FOR AND FOLLOW UP FROM PAROLE SUITABILITY HEARINGS.**

Defendants have a process to identify and provide reasonable accommodations to class members to prepare for parole suitability hearings and complete post-hearing tasks.  Defendants already make all standard blank-template BPH forms and notices—including ADA appeal forms—readily available at every institution in accessible formats, including large print, Braille, and audio.  (Moeller Decl. ¶ 6.)  Additionally, Defendants have a process to provide access to assistive devices that allow blind and low-vision individuals to read and write privately and independently, where possible.  (Lozano Decl. ¶¶ 11-12, 16-20; Buenafe Decl. ¶ 7, 9; Moeller Decl. ¶¶ 7, 9, 11-12.)  Plaintiffs have not shown that systemic deficiencies preclude them from effectively preparing for parole-suitability hearings or complete post-hearing tasks.  Accordingly, the Court should deny Plaintiffs' motion for relief.  (*See* ECF No. 3525-8 at 16-20.)

**A.    Defendants Have a Process for Identifying and Providing Reasonable Accommodations for Blind and Low-Vision Class Members.**

As explained, Defendants have created a process to identify and track the primary visual accommodations of blind and low-vision class members, and are taking additional steps to improve their processes.  (Lozano Decl. ¶¶ 6, 8-10, 12, 14-15.)  To facilitate identification and tracking of class members' reading and writing accommodations without using the existing Request for a Reasonable Accommodation process (CDCR form 1824), Defendants retained the Western University of Health Sciences Eye Care Institute (Eye Care Institute) as vision consultants.  (Lozano Decl. ¶ 12.)  The consultants will conduct individualized face-to-face assessments of each DPV class member to identify the specific alternative formats and auxiliary devices needed to accommodate each class member's unique reading and writing needs.  (*Id.*; Sukhija Decl. ¶¶ 5-6.)  Factors such as the patient's age, education, work history, professional needs, desire to learn, computer literacy, and physical or mental limitations will be assessed to

17

determine the most appropriate accommodations, and DPV class members will be able to test-use the various auxiliary devices that may be recommended. (Sukhija Decl. ¶ 6.) If an electronic auxiliary device is recommended, the DPV class member's assessment will include an individualized training plan for the device(s) that best suits their needs. (*Id.*) This individualized assessment and training will minimize class members' dependence on third parties and help to ensure the class member can read and write independently and privately. (*Id.*)

CDCR has established a schedule to evaluate class members, prioritizing individual assessments of DPV class members with a scheduled parole suitability hearing in 2024 and those housed at the Substance Abuse Treatment Facility (SATF). (Lozano Decl. ¶ 13.) To date, vision consultants completed individualized assessments of four DPV class members housed at SATF, and one DPV class member housed at California Institution for Women. (*Id.*; Sukhija Decl. ¶ 8.)

If, during the individualized assessment, it is determined that printed materials in an alternative format (*e.g.* large print, Braille, or audio) are required, that information will be documented in the SOMS. (Lozano Decl. ¶ 15.) If a DPV class member refuses to be assessed by the Eye Care Institute, the CCHCS provider will document the refusal in CERNER Electronic Health Record System and the local ADA Coordinator or designee will then interview that class member to determine what accommodations are needed, if any, and document that in SOMS. (*Id.* at ¶ 14.) The visual accommodation information entered in SOMS is accessible to authorized CDCR and Board staff, where it can be reviewed to confirm the accommodations needed for a class member to prepare for an upcoming parole suitability hearings and complete post-hearing tasks. (*Id.* at ¶¶ 14-15.)

If specific auxiliary devices are recommended by the vision consultants to accommodate a DPV class member's unique reading and writing needs, the device will be provided to the class members for private use as soon as reasonably possible. (*Id.* at ¶¶ 16-17.) In the meantime, DPV class members' reading and hand-writing needs will be accommodated through in-cell checkout use of a Zoomax Snow 12 electronic assistive device as detailed below. (*Id.* at ¶¶ 18-20.) Pending deployment of these devices at all DPV-designated institutions, the reading and writing needs of DPV class members who have a scheduled parole suitability hearing will be

18

accommodated through the assistive devices already available at their assigned institutions and through the assistance of CDCR library staff.  (Lozano Decl. ¶¶ 21-22; Buenafe Decl. ¶¶ 6-10.)

As Mr. Parker acknowledges, DNV class members can read and write with moderate enlargement of text and CDCR already provides magnifiers suitable to meet the needs of this population.  (*See* Parker Decl. ¶¶ 5-6, ECF No. 3525-5.)  Various non-electronic LED-lighted magnifiers are also available upon request.  (Lozano Decl. ¶ 23.)  DNV class members requesting accommodations beyond the non-electronic magnifiers can make their request through the existing Reasonable Accommodation Request process.  (*Id.* at ¶ 24.)  The DNV class member will be referred to a CCHCS medical provider for an evaluation, who may refer that class member to a vision specialist for further assessment.  (*Id.*)  Since DNV class members' reading and writing needs are reasonably accommodated through corrective lenses and non-electronic auxiliary devices, CDCR does not track alternative formats for printed materials (*e.g.*, large print, Braille, or audio) for these class members.  (*Id.* at ¶ 25.)

Because CDCR already has a process that provides individual assessments by a vision consultant to identify reasonable reading and writing accommodations for blind and low-vision class members, and has a process to provide class members the appropriate auxiliary devices, no additional injunctive relief is required.

**B.    Standard Board Forms and Notices Are Available to All Blind and Low-Vision Class Members in Accessible Formats at All Institutions.**

Copies of the standard blank template BPH forms and notices[6] are readily available to vision-impaired class members in large print, Braille and audio format at the ADA Coordinator's Office or in the law libraries at each CDCR institution, upon request.  (Moeller Decl. ¶ 6.)  The Board's ADA compliance unit completes bi-annual audits to ensure that all of these forms are readily available in accessible formats at each institution.  (*Id.*)  Vision-impaired class members can review these forms with their specific information by using auxiliary devices and assistance

---

[6] These notices include the Notice and Request for Assistance at a Parole Proceeding (BPH Form 1073), Request for Reasonable Accommodations (BPH Form 1074), Petition to Advance Hearing Date (BPH Form 1045-A), Hearing Rights Form (BPH Form 1003), and Notice of Hearing Rights (BPH Form 1002).  (*See generally*, Lozano Decl. ¶ 29.)

of CDCR library staff, as detailed below.  Because Defendants are already in compliance, no additional orders are required.

### C. Defendants Will Provide Blind and Low-Vision Class Members In-Cell Access to Electronic Assistive Devices for Independent Reading and Writing.

CDCR currently accommodates the writing needs of the blind individuals by providing access to scribes such as ADA workers, library staff, and CDCR custody staff.  (Lozano Decl. ¶ 7; Buenafe Decl. ¶¶ 6, 8, 10.)  CDCR acknowledges that some class members may not be comfortable discussing potentially sensitive matters (*e.g.*, the details of their criminal history) with another incarcerated person, and thus may not want the assistance of an ADA worker to scribe documents in preparation of a parole suitability hearing.  (Lozano Decl. ¶ 7.)  Prison policy dictates that CDCR custody staff may only assist incarcerated persons with writing CDCR forms and documents, but law library staff are available to assist with writing non-CDCR documents, such as substance abuse relapse-prevention plans, victim remorse letters, letters seeking support from persons in the community, and summaries of the insight gained from self-help books (aka "book report").  (Lozano Decl. ¶ 7; Buenafe Decl. ¶¶ 8, 10.)

To provide additional accommodations for DPV class members' private and independent reading and writing needs, Defendants will use the recommendations provided by the Eye Care Institute following the class member's individual assessment to provide each class member the auxiliary device(s) recommended to meet their unique needs for their private use as soon as reasonably possible.  (Lozano Decl. ¶¶ 16-17.)  This includes in-cell use of the auxiliary device, and use in other areas of the institution, such as programming areas and education, unless it is determined to be an undue burden or threat to the safety and security of the institution.  (*Id.* at ¶ 16.)  These devices will enable class members to read and review printed materials in accessible formats such as enlarged text, Braille, or audio (text-to-speech), and independently and privately complete writing tasks[7].  (*Id.*)  Individuals whose writing needs cannot be accommodated with

---

[7] For example, when used with a stand, Zoomax Snow 12 assistive device allows for real-time variable magnification of a sheet of paper placed underneath the devices' camera, allowing DPV class members who require magnification to hand-write documents.  (Lozano Decl. ¶ 18.) Laptops with a Windows 10 or 11 operating system have a built-in screen magnification and

these auxiliary devices will have access to "trusted scribes" in the form of library staff, as described above. (Lozano Decl. ¶ 22; Buenafe Decl. ¶¶ 6, 8, 10.)

To accommodate DPV class members' visual needs pending completion of the Eye Care Institute's assessments, CDCR has initiated procurement of 100 electronic auxiliary Zoomax Snow 12 devices. (Lozano Decl. ¶¶ 18-19.) This device has a 12-inch full-HD display, magnification up to 19 times, full-page content scanning with Optical Character Recognition (OCR) text-to-speech[8], and an optional foldable stand that enables real-time magnification for hand-writing tasks. (*Id.* at ¶ 18.) The devices will allow DPV class members who require enlarged font or audio formats to independently and privately review printed materials related to their preparation for a parole suitability hearing, and will allow low-vision DPV class members to complete any desired hand-writing tasks inside their cells. (*Id.*)

As of December 6, 2023, 20 of these devices were distributed for in-cell checkout use by DPV class members at SATF (which houses the largest number of class members currently designated as DPV). (*Id.* at ¶ 19.) The Zoomax Snow 12 assistive devices will be available to DPV class members for in-cell checkout use at all remaining DPV-designated institutions approximately within the next 90 days. (*Id.*)

Pending deployment of the Zoomax Snow 12 devices described above, Defendants will accommodate the reading and writing needs of the DPV class members who are scheduled for a parole suitability hearing through the assistive devices already available to these class members at their assigned institutions, and through assistance from library staff, as described above. (*Id.* at ¶ 21; Buenafe Decl. ¶¶ 6-10.) And the Board will ensure that all DPV class members scheduled for a parole suitability hearing timely receive Board-generated documents related to their parole suitability hearing, specifically hearing transcripts and CRAs, in either large print or audio formats within ten days of class member's written request to the Board for the same. (Moeller Decl. ¶ 13.)

Finally, all blind and low-vision class members currently have access to non-electronic

---

screen reader software that accommodates the writing needs of vision-impaired individuals who require a computer to write. (Sukhija Decl. ¶¶ 10-11.)

[8] The OCR feature enables the user to convert printed text into audio format.

21

assistive devices, including LED-lighted magnifiers capable (in some cases) of magnifying text up to 23 times, for private in-cell use. (Lozano Decl. ¶ 23.) Mr. Parker admits these magnifiers are suitable to meet the reading and writing needs of the DNV population. (*See* Parker Decl. ¶ 6, ECF No. 3525-5.)

Because Plaintiffs acknowledge that DNV class members' reading and writing needs are already adequately accommodated by existing processes, and because Defendants are actively working to improve the visual accommodation options, the Court should decline to intervene and instead allow Defendants to continue implementing their existing plan.

## V. NO INTERFERENCE WITH CDCR'S PERSONNEL DECISIONS IS WARRANTED BECAUSE CDCR IS APPROPRIATELY ACCOMMODATING CLASS MEMBERS.

Plaintiffs fail to demonstrate that a Court order is necessary to redirect CDCR personnel to assist class members with parole hearing preparations or post-hearing tasks. Plaintiffs complain that Defendants have "walked away" from relying on Correctional Counselors to assist with "reading and writing," and seek an order that dictates prison-staffing decisions, but have not shown any systemic deficiency in accommodations tied to Correctional Counselors or staffing decisions. (ECF No. 3525 at 28.) Moreover, no such order is necessary because Defendants are sufficiently meeting their obligations by providing reasonable accommodations to deaf or blind and low-vision class members for reading and writing tasks needed to adequately complete parole-hearing preparation, to grieve ADA violations, and to seek parole-decision review.

Plaintiffs' unreasonable demand for court-ordered staffing requirements is unnecessary, and disregards the accommodation efforts in effect and underway, while they also fail to show that a staffing mandate would better accommodate class members.

Further, Plaintiffs ignore that this Court granted the Court Expert's request for subject-matter experts six months ago, and his pending report will address staffing as it relates to ADA compliance at SATF (a facility with one of the largest class-member populations statewide) as part of the Court Expert's investigation. (ECF Nos. 3483, 3500.) The Court Expert is in the process of reporting on ADA-related positions and SATF's self-monitoring of ADA compliance with the benefit of these retained subject-matter experts that, presumably, have been studying this

22

issue for over six months.  (ECF No. 3539 at 2; ECF No. 3529.)  Plaintiffs offer no legitimate reason for acting outside of this established court-guided process—and bypassing the Court Expert and subject-matter experts' analyses, which could substantially inform statewide policy decisions.  Moreover, Plaintiffs' request for an order directing CDCR's personnel and staffing decisions treads on CDCR's ability to safely and securely manage the day-to-day operations of its institutions.  (*See Bell*, 441 U.S. at 547 (according wide-ranging deference to prison administrators in the adoption and execution of policies and practices that impact prison order, discipline, and security).)  Plaintiffs' request for a further, potentially disruptive, staffing order is not justified.

Significant changes are in progress for most blind/low vision class members, and Plaintiffs' race-to-the courthouse approach based on stale arguments, speculation, and outdated information about library-dependent access to auxiliary devices is not conducive to ensuring class-member accommodation to maximize independence and privacy.  (*See generally*, ECF No. 3525 at 30.)  The requested Court intervention is not narrowly drawn, not grounded in reforms *necessary* to correct the violation of the Federal right, and is overly intrusive.  *See Armstrong*, 622 F.3d at 1074 ("Injunctions, whether controlled by the PLRA or otherwise, require evidence of rights violations commensurate with the scope of the relief being ordered.")  As explained, Dr. Sukhija's individualized assessment of blind/low vision class members are already underway, and it comports with Plaintiffs' recommendation to provide individual assessments.  (Sukhija Decl. ¶ 6; Parker Decl. ¶ 3.)  Indeed, the class-member testimony Plaintiffs submitted shows that class members have sought auxiliary devices to privately and independently read or write, to the extent their disabilities permit, and supports the effectiveness of the accommodations already in place or underway.  (Sukhija Decl. ¶ 6-7, 15; *see e.g.*, Jackson Decl., Exs. 37, 46, 50, 52.)  Hence, Plaintiffs cannot reasonably dispute that CDCR's policy accommodates these class members.

Plaintiffs incorrectly suggest that written release plans, remorse or apology letters, book reports, and other similar works bear more weight on parole suitability decisions, when no single factor is determinative.  In fact, circumstances tending to show parole suitability are broadly defined and include factors that incarcerated individuals—disabled or not—can control to better

23

their chances for parole, including a stable social history, signs of remorse, age, and behavior in custody.  (*See* Cal. Code Regs. tit. 15, § 2281(d), *cf.* § 2281(c) (including as circumstances tending to show unsuitability certain aspects of the commitment offense and the inmate's record of violence).)  Since "all relevant, reliable information available" is considered when determining suitability for parole, any suggestion that a parole suitability determination hinges on a written release plan, book report, or letter, is misplaced.  (*See* Cal. Code Regs. tit. 15, § 2281(b).)  This Court need only review the parole-suitability-hearing transcripts from Plaintiffs' inmate witnesses to confirm a person will not be deemed unsuitable for parole simply because he failed to present a release plan at his hearing.  (Moeller Decl., Ex. B at 106:1-6.); *see In re Criscione* (2009) 173 Cal.App.4th 60, 76 (holding that the lack of adequate parole plans was not indicative of current dangerousness).)  Exaggerating the importance of release plans or writings cannot justify requiring CDCR to designate personnel to assist with these tasks.

Nevertheless, CDCR recognizes the value of these written items, and that a small population of class members may need assistance.  Despite their efforts to discount assistance provided by library staff on the grounds that prison libraries (like libraries in the community) have "limited hours," Plaintiffs ultimately concede that librarians are a "viable option."  (ECF No. 3525 at 28.)  Indeed, librarians and library staff are qualified to assist class members prepare writings included in class member's parole-suitability-hearing preparation.  (Buenafe Decl. ¶¶ 6, 8-10; Lozano Decl. ¶ 22.)  Staff members also are available to assist with pre-hearing letters or reports and post-hearing tasks, not already covered by existing policy, that do not arise to legal advice.  (*Id.*)  This includes assistance writing letters in the preparation of release plans.  (Buenafe Decl. ¶ 8; Lozano Decl. ¶ 33.)

Designated staff members are also available to assist during *Olson* reviews.  Multiple sources of information are used, including the completion of a questionnaire for DPV class members with upcoming hearings, to identify and address unique class-member needs.  (Lozano Decl. ¶ 30.)  This questionnaire both identifies the resources available and what assistance is needed.  (*Id.*)  Staff will be available to navigate computer access, ensure screen-reader functionality, and read hand-written documents not otherwise accessible to DPV class members.

24

(*Id.* at ¶¶ 31-33.)  Staff will also provide guidance on using accessibility features to review and print documents, and to facilitate other tasks related to a parole-suitability-hearing.  (*Id.*)  Additional assistance is available from panel attorneys, who may raise appropriate and timely objections, either through the Board's ADA Compliance Unit, or by submitting a grievance to the Board.  (Doetsch Decl. Ex. A.)  Further, the Board aids with parole placement of class members upon a grant of parole.  (*Id.* at ¶ 24.)

These efforts remain bolstered by existing policy that mandates CDCR personnel utilize effective communication when providing class members with documents related to parole-hearing preparation or post-hearing tasks[9], including reading documents or enlisting a SLI, and all of this remains subject to Plaintiffs' existing monitoring access.[10]  (Lozano Decl. Ex. B.)

These resources provide reasonable accommodations, as is illustrated by DPV Class Member 4's recent experience.  (Jackson Decl. ¶ 86.)  Contrary to Plaintiffs' lop-sided portrayal of Class Member 4's accessibility to release-plan preparation, the Board commended him for presenting a "very strong" and comprehensive release plan before granting him parole.  (Moeller Decl. ¶ 20, Ex. D at 121:20-24.)  The Board recognized his programing, including anger management, GED education, Narcotics and Alcoholics Anonymous, a Braille transcription course, and others to address relevant risk factors.  (Moeller Decl. ¶ 20, Ex. D at 121.)  Thus, CDCR's existing programs are being successfully accessed, as demonstrated by DPV Class member 4's recent experience.  (Jackson Decl. ¶ 86.)  For this reason as well, Plaintiffs' request for injunctive relief should be denied.

## CONCLUSION

For all of the reasons detailed above, and in the supporting declarations, the Court should deny Plaintiffs' motion for an order enforcing the revised permanent injunction.

---

[9] These documents include the service of notice of rights; the service of the post-conviction report; service of the CRA; service of the hearing date, time, and place (BPH Form 1080); completion of the notice and request for assistance at the parole proceeding (BPH Form 1073); request for reasonable accommodation grievance (BPH form 1074); and service of non-violent offender parole review documents.  (Lozano Decl. ¶ 29.)

[10] Plaintiffs have broad access to ensure class-members' needs are accommodated related to their monitoring duties including document production, on-site tours, access to class-member or staff interviews, and the authorization to conduct formal discovery.  (ECF No. 158 at 4, 5.)

25

Dated: December 12, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
SHARON A. GARSKE
Supervising Deputy Attorney General

TRACE O. MAIORINO
Deputy Attorney General
*Attorneys for Defendants*
*Gavin Newsom, Board of Parole Hearings,*
*and CDCR*

CF1997CS0005

26

# CERTIFICATE OF SERVICE

Case Name:   **J. Armstrong, et al. v. Gavin Newsom, et al.**        No.   **C 94-2307 CW**

I hereby certify that on December 12, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1.      DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

2.      DECLARATION OF PRINCIPAL LIBRARIAN BRANDY BUENAFE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

3.      DECLARATION OF HEIDI L. RUMMEL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

4.      DECLARATION OF DEPUTY DIRECTOR JARED LOZANO IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

5.      DECLARATION OF DANIEL MOELLER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

6.      DECLARATION OF SERENA SUKHIJA, O.D., IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

7.      DECLARATION OF I. STREAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

8.      DECLARATION OF TARA DOETSCH IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ORDER TO ENFORCE THE REVISED PERMANENT INJUNCTION [ECF NO. 3525]

I certify that participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on December 12, 2023, at Los Angeles, California.

| | |
|---|---|
| L. Smith | /s/ L. Smith |
| Declarant | Signature |