DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:    (415) 510-3594
Fax:             (415) 703-5843
E-mail: Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

### A. Plaintiffs' Enforcement Motion Regarding Accommodations for Deaf, Blind, and Low-Vision Class Members in the BPH Process

On November 14, 2023, Plaintiffs filed a Motion to Enforce the Court's prior orders in this case related to providing accommodations for deaf, blind and low-vision class members to prepare for parole-suitability hearings and complete post-hearing tasks.  ECF Nos. 3525, 3525-1, 3525-2, 3525-3, 3525-4, 3525-5, 3525-6, 3525-7, 3525-8.  Defendants filed their opposition on December 12, 2023.  ECF Nos. 3543, 3543-1, 3543-2, 3243-3, 3543-4, 3543-5, 3543-6, 3543-7.  Plaintiffs filed their reply, and supporting declarations and exhibits, on December 27, 2023.  ECF Nos. 3554, 3554-1, 3554-2, 3554-3, and 3554-4.  Defendants filed their objections to Plaintiffs' reply evidence on January 3, 2024.  ECF No. 3556.  The Court has permitted Defendants to file a response to Plaintiffs' reply evidence on January 11, 2024, and Plaintiffs may file a response within seven days, thereafter.  ECF No. 3557.

### B. Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class Members

#### 1. Plaintiffs' Statement

##### a. RJD and Five Prisons Orders

Plaintiffs continue to monitor remedial efforts found necessary in order to prevent further violations of the ARP and class members' ADA rights at six prisons including changes to the staff misconduct investigation process and implementation of Audio Visual Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1    Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A,

2    B.

3         Following a year of negotiations, the changes to the staff misconduct complaint

4    process were incorporated into new regulations, and the Notice of Change to Regulations,

5    22-06, was published on April 8, 2022.  On August 11, 2022, Plaintiffs' counsel received

6    written notice that Defendants unilaterally changed regulations stemming from the negotia-

7    tions.  Specifically, Defendants removed from regulations the Allegation Decision Index

8    ("ADI"), the negotiated tool to be used by CDCR in deciding which staff misconduct

9    complaints were sufficiently serious to warrant referral to the Office of Internal Affairs

10   ("OIA') for investigation.  Defendants nevertheless agree the ADI will continue to apply at

11   the six prisons currently covered by Court order per Remedial Plan requirements.

12        Defendants have also begun quarterly production of documents in compliance with

13   the Court's Orders.  Plaintiffs have produced multiple reports identifying ongoing failures

14   to hold staff accountable for misconduct.  Plaintiffs' reports evidence incomplete and

15   biased investigations that thwart the discovery of misconduct and, even when misconduct

16   is apparent during the investigation, poor decision-making on the part of Hiring

17   Authorities, preventing accountability.  Most recently, Plaintiffs reported on serious

18   concerns regarding the screening of staff misconduct complaints.  *See* December 13, 2023,

19   Letter from Ben Bien-Kahn attached hereto as **Exhibit A**.  In response to ongoing reports

20   of problems, "[t]he Court Expert will be working with the parties to develop a

21   methodology for reviewing individual cases in a manner that will allow the parties to reach

22   agreement on shortcomings and craft solutions."  ECF No. 3477 at 4.  Plaintiffs remain

23   hopeful that this process will result in needed changes.

24        CDCR is a statewide system.  Plaintiffs assert that violations of the ADA and ARP

25   found thus far at six prisons exist system-wide and are committed to bringing such

26   evidence before the Court until all class members are protected.  Plaintiffs continue to

27   discuss with Defendants the implementation of their Early Warning System (EWS) to

28   guard against such widespread abuse by one officer.  Plaintiffs remain optimistic that the

EWS can act as a tool to identify and root out staff misconduct before serious problems arise and are currently awaiting a written response from Defendants to problems that have been identified prior statements.  *See* ECF 3526, Exhibits B and C.  The parties are continuing negotiations.

### b.     False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.

Defendants have agreed to multiple changes, but Plaintiffs continue to raise outstanding problems.  Most concerning, Defendants have notified Plaintiffs that after further consideration they will not be identifying when an incarcerated person receives an RVR within a certain period of time after having filed a staff complaint.  Defendants assert that, when that happens, incarcerated people can simply file an additional staff complaint. But this is unlikely to occur in most cases for many reasons, including fear of further retaliation.  The onus is on CDCR to discover and root out this pervasive form of retaliation if they are serious about ensuring the effectiveness of the staff complaint process.

Further, the issuance of RVRs to incarcerated people for filing staff complaints after

1   the complaint is not confirmed remains a significant problem.

2        Plaintiffs are hopeful that the parties can agree to resolve problems and that

3   additional court intervention will not be necessary.

4        **2.**      **Defendants' Statement**

5             **a.**      **RJD and Five Prisons Orders**

6        Notwithstanding Plaintiffs' concerns and objections related to the recent revisions

7   to the staff-misconduct processes, CDCR's staff-misconduct investigations and discipline

8   processes are in compliance with this Court's orders applicable to the six prisons, as well

9   as the comprehensive and effective remedial plans.  ECF Nos. 3059, 3060, 3217, 3218, and

10  3393.  CDCR has dramatically overhauled its processes to ensure unbiased and complete

11  investigations and, although not required by the Court's orders, Defendants have deployed

12  statewide the processes that restructure CDCR's staff misconduct allegation, screening,

13  referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-

14  upon measures constitute substantial improvements that will go a long way to bringing

15  Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at

16  2.  The Court found, the "implementation of these [] remedial measures is likely to have a

17  positive impact on…the overall reliability of the outcomes of investigations." *Id.*, at 15.

18  Defendants continue to put forth tremendous effort and resources to ensure the successful

19  deployment of these statewide processes and will continue to coordinate efforts with

20  stakeholders as these new processes are further developed.

21            **b**.      **Demands for RVR Reform**

22       Defendants have made significant progress and commitments to address Plaintiffs'

23  demands that CDCR address the alleged practice of issuing false and retaliatory Rules

24  Violations Reports (RVRs) to class members, as detailed in previously filed statements.

25  *See* ECF Nos. 3412 at 14-16, 3526 at 7, 8.  Defendants will continue discussions with

26  Plaintiffs and the Court Expert, to further address Plaintiffs' concerns related to the RVR

27  process noted above, and to further discuss CDCR's extensive proposed revisions to the

28  extent such revisions are specifically related to class-member concerns.  CDCR continues

1    to address these issues during the parties' workgroups and to seek collaborative resolution

2    of RVR issues specifically related to class-member accommodation or alleged

3    discrimination or retaliation to the extent it is required to do so under the remedial plans,

4    the ADA, or prior court orders.  Plaintiffs' general complaints about the RVR process,

5    unrelated to class-member accommodation, are not properly raised in this case.

6    **C.      Court Expert Investigation Into SATF, the State's Largest Prison**

7            **1.      Plaintiffs' Statement**

8            In November 2021, this Court ordered the Court Expert to investigate the treatment

9    of people with disabilities at the California Substance Abuse Treatment Facility and State

10   Prison, Corcoran (SATF).  ECF No. 3338.  In December 2022, the Court Expert filed a 67-

11   page report, finding that people with disabilities at SATF are "living diminished and need-

12   lessly difficult lives," and as a result "face harsher prison conditions, and thus greater pun-

13   ishment, than their peers."  ECF No. 3446 at 4.  People with disabilities were denied

14   accommodations needed to safely and independently perform a wide array of activities,

15   including to eat, perform bodily functions, write, and participate in rehabilitative programs.

16          On February 24, 2023, the Court ordered additional review and action by the Court

17   Expert, including a much-needed staffing analysis, development of policies to ensure safe

18   housing of people with disabilities, and another report on conditions at SATF.  ECF

19   No. 3467. The Court Expert filed his second report on August 24, 2023, finding that

20   CDCR had failed to address many of the concerns in his first report, and on November 28,

21   2023, the Court Expert filed a third report documenting continued lack of progress by

22   CDCR and recommending further action by the Court.  ECF No. 3529. The Court issued a

23   stipulated order on December 7, 2023, which requires, among other things, that CDCR

24   develop policies to address problems that had been identified by the Court Expert almost a

25   year before.  ECF No. 3538.

26          Plaintiffs are glad that there finally is a plan to draft policies on several important

27   issues, develop meaningful auditing mechanisms, and procure needed disability

28   accommodations.  Plaintiffs, however, are discouraged that it required a Court order and

1   that CDCR did not take these actions in response to the Court Expert's report filed a year

2   ago – and, in fact, had steadfastly ignored these very issues **for years**, notwithstanding

3   Plaintiffs' repeated reports and demands for action.  *See* ECF Nos. 3510-1, 3510-2, 3510-

4   3.  It should not take a Court-ordered investigation, three reports by the Court Expert,

5   multiple rounds of briefing by the parties, and multiple orders by the Court to compel the

6   State to act in the face of undisputed violations of the ADA and ARP.  *See* ECF No. 3467

7   at 2 (adopting Court Expert's undisputed findings); *Armstrong v. Brown*, 768 F.3d 975,

8   984-85 (9th Cir. 2014) (finding that Defendants were not fulfilling their obligations where

9   they took action only in response to litigation).

10          Since the Court Expert's first report, Plaintiffs have reported that many of the

11   problems identified by the Court Expert at SATF can be found statewide.  Plaintiffs also

12   have reported other serious violations of the ADA and ARP at SATF.  It is critical that

13   Defendants immediately and fully address these issues and not wait to act only after

14   expensive and resource-intensive litigation.

15          **2.      Defendants' Statement**

16          The Court Expert filed his second report concerning the treatment of people with

17   disabilities at the SATF recognized the numerous proactive measures implemented at

18   SATF to further respond to the needs of incarcerated people with disabilities.  ECF No.

19   3500.  The report demonstrates that the coordinated efforts between CDCR and the

20   California Correctional Health Care Services (CCHCS), with the Court Expert's guidance

21   and with input from Plaintiffs, are working to effectively respond to the issues raised by

22   the Court and addressed by the Court Expert following his initial investigation. The Court

23   Expert now reports that SATF has made "significant improvements in the delivery of

24   accommodations to class members" and that "the culture at SATF has improved," since his

25   first report.  ECF No. 3500 at 4, 6.  As noted in the report, class members have reported to

26   the Court Expert, through personal interviews and survey responses, "improvements in

27   their ability to get the accommodations they needed and in the attitudes of staff."  ECF No.

28   3500 at 4.  The Court Expert reports that through these responsive collaborative efforts,

SATF has significantly improved the process for receiving incarcerated people from other institutions and has reduced the likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities. *Id*. The Court Expert further reported that SATF has improved the process for collecting and handling patient requests for medical care (Form 7362s), has improved the processes for issuing, repairing, and replacing DME (including through the successful relaunch of its in-house wheelchair repair program), and has significantly improved the delivery of medical supplies, such as incontinence supplies, to class members. *Id*. Furthermore, the Court Expert states that "the current leaders and staff are to be given credit for the significant effort they made to address the problems" identified in the first report. ECF No. 3500 at 5.

In response to this Court's order, the Court Expert issued a November 28, 2023 Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF to which the parties entered into a stipulation addressing multiple issues. ECF Nos. 3529, 3538. Following the parties' stipulation, the Court issued its order setting deadlines for the further development, with Plaintiffs' input, of policies addressing various issues at SATF, including whiteboard captioning technology, accessible phones, and effective communication of announcements and, therefore, addressing Plaintiffs' concerns noted above. ECF No. 3538. Defendants look forward to collaborating with Plaintiffs and the Court Expert to address and resolve these remaining issues at SATF.

**D.     Accommodations for Deaf and Hard-of-Hearing Class Members**

**1.     Plaintiffs' Statement**

Defendants for years have failed to provide adequate disability accommodations to people who are D/deaf and hard-of-hearing who, as a result of their disability have lived in significant isolation; they have not been able to meaningfully participate in prison programs, services, and activities and have not been able to maintain ties with loved ones. The few recent, halting steps forward in certain areas primarily are the result of this Court's order for an investigation of conditions at SATF and resulting orders to remedy ADA and ARP violations discovered during that investigation.

**CART.**  Defendants have backtracked on their assurances to this Court that CART would be expanded to programming at eleven prisons.  In September 2023, Defendants explicitly represented to the Court that CART will be "expanded to rehabilitative sponsor led programs, religious services, mental health treatment groups, and substance use abuse treatment."  ECF No. 3504 at 11-12.  In early October, they doubled down on this representation, stating that "Phase Two will expand CART to *all* programming areas at SATF and at the ten other institutions."  ECF No. 3515 at 14 (emphasis added).  But on November 21, 2023, Defendants informed Plaintiffs' counsel—for the first time—that they have no intention to expand CART in the ways described to this Court, or at all.

Instead, they said they now plan to use auto-captioning on a "ViewSonic captioning whiteboard," which apparently has been in their possession for years and which they have not tested against other forms of auto-captioning—such as Teams and WebEx— that have already proven to be ineffective.  Indeed, when Defendants decided to use ViewSonic instead of following through with promises to the Court, Defendants admitted that they had not tested whether the ViewSonic is an equally effective alternative to CART through any objective means and could not explain whether or how their latest auto-captioning proposal would avoid the pitfalls of their prior ones, including how accurate it would be, whether CDCR-specific terms could be preloaded into it, how many lines of text could be viewable at a time, and whether the font size and type could be adjusted to accommodate people with vision disabilities (features commonplace with CART).  Despite their abrupt and unilateral decision to revoke expansion of CART to any programs at any institutions, Defendants have not filed errata or sought to correct their multiple misrepresentations to the Court regarding CART, and deaf people who require captioning at SATF and statewide are still excluded from prison programs, services, and activities.  Defendants have not made any attempt to explain how their last-minute alternative is equally effective to CART—as is their burden—by any objective measure.

On December 7, 2023, this Court ordered that by February 5, 2024, Defendants must provide Plaintiffs with a demonstration of the ViewSonic whiteboard in multiple

institutional settings and to "have a subject matter expert present at the demonstration to answer Plaintiffs' questions regarding the capabilities of the white boards' captioning technology." *See* ECF No. 3528 at 8.  The Court ordered the parties to meet and confer following the demonstration, with the assistance of the Court Expert.  Plaintiffs hope that the parties can resolve their concerns through this process.  If not, additional judicial intervention likely will be required.

**Hearing Aids.**  Plaintiffs received a copy of CCHCS's bid proposal and service specifications for provision of new hearing aids on November 15, 2023.  The specifications in that bid are largely reflective of the specifications that CCHCS and Plaintiffs negotiated with the assistance of the Court Expert, *see* ECF No. 3526 at 11-12. Plaintiffs await the results of the bid process and will monitor implementation to ensure it is timely and finally remedies the longstanding needs of people using inadequate hearing aids.

**Accessible Phones**.  D/deaf and hard-of-hearing people continue to be denied equal access to phone services.  Access to captioned phones and TTY/TDDs continues to be an urgent issue due to lack of accessible placement, burdensome restrictions, equipment failures, and other logistical barriers. To access a captioned phone at San Quentin Rehabilitation Center, for example, an elderly deaf class member with serious medical conditions must travel some distance from his housing unit and stand outside, in the rain, wind, and cold, to use a captioned phone that is placed outside on a garbage can for him to use.  This is the same class member who the Court Expert, in a report filed a year ago, explained already had "lost touch with family members outside of the institution due to a lack of disability accommodations," and in particular CDCR's failure to ensure equal phone access.  *See* ECF 3446 at 40.  That this issue remains is simply unacceptable.

On December 7, 2023, Defendants produced Local Operating Procedures (LOPs or OPs) for eighteen institutions with updated provisions related to captioned phones, TTYs, and/or TDDs.  According to Defendants, policies had not yet been finalized for the remaining institutions, although Defendants previously informed the Court that these

policies would be updated with revisions by November 3.  *See* ECF 3526 at 17.  These LOPs suffer from the same core defects that Plaintiffs have raised numerous times, which create disparity between hearing people and d/Deaf and hard of hearing people: They are exclusively located in areas that are difficult to access or typically off-limits, such as officer and lieutenant offices, and are often physically locked away;[2] they include a heightened level of staff control and interference than "regular" phones;[3] and they lack privacy typically afforded to calls, including by requiring real-time oversight and intervention into calls.[4]  Numerous LOPs fail to state that accessible phones will be freely accessible in housing units, and when housing units are mentioned, the phone is often in a restricted location such as the officer's Control Booth.

The Court has ordered Defendants to install captioned phones in the housing units at SATF.  ECF No. 3538 at 7.  On January 8, 2024, Defendants indicated their intention to install captioned phones in the housing units at all institutions, using a "similar timeline" as enumerated for SATF.  However, Defendants have indefinitely postponed disclosure of any timelines or information about statewide rollout of accessible phone installation until after they have complied with the Court's requirements for SATF.

Lastly, Defendants have not made the phone call feature on tablets accessible for D/deaf and hard-of-hearing people or proposed an equally effective alternative way for D/deaf and hard-of-hearing people to make calls to their loved ones.  Hearing people can call their loved ones on their tablets at their convenience and from their cell, including during periods of lockdown.  D/deaf and hard of hearing people do not have this option.  Moreover, hearing people can use their tablets to place video calls to loved ones when

---

[2] *See, e.g.*, Sierra Conservation Center LOP ("Caption phones have been installed in the Facility A, B, and C Lieutenant Offices.").

[3] *See, e.g.,* Calipatria State Prison OP ("The inmate's assigned CCI will call family to arrange date and time of TDD call . . . [i]n the event of an inmate family emergency. . . the emergency must be verified").

[4] *See id.* ("Position the caption phone in a manner that is easily seen and read by [] staff monitoring the call. Should the call time run out or the conversation become inappropriate, warn the inmate and if necessary, terminate the call").

connected to a kiosk, usually available in the dayroom.  D/deaf and hard of hearing people cannot make video calls, as hearing people do, due to lack of accessible video call programming on tablets. Plaintiffs look forward to providing input into accessibility features for tablets in the next statewide contract, consistent with the Court's Order.  *See* ECF No. 3538 at 7.  Lack of accessible calling features on tablets has long created significant disparities between hearing people and D/deaf and hard of hearing people, and accessible video calling is a necessary component of any tablet programming at CDCR.

**Effective Communication of Announcements.**  There remains no robust and durable system to provide and audit effective communication of announcements, which continues to be a significant issue for D/deaf and hard of hearing individuals.  Defendants shared a draft tablet notification policy with Plaintiffs that, if successful, will only be a partial solution to a much larger problem.  Plaintiffs have significant concerns about the limited scope and utility of the proposed policy, which applies only to a very narrow subset of announcements, *see* ECF 3526 at 13, as well as the lack of clear policies regarding tablets in general.  In fact, when Plaintiffs requested information about class member access to tablets, including where tablets are allowed to be and whether there is "any information generally on class member access to tablets," Defendants simply responded, "There is no current policy that has been implemented." Plaintiffs look forward to future discussions with Defendants and the Court Expert on this issue.

**2.      Defendants' Statement**

Plaintiffs' foregoing critique fails to capture the tremendous internal effort and attention being put forward to accommodate this population and, at this juncture, seems particularly sharp-elbowed in light of the significant overlap of these issues—CART, accessible phones, and effective communication of announcements—and the parties' recent stipulation following the Court Expert's November 28, 2023 Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF that addressed these issues.  ECF Nos. 3529, 3538.  Following the parties' stipulation, the Court issued its order setting deadlines for the further development, with Plaintiffs' input, of policies addressing

various issues at SATF, including whiteboard captioning technology, accessible phones, and effective communication of announcements, therefore, addressing Plaintiffs' concerns noted above.  ECF No. 3538.  Defendants' further efforts to accommodate this population are detailed in previously filed statements.  *See e.g.*, ECF No. 3526, at 16-18.  Plaintiffs' myopic attachment to CART as demonstrated above, fails to acknowledge the unprecedented implementation of policy that provides these class members with up-to-the-minute technology to enhance their day-to-day lives and further ensure access.  Overall, there are approximately 84 DPH class members statewide and their preferred effective communication is sign language or other methods.  As of January 8, 2024, there are twelve DPH class members, statewide, whose primary or alternate means of effective communication is written notes.  Beginning the week of November 20, 2023, CDCR began deployment of iPhone and iPad devices equipped with the translate app and the live captioning accessibility feature to DPH class members whose primary or alternative method of communication is written notes, to include those who use sign language.  Class members who received an iPhone or iPad are approved to have the device within their possession during program, services, activities, and housing unit settings, including restrictive housing and any off-site appointments (*e.g.*, medical, same-day court appearances).  This device is helpful  for informal day-to-day interactions to help DPH class members participate in programs, services and activities.  Moreover, in accordance with CDCR's independent obligation to identify and remedy issues as they develop and to further accommodate those in its custody, CDCR periodically conducts informal demonstrations, tests, or other events to, among other things, gain insight from incarcerated people, identify logistical or technical obstacles, gain differential data or information, and identify or resolve potential security concerns.  Mindful that the Court ordered Defendants "make CART or an alternative reasonable accommodation available at SATF," CDCR has explored technological alternatives to CART.  During a November 21, 2023 workgroup meeting with Plaintiffs, CDCR reported on then-recent testing to compare CART to ViewSonic.  CDCR reported to Plaintiffs that during such a test, the instructor

was approximately ten feet from the ViewSonic and that there was no issue capturing the instructor's voice.  CDCR reported to Plaintiffs that results from this test favored ViewSonic over CART, for accuracy.  During this meeting, CDCR offered to provide a demonstration of this technology and such a demonstration is scheduled for January 30, 2024, at San Quentin.  More recently, on December 6, 2023, CDCR conducted an informal demonstration of CART and ViewSonic along with six class-member volunteers at San Quentin.  Class members were able to observe and compare the various features of these technologies.  Insight gained from the experience suggests that ViewSonic is an equally effective alternative to CART.  As to accessible phone calls, Plaintiffs are conflating various sub-populations because hard-of-hearing class members (as opposed to Deaf, non-signers and Deaf signers when calling people who do not sign) are able to use their hearing aids and volume controls to use the telephones to make and complete calls outside of the institution.  Similarly, it is not true that all deaf and hard of hearing people cannot make video calls using kiosks because Deaf or hard of hearing people that can sign or the DNH population, who can hear with hearing aids, can make video-calls.

Meanwhile, to the extent that Plaintiffs raise individual-advocacy concerns, Defendants will respond in the proper forum in accordance with CDCR's newly deployed advocacy-response process.  Defendants remain committed to providing class members equal access to programs, services, and activities in accordance with the ADA and the ARP and will continue to confer with stakeholders to ensure the further accommodation of this population.

**E.      Accommodations for Blind and Low Vision Class Members**

**1.      Plaintiffs' Statement**

The parties formed a workgroup to address issues facing blind and low-vision class members.  The workgroup covered, among other things, reading and writing accommodations, orientation and mobility training for blind and low-vision class members, accommodations assessments and skills training, braille literacy, availability of white canes, accessibility of the ViaPath tablet program (including training), and

1   photophobia accommodations.

2       Plaintiffs sent a December 10, 2021 demand letter regarding the need for a

3   statewide system for identifying, documenting, and providing reading and writing

4   accommodations for blind and low-vision class members.  As Plaintiffs explained in the

5   demand letter, Defendants must (1) identify, track, and produce the accessible formats of

6   written materials (such as large print, braille, and audio) that blind and low-vision class

7   members need to read and write (a statewide request first made by letter on March 15,

8   2021) and (2) make auxiliary aids for reading and writing—such as electronic video

9   magnifiers—available to these class members outside restricted locations and hours.

10      On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants

11  to resolve disputes between the parties regarding the need for reading and writing

12  accommodations for blind and low-vision class members.  The parties negotiated the terms

13  of the stipulation from that point until November 2023.  In November 2023, after Plaintiffs

14  filed their motion challenging Defendants' failure to adequately accommodate blind and

15  low-vision class members and deaf and hard of hearing class members preparing for their

16  Parole Board Hearings, Defendants promptly ceased negotiations over the draft blind/low-

17  vision reading and writing accommodations stipulation and cancelled future meetings of

18  the blind and low-vision work group.  At present, there are no scheduled meetings of the

19  blind and low-vision workgroup, and there are no meetings scheduled to continue

20  negotiations over the blind and low-vision reading and writing accommodations

21  stipulation.  Notably, however, even if successful, Plaintiffs' BPH motion would not

22  address all issues that the blind and low-vision reading and writing accommodations

23  stipulation aims to address.

24      In December 2023, Defendants began to conduct low-vision individual assessments

25  of blind and low-vision class members at SATF.  Plaintiffs are taking steps to monitor

26  these individualized assessments.  Defendants, however, have not responded to Plaintiffs'

27  repeated requests to meet and confer regarding these individualized assessments so that

28  Plaintiffs can determine the extent to which they accommodate blind and low-vision class

members' reading and writing needs.  From the limited information that Defendants

disclose in their statement, it is apparent that Defendants still do not have a comprehensive

plan for reasonably accommodating these class members' needs. In their statement,

Defendants report no efforts to purchase electronic writing devices for blind and low-

vision class members who cannot write by hand; no plan to enable class members to

readily print out what they draft on any issued electronic writing devices; no plan to ensure

that blind and low-vision class members who cannot write by hand can fill out CDCR

forms electronically or in any other accessible manner; no plan to provide critical,

individualized training to blind and low-vision class members on how to use the assistive

devices recommended for them by the vision consultant; no plan to require a prompt

timeframe by which individualized assessments must occur and by which class members

must be issued their recommended assistive devices; and no plan to address numerous

issues that the parties had been negotiating in a stipulation for over a year.

    **2.**       **Defendants' Statement**

       Defendants acknowledge that Plaintiffs requested a meeting to discuss the nature of

documentation generated by the Eye Care Institute vision consultants related to the

individualized assessments of DPV class members.  On January 3, 2024, Defendants

responded to this request by pointing out to Plaintiffs that their current pending motion to

enforce the revised permanent injunction ECF No. 3525 effectively covers all of the topics

discussed in the blind and low vision workgroup and stipulation.  Defendants have

requested that Plaintiffs identify any topics or items that Plaintiffs believe are not covered

by their motion.  To date, Defendants have not received any response from Plaintiffs that

identifies topics in need of further discussion.

       Nevertheless, since receiving the Plaintiffs' demand letter on December 10, 2021,

Defendants have made remarkable progress to further accommodate the blind or low

vision incarcerated population as detailed below and in the Defendant's recent filings with

the Court.  Defendants believe, however, it is no longer necessary to continue discussions

related to Plaintiffs' proposed stipulation in light of newly drafted or imminent policies

1  and the anticipated individual assessment of DPV class members' unique disabilities.[5]

2  Defendants look forward to further collaboration in the future to address the needs of this

3  population.

4        To facilitate identification and tracking of DPV class members' reading and writing

5  accommodations without using the existing Request for a Reasonable Accommodation

6  process (CDCR form 1824), California Correctional Health Care Services (CCHCS)

7  retained the Western University of Health Sciences Eye Care Institute (Eye Care Institute)

8  to conduct individualized face-to-face assessments to identify the specific visual

9  accommodation (*e.g.*, auxiliary devices, alternative formats) each DPV class member

10  needs to accommodate their unique reading and writing needs.  *See* ECF No. 3543-5 at ¶

11  12; and *see* ECF No. 3543-6 at ¶¶ 5-6.  DPV class members' individualized assessments

12  began on December 7, 2023, and the Eye Care Institute vision consultants have already

13  assessed four DPV class members housed at SATF and one DPV class member housed at

14  California Institution for Women (CIW).  *See* ECF No. 3543-5 at ¶ 13; and *see* ECF No.

15  3543-6 at ¶ 8.  Additional assessments have been conducted during the week of January 8,

16  2024, and are currently scheduled up to January 17, 2024.  If, during their individualized

17  assessment by the Eye Care Institute, a DPV class member is determined to require an

18  auxiliary device or an alternative reading format this information will be documented in

19  SOMS.  *See* ECF No. 3543-5 at ¶ 15.

20        If the Eye Care Institute vision consultants recommend an auxiliary device to

21  accommodate a DPV class member′s reading and writing needs, CDCR will issue the

22  auxiliary devices recommended for the class member's private use as soon as reasonably

23  possible following CDCR's receipt of the vision consultants' recommendation.  *Id.* at ¶ 16.

24

---

[5] Defendants' continued efforts to accommodate class members is further evidence that the
25  stipulation is not warranted.  For example, recently a directive was issued authorizing
voluntary overtime for Correctional Counselors (I) to assist *Armstrong* II class members
26  with DPV, DPH, DDP codes with pre-release planning, to provide extra time to these class
members to complete *Olson* reviews, and to provide other effective communication needs
27  to prepare for suitability hearings before the Board of Parole Hearings. To the extent that
this crosses over with the requirements in the SATF stipulation (ECF No. 3538 at 4)
28  Defendants will provide the required updates.

This includes in-cell use of the auxiliary device, and use in other areas of the institution, such as programming areas and education, unless it is determined to be an undue burden or threat to the safety and security of the institution.  *Id.*  To ensure that following the vision consultants' assessment and recommendation, recommended assistive devices are provided in a timely manner to the assessed DPV class members, CDCR has initiated procurement of the following assistive devices: five LyriQ Text-to-Speech Readers; 20 Ruby XL HD video magnifiers; five Ruby 5 video magnifiers; 20 Mattingly hand-held illuminated magnifiers with six-time magnification; and 20 Mattingly stand illuminated magnifiers with six-time magnification.  *Id.* at ¶ 17.  The supply of assistive devices will be held at CDCR Headquarters and will be replenished upon the recommendation of and in consultation with the Eye Care Institute vision consultants.  *Id.*

Pending completion of the DPV class members' individualized assessments by the Eye Care Institute vision consultants, DPV class members' independent and private reading and hand-writing needs will be reasonably accommodated through in-cell check-out access to Zoomax Snow 12 electronic assistive devices discussed in detail in the declaration of Deputy Director Jared Lozano in support of Defendants' opposition to Plaintiffs' motion for order to enforce the revised permanent injunction (*see* ECF No. 3543-5 at ¶ 18).  CDCR has initiated procurement of 100 Zoomax Snow 12 assistive devices for distribution at all DPV-designated CDCR institutions for in-cell use of DPV class members on a check-out basis.  *Id.* at ¶ 19.  As of December 6, 2023, 20 Zoomax Snow 12 devices were delivered for DPV class members' use at Substance Abuse Treatment Facility, which currently houses the largest number of DPV class members.  *Id.* The Zoomax Snow 12 assistive devices will be available at the remaining DPV-designated institutions within approximately 90 days of December 11, 2023.  *Id.*

CDCR is working to address the other issues covered by the draft blind and low-vision reading and writing accommodations stipulation through internal policies and directives.  On January 4, 2024, CDCR issued a memorandum titled "Implementation of Electronic Magnifiers for Incarcerated Persons with a Permanent Vision Impairment", a

true and correct copy of which is attached hereto as **Exhibit B**.  CDCR further committed to the January 2024 issuance of a memorandum directing provision of various printed materials to DPV class members in alternative formats such as large print and Braille, and the tracking of DPV class members' visual accommodations (following individualized assessments) in SOMS.  *See* ECF No. 3543-5 at ¶ 10.

**F.     Effect of the COVID-19 Pandemic on the *Armstrong* Class**

On July 25, 2023, CCHCS issued a memorandum instructing institutions that they are no longer required to keep vacant the approximately 6,700 beds that had been identified for quarantine and medical isolation housing, and that this space will revert back to general population housing.  This has served Defendants' efforts to reduce the number of class members on the expedited transfer list, notwithstanding remaining obstacles detailed in previously filed Joint Case Status Statements.  ECF Nos. 3369, 3391, 3412, 3452, 3484.  As of January 8, 2024, there were 25 non-reception center class members on the expedited transfer list awaiting expedited transfer, which is similar to pre-pandemic numbers.  Plaintiffs applaud Defendants' efforts to return the number of inaccessibly housed class members to pre-pandemic levels, and are hopeful that the significant reduction will be sustainable.

**G.     Problems Regarding Access to Assignments for Class Members**

The program-access workgroup continues to meet to discuss credit earning, the assignment process, and disparities in the program-access assignment data in response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 13-14.  The parties met most recently with the Court Expert on December 6, 2023.

**H.     Statewide Durable Medical Equipment Reconciliation**

**1.     Plaintiffs' Statement**

Defendants have agreed to ensure that anyone who had not been seen by a health care provider in the last year would be seen for the purpose of reconciling their DME.  The only outstanding issue then is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually.  Defendants maintain

that this is already a requirement during visits with Primary Care Providers, yet thousands of class members without needed DME were identified by Defendants, despite this existing requirement.  A process for ensuring that staff actually reconcile DME during encounters is necessary.

Unfortunately, Defendants' disability tracking system still fails to identify and track class members with upper-extremity disabilities.  Plaintiffs are committed to resolving this ongoing problem.

### 2.   Defendants' Statement

Collaboration between the parties continues to develop a sustainable DME accountability process and progress has been made as noted above and as detailed in the March 15, 2023 and May 15, 2023 Joint Case Status Statements.  *See* ECF Nos. 3473 at 23-26; 3484 at 22-25.  CCHCS and CDCR agree that individuals with upper-extremity disabilities that limit a major life activity require accommodation under the ADA, but disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP) code for multiple reasons communicated to Plaintiffs as noted in the March 15, 2023 Joint Case Status Statement.  *See* ECF No. 3473 at 26.  Notwithstanding these disagreements, CDCR and CCHCS will continue to communicate with stakeholders about these issues.

### I.   Joint Monitoring Tool

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert about informal briefing, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance.

### J.   ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  The parties most recently met with the Court Expert about these issues on December 19, 2023.  The parties have almost finalized a new Master Planning process to

share information or plans related to Master Planning projects and to tour completed projects.  This new process may continue to evolve as it is put into use by the parties.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who will review them and provide timely feedback.  The parties agreed that, when necessary, they will conduct joint tours with their respective experts, before ADA accessibility construction projects begin and after they are completed, to identify and resolve any ADA-non-compliance issues.

Respectfully submitted,

DATED:  January 12, 2024            ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/Penny Godbold*
Penny Godbold

Attorneys for Plaintiffs

DATED:  January 12, 2024            ROB BONTA
Attorney General of the State of California

By:  */s/Trace O. Maiorino*
Trace O. Maiorino
Deputy Attorney General

Attorneys for Defendants

**FILER'S ATTESTATION**

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.

DATED:  January 12, 2024            */s/Penny Godbold*
Penny Godbold

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Benjamin Bien-Kahn
Email:  bbien-kahn@rbgg.com

December 13, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Ed Swanson                            Jennifer Neill
Court Expert                          Tamiya Davis
Swanson  McNamara LLP                 CDCR Office of Legal Affairs
ed@smllp.law                          Jennifer.Neill@cdcr.ca.gov
                                      Tamiya.Davis@cdcr.ca.gov

Re:     *Armstrong v. Newsom*:  Plaintiffs' Proposed Agenda for December 18,
        2023 Meeting re Centralized Screening Team Decision Making
        <u>Our File No. 0581-03</u>

Dear Ed, Jenn and Tamiya:

Plaintiffs' counsel look forward to meeting with Defendants on December 18, 2023 to discuss Centralized Screening Team ("CST") decision making.  In addition to any concerns raised by the Court Expert or Defendants, Plaintiffs' counsel hope to discuss the following topics outlined in more detail below:

- **Defendants' responses to CST screening decisions in Plaintiffs' most recent staff misconduct report;**

- **Current CST screening standards**

- **Data regarding CST screening**

- **Outstanding information requests**

**Background**

The Remedial Plans require the CST to "evaluate whether complaints received by CDCR include an allegation(s) of staff misconduct" and, using the Allegation Decision Index ("ADI"), determine how to route the allegation for investigation—either to the

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 2

Office of Internal Affairs ("OIA") or back to the local institution.  Dkts. 3392-1 at 4-5; 3392-2 at 5.

Plaintiffs have, for years, raised concerns that OIA is not adequately staffed to handle the influx of cases routed by the CST under the new system.  We have objected to any effort by CDCR to use CST screening as a way to stem the flow of complaints that should be routed to OIA per Remedial Plan requirements.  The solution should be to increase OIA staffing, not to implement difficult to administer screening protocols designed to ensure the re-routing of complaints away from OIA.

Plaintiffs were cautiously optimistic after learning that Defendants had abandoned the "causal connection/material misrepresentation" standards at our October 18, 2023 meeting.  Since then, however, we have become more concerned that new screening standards are actually resulting in greater numbers of staff misconduct complaints being improperly screened and routed back to the local prisons.  As described in more detail below, it appears that under new screening standards (which have not yet been clearly explained by Defendants) the "factually implausible" standard provides a different, subjective and difficult to administer standard that provides significant leeway for CST staff to conclude that, because they believe the alleged staff misconduct was unlikely to have occurred, the complaint should be routed locally.  Said another way, if the CST determines there is no reasonable belief that staff misconduct occurred, the complaint is processed as a "routine" grievance regardless of whether it raises an allegation of staff misconduct, in violation of the Remedial Plans.

In fact, the most recent data received by Plaintiffs' counsel supports the conclusion that the CST screening changes that reportedly took place around the time of the elimination of the causal connection/material misrepresentation standards – in August 2023 – have resulted in the number of routine grievances increasing significantly.  Plaintiffs are very concerned.

1.      **Defendants' Response to CST Screening in Plaintiffs' Quarterly Reports**

Defendants' recent responses to Plaintiffs' staff misconduct reports present the clearest illustration of CST screening problems.  Defendants disagreed with Plaintiffs' counsel in all but one of the 25 examples listed in the last two reports.  *See* Defendants' December 11, 2023 Response to Plaintiffs' November 6, 2023 Report ("Dec. 11

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 3

Response") at 9-14; Defendants' September 15, 2023 Response to Plaintiffs' August 11, 2023 Report ("Sept. 15 Response") at 2-7.[1]

**At the December 18, 2023 meeting, Plaintiffs wish to discuss each of the first five examples included in Plaintiffs' counsel's most recent report (listed below), where Defendants disagree that the complaint raises a staff misconduct allegation:**

1) Grievance Log No. 426810

**Plaintiffs' Report:**

The person alleges that a Lieutenant denied his request for single cell housing due to his disability-related safety concerns, and forced him to house with a cellmate, even though they each stated they were not compatible with each other. He also alleges that staff are retaliating against him for seeking assistance "against this abuse of authority" by blocking phone calls from his daughter.

**Defendants' Response:**

Upon review, Defendants contend CST appropriately routed this for grievance response, as all incarcerated persons are required to house in accordance with Title 15, Integrated Housing Codes, and custody supervisors review all accommodations prior to housing. In this case, the claimant was not denied access to the telephone and there is no information to support they were subject to an act of retaliation.

**Plaintiffs' Position:**

**The complaint raises an allegation of staff misconduct on the ADI in that staff disregarded his safety concerns and housed him inappropriately. The screening decision pre-judges whether or not staff violated policy in making that housing decision. This is beyond the scope of screening and the complaint against the Lieutenant should have been routed as a staff complaint.**

2) Grievance Log No. 452837

---

[1] Defendants did not share their position with Plaintiffs or the Court Expert on whether the CST improperly routed any "routine" grievances identified in Appendix A, even though we requested they do so in the most recent report so that we and the Court Expert would be able to assess how far apart the parties are on this critical issue.

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 4

**Plaintiffs' Report:**

The person alleges that an officer sexually assaulted him in his cell.

**Defendants' Response:**

Upon review, Defendants contend CST appropriately routed this grievance which was deemed factually implausible.  Allegations screened by CST as being factually implausible are processed as routine and routed to the originating source office, which refers such allegations to the Health Care Appeals Registered Nurse within the local Health Care Grievance Office for health record review and consideration for MH-5 submission, if clinically appropriate.

**Plaintiffs' Position:**

**Plaintiffs do not agree that the allegation here was factually implausible, nor that this is the type of allegation that should be dismissed under any such standard.  His specific allegation appears to be that staff entered his cell and assaulted him, leaving behind a tissue with saliva or semen.  This may not have occurred but it could have and warrants investigation.**

3) Grievance Log No. 448668

**Plaintiffs' Report:**

The person alleges that an officer is targeting and harassing him because of his race, including by denying him access to yard and threatening to write a false RVR against him.

**Defendants' Response:**

Upon review, Defendants acknowledge a clarifying interview likely could have been completed to collect additional information regarding the alleged misconduct and/or to ensure appropriate routing.

**Plaintiffs' Position:**

**This complaint raises clear staff misconduct allegations.  A clarifying interview should only be used when the allegations in the complaint are not clear.  *See* Remedial Plans at 4 (the CST may only conduct an interview "if necessary to make a screening decision").  It is concerning that Defendants believe an interview is**

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 5

**necessary in this case to ensure appropriate routing, and just further suggests that what is actually occurring at this stage is an expectation that CST pre-judge the complaint.**

    4) Grievance Log No. 420235

**<u>Plaintiffs' Report:</u>**

The person alleges that a Sergeant conducted a biased interview of him regarding an assault by staff in order to protect the officers involved, and tried to file a false report on the incident.

**<u>Defendants' Response:</u>**

Upon review, Defendants contend CST appropriately routed the grievance for grievance response. In this case, the claimant described dissatisfaction with not being able to give a full recounting of an incident during an interview conducted at the local level. However, CST determined an investigation regarding the incident was already opened and assigned to AIU under Grievance Log Number 416070, which would allow the claimant to provide a full accounting of the incident during the related investigatory interview. If, during the course of the fact-finding process, staff misconduct was identified, then it would have been returned to CST directly for proper assignment to LDI or AIU as appropriate.

**<u>Plaintiffs' Position:</u>**

**Here again, the misconduct alleged in the complaint is clear. Defendants response, that the interview was not biased and that he was allowed to give a full accounting of events because his case was assigned to AIU, is an improper pre-judgment of whether the staff misconduct occurred instead of a screening decision about whether staff misconduct was alleged.**

    5) Grievance Log No. 431672

**<u>Plaintiffs' Report:</u>**

The person alleges that a Sergeant ordered him to the back of the chow line and then tried to handcuff him in retaliation for filing a 602 against him, and that the Sergeant is disrespectful and threatens incarcerated people.

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 6

**Defendants' Response:**

Upon review, Defendants acknowledge this grievance should have been split into two separate claims.  The first claim should have solely addressed the claimant being placed in mechanical restraints while the second should have addressed the alleged disrespectful or threatening comments.  Regarding the first claim, Defendants contend CST appropriately routed this claim for grievance response.  Peace officers within CDCR are authorized to provide direction and orders and to place incarcerated persons in mechanical restraints.  Regarding the second claim, Defendants acknowledge a clarifying interview likely could have been completed to collect additional information regarding the alleged misconduct and to ensure appropriate routing.

**Plaintiffs' Position:**

**The allegation that staff retaliated against him was clear and a clarifying interview is not necessary.  Defendants' response that a clarifying interview was warranted to ensure proper routing only further suggests that the intent is to gather more information in order to pre-judge whether misconduct occurred.  Plaintiffs also object to the splitting of claims such as in this case, in violation of the Remedial Plans.  *See* Remedial Plans at 4 (the CST must route together all "allegations directly related in time and scope").**

**The acts alleged on the part of the sergeant (that he ordered the class member to the back of the line and improperly placed him in restraints) are the alleged acts of retaliation – the staff misconduct – that the incarcerated person is complaining of.  It does not make sense to split the conduct into multiple claims and have someone conduct a routine investigation in to the cuffing itself when the alleged problem with the cuffing is that it was conducted in retaliation.**

Defendants' disagreements with Plaintiffs regarding the CST's improper routing of staff misconduct complaints on the ADI to LDIs similarly show that they approve of the CST pre-judging the merits of complaints.  **Defendants' positions appear to show that the parties fundamentally disagree on what the CST is required to do under the RJD and Five Prisons Remedial Plans.**

### 2) The Current Factually Impossible/Implausible CST Screening Standards

On October 13, 2023, Defendants told Plaintiffs and the Court Expert for the first time that "the CST is no longer screening cases using the 'causal connection' or 'material misrepresentation' standards," and that it has instead implemented new "factually

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 7

impossible/factually implausible" screening standards statewide.  On October 17, 2023, Defendants shared via an e-mail from Tamiya Davis a brief summary of the guidance provided to the CST regarding the identification of impossible and implausible claims. According to that email, Defendants define a factually impossible claim as "an allegation that defies the laws of physics, biology, or any other scientific discipline."  Defendants define a factually implausible claim as "an allegation that could possibly be true, but the chance the allegation is true is so slim it can reasonably be compared to the chance of being struck by lightning."

        As discussed during our October 18, 2023 meeting, Plaintiffs do not object in theory to treating as "routine" staff misconduct allegations that are factually <u>impossible</u>. But we are especially concerned about the CST's ability to apply the factually implausible standard without screening out plausible allegations of staff misconduct that should be investigated by the AIU or an LDI.  Plaintiffs have already identified multiple problematic examples:

- As discussed above, Grievance Log No. 452837 is one such example where we can see no basis for concluding that the chance that an officer would enter an incarcerated person's cell and sexually assault them "is so slim it can be reasonably be compared to the chance of being struck by lightning."

- Also, from Defendants' October 17, 2023 email, the example that **"Claimant alleged that the use of pepper spray and batons 'already killed me once"** was determined to be "factually impossible" claim.  It is more reasonable to interpret the claimant to be using hyperbole than to be claiming that he has literally been killed and then returned from the dead. An allegation that staff used pepper spray and batons against the claimant is a serious one that should be investigated, notwithstanding the use of hyperbolic language.

- Similarly, also from the October 17, 2023 email: **"Claimant alleged a counselor refused to issue the claimant a transgender card so the counselor could rape and beat the claimant.  Furthermore, two officers have a bottle with spit they keep at the podium which they plan to use to blind and kill the claimant."**  This claim was determined to be factually implausible.  The allegation that a counselor refused to issue someone a transgender card is a staff misconduct complaint.  That the counselor intends to rape and beat the claimant is not likely, but it is not impossible and not entirely implausible.  The fear may be unjustified but the fact that

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 8

> this person is living in fear of this staff member is worthy of investigation. Maybe they witnessed some form of misconduct committed by this staff member or have experienced disrespect? This complaint is a bad example of one that should be treated as "routine" given the seriousness and plausibility of the first allegation.

Plaintiffs therefore have serious concerns about how the new standards will be implemented and the risk of improperly screening complaints of serious staff misconduct away from OIA in violation of the Remedial Plans. **The actual number of fantastically and truly impossible/implausible claims is small.** In the random sample of routine grievances from Q3 2023, Plaintiffs' counsel identified only 2 of 97 complaints containing staff misconduct allegations that were factually impossible or implausible (or only 2% of the total). *See* Nov. 6, 2023 Report at 45, n.39. The low percentage is consistent with our expectations based on our analysis of past productions. Thus, the creation of subjective and difficult to apply screening standards to attempt to stem the flow of complaints to OIA, at the risk of screening out serious staff misconduct complaints is not justified. **Plaintiffs object.**

The solution is to properly staff the AIU, to dedicate little time to investigating claims that are impossible, and to efficiently manage resources to ensure that claims are not artificially split in ways that work is duplicated between many investigators.

**We reiterate the following requests made at the October 18 meeting:**

- **Please provide specific information on when and how the "factually impossible/factually implausible" standard was implemented, including a description of what was specifically told to the CST screeners (beyond the summary provided in Tamiya Davis's October 17 email), and when it was communicated to them.**

- **Please produce any written instructions or guidance that was provided to the CST screeners—including any e-mails, memos, or trainings.**

### 3) Data Confirming the Number of Routine Complaints is Increasing

Our findings that Defendants are erroneously classifying many complaints as routine is consistent with data produced by Defendants that show a marked increase in the number of complaints the CST is classifying as routine, starting in August 2023. *See* Nov. 6, 2023 Report at 46-47.

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 9

In August and September 2023, the CST processed more complaints than in any of the other months.  But in those two months, the CST also categorized the highest percentage of complaints as routine and the lowest percentage of complaints as alleging staff misconduct.  Perhaps most troublingly, in September 2023, the CST processed the most complaints of any month (5,665) but also classified, by a very large margin, the fewest complaints as alleging staff misconduct of any month (325).  (September 2022 had the second fewest staff misconduct complaints, with 435.)  September 2023 had only 37% of the number of staff misconduct complaints in June 2023 (868 staff misconduct complaints).  *See id.*

Given that the data is consistent with Plaintiffs' analysis that the CST is failing to identify increasing numbers of staff misconduct complaints, we are particularly disappointed that Defendants are refusing to produce a sample of 150 grievances screened as routine by the CST each quarter (rather than the 100 grievance sample that is currently produced).  This request is modest.  Effective monitoring of CST decision making is critical.

**To account for the influx of 1824s, 602-HCs and other complaints into the staff complaint screening process, which tend to naturally be more likely to be routine and are therefore diluting the sample, we reiterate our request that, moving forward, CDCR produce a sample of 150 grievances screened routine by the CST and that at least 100 of those grievances be 602s.**

**4) Outstanding Questions/Requests for Information**

On October 13, 2023, Defendants reported by e-mail that they are "closely monitor[ing] repeat filers" and batching complaints together.  At the October 18 meeting, Defendants stated that, for example, if they receive 7 duplicative complaints from one person, they are batched together both for screening by the CST, and for investigation.

- **How is the batching of complaints impacting the data?  How many complaints have been batched together?  What percentage?**

- **What are CDCR's expectations for when the CST should batch together complaints from the same complainant?  When and how were those expectations communicated to CST screeners?**

In the October 13, 2023 letter, Defendants reported that "CST initiated a secondary screening process which includes a selective review by health care and custody

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 10

experts to ensure staff misconduct allegations are properly identified." Oct. 13 Letter at 4. At the October 18 meeting, Defendants were unable to say much more about this process.

- **When was the "secondary screening process" implemented by CST? Please produce any written instructions, guidance and training on this process.**

- **Please explain how the "secondary screening process" works. How often is a random sample of cases reviewed? How many are sampled? What happens when the "secondary screening" identifies errors?**

In the October 13, 2023 letter, Defendants reported that "CST also initiated an internal auditing or dispute process," which "allows the institutional Office of Grievances (OOG) to dispute CST's designation that a claim is routine and request additional review for possible elevation to an allegation inquiry or investigation." Oct. 13 Letter at 4. At the October 18 meeting, Defendants were unable to say much more about this process.

- **When was the "internal auditing or dispute process" implemented? Please produce any written instructions, guidance and training on this process, both to CST and to the institution staff.**

- **Please explain how the "internal auditing or dispute process" works. How does the institution staff dispute a screening decision? How does the CST determine if the institution is correct and the grievance should be re-routed?**

   **Plaintiffs also reiterate our request at the October 18 meeting to observe a CST screener training.**

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4404363.1]

Ed Swanson
Jennifer Neill
Tamiya Davis
December 13, 2023
Page 11


     We look forward to meeting.

                         Sincerely,

                         ROSEN BIEN
                         GALVAN & GRUNFELD LLP

                         */s/ Ben Bien-Kahn*

                  By:  Ben Bien-Kahn
                     Senior Counsel

BBK:BBK

| cc: | | |
|---|---|---|
| August Gugelmann | Brianne Burkart | Diane Toche |
| Nicholas Meyer | John Dovey | Joseph Bick |
| Patricia Ferguson | Robin Hart | Cory Lo |
| Chor Thao | CCHCS Accountability | Lourdes White |
| Ramon Ruiz | Joseph Williams | Mona Houston |
| OLA *Armstrong* | Cathy Jefferson | Lois Welch |
| Sharon Garske | Jason Anderson | Steven Faris |
| Trace Maiorino | Jane Moses | CDCR CAMU |
| Sean Lodholz | Aaron Perez | Gurpreet Sandhu |
| Olena Likhachova | Alexandrea Tonis | Ursula Stuter |
| Anne Kammer | Joshua (Jay) Leon Guerrero | Co-Counsel |
| Jillian Hernandez | Dawn Lorey | |

# EXHIBIT B

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date:     January 4, 2024

To:       Associate Directors, Division of Adult Institutions
          Wardens
          Americans with Disabilities Act Coordinators

Subject:  **IMPLEMENTATION OF THE ZOOMAX SNOW 12 ELECTRONIC MAGNIFIERS FOR INCARCERATED PERSONS WITH A PERMANENT VISION IMPAIRMENT**

The purpose of this memorandum is to implement a process for the use of the Zoomax Snow 12 electronic magnifiers in housing units, including in-cell, for incarcerated persons with a permanent vision impairment, impacting placement (DPV).

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide access to programs, services, and activities for all incarcerated persons and paroled persons with disabilities, as required by Federal Law, the Americans with Disabilities Act (ADA), and the *Armstrong* Remedial Plan. The ADA guarantees equal opportunity and provides basic civil rights protections for individuals with disabilities in public and private sector services and employment.

A comprehensive evaluation was conducted and identified the capabilities of the Zoomax Snow 12 would provide the most beneficial accommodation to the DPV population. The Zoomax Snow 12 is a portable electronic video magnifier with various features and benefits that can provide independence to DPV incarcerated persons reading and writing needs. With the Zoomax Snow 12, the DPV incarcerated person can read, write, and look at objects more easily and perform full-page content scanning with Optical Character Recognition (OCR) text to speech.

Institutions designated to house DPV incarcerated persons shall develop a plan to allow access to the Zoomax Snow 12 electronic magnifier within the DPV housing units (to include in-cell use, restricted housing units, and specialized bed units as needed). The attached check-in/check-out tracking sheet shall be completed by the assigned custody supervisors to document the process and submitted to the ADA office by the 5th of the following month. The DPV incarcerated person will have the ability to check the device out, including overnight use, and shall be allowed additional time for pending legal proceedings, including Board of Parole Hearings preparation.

The Warden, or designee, shall designate the appropriate custody supervisor (e.g., ADA Field Training Sergeants or facility program sergeants) to inspect the Zoomax Snow 12 electronic magnifiers weekly to ensure there is no damage or alteration to the Zoomax Snow 12 electronic magnifier. If the Zoomax Snow 12 electronic magnifier is altered or destroyed, the supervisor shall determine if it was intentional or unintentional based on the circumstances, and all available information will be provided to the ADA Coordinator. If deemed intentional, the ADA Coordinator will determine the best course of action (i.e., access to the Zoomax Snow 12 electronic magnifier or provide an alternate reasonable accommodation).

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

**PROCUREMENT AND TRAINING FOR THE ELECTRONIC MAGNIFIERS**

The Class Action Management Unit (CAMU) has procured the initial order of the Zoomax Snow 12 electronic magnifiers and will provide them to the ADA Offices at DPV designated institutions. Replacement orders for the Zoomax Snow 12 electronic magnifiers will be the responsibility of each institution. When ordering replacements, all institutions shall order the same model for consistency (see attached specifications), however, the choice of vendor is at the discretion of the institution, consistent with current established procurement policies.

An instruction guide for the Zoomax Snow 12 electronic magnifiers will be provided to staff and DPV incarcerated persons (see attached). The ADA Coordinator or designee shall ensure all DPV incarcerated person(s) authorized to utilize the Zoomax Snow 12 electronic magnifier are provided training on the proper use and care. A CDC Form 128-B information chrono shall be completed documenting the training and forwarded to Case Records for scanning into the Electronic Records Management System.

If an incarcerated person who is not designated DPV submits a request for access to the Zoomax Snow 12 electronic magnifier, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. The Reasonable Accommodation Panel will consider all requests on a case-by-case basis.

The ADA Coordinator or designee shall communicate this information regarding access to Zoomax Snow 12 electronic magnifiers to the local Inmate Advisory Counsel and by institutional bulletins/notices located within housing units.

All CDCR institutions shall update their Disability Placement Program (DPP) Local Operating Procedures (LOP) to reflect the direction included in this memorandum and provide a copy of the DPP LOP to their respective Mission Associate Director and the CAMU mailbox (CDCR.CAMU@cdcr.ca.gov) within 90 days of the release date of this memorandum. The LOP must explain the process for access, inventorying, tracking, and security inspection of the electronic magnifiers. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

Wardens or designees shall ensure all custody supervisors and managers (i.e., Sergeants, Lieutenants, Captains, Associate Wardens, Chief Deputy Wardens, and Wardens) are trained on the expectations set forth in this memorandum by utilizing the Learning Management System Course code 11063890 within 90 days of the date of this memorandum. Institutions shall provide proof of practice to their respective Mission Associate Directors.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Implementation of the Zoomax Snow 12 Electronic Magnifiers for Incarcerated Persons with a
Permanent Vision Impairment
Page 3


If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Darnell Mebane, Captain, CAMU, at
(916) 202-5130 or Darnell.Mebane@cdcr.ca.gov.



RON BROOMFIELD
Director
Division of Adult Institutions

Attachments

cc:     Joseph (Jason) Williams
        Jennifer Benavidez
        Jared D. Lozano
        Sadie Richmond
        Raquel Buckel
        Dawn Lorey
        Lourdes White
        Darnell Mebane
        Chor Thao
        Megan Roberts
        In-Service Training Managers

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Zoomax Snow 12 Tracking Sheet

Unit: _____    Date: _____

| Name | CDCR# | Housing | Time Checked out | Time Returned |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Incarcerated people in the Disability Placement Program (DPP) with a verified vision disability impacting placement (DPV) may sign up to check out the Zoomax Snow 12 portable desktop magnifier auxiliary device to include overnight use and shall be allowed additional time if pending legal proceedings.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8





DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Put **SNOW 12** on the reading material and enjoy reading time now!





## Simple & intuitive

Six simple buttons make it easy and intuitive for everyone to enjoy.



## Superior image quality

Our best-ever camera produces the sharpest images with great details and lively colors.



## Slim and modern

Thinner than a notebook computer, Snow 12 is stylish and comfortable to hold.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Writing is possible and more comfortable than ever with a **foldable** **stand!**





### Comfortable writing space

Bigger writing space for you to use for writing, doodling, signing and creating!



### OCR and text-to-speech

Quickly and easily convert printed text into speech with over 20 languages.



### See virtually everything with ease

Hold a pill bottle, printed material, recipe or homework under and read it.

DocuSign Envelope ID: E3895B80-553B-4B73-8430-F701A0D304F8

# Technical Specifications

| | |
|---|---|
| Display | 12-inch full HD touch screen |
| Full HD camera | 13 megapixels |
| Magnification | 2.7x to 19x or 2.5x to 19x w/stand |
| Color modes | Full color & 10 high-contrast color modes |
| OCR and text to speech (optional) | 20+ languages |
| File formats | JPG, PDF, RTF, and TXT |
| Foldable stand | Yes |
| Working height under camera | 14 cm (5.5 in.) |
| Distance viewing | Yes (optional with SnowLink*) |
| Panning | Touch screen panning & analog stick panning |
| Connect to TV/monitor/iPhone | Yes |
| Continuous use time | 2.5 hours |
| Charging time | 2 hours |
| Weight | 960 g (2.12 lbs.) or 2,240 g (4.9 lbs.) w/stand |
| Dimensions (H/W/D) | 29x22x2.4 cm (12x9x1 in.) |

*Coming soon: optional distance camera for viewing presentations at school or in the workplace.

+86-571-8700-6308     www.zoomax.com      sales@zoomax.com

