Edward W. Swanson, SBN 159859
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Court Expert

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. CV 94-2307 CW |
| Plaintiffs, | **COURT EXPERT'S QUARTERLY REPORT ON INVESTIGATIONS AND DISCIPLINE** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

    Pursuant to the Court's orders for remedial measures at RJD, LAC, COR, SATF, CIW, and KVSP, the Court Expert provides the following report on implementation of CDCR's new investigations and discipline system.

**Changes to Centralized Screening and AIU**

    Over the past several months, Plaintiffs have raised concerns that the Centralized Screening Team (CST) is not functioning as the Court's remedial plans contemplate. As the Court is aware, the remedial plan requires that CST review all complaints filed by or on behalf of an incarcerated person to determine whether they allege staff misconduct and, if so, whether the staff misconduct is of a form listed on the Allegation Decision Index (ADI). CST routes allegations of ADI staff misconduct to the Office of Internal Affairs Allegation Inquiry Unit

(AIU) for investigation and allegations of non-ADI staff misconduct to Locally Designated Investigators (LDIs) for inquiry. "Routine" complaints, meaning those that do not allege staff misconduct, are sent to local Offices of Grievances. *See* Dkt 3336-1 (Five Prison Remedial Plan), 4-5. Importantly, CST is not an investigative body, and its staff are not trained to conduct investigations or inquiries. Under the court-ordered remedial plan, the role of CST is not to evaluate the merits of a complaint but only to determine whether it alleges staff misconduct and, if so, whether it alleges a type of misconduct on the ADI.

As the Court Expert has reported since the inception of the new investigations and discipline process, the volume of cases flowing to CST has consistently exceeded CDCR's initial estimates. *See* June 2022 Report (Dkt. 3420), 2. This has raised concerns not just about CST's ability to screen complaints but about the effect on the workload of AIU investigators and LDIs, who, as a result of the larger-than-expected number of cases, may struggle to conduct comprehensive and unbiased investigations within the remedial plan's timelines. Recognizing this problem, CDCR has explored various options for reducing the number of cases that CST sends to AIU. For example, CDCR worked with mental health staff to implement policies for identifying the most frequent filers of staff misconduct complaints and routing their complaints to the institutions for initial review. Dec. 2023 Report (Dkt. 3555). In 2022, CDCR also proposed implementing a "causal connection" screen pursuant to which CST would assess whether a complaint sufficiently alleged that a staff member's actions were connected to a protected status or activity before referring the matter to AIU. Sept. 2022 report (Dkt. 3433). After Plaintiffs raised concerns with both the reliability of this proposed screen and the notion that it would result in CST reviewing the merits of complaints (concerns the Court Expert shared), CDCR implemented it only at non-*Armstrong* prisons, *see* Dec. 2022 Report (Dkt. 3449), and subsequently discontinued the practice. *See* Dec. 2023 Report (Dkt. 3555). However, based on their review of screening decisions in randomly-selected cases, Plaintiffs continued to suspect that CST was reviewing the merits of complaints before making a routing decision. *See* Sept. 2023 Report (Dkt. 3513); Dec. 2023 Report (Dkt. 3555).

Plaintiffs' concerns were well founded. At a meeting to discuss CST in January 2024, Plaintiffs and the Court Expert learned that CST was designating at least some complaints as routine based on CST's assessment of the merits, rather than based on the nature of the allegations as they appeared on the face of the complaint. Further, CST was using the "clarification interview" process—which allows CST staff to interview a complainant when necessary to better understand what his or her complaint alleges—to conduct cursory investigations and, it appears, designating as "routine" complaints that, based on the clarifying interview, did not appear to raise meritorious claims of staff misconduct.

The Court Expert shares CDCR's concerns about AIU and LDI caseload and has repeatedly expressed to the parties that adjustments to the screening and routing procedures may be appropriate. However, the current investigations and discipline process is the product of extensive and collaborative negotiations and is governed by Court order; it is not appropriate for CDCR to change the screening process without at least giving notice to—and ideally consulting with—Plaintiffs and the Court Expert. On this occasion and others, however, CDCR has chosen to make unilateral changes to the system without notice.

Most egregiously, the Court Expert and Plaintiffs learned through a January 2024 report by the Office of the Inspector General that, in August 2020, CDCR "violated its regulations by redirecting backlogged allegations of staff misconduct to be processed as routine grievances." OIG Special Review No. SR-23-01 (Jan. 29, 2024), 1.[1] Briefly stated, the OIG found that CDCR had amassed a backlog of complaints that screening teams had determined alleged staff misconduct.[2] CDCR cleared this backlog by redesignating 595 cases as routine—in other words, as cases that did not allege staff misconduct—and redirecting them to the local institutions for

---

[1] https://www.oig.ca.gov/wp-content/uploads/2024/01/OIG-Special-Review-No-SR-23-01.pdf

[2] The backlog consisted of cases from the legacy process, under which prison staff reviewed grievances in the first instance to determine if there was a reasonable belief that misconduct occurred; if so, the grievance was sent to the Allegation Inquiry Management Section (AIMS) for investigation. This process was replaced with the current system under which CST makes the initial screening decision and AIU (rather than AIMS) conducts investigations. The redirected cases predated implementation of the new system.

review. The OIG analyzed a random sample of 71 complaints that had been redirected and concluded that all 71 of them "contained at least one allegation of staff misconduct" that should have been investigated by OIA. *Id.* at 4. When redirecting the backlogged cases, CDCR had instructed local institutions to elevate the grievances—sending them back to OIA for investigation—if they found the complaints alleged staff misconduct. However, only one of the 71 cases found by OIG to allege staff misconduct was in fact sent back to OIA for investigation. *Id.* at 5.

In response to a draft of the OIG report—but before Plaintiffs or the Court Expert knew the redirection had taken place—CDCR represented in a letter to OIG that it "undertook a review of the grievances within the backlog" and redirected only "grievances [that] the newly activated Centralized Screening Team had incorrectly screened as including allegations of potential staff misconduct[.]" Report, 8-9 (CDCR's letter to the OIG). The Inspector General's final report disputed this assertion, finding that nothing in CDCR's written directive "indicates that the department … had performed a review of those grievances and determined that they had been incorrectly screened or misclassified" and noting that "[t]he department did not mention that it had performed such a review during any of the conversations we have had … [n]or did the department provide us with any records of having conducted such a review." *Id.* at 10-11.

The Court Expert has profound concerns about CDCR's actions. First, the redirection resulted in closure of hundreds of claims that had been (correctly, according to the OIG's review) determined to raise allegations of staff misconduct that merited investigation; instead, those complaints were treated as routine grievances, not allegations of staff misconduct, and reviewed by local institutions in processes that the OIG found inadequate in many instances. *Id.* at 6.[3] These substantive issues are significant. But just as significant to the Court Expert is the Department's lack of transparency. Even though the parties and the Court Expert had been

---

[3] For example, the OIG found that many cases were reviewed by staff not trained as investigators, that staff did not always review all the allegations in the complaint, that staff did not always interview the complainant or the subject of the complaint, that staff did not always review relevant documentation, and that some allegations were investigated by staff that ranked lower than the staff alleged to have committed the misconduct. *See* OIG Report 4-7.

engaged in ongoing discussions about CST screening processes and AIU workload, CDCR did not disclose to Plaintiffs or the Court Expert its decision to redesignate as routine nearly 600 complaints that had been found to allege staff misconduct; much less did it discuss the proposal in advance. Nor was CDCR forthcoming when the issue came to light through the OIG report. The Court Expert asked in writing about the review process described in CDCR's letter to the OIG, and the Department reiterated that it redirected cases to local institutions only after a secondary review showed the allegations in the complaints did not rise to the level of staff misconduct. In a subsequent meeting, however, CDCR revealed that this review was much more limited and served only to ensure that no allegations concerning use of force or PREA violations were redirected.[4]

This is not the only instance where CDCR took unilateral action to address issues that were the subject of collaborative efforts. As discussed above, CDCR unilaterally changed the function of the CST to conduct some merits-based screening of complaints. And as reported last year, CDCR unilaterally and without notice changed the language of regulations implementing the Court-ordered reforms that the parties had negotiated. *See* Sept. 2022 Report (Dkt. 3433), 5 (noting that "CDCR published proposed changes to the emergency regulations without giving Plaintiffs prior opportunity to review them, despite the fact that the changes related to matters that had been the subject of extensive negotiation" and expressing the expectation that CDCR would give prior notice should it "anticipate future changes to regulations related to investigations and discipline").

The parties and the Court Expert have had frank discussions about this lack of transparency, and CDCR has acknowledged errors in this regard.[5] CDCR must do better. The

---

[4] The OIG report similarly notes that the redirected cases did not include "those alleging improper use of force, violations of the Prison Rape Elimination Act, allegations made by incarcerated people no longer in custody or under parole supervision, and outstanding AIMS cases whose status the department was still researching as of the date of this publication." OIG Report, 1 n.1.

[5] In these discussions, CDCR disclosed that it had conducted a similar redesignation of cases at RJD and LAC. The Department explained that LDIs asked CST to revisit its screening decisions on approximately 1200 cases that LDIs believed had been improperly routed; CST concluded

new investigation and discipline process is not perfect and will require refinement. In particular, changes in both staffing levels and procedures may well be necessary to ensure investigators have the resources to conduct competent and thorough investigations. But there is a Court-ordered remedial plan in place. If CDCR believes material changes to the investigation and disciplines system are necessary, it must proactively discuss those changes with Plaintiffs and with the Court Expert before implementation. The Court Expert should not have to press for information or, worse, to wait for the OIG to reveal actions CDCR has already taken. And it should go without saying that CDCR must be forthright in its responses when asked about modifications it has implemented or is contemplating.

Since the parties' meetings on CST and case redirection, CDCR has issued a set of proposals with broad changes to the investigations process. These include redefining "staff misconduct" and modifying the ADI (which would decrease the number of cases that reach AIU), eliminating certain staffing positions and increasing others (to direct more resources towards AIU investigation of serious allegations), revamping the software used to track cases, and creating streamlined processes for allegations that do not require full-blown investigations. The Court Expert welcomes these suggestions not because he necessarily agrees with all of them but because they signal acknowledgement that it will require collaboration and transparency to develop a system that can reliably find and discipline staff misconduct.

**Case volume and investigation and discipline timelines**

CST continues to receive high numbers of cases and to route only a small percentage of them to AIU. In his last report the Court Expert noted that case totals overall were increasing while the percentage of cases routed to AIU dropped, a possible indication that CST was categorizing at least some staff misconduct allegations as routine. As the table below shows, case volume has dropped slightly while the percentage of cases sent to AIU has increased slightly.

---

that it had indeed misclassified 230 of those complaints. The Court Expert cannot opine on whether CST was right to reclassify these complaints.

| Time period | Cases/month (average) | Cases routed to OIA (average) |
|---|---|---|
| December 2022 - February 2023 | 3600 | 11% |
| March - May 2023 | 3770 | 10% |
| June - August 2023 | 4910 | 8% |
| September - November 2023 | 5760 | 4% |
| December 2023 - January 2024[6] | 5570 | 5% |

AIU investigations must be completed within 120 or 180 days, depending on whether they are assigned to custody supervisors (sergeants and lieutenants) or to special agents. CDCR continues to fail to meet those deadlines in some cases, although the trend continues to improve. CDCR data shows that for cases received during the five months from December 2022 through April 2023, AIU closed an average of 67% of investigations on time; for cases received during the five months from May through September 2023, the average on-time closure rate increased to 78%. While the remedial plan allows cases to stay open past the 120- or 180-day mark for "extenuating circumstances" (Dkt. 336-1, 6), the Court Expert has not received information from CDCR on the reasons for the delays in these cases. That more than one-fifth of cases received through September 2023 were not closed on time may well be an indication of insufficient staffing at AIU.

Overall, the rate at which discipline has been imposed in closed cases does not appear to have improved since the Court Expert's last report. At that time, data indicated that 43% of cases closed through October 2023 were pending discipline; the figure remains roughly constant. The Court Expert also reviewed data on cases that are at least one year old. As of October 2023, hiring authorities had yet to act on 16% of the cases AIU had received as of October 2022. The data as of January 2024 is nearly the same: 17% of cases that AIU received as of January 2023 remain pending. The Court Expert and the parties will continue to discuss the timeliness of Hiring Authority decision-making.

/ / /

---

[6] Only two months of data are available here, compared to three for previous periods.

**Review of closed cases**

The parties will continue to meet in confidential sessions to discuss the specifics of cases where Plaintiffs have raised concerns about the investigations conducted or discipline imposed. The Court Expert continues to find these meetings productive.

Dated: March 31, 2024                            Respectfully submitted,

                                                 /s/
                                                 Edward W. Swanson
                                                 SWANSON & McNAMARA LLP