DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:    (415) 510-3594
Fax:          (415) 703-5843
E-mail:  Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. C94 2307 CW<br><br>**JOINT CASE STATUS STATEMENT**<br><br>Judge:   Hon. Claudia Wilken |

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

### A. Plaintiffs' Enforcement Motion Regarding Accommodations for Deaf, Blind, and Low-Vision Class Members in the BPH Process

#### 1. Plaintiffs' Statement

On March 20, 2024, this Court granted in part and denied in part Plaintiffs' Motion to Enforce the Court's prior orders, ECF No. 3583, and issued an Order for a Further Parole Remedial Plan, ECF No. 3584. Since that time, Plaintiffs' counsel has reached out to Defendants on multiple occasions requesting to meet to discuss the new Remedial Order and to resume the parties' previous bi-monthly meetings on all remedial issues. Defendants have refused to schedule any meetings.

Prior to receiving the Court's order, Defendants committed to providing panel attorney trainings on ADA issues, in lieu of having Parole Justice Works (PJW) provide such trainings, and to allow Plaintiffs' counsel to observe and comment on these trainings. However, after receiving the Order, Defendants cancelled trainings that had been scheduled for April and do not expect to provide ADA training until the summer. Plaintiffs will continue efforts to meet with Defendants to move necessary reforms forward.

#### 2. Defendants' Statement

Defendants are preparing further remedial plans that include policies and procedures, and will present these plans to Plaintiffs and the Court Expert, in accordance with the time schedule ordered by this Court, so that the parties may engage in the court-ordered meet-and-confer process. ECF No. 3584. Defendants have not "refused" to meet

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1  with Plaintiffs' counsel as they have suggested.  Rather, once Defendants provide the

2  plans, which are due by May 20, 2024, the parties will engage in the meet-and-confer

3  process provided in the Court's order.

4        Defendants remain committed to permitting Plaintiffs an opportunity to observe

5  trainings provided to panel attorneys appointed to represent class members during parole-

6  suitability hearings.  BPH has provided and Plaintiffs' counsel have commented on prior

7  training materials for the panel attorneys.  Because the Court's enforcement order specifies

8  material that must be included in the attorney training, and implementation of the Court's

9  enforcement order is not complete, BPH determined it would be more efficient and

10  appropriate, and less confusing, to temporarily postpone the panel attorney training until

11  those new policies and plans can be added to the training.  This will ensure the most up-to-

12  date training for the panel attorneys.  Defendants will provide timely notification to

13  Plaintiffs once these trainings are scheduled so that Plaintiffs may observe and provide

14  feedback.

15  **B.**     **Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class**
          **Members**
16

17        **1.**     **Plaintiffs' Statement**

18            **a.**     **RJD and Five Prisons Orders**

19        Plaintiffs continue to monitor remedial efforts found necessary in order to prevent

20  further violations of the ARP and class members' ADA rights at six prisons including

21  changes to the staff misconduct investigation process and implementation of Audio Visual

22  Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059,

23  3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in

24  Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A,

25  B.

26        Plaintiffs have issued nine quarterly reports and have identified scores of cases that

27  show failures by Defendants to conduct complete and unbiased investigations and impose

28  appropriate and consistent discipline.  Defendants are also failing to comply with other

provisions of the Remedial Plans that impact class members statewide, including failing to meet deadlines for completing investigations and to appropriately route allegations of misconduct to LDIs and the AIU.  Even when investigators timely complete investigations, cases languish on the desks of Hiring Authorities for months.  Plaintiffs' counsel have outlined additional reforms that are necessary to bring Defendants' accountability system into compliance and to avoid future litigation.  *See* April 11, 2024, Letter from Penny Godbold to Jenn Neill and Tamiya Davis, attached hereto as **Exhibit A**.  Plaintiffs' counsel and the Court Expert have expressed serious concerns about the lack of transparency and about unilateral changes to the accountability system that have been made by Defendants. As the Court Expert has recognized, "both staffing levels and procedures may well be necessary to ensure investigators have the resources to conduct competent and thorough investigations. But there is a Court ordered remedial plan in place. If CDCR believes material changes to the investigation and disciplines system are necessary, it must proactively discuss those changes with Plaintiffs and with the Court Expert before implementation."  *See* ECF 3587 at 6.  The parties met on May 2, 2024 to discuss proposed reforms, and Defendants agreed to, within a week, provide a plan and timeline for responding to each of Plaintiffs' counsel's requests.  The parties also met on May 9, 2024 to discuss Defendants' proposal to modify the screening and routing of staff misconduct complaints.  The parties agreed to review a random selection of staff misconduct complaints in an effort to better understand Defendants' proposal, and Defendants will provide a proposed plan for this endeavor by May 17, 2024.

CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six prisons exist system-wide and are committed to bringing such evidence before the Court until all class members are protected.  *See* Exhibit A at 7-8.

### b.     False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

Plaintiffs' counsel continues to identify class members who have received false, retaliatory, discriminatory or otherwise inappropriate RVRs.  The use of RVRs to retaliate against and discourage the filing of staff misconduct complaints will persist unless Defendants take action to identify and root out problems through meaningful reforms to the RVR process.

Plaintiffs are hopeful that the parties can agree to resolve problems and that additional court intervention will not be necessary.

**2.      Defendants' Statement**

**a.      RJD and Five Prisons Orders**

CDCR has dramatically overhauled its processes to ensure unbiased and complete investigations and, although not required by the Court's orders, Defendants have deployed statewide processes that restructure CDCR's staff misconduct allegation, screening, referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-upon measures constitute substantial improvements that will go a long way to bringing Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at 2.  The Court found, the "implementation of these [] remedial measures is likely to have a positive impact on…the overall reliability of the outcomes of investigations." *Id.*, at 15.  Despite the tremendous efforts and resources directed toward improving the staff misconduct investigation and discipline processes, modifications are necessary to ensure sustainability.  Before meeting with the Plaintiffs and the Court Expert on May 2, 2024, CDCR shared its initial modification proposal.  The parties met on May 2, 2024 and again on May 9, 2024, as noted above by Plaintiffs, to discuss proposals to modify the current processes and look forward to continuing these discussions to proactively develop

1  necessary modifications to these processes.

2            **a.     Demands for RVR Reform**

3         Defendants have made significant progress and commitments to address Plaintiffs'

4  demands that CDCR address the alleged practice of issuing false and retaliatory Rules

5  Violations Reports (RVRs) to class members, as detailed in previously filed statements.

6  *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.  Defendants continue their communications with

7  Plaintiffs and the Court Expert, to further address Plaintiffs' concerns related to the RVR

8  process noted above, and to further discuss CDCR's extensive proposed revisions as they

9  relate to class-member concerns.  CDCR continues to address these issues to the extent

10  they are specifically related to class-member accommodation, alleged discrimination, or

11  retaliation and to the extent it is required to do so under the remedial plans, the ADA, or

12  prior court orders.  Plaintiffs may disagree with the investigation or discipline imposed, but

13  that does not necessarily mean that the RVR was false or retaliatory.  Plaintiffs' general

14  complaints about the RVR process, unrelated to class-member accommodations, are not

15  properly raised in this case.

16  **C.    Court Expert Investigation Into SATF, the State's Largest Prison**

17        **1.     Plaintiffs' Statement**

18         In November 2021, this Court ordered the Court Expert to investigate the treatment

19  of people with disabilities at the California Substance Abuse Treatment Facility and State

20  Prison, Corcoran (SATF).  ECF No. 3338.  In December 2022, the Court Expert filed a 67-

21  page report, finding a substantial breakdown in the disability accommodation process at

22  SATF.  ECF No. 3446 at 4.  The Court ordered corrective action, including additional

23  analysis and reporting by the Court Expert and the development of policies and procedures

24  by CDCR.  *See* ECF No. 3467; ECF No. 3538.  Plaintiffs currently are working with

25  CDCR and the Court Expert to ensure adequate policies are drafted and implemented.  If

26  the parties are not able to reach agreement on those policies, the parties will bring any

27  disputes to the Court, pursuant to the Court's order.

28         Unfortunately, the issues identified by the Court Expert in 2022 persist at SATF—

including for the very same people featured in the Court Expert's initial report.  *See, e.g.*, **Exhibit B** attached hereto (Letter from Skye Lovett & Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs (Feb. 6, 2024) (Person A)).  In addition, Plaintiffs have identified other serious violations of the ADA and ARP at SATF.  For example, Plaintiffs have been waiting for over five months for a response after raising concerns with inadequate wheelchairs and denials of non-formulary accommodations at SATF.  *See* **Exhibit C** attached hereto (Letter from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, and Brianne Burkart, CCHCS Office of Legal Affairs, Non-Formulary Wheelchairs at SATF (Nov. 29, 2023) (without attachments)).

CDCR's delayed and poor-quality responses to concerns at SATF show that CDCR still "has not demonstrated that it is able to self-monitor and self-correct in the manner that would justify a lesser level of scrutiny by the Court and other outside monitors."  ECF No. 3473 at 5-6.  The Court Expert's upcoming report on staffing and self-monitoring and -correction processes will be critical to ensuring that action is taken to address the root of these problems.  It should not take a Court-ordered investigation, three reports by the Court Expert, multiple rounds of briefing by the parties, and multiple orders by the Court to compel the State to act in the face of clear and undisputed violations of the ADA and ARP.  Until CDCR develops its own expertise not dependent on Plaintiffs' counsel and takes a proactive, systems-minded approach to problems, people with disabilities will remain without the accommodations they need and are entitled to, and this case will continue with no end in sight.

### 2.    Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and the California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with

input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation.  The Court Expert has since reported that SATF has made "significant improvements in the delivery of accommodations to class members" and that "the culture at SATF has improved," since his first report.  ECF No. 3500 at 4, 6.  As noted in the report, class members have reported to the Court Expert, through personal interviews and survey responses, "improvements in their ability to get the accommodations they needed and in the attitudes of staff."  ECF No. 3500 at 4.  The Court Expert reports that through these responsive collaborative efforts, SATF has significantly improved the process for receiving incarcerated people from other institutions and has reduced the likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities.  *Id*. The Court Expert further reported that SATF has improved the process for collecting and handling patient requests for medical care (Form 7362s), has improved the processes for issuing, repairing, and replacing DME (including through the successful relaunch of its in-house wheelchair repair program), and has significantly improved the delivery of medical supplies, such as incontinence supplies, to class members.  *Id*.  As noted by the Court Expert, "the current leaders and staff are to be given credit for the significant effort they made to address the problems" identified in the first report.  ECF No. 3500 at 5.

In response to this Court's order, the Court Expert issued a November 28, 2023 Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF to which the parties entered into a stipulation addressing multiple issues.  ECF Nos. 3529, 3538.  Following the parties' stipulation, the Court issued its order setting deadlines for the further development, with Plaintiffs' input, of policies addressing various issues at SATF, including whiteboard captioning technology, accessible phones, and effective communication of announcements and, therefore, addressing Plaintiffs' concerns noted above.  ECF No. 3538.  In fact, Defendants provided the proposed Reasonable Accommodation Policy on March 6, 2024, and await feedback from Plaintiffs.  The parties and the Court Expert continue to regularly meet to discuss the various issues addressed in

1   the stipulation.  Defendants look forward to continued collaboration with Plaintiffs and the

2   Court Expert to resolve these remaining issues at SATF.

3   **D.      Accommodations for Deaf and Hard-of-Hearing Class Members**

4         **1.      Plaintiffs' Statement**

5         As of April 2024, at least 4,350 people who are deaf or hard of hearing are housed

6   in a California state prison.  CDCR has failed to accommodate them for decades, and too

7   many remain in significant isolation, unable to meaningfully participate in prison programs

8   or maintain ties with loved ones.  Over the years, Defendants have responded to Plaintiffs'

9   concerns with a "can't do" attitude consisting of delays and artificial barriers.  *See* Hon.

10  Thelton Henderson, Confronting the Crisis:  Current State Initiatives and Lasting Solutions

11  for California Prison Conditions, 43 U.S.F. L. Rev. 1, 7 (Summer 2008) (discussing

12  "trained incapacity" where prison officials "have trained themselves to be incapacitated

13  and incapable of meaningful change").  For example, the then-Assistant Deputy Director

14  of DAI Program Operations told the Court in September 2023, and again in October 2023,

15  that CDCR had not identified any vibrating watch that would work in a prison.  *See* ECF

16  3504 at 10; ECF 3504-1 ¶ 12; ECF 3515 at 12; ECF 3515-1 ¶ 12.  But in fact, vibrating

17  watches have been used in California and other prisons for years without issue.

18        The few areas of recent movement to improve accommodations for deaf and hard-

19  of-hearing people are the result of Court order, not Defendants' initiative, as outlined

20  below.  In order to effect meaningful change – and finally comply with the requirements of

21  the Americans with Disabilities Act and *Armstrong* Remedial Plan – Defendants must

22  work collaboratively with Plaintiffs and focus on bold solutions, not erecting barriers.[2]

23  _____

24  [2] This involves sharing drafts of policies proposed to remedy longstanding harms and
     provide accommodation.  To give one example, Plaintiffs for years demanded that

25  Defendants provide personal sound amplification devices as reasonable accommodations.
     When Defendants finally agreed to do so, they issued a policy without providing Plaintiffs'

26  counsel an opportunity to review and comment.  The resulting policy was grossly
     inadequate.  Among other things, it required people with disabilities to request the device

27  outside of the negotiated 1824 process, circumventing existing tracking and auditing
     mechanisms; would result in denial of adequate batteries to use the devices; did not allow

28  the device to be issued as an interim accommodation; forced people with disabilities to pay
     (footnote continued)

1    **CART.**  Plaintiffs' counsel has demanded that CDCR provide captioning services

2    so that deaf and severely hard-of-hearing people can participate in programs, services, and

3    activities since at least 2019.  CDCR took no action.  In February 2023, the Court ordered

4    CDCR to provide "CART [computer assisted real time transcription] or an alternative

5    accommodation" at SATF "as soon as possible."  ECF No. 3467 at 3.  Notwithstanding

6    repeated representations to the Court and Plaintiffs' counsel that CART would be

7    implemented statewide, in November 2023, Defendants asserted that they instead intended

8    to use a ViewSonic whiteboard, which relies on a proprietary software to generate captions

9    automatically, without a human transcriptionist.  On December 7, 2023, this Court ordered

10   Defendants to provide Plaintiffs with a demonstration of the ViewSonic whiteboard.  ECF

11   No. 3528 at 8.  That demonstration took place on March 27, 2024.

12   The demonstration could not be meaningfully completed, because Defendants had

13   failed to procure microphones that adequately picked up the spoken words that need to be

14   transcribed—a fundamental component to working transcription, and a threshold

15   technological requirement for demonstrating technology that is meant to capture spoken

16   words.  Defendants used lapel microphones—which can only pick up audio from the

17   person wearing the mic, and not from other voices in the group or room—and during the

18   demonstration, they lost and/or misplaced the receiver that connected the microphone to

19   the computer running CART.  From what Plaintiffs' counsel could observe, the ViewSonic

20   whiteboard and myViewBoard software did not transcribe spoken words in any intelligible

21   way, and appear to have not been meaningfully vetted by Defendants.  At the

22   demonstration, the technology did not identify different speakers, generated gibberish

23   when audio input was insufficient, displayed only a few lines of text at a time, and reverted

24   _____

25   if they were victimized and someone stole their device; would require confiscation of the
     device upon parole; did not ensure that staff would know the device was a protected form

26   of property; and failed to advise medical staff of how to respond to patients' requests for a
     device in healthcare encounters.  Plaintiffs informed Defendants of these and other issues

27   in November 2023 and, as of April 2024, Defendants stated only that they have revised the
     policy and are negotiating it with the officer's union but will not share a draft with

28   Plaintiffs' counsel, raising the real possibility that the process will begin again – with even
     more delay – if the revised policy also is inadequate.

to displaying "Hey Cortana" at seemingly random intervals with no discernible cue.  While on site, Defendants' Subject Matter Expert Sylvia Dumalig stated that CDCR was looking into identifying a "menu" of options for microphones that would be suitable for providing CART or other transcription services for programs, as ordered by this Court over fourteen months ago.

After the demonstration, Plaintiffs requested information on CDCR's efforts to identify new microphones and indicated a willingness to accept a replacement demonstration done by video (as opposed to in-person).  On April 16, the Court Expert asked that, within 14 days, Defendants provide "(1) CDCR's specific plans for addressing the microphone issues, including a timeline, and (2) [respond to] plaintiffs' request that CDCR conduct audio/video recorded-only re-testing of the two systems with better microphones, and, if it agrees to do so, a timeline."  Fourteen days later, Defendants identified only two microphones: another lapel microphone (which only captures the speech of a single person) and another microphone that is advertised as only capturing the speech of "up to four" people in a room.  In response, Plaintiffs' counsel raised concerns over the suggested microphones, the lack of testing or even the existence of a "menu" of options for microphones that would work in group and program settings, and a lack of progress on implementation of CART or an equally-effective alternative after over a year. Plaintiffs asked for a meeting to resolve these concerns, begin to move forward on transcription issues that can be accomplished outside of the demonstration process, and to come to an agreement on how to conduct a second demonstration so as to avoid litigation. Defendants refused that meeting.  Defendants have, at this time, identified no microphone technology that can be used to provide transcription services in self-help groups or programs with more than four people present.

It has now been **over fourteen months** since the Court ordered that "CART or an alternative accommodation" be provided for programming and education at SATF "as soon as possible," and neither CART nor an alternative accommodation has been provided in those settings.  Indeed, Defendants have not even been able to complete a successful,

functioning demonstration of CART or an equally-effective alternative during that period, and they cannot identify a working solution for even the most basic of components for transcription services, such as working microphones.  That is yet another fourteen months that people with severe hearing disabilities are unable to participate in education and rehabilitative programs that can reduce their sentences, make them more likely to be found suitable for parole, or prepare them for reentry into the community.

Plaintiffs' counsel will continue to work with Defendants and the Court Expert on this matter, but they have not been afforded an opportunity to speak with Defendants about how to secure working microphones or how to conduct a second demonstration that will meaningfully demonstrate the contemplated captioning technologies.  Additional judicial involvement may be necessary.

Notably, Defendants' recitation of their efforts, below, omits a few important details: First, the most significant limiting factor for CART appeared to the quality of the microphones sending sound to the CART provider.  Defendants appeared well aware of this limitation, but had done nothing to remedy it.  Second, Defendants puzzlingly contend that CART is not available "on demand," when the opposite is demonstrably true.  *See* PurpleVRS, https://www.purplevrs.com/cart (listing "on-demand availability" among the "CART Captioning Features") (last visited May 8, 2024).

**Accessible Phones**.  D/deaf and hard-of-hearing people continue to be denied equal access to phone services, including video calls.  Access to captioned phones and TTY/TDDs continues to be an urgent issue due to placement of the phones in inaccessible locations, burdensome restrictions, equipment failures, and other logistical barriers. Defendants informed Plaintiffs that they intend to replicate their current efforts at SATF— as governed by the SATF Order, ECF No. 3538—on a statewide basis.  As of now, Defendants have indefinitely postponed disclosure of any timelines or information about statewide rollout of accessible phone installation until after they have complied with the Court's requirements for SATF, which the parties are in the process of negotiating.

Defendants seemingly have spent more energy creating reasons to delay discussion

1    than to solve problems and finally remedy discrimination against people with disabilities in

2    their custody. Defendants refused to cover the accessible phone issues described above

3    during a Deaf/Hard-of-Hearing Workgroup meeting in March 2024 because, they said at

4    the time, they viewed the issues to be in the scope of negotiations described required by

5    the SATF Order.  However, three weeks later Defendants changed course, refused to

6    discuss the issues in those negotiations, said they belonged instead in the workgroup, but

7    refused to schedule a separate meeting to discuss them.

8         While Defendants fabricate delays, the ongoing harm is substantial.  Consider, for

9    example, an elderly deaf person who is housed at San Quentin – someone the Court

10   already found in February 2023 had "lost touch with family members outside of the

11   institution due to a lack of disability accommodations," including accessible phones.  ECF

12   No. 3446 at 40; ECF No. 3467 at 1.  Over a year later, that same person can use an

13   accessible phone only if he stands outside in the elements, a long walk from his housing

14   unit, and uses a captioned phone that is placed on the top of a garbage can – and only if the

15   officers on that day decide to allow it.  *See* ECF No 3526 at Ex. D (, Letter from Claudia

16   Ceseña & Rita Lomio, Plaintiffs' Counsel, to Ramon Ruiz, CDCR Office of Legal Affairs,

17   Captioned Phone Implementation (Nov. 2, 2023)).  To this, Defendants state only that

18   "there are no plans to install any additional captioned phones at San Quentin at this time."

19   That is unacceptable.

20        **Effective Communication of Announcements.**  There remains no robust and

21   durable system to provide and audit effective communication of announcements, which

22   continues to be a significant issue for deaf and hard-of-hearing individuals.  Plaintiffs have

23   significant concerns about Defendants' proposal for effective communication of

24   announcements and are working to resolve those concerns through the process outlined in

25   the SATF Order to determine if additional Court involvement is necessary.  Defendants'

26   statement indicates that they erroneously regard their legal obligations as extending only to

27   the accommodation of DPH class members, despite the Court's finding that both "Deaf

28   people and many hard of hearing people cannot hear an audio announcement played over

the intercom." ECF 3446 at 37. Defendants must effectively communicate announcements to both DPH and DNH class members.

Defendants' statement that they "have not yet received Plaintiffs' specific edits" to Defendants' draft policy regarding using tablets for announcements that Defendants produced on March 6, 2024, is misleading. Defendants produced a materially identical draft of this policy to Plaintiffs on November 2, 2023. Plaintiffs promptly submitted an extensive list of concerns and questions about the draft policy to Defendants on November 23, 2023. Nearly six months later, and after repeated inquiries from Plaintiffs about why Defendants had not responded to these concerns, Defendants submitted responses to Plaintiffs on May 8, 2024, which Plaintiffs are reviewing.

**Hearing Aids.** On March 1, 2024, Defendants informed Plaintiffs that CCHCS executed new hearing aid contracts on February 1, 2024 to better accommodate deaf and hard-of-hearing people. For the few class members who have been informed of the availability of new hearing aids and permitted to access them, they report significant improvement in their access to programs, services and activities through the hearing aids. If these new, working hearing aids are reliably, systematically, and promptly provided to all hearing aid users, they have the potential to provide significant improvements in quality of life and ability to rehabilitate.

Unfortunately, Defendants have refused to provide the new hearing aid contracts to Plaintiffs' counsel to facilitate disability accommodation monitoring. Defendants have failed to provide basic and essential information as to whether there is a sufficient supply to meet demand, or how CCHCS plans to ensure that contractors can meet the need for new hearing aids, including any initial influx of requests for them. In addition, CCHCS appears to have backtracked on a critical agreement made between the parties that anyone with a hearing disability, regardless of pure tone average, would be considered for a hearing aid on a case-by-case basis. Plaintiffs will attempt to address these issues with Defendants.

### 2.     Defendants' Statement

Plaintiffs' overly broad allegations are not only largely inaccurate, but lack the nuance necessary to address this large population of class members in which there are vast differences in degrees of qualifying disabilities.  Plaintiffs' statement that class members are "unable to participate in education and rehabilitative programs that can reduce their sentences," is untrue because there are only a small number of class members who need transcription services, and this broad characterization is misleading.  Further, Plaintiffs' aggressive tone and statements—which, unfortunately, now typify their communication with Defendants on Deaf and Hard-of-Hearing issues—ignore the ongoing collaborative work being performed in response to the SATF stipulation and in the Deaf and Hard-of-Hearing working group.  Oddly, Plaintiffs cite a 2008 publication to support their misguided allegations without noting the dramatic increase in available technologies given to class members to accommodate them.  Not only have all class members been offered Viapath tablets, but some class members also have iPads or iPhones and laptops (for education programming).  Moreover, CDCR deployed CART for due-process events on July 24, 2023.  Hence, today's correctional landscape is vastly different from the one that existed 16 years ago.  Plaintiffs' foregoing critique, which is seemingly designed to create disputes and not resolve them, shows significant bias and disregard for the extensive efforts and attention being put toward accommodating this population and, at this juncture, seems particularly sharp-elbowed in light of the significant overlap of these issues— CART, accessible phones (TTD-TTY and CapTel captioning), and effective communication of announcements—and the parties' recent stipulation following the Court Expert's November 28, 2023 Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF that addressed these issues.  ECF Nos. 3529, 3538. Following the parties' stipulation, the Court issued its order setting deadlines for the further development, with Plaintiffs' input, of policies addressing various issues at SATF, including whiteboard captioning technology, accessible phones, and effective communication of announcements that therefore, address Plaintiffs' concerns noted above.

1   ECF No. 3538.  Defendants' further efforts to accommodate this population are detailed in

2   previously filed statements.  *See e.g.*, ECF No. 3526, at 16-18.

3          Defendants are surprised by Plaintiffs' harsh criticism of the March 27, 2024

4   demonstration of CART and ViewSonic in a correctional setting because during, and

5   immediately following, the demonstration of these technologies, other participants were

6   optimistic that a resolution was attainable.  Moreover, to date, Plaintiffs have not provided

7   Defendants with any letter outlining their critique of the demonstration, but instead, have

8   sought more than the parties' stipulation requires by demanding additional demonstrations

9   comparing CART to ViewSonic.  Not only are these demonstrations not required by the

10  parties' stipulation, they present scheduling challenges.  For example, the initial

11  demonstration was scheduled for January 30, 2024, but ultimately took place on March 27,

12  2024 to accommodate Plaintiffs and their required attendees.  Defendants believe

13  Plaintiffs' characterization about the microphones during the demonstration are

14  exaggerated and fail to accurately describe varying environments or contexts in which

15  these transcription services were demonstrated and will be used.  For example, built-in

16  microphones in the laptops worked well in the medical-inpatient and education setting.  In

17  the gym setting, with Integrated Substance Use Disorder Treatment, the microphone

18  picked up the instructor well, too.  During the ViewSonic demonstration on the large

19  boards, the microphones accurately picked up voices from around the room.  As in any

20  public or group setting, softer-spoken individuals will need to be trained to speak louder to

21  ensure accurate transcription.  Plaintiffs wrongly assert that Defendants relied solely on

22  lapel-microphones, but in reality, these lapel-microphones were used when appropriate and

23  only in a few settings.  For example, when an instructor is interacting with a class, and

24  moving around, the lapel-microphone was sufficient.  Defendants are committed to

25  ensuring the appropriate microphones are used and will continue to improve this aspect of

26  the transcription services.  Plaintiffs' characterization of the phrase, "hey Cortana," is also

27  off the mark.  This phrase is a reset notification by the system.

28

1    Further, Plaintiffs fail to mention the inherent shortcomings of CART that were

2  observed and discussed at the demonstration, including CART not being available on-

3  demand in a correctional setting.  And merely pointing to an entry on a website does not

4  equate to being "on-demand" in a correctional setting to ensure class-member access.

5  Plaintiffs ignore that CART requires a 72-hour notice and strict adherence to a schedule

6  which is not always possible in a correctional setting because schedules are subject to

7  change.  For each schedule change, the advance notice is again required.  During a recent

8  demonstration, the CART operator signed off early, without warning, and the CART

9  services provider did not respond to telephone calls made once the operator signed-off,

10  leaving CDCR with no CART operator to provide transcription services.  Further, CART

11  does not work well with people who have limited English skills and the transcriber

12  periodically inserts unintelligible script instead of words.  This is not attributable to the

13  microphone used.  CART unnaturally inhibits the flow of conversation that will inhibit

14  class-member participation because it inserts an approximate five-second delay, whereas

15  ViewSonic does not.  Because CART is dependent on an operator it is subject to human

16  error.  For example, during the demonstration, the operator did not differentiate between

17  speakers or identify them consistently, and had difficulty keeping up with the different

18  speakers.  ViewSonic was superior in this regard.  CDCR has experienced similar failings

19  with CART in other settings.  For example, at a recent parole-suitability hearing, a class

20  member was provided CART, a sign-language interpreter, and a certified deaf interpreter.

21  The CART operator failed to accurately transcribe the hearing causing the class member's

22  attorney to waive the CART service because it was not accurate.

23    Offering these technologies to class members is inherently challenging given the

24  structural limitations and security requirements of a correctional setting.  Defendants are

25  committed to meeting their obligation to accommodate the class members who may benefit

26  from these technologies.  But Plaintiffs' myopic attachment to CART fails to acknowledge

27  the unprecedented implementation of policy that provides these class members with up-to-

28  the-minute technology to enhance their day-to-day lives and further ensure access.

1    Overall, there are approximately 78 DPH class members statewide and their

2   preferred effective communication method is sign language or other methods.  As of May

3   6, 2024, there are 46 DPH class members, statewide, whose primary or alternate means of

4   effective communication is written notes.  Last year, CDCR began deployment of iPhone

5   and iPad devices equipped with the translate application and the live-captioning

6   accessibility feature to DPH class members whose primary or alternative method of

7   communication is written notes, to include those who use sign language.  Class members

8   who received an iPhone or iPad are approved to have the device within their possession

9   during programs, services, activities, and housing unit settings, including restrictive

10   housing and any off-site appointments (*e.g.*, medical, same-day court appearances).  These

11   devices use state-of-the-art speech-to-text technology that addresses the needs of the DPH

12   class members during informal day-to-day interactions as well as programs, services, and

13   activities.  Disappointingly, Plaintiffs' statement ignores CDCR's proactive actions of

14   acquiring and distributing these devices as accommodations, without court intervention.

15    Plaintiffs attempt to depict CDCR as failing to proactively seek a resolution.  This is

16   false.  CDCR has in fact been proactive on this issue.  CDCR periodically conducts

17   informal demonstrations, tests, or other events to, among other things, gain insight from

18   incarcerated people, talk with staff, identify logistical or technical obstacles, gain

19   differential data or information, and identify or resolve potential security concerns.

20   Mindful that the Court ordered Defendants to "make CART *or an alternative reasonable*

21   *accommodation* available at SATF," (emphasis added) CDCR has explored technological

22   alternatives to CART.  During a November 21, 2023 workgroup meeting with Plaintiffs, in

23   an ongoing effort to promote collaboration and ensure transparency, CDCR reported on a

24   then-recent test of the CART and ViewSonic technologies, the results demonstrated that

25   ViewSonic was far superior to CART, for accuracy.  During the November 21, 2023

26   meeting, and before the parties entered into the SATF stipulation noted above, CDCR

27   offered to provide a demonstration of this technology and, as noted above, a demonstration

28   was ultimately scheduled for March 27, 2024, at San Quentin.  On December 6, 2023,

1   CDCR exhibited CART and ViewSonic to six class-member volunteers at San Quentin.

2   The class members were able to observe and compare the various features of these

3   technologies.  Insight gained from the experience suggests that ViewSonic is an equally

4   effective and preferred alternative to CART.

5            As to accessible phone calls, Plaintiffs are conflating various sub-populations

6   because hard-of-hearing class members (as opposed to Deaf non-signers and Deaf signers

7   when calling people who do not sign) are able to use their hearing aids and volume

8   controls to use the regular telephones to make and complete calls outside of the institution.

9   Defendants object to, and are troubled by Plaintiffs hollow accusations that Defendants

10  "fabricate" delays or "have spent more energy creating reasons," for delaying action on

11  this issue, as they fail to acknowledge the incredible effort put forth to accommodate class

12  members in the correctional setting or the inherent structural challenges that must be

13  overcome.  Defendants have sought to be transparent by ensuring that a responsive policy

14  may be successfully implemented at SATF, per the parties' stipulation, before deploying

15  the policy at other institutions.  This includes Plaintiffs' misleading assertion concerning

16  the installation of additional phones, to which CDCR has stated numerous times that it is

17  currently focused on installing captioned phones at SATF before extending efforts

18  statewide.  CDCR has often repeated that it is focusing on SATF before installing

19  captioned phones at other institutions.

20           With respect to effective communication of public announcements to DPH class

21  members, CDCR continues to work diligently to ensure DPH class members receive the

22  information provided by these announcements through the implementation of multiple

23  existing processes such as use of whiteboards, flickering of lights, face-to-face

24  communication, and the development of a new process that will take advantage of

25  technology available to the incarcerated population.  In light of the overlap, CDCR

26  continues to meet and confer with Plaintiffs and the Court Expert on this issue as part of

27  the court-ordered SATF investigation and the subsequent stipulation between the parties.

28  Defendants shared its policy utilizing tablets to ensure effective communication of

1    announcements on March 6, 2024, but have not yet received Plaintiffs' specific edits to

2    that policy.

3        CCHCS provided Plaintiffs' counsel with a link to the public website Cal eProcure

4    on November 6, 2023, to review the hearing-aid contract bid information.  The website

5    contains the hearing-aid contract, exhibits and addendums needed for potential bidders to

6    review, which was also accessible to Plaintiffs' counsel for their review.  Defendants

7    understand that Plaintiffs are aware of the information posted on the website because

8    CCHCS received a request from Plaintiffs on November 27, 2023 alerting CCHCS to an

9    agreed-upon hearing-aid specification that had been inadvertently omitted from the bid

10   information.  In response, and on that same day, CCHCS issued an addendum to the bid

11   information for the contract to include the specification.  Plaintiffs' counsel has been

12   engaged and updated throughout the hearing-aid bidding and contracting process.  CCHCS

13   confirmed the contract available on the public website was identical to the executed

14   contract, absent the name of the vendor and the rates.  At no point did CCHCS  give any

15   indication that the specifications in the formal executed contract were contrary to what was

16   agreed upon by all parties, including the provision that anyone with a hearing disability,

17   regardless of pure tone average, would be considered for a hearing aid on a case-by-case

18   basis. The Plaintiffs' concerns with the supply of hearing aids are unfounded as Plaintiffs

19   have not provided any documentation to support an issue exists.  CCHCS has met with the

20   number-one ranked hearing aid vendor, Pacific Coast Hearing Aid, and are satisfied with

21   the developments they have made to accommodate the influx of hearing aid services.

22   Additionally, should an issue arise in which the number-one ranked vendor is unable to

23   fulfill its contractual obligations, CCHCS has contracted with the number-two ranked

24   hearing aid vendor, The Maclean Group, and number-three ranked hearing aid vendor,

25   Virtual Benefit Solution.

26       Defendants remain committed to providing class members equal access to

27   programs, services, and activities in accordance with the ADA and the ARP and will

28   continue to confer with stakeholders to ensure the further accommodation of this

1  population.

2  **E.      Accommodations for Blind and Low Vision Class Members**

3        **1.      Plaintiffs' Statement**

4        Plaintiffs sent a December 10, 2021, demand letter to Defendants regarding the

5  need for a statewide system for identifying, documenting, and providing reading and

6  writing accommodations for blind and low-vision class members.  As Plaintiffs explained

7  in the demand letter, Defendants must (1) identify, track, and produce the accessible

8  formats of written materials (such as large print, braille, and audio) that blind and low-

9  vision class members need to read and write (a statewide request first made by letter on

10 March 15, 2021) and (2) make auxiliary aids for reading and writing—such as electronic

11 video magnifiers—available to these class members outside restricted locations and hours.

12       On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants

13 to resolve disputes around these two issues.  The parties negotiated the terms of the

14 stipulation from that point until November 2023.  In November 2023, after Plaintiffs filed

15 their motion challenging Defendants' failure to adequately accommodate blind and low-

16 vision class members and deaf and hard of hearing class members preparing for their

17 Parole Board Hearings, Defendants promptly ceased negotiations over the draft blind/low-

18 vision reading and writing accommodations stipulation.  Defendants also cancelled future

19 meetings of the joint blind and low-vision work group, which the parties had previously

20 formed to discuss issues relating to the accommodation of blind and low-vision class

21 members in CDCR custody.  At present, there are no scheduled meetings of the blind and

22 low-vision workgroup, and there are no meetings scheduled to continue negotiations over

23 the blind and low-vision reading and writing accommodations stipulation.

24       On March 6, 2024, in response to a court-ordered stipulation requiring CDCR to

25 explain how when and how it would resolve "all issues" at SATF addressed in the current

26 draft Blind/Low-Vision Stipulation, Defendants produced a memorandum dated January

27 31, 2024, regarding visual accommodations for certain blind and low-vision class

28 members.  On April 23, 2024, Plaintiffs submitted objections to Defendants, detailing the

ways in which Defendants' response fails to comply with the Court's order and outlining the steps that Defendants must take promptly to amend and develop policy to comply with the Court's order. Plaintiffs await a response from Defendants.

Plaintiffs are particularly concerned about Defendants' failure to accommodate people with monocular vision, who have a narrower field of vision and severely limited depth perception, especially at shorter distances, *see, e.g.*, *E.E.O.C. v. United Parcel Service, Inc.*, 424 F.3d 1060, 1064-65 (9th Cir. 2005), and who may face safety risks in a prison environment. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1067 (9th Cir. 2014) (finding that monocular vision can cause physical injury in prison where plaintiff "bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions"). Defendants do not proactively identify, track, or accommodate people with monocular vision in their custody, and recently redefined the DNV code from what was agreed upon in the Armstrong Remedial Plan—defining DNV as <u>all</u> incarcerated people "who have a vision impairment correctable to central vision acuity better than 20/200 with corrective lenses"—to now exclude those with monocular vision. When Defendants submitted to Plaintiffs proposed guidance to healthcare providers instructing these providers that incarcerated people with monocular vision should be excluded from DPV or DNV designation, Plaintiffs strongly objected. *See* **Exhibit D** attached hereto (Letter from Michael Nunez, Plaintiffs' Counsel, to Brianne Burkhart, CCHCS Counsel (Oct. 20, 2023)). We have seen institutions, particularly SATF, deny needed accommodations to people with monocular vision simply because they do not have a DPP code. *See, e.g.*, **Exhibit E** attached hereto (Letter from Marie Berry and Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, SATF's Failure to Accommodate People with Monocular Vision (Oct. 18, 2023) (with Exhibit 1)).

## 2.    Defendants' Statement

The vast majority of the issues addressed in the blind and low-vision stipulation previously negotiated by the parties is addressed in the January 31, 2024 memorandum titled "Accommodations for Incarcerated Persons with a Vision Impairment, Impacting

1   Placement." This memorandum outlines the process for identification, tracking, and

2   provision of reading and writing accommodations, including electronic assistive devices

3   (*e.g.*, electronic magnifiers, electronic readers, laptops), to vision-impaired class members

4   with a DPP designation of DPV. Pursuant to this memorandum, each DPV class member

5   who, following an individualized assessment by the Eye Care Institute vision consultants,

6   is recommended an assistive device to accommodate their independent reading and writing

7   needs, will be issued the recommended assistive device(s) for private and independent in-

8   cell use, with minimal restrictions. These individually issued devices will allow DPV class

9   members to privately and independently access printed materials related to CDCR

10  programs, services and activities, including when preparing for BPH hearings or

11  conducting post-hearing tasks. Moreover, the January 31, 2024 memorandum and the

12  attached template Local Operating Procedures: (a) direct provision of CDCR due process

13  documents in Braille or large print format to DPV class members who, following

14  individualized assessment, are determined to require large print or Braille print materials

15  as primary visual accommodation; (b) outline the process for acquisition, issuance and

16  replacement of the electronic assistive devices recommended as accommodations for DPV

17  class members who cannot write by hand; (c) discuss DPV class members' individualized

18  training on the use of the assistive devices recommended by the vision consultants; and (d)

19  creates a timeframe for individualized assessments and the issuance of the recommended

20  assistive devices. Further, in accordance with recent court orders (ECF Nos. 3583, 3584),

21  Defendants are developing procedures for conducting individualized assessments of DNV

22  class members to identify, document, and track their required accessible format or

23  auxiliary device for reading and writing purposes that are to be implemented once the

24  court-ordered meet-and-confer process with Plaintiffs is complete. Plaintiffs falsely

25  contend that Defendants have "redefined" the DNV code, which they have not. Rather,

26  CCHCS issued a December 4, 2023 memorandum, a copy of which is attached hereto as

27  **Exhibit F**, to provide needed clarification to the providers in the field. Moreover,

28  Plaintiffs were involved in the drafting of this memo because they were given an

1   opportunity to review and to provide feedback before it was issued.  Regardless of

2   Plaintiffs' false characterizations, Defendants will continue to provide required

3   accommodations to class members in accordance with the ADA and the applicable court

4   orders.

**F.      Problems Regarding Access to Assignments for Class Members**

6          The program-access workgroup continues to meet to discuss credit earning, the

7   assignment process, and disparities in the program-access assignment data in response to

8   Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 1314.  The

9   parties met again to discuss these issues on April 24, 2024. The next meeting is scheduled

10  for July 18, 2024.

**G.      Statewide Durable Medical Equipment Reconciliation**

**1.      Plaintiffs' Statement**

13         Defendants have agreed to ensure that anyone who had not been seen by a health

14  care provider in the last year would be seen for the purpose of reconciling their DME.  The

15  only outstanding issue then is to ensure a process whereby health care providers actually

16  undertake a reconciliation during at least one encounter annually.  Defendants maintain

17  that this is already a requirement during visits with Primary Care Providers, yet thousands

18  of class members without needed DME were identified by Defendants, despite this

19  existing requirement.  A process for ensuring that staff actually reconcile DME during

20  encounters is necessary.  On April 3, 2024, Defendants produced their first quarterly set of

21  DME Reconciliation reports.  One of the reports, the Non-*Armstrong* Patients with DME

22  Report, lists 104 patients system wide whose permanent DME indicates that they are very

23  likely class members who also should have a DPP tracking code to ensure proper housing

24  and retention of DME.   A second report, the DME Documentation Discrepancy Report,

25  lists 2,054 patients with DME discrepancies, such as missing orders or missing receipts for

26  DMEs in their possession.  This report also notes a 15.6% DME documentation

27  discrepancy rate.  A third report, the Durable Medical Equipment and DPP Code

28  Mismatches Report, lists 488 patients with a DPP code and DME mismatches, and lists

1   266 patients with permanent DME but missing DPP codes.  These reports show that there

2   remain substantial problems with missing DPP codes, and poorly documented and tracked

3   DME.  These problems can result in staff members not knowing when someone has a

4   disability that has been verified and needs to be accommodated, and can result in improper

5   removals of DME when searching cells and when people transfer to new units or new

6   prisons.

7          Unfortunately, Defendants' disability tracking system still fails to identify and track

8   class members with upper-extremity disabilities.  Plaintiffs are committed to resolving this

9   ongoing problem.

10         **2.     Defendants' Statement**

11         Collaboration between the parties continues to develop a sustainable DME

12   accountability process and progress has been made as noted above and as detailed in the

13   March 15, 2023 and May 15, 2023 Joint Case Status Statements.  *See* ECF Nos. 3473 at

14   23-26; 3484 at 22-25.  CCHCS and CDCR agree that individuals with upper-extremity

15   disabilities that limit a major life activity, require accommodation under the ADA, but

16   disagree that CCHCS and CDCR must create a new Disability Placement Program (DPP)

17   code for multiple reasons communicated to Plaintiffs as noted in the March 15, 2023 Joint

18   Case Status Statement.  *See* ECF No. 3473 at 26.  Notwithstanding these disagreements,

19   CDCR and CCHCS will continue to communicate with stakeholders about these issues.

20   **H.     Joint Monitoring Tool**

21         The parties remain committed to developing a strong and effective joint monitoring

22   tool.  The parties continue to convene small work groups, confer with the Court Expert

23   about informal briefing, and continue to meet to discuss and resolve the few remaining

24   disputes between the parties such as a format for scoring and reporting compliance.  Most

25   recently, the parties met on April 12, 2024, for a presentation regarding Defendants'

26   proposed scoring process.  Plaintiffs will review the materials provided by Defendants

27   following the presentation and look forward to meeting further with Defendants and the

28   Court Expert to discuss issues.

**I.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  The parties met with the Court Expert about these issues on March 7, 2024, and held multiple meetings regarding specific institutions as recently as April 16, 2024.  The parties have agreed upon a new Master Planning process to share information or plans related to Master Planning projects and to tour completed projects.  This new process may continue to evolve as it is put into use by the parties.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who is reviewing them and will provide timely feedback.  Plaintiffs have returned the first set of plans, for CSP-Lancaster, with their access expert's comments and requests for additional details and accessibility features.  The parties agreed that, when necessary, they will conduct joint tours with their respective experts, before ADA accessibility construction projects begin and after they are

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1  completed, to identify and resolve any ADA-non-compliance issues.

2

3                               Respectfully submitted,

4  DATED:  May 15, 2024         ROSEN BIEN GALVAN & GRUNFELD LLP

5                               By: /s/Penny Godbold
6                                   Penny Godbold

7                               Attorneys for Plaintiffs

8

9  DATED:  May 15, 2024         ROB BONTA
                                Attorney General of the State of California
10

11                             By: /s/Trace O. Maiorino
                                   Trace O. Maiorino
12                                 Deputy Attorney General

13                             Attorneys for Defendants

14

15                   **FILER'S ATTESTATION**

16        As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence

17  in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I

18  have maintained records to support this concurrence.

19

20  DATED:  May 15, 2024         /s/Penny Godbold
                                 Penny Godbold
21

22

23

24

25

26

27

28

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email:  pgodbold@rbgg.com

April 11, 2024

VIA ELECTRONIC MAIL ONLY

Jennifer Neill
Tamiya Davis
CDCR Office of Legal Affairs
Jennifer.Neill@cdcr.ca.gov
Tamiya.Davis@cdcr.ca.gov

> Re:   *Armstrong v. Newsom*
> Reforms Needed to Address Accountability System Failures
> Our File No. 0581-03

Dear Jenn and Tamiya:

The changes made thus far to CDCR's accountability system have failed to ensure that Defendants hold staff accountable when officers engage in disability-related misconduct.

Plaintiffs have issued nine quarterly reports and have identified scores of cases that show failures by Defendants to conduct complete and unbiased investigations and impose appropriate and consistent discipline.  Defendants are also not complying with other provisions of the Remedial Plans that impact class members statewide, including failing to meet deadlines for completing investigations and to appropriately route allegations of misconduct to LDIs and the AIU.  And even when investigators timely complete investigations, cases languish on the desks of Hiring Authorities for months.

These problems arise at a time when Defendants are spending millions of taxpayer dollars implementing the "California Model" aimed at "promoting positive relationships between staff and incarcerated people" through "professional, positive, and respectful communication."  *See* Explanation of Dynamic Security, https://www.cdcr.ca.gov/the-california-model/, last visited April 9, 2024.  The cases reviewed by Plaintiffs' counsel show that CDCR fails to hold staff accountable when they engage in harmful, disrespectful, and unprofessional conduct, including instances of unnecessary and excessive force against people with serious disabilities and mental illness.  To our surprise, CDCR recently eliminated the previously-required annual de-escalation training

[4464645.3]

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 2

for custody officers, which was aimed at achieving the California Model principles of improving communication and reducing use-of-force incidents. Data published on CDCR's own website confirms that statewide use-of-force incidents have increased by 29 percent over the last year. *See* https://www.cdcr.ca.gov/research/wp-content/uploads/sites/174/2024/03/Incident_Report_Public_d2402.pdf (reporting an increase in total UOF Incidents between February 2023 and February 2024).

If CDCR is serious about eliminating staff misconduct and improving relationships between incarcerated people and staff, it must take significant and immediate steps to improve accountability. **Below, Plaintiffs propose a series of additional remedies that are necessary to bring Defendants into compliance and avoid future litigation, including discovery.** Plaintiffs look forward to discussing these needed changes, along with changes proposed by Defendants, on May 2, 2024.

## I.    CDCR MUST ENSURE COMPLETE AND UNBIASED INVESTIGATIONS

The cases discussed in Plaintiffs' reports have repeatedly shown that investigators fail to adequately perform the most basic function of an investigation—to discover and document what actually happened.

Investigators fail to gather all relevant evidence, including pivotal video evidence (sometimes because the video had been destroyed before it was requested and sometimes because the wrong or too short a period of video footage was requested). In their investigation reports, investigators often mischaracterize or omit critical evidence and include irrelevant information that appears designed to discredit incarcerated people or exculpate staff. The format of most investigation reports is impenetrable and poorly organized in ways that make it difficult for Hiring Authorities to determine whether misconduct occurred. In addition, Defendants admit that AIU supervisors and Hiring Authorities do not conduct meaningful reviews of such reports to determine if the evidence cited is complete, accurate and unbiased, even though Defendants' own regulations and the Remedial Plans require that they perform those important tasks.

To date, Defendants have not proposed any meaningful reforms to address these problems. Plaintiffs propose the following changes, most of which we have previously raised with Defendants in November 2023 and February 2024:

- Defendants must establish benchmarks for what constitutes a complete and unbiased investigation. Prior to starting an investigation, Defendants must require investigators to describe all potential sources of evidence needed to determine what happened. Investigators must then gather all such evidence and discuss it in

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 3

the report.  Defendants must also require that investigators explain why they could not obtain any evidence.

- Investigative supervisors must perform meaningful and critical reviews of investigation reports and evidence, including reviewing all evidence discussed in the reports, to determine whether each investigation was complete and unbiased and the report accurately described the evidence.

- Defendants must retain all BWC and AVSS footage for a minimum of **180 days**, consistent with the recommendation of the OIG to "prevent the deletion of video evidence after 90 days" for cases under inquiry or investigation.  (*See* Annual Report, Table 5 at 18, https://www.oig.ca.gov/wp-content/uploads/2024/03/2023-OIG-Annual-Report.pdf)  Currently, Defendants automatically destroy all video after 90 days unless Defendants take affirmative steps to preserve the video.  Far too frequently, video evidence that would resolve allegations of staff misconduct is unavailable because Defendants failed to preserve it before it was destroyed.

- Defendants must improve the format of reports and require that investigators provide a summary whether the evidence supports a finding that misconduct occurred.

- Defendants must develop a robust system for tracking and evaluating the performance of investigators in the AIU and at the institutions.  Defendants must then use that information to provide additional training to poor-performing investigators.  If the investigator still cannot meet expectations with extra training, Defendants must remove such investigators from investigatory positions.

## II.    ADDITIONAL STAFFING IS NECESSARY TO ENSURE COMPLETE, UNBIASED, AND TIMELY INVESTIGATIONS

Defendants acknowledge that additional staff are necessary to handle the number of staff complaints that are currently in the system.  In January 2024, Defendants admitted to Plaintiffs' counsel and the Court Expert that they had been screening out staff misconduct complaints as "routine" that should have been routed to AIU, in violation of the court-ordered Six Prisons Remedial Plans.  *See* Court Expert's Quarterly Report on Investigations and Discipline (March 31, 2024), Dkt. 3587 at 2-3.  Defendants also acknowledge that they lack sufficient investigative staffing to handle all complaints that should have been routed to OIA but were not.  As the Court Expert has noted, the fact that more than one-fifth of cases received through September 2023 were not closed on time may well be an additional indicator of insufficient staffing.  *Id.* at 7.

[4464645.3]

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 4

Recognizing this concern, Defendants reportedly commenced a 30-day pilot on March 19, 2024, at two prisons (CSP-SAC and Folsom) to determine the number of staff complaints and the total number of complaints that should be routed to the AIU. Plaintiffs support this effort, which we understand is intended to determine investigator caseloads if Defendants were to come into compliance with the Six Prisons Remedial Plans and stop misclassifying staff complaints as "routine." Defendants also have put forward multiple proposals aimed at reducing the number of staff complaints in the system in an effort to manage caseloads. Plaintiffs remain willing to discuss Defendants' proposed changes on May 2, 2024.

That said, the steps taken to date to address staffing deficiencies are inadequate and, in some cases, may undermine the process by screening out credible and serious staff misconduct complaints. *See* Dkt. 3587 at 3-6. The primary focus must be on ensuring that the OIA, AIU, and institutions are staffed to handle the high number of complaints and not on efforts to divert allegedly non-credible allegations at the screening stage.

Plaintiffs therefore propose the following reform:

- Defendants must take steps to identify the average number of monthly staff complaints and the average time it takes for an investigator to complete a staff misconduct investigation, and to create a staffing plan to ensure they have enough investigator positions to complete unbiased and complete investigations by the deadlines set forth in the Remedial Plans.

## III. CDCR MUST ENSURE CONSISTENT AND APPROPRIATE DISCIPLINE

Plaintiffs' counsel have identified numerous cases where Hiring Authorities have failed to issue consistent and appropriate discipline. In some cases, Hiring Authorities have failed to sustain allegations of misconduct despite clear proof of such included in investigation reports. In other cases, Hiring Authorities have sustained allegations of misconduct but have failed to impose appropriate discipline consistent with CDCR's policies, including the Disciplinary Matrix. Moreover, there are currently no safeguards to ensure Hiring Authority decisions are reviewed. Defendants have thus far not proposed any changes to address these serious failures.

Hiring Authorities have also delayed accountability by failing to take swift action on completed cases. According to data produced by Defendants on February 1, 2024, 45 percent (1,733 of 3,817) of the staff complaints routed to the AIU between December 2022 and January 2024 where investigations have been completed are currently waiting for Hiring Authority action. *See* Plaintiffs' February 2024 Report at 47.

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 5

These delays mean that credible allegations of staff misconduct are sometimes pending on wardens' desks around the state for months or even years.  In some cases, the Hiring Authorities' delays have resulted in the statute of limitations expiring, making discipline impossible.

It is clear that Hiring Authorities are too busy with other responsibilities to review all investigations, especially in cases with multiple exhibits and video evidence.  Defendants previously rejected Plaintiffs' proposal to centralize disciplinary decision making, stating that it was essential for Hiring Authorities to make disciplinary decisions about staff at their own prisons.  Now, to account for Hiring Authorities who are overwhelmed at prisons with a high number of complaints, Defendants have spread cases statewide, meaning that Hiring Authorities are no longer making disciplinary decisions at their own prisons.  Thus, the primary reason Defendants insisted that Hiring Authorities be responsible for disciplinary decisions no longer applies.

In light of these issues, Defendants must make the following changes:

- Defendants must centralize disciplinary decision making at CDCR headquarters.  Doing so will improve the likelihood of appropriate and consistent application of the Disciplinary Matrix.  It will also ensure consistent application of statewide policies, including use-of-force policies, and it will enable Defendants to closely monitor misconduct in their prisons.

- If Defendants do not centralize disciplinary decision-making, they must adopt a system for holding Hiring Authorities accountable if they are doing a poor job identifying misconduct and ensuring appropriate discipline.

- Defendants must require that disciplinary decisions are made within 30 days after the close of an investigation.

## IV.  RESOLUTION OF DISAGREEMENTS REGARDING USE-OF-FORCE CASES

Plaintiffs have reported on numerous cases where staff violated CDCR's use-of-force policies—including by failing to deescalate situations, unnecessarily escalating situations, using immediate force when no imminent threat was present, and using excessive force—but CDCR failed to hold staff accountable.  Defendants have agreed with Plaintiffs' conclusions in few of these cases, concluding instead that staff were compliant with use of force policies.  In discussions with Plaintiffs about individual cases, Defendants have often been unable to clearly explain how they interpret their own

[4464645.3]

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 6

use-of-force policies.  Defendants' uncertainty about their policies suggests that staff, who are responsible for complying with policy, and Hiring Authorities, who must enforce the policies, may also lack clarity about use-of-force expectations.

Consistent with Plaintiffs' findings, the OIG recently found that officers are frequently resorting too quickly to using force.  *See* July 3, 2023 OIG Report re Monitoring the Use-of-Force Review Process of the CDCR at 1 (finding that in 44 of 113 incidents reviewed in which officers had the opportunity to deescalate prior to using force (or 39%), "officers failed to effectively communicate with the incarcerated person or did not adequately attempt de-escalation strategies").  The OIG reports that CDCR's de-escalation training course was removed from its required annual training program in 2020, and recommends that CDCR "reinstate its de-escalation course as mandated training for all custody staff." *Id.*

To ensure that Defendants hold staff accountable when they violate the use-of-force policies, Defendants must take the following steps:

- The parties should mutually agree on a use-of-force expert to review cases, resolve disputes between the parties, and make recommendations regarding changes within CDCR to either update its policies or to bring Defendants into compliance with policies.

- In conjunction with retaining a use-of-force expert, the expert should review and evaluate the IERC process to make recommendations to ensure that staff involved in that process understand and apply all use-of-force policy requirements.

- Defendants should ensure that all cases alleging excessive or unnecessary force are reviewed—and disciplinary decisions are made—by a use-of-force subject-matter expert at the headquarters level.

- Defendants must clarify that an improper immediate use of force (force taken when there is no imminent threat) is an "unnecessary use of force" and violates existing policy.

- Per the OIG's recommendation, Defendants should reinstate their de-escalation course as mandated training for all custody staff.  This course should be in addition to the training required by the Six Prisons Orders.

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 7


## V.      REMEDIES TO ENSURE STATEWIDE DISABILITY-RELATED STAFF MISCONDUCT IS ADDRESSED

Disability-related staff misconduct is occurring statewide, beyond the Six Prisons currently covered by *Armstrong* orders.[1]  Because disability-related staff misconduct is occurring statewide, it is essential for Defendants to have a **uniform statewide accountability system**.  This should necessarily include access to the same types and quality of evidence at all prisons.  Defendants already agree that cameras are a "powerful tool" to address misconduct in prisons.  *See* 2023-24 Budget Request Re Statewide Correctional Video Surveillance Continuation at 4.  Defendants have also specifically acknowledged that the existence of audio and video evidence, achieved through implementation of BWCs, "improves the institution's ability to conduct and conclude investigations compared to investigations reliant solely on eyewitness testimony."  *Id.* at 6.  There is no doubt that body-worn camera evidence is essential to most investigations because hearing the dialogue between officers and incarcerated people is often critical to understanding whether a violation has occurred.  *See, e.g.,***SATF-20032741** (BWC evidence capturing dialogue was essential to uncovering the egregious failure of staff to conduct a confidential interview with a class member reporting disability discrimination).

---

[1] Plaintiffs have sent letters about disability-related staff misconduct at CHCF, CMF, SAC, MCSP, CCI, VSP, and NKSP and are aware of additional allegations of disability-related staff misconduct that have been filed on 602 Forms at other prisons including SOL and CTF.  These allegations include: an officer who allegedly pushed a class member out of his wheelchair during an unnecessary use of force (*See* letter from Jacob Hutt dated February 22, 2024); a class member who alleged staff ordered him to the ground and told him, "I don't give a fuck," when he explained he was wearing a yellow vest and unable to get down (*See* letter from Amber Norris dated October 9, 2023); a class member who alleges that staff retaliated against him and housed him with a new cellmate who attacked him after he complained on a 602 about staff failing to accommodate his mobility and vision disabilities (*See* letter from Caroline Jackson dated March 16, 2023).  *See also* letter from Emilio Bustamante, Marissa Hatton and Amber Norris dated April 5, 2024 (re: CMF); letter from Jacob Hutt dated June 1, 2023 (re: CHCF); letter from Ernest Galvan and Penny Godbold dated May 8, 2023 (re: MCSP); letter from Jacob Hutt and Amber Norris dated October 5, 2022 (re: CHCF); letter from Gabriela Pelsinger and Rita Lomio  dated May 12, 2022 (re: SAC); letter from Jacob Hutt and Amber Norris dated February 18, 2022 (re: CHCF); letter from Ben Bien-Kahn dated April 6, 2023 (re: CCI); letter from Claudia Ceseña, Ilian Meza Peña and Amber Norris dated October 20, 2023 (re: CMF).

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 8

In addition, staff misconduct complaints must be treated the same regardless of the prison of origin. Despite stating they intend to use the same accountability process statewide, Defendants have multiple times taken unilateral action that contradicts that claim. For example, Defendants adopted a problematic "causal connection" requirement for screening staff misconduct complaints at every prison except the six covered by the Remedial Plans. *See* Dkt. 3440 at 11. Further, the inappropriate recategorization of nearly 600 backlogged staff complaints as "routine," as discovered and reported on by the OIG, *see* Dkt. 3587 at 3-5, appears (based on Defendants' response to Plaintiffs' request for production of cases) to have primarily impacted non-Six Prisons claims. Lastly, Defendants recently deployed strike teams to address backlogs of staff complaints assigned to LDIs at only LAC and RJD, two prisons currently covered by court order. These actions show that Defendants have been treating, and will likely continue to treat, staff complaints by incarcerated people at non-Six Prisons differently simply based on the prison of origin. Plaintiffs have already attempted, including after the Allegation Decision Index ("ADI") was removed from regulation unilaterally and without prior notice to Plaintiffs and the Court Expert, *see* Dkt. 3587 at 5, to have the parties at least stipulate to using the ADI statewide. Defendants have thus far refused. Statewide staff misconduct investigations must be held to the same high standards in place at the Six Prisons.

To avoid future litigation aimed at improving evidence and ensuring uniform standards for investigations and discipline:

- Defendants must, within a reasonable period of time, implement fixed cameras and BWCs at all prisons. Fixed cameras and BWCs are essential pieces of any system that can hold staff accountable for disability-related misconduct.

- Defendants must agree to maintain the same accountability system—including screening, investigations, discipline, and all related processes—statewide.

## VI.  DEFENDANTS MUST COMPLY WITH THE ACCOUNTABILITY ORDERS FOR THE NON-SIX PRISONS

The Court mandated that Defendants track and investigate and produce monthly reports to Plaintiffs' counsel regarding the outcome of investigations into **all** statewide allegations regarding the failure of staff to comply with *Armstrong* orders, the *Armstrong* Remedial Plans, and ADA requirements. *See* Dkt. 2479 at 2. Defendants are required to produce investigation files when Plaintiffs have good faith disagreement with the outcome of an investigation. *Id.* at 3. In its Six Prisons orders, the *Armstrong* Court clarified that the requirements of the accountability orders apply to all allegations of

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 9

disability-related staff misconduct, including allegations that staff denied class members access to services, programs, activities, accommodations, or assistive devices; used excessive or unnecessary force against a class member; or violated the ADA's anti-retaliation and intimidation provisions.  *See* Dkt. 3059 at 33-35; Dkt. 3217 at 34-36.

Pursuant to these orders, Defendants must produce statewide allegations of disability-related staff misconduct to Plaintiffs' counsel on a monthly basis.  However, disability-related staff misconduct complaints (of the type that are included in the quarterly production for the Six Prisons) which class members file on 602 forms and which Defendants route for investigation through the staff complaint process, do not generally appear on statewide monthly *Armstrong* non-compliance logs.  For example, some of these allegations discussed in footnote 1, *supra*, appear on accountability logs, but many do not.  In the case of the of the class member at CCI who alleged that an officer refused to accommodate his disability and then retaliated against him by closing the door on him and denying him access to an ADA Worker, Defendants initially included this case on the April 2023 Compliance Log as "Staff Retaliating-No access."  However, on the June 2023 Log, Defendants indicated that the case had been "cancelled" from the log because it was "entered in error."  The inclusion of some but not all disability-related staff misconduct allegations on the logs and the removal of the CCI allegation from the logs suggests that there is confusion about which staff misconduct allegations belong on the logs.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[4464645.3]

Jennifer Neill
Tamiya Davis
April 11, 2024
Page 10


As a result, Plaintiffs' counsel do not have access to monthly logs showing the outcome of all statewide allegations of disability-related staff misconduct.  Defendants are therefore not complying with the orders of the Court.

- Defendants must come into compliance with court-ordered accountability requirements which impact claims of disability-related staff misconduct at all CDCR prisons, to produce logs regarding the outcome of those cases to Plaintiffs' counsel, and to ensure production of investigation files to Plaintiffs' counsel.

Plaintiffs look forward to meeting on May 2, 2024.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:  Penny Godbold
Of Counsel

PMG:cg

cc:  Ed Swanson          Trace Maiorino
     August Gugelmann    Sean Lodholz
     Audrey Barron       Olena Likhachova
     Patricia Ferguson   Sharon Garske
     Ramon Ruiz          Amarik Singh
     Chor Thao           Ursula Stuter
     Co-counsel

[4464645.3]

# EXHIBIT B



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Sara Norman
Donald Specter

VIA EMAIL ONLY

February 6, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

Ms. Brianne Burkart
CCHCS Office of Legal Affairs

RE:     *Armstrong* Advocacy Letter
██████ ████████ █████ SATF (Person A in Court Expert's SATF Report)

Dear Ms. Davis:

We write regarding Defendants' failure to accommodate ██████ ████████ █████ a 64-year-old full-time wheelchair user with low vision currently housed at SATF. Despite repeated requests since his transfer from SVSP to SATF on December 27, 2023, Mr. █████ remains without accommodations critical to his independence, safety, and dignity. Mr. █████ was housed on Facility A until earlier this afternoon, when it appears he may have been admitted to the mental health crisis bed following an incident of self-harm.

This is not the first time Mr. █████ has been without accommodations after transferring to SATF. When Mr. █████ previously transferred from SVSP to SATF in October 2021, the institution failed for six months to address his requests to replace the durable medical equipment lost during his transfer. He did not receive the items he had lost until after he attempted suicide. The Court Expert described these failures in his first report regarding the treatment of people with disabilities at SATF, referring to Mr. █████ as "Person A." Dkt. No. 3446 at 18-20 (Dec. 20, 2022) ("To be clear, Person A told us that he did not attempt suicide *because of* his difficulty obtaining DME, but said that the difficulty he encountered contributed to his overall feelings of hopelessness and negative mental health.").

## I.     Incontinence Supplies

Mr. █████ has urinary and fecal incontinence for which he is ordered 45 XXL diapers per week. He reported that, prior to transferring to SATF in December, he told SVSP healthcare staff of the problems he had with his previous transfer to SATF, and SVSP healthcare staff agreed to issue him an additional week of diapers. He transferred to SATF with three weeks of diapers

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnell • Ruth Morgan • Adrienne Yandell



and ran out in mid-January. Mr. ████ reported that when he requested additional diapers from healthcare staff at SATF, they issued him XL diapers rather than XXL diapers, telling him that the diapers he requested were not available. Mr. ████ reported that when he protested that the diapers were not large enough, nursing staff responded, "You either take that or take nothing."

Mr. ████ electronic medical record documents issuance of diapers of varying sizes since mid-January.

| January 16 | 7536 DME/Supply Receipt: 11 XXL Briefs<br><br>On the signed receipt in the medical record, Mr. ████ wrote: **"I've only received 11-of 35 as need/size unknow [sic] needed 2XX"** |
|---|---|
| January 18 | 7536 DME/Supply Receipt: 2pk XL briefs |
| January 22 | 7536 DME/Supply Receipt: 45 XXL Briefs |
| January 29 | 7536 DME/Supply Receipt: 45 XL briefs |
| January 31 | Progress Note (LVN ████): "Pt submitted formal written complaint requesting the proper ordered size of XXL briefs. This writer looked in the stock room, no XXL are available. Pt was advised that size maybe a special order item due to the size. Pt will ask DME nurse regarding W/C and XXL briefs tomorrow." |

It was inappropriate for healthcare staff to direct Mr. ████ to return to the clinic again to ask for these supplies, after he already had informed staff issuing him the supplies and submitted a "formal written complaint." Progress Note (Jan. 31, 2024). Mr. ████ reported that the XL diapers he was provided fit poorly and were less absorbent than XXL diapers. As a result, he described modifying his behavior in demeaning ways, including by eating and drinking less to avoid a toileting accident he could not manage without the correct supplies. It does not appear that healthcare staff issued him XXL diapers until today – after Plaintiffs' counsel wrote to Defendants last Friday to ask that Mr. ████ be provided supplies in the correct size.

Mr. ████ account is alarmingly reminiscent of the Court Expert's finding that healthcare staff at SATF denied the correct diapers to class members, "not because the class members did not require [those diapers] as an accommodation, but because healthcare workers mistakenly believed they were not available at SATF." Dkt. No. 3446 at 34. In response to the Court Expert's findings, SATF leadership represented that they were addressing the availability of supplies in patient care areas, including clinics, and had retrained staff on the process for ordering medical suppies. *See* Dkt. No. 3510-1, Ex. 17 (Sept. 21, 2023) (SATF Tracking Tool). Mr. ████ experience calls into question the efficacy of that training.



We request that SATF:

**(1)**  Investigate and report why, when Mr. ██████ order for incontinence supplies specifies that he requires XXL diapers, those diapers were not readily available, and what corrective action will be taken;

**(2)**  Explain what healthcare staff at SATF should have done after Mr. ██████ first requested XXL diapers, and whether that was done in this case;

**(3)**  Explain whether XXL diapers are available at all times in the (a) clinics, (b) housing units, and (c) medical warehouse at SATF and if not, why not; and

**(4)**  Explain what action, if any, healthcare staff took to investigate the availability of XXL diapers after Mr. ██████ reported that he had not received them, and identify whether this action was consistent with SATF policy.

## II.  Trapeze Bar

Mr. ██████ requires an overhead trapeze bar to maneuver and assist with transfers to and from bed. He reported that when he initially saw a provider following his transfer to SATF, he informed the provider that he previously had a trapeze bar and requested that he again be provided the accommodation at SATF. Mr. ██████ reported that the provider responded that he would need to be re-evaluated. As Mr. ██████ had not yet received the accommodation as of February 2, 2024, he believed the provider ultimately had denied his request.

In fact, it appears that Mr. ██████ provider intended to grant his request. On January 2, 2024, after Mr. ██████ was seen for his initial interfacility transfer visit, the provider submitted a Request for Services for a trapeze bar. The same day, a Chief Physician and Surgeon denied the request, noting, "This is not a DME. Update 7410/1845 to include the accommodation." The provider entered a routine-priority order for the trapeze bar as non-formulary durable medical equipment, with a compliance date of April 1, 2024. However, contrary to policy, the provider does not appear to have updated the 1845/7410 to verify Mr. ██████ disability and communicate to custody staff via the Strategic Offender Management System that he required an accommodation. *See* Memorandum from Dr. Grace Song, Deputy Medical Executive, Clarification on Use and Documentation of Trapeze vs. Grab Bars (Apr. 16, 2021).

Failure to timely provide trapeze bars to class members at SATF has been the subject of numerous advocacy letters and negotiations between the parties for years. Institution leadership have assured Plaintiffs' counsel that trapeze bars are readily available and will be installed within 24 hours. It is inexplicable, then, that Mr. ██████ has waited over a month to receive an accommodation that he reports he previously had at another institution. He reported that in the

interim, he tied shoelaces to the bunk above him to help him maneuver and transfer. He described falling on at least one occasion when the shoelace broke as he was trying to transfer.

We request that SATF:

**(5)** Immediately install a trapeze bar in Mr. ███████ current housing assignment or explain why this cannot be done, and assign him to a bed with a trapeze bar when he is discharged from the mental health crisis bed;

**(6)** Explain the policy and/or process for healthcare staff to document a trapeze bar for a patient, how that should be communicated to custody staff, and how custody will install the trapeze bar or otherwise ensure the patient is housed in a bed with a trapeze bar, and the timeframes for doing so;

**(7)** Investigate and report on the reasons for the delay in providing Mr. ███████ a trapeze bar and all corrective action taken;

**(8)** Provide training to Mr. ███████ provider on correctly documenting that a patient requires a trapeze bar as an accommodation; and

**(9)** Explain why Mr. ███████ was not assigned to a bed with a trapeze bar upon transfer to SATF, including whether his CDCR 1845/7410 documented need for such a placement, and if it did not, why not.

### III.  Non-Formulary Wheelchair

Mr. ███████ wheelchair was in poor repair when he arrived to SATF. *See* Progress Note (Dec. 20, 2023) (requested "new wheelchair due to 'bearing being no good'" while at SVSP; it does not appear that a replacement wheelchair was provided before he transferred to SATF). On January 15, he filed two sick call requests reporting excruciating pain due to his cervical condition, and requesting a wheelchair he could operate independently, as "the one I have at present I'm unable to do so (due to my disability state)." On January 17, the date his 7362 was triaged, he received a one-for-one exchange of his wheelchair.

Unfortunately, Mr. ███████ reported that the wheelchair he received in exchange is just as difficult to operate. He reported that people who push him frequently complain that the wheelchair is heavy and does not roll well. And Mr. ███████ who has a serious cervical condition, reported that the effort of pushing the wheelchair himself has caused such significant pain that he requested, and a provider agreed to provide, a neck brace. *See* Outpatient Progress Note (Jan. 30, 2024) ("Avoid strenuous exercise. Orders: Collar, Cervical spine").


Mr. ██████ reported that he previously used a lightweight wheelchair recommended by a physical therapist, which was easier for him to operate independently. He reported that he recently filed an 1824 while at SATF requesting that he again be provided a lightweight wheelchair. However, he reported that when interviewed by healthcare staff about his request, healthcare staff focused narrowly on the state of his current wheelchair, and did not address his concern that his wheelchair is too heavy for him to operate himself. It appears that a nurse may have documented this encounter in Mr. ██████ electronic medical record:

> Pt was brought up to the clinic for a formal written complaint regarding his current W/C. Pt is complaining that the W/C he came to SATF with from another facility was made just for him by a physical therapist and would like it back. He states this W/C was temporarily given to him until he could get that previous W/C back. When asking Pt what he feels is wrong with the W/C he is currently using, he states that it is hard for him to wheel himself due to his bone disorder. He was asked if he is aware of any broken parts/pieces on the W/C and Pt refuses having knowledge of anything broken on the W/C. Pt's only complaint is the lack of ease to wheel himself. Pt will come to clinic in the morning to speak with DME MA in hopes to help get his problem resolved.
>
> Jan. 31, 2024 (LVN ██████)

Again, it was inappropriate for healthcare staff to direct Mr. ██████ to return to the clinic after he already had informed healthcare staff of his concern and submitted a "formal written complaint." Progress Note (Jan. 31, 2024). Moreover, there is no documentation of a subsequent encounter between Mr. ██████ and healthcare staff regarding his request for a wheelchair that is easier to operate, and it does not appear that Mr. ██████ is scheduled to meet with his provider regarding his request.

Plaintiffs' counsel raised concerns with SATF staff's failure to evaluate people for, and timely provide, lightweight wheelchairs in November 2023. *See* Letter from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, and Brianne Burkart, CCHCS Office of Legal Affairs, Non-Formulary Wheelchairs at SATF (Nov. 29, 2023). We requested that the institution develop a corrective action plan to address training for custody staff, healthcare staff, and all members of the RAP regarding the availability of non-formulary and/or lightweight wheelchairs depending on a person's disability needs. We have not received a response in 69 days – well beyond the up to 45 days outlined by Defendants' policy.

. . . .
. . . .

We request that SATF:

**(10)** Evaluate Mr. ██████ for a wheelchair that will better accommodate his disability and allow him as much independence as possible, and report the outcome of the evaluation and whether and when a new wheelchair was ordered and provided to Mr. ██████ and

**(11)** Explain whether healthcare staff at SATF, including LVN ██████, responded appropriately to Mr. ██████ request for a wheelchair that better accommodated his disability and, if not, what will be done to prevent that from happening again.

Thank you for your prompt attention to these matters. We look forward to your response.

Sincerely yours,

Skye Lovett
Investigator

Rita Lomio
Senior Staff Attorney

cc:   Mr. ██████
Co-counsel
Ed Swanson, Audrey Barron
Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLA Armstrong (CDCR Office of Legal Affairs)
Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)
Dawn Lorey, Lourdes White, Darnell Mebane, Cory Lo, CDCR CAMU (DAI)
Lois Welch, Steven Faris (OACC)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, Dawn Stevens, Dharmendra Sharma, Antronne Scotland, CCHCS Accountability, CS Advocacy (CCHCS)

# EXHIBIT C



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Sara Norman
Donald Specter

VIA EMAIL ONLY

November 29, 2023

Ms. Tamiya Davis
CDCR Office of Legal Affairs

Ms. Brianne Burkart
CCHCS Office of Legal Affairs

RE:        *Armstrong* Advocacy Letter
           Non-Formulary Wheelchairs at SATF

Dear Ms. Davis and Ms. Burkart:

I write regarding SATF staff's failure to evaluate people for, and timely provide, non-formulary wheelchairs. The institution housed at least 222 wheelchair users as of yesterday, nearly 100 of whom use a wheelchair full-time. The patient registry for SATF, available on the CCHCS Quality Management server, also lists 25 patients at SATF who use wheelchairs and have some form of paralysis (paraplegia or hemiplegia) documented as a chronic condition.

**1.        ███████  ████████  ██████  DPW**

███ ████ is a full-time wheelchair user who has limited mobility in his upper body. He has metal and screws in his jaw as a result of being shot in the face, and he has had reconstruction done on his neck. He had a stroke several years ago that worsened his physical condition, has limited ability to move his left shoulder, and has limited strength in his left hand.

Mr. ████ reported that, as a result of his disabilities and medical condition, it is difficult and painful for him to push himself in his heavy wheelchair, and he has to rely on other people to push him. Mr. ██████ who also has incontinence, would prefer to be independent and navigate himself from his bed to the dayroom, to the shower, and to the toilet, particularly at night when an ADA worker is not available. He reported that independence is important to afford him dignity; if he could push himself to the bathroom, he would not have to have someone wait there for him to finish. And he reported that pushing himself is also a form of exercise; he is concerned that his condition is worsening and he would like to stay as active as possible.

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnell • Ruth Morgan • Adrienne Yandell

Ms. Tamiya Davis & Ms. Brianne Burkart
Re: Non-Formulary Wheelchairs at SATF
November 29, 2023
Page 2

The RAP at SATF failed to address Mr. █████ request for a wheelchair that would better accommodate his disabilities. In particular, on June 29, 2023, with the assistance of Plaintiffs' counsel, Mr. █████ submitted an 1824 requesting "a lighter wheelchair that is easier for me to push," explaining that "my wheelchair is very heavy, making it hard to push myself." *See* **Exhibit A**, 1824 Log No. SATF-A-23-01228.

Sergeant █████ interviewed Mr. █████ in response to this request. The sergeant failed to address Mr. █████ request for a different (lighter) wheelchair, and instead simply advised him to "get medically revaluated [sic] as he states his [sic] losing strength" and to have his wheelchair inspected in case it needs repair.

| STATE OF CALIFORNIA | DEPARTMENT OF CORRECTIONS & REHABILITATION | | CDCR-128B |
|---|---|---|---|
| INMATE: █████ | CDCR#: █████ | HOUSING: A2-█████ | |

On June 30, 2023, the appeals office received a Reasonable Accommodation Request (CDCR 1824) Log number SATF-A-23-01228, in which you state you have a difficult time navigating over the rough terrain on the yard with the wheelchair, you state the wheelchair is very heavy to push it by yourself and your requesting for a lighter wheelchair that will be easier for you to push yourself on the yard.

During the interview Inmate █████ stated he is requesting a new wheelchair due to the one he is issued, is too heavy. Inmate █████ stated he has a difficult time navigating in the morning when transferring from the bed to the wheelchair. Inmate █████ stated its difficult accessing the restroom where he has to transfer to the toilet because of his injuries and old age. However, █████ stated that he does not have issues accessing PSA's throughout the day as he utilizes the ADA workers to access those programs. █████ stated if he had a different wheelchair that is lighter it would make his life easier as he is getting older and is losing his strength.

I advised █████ to submit a medical request form to medical so he could get medically revaluated as he states his losing strength. Additionally, to turn a medical request form so his assigned wheelchair could get inspected, based on my observations the assigned wheelchair does not require repair and appeared to be functional.

I informed █████ to utilize ADA care givers for his ADL's and if he can't find one to ask his Floor Staff Correctional Officers and one will be afforded to him.

Effective Communication was achieved as I'm currently in the list for Spanish Interpreter

█████

Facility A, Correctional Sergeant
CSATF/SP Corcoran

The sergeant also informed Mr. █████ "to utilize ADA care givers for his ADL's," failing to recognize the importance of Mr. █████ independence under the ADA. *See* 28 C.F.R.

§ 35.160(b)(2) ("In order to be effective, auxiliary aids and services must be provided … in such a way as to protect the privacy and independence of the individual with a disability."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506-07 (4th Cir. 2016) (holding that blind voters were denied meaningful access to absentee voting program in violation of ADA where they could vote absentee only with assistance from sighted persons and could not vote absentee privately and independently at place and time of their choosing).

Healthcare staff also failed to substantively address Mr. ███████ request for a lighter wheelchair. Mr. ██████ filed a 7362 on July 2, 2023, asking for a lighter wheelchair because his current one was too heavy for him in light of his medical condition. An MA told him that "we do not have a lighter wheelchair," and an RN told him that "we do not special order wheelchairs." This is difficult to understand, as the CME informed Plaintiffs' counsel in November that lightweight wheelchairs can be provided to patients if needed.



Finally, the RAP response itself, dated July 28, 2023, also failed to address Mr. ██████ request for a different wheelchair to better accommodate his disability, and instead simply told him that "[t]he wheelchair repair shop has been re-opened and SATF is now able to perform most wheelchair repairs in-house."

This represented a "missed opportunity to recognize that [custody and healthcare staff] apparently did not understand the nonformulary process or their responsibility to utilize it to accommodate the individual needs of people with disabilities." Court Expert's Report Regarding Treatment of People with Disabilities at SATF, Dkt. No. 3446 at 57 (Dec. 20, 2022) (discussing RAP's failure to identify improper denials of DME "on the grounds that the DME was simply not issued at SATF").

Ms. Tamiya Davis & Ms. Brianne Burkart
Re: Non-Formulary Wheelchairs at SATF
November 29, 2023
Page 4

The Court Expert recommended almost a year ago that "[h]ealthcare staff, including PCPs and RNs, and all members of the RAP should also be reminded of the responsibility to provide individualized accommodations, even if doing so requires ordering nonformulary items." *Id.* at 63 (Recommendation 19). Defendants reported that members of the RAP received training in response to this recommendation, and that a subject matter expert attended the SATF RAP weekly for the month of December 2022 and would "continue on an ongoing basis" and provide "ongoing training." SATF Tracking Tool, Dkt. No. 3510-1, Ex. 17 (Sept. 21, 2023). As the RAP's treatment of Mr. ███████ request shows, this corrective action has not yet proved effective.

Mr. ██████ reported that the RAP's denial of his request made him feel "many emotions – sad, frustrated, discriminated against, and angry." We are concerned that the SATF RAP's failure to provide accommodations, including non-formulary accommodations, to class members like Mr. ██████ may discourage those class members from requesting needed accommodations again.

**2.** ██████ ██████ ██████ **DPW**

██████ ██████ a full-time wheelchair user, filed an 1824 in January 2023, with the assistance of Plaintiffs' counsel, requesting a quickie wheelchair. *See* **Exhibit B**, 1824 Log No. SATF-G-23-00134. Mr. ██████ explained that "my current wheelchair is not meeting my disability needs," that he is paraplegic, and that "when I was in the community, I was fitted for a quickie wheelchair that fit me properly." The RAP response, dated February 16, 2023, stated that "a quickie wheelchair order was placed on 1/23/2023."

During a Plaintiffs' monitoring tour two months later, we learned that Mr. ██████ still did not have the quickie wheelchair. We helped Mr. ██████ file another 1824, explaining that his current chair did not fit correctly, causing back pain, and that he had previously been approved for a quickie wheelchair. *See* **Exhibit C**, 1824 Log No. SATF-F-23-00740. During the RAP's discussion of the request, which Plaintiffs' counsel observed, medical staff reported that contrary to the response Mr. ██████ received in February, the wheelchair had not been ordered, as SATF did not yet have a contract to fabricate it. Medical staff also reported that Mr. ██████ was accommodated with the wheelchair he had at the time. However, when queried by the ADA Coordinator, medical staff admitted that Mr. ██████ had not actually been seen to evaluate his wheelchair, and that their opinion was based only on the type of wheelchair he had been issued – the same type he reported in the 1824 did not fit and was causing him pain.

The RAP response, dated May 8, 2023, stated that "a Quickie Wheelchair is customized to a patients [sic] by measurement, thus you were measured by your Primary Care Provider (PCP) on 4/19/2023 based on the recommended layout. This information was provided to the wheelchair vendor. Health Care Services is now in the process of obtaining a contract with the wheelchair

Ms. Tamiya Davis & Ms. Brianne Burkart
Re: Non-Formulary Wheelchairs at SATF
November 29, 2023
Page 5

vendor. Once all requirements are obtained, and [sic] emergent order for a Quickie Wheelchair will be placed." From the medical record, it appears that the CME approved an order for a quickie wheelchair via a paper RFS (not the PowerForm) on April 13, 2023. We do not see it listed in the Orders in the electronic medical record, and we cannot tell whether a quickie wheelchair has been provided to Mr. ███.

3.  ███ ███ ███ **DPW, DNV**

On May 1, 2023, a non-formulary wheelchair with dual hand rim on the left side or a single arm lever and a car closure seat belt was ordered for ███ a full-time wheelchair user, then at CHCF, due to right sided weakness. *See* **Exhibit D** ("Patient can only use left upper extremity and would benefit from belt for trunk control").

Mr. ███ was transferred to SATF on July 14, 2023, but was sent to the hospital shortly thereafter as an administrative admission and then to CHCF. He returned to SATF on July 21, 2023. It does not appear that the non-formulary wheelchair order was reconciled until October 2, 2023, when a new RFS was submitted. On October 30, after asking repeatedly, he was given a lightweight wheelchair that he had seen in the clinic, which he said was much better for him, allowed him to move independently more easily over short distances, and was lower to the ground, although his provider on November 14, 2023, documented, a pressure ulcer, stage 1, "area 2-3 cm hyperemia, with skin excoriation sacral area," "likely secondary to rubbing with wheelchair." As of today, however, it does not appear that he has received the prescribed wheelchair requested on October 2.

\* \* \* \* \*

**I request as follows:**

1.  **Please evaluate ███ ███ ███ for a wheelchair that will better accommodate his disability and allow him as much independence as possible.**

2.  **Please explain whether and when ███ ███ ███ received a quickie wheelchair.**

    a.  **Please explain the reason(s) for the delay in providing Mr. ███ with a quickie wheelchair since the RAP told him an order had been placed on January 23, 2023.**

   **b.**     **Please provide a copy of the contract with the quickie wheelchair vendor and a list of vendors able to evaluate patients at SATF for and fabricate non-formulary wheelchairs.**

   **c.**     **Please explain what happened to the paper RFS submitted on April 13, 2023, including where it went after it was finalized and why it does not appear under "orders" in the electronic medical record.**

**3.**     **Please explain whether and when ██████ ██████ ██████ received the wheelchair ordered for him at CHCF.**

   **a.**     **Please explain the reason(s) for the delay.**

   **b.**     **Please explain why the order was not reconciled when Mr. ██████ arrived at SATF on or around July 21, 2023.**

**4.**     **Please provide copies of all SATF RFS forms for non-formulary wheelchairs from January 1, 2023, to present, whether approved or denied.**

**5.**     **Please develop and produce a corrective action plan to address the concerns outlined in this letter, including:**

   **a.**     **Training for custody staff, healthcare staff, and all members of the RAP regarding the availability of non-formulary wheelchairs depending on a person's disability needs; and**

   **b.**     **Direct education to people with disabilities that alternate wheelchairs (including lightweight wheelchairs) may be available to them and how they can request them. This is particularly important because people may have been told, as Mr. ██████ was, that no other wheelchair was available and simply stopped asking. Others may not know what other types of wheelchairs exist that might better accommodate their disabilities. Please also explain how this outreach will be made accessible; both Mr. ██████ and Mr. ██████ have limited English proficiency.**

. . . .
. . . .
. . . .
. . . .
. . . .

Ms. Tamiya Davis & Ms. Brianne Burkart
Re: Non-Formulary Wheelchairs at SATF
November 29, 2023
Page 7

Thank you for your prompt attention to this matter.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

cc:   Mr. ▮▮▮▮ (redacted) (Spanish)
Mr. ▮▮▮▮ (redacted)
Mr. ▮▮▮▮ (redacted) (Spanish)
Ed Swanson, Audrey Barron
Co-counsel
Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera,
Ursula Stuter, OLA Armstrong (OLA)
Lois Welch, Steven Faris (OACC)
Brianne Burkart (CCHCS Legal)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy
Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron
Perez, CCHCS Accountability (CCHCS)
Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer,
Gurpreet Sandhu (OAG)

# EXHIBIT D



**ROSEN BIEN GALVAN & GRUNFELD LLP**

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email: mnunez@rbgg.com

October 20, 2023

<u>VIA ELECTRONIC MAIL ONLY</u>

Brianne Burkart
Attorney
California Correctional Health Care Services
P.O. Box 588500
Elk Grove, CA 95758
Brianne.Burkart@cdcr.ca.gov

      Re:    *Armstrong v. Newsom*:  Plaintiffs' comments regarding draft CCHCS
             Message to Providers Regarding Updated DNV Memo
             <u>Our File No. 0581-03</u>

Dear Ms. Burkart:

      Thank you for providing us with the draft CCHCS Message to Providers regarding the updated DNV memo, which we received on October 9, 2023.  I write to provide Plaintiffs' comments on the draft Message to Providers.

      Plaintiffs strongly object to categorically excluding people with monocular vision from the DNV designation.  *See* Message to Providers ("If a patient is blind or low vision in one eye and the other eye is better than 20/70, they are neither DPV nor DNV.") People with monocular vision can still have a disability within the meaning of the ADA. *Fahey v. Twin City Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1071 (D.S.D. 2014) (individual who had limited peripheral vision due to blindness in one eye was disabled within the meaning of the ADA); *Coleman v. Southern Pacific Transp. Co.*, 997 F. Supp. 1197, 1203-04 (D. Ariz. 1998) (plaintiff blind in one eye had disability under ADA); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S., 555, 567 (1999) (observing that "people with monocular vision 'ordinarily' will meet the Act's definition of disability"); *Gil v. Vortex*, LLC, 697 F. Supp. 2d 234, 239-40 (D. Mass. 2010) (allegation that plaintiff had monocular vision and was limited in major life activities of seeing and working sufficient to plead that plaintiff had disability under ADA).

[4377204.3]

Brianne Burkart
October 20, 2023
Page 2

Furthermore, incarcerated people with monocular vision may still need accommodations for their vision disabilities, including both magnification aids to help them utilize their remaining vision to access programs, services, and activities as well as visual impairment vests to efficiently and effectively communicate to staff and other incarcerated people that they have limited vision. *See* Letter from Marie Berry and Rita Lomio, Plaintiffs' Counsel, to Tamiya Davis, CDCR Office of Legal Affairs, Re: SATF's Failure to Accommodate People with Monocular Vision (Oct. 18, 2023) (discussing class members with monocular vision who were denied needed accommodations because they did not have a DPP vision code). Plaintiffs strongly urge that Defendants promptly revise this memo to clarify that people with monocular vision are not categorically excluded from the DNV designation.

In the Patients Currently Designated as DNV Who Appear to Be DPV section, the Message to Providers states that "[i]f the patient does not already have a magnifier offer them one and place the order." We presume that this language is referring to the lighted non-electronic magnifiers that Defendants reported making available to DPV and DNV class members in Spring of 2022. If that is correct, we request that Defendants revise this language to clarify that fact as follows: "If the patient does not already have a *lighted, non-electronic* magnifier offer them one and place the order." (proposed new text in italics).

Finally, in the Patients Currently Designated as DNV Who Appear to not Qualify for a Disability-Vision Code section, the memo states "[i]f a patient complains of worsened visual acuity and they have not seen an eye care provider in the past 2 years, please order an Optometry follow up visit." Plaintiffs object to limiting optometry follow-up visits for class members who report worsening vision to only those class members who have "not seen an eye care provider in the past 2 years." First, the language "seen an eye care provider" is vague; a patient could see an eye care provider without having their vision evaluated. For clarity, Plaintiffs request that Defendants revise "not seen an eye care provider" to read "not had their vision evaluated by an ophthalmologist or optometrist."

Second, plaintiffs request that Defendants revise this language to direct that all DNV class members who report that their vision has worsened be scheduled for an optometry follow-up visit. It is inappropriate to ignore class members who report that their vision has worsened merely because they saw an eye care provider nearly two years ago or even because they had their vision evaluated nearly two years ago. There are many degenerative vision conditions such as Retinitis Pigmentosa and Macular Degeneration, and the speed at which eye sight deteriorates can vary depending on the degenerative condition and can vary from person to person. *See, e.g.*, Age-Related Macular Degeneration, National Eye Institute, https://www.nei.nih.gov/learn-about-eye-

Brianne Burkart
October 20, 2023
Page 3


health/eye-conditions-and-diseases/age-related-macular-degeneration (last visited Oct. 18, 2023) (age-Related Macular Degeneration "happens very slowly in some people and faster in others" and "Wet AMD [. . . ] is a less common type of late AMD that usually causes faster vision loss").  At a minimum, Plaintiffs strongly urge Defendants to shorten the time threshold for follow-up appointments for DNV patients who report worsening vision from two years since a patient's last vision assessment to one month.

   Thank you for the opportunity to comment on the draft Message to Providers and for considering Plaintiffs' comments.


       Sincerely,

       ROSEN BIEN
       GALVAN & GRUNFELD LLP

       */s/ Michael S. Nunez*

     By: Michael S. Nunez
       Senior Counsel

MSN:can

cc: Tamiya Davis    Jillian Hernandez   Ava Lau-Silveira
  Nicholas Meyer   John Dovey     Dawn Lorey
  Patricia Ferguson  Robin Hart     Diana Toche
  Chor Thao     CCHCS Accountability  Joseph Bick
  Ramon Ruiz    Joseph (Jason) Williams Cory Lo
  OLA *Armstrong*   Cathy Jefferson    Lourdes White
  Sharon Garske   Jason Anderson    Mona Houston
  Trace Maiorino   Jane Moses     Lois Welch
  Sean Lodholz    Aaron Perez     Steven Faris
  Olena Likhachova  Joshua (Jay) Leon Guerrero Alexandrea Tonis
  Anne Kammer   Ed Swanson     Co-Counsel
  Gurpreet Sandhu  Audrey Barron

[4377204.3]

# EXHIBIT E



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Legal Director:*
Margot Mendelson

*Staff Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Sara Norman

VIA EMAIL ONLY

October 18, 2023

Tamiya Davis
CDCR Office of Legal Affairs

Re:     *Armstrong* Advocacy Letter
        SATF's Failure to Accommodate People with Monocular Vision

Dear Ms. Davis:

Almost four years ago, Plaintiffs explained why people with monocular vision should be eligible for a DPP code and provided Defendants with a summary of the relevant law. *See* **Exhibit 1**, Letter from Michael Nunez, Plaintiffs' Counsel, to Russa Boyd, CDCR Office of Legal Affairs, Defendants' Proposed Change to DPV Definition (Dec. 5, 2019). Among other things, people with monocular vision face unique challenges and safety concerns in the prison environment. These individuals have a narrower field of vision and severely limited depth perception, particularly at shorter distances, limiting their ability to navigate without injury to themselves or inadvertent contact with others. This may put them at risk of harm. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1067 (9th Cir. 2014) (finding that monocular vision can cause physical injury in prison where plaintiff "bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions").

Under Defendants' interpretation of the ARP, people with monocular vision do not qualify for a DNV or DPV code on that basis alone, and Defendants do not otherwise document that a person has monocular vision in a way accessible to non-medical staff. Nonetheless, people with monocular vision remain *Armstrong* class members and must be provided reasonable accommodations under the ADA and ARP.

Today, people at SATF with monocular vision continue to be denied disability accommodations because Defendants do not clearly identify and track these class members; the RAP at SATF is not complying with the memorandum entitled, "Reiteration of Reasonable Accommodation Requirements," dated October 28, 2022, which states that "[s]taff should not rely on a medical diagnosis or DPP/DDP codes in order to determine the necessary accommodation."

**Board of Directors**

Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnel • Ruth Morgan • Adrienne Yandell

We remain concerned that, as in the examples below, Defendants' narrow definitions of the DNV and DPV codes will continue to exclude class members from meaningful consideration of their requests for accommodation, similar to what we see with people with upper extremity disabilities. We request that Defendants explain how class members with monocular vision are identified, tracked, and accommodated statewide, including whether Defendants will expand the criteria for a DNV code to include people with monocular vision and be consistent with the broad definition set forth in the ARP. *See* ARP § II.D.4 ("Inmates/parolees who have a vision impairment correctable to central vision acuity better than 20/200 with corrective lenses shall be designated as DNV."). We also request that Defendants provide immediate guidance to the RAP at SATF in the interim to correct this overreliance on DPP codes and ensure that the reasonable accommodation requests of the two class members described below are immediately evaluated in compliance with the ADA and ARP.

1.   ███ ██████ ██████

███ ██████ ██████ is blind in his left eye due to a retinal detachment and has hyperopia and presbyopia in his right (sighted) eye. Mr. ██████ does not have a DPP code. Although the visual acuity in his sighted eye is documented as 20/25 with correction, he reports that vision in that eye is shaky and progressively getting worse, making it difficult for him to walk up and down stairs, or even walk straight ahead of him. He reports that even with correction, he is unable to see clearly past 20 feet. As a result, Mr. ██████ states that he must avoid going up or down stairs for risk of falling, and "put [his] head down, follow the line, and hope that it takes [him] where [he is] going" when he walks. This causes him to run into things and people on a regular basis.

On July 5, 2023, Mr. ██████ submitted a CDCR 1824 reporting some of the issues he faces due to his low vision, including that he is dropping items and running into things and people, and requesting various accommodations to address them. *See* **Exhibit 2**, Log No. SATF-D-23-01270. In particular, Mr. ██████ requested a magnifier, DPP code, vision vest, printed alert on his cell door, extra shower time, greater staff assistance, and a single cell.

The RAP response, dated August 4, 2023, does not meaningfully address his requests for a magnifier, vision vest, printed alert on his cell door, extra shower time, or greater staff assistance. Instead, it simply states: "You do not meet the criteria for a DNV or DPV code at this time." But, as noted above, the lack of a DPP code may not preclude consideration of whether someone requires reasonable accommodations for their disability:

> Staff should not rely on a medical diagnosis or DPP/DDP codes in
> order to determine the necessary accommodation. Accommodations
> should be provided based on the IP's needs. It is the expectation that

> staff utilize sound correctional judgment when determining the
> reasonableness of the IP's request, and understand they should
> provide reasonable accommodations without relying on a Chrono or
> medical prescription.

*See* Memorandum from Connie Gipson, Director, Division of Adult Institutions, and Tammy
Foss, Director, Corrections Services, Reiteration of Reasonable Accommodation Requirements
(Oct. 28, 2022).

The response also denied Mr. ███████ single cell request: "The RAP considered your
request for single cell housing and determined your medical condition does not cause a level of
vulnerability which would prevent your continued double cell housing." Once again, the RAP did
not specify how it came to this determination.

It does not appear that anyone on the RAP interviewed Mr. ███████ about his disability-
related needs in response to the 1824. *See* 28 C.F.R. § 35.160(b)(2) ("In determining what types
of auxiliary aids and services are necessary, a public entity shall give primary consideration to the
requests of individuals with disabilities."). Instead, it appears that Mr. ███████ was asked only
whether he "had any safety or enemy concerns," and was not interviewed to understand the
disability-related vulnerability he had that might necessitate a housing accommodation.[1]

If he had been interviewed about his disability-related concerns, Mr. ███████ would have
been able to explain that his current card magnifier is small and it takes him a long time to read
and write with it. Because of the shaking in his vision, Mr. ███████ requires significant
magnification or large print to distinguish letter order when reading and writing; he reports, for
example, that he sometimes writes letters in the wrong order because of distortions to his vision.
Mr. ███████ reports that he benefits from bright light when reading for similar reasons.
Although the lighted magnifiers in the law library are helpful to him, he does not have ready
access to them at all times and therefore regularly has to ask staff to read paperwork to him or tell
him what it is: "They tell me what [the paperwork is] for, and I take their word for it—I kind of

---

[1] We are deeply concerned that the only interviews related to Mr. ███████ 1824 were of
unnamed staff in his building who reportedly told an FTS they had not observed him "dropping or
bumping into things." Mr. ███████ reported that some regular staff in his building are aware of
his vision problems, thereby changing how they interact with him and sometimes allowing him to
take longer showers. When other officers are present, Mr. ███████ is left to change his behavior,
often forgoing showers and instead cleaning himself in his cell where he can take his time. One
officer informally placed Mr. ███████ on a lower tier bunk after he fell down the stairs, but Mr.
███████ fears that "if [he] was to move to another institution and show up without a DPV code,
[he] would end up on an upper tier and fall off the stairs again."

have to. And then they show me where to sign." Mr. ████ therefore is not provided independence and privacy in reading and writing. *See* 28 C.F.R. § 35.160(b)(2) ("In order to be effective, auxiliary aids and services must be provided … in such a way as to protect the privacy and independence of the individual with a disability."); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506-07 (4th Cir. 2016) (holding that blind voters were denied meaningful access to absentee voting program in violation of ADA where they could vote absentee only with assistance from sighted persons and could not vote absentee privately and independently at place and time of their choosing).

Mr. ████ also could have explained that the behavior he sometimes exhibits due to his vision disability—such as stumbling around, running into people, and dropping items—has led to day-to-day issues with staff, particularly those who are unfamiliar with his situation. He has learned not to try to explain his disability to or request accommodations from staff who are unfamiliar with him, reporting: "The first thing they do is check the computer, and if there's no documentation, they automatically think that you're not telling the truth." As a result, Mr. ████ must adapt his daily routines, such as by opting to refuse showers in order to avoid being rushed by officers. He told us that he moves slowly due to his poor vision and has to make sure he is grabbing the right things in the shower, so he "has taught [him]self that [he is] better off just bird bathing. It doesn't pay to try to explain things to them or debate." Mr. ████ also explained to us that staff regularly shout at him for things like not properly standing behind the line at pill call, or not seeing them waving at him. He added that officers sometimes assume he is under the influence or trying to cause trouble when he drops a tray, trips, or moves oddly around the prison.

Mr. ████ also reported that incarcerated people get frustrated with his behavior. Mr. ████ who is housed on a Level IV yard and also has incontinence and self-catheterizes two or three times a day, expressed concern with being abused by a cellmate due to his vision issues, explaining that his disabilities can cause him to make a mess in his cell, like when he does not notice he sprayed mustard on the wall or does not properly aim for the toilet. This alone makes Mr. ████ fear for his safety; he stated that other incarcerated people often are not understanding of his conditions and the needs that accompany them. His concern is then further exacerbated by the fact that his vision issues cause him to splash water around the cell floor when he is cleaning himself after an accident or self-catheterizing. And this is not an infrequent occurrence; Mr. ████ informs us that he cleans himself in-cell at least once a day, greatly increasing his risk of confrontation with any cellmate.

**2.** ████ ████ ████

████ ████ ████ is blind in his right eye and has glaucoma in his left eye. On June 20, 2023, Mr. ████ submitted an 1824 reporting issues caused by his low vision, including

eye strain due to his left eye compensating for his right eye blindness, difficulty focusing, and headaches when he is completing computer-based and paper class assignments. *See* **Exhibit 3**, Log No. E-23-01265. Mr. ███ does not have a DPP code.[2] To address these concerns, Mr. ███ requested to be unassigned from his GED education class, to have his DPV code reassigned, and to be provided a LED magnifier and a lower bunk/lower tier accommodation.

Mr. ███ was not interviewed in response to his 1824. Instead, the RAP stated, "you do not meet the criteria for DNV and DPV disability codes" and apparently on that basis denied his request for housing accommodations. Mr. ███ request for an LED magnifier went unaddressed. His requests for accommodations in education were denied on the basis of existing accommodations, without addressing his report that those accommodations were not effective.

* * * * *

We request as follows:

**Requests to Headquarters**

1.    Please develop a reliable system to identify, track, and accommodate people with monocular vision.

2.    Please amend the lighted magnifier memorandum to clarify that patients without a DPV or DNV code may be issued a lighted magnifier as a reasonable accommodation.

3.    Please provide interim guidance to the RAP at SATF regarding properly accommodating people with monocular vision regardless of whether they have a DPP code.

. . .
. . .
. . .
. . .

---

[2] Since submitting this 1824, Mr. ███ was re-assigned a DPV code on September 20, 2023. *See* Ophthalmology Consultation (Sept. 1, 2023) (noting "lack of depth perception" and "lack of field of vision"); *see also* CDCR 1845/7410 (Sept. 20, 2023). However, the code was removed again a month later. *See* Outpatient Progress Note (Oct. 17, 2023) ("patient does not meet criteria for DPV or DNV designation"); *see also* CDCR 1845/7410 (Oct. 17, 2023).

Tamiya Davis
Re: SATF's Failure to Accommodate People with Monocular Vision
October 18, 2023
Page 6

**Request to SATF**

4.      Please reconsider the disability accommodation requests made by Mr. ███████ and Mr. ████ discussed above, and interview both class members before making a determination. Please produce a copy of the reissued RAP responses.

                                Sincerely yours,

                                Marie Berry
                                Litigation Assistant

                                Rita Lomio
                                Senior Staff Attorney

cc:    Mr. ██████ (redacted)
       Mr. ████ (redacted)
       Co-counsel
       Ed Swanson, Audrey Barron (Court Expert)
       Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silveira, OLA Armstrong (OLA)
       Brianne Burkart (CCHCS Legal)
       Lois Welch, Steven Faris (OACC)
       Mona Houston, Lourdes White, Jillian Hernandez, Cory Lo, CAMU Mailbox (DAI)
       Diana Toche, Joseph Bick, John Dovey, Robin Hart, CCHCS Accountability, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez (CCHCS)
       Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

EXHIBIT 1



101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael S. Nunez
Email:  mnunez@rbgg.com

December 5, 2019

<u>VIA ELECTRONIC MAIL</u>

Russa Boyd
CDCR Office of Legal Affairs
Russa.Boyd@cdcr.ca.gov

Re:    Defendants' Proposed Change to DPV Definition
       *Armstrong v. Newsom*
       <u>Our File No. 0581-03</u>

Dear Russa:

I write in response to Defendants' proposed revised DPV definition that we received on November 5, 2019.  Defendants propose to narrow the DPV definition so that it tracks the definition of legal blindness used by the Social Security Administration ("SSA").  Email from Vincent Cullen (Nov. 5, 2019); 20 C.F.R. § 404.1581.

Class members with vision disabilities who are classified as DPV are eligible for placement at designated institutions–facilities with resources intended to provide them access to the prisons' available programs, services, and activities.  Armstrong Remedial Plan ("ARP") §§ I(A), II(C)(3).  Plaintiffs object to Defendants' proposed revision because it is based upon an antiquated and irrelevant definition of legal blindness, it improperly excludes members of the *Armstrong* class with vision disabilities from placement at designated institutions, is inconsistent with the concept of vision disability in the Americans with Disabilities Act, and is based on factually inaccurate assumptions.

## I.    The Social Security Administration's Definition of Legal Blindness Is Irrelevant to the Armstrong Remedial Process

Narrowing the scope of the DPV definition so that it tracks the SSA's definition of legal blindness is misplaced.  The SSA's definition of legal blindness is used for determining eligibility for benefits payments, not for determining whether someone has a vision disability necessitating particular accommodations in prison.  20 C.F.R. § 404.1581.  The DPV designation is part of the *Armstrong* remedial process intended to

[3466700.3]

Russa Boyd
December 5, 2019
Page 2

remedy violations of the Americans with Disabilities Act. The SSA's definition of legal blindness is irrelevant to the remedial process here because it predates the ADA and bears no relation to the ADA's definition of vision disability. In fact, nowhere does the ARP even suggest that the Social Security Administration may dictate which persons with visual impairments can participate in Defendants' plans designed to facilitate equal access for people with disabilities.

## II.    Defendants' Proposed DPV Definition Would Categorically Exclude Class Members from Receiving the Benefits of the DPV Status

Defendants' proposed revised DPV definition would exclude members of the *Armstrong* class with significant vision disabilities from participating in a key aspect of Defendants' plan for providing access to their programs and services. Persons with vision disabilities in the Armstrong class include "all present and future California state prisoners and parolees with … sight … disabilities that substantially limit one or more of their major life activities." Order Certifying the Class at 2, *Armstrong v. Wilson* (N.D. Cal. Jan. 13, 1995) (No. C094-2307). Seeing is a major life activity. ARP § II(a).

Categorically excluding people with monocular vision from the DPV designation is unacceptable. Monocular vision is a serious condition. *See, e.g.*, *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014); *Garcia v. Nev. Bd. of Prison Commis.*, No. 3:06–CV–0118 JCM (VPC), 2008 WL 818981, at *17 (D. Nev. Mar. 24, 2008). Monocular vision restricts sight in several ways. Individuals with monocular vision have a narrower field of vision and severely limited depth perception, particularly at shorter distances. *See e.g.*, *E.E.O.C. v. United Parcel Service, Inc.*, 424 F.3d 1060, 1064-65 (9th Cir. 2005). Individuals with monocular vision have difficulty using sight to perform a variety of close range activities such as pouring liquids, working with tools, and tying knots. *See Id.* at 1065, 1070.

It is critical for class members with monocular vision to be eligible for the DPV designation in the prison context. There are "dangers inherent in the prison setting," and prison "is far from a violent-free environment." *Lane v. Tews*, No. CV 14-1324-GW (PLA), 2016 WL 8738265, at *9, n.7 (C.D. Cal. Dec. 7, 2016) *R&R adopted* 2017 WL 1423700 (C.D. Cal. Apr. 14, 2017), *aff'd* 910 F.3d 1293 (9th Cir. 2018). In prisons, due to their visual impairments, people with monocular vision have injured themselves on equipment, bumped into objects, and bumped into other people, sometimes provoking physical altercations. *Colwell*, 763 F.3d at 1067; *Cobbs v. Pramstaller*, 475 Fed. Appx. 575, 578 (6th Cir.2012) (prisoner with monocular vision bumped into objects on blind side); *Michaud v. Bannister*, No. 2:08–cv–01371–MMD–PAL, 2012 WL 6720602, at *4 (D. Nev. Dec. 26, 2012) (prisoner blind in one eye reported visual impairment increased inadvertent contact with other prisoners and "increased the chances of being involved in a fight"). Given the challenging and sometimes dangerous prison environment and the

Russa Boyd
December 5, 2019
Page 3

functional impact of monocular vision, it is especially appropriate for class members with
monocular blindness to have access to the additional support that designated institutions
are required to provide.

Defendants argue that excluding people with monocular vision from the definition
of DPV is appropriate because, in the community, people with monocular vision can
"drive, hold jobs," and "maintain functional activities."  Email from Vincent Cullen
(Nov. 5, 2019).  However, whether class members can participate in activities that are not
even available in prison is not relevant to the analysis of whether they need to be
identified as having a disability and whether they require accommodations while in
prison.  In fact, people with monocular vision do require identification and
accommodations in a prison setting, for the reasons stated above.

Further, many totally blind persons in the community hold full-time jobs, marry,
raise children, cook, and run households.  American Foundation for the Blind, Disability
Employment Research: Key Takeaways, https://www.afb.org/research-and-
initiatives/employment/reviewing-disability-employment-research-people-blind-visually
(last visited Nov. 27, 2019); National Federation of the Blind, Parenting without Sight:
What Attorneys, Social Workers, and Parents Should Know About Blindness,
https://www.nfb.org/sites/www.nfb.org/files/images/nfb/publications/brochures/blindpare
nts/parentingwithoutsight.html (last visited Nov. 27, 2019); see also, e.g., National
Federation of the Blind, Blind Teachers: Questions and Answers,
https://www.nfb.org/sites/www.nfb.org/files/images/nfb/publications/fr/fr14/issue2/f1402
18.html (last visited Dec 5, 2019).  Yet, Defendants are not arguing that simply because
totally blind persons can participate in these activities, they should also be removed from
the DPV code.  Similarly, deaf people in the community can also drive and participate in
the activities listed, and Defendants do not dispute that people who are deaf warrant the
analogous DPH designation.  See, e.g., Bates v. United Parcel Service, Inc., 511 F.3d
974, 987-88 (9th Cir. 2007) (discussing deaf individual with driver's license).  Thus, the
ability to work, drive, and perform other unspecified tasks is no basis to categorically
exclude them from the DPV definition or placement at designated institutions.

## III.    Defendants' Proposed Revision Is at Odds with the ADA

Defendants' proposed revised DPV definition is also inconsistent with the ADA's
definition of vision disability.  Persons need not be totally or "legally" blind to have a
vision disability under the ADA.  Under the ADA, a disability is a "physical or mental
impairment that substantially limits one or more major life activities."  42 U.S.C.
§ 12102(1)(a).  To meet the definition of disability, an impairment must only
substantially limit one major life activity.  Id. § 12102(4)(c).  Seeing is a major life
activity.  Id. § 12102(2)(a).  The ADA directs that the definition of disability is to be
broadly construed.  Id. § 12102(4)(a).

Russa Boyd
December 5, 2019
Page 4

Courts have held that monocular vision constitutes a disability under the ADA. *Fahey v. Twin City Fan Companies, Ltd.*, 994 F. Supp. 2d 1064, 1071 (D.S.D. 2014) (individual who had limited peripheral vision due to blindness in one eye was disabled within the meaning of the ADA); *Coleman v. Southern Pacific Transp. Co.*, 997 F. Supp. 1197, 1203-04 (D. Ariz. 1998) (plaintiff blind in one eye had disability under ADA); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) (observing that "people with monocular vision 'ordinarily' will meet the Act's definition of disability"); *Gil v. Vortex, LLC*, 697 F. Supp. 2d 234, 239-40 (D. Mass. 2010) (allegation that plaintiff had monocular vision and was limited in major life activities of seeing and working sufficient to plead that plaintiff had disability under ADA).

Categorically excluding all inmates with monocular vision from the DPV designation is at odds with the Supreme Court's recognition that people with monocular vision "ordinarily" have disabilities warranting the full protections of the ADA, *Kirkingburg*, 527 U.S. 567, with other courts that have found monocular vision to constitute a disability under the ADA, and with the ADA's direction to broadly construe the definition of disability, 42 U.S.C. § 12102(4)(a).  To comply with the ADA, Defendants should instead ensure that class members with monocular vision that substantially limits their ability to see are eligible for the DPV designation and for placement at a designated institution.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael S. Nunez*

By:   Michael S. Nunez

MSN:cg

cc:   Ed Swanson
      Alexander Power
      Nicholas Meyer
      Patricia Ferguson
      Tamiya Davis
      OLA Armstrong
      Joanna Hood
      Annakarina Fennell
      Damon McClain
      Sean Lodholz
      Kelly Mitchell
      Teauna Miranda
      Bruce Beland
      Robert Gaultney

      John Dovey
      Donald Meier
      Robin Hart
      Ceasar Aguila
      CCHCS Accountability
      Cindy Flores
      Joseph Williams
      Cathy Jefferson
      Vincent Cullen
      Desiree Collum
      Lynda Robinson
      Barbara Pires
      Ngoc Vo
      Samanta Chastain
      Olga Dobrynina

      Dawn Malone Stevens
      Bryan McCloughan
      Alexandrea Tonis
      Gently Armedo
      Matt Espenshade
      Lois Welch
      Steven Faris
      Prison Law Office

[3466700.3]

# EXHIBIT F



CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | December 4, 2023 |
| **To:** | Regional Health Care Executives<br>Chief Executive Officers<br>Chief Medical Executives |
| **From:** | |

*DocuSigned by:*
JOSEPH J WILLIAMS
JOSEPH (JASON) WILLIAMS
Director (A)
Corrections Services

*DocuSigned by:*
Joseph Bick
JOSEPH BICK, M.D.
Director
Health Care Services

| | |
|---|---|
| **Subject:** | **CLARIFICATION ON THE DEFINITION OF VISION-IMPAIRED NON-IMPACTING PLACEMENT (DNV)** |

The purpose of this memorandum is to clarify the definition for vision-impaired patients in the Disability Placement Program (DPP), Vision Impaired Non-Impacting Placement (DNV) for the California Correctional Health Care Services and Division of Adult Institutions.  This memorandum supersedes the July 17, 2018, memorandum entitled, "Expansion of Vision-Impaired Patient Definition".

The DPP DNV definition is clarified to reflect the following language:

The DNV code shall be applied to individuals whose vision can be corrected to central visual acuity of better than 20/200, and no better than 20/70 with the use of corrective lenses.

Note:

- A Vision Impaired Vest shall be ordered and provided to all DNV patients.
- The issuance of Prescription and/or Reading Glasses alone does not meet DNV criteria.
- The absence of vision in one eye does not automatically place the patient in a DPP class.

A Learning Management System (LMS) training pertaining to this memorandum has been developed and the Chief Executive Officer (CEO), or their designee, shall ensure all CEOs, Chief Medical Executives, and Primary Care Providers receive On-The-Job Training via LMS within 90 days of release of this memorandum.

If you have any questions or concerns regarding this memorandum, please contact Captain Joshua Leon Guerrero, Healthcare Policy and Litigation Support, Corrections Services, via email at Joshua.LeonGuerrero@cdcr.ca.gov.

cc:   Americans with Disabilities Act Coordinators        Chief Physicians & Surgeons
      Health Care Compliance Analysts                     Regional Deputy Medical Executives
      Primary Care Providers                              Deputy Medical Executives