1   DONALD SPECTER – 083925
    RITA K. LOMIO – 254501
2   MARGOT MENDELSON – 268583
    PATRICK BOOTH – 328783
3   JACOB J. HUTT – 5565791, *pro hac vice*
    PRISON LAW OFFICE
4   1917 Fifth Street
    Berkeley, California  94710-1916
5   Telephone:    (510) 280-2621
    Facsimile:    (510) 280-2704
6
    MICHAEL W. BIEN – 096891
7   GAY C. GRUNFELD – 121944
    THOMAS NOLAN – 169692
8   PENNY GODBOLD – 226925
    CAROLINE JACKSON – 329980
9   ROSEN BIEN
    GALVAN & GRUNFELD LLP
10  101 Mission Street, Sixth Floor
    San Francisco, California  94105-1738
11  Telephone:    (415) 433-6830
    Facsimile:    (415) 433-7104
12
    LINDA D. KILB – 136101
13  DISABILITY RIGHTS EDUCATION &
    DEFENSE FUND, INC.
14  3075 Adeline Street, Suite 201
    Berkeley, California  94703
15  Telephone:    (510) 644-2555
    Facsimile:    (510) 841-8645
16
    Attorneys for Plaintiffs

17

18                  UNITED STATES DISTRICT COURT

19                NORTHERN DISTRICT OF CALIFORNIA

20

21  JOHN ARMSTRONG, et al.,                 Case No. C94 2307 CW

22          Plaintiffs,              **PLAINTIFFS' OBJECTIONS TO
                                     DEFENDANTS' REMEDIAL
23      v.                           PROPOSAL [Dkt. No. 3596]**

24  GAVIN NEWSOM, et al.,            Judge:   Hon. Claudia Wilken

25          Defendants.

26

27

28

[4509611.4]
                                              Case No. C94 2307 CW
PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL

1

**INTRODUCTION**

2          On March 20, 2024, this Court granted in part Plaintiffs' Motion to Enforce the

3    Revised Permanent Injunction, *see* Dkt. No. 3583 ("Remedial Findings"), and ordered

4    Defendants "to develop a plan to ensure that they come into compliance with the Revised

5    Permanent Injunction and the Americans with Disabilities Act (ADA) that includes the

6    components" set forth in the Order for Further Parole-Related Remedial Plan, Dkt.

7    No. 3584 ("Remedial Order") at 1, (collectively "Remedial Orders").  The Remedial

8    Orders required Defendants to develop a parole-related remedial plan and, following a

9    meet-and-confer period with Plaintiffs, file the Remedial Plan with the Court within 75

10   days of the Remedial Orders.  *See* Remedial Order, Dkt. No. 3584 at 8.  Plaintiffs may file

11   objections thereafter.  *See id.*  Defendants filed their Notice of Compliance With Order for

12   Additional Remedial Measures [ECF Nos. 3583, 3584] ("Remedial Proposal") with the

13   Court on June 3, 2024.  *See* Dkt. No. 3596.

14          Defendants' Remedial Proposal is deficient in several key regards:  first, it fails to

15   provide sufficient accommodations for writing, a key element of parole hearing

16   preparation and follow up.  In fact, Defendants' Remedial Proposal **reduces** class

17   members' current, inadequate access to staff scribing assistance for completing parole-

18   related writing tasks, such as drafting documents, release planning, and drafting parole-

19   related grievances.  Second, Defendants' Remedial Proposal arbitrarily excludes many

20   deaf class members who have difficulty reading English by setting the reading score

21   needed to qualify for assistance too low.  Third, Defendants' Remedial Proposal fails to

22   fully implement Court-ordered procedures for identifying the communication needs of

23   blind and low-vision class members.  Fourth, Defendants' Remedial Proposal excludes

24   many low-vision class members from receiving the significant additional attorney

25   assistance the Court ordered.

26          Plaintiffs request that this Court order Defendants to amend their Remedial

27   Proposal in these four areas to comply with this Court's Remedial Orders as set forth

28   below.

## I.    DEFENDANTS' PLAN REDUCES THE AVAILABLE ASSISTANCE WITH WRITING, RELEASE-PLANNING AND PREPARING PAROLE-RELATED GRIEVANCES; DEFENDANTS SHOULD RESTORE IT.

In the Enforcement Motion, Plaintiffs requested that this Court order Defendants to hire additional staff to assist class members with writing tasks, including drafting documents for their parole hearings, developing release plans, and preparing parole-related grievances.  *See* Pls' Mot. to Enf. Rev. Perm. Inj., ("Enforcement Motion"), Dkt. No. 3525 at 29-30.  The Court denied Plaintiffs' request for additional staff to help with drafting release plans and other parole-related documents, relying in part on Defendants' representation that a "recent directive authorizes voluntary overtime for Correctional Counselors (I) to assist DPV, DPH, and DDP class members with pre-release planning, … and other effective communication accommodations for parole suitability hearing preparations."  *See* Remedial Findings, Dkt. No. 3583 at 32 (citing Defs' Resp. to Pls' Reply in Supp. of Pls' Enforcement Motion, Dkt. No. 3562, at 8).

Unfortunately, Defendants' Remedial Proposal rescinds this promised assistance, and Defendants have refused Plaintiffs' request to restore it.  *See* Decl. of Caroline Jackson in Supp. of Pls' Objections to Defendants Remedial Proposal ("Jackson Objection Decl."), filed herein, Ex. A at 3-4; *id.*, Ex. C at 2.  Instead, the Remedial Proposal restricts class members' writing assistance to four sources:  (1) ADA workers, who are other incarcerated people; (2) library staff members, who are available only during the limited times the class members have access to the library; (3) assistive devices, which will not benefit deaf signers and will not be sufficient for all blind and low-vision class members to independently perform writing tasks; and (4) parole attorneys, who are available during attorney-client meetings only from the time of their appointment until the hearing is held, waived, postponed, continued or the class member stipulates to unsuitability.  *See generally,* Defs' Remedial Proposal, Dkt. No. 3596.

These sources are insufficient.  First, this Court has already found that requiring class members to rely on other incarcerated individuals for assistance "violates parolees' rights to privacy and raises the potential for abuse and extortion."  *See* Findings of Fact

1   and Concl. of Law, Dkt. No. 523 at 49.  This concern continues to apply, especially given

2   the sensitivity of the material at issue.  *See* Enforcement Motion, Dkt. No. 3525 at 22.

3   CDCR policy excludes ADA workers from "accessing CDCR and legal correspondence"

4   in most instances.  *See* Declaration of Jared Lozano in Supp. of Defs' Opposition to

5   Enforcement Motion, Dkt. No. 3543-5 ¶ 7.  Moreover, class members with vision

6   disabilities face significant difficulty finding a private space to communicate with ADA

7   workers.  *See* Enforcement Motion, Dkt. No. 3525 at 22.  And deaf signers do not have an

8   effective way of communicating with ADA workers at all, because Defendants refused

9   Plaintiffs' request to provide sign language interpreters for deaf class members to receive

10  writing assistance from ADA workers.  *See* Jackson Objection Decl., Ex. C at 2.

11  Accordingly, ADA workers are not a viable resource or an adequate accommodation.

12          Second, Defendants have made library staff effectively unavailable to deaf signers

13  to assist with writing, because Defendants have refused to provide sign language

14  interpreters to facilitate communication between deaf signers and library staff.  *See*

15  Jackson Objection Decl., Ex. C at 2.  Without a sign language interpreter available, deaf

16  signers will have to communicate with library staff using written English—the very task

17  they need the librarian's help accomplishing.  Further, this Court has already found that

18  accommodations available solely "during the libraries' limited hours" are not sufficient.

19  *See* Remedial Findings, Dkt. No. 3583 at 21.  Moreover, the Court Expert has found that,

20  at one prison that houses a large number of blind and low-vision class members, "there is a

21  shortage of librarians … and libraries are often unavailable to class members."  *See* Court

22  Expert's 2d Rep. Re. Treatment of People with Disabilities at Substance Abuse Treatment

23  Fac., Dkt. No. 3500, at 15.  And Defendants' own person most knowledgeable has testified

24  in deposition that there are no "prisons that allow blind and low-vision class members to

25  visit libraries at any time of day."  *See* Decl. of Caroline Jackson in Supp. of Pls'

26  Enforcement Motion ("Jackson Decl."), Dkt. Nos. 3525-2 & 3525-3, Ex. 18 at 125:9-12.

27  Accordingly, library workers are not sufficient as an accommodation.

28          Third, the assistive devices that Defendants will provide to blind and low-vision

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL

1  class members, while helpful, will not solve the issue completely.  These devices will not

2  help deaf signers complete writing tasks.  And some blind and low-vision class members

3  will still need assistance with writing tasks, regardless of the assistive devices available to

4  them.  *See* Remedial Findings, Dkt. No. 3583 at 18.

5         In practice, Defendants' proposal leaves only parole attorneys to assist.  The

6  Remedial Orders require panel attorneys to spend "significantly" more time representing

7  class members with hearing and vision disabilities, *see* Remedial Order, Dkt. No. 3584 at

8  7, which increases the availability of this assistance.  Yet Defendants do not provide parole

9  attorneys until approximately four months before the scheduled parole suitability hearing.

10  *See* Jackson Decl., Dkt. No. 3525-2, ¶ 7 (parole attorneys are appointed 150 calendar days

11  before each scheduled hearing); Defs' Remedial Proposal, Dkt. No. 3596 at 129 (parole

12  attorneys must hold the first attorney-client within 30 calendar days of appointment).  And

13  the attorney's representation typically ends "when a scheduled hearing results in a waiver,

14  stipulation, postponement, continuance, grant of parole, or denial of parole," Defs'

15  Remedial Proposal, Dkt. No. 3596 at 134, which is well before the deadline for decision

16  review, *see* Decl. of Daniel Moeller In Supp. of Defs' Opp. to Pls' Enforcement Motion,

17  Dkt. No. 3543-1 at 40 ("Following the panel's decision, the Board conducts decision

18  review for no more than 120 days.").  However, it remains that many parole candidates

19  spend years preparing for their hearings.  They may draft additional grievances and

20  requests for decision review after the hearing has concluded.  *See* Decl. of Keith Wattley

21  In Supp. of Pls' Enforcement Motion, Dkt. No. 3525-6, ¶¶ 25, 34.  For this reason, the

22  Remedial Orders require Defendants to provide blind and low-vision class members with

23  necessary assistive devices at least one year before the hearing and for at least six months

24  thereafter.  *See* Remedial Order, Dkt. No. 3584 at 4.  Defendants must make staff available

25  to provide writing assistance during at least this same timeframe.  Otherwise, deaf signing,

26  blind and low-vision parole candidates who need to begin preparing when non-disabled

27  candidates do—far earlier than four months in advance of their parole suitability hearing—

28  will not have access to attorney assistance with writing tasks.  And their only meaningful

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL

1 assistance will disappear before they have had a chance to grieve or request decision

2 review of the hearing.

3       Because Defendants' Remedial Proposal runs contrary to representations made to

4 the Court and fails to ensure sufficient access to assistance with writing tasks, including

5 drafting documents, release planning, and drafting parole-related grievances, Plaintiffs

6 object.  Plaintiffs request that the Court order Defendants to fulfill their promise that

7 Correctional Counselors, or other personnel, be assigned and mandated to routinely

8 provide assistance with parole-hearing related writing tasks.  Defendants can do so with

9 any of a number of different types of personnel who may be suitable, including: Correctional

10 Counselors, whom Defendants previously required to help with these tasks, *see* Remedial

11 Findings, Dkt. No. 3583, at 32; Parole Services Associates, who are CDCR employees

12 tasked with assisting incarcerated persons with establishing relationships and housing in the

13 community to help them succeed on parole, *see* Jackson Objection Decl. ¶ 10 & Ex. F at 2;

14 social workers, who are responsible for coordinating patient placements with community

15 services, *see id.* ¶ 11 & Ex. G at 1; or Transitional Case Management Program benefits

16 workers, who are tasked with assisting incarcerated persons with applying for benefits in

17 preparation for release, *see id.* ¶ 12 & Ex. H.

**II.    DEFENDANTS' PLAN ARBITRARILY EXCLUDES MANY DEAF SIGNERS WITH DIFFICULTY READING ENGLISH**

20       This Court ordered Defendants to provide video translations of certain parole-

21 related documents to "all deaf class members who Defendants have identified as using

22 American Sign Language (ASL) as their primary method of communication and who have

23 difficulty understanding written English (deaf signer class members)."  *See* Remedial

24 Order, Dkt. No. 3584 at 5.  For hearing transcripts, which are also provided to parole

25 candidates in written form, the Court ordered Defendants to record sign language

26 interpreted parole suitability hearings "to enable deaf signer class members to understand

27 to the best of their ability what transpired during their parole hearings for the purpose of

28 preparing for parole proceedings and preparing requests for decision review, as well to

1   enable them to establish translation errors that may have occurred during the hearings for

2   the purpose of requesting decision review or filing parole-related grievances." Remedial

3   Findings, Dkt. No. 3583 at 15.

4          Defendants' Remedial Proposal restricts all video translations, including video

5   recordings of parole suitability hearings, to deaf signing class members with reading scores

6   of 4.0 or below (*i.e.*, at or below a fourth-grade reading level)—a group of just eleven

7   people. *See* Jackson Objection Decl. ¶ 14. As discussed below, this threshold excludes

8   many deaf signers from the Remedial Proposal who have difficulty reading parole-related

9   documents and is not consistent with Defendants' other policies regarding effectively

10  communicating written materials to deaf signers. It also excludes many deaf signers from

11  receiving the video recordings that this Court has found are essential for these class

12  members to be able to file parole-related grievances or request decision review.

13         Plaintiffs have raised this objection with Defendants, *see* Jackson Objection Decl.,

14  Ex. A at 7, and Defendants have refused to change the reading score threshold, *see id.*,

15  Ex. C at 2. Plaintiffs now raise this objection with the Court.

16  **A.    Defendants' 4.0 Reading Score Threshold Does Not Provide Sufficient
            Access to Written Documents And Is Inconsistent With Their Own**
17  **        Policies**

18         Defendants' decision to limit the Remedial Proposal to only deaf signers who score

19  at or below a 4.0 on a standardized reading and writing test does not comply with this

20  Court's prior Orders. Plaintiffs established—and Defendants did not refute—that many

21  parole-related documents are written well above a fourth-grade level. For example,

22  Comprehensive Risk Assessments, which are among the most crucial documents for parole

23  candidates to study, were written at a tenth-grade level or higher according to Plaintiffs'

24  expert's analysis. *See* Decl. of Roger Williams in Supp. of Pls' Enforcement Motion, Dkt.

25  No. 3525-7, ¶ 17. Many parole-related documents contain technical language, which

26  individuals who use sign language as their primary method of communication are unlikely

27  to understand, regardless of their reading level. *See id.* ¶ 15. Deaf signers cannot

28  overcome these barriers as easily as others can by using a dictionary (where they often will

1    not choose the correct meaning among multiple options), or asking another person (who

2    very likely does not know sign language).  *See id.* ¶ 14.

3         Further, the score from a standard reading and writing test is not a reliable method

4    of determining whether a given deaf signer has difficulty reading English.  The score that

5    an incarcerated deaf signer receives "on the standard inmate reading and writing

6    assessment … says little about his overall ability to understand and to communicate

7    effectively" in all contexts.  *See Pierce v. Dist. of Columbia*, 128 F. Supp. 3d 250 at 276

8    (D.D.C. 2015) (Brown Jackson, J.) (holding that a deaf sign language user with an "above

9    average" reading score required sign language interpreters to communicate effectively with

10   jail personnel).  Illustrating this point, Plaintiffs previously introduced evidence of a deaf

11   signing class member with a reading score of 12.9 who reported "needing a dictionary to

12   understand books written at a normal, adult reading level."  *See* Pls' Reply in Supp. of Pls'

13   Enforcement Motion, Dkt. No. 3554, at 9.  Accordingly, Defendants' decision to limit

14   video translations solely to deaf signers with a reading score of 4.0 or lower will deny

15   effective communication of parole-related documents to many deaf signers who have

16   difficulty reading English but have reading scores above the 4.0 level.

17        Video recording hearings is also essential for all deaf signers, not just those with

18   low reading scores, to request decision review or file parole-related grievances.  *See* Dkt.

19   No. 3583 at 15.  As this Court previously found, "any sign language translation provided

20   during a parole suitability hearing is not captured on the written transcript for the hear-

21   ing … unless there is a video recording of the sign language testimony and translation

22   provided during the hearing, it is not possible to establish after the hearing whether there

23   were any errors in the sign language translation provided during the hearing."  *Id.* at 14.

24        Finally, Defendants' use of a 4.0 grade level reading score is inconsistent with their

25   other policies regarding deaf signers.  For example, CDCR's Effective Communication

26   Policy requires officers to use a sign language interpreter with *all* deaf signing class

27   members, not just those with reading scores of 4.0 or lower, to ensure effective communi-

28   cation of written communications such as Rules Violation Reports, Administrative

1  Segregation Unit (ASU) Placement Notices, Classification Committee Chronos, and

2  Reasonable Accommodation Panel (RAP) responses.  *See* Lozano Decl., Ex. B at 4, Dkt.

3  No. 3543-5 at 20 ("An incarcerated person's primary method of communication shall be

4  utilized during the qualifying events described in this directive, when the primary method

5  is SLI [Sign Language Interpreter]").  Defendants present no reason for providing less

6  support for deaf signers to access the lengthy and highly consequential parole-related

7  documents, such as the Comprehensive Risk Assessment and Probation Officer Reports,

8  than Defendants provide for deaf signers to access less complex documents like Classifi-

9  cation Committee Chronos and RAP responses.  *See* Jackson Objection Decl., Ex. C at 2.

10  **B.     Including All Deaf Signers Does Not Impose an Undue Burden on
         Defendants**

11

12  Including all deaf signers eligible for parole suitability hearings will not impose an

13  un burden on Defendants.  Based on Plaintiffs' investigation, at the present time, just

14  **twenty-two individuals in all of CDCR** both use sign language as their primary method

15  of communication and are expected to have a live parole suitability hearing.  *See* Jackson

16  Objection Decl. ¶ 14.  Defendants have already committed to accommodating eleven

17  members of this group.  *See id.*  And several of these hearings are not scheduled to occur

18  for at least five years.  *See id.*  Even if Plaintiffs' calculations are incorrect, there are just

19  forty-eight individuals in all of CDCR who are deaf and use sign language as their primary

20  method of communication.  *See id.* ¶ 13.  Accordingly, the burden on Defendants to

21  accommodate these additional deaf signing class members will be minimal.

22  Plaintiffs request that the Court order Defendants to amend the Remedial Proposal

23  to conform to CDCR's existing policies regarding effective communication with deaf

24  signers, and remove the improper restriction to deaf signers with a reading score of 4.0 or

25  lower.

26  / / /

27  / / /

28  / / /

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL

1  **III.   DEFENDANTS' PLAN FAILS TO GIVE FULL EFFECT TO THE PROPOSAL SET FORTH IN THE LOZANO DECLARATION, DEPRIVING PEOPLE WITH DISABILITIES OF DOCUMENTS IN ACCESSIBLE FORMATS**

2

3

4          The Court ordered Defendants to "formalize and implement the procedures

5   described in the declaration of Jared Lozano, Docket No. 3543-5, for conducting

6   individualized assessments of DPV class members to identify, **document, and track** the

7   accessible format … and/or auxiliary device that best ensures effective communication of

8   printed material to each DPV class member" and to perform a comparable evaluation for

9   DNV class members.  *See* Remedial Order, Dkt. No. 3584 at 2 (emphasis added).  The

10  Lozano declaration states in part:

11          If a DPV class member refuses to be assessed by the Eye Care Institute team,
            the CCHCS provider will document the refusal in CERNER Electronic
12          Health Record System.  The local ADA Coordinator or designee will then
            interview that class member to determine what accommodations are needed,
13          if any, and document that in SOMS, which is accessible to authorized CDCR
            and Board staff.

14

15  Dkt. No. 3543-5 ¶ 14.  Defendants' Remedial Proposal abandons this approach.  In the

16  Remedial Proposal, when class members refuse a vision evaluation, Defendants will

17  "educate" class members on the purpose of the vision evaluation and provide an

18  opportunity to request one later.  *See* Defs' Remedial Proposal, Dkt. No. 3596 at 57.

19  However, Defendants do not require staff to meet with the incarcerated person to ask their

20  primary and alternate methods of communication and "document that in SOMS[] …."

21  Lozano Decl. ¶ 14.  *See* Defs' Remedial Proposal, Dkt. No. 3596 at 57.

22          Plaintiffs raised objections to this omission.  *See* Jackson Objection Decl., Ex. B at

23  2; *id.*, Ex. D at 1.  Defendants refused to incorporate this provision regarding documenting

24  and tracking accessible formats into the Remedial Proposal.  *See id.*, Ex. C at 2-3; *id.*,

25  Ex. E at 3-4.  Plaintiffs now raise this objection with the Court.

26          The plain language of the Court's order requires Defendants to document and

27  affirmatively provide accommodations to *all* blind and low-vision class members, not just

28  those who consent to an evaluation by a vision specialist.  The remainder of Defendants'

1   Remedial Proposal relies heavily on Defendants' personnel providing documents in the

2   class member's "primary visual accommodation" as documented in SOMS.  *See* Defs'

3   Remedial Proposal, Dkt. No. 3596 at 53, 62-64.  Due to Defendants' refusal to document a

4   "primary visual accommodation" in SOMS for class members who do not participate in

5   the vision specialist's evaluation, *see* Jackson Objection Decl., Ex. E at 3-4, these class

6   members will have to request accommodations each time—an arrangement that this Court

7   has already found violates the ADA and the Revised Permanent Injunction.  *See* Remedial

8   Findings, Dkt. No. 3583 at 20-21.  To date, approximately 29% of class members who

9   have been offered the vision assessment refused it.  *See* Jackson Objection Decl. ¶ 16.  It is

10  Plaintiffs' understanding that some class members refused due to the burden of traveling

11  for hours in shackles for the purposes of participating in the evaluations, and others due to

12  not knowing the purpose of the evaluation.  *See id.* ¶ 17.  Although the parties are taking

13  steps to reduce the rate of refusal, *see id.*, Defendants still must accommodate this group.

14         While Plaintiffs do not expect Defendants to issue expensive assistive devices to

15  class members without consulting with a specialist, Defendants have provided no reason

16  for their refusal to simply ask if the class member requires documents in large print or

17  Braille, or to have documents read aloud, and document that information in SOMS so that

18  Defendants can affirmatively provide accommodations going forward.  *See* Jackson

19  Objection Decl., Ex. C at 2-3; *id.*, Ex. E at 3-4.  Indeed, these measures are necessary for

20  Defendants to fulfill ADA requirements to "undertake an investigation to determine what

21  constitutes a reasonable accommodation while given primary consideration to the disabled

22  person's preference" and "to affirmatively provide that accommodation without waiting

23  for a request."  *See* Remedial Findings, Dkt. No. 3583 at 19.  Moreover, the Court ordered

24  Defendants to take this approach by requiring Defendants implement the measures set

25  forth in the Lozano Declaration "to identify, **document, and track** the accessible

26  format … that best ensures effective communication of printed material to each DPV class

27  member."  *See* Remedial Order, Dkt. No. 3584 at 2 (emphasis added).

28

1    Plaintiffs request this Court order Defendants to incorporate this requirement from

2  paragraph 14 of the Lozano Declaration, Dkt. No. 3543-5, into the Remedial Proposal.

3  **IV.  DEFENDANTS' PLAN IMPERMISSIBLY EXCLUDES INDIVIDUALS WITH CERTAIN VISION DISABILITIES FROM RECEIVING**

4  **ADDITIONAL ATTORNEY ASSISTANCE**

5    The Court ordered Defendants to "develop policies and procedures to ensure that

6  those panel attorneys hold additional meetings and spend significantly more time on their

7  representation of class members with hearing and vision disabilities than currently required

8  under the Panel Attorney Program Guide for the Parole Suitability Hearing Process

9  (Guide)."  Remedial Order, Dkt. No. 3584 at 7.  Defendants' Remedial Proposal includes

10 revisions to the Guide, which governs the conduct of state-appointed parole attorneys.

11 These revisions include an Addendum requiring attorneys to hold at least one additional

12 attorney-client meeting and otherwise spend "significantly more time" representing

13 individuals with certain disabilities.  *See* Defs' Remedial Proposal, Dkt. No. 3596 at 139.

14 However, Defendants did not apply this Addendum to all individuals with "hearing and

15 vision disabilities," as this Court's Order plainly required.  Rather, Defendants limited the

16 application to individuals with hearing and vision disabilities that impact their placement

17 in CDCR, indicated by a DPH or DPV code.

18    Plaintiffs' counsel raised this objection with Defendants.  *See* Jackson Objection

19 Decl., Ex. A at 5.  Defendants refused to include class members with vision disabilities

20 that do not impact placement (*i.e.*, DNV class members) in the Addendum.  *See id.*, Ex. C

21 at 5.

22    Plaintiffs object to Defendants' failure to include individuals with a DNV code in

23 the Addendum requiring significant additional time.  This Court's order plainly applies to

24 class members with both DPV and DNV codes.  *See* Remedial Order, Dkt. No. 3584 at 2.

25 Like class members with DPV codes, class members with DNV codes have vision

26 disabilities that require individualized assessment, accessible documents and possibly

27 assistive devices to accomplish reading and writing tasks.  *See id.*  Especially because

28 Defendants plan to rely so heavily on attorneys to assist class members with reading and

1    writing tasks, *see supra* at 4-5, Plaintiffs request that this Court order Defendants to

2    include DNV class members in the Addendum to the Panel Attorney Guide.  This

3    inclusion will not impose an undue burden on Defendants, as Plaintiffs estimate there are

4    between 73 and 109 class members in all of CDCR who expect to have live parole

5    suitability hearings at some point.  *See* Jackson Objection Decl. ¶ 15.

6                                          **CONCLUSION**

7           Plaintiffs respectfully request that the Court sustain their objections to Defendants'

8    Remedial Proposal and enter Plaintiffs' Proposed Order so that deaf signers and blind and

9    low-vision class members can begin to receive effective accommodations in preparing for

10   and following up after parole suitability hearings, parole-related grievances, and parole-

11   related appeals.

12   DATED:  June 26, 2024              Respectfully submitted,

13                                      ROSEN BIEN GALVAN & GRUNFELD LLP

14
                                        By:  */s/ Caroline E. Jackson*
15                                           Caroline E. Jackson

16                                      Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OBJECTIONS TO DEFENDANTS' REMEDIAL PROPOSAL