1    DONALD SPECTER – 083925
     RITA K. LOMIO – 254501
2    MARGOT MENDELSON – 268583
     PATRICK BOOTH – 328783
3    JACOB J. HUTT – 5565791, *pro hac vice*
4    PRISON LAW OFFICE
     1917 Fifth Street
5    Berkeley, California  94710-1916
     Telephone:    (510) 280-2621
6    Facsimile:    (510) 280-2704

7    MICHAEL W. BIEN – 096891
     GAY C. GRUNFELD – 121944
8    THOMAS NOLAN – 169692
     PENNY GODBOLD – 226925
9    MICHAEL FREEDMAN – 262850
     ROSEN BIEN
10    GALVAN & GRUNFELD LLP
     101 Mission Street, Sixth Floor
11    San Francisco, California  94105-1738
     Telephone:    (415) 433-6830
12    Facsimile:    (415) 433-7104

13    LINDA D. KILB – 136101
     DISABILITY RIGHTS
14    EDUCATION & DEFENSE FUND, INC.
15    3075 Adeline Street, Suite 201
     Berkeley, California  94703
16    Telephone:    (510) 644-2555
     Facsimile:    (510) 841-8645

17

18    Attorneys for Plaintiffs

     CALIFORNIA OFFICE OF THE
     ATTORNEY GENERAL
     ROB BONTA
     Attorney General of the State of California
     MONICA ANDERSON
     Senior Assistant Attorney General
     SHARON A. GARSKE
     Supervising Deputy Attorney General
     SEAN LODHOLZ
     OLENA LIKHACHOVA
     ANNE M. KAMMER
     GURPREET SANDHU
     TRACE O. MAIORINO
     Deputy Attorneys General
     State Bar No. 179749
     455 Golden Gate Avenue, Suite 11000
     San Francisco, California  94102-7004
     Telephone:    (415) 510-3594
     Fax:           (415) 703-5843
     E-mail: Trace.Maiorino@doj.ca.gov

     Attorneys for Defendants Gavin Newsom
     and the California Department of Corrections
     and Rehabilitation

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>GAVIN NEWSOM, et al.,<br><br>        Defendants. | Case No. C94 2307 CW<br><br>**JOINT CASE STATUS STATEMENT**<br><br>Judge:  Hon. Claudia Wilken |

[4528320.3]

The parties submit this Joint Case Status Statement pursuant to the Stipulation and Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file periodic joint statements describing the status of the litigation" every other month, beginning on May 16, 2011.

## CURRENT ISSUES[1]

**A.    Plaintiffs' Enforcement Motion Regarding Accommodations for Deaf, Blind, and Low-Vision Class Members in the BPH Process**

### 1.    Plaintiffs' Statement

On March 20, 2024, this Court granted in part and denied in part Plaintiffs' Motion to Enforce the Court's prior orders, ECF No. 3583, and issued an Order for a Further Parole Remedial Plan, ECF No. 3584.  Defendants provided a responsive proposal to Plaintiffs on May 20, 2024.  Plaintiffs provided written feedback and the parties met and conferred thereafter.  Defendants filed the proposal with the Court on June 3, 2024.  *See* ECF No. 3596.  In accordance with the proposal, Defendants held panel attorney trainings on ADA issues on June 10 and 24, 2024, which Plaintiffs' counsel observed.  Defendants intend to schedule an additional panel attorney training.  Plaintiffs' counsel filed objections to Defendants' proposal on June 26, 2024, Dkt. No. 3600.  Defendants' response is due July 15, 2024 and Plaintiffs' reply is due July 22, 2024.

### 2.    Defendants' Statement

In accordance with the Court's order, Defendants prepared, and presented to Plaintiffs, further remedial plans that included policies and procedures on May 20, 2024, following which the parties engaged in the meet-and-confer process with the Court Expert's assistance.  ECF No. 3584.  Defendants filed their notice of compliance with the Court's order on June 3, 2024, along with the required policies and procedures.  ECF No. 3596.

The policies and procedures filed with Defendants' notice of compliance stated

---

[1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or *Defendants' Statement*.

1  BPH would conduct trainings on June 10 and 24, 2024, for panel attorneys appointed to

2  represent class members during parole suitability hearings, with additional trainings to be

3  scheduled as necessary.  BPH previously provided Plaintiffs with prior panel attorney

4  training materials and Plaintiffs offered comments and feedback.  Prior to the trainings on

5  June 10 and 24, 2024, BPH provided Plaintiffs updated training materials that incorporated

6  previous feedback from Plaintiffs, and again offered Plaintiffs an opportunity to provide

7  feedback before the trainings.

8      On June 10 and 24, 2024, Plaintiffs had an opportunity to observe the trainings

9  provided to panel attorneys.  BPH provided Plaintiffs finalized versions of the training

10 materials used during each training session after each training.  BPH will be scheduling a

11 third panel attorney training in the coming weeks, and Plaintiffs' counsel will again be

12 invited to observe.

13 **B.     Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class
14          Members**

15      **1.      Plaintiffs' Statement**

16          **a.      RJD and Five Prisons Orders**

17      Plaintiffs continue to monitor remedial efforts found necessary in order to prevent

18 further violations of the ARP and class members' ADA rights at six prisons including

19 changes to the staff misconduct investigation process and implementation of Audio Visual

20 Surveillance Systems that include body-worn camera technology.  *See* ECF Nos. 3059,

21 3060, 3217 and 3218.  Party agreements regarding Court ordered changes are found in

22 Defendants' RJD and Five Prisons Remedial Plans ("Plans").  *See* ECF No. 3393, Exs. A,

23 B.

24      Plaintiffs have issued nine quarterly reports and have identified scores of cases that

25 show failures by Defendants to conduct complete and unbiased investigations and impose

26 appropriate and consistent discipline.  Defendants are also failing to comply with other

27 provisions of the Remedial Plans that impact class members statewide, including failing to

28 meet deadlines for completing investigations and to appropriately route allegations of

misconduct to LDIs and the AIU.  Even when investigators timely complete investigations, cases languish on the desks of Hiring Authorities for months.  Plaintiffs' counsel have outlined additional reforms that are necessary to bring Defendants' accountability system into compliance and to avoid future litigation.  *See* Dkt. 3592, Exhibit A.  Plaintiffs' counsel and the Court Expert have expressed serious concerns about the lack of transparency and about unilateral changes to the accountability system that have been made by Defendants. As the Court Expert has recognized, "both staffing levels and procedures may well be necessary to ensure investigators have the resources to conduct competent and thorough investigations. But there is a Court ordered remedial plan in place. If CDCR believes material changes to the investigation and disciplines system are necessary, it must proactively discuss those changes with Plaintiffs and with the Court Expert before implementation."  *See* ECF 3587 at 6.  Plaintiffs have received a response from Defendants to some but not all of the reforms outlined in Dkt. 3592, Exhibit A.  The parties also agreed to review a random selection of staff misconduct complaints in an effort to better understand Defendants' proposal.  The parties are meeting on July 16, 2024 to discuss proposed reforms.

CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six prisons exist system-wide and are committed to bringing such evidence before the Court until all class members are protected.  *See* Dkt. 3592, Exhibit A at 7-8.

### b.    False, Retaliatory and Discriminatory RVRs

Despite significant progress made towards court-ordered improvements to the staff misconduct investigation and disciplinary system, the endemic use of false and retaliatory RVRs by staff to cover up disability-related misconduct and/or to retaliate against class members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same biased review that plagues the staff inquiry and investigation processes also denies class members due process in disciplinary hearings, resulting in longer terms of imprisonment, denials of privileges, housing at higher classification levels, and an unwillingness to report future misconduct or request disability-related help.

1    Steps taken thus far by Defendants to eliminate the problem have not gone far

2    enough and Plaintiffs' counsel continues to identify class members who have received

3    false, retaliatory, discriminatory or otherwise inappropriate RVRs.  *See* June 4, 2024, letter

4    Re: Discriminatory RVR Issued to Class Member, attached hereto as **Exhibit A**.

5    Plaintiffs' counsel remains especially concerned about the ongoing issuance of RVRs to

6    class members for filing "false" staff misconduct complaints.  *See* June 7, 2024, Email

7    from Penny Godbold to Tamiya Davis Re: Request for HQ Level Review of RVRs for

8    Filing Staff Complaints, attached hereto as **Exhibit B**, without attachments.  The use of

9    RVRs to retaliate against and discourage the filing of staff misconduct complaints will

10    persist unless Defendants take action to identify and root out problems through meaningful

11    reforms to the RVR process.

12    Plaintiffs are hopeful that the parties can agree to resolve problems and that

13    additional court intervention will not be necessary.

14    **2.    Defendants' Statement**

15    **a.    RJD and Five Prisons Orders**

16    CDCR has dramatically overhauled its processes to ensure unbiased and complete

17    investigations and, although not required by the Court's orders, Defendants have deployed

18    statewide processes that restructure CDCR's staff misconduct allegation, screening,

19    referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-

20    upon measures constitute substantial improvements that will go a long way to bringing

21    Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at

22    2.  The Court found, the "implementation of these [] remedial measures is likely to have a

23    positive impact on…the overall reliability of the outcomes of investigations." *Id.* at 15.

24    Despite the tremendous efforts and resources directed toward improving the staff

25    misconduct investigation and discipline processes, modifications are necessary to ensure

26    sustainability.  CDCR shared its initial modification proposal with the Court Expert and

27    Plaintiffs.  CDCR will continue to discuss needed modifications to the current processes to

28    ensure its sustainability and looks forward to proactively developing modifications without

1  protracted delay.

2          **b.**     **Demands for RVR Reform**

3         Defendants have made significant progress and commitments to address Plaintiffs'

4  demands that CDCR address the alleged practice of issuing false and retaliatory Rules

5  Violations Reports (RVRs) to class members, as detailed in previously filed statements.

6  *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.  CDCR continues to address these issues to the

7  extent they are specifically related to class-member accommodation, alleged

8  discrimination, or retaliation and to the extent it is required to do so under the remedial

9  plans, the ADA, or prior court orders.  Plaintiffs may disagree with the investigation or

10  discipline imposed, but that does not necessarily mean that the RVR was false or

11  retaliatory.  Plaintiffs' general complaints about the RVR process, unrelated to class-

12  member accommodations, are not properly raised in this case.

13  **C.**     **Court Expert Investigation Into SATF**

14        **1.**     **Plaintiffs' Statement**

15         In November 2021, this Court ordered the Court Expert to investigate the treatment

16  of people with disabilities at the California Substance Abuse Treatment Facility and State

17  Prison, Corcoran (SATF).  ECF No. 3338.  In December 2022, the Court Expert filed a 67-

18  page report, finding a substantial breakdown in the disability accommodation process at

19  SATF.  ECF No. 3446 at 4.  The Court ordered corrective action, including additional

20  analysis and reporting by the Court Expert and the development of policies and procedures

21  by CDCR.  *See* ECF No. 3467; ECF No. 3538. Plaintiffs currently are working with

22  CDCR and the Court Expert to ensure adequate policies are drafted and implemented.  If

23  the parties are not able to reach agreement on those policies, the parties will bring any

24  disputes to the Court, pursuant to the Court's order.

25         The issues identified by the Court Expert in 2022 persist at SATF, and Plaintiffs

26  have identified other serious violations of the ADA and ARP at SATF that have not been

27  timely resolved. Substantial reforms to staffing and self-monitoring and self-correction

28  processes are urgently needed. Plaintiffs are hopeful that the Court Expert's forthcoming

report on those issues will result in the allocation of sufficient resources, and development of robust systems, necessary to comply with the *Armstrong* Remedial Plan and Americans with Disabilities Act.

### 2.    Defendants' Statement

The Court Expert's second report concerning the treatment of people with disabilities at SATF recognized the numerous proactive measures implemented at SATF to further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The report demonstrates that the coordinated efforts between CDCR and the California Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with input from Plaintiffs, are working to effectively respond to the issues raised by the Court and addressed by the Court Expert following his initial investigation.  The Court Expert has since reported that SATF has made "significant improvements in the delivery of accommodations to class members" and that "the culture at SATF has improved," since his first report.  ECF No. 3500 at 4, 6.  As noted in the report, class members have reported to the Court Expert, through personal interviews and survey responses, "improvements in their ability to get the accommodations they needed and in the attitudes of staff."  ECF No. 3500 at 4.  The Court Expert reports that through these responsive collaborative efforts, SATF has significantly improved the process for receiving incarcerated people from other institutions and has reduced the likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities.  *Id.* The Court Expert further reported that SATF has improved the process for collecting and handling patient requests for medical care (Form 7362s), has improved the processes for issuing, repairing, and replacing DME (including through the successful relaunch of its in-house wheelchair repair program), and has significantly improved the delivery of medical supplies, such as incontinence supplies, to class members.  *Id.*  As noted by the Court Expert, "the current leaders and staff are to be given credit for the significant effort they made to address the problems" identified in the first report.  ECF No. 3500 at 5.

In response to this Court's order, the Court Expert issued a November 28, 2023

1   Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF

2   to which the parties entered into a stipulation addressing multiple issues.  ECF Nos. 3529,

3   3538.  Following the parties' stipulation, the Court issued its order setting deadlines for the

4   further development, with Plaintiffs' input, of policies addressing various issues at SATF,

5   including whiteboard captioning technology, accessible phones, and effective

6   communication of announcements and, therefore, addressing Plaintiffs' concerns noted

7   above.  ECF No. 3538.  The parties and the Court Expert continue to regularly meet to

8   discuss the various issues addressed in the stipulation.  Defendants look forward to

9   continued collaboration with Plaintiffs and the Court Expert to resolve these remaining

10  issues at SATF.

11  **D.      Accommodations for Deaf and Hard-of-Hearing Class Members**

12  **1.      Plaintiffs' Statement**

13          As of June 2024, at least 4,525 people who are deaf or hard of hearing are housed in

14  a California state prison.  CDCR has failed to accommodate them for decades, and too

15  many remain in significant isolation, unable to meaningfully participate in prison programs

16  or maintain ties with loved ones.  Over the years, Defendants have responded to Plaintiffs'

17  concerns with a "can't do" attitude consisting of delays and artificial barriers.  *See* Hon.

18  Thelton Henderson, Confronting the Crisis:  Current State Initiatives and Lasting Solutions

19  for California Prison Conditions, 43 U.S.F. L. Rev. 1, 7 (Summer 2008) (discussing

20  "trained incapacity" where prison officials "have trained themselves to be incapacitated

21  and incapable of meaningful change").

22          Most areas of recent movement to improve accommodations for deaf and hard-of-

23  hearing people are the result of Court order, not Defendants' initiative.  In order to effect

24  meaningful change – and finally comply with the requirements of the Americans with

25  Disabilities Act and *Armstrong* Remedial Plan – Defendants must work collaboratively

26  with Plaintiffs and focus on bold, complete solutions, not reactive half-measures.

27          **CART.**  In February 2023, the Court ordered CDCR to provide "CART [computer

28  assisted real time transcription] or an alternative accommodation" at SATF "as soon as

possible." ECF No. 3467 at 3. However, fifteen months later, Defendants have not implemented CART or an equally effective alternative for any programs, services, or activities—indeed, Defendants have not even been able to articulate a plan to comply with the Court's Order or completed a successful, functioning demonstration of CART or an equally-effective alternative during that period, and they cannot identify a working solution for even the most basic of components for transcription services, such as working microphones.

Defendants asserted that instead of CART, they intended to use a "ViewSonic whiteboard," which shows only two lines of text at a time (as opposed to an entire screen of text, as CART does), and generates captions automatically, without a human to make sense of what is heard. On December 7, 2023, this Court ordered Defendants to provide Plaintiffs with a demonstration of the ViewSonic whiteboard. ECF No. 3528 at 8. That demonstration took place at San Quentin on March 27, 2024, but did not provide meaningful results because the microphones Defendants used were too poor in quality.

Due to the significant delays encountered when coordinating in-person demonstration of CART and ViewSonic, the parties agreed to conduct a second demonstration by audio/video only—in other words, Plaintiffs would accept videos of the transcription in lieu of watching it onsite in real time. Between April 10th and May 9th, Plaintiffs sent four separate requests to meet with Defendants to discuss concerns over microphone quality, how to make the second demonstrations meaningful so as to avoid litigation, and how to move forward on stalled CART implementation issues distinct from issues related to the demonstration process itself. Defendants refused every request. Defendants completed a second round of audio/video demonstrations which were produced to Plaintiffs on June 21, 2024.

Plaintiffs look forward to engaging with the Court Expert in the factfinding procedure this Court has laid out to determine whether ViewSonic is equally effective to CART. Plaintiffs have provided the CART/ViewSonic demonstration videos to three subject matter consultants, one of whom is a certified Assistive Technology Professional

(ATP) working in the field of disability rights, and the other two of whom have significant experience evaluating the effectiveness of captioning technology, and most importantly, who are themselves deaf. All three professionals have resoundingly determined that ViewSonic is less effective than CART.  To Plaintiffs' knowledge, Defendants have not consulted with any experts.

Defendants ignore many ways that CART far out-performs ViewSonic, which Plaintiffs' deaf consultants found essential to effective communication: (1) CART's presentation and rate of display change make it easier to read and understand; it has high contrast, display customization options, a dedicated screen for captions, and importantly, it displays multiple lines of text that scroll at a consistently predictable pace. On the other hand, the ViewSonic display does not scroll, but rather flashes one-to-two lines of text at a time, which generally lacked enough context for reading comprehension, and that disappeared from the screen rapidly. As the artificial intelligence adjusted, the words on the screen constantly deleted and overwrote themselves, causing the words to jump around the screen and entire sentences to change meaning.  Our deaf consultants found ViewSonic's constant changes to be difficult to decipher and extremely distracting. (2) The words displayed by CART are more accurate and reliable; indeed, the five-second delay that Defendants complain of below was found by our deaf experts to be a benefit of CART, because it signifies that the transcriptionist is ensuring they understand correctly before they transcribe.  By contrast, the ViewSonic artificial intelligence spits out sometimes-nonsensical words as fast as it can, and then retroactively overwrites them, making it far less effective for conveying words and ideas accurately. (3) CART visually indicates each time the person speaking changes by using ">>" and starting a new paragraph, while ViewSonic gives no indication whatsoever of a change in speaker—such that a conversation between multiple different people is represented as one long run-on sentence—making group conversations impossible to follow.

Defendants still have not demonstrated a commitment to microphone technology that can pick up the audio from groups and programs in prison. After the March 27, 2024

demo, the parties and the Court Expert discussed the need for better microphones to facilitate transcription services. Defendants have since represented to Plaintiffs that their additional demonstration videos feature the JABRA Speak 750, which is marketed as designed "for meetings of up to 6 people," with a microphone range of only seven and a half feet,[2] and the ALVOXCOM mic system, which is a lapel microphone made for a single person.[3]  Below, they indicate an intent to test the EMEET M0 Plus and the EMEET Office Core Luna Plus.  It remains to be seen whether these additional microphones will prove effective.  Plaintiffs have agreed to provide their written position on whether Defendants have met their burden to show that ViewSonic is an equally effective alternative to CART to Defendants and the Court Expert on July 22, 2024. Defendants will provide a written response and position by July 29, 2024. The parties will meet and confer on their findings and legal positions on August 1, 2024.

The insufficient March 27, 2024 demonstration has already caused a significant setback, and Plaintiffs have concerns over the sufficiency of the second demonstration. It is Plaintiffs' position that, without a meaningful demonstration of the captioning technologies, Defendants will be categorically unable to meet their burden to show that ViewSonic is an equally effective alternative to CART. Additional judicial involvement may be necessary.

**Accessible Phones**.  D/deaf and hard-of-hearing people[4] continue to be denied equal access to phone services, including video calls.  Access to captioned phones and

---

[2] Technical Specifications Sheet, found at <https://www.jabra.com/business/speakerphones/jabra-speak-series/jabra-speak-750##7700-409>

[3] https://www.alvoxcon.com/products/alvoxcon-wireless-usb-microphone-for-iphone-computer-rechargeable-handheld-lapel-mic-system-for-macbook-pc-laptop-zoom-meeting-classroom-teaching-teacher-podcast-vlog?_pos=1&_sid=af7c8f1da&_ss=r

[4] Below, Defendants categorically state that "hard-of-hearing class members ... are able to use their hearing aids and volume controls to use the regular telephones to make and complete calls outside of the institution."  This is not true.  While *some* hard-of-hearing class members can do so, others cannot.  The many hard-of-hearing class members who cannot hear well enough to communicate by telephone, even with hearing aids and volume control, remain unaccommodated, in addition to the deaf non-signers.

TTY/TDDs continues to be an urgent issue due to placement of the phones in inaccessible locations, burdensome restrictions, equipment failures, and other logistical barriers. Defendants informed Plaintiffs that they intend to replicate their current efforts at SATF— as governed by the SATF Order, ECF No. 3538—on a statewide basis.  As of now, Defendants have indefinitely postponed disclosure of any timelines or information about statewide rollout of accessible phone installation until after they have complied with the Court's requirements for SATF.  The parties have met several times through the court-ordered SATF stipulation process and will continue to work with Defendants to resolve disputes regarding accessible phones at SATF; however, it remains unclear when these devices will become available statewide and there is no reason to delay installation of captioned phones statewide.

The ongoing harm is substantial.  Consider, for example, an elderly deaf person who is housed at San Quentin – someone the Court already found in February 2023 had "lost touch with family members outside of the institution due to a lack of disability accommodations," including accessible phones.  ECF No. 3446 at 40; ECF No. 3467 at 1. Over a year later, that same person can use an accessible phone only if he stands outside in the elements, a long walk from his housing unit, and uses a captioned phone that is placed on the top of a garbage can – and only if the officers on that day decide to allow it.  *See* ECF No. 3526 at Ex. D.  To this, Defendants state only that "there are no plans to install any additional captioned phones at San Quentin at this time."  That is unacceptable.

**Effective Communication of Announcements.**  There remains no robust and durable system to provide and audit effective communication of announcements, which continues to be a significant issue for deaf and hard-of-hearing individuals.  Plaintiffs have significant concerns about Defendants' proposal for effective communication of announcements and are working to resolve those concerns through the process outlined in the SATF Order.  Defendants acknowledge below that their proposal for effective communication of announcements covers only class members assigned a DPH code, which ignores this Court's finding that hard-of-hearing class members—not just deaf class

members—do not currently receive effective communication of announcements. *See* ECF No. 3446 at 37; Order, ECF No. 3467 at 2 (adopting Court Expert's undisputed findings). At this time, it appears Court involvement may be necessary to resolve the dispute.

It is worth noting that Defendants' report of an 86% OACC compliance score, even if it accurately reflected the state of effective communication of announcements statewide, still leaves the possibility that 14% of deaf and hard of hearing class members—or approximately 634 people—never receive effective communication of announcements.

**Hearing Aids.**  On March 1, 2024, Defendants informed Plaintiffs that CCHCS executed new hearing aid contracts on February 1, 2024, to better accommodate deaf and hard-of-hearing people.  Defendants have also given assurances that they have the capacity to respond to any influxes in demand for new hearing aids.  Although Plaintiffs remain concerned that Defendants have not adequately educated class members that new hearing aids are available and how to request them, those who have received the new hearing aids report significant improvement in their access to programs, services and activities through the hearing aids.  Plaintiffs will continue to work with Defendants in an attempt to ensure the roll-out is successful.

## 2.  Defendants' Statement

Plaintiffs' overly broad allegations are not only largely inaccurate, but lack the nuance necessary to address this large population of class members in which there are vast differences in degrees of qualifying disabilities.  Plaintiffs' aggressive tone and statements—which, unfortunately, now typify their communication with Defendants on Deaf and Hard-of-Hearing issues—ignore the ongoing collaborative work being performed in response to the SATF stipulation and in the Deaf and Hard-of-Hearing working group. Plaintiffs' statement that class members "remain in significant isolation, unable to meaningfully participate in prison programs or maintain ties with loved ones," is untrue and this broad characterization is misleading.  Not only have all class members been offered Viapath tablets—which enhance class members' ability to connect with loved ones via various methods, including electronic messaging and letters—but some class members

1    also have iPads or iPhones and laptops (for education programming).  Last year, CDCR

2    began deployment of iPhone and iPad devices equipped with the translate application and

3    the live-captioning accessibility feature to DPH class members[5] whose primary or

4    alternative method of communication is written notes, to include those who use sign

5    language.  Class members who received an iPhone or iPad are approved to have the device

6    within their possession during programs, services, activities, and housing unit settings,

7    including restrictive housing and any off-site appointments (*e.g.*, medical, same-day court

8    appearances).  These devices use state-of-the-art speech-to-text technology that addresses

9    the needs of the DPH class members during informal day-to-day interactions as well as

10   programs, services, and activities.  Moreover, in addition to these technological

11   accommodations, class members still have access to TTY, TDD, or Caption phones.

12   Disappointingly, Plaintiffs' statement ignores CDCR's proactive actions of acquiring and

13   distributing these devices as accommodations, without court intervention.  Moreover,

14   CDCR deployed CART for due-process events on July 24, 2023.  Oddly, Plaintiffs cite a

15   2008 publication to support their misguided allegations without noting the dramatic

16   increase in available technologies given to class members to accommodate them or

17   recognizing that today's correctional landscape is vastly different from the one that existed

18   16 years ago.

19           Plaintiffs' foregoing critique, which is seemingly designed to create disputes and

20   not resolve them, shows significant bias and disregard for the extensive efforts and

21   attention being put toward accommodating this population and, at this juncture, seems

22   particularly sharp-elbowed in light of the significant overlap of these issues—CART,

23   accessible phones (TTD-TTY and CapTel captioning), and effective communication of

24   announcements—and the parties' stipulation following the Court Expert's November 28,

25   2023 Addendum to Second Report Regarding the Treatment of People with Disabilities at

---

[5] Overall, there are 80 DPH class members statewide and their preferred effective communication method is sign language or other methods.  As of July 12, 2024, there are 51 DPH class members, statewide, whose primary or alternate means of effective communication is written notes.

1  SATF that addressed these issues.  ECF Nos. 3529, 3538.  Following the parties'

2  stipulation, the Court issued its order setting deadlines for the further development, with

3  Plaintiffs' input, of policies addressing various issues at SATF, including whiteboard

4  captioning technology, accessible phones, and effective communication of announcements

5  that directly address Plaintiffs' concerns noted above.  ECF No. 3538.  Defendants' further

6  efforts to accommodate this population are detailed in previously filed statements, and are

7  ongoing.  *See*, *e.g.*, ECF No. 3526, at 16-18.

8      **CART & ViewSonic.**  Defendants are surprised by Plaintiffs' harsh criticism of the

9  March 27, 2024 demonstration of CART and ViewSonic in a correctional setting because

10  during, and immediately following, the demonstration of these technologies, other

11  participants were optimistic that a resolution was attainable.  Plaintiffs' June 3, 2024

12  correspondence seems to perpetuate a false narrative of the demonstration and Plaintiffs

13  continue to seek more than the parties' stipulation requires by demanding additional

14  demonstrations comparing CART to ViewSonic.  Not only are these demonstrations not

15  required by the parties' stipulation, but they also present scheduling challenges.  For

16  example, the initial demonstration was scheduled for January 30, 2024, but ultimately took

17  place on March 27, 2024, to accommodate Plaintiffs and their required attendees.

18  Nevertheless, a recent video-taped demonstration, with audio, was produced to Plaintiffs

19  on June 21, 2024.  Defendants believe Plaintiffs' characterization about the microphones

20  during the demonstration are exaggerated and fail to accurately describe varying

21  environments or contexts in which these transcription services were demonstrated and will

22  be used.  For example, built-in microphones in the laptops worked well in the medical-

23  inpatient and education setting.  In the gym setting, with Integrated Substance Use

24  Disorder Treatment, the microphone picked up the instructor well, too.  During the

25  ViewSonic demonstration on the large boards, the microphones accurately picked up

26  voices from around the room.  As in any public or group setting, softer-spoken individuals

27  will need to be trained to speak louder to ensure accurate transcription.  Nevertheless,

28  Defendants are committed to ensuring the appropriate microphones are used depending on

the specific educational or programming context.  CDCR will continue to improve this aspect of the transcription services as evidenced by its testing of numerous microphones, including the JABRA Speak 750, the ALVOXCOM Handheld and Lapel Mic System, the EMEET Conference Speakerphone M0 Plus, and the EMEET Office Core Luna Plus Meeting Kit.

Further, Plaintiffs fail to mention the inherent shortcomings of CART that were observed and discussed at the demonstration, including CART not being available on-demand in a correctional setting.  And merely pointing to an entry on a website does not equate to being "on-demand" in a correctional setting to ensure class-member access. Plaintiffs ignore that CART requires a 72-hour notice and strict adherence to a schedule which is not always possible in a correctional setting because schedules are subject to change.  For each schedule change, the advance notice is again required.  During one demonstration, the CART operator signed off early, without warning, and the CART services provider did not respond to telephone calls made once the operator signed-off, leaving CDCR with no CART operator to provide transcription services.  Further, CART does not work well with people who have limited English skills and the transcriber periodically inserts unintelligible script instead of words.  This is not attributable to the microphone used.  ViewSonic, however, uses AI software that is able to accommodate multiple languages and even translation.  CART unnaturally inhibits the flow of conversation because it inserts a multi-second delay, thereby hindering class-member participation.  Whereas, ViewSonic does not insert such a delay.  Moreover, because CART is dependent on an operator it is subject to human error.  For example, during the demonstration, the operator did not differentiate between speakers or identify them consistently, and had difficulty keeping up with the different speakers.  ViewSonic was superior in this regard.  Defendants have experienced similar failings with CART in other settings.  For example, at a parole-suitability hearing, a class member was provided CART, a sign-language interpreter, and a certified deaf interpreter.  The CART operator failed to accurately transcribe the hearing, causing the class member's attorney to waive the CART

1    service because it was not accurate.

2          In terms of accuracy and reliability, ViewSonic utilizes advanced AI to generate

3    captions instantaneously with high accuracy.  While there is a difference in approach,

4    ViewSonic's real-time updates ensure minimal delay, allowing users to follow

5    conversations as they happen.  Undisputedly, AI continues to learn and improve over time,

6    increasing its effectiveness.  ViewSonic's AI-driven captions are designed to provide real-

7    time accuracy, which is crucial in dynamic and interactive group settings.  The occasional

8    adjustments made by the AI are aimed at improving the overall accuracy of the

9    transcriptions.  While CART's method of indicating speaker changes is beneficial, the

10   approach of prompting speaker identification is also effective for both systems and, with

11   training, this practice can be incorporated into group settings.  AI technology innovations

12   offer more customization, features, and settings to enhance user experience.  ViewSonic's

13   flexibility is easier to use in a variety of correctional settings making it a more versatile

14   tool to meet class members' captioning needs, including spontaneous captioning events.

15   The broader accessibility of this technology enhances overall compliance.

16         Offering these technologies to class members is inherently challenging given the

17   structural limitations and security requirements of a correctional setting.  Mindful that the

18   Court ordered Defendants to "make CART or an *alternative reasonable accommodation*

19   available at SATF" (emphasis added), CDCR has proactively explored technological

20   alternatives to CART.  Defendants will continue to collect data on key metrics such as

21   accuracy, latency, completeness, user qualitative data from a large enough sample of class

22   members, and, where appropriate, relying on expert consultation to meet their obligation to

23   accommodate the class members who may benefit from these technologies.  But Plaintiffs'

24   myopic attachment to CART fails to acknowledge the unprecedented implementation of

25   policy that provides these class members with up-to-the-minute technology to enhance

26   their day-to-day lives and further ensure access.

27         **Accessible Phones**.  As to accessible phone calls, Plaintiffs are conflating various

28   sub-populations because hard-of-hearing class members (as opposed to Deaf non-signers

and Deaf signers when calling people who do not sign) are able to use their hearing aids and volume controls to use the regular telephones to make and complete calls outside of the institution.  Defendants object to, and are troubled by Plaintiffs' hollow accusations that Defendants "fabricate" delays or "have spent more energy creating reasons," for delaying action on this issue, as they fail to acknowledge the incredible effort put forth to accommodate class members in the correctional setting or the inherent structural challenges that must be overcome.  Defendants have sought to be transparent by ensuring that a responsive policy may be successfully implemented at SATF, per the parties' stipulation, before deploying the policy at other institutions.  This includes Plaintiffs' misleading assertion concerning the installation of additional phones, to which CDCR has stated numerous times that it is currently focused on installing captioned phones at SATF before extending efforts statewide.  CDCR has often repeated that it intends to install captioned phones at other institutions; this includes housing units at San Quentin.  Finally, Plaintiffs' anecdote above about a telephone placed "on top of a garage can," is no longer true, as this situation has been rectified.  Institutions statewide have available TTY, TDD, or caption phones, and testing of these devices continues to ensure they remain functioning and available to class members.

**Effective Communication of Announcements.**  With respect to effective communication of public announcements to DPH class members, CDCR continues to work diligently to ensure DPH class members receive the information provided by these announcements through the implementation of multiple existing processes such as use of whiteboards, flickering of lights, face-to-face communication, and the development of a new, multi-faceted approach to providing announcements to the DPH population, that was detailed in a July 3, 2024 letter to Plaintiffs and to the Court Expert.  In light of the overlap, CDCR continues to meet and confer with Plaintiffs and the Court Expert on this issue as part of the court-ordered SATF investigation and the subsequent stipulation between the parties.  Defendants shared their policy utilizing tablets to ensure effective communication of announcements on March 6, 2024, but Plaintiffs have refused to provide

specific edits to that policy.  As noted above, Defendants further responded to Plaintiffs' recent communication on July 3, 2024, in anticipation of the meeting with the Court Expert.  Despite Plaintiffs' characterizations, class members are being accommodated as demonstrated by recent auditing data from OACC that shows 86% compliance rating on this topic.  OACC collected auditing data from a sample size of 263 class members and of these class members 225 class members indicated that they are made aware of announcements and alarms (225 ÷ 263 = .855 or 86%; 38 ÷ 263 = .144 or 14%.).

**Hearing Aids.**  CCHCS executed a new hearing aid contract on February 1, 2024. Since the implementation of the new contract, Defendants have received reports from several class members who have noted the hearing aids are better quality and have made a noticeable improvement in their lives.  CCHCS has been in communication with the hearing-aid vendor who has indicated they made significant efforts to accommodate the increase in demand for new hearing aids.  Based on the demand, it appears the people who require new hearing aids are aware that they are available and are being accommodated. At this point, the Defendants believe the overall concerns of the Plaintiffs regarding hearing aids have been addressed and any future concerns are appropriately addressed through the regular advocacy process.

Defendants remain committed to providing class members equal access to programs, services, and activities in accordance with the ADA and the ARP and will continue to confer with stakeholders to ensure the further accommodation of this population.

**E.     Accommodations for Blind and Low Vision Class Members**

**1.     Plaintiffs' Statement**

On September 22, 2022, Plaintiffs submitted a proposed stipulation to Defendants to resolve disputes around identifying, documenting, and providing reading and writing accommodations for blind and low-vision class members.  The parties negotiated the terms of the stipulation from that point until November 2023.  On March 6, 2024, in response to a court-ordered stipulation requiring CDCR to explain how when and how it would resolve

"all issues" at SATF addressed in the current draft Blind/Low-Vision Stipulation, Defendants produced a memorandum dated January 31, 2024, regarding visual accommodations for certain blind and low-vision class members.  Dkt. 3538 at 5.  On April 23, 2024, Plaintiffs submitted objections to Defendants, detailing the ways in which Defendants' response fails to comply with the Court's order and outlining the steps that Defendants must take promptly to amend and develop policy to comply with the Court's order.   Defendants responded to Plaintiffs' objections on June 24, 2024, and the parties will meet on July 17, 2024, to determine whether they are able to resolve remaining disagreements.

Defendants contend that the new visual accommodations policy "create[s] a timeframe for individualized assessments."  This is inaccurate.  The new policy contains timeframes for issuing recommended devices (*see* ECF No. 3596 at 54), but unfortunately contains no requirement that blind and low-vision class members be individually assessed within a specific amount of time.  Plaintiffs have repeatedly advocated for Defendants to ensure that blind and low-vision class members are evaluated by a vision specialist on an expedited basis to determine their needed visual accommodations, but Defendants have thus far refused to amend their policy to ensure that individualized assessments are completed in a timely manner.

Plaintiffs are particularly concerned about Defendants' failure to accommodate people with monocular vision, who have a narrower field of vision and severely limited depth perception, especially at shorter distances, *see, e.g., E.E.O.C. v. United Parcel Service, Inc.*, 424 F.3d 1060, 1064-65 (9th Cir. 2005), and who may face safety risks in a prison environment.  *See, e.g., Colwell v. Bannister*, 763 F.3d 1060, 1067 (9th Cir. 2014) (finding that monocular vision can cause physical injury in prison where plaintiff "bumps into other inmates who are not good-natured about such encounters, triggering fights on two occasions").  Defendants do not proactively identify, track, or accommodate people with monocular vision in their custody, and recently redefined the DNV code from what was agreed upon in the *Armstrong* Remedial Plan—defining DNV as all incarcerated

1  people "who have a vision impairment correctable to central vision acuity better than

2  20/200 with corrective lenses"—to now exclude those with monocular vision.  When

3  Defendants submitted to Plaintiffs proposed guidance to healthcare providers instructing

4  these providers that incarcerated people with monocular vision should be excluded from

5  DPV or DNV designation, Plaintiffs strongly objected.  *See* Dkt. 3592, Exhibit D.

6  Plaintiffs' counsel have seen institutions, particularly SATF, deny needed accommodations

7  to people with monocular vision simply because they do not have a DPP code.  *See*, *e.g.*,

8  Dkt. 3592, Exhibit E.

9       **2.       Defendants' Statement**

10      Plaintiffs contend that the parties negotiated the terms of the draft blind and low-

11  vision stipulation from September 22, 2022, until November 2023.  Notably, the last

12  version of the draft stipulation discussed by the parties was the draft stipulation sent to

13  Defendants by Plaintiffs on August 3, 2023.  Since that time, Plaintiffs unilaterally revised

14  that draft stipulation on October 24, 2023, and again on November 20, 2023.  Moreover,

15  Defendants have responded to the concerns raised in Plaintiffs' April 23, 2024 letter and

16  further discussed Plaintiffs' concerns at a June 17, 2024 meeting with the Plaintiffs and the

17  Court Expert.  At that meeting, Defendants also responded to the Court Expert's inquiries

18  and later sent a comprehensive written response on June 24, 2024.  The parties are

19  scheduled to meet with the Court's expert on July 17, 2024

20      The vast majority of the issues addressed in the blind and low-vision stipulation

21  previously negotiated by the parties are addressed in the January 31, 2024 memorandum

22  titled "Accommodations for Incarcerated Persons with a Vision Impairment, Impacting

23  Placement," and later revised with input from Plaintiffs.  *See* ECF No. 3596 at 52-78.  This

24  memorandum outlines the process for identification, tracking, and provision of reading and

25  writing accommodations, including electronic assistive devices (*e.g.*, electronic magnifiers,

26  electronic readers, laptops), to vision-impaired class members with a DPP designation of

27  DPV.  Pursuant to this memorandum, each DPV class member who, following an

28  individualized assessment by the Eye Care Institute vision consultants, is recommended an

assistive device to accommodate their independent reading and writing needs, will be issued the recommended assistive device(s) for private and independent in-cell use, with minimal restrictions.  These individually issued devices allow DPV class members to privately and independently access printed materials related to CDCR programs, services, and activities, including when preparing for BPH hearings or conducting post-hearing tasks.  Pending the completion of the individual assessments, institutions have the Zoomax Snow 12 (a portable video magnifier) as a reading and writing accommodation available through a check-in and check-out process.  Moreover, the January 31, 2024 memorandum and the attached template Local Operating Procedures: (a) direct provision of CDCR due process documents in Braille or large print format to DPV class members who, following individualized assessment, are determined to require large print or Braille print materials as primary visual accommodation; (b) outline the process for acquisition, issuance and replacement of the electronic assistive devices recommended as accommodations for DPV class members who cannot write by hand; (c) discuss DPV class members' individualized training on the use of the assistive devices recommended by the vision consultants; and (d) create a timeframe for individualized assessments and the issuance of the recommended assistive devices.  Further, in accordance with recent court orders (ECF Nos. 3583, 3584), Defendants have developed procedures for conducting individualized assessments of DNV class members to identify, document, and track their required accessible format or auxiliary device(s) for reading and writing purposes that are to be implemented once the court-ordered meet-and-confer process with Plaintiffs is complete.  *See* ECF No. 3596 at 52-78.  Plaintiffs' complaint that there is no "timeframe" imposing a deadline for blind and low-vision class members to be individually assessed within a specific amount of time, fails to acknowledge that these assessments are conducted by outside medical professionals who must balance numerous factors including the rigors of their regular medical practice with the unique challenges a correctional setting can present.  Defendants continue to improve the frequency of these assessments by, for example, contracting with additional medical professionals to avail themselves to on-site individual

1  assessments.

2      Plaintiffs falsely contend that Defendants have "redefined" the DNV code, which

3  they have not.  Rather, CCHCS issued a December 4, 2023 memorandum to provide

4  needed clarification to the providers in the field.  *See* ECF No. 3592 at 23, 71.  This

5  memorandum does not exclude people with monocular vision from DNV and DPV

6  designation, but rather instructs practitioners that the absence of vision in one eye does not

7  automatically place a patient in a DPP class.  There is no exclusion of incarcerated people

8  with monocular vision as Plaintiffs suggest.  Instead, these incarcerated people undergo the

9  same visual tests for field of view and visual acuity to determine if they qualify for a code.

10  Moreover, Plaintiffs were involved in the drafting of this memo because they were given

11  an opportunity to review and to provide feedback before it was issued.  Defendants will

12  continue to provide required accommodations to class members in accordance with the

13  ADA and the applicable court orders.

14  **F.    Problems Regarding Access to Assignments for Class Members**

15      The program-access workgroup continues to meet to discuss credit earning, the

16  assignment process, and disparities in the program-access assignment data in response to

17  Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680 at 1314.  The

18  parties' next meeting is scheduled for July 18, 2024.

19  **G.    Statewide Durable Medical Equipment Reconciliation**

20      **1.    Plaintiffs' Statement**

21      Defendants have agreed to ensure that anyone who had not been seen by a health

22  care provider in the last year would be seen for the purpose of reconciling their DME.  The

23  only outstanding issue then is to ensure a process whereby health care providers actually

24  undertake a reconciliation during at least one encounter annually.  Defendants maintain

25  that this is already a requirement during visits with Primary Care Providers, yet thousands

26  of class members without needed DME were identified by Defendants, despite this

27  existing requirement.  A process for ensuring that staff actually reconcile DME during

28  encounters is necessary.  On April 3, 2024, Defendants produced their first quarterly set of

DME Reconciliation reports.  These reports show that there remain substantial problems with missing DPP codes, and poorly documented and tracked DME.  These problems can result in staff members not knowing when someone has a disability that has been verified and needs to be accommodated, and can result in improper removals of DME when searching cells and when people transfer to new units or new prisons.

Unfortunately, Defendants' disability tracking system still fails to identify and track class members with upper-extremity disabilities.  Plaintiffs are committed to resolving this ongoing problem.

### 2.    Defendants' Statement

CCHCS informed Plaintiffs it would ensure class members who have not been seen by a provider in the last year would be scheduled and given an opportunity to discuss appropriate DME for their condition.  Aside from the scheduled appointment, class members have several other means by which they can have their DME needs accommodated, including submission of a Form 7362 (Health Care Service Request Form) or Form 1824 (Reasonable Accommodation Request Form).  Additionally, CDCR and CCHCS have numerous checks and balances in place to ensure DME is accounted for. The DME Discrepancy Reports were specifically designed to detect errors within the system and highlight the errors for staff to take necessary action to remediate.  The success of this process is evidenced by the dramatic decrease in the discrepancy rates since inception of the reports.  For example, the January 2020 report reflected a 53% discrepancy rate, whereas the current rate of discrepancy is significantly less, 15.7%.  It should be noted, and Plaintiffs are aware, the reports are working documents and are reflective of and influenced by the timing of the information recorded.  This means that the report will reflect an error from the time the provider places an order in the system until the patient is issued the DME.  CCHCS has committed to providing Plaintiffs the DME Discrepancy Reports on a quarterly basis and will continue to communicate with stakeholders about these issues.

**H.     Joint Monitoring Tool**

The parties remain committed to developing a strong and effective joint monitoring tool.  The parties continue to convene small work groups, confer with the Court Expert about informal briefing, and continue to meet to discuss and resolve the few remaining disputes between the parties such as a format for scoring and reporting compliance.  The parties continue to work towards a collaborative solution for scoring and reporting.

**I.     ADA Structural Barriers, Emergency Evacuation Procedures, and Master Planning Process**

The parties continue to engage in the Master Planning Process aimed at ensuring that CDCR prisons are accessible to people with disabilities in compliance with the ADA.  The parties met with the Court Expert about these issues on June 27, 2024.  The parties have agreed upon a new Master Planning process to share information or plans related to Master Planning projects and to tour completed projects.  This new process may continue to evolve as it is put into use by the parties.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who is reviewing them and will provide timely feedback.  Plaintiffs have returned the first set of plans, for CSP-Lancaster, with their access expert's comments and requests for additional details and accessibility features.  The parties agreed that, when necessary, they will conduct joint tours with their respective experts, before ADA accessibility construction projects begin and after they are

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

completed, to identify and resolve any ADA-non-compliance issues.

Respectfully submitted,

DATED:  July 15, 2024          ROSEN BIEN GALVAN & GRUNFELD LLP

                               By:  /s/Penny Godbold
                               Penny Godbold

                               Attorneys for Plaintiffs


DATED:  July 15, 2024          ROB BONTA
                               Attorney General of the State of California

                               By:  /s/Trace O. Maiorino
                               Trace O. Maiorino
                               Deputy Attorney General

                               Attorneys for Defendants


## FILER'S ATTESTATION

As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.


DATED:  July 15, 2024          /s/Penny Godbold
                               Penny Godbold

# EXHIBIT A



ROSEN BIEN
GALVAN & GRUNFELD LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Penny Godbold
Email:  pgodbold@rbgg.com

June 4, 2024

<u>VIA ELECTRONIC MAIL ONLY</u>

> **PRIVILEGED AND
> CONFIDENTIAL**
>
> **SUBJECT TO
> PROTECTIVE ORDERS**

Tamiya Davis
CDCR Office of Legal Affairs
Tamiya.Davis@cdcr.ca.gov

      Re:    *Armstrong v. Newsom*: Discriminatory RVR issued to ██████ ██████
                  ████████ DPM, RJD
                  <u>Our File No. 0581-03</u>

Dear Tamiya:

      We write on behalf of ████ ██████████ ██████ DPM, an RJD declarant who is elderly and uses a four-wheeled walker.  Plaintiffs' counsel previously reported on Mr. ████████ and the discriminatory RVR he received, in a prior staff misconduct report.  We write now to request that headquarters review the RVR and take appropriate action in response.

      On February 20, 2022, Mr. ████████ received a Rules Violation Report (RVR)(Log #7160473) for "Disobeying an Order," which he challenged via 602 on March 17, 2022.  The primary basis for Mr. ████████ RVR was that he walked the wrong way around the track.[1]  He reports that he was simply heading to medical to drop of a 7362 form and that he was taking the shortest path of travel as a disability accommodation.  CDCR policy requires that staff "utilize sound correctional decision

---

[1] The other claimed basis was that Mr. ████████ was not wearing proper attire because he was not wearing his "blues" at the time.  Mr. ████████ explained that he was not aware and that because he dropped off the 7362 during his yard time, he believed he was allowed to wear his yard clothes.  *See* <u>602</u> at 3.  The policy requirement simply states that incarcerated people must wear "proper attire," not that they must wear "blues."  *See* <u>AIMS Relevant Docs</u> at 11.

[4508977.1]

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 4, 2024
Page 2

making in determining the reasonableness of the [incarcerated person]'s request, and understand they should provide reasonable accommodations without relying on a Chrono or medical prescription.  Examples of accommodations may include, but are not limited to:  providing the [incarcerated person] a shorter path of travel …"  *See* Revised Durable Medical Equipment Policy (March 5, 2020) at 3.



As shown in BWC footage, Officers ████ and ████ stopped him after he was returning from medical and informed him he was walking the wrong way. Mr. ████ attempted to assert his right to walk the shortest distance as an accommodation for his mobility disability.  Instead of accommodating his disability, or offering any alternatives, the officers argued with him, insisting that he should walk the longer route in the future.  Mr. ████ acquiesced and returned to his housing unit. As confirmation that the officers knew of his disability and failed to accommodate him, Officer ████ can be heard saying, "Oh and 'I'm ADA so I go the shortest route.' Mmm … no, you're gonna do what everyone else is doing."  *See* BWC (linked above) at 11:20:00.

Following this encounter, staff then issued Mr. ████ a discriminatory RVR for failing to obey an order.  At the outset, it is worth noting that there is no indication in this case that he did in fact disobey an order.  Custody staff called out Mr. ████ for walking the wrong way, but they did not order him to stop nor did they give him any specific order to do something differently in that moment.  He was only told not to do so again.  More importantly, disciplining a class member for failing to walk the longest distance around the track amounts to disability discrimination when he was requesting, and policy requires, staff to provide disability accommodations, including the specific accommodation he is requesting.  This RVR should be reviewed and voided.

The RVR had devastating consequences at his parole hearing.  According to the hearing transcript obtained by Plaintiffs, the RVR was his only disciplinary infraction during his 12-year term of current incarceration, and was a significant factor in the commissioners' decision to deny parole.  In announcing the Board's decision the commissioner states: "[W]e fast forward to this recent, uh, counseling chrono you received in February this year and you wanted to blame this staff member, uh, for falsely documenting your misconduct when it was clear, um, that you were violating the rules. **You know having the ability to take full responsibility for your negative actions is one of the main factors we as a panel consider when we're assessing whether someone has rehabilitated or not.**  Unfortunately, um, after hearing your testimony today Mr. ████ … you've fallen way short of that mark.  So, you need more work and develop [sic] in this area."  *See* Transcript at 78 (emphasis added).

**PRIVILEGED AND CONFIDENTIAL**
Tamiya Davis
June 4, 2024
Page 3

Mr. ██████████ discriminatory RVR was part of a wider pattern of inappropriate and discriminatory discipline issued to people with disabilities in response to class members walking the shortest distance around the track. *See* Plaintiffs' Review of CDCR Accountability System dated May 12, 2023 at 21-22.

### Headquarters Level Review of the RVR

Because there is no indication, as part of raising this case pursuant to staff misconduct reporting, that CDCR has reviewed the RVR in this case, Plaintiffs' request that CDCR Headquarters staff review this discriminatory RVR and take appropriate action to void and purge the record from his file. **Please report on what action was taken in response to the review.**

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Penny Godbold*

By:   Penny Godbold
      Of Counsel

PMG:sms

cc:   Ed Swanson          OLA *Armstrong*
      August Gugelmann    Sean Lodholz
      Audrey Barron       Trace Maiorino
      Patricia Ferguson   Olena Likhachova
      Ramon Ruiz          Sharon Garske
      Chor Thao           Ursula Stuter
                          Co-Counsel

[4508977.1]

# EXHIBIT B

| From: | Penny Godbold |
|---|---|
| To: | CDCR OLA Armstrong CAT Mailbox; Davis, Tamiya@CDCR; Ruiz, Ramon@CDCR; Armstrong Team - RBG only |
| Cc: | Stuter, Ursula@CDCR; Ed Swanson; audrev ████████     August Gugelmann; SinghA@oic |

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

| Subject: | Request for HQ Review of Response Re: Issuance of Retaliatory RVRs for Filing Staff Complaints, 04-08-2022 [IWOV-DMS.FID3579] [IMAN-DMS.FID5932] |
|---|---|
| Date: | Friday, June 7, 2024 1:26:20 PM |
| Attachments: | 06.03.24 Response to Issuance of Retaliatory RVRs for Filing Staff Complaints.pdf |
| | PG-Defs, Issuance of Retaliatory RVRs for Filing Staff Complaints, 04-08-2022, 581-3.PDF |
| | Memo Re Accountability for Falsely Alleging Staff Misconduct, rec"d 06-06-2023, 581-3.pdf |

Tamiya,

Thank you for Defendants' response to our advocacy letter from April 2022 regarding RVRs received by Mr. ████████ for supposedly filing false complaints against staff.

We are concerned, however, that the advocacy response, signed by Warden Hill, is inconsistent with our understanding of Defendants' position regarding when it is appropriate to issue an RVR for filing a staff complaint.  As articulated in Title 15, during multiple negotiations, and as memorialized in the last version of the memo entitled, "Incarcerated Persons Accountability for Knowingly and Falsely Alleging Staff Misconduct" that was provided to Plaintiffs' counsel in June 2023 (attached), discipline is only appropriate when the incarcerated person has knowingly accused the staff member of false misconduct.  The purpose of the negotiated memo was to address concerns regarding the ongoing issuance of inappropriate RVRs for filing complaints and to re-articulate the standard included in Title 15, subsection 3482(d)(2) which states in part... ."when completing a CDCR Form 602-1, a claimant shall not... include information or accusations _known_ to the claimant to be false."  (emphasis added).  We do not believe the parties are in dispute regarding the standard.  Yet, Warden Hill's response upholds RVRs for filing false complaints, discussed below, when there is no evidence that Mr. ████████ knowingly accused the staff members of false misconduct.  In fact, Mr. ████████ maintains to this day that staff misconduct he alleged in fact occurred.

<span style="color:red">Plaintiffs seek clarification from CDCR Headquarters  --  Do the cases cited below meet the standard for upholding RVRs for filing false staff misconduct</span>

complaints?

In **RVR 7155001, Falsification of a Document,** where Mr. ███ accused the staff member of violating his legal mail rights, Warden Hill's response concludes that the officer did not refuse to accept the legal mail, he simply delayed while he consulted a supervisor. This is a classic example of a case where the action taken by the officer may not amount to staff misconduct but the class member nevertheless believes that his legal mail rights were violated. Defendants have represented that they agree that RVRs are not warranted in such cases. There is no evidence that Mr. ███ knowingly filed a false complaint in this case and in fact the officer's conduct (initially refusing to accept the mail when the envelope was properly addressed to a legal mail recipient) may have actually violated the strict letter of the policy.

In **RVR 7123816, Falsification of a Document,** where Mr. ███ accused the staff member of making derogatory statements towards him, Warden Hill's response states that the LDI concluded (after reviewing BWC footage) that the allegation was false. Warden Hill concludes, based on the same evidence relied on by the LDI in issuing the RVR that, because there is purportedly no evidence that a derogatory comment occurred, an RVR is appropriate because that means the allegation was false. However, because (to Plaintiffs' knowledge) the BWC footage was not produced, it remains unclear whether the LDI relied on relevant footage, whether the footage revealed a comment but the LDI concluded it was not derogatory, or whether any number of other problems consistent with Plaintiffs' reports regarding incomplete and biased investigations existed in this case. Most relevant, Defendants have failed to identify evidence that Mr. ███ was aware the allegation was false when he made it. Mr. ███ continues to assert that he believes misconduct occurred.

Regarding the third RVR**, RVR 7156139, Falsification of a Document,** cited in Plaintiffs' April 2022 letter, Defendants fail to respond. In that case Mr. ███ reported that an officer walked away and failed to leave a ducat for him at his cell door "at about 5:30 p.m." on December 1, 2021. The investigator concluded, after reviewing AVSS footage, that no one even approached Mr. ███ cell between 5:30 to 6:16 hours and therefore issued him an RVR for filing a false complaint. But the investigator did not review footage prior to 5:30 despite Mr. ███ stating it occurred "at about 5:30". Mr. ███ continues to assert that this did occur and Defendants have not cited any evidence indicating that he believed otherwise when he made the complaint.

Plaintiffs' counsel seek clarification from CDCR Headquarters regarding whether these

RVRs meet the standard for intent to file a false staff misconduct complaint.  If not, please report on what action will be taken in response.  Defendants' response also cites an updated version of the memo entitled  "Incarcerated Persons Accountability for Knowingly and Falsely Alleging Staff Misconduct" dated February 2024.  Please produce a copy of this memo in your response.

We look forward to hearing back from you.
Thanks,
-Penny

---

**From:** CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>
**Sent:** Monday, June 3, 2024 11:14 AM
**To:** Davis, Tamiya@CDCR ████████████████>; Ruiz, Ramon@CDCR
███████████████>; Armstrong Team - RBG only ███████████████
**Cc:** Stuter, Ursula@CDCR ██████████████ CDCR OLA Armstrong CAT Mailbox
██████████████; Ed Swanson ████████; audrey@████████ August
Gugelmann ████████████>; SinghA@oig███████ ████████████



**Subject:** RE: Armstrong: Issuance of Retaliatory RVRs for Filing Staff Complaints, 04-08-2022 [IWOV-DMS.FID3579]

[EXTERNAL MESSAGE NOTICE]

Good morning,

Please see CDCR's response attached.

*Gabriela Anderson*
Office Technician - Typing
**Class Actions Litigation, Administrative Support Team**
**Office of Legal Affairs – HQ, CDCR**
1515 S Street, Suite 314-S
Sacramento, CA 95811
Mobile Phone: ▮▮▮▮▮▮▮▮

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Adam Dean <ADean@rbgg.com>
**Sent:** Friday, April 8, 2022 3:23 PM
**To:** Neill, Jennifer@CDCR ▮▮▮▮▮▮▮▮▮▮▮>; Davis, Tamiya@CDCR ▮▮▮▮▮▮▮▮
**Cc:** Ed Swanson ▮▮▮▮▮▮▮▮▮>; audrey▮▮▮▮▮▮ August Gugelmann <▮▮▮▮▮▮▮▮



**Subject:** Armstrong: Issuance of Retaliatory RVRs for Filing Staff Complaints, 04-08-2022 [IWOV-DMS.FID3579]

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Jenn and Tamiya,

Please see the attached letter from Attorney Penny Godbold.

Best,

Adam Dean
Paralegal
He/him



**101 Mission Street, 6th Floor**
**San Francisco, CA 94105**
(415) 433-6830 (telephone)
(415) 433-7104 (fax)
adean@rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at adean@rbgg.com.