DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PATRICK BOOTH – 328783
JACOB J. HUTT – 5565791, *pro hac vice*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS
EDUCATION & DEFENSE FUND,
INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

Attorneys for Plaintiffs

CALIFORNIA OFFICE OF THE
ATTORNEY GENERAL
ROB BONTA
Attorney General of the State of California
MONICA ANDERSON
Senior Assistant Attorney General
SHARON A. GARSKE
Supervising Deputy Attorney General
SEAN LODHOLZ
OLENA LIKHACHOVA
ANNE M. KAMMER
GURPREET SANDHU
TRACE O. MAIORINO
Deputy Attorneys General
State Bar No. 179749
455 Golden Gate Avenue, Suite 11000
San Francisco, California  94102-7004
Telephone:   (415) 510-3594
Fax:            (415) 703-5843
E-mail: Trace.Maiorino@doj.ca.gov

Attorneys for Defendants Gavin Newsom
and the California Department of Corrections
and Rehabilitation

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **JOINT CASE STATUS STATEMENT** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

1    The parties submit this Joint Case Status Statement pursuant to the Stipulation and

2    Order entered March 28, 2011 (ECF No. 1868), which provides that "[t]he parties will file

3    periodic joint statements describing the status of the litigation" every other month,

4    beginning on May 16, 2011.

5                              **CURRENT ISSUES[1]**

6    **A.    Plaintiffs' Enforcement Motion Regarding Accommodations for Deaf, Blind,
          and Low-Vision Class Members in the BPH Process**
7

8    On March 20, 2024, this Court granted in part and denied in part Plaintiffs' Motion

9    to Enforce the Court's prior orders, ECF No. 3583, and issued an Order for a Further

10   Parole Remedial Plan, ECF No. 3584.  The Court subsequently ruled on Plaintiffs'

11   Objections to Defendants' Remedial Plan on July 31, 2024, requiring Defendants to revise

12   the Remedial Plan within 14 days of the Court's order and to meet and confer with

13   Plaintiffs regarding providing accommodations for deaf signers to access certain parole-

14   related documents.  *See* ECF No. 3609.

15   On August 14, 2024, Defendants filed their second notice of compliance with the

16   Court's order for further parole-related remedial plan and continue to implement these

17   revised policies.  ECF No. 3615.  Plaintiffs will monitor compliance.

18   **B.    Allegations of Abuse, Retaliation, and Violence by CDCR Staff Against Class
          Members**
19

20        **1.    Plaintiffs' Statement**

21             **a.    RJD and Five Prisons Orders**

22   Plaintiffs continue to monitor remedial efforts the Court found to be necessary in

23   order to prevent further violations of the ARP and class members' ADA rights at six

24   prisons, including changes to the staff misconduct investigation process and

25   implementation of Audio Visual Surveillance Systems that include body-worn camera

26   technology.  *See* ECF Nos. 3059, 3060, 3217 and 3218.  Party agreements regarding Court

27   ────────────────────────

28   [1] Statements are joint unless otherwise delineated as either *Plaintiffs' Statement* or
     *Defendants' Statement*.

1  ordered changes are found in Defendants' RJD and Five Prisons Remedial Plans ("Plans").
2  *See* ECF No. 3393, Exs. A, B.

3      Plaintiffs have issued ten quarterly reports and have identified scores of cases that
4  show failures by Defendants to conduct complete and unbiased investigations and impose
5  appropriate and consistent discipline.  Defendants are also failing to comply with other
6  provisions of the Remedial Plans that impact class members statewide, including failing to
7  meet deadlines for completing investigations and to appropriately route allegations of
8  misconduct to the appropriate investigators.  Even when investigators timely complete
9  investigations, cases languish on the desks of Hiring Authorities for months.  Plaintiffs'
10 counsel have outlined additional reforms that are necessary to bring Defendants'
11 accountability system into compliance and to avoid future litigation.  *See* ECF No. 3592,
12 Exhibit A.  Plaintiffs' counsel and the Court Expert have expressed serious concerns about
13 the lack of transparency and about unilateral changes to the accountability system that
14 have been made by Defendants.  As the Court Expert has recognized, "both staffing levels
15 and procedures may well be necessary to ensure investigators have the resources to
16 conduct competent and thorough investigations.  But there is a Court ordered remedial plan
17 in place.  If CDCR believes material changes to the investigation and disciplines system
18 are necessary, it must proactively discuss those changes with Plaintiffs and with the Court
19 Expert before implementation."  *See* ECF No. 3587 at 6.  Defendants responded that they
20 will implement some, but not all, of the reforms outlined in ECF No. 3592, Exhibit A.  On
21 July 8 and July 16, 2024, Defendants sent their own proposals to change the Court-ordered
22 accountability system, and the parties and the Court Expert met on July 16, 2024 to discuss
23 those proposed changes.

24     Plaintiffs share the Court Expert's concerns, expressed at the July 16 meeting, that
25 Defendants' proposals are primarily designed to reduce the number of staff complaints in
26 the system, and not to improve the quality of investigations.  Plaintiffs agree with the
27 Court Expert that, unless the quality of investigations improves, the changes proposed by
28 Defendants will not result in appropriate accountability for staff who violate policy and

1  harm incarcerated people.  Plaintiffs have asserted for years that Defendants have failed to

2  ensure adequate staffing to investigate allegations of staff misconduct, *see, e.g.,* ECF No.

3  3430 at 6, ECF No. 3440 at 6, ECF No. 3452 at 5, and Defendants' failure to acknowledge

4  this resource problem has contributed to their longstanding failure to timely conduct

5  complete and unbiased investigations, as required by the Court.  Nevertheless, Plaintiffs

6  are engaging in good faith negotiations with Defendants on their proposed changes to the

7  accountability system, and expect that Defendants will do the same with respect to the

8  necessary reforms Plaintiffs have proposed in order to bring Defendants into compliance

9  with the Court's Orders and to ensure that the system will hold staff accountable for abuse,

10 retaliation and violence against class members.

11      On September 4, 2024, the Department of Justice announced that they are

12 investigating complaints of sexual staff misconduct at two women's prisons, CIW and

13 CCWF.  The investigation seeks to determine whether CDCR reasonably protects people

14 housed at these facilities from sexual abuse as required by the U.S.

15 Constitution.  According to the press release, the investigation was opened, in part, due to

16 reports of "an unsafe and inaccessible reporting process and the absence of staff

17 accountability."  *See* https://www.justice.gov/opa/pr/justice-department-announces-civil-

18 rights-investigation-correctional-staff-sexual-abuse-two.  Until the DOJ concludes its

19 investigation, Plaintiffs cannot agree to make any changes to the way CDCR investigates

20 sexual misconduct complaints.

21      CDCR is a statewide system.  Violations of the ADA and ARP found thus far at six

22 prisons exist system-wide and Plaintiffs are committed to bringing such evidence before

23 the Court until all class members are protected.  *See* ECF No. 3592, Exhibit A at 7-8.

### b.    False, Retaliatory and Discriminatory RVRs

25      Despite significant progress made towards Court-ordered improvements to the staff

26 misconduct investigation and disciplinary system, the endemic use of false and retaliatory

27 RVRs by staff to cover up disability-related misconduct and/or to retaliate against class

28 members who report misconduct remains a problem.  *See* ECF No. 3296 at 9.  The same

1    biased review that plagues the staff inquiry and investigation processes also denies class

2    members due process in disciplinary hearings, resulting in longer terms of imprisonment,

3    denials of privileges, housing at higher classification levels, and an unwillingness to report

4    future misconduct or request disability-related help.  Steps taken thus far by Defendants to

5    eliminate the problem have not gone far enough, and Plaintiffs' counsel continues to

6    identify class members who have received false, retaliatory, discriminatory or otherwise

7    inappropriate RVRs.  *See* ECF No. 3606, Exs. A and B.  The use of RVRs to retaliate

8    against and discourage the filing of staff misconduct complaints will persist unless

9    Defendants take action to identify and root out problems through meaningful reforms to

10   the RVR process.  Plaintiffs are hopeful that the parties can agree to resolve problems and

11   that additional court intervention will not be necessary.

12         **2.    Defendants' Statement**

13               **a.    RJD and Five Prisons Orders**

14         CDCR has dramatically overhauled its processes to ensure unbiased and complete

15   investigations and, although not required by the Court's orders, Defendants have deployed

16   statewide processes that restructure CDCR's staff misconduct allegation, screening,

17   referral, investigative, and disciplinary processes.  As the Court has noted, "[t]hese agreed-

18   upon measures constitute substantial improvements that will go a long way to bringing

19   Defendants into compliance with the ARP and ADA at the six prisons."  ECF No. 3356 at

20   2.  The Court found, the "implementation of these [] remedial measures is likely to have a

21   positive impact on … the overall reliability of the outcomes of investigations."  *Id.* at 15.

22   Despite the tremendous efforts and resources directed toward improving the staff

23   misconduct investigation and discipline processes, modifications are necessary to ensure

24   sustainability.  CDCR shared its initial modification proposal with the Court Expert and

25   Plaintiffs.  The parties and Court Expert have met extensively to discuss these proposals,

26   Plaintiffs' responses, and to identify areas of agreement.  The parties met on August 22,

27   2024, and the parties will meet again on September 18, 2024.  CDCR will continue to

28   discuss needed modifications to the current processes to ensure its sustainability and looks

1   forward to proactively developing modifications without protracted delay.

2       Plaintiffs have inserted information about a recent inquiry into allegations of sexual

3   misconduct at two institutions by the US DOJ, despite knowing that CDCR cannot

4   comment on open investigations.  Until the US DOJ completes its investigation into

5   CDCR's process to investigate sexual misconduct and the matter has been fully

6   adjudicated, the parties cannot engage in discussions about staff misconduct reform related

7   to sexual misconduct.

8               **b.      Demands for RVR Reform**

9       Defendants have made significant progress and commitments to address Plaintiffs'

10  demands that CDCR address the alleged practice of issuing false and retaliatory Rules

11  Violations Reports (RVRs) to class members, as detailed in previously filed statements.

12  *See* ECF Nos. 3412 at 14-16, 3526 at 7-8.  CDCR continues to address these issues to the

13  extent they are specifically related to class-member accommodation, alleged

14  discrimination, or retaliation and to the extent it is required to do so under the remedial

15  plans, the ADA, or prior court orders.  Plaintiffs may disagree with the investigation or

16  discipline imposed, but that does not necessarily mean that the RVR was false or

17  retaliatory.  Plaintiffs' general complaints about the RVR process, unrelated to class-

18  member accommodations, are not properly raised in this case.

19  **C.      Court Expert Investigation Into SATF**

20          **1.      Plaintiffs' Statement**

21      In November 2021, this Court ordered the Court Expert to investigate the treatment

22  of people with disabilities at the California Substance Abuse Treatment Facility and State

23  Prison, Corcoran (SATF).  ECF No. 3338.  In December 2022, the Court Expert filed a 67-

24  page report, finding a substantial breakdown in the disability accommodation process at

25  SATF.  ECF No. 3446 at 4.  The Court ordered corrective action, including additional

26  analysis and reporting by the Court Expert and the development of policies and procedures

27  by CDCR.  *See* ECF No. 3467; ECF No. 3538.  The parties currently are working with the

28  Court Expert to ensure adequate policies are drafted and implemented and plan to bring

1    disputes to the Court for resolution on October 11, 2024.

2           In his 2022 report, the Court Expert noted that "SATF may be simply too consumed

3    by managing the needs of its large and complex population to be able to recognize when

4    there are systemic failings in the treatment of its disabled population and to fix those

5    failings." ECF No. 3446 at 5.  As a result, the Court Expert recommended that CDCR

6    "consider changing the makeup of the population at SATF to enable it to better serve the

7    population it houses."  *Id.* at 65.

8           CDCR has done the exact opposite.  Since the Court Expert made his

9    recommendations, CDCR has dramatically increased the population of people with

10   documented physical and learning disabilities at SATF.  That population is now **148%** of

11   what it was in December 2022.  **As of September 2024, SATF houses 1,297 people with**

12   **those disabilities (more than any other prison), up from 875 in December 2022**.  This

13   number does not include all people at SATF with serious mental health conditions or

14   intellectual disabilities.

15          The institution is unable to manage this large population.  Plaintiffs' counsel visited

16   SATF in July 2024 and found little expertise in the ADA office and widespread violations

17   of the ADA and *Armstrong* Remedial Plan.  Plaintiffs' counsel observed a meeting of the

18   SATF Reasonable Accommodation Panel (RAP) that was over five hours long, during

19   which the RAP reviewed 123 requests for disability accommodations.  We observed

20   people with complex disability needs perfunctorily denied accommodations; in some

21   cases, the RAP's discussion lasted less than 60 seconds.  Staff largely failed to interview

22   people with disabilities and instead inappropriately relied on custody staff observations

23   and uninformed assumptions about disabilities.  RAP members were unfamiliar with the

24   individualized nature of disabilities and common accommodations, and at one point during

25   the meeting had to Google what a condom catheter was.  It was unsurprising, then, that

26   people with disabilities expressed a lack of faith in the disability request system at the

27   institution.  One said: "It was useless.  Every time you try to ask the ADA for something,

28   they don't trust or don't believe [you].  I just kind of gave up putting the paperwork in."

A team from California Correctional Health Care Services (CCHCS), which observed the SATF RAP the week before Plaintiffs' counsel, reached similar conclusions in a Special Review.  *See* **Exhibit A**, CCHCS Memorandum, Substance Abuse Treatment Facility – Special Review (Aug. 15, 2024).  The CCHCS team identified "serious concerns regarding SATF's RAP process" and found that "SATF discontinued practices that were effective."  For example:

- The CCHCS team found that SATF was no longer interviewing people with disabilities about their concerns to ensure they can access programs, services, and activities.  *Id.*

- The CCHCS team found that the SATF RAP "now automatically denies" requests for accommodation if medical staff "deems a requested item is not medically necessary," "without considering the reasonable accommodation criteria."  *Id.*  This is a clear violation of the ADA and *Armstrong* Remedial Plan. And it is not a new issue.  The Court Expert in 2022 stated that "ADA staff who sit on the RAP should also be retrained on their independent duty to provide DME where it is a reasonable accommodation, regardless of whether providers believe it is 'medically necessary.'"  ECF No. 3446 at 32.  Yet even on this foundational issue, SATF has gone backwards.

The CCHCS team reported giving feedback to the SATF RAP during their visit, and yet Plaintiffs' counsel observed the very same problems during the RAP meeting the following week, as described above.  The CCHCS team also reported having "to intervene to ensure [an] accommodation was provided" to a class member:

> There have been instances where SATF has refused to provide a lighted magnifier, to the extent Corrections Services staff had to intervene to ensure the accommodation was provided. In this particular instance Corrections Services staff made attempts to encourage SATF staff to accommodate an IP and issue the magnifier and SATF staff refused. Corrections Services went as far as speaking with DAI management, Class Action Management Unit (CAMU), and direction was provided to SATF, to which they still did not comply. This practice highlights the failure of SATF's current approach and the need for a more comprehensive review process. While onsite to confirm the IP received the magnifier as a reasonable accommodation, Corrections Services ensured the ADAC issued the magnifier to the IP and documented it in the property section in SOMS.

**Exhibit A** at 2.  That this level of intervention is needed by an entity outside of CDCR to simply give a person with a disability a lighted magnifier is deeply troubling.

Plaintiffs have raised concerns with the SATF RAP for years, and Defendants' delayed and perfunctory responses have not fixed the issue, as CCHCS's Special Review

makes clear.  It is concerning that Defendants are not able to articulate a plan to address these concerns other than to say below that they want Plaintiffs' counsel to write yet another advocacy letter or report of the problems.[2]  It also is concerning that Defendants appear to fault Plaintiffs' counsel for helping people with disabilities in submitting requests, and do not appear to understand that what they refer to as a "spike" in fact is an example of untapped need that should be addressed.  *Cf. Armstrong v. Newsom*, 484 F. Supp. 3d 808, 830 (N.D. Cal. 2020), *aff'd*, 58 F.4th 1283 (9th Cir. 2023) (noting that Defendants' data "do not take into account ADA requests and grievances that class members did <u>not</u> make or submit").

Counsel for Defendants observed the same RAP meeting and have access to the same 1824 responses as Plaintiffs' counsel, and have a number of pending advocacy letters before them regarding failures of the SATF RAP.  The existing advocacy process has failed here—indeed, when Plaintiffs' counsel asked for an explanation of whether CDCR headquarters agreed with how SATF responded to requests for accommodations, CDCR headquarters' staff responded with a one-page letter over four months later that simply said, "CDCR acknowledges the concerns raised in this letter."  **Exhibit B**, Letter from Ronald Broomfield, Director, Division of Adult Institution (Sept. 10, 2024); *see also* **Exhibit C**, Letter from Rita Lomio, Plaintiffs' Counsel (May 8, 2024) (without exhibits).  That is certainly not a successful way of collaborating and resolving disputes.  In February 2024, Plaintiffs' counsel requested a meeting to discuss concerns with the advocacy response process, but Defendants still have not responded to that request.[3]  We are left in

---

[2] Plaintiffs' counsel provided a detailed summary of a number of concerns with the 1824 process at SATF during an exit meeting and PowerPoint presentation on July 25, 2024.

[3] In February 2023, the Court ordered that "[t]he Court Expert shall work with the parties to discuss modifications to Defendants' policies and procedures to ensure that Defendants respond substantively to letters by Plaintiffs' counsel in a reasonably timely manner." ECF 3467 at 4.  The parties and Court Expert met several times and agreed on a general process, but Plaintiffs have raised a number of concerns with implementation since that time, including inaccurate and incomplete responses and substantially delayed responses. In fact, Defendants have not responded to several advocacy letters related to SATF for over 120 days.

1  the same place we were in 2022, when the Court Expert found:

2      [I]t was not management that identified these problems; it was Plaintiffs'
       counsel. . . . SATF has not demonstrated that it is able to self-monitor and
3      self-correct in the manner that would justify a lesser level of scrutiny by the
       Court and other outside monitors. Self-correction has to be the goal, and our
4      investigation showed it is a long way off.

5  ECF No. 3446 at 5.

6      Some improvements persist through the outstanding effort of individual staff and

7  incarcerated people.  For example, two incarcerated people, including a full-time

8  wheelchair user, supported by a dedicated compliance sergeant, operate the wheelchair

9  repair clinic, which has reduced wait times for simple wheelchair and walker repairs.  And

10 a lieutenant on the same yard has demonstrated initiative, leadership, and a commitment to

11 dynamic security, including by supporting a wheelchair basketball team and an e-

12 newspaper that includes information about people with disabilities and accommodations.

13
14
15
16  
17
18
19

20     Overall, however, Plaintiffs are alarmed with the degree of backsliding observed at

21 SATF.  Last year, the Court Expert expressed concern about the sustainability of positive

22 changes at SATF.  *See* ECF No. 3500 at 5 ("Our largest concern is the issue of

23 sustainability").  Those concerns have now been realized.  Defendants below quote the

24 Court Expert's report from August 2023 crediting the "current leaders"—but since then

25 (and, in fact, since Plaintiffs' visit in July 2024) the warden and ADA Coordinator at

26 SATF have been replaced, and there are two new people acting in those positions.

27     Substantial and durable reforms are urgently needed to provide staff the supports

28 they need to do their jobs well and to ensure reforms do not depend on the presence of a

1    particular individual in a particular position.  Defendants' reference below to the fact that

2    "custody staff assigned to the ADA office are required to complete training" suggests that,

3    even now, Defendants do not understand the magnitude of the problem and the reforms

4    needed to fix them.  Existing training clearly has proven inadequate to the task at hand.

5    Similarly, Defendants below state that SATF staff "demonstrate significant dedication to

6    meeting class members' needs" and, as an example, state that the ADA Coordinator toured

7    facilities with grabbers to "directly educate class members."  In fact, during Plaintiffs' visit

8    to SATF in July, the ADA Coordinator said that he had no plans to directly inform people

9    with disabilities that grabbers, a common, inexpensive device that can improve safety and

10   independence, were available after Plaintiffs' counsel advocated on behalf of an 80-year-

11   old full-time wheelchair user at SATF who has difficulty safely reaching items on the floor

12   and in his locker.  *See* **Exhibit D**, Letter from Rita Lomio, Plaintiffs' Counsel (Apr. 26,

13   2024).  The team from Plaintiffs' counsel then took the unused grabbers stored in the ADA

14   office and toured the facility with them during the site visit, asking wheelchair users if they

15   wanted them, and then relayed a list of people who wanted them to the ADA office.  We

16   appreciate the ADA Coordinator acknowledging then that his previous approach was

17   incorrect, and we are glad to hear that ADA staff at SATF are following Plaintiffs'

18   counsel's example and now touring facilities with grabbers.

19            In light of these concerns, Plaintiffs eagerly await the Court Expert's forthcoming

20   report and recommendations on staffing and sustainability and hope it will result in the

21   allocation of sufficient expertise and resources, and development of robust systems,

22   necessary to comply with the *Armstrong* Remedial Plan and Americans with Disabilities

23   Act.

24            Finally, Plaintiffs' counsel visited the institution when the area was under an

25   extreme heat warning, with an outside temperature high of 116 degrees Fahrenheit.  The

26   housing units at SATF are not air conditioned, and Plaintiffs' counsel recorded

27   temperatures of over 90 degrees in the cells of wheelchair users.  Little relief was available

28   to people with disabilities, who are particularly susceptible to heat-related illnesses and

1   death.  *See* Cal. Dep't of Public Health, Extreme Heat, https://www.cdph.ca.gov/Programs/

2   EPO/Pages/Extreme%20Heat%20Pages/BI_Natural-Disasters_Extreme-Heat.aspx (last

3   visited August 10, 2024).  The institution had broken ice machines, swamp coolers, and

4   handheld thermometers with dead batteries that staff could not replace.  There were no

5   cooling stations for incarcerated people, and there were no shade structures or misters on

6   the yard for incarcerated people.  The institution did not provide individual fans for people

7   who could not afford to buy their own.  The medical warehouse was not air conditioned

8   and had experienced recent high temperatures of 102.5 and 112 degrees—well above the

9   temperature at which many disability-related supplies, including catheter supplies and

10  hearing aid batteries, should be stored.  Plaintiffs' counsel raised these urgent issues with

11  Defendants by email on July 15, 2024, and during a meeting on July 25, 2024.  *See*

12  **Exhibit E**, Email from R. Lomio, Extreme Heat at SATF (July 15, 2024) (without

13  attachments).  Plaintiffs look forward to learning more about efforts the headquarters' level

14  heat-plan task force will take to protect people with disabilities and ensure disability-

15  related supplies are stored appropriately.

16          **2.      Defendants' Statement**

17          The Court Expert's second report concerning the treatment of people with

18  disabilities at SATF recognized the numerous proactive measures implemented at SATF to

19  further respond to the needs of incarcerated people with disabilities.  ECF No. 3500.  The

20  report demonstrates that the coordinated efforts between CDCR and the California

21  Correctional Health Care Services (CCHCS), with the Court Expert's guidance and with

22  input from Plaintiffs, are working to effectively respond to the issues raised by the Court

23  and addressed by the Court Expert following his initial investigation.  The Court Expert

24  has since reported that SATF has made "significant improvements in the delivery of

25  accommodations to class members" and that "the culture at SATF has improved," since his

26  first report.  ECF No. 3500 at 4, 6.  As noted in the report, class members have reported to

27  the Court Expert, through personal interviews and survey responses, "improvements in

28  their ability to get the accommodations they needed and in the attitudes of staff."  ECF No.

3500 at 4.  The Court Expert reports that through these responsive collaborative efforts, SATF has significantly improved the process for receiving incarcerated people from other institutions and has reduced the likelihood that class members lose access to Durable Medical Equipment (DME) or medication necessary to accommodate their disabilities.  *Id.*  The Court Expert further reported that SATF has improved the process for collecting and handling patient requests for medical care (Form 7362s), has improved the processes for issuing, repairing, and replacing DME (including through the successful relaunch of its in-house wheelchair repair program), and has significantly improved the delivery of medical supplies, such as incontinence supplies, to class members.  *Id.*  As noted by the Court Expert, "the current leaders and staff are to be given credit for the significant effort they made to address the problems" identified in the first report.  ECF No. 3500 at 5.

In response to this Court's order, the Court Expert issued a November 28, 2023, Addendum to Second Report Regarding the Treatment of People with Disabilities at SATF to which the parties entered a stipulation addressing multiple issues.  ECF Nos. 3529, 3538.  Following the parties' stipulation, the Court issued its order setting deadlines for the further development, with Plaintiffs' input, of policies addressing various issues at SATF, including whiteboard captioning technology, accessible phones, and effective communication of announcements.  ECF No. 3538.  The parties and the Court Expert continue to regularly meet to discuss the various issues addressed in the stipulation and anticipate filing a joint statement providing a status upon on all of the items and reporting on all unresolved issues for Court resolution on October 11, 2024.

Meanwhile, as recognized above by Plaintiffs, staff at SATF continue to demonstrate significant dedication to meeting class members' needs.  For example, the ADA Coordinator reported on efforts to directly educate class members regarding available assistive devices, such as grabbers and pocket talkers, by touring the facilities with these items.  Compliance Sergeants and ADA staff continue to round the yards to identify the needs of the incarcerated population and to address issues at the lowest level while also educating the population on all available resources and accommodations offered

1  by CDCR.  All of this is in addition to the education provided through monthly townhalls,

2  the Inmate Advisory Council, the television channel, and ViaPath tablets.

3       With respect to the RAP process, Plaintiffs' critique of this process is unfairly harsh

4  and fails to appreciate the spike in the submission of class members' request for

5  accommodations, by the submission of a Form 1824, that seemed to coincide with an

6  *Armstrong* monitoring tour.  For example, there were 280 CDCR Form 1824s submitted in

7  June, but that number spiked to 475 in July.  Based on the data, the spike in Form 1824s is

8  apparently attributable to Plaintiffs touring SATF and assisting their clients with

9  submission of these request for accommodations.  Although Plaintiffs are well-within their

10  right to assist class members, it is unfair to then criticize staff for the corresponding spike

11  in requests.  Moreover, the majority of the Form 1824s included in that spike were for lack

12  of programming and requests for classification committee due to the new conversions on

13  Facility C and E, disagreement with healthcare treatment, requests for healthcare

14  appointments, requests for MRI or surgery and not for disability accommodations, as

15  Plaintiffs seem to allege.  Further, the spike in Form 1824s is partially attributed to the

16  facility conversions that have been happening at SATF.  In the Spring and Summer of

17  2024 SATF underwent the two yard conversions noted above.  Facility C converted from a

18  General Population Mainline level IV to a non-designated programming facility (NDPF)

19  level III.  Facility E converted from a Sensitive-Needs Yard (SNY) Level III to a NDPF

20  level II.  During the two conversions, DPP class members transferred out to other

21  institutions and there were some new DPP class members who transferred into SATF.

22  These facility conversions are a positive development for SATF and its population.  Both

23  of these yards converted to lower-level programming facilities which means they house

24  incarcerated persons with lower custody scores, less violence, fewer incidents, and offer

25  more opportunity to program.  But this also means that lower-level facilities, especially

26  level II, house an older population consisting of more DPP class members.

27       Defendants object to Plaintiffs inserting into this joint statement their harsh

28  critiques of the RAP process following their July monitoring tour.  These issues are more

1   properly addressed in Plaintiffs' written report, that is forthcoming, to which Defendants

2   will have an opportunity to fully investigate Plaintiffs' allegations and fully respond in

3   accordance with the long-standing process.  Plaintiffs' allegations against the RAP that

4   they observed on one day in July seem intentionally provocative and undermine the

5   collaborative processes that are in place.  For example, Plaintiffs speculate that, "at one

6   point during the meeting [RAP members] had to Google what a condom catheter was."

7   But a condom catheter is a healthcare supply item given to a patient with an appropriate

8   prescription and not something that the ADA office would be authorized to "prescribe" or

9   required to provide under applicable policy.

10          Custody staff assigned to the ADA office are required to complete training, most of

11  which Plaintiffs have been extensively involved in developing over the course of this

12  decades-long case.  This training addresses and includes, the *Armstrong* advocacy process,

13  effective communication, the Disability Placement Program (DPP), the *Armstrong*

14  Remedial Plan, ADA caption phones, the RAP, expedited transfer process for class

15  members, reasonable accommodation requirements, Developmental Disability Placement

16  (DDP) Program, appropriate housing for DDP participants, DDP RVR process, and other

17  training.  SATF staff strive to be prepared, organized, and on-task while completing their

18  RAP duties and Plaintiffs' baseless assertions that RAP participants efforts were

19  "perfunctory" or "lasted less than 60 seconds," is wrong and not well taken.  Although

20  Plaintiffs' counsel demanded an "explanation of whether CDCR headquarters agreed with

21  how SATF responded to requests for accommodations," CDCR will not participate in

22  Plaintiffs' unilaterally imposed "pass or fail" exercise.  Instead, CDCR will focus on

23  policy implementation and work with the institution when CDCR identifies a failure to

24  follow policy or non-compliance.  For example, during the week of September 9th, 2024,

25  SATF RAP had 41 new RAP requests, all of which were processed in compliance with the

26  new process, and the compliance sergeants properly completed each IAP which included

27  conducting an in-person interview with each person.

28          SATF has been assigned a new ADA Coordinator who is being on-boarded this

1   month, has already completed several components of the required training, has previously

2   served as the manager of SATF's Office of Grievances, and, therefore, has extensive

3   experience with the RAP and grievance processes.  Hence, Plaintiffs claim that their

4   concern of whether SATF can sustain the progress cited by the Court Expert in his report is

5   now "realized" because of personnel changes is simply not believable and seems

6   intentionally drafted to declare someone a failure before he's ever been given an

7   opportunity to demonstrate competence.

8          Further, it is important to note that the citation to one class member's path to a

9   lighted magnifier has been mischaracterized more than once, fails to acknowledge all of

10  the effort put forth by staff, and does not indicate a systemic failure.  When an advocacy

11  came in for this class member, CDCR was already working with SATF ADA staff to

12  accommodate him with the devices he needed.  Since July 2024, the SATF ADA Office

13  has issued at least seven lighted magnifiers to individuals without a vision impairment

14  designation.  The parties are still negotiating SATF Stipulation items 1-3 where this issue

15  is directly related and, because the policy is not finalized, SATF ADA staff have not been

16  provided the final direction or training.  Additionally, Plaintiffs' citation to only one

17  unidentified incarcerated person, who alleges that it is "useless" to seek accommodations

18  should be raised in the advocacy process and not here, so that Defendants can properly

19  investigate this individual's allegations and determine what, if any, reasonable

20  accommodations he is entitled to under the remedial plan, applicable policies, the ADA,

21  and this Court's orders.

22         It is also concerning that Plaintiffs refer to CCHCS as an outside agency in this

23  statement without recognizing the nuanced relationship that exists in, what appears to be,

24  an attempt to weaponize the differences between CDCR and CCHCS in their duties and

25  responsibilities.  CDCR and CCHCS are responsible for the same incarcerated people and

26  owe a similar duty of care to both.  CCHCS, in their review, stated that they provided

27  feedback to SATF and Plaintiffs point out that "Plaintiffs' counsel observed the very same

28  problems during the RAP meeting the following week."  But Plaintiffs have yet to provide

their own monitoring report to CDCR, and instead rely on an internal process that "raised concerns" with regard to the processes that are the subject of extensive, nearly year-long negotiations, (ECF No. 3533), that continue to take place, as of the date of this joint statement.  Plaintiffs have continuously reviewed and offered extensive comments and revisions to various training materials and participated in the development of training materials.  And yet, instead of further utilizing the collaborative process to improve existing processes, Plaintiffs seek to leverage imperfections of the process to minimize the significant improvements made by Defendants to improve the vast majority of class-members' daily lives.  Plaintiffs' skewed and lopsided critique is not appropriate in this forum.  Nonetheless, Defendants look forward to finally implementing the agreed upon policies and procedures.

Plaintiffs' statements that "it is concerning that Defendants are not able to articulate a plan to address these concerns other than to say below that they want Plaintiffs' counsel to write yet another advocacy letter or report of the problems," and "[i]t also is concerning that Defendants appear to fault Plaintiffs' counsel …" is not only inaccurate, but disingenuous, at best, in light of the fact that Defendants have negotiated with Plaintiffs for the past 10 months on how to best address certain stipulated processes at SATF.  This includes Defendants' patient consideration during protracted negotiations of Plaintiffs' insistence to focus on minutiae that included non-substantive language edits.  In reality, Defendants accepted many of Plaintiffs' proposals during this protracted process but stopped short of ceding their custodial responsibility to Plaintiffs.  To accuse CDCR of being unwilling to add another meeting to discuss the advocacy process is also disingenuous.  It is unclear what Plaintiffs hope to achieve by requesting another meeting when they can communicate with Defendants regarding the advocacy process, by other means.  *See* **Exhibit F**, Email from Marissa Hatton, Non-Advocacy Letter Request (July 24, 2024).

Finally, Defendants object to Plaintiffs including allegations that SATF did not appropriately respond to heat experienced by incarcerated people.  This issue falls squarely

within the jurisdiction of *Coleman* and should not be included in this statement.  CDCR has a headquarter-level heat plan task force that will be addressing all responses to advocacies and to any modifications to the responsive plans, moving forward.  Moreover, the August 15, 2024, CCHCS Memorandum cited by Plaintiffs, identifies various adjustments made at SATF to address heat-related concerns.  *See* **Exhibit A**, CCHCS Memorandum, Substance Abuse Treatment Facility – Special Review (Aug. 15, 2024).

**D.      Accommodations for Deaf and Hard-of-Hearing Class Members**

**1.      Plaintiffs' Statement**

As of September 2024, over 4,800 people who are deaf or hard-of-hearing are housed in a California state prison.  CDCR has failed to accommodate them for decades, and too many remain in significant isolation, unable to meaningfully participate in prison programs or maintain ties with loved ones.  The Court's December 7, 2023 Order ("SATF Stipulation") has spurred work by the parties and Court Expert to address (1) CART (computer-assisted real time transcription), also known as real-time captioning; (2) accessible phones; (3) effective communication of announcements; and (4) tablet accessibility.  *See* ECF No. 3538.  The parties will update the Court on those issues separately, in a statement that the parties expect to file on October 11, 2024.  For that reason, Plaintiffs do not address Defendants' misstatements below regarding captioning and accessible phones.  In this statement, Plaintiffs instead focus on two issues not currently covered by the SATF Stipulation.

**Sign Language Interpreter Shortage:** Over the past several months, deaf class members who use sign language as their primary method of communication have reported widespread failures to ensure access to on-site sign language interpreters. As a result, class members are relegated to interpretation via endlessly faulty video-conferencing equipment that all but prohibits effective communication in programs, services and activities.  The most recent staffing information posted on Defendants' website reports that, as of September 10, 2024, six of the twenty-two sign language interpreter positions statewide are vacant—**a 27% vacancy rate**.  The deaf signers at the Central California Women's

1   Facility currently have no staff interpreters at all, after their staff interpreter resigned due

2   to, according to her, the toll on her mentally and physically that CCWF's failure to

3   accommodate deaf class members has taken on her.  *See* Email from R.  Lomio to E.

4   Swanson, Armstrong | Hiring and Retention of Staff Sign Language Interpreters (July 16,

5   2024), attached as **Exhibit G.**  At San Quentin, a staff interpreter who has since resigned

6   told counsel for both parties that he was overwhelmed, overworked, and being forced to

7   interpret in conditions worse than he would have outside of state service—and for less

8   money.  *Id.*  At SATF, ADA staff reported to counsel for both parties that he has tried for

9   months to fill the three vacant staff interpreter positions, has received no applications at all

10   during that time, and has no power to raise salaries to attempt to recruit candidates. *Id.*

11          These growing vacancies leave institutions increasingly reliant on contract sign

12   language interpreters, who are paid by the hour to staff specific assignments, such as a

13   group program or religious service.  Even there, however, Defendants have failed.  CDCR

14   allowed the statewide contract for sign language interpreters to expire at the end of 2023

15   without a replacement contract in place.  While CDCR took six months to execute a new

16   contract, their own plan was to instruct individual institutions to enter into their own

17   contracts with local interpreting agencies through the "Service and Expense" process,

18   which carries a $10,000 cap.  At one institution, which houses fourteen deaf signers, this

19   amounted to a budget of just $119 (not enough for even two hours of interpreting services)

20   per class member per month for the expected six-month period before a new contract

21   would be in place.  Without sufficient plans in place for on-site sign language interpreters,

22   and without sufficient connectivity and equipment for remote interpretation, deaf signers

23   can only access interpreting services through existing videoconferencing equipment, which

24   freezes, blurs, disconnects, fails to ensure the remote interpreter can hear what they are

25   supposed to be interpreting, and otherwise prevents effective communication.  Class

26   members have made clear that the technological issues are not isolated occurrences, but

27   rather pervasive issues that have the effect of completely denying access to programs,

28   services and activities.

Defendants have offered no plan to increase pay for staff interpreters or address other working condition concerns that staff interpreters who have since resigned have raised.  Plaintiffs' counsel has advised Defendants of this Court's 2007 Order, requiring them to "employ, through whatever salary is necessary, sufficient qualified interpreters to serve the needs of the DPH prisoners housed at each institution."  *See* ECF No. 1045 at 8. And Defendants have offered no plan to improve remote interpreting services; instead contending that their staff members, who are never the ones actually using the service in a group setting, have not identified any issues.  The parties have begun discussions through the Deaf and Hard-of-Hearing Workgroup and will continue to update the Court.

**Personal Sound Amplification Products:**  Plaintiffs' counsel has long advocated for Defendants to provide Personal Sound Amplification Products, an over-the-counter device designed to amplify sound, to deaf and hard-of-hearing class members as needed to supplement or take the place of hearing aids and to act as an interim while class members are without hearing aids.  Defendants have released multiple policies in recent years that have failed to address Plaintiffs' concerns, often finalizing policies before attempting to resolve disputes with Plaintiffs' counsel despite Plaintiffs' counsel's repeated requests to discuss concerns, which has necessitated multiple labor-intensive revisions.  *See* Dkt. No. 3592 at 9-10 n.2.  Most recently, Defendants have promulgated a memorandum that allows class members who have already been assigned a DNH or DPH code to request and receive a Personal Sound Amplification Product within one week of their request. However, Defendants have refused to allow these devices in circumstances where they are perhaps the most necessary: for individuals who have reported difficulty hearing but have not yet been assigned a hearing disability code.  These individuals can wait up to 90 days for a hearing evaluation, which is also their first opportunity to receive hearing aids. Following the evaluation, they must wait additional time for healthcare staff to review the specialist report from the evaluation and assign a hearing disability code.  Only after this long wait—which often will exceed 90 days—will class members with hearing disabilities be eligible to receive a Personal Sound Amplification Product under Defendants' current

1  policy.  In the community, the same person would be able to acquire a similar item within

2  one or two days.

3        Below, Defendants mischaracterize *Duvall v. County of Kitsap*, 260 F.3d 1124 (9th

4  Cir. 2001), to claim they are legally barred from providing requested accommodations

5  until they have undertaken an expert evaluation.  That is not so.  *Duvall* stands for the

6  proposition that public entities cannot deny requested accommodations in favor of

7  alternatives without conducting a reasonable inquiry into whether the alternative will be

8  effective.  Here, Defendants offer individuals with hearing disabilities no accommodation[4]

9  designed to provide access to programs, services and activities for months, while waiting

10  for Defendants to conduct an inquiry.  Defendants have provided no explanation for why

11  such a long waiting period is necessary, when the requested accommodation is fairly

12  inexpensive and is easy to take back and reuse if it turns out not to be necessary.

13        In addition, Defendants have been unable to explain how they will track and

14  monitor these disability accommodation requests, which their policy, over Plaintiffs'

15  counsel's objection, requires to be made outside of the established CDCR 1824 process for

16  requesting reasonable accommodations for a disability set forth in the *Armstrong* Remedial

17  Plan.  *See* ARP § IV.I.23(a) ("An inmate/parole with a disability may request an

18  accommodation . . . through the CDC Form 1824 appeal process").

19        Plaintiffs remain deeply concerned that Defendants' refusal to provide Personal

20  Sound Amplification Products as an interim accommodation will prolong hard-of-hearing

21  class members' exclusion from programs, services and activities while they wait months

22  for an accommodation that Defendants could provide in a matter of days, and provides

23  further evidence of Defendants' failure to understand the accommodation needs of deaf

24  and hard-of-hearing people and their duty to timely accommodate people with disabilities.

25

26  [4] Below, Defendants claim to provide individuals with hearing aids, iPads and written
   notes while they wait for a hearing code.  Plaintiffs find this position puzzling, as
27  Defendants claim their duty to "undertake a fact-specific investigation" involving
   "experts" prevents them from issuing a $60 pocket talker, but have no problem with
28  issuing hearing aids and iPads that cost many hundreds of dollars more.

2. **Defendants' Statement**

Plaintiffs' overly broad allegations are not only largely inaccurate but lack the nuance necessary to address this large population of class members in which there are vast differences in degrees of qualifying disabilities. Plaintiffs' statement that class members "remain in significant isolation, unable to meaningfully participate in prison programs or maintain ties with loved ones," is untrue and this broad characterization is misleading. CDCR has also confirmed through the existing ViaPath vendor that 96% of DNH class member at SATF have used their tablets to make phone calls from January 1, 2024, through September 3, 2024. Not only have all class members been offered ViaPath tablets—which enhance class members' ability to connect with friends and family via various methods, including electronic messaging and letters—but some class members also have laptops for education programming and iPads or iPhones. Last year, CDCR began deployment of iPhone and iPad devices equipped with the translate application and the live-captioning accessibility feature to DPH class members[5] whose primary or alternative method of communication is written notes, to include those who use sign language. As of September 16, 2024, 50 iPads and iPhones have been issued to qualifying class members statewide. Class members who received an iPhone or iPad are approved to have the device within their possession during programs, services, activities, and housing unit settings, including restrictive housing and any off-site appointments (*e.g.*, medical, same-day court appearances). These devices use state-of-the-art speech-to-text technology that addresses the needs of the DPH class members during informal day-to-day interactions as well as programs, services, and activities. Moreover, in addition to these technological accommodations, class members still have access to TTY, TDD, or Caption phones. Disappointingly, Plaintiffs' inaccurate statement that CDCR, "has failed to accommodate them for decades" ignores CDCR's proactive actions of acquiring and distributing these

---

[5] Overall, there are 80 DPH class members statewide and their preferred effective communication method is sign language or other methods. As of July 12, 2024, there are 51 DPH class members, statewide, whose primary or alternate means of effective communication is written notes.

devices as accommodations, without court intervention.  Moreover, CDCR deployed CART for due-process events, more than a year ago, on July 24, 2023.  Defendants remain committed to providing class members equal access to programs, services, and activities in accordance with the ADA and the remedial plans and will continue to confer with stakeholders to ensure the further accommodation of this population.

**Sign-Language Interpretation.**  Defendants are mindful of their obligations to provide sign-language interpretation services to serve the needs of the DPH population, as required by the Court's orders, the ARP, and the ADA.  Plaintiffs' contention that there is no "plan" to address this issue is incorrect.  To meet these obligations, CDCR continuously works to ensure that the qualified sign-language interpretation services are available to the class members who need them.  CDCR puts forth significant effort to hire and retain qualified staff but is not authorized to unilaterally increase the salaries of state-employed sign-language interpreters.  CDCR, however, has submitted requests for the authority to increase the salary of certain positions.  Further, Plaintiffs seem to ignore that there is an industry-wide shortage of interpreters who will work in a correctional setting, even though CDCR pays as much as $204 per hour for services.  To support staff and identify workplace concerns, CDCR conducts quarterly conference calls with sign-language interpreters and offers additional training to them.  The needs of class members are now supplemented with sign-language interpreters through three fully implemented, services contracts.  These contracts are in place and are tracked to ensure that contracted coverage remains in place.  CDCR is currently reviewing staffing needs and the workload of each staff member as part of its continued efforts to meet the needs of these class members.  Finally, Plaintiffs' complaints of isolated incidents where remote interpretation may "freeze[], blur[], or disconnect[]," on occasion, does not equate to a widespread denial of effective communication.  Staff routinely demonstrate that remote access is accessible, reliable, and functions properly to accommodate class members.

**Personal Sound Amplification Products.**  Plaintiffs' statement on this issue fails to acknowledge that under the ADA, Defendants have a duty "to undertake a fact-specific

investigation" and "to gather sufficient information from the [disabled individual] and qualified experts as needed to determine what accommodations are necessary" when an incarcerated person reports the need for an accommodation. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (alteration in original) (quoting *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th 1999)).  Likewise, per the ARP, Defendants "shall provide reasonable accommodations or modifications *for known* physical or mental disabilities of qualified inmates/parolees," and "shall consider, on a case-by-case basis, accommodations for inmates/parolees with impairments that are temporary in nature." ARP (amended 1/3/2001) at 7 (emphasis added).  Of course, Plaintiffs are entitled to their differing interpretation of *Duvall*, but Defendants object to their mischaracterization of Defendants' position.  Defendants do not claim to be "legally barred," from providing requested accommodations and Plaintiffs' inaccurate assertion is misleading.  And to assert that Defendants offer incarcerated people "no accommodation" while waiting is flat wrong.  Defendants provide other accommodations, including, hearing aids, iPads, and written notes while the person is waiting a short time for a decision.  Nonetheless, Defendants' established process for determining whether to provide a Personal Sound Amplification Product (*i.e.*, pocket talker) at no cost to an individual without a verified hearing disability who requests such an accommodation complies with both the ADA and the ARP.  Moreover, the process results in the individual being referred for an evaluation by healthcare, which in turn ensures that individuals experiencing hearing loss have access to the care they need and can be properly designated as Disability Placement Program participants.  Plaintiffs' critique of CDCR's policy is misguided, given that the current May 14, 2024, memorandum was the result of negotiations with Plaintiffs at numerous workgroups.  Hence, Plaintiffs' contention that CDCR is, "often finalizing policies before attempting to resolve disputes with Plaintiffs' counsel," is false.  Finally, by selecting the Form 22 process, CDCR sought to streamline the process and avoid overloading the Form 1824 process with requests for these devices.  This complies with the ARP, which permits requests through the 1824 process but does not prohibit CDCR from utilizing additional

1   established processes to receive and review requests for accommodations.  And, as CDCR

2   shared with Plaintiffs at a December workgroup meeting, CDCR received no complaints

3   from class members about this process following the November 2023 implementation.

4   **E.      Accommodations for Blind and Low Vision Class Members**

5        **1.      Plaintiffs' Statement**

6        Many of the prior disputes regarding accommodations for blind and low-vision

7   class members have been resolved as part of the SATF Stipulation Process which required

8   Defendants to "explain in writing to the Court Expert and Plaintiffs' counsel when and

9   how it will resolve all issues at SATF addressed in the current draft Blind/Low-Vision

10  stipulation," *see* ECF No. 3538 at 5.

11       Plaintiffs' counsel recently reported problems related to individualized vision

12  assessments at SATF, SATF Stipulation Item #5.  The specific concerns relate to claims

13  that people are "refusing" vision assessments when they report to Plaintiffs' counsel that

14  they have not refused, the failure to thoroughly evaluate writing needs resulting in class

15  members being forced to rely on others to write, delays in the issuance of recommended

16  devices and long wait times for assessments.  *See* Letter from Tania Amarillas and Rita

17  Lomio (August 7, 2024), attached as **Exhibit H.**  Plaintiffs' counsel sent a follow up to the

18  letter, via email on September 11, 2024, asking the specific reason for the delays in

19  multiple cases from the letter including a class member that had not received glassed 160

20  days after they were recommended by the specialist, a class member who had not received

21  a laptop 244 days after recommended, and a class member who had not received

22  orientation and mobility training 203 days after it was recommended.  *See* Email from Rita

23  Lomio to Defendants (September 11, 2024), attached as **Exhibit I.**  Plaintiffs' counsel

24  await a response.

25       Plaintiffs also remain concerned about Defendants' failure to accommodate people

26  with monocular vision, who have a narrower field of vision and severely limited depth

27  perception, especially at shorter distances, and who may face safety risks in a prison

28  environment.  *See* Joint Case Status Statement, ECF No. 3606 at 20-21.  Plaintiffs continue

1    to encounter class members who have been denied accommodations because their DPP

2    vision code was removed by CDCR because they have monocular vision.  Plaintiffs

3    continue to assert that these class members must be identified as having a disability.

4        The parties are continuing to negotiate these issues.

5        **2.      Defendants' Statement**

6        Defendants are reviewing Plaintiffs letter received on September 12, 2024, that

7    relates to SATF Stipulation Item No. 5 and will provide Plaintiffs with a response.

8    Plaintiffs' assertion that "the failure to thoroughly evaluate writing needs resulting in class

9    members being forced to rely on others to write…" is misleading.  Also misleading is

10   Plaintiffs' claim that there were "delays in multiple cases."  This is not true, there were

11   three cases and in one case the class member has been issued a Zoomax for personal use as

12   an interim accommodation until which time his laptop is issued.  As outlined in

13   Defendants' policy (Accommodations for Incarcerated Persons with a Vision Code), DPV

14   and DNV class members may check-out various assistive devices to write independently

15   while waiting for their vision assessment or for their own personal devices.

16       Under Defendants' current plan, assistive devices recommended by the vision

17   specialist that are available in the ADA Coordinator's inventory will be issued to the class

18   member within five business days of the ADA Coordinator's receipt of the vision

19   specialist's recommendation.  *See* ECF No. 3615 at 33.  Assistive devices that are not

20   available in the ADA Coordinator's inventory will have procurement initiated within two

21   business days of the ADA Coordinator's receipt of the vision specialist's recommendation.

22   *Id*.  If procurement of the recommended assistive device(s) is needed, the ADA

23   Coordinator is required to ensure that the incarcerated person's reading and writing needs

24   are reasonably accommodated pending the issuance of the assistive device(s)

25   recommended by the vision specialist.  *Id.*

26       To address potential future delays in the issuance of ADA laptops recommended as

27   a writing accommodation by the vision specialist, Defendants are working to acquire a

28   stockpile of ADA laptops for deployment to the DPV-designated institutions' ADA

1  Coordinators for issuance to the class members following the vision specialist's

2  recommendation.  As explained during the parties' meeting on July 17, 2024, in addition to

3  having access to Zoomax Snow 12 assistive devices equipped with text-to-speech

4  technology already available for checkout use at all DPV-designated institutions, LyriQ

5  scanner-reader devices are being procured to be made available to blind class members for

6  checkout use, pending class member's assessment by the low-vision specialist or the

7  issuance of the device following vision specialist's recommendation.

8         Finally, although Plaintiffs continue to assert that all incarcerated people with

9  monocular vision "must be identified as having disability," monocular vision diagnosis—

10  in and of itself—does not qualify as a disability.  *See Albertson's, Inc. v. Kirkingburg*, 527

11  U.S. 555, 566 (1999) (The ADA requires monocular individuals, like others claiming the

12  Act's protection, to prove a disability by offering evidence that the extent of the limitation

13  on a major life activity caused by their impairment is substantial.).  Incarcerated people

14  with monocular vision undergo the same visual tests for field of view and visual acuity to

15  determine if they qualify for a code.  *See* ECF No. 3606 at 23.  In addition, on a case-by-

16  case basis, if the incarcerated person with monocular vision reports to their medical

17  provider that their vision is interfering with their ability to function independently and their

18  access to CDCR programs and services, that person may be referred to a specialist to

19  address their concerns.

20  **F.    Problems Regarding Access to Assignments for Class Members**

21         The program-access workgroup continues to periodically meet to discuss credit

22  earning, the assignment process, and disparities in the program-access assignment data in

23  response to Plaintiffs' allegations of disability-related discrimination.  ECF No. 2680

24  at 1314.  The parties' last meeting was scheduled on July 18, 2024.

25  **G.    Statewide Durable Medical Equipment Reconciliation**

26         **1.    Plaintiffs' Statement**

27         Defendants have agreed to ensure that anyone who had not been seen by a health

28  care provider in the last year would be seen for the purpose of reconciling their DME.  The

only outstanding issue, then, is to ensure a process whereby health care providers actually undertake a reconciliation during at least one encounter annually. Defendants maintain that this is already a requirement during visits with Primary Care Providers, yet thousands of class members without needed DME were identified by Defendants, despite this existing requirement. A process for ensuring that staff actually reconcile DME during encounters is necessary. On April 3, 2024, Defendants produced their first quarterly set of DME Reconciliation reports. These reports show that there remain substantial problems with missing DPP codes, and poorly documented and tracked DME. These problems can result in staff members not knowing when someone has a disability that has been verified and needs to be accommodated, and can result in improper removals of DME when searching cells and when people transfer to new units or new prisons.

Unfortunately, Defendants' disability tracking system still fails to identify and track class members with upper-extremity disabilities. Plaintiffs are committed to resolving this ongoing problem.

### 2.    Defendants' Statement

CCHCS informed Plaintiffs it would ensure class members who have not been seen by a provider in the last year would be scheduled and given an opportunity to discuss appropriate DME for their condition. Aside from the scheduled appointment, class members have several other means by which they can have their DME needs accommodated, including submission of a Form 7362 (Health Care Services Request Form) or Form 1824 (Reasonable Accommodation Request Form). Additionally, CDCR and CCHCS have numerous checks and balances in place to ensure DME is accounted for. The DME Discrepancy Reports were specifically designed to detect errors within the system and highlight the errors for staff to take necessary action to remediate. The success of this process is evidenced by the dramatic decrease in the discrepancy rates since inception of the reports. For example, the January 2020 report reflected a 53% discrepancy rate, whereas the current rate of discrepancy is significantly less, 15.5%. It should be noted, and Plaintiffs are aware, the reports are working documents and are

1   reflective of and influenced by the timing of the information recorded.  This means that the

2   report will reflect an error from the time the provider places an order in the system until

3   the patient is issued the DME.  CCHCS has committed to providing Plaintiffs the DME

4   Discrepancy Reports on a quarterly basis and will continue to communicate with

5   stakeholders about these issues.

6   **H.      Joint Monitoring Tool**

7            The parties remain committed to developing a strong and effective joint monitoring

8   tool.  The parties continue to convene small work groups, confer with the Court Expert

9   about informal briefing, and continue to meet to discuss and resolve the few remaining

10  disputes between the parties such as a format for scoring and reporting compliance.  The

11  parties continue to work towards a collaborative solution for scoring and reporting.

12  **I.      ADA Structural Barriers, Emergency Evacuation Procedures, and Master
            Planning Process**

13

14           The parties continue to engage in the Master Planning Process aimed at ensuring

15  that CDCR prisons are accessible to people with disabilities in compliance with the

16  ADA.  The parties also developed position statements on disputed issues and met with

17  the Court Expert to try to narrow or resolve the disputes on July 23, 2024.  The parties

18  met again with the Court expert after exchanging additional position statements on

19  September 6, 2024.  As noted in prior statements, the parties have agreed upon a new

20  Master Planning process to share information or plans related to Master Planning

21  projects, to have Plaintiffs' expert provide comments on plans, and to tour completed

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

projects.  Defendants recently shared initial construction documents, including detailed plans for accessibility improvements, with Plaintiffs' expert who has reviewed the first three sets and will provide feedback on additional plans soon.


                                          Respectfully submitted,

DATED:  September 17, 2024         ROSEN BIEN GALVAN & GRUNFELD LLP

                                   By:  */s/ Penny Godbold*
                                        Penny Godbold

                                   Attorneys for Plaintiffs


DATED:  September 17, 2024         ROB BONTA
                                   Attorney General of the State of California

                                   By:  */s/ Trace O. Maiorino*
                                        Trace O. Maiorino
                                        Deputy Attorney General

                                   Attorneys for Defendants


                          **FILER'S ATTESTATION**

        As required by Local Rule 5-1, I, Penny Godbold, attest that I obtained concurrence in the filing of this document from Deputy Attorney General Trace O. Maiorino, and that I have maintained records to support this concurrence.


DATED:  September 17, 2024              */s/ Penny Godbold*
                                        Penny Godbold

# EXHIBIT A

Docusign Envelope ID: DED0ACED-13BB-4DA7-95D8-2F72B134D402



# MEMORANDUM

| | |
|---|---|
| **Date:** | August 15, 2024 |
| **To:** | JOSEPH (JASON) WILLIAMS<br>Director<br>Corrections Services |
| **From:** | *Joseph K. Edwards*<br>B0833E8108E94ED...<br>JOSEPH EDWARDS<br>Associate Warden<br>Field Operations, Corrections Services |
| **Subject:** | **SUBSTANCE ABUSE TREATMENT FACILITY - SPECIAL REVIEW** |

On July 10 and 11, 2024, staff from California Correctional Health Care Services (CCHCS), Field Operations, Corrections Services conducted an onsite Special Review at Substance Abuse Treatment Facility (SATF). The Special Review consisted of identifying key issues regarding Health Care and the Americans with Disabilities Act (ADA) patients during the Prison Law Office (PLO), Armstrong Monitoring Tour (AMT). The review team consisted of the following personnel:

> Joseph Edwards, Associate Warden
> Adam Fouch, Associate Warden, Retired Annuitant
> Dharmendra Sharma, Captain
> Amelia Esquivel, Captain

The following narrative represents a summary of the information provided through interviews, and observations.

## Reasonable Accommodation Panel

SATF averaged approximately 80 RAP cases per week, which could last up to four hours per session. Between June 2024 to present, SATF received 227 cases in June and 443 in July. The increase in July was due to an AMT by the PLO, in which the PLO filed the CDCR 1824, Reasonable Accommodation Request, for the Incarcerated Persons (IPs). Per the ADA Analyst, the number of cases as of August 14, 2024, are approaching their average number of cases (147).

During Fall of 2022 through Spring of 2023, the Reasonable Accommodation Panel (RAP) Subject Matter Experts (SMEs) made numerous tours to SATF, the RAP process was observed to be correcting previously identified issues and moving in the right direction. Staff were engaged in the process and medical and custody were working together to utilize their tools to solve the incarcerated population concerns in a timely and efficient manner. There were multiple in-person RAP observations and trainings provided by both CCHCS and DAI Subject Matter Experts (SMEs). The ADA Compliance Sergeants were conducting the

# MEMORANDUM

Interim Accommodation Procedure (IAP) during this time. The ADA Compliance Sergeants would conduct thorough IAPs to determine if an interim accommodation was needed pending the RAP decision. The Sergeants conducted interviews of IPs, housing unit staff, and in some cases work supervisors during the IAP process. The SMEs observed some areas of concern, but overall, the RAP process was efficient.

However, on July 10, 2024, Corrections Services staff participated in SATF's RAP. During this review, it was identified there are serious concerns regarding SATF's RAP process. SATF discontinued practices that were effective which they had been utilizing during prior RAPS.

- SATF does not utilize their Compliance Sergeants to complete the IAP.
  - Instead, they rely on the one ADA Analyst assigned to the ADA Coordinator's (ADAC) office. During this review it was identified the analyst did not interview the IPs.
- It was also determined during the review, the Compliance Sergeants are in 60/40 bid positions. SATF has made a significant change in its hiring practices for the ADA Compliance Sergeants.
  - Of the nine ADA Compliance Sergeants, two are now management-assigned, and the remaining seven are filled through a post and bid process, based on seniority.
  - When the positions were created, they were all management positions. This does not give the administration any control of who is in the position and leaves them for bid by the highest seniority number.
- The ADA analyst only interviews the housing staff to see if they notice any issues with the IP. However, IPs are not interviewed to ensure they can access Programs, Services, and Activities (PSAs).
- During this RAP observation, SATF did not interview the IP even if more detail was needed to discern the issue. This practice does not address concerns the IP may potentially have such as safety concerns, accessing PSAs, or mental health needs, etc.
  - During prior observations the IPs were being interviewed to determine if they have any additional or underlining issues related to safety concerns, accessing PSAs, or mental health needs, etc.
- If medical deems a requested item is not medically necessary, the RAP now automatically denies the request, without considering the reasonable accommodation criteria.
  - During prior observations, the RAP would consider providing requested items as a reasonable accommodation even when medical determined the request was not medically necessary.

There have been instances where SATF has refused to provide a lighted magnifier, to the extent Corrections Services staff had to intervene to ensure the accommodation was provided. In this particular instance Corrections Services staff made attempts to encourage SATF staff to accommodate an IP and issue the magnifier and SATF staff refused. Corrections Services went as far as speaking with DAI management, Class Action Management Unit (CAMU), and direction was provided to SATF, to which they still did not comply. This practice highlights the failure of SATF's current approach and the need for a more comprehensive review process. While onsite to confirm the IP received the magnifier as a reasonable accommodation, Corrections Services ensured the ADAC issued the magnifier to the IP and documented it in the property section in SOMS.

Docusign Envelope ID: DED0ACED-13BB-4DA7-95D8-2F72B134D402

# MEMORANDUM

**Heat Related Concerns**

During the July 2024 tour, SATF was hitting record temperatures of 116 degrees outside. While on the tour, each housing unit was humid and very warm. The housing area and officer areas had fans running to circulate the air. When walking into the housing unit, it was much cooler in the officer stations than the sections in the IP housing areas.

On July 19, 2024, Division of Adult Institutions assigned Raul Morales as acting Warden at SATF. Subsequently, on August 12, 2024, Corrections Services took part in a follow-up tour regarding heat related concerns. The following adjustments were made at SATF to alleviate some of the heat factors for staff and the incarcerated population:

- 70 pedestal fans and distributed them throughout the institution.
- 7 Port-o-Cools and sent them to the units registering the hottest temperatures.
- 80 Igloo coolers for staff and incarcerated persons and are filling them with iced water daily. They are making sure IP's and staff could utilize them.
- All their broken ice makers were repaired.
- Canopies were installed on the lower-level yards for shade, they are currently building canopies on the Level III and IV yards, and also installing misters.
- Doors are being left open for air flow and dayrooms are rotated depending on existing heat temperatures.
- Some heat sensitive items in the medical warehouse have been moved to a temperature-controlled location in education.

Corrections Services still found some issues with C Yard's heat medication list not being printed. The Captain onsite was conducting training and reminders were being sent out daily to check the heat logs and to log their times.

**Conclusion**

All identified concerns were shared with SATF staff during the tour.

If you should have any questions or concerns, please feel free to contact Associate Warden Joseph Edwards via email at Joseph.K.Edwards@cdcr.ca.gov.

# EXHIBIT B

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**DIVISION OF ADULT INSTITUTION**
Ronald Broomfield, Director
1515 S Street Sacramento, CA 95811



September 10, 2024

<u>VIA EMAIL ONLY</u>

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

RE:    ***ARMSTRONG v. NEWSOM - CART ELIGIBILITY***

Dear Ms. Lomio:

I write in response to your letter of May 8, 2024, regarding Communication Access Real-Time Translation (CART).   You requested that the California Department of Corrections and Rehabilitation (CDCR) provide: (1) guidance provided to the field regarding evaluation of CART requests; (2)   recommendations by Class Action Management Unit (CAMU) Correctional Counselor II's (CCII) to institutions regarding the 1824s requesting CART; and (3) an explanation of SATF's analysis of what constitutes a "case-by-case" evaluation.

I.      <u>Guidance provided to the field regarding evaluation of CART requests</u>

RESPONSE: CDCR has provided a copy of the statewide policy dated July 24, 2023, titled "Revised Implementation of Communication Access Real/Time Translation Services for Deaf and Hard of Hearing Incarcerated Persons." In addition, CAMU has provided additional direction during multiple statewide ADAC meetings. Lastly, CAMU is currently reviewing a sample size of five 1824s at each institution statewide.

II.      <u>Recommendations by CAMU CCIIs to institutions regarding the 1824s requesting CART</u>

RESPONSE:  CAMU directed the CAMU CCIIs to conduct a review of the 1824s submitted. If concerns or discrepancies were identified, this information was communicated to the institution as well as Headquarters.  However, CDCR will not be providing any internal communications.

III.      <u>An explanation of SATF's analysis of what constitutes a "case-by-case" evaluation</u>

RESPONSE: CDCR acknowledges the concerns raised in this letter. CDCR will continue to  work with all institutions on how to conduct a case-by-case evaluation.

Please let me know if you have any questions.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

Docusign Envelope ID: 2FF02104-3024-48EF-8254-69DD003B09C8

*ARMSTRONG V. NEWSOM - CART ELIGIBILITY*
Page 2


Sincerely,

DocuSigned by:

*Ronald Broomfield*          9/10/2024

499E547EE65C411...

**Ronald Broomfield**
Director, Division of Adult Institution

Cc:
Ed Swanson, Court Expert
Plaintiffs' Counsel
Defendants' Counsel

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

# EXHIBIT C



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

VIA EMAIL ONLY

May 8, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:   *Armstrong* Advocacy Letter
CART Eligibility

Dear Ms. Davis:

By policy, people designated DNH may request CART via the 1824 process, those requests shall be considered on a case-by-case basis, and staff shall provide CART unless they "can demonstrate that another equally effective means of communication is available." *See* CART Memo at 1-2 (July 24, 2023). When providing feedback on that policy prior to issuance, Plaintiffs' counsel repeatedly explained that RAPs need additional guidance on how to evaluate such 1824s and that Defendants must develop a reliable oversight mechanism to review denials of 1824s requesting CART.

On October 24, 2023, I wrote to Defendants with concerns about how the SATF RAP denied a request for CART by ███ ████ ████ based only on a cursory review of his DPP code and primary and secondary forms of communication. *See* Exhibit 1. I asked that CDCR headquarters provide the field with additional direction, direct institutions to re-evaluate all denials of CART, and explain how it would audit denials going forward.

On November 9, 2023, you and I met with SATF ADA Coordinator Scaife and discussed his interpretation of the CART memorandum. At that meeting he explained that he read the memorandum to allow CART only for people who are designated DPH or who have written notes documented as a form of communication. He said, "I know it [the memorandum] says we offer on a case-by-case basis, but in my opinion, we offer equally accessible means." When I asked what those means were, he said that they were the primary and secondary forms of communication documented in SOMS.

I raised this issue again during a meeting with CDCR officials and attorneys and the Court Expert on November 21, 2023. At that meeting, you said, "We don't have a disagreement that the AW gave the wrong answer and that requires more direction and guidance to the field. His answer

Ms. Tamiya Davis
Re: CART Eligibility
May 8, 2024
Page 2

was this is the crtieria for CART: particular code and particular method of communication." You said that the parties did not have a disagreement with the intent of the memorandum, concluding, "We need to correct that problem at SATF." I followed up by email that same day and provided another example of the SATF RAP denying a request for CART, this time from ███████ █████████████, without conducting an adequate individualized assessment. *See* Exhibit 2.

I was surprised, then, to receive a letter from SATF Warden Phillips **76 days later**, on February 5, 2024, and another on February 12, 2024 (dated February 8), doubling down on the the SATF RAP's previous approach. *See* Exhibits 3 & 4. Warden Phillips stated that the RAP "conducted a case-by-case evaluation of the request" for CART by Mr. ██████ and that "[t]he RAP demonstrated that other equally effective means of communication were available." The RAP did no such thing. Instead, the RAP stated only:

> On 8/23/2023, the RAP reconvened to discuss your request. Your request to receive CART services was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

The RAP ignored, among other things, the fact that Mr. ██████ had expressly stated in his request that his hearing aids were not accommodating him.

> **WHAT DO YOU NEED?**
> WOULD LIKE TO PARTICIPATE IN C.A.R.T PROGRAM — COMMUNICATION ACCESS REALTIME . AM DNH. DONOVAN VALLEY STATE — CDCR WORKING TOWARD REPLACING MY DIGITAL HEARING AIDS WITH DIGITAL. "FLAME 250 NOT "DIGITAL" NOT A HEARING AID AS ADVERTISED ON GOOGLE.

As to Mr. ███████, Warden Phillips asserted that the RAP conducted "a case-by-case review" by reviewing "the history of effective communication for the incarcerated person and discovered he had a detailed history up to current time, of successfully communicating and demonstrating repeated understanding using his existing primary and secondary means of communication." This, too, is not reflected in the RAP response.

> Your request to receive CART services during due process events was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

Neither Mr. ███████ nor Mr. ███████ were interviewed to better understand their communication needs, even though their CDCR 1824 requests should have put the institution "on notice" that they "could not fully participate" in programs with their current accommodations alone. *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 274 (D.D.C. 2015) (Jackson, J.) (prison officials violated rights of deaf class member who requested an interpreter when they said written notes and lip reading were sufficient); *id.* at 271 (provision of reasonable accommodations "is best done through an informal, interactive process that involves" the person with the disability) (internal quotation marks and citations omitted).

The RAP also did not appear to demonstrate CART, a new technology in CDCR that people may not be familiar with, to the class members so they could make an informed decision as to whether it would help them or see if another accommodation would be appropriate, even though Mr. ██████ expressly requested additional information about CART.



Had the RAP interviewed Mr. ███████ who is also designated DD2, they would have learned that he, too, had never used CART and knew only what he had seen on informational posters in his housing unit and on his tablet, so would have benefited from a demonstration of the technology.

**Reliance solely on documented "primary" and "alternate" forms of communication is insufficient.** The hard-of-hearing population is diverse, with diverse needs; people may need different, or multiple, devices to accommodate them in various settings and for different types of communication, including through use of captioning *and* hearing aids in tandem to attempt to fully understand communication.

The responses by the SATF Warden, which presumably were approved by both CDCR headquarters and the Office of Legal Affairs, indicate that the parties still do not agree regarding what constitutes a "case-by-case" evaluation, as required by law, when someone requests CART. *See* Dkt. No. 3583, Order at 40 (Mar. 20, 2024) (public entities must "give primary consideration to the requests of the [disabled person] with respect to auxiliary aid requests and give deference to such requests") (quoting *Updike v. Multnomah County*, 870 F.3d 939, 958 (9th Cir. 2017)).

The responses also diverge from the approach that Dawn Lorey repeatedly has asserted is "baked into the RAP process." In meetings held to discuss SATF Stipulation Items 1-3, on March 27, 2024, and again on April 24, 2024, Dawn Lorey has stated that the RAP routinely consults

directly with class members regarding their need for accommodation. Yet that clearly did not happen in these instances.

It is critical that the parties resolve this issue without further delay—both to ensure that people have appropriate access to CART for due process encounters now, and to ensure access when captioning is rolled out to all programming and education (something the Court ordered in February 2023 must happen at SATF "as soon as possible"). By email on May 6, 2024, Defendants refused Plaintiffs' request to meet to figure out a timeline for resolving this issue. Plaintiffs will follow-up separately about that, but in the meantime we request the below information as soon as possible to determine whether the parties have a dispute and how best to address it going forward:

1.   All guidance provided to the field regarding evaluation of CART requests, including the guidance provided to ADA Coordinators on December 12, 2023.

2.   All recommendations by all CAMU CCIIs to institutions regarding their review of the 1824s submitted where CART has been requested. (This is discussed on page 2 of Warden Phillips's letters.)

3.   A written explanation of whether CDCR headquarters agrees with the responses provided by the SATF Warden and with the SATF Warden's analysis of what constitutes a "case-by-case" evaluation. If Defendants agree, please explain why. If Defendants do not agree, please explain why the responses were issued.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

cc:   Ed Swanson, Audrey Barron (Court Expert)
      Co-counsel
      Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLA Armstrong (OLA)
      Lois Welch, Steven Faris (OACC)
      Brianne Burkart (CCHCS Legal)
      Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS Accountability (CCHCS)

Ms. Tamiya Davis
Re: CART Eligibility
May 8, 2024
Page 5

Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

# EXHIBIT D



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

VIA EMAIL ONLY

April 26, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:   *Armstrong* Advocacy Letter
███████████████ SATF

Dear Ms. Davis:

I write regarding ████ ████ an 80-year-old full-time wheelchair user housed at SATF. Mr. ██████ has difficulty safely reaching items on the floor and in his locker, which has doors that open in the wrong direction (see below).



IMG-0268.JPG
IMG-0268-Facility F2-POD█ OPW bunk with doors opening in the wrong direction for full use by inmate

Mr. ██████ filed an 1824 requesting a grabber, which was approved by the RAP in January 2024, but he was told "[t]here is no timeline for when we will be able to provide you with your grabber."

The RAP reviewed your request for a grabber and determined that it is reasonable. The ADA office is starting the procurement process. There is no timeline for when we will be able to provide you with your grabber. In the interim, you may request assistance from staff and ADA workers.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied**: If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife                   Date sent to inmate: JAN 1 8 2024
ADA Coordinator/Designee    Signature



Re: ██████ ████ ████

Ms. Tamiya Davis

April 26, 2024

Page 2

A grabber is a common device that can improve safety and independence and that is readily available through MaxiAids, Amazon, hardware stores, and pharmacies.



Grabber Buddy
Innovative Reacher
Tool
**$12.71**
Home Depot, 10+
Free delivery
4.3 ★★★★☆ (117)

I informed CDCR headquarters of the delay in providing Mr. ████ a grabber by letter dated March 20, 2024. *See* Letter from Rita Lomio, Plaintiffs' Counsel, to Sharon Garske, Office of the Attorney General, Plaintiffs' Feedback on Draft Proposal Regarding Non-Medical Assistive Devices at 8 (Mar. 20, 2024).

Over a month later, Mr. ████ still does not have the grabber approved for him **99 days ago**.

I ask that CDCR headquarters assist SATF in procuring a grabber for Mr. ████ immediately and that SATF provide an explanation of:

1.      all action taken from January 2024 to present to procure a grabber for Mr. ████ including whether SATF asked headquarters for help;
2.      the reason for the delay;
3.      the date when Mr. ████ finally was provided a grabber;
4.      the cost of the grabber; and
5.      the vendor that supplied the grabber, and any alternate vendors considered.

Thank you for your attention to this matter.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

Ms. Tamiya Davis
Re: 
April 26, 2024
Page 3

cc:     Mr. ████
        Ed Swanson, Audrey Barron
        Co-counsel
        Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula
        Stuter, OLA Armstrong (OLA)
        Lois Welch, Steven Faris (OACC)
        Brianne Burkart (CCHCS Legal)
        Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson,
        Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS
        Accountability (CCHCS)
        Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet
        Sandhu (OAG)

# EXHIBIT E

| | |
|---|---|
| **From:** | Rita Lomio <rlomio@prisonlaw.com> |
| **Sent:** | Monday, July 15, 2024 6:51 PM |
| **To:** | Ferguson, Patricia@CDCR; Davis, Tamiya@CDCR; Meyer, Nicholas@CDCR; Thao, Chor@CDCR; Ruiz, Ramon@CDCR; Lau-Silveira, Ava; Stuter, Ursula@CDCR; CDCR OLA Armstrong CAT Mailbox; Sharon Garske; Trace Maiorino; Sean Lodholz; Olena Likhachova; Anne Kammer; Gurpreet Sandhu; Lorey, Dawn@CDCR; White, Lourdes@CDCR; Mebane, Darnell@CDCR; Lo, Cory@CDCR; Burkart, Brianne@CDCR; Diana@CDCR; Dr. Joseph@CDCR; Dovey, John@CDCR; Hart, Robin@CDCR; CCHCS Accountability Log@CDCR; Williams, Joseph@CDCR; Jefferson, Cathy@cdcr; Anderson, Jason@CDCR; Moses, Jane@CDCR; Leon Guerrero, Joshua@CDCR; Perez, Aaron@CDCR; dawn.stevens@cdcr.ca.gov; Dharmendra.Sharma@cdcr.ca.gov; Antronne.Scotland@cdcr.ca.gov; Ed Swanson; Audrey Barron |
| **Cc:** | Armstrong Team; Armstrong Team - RBG only |
| **Subject:** | FW: Extreme Heat at SATF |
| **Attachments:** | SATF LOP 2024(4523186.1).pdf; MH HQ Memo - 2024 Heat Plan and Updates(4523192.1).pdf |

[EXTERNAL MESSAGE NOTICE]

Hi all,

During last week's tour of SATF, we identified heat-related issues affecting *Armstrong* class members, including those confined to DPW cells. Due to the serious and urgent nature of the issue, which cuts across all cases, we shared our summary email report with the *Plata* Receiver, *Coleman* Special Master, and Defendants in *Coleman*. That email is below. We look forward to working with CDCR and CCHCS to address these issues both to provide immediate relief to class members and also to ensure policies are in place to make sure class members are safely and accessibly housed during extreme heat events, such as the one SATF experienced last week.

 

If you would like additional information about our findings, please let us know. During last Friday's interview with the SATF warden, Ramon offered to have a "bigger discussion with Plaintiffs' counsel" about heat-related issues and possible solutions. We look forward to learning what Defendants have done or will do at SATF and statewide in light of the serious issues identified last week.

Rita

+++++++

I wanted to share information from our SATF tour this past week related to temperatures in the housing units. The short version is that people are living in suffocating heat without access to mitigating measures like cool water. Staff are determining UHT stages based on temperature measurements in areas that do not represent the in-cell/-pod temperatures incarcerated people experience, and that in some cases are at least ten degrees cooler than the cells in which people are confined – something the acting warden, acting chief deputy warden, and ADAC all believed was required by policy.

**Is that really the policy – to go by dayroom temperature even if the dayroom is closed and people are locked in cells and pods that are much hotter?** I am attaching the statewide heat plan and SATF OP.

<u>Temperature measurements and class member experience</u>

We checked out handheld thermometers from central control on the complexes (the same ones staff are supposed to use) and measured the temperature in a few cells housing people with disabilities. I took the temperature where someone's head would be if they were sleeping on their bed (that generally was hotter than the vents at the top of the cells, possibly because that is where the window is and/or the bed is pressed up against concrete that is baked in the sun). We also looked at the thermometer mounted in the dayroom. On E yard (Level II, 270), thermometers were mounted between the first and second tiers, on the side of the second-tier floor facing the open dayroom. On G yard (Level II, 6- to 8-person pods), a thermometer was mounted above the door in the housing unit section that opened to the central officer area – a location many yards from the pods.

Here are some of the readings:

| Day | Time | Unit | Cell/Pod | Cell Temp | Dayroom Temp | Outdoor Temp* |
|---|---|---|---|---|---|---|
| 7/10 | 1749 | E4 | ▮ | **90.2/90.3** | 84 or 85 | 105 |
| *We took readings on two separate thermometers. This is the cell of ▮▮▮▮, DPO, who is on heat meds according to a sign on his door. The ADA Coordinator told me that only the ambient dayroom temperature would trigger stage 2, and it was beneath 90 degrees. No ice or ice water was available for incarcerated people, and no extra fans were available. There are no food ports in the doors that can be left open overnight, and the cell doors are shut overnight. Mr. ▮▮▮ reported that he has mostly been locked down except for that day, when program was running for part of the day. He said "it's horrible," he felt nauseous and dizzy yesterday but staff wouldn't call a man down. He said he can't sleep and staff don't do rounds. This heightened his anxiety and fear. He has a little fan but it didn't produce much of a breeze.* | | | | | | |
| 7/10 | 1515 | E5 | ▮ | 83 | 70 | 103-105 |
| *This is a DPW cell.* | | | | | | |
| 7/11 | 0926 | G1 | ▮ | 81.3 | 84 (61% humidity) | 83-87 |
| *▮▮▮▮, EOP, DPO, 65 years old, reported he's struggling with the heat. Per EHRS, on 7/7: "IP was found on the floor lethargic and not obeying to verbal commands." 7/8: "Patient states that he just does not do well in the heat. Vitals were normal patient was encouraged to hydrate and was sent back to housing area." 7/12: "I/P c/o feeling hot and lightheaded. Vitals taken B/P 106/67, pulse 65, temp 98.8, 02 96%, R 16, Blood sugar 157, pain 0/10. Educated patient on the importance of staying hydrated in this heat and to apply wet wash cloths on forehead to stay cooler." He filed a 602 with help from someone else on 7/8: "I had told Miss▮▮▮ that I've heat strokes in past, she said that's not my business July 4 when we came back in noon. I informed I need toilet paper I'm took not and faint she stated she doncare even no he was housed in hospitals before because of issues. I said I could not breath and needed water, cool. It was 87.9 on the wall when sgt. Came on the downstairs 93 upstairs that's at 945 pm. So they now it really hot and the don't care it 87.8 in dayroom and ninetys in cells accordin to our clock with temp. please help me before I have stroke of heart attack." He got an OOG acknowledgement that says he'll receive a response no later than 9/7/24.* | | | | | | |
| 7/11 | 1802 | E1 | ▮ | **91.9** | 76 (handheld) 80 (mounted) | 108 |
| *Stage 2 was not called. ▮▮▮▮, DPW, TABE 01.0, Spanish speaker, 57 years old, was sweating profusely, using a rag to mop his forehead. He was miserable and frustrated, had a small fan in his cell that weakly blew hot around, and the igloo in the unit was empty. He didn't know if anything was available to help him because of the heat. We asked housing officers to refill the igloo with ice water and to explain to him in Spanish that it was available and how to get it as he was locked in his cell. Housing officers said they could crack his cell door.* | | | | | | |

2

\* This comes from [timeanddate.com](timeanddate.com). I used the closest time available on that website or a range of temperatures if it fell between two listed times.

People on some yards at SATF largely have been locked in their cells/pods lately. That's for a variety of reasons, including staff shortages, altercations on the yard, and because that dayroom is closed whenever someone is on suicide precautions in the unit (four people were placed on suicide precautions in one unit on E yard the day I was there).

A lot of people at SATF are on heat meds. In F3 (Level II EOP), the housing officer estimated that 80% of the residents were on heat meds. People reported being unable to sleep because of the heat, excessive sweating, nausea, dizziness, and fatigue.

Staff interpretation of heat plan requirements

SATF management (acting warden, acting chief deputy warden, and ADAC) interprets the heat plan to be based on "ambient dayroom temperature," even when residents are not allowed in the dayroom and are locked in cells much hotter. Because of that interpretation, although we measured temperatures in cells that were over 90 degrees, staff would not call a stage 2 because the dayroom temperature was below 90 degrees.

We witnessed the ADAC specifically tell staff that although we had just measure a cell temperature above 90 degrees in the cell for someone on heat meds, staff should not call a stage 2 because the "ambient dayroom temperature" – as taken by a thermometer mounted between the first and second tier in an area of increased airflow – was below 90 degrees. That meant no mitigation measures were activated; ice water was not made available. Instead, people had access only to small squirts of hot water in their sink. (I tested the cold water button in one cell and only hot water came out.)

We also witnessed an exchange between the ADAC and an IAC representative in D2 (Level IV SNY, 270) related to heat.

| ADAC | UHT is based on the thermometer/ambient temperature in the dayroom, per policy. Could we do something different from policy? Yes. Open tray slots, provide cold water. |
|------|------|
| IAC Representative | Things are being brought to me, people are reporting heat-related illness, not being allowed to open their food ports. |
| ADAC | There's no capacity for ice; demand would break the ice machines. Can provide cool water. Director came down a few weeks ago and said to try to say yes. |

The one exception is on C yard, where staff told us that in-cell measurements can be the basis to go up a UHT stage. That interpretation, however, was squarely rejected by the acting warden, acting chief deputy warden, and ADAC.

Lack of working equipment

SATF is ill equipped for the heat. A few examples are below – this is by no means a full list.

- The acting warden said that **ice machines** in the kitchens on some yards were broken. The acting chief deputy warden said that they would not provide ice in the supply warehouse outside the perimeter because it had to be kept on standby in case a stage 2 was called.
- **Swamp coolers** had stopped working and staff had put in multiple work order slips over a period of weeks because cell **vents were blowing hot air**. In D5, for example, staff said several cells aren't blowing cold air (█ , █ ) and that they have submitted work orders. The circuits/power went out in █ also, so currently running an extension cord so the occupant can turn on their fan. There's also an electrical access issue in █ .
- On Thursday, we were unable to take many temperatures because the **handheld thermometers** were not working. Staff told us that the batteries had died, and staff did not know how to change the batteries (that is,

how to remove the plastic cover) or where spare batteries were. In some cases, there may have been one thermometer that was working but it had been checked out. (For example, on G yard as of Thursday morning, seven of the eight thermometers were not operational.)

- Staff did not have **personal fans** to issue to people who were too poor to buy their own. A couple housing unit officers said they wished they had some to give out. The captain of C yard said that there's no program for loaner fans for individuals because we have nothing to give.

- Class member in D1-█ (Level IV SNY, 270 design) reported that the in-cell temperature had been tested and showed 94 degrees. A captain reportedly came to the unit and took a picture of the heat log that morning (another class member said this was around 8 am). The class member reported that people can ask for in-cell temperatures to be measured, but those temperatures are not routinely taken. He reported that there is no ice available and no fans for loan, and tray slots weren't opened. Per the captain, there are no **fans in the dayroom**, but there are work orders (seven in the last two months).

- In D4, there is cold water available from the **water fountain** in C Section but not in A Section. Staff told us that's been a problem for four months. Plant Ops reportedly is coming to install new water fountains in A Section, but no ETA.

## Staff indifference and lack of knowledge

Staff at all levels – from yard officers to the acting warden – demonstrated little urgency or concern about how the heat was affecting the incarcerated population. Staff mostly were in heavily air conditioned spaces not available to our clients or, if on E yard, under a shade structure (purchased by CCPOA) with misters that were off-limits to incarcerated people. The small amount of shade cast by housing buildings themselves was in the out of bounds area most of the day. On E yard, yard officers said that the only shade on the yard available for people was that cast by the wall on the handball court – and indeed, we saw incarcerated people squished together like pigeons in the small amount of shade that cast. On C3 (Level III PF, 180 design), a housing officer told us "I'm not sure what a heat-related illness symptom would be."

## Our efforts on site

At the end of the day on Monday, we told ADA staff that a class member had reported sweltering temperatures in his cell and that his request to be allowed to have his food port open overnight to allow some air circulation and relief had been denied. We asked them to reconsider. The next day, ADA staff told us they had contacted the sergeant who said that would be no problem. We do not know if they actually directed food ports to be open.

Sara relayed some of our observations from Wednesday's walking tour related to heat to Tammy, Jenn, and Tamiya. The acting warden asked to speak with me about it on Thursday. I met with her and the acting chief deputy warden that afternoon. They largely wanted to present the steps they had taken after being contacted by headquarters.

It was unimpressive.

The acting warden told me she had sent an email Wednesday night to the captains to tell them not to come to Thursday's morning meeting and instead to check on their yards. She said that she told staff at the morning meeting to provide ice water in all housing units where yard ice machines were working, even if not on stage 2.

Basically, the only immediate steps they reported taking where:

- Ice water was to be provided in all housing units if the yard ice machines were operational (they said some weren't, and mentioned the G yard ice machine as one of those that were broken)
- People would be permitted showers

They said they had started the procurement process for a few items which, they said, would require going through the three-bid process and receiving funding, and could take a long time to get. They also reminded me that California is in a "budget crisis."

- 30-inch industrial fans (I think they said they want to purchase 40 of them)
- Parts for swamp coolers in the building (it sounds like they had ordered this previously but the "parts are still on order"). They acknowledged that the water for the swamp coolers are not designed to be cooled.

**Is there no process to acquire equipment and supplies during emergencies, including extreme heat events?**

They also said they were "researching" a few options:

- Whether they can purchase misters (Corcoran across the street has them).
- Whether they can turn on the showers on the yard (apparently the water was turned off a while ago).
- Whether they can crack cell doors on D (Level IV SNY, 270) and E (Level II PF, 270) to allow airflow, but it is "all or nothing," except for in E1, which used to be administrative segregation.
- Whether they can create cooling stations/spaces at the prison. The acting chief deputy warden said they simply cannot find the space. They reminded me that dining halls (e.g., D yard) and gyms (e.g., E yard I believe) currently are closed because they need serious structural repair.

When I asked whether they could get small fans to issue to indigent people suffering from the heat, the acting chief deputy warden said there was no policy that would require them to do so ("no policy or procedure in place to do that") and they "don't have the money to provide that."

When I explained that temperatures in cells were over 90, even if dayroom temperatures were lower, the acting chief deputy warden said that their hands were bound by policy, which required them to act based on dayroom temperatures.

I told the acting warden that tensions between incarcerated people and staff were simmering on some of the yards, more than I had ever seen at SATF before. (In one very sad instance, Marie and I heard from people on G yard that they had asked for ice the night before, been refused, and things escalated and resulted in a use of force against someone who reported having a developmental disability.)

After meeting with the acting warden on Thursday afternoon, we visited more housing units during third watch, when the temperatures usually are the highest at the prison. We saw that ice water was in fact **not** available in the housing units, that staff were not aware of the acting warden's new direction to provide ice water, and that the captain of F yard (Level II, closed door pods of 6 to 8 people) did not know of that direction either. The ADAC told me he had been in the morning meeting and that to his memory the acting warden had not given any specific direction about providing ice water. He said he also had seen no email directing it.

He apparently reported to the acting warden Thursday evening and, on Friday morning, she told me that she sent an email to direct ice water to be provided on the housing units even if the units were not on stage 2. I do not know if she in fact sent that email or if staff are complying with it, as we didn't visit housing units on Friday.

* * * * *

That's a high-level summary of heat concerns at SATF. Please let me know if you would like any additional information. On a personal note, our team tried to take as many precautions as possible. We tried to limit our time in hot environments and took breaks in air conditioned spaces largely not available to incarcerated people. We had access to cold water, spray bottles, and wet towels. But it still was oppressively hot. I cannot imagine what it would be like to be locked in a cell there without ready access to cold water.

Rita

Rita K. Lomio (she/her)
Senior Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
███████████

# EXHIBIT F

| | |
|---|---|
| **From:** | Marissa Hatton |
| **To:** | Davis, Tamiya@CDCR; Thao, Chor@CDCR; Stuter, Ursula@CDCR |
| **Cc:** | Jess Shen; Joshua Marin |
| **Subject:** | Non-Advocacy Letter Request for ▇▇▇▇▇▇▇▇, DNH, DNM, SAC |
| **Date:** | Wednesday, July 24, 2024 1:00:27 PM |

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hey folks,

Recently at CMF, Ursula and Chor mentioned that Defendants would welcome informal emails for "low-hanging fruit" requests, instead of a multi-page advocacy letter. I agree, and if we can get this to work, I think it'll save everyone a ton of time (and people will get accommodations faster as well). So I'm trying it out here!

▇▇▇▇▇▇▇▇, DNH, DNM, SAC, has been asking for over-the-ear headphones (OTEH) since August of last year. In November 2023, the RAP told him he would receive a pair when the next shipment came in, but he still did not have them several months later. **Can SAC provide a pair of OTEH to Mr. ▇▇▇▇▇, and if they're waiting for a shipment, can you let us know when it will come in?**

Let me know if there's anything else I can answer for you. If you think the format of this email was effective (or should be changed to make it effective), please let me know.

Thanks,
--
**Marissa K. Hatton** (she/her)
Staff Attorney | Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
▇▇▇▇▇▇▇

# EXHIBIT G

| | |
|---|---|
| **From:** | Rita Lomio |
| **To:** | Ed Swanson; Audrey Barron |
| **Cc:** | Ruiz, Ramon@CDCR; Davis, Tamiya@CDCR; Anne Kammer; Burkart, Brianne@CDCR; Deaf and HOH Work Group; Armstrong Team; Armstrong Team - RBG only; Ferguson, Patricia@CDCR; Meyer, Nicholas@CDCR; Chor@CDCR; Lau-Silveira, Ava; Stuter, Ursula@CDCR; CDCR OLA Armstrong CAT Mailbox; Sharon Garske; Trace Maiorino; Sean Lodholz; Olena Likhachova; Gurpreet Sandhu; Lorey, Dawn@CDCR; White, Lourdes@CDCR; Mebane, Darnell@CDCR; Lo, Cory@CDCR; Toche, Diana@CDCR; Bick, Dr. Joseph@CDCR; John D@CDCR Dovey; CCHCS Accountability Log@CDCR; Joseph@CDCR Williams; Cathy@cdcr; Jason@CDCR; Moses, Jane@CDCR; Joshua@CDCR; Aaron@CDCR; CDCR CCHCS Advocacy Correction Services; Dawn@CDCR; Sharma, Dharmendra@CDCR; Scotland, Antronne@CDCR; Robin@CDCR; Welch, Lois@CDCR; Steven@CDCR |
| **Subject:** | Armstrong \| Hiring and Retention of Staff Sign Language Interpreters |
| **Date:** | Tuesday, July 16, 2024 6:41:56 PM |

[EXTERNAL MESSAGE NOTICE]

Hi Ed and Audrey,

We wanted to share some information related to Item 1 of the proposed Deaf/Hard-of-Hearing Workgroup Agenda (hiring and retention of staff sign language interpreters) to provide you with some context. This information already is known to the parties.

- Last month, ███████████, a staff sign language interpreter at CCWF, sent a letter of resignation to Defendant Newsom. In that letter, she stated: "My resignation is being submitted due to CCWF's failure to comply with the ADA, which not only harms D/HH inmates daily but has taken a toll on me mentally and physically. Over the last three years, I have made ongoing attempts to advise and devise resolutions for CCWF to abide by *Armstrong v. Newsom*, Case No. 94-cv-02307 CW (N.D. Cal. Mar. 11, 2021), yet all suggestions or actions have been thwarted. Instead, retaliatory actions for my advocacy have transpired." Her position has not yet been filled, and CCWF is without a staff interpreter.

- Last October, ███████████, then a staff sign language interpreter at San Quentin who has since resigned, told counsel for both parties that he was overwhelmed, overworked, and being forced to interpret in conditions worse than he would have outside of state service. In particular, he said he was forced to work too many hours without breaks or a team interpreter to partner with and received less pay than he would make outside the prison system. He said that a policy outlining expectations regarding provision of sign language interpretation, including when breaks and team interpretation are needed, should be developed by headquarters. He reported that he "leave[s] in despair" at times because of San Quentin's unacceptable failure to accommodate deaf signers and false and inaccurate SLI logs. He explained that there is inadequate vetting of staff interpreter competency by CDCR, that VRI does not work adequately in many settings in the institution, and that deaf signers as a result are receiving poor quality interpretation. He reported a lack of opportunities to promote, to receive pay increases, and, because of the way staff interpreter pay is structured, that his retirement would not be calculated based on his full salary, which includes a $30,000 annual stipend. His position has not yet been filled.

- Three of the four staff sign language interpreters at SATF have resigned and left state service. The ADAC reported to counsel for both parties that he and the IPO (institutional personnel officer) have been seeking candidates but, so far, no one has applied. One job posting

reportedly has been up 4 or 5 months. It is the ADAC's understanding that sign language interpreter jobs outside of CDCR pay better, but he and the IPO have no authority to provide sign-on bonuses or to raise salaries.

I hope this context is helpful. We look forward to discussing this issue at next week's workgroup meeting.

Rita

Rita K. Lomio (she/her)
Senior Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
████████████

# EXHIBIT H



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Heather MacKay
Donald Specter
Jerrod Thompson

VIA EMAIL ONLY

August 7, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

Ms. Brianne Burkart
CCHCS Office of Legal Affairs

RE:     *Armstrong v. Newsom*
Individualized Vision Assessments at SATF (SATF Stipulation #5)

Dear Ms. Davis and Ms. Burkart:

Plaintiffs' counsel met with blind and low vision class members at SATF during the July 2024 monitoring tour to discuss the individualized vision assessments conducted by WesternU Health. Class members who attended their assessment reported generally positive experiences with the staff at WesternU and satisfaction with the Zoomax Snow 12 and LyriQ devices issued to them as reading accommodations following the assessment. However, a number of class members reported issues with the individualized vision assessments process.

In this letter, we discuss four areas of particular concern:

I.      false "refusals" of vision assessments,

II.     writing needs not being thoroughly evaluated during the assessments and class members being forced to rely on others to write,

III.    delays in the issuance or denial of a recommended device and/or training, including delays of over 244 days with no clear procurement plan, and

IV.     long wait times for assessments of class members who arrived to SATF after February 26, 2024.

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

Ms. Tamiya Davis
Re: Individualized Vision Assessments at SATF (SATF Stipulation #5)
August 7, 2024
Page 2

We ask that Defendants explain how they will address these concerns to avoid similar issues as vision assessments are rolled out statewide. We also make a number of specific requests throughout this letter related to SATF.

## I.    FALSE AND UNINFORMED "REFUSALS" OF VISION ASSESSMENTS

On June 7, 2024, Defendants produced a list of blind and low vision class members at SATF who had been offered and reportedly refused a vision assessment with Western U.[1] Plaintiffs' counsel spoke with eight of the 14 class members on Defendants' list and received concerning reports regarding the refusal process.

Issues with informed refusals at SATF are not new. Last year, CCHCS conducted a survey of the 16 institutions with the highest offsite specialty care refusal rates, which included SATF. One of the main themes identified was communication about appointments. As seen below, the survey listed reasons of, "We believe patient refused, but patient says did not intend to refuse," and, "Patients do not know why they are being seen."[2]

## Main Themes & Initial Recommendations

| # | THEMES | REASONS | INITIAL RECOMMENDATIONS |
|---|--------|---------|-------------------------|
| 1 | Communication | • We believe patient refused, but patient says did not intend to refuse<br>• Patients do not know why they are being seen<br>• Patients know in advance they don't want to go / don't feel appt is necessary | • CA Model Peer Support Specialist Program – check-ins prior to appt date<br>• L6S improvement projects – improvements in the way we talk about specialty referrals<br>• Explore notification; advocate for notification functions in tablet RFP development |

As explained in more detail below, we saw these same issues arise at SATF this year related to vision assessments.

//
//

---

[1] *See* Letter from Chor Thao, CDCR Office of Legal Affairs, to Jacob Hutt, Prison Law Office, *Armstrong v. Newsom*: Second Response Re: Request for Information Re: Individualized Assessments of Blind and Low Vision Class Members (June 7, 2024).

[2] *See* Attachment A: Specialty Refusals Survey Findings (Oct. 2023).

Ms. Tamiya Davis
Re: Individualized Vision Assessments at SATF (SATF Stipulation #5)
August 7, 2024
Page 3

█████████████████, DPV, F3, was scheduled to have a vision assessment on April 18, 2024. According to Mr. ████████ medical records, medical staff noted he refused his vision assessment on April 16, 2024.[3] When we spoke with Mr. ████████ he reported he was not called for a vision assessment nor had he refused the assessment. In the handwritten refusal scanned in the medical records, which is not signed by Mr. ████████ medical staff wrote, "Patient stated he will take care of his eyes when he paroles no need for appt."[4] That does not make any sense; Mr. ████████ is sentenced to life without the possibility of parole. Mr. ████ expressed interest in having an assessment and reported he would have gone had he been given the opportunity. He is currently trying to make do with a card magnifier to read and write, but the card magnifier does not properly accommodate his needs.



---

[3] *See* Refusal of Examination/Treatment (Apr. 16, 2024).
[4] *Id.*

Ms. Tamiya Davis
Re: Individualized Vision Assessments at SATF (SATF Stipulation #5)
August 7, 2024
Page 4

████████████████, DNM, DPV, D3, was scheduled to have a vision assessment on February 15, 2024. Mr. ████ told us that he refused the appointment because the nurse who told him about it said it was for a routine eye exam, which he had already recently completed. The nurse reportedly told Mr. ████ that it was "no big deal" if he did not want to go to the appointment. Mr. ████ stated he asked the nurse if this appointment was to get devices, but the nurse told him it was not. The nurse documented something differently on the refusal form; namely, that Mr. ████ had been informed the appointment was for the low vision specialist. We are concerned about the accuracy of this documentation, including the failure to correctly document Mr. ████ disability code and effective communication. Two months later, Mr. ████ found out that people were going out to WesternU for vision assessments and asked medical staff about it. During this conversation, Mr. ████ found out he had actually refused his WesternU vision assessment and asked to be rescheduled. At the time of our visit, he still had not been seen and had not been told if or when he would be.

████████████████, DPM, DPV, A3, was scheduled to have a vision assessment on February 15, 2024. However, Mr. ████ was unable to go to the appointment because transportation staff did not accommodate his need for an accessible vehicle as he was unable to walk up and down stairs and had a "Ground Floor – No Stairs" restriction. Mr. ████ refusal paperwork confirms this as well: "Patient states he didn't go because the van didn't have a lift."[5] He was informed by ADA staff that he would be placed back on the referral list, but he had no information about when his rescheduled appointment would take place.

**REQUESTS**: Please ensure that the class members named above are promptly rescheduled to see Defendants' vision specialists.

In addition, we ask that medical staff at the institution be trained to ensure that patients are properly educated regarding their vision assessment before a refusal form is completed.

We also ask that the "refusals" reported in this section for Mr. ████████ and Mr. ████ be investigated through the accountability process, that Defendants' provide us with a report of their findings, and that Defendants develop and produce a plan to avoid this problem in the future.

Finally, please investigate whether the other blind and low vision patients who reportedly refused their assessment in fact did so.

---

[5] *See* Refusal of Examination/Treatment (Feb. 15, 2024)

Ms. Tamiya Davis
Re: Individualized Vision Assessments at SATF (SATF Stipulation #5)
August 7, 2024
Page 5

## II. WRITING NEEDS ARE NOT BEING MEANINGFULLY EVALUATED DURING VISION ASSESSMENTS

Nearly all of the class members we interviewed who attended their individualized vision assessment reported that the vision specialists at WesternU failed to meaningfully discuss their need for writing accommodations.[6] Only one class member, ███████████████, DPV, G3, received a meaningful writing accommodation recommendation for a personal laptop and typing classes. However, as discussed in section III, Mr. ██████ has yet to receive the laptop or start typing classes. More commonly, class members reported that the vision specialists asked them about their ability to type and use a computer but failed to discuss their need for writing accommodations any further. Many blind and low vision class members continue to be without the ability to independently write. Class members reported relying on other people, such as friends or ADA workers, in order to complete writing tasks.

For example, ███████████████, DPV, F1, had an individualized vision assessment on February 29, 2024. Mr. ██████ reported that the assessment primarily focused on his ability to read independently. Mr. ██████ was not asked about his need for writing accommodations during the assessment. According to the report from February 29, the specialist asked, "How do you currently write letters/from/notes when you're with your lawyer?" The specialist's report then states, "Someone writes for him."[7] It is also noted in the specialist's report that Mr. ██████ knows how to type and use a computer. (Mr. ██████ reported taking an 18-month typing class and feeling confident in his ability to use a laptop.) However, the specialist's only recommendation is for a Zoomax Snow 12 Portable CCTV with headphones and one to two hours of training. Although the Zoomax has been working well as a reading accommodation, Mr. ██████ explained that it does not help him write. Instead, he has to ask other people to write for him and wait to "catch someone in a good mood." According to Mr. ██████ it can sometimes take two to three days to get assistance writing.

███████████████, DNH, DPV, D2, had an individualized vision assessment on February 29, 2024. The vision specialist recommended a LyriQ Assistive Text-to-Speech Reader with headphones and 30-60 minutes of training and a scribe (that is, another person to write for

---

[6] Plaintiffs' counsel reported similar issues earlier this year in an advocacy letter sent on behalf of ██████, a DPV class member at SATF. *See* Letter from Jacob Hutt, Prison Law Office, to Chor Thao, CDCR Office of Legal Affairs, Electronic Writing Accommodation for ██████ ███████████████, DNH, DPV (Jan. 18, 2024). In response, Defendants said that Zoomax devices would provide writing accommodations but, as noted above, class members reported that Zoomax devices do not adequately accommodate them for writing.

[7] *See* Optometry Consultation (Feb. 29, 2024).

him).[8] Mr. ████ reported that the vision specialist did not discuss possible writing accommodations beyond a scribe. The report from WesternU notes that Mr. ████ is able to type and knows how to work a computer. Mr. ████ explained that he would be very interested in getting a personal laptop because "it is not great to rely on people because they leave or you can't find someone you can trust." Currently, Mr. ████ relies on friends or ADA workers to help him write, which works fine for short writing tasks, but he does not feel comfortable using a scribe for longer writing tasks, such as legal pleadings.

████████████████, DPM, DNH, DPV, D1, had an individualized vision assessment on March 7, 2024. The vision specialist recommended new prescription eyeglasses, a white cane with a rolling ball tip, and personal Zoomax.[9] According to the specialist's report, the Zoomax was recommended for "reading documents and writing." However, Mr. ████████ stated it is "very awkward" to use the Zoomax as a writing accommodation and that he lacks the resources (e.g., extra paper) to try and practice writing with it. Mr. ████████ instead is interested in getting a writing guide and bold lined paper to be able to handwrite.[10] However, these kinds of accommodations were not presented or discussed during his individualized assessment.

In addition, four other class members raised similar concerns:

- ████████████████, DLT, DPV, G3, stated that he was not asked about devices that would allow him to write independently during his vision assessment. Mr. ████████ explained he has some experience using a laptop and expressed interest in getting one for his writing needs. Mr. ████████ reported it can be difficult to get to writing devices, like the ADA computer in the law library, because it is not open very often. Currently, Mr. ████████ asks a friend to help him write, but he would prefer to write independently and on his own time.

- ████████████████, DNH, DPV, E4, reported that she was not asked about devices that would allow her to write independently during her vision assessment. She stated that she would prefer to have a writing device instead of having to rely on others to write: "If I don't have to ask someone for writing, it's better for me. If I can do my own writing with a machine, I'll take that any day of the week. I love to write."

---

[8] *See* Optometry Consultation (Feb. 29, 2024).
[9] *See* Optometry Consultation (Mar. 7, 2024).
[10] *See* sample writing guide (https://www.maxiaids.com/product/writing-guide-set) and bold lined paper (https://www.maxiaids.com/product/low-vision-paper-with-binder-holes-100-page-pad) from MaxiAids.



- ████ █████ ██████, DPO, DPV, INF, reported that other than asking him about his ability to type and use a computer, he was not asked about his need for writing accommodations in prison by the vision specialist at WesternU. Mr. █████ expressed an interest in some sort of writing device that could help him write on his own and be easy to use. (Mr. █████ is 73 years old and does not have much experience with technology.) Currently, Mr. █████ has to rely on the assistance of staff in the CTC to help him write. He explained that he has not been able to write independently in a long time, and while he appreciates when staff are able to help, he would prefer to be able to write independently.

- ████████████████, DNH, DPV, F2, reported that he was instructed to use his Ruby 10 magnifier as a writing accommodation during his vision assessment. However, Mr. ████ finds it cumbersome to use the magnifier when writing because he has to constantly move the page and position his hand in an awkward way in order to not be in the way of the magnifier. Mr. █████ expressed interest in having a laptop, which would make it much easier for him to write effectively. However, this option was not discussed during his vision assessment.

   <u>**REQUEST**</u>:  Please ensure that the class members named above are promptly reevaluated by Defendants' vision specialists in order to determine what types of writing accommodations will allow them to write independently and promptly issue the recommended writing device(s).

## III.   DELAYS IN ISSUANCE OR DENIAL OF A RECOMMENDED DEVICE AND/OR TRAINING

   Most blind and low vision class members received similar device recommendations (Zoomax Snow 12 and LyriQ) following their vision assessment. However, a small number of class members were recommended other devices and/or training. According to policy, ADA staff should initiate procurement of assistive devices recommended by the vision specialists within five business days.[11] Unfortunately, it appears that Defendants have failed to provide these less common recommendations—including special eyeglasses, laptops, and orientation and mobility training—to class members, and some have been waiting over 244 days for these accommodations.

//
//
//
//

---

[11] *See* Dkt. 3596 at 54.

█████████████████, DPW, DNH, DPV, C8, had an individualized vision assessment on February 29, 2024. The specialist recommended a Zoomax device with headphones (with one to two hours of training) and "[g]lasses with frosted lens OD."[12] The specialist at WesternU wrote, "We recommend that the patient receives a pair of glasses with a frosted right lens and a filled in prescription in the left eye of +1.00 -0.25 x 060. This will eliminate the patient's constant diplopia secondary to cranial nerve palsy OD."[13] On March 26, 2024, Mr. ██████ saw the onsite optometrist, who placed an order for the glasses with a frosted lens. However, the order was changed because "frosted lens not available per PIA."[14] Mr. ██████ received the glasses without the frosted lens on April 11, 2024. ADA staff should have initiated procurement of the correct glasses within five business days per policy.

> **REQUEST**: Please explain (1) all efforts by SATF, CDCR, and CCHCS staff to obtain the recommended glasses, along with when and how procurement orders were placed and the results of those orders, (2) why Mr. ██████ has not received the frosted glasses 160 days after they were recommended by the specialist, and (3) what will be done to ensure this does not happen in the future, including what oversight CDCR headquarters will provide.
>
> In addition, please ensure that Mr. ██████ immediately receives prescription eyeglasses with a frosted lens as recommended by Defendants' vision specialists and let us know when he received the glasses, what the procurement process was, and what vendor supplied the glasses. Please also explain why the onsite optometrist changed the order for glasses based on availability, rather than initiating a request for non-formulary glasses.[15]

█████ ████████ ████████, DPV, G3, had an individualized vision assessment on December 7, 2023. The specialist recommended a personal Dell laptop with Windows Narrator and Typing Tutor software and 30 or more hours of training in order to learn to use this equipment.[16] Unfortunately, Mr. ██████ has yet to be issued a laptop. In the meantime, Mr. ██████ is having to rely on others to write. Mr. ██████ explained that he is actively preparing for his parole suitability hearing currently scheduled for 2027 but has been unable to do any writing on his own.

---

[12] *See* Optometry Consultation (Feb. 29, 2024).

[13] *Id.*

[14] *See* Optometry Consultation (Mar. 26, 2024).

[15] *See* Dkt. 3446 at 34 (Court Expert finding that "[d]enying a class member a needed accommodation because that item is not kept at the medical supply warehouse is never acceptable."); *id.* at 62 ("Providers should be trained that there is never a situation in which they can deny a request for DME because the DME is 'not available.'").

[16] *See* Optometry Consultation (Dec. 7, 2023).

He is also enrolled in self-help groups such as CGA, NA, AA, and Anger Management, but he cannot participate fully because he cannot complete any of the written assignments and cannot take notes during group meetings. Mr. ███ stated that sometimes others in the group will help him read and write, but he cannot always rely on their assistance. He added that he also needs help filling out his canteen slips and package list and writing emails on his tablets. While he has been able to get assistance from others, it can take several days to find someone who can help. However, many of these concerns would be resolved if Mr. ███ had the ability to independently write on a laptop. Additionally, as the vision specialist recommended, Mr. ███ needs typing lessons before he can effectively use the laptop. These lessons have also not yet been offered but could have been started even if his laptop was not yet ready for deployment. When we interviewed the ADA Coordinator at SATF on July 12, 2024, 218 days after typing classes were recommended, he stated, "I don't know how we'll teach him to type." (Plaintiffs' counsel recommended that ADA staff reach out to outside independent living centers.)

> **REQUEST**: Please explain (1) all efforts by SATF, CDCR, and CCHCS staff to obtain the recommended laptop and typing classes, along with when and how procurement orders were placed and the results of those orders, (2) why Mr. ███ has not received the laptop or typing classes 244 days after they were recommended by the specialist, and (3) what will be done to ensure this does not happen in the future, including what oversight CDCR headquarters will provide.
>
> Please ensure that Mr. ███ receives a laptop and typing classes as recommended by Defendants' vision specialists and let us know when he received both and what the procurement process was and what vendor(s) supplied the laptop and typing classes.

███ ███ ███, DNH, DPV, F2, had an individualized vision assessment on January 17, 2024. Mr. ███ was recommended an aid/ADA worker to help him, a Ruby 10 magnifier, and orientation and mobility training.[17] Mr. ███ stated he received the Ruby 10 magnifier in a timely manner but has not received the recommended orientation and mobility training. Mr. ███ reported having trouble using a white cane and has previously injured his foot and head as a result of bumping into things.

> **REQUEST**: Please explain (1) all efforts by SATF, CDCR, and CCHCS staff to obtain the recommended orientation and mobility training, along with when and how procurement orders were placed and the results of those orders, (2) why Mr. ███ has not received the training 203 days after they were

---

[17] *See* Ophthalmology Consultation (Jan. 17, 2024).

recommended by the specialist, and (3) what will be done to ensure this does not happen in the future, including what oversight CDCR headquarters will provide.

Please ensure that Mr. ███ receives orientation and mobility training as recommended by Defendants' vision specialists and let us know when he received the training.

## IV. NEW ARRIVALS EXPERIENCE LONG WAIT TIMES FOR VISION ASSESSMENTS AND HAVE INADEQUATE INFORMATION ABOUT HOW TO ACCESS INTERIM ACCOMMODATIONS

Lastly, we are concerned that class members who are new to SATF or who have recently been identified as DPV are not being seen promptly by Defendants' vision specialists. We are also concerned that these class members are not being provided adequate interim accommodations while they await their appointment.

████████████████, DPO, DPV, D3, arrived to SATF on April 17, 2024. Mr. ████ has yet to see the vision specialists at WesternU. According to the medical records, Mr. ████ has no light perception in either eye.[18] Currently, Mr. ████ has to rely on others in order to read and write and tries to limit their requests to not "bug" other people. Mr. ████ previously used a Zoomax while housed at CMF, but they had not been informed that SATF also had a Zoomax available for check-out. Mr. ████ stated, "I have a lot of stuff that I want to read but haven't been able to." Mr. ████ expressed their eagerness to go to WesternU for their assessment because they want to be able to enroll and participate in a GED program. They also reported that they do not currently own a TV or radio and do not have a talking book player. Additionally, the tablet is difficult for them to operate without assistance. Because of this, Mr. ████ described their experience at SATF so far as "miserable."

Similarly, ████████████████, DPV, E2, arrived to SATF on June 12, 2024, and has yet to see the vision specialists at WesternU. Mr. ████ has optic atrophy and a visual acuity of 20/400.[19] Mr. ████ explained that he is new to CDCR and has only been in custody a few months. At the time of our interview on July 9, 2024, Mr. ████ was without a tablet, TV, or radio, and like Mr. ████ had very little access to any recreational materials. Mr. ████ cannot read on his own, and although he was issued a handheld magnifier, it is not strong enough to help him read independently. Moreover, Mr. ████ was not informed of how he could access a Zoomax in order to read. (Plaintiffs' counsel helped Mr. ████ file an 1824 requesting help

---

[18] *See* Ophthalmology Consultation (Oct. 17, 2023).
[19] See Ophthalmology Consultation (Apr. 28, 2024).

accessing a Zoomax and understand that as a result, Sergeant ███ has helped Mr. ███ check out the Zoomax and will renew it for him regularly unless another person on the yard needs it.)

According to Defendants, class members awaiting vision assessments will have access to the Zoomax as an interim accommodation.[20] At SATF, these devices are not kept in the housing units and there are only a few devices available on each yard. Plaintiffs' counsel spoke with housing unit officers regarding the Zoomax and found that some officers were unaware of the process. For example, a regular housing unit officer in E1 reported that he had never heard of the Zoomax, did not know what it was, who it was for, where it was, or the process for checking it out. Similarly, the housing officers in E4 had never heard of the Zoomax.

**REQUESTS**:  Please ensure that Mr. ███ and Mr. ███ are seen by Defendants' vision specialists as soon as possible. We also ask that all custody staff at SATF and blind and low vision class members be educated on the Zoomax check-out process to ensure that class members awaiting their vision assessment have access to the loaner Zoomax as an interim accommodation.

Thank you for your attention to this matter.

Sincerely yours,

Tania Amarillas
Investigator

Rita Lomio
Senior Staff Attorney

cc:  Ed Swanson, Audrey Barron
     Co-counsel
     Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera,
     Ursula Stuter, OLA Armstrong (OLA)
     Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer,
     Gurpreet Sandhu (OAG)

---

[20] *See* Letter from Olena Likhachova, Attorney General's Office, to Rita Lomio, Prison Law Office, and Ed Swanson, Court Expert, SATF Stipulation No. 6 (July 25, 2024).

Ms. Tamiya Davis
Re: Individualized Vision Assessments at SATF (SATF Stipulation #5)
August 7, 2024
Page 12

Dawn Lorey, Lourdes White, Darnell Mebane, Cory Lo (DAI)
Brianne Burkart (CCHCS Legal)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Jason
Anderson, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, Dawn Stevens,
Dharmendra Sharma, Antronne Scotland, Joseph Edwards, CCHCS Accountability
(CCHCS)
Lois Welch, Steven Faris (OACC)

# EXHIBIT I

| | |
|---|---|
| **From:** | Rita Lomio |
| **To:** | Sharon Garske; Olena Likhachova; Davis, Tamiya@CDCR; Stuter, Ursula@CDCR; Ruiz, Ramon@CDCR; Trace Maiorino; Thao, Chor@CDCR |
| **Cc:** | Ed Swanson; Audrey Barron; Armstrong Team; Armstrong Team - RBG only |
| **Subject:** | SATF Stipulation 5 |
| **Date:** | Wednesday, September 11, 2024 4:59:27 PM |
| **Attachments:** | Exhibit 41 - 24.08.07 Arm Advocacy re Individualized Vision Assessments.pdf |

[EXTERNAL MESSAGE NOTICE]

Hi Sharon,

I am writing to follow up on our discussion today regarding SATF stipulation 5. We'd like to understand:

1. The reason for the delay in providing glasses with a frosted lens to ███████. See page 8 of the attached letter, which explains that, as of the date of the letter, it appeared he had not received the glasses **160 days** after they were recommended by the specialist. When, if at all, was he provided the accommodation?

2. The reason for the delay in providing a laptop and typing classes to ███████. See pages 8-9 of the attached letter, which explain that, as of the date of the letter, it appeared he had not received those accommodations **244 days** after they were recommended by the specialist. When, if at all, was he provided the laptop and typing classes?

3. The reason for the delay in providing orientation and mobility training to ███████. See pages 9-10 of the attached letter, which explain that, as of the date of the letter, it appeared he had not received the training **203 days** after it was recommended by the specialist. When, if at all, was he provided the training?

Olena very helpfully responded to Audrey's request for information about the process for implementing recommendations from the vision specialist (see below), and we'd like to understand what happened in the cases above.

Rita