# Exhibit 6

**DECLARATION OF** ███████████████

I, ████████████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation (CDCR) number is ████████ I am currently housed at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF). I am housed on Facility E. That's a Level II yard with celled housing. I am 36 years old.

3.     I have been incarcerated in CDCR on my current term since December 2023. I have been housed at SATF since April 2024. I was first housed in Building E1 and now am housed in E2.

<u>Resident Advisory Council</u>

4.     I was elected as Secretary for the Facility E Resident Advisory Council (RAC), formerly called the Inmate Advisory Council, on August 4, 2024. Before August 4, 2024, I served as an honorary representative of the RAC and assisted with the duties of the Secretary.

5.     Pursuant to the CDCR Official Bylaws of the Inmate Advisory Council, SATF, revised in June 2020 and signed by then-Warden Stu Sherman, as Secretary it is my duty, among other things, to record business and all actions taken or voted upon, to prepare minutes for the Warden, and to maintain a copy of said minutes in a permanent archive file. Pursuant to the bylaws, it also is my duty to maintain a daily log to record all business that transpires each day in order to provide an accurate and permanent record of IAC activities. Pursuant to the bylaws, it also is my duty to make all requests for unlocks, ducat lists, etc., for all meetings when necessary. Pursuant to the bylaws, it also is my duty to notify all RAC representatives of upcoming RAC activities, of actions requested by the Warden or his representative, or actions to be performed by the Executive Body.

6.     As part of my RAC duties, I enter all housing units on Facility E and any areas that residents have access to in order to speak with and try to help other residents.

<u>Hearing Disability</u>

7.      I am hard of hearing.

8.      CDCR classifies me as DNH.

9.      I have hearing aids. With or without my hearing aids, how much I can hear depends on the setting I am in and the type of sounds in that setting. For example, I have a hard time hearing male voices, which typically are lower than female voices.

10.     It's also harder for me to hear in environments with background noise. There usually is a lot of background noise in my housing unit. At any given time, there may be many people, including both residents and staff, talking in multiple conversations at the same time and noise from televisions and fans. The yard similarly has background noise a lot of the time.

11.     To try to piece together what someone is saying in environments with lots of background noise, I have learned over the years to combine different cues. For example, I might look at someone and try to see how their lips are moving and try to piece that information together with the few words I can make out. But that doesn't always give me the full picture of what they're saying.

12.     Sometimes I can't wear my hearing aids because they echo or amplify sounds that interfere with my ability to hear. For example, when I met with attorneys from the Prison Law Office on August 5, 2024, we were in an attorney visiting room on Facility E. There was background noise that sounded like it could be an electric drill or a pipe squealing, and it bothered me so much I needed to remove my hearing aids. As another example, the frequency range of fans is amplified by my hearing aids and interferes with my ability to hear.

<u>Delays in Getting Hearing Aids</u>

13.     When I arrived to CDCR custody in December 2023, I was housed at Wasco State Prison. I didn't have my hearing aids with me. I asked for them and was given a right-ear hearing aid in February 2024. I was told that they did not have any left-ear hearing aids available at that time. The hearing aid dispenser told me that he would put in a

follow-up request to provide a left-ear hearing aid and that if I transferred before it arrived, the request would follow me to my new institution.

14.     I did not receive the left-ear hearing aid before I transferred to SATF in April 2024. I submitted 7362s and an 1824 at SATF asking for hearing aids.

15.     On June 9, 2024, I submitted a 7362 explaining that my right-ear hearing aid had fallen out and was lost. Another resident told me that it had been found and turned in to an officer working in the medical clinic at the time. I went and spoke to that officer. The officer told me that he turned the hearing aid into medical staff but could not remember which staff person he gave it to. Unfortunately, it wasn't returned to me, and I was without a hearing aid for either ear.

16.     I wasn't seen by the hearing aid dispenser at SATF until July 23, 2024, when I received two hearing aids (one for each ear).

<u>Population and Layout of Housing Unit</u>

17.     According to the Unlock Report I get as part of my work on the RAC, which is a kind of roster, there were 145 people (including myself) housed in E2 on August 1, 2024.

18.     E2 is celled housing, with two tiers of housing. The other buildings on Facility E have the same layout.

19.     Above the entrance to the building is the control booth where the control officer is stationed. Some people call it a watch tower. It's positioned so the officer can observe what's going on both inside the housing unit and also on the yard from an elevated level. That officer is responsible for making PA announcements as well as unlocking doors. The space is entirely enclosed and incarcerated people are not allowed access to it. There's a sliding window/door between the control booth and the housing unit. There is always a control booth officer present in the housing unit.

20.     Gabriela Pelsinger, an investigator at the Prison Law Office, showed me the below photographs. These photographs show a control booth similar to the control booth in E2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





21.     There are supposed to be two housing unit officers on the floor, but there are not always two – sometimes there is only one floor officer, or none at all. For example, the morning of August 6, 2024, there were no floor officers until about 0845.

22.     Ms. Pelsinger also showed me the below photographs. These photographs are an accurate reflection of the layout of my housing unit from different perspectives. My unit does not have the yellow paint on the stairwell.





Announcements in Housing Units

23.     Throughout the day, staff frequently make announcements in the housing units over the loudspeaker. They make announcements about a wide range of things. This includes announcements that apply to all or a subset of people, like program availability, that people can go to yard, that people can go to dayroom, that people in DRP class can go to class, release for education, and release for chow. It also includes orders or policy enforcement, like telling us not to go out of bounds, telling us that there is no in-cell visiting, and telling us not to go to the top tier unless going to the shower or your cell.

24.     Individual announcements also are frequently made over the intercom in the housing unit. These are announcements informing individuals of places they need to be at a particular time, like they need to be at medical for an appointment or program office for interviews or a classification hearing. This is one of the reasons why announcements are so frequent – when you have over a hundred people in a building all with different appointments, that's a lot of announcements.

25.     I almost never understand what is being said when announcements are made in my building over the PA system. This is because of a few variables, including my hearing disability, background noise, staff speaking too closely into the microphone so the speech is muffled, and that the intercom sometimes distorts speech. If the person speaking has a lower/deeper voice, that is harder for me to hear as well.

26.     In E2 where I am housed, the PA system is too loud. When it's that loud, it's a shock to the ears, and I can't understand what is being said.

27.     When I was in E1 when I first got to SATF, I also had a hard time understanding the PA system because it was so distorted.

28.     I have visited E5 as part of my duties for the RAC, and have observed that that system is distorted as well and it's hard to hear what is being said over the PA system.

29.     Making matters worse, staff do not usually flash lights *before* they make announcements. Oftentimes they flash lights only *after* they make an announcement. That does not help me because the lights are supposed to be a cue that I should be prepared to listen.

30.     Constant announcements that I cannot understand causes me sensory overload.

31.     I am worried that because I can hear sometimes and in some settings, staff think I'm making up the challenges I have with announcements.

<div align="center">Ducats</div>

32.     Sometimes I receive ducats for appointments, such as medical appointments, mental health appointments, and interviews. I don't receive ducats consistently; sometimes I don't receive a ducat at all, and other times I receive a ducat after the appointment has occurred. As a member of the RAC, I have seen ducats come into the program office to be distributed by the program clerk. The ducats come with a signature sheet for the residents to sign once they have received the ducat. In my specific unit, the porter assigned to pass out the ducats on a particular day sometimes will sign for each person before the ducats are distributed.

1     33.     When I do get a ducat, the time listed almost always is not the time the

2 appointment in fact occurs. Sometimes the appointment happens earlier than the time listed

3 on the ducat, and sometimes it happens later, *or sometimes the appointment does not happen at all. @ 8/15/24*

4     34.     For example, I received a ducat to go to the medical clinic on July 8, 2024.

5 The ducat listed a 0930 appointment time. I did not go to the appointment at that time. In

6 my experience, you're supposed to wait until you are called. If you show up for an

7 appointment at medical based on the time of the appointment on your ducat, staff often

8 will tell you something like, "We haven't called for you yet." I wasn't called until much

9 later that day, around 1700.

10     35.     A true and correct copy of the ducat I got is below.



11
12
13
14
15
16

17     36.     Another example is that I got three ducats to go to mental health on June 21,

18 2024. They listed the scheduled times as 1500, 1515, and 1530. I was called earlier in the

19 day for those appointments (I just had one appointment that covered all three ducats).

20     37.     True and correct copies of the ducats I got are on the next page.

21
22
23
24
25
26
27
28

[3617361.1]

8

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
OTRR314     INMATE PRIORITY PASS

| INMATE'S NAME | | CDC# | HOUSING AREA/BED |
|---|---|---|---|
| | | | E 002 |
| ISSUED BY U. UNKNOWN | ISSUE DATE 06/17/2024 | APPT. DATE 06/21/2024 | APPT. TIME 15:00 |
| APPT. LOCATION E Clinic Room 127 | TYPE / REASON Mental Health/ | | |
| ARRIVAL TIME: | RECORDED BY: | | |
| DEPART TO: | DEPART TIME: | RECORDED BY: | |

291

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
OTRR314     INMATE PRIORITY PASS

| INMATE'S NAME | | CDC# | HOUSING AREA/BED |
|---|---|---|---|
| | | | E 002 |
| ISSUED BY U. UNKNOWN | ISSUE DATE 06/17/2024 | APPT. DATE 06/21/2024 | APPT. TIME 15:15 |
| APPT. LOCATION E Clinic Room 127 | TYPE / REASON Mental Health/ | | |
| ARRIVAL TIME: | RECORDED BY: | | |
| DEPART TO: | DEPART TIME: | RECORDED BY: | |

292

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
OTRR314     INMATE PRIORITY PASS

| INMATE'S NAME | | CDC# | HOUSING AREA/BED |
|---|---|---|---|
| | | | E 002 |
| ISSUED BY U. UNKNOWN | ISSUE DATE 06/19/2024 | APPT. DATE 06/21/2024 | APPT. TIME 15:30 |
| APPT. LOCATION E Clinic Room 127 | TYPE / REASON Mental Health/ | | |
| ARRIVAL TIME: | RECORDED BY: | | |
| DEPART TO: | DEPART TIME: | RECORDED BY: | |

293

38.    Because I do not always receive a ducat and because the time listed on a ducat can be earlier or later than the actual time of an appointment, I do not feel that ducats alone are a reliable way for me to learn when I need to report to a program or encounter.

<u>Daily Schedule</u>

39.    It is really important for hard-of-hearing people to know about announcements because there are a lot of program changes on our yard throughout the day. Over the last month or so, we've had frequent changes to regular programming due to staff shortages, including when staff need to respond to an incident on Facility D, the Level IV yard on our complex. That means programs, including chow, yard, and dayroom, are delayed or cancelled.

40.    There is a Daily Activity Schedule (DAS) for Facility E. I got a copy of the Daily Activity Schedule for July 2024 from the program office as part of my RAC duties. A true and correct copy is below. *The schedule in this DAS has been in effect since I've been at SATF. @ 8/15/24*

OP 112 - ATTACHMENT E

Revised: July 2024

**FACILITY 'E' LEVEL-II NDPF DAILY ACTIVITY SCHEDULE**

**First Watch Begins**

| | |
|---|---|
| 2230 | First Watch staff arrives; Conduct security & equipment check. |
| 0030 | Institutional Count |
| 0045 | Backside Window Checks |
| 0300 | Institutional Count; Positive and Negative |
| 0330 | Wake-Up Call for Early Dining Workers |
| 0415 | Release Early Dining Workers |
| 0500 | Institutional Count |
| 0600 | Unlock Bar Boxes |

**Second Watch Begins**

| | |
|---|---|
| 0630 | Second Watch staff arrives; Conduct security & equipment check. |
| 0635 | Cell Doors open / Breakfast Release and Pill Line. |
| 0730 | Vocation/Education Group/DRP Early Release. Announce Any Program Deviations In All Housing Units Over the P.A. |
| 0830 | Pending Tool Count Clearance. Yard & Dayroom Release for A1/A & A2/B Inmates. Gym activities designated during yard times. |
| 1000 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. Education Group Release |
| 1030 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. |
| 1100 | Medication release including close custody P.M worker release) |
| 1130 | C/C Dayroom/Yard Release. (Monday through Friday only) |
| 1200 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. Close Custody Count |
| 1245 | Final Medication Call (exception will be made on case-by-case basis on medical discretion) |
| 1300 | 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. Education Group Release |
| 1400 | Yard/Dayroom recall for all inmates. |

**Third Watch Begins**

| | |
|---|---|
| 1430 | Third Watch staff arrives; Conduct security & equipment/inventory check. |
| 1445 | Yard & Dayroom Release for A1/A & A2/B inmates. C/C Yard Release (Monday through Friday only) |
| 1600 | Yard recall for all inmates. |
| 1630 | Dayroom recall for all inmates. |
| 1700 | Institutional Standing Count: Once Count is Cleared, Start Evening Meal/Diabetics Medication |
| 1900 | Telephones available for use. Yard and Dayroom release upon completion of the evening meal and Dining Tool Inventory clearing. |
| 2000 | Close Custody Count. Medication Distribution one building at a time. 5-minute Inline, followed by a 5-minute Outline, no two-way traffic. |
| 2100 | Yard/Dayroom recall for all inmates. |
| 2115 | Personal Alarm Device Testing-All Housing Units |
| 2200 | Institutional Count / Lock Bar-Boxes |
| 2215 | Security Check of Housing Unit /Program Areas |

NOTE: Any Deviation From This Schedule Shall Be Approved by the Program Lieutenant or Above and Be Logged in the Housing Unit Logs.

**Staff Training Days**
The first Wednesday and second Friday, are designated staff training days. Supervisors will ensure staff complete their training assigned. There will be no yard or dayroom on training days.

**DAILY RECREATION YARD / DAYROOM ACTIVITIES**
Refer to the attached 'Yard Recreation / Dayroom Daily Activity Schedule'. This will be accomplished, so all housing units have equal access to the Recreational Yard and Dayrooms.

**INCLEMENT WEATHER AND FOG CONDITIONS**
1.    No yard activities.
2.    Dayroom activities only

All inmates will be escorted when outside of the housing unit (example, dining release, visiting, vocational, education, DRP, etc.)

**GYM ACTIVITIES**
Gym Activities Shall Run Monday through Sunday. The Maximum Number of inmates Allowed in the Gym is 30; unless special activities are scheduled. NOTE: The Recreation equipment box will be unlocked and opened for (10) minutes at the top of the hour. At the conclusion of the (10) minute unlock the Recreation box will be re-secured. Staff will log all yard releases, Inline / Outline, dayroom activities, and mandatory showers (during modified program) in the Housing Unit Logbook. Schedule deviations will be approved by the Program Lieutenant or above, then log in the Housing Unit Logbook.

Staff Shall Log All Yard Releases, Dayroom Releases, and/or any building activities that occur in the unit. Gym Activities Shall Also Be Logged in the Gym Logbook. It should be noted that if inmates elect to secure/close their assigned cell door, they will be afforded the opportunity to access their cell during the Inline/Outline.

During Mass Movement, Inmates Shall Walk Along The White Line: Movement On The Track Shall Be Counter Clockwise.

Facility E Captain                    M. JONES                    Complex I, Associate Warden

Changes / revisions to the DAS require the AWs approval prior to implementation via policy memorandum to the Warden.

41.    Although the DAS lists specific times for events, in practice these events happen at different times that are hard to predict. For example, pill call doesn't always run at the scheduled time; sometimes it starts earlier, and sometimes it starts later. The same is true for chow.

42.    The RAC raised concerns with programs not running as scheduled to custody staff in June 2024. At the direction of the then-RAC Chairman, I typed a memorandum entitled, "SGT AGENDA FOR MONTH OF JUNE 2024," and dated June 4, 2024, which outlines our concerns and was submitted to a sergeant on the yard.

43.    A true and correct copy of the memorandum is attached as **Exhibit A**.

44.    Since we submitted that memo, programs still are not running as scheduled.

45.    I received a message on my tablet that said for four o'clock medication pass, staff will call buildings one-by-one to let them know when people can leave to get medication. I showed the message to Rita Lomio, an attorney at the Prison Law Office, when she visited SATF in July 2024. Ms. Lomio directed staff to take a photograph of the message, and they did so with my permission.

46.    A true and correct photograph of the message on my tablet is below.



47.    I used to be on the list for medications at four o'clock, but I couldn't always hear the announcement. If we're locked in our cells at the time, when staff make an announcement for four o'clock medication line, they tell people to flash their cell lights if they want to go out. We've been on modified program a lot lately, meaning no dayroom or yard, so we are in our cells when announcements are made. I asked for my medication delivery time to be moved to later in the evening because I couldn't reliably hear the announcements and because it is so hot in the afternoons that it's uncomfortable to wait for long periods of time on the yard outside of the medication window if there's a delay. Later in the evening, there's typically not much movement in the unit, so if I see people leaving, it's a good sign it's pill call and I should ask to leave too.

48. When staff call us out for yard or dayroom release, we have to flash our cell lights to indicate we want to be released. If I don't hear what they're saying, I won't know to flash my lights.

49. Staff do an hourly unlock, which is where they open cell doors and the yard access door, allowing people who were on the yard to return to the housing unit (in-line) or from the housing unit to the yard (out-line). *We also have to flash our lights in order for staff to open our doors during hourly unlocks. (initials) 8/11/24*

50. The Daily Activity Schedule notes that in-line and out-line are five minutes long. In my experience, in-line and out-line are usually 5-10 minutes long and some officers open in-line and out-line early, so even if some residents show up on time, staff have already completed the release and people are stuck where they are.

51. That's why it's really important for me to be able to understand announcements. Sometimes a combination of releases is done at the same time. For example, on August 5, 2024, I was expecting to be released for an interview based on a ducat with an "Outside Agency/Outside Agency – Other" at 0800. When they opened my door at around 0830 or 0845, I wasn't sure if it was for that ducat or for yard, dayroom, or my DRP class, which usually starts at 0815, and I wasn't sure where I was supposed to go. I didn't know what the ducat was for; it turns out it was for an interview with the Prison Law Office, but that interview did not start until after 1030.

52. A true and correct copy of the ducat I got is below.

| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION | | | |
|---|---|---|---|
| OTRR314 | INMATE PRIORITY PASS | | |
| INMATE'S NAME | | CDC# | HOUSING AREA/BED |
| | | | E 002 |
| ISSUED BY | ISSUE DATE | APPT. DATE | APPT. TIME |
| | 07/31/2024 | 08/05/2024 | 08:00 |
| APPT. LOCATION | TYPE / REASON | | |
| COMPLEX I | Outside Agency/Outside Agency - Other | | |
| ARRIVAL TIME: | RECORDED BY: | | |
| DEPART TO: | DEPART TIME: | RECORDED BY: | |
| | | | 329 |

53. Another example is that sometimes staff make an announcement to say that chow will be happening soon. I've been told that they're supposed to give us a five-minute warning so that we can prepare. When I can't hear that announcement, I am not able to

prepare and then when it's time for chow, I am not ready. Sometimes, for example, I

haven't gotten dressed yet (you need to wear your blues in chow). Other times, I haven't

been able to use the bathroom (I sometimes need to put on my condom catheter in the

morning, before going to breakfast).

<u>Whiteboard</u>

54.    There now is a whiteboard in my building. Staff put it out in July 2024. I had

never seen it before then. It is not updated regularly and does not record all the

announcements made in the unit throughout the day. In July 2024, I started updating it

when I had time based on information I knew from my work with the RAC and canteen, as

well as from occasional input from the floor officers.

55.    The whiteboard is not very large, and not a lot of information can fit on

there. Ms. Lomio showed me the below photographs of whiteboards in other units at

SATF. It's hard to tell scale from the photographs, but they look generally like the one we

have in E2.





56.     I typically place the whiteboard on the medical and 602 lockboxes in the unit (E2), which are located outside the officer's office. As a result, the whiteboard faces B-section. People in A- and C-sections cannot see it, and those in B-section can only see it when they are standing close to it (basically, when they are exiting the building).

57.     The whiteboard on Tuesday, August 6, 2024, had outdated information because I had not had a chance to update it in two days. On August 6, 2024, it still said (a) chow was running late due to free staff and not correctional staff, (b) canteen is no longer conducting money checks and people should contact trust, and (c) canteen slips need to be placed in bag located on grate on Sunday night for first draw only.

58.     I put (a) on the whiteboard after chow because I thought it might help explain to people why everything else that day would probably run late. I said chow was late because of free staff because sometimes people get frustrated at custody staff due to frequent program delays or cancellations, and I wanted to explain that this time it was not their fault.

59. I put (b) on the whiteboard because I work in canteen and a lot of people come up to canteen asking for money checks, so I thought it would help educate people.

60. I put (c) on the whiteboard because now A-section upper tier houses orientation residents (people newly arrived to the yard) and I thought it would help educate them. As of Tuesday, August 6, 2024, the information on the whiteboard was no longer accurate; Sunday already passed and the next weekend should be second draw's turn. (Draw is based on the last two numbers of your CDCR number; 0-33 is first draw, 34-66 is second draw, and 67-99 is third draw.)

61. My writing on the whiteboard is pretty small to fit in all that text. I've been told my penmanship is not that good, so sometimes it may be hard to read.

62. As of August 6, 2024, I'm the only person who updates the whiteboard. It does not reflect all announcements made in the unit throughout the day. I only update it in the morning, before I go to class and/or work.

<div align="center">Scrollboard</div>

63. On or around August 6, 2024, I visited all the housing units on Facility E (buildings E1, E2, E3, E4, and E5). I observed there were two electronic scrollboards in E3, one in A-section and one on C-section. I did not observe scrollboards in any of the other housing units. The electronic scrollboards in E3 were not operating at the time I visited (at least, there was no visible text on them).

64. Plaintiffs' counsel showed me the below photograph of a scrollboard that they told me was from another facility at SATF. That looks similar to the scrollboard I saw in E3.

65.    Because of the layout of our housing unit, which is sometimes called a "270" because of the number of degrees created by the three sections (A, B, and C), if you were in E3, you would only be able to see the scrollboard if you were in A- or C-section. The size of the text would be too small for me to read from my cell.

<u>Alarm System</u>

66.    There is no functioning alarm in my building. I have not heard the audio component and I don't think the visual component of the alarm has worked for some time. I have to rely on seeing what other people do around me. Even when the alarm light was working, it's not that noticeable and therefore doesn't effectively tell me when there's an alarm.

67.    On or around August 6, 2024, I visited all the housing units on Facility E to see where the alarm light is located. In each case, there was a red light attached to a pole directly above the podium in the dayroom.

<u>Previous CDCR 1824</u>

68.    On or around April 3, 2024, shortly after I arrived to SATF, I submitted a CDCR 1824. I wrote, among other things, that "I can't hear the PA announcements" and that "[t]he PA sounds very muffled and I'm DNH." I listed, in the "What do you need?" section of the 1824, "I need the c/o to inform me of where I am going via normal voice instead of over the PA." The log number for my 1824 is 543876.

69.    A sergeant came to talk to me after I filed the 1824. Ms. Lomio told me that the sergeant documented the following on the Interim Accommodation Procedure (IAP)/Interview Worksheet: "He said he only has a problem hearing announcements on P.A. and he can hear when officer in control booth opens the window and shouts to him." That is correct – I did tell that to the sergeant.

70.    Ms. Lomio told me that the sergeant documented: "I spoke with officers and advised them to open his door and speak to him without P.A."

71.    I did not know that information. The sergeant just told me that they would try to address the issue.

72.    I got a written response from the Reasonable Accommodation Panel (RAP) later, dated April 24, 2024. The RAP wrote that "you were interviewed and advised to wear your hearing aid to assist hearing announcements on the PA."

73.    That's not true. The sergeant who interviewed me didn't tell me to wear my hearing aids, and my hearing aids don't help me hear announcements.

74.    The written RAP response also says I was issued a pocket talker "to further assist you," but the pocket talker doesn't help me hear announcements either.

75.    The written RAP response did not mention anything about the control officer not using the PA system to talk to me and instead being advised to open my door and speak to me directly without the PA system.

76.    Since I got the RAP response, sometimes Officer ██████, who is the regular control officer on second watch in E2, will pop my door and open the control window and orally communicate directly to me or use physical cues (like gesturing a

1  shower) to communicate basic information to me. She is the only control officer who does

2  that. No one else will do it unless I prompt them by making an exaggerated gesture with

3  my arms to ask, "What did you say?" *That is embarrassing to have to do in front of everyone. (2) 8/15/24*

4       77.    Since I got the RAP response, no staff has come to talk to me to see if I am

5  still having problems hearing announcements or whether things have improved.

6       78.    It's frustrating not being able to hear announcements. When I get responses

7  like the one I got to my 1824, it doesn't seem like anything is going to change.

8                                 Announcements in Other Locations

9       79.    Facility E has a large outside area that we refer to as "the yard."

10  Announcements are made on the yard, including for the same types of things that

11  announcements are made in the building. There are loudspeakers outside each of the five

12  housing units, above each control tower (the entrance to each building), in a bullhorn style.

13  There also is a loudspeaker located above medical, canteen, and one above the ~~chow hall.~~ *Gym (2) 8/15/24*

14       80.    Ms. Pelsinger showed me the photographs of E yard on the next page. These

15  photographs show the locations of some of the loudspeakers on the yard. The first

16  photograph shows E3, E4, and E5. Ms. Pelsinger told me that the Prison Law Office put a

17  blue circle around the area I identified to them as the yard loudspeaker for E5. That is

18  correct. There are similar loudspeakers in the same locations on the other housing units.

19  The second photograph shows the program area (including ~~medical, canteen,~~ *Gym and (2) 8/15/24* chow hall) on

20  the other side of the yard from the housing units; you can see a loudspeaker on the left side

21  on the photograph.

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25
26
27
28

loud speaker ⟲ blurry

↓



81.    As of August 6, 2024, the loudspeaker outside E2 doesn't work, and the volume on the loudspeaker for E1 is low.

82.    It can be really hard to hear announcements on the yard. Out on the yard, there can be a lot of distractions and noise, including from people talking. Often when an announcement is made, it only comes from the loudspeaker of one of the buildings.

83.    Usually the loudspeaker outside of E5 is used to make announcements on the yard. That means if I'm over by E1, or if I'm in canteen, or by my own building on E2, most of the time I can't hear what is being said, and sometimes I can't even hear that an announcement is being made at all. When I'm in the canteen building, I can usually hear that an announcement is being made but what is being said is not intelligible to me.

84.    Ms. Pelsinger showed me the photograph of E yard below. It shows how large the yard is. This photograph is taken from the work change/chow hall area. The housing unit in the distance to the right in the photograph is E5. Building E1 is not visible in this photograph, but would be off to the left. *CG* 8/15/24



85.     Recently, I've observed that sometimes a single announcement will come out of two yard speakers at the same time, but they are out of sync so the speech overlaps and it sounds like there's cross-talk. That, plus the low volume, means I cannot understand what is being said.

86.     To give one example of when I did not receive a ducat, was on the yard, and missed an important medical appointment: On or around May 17, 2024, I was out on the yard, over by building E4. Another resident told me that I was being called in the building for CTC. I asked if he was sure, and the resident told me something like, "Yeah, they called you a couple times." So I went to the CTC and asked the officer if they had called me. The officer said something like, "Why are you not in your blues? Yes, we called you. But they already left." I told him that I had my blues in my walker (there's a storage area under my walker seat) but I wasn't sure that they had called me, because it was another resident that told me and I wanted to verify before I got dressed. (It was very hot that day.) The officer told me to stay close by and to be dressed and ready to go. I waited outside for about 15-20 minutes but because it was so hot, I went back to the shade by building E4 to wait, but was never called. When the yard was recalled, I went back to my housing unit.

87.     On or around May 21, 2024, a nurse came to my cell door in the early morning before chow. She asked why I had missed my appointment. I told her that no one called for me and that I did not refuse. She told me that she would reschedule the appointment. She never asked me to sign a refusal form. Ms. Lomio showed me this refusal form, which she said appears in my medical record.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23



24   88.   I have never seen this form before; the nurse did not ask me to sign it. The

25 form does not accurately reflect my conversation with the nurse.

26   89.   There are also lights for alarms outside the buildings. The lights are pretty

27 small and hard to see even when they are "on" during the day. You can see that on the

28 photograph above, on page 19. Ms. Pelsinger told me that PLO put a red circle around the

1  place I identified to them as the alarm light for E5. That is correct. There is a similar light

2  in the same location on the other buildings.

3      90.    Ms. Pelsinger showed me the below photograph of the program area on my

4  yard. This is a temporary shade structure that is only available for staff, not incarcerated

5  people. The photograph shows what the alarm light looks like – it's the red light with the

6  black backdrop on the upper left hand side of the photograph. That's the same type of

7  alarm light outside the housing units.



25      91.    Sometimes on the yard when there's an alarm, staff don't use the PA system

26 and instead shout, but I can't always hear that. Sometimes the person shouting may be on

27 the opposite side of the yard. This occurs more often during third watch.

<u>Tablets</u>

92.     After I arrived at SATF in April 2024, it took approximately 30 days for me to get a tablet.

93.     A number of residents have approached me in my capacity as an RAC representative and told me about delays in getting a tablet, sometimes for more than a month or even two months. Unfortunately, I am not able to help them. Instead, I tell them that the RAC spoke with the ViaPath representative, and the ViaPath representative said that there is a shortage of ViaPath tablets assigned to this yard.

94.     Sometimes the tablets don't work and I can't even log on for a few hours. Sometimes I don't see a signal, and sometimes there's an Internet connection but I still can't log on and just get an error. I'm not sure why that happens. Over the weekend of August 3-4, 2024, the system was down for a few hours and I couldn't use the tablet.

95.     I have never seen a notification appear on the lock screen of my tablet. Instead, I have to enter my pin to access any content. After typing in my pin, sometimes there is a required notice that I have to open and acknowledge that I've read it before I can continue utilizing the functions of my tablet. But I don't see that notice (or even that there is a notice) until I have entered my pin to log into my tablet.

96.     When I met with PLO attorneys on August 5, 2024, we met in the attorney visiting room on Facility E. I brought my tablet at the PLO attorneys' request but could not log on because there was no connectivity in this area. I've tried to log into my tablet in the program office but there was no connectivity there either and I wasn't able to do it. (I had permission to have my tablet in the program office at the time because a sergeant had asked me to see if a certain notice she had sent out in fact had been distributed.)

97.     We are not allowed to have our tablets on the yard.

98.     I once tried to take my tablet out onto the yard, but an officer told me that we were not permitted to have our tablets on the yard.

99.     I received a message on my tablet on or around April 17, 2024. The message was sent as a "Facility Message" with a subject line of: "Please review memorandum

regards to GTL/ViaPath Tablets." Below the subject is the following message: "Just a friendly reminder, GTL/ViaPath Tablets are not allowed in these designated areas. Do not bring this item out in these designated areas or be subject to disciplinary action. -Second Watch Facility Supervisors." The message attaches a document. The document is a memorandum dated August 22, 2022, entitled, "OPERATIONAL PROCEDURE 526 – STATEWIDE KIOSK AND TABLET PROGRAM." The memorandum states: "Tablets are to be utilized within the inmate's respective housing unit only. Tablets shall not be allowed outside of the inmate's assigned housing unit (i.e. yard/work/education/clinic/etc.)." The memorandum is signed by "T. Cisneros, Warden."

100.     A copy of a document entitled, "Reduction of E-Messaging, Talking Points" was provided to me by another RAC member to distribute to residents in my housing unit. A true and correct copy of that document is attached as **Exhibit B**. The document says that CDCR will reduce the number of free e-messages allowed but that phone calls will remain free. I got the same talking points document on my tablet, but it lists the date of the change as August 1, 2024, whereas the hard copy document lists July 1, 2024.

<u>Pager System</u>

101.     I want to know what announcement is being made at the time it is made. It doesn't matter to me how that is done. What matters most to me is that it be done effectively. It seems like using technology would be the best way to communicate with people like me who have difficulty hearing announcements because of a disability.

102.     In my experience, relying on staff or an ADA worker to come and tell me an announcement is not reliable. If they are not working that day or not familiar with their duties and responsibilities, it can create a problem. That has been my experience with announcements in the building – only Officer ███████ consistently tells me about certain announcements directly rather than through the PA system.

103.     I also would not be comfortable reporting that staff or another resident failed to give me notification of an announcement. That just causes problems. You still have to deal with the staff person or resident – if you get them in trouble, it could create hostility.

104.   I don't think other people would be comfortable with it either. People have raised similar concerns to the RAC – in particular, about a sergeant asking people if they recalled submitting a 602 after they had submitted one. That made people feel scared they might be retaliated against. And so they just answer "no." The RAC here had to talk to the sergeant and told her that she's intimidating people by doing that.

105.   I also don't trust that staff accurately record what I say. One example of that is the "refusal" I talked about earlier. Another is that I was called out of my DRP class by an ADA sergeant to complete a general survey form. I wanted to get back to my class, so I answered the questions in a hurry. The ADA sergeant filled out my answers instead of letting me write them directly. In one case, he asked a question, and I said it doesn't apply to me. I saw him write down "no" as the answer. But that's not what I said. So I am also concerned that they won't accurately document what I say.

106.   A pager system would be helpful to make sure I know about announcements when they are made. It would be huge. It would help if I was in my cell, the dayroom, or on the yard, and probably other areas as well. It would be great if it could vibrate when an announcement is made. And it would be great if it could send individual messages just to me, so if I'm being paged for a medical appointment, only my pager vibrates, not everyone else's.

*[handwritten marginal note, initialed "D 8/15/24"]*

*[handwritten insertion:]* #107. I did not get an orientation manual when I arrived at SATF, and I still do not have one. When I got to SATF, I was processed through R&R. When I was in R&R, I was told to sign a form saying I got an orientation manual (even though I didn't) and was told to watch an orientation video, but the video was paused

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Corcoran, California, on this 15th day of August, 2024.

*[handwritten continuation, lines 23–28:]* → the whole time I was in R&R. Other residents have told the RAC that they did not receive an orientation manual either. The RAC raised this concern with the Facility captain in a memorandum dated February 8, 2024, with the subject line "ECHO FACILITY, CAPTAIN AGENA [sic] FEBURAY [sic] 2024." A true and correct copy of that memo is attached as Exhibit C. To my knowledge, the captain has not responded to this request.



*[handwritten date:]* 8/15/24

*[handwritten, circled initials:]* 8/15/24

# Exhibit A



State Of California

Department of Corrections and Rehabilitation

## Memorandum

# ECHO FACILITY – NDPF
# RESIDENT ADVISORY COUNCIL
# (R.A.C)

Date: June 04, 2024

To: 2nd Watch SGT's
Facility E Program
CSATF/SP

Subject: SGT AGENDA FOR MONTH OF JUNE 2024

The following agenda issues are being raised by the resident population to be addressed at the Sergeant's level of review for resolution:

TOPIC #1
0635 unlock is being announced over the radio Saturday through Wednesday per OP 112 and the Control Booth Officers are not releasing for diabetic line, IDL workers, or the general breakfast release on time.

TOPIC #2
0635 hours the building floor officers are not reporting to the Dining Hall for coverage in a timely manner resulting in a delay of program.

TOPIC #3
Building E1 on average is not being released for morning chow until on or after 0700 hours.

TOPIC #4
Operational Procedure 116- Vocational/Academic Work Change states in section IV (A)(4),"At approximately 0630 hours, Facilities A,B,E,F & G shall begin early morning chow release for vocational/academic students. This OP is not being enforced on this facility and we would like to know why?

TOPIC #5
Operational Procedure 203 states, the breakfast meal shall

June 04, 2024
SGT AGENDA FOR MONTH OF JUNE 2024
Page 2 of 2

TOPIC #5 (continued)
begin at approximately 0630 hours."It also states," The Facility
Sergeant or Lieutenant will be present during the feeding
process." This is not being followed. We believe this will
assist in the orderly facilitation of chow.

TOPIC #6
After chow is completed the Building officers are not returning
to their posts in a timely manner. This is causing delays
in Yard/Dayroom release because officers are not in their
buildings when 0830 Program release is supposed to happen
per OP 112. Tool count is being cleared between 0800-0815
each day.

TOPIC #7
During 2nd Watch the residents are limited to 5 1/2 hours
of programming, yard, and dayroom access. When the program
is delayed beyond the times alotted in the Daily Activity
Schedule (OP-112) it creates a domino effect. Add to this
the Control Booth Officers recalling yard/dayroom early and
we are loosing a significant amount of time each day. 15
minutes late to release and 5-10 minutes early recall and
25 minutes of rehabilitative time is stolen from the residents.

TOPIC #8
Building E3 is not opening their dayroom until 0930 everyday
because the floor officers don't want inmates out while cleaning
is taking place. This is effecting the residents ability
to have equal access to program like the other buildings.
There is nothing in the OP-112 that says dayroom will be
delayed until cleaning is completed.

TOPIC # 9
The Resident Advisory Council is requesting the Program/Yard
Sergeants conduct a tour of each Control Booth to make sure
the Wall Clocks in the Booths are not being set ahead and
are in sync with the institutional time which is displayed
on each GTL Tablet. This will ensure the ordely and timely
opening and recall of program on 2nd Watch. Yard/Dayroom
is to be opened at 0830 hours and recalled at 1400 hours unless
the deviations are reported by Lieutenant or above.


Thank you for your time and consideration in helping us to
resolve these issues for the resident population.

RAC Chairman
CSATF/SP

# Exhibit B

# Reduction of E-Messaging, Talking Points

**Top-Line Messages**

- Beginning July 1, 2024, limited-term funding from the Legislature will expire for e-messages. As a result, CDCR will reduce the number of free outgoing e-messages available each week through institution tablets or kiosks. Incarcerated individuals will still have many ways to communicate.

- The incarcerated population currently receive 20 free e-messages per week. As of July 1, 2024, CDCR will cease funding 15 free e-messages per week, while ViaPath will continue to cover 5 free messages per week. Any messages beyond the 5 allocated by ViaPath will be subject to a charge of $0.05 each for both inbound and outbound messages.

- Current cost for e-messages vary from month-to-month. In March 2024, CDCR paid approximately $94,850 for e-message services used by incarcerated people statewide.

- CDCR and ViaPath have been providing 20 free e-messages since January 1, 2023.

- We remain steadfast in our commitment to offering multiple avenues for maintaining connections with loved ones. CDCR is dedicated to supporting opportunities for incarcerated individuals to stay connected through unrestricted free audio calls, complimentary 15-minute video calls every two weeks, and three days of in-person visitation.

- CDCR recognizes communication is essential to the incarcerated population in building and maintaining support systems and aids in successful rehabilitation. We are committed to providing several pathways for incarcerated people to maintain ties with loved ones to include tablets and phone calls.

**Background:**

- The California Department of Corrections and Rehabilitation (CDCR) has partnered with the California Department of Technology (CDT) to enter into a contract with ViaPath Technologies (formerly Global Tel*Link Corporation, or GTL) to enhance communications, technology access, and family connections for the incarcerated population in state prisons.

- Tablets were provided at no cost to families or incarcerated people, although certain premium features, such as streaming music services, may incur charges.

- These paid tablet services are funded through the incarcerated individual's Trust Fund. Family and friends can make deposits to Trust Fund accounts through Connect Network, ViaPath Technologies' one-stop resource for assisting family and friends in connecting and communicating with their incarcerated loved ones. Learn more about Connect Network and how to get started. (web.connectnetwork.com/get-started-cdcr)

- The tablets provide a variety of communication options, including domestic and international telephone calls, video calls, video messages, e-messages, e-cards, and photo sharing.

- Phone calls are free. Additionally, incarcerated individuals are entitled to a complimentary 15-minute video call every two weeks. Additional video messages, previously complimentary, now incur a charge of $0.20 per minute.
- Since January 1, 2023, incarcerated people have received 20 free e-messages per week, with the state of California covering the cost of 15 messages and ViaPath covering the remaining 5.

- As of July 1, 2024, the state of California will cease funding the 15 free e-messages per week, while ViaPath will continue to cover 5 free messages per week. Any messages beyond the 5 allocated by ViaPath will be subject to a charge of $0.05 each for both inbound and outbound messages.

# Exhibit C

# Memorandum

Date : FEBURAY 08,2024

To :

███████
ECHO FACILITY,
CAPTAIN
CSATF/SP

Subject: ECHO FACILITY,CAPTAIN AGENA FEBURAY 2024

The Echo Facility Inmate Advisory Council, Executive Body
in behalf of the Population would like to discuss the
following concerns.

### Concern #1: Law Library

The population would like a update as to when the Library
will have a full time worker? It is going on three (3)
years now.

### Concern #2: Mental Health

The IAC is requesting update as to when will the next
Meeting be held. Do to the no going issues or lack of
Mental Health. How long dose it take for a inmate to be
seen, on a Mental Health (Emergency) Referal.

### Concern #3: Food Sale

The IAC has done everthing to help can the process start.
The Food Sale promoting pro-social donation to the community
In delaying will only show umpreparedness and build resentment.

### Concern #4 Via-Path Tablets

The Echo Facility is requesting the expanded access to the
Via-Path (tablet) telephone service's. As to mirror A-B yard
times. 0700-1630 hur to 1730-2130 hurs. This will continue
to build family and community ties.

### Concern #5 Title 15's/Inmate Orientation OP.166

The Inmate Population is requesting that the Title 15, as well
as the Inmate Orientation OP.166 Manual's be provided.so as
the population has all the information needed to effectivly
conducat, understand what are the set policy and/or procedures
are for this facility.

### Concern #6 GYM/YARD

The population is requesting a update on the GYM. When will it
be fixed? Population is stating that the yard looks like trash.
Add resolutions. They inmates not assigned because
to hold a fix no the yard.

SUBJECT:    ECHO CFACILITY, CAPTAIN AGENA "FEBURAY 2024"

## Concern#7 Living Condition

The population is requesting that a remedy be found or made so as all inmate will meet California Code of Regulations Title 15,Article 5. 3060 personal Cleanliness 3061 Personal Hygiene, bathing etc. butont limited to. see; section 5058 penal code.The population is requesting that 2-4 washers and dryers be placed into each building so as the popualtion may have physical hygiene, personal cleanliness to meet C.C.R's policy. Or that hooks be sold and a area in one's cell be allowed for drying work/personal clothing. *or workers be allowed extra blues, and whites*

## Concern#8 Partition

The population is requesting a remedy on these out-dated policy and/or decision. Inmates are being frosted to used the restroom in front of each other. This is not only a embarrassment and indignity, but more then anything degradation. Under the new policy and/or decisions (PREA) provisions should be made for uncertan future events. I beleave that reasonable protection should appy from the constant threat of violence and sexual assault, we need not wait until an assault occurs to obtain relief.

## Concern#9 IAC Equipment

For the past 6-8 months now, Echo Facility IAC's out-dated equipment has not allowed the IAC to carry out it's approved activities. The Chairmen at these times has been utility his personal typewriter and supplies. It is taking a toll on family and loved one's. The IAC is requesting do to the cost of paper and/or correction tape, replacement ribbons, and replacement wheels. That of the Dell computer's that are utilized for college courses. As well as meet the California Code of Regulations and policy. *IAC is under the impression that Dell computers are used for College courses. Inc is requesting Equipment to assist in its Day today Activities*

ECHO FACILITY, ████████
CHAIRMAN
CSATF/SP

████████████████████

ECHO FACILITY,
CAPTAIN
CSATF/SP

_____

[APPROVED/DISAPPROVED]

# Exhibit 7

**DECLARATION OF** ████████ ████████

I, ████████ , declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation (CDCR) number is ████ . I am currently housed at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), on C yard. I am 46 years old.

3.      I have been incarcerated in CDCR on my current term since March 14, 2017.

<u>Hearing Disability</u>

4.      I cannot hear much with my right ear. The sound that I hear with my right ear isn't clear. I also have hearing loss in my left ear, though hearing in my left ear is more normal. CDCR has assigned me a DNH code.

5.      I am prescribed hearing aids for both ears but I don't currently have working hearing aids; they broke in February or March of this year.

6.      I have trouble hearing even when I have my hearing aids, especially in certain settings. It's very difficult to understand what people are saying in the dayroom because of background noise – television, people playing cards, slamming dominoes, people talking on the phone, the shower running. All of those different sounds echo. I look at people when they speak and try to read their lips and facial expressions. This helps to a certain extent, but it's still agitating to be in such a loud environment where I understand so little.

7.      I also have trouble understanding speech in the classroom. I was on D yard when I first transferred to SATF and was enrolled in Transitions, a class that helps people prepare for release. I had my hearing aids then, and they helped some, but I still felt like I missed things. It was especially hard when there was background noise from other people in class talking during a lecture or when we watched a video. It made me so frustrated not to understand – I needed to learn the content in Transitions, like how to open a bank

1

1  account, because it's stuff I've been away from for the last seven years. I have a daughter

2  and it's important for me to be able to show up for my family when I get out.

3  <center>TTY/TDD</center>

4    8.    I have used a teletypewriter (TTY) for phone calls for years while in CDCR

5  custody. I have used it because of my hearing disability and because the sound gets

6  distorted when I used the dayroom phone with my hearing aids even with volume control. I

7  also used it because I sometimes call loved ones who use TTY, including my daughter who

8  is mute.

9    9.    It was a headache to use the TTY at SATF.

10    10.    When I first got to SATF on October 16, 2023, I was housed in Building D3.

11  When I was there, I asked an officer if I could use the TTY. They responded, "What is

12  that?" The officer did not help me access it.

13    11.    I then put in a request to the ADA sergeant on D yard to use the TTY when I

14  was in D3. He later told me that he never got my request. _I was in D3 for around a month and I wasn't able to use the TTY at all while I was there._

15    12.    When I came off of orientation status, I was moved from D3 to D4. The TTY

16  on D yard is in D2, so I wanted to move to D2. I told officers that I wanted to be housed in

17  D2 because I needed to use the TTY. They would not allow that, and I ended up agreeing

18  to move to D4 because the officers threatened me with a 115 (Rule Violation Report) if I

19  didn't.

20    13.    In order to access the TTY while I was housed in D4, I would have to get the

21  tower officer in my building to unlock my cell and let me out of the building so I could go

22  to D2 where the TTY was. When I asked the tower officer directly, he wouldn't let me out.

23  There were two regularly assigned floor officers who got me let out most of the time I

24  asked – they would talk to the tower officer for me. But the tower officer would only let

25  me out if the regular floor staff told him to.

26    14.    I asked a few times to be allowed to use the TTY during modified

27  programming but staff wouldn't usually let me out. I was told, "We don't do phone calls

28  during lockdowns." The last time I remember that happening on D yard was at the end of

<center>2</center>

1    February 2024. I thought about filing an 1824 but I didn't because I figured they just

2    would've denied me anyhow.  → *see pg. 8 for additional*

3                                    Announcements

4        15.    Like I mentioned above, it's difficult for me to understand what people are

5    saying in the dayroom. The same is true for announcements made over the public address

6    (PA) system. I can usually hear that an announcement is happening, but I often can't

7    understand what the officer is saying.

8        16.    There have been a few officers who I could understand over the PA system.

9    An officer who used to work in the tower in my building was very loud and very clear

10   when he made announcements, and there is an officer who works in my building on one

11   shift two days a week who I can understand. Most of the time, though, I can't understand

12   announcements over the PA system, and I need to rely on someone else to tell me if the

13   announcement related to me and what it was for. *I have a particularly hard time understanding the regular tower officer who does not speak clearly. S.B. 8/15*

14       17.    Some of the tower officers who work in my building just recently started

15   flashing the lights when they make an announcement. Not everyone does it – to my

16   knowledge, one of the regular tower officers has never flashed the lights for an

17   announcement – but other officers flash the lights consistently. *still, flashing the lights doesn't tell me what the announcement is for, only that it's happening. SB 8/15*

18       18.    Some announcements made over the PA system only apply to one person,

19   like announcements for medical appointments. Other announcements apply to multiple

20   people, like announcements for education or yard release, packages, law library, or open

21   line laundry.

22       19.    I rarely get ducats for either individual or group appointments. I've gotten a

23   few ducats for physical therapy, but I otherwise don't remember ever getting a ducat for a

24   medical appointment. The only ducats I get consistently are for sweat lodge. Incarcerated

25   people are supposed to sign that they received a priority ducat, but staff who distribute

26   ducats don't always ask us to or give us the chance to sign.

27       20.    When I do get a ducat, the time is often wrong, sometimes by hours. For

28   example, I might get an 8 am ducat but not get called until 12 pm. Staff won't let you out

→ *Sometimes staff only give me the chance to sign for a ducat if I say something about it, but even then, staff don't always let me sign for the ducat anyways. SB. 8/15*

3

1   at the time on the ducat. When I have told staff that I have a ducat, the officer has

2   responded, "They'll call for you."

3       21.    I was referred to see physical therapy, and I saw the physical therapist once

4   earlier this year. I thought I was going to keep going, but they stopped calling me.

5       22.    At some point in May, a woman came around to my door before breakfast

6   and asked why I'd been missing physical therapy. I told her I didn't know that I had

7   physical therapy, but that I'd go if I was called. I didn't sign a refusal form. A *and she didn't ask me too.*

8   representative from the Prison Law Office showed me the refusal form below, which they

9   said appears in my medical record. *Nobody ever asked me to sign this form.*

       *S.P. 8/15*



### REFUSAL OF EXAMINATION AND / OR TREATMENT

| PATIENT NAME (TYPE OR PRINT CLEARLY) | CDCR NUMBER | INSTITUTION |
|---|---|---|
| ██████ | ██████ | SATF |

Having been fully informed of the risks and possible consequences involved in refusal of the examination and/or treatment in the manner and time prescribed for me, I nevertheless refuse to accept such examination and/or treatment. I agree to hold the Department of Corrections and Rehabilitation, the staff of the medical department and the institution free of any responsibility for injury or complications that may result from my refusal of this examination and/or treatment, specifically:

Describe the examination and/or treatment refused as well as the risks and benefit of the intervention:

*Patient refused virtual PT on 5/28/24 for weekly visits. Patient states no one called for him, but kls. Re-educated patient on the visits & benefits of keeping medical appts.*



| PATIENT SIGNATURE | DATE. | ☒ PATIENT REFUSES TO SIGN | DATE 5/28/24 |
|---|---|---|---|
| | | WITNESS | |
| NAME OF WITNESS (PRINT/TYPE) | | | |
| WITNESS SIGNATURE | DATE 5/28/24 | | DATE 5/28/24 |

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | CDCR #: ██████ |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☑ Additional time | ☑ Patient asked questions | Last Name: ██████ |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☑ Patient summed information | First Name: ██████ MI: |
| ☐ DPS ☐ DNH | ☐ Louder ☑ Slower | Please check one: | DOB ██████ |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached? ☑ Reached | |
| ☑ Not Applicable | ☐ Other* | *See chrono/notes | |
| 4. Comments: 0510 | | | |

23.     A representative from the Prison Law Office also told me that there is a note in my medical record from May 17, 2024, that says: "specialty clinic officer stated that pt refused to come to CTC for PT appt." *I never refused an appointment - I didn't know that I was called for physical*

24.     I went to physical therapy one other time after the woman came to my door. *therapy that day.* That was when a non-regular officer was working that day and asked me personally if I wanted to go, not through the PA system. *S.B 8/15*

25.     I also have trouble understanding announcements when I'm on the yard. Sometimes announcements on the yard come from the observation tower, but other times they are made by the building tower officers. *→ see pg. 9 for additional*

26.     When I was on D yard, I missed an appointment with the woman from parole services because I was out on the yard. I don't know if staff called me for that appointment. If they did, I didn't hear it, and no one came and told me that I had been called. *I learned that I missed the appointment when she came back the next day to meet with me. S.B 8/15*

27.     I filed an 1824 in February asking for a service dog because I don't hear a lot of the time when the tower calls me or I'm being paged on the PA system. I thought a service dog might be able to get my attention. The 1824 was assigned the log number 522096.

28.     No staff person came and interviewed me about my request, the problems I was having hearing announcements, or potential solutions. I just got a written denial about a month later.

29.     The Reasonable Accommodation Panel (RAP) misunderstood my request. The written response I got from the RAP said that I was "not requesting an accommodation at access Programs, Services, or Activities (PSA)s while incarcerated," and that someone would meet with me to help me with a benefits application for when I'm released. I think they thought I was asking for a service dog when I go home, but I was asking for one right now. The RAP didn't say anything back to me about the fact that I'm not getting announcements. *This RAP response, and other denials I've gotten from the RAP make me feel like there is a culture of denying requests, even when an individual officer might be willing to grant the request.*
*S.B. 8/15.*

5

30.     I also wrote up a regular officer in my building for not making announcements. I don't hear him call me when I have a medical appointment and I'm out on the yard. And when I do hear him make an announcement, I can't understand him at all because he mumbles.  → see page 9  for additional

<u>1824 Process</u>

31.     My teacher in Transitions, the class on D yard that I mentioned above, recommended that I ask for captioning for class. She told me there was a new program for captioning that might help me understand lectures and videos that she'd show us. She had tried to have me move up closer to the front of the room or sit by the speakers, but that alone didn't let me hear or understand everything happening in class.

32.     Based on what my teacher told me, I thought captioning could help me for other things too, like medical and mental health appointments. I especially have trouble understanding the provider at telemedicine appointments when they have an accent I don't recognize and can't hear well or when there's noise in the background.

33.     I filed two 1824s in March requesting captioning. The log numbers for those 1824s were 534889 and 539828. In the first 1824, I asked for a special tablet that does closed captioning. Then I learned from the Prison Law Office about the CART program for captioning, so I filed a second 1824 asking for CART for appointments, pre-release meetings, medical, and Transitions.

34.     Both responses from the RAP denied my request for captioning. The response to my first 1824 said that CART and the iPhone/iPad that provides captioning are only for people with hearing loss who use written notes for effective communication. The RAP said that "A review of SOMS indicates that you are designated DNH with a primary EC of hearing aids and alternate of need staff to speak loudly and clearly." The response to my second 1824 said that "With your hearing aids and [Personal Sound Amplification Device (PSAD)], you have demonstrated an ability to maintain a functional hearing level which enables you to achieve effective communication without written notes. Your current effective communication history demonstrates your ability to effectively communicate

6

1 with your current assistive devices and required methods of communication, which are the

2 use of your hearing aids and for staff to speak loudly and clearly."

3      35.    I do have a PSAD. I use it to listen to my television inside the cell, but it

4 doesn't help me in the dayroom because of the way sound echoes in the dayroom, and it

5 doesn't help me in other settings because of background noise.

6      36.    No one interviewed me about my 1824s, so I don't know how the RAP

7 decided that I can communicate with my hearing aids and PSAD alone in all prison

8 settings. The reasons given in the responses didn't make sense to me. Why don't I need the

9 accommodation? What's the reason? I would've wanted to explain my situation at the

10 RAP. It seems like they never call incarcerated people to be there, but a lot of people can't

11 articulate properly when they're writing – I'm a better speaker than I am a writer.

12      37.    Every 1824 I've filed since I got to this prison hasn't addressed my issue or

13 has been denied. They deny you, deny you, deny you, just because they can, until you push

14 the issue and do something extreme. It's more frustrating than I can say. The 1824 process

15 is supposed to be to help me. Just because I'm not completely disabled, they just

16 automatically want to deny me because I'm not completely deaf or quadriplegic. In the

17 normal world, I have an elderly mother, family with mental disabilities, and my dad was

18 paraplegic. I know the accommodations on the street are much easier to get, but I don't get

19 even basic accommodations just because I'm in prison. I'm still a human being.

20

21      I declare under penalty of perjury under the laws of the United States of America

22 that the foregoing is true and correct, and that this declaration is executed at Corcoran,

23 California, on this _____ /5 _____ day of August, 2024.

24

25

26 

27

28

7

14.5.   I couldn't always use it when I wanted to call my family or needed to make other calls to get ready to go home. I probably used the TTY dozens of times at SATF but I would've used it more if staff had let me and I didn't have to jump through so many hoops to get to the phone. I was moved to C yard in March 2024. I now only use my tablet to make phone calls from inside my cell because I've been denied the TTY so many times that I want to avoid the frustration and stress of being denied communication with my family, especially as I am so close to being released. I don't want to have any problems with staff. I was also recently provided over the ear headphones with a microphone to use with the tablet, and I do not have a cellmate, so my cell has less background noise, which allows me to hear my family. However, I cannot use the tablet calls to communicate with my daughter because she is mute and cannot use a regular telephone to respond to me. The only way we have of communicating over the tablet is using the messaging app, which costs 5 cents per message (2,000 characters maximum per message). Sometimes the wifi goes out when I'm in the middle of writing a message to my daughter and the message is completely lost.

S.P.  8-15-24

25.5.   I have the same problems understanding announcements made over the speakers on the yard as I do understanding announcements made over the PA system in the building, and in fact, it is usually harder to hear announcements on the yard because it is a larger open area with more activity going on.

S. P 8/15/24

30.5.   In this grievance, I also included details about other ways that the officer doesn't do his job, that affects staff's safety and policy, in the hopes that addressing staff safety would make CDCR take the 602 more seriously.

S.B 8/15

30.5 continued   Because of my hearing, I don't know whether I just can't hear him or if he's not making the announcement at all. Nothing has changed since I filed the 602 and I haven't yet gotten a response.

No matter where I am in the prison, I need to know if staff are making an announcement, if the announcement relates to me, and what the announcement was for. I thought a service dog might help alert me to announcements so I could ask for clarification, but SATF denied me that accommodation. My tablet isn't an option because I can't take my tablet onto the yard and I need announcements there too. It would be helpful to have something I could wear or take with me to different areas to alert me to announcements.

S.B 8/15

9.

# Exhibit 8

1                **DECLARATION OF** █████████

2      I, ████████ declare:

3      1.      I have personal knowledge of the matters set forth herein, and if called as a

4 witness, I could and would competently so testify.

5      2.      My California Department of Corrections and Rehabilitation (CDCR)

6 number is ████. I have been in CDCR custody since December 14, 2010. I am 66 years

7 old.

8      3.      I am currently housed at the San Quentin Rehabilitation Center (SQ). Before

9 I was at SQ, I lived for over ten years at the California Substance Abuse Treatment Facility

10 and State Prison, Corcoran (SATF). I was housed at SATF from 2011 until October 2023,

11 when I transferred to SQ.

12                        <u>Hearing Disability</u>

13      4.      I am deaf. I have had hearing loss for my whole life, but I really lost my

14 hearing as an adult when I was in county jail. I used to be able to hear a little with a pocket

15 talker in quiet, one-on-one settings, but that was only for a short time and is no longer true.

16 I don't wear hearing aids because they don't help me.

17      5.      The only way I can effectively understand what is going on around me is

18 through written notes. I don't read lips. I am starting to learn American Sign Language

19 through a class here at SQ, but I am not fluent yet.

20      6.      In December 2022, the Court Expert in the *Armstrong* case submitted a

21 report about treatment of people with disabilities at SATF. In the report, the Court Expert

22 wrote about a deaf person who did not know sign language, who the Court Expert called

23 "Person E." I am Person E.

24                         <u>TTY/TDD</u>

25      7.      Because of my hearing, I can't make voice calls using the dayroom phones

26 or the phone call application on the ViaPath tablets. The only way I can reliably make

27 phone calls is with a phone that captions what the person I am calling says. One option for

28 making those calls is TTY.

8.     When I was at SATF, I was told that the TTY was broken and then that it was removed and wasn't available anymore. Because of that, I didn't make phone calls for a long time. I tried to keep in touch with my family through email, but they didn't always check their email or have an email address, and I eventually lost touch with several members of my family.

9.     Finally, I learned that there was supposed to be a TTY on my yard. I asked to use it in March or April 2023. I thought I'd try to call my family because everything else had failed. I tried it probably a dozen times that day – seven times in the morning, and four or five times in the afternoon, but it never worked. Everyone got involved – ADA workers, custody officers, other inmates. There was no privacy.

10.    After that, I decided I didn't want to mess with it anymore. I've been denied accommodations so many times, it feels like the same problem over and over when things like that happen. It's just trouble, and I get too tired of it. I didn't want to bother anyone with it anymore.

11.    A week after that, a lieutenant came to talk to me about the TTY. I told the lieutenant it didn't work and that I didn't want to use it anymore.

12.    Then a week after that, right before I met with someone from the Prison Law Office, staff sent me a note saying that they'd gotten the TTY fixed. I waved them away to say no, I didn't want to use the phone – it had been such a circus when I tried the first time. I said thanks for the update, but I don't want to use it.

13.    I tried to use the TTY again one time after that. The officer told me that I had to go to an ADA worker who had been trained to help me make the call. I wasn't trained myself. I said never mind – I didn't want to get involved in making a call with an ADA worker, since making a call means giving personal information. I haven't used the TTY since then.

<div align="center">Captioned Phones</div>

14.    A representative from the Prison Law Office told me that captioned phones were coming to SATF. I waited for the captioned phone for a very long time. Finally, in

<div align="center">2</div>

September 2023, someone from the Inmate Advisory Council (IAC) on my yard at SATF told me there was a captioned phone in the chapel on that yard (G yard).

15.    On the morning of September 13, 2023, the ADA Coordinator from the IAC (an incarcerated person) came with me to the chapel to sign up with the ADA sergeant to use the phone. The ADA sergeant wasn't there, so I left a note saying I wanted to make a call on the captioned phone that day or the next morning.

16.    That evening, an ADA sergeant came to talk with me, the ADA Coordinator for the IAC, and the housing staff in my unit. After the sergeant talked with the housing staff, the sergeant told me that the housing staff didn't have any sign-up sheets for the captioned phone, and that the sergeant would need to email a supervisor about adding me to the schedule for the phone the next day. The next morning, the housing staff finally called me to sign up to use the phone.

17.    I tried to call the Prison Law Office on the morning of September 14, 2023. An ADA sergeant was with me. We had to try making the call several times before the call actually connected, using two or three sets of instructions. When it connected, the quality of the connection was poor – I could tell by the responses I was reading that the person I was talking with didn't understand me. Then the call disconnected three times.

18.    After that, I gave up. I got so frustrated with the phone. It seemed like every time I wanted the phone, there was a problem, so I just let it go. I did file a grievance though, to tell CDCR how frustrating it was that after waiting so long for the captioned phone, I wasn't invited to the IAC meeting where it was introduced or told about it directly. I felt like I was the last person to find out about it, even though everyone knew that I needed it. It was like being told to go to an ADA worker to use the TTY all over again.

19.    I talked with the Prison Law Office on a confidential call after that. We didn't use the captioned phone – we had a video call where the representatives from the Prison Law Office shared their screen and typed notes to me. A representative from the Prison Law Office asked me about what would need to be better with the process for

signing up for and using the captioned phone, then asked me if I would be willing to try the captioned phone again. I told them I would try to sign up if they wanted me to. The Prison Law Office told me they would send an advocacy letter about my access to the captioned phone.

20.    I tried to use the captioned phone to call the Prison Law Office again a few days after that. An ADA sergeant was supposed to help me with the call, but we tried the Prison Law Office number and the number for the prison a dozen times and it either wouldn't connect or it wouldn't connect with captions. I had a set of instructions that I had asked for, and we followed all the steps – making sure the red light for the captions was on and dialing "9" for long-distance calls – but the call still didn't connect. I left because it wasn't working.

21.    I don't know what happened when I was gone, but I was called back to use the phone and there was a lady talking with someone from the Prison Law Office who got the call to connect. I wasn't sure what she had done to fix it.

22.    I tried calling the Prison Law Office again one more time that day with the ADA sergeant to test the instructions. The ADA sergeant said I shouldn't dial a "9," but I had tried that and it didn't work. After that, I still wasn't sure what I should do to use the phone.

23.    Because I still wasn't sure how to use the phone and didn't know if the connection problems had been worked out, I didn't want to use the captioned phone to call anyone but the Prison Law Office, including my family. I didn't want to be wondering if the reason I couldn't connect with someone was because of problems with the captioned phone – I wanted to know for sure that if I couldn't reach someone, it was for some other reason.

24.    There is a captioned phone at SQ, where I am now. The only captioned phone I know about is at 4 Post, which is in the front of the prison outside of my housing unit. I've tried to use the phone a few times, but I've had problems using it here too. To use the phone, I need to put the phone on the lid of a trash can the staff have there outside

4

of 4 Post, so that I'm standing outside even if it's raining. I can't use the phone if it's foggy because there's no movement allowed when there's fog, so I can't leave my housing unit. The officers are also standing right there, so I have no privacy. When I have tried to use the phone, I've been turned away, even at times I've signed up, or the phone hasn't worked. I've given up using the phone here too. I'd try to use it if it were in my housing unit – I think it would actually be accessible to me there.

<div align="center">Captioning</div>

25.    Because I am deaf, I need captioning for other settings too, not just to use the phone. I asked for CART for captioning five years ago, in 2019, when I was at SATF. I still have never used CART for a class, church, group, or other program.

26.    In August 2023, when I was at SATF, there was a meeting on my yard about CART. During the meeting, I had a laptop that showed closed captions. I tried to follow along as best I could, but there were so many misspelled words and incomplete sentences. It scrolled so fast that I couldn't read it. It also looked sometimes like it was fast forwarding – it would put out one sentence then go to the next sentence, without time to read the first one. I didn't catch much. I don't think the laptop with closed captions was CART. The only thing I understood was a pre-made video they showed of CART on a laptop, because the video had already been captioned. No one came to talk to me about what happened after that, so I still don't know what was presented. All I got from that meeting was that CART is new, they were only doing it for certain things (although I wasn't sure what), staff are still in training, and that I should file an 1824 to get it started.

27.    The training made me feel excluded and even more confused than I was before. I don't think they showed CART, which I would've wanted so we could actually see how it works and what was being said by others at the meeting. I didn't have any idea what the other deaf and hard-of-hearing people at the meeting were talking about, because the captioning I was seeing on the laptop made absolutely no sense.

28.    I knew by that time that I would be transferring to SQ, so I didn't file an 1824 to ask for CART. I wasn't interested in trying at SATF anymore – nothing worked

<div align="center">5</div>

when I was there – and I wanted to get out. I didn't want to deal with that institution anymore for anything. I decided to wait until I got to SQ to see if they had CART.

29.    I learned later that staff use CART for only due process, like when you're in trouble and have a 115 hearing or you have committee. CART still isn't provided for programs. That makes me frustrated, because it seems like CART is only used when it makes things easier for CDCR staff. I thought the whole idea behind CART was that I could use it for me, for my program, so I can understand my programming. But it feels like for that, they're dragging their feet.

30.    Like I said above, I still don't have CART for programs, but I now have an iPad in an orange case for captioning. It's better than nothing, but it took a long time to learn to use. At first, the words would disappear before I'd finished reading them, and I couldn't go back to see what I'd missed. I would have to constantly look at the screen to see what was said, and if my attention was pulled away for just a second, I would miss big parts of a conversation.

31.    I've figured out how to keep more words on the screen now, but I still have problems with the captions on the iPad. The captions on the iPad often miss words and even full sentences. The range isn't very good. If the microphone isn't directly next to the speaker, then sometimes nothing will show up at all. It's even worse in settings with background noise. Words are often misspelled, which makes conversation hard to follow. And sometimes the captions on the iPad show profanity, and I have to ask if someone actually used the word that showed up on the screen. Often they didn't – the iPad just added profanity where no one actually used it. For example, when I met with representatives from the Prison Law Office last year, the iPad captioning transcribed something they said as if they were cussing me out, saying b-tch and f-ck. I asked if that's what they had said – they said no.

32.    The captions on the iPad also don't tell me who is speaking.

33.    I have a lot of trouble using the iPad in certain settings. Earlier this year, I was enrolled in a substance abuse class called ISUDT. The class was held in the gym. A representative from the Prison Law Office showed me the photographs of the gym below.





34.     These photographs look like the gym at SQ, although I've never seen beds in the gym. Instead, the gym was divided into eight to ten different bays, where different class groups met, including my class. The bays were divided with collapsible panels that were around eight feet tall. There were no roofs on the different class bays.

35.     There were around 12 people in my class, plus the counselor/teacher and a mentor (an incarcerated person). The room was set up with six tables in a horseshoe shape, facing the teacher and mentor's table at the front. I sat at one end of the horseshoe so I was closest to the teacher.

36.     I tried to use my iPad in the class, but the iPad caught so little. I set it up so the microphone faced the teacher, but then I could only understand her. Even then, I could only read what she said when she faced me directly. If she turned her head even slightly away, I couldn't understand her.

37.     I couldn't understand most of what happened in the class, so I stopped paying attention unless I saw the screen of my iPad light up. Then I knew that the teacher was probably facing me, speaking to me directly, and I would respond to her questions as best I could. I never understood what any of my classmates were saying or what the teacher was saying to other students. I think I missed probably 97 or 98% of everything that was said in that class.

38.     I've also tried to use my iPad at medical appointments. I often see the doctor on telemed, which means they're on a computer screen, and there's a nurse in the room with me. When I've tried to use the iPad to transcribe what the telemed doctor is saying directly, it doesn't pick up anything. I've tried to explain that to medical staff, but they don't always understand me at first. I have to teach them that the iPad won't pick up anything unless it's very close to the person speaking.

39.     When the iPad won't pick up what the telemed doctor says, the nurse in the room needs to repeat it to me. Even then, the captioning on the iPad often misses or misspells words, especially medical terms. Because of that, I'm not always sure that I've understood everything that medical staff is saying or if my understanding is correct.

40.     Medical staff have offered to handwrite notes to me, but I've noticed that when they handwrite notes, they write much less than the iPad transcribes (even if what the iPad transcribes isn't helpful). That makes me doubt that I'm getting all the information I should from handwritten notes.

41.     In January this year, I filed an 1824 asking for live closed captions for medical appointments so that I can communicate directly with the doctor. The log number for my 1824 is 511002.

42.     I don't remember anyone coming to talk to me about the 1824. Instead, I just got a response from the Reasonable Accommodation Panel that said that CCHCS equipment couldn't do closed captioning, and that medical staff would write notes to me legibly.

43.     Like I explained above, I don't think I get the same amount of information when staff write notes or when the nurse has to repeat what the doctor says, which makes me worry that I'm missing something related to my health. I see a few different specialists and I have multiple conditions I'm being treated for. Some of my medication hasn't been effective, so my doctor wants to do more examinations and might want to try other medication. It's important to me that I have all the information that I could need, but I don't feel right now like I have a totally clear understanding of what's going on with me or why.

44.     I also told ADA staff here that I want a microphone to use with my iPad to try to enhance the quality of sound and hopefully the quality of captions. I was told they don't hand them out individually. I suggested to ADA staff that they have microphones stationed in different places in the prison so I can check them out for use in those locations for programs and groups. The person I talked to, the CAMU CCII, said he would take it back to the group and discuss it, but I haven't heard anything since then. That was a few months ago.

9

45.     Last year, staff at SQ showed me two kinds of captioning. One board was smaller, with complete sentences, which showed multiple lines of text. The other board was larger, with two or three lines of text at the top.

46.     The larger board with two or three lines of text showed captions way too quickly for me to read. I preferred the board with complete sentences and multiple lines of text, so that I could follow along. Without multiple lines of text to orient myself to the conversation, I was worried that I missed important information. I have the same problem with the iPad – it might transcribe a full screen of text, but sometimes when it gets to the end, everything disappears instead of scrolling, so I'm lost if I didn't read to the end quickly enough. During the demonstration, I turned to watch the screen with more lines of text to understand what was going on, then looked at the screen with fewer lines of text and my iPad to see how much they were actually picking up.

47.     During the demonstration, the other deaf participants and I told AW Rosalez, the ADA Coordinator at SQ, that we needed more lines of text on the board with only two or three lines if it was going to be helpful. It just moved too fast for any of us to keep up.

48.     During the demonstration, the other deaf participants, who all use sign language, also said that the board with two or three lines transcribed some words differently than the sign language interpreter had interpreted them. They told AW Rosalez that they wanted to have a sign language interpreter inset in the corner of the screen, so they could compare what the interpreter was signing to what the screen was transcribing and hopefully understand more.

49.     After the demonstration, I filled out a written survey. A representative from the Prison Law Office showed me the survey below, which looks like the survey I filled out.

//
//
//

Questionnaire for DPH class members          Date: _12-7-23_

Name_[redacted]_          CDCR#_[redacted]_

DPP Code:_ DPH _

On behalf of CAMU, we'd like to thank you for voluntary participating in our CART/ViewSonic closed captioning demo at San Quentin. We appreciate you answering the questions below and providing CAMU your feedback. Thank you!

**Question#1:** Please tell us your opinion about the ViewSonic board closed captioning demo which was held in the Chapel? _Both screens are excellent for me._

**Question #2:** Please tell us your opinion about the CART services demo which was held in the Chapel? _The voice activated is far better than getting a stenographer._

**Question #3:** Which services would you prefer (the ViewSonic board or CART)? _Both are good_

**Question #4:** What do you think about the iPad translation app? _The microphones should be able to pick up better on softer voices and a little further of distance_

**Question #5:** Do you have anything else to add for us to consider (i.e sonic view board, CART, iPad)? _yes - add an extra line and maybe as suggested to have an interpreter in corner of screen_

_? How are you going to put these in motion to each class—when we are in different programs?_

50.     In the survey, I said that both screens were excellent. When I said that, I was referring to the microphones. I also had my iPad at that meeting, and I saw that both screens were picking up the speaker much better than the iPad. I actually had to move to be closer to the speaker during the meeting to try to get my iPad to pick up what they were saying, but even that didn't work.

51.     In the survey, I said that having a voice-activated screen was better than having a stenographer. I thought both screens they showed were voice-activated. What I meant was that generally, it's probably easier to use a voice-activated screen than to hire a

11

stenographer. What I need is for something to be accurate, and for there to be enough lines of text visible at a time that I can keep up, review the content, and understand what was said. It doesn't matter to me if it's a human transcriptionist/stenographer as long as it works for me.

52.     I also said in the survey that the larger board should have another line. Of the two boards they showed at that meeting, only the one with more lines of text worked for me. I haven't seen or heard anything about that or about the whiteboard since the demonstration.

53.     There was an event here on the yard earlier this month about changes at SQ. I sent a GA-22 form to the ADA office asking for a speech-to-text device so I could follow along and give feedback and my ideas, since my iPad wouldn't work on the yard. I also need captions in larger font because my vision isn't too good. I got a response after the weekend the event happened, with a few pages of information about the event.

54.     I feel that it's hopeless to continue trying to get something that I've been fighting for since I learned about it, years ago. It's hopeless to keep trying to get something that will help me get in programs. I'm fatigued and I'm frustrated. I'm tired of getting my hopes up. I don't have any more moxie, no more get up and go energy. It's the same thing again and again – dead end, brick wall.  I don't want to keep filing 1824s. I shouldn't have to wait for something I need now. I can't go to veteran groups, I can't go to church, I'm not getting anything. I feel defeated. If it happens, it happens. If it don't, then it don't.

55.     I'll keep going to programs whether I learn something or not. But I have the parole board in a few years, and I feel like I'm behind. I don't know what I'll tell them when they ask what I learned in my groups. I worry about not being able to explain myself and being criticized, like people often do when I try to explain that I'm deaf, I don't know sign language, and I can't read lips. I read in the San Quentin newspaper about people who have been here for years and keep doing all kinds of programming. They're old and they keep getting denied at the parole board. I see them, and I think, that could be me.

56.     All I really do is read books, play games on my tablet, and sometimes go to the yard, because there's nothing else for me here. I can't play sports because I only have one kidney, I can only exercise a little bit, and it's lonely and boring. With the changes happening at SQ, I worry that if I don't do programs and really participate, they'll ship me off somewhere else and I won't have the opportunity to try anymore.

<u>Announcements</u>

57.     When I was at SATF, ADA workers would sometimes tell me about announcements. They very rarely brought a whiteboard with them to explain what the announcement was for – they would just expect me to hear them or read their lips, or they would tell someone else in the cell who was trying to learn sign language to fingerspell the information to me. Sometimes I would go to the podium to learn what had happened, and the officer would ask, "didn't they tell you?" I would explain that the ADA worker hadn't given me a note and that I didn't know what the announcement was for. Eventually ADA workers stopped coming to tell me about announcements, and I just had to rely on someone in my pod to tell me what an announcement was for and if it related to me.

58.     A representative from the Prison Law Office told me that CDCR was considering asking people at SATF designated DPH regularly whether staff and ADA workers provided individual notification of announcements to them. I've told staff before when ADA workers haven't given me announcements like they should, or when staff don't give announcements, and nothing changed. Sometimes things even got worse. I'm not sure how telling staff if I didn't get announcements would change anything – nothing really improved the whole time I was at SATF.

//
//
//
//
//

13

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at San Quentin,

3  California, on this _20th_ day of August, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

Exhibit 9

1          **DECLARATION OF** ███████████████

2     I, ████████████ declare:

3     1.     I have personal knowledge of the matters set forth herein, and if called as a

4     witness, I could and would competently so testify.

5     2.     My California Department of Corrections and Rehabilitation (CDCR)

6     number is ██████. I am currently housed at the California Substance Abuse Treatment

7     Facility and State Prison, Corcoran (SATF). I am 47 years old.

8     3.     I have been in CDCR custody since 2004. I have been housed at SATF since

9     October 2023. I currently live on Facility A at SATF, which is a Level II yard.

10                              Hearing Disability

11    4.     I am hard-of-hearing. I did not have hearing problems before I entered the

12    military. In the military, I was exposed to frequent explosions, and I think that is what

13    damaged my hearing. My hearing has been getting worse. I have constant ringing in my

14    ears, which makes it difficult to hear and focus on what is going on.

15    5.     I have been reporting problems with my hearing for a while, and even saw an

16    audiologist around 2010 or 2011 when I was housed at Lancaster. They told me I had

17    hearing loss. But it wasn't until June 2024 that I got designated as having a hearing

18    disability. CDCR now classifies me as DNH. I also got hearing aids and a pocket talker.

19                              Individual Assessments

20    6.     Rita Lomio, an attorney at the Prison Law Office, told me that CDCR had

21    hired an Assistive Technology Professional. I hadn't heard of an Assistive Technology

22    Professional before, but Ms. Lomio told me that CDCR said that the person conducted

23    individual assessments of four deaf people at SATF to determine their specific

24    communication challenges, evaluate the environments in which the individual

25    communicates, assess their assistive technology needs, and create a tailored plan to meet

26    those needs.

27    7.     An individual assessment like that would be really helpful for me. I do not

28    have much knowledge of what accommodations can help me. Like I mentioned before, I

                                        1

only started losing my hearing when I was in the military, and I went from the military to being incarcerated. When I was given hearing aids and a pocket talker earlier this year, I thought that was all I had coming. I didn't know what my rights are and what other possible accommodations might be.

8.      Then I met another incarcerated person who knows sign language, who happened to be housed in my pod. He told me that there may be other things that can help me, like a speech-to-text iPad. I submitted a CDCR 1824 requesting the iPad, but have not gotten a response yet and no staff person has come to talk to me about it.

9.      I also read the July 2024 edition of the San Quentin News, a newspaper run by incarcerated people at San Quentin. There was an article about a sign language class at San Quentin. I was really moved by the article. It talked about the isolation deaf people face in prison and how people learned sign language so they could build a community. I want to learn sign language. I am worried that my hearing will continue to deteriorate and I won't have any other way to talk to people. I also want to be in an environment like that described in the San Quentin News article; where people with disabilities are welcomed and part of the broader incarcerated community and able to access programs freely. I have asked staff here if there's a similar sign language class I can take at SATF, but staff tell me there are no hearing impaired programs here.

10.     Another incarcerated person, who is also hard of hearing, showed me last month a CDCR memorandum about vibrating watches, which was dated June 3, 2024. I hadn't heard about it before, and I didn't know that I could ask for a vibrating watch. So I filed an 1824 asking for a vibrating watch. The log number is 604716. No staff person came to talk to me about it. I just got a written denial dated September 3, 2024. It says: "On 8/7/2024, the ADA Coordinator reviewed your request for a vibrating watch and determined you do not need a vibrating watch to access Programs, Services, and Activities (PSA)s. A review of SOMS indicates you are currently designated DNH and can hear at a functional level while using hearing aids."

11.     The same incarcerated person showed me an informational letter from the Prison Law Office. It listed a number of accommodations for people with hearing disabilities that it said were available in prison, like vibrating watches, CART, and the text-to-speech iPad. That information was eye-opening to me. I didn't know about those accommodations or that I could ask for them. I submitted an 1824 on September 13, 2024, asking for CART. I have not yet received a response, and no staff has come to speak to me about it.

12.     I don't understand how SATF staff could deny me accommodations that I asked for without even talking to me. The only thing they granted was recognizing me as disabled and giving me hearing aids, a pocket talker, over-ear headphones, and closed captioning in dayroom TV. But that's not enough.

13.     Incarcerated people turn the closed captioning off of the dayroom television, probably because it covers up part of the picture. I don't want to sit there and argue with them, and I'm fortunate that I have my own personal TV, so I can watch television by myself on my bed.

14.     I have hearing aids, but I don't have hearing aid batteries for them right now so I am not wearing them. The hearing aid batteries sometimes only last 3-4 days. The compliance sergeant said that someone is supposed to come to my cell to give me hearing aid batteries, but that has never happened. Instead, I have to go to the medical window. They tell me they're out of stock or on back order. Even with hearing aids, though, I can't understand everything that is being said. I've been trying to see the hearing aid specialist again since I got the hearing aids in June. Right now, even with full volume, I can't hear with my right hearing aid. The left side is low and muffled and keeps sliding out. I've been asking to be seen so it can be adjusted. I put in a few 7362s about it. Every time I submit one, I get called into clinic. The nurse told me not to put in anymore requests, because I won't be seen any sooner. But to me, it's a safety issue; I need to be able to hear an alarm or if I'm being called. If I don't respond to an announcement, I can be written up.

15.     I also have a pocket talker, which can help me pick up words in quiet, one-on-one settings where I am close to the person I am speaking with. I also have to watch their lips to try to piece together what they're saying, and I still cannot process everything they are saying.

16.     Even though I have pocket talker, I try not to use it too often. That's because custody staff give me a hard time about it. Just yesterday I was called to visiting to meet with a representative from the Prison Law Office, and I was wearing the pocket talker because my hearing aids aren't working. The compliance sergeant stopped me and asked me what the headphones were for and whether I needed it. That sort of thing happens regularly. I think staff assume that it is a radio because they see the headphones I wear with it. Sometimes I feel like staff treat me like I'm seven years old, scolding and berating me in front of other incarcerated people. For example, I had an appointment in the CTC and had to go through work change. Staff there saw me wearing my pocket talker and said I couldn't come in here with it. I responded that I need it. They told me that I am not coming in with a radio. I explained that I need it because of my disability. They said OK then. I shouldn't have to have that conversation in front of everyone. I wish staff understood that it's a disability accommodation, not a radio, or at the very least took me to a private area before asking me about what it is. It's embarrassing to have to say in front of everyone.

17.     The same thing happens at chow sometimes; staff sometimes stop me when I'm trying to go inside with everyone else to tell me I'm not allowed to bring a radio in. At times I'd rather miss a meal than have to deal with certain staff members if this is what I have to go through. I wish they would just accept that it's a disability accommodation and not single me out and berate me in front of the whole incarcerated population. Those types of interactions add up, so I try not to use the pocket talker unless absolutely necessary.

18.     It is really difficult to have my requests for accommodations for my disability be denied. It starts to feel like everything is pounding on top of me—denial after denial. I have depression, anxiety, and PTSD, and being constantly told "no," without

4

anyone even talking to me about what I need and why (instead, custody staff bring me the written denials and tell me that my requests have been denied), and without being able to meaningfully participate in life here at SATF because of my disabilities exacerbates my mental health problems. Everyone's making decisions about me, but no one has come to talk to me. I shut down, have trouble sleeping more than a few hours a night, and don't feel like eating – I've lost weight over the last year.

19.    If I had an individual assessment with someone who would take the time to talk to me and really understand my disability and how it affects my ability to live in prison, maybe things would be different. Maybe they would take it seriously. Otherwise, ADA staff here, through their written denials, seem to not believe me when I say I need help. Or they think it's not that serious. It seems like they think, "You got hearing aids, you're good to go." It's like a broken record. My hearing aids don't correct my hearing loss, they just amplify sounds.

<div align="center">Program Participation</div>

20.    One thing that I would like to talk with an Assistive Technology Professional about is how to be able to participate in programs. My parole eligibility date isn't until 2037, and it's really important for me to better myself while in prison so I can be prepared when I get out.

21.    Before I was at SATF, I was housed at California Men's Colony, which people refer to as "CMC." There were a lot more rehabilitative programs at CMC than there are at SATF. I tried to attend those programs, including related to understanding victim impact, Criminal Gang Members Anonymous, and other groups. I'd sit in the front row to try to hear, but even then I couldn't follow. I had to constantly disrupt the class, asking in front of everyone for the inmate facilitator or the instructor to stop, say it again, look in my direction, just to try to follow along. I felt like a burden. I could tell other participants were getting frustrated with me. They would look at me when I had to interrupt and roll their eyes or otherwise express frustration. I wouldn't want me in class if I were them; I understand that when I have to stop the class to ask for information to be

<div align="center">5</div>

repeated, I interrupt the flow and slow things down. A lot of people are in these classes to try to earn milestone or other credits so they can get out of prison faster; I didn't want to be the guy with a disability slowing everyone down. I could feel their eyes on me. I am part of the CCCMS program, and when everyone is staring at me like that, I can feel my PTSD, my anxiety, and my depression kicking in. I feel like I'm bothering people. It affects my self-esteem, makes me want to shut down, makes me want to not participate, and makes me want to not even attend. I'm affecting more than just the instructor – I'm hurting the entire class.

22.    That left me with a choice of whether to keep interrupting, slowing down the class, and frustrating other inmates, or just keeping my mouth shut and smile and nod as if I understood what was happening in the group, even though I didn't. I stopped interjecting and either stopped going to class or just sat in class without being able to understand what anyone was saying.

23.    Here at SATF, I'm on the waiting list for groups. There are some other lifer groups and religious programs I have dropped in on, but I had the same problem as I had at CMC – I just can't understand what people are saying, and when I try to stop the meeting and ask them to repeat themselves, I see everyone looking at me and being frustrated. I've decided I am just going to hold back because of the stigma of my disability.

24.    I've decided I won't say anything in groups when I can't understand; I don't want to be viewed as a disrupter or feel like a burden. It's hard enough as it is living in prison with a disability. Sometimes when I have to lean in a lot to try to hear what people are saying, inmates will tell me stuff like, "Dude, relax, back-up." They think I'm being aggressive; they don't understand that I am just trying to understand as much as I can without invading their personal space.

25.    I've been thinking of what would help me participate in class or group. I don't know what all the options would be, but it seems that captioning would help. If there was some way I could have what people are saying written out, so if I didn't catch something with my hearing, I could refer to something in writing to see what had been

said. It would be used to support my hearing. The other thing that would help—and it may seem petty—is just a little patience and understanding. I'm not trying to be a burden on anyone. But that's what I feel like. It makes me want to stop trying.

<div align="center">Effective Communication of Announcements</div>

26.     I'd like to talk to an Assistive Technology Professional about what types of technology would help with announcements. I have trouble hearing announcements. I've been asking floor staff on both Second Watch and Third Watch since July to flash the lights to my pod when they are trying to get my attention, but they rarely ever do that. They did it yesterday, when they were calling me to go speak with Ms. Lomio. But that was not what normally happens.

27.     It would help if announcements were displayed in writing, so I could read what was said and be able to know if it applied to me. There's an electronic display in the dayroom, but the whole time I've been here I've never seen it used.

28.     The RAP denied my request for a vibrating watch. The log number for that is 604716. The written response said they had reviewed my medical record and saw "zero missed appointments on your chart from the dates of 10/10/2023-07/31/2024." When I read that, it made me feel frustrated and sad. It seems like they're doubting what I tell them my need is and that hearing aids are enough. I don't understand why they don't believe me when I say the hearing aids alone are not enough.

29.     What the RAP doesn't understand is that right now, I have to be constantly on alert to see if there are announcements being made that might apply to me. It requires a lot of mental effort to focus on that, and it means I can't focus on other things like studying for college. I feel almost like I have ADHD; I am constantly pacing back and forth, back and forth, getting up and down, watching, going to officer's office to ask if they called me. It's stressful. I am lucky to have some good neighbors in my dorm who are willing to help me when they're in the unit and hear I'm being called. But I can't depend on that to always be the case.

<div align="center">7</div>

30.     I get ducats for some appointments, but not all. Even when we do get ducats, they often don't list the time the appointment actually occurs (sometimes the appointment occurs before the time listed on the ducat, sometimes after). If I show up at a medical or mental health appointment at the time listed on the ducat, staff will tell me something like, "What are you doing here? We didn't call you," and order me to leave. At prisons I was at before SATF, like CMC, you are expected to show up at your ducated time and the appointments usually happen at that time. But that is not the case at SATF. It's confusing. I am trying to do the right thing and follow the time on the ducat, but I'm told that it was wrong to do that and I need to wait to be called.

31.     I read something in the San Quentin News about special housing for the deaf population that had a multi-colored light fixture to help communicate with people with hearing disabilities. We don't have anything like that here.

32.     Ms. Lomio told me that CDCR has said that a "human element is equally important to ensure that individual announcements are timely and effectively communicated." It really depends on the staff. I don't like interacting with staff more than I have to because sometimes they seem bothered to have to come out of their office to talk to me. It's not every staff person, but it happens enough that I don't want to continue to have those kinds of interactions. I would rather have pager or other device that staff can use to alert me about an announcement.

<div align="center">Phone Services</div>

33.     We're able to use phone services on the tablet until 11 pm. I use it to speak with my family, including my mom, who has been by my side for all 23 years I've been incarcerated. Their guidance, support, and encouragement is the only reason I haven't just given up and taken measures to hurt myself in prison.

34.     I am able to use the phone on my tablet when my hearing aids are working and when I have over-ear headphones. Right now, I don't have hearing aid batteries so I am not able to make a phone call on the tablet and fully understand what is being said. Instead, I have to rely on messaging through the tablets. But only five messages are free

<div align="center">8</div>

right now and I don't have much money, so I don't usually use more than that. Ms. Lomio asked me if I was familiar with captioned phones or a TTY. I'm not sure if we have that here; staff have not told me about that.

<u>Conclusion</u>

35.     It feels like I need to explain my disability and defend my need for accommodations in the process, and even then I am not taken seriously. Staff seem to think I am trying to manipulate or lie to get something I'm not entitled to. But I am just trying to get help for my disability. No one seems to understand that I'm the one who is living with this, I'm the one who suffers and cries out for help. Staff don't seem to understand how much my disability impacts me day to day. It makes me feel it's better to keep my mouth shut and get out of the way. I wish people would take the time to understand me and my needs and explain what options are available, instead of just telling me, "I don't know" and "There's nothing I can do for you."

36.     It seems like there is just barrier after barrier, and people keep directing me to dead ends. In the last week, give or take, a yellow flyer was posted in my housing unit. A true and correct copy is attached as **Exhibit A**. It is titled "ADA," so I went to read it. It says if I'm having problems I should talk to my building officer. But when I have done that, they direct me to the compliance sergeant, who just tells me if I disagree with an 1824 denial, I should 602 it. Non-regular officers sometimes work in my building as the building officers. I'd estimate it happens about once or twice a week. In those cases, when I ask for information about disability accommodations (for example, when I learned from the Prison Law Office handout that something might be available), the non-regular officers usually will tell me they don't know and to wait until the regular officer is back to ask for help.

37.     The flyer also says to fill out a 22 if the building officers can't help me. I have done that in the past, but have not gotten a response and have been told it was not received.

38.     The flyer also says to talk to a "peer support inmate." I don't understand why they are telling me to go to another inmate. I am not comfortable sharing my disability and

needs with an inmate. When you're in prison, you need to put up a front, you need to show you're not weak. People will prey on weakness.

39.    The flyer makes no mention at all of the CDCR 1824 process. But that's the only way I've gotten a response in the past, even if it was just a "no."

40.    I'm doing my best not to take my frustrations out on anyone, but what do I need to do to get help?

41.    What I am asking for—a vibrating watch, speech-to-text, captioning, being told of announcements, and someone to listen to me and help me see if something else might help me—may seem insignificant to the hearing population but they make an enormous difference to us whose daily activities are impacted. It's the little things that others take for granted that make me feel normal and not hopeless, vulnerable, lost, or without a sense of purpose or that people and staff are staring at me or my hearing aids, ridiculing, mocking, or doubting me because I can't hear like they can. Therefore before anyone makes a decision about me, why not ask me what is the best way I can get the help I so desperately need? I feel like I've exhausted every avenue – 22s, 7362s, 1824s, 602s, 602-HCs, and talking to every of level of staff. I'm not sure what more I can do.

//
//
//
//
//
//
//
//
//
//
//
//

10

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at Corcoran,

3  California, on this ___17TH___ day of September, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



# ADA

## **POCKET TALKERS & WHEELCHAIR/WALKER BAGS**

THE ADA OFFICE IS OUT OF POCKET TALKERS AND WHEELCHAIR/WALKER BAGS. IF YOU NEED ONE WRITE IT ON A 22 FORM AND GIVE IT TO YOUR BUILDING COPS TO GIVE TO THE COMPLIANCE SERGEANT. EVERYONE THAT HAVE SUBMITTED FOR ONE ALREADY ARE ON A LIST IN THE ADA OFFICE AND AS SOON AS THE INSTITUTION GETS THEM IN, THEY WILL BE HANDED OUT.

## ****ADA ISSUES****

1. FIRST TALK TO YOUR BUILDING OFFICERS TO GET THE QUICKEST REMEDY.
2. IF IT'S SOMETHING YOUR BUILDING COP CAN'T ANSWER THEY WILL INSTRUCT YOU TO FILL OUT A 22 FORM.
3. THE COMPLIANCE SERGEANT TOURS EVERY BUILDING MONDAY-FRIDAY ANYWHERE BETWEEN 8:30-3:10.
4. THE BUILDING OFFICERS WILL HOLD ONTO THE 22 FORM AND GIVE IT TO THE COMPLIANCE SERGEANT. DO NOT PUT THE 22 FORM IN THE MAIL IT WILL TAKE LONGER TO GET.
5. IF NEEDED THE COMPLIANCE SERGEANT WILL DIRECT YOU WHAT TO DO NEXT FOR YOUR SPECIFIC ISSUE, WHICH MOST TIMES WILL BE FASTER THAN FILLING OUT ANY OTHER FORMS.
6. TALK TO YOUR LOCAL PEER SUPPORT INMATE TO DIRECT YOU

Exhibit 10

# DECLARATION OF ███████████

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation (CDCR) number is ███████ I am currently housed at the California Substance Abuse Treatment Facility and State Prison.  I am 30 years old.  I have been incarcerated in CDCR since October 9, 2019.

3.      I am a member of the *Armstrong* class.  My DPP codes are DPH and DPM.  This means that I have a hearing disability and a mobility disability that affect where I can be housed within CDCR.  I am currently housed on Facility C.  This is a level three security yard, which is one of the higher levels of security classification.  We are housed in cells and do not have much freedom to move around the institution, other than the limited times when we are let out of our cells.

4.      I am deaf and use sign language as my primary method of communication.  I can read lips somewhat, but I do not speak because people usually do not understand me when I talk.

5.      Because I am deaf, I need to use a videophone to place calls.

6.      I use a videophone that is located in the dayroom of my housing unit C-8-B Section on Facility C Yard.  I have to share this videophone with anyone else who is deaf on Facility C.

7.      When using the videophone, I can dial any number as though I am using a regular telephone.  Anyone I call using the videophone does not need to be on an approved list of visitors, unlike video visitation, and I do not need to set an appointment in advance of calling someone, I can just place the call.  If the person I am calling does not know sign language, the videophone will connect to a sign language interpreter who will interpret the videophone call.

8.      Staff do not closely watch me during my videophone calls, although they frequently rush me to complete my call. Even when I indicate that I am wrapping up the

call, one of the tower staff officers will threaten to write me up if I do not hang up immediately. But if I hang up immediately, the person to whom I am speaking may be offended. When I call back at a later time, the person may still be upset with me.

9.      I also have access, as does everyone else with a tablet, to video visitation. Video visitation is not the same thing as a videophone and is not designed for phone calls with deaf people.  For example, video visitation costs money and videophone calls are free.  To use video visitation, the person that I want to speak to has to have an account with the video visitation company.  They also have to be an approved as a visitor, and you have to schedule the visit.

10.      One of the main reasons that video visitation does not work the same as a videophone is that there is a blurring feature that distorts the signer's hands.  The blurring makes it hard for me to use sign language during video visitation, because my hands keep getting blurred out.  Sign language requires a clear view of both the signer's face and hands. Also, another way that video visits do not work like a videophone is that video visitation does not connect to a sign language interpreter, so I am not able to communicate with anyone that does not know sign language.

11.      Video visitation does not work as a substitute for videophone calls.

12.      In my housing unit, we have each been personally issued a GTL tablet computer.  Incarcerated people can use the GTL tablet computers to access many prison programs, services and activities, including placing telephone calls.  While some of the services on the tablets are free, many others cost money.  For example, I can use the tablets to send and receive electronic messages, but each message costs money.  The television shows and movies on the tablets also all cost money to access.

13.      Using the tablet computers, non-deaf incarcerated people can place telephone calls from inside their cells from 8:00am until 11:00pm.  This includes during times when we are locked up and not allowed to leave our cells, which happens frequently, as explained below.

14.      Even though everyone else can freely place telephone calls from inside of

their cell using tablet computers, I may not do so because the tablets do not allow for videophone calls. Instead, I have to ask correctional officers to let me out of my cell, to wait to be let out, and to be allowed in the dayroom of my housing unit's B section where the videophone is located anytime that I want to place a phone call.

15. For me, the only time I can get permission to leave my cell and place a videophone call is during our dayroom time. Dayroom time is the limited period of time each day when we are allowed out of our cells. On Schedule A days, dayroom time is supposed to be in the morning on 2nd watch from 8:30 a.m. until 11:00 a.m. (2 hours and 30 minutes) and again in the afternoon on 3rd watch from 2:45 p.m. until 4:00 p.m. (1 hour and 15 minutes). On Schedule B days, dayroom time is supposed to be on 2nd watch from 12:45 p.m. until 2 p.m. (1 hour and 15 minutes) and in the evening on 3rd watch from 5:45 p.m. until 8.00 p.m. (2 hours and 15 minutes). Because my access to the videophone is limited to dayroom time, my phone time is more limited than those who are able to place phone calls from their tablets in their cells.

16. But, in reality, my dayroom time is often even more limited. My understanding of the policy is that officers are supposed to let me out of my cell during dayroom hours. But certain officers almost never let me out of my cell and into the dayroom during other times of day, no matter how many times I request to use the phone. On those occasions, no matter how often I have requested to be let out of my cell in order to access to the videophone when it is not dayroom time, I am always denied.

17. Several times I have received an electronic message from my tablet from a friend or family member asking to call right away because it was an emergency. I would then ask the officer to be let out to call my friend or family member because it was dayroom time. I would explain that it was an emergency. I would then be told to wait until dayroom time for bottom tier in order to use the videophone. I have been denied access to the videophone multiple times simply because my tier is not allowed to be out of their cells at that time even though it is dayroom time. This is very unfair.

18. Sometimes me having to depend on staff to let me out of my cell to use the

videophone causes problems with staff.  I do not like being dependent on staff for access to the phone when everyone else is not and can use the phone without having to ask staff for something.

19.     One major problem of restricting my phone access to dayroom times is that dayroom time in my housing unit is regularly cut short.  Almost every day, officers let us out for dayroom late, sometimes up to an hour late.  And then they often make us go back to our cells 20-30 minutes early, even if we have already signed up for phone time on the phone schedule during that time.  This cuts in to my already limited time to access the phone.  Others who place calls on their tablets from inside of their cells are not impacted if dayroom starts late or ends early.

20.     Another major problem of limiting my phone access to dayroom time is that there are a number of other important activities, such as taking a shower, playing cards, or other recreational activities, that are also limited to my dayroom time.  Sometimes, the prison runs dayroom and yard at the same time, so dayroom time is also my only opportunity to go outside and might be my only opportunity to see friends in my building.  Essentially, every time we have dayroom, I have to choose between placing a videophone call during these limited times or engaging in these other activities.  Other people do not have to make this difficult choice because they can place phone calls while they are locked up in their cells during non-dayroom and yard times.

21.     Another major problem with only having access to videophones during limited times is that dayroom is often canceled.  Dayroom can be cancelled for "modified programming" or because of a "lockdown."

22.     "Modified programming" can happen if the prison is short-staffed or staff are in "training" on a training day.  Modified programming means that dayroom and other rehabilitative programming is more limited or cancelled.

23.     At my institution, modified programming happens frequently.  It seems like every fourth day we are on modified programming for some reason.  During modified programming, I can see that other incarcerated people can place calls on their tablets from

1  inside their cells.

2       24.    The only way I can place a call during modified programming is by finding

3  an officer who is willing to let me out of my cell to use the video phone. I do not like

4  having to ask the officers to be let out of my cell during modified programming.  I worry

5  they will get upset or annoyed about having to let me out.  Sometimes I do not bother

6  asking.   When I do ask, officers always refuse to allow me access due to modified

7  programming.

8       25.    "Lockdown" usually means there is some type of emergency or urgent issue

9  at the prison such as a fight or other incident.  During lockdowns, the officers often will

10  not let us out of our cells for any reason: we cannot leave to shower, we cannot go to

11  rehabilitative programming, and I cannot leave to place a videophone call.  However, I can

12  see that other incarcerated people can place calls from inside their cells even when we are

13  on lockdown.

14       26.    We get placed on lockdown frequently and it can last days.  During the last

15  week of August in 2024, we were placed on lockdown for five days straight.  My

16  understanding is that the five day lockdown in August was due to a fight in a completely

17  different part of Facility C and had nothing to do with the people in my housing unit or any

18  of the housing units near mine.

19       27.    Being able to place calls to friends and family from inside my cell without

20  having to ask staff to let me out and regardless of what is happening with modified

21  programs or lockdowns would make a huge difference in my life.  Right now I never know

22  if and when I will be let out to use the phone and it is difficult to plan to communicate with

23  people because I never know if dayroom will be delayed or not happen at all.

24       28.    Having these restrictions on phone calls is very upsetting and unfair.  It is

25  very important to me to keep in contact with my loved ones often.  My mother is getting

26  older and recently had back surgery, so I try to call her any time I can.  I also have young

27  children and I want them to know who their father is.  They are too young to write letters.

28  The only way I can have a relationship with my children is by calling them.

29.     Not being able to place calls is also really hard for me because my family cannot visit me.  All my family live in San Diego, which is a six-hour drive from the prison where I am housed.  I am close with my mother but she is aging and has a bad back, severe vertigo, high blood pressure, anemia, mobility challenges, and is on dialysis, and is unable to make the drive to see me.  It is hard for me to not be able to call her more and she cries every time I call, which breaks my heart.  My sorrow and stress are increased because I do not have more frequent opportunities to see my family, and increased access to videophones and direct communication would help to reduce that sorrow and stress.  I have tried every way I can to transfer to a prison she can visit, but I am always denied.  I have not had a hug from my mother in five years.  Not being able to see her in person is bad enough, but it is made even worse when I cannot get access to the videophone or am unable to reach her for days on end.

30.     It is extremely frustrating and deeply unfair that others can call their families and friends whenever they want, but I can't because I am deaf.  The limitations on dayroom time is bad enough, but the unpredictability of the modified programming and lockdowns make it even worse because they happen at random.  I can make a plan to call my mother or call a friend and then, all of a sudden, I am unable to call because there was a fight three buildings away.

31.     The videophone is in the dayroom and that means that the videophone has a clear view of the showers.  Sometimes, when I am on a call with my mother or with my children, there are people that walk by in view of the video and they might be partially dressed, coming back from the shower.  I do not want my family having to see people in the background who are walking by.  Also, people can see who I am talking to.  I do not want to have my family exposed to anyone who cares to walk by and stop and see them.  Even if I had a privacy screen, that would not necessarily stop people from being able to walk by and see my family.

32.     It is unfair that I do not have the same ability to be in contact with family and friends because I am deaf.

6

1      I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at Corcoran,

3  California, on this _____ 17th _____ day of September, 2024.

7

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone: (510) 644-2555
Facsimile: (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF ETIENNE HARVEY** |
| v. | Judge: Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

## DECLARATION OF ETIENNE HARVEY

1.   I, Etienne Harvey, do hereby declare:

2.   I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

3.   I am a certified sign language interpreter and fluent in American Sign Language.

4.   On September 17, 2024, I provided sign language interpretation services for █████████, who communicates using American Sign Language, when he met with Daniel Greenfield, an attorney with the Prison Law Office. Another sign language interpreter assisted me.

5.   On September 17, 2024, I communicated the contents of █████████'s declaration to █████████ by translating the declaration from English into American Sign Language.

6.   I affirm that I interpreted the declaration accurately, completely, and impartially.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this 17ᵗʰ day of September, 2024, at Corcoran, California.

Etienne Harvey