Exhibit 11

**<u>DECLARATION OF</u>** ██████████████

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation (CDCR) number is ██████. I am currently housed at the California Substance Abuse Treatment Facility and State Prison, on Facility G. I am 46 years old. I have been incarcerated in CDCR since February 11, 2002.

3. I am a member of the *Armstrong* class. I have a DPH code. I am deaf. I use sign language as my primary method of communication.

4. Because I am deaf, the only way I can place phone calls is by using a videophone. A videophone is a stand-alone device or a device with software that allows me to place calls to other people using sign language. I can communicate directly using sign language using video if the person I am speaking with knows sign language. If they do not know sign language then the videophone automatically connects me to a sign language interpreter, who interprets the call between me and the person I am calling.

5. Staff do not closely watch me during videophone calls. I have been provided a privacy screen that I can put up around the videophone call that makes it so that nobody can see me or the person I am calling unless they come over and look on purpose, which custody staff rarely do, although other people in my housing unit still find a way to look around the privacy screen.

6. Videophone calls are not the same thing as "video visitation" which is something that everyone in prison has access to. Even though you might think I could place videophone calls using video visitation, it is not equal to a videophone call for multiple reasons. First, it is hard to communicate on video visitation using sign language, because video visitation is designed to blur the background which means everything around you is blurred except one's face and shoulders. This means that when I am using sign language and my hands stretch out past my face, my hands get blurred out, making it difficult for the other person to see what I am signing to them. I also cannot use video

1

visitation to connect to a sign language interpreter, so I cannot use it to communicate with people who do not know sign language. Video visitation is more difficult to use than videophone calling because, with video visitation, you have to make an appointment. The person you are calling also has to have special software to participate in the visit. With a videophone call I can connect directly to the person I am calling and they do not need to have special software. If they do not know sign language, the sign language interpreter just speaks to them directly over the phone and then interprets the call to me on video. Also, videophone calls are free in comparison to video visits which cost money. For these reasons, video visitation is not the same as a videophone call, and I do not use it in place of videophone calls.

7.      I have a tablet computer that was issued to me by CDCR. This tablet computer has software on it that allows people to place telephone calls from inside their cells. However, I cannot use the tablet computer to place videophone calls because the tablets do not have videophone software. Instead of placing phone calls with the ease of my own tablet, in order to place a videophone call, I have to be able to exit my dorm pod and go to the central area of my housing unit. People who are not deaf and can place phone calls through their tablets are not restricted to the location where their call has to take place like I am.

8.      I have a habit of placing calls at 5:30 p.m., which happens during the third shift of housing unit officers, known as "third watch." Because I am on a level 2 security yard with dorm housing which means I am not locked in a cell, on most days I can simply walk over to the videophone without obtaining permission from a housing unit officer.

9.      However, sometimes movement is restricted in my housing unit and we are required to stay in our dorm pods which means I cannot access the videophone outside of my dorm pod. These periods are usually referred to as "modified programming," where the usual programming schedule in the facility is changed either due to a staffing shortage or the need for staff members to attend a meeting or training. There are also periods of "lockdown," usually in response to an emergency such as a fight, where we are required to

1  stay in our pods.  During these times, non-deaf people can place telephone calls with no

2  restrictions, using their tablet computers inside of their dorm pods.

3       10.    When that happens, I usually do not get to place my regular 5:30 p.m.

4  videophone calls because, in order to get access to the videophone, I would have to ask an

5  officer to allow me to come out of my dorm pod in order to use the videophone.  I am not

6  comfortable making that request if I do not know the officer.  I have been in prison long

7  enough to learn, from my own experience and observation, that even something that

8  should not be a problem, such as asking to get out of my pod to go use the videophone, can

9  make an officer who I do not know frustrated.  Even if they do not get angry I have

10  observed them get annoyed and act like someone is a troublemaker or are making their job

11  more difficult for just asking for something.  That is not a situation I want to risk being in

12  so, if we are locked up due to modified programming or a lockdown, I do not ask a third-

13  watch officers to let me out of my pod to use the videophone unless I know them.

14       11.    Luckily for me, I know the second-watch officer well because he is my boss.

15  I feel comfortable asking this officer to let me out of the pod.  So, if we have modified

16  programming and my boss is working, I am able to get out of my dorm and I can make

17  videophone calls, as I am supposed to be allowed to do.  However, my boss is not always

18  working.  Sometimes, when a different officer is working on second watch, I do not get to

19  make videophone calls because I am not willing to ask and risk the consequences of

20  upsetting the officer.

21       12.    At one point over a year ago, I learned that SATF issued a memo to all the

22  officers announcing to them that deaf people like me should be let out of our pods once per

23  shift to place videophone calls.  This was effective for a brief period of time: any time I

24  asked an officer on second or third watch to let me out for a videophone call, they would

25  let me do it, even if we did not know each other well.  But, over time, it seemed like the

26  officers stopped letting me out for videophone calls.  I did not want to press the issue by

27  asserting my right to be let out for calls because I do not want to risk creating conflict with

28  correctional officers.

13.     I strongly believe in mutual respect.  I am afraid of doing anything that could cause a conflict with an officer because I do not want to risk getting written up for a disciplinary violation.  I am serving a 40-year sentence and I am in the midst of having a parole suitability hearing: I started to have one in February 2024, but it was continued until August 2024, and then postponed until January 2025.  With a parole suitability hearing coming up so soon, I know that getting even a written warning from an officer, known as a "counseling chrono," could lead to a parole denial and ruin my chances of being able to go home.  I have observed, in my many years in prison, that people that speak up for their rights are considered troublemakers or agitators.  I have observed that these are the people that often have negative interactions with staff and are at risk of being written up by officers.  I do not want to risk that happening so I do not want to have to ask for anything from officers.

14.     It is very difficult for me when I cannot place calls to family and friends.  I am the only deaf person in my housing unit, which makes me very isolated.  My only contact with others through sign language is when I place videophone calls.  When I am unable to be in contact and communicate with others, because I cannot get access to the videophone to make a phone call, I get anxious and unable to sleep.  Placing calls to family and friends outside of prison makes me feel calmer, more connected, and helps me sleep.

15.     Even if I could go use the videophone any time I wanted, it still would not be equal to placing calls on my tablet due to the difference in privacy.  I have a physical screen that I am allowed to set up around the videophone, which is supposed to prevent other people from looking at the people I am calling.  But the other people in my housing unit still find a way to look around the privacy screen.  It makes me uncomfortable and embarrassed to have people constantly peeking in on my calls because, if my family or friends are on video, they can see them.

16.     If I was able to place videophone calls from inside my dorm pod, like other people can through their tablets, I would not have to worry about having a conflict with custody staff about being let out to access the videophone.  I would not have to worry

1  about whether we were on lockdown or modified program and I was going to miss my
2  only chance to talk to someone that day.

3      17.    Another thing we can do on the tablet computers is to watch videos.  I like to
4  watch any video that has somebody signing.  CDCR has a number of educational videos
5  with signing that are free to watch.  Sometimes it is hard to see the signer on such a small
6  screen.  It can be hard for me to watch these videos because the screen size is so small that
7  my eyes get tired from trying to see the signer.  Having a larger screen would give me
8  greater access to videos with sign language.

9

10

11  //
12  //
13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at Corcoran,

3  California, on this _____ 17 _____ day of September, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:   (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:   (510) 644-2555
Facsimile:   (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF ETIENNE HARVEY** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

# DECLARATION OF ETIENNE HARVEY

1.    I, Etienne Harvey, do hereby declare:

2.    I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

3.    I am a certified sign language interpreter and fluent in American Sign Language.

4.    On September 17, 2024, I provided sign language interpretation services for ███████████, who communicates using American Sign Language, when he met with Daniel Greenfield, an attorney with the Prison Law Office. Another sign language interpreter assisted me.

5.    On September 17, 2024, I communicated the contents of ███████████'s declaration to ███████████ by translating the declaration from English into American Sign Language.

6.    I affirm that I interpreted the declaration accurately, completely, and impartially.

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this 17th day of September, 2024, at Corcoran, California.

Etienne Harvey

Exhibit 12

**DECLARATION OF** ██████████████

I, ████████████████, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    My California Department of Corrections and Rehabilitation (CDCR) number is ████████ I am currently housed at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF).

3.    I previously submitted a declaration related to accommodations for people with hearing disabilities at SATF, dated August 15, 2024.

<u>Effective Communication of Announcements</u>

4.    As a representative to the RAC, I assist with preparing agendas for meetings with institution leadership. On August 30, 2024, the RAC met with healthcare leadership at SATF, including the CEO (who joined remotely), an SRN III, and two SRN IIs. One of the issues we raised was that ducats are not reliable. I also shared concerns with the process for refusals on the yard. I told healthcare leadership that I had been informed by healthcare staff that I had "refused" an MRI, which is important to me, as I discuss in more detail below. I didn't intend to refuse the MRI and I wasn't asked to sign a refusal form – I was never presented an opportunity to refuse. The RAC chairman told healthcare leadership that members of the RAC receive many complaints about alleged refusals, where residents report that they were not called or given an opportunity to sign a refusal form.

5.    After that meeting, people continued to tell me that they were told they had refused when they had not. On September 11, 2024, I prepared a memorandum to SRN II ████████ and SRN III ████████ following up on the meeting on August 30. The memorandum reported that the RAC was continuing to receive concerns regarding alleged refusals of medical appointments. The memorandum also requested assistance with enforcing compliance with Health Care Department Operations Manual policy regarding refusals. I provided the memorandum to the captain on September 13, 2024, and informed the captain that I believe the issue is a joint healthcare-custody issue. Enclosed as **Exhibit A** is a true

and correct copy of the memorandum regarding refusals that I prepared and delivered to the captain, dated September 11, 2024.

6.      I reviewed paragraph 9 of the Declaration of Anu Banerjee in Support of Defendants' Statement on SATF Stipulation Item No. 7. Plaintiffs' counsel told me that I am "Class Member No. 6" referred to in that paragraph.

7.      Dr. Banerjee states that I "refused to attend medical appointments that were scheduled for July 19, 2024 and May 17, 2024."

8.      I did decline physical therapy on July 19, 2024. I went to the clinic and physically signed a refusal form, as per policy. I did that because I am not comfortable with physical therapy until I have an MRI and we know what is wrong with my knee. It's really scary not to know what is wrong with my knee, and why some movements create excruciating pain. I don't want to exacerbate the problem, and I am worried that will happen if I have physical therapy without a diagnosis of the problem.

9.      I did not refuse a medical appointment on May 17, 2024. That seems to be the appointment I talked about in my prior declaration at paragraphs 86 through 88. That appointment was with the hearing aid specialist. I would have wanted to attend that appointment – I had been asking to see the specialist for some time, since before I got to SATF.

10.     Dr. Banerjee's declaration says I was scheduled to see the hearing aid specialist on September 17, 2024. I did see the hearing aid specialist today. I received a ducat for the appointment last night. The ducat listed the appointment time as 11 am today. An officer notified me around 9.45 am this morning when I was in the education building that medical needed me. I went to the appointment and it was with the hearing aid specialist. The hearing aid specialist gave me new hearing aids, which so far, have worked better.

//

//

2

| DEPART TO: | DEPART TIME: | RECORDED BY: | |
|---|---|---|---|
| | | | 421 |

**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**

OTRR314    **INMATE PRIORITY PASS**

| INMATE'S NAME | | CDC# | HOUSING AREA/BED |
|---|---|---|---|
| ▮▮▮▮▮ | | ▮▮▮ | E 002 1 ▮ |

| ISSUED BY | ISSUE DATE | APPT. DATE | APPT. TIME |
|---|---|---|---|
| U. UNKNOWN | 09/04/2024 | 09/17/2024 | 11:00 |

| APPT. LOCATION | TYPE / REASON |
|---|---|
| S CTC ONSITE Clinic | Specialty Services/ |

| ARRIVAL TIME: | RECORDED BY: | |
|---|---|---|
| DEPART TO: | DEPART TIME: | RECORDED BY: |

11.     Dr. Banerjee lists a number of medical appointments that I have attended. I'm not sure if that's meant to imply that I do receive effective communication of announcements. That's similar to what the Reasonable Accommodation Panel (RAP) told me in a written response after I raised issues with effective communication of announcements and asked for a vibrating watch. The log number for that is 603586. The RAP listed dates on which I received medication, missed medications, attended appointments, and allegedly refused appointments. The RAP determined that, "You are safely accessing, Programs, Services, and Activities (PSA)s," and concluded that, "Based on the criteria for and evaluation from medical along with consideration by the RAP, a vibrating watch and reader is not required for your access to PSAs."

12.     I was upset when I got that response. No one interviewed me to ask how I was doing, how I get announcements, how hard it is to manage with my disability in prison. No one asked me if I might be missing other programs as well – which I am, as discussed in my previous declaration (for example, I miss breakfast, as discussed at paragraph 53). Instead, the written response seemed to say I was a liar and that I could hear because I attend some medical appointments. It's hard to understand why, with a full interdisciplinary panel, the RAP didn't consider asking me whether there were other problems, and instead focused on trying to disprove my concerns.

13.     What I would have told ADA staff if they had asked me about it is that every day is made stressful because I have to be constantly vigilant for any announcement, and

3

there are a lot made throughout the day. If I know I may have an appointment that day, or even if I do not know if I may have an appointment, any time an announcement is made, I have a feeling of increased anxiety; I have to put myself in extra alert mode. I can't even rest on my bed in my cell – every time I hear an announcement, I have to strain to make sure they are not calling me because I am scared to miss something. My whole body tenses up—it's like a reflex—trying to make sure I am paying attention to what an announcement is to make sure I'm not being called for something. It's exhausting to live every day like that.

14.     The RAP response also said I refused or was a no-show for my Eliquis. Again, they seemed to be saying I am a liar and refusing treatment. But that medication is really important to me because it's important to reduce my stroke risk because I have atrial fibrillation. I was not refusing my medication – I was just missing the announcement for pill call in the morning. The RAP response mentions it became KOP (keep on person). That's because I had missed it so much that a provider was willing to change it to KOP. That makes it easier for me because then I don't have to rely on announcements for pill call. But the way the RAP used it, it seemed like they were trying to prove that it's my fault I am missing things, without seeking clarification about why I missed my medication those days.

15.     I can get in trouble or miss out on important things if I don't get effective communication of announcements. One example is with an MRI, which I have been asking for for a while because I want to know what is wrong with my knee.

16.     On August 12, 2024, I was working in the program office when an officer told me that nursing staff were calling for me. I reported to the clinic and completed a questionnaire with a nurse about my MRI, which the nurse said was scheduled for the next day. That evening, I received a ducat for "CTC MRI" for August 13, 2024, at 1:15 pm.

4

CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE PRIORITY PASS
OTRR314

| INMATE'S NAME | CDC# | HOUSING AREA/BED |
| | E 002 1 | |

| ISSUED BY | ISSUE DATE | APPT. DATE | APPT. TIME |
| U. UNKNOWN | 08/08/2024 | 08/13/2024 | 13:15 |

APPT. LOCATION
S CTC MRI Medical

TYPE / REASON
Radiology/

| ARRIVAL TIME: | RECORDED BY: | |
| DEPART TO: | DEPART TIME: | RECORDED BY: |

17.    Based on past experience, I did not think the time on the ducat would be correct, so on August 13, 2024, I notified housing unit officers that I would be working in the program office and was expecting an appointment that day so that they would know where to find me when it was time for the appointment. However, I was never called for an appointment. On August 14, 2024, I submitted a 7362 reporting that, "I was scheduled for a MRI on 8/13, but was never called."

18.    On August 24, 2024, I had an appointment with a primary care provider. I asked the provider why I hadn't had the MRI. The provider told me that I had refused. He insisted that custody staff would not lie about me refusing an appointment. A representative from the Prison Law Office informed me that the provider documented, "Per custody, he refused MRI right knee on 8/13/24. To resubmit MRI."

19.    A representative from the Prison Law Office also informed me that my electronic medical record contains an email from an OT to a provider that reads, "Per custody, patient refused prior to coming to appointment. Please obtain a refusal if you haven't done so already. The order will be canceled, but if it determined that it's still needed, please submit a new one." A representative from the Prison Law Office informed me that the provider then forwarded the email to the "SATF E Yard Message Pool" and said, "E yard team, Please obtain informed refusal for Knee MRI."

20.    As I said above, I was never asked to sign a refusal for the MRI. I did not refuse the MRI – I did not tell custody that I wanted to refuse the MRI. This appointment

5

was important to me. I have unexpected, excruciating pain in my knee at certain movements. The pain worsens when it's cold, which also affects my mobility. For the last year, my knee has been buckling randomly several times a day, which makes it dangerous for me to move around. I use a walker because of that issue. I am reluctant to move forward with physical therapy until I understand why I am having this issue, because I don't want to inadvertently exacerbate the problem.

21.     On August 27, 2024, I filed a 602 reporting that my specialty appointment was marked as "refused," although I was never called. The specialty appointment I was referring to was the MRI. The log number for that 602 is 615421. I have not yet received a response.

22.     On August 29, 2024, I saw a nurse in response to the 7362 I filed about the status of my MRI. I told the nurse that I had not refused the MRI – to my knowledge, I hadn't been called to the MRI.

23.     Nursing staff later told me that the request for the MRI to be rescheduled was denied by the chief physician and surgeon. I also received a patient letter that read, "You will need to comply with physical therapy before they will approve another MRI."

24.     I haven't received an announcement to report to physical therapy. A representative from the Prison Law Office showed me an email from my electronic medical record from a nurse on my yard to the "SATF E Yard Message Pool" from September 5, 2024, that reads, "The patient refused this appointment. **Please obtain a refusal.** The order has been canceled. If it is determined the patient needs to be rescheduled, please enter new orders." I did not refuse that appointment – if I had been called for the appointment, I would've gone because my provider told me that if I didn't go, I wouldn't get my MRI rescheduled. No one has asked me to sign a refusal form for this appointment. I didn't know until I spoke with a representative from the Prison Law Office what had happened to the appointment; I thought maybe it had been cancelled.

25.     Another example of when I got in trouble for not hearing an announcement is from August 23, 2024. I was in the RAC office in the program office when an

incarcerated person told me that staff had made an announcement for me. The incarcerated person didn't know what it was for – he just heard staff ask on the radio if anyone had a visual on me. I asked a lieutenant in the program office if I was being called and where I was supposed to go, but he did not know. I then used the phone in the RAC office to call my housing unit, which is some distance away, but no one answered. I then used the phone to call visiting. I identified myself as an inmate and asked whether I needed to report there. The officer who answered the phone in visiting asked for my name and CDCR number, which I provided, and then said I should have contacted my housing unit first. Then I went over to work change to ask if they knew whether I was being called and where I should go. The officers there asked me where I had been, said they had been looking for me for 30 minutes, and directed me to a van that was waiting to take me to BPH where I had a legal call with the Prison Law Office.

26.     Later that same day, two sergeants, Sergeant ████ and Sergeant ████ called me into their office. They told me that incarcerated people, including myself, are not permitted to use the phone. I told them that I thought I was allowed to use the phone so long as I identified myself as an inmate and did not use the phone to call outside the prison. One of the sergeants acknowledged that staff had not made the rules clear regarding phone use. That's true – no one told me I wasn't allowed to use the phone, and in fact I and other RAC members had used the phone to contact the captain and other CDCR staff without being told it was not allowed.

27.     I later received a serious RVR from Sergeant ████ for using the phone. The RVR was for "unlawful influence" under Section 3013 of Title 15. Because of that, I was barred from accessing the RAC office and unable to complete my duties during Second Watch. It was only through the intervention of other CDCR staff that the RVR was dismissed, but it was very stressful to have a Serious RVR hanging over my head. It could have meant loss of privileges and good time credits, which would mean I would be in prison for longer because of it. This RVR would have been my first RVR in CDCR.

7

28.     I am lucky there was intervention and my RVR was dismissed, but I can't count on that happening again, and I was really scared that I would lose my ability to serve on the RAC and that I would be in prison longer.

Phone Access

29.     Being able to call my friends and family is really important to me. Just the other day, I told my friend how happy I was that he answered my call and that he probably can't understand the positive effects for my mental health to have contact with people on the outside. I've been incarcerated since March 2023, and I understand that people's lives move on outside of prison, they become accustomed to me not being around. It's so important for me to be able to maintain the contacts I can.

30.     I am a social person, and having the ability to talk on the phone to loved ones has been huge for my mental health. It is so important to have a moment to realize that life is going on outside of prison and there are things to look forward to.

31.     I have been the victim of sexual harassment and abuse at SATF. I filed a PREA complaint about it. It has been so hard to get consistent mental health assistance here to help me process what happened. I don't know what I would have done if I didn't have a friend I could call to talk to about the whole situation, I simply do not know how I would have coped with it.

32.     It is really important for me to feel like I can be there for my loved ones on the outside too. It can be hard for people to come visit in person. We have a new newsletter on Facility E called The Progressive Road. It's available on the tablets. My friend and my mom wrote articles for the most recent newspaper. Here's part of what my friend wrote about how hard it is to visit in person:

> If I choose to visit ▆▆▆ in person, it costs me a couple of hundred dollars in gas, around eight hours in the car, and an entire day away from my child. During the visit I only get two hugs, I feel like I'm incarcerated, I feel like I'm being watched and judged by the Correctional Officers and other inmates. I have to bring money so ▆▆▆ can get food and drinks from the vending machines and in the end, I have a long and emotional drive home where I feel more alone than I have most times in my life. All of that for only a few hours spent face-to-face with my friend. Yet I don't attend a face-to-face visit for me, I go so he remembers he has someone who cares, someone

8

who misses him on the outside, who is praying this will be the last time he is behind those walls.

33.     That is tough to read. I never want my friends and family to feel like staying in contact with me is even more of a burden.

34.     Access to the phones is one of the most important concerns for people on Facility E. Residents report that having a connection to the outside, an escape from the mentality of prison, and a way to stay in contact with family and loved ones, is vital to our sense of hope and our personal security. It means everything to know we have a community to go back to and people who still care about us. No one wants to think they'll be alone when they're released.

35.     Every night for the last few weeks, when I've tried to make calls after 7 pm, the call doesn't connect or the audio cuts out (either for me or my loved one), and then the tablet disconnects. For people who try to have video visits on the tablet, the signal cuts out and the call disconnects. As a result, there is a huge demand on the tablet kiosks, which are also used by people who have not yet received tablets themselves to make phone calls. Many people have recently transferred to this yard and to my knowledge, haven't received tablets, which affects the demand on the kiosks.

36.     Tensions are high over phone calls through the tablet kiosk. A few days ago, I witnessed an altercation between two people over access to the tablet kiosk. The altercation was related to one person believing the other had cut in line, and that he wasn't able to use the phone on the tablet kiosk as a result.

37.     The RAC has advocated for several months for increased hours for tablet calls. Since Facility E is now a Level II yard, we have asked that the hours during which people can make phone calls match Facility A and Facility B, which I understand go until 11 pm. The then-facility captain, Captain ███ informed the RAC in April 2024 that our proposal to extend the phone times had been approved. A true and correct copy of those meeting minutes is attached as **Exhibit B**. We posted the meeting minutes from that

9

1  meeting so that the resident population would know about the planned changes. I made

2  multiple copies of the meeting minutes because people asked for it so frequently.

3      38.    People constantly ask about the status of phone time because phone time is

4  so important to them. People on Facility E were very excited that the phone times were

5  being extended. People often approached me to ask for the status of the phone times, and

6  to this day still do.

7      39.    ███████████████████████████████████████

8  ███████████████████████████████████████████

9  ███████████████████████████████████████████

10 ███████████████████████████████████████ I

11 took the minutes from that meeting. A true and correct copy of those meeting minutes is

12 attached as **Exhibit C**.

13     40.    Two lieutenants signed those meeting minutes, but Captain ████ did not sign

14 them. We have not posted the minutes because Captain ████ didn't sign them. I'm not

15 sure why, but he is no longer the assigned captain on this yard, so maybe he didn't get to it

16 before he left. The minutes were distributed to the RAC representatives in each building,

17 and they may have shared the information with others. ███████████████████

18 ███████████████████████████████████████████

19 ██████████

20     41.    ███████████████████████████████████████

21 ███████████████████████████████████████████

22 ███████████████████████████████████████████

23 I worry that people, including people with disabilities, won't raise concerns with the RAC

24 if we aren't seen as effective because we are meant to be the vessel to communicating

25 information to the administration.

26     42.    We just got a new captain on the yard. I and other RAC members met with

27 him and told him that if there is one thing he can do for the population, it would be

28 expanding phone times. We told him that would ease stress on the yard and show the

population that he wants to help other than give us a bunch of "no's." He said he'd look into it and asked us for a copy of the April 2024 meeting minutes.

Over-Ear Headphones

43.     I have a hard time because of my disability hearing on the tablet without my hearing aids. I need over-ear headphones to use the tablet, which let me keep my hearing aids in. Otherwise, I can't hear well enough to use the phone services on the tablet. There was a time my over-ear headphones broke, and it took about a week to get them replaced. I had to borrow someone's over-ear headphones, but if I hadn't been able to do that, I wouldn't have been able to call my loved ones.

44.     The over-ear headphones that are issued to us are uncomfortable and the cups put pressure on my hearing aids. I have to constantly adjust them, like lifting one side off to relieve the pressure, which makes it hard to hear. I submitted an 1824 requesting over-ear headphones with bigger ear cups. The log number is 605290. The RAP denied my request and said: "OTEH issued are the only model currently available through the CDCR you may utilize the purchase process to buy alternatives."

Modified Programming

45.     Program on Facility E is often modified. That can happen when the facility is short-staffed, including when staff are re-directed to other posts.

46.     Sometimes during modified programming, we don't have any floor staff in my housing unit. For example, last week, there was a staff training day and there was no floor staff for some period of time.

47.     A few days ago, we were on modified programming with yard only, and no dayroom. We were told it was because of staff shortages and we only had one floor officer at the time. Because we're locked in our cells during modified programming, it can be hard to get staff's attention, especially because the floor officers (when there are floor officers in the building) are usually in their office with the door closed. I wanted to get let out so I could go to work, and it took almost half an hour for me to get the attention of the porter, because he was sitting and watching television on the other side of the building, and I

needed him to get the officer's attention. I was yelling at the porter to try to get his attention, but he said he didn't hear me until he turned towards my cell when he was going to talk to the officer. After I got the porter's attention, he went to the officer and relayed my message. The officer then let me out, but it took a while.

48.     That is not an unusual occurrence. Especially during staff training days, it's really hard to get the attention of staff and be released from my cell, especially when there are no floor officers. I've tried flicking the light in my cell to get the tower officer's attention. Usually they just ignore me.

49.     I sometimes have to yell to get the officer's attention when I need an incontinence shower whenever I am locked in my cell, including during modified programming. It's easier for me to change my condom catheter in the shower because it can be messy. But it's really embarrassing to have to shout to officers to get their attention and say what you need – everyone can hear. And even then, they sometimes do not respond, and I have to wait until pill call, when the officers have to let people out for medication distribution when they flick their cell lights.

Dr. Swett's Declaration

50.     A representative from the Prison Law Office showed me a copy of the declaration of Nathan Swett, signed September 9, 2024. He talks about individual assessments of deaf people, but not hard-of-hearing people like me.

51.     Being able to hear some things is at times just as difficult as not being able to hear anything at all. I struggle all day, every day, doing things that many people take for granted. Being someone who has difficulty hearing certain frequencies or ranges of sound is very difficult. When we do hear noises, we go on high alert, because we are not sure if someone is trying to talk with us or get our attention, and when we are having a conversation, we have to take in extra cues to try to piece together what the other person is trying to tell us. Being so attentive is a huge cognitive load – it's very mentally taxing and exhausting. Often, we have to ask people to repeat themselves multiple times, which makes people frustrated with us – especially when we ask custody staff to repeat

12

themselves. People don't recognize that even if it looks like I'm following a conversation, it might be because I'm focusing incredibly hard or pretending to understand things that I missed. I don't want to look stupid. If I were totally deaf, I think people would understand better that I need help.

52.     Dr. Swett talks about all the "low-tech" ways that CDCR currently uses to communicate with people. In my experience, those low-tech methods are often ineffective. For example, a hard-of-hearing person like me cannot rely solely on intercom announcements – some of us can't even hear them. We also can't rely on the ViaPath tablets – some of us don't have them, often the network service is not working, the tablets don't work outside the housing unit, and the tablets don't alert me to when a message is received. Dr. Swett also talks about vibrating watches, but as discussed above, I and other people designated DNH have asked for them and been denied. In addition, Dr. Swett mentions whiteboards. Staff in my unit never update the whiteboard. I have to take it on myself to do that. Dr. Swett also refers to staff and ADA workers, but neither staff nor ADA workers currently provide me with individual notification of all announcements. It only happens occasionally, like today when staff told me I had to go to the appointment with the hearing aid dispenser.

53.     It's disheartening to read Dr. Swett's declaration and see no mention of people who are hard-of-hearing like me, as opposed to people who are completely deaf. I need help too, even if I don't have a DPH code.

//
//
//
//
//

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at Corcoran,

3  California, on this _____17_____ day of September, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



State Of California                                        Department of Corrections and Rehabilitation

Memorandum

# ECHO FACILITY – NDPF
# RESIDENT ADVISORY COUNCIL
# (R.A.C)

Date:     SEPTEMBER 11, 2024

To:       SRNII GASPAAR
          SRNIII HARDY

Subject:  SEEKING URGENT ASSISTANCE w/ REFUSALS

IN BEHALF OF THE RESIDENT'S HERE ON ECHO FACILITY, WE ARE STILL CONTINUING TO RECEIVE CONCERNS REGARDING ALLEGED REFUSALS OF MEDICAL APPOINTMENTS. THIS IS AN ISSUE WE BROUGHT UP IN OUR RECENT MEETING ON AUGUST 30, 2024. WE WERE ASSURED THIS ISSUE WOULD BE LOOKED INTO, BUT THEN WERE ALSO TOLD THAT THIS IS A CUSTODY ISSUE.

IN ACCORDANCE WITH HEALTH CARE DEPARTMENT OPERATIONS MANUEL SECTION 3.1.5(c)(3)(C)(4). SCHEDULING STRATEGIES:

"PATIENTS WHO ARE INSISTENT IN THEIR REFUSAL TO REPORT SHALL NOT BE SUBJECTED TO CELL EXTRACTION OR USE OF FORCE TO GAIN COMPLIANCE WITH THE PRIORITY HEALTH CARE DUCAT. IN THESE INSTANCES, LICENSED HEALTH CARE STAFF MUST RESPOND TO THE PATIENT'S HOUSING UNIT TO PROVIDE THE NECESSARY PATIENT EDUCATION REGARDING THE REFUSAL. CUSTODY STAFF CANNOT ACCEPT REFUSALS ON BEHALF OF THE PATIENT, NOR CAN REFUSALS BE TAKEN OVER THE PHONE."

WE ARE REQUESTING YOUR ASSISTANCE WITH ENFORCING COMPLIANCE WITH THIS POLICY. SEVERAL RESIDENTS HAVE STATED THAT THEY AREN'T EVEN BEING NOTIFIED OF THEIR APPOINTMENTS, REGARDLESS IF THEY RECEIVE A DUCAT, AND ARE BEING MARKED AS REFUSALS. DUCATS ARE ONLY HELPFUL FOR COMMUNICATING THAT THERE IS AN APPOINTMENT, BUT SINCE THE TIMES ON DUCATS ARE RARELY, IF EVER, COMPLIED WITH, THEY ARE NOT USEFUL TO THE PATIENT.

RESPECTFULLY SUBMITTED,

C.MERRILL
RAC SECRETARY
FACILITY E
CSATF/SP

# Exhibit B

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date : APRIL 23, 2024

To : J. VACA
FACILITY 'E' CAPTAIN
CSATF/SP

Subject: CAPTAIN MEETING           ADMINISTRATION    EXECUTIVE BODY

CAPTAIN J. VACA  CHAIRMAN PACHECO
VICE CHAIRMAN PROFIT
SECRETARY WILLIAMS
PARLIAM BENNETT
SGT@ARMS SUTHERLAND
HON SUB COLLINS
ELECT COOR DEL VILLAR
ADA COOR RATLIFF

On 4-16-24 there was a meeting with Captain Meeting with
the Facility 'E' Executive Body regarding the California Model
NDPF Program. This agenda was going to be submitted to IAC COORDIN-
ATOR

**CAPTAIN VACA:** Thank you all for attending lets start with any
agenda that needs to be addressed goes through me first. Now
family visiting rooms I talked to LT Herrera and she said she has
some people who clean the family visiting rooms because of the
conditions.

**CHAIRMAN PACHECO:** LT Herrera had spoke with us saying that they
have inmates on B-Yard to clean the family visiting rooms.

**CAPTAIN VACA:** LT Herrera said that there not really dirty just
deep cleaning. I would contact LT Herrera again about this issue.

**CAPTAIN VACA: Notice Of OP what do you mean by that?**

**HON SUB COLLINS:** We would like to have a notice of notification or
any regulation changes. Any regulations or changes the RAC would
like copies for our bulletines.

**CAPTAIN VACA:** Well break it down because to have everything is
irrelevant.

**HON SUB COLLINS:** Well Captain to get rules and regulations for
our copies could eliminate the steady asking for copies and some
delays. We are asking for up-dates only nothing confidential.

**CAPTAIN VACA:** Ok I understand that more clearly I would get at my
SGT to give you any up-dates as long as its not confidential.

APRIL 23, 2024                    CAPTAIN MEETING
                                      (PG#2)


**CAPTAIN VACA:** Now the gym, we are #4 on the list. I know volunteers would like to help so I would get at my 3rd watch SGT.

**CHAIRMAN PACHECO:** Could you let the SGT know we are ready to get started cleaning we would appreciate that Captain Vaca.

**CAPTAIN VACA:** Well I have good news the phone extension time has been approved from 7am-11pm. I can not give you an exact date and time when this will change but it was approved.

**EXECUTIVE BODY:** We would like to inform the Residents that we issued copies regarding the NDPF MEMORADUM dated January 6, 2020 to all inmates and the subject was, NEW VISION AND MISSION STATEMENT FOR THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION AND CALIFORNIA CORRECTIONAL HEALTH CARE SERVES/MEMERANDOM dated December 12, 2017 NON-DESIGNATED PROGRAMMING FACILITY EXPANTIONS FOR 2018/MEMORADOM dated August 7, 2023 TO ALL WARDENS, ASSOCIATE WARDENS, BUSINESS SERVICES, CORRECTIONAL BUSINESS MANAGERS, AND PRISON CANTEEN MANAGERS.


T. WILLIAMS BM9260                        J. PACHECO K-26381
FACILITY 'E' SECRETARY                    FACILITY 'E' CHAIRMAN
CSATF/SP                                  CSATF/SP


                    J. VACA
                    FACILITY 'E' CAPTAIN
                    CSATF/SP

# Exhibit C



State Of California                                                    Department of Corrections and Rehabilitation

Memorandum

# ECHO FACILITY – NDPF
# RESIDENT ADVISORY COUNCIL
# (R.A.C)

Date:    August 13, 2024

To:      Echo Facility Residents

Subject: **RAC MEETING WITH CAPTAIN**

<u>**ADMINISTRATION:**</u>                    <u>**RAC EXECUTIVE BODY:**</u>

Captain J. Vaca                      Merrill - Secretary
Lt. Brainard (3rd Watch)             Solorio - Transgender Coord.
Lt. Ojeda (2nd Watch)                Odu - Sub-Comm. Coord.
                                     Clark - Parliamentarian
                                     Ratliff - Vice Secretary
                                     Walker - Honorary Rep.
                                     Collins - Chairman

The below information is a summary of the meeting that was conducted
with the above individuals.

Captain Vaca mentioned that there is a need for a Barber and Shoe
Shiner. They have decided to reopen the shop located outside the
gate, so unfortunately, Lifers are not eligible to apply. If you
are interested, please contact one of the Executive Body RAC Reps.

During this meeting, the appointment of Chairman Collins was brought
into question, specifically the validity. Documentation was provided
to show the process we went through, as well as the Bylaws, and all
of the above Administration concluded that the proper procedures
were followed.

Lt. Ojeda introduced himself to the Executive Body and informed us
that he is our assigned 2nd Watch coverage Lt. and will be working
Mondays and Tuesdays.

-- CONTINUED --

MEMORANDUM CONTINUED:

████████████████████████████

████ The Captain is looking into ways to resolve this. The RAC requested that the phones turn on at 0635 which the DAS (Daily Activity Schedule) stipulates is when cell doors are allowed to be open; the Captain stated that he would "look into" this request and should get back to us in about a week with an update. (NOTE: This by no means is any type of promise or guarantee).

The issue with program constantly being opened late was brought up. The Lt. and Captain (Lt. Ojeda) explained that this has been an issue they have been working on resolving and involves an issue with the Kitchen Free Staff. While our Facility does have a Free Staff worker assigned, this worker is being constantly redirected to another Facility. Lt. Ojeda stated he has discussed this issue with the Food Service Manager and was told that the issue would be resolved. He mentioned that he was assured that the issue would be resolved, but evidently it has not been, so he will follow up. Since chow has been delayed, it has resulted in Tool Count being delayed and pursant to the DAS, Tool Count must clear before Program can start.

The issue with Education and DRP being released late was also addressed in this meeting. The RAC was asked to inform the population that effective IMMEDIATELY, anyone who is in DRP, DRP Behind-the-Wall, or Education, MUST stay out after completing Chow and wait for their class to begin. If anyone decides to go back into the housing unit after chow and is therefore late for class, they will have to deal with the repercussions at that point. If you have class in the Education rooms and are NOT ADA, you are permitted to wait at the Bleachers located in front of Education. If you are ADA, you are permitted to wait in front of Education behind the Yellow Line. If you have DRP Behind-the-wall, you are permitted to wait in front of Work Change.

The issue with access to condoms was also addressed. This issue is resolved in that Transgender Coordinator Solorio has been provided access to the condoms for distribution until boxes can be placed in each housing unit for easy access. LGBTQ residents will be allotted 3 condoms per week which will ONLY be distributed on Mondays.

The issue regarding the missing WheelChair piece was addressed and resolved.

This concludes the summary for this meeting.

SIGNATURES LOCATED ON OPPOSITE SIDE

C. Merrill
RAC Secretary
Facility E
CSATF/SP

J. Ratliff
RAC Vice Secretary
Facility E
CSATF/SP

A. Collins
RAC Secretary
Facility E
CSATF/SP

Lt. J. Brainard
3rd Watch Lieutenant
Facility E
CSATF/SP

J. Vaca
Captain
Facility E
CSATF/SP

Lt. Ojeda
Lieutenant (2nd Watch)
Facility E
CSATF/SP

# Exhibit 13

**DECLARATION OF** ███████████████

I, ███████████████ declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      My California Department of Corrections and Rehabilitation (CDCR) number is ███████ I am currently housed at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF). I am 53 years old.

3.      I have been in CDCR custody since August 2003. I have been housed at SATF since 2022. I currently live on Facility E at SATF. I previously lived on Facility F and Facility G at SATF. I have been housed on Facility E since March 2023.

4.      I am hard-of-hearing. I wear a hearing aid in my left ear. I hear very little in my right ear so I don't wear a hearing aid in that ear – a hearing aid doesn't significantly improve the hearing in my right ear. CDCR has assigned me a DNH code.

5.      I was recently elected to be the ADA Coordinator on the Resident Advisory Council (RAC). I am also assigned as an ADA worker. As an ADA worker and as the ADA Coordinator on the RAC, I speak with many people with disabilities on Facility E.

6.      My job as the ADA Coordinator on the RAC is to understand what issues people with disabilities are facing due to their disabilities and to raise those concerns with staff to try to resolve them.

7.      In my experience, many people with disabilities in prison are reluctant to ask for help. As someone with a disability, I know that it can be difficult to constantly interact with people who don't understand your disability and to be in a position to always be asking for help because of your disabilities. People with disabilities also don't want to appear weak. If you look weak, you're vulnerable. Prison can be a hostile environment for people with disabilities. It can also be difficult to be told "no" all the time and feel that no one understands your disability and what help you need. As an ADA worker, I have seen people with disabilities give up on asking for help because their requests are denied. It is important to me as ADA Coordinator to be responsive to what people share with me so

1

that people with disabilities aren't deterred from asking for help, and if they are not comfortable asking for help directly, I can advocate for them.

Canteen

8.      Residents at SATF who can afford canteen get canteen once per month. Canteen gives people independence – people who get canteen can make their own food, for example. When I get canteen, I use my canteen to contribute to a spread so I can eat with other people on the yard. I feel that brings a sense of community. That's important to me as a representative to the RAC – I feel that we on the RAC share a goal of trying to pull the yard together as a community, especially because the yard conversion from Level III SNY to Level II NDPF has been difficult. Many residents feel like the environment has become more restrictive and that's particularly hard on people who are serving long terms, like me. Canteen gives us a chance to have personal preference, to purchase snacks and other things not otherwise available, including hygiene products (for example, they don't issue us deodorant here, but you can buy it at canteen or through quarterly packages). It may sound like a small thing, but to people in prison, canteen means a lot. It brings a sense of normalcy and it helps break the monotony of prison life.

9.      I have received many complaints from people with disabilities on Facility E about access to canteen. Canteen on Facility E recently has run on a "first-come-first-serve" basis. That system disadvantages people with disabilities who can't get to the canteen window as fast as people who are not disabled. For example, people with wheelchairs need to wait for someone to push them around the track – they can't rush across the yard and up to the window like other people can. People with disabilities end up at the back of the line for canteen. They have to wait a long time for canteen in the hot sun, and sometimes people who get to the window late don't get canteen at all.

10.      In the last week or so, I raised concerns with the canteen manager about equal access to canteen for people with disabilities (who we call "ADAs" as shorthand). The canteen manager told me that he would run half-and-half (alternate between calling non-ADAs and ADAs to the window to get their purchases), so that people with

2

1    disabilities wouldn't be at the back of the line. Canteen ran that way that day, and I didn't

2    receive complaints. However, I don't think that's the policy.

3       11.    The next day when canteen was running, however, some ADAs came to my

4    building to tell me again that canteen wasn't running in an accessible way. I went to the

5    yard and saw that canteen was running as "first-come-first-serve," like it had in the past. I

6    told the canteen manager that wasn't equal access and wasn't what we had talked about

7    and what had worked the last time there was canteen.

8       12.    I left, and by the time I got back, the canteen manager had run canteen for all

9    the ADAs who were waiting. This wasn't the usual way of doing things, so I assume the

10   canteen manager did it that way because I had raised concerns about ADA access.

11   Everyone else was angry because they felt like the ADAs had cut them in line after I talked

12   to the canteen manager. It's a really sensitive issue. There was one person in particular

13   who got so upset and hostile because he said he thought the canteen manager had allowed

14   ADAs to cut in line because I talked to him. I thought for a moment that he might try to

15   fight me.

16                                    Announcements

17      13.    One of the other significant issues people with disabilities have raised with

18   me in my capacity as ADA Coordinator on the RAC relates to announcements. People who

19   are deaf or hard-of-hearing don't always know when they are being called out to a group or

20   an appointment over the public address system, which staff use to make announcements in

21   the housing units and on the yard.

22      14.    I have the same problem with announcements that I have heard about from

23   other people with disabilities. I often can hear that an announcement is being made.

24   However, I can't always understand what staff are saying over the public address system,

25   so I don't know if the announcement being made pertains to me. Staff sometimes flash the

26   lights, but staff flashing the lights in the dayroom doesn't help because I don't know if the

27   lights are flashing for something that relates to me. I am very attentive to announcements

28

                                          3

that are made because I can't always understand what staff are saying, and sometimes need to approach staff to ask if an announcement was for me.

15.    I also can't always understand announcements made over the loudspeaker on the yard. On the yard, I also can't see lights flash, so I don't know that I might need to ask officers if an announcement was made and whether the announcement was for me.

16.    I don't always receive ducats for healthcare appointments. I very rarely receive a ducat for appointments that are scheduled in response to a 7362, for example. Ducat times are very rarely accurate, but when I don't receive a ducat, I don't even know to listen for an announcement for me.

17.    For example, I put in a 7362 on September 15 because I wasn't feeling well. On September 16 in the afternoon, I was in the cell and my cellmate came back from the dayroom to tell me that staff had been calling for me to go to the clinic. I hadn't received a ducat or heard anything over the public address system – I don't know how long it had been since they called me.

18.    I haven't figured out how to resolve this issue yet as ADA Coordinator. I have told the ADA sergeant on Facility E that people who can't hear information on the public address system miss out on announcements and don't always know when they're being called out. I've encouraged other hard-of-hearing people to raise their concerns with the ADA sergeant directly about the same problem. A few months ago, the ADA sergeant told me and other ADA workers that he would speak with housing unit officers about this issue, but still announcements have not improved.

19.    It would be helpful to have something that I could wear, like a watch, that would consistently tell me when an announcement was made by vibrating or lighting up and if the announcement was related to me. I've never seen the tablets we are issued vibrate, chime, or light up for notifications. It would need to work in every part of the prison – as I said above, I worry that I miss announcements on the yard in particular.

20.    It would also be helpful to be able to see announcements written down and visible in a central location so that I don't need to interrupt staff to ask what an

1 announcement was for when I don't understand what was said over the public address
2 system.

3    21.    I am an ADA worker now, and providing individual notification of
4 announcements to hard-of-hearing people is not something I have been asked to do. Any
5 system for notification of announcements by ADA workers would require staff to be
6 diligent in directing ADA workers to alert specific people about announcements as they
7 are made, and there would have to be enough ADA workers always present to assist. I'm
8 not sure if there are enough ADA workers now to perform that function throughout the
9 day; right now, we are busy helping people with writing tasks, cleaning cells (and officers
10 have asked me to clean the showers), and pushing wheelchair users, among other things. It
11 seems like they would need to specially designate someone to perform that task and give
12 them clear direction and oversight – it may even require multiple ADA workers per
13 building, depending on how many people in the unit require individual notification due to
14 their disabilities. For example, if multiple people were being called at the same time, some
15 may be in the unit and some on the yard, and it may take some time to find and notify each
16 of them of the announcement. And it may be that the ADA worker doesn't know everyone
17 on Facility E or even in a specific building, so wouldn't know what they look like or where
18 to find them. We have a lot of new people arriving – people arrive daily – and I don't even
19 know everyone in my housing unit. I may have seen their face but I don't know their name
20 or where they live.

21                         Phone Access

22    22.    When I lived on Facility F at SATF, the phones turned on around 7 am and
23 the phones ran until late in the evening. I was able to make calls late at night, after we were
24 locked down in the cells. I use the TTY, but I could make calls on the tablets later than I
25 could make calls on the TTY, because I couldn't make calls on TTY after dayroom was
26 recalled.

27    23.    I understand that before I was elected to the RAC on Facility E, the RAC
28 advocated for phone times on the tablet to be extended to 7 am to 11 pm. When I started on

the RAC, the chairman gave me a copy of a request for a meeting sent to staff and dated July 30, 2024, which requested incentives for the population following the yard converting from a Level III SNY to a Level II NDPF. One of the incentives/enhanced programming ideas was "Tablet phone hours extended to 0700hrs-2300hrs."

24.　　I began acting as the ADA Coordinator on the RAC before I was elected in mid-August. I campaigned for the vote leading up to the ADA Coordinator election.

25.

The Captain is looking into ways to resolve this. The RAC requested that the phones turn on at 0635 which the DAS (Daily Activity Schedule) stipulates is when cell doors are allowed to be open; the Captain stated that he would "look into" this request and should get back to us in about a week with an update. (NOTE: This by no means is any type of promise or guarantee.)

26.

Minutes from meetings need to be approved by staff before they are posted on the wall for the population. The copy of the minutes I was given hadn't been signed by all staff members and I haven't seen it posted, but the person may have learned about it from someone at the meeting or who had seen the minutes.

27.　　Phone time is incredibly important for me and other residents. When I'm talking to someone on the outside on the phone, I don't feel like I'm in prison anymore – I

6

1   feel like I'm with my loved one. That outlet is important. I've been incarcerated for a long

2   time and I feel that I have to take on a gruff persona to protect myself in prison, but that's

3   not who I am. Talking with my loved ones helps me reconnect with myself.

4

5

6   //

7   //

8   //

9   //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

1    I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct, and that this declaration is executed at Corcoran,

3   California, on this _____17th_____ day of September, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit 14

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:  (510) 280-2621
Facsimile:   (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:  (415) 433-6830
Facsimile:   (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:  (510) 644-2555
Facsimile:   (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF** ███ ███ |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

1    **DECLARATION OF** ████████  ████████

2        1.    I have personal knowledge of the matters set forth herein, and if called as a

3    witness, I could and would competently so testify.

4        2.    My California Department of Corrections and Rehabilitation (CDCR)

5    number is ████████ I am currently housed at the Richard J. Donovan Correctional

6    Facility ("RJD"). I am 42 years old.

7        3.    I am a member of the *Armstrong* class. I have a DPH code, meaning that I

8    am deaf. My primary method of communication is ASL and my alternate method

9    of communication is writing.

10       4.    I have been incarcerated in CDCR since about 10 years. I have been

11   housed at RJD since 2021          . I am currently housed on            .

12       5.    I am housed in E-24        . My security level is 1) . We are allowed

13   to leave our cells and move freely around the prison between the hours of _7am_ and
     dorm

14   _4pm_ and the again between 5p

15   and 8:45 pm. By 9 pm I have

16   to be back in my dorm.

17

18   6. I use a videophone to

19   communicate with family and

20   friends. The video phone is located

21   in the rotunda of the housing

22   unit. I do not have access to

23   the rotunda during the times

24   I am supposed to be locked

25   in my dorm.

26

27   7. Everyone else who is not

28   deaf can use their tablet to place
     phone calls from 6 am to 11pm.

[4571437.1]                                                    Case No. C94 2307 CW

                  DECLARATION OF ____CD____

8. When there is a lockdown or modified programming the I do not get access to the phone because the door is locked to the rotunda and we are not allowed out.

9. My access to the videophone is restricted at least 3 sometimes 4 times a week.

10. A week or two ago there was an incident on the yard and we had no access to the phone for hours. Everyone else was able to make phone calls from their tablets during this time.

11. There are also video visitation kiosks. Those are located in the dayroom of our housing unit. We do have access to the video visitation kiosks during lock downs but those do not work well for sign language communication because the

the background is blurry and it blurs my hands when I am signing. Also, the videophone calls are free and the video visitation costs money.

12. This means that hearing people can have voice calls or video visit calls during lockdowns and modified programs and we can't access the videophone to make calls.

13. Some staff members deny access to the videophone even during the hours that we are supposed to have access to the phone.

14. Sometimes it is so difficult to use the phone so I try to avoid having a encounter with staff and I do not use the phone. But sometime it cannot be avoided and I need to place a phone call. I

do not like having to rely on the staff in order to access the phone. It does not seem fair because only deaf people have to go through staff to place a phone call.

14. There are at least six deaf people in E-24 and only one videophone. We have to sign up to use the phone. Our phone time is further limited by the fact that we are sharing one phone. So our access is limited by when the phone is not in use by someone else.

15. The tablet I have has a screen that is less than 10 inches. This makes it hard to see the interpreter for programs.

DECLARATION OF _____

It would be easier for me to have access to the programs if the interpreter was bigger. It is a struggle to see the interpreter and would be better if the screen was larger.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to the best of my knowledge, and that this declaration is executed at RJD in San Diego, California this 18 day of September, 2024.

On September 18, 2024, I read this entire document to ███ ████████ through a certified sign language interpreter. I used effective communication techniques to read this document to ██████████ in American Sign Language through an interpreter. I recorded any corrections that he made. The substance of what I conveyed to ██ through the interpreter is identical to the substance of this document, including the handwritten corrections.

Penelope M. Godbold, Esq.

[4571437.1]                                                4                    Case No. C94 2307 CW
DECLARATION OF ___C Q___

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF JOANNE BURNS** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

## DECLARATION OF JOANNE BURNS

1.    I, Joanne Burns, do hereby declare:

2.    I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called witness, I could and would competently so testify.

3.    I am a certified sign language interpreter and fluent in American Sign Language.

4.    On September 18, 2024, I and another sign language interpreter provided sign language interpretation services for ▮▮▮▮▮ and ▮▮▮▮▮ who both communicate using American Sign Language, when they met with Penny Godbold, an attorney with Rosen Bien Galvan and Grunfeld LLP.

5.    On September 18, 2024, I and another sign language interpreter provided interpretation services as ▮▮▮▮▮ and ▮▮▮▮ completed signed declarations, including by translating the contents of each declaration from English into American Sign Language.

6.    I affirm that I interpreted all communications related to the declarations accurately, completely and impartially, using my best skill and judgement in accordance with the standards prescribed by law and the Code of Professional Conduct for the Registry of Interpreters for the Deaf.

I declare under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this _10_ day of October, in _San Diego_ , California.

_Joanne Burns_
Joanne Burns

[4585969.1]

Case No. C94 2307 CW

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF KETURAH HOLIDAY** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

# DECLARATION OF KETURAH HOLIDAY

1.    I, Keturah Holiday, do hereby declare:

2.    I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called witness, I could and would competently so testify.

3.    I am a certified sign language interpreter and fluent in American Sign Language.

4.    On September 18, 2024, I and another sign language interpreter provided sign language interpretation services for ▮▮▮▮▮▮ and ▮▮▮▮▮▮, who both communicate using American Sign Language, when they met with Penny Godbold, an attorney with Rosen Bien Galvan and Grunfeld LLP.

5.    On September 18, 2024, I and another sign language interpreter provided interpretation services as ▮▮▮▮▮ and ▮▮▮▮▮ completed signed declarations, including by translating the contents of each declaration from English into American Sign Language.

6.    I affirm that I interpreted all communications related to the declarations accurately, completely and impartially, using my best skill and judgement in accordance with the standards prescribed by law and the Code of Professional Conduct for the Registry of Interpreters for the Deaf.

I declare under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this 10 day of October, in ___2024___, California.

_____
Keturah Holiday