Exhibit 15

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   JACOB J. HUTT*
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California 94710-1916
   Telephone:   (510) 280-2621
5  Facsimile:   (510) 280-2704

6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
8  MICHAEL FREEDMAN – 262850
   ROSEN BIEN
9  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
10 San Francisco, California 94105-1738
   Telephone:   (415) 433-6830
11 Facsimile:   (415) 433-7104

12 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14 Berkeley, California 94703
   Telephone:   (510) 644-2555
15 Facsimile:   (510) 841-8645

16 * Admitted pro hac vice

17 Attorneys for Plaintiffs

18                  UNITED STATES DISTRICT COURT

19                  NORTHERN DISTRICT OF CALIFORNIA

20

21 JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW

22         Plaintiffs,                  **DECLARATION OF** ▮▮▮▮▮

23     v.                               Judge:  Hon. Claudia Wilken

24 GAVIN NEWSOM, et al.,

25         Defendants.

26

27

28

**DECLARATION OF** ████████████

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. My California Department of Corrections and Rehabilitation (CDCR) number is ████████ I am currently housed at the Richard J. Donovan Correctional Facility ("RJD"). I am 44 years old.

3. I am a member of the *Armstrong* class. I have a DPH code, meaning that I am deaf. My primary method of communication is ASL and my alternate method of communication is ASL AND INTERPRETER

4. I have been incarcerated in CDCR since 2016 . I have been housed at RJD since 2016 . I am currently housed on ECHO YARD

5. I am housed RJDCF . My security level is 1 . We are allowed to leave our cells and move freely around the prison between the hours of 6AM and 9PM.

6.) I'M DEAF AND I USE (VP) FOR Communication (VP) MEANS VIDEO phonE, THE (VP) IS LOCATED AT HOUSING ROUNTUDA AND IT IS LOCKED AND I do NOT HAVE ACCESS TO VP. EXCEPT 7AM TO 4pm. I should HAVE ACCESS AT 5pm TO 8:45pm.

7.) I should be Able TO USE (VP) AT ANY TIME THE HEARING INMATES ARE Allowed TO USE THE phonE.

8.) THE HEARING INMATE HAS ACCESS TO TELEPHONE from 6AM TO 8:45pm AND WE ARE PREVENTED FROM USING (VP) AT MOST OF PERMITTED TIME FOR (VP).

9.) THE problem FOR not having ACCESS TO (VP) IS because THE STAFF MAY NOT BE AWARE ABOUT OUR phone privileges OR because THE YARD IS DOWN OR because THERE IS only ONE STAFF AT THE TIME. WE ARE NOT Allowed TO USE THE (VP) IF THIS HAPPENS. IT HAPPENS 2-3 TIMES A WEEK FOR MY DENIAL TO (VP) ACCESS.

10.) WHERE THE roundenda IS closed, IT bothers ME that I have TO GET STAFF ATTENTION IN order TO USE THE (VP),

11.) SOMETIMES IT IS VERY DIFFICULT TO GET THE STAFF'S ATTENTION TO USE THE (UP) DEPENDING ON THEIR MOOD. SOMETIMES THEY WILL HELP, SOMETIMES THEY WONT AND SOMETIMES I JUST GIVE UP-

1
2
3
4
5
6
7
8
9
10
11
12
13
14      I declare under penalty of perjury under the laws of the State of California that the
15  foregoing is true and correct to the best of my knowledge, and that this declaration is
16  executed at RJD in San Diego, California this _18_ day of September, 2024.
17
18
19
20      On September _18_ P6 2024, I read this entire document to Mr. ▮▮▮▮ through a
21  certified sign language interpreter.  I used effective communication techniques to read this
22  document to Mr. ▮▮▮▮ in American Sign Language through an interpreter.  I
23  recorded any corrections that he made.  The substance of what I conveyed to Mr.
24  through the interpreter is identical to the substance of this document, including the
25  handwritten corrections.
26
27
28                          Penelope M. Godbold, Esq.

[4571437.1]                     4                  Case No. C94 2307 CW

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF JOANNE BURNS** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

## DECLARATION OF JOANNE BURNS

1.     I, Joanne Burns, do hereby declare:

2.     I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called witness, I could and would competently so testify.

3.     I am a certified sign language interpreter and fluent in American Sign Language.

4.     On September 18, 2024, I and another sign language interpreter provided sign language interpretation services for ▮▮▮▮▮▮ and ▮▮▮▮▮▮ who both communicate using American Sign Language, when they met with Penny Godbold, an attorney with Rosen Bien Galvan and Grunfeld LLP.

5.     On September 18, 2024, I and another sign language interpreter provided interpretation services as ▮▮▮▮▮and ▮▮▮▮ completed signed declarations, including by translating the contents of each declaration from English into American Sign Language.

6.     I affirm that I interpreted all communications related to the declarations accurately, completely and impartially, using my best skill and judgement in accordance with the standards prescribed by law and the Code of Professional Conduct for the Registry of Interpreters for the Deaf.

I declare under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this _10_ day of October, in _San Diego_ , California.

_Joanne Burns_
Joanne Burns

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

* Admitted pro hac vice

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN ARMSTRONG, et al.,

        Plaintiffs,

      v.

GAVIN NEWSOM, et al.,

        Defendants.

Case No. C94 2307 CW

**DECLARATION OF KETURAH HOLIDAY**

Judge:   Hon. Claudia Wilken

# DECLARATION OF KETURAH HOLIDAY

1. I, Keturah Holiday, do hereby declare:

2. I am over 18 years of age and have personal knowledge of the matters set forth herein, and if called witness, I could and would competently so testify.

3. I am a certified sign language interpreter and fluent in American Sign Language.

4. On September 18, 2024, I and another sign language interpreter provided sign language interpretation services for ▇▇▇▇▇ and ▇▇▇▇▇, who both communicate using American Sign Language, when they met with Penny Godbold, an attorney with Rosen Bien Galvan and Grunfeld LLP.

5. On September 18, 2024, I and another sign language interpreter provided interpretation services as ▇▇▇▇▇ and ▇▇▇▇▇ completed signed declarations, including by translating the contents of each declaration from English into American Sign Language.

6. I affirm that I interpreted all communications related to the declarations accurately, completely and impartially, using my best skill and judgement in accordance with the standards prescribed by law and the Code of Professional Conduct for the Registry of Interpreters for the Deaf.

I declare under penalty of perjury, that the foregoing is true and correct and that this declaration was executed this ⟨10⟩day of October, in ___2024___, California.

_____
Keturah Holiday

# Exhibit 16

1  DONALD SPECTER – 083925
    RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
    JACOB J. HUTT*
3  PRISON LAW OFFICE
    1917 Fifth Street
4  Berkeley, California 94710-1916
    Telephone:  (510) 280-2621
5  Facsimile:  (510) 280-2704

6  MICHAEL W. BIEN – 096891
    GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
    PENNY GODBOLD – 226925
8  MICHAEL FREEDMAN – 262850
    ROSEN BIEN
9  GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
10  San Francisco, California 94105-1738
     Telephone:  (415) 433-6830
11  Facsimile:  (415) 433-7104

12  LINDA D. KILB – 136101
     DISABILITY RIGHTS EDUCATION &
13  DEFENSE FUND, INC.
     3075 Adeline Street, Suite 201
14  Berkeley, California 94703
     Telephone:  (510) 644-2555
15  Facsimile:  (510) 841-8645

16  * Admitted pro hac vice

17  Attorneys for Plaintiffs

18          UNITED STATES DISTRICT COURT

19          NORTHERN DISTRICT OF CALIFORNIA

20

21  JOHN ARMSTRONG, et al.,        Case No. C94 2307 CW

22        Plaintiffs,        **DECLARATION OF** ▮▮▮▮

23      v.

24  GAVIN NEWSOM, et al.,        Judge:  Hon. Claudia Wilken

25        Defendants.

26

27

28

[4552855.3]                               Case No. C94 2307 CW

1   **DECLARATION OF** ▮▮▮▮▮

2   1.    I have personal knowledge of the matters set forth herein, and if called as a
3   witness, I could and would competently so testify.

4   2.    My California Department of Corrections and Rehabilitation (CDCR)
5   number is ▮▮▮. I am currently housed at the San Quentin Rehabilitation Center ("San
6   Quentin"). I am 40 years old.

7   3.    I am a member of the *Armstrong* class. I have a DPH code, meaning that I
8   am deaf. My primary method of communication is sign language and my alternate method
9   of communication is written notes.

10   4.    I am also a member of the *Coleman* class. I have been diagnosed with
11   depression and I receive mental health services at the CCCMS level of care.

12   5.    I have been incarcerated in CDCR since December 10, 2013. From October
13   2016 until April 2022, I was housed at the Substance Abuse Treatment Facility and State
14   Prison (SATF). I have been housed at San Quentin since approximately April 6, 2022. I
15   am currently housed on South Block, in what is considered an "earned living unit" or
16   "honor building." To be housed in this unit, I had to demonstrate active engagement in
17   programming and remain free from any disciplinary write-ups for two years.

18   6.    Although I am housed in a cell, my housing unit is a Level 2, minimum
19   security unit. We are allowed to leave our cells and move freely around permitted areas of
20   the prison beginning after breakfast, around 6:30 or 7:00am, until count occurs at 3:30.
21   Free movement resumes around 5:30 or 6:00p.m. and ends at approximately 8:30 pm. The
22   other housing units at San Quentin have more movement restrictions and you cannot enter
23   and exit your cell freely throughout the day.

24   **Telephone Access at San Quentin**

25   7.    CDCR has issued tablet computers free of charge to all incarcerated people,
26   including me. The tablet computers allow incarcerated people to participate in a number
27   of prison programs, services and activities, while inside their cells.

28   8.    I am aware and have observed that incarcerated persons can use the tablets to

1   place telephone calls from inside their cells.  Until September 17, 2024, the times of day

2   that incarcerated people could use the tablets to place telephone calls from inside their cells

3   were from 6:00 a.m. until 3:30 p.m. and from 5:00 p.m. until 8:30 p.m.

4        9.     On September 17, 2024, I received a written notification on my tablet stating

5   that telephone access would be extended until 11:00 p.m. each evening.  I understand that

6   this happened because several hundred people housed at San Quentin submitted grievances

7   requesting the extended access.

8        10.    Prison officials have told me that, once the extended access begins, deaf

9   individuals will have different rules than non-deaf people.  Non-deaf people will be able to

10  place calls continuously from 5:00 p.m. until 11:00 p.m.  Deaf signers will be required to

11  be in our cells for institutional count from 9:00-9:30 p.m. and will not be able to place calls

12  during this time.  If we want to use the videophone after that time, we will have to inform

13  officers in advance—prior to 9:00 p.m.—so that they can leave our cell doors unlocked.  If

14  we do not plan in advance, we will not be able to place calls after 9:30 p.m.

15       11.    Unlike in the past, when everyone had to sign up to use the limited number

16  of phones available in the housing unit, because everyone is personally issued a tablet

17  computer and can use that tablet at their own convenience inside of their cell, there are no

18  restrictions on the number of calls nor the number of people that can be placing a call, at

19  any given time.

20       12.    From what I have observed, incarcerated people can place calls from

21  anywhere in the prison that has wireless internet.  At San Quentin, this includes the library,

22  the chapel, the yard, the education areas, the medical areas, and the vocational areas.

23       13.    I am aware and have observed that, by using the tablet computers to place

24  telephone calls, incarcerated people are not restricted by what is going on outside of their

25  cells when placing calls from inside of their cells. For example, if there is an alarm or a

26  disturbance occurring outside of people's cells in the dayroom, I have observed that people

27  are still able to place calls from their tablets inside of their cells until problems outside of

28  the cells are resolved.  This is also true during "modified programming," such as when

1  there is a staffing shortage, a staff meeting, or some other need to modify the normal,

2  allowed, out-of-cell time that is permitted in a housing unit. During "modified

3  programing" incarcerated people are not let out of their cells as much as normal

4  programming but incarcerated people are still able to place phone calls on their tablets

5  from inside their cells when programming is modified. The same is true during periods of

6  "lockdown," where the prison staff cancel dayroom, yard time, or rehabilitative

7  programming. I have observed that even during lockdown incarcerated persons can still

8  place calls from their tablets inside their cells. Indeed, from what I have observed, periods

9  of time when people are locked in their cells more are the times that people use their

10  tablets more, including to place phone calls, because there is very little to do otherwise.

11      14.    I would very much like to be able to place calls from inside my cell, with the

12  same unrestricted access to the phone, same privacy, without having to share a device and

13  wait for others, in the same manner that the people who are not deaf or hard of hearing can.

14  But I cannot, solely because I am deaf and CDCR requires deaf people to place calls from

15  stationary videophones located outside of our cells.

16                    **Videophone Access at San Quentin**

17      15.    Because I am deaf, and I use sign language to communicate, I use a

18  "videophone" which has video-conferencing technology, similar to FaceTime or Zoom, to

19  allow me to communicate with others on the phone. Currently, the only way I can access

20  the videophone is when I have permission to be outside of my cell either for general

21  purposes (where we are allowed to choose where we go and what we do, including placing

22  calls), or specifically for the purpose of placing a call.

23      16.    The prisons that house people who use sign language to communicate have

24  installed videophones for us to use to place phone calls. The videophone that I use is

25  located in the dayroom of my housing unit, on the first floor. I am housed on the second

26  tier, along with all the other deaf signers on South Block. The videophone is attached to

27  the wall and cannot be moved. I can use the videophone to call anyone, including people

28  who do not know sign language or who use a standard telephone. When I use the

[4552855.3]                                    4                           Case No. C94 2307 CW
                              DECLARATION OF ▬▬▬▬▬▬

1  videophone to dial a number associated with a standard telephone, the videophone

2  connects automatically to a sign language interpreter who works for the federally funded

3  Video Relay Service.  The Video Relay Service interpreter will interpret the call at no cost

4  to myself or the person I am calling.

5      17.    I cannot place telephone calls from inside of my cell using the tablet

6  computer because the tablet does not have software that allows incarcerated persons to

7  place videophone calls.  When I place a call using a videophone the only way for me to do

8  so is to have permission to be outside of my cell and placing a call.

9      18.    As a result, my access to calls is not equal to the access that non-deaf people

10  have because out of cell time, when I must place my calls, is more limited than the times

11  when others can place calls.  This is especially true when program is modified or we are on

12  lockdown, which happens regularly.  Also, I have to share the videophone with others and

13  sometimes must wait to place a call.  Also, because I am not allowed to place calls in my

14  cell, I do not have the same privacy for my calls as others do.  All of this makes me feel

15  frustrated because it seems unfair and like I am a lesser because of my disability.

16                      **Daily Limitations on Videophone Access**

17      19.    Because I need to be allowed outside of my cell to place calls, there are times

18  every day that others can place calls to their loved ones, because they can do so from

19  inside of their cells on their tablet, but I cannot.

20      20.    In my housing unit, we are allowed to move freely most of the day, but we

21  are required to be inside our cells for count and for evening recall.

22      21.    Phone access is cut off for everybody from about 3:30 p.m. until 5:00 p.m. to

23  allow for institutional count of every incarcerated person.  However, my access to calls is

24  cut off for longer because we are required to return to our cells by 3:30 p.m. and cannot

25  leave until count has "cleared," which often does not occur until 5:30 or 6:00p.m.

26      22.    I typically do not have access to phone calls daily for about 30-60 minutes

27  while others are still permitted to place calls inside their cells.  During these daily times, I

28  have tried but I cannot get permission to be outside of my cell and on the videophone.

1    Once hours are extended until 11:00pm, there will be an additional 30 minutes per day

2    when others can place calls, but I cannot.

3                      **Periodic Limitations on Videophone Access**

4            23.    Beyond the 60 minutes daily when I do not have permission to be outside my

5    cell and placing a videophone call, there are other events that happen periodically where I

6    am required to be inside my cell for a much longer period of time.  I will explain these

7    circumstances more below.  During these occasions, I have to get express permission to

8    exit my cell for the purposes of placing a call.

9            24.    My videophone access is limited for a full day each month referred to as

10   "training day."  During this day, the officers who regularly work in my housing unit

11   participate in training and a different correctional officer takes over their shift.  On training

12   day, the institution is placed on "modified programming," meaning that we have to spend

13   most of this day inside our cells and we need permission from the officers to leave.

14   Usually, we are let out only for showers and maybe meals.

15           25.    It is difficult for me to get permission to leave my cell on training days for

16   several reasons, including because I am deaf.  Because we are locked in our cells, I have to

17   rely on a porter to communicate.  Usually, there is a porter (another incarcerated person

18   who is allowed to be in the dayroom to clean it and to run errands for the custody officer)

19   in the dayroom.  I have to attempt to communicate my request to be let out of the cell to

20   use the phone through the porter.  Sometimes the porter will know sign language, and I can

21   communicate freely.  But most of the porters do not know sign language, and I have to

22   attempt to convey my request to be let out through gestures or written notes, which can be

23   difficult.  It makes me uncomfortable and nervous to communicate this way, because I am

24   not confident that I have been understood and that I am understanding what is being said.

25   When it comes to communicating with custody staff through another incarcerated person,

26   it is scary to not know exactly what is being said.

27           26.    These substitute officers, who do not know me and do not know our housing

28   unit well, do not usually let me go place a videophone call.  If I am already out of my cell,

[4552865.3]                                  6                        Case No. C94 2307 CW

DECLARATION OF ▮▮▮▮▮▮▮

1    sometimes I can explain the situation to a lieutenant, and the lieutenant intervenes, but that

2    is typically the only way I get to place call.

3        27.    I find it deeply frustrating and demeaning to have to negotiate for phone time

4    when I know that people who are not deaf do not have to jump through these hoops.  Every

5    time I have to reach out to an officer to ask permission for something, I worry that I will

6    upset the officer and they will do something to retaliate against me.  This is especially true

7    for unfamiliar officers, because I do not know how they will react.

8        28.    Even something as minor as a disciplinary write-up called a "counseling

9    chrono" or "128B chrono" can have huge consequences for me:  First, it could mean I get

10    transferred to more restrictive housing.  I have seen a number of people be transferred out

11    of our earned living unit for counseling chronos they have received for things like stepping

12    out of bounds, collecting too much toilet paper, or taking a quick shower without

13    permission.  Second, it could extend my time in prison.  I am serving a life sentence in

14    prison and I have a parole suitability hearing in December of this year.  If I get a

15    counseling chrono this close to my parole date, it could easily cause the Board to deny me

16    parole.  Because of all this, I walk on eggshells trying to stay out of trouble.

17        29.    I have tried everything to make sure the officers understand that I am not

18    asking for a special favor, I am only asking them to follow the rules.  I have a copy of a

19    memo that was published on October 6, 2023, that says that deaf signers are supposed to

20    be let out of their cells during modified programming to use the videophone.  I have shown

21    this to the officers to request permission to place a call during modified programming, but

22    officers still refuse and tell me to wait until regular programming.  When I show them the

23    memo and they still say no, I typically do not press the matter any further, because I am

24    worried that I will upset the officer.

25        30.    On non-training days, the officers who regularly work in my housing unit

26    usually let me out of my cell to use the phone during modified programing, but I have to

27    go through the frustrating and demeaning process of asking permission, and hoping they

28    understand me and follow the policy.  Officers who are new to the unit or assigned only

1    temporarily to fill in for an absent officer, however, still typically do not let me out of my

2    cell to place a call.

3         31.    Even regular officers will not let me out of my cell during lockdowns. Most

4    recently, in July or August 2024, my housing unit was placed on lockdown for about 10

5    days due to an outbreak of a virus, which I believe is called norovirus. For this entire 10-

6    day period, I was not able to place any calls because officers would not let me out of my

7    cell to use the videophone. During this time I saw non-deaf individuals placing phone

8    calls on tablets from their cells without any restrictions.

9         32.    My housing unit is placed on lockdown approximately once per month for

10   different types of disturbances. The most common disturbance is when an incarcerated

11   person does not show up to a class or appointment, usually because they lost track of time.

12   When the happens, the prison announces "unit recall" or "institution recall," which means

13   that everyone in that housing unit or in the entire prison has to go back to their cells

14   immediately and stay there until everyone is accounted for. The prison also has institution

15   recall every time an officer sees someone outside the perimeter of the prison who could be

16   an escaped incarcerated person. This happens fairly frequently at San Quentin, because

17   there is often heavy fog that can make it appear as though someone is wearing our blue

18   prison uniform when they are wearing street clothes.

19        33.    I was previously housed at SATF. At SATF, we did not have unit recall or

20   institution recall every time a person failed to show up for an appointment.

21        34.    Finally, there is occasionally something called a "program activity report"

22   that says that incarcerated people cannot make phone calls on the telephones in the

23   dayroom. During these times, I have observed that incarcerated people can still place calls

24   on their tablets from their cells. Some officers interpret this rule to mean that deaf signers

25   cannot leave their cells to place videophone calls. This is another occasion when non-deaf

26   people can place calls but I cannot.

27        35.    In addition to the restrictions above, there are times when I cannot use the

28   videophone because the one videophone I have access to is broken. When the videophone

1  breaks late in the day on Friday or on the weekend, we have to wait until at least Monday

2  before a technician can fix the videophone. This means that I may have to wait several

3  days to place a videophone call, because I do not have the option to use another

4  videophone.

5                    **Sharing the Videophone with Six Other People**

6         36.    Even when I do have access to the videophone, I cannot always use it. There

7  are a total of seven people on my yard who have been approved to use the videophone,

8  meaning that all seven of us share a single device.

9         37.    I am a very social person and my call list includes over 300 people that I

10  count on being able to call on to help my mental health. I call my father daily. I have two

11  children, whom I try to call every chance I can. There are other people that I call on a

12  weekly basis, ranging from my sister, to clergy members, to deaf advocacy organizations.

13         38.    It is common that, when I go to use the videophone, someone else is using it

14  already and I have to wait my turn. It is also common that, while I am placing a

15  videophone call, someone else will be waiting to use the phone right after me. As a

16  courtesy to others that I know are waiting to use the phone, I usually cut my own calls

17  short, or I do not place as many calls as I would like, because I do not want to cause any

18  problems with other people who are also waiting to use the videophone. There are also

19  times when I have to end my phone time early because one of the other deaf people has an

20  appointment with a lawyer or a member of the clergy that takes priority over my call.

21         39.    When I place calls, the person I am calling is not always able to answer.

22  Because of my limited access to the videophone, I cannot simply call back in a few

23  minutes – by that time, I may have to get back in line to use the phone because there is

24  another deaf signer using it, or I may have been required to go back to my cell for count or

25  recall.

26         40.    These limitations on calling take a big toll. I want so much to be part of my

27  children's lives, but they seem increasingly disconnect and quiet when I call. I think it is

28  because I am not able to call them often, and I have no other way to reach out to them, so

they think I am forgetting about them.  It is also stressful for my family when I do not call – when we finally connect, they tend to be worried because they thought I got in trouble or that something bad happened to me.

41.     Sometimes the difficulty getting access to videophone has devastating consequences.  On one occasion, I kept missing the opportunity to reach my sister on the videophone, and I went without seeing or conversing with her for almost two months.  One day, I received an electronic message from my sister saying that she was free in case I was able to call right then.  I went to the videophone right away to call her, but someone else was using the phone and I had to wait.  By the time the phone was available, my sister was no longer available and I had lost my chance to see her.  I was seriously distraught after that incident.

## Lack of Privacy

42.     Privacy is another significant reason why the phone access that I have, where I have to exit my cell and go use a phone in a public location each time I place a call, is not equal to the access that all the non-deaf people in my prison have.

43.     The videophone is located in the dayroom.  While I have a three-sided privacy screen that I can put up around me during calls, it is not enough to keep out prying eyes.  The screen is only 5½ feet high, making it easy for other incarcerated people to look over the top of it.  People on the second and third tiers of my housing unit can also easily see the videophone screen from the walkway of their tier.

44.     I have attached as **Exhibit A** some photographs that show the videophone in North Block, which has a layout that is very similar to South Block, and which depict the exact same privacy screen that we now use in South Block.  The first picture shows the view of the videophone from the second tier, and you can see that the screen is clearly visible.  You can also see that the person standing next to the privacy screen can see over it.  The second picture shows that a person standing next to the privacy screen can see over it.

45.     During my calls, it is common for other incarcerated people watch my call.  I

never know quite why they are staring, but especially when there are women or children on the call, it makes me very uncomfortable to have my friends and family seen. I find it embarrassing and demeaning and find it to be an invasion of privacy. It is especially uncomfortable to have other incarcerated people, some who are strangers, leering at my children, nieces and nephews. It can make me so upset that I need to end the call and go cool down.

46.    The videophone location is also in a high-traffic part of the dayroom, right by the entrance. Because of the location, the privacy screen constantly gets jostled during the call. People will bump the screen as they walk past on their way in and out of the building, porters pushing large carts will bump the screen with their carts. Even the breeze that comes in when someone opens the door will jostle the screen. The jostling is so bad— and so distracting, that I have to wrap my feet around the bottom of the privacy screen to hold it in place during my calls. I have complained about this, and I know that attorneys from the Prison Law Officer have taken pictures so they can advocate to move the videophone to a better location, but nothing has changed.

47.    If I had videophone software on my tablet, I would be able to place calls from the privacy of my own cell, instead of doing so in a high-traffic area where everyone can see.

48.    Staff do not closely watch me when I place video calls. Staff cannot monitor my videophone activity from where they are typically stationed in the housing unit because the privacy screen blocks the direct line of sight from staff to the videophone. In order to see what I am doing, they have to come over and look behind the privacy screen. Staff rarely ever do this. However, I have seen that officers in various locations, including officers in my housing unit, have computer screens that allow them to monitor our videophone calls in real time and to watch recorded calls at a later time.

### Lack of Convenience

49.    The fact that I can only place calls from a fixed location in the dayroom also makes it less convenient for me to place calls. I often place calls while I am working

1 | on homework for one of my college classes or rehabilitative programs. It would help me a
2 | lot to be able to sit at a table when I call, so I can consult my papers or take notes. But
3 | because the videophone is not located near a table, and the only tables in prison are bolted
4 | to the ground, I have to do everything on my lap, which is very cramped.

5 |      50.    Having videophone software on the tablets would be very helpful, because it
6 | means that I could sit at a table with my homework when I place a call. On a nice day, I
7 | could even sit outside.

8 | **Emotional Impact**

9 |      51.    I find it frustrating and unfair not to be able to place calls as easily or as
10 | privately as other incarcerated persons, simply because I am deaf. I have filed CDCR
11 | 1824 Forms requesting access to videophone calls on the tablet computers, and I have seen
12 | 1824 requests filled out by other deaf signers, but all of our requests for equal access to in
13 | cell tablet calls have been denied.

14 |      52.    Being able to stay in regular and unrestricted contact through videophone
15 | access with people who are outside of the prison is extremely important for me and my
16 | mental health. Having that connection to the outside world keeps me focused on positive
17 | things. When I have trouble placing videophone calls, either because I have trouble
18 | getting out of my cell, because my time gets restricted due to a lockdown, or because
19 | someone else is using the shared phone, I get anxious and my thoughts turn negative.

20 | **In-Cell Videophone Access in Tulare County Jail**

21 |      53.    I was recently housed in the Tulare County Jail in Visalia, California from
22 | approximately November 29 to December 13, 2023, for the purposes of re-sentencing.
23 | During this time, the Tulare County Jail gave me both a tablet computer and a laptop
24 | computer that both allowed me to place video calls from inside of my cell.

25 |      54.    The tablet computer was the very same type of tablet computer that we use in
26 | CDCR. I believe it is made by ViaPath. I was given the impression that the tablet
27 | computer they gave me was specifically for deaf incarcerated people and that non-deaf
28 | people received a different tablet. The tablet I was given did not contain software for

placing standard telephone calls nor for conducting video visitation.  But it had software on it that allowed me to place videophone calls and I was allowed to place those calls from inside my cell.  The software did not blur the background of the call, so nothing interfered with the visibility of my signing.  The call also had a banner stating that the call was being monitored and recorded.  The officers also showed me a computer monitor in the officer's station, where they were able to remotely monitor my call.

55.    I was also given a laptop computer that had only videophone software on it. There was nothing else that I could use the device for.  Like the tablet computer, the videophone software on the tablet let me place a call on a line that was monitored and recorded, without blurring my hands as I tried to communicate through sign language.

56.    With these two different options, I was able to place videophone calls from inside my cell if I needed to.  I saw that the non-deaf people at the Tulare County Jail each had a tablet computer that looked the same as mine and they were able to use it to place telephone calls from inside their cells.

57.

58.    I have also learned that the prison might try to increase videophone access by increasing access to video visitation.  Video visitation is not equal to a videophone call. First, I still would have to be able to exit my cell for the purposes of video visitation, so I

1   would still have limited access and no privacy.  Second, video visitation is a paid service,

2   while videophone calls are free.  Third, it is difficult for me to communicate using video

3   visitation: the video visitation software often blurs my hands and arms when I am signing,

4   making communication unclear, and the transmission of the video signal is sometimes

5   choppy.  Fourth, because it is not a true videophone call, it is not possible to connect to a

6   sign language interpreter through "video visitation" so it is not possible to communicate

7   with people who do not know sign language.  Finally, video visitation requires the other

8   person to be an approved visitor, to download special software, and to make an

9   appointment.  None of those steps are necessary for me to place a videophone call.

10  Essentially, even if everyone in prison had their own personal video visitation kiosk in the

11  dayroom, it still would not be equal to having in-cell access to a videophone.

12                                **Tablet Size**

13     59.    Even though I am still fairly young, I still find the tablets difficult to use for

14  entertainment because they are too small.  In the evenings, I sometimes like to watch

15  educational videos in sign language.  The small size of the tablets makes my eyes get tired

16  quickly from looking at such a small image.  When trying to watch videos with closed

17  captions, I also sometimes have problems where the captions are either too small to read or

18  they block the images in the movie.  Understand that my deaf peers who are older have

19  more problems with their vision and more difficulty understanding sign language and

20  watching captioned videos on the small tablet screens.

21                    **Sign Language Interpreters in Groups**

22     60.    I use sign language interpreters to access rehabilitative programming and

23  other programs, services and activities in prison.  Usually, the interpreters sometimes

24  appear in person and sometimes appear on a computer.  I have never had anyone else in

25  my rehabilitative groups say or do anything that makes me think they are not comfortable

26  participating because there is a sign language interpreter present.

27     61.    In the groups, I know the interpreters are doing their best, but sometimes

28  they make mistakes or are not completely clear, and it can cause problems.  The

conversations in these groups can be very sensitive.  When I do not understand the interpreter, I do not want to interrupt and ask for clarification, because it would be too disruptive in such a sensitive conversation.  But when I do not understand the interpreter, I might not react appropriately – I might think someone is being funny when they are being serious, or vice versa.  The other people in my groups can get offended when I do not react in an appropriate way, which can cause conflicts between us.  It is also embarrassing for me to realize that I have laughed when I shouldn't, or to see that everyone else is laughing and not understand why.  And, of course, when the interpreter does not interpret clearly, I do not get as much benefit from attending the group.

62.    Having an interpreter on site is much more effective than having a remote interpreter.  The equipment that CDCR uses to provide remote interpreting does not work well.  The remote interpreter constantly will say they cannot hear what other people are saying.  When the interpreter cannot hear someone, I often have to be the person who interrupts and asks them to repeat or to slow down.  It is very awkward for me.  At least when the interpreter is present in person, the interpreter can be the one to ask someone to repeat what they did not hear or to ask people to slow down when they are talking too fast. That lets me focus on my own experience of taking the class.  I can choose to advocate for

///
///
///
///
///
///
///
///
///
///
///

1  myself if there is something that the interpreter did not sign clearly, but I do not have to

2  also advocate for the interpreter's needs.

3      I declare under penalty of perjury under the laws of the State of California that the

4  foregoing is true and correct to the best of my knowledge, and that this declaration is

5  executed at San Quentin, California this 25th day of September, 2024.

6

7

8

9      I read this entire document to ▮▮▮▮▮ in American Sign Language, a language

10 in which I am fluent, on two separate occasions on September 19 and 24, 2024.  On each

11 occasion, we communicated via Microsoft Teams and I used effective communication

12 techniques to verify that ▮▮▮▮▮ understood.  The substance of what I conveyed to

13 ▮▮▮▮▮ both times is identical to the substance of this document.

14

15                                      /s/ Caroline E. Jackson
16                                      Caroline E. Jackson, Esq.

17

18

19

20

21

22

23

24

25

26

27

28

[4552855.3]

16

Case No. C94 2307 CW

DECLARATION OF ▮▮▮▮▮

**Armstrong et al., Monitoring Tour**
**San Quentin State Prison**
**May 22, 2023**



SQSP North Block-IMG_3179 VRS Area View From 2nd Tier.JPG

**Armstrong et al., Monitoring Tour**
**San Quentin State Prison**
**May 22, 2023**



SQSP North Block-IMG_3175 VRS Privacy Screens.JPG

]

DEF CDCR 0028

Exhibit 17

**DECLARATION OF** ████████████

I, ██████████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation (CDCR) number is ████. I have been in CDCR custody since January 2009. I am 40 years old.

3.     I am currently housed at Mule Creek State Prison (MCSP). Before I was at MCSP, I lived for over four years at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF). I was housed at SATF from March 2018 until March 2019 and again from February 2020 until I transferred to MCSP around July 3, 2024.

4.     When I was housed at SATF, I primarily lived on Facility D, which is a Level IV yard with celled housing. I now live on Facility B at MCSP, which is a Level III yard with celled housing.

5.     I am mostly deaf in my right ear and partially deaf in my left ear. CDCR has assigned me a DNH code. I am prescribed hearing aids, but hearing aids alone don't always allow me to understand speech, especially in loud environments where there is background noise. For example, when I try to speak with loved ones on the phone in the dayroom, I often can't hear them at all when the dayroom is busy and loud. Even when I do hear them, I have trouble distinguishing between their voices and the voices of people speaking in the background. In that kind of environment, interruptions, like the automated message saying that the phone call is being monitored or announcements over the public address system from the tower officer, can be confusing and make it even more difficult for me to understand my family.

<u>Tablet-Based Phone Calls</u>

6.     I had a ViaPath tablet when I was housed at SATF. I used the phone application on the tablet to call my family from inside my cell, though with complications.

7.     A representative from the Prison Law Office told me that CDCR said that 96% of DNH class members at SATF used their tablets to make phone calls from January

1

1, 2024, through September 3, 2024. That number doesn't surprise me. Phone calls are really important to incarcerated people. Even if you can't hear everything, some communication is better than nothing.

8.     I made calls on the tablet at SATF even though I could not always hear what the other person was saying clearly. When I was at SATF, I would turn the volume on the tablet all the way up because I can't hear otherwise. I didn't find the over-ear headphones provided by CDCR to be very helpful, so instead I would use the earbuds provided with the tablets, without my hearing aids (because I could only put either earbuds or hearing aids in my ears). Sometimes, though, I periodically would get a written message when I was starting the phone application that said something to the effect of, "loud sounds may damage your ears." The volume then automatically turned down to a point that I could no longer hear, so that I had to turn it all the way back up again. I have a tablet now at MCSP and have the same problem. I've put in multiple tablet trouble tickets to have that feature removed, since it prolongs the process of making a phone call.

9.     Despite the problems I have with making phone calls on the tablets, using the tablet to make phone calls at SATF was the obvious choice because we were locked down in our cells so often. It took me a long time to get access to the Telecommunications Device for the Deaf (TDD) when I was at SATF because staff wouldn't provide it to me – I filed a grievance and the Prison Law Office sent an advocacy letter. But even once I did have access to it, I don't think I could've used it during lockdowns or modified programming when I was on D yard because I wasn't allowed out of my cell. In my experience, lockdowns and modified programming are similar because they involve many of the same limitations on out-of-cell time, including sometimes access to the phones, which disproportionately affects people who don't have tablets or who can't use the tablets to make a call.

10.     When I was on D yard at SATF, the program was modified very often. The program would be modified for many reasons – because metal was missing; because there had been a written note, or "kite," with a threat on staff; or because of a fight that staff

2

perceived to be related to a group. The program often was shut down because of overdoses, especially in the last few years. The program also would be modified when D yard was short-staffed, including when staff were diverted from D yard to assist with searches on other yards. Sometimes the program would be modified for days because of those kinds of events.

11.     To get out of the cell during lockdowns and modified programming at SATF was very difficult. During a full lockdown, I would need to get the attention of officers directly because there is no one else in the dayroom to ask to relay a message. During modified programming, I might be able to ask a porter to relay a message for me. To get the attention of either the porter or staff, I would yell out of my door or use a piece of paper to try to flag someone down. Porters sometimes would ignore me and officers didn't always respond, like when they were in their office.

12.     There were times when I was locked down on D yard at SATF and we were getting meals in our cells when I couldn't even turn in a medical care request because the building officer wouldn't let me out of my cell to give it to the nurse, even though the nurse was in the building giving out medication (at that time, there was no box for 7362s in the building). That happened even when I tried to get an officer's attention by waving at the door or yelling or when I told them the day before that I would need to be let out to turn in a medical slip. If staff wouldn't let me out to ask for medical care, I don't think they would let me out just to use the phone.

13.     To me, it would give a fuller picture of what it's like to use the tablet to make calls as a partially deaf person to say that while 96% of people designated DNH may make calls on the tablets, not all of us necessarily have the accommodations we need to make phone calls effectively, but place calls on the tablet regardless of complications because there are no other options or services provided to accommodate them.

14.     When I transferred out of SATF, I was asked to give up my tablet when I left from R&R (Receiving and Release).

3

1       15.    I was not given a tablet when I got to MCSP on July 3, 2024. When I still did

2  not have a tablet on July 22, 2024, I filed an 1824 asking for one. I now have a tablet. On

3  B yard at MCSP, I can make phone calls from 6 am until 11 pm. That access feels like so

4  much more than we had at SATF, when I could only make calls on the tablets from 9 am

5  until before 9 pm, not including losses in connectivity and other scheduled outages.

6       16.    Having as much phone time as possible, particularly late in the evenings

7  after 9 pm, is meaningful to me. I think it's meaningful to many people. For me, I work at

8  PIA Sewing from 7 am until 2 pm or 3 pm. I also am taking a college class and sometimes

9  don't get out of class until 7:20 pm and then I need to study. My daughter is sick and my

10  wife is very worried about her, so I want to be able to talk to them to build a stronger

11  relationship with them and show my feelings and care for them for as long as I can in the

12  evening after work, to try to put their minds at ease. My wife works until around 3 pm and

13  takes care of our three children after work, so she isn't available usually until after 7 pm.

14  Without being able to speak with them at night, it would be harder for me to be a father.

15  My family is mixed – my children are not my biological children, and two of my children

16  were adopted by my wife. It's important to me to be able to build a bond with them in case

17  I do get out of prison, so that I can care for them. I was a foster child and I know that it's

18  more complicated to grow up as a child being raised by someone who isn't your natural

19  parent because some don't show the same love and affection that a natural parent would

20  show to their child. I need to build my children's trust and try to guide them as much as I

21  can and show them my love like a father. I know the time later in the evening after the

22  children go to bed is meaningful to me and my wife too – that's when we're really able to

23  talk.

24       17.    As I said above, I have been incarcerated in CDCR since 2009. Since phone

25  calls became available on the tablets, the yards I've been on have become less violent. [over the phones JS.] I'm

26  not sure someone in society could understand how meaningful phone calls are to people in

27  prison.

28

Previous Declaration

18.     On August 14, 2020, I signed a declaration in *Armstrong v. Newsom* about being denied access to the Telecommunications Device for the Deaf (TDD) at SATF. In my declaration, I explained that I filed a 602 requesting access to the TDD or to phone calls in the evening to accommodate my hearing disability. I described how other incarcerated people then approached me because building officers had told them that people would be losing their privileges because "the guy with the hearing aids," meaning me, had filed an appeal complaining that others were getting extra privileges, including phone calls. I explained how people insinuated that I would be beaten up because of what the officers had said. I believe the officers' comments put my life in danger from other incarcerated people by singling me out. After that, and after other experiences trying to get access to basic things that I needed, I stopped asking because of hostility from officers and comments the officers would make towards me.

19.     I don't think a person who has never been to prison can understand the danger that I was in because of what people told me that the officers had said. I didn't feel safe anywhere. I didn't know how people would react to what officers had said or if someone would act violently without warning, but my assumption was that someone would act violently. What people told me officers had said wasn't true, but it was their word against mine, and because the information came from a few custody officers, I didn't feel that I could go to custody officers for help because of their conduct and attitude towards me. I had to try to diffuse the situation on my own. I don't know what else officers might have told people about me that could put me at risk.

20.     Officers reacting that way to my request made me think twice before asking for things that I needed – I didn't want to be retaliated against anymore for making any request, including related to accommodations for my disability. There were times I wanted to file a grievance but didn't, like when officers searched my cell and threw my property all over the floor. I also stopped asking for phone calls in the evening, even though I could hear my family better then.

21.     One reason I think that the rumor endangered me so much, which the officers would've known, was that it related to people's access to the phones. As I said above, phone calls are incredibly meaningful to me and to many other people in prison. Taking phone calls away from people is taking away their access to their parents, who may be sick, or to their kids, who might need mentorship or support. Phone calls help us build better relationships with our loved ones. Without phone calls, I think I and many other people would feel helpless – we wouldn't be able to help people we know we could support even though we are in prison. My sister, my grandmother, and my wife have told me how much it means to them just to be able to hear my voice.

22.     When I was at SATF, I witnessed physical fights between incarcerated people over access to the phones. That happened more than once – for example, when someone wouldn't get off the phone when their phone time was over, or someone tried to take someone else's turn on the phones. Especially before in-cell phone calls on the tablets, lockdowns aggravated tensions over the phone because people had less access. I remember hearing about people who were stabbed during fights over phone time in another block on D yard at SATF. Although I didn't witness it myself, altercations like that and like the ones that I witnessed are one reason I feared for my own life when staff told people they would lose phone time because of me.

## Ducating System

23.     At SATF, I found that the time on ducats for medical appointments was not always accurate. I was expected to report to medical only when the tower officer said to. In practice, the ducat meant that I had an appointment, but it didn't say when I actually would be seen for the appointment. Sometimes I was called early or late on the ducat. I wouldn't have been allowed to go to the clinic just because it was the time listed on my ducat if the officer hadn't called me. And even when I reported to medical because someone called for me, I'd still sometimes have to wait for up to an hour.

24.     Announcements made over the public address system are not always clear and are not a reliable way to learn about appointments either because it's sometimes very

difficult to understand what the officer is saying. At SATF and now at MCSP, when an officer opens my door, I have to go to the tower officer to try to clarify what they had announced, because I can't understand the announcement enough to know if it relates to me or my cellmate. I don't want to be written up for not understanding what the officer said.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at Ione,

3  California, on this _____ 9 _____ day of October, 2024.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 18

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 2/21/2024          **Date IAC Received 1824:** 2/20/2024          **1824 Log Number:** 522096

**Inmate's Name:** ▇▇▇          **CDCR #:** ▇▇          **Housing:** C8-▇▇

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Medical Executive G. Ugwueze, Psychologist Dr. ▇▇, Health Care Grievance Representative ▇▇es, Custody Appeals Representative ▇▇, Associate Governmental Program Analyst ▇▇ Staff Services Analyst ▇▇, Field Training Lieutenant ▇▇, Principle (A) ▇ ▇▇

**Summary of Inmate's 1824 Request:** Inmate reports being DTL and DNH; Inmate requests to be provided a service dog upon parole to assist with daily activities.

### Interim Accommodation:

☒ No interim accommodation required: You are not requesting an accommodation at access Programs, Services, or Activities (PSA)s while incarcerated.

### RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate reports being DTL and DNH; Inmate requests to be provided a service dog upon parole to assist with daily activities.

**Response:** On 2/21/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

You are not requesting an accommodation at access PSAs while incarcerated. A review of Strategic Offender Management System (SOMS) indicates you have a control date of 8/21/2024; once you are within 120 days to release, Transitional Case Management Program (TCMP) will meet with you to assist with application process for benefits you can receive upon release.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2, and your concerns will be addressed through the Inmate Grievance Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife _____          _____          **Date sent to inmate:**          MAR 1 9 2024

**ADA Coordinator/Designee**          **Signature**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 08/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | 522096 | FEB 2 0 2024 |

*********TALK TO STAFF IF YOU HAVE AN EMERGENCY*********

**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| ▮▮▮▮▮▮ | ▮▮▮▮▮▮ | | D-9- |

INSTRUCTIONS:

o You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
o You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
o Submit this form to the Custody Appeals Office.
o The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
o The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
o If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?

*[handwritten, partially illegible]* I am DLT & DMH and Due to my Disability Not getting better I am Requesting a Service Dog to Help Me get through my Daily Activities I'm getting Ready to Parole and I'm going to Need ...

WHY CAN'T YOU DO IT?

*[handwritten, partially illegible]* To Have a Service Dog For My Disability once I'm out there to phase for Example when Loud or Being aware of D.A System I Don't Hear it to fast ...

WHAT DO YOU NEED?

*[handwritten, partially illegible]* I Need that the Dog Can get my Attention and or Desk ... and ... for the Dog I'm Help to phase closely this world as well as my past trauma tendsm.

(Use the back of this form if more space is needed)

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY? | Yes ☐ | No ☐ | Not Sure ☐ |
|---|---|---|---|

List and attach documents, if available:

I understand that ▮▮▮▮▮▮▮▮▮▮ cooperate may cause this request to be disapproved.

2-18-24
**DATE SIGNED**

Assistance in completing this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day</u>.
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▮▮▮▮▮▮▮▮    CDCR #: ▮▮▮▮    CDCR 1824 Log #: 522096

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**    Date CDCR 1824 received by IAC: 02 / 20 / 24

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

☐ **Yes / Unsure** (Complete Steps 2 &/or 3)    ☑ **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care ap▮▮▮▮▮▮▮safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.

| ▮▮▮▮▮▮▮▮ | AGPA | ▮▮▮▮▮▮▮▮ | 02 / 20 / 24 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**    *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____    Due back to IAC: ____ / ____ / ____    Returned to IAC: ____ / ____ / ____

Assigned to: _____    Title: _____

Information needed: _____
_____
_____
_____

Note 1:  Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2:  IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:** _____    **Location:** _____

Interviewer notes: _____
_____
_____
_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____
_____
_____
_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____
_____
_____
_____

*Notes:*  I/M IS NOT REQUESTING AN ACCOMMODATION TO ACCESS PSA'S WHILE INCARCERATED. A REVIEW OF SOMS INDICATES I/M HAD A CONTROL DATE OF 8/21/2024; ONCE I/M IS WITHIN 120 DAYS TO RELEASE, ~~TCMP WILL MEET WITH I/M TO ASSIST WITH APPLICATION PROCESSES FOR BENEFITS HE CAN RECEIVE UPON RELEASE~~

| _____ | _____ | _____ | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

DRAFT

## IAP / Interview Worksheet

Inmate: ███████████    CDCR #: ████████    CDCR 1824 Log #: 522089

---

**Step 3:** **DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

**Accommodation(s) provided:**

_____

_____

_____

**Date provided:**

____ / ____ / ____

____ / ____ / ____

____ / ____ / ____

Comments: _____

_____

| ███████████ | AGPA | | 02 / 21 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note: When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

### IAP processing instructions for the Appeals Coordinator

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

### Step 2 Interviewer Instructions

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name
CHSS035C
As of: 02/20/2024

CDC #:                    PID #:
Tuesday February 20, 2024 02:45:07 PM

# DPP Disability/Accommodation Summary

## OFFENDER/PLACEMENT

CDC#:
Name:
Facility: SATF-Facility D
Housing Area/Bed: D 004
Placement Score: 54
Custody Designation: Medium (A)
Housing Program: Sensitive Needs Yard
Housing Restrictions: Ground Floor-Limited Stairs
Lower/Bottom Bunk Only
Physical Limitations to Lifting Restriction- Unable to Lift more than
Job/Other: 19 Pounds
No Rooftop Work
Permanent - 12/31/9999

## DISABILITY ASSISTANCE

Current DDP Status: NCF
DDP Adaptive None
Support Needs:
Current DDP Status Date: 12/23/2003
DPP Codes: DLT, DNH
DPP Determination Date: 11/14/2018
Current MH LOC: GP
Current MH LOC Date: 09/26/2023
SLI Required: No
Interview Date: 09/11/2017
Primary Method(s) - Hearing: Hearing Aids
Alternate Method – Hearing: Need Staff to Speak Loudly and Clearly
Non-Formulary Inmate interviewed on 9/11/17 by CCI
Accommodations/Comments:

Additional Alternate: American Sign Language.

TimeStamp: 11 September 2017 16:17:07 ---
User:

Learning Disability:
Initial Reading Level: 05.0
Initial Reading Level Date: 03/26/2021
Durable Medical Equipment: Hearing Aid
Non-invasive Airway Assistive Devices - C-Pap
Machine
Electrical Access
Eyeglass Frames
Foot Orthoses
Hearing / Mobility Impaired Disability Vest
Incontinence Supplies
Other (Include in Comments)
Partial Lower Denture
Therapeutic Shoes/Orthotics

Languages Spoken:

## IMPORTANT DATES

Date Received: 03/14/2017
Last Returned Date:
Release Date: 03/07/2026

## WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start Date: 11/16/2023

# Exhibit 19

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 3/20/2024    **Date IAC Received 1824:** 3/18/2024    **1824 Log Number:** 534889

**Inmate's Name:** ▉▉▉▉▉▉    **CDCR #:** ▉▉▉▉▉    **Housing:** C8-▉▉▉

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Medical Executive G. Ugwueze, Psychologist Dr. ▉▉▉ Health Care Grievance Representative ▉▉▉ Custody Appeals Representative ▉▉▉▉ Associate Governmental Program Analyst ▉▉▉ Registered Nurse ▉▉▉ Staff Services Analyst ▉▉▉ Staff Services Analyst ▉▉▉ Assistant Principal (A) ▉▉▉

**Summary of Inmate's 1824 Request:** Inmate requests CART and an iPhone/iPad with captioning; Inmate reports it is hard to breathe with a C-PAP while the heater is on.

### Interim Accommodation:

☒ No interim accommodation required: You were issued a Personal Sound Amplification Device (PSAD) on 3/21/2024. Batteries may be exchanged on a one for one basis by contacting your Facility Field Training Sergeant (FTS).

### RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate requests CART and an iPhone/iPad with captioning; Inmate reports it is hard to breathe with a C-PAP while the heater is on.

**Response**: On 3/20/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

You were issued a Personal Sound Amplification Device (PSAD) on 3/21/2024. Batteries may be exchanged on a one for one basis by contacting your Facility Field Training Sergeant (FTS).

Use of cart is intended for hearing impaired individuals who utilize written notes for Effective Communication (EC). Issuance of iPhone/iPad is intended for inmates with a profound hearing loss who utilize written notes for Effective Communication (EC). A review of SOMS indicates you are designated DNH with a primary EC of hearing aids and alternate of need staff to speak loudly and clearly. You are currently accommodated with hearing aids and have been provided a pocket talker as an additional means of achieving EC.

Heating and cooling units have a scheduled that has not taken place yet. You are encouraged to report any breathing issued to custody staff immediately so medical attention can be provided.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied**: If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife _____        _____        **Date sent to inmate:**    APR 1 0 2024

**ADA Coordinator/Designee**        **Signature**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | 534889 | CSATF OFFICE<br>MAR 18 2024<br>OF GRIEVANCES |

**\*\*\*\*\*\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\*\*\*\***
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| ▋▋▋▋▋ | ▋▋▋▋ | ▋ | L-8 ▋ |

INSTRUCTIONS:
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
Well When I'm At Medical Appointments connections, court, dental Groups etc... I Have Problems to Be it Bee Brought to Re Attention that They Have Some Special Tablet or

**WHY CAN'T YOU DO IT?**
Something that Dose A Close Caption Getting for My Appointments And Groups Dease I Am SICK

**WHAT DO YOU NEED?**
And Would like to Be Accommodated with this thank you And Can we Please get Dedoral order to get Heated room & DEAF with A C-pap And the Heter at The Time it unit is Really causing problems with My Treatment (Use the back of this form if more space is needed)

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY? | Yes ☐ | No ☐ | Not Sure ☐ |
|---|---|---|---|

List and attach documents, if available:
_____
_____
_____

I understand that st▋▋▋▋▋▋▋▋▋nd my failure to cooperate may cause this request to be disapproved.

▋▋▋▋▋▋▋▋▋▋    3-17-24
**DATE SIGNED**

Assistance in completing this form was provided by:

_____    _____    _____
Last Name          First Name          Signature

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall</u> complete Step 1 below within 1 working day. Step 2 should be completed whenever the inmate's request is unclear or when additional input from the inmate and/or staff will help the RAP better understand the request.

Inmate: ▉▉▉▉▉▉▉▉ , CDCR #: ▉▉▉▉▉▉    CDCR 1824 Log #: 534889

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**    Date CDCR 1824 received by IAC: 03 / 18 / 24

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)    [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely navigate stairs.
- Cannot safely access upper bunk.
- Seizure disorder and is assigned an upper bunk.
- Workplace safety concerns.
- Hearing or vision claims that may jeopardize safety.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care a▉▉▉▉▉▉safety concerns.

| ▉▉▉▉▉▉ | AGPA | ▉▉▉▉ | 03 / 18 / 24 |
|---|---|---|---|
| Person Completing Step 1 | Title | | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**    *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____    Due back to IAC: ____ / ____ / ____    Returned to IAC: ____ / ____ / ____

Assigned to: _____    Title: _____

Information needed: _____

_____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

Inmate Interview Date/Time:_____ Location:_____

Interviewer notes: _____

_____

_____

**Staff Interviewed:** ▉▉▉▉▉▉ Title: ~~FTS~~    Interview date: 03 / 21 / 24

Interviewer Notes: I/m was issued a pocket talker _____

_____

_____

**Staff Interviewed:** _____ Title: _____ Interview date: ____ / ____ / ____

Interviewer Notes: USE OF CART IS INTENDED FOR HEARING IMPAIRED INDIVIDUALS WHO UTILIZE WRITTEN NOTES FOR EC. ISSUANCE OF IPHONE/IPAD IS INTENDED FOR INDIVIDUALS WITH A PROFOUND ~~HEARING LOSS WHO UTILIZE WRITTEN NOTES. A REVIEW OF SOMS INDICATES I/M IS~~ DESIGNATED DNH WITH PRIMARY EC OF HEARING AIDS AND ALTERNATE OF NEED STAFF TO

***Notes:*** SPEAK LOUDLY AND CLEARLY. I/M IS CURRENTLY ACCOMMODATED WITH HEARING AIDS. I/M MAY BE OFFERED A POCKET TALKER. HEATING/COOLING UNITS HAVE A SCHEDULED CONVERSION THAT HAS ~~NOT TAKEN PLACE YET. I/M IS ENCOURAGED TO REPORT BREATHING ISSUES TO CUSTODY STAFF~~ ~~IMMEDIATELY SO MEDICAL ATTENTION CAN BE PROVIDED.~~

| ▉▉▉▉▉▉ | AGPA | ▉▉▉▉ | 03 / 21 / 24 |
|---|---|---|---|
| | Title | Signature | Date Completed |

**IAP / Interview Worksheet**

Inmate: _____    CDCR #: _____    CDCR 1824 Log #: 534889 _____

---

**Step 3:    DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

_____

Accommodation(s) provided:                                    Date provided:

_____    ___/___/___

_____    ___/___/___

_____    ___/___/___

Comments: _____

_____

_____

| [redacted] | AGPA | | 03 / 19 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note:  When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

**IAP processing instructions for the Appeals Coordinator**

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3.  The interviews conducted in Step 2 will help with the decision in Step 3.  Step 3 documents the decision.  When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

**Step 2 Interviewer Instructions**

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2.  If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing.  Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder.  Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ████████

CDC #: ████████    PID #: ████████

CHSS035C **DPP Disability/Accommodation Summary** Monday March 18, 2024 11:42:49 AM

As of: 03/18/2024 ➡

| OFFENDER/PLACEMENT | DISABILITY ASSISTANCE |
|---|---|
| CDC#: ████████ | Current DDP Status: NCF |
| Name: ████████ | DDP Adaptive: None |
| Facility: SATF-Facility C | Support Needs: |
| Housing C 008 ████████ | Current DDP Status Date: 12/23/2003 |
| Area/Bed: | DPP Codes: DLT, DNH |
| Placement 54 | DPP Determination Date: 11/14/2018 |
| Score: | Current MH LOC: GP |
| Custody Medium (A) | Current MH LOC Date: 09/26/2023 |
| Designation: | SLI Required: No |
| Housing Non-Designated Program Facility | Interview Date: 09/11/2017 |
| Program: | Primary Method(s) - Hearing: Hearing Aids |
| Housing Ground Floor-Limited Stairs | Alternate Method - Hearing: Need Staff to Speak |
| Restrictions: Lower/Bottom Bunk Only | Loudly and Clearly |
| Physical Lifting Restriction- Unable to Lift more than 19 | Non-Formulary Inmate interviewed on |
| Limitations to Pounds | Accommodations/Comments: 9/11/17 by CCI ████████ |
| Job/Other: No Rooftop Work | |
| Permanent - 12/31/9999 | Additional Alternate: American Sign Language. |

**DISABILITY ASSISTANCE (continued)**

TimeStamp: 11 September 2017 16:17:07 --- User: ████████

Learning Disability:
Initial Reading Level: 05.0
Initial Reading Level Date: 03/26/2021
Durable Medical Equipment: Hearing Aid
Non-invasive Airway
Assistive Devices - C-Pap Machine
Electrical Access
Eyeglass Frames
Foot Orthoses
Hearing / Mobility Impaired Disability Vest
Incontinence Supplies
Other (Include in Comments)
Partial Lower Denture
Therapeutic Shoes/Orthotics
Languages Spoken:

| IMPORTANT DATES | WORK/VOCATION/PIA |
|---|---|
| Date Received: 03/14/2017 | Privilege Group: A |
| Last Returned Date: | Work Group: A1 |
| Release Date: 03/07/2026 | AM Job Start Date: |
| Release Type: Earliest Possible Release Date | Status: |
| | Position #: |
| | Position Title: |
| | Regular Days On: |