# Exhibit 76

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

Andrea L. Bourne, Au.D. CCC-A

Audiology Consulting

Pacifica, CA 94044

andreabourne@aol.com



## Introduction

I am a California state-licensed audiologist with over 28 years of clinical experience. I have worked for the Veterans Health Administration (VHA) for 27 years, gaining extensive experience in aural rehabilitation and hearing assistive technology. ("Aural" means relating to the ear or the sense of hearing, and "aural rehabilitation" means strategies to improve the communication of people with hearing loss and to reduce the limitations caused by hearing loss.)

I have completed thousands of hearing aid evaluations and hearing aid fittings over the past 27 years at the VHA. I conduct medical/legal audiology exams for the Veterans Benefits Administration (VBA), and I have written hundreds of medical opinions on hearing loss and/or tinnitus. I am a leader in Audiology Clinical Video Telehealth (Tele-Audiology) and oversee one of the largest Tele-Audiology programs in the United States. Over the past ten years I started several Tele-Audiology programs across Northern California, including the California State Veterans Home in Yountville. The Tele-Audiology programs serve thousands of veterans each year to treat their hearing health care needs.

I am also an adjunct professor at the University of Pacific (UOP) Doctor of Audiology Program working as a preceptor in clinic and providing classroom instruction. In all my clinical environments I work with individuals from a wide range of socio-economic backgrounds. I am an expert at evaluating hearing-related communication needs and fitting a wide range of hearing aid and assistive listening device technology, ranging from refurbished hearing aids donated from the Ear of the Lion Hearing Foundation to high-end premium hearing aid and assistive listening device technology. A true and correct copy of my resume is attached hereto as Exhibit A.

I was retained by the Prison Law Office as an expert to work with Plaintiffs' counsel in *Armstrong v. Newsom* for the purpose of drafting a report regarding effective communication of announcements for deaf and hard-of-hearing incarcerated people. I am being compensated for the work on this project at a rate of $300.00 per hour.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

### May 2022 CDCR Prison Tour

In May 2022 I was asked to assess the quality of the hearing aids and other hearing technology available to deaf and hard-of-hearing individuals incarcerated in the California Department of Corrections and Rehabilitation (CDCR) and to offer an opinion on any hearing technology that CDCR uses to ensure deaf and hard-of-hearing people have equal access to the programs, services and activities in CDCR. I accompanied RBGG attorney Caroline Jackson on a visit to R.J. Donovan Correctional Facility (RJD) on May 24 and 25, 2022. During the tour we walked through several different environments:

- The visiting rooms for Facility D, including the enclosed courtyard immediately outside the visiting room, and for Facility E;
- Two housing units in Facility A and one in Facility E;
- The medical clinic in Facilities A and E;
- The Mental Health Services Delivery buildings for Facilities A and E;
- The Recreation Room for Facility A;
- The Chapel for Facility A;
- The recreation yard for Facilities A and E;
- The areas where Classification Committee meetings and disciplinary hearings take place on Facilities A and E;
- Academic classrooms on Facility B;
- ISUDT programming area in Facility B;
- The carpentry classroom in Facility B, including the enclosed classroom within the carpentry suite;
- The chow hall on Facility E;
- Several classrooms on Facility E, including one immediately off the yard, one adjacent to a housing unit dayroom, one adjacent to a lobby area in a housing unit, and one off a hallway near the computer lab;
- The Triage and Treatment area;
- The Board of Parole Hearings building, including three of the four rooms in which parole hearings, court appearances, and attorney video visits take place;
- The Reception and Receiving building; and
- The PIA shoe factory.

I observed how prison presented a challenging communication environment, especially for deaf and hard-of-hearing individuals. Most of the prison environments had challenging listening environments which included large rooms with high ceilings, flat, hard surfaces and open floor plans. These are inherently difficult listening environments for anyone with hearing loss, yet this is a typical environment I observed at the facility. In these types of environments there is significant reverberation which degrades the speech signal, especially for people with hearing impairment.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

The most challenging listening environments were spaces where socialization takes place, as opposed to formal programming. The three areas that stood out to me most were the housing units in Facility A, the visiting area, and the recreation yard. The housing units had high ceilings and many hard surfaces creating reverberation, as well as poor lighting that would make it difficult for individuals with hearing loss to use visual cues to supplement their hearing. At the time of my tour there were not many incarcerated people in the unit but there was noise from fans, showers, and people talking. Announcements would be especially difficult to understand in this unit due to the room acoustics, poor lighting, lack of visual cues, and background noise masking the signal. The problems hearing and understanding the announcements would be amplified if all the incarcerated people were in the unit. The housing units that I visited in Facility A at RJD looked similar to the following photographs from Facility E at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), provided to me by Plaintiffs' counsel, although the lighting in the photographs appears brighter than what I experienced at RJD.





[March 2021 SATF Tour DEF 0011, 0026, 0091, 0095]

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

The visiting area at RJD was a large room with a loud air filter and several vending machines running audibly. I expect that when multiple families or groups visit inside the room simultaneously, the noise level would increase quickly, making it quite challenging for a person with hearing loss to understand other speakers. The yard was chaotic with frequent announcements over a public address system. The sound quality of the public address system was so poor that it was difficult to understand. Further, the frequent announcements created ongoing background noise that would interfere with the ability of any person with hearing loss to understand their conversation partner. Although most formal programming did not take place in these environments, they presented a challenge for individuals with hearing loss to have even basic conversations or to communicate with correctional officers.

Two other particularly noisy areas were the Shoe Factory and Carpentry Classroom, which both housed noisy equipment necessary to support the functions of the spaces. When I spoke with some of the staff or incarcerated people in these two settings, I had to be close and watch the speaker's face to help understand the words. If hard-of-hearing class members work in these environments, they may need to use hearing protection devices in lieu of hearing aids to avoid further damage to their ears, making it even more difficult for hard-of-hearing people to hear announcements.

In my final report, I stated that "it may ultimately be necessary to provide FM systems and other technology to maximize the benefit individuals can receive from their hearing aids and to ensure equal access to CDCR educational, vocation, rehabilitative, and mental health programming." A true and correct copy of my report is attached hereto as Exhibit B.

### Document Review

In order to understand how announcements are currently communicated to deaf and hard-of-hearing people in CDCR custody, I reviewed the *Armstrong* Remedial Plan; the Court Expert's Report Regarding Treatment of People with Disabilities at SATF; audiology records for 42 class members housed across seven yards at SATF who are assigned a DNH DPP code; four Reasonable Accommodation Requests and Reasonable Accommodation Panel Responses to the requests, as well as the audiology records of the people who submitted these requests; the section of the Court's December 7th, 2023 order regarding announcements (SATF Stipulation Item 7); and CDCR proposals in response to the Stipulation dated March 20th, May 8th, and July 3rd, as well as Plaintiffs' counsel's responses to these proposals. I also reviewed photographs of Facility E at SATF.

### How the Most Common Type of Hearing Loss Works, and Why Hearing Aids Don't "Fix" Hearing Loss

There are three different types of hearing loss:
- Conductive, which involves the outer or middle ear,
- Sensorineural, which involves the inner ear, and
- Mixed, which is a mix of the two.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



To understand why many hard-of-hearing people, not just deaf people, need non-auditory accommodations for announcements, it may be helpful to understand how the most common type of hearing loss (sensorineural or SNHL) works.



There are several stages of auditory processing that affect speech perception, starting with the speech signal which includes speech sounds ranging from 250 Hertz (low frequency) to 6000 Hertz (high frequency). Within the cochlea are thousands of tiny hair cells that help translate the sound vibrations from speech signals into electrical signals that are sent to the brain through the auditory nerve. Each hair cell is responsible for translating a specific pitch or

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

frequency. When these cells die or are damaged, the auditory system loses the ability to translate that frequency. In most people who develop hearing loss, the hair cells in the cochlea are damaged or missing so the signals cannot be transmitted efficiently to the brain.



Hearing aids do not restore damaged cochlear hair cells. A hearing aid *aids* a person's ability to hear. It makes some sounds louder so a person with hearing loss can listen, communicate, and participate more fully in daily activities, and it can help in both quiet and noisy situations. A hearing aid amplifies sound vibrations entering the ear and the *intact hair cells* convert the sound into neural signals that are passed along to the brain. If the inner ear is too damaged, then even large sound vibrations will not be converted into neural signals, making a hearing aid less effective. Using a hearing aid with damaged cochlear hair cells is like connecting a new high-quality stereo to a damaged speaker wire. The final signal will sound distorted regardless of how loud the volume is set. This means the brain needs to work even harder to process incoming information.

Thus, even with hearing aids, a person with hearing loss will likely still struggle to understand speech. One of the contributing factors is that a speech sound lasts only a fraction of a second, and in that fraction of a second, the ear must separate the information at multiple frequencies within the cochlea and the cochlear hair cells must transmit the information so it can be analyzed by the brain. A person with damaged cochlear hair cells—meaning, a person with sensorineural hearing loss—must concentrate much harder to process this fast-moving information than a person without hearing loss.

We hear with our ears, but we listen with our brain. Speech perception relies on cognitive factors including memory, vocabulary, and attention. The harder the brain is working at processing speech, the fewer cognitive resources are available for memory and comprehension. Some people may have other disabilities, such as intellectual and speech processing disabilities, which also will increase the cognitive load of trying to listen and perform other mental tasks simultaneously.

Unanticipated speech signals can also pose a significant challenge, which is why it is important to gain a person's attention prior to attempting to communicate. Speech, such as a loudspeaker

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

announcement, presented without first getting a hard-of-hearing person's attention greatly diminishes the likelihood the message will be effectively received.

In this sense, hearing aids do not correct hearing the way eyeglasses correct vision. The auditory system differs from other sensory systems such as vision because it must work very fast. In most situations when vision is used to communicate a message such as reading a note, text, or message board, the person is not expected to see only a brief flash of the text and then process the information effectively.

Additional reasons that hearing aids do not fully resolve hearing loss is that their effectiveness depends on visual cues, room acoustics, and whether—at the moment the person hears the sound—the person is facing the direction of the sound. Hearing care professionals emphasize the importance of a hard-of-hearing person facing the speaker to receive visual cues so the speech signal travels directly from the speaker to the listener without reflection or reverberation, which degrades the speech signal.

When we talk about the "speaker," we are typically referring to face-to-face communication and not loudspeaker announcements. Loudspeaker announcements add even greater challenges because they lack visual cues, loudspeaker directions and locations vary, and speakers often distort the signal, especially with higher volumes, which was the case at the prison I toured. Even the best directional microphone technology can't clean up sound that reverberates around a large space with flat surfaces.

The image below depicts how sound can reflect or reverberate off of ceilings and walls. Sound reaches ears directly from source as well as indirectly through reflections. Since reflections take a longer path, they arrive later and can distort the direct sound from the source. This can negatively affect speech intelligibility.



Thus, if an announcement is unexpected or the hard-of-hearing person is not facing the speaker, coupled with the complexity and variability of a damaged auditory system, it is likely that a hard-of-hearing person will need some type of non-auditory accommodations, such as a visual and/or tactile alerting and messaging system, in order to effectively understand what was announced.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

## Common Scenarios Hearing Aids Are Not Used

There are many scenarios when hearing aids are either not worn or not available. Some of the scenarios are within a class member's control, but many are not. Some examples of when a class member should not be expected to wear their hearing aid(s) are when they are sleeping, bathing, resting, and even exercising. Hearing aids are not designed or intended to be worn while sleeping. They would not be physically comfortable and would cause feedback. Similarly, we do not recommend that people wear hearing aids when bathing because they are battery-operated electronic devices which can become damaged from water and moisture. There are also times hearing aids are either not functioning or not available to class members. Hearing aids are small electronic devices worn on the ear, and even with the best maintenance habits the hearing aids can stop working when exposed to external factors such as excessive moisture (including from humidity or sweat from heat or exercise), which can cause the hearing aid to malfunction or the battery to corrode, as well as dirt, skin, and ear wax. There will also be times the internal hearing aid components fail and will need to be repaired or replaced. Additional reasons a class member cannot use a hearing aid that I read about in the class member audiology treatment records were that no devices were available in stock, hearing aids were lost in transit, or individuals were waiting for an audiology consult.

## Benefits and Limitations of a Personal Sound Amplification Device

Use of a Personal Sound Amplification Device (PSAD), sometimes called a pocket talker, will not ordinarily accommodate a hard-of-hearing person's effective communication needs when it comes to announcements. A PSAD is a basic hearing amplifier that increases the volume of what the user hears. To be clear, it is important to have PSADs available to meet the needs of this population and serve as a back-up for people who will benefit from them when their hearing aids are unavailable. From my visit to RJD in May 2022, I understand that it would not be unusual for a hard-of-hearing person to wait weeks for an audiology appointment when their hearing aids break, depending on how frequently audiology services are available at the prison. That said, everything I already stated about the limitations of hearing aids alone applies to PSADs as well.

PSADs are designed to facilitate one-on-one communication with people facing each other from a few feet away. PSADs amplify all sounds and are very susceptible to background noise and reverberation (hearing aids, by contrast, have more advanced signal processing technology). That is why the person speaking with the hard-of-hearing person is speaking into the PSAD microphone and why PSADs are most helpful in quiet, one-on-one listening situations. Although a PSAD may allow a hard-of-hearing person to know that an announcement is occurring, it is not realistic to expect it to relay the content of the announcement with any clarity. PSADs therefore will not accommodate many people with hearing loss to hear announcements.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

## Many People Designated DNH in CDCR Need Non-Auditory Accommodations for Announcements

Based on my review of available data, the population of people assigned a DNH code contains a substantial percentage of people whose hearing loss is significant enough that they need non-auditory accommodations for announcements.

In order to assess the degree of hearing loss among hard-of-hearing people assigned a DNH code at SATF, I reviewed the audiology records of a 10% sample of this population. I reviewed the Disability Placement Program (DPP) roster dated 7/1/2024, and determined that as of that date there were 356 people incarcerated at SATF assigned a DNH code. I asked Plaintiffs' counsel to produce the audiology records of no fewer than 35 of these people (approximately 10% of 356). A true and correct copy of the July 1, 2024 DPP roster filtered for people at SATF with DNH codes is attached as Exhibit C. I have reviewed the Declaration of Amber Norris, attached as Exhibit D, which states that Ms. Norris created the sample by selecting and downloading the audiology records of six people assigned a DNH code listed at each SATF Facility, A-G, on the DPP roster, for a total of 42 people. This process ensures that I reviewed the audiology records of a cross section of DNH class members at SATF.

Of the 42 records I reviewed, 38 contained audiograms. All the class member audiograms documented sensorineural hearing loss (SNHL), which is permanent damage to the inner ear. The following is a breakdown of the audiograms by degree of hearing loss.

| Degree of SNHL | Description | Records | % of Sample |
|---|---|---|---|
| **Mild** | May hear some speech sounds without amplification but soft sounds are hard to hear, especially in noisy environments. | 1 | 3% |
| **Moderate** | May hear only some speech sounds when another person is talking at a normal level without amplification, especially situations with a lot of background noise; higher volumes are required for hearing speech sounds, TV, and radio. | 13 | 34% |
| **Severe** | Will hear no speech when a person is talking at a normal level and only some loud sounds without amplification, especially when background noise is present; even with hearing aids, speech may be difficult to understand. | 19 | 50% |
| **Profound** | Will not hear any speech and only very loud sounds without amplification. It is difficult to hear and understand sounds, even when amplified. | 5 | 13% |

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

People in all four categories (mild, moderate, severe, and profound) may potentially benefit from hearing aids and may also need additional hearing accommodations.

As noted in the table above, my analysis of 38 audiograms showed 63% of the people had documented severe or profound SNHL. This group clearly has considerable damage to their inner ear and will very likely require more than just hearing aids or a pocket talker for effective communication of announcements. Someone with profound hearing loss, for example, may have some residual hearing and may rely on hearing aids to provide some benefit, even if just for environmental sounds or speech in certain settings, particularly if they are late-deafened, do not know ASL, and do not want or are not a candidate for cochlear implants. However, they will not understand speech clearly in all settings and will also likely need to rely on visual or tactile information, such as written information.

Beyond the group of people who have severe or profound hearing loss, it is difficult to predict how effectively the 34% with moderate SNHL or the one person with mild SNHL can receive effective communication of announcements unless they are individually evaluated to determine their hearing handicap level. According to the American Speech-Language-Hearing Association (ASHA), "[h]earing handicap means the disadvantage imposed by a hearing impairment on a person's communicative performance in the activities of daily living[.]" ASHA, *On the Definition of Hearing Handicap* (1981), https://www.asha.org/policy/rp1981-00022/. This is determined not by reviewing an audiogram or other hearing test results alone, but instead by an in-depth interview of the person to understand their environments, their communicative needs in those environments, and the challenges they are experiencing. In my practice, for example, we take a patient-centered approach, and in addition to measuring the extent of hearing impairment, we assess the person's communicative needs and the nature of the settings in which their communication occurs.

I use an assessment tool called COSI (Client-Oriented Scale of Improvement), which helps identify and measure outcomes for distinct settings where a person is having difficulty hearing. For each setting, I ask the patient for specific information such as what the activity is, how many people are present, what the communication type is, what the room is like, and how their difficulty hearing impacts them—for example, does it make them feel left out, does it affect safety (for example, if they cannot hear traffic), or does it affect their ability to understand information presented to them. If someone is a student, or if they attend AA meetings, I would ask them about the classroom and AA settings, the types of speech and communication in those settings, and the challenges they are having. It may be that in those settings they need an array microphone system and/or captioning in addition to their hearing aids. If someone spends most of their time at home watching television in an otherwise quiet environment, a TV streaming device may be most appropriate. After the interview, we follow-up with the clients to see how the technologies and strategies we recommended are working in practice and to make adjustments as necessary.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

Based on my review of the medical records, it's clear that the DNH code, as used by CDCR, covers a wide range of hearing disabilities, some of which will require non-auditory accommodations in addition to hearing aids, and some of which will not. For the class members who have mild or moderate hearing loss, I cannot tell from reviewing the audiogram alone if they will need further accommodations; because two individuals with the same audiogram can experience quite different challenges, a person's needs cannot simply be defined by the audiological profile. Hearing handicap is highly variable, and people should be individually assessed by a hearing healthcare professional with assistive listening technology experience or an assistive technology professional who has knowledge of the impact of hearing loss, experience evaluating people who are deaf and hard of hearing, and expertise with accommodations available to deaf and hard-of-hearing people to determine what non-auditory accommodation, if any, they need. Unfortunately, none of the audiology records I reviewed documented anything about the class member's report of how well the hearing aids were helping with hearing announcements or any other inquiry by a hearing care professional of whether the class member needed accommodations for hearing announcements.

It is critical that when incarcerated people with hearing disabilities are individually assessed to determine what announcement accommodations they need, the examiner gives primary consideration to the person's reported needs. This is because standard hearing assessments take place in a quiet room in which the examiner and the patient are physically close to one another. Measuring a patient's hearing ability in this controlled environment will not accurately capture whether they need accommodations to receive effective communication of announcements in a noisy congregate setting, where they may be physically distant from the loudspeaker. The examiner must rely upon the patient's report of when and how well they can hear auditory announcements in real-life settings.

**<u>Reasonable Accommodation Requests and Reasonable Accommodation Panel Responses</u>**

I reviewed the audiology records, including audiograms, of four people assigned a DNH code who requested and were denied accommodations via CDCR's Reasonable Accommodation Request process this year. I also reviewed the requests that they submitted and SATF's responses to them. Each person has hearing loss but was denied hearing accommodations by SATF staff during the Reasonable Accommodation Request process, even though there is no indication that hearing professionals interviewed the person to assess their accommodation needs in real-life settings.

1. ██████████ **Facility D**

   His 2/9/2018 audiogram documented profound hearing loss in both ears, which means amplified speech is difficult or impossible to understand. Based on his audiogram, it is unlikely he receives any significant benefit from hearing aids or a pocket talker, and he should be evaluated for a cochlear implant.

On the CDCR 1824 Reasonable Accommodation Request form, [redacted] requested speech-to-text technology and a vibrating watch. The request was denied by the RAP, and he was advised to rely on his hearing aids, pocket talker, and a captioned phone. The RAP wrote, “You do not have a severe hearing impairment impacting placement.”

I strongly disagree with the RAP response and advise that his request be reconsidered to better accommodate his considerable hearing disability. It is not realistic to expect [redacted] to rely on his hearing aids or pocket talker to understand speech in any of his listening conditions. He should be afforded accommodations, such as speech to text technology, to assist him with effective communication.

**2. [redacted] Facility E**

His 2/13/2024 audiogram documented a symmetrical moderate to mild sensorineural hearing loss, which means he will have difficulty understanding speech at a normal level, especially with lack of visual cues and the presence of background noise.

On the CDCR 1824 Reasonable Accommodation Request form, [redacted] requested help with hearing PA announcements and said, “I can’t hear the PA announcements” and “the PA sounds very muffled.” The request was denied by the RAP, and he was advised to rely on his hearing aids or pocket talker to hear PA announcements.

The IAP Interview Worksheet documented that a sergeant interviewed [redacted] and that [redacted] said that he can hear when officers in the control booth open the window and shout at him, but he cannot hear PA announcements. The interviewer documented that they advised the officers in the control booth to open his door and speak to him without the PA. This does not seem to be a comprehensive solution; it is not clear that all officers will know to do this for [redacted], how it would be audited, and what to do if [redacted] is not in his cell at the time of the announcement.

There is no documentation in the 1824 file that suggests CDCR had an audiologist or other hearing care professional assess [redacted] to determine whether he should be provided hearing accommodations in addition to the ones he already had, given that he reported difficulty hearing announcements even with his existing accommodations. I would want to know more from [redacted] about the problems he is having, what types of announcements he is missing, when those announcements are made, and all the locations he may be in when an announcement is made. For example, he may be hearing some announcements but not others due to a lot of background noise in certain environments at certain times. Some people have less ability to predict and discern speech, depending on education level and knowledge of vocabulary and language. Someone may have other disabilities, such as intellectual and speech processing disabilities, that must be considered together to determine the appropriate accommodation.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**3.** ███████████    **Facility A**

His 11/15/2023 audiogram documented an asymmetrical sensorineural hearing loss. The right ear had mild hearing loss at one of the high frequencies, but overall essentially normal hearing for speech understanding. The left ear had a moderate hearing loss at most of the frequencies where speech occurs and therefore requires speech to be amplified and background noise reduced. If announcements are occurring when he is not expected to be wearing his hearing aid, such as when he is sleeping, he may experience difficulties hearing the announcement.

On the CDCR 1824 Reasonable Accommodation Request form, ███████ requested assistance with hearing announcements and a bed shaker alarm to wake him up for programs. He wrote: "I can't hear when people are up in the morning and I have a hard time hearing when morning meal is called. My hearing is bad and I don't sleep with hearing aids or a pocket talker. There is a device that can be put under my pillow and vibrate when it is time for me to get up." The request was denied by the RAP and he was advised to rely on his hearing aids to hear PA announcements and to ask his peers and ADA workers or staff for clarification ("If you are ever unclear as to what is said during a public announcement, you are encouraged to ask any one of your peers, ADA workers, or staff for clarification.").

There is no documentation in the 1824 file that CDCR had an audiologist or other hearing care professional assess ███████ to determine whether he should be provided additional hearing accommodations. I recommend interviewing ███████ and providing a patient-centered care approach to treating the impact his hearing loss is having on his ability to effectively hear announcements and be independent.

**4.** ███████    **Facility E**

His 8/21/2023 audiogram documented symmetrical moderately-severe sensorineural hearing loss across all the test frequencies, including all frequencies where speech occurs. For ███████, normal speech is inaudible and may be difficult to understand, even with hearing aids.

On the CDCR 1824 Reasonable Accommodation Request form, ███████ indicated he had problems hearing announcements, and he requested a speech-to-text device, over the ear headphones (OTEH), a vibrating watch, and sign language classes. The request for everything but the OTEH was denied by the RAP, and he was advised to rely on his hearing aids and loud and clear speech from staff. The RAP also said that ███████ demonstrated the ability to achieve effective communication through equally effective means with hearing aids and staff speaking loud and clear.

I do not agree with how the RAP apparently came to its decision, and in light of ███████ moderately-severe hearing loss, I question how they determined that ███████

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

"demonstrated the ability to achieve effective communication through equally effective means." There is no documentation in the 1824 file indicating that they interviewed him about his announcement-related needs. ██████ has significant hearing loss and he will likely have difficulty understanding speech, including announcements over a loud speaker, with hearing aids alone. He would benefit from additional devices with text messaging capabilities.

The 1824s discussed above are attached as Exhibits E-H.

### Assistive Devices

Over my 28 years of clinical experience, I have worked with thousands of people suffering with hearing loss. In addition to patients receiving a high-quality customized hearing aid, every patient requires aural rehabilitation. Aural rehabilitation helps reduce the impact of hearing loss on communication and may include an assessment of assistive technologies to improve the person's access to effective communication.

I have seen firsthand how important accommodations are for hard-of-hearing people. People with hearing loss, including from untreated ear infections as a child, may end up struggling in school because they never received the tools they needed to be successful. They may be viewed as irresponsible or unintelligent when they simply do not know what was being said or what was expected of them, and they may be isolated from their peers due to the challenges of communication. Those problems may follow them for life. That is why it is particularly important when people report having problems hearing in certain settings, as with the people above who submitted CDCR 1824s requesting help, to assess them for tools that can help them be independent and be aware of and participate in all aspects of prison life. People can feel discouraged, embarrassed, and like they are a burden when they continually have to ask others for help, and they may simply give up.

At present, I understand that CDCR provides hearing aids and sound amplifiers (also known as PSADs, discussed above) as treatment for hearing loss. For the reasons discussed above, these types of accommodations for most individuals suffering with hearing loss—including a substantial proportion of people with a DNH code who have severe or profound hearing loss, based on my review of available data—are not a stand-alone cure. To communicate effectively in challenging listening environments, additional technology is frequently required for hard-of-hearing people.

For both deaf and hard-of-hearing populations, visual and tactile alerting and messaging devices provide an indispensable means to receive communication of announcements, and they can be used with or without hearing aids. Sound fades as it travels, which is why it is harder to hear someone from across a room. Distance, noise, and echoes (reverberation), which degrade the speech signal, can happen at the same time, creating particularly challenging listening environments and making it difficult to hear and cognitively demanding to comprehend. I believe a hard-of-hearing person in the types of prison settings that I observed at RJD may need to be constantly vigilant to try to determine which announcements are relevant to them and to spend time trying to ask others what was said. This experience undoubtedly would be stressful

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

and time consuming. For this reason, non-auditory forms of accommodations for announcements are critical for independence and equal access.

There are at least two types of non-auditory accommodations that could help relay announcements to deaf and hard of hearing people in a residential setting like a prison and that should be made available: wearable paging devices and visual paging systems.

Wearable paging devices are standard accommodations for deaf and hard-of-hearing people to receive real-time notifications of other people communicating with them. In the community, smart watches connected to Bluetooth and Bluetooth-capable hearing aids are probably the most common wearable technology devices. Smart watches allow a deaf or hard-of-hearing person to receive texts and notifications, with both tactile and visual alerts, without even looking at their smart phone or tablet. For hard-of-hearing people who have access to a smart phone or tablet, the standard accommodation is Bluetooth hearing aids paired with the phone or tablet. When a hard-of-hearing person wearing Bluetooth hearing aids receives a text message or phone call, an auditory alert emits from their hearing aid directly into their ear, which avoids problems with distance, noise, and echoes from external sounds. These wearable devices are necessary for many deaf and hard-of-hearing people to ensure that when a third party transmits a call, message, announcement, or alert to them, they receive effective communication of it in real time.

Based on the acoustic environments that I observed at RJD and my review of class members' records, I believe similar technology would be useful for some people in CDCR custody who cannot hear and understand auditory announcements. It is arguably even more important for incarcerated people with hearing loss to have these wearable devices available since they can get hurt or in trouble if they do not receive or respond to an announcement. Plaintiffs' counsel provided me with information about the MMCall Correctional Facility Inmate Paging System, which I understand other prison systems use. I have reviewed the User Manual of this paging system, attached as Exhibit 1 to the Declaration of Jacob Hutt, attached as Exhibit I, and have confirmed that it contains the necessary features of a real-time, accessible paging system for a deaf and hard-of-hearing incarcerated population. The "Receiving Messages" and "Settings" section of the User Manual explains that the watch pager can emit visual, tactile, and auditory alerts when the user receives a page—these accessibility features are helpful for my patients in the community, and I would expect them to be helpful for people in prison.



[Image of MM Call Inmate Pager]

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

The next accommodation is visual paging systems. These systems display general and individualized information on TV screens. These systems are used in places like airports, DMVs, and pharmacies.



[Images of visual paging system at an airport]

Wearable devices and visual paging systems are not "either or." CDCR should make both available. First, some people, depending on their disabilities and individual factors, may primarily benefit from a wearable device and some from a visual paging system. For example, visual paging systems can be particularly helpful for people who have difficulty wearing individual aids due to cognitive deficits and manual dexterity issues. The hand function declines with age, and age-related changes to the hand, such as osteoarthritis, peripheral neuropathy, and tremors, affect fine motor skills. Tactile sensitivity is particularly important for successful operation and maintenance of a hearing aid. Whereas pager watches can be lost by a forgetful user and may require some fine motor skills to manipulate, a visual paging system is a congregate display where the incarcerated person only needs to look up at the screen to see what is being announced. My patients who have severe vision disabilities, by contrast, may not benefit from a TV screen that visually displays announcements.

Second, it is critical that people have back-up accommodations in the event one is not functional. No device or technology is perfect and may become inoperative at certain times. In my professional experience advising people with disabilities on assistive devices, I routinely recommend and issue multiple technologies and back-ups. For example, at the VA, we provide a backup set of hearing aids to patients. I also sometimes will provide both hearing aids and other devices, including a PSAD.

## Summary and Recommendations

Hearing depends on a series of complex steps that change acoustic signals into electrical signals that then travel to the brain for processing. If the ear is too damaged, then even amplified sounds will not be converted into neural signals, making a hearing aid less effective. Hearing aids do not correct hearing the way eyeglasses correct vision. A hearing aid *aids* a person's ability to hear, but speech perception (listening) relies on cognitive factors including memory, vocabulary and attention. Hearing handicap is highly variable and that is why two individuals

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

with the same audiogram can experience different challenges, and their needs cannot be solely defined by the audiological profile. For many hard-of-hearing people, hearing aids are not a stand-alone cure, and additional technology is required. For both deaf and hard-of-hearing populations, visual and tactile alerting and messaging devices provide an indispensable means to receive communication of announcements and can be used with or without hearing aids.

The DNH code covers a wide range of hearing disabilities, some of which will require non-auditory accommodations in addition to hearing aids, and some of which will not. Both DNH and DPH class members—and anyone who reports difficulty hearing—should be individually assessed by a hearing healthcare professional with assistive listening technology experience or an assistive technology professional who has knowledge of the impact of hearing loss, experience evaluating people who are deaf and hard of hearing, and expertise with accommodations available to deaf and hard-of-hearing people to determine what non-auditory accommodation, if any, they need in different prison settings and for different types of communication. The assessor should consider both wearable paging devices and congregate visual paging systems.

I appreciate the opportunity to participate in this important work. Please let me know if I can be of any additional service to the deaf and hard-of-hearing class members in the CDCR system.

Sincerely,

Andrea L. Bourne, Au.D. CCC-A

July 26, 2024

**Andrea Bourne, Au.D. CCC-A**
545 Monterey Road
Pacifica, CA 94044
(415) 595-0670

**PROFESSIONAL SUMMARY**
A dedicated hearing healthcare professional with 28 years of experience in diagnostic and rehabilitative audiology. Extensive experience with hearing aids and assistive listening technology. Proven leadership ability in coordinating and motivating diverse teams to implement new and innovative projects.

**EDUCATION**
- 2005: Au.D. Central Michigan University, Mt. Pleasant, MI
- 1995: M.A. San Diego State University, San Diego, CA
- 1993: B.A. San Diego State University, San Diego, CA

**LICENSURE and CERTIFICATION**
- California State License in Audiology (#AU1662)
- American Speech-Language-Hearing Association (ASHA)

**PROFESSIONAL EXPERIENCE**
**August 2015-Present: Chief, Rehabilitation Service**
**Department of Veterans Affairs Health Care System, San Francisco**
- Evaluate and treat veteran patients using comprehensive audiometric assessments, advanced hearing aid and assistive listening device technology, and patient-centered aural rehabilitation techniques.
- Responsible for all aspects of Audiology, Speech Pathology, Physical Therapy, Occupational Therapy, Blind Rehabilitation, and Prosthetics care coordination for veterans as part of a large, complex, and multi-division facility.
- Responsible for general supervision of clinical and training programs, and overall technical and administrative oversight for operations within the service.

**August 2021-Present: Adjunct Professor**
**University of the Pacific Doctor of Audiology Program, San Francisco**
- Adjunct professor at the University of Pacific (UOP) Doctor of Audiology Program working as a preceptor in clinic and providing classroom instruction.
- Evaluate and treat patients using comprehensive audiometric assessments, advanced hearing aid and assistive listening device technology, and patient-centered aural rehabilitation techniques.

**January 2007-August 2015: Chief, Audiology and Speech Pathology Service**
**Department of Veterans Affairs Health Care System, San Francisco**
- Evaluated and treated patients using comprehensive audiometric assessments, advanced hearing aid and assistive listening device technology, and patient-centered aural rehabilitation techniques.
- Managed rehabilitation sections delivering specialized, complex, professional services which significantly impacted the care provided to veterans.

**December 1998-March 2006: Clinical Audiologist; Audiology and Speech Pathology Service**
**Department of Veterans Affairs Health Care System, San Francisco**
- Evaluated and treated veteran patients using comprehensive audiometric assessments, advanced hearing aid assistive listening device technology, and patient-centered aural rehabilitation techniques.

**June 1997-November 1998: Starkey Laboratories, Eden Prairie, MN**
**National Outside Sales Associate, Government Services**
- Designed and implemented local and regional seminars to educate and train government audiologists on Starkey's products and services.

**HONORS and AWARDS**
- Certificate of Achievement (2017, September). Reduce Travel and Bring Care Rural Patients (Telemedicine): Innovation Challenge. Poster session. Annual Summit of the Hospital Council of Northern and Central California.
- Innovation/System Redesign Award from the Association of VA Audiologists, 2017, February.
- San Francisco Bay Area Federal Executive Board: 2016 Federal Employee of the Year: Customer Service Group Award.
- Annual Performance Awards, Outstanding Rating: 2023, 2022, 2021 2020, 2019, 2018, 2017, 2016, 2015, 2014, 2013, 2012, 2011, 2010, 2009, 2008, 2007, 2006, 2005.
- 2009 SFVAMC Super Star Award.
- 2016, 2006, 2000 Special Contribution Award, San Francisco VAHCS.

**PRESENTATIONS and PUBLICATIONS**
- McArdle, R.A., Tomasek, R.A., Bourne, A.L., Wiseman, B.W. (2018, March). Audiology Assessment Clinical Extenders (AACA). Joint DoD/VA Audiology Annual Conference.
- Bourne, A. L., Drexler, M. (2017, September). Reduce Travel and Bring Care Rural Patients (Telemedicine): Innovation Challenge. Poster session. Annual Summit of the Hospital Council of Northern and Central California.
- Ballachanda, B., Bourne, A. L., Collins, K., Meyers, C., Nitenson, J. (2017, September). Telehealth for Audiologists and Hearing Aid Dispensers – Presentations and Panel Discussion. California Academy of Audiology Annual Conference.
- Pross, S. E., Bourne, A. L., Cheung, S. W. (2016) TeleAudiology in the Veterans Health Administration. *Otology & Neurotology, 37:847–850*.
- Williams-Sanchez, V., McArdle, R. A., Wilson, R. H., Kidd, G. R., Watson, C. S., & Bourne, A. L. (2014). Validation of a screening test of auditory function using the telephone. *Journal of the American Academy of Audiology, 25:937–951*.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Andrea L. Bourne, Au.D. CCC-A

Audiology Consulting

Pacifica, CA 94044

andreabourne@aol.com



## Introduction

I am a state-licensed audiologist with over 25 years of clinical experience. I have worked for the Veterans Health Administration (VHA) for 25 years gaining extensive experience in auditory rehabilitation. I have completed thousands of hearing aid evaluations and hearing aid fittings over the past 25 at the VHA. I conduct medical/legal audiology exams for the Veterans Benefits Administration (VBA), and I have written hundreds of medical opinions on hearing loss and/or tinnitus. I am a leader in Audiology Clinical Video Telehealth (Tele-Audiology) and lead one of the largest Tele-Audiology programs in the United States. Over the past eight years I started several Tele-Audiology programs across Northern California including the California State Veterans Home in Yountville. The Tele-Audiology programs serve thousands of veterans each year to treat their hearing health care needs. I am also an adjunct professor at the University of Pacific (UOP) Doctor of Audiology Program working as a preceptor in clinic and providing classroom instruction. In all my clinical environments I work with individuals from a wide range of socio-economic backgrounds. I am an expert at evaluating hearing aid needs and fitting a wide range of hearing aid technology from refurbished hearing aids donated from the Ear of the Lion Hearing Foundation to high-end premium technology.

I was asked to assess the quality of the hearing aids and other hearing technology available to deaf and hard of hearing individuals incarcerated in the California Department of Corrections and Rehabilitation (CDCR), and to offer an opinion on any hearing technology that CDCR uses to ensure deaf and hard of hearing people have equal access to the programs, services and activities in CDCR. I accompanied RBGG attorney Caroline Jackson on a visit to R.J. Donovan Correctional Facility (RJD) on May 24 and 25, 2022. We interviewed nine deaf and hard of hearing individuals housed at RJD, eight of whom gave permission to share the information disclosed in the interview with CDCR. Although CDCR declined to allow me to examine these individuals, I was able to visually inspect their hearing aids. I also did not have the opportunity to subjectively assess the hearing aid volume or sound quality of any CDCR hearing aids using customary equipment, such as a listening stethoscope, as CDCR denied permission for this as well.

Prior to the tour, I was provided several documents to review.  These documents included the medical records of most interviewees, reflecting their appointments with the audiology providers and the Ear Nose and Throat (ENT) specialists they had seen while

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

in CDCR custody, going back to 2018. Documents also included survey responses from eight of the nine interviewees regarding their experience using the hearing aids available to them and their experience attempting to communicate with institutional staff, and a report that Plaintiffs' counsel drafted regarding their interviews of deaf and hard of hearing class members in August of 2021. I also reviewed documents describing the specifications of the Flame-250 and Rexton Arena HP3 hearing aids, the ones currently in use by CDCR. Following the tour, I received a list dated 6/2/2022 of all *Armstrong* class members including their disability code and durable medical equipment.

We toured several different environments, including housing units on Facilities A and E, medical facilities on Facility A and E, the Triage and Treatment Area, the several rooms used by the Board of Parole Hearings, and a variety of mental health, educational, rehabilitative, and vocational programming spaces on Facilities A, B, and E. As part of my research relating to this report, I also reviewed the VA National Hearing Aid and Wireless Accessories contract for the period 11/1/2019 through 10/31/2024, FDA Regulation of Hearing Aids, Medi-Cal Hearing Aid Program Coverage, other State Department of Human Services Hearing Aid Programs, Soroya Hearing Technology, and Rexton Hearing Technology. Finally, I have been provided excerpts of Defendants' statements in recent Case Management Conference Statements, reflecting CDCR's position of the hearing aids they provide.

Overall, I found the quality of the CDCR issued hearing aids to be very poor. In fact, I would describe the Flame 250 and Rexton HP3 as Personal Sound Amplification Products (PSAP) rather than hearing aids by today's standards. These products do not have the ability to be tailored to the individual's frequency specific hearing impairment needs. Hearing aids are the gold standard for treating hearing loss and hearing aids should be calibrated to amplify specifically the sounds a person no longer hears. The CDCR hearing aids are not capable of adjusting amplified sounds to meet the person's unique hearing loss. Current modern hearing aid technology can be either basic or advanced, depending on the brand or model, but even basic modern hearing aids are far more advanced and customizable than the CDCR hearing aids. The CDCR hearing aids are not equipped with modern technology such as digitally programmable capabilities, adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression, and tinnitus sound generators. Even the low-cost, refurbished hearing aids I fit to very low-income individuals eligible through the Ear of the Lion Foundation are digitally programmable and are much high quality than the CDCR hearing aids.

There is also no evidence that verification measurements of hearing aid function are obtained when fitting CDCR hearing aids. I have explained this need in greater detail in the audiology services section below.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

The current CDCR issued hearing aids significantly reduce access to important speech information not only during daily listening and communication experiences deaf and hearing individuals encounter with institutional staff and other incarcerated people, but also in classroom lectures and discussions in all CDCR's educational, vocation, rehabilitative, and mental health programming. Most structured and unstructured environments at RJD have high levels of background noise and are not equipped with sound absorbing materials to reduce reverberation and increase listening ease. Even the yard announcements (Facilities A and E) were very distorted and had garbled speech. It was very difficult to understand the announcement even with my normal hearing sensitivity. Also, depending on where I was standing in the yard, if too close to the speaker the signal was so loud and sharp it was painful to hear.

I was also concerned that RJD appears to provide only hearing aids for individual use. I believe many of the individuals at RJD would benefit from having a personal sound amplifier such as a pocket talker, in addition to hearing aids. This is especially important given the infrequency of available on-site audiology services and the need to have uninterrupted hearing assistance in all daily activities for the safety and welfare of people living with hearing loss. It may ultimately be necessary to provide FM systems and other technology to maximize the benefit individuals can receive from their hearing aids and to ensure equal access to CDCR educational, vocation, rehabilitative, and mental health programming.

## I.    Overview Of CDCR: Hearing Aid Users And Available Assistive Hearing Technology

As of June 2, 2022, the California Department of Corrections and Rehabilitation (CDCR) reports  having at least 3,102 hearing aid users who are also *Armstrong* class members housed at any of 34 prisons statewide.[1] The RJ Donovan Correctional Facility houses 237 hearing aid users who are also *Armstrong* class members.

At present, I understand that CDCR provides hearing aids as treatment for hearing loss and may have Personal Sound Amplifiers (PSAPs) available in certain spaces to loan temporarily to people whose hearing aids are not working or who have difficulty hearing. CDCR currently provides either of two models of hearing aids: the Flame-250, which is manufactured by Soroya, and the Rexton Arena HP3. I further understand that CDCR

---

[1] The data I reviewed included 54 individuals statewide who were listed as having hearing aids but did not have either of the codes I am told indicates having an identified hearing disability.  From what I understand, there may be others who have hearing aids but who do not appear on the list of *Armstrong* class members that Plaintiffs' counsel provided to me.  At RJD, there were 14 individuals listed as having hearing aids who did not have a corresponding code indicating a hearing disability.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

provides the Flame-250 as a matter of course, and provides the Rexton Arena to individuals with more specialized needs.

I saw no indication that CDCR provides any other listening technology to incarcerated people for routine, personal use. When I toured RJD, I noted that PSAPs were available in each medical clinic we toured and were available near the offices where Incarcerated person Classification Committee and disciplinary hearings were held. I was told that these devices were available on loan during the encounter itself, but were not issued to any individual for their own personal use. In reviewing the CMC statements, I learned that CDCR does not provide FM systems or any other technology designed to supplement hearing aids in more challenging listening environments.

## II.    Hearing Aids Are Outdated, The Quality Is Poor, And There Is No Evidence Of Hearing Aid Verification

The hearing aids offered by the CDCR are poor quality, are not digitally programmable which is a current industry standard in order to be properly fit to a person's unique hearing loss configuration and listening needs, and there is no evidence of objective hearing aid fitting verification. The negative effects of these CDCR hearing aids include restricted access to classroom lectures and discussions in CDCR's educational, vocation, rehabilitative, and mental health programming. To obtain optimal benefit hearing aids should be adjusted to match the prescriptive amplification needs of an individual and the fitting properly verified with probe microphone measurements. Well researched prescriptive formulas have been available and used to properly fit hearing aids for decades. Prescriptive formulas do not appear to be used to fit CDCR issued hearing aids. The actual fitting of the device is not just about ensuring it physically fits comfortably in the person's ear, but that it has the correct programming to meet the person's frequency specific impairment needs and the fitting is objectively verified.

### A.    Features That CDCR's Hearing Aids Should Have And Why These Features Are Important

Hearing impaired listeners struggle to comprehend information when background noise is present much more than normal hearing listeners. The CDCR hearing aids I examined do not have the necessary noise reduction strategies for steady state and transient noise. Digital noise reduction is a nearly universal feature in modern hearing aids to reduce listening effort and fatigue for individuals with hearing impairment. Hearing loss causes degraded speech signals to be sent to the brain and consequently more cognitive resources are applied to speech reception. This results in fewer cognitive resources available for other tasks such as memory and comprehension. Deaf and hard of hearing individuals are disadvantaged in nearly every CDCR environment compared to normal hearing individuals because their increased listening effort reduces their memory, concentration and other cognitive resources. While the cost of modern hearing aids may

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

be higher than the current models CDCR uses, the value pays for itself when you consider the wide range of health benefits properly fit hearing aids offer. The negative effects of untreated or insufficiently treated hearing loss include restricted ability to interact with other people; missing vital information, especially in emergency situations, which can lead to unpleasant encounters; heightened stress or anxiety due to the extra effort of understanding the world; and unnecessary fatigue from heightened stress and anxiety.

People have different degrees of hearing loss at different frequencies and the amplified sound should be shaped and fine-tuned for their loss. As you can see in the picture below hearing loss comes in many different configurations. To meet the goal of providing amplification to optimize speech understanding, especially in difficult listening environments, hearing aids need to be capable of adjusting separate frequencies bands across the entire speech spectrum.



The CDCR issued hearing aids offer very limited adjustments to accommodate different hearing loss configurations. After reviewing the Rexton Arena HP3 Technical

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Data sheet I am unclear if the Rexton has any control other than volume control. The Flame 250 is also problematic: its two potentiometers can only adjust a broad band of low frequency amplification, e.g., gain below 1000 Hz gets reduced up to 20 dB, and total hearing aid output. By contrast, Modern digitally programmable hearing aids can be tailored to a person's precise hearing threshold levels, e.g., increasing 2000-Hz sounds by 10 dB, 2500-Hz sounds by 15 dB and 3000-Hz sounds by 30 dB. These gain adjustments can be adjusted differently for soft, average and loud input levels as well as total output levels for specific frequency bands.

It is also important for hearing aids to offer options for treating ringing in the ears, a condition called tinnitus that is very common among people with hearing loss. I did not see any indication that either hearing aid has options for treating tinnitus, such as a tinnitus sound generator. Such options are standard in most hearing aids and can be essential treatment for people with tinnitus, because the ringing in their ears can prevent them from hearing and understanding sound even with properly fit hearing aids, especially in noisy or complicated listening conditions.

**B.      The Flame-250 And Rexton Arena HP3 Are Not Used By The VA And Cannot Be Made Adequate Simply By Better Adjustments**

I was informed that Defendants have stated that the hearing aids they provide to incarcerated individuals are the same devices that the VA provides to veterans. This is not correct. I have worked as a clinical audiologist for the Veterans Health Administration for 25 years and I can attest that these hearing aids are not offered by the VA and fall well below the minimum standards that the VA requires for hearing aids. The US government has the largest hearing aid program in the country which is used in the Veterans Administration for veterans accessing VA Health Care. It is available to ensure veterans can actively participate in their health care. The VA contract is arranged with a list of several minimal requirements, such as digitally programmable capabilities, adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, and active feedback suppression. *Neither the Flame 250 nor the Rexton Arena HP3 hearing aids would meet minimum acceptable standards in the VA program.*

According to the Defendants' statement, "Patients may need to be educated on using different settings for complaints of quality or fitted with different tips for complaints of discomfort." However, without the ability to adjust the additional programs to the person's unique hearing loss prescription, the additional settings offer little benefit. Furthermore, while the non-custom tips used on hearing aids typically come in various sizes such as small, medium and large, even more important is the venting properties in the domes to help shape the proper frequency response and low and high frequency amplification needs of each patient. The CDCR hearing aids coupled with domes I observed at RJD did not have any venting properties. All the domes appeared to

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

be closed domes. This can be a problem because closed domes can occlude the ear canal and increase the low frequency amplification which is not always appropriate and can make amplified sound and the person's own voice sound too hollow and unnatural. In general people with mild to moderate hearing loss benefit more from vented domes and people with moderate to severe hearing loss benefit more from closed domes.

Most of the major hearing aid companies in the United States offer very low MediCal pricing of $199-$300 per device for modern entry level hearing aids. In addition, several states have negotiated contracts with very low pricing for high quality hearing aids. Why does the CDCR provide such low-quality hearing aids when low-cost, high-quality devices are readily available? Surely they can do better for the 3,102 hearing aid people who are relying on CDCR to provide for their hearing health care needs and are powerless to obtain any quality devices on their own despite repeated requests for better quality hearing aids.

### C.    The Rexton Arena HP3 Is Poor Quality and Does Not Appear Intended For Sale In The United States

The Rexton Headquarters in the United States has never heard of the Arena HP3 device. I contacted the Rexton company by telephone to inquire about the Arena HP3 device and if it had a telecoil. They could not answer my questions and stated the Arena HP2 was discontinued in 2015 and there was no record of an HP3 manufactured by Rexton. The specifications of the device described as the Rexton Arena HP3 are unclear because the documents Defendants shared contain conflicting information. The Defendants shared a document of an online advertisement from "Professional Hearing Solutions (Pvt.Ltd), Pakistan's Best Hearing Aids & Audiology Center". The advertisement lists "With: Telecoil" and lists "Maximum Power Gain: 110 dB". This advertisement is not consistent with the Rexton Arena HP3 technical specification sheets the Defendants provided which list a Maximum Power of 140 dB SPL and does not list a telecoil. Based on this conflicting information, it is difficult to know the specifications of the Rexton Arena HP3 without further testing.



I had the opportunity to interview two individuals who used the Rexton: ▮▮▮▮▮▮▮▮▮, and ▮▮▮▮ Both men were quite dissatisfied with the Rexton hearing aid. ▮▮▮▮▮▮▮ said his did not work at all, whereas a pocket talker he used previously worked well for him. ▮▮▮▮, who has used hearing aids for most of his life, had stopped using the hearing aid due to it providing little benefit. Based on a review of the hearing aid dispensers' progress notes it does not appear any of the hearing aids are fitted to any prescriptive formula or tested in any objective way to ensure at least soft speech is audible, normal speech is comfortable and loud speech is tolerable. Also critical in all hearing aid fittings is to ensure the maximum power output does not exceed the patients comfort level. Special precautions need to be taken for hearing aids like the Rexton with a maximum output above 132 dB, to avoid further damaging users' hearing.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**D.    The Flame 250 Is Poor Quality And Does Not Appear To Be Widely Used In The United States**

According to the Defendants, the Flame 250 is used worldwide and in government-funded programs including CDCR. This consultant was unable to identify any other US government funded hearing aid programs using the Flame 250. The Flame 250 does not list a telecoil in its technical specification sheet and likely does not have one. The Flame 250 is advertised online as a cheap hearing aid.  While it may be a very low-cost device, it is  unacceptable because the Flame aid is not digitally programmable and cannot be custom fit to an individual's hearing loss. The device only offers two potentiometers to adjust the frequency response: low cut and output control. These two controls are inadequate to adjust the frequency response to a person's prescriptive needs. Modern hearing aids can adjust several bands of frequencies from three to twenty in small dB increments and can adjust the bands differently for soft, average and loud input sounds as well as for maximum power levels. These changes can be performed in each of the three (or more) programs to maximize hearing for unique listening environments. One program may be for quiet listening environments, one program for noisy environments, another for classroom or telephone/telecoil. The three programs in the Flame 250 cannot be individually adjusted to meet the person's needs. Based on a review of the hearing aid dispensers' progress notes, it does not appear any of the hearing aids are fitted to any prescriptive formula or tested in any objective way to ensure at least soft speech is audible, normal speech is comfortable and loud speech is tolerable.

I had the opportunity to interview several individuals who use the Flame 250: ███████ ██████████ ████████████ and ███████████, as well as others who did not want their names disclosed. Each of them was very dissatisfied with the Flame 250's unnatural sound quality, lack of adjustable programs, lack of telecoil, and physical discomfort. ████████ who had been using hearing aids since 2008, said the Flame 250 was much lower quality than the hearing aid he initially got when living in the community. When I looked at class members' Flame-250s I asked them about the telecoil option. Two individuals interviewed (████████ and ████████) were aware of the t-coil option and how to use it. They both said it didn't work. I was unable to determine whether this was due to the Flame-250 not having a working telecoil option or the telephone not having an induction loop. I understand that Plaintiffs' counsel has asked CDCR if the telephones in the dayrooms at RJD have induction loops, but as of the date of the report, Plaintiffs' counsel had not received a response.

**All hearing aids that CDCR provides must be digitally programmable hearing aids with adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression and telecoils. Individuals with tinnitus should have access to hearing aids with tinnitus sound generators.  These hearing aids must be digitally programmed using software to conform to the prescriptive hearing needs of each**

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

**individual and probe microphone measurements must be used to confirm adequate access to acoustic information for speech communication.** CDCR may be able to take advantage of the very low MediCal pricing or other state contract pricing options to purchase modern digitally programmable hearing aids at a reduced cost range of $200-$300 per device.

## III.    The Prison Environment Necessitates Up-to-Date Hearing Technology

I toured the following areas at RJD to observe the acoustic environment and to learn about the type of communication tasks that incarcerated individuals typically perform in that environment:

- The visiting rooms for Facility D, including the enclosed courtyard immediately outside the visiting room, and for Facility E;

- Two housing units in Facility A and one in Facility E;

- The medical clinic in Facilities A and E;

- The Mental Health Services Delivery buildings for Facilities A and E;

- The Recreation Room for Facility A;

- The Chapel for Facility A;

- The recreation yard for Facilities A and E;

- The areas where Classification Committee meetings and disciplinary hearings take place on Facilities A and E;

- Academic classrooms on Facility B;

- ISUDT programming area in Facility B;

- The carpentry classroom in Facility B, including the enclosed classroom within the carpentry suite;

- The chow hall on Facility E;

- Several classrooms on Facility E, including one immediately off the yard, one adjacent to a housing unit dayroom, one adjacent to a lobby area in a housing unit, and one off a hallway near the computer lab;

- The Triage and Treatment area;

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

- The Board of Parole Hearings building, including three of the four rooms in which parole hearings, court appearances, and attorney video visits take place;

- The Reception and Receiving building; and,

- The PIA shoe factory.

**A.    RJD Has Many Challenging Listening Environments That Require Advanced Hearing Technology To Be Able To Hear Adequately In These Settings**

RJD presented a challenging communication environment, especially for deaf and hard of hearing individuals. Most of the RJD environments had challenging listening environments which included large rooms with high ceilings, flat, hard surfaces and open floor plans. These are inherently difficult listening environments for anyone with hearing loss, yet this is a typical environment I observed at the RJD facility. In these types of environments there is significant reverberation which degrades the speech signal, especially for people with hearing impairment. In typical listening situations, sound reaches our ears directly from a source as well as indirectly via reflections known as reverberation. Since reflections follow a longer path, they arrive later, thus distorting the direct sound from a source. Such distortions have a negative impact on speech intelligibility.

The most challenging listening environments appeared to be spaces where socialization takes place, as opposed to formal programming. The three areas that stood out to me most were the housing units in Facility A, the visiting area, and the recreation yard. The housing units had high ceilings and many hard surfaces creating reverberation, as well as poor lighting that would make it difficult for individuals with hearing loss to use visual cues to supplement their hearing. The visiting area was a large room with a loud air filter and several vending machines running. I expect that when multiple families or groups visit in the room simultaneously, the noise level would increase quickly, making it nearly impossible for a person with hearing loss to understand other speakers. The yard was chaotic with frequent announcements being made over a public address system. The sound quality of the public address system was so poor that it was difficult to understand and, depending on where I stood, painful to hear. Further, the frequent announcements created ongoing background noise that would interfere with the ability of any person with hearing loss to understand their conversation partner.

Although most formal programming did not take place in these environments, they presented a challenge for individuals with hearing loss to have even basic conversations or to communicate with correctional officers. **Anyone attempting to use hearing aids in these environments would need the hearing aids to have adaptive directional**

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

**microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, and active feedback suppression to allow them to hear in the presence of such loud background noise and to prevent the many loud noises from hurting their ears.**

With the exception of the chapel and the recreation room, spaces for formal programming generally had better listening environments. The areas were quiet and had at least a modicum of sound absorption to minimize reverberation. **Even with these good listening conditions, however, individuals with hearing loss still need hearing aids that have adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, and active feedback suppression**.

### B.    Recommendations For Additional Hearing Technology And Other Accommodations

Even in an ideal listening environment, many people with hearing loss require additional technology to supplement their hearing aids. This technology can include PSAPs, FM systems, or other types of assistive listening devices. . Those who do not hear well enough to understand speech regardless of amplification may require text-based services to ensure communication access.

### 1.    PSAPs, Especially Pocket Talkers, Should Be Made Routinely Available To Class Members

In drafting this report, I reviewed a memo that I was told that CDCR was preparing to implement systemwide regarding issuing PSAPs to deaf and hard of hearing incarcerated people. The memo stated that PSAPs are not recommended by medical and hearing aid specialists to meet the needs of individuals with hearing loss, and it allows healthcare staff to issue a PSAP only "if the incarcerated person has been diagnosed with permanent hearing impairment and has had a formal audiology evaluation where no other options exist in accommodating the incarcerated person's hearing loss."

I consider this approach unconscionable. Medical and hearing aid specialists typically do recommend hearing aids rather than PSAPs to meet the needs of individuals with hearing loss, but the two are not mutually exclusive. This is especially true with the CDCR hearing aids, given their poor quality and the time it takes to access hearing health care and hearing aid maintenance. Although a person's hearing disability is invisible, it still requires access to amplification every day and in all listening situations. At the VA, we receive several consults a week from physicians requesting pocket talkers for patients, despite current hearing aid use. There are many reasons why a person will benefit from both hearing aids and a personal amplifier, and on average we issue about 30-40 Pocket Talkers per month. Many of our older patients prefer Pocket Talkers to hearing aids because the controls are easier to use and because they are easier to take on an off. We

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

dispense the William Sound Pocket Talker Ultra 2.0 because this model with comes with a tone control and telecoil option and offers improved sound quality compared to previous models. Tone control allows the user to have greater amplification of high or low frequencies, depending on their hearing needs. In general, Pocket Talker is a brand of PSAP that is higher quality than other brands.

**I recommend that CDCR offer the William Sound Pocket Talker Ultra 2.0 to every person who has been determined to require hearing aids as a back-up for when their hearing aids go down. The cost of the Williams Sound Pocket Talker Ultra 2.0 is approximately $100.00 per unit. If CDCR is unwilling to provide a Pocket Talker to everyone, at a minimum CDCR should provide Pocket Talkers (1) temporarily to anyone whose hearing aids are not working, so they can use it until they receive new batteries or can have the hearing aid fixed; and (2) permanently to anyone who reports not being able to hear well enough in certain environments with hearing aids alone, and it is determined that a Pocket Talker would provide additional benefit.** Because audiology services are provided only once a month, it would not be unusual for someone to wait weeks for an audiology appointment when their hearing aids break. For most hearing aid users, it will not be enough to ask everyone to just speak louder, hearing aid users still need to have amplification in most environments. Not everyone will want a Pocket Talker, however several of the class members interviewed stated that they got more benefit from using a Pocket Talker than from hearing aids alone. It is important to have Pocket Talkers available to meet the needs of this population, in addition to providing Pocket Talkers as back-up for people who will benefit from them when their hearing aids go down.

## 2.    Hearing Aid Users May Also Need Access To FM Systems in Classroom Settings

Even in an ideal listening environment, hearing aid users may require an FM system to have full access, especially in a of group environment or classroom. It is important to note that background noise as minimal as coughing or shuffling papers can interfere with a student's ability to understand the instructor if the student has hearing loss.

There are several different kinds of FM systems that can cost as low as $100-300 dollars. When there is no sound system in use, FM systems can include either individual or area microphones. An individual microphone is given to an individual speaker, such as the instructor for a class, so that everything said into the microphone will go directly to the hearing aids or headphones of the person listening and they will not have interference from other background noise. This type of microphone is particularly effective in environments with a primary speaker, such as lecture-based courses. Area microphones can be installed to pick up all sound within a certain proximity to the microphone. This type of microphone is more effective for discussion-heavy settings where there is no primary speaker and turn-taking is not well controlled.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

**In my opinion, CDCR should make sure that FM systems are available to individuals who use hearing aids and cannot hear and understand in academic, substance abuse and/or vocational classes and discussion groups, so that auditory access is complete and so that incidental background noise from the hallway or from other students does not interfere with their access to the group.**

FM systems and induction loops pair with hearing aids through the telecoil setting. It would be necessary for the hearing aids the CDCR provides to have a working telecoil setting in order for hearing aid users to benefit from an FM system.

## IV.    RJD Audiology Services Are Insufficient to Ensure Appropriate Hearing Aid Quality

I was not able to provide an in-depth analysis of the audiology services available because I have not had the opportunity to observe audiology appointments nor to ask questions of the providers to determine the direction they have received. Based on interviews with class members, a tour of the facility, and review of audiology records, my overall impression of the CDCR hearing aid program is poor. It is an inadequate program because it denies class members decent hearing aids with modern technology to improve their hearing ability and ease of listening in the inherently noisy listening environments at RJD. Large rooms with high ceilings, flat, hard surfaces and open floor plans are difficult listening environments for anyone with hearing loss, yet this is a typical environment I observed at the RJD facility. It is also inadequate   because audiology providers do not appear to have sufficient tools, i.e., real ear equipment and computerized hearing aid programming capability, or time with patients to properly adjust hearing aids to fully meet patients' listening needs, including both the hearing prescription itself and the proper fit of the device.

### A.    Hearing Tests Are Inadequate To Identify The Accommodations Necessary To Ensure Effective Communication

I was told that the only piece of equipment used to conduct audiology testing and hearing aid fittings is a portable audiometer. While portable audiometers are capable of valid diagnostic testing, the reviewed CDCR audiograms do not list the make and model of the equipment or the calibration date. This information would be helpful in assessing the exam quality. I reviewed several audiograms and audiology reports conducted by the hearing aid dispensers and there were some audiograms with incomplete information. It also does not appear that class member's middle ear function is being evaluated during audiology examinations or at least none of the information is documented. The purpose of assessing middle ear function is to ensure the tympanic membrane is intact and the ossicles (malleus, incus and stapes) are transmitting sound waves to the inner ear. It also does not appear that RJD audiologists routinely test a person's ability to understand speech with or without hearing aids. This test is necessary to determine whether and how

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

much using a hearing aid will improve the person's ability to understand speech. This test can be conducted both under perfect listening conditions (i.e., with no background noise), and under varying levels of background noise, known as the Speech-in-Noise Test or SIN. **In my opinion, every person with suspected or identified hearing loss should receive a comprehensive hearing test every other year that includes tests of pure tone air and bone conduction, middle ear function, their ability to understand speech in quiet, and Speech-in-Noise Testing. There should also be routine supervision by a supervisor to ensure that audiology reports are complete.**

### B.    Hearing Aid Fittings Are Inadequate To Ensure Hearing Aid Fits And Works Effectively

There is also no evidence that verification measurements of hearing aid function are obtained when fitting CDCR hearing aids at RJD. Verification of a hearing aid fitting is an objective measure (often referred to as real-ear measurements or probe-microphone measurements) that ensures the hearing aid is operating appropriately for soft, average and loud speech input levels, as well as testing the frequency specific maximum power output to ensure it is tolerable. Audiology best practices guidelines state that probe microphone measurements should be completed to ensure that hearing aid gain and output meet prescribed targets. Currently, probe microphone measurements are the gold standard to verify hearing aid fittings and are the only way to ensure the aid is providing an audible signal. Based on the audiology progress notes and the information from the class member interviews there does not appear to be any probe microphone equipment to verify the hearing aid fittings. **In my opinion, every hearing aid fitting must include probe microphone measurements to confirm adequate access to acoustic information for speech communication**.

### C.    Audiology Services Are Inadequate To Meet Demand

Unfortunately, there was not a dedicated space for audiology services. I learned audiology services are only available one day each month and staffed by a hearing aid dispenser. Monthly services are not adequate to provide the needed follow up for aural rehabilitation and timely hearing aid maintenance, as it necessarily will result in patients waiting weeks or longer before having their hearing aids fixed. Because CDCR currently does not provide any form of back-up amplification, these individuals spend that time without access to much of the programming otherwise available to them in prison.

Seeing just 20 or 25 patients per month also is not sufficient to meet demand. I am told that RJD currently houses approximately 240 individuals who use hearing aids. A clinic seeing 20 patients per month will only be able to see each individual once per year. In my clinic at the VA, we expect to see patients twice per year, and more often if they are elderly or are having trouble with their hearing aids. These mid-year check-ups are necessary to ensure hearing aids are working properly and to catch problems in the early

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

stages before the hearing aid becomes unusable for a period of time. **In my opinion, an audiology practice like RJD's with 237 patients should expect to have approximately 500 available appointments annually, to ensure that each individual can have 1-2 appointments per year and more as needed. Appointments should be available weekly to ensure patients do not have to wait longer than necessary without hearing access. Once RJD has the equipment and technology to provide a comprehensive appointment, each hearing test and hearing aid fitting appointment should be expected to last approximately one hour. The hearing aid follow up, maintenance, and trouble-shooting appointments should be expected to last approximately 30 minutes.**

> D.     **Audiology Appears Not To Educate Class Members On Strategies To Maximize Their Hearing For Effective Communication**

Of the audiology notes I reviewed, none documented reviewing aural rehabilitation or listening strategies for class members. Aural rehabilitation and listening strategies include how to prepare for encounters to maximum the ability to understand what people say, and how to ask for repetition in a way that will not anger the other conversation participant. These services are a routine and essential part of the services that we provide to ensure people with hearing losses can access their environments. **In my opinion, audiology providers should routinely provide aural rehabilitation to their incarcerated patients.**

## V.     Summary Of Recommendations

Significant improvements need to be made in the quality of hearing aids provided and the timely subsequent follow up care to meet the individual hearing health care needs of class members. The CDCR audiology program is inconsistent with the CDCR Vision and Mission ensuring individuals are equipped for active participation in rehabilitative and restorative justice programs. Immediate improvements to the CDCR audiology program are necessary to allow class members access to CDCR's educational, vocation, rehabilitative, and mental health programming. The following is a list of recommended additions to the current audiology services:

**Class members require access to modern hearing aid technology with digitally programmable hearing aids with adaptive directional microphone technology, adaptive signal processing, noise reduction strategies for steady state and transient noise, active feedback suppression and telecoils.**

**All CDCR hearing aids must have functional telecoils to support effective telephone communication and access looped signals.**

**Individuals with tinnitus should have access to hearing aids with tinnitus sound generators.**

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

**CDCR should take advantage of the very low MediCal pricing or other state contract pricing options to purchase modern digitally programmable hearing aids for all deaf and hard of hearing class members who would benefit from hearing aids.**

**FM systems should be available during academic, rehabilitative, vocational or college courses to increase access to speech signals and reduce distracting background noises for those who cannot otherwise participate.**

**Hard of hearing class members require a quality personal amplifier such as the William Sound Pocket Talker Ultra 2.0 as an addition to their hearing aids in the event the hearing aids are not functioning. This model comes with a tone control and telecoil option and offers improved sound quality compared to previous models.**

**Timely hearing health care must be available and CDCR should increase from monthly to weekly audiology services to ensure hearing aid problems can be resolved in a timely manner. Consider offering Tele-Audiology services to supplement face to face care to reduce delays in hearing aid services.**

**Probe microphone measurements must be used to confirm adequate access to acoustic information for speech communication**.

In addition, I would like observe one or more audiology appointments and have the opportunity to interview a provider regarding their approach.

I appreciate the opportunity to participate in this important work. Please let me know if I can be of any additional service to the deaf and hard of hearing class members in the CDCR system.

Sincerely,

Andrea L. Bourne, Au.D. CCC-A

### Appendix A: Class Member Interviews

My recommendations arise in part from my interviews with the class members below, review of selected documents from their medical records, and where available, review of their response to a survey describing their experience using their hearing aids in the listening environments in prison. Interviewees included individuals using the Flame 250 and Rexton Area HP3 hearing aids, as well as individuals who had reported barriers to accessing audiology services and/or obtaining hearing aids. I have limited summaries to those individuals whom medical records indicated used either the Flame 250 or the Rexton Arena HP3 and who gave permission for me to share their information with CDCR.

**A.** ███████████████████

███████████ lack of modern hearing technology is limiting his access to CDCR's medical, educational, vocation, rehabilitative, and mental health programming. ███████████ reports dissatisfaction with his CDCR hearing aids. He appeared to be wearing a Flame 250. He reports a lot of problems with whistling and feedback, especially when he turns up the hearing aid volume. He states the CDCR hearing aid does not give him benefit in any listening situation. He has tried all three settings and he still cannot understand speech. He was told the hearing aid has a telecoil, but he reports it does not work. He reported he has worn digitally programmable hearing aids in the past and he could hear much better. He indicated that previous aids he used outside of the prison system worked much better because the aids were fine tuned to his unique hearing loss configuration. He reported that he has tried pocket talkers and FM systems in the past but neither provided him noticeable benefit.

**B.** ███████████████████

███████████ audiogram results from 5/13/19 reveal a bilateral mixed hearing loss. The test appears complete. He was seen by an ENT physician, diagnosed with otosclerosis and cleared for binaural amplification. He was fit with Flame 250 BTE aids on 10/3/19. Both aids were replaced with new Flame 250 aids on 3/23/22. He does not like the Flame 250 hearing aids. He is dissatisfied with the hollow sound he hears, and he wants hearing aids that provide a more natural sound quality and are rechargeable to eliminate the need to frequently replace batteries. He also reported that Flame 250 hearing aids are not physically comfortable and do not stay seated in his ears securely. He reported he often needs more volume but experiences feedback when he increases the hearing aid volume. He reported he was told he had a program for background noise and for the telephone but could not make these settings work properly.

He has been working in the RJD shoe factory for the past 10 years. He is unable to hear and communicate without his hearing aids. For the safety of himself and others he chooses to wear his hearing aids rather than hearing protection while at work. He reports

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

significant difficulty hearing and understanding speech and needs frequent repetition before understanding speech. He reports the need to wear a face mask has interfered with his successful hearing aid use and he wants hearing aids that go inside of his ears rather than behind his ears. He reports his hearing aids have poor sound quality and amplify too much background noise. He also reports it takes approximately three months to get a hearing aid repaired or replaced. He has stopped attending groups and educational classes because he cannot hear well enough to actively participate. In addition, he reported he misses important announcements and he nearly missed attending our meeting due to the lack of speech audibility and clarity while wearing the Flame 250.

C.    ████████████████████

████████████ had a hearing test completed on 11/19/20 with pure tone aid and bone conduction results documented on the audiogram. The test results showed a moderate to severe sensorineural hearing loss. Speech testing was not completed so his word recognition ability is unknown at this time. This makes it difficult to set expectations for hearing aid benefit. ████████████ was issued two Flame 250 hearing aids on 11/19/20. He is dissatisfied with the hearing aids because they amplify too much background noise and do not provide good speech clarity. He reports he cannot understand speech, especially high frequency female voices. He cannot adjust the Flame 250 hearing aids. He reported his hearing aids have a high, medium and low program but the different programs do not make speech clearer, just louder. He has not tried using a telecoil, he just uses the telephone volume control. During a recent Board Hearing he was offered a pocket talker to use, but the headphones were dirty and had body fluids from previous individuals using the device. ████████████ seems to be sensitive to loud noises and reported he experiences physical pain when there is too much background noise and loud environmental sounds. He is experiencing recruitment due to his hearing loss. Recruitment is the rapid growth of perceived loudness for those sounds located in the pitch region of a hearing loss. ████████████ has trouble hearing and communicating over the telephones. He is also interested in using a pocket talker as a back up to his CDCR hearing aids. He is involved in CDCR programs; however, he reports that he serves only as a facilitator, and never as a participant, because the role allows him to control the communication and ensure he can understand the others involved.

D.    ████████████████████

████████████ reported a history of using the Flame-250 but did not have hearing aids at the time of his interview. His most recent hearing evaluation, conducted 9/24/19, was difficult to read. It contained right and left air conduction thresholds, but no masked bone conduction thresholds. The audiogram comments indicate the left ear was draining, but the ENT note indicates left sensorineural hearing loss. It is unclear if the left hearing loss is conductive or sensorineural based on the incomplete audiometric results. Recording indicated tinnitus but did not indicate prescribing any treatment for tinnitus, such as a

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

tinnitus sound generator. He reports his ears ring so loudly he can barely hear in his daily listening environments. He reports using a hearing aid made the ringing louder, in addition to making the sound in his environment louder. He uses a fan or TV to help mask the ringing in his ears so he can sleep at night. He reports his Flame 250 has been broken since he was in a car accident on September 30th and he still does not have a replacement. He also does not have a spare hearing aid or a pocket talker to help him with access to the CDCR programs and necessary communication with institutional staff. He is unable to hear in the yard and relies on other incarcerated people to repeat what is announced. He struggles to hear on the telephone even when the sound is amplified. He is in an education class on B Yard and his teacher helps him access the class with one-on-one assistance. However, when she speaks to the whole class he cannot hear other students speaking. He recalls when he had hearing aids he could hear the teacher and other students more easily. Due to his hearing disability, he misses announcements.

E. 

_____ uses Rexton Arena HP3 hearing aids. He needs to be seen by audiology because his hearing aid does not work well and his earmold does not fit him well. He had to cut away pieces of his current earmold so it fit more securely and comfortably in his ear. He reported that when he wears the Rexton hearing aids outside he only hears wind noise. He reported that he had a pocket talker in 2020, but it was taken away when he quarantined following an off-site medical visit. He reported that with the pocket talker, he could hear anything he needed, and had an easier time hearing and communicating.

F. _____

_____ has severe hearing loss and communicates via ASL. He was fit with two Rexton Arena HP 3 hearing aids with custom soft earmolds on 5/28/21. He had a follow up appointment on 7/30/21 and reported distorted sound quality in his left ear. He was referred by his PCP for follow up to rule out eustachian tube dysfunction. He stopped using the hearing aids because the batteries drain so quickly and it is a hardship to get the batteries replaced at CDCR.

Based on records I was provided, _____ also previously reported that the hearing aid has two volume settings, one of which is much too quiet, and the other of which is much too loud and squeals. He further reported the hearing aid lacks a T-coil, which means he cannot use it to access telephone or entertainment. I noted that this report appears to have been made after his July 30, 2021 encounter with audiology, suggesting that they were not able to solve the problem through adjusting the hearing aid.

# Class Member Reports of Poor Quality/Poorly Functioning Hearing Aids

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

### Class Member Reports of Poor Quality/Poorly Functioning Hearing Aids

Below is a list of class members who, since July 2021, reported that their current hearing aids do not appropriately accommodate their hearing.  It does not include class members who asked to remain anonymous.  Many of these class members reported receiving information from medical staff that only one model of hearing aid is available to them.  It should be noted that this list is not intended to be exhaustive.  It is largely limited to individuals that Plaintiffs' counsel chose to interview during tours.

**Calipatria State Prison (CAL)**

1. ███████████
2. ████████████

**California Correctional Institution (CCI)**

3. █████████████
4. █████████████

**California Health Care Facility (CHCF)**

5. ███████████████
6. █████████████
7. ████████████████
8. ████████████████
9. ███████████████

**California Training Facility (CTF)**

10. ██████████

**CSP – Los Angeles County (LAC)**

11. ████████████
12. █████████████
13. █████████████

**Central California Women's Facility (CCWF)**

14. ███████████████
15. █████████████
16. ███████████████
17. █████████████
18. ███████████████

**California Institute for Women (CIW)**

19. █████████████

**Mule Creek State Prison (MCSP)**

20. █████████████
21. █████████████
22. ██████████████
23. ██████████
24. █████████
25. ████████████
26. ██████████
27. █████████████

**North Kern State Prison (NKSP)**

28. █████████████████

**RJ Donovan Correctional Facility (RJD)**

29. █████████████
30. ███████████
31. █████████████
32. ████████████
33. ████████████
34. ████████████
35. ████████████
36. ██████████████
37. ████████████
38. ███████████████
39. ███████████
40. ██████████
41. ███████████
42. ██████████████
43. ███████████
44. ███████████
45. ██████████████
46. ██████████

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**



**CSP – Sacramento (SAC)**

47. ██████████
48. ██████████

**San Quentin State Prison (SQ)**

49. ██████████
50. ██████████
51. ████████████

**Substance Abuse Treatment Facility (SATF)**

52. ████████████
53. ████████████
54. ██████████
55. ██████████
56. ████████████
57. ██████████

**Salinas Valley State Prison (SVSP)**

58. ██████████
59. ██████████

**Wasco State Prison (WSP)**

60. ████████████
61. ██████████
62. ████████████

**Valley State Prison (VSP)**

63. ██████████████

**Folsom State Prison (FSP)**

64. ████████████
65. ██████████
66. ████████████
67. ██████████
68. █████████
69. ██████████
70. ████████████
71. ██████████
72. ██████████

**Complaints from RJD in 2020**

In addition, we received the following complaints from RJD in 2020. In addition to the individuals below, we received reports from eight others who did not give permission to share their names with CDCR.



1. ██████████
2. ██████████
3. ████████
4. ██████████
5. █████████
6. ████████
7. ███████
8. ██████████
9. ██████████
10. █████████
11. ███████
12. ████████
13. ████████
14. ████████

15. █████████
16. ██████████
17. █████████
18. ████████
19. ████████
20. █████████
21. ██████████
22. ██████████
23. █████████
24. ████████
25. ████████
26. █████████
27. ████████

Selected
Inmate
Type:
ASP, CAC, CAL, CCI, CCWF, CCWF-RC, CEN,
DPP and/or Learning Disability

## Disability Inmate Roster

NOTE: CAMU utilizes this report for mandated court reporting. No changes

Communication Method Legend: **H** - Hearing, **S** - Speech, **V** - Vision

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | Durable Medical | | N | 10.5 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 00.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DNH | Ground Floor-Limited | Hearing Aid, Hearing | | | N | 08.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | MCC: Rescind walker with | | N | 05.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Air Cushion (for | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH | | Eyeglass Frames, Hearing | MCC: Right hearing aid | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DPW,DNH | Barrier Free/Wheelchair | Eyeglass Frames, Hearing | Durable Medical | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | MCC: SEE 7410 PENDING | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Compression Stocking, | Accommodation Chrono: | Unverified | N | 04.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | | A | | DNM,DNH | Ground Floor-Limited | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DLT,DNH | Ground Floor-No Stairs, | Canes, Electrical Access, | MCC: No repetitive | | N | 07.6 | H: Need Staff to Speak | |
| SATF | | A | | DNH | Ground Floor-Limited | Canes, Electrical Access, | Accommodation Chrono: | | N | 11.8 | H: Hearing Aids | H: Reads Lips |
| SATF | | A | | DNM,DNH | Ground Floor-Limited | Back Braces, Canes, | MCC: back brace. LD w/ | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Durable Medical | | N | 04.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Canes, Electrical Access, | MCC: CPAP/BIPAP | | N | 09.9 | H: Need Staff to Speak | H: None |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | | | N | 11.3 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DNH | | Compression Stocking, | MCC: Hearing aids and | | N | 12.9 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Canes, Compression | Accommodation Chrono: | | N | 11.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.0 | H: Need Staff to Speak | H: None |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH | | Eyeglass Frames, Hearing | MCC: hold for electrolysis | | N | 09.4 | H: Hearing Aids | H: Reads Lips |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Back Braces, Canes, | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids | H: Reads Lips |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH,DPV | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Use Simple | H: Reads Lips |
| SATF | | A | | DNH,DNV | Ground Floor-Limited | Diabetic | Accommodation Chrono: | | N | 09.9 | H: Hearing Aids | H: Hearing Aids |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | Unverified | N | 00.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-Limited | Back Braces, Canes, | MCC: Temporal Walker, | | N | 12.9 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | Accommodation Chrono: | | N | 09.9 | H: Need Staff to Speak | |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: None |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Back Braces, Compression | Accommodation Chrono: | | N | 09.4 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Compression Stocking, | Accommodation Chrono: | Unverified | N | 00.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 07.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 11.2 | H: Hearing Aids | H: Hearing Aids |
| SATF | | A | | DLT,DNH | Ground Floor-Limited | Air Cell Cushion - High | Durable Medical | | N | 11.3 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 10.8 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Accommodation Chrono: | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Canes, Compression | Accommodation Chrono: | | N | 00.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | A | | DPM,DNH | Ground Floor-No Stairs, | Diabetic | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DPO,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 06.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | A | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 09.9 | H: Reads Lips S: | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Full Upper Denture, | Accommodation Chrono: | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 08.5 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 04.4 | H: Hearing Aids | H: Reads Lips |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | MCC: see 1845/7410. | | N | 09.6 | H: Hearing Aids | H: Reads Lips |
| SATF | ████ | A 002 | ██ | DNH | | Hearing Aid | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Ankle Foot Orthoses/Knee | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 002 | ██ | DNH | Lower/Bottom Bunk Only | Back Braces, Electrical | Accommodation Chrono: | | N | 07.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPW,DNH | Barrier Free/Wheelchair | Ankle Foot Orthoses/Knee | Durable Medical | Unverified | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DLT,DNH | Ground Floor-Limited | Canes, Compression | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | Accommodation Chrono: | Unverified | N | 07.0 | H: Hearing Aids | H: Reads Lips |
| SATF | ████ | A 003 | ██ | DPW,DNH | Barrier Free/Wheelchair | Air Cushion - Full (for | Accommodation Chrono: | | N | 10.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DNH | Ground Floor-Limited | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Accommodation Chrono: | | N | 10.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPO,DNH | Ground Floor-No Stairs, | Canes, Compression | Accommodation Chrono: | | N | 07.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPO,DNH | Ground Floor-No Stairs, | Air Cushion - High | Accommodation Chrono: | | N | 05.0 | H: Need Staff to Speak | H: None |
| SATF | ████ | A 003 | ██ | DPM,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DNH | Ground Floor-Limited | Back Braces, Canes, | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | A 003 | ██ | DNM,DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids S: | |
| SATF | ████ | B 001 | ██ | DNM,DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 07.9 | H: Hearing Aids | H: None |
| SATF | ████ | B 001 | ██ | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Durable Medical | | N | 05.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 001 | ██ | DPO,DNH | Ground Floor-No Stairs, | Canes, Compression | MCC: NO OPERATING | | N | 10.0 | H: Need Staff to Speak | H: None |
| SATF | ████ | B 001 | ██ | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | MCC: DME:  Right carpal | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 001 | ██ | DNH | Ground Floor-No Stairs, | Back Braces, Canes, | MCC: Low Bunk.  Cane, | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 001 | ██ | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Accommodation Chrono: | | N | 05.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Durable Medical | | N | 08.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ████ | B 002 | ██ | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | MCC: Hearing aids. | | N | 08.5 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 002 | ██ | DPW,DNH | Barrier Free/Wheelchair | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DLT,DNH | Ground Floor-Limited | Canes, Compression | Accommodation Chrono: | | N | 07.7 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 002 | ██ | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DPM,DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | | | N | 11.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DNM,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 11.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 002 | ██ | DNM,DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | N | 12.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DNM,DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | MCC: low bunk | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DNH | | Hearing Aid, Hearing | MCC: HEARING AIDS. | | N | 03.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 002 | ██ | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 002 | ██ | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 003 | ██ | DNH | Lower/Bottom Bunk Only | Back Braces, Canes, | Accommodation Chrono: | | N | 06.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 003 | ██ | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | MCC: hearing-mobility | | N | 10.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 003 | ██ | DLT,DNH | Ground Floor-Limited | Back Braces, Compression | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | B 003 | ██ | DPM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | | N | 04.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ████ | B 003 | ██ | DNM,DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Durable Medical | | N | 12.9 | H: Need Staff to Speak | |
| SATF | ████ | C 001 | ██ | DPM,DNH | Ground Floor-No Stairs, | Binder Abdominal, Canes, | Accommodation Chrono: | | N | 01.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | ████ | C 001 | ██ | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | N | | H: Hearing Aids | H: None |
| SATF | ████ | C 002 | ██ | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Durable Medical | | N | | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | ████ | C 003 | ██ | DPM,DNH | Grab Bar Required, | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ████ | C 003 | ██ | DPW,DNH | Barrier Free/Wheelchair | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 08.0 | H: Hearing Aids | H: Written Notes |
| SATF | ████ | C 004 | ██ | DNM,DNH | Ground Floor-Limited | Back Braces, Full Lower | Durable Medical | | N | 04.0 | H: Hearing Aids | H: Reads Lips |
| SATF | ████ | C 004 | ██ | DNM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | | N | 10.7 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | ████ | C 004 | ██ | DNM,DNH | Lower/Bottom Bunk Only | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |

| SATF | | C 005 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 11.0 | H: Hearing Aids, Need | |
| SATF | | C 007 | | DNH | Ground Floor-Limited | Canes, Hearing Aid, | Accommodation Chrono: | | | N | 05.0 | H: Assistive Listening | H: Written Notes |
| SATF | | C 007 | | DPM,DNH,DN | Ground Floor-No Stairs, | Canes, Electrical Access, | Accommodation Chrono: | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 007 | | DPM,DNH | Ground Floor-No Stairs, | Canes, Electrical Access, | | | | N | 05.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 007 | | DNH | | Back Braces, Eyeglass | | | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 008 | | DNH | Ground Floor-Limited | Back Braces, Hearing Aid, | Accommodation Chrono: | | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 008 | | DPW,DNH,DP | Barrier Free/Wheelchair | Canes, Compression | Durable Medical | | | N | 09.9 | H: Hearing Aids V: | H: Need Staff to Speak |
| SATF | | C 008 | | DPW,DNH | Ground Floor-Limited | Back Braces, Diabetic | Accommodation Chrono: | | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 008 | | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Accommodation Chrono: | | | N | 09.5 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | C 008 | | DLT,DNH | Ground Floor-Limited | Electrical Access, Eyeglass | Accommodation Chrono: | | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | Accommodation Chrono: | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DPM,DNH,DP | Ground Floor-No Stairs, | Back Braces, Canes, | MCC: DPV/DPM/DNH see | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DPM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | | | | N | 08.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DPM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DLT,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | MCC: Issued | | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNH | | Canes, Hearing Aid, | MCC: avoid dust and | | | N | 07.9 | H: Use Simple | H: Hearing Aids |
| SATF | | D 001 | | DNM,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DPW,DNH | Barrier Free/Wheelchair | Air Cushion - Full (for | Durable Medical | Unverified | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNH | Lower/Bottom Bunk Only | Canes, Compression | Accommodation Chrono: | | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNM,DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | | | N | 08.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | D 001 | | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | MCC: MCC updates: | | | N | 09.0 | H: Need Staff to Speak | |
| SATF | | D 001 | | DNM,DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Durable Medical | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 001 | | DNH | | Hearing Aid, Hearing | MCC: DNH, hearing | | | N | 08.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 002 | | DNH,DPV | Ground Floor-Limited | Hearing / Vision Impaired | Durable Medical | | | N | 11.0 | H: Use Simple | H: Need Staff to Speak |
| SATF | | D 002 | | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 002 | | DLT,DNH,DP | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 002 | | DNH | Lower/Bottom Bunk Only | Back Braces, Canes, | Accommodation Chrono: | | | N | 12.0 | H: Written Notes | H: Need Staff to Speak |
| SATF | | D 002 | | DNM,DNH | | Canes, Compression | MCC: see 7410 pt does | | | N | 10.0 | H: Assistive Listening | H: Need Staff to Speak |
| SATF | | D 003 | | DPM,DNH | Ground Floor-No Stairs, | Compression Stocking, | MCC: CPAP machine with | | | N | 10.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | MCC: Pending surgical | | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | D 003 | | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | MCC: ADA cell, trapeze, | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DPM,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | MCC: transgender; no LB | | | N | 06.4 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DNH | Lower/Bottom Bunk Only | Electrical Access, Eyeglass | Accommodation Chrono: | | | N | 07.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | D 003 | | DNM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Durable Medical | | | N | 07.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DNH | Lower/Bottom Bunk Only | Electrical Access, Eyeglass | Accommodation Chrono: | | | N | 06.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 003 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | MCC: Walker, wheelchair, | | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DPO,DNH | Ground Floor-No Stairs, | Back Braces, Electrical | Accommodation Chrono: | | | N | 07.7 | H: Assistive Listening | |
| SATF | | D 004 | | DNH | Lower/Bottom Bunk Only | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | | N | 05.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | Accommodation Chrono: | | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 004 | | DNH | | Hearing Aid, Hearing | MCC: Med treatment | | | N | 08.0 | H: Need Staff to Speak | H: None |
| SATF | | D 005 | | DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | Lower/Bottom Bunk Only | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | Lower/Bottom Bunk Only | Back Braces, Hearing Aid, | Accommodation Chrono: | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | | N | 10.2 | H: Hearing Aids | H: Need Staff to Speak |

| | | | | | | | | | N | | H: Hearing | H: Speak |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF | | D 005 | | DNH | | Ankle Foot Orthoses/Knee | | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | | Eyeglass Frames, Hearing | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNM,DNH | Lower/Bottom Bunk Only | Hearing / Mobility | Durable Medical | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | | Eyeglass Frames, Full | | | N | 12.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | D 005 | | DNH | | Ankle Foot Orthoses/Knee | | | N | 12.9 | H: Hearing Aids | H: Assistive Listening |
| SATF | | D 005 | | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 001 | | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | MCC: LB AVOIDS | | N | 02.0 | H: Hearing Aids | H: Reads Lips |
| SATF | | E 001 | | DPW,DNH | Barrier Free/Wheelchair | Air Cushion (for | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 001 | | DPM,DNH | Ground Floor-No Stairs | Eyeglass Frames, Full | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 001 | | DPM,DNH | Ground Floor-No Stairs | Compression Stocking, | Accommodation Chrono: | | N | 09.4 | H: Hearing Aids | H: Reads Lips |
| SATF | | E 001 | | DPM,DNH | Ground Floor-No Stairs | Compression Stocking, | | Unverified | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 001 | | DPM,DNH | Grab Bar Required, | Canes, Hearing / Mobility | MCC: Trapeze Bar grab | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | E 001 | | DPM,DNH | Ground Floor-No Stairs | Full Upper Denture, | Accommodation Chrono: | | N | 02.0 | H: Hearing Aids, Need | H: Written Notes |
| SATF | | E 001 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 001 | | DNH | | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | E 001 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DPW,DNH | Barrier Free/Wheelchair | Back Braces, Bubble | Accommodation Chrono: | Unverified | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DPM,DNH | Ground Floor-No Stairs | Canes, Compression | | | N | 10.5 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DPM,DNH | Ground Floor-No Stairs | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DPM,DNH | Ground Floor-No Stairs | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: None |
| SATF | | E 002 | | DLT,DNH | Ground Floor-Limited | Canes, Hearing / Mobility | | | N | 10.0 | H: Need Staff to Speak | H: None |
| SATF | | E 002 | | DNH | Ground Floor-No Stairs | Eyeglass Frames, Hearing | Durable Medical | | N | 12.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | E 002 | | DNH | | Ankle Foot Orthoses/Knee | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DPO,DNH | Ground Floor-No Stairs | Back Braces, Canes, | MCC: x | | N | 11.2 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | E 002 | | DPO,DNH | Ground Floor-No Stairs | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 11.2 | H: Need Staff to Speak | H: Written Notes |
| SATF | | E 002 | | DPM,DNH | Ground Floor-No Stairs | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 11.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DNH | | Hearing Aid, Hearing | MCC: Hearing vest, DNH | | N | | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 002 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DPM,DNH | Ground Floor-No Stairs | Back Braces, Binder | Accommodation Chrono: | | N | 00.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | E 003 | | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | E 003 | | DPM,DNH | Ground Floor-No Stairs | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 10.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DPM,DNH | Ground Floor-No Stairs | Eyeglass Frames, Full | MCC: see 7410/1845, | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DNH | | Hearing Aid, Hearing | MCC: hearing impaired | | N | 12.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | E 003 | | DPM,DNH | Ground Floor-No Stairs | Canes, Compression | MCC: Accommodations: | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DPO,DNH | Ground Floor-No Stairs | Air Cushion (for | Accommodation Chrono: | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | Accommodation Chrono: | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 003 | | DPO,DNH | Ground Floor-No Stairs | Canes, Electrical Access, | Durable Medical | | N | 10.8 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | E 004 | | DPM,DNH | Ground Floor-No Stairs | Diabetic | Accommodation Chrono: | | N | 05.0 | H: Hearing Aids | H: Assistive Listening |
| SATF | | E 004 | | DPW,DNH,DN | Barrier Free/Wheelchair | Eyeglass Frames, Foot | Durable Medical | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DNH,DPV | Ground Floor-Limited | Back Braces, Canes, | Durable Medical | | N | 09.0 | H: Hearing Aids V: | H: Need Staff to Speak |
| SATF | | E 004 | | DPO,DNH,DN | Ground Floor-No Stairs | Air Cell Cushion - High | Durable Medical | | N | 09.9 | H: Hearing Aids V: | H: Hearing Aids |
| SATF | | E 004 | | DNM,DNH | Ground Floor-Limited | Canes, Compression | MCC: HEARING VEST, | | N | 12.9 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | E 004 | | DPO,DNH | Ground Floor-No Stairs | Eyeglass Frames, Hearing | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DPM,DNH | Ground Floor-No Stairs | Canes, Compression | | | N | 06.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DNH | | Eyeglass Frames, Hearing | MCC: GLASSES | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DNH | Ground Floor-No Stairs | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DLT,DNH | Ground Floor-Limited | Canes, Compression | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | E 004 | | DPM,DNH | Ground Floor-No Stairs | Canes, Eyeglass Frames, | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | DPM,DNH | Ground Floor-No Stairs | Canes, Electrical Access, | Accommodation Chrono: | | N | 07.0 | H: Hearing Aids, Need | H: Written Notes |
| SATF | | E 004 | | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Full | Accommodation Chrono: | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF | | E 004 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | N | 10.5 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 004 | | | Eyeglass Frames, Hearing | | | N | 02.0 | H: Hearing Aids | |
| SATF | | E 004 | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 005 | DPM,DNH | Ground Floor-No Stairs, | Diabetic | | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 005 | DNH | Lower/Bottom Bunk Only | Hearing Impaired | Accommodation Chrono: | | N | 04.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | E 005 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Accommodation Chrono: | Unverified | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 005 | DNH | | Hearing Aid, Hearing | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | E 005 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DLT,DNH,DP | Ground Floor-Limited | Back Braces, Canes, | | | N | 08.0 | V: Text to Speech | |
| SATF | | F 001 | DNH | | Back Braces, Eyeglass | | | N | 12.9 | H: Need Staff to Speak | |
| SATF | | F 001 | DPO,DNH | Ground Floor-No Stairs, | Canes, Compression | | | N | 07.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DPM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | | N | 04.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 001 | DNH | | Canes, Hearing / Mobility | Durable Medical | | N | 04.4 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 11.8 | H: Need Staff to Speak | |
| SATF | | F 001 | DLT,DNH,DN | Ground Floor-Limited | Back Braces, Canes, | MCC: cane rescinded, not | | N | 12.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | F 001 | DPM,DNH | Grab Bar Required, | Back Braces, Canes, | Accommodation Chrono: | | N | 05.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | | F 001 | DPW,DNH | Barrier Free/Wheelchair | Air Cushion (for | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | F 001 | DLT,DNH | Ground Floor-Limited | Diabetic | Accommodation Chrono: | | N | 12.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DNH | | Diabetic | | | N | 09.4 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 001 | DPM,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | Unverified | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DLT,DNH | Ground Floor-Limited | Canes, Electrical Access, | Accommodation Chrono: | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | MCC: DPM, DNH, CANE, | | N | 11.8 | H: Hearing Aids | H: Reads Lips |
| SATF | | F 001 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Accommodation Chrono: | | N | 06.6 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 001 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | N | 11.0 | H: Need Staff to Speak | H: Written Notes |
| SATF | | F 001 | DNM,DNH | Lower/Bottom Bunk Only | Canes, Diabetic | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 001 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | F 001 | DNH | Lower/Bottom Bunk Only | Diabetic | Accommodation Chrono: | | N | 10.9 | H: Hearing Aids | H: Reads Lips |
| SATF | | F 001 | DNH | | Eyeglass Frames, Hearing | | | N | 07.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 002 | DPW,DNH | Barrier Free/Wheelchair | Back Braces, Canes, | Durable Medical | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 002 | DPO,DNH | Ground Floor-No Stairs, | Canes, Electrical Access, | Accommodation Chrono: | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | MCC: Hearing aids and | | N | 10.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Accommodation Chrono: | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | | Eyeglass Frames, Hearing | MCC: Allow cover for | | N | 06.2 | H: Need Staff to Speak | H: None |
| SATF | | F 002 | DNH | | Eyeglass Frames, Hearing | | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPO,DNH | Grab Bar Required, | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 11.8 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPO,DNH,DN | Grab Bar Required, | Canes, Compression | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | MCC: lower lower, | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | N | 09.9 | H: Need Staff to Speak | |
| SATF | | F 002 | DNH,DPV | Grab Bar Required, | Canes, Eyeglass Frames, | Accommodation Chrono: | Unverified | N | 03.0 | H: Hearing Aids V: | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPM,DNH | Ground Floor-No Stairs, | Canes, Compression | Accommodation Chrono: | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Ground Floor-Limited | Back Braces, Canes, | MCC: LB, LT, cane, | | N | 10.0 | H: Hearing Aids S: | |
| SATF | | F 002 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | MCC: Rescind vision | | N | 09.0 | H: Need Staff to Speak | H: Written Notes |
| SATF | | F 002 | DPM,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | MCC: Rescind vision | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 09.0 | H: Need Staff to Speak | H: None |
| SATF | | F 002 | DPO,DNH | Ground Floor-No Stairs, | Back Braces, Canes, | Accommodation Chrono: | | N | 08.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DPO,DNH | Ground Floor-No Stairs, | Canes, Eyeglass Frames, | MCC: LOW BUNK, LOW | | N | 01.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | F 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | N | 07.8 | H: Need Staff to Speak | H: Hearing Aids |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF | | F 002 | DNH | | Ankle Foot Orthoses/Knee | | | N | 12.9 | H: Hearing Aids | H: Written Notes |
| SATF | | F 002 | DNH | | Binder Abdominal, | Durable Medical | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNM,DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | Yes | -Recommend student | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | | Eyeglass Frames, Hearing | | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNM,DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 04.0 | H: Need Staff to Speak | H: None |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 12.9 | H: Need Staff to Speak | H: None |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 11.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | N | 06.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | | Electrical Access, | Accommodation Chrono: | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | | Eyeglass Frames, Hearing | | | N | 12.4 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 10.3 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 002 | DNH | Lower/Bottom Bunk Only | Diabetic | Accommodation Chrono: | | N | 11.3 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Ground Floor-Limited | Back Braces, Canes, | Accommodation Chrono: | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Ground Floor-Limited | Electrical Access, Eyeglass | MCC: lower bunk  two | | N | 05.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 03.5 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | F 003 | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | N | 00.0 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | MCC: (9/8/2017 Removed | | N | 11.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DPW,DNH | Barrier Free/Wheelchair | Back Braces, Compression | | | N | 02.3 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | G 001 | DPO,DNH | Ground Floor-No Stairs, | Binder Abdominal, Canes, | Durable Medical | | N | 12.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | MCC: Hearing aid, | | N | 12.9 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | G 001 | DPM,DNH | Ground Floor-No Stairs, | Ankle Foot Orthoses/Knee | MCC: BOTTOM BUNK, | | N | 10.7 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNM,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | N | 09.0 | H: Need Staff to Speak | H: Assistive Listening |
| SATF | | G 001 | DPM,DNH | Ground Floor-No Stairs, | Canes, Compression | Durable Medical | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DLT,DNH | Ground Floor-Limited | Back Braces, Canes, | MCC: Low bunk, Hearing | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | | | N | 02.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | | Eyeglass Frames, Hearing | MCC: see 1845/7410 | | N | 12.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | Lower/Bottom Bunk Only | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 01.0 | H: Hearing Aids | H: None |
| SATF | | G 001 | DNH | | Eyeglass Frames, Foot | MCC: Eyeglass frames. | | N | 02.2 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 001 | DNH | | Ankle Foot Orthoses/Knee | MCC: has hearing | | N | 04.0 | H: Need Staff to Speak | H: Written Notes |
| SATF | | G 001 | DNH | | Electrical Access, Eyeglass | Durable Medical | | N | | H: Hearing Aids | H: Reads Lips |
| SATF | | G 001 | DNM,DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | MCC: mobility-hearing | | N | 05.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | G 001 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | | | N | 10.0 | H: Need Staff to Speak | H: Reads Lips |
| SATF | | G 001 | DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | | N | 09.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | | G 002 | DPM,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Durable Medical | | N | 03.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DNM,DNH | Ground Floor-Limited | Back Braces, Diabetic | | | N | 01.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | | G 002 | DPM,DNH | Ground Floor-No Stairs, | Canes, Electrical Access, | Accommodation Chrono: | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DLT,DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | MCC: see 1845/7410 | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DNH,DPS | | Eyeglass Frames, Hearing | | | Y | 05.0 | H: American Sign | H: Hearing Aids |
| SATF | | G 002 | DLT,DNH | Ground Floor-Limited | Ankle Foot Orthoses/Knee | Accommodation Chrono: | | N | 10.3 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DNH | Ground Floor-Limited | Electrical Access, Eyeglass | Accommodation Chrono: | | N | 06.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | G 002 | DPW,DNH | Barrier Free/Wheelchair | Eyeglass Frames, Hearing | Accommodation Chrono: | | N | 12.9 | H: Hearing Aids | H: Need Staff to Speak |

| Facility | | Housing | Code | Restriction | Equipment | MCC/Accommodation | Verify | Note | N | Num | H1 | H2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SATF | ▮ | G 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | MCC: DPO/ mostly wheel | | | N | 08.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DPO,DNH | Grab Bar Required, | Air Cell Cushion - High | Accommodation Chrono: | | | N | 08.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 002 | DNH | Unrestricted | Hearing Aid, Hearing | | | | N | 03.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 002 | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | | | | N | 02.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DPW,DNH | Barrier Free/Wheelchair | Air Cell Cushion - High | Durable Medical | | | N | 10.9 | H: Need Staff to Speak | H: None |
| SATF | ▮ | G 002 | DPM,DNH | Grab Bar Required, Canes | Back Braces, Canes, | Accommodation Chrono: | Unverified | | N | 10.3 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 002 | DPM,DNH | Ground Floor-No Stairs, | Diabetic | MCC: please, no lifting > | Unverified | | N | 02.5 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 12.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 01.0 | H: Hearing Aids | H: Reads Lips |
| SATF | ▮ | G 002 | DPM,DNH | Ground Floor-No Stairs, | Eyeglass Frames, Hearing | MCC: Eye glasses Low | | | N | | | |
| SATF | ▮ | G 002 | DLT,DNH | Ground Floor-Limited | Canes, Hearing / Mobility | MCC: lower bed, lower | | | N | 03.4 | H: Need Staff to Speak | H: Written Notes |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Compression Stocking, | Accommodation Chrono: | Yes | VERIFIED LEARNING | N | 06.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 00.7 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Electrical Access, Eyeglass | Accommodation Chrono: | | | N | 10.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | MCC: lower bunk, lower | Unverified | | N | 01.5 | H: Need Staff to Speak | H: Need Staff to Speak |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | | N | 09.4 | H: Use Simple | |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | | N | 02.0 | H: Hearing Aids | |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Back Braces, Eyeglass | Accommodation Chrono: | | | N | 08.0 | H: Hearing Aids | |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 09.9 | H: Need Staff to Speak | |
| SATF | ▮ | G 002 | DNM,DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Foot | Accommodation Chrono: | | | N | 12.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 08.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 002 | DNH | Lower/Bottom Bunk Only | Back Braces, Electrical | Accommodation Chrono: | | | N | 10.3 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DPM,DNH | Ground Floor-No Stairs, | Compression Stocking, | MCC: See 1845/7410 | | | N | 06.2 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 09.6 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Ground Floor-No Stairs, | Compression Stocking, | MCC: lower bunk, lower | | | N | 10.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 003 | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | MCC: Lay in for 4 mos | | | N | 04.1 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Ground Floor-Limited | Hearing Aid, Hearing | MCC: No working near | | | N | 10.7 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 003 | DLT,DNH,DP | Ground Floor-Limited | Canes, Eyeglass Frames, | Durable Medical | | | N | 04.0 | H: Need Staff to Speak | H: None |
| SATF | ▮ | G 003 | DNH | Ground Floor-Limited | Electrical Access, Eyeglass | Durable Medical | | | N | 12.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | MCC: See 1845 | | | N | 07.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | MCC: low bunk | | | N | 12.4 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 003 | DPO,DNH | Ground Floor-No Stairs, | Air Cell Cushion - High | Accommodation Chrono: | | | N | 04.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 003 | DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | MCC: Insoles size 10, | | | N | 08.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DPM,DNH | Ground Floor-Limited | Eyeglass Frames, Hearing | | | | N | 06.4 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Diabetic | | | | N | 01.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 003 | DNM,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Durable Medical | | | N | 03.6 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 12.0 | H: Need Staff to Speak | H: Hearing Aids |
| SATF | ▮ | G 003 | | | Eyeglass Frames, Hearing | MCC: Hearing aids, | | | N | 00.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Hearing Aid, Hearing | Accommodation Chrono: | | | N | 09.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 05.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 09.9 | H: Need Staff to Speak | H: Written Notes |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Canes, Crutches, Eyeglass | Accommodation Chrono: | | | N | 08.0 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | | Eyeglass Frames, Hearing | | | | N | 12.9 | H: Need Staff to Speak | H: None |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Full | Accommodation Chrono: | | | N | 09.4 | H: Hearing Aids | H: Hearing Aids |
| SATF | ▮ | G 003 | DNH | Lower/Bottom Bunk Only | Diabetic | MCC: DNH | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | S INF | DLT,DNH | Ground Floor-No Stairs, | Back Braces, Eyeglass | MCC: Must be within | | | N | 12.9 | H: Hearing Aids | H: None |
| SATF | ▮ | S INF | DNH | Ground Floor-Limited | Canes, Compression | Accommodation Chrono: | | | N | 09.9 | H: Hearing Aids, Need | H: Written Notes |
| SATF | ▮ | S INF | DLT,DNH | Ground Floor-Limited | Canes, Eyeglass Frames, | Accommodation Chrono: | | | N | 09.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | ▮ | S INF | DPW,DNH | Barrier Free/Wheelchair | Back Braces, Canes, | MCC: DPW | | | N | 09.7 | H: Reads Lips | H: Hearing Aids |
| SATF | ▮ | S INF | DNH | Lower/Bottom Bunk Only | Eyeglass Frames, Hearing | Accommodation Chrono: | | | N | 10.9 | H: Hearing Aids | H: Need Staff to Speak |

| SATF | | | S INF | | DPW,DNH | Barrier Free/Wheelchair Accessible, Ground Floor, Double Bunk/Limited | Air Cell Cushion - High Profile/Pelvic Electrical | Accommodation Chrono: Durable Medical Equipment | | | N | 12.9 | H: Reads Lips | H: Assistive Listening Device |
| SATF | | | S INF | | DPO,DNH | Ground Floor-No Stairs, Walk-In Barrier Free | Canes, Eyeglass Frames, Hearing Aids | Accommodation Chrono: DPH, Hearing | | | N | 00.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | | S INF | | DPM,DNH | Ground Floor-No Stairs, Double Bunk/Limited | Compression Stocking, Medical Shoes | Accommodation Chrono: DPH, Hearing | | | N | 07.0 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | | UNK-U | | DPO,DNH | Ground Floor-No Stairs, Double Bunk/Limited | Back Braces, Compression | Accommodation Chrono: DPH, Durable Medical | | | N | 07.9 | H: Hearing Aids | H: Need Staff to Speak |
| SATF | | | UNK-U | | DNM,DNH,DP | Ground Floor-Limited | Compression Stocking, Eyeglass Frames, Hearing | Accommodation Chrono: DPH, Hearing | | | N | 10.9 | H: Hearing Aids V: Large Print Material | H: Written Notes |
| SATF | | | Z  001 | | DNH | Lower/Bottom Bunk Only | Back Braces, Compression Stocking, Eyeglass | Accommodation Chrono: Medical condition, DPP | Unverified | | N | 09.6 | H: Need Staff to Speak Loudly and Clearly | H: None |

1   DONALD SPECTER – 083925
    RITA K. LOMIO – 254501
2   MARGOT MENDELSON – 268583
    JACOB J. HUTT – 5565791, *pro hac vice*
3   PRISON LAW OFFICE
    1917 Fifth Street
4   Berkeley, California  94710-1916
    Telephone:    (510) 280-2621
5   Facsimile:    (510) 280-2704

6   MICHAEL W. BIEN – 096891
    GAY C. GRUNFELD – 121944
7   THOMAS NOLAN – 169692
    PENNY GODBOLD – 226925
8   CAROLINE JACKSON – 329980
    ROSEN BIEN
9   GALVAN & GRUNFELD LLP
    101 Mission Street, Sixth Floor
10  San Francisco, California  94105-1738
    Telephone:    (415) 433-6830
11  Facsimile:    (415) 433-7104

12  LINDA D. KILB – 136101
    DISABILITY RIGHTS EDUCATION &
13  DEFENSE FUND, INC.
    3075 Adeline Street, Suite 201
14  Berkeley, California  94703
    Telephone:    (510) 644-2555
15  Facsimile:    (510) 841-8645

16  Attorneys for Plaintiffs

17

18                  UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20

21   JOHN ARMSTRONG, et al.,          Case No. C94 2307 CW

22              Plaintiffs,           **DECLARATION OF AMBER NORRIS**

23        v.                          Judge:   Hon. Claudia Wilken

24   GAVIN NEWSOM, et al.,

25              Defendants.

26

27

28

1    I, Amber Norris, declare:

2    1.    I am an Investigator at the Prison Law Office, which serves as counsel of

3    record for the Plaintiff class in *Armstrong v. Newsom*. I have personal knowledge of the

4    facts set forth herein and, if called as a witness, I could competently so testify.

5    2.    Defendants in *Armstrong* regularly produce DPP Roster spreadsheets, which

6    list all people with DPP codes in the California state prisons.

7    3.    At the direction of Jacob Hutt, an attorney at the Prison Law Office, I located

8    the July 1, 2024, DPP Roster, sorted by housing. I filtered the spreadsheet by prison

9    (SATF) and then by DPP code (DNH).

10    4.    SATF has seven housing facilities (A-G), excluding the Infirmary and RHU.

11    I identified from the filtered spreadsheet the first six people designated DNH on Facilities

12    A, B, C, D, E, and G. I inadvertently missed the first person on the spreadsheet for Facility

13    F, ███████████████████    As a result, for Facility F, I selected the people on the

14    spreadsheet appearing at positions 2-7 (instead of 1-6). The people I selected through this

15    process are:

| Name | CDCR # | Current Facility-Bed | |
|------|--------|----------------------|---|
| ████ | ████ | A  001 | ████ |
| | | A  001 | |
| | | A  001 | |
| | | A  001 | |
| | | A  001 | |
| | | A  001 | |
| | | B  001 | |
| | | B  001 | |
| | | B  001 | |
| | | B  001 | |
| | | B  001 | |
| | | B  001 | |
| | | C  001 | |
| | | C  001 | |
| | | C  002 | |
| | | C  002 | |

DECLARATION OF AMBER NORRIS



5.    For each person listed above, I reviewed their electronic medical records in CERNER. In the medical records, I used a filter for "Audiology Consultation Note" to identify relevant documentation. I downloaded the most recent audiology consult that included an evaluation. For any patient who did not have an evaluation completed since 2020, I downloaded any audiology consult or relevant notes regarding audiology consults.

. . . .

. . . .

. . . .

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct, and that this declaration is executed at Fremont,

3    California, this 26th day of July, 2024.

4

5

6

7                                                        _____

8                                                        Amber Norris

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 1/3/2024          **Date IAC Received 1824:** 12/29/2023          **1824 Log Number:** 498625

**Inmate's Name:** ▮▮▮▮          **CDCR #:** ▮▮▮▮          **Housing:** D5-▮▮▮▮

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Executive Officer A. Banerjee, Chief Medical Executive G. Ugweze, Chief Psychologist Dr. J. Howard, Health Care Grievance Representative ▮▮▮▮, Custody Appeals Representative ▮▮▮▮, Associate Governmental Program Analyst ▮▮▮▮ Health Program Manager III ▮▮▮▮, Registered Nurse ▮▮▮▮, Field Training Lieutenant ▮▮▮▮▮, Vice Principal ▮▮▮▮

**Summary of Inmate's 1824 Request:** Inmate alleges they were advised they are eligible for new iPhone and watch technology due to their hearing impairment; Inmate requests speech to text technology and a new watch.

---

### Interim Accommodation:

☒ No interim accommodation required: You are currently accommodated with hearing aids and a Personal Sound Amplification Device (PSAD).

---

### RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate alleges they were advised they are eligible for new iPhone and watch technology due to their hearing impairment; Inmate requests speech to text technology and a new watch.

**Response:** On 1/3/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad/ iPhone with live captioning or a vibrating watch to access Programs, Services, or Activities (PSA)s.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife                        _(signature)_                        **Date sent to inmate:**

**ADA Coordinator/Designee**          **Signature**                                    **JAN 2 5 2024**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) Saff | LOG NUMBER (Staff Use Only) 498685 | DATE RECEIVED BY STAFF: |
|---|---|---|

CSATE OFFICE

DEC 29 2023

OF GRIL

**\*\*\*\*\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\*\*\***
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT Rec-Aid | HOUSIN D-5 |
|---|---|---|---|

**INSTRUCTIONS:**
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?** I WAS Informed of the fact I am Eligelble for the "iPhone" for Deaf People who do not use Sign language with speach to Technology; AND I NOT getting that Accomodation of The "iPhone" or the "iTablet" Pursuant To November 2023. As well APProve the watch;

**WHY CAN'T YOU DO IT?** The Personnel Hasn't Issued the "iPhone; or iTablet"

**WHAT DO YOU NEED?** 1. Please Accommodate this Deaf Person with Such Speach-to-Text Technology with in a Reasonable Time frame; 2. Please accommodate the vibrating Alarm watch Respectfully Request

_(Use the back of this form if more space is needed)_

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**    Yes ☐    No ☐    Not Sure ☐
List and attach documents, if available:

I understand that staff have a right to interview or examine me, and my failure to cooperate may cause this request to be disapproved.

| INMATE'S SIGNATURE | DATE SIGNED |
|---|---|

Assistance in completing this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

**Interim Accommodation Procedure (IAP) / Interview Worksheet**

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day.</u>
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▮▮▮▮▮      CDCR #: ▮▮▮▮▮      CDCR 1824 Log #: 498625

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**      Date CDCR 1824 received by IAC: 12 / 29 / 23

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)      [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care app▮▮▮▮▮ safety concerns.

| Person Completing Step 1 | Title | Signature | Date Completed |
|---|---|---|---|
| ▮▮▮▮▮ | AGPA | ▮▮▮▮▮ | 12 / 29 / 23 |

---

**STEP 2    CDCR 1824 INTERVIEWS**      *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ___ / ___ / ___      Due back to IAC: ___ / ___ / ___      Returned to IAC: ___ / ___ / ___

Assigned to: _____      Title: _____

Information needed: _____

_____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

Inmate Interview Date/Time:_____      Location:_____

Interviewer notes: _____

_____

_____

Staff Interviewed: _____  Title: _____  Interview date: ___ / ___ / ___

Interviewer Notes: _____

_____

_____

Staff Interviewed: _____  Title: _____  Interview date: ___ / ___ / ___

Interviewer Notes: ._____

_____

_____

*Notes:*  ISSUANCE OF THE IPHONE TECHNOLOGY IS INTENDED FOR INDIVIDUALS WITH PROFOUND HEARING LOSS. I/M IS CURRENLTY DESIGNATED DNH AND IS BEING ACCOMMODATED WITH HEARING AIDS AND A POCKET TALKER. I/M'S CURRENT METHODS OF EC ARE HEARINGS AND STAFF SPEAK LOUDLY AND CLEARLY.

| Interviewer (Print Name) | Title | Signature | Date Completed |
|---|---|---|---|
| | | | ___ / ___ / ___ |

**IAP / Interview Worksheet**

Inmate: ▮▮▮▮▮▮    CDCR #: ▮▮▮▮▮    CDCR 1824 Log #: 498625

---

**Step 3:**   DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

_____

**Accommodation(s) provided:**                          **Date provided:**

_____    ___ / ___ / ____

_____    ___ / ___ / ____

_____    ___ / ___ / ____

Comments: _____

_____

_____

| ▮▮▮▮▮▮▮▮ | AGPA | | 01 / 02 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note: When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

**IAP processing Instructions for the Appeals Coordinator**

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3.  The interviews conducted in Step 2 will help with the decision in Step 3.  Step 3 documents the decision.  When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

**Step 2 Interviewer Instructions**

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2.  If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing.  Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder.  Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ▮▮▮▮▮                                                     CDC #: ▮▮▮▮    PID #: ▮▮▮▮

**CHSS035C DPP Disability/Accommodation Summary** Friday December 29, 2023 12:35:52 PM

As of: | 12/29/2023 |   ➡

---

### OFFENDER/PLACEMENT

CDC#: ▮▮▮▮
Name: ▮▮▮▮
Facility: SATF-Facility D
Housing Area/Bed: D 005 ▮▮▮▮
Placement Score: 841
Custody: Medium (A)
Designation:
Housing Program: Sensitive Needs Yard
Housing Restrictions: Lower/Bottom Bunk Only
Physical Limitations: No Rooftop Work
to Job/Other: Permanent - 12/31/9999

### DISABILITY ASSISTANCE

Current DDP Status: NDD
DDP Adaptive: None
Support Needs:
Current DDP Status Date: 10/21/2005
DPP Codes: DNH
DPP Determination Date: 11/18/2021
Current MH LOC: CCCMS
Current MH LOC Date: 06/06/2019
SLI Required: No
Interview Date: 04/30/2016
Primary Method(s) - Hearing: Hearing Aids
Alternate Method - Hearing: Need Staff to Speak Loudly and Clearly
Non-Formulary: Already posseses a Dual
Accommodations/Comments: Vision/Hearing Vest.
Learning Disability:
Initial Reading Level: 03.0
Initial Reading Level Date: 02/25/2020
Durable Medical Equipment: Hearing Aid
Ankle Foot Orthoses/Knee Ankle Foot Orthoses (AFO/KAFO)
Eyeglass Frames
Incontinence Supplies
Partial Upper Denture - Acrylic
Languages Spoken:

---

### IMPORTANT DATES

Date Received: 10/12/2000
Last Returned Date:
Release Date: 10/21/2034
Release Type: Minimum Eligible Parole Date

### WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start Date: 12/30/2022
Status: Full Time
Position #: REC.002.005
Position Title: D-5 3/W REC WRKR
Regular Days On: Tue,Wed,Thu,Fri,Sat (14:30:00 - 17:00:00)
Tue,Wed,Thu,Fri,Sat (18:00:00 - 22:00:00)

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

RAP Meeting Date: 4/10/2024      Date IAC Received 1824: 4/5/2024      1824 Log Number: 543876

Inmate's Name: ▮▮▮▮▮▮▮▮      CDCR #: ▮▮▮▮▮▮      Housing: E2-▮▮▮▮

RAP Staff Present: ADA Coordinator N. Scaife, Associate Governmental Program Analyst ▮▮▮▮ Psychologist Dr. ▮▮▮ Chief Physician and Surgeon W. Kokor, Staff Services Analyst ▮▮▮▮ Registered Nurse ▮▮▮▮ Health Care Grievance Representative ▮▮▮▮ Office of Grievance Representative ▮▮▮ Field Training Lieutenant ▮▮▮▮

**Summary of Inmate's 1824 Request:** Inmate reports difficulty carrying items; Inmate reports difficulty hearing announcements; Inmate requests a walker bag and personal notifications.

Interim Accommodation:

☒ No interim accommodation required: You are not alleging a disability or requesting an accommodation to access Programs, Services, or Activities (PSA)s.

RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate reports difficulty carrying items; Inmate reports difficulty hearing announcements; Inmate requests a walker bag and personal notifications.

**Response:** On 4/10/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

A review of Strategic Offender Management System (SOMS) indicates you are prescribed a temporary walker for 6 months. However, SATF is currently out of walker bags you have been placed on the waitlist and will receive a bag when stock arrives, and your name is reached on the list. In interim, you may request assistance carrying items from ADA workers.

Per the Interim Accommodation Procedure (IAP) worksheet, dated 4/6/2024, you were interviewed and advised to wear your hearing aid to assist hearing announcements on the PA. You were also issued a pocket talker on 4/9/2024 to further assist you.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife _____          _____          Date sent to inmate:   APR 2 4 2024

**ADA Coordinator/Designee**          Signature

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | 343876 | APR 05 2024 |
| | | OF GRIEVANCES |

**TALK TO STAFF IF YOU HAVE AN EMERGENCY**
DO NOT use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDCR 7362 or a CDCR 602-HC.

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| | | | B1 |

INSTRUCTIONS:
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**

I have incontinence supplies that I have to KOP and I need to be able to put it somewhere when I leave the unit.

I can't hear the PA announcements

**WHY CAN'T YOU DO IT?**

I don't have a bag for my walker

The PA sounds very muffled and I'm DNH.

**WHAT DO YOU NEED?**

I need a bag that attaches to my walker

I need the C/o to inform me of where I am going via normal voice instead of over the PA.

*(Use the back of this form if more space is needed)*

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY? | Yes ☑ | No ☐ | Not Sure ☐ |
|---|---|---|---|

List and attach documents, if available:
See Medical file

I understand that staff have a right to interview or examine me, and my failure to cooperate may cause this request to be disapproved.

| | 4/3/24 |
|---|---|
| **INMATE'S SIGNATURE** | **DATE SIGNED** |

Assistance in completing this form was provided by:

| | | |
|---|---|---|
| Last Name | First Name | Signature |

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day.</u>
Step 2 should be completed whenever the inmate's request is unclear or when additional input from the inmate and/or staff will help the RAP better understand the request.

Inmate: ▮▮▮▮▮          CDCR #: ▮▮▮▮▮          CDCR 1824 Log #: 543876

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**          Date CDCR 1824 received by IAC: 04 / 05 / 24

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)     [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.          • Cannot safely navigate stairs.
- Cannot safely access upper bunk.          • Seizure disorder and is assigned an upper bunk.
- Workplace safety concerns.          • Hearing or vision claims that may jeopardize safety.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care a▮▮▮▮▮fety concerns.

| ▮▮▮▮▮ | AGPA | ▮▮▮▮▮ | 04 / 05 / 24 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2     CDCR 1824 INTERVIEWS**     *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: 04 / 05 / 24          Due back to IAC: 04 / 06 / 24          Returned to IAC: 04 / ▮▮ / 24
Assigned to: FACILITY E                                                  Title: FTS

Information needed: <u>PLEASE ADVISE I/M SATF IS OUT OF STOCK OF WALKER BAGS; I/M HAS BEEN PLACED ON WAITING LIST. PLEASE ADVISE I/M OF THE AVAILABILITY OF POCKET TALKERS AND DETERMINE IF THIS WOULD BETTER ACCOMMODATE THE I/M.</u>

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

Inmate Interview Date/Time: 4/6/24 1150          Location: E1 Dayroom
Interviewer notes: SPOKE TO I/M ABOUT WALKER BAG ADVISED HIM HE WOULD RECIEVE ONE AS SOON AS THEY CAME IN. ALSO I/M WAS NOT WEARING HEARING AID AND I ADVISED him TO WEAR IT. HE SAID HE ONLY HAS A problem HEARING ANNOUNCEMENTS ON PA. AND HE CAN

Staff Interviewed: ▮▮▮▮▮          Title: SGT          Interview date: 04 / 06 / 24
Interviewer Notes: HEAR WHEN OFFICER IN control BOOTH opens the window And Shouts to him. I spoke to OFFICERS and ADVISED them to open his DOOR and speak to him without P.A.

Staff Interviewed: ▮▮▮▮▮          Title: ____          Interview date: ___ / ___ / ___
Interviewer Notes: A REVIEW OF SOMS INDICATES I/M IS PRESCRIBED A TEMP WALKER FOR 6 MONTHS. ~~HOWEVER, SATF IS CURRENTLY OUT OF STOCK OF WHEELCHAIR/WALKER BAGS. I/M HAS BEEN PLACED ON THE WAITING LIST AND WILL RECEIVE A BAG WHEN STOCK ARRIVES. IN INTERIM, I/M MAY REQUEST ASSISTANCE CARRYING ITEMS FROM ADA WORKERS~~

*Notes:* I/M IS DESIGNATED DNH, HEARING IMPAIRED NOT IMPACTING PLACEMENT, WITH NEEDS STAFF TO SPEAK LOUDLY AND CLEARLY AS PRIMARY EC. I/M IS PRESCRIBED HEARING AIDS. I/M IS ENCOURAGED ~~TO UTILIZE HEARING AIDS.~~ I/m was issued a pocket talker on 4/9/24

| ▮▮▮▮▮ | ▮▮▮▮▮ | ▮▮▮▮▮ | 4 / 5 / 24 |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

## IAP / Interview Worksheet

Inmate: ▮▮▮▮▮▮▮▮   CDCR #: ▮▮▮▮▮▮   CDCR 1824 Log #: 543876

---

**Step 3:** DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason:_____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason:_____

_____

_____

Accommodation(s) provided:                                          Date provided:

_____    ____/____/____

_____    ____/____/____

_____    ____/____/____

Comments:_____

_____

_____

| ▮▮▮▮▮▮▮▮ | AGPA | | 04 / 05 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note: When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

**IAP processing instructions for the Appeals Coordinator**

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

**Step 2 Interviewer Instructions**

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ██████████████    CDC #: ██████  PID #: ████████

**CHSS035C DPP Disability/Accommodation Summary** Friday April 05, 2024 12:46:19 PM

As of: 04/05/2024  ⇨

## OFFENDER/PLACEMENT

CDC#: ████████
Name: ████████████████
Facility: SATF-Facility E
Housing E 001 ████████████
Area/Bed:
Placement 19
Score:
Custody Unclassified
Designation:
Housing Non-Designated Program Facility
Program:
Housing Lower/Bottom Bunk Only
Restrictions:
Physical
Limitations to
Job/Other:

## DISABILITY ASSISTANCE

Current DDP Status: NCF
DDP Adaptive None
Support Needs:
Current DDP Status Date: 04/19/2017
DPP Codes: DNH
DPP Determination Date: 01/11/2024
Current MH LOC: CCCMS
Current MH LOC Date: 06/26/2017
SLI Required: No
Interview Date: 01/19/2024
Primary Method(s) - Hearing: Need Staff to Speak Loudly and Clearly
Alternate Method - Hearing: Reads Lips
Non-Formulary
Accommodations/Comments:
Learning Disability:
Initial Reading Level: 12.0
Initial Reading Level Date: 01/30/2024
Durable Medical Equipment: Hearing Aid
Canes
Eyeglass Frames
Hearing / Mobility
Impaired Disability
Vest
Incontinence
Supplies
Other (Include in
Comments)
Walkers
Languages Spoken:

## IMPORTANT DATES

Date Received: 12/13/2023
Last Returned Date:
Release Date: 06/27/2026
Release Type: Earliest Possible Release Date

## WORK/VOCATION/PIA

Privilege Group: U
Work Group: U
AM Job Start Date:
Status:
Position #:
Position Title:
Regular Days On:

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 1/24/2024    **Date IAC Received 1824:** 1/23/2024    **1824 Log Number:** 509684

**Inmate's Name:** ███████████    **CDCR #:** ███████    **Housing:** A3-███████

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Medical Executive G. Ugweze, Psychologist Dr. ████ Health Care Grievance Representative ██████ Custody Appeals Representative ██████, Associate Governmental Program Analyst ██████ Registered Nurse ██████, Staff Services Analyst██████, Field Training Lieutenant ██ ██████

**Summary of Inmate's 1824 Request:** Inmate alleges it is difficult for them to hear dining and medication pass notifications; Inmate requests a bed shaker to wake them up for programs.

### Interim Accommodation:

☒ No interim accommodation required: Housing unit staff and ADA Workers will continue to provide clarification of public announcements any time you deem necessary.

## RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate alleges it is difficult for them to hear dining and medication pass notifications; Inmate requests a bed shaker to wake them up for programs.

**Response:** On 1/24/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

The RAP has determined you do not require a bed shaker alarm to access the dining hall or the medication line. You are accommodated with hearing aids and your primary method of achieving effective communication is for staff to speak loudly and clearly. You have no alternate method of communication required. If you are ever unclear as to what is said during a public announcement, you are encouraged to ask any one of your peers, ADA workers, or staff for clarification. Regarding programs that occur around the same time every day, such as the morning and evening meals, and medication lines; an alarm is not necessary to guarantee your access. Your watch and any other time piece without an alarm will provide equally effective means of telling you what time of day it is relative to repetitive programs.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife _____         _N. Scaife (signature)_ _____         Date sent to inmate: **FEB 2 2 2024**

**ADA Coordinator/Designee**                **Signature**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | 509684 | CSATF OFFICE JAN 23 2024 OF GRIEVANCES |

************TALK TO STAFF IF YOU HAVE AN EMERGENCY************
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| | | 3/w ADA | A3 |

**INSTRUCTIONS:**
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
I can't hear when people are up in the morning and I have a hard time hearing when the morning meal is called

**WHY CAN'T YOU DO IT?**
My hearing is bad and I don't sleep with hearing aids or a pocket talker

**WHAT DO YOU NEED?**
There is a device that can be put under my pillow and vibrate when it is time for me to get up

_(Use the back of this form if more space is needed)_

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**   Yes ☐   No ☐   Not Sure ☐

List and attach documents, if available: Review the D.E.C.S and S.O.M.S

I understand that [redacted] cooperate may cause this request to be disapproved.

| | **DATE SIGNED** |
|---|---|

Assistance in completing this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) **shall complete Step 1 below within 1 working day.**
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▓▓▓▓▓▓▓▓    CDCR #: ▓▓▓▓▓▓    CDCR 1824 Log #: 509684

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**    Date CDCR 1824 received by IAC: 01 / 23 / 24

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

☐ **Yes / Unsure** (Complete Steps 2 &/or 3)    ☑ **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care appliances which involve safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.

| ▓▓▓▓ ▓▓▓▓ | AGPA | ▓▓▓▓▓▓▓▓ | 01 / 23 / 24 |
|---|---|---|---|
| Person Completing Step 1 | Title | | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**    *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____    Due back to IAC: ____ / ____ / ____    Returned to IAC: ____ / ____ / ____

Assigned to: _____    Title: _____

Information needed: _____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:** _____    **Location:** _____

Interviewer notes: _____

_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

---

***Notes:*** HOUSING UNIT STAFF UTILIZE HEARING IMPAIRED NOTIFICATION. I/M IS CURRENT DNH WITH EC OF NEED STAFF TO SPEAK LOUDLY. I/M MAY UTILIZE THE SPECIAL PURCHASE ORDER PROCESS TO PURCHASE THE REQUESTED ITEM. I/M IS ALSO ACCOMMODATED WITH POCKET TALKER.

| | | | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

DRAFT

## IAP / Interview Worksheet

Inmate: ████████    CDCR #: ████████    CDCR 1824 Log #: 509684

---

**Step 3:** **DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason:_____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason:_____

_____

_____

**Accommodation(s) provided:**    **Date provided:**

_____    ____/____/____

_____    ____/____/____

_____    ____/____/____

Comments:_____

_____

_____

| ████████ | AGPA | | 01 / 23 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

**Note:** When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

### IAP processing Instructions for the Appeals Coordinator

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

### Step 2 Interviewer Instructions

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇                    CDC #: ▇▇▇    PID #: ▇▇▇

CHSS035C **DPP Disability/Accommodation Summary** Tuesday January 23, 2024 01:25:41 PM

As of: 01/23/2024  ⇨

## OFFENDER/PLACEMENT

CDC#: ▇▇▇
Name: ▇▇▇▇▇▇▇▇▇
Facility: SATF-Facility A
Housing A 003 ▇▇▇▇▇
Area/Bed:
Placement 19
Score:
Custody Medium (A)
Designation:
Housing Non-Designated Program Facility
Program:
Housing Ground Floor-No Stairs
Restrictions: Lower/Bottom Bunk Only
Physical Limited Wheelchair User
Limitations to Special Cuffing Needed
Job/Other: Lifting Restriction- Unable to Lift more than 19
Pounds
No Rooftop Work
Permanent - 12/31/9999

## DISABILITY ASSISTANCE

Current DDP Status: NCF
DDP Adaptive None
Support Needs:
Current DDP Status Date: 11/20/2003
DPP Codes: DPO, DNH
DPP Determination Date: 11/24/2023
Current MH LOC: GP
Current MH LOC Date: 04/10/2017
SLI Required: No
Interview Date: 07/12/2021
Primary Method(s) – Hearing: Need Staff to Speak
Loudly and Clearly
Alternate Method - Hearing: None
Non-Formulary EEC chrono completed 7-
Accommodations/Comments: 12-21, but not entered
until 7-19-21 due to
Administrative Error.
TimeStamp: 19 July 2021
08:07:36 --- User: ▇▇▇
▇▇▇▇▇▇

Learning Disability:
Initial Reading Level: 05.0
Initial Reading Level Date: 11/08/2021
Durable Medical Equipment: Air Cell Cushion - High
Profile (Roho)
Hearing Aid
Ankle Foot Orthoses/Knee
Ankle Foot Orthoses
(AFO/KAFO)
Compression Stocking
Canes
Mobility Impaired
Disability Vest
Eyeglass Frames
Incontinence Supplies
Other (Include in
Comments)
Partial Lower Denture -
Acrylic
Partial Upper Denture -
Acrylic
Therapeutic
Shoes/Orthotics
Walkers
Wheelchair
Languages Spoken:

## IMPORTANT DATES

Date Received: 03/29/1994
Last Returned 11/19/1998
Date:
Release Date: LWOP
Release Type: Minimum Eligible Parole Date

## WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start 11/16/2021
Date:
Status: Full Time
Position #: AD1.002.028
Position Title: A YARD ADA WORKER GROUP A
Regular Days Monday through Friday (14:00:00 -
On: 16:45:00)
Monday through Friday (17:30:00 -
21:30:00)

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 3/6/2024    **Date IAC Received 1824:** 3/4/2024    **1824 Log Number:** 528488

**Inmate's Name:** ▮▮▮▮    **CDCR #:** ▮▮▮    **Housing:** E1-▮▮▮

**RAP Staff Present:** ADA Coordinator P. Llamas, Chief Physician and Surgeon (A) R. Davydov, Psychologist Dr. ▮▮▮ Health Care Grievance Representative ▮▮▮ Custody Appeals Representative▮▮ ▮▮ Associate Governmental Program Analyst ▮ ▮▮ Registered Nurse ▮▮ Staff Services Analyst ▮▮▮ Staff Services Analyst ▮ ▮▮

**Summary of Inmate's 1824 Request:** Inmate reports difficulty hearing; Inmate requests an iPad, Over the Ear Headphones (OTEH), a vibrating watch, and sign language classes.

### Interim Accommodation:

☒ No interim accommodation required: You are eligible for OTEH and are currently on the wait list based on a previous request.

### RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate reports difficulty hearing; Inmate requests an iPad, Over the Ear Headphones (OTEH), a vibrating watch, and sign language classes.

**Response:** On 3/6/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

A review of Strategic Offender Management System (SOMS) indicates you are currently on the wait list for OTEH. Once stock arrives and your name is reached on the list you will be issued OTEH. iPad technology is intended for individuals with profound hearing loss who utilize written notes. You are currently designated DNH with EC of hearing aids and need staff to speak loud and clear. You have demonstrated the ability to achieve effective communication through equally effective means such as with your hearing aids and with staff speaking loudly and clearly. ASL classes are currently not available at SATF. Although your PLO memo makes mention of a vibrating watch, they are not yet available for distribution. In the meantime, you may request to purchase one through the ADA special purchase order process.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife _____    _____    Date sent to inmate:    **MAR 2 8 2024**

**ADA Coordinator/Designee**    **Signature**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) **528488** | DATE RECEIVED BY STAFF: MAR 04 2024 OF GRIEVANCES |
|---|---|---|

*************TALK TO STAFF IF YOU HAVE AN EMERGENCY*************
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMAT[redacted] | CDCR NUMBER | ASSIGNMENT | HOUSING E-1 |
|---|---|---|---|

**INSTRUCTIONS:**
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service, or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
I have problems Hearing ANNOUNCEMENTS, I ALso
HAve Need of over The ear Head phones

**WHY CAN'T YOU DO IT?** I Am following the instructions
On a Memo From The Prison Law office on
Accommodations For Deaf or Hard of Hearing people

**WHAT DO YOU NEED?** I Would Like to Be evaluated For the
Speech to text I-PAD and over the ears
Head phones Please
And i Also Would Like the vibrating WATch
And to learn sign Language
Thank you                    (Use the back of this form if more space is needed)

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?   Yes ☐   No ☐   Not Sure ☐ |
|---|
| List and attach documents, if available: |

I understand th[redacted] cooperate may cause this request to be disapproved.
3-4-24
**DATE SIGNED**

Assistance in compiling this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) shall complete Step 1 below within 1 working day.
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▮▮▮▮      CDCR #: ▮▮▮▮      CDCR 1824 Log #: 528488

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**      Date CDCR 1824 received by IAC: 03 / 04 / 24

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)    [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely navigate stairs.
- Cannot safely access upper bunk.
- Seizure disorder and is assigned an upper bunk.
- Workplace safety concerns.
- Hearing or vision claims that may jeopardize safety.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care appliances which involve safety concerns.

| ▮▮▮▮▮▮ | AGPA | ▮▮▮▮▮▮ | 03 / 04 / 24 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**     *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____    Due back to IAC: ____ / ____ / ____    Returned to IAC: ____ / ____ / ____

Assigned to: _____    Title: _____

Information needed: _____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:** _____ **Location:** _____

Interviewer notes: _____

_____

_____

**Staff Interviewed:** _____ Title: _____ Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

**Staff Interviewed:** _____ Title: _____ Interview date: ____ / ____ / ____

Interviewer Notes: _____

~~I/M IS ELIGIBLE FOR OTEH AND IS CURRENTLY ON THE WAIT LIST BASED ON A PREVIOUS~~
~~REQUEST. ONCE STOCK ARRIVES AND I/M'S NAME IS REACHED ON THE LIST, I/M WILL BE ISSUE~~

**Notes:** OTEH. I-PAD TECHNOLOGY IS INTENDED FOR INDIVIDUALS WITH PROFOUND HEARING LOSS WHO
~~UTILIZE WRITTEN NOTES. A REVIEW OF SOMS INDICATES I/M IS DESIGNATED DNH WITH EC OF HEARING~~
~~AIDS AND NEEDS STAFF TO SPEAK LOUD AND CLEAR. ASL CLASSES ARE NOT CURRENTLY AVAILABLE AT~~
~~SATE. I/M IS CURRENTLY ACCOMMODATED WITH HEARING AIDS.~~

| | | | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

DRAFT

## IAP / Interview Worksheet

Inmate: ▮▮▮▮            CDCR #: ▮▮▮▮            CDCR 1824 Log #: 528488

---

**Step 3:** DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

**Accommodation(s) provided:**                                    **Date provided:**

_____      ___ / ___ / ___

_____      ___ / ___ / ___

_____      ___ / ___ / ___

Comments: _____

_____

_____

| ▮▮▮▮ | AGPA | | 03 / 05 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note: When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

### IAP processing Instructions for the Appeals Coordinator

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e,g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

### Step 2 Interviewer Instructions

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ▮▮▮▮▮▮▮▮▮▮▮                                    CDC #: ▮▮▮▮▮    PID #: ▮▮▮▮▮▮

CHSS035C **DPP Disability/Accommodation Summary** Monday March 04, 2024 02:20:28 PM

As of: 03/04/2024 ➡

---

## OFFENDER/PLACEMENT

CDC#: ▮▮▮▮▮▮
Name: ▮▮▮▮▮▮▮▮▮▮
Facility: SATF-Facility E
Housing E 001
Area/Bed: ▮▮▮▮▮
Placement 24
Score:
Custody Medium (A)
Designation:
Housing Non-Designated Program Facility
Program:
Housing Barrier Free/Wheelchair Accessible
Restrictions: Grab Bar Required
Ground Floor-No Stairs
Lower/Bottom Bunk Only
Physical Full Time Wheelchair User
Limitations to Transport Vehicle with Lift
Job/Other: Lifting Restriction- Unable to Lift more than 19
Pounds
No Rooftop Work
Permanent - 12/31/9999

## DISABILITY ASSISTANCE

Current DDP Status: NCF
DDP Adaptive None
Support Needs:
Current DDP Status Date: 04/10/2003
DPP Codes: DPW, DNH
DPP Determination Date: 08/31/2023
Current MH LOC: CCCMS
Current MH LOC Date: 12/11/2013
SLI Required: No
Interview Date: 09/08/2023
Primary Method(s) - Hearing: Hearing Aids
Alternate Method - Hearing: Need Staff to Speak
Loudly and Clearly
Non-Formulary
Accommodations/Comments:
Learning Disability:
Initial Reading Level: 12.9
Initial Reading Level Date: 03/18/2013
Durable Medical Equipment: Air Cushion (for
Wheelchair Seat)
Hearing Aid
Back Braces
Compression
Stocking
Commode Chair
Eyeglass Frames
Hearing / Mobility
Impaired Disability
Vest
Incontinence
Supplies
Knee Braces
Other (Include in
Comments)
Therapeutic
Shoes/Orthotics
Truss Hernia Support
Wheelchair
Languages Spoken:

---

## IMPORTANT DATES

Date Received: 04/22/1988
Last Returned 06/05/1996
Date:
Release Date: 01/21/2038
Release Type: Minimum Eligible Parole Date

## WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start 03/04/2024
Date:
Status: Reentry
Position #: ISO.003.003
Position Title: E DRP ISO-3 EDUC RM 188
Regular Days On: Monday, Wed, Friday (13:15:00 -
15:15:00)

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   JACOB J. HUTT – 5565791, *pro hac vice*
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California  94710-1916
   Telephone:   (510) 280-2621
5  Facsimile:    (510) 280-2704

6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
8  CAROLINE JACKSON – 329980
   ROSEN BIEN
9  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
10  San Francisco, California  94105-1738
   Telephone:   (415) 433-6830
11  Facsimile:    (415) 433-7104

12  LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13  DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14  Berkeley, California  94703
   Telephone:   (510) 644-2555
15  Facsimile:    (510) 841-8645

16  Attorneys for Plaintiffs

17

18                    UNITED STATES DISTRICT COURT

19                  NORTHERN DISTRICT OF CALIFORNIA

20

21  JOHN ARMSTRONG, et al.,                Case No. C94 2307 CW

22              Plaintiffs,                **DECLARATION OF JACOB HUTT**

23        v.                               Judge:   Hon. Claudia Wilken

24  GAVIN NEWSOM, et al.,

25              Defendants.

26

27

28
   [4356643.1]
                                                     Case No. C94 2307 CW
   DECL. OF JACOB HUTT IN SUPPORT OF PLAINTIFFS' STATEMENT REGARDING THE SATF
                                    STIPULATION

1    I, Jacob J. Hutt, declare:

2        1.        I am an attorney duly admitted to practice before this Court.  I am a Staff

3    Attorney at the Prison Law Office, counsel of record for Plaintiffs.  I have personal

4    knowledge of the facts set forth herein, and if called as a witness, I could competently so

5    testify.  I make this declaration in support of Plaintiffs' Statement Regarding the SATF

6    Stipulation.

7        2.        On March 15, 2024, I contacted by phone MMCall, a paging systems

8    company, spoke with a company representative, and requested that the representative send

9    me a user manual for MMCall's Correctional Facility Inmate Paging System. The same

10   day, I received an email from Jazmin Paredes (j.paredes@mmcallus.com), an MMCall

11   representative, attaching the user manual for the Correctional Facility Inmate Paging

12   System. A true and correct copy of the email and user manual are attached hereto as

13   **Exhibit 1.**

14       I declare under penalty of perjury under the laws of the United States of America

15   that the foregoing is true and correct, and that this declaration is executed at New York,

16   New York this 19th day of July, 2024.

17

18                                                    _____

19

20                                                    Jacob J. Hutt

21

22

23

24

25

26

27

28

 Gmail

**Jacob <jacob.hutt@gmail.com>**

---

## MMCall Watch Pager | Jacob Hutt

**Jazmin Paredes** <j.paredes@mmcallus.com>                    Fri, Mar 15, 2024 at 12:01 PM
To: jacob.hutt@gmail.com

Good morning Jacob

As discussed, please find attached the watch user manual.

If you'd like to schedule a meeting, you can use the following link:

Book a Quick Call or Meeting

Please let me know if you have any questions,

Best,

--

**Jazmin Paredes** | MMCall



1150 NW 72nd Ave, Miami, FL 33126

Office: (855) 638-2034

Direct: (786) 206-6897

---

📄 **Watch Pager User Manual (1).pdf**
230K



# Watch Pager User Manual

(855) 638-2034 | www.MMCallUS.com

**MMCall**

# 1. Turning On/Off Pager



**Step A:** Turn on pager by pressing and holding the right arrow for 5-10 seconds. If it doesn't turn on, connect it to the charger.



**Step B:** To turn off pager, press and hold the right arrow for 5 seconds. Once a pop up appears choose yes to confirm.

# 2. Charging Pager

To connect the watch pager to the charger, align the pins on the charging square with those on the back of the watch pager.

To connect the beeper to the charger, lift the rubber cover on the right side and connect the micro USB.

**IMPORTANT:** When the watch pager and beepers are properly connected, the battery icon shows a lightning bolt.

# 3. Receiving Messages

The pager can store up to 16 messages. When a new message is received, and there are 16 stored messages, the oldest message will be automatically deleted.



**01/01:** the number of this message over the number of messages stored in the pager.

**09:30:** the time when the message was received.

**N01:** how many times this exact message was received.

Press OK to go back to the list of messages.

---

**MMCall**

## 4. Deleting Messages

   

**Step A:** Select the message from the message list and press OK.

**Step B:** Press the left arrow to start the deleting process.

**Step C:** Select the Yes option.

**Step D:** Press OK to confirm message deletion.

## 5. Settings

   

**Step A:** Turn on pager by pressing and holding the right arrow for 5-10 seconds. If it doesn't turn on, connect it to the charger.

**Step B:** Hold the left arrow until you see the password prompt.

**Step C:** Tap the right arrow 3 times to select the last number.

**Step D:** Tap the left arrow once to change the password to 1235.

MMCall

  

**Step E:** Tap OK to access the "Normal Setup".

**Step F:** Use the left and right arrows to navigate the menu.

**Step G:** Press and hold the left arrow for 5 seconds to exit the settings.

**1-Clock Setup:** Update the date and time on the pager in 24-hour format. (Hour : Minute : Second)

**2-Disp Timeout:** Adjust how long the display stays on after receiving a message or pressing any of the buttons on the pager.

**3-Vibration:** Setup how long the pager will vibrate upon receiving a message.

**4-Sound:** [Only for beepers model NC8] Turn on/off sound.

**5-Touch Vibrate:** Enable/disable vibration when pushing any of the buttons on the pager.

**6-Time Power Off:** Set up a time to automatically turn off the pager.

**7-User Password:** Change the password to access the settings.

**8-Receive Test:** [Only use if asked by our Team] Test the signal reception.

**9-Power Off:** Power off the pager.

**10-Admin Setup:** Access the Admin settings.

Exhibit 77

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

Andrea L. Bourne, Au.D. CCC-A

Audiology Consulting

Pacifica, CA 94044

andreabourne@aol.com



## Introduction

I previously drafted a report regarding effective communication of announcements for deaf and hard-of-hearing people, which I understand was provided to CDCR officials on July 26, 2024. Plaintiffs' counsel subsequently asked me to draft an addendum (1) describing the differences between audiologists and hearing aid dispensers, (2) analyzing the medical records of seven class members at SATF, and (3) explaining concerns I had with the reliability of some of the medical records of people at SATF. I am being compensated for the work on this project at a rate of $300.00 per hour. Please refer to my earlier report for further information about my background, qualifications, and experience.

## Audiologists v. Hearing Aid Dispensers

The majority of SATF audiology evaluation and treatment records I reviewed in the course of preparing my previous report and this addendum were conducted by hearing aid dispensers, not audiologists. While both audiologists and hearing aid dispensers are considered hearing healthcare professionals, there are differences in the education and training, scope of practice, and licensing and regulation of the two professions. *See* American Speech-Language-Hearing Association, Audiologist and Hearing Aid Dispenser: What Is the Difference? https://www.asha.org/aud/otc-hearing-aid-toolkit/audiologist-and-hearing-aid-dispenser-what-is-the-difference/ (last visited Aug. 17, 2024).

Audiologists are healthcare professionals who specialize in the assessment, diagnosis, and treatment of hearing and balance disorders. They hold advanced degrees in audiology and are licensed to practice in the state. Audiologists undergo extensive education and clinical training, typically completing doctoral programs that focus on the anatomy and physiology of the auditory system, hearing assessment techniques, rehabilitation strategies, and the selection and fitting of hearing aids and other assistive devices. Audiologists are licensed healthcare professionals regulated by state licensing boards.

Hearing aid dispensers/specialists are professionals who specialize in the fitting and dispensing of hearing aids. They are licensed or certified to dispense hearing aids in the state but may have varying levels of education and training. Hearing aid dispensers focus primarily on the selection, fitting, and adjustment of hearing aids based on audiometric results and individual preferences.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

Hearing aid dispensers do not diagnose hearing loss or hearing disorders and are not trained to diagnose or treat tinnitus, hyperacusis, auditory processing disorders, or other auditory cognitive processing skills. Hearing aid dispensers are licensed or certified to dispense hearing aids in accordance with state regulations.

### Medical Record Review - Individual Class Members

Plaintiffs' counsel asked me to review audiology records for seven hard-of-hearing people at SATF. Amber Norris again provided me with the relevant records, as described in the Supplemental Declaration of Ms. Norris, attached as Exhibit A. I also reviewed the declarations of these patients describing their hearing challenges in prison, as well as a recent 1824 denial for ███████ (log no. 590923), attached as Exhibit B.

A summary of my findings for each patient is below. I note at the outset that many of the most recent hearing tests for these patients appear to be several years old (and in one case a decade old). According to the records, those hearing tests were conducted by hearing aid dispensers. I did not see any indication in the records provided to me that any of these patients had been seen by an audiologist or were otherwise evaluated for treatment for their hearing disability beyond the hearing aids provided by a hearing aid dispenser, even for the six patients who submitted 1824s asking for help due to problems navigating the prison environment because of their disability (███████████████████████████████████████ and ███████████).

I also note that, to a person, the nature of each person's hearing loss according to the available records suggested that this person would have difficulty understanding speech regardless of amplification, and especially in background noise. I am concerned that each person has been assigned a code (DNH) that is defined as: "Individual has a hearing impairment and uses an assistive hearing device to achieve effective communication." This definition is inaccurate and misrepresents the benefit a hearing aid and assistive listening devices alone can provide. How is this being measured by CDCR? As I explained in my previous report, regardless of the degree of hearing loss, issuing a hearing aid or pocket talker to an individual does not ensure effective communication in all settings. It would be more accurate for the code to state: "Individual has a hearing impairment and uses an assistive hearing device to aid in effective communication." But even then, people who primarily use written notes or sign language to communicate, who I understand are more likely designated DPH by CDCR, may use a hearing aid to allow them to hear certain sounds, such as environmental noises like doors slamming.

More broadly, to the extent SATF is deciding accommodations based on whether someone is designated DNH or DPH, that system is flawed. Everyone who is designated DNH cannot be treated the same; they have unique disabilities and individual disability needs. In the community, we do not divide people with hearing disabilities and determine accommodation needs in that binary manner - it simply does not take into account someone's true disability and individual accommodation needs.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

1. ██████████

I reviewed ████████'s audiology records. It contained a physician report dated April 21, 2017, which documented a moderate sensorineural hearing loss in the left ear with fair word recognition ability and moderately-severe to profound sensorineural hearing loss in the right ear with poor word recognition ability. The records did not contain a copy of the audiogram.

████████ submitted a declaration describing his hearing loss similar to this description on his April 21, 2017, report. He reported he has not had functioning hearing aids for at least the past five months. He stated, "I have trouble hearing even when I have my hearing aids, especially in certain settings." He went on to describe several different environments in the prison where he could not understand speech or effectively communicate due to the background noise and reverberation present. His declaration is not surprising – his hearing challenges are not simply due to the volume settings on his hearing aids. The problems he is describing are consistent with frustrations the majority of people suffering from severe to profound hearing loss and fair to poor word recognition ability frequently experience. Hearing aids alone will not provide effective communication in all settings, and I would expect that ████████ requires additional accommodations to aid in his communication.

2. ██████████

I reviewed ████████ s audiogram dated February 21, 2024. It documented mild to severe sensorineural hearing loss in his right ear and mild to profound sensorineural hearing loss in his left ear. ████████ will have difficulty understanding speech at a normal level, especially with lack of visual cues and the presence of background noise. In his declaration he reported, "when there is background noise or other people talking - I typically cannot rely on hearing aids or people speaking loudly alone." This type of report and problem is not unusual with ████████'s type and degree of hearing loss. It is also not surprising to read his report that he has difficulty hearing announcements in various prison settings.

████████ also reported problems receiving timely access to hearing aid batteries and that at times the facility is out of stock. This information reinforces the point that there need to be redundancies, such as non-auditory communication, built into the hearing accommodations program to ensure class members have access at all times to information regarding programs, services and announcements, including when their hearing aids are not functioning as intended.

3. ██████████

I reviewed ████████ s audiogram dated February 3, 2020. It documented moderately-severe to severe sensorineural hearing loss in both ears. At that time the hearing aid dispenser described the hearing loss as severe to profound and recommended hearing aids for both ears. His hearing loss is severe enough that normal speech levels will be inaudible, and even with hearing aids, speech may be difficult to understand.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

In his declaration ██████████ indicated he has difficulty understanding speech, especially when background noise is present. This is expected given his degree of hearing loss. He described listening challenges in many of his daily environments that are very common with his type and degree of hearing loss. It is also not surprising to read his report that he has difficulty hearing announcements in various prison settings. Hearing aids alone will not provide effective communication in all settings, including the ability to hear and understand announcements over a loudspeaker. I would expect that ██████████ requires additional accommodations.

4.  ██████████

I reviewed ██████████ s audiology records. The records contained an audiogram dated October 1, 2013, which documented moderate to moderately-severe sensorineural hearing loss across all of the frequencies where speech occurs. That is the most recent audiogram based on what was provided to me. Although the records showed he was issued two Flame 250 hearing aids in September 2023, the test in his record is over ten years old and no longer considered a valid representation of his hearing sensitivity. He should have received a new hearing test prior to receiving new hearing aids. Furthermore, he needs hearing aids that can be adjusted to his current hearing loss, not the Flame 250 which cannot provide the benefit he needs to aid in his communication.

In his declaration ██████████ reported, "If there is background noise around me, it's really challenging for me to comprehend anything that people are saying, even with my hearing aid. It's even worse with my pocket talker, because the pocket talker amplifies everything - it's a garbled mess." His report is consistent with the challenges people living with the type and degree of hearing loss he had even ten years ago often experience, especially in challenging listening environments, despite using hearing aids – although again, the audiogram I reviewed is too old to be considered a valid representation of his hearing sensitivity, which likely has become more severe since 2013. Hearing aids can improve hearing and aid in effective communication, but hearing aids are not a cure for hearing loss and do not restore normal hearing or ensure effective communication in all settings.

5.  ██████████

I previously reviewed ██████████ s records as part of my report dated July 26, 2024. His February 13, 2024, audiogram documented a symmetrical moderate to mild sensorineural hearing loss, which means he will have difficulty understanding speech at a normal level, especially with lack of visual cues and the presence of background noise.

In his declaration ██████████ reported difficulty hearing in noisy environments such as his housing unit where multiple conversations occur at the same time compounded by noise from televisions and fans. He also stated, "I almost never understand what is being said when announcements are made in my building over the PA system." His report is consistent with the challenges people living with hearing loss often experience, especially in challenging listening environments, despite using hearing aids. Again, hearing aids can improve hearing and aid in

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

effective communication, but hearing aids are not a cure for hearing loss and do not restore normal hearing or ensure effective communication in all settings.

6. ███████████████

I reviewed ████████ s audiogram dated December 9, 2021. It documented right ear anacusis which means his right ear is deaf. The left ear had a moderate to severe high frequency hearing loss. This type of hearing loss presents particular challenges with understanding speech in nearly all listening situations, as well as sound localization and spatial orientation.

In his declaration ████████ reported he has been without hearing aids for over three months and he is unsure if or when he will be seen by a hearing healthcare specialist to get new hearing aids. He reported problems hearing and understanding announcements without his hearing aids. He stated, "I can't make out what words are being spoken - I can only hear that an announcement over the PA system is happening." The problems ████████ described in his declaration are expected given his type and degree of hearing loss. I am concerned that he has not been accommodated with announcements and had not received new hearing aids; in my practice, I would not put one of my patients in a position to wait over three months for hearing aids.

7. ███████████████

I previously reviewed ████████'s records as part of my report dated July 26, 2024. I noted that his audiogram, dated February 9, 2018, documents profound hearing loss in both ears. Based on that audiogram, regardless of the power level or technology, it is unlikely that he receives any significant benefit from his hearing aids and pocket talker, alone or in combination. I did not see any evidence that ████████ has had his hearing tested or that he has been seen by a hearing health care professional since 2018, and I did not see that he has received other necessary hearing-related accommodations since at least the date of that test. In my opinion, ████████ needs to be referred to an audiologist for a comprehensive audiological evaluation and should receive the speech-to-text and vibrating watch accommodations he describes requesting in his declaration and which I reviewed to prepare my previous report. I believe that if audiologists, and not only hearing aid dispensers tasked with distributing hearing aids, were meaningfully participating in and overseeing the delivery of hearing health care services at SATF then class members like ████████ would be getting the timely and accurate hearing testing and treatment, including non-auditory accommodations, they need to maximize their ability to achieve effective communication.

I understand that, with help from the Prison Law Office, ████████ submitted another 1824 in July 2024, attached as Exhibit B, stating:

> I am DNH and I have problems communicating with staff and understanding the instructions that they are giving me over the P.A. system or directly. I also regularly miss announcements for yard/exercise, medical appointments/dental, religious services, etc.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

There is a communication barrier - I cannot hear the P.A. system clearly translate the message, I cannot read officers' lips clearly and sometimes I miss the translation of a word in conversation.

I need to be considered for the "Multifunction Pedometer Bracelet" vibrating watch so I can notify myself of appointments and start/end times for yard. I need a speech-to-text iPhone/iPad so I can have transcriptions of conversations to make sure I see and understand every word! I also need an officer to come to my door to make individual announcements for medical appointments, yard, etc.

The RAP denied ██████'s requests for individual notification of announcements and a text-to-speech iPad, and did not make a decision as to the vibrating watch. It does not appear the RAP interviewed ██████ before denying his requests, although it says he was "observed accessing PSA's [sic] and being notifies [sic] of every announcement that pertains to the facility or personal notifications."

██████ is clearly affected by his chronic disabling condition. The RAP's decisions show a gross misunderstanding and lack of appreciation of the disabling impact of hearing loss. Speech-to-text technology is for both deaf and hard-of-hearing people and should be available to both groups if they report the need. Speech-to-text technology can be used as a support for residual hearing. Hearing aids and assistive listening devices <u>do not</u> restore hearing to normal. ██████ medical record documents that he has a profoundly disabling condition despite the use of hearing aids. His most recent hearing test was in February 2018, and there is no evidence he has been seen by an audiologist or received any type of audiology care for the past six years. As I discussed in my previous report, it is critical to solicit and carefully consider the patient's description of their needs as a result of their hearing loss. Consulting an officer or other prison staff to determine if a requested accommodation is necessary for a class member's invisible disability without talking to the class member himself is inappropriate.

As mentioned in my previous report, I am an adjunct professor working as a preceptor in clinic and providing classroom instruction. If one of my students responded to a patient in the manner described above, I would doubt whether they had grasped the fundamental principles of audiological care and I would have serious concerns about their apparent lack of empathy for the patient.

The CDCR hearing health care delivery system needs to learn how to receive and interpret patient reported information and engage patients to develop effective strategies to manage their chronic disability. Engaging patients, listening to their needs, and giving them choices results in better rehabilitation and hearing health outcomes. The current system keeps them victims of their disability and risks making patients reliant on ineffective coping strategies, such as bluffing, to communicate. Bluffing is a very common coping mechanism for people living with hearing loss. Some examples of bluffing are when the hard of person simply nods their head or agrees to something because they already asked "What?" three times and still have no idea

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

what the person said. Another example is watching what people are doing and following along to pass or fit in with others. They may also predict what was communicated because of the time of day (such as mealtime) despite not actually hearing or understanding the communication. We encourage patients to stop the bluffing. People with a chronic hearing disability should not have to pretend to understand when they do not. By continuing this coping strategy they mask their disability and may misrepresent their communication ability to others. I see this in my clinic when a patient reports, "My spouse says I have selective hearing, because sometimes I understand, but other times I don't." This may be the case when prison staff report about a class member's ability to communicate because of an anecdotal observation. Just because they did not miss a medical appointment on a particular day, does not mean they heard the announcement, can effectively communicate in all settings, and do not need additional accommodations.

### Concerns with Accuracy of Medical Records

For my July 26, 2024, report, I reviewed audiology records for a subset of people designated DNH at SATF. I am concerned that some of the medical records may contain inaccurate information and suggest the need for greater oversight and quality assurance measures.

A comprehensive audiological evaluation typically includes the following tests:

1. Otoscopic evaluation (Otoscopy)

2. Immittance

3. Pure Tone Audiometry

4. Speech Audiometry

5. Speech in Noise Tests

Below I describe what I saw related to each test in the medical records. The tests I reviewed were completed by hearing aid dispensers, not audiologists. I recommend the CDCR retain audiology experts to implement increased oversight and quality assurance measures for hearing testing in the CDCR system.

1. Otoscopy

An otoscopic examination is performed to evaluate the condition of the external auditory ear canal (outer ear), tympanic membrane, and the middle ear. It is typically the initial procedure in an audiological evaluation.

In the records I reviewed otoscopy appeared to be consistently performed and results documented in the class member's medical record.

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

2. Immittance

Immittance audiometry consists of three objective tests: tympanometry test, acoustic reflex threshold test, and acoustic reflex decay test. These tests assess and give clinical insight into any pathologies of the middle ear, cochlea, and VIIth and VIIIth cranial nerves, to assess status of middle ear function, to cross check with audiogram (e.g., type of hearing loss), and to identify contraindications for other procedures (e.g., cerumen removal).

In the records I reviewed I did not find any evidence immittance testing was performed except for one class member seen by an audiologist in an ENT clinic.

3. Pure Tone Audiometry (Air and Bone Conduction)

Pure tone audiometry is the gold standard for determining the type, degree, and configuration of hearing loss. These tests are performed by measuring a patient's response to tones at frequencies of 250, 500, 1000, 2000, 3000, 4000, and 8000 Hz to determine hearing thresholds (8000 Hz is not tested with bone conduction). The hearing thresholds obtained at 500, 1000, and 2000 Hz are used to calculate the pure tone average (or PTA) in each ear. The results provide a framework for diagnosis, monitoring, or further examination of ear concerns. Repeated interval evaluations track changes in hearing as an indicator for changes in ear health over time. Pure tone audiometry should be performed when there is any concern for auditory perception, ear trauma, or otologic disease.

In the records I reviewed, pure tone audiometry appeared to be consistently performed and results documented in the class member's medical record.

4. Speech Audiometry

Speech audiometry is a fundamental tool in the audiological evaluation and can provide valuable information in the facilitation of audiological rehabilitation management. It typically consists of two tests which include speech reception/recognition threshold (SRT) and word recognition score (WRS).

a. Speech Reception Threshold (SRT) Test

The speech threshold measure is a test of hearing and determines the lowest volume a person can hear and recognize speech 50% of the time. It can be used as a means to cross-check the validity of pure tone thresholds determined via pure tone audiometry. The SRT decibel level obtained typically approximates the PTA. The SRT and PTA should be within approximately 7 dB of each other.

In the records I reviewed I saw SRT performed on about 25% of the hearing tests. Of the 10 test with SRT results, 8 showed good agreement for SRT and PTA; two of the exams did not appear to have reliable results:

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

· ████████ has SRT results of 35 in each ear, but the PTA was 90 in the right ear and 75 in the left ear. The SRT was 40-55 better than the PTA which cannot be valid. Either the speech results are invalid or the pure tone results are invalid.

· ████████ has SRT results of 30 dB in each ear, but the right ear PTA is 50 dB and the left ear PTA is 53 dB. The PTA is approximately 20 dB better than the SRT in both ears. Either the speech results are invalid or the pure tone results are invalid.

b. Word Recognition (WRS) Test

The goal of this test is to determine the patient's optimum performance for word recognition under controlled and standardized conditions. It is important to remember the test is *not* to determine an estimate of how well the patient performs in the real world.

· Cross check with pure tone results.

· Provide information on an individual's best performance under optimal, controlled and reproducible conditions.

· To identify an asymmetry that is not presented by pure tones.

· Analysis of error patterns in word recognition.

· To monitor performance over time.

· Provide information about patient discomfort or tolerance to speech stimuli.

· To assist in making amplification decisions.

· Can help audiologists determine proper gain and maximum sound output levels from hearing aids and other assistive listening devices.

While this test is part of the standard audiological evaluation, it is only providing information about a person's performance in a quiet and controlled condition. Speech-in-noise measures usually provide more meaningful information about real world performance. In the records I reviewed I saw WRS performed on about 50% of the hearing tests.

Some of the WRS tests I reviewed documented scores of 90-100% when the loudness level of the speech test was just at or below the hearing thresholds. This is very improbable – regardless of hearing level, most people have poor word recognition scores when the speech sounds are at or below their hearing thresholds. For example, Roy Ramos has a profound sensorineural hearing loss with pure tone thresholds at 90 dB in the right ear across all test frequencies where speech occurs and 75-85 dB in the left ear across most of test frequencies when speech occurs. He had a score of 90% in the right ear and 100% in the left ear when speech was presented at 80 dB, which is quieter than the quietest sound his ears can detect at most frequencies. This

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

test does not appear valid and should not be part of the class member's medical record. I saw similar results for William Purcaro where he had scores of 80% in both ears when the speech volume was only increased 5 decibels above his PTA, which is barely louder than the quietest sound his ears can detect.

It is important that information in patient medical records be accurate. If I saw test results like these from any of the audiologists or audiology assistants I supervise, I would be very concerned that they either:

    a.  Did not understand how to perform the test accurately;

    b.  Did not understand the significance of agreement between pure tone results and speech results, and the need to investigate further if the results contradict one another; or

    c.  Entered test results into a patient record that they did not actually obtain.

I would immediately remove the providers from direct patient care until they received more training and demonstrated competence to perform and interpret the required testing.

Here are a few other examples of results that seem invalid:

    ·    █████████ Word Recognition score of 100% in the left ear is unlikely given the degree of hearing loss and the speech presentation level just above thresholds, which is barely louder than the quietest sound his left ears can detect.

    ·    ████████ Word Recognition scores of 100% appear invalid given degree of hearing loss and the speech presentation level the same as the hearing thresholds levels, which is about the same as the quietest sounds his ears can detect.

    ·    ██████: Word Recognition scores of 100% appear invalid given degree of hearing loss and speech presentation level is the same as the hearing threshold levels, which is about the same as the quietest sounds his ears can detect.

5. <u>Speech in Noise Testing</u>

Speech in noise tests (especially those that utilize multi-talker babble speech) are useful in providing insight to functional impacts of a patient's hearing loss and their communication. Although for the purpose of determining accommodations, no audiological test alone can replace a discussion with a patient about their needs, a speech in noise test would be the most reliable indicator of whether an individual could understand a PA announcement while there is a fan or heater running, or a television playing. The most commonly used tests include: Quick speech in noise test (Quick-SIN), Words in noise test (WIN), Bamford-Kowal-Bench Speech-in-Noise (BKB-SIN), and the Hearing in noise test (HINT).

PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS

In the records I reviewed I did not find any evidence speech in noise testing was performed except for one class member seen by an audiologist in an ENT clinic.

## Conclusion

CDCR is a highly complex system and it serves a highly complex population. Based on the records I reviewed it appears many class members suffer from several chronic conditions, including hearing loss. There does not appear to be a system in place for ensuring hearing health care is managed appropriately or the rehabilitation needs of class members are taken seriously, beyond the provision of hearing aids and sometimes pocket talkers. Patients do not seem to be evaluated by audiologists regularly or after reporting challenges related to their hearing disability and a need for additional accommodations via the CDCR 1824 process.

While hearing aid dispensers provide valuable services, the CDCR audiology program must be managed by a team of audiologists providing oversight of the program and ensuring any hearing aid dispenser measuring hearing and fitting hearing aids to class members is properly trained to perform a comprehensive exam. The program should also incorporate regular competency assessments of each examiner as part of the CDCR health care system's quality assurance program.

I was saddened to see in the declarations of hard-of-hearing people at SATF that some expressed a feeling of hopelessness after requesting help and being denied. Hearing loss is an invisible disability but it can have a damaging impact on a person's communication and participation in activities of daily living. That is particularly true in prison, where people do not have access to what people in the community have; indeed, the first intervention for people in the community is often a smartphone that has speech-to-text capabilities, text messaging, and non-auditory alerts, such as vibration and flashing lights.

To properly accommodate people, providers must support and encourage patients in actively participating in communication and doing everything they can to engage and interact. Being assertive and asking for help are strategies we teach patients to be active participants in their care. The alternative – staying a victim of their chronic disability, passively accepting whatever device is provided, and developing coping strategies such as bluffing or relying on others to receive information – is a dysfunctional way of living with hearing loss. I see that often with the veteran population I work with – they often are used to listening to others and feel lucky to get anything at all, so they say everything is fine when it is not. I encourage them to give feedback and have high standards for accommodations and what they may be able to accomplish with them, and view it as my job to help identify accommodations to provide them independence. The responses I see from the RAP at SATF to patients attempting to self-advocate does the exact opposite and can damage people's willingness to ask for help and get the accommodations they need to be full participants in prison life. SATF should do everything it can to support people with hearing disabilities to be independent and active in their prison environment and, as we do in the community, listen to what people say they need and the challenges they are having – they are in the best position to know.

**PRIVILEGED AND CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

Sincerely,

Andrea L. Bourne, Au.D. CCC-A

August 26, 2024

Exhibit A

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 5565791, *pro hac vice*
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF AMBER NORRIS** |
| v. | Judge:   Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

[4356643.1]

1    I, Amber Norris, declare:

2    1.    I am an Investigator at the Prison Law Office, which serves as counsel of

3    record for the Plaintiff class in *Armstrong v. Newsom*. I have personal knowledge of the

4    facts set forth herein and, if called as a witness, I could competently so testify.

5    2.    At the direction of Rita Lomio, an attorney at the Prison Law Office, on

6    August 16, 2024, I reviewed the electronic medical records of ███████████████████;

7    (2)████████████████    (3)███████████████    (4)███████████

8    ██████; (5)███████████████

9    3.    For each person listed above, I reviewed their electronic medical records in

10   CERNER. In the medical records, I used a filter for "Audiology Consultation Note" to

11   identify relevant documentation. I downloaded the most recent audiology consult that

12   included an evaluation. For any patient who did not have an evaluation completed since

13   2020, I downloaded audiology consults or relevant notes regarding audiology consults

14   during their time of incarceration.

15   I declare under penalty of perjury under the laws of the United States of America

16   that the foregoing is true and correct, and that this declaration is executed at Fremont,

17   California, this 26th day of August, 2024.

18
19
20
21
22   _____
     Amber Norris
23
24
25
26
27
28

Exhibit B

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 7/24/2024          **Date IAC Received 1824:** 7/11/2024          **1824 Log Number:** 590923

**Inmate's Name:** ▮▮▮▮          **CDCR #:** ▮▮▮▮          **Housing:** D5-▮▮

**RAP Staff Present:** Associate Warden (A) A. Iversen, Associate Warden J. Ourique, Associate Governmental Program Analyst ▮▮▮▮ Chief Medical Executive Dr. G. Ugwueze, Psychologist Dr. ▮▮▮ Healthcare Compliance Analyst ▮▮▮ Registered Nurse ▮▮▮ Health Care Grievance Representative ▮▮▮ Office of Grievance Representative ▮▮▮ Compliance Lieutenant ▮▮▮

**Summary of Inmate's 1824 Request:** Inmate reports being hearing impaired and having trouble understanding staff both over the PA and in person resulting in him missing announcements for Programs, Services, and Activities (PSA)s; Inmate requests a vibrating watch, text-to-speech iPad, and personal notifications.

---

Interim Accommodation:

☒ No interim accommodation required: You are safely accessing PSA's.

---

## RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate reports being hearing impaired and having trouble understanding staff both over the PA and in person resulting in him missing announcements for Programs, Services, and Activities (PSA)s; Inmate requests a vibrating watch, text-to-speech iPad, and personal notifications.

**Response:** On 7/17/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request. It was determined more time was required to review your request and gather information. Your request was scheduled to be seen again in RAP on 7/24/2024.

On 7/24/2024, the RAP reconvened to discuss your request.

A review of Strategic Offender Management System (SOMS) Effective Communication (EC) history page shows that you had four documented EC interactions with staff in the month of June a review of documentation from those EC interactions shows that staff were able to effectively communicate with you through a combination of your primary method of EC: hearing aids and your secondary method of EC: needing staff to speak loudly and clearly.

Per the Interim Accommodation Procedure (IAP) worksheet, dated 7/18/2024, you were observed accessing PSA's and being notifies of every announcement that pertains to the facility or personal notifications.

You will not receive a text to speech iPad as you are not designated DPH, and you currently achieve effective communication through existing accommodations.

Per memo titled "Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Persons," your request for a vibrating watch will be reviewed by the RAP. If request is disapproved, vibrating watches were made available for the incarcerated population to purchase via the quarterly package process at the beginning of the month.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife                          _signature_                          **Date sent to inmate:** AUG 0 9 2024

**ADA Coordinator/Designee**          **Signature**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | 590923 | JUL 11 2024 |
| | | OF GRIEVANCE |

\***\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\***
DO NOT use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC.

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| | | | |

**INSTRUCTIONS:**
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
I am DNH and I have problems communicating with staff and understanding the instructions that they are giving me over the P.A. system or directly. I also regularly miss announcements for yard/exercise, medical appointments/dental, religious services, etc.

**WHY CAN'T YOU DO IT?**
There is a communication barrier - I cannot hear the P.A. system clearly, translate the message, I cannot read officers' lips clearly and sometimes I miss the translation of a word in conversation.

**WHAT DO YOU NEED?**
I need to be considered for the "Multifunction Pedometer Bracelet" vibrating watch so I can notify myself of appointments and start/end times for yard. I need a speech-to-text iPhone/iPad so I can have transcriptions of conversations to make sure I see and understand every word! I also need an officer to come to my door to make individual announcements for medical appointments, yard, etc.    *(Use the back of this form if more space is needed)*

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY? | Yes ☐ | No ☐ | Not Sure ☐ |
|---|---|---|---|

List and attach documents, if available:

I understand that staff have a right to interview or examine me, and my failure to cooperate may cause this request to be disapproved.

7/10/24
DATE SIGNED

Assistance in completing this form was provided by:
**PRISON LAW OFFICE**

| Last Name | First Name | Signature |
|---|---|---|

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) shall complete Step 1 below within 1 working day.
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▓▓▓▓▓▓     CDCR #: ▓▓▓▓▓     CDCR 1824 Log #: 590923

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**     Date CDCR 1824 received by IAC: 7 / 11 / 2024

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)     [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.

| ▓▓▓▓▓▓ | SSA | ▓▓▓▓▓▓ | 7 / 11 / 2024 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**     *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____     Due back to IAC: ____ / ____ / ____     Returned to IAC: ____ / ____ / ____

Assigned to: _____     Title: _____

Information needed: _____
_____
_____
_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:**_____     **Location:**_____

Interviewer notes: _____
_____
_____

**Staff Interviewed:** _____     Title: _____     Interview date: ____ / ____ / ____

Interviewer Notes: _____
_____
_____

**Staff Interviewed:** Notes     Title: Notes     Interview date: ____ / ____ / ____

Interviewer Notes: A review of the SOMS effective communication history page indicates that you had four documented EC interactions with staff in the month of June. A review of the documentation from those EC interactions shows that staff were able to effectively communicate with you through a combination of your primary method of EC: hearing aids and your secondary method of EC: need staff to speak loudly and clearly.

***Notes:*** Per memo titled, "issuance of vibrating watches as a reasonable accommodation for permanent hearing-impaired, impacting placement incarcerated persons," the inmate's request for a vibrating watch will be reviewed by the RAP. If request is disapproved, vibrating watches were made available for the incarcerated population to purchase via the quarterly package process on 7/1/2024.

| _____ | _____ | _____ | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

**DRAFT**

## IAP / Interview Worksheet

Inmate: ▓▓▓▓▓▓▓▓▓▓    CDCR #: ▓▓▓▓▓    CDCR 1824 Log #: 590923

---

**Step 3:**  **DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

_____

**Accommodation(s) provided:**                                          **Date provided:**

_____    ___/___/____

_____    ___/___/____

_____    ___/___/____

Comments: _____

_____

_____

_____   _____   _____   ___/___/____
Person Completing Step 3         Title                    Signature                  Date Completed

**Note:** When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

### IAP processing Instructions for the Appeals Coordinator

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

### Step 2 Interviewer Instructions

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ███████ ███████                                                    CDC #: ████████  PID #: ████████
CHSS035C                    **DPP Disability/Accommodation Summary**              Thursday July 11, 2024 11:00:35 AM
As of: 07/11/2024 ➡

---

| **OFFENDER/PLACEMENT** | **DISABILITY ASSISTANCE** |
|---|---|
| CDC#: | Current DDP Status: NDD |
| Name: | DDP Adaptive: None |
| Facility: SATF-Facility D | Support Needs: |
| Housing Area/Bed: D 005 ████ | Current DDP Status Date: 10/21/2005 |
| Placement Score: 841 | DPP Codes: DNH |
| Custody Designation: Medium (A) | DPP Determination Date: 11/18/2021 |
| Housing Program: Sensitive Needs Yard | Current MH LOC: CCCMS |
| Housing Restrictions: Lower/Bottom Bunk Only | Current MH LOC Date: 06/06/2019 |
| Physical Limitations to No Rooftop Work | SLI Required: No |
| Job/Other: Permanent - 12/31/9999 | Interview Date: 04/30/2016 |
| EOP Accommodation | Primary Method(s) - Hearing: Hearing Aids |
| Recommendations: | Hearing: |

Alternate Method – Hearing: Need Staff to Speak Loudly and Clearly
Non-Formulary Already posseses a Dual Vision/Hearing Vest.
Accommodations/Comments:
Learning Disability:
Initial Reading Level: 03.0
Initial Reading Level Date: 02/25/2020
Durable Medical Equipment: Hearing Aid
Ankle Foot Orthoses/Knee Ankle Foot Orthoses
(AFO/KAFO)
Eyeglass Frames
Hearing Impaired Disability Vest
Incontinence Supplies
Partial Upper Denture - Acrylic
Therapeutic Shoes/Orthotics
Languages Spoken:

---

| **IMPORTANT DATES** | **WORK/VOCATION/PIA** |
|---|---|
| Date Received: 10/12/2000 | Privilege Group: A |
| Last Returned Date: | Work Group: A1 |
| Release Date: 10/21/2029 | AM Job Start Date: 05/11/2024 |
| Release Type: Earliest Possible Release Date | Status: Half-Time |
| | Position #: REC.002.006 |
| | Position Title: D-5 3W REC WORKER |
| | Regular Days On: Tue,Wed,Thu,Fri,Sat (13:00:00 - 17:00:00) |

Exhibit 78



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

VIA EMAIL ONLY

April 10, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

      RE:   *Armstrong* Advocacy Letter
               █████████████████

Dear Ms. Davis:

      I write regarding ██████████ a 59-year-old, hard-of-hearing class member housed at SATF. ██████████ filed a CDCR 1824 requesting an iPhone or iPad with speech-to-text technology and a vibrating watch. *See* Attachment, Log No. 498625. On January 25, 2024, the SATF Reasonable Accommodation Panel (RAP) summarily denied the request, apparently based only on a record review that showed ██████████ is designated DNH, has been issued hearing aids and a pocket talker, has access to a captioned phone, and has his methods of effective communication listed as hearing aids and "staff speak loudly and clearly." *Id.*

      There are a number of problems with this response, none of which are new at SATF. We repeatedly have raised these issues with CDCR headquarters officials in letters and meetings, and yet no action appears to have been taken to correct the RAP at SATF. As a result, the RAP continues to inappropriately deny requests for accommodation based on cursory record review and outdated assumptions about the accommodation needs of deaf and hard-of-hearing people.

      **First**, the SATF RAP inappropriately relied on the lack of a DPH code to deny the requested accommodation ("You do not have a severe hearing impairment impacting placement."). This is yet another example of the RAP at SATF failing to comply with the memorandum entitled, "Reiteration of Reasonable Accommodation Requirements," dated October 28, 2022, which states that "[s]taff should not rely on a medical diagnosis or DPP/DDP codes in order to determine the necessary accommodation."

      **Second**, the SATF RAP did not comply with the memorandum entitled, "Amended Issuance of iPads to Incarcerated Persons with a Permanent Hearing Disability," dated December 21, 2023, which states (at page 2): "If an incarcerated person who is not designated DPH submits a request for an iPad," their request "will be considered on a case-by-case basis by the Reasonable Accommodation Panel." During the most recent Deaf/Hard-of-Hearing Workgroup meeting on March 21, 2024, Plaintiffs' counsel raised concerns that people without DPH codes would be inappropriately excluded from this accommodation and inquired about individualized assessments for people like ██████████ who are designated DNH. Lourdes White assured us that people designated DNH could request and be considered for the accommodation. That did not happen here.

**Board of Directors**
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Vishal Shah • Adrienne Yandell

> **Notes:** ISSUANCE OF THE IPHONE TECHNOLOGY IS INTENDED FOR INDIVIDUALS WITH PROFOUND HEARING LOSS. I/M IS CURRENLTY DESIGNATED DNH AND IS BEING ACCOMMODATED WITH HEARING AIDS AND A POCKET TALKER. I/M'S CURRENT METHODS OF EC ARE HEARINGS AND STAFF SPEAK LOUDLY AND CLEARLY.

**Third**, the SATF RAP apparently did not interview ███████ or give primary consideration and deference to his request. But, as the Court recently reaffirmed, public entities must "give primary consideration to the requests of the [disabled person] with respect to auxiliary aid requests and give deference to such requests." Dkt. No. 3583, Order at 40 (Mar. 20, 2024) (quoting *Updike v. Multnomah County*, 870 F.3d 939, 958 (9th Cir. 2017)).

Here, the SATF RAP denied ███████ requests for certain accommodations (speech-to-text technology and a vibrating watch) because he had access to other accommodations (hearing aids, a pocket talker, and a captioned phone). But these are not either/or accommodations. A captioned phone does not serve the same function as a vibrating watch; it cannot help someone communicate with their peers in their housing unit or alert them to a specific time. The hard-of-hearing population is diverse, with diverse needs; people may need different, or multiple, devices to accommodate them in various settings and for different types of communication, including through use of speech-to-text *and* their residual hearing in tandem to attempt to fully understand communication in a noisy dayroom.

If the RAP had interviewed ███████ it would have learned that he experiences white noise with his hearing aids (in fact, according to an audiology consultation note dated January 18, 2024, he does not wear his hearing aids) and that even with his pocket talker, he has trouble hearing announcements. Over two decades ago, the Court found that "[h]earing aids may improve an individual's ability to hear sound, but do not fully restore hearing, and may be rendered ineffective by background noise or poor acoustics. Although people may attempt to accommodate hearing impaired individuals by speaking louder, this may distort hearing for individuals who use a hearing aid." Dkt. 523, Findings of Fact and Conclusions of Law at 11 (Dec. 22, 1999). The SATF RAP's simplistic reasoning is evidence that, 24 years later, the Court's finding of "misconceptions about hearing impairment or deafness" remains true and a barrier to compliance with the ADA and *Armstrong* Remedial Plan at SATF. *Id.* at 10.

We request as follows:

**<u>SATF</u>**

1.    Please immediately evaluate ███████ for and provide him with an iPad with speech-to-text technology and a vibrating watch. If SATF will not provide him those accommodations, please explain why.

2.    Please produce all RAP responses from December 18, 2023, to present, regarding requests for speech-to-text technology and reconsider any responses that denied such requests. Please produce copies of any amended RAP decisions.

**CDCR Headquarters**

3.    Please explain whether Defendants agree with the concerns outlined in this letter regarding the SATF RAP's response to ███████ CDCR 1824. If Defendants agree, please explain what will be done (a) to make sure this does not happen in the future and (b) to make sure others were not denied accommodations at SATF by the RAP on similar grounds. If Defendants do not agree, please explain why.

4.    Please explain (a) how RAPs are expected to conduct the "case-by-case" review of requests from people without DPH codes for speech-to-text technology as outlined in the iPad memorandum dated December 21, 2023, (b) whether the person with the disability must be interviewed before the request is denied (and if not, why not), (c) what are appropriate grounds for denial, and (d) what, if any, direction was provided to RAPs on these issues.

5.    Please explain how Defendants have monitored and/or will monitor institutions' compliance with the iPad memorandum dated December 21, 2023, and the results of that monitoring, including any corrective action or additional direction provided to the institutions.

6.    Please retrain the SATF RAP about the diverse needs of deaf and hard-of-hearing people, retain consultants with relevant expertise in assistive devices and other accommodations for deaf and hard-of-hearing people, and develop a process for the SATF RAP to work with those consultants to identify appropriate accommodations and assistive technology.

Thank you for your prompt attention to this matter.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

cc:    ███████
Ed Swanson, Audrey Barron (Court Expert)
Co-counsel
Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLA Armstrong (OLA)
Lois Welch, Steven Faris (OACC)
Brianne Burkart (CCHCS Legal)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS Accountability (CCHCS)

Ms. Tamiya Davis
Re: ███████████
April 10, 2024
Page 4

Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

Attachment

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 1/3/2024          **Date IAC Received 1824:** 12/29/2023          **1824 Log Number:** 498625

**Inmate's Name:** ███          **CDCR #:** ███          **Housing:** D5-███

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Executive Officer A. Banerjee, Chief Medical Executive G. Ugweze, Chief Psychologist Dr. J. Howard, Health Care Grievance Representative ███, Custody Appeals Representative ███, Associate Governmental Program Analyst ███, Health Program Manager III ███, Registered Nurse ███, Field Training Lieutenant ███, Vice Principal ███

**Summary of Inmate's 1824 Request:** Inmate alleges they were advised they are eligible for new iPhone and watch technology due to their hearing impairment; Inmate requests speech to text technology and a new watch.

### Interim Accommodation:

☒ No interim accommodation required: You are currently accommodated with hearing aids and a Personal Sound Amplification Device (PSAD).

### RAP RESPONSE:

**RAP is able to render a final decision on the following:** Inmate alleges they were advised they are eligible for new iPhone and watch technology due to their hearing impairment; Inmate requests speech to text technology and a new watch.

**Response:** On 1/3/2024, the RAP met and discussed your 1824, Reasonable Accommodation Request.

You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad/ iPhone with live captioning or a vibrating watch to access Programs, Services, or Activities (PSA)s.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-2 and your concerns will be addressed through the Inmate Appeal Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife                          _signature_                          **Date sent to Inmate:**

**ADA Coordinator/Designee**          **Signature**                                    **JAN 2 5 2024**

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| Satf | 498685 | CSATF OFFICE DEC 29 2023 OF GRIE |

*************TALK TO STAFF IF YOU HAVE AN EMERGENCY*************

**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT Rec-Aid | HOUSING D-5 |
|---|---|---|---|

**INSTRUCTIONS:**

- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**
I WAS Informed of the fact I am Eligelble for the "iPhone" for Deaf people who do not use Sign language with speach to Technology; AND I NOT getting that Accomodation of The "iPhone" or the "iTablet" Persuant To November 2023. As well Approve the watch;

**WHY CAN'T YOU DO IT?**
The personnel Hasn't Issued the "iPhone; or iTablet"

**WHAT DO YOU NEED?**
① Please Accomodate this Deaf person with such speach-to-Text Technology with in a Reasonable Time frame; ② Please accomodate the vibrating Alarm watch Respectfully Request

_(Use the back of this form if more space is needed)_

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**     Yes ☐     No ☐     Not Sure ☐

List and attach documents, if available:

I understand that staff have a right to interview or examine me, and my failure to cooperate may cause this request to be disapproved.

| **INMATE'S SIGNATURE** | **DATE SIGNED** |
|---|---|

Assistance in completing this form was provided by:

| Last Name | First Name | Signature |
|---|---|---|

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day</u>. Step 2 should be completed whenever the inmate's request is unclear or when additional input from the inmate and/or staff will help the RAP better understand the request.

Inmate: ▮▮▮▮▮        CDCR #: ▮▮▮▮▮        CDCR 1824 Log #: 498625

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**        Date CDCR 1824 received by IAC: 12 / 29 / 23

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

☐ **Yes / Unsure** (Complete Steps 2 &/or 3)        ☑ **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:
- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care ap▮▮▮▮▮ ▮fety concerns.

| ▮▮▮▮▮ | AGPA | ▮▮▮▮▮ | 12 / 29 / 23 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

**STEP 2    CDCR 1824 INTERVIEWS**        *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____        Due back to IAC: ____ / ____ / ____        Returned to IAC: ____ / ____ / ____

Assigned to: _____        Title: _____

Information needed: _____
_____
_____
_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

Inmate Interview Date/Time:_____    Location:_____

Interviewer notes: _____
_____
_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____
Interviewer Notes: _____
_____
_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____
Interviewer Notes: ._____
_____
_____

***Notes:*** ISSUANCE OF THE IPHONE TECHNOLOGY IS INTENDED FOR INDIVIDUALS WITH PROFOUND HEARING LOSS. I/M IS CURRENLTY DESIGNATED DNH AND IS BEING ACCOMMODATED WITH HEARING AIDS AND A POCKET TALKER. I/M'S CURRENT METHODS OF EC ARE HEARINGS AND STAFF SPEAK LOUDLY AND CLEARLY.

| | | | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

**IAP / Interview Worksheet**

Inmate: ████████     CDCR #: ████████     CDCR 1824 Log #: 498625

---

**Step 3: DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐ An Interim Accommodation **IS NOT required**.

Reason: _____

_____

☐ An Interim Accommodation **IS required**.

Reason: _____

_____

_____

Accommodation(s) provided:                               Date provided:

_____    ___ / ___ / ___

_____    ___ / ___ / ___

_____    ___ / ___ / ___

Comments: _____

_____

_____

| ████████ | AGPA | | 01 / 02 / 24 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note: When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

**IAP processing Instructions for the Appeals Coordinator**

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3. The interviews conducted in Step 2 will help with the decision in Step 3. Step 3 documents the decision. When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

**Step 2 Interviewer Instructions**

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2. If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing. Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder. Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: █████████    CDC #: ██████  PID #: ██████

**CHSS035C** **DPP Disability/Accommodation Summary** Friday December 29, 2023 12:35:52 PM

As of: |12/29/2023|  ➡

---

### OFFENDER/PLACEMENT
CDC#: ██████
Name: ████████████
Facility: SATF--Facility D
Housing Area/Bed: D 005 ████████
Placement Score: 841
Custody: Medium (A)
Designation:
Housing Program: Sensitive Needs Yard
Housing Restrictions: Lower/Bottom Bunk Only
Physical Limitations: No Rooftop Work
to Job/Other: Permanent - 12/31/9999

### DISABILITY ASSISTANCE
Current DDP Status: NDD
DDP Adaptive: None
Support Needs:
Current DDP Status Date: 10/21/2005
DPP Codes: DNH
DPP Determination Date: 11/18/2021
Current MH LOC: CCCMS
Current MH LOC Date: 06/06/2019
SLI Required: No
Interview Date: 04/30/2016
Primary Method(s) - Hearing: Hearing Aids
Alternate Method - Hearing: Need Staff to Speak Loudly and Clearly
Non-Formulary Already posseses a Dual
Accommodations/Comments: Vision/Hearing Vest.
Learning Disability:
Initial Reading Level: 03.0
Initial Reading Level Date: 02/25/2020
Durable Medical Equipment: Hearing Aid
Ankle Foot Orthoses/Knee Ankle Foot Orthoses (AFO/KAFO)
Eyeglass Frames
Incontinence Supplies
Partial Upper Denture - Acrylic
Languages Spoken:

---

### IMPORTANT DATES
Date Received: 10/12/2000
Last Returned Date:
Release Date: 10/21/2034
Release Type: Minimum Eligible Parole Date

### WORK/VOCATION/PIA
Privilege Group: A
Work Group: A1
AM Job Start Date: 12/30/2022
Status: Full Time
Position #: REC.002.005
Position Title: D-5 3/W REC WRKR
Regular Days On: Tue,Wed,Thu,Fri,Sat (14:30:00 - 17:00:00)
Tue,Wed,Thu,Fri,Sat (18:00:00 - 22:00:00)

# Exhibit 79

**Rita Lomio**

| | |
|---|---|
| **From:** | Rita Lomio |
| **Sent:** | Friday, July 26, 2024 2:00 PM |
| **To:** | 'CDCR OLA Armstrong CAT Mailbox'; Audrey Lim; 'Davis, Tamiya@CDCR' |
| **Cc:** | Armstrong Team; 'armstrongteam@rbgg.com'; 'ed@smllp.law'; 'audrey@smllp.law'; 'Ruiz, Ramon@CDCR'; 'Ferguson, Patricia@CDCR'; 'Meyer, Nicholas@CDCR'; 'Thao, Chor@CDCR'; 'Lau-Silveira, Ava'; 'Stuter, Ursula@CDCR'; 'Davis, Tamiya@CDCR'; 'Lopez, Amber@CDCR'; 'Burkart, Brianne@CDCR'; 'Welch, Lois@CDCR'; 'Faris, Steven@CDCR'; 'Chuidian, Saundra'; 'White, Lourdes@CDCR'; 'Lo, Cory@CDCR'; 'CDCR CAMU Advocacy Mailbox'; 'Toche, Diana@CDCR'; 'Bick, Dr. Joseph@CDCR'; 'Dovey, John@CDCR'; 'Hart, Robin@CDCR'; 'CCHCS Accountability Log@CDCR'; 'Williams, Joseph@CDCR'; 'Jefferson, Cathy@cdcr'; 'Anderson, Jason@CDCR'; 'Lorey, Dawn@CDCR'; 'Moses, Jane@CDCR'; 'Leon Guerrero, Joshua@CDCR'; 'Perez, Aaron@CDCR'; 'sharon.garske@doj.ca.gov'; 'trace.maiorino@doj.ca.gov'; 'sean.lodholz@doj.ca.gov'; 'olena.likhachova@doj.ca.gov'; 'anne.kammer@doj.ca.gov'; 'gurpreet.sandhu@doj.ca.gov'; 'CDCR CCHCS Advocacy Correction Services' |
| **Subject:** | RE: Armstrong Advocacy \| ███████████ SATF |
| **Attachments:** | 24.04.10 Arm Advocacy ████████ SATF.pdf |

Hi Tamiya/all,

We have not received a response to this advocacy letter on behalf of a class member with hearing loss at SATF, sent **107 days ago**.

We met with ███████ when we were at SATF on July 10. He still has not received any of the requested accommodations and said that an ADA sergeant simply told him that his request had been denied. He reported that not being able to hear and not being adequately accommodated made him feel overwhelmed and frustrated. He said, "Now I've just given up."

We filed another 1824 for him on site requesting accommodations for his hearing disability. During the RAP meeting last week, ADA staff simply stated that his documented methods of effective communication are "hearing aid" and "speak loudly and clearly." The case was tabled.

We ask that ███████ receive a speech-to-text iPad and vibrating watch immediately and that he be assessed by a hearing professional for possible additional accommodations. We'd like to direct your attention to pages 11-12 of Dr. Bourne's report, which we shared with you earlier today, which says, of ███████:

> His 2/9/2018 audiogram documented profound hearing loss in both ears, which means amplified speech is difficult or impossible to understand. Based on his audiogram, it is unlikely he receives any significant benefit from hearing aids or a pocket talker, and he should be evaluated for a cochlear implant.

> On the CDCR 1824 Reasonable Accommodation Request form, ███████ requested speech-to-text technology and a vibrating watch. The request was denied by the RAP, and he was advised to rely on his hearing aids, pocket talker, and a captioned phone. The RAP wrote, "You do not have a severe hearing impairment impacting placement."

> I strongly disagree with the RAP response and advise that his request be reconsidered to better accommodate his considerable hearing disability. It is not realistic to expect ███████ to rely on his hearing aids or pocket

talker to understand speech in any of his listening conditions. He should be afforded accommodations, such as speech to text technology, to assist him with effective communication.

We also request a response to our advocacy letter dated April 10, 2024, and an explanation for the delayed response.

Rita

Rita K. Lomio (she/her)
Senior Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2632

---

**From:** arm-plo@prisonlaw.com <arm-plo@prisonlaw.com> **On Behalf Of** CDCR OLA Armstrong CAT Mailbox
**Sent:** Thursday, April 11, 2024 9:07 AM
**To:** Audrey Lim <audrey@prisonlaw.com>
**Cc:** Armstrong Team <arm-plo@prisonlaw.com>; armstrongteam@rbgg.com; ed@smllp.law; audrey@smllp.law; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Lopez, Amber@CDCR <amber.lopez@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Chuidian, Saundra <Saundra.Chuidian@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Lo, Cory@CDCR <cory.lo@cdcr.ca.gov>; CDCR CAMU Advocacy Mailbox <m_CAMUAdvocacy@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Dovey, John@CDCR <John.Dovey@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Anderson, Jason@CDCR <Jason.Anderson@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Moses, Jane@CDCR <Jane.Moses@cdcr.ca.gov>; Leon Guerrero, Joshua@CDCR <Joshua.LeonGuerrero@cdcr.ca.gov>; Perez, Aaron@CDCR <Aaron.Perez@cdcr.ca.gov>; sharon.garske@doj.ca.gov; trace.maiorino@doj.ca.gov; sean.lodholz@doj.ca.gov; olena.likhachova@doj.ca.gov; anne.kammer@doj.ca.gov; gurpreet.sandhu@doj.ca.gov; CDCR CCHCS Advocacy Correction Services <m_CCHCSAdvocacyCS@cdcr.ca.gov>
**Subject:** RE: Armstrong Advocacy | ██████████ SATF

Good morning,

This confirms we have received your request and are reviewing it.

# Laura Canela
**Staff Services Analyst**
**Class Actions Litigation, Administrative Support Team**
**Office of Legal Affairs – HQ, CDCR**
**1515 S St. Suite 314-S Sacramento, CA 95811**
**Phone: (916) 917-4079**

**CONFIDENTIALITY NOTICE**: **This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized**

**interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.**

---

**From:** Audrey Lim <audrey@prisonlaw.com>
**Sent:** Wednesday, April 10, 2024 4:59 PM
**To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Armstrong Team <arm-plo@prisonlaw.com>; armstrongteam@rbgg.com; ed@smllp.law; audrey@smllp.law; Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; Lopez, Amber@CDCR <amber.lopez@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Chuidian, Saundra <Saundra.Chuidian@cdcr.ca.gov>; Houston, Mona@CDCR <Mona.Houston2@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Hernandez, Jillian@CDCR <Jillian.Hernandez@cdcr.ca.gov>; Lo, Cory@CDCR <cory.lo@cdcr.ca.gov>; CDCR CAMU Advocacy Mailbox <m_CAMUAdvocacy@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Dovey, John@CDCR <John.Dovey@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Jefferson, Cathy@cdcr <Cathy.Jefferson@cdcr.ca.gov>; Anderson, Jason@CDCR <Jason.Anderson@cdcr.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; Moses, Jane@CDCR <Jane.Moses@cdcr.ca.gov>; Leon Guerrero, Joshua@CDCR <Joshua.LeonGuerrero@cdcr.ca.gov>; Perez, Aaron@CDCR <Aaron.Perez@cdcr.ca.gov>; sharon.garske@doj.ca.gov; trace.maiorino@doj.ca.gov; sean.lodholz@doj.ca.gov; olena.likhachova@doj.ca.gov; anne.kammer@doj.ca.gov; gurpreet.sandhu@doj.ca.gov
**Subject:** Armstrong Advocacy | ▮▮▮▮▮▮ SATF

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Tamiya,

Attached please find a letter regarding the SATF RAP's failure to properly consider a class member's request for speech-to-text technology and a vibrating watch to accommodate his hearing disability. The flaws in the RAP's reasoning are not new, and we make several requests of CDCR headquarters at the end of the letter to address those concerns.

Thank you,
Audrey

----

**Audrey Lim**
She/her
Litigation Assistant
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710

Exhibit 80

**Rita Lomio**

| | |
|---|---|
| **From:** | deaf_hoh_work_group@prisonlaw.com on behalf of Burkart, Brianne@CDCR |
| **Sent:** | Friday, April 19, 2024 2:04 PM |
| **To:** | Marissa Hatton |
| **Cc:** | Deaf and HOH Work Group; Ed Swanson; Audrey Barron; Caroline Jackson |
| **Subject:** | RE: Follow up Qs Re Hearing Aids |

Hi Marissa-

Please see our response to your questions below. I have added a response to Caroline's question from an email sent on April 2nd to the bottom of the list. Thank you for your patience as I gathered the information for our response.

Sincerely,

**Brianne Burkart**
**Attorney IV,** CCHCS Office of Legal Affairs
P.O. Box 588500
Elk Grove, CA 95758
(916) 691-6051 Office
(916) 513-1083 Cell Phone
Brianne.Burkart@cdcr.ca.gov

 CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Marissa Hatton <mhatton@prisonlaw.com>
**Sent:** Friday, March 29, 2024 9:37 AM
**To:** Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; Ed Swanson <ed@smllp.law>; Audrey Barron <audrey@smllp.law>
**Subject:** Follow up Qs Re Hearing Aids

CAUTION: This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Brianne:

Thanks for your time last week during the deaf and hard-of-hearing workgroup. I have a few follow-up questions regarding hearing aids. We all share the goal of being able to remove this issue from the agenda, and Plaintiffs hope that addressing these issues will move us closer to finally resolving our concerns regarding hearing aid quality.

1. **Care Guide Discussed at Sept. 29, 2023 Negotiation. Do Defendants plan to develop a "care guide" or other written guidance for providers regarding referrals for comprehensive audiometric hearing evaluations, hearing aid fitting, and for non-formulary hearing aids and other otological care?**  During the parties' in-person hearing aid negotiation on September 29, 2023, we discussed CCHCS's plan to develop a "care guide" to provide guidance to providers on the comprehensive audiometric hearing evaluation and referrals for evaluation for hearing aids and hearing aid fitting.  We ask to review the guide given our concerns about CCHCS's recent representation on determining hearing aid eligibility (see #2, below).

   **RESPONSE:** The long-term goal is to have a comprehensive guide to disabilities which includes determining who needs evaluations and how they should be evaluated.  Such guides take time to develop and vet. Once drafted, CCHCS will share the guide with Plaintiffs' counsel and the Court Expert.

   For the time being, our providers are able to access onsite hearing tests/screening through our hearing aid specialists. CCHCS has a low threshold for referrals.  Providers may also utilize InterQual criteria for hearing aids as well as cochlear implants.

2. **We would like clarity on the criteria Defendants will use to determine hearing aid eligibility.**  During the meeting, you suggested that Defendants would be relying on pure tone testing alone to determine eligibility.  This is inconsistent with your October 17, 2023 email negotiating the hearing aid contract, which stated: "CCHCS has removed the following language 'patients with hearing levels in the pure tone average of 500, 1000, and 2000 Hz of 34 dB or less do not require amplification devices' from the contract."  This email is attached for reference.  This is also inconsistent with what Defendants stated during the September 29 meeting and the language of the contract Defendants provided to us on November 6, 2023 (attached for reference): Section 3(h) of this contract lists *seven separate tests required (at minimum) for the comprehensive audiometric hearing evaluation.* This discrepancy is part of what prompted our request to see the contract, or relevant portions of it, during our last workgroup meeting.

   **RESPONSE:** As indicated in my October 17, 2023 email, CCHCS removed the above referenced language from the hearing aid contract. Additionally, the current hearing aid contract includes Section 3(h) and is consistent with our negotiations and the previously shared contract.

3. **Is the final, executed contract identical to the specifications in the request for bid provided to Plaintiffs on November 6, 2023 (attached for reference)?**  Defendants had committed to making some changes, such as adding a requirement for digitally programmable devices.  We would like to confirm that those changes made it into the final version, and that we can rely on the November 6, 2023 exhibit to the request for bid as a complete, true, and correct copy of the existing contract that Defendants hold, for the purpose of future negotiations. Please let us know if the attached exhibit is not the complete and final agreement reached between CDCR and the vendor(s).

   **RESPONSE:** CCHCS provided Plaintiffs' counsel with a link to the public website Cal eProcure on November 6, 2023, to review the hearing-aid contract bid information.  The website contains the hearing-aid contract, exhibits and addendums needed for potential bidders to review, which was also accessible to Plaintiffs' counsel for their review.  Defendants understand that Plaintiffs are aware of the information posted on the website because CCHCS received a request from Plaintiffs on November 27, 2023, alerting CCHCS to an agreed-upon

hearing-aid specification that had been inadvertently omitted from the bid information.  In response, and on that same day, CCHCS issued an addendum to the bid information for the contract to include the specification.  I have attached the addendum for your convenience. The document attached in your March 29, 2024 email along with the addendum reflects the contents of the contract, excluding the vendor names and rates.

4. **What is the make and model of the hearing aids in the secondary and tertiary contracts that Defendants have signed?**  We understand the primary contract is for the Starkey Muse 1000 High-Powered BTE; however, we did not receive information regarding the secondary and tertiary contracts.  We also have some concerns about using the Starkey as the primary device, as a "high-powered" hearing aid risks damaging the hearing of many DNH class members.  We understand that many audiologists restrict "power" devices to only individuals who require the extra boost in volume: providing a non-power device to someone who needs it will be ineffective; providing a power device to someone who does not need it risks damaging their hearing.

    **RESPONSE:** Rank 2 vendor will offer Audicus Clara. Rank 3 vendor has two options of Widex hearing aids without Bluetooth, the Magnify 110-10 and the Evoke 110-312 for severe to profound hearing loss.

5. **Is the Starkey Muse 1000 High-Powered BTE a "power" device?**  See above (#4) for our concerns regarding the availability of both power and non-power devices.  **If it is a power device, is there a way to calibrate the device so it does not risk damaging a user's hearing?**

    **RESPONSE:** CCHCS reached out to the Rank 1 vendor and asked if the Starkey Muse 1000 was able to be calibrated so it does not risk damaging the user's hearing. The vendor indicated all hearing aids have an output adjustment to prevent dangerous levels of sound.

6. **What is the basis for the contracting department's conclusion that the hearing aid contracts will suffice to meet demand?**  At the meeting, we learned that CCHCS had asked the contracting department, who said they were "not worried" about meeting the demand for the new, improved hearing aids.  However, CCHCS did not have any information on the basis for that conclusion.  This is especially concerning if, as was the case for CCHCS's previous contract, the primary contract (the Flame 250, a non-power device) and the secondary contract (the Rexton Arena, a power device) were designed for two different populations, such that Defendants could not use the hearing aids under the secondary contract if the primary contractor ran out of devices.  Given that the new devices should be a significant improvement over the old ones, we expect a spike in demand.  ***To answer this question, please provide the portion of the contract that deals with quantity and/or inventory, or in the alternative, concrete information about (1) the number of hearing aids the contractor will provide up front and on an ongoing basis and (2) when those hearing aids can be expected to be disbursed to the institutions, and in what quantities?***

    **RESPONSE:** Pursuant to Section 5(b) of the contract, the Contractor is responsible for fitting and supplying the hearing aids. The Contractor is responsible for provisioning the devices to meet the terms and conditions of the Agreement. The contract does not limit the Contractor from procuring one make and model of hearing aid, but rather Section 5(c) requires the Contractor to provide a range of models. If one model of device is unavailable, the Contractor is required to provide a different model that meets the requirements set forth in the contract.

Our contracting team reached out to the Rank #1 Contractor who has indicated they maintain a 30-day supply or more on hand at all times. The Contractor also indicated they performed a substantial amount of research prior to bidding and confirmed with their vendor that the model they are currently supplying is readily available and will be available for years to come. Based on historical data, 238 devices were dispensed in FY 21/22 and 264 devices in FY 22/23 per month, on average. This information was provided to all bidders prior to contracting. Additionally, if the Rank #1 Contractor is unable to perform at any time, CDCR/CCHCS will reach out to the Rank #2 AND Rank #3 Contractors for services.

6. **Email from Caroline Jackson sent April 2, 2024: Would you mind also telling us the name of the company that holds each of the three contracts?**

   **RESPONSE:** Rank 1: Pacific Coast Hearing Aid, Rank 2: The Maclean Group LLC, Rank 3: Virtual Benefit Solution, Inc.

We appreciate your efforts to answer these questions and look forward to hearing from you.

Best,
Marissa
--
**Marissa K. Hatton** (she/her)
Staff Attorney | Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2621

# Exhibit 81



*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

March 20, 2024

Sharon Garske
Office of the Attorney General

Re:  *Armstrong v. Newsom*
     Plaintiffs' Written Feedback on Draft Proposal Regarding Effective Communication of
     Announcements (SATF Stipulation Item 7)

Dear Sharon:

    CDCR for decades has failed to develop the policies, procedures, and infrastructure
necessary to ensure effective communication of the many and varied auditory announcements that
structure and direct prison life. This has resulted in people with hearing disabilities living
diminished lives. They regularly miss critical information; are late to or miss programs, services,
and activities, including parole preparation appointments, medical appointments, pill call,
canteen, religious services, yard, dayroom, emergency alarms, job assignments, and educational
assignments; are at risk of being and have been punished for failing to hear orders; and some have
the degrading experience of spending their days sitting in the dayroom, being ever-vigilant to
whether an announcement is being made because they do not want to miss anything important.

    A complete and durable solution to this problem requires a layered, multimodal approach
that accounts for the distinct types of audible announcements that regulate all aspects of prison
life, for variation in the audience's hearing disabilities and communication needs, and for the need
for back-up measures in the event that systems break down. Such a solution requires use of
assistive technology widely available in other prison systems, effective and ongoing training, and
robust monitoring and self-correction mechanisms.

    CDCR has never proposed such a solution—or even come close. Instead, its approach to
this issue has been an *ad hoc* and grudging series of unfulfilled promises. For example, CDCR
bought and installed electronic scrollboards for announcements at some institutions in 2019, but
they have sat unused because CDCR did not want to go through labor negotiation process and
claimed later that the scrollboards, which were selected without input from an accessibility expert
of Plaintiffs' counsel, were too difficult to use. The vibrating watches promised by CDCR in a
sworn court filing over five months ago also have not been supplied, with no explanation.

**Board of Directors**
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Vishal Shah • Adrienne Yandell

Sharon Garske
Re: Plaintiffs' Feedback on Effective Communication of Announcements
March 20, 2024
Page 2

CDCR's proposal now—a two-page tablet policy that raises more questions than answers—remains nothing more than a Band-Aid that suggests CDCR still does not understand the scope of the problem and the robust action and reforms needed.

To help move this issue forward, with this letter we provide a brief summary of the history of these issues in this case (Section I), a description of necessary features of any system to provide effective communication of announcements (Section II), an overview of how CDCR's current proposal fails to incorporate these necessary features (Section III), and a clear roadmap to developing a functioning announcements system (Section IV).

We also provide a proposed agenda for the meet and confer scheduled for March 28, 2024, to structure discussion and help identify any areas of disagreement which may require further Court action. *See Armstrong v. Newsom*, 58 F.4th 1283, 1297 (9th Cir. 2023) ("relief prescribing more specific mechanisms of compliance is appropriate" where less intrusive means have failed) (citation omitted); Dkt. 3538, Order on SATF Stipulation at 5 ("If the Court Expert determines the parties are not able to reach agreement regarding the proposal, the parties shall, within 30 days of the Court Expert's determination that an agreement cannot be reached, submit a joint statement to the Court discussing the disputes regarding the proposal.").

We look forward to meeting with you and the Court Expert next week. If you have any questions or concerns in the meantime, please do not hesitate to contact us.

Sincerely yours,

Jacob Hutt
Staff Attorney

Skye Lovett
Investigator

Encl.:  Appendix A - 23.11.23 Plfs' Proposed Agenda for Deaf-HH Workgroup - December 4, 2023 (Highlighted Excerpt)
cc:  Co-counsel
Ed Swanson, Audrey Barron (Court Expert)
Patricia Ferguson, Tamiya Davis, Jennifer Neill, Ramon Ruiz, Ava Lau-Silveira, Katie Riley, Ursula Stuter (CDCR Office of Legal Affairs)
Brianne Burkart (CCHCS Office of Legal Affairs)
Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)
Dawn Lorey, Lourdes White, Darnell Mebane, Kristina Davis, Megan Roberts (CAMU)

**Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of Announcements (SATF Stipulation Item 7)**

## I.    Overview of CDCR's Awareness of and Refusal to Meaningfully Address This Issue

CDCR has known of the failures of existing systems for providing effective communication of announcements for years. The parties have met no fewer than 16 times since July 2021 to discuss the issue through the Deaf/Hard-of-Hearing workgroup without any notable progress. At SATF specifically in the last eight years alone, Plaintiffs' counsel raised the problem following monitoring tours in October 2016, March 2017, June 2018, September 2018, and December 2018. A joint audit of SATF in 2018 by the Office of Audits and Court Compliance ("OACC") and Plaintiffs' counsel also identified the problem, and in 2019 OACC directed SATF management to complete a Corrective Action Plan to address this issue. Deaf people at SATF repeatedly reported the problem to facility captains for consecutive months in 2019.

In December 2022, following a year-long investigation, the Court Expert reported that "[d]eaf people and many hard of hearing people cannot hear an audio announcement played over the intercom." Dkt. 3446 at 37. The Court Expert used the example of Person E, a deaf non-signer, to illustrate the problem at SATF. Person E reported that custody staff "either do nothing to deliver him announcements, or sometimes they send another incarcerated person" to fingerspell, using the ASL alphabet, the announcement to him. *Id.* at 38-39. Person E reported that custody staff "made an announcement over the intercom for him to report for the interview" with the Court Expert, but did not effectively communicate the announcement to him, so he did not learn of the announcement until another incarcerated person told him. *Id.* at 39.

**Over fourteen months later, the same thing happened to Person E—this time at San Quentin.** Plaintiffs' counsel scheduled an interview with Person E last week to solicit his thoughts on CDCR's proposal related to effective communication of announcements. Although the legal visit was scheduled for 9:00 am, and Plaintiffs' counsel arrived at the institution at 8:30 am, Person E did not arrive to the interview room until 9:55 am—almost an hour late—because, among other reasons, staff had failed to effectively announce to him that Plaintiffs' counsel was there to interview him.

Since the Court Expert's first SATF report, CDCR headquarters staff have made misleading and transitory promises. For example, in January 2023, the then-Director of the Division of Adult Institutions ("DAI") told the Court that "CDCR has created a working group to identify ways to audit staff communication of announcements to deaf persons" and that "CDCR is amenable to input from Plaintiffs' Counsel and the Court Expert[.]" Dkt. 3453-1 at 13 ¶ 22. After unsuccessfully attempting to learn more about the working group and being promised an opportunity to participate, a CDCR attorney informed Plaintiffs' counsel ten months later that the working group no longer was in existence, that CDCR attorneys were not involved in its short lifespan, and that there were no findings or recommendations to report from any work that the working group did.

**Board of Directors**
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Vishal Shah • Adrienne Yandell

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

CDCR's proposals have also evidenced a lack of understanding of the issue to be solved,
pointing to ineffective policies and training videos that say what to do after the fact when
someone does not show up to an appointment or a sergeant notices that housing officers did not
provide effective communication of announcements, and providing no guidance on how to ensure
contemporaneous effective communication of the announcement in the first place. *See, e.g.*,
Gipson Declaration, Dkt. 3453-1 at 13 ¶ 23. In fact, it is deeply troubling that even now, CDCR
inexplicably refuses to take training videos it developed on "effective communication of
announcements" out of circulation, notwithstanding the fact that the Department has been on
notice for months that the videos contain profoundly wrong information on how to communicate
announcements to deaf people (and, once again, it was Plaintiffs' counsel and not CDCR that
identified the obvious problems).

Proposals generated by CDCR headquarters staff also have evidenced a lack of awareness
of on-the-ground realities and existing processes in the institutions. For example, in January 2023,
the then-DAI Director told the Court that "CDCR will also add to their monthly Captain's
meetings that staff will ask the deaf and hard-of-hearing class members whether they are
receiving announcements." Dkt. 3453-1 at 13 ¶ 23. But the Captain's meetings were and are only
for deaf signers, not deaf non-signers like Person E and the many other hard-of-hearing people.

In addition, although the then-Assistant Deputy Director of DAI Program Operations told
the Court in September 2023, and again in October 2023, that CDCR had not identified any
vibrating watch that would work in the institution, *see* Dkt. 3504 at 10; Dkt. 3504-1 ¶ 12; Dkt.
3515 at 12; Dkt. 3515-1 ¶ 12, in fact, vibrating watches have been in use in the institutions **for
years**. Indeed, SATF leadership reported that "SATF and the ADAC have not encountered any
security concerns related to the possession of these watches," and that "[t]he [ADA Coordinator
(ADAC)] regularly approves the purchase of vibrating or talking watches." Letter from Bryan D.
Phillips, Warden, and Dr. Anu Banerjee, Chief Executive Officer, to Rita Lomio, Prison Law
Office, Summary of SATF AMT Findings at 3 (Feb. 16, 2024). CDCR headquarters staff have
not addressed these inconsistencies or answered basic questions about the quality of the vibrating
watch selected (which class members report is poor), who will receive a watch, or how the
watches will be provided, notwithstanding Plaintiffs' counsel's repeated attempts to get such
information through the Deaf/Hard-of-Hearing workgroup.

CDCR also has, since at least March 2023, suggested that tablets could be used to provide
effective communication of announcements. CDCR did not provide a proposal until four months
ago, when it shared a two-page draft policy in the Deaf/Hard-of-Hearing workgroup, about which
Plaintiffs' counsel raised extensive concerns, including regarding scope, reliability, accessibility,
and feasibility.

CDCR's failure to meaningfully address these issues and work collaboratively with
Plaintiffs' counsel necessitated Court action. On December 7, 2023, the Court ordered CDCR to
"provide to Plaintiffs and the Court Expert either: (1) a draft proposal regarding how CDCR will

Page 4

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

audit whether officers at SATF effectively communicate announcements to deaf and hard-of-hearing people, and how CDCR will take corrective action when officers are found to fail to communicate such announcements; or (2) a draft proposal regarding an alternative, auditable method of ensuring effective communication of announcements that does not rely on correctional staff or ADA workers to communicate announcements to deaf and hard-of-hearing people." Dkt. 3538 at 5.

CDCR's proposal falls woefully short of a complete and durable solution. Instead, it is almost identical to the two-page tablet policy it shared four months ago. Plaintiffs' counsel provided a detailed list of written concerns, which CDCR officials refused to discuss in the workgroup, instead promising that they would consider and incorporate them into the proposal produced in response to the SATF Stipulation—something they did not do (see Section III, below).

## II.    Necessary Components of a Functioning System for Effective Communication of Announcements

In light of CDCR's continued failure to develop a system for effective communication of announcements for deaf and hard-of-hearing people, Plaintiffs' counsel has developed an outline of what such a system must contain:

1. The system must notify class members, in real time, that an announcement is being made;

2. The system must effectively communicate the content of both individualized and group announcements to individuals in a timely manner;

3. The system must provide accessible, non-auditory alarms for emergency announcements;

4. The system must incorporate multiple technologies to ensure that if one breaks down, there is a readily available backup;

5. The system must ensure that all people with hearing disabilities–including DNH class members–are accommodated;

6. The system must include training for staff and incarcerated people on how the system's technologies work; and

7. The system must audit and correct the performance of staff and identify where changes to policy or practice are necessary to ensure equal access.

We discuss these components in detail below, and we explain how Defendants' current system fails to include each component.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

### A. Real-Time Notification That An Announcement Is Being Made

A functioning announcement system for the deaf and hard-of-hearing population must
include non-auditory, real-time notification that an announcement is being made. That is, the
system must immediately alert deaf and hard-of-hearing class members through tactile (meaning,
perceptible by touch) and visual methods of this fact. Consider, for example, text messages on an
iPhone. The iPhone is able to vibrate and show a visual indicator that a text message has been
received, so the user knows to go into the text messaging application to view the content of the
message.

At present, Defendants' policy relies on housing unit officers flashing lights to indicate
that an announcement is being made and sending ADA workers or officers themselves to
communicate the content of the announcement. This system has been in place for decades and has
not proven effective, as Plaintiffs' counsel has reported for years and the Court Expert found in
his Second SATF Report last year. Dkt. 3500 at 12. The largest obstacle to compliance, reported
in the Court Expert's report and observed yet again at SATF by Plaintiffs' counsel last
November, is that in practice, housing officers do not comply with their obligations; they do not
flash the lights to indicate an announcement is being made, and ADA workers and staff do not
communicate announcements to deaf and hard-of-hearing people.[1]

This system also has practical barriers; housing officers cannot flash lights in specific cells,
and only can flash lights in the dayroom or other common areas, which can be easily missed if
someone is reading or sleeping in a cell. The constant flashing of lights also can lose its
meaning—it is hard for people to distinguish what is an announcement relevant to them. In
addition, announcements are made throughout the prison—including in libraries and on the
yard—where there are no lights to flash.

### B. Timely Communication of the <u>Content</u> of Announcements

A functioning announcement system for the deaf and hard-of-hearing population must
include effective transmission of the content of announcements. The content of individual
announcements typically is brief, such as "Jones, report to the podium," but may in some cases be
detailed, such as instructing a specific person that they are out-of-bounds and should return to
their cell because it is not time to use the tablet kiosk, or telling someone that they will be subject

---

[1] *See* Dkt. 3532-2, Ex. A to Court Expert's Addendum to Second SATF Report (Plaintiffs'
Summary of November 2023 SATF Monitoring Tour Findings) at 7-8 (discussing Plaintiffs' on-
site observations of officers failing to flash the lights to provide real-time notification of
announcements); Dkt. No. 3500 at 12 (Court Expert's second SATF report noting class members'
reports that "ADA workers do not come to their cell as directed").

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

to progressive discipline if they do not close their cell door.[2] The content of group announcements (those that are unit- and facility-wide) similarly is typically brief, as in "last call for yard," or an announcement that a program or canteen has been cancelled that day, but also may be detailed, such as explaining to a yard that the reason for limited movement at a given time is due to fog conditions, and giving updates about resulting schedule changes. It is necessary for deaf and hard-of-hearing people to learn the content of these detailed and brief announcements as quickly as people without hearing disabilities can learn this content.

As noted above, Defendants' current policy, which relies on staff to flash the lights and notify deaf people individually of the content of an announcement either personally or through an ADA worker, has resulted in widespread noncompliance for years, notwithstanding repeated reports of problems from Plaintiffs' counsel and the Court Expert and renewed training. In many cases, and as deaf and hard-of-hearing people at SATF reported to the Court Expert, staff simply do not relay the content of an announcement at all.[3] Sometimes officers attempt to provide effective communication of only a small subset of announcements (such individual announcements) and not others (such as unit-wide announcements like canteen availability and changes to library hours).

## C. Accessible Alarms and Emergency Announcements

A complete announcement system also must include non-auditory alarms to communicate emergencies to the deaf and hard-of-hearing population. Alarms may occur in any or all parts of an institution and require immediate action by all incarcerated people in the affected area, whether to "get down" due to nearby violence or medical emergency or to initiate evacuation procedures.

---

[2] Other individual announcements include instructions for specific people to report for healthcare appointments, visiting, count, lock-up, unlock, attorney interviews, due process encounters, mental health groups, captain's meetings, IAC meetings, work programs, education, interviews with correctional counselors, self-help groups, and same-day evaluations by nurses in response to 7362s.

[3] *See, e.g.*, Dkt. 3446 at 38-39 ("[A deaf non-signer at SATF] told us that custody staff do not write down announcements for him, and instead they either do nothing to deliver him announcements, or they sometimes send another incarcerated person to sign the announcement to him by spelling the letters of the words, since he can understand the sign language alphabet."); 1824 Log No. SATF-F-23-00127 (93-year-old man reporting that staff usually do not tell him about announcements unless he goes to the podium to ask, and requesting that he be informed of announcements like mail); Letter from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, Discriminatory and False RVR Issued to ████████████ CSP-SAC (Apr. 15, 2022) (hard-of-hearing class member who first learned that he had missed a medical appointment when he received a copy of an RVR issued for missing it three days later).

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

Plaintiffs' counsel has requested information about visual alarms for over two years, but
does not yet have a complete understanding of where visual alarms are installed and how they are
maintained. In the interim, deaf and hard-of-hearing people report that they often are not aware of
ongoing emergencies or do not know why an alarm is underway, and so do not know how, or how
quickly, they must respond.

### D. Back-up Systems and a Layered Approach

A functioning system for non-auditory announcements for deaf and hard-of-hearing class
members will rely on multiple systems to accommodate a range of disability needs and to avoid
disruptions in effective communication. The importance of building redundant systems that have
fail-proof backups is well-established in a variety of industries.[4]

In the context of announcements in CDCR institutions, redundancies and layered systems
are necessary given the likelihood of power outages, network and connectivity lapses, and other
disruptions. The need for multiple, redundant technologies has been evident in Defendants'
experiences piloting announcement technologies, which have not always functioned consistently.
For example, Defendants installed electronic scrolling marquees in several housing units, but
never activated them for announcements due to labor concerns. Instead, the marquees display
either generic messages, like "NO SMOKING" or "HAPPY HOLIDAYS," or a series of dots and
no legible message.

. . . .
. . . .
. . . .
. . . .
. . . .
. . . .

---

[4] *See, e.g.*, 14 C.F.R. § 25.795(c)(2)(i) (Federal Aviation Administration regulation discussing
"redundant airplane systems necessary for continued safe flight and landing"); 49 C.F.R. §
220.9(a) (Federal Railroad Administration regulation: "[E]ach occupied controlling locomotive in
a train shall have a working radio, and each train shall also have communications redundancy, . .
."); 49 C.F.R. § 1570.113(b)(3)(iv) (Transportation Security Administration regulation regarding
"[r]edundant and backup systems to ensure the continuity of operations"); *see also* General
Electric, "Levels of Redundancy," https://www.ge.com/digital/documentation/cimplicity/version
10/oxy_ex-2/networking/topics/g_cimplicity_networking_levelsof_redundancy.html ("The
principle of redundancy in automated systems provides for switchover of functionality to a
backup component in case of failure of a primary component.") (last visited March 20, 2024).

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)



**Image:** Scrolling marquee in Building E5 at SATF facing one side of the control tower,
displaying a series of dots and no legible message (May 2021 SATF Tour, DEF 0026)

In addition, class members report that their ViaPath tablets frequently break down, causing
disruptions in their ability to use the tablets as a means of communication. It is critical for a
complete announcements system that layered systems are in place so that if one technology
experiences disruptions, another can continue effective communication for deaf and hard-of-
hearing class members.

### E.  Accommodation of All Deaf and Hard-of-Hearing Class Members' Needs

Defendants' announcements system must accommodate the wide range of deaf and hard-
of-hearing class members, including those who are designated DNH. The Court already found
that "Deaf people **and many hard of hearing people** cannot hear an audio announcement played
over the intercom." Dkt. 3446 at 37 (emphasis added); Order, Dkt. 3467 at 2 (adopting Court
Expert's undisputed findings); *see also* Dkt. 3500 at 4 (Court Expert's subsequent report that
"Deaf **and hard-of-hearing people** still do not consistently receive announcements, . . .")
(emphasis added).[5] That is why the Court ordered Defendants to produce, in relevant part, a
proposal for effective communication of announcements for "deaf **and hard-of-hearing people**."
Dkt. 3538 at 5 (emphasis added); *see also* ARP § I.E.1. ("Reasonable accommodation shall be

---

[5] This echoes the findings of court experts in other jurisdictions, which have found that
correctional departments fail to meet their legal obligations when they exclude non-deaf hard-of-
hearing incarcerated people who have hearing loss short of severe or profound hearing loss from
accommodations for announcements. *See Briggs v. Massachusetts*, Fifth Report of the Settlement
Monitor at 93 ("The sole reliance on decibel loss, without consideration of the prisoner's distance
from the announcement, individual circumstances, or history of missing announcements, does not
meet the Department's obligations.").

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

afforded inmates/parolees with disabilities, e.g., vision, speech, hearing impaired, and learning disabled inmates, to ensure equally effective communication with staff, other inmates, and, where applicable, the public."); ARP § II.D.3 (requiring reasonable accommodations for people with "permanent hearing impairments" that do not impact placement).

We have reported for years that CDCR staff do not provide effective communication of announcements to DNH class members.[6] Consider the following recent reports from DNH class members regarding their ability to hear announcements:

| | |
|---|---|
| "[A]pparently I missed 3 or 4 announcements recently about property. The of[f]icer in the property dept. told me they called for me at least once before I heard the announcement to pick up a vocational textbook (I'd ordered) on the second date they informed my unit it was available for pick up. I could have picked up the text two days earlier if I'd heard an announcement the first time the property dept. called for me. . . . The property dept. called me on Feb 14th, Feb 15th and Feb 16th! I ONLY heard the Feb 16th announcement & I only heard THAT because I went to the cop shop to ask a question; officer then told me in person that I was being called to property. Very, very frustrating!" | CIW |
| "Yes, cannot hear or make out what their saying." *(when asked if the class member misses announcements in program areas)* | SATF |
| "I always miss the announcements. I am unable to know when they make the announcement." | RJD |
| "When announcements are made, I can't understand what they say." | CTF |
| "Very rar[e]ly do I understand what is offered via announcements unless it is for me, if for me the C/o in tower-control booth will crack my door, the[n] yell from the bars at the booth. . . . Sometimes I will hear someone talking from P.A. but I cannot understand what is being said." | SVSP |

---

[6] *See, e.g.*, July 2017 FSP and FWF Monitoring Tour Report at 11-12; November 2018 COR Monitoring Tour Report at 13-14; February 2019 MCSP Monitoring Tour Report at 8-9; January 2020 HDSP Monitoring Tour Report at 10-11; July 2021 CMF Monitoring Tour Report at 19-20; April and May 2021 SATF Monitoring Tour Report at 9-11; September 2022 PBSP Monitoring Tour Report at 4-5; September 2022 and April 2023 CIM Monitoring Tour Report at 1-2; December 2022 SAC Monitoring Tour Report at 55-57; October 2023 CHCF Monitoring Tour Report at 15-16.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

| | |
|---|---|
| "[I]t's hard to understand the name they want unless I go to the podium and ask who they want." | SATF |

In practical terms, this means that CDCR must incorporate multiple forms of accommodation to account for the fact that class members' diverse hearing disabilities will require diverse accommodations. For instance, a class member who is deaf and has no residual hearing may require tactile notification technology, such as a vibrating pager, to alert them that an announcement over the public address system ("P.A.") is even occurring. On the other hand, a hard-of-hearing class member with some residual hearing may be able to hear that a P.A. announcement is taking place and may not need tactile notification technology, but may need a visual aid—such as a video display board—in order to understand the content of the announcement. A system that made only a vibrating pager or the video display board available, then, would fail to accommodate these class members' individual needs.

Similarly, for some DNH class members, the public address system alone may be sufficient if it is updated to provide clearer and louder sound. But for class members whose hearing disabilities already make it difficult to discern the content of what is being announced, staff's use of the distorted and ineffectively located public address systems does not effectively communicate announcements:

| | |
|---|---|
| "Most of the time the control booth announcement sounds distorted." | SVSP |
| "[A]nnouncements are made too low, are not spoken clearly or garbled." | SATF |
| "The speakers face B side and so . . . [i]f housed in A or C side sometimes announcements are muffled." | RJD |
| "When they talk into the noise cancelling mike, they do not speak directly into it. Their voices are garbled + sounds like giberish." | VSP |
| "I can not understand what the announcement is. All I hear is mumbling." | RJD |
| "The intercom . . . is muphiled [sic] and hard to understand." | CIW |

These and many other hard-of-hearing class members designated DNH need effective communication accommodations for announcements, including with the technologies discussed above. Defendants must not exclude DNH class members from their forthcoming system to effectively communicate announcements.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

## F. Training

In order for the announcement system to function, both staff and incarcerated people must
be effectively trained on how it works. Effective training of staff on the announcement system
should involve (a) identifying which staff must receive the training; (b) educating these staff, in
an interactive and ongoing manner, on how to use specific technologies; (c) educating these staff
on knowing which situations should trigger the use of these technologies; and (d) updating the
training at a regular period in response to updates to announcement technologies.

The need for effective staff training is clear from the current, broken system, in which staff
do not utilize available technologies in an appropriate manner. For example, even with respect to
the simple P.A. announcement system, hard-of-hearing class members report that staff display a
lack of training in how to effectively use this system:

| | |
|---|---|
| "Show staff how to use the mic. Some are talking too close or too fare [sic] too loud and is distorted." | SATF |
| "The PA system, most guards need basic or remedial training on the proper way to speak into the microphone ie. too close to their mouth, yelling into it, talking too fast, too much loud noise in the dayroom, slurring their words." | RJD |
| "Most make [announcements] over the PA (Public Address) system, but many officers do not speak slowly or enunciate clearly. Some speak too close to the microphone (it sounds garbled) or almost whisper into the mic (it sounds too quiet!)." | CIW |
| "Some staff don't know how to use the PA system and the message is severly garbbled." | RJD |

Thus, in addition to the need for updated P.A. announcement equipment, there is a need for staff
to learn how to use the equipment appropriately. The need for effective staff training will be even
greater for a system that relies on new technologies, such as watch pagers and video displays, as
discussed below.

Deaf and hard-of-hearing incarcerated people must also receive effective training on how
to use the technologies of an announcement system. We have detailed at length how, for example,
failure to train class members on the accessibility technology of the ViaPath tablets has resulted
in class members' unequal access to these devices. *See* Letter from Jacob Hutt, Plaintiffs'
Counsel, to Chor Thao, CDCR Office of Legal Affairs, Defendants' Continued Failure to Provide
Tablet Accessibility Training (Dec. 20, 2023). Particularly for elderly class members who do not

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

have experience with current electronic technologies and people who have not been able to keep
up with technological advances as a result of their incarceration, it is critical that Defendants
provide patient, one-on-one training.

### G. Auditing

The Court Expert repeatedly has found that a necessary but lacking component of an
announcement system at SATF is robust auditing. *See* Dkt. 3446 at 42; Dkt. 3467 at 2 (Court
adopting Court Expert's undisputed findings); Dkt. 3500 at 12 n.9; Dkt. 3529 at 7. In response,
Defendants have recycled references to the same monitoring systems—audits by the Office of
Audits and Court Compliance, surveys administered by Field Training Sergeants (FTS), monthly
Captain's meetings with deaf signers, and Health Care Access Unit audits, for example—that thus
far have proven insufficient to identify and correct widespread and persistent failures to
effectively communicate announcements to deaf and hard-of-hearing people who cannot
understand announcements made over the public address system. The result is monitoring that
does little more than respond to concerns that deaf and hard-of-hearing people do not receive
announcements "by stating that staff will ensure they receive announcements." Dkt. 3446 at 42.

A robust auditing system will address each of following factors of an announcement:

**Timeliness:** The announcement system must record sufficient information about
announcements in order to audit the timeliness of both (a) the non-auditory <u>notification</u> of
the announcement and (b) the non-auditory transmission of the <u>content</u> of the
announcement. The audit must verify whether both were received by class members
contemporaneously with or immediately following the corresponding auditory
announcement.

**Accessibility:** Audits must capture whether the notification and content of an
announcement were transmitted by staff in a manner—i.e. through visual alert and
vibration—that actually alerted deaf and hard-of-hearing people to the announcement.

**Accuracy and Completeness:** Audits must assess whether the information
communicated about each announcement was accurate in comparison to content
communicated in a corresponding auditory announcement. Audits must also assess
whether certain announcements are not being transmitted to deaf and hard-of-hearing
class members at all. Specifically, regarding group announcements, audits must determine
whether the complete set of group (unit- or facility-wide) announcements that are
communicated out loud are also communicated in a non-auditory manner to deaf and
hard-of-hearing class members. Regarding individual announcements, audits must verify
that when staff receive notice of something that requires them to make an announcement
to a deaf or hard-of-hearing class member (e.g. housing unit staff receive a call from the

Page 13

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

clinic that healthcare staff are ready for a specific class member to report to the clinic),
that staff do, in fact, proceed to make an accessible announcement to that class member.

Defendants' auditing mechanism cannot rely on deaf and hard-of-hearing people to report
announcements they may have neither heard nor understood. Several of Defendants' current
monitoring mechanisms are incomplete because they involve interviewing deaf and hard-of-
hearing people about whether they receive announcements.

Finally, a robust auditing mechanism must be coupled with a robust self-correction
mechanism, as the Court has explicitly recognized. *See* Dkt. 3538 at 5 (asking Defendants to
propose, as one option, "how CDCR will take corrective action when officers are found to fail to
communicate" announcements). Leadership at SATF, however, has not historically taken action
to correct identified problems, whether a problem was identified by Defendants' own audits, by
the Court Expert, or by Plaintiffs' counsel. *See, e.g.*, Dkt. 3459, Plaintiffs' Response to Court
Expert's First Report at 26-27 (Defendants "ignoring findings that even when SATF has been
aware of the issue, it has not been able to develop a durable solution"); Dkt. 3510-1, Declaration
of Rita Lomio ¶ 38.

## III.    Defendants' Proposal Does Not Include the Necessary Components of a Non-Auditory System for Communicating Announcements

Defendants' proposal, as set forth in the draft memorandum entitled, "Implementation of
Public Address Announcements Via ViaPath Technology Tablets" (hereinafter "the Draft
Memo"), fails to include any of the necessary components of a functioning announcement system
discussed above.

Defendants' proposal is virtually identical to a draft memorandum that Defendants sent to
Plaintiffs four months ago. Plaintiffs previously explained why the proposal is inadequate and
submitted specific questions, which Defendants did not respond to. **We attach those questions as
Appendix A and ask that Defendants be prepared to answer them at the parties' meet and
confer scheduled for March 28, 2024.** We briefly summarize below why Defendants' tablet-
based proposal is inadequate.

### A.    Defendants' proposal does not contain any system for providing real-time notification of announcements.

The Draft Memo does not address real-time notification that an announcement has been
made. Instead, it provides in relevant part that a housing unit supervisor will send a notice of a
schedule of events to incarcerated people twice a day; that when events are modified, supervisors
will send amended notices before the event when possible; and that DPH class members will be
"advised of . . . how to locate the notices on their tablet."

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

This does not constitute real-time notification that an announcement has been made. Even if an announcement message became available on a user's ViaPath tablet at the same time that staff made the announcement audibly, if a deaf or hard-of-hearing person is not alerted to the fact that there is an announcement to check on their tablet, they will not know that it is there. The Draft Memo does not explain how a deaf or hard-of-hearing person who is watching television, reading a book, writing a letter, or doing any other activity and is not constantly monitoring the notice application of their tablet would know that an announcement was made. And while deaf and hard-of-hearing people may be advised to check their tablets twice daily (at the beginning of programming watches), there is no mechanism to alert them to commonplace schedule changes announced at other times.

To Plaintiffs' counsel's knowledge, the current ViaPath tablets are not capable of sending such alerts at all, let alone non-auditory, tactile or visual alerts, to individuals not already operating their tablets (in other words, accessible push notifications). Representatives from CDCR's Enterprise Information Services informed the parties at the October 17, 2023 meeting of the Deaf/Hard-of-Hearing workgroup that tablet users cannot be alerted to incoming announcements if not already using their tablets. In the words of one deaf tablet user incarcerated at SVSP, "[Y]ou would have to be constantly checking your tablet for appointments but the tablet you can't hear when you have incoming message[s]."

The extent to which the ViaPath tablets can provide notification of new announcements to individuals already using their tablets is unclear. We understand that in order to view an announcement on the ViaPath tablets, the user is responsible for proactively logging out of any application that they are currently using, logging back into the tablet, and opening the tablet's notice application to see whether there are any new announcements. Defendants have represented in the Deaf/Hard-of-Hearing workgroup that the addition of new announcements to the tablet's notice application will trigger a "hard stop" requiring class members to acknowledge the notice before they continue to use the tablet. This information, however, does not appear in the Draft Memo. Plaintiffs' counsel requested but never received a demonstration of this feature. Such a feature is critical, as explained by a hard-of-hearing user incarcerated at MCSP, who noted, "[W]here announcements are made on the tablets is a place where I or many of us don't go to, so if not alerted we would miss our announcements."

In summary, the current ViaPath tablets, by storing announcements in an application without sending a real-time, tactile and visual alert to the user that a new announcement is available in that application, therefore do not appear to be a viable method of providing real-time notification of announcements.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

**B. Defendants' proposal does not contain any system for the timely communication of the content of announcements.**

Defendants' proposal does not include any requirement that staff timely communicate the content of individual or group auditory announcements to deaf and hard-of-hearing class members in a non-auditory manner. Although the Draft Memo reports that the ViaPath tablets can send "individual" messages to the user, the Memo would require communication only of a schedule of activities, and provides as examples only a handful of scheduled activities that are unit- and facility-wide. *See also* Attachment B to the Draft Memo, Schedule of Events (example schedule for "Facility D-Second Watch" at LAC).

This is plainly inadequate. CDCR staff must effectively communicate the announcements themselves, not simply a schedule of when activities—and corresponding announcements—are expected to occur. There are a number of reasons for this. First, there are innumerable individual and group announcements throughout the day whose content has nothing to do with a planned schedule. From an announcement such as "Jones, report to the podium," to a yard-wide announcement about an unexpected occurrence at the prison, many announcements are simply unrelated to scheduled events.

Furthermore, for the subset of announcements that are related to unit- or facility-wide scheduled events, these events may occur at different times from what was anticipated in a schedule, meaning that announcements will occur at different times from what was stated in the schedule. Defendants' only attempt to address this extremely common scenario is a single line in the Draft Memo: "In the event the schedule has been modified, the assigned housing unit supervisor shall ensure an amended notice is sent to the incarcerated population before the event when possible." This ignores the reality of prison life. There are constant changes to scheduled activities in all types of prison programs, services, and activities, which a housing unit supervisor cannot be expected to know in advance. *See, e.g.*, Dkt. 3532-2 at 8 ("At the time of our tour, there were vacancies in canteen staff, [] so that program was not running consistently on any yard, as canteen staff were moving around the yards without a preset schedule."). Sending an "amended notice" will capture only the limited subset of scheduled activities that are modified well in advance of the scheduled time, but would omit last-minute changes to scheduled events. And even for scheduled events whose times have not changed, under Defendants' proposal, deaf and hard-of-hearing class members will still miss out on the array of event reminders that are announced at the time of the event itself. In other words, Defendants' proposal is not a replacement for audible announcements; it is closer to an electronic bulletin board.

Finally, Defendants' proposal leaves untouched announcements regarding scheduled encounters for an individual's appointments (including one-on-one appoinements and groups, such as education or mental health groups). The status quo for these appointments is issuance of

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

ducats, which Defendants describe as part of their system for non-auditory announcements.[7] The use of ducats is similar to the use of the ViaPath tablets that Defendants propose—ducats also are a written system to communicate the schedule of a program in advance, usually only once (individuals do not typically receive more than one ducat for the same upcoming event).

But the ducating system has existed for years and has not resulted in effective communication of appointments for incarcerated people. Deaf and hard-of-hearing people report that in many cases, the time listed on a ducat does not reflect the actual time of the ducated event. This concern is confirmed by CDCR and CCHCS's own audits and Plaintiffs' counsel's interviews with medical schedulers.[8] Last November, a medical scheduler at SATF, who is responsible for scheduling nursing line appointments in response to patients' CDCR 7362s, reported that when she schedules a nursing line appointment a day or more in advance so that a patient receives a ducat, the "RN line is not consistent with the time we schedule it" in practice. And Plaintiffs' counsel repeatedly learns that staff fail to effectively announce changes to the times listed on class members' ducats, causing class members to miss appointments or show up late when an appointment is moved up earlier, or wait for lengthy periods of time if the appointment is late. Deaf and hard-of-hearing people also report that ducats sometimes are not issued at all. And in fact, the same medical scheduler at SATF described above reported that she often tries to schedule people to be seen on the nursing line same-day, such that they would not receive a ducat.

### C. Defendants' proposal relies on a single technology–the ViaPath tablet–that has well-documented limitations and is not always available to deaf and hard-of-hearing people.

Defendants' proposal is not multimodal—that is, it does not contain multiple technologies that can back each other up in case one technology experiences disruptions. Instead, it relies on a single technology—the ViaPath tablet—whose functionality is known to be volatile.[9] Many deaf

---

[7] *See* Dkt. 3504 at 10 (Defendants' report to the Court that they would "continue to issue ducats to incarcerated persons for medical appointments, due-process events, visiting, and other events," as part of efforts to "develop methods to reliably communicate announcements to deaf and hard-of-hearing class members").

[8] Plaintiffs' counsel previously briefed this issue and provided supporting documentation. *See, e.g.*, Dkt. 3510, Plaintiffs' Response to Court Expert's Second Report at 11-12 ("The ducating system also relates to only a small subset of announcements, and even then is inadequate because, as the Health Care Access Unit's audit last year showed, appointment times can change, and patients at SATF can be called to the medical clinic over an hour before their scheduled (ducated) appointment times.").

[9] *See, e.g.*, Letter from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, ▮▮▮▮▮▮▮▮▮▮▮ DPH (SLI), CCCMS, SQ at 1 (Oct. 13, 2023) ("When I visited him in segregation yesterday, his tablet was not operational and housing officers told me

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

and hard-of-hearing class members are concerned that poor connectivity between the tablets and
Defendants' network, frequent and random instances of the tablets suddenly logging users out,
inaccessibility for people who are blind, have low vision, or have other disabilities, and other
issues would result in poor communication of announcements in a tablet-based solution. Distinct
from functionality concerns, class members also sometimes experience long wait times for tablet
issuance or repair.[10] And beyond technological limitations, CDCR's own limitations on how and
where class members can take their tablets would undermine the use of this technology as an
accommodation for announcements.

### D. Defendants' proposal appears in part to exclude DNH class members.

With respect to the scope of Defendants' announcements proposal, the Draft Memo
appears to limit accommodations to DPH class members. We recognize that the Draft Memo's
tablet-based proposal would apply to the incarcerated population "regardless of inclusion in the
Disability Placement Program." But Defendants state elsewhere in the Draft Memo that (a) staff
are required to ensure effective communication of announcements to DPH class members
(omitting reference to DNH class members) and (b) ADA staff are required to ensure only that
"each DPH class member is advised of this new process."[11] For the reasons discussed above,
Defendants' announcement system must accommodate both DPH <u>and</u> DNH class members, and
both categories of class members must be trained on the system.

### E. Defendants' proposal does not include a robust training or auditing system for announcements.

Defendants' proposal does not contain any proposal for how Defendants will meaningfully
train or audit staff on a comprehensive announcement system. Even with respect to the narrow,
tablet-based proposal, moreover, the auditing that Defendants propose is inadequate. For

---

that tablets regularly do not work in that unit."); Dkt. 3532-2 at 12 n.2 ("The tablet has limited in-
screen magnification, but Plaintiffs' counsel have reported concerns with the functionality of text-
to-speech software with tablet applications.").

[10] Plaintiffs' counsel previously described, for example, a deaf non-signer who had been waiting
to receive a tablet for eight months. Similarly, a hard-of-hearing class member was issued a
grievance response regarding their tablet reporting that "The representative for Via Path at KVSP
relayed the following information, 'Due to low inventories of the Tablets, in addition to logistics
issues with China, the issuance of tablets has been dramatically delayed,'" and that "CDCR has
no jurisdiction over Tablet issues."

[11] Plaintiffs' counsel is in receipt of Defendants' Attachment C, CDCR 128B, titled "Advisement
of Tablet Notifications for DPH Chrono." We have not yet provided proposed revisions to the
form, as we believe it may largely need to be rewritten based on the outcomes of the parties'
discsussions.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

example, Defendants propose that a supervisor audit the tablet-based system "to ensure the
notices were sent at the start of each second and third watch shift during the precedent month,"
but not whether changes to the schedule were timely communicated. (Plaintiffs raised this point to
Defendants four months ago in response to a previous, nearly identical draft of this proposal.)
And the Draft Memo does not propose any auditing of the tablet devices themselves to make sure
that they are in working order.

<div align="center">*****</div>

In sum, Defendants have proposed no alternative, auditable method of effectively
communicating individual or group announcements.

## IV.     Recommendations

As discussed above, Defendants' proposal to send a twice-daily notice of scheduled
activities to incarcerated people does not include any of the necessary components of a
functioning announcement system for deaf and hard-of-hearing class members.[12] Below we
provide recommendations for how Defendants can build a functioning announcement system for
deaf and hard-of-hearing class members, based on the principles outlined above.

### A. Individual Accommodations

#### 1.   Visual and Tactile Notification Devices (Pagers)

Defendants should utilize a visual and tactile notification device, such as a watch pager, to
alert deaf and hard-of-hearing class members of announcements in real time and to send the text
(content) of announcements themselves. The watch pager is worn on the user's wrist and receives
both visual and tactile real-time notifications of announcements. Pictured below is the MMCall
watch pager.

---

[12] We note that a revised proposal could include tablets as a *supplement* to the use of the
technologies discussed below, if the tablets could receive real-time, accessible alerts and text-
based messages of individual and group announcements. Defendants are currently developing a
bid proposal for a new tablet contract, which could include a requirement that the next tablets
include these capabilities. But the utility of the ViaPath tablets for non-auditory individual
announcements is limited by the reality that deaf and hard-of-hearing people are not always in
contact with their tablets; the limitations on where individuals can take their tablets; and the well-
known connectivity problems with the tablets that would render them unreliable. A tablet-based
system for communicating individual announcements therefore should not be the sole method for
providing these announcements, but could be one part of a functioning system.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)



Another option is the standard pager, which performs the same functions as the watch pager but is
clipped onto the user's clothing. Pictured below is the Spok Standard Pager T5.[13]



In both of these options, staff have the ability to send real-time, non-auditory notifications of
announcements and the contents of announcements themselves to the users' devices simply by
typing a message through a computer or by pressing a button containing a pre-set message. *See*
Michigan Department of Corrections, Policy Directive Re: Deaf and/or Hard of Hearing

---

[13] Plaintiffs' counsel previously suggested that Defendants employ pagers, including the Spok, to
communicate announcements to deaf and hard-of-hearing people. In July 2022, Defendants
reported in the Deaf/Hard-of-Hearing workgroup that after preliminary conversations with Spok
and the Michigan corrections system, the directorate had determined that CDCR would not
pursue pagers because they would require additional staffing and development of technological
infrastructure, and would not fully replace face-to-face announcements. Defendants instead
reported that they would continue to improve announcements via existing resources, such as
ADA workers. The Court has since ordered Defendants to develop an auditable alternative to
ADA workers and other existing resources. *See* Dkt. 3538 at 5.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

Prisoners, No. 04.06.156 at 1, May 1, 2021 (detailing how the Department's pager system
"allow[s] staff to send messages to a pager(s) through their computer").

Pager technologies have become increasingly common in correctional settings for deaf and
hard-of-hearing residents. For example:

- **Colorado**: Per court-enforceable settlement in *Disability Law Colorado v. Colorado
  Department of Corrections (CDOC)*, CDOC is required to provide "MMCall [a vibrating
  pager device] or substantially similar technology (including similar length and intensity of
  vibration upon receipt of a notification)" to provide real-time notification of
  announcements. Dkt. 74, Order Approving Joint Motion to Dismiss and Request to Retain
  Jurisdiction to Enforcement Settlement Agreement, Exhibit 1 at 12.

- **Illinois:** In response to a court-approved settlement agreement, the Illinois Department of
  Corrections has installed a tactile notification system statewide for deaf and hard-of-
  hearing residents, in which residents wear a watch that vibrates when it is receiving an
  announcement. *See Holmes v. Jeffreys*, Dkt. 743, Defendant's Status Report to the Court at
  11; *Holmes v. Baldwin*, Stipulation of Settlement at 27. Illinois's corresponding operating
  policy requires that the prison system "best ensure timely notification" of announcements
  for deaf and hard-of-hearing residents. *See* Illinois Department of Corrections,
  Administrative Directive: ADA Accommodations, No. 04.01.111, Effective Date June 1,
  2023.

- **Kentucky:** Under court-approved settlement, the Kentucky Department of Corrections
  (KDOC) was required to provide notification of announcements to deaf incarcerated
  people "in real time." *See Adams & Knights v. Kentucky Department of Corrections*, Dkt.
  81-1, Settlement Agreement at 13, June 24, 2015. Consistent with this requirement, the
  *Adams & Knights* settlement monitor reported that KDOC had made pagers available to
  incarcerated people. *See* Ninth Semi-Annual Report by the Settlement Monitor at 8 (Dec.
  16, 2020).

- **Maryland:** Under settlement agreement, the Maryland correctional department was
  required to provide "functional personal pagers" that "include visual as well as vibrating
  functions" to alert deaf residents to announcements. *See Jarboe v. Maryland Department
  of Public Safety and Correctional Services*, Settlement Agreement at 22 (Feb. 20, 2015).

- **Massachusetts:** The court-approved settlement in *Briggs v. Massachusetts Department of
  Corrections (MDOC)* requires MDOC to alert deaf and hard-of-hearing residents of events
  "in real time." Dkt. 199-2, Settlement Agreement at 48. Consistent with this requirement,
  the *Briggs* settlement monitor reported that MDOC had distributed pagers to incarcerated
  people for alert of notices. *See* Fifth Report of the Settlement Monitor at 143 (Jan. 26,
  2023).

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

- **Michigan:** Under court-approved settlement, the Michigan Department of Corrections (MDOC) was required to notify deaf and hard-of-hearing incarcerated people of announcements "in real time." *McBride v. Michigan Department of Corrections*, Dkt. 118-2, Settlement Agreement at 20. To comply with this requirement, MDOC has implemented a Page Alert Broadcast System, in which deaf and hard-of-hearing residents are issued pagers that provide alerts of announcements. *See* Michigan Department of Corrections, Policy Directive Re: Deaf and/or Hard of Hearing Prisoners, No. 04.06.156 (May 1, 2021).

There are numerous benefits—both for residents and for correctional facilities—of implementing a pager technology. For deaf and hard-of-hearing residents, a pager technology is likely to successfully alert the resident that an announcement is occurring due to the technology's visual and tactile components. Because this technology—unlike tablets or flashing lights—is worn by the user, the risk of a missed real-time notification is significantly less likely. Relatedly, pager technology can be effective in conveying a real-time notification of an announcement regardless of the user's location, including if the user is outside on the yard. For correctional facilities, pager technology has the benefit of being easily auditable through the automatic creation of logs, as discussed in greater detail below.

Furthermore, pagers are not limited to providing real-time notification of individual announcements. For common, relatively short announcements–such as "Jones, report to podium for medical"—they can also timely communicate the content of these announcements. *See, e.g.*, User Manual for MMCall Watch Pager (on file with Plaintiffs' counsel and available here). This benefit makes pagers superior to flashing lights for many deaf and hard-of-hearing people. That is, by simultaneously conveying both a real-time notification and the content of an announcement, a pager—unlike a flashing light—allows a deaf or hard-of-hearing user to determine, without delay, whether the announcement was meant for them (as opposed to another incarcerated person).

Finally, consistent with the need for redundant systems in the event that technologies break down, Plaintiffs recommend that Defendants require that when an individual's pager is not working, this information be promptly logged and addressed, and staff provide face-to-face notification in the meantime. Staff should log that they have provided these backup methods of notification in the unit logbook.

## 2. Personal Alert Devices (Vibrating Watches and Pillow-/Bed-Shaker Alarms)

Plaintiffs recommend that Defendants provide vibrating watches and other personal alert devices in addition to pager technology to class members to increase their independence— something other prison systems do as a matter of course, and that CDCR told the Court last year

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

that they would do.[14] Scheduled individual and unit- or facility-wide events are announced orally over the public address system, which provides reminders to hearing people as well as announcing programs themselves. Deaf and hard-of-hearing people who cannot understand auditory announcements do not benefit from these event reminders and so frequently miss the events. These personal alert devices thus serve a separate purpose from pagers, and for this reason, correctional systems have been required to implement both technologies. *See, e.g.*, *Briggs v. Massachusetts*, Fourth Report of the Settlement Monitor at 52-53 (reporting Massachusetts correctional department's compliance under Settlement Agreement with implementing both vibrating watches and pager-receivers).

Defendants also should make pillow- or bed-shaker alarms available to deaf and hard-of-hearing people, which are common in other prison systems. *See, e.g.*, *Adams & Knights v. Kentucky Department of Corrections*, Dkt. 99, Ninth Semi-Annual Report by Settlement Monitor at 8 (bed shakers and vibrating alarm clocks available at all Kentucky prisons); *Heyer v. U.S. Board of Prisons*, Dkt. 181-1, Partial Settlement Agreement at 8-9 (bed-shaking device, pillow- or bed-shaking alarm). These non-auditory alarms have a vibrating component that can be placed under the user's pillow, which typically provides stronger vibration than a vibrating watch. They are also superior to a system in which another incarcerated person or staff touches a deaf or hard-of-hearing person to wake them, given the traumatic and violent experiences of many people in prison. Pictured below are the DEAFWORKS Futuristic 2 Alarm Clock, which can provide non-auditory visual and tactile alarms, and the Sonic Alert Super Shaker Bed Shaker.

_____

[14] *See, e.g.*, *Armstrong*, Dkt. 3510 at 12 (Plaintiffs' report to the Court that "other state prison systems, including Florida and Massachusetts, appear to provide vibrating watches"); *Holmes v. Jeffreys*, Dkt. 592, Defendant's Status Report to the Court at 4 (over 2300 total watches with vibrating alarms issued to deaf and hard-of-hearing people in Illinois prisons); *id.*, Dkt. 623, Defendant's Status Report to the Court at 2 (tactile watches with 12 alarm options offered to every *Holmes* class member); *see also Armstrong*, Dkt. 3515-1 ¶ 12 (pending security testing of a specific model, "Defendants will provide the vibrating watches as a reasonable accommodation" to deaf and hard-of-hearing people statewide). Plaintiffs understand that some vibrating watches also have tactile or braille displays making them more accessible to deaf and hard-of-hearing people who are also blind or have low vision.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)



### 3. Individualized Assessments

Defendants should incorporate an evaluation of the need for these individual accommodations into the existing process for identifying DPH and DNH class members' methods of communication. *See* CDCR Memorandum, Revised Equally Effective Communication Policy at 3 (Aug. 24, 2023). In practice, we recommend that the interview that occurs within 14 days of an individual's assignment of a DPH or DNH code, or upon arrival to the institution if not previously done, include an evaluation of whether and to what extent the class member requires use of the announcement technologies discussed above. Defendants should issue these technologies or otherwise make them available to an individual when they would reasonably accommodate the individual's hearing disability. Reasonable Accommodation Panels should also be permitted to issue these accommodations on a case-by-case basis, regardless of whether the requestor has a DPP code, and including as an interim accommodation pending a healthcare appointment (such as an audiology appointment) to verify a disability. Finally, Defendants should ensure that this assessment of all deaf and hard-of-hearing class members for announcement accommodations is not only prospective but occurs for people who are already in custody, similar to Defendants' retroactive, individualized assessments of all SATF DPV class members for visual accommodations.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

## B. Congregate Accommodations

### 1. Visual Displays

Plaintiffs recommend that Defendants implement a system of video display boards to timely communicate the content of announcements to deaf and hard-of-hearing class members. Defendants must adopt these video displays in addition to pagers in order to accommodate the needs of individual class members and to avoid disruptions in effective communication when other technologies, like the pagers, experience disruptions.

Accessible and properly-maintained display systems in common spaces could provide complete information for most, if not all, individual and group announcements. Defendants could, for example, install video monitors to display information about an announcement in text, sign language, or images. These larger displays would provide complete information about announcements that are too long to fit on the display of a personal, portable device like a pager. We provide an example of such a display below:



Private service providers and state agencies frequently make use of similar video or electronic displays placed in congregate settings.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)



**Image:** Electronic notification display at San Francisco International Airport listing the time and
information related to individuals and full flights.



**Image:** Large television displays at the Sonoma County Department of Motor Vehicles

We recommend that Defendants work with an accessibility and design expert to develop a similar
video display system to the examples above from other government agencies and corporations.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

These displays should be installed in all housing units, in locations that are visible from every cell or dormitory, and in other congregate programming settings.

Defendants must implement these common-area display systems in addition to pager technologies to ensure that the announcement system has built-in redundancies, as discussed above. If an individual's pager is temporarily not working, for example, they can rely in part on a video display board to determine what an announcement states. Making these technologies available also will serve to accommodate hard-of-hearing class members who may not need to be notified of an announcement with a pager or other tactile or visual alert, but who will need a visual display to understand an announcement's content.

## 2.  Upgrade P.A. Announcement System

Defendants should address well-documented issues with their current public-address announcement system. First, Defendants must conduct an evaluation of the quality of current public-address equipment, including evaluating whether the equipment is in need of repair, replacement, or upgrade to ensure announcements are made with sufficient clarity and volume. Based on that evaluation, Defendants must repair or purchase new P.A. equipment as necessary. Second, Defendants must conduct an evaluation of the positioning of P.A. equipment in housing units to determine whether there are areas of the housing units in which it is especially difficult to hear announcements, and correct the positioning of the equipment, or add additional speakers.

## 3.  Emergency Alarms – Colored Lights

Defendants must ensure that visual alarms for emergencies are operational in every area of an institution where deaf and hard-of-hearing people are allowed. Because activation of an alarm requires immediate action, alarms must be communicated immediately to all individuals in the affected area and adjacent areas (so that an individual who cannot hear an audible alarm does not try to leave a dayroom if an alarm is in progress on the yard, for example). Incarcerated people must have a clear line of sight to any visual alarms for all cells, dormitories, and common areas in their respective facilities. *See, e.g.*, *Briggs v. Massachusetts*, Dkt. 368, Order After a Bench Trial at 14 (noting the recommendation of Massachusetts Commission for the Deaf and Hard-of-Hearing that the prison system provide "visual alarms in cells, showers, and the common areas in their respective facilities"). And given the urgency of alarms, they must be communicated on a dedicated technology, such that a deaf or hard-of-hearing person who receives a notification on that technology immediately understands that an alarm is in progress.

Defendants have installed but are not yet using different colored lights in certain housing units that could provide one part of a system for visual alarms. Each color could signify the status of a given alarm—for example, red might signify an alarm in the building; yellow, an alarm immediately outside on the yard; and green, that the alarm was cleared.

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)



**Image:** Three vertically stacked colored lights (red, yellow, and green) in Alpine at San Quentin,
located above posted notices and a drop box for medical grievances

Other visual alarm technologies might include strobe lights, or pulsating lights that emit "visually
loud" light when activated.

Critically, whatever visual alarm technology Defendants choose, it must be immediately
linked to the corresponding audible alarm, so that activating the visual alarm requires no
additional action by staff, and risks no delay between the audible alarm and its accessible
alternative. In other words, when staff activate their personal alarm device, it must automatically
trigger a visual as well as an audible alarm. We recommend further that Defendants communicate
alarms on visual and tactile notification devices, such as pagers, as well, both to ensure
redundancies in the announcement system and to accommodate class members who have both
vision and hearing disabilities. *See Armstrong* DPP Roster (Mar. 1, 2024) (44 class members who
are both deaf or hard-of-hearing <u>and</u> have a severe vision disability).

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

## C. Training

Plaintiffs recommend that Defendants develop a robust, interactive training plan for both staff and incarcerated people on how to use existing and new announcement technologies. Specifically:

1. Defendants should train staff on the effective use of the P.A. system, including regarding voice tone, positioning, and speed.

2. Defendants should develop and implement a plan to train designated staff on:

    a. How to use the pager, video display, public address, and alarm technologies discussed above.

    b. When to use these technologies.

    c. What to do when these technologies do not work.

3. Defendants should develop and implement a plan to train deaf and hard-of-hearing incarcerated people on how to use new announcement technologies. This plan must be interactive, it must allow participants to request and receive follow-up training, and it must include a mechanism to verify that the participant understands how to use the technologies.

4. Defendants should develop policy to ensure that all training materials are updated promptly when announcement technologies are modified in a material way.

## D. Auditing

Defendants must develop a comprehensive system for auditing and correcting issues with announcements for deaf and hard-of-hearing class members. Based on the foregoing, Plaintiffs recommend that Defendants implement the following systems, at a minimum, to audit the announcement technologies discussed in this comment:

### 1. Timeliness

As discussed above, Defendants must implement pager and congregate visual display technologies. Timeliness audits of staff using these technologies must determine whether non-auditory notifications and content of announcements were sent at the same time as, or very near in time to, corresponding auditory announcements. It is relatively easy to track the timing of many non-auditory announcements due to developments in technology: Current pager technologies, for example, can automatically store a record of all transmitted messages, including the timestamp. *See* MMCall, "Prison Pagers Deaf & Hard of Hearing" (last visited Mar. 20, 2024) ("Records of all messages sent can be downloaded from the software as a CSV or HTML file at any time."). **Plaintiffs wish to discuss with Defendants at the March 28, 2024, meet and confer how**

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

**Defendants can create an auditable record of when corresponding auditory announcements
are made, in a manner that is not unduly burdensome on staff.**

### 2. Accessibility

Defendants must audit whether announcements transmitted by the technologies
recommended above were, in fact, sent in a manner that would alert the deaf or hard-of-hearing
user of an announcement. This will primarily involve, at a regular period, (a) maintenance testing
the visual and tactile alert features of deaf and hard-of-hearing class members' devices, and (b)
network and/or connectivity testing of the technologies to ensure that they can receive alerts and
messages.

Should maintenance and connectivity testing reveal that use of a specific technology for an
individual or group is not feasible pending repairs, that information also should be documented,
and the affected class members should be provided alternative accommodations. To ensure that
the alternative is audited equally with the primary, the timeliness, content, and manner of all
announcements communicated using that alternative should be recorded, as described above.

### 3. Accuracy and Completeness

Supervisory staff must determine whether announcements communicated in an auditory
manner were also provided on a pager or visual display, and whether the content was
communicated accurately. Accuracy could be audited by, for example, reviewing a sample of
non-auditory announcements during a given period to determine whether the content of these
announcements were substantially similar to the typical content of corresponding auditory
announcements. Auditing for completeness could be performed by, for example, reviewing the
number of non-auditory announcements that a deaf or hard-of-hearing individual received over a
specific time period, such as one month. This number could be compared to an expected number
of individual announcements received by an incarcerated person during the same period to
determine whether there was an underutilization of the technology for transmitting non-auditory
announcements. *See, e.g.*, *Holmes v. Jeffreys*, Dkt. 743, Defendant's Status Report to the Court at
11 (discussing Illinois correctional department's policy of auditing whether staff were
"underutiliz[ing]" a non-auditory technology for announcements). **Plaintiffs wish to discuss with
Defendants at the March 28, 2024, meet and confer how Defendants can create an auditable
record of the content of auditory announcements to compare with electronically-tracked
non-auditory announcements, in a manner that is not unduly burdensome on staff.**

### 4. Correction

Finally, Defendants must implement a policy requiring leadership to regularly review the
results of audits, take prompt corrective action if certain minimum thresholds are not met, and
closely monitor the efficacy of that action. Defendants can draw on the experiences of other

Re: Plaintiffs' Response to Defendants' Proposal Regarding Effective Communication of
Announcements (SATF Stipulation Item 7)

correctional systems in developing this policy for corrective action. *See, e.g.*, *id.* at 12 (discussing Illinois correctional department's requirement that problems discovered in an audit "must include a justification or corrective action outlining how the identified issue will be corrected the following week. A report is then compiled and sent to the respective Deputy Director every two weeks where it is reviewed and ultimately reported to the Chief of Operations, IDOC Legal, and the Statewide ADA Compliance Officer. This practice began in early November 2021 and has resulted in marked increase in use of the system.").

Effective communication of certain announcements may be a joint responsibility of custody and healthcare staff, and policy should require that corrective action plans are developed in coordination with staff at the highest level in all impacted program areas (e.g., healthcare access, education). The ADA Coordinator and a headquarters' representative from the Class Action Management Unit also should participate in developing and monitoring any corrective action plan related to effective communication of announcements.

To protect class members from the adverse consequences resulting from failure to provide effective communication of announcements, all corrective action plans must include measures to mitigate harm for deaf and hard-of-hearing people. Mitigation could include, for example:

- Limitations on issuing RVRs to deaf and hard-of-hearing people for failure to respond to notices, and/or automatic review by ADA staff of each RVR issued to a deaf or hard-of-hearing person for failure to respond to notices;

- Additional audits by the SRN II team of missed appointments or refusals of care by deaf or hard-of-hearing patients, with efforts made to reschedule deaf and hard-of-hearing patients as soon as possible;

- Deployment of Compliance Sergeants/FTS to closely monitor communication of announcements in units housing deaf and hard-of-hearing people, to provide effective communication where regular housing unit officers did not, and to provide real-time feedback to those officers; or

- Scheduling specific times and days for deaf and hard-of-hearing people only to receive canteen, indigent envelopes, or laundry, at which time supervisory staff themselves provide personal notification at the time of the program.

Defendants' policy also should explain what will happen when an institution continues to perform poorly on audits after completion of a corrective action plan, including whether improvement (or lack thereof) on audits will be incorporated into performance evaluations for leadership.

# APPENDIX A

**Please provide an update on the following:**

(i)    The estimated timeline for entering into a new tablet contract.

(ii)    The status of drafting and reviewing local operating procedures regarding expanded access to videophones, captioned phones, and TTY/TDD, including during modified programming. **Please provide any finalized LOPs or interim institutional policies/memoranda in advance of the workgroup meeting.**

(iii)    The results of any monthly audits to date of videophone, captioned phone, and TTY/TDD sign-up logs by CAMU CCIIs, which Defendants reported in October would be added to their "top ten" to ensure that class members were meaningfully accessing these devices. **Please produce any available results of these audits in advance of the workgroup meeting.**

(iv)    An explanation how Defendants will make accessible video calls available to deaf people who do not know sign language and who require captioning.

5.    ==**Effective Communication of Announcements**==:

For years, Plaintiffs' counsel has raised concerns with effective communication of announcements to deaf and hard-of-hearing people. The topic has been on meet-and-confer and workgroup agenda for at least three years, without any discernible progress and without clear information from Defendants.

a.    **Draft Tablet Notification Memorandum**

Plaintiffs have reviewed the draft tablet notification memorandum produced by Defendants. This appears to be a very narrow policy that is not a complete solution to ensure and audit effective communication of announcements.

Please come prepared to discuss questions and concerns regarding that memorandum, including:

(i)    The draft memo states, "In the event the schedule has been modified, the unit supervisor, or designee, shall ensure an

amended notice is sent to the incarcerated population as soon as reasonably possible." How will the unit supervisor know that schedules have changed? Will the policy require that the notification go out *before* the scheduled event begins? How will staff ensure that class members see the amended notice on time? Will they get an alert or do they have to constantly monitor their email?

(ii)     Why does the memorandum provide for auditing only of the initial schedule of events at the start of each second and third watch shift, and not whether changes to the schedule were timely communicated? In our experience, including during our recent visit to SATF, the schedule often does not follow the planned schedule.

(iii)    Why does the memorandum only require education to the IAC, and not directly to class members? ("Wardens or designee shall communicate this information regarding available tablet notifications to the Inmate Advisory Council to ensure awareness to the incarcerated persons.")

(iv)    How will Defendants ensure that individual announcements, such as healthcare appointments (which people do not always receive a ducat for and, even when they do, are often called before or after the ducated time), which are not included in the tablet notification memorandum, will be effectively communicated to deaf and hard-of-hearing people? How will that be audited?

(v)     What are staffs' obligations to provide individual notification to people? Simply flashing the lights is not sufficient. The lights flash many times during the day and people are forced to inquire each time whether the flashing lights were meant for them – a disruptive and ineffective system. Have Defendants reconsidered whether and how to use the electronic scrollboards that they purchased years ago but never used? What capabilities for notification of announcements do the iPhones recently distributed to deaf class members have? Plaintiffs previously had recommended that Defendants use a pager system – can those phones provide a similar functionality?

(vi)    When will Defendants provide a demonstration of the "Notifications via ViaPath Technology Tablets" outlined in the draft

memorandum produced to Plaintiffs' Counsel on November 2, 2023, which we requested at the last workgroup meeting?

(vii)     In the last workgroup meeting, we requested details on what information regarding accessibility features and tablet notification system is provided to class members (especially DNH and DPH class members) who choose not to receive a tablet, before they reject the tablet. When will that be provided?

(viii)    In the last workgroup meeting, Defendants reported that people may not have their tablets at work assignments, medical appointments, and at dining halls. How will CDCR ensure effective communication of announcements made via tablets to those who do not have their tablets at those times? **Plaintiffs also request any written policy about where people may take their tablets.**

(ix)     What systems are in place to require institutions (or Headquarters) to request information from ViaPath regarding what types of trouble tickets ViaPath is receiving from class members and whether and how often those technological issues are interfering with effective notification of announcements? We are particularly concerned about wifi connectivity, particularly in segregated housing, although people report connectivity concerns in all types of housing units. We requested this information at the last workgroup meeting.

b.     **FTS Audits**

At the last workgroup meeting, Defendants stated that FTS sergeants at the *Armstrong* Six institutions under court order would help audit non-tablet announcements to ensure they are being effectively communicated. How will they do so? Has that information been codified in an OP or memorandum? How will non-tablet notification of announcements be audited at other institutions that do not have ADA Sergeants? **In advance of the workgroup, please provide examples of the surveys conducted by FTS at each of the six institutions to ensure effective communication of announcements, which we requested at the last workgroup meeting.** Has any change in this policy been discussed following Plaintiffs' counsel's concerns voiced at the last workgroup meeting?

Exhibit 82



**Skye Lovett <skye@prisonlaw.com>**

---

## Armstrong v. Newsom, et al. - SATF Stipulation Item 7

---

**Jacob Hutt** <jacob@prisonlaw.com>                                      Fri, May 31, 2024 at 4:41 PM
To: Trace Maiorino <Trace.Maiorino@doj.ca.gov>, Ed Swanson <ed@smllp.law>
Cc: Audrey Barron <audrey@smllp.law>, Olena Likhachova <Olena.Likhachova@doj.ca.gov>, Skye Lovett <skye@prisonlaw.com>, Rita Lomio <rlomio@prisonlaw.com>, Marissa Hatton <mhatton@prisonlaw.com>, Caroline Jackson <CJackson@rbgg.com>, "Gay C. Grunfeld" <GGrunfeld@rbgg.com>, "Ferguson, Patricia@CDCR" <Patricia.Ferguson@cdcr.ca.gov>, "Davis, Tamiya@CDCR" <Tamiya.Davis@cdcr.ca.gov>, "Ruiz, Ramon@CDCR" <ramon.ruiz@cdcr.ca.gov>, "Lau-Silveira, Ava" <Ava.Lau-Silveira@cdcr.ca.gov>, "Lorey, Dawn@CDCR" <Dawn.Lorey@cdcr.ca.gov>, "White, Lourdes@CDCR" <Lourdes.White@cdcr.ca.gov>, "Davis, Kristina@CDCR" <Kristina.Davis@cdcr.ca.gov>, "Mebane, Darnell@CDCR" <Darnell.Mebane@cdcr.ca.gov>, Sharon Garske <Sharon.Garske@doj.ca.gov>, Anne Kammer <Anne.Kammer@doj.ca.gov>, Armstrong Team <armplo@prisonlaw.com>, CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>, Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>

Dear Trace and Ed,

Attached please find Plaintiffs' summary of the parties' disagreements regarding effective communication of announcements (SATF Stipulation #7).

As discussed in the letter, given that Defendants did not substantially modify their March 6th proposal following Plaintiffs' detailed objections to this proposal, it is clear to Plaintiffs that the parties "are not able to reach agreement regarding the proposal." Dkt. 3538 at 5. Unless Defendants will modify their proposal in the manner outlined below by June 21, 2024, we ask that the Court Expert timely make a determination that the parties cannot reach agreement and that the parties begin drafting a joint statement of disputes to the Court.

We have not redlined Defendants' draft policy. We reiterate the position we expressed in our April 3, 2024, email that it would not be a productive use of time to redline a fundamentally inadequate draft policy. Our March 20th comments and the attached letter explain in detail what this draft policy is missing.

Finally, we request that Defendants submit to Plaintiffs no later than June 21, 2024, any and all responses received to CDCR's survey regarding technological solutions for providing effective communication of announcements used in other correctional jurisdictions.

Thank you,
Jacob
[Quoted text hidden]

---

📄 **24.05.31 Plaintiffs' Summary of Disagreements re SATF Stipulation Item 7.pdf**
249K



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter
Jerrod Thompson

VIA EMAIL ONLY

May 31, 2024

Trace Maiorino
Office of the Attorney General

Ed Swanson
*Armstrong* Court Expert

Re:     *Armstrong v. Newsom*: Plaintiffs' Summary of Parties' Disagreements Regarding Effective
Communication of Announcements (SATF Stipulation #7)

Dear Mr. Maiorino and Mr. Swanson:

We write in response to CDCR's updated proposal for effective communication of
announcements, pursuant to SATF Stipulation #7. As background, CDCR produced an initial
proposal on March 6, 2024, Plaintiffs submitted comments on March 20, the parties met to
discuss on March 28, CDCR produced an updated proposal on May 8, and the parties met to
discuss CDCR's updated proposal on May 9. The parties agreed that Plaintiffs would review
CDCR's updated proposal and summarize the parties' agreements and disagreements by May 31.

As discussed below, given that Defendants did not substantially modify their March 6th
proposal following Plaintiffs' detailed objections to this proposal, it is clear to Plaintiffs that the
parties "are not able to reach agreement regarding the proposal." Dkt. 3538 at 5. Unless
Defendants will modify their proposal in the manner outlined below by **June 21, 2024**, we ask
that the Court Expert timely make a determination that the parties cannot reach agreement and
that the parties begin drafting a joint statement of disputes to the Court.

Defendants' updated proposal splits accommodations for general announcements and
individual announcements into two different systems; per this updated proposal, staff or ADA
workers would transmit certain individual announcements via face-to-face notification to DPH
class members only. As a preliminary matter, we urge Defendants to depart from a proposal that
relies on face-to-face notifications and instead to adopt a multimodal, technology-based system
for effectively communicating both general and individual announcements to deaf and hard-of-
hearing class members, as we discussed in our March 20th comments. A technology-based
system will more likely transmit announcements effectively, it will require less additional work
from housing unit officers, and it will be easier for Defendants to audit. Still, in an effort to

1

provide a comprehensive summary of the parties' disagreements based on Defendants' current proposal, we address Defendants' two proposed systems in two separate sections below.

## I.  Defendants' Updated Proposal for General Announcements Still Lacks the Necessary Components of an Effective Communication System

In the two months since producing their initial proposal on March 6, 2024 (which itself was materially almost identical to a draft policy that Defendants produced on November 2, 2023), Defendants have barely updated their proposal for how to effectively communicate general announcements to deaf and hard-of-hearing class members. Defendants' inaction is striking given Plaintiffs' extensive comments, dated March 20, 2024, that explained why Defendants' initial proposal was inadequate and how it should be updated. Below, we summarize why Defendants' proposal for general announcements still lacks the necessary features of a functioning system.

### A.  Defendants' Updated Proposal for General Announcements Still Lacks a Plan for Tactile and Visual Real-Time Notifications of These Announcements

Defendants' updated tablet-based proposal for general announcements still does not contain a method of providing real-time, tactile and visual notifications to deaf and hard-of-hearing class members. There are several specific deficiencies with Defendants' proposal related to real-time notifications. First, the draft policy contains no provision regarding tactile notifications of announcements, the need for which Plaintiffs discussed repeatedly in our March 20th comments. *See* Plaintiffs' Comments at 6, 11, 15, 19, 22 (Mar. 20, 2024) (hereinafter "Comments").

Second, the updated draft policy does not contain any reference to visual notifications. Defendants stated in separate written correspondence to Plaintiffs that an "alert will be displayed on the home screen of the tablet and will need to be acknowledge [sic] by the class member before the tablet's further use." Defendants' 5/8/2024 Answers to Plaintiffs' 11/20/2023 Questions re: Draft Tablet Notification Memorandum. But Defendants confirmed during the parties' May 9, 2024, meeting that these are not visual alerts that will pop up on the tablet user's screen akin to a push notification for a text message. They will be seen by the class member only if the class member has independently begun attempting to access their tablet.

Third, even if real-time tactile and visual notifications of announcements were sent via tablet, deaf and hard-of-hearing class members cannot be expected to constantly hold onto and monitor their tablets for notifications of these announcements throughout the day, as we explained at length in our comments. *See* Comments at 14-15.

Finally, we wish to address a hypothetical improvement to this updated proposal that the parties discussed at the May 9, 2024, meeting. The Court Expert inquired whether Defendants could address Plaintiffs' real-time notification concerns by requiring staff to flash housing-unit lights every time staff prepared to send a notice out on the tablets. This concept is purely hypothetical—it is not what Defendants proposed in their May 8th updated draft policy.

2

Regardless, we reiterate here that this would not address our concerns. As stated in our comments, "housing officers cannot flash lights in specific cells, and only can flash lights in the dayroom or other common areas, which can be easily missed if someone is reading or sleeping in a cell. The constant flashing of lights also can lose its meaning—it is hard for people to distinguish what is an announcement relevant to them. In addition, announcements are made throughout the prison—including in libraries and on the yard—where there are no lights to flash." *Id.* at 6.

> **ACTION REQUIRED:** Defendants must adopt an announcement system, preferably via multimodal technologies such as pager watches and unit-wide display screens, that immediately alerts deaf and hard-of-hearing class members through tactile and visual methods that an announcement is being made, as detailed in Plaintiffs' Comments.

### B. Defendants' Updated Proposal for General Announcements Still Lacks a Plan for Effective Communication Of All Categories of General Announcements

Defendants have made no material changes to the types of general announcements that the draft policy would cover. As with Defendants' March 6th proposal, their May 8th proposal does not outline any system for timely communicating actual announcements. Instead, as we explained previously, Defendants' proposal "would require communication only of a schedule of activities," rendering it "closer to an electronic bulletin board" than a system for effective communication of announcements. For a more detailed explanation of why this proposal is inadequate, please refer to pages 16-17 of Plaintiffs' March 20th comments.

> **ACTION REQUIRED:** Defendants must adopt a system, preferably via multimodal technologies, that effectively communicates all content of general announcements—not simply transmitting a twice-daily notice of scheduled activities—to individuals in a timely manner.

### C. Defendants' Updated Proposal Still Lacks a Plan for Accessible Alarms and Emergency Announcements

Plaintiffs' March 20th comments explained the need for a non-auditory alarm system for deaf and hard-of-hearing class members, *see* Comments at 7-8, and recommended that Defendants use colored lighting systems to signify the status of a given alarm. *See id.* at 27-28. Defendants' updated May 8th proposal contains no information on plans to implement any type of accessible alarms.

> **ACTION REQUIRED:** Defendants must adopt a system for accessible alarms and emergency announcents, such as different colored lights, which are immediately linked to corresponding audible alarms.

**D. Defendants' Updated Proposal for General Announcements Still Relies on a Single Technology—the ViaPath Tablet—That Has Well-Documented Limitations and Is Not Always Available to Deaf and Hard-of-Hearing Class Members**

Plaintiffs' March 20th comments explained the need for a multiple-technology announcement system, so that (1) Defendants can accommodate the range of disability needs among the deaf and hard-of-hearing population, and (2) Defendants can avoid disruptions in effective communication when one technology is not functioning properly. *See* Comments at 8-9. We explained how Defendants' proposal—by relying on a single, volatile technology, the ViaPath tablets—failed to plan for expected technological disruptions. *See id.* at 17-18.

Defendants' updated proposal for general announcements ignores this point entirely. It continues to rely solely on the ViaPath tablets for general announcements, which have well-documented limitations and are not available at all times and at all locations to deaf and hard-of-hearing class members. Furthermore, even if the extensive functionality problems with the ViaPath tablets were fully resolved and if Defendants permitted class members to keep possession of their tablets at all times and in all locations, Defendants' proposal would still lack a multimodal element with built-in redundancies. It is critical that Defendants implement a multiple-technology system—such as adding visual displays in congregate areas—so that even if a deaf or hard-of-hearing individual's pager watch or tablet is temporarily not working or not accessible to them, the individual can still effectively receive the content of announcements.

> **ACTION REQUIRED:** Defendants must implement a multiple-technology system for communicating general announcements, such as by combining pager watches, visual display boards, and personal alert devices, and by upgrading their P.A. system.

**E. Defendants' Updated Proposal for General Announcements Still Excludes DNH Class Members**

Plaintiffs' March 20th comments detailed at length how many DNH class members need and do not currently receive effective communication of announcements. *See* Comments at 9-11. We noted that while Defendants' tablet-based proposal would apply to the entire incarcerated population, DNH class members appeared to be excluded from the most fundamental aspects of the program, *see id.* at 18, and we recommended that Defendants conduct individualized assessments of all DPH <u>and</u> DNH class members within 14 days of an individual's assignment of their hearing code to determine whether and how each class member should receive effective communication of announcements.

Defendants' updated proposal for general announcements again excludes DNH class members without explanation. *See* Draft SATF Tablet Notification Policy at 3 (May 8, 2024) ("The ADA Coordinator or designee shall ensure each DPH class member is advised of this new process and how to locate the notices on their tablet.") (hereinafter "May 8th Proposal"). Not only do Defendants fail to ensure that DNH class members will be advised of how to locate notices of

scheduled activities on their tablets, but more fundamentally, they ignore Plaintiffs' recommendation that Defendants conduct individualized assessments of all deaf and hard-of-hearing class members, including individuals assigned a DNH code, to determine what announcement accommodations each person needs.

> **ACTION REQUIRED:** Ensure that DNH class members are included in Defendants' system for effectively communicating general announcements to deaf and hard-of-hearing class members, including by individually assessing the announcement accommodations needed by each class member.

### F. Defendants' Updated Proposal for General Announcements Still Lacks a Robust Training or Auditing System

Defendants' updated proposal inexplicably rejects all of the aspects of training that Plaintiffs recommended in our March 20th comments, and offers nothing in return beyond the addition of ViaPath instructions for how to type in a username and password. *See* Attachment C, SATF Tablet Notification Policy (May 8, 2024) ("How to Access GTL Command Center Tablet Website"). This is plainly inadequate for reasons we have already provided. For a detailed explanation of why Defendants must train both staff and incarcerated people on announcement technologies, please refer to pages 12-13 of Plaintiffs' March 20th comments, and for specific training recommendations, please refer to page 29.

> **ACTION REQUIRED:** Defendants must develop a robust, interactive training plan for both staff and incarcerated people on how to use existing (i.e., P.A. announcement systems) and new (i.e., tablets and pager watches) announcement technologies.

With respect to auditing effective communication of general announcements, Defendants' May 8th proposal contains no updates besides a sample proof-of-practice memorandum (Attachment E) that is substantively identical to Defendants' initial proposal. In response to Plaintiffs' query of why Defendants' draft policy does not provide for auditing of "whether changes to the schedule were timely communicated," Defendants respond vaguely that "[a] more robust auditing process will be developed by CAMU and OACC." Defendants' 5/8/2024 Answers to Plaintiffs' 11/20/2023 Questions re: Draft Tablet Notification Memorandum. The Court's order for CDCR to produce a plan for auditing effective communication of announcements cannot be satisfied by assuring Plaintiffs and the Court Expert that an auditing plan "will be developed" sometime in the future. For a proposed framework on how to develop an auditing system for technology-based announcements, please refer to pages 29-30 of our comments.

> **ACTION REQUIRED:** Defendants must develop an auditing plan for technology-based announcements that audits the timeliness, accessibility, and accuracy and completeness of non-auditory announcements.

### G. Defendants' Updated Proposal for General Announcements Still Lacks Meaningful Corrective Action Requirements

Defendants' original proposal allowed unspecified "corrective action" to occur when "it is discovered that the notices [via tablet] were not sent." Plaintiffs' Comments urged Defendants to implement a policy requiring leadership to regularly review the results of audits described above, take prompt corrective action, and closely monitor the outcomes. *See* Comments at 30-31. Plaintiffs proposed that a policy regarding corrective action plans require coordination between the ADA Coordinator, headquarters' level staff, and impacted program areas that are jointly responsible for announcements (such as healthcare access and education); include measures to mitigate harm resulting from failure to effectively communicate announcements; and specify what will happen if an institution continues to perform poorly on audits after completion of the corrective action plan. *Id.* These recommendations resulted from findings that, even when SATF was on notice that announcements were not being effectively communicated to deaf and hard-of-hearing people, the institution failed to take appropriate action to remedy the problem. *Id.* at 14.

Defendants' updated proposal does not incorporate these recommendations. It simply requires that any corrective action taken be reported by the Warden or designee to the Associate Director in a monthly proof of practice memorandum. *See* Attachment E, May 8th Proposal. Although Defendants' updated proposal newly involves institution leadership in developing and reporting corrective action, it still fails to specify when or at what threshold corrective action should be taken, what that corrective action may or must consist of, and whether and how institution leadership will monitor the efficacy of corrective action taken.

> **ACTION REQUIRED:** Defendants must develop a complete and specific policy for institution leadership to coordinate with headquarters' staff and impacted program areas to develop corrective action plans in a timely manner when auditing finds that certain minimum thresholds for communicating general announcements to deaf and hard-of-hearing people were not met. These corrective action plans should include the additional measures discussed above and in Plaintiffs' March 20th Comments.

### H. The Parties Disagree on Inclusion of Vibrating Watches in Defendants' System for Accessible Announcements

Plaintiffs recommended that Defendants issue vibrating watches and other personal alert devices to deaf and hard-of-hearing people as part of an announcements system. *See* Comments at 22-23. This recommendation continued years-long discussion between the parties of vibrating watches as a partial solution for effective communication of announcements. In addition to announcing the programs themselves, scheduled announcements made orally over the public address system provide event reminders to hearing people, which are not accessible to deaf and hard-of-hearing class members. A complete announcements system must include vibrating watches and other personal alert devices to promote class member independence and compensate for an oral event reminder system that is largely inaccessible.

Defendants informed the Court and Court Expert in 2023 that they would provide vibrating watches to deaf and hard-of-hearing people part of a system for accessible announcements. *See* Dkt. 3515 at 12 (Oct. 5, 2023); *see also* Dkt. 3529 at 7-8 (Nov. 28, 2023) (Court Expert's report that "Defendants also reported to the Court Expert that they had tested two vibrating watch models" as a technological solution for accessible announcements). Nonetheless, Defendants repeatedly have refused to discuss vibrating watches in the context of these Court-ordered negotiations. *See, e.g.*, Email from Olena Likhachova, Office of the Attorney General, to Jacob Hutt, Prison Law Office (Apr. 12, 2024) ("The vibrating watch issue will remain in the D/HOH workgroup"); Email from Trace Maiorino, Office of the Attorney General, to All Parties (May 8, 2024) ("Defendants maintain that [vibrating watch technology] falls outside the scope of the SATF stipulation as the watches would not be used to send notifications to class members.").

Defendants reported earlier this month that they are "close to finalizing the memorandum addressing the issuance of vibrating watches to class members." Letter from Chance Andes, San Quentin Warden (Acting), to Claudia Ceseña and Tovah Ackerman, Plaintiffs' Counsel, SQSP's Failure to Accommodate D/deaf and Hard of Hearing Class Members at 3 (May 22, 2024). This memorandum and the broader policy for issuing vibrating watches is squarely part of Defendants' system for announcements, and Plaintiffs' counsel must have an opportunity to review the draft memorandum before it is finalized as part of the parties' negotiations of announcements pursuant to the Court's order. We do not agree with moving discussion of vibrating watches to the Deaf/Hard-of-Hearing workgroup, for the reasons described in our comments. *See* Email from Jacob Hutt, Prison Law Office, to Olena Likhachova, Office of the Attorney General (Apr. 16, 2024). It is clear to Plaintiffs that the parties disagree on inclusion of vibrating watches in Defendants' system for effectively communicating announcements.

> **ACTION REQUIRED:** Defendants must provide vibrating watches to deaf and hard-of-hearing people as part of their system for effectively communicating announcements. Please provide the "close to final[]" draft memorandum addressing the issuance of vibrating watches to class members, so that Plaintiffs' counsel may review and so the parties can work to resolve any concerns.

## II. Defendants' New Proposal for Individual Announcements Still Omits Most Types of Individual Announcements, Excludes DNH Class Members, Does Not Explain How Face-to-Face Notifications Will Be Accessible, and Lacks a Meaningful Auditing and Corrective Action System

With respect to individual announcements, Defendants' updated draft policy states that housing unit staff and ADA workers "shall be required to provide a face-to-face notification to the DPH incarcerated population" of "individual schedule change[s] (e.g., medical/legal add-on appointments, etc.)." Regarding auditing, the draft policy states:

Housing unit staff shall ensure the notification, specifically date, time, and appointment type, has been documented in the housing unit logbook (to include those notifications

provided by the ADA worker). Facility sergeants shall ensure these personal notifications are being logged during their daily housing unit tours. If personal notifications are not documented, the sergeant shall provide remedial training and document it in the logbook.

Finally, the updated proposal states that a monthly proof-of-practice memorandum "will document any corrective action that was taken if it is discovered that . . . documentation of personal announcements to DPH class members was not occurring."

As discussed below, this updated proposal still lacks a plan to effectively communicate most types of individual announcements, still excludes DNH class members, does not explain how the face-to-face notifications will be accessible, and still lacks a meaningful auditing and corrective action plan. We urge Defendants to adopt Plaintiffs' March 20th recommendations for individual announcements and implement "an alternative, auditable method of ensuring effective communication of announcements that does not rely on correctional staff or ADA workers to communicate announcements to deaf and hard-of-hearing people," such as with pagers and visual displays. Dkt. 3538 at 5.

### A. Defendants' New Proposal Omits a Wide Variety of Individual Announcements and Excludes DNH Class Members

Under Defendants' updated draft policy, staff would provide face-to-face notifications only of "individual schedule change[s] (e.g., medical/legal add-on appointments, etc.)" and only for DPH class members. This is inadequate in multiple respects, which we discussed in detail in our March 20th comments. First, Defendants are required to effectively communicate all individual announcements to deaf and hard-of-hearing class members, beyond "schedule changes." Many individual announcements made over the loudspeaker do not follow any schedule—such as unscheduled announcements for a specific individual to report for an interview with a correctional counselor or a same-day evaluation by a nurse in response to a 7362—and would thus fall outside Defendants' proposal. And even for those announcements that correspond to unchanged, scheduled events listed on an individual ducat, there are typically auditory announcements of these ducated appointments, which Defendants must provide in a non-auditory manner to deaf and hard-of-hearing class members. Furthermore, as we explained in our March 20th comments, both staff and class members report that the time listed on a ducat often does not reflect the actual time of the ducated event, even when there has been no "schedule change."

Second, as discussed in Part I.E, Defendants' updated proposal continues to exclude DNH class members from its coverage by requiring staff or ADA workers to provide face-to-face notifications only to DPH class members. Our March 20th comments laid out in detail why hard-of-hearing class members designated DNH need accessible notifications of individual announcements. Defendants must implement a system for effective communication of

announcements that individually assesses <u>all</u> deaf and hard-of-hearing class members' needs and accommodates them accordingly.

> **ACTION REQUIRED:** Defendants must adopt a system that effectively announces all individual announcements, not just schedule changes, and must include all deaf and hard-of-hearing people—including those assigned a DNH code—in this system.

### B. Defendants' New Proposal for Communication of Certain Individual Announcements Does Not Explain How Face-to-Face Notifications Will Be Accessible to Deaf and Hard-of-Hearing Class Members

At the heart of Defendants' new proposal for effective communication of individual announcements is the old requirement that staff or ADA workers provide face-to-face notifications to deaf and hard-of-hearing class members. *See Armstrong* Remedial Plan § IV.I.2.b ("The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc."); SATF OP 403, Disability Placement Program at 53 (June 19, 2023) ("Custody staff shall also ensure, through personal notification (via dry erase board or other means such as ADA Workers), that the announcement has been communicated"). The parties have discussed how, despite this requirement, even when staff or an ADA worker carries out some form of face-to-face notification, they often do not do so in a manner that ensures that the deaf or hard-of-hearing person actually understands the announcement. The result is systematic miscommunication between staff (or ADA workers) and class members.

This is particularly important because of Defendants' recent mistraining of staff and apparent refusal to correct that mistraining. In October 2023, Defendants produced training videos for staff regarding effective communication of announcements, which, among other things, showed an officer attempting to speak to a deaf class member to provide face-to-face notification, instead of writing notes. When Plaintiffs' counsel and the Court Expert raised this and other concerns and asked that the videos be removed, Defendants refused and insisted that the videos were "beneficial to staff." Email from Ramon Ruiz, CDCR Office of Legal Affairs, to All Parties (Mar. 20, 2024). Although Defendants have since removed the videos, headquarters' staff reported earlier this month that CDCR cannot identify how many staff viewed the videos, and that CDCR believes no additional action is required to correct the improper training. Without further and effective guidance, therefore, staff may continue to rely on the lessons they learned from a training that got things exactly wrong.

Defendants' proposal is silent on this critical issue. The proposal contains no information regarding *how* staff (or ADA workers) should carry out a face-to-face notification of an announcement for a deaf or hard-of-hearing person. Specifically, the proposal does not address:

1. The non-auditory method, including via electronic technology (e.g., iPad) or analog device (e.g., whiteboard), that staff must use to transmit the announcement to the class member when cell-side or face-to-face with the class member.

2. The steps that staff must take when a deaf or hard-of-hearing class member is sleeping or otherwise nonresponsive when staff carries out their face-to-face notification.

3. The steps that staff must take to confirm that, once they have transmitted the notification, the class member actually understands the notification.

4. If staff rely on an ADA worker to carry out the face-to-face notification, the steps that staff must take to follow up with the ADA worker to ensure that they performed their duty effectively.

If Defendants use a face-to-face notification system for announcements, the system must address these issues. We discourage Defendants from relying on ADA workers in this system. As the Court Expert reported to the Court, the experience of deaf class members is that "ADA workers do not come to their cell as directed, they do not accurately communicate the announcement, or they refuse to write down the announcement for the deaf person to read." Dkt. 3500 at 12 (Court Expert's Second SATF Report).

> **ACTION REQUIRED:** If Defendants use a face-to-face notification system for announcements, Defendants must develop detailed requirements for how staff must carry out these notifications in an accessible manner, including by addressing the topics listed above.

### C. Defendants' New Proposal for Auditing Face-to-Face Notifications of Certain Individual Announcements Rejects the Basic Elements of a Functioning Audit System That Plaintiffs Outlined

In their May 8th Proposal, Defendants appear to reject Plaintiffs' recommendation that Defendants audit whether staff are communicating non-auditory announcements (1) timely, (2) accessibly, and (3) accurately and completely. Instead, Defendants vaguely suggest in their new proposal that, on a daily basis, supervisory staff will review logs that housing unit officers will document of their face-to-face notifications to DPH class members of certain individual announcements. According to the proposal, a monthly proof-of-practice memorandum authored by the Warden or designee would confirm that these reviews were completed.

This proposed auditing structure would not determine (1) whether face-to-face notifications were completed in a timely manner, (2) whether the face-to-face notifications were conducted in manner that was accessible to the deaf or hard-of-hearing class member, (3) whether the information communicated in the face-to-face notification was accurate and whether there were any individual announcements that were never communicated via face-to-face notification to the class member. Moreover, the proposed auditing structure, which relies on documentation specific to housing units, would not allow individual announcements that take place outside a housing unit, such as announcements communicated in a classroom or at a clinic or job site, to be audited. As discussed below, Defendants' continued refusal to develop an actual plan for how

they will audit whether SATF staff are effectively communicating announcements demonstrates that the parties are not able to reach agreement.

### 1. Defendants' Housing Unit Logbook Proposal Does Not Involve Auditing the Timeliness of Individual Non-Auditory Announcements

Defendants' May 8th proposal states that staff will ensure that the "notification [] time . . . has been documented in the housing unit logbook." As we explained in our March 20th comments, however, "[t]imeliness audits . . . must determine whether non-auditory notifications and content of announcements were sent at the same time as, or very near in time to, corresponding auditory announcements." Comments at 29. And at the parties' March 28, 2024, meet and confer regarding Defendants' March 6, 2024, proposal, the parties discussed the need for an announcements audit to determine whether non-auditory individual announcements were delayed with respect to when the event being announced actually occurred. For example, Defendants' auditing system must be able to compare (a) the time at which housing unit staff receive notice of an event pertaining to an individual class member—such as a call from the clinic or from the class member's program—with (b) the time at which these staff (or an ADA worker) provided a face-to-face notification of the individual announcement to the class member. Defendants' new proposal—as with their old proposal—still relates only to the timing at which the notification itself occurred. This represents only one half of a timeliness audit.

### 2. Defendants' Housing Unit Logbook Proposal Does Not Involve Auditing the Accessibility of Individual Non-Auditory Announcements

Defendants' auditing proposal does not contain any inquiry into the accessibility of the face-to-face notification. In other words, as we explained in our March 20th comments, the auditing proposal does not assess whether face-to-face notifications "were transmitted by staff in a manner . . . that actually alerted deaf and hard-of-hearing people to the announcement." Comments at 13. The only information that a reviewing sergeant will be auditing, under Defendants' proposal, is whether a housing unit officer wrote down in a logbook that the officer delivered—or instructed an ADA worker to deliver—a face-to-face notification of an announcement. By contrast, nowhere in Defendants' proposal would a sergeant audit whether the staff (or an ADA worker) performed the face-to-face notification in an accessible manner or whether the given incarcerated person actually understood the content of the face-to-face notification. Put differently, if an officer went to a cell and spoke through the door, that would be recorded as notification, even if the class member could not hear what the officer was saying and required instead written notes.

### 3. Defendants' Housing Unit Logbook Proposal Does Not Involve Auditing the Accuracy and Completeness of Individual Non-Auditory Announcements

Similarly, Defendants' auditing proposal does not contain any inquiry into the accuracy and completeness of the non-auditory announcements. With respect to accuracy, nothing in Defendants' proposal involves auditing whether the information that staff or an ADA worker

communicated to the class member during a face-to-face notification was accurate. With respect to completeness, nothing in Defendants' proposal involves verifying that, in each instance that staff receive notice of an event that requires them to make an announcement to a deaf or hard-of-hearing class member, staff (or an ADA worker) do, in fact, proceed to carry out a face-to-face notification to that class member. *See* Comments at 13-14.

<p style="text-align:center">***</p>

An electronic system for transmitting non-auditory announcements would address these concerns and significantly streamline Defendants' auditing process, as discussed in our March 20th comments. A pager watch system, for example, would have the benefit of automatically maintaining a record of whether the announcement was successfully transmitted, the time at which the announcement was transmitted, and the information contained in the announcement, regardless of a class member's physical location.

If Defendants proceed with a face-to-face notification system rather than a pager-based system, meaningful auditing will be more challenging to accomplish. Defendants could still audit with a sampling method, as discussed in Plaintiffs' March 20th comments (pg. 30) and during the parties' March 28, 2024, meet and confer. But because logbook entries are imperfect documentation, it will be more complicated than in a pager-based system to verify that a sufficient number of non-auditory face-to-face notifications occurred and were effective as compared to the expected number of overall notifications.

Defendants could also review a sample of body-worn camera (BWC) footage during a given period, based on dates and times documented in the housing unit logbooks and/or dates and times generated from institutional records of class members' daily movements (e.g. EHRS, classroom attendance). BWC footage could show the time at which staff receive notice of an event versus the time at which they deliver the face-to-face notification of an individual announcement to a DPH class member (timeliness); whether staff are communicating the notification to the class member in an accessible manner (accessibility); whether staff are transmitting accurate information to the class member (accuracy); and whether staff are failing to carry out any face-to-face notifications when an announcement needs to be made to an individual class member (completeness). AVSS footage could also be reviewed in comparison with the housing unit logbooks to determine whether staff are, in fact, carrying out face-to-face notifications at the times that they document in their logbooks. Still, reviewing BWC or AVSS footage in order to audit whether, when, and how a notification was made to a class member would likely be more challenging than reviewing pager transmission logs.

We note that if Defendants reject Plaintiffs' recommendation and opt for a plan that involves ADA workers carrying out face-to-face notifications, it will be extremely difficult—but still required—for Defendants to audit whether ADA workers are carrying out timely, accessible, accurate, and complete non-auditory announcements to deaf and hard-of-hearing class members. In fact, given class members' persistent reports that ADA workers communicate incorrect or inaccessible information about announcements, the need for robust auditing would be especially

<p style="text-align:center">12</p>

critical if class members are receiving announcements secondhand via ADA workers. We reiterate, as discussed in Part II.B above, that we discourage Defendants from incorporating ADA workers into this system.

> **ACTION REQUIRED:** Defendants must implement an auditing system that enables supervisors to determine whether staff are conducting non-auditory announcements— whether via face-to-face notification or via electronic technology—timely, accessibly, and accurately and completely.

### D. Defendants' New Proposal for Individual Announcements Fails to Meaningfully Consider or Revise Expectations for Corrective Action

Defendants' updated draft proposal for individual announcements fails to engage with corrective action as required by the Court. *See* Dkt. 3538 at 5 ("Defendants must provide . . . a draft proposal regarding. . . how CDCR will take corrective action when officers are found to fail to communicate [] announcements."). Defendants' proposed policy memorandum devotes only two sentences to corrective action. The first prescribes "remedial training" when facility sergeants who tour housing units during daily rounds find that personal notifications are not documented in unit logbooks. The second requires only that corrective action be documented, not that corrective action actually be taken, or what that corrective action should be.

Absent a corrective action requirement and description of what that corrective action should entail beyond "remedial training," these requirements are merely a reiteration of the status quo. For years, Defendants have responded to staff's failure to effectively communicate announcements with little more than training and retraining, all while reassuring class members who report that they do not receive announcements that "staff will ensure they receive announcements." Dkt. 3446 at 42 (Court Expert's SATF Report). But Plaintiffs' counsel have reported repeatedly in workgroup meetings and court filings that training has had minimal apparent effect in rectifying these policy violations. *See, e.g.*, Dkt. 3510 at 11 (Plaintiffs' Response to Court Expert's Second SATF Report). As the Court Expert recommended almost 18 months ago, custody staff who still fail to effectively communicate announcements even after they have received training must be subject to progressive discipline. *See* Dkt. 3446 at 42.

Corrective action is not incidental to the Court's order—it gives weight to auditing and will be integral to remedying the exclusion of deaf and hard-of-hearing people from Defendants' programs, services, and activities. Defendants' policy must describe a specific process by which progressive discipline can and will occur when staff do not effectively communicate announcements to deaf and hard-of-hearing class members. *See* CDCR Department Operations Manual § 33030.1 (describing progressive discipline as an "accepted principle" which must be "consistently appl[ied]" when corrective or adverse action is imposed). The policy must contain, at a minimum, the following features:

13

1. As discussed in Part II.C above, Defendants must gather sufficient information during auditing to determine not only whether staff documented that individual announcements occurred, but whether staff actually communicated individual announcements in a timely, accessible, accurate, and complete manner.

2. If staff are found to have failed to communicate announcements for any of those reasons, Defendants must document the specific nature of the policy violation.

3. Defendants must then document the corrective action taken in response to the documented policy violation.

4. Defendants must identify when prior corrective action has not been effective and impose progressive discipline.

> **ACTION REQUIRED:** Defendants must develop a proposal to take corrective action in response to staff who fail to effectively communicate announcements, which must include the topics listed above.

***

It is clear to Plaintiffs that the parties "are not able to reach agreement regarding [Defendants'] proposal." Dkt. 3538 at 5. After receiving Plaintiffs' detailed comments on Defendants' initial proposal on March 20, 2024, Defendants responded with a revised proposal that contains hardly any revisions. In light of Defendants' unwillingness to produce a proposal that incorporates the most basic elements of an effective-communication-of-announcements policy, Plaintiffs are prepared to return to the Court to brief the parties' disagreements. Unless Defendants will modify their proposal in the manner outlined above by **June 21, 2024**, we ask that the Court Expert timely make a determination that the parties cannot reach agreement and that the parties begin drafting a joint statement of disputes to the Court.

Sincerely yours,

Jacob Hutt                              Skye Lovett
Staff Attorney                         Investigator

cc:    Co-counsel
       Audrey Barron (Court Expert)
       Patricia Ferguson, Tamiya Davis, Ramon Ruiz, Ava Lau-Silveira, OLA Armstrong (CDCR Office of Legal Affairs)
       Brianne Burkart (CCHCS Office of Legal Affairs)
       Sharon Garske, Olena Likhachova, Anne Kammer (Office of the Attorney General)
       Dawn Lorey, Lourdes White, Darnell Mebane, Kristina Davis (CAMU)

Exhibit 83

C A L I F O R N I A

**DEPARTMENT OF JUSTICE**

*Rob Bonta*
**Attorney General**

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101
P.O. BOX 85266
SAN DIEGO, CA 92186-5266

Public:  (619) 738-9000
Telephone:  (619) 321-5781
Facsimile:  (619) 645-2581
E-Mail:  Anne.Kammer@doj.ca.gov

July 3, 2024

Jacob Hutt
Prison Law Office

Ed Swanson
*Armstrong* Court Expert

***Via Electronic Mail***

RE:    Defendants' Response to Plaintiffs' May 31, 2024 Letter Entitled "*Armstrong v. Newsom*: Plaintiffs' Summary of Parties' Disagreements Regarding Effective Communication of Announcements (SATF Stipulation #7)"

Dear Mr. Hutt and Mr. Swanson,

We write in response to Plaintiffs' May 31, 2024, letter summarizing the parties' disagreements regarding Defendants' proposal for effective communication of announcements to deaf and hard-of-hearing class members housed at California Substance Abuse Treatment Facility (SATF Stipulation Item No. 7).  Plaintiffs requested multiple modifications to Defendants' initial proposal for effectively communicating announcements to these class members.  Defendants have considered each proposed modification and respond below.

I.    **EFFECTIVE COMMUNICATION OF GENERAL ANNOUNCEMENTS**

- **"Defendants must adopt an announcement system, preferably via multimodal technologies such as pager watches and unit-wide display screens, that immediately alerts deaf and hard-of-hearing class members through tactile and visual methods that an announcement is being made," "communicates all content of general announcements—not simply transmitting a twice-daily notice of scheduled activities—to individuals in a timely manner," and "implement[s] a multi-technology system for communicating general announcements . . ."** (May 31, 2024 Letter at pp. 3-4.)

Defendants' proposed system for effectively communicating general announcements to deaf and hard-of-hearing class members at SATF relies on more than one means of communication to ensure these individuals receive timely and consistent notification of important information throughout the day.  In addition to the methods of communicating verbal

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

announcements specifically contemplated by the *Armstrong* Court Ordered Remedial Plan (amended January 3, 2001), including whiteboards, flicking lights, and public address systems, assistive technology will play a key role in Defendants' proposed system.

To incorporate technology, Defendants have retained a RESNA-certified[1] assistive technology professional (ATP) who will individually assess each class member at SATF with a permanent hearing impairment impacting placement (DPH) to determine their specific communication needs and challenges, and will create a tailored plan for use of specific assistive devices. Defendants' ATP will use a structured approach that includes identifying the class member's communication needs and challenges, reviewing their medical and audiological history, assessing their environment, choosing the appropriate technologies, and providing comprehensive training on how to use selected assistive devices effectively. Defendants will work collaboratively with the ATP to timely procure and provide class members with recommended technologies that do not pose a security concern.

Defendants are also committed to leveraging existing devices to provide effective communication of general announcements to deaf and hard-of-hearing class members. As set forth in Defendants' memorandum entitled "Implementation of Public Address Announcements Via ViaPath Technology Tablets at Substance Abuse Treatment Facility" (tablet notification policy, included with **Attachment A**), Defendants will utilize the current ViaPath tablets to communicate general announcements throughout the day to all members of the SATF population, including deaf and hard-of-hearing class members. The ViaPath tablets will display notifications on the device's home and lock screens that the incarcerated individual must acknowledge, ensuring they read the message. Notices of Schedule of Events will be sent via the ViaPath tablets to the population twice daily – at the beginning of second and third watches. Notices will also be sent via the ViaPath tablets regarding any changes to the Schedule of Events. DPH Class members will be educated regarding the notification process, including how to locate the notices on their tablet and when to expect the notices. In addition, a proof of concept (POC) utilizing the ViaPath tablets for medical scheduling, reminders, and updates via a health care portal is currently underway. To address the need for a means of tactile notification, as further detailed in **Attachment B**, Defendants will issue vibrating watches as a reasonable accommodation for DPH class members at no cost to the class member.

Staff will also continue to utilize the existing whiteboards and dry-erase markers in housing units at SATF where deaf and hard-of-hearing class members reside to communicate general announcements, such as the daily schedule, schedule changes, and unplanned general announcements. The whiteboards have been in use for a number of years and have proven to be an effective means of visually displaying information for deaf and hard-of-hearing class members.

---

[1] The Rehabilitation Engineering and Assistive Technology Society of North America (RESNA) certifies assistive technology service providers who have met a national standard of job-based knowledge and experience. ATP-certification recognizes demonstrated competence in analyzing the needs of individuals with disabilities, assisting in the selection of assistive technology for the individual's needs, and providing training in the use of selected devices.

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

- **"Defendants must adopt a system for accessible alarms and emergency announcements, such as different colored lights, which are immediately linked to corresponding audible alarms."** (May 31, 2024 Letter at p. 3.)

Defendants currently utilize visual alarms (flashing red lights) to alert incarcerated individuals at SATF of emergencies. This system effectively communicates the existence of an emergency to the entire population, including deaf and hard-of-hearing class members. Incarcerated individuals do not receive notice regarding the status of an emergency and, as such, the multi-colored light system proposed by Plaintiffs to indicate the status of an alarm is not necessary.

- Defendants must **"[e]nsure that DNH class members are included in Defendants' system for effectively communicating general announcements to deaf and hard-of-hearing class members, including by individually assessing the announcement accommodations needed by each class member."** (May 31, 2024 Letter at p. 5.)

Class members who have residual hearing at a functional level with hearing aids (DNH) receive general announcements via the public address systems, the ViaPath tablets, and whiteboards, as set forth above. DNH class members may continue to use the 1824 Request for Reasonable Accommodation process to request additional assistance as needed.

- **"Defendants must develop a robust, interactive training plan for both staff and incarcerated people on how to use existing (i.e., P.A. announcement systems) and new (i.e., tablets and pager watches) announcement technologies."** (May 31, 2024 Letter p. 5.)

Defendants understand that any technology used to communicate general announcements to deaf and hard-of-hearing class members must be used correctly to be effective. To that end, staff currently receive training on use of the public address systems, whiteboards, lights, and will be trained on the new feature on the ViaPath tablets for effective communication of general announcements to the deaf and hard-of-hearing population. DPH class members who elect to use vibrating watches will receive training from the ADA Office at the time of issuance. DPH class members who undergo individualized assessments with Defendants' ATP will receive comprehensive training on how to use any selected assistive devices effectively. Defendants' ATP will also be available, as needed, to provide additional training on specific assistive devices to staff.

- **"Defendants must develop an auditing plan for technology-based announcements that audits the timeliness, accessibility, and accuracy and completeness of non-auditory announcements" and "a complete and specific policy for institution leadership to coordinate with headquarters' staff and impacted program areas to develop corrective action plans in a timely manner when auditing finds that certain minimum thresholds for communicating general announcements to deaf and hard-of-hearing people were not met."** (May 31, 2024 Letter at pp. 5-6.)

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

As set forth in **Attachment A**, monthly audits will be conducted to ensure the Notices of Schedule of Events were sent at the start of each second and third watch shift during the preceding month.  By the fifth day of the month, the Warden or designee will complete a proof of practice (POP) memorandum, confirming the monthly audit was completed.  The POP memorandum will be addressed to SATF's Associate Director and will document any corrective action that was taken if it is discovered that the Notices were not sent.  As detailed in Department Operations Manual section 33030.8.1, corrective action may include in-service training, on-the-job training, counseling, or letters of instruction.

Additionally, the Office of Audits and Court Compliance Audit Tool continues to collect information directly from class members regarding effective communication of announcements through inclusion of the following question: "Do incarcerated persons with hearing disabilities state they are made aware of announcements and alarms throughout the institution?"  Recent audit results based on more than 260 interviews demonstrate an 86% compliance rate statewide.

- **"Defendants must provide vibrating watches to deaf and hard-of-hearing people as part of their system for effectively communicating announcements."**  (May 31, 2024 Letter at p. 7.)

As detailed in **Attachment A**, Defendants will issue vibrating watches as a reasonable accommodation for DPH class members at no cost to the individual.  Vibrating watches for each DPH class member housed at SATF have been shipped to the institution for immediate distribution to class members by the ADA Office.



If an incarcerated individual who is not designated DPH requests a vibrating watch, the individual may submit a CDCR Form 1824, Request for Reasonable Accommodation, which the Reasonable Accommodation Panel will consider on a case-by-case basis.  The vibrating watches

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

do not count against the incarcerated individual's total square footage of property or the three-appliance limit.  Vibrating watches are approved for use during programs, services, and activities, and in housing unit settings, including Restrictive Housing, off-site medical appointments, and same-day court appearances.

## II.    EFFECTIVE COMMUNICATION OF INDIVIDUAL ANNOUNCEMENTS

- **"Defendants must adopt a system that effectively announces all individual announcements, not just schedule changes, and must include all deaf and hard-of-hearing people—including those assigned a DNH code—in this system."** (May 31, 2024 Letter at p. 9.)

Defendants' ATP will assess each DPH class member at SATF to determine their specific communication needs and challenges, and will create a tailored plan for use of specific assistive devices to ensure effective communication of general and individual announcements. Defendants believe that these individualized assessments are critical and necessary to determine each class member's specific needs, preferred communication modes, and required assistive technology.  Defendants' ATP will identify and confirm the class member's preferred forms of communication, determine effective devices or systems tailored to the individual, and evaluate the class member's daily environment to ensure the selected communication methods are accessible and usable.  As noted above, Defendants will work with the ATP to timely procure and provide class members with recommended technologies that do not pose a security concern.

In addition, Defendants have received consistent positive feedback from the DPH population regarding the use of iPads and installed speech-to-text technology to assist in effectively communicating with staff, incarcerated individuals, visitors, and others.  These iPads serve to minimize, if not eliminate, this populations' potential for a "lonely and frustrating existence" due to an inability to widely communicate with others, as noted by the Court Expert in his initial SATF report.  (ECF No. 3446 at 38.)  Meanwhile, Defendants are working to ensure that the next tablet contract includes more robust accessibility features, which will further enhance the ability to effectively communicate scheduling changes and other information to these class members.

Defendants continue to believe that a human element is equally important to ensure that deaf and hard-of-hearing class members receive timely notification of individual announcements. Staff use face-to-face communication when conveying individualized information to DPH class members.  As detailed in **Attachment A**, if housing unit staff are notified of an individual announcement pertaining to a DPH class member at SATF (*e.g.*, medical/legal add-on appointments, etc.), housing unit staff or Americans with Disabilities Act (ADA) workers will provide a face-to-face notification to the DPH class member.  Staff also continue to employ visual cues and aids such as opening cell doors, using flashlights, whiteboards, and written notes to convey individual announcements effectively.

- **"If Defendants use a face-to-face notification system for announcements, Defendants must develop detailed requirements for how staff must carry out these notifications in an accessible manner," and "implement an auditing system . . ."** (May 31, 2024 Letter at pp. 10, 13.)

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

As detailed in **Attachment A**, Defendants will audit the effective communication of individual announcements to DPH class members at SATF through the use of a manual log each time an officer or ADA worker provides an individual announcement to a DPH class member:

Documentation of Individual Face to Face Announcements for DPH Class Members          SATF Housing Unit _____

| Incarcerated Person's Name | CDCR No. | Date | Time | Announcement Type[1] | Comments | Incarcerated Person's Signature[2] | Supervisor Initials |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |

1 = Medical appointment, Work, Legal visit, etc.                    2 = Incarcerated Person's signature acknowledges they received and understood the notification

Housing unit staff shall ensure the notification, specifically date, time, appointment type, and class member's signature indicating they received and understood the notification, has been recorded on the Documentation of Individual Face to Face Announcements log (see above) at the time the announcement is provided. Facility sergeants shall ensure these personal notifications are being logged during their daily housing unit tours. DPH class members will review the logs weekly and confirm receipt and understanding of the announcement(s).

Additionally, Defendants will conduct monthly audits of the logs and will provide proof of practice, to include any corrective action taken, when face-to-face announcements are not occurring or are not being documented. Compliance Sergeants interview DPH class members to evaluate the occurrence and effectiveness of the face-to-face communication and log these interviews within the ADA checklist. The Compliance Lieutenant and ADAC review the checklists weekly and address the non-compliant items through corrective action.

*Defendants' Response to Plaintiffs' May 31, 2024 Letter Re: SATF Stipulation Item No. 7*

- **"Defendants must develop a proposal to take corrective action in response to staff who fail to effectively communicate announcements . . ."** (May 31, 2024 Letter at p. 14.)

As detailed in **Attachment A**, if personal notifications are not documented, the facility sergeant will provide remedial training to housing unit staff and document it on a CDCR Form 844, Training Participation Sign-In Sheet. On a monthly basis, the assigned facility manager will review the Documentation of Individual Face to Face Announcements log to ensure documentation is present reflecting personal notifications are occurring in accordance with policy. The assigned facility manager will also ensure the facility sergeant is reviewing the log daily and initialing the log as required. By the fifth day of the month, the Warden or designee will complete a proof of practice (POP) memorandum, confirming the monthly audit was completed. The POP memorandum will be addressed to SATF's Associate Director and will document any corrective action that was taken if it is discovered that documentation of individual announcements to DPH class members was not occurring. As detailed in Department Operations Manual section 33030.8.1, corrective action may include in-service training, on-the-job training, counseling, or letters of instruction.

We look forward to meeting with you in a few weeks regarding this matter. Please do not hesitate to contact us with any questions or concerns in the interim.

Sincerely,

ANNE M. KAMMER
Deputy Attorney General

For    ROB BONTA
Attorney General

Encl.:   Attachment A (Tablet Notification Memorandum with attachments)
        Attachment B (Vibrating Watch Memorandum with attachments)

cc:     Sharon Garske, Trace Maiorino, Olena Likhachova (OAG Armstrong)
       Audrey Barron (Court Expert)
       Patricia Ferguson, Tamiya Davis, Ramon Ruiz, Ava Lau-Silveira, Ursula Stuter, OLA Armstrong (CDCR Office of Legal Affairs)
       Dawn Lorey, Lourdes White, Darnell Mebane, Kristina Davis, Megan Roberts (CAMU)

CF1997CS0005
84613328.docx

# Attachment A

State of California                                                 Department of Corrections and Rehabilitation

# Memorandum

Date:

To:    Bryan Phillips, Associate Director (A), High Security Mission, Division of Adult Institutions
       Peggy Llamas, Warden (A), Substance Abuse Treatment Facility
       Nate Scaife, Americans with Disabilities Act Coordinator, Substance Abuse Treatment Facility

Subject:    **IMPLEMENTATION OF PUBLIC ADDRESS ANNOUNCEMENTS VIA VIAPATH TECHNOLOGY TABLETS AT SUBSTANCE ABUSE TREATMENT FACILITY**

The purpose of this memorandum is to implement a new process at Substance Abuse Treatment Facility (SATF) for providing public address announcements to the incarcerated population via the existing Viapath Technology Tablet.

Per the *Armstrong* Remedial Plan (ARP), staff are required to ensure effective communication of public announcements to incarcerated persons designated as DPH (permanent hearing impairment, impacting placement). However, this new process will notify the incarcerated population regardless of inclusion in the Disability Placement Program. This new process supplements and does not replace the existing required means of effectively communicating public address announcements in housing units where incarcerated persons designated as DPH reside. These existing required means of effectively communicating public address announcements include flicking the housing unit lights on and off several times to alert that an announcement is imminent, communicating verbal announcements via written messages on a whiteboard, or by face-to-face personal notification, and flickering of lights. It is the department's court-ordered obligation to ensure the incarcerated population obtains all information from public address announcements.

The Viapath Technology Tablet is able to provide group messages to the incarcerated population. This capability will be utilized as a means of notifying the incarcerated population of public address announcements. In the event of any technical issues regarding this process, please contact the SATF Enterprise Information Services office.

**NOTIFICATION REQUIREMENTS**

The housing unit supervisor (i.e., sergeant/lieutenant) shall ensure a daily notice of scheduled events or activities, including the scheduled times, are sent to the incarcerated population housed in mainline.  This shall occur at the start of each second and third watch shift.  See Attachment A to this memorandum for directions on how to send notices. In the event of an emergency where staff are unable to send the notice of scheduled events at the start of the shift, the notice shall be sent as soon as possible. The assigned housing unit supervisor shall ensure the notice includes a schedule of events or activities, including the scheduled times, occurring during the shift (*see* Attachment B). These events or activities may include:

- Yard
- Dayroom
- Canteen
- Medication Pass (if applicable)

- Mail call (to include legal mail)
- Phone call signups
- Religious services
- Dining time

Bryan Phillips, Associate Director (A), High Security Mission, Division of Adult Institutions
Peggy Llamas, Warden (A), Substance Abuse Treatment Facility
Nate Scaife, Americans with Disabilities Act Coordinator, Substance Abuse Treatment Facility
Page 2

If the schedule has been modified, the assigned housing unit supervisor shall ensure an amended notice is sent to the incarcerated population reflecting the modification before the event when possible.

Housing unit supervisors shall refer to Attachment C for directions on how to access the noticing feature/command system.

**DPH Class Member Personal Notifications**

In the event housing unit staff are notified of an individual announcement pertaining to a DPH class member, (e.g., medical/legal add-on appointments, etc.), housing unit staff or Americans with Disabilities Act (ADA) workers shall be required to provide a face-to-face notification to the DPH incarcerated population. Housing unit staff shall ensure the notification, specifically date, time, appointment type, and incarcerated person signature indicating they received the notification, has been recorded on the Documentation of Individual Face to Face Announcements log (*see* Attachment D) at the time the announcement is provided. Facility sergeants shall ensure these personal notifications are being logged during their daily housing unit tours and initial the Attachment D. If personal notifications are not documented, the sergeant shall provide remedial training and document it on a CDCR Form 844, Training Participation Sign-In Sheet.

**AUDITING AND PROOF OF PRACTICE REQUIREMENTS**

On a monthly basis, the assigned facility manager, or designee (not below the rank of Correctional Lieutenant), shall review the command system to ensure the tablet notices were sent at the start of each second and third watch shift during the preceding month. *See* Attachment E for how to view notices and confirmation report.

In addition, the assigned facility manager shall review the Documentation of Individual Face to Face Announcements log monthly to ensure documentation is present reflecting personal notifications are occurring face-to-face for the DPH population. In addition, the assigned facility manager shall ensure the facility sergeant is reviewing the log daily and initialing the log.

By the fifth day of every month, the Warden or designee shall complete a proof of practice (POP) memorandum, confirming these reviews were completed (*see* Attachment F for reference). The POP memorandum shall be addressed to SATF's Associate Director and will document any corrective action that was taken if it is discovered that the notices were not sent or documentation of personal announcements to DPH class members was not occurring.

**DPH CLASS MEMBER TRAINING**

The ADA Coordinator or designee shall ensure each DPH class member is advised of this new process and how to locate the notices on their tablet. The ADA Coordinator or designee shall ensure the DPH class member signs a California Department of Corrections and Rehabilitation (CDCR) Form 128B Informational chrono (*see* Attachment G) acknowledging they have been provided the instructions.

Bryan Phillips, Associate Director (A), High Security Mission, Division of Adult Institutions
Peggy Llamas, Warden (A), Substance Abuse Treatment Facility
Nate Scaife, Americans with Disabilities Act Coordinator, Substance Abuse Treatment Facility
Page 3


The CDCR Form 128-B shall be forwarded to Case Records for placement in the incarcerated person's Electronic Records Management System file.

SATF shall update their existing Local Operating Procedure (LOP) to outline the expectations for all custody supervisors on this directive. SATF shall provide a copy of their LOP within 90 days of this memorandum to their Mission Associate Director. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

In addition, incarcerated persons will be made aware of this process via the Inmate Advisory Council and other local means of communication, which may include, but is not limited to, town halls, bulletins, etc.

All custody supervisors and managers shall be provided on the job training regarding expectations for sending notifications via the Viapath Technology Tablet within 90 days of the date of this memorandum. SATF shall provide a POP to their Mission Associate Director.

If you have any questions, please contact Darnell Mebane, Captain, Class Action Management Unit, at (916) 202-5130 or at Darnell.Mebane@cdcr.ca.gov.



RON BROOMFIELD
Director
Division of Adult Institutions


Attachments

cc:     Joseph (Jason) Williams
        Jared D. Lozano
        Jennifer Benavidez
        Antronne Scotland
        Raquel Buckel
        Dawn Lorey
        Lourdes White
        Americans with Disabilities Act Coordinators
        Darnell Mebane
        Jillian Hernandez
        Megan Roberts



# Attachment A-Staff Quick Reference Guide

# Creating a Notice

## Setup for Creating Notices

Access Command Center: https://command-center.telmate.com

To create a notice, go to: **Settings > Notices**



To create a notice, select the "Create Notice" link in the upper right corner.

| ACTIONS | TITLE | MESSAGE | ATTACHMENT | AUDIENCE | STATUS | PUBLISH DATE | UNPUBLISH DATE | UPDATED | DISPLAY MEDIUM | DISPLAY FREQUENCY | SEND RECEIPT |
|---------|-------|---------|------------|----------|--------|--------------|----------------|---------|----------------|-------------------|--------------|
| Edit \|Confirmation Report | GTL Tablet Cleaning instru... | Please see review and ackn... | | All Inmates | Published | 09:32 MDT 08/05/2021 | | 09:32 MDT 08/05/2021 by Rob Cevasco | In Notices App + At Log In | Once | No |
| Edit \|Confirmation Report | MOTION document | Document for viewing only | | All Inmates | Published | 09:20 MDT 08/05/2021 | | 09:20 MDT 08/05/2021 by Rob Cevasco | In Notices App | | |
| Edit \|Confirmation Report | ORDER document | Document for viewing only | | All Inmates | Published | 09:19 MDT 08/05/2021 | | 09:19 MDT 08/05/2021 by Rob Cevasco | In Notices App | | |

 QRG    Creating a Notice



Fields to Complete:

1) Title of Notice
2) Message (Brief description of notice)
3) Attachment – Notices must have an attachment in a jpg, png, or pdf format and be less than 5MB
4) Status – automatically set to published
5) Dates – a start date is required, but an end date is optional; if a Notice does not end, leave the end date blank; you can set a date in the future
6) Display Medium – automatically set to 'In Notices App' and 'At Log In'
7) Acknowledgement Style
    a. Confirm Button – user is required to open the attachment and select the Confirm Button
    b. Photo Signature – user is required to take a photo to indicate acknowledgement; this is a one-time acknowledgement
8) Display Frequency
    a. Once
    b. At Every Log In
9) Send receipt of Acknowledgement to inmate Message App. If frequency is set to every log in, it is suggested this setting be set to NO.

### *Attachment B-<u>Example ONLY</u>*

### *California State Prison, Los Angeles*

### *Facility D-Second Watch*

### *Schedule of Events*

- **0630 Morning Chow**
- **0900 Dayroom**
- **1100 Yard**
- **1200 Religious services**
- **1330 Yard recall**
- **1200 Medication pass**
- **1300 Canteen**



**Staff Quick Reference Guide**

# How to Access GTL Command Center Tablet Website

## Steps to Login to Command Center

1) **Type in URL:** Command-center.telmate.com (Google Chrome or Firefox browser recommended)
2) **Username:**  enter your work email address (not case sensitive).
3) **Password:**  enter initial Password:  Welcome1!





How to Access GTL Command Center Tablet Website

1) Change your password upon initial login. If you are not prompted to do so, click the down arrow next to your name in the upper right corner and select Change Password.



If staff are having issues with Command they should reach out to 1-800-685-1594 or cdcrsupportuser@viapath.com

Documentation of Individual Face to Face Announcements for DPH Class Members            SATF Housing Unit _____

| Incarcerated Person's Name | CDCR No. | Date | Time | Announcement Type[1] | Comments | Incarcerated Person's Signature[2] | Supervisor Initials |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

1 = Medical appointment, Work, Legal visit, etc.            2 = Incarcerated Person's signature acknowledges they received and understood the notification

ATTACHMENT D

# Viewing Notices on ViaPath Command Center

A link to Command can be found in the *Start* menu under *CDCR Enterprise Shortcuts*.





ATTACHMENT D

Once logged in, from the left navigate to *Settings* and then click *Notices.*





You can click on *Confirmation Report* for any notice and have it emailed to up to 5 recipients.

State of California                                              Department of Corrections and Rehabilitation

# Memorandum

Date:

To:      Matthew Atchley
         Associate Director
         High Security Mission
         Division of Adult Institution

Subject:  **MONTHLY CERTIFICATION OF PUBLIC ADDRESS ANNOUNCEMENTS VIA VIAPATH TECHNOLOGY TABLETS AND FACE-TO-FACE NOTIFICATIONS FOR DPH CLASS MEMBERS AT SUBSTANCE ABUSE TREATMENT FACILITY**

This memorandum certifies both the required monthly reviews of notices of scheduled events to the incarcerated population via ViaPath Technology tablets, as well as the documentation of personal face-to-face notifications to DPH class members for individual schedule changes. The reviews revealed the following information:

**TABLET NOTICES**
- (example) Facility A, C, D, E, F, G – identified 100 percent compliance for sending out tablet notices at the start of each second watch and third watch shift during the preceding month.

- (example) Facility B – identified 50 percent compliance for sending out tablet notices at the start of each second watch and third watch shift during the preceding month. Specifically, tablet notices were not sent out on third watch on the following dates: 4-1, 4-3, 4-4 etc. The following corrective action was taken: (please explain any corrective actions, to include any continued non-compliance with the policy or disciplinary action in detail).

**DPH PERSONAL NOTIFICATION DOCUMENTATION**
- (example) Facility F and G – identified 100 percent compliance for documenting personal notifications for DPH class members in the housing unit logbooks.

- (example) Facility A, B, C, D, E – identified 50 percent compliance for documenting personal notifications for DPH class members in the housing unit logbooks in the event of an individual schedule changes and/or modification or cancellation of schedule event(s). Specifically, there were no entries made in these logbooks on the following dates: 4-1, 4-3, 4-4, etc. The following corrective action was taken: (please explain any corrective actions, to include any continued non-compliance with the policy or disciplinary action in detail).

If you have any questions, please contact me at (559) 992-7100 ext. 5507.


BRYAN PHILLIPS
Warden
Substance Abuse Treatment Facility
Division of Adult Institutions

STATE OF CALIFORNIA                                                                                          DEPARTMENT OF CORRECTIONS AND REHABILITATION
**ADVISEMENT OF TABLET NOTIFICATIONS FOR DPH CHRONO**
CDCR 128B (Revised ##/2024)                                                                                                      **Page 1 of 2**

| | | |
|---|---|---|
| INCARCERATED PERSON NAME | CDCR NO. | INSTITUTION |

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide all incarcerated persons equal access to programs, services, and activities, as required by state and federal law, including the Americans with Disabilities Act (ADA).

It is the department's goal to ensure the incarcerated population can obtain information from public address announcements via technology. The Viapath Technology Tablet has the capability to provide group messages to the incarcerated population at any time. To ensure you are notified of public address announcements, the assigned housing unit supervisor will send a daily notice to your tablet at the start of each second and third watch shift. In the event of an emergency where staff are unable to send the notice of scheduled events or activities at the start of the shift, the notice shall be sent as soon as possible. The assigned housing unit supervisor shall ensure the notice includes a schedule of events or activities, including the scheduled times, occurring during the shift. These events or activities include, but are not limited to, the following: yard, dayroom, canteen, medication pass, mail call, phone call signups, religious services, and dining time. If the schedule has been modified, the unit supervisor shall ensure an amended notice is sent to you via your tablet before the event when possible.

This new process supplements and does not replace the existing means of effectively communicating public address announcements in housing units. These existing means of effectively communicating public address announcements include flicking the housing unit lights on and off several times to alert that an announcement is imminent, communicating verbal announcements via written messages on a whiteboard, or by face-to-face personal notification, etc.

In the event of an individual schedule change (i.e. medical/legal add-on, etc.), housing unit staff or ADA workers shall be required to provide you with a face-to-face notification prior to the scheduled event.

Please sign and date below indicating you understand this new process and how to locate the notices via your tablet. By signing below, you acknowledge that you have been provided the instructions on this new process and how to access notices via your tablet and that those instructions were effectively communicated to you.

Do you have a personal tablet?                    Yes                    No

If no, would you like to have a personal tablet given this information?                    Yes                    No

| | | |
|---|---|---|
| INCARCERATED PERSON NAME | CDCR NUMBER | INCARCERATED PERSON SIGNATURE |

| | | |
|---|---|---|
| STAFF NAME AND TITLE (PRINTED) | DATE ISSUED | STAFF SIGNATURE |

**DISTRIBUTION**        **Original**: ADA Office        **Copies:**        ERMS, Facility Captain, Counselor, Incarcerated Person

**ADVISEMENT OF TABLET NOTIFICATIONS FOR DPH CHRONO**

**CDCR 128B (Revised ##/2024)**

# Attachment B

State of California                                              Department of Corrections and Rehabilitation

# Memorandum

Date:   June 3, 2024

To:     Associate Directors, Division of Adult Institutions
        Wardens
        Americans with Disabilities Act Coordinators

Subject: **ISSUANCE OF VIBRATING WATCHES AS A REASONABLE ACCOMMODATION FOR PERMANENT HEARING-IMPAIRED, IMPACTING PLACEMENT INCARCERATED PERSONS**

The purpose of this memorandum is to provide direction to institutions on the issuance of vibrating watches as a reasonable accommodation for incarcerated persons with a permanent hearing impairment, impacting placement (DPH). This direction is in keeping with the California Department of Corrections and Rehabilitation (CDCR) policy of ensuring incarcerated persons with disabilities have equal access to its programs, services, and activities. The vibrating watch will assist with providing personal notifications to the DPH incarcerated person and shall be provided at no cost.

**PROCESS FOR OFFERING AND PROVIDING VIBRATING WATCHES TO DPH INCARCERATED PERSONS**

The ADA office will offer a vibrating watch to all DPH incarcerated persons housed at their institution. See Attachment A for specifications regarding the watch being offered. If the DPH incarcerated person accepts, the ADA office will be responsible for issuing one vibrating watch to the DPH incarcerated person. This includes, confirming they have read and understood the instruction manual, and have signed the CDCR Form 128-B, Vibrating Watch User Agreement Chrono (Attachment B).

The DPH incarcerated person shall sign a CDC Form 193, Inmate Trust Account Withdraw Order, with the reimbursement cost of $35.00 for the vibrating watch in the event of loss and/or intentional destruction/alteration. A copy of the Vibrating Watch User Agreement Chrono, and the CDC Form 193 shall be forwarded to the Case Records for scanning into the Electronic Records Management System. Upon issuance of the vibrating watch, the ADA Coordinator will enter the vibrating watch into the Registerable Property list via the Strategic Offender Management System (SOMS) Module.

The DPH incarcerated person shall be financially responsible for any damage resulting from intentional destruction/alteration of the state issued vibrating watch. The ADA Coordinator shall remove the vibrating watch from the DPH incarcerated person's Registerable Property list in SOMS if the incarcerated person is no longer in possession of the watch for any reason. If the DPH incarcerated person is determined to be indigent in keeping with California Code of Regulations (CCR), Title 15, Section 3000, a replacement item shall be provided by the department.

The vibrating watch will not be considered the incarcerated person's personal property, nor will it be considered a healthcare appliance, as outlined in CCR, Title 15, Section 3190. As such, it will not count against the incarcerated person's total square footage of property, nor will it be restricted by the three-appliance limit, as outlined in the Department Operations Manual, Section 54030.8(c)(1). Additionally, DPH incarcerated persons, who have received a vibrating watch, are approved to have the device during programs, services, and activities, and in housing unit settings, including Restrictive

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

Housing, off-site medical appointments, and same day court appearances. Upon parole or discharge, the vibrating watch shall be collected by ADA staff and for appropriate tracking and shall be removed from SOMS property.

The DPH incarcerated person may request a replacement of the vibrating watch if reasonable wear and tear or malfunction occurs. In addition, the request for batteries must adhere to reasonable intervals of use made within timeframes consistent with typical usage, which is available in the Vibrating Watch User Guide. The institution will follow their Local Operating Procedure (LOP) with regards to the collection and disposal of used/dead batteries. The incarcerated person will receive a replacement vibrating watch and battery replacement as a one-for-one exchange via submission of a Form GA 22 to the ADA office. The ADA office shall respond and issue the vibrating watch and/or replacement battery to the DPH incarcerated person within five business days of notification. In addition, if it has been determined that the vibrating watch was lost or damaged due to staff neglect, the ADA office shall approve and replace the vibrating watch.

If an incarcerated person who is not designated DPH submits a request for a vibrating watch, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. All requests would be considered on a case-by-case basis by the Reasonable Accommodation Panel.

The Class Action Management Unit (CAMU) has procured the initial order of vibrating watches and will provide them to the ADA Offices at each institution. Replacement orders for the vibrating watches will be the responsibility of each institution. When ordering replacements, all institutions shall use the model on Attachment A as a referenced model for consistency.

**PURCHASE PROCESS FOR INCARCERATED POPULATION NOT DESIGNATED DPH**

All incarcerated persons not designated as DPH may purchase a vibrating watch from any departmentally approved authorized personal property package vendor as part of their quarterly package order in keeping with CCR, Title 15, Sections 3044, 3190, and the Authorized Personal Property Schedule. In addition, incarcerated persons shall be authorized to possess and wear their vibrating watches during programs, services, and activities.

The Office of Policy Standardization Unit and CAMU has identified a vendor who will be providing the department with a rechargeable, vibrating, watch that has no audible sounds. This will meet all of the department's current regulations. The approved vibrating watch will be available for all incarcerated persons to purchase via the quarterly package process beginning on or around July 1, 2024.

Wardens or designees shall update their Disability Placement Program LOP to reflect this process and provide a copy to their respective Mission Associate Director within 90 days from the date of this memorandum. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

In addition, incarcerated persons will be made aware of this process via the Inmate Advisory Council and other local means of communication.

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 3

Wardens, or their designees shall ensure all custody staff are provided access to the updated LOP (e.g., an institutional share folder) to ensure awareness of this new process. The ADA Coordinator shall conduct in-person training with all ADA staff, to include review of the policy and updated LOP.

If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Darnell Mebane, Captain, CAMU, at (916) 202-5130 or Darnell.Mebane@cdcr.ca.gov.

DocuSigned by:

*Ronald Broomfield*

499E547EE65C411

RON BROOMFIELD
Director
Division of Adult Institutions

Attachments

cc:    Dr. Joseph Bick, M.D.
       Joseph (Jason) Williams
       Jared D. Lozano
       Jennifer Benavidez
       Antronne Scotland
       Raquel Buckel
       Dawn Lorey
       Janan Cavagnolo
       Lourdes White
       Darnell Mebane
       Mark Tillotson
       Margo Wilkerson
       Megan Roberts
       In-Service Training Managers

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS AND REHABILITATION
**VIBRATING WATCH USER AGREEMENT CHRONO**
CDCR 128B (Revised 06/2024)                                                                                    Page 1 of 1

_____     _____     _____
INCARCERATED PERSON NAME                                 CDCR NO.                        HOUSING

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide all incarcerated persons equal access to programs, services, and activities, as required by state and federal law, including the Americans with Disabilities Act (ADA).

On _____, you were provided a vibrating watch as a reasonable accommodation to assist you with participating in CDCR programs, services, and activities. This accommodation does not replace your primary or alternate method of effective communication. You will be allowed to maintain possession of this device in all programs, services, and activities, and in housing unit settings, including Restrictive Housing, off-site medical appointments, and same-day court appearances. This accommodation will begin immediately and remain in effect until further notice. Upon parole or discharge, the vibrating watch shall be collected by the ADA staff and for appropriate tracking and removal from SOMS Property.

The vibrating watch is considered state property. You will be financially responsible for the damage caused by intentional damage, destruction, or alteration. As such, you shall sign a conditional CDCR Form 193, Inmate Trust Account Withdrawal, which stipulates the cost you would be responsible for paying in the event the vibrating watch is intentionally damaged, destroyed, or altered, and needs to be replaced.

If the vibrating watch or any of the components (e.g., chargers, etc.) are altered, or destroyed, staff shall notify the ADA Coordinator. The ADA Coordinator will determine the best course of action (i.e., replacement of the vibrating watch or provide an alternate visual accommodation). Staff shall immediately notify the ADA office if the vibrating watch is confiscated for any reason (e.g., intentionally destroyed, altered, etc.). If the ADA Coordinator determines the best course of action is to remove the vibrating watch, the ADA Coordinator shall document their reasoning for the removal in a CDCR 128B chrono and ensure the vibrating watch is removed from your Registerable Property.

Please sign and date below, indicating you understand why the device is being provided to you, when it may be used, have been provided instructions on how to operate the vibrating, and have no additional questions on how to operate the vibrating watch. In addition, you also acknowledge that you are financially responsible for the damage caused by intentional destruction or alteration of the vibrating watch. You may also be subject to disciplinary actions pursuant to CCR, Title 15, Section 3011 in the event the vibrating watch is intentionally damaged, destroyed, or altered.

**Do you accept the issuance of this vibrating watch?** ◯ **Yes**             ◯ **No**

_____     _____     _____
INCARCERATED PERSON NAME                        CDCR NUMBER                    INCARCERATED PERSON SIGNATURE

_____     _____     _____
STAFF NAME AND TITLE (PRINTED)                  DATE ISSUED                    STAFF SIGNATURE

**DISTRIBUTION**        **Original**: ADA Office        **Copies:**     ERMS, Incarcerated Person



## Instruction

**Display button functions:**

Time   Date/Week   Step   Calorie   Distance   Sleep monitor(SP)   Remaining battery

### Check sleep monitor data :

SP:H1 is good sleep quality,C2 is normal sleep quality,L3 is poor quality sleep.
Monitor default time is from 23:00 to 7:00.

How to set time,date and year?Press and release the display button to display the current time.With the time showing,now hold down the display button until the digitals are flashing,press display button to decrease the digitals,press function button to increase digitals,when the time digitals are correct,hold the button to confirm it.The settings are Time-Date-Year.

### Function button operation:

1.Press the function button 1 time to display alarm $\text{AL}$ ,now hold down the function button to display $\text{A1,A2,A3}_{\text{0F 0F 0F}}$,alarms are OFF as default.Hold down the button to turn on the alarms $\text{A1,A2,A3}_{\text{0N 0N 0N}}$,press buttons to set the alarms time,the setting method is same with setting current time.

2.Press the function button 2 times to display 12/24 H,hold down the button until digitals are flashing,press the button to change between 12 and 24.

3.Press the function button 3 times to display $\text{ST}_{\text{EP}}$,hold down the button to see current steps,press the button to cycle steps of everyday, 30 days step memory is maximum.

4.Press the funciton button 4 times to display $\text{H}_{\text{UF}}$,smart light function is off as default,hold down the button until the leds are flashing,now press the button to turn ON/OF this function.

5.Press the function button to display g(Kilometers),hold down the button until "g —" is flashing,press the button change between "g" and "E"(Miles).

## Specifications

**Size:**224*16.5*9.4mm(Large strap) 244*16.5*9.4mm(Small strap)
**Working atmospheric pressure:**m860hpa-1060hPa
**Battery life:**Charging and discharging>300 times
**Power supply voltage:**DC=4.5V-5V
**Weight:**20g(Net weight)
**Display:**LED display
**Charging mode:**Micro USB port
**Battery capacity:**50mAh
**Sleep current:**25uA
**Standby time:**45 days
**Material:**Silicone



Display Button   Function Button



Please remove the electroic part from strap, and connect it with USB cable for charging like below picture



See Time When Turn Wrist



# Multifunction Pedometer Bracelet

## User Manual

W5VP

## Product Overview


Time Display


Date Display


3 Vibrating alarms


12/24 time conversion


Week display


Calorie display


Record 30 days of exercise steps


Sleep quality monitoring


Remaining battery display


Km/mile conversion


Smart light


Micro USB

Exhibit 84

C A L I F O R N I A
## DEPARTMENT OF JUSTICE

**Rob Bonta**
**Attorney General**

600 WEST BROADWAY, SUITE 1800
SAN DIEGO, CA 92101
P.O. BOX 85266
SAN DIEGO, CA 92186-5266

Public: (619) 738-9000
Telephone: (619) 321-5781
Facsimile: (619) 645-2581
E-Mail: Anne.Kammer@doj.ca.gov

July 18, 2024

Jacob Hutt
Prison Law Office

***Via Electronic Mail***

RE:    *Armstrong, et al. v. Newsom, et al.*
       <u>United States District Court, Northern District of Ca., Case No. 4:94-cv-02307-CW</u>
       Defendants' Response to Plaintiffs' July 10, 2024 Email "Re: *Armstrong v. Newsom, et al.* – SATF Stipulation Item 7"

Dear Mr. Hutt,

       We write to provide CDCR's responses to the inquiries, delineated in bold below, in your July 10, 2024 email correspondence following your review of Defendants' July 3, 2024 letter responding to Plaintiffs' summary of disagreements regarding SATF Stipulation Item No. 7 (effective communication of announcements).

**1. Assistive technologies. Defendants report that for DPH class members housed at SATF, an assistive technology professional (ATP) will "determine their specific communication needs and challenges and will create a tailored plan for use of specific assistive devices." At or before the parties' July 18th meeting, please report:**

**(a) whether the ATP will evaluate class members for issuance of a pager or pager watch as an announcement accommodation.**

The Assistive Technology Professional (ATP) will evaluate DPH class members at SATF without pre-determining the technology needed. The assessment will consider the individual's specific needs, the environment, and the tasks required. Based on this comprehensive evaluation, the ATP will determine the appropriate tools or technology necessary to ensure effective functional communication.

**(b) if the ATP will evaluate class members for pagers or pager watches, what make and model of pager or pager watch Defendants will issue to class members for whom the ATP recommends this device;**

Specifying the make and model of pagers or pager watches in advance would imply a pre-determined need for these tools. The ATP will conduct thorough assessments of DPH class members at SATF to evaluate each individual's needs, environment, and tasks before determining the appropriate tools and technology necessary for effective functional communication. The decision on the appropriate tools and technology will be made only after the assessment is completed.

**(c) whether the ATP will advise CDCR as to the placement of visual displays to display announcements to deaf and hard-of-hearing class members in congregate settings and/or will evaluate class members for issuance of a visual display (*i.e.*, video screen) as an announcement accommodation;**

The ATP and CDCR are exploring all viable options for providing announcements to DPH class members at SATF in congregate settings.

**(d) the full list of "specific assistive devices" that the ATP will be able to recommend for issuance to a class member and that Defendants will approve based on the ATP's recommendation;**

The ATP will not provide a "full list" of assistive devices that may be recommended for issuance to a DPH class member at SATF. Technology and devices will be considered based on the individual's specific needs as determined by the ATP's comprehensive assessment.

**(e) when these individualized assessments of class members at SATF will begin and when Defendants expect to complete them for all class members currently housed at SATF; and**

The individualized assessments of DPH class members at SATF will begin in August and be completed within a reasonable time following the start date.

**(f) whether the individualized assessments will occur off-site (and if so, where) or in person at SATF.**

The individual assessments of DPH class members will be conducted in person at SATF.

**2. Exclusion of DNH class members. We are disappointed that Defendants continue to refuse to develop a plan to effectively communicate announcements to DNH class members. We have retained Dr. Andrea Bourne, Au.D. CCC-A, to prepare an expert report regarding the need for Defendants to individually assess hard-of-hearing class members' needs for announcement-related accommodations and to accommodate these class members accordingly.**

Defendants request that Plaintiffs produce Dr. Bourne's curriculum vitae to Defendants on or before July 22, 2024. Defendants also request that Plaintiffs produce Dr. Bourne's expert report.

**3. Vibrating watches.** We have reviewed the CDCR memorandum entitled, "Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Persons." At or before the parties' July 18th meeting, please answer the following questions regarding this policy:

**(a) What guidance will Headquarters provide to institutional Reasonable Accommodation Panels (RAPs) to ensure that incarcerated people who do not have a DPH code and who request a vibrating watch may be issued one by the RAPs on a case-by-case basis?**

Pursuant to CDCR's statewide policy memorandum: "If an incarcerated person who is not designated DPH submits a request for a vibrating watch, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. All requests would be considered on a case-by-case basis by the Reasonable Accommodation Panel." (Memo. at 2.) ADA Coordinators have been provided directions in terms of the how to assess an individual on a case-by-case basis, and sufficient information will be available for a RAP to determine whether a non-DPH class member should be issued a vibrating watch.

**(b) If non-DPH class members are approved by the RAP for a vibrating watch, will these class members be required to pay for the vibrating watch?**

If approved by a RAP, the non-DPH class member will receive a vibrating watch free of charge.

**(c) What education will institutional ADA offices provide to incarcerated people who do not have a DPH code regarding the availability of vibrating watches as a reasonable accommodation at no cost?**

Incarcerated persons will be made aware of this process via the Inmate Advisory Council, the ADA orientation manual, and other local means of communication.

**(d) What is the make and model of the vibrating watch that Defendants will issue to class members? (The memorandum includes reference to 'W5VP,' which may correspond to the <u>Sida-Earcy Fitness Watch</u>, ASIN #B0CZP5TSXL; we wish to confirm that this is correct.)**

Vibrating watches for each DPH class member housed at SATF have been shipped to the institution for immediate distribution to class members by the ADA Office.



In addition, the WOBL 8-alarm vibrating reminder watch has been offered and issued to DPH class members statewide.

www.maxiaids.com/product/wobl-8-alarm-vibrating-reminder-watch-black
**Manufacturer: Maxi Aids SKU: 902006 |**
**Availability: Usually ships within 1 to 2 business days**
**List Price:**
**Our Price: $37.95**
**Up to 8 daily vibration/audible alarms**

- **Countdown timer, date, and lock out feature**
- **Approximately 1 ¼" diameter face with Velcro band**
- **Water-resistant and shock-resistant**
- **Uses one CR2032 battery (included)**



**(e) What testing, if any, have Defendants conducted to determine the sufficiency of the vibration in the vibrating watches to ensure that they can notify the wearer of an alert? If the watch model selected by Defendants does not vibrate sufficiently or is not easy enough to use for a given class member, will Defendants procure a different model as a reasonable accommodation?**

As mentioned during the last Deaf/Hard-of-Hearing workgroup, a trial was conducted at select institutions, and DPH class members at those institutions had an opportunity to test various vibrating watches. The class members' responses were taken into account, and led to Defendants identifying the WOBL 8-alarm vibrating watch. However, CDCR is currently testing other vibrating watches to provide additional options for the ADA office.

**(f) Who is Defendants' vendor for these watches?**

Maxi-Aids.

**(g) The vibrating watch memorandum states: "The DPH incarcerated person shall sign a CDC Form 193, Inmate Trust Account Withdraw Order, with the reimbursement cost of $35.00 for the vibrating watch in the event of loss and/or intentional destruction/alteration." How did CDCR determine that $35.00 was the appropriate reimbursement cost?**

The appropriate reimbursement cost was determined by the actual price charged by the vendor. Maxi-Aids charges $37.95 plus tax, and that amount was rounded down to $35.00.

**(h) What education has been provided to class members on how to use the vibrating watch?**

At the time of issuance, the ADA Office will confirm that the class member has read and understands the vibrating watch's instruction manual, and that the class member understands and has signed the CDCR Form 128-B, Vibrating Watch User Agreement Chrono. If needed the incarcerated person can always request for additional training.

**(i) How, if at all, did Defendants evaluate whether this model of vibrating watch was usable by deaf class members as an accessible event reminder accommodation?**

Please see the response to (e) above.

**4. DPH Personal Notifications. We ask that Defendants clarify the scope of individual announcements that would be covered by "DPH Class Member Personal Notifications" in Attachment A of Defendants' July 3rd response. At or before the parties' July 18th meeting, please confirm whether or not staff or ADA workers would be required to provide face-to-face notification of:**

**(a) announcements of unscheduled events (*e.g.*, announcing that the class member must immediately report to a given location for an evaluation by a nurse in response to a 7362)**

Yes, staff or ADA workers will be required to promptly provide DPH class members with face-to-face notifications when announcements are made notifying them of unscheduled events.

**(b) announcements of scheduled events (*e.g.*, announcing that the class member must immediately report to a given location for an event for which they previously received a ducat)**

Yes, staff or ADA workers will be required to promptly provide the DPH class members with face-to-face notification when an announcement is made indicating the DPH class member did not report to a given location for a scheduled, ducted event.

**Finally, I am following up on our April 16th and May 31st requests that Defendants produce the results of Defendants' nationwide pager survey. Please produce any and all results of the survey in advance of our July 18th meeting.**

Defendants did not conduct a "nationwide pager survey." Rather, Defendants sent an informal request for information regarding Notifications for Deaf and Hard of Hearing Individuals to twelve (12) state correctional facilities. Four states responded to the request: Texas, North Carolina, Minnesota, and Massachusetts. Texas and North Carolina do not use a pager system. Minnesota and Massachusetts use pager systems.

We look forward to meeting with you tomorrow regarding this matter. Please do not hesitate to contact us with any questions or concerns in the interim.

Sincerely,

*anne M. Kammer*

ANNE M. KAMMER
Deputy Attorney General

For    ROB BONTA
Attorney General

cc:    Ed Swanson, Audrey Barron (Court Expert)
Patricia Ferguson, Tamiya Davis, Ramon Ruiz, Ava Lau-Silveira, Ursula Stuter, OLA Armstrong (CDCR Office of Legal Affairs)
Dawn Lorey, Lourdes White, Darnell Mebane, Kristina Davis, Megan Roberts (CAMU)

Exhibit 85

**Rita Lomio**

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> on behalf of Sharon Garske |
| **Sent:** | Wednesday, August 7, 2024 9:27 AM |
| **To:** | Rita Lomio; ed@smllp.law; audrey@smllp.law; Penny Godbold; Caroline Jackson; Jacob Hutt; Marissa Hatton; Skye Lovett; Sophie Hart; Daniel Greenfield; Armstrong Team; Armstrong Team - RBG only; Jerrod Thompson |
| **Cc:** | Jenn Neill; Ferguson, Patricia@CDCR; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer; Olena Likhachova; Trace Maiorino; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR; Davis, Kristina@CDCR; Roberts, Megan@CDCR (DAI); Wilkerson, Margo@CDCR; Burkart, Brianne@CDCR; Bick, Joseph (CMF)@CDCR; Suzanne.Benavidez@cdcr.ca.gov |
| **Subject:** | RE: Armstrong: For Review: SATF Stipulation Status Statement |

Hi Rita,

CDCR and CAMU have provided responses to your questions in the below chart in red.

| 1 | 9:5-8 | "Defendants retained a qualified expert who is RESNA-certified assistive technology professional to advise Defendants on how to leverage **existing** technology and devices to provide effective communication of general announcements to deaf and hard-of-hearing class members."<br><br>Does reference to "existing" technology and devices here mean that Dr. Swett will consider only technology and devices already in the prison system, and not pagers and congregate visual displays?<br><br>Dr. Swett and CDCR are exploring viable options for providing general announcements to deaf and hard-of-hearing class members at SATF in congregate settings, including but not limited to the "technology and devices already in the prison system." |
|---|---|---|
| 2 | 9:8-9 | ViaPath tablets<br><br>Are incarcerated people allowed to use tablets on all yards at SATF, and is there sufficient reception on the yards to use the tablets?<br>During our visit to SATF last month, class members and line staff uniformly said that tablets are <u>not</u> allowed on the yard. Some referenced a memorandum to that effect. Would you please confirm and send us a copy of any relevant memoranda, including statewide and SATF-specific memoranda?<br><br>Incarcerated persons at SATF are allowed to use the tablets on all facilities, however, the tablets are not operational on the recreational yards (i.e., outdoors) because of connectivity limitations. |
| 3 | 9:9-10 | "The ViaPath tablets will display notifications on the device's home and lock screens that the incarcerated individual must acknowledge, ensuring they read the message."<br><br>If someone is using a tablet, including to read, watch videos, make phone calls, or draft emails, will the notification display on their screen? Put differently, if they are using an |

app, will they see the message (e.g., will the screen they are watching a movie on be interrupted to show a message), or will they see the message only after closing the application and returning to the home or lock screen?

Yes, the notification will appear on the home screen while the incarcerated person is using one of the tablet's applications.

| 4 | 9:26-28 | "[B]ased on feedback from both incarcerated persons and staff, Defendants continue to believe that a human element is equally important to ensure that individual announcements are timely and effectively communicated."<br><br>Please explain how Defendants obtained feedback from incarcerated people, including who provided feedback and whether they were class members, and when, by and to whom, and under what circumstances the feedback was solicited and given. Please produce all relevant documentation, including of the content of the feedback.<br><br>Incarcerated persons regularly interact with correctional staff.  In the course of doing so, the incarcerated population provides feedback to CAMU CCIIs and Compliance Sergeants who conduct internal monitoring.  During regular programming, incarcerated persons reported to programming staff their concerns. |

Thank you,
Sharon

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, August 2, 2024 6:07 PM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@rbgg.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sharon,
??
Thanks again for sending Defendants??? draft of the joint statement. We have a few fact questions, which are listed below. Would you please provide answers by next Wednesday?
??

| 1 | 9:5-8 | ???Defendants retained a qualified expert who is RESNA-certified assistive technology professional to advise Defendants on how to leverage **existing** technology and devices |

| | | |
|---|---|---|
| | | to provide effective communication of general announcements to deaf and hard-of-hearing class members.??? ?? Does reference to ???existing??? technology and devices here mean that Dr. Swett will consider only technology and devices already in the prison system, and not pagers and congregate visual displays? |
| 2 | 9:8-9 | ViaPath tablets ?? Are incarcerated people allowed to use tablets on all yards at SATF, and is there sufficient reception on the yards to use the tablets? ?? During our visit to SATF last month, class members and line staff uniformly said that tablets are <u>not</u> allowed on the yard. Some referenced a memorandum to that effect. Would you please confirm and send us a copy of any relevant memoranda, including statewide and SATF-specific memoranda? |
| 3 | 9:9-10 | ???The ViaPath tablets will display notifications on the device???s home and lock screens that the incarcerated individual must acknowledge, ensuring they read the message.??? ?? If someone is using a tablet, including to read, watch videos, make phone calls, or draft emails, will the notification display on their screen? Put differently, if they are using an app, will they see the message (e.g., will the screen they are watching a movie on be interrupted to show a message), or will they see the message only after closing the application and returning to the home or lock screen? |
| 4 | 9:26-28 | ???[B]ased on feedback from both incarcerated persons and staff, Defendants continue to believe that a human element is equally important to ensure that individual announcements are timely and effectively communicated.??? ?? Please explain how Defendants obtained feedback from incarcerated people, including who provided feedback and whether they were class members, and when, by and to whom, and under what circumstances the feedback was solicited and given. Please produce all relevant documentation, including of the content of the feedback. |

??

If you need clarification on any of the questions above, please let us know.

??

Thank you for your help ??? we appreciate it.

??

Rita

??

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Tuesday, July 30, 2024 1:56 PM
**To:** 'Sharon Garske' <Sharon.Garske@doj.ca.gov>; 'ed@smllp.law' <ed@smllp.law>; 'audrey@smllp.law' <audrey@smllp.law>; 'Penny Godbold' <PGodbold@rbgg.com>; 'Caroline Jackson' <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; 'Armstrong Team - RBG only' <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** 'Jenn Neill' <Jennifer.Neill@cdcr.ca.gov>; 'Ferguson, Patricia@CDCR' <Patricia.Ferguson@cdcr.ca.gov>; 'tamiya.davis@cdcr.ca.gov' <tamiya.davis@cdcr.ca.gov>; 'ursula.stuter@cdcr.ca.gov' <ursula.stuter@cdcr.ca.gov>; 'Lau-Silveira, Ava' <Ava.Lau-Silveira@cdcr.ca.gov>; 'chor.thao@cdcr.ca.gov' <chor.thao@cdcr.ca.gov>; 'ramon.ruiz@cdcr.ca.gov' <ramon.ruiz@cdcr.ca.gov>; 'Anne Kammer' <Anne.Kammer@doj.ca.gov>; 'Olena Likhachova' <Olena.Likhachova@doj.ca.gov>; 'Trace Maiorino' <Trace.Maiorino@doj.ca.gov>; 'dawn.lorey@cdcr.ca.gov' <dawn.lorey@cdcr.ca.gov>; 'darnell.mebane@cdcr.ca.gov' <darnell.mebane@cdcr.ca.gov>; 'White, Lourdes@CDCR'

<[Lourdes.White@cdcr.ca.gov](mailto:Lourdes.White@cdcr.ca.gov)>; 'Davis, Kristina@CDCR' <[Kristina.Davis@cdcr.ca.gov](mailto:Kristina.Davis@cdcr.ca.gov)>; 'Roberts, Megan@CDCR (DAI)' <[Megan.Roberts2@cdcr.ca.gov](mailto:Megan.Roberts2@cdcr.ca.gov)>; 'Wilkerson, Margo@CDCR' <[Margo.Wilkerson@cdcr.ca.gov](mailto:Margo.Wilkerson@cdcr.ca.gov)>; 'Burkart, Brianne@CDCR' <[Brianne.Burkart@cdcr.ca.gov](mailto:Brianne.Burkart@cdcr.ca.gov)>; 'Bick, Joseph (CMF)@CDCR' <[Joseph.Bick@cdcr.ca.gov](mailto:Joseph.Bick@cdcr.ca.gov)>; 'Bick, Joseph (CMF)@CDCR' <[Joseph.Bick@cdcr.ca.gov](mailto:Joseph.Bick@cdcr.ca.gov)>; '[Suzanne.Benavidez@cdcr.ca.gov](mailto:Suzanne.Benavidez@cdcr.ca.gov)' <[Suzanne.Benavidez@cdcr.ca.gov](mailto:Suzanne.Benavidez@cdcr.ca.gov)>

**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

??

Thanks, Sharon. We???ll take a look and return the draft to you on August 12.

??

---

**From:** Sharon Garske <[Sharon.Garske@doj.ca.gov](mailto:Sharon.Garske@doj.ca.gov)>
**Sent:** Monday, July 29, 2024 7:39 PM
**To:** [ed@smllp.law](mailto:ed@smllp.law); [audrey@smllp.law](mailto:audrey@smllp.law); Penny Godbold <[PGodbold@rbgg.com](mailto:PGodbold@rbgg.com)>; Caroline Jackson <[CJackson@rbgg.com](mailto:CJackson@rbgg.com)>; Jacob Hutt <[jacob@prisonlaw.com](mailto:jacob@prisonlaw.com)>; Rita Lomio <[rlomio@prisonlaw.com](mailto:rlomio@prisonlaw.com)>; Marissa Hatton <[mhatton@prisonlaw.com](mailto:mhatton@prisonlaw.com)>; Skye Lovett <[skye@prisonlaw.com](mailto:skye@prisonlaw.com)>; Sophie Hart <[sophieh@prisonlaw.com](mailto:sophieh@prisonlaw.com)>; Daniel Greenfield <[danielg@prisonlaw.com](mailto:danielg@prisonlaw.com)>; Armstrong Team <[arm-plo@prisonlaw.com](mailto:arm-plo@prisonlaw.com)>; Armstrong Team - RBG only <[ArmstrongTeam@rbgg.com](mailto:ArmstrongTeam@rbgg.com)>; [jthompson@prisonlaw.com](mailto:jthompson@prisonlaw.com)
**Cc:** Jenn Neill <[Jennifer.Neill@cdcr.ca.gov](mailto:Jennifer.Neill@cdcr.ca.gov)>; Ferguson, Patricia@CDCR <[Patricia.Ferguson@cdcr.ca.gov](mailto:Patricia.Ferguson@cdcr.ca.gov)>; [tamiya.davis@cdcr.ca.gov](mailto:tamiya.davis@cdcr.ca.gov); [ursula.stuter@cdcr.ca.gov](mailto:ursula.stuter@cdcr.ca.gov); Lau-Silveira, Ava <[Ava.Lau-Silveira@cdcr.ca.gov](mailto:Ava.Lau-Silveira@cdcr.ca.gov)>; [chor.thao@cdcr.ca.gov](mailto:chor.thao@cdcr.ca.gov); [ramon.ruiz@cdcr.ca.gov](mailto:ramon.ruiz@cdcr.ca.gov); Anne Kammer <[Anne.Kammer@doj.ca.gov](mailto:Anne.Kammer@doj.ca.gov)>; Olena Likhachova <[Olena.Likhachova@doj.ca.gov](mailto:Olena.Likhachova@doj.ca.gov)>; Trace Maiorino <[Trace.Maiorino@doj.ca.gov](mailto:Trace.Maiorino@doj.ca.gov)>; [dawn.lorey@cdcr.ca.gov](mailto:dawn.lorey@cdcr.ca.gov); [darnell.mebane@cdcr.ca.gov](mailto:darnell.mebane@cdcr.ca.gov); White, Lourdes@CDCR <[Lourdes.White@cdcr.ca.gov](mailto:Lourdes.White@cdcr.ca.gov)>; Davis, Kristina@CDCR <[Kristina.Davis@cdcr.ca.gov](mailto:Kristina.Davis@cdcr.ca.gov)>; Roberts, Megan@CDCR (DAI) <[Megan.Roberts2@cdcr.ca.gov](mailto:Megan.Roberts2@cdcr.ca.gov)>; Wilkerson, Margo@CDCR <[Margo.Wilkerson@cdcr.ca.gov](mailto:Margo.Wilkerson@cdcr.ca.gov)>; Burkart, Brianne@CDCR <[Brianne.Burkart@cdcr.ca.gov](mailto:Brianne.Burkart@cdcr.ca.gov)>; Bick, Joseph (CMF)@CDCR <[Joseph.Bick@cdcr.ca.gov](mailto:Joseph.Bick@cdcr.ca.gov)>; Bick, Joseph (CMF)@CDCR <[Joseph.Bick@cdcr.ca.gov](mailto:Joseph.Bick@cdcr.ca.gov)>; [Suzanne.Benavidez@cdcr.ca.gov](mailto:Suzanne.Benavidez@cdcr.ca.gov)
**Subject:** Armstrong: For Review: SATF Stipulation Status Statement

??

Hi All,

??

Attached for review and comment is the draft joint SATF stipulation status statement.?? Please note, as discussed at recent SATF stipulation meetings, we have inserted ???placeholder??? language for SATF 1-3 and 9 & 10 as the parties are actively negotiating those items and in SATF 6 until CCHCS provides an update to that item.?? We can continue to revise and update those sections as appropriate.?? We have also inserted placeholders for attachments, which can be finalized in the final review of the statement.??

??

Please forward the statement to others in your offices as appropriate.??

??

Please contact us with any questions.?? Thank you.

Sharon

??

??

Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222

??

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is

prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 86

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                 GAVIN NEWSOM, GOVERNOR

**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN**
WARDEN BRYAN D. PHILLIPS
CEO ANU BANERJEE, Ph.D, FACHE
900 Quebec Avenue, Corcoran, CA 93212



February 16, 2023

VIA EMAIL ONLY

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

### RE:   *ARMSTRONG v. NEWSOM* – SUMMARY OF SATF AMT FINDINGS

Dear Ms. Lomio:

We write in response to your letter of November 21, 2023, regarding the summary of your monitoring tour at California Substance Abuse Treatment Facility (SATF).  You report multiple issues requiring response from local custody and healthcare staff, and from California Department of Corrections and Rehabilitation (CDCR) headquarters as well.

The following is an itemized response to your concerns:

### I.    Tracking of Non-Medical Assistive Devices

SATF looks forward to continued coordination between headquarters, Class Action Management Unit (CAMU), and Enterprise Information System (EIS) to expand the capabilities of the Strategic Offender Management System (SOMS) property module.  As of now, SATF most commonly allows the purchase of non-medical assistive devices such as talking and vibrating watches for the vision and hearing impaired.  As these are received and issued, they are  added to SOMS as registered personal property.  Similarly, as with newer devices such as the Personal Sound Amplification Device (PSAP) and the iPhone/iPad, SOMS has been updated to allow entry into SOMS as registered property.  SATF is monitoring these updates and complying with direction as it becomes available.

Regarding Person E and the Ergo Writer, the CDCR and California Correctional Health Care Services (CCHCS) do not have a disability code for upper extremity disabilities.  Similarly, the Ergo Writer, Arthwriter, and Steady Write pen do not exist in SOMS.  However, Person F received the Ergo Writer on July 26, 2023, and Americans with Disabilities Act (ADA) staff entered it into the SOMS property module as a Property Package Received.

### CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

DocuSign Envelope ID: 94B7D172-8004-4234-A545-F68D42D0A652

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
Page 2

**II.    Charges for Non-Medical Assistive Devices**

SATF is aware of CDCR's intent to incur the cost of Reasonable Accommodation Panel (RAP) approved assistive devices which are not medically prescribed.  Current CDCR procurement processes do  not  allow such purchases in the time constraints imposed by the RAP process. SATF will remain diligent in ensuring each request for reasonable accommodation is granted when access to programs, services, and activities or the performance of activities of daily living cannot be achieved without any reasonable alternative. Upon receipt of more specific direction, SATF will update our local operating procedures accordingly.

**III.    Accessible Phones (TDD, Captioned Phones, and Tablets)**

**TDD**
SATF agrees that the current method of testing the TTY/TDD is inadequate.  Although we have confirmed policy required quarterly testing, the manner in which we test does not benefit our staff or the incarcerated population.  Our CAMU Correctional Counselor II (CCII) contacted the California Relay Service and discovered a manner in which to test the Voice Carry Over (VCO) function that was not previously present in Departmental policy, nor known to any of our staff. Specific to the two issues identified in your report (garbling and VCO), the CCII discovered an improved testing method that has been implemented at SATF.

Moving forward, SATF will ensure quarterly testing is conducted by housing unit staff with the assistance of the ADA Field Training Sergeant (FTS).  This will ensure on-site personnel with the most contact with the hearing-impaired population have the knowledge and ability to provide assistance when needed.  Additionally, SATF will update our local quarterly testing policy to include this new information.

**Captioned Phones**
SATF is in receipt of previous advocacy regarding Person E and his use of the captioned phone in the facility Chapel.  SATF sent a response to CAMU and the Office of Legal Affairs (OLA) on September 26, 2023, outlining Person E's successful use of the captioned phone and his ability to access it moving forward.  The response also reports 78% completion rate of Learning Management System (LMS) training for the previous year 2022.  Our In-Service Training (IST) department is currently cycling the training again to all custody staff.  Furthermore, the Americans with Disabilities Act Coordinator (ADAC) has completed an operational plan for the ADA FTS to complete during the weeks of December 4 and December 11, 2023.  The FTS will conduct town hall meetings with staff and hearing/vision disabled inmates to facilitate hands-on training with the caption phones and other assistive devices related to each respective disability.

SATF is currently in the process of identifying or procuring additional phone lines in order to relocate each captioned phone to the housing unit dayrooms.  The intent is to maintain each captioned phone in the designated housing unit, for use near the normal housing unit Global Tel

*LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF*
Page 3

Link Corporation (GTL) inmate phones. The captioned phones will remain accessible in the facility Chapels in the meantime.

## Tablets

CDCR continues to pursue ways to increase the accessibility of GTL tablets to deaf and hard-of-hearing users. In the meantime, SATF has issued interim policy to allow hearing impaired inmates greater access to the Telecommunications Device for the Deaf (TDD) or captioned phone. The policy states DNH (hearing impaired individual) and DPH (deaf or severely hearing-impaired individual) class members may sign-up during normal programming hours. Housing unit staff shall allow access as a means of reasonable accommodation when security concerns would not otherwise prohibit access. DNH and DPH class members will be allowed to sign up for additional time slots for both the TTY/TDD and captioned phones. If a DNH or DPH class members use of the TTY/TDD or captioned phone is cancelled for any reason outside their control, the DNH or DPH class member will be allowed to sign-up for a vacant slot during the same day as the cancellations, if available. CDCR is also in pursuit of a vendor with an appropriate over-the-ear headphone to supply all necessary institutions.

## IV.    VIBRATING WATCHES

The ADAC at SATF regularly approves the purchase of vibrating or talking watches from the MaxiAids catalog to inmates with qualifying disabilities. SATF and the ADAC have not encountered any security concerns related to the possession of these watches. The ADAC and CAMU CCII have both communicated with the inmate mentioned in your report about the specific vibrating watch tested by CAMU. These communications included conversations completed with a Sign Language Interpreter (SLI) and without. In the one occurrence in which an SLI was not used, it was because one was not available. Written notes were used to ask if he wanted to postpone the meeting until an SLI was available, and he declined. The ADAC has since confirmed with the assistance of an SLI, and with complete certainty that the inmate who tested the watch was able to effectively communicate his opinion of that watch on the survey. We all have the same understanding the person who tested the watch believes it was of poor quality and did not vibrate nearly strong enough. Due to these issues, he had no interest in continuing to use it.

## V.    EFFECTIVE COMMUNICATION OF ANNOUNCEMENTS

SATF is committed to ensuring all disabled inmates are offered equal access to programs, services, and activities. In doing so, SATF follows the Armstrong Remedial Plan (ARP) and Local Operational Procedure (OP) 403 – Disability Placement Program.

The ARP states the following:
*"Each institution/facility (DPP designated institutions, non-designated institutions, and reception centers) shall ensure that effective communication is made with inmates who have hearing*

**LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF**
Page 4

*impairments impacting placement regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc. All verbal announcements in housing units where inmates with hearing impairments impacting placement reside shall be done on the public address system (if applicable) and by flicking the unit lights on and off several times alerting hearing-impaired inmates that an announcement is imminent. The verbal announcements may be effectively communicated via written messages on a chalkboard or by personal notification, etc."*

Local OP 403 – Disability Placement Program, on page 52 of 79, states the following:
*"CSATF/SP shall ensure that effective communication is made with inmates who have hearing impairments, impacting placement, regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc.*

*All verbal announcements in units where inmates with hearing impairments impacting placement are housed, will be done on the building's public address system and by turning the unit lights on and off several times (where possible), alerting hearing-impaired inmates that an announcement is imminent. Custody staff shall also ensure, through personal notification (via dry erase board or other means such as ADA Workers), that the announcement has been communicated to the inmate..."*

SATF currently houses seven hearing impaired inmates impacting placement (disability code DPH). In your report notes, you observed regular housing officers on Facility G make public announcements about recreation yard without flashing the lights or providing individual notification. The CAMU CCII was with you as you observed this, and confirmed you were in housing unit G2 at that time. The CAMU CCII and ADAC have identified the officer you are referring to and have since discussed the matter with him. At the time of your tour, and at the time of this writing, there was/is one DPH inmate on Facility G, and he is not housed in G2. He is housed in G3. There is, however, an inmate housed in G2 whose primary method of communication is through the use of an SLI, and his alternate method is the use of his hearing aids. This inmate is designated DNH (hearing impaired, not impacting placement), and he is not deaf. While SATF remains committed to achieving effective communication with our hearing-impaired inmates impacting placement, the ARP and DPP do not require flashing lights and personal notification for the example you provided. We will continue to provide appropriate notifications where required and continue to keep our white boards current and updated as our daily schedules fluctuate.

## VI.    CART

SATF and the ADAC are aware of existing policy related to Communication Access Real-Time Translation (CART) and provide the accommodation, when appropriate. With regard to the

DocuSign Envelope ID: 94B7D172-6004-4224-A545-F68D42D0A652

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS
MEMBERS AT SATF***
Page 5

recent committee in which CART was used, the transcripts have been provided by CART, and
scanned into the Electronic Records Management System (ERMS).

The two 1824s referenced in your letter are from ███████████ and ███████████
Separate advocacies were received for both individuals asserting the same or similar issues. An
advocacy response was provided to you for ██████████ on February 12, 2024. For ██████████ the
advocacy response was sent to you on February 6, 2024.

Of note, the ADAC has approved other inmates at SATF to use CART for due process events.  At
the roll-out of CART, the ADAC met with Inmate Advisory Councils (IAC) and hearing-impaired
inmates.  At that time there were 12 DNH inmates who used written notes as a form of effective
communication.  The ADAC granted CART access to each of them in August of 2023 as a non-
formulary accommodation during due process events, and this is documented in SOMS.

SATF and the ADAC will continue following evolving policy and procedure regarding any type of
live captioning hardware or software as it is released.

**VII.    AUXILIARY AIDS IN THE LIBRARIES**

Regarding the availability of librarians at SATF, we currently have a Senior Librarian and two
Library Technical Assistants (LTAs) covering all six libraries across the institution.  Therefore, we
are operating on a rotational schedule in order to have each library open two days per week.
However, this is only achievable with all three staff members are at the institution (excluding sick
time, holidays, training days, or vacations).  SATF currently has five vacant library positions.  The
Librarian and LTA positions were advertised, but no qualified applications were received. We are
currently working with our personnel department to readvertise the positions.

You report Defendants previously told the court SATF would consider requests for additional
library access on a case-by-case basis, but you believe that to be untrue.  You state case-by-case
considerations were not made, and the RAP simply ignored the requests or denied them by
reciting existing policy.  You have cited several RAP responses to illustrate your claim, but your
citations are only partial, and do not include all necessary and relevant information.

Clarification of the RAP responses you cited is as follows:

**SATF-F-23-01097**
Your report does not include the portions of the RAP response which explained during the time
of the 1824 the institution was on a modified program due to mass institutional searching, during
which time library resources were only available via paging.  It also doesn't mention the inmate
was reminded that during this temporary period of time, he had unrestricted access to the full-

*LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF*
Page 6

page magnifier in his housing unit to assist him with reading and writing.  As such, alternate means of accessibility were available.

### SATF-E-23-00137

Your report does not include the portion of the RAP response which explained the inmate had unrestricted access to a full-page magnifier in his housing unit, which provides an alternate method of equal access.

### SATF-F-23-00326

The inmate claims that even if the library were open as much as he would like it to be, he would be unable to go because he is 'double assigned' and could not go anyway.  The RAP response clarifies to the inmate that he may access the library while not relegated to any other assignment and reminds him the full-page magnifier is always available his housing unit, which offers an alternate means of accessibility.

### SATF-F-23-00753

The filer of this 1824 did not request additional library access.  The inmate made three specific requests: 1) I would like to speak with someone knowledgeable about the Hadley School Braille course and would like to enroll in this course; 2) I need a keyboard, ideally with braille on it, to attach to my ViaPath tablet.  Please coordinate with ViaPath to provide me with one; and  3) I would like reasonable access to an omni reader or similar scanner/reader in my cell, which will read documents to me.  Your report does not include that the RAP response also reports the inmate was provided a handheld lighted magnifier on April 10, 2023, and also received a personal meeting with education staff resulting in a substantive response to each of his three requests.

With regard to the extended period of time in which a repaired assistive device was not returned to SATF, it is important to note that regardless of that problem, none of the libraries were without an operational Merlin or DaVinci.  Even with devices out for repair, all libraries were outfitted with either a Merlin or DaVinci to ensure consistent and equitable access.

As of the time of this writing, SATF has received 20 Zoomax digital magnifiers which will be made available to DPV inmates for in-cell use.

### VIII.  AUXILIARY AIDS IN THE RESTRICTED HOUSING UNIT

SATF has received your previous advocacy about the lack of reading and writing accommodations available to blind and low-vision people in the Restricted Housing Unit (RHU).  In coordination with our education team, SATF has placed an ADA computer into the RHU, and it is connected to the inmate network.  It has the same functionality as the ADA computers in our general population.  It is equipped with JAWS, and Windows Ease of Access, which includes a magnifier, narrator, on-screen keyboard, and Windows Speech Recognition.  Inmates housed in the RHU

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
Page 7

will work with our education team to obtain individualized username and passwords to access individual Canvas accounts which will allow word processing and printing.  Additionally, SATF has purchased a Merlin to be placed in the RHU to supplement the ADA computer.  Due to the very recent addition of these new devices in the RHU, updates to multiple local operational procedures are pending.

The ADAC will work with our education team to follow up on pending repair of the inoperable LexisNexis in the RHU.  However, it is important to note the ViaPath tablets have a Law Library application which contains access to LexisNexis.  This is available to inmates housed in the RHU while inside their cells and is compatible with imbedded accessibility features such as the talk back screen reader, select to speak, captions, magnification, high contrast text, text to speech output (how fast or slow the voice speaks), color correction, color inversion, and adjustment/enlargement of font size, display size, and screen rotation.

### IX.  FIELD TRAINING SERGEANTS (FTS) AND 1824s

The RAP has met with specifically identified 1824 high filers, especially those who continually use the 1824 for a purpose it is not designed for.  The RAP has also met with the IACs about the same issue.  As it must be reasonably understood, the RAP at SATF receives the largest volume of 1824s in the state.  This consistently exhausts resources across multiple program areas thereby greatly reducing available resources to monitor other areas of the DPP . The reason the RAP conducted this education was to increase personal communication, improve patient care, and streamline the RAP process to improve our performance.  During these meetings, the ADAC, other members of the RAP, and the FTS have made it abundantly clear that our message was not to be interpreted as a discouragement from requesting a reasonable accommodation related to a disability.

The ADAC has confirmed with the ADA Field Training Lieutenant that you have misrepresented his statements to you about his lack of review of previous SATF reports from you or the Court Expert.  There have in fact been multiple.  He has received them from the ADAC, and they have been the basis for the specific topics for discussion in weekly meetings between the Lieutenant, FTS, and the ADAC.

### X.  TRIAGING AND RESPONDING TO DME-RELATED 7362s

As noted by Plaintiffs above, the issue raised regarding ███████████, was addressed in the advocacy letter dated October 9, 2023. SATF maintains Health Care Department Operations Manual (HCDOM) 3.1.5 Scheduling and Access to Care policy was followed. Additionally, SATF notes that ██████was seen per nursing face-to-face documentation dated October 9, 2023, the chief complaint was a request for change in medication and the expired wheelchair was also removed during this encounter. There is no documentation to support that ██████ disagreed with the wheelchair being removed; however, it is documented that ██████was

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
Page 8

upset that he had to wait a week to address his medication concern with his provider and reported a complaint would be filed with the Prison Law Office.

In the case of , per pre-boarding transfer documentation dated July 26, 2023, from San Quentin State Prison, the registered nurse (RN) noted the there was no missing Durable Medical Equipment (DME) prior to transfer; however, RN, completed a 7536 DME receipt removing a wedge pillow, back brace and foot orthosis denoting items were not in possession. Upon arrival to SATF, per initial health screening documentation dated July 26, 2023, the RN only noted a missing wedge pillow which is a non-formulary item and was not available to dispense from Release and Receiving (R&R). Per Operational Procedure 467 - Durable Medical Equipment, the R&R RN shall notify the Care Team via message pool of the missing DME for follow up and complete an electronic Health Care Incident Report (HCIR). SATF acknowledges that the current approved procedure was not followed by the RN staff located in R&R and subsequently staff in R&R received training on November 30, 2023. Additionally, the 7362 submitted by ▮▮▮ on July 27, 2023, was triaged appropriately, and routed to the Medical Assistant (MA) for resolution. Per Progress Note dated August 8, 2023, an order to the warehouse was placed on August 7, 2023, for the wedge pillow. The wedge pillow was delivered to the clinic and issued to the patient on the same date of August 11, 2023, two days past the compliance date. The MA was counseled and provided training regarding delivery time frame compliance on November 30, 2023.

In the case of ▮▮▮▮▮▮, after reviewing the CDCR 7362 that was submitted on September 5, 2023, SATF acknowledges that because ▮▮▮ reported "aggravated injuries" as a "symptom," this 7362 should been triaged accordingly and seen within one business day.  The RN involved in this case received training on November 30, 2023.

In the case of ▮▮▮▮▮▮, after reviewing the CDCR 7362 that was submitted on September 13, 2023, SATF acknowledges that because ▮▮▮ reported "back and legs go out" as a "symptom," this 7362 should been triaged accordingly and seen within one business day.  The RN involved in this case received training on November 30, 2023.

In the case of ▮▮▮▮▮▮, after reviewing the CDCR 7362 that was submitted on September 13, 2023, SATF acknowledges that because ▮▮▮ reported "unsteady and trouble seeing" as a "symptom," this 7362 should have been triaged accordingly and seen within one business day. The RN involved in this case received training on December 5, 2023. During the face-to-face nursing encounter on September 28, 2023, the RN exam noted the patient's gait was steady and had normal strength and sensation in bilateral lower extremities. ▮▮▮ was appropriately

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
**Page 9**

referred to the Primary Care Physician (PCP) for further evaluation for the request for a walker/wheelchair. Per Outpatient Progress Notes dated October 10, 2023, the patient was incoherent and was sent to higher level of care and the evaluation for walker/wheelchair could not be completed by the PCP. While ▓▓▓ was hospitalized, brain imaging, including computed topography (CT) and magnetic resonance imaging (MRI) were completed, and results were unremarkable. ▓▓▓ was seen by Neurology on October 19, 2023, and the exam did not note any neurological deficits. ▓▓▓ was seen on November 18, 2023, and reported to his provider his attempts to manage his stress in healthy ways including stretching, running, walking laps, and working out. No neurological deficits were noted at this encounter. Although SATF contends that there is sufficient evidence within the medical record to conclude that ▓▓▓ does not meet medical necessity for a walker or wheelchair, a new examination was completed on November 29, 2023. Per progress notes, PCP observed patient's balance and steady gait to and away from the exam room, able to move all extremities, no focal deficits, motor strength intact 5 out of 5. ▓▓▓ is currently accommodated with a low bunk due to seizure history and is not a class member. PCP did not find any evidence to support any type of assistive device for mobility.

In the case of ▓▓▓ after reviewing the electronic medical health record, SATF agrees with the Plaintiffs' findings that the 7362 was never processed by the MA. Training was provided on December 5, 2023. On November 29, 2023, Chief Physician and Surgeon interviewed ▓▓▓ to ensure during the time the gloves were missing, ▓▓▓ did not experience any issues accessing programs, services, or activities. ▓▓▓ reported that in addition to the wheelchair, he also uses a cane and prosthesis as prescribed. ▓▓▓ stated he was able to access all programs during the time his gloves were not in his possession. He further stated, since having his prosthesis replaced two months ago, he has been ambulatory and does not need a wheelchair. ▓▓▓ requests to transition to walker. An order for his primary care to evaluate for a walker has been placed and ▓▓▓ will be seen prior to the compliance date of December 13, 2023.

SATF acknowledges that commitments were made to the Plaintiffs in the prior advocacy letter noted by Plaintiffs regarding a 7362 audit that focuses on servicing all 7362s that reference DME within one business day. At the time, the intent of the commitment was to develop a system here at SATF to self-monitor our current processes and fulfill DME requests at the earliest date possible. It was not intended to replace the current policy as it pertains to triaging 7362s. SATF does not plan to change any policies related to the 7362 processes. The nursing department performs a monthly 7362 audit, this audit consists of a random sampling of all 7362s from each yard (which includes but is not inclusive to those related to DME) to determine if they are processed timely and triaged appropriately per HCDOM 3.1.5 Scheduling and Access to Care policy. This audit is time limited and subject to review and revision as issues are identified.

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
Page 10

## XI. EFFECTIVE COMMUNICATION WITH DEAF AND HARD-OF-HEARING CLASS MEMBERS DURING HEALTHCARE APPOINTMENTS

SATF contends a response to the advocacy letter for ███████████████ was submitted on September 26, 2023. However, the allegation of non-compliance made on behalf of ███████ (Person E) for the September 26, 2023, medical encounter was discovered during the monthly effective communication audit that SATF performs. Subsequently the allegation was placed on the accountability log on October 10, 2023, Log No. 00046152. Inquiry findings were confirmed, and the provider received verbal counseling. In review of the ADA summary tab of EHRS, the primary and secondary methods of communication were selected by ██████ on December 13, 2022, and again on August 21, 2023. Upon receipt of Plaintiffs' letter , the ADAC noted that ██████ had transferred to San Quentin State Prison on October 23, 2023, where his primary and secondary methods selection remained the same. The ADAC at San Quentin was notified of Plaintiffs' concern on November 22, 2023, and a new designation by ██████ was made on November 27, 2023.

## XII. SIGN LANGUAGE INTERPRETATION FOR DEAF SIGNERS

Plaintiffs' Counsel's allegation of failure to provide effective communication for ███████████, (encounters November 2 and 7, 2023) and █████████████, (encounter date June 26, 2023) were placed on the healthcare accountability log on November 27, 2023. In the case of ████ Log No. 00047275, an inquiry was completed and  not confirmed. In the case of ██████ Log No. 00047316, the inquiry was confirmed. The remaining persons raised by Plaintiffs were previously identified during routine audits completed by SATF staff or headquarters staff as follows:

████████████, (encounter date October 26, 2023), placed on log November 14, 2023, under Log No. 00047115 and the inquiry was confirmed.

██████████, (encounter date October 4, 2023), placed on log November 13, 2023, under Log No. 00047090 and the inquiry was not confirmed.

██████████, (encounter date September 2, 2023), placed on the log October 13, 2023, under Log No. 00046209 and was confirmed.

## XIII. RECONCILIATION AUDITS

Development of the reconciliation audit began as a data collection method for SATF to gain understanding where problems may exist. Throughout the duration of the audit, when issues are identified, individual providers receive training.  SATF has not identified a need to add additional auditors at this time. Ultimately, primary care providers are responsible for reconciling news arrivals to the institution for their respective care teams, not the auditor.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

***LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF***
**Page 11**



██████████████ **Log No 23-01488**
SATF acknowledges the RAP response provided to ████████ under Log No. 23-01488 was answered incorrectly due to the time lapse from when the RAP made a determination and when the response was sent to ████████. At the time medical wrote the DVP (August 11, 2023), ████████ was not a class member and there was an order for Optometry pending. RAP met on August 16, 2023, to review the case, and the information provided in the medical DVP was accurate. RAP was unaware that ████████ was no longer housed at SATF between the dates of August 19-30, 2023, resulting in the cancelled optometry order when the RAP response was issued on September 7, 2023.

Plaintiffs incorrectly report that ████████'s optometry appointment was not reconciled because NP ████████ was on vacation. In fact, the sending institution, CMF, failed to reconcile the Consult to Optometry order upon arrival. Consequently, when ████████ returned to SATF the order was not visible to the receiving institution. The current reconciliation tool available to providers has limitations and only populates orders from the previous encounter. The success of the tool primarily depends on each proceeding institution performing a proper reconciliation on new arrivals, so the orders are visible to the successive institution. Nonetheless, ████████ was seen by optometry on November 30, 2023. On exam ████████ has 20/25 vision in one eye which is correctable to 20/20 vision.

## XIV.    RELATIONSHIPS BETWEEN PATIENTS WITH DISABILITIES AND HEALTHCARE STAFF

SATF maintains that the presence of a custody officer during a health care encounter is dependent on the incarcerated persons security level. For example, maximum security individuals are always accompanied by a custody officer. Incarcerated individuals receiving care in an outside hospital, also are always accompanied by a custody officer. However, in general, custody staff is not required during a health care encounter with a patient who is not maximum custody or whose current behavior does not present a threat to the safety of staff or other patients as noted by Plaintiffs. Considering the recent interviews conducted by Plaintiffs with custody officers, the Captain of Healthcare has reiterated the policy to CTC officers. SATF will also revise current verbiage in OP 427 to mirror precise language in HCDOM § 3.1.5(c)(3)(E)(3) at the next annual revision date to ensure there is less confusion regarding the different requirements based on security level. Attached to this letter is CCHCS Memorandum dated March 5, 2018, titled "Security Precautions and Inmate Privacy During Health Care Encounters" for Plaintiffs' consideration.

## XV.    RVRs INITIATED BY MENTAL HEALTH STAFF

SATF is unable to substantiate Plaintiffs' claims that mental health staff are issuing Rule Violation Reports (RVR). In response to the first Court expert report, SATF initiated RVR training to all health care staff which included all medical, dental, and mental health staff.    Training was completed in October 2022.    SATF requests that Plaintiffs provide specific cases occurring after October 2022 for investigation.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

**LACK OF WRITING ACCOMMODATIONS AND PROGRAMING FOR BLIND AND LOW-VISION CLASS MEMBERS AT SATF**
Page 12

Sincerely,

DocuSigned by:

*Bryan Phillips*        2/16/2024
92548B2349FE4E7...
BRYAN D. PHILLIPS
Warden (A)

DocuSigned by:

*Anu Banerjee*        2/16/2024
22A0E0021FCB4AB...
ANU BANERJEE, Ph.D., FACHE
Chief Executive Officer

Cc:
Ed Swanson, Court Expert
Plaintiffs' Counsel
Defendants' Counsel

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

DocuSign Envelope ID: 94B7D172-80D4-4224-A545-F68D42D0A652

# Attachment #1

CSATF/SP shall ensure the CCR, notices, orientation packages, announcements and similar printed materials distributed to inmates, are accessible to inmates with disabilities. Accommodations such as magnifiers, photocopy enlarging, inmate or staff assistance, computer assisted devices, and audiotapes shall be given when necessary. Institution staff shall provide the assistance and equipment necessary to all inmates with disabilities on a case-by-case basis to ensure that inmates who have difficulty reading and/or communicating in writing will be provided reasonable access to forms, regulations and procedures.

The ADA Coordinator has overall responsibility to ensure all written materials provided to inmates with disabilities are provided in accessible formats such as large print, audiotape, or are provided the assistance or equipment necessary to ensure access. The CCR, Title 15 on audiocassette/CD may be obtained via the LTA.

The LTA will ensure disabled inmates are provided access to equipment, or written materials, as soon as possible, but at least within seven working days upon request.

R&R Officers responsible for disseminating written orientation materials will ensure large print Orientation Manuals are provided to visually impaired inmates, who require large print.

(2)   Verbal Announcements and Alarms

CSATF/SP shall ensure that effective communication is made with inmates who have hearing impairments, impacting placement, regarding public address announcements and reporting instructions, including those regarding visiting, yard release and recall, count, lock-up, unlock, etc.

All verbal announcements in units where inmates with hearing impairments impacting placement are housed, will be done on the building's public address system and by turning the unit lights on and off several times (where possible), alerting hearing impaired inmates that an announcement is imminent. Custody staff shall also ensure, through personal notification (via dry erase board or other means such as **ADA Workers**), that the announcement has been communicated to the inmate. Notification requirements for specific inmates should be noted on the **picture board/binder** as described below (Special Identification).

Attachment #2



# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Claudia Ceseña
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Sara Norman
Donald Specter

VIA EMAIL ONLY

November 21, 2023

Ed Swanson
Court Expert

Tamiya Davis
CDCR Office of Legal Affairs

RE:    *Armstrong v. Newsom*
       Summary of SATF Monitoring Tour Findings

Dear Mr. Swanson and Ms. Davis:

Plaintiffs conducted a monitoring tour of SATF this month. During the tour, we saw nothing to suggest that our previous concerns had been addressed. *See* Dkt. No. 3510. In fact, we found evidence of backsliding. We learned that previously promised corrective actions either had not in fact been implemented or had been rescinded. *See Armstrong v. Newsom*, 58 F.4th 1283, 1298 (9th Cir. 2023) (holding that district court properly "include[d] measures in its orders that Defendants may have adopted voluntarily" because "voluntary plans may change").

In light of the Court's November 7, 2023 order, we provide a summary here of several findings related to Defendants' failure to cure the violations found in the Court Expert's first and second SATF reports and inaccurate information provided by Defendants to the Court, Court Expert, and Plaintiffs' counsel. We do not attempt to "re-prove" the Court Expert's previous findings. Those findings are undisputed. Nor do we re-explain why Defendants' proposed remedies are inadequate. The parties already briefed that issue.

We also note that the information in this letter is by no means complete. It has been difficult to get timely, accurate, and complete information from Defendants and to keep up with Defendants' ever-changing positions on many of these issues.[1]

---

[1] Furthermore, we intentionally focused our recent monitoring tour on issues not directly covered by the Court Expert's investigation. (The Court's recent order was issued during our tour.) We will later share in writing our concerns about ADA violations and *Armstrong* violations that do not directly fall within the scope of the Court Expert's current investigation and/or that require additional investigation by Plaintiffs' counsel to confirm. We shared several such issues with institution and headquarters officials during an exit meeting yesterday.

[4393326.1]

**Board of Directors**
Christiane Hipps, President and Treasurer • Seth Morris, Vice President
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Michael Marcum • Jean Lu
Claire McDonnell • Ruth Morgan • Adrienne Yandell

DocuSign Envelope ID: 94B7D172-8004-4234-A545-F68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 2

We ask that Defendants explain what they will do to address each issue below. Plaintiffs may send more specific requests related to these issues at a later time.

## CUSTODY

### 1.    Tracking Non-Medical Assistive Devices

Defendants told the Court that they would respond to Plaintiffs' April 11, 2023 letter requesting that they develop a system to purchase and track non-medical devices as reasonable accommodations by November 6, 2023. *See* Dkt. No. 3504 at 7. Defendants have not done so as of November 20.

The interim solution Defendants said is in place still does not appear to be working. Plaintiffs previously informed Defendants that the ErgoWriter for Person F did not appear to be properly documented. *See* Dkt. No. 3510 at 20 n.7 (Sept. 21, 2023). According to the electronic medical record and DPP Roster dated November 17, 2023, that appears still to be the case. Defendants also have not explained whether and how they intend to document reasonable accommodations that individuals previously purchased for themselves.

### 2.    Charges for Non-Medical Assistive Devices

On October 5, 2023, Defendants represented to the Court that "**effective immediately** statewide, when RAP approves a Reasonable Accommodation that allows access to programs, services, and activities, CDCR will incur the cost associated with the reasonable accommodation when no reasonable alternative exists, unless such an accommodation creates an undue burden under the ADA. CDCR will revise the applicable local operating procedures to comport with the foregoing policy." Dkt. No. 3515 at 7 (emphasis added). The next week, Plaintiffs' counsel asked Defendants for a copy of "whatever direction went out to the field about the new statewide policy referenced in Defendants' court filing." *See* Email from Rita Lomio, Prison Law Office, to Trace Maiorino, Office of the Attorney General (Oct. 13, 2023). Defendants have not responded over a month later.

During our monitoring tour, the ADA Coordinator said that he had not received any direction to depart from existing policy that requires the person with a disability to pay for non-medical reasonable accommodations and said pocket talkers are the only non-medical reasonable accommodation he has "provided without the inmate paying for it." The ADA Coordinator said that he had not received instruction to update the LOP related to payment for reasonable accommodations.

DocuSign Envelope ID: 94B7D172-6004-4224-A545-F68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 3

**3.    Accessible Phones**

    **a.    TDD**

Defendants have twice told the Court – first in January and then in September 2023 – that SATF would test TDDs monthly. *See* Dkt. No. 3453 at 16; Dkt. No. 3504 at 11. That appears to be untrue. Both the ADA Coordinator and CAMU CCII confirmed that testing is supposed to be done quarterly per the most recent LOP, which the ADA Coordinator confirmed is dated June 2023, and not monthly. The ADA Coordinator said that SATF did not document testing of the TDD but had repeatedly found problems with the TDD during tests.

Defendants represented during a Deaf/Hard-of-Hearing Workgroup meeting that the CAMU CCII would be responsible for testing. Both the ADA Coordinator and CAMU CCII said they had received no direction that the CAMU CCII (or any other particular staff person) should be responsible for testing, and that they eventually wanted to have the CCI who tests VRI be responsible for testing the TDD. (That may not be a good system, as housing officers and not just ADA staff need to be familiar with the TDD and how to use it.)

The manner of testing itself seems to be inadequate. It appears to require only that the TDD be connected and that a prison line be called, with the tester confirming that the automated introductory language on the line is transcribed. The tester does not confirm that Voice Carry Over (VCO) works and does not do a test call with a live person on the other side to make sure the connection is sufficient to support a clear conversation.

When we tested the TDD during the tour, we found that no one knew how to get VCO to work (both ADA staff and housing officers were with us) and that the connection was insufficient to support a clear conversation. As seen in the transcript on the next page, text was garbled with Xs and ~s in place of words.

. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .

[4393326.1]

| *Transcription of automated recording at beginning of call* | *Transcription of call itself* |
|---|---|
| DIAL A DTMF 1 FOR ENGLISH, MARQUE EL NUMERO DOS EN DTMF PARA ESPANCUTO MAKE A COLLECT CALL DIAL A DTMF 0MPTHIS CALL WILL BE RECORDED AND MONITORED. THANK YOU FOR USING GLOBAL TEL LINK. YOUR CALL IS BEING PROCESSED. THANK YOUTHANK YOU. THIS CALL IS FROM AN INMATE AT THE CALIFORNIA DEPT OF CORRECTIONS. THIS CALL WILL BE RECORDED AND MONITORED. PLEASE DIAL THE FOLLOWING  5 1 | 0 2 8 0 2 6 2  510-280-2621  RING 1 ^X^IN LAW OFFICE (F) GA this is rita from satf ga (CA HERE GARBLE PLEASE REPEAT) GA ^'^XX^X'X^'-^'X^XX'X^X''X^'X^'^^PVO-UR VOICE GA hello this is rita calling from satf wanting to test tdd :a HI RITA I CAN IT S WORKING GA hi ashley rita here i was trying to see if this tdd would work and whether i could use my voice to speak withyou directly ga ^'^XX'X^X'X^N^G^X'X^^X'-^^X^''X^WE OUR OFFICE GA we are not receiving what you are saying it is coming back garbled can you try another sentence ga ^X''X^'^^PH I TIXX^ RITA YOU SHOULD WRITE  OUR OFFICE) GA thanks ashley hope you have a good day ga THANKS RITA GOOD 'LUCK SKSK (PERSON HUNG UP) GA |

(The lowercase text is what we typed on the TDD at SATF, and the capitalized text is what we received back when we attempted to speak with the Office Manager at the Prison Law Office.)

###### b.    Captioned Phones

Defendants told the Court that they provided the Court Expert and Plaintiffs with a captioned phone survey on October 5, 2023 (the same day they filed their reply brief) "that addressed accessibility, location, functionality, and class-member education." *See* Dkt. No. 3515 at 13. In fact, the survey contained limited information on SATF (reprinted below) and on its face raised serious concerns, which Plaintiffs memorialized in a letter. *See* Letter from Claudia Ceseña

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 5

& Rita Lomio, Prison Law Office, to Ramon Ruiz, Office of Legal Affairs, Captioned Phone
Implementation (Nov. 2, 2023). Defendants have not yet responded.

| Have Institution Received Caption Phones? | Yes |
|---|---|
| Amount of Caption Phones Ordered | 9 |
| Location of Caption Phones | Designated clustered buildings per facility, CTC, and STRH |
| Are Caption Phones Accessible to MHCB and CTC Inmates? | Yes |
| Any Barriers for DPH Inmates to access Caption Phones? i.e. recv'd caption phones,however, phones have not been installed (please advised if a remedy ticket has been submitted to EIS for installation. Please include the date of submission and remedy ticket number. | None |
| Please provide a brief statement on how will the Caption Phone info be communicated to your Deaf/HoH populations. i.e. how it works? | Townhall meetings with IAC members |

Defendants also still have not responded to Plaintiffs' concerns and information requests
regarding captioned phones at SATF sent **over two months ago**, including related to class
member education, hours of availability, and sign-up processes. This letter was based on the
experience of Person E, a deaf man discussed at length in the first SATF report. *See* Letter from
Mackenzie Halter, Prison Law Office, to Tamiya Davis, Office of Legal Affairs, ████████,
████, DPH, SATF | Captioned Phones on G Yard, at 1 n.1 (Sept. 19, 2023).

The November 2023 tour showed little has changed. Captioned phones are not located or
available for use in the housing units; instead, they are located and available for use in the
chapels. The ADA Coordinator said that he wanted to make captioned phones available in the
housing units to make them more accessible and to address logistical barriers, but he was
instructed by headquarters to get the captioned phones installed as fast as possible and, because
they require an institutional phone line, it was easier and faster to locate them in the chapel where
there was an available phone line already instead of installing a new phone line in the housing
units. The ADA Coordinator said headquarters had not provided direction on where the captioned

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

phones should be installed, and there are no current plans to install additional lines so that captioned phones can be located in more convenient locations. The ADA Coordinator said that during modified programming, it would be a challenge, but not impossible, to allow access to the captioned phone.

We viewed the captioned phone on Facility G and confirmed Person E's account from September that the captioned phone is in the hallway outside the chapel. The captioned phone is only accessible with a key held by the FTS sergeant, and we had to wait while the sergeant came to unlock the chapel and their office, where the captioned phone was kept. It then took us three tries before we could get a call to connect. (The posted instructions say that the captioned phone needs to be plugged in 15-30 minutes before use.) There appeared to be no plan for allowing a class member to use the captioned phone for a confidential legal call.

Regularly-assigned housing officers on Facilities F and G were unaware during our visit of what a captioned phone is and what the sign-up process for it is. An officer on Facility G guessed that perhaps it was a videophone or "braille" phone. (Facility G is where Person E previously was housed.) The lieutenant on Facility G similarly said he did not know if captioned phones were installed, and said this was because he's a "coverage" lieutenant, even though he is a permanent lieutenant who regularly covers Facility G.

The ADA Coordinator said that the previous LMS training on captioned phones was from 2022, and to his recollection only about 60% of staff completed it. He said that he asked IST to repost the LMS training recently. It is not clear what this training consists of; if it simply requires staff to read a policy memorandum regarding captioned phones, it will be ineffective. Instead, FTS should bring staff to view a captioned phone and see how it works, so they are informed and can help educate people with disabilities about its availability if, for example, someone is having trouble hearing their loved ones on the regular phone in the housing unit.

c.    **Tablets**

People who require captioning or sign language still cannot use the tablets to make phone calls, as the tablets still do not have accessible phone features.

SATF still has not issued an interim policy to allow people greater access to the TDD or captioned phone, including during modified programming, to allow closer-to-equal access to their hearing peers who can make phone calls through their tablets. The ADA Coordinator on November 15, 2023, said that headquarters had instructed him to develop such a policy a week before and that a draft was pending with the warden. He reported that the policy would allow one extra TDD or captioned phone call a day – a restriction not placed on hearing people who, as we understand it, have no limitation on the number of calls they can place through the tablet. Such a

DocuSign Envelope ID: 94B7D172-80D4-4224-A545-F68D42D0A652

restriction is particularly inappropriate because many deaf and hard-of-hearing people who require use of accessible phones are profoundly isolated in prison, and rely even more on the ability to speak with family and loved ones through accessible phones for social interaction and support.

In addition, SATF has revised its memorandum allowing greater access to the videophone to make it **more restrictive**. It now allows deaf signers to make an additional videophone call only once on second watch and once on third watch – again, such limitations are not placed on hearing people.

SATF also appears to have a sizable waiting list for over-ear headphones for the tablet, and it is not clear when those will be provided by headquarters or its contractor, ViaPath. The ADA Coordinator reported that SATF ran out of over-ear headphones about two or three months ago.

### 4.    Vibrating Watches

Defendants appear to have grossly misstated the security risk of a vibrating watch to the Court. *See, e.g.*, Dkt. No. 3504-1 at 6 (stating that Defendants have not identified any vibrating watches "that will work and also meet institutional security requirements"); Dkt. No. 3515 at 11-12 ("the alarm creates a security risk that must be addressed to ensure the safety of staff and incarcerated population"). Headquarters staff appears unaware that, in fact, Deaf people who can afford to pay for a vibrating watch already have such watches and have used them successfully in multiple prisons, including at SATF, for quite some time without creating any security problems.

Defendants also told the Court that vibrating watch testing would be concluded by October 19. Dkt. No. 3515 at 12. That deadline was not met, and we have not heard Defendants' final decision based on the vibrating watch they had three Deaf people test. One of those Deaf people housed at SATF told Plaintiffs' counsel that the vibrating watch they were given was of such low quality that he could not feel the vibration. He reported that he was asked to fill out a survey in writing without the assistance of a sign language interpreter (he is documented as reading at a fourth-grade level, while the survey is written at a seventh- or eighth-grade level, according to a secure online tool that measures ease of reading). It seems a better and more cost-effective approach would be to see what types of vibrating watches are already working well for Deaf people in prison and to order those watches without further delay for all Deaf people.

### 5.    Effective Communication of Announcements

Deaf and hard-of-hearing people at SATF continued to report to Plaintiffs' counsel that they do not receive effective communication of announcements. One deaf person housed in a unit with other deaf people said that when the lights flash, all deaf people have to go up to the housing

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

officer to try to figure out which of them was being called. Another hard-of-hearing person reported that he tries to stay in the dayroom as much as possible so that he can more easily hear announcements, but that he often misses mail because mail often is announced after the dayroom has been recalled, when he is back in his cell. Several class members also filed 1824s about lack of effective communication of announcements. *See, e.g.*, Log No. SATF-F-23-00127 (93-year-old man reporting that he cannot understand announcements over the loudspeaker and staff usually do not tell him about announcements unless he goes to the podium to ask, and requesting that he be informed of announcements like mail) (filed with assistance of Plaintiffs' counsel); Log No. SATF-G-23-01530 (person designated DNH reporting that he cannot hear announcements in the building; the sergeant who interviewed him in response to his 1824 noted "he expressed frustration and is valid," and "I did observe ███████ constantly studying my lips as I spoke, and trouble hearing"); Log No. SATF-F-23-00874.

During the walking tour, we observed regular housing officers on Facility G announce over the intercom "Yard/dayroom," without flashing the lights or providing individual notification. Shortly thereafter, they announced, "Last call for yard," again without flashing the lights or providing individual notification. Only after Plaintiffs' counsel inquired about the lack of effective communication did the officers flash the lights, but they still did not provide individual notification and instead said that if someone came to the door late because they could not hear the announcement, the officer would let them out. The whiteboard near the officer podium listed the day's schedule but at times that were not consistent with how the schedule in fact was being run that day. The officer explained that it was because they were short staffed because officers had been pulled onto Facility D to search for missing metal and that the schedule is usually subject to change based on staffing and programming at the time. At the time of our tour, there were vacancies in canteen staff, and so that program was not running consistently on any yard, as canteen staff were moving around the yards without a preset schedule. While on Facility E, we heard the announcement "12 o'clock meds" over the intercom at 11:25 am.

Defendants' proposed tablet solution does not address individual announcements (that is, it discusses only the unit-wide announcements of yard, dayroom, canteen, medical pass, mail call, phone call signups, religious services, and dining time). But ADA staff reported that healthcare ducat times are not always accurate; even if someone is scheduled to be seen by healthcare staff at 11 am, they may be called at 9:30 am or 2:30 pm depending on how the line is run that day or whether there is modified programming. An SRN II confirmed that appointments take place "usually within hours" of the time listed on the ducat, but reported that she does not audit the accuracy of healthcare ducat times. The medical scheduler on Facility D also confirmed that the RN line in practice does not run consistently with the times she schedules appointments for and that when she puts someone on the same-day RN line, they will not get a ducat for it, so they will not know in advance what time they will be called to the clinic.

DocuSign Envelope ID: 94B7D172-8004-4234-A545-F68D42D0A652

### 6.    CART

The ADA Coordinator reported that he observed CART used for an initial classification committee and that CART appeared to be more accurate than the autocaptioning used previously. He reported that he did not see any issues with it except (1) it did not transcribe certain CDCR acronyms correctly (e.g., "CCI"), and (2) the counselor requested a copy of the transcript from the vendor but did not receive it within 24 hours as required. (Although Defendants previously said they would send the vendor a list of CDCR acronyms, Plaintiffs' counsel has not seen it and cannot confirm it is complete or was in fact sent to the vendor.)

Alarmingly, the ADA Coordinator said that he will allow CART only to people who are designated DPH or have "written notes" currently documented on SOMS as a primary or secondary form of communication. That is contrary to the CART policy memorandum, which permits people designated DNH to request CART via the 1824 process and provides that those requests shall be considered on a case-by-case basis and that staff shall provide CART unless they "can demonstrate that another equally effective means of communication is available." The ADA Coordinator acknowledged this language but said that if someone has another form of communication documented on SOMS, such as speaking loudly and clearly or lipreading, he views that as a *de facto* equally effective alternative and does not conduct any further inquiry into the matter and will on that basis alone deny the CART request.

We found at least two 1824s from class members at SATF improperly denied on this basis. *See* 1824 Log Nos. 23-01511 & 23-01531. We sent one to Defendants on October 24, 2023, and asked that headquarters provide appropriate direction to the field. *See* Email from Rita Lomio, Prison Law Office, to Ramon Ruiz, Office of Legal Affairs. Instead of providing such direction to expeditiously address the problem, Defendants apparently simply routed it to the SATF ADA Coordinator to respond to as an advocacy letter, which he had not done as of the date of our tour.

When we visited SATF again on November 15, 2023, we were shown an iPhone with speech-to-text software. It is unclear whether this is supposed to be an alternative to CART. We tested it for over an hour and, based on our review, determined it is not an adequate alternative, although, if improved, could be a useful tool for deaf and hard-of-hearing people's informal, one-on-one communication with other incarcerated people and help lessen their isolation. The software often abruptly stopped transcribing speech, mid-sentence. The software did not transcribe accurately (and often listed gibberish like "It'll take Maria 22nd stamp at one and that's not totally true"), did not identify who was speaking, and could not pick up what people were saying a few feet or yards away. Unless two languages were displayed at once, the text disappeared suddenly, before it could be fully read. When two languages were displayed at once, the non-English language was distracting and sometimes filled up the entire screen so the English could not be viewed. It was not clear whether the font size or background color could be changed.

DocuSign Envelope ID: 94B7D172-80D4-4224-A54E-E68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 10

**7.      Auxiliary Aids in the Libraries**

The ADA Coordinator reported that SATF still is short librarians, and the staff they do have are rotating between yards, so not every library is open every day.

Defendants previously told the Court that blind and low-vision people at SATF can submit an 1824 for additional library access that "will be considered on a case-by-case basis." *See* Dkt. No. 3504 at 9. That appears to be untrue; such requests are either ignored or denied based on recitation of existing policy on GLU/PLU access. For example:

| 1824 Request | RAP Response |
|---|---|
| DPV class member reported lack of sufficient access to auxiliary aids in the law library, which impairs his ability to complete personal correspondence and CDCR forms, as well as read legal mail and court transcripts. He reported that the library has been closed since approximately May 31, 2023, and the institution is on modified lockdown.<br><br>▆▆▆▆▆▆▆▆, *DPV, DPW*<br>*Log No. SATF-F-23-01097* | "The facility Library is open Monday through Friday with the following COVID-19 guidelines. Library hours will be in accordance with your yard schedule. You will be able to access the library only during your yard times. No more than 4 inmates will be allowed inside the library at a time. PLU inmates will have priority. When one inmate leaves, another may enter. All inmates must leave when their yard time is over, no exceptions." |
| DPV class member said he is "not being afforded adequate time in law library" to prepare legal material and requested to be provided "a reading machine to read in cell or additional time in law library."<br><br>▆▆▆▆▆▆▆▆, *DPV*<br>*Log No. SATF-E-23-00137* | "The Education Department provided the RAP with a Disability Verification Process (DVP) Worksheet indicating library records show you are accessing the library in accordance with your General Legal User (GLU) status. You do not qualify for Priority Legal User (PLU) status due to lawyer representation." |
| DPV class member reported that he needed access to auxiliary aids in the law library to read and write and "not only is the law library not open enough, I am double assigned and could not go anyway." | "The Education Department provided the RAP with a Disability Verification Process (DVP) Worksheet indicating a review of your schedule in Strategic Offender Management System (SOMS) shows your availability to access assistive |

| | |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮ *DPV*<br>*Log No. SATF-F-23-00326* | equipment in the library, especially on Saturdays. . . . When access to the Law Library and Davinci is not possible, you may continue to use the full page magnifiers and ADA workers in your housing unit to assist you." |
| DPV class member reported that he cannot read independently unless he is in the library, "which is closed very often (only open a few times per week, shut down when short staffed). If I have a Monday homework assignment due Wednesday, I can't get to the library in time to complete it."<br><br>▮▮▮▮▮▮▮▮▮▮ *DPV*<br>*Log No. SATF-F-23-00753* | No substantive response to the class member's concern regarding sufficiency of library access. |

The second SATF report stated that the seven-month delay in repairing an assistive device in the Facility D law library may have been caused by Defendants' failure to pay the vendor for repair. Dkt. No. 3500 at 14-15. The ADA Coordinator said that such payment was the responsibility of headquarters, not SATF.

## 8. Auxiliary Aids in the Restricted Housing Unit

Over six months ago, Plaintiffs' counsel reported serious concerns with the lack of reading and writing accommodations available to blind and low-vision people in the Restricted Housing Unit (RHU) (then called Short-Term Restricted Housing, or STRH). *See* Letter from Jacob Hutt, Prison Law Office, to Chor Thao, CDCR Office of Legal Affairs, Lack of Reading and Writing Accommodations for Blind and Low-Vision Class Members in STRH at SATF (May 17, 2023). Plaintiffs' counsel has not yet received a response, although Defendants' stated that they would respond by October 23, 2023. *See* Email from Tamiya Davis, CDCR Office of Legal Affairs, to Jacob Hutt, Prison Law Office (Aug. 23, 2023). Plaintiffs' counsel reported in that letter that even the minimal accommodations sometimes available to other blind and low-vision people in general population law libraries, such as desktop magnifiers, were unavailable to people in restricted housing, and that blind and low-vision people were subjected to extreme isolation on the basis of their disability as a result.

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

These concerns do not appear to have been addressed. Plaintiffs' counsel visited the RHU on November 8, 2023. At the time, the RHU housed two people designated DPV and one person designated DNV. Plaintiffs' counsel observed a new computer in RHU outside of the "law library" cage, but staff informed Plaintiffs' counsel that it was not plugged in and could not be turned on. The regular second watch officer present had not used the computer himself and did not know what functions would be available on the computer. He informed Plaintiffs' counsel that individuals who would like to access legal paperwork from their property or use the "law library" kiosk, including blind and low-vision individuals who may need the computer as a reading and writing accommodation, must submit a GA-22 in writing to the legal officer to be scheduled. He later added that these class members may make requests orally, but these requests may not be copied into the legal log that includes scanned GA-22 forms.

The LexisNexis module in the "law library" kiosk, which has in-screen magnification but no text-to-speech functions, was out of service at the time of Plaintiffs' counsel's visit. Staff informed us that it had been out of service for several months, and the ADA Coordinator reported that there was no estimated completion date for repairs.[2]

The ADA Coordinator reported that he is in the process of acquiring a desktop video magnifier for RHU, which would allow blind and low-vision class members to more independently read legal material, but had no estimated timeline for procurement.

9.    **FTS Sergeants and 1824s**

In the second SATF report, the Court Expert noted: "we did hear both in surveys and in interviews that some class members felt that FTS sergeants were discouraging the use of the 1824 process by asking class members to first address problems with the FTS sergeants. We think it is reasonable for FTS sergeants to remind class members that they are an available resource and that they may be able to resolve an issue faster than a class member could receive assistance from an 1824, but FTS sergeants should be cautious not to use language that could be interpreted as discouraging the filing of 1824s." Dkt. No. 3500 at 18.

During our visit in November 2023, the lieutenant who supervises all FTS sergeants reported that he had not read the second SATF report, did not know that the Court Expert had made the findings listed above, and had therefore not spoken with FTS about the issue.

---

[2] In the interim, class members reportedly may use their tablets to access similar law library functions. The tablet has limited in-screen magnification, but Plaintiffs' counsel have reported concerns with the functionality of text-to-speech software with tablet applications.

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

## HEALTHCARE

### 10.     Triaging and Responding to DME-Related 7362s

In the second SATF report, the Court Expert wrote that SATF healthcare leadership had encouraged nursing staff to treat 7362s regarding DME as "symptomatic," so that patients with DME concerns would be treated promptly. *See* Dkt. No. 3500 at 10 n.6; *see also* HCDOM § 3.1.5(c)(2)(B)(3)(a)(3) ("Patients who submit CDCR 7362s that describe symptoms shall be seen by the Primary Care RN within one business day.").

It appears that, at the time the second report was filed on August 24, 2023, that practice was no longer in place, and had not been in place for some time. Instead, on June 26, 2023, the CNE reportedly issued written direction to nursing staff to revert back to previous policy, as outlined in the HCDOM, that does not require DME-related 7362s to be triaged as symptomatic. *See* Memorandum, Prison Law Office Request for Review of Patient ███████████ (Nov. 8, 2023) (internal citations omitted). The memorandum reportedly directed RNs to use "clinical judgement [sic] during the 7362 review process." *Id.*

Plaintiffs' counsel learned that the information in the second SATF report was outdated after raising a concern that an *Armstrong* class member at SATF had requested an extension of his temporary wheelchair via a 7362 because he was worried that upcoming loss of the wheelchair would "lead to a fall," but that 7362 was triaged as asymptomatic, instead of symptomatic. *See* Individual Patient Medical Concern – Request for Review (███████████, SATF) (Oct. 9, 2023). Plaintiffs' counsel inquired why the practice described in the second SATF report of triaging the 7362 as symptomatic was not followed. CCHCS responded that, in its view, the 7362 was properly triaged as asymptomatic "as the triaging RN noted the patient was still in possession of the wheelchair." *See* Memorandum, Prison Law Office Request for Review of Patient ███████ ███████████ (Nov. 8, 2023) (internal citations omitted). But although he had it at the time of the triage, it was removed from him several days later, after the order for the wheelchair expired and **before** he was seen for the "asymptomatic" 7362, putting him at risk of falling. He was re-issued a wheelchair only after Plaintiffs' counsel advocated on his behalf.

This does not appear to be an isolated incident. Patients with disabilities report, and their recent medical records appear to confirm, that their 7362s requesting repair and replacement of their DME still are not addressed timely – sometimes leading class members to file 1824s to attempt to remedy their concerns. A few examples are below.

| Patient DME Requests & Response | Calendar Days (Cumulative) |
|---|---|
| ■■■■■■■■■■■■ | |
| *Initial Health Screening (July 26, 2023)*: RN at R&R noted missing wedge pillow, "PT DID NOT HAVE ON ARRIVAL." It is not clear whether the RN took any action other than to note the missing wedge pillow. | 0 |
| *7362 (dated July 27, 2023, triaged July 31)*: "I am requesting a replacement wedge pillow. My wedge pillow was lost in transfer from S.Q. I arrived here on 7-26-23 at SATF." The triaging nurse noted "MA" on the 7362. | 1 |
| *1824 (Aug. 7, 2023, Log No. 23-01474)*: "I am a new arrival. . . My medical device (w[ed]ge pillow) was lost during transport. I used it when sleeping and sitting up. I reported it missing whe[n] I arrive to R/R medical staff during intake, also to ADA SGT and file a CDCR 7362 dated 7-27-2023. As of todate it has not been replaced. . . Having pain when sleeping and sitting up." The RAP response also noted no interim accommodation because "you are not alleging a disability or requesting an accommodation to access Programs Services, or Activities," and encouraged him to use a 7362 as the "appropriate avenue[] to address issues." | 12 |
| *7536 (Aug. 11, 2023)*: Issued "Wedge Pillow" by clinic medical assistant. | 16 |
| ■■■■■■■■■■ | |
| *7362 (dated Sept. 5, 2023, triaged Sept. 7)*: "Due to my aggravated injuries, I the ADA patient immediat[e]ly must be provided with a new wheelchair wide width <u>tire</u> to ease my movement. . . I filed the 1824." The triaging nurse noted "MA" on the 7362. | 0 |
| *7536 (Sept. 12, 2023)*: Issued "18 inch Drive loaner" wheelchair by clinic RN. | 7 |

DocuSign Envelope ID: 94B7D172-60D4-4224-A54E-F68D42D0A652

| | |
|---|---|
| ██████████████ | |
| *7362 (dated Sept. 13, 2023, triaged Sept. 14)*: "I am in need of a walker because I need a place to sit when the yard go[e]s down. Standing for long periods of time my back go out and my legs want to give." Triaged as "RN Asy" (asymptomatic). | 0 |
| *7536 (Sept. 22, 2023)*: "Blue standard walker" issued by a clinic RN. | 9 |
| ██████████████ | |
| *7362 (dated Sept. 13, 2023, triaged Sept. 14)*: "I've had two strok[e]s and I very unsteady and have trouble seeing. I'm requesting a walker." Triaged as "ARN" (asymptomatic RN). | 0 |
| *Nursing Face-to-Face (Sept. 28, 2023)*: "Refer[r]ed to provider for request for walker" within 14 calendar days. | 15 |
| *Outpatient Progress Note (Oct. 10, 2023)*: Provider noted that "pt is not oriented and incoherent," and sent ██████ out to a higher level of care for further evaluation. There is no indication that ██████ was provided a walker. | 27 |
| *7362 (Oct. 18, 2023)*: "Eye off set – falling – and need a wheelchair please." | 35 |
| *Nursing Face-to-Face (Oct. 19, 2023)*: "Patient is requesting for wheel chair because he feels tired an[]d falls when walking around in the yard." The nurse noted a recent neurology consultation and scheduled provider follow-up and that "issue resolved." | 36 |
| *Outpatient Progress Note (Oct. 31, 2023)*: No documentation from provider regarding requests for walker or wheelchair. | 48 |
| **Plaintiffs' Note:** As of November 21, 2023 at 9:45 AM, there is no indication in ██████'s medical record that he has been assessed for either a walker or a wheelchair. | 69 |

DocuSign Envelope ID: 94B7D172-60D1-4234-A545-F68D42D0A652

| | |
|---|---|
| ████████████ | |
| *7362 (Sept. 19, 2023)*: "Need gloves for wheelchair." The triaging nurse noted "MA" on the 7362.<br><br>**Plaintiffs' Note:** According to an SRN II interviewed during Plaintiffs' monitoring tour, 7362s requesting wheelchair gloves may be triaged as asymptomatic, but should be addressed by the next business day by an MA. The MA should then enter a progress note documenting the encounter with the patient at which the item was issued. The electronic medical record does not indicate that any of these steps were followed in this case. | 0 |
| *1824 (Nov. 7, 2023, Log No. 476138)*: Requesting wheelchair gloves, with the assistance of Plaintiffs' counsel during monitoring tour. | 49 |
| *7536 (Nov. 8, 2023)*: Issued "gloves for wheelchair use size extra large" by Psych Tech. | 50 |

Many of these delays are longer than those Plaintiffs' counsel reported in June 2023. *See* Letter from Skye Lovett and Rita Lomio, Prison Law Office, to Dr. Joseph Bick, Director of CCHCS Health Care Services, and Jason Williams, Director of CCHCS Corrections Services, Need for SATF LOP and HCDOM Revisions to Ensure Timely Response to 7362 Requests for Durable Medical Equipment Repair and Replacement at 5-6 (June 5, 2023) (table summarizing responses to patients' requests for DME repair or replacement).

In response to Plaintiffs' letter, CCHCS stated:

In July 2023, SATF began conducting CDCR 7362 audits focused on the DME process. SATF will conduct these audits for the next six months to ensure process efficiency. Subsequently, the Nursing Sub-Committee and leaders will report and review the data to ensure accuracy and facilitate appropriate follow-up actions. Summaries of these audits may be available in the beginning of February 2024.

Plaintiffs' counsel do not know whether the above concerns were captured by the audit of 7362s related to the DME process, but are concerned that problems have persisted from July 2023, when the audit began, to present.

DocuSign Envelope ID: 94B7D172-6004-4234-A545-F68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 17

Plaintiffs' counsel also are concerned with the continuity of the instruction given to staff on triaging 7362s related to DME in light of the departure of the former Chief Nurse Executive, Juliet Ogbologu. The position currently is filled by an Acting CNE who has been at SATF for the last year and acting in the position since October 10, 2023.

### 11. Effective Communication with Deaf and Hard-of-Hearing Class Members During Healthcare Appointments

#### a. Written Notes for Deaf Non-Signer "Person E"

In the second SATF report, the Court Expert wrote that one deaf class member who does not know sign language (█████████████, or "Person E") reported that at least one healthcare staff member continued to make him write notes during healthcare encounters, despite healthcare staff being trained that "some deaf people can speak but cannot sign and how to correctly accommodate those class members." *See* Dkt. No. 3500 at 12; Dkt. No. 3446 at 64.

This may be because Defendants to this day have not updated documentation in Person E's medical records to accurately reflect his disability accommodation needs. In particular, the medical record for all patients contains an easy-to-access ADA summary page which includes the methods of communication. Plaintiffs' counsel informed Defendants over two months ago that the information on Person E's ADA summary page is wrong and gets his needs exactly backwards, stating that he needs no accommodation for a hearing disability (when in fact he needs written notes) and that he needs written notes for a speech disability (when in fact he can voice). *See* Letter from Mackenzie Halter, Prison Law Office, to Tamiya Davis, Office of Legal Affairs, █████████████, DPH, SATF | Captioned Phones on G Yard, at 1 n.1 (Sept. 19, 2023). Defendants have not responded to our letter, and as of November 20, 2023, Defendants have not updated Person E's medical record to prevent this problem from happening again.

Person E's current "Methods of Communication," as they appear in the electronic medical record, are copied below, alongside those of a Deaf signer housed on the same facility as Person E while he was at SATF.

. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .
. . . .

[4393326.1]

| Methods of Communication | Methods of Communication |
|---|---|
| **SLI:** No | **SLI:** Yes |
| **Hearing Primary:** None | **Hearing Primary:** American Sign Language |
| **Hearing Secondary:** | **Hearing Secondary:** Reads Lips |
| **Speech Primary:** Written Notes | **Speech Primary:** |
| **Speech Secondary:** | **Speech Secondary:** |
| **Vision Primary:** | **Vision Primary:** |
| **Vision Secondary:** | **Vision Secondary:** |
| **Interview Date:** 08/21/2023 00:00 | **Interview Date:** 02/02/2007 00:00 |

**(left) Person E, (right)** ██████████

In addition, Person E met with a provider at SATF in September 2023 to discuss several serious medical concerns, including colon cancer surveillance (for which he is at high risk), the results of a recent biopsy, chronic neck pain, and changes to his medication. Person E reported that the provider wrote very little and mostly spoke, notwithstanding Person E's attempts to explain that he could not hear and required written notes. He reported giving up trying to get the provider to accommodate his disability: "I shook my head – forget it."

The communication therefore was ineffective, and Person E did not understand the plan of care. He filed several 7362s in the following days asking for information covered in the appointment, including about whether he could receive a cervical pillow and be prescribed certain medications as "keep on person." Person E later explained to Plaintiffs' counsel that the provider had not effectively communicated to him that he had ordered two other medications, and that Person E did not take these two medications as a result.

The provider's documentation of effective communication during that appointment is confusing and contradictory. The provider documented, apparently in a free text field for the encounter itself, that, "I spoke slowly in basic language, repeated information to patient. Patient expressed understanding of plan of care. Effective communication achieved." Outpatient Progress Note (Sept. 26, 2023). That, of course, is not effective communication to Person E. The provider also documented elsewhere that he spoke louder and slower and "Written notes were utilized

during the encounter," but, in violation of policy, no written notes were scanned into the electronic medical record. *See* Effective Communication (Sept. 26, 2023).

### b.    Sign Language Interpretation for Deaf Signers

Plaintiffs' counsel reported following our monitoring tour in January 2023 that medical staff on several facilities housing Deaf class members who use sign language were not familiar with video remote interpretation (VRI), did not have the equipment easily accessible, and were unable to connect to VRI. Several months later, however, Plaintiffs' counsel continued to see entries in the electronic medical record of patients who use sign language suggesting that VRI equipment was not available or not working properly. *See* Letter from Sophie Hart *et al.*, Prison Law Office, to Dr. Joe Bick, Director of CCHCS Healthcare Services, and Tamiya Davis, CDCR Office of Legal Affairs, Provision of Sign Language Interpretation During Healthcare Encounters at SATF (Apr. 24, 2023).

Defendants responded to Plaintiffs' advocacy letter almost seven months later. *See* Letter from Nicholas Meyer, CDCR Office of Legal Affairs, to Sophie Hart and Rita Lomio, Prison Law Office (Nov. 15, 2023). Defendants reported that the institution audited VRI systems and connectivity at all clinics in April and May, and conducted additional training at a "Nursing Skills Fair." Defendants also reported that the institution was developing a job aid to be posted near each workstation. Defendants stated that while several of the incidents reported in Plaintiffs' letter were still under review, the medical provider responsible for an additional incident was given training on the requirement to provide sign language interpretation.

Nonetheless, Plaintiffs' counsel continues to see evidence in the electronic medical record that the same patients are not provided interpretation at their encounters, sometimes with the same providers.[3]

| Patient / Encounter Date | Medical Record Entry |
|---|---|
| ███████ G2 (Nov. 7, 2023) | Secondary method used. Pt refused to get out of the band. **No SLI interpreters after hours.**  (RN ███████) |

---

[3] Though not within the scope of this review, Plaintiffs' counsel also saw evidence in the electronic medical record that off-site medical encounters for Deaf patients at SATF may have taken place without sign language interpretation.

DocuSign Envelope ID: 94B7D172-60D4-4224-A545-F68D42D0A652

| | |
|---|---|
| ████████, G2 <br><br> (Nov. 2, 2023) | PREP & SCREENING: OFFSITE MRI Prostate on 11/07/23. . . Please review [instructions] with patient and email the screening form to offsite or myself 2 days before the appointment. We will need this screening form back to send to the outside facility to ensure that the exam will be done safely. <br><br> **Plaintiffs' Note:** There is no documentation in the electronic health record that an interpreter was provided to review the instructions with ████, who is also DD1. |
| ████████████, A2 <br><br> (Oct. 26, 2023) | **Communication via post-it notes. SLI unavailable.** <br> (P&S ████████████) <br><br> **Plaintiffs' Note:** Dr. ████████████ is the same provider Plaintiffs' counsel discussed denying an interpreter to ████ ████████ in our April 2023 advocacy letter. According to Defendants' response, non-compliance at that December 2022 encounter was confirmed, and the provider (Dr. ████████████) was provided training on the requirement to provide interpretation. |
| ████████████, G2 <br><br> (Oct. 4, 2023) | Onsite audiology with ████ Clinic conducted. IP returned to custody in stable condition. . . Equipment Accommodation: Yes. Comment: hearing aids. . . **Sign Language Interpreter: No.** <br> (RN ████████████) |
| ████████, G2 <br><br> (Sept. 27, 2023) | cysto 9/27/23 to be **r/s due to inability to secure SLI**; new appointment pending. <br><br> 9/26/23 RN requested SLI via CIT; only zoom interpreter available. Per PPA, they cannot accommodate zoom for this case and appt on 9/27/23 has been cx'd <br> (RN ████████████) |
| ████████, G2 <br><br> (Sept. 2, 2023) | **SPEAK SLOWLY TO ALLOW INMTE TO READ LIPS.** PROVIDED FOLEY CATH CARE IN WRITING TO INMATE. <br> (LVN ████████████) |

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

| | |
|---|---|
| | **Plaintiffs' Note:** ▮▮▮▮▮ secondary method of communication is hearing aids; "reads lips" is not a documented method of effective communication for ▮▮ ▮▮▮ It appears that ▮▮▮▮ was interviewed on October 19, 2023, by an SRN about this incident, and reported that "they tried to use VRI during this visit but the reception kept on going on and off." |
| ▮▮▮▮▮, G3 <br><br> (Aug. 30, 2023) | PREP: Offsite PET/CT on 9/6/23. . . Please review [instructions] with patient. <br><br> **Plaintiffs' Note:** There is no documentation in the electronic health record that an interpreter was provided to review the instructions with ▮▮▮▮▮ The procedure could not move forward because ▮▮▮▮▮ate beforehand, although the procedure required nothing by mouth. A healthcare grievance note was entered into ▮▮▮▮▮ record on November 3, 2023, noting that "Alleges appropriate Positron Emission Tomography (PET) preparation instructions were not provided and it would be an extended wait to be rescheduled." |
| ▮▮▮▮▮, G3 <br><br> (June 26, 2023) | Patient was reminded of off site specialty appointment scheduled for 6/28/23 patient confirmed this appointment. . . **Speech Language Interpreter: No**. <br><br> (LVN ▮▮▮▮▮) |

## 12.    Reconciliation Audits

The second SATF report described an auditing system developed by a nurse practitioner at SATF to determine whether primary care providers on each yard properly reconciled appointments for every new arrival to the institution. *See* Dkt. No. 3500 at 7. This reconciliation audit, which is ongoing, still depends on a single provider at SATF – NP ▮▮▮▮▮ – and does not take place when he is on vacation or otherwise away from the institution. Plaintiffs' counsel remain concerned that this system will continue to allow patients' DME, medication, and pending appointments to slip through the cracks, disrupting continuity of care and denying them accommodations upon arrival to SATF.

For example, in early August, a class member with monocular blindness filed an 1824 reporting optic nerve damage, light sensitivity, and difficulty reading small print. *See* Log No. 23-

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 22



01488 (███████████████). The Disability Verification Process worksheet, completed on August 11, noted that "Patient has an appointment pending scheduling for Optometry." According to ███████'s electronic medical record, an order had been entered for him to see optometry on August 11 on a routine priority basis. However, the order was discontinued on August 22, presumably when ██████████ transferred to another institution for a mental health crisis bed placement. It was not re-ordered when he returned to SATF on August 30. Nonetheless, the RAP response ████████ received on September 7 incorrectly stated that "you have an appointment pending scheduling for Optometry."

To understand why ██████████'s optometry appointment had not been reconciled, Plaintiffs' counsel reviewed the case with NP ████ NP ████ found that two appointments had not been reconciled when ██████████ returned to SATF, including a nursing appointment to check on ███████'s mental status following discharge from an EOP level of care after his crisis bed placement. However, although ██████████'s arrival to the institution appeared in NP ████'s reconciliation audit spreadsheet, NP ████ explained that these appointments had not been reconciled – or captured by the reconciliation audit – because he was on vacation when ██████████ returned to SATF on August 30. They were not detected for nearly three months, and even then only after Plaintiffs' counsel inquired about ██████████'s referral to optometry.[4]

### 13. Relationships Between Patients with Disabilities and Healthcare Staff

We remain concerned that Defendants are not proactively identifying or addressing barriers to relationships between healthcare staff and people with disabilities.

#### a. Patient Privacy and Therapeutic Relationships in CTC

Multiple regular custody staff in the CTC interviewed on different days during Plaintiffs' monitoring tour stated that according to policy, custody staff should be present for medical encounters for all patients. Providers may request that a patient's door be closed for an encounter, so long as custody staff maintain visual contact from outside the room, but custody staff must be present for all encounters with nursing staff – including during exchanges of sensitive medical information and other personal care (such as bed baths and showers). When a privacy screen is erected in these cases, custody staff reported that they stand inside the privacy screen with the patient and their care team. One regular officer explained that custody are expected to deactivate

---

[4] It appears that this optometry appointment was not reconciled when ██████████ returned to SATF because it had not been reconciled by providers at CMF, where he was transferred for mental health crisis bed placement, and so was not available for providers at SATF to reconcile. A new order was entered for ████████ to see optometry on November 8, after he filed another 1824 with the assistance of Plaintiffs' counsel. *See* Log No. 475362.

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

their body-worn cameras during this encounter, but stand in close proximity to a patient facing perpendicularly to them, so that the officer can still see the patient in their peripheral vision. For patients on restricted housing status, a second officer stands outside the room.

The regular officers who described this policy reported that it was consistent with the Title 15 and with OP 427, which governs the CTC. However, the Chief Medical Executive, Chief Physician & Surgeons, and acting Chief Nurse Executive were unfamiliar with the policy, and believed that, like for patients on facility clinics, custody staff would not typically be present for encounters with the care team (the acting Chief Nurse Executive believed that nursing staff could request the presence of custody staff at an encounter). According to the SATF Chief Medical Executive, Dr. Godwin Ugwueze, patients on facility clinics can expect privacy in their encounters with medical staff, with a few exceptions for patients with certain mental health concerns, patients with a history of violence against medical staff, or patients on a restricted housing status. *See* HCDOM § 3.1.5(c)(3)(E)(3) ("As a default, custody staff is not required during a health care encounter with a patient who is not maximum custody or whose current behavior does not present a threat to the safety of staff or other patients.").

Denying visual and auditory privacy during healthcare encounters to patients in the CTC, many of whom have complex medical needs and and may be housed in CTC due to their disabilities, deprives them of dignity and erodes the trust between patients and their care teams.

### b.    RVRs Initiated By Mental Health Staff

In the first SATF report, the Court Expert found that "nursing staff's issuance of RVRs has damaged relationships with incarcerated people. . . When nurses are given the power to recommend punishment for their patients, even for minor rules violations, they are no longer just care providers; they are imposers of discipline." Dkt. No. 3446 at 50. In response to the Court Expert's findings, we understand that the Receiver is in the process of revising a policy related to RVRs initiated by medical staff.

Plaintiffs raised similar concerns with issuance of RVRs against patients with disabilities by mental health staff at SATF. *See* Letter from Tania Amarillas *et al.*, Prison Law Office, to Ed Swanson, Court Expert (Feb. 28, 2022) ("The RVRs initiated by mental health staff, like those initiated by medical staff, demonstrate a failure to appropriately consider whether a physical or mental disability contributed to the alleged misconduct [and] an unduly adversarial relationship between staff and patients"). Defendants apparently have declined to take any action in response to this letter, even though the same reasoning as to medical staff applies to mental health staff. Instead, Defendants told Plaintiffs' counsel on November 6, 2023, that "This letter was sent to Ed. Defendants did not and do not plan on issuing a response."

DocuSign Envelope ID: 94B7D172-60D4-4234-A545-F68D42D0A652

Mr. Ed Swanson & Ms. Tamiya Davis
Re: Summary of SATF Monitoring Tour Findings
November 21, 2023
Page 24

We appreciate your prompt attention to this matter. Please let us know if you would like copies of any of the documents referenced in this letter.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

Skye Lovett
Investigator

cc:   Audrey Barron
Co-counsel
Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLA Armstrong (OLA)
Lois Welch, Steven Faris (OACC)
Brianne Burkart (CCHCS Legal)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS Accountability (CCHCS)
Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

# Exhibit 87

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   JACOB J. HUTT – 804428, *pro hac vice*
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
5  Facsimile:    (510) 280-2704

6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
8  CAROLINE JACKSON – 329980
   ROSEN BIEN
9  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
10 San Francisco, California  94105-1738
   Telephone:    (415) 433-6830
11 Facsimile:    (415) 433-7104

12 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14 Berkeley, California  94703
   Telephone:    (510) 644-2555
15 Facsimile:    (510) 841-8645

16 Attorneys for Plaintiffs

17
                    UNITED STATES DISTRICT COURT
18
                  NORTHERN DISTRICT OF CALIFORNIA
19

20
   JOHN ARMSTRONG, et al.,                Case No. C94 2307 CW
21
               Plaintiffs,                **NOTICE OF MANUAL FILING OF**
22                                         **EXHIBIT 87 TO THE DECLARATION**
          v.                               **OF JACOB J. HUTT IN SUPPORT OF**
23                                         **JOINT STATUS STATEMENT**
   GAVIN NEWSOM, et al.,                   **REGARDING COMPLIANCE WITH**
24                                         **THE COURT'S DECEMBER 7, 2023**
               Defendants.                 **ORDER**
25
26                                         Judge:  Hon. Claudia Wilken

27

28

# NOTICE OF MANUAL FILING

## Regarding: Exhibit 87 to the Declaration of Jacob J. Hutt

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served in hard-copy shortly. For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

1. ☐ Unable to Scan Documents

2. ☐ Physical Object (please describe):

3. ☑ Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media

4. ☐ Item Under Seal in Criminal Case

5. ☐ Conformance with the Judicial Conference Privacy Policy (General Order 53)

6. ☐ Other (please describe

DATED:  October 16, 2024          Respectfully submitted,

PRISON LAW OFFICE

By:  */s/Jacob J. Hutt*
_____
Jacob J. Hutt

Attorneys for Plaintiffs

Exhibit 88

1  DONALD SPECTER – 083925
   RITA K. LOMIO – 254501
2  MARGOT MENDELSON – 268583
   JACOB J. HUTT – 804428, *pro hac vice*
3  PRISON LAW OFFICE
   1917 Fifth Street
4  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
5  Facsimile:    (510) 280-2704

6  MICHAEL W. BIEN – 096891
   GAY C. GRUNFELD – 121944
7  THOMAS NOLAN – 169692
   PENNY GODBOLD – 226925
8  CAROLINE JACKSON – 329980
   ROSEN BIEN
9  GALVAN & GRUNFELD LLP
   101 Mission Street, Sixth Floor
10 San Francisco, California  94105-1738
   Telephone:    (415) 433-6830
11 Facsimile:    (415) 433-7104

12 LINDA D. KILB – 136101
   DISABILITY RIGHTS EDUCATION &
13 DEFENSE FUND, INC.
   3075 Adeline Street, Suite 201
14 Berkeley, California  94703
   Telephone:    (510) 644-2555
15 Facsimile:    (510) 841-8645

16 Attorneys for Plaintiffs

17

18              UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA
19

20
   JOHN ARMSTRONG, et al.,              Case No. C94 2307 CW
21
              Plaintiffs,               **NOTICE OF MANUAL FILING OF**
22                                       **EXHIBIT 88 TO THE DECLARATION**
        v.                               **OF JACOB J. HUTT IN SUPPORT OF**
23                                       **JOINT STATUS STATEMENT**
   GAVIN NEWSOM, et al.,                 **REGARDING COMPLIANCE WITH**
24                                       **THE COURT'S DECEMBER 7, 2023**
              Defendants.               **ORDER**
25
                                        Judge:  Hon. Claudia Wilken
26

27

28

**NOTICE OF MANUAL FILING**

<u>Regarding: Exhibit 88 to the Declaration of Jacob J. Hutt</u>

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office. If you are a participant in this case, this filing will be served in hard-copy shortly. For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

This filing was not e-filed for the following reason(s):

1. ☐ Unable to Scan Documents
2. ☐ Physical Object (please describe):
3. ☑ Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media
4. ☐ Item Under Seal in Criminal Case
5. ☐ Conformance with the Judicial Conference Privacy Policy (General Order 53)
6. ☐ Other (please describe

DATED:  October 16, 2024                Respectfully submitted,

PRISON LAW OFFICE

By:  */s/Jacob J. Hutt*
_____
      Jacob J. Hutt

Attorneys for Plaintiffs