# Exhibit 89

| | |
|---|---|
| **From:** | Tovah Ackerman <tovah@prisonlaw.com> |
| **Sent:** | Wednesday, November 29, 2023 8:22 PM |
| **To:** | Ruiz, Ramon@CDCR |
| **Cc:** | Davis, Tamiya@CDCR; Ursula.Stuter@cdcr.ca.gov; Burkart, Brianne@CDCR; Deaf and HOH Work Group; Ed Swanson; Audrey Barron; Armstrong Team; Armstrong Team - RBG only; Ferguson, Patricia@CDCR; Meyer, Nicholas@CDCR; Chor@CDCR; Ava.Lau-Silveira@cdcr.ca.gov; CDCR OLA Armstrong CAT Mailbox; Sharon Garske; Trace Maiorino; Sean Lodholz; Olena Likhachova; Anne.Kammer@doj.ca.gov; Gurpreet.Sandhu@doj.ca.gov; Lorey, Dawn@CDCR; White, Lourdes@CDCR; Hernandez, Jillian@CDCR; Lo, Cory@CDCR; Toche, Diana@CDCR; Bick, Dr. Joseph@CDCR; John D@CDCR Dovey; Robin@CDCR; CCHCS Accountability Log@CDCR; Joseph@CDCR Williams; Cathy@cdcr; Jason@CDCR; Jane.Moses@cdcr.ca.gov; Joshua@CDCR; Aaron@CDCR; Welch, Lois@CDCR; Steven@CDCR; Legarda, Alicia@CDCR; Skye Lovett |
| **Subject:** | Re: Armstrong \| Plaintiffs' Proposed Agenda for December 4 D/HH Workgroup |

Dear Ramon,

Plaintiffs' counsel have reviewed the training videos you produced to us on October 23 regarding effective communication of announcements to deaf and hard-of-hearing class members. We have serious concerns about the efficacy of these training videos in helping to improve the longstanding problem of EC of announcements. We outline these concerns briefly below.

Please come to the Work Group meeting on December 4 prepared to discuss the substance of these two training videos (see Agenda Item 5(c)). If you haven't already, we ask that you watch the videos. They are short; the "what not to do" video is 2 minutes and 4 seconds, and the "what to do" video is one minute, 35 seconds.

Our Concerns:

1. The videos do not ensure that staff understand their obligation to ensure effective communication of announcements to the full deaf and hard-of-hearing community. The instructions at the beginning of the "what not to do" video are misleading, as they only discuss the obligation to provide personal notifications to people designated DPH. These instructions, and the videos, entirely omit discussing effective communication of building-wide announcements or discussing effective communication methods for notifying the DNH population of announcements. Plaintiffs have for years reported that hard-of-hearing people also cannot understand announcements and miss programs, services, and activities as a result. The ARP also broadly requires that all people with hearing disabilities be given reasonable accommodation "to ensure equally effective communication with staff, other inmates, and where applicable, the public." ARP at 4.

2. The videos do not accurately show what should be done to ensure effective communication even to the more narrow deaf community. In fact, the "what to do" video, purporting to show how communication "should have been handled," 1) involves no effective communication at the time of the announcement, 2) requires a sergeant to notice that a deaf person did not leave their cell in response to an announcement and to direct a housing officer to give effective communication, and 3) the officer then doing so by speaking at the deaf person (and not writing notes). At no time do either training videos discuss flashing the lights *during or before an announcement*, or otherwise ensuring effective communication with Deaf and Hard of Hearing class members, as the unit-wide announcement is made. Instead, the videos begin with a sergeant noticing that a DPH class member has not left his cell for dayroom *only after the unit-wide announcement has been made (presumably without effective*

1

*communication) - the announcement itself is not portrayed in the video*, when the class member has already missed the notification and part of dayroom. The sergeant then decides to instruct an officer to provide EC through personal notification. In addition, the supposed "what to do" video shows the officer attempting to use oral communication with the Deaf class member, instead of writing on a whiteboard or piece of paper. Speaking aloud is, by definition, communication that a Deaf class member cannot hear.

3. Both videos, the "what not to do" and the supposed "what to do" videos, focus more on peer pressure dynamics between staff rather than the requirements under the ARP. In fact, the ARP requirements for effective communication of announcements are not reflected anywhere in either video.

   **Please come to next week's meeting prepared to explain why these videos do not portray, discuss, or inform the viewer of the explicit ARP requirement to ensure effective notification of announcements for all deaf and hard-of-hearing class members by flicking the lights prior to or during a unit announcement, providing personal notifications, and/or using a whiteboard to communicate with class members.**

   **Further, we request that Defendants stop showing these training videos in the field and re-record training videos, in collaboration with Plaintiffs' counsel, that accurately reflect, describe, and train staff on effective communication of announcements, as required by the ARP.**

Thank you,
Tovah


On Thu, Nov 23, 2023 at 3:19 PM Skye Lovett <skye@prisonlaw.com> wrote:
Good afternoon,

Please find attached Plaintiffs' proposed agenda for the December 4 meeting of the Deaf/Hard-of-Hearing Workgroup.

Please contact me with any questions or concerns.

Thank you,
Skye


--
Skye Lovett
Pronouns: they/them
Investigator
Prison Law Office
prisonlaw.com
(510) 280-2648


--
Tovah Ackerman (she/her)
Investigator
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
Tovah@prisonlaw.com

(510) 280-2647

# Exhibit 90

| From: | Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov> |
|---|---|
| Sent: | Monday, March 25, 2024 5:04 PM |
| To: | Skye Lovett; Ruiz, Ramon@CDCR; Stuter, Ursula@CDCR; Lau-Silveira, Ava; Burkart, Brianne@CDCR |
| Cc: | Deaf and HOH Work Group; Ed Swanson; Audrey Barron; Armstrong Team; Armstrong Team - RBG only; Ferguson, Patricia@CDCR; Meyer, Nicholas@CDCR; Thao, Chor@CDCR; CDCR OLA Armstrong CAT Mailbox; Sharon Garske; Trace Maiorino; Sean Lodholz; Olena Likhachova; Anne Kammer; Gurpreet Sandhu; Lorey, Dawn@CDCR; White, Lourdes@CDCR; Mebane, Darnell@CDCR; Lo, Cory@CDCR; Toche, Diana@CDCR; Bick, Dr. Joseph@CDCR; Dovey, John@CDCR; CCHCS Accountability Log@CDCR; Williams, Joseph@CDCR; Jefferson, Cathy@cdcr; Anderson, Jason@CDCR; Moses, Jane@CDCR; Leon Guerrero, Joshua@CDCR; Perez, Aaron@CDCR; CDCR CCHCS Advocacy Correction Services; Stevens, Dawn@CDCR; Sharma, Dharmendra@CDCR; Scotland, Antronne@CDCR; Hart, Robin@CDCR; Welch, Lois@CDCR; Faris, Steven@CDCR; Legarda, Alicia@CDCR |
| Subject: | RE: Armstrong | Plaintiffs' Proposed Agenda for March 21 D/HH Workgroup |

Hello all,

Defendants have decided to remove the training videos related to effective communication of announcements from the staff training LMS portal.

Best,

*Tamiya Davis*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Cell: 916.247.5094

---

**From:** Skye Lovett <skye@prisonlaw.com>
**Sent:** Thursday, March 7, 2024 5:28 PM
**To:** Ruiz, Ramon@CDCR <ramon.ruiz@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Stuter, Ursula@CDCR <Ursula.Stuter@cdcr.ca.gov>; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; Ed Swanson <ed@smllp.law>; Audrey Barron <audrey@smllp.law>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; Meyer, Nicholas@CDCR <Nicholas.Meyer@cdcr.ca.gov>; Thao, Chor@CDCR <Chor.Thao@cdcr.ca.gov>; CDCR OLA Armstrong CAT Mailbox <OLAArmstrongCAT@cdcr.ca.gov>; Sharon Garske <Sharon.Garske@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; Sean Lodholz <Sean.Lodholz@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Anne Kammer <Anne.Kammer@doj.ca.gov>; Gurpreet Sandhu <Gurpreet.Sandhu@doj.ca.gov>; Lorey, Dawn@CDCR <Dawn.Lorey@cdcr.ca.gov>; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Mebane, Darnell@CDCR <Darnell.Mebane@cdcr.ca.gov>; Lo, Cory@CDCR <cory.lo@cdcr.ca.gov>; Toche, Diana@CDCR <Diana.Toche@cdcr.ca.gov>; Bick, Dr. Joseph@CDCR <Joseph.Bick@cdcr.ca.gov>; Dovey, John@CDCR <John.Dovey@cdcr.ca.gov>; CCHCS Accountability Log@CDCR <m_CCHCSAccntLog@cdcr.ca.gov>; Williams, Joseph@CDCR <Joseph.Williams@cdcr.ca.gov>; Jefferson, Cathy@cdcr

<Cathy.Jefferson@cdcr.ca.gov>; Anderson, Jason@CDCR <Jason.Anderson@cdcr.ca.gov>; Moses, Jane@CDCR <Jane.Moses@cdcr.ca.gov>; Leon Guerrero, Joshua@CDCR <Joshua.LeonGuerrero@cdcr.ca.gov>; Perez, Aaron@CDCR <Aaron.Perez@cdcr.ca.gov>; CDCR CCHCS Advocacy Correction Services <m_CCHCSAdvocacyCS@cdcr.ca.gov>; Stevens, Dawn@CDCR <Dawn.Stevens@cdcr.ca.gov>; Sharma, Dharmendra@CDCR <Dharmendra.Sharma@cdcr.ca.gov>; Scotland, Antronne@CDCR <Antronne.Scotland@cdcr.ca.gov>; Hart, Robin@CDCR <Robin.Hart@cdcr.ca.gov>; Welch, Lois@CDCR <Lois.Welch@cdcr.ca.gov>; Faris, Steven@CDCR <Steven.Faris@cdcr.ca.gov>; Legarda, Alicia@CDCR <Alicia.Legarda@cdcr.ca.gov>
**Subject:** Armstrong | Plaintiffs' Proposed Agenda for March 21 D/HH Workgroup

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good evening,

Please find attached Plaintiffs' proposed agenda for the March 21, 2024 meeting of the Deaf/Hard-of-Hearing Workgroup.

Please contact me with any questions or concerns.

Thank you,
Skye

--
Skye Lovett
Pronouns: they/them
Investigator
Prison Law Office
prisonlaw.com
(510) 280-2648

# Exhibit 91



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Jacob Hutt
A.D. Lewis
Rita Lomio
Heather MacKay
Donald Specter
Jerrod Thompson

VIA EMAIL ONLY

September 19, 2024

Sharon Garske
Office of the Attorney General

RE:   *Armstrong v. Newsom*
      Improper Denials of Speech-to-Text Accommodations at SATF

Dear Ms. Garske:

As you requested today, attached to this letter is a list of 26 examples of the SATF RAP denying requests for speech-to-text accommodations made by hard-of-hearing people. This is not an exhaustive list; we did a simple text search of 1824s produced for the time period between September 19, 2023, and May 20, 2024, and also added one more recent 1824 that we requested separately from Defendants. We have received reports that the SATF RAP recently has denied additional requests for speech-to-text accommodations, but we do not have copies of those 1824s.

In each case, the SATF RAP did not interview the person requesting the accommodation. The RAP instead improperly relied on DPP code, documented methods of communication, and whether staff stated that effective communication had been achieved for the limited encounters where documentation of effective communication is required.

When we interviewed then-ADA Coordinator Scaife in July 2024, he stated that when a hard-of-hearing person requests speech-to-text technology, he will deny the request if the person has a DNH code and if staff have documented that they achieved effective communication. ADA Coordinator Scaife said that his approach was based on the limited number of iPads available at the prison:

> I do think about running a company. And running it in a sustainable way. I have no problem with saying, "Hey, if we're going to give speech-to-text/text-to-speech devices to all [hard-of-hearing people], great, let's say we'll do that, and give me the resources to do it." But if we're running on limited supply of equipment and need to take steps of identify who needs them, that's something different.

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Christiane Hipps
Jean Lu • Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

Sharon Garske
Improper Denials of Speech-to-Text Accommodations at SATF
September 19, 2024
Page 2

That approach is unlawful. Prison officials may not limit accommodations to "whatever aids are in the prison's possession" and may not deny accommodations by "relying solely on the assumptions of prison officials regarding that individual's needs." *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 271, 272, 276 (D.D.C. 2015) (Jackson, J.).

By memorandum, Defendants have directed SATF and other institutions to evaluate requests for speech-to-text accommodations on a case-by-case basis.

| | |
|---|---|
| Revised Implementation of **Communication Access Real-Time Translation** Services for Deaf and Hard of Hearing Incarcerated Persons (July 24, 2023) | IPs with verified hearing disabilities (DNH or DPH) shall be able to request CART services through the 1824/Reasonable Accommodation Process (RAP) process which shall be evaluated and granted on a case by case basis. Staff shall offer CART unless it can demonstrate that another equally effective means of communication is available. |
| Amended Issuance of **iPads** to Incarcerated Persons with a Permanent Hearing Disability (Dec. 21, 2023) | If an incarcerated person who is not designated DPH submits a request for an iPad, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. All requests will be considered on a case-by-case basis by the Reasonable Accommodation Panel. |

Plaintiffs repeatedly informed CDCR headquarters that the SATF RAP is improperly denying requests for speech-to-text accommodations.[*] CDCR headquarters has failed to intervene. The result is that SATF continues to systematically deny requests for this accommodation by anyone without a DPH code. Indeed, earlier this week hard-of-hearing people at SATF reported that Compliance Sergeants still tell them that speech-to-text iPads are for DPH class members only—a clear violation of CDCR's own policy that staff should not rely on DPP codes to determine appropriate accommodations.

---

[*] For example, in April 2024, I provided an example of an improper denial by the SATF RAP of a request for a speech-to-text iPad and asked Defendants to "explain (a) how RAPs are expected to conduct the 'case-by-case' review of requests from people without DPH codes for speech-to-text technology as outlined in the iPad memorandum dated December 21, 2023, (b) whether the person with the disability must be interviewed before the request is denied (and if not, why not), (c) what are appropriate grounds for denial, and (d) what, if any, direction was provided to RAPs on these issues." Letter from Rita Lomio, Plaintiffs' Counsel, to Tamiya Davis, CDCR Office of Legal Affairs, ███████████, SATF at 3 (Apr. 10, 2024). I have not received a response to that letter.

Several individuals who filed 1824 requests listed in the table attached to this letter also have submitted declarations regarding their need for captioning as an accommodation. ███ █████ reported that a "speech-to-text device would help me communicate with others, including my peers and staff" (¶¶ 33-34). ███████████ explained that "even with my hearing aids I have trouble hearing," and "I rarely talk to people out on the dayroom because of my hearing disability. I thought an iPad with speech-to-text technology might help me communicate with other people, including staff and my peers" (¶¶ 24-25). And ███████████, who learned about captioning services from a teacher whose informal attempts to accommodate him had not allowed him to fully understand classroom content, explained that he struggles to understand speech in education, medical and mental health appointments, and pre-release meetings (¶¶ 31-33). These declarants report that they were not interviewed about their requests, received denials that did not accurately describe their hearing needs, and that these denials caused them to doubt the efficacy of the 1824 process.

We hope this information is helpful as you evaluate the Court Expert's proposal regarding Item 9 of the SATF Stipulation. We also ask that Defendants:

1.     Identify and produce all 1824s and RAP responses from May 20, 2024, to present, related to speech-to-text accommodations, including CART and iPads;

2.     Reconsider all denials by the SATF RAP identified in response to (1) above and the table attached to this letter, and either issue the person the requested speech-to-text accommodation or provide the accommodation on an interim basis until they are assessed by an assistive technology professional with expertise in accommodations for hard-of-hearing people; and

3.     Explain how Defendants will ensure that SATF no longer improperly denies requests for speech-to-text accommodations going forward.

I look forward to your response.

Sincerely yours,

*/s/ Rita Lomio*
Rita Lomio
Senior Staff Attorney


cc:     Co-counsel
        Ed Swanson, Audrey Barron (Court Expert)

Sharon Garske
Improper Denials of Speech-to-Text Accommodations at SATF
September 19, 2024
Page 4

Tamiya Davis, Patricia Ferguson, Nicholas Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silveira, Ursula Stuter, OLA Armstrong (CDCR Office of Legal Affairs)
Brianne Burkart (CCHCS Office of Legal Affairs)
Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (Office of the Attorney General)
Dawn Lorey, Lourdes White, Darnell Mebane, Cory Lo, CDCR CAMU Mailbox (Division of Adult Institutions)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, CCHCS Accountability, Joseph (Jason) Williams, Jason Anderson, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CS Advocacy Mailbox, Dawn Stevens, Dharmendra Sharma, Antronne Scotland, Joseph Edwards (CCHCS)
Lois Welch, Steven Faris (OACC)

Appendix

Improper Denials of Requests for Speech-to-Text at SATF

| Date of Response | RAP Response | Interviewed? | Name, CDCR No. | DPP Code(s) | 1824 Log No. |
|---|---|---|---|---|---|
| 8/9/24 | "You will not receive a text to speech iPad as you are not designated DPH, and you currently achieve effective communication through existing accommodations." | No | | DNH | 590923 |
| 4/18/24 | "The use of CART is intended for individuals with severe hearing loss who must rely on written notes to establish effective communication during due process events. With your hearing aids and PSAD, you have demonstrated an ability to maintain a functional hearing level which enables you to achieve effective communication without written notes . . . As such, you have equally accessible means of establishing effective communication with your current assistive devices and methods of communication. You do not require CART to establish effective communication and/or access PSAs." | No | | DLT, DNH, LD | 539828 |
| 4/10/24 | "Use of cart is intended for hearing impaired individuals who utilize written notes for Effective Communication (EC). Issuance of iPhone/iPad is intended for inmates with a profound hearing loss who utilize written notes for Effective Communication (EC). A review of SOMS indicates you are designated DNH with a primary EC of hearing aids and alternate of need staff to speak loudly and clearly. You are currently accommodated with hearing aids and have been provided a pocket talker as an additional means of achieving EC." | No | | DLT, DNH, LD | 534889 |
| 3/28/24 | "iPad technology is intended for individuals with profound hearing loss who utilize written notes. You are currently designated DNH with EC of hearing aids and need staff to speak loud and clear. You have demonstrated the ability to achieve effective communication through equally effective means such as with your hearing aids and with staff speaking loudly and clearly." | No | | DPW, DNH | 528488 |
| 3/20/24 | "iPhones or iPads are intended for individuals with a DPP verification code of DPH who have profound hearing loss and utilize written notes to achieve effective communication." | No | | DNH | 523321 |
| 3/13/24 | "You are designated DNH, meaning your hearing loss is not so severe that you must rely on written communication. Rather, you have residual hearing at a functional level with hearing aids. Furthermore, you possess a personal sound amplification product | No | | DPW, DNH | 520909 |

| | | | | | |
|---|---|---|---|---|---|
| | (PSAP) to provide even further assistance with hearing. Your recent effective communication (EC) history has been reviewed, showing successful EC achievement at due process events using existing methods, such as staff speaking loudly and clearly, and your use of hearing aids. Therefore, the ADAC determined you do not require CART to establish EC, as currently available methods have proven to provide equal accessible means." | | | | |
| 3/7/24 | "Per the Interim Accommodation Procedure (IAP) worksheet, dated 02/08/2024, notes a review of the Strategic Offender Management System (SOMS) indicates you have a DPP verification code of DNH with a primary method of disability assistance which requires staff to speak loudly and clearly, and an alternate method of use of hearing aids. Issuance of iPhone technology is intended for individuals with profound hearing loss who utilize written notes to achieve effective communication. The RAP reviewed your request and determined you do not meet criteria for issuance of iPhone technology as a reasonable accommodation." | No | ■■ | DNH | 517620 |
| 2/15/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids and a pocket talker. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ■■ | DNM, DNH | 505659 |
| 2/15/24 | "You do not have a severe hearing impairment impacting placement. Your hearing is restored to a functional level with your prescribed hearing aid. The live captioning provided by the iPhone and iPad is designed to be received from in-person communication, not through the use of a telephone. If you cannot use the telephone effectively, you may continue to use your GTL tablet and Over The Ear Headphones to communicate with your family. You may also access the TTY phone and caption phone on your facility." | No | ■■ | DNH[1] | 505665 |
| 2/9/24 | "You are DNH and are currently accommodated with hearing aids and a Personal Sound Amplification Device (PSAD). Your primary method | No | ■■ | DNH | 503894 |

---

[1] At the time the SATF RAP reviewed this request, ████████ s non-formulary accommodations included: "CART service shall be provided during due process events."

| | | | | |
|---|---|---|---|---|
| | of effective communication is hearing aids with an alternate of need staff to speak loudly and clearly. You do not require an Ipad or iPhone with live captioning to access PSAs." | | | |
| 2/7/24 | "Issuance of the iPhone technology is intended for individuals with profound hearing loss. You are currently designated as DNH and are being accommodated with hearing aids and a pocket talker . . . You do not require live captioning to achieve effective communication." | No | ▇ | DPW, DNH, LD | 502652 |
| 2/1/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of staff speaking loudly and clearly and hearing aids are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ▇ | DPO, DNH | 500990 |
| 1/31/24 | "A review of SOMS indicates you are designated DNH and are accommodated with hearing aids and a Personal Sound Amplification Device (PSAD). A review of your communication methods shows that you do not require written notes to establish EC. You request to use CART services has been denied. Your current Durable Medical Equipment (DME) and assistive devices provide equally effective means of achieving effective communication." | No | ▇ | DNH | 499284 |
| 1/25/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ▇[2] | DNH | 498625 |
| 1/12/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general | No | ▇ | DNH, DPV, LD | 491830 |

---

[2] There is a pending *Armstrong* advocacy letter for ▇ that discusses this denial.

| | communication. You do not require an iPad or iPhone with live captioning to access PSAs." | | | | |
|---|---|---|---|---|---|
| 1/10/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ■ | DPM, DNH | 490926 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) method of need staff to speak loudly and clearly is sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ■ | DNM, DNH | 490909 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, access to the caption phone, and Communication Access Real-time Translation (CART) during due process events. Your current Effective Communication (EC) methods of need staff to speak loudly and clearly and written notes are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ■ | DNM, DNH | 490979 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ■ | DNH | 490984 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, access to the caption phone, and Communication Access Real-time Translation (CART) during due process events. Your current Effective Communication (EC) methods of hearing aids and written notes are sufficient to | No | ■ | DPM, DNH | 490952 |

| | | | | | |
|---|---|---|---|---|---|
| | maintain EC during due process and all general communication. You do not require an iPad with live captioning to access PSAs." | | | | |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, CART service during due process events and access to the caption phone. Your current Effective Communication (EC) methods of staff speaking loudly and clearly and written notes are sufficient to maintain EC during due process and all general communication. You do not require an iPad with live captioning to access PSAs." | No | ██████ | DPW, DNH | 490965 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of need staff to speak loudly and clearly and hearing aids are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ██████ | DPM, DNH | 490970 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids and pocket talker during due process events and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and staff speaking loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ██████ | DLT, DNH | 490976 |
| 1/9/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the caption phone. Your current Effective Communication (EC) methods of hearing aids and need staff to speak loudly and clearly are sufficient to maintain EC during due process and all general communication. You do not require an iPad or iPhone with live captioning to access PSAs." | No | ██████ | DPM, DNH | 490660 |
| 11/29/23 | "A review of the Strategic Offender Management System (SOMS) indicates you are designated DNH and are accommodated with hearing aids and require staff to speak loudly and clearly. A review of your communication methods shows that you do not require written notes to establish effective communication (EC). Your request to use CART services has been denied." | No | ██████ | DPM, DNH | 471979 |

Appendix
Improper Denials of Speech-to-Text Accommodations at SATF
September 19, 2024
A-6

| 11/3/23 | "Your request to receive CART services at your BPH hearing in November was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish Effective Communication (EC). Currently the [CDCR] offers CART to qualifying individuals during classification committees, Administrative Segregation Unit (ASU) Placement Notice Hearings, Rule Violation Report (RVR) Hearings, and biannual interviews covered by the staff misconduct orders. Your request to use CART services has been denied. You may request additional assistance from BPH staff during your BPH hearing." | No | ███ | DPW, DNH | 460315 |

Exhibit 92

**Rita Lomio**

| | |
|---|---|
| **From:** | Sharon Garske <Sharon.Garske@doj.ca.gov> on behalf of Sharon Garske |
| **Sent:** | Wednesday, August 28, 2024 1:14 PM |
| **To:** | 'Rita Lomio'; 'ed@smllp.law'; 'audrey@smllp.law'; 'Penny Godbold'; 'Caroline Jackson'; 'Jacob Hutt'; 'Skye Lovett'; 'Sophie Hart'; 'Daniel Greenfield'; 'Armstrong Team'; 'Armstrong Team - RBG only'; 'Jerrod Thompson' |
| **Cc:** | 'Jenn Neill'; 'Ferguson, Patricia@CDCR'; 'tamiya.davis@cdcr.ca.gov'; 'ursula.stuter@cdcr.ca.gov'; 'Lau-Silveira, Ava'; 'chor.thao@cdcr.ca.gov'; 'ramon.ruiz@cdcr.ca.gov'; Anne Kammer; Olena Likhachova; Trace Maiorino; 'dawn.lorey@cdcr.ca.gov'; 'darnell.mebane@cdcr.ca.gov'; 'White, Lourdes@CDCR'; 'Davis, Kristina@CDCR'; 'Roberts, Megan@CDCR (DAI)'; 'Wilkerson, Margo@CDCR'; 'Burkart, Brianne@CDCR'; 'Bick, Joseph (CMF)@CDCR'; 'Suzanne.Benavidez@cdcr.ca.gov' |
| **Subject:** | RE: Armstrong: For Review: SATF Stipulation Status Statement |

Hi all,

We write to provide responses to items #2 and 3.

2.  Please confirm that notifications will <u>not</u> appear on the lock screen of the tablet. (That is, a notification will not display on the tablet screen when the user is not using the tablet/not signed into the tablet.)
    **CDCR response:** Notifications <u>will not</u> appear on the lock screen of the tablet.

3.  Please confirm that notifications will <u>not</u> appear on the screen while someone is using an app on the tablet, but only after they exit the app and are on the home screen.
    **CDCR response:** Notification <u>will not</u> appear on the screen when in use.

    The notification will only appear at the time the individual logs in to the device. The log in occurs at the start of use (if the tablet was idle/not in use), or at any time the individual goes from utilizing one application to another.

Thank you.
Sharon

---

**From:** Sharon Garske
**Sent:** Monday, August 26, 2024 9:43 AM
**To:** Rita Lomio <rlomio@prisonlaw.com>; ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR

<Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

Hi All,

Attached are the OP 526 Tablet and OP 526 memo in response to your request #1.  CDCR is working to obtain more information from ViaPath to respond to your requests #2 and #3 below.  We will provide a response this week.

Thank you,
Sharon

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, August 16, 2024 5:20 PM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Thanks, Sharon. A few follow-up requests to make sure we're operating from the same set of facts:

1. Please produce OP 526, Statewide Kiosk and Tablet Program, as well as the memorandum from then-SATF warden T. Cisneros dated August 22, 2022, entitled, "OPERATIONAL PROCEDURE 526 – STATEWIDE KIOSK AND TABLET PROGRAM."

2. Please confirm that notifications will <u>not</u> appear on the lock screen of the tablet. (That is, a notification will not display on the tablet screen when the user is not using the tablet/not signed into the tablet.)

3. Please confirm that notifications will <u>not</u> appear on the screen while someone is using an app on the tablet, but only after they exit the app and are on the home screen.

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Wednesday, August 7, 2024 9:27 AM
**To:** Rita Lomio <rlomio@prisonlaw.com>; ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova

<Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

Hi Rita,

CDCR and CAMU have provided responses to your questions in the below chart in red.

| | | |
|---|---|---|
| 1 | 9:5-8 | "Defendants retained a qualified expert who is RESNA-certified assistive technology professional to advise Defendants on how to leverage **existing** technology and devices to provide effective communication of general announcements to deaf and hard-of-hearing class members."<br><br>Does reference to "existing" technology and devices here mean that Dr. Swett will consider only technology and devices already in the prison system, and not pagers and congregate visual displays?<br><br>Dr. Swett and CDCR are exploring viable options for providing general announcements to deaf and hard-of-hearing class members at SATF in congregate settings, including but not limited to the "technology and devices already in the prison system." |
| 2 | 9:8-9 | ViaPath tablets<br><br>Are incarcerated people allowed to use tablets on all yards at SATF, and is there sufficient reception on the yards to use the tablets?<br>During our visit to SATF last month, class members and line staff uniformly said that tablets are <u>not</u> allowed on the yard. Some referenced a memorandum to that effect. Would you please confirm and send us a copy of any relevant memoranda, including statewide and SATF-specific memoranda?<br><br>Incarcerated persons at SATF are allowed to use the tablets on all facilities, however, the tablets are not operational on the recreational yards (i.e., outdoors) because of connectivity limitations. |
| 3 | 9:9-10 | "The ViaPath tablets will display notifications on the device's home and lock screens that the incarcerated individual must acknowledge, ensuring they read the message."<br><br>If someone is using a tablet, including to read, watch videos, make phone calls, or draft emails, will the notification display on their screen? Put differently, if they are using an app, will they see the message (e.g., will the screen they are watching a movie on be interrupted to show a message), or will they see the message only after closing the application and returning to the home or lock screen?<br><br>Yes, the notification will appear on the home screen while the incarcerated person is using one of the tablet's applications. |
| 4 | 9:26-28 | "[B]ased on feedback from both incarcerated persons and staff, Defendants continue to believe that a human element is equally important to ensure that individual announcements are timely and effectively communicated." |

| | | Please explain how Defendants obtained feedback from incarcerated people, including who provided feedback and whether they were class members, and when, by and to whom, and under what circumstances the feedback was solicited and given. Please produce all relevant documentation, including of the content of the feedback.

Incarcerated persons regularly interact with correctional staff. In the course of doing so, the incarcerated population provides feedback to CAMU CCIIs and Compliance Sergeants who conduct internal monitoring. During regular programming, incarcerated persons reported to programming staff their concerns. |

Thank you,
Sharon

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, August 2, 2024 6:07 PM
**To:** Sharon Garske <Sharon.Garske@doj.ca.gov>; ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Hi Sharon,
??
Thanks again for sending Defendants??? draft of the joint statement. We have a few fact questions, which are listed below. Would you please provide answers by next Wednesday?
??

| 1 | 9:5-8 | ???Defendants retained a qualified expert who is RESNA-certified assistive technology professional to advise Defendants on how to leverage **existing** technology and devices to provide effective communication of general announcements to deaf and hard-of-hearing class members.???
??
Does reference to ???existing??? technology and devices here mean that Dr. Swett will consider only technology and devices already in the prison system, and not pagers and congregate visual displays? |
| 2 | 9:8-9 | ViaPath tablets
??
Are incarcerated people allowed to use tablets on all yards at SATF, and is there sufficient reception on the yards to use the tablets?
?? |

| | | During our visit to SATF last month, class members and line staff uniformly said that tablets are <u>not</u> allowed on the yard. Some referenced a memorandum to that effect. Would you please confirm and send us a copy of any relevant memoranda, including statewide and SATF-specific memoranda? |
|---|---|---|
| 3 | 9:9-10 | ???The ViaPath tablets will display notifications on the device???s home and lock screens that the incarcerated individual must acknowledge, ensuring they read the message.??? ?? If someone is using a tablet, including to read, watch videos, make phone calls, or draft emails, will the notification display on their screen? Put differently, if they are using an app, will they see the message (e.g., will the screen they are watching a movie on be interrupted to show a message), or will they see the message only after closing the application and returning to the home or lock screen? |
| 4 | 9:26-28 | ???[B]ased on feedback from both incarcerated persons and staff, Defendants continue to believe that a human element is equally important to ensure that individual announcements are timely and effectively communicated.??? ?? Please explain how Defendants obtained feedback from incarcerated people, including who provided feedback and whether they were class members, and when, by and to whom, and under what circumstances the feedback was solicited and given. Please produce all relevant documentation, including of the content of the feedback. |

??

If you need clarification on any of the questions above, please let us know.

??

Thank you for your help ??? we appreciate it.

??

Rita

??

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Tuesday, July 30, 2024 1:56 PM
**To:** 'Sharon Garske' <Sharon.Garske@doj.ca.gov>; 'ed@smllp.law' <ed@smllp.law>; 'audrey@smllp.law' <audrey@smllp.law>; 'Penny Godbold' <PGodbold@rbgg.com>; 'Caroline Jackson' <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; 'Armstrong Team - RBG only' <ArmstrongTeam@rbgg.com>; Jerrod Thompson <jthompson@prisonlaw.com>
**Cc:** 'Jenn Neill' <Jennifer.Neill@cdcr.ca.gov>; 'Ferguson, Patricia@CDCR' <Patricia.Ferguson@cdcr.ca.gov>; 'tamiya.davis@cdcr.ca.gov' <tamiya.davis@cdcr.ca.gov>; 'ursula.stuter@cdcr.ca.gov' <ursula.stuter@cdcr.ca.gov>; 'Lau-Silveira, Ava' <Ava.Lau-Silveira@cdcr.ca.gov>; 'chor.thao@cdcr.ca.gov' <chor.thao@cdcr.ca.gov>; 'ramon.ruiz@cdcr.ca.gov' <ramon.ruiz@cdcr.ca.gov>; 'Anne Kammer' <Anne.Kammer@cdcr.ca.gov>; 'Olena Likhachova' <Olena.Likhachova@doj.ca.gov>; 'Trace Maiorino' <Trace.Maiorino@doj.ca.gov>; 'dawn.lorey@cdcr.ca.gov' <dawn.lorey@cdcr.ca.gov>; 'darnell.mebane@cdcr.ca.gov' <darnell.mebane@cdcr.ca.gov>; 'White, Lourdes@CDCR' <Lourdes.White@cdcr.ca.gov>; 'Davis, Kristina@CDCR' <Kristina.Davis@cdcr.ca.gov>; 'Roberts, Megan@CDCR (DAI)' <Megan.Roberts2@cdcr.ca.gov>; 'Wilkerson, Margo@CDCR' <Margo.Wilkerson@cdcr.ca.gov>; 'Burkart, Brianne@CDCR' <Brianne.Burkart@cdcr.ca.gov>; 'Bick, Joseph (CMF)@CDCR' <Joseph.Bick@cdcr.ca.gov>; 'Bick, Joseph (CMF)@CDCR' <Joseph.Bick@cdcr.ca.gov>; 'Suzanne.Benavidez@cdcr.ca.gov' <Suzanne.Benavidez@cdcr.ca.gov>
**Subject:** RE: Armstrong: For Review: SATF Stipulation Status Statement

??

Thanks, Sharon. We???ll take a look and return the draft to you on August 12.

??

---

**From:** Sharon Garske <Sharon.Garske@doj.ca.gov>
**Sent:** Monday, July 29, 2024 7:39 PM

**To:** ed@smllp.law; audrey@smllp.law; Penny Godbold <PGodbold@rbgg.com>; Caroline Jackson <CJackson@rbgg.com>; Jacob Hutt <jacob@prisonlaw.com>; Rita Lomio <rlomio@prisonlaw.com>; Marissa Hatton <mhatton@prisonlaw.com>; Skye Lovett <skye@prisonlaw.com>; Sophie Hart <sophieh@prisonlaw.com>; Daniel Greenfield <danielg@prisonlaw.com>; Armstrong Team <arm-plo@prisonlaw.com>; Armstrong Team - RBG only <ArmstrongTeam@rbgg.com>; jthompson@prisonlaw.com
**Cc:** Jenn Neill <Jennifer.Neill@cdcr.ca.gov>; Ferguson, Patricia@CDCR <Patricia.Ferguson@cdcr.ca.gov>; tamiya.davis@cdcr.ca.gov; ursula.stuter@cdcr.ca.gov; Lau-Silveira, Ava <Ava.Lau-Silveira@cdcr.ca.gov>; chor.thao@cdcr.ca.gov; ramon.ruiz@cdcr.ca.gov; Anne Kammer <Anne.Kammer@doj.ca.gov>; Olena Likhachova <Olena.Likhachova@doj.ca.gov>; Trace Maiorino <Trace.Maiorino@doj.ca.gov>; dawn.lorey@cdcr.ca.gov; darnell.mebane@cdcr.ca.gov; White, Lourdes@CDCR <Lourdes.White@cdcr.ca.gov>; Davis, Kristina@CDCR <Kristina.Davis@cdcr.ca.gov>; Roberts, Megan@CDCR (DAI) <Megan.Roberts2@cdcr.ca.gov>; Wilkerson, Margo@CDCR <Margo.Wilkerson@cdcr.ca.gov>; Burkart, Brianne@CDCR <Brianne.Burkart@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Bick, Joseph (CMF)@CDCR <Joseph.Bick@cdcr.ca.gov>; Suzanne.Benavidez@cdcr.ca.gov
**Subject:** Armstrong: For Review: SATF Stipulation Status Statement
??
Hi All,
??
Attached for review and comment is the draft joint SATF stipulation status statement.?? Please note, as discussed at recent SATF stipulation meetings, we have inserted ???placeholder??? language for SATF 1-3 and 9 & 10 as the parties are actively negotiating those items and in SATF 6 until CCHCS provides an update to that item.?? We can continue to revise and update those sections as appropriate.?? We have also inserted placeholders for attachments, which can be finalized in the final review of the statement.??
??
Please forward the statement to others in your offices as appropriate.??
??
Please contact us with any questions.?? Thank you.
Sharon
??
??
Sharon A. Garske
Supervising Deputy Attorney General
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102
Office: 415-510-4438
Cell: 916-208-0222
??

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is

prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 93



# PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Daniel Greenfield
Mackenzie Halter
Alison Hardy
Sophie Hart
Lily Harvey
Jacob Hutt
A.D. Lewis
Rita Lomio
Heather MacKay
Donald Specter
Jerrod Thompson

VIA EMAIL ONLY

September 27, 2024

Tamiya Davis
CDCR Office of Legal Affairs

RE:     *Armstrong v. Newsom*
        Systematic Denials of Vibrating Watches to DNH Class Members at SATF

Dear Ms. Davis:

Defendants told the Court a year ago that they would "provide . . . vibrating watches as a reasonable accommodation to deaf **and hard-of-hearing individuals** at SATF and elsewhere upon request and approval," and that when the RAP approves a reasonable accommodation, "CDCR will incur the cost associated . . . when no reasonable alternative exists, unless such an accommodation creates an undue burden under the ADA."[1]

Nonetheless, hard-of-hearing people at SATF continue to be systematically denied vibrating watches as an accommodation. We continue to see the Reasonable Accommodation Panel (RAP) at SATF improperly deny requests for vibrating watches from class members designated DNH based on DPP code alone, without interviewing class members to understand their disability-related needs and challenges in prison due to their hearing loss, in violation of both existing policy and the Americans with Disabilities Act. These denials evidence the same "misconceptions about hearing impairment or deafness" that the Court identified more than two decades ago.[2]

Defendants have not addressed these concerns in response to Plaintiffs' advocacy. Over five months ago, Plaintiffs' counsel reported that the SATF RAP denied a vibrating watch to an elderly hard-of-hearing man without interviewing him, based on his DPP code alone.[3] When Defendants had not responded after 107 days, we again requested that he be issued a vibrating

---

[1] Dkt. No. 3515 at 7, 12 (emphasis added).

[2] *See* Dkt. No. 523 at 10.

[3] *See* Letter from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs, ████████████, SATF (Apr. 10, 2024).

**Board of Directors**
Jason Bell • Chesa Boudin • Vanita Gaonkar • Nick Gregoratos • Christiane Hipps
Jean Lu • Claire McDonnell • Seth Morris • Keramet Reiter • Vishal Shah • Adrienne Yandell

watch, explaining that Dr. Bourne had found that he has profound bilateral hearing loss, "which means amplified speech is difficult or impossible to understand" and that "[i]t is not realistic to expect [him] to rely on his hearing aids or pocket talker to understand speech in any of his listening conditions."[4] We still have not received a response.

Defendants issued an unclear policy memorandum without input from Plaintiffs' counsel that unsurprisingly has not fixed the problem. In particular, on June 3, 2024, Defendants released a memorandum regarding issuance of vibrating watches that is confusing on its face, stating both that the RAP will consider on a "case-by-case basis" requests for vibrating watches submitted by people not designated DPH, and that all people not designated DPH "may purchase a vibrating watch."[5] Plaintiffs' counsel requested an explanation of what guidance headquarters' staff would provide to institutions to ensure that people not designated DPH may be issued vibrating watches on a "case-by-case basis." Defendants replied:

> ADA Coordinators have been provided directions in terms of the how to assess an individual on a case-by-case basis, and sufficient information will be available for a RAP to determine whether a non-DPH class member should be issued a vibrating watch.[6]

Just weeks later, however, the SATF RAP denied a DNH class member's request for a vibrating watch, explaining: "As you are not designated DPH you do not qualify to be accommodated with a vibrating watch."[7]

As summarized in the table on the next page, the SATF RAP denies DNH class members who request a vibrating watch as standard practice, based on rote reference to policy, on misconceptions about what staff *think* a person can hear, and on the mere fact that a person has hearing aids. That is not appropriate. Please note that the table on the next page is not a comprehensive list of all times the SATF RAP has improperly denied a request for a vibrating watch. It is meant only to illustrate the scope and duration of the problem.

---

[4] Email from Rita Lomio, Prison Law Office, to Tamiya Davis, CDCR Office of Legal Affairs (July 26, 2024).

[5] Memorandum, "Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Persons" (June 3, 2024).

[6] Letter from Anne Kammer, Office of the Attorney General, to Jacob Hutt, Prison Law Office, Defendants' Response to Plaintiffs' July 10, 2024 Email at 3 (July 18, 2024).

[7] 1824 Log No. 592614 (Aug. 13, 2024).

Tamiya Davis
Systematic Denials of Vibrating Watches to DNH Class Members at SATF
September 27, 2024
Page 3

| Date | RAP Response | Interviewed? | Name, CDCR No. | DPP Code(s) | 1824 Log No. |
|------|--------------|--------------|----------------|-------------|--------------|
| 9/3/24 | "Per CDCR memo, Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Person Dated 6/3/2024, all persons not designated DPH may purchase a vibrating watch from any departmentally approved authorized personal property package vendor as part of their quarterly package order in keeping with title 15 and the authorized personal property schedule. A review of Strategic Offender Management System (SOMS) indicates you are designated DNH and are accommodated with hearing aids and a pocket talker." | No | ▉ | DNH | 603586 |
| 8/13/24 | "Per CDCR memo, Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Person Dated 6/3/2024, all persons not designated DPH may purchase a vibrating watch from any departmentally approved authorized personal property package vendor as part of their quarterly package order in keeping with title 15 and the authorized personal property schedule. As you are not designated DPH you do not qualify to be accommodated with a vibrating watch." | No | ▉ | DNH | 592614 |
| 8/9/24 | "The RAP considered your request for a vibrating watch, and you were disapproved for a vibrating watch. Per CDCR memo, 'Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement', Incarcerated Person, dated 6/3/2024, all persons not designated DPH may purchase a vibrating watch from any departmentally approved authorized personal property vendor as part of their quarterly package order in keeping with title 15 and the authorized personal property schedule." | No | ▉ | DNH | 590266 |
| 8/9/24 | "Per memo titled 'Issuance of Vibrating Watches as a Reasonable Accommodation for Permanent Hearing-Impaired, Impacting Placement Incarcerated Persons,' your request for a vibrating watch will be reviewed by the RAP. If request is disapproved, vibrating watches were made available for the incarcerated population to | No | ▉ | DNH | 590923 |

Tamiya Davis
Systematic Denials of Vibrating Watches to DNH Class Members at SATF
September 27, 2024
Page 4

| | | | | | |
|---|---|---|---|---|---|
| | purchase via the quarterly package process at the beginning of the month." | | | | |
| 8/7/24 | "A review of Strategic Offender Management System (SOMS) indicates you are designated DNH and are accommodated with hearing aids as well as a pocket talker. You do not meet criteria to be accommodated with a vibrating watch." | No | ■ | DNH | 590237 |
| 6/3/24 | By memorandum dated June 3, 2024, CDCR headquarters directed institutions to consider requests for vibrating watches by people not designated DPH on a "case-by-case basis." | | | | |
| 3/28/24 | "Although your PLO memo makes mention of a vibrating watch, they are not yet available for distribution. In the meantime, you may request to purchase one through the ADA special purchase order process." | No | ■ | DNH, DPW | 528488 |
| 3/12/24 | "A review of Strategic Offender Management System (SOMS) indicates you are currently designated DNH with primary Effective Communication (EC) of needs staff to speak loudly and clearly and alternate of hearing aids. Accounting confirmed you are not considered indigent. You may utilize approved processes to purchase a vibrating watch." | No | ■ | DNH | 520316 |
| 2/7/24 | "You are currently designated as DNH and are being accommodated with hearing aids and pocket talker." | No | ■ | DNH, DPW | 502652 |
| 1/25/24 | "You do not have a severe hearing impairment impacting placement. You are accommodated with hearing aids, pocket talker, and access to the captioned phone." | No | ■ | DNH | 498625 |
| 10/5/23 | "You may utilize a 602 to address disagreement with disapproval for special purchase order request." | No | ■ | DNH, DPM | 447193 |
| 10/5/23 | CDCR issues statewide direction that when the RAP approves a reasonable accommodation to ensure class-member access to programs, services, and activities in compliance with the ADA and the remedial plan, CDCR will incur the cost associated with the reasonable accommodation when no reasonable alternative exists, unless such an accommodation creates an undue burden under the ADA. | | | | |

\* An asterisk indicates that there is pending *Armstrong* advocacy for a vibrating watch for this class member.

Existing guidance and training—and repeated advocacy by Plaintiffs' counsel—has not resolved this problem. In light of inaction by CDCR headquarters' staff, we are concerned that we do not share an understanding of what is required of the RAP to substantively review the requests of people with disabilities.

Tamiya Davis
Systematic Denials of Vibrating Watches to DNH Class Members at SATF
September 27, 2024
Page 5

We request as follows:

1.  Please identify and produce all SATF 1824s and RAP responses from October 5, 2023, to present, related to vibrating watches.

2.  Please reconsider all denials by the SATF RAP identified in response to (1) above and the table in this letter, and either issue the person a vibrating watch or provide the accommodation on an interim basis until they are assessed by an assistive technology professional with expertise in accommodations for hard-of-heraing people.

3.  Please explain how Defendants will ensure that SATF no longer improperly denies requests for vibrating watches going forward.

Thank you for your prompt attention to this matter.

Sincerely yours,

*/s/ Skye Lovett*
Skye Lovett
Investigator

*/s/ Rita Lomio*
Rita Lomio
Senior Staff Attorney

cc:    Co-counsel
Ed Swanson, Audrey Barron (Court Expert)
Patricia Ferguson, Nicholas Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silveira, Ursula Stuter, OLA Armstrong (CDCR Office of Legal Affairs)
Brianne Burkart (CCHCS Office of Legal Affairs)
Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (Office of the Attorney General)
Dawn Lorey, Lourdes White, Darnell Mebane, Cory Lo, CDCR CAMU Mailbox (Division of Adult Institutions)
Diana Toche, Joseph Bick, John Dovey, Robin Hart, CCHCS Accountability, Joseph (Jason) Williams, Jason Anderson, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CS Advocacy Mailbox, Dawn Stevens, Dharmendra Sharma, Antronne Scotland, Joseph Edwards (CCHCS)
Lois Welch, Steven Faris (OACC)

Exhibit 94

# ADA PAGING GUIDELINES
## Minnesota Department of Corrections

The Minnesota Department of Corrections (DOC) ensures that incarcerated persons/residents who are deaf or hard of hearing have access to an effective paging system to notify them of oral announcements made over the public address system in their assigned living units, particularly with respect to scheduled activities and movements for meals, recreation, appointments, and programming.

Incarcerated persons/residents who are deaf or hard of hearing and who have been approved to use a pager must be sent a preprogrammed or customized message notifying them of every general announcement made over the public address system in their living units, including those related to security counts and large group movements or mass movements for meals, recreation, pill window, canteen, programming assignments, lockdown, tornado warning, etc. Except in emergencies, pages for general announcements must be made immediately after the general announcement is made over the public address system. A pager message must also be sent for any individual appointments they have that require movement (for example, medical appointments, legal calls, or visits). The sergeant/officer in charge (OIC) of the living unit or program area is responsible for ensuring that required pages are sent.

A.  **Access to ADA Paging**
1.  If an incarcerated person/resident is identified as deaf or hard of hearing during a medical assessment upon initial intake or transfer from another facility, the facility ADA coordinator must determine whether the individual has an immediate need for access to an ADA pager to enable them to receive oral announcements in their living unit and to follow required movements.
    a)  If the need is immediate, the facility ADA coordinator must approve the individual for access to the ADA pager and notify the unit sergeant/OIC and the unit lieutenant.
    b)  If the need is not immediate, pager access must await approval by the facility ADA committee.

2.  If an incarcerated person/resident self-identifies as deaf or hard of hearing and wishes to have access to the ADA paging system, they may submit a Request for Modification in accordance with Policy 203.250, Modifications for Incarcerated Persons/Residents with Disabilities.

3.  Upon receipt of a request for modification, the facility ADA coordinator must assess the need for access to the ADA paging system in accordance with the procedures set forth in Policy 203.250.

4.  When an incarcerated person/resident has been approved to access the paging system by the facility ADA coordinator or committee, the living unit OIC or designee must provide them with a pager and charging cord, have them complete a Pager Equipment Agreement, and assign them a pager number and groups in the paging system so they can begin receiving messages regarding announcements and movements (e.g., meals, recreation, medical appointments). Information is documented in COMS under the ADA tab for the equipment.

5.  Living unit staff must send pages for every general announcement made over the public address system in the unit, including such examples as announcements regarding counts; mass movements for meals, recreation, pill window, canteen, and linen switch out; lockdown; tornado warning; and programming assignments. Except in emergencies, pages for general announcements must be made immediately after the general announcement is made over the public address system.

6.  Announcements or customized messages for an individual who has been approved to use a pager must also be sent over the pager system to that specific individual.

B.     **Unit and Facility Transfers**

When an incarcerated person/resident who has been approved to use the ADA paging system moves from one living unit to another within the facility or transfers from the facility to another facility, the OIC, designee, or transfer coordinator is responsible for contacting the receiving unit or the receiving facility's facility administrator to communicate that the individual is approved for accommodations before the transfer occurs so accommodations are readily available and implemented upon transfer.

1.  For internal facility moves, the individual will keep their pager and charging cord. The facility administrator, OIC, or designee updates the pager and groups in the system.

2.  For facility-to-facility transfers, the individual must return the pager and charging cord to the OIC prior to the transfer.
    a)  The OIC must return the equipment to the facility administrator and communicate to the administrator and to the transfer coordinator that the individual is moving to another facility.
    b)  The sending facility's transfer coordinator must check for accommodations and send the information to the receiving facility's transfer coordinator.
    c)  The receiving facility's OIC, facility administrator, or designee issues a pager and charging cord and has the individual sign a new Pager Equipment Agreement provided by the facility ADA coordinator.  Information is documented in COMS under the ADA tab for the new equipment.

C.     **Raising and Responding to Paging Issues**

1.  Incarcerated people/residents who are experiencing issues with their assigned pager, including not receiving required pages, should send a kite to the unit lieutenant and facility ADA coordinator.

2.  Staff who are otherwise aware of possible issues with ADA paging, including complaints about not receiving pages, must complete and submit an incident report documenting the issue, with a copy to the unit lieutenant or the facility ADA coordinator.

3.  The unit lieutenant or facility ADA coordinator must follow up on any complaints, whether received by kite or incident report, that pages are not being sent when required. Such follow-up should include reviewing electronic pager records to determine whether living unit staff have or have not sent any required pages. If staff have failed to send required pages, the lieutenant or facility ADA coordinator must take steps to ensure the issue is appropriately addressed through performance management or other corrective action. This may include reporting the issue to the appointing authority per Policy 103.219, Employee Misconduct Investigation and Discipline.

# Exhibit 95

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-00792-RBJ

CENTER FOR LEGAL ADVOCACY
d/b/a DISABILITY LAW COLORADO,

        Plaintiff,

v.

 COLORADO DEPARTMENT OF CORRECTIONS, and
DEAN WILLIAMS, in his official capacity as Executive Director of the Colorado Department of Corrections,

        Defendants.

---

**ORDER APPROVING JOINT MOTION TO DISMISS AND
REQUEST TO RETAIN JURISDICTION TO ENFORCE SETTLEMENT AGREEMENT**

---

      Plaintiff and Defendants have reached a settlement of this case and have moved the Court to acknowledge the settlement and dismiss the case. For good cause shown, the Parties' Joint Motion to Dismiss and Request to Retain Jurisdiction to Enforce is GRANTED and this action is dismissed with prejudice. The terms and conditions of the Release and Settlement Agreement are incorporated by reference into this Order. Notwithstanding the dismissal of this action, the Court retains jurisdiction solely to enforce the terms of the attached Release and Settlement Agreement, in accordance with § 16 of the Release and Settlement Agreement. *See Floyd v. Ortiz*, 300 F.3d 1223, n. 3 (10th Cir. 2002) (citing *Morris v. City of Hobart*, 39 F.3d 1105, 1110 (10th Cir. 1994)); and *Kokkonen v. Guardian Life Ins. Co*., 511 U.S. 375 (1994).

IT IS SO ORDERED

Dated:  August 15, 2022

                          *[signature]*

                          ————————————————————
                          R. Brooke Jackson
                          Senior United States District Judge

DocuSign Envelope ID: E7B518D9-27DA-4AA2-9D03-C48C2176F6EF

# **RELEASE AND SETTLEMENT AGREEMENT**

This Release and Settlement Agreement (the "Agreement") is made as of the __th day of _____, 2022 (notwithstanding the actual date of execution) by and between THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW COLORADO the "Plaintiff", the STATE OF COLORADO, and the Office of Risk Management for the State of Colorado, collectively, the "State."

WHEREAS, Plaintiff filed a civil lawsuit entitled *THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW COLORADO v. COLORADO DEPARTMENT OF CORRECTIONS and DEAN WILLIAMS in his capacity as Executive Director of the Colorado Department of Corrections,* United States District Court for the District of Colorado, Civil Action No. 21-CV-07792 (the "Litigation"), alleging that the Colorado Department of Corrections failed to abide by Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the accommodations it provides to Deaf and hard of hearing individuals in its custody (the "Allegations"); and

WHEREAS, the Parties wish to avoid the uncertainties and expense of litigation and to settle and compromise, on the terms set forth below, all claims that are or could be asserted in any litigation or any claim otherwise arising from or relating to the Allegations; and

WHEREAS, the Parties acknowledge that the promises and covenants contained herein are good and valuable consideration for all Parties to execute this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, the Parties hereby agree and covenant as follows:

1.    <u>DEFINITIONS.</u> The Parties agree that for purposes of this Agreement the terms listed below shall be defined as follows:

     a.  "ASL" means American Sign Language.

     b.  "ASR" means automatic speech recognition, that is, the rendering of speech into text using machine automation. To be used in conjunction with this Agreement, an ASR system must provide real-time text transcription that

# **EXHIBIT 1**

DocuSign Envelope ID: EZB518D2-27DA-4AA9-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

provides communication for DHOH people that is as effective as communication for hearing people.

c.  "CDOC" means the Colorado Department of Corrections, an agency of the State.

d.  "CHP" means Correctional Health Partners, a Colorado Limited Liability Corporation, and a non-party to the Litigation.

e.  A person is "Deaf or Hard of Hearing" or "DHOH" when they are a person determined to have a hearing disability pursuant to the examination referred to in § 2(f) below or, while awaiting such examination, a person whose inability to hear is obvious and/or was previously known to CDOC.

f.  "Exemplar Constituents" means the individuals identified as such in the Plaintiff's Second Amended Complaint.

g.  "Interpreter" means a qualified, certified sign language interpreter who meets the requirements of 28 C.F.R. § 35.104. As used in this Settlement, it shall be understood to include a Certified Deaf Interpreter (as part of a Deaf/hearing team, where a Deaf person's ASL literacy is not sufficient to rely only on ASL) as well as an interpreter into a different sign language (for example, Mexican Sign Language or Black American Sign Language) where necessary.

h.  "Major medical appointment" means:

   i.  audiology screenings and appointments;

   ii.   discussion of patient's symptoms for any diagnostic purpose, and discussing medical conditions, medications, and/or medical history;

   iii.  explaining medical conditions, treatment options, tests, medications, surgery, and other procedures;

   iv.  providing a diagnosis or recommendation for treatment;

   v.  communications immediately preceding, during, and immediately after surgery or other procedures and all post-op check ups;

DocuSign Envelope ID: E7B518D9-27DA-49A2-9D03-C48C2176E6EF

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

> vi.  obtaining informed consent for treatment;
>
> vii.  mental or behavioral health appointments;
>
> viii.  providing instructions for medications, post-treatment activities, and follow-up treatments; and
>
> ix.  all appointments where new or complex information will be discussed.
>
> x.  Major medical appointments does not include routine medical appointments, including blood pressure checks, medication refills, and dental cleanings.
>
> xi.  Major medical appointments does not include emergency medical services.

i.  "OCA" means Offender Care Aid, a job designation held by certain individuals in CDOC's custody assigned to assist disabled individuals with daily tasks and necessities.

j.  "Policies" means Administrative Regulations, Clinical Standards, and any other memorialization of rules and procedures maintained by CDOC.

k.  "VRI" means video remote interpretation. As used in this Settlement, it is understood to mean the provision of sign language interpretation by remote video connection on demand, without the need for an advance request.

2.  <u>AUDIOLOGICAL SCREENING AND REFERRAL FOR AUDIOLOGICAL EXAM</u>. CDOC agrees to screen all individuals in its custody for hearing loss, audiological examination, and provision of hearing aids in accordance with the following terms.

a.  All individuals over the age of 65 in CDOC's custody shall be screened for referral to an audiologist at least every three years.

b.  All individuals in CDOC's custody with a comorbidity, or a history of hearing loss risk factors shall be screened for referral to an audiologist at least every two years.

DocuSign Envelope ID: E7B5180?-27DA-4?A?-9D?3-C48C2?376F6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

c.  All individuals in CDOC's custody may request screening for referral to an audiologist at any time, regardless of their last screening date.

d.  When CDOC screens individuals in its custody for referral to an audiologist, it shall utilize an otoacoustic emissions test applying the DPOAE DP 4s Screening protocol on the MAICO Ero-Scan® OAE Test System maintained by CDOC.

e.  When the result of the screening procedure specified in subparagraph (d) indicates referral to an audiologist, CDOC shall submit a request for a referral for examination by an audiologist on behalf of the screened individual within two business days of such screening.

f.  When an individual in CDOC's custody is examined by an audiologist pursuant to § 2(e), CDOC will ask the audiologist to determine whether the individual has a hearing disability and/or requires hearing aids by applying community standards of care.  The current hearing aid provision criteria in CDOC's "Clinical Standards and Procedures, Health Care Appliances" will be removed and instead state that an audiologist will make the determination as to whether the incarcerated person has a hearing disability and/or needs hearings aids, applying community standards of care. CDOC will notify all contracted audiologists of this policy change.

g.  When an audiologist makes a determination pursuant to § 2(f), CDOC shall adopt the determination of the audiologist as to whether the examined individual has a hearing disability and/or requires hearing aids. For purposes of this Agreement, an individual in CDOC's custody requires hearing aids when an audiologist has determined that the individual requires hearing aids by applying community standards of care pursuant to § 2(f), and reported that determination to CDOC.

h.  CDOC shall revise its policies to include and conform to the requirements of §§ 2(a) – (g).

3.  <u>PROVISION OF HEARING AIDS</u>. CDOC agrees to provide hearing aids to individuals in its custody in accordance with the following terms.

DocuSign Envelope ID: EZB518D9-27DA-4AA9-9D03-C48C21576E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

a. CDOC shall provide hearing aids to all individuals in its custody who require hearing aids, regardless of whether CDOC has previously provided those individuals with hearing aids, unless CDOC can demonstrate that an individual in its custody has previously lost or damaged their CDOC-issued hearing aids on at least two prior occasions.

b. CDOC shall permit individuals in its custody who require hearing aids to possess a remote-control associated with their hearing aids.

c. CDOC shall permit individuals in its custody who require hearing aids to exchange depleted hearing aid batteries for new ones (at no cost to the individual) during med line, which occurs twice daily.  If an individual who requires hearing aids needs to replace a battery at another time, they may request a replacement from CDOC staff members assigned to their housing unit, who will provide a replacement as soon as possible.

d. CDOC will make good faith efforts to ensure that batteries for all types of hearing aids in use by individuals housed at a given facility are stocked and available at all times.

e. CDOC shall revise its policies to include and conform to the requirements of §§ 3(a) – (d).

f. CDOC will make good faith efforts to amend its contracts with CHP to require:

   i. that individuals in its custody who are provided with new hearing aids receive at least one in-person follow-up appointment with an audiologist no more than six months after their receipt of new hearing aids.

   ii. that individuals in its custody who require hearing aids have annual re-evaluations utilizing equipment that meets the requirements set forth in the American National Standards Institute (ANSI) standard S3.6-2018, and that testing will be conducted in an acoustic environment that will not adversely influence the measurement of auditory thresholds. If there is a hearing threshold

DocuSign Envelope ID: E7B518D9-27DA-49A2-9D03-648C2476FEEF

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

shift of 10 dB or more across any tested frequency, the individual will be referred to an audiologist.

iii. that individuals in its custody who require hearing aids have annual hearing aid assessments that shall be conducted by a clinical nursing staff member trained to conduct such assessments by an audiologist and are provided what the audiologist, in their professional opinion, believes is adequate supervision. This trained clinical staff member will provide hearing aid assessments in accordance with the procedure set forth in Exhibit B.

iv. that individuals in its custody who require hearing aids receive loaner hearing aids within ten days at no cost to the individual from an audiologist while their hearing aids are repaired, calibrated, or replaced.

v. that when individuals in its custody are determined by an audiologist to require hearing aids pursuant to § 2(f) of this Agreement, the individual receives the required hearing aids within sixty (60) days of that determination.

vi. that repairs or calibration of hearing aids take place within sixty (60) days of the date when the hearing aids are conveyed to an audiologist for repair or recalibration.

g. If, within six months of the Effective Date, CDOC is unable to amend its contracts with CHP to achieve the requirements of § 3(f)(iii), it will provide loaner hearing aids as described in that section.

4. <u>ACCOMODATIONS AND AUXILIARY AIDS.</u> CDOC agrees to evaluate individuals in its custody for accommodations and auxiliary aids in accordance with the following terms:

a. When an individual in CDOC's custody is determined to have a hearing disability pursuant to § 2(f) of this Agreement, they will be assessed by a qualified professional to determine the auxiliary aids and services reasonably necessary to ensure equally effective communication and access to services (the "Assessment").

Case 1:21-cv-00792-RBJ   Document 74   Filed 08/15/22   USDC Colorado   Page 8 of 33
Case 4:94-cv-02307-CW   Document 3630-12   Filed 10/16/24   Page 44 of 659
DocuSign Envelope ID: E7B518D9-27DA-49A2-9D03-C48C21576E6F

b. The parties will designate one or more mutually agreed upon expert consultants in issues relating to deafness, hearing loss, and adaptation, with whom CDOC can confer periodically throughout the Agreement to undertake the following tasks:

    i. recommend to CDOC Assistive Technology and other measures to implement this agreement;

    ii. recommend to CDOC Reasonable Modifications and Auxiliary Aids and Services programs and facilities accessible to DHOH incarcerated people;

    iii. report annually on any newly-available assistive technology and improvements to existing assistive technology that it recommends CDOC adopt; and

    iv. evaluate DHOH incarcerated people to assess appropriate assistive technology, auxiliary aids and services, and other reasonable modifications, and training in the same that each such person requires.

c. CDOC will approve and provide the auxiliary services recommended in the Assessment in accordance with its duties and obligations under 28 CFR § 35.160-164.

d. When new accommodations are approved pursuant to § 4(c), CDOC shall provide the individual for whom those accommodations were approved with a printed copy of their Accommodation Tracking System (ATS) report listing all of their approved accommodations, and that individual shall be permitted to carry the report on their person.

e. For DHOH individuals, the following accommodations and auxiliary aids are presumed not to require a fundamental alteration in the nature of a service, program, or activity or an undue financial and administrative burden pursuant to 28 CFR § 35.164:

    i. Hearing aids, batteries, and remote controls;

    ii. Interpreters;

    iii. ASR;

    iv. Vibrating watches;

    v. Armband alarms;

    vi. Captioned telephones; and

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

   vii. Videophones.

 f. Once an accommodation or auxiliary aid or service is approved pursuant to an Assessment, that status will not change as a result of an individual's transfer to another housing assignment at the same or lower custody level, and such accommodations or auxiliary aids or services will not be revoked except pursuant to a later Assessment, provided that CDOC may temporarily revoke such accommodations or auxiliary aids or services pending an Assessment if they pose a threat to safety or security.

 g. When an incarcerated person is transferred to a housing assignment with a higher custody level, a new Assessment shall be conducted to determine which auxiliary aids are reasonably necessary to ensure equally effective communication and access to services consistent with the individual's new housing assignment.

 h. CDOC shall revise its policies to include and conform to the requirements of §§ 4(d) – (g).

 i. Nothing in this Agreement precludes an individual incarcerated person from requesting a specific accommodation pursuant to the CDOC's accommodation request process.

5. <u>INTERPRETER AND ASR SERVICES.</u> CDOC agrees to provide interpretation and ASR services to DHOH individuals in accordance with the following terms.

 a. CDOC shall provide an Interpreter or ASR as appropriate based on the person's primary language and any determination made pursuant to § 4(c), when individuals in its custody previously determined to have a hearing disability pursuant to § 2(f) of this Agreement request such services for any of the following activities:

   i. Intake and orientation;

   ii. Major medical appointments;

   iii. Educational courses during class time;

   iv. Religious programming;

   v. Case manager meetings;

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C2476E6EF

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

     vi.  Disciplinary investigations and hearings;

    vii.  PREA complaints and investigations;

   viii.  Classification/re-classification hearings;

    ix.  Parole board hearings; and

    x.  Substantive meetings relating to vocational and residential programming, including, for example, meeting in which information is exchanged that can affect the DHOH incarcerated person's ability to participate in the program in question.

b. Where necessary based on ASL literacy, country of origin, or other relevant factors, CDOC will provide a Certified Deaf Interpreter, Black American Sign Language interpreter, or interpreter in other sign languages.

c. Where necessary based on timing of hearing loss and ASL literacy, CDOC will provide ASR.

d. When CDOC has two or more days of advanced notice that ASL interpretation services are required for any activity listed in § 5(a), it shall provide an on-site interpreter during that activity, except when on-site interpretation would materially interfere with security or infection control measures. In such cases, CDOC shall provide VRI in lieu of on-site interpretation.

e. When CDOC has less than two days of advanced notice that ASL interpretation services are required for any activity listed in § 5(a), it shall provide an on-site interpreter or VRI during that activity.

f. CDOC will evaluate requests for Interpreters or ASR for other types of interaction, including but not limited to routine meetings related to vocational and residential programming, grievance preparation, library services, and interpretation of complex written materials. CDOC will evaluate such requests on a person-by-person and/or case-by-case basis, and approve them when the incarcerated person demonstrates that the accommodation is necessary for them to access the full benefits of CDOC's services and programs. Where a person has demonstrated that a specific type of accommodation is necessary in a specific context to

DocuSign Envelope ID: EZB518D9-27DA-4AA9-9D93-C48C21576E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

access the full benefits of CDOC's services and programs, they will be entitled to this accommodation in this context going forward, and will not have to reestablish the necessity for each request. They may be required to provide notice to CDOC of the need for the accommodation in a new context.

g. CDOC shall revise its policies to include and conform to the requirements of this § 5.

6. <u>ADAPTIVE TECHNOLOGY</u>.

a. CDOC shall provide the following communications technologies at all facilities where individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement are housed:

  i. VRI; and

  ii. ASR services.

b. All VRI services provided by CDOC shall meet the standards set forth at 28 C.F.R. § 35.160(d).

c. CDOC shall furnish sufficient equipment such that the technologies identified in § 6(a) are readily accessible during:

  i. All medical encounters, including unscheduled, minor, or emergency medical encounters;

  ii. Case management interactions;

  iii. Investigations of potential COPD violations and other disciplinary matters; and

  iv. Other unscheduled interactions between staff and individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement.

d. CDOC shall provide training to both medical and non-medical staff on how and when to utilize the communications technologies listed in § 6(a).

e. CDOC shall provide at least one captioned telephone in each living unit housing one or more individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement.

f. CDOC shall provide closed captioning of all video content presented at CDOC facilities, including intake and

DocuSign Envelope ID: E7B518D9-27DA-44A2-9D03-648C2176E6F5

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

orientation videos, educational videos, and CDOC-generated content.

g. CDOC shall implement MMCall or substantially similar technology (including similar length and intensity of vibration upon receipt of a notification) to provide text-based notifications of auditory announcements.

   i. Text-based notifications of auditory announcements will be provided to individuals who meet certain eligibility criteria through a two-step process.

      1. First, as an initial screening, individuals will automatically qualify for this technology if, based on the most recent available medical records, they have a present diagnosis by an audiologist of a:

         a. "severe" or greater level of hearing loss. This will be defined as an average hearing loss of 71 dBHL or greater at the frequencies of 500 Hz, 1000 Hz, and 2000 Hz in the better ear.

         OR

         b. PB Max score of 60% or below in the better ear on a recorded presentation of a phonemically or phonetically balanced monosyllabic word recognition test.

      2. Second, if an individual wears hearing aids and does not meet either initial screening criteria in § 6(g)(1) of this Agreement, that individual will receive a QuickSIN test. The QuickSIN will be administered in a sound field while the individual is wearing their hearing aids at their typical use settings. If the individual receives a score of 12 or higher on the QuickSIN test, then they will qualify for the technology described in § 6(g) of this Agreement.

DocuSign Envelope ID: EZB518D9-27DA-4AA9-9D03-648C2176F6F5

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

    3.  In order to implement the provisions of § 6(g) of this agreement, CDOC will offer a one-time screening opportunity for text-based notification eligibility once such technology is available. CDOC will screen DHOH individuals upon intake to determine eligibility for text-based notification.

  ii.  Individuals who qualify for text-based notifications must elect to receive either text-based notifications, or face-to-face notifications of announcements from an OCA.

  iii.  CDOC shall transmit all announcements that would otherwise be conveyed over the public address system to qualifying individuals via the text-based notification system, including but not limited to:

    1.  General announcements such as mealtimes, med lines, and lockdowns;

    2.  Individual or irregular announcements, such as instructions for an individual to report to a particular location within a facility.

  iv.  CDOC shall provide a receiver to individuals who qualify for text-based notifications at no cost to the individual, except where CDOC can demonstrate that the individual has lost or destroyed the receiver on at least two prior occasions.  In such cases, CDOC may charge the qualifying individual for a replacement receiver.

  v.  CDOC shall revise its policies to include and conform to the requirements of this § 6(g).

h.  CDOC will provide individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement with a vibrating watch upon request. To be used in conjunction with this Agreement a vibrating watch must be able to permit the user to set at least three alarms and must be able to wake the average person from deep sleep.

DocuSign Envelope ID: E7B519D9-27DA-4AA9-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

7. EMERGENCY NOTIFICATION SYSTEM. CDOC will ensure that DHOH incarcerated people receive notice of emergencies at the same time as all other incarcerated people in their living unit.  To do this, CDOC will:

   a. Send a notice through the notification system referenced in paragraph 6(g) whenever the existing emergency notification system is used;

   b. Ensure that there are strobes in day halls in all facilities Level 3 and higher, and in all dorm rooms in Level 1 and 2 facilities;

   c. Ensure that all DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) have the opportunity to be housed in a cell that either has a strobe or is within line of sight to a strobe;

   d. Ensure that staff evacuate DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) when the emergency notification system is used in an active emergency or during a drill where other incarcerated people are evacuating, including checking cells and other locations to ensure that no such person is left behind;

   e. Staff will otherwise notify these individuals if the emergency notification system is being used for a drill or non-emergency situation in which other incarcerated people are not evacuating; and

   f. Continue to evaluate other technologies capable of individually notifying DHOH incarcerated people who meet the qualifications for text-based notifications in § 6(g)(i) when the emergency notification system is used.

8. CLEAR FACE MASKS. Whenever protective masks are worn by CDOC personnel, such personnel shall use clear face masks during communications with DHOH individuals.

9. USE OF RESTRAINTS. CDOC agrees to revise its policies regarding the use of restraints on individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement in accordance with the following terms.

   a. CDOC shall refrain from handcuffing individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement behind their backs.

   b. In general, CDOC will refrain from using black box restraints on individuals in its custody who utilize sign

Case 1:21-cv-00792-RBJ   Document 74   Filed 08/15/22   USDC Colorado   Page 15 of 33
Case 4:94-cv-02307-CW   Document 3630-12   Filed 10/16/24   Page 51 of 659
DocuSign Envelope ID: EZB518D9-27DA-41A2-9D03-C48C2176E6F

language or handwriting as their primary means of communication. Notwithstanding this provision, CDOC may use black box restraints during transport where an individualized assessment determines that a failure to do so would create unacceptable safety risks.

c.  In general, CDOC will refrain from using black box restraints on any individuals in its custody who utilize sign language or handwriting as their primary means of communication during any outside medical appointment. Notwithstanding this provision, CDOC may use black box restraints during outside medical appointments where an individualized assessment determines that a failure to do so would create unacceptable safety risks, or during an emergent security situation.

10. <u>TRAINING</u>.  The Parties will meet and confer regarding any additional training necessary to implement the terms of this Agreement.

11. <u>ASSISTIVE LISTENING SYSTEMS</u>. CDOC shall provide to DHOH incarcerated people, as an accommodation upon request and when appropriate, an assistive listening system for use during group interactions that include individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement. To be used in conjunction with this Agreement, an assistive listening system must ensure that the average hard of hearing person(s) using the system, including but not limited to those who use hearing aids, can effectively and simultaneously understand the words spoken by the hearing person(s).

12. <u>INFORMATIONAL MATERIALS FOR INDIVIDUALS WITH HEARING DISABILITIES.</u>  An informational document for individuals with hearing disabilities, drafted by the Parties, is attached to this document as Exhibit A.

a.  CDOC shall make Exhibit A available at no charge:

i.  to all individuals in its custody following resolution of this matter;

ii.  to all individuals in its custody upon request;

iii.  to all individuals in its custody during the intake process;

DocuSign Envelope ID: E7B518D9-27DA-4AA9-9D03-C48C21776E6E

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

     iv. to all individuals determined to have hearing disabilities pursuant to § 2(f) of this Agreement annually.

13. <u>CHANGES TO CDOC POLICY.</u> If CDOC believes it is necessary to alter or amend any of the policies controlled by this Agreement in a manner that is inconsistent with its terms, it shall meet and confer with Plaintiff before making any such changes. Notwithstanding such conferral, the terms of this Agreement shall continue to bind the Parties unless and until the Agreement is amended in writing and signed by the Parties.

14. <u>IMPLEMENTATION AND REPORTING.</u>

    a. Within thirty (30) days of the effective date of this Agreement, CDOC shall provide notice to all individuals in its custody of this Agreement and its terms. The notice will be substantially in the form of Exhibit A to this Agreement. CDOC shall create an ASL version of Exhibit A and make it available during staffing meetings with individuals for whom ASL is their primary language, monthly on day hall televisions in day halls where such individuals are housed, upon intake and orientation, and upon request.

    b. Within thirty (30) days of the effective date of this Agreement, CDOC will provide Plaintiff with copies of all relevant training materials so that the parties can meet and confer as anticipated by § 10.

    c. CDOC shall disclose the following documents and information to Plaintiff and its counsel monthly for the first three months of the term of this Agreement and quarterly thereafter for the period preceding disclosure:

       i. a summary of all negotiations and minutes of all meetings with CHP relating to CDOC's obligations under §3(f) of this Agreement;

       ii. all ADA grievances filed by the Exemplar Constituents, and CDOC's responses to those grievances,;

       iii. all requests for accommodations filed by the Exemplar Constituents, and CDOC's responses to those requests;

iv. logs of all messages sent using the text-based notification system described in § 6(g) of this Agreement, including the date, time, sender, and recipient of such messages; and

v. transcripts of all ASR communications by Exemplar Constituents.

d. If Plaintiff believes that additional information or documents is/are necessary to monitor the implementation of this Agreement or if Defendants believe any of the disclosure requirements in ¶ 14(c) are too burdensome, the parties shall meet and confer to discuss provision or discontinuation of provision of such information or documents.

e. Representatives of CDOC and Plaintiff shall meet monthly for the first three months of the term this agreement, and quarterly thereafter, to discuss the implementation of this Agreement and the needs of DHOH incarcerated people until the end of the term of this Agreement.

f. CDOC shall notify Plaintiff when its implementation of the terms of this agreement is complete. CDOC shall provide such notification no later than one hundred and eighty (180) days after the effective date of this Agreement.

15. INFORMAL DISPUTE RESOLUTION.

a. Anytime during the term of this Agreement, if either party believes that a dispute exists relating to the performance or interpretation of this Agreement, it shall notify the other party in writing that it is invoking this dispute resolution process. Its notice shall describe the dispute in sufficient detail to enable the other party to conduct a meaningful investigation of the alleged dispute.

b. The other party shall respond in writing to such notice within ten (10) business days of receipt of the notice.

c. Counsel for the Parties shall meet and confer regarding the dispute by telephone or in person within ten (10) days of the transmittal of the response described in §

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

15(b), either in person or telephonically, to attempt to resolve the issue informally.

d. If the Parties are unable to resolve the dispute through the informal process described in this § 15, then either party may submit the dispute for judicial resolution in accordance with the terms of § 16.

16. JUDICIAL DISPUTE RESOLUTION.

   a. If after completing the informal dispute resolution process in § 15 of this Agreement, either party believes that the other party remains in breach of the terms of this Agreement, that party may submit the dispute for resolution by the Court.

   b. In resolving the dispute, the Court will apply Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

   c. The Parties agree that the United States District Court for the District of Colorado shall retain continuing jurisdiction over any attempt to enforce this Settlement Agreement by either of the Parties.

   d. The Parties may move the U.S. District Court to enforce the Agreement, subject to the terms of §§ 14-16 of this Agreement.

   e. The prevailing party in any court proceeding shall be entitled to its attorneys' fees and costs pursuant to 42 U.S.C. § 12205 and the cases interpreting that provision including the fee-shifting standards in *Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 422 (1978).

17.    TERM.  The term of this Agreement shall be two years from the date of CDOC's notice of implementation described in § 14(f), provided that the dispute resolution mechanism in §§ 14-16 remain in force through the resolution of any disputes pending at the end of the term.

18.    NOTICE TO PARTIES. All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the email addresses set forth below.

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C21376E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

|  |  |
|---|---|
| To Defendants | Cole Woodward |
|  | cole.woodward@coag.gov |
|  |  |
|  | Phil Barrett |
|  | philip.barrett@coag.gov |
|  |  |
| To Plaintiffs | Amy Robertson |
|  | arob@foxrob.com |
|  |  |
|  | Laura Rovner |
|  | lrovner@law.du.edu |
|  |  |
|  | Pilar Gonzalez Morales |
|  | pgonzalez@creeclaw.org |
|  |  |
|  | Meghan Baker |
|  | mbaker@disabilitylawco.org |

19. <u>FEES & COSTS.</u>  This Agreement is contingent on execution of an agreement among the parties addressing Plaintiff's claim for attorneys' fees.

20. <u>RELEASE</u>. Plaintiff, for itself and its heirs, successors, assigns, agents, and representatives, including legal representatives, hereby releases, acquits, and forever discharges the State of Colorado, the State's departments, agencies, and instrumentalities, and the State's current and former officers, employees, agents, and successors from any and all claims, demands, causes of action, and obligations, whether asserted or unasserted, whether matured, unmatured, or wholly inchoate, and whether known or unknown, including but not limited to all claims pursuant to Title II of the Americans with Disabilities Act (42 U.S.C. § 12131), and Section 504 of the Rehabilitation Act (29 U.S.C. § 794) with respect to the Allegations concerning conduct occurring before or during the Term of this Agreement.

21. <u>STIPULATION TO DISMISS AND COVENANT NOT TO SUE</u>. The Parties agree to jointly file this Agreement with the Court, together with a stipulation to conditionally dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a), with the Court retaining

DocuSign Envelope ID: E7B518D9-27DA-4AA9-9D03-C48C2176F6EF

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

jurisdiction to enforce this Agreement in the event of any disputes that may arise between the Parties until the Agreement terminates.

Plaintiff expressly agrees and covenants that it will not sue or assert any cause of action, at law or equity, and whether before a court of law or an administrative agency, on its behalf, or on behalf of the Exemplar Constituents, against the State or any of the state's current or former officers, official, employees, departments, or agencies for any claims for damages or injunctive relief that Plaintiff has or may have in the future arising from the Allegations.

22.    <u>INTENDED THIRD PARTY BENEFICIARIES</u>. The Parties agree and acknowledge that all agencies, officers and employees of the State, although they are not signatory Parties hereto, are intended third-party beneficiaries of this Release and Settlement Agreement, and each and all of them shall have the right to rely upon and enforce this Release and Settlement Agreement in any court of competent jurisdiction in the event that any action or proceeding based upon claims or causes of action released hereby may be threatened or commenced.

23.    <u>NO ADMISSION OF LIABILITY</u>.  This Agreement is entered into for the purposes of avoiding litigation and does not constitute an admission of liability or evidence of any wrongdoing or omission of any kind.  This Agreement shall not be offered or received into evidence or otherwise filed or lodged in any proceeding against any party except as may be necessary to prove or enforce its terms.

24.    <u>PORTIONS OF SETTLEMENT PAYMENTS MAY BE WITHHELD</u>.  Pursuant to C.R.S. §24-30-202.4, the State Controller may offset the Settlement Payments by any debts owed by Plaintiff or the Civil Rights Education and Enforcement Center ("CREEC") to State agencies under the vendor offset interception system for:  (a) unpaid child support or child support arrearages; (b) unpaid balance of tax, accrued interest and other charges specified in Article 21, Title 39, C.R.S.; (c) unpaid loans due to the Student Loan Division of the Department of Higher Education; (d) owed amounts required to be paid to the Unemployment Compensation Fund; (e) medical bills incurred by Plaintiff paid in part or in full by Medicaid or Medicare; and (f) other unpaid debts owing to the State or any state agency thereof, the amount of which is found to be owing as a result of final agency determination or reduced to judgment as certified by the Controller.  Any debts owed by Plaintiff shall solely be taken from his portion of the settlement.

25.    <u>INTERNAL REVENUE SERVICE W-9 FORMS</u>. Plaintiff and CREEC will provide fully executed and signed I.R.S. W-9 forms, or ITIN

Case 1:21-cv-00792-RBJ   Document 74   Filed 08/15/22   USDC Colorado   Page 21 of 33
Case 4:94-cv-02307-CW   Document 3630-12   Filed 10/16/24   Page 57 of 659

DocuSign Envelope ID: E7B518D9-27DA-4AA9-9D03-C48C2176EF6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

(Individual Taxpayer Identification Number) forms, to the State prior to payment of any amounts under this Release and Settlement Agreement.

26.   <u>REPORTING AND TAX TREATMENT OF SETTLEMENT PAYMENT</u>.  It is expressly intended and understood that the Fees and Costs Payments represent recovery of Plaintiff's attorneys' fees and costs associated with the Litigation. Notwithstanding such intent and understanding, Plaintiff and CREEC agree that the State may file such tax forms and reports reflecting the Fees and Costs Payments that it deems necessary or appropriate, including but not limited to a Form 1099, with taxing authorities.  In the event any part of the Settlement Payments is determined to be taxable, Plaintiff or CREEC will be solely responsible for any tax liability arising therefrom related to their tax obligations, including any interest or penalty assessed.  In the event that any claim is ever asserted against the State to satisfy a tax liability arising from Plaintiff's or CREEC's failure to pay any tax owed from them on the Settlement Payment, Plaintiff and CREEC agree to defend, indemnify, and hold the State harmless on such claim, including any interest or penalties, within thirty (30) days after notification from the State that a taxing authority has asserted a tax claim, or such longer period as specified by the taxing authority.  Plaintiff and CREEC agree that neither the State of Colorado, any other state employee and/or agency, nor the Office of the Colorado Attorney General have made any representations or given any legal opinion concerning the tax treatment of the Fees and Costs Payments, and are expressly not relying on any such representation or opinion.  Plaintiff and CREEC have sought and received such tax opinions and advice as they deem necessary from attorneys and/or tax advisors of their choice.

27.   <u>OPEN RECORDS REQUIREMENTS</u>. This Release and Settlement Agreement is not confidential.  Plaintiff understands and agrees that the State of Colorado and its agencies and departments are bound by applicable public disclosure laws including, without limitation, the provisions of C.R.S. §24-72-101, *et seq.* (Colorado Open Records Act), as presently or subsequently amended, and that the State of Colorado may be required to disclose this Release and Settlement Agreement in its entirety if requested to do so under such statutes.  Plaintiff understands that this Release and Settlement Agreement are public records and further agrees that he will not hold the State of Colorado, or its administrators, officers, agents, or employees, liable for release of information contained in public records under such statutes.

28.   <u>WARRANTIES AND REPRESENTATIONS</u>. Plaintiff represents and warrants that he has not assigned or transferred any claim arising from or related to the Incident to any third party and that no third

Case 1:21-cv-00792-RBJ Document 74 Filed 08/15/22 USDC Colorado Page 22 of 33
Case 4:94-cv-02307-CW Document 3630-12 Filed 10/16/24 Page 58 of 659
DocuSign Envelope ID: E7B518D9-27DA-4AA2-9D03-C48C2176EEF

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

party has been subrogated to their interest in claims purported to be released hereby, or, if any third party has been subrogated to Plaintiff's interest, the interest of any subrogee has been settled, compromised, and extinguished. Plaintiff agrees to defend and indemnify the State, its departments, agencies, officers, and employees, and to hold them harmless against the claims of any assignee or subrogee to claims purported to be released hereby that may hereafter be asserted.

29. <u>INTEGRATION</u>. This Release and Settlement Agreement constitutes the entire agreement of the Parties regarding the subject matter hereof. The terms of this Release and Settlement Agreement are contractual in nature and not mere recitals. As such, the Parties understand, acknowledge and agree that this Release and Settlement Agreement is fully integrated and supersedes all previous oral or written agreements of the Parties.

30. <u>BINDING EFFECT</u>. This Release and Settlement Agreement shall take effect to the benefit of, and be binding upon, the heirs, successors, assigns and legal representatives of the Parties and any third-party beneficiaries.

31. <u>GOVERNING LAW</u>. This Release and Settlement Agreement is entered into in Colorado and shall be governed by the laws of the State of Colorado, except as provided in § 16.

32. <u>HEADINGS</u>. The headings used in this Release and Settlement Agreement are for the convenience of the Parties only. As such, these headings shall not have any legal effect whatsoever or, in any other way alter or modify the meaning or interpretation of this Release and Settlement Agreement.

33. <u>SEVERABILITY</u>. If any provision of this Release and Settlement Agreement should be declared to be unenforceable, the remainder of this Release and Settlement Agreement shall continue to be binding upon the Parties.

34. <u>ADVICE OF COUNSEL.</u> Plaintiff represents that (a) it has relied upon the advice of attorneys and/or other consultants of his own choice concerning the legal and federal, state and local tax consequences of this Release and Settlement Agreement, (b) this Release and Settlement Agreement has been thoroughly read by Plaintiff and its terms have been explained to its satisfaction by an attorney or attorneys of its choice, and (c) the terms of this Release and Settlement Agreement, including its release of unasserted and unknown claims, are fully understood and voluntarily accepted by Plaintiff. Plaintiff further understands and agrees that this Release and Settlement Agreement shall be forever binding and that no

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

cancellation, rescission, or modification of, or release from the terms of, this Release and Settlement Agreement shall be made based upon any mistake of fact or of law.

35.   <u>EXECUTION IN COUNTERPARTS.</u>   This Release and Settlement Agreement may be executed in counterparts, each of which shall have full force and effect upon execution by all Parties to this Release and Settlement Agreement, but which together shall constitute a single instrument.

36.   <u>EFFECTIVE DATE/CONTROLLER APPROVAL.</u> This Release and Settlement Agreement shall not be deemed valid until it shall have been approved by the State Controller or his designee, as provided by C.R.S. §2430202(1).

[*The remainder of this page has intentionally been left blank.*]

DocuSign Envelope ID: F7B518D9-27DA-41A2-9D03-C48C21776E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

FOR THE PLAINTIFF:

_____          Date: 6/22/2022

THE CENTER FOR LEGAL ADVOCACY d/b/a DISABILITY LAW
COLORADO

FOR THE COLORADO DEPARTMENT OF CORRECTIONS &
EXECUTIVE DIRECTOR DEAN WILLIAMS

BY: _____     Date: 07/19/2022
     DEAN WILLIAMS,
     Executive Director

FOR THE COLORADO DEPARTMENT OF PERSONNEL &
ADMINISTRATION:

BY: _____     Date: 7/29/2022
     KARA VEITCH (or designee)
     Executive Director

FOR THE STATE OF COLORADO:

BY: _____     Date: 8/1/2022
     ROBERT JAROS, CPA, MBA, JD (or designee)
     State Controller

Page 23 of 25

DocuSign Envelope ID: E7B519D9-27DA-41A2-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

[*The remainder of this page has intentionally been left blank.*]

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

<u>APPROVED AS TO FORM ONLY:</u>

PHILIP J. WEISER
Attorney General

*Philip Barrett*          7/29/2022
2C1533CA81064BA

COLE J. WOODWARD
PHILIP BARRETT
Attorneys   CDOC   and   Executive
Director Dean Williams

FOX & ROBERTSON, PC

_____

AMY ROBERTSON

STUDENT LAW OFFICE
Laura Rovner

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales

Attorneys for Plaintiff

[*End of Document*]

DocuSign Envelope ID: E7B51BD9-27DA-41A2-9D03-C48C2176E6F

*DLC v. CDOC & Dean Williams, Exec. Dir.*
Release and Settlement Agreement

<u>APPROVED AS TO FORM ONLY:</u>

PHILIP J. WEISER
Attorney General

_____
COLE J. WOODWARD
PHILIP BARRETT
Attorneys    CDOC    and    Executive
Director Dean Williams

FOX & ROBERTSON, PC

_____
AMY ROBERTSON

STUDENT LAW OFFICE
Laura Rovner

CIVIL RIGHTS EDUCATION AND ENFORCEMENT CENTER
Pilar Gonzalez Morales

Attorneys for Plaintiff

[*End of Document*]

DocuSign Envelope ID: E7B519D9-27DA-41A2-9D03-C48C21376E6E

## Information Sheet for Deaf and Hard of Hearing Incarcerated People

**INTERPRETERS**: CDOC will provide an interpreter for qualified Deaf incarcerated people for:

- Intake and orientation.
- Major medical appointments.
- Case manager meetings.
- Classes.
- Religious programming.
- Disciplinary investigations and hearings – including the initial investigation.
- PREA complaints and investigations.
- Classification hearings.
- Parole hearings.
- Other major meetings at work or in your living unit.

If you ask two days ahead of time, CDOC will try to get an in-person interpreter. You can request an interpreter by VRI at any time for any interaction, even with no notice. VRI interpreters will be available to all medical personnel, case managers, and investigators.

You may request an interpreter for other types of meetings or to help you understand things in writing, like grievances, library resources, and homework. CDOC will evaluate that request on an individual basis.

You may request a Deaf interpreter or an interpreter in another sign language such as Black American Sign Language or Mexican Sign Language.

**CAPTIONING**:

- If you are hard of hearing but do not use sign language, you can request that CDOC provide text or captions by "automatic speech recognition" (ASR) for the meetings listed above. ASR converts whatever the speaker is saying into text so you can read it.
- CDOC will provide closed captioning for any videos it shows, including intake and orientation videos and educational videos, and any videos CDOC creates.

**TELEPHONES**: CDOC will provide the following on an equal basis with the way it provides regular telephones to hearing incarcerated people:

- Videophones for Deaf incarcerated people who communicate using sign language.
- Captioned telephones for hard of hearing incarcerated people.

**TEXT NOTIFICATIONS**: If you are completely Deaf or meet certain hearing loss criteria, CDOC will provide you with a wristwatch pager that will send you a text notification that is the same as the messages broadcast over the public address system. This system will notify you of general announcements like chow or recreation, and it will also notify you of individual announcements like when you should go to visiting or medical.

**EMERGENCY NOTIFICATIONS**: CDOC will also provide qualified Deaf and hard of hearing incarcerated people with emergency notifications by strobe lights visible from their cell and by text notification. If you need to evacuate during an emergency, staff will come to your cell to tell you.

**EXHIBIT A**

DocuSign Envelope ID: E7B518D8-27DA-42A2-9D03-C48C21376E6F

**RESTRAINTS**: CDOC will not handcuff Deaf or hard of hearing incarcerated people behind their backs.  CDOC will not use "black box" handcuffs on incarcerated people who communicate using sign language unless they are a security risk. If CDOC uses "black box" cuffs during transport, they will be removed during any outside medical appointment unless a security or safety risk arises during the appointment.

**HEARING EXAMS**:

- You will be screened for referral to an audiologist when you first enter CDOC custody. The audiologist will determine whether you have a hearing disability and whether you require hearing aids.

- You will also be referred for an audiologist screening any time during your sentence if you request it.

- Incarcerated people over 65 will be screened at least every three years, and incarcerated people with a history of risk for hearing loss will be screened at least every two years.

**HEARING AIDS**:

- If the audiologist determines that you need hearing aids, CDOC will provide them within 60 days.

- You may exchange dead hearing aid batteries for new ones during med line. If you need a new battery at a different time, you may request one from housing unit staff.

- If your hearing aids require a remote control, you will be permitted to have that device.

- If your hearing aids require repair, recalibration, or replacement, CDOC will ensure that within 10 days you receive loaner hearing aids while your hearing aids are unavailable.

- If your hearing aids are sent out for repair, recalibration, or replacement, they will be returned to you within 60 days.

- If you use at least one hearing aid, you will be provided an annual hearing re-evaluation and an annual hearing aid assessment to see if any repairs are needed and if the hearing aids are functioning correctly.

**ASSISTIVE LISTENING SYSTEMS**: CDOC will provide qualified hard of hearing incarcerated people, if requested and appropriate, with an assistive listening device that will amplify the sound during group interactions.

**CLEAR FACE MASKS**: When CDOC staff are required to wear face masks for public health reasons, they will wear clear masks when they communicate with Deaf and hard of hearing incarcerated people.

**VIBRATING WATCHES**: CDOC will provide an effective vibrating watch for Deaf and hard of hearing incarcerated people to purchase on canteen. The watch should have the ability for the wearer to set at least three alarms and be able to wake the average person from deep sleep.

**OTHER ACCOMMODATIONS**:

- You may request other accommodations that you need. If CDOC denies the accommodation, they have to tell you why.

- You also can request an Accommodation Tracking Sheet with a list of your current accommodations. You can keep this on you at all times.

- If you had a disciplinary action because of your hearing loss, you can ask the ADA coordinator to consider overturning the disciplinary action.

- When you transfer to another facility, you get to keep the same accommodations unless they are a security risk.

DocuSign Envelope ID: E7B5189D9-27DA-41A2-9D03-C48C21376E6F

**Hearing Aid Assessment – Procedure**

1) The individual will first complete a written questionnaire with the below questions. If the individual is unable to complete a written questionnaire with the below questions, the trained clinical staff member will first **ask the individual who uses the hearing aids the following questions, through a sign language interpreter if necessary**:

    a) "How is the fit, feel, and comfort of this device on your ear?"

        i. If there are fit issues, these may be able to be corrected in the facility.

        ii. If not, this may require further measures, such as taking a new impression of the ears.

    b) "How is the overall volume or loudness of your hearing aid(s)?"

        i. If the hearing aid has been fit correctly and there has not been a significant change in their hearing sensitivity, the hearing aids should be delivering speech information in the listener's dynamic range.

    c) "How have your hearing aids been performing in noisier listening environments?"

        i. If an individual is experiencing significant difficulty in noisy environments, it may be due to one of the hearing aids malfunctioning or being out of balance with the other.

        ii. If this is not found to be the case, it will likely require the audiologist to make adjustments to the adaptive features of the hearing aids, which are designed to process speech in the presence of varying levels of background noise. This will likely require some computerized adjustment to the hearing aids in the office of an audiologist.

    d) "How have individuals' voices sounded to you?  Have they sounded too sharp or brassy, too muffled, or does the quality of speech seem appropriate?"

        i. These issues are typically adjusted with the fitting computer by the audiologist by varying the compression settings of the hearing aid.

    e) "Is the battery life similar in both of the hearing aids?"

        i. A significantly reduced battery life may indicate some corrosion on the battery contacts or internal corrosion.

    f) "Is the hearing aid producing internal noise that you perceive or has the hearing aid been intermittent (cutting in and out)?"

**EXHIBIT B**

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C2176E6E

i. This may provide some additional information on whether there are inconsistencies, distortions, or cutting in and out of the hearing aid(s) that were not able to be heard during the short listening test by the trained clinical staff member.

2) Next, complete a **visual inspection of the hearing aid**. This does not require any particular equipment. To complete this visual inspection, the trained clinical staff member will:

- Look for any cracks in tubing, earmold, shells, or the case of the hearing aids;
- Look for any damage to any parts of the hearing aid, such as the ear hook;
- Inspect the tubing that goes from a behind-the-ear hearing aid to the earmold;
- Look for missing vent plugs;
- Look for occlusions of ear wax, including in the wax traps;
- Look for damage to external controls, etc.;
- Inspect the battery contacts (in a non-rechargeable hearing aid) to ensure that there is no corrosion;
- Inspect the tubing from the ear hook to the earmold to ensure it is not occluded with moisture, wax, or other debris; and
- Ensure that there is a vent plug in place, if there is supposed to be one, with the hearing aid.

3) Next, the trained clinical staff member will conduct a **listening test on themselves** with the hearing aid. To complete this test, they will:

- Check that the hearing aid powers on and off;
- Listen for any obvious distortion or static or noise in the device;
- Listen to see if the movement of any external controls (such as volume wheels and switches) leads to any static or a cutting in and out of the sound coming through the hearing aids; and
- Complete a Ling Six Sound Test.
  - i. In order to conduct this test on themselves, the trained clinical staff member will:

DocuSign Envelope ID: E7B518D9-27DA-41A2-9D03-C48C2176E6F

1. Set the controls to where the individual wearing the hearing aids has them in their typical listening use;
2. Say the Ling six sounds while they are listening to the hearing aid to ensure that all six sounds are audible to themselves through the hearing aids.

4) Then, the trained clinical staff member will conduct a **listening test with the individual who uses the hearing aids** while that individual is using their hearing aids. The Ling Six Sound Test will be conducted. If the individual is using two hearing aids, this listening test should be done one ear at a time. To complete this listening test:

   a) The individual should be approximately six feet away from the speaker (likely the trained clinical staff member), and either have their eyes closed or be facing the other way at the time the speaker creates the six Ling sounds in a random order.

   b) The individual who is using the hearing aid should be able to repeat those sounds back to the speaker.

   c) The person producing the Ling six sounds should make sure that they alter the order when they are doing this test so the individual cannot learn to guess which sound they are saying.

   - *Summary:* If an individual can hear all six of the Ling sounds, the hearing aids are providing adequate amplification for the entire frequency range of speech. However, if the individual can't hear all six Ling sounds, this is indicative that the hearing aid is not providing adequate amplification.

5) After completing this complete procedure, **the trained clinical staff member will determine whether the hearing aids need repair and whether it is a repair they can complete at the facility or if it necessitates repair by an audiologist or through the manufacturer.**

   a) Hearing aids will need to be repaired by audiologists when:

      i. There is a clear electrical abnormality (static, noise, intermittent, etc.);

      ii. There is damage to the structure of the hearing aid that cannot be fixed on site;

DocuSign Envelope ID: E7B5198D9-27DA-49A2-9D03-C48C2176E6F

    iii.   A change is needed in terms of the amount of amplification or gain for the individual's hearing loss;

    iv.   A change is needed in the amount of noise management; or

    v.   Changes are needed in compression settings.

## **Hearing Aid Assessment – Equipment**

Necessary equipment for the trained clinical staff member completing repairs on a hearing aid includes:

- Replacement tubing and cement;
- A battery tester;
- Cleaning equipment to clean battery contacts;
- Replacement wax traps;
- Microphone covers;
- Replacement battery doors;
- Replacement ear hooks for behind the ear hearing aids;
- Cleaning solution;
- Spare batteries of various sizes for non-rechargeable hearing aids;
- A hearing aid stethoscope;
- Tools to assist in repairs (tubing expander, pliers, tools to help remove tubing); and
- Replacement vent plugs.

# Exhibit 96

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RALPH HOLMES, *et al.,* on behalf of themselves ))
and all others similarly situated, )
)
Plaintiffs, )      Case No. 11 C 2961
)
v. )      Magistrate Judge Young B. Kim
)
ROB JEFFREYS, Director, )
Illinois Department of Corrections, )
)
Defendant. )

## DEFENDANT'S STATUS REPORT TO THE COURT

Defendant Rob Jeffreys, Director of the Illinois Department of Corrections, by and through his attorney, Kwame Raoul, Attorney General for the State of Illinois, and pursuant to his continuing obligation under the Settlement Agreement, entered July 26, 2018 ("Agreement"), hereby submits the instant Status Report to the Court. This status report contains information and data collected regarding the Illinois Department of Corrections' ("IDOC") compliance with the Agreement during the months of October, November, December 2021 and January and February 2022. Defendant states as follows:

## SECTION IV

## IDENTIFYING DEAF AND HARD OF HEARING INMATES THROUGH HEARING SCREENING AND AUDIOLOGICAL EVALUATIONS

The IDOC conducts a physical examination of all individuals in custody upon admission to a reception or classification center ("R&C"). The IDOC requires, in compliance with the Agreement, that upon admission to a Reception and Classification facility, each individual in custody shall, on the day of intake, be observed by trained staff for auditory ability. Staff shall document the findings on the Individual in Custody Medical History form (DOC0092). IDOC Administrative Directive No. 04.03.101 §§ II(G)(1)(c)(2)(d). Individuals in custody who self-report as deaf or hard of hearing or who have been determined to have hearing loss during their Intake Physical Examination are provided hearing screenings as required under the Agreement.

1

Individuals in custody can also request to receive a Hearing Screening at any time and, if they make such a request, the individual in custody is to receive such a screening within thirty (30) days of receipt of the request. IDOC has continually reminded all Health Care Unit Administrators of the thirty-day requirement for conducting hearing screenings. Notices regarding hearing screenings were prominently displayed in IDOC facility living units and medical units.

Over the current reporting period, the Covid-19 global pandemic has continued to impact every facility within the Department in a number of ways, including by, at times, limiting the ability of individuals in custody to move from their housing unit to the healthcare unit for a hearing screening or consultation. Most recently, the Department experienced significant rates of Covid-19 positive cases at each of the facilities, especially in December 2021 and January 2022. As the recent spike in Covid-19 infections subsides at all facilities, IDOC continues to move toward its previously high rates of compliance in this area. The variants of Covid-19 require monitoring and implementation of additional mitigation requirements whenever warranted. The issue is being monitored by IDOC Legal and the Statewide ADA Coordinator to ensure full compliance is returned as soon as feasible.

Further, the Department is required to refer a patient to an audiologist for an Audiological Evaluation within thirty (30) days of a failed hearing screening. The Department adopted procedures satisfy this requirement and has followed the issue closely, but the same COVID restrictions mentioned above have impacted full compliance. According to the ADA Reports provided in Exhibit A, during this reporting period there were 309[1] failed hearing screenings of which 261 (84%) were referred within the 30 days required with an average of being referred less than 10 days after the failed hearing screening (or at least 20 days earlier than the required timeframe) during each of the reporting months. Of the 48 failed hearing screenings not referred within the 30 days required, 8 were referred shortly after 30 days.[2] IDOC Legal

---

[1] This number obviously does not include individuals who passed their hearing screening, nor does it include individuals who transferred, paroled or discharged shortly after the failed hearing screening.

[2] One hearing screening at East Moline in October (38 days), one hearing screening at Illinois River in October (34 days), one hearing screening at Illinois River in December (33 days), one hearing screening at Lawrence in November (32 days), two hearing screenings at Sheridan in October (33 and 32 days), and two hearing screenings at Sheridan in November (38 and 38 days).

investigated the reasons for the delay or omission for each of the other 40 failed hearing screenings. The delays for each of the 40 not referred within 30 days or shortly thereafter, severe nursing and/or physician shortages and/or Covid-19 quarantine of the patient or the facility caused the delay.[3] Only one case was missed due to staff error.[4] These numbers demonstrate there is not a systemic issue in this area.

Just as is the case in the general public when a patient is seeing a specialist, there are steps that must take place to refer the patient to the specialist here. These steps include the requirement that the individual in custody see a physician after a failed hearing screening for the physician to authorize and generate the referral in order to obtain an identification number used to track and pay for the services being rendered. For the same reasons noted above, the Covid-19 pandemic has slowed appointments in the healthcare unit or limited movement and has had an impact on healthcare unit staff, resulting in some delays for the referral process. Once the patient sees the provider, the remainder of the process is streamlined. When there are delays in getting the individual to the provider, there are delays in generating a referral. This is not a step that can be skipped.

After the referral is generated, an appointment date is obtained for the audiology appointment. The Agreement does not provide a timeframe for when the appointment must take place. There were previously significant wait times for these appointments due to limited providers who have limited appointments and were majorly impacted by COVID-19 for a significant period of time. To address these issues, IDOC has continued working directly with Wexford on ways to reduce the wait times for audiology appointments, including reaching out to every licensed audiologist in the state of Illinois to determine whether there are any providers willing to provide services to individuals in custody. After Wexford attempted to reach every licensed audiologist in the state of Illinois, it contracted with or brought on board additional providers identified through this statewide survey. Presently, Wexford has contracted with two providers to provide

---

[3] This is the case for Big Muddy's one delayed referral from February 2022, Graham's two delayed referrals from January 2022, Hill's three delayed referrals from December 2021, Illinois River's ten delayed referrals from October, November, and December 2021, and February 2022, Jacksonville's one delayed referral from November 2021, Lincoln's six delayed referrals from November 2021, Menard's two delayed referrals from January 2022, and Sheridan's fourteen delayed referrals in October, November, and December 2021.

[4] This is the case for Western's one delayed referral from October 2021.

services in person at all of the facilities. This has drastically reduced wait times and the backlog because these providers are able to dedicate more time to the Department than other providers have ever been able to before. These providers also come on site which removes limitations on the number of individuals in custody a provider may allow in their public practice at one time and allows more efficiency in the individuals being seen. As a result, the number of those waiting for their first audiology appointment has been reduced by from where it was at the time of the last status report in December. The number of those waiting reported in the December 2021 status report was 205 individuals. As of April 20, 2022, there are 209 individuals waiting for their initial audiology appointment and only 28 have been waiting more than 90 days. The main reason the number of those waiting has not decreased during this reporting period is due to Covid-19 quarantines prevalent throughout the facilities in December 2021 through February 2022. Despite the total numbers being close to where they were in December, only 2 facilities have more than 20 people waiting to attend their initial audiology appointment. *See* Exhibit E. IDOC and Vendor continue to exhaust all avenues to decrease the list of those waiting for an appointment and decrease wait times and the efforts already undertaken have drastically reduced the wait times for audiology appointments.

IDOC documents and maintains in the individual in custody's medical file the results of all Hearing Screenings and Audiological Evaluations which include a record containing a description of the determination made as to the type, degree, and configuration of any hearing loss or hearing level. IDOC notes in Offender 360, its centralized database, which individuals in custody are classified as Deaf or Hard of Hearing. (Exhibit B). In addition, each facility documents the date of the hearing screening and the date of the request[5] in order for IDOC and class counsel to monitor compliance in this Section (Exhibit A). Prior to submission of the reports with each status report, IDOC Legal and the Statewide ADA Compliance Officer spend considerable time looking at every document and report provided to class counsel to ensure accuracy. If any information is missing at the time the report is submitted internally, the facility is contacted

---

[5] If the date of the request is available. At times, the individual in custody was screened for reasons other than a request, through a verbal request, and in other ways where those dates are not always readily apparent. Based on a review of records and attempts to fill in any missing dates, however, those individuals are typically seen for their screening right away, in compliance with the 30-day requirement. For example, the individual may be with a nurse at sick call when the nurse recommends a screening, and the screening takes place at the same time.

and every measure is taken not only to acquire any missing information but to resolve any reporting issues for future reports prior to reporting to class counsel. Therefore, to the extent there is missing information from the *current* areas of the reports when provided to class counsel, it is almost certain that IDOC staff have already made every attempt to provide the information before submission. In the case of missing referral dates, the only referral dates missing from the reports this reporting period are those where there is not yet a date to fill in for the reasons stated above.

**SECTION V**

**CREATION AND MAINTANCE OF A CENTRALIZED DATABASE OF DEAF AND HARD OF HEARING INMATES**

The IDOC maintains a centralized database for individuals in custody containing an entry for each Deaf or Hard of Hearing individual in custody, including the name of the individual and facility at which the Deaf and Hard of Hearing individual is housed, indicating compliance with paragraph 40 of this Section. Individuals in custody with a communication plan completed by the Chicago Hearing Society are entered into Offender 360 promptly and regularly and are then approved by the facility ADA Coordinators.

**SECTION VI**

**DEAF AND HARD OF HEARING INMATE IDENTIFICATION CARD**

All individuals in custody identified as Deaf or Hard of Hearing are offered the opportunity to have an IDOC-issued identification card that clearly indicates the individual in custody is Deaf or Hard of Hearing in compliance with this Section of the Agreement. The Deaf or Hard of Hearing designation is placed upon the back of the identification cards.

**SECTION VII**

**DEAF AND HARD OF HEARING INMATE
AUXILIARY AIDS AND SERVICES ASSESSMENT**

The IDOC entered into a contract with the Chicago Hearing Society ("CHS") to retain one or more Qualified Specialists who will perform an Auxiliary Aids and Services Assessment for every individual in custody identified as Deaf or Hard of Hearing. The Qualified Specialists are completing Auxiliary Aids and Services Assessments for individuals in custody identified as Deaf or Hard of Hearing by an audiologist.

5

IDOC has also retained the CHS for purposes of retaining a Certified Deaf Interpreter ("CDI") for the Auxiliary Aids and Services Assessment when a Deaf or Hard of Hearing individual in custody has no proficiency in either English or American Sign Language, or when the Qualified Specialist determines that a CDI is necessary.

The Qualified Specialists from the CHS are asked to consult with the Facility ADA Coordinators and the Deaf or Hard of Hearing individuals in custody. The Qualified Specialists memorialize their determinations regarding the specific Auxiliary Aids and/or Services the individual in custody needs to communicate effectively. The determinations of the Qualified Specialists are documented in the individual in custody's Communication Plan. Further, the IDOC follows the determinations of the Qualified Specialists as required by the Agreement.

Because of the COVID-19 pandemic preventing CHS from conducting assessments in-person at the facilities for a considerable length of time, IDOC worked closely with the CHS during the beginning of the pandemic in order to establish a plan that would enable Qualified Specialists to effectively evaluate individuals in custody during this time of crisis. The contract with CHS was amended and virtual assessments began in September 2020. Virtual assessments allow CHS to evaluate individuals in custody without coming inside of the facility. From October through December 2021 and January through February 2022 IDOC and CHS completed 125 virtual assessments. See Exhibit D. Throughout the reporting period, individuals are able to see CHS within about 45 days.

In the meantime, all hearing-impaired individuals in custody have preliminary communication plans or some kind of documentation for their accommodations while awaiting an assessment by a Qualified Specialist. Over 2245 communication plans have been finalized and have been entered into the system. After a recent status report, the class raised concerns about the timing of the signatures on the communication plans, specifically that the ADA Coordinator did not sign the communication plan for some time after CHS completed it.[6] The Agreement requires that the Qualified Specialist memorialize the

---

[6] The class also raised an issue about the manner in which the Qualified Specialists fill out the forms. It appears the class also raised their concerns with Chicago Hearing Society and the Department defers to the Qualified Specialists.

determination of the aids and services needed; it does not require the signature of the ADA Coordinator even though the form does ask for it. Any delay in a signature on the form which is not required under the Agreement and lack of which does not prevent the aids and services from being provided is a red herring. The Agreement requires that the determinations of the Qualified Specialist are followed and implemented, which is what takes place.

## SECTION VIII

### AUXILIARY AIDS AND SERVICES PRIOR TO THE AUXILIARY AIDS AND SERVICES ASSESSMENT

Prior to the completion of the Auxiliary Aids and Services Assessment for a Deaf or Hard of Hearing individual in custody, facilities provide preliminary accommodations as required by the Agreement. Preliminary accommodations for the Deaf and Hard of Hearing are identified through an interactive dialogue between the individual in custody and the Facility ADA Coordinator. Through this interactive dialogue, interim Communication Plans or other documentation is completed by the ADA Coordinators prior to the completion of an Auxiliary Aids and Services Assessment by CHS in order for any preliminary accommodations to be provided. Deaf or Hard of Hearing individuals in custody are not denied accommodations during the wait for a CHS appointment.

## SECTION IX

### PROVISION AND MAINTENANCE OF AUXILIARY AIDS AND SERVICES TO DEAF AND HARD OF HEARING INMATES AND IMPLEMENTATION OF COMMUNICATION PLAN

The IDOC provides Deaf and Hard of Hearing individuals in custody, at no cost to the individual in custody and subject to the limitations of Paragraph 65 of the Agreement, the Auxiliary Aids and Services provided for in the individual in custody's Communication Plan. IDOC exercises reasonable efforts to secure, in a timely manner, hearing aids for those individuals in custody whose Auxiliary Aids and Services Assessment indicate they should be provided a hearing aid(s). The IDOC maintains an adequate supply of readily available hearing aid batteries.[7] Further, the IDOC continues to engage in the interactive process

---

[7] While class counsel routinely provides individual complaints from class members regarding the provision of hearing aid batteries, the issues are primarily related to the individual in custody not communicating with the ADA Coordinator or not following

with those individuals in custody identified as Deaf or Hard of Hearing for purposes of maintenance of Auxiliary Aids and Services.

Additional accommodations for individuals in custody who have hearing impairments may include, but are not limited to, the following: vibrating watches, over-the-ear headphones, American Sign Language interpreters, closed captioned television, tactile notification pagers, Video Relay Service phone calls, TTY phone calls, white boards, and, in select cases, a personal attendant.

Class counsel has previously raised issues regarding ASL interpreters. As reported to the Court previously, the Department takes this issue very seriously and is making every effort to try to provide interpreters to individuals in custody when interpreters are needed. The Department previously evaluated each of the designated ASL users to determine whether transfers are possible to focus the need for interpreters at a handful of facilities. It has been determined that a reduction in the facilities at which interpreters are needed is not possible at this time due to transfer holds or other needs of the individuals in custody preventing their transfer. The Department has implemented the use of remote interpreting through Propio language services.

IDOC Legal and the Statewide ADA Compliance Officer continue to work closely with the facilities who house ASL users to ensure compliance and accurate reporting in this area. The Department has provided recent reports regarding its compliance with the requirement to provide ASL interpreters and will continue to work collaboratively with the plaintiffs to ensure compliance in this area. See the Department's update provided to counsel and the Court on April 8, 2022, for further information.

The Department also has some access to the "master contract" for ASL interpreting through the Department of Central Management Services. The Department has not utilized this master contract as the issues with Propio firewalls have been resolved and Propio is in place. As a reminder to staff, the

---

procedures for obtaining hearing aid batteries through nurse sick call or the Health Care Unit. Upon receipt of any such complaints, IDOC Legal and the Statewide ADA Compliance Officer communicate with the facility to determine the issue. Typically, these issues could easily be resolved without class counsel involvement if the individual in custody communicates any issues to facility staff.

Department again gave direction statewide that ASL users do not need to request interpreters for all high stakes interactions and that an interpreter should be automatically provided.

The IDOC has received reports of lost and stolen Auxiliary Aids and Services provided in the individual in custody's Communication Plan. Accommodations that are lost or stolen are replaced pursuant to the restrictions of Paragraph 65 of the Agreement.

## SECTION X

### IDOC STAFF TRAINING ON MATTERS REGARDING DEAF AND HARD OF HEARING INMATES

The IDOC Training Academy created and updated training materials addressing the topics required under the Agreement. The training materials (previously disclosed to Plaintiffs) are presented in annual Cycle Training, Pre-Service Orientation Training, ADA Coordinator Training and Cadet Training. During this reporting period, approximately 3118 employees received ADA training through "Cycle Training Day 2," 290 through Cadet Training, 22 through ADA Coordinator Training and 117 through Pre-Service Orientation Training.

## SECTION XI

### ORIENTATION

The facility orientation manuals were long-ago updated to include information about the rights of Deaf and Hard of Hearing individuals in custody. Individuals in custody attending orientation who are Deaf or Hard of Hearing are provided a subsequent orientation session. If the individual in custody communicates through American Sign Language, then during the second, separate orientation session, IDOC will provide a Qualified Interpreter to assist the individual in custody in understanding the orientation content provided orally.

## SECTION XII

### COMMUNICATION DEVICES/TECHNOLOGIES FOR DEAF AND HARD OF HEARING INMATES

Video Remote Interpretation (VRI) equipment and translation services are available in all IDOC facility healthcare units. Deaf or hard of hearing individuals in custody who need assistance interpreting

medical or mental health information have access to this service. In response to class counsel's concerns, the Department has reiterated this requirement for ASL users.

All IDOC facilities maintain a Video Relay Service (VRS) phone. In August 2020, class counsel expressed various concerns with using the Securus-based VRS systems for attorney calls due to some delays that occurred a few times in getting the attorney's number approved for the system to allow the call. As reported in early September 2020, Securus agreed to immediately process the requests for attorney number additions if they are submitted separately and clearly marked as an attorney number requiring rush processing. The Department also agreed to transition from Securus-based VRS back to the Sorenson VRS system for attorney calls only. The Sorenson system eliminates the requirement for approval of the phone number in advance. The installation of all facilities is now complete.

Facilities housing the Deaf and Hard of Hearing possess two TTY machines. The TTY equipment can access publicly available relay service numbers. The volume on all IDOC housing unit phones is set to 65 decibels or higher and background noise cancellation is activated on the phones. Individuals in custody utilizing TTY or VRS phones are given three times the amount of time usually allotted to non-hearing-impaired individuals in custody at no expense to the user. Data is being collected regarding TTY and VRS usage as required by the Settlement. See monthly facility reports contained in Exhibit A.

Class counsel has previously expressed concerns with video phones or TTY machines that are broken. Whenever equipment is broken, the facility works to replace it. Of course, replacements take time and the facility works to provide alternatives in the meantime. Class members should report any issues with equipment to the facility ADA Coordinator in order for the issues to be resolved as quickly as possible.

## SECTION XIII

### TELEVISION FOR DEAF AND HARD OF HEARING INMATES

Televisions purchased by IDOC or individuals in custody support open or closed captioning as required by the Agreement. Facilities ensure that closed captioning is activated on movies shown through the IDOC system and on televisions in common areas as required by the settlement. Facilities monitor the use of closed captioning during unscheduled inspections via IDOC form DOC0481. See monthly facility

10

reports attached as Exhibit A. If the inspection determines there is an issue with closed captioning, the issue is resolved or investigated further. To the extent an inspection report indicates the closed captioning was not functioning at the time of the inspection, IDOC reports that except where otherwise noted this is due to the televisions not being on and not due to this feature being inactive. Any issues with closed captioning at the time of an inspection are immediately addressed.

IDOC provides Deaf and Hard of Hearing individuals in custody over the ear headphones, free of charge, in accordance with the settlement agreement.

## SECTION XIV

## VISUAL AND TACTILE ALERT NOTIFICATIONS
## FOR DEAF AND HARD OF HEARING INMATES

The Agreement requires IDOC to begin making reasonable efforts to provide Deaf and Hard of Hearing individuals in custody with a safe and effective tactile notification system that will advise them of events such as the arrival of visitors, commencement of meals, showers, yard time, medical appointments, evacuations, and emergencies.

The IDOC has installed visual notification systems (strobe lights) for outdoor warning shots at all facilities that have the capability to fire warning shots. Additional facilities do not have the capability to fire warning shots and, therefore, strobes will not be installed. The strobes have been tested and are visible during daylight hours.

IDOC has taken a number of approaches to providing tactile notifications to individuals in custody. First, all Deaf and Hard of Hearing individuals in custody were offered a new tactile watch (VibraLite) that allows the individual in custody to set 8-12 separate alarms, depending on the version. This watch, coupled with readily available schedules, provides all individuals in custody who accepted it with a safe and effective tactile alert system for being notified of any appointments and programming as desired.

Additionally, another tactile notification pager system (MMCall) has been installed statewide. To operate the paging system, each facility was provided with standalone PCs and monitors. Each PC is able to send messages to watch "pagers" that individuals in custody wear. The watches both vibrate and send a

written message to indicate the reason for the page, such as "medical," "visitor," "yard," etc. All facilities report they have passed out the pagers and are utilizing the system when there is movement, except for the facilities that do not have deaf or hard of hearing individuals in custody or where all hard of hearing individuals in custody have refused the system.[8]

In its review, the Department previously noticed a range in the use of the system. In response, direction was (again) given to all facilities statewide of their obligations and that the MMCall pager systems must be utilized. Former Chief of Operations John Eilers directed the Wardens to ensure the system is used to its full capacity and ensure that officers are using the systems to page individuals for all announcements, appointments, etc. A memo outlining these expectations was read at roll call at all facilities for seven days. In order to ensure this direction is followed, the Warden in coordination with the ADA Coordinator is required to review the tactile pages completed every two weeks. Any discrepancies, including underutilization, must include a justification or corrective action outlining how the identified issue will be corrected the following week. A report is then compiled and sent to the respective Deputy Director every two weeks where it is reviewed and ultimately reported to the Chief of Operations, IDOC Legal, and the Statewide ADA Compliance Officer. This practice began in early November 2021 and has resulted in marked increase in use of the system. The Department recently provided detailed updates showing the improvements made in this area and the actions taken when there are issues. It is expected that the oversight of the Department has resolved past issues.

## SECTION XV

## EQUAL ACCESS TO PRISON EMPLOYMENT

IDOC does not deny assignment opportunities to an otherwise qualified Deaf or Hard of Hearing individual in custody unless, after conducting an individualized assessment, including consultation with the individual in custody, it is determined that the Deaf or Hard of Hearing individual in custody cannot perform the essential functions of the position with or without a reasonable accommodation. Facilities are required

---

[8] Crossroads ATC, Elgin Treatment Center, Fox Valley ATC, Kewanee Life Skills Re-Entry Center, North Lawndale ATC, Peoria ATC, Stateville-NRC, and Vandalia.

to log the reason for any assignment being denied to a Deaf or Hard of Hearing individual in custody. See monthly facility reports attached as Exhibit A.

## SECTION XVI

## HAND RESTRAINTS REGARDING DEAF AND HARD OF HEARING INMATES

On 9/21/2018 a directive was sent out to all facilities by the Chief of Operations regarding the use of hand restraints on deaf and hard of hearing individuals in custody. A copy of this directive was previously provided to plaintiffs' counsel.

## SECTION XVII.

## FACILITY AND CELL ASSIGNMENTS AND TRANSFERS OF DEAF AND HARD OF HEARING INMATES

Deaf and Hard of Hearing individuals in custody are not transferred solely because of their Deaf or Hard of Hearing status to a higher security prison, or to a prison which does not offer comparable programming. Direction was sent to all facilities by the Transfer Coordinator's Office regarding the requirements in this section related to the transfer of Deaf and Hard of Hearing individuals in custody. Further, requests by Deaf and Hard of Hearing individuals in custody to be housed with another Deaf or Hard of Hearing individual in custody are considered. IDOC previously tendered a copy of the direction provided by the Transfer Coordinator's Office.

## SECTION XVIII

## CREATION AND DISSEMINATION OF MATERIALS MEMORIALIZING DEAF AND HARD OF HEARING INMATES' RIGHTS

The facility orientation manuals were updated to include information about the rights of Deaf and Hard of Hearing individuals in custody.

## SECTION XIX

## MONITORING AND REPORTING

The Agreement requires reporting of compliance every 120 days. This report satisfies that requirement. Additionally, the attachments to this report contain additional information as noted below.

Exhibit A is one .zip drive, containing one folder for each October, November, December 2021 and January, February 2022 facility reports, with subfolders per facility. Included and organized within these folders are:

- Cover pages ("Cover")[9] listing the number of communication plans and the names of those who received them, the number of hearing screenings, the number of audiological evaluations, the number of grievances specific to this Agreement received and the names of those who wrote them, whether interpreters or VRI was utilized, whether TTY or VRS machines were utilized, whether individuals in custody were denied a hearing screening during a periodic physical examination, whether the facility denied employment to class members, and, for Reception and Classification Centers, the number of intakes in the reporting month;

- Communication Plans ("ComPlan") for all communication plans completed during the reporting month, both by CHS virtually and any interim plans completed by the facility;

- Hearing Screenings ("HearScn") for all hearing screenings completed during the reporting month;

- Audiological Evaluation results ("Audio") for all audiological evaluations completed during the reporting month, along with documentation for ENT appointments and hearing aid pick up;

- Grievances ("Griev") filed during the reporting month which, if true, would constitute a violation of the Agreement;[10]

- VRI/Interpreter Logs ("Interp") which log use of interpreters for high-stakes interactions whether through an in-person interpreter or VRI;

---

[9] Naming conventions utilized for all reports in Exhibit A are included in parentheticals.

[10] If a response to the grievance is not provided, there is typically a reason for the lack of response, such as the grievance not reaching the 2nd level for a response or a response being provided after the report is submitted. These reasons are provided in the relevant Cover page.

- TTY and VRS logs ("TTYVRS") logging all TTY and/or VRS usage at the facility;

- Unscheduled Inspection Reports ("DOC0481") which include the inspection of whether televisions had closed captioning;[11]

- Individual Hearing Screening reports ("ADARpt") which includes individuals in custody who requested a Hearing Screening, whether they received the requested Hearing Screening, and why any individuals in custody did not receive the requested Hearing Screening. It also contains information reflecting the identification of each individual in custody who, based on a Hearing Screening after the date of this Agreement, was found to require an Audiological Evaluation (and any subsequent steps to provide this evaluation);

- Accommodations ("Accom") such as watches, headphones, hearing aids, etc. provided to individuals in custody in the reporting month. This report may take the form of pdfs of property receipts or lists of accommodations provided. Additionally, some facilities simply report this information within the ADA Report in the preceding section;[12]

- 5% of documents for the Intake screenings ("Intake") at the reception and classification centers; and

- MMCall ("MMCall") printouts of the pages sent during the month.[13]

Exhibit B contains a listing of all individuals in custody identified as Deaf or Hard of Hearing and the location where each individual in custody is housed.

Exhibit C contains a list of ADA coordinators at each facility.

---

[11] A concern was raised by operations staff regarding production of information contained in the inspection reports that, if released, could pose safety and security concerns. As this information is irrelevant to this litigation and often also contains privileged or protected information, non-*Holmes* related information has been redacted. If a facility did not provide a report, they did not complete Unscheduled Inspections in the reporting month.

[12] If a facility does not have an Accommodations report or list accommodation provisions in their ADA Report, they reported having none in the reporting month.

[13] Crossroads ATC, Elgin, Fox Valley ATC, Kewanee, North Lawndale ATC, Peoria ATC, Stateville NRC, and Vandalia report they did not have pages in certain months of the reporting period because they do not have individuals who use the system – either due to refusals or not having hard of hearing individuals who reside there.

Exhibit D contains a list of individuals in custody who have completed virtual assessments with CHS.

Exhibit E contains the audiology wait times information as of April 20, 2022.

Dated: April 22, 2022

Respectfully submitted,

KWAME RAOUL
Illinois Attorney General

/s Michael D. Arnold
Michael D. Arnold
Assistant Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-3720
Michael.Arnold@ilag.gov

Counsel for Defendant

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing **DEFENDANT'S STATUS REPORT TO THE COURT** was served on all counsel of record on April 22, 2022, by filing a copy of the same through the Court's CM/ECF filing system.


/s/ *Michael D. Arnold*

# Exhibit 97

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |  |
|---|---|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, | ) ) ) | | |
| Plaintiffs, | ) | Case No. 11 C 2961 | |
| v. | ) ) | Honorable Marvin E. Aspen | |
| JOHN BALDWIN, Acting Director of Illinois Department of Corrections; *et al.,* | ) ) ) | Magistrate Judge Young B. Kim | |
| Defendants. | ) ) | | |

## STIPULATION OF SETTLEMENT

This Settlement Agreement, dated April 23, 2018, is made and entered into pursuant to Rule 23 of the Federal Rules of Civil Procedure and contains the terms of a settlement entered into by and among the Plaintiffs, on behalf of themselves and members of the Plaintiff Class, and Defendant, through their respective counsel in the above captioned action (collectively, "the Parties").

## I. INTRODUCTION AND BACKGROUND

1. Plaintiffs, Ralph Holmes and the other named Plaintiffs ("Plaintiffs"), are deaf and hard of hearing inmates incarcerated in facilities under the control of the Illinois Department of Corrections ("IDOC").[1] Plaintiffs initiated this lawsuit against Salvador A. Godinez in his official capacity as director of IDOC. Pursuant to prior Court order and Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Godinez, who is no longer the Director of the Illinois Department of Corrections, has been replaced as Defendant by John Baldwin, the current Director of the Illinois Department of Corrections.

---

[1] The term "inmate" as used in this document is interchangeable with the term "offender" as used in IDOC policies and procedures.

1

2.      Plaintiffs' complaint alleges that IDOC has denied Plaintiffs and other deaf and hard of hearing inmates in IDOC custody the assistance they need to communicate effectively and participate in IDOC programs and services, in violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act, the Religious Land Use and Institutionalized Persons Act, and the Eighth and Fourteenth Amendments to the Constitution of the United States.

3.      Plaintiffs brought this action as a class action on behalf of themselves and all current and future deaf or hard of hearing individuals incarcerated in IDOC facilities who require accommodations, including interpreters or other auxiliary aids or services, to communicate effectively, and/or to access programs or services available to individuals incarcerated by IDOC. By order dated October 8, 2014, the Court granted Plaintiffs' motion for class certification, certifying a class of deaf and hard of hearing IDOC inmates (the "Class").

4.      Through this action, Plaintiffs have sought declaratory and injunctive relief to remedy the alleged past violations of the statutory and constitutional rights of the Class, and to prevent future violations of the same.

5.      In the interest of compromise and settlement and in recognition of the positions of the Parties to the above case, Plaintiffs, by their counsel, and Defendant Baldwin, by his counsel, and in his official capacity as Director of IDOC, have agreed to enter into this Settlement Agreement.  Without conceding any infirmity in their claims or defenses, after extensive discovery, the Parties have engaged in arm's-length settlement negotiations to resolve the claims raised by this action as set forth in Plaintiffs' Complaint. Plaintiffs and Defendant have reached an agreement for settling this litigation that the Parties believe is fair, reasonable, and adequate to protect the interests of the Parties. The Parties believe that this Settlement Agreement will benefit deaf and hard of hearing inmates who are confined in IDOC correctional facilities.

6.      The terms of this Settlement Agreement shall be applicable to and binding upon the Class, the Defendant in his official capacity as Director of IDOC, the IDOC and its officers, agents, and employees, and the successors and assigns of each of them.

7.      This Settlement Agreement applies to all of IDOC's existing correctional facilities housing adult male and female inmates, as well as any new facilities where adult inmates are confined during the life of this Settlement Agreement.

8.      By entering into this Settlement Agreement, neither the Defendant, IDOC, nor the State of Illinois admits any liability regarding the allegations made in this action, and nothing herein shall be deemed as an admission of fault of any kind by the Defendant or IDOC. The Defendant and IDOC specifically deny that any incarcerated individuals' rights have been violated or will be violated in the future. Moreover, this Settlement Agreement and all reports drafted in response to it may not be used as evidence of liability or lack of liability in any other legal proceeding.

9.      The Parties will file this Settlement Agreement with the Court, and ask that the Court approve it; approval is a condition precedent to the Settlement Agreement's effectiveness. Upon Court approval and subsequent termination of the Court's jurisdiction and completion of the obligations under this Settlement Agreement, this Settlement Agreement shall constitute full and final settlement of the Plaintiffs' and Class members' claims that have been brought, and claims for injunctive relief that could have been brought in this action, relating to the factual allegations in the Complaint or the provision of Auxiliary Aids and Services to deaf and hard of hearing inmates while in IDOC custody, from the beginning of time to the Effective Date of this Settlement Agreement.

## II. JURISDICTION

10. This Court has subject matter jurisdiction over this litigation pursuant to 28 U.S.C. §§ 1331 and 1343 and the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

11. For purposes of this Settlement Agreement, the Parties consent to and will not contest the jurisdiction of this Court over this matter.

12. The Court shall retain jurisdiction over this matter to enforce the terms and conditions of this Settlement Agreement, to resolve disputes arising hereunder, and for such other actions as may be necessary or appropriate for construction or execution of this Settlement Agreement, as limited by the Termination provisions below.

## III. DEFINITIONS

The following definitions shall apply to the following terms used in this Stipulation of Settlement:

13. "Agency ADA Coordinator" shall mean an employee of IDOC who has oversight over Class Members receiving the auxiliary aids and services necessary for effective communication for access to programs and services as set forth in this Settlement Agreement.

14. "Audiological Evaluation" means a procedure performed by a licensed audiologist to measure the type, degree, configuration, and level of a person's hearing loss through audiological tests that result in an audiogram. The Audiological Evaluation is specifically designed to measure the level of hearing rather than screen whether a person may be deaf or hard of hearing. IDOC will request, and exercise reasonable effort to obtain from all licensed audiologists performing Audiological Evaluations, an "Audiological Report" that makes findings as to (1) the level and nature of hearing loss in each ear of the person subject to the evaluation; and (2) whether

the person subject to the evaluation would benefit from a hearing aid in the person's left ear, right ear, both ears, or neither ear.

15.      "Auxiliary Aids and Services" that may be provided include, but not be limited to, the following: Qualified Interpreters; Video Remote Interpretation ("VRI"); real-time computer-aided transcription services; telephone handset amplifiers; assistive listening devices; assistive listening systems; hearing aids; hearing aid batteries; headphones; vibrating alarm clocks and watches; tactile alarm clocks and watches; telephones compatible with hearing aids; closed caption decoders; open – and closed – captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and captioned telephones; and other effective methods of making aurally delivered information available to Deaf or Hard of Hearing individuals.

16.      "Auxiliary Aids and Services Assessment" shall mean an individualized assessment of an inmate performed by a Qualified Specialist (as defined herein) for the purpose of determining what Auxiliary Aids and/or Services are necessary to ensure effective communication with the inmate and to permit the inmate to adequately, equally and fully participate in all services, programs, activities, benefits, and other opportunities offered at the IDOC facility in which the inmate is incarcerated to inmates who are neither Deaf nor Hard of Hearing.

17.      "Certified Deaf Interpreter (CDI)" is an individual who is deaf or hard of hearing who works with a hearing Qualified Interpreter to ensure effective interpretation between a person speaking in English and a person who is deaf or hard of hearing who is not fluent in English or American Sign Language. After the Qualified Interpreter has interpreted spoken English into American Sign Language, the CDI interprets from American Sign Language to a form of sign

5

language understood by the deaf or hard of hearing person who does not have fluency in either English or American Sign Language. A CDI is certified to have demonstrated knowledge and understanding of interpreting, deafness, the Deaf community, and Deaf culture, as well as specialized training and/or experience in the use of gesture, mime, props, drawings and other tools to enhance communication, as well as native or near-native fluency in American Sign Language. A CDI may be appropriate in several situations including, but not limited to, when the deaf person has underdeveloped ASL skills, limited socialization in the deaf community, limited education, cognitive challenges, delayed language, organic issues causing affect deficiencies, mental illness, and other physical challenges. In Illinois, all persons working as a CDI are required to be licensed pursuant to the Illinois Interpreter for the Deaf Licensure Act of 2007, 225 ILCS 443/1 et seq., and the regulations thereunder at 68 IL Admin Code 1515.10 et seq.

18.     "Chief Administrative Officer" shall mean the highest ranking official of a correctional facility.

19.     "Class Counsel" refers to counsel of record for the named Plaintiffs in this matter and the "Class Members."

20.     "Class" or "Class Members" refers to all current and future deaf or hard of hearing individuals incarcerated within IDOC who require accommodations, including interpreters or other Auxiliary Aids or Services, to communicate effectively to adequately access programs or services available to individuals incarcerated within IDOC.

21.     "Communication Plan" shall mean the ADA Individualized Communication Plan described in Section IX, which contains the information gathered through the Auxiliary Aids and Services Assessment, and shall list the accommodations approved for the offender.

22.     "Deaf or Hard of Hearing inmate" means an inmate who, unaided by hearing aids or any medical device, is unable to hear in either one or both ears to a sufficient degree to be able to understand the spoken word, particularly with the level of noise in the prison environment. Persons who cannot hear in one ear to a decibel level of 40 are presumed to meet the definition of Deaf or Hard of Hearing.  For purposes of the accommodations, rights, and other provisions outlined herein, an inmate shall be deemed to meet the definition of "Deaf or Hard of Hearing inmate" at the earliest of these points in time: (a) if the inmate, as of the date of this Agreement, has already been designated by, or treated as, Deaf or Hard of Hearing by IDOC; (b) if a Hearing Screening of the inmate demonstrates that the inmate meets the definition; or (c) if an Audiological Examination of the inmate demonstrates that the inmate meets the definition.

23.     "Effective Date" shall mean the date upon which this Settlement Agreement is approved and entered by the Court or a motion to approve or enter the Settlement Agreement is granted, whichever occurs first, as recorded on the Court's docket.

24.     "Facility ADA Coordinator" shall mean a person at each IDOC facility responsible for ensuring that Class Members at that facility receive the auxiliary aids and services necessary for effective communication for access to programs and services.

25.     "Hearing Screening" means a standard, recognized medical procedure performed by appropriate medical staff to identify whether an individual may have a hearing issue, including whether they may be deaf or hard of hearing. Such a screening does not measure the level of hearing a person has but identifies only whether a person might have a hearing issue, including whether the person may be deaf or hard of hearing.  Such a screening may consist of multiple steps, such as a test for gross hearing loss, then a test using an audioscope.

26. "High Stakes Interactions" are defined as those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications may have serious repercussions for inmates. High Stakes Interactions include: medical care and appointments, including dental, vision, audiological, mental health care and appointments, and include both individual therapy and group counseling sessions (unless the medical care or appointment is routine and does not involve substantial conversation, for example, blood work for routine lab tests or regular allergy shots); disciplinary investigations and disciplinary hearings; educational programs, specific training sessions and general educational opportunities that include a verbal component; vocational programs that include a verbal component; transfer and classification meetings; meetings with the Facility ADA Coordinator to discuss Auxiliary Aids and Services in the development of the inmate's Communication Plan.

27. "Intake Physical Examination" means the physical examination that IDOC administers to all new inmates upon the inmate entering IDOC custody.

28. "Periodic Physical Examination" means the physical examination that IDOC administers to inmates on a cyclical basis.

29. "Primary Consideration" means that in determining what type of Auxiliary Aids and Services are necessary to comply with the ADA and this Settlement Agreement, IDOC shall give primary consideration and substantial weight to the expressed preference for a particular Auxiliary Aid or Service made by the Deaf or Hard of Hearing inmate. *See* 28 C.F.R. §35.160. Primary Consideration is subject to and limited by the provisions in Paragraph 51 of this Settlement Agreement.

30. "Qualified Interpreter" means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially,

8

both receptively and expressively, using any necessary specialized vocabulary. Qualified interpreters include, for example, sign language interpreters, oral transliterators, certified deaf interpreters, and cued-language transliterators. 28 C.F.R. §35.104. A Qualified Interpreter must be licensed to practice in the State of Illinois pursuant to the Interpreter for the Deaf Licensure Act of 2007, 225 ILCS 443/1-900. No inmate or Correctional Officer qualifies or may be used as a Qualified Interpreter.

31. "Qualified Specialist" shall mean a person, contracted through the Chicago Hearing Society or otherwise, who is familiar with American Sign Language, oral communication, and gestural communication who has experience assessing the reading and writing ability of Deaf and Hard of Hearing individuals, and who is able to determine when a Certified Deaf Interpreter is necessary. The Qualified Specialist performs an Auxiliary Aids and Services Assessment.

## IV.  IDENTIFYING DEAF AND HARD OF HEARING INMATES THROUGH HEARING SCREENING AND AUDIOLOGICAL EVALUATIONS

32. Within ninety (90) days of the Effective Date, IDOC (either through amendment of IDOC Administrative Directive No. 04.03.101 §§ II(G)(2)(a) and (b), or otherwise) shall adopt a policy and procedure pursuant to which Hearing Screenings are required as a routine and regular part of (a) IDOC's Intake Physical Examination for all inmates; and (b) IDOC's Periodic Physical Examinations of all IDOC inmates who self-report as deaf or hard of hearing or who have been determined to have hearing loss during their Intake Physical Examination.

33. Within thirty (30) days after IDOC takes the action identified in Paragraph 32, a Hearing Screening shall take place for (a) all Intake Physical Examinations and (b) Periodic Physical Examinations of inmates who self-report as deaf or hard of hearing or who have been

determined to have hearing loss by an Intake Physical Examination. This shall not apply to individuals who are in the custody of the IDOC for less than 24 hours and are then either released or transferred to a different correctional agency or governmental entity.

34. Within ninety (90) days of the Effective Date, IDOC shall implement a procedure whereby inmates can request to receive a Hearing Screening and, if an inmate makes such a request, the inmate will receive such a screening within thirty (30) days. An inmate's request for a hearing aid or to be identified as Deaf or Hard of Hearing will be considered a request for a Hearing Screening.

35. Within ninety (90) days of the Effective Date, IDOC shall prominently display in all IDOC facility inmate living units and medical units a notice informing inmates that they may request a Hearing Screening. This notice shall be in large print, at least 20 point font, and in simple English. It may be removed after being posted for twenty-one (21) calendar days. Inmates who do not have access to the posted notice due to various safety or other restrictions imposed on them shall receive a copy of the notice.

36. Within ninety (90) days of the Effective Date, IDOC (either through amendment of IDOC Administrative Directive No. 04.03.101 §§ II(G)(2)(a) and (b), or otherwise) shall adopt a policy and procedure pursuant to which inmates whose Hearing Screenings determine that they may be Deaf or Hard of Hearing must be referred to an audiologist for an Audiological Evaluation at the earlier of: (a) thirty (30) days after arrival to their home facility; or (b) 45 days after being admitted into IDOC custody. If, after an initial referral, an inmate is transferred before his audiological appointment, then IDOC shall have fourteen (14) days to issue a new referral. The failure to show appropriate response to presentation stimuli in either ear during the Hearing Screening will indicate that the inmate may be Deaf or Hard of Hearing.

37.     Inmates identified as Deaf or Hard of Hearing by Audiological Evaluation shall (a) undergo an Auxiliary Aids and Services Assessment, outlined herein; and (b) undergo a new Audiological Evaluation every three years, to determine if changes in hearing have occurred. If it is determined by both the Deaf or Hard of Hearing inmate and IDOC that the inmate is to be considered Deaf or Hard of Hearing and does not need a Hearing Screening to prove such status (i.e., profoundly deaf inmate who would not benefit from hearing aids), the Deaf or Hard of Hearing inmate may be referred directly to the Auxiliary Aids and Services Assessment, without a Hearing Screening.

38.     IDOC shall document and maintain in the inmate's medical file the results of all Hearing Screenings and Audiological Evaluations which will include a record containing a description of the determination made as to the type, degree, and configuration of any hearing loss or hearing level.  IDOC shall note in a centralized database of inmates (which contains the characteristics and information set forth below), whether the inmate has been classified as Deaf or Hard of Hearing.

## V.     CREATION AND MAINTENANCE OF A CENTRALIZED DATABASE OF DEAF AND HARD OF HEARING INMATES

39.     Within ninety (90) days of the Effective Date, IDOC will employ a centralized database for inmates containing an entry for each Deaf or Hard of Hearing inmate. IDOC may choose to use Offender 360 as this centralized database, so long as Offender 360 has the capabilities required to comply with the terms of this Settlement Agreement.

40.     This centralized database will include at least the following information:

    a.      the name of the inmate;

    b.      the facility at which the inmate is housed;

     c.      whether the inmate was provided, and whether the inmate accepted, an identification card as described in this Settlement Agreement;

     d.      a copy, or description of the contents, of the written record of the Auxiliary Aids and Services Assessment and Communication Plan for the inmate, as described in this Settlement Agreement; and

     e.      a copy, or description of the contents, of any written records concerning the provision of Auxiliary Aids and Services, as described in this Settlement Agreement, including the inmate's Communication Plan.

41.     On a continuing basis after the Effective Date, IDOC shall promptly and regularly update the centralized database to account for information relating to all inmates identified as Deaf or Hard of Hearing.

42.     This information in the centralized database shall be accessible to all IDOC personnel who are responsible for IDOC's compliance with the ADA or with this Settlement Agreement.

## VI.    DEAF AND HARD OF HEARING INMATE IDENTIFICATION CARD

43.     Subject to Paragraph 44 immediately below, within thirty (30) days of the Effective Date, or within thirty (30) days of being identified as Deaf or Hard of Hearing in the case of inmates identified as Deaf or Hard of Hearing after the Effective Date, IDOC shall offer inmates identified as Deaf or Hard of Hearing an IDOC-issued inmate identification card that clearly indicates the inmate is Deaf or Hard of Hearing.

44.     Deaf and Hard of Hearing inmates will be given the option of declining to receive such an identification card; each inmate shall be free to change his or her mind about whether to receive and carry such an identification card and, barring unforeseen circumstances, IDOC shall

12

accommodate the inmate's decision within fourteen (14) days provided that once an inmate changes his or her mind pursuant to this paragraph, they must wait either twelve (12) months or upon transfer to a new parent facility, whichever is earlier, to change their mind again.

## VII.   DEAF AND HARD OF HEARING INMATE AUXILIARY AIDS AND SERVICES ASSESSMENT

45.    Within sixty (60) days of the Effective Date, IDOC will enter into a contract with Chicago Hearing Society to retain one or more Qualified Specialists who will perform an Auxiliary Aids and Services Assessment for every inmate identified as Deaf or Hard of Hearing.

46.    IDOC shall retain a Certified Deaf Interpreter ("CDI") for the Auxiliary Aids and Services Assessment when a Deaf or Hard of Hearing inmate has no proficiency in either English or American Sign Language, or when the Qualified Specialist determines that a CDI is necessary.

47.    As to all current IDOC inmates who have been identified as Deaf or Hard of Hearing as of the Effective Date, the Auxiliary Aids and Services Assessment shall be performed within one hundred twenty (120) days of the events described in Paragraph 33 of this Agreement. If the Chicago Hearing Society is unable to provide a willing and able Qualified Specialist, IDOC shall make reasonable efforts to secure a Qualified Specialist to perform an Auxiliary Aids and Services Assessment on the inmate. If IDOC is unable to secure a Qualified Specialist for the inmate, the time frames for obtaining an Auxiliary Aids and Services Assessment outlined in this Agreement will be stayed until such time as the Chicago Hearing Society is able to provide a Qualified Specialist or IDOC is otherwise able to secure one based on reasonable efforts. IDOC will not be considered to be in noncompliance with this provision if it is unable to perform a requirement through no fault of its own.

48.    As to all inmates identified as Deaf or Hard of Hearing after the Effective Date, once a Qualified Specialist is retained, the Auxiliary Aids and Services Assessment shall be

performed promptly after, and in any case no later than thirty (30) days after the Audiological Report for the inmate is issued. If the Chicago Hearing Society is unable to provide a willing and able Qualified Specialist, IDOC shall make reasonable efforts to secure a Qualified Specialist to perform an Auxiliary Aids and Services Assessment on the inmate. If IDOC is unable to secure a Qualified Specialist for the inmate, the time frames for obtaining an Auxiliary Aids and Services Assessment outlined in this Agreement will be stayed until such time as the Chicago Hearing Society is able to provide a Qualified Specialist or IDOC is otherwise able to secure one based on reasonable efforts. IDOC will not be considered to be in noncompliance with this provision if it is unable to perform a requirement through no fault of its own.

49. As part of the Auxiliary Aids and Services Assessment, the Qualified Specialist will consult with the Agency ADA Coordinator and/or the Facility ADA Coordinator in the facility where the Deaf or Hard of Hearing inmate is currently housed, or in the case of incoming inmates, will be housed, as to any specific limitations relevant to the Assessment. As part of the Auxiliary Aids and Services Assessment, the Qualified Specialists will consult with the Deaf or Hard of Hearing inmate as to their needs and preferences for communication.

50. Based on the Auxiliary Aids and Services Assessment, the Qualified Specialists shall make and memorialize a determination, as to each Deaf and Hard of Hearing inmate, of the specific Auxiliary Aids and/or Services the inmate needs to communicate effectively (including whether hearing aids, Qualified Interpreters, or other specific aids and services are needed) in at least each of the following prison settings/environments: (a) disciplinary investigations and proceedings; (b) grievance preparation and proceedings; (c) interviews with Internal Affairs or other investigators; (d) interviews or proceedings relating to placement in or removal from protective custody; (e) safety alerts; (f) medical care and appointments, including dental, vision,

audiological, mental health care and appointments, including individual and group therapy or counseling sessions; (g) regular daily environments, such as halls, meal rooms, gyms, and recreational settings; (h) pre-release meetings, including pre-release parole meetings; (i) transfer and classification meetings; (j) meetings with Agency or Facility ADA Coordinator to discuss Auxiliary Aids and Services; (k) library services; (1) educational programs and testing; and (m) vocational, religious, and any other programs and services (and benefits) offered by IDOC to inmates at the facility in which the inmate is incarcerated.

51.     The determinations of the Qualified Specialists concerning the Auxiliary Aids and Services that each Deaf and Hard of Hearing inmate requires to communicate effectively in various prison settings shall be followed and implemented for each inmate unless the IDOC has documented that such Auxiliary Aids and Services constitute an "undue financial burden" on IDOC and/or present a clear and present safety and/or security concern that cannot be addressed in any manner except by the denial of the Auxiliary Aids and Services, and IDOC provides the best alternative means of accommodating the needs of the Deaf or Hard of Hearing inmate to effectively communicate that do not implicate the identified security concern.  For purposes of this provision, implementing an Auxiliary Aid or Service constitutes an "undue financial burden" when IDOC can meet its burden of showing an undue financial burden under applicable law, including 28 C.F.R. § 35.164, that the determination of an undue financial burden was made by the head of IDOC or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and was accompanied by a written statement of the reasons for reaching that conclusion. Also, if an action required to comply with this Agreement is denied solely due to an undue financial burden, IDOC shall take other action that would not result

in such a burden but would nevertheless ensure that, to the maximum extent possible, individuals who are deaf or hard of hearing receive the benefits or services provided by IDOC.

52. The Qualified Specialists will apply the following principles in making the Auxiliary Aids and Services Assessment:

    a.    In determining whether a Deaf or Hard of Hearing inmate should be provided hearing aids in any of the foregoing settings/environments, Qualified Specialists shall defer to and accept the findings in the Audiology Report.

    b.    If, based on the Audiological Evaluation and Audiology Report, the Qualified Specialist determines that two hearing aids should be provided to any Deaf or Hard of Hearing inmate, then two hearing aids, not one, shall be provided. If the Qualified Specialist determines that one hearing aid should be provided, then one hearing aid, not zero, shall be provided for the ear needing the hearing aid, subject to the conditions in Paragraph 51 of this Agreement.

    c.    If the Qualified Specialist determines that a Deaf or Hard of Hearing inmate's primary language is American Sign Language ("ASL"), there is a presumption that the inmate requires an ASL interpreter for High Stakes Interactions.

    d.    If the Qualified Specialist determines that a Deaf or Hard of Hearing inmate's primary language is ASL, then there is a presumption that the inmate requires an ASL interpreter for religious services.

16

e.  Preference for a particular Auxiliary Aid or Service by a Deaf and Hard of Hearing inmate shall be given Primary Consideration.

53.  The results of Auxiliary Aids and Services Assessments for each inmate, including the determinations outlined in Paragraph 50 above, shall be documented in the inmate's Communication Plan, in a form attached as Exhibit A to this Agreement. Each inmate's Communication Plan will be placed in the inmate's medical file and on the centralized database referred to herein, and a copy will be provided to the inmate.

## VIII.  AUXILIARY AIDS AND SERVICES PRIOR TO THE AUXILIARY AIDS AND SERVICES ASSESSMENT

54.  The Parties recognize that in many circumstances, Deaf and Hard of Hearing inmates require access to Auxiliary Aids and Services prior to IDOC's completion of the Auxiliary Aids and Services Assessment.

55.  Therefore, prior to the completion of the Auxiliary Aids and Services Assessment for an inmate, IDOC will provide the inmate with a preliminary accommodation if: (a) an inmate has requested an accommodation; (b) it is apparent to IDOC staff that an inmate requires assistance due to being Deaf or Hard of Hearing; and (c) it is feasible for IDOC to provide such accommodation.  In such cases, IDOC shall provide the accommodation requested by the inmate until the Auxiliary Aids and Services Assessment has been completed.

56.  As set forth further in this Agreement, it is generally considered feasible to provide the following Auxiliary Aids and Services: hearing aids, batteries/maintenance of existing hearing aids or other devices, Qualified Interpreters, VRI, and accessible telecommunications (such as TTY and videophones/VRS).

17

57.     IDOC will designate at least one (1) employee at each intake facility to serve as the Facility ADA Coordinator responsible for ensuring that Class Members receive the Auxiliary Aids and Services necessary for effective communication for access to programs and services requested prior to the completing of the Auxiliary Aids and Services Assessment.

58.     All IDOC personnel who interface with inmates during the Intake process will receive training on responding to requests for Auxiliary Aids and Services.

59.     Nothing in this Section precludes IDOC from expediting the time frame for performing the Auxiliary Aids and Services Assessment.

## IX.     PROVISION AND MAINTENANCE OF AUXILIARY AIDS AND SERVICES TO DEAF AND HARD OF HEARING INMATES AND IMPLEMENTATION OF COMMUNICATION PLAN

60.     Subject to Paragraph 65 below, promptly following completion of an inmate's Auxiliary Aids and Services Assessment, IDOC will provide the inmate, at no cost to the inmate, the Auxiliary Aids and Services provided for in the inmate's Communication Plan.

61.     IDOC shall exercise reasonable efforts to secure, in a timely manner, hearing aids for inmates whose Auxiliary Aids and Services Assessments indicate they should be provided a hearing aid or hearing aids.

62.     IDOC shall keep an adequate supply of readily available hearing aid batteries so that hearing aid batteries can be replaced promptly upon a need for new batteries; hearing aid batteries shall be replaced within forty-eight (48) hours after an inmate notifies IDOC of the need for new batteries.

63.     If an inmate's hearing aid is broken, IDOC shall exercise reasonable efforts to repair the hearing aid in a timely manner.  IDOC must evaluate whether any additional Auxiliary Aids and Services are needed during the time the inmate is without a hearing aid.

64.     The information contained in the inmate's approved Auxiliary Aids and Services Assessment concerning the Auxiliary Aids and Services the inmate requires to communicate effectively shall be made available to whoever is responsible for providing the inmate Auxiliary Aids and Services, such as counselors; doctors and other medical personnel; personnel communicating with the inmate concerning grievances, disciplinary proceedings, protective custody matters, pre-release and meetings, and transfer or classification meetings; and personnel communicating with the inmate concerning educational and vocational programs and services and library services.

65.     IDOC may deny an inmate an Auxiliary Aid or Service provided for in the inmate's Communication Plan only if the Deaf or Hard of Hearing inmate refuses the Auxiliary Aid or Service, if IDOC has a clear and present safety and/or security concern that cannot be addressed in any manner other than by the denial of the Auxiliary Aid or Service, or the acquisition of the Auxiliary Aid or Service would result in an undue financial burden as defined in Paragraph 51 and consistent with the law (including 28 C.F.R. § 35.164), and IDOC provides the next best alternative means of accommodating the needs of the Deaf or Hard of Hearing inmate for access to the programs and services that do not implicate the identified security concern or present an undue financial burden. Any Auxiliary Aid or Service may be modified, revised, or removed from the Communication Plan by agreement of the inmate and the applicable facility ADA coordinator. If an inmate declines an Auxiliary Aid or Service set out in the inmate's Communication Plan, IDOC will provide the inmate a document advising the inmate of the right to such Auxiliary Aid or Service and ask the inmate to sign the document.  The Auxiliary Aids and Services provided for in the inmate's Communication Plan will be provided without cost to the inmate unless the inmate intentionally damages, alters, trades, traffics with, or loses the accommodation.  In such

19

circumstances, the inmate shall pay the replacement costs of the accommodation, including any postage.

## X. IDOC STAFF TRAINING ON MATTERS REGARDING DEAF AND HARD OF HEARING INMATES

66. Within one hundred twenty (120) days of the Effective Date, IDOC shall develop materials to be used in the annual ADA training required by IDOC Administrative Directive No. 04.01.111 § H(1), which shall address:

    a.    communicating with individuals who are Deaf and Hard of Hearing;

    b.    the unique needs and problems encountered by individuals who are Deaf or Hard of Hearing;

    c.    identification of various communication needs for inmates who are Deaf and Hard of Hearing;

    d.    the proper use and role of Qualified Interpreters;

    e.    a policy for hand restraints to be removed so that Deaf and Hard of Hearing inmates can effectively communicate through American Sign Language;

    f.    the use of TTYs, Videophones, and other equipment that IDOC facilities must provide under this Settlement Agreement;

    g.    the process for Deaf and Hard of Hearing inmates to effectively communicate with IDOC employees during all High Stakes Interactions; and

    h.    such other information as relevant to facilitating compliance with this Settlement Agreement.

67.     Within one hundred and fifty (150) days of the Effective Date, and on an annual basis thereafter, IDOC will conduct ADA training as required by IDOC Administrative Directive No. 04.01.111 § H(1) using the materials referenced in the preceding paragraph.

68.     In addition to the training outlined above, prior to assuming the role of Agency ADA Coordinator or Facility ADA Coordinator, such employees shall receive training on the requirements of this Settlement Agreement, the Americans with Disabilities Act, and the Rehabilitation Act, as well as their specific duties in connection thereof.

## XI.     ORIENTATION

69.     Within 120 days of the Effective Date, IDOC shall provide the following accommodations for Deaf and Hard of Hearing inmates for the inmate orientation program and procedure, including any Statewide and facility-specific orientation programs and procedures:

   a.     All written orientation materials including without limitation all orientation manuals, will be drafted in simple and plain English.

   b.     All videos used during orientation shall include closed captioning using American Sign Language which has been reviewed for accuracy of the interpretation by the Illinois Deaf and Hard of Hearing Commission or a Qualified Interpreter.

   c.     All orientation content communicated by video shall be interpreted into American Sign Language. Prior to their use, all materials translated into American Sign Language must be approved by a Qualified Interpreter or a qualified linguist proficient in both ASL and English to assess the accuracy of the interpretation.

d. For all inmates attending orientation who IDOC has reason to believe are or may be Deaf or Hard of Hearing, IDOC shall meet with the inmate in a separate, subsequent orientation session to go over all orientation content provided orally at the initial orientation session. If the inmate communicates through American Sign Language, then during the second, separate orientation session, IDOC shall provide a Qualified Interpreter to assist the inmate in understanding any orientation content provided orally.

e. IDOC shall reserve the first row of seats during the orientation for inmates who are disabled.

## XII. COMMUNICATION DEVICES/TECHNOLOGIES FOR DEAF AND HARD OF HEARING INMATES

70. Within ninety (90) days of the Effective Date, except for subsections (c) and (d) below which contain their own time frames, IDOC will make the following communication technologies available at any facility that houses a Deaf or Hard of Hearing inmate:

a. Video Remote Interpreting ("VRI"): All facilities which house a Deaf or Hard of Hearing inmate for whom sign language interpretation is necessary for effective communication shall have VRI available for communication regarding medical issues. The VRI equipment shall be kept in good working condition at all times and, if broken, shall be fixed, or replaced if necessary, as soon as practicable. The VRI shall comport with 28 C.F.R. 35.160(d).

b. Teletypewriter ("TTY"): All facilities which house a Deaf or Hard of Hearing inmate shall provide access to at least two TTY units or equivalent technology. IDOC shall enable all such equipment to access publicly

22

available relay service phone numbers including, but not limited to, 711 and 1-800 numbers. Such equipment shall be kept in good working condition at all times (subject to normal wear and tear and the intentional damaging of the equipment outside the control of IDOC) and if the equipment breaks, it shall be fixed or replaced as soon as practicable. Deaf and Hard of Hearing inmates shall have three times the amount of time to use TTY equipment as non-Deaf and Hard of Hearing inmates who use traditional voice telephones, and the Deaf and Hard of Hearing inmates will be informed of such additional time for TTY usage.

c.      Videophones/VRS:  Within 6 months of the Effective Date, all facilities which house a Deaf or Hard of Hearing inmate who communicates primarily through ASL shall provide access to at least one Videophone/VRS. IDOC will ensure that all Videophones/VRS systems are able to call other Videophone/VRS services, which may require the use of 1-800 numbers. Videophones/VRS systems shall be designed to allow voice carry-over relay. The Videophone/VRS equipment shall be kept in good working condition at all times (subject to normal wear and tear and the intentional damaging of the equipment outside the control of IDOC), and if broken, shall be repaired or replaced as soon as practicable. Deaf and Hard of Hearing inmates shall have three times the amount of time to use videophones/VRS equipment than non-Deaf and Hard of Hearing inmates who use traditional voice telephones, and the Deaf and Hard of Hearing inmates will be informed of such additional time for such usage.

23

       d.      Amplified Telephones:  Within nine months of the Effective Date, all facilities which house a Deaf or Hard of Hearing inmate shall provide access to at least two telephones which allow amplification to at least 55 decibels. These amplified telephones shall be kept in good working condition at all times (subject to normal wear and tear and the intentional damaging of the equipment outside the control of IDOC), and if broken, shall be repaired or replaced as soon as practicable.

       e.      Rates paid for use of telecommunications: IDOC shall ensure that Deaf and Hard of Hearing inmates pay no more than other inmates in the making and receiving of telephone calls regardless of the means of the call.

71.     The list of technological equipment in this section is not exhaustive.  IDOC agrees to keep abreast of evolving technology and to add additional equipment to reflect technological advances, as warranted and subject to financial considerations.

72.     Deaf and Hard of Hearing inmates shall have access to the technological equipment during the same times of day and with no greater restrictions, limitations, or access than those placed on non-Deaf or Hard of Hearing inmates who use regular telephone equipment, except that in some facilities where communication equipment is not located in the cell houses, IDOC  shall grant appointments to use the equipment the same day or, at the latest, before 5:00 p.m. the following day, provided that inmates may only make a request for such appointments during the time when non-Deaf or Hard of Hearing inmates have access to regular telephone equipment.

## XIII. TELEVISION FOR DEAF AND HARD OF HEARING INMATES

73.     Within one hundred eighty (180) days of the Effective Date, IDOC will ensure that all audio-visual media already owned shall display open or closed captioning, and any new audio-visual media purchased for inmate use in IDOC facilities shall support open or closed captioning.

74.     New televisions purchased by IDOC for inmate use shall support open or closed captioning.

75.     Movies shown through the IDOC system will include either open or closed captioning. Any television in a common area of a facility that houses Deaf and Hard of Hearing inmates must be set so that the captioning is turned on at all times.

76.     IDOC shall permit Deaf and Hard of Hearing inmates to purchase televisions which support open or closed captioning with the inmate's own funds to the same extent that non-Deaf and Hard of Hearing inmates are allowed to purchase televisions. In the event that the closed captioning feature contained on televisions purchased through a facility Commissary malfunctions, IDOC personnel will work with the Deaf or Hard of Hearing inmate to address and resolve the problem as soon as practicable.

77.     IDOC shall provide Deaf and Hard of Hearing inmates the opportunity to use (at no cost to them) and possess headphones that fit over the ears (compared to ear buds) to allow them to hear television programming without disturbing other inmates, if such headphones are listed on the inmate's Communication Plan.  Such headphones become the property of the inmate to whom they are provided, and if the inmate is transferred to another facility, the headphones will be accepted for use by the inmate at the new facility unless the inmate's use of the headphones at the new facility presents safety or security concerns.  If the headphones break, and it is not the fault of the inmate, or it is because of normal wear and tear, IDOC shall repair or replace the

headphones as soon as practicable. If such over-the-ear headphones are insufficient for the inmate, other accessories, such as in-line amplifiers or equalizers shall be considered.

## XIV.  VISUAL AND TACTILE ALERT NOTIFICATIONS FOR DEAF AND HARD OF HEARING INMATES

78.     Beginning shortly after the Effective Date and continuing thereafter IDOC will begin making reasonable efforts to provide, and no later than one hundred eighty (180) days of the Effective Date IDOC shall provide Deaf and Hard of Hearing inmates with a safe and effective tactile notification system that will advise them of events such as the arrival of visitors, commencement of meals, showers, yard time, medical appointments, evacuations, and emergencies.  IDOC shall ensure that visual or tactile notification to all Deaf and Hard of Hearing inmates occurs any time a "warning shot" is fired or inmates are ordered to lie on the ground. Deaf and Hard of Hearing inmates will be notified and trained regarding the notification system(s) in use by the IDOC.

## XV. EQUAL ACCESS TO PRISON EMPLOYMENT

79.     IDOC shall not deny an employment opportunity to an otherwise qualified Deaf or Hard of Hearing inmate unless, after conducting an individualized assessment, including consultation with the inmate, it is determined that the Deaf or Hard of Hearing inmate cannot perform the essential functions of the employment opportunity with or without a reasonable accommodation.

## XVI.  HAND RESTRAINTS REGARDING DEAF AND HARD OF HEARING INMATES

80.     Within sixty (60) days of the Effective Date, IDOC shall implement a policy relating to the removal of handcuffs of Deaf and Hard of Hearing inmates when they are communicating through American Sign Language.

81.    Deaf and Hard of Hearing individuals using TTY machines or Videophones shall also be permitted to use the equipment without hand restraints.

## XVII.  FACILITY AND CELL ASSIGNMENTS AND TRANSFERS OF DEAF AND HARD OF HEARING INMATES

82.    A Deaf or Hard of Hearing inmate may not be transferred solely because of the inmate's Deaf or Hard of Hearing status to a higher security prison, or to a prison which does not offer comparable programming to the inmate's current parent facility.

83.    If a Deaf or Hard of Hearing inmate requests to be housed with another Deaf or Hard of Hearing inmate, IDOC shall consider such request.

## XVIII. CREATION AND DISSEMINATION OF MATERIALS MEMORIALIZING DEAF AND HARD OF HEARING INMATES' RIGHTS

84.    Within one hundred twenty (120) days of the Effective Date, IDOC will update, each facility's Orientation Manual to include information about the rights of Deaf and Hard of Hearing inmates, as guaranteed by this Settlement Agreement, along with the services available to them (hereinafter "rights materials").

85.    IDOC will provide current Deaf and Hard of Hearing inmates, and any future Deaf and Hard of Hearing inmates, with a new Orientation Manual, inclusive of rights materials.

## XIX.  MONITORING AND REPORTING

86.    The Court, with the assistance of Class Counsel, shall act as a monitor ("Monitor") concerning compliance with this Settlement Agreement.

87.    In the role of Monitor, the Court shall receive and analyze information regarding IDOC's compliance with the Settlement Agreement, assess and make findings regarding IDOC's compliance, and enter appropriate orders to ensure both IDOC's compliance and adequate monitoring of IDOC's compliance.

88.     In assisting the Court in its role as Monitor, Class Counsel shall receive and analyze information provided by IDOC as described herein, monitor matters relating to Deaf and Hard of Hearing inmates (via such avenues as inmate grievances, inmate interviews, and prison site visits), conduct fact investigation as appropriate, identify actual areas of noncompliance with the Settlement Agreement, attempt resolution of compliance issues with IDOC without Court intervention, make the Court aware of issues that may merit the Court's attention, and move for appropriate action by the Court in the event an issue cannot be resolved without Court intervention. Class Counsel may request that IDOC provide documents or other information reasonably related to the review and evaluation of IDOC's compliance with the Settlement Agreement; should IDOC refuse to provide such documents or information, the Court may determine whether such documents or information should be provided.

89.     In addition to any other information requested by the Court concerning IDOC's compliance with the Settlement Agreement, beginning one-hundred twenty (120) days following the Effective Date, and every one-hundred twenty (120) days thereafter, IDOC shall provide the Court and Class Counsel with a report, generated at IDOC's expense and publicly filed (except that, as indicated below, certain elements of the report may be filed under seal in order to protect the security of IDOC facilities and the medical privacy or IDOC inmates), which shall include the following elements:

a.      <u>Implementation of Settlement Generally</u>

(i)     a report as to the status of implementation of each of the provisions of this Settlement Agreement, which addresses, in separate sections for each of Sections IV through XIX of this Agreement, the factual information showing whether and how IDOC has implemented the

provisions in each section, including the documents and information set forth in more detail below;

b.     <u>Deaf and Hard of Hearing Inmates</u>

(i)     a listing, to be updated as needed with each successive report, of all inmates identified as Deaf or Hard of Hearing and the location where each such inmate is housed (may be filed under seal);

c.     <u>Hearing Screenings</u>:

(i)     a copy of any policy or procedure adopted pursuant to Paragraphs 32, 34 and 36 of this Agreement, and the date(s) on which such policies and procedures were implemented;

(ii)     a report of: (a) the number of inmates who since the date of this Agreement have gone through Intake Physical Examination; (b) the number of such inmates who have received a Hearing Screening; and (c) if applicable, a description of the reasons why any inmates did not receive a Hearing Screening;

(iii)     a report of: (a) the number of inmates who since the date of this Agreement have gone through a periodic physical examination; (b) the number of such inmates who have received a Hearing Screening; and (c) if applicable, a description of the reasons why any inmates did not receive a hearing screening;

(iv)     a report of: (a) the names of the inmates who since the date of this Agreement requested a Hearing Screening; (b) whether each such inmate received the requested Hearing Screening; and (c) if

29

applicable, the reasons why the inmate did not receive the requested Hearing Screening (may be filed under seal);

d.  Audiological Examinations:

(i)  a report listing each inmate who, based on a Hearing Screening after the date of this Agreement, was found to require an Audiological Evaluation, and a copy of any reports of any such inmate's Hearing Screening(s) (may be filed under seal);

(ii)  a report of whether each such inmate who, based on a Hearing Screening after the date of this Agreement, was found to require an Audiological Evaluation, received the Audiological Evaluation; and, if applicable, the reasons why the inmate did not receive the Audiological Evaluation (may be filed under seal);

(iii)  a report of the Audiological Evaluations of each inmate who received an Audiological Evaluation since the date of this Agreement, and a copy of the reports of such Audiological Evaluations (may be filed under seal);

e.  Qualified Specialists, Auxiliary Aids and Services Assessments, and Communication Plans:

(i)  a description of facts showing whether and how IDOC has implemented the requirements in Paragraphs 45-59 of this Agreement;

(ii)  a report of the names and hire dates of any individuals serving the IDOC as Qualified Specialists, or Qualified Interpreters;

30

(iii)    a copy of the written record of any Auxiliary Aids and Services Assessments provided to any Deaf or Hard of Hearing inmate (may be filed under seal);

(iv)    a copy of all Communication Plans for Deaf and Hard of Hearing inmates completed or updated during the relevant time period (may be filed under seal);

(v)    a report of whether determinations made by Qualified Specialists as set out in any Communication Plans are being implemented and, if applicable, a description of the instances in which determinations made by Qualified Specialists have not been implemented, and the reasons why (may be filed under seal);

f.    <u>Deaf and Hard of Hearing Inmate Grievances</u>:

(i)    a copy of all grievances filed after the date of this Agreement alleging facts that, if true, would be violations of this Settlement Agreement (may be filed under seal);

(ii)    a copy of any responses to such grievances and a description of the resolution of such grievances (may be filed under seal);

g.    <u>Deaf and Hard of Hearing Centralized Database</u>:

(i)    a report describing the implementation of any centralized database required pursuant to Paragraphs 39-42 of this Agreement and the date(s) that such database became effective and operational to meet the requirements in Paragraphs 39-42;

31

h.   <u>Orientation</u>:

(i)   a description of facts showing whether and how IDOC has implemented Paragraph 69 of this Agreement;

(ii)   a copy of the facility inmate orientation manuals implemented pursuant to this Settlement Agreement during the current reporting period, and the date(s) upon which such manuals became effective;

i.   <u>ADA Training</u>:

(i)   a report describing facts showing whether and how IDOC has implemented the requirements in Paragraphs 66-68 of the Agreement;

(ii)   a copy of all ADA training materials implemented by IDOC pursuant to this Settlement Agreement, and the date(s) upon which such materials became effective;

(iii)   a copy of all policies and procedures regarding IDOC ADA training created or updated after the date of this Settlement Agreement;

j.   <u>ADA Coordinators</u>:

(i)   a list of ADA coordinators at each facility and the Agency ADA Coordinator;

k.   <u>Visual/Tactile Notification Systems</u>:

(i)   a report describing any visual or tactile notification system implemented, the date(s) upon which such systems were implemented, and the method by which Deaf and Hard of Hearing Inmates have been notified of any such system(s);

32

l.    <u>Communication Devices and Technologies</u>:

    (i)    a report of facts describing whether and how IDOC has implemented the requirements in Paragraph 70-79 of this Agreement;

    (ii)    data showing Deaf and Hard of Hearing inmate's usage of communication services including TTY and videophones/VRS;

m.    <u>Employment Opportunities</u>:

    (i)    a description of any instance in which any Deaf or Hard of Hearing inmate was denied an employment opportunity (may be filed under seal);

n.    <u>Identification Cards</u>:

    (i)    a list of inmates who after the date of the Settlement Agreement received an Identification Card indicating their hearing issue;

o.    <u>Hand Restraints and Cell Assignments</u>:

    (i)    a copy of all policies and procedures relating to the implementation of Paragraphs 80-81 of this Agreement, and a description of the date(s) on which such policies and procedures were implemented;

    (ii)    a description of facts showing whether and how IDOC has implemented Paragraphs 80-81 of the Agreement;

p.    <u>Interpreters</u>:

    (i)    a record showing interpreter services provided after the date of the Agreement, which includes the inmate for whom each interpreting service was provided; the date the service was provided; the

33

reason/event for which the service was provided; and the name of the interpreter;

q.  <u>Annual Compliance Reports</u>:

(i)  copies of all annual compliance reports relating to Deaf and Hard of Hearing inmates created pursuant to IDOC Administrative Directive No. 04.01.111 § II(G)(4)(d).

90.    Materials and information provided in any report made pursuant to Paragraph 89 do not need to be re-supplied in subsequent reports; only new information since the date of the last report must be provided.  However, data and incidents subject to prior reports must be updated with current information at the time of any report.  All reports submitted by IDOC pursuant to this Agreement are for the sole purpose of determining compliance with this agreement.

91.    Beginning one-hundred-fifty (150) days following the Effective Date, and every one-hundred-twenty (120) days thereafter, or as otherwise scheduled by the Court, the Court shall conduct a hearing with IDOC counsel and Class Counsel to discuss issues relating to IDOC's compliance with this Settlement Agreement, including: the information generated in the compliance reports outlined above and any further actions that need to be taken by the Court or the Parties.  The Court may schedule other hearings as well, as the Court deems fit, to deal with issues as they arise relating to the monitoring and enforcement of this Agreement.

## XX.  COURT'S RESOLUTION OF ISSUES OF NON-COMPLIANCE

92.    If Class Counsel believes that IDOC may be in violation of the Settlement Agreement, then Class Counsel may investigate and bring any motion to the Court's attention regarding any such potential non-compliance.  Consistent with the Federal Rules of Civil Procedure and the Local Rules for the Northern District of Illinois, Class Counsel and IDOC

counsel shall meet and confer and attempt to resolve any issues of potential non-compliance prior to such issues being the subject of any motion with the Court. The Parties are required to negotiate through this process in good faith.

93. If after a hearing the Court finds that IDOC has been in substantial non-compliance with the Settlement Agreement, then the Court has the power to enter, and shall enter, whatever orders are necessary to ensure compliance with the terms of the Settlement Agreement, including ordering equitable or injunctive relief such as requiring IDOC to take actions to become compliant with the terms of this Settlement Agreement. The Court also may award reasonable attorney's fees for any work expended by Class Counsel in investigating and litigating such non-compliance. If the Court does not make a finding of non-compliance, Class Counsel will not be entitled to fees and will not seek them.

94. For the Court to have the power to enter orders necessary to ensure compliance with the terms of this Settlement pursuant to Paragraph 93 and the other provisions of this Settlement Agreement, the Court must simply find that there has been substantial non-compliance with the Settlement Agreement, and need not make any additional findings that the non-compliance with the terms of the Settlement Agreement (or the conduct by IDOC constituting or resulting in non-compliance with the Settlement Agreement) constitutes a violation of federal law or is the result of deliberate indifference. "Substantial non-compliance" as used here means acts or omissions which do not meet the requirements of a particular provision of this Settlement Agreement and have a material effect on the ability of a Party to meet the goals and objectives of the relevant provision. In determining whether particular acts or omissions constitute "substantial non-compliance," the Court must consider, at a minimum, the following factors: the nature of the alleged non-compliance, the extent to which the alleged non-compliance deviates from the

particular settlement terms, such as the number of facilities or inmates affected, the length of any delay in implementing a particular provision in the time allotted under the Agreement, the duration of the alleged non-compliance, and the extent to which the alleged non-compliance has a material effect on the rights of deaf and hard of hearing inmates or the goals and objectives of this Settlement Agreement. No finding of any particular intent – such as deliberate indifference, a lack of diligence, or intentional violation of the Settlement Agreement – is required for a determination of "substantial non-compliance;" however, in fashioning an appropriate remedy for any substantial non-compliance, the Court may consider intent, including any diligence or lack thereof in causing or avoiding any "substantial non-compliance" and whether efforts have been made to cure any "substantial non-compliance." Neither side will take any position that is contrary to the enforcement terms agreed to herein during the court's supervision of IDOC's implementation of the terms of this Settlement Agreement.

## XXI. DELIVERY OF INFORMATION TO CLASS COUNSEL

95. Delivery of information to Class Counsel pursuant to this Settlement Agreement shall be made to: Equip for Equality, Attn.: Barry C. Taylor, 20 North Michigan Avenue, Suite 300, Chicago, Illinois 60602; Winston & Strawn LLP, Attn.: Robert L. Michels, 35 W. Wacker Drive, Chicago, Illinois 60601; Alan Mills, Uptown People's Law Center, 413 N. Sheridan Rd., Chicago, IL, 60640; and Howard A. Rosenblum, National Association of the Deaf, 8630 Fenton Street, Suite 820, Silver Spring, Maryland 20910. Delivery through electronic means, such as through email or electronic filing with the Court, is acceptable.

## XXII. NOTICE

96. IDOC shall work with Class Counsel to provide notice of the proposed settlement to all Class Members. The Notice shall be in the form of Exhibit B hereto.

## XXIII. ATTORNEYS' FEES AND COSTS

97.     In full settlement of all attorneys' fees incurred in connection with the Litigation, IDOC shall pay to Class Counsel the amount of $1,500,000.00 ("Fee Payment").  With respect to the first half of this Fee Payment ($750,000.00), IDOC will voucher that amount (i.e. submit that amount to the Illinois Office of the Comptroller for payment) by August 1, 2018, if all of the following three conditions (collectively, the "Three Voucher Conditions") have been met by June 30, 2018: (i) this Settlement Agreement is fully executed; (ii) the Court approves this Settlement Agreement; and (iii) all paperwork that is necessary for the vouchering of this half of the amount is submitted to IDOC.    With respect to the second half of the Fee Payment, IDOC will voucher that amount by August 1, 2018, if by June 30, 2018 the Three Voucher Conditions are met and IDOC has received its full requested supplemental appropriation for Fiscal Year 2018. If the Three Voucher Conditions are not met by June 30th for the first half of the Fee Payment, then IDOC will voucher the entire amount (both halves) once the Voucher Conditions have been met and within 30 days of when the Illinois General Assembly fully appropriates a full Fiscal Year 2019 budget and the Governor authorizes the funds to IDOC for the payment.    The date of the actual payment of any amount that IDOC vouchers is subject to the authority of the Illinois Comptroller.

98.     Nothing in this Section precludes Class Counsel from seeking reasonable attorneys' fees pursuant to Paragraphs 92-93 above.

## XXIV.  STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. §3626

99.     For purposes of this Settlement Agreement only and in order to settle this matter, the parties agree and represent that this Settlement Agreement complies in all respects with the provisions of 18 U.S.C. 3626(a).

37

100. The parties agree and represent that the prospective relief specifically contained in this Settlement Agreement are narrowly drawn, extend no further than necessary, are the least intrusive means necessary to address the Plaintiffs' allegations, and are not intended to have an adverse impact on public safety or the operation of a criminal justice system. The parties agree to file an agreed motion asking the Court, as part of its evaluation of the fairness of the Settlement Agreement, to enter an order finding that the provisions of the Settlement Agreement are narrowly drawn, extend no further than necessary to address the violations of federal rights alleged by Plaintiffs, are the least intrusive means necessary to address those alleged violations, and are not intended to have an adverse impact on public safety or the operation of a criminal justice system.

## XXV. MODIFICATION

101. The terms of this Settlement Agreement may be modified only by the Court upon written agreement by the Parties and the Office of the Illinois Attorney General.

## XXVI. JUDICIAL RETENTION OF JURISDICTION OF THIS MATTER

102. The Court shall retain jurisdiction to oversee, supervise, and enforce the terms and conditions of this Settlement Agreement, to resolve disputes arising out of or relating to this Settlement Agreement, and for such other actions as may be necessary or appropriate for execution, construction, or implementation of this Settlement Agreement, as limited by the Termination provisions below.

103. The Parties and the Court shall not take any action to remove, challenge or undermine the Court's jurisdiction over this matter, including to interpret and enforce the provisions of this Settlement Agreement, prior to the Termination of this Settlement Agreement per the terms outlined herein. If for any reason the Court were to lose or decline to assert

jurisdiction over this matter consistent with the terms of this Settlement Agreement, Plaintiffs shall have the right to proceed with this action and fully litigate their claims.

## XXII. TERMINATION OF JURISDICTION/SETTLEMENT COMPLETION

104.    The Court shall retain such jurisdiction over this matter, including to interpret and enforce this Settlement Agreement, and enter appropriate orders requiring compliance with the Agreement, for not less than two years following the Effective Date.  If the Court finds that, during the two years following the Effective Date, IDOC has failed to show that it is in substantial compliance with any portion of this Settlement Agreement, then the Court will extend the period of its jurisdiction to supervise and enforce any such portion of this Settlement Agreement, until IDOC shows it has achieved substantial compliance, for a period of time not to exceed two additional years.  Subject to the provisions in Paragraph 107, beginning two years after the Effective Date, the Court's jurisdiction shall terminate with respect to any and all provisions of this Settlement Agreement with which the Court has found IDOC in substantial compliance.

105.    Subject to the provisions in Paragraph 103 allowing Plaintiffs to proceed with their claims in certain circumstances, the Class, and each member thereof, agrees to release, and hereby releases and forever discharges the Defendant and the State of Illinois, their agents, former and present employees, successors, heirs and assigns and all other persons ("Releasees") from all actions, claims, demands, suits, causes of action, controversies, and disputes seeking equitable relief (but not claims, demands, suits, causes of action, controversies, or disputes for damages) and any related costs and expenses of such released claims, demands, suits, causes of action, controversies, and disputes, which arose or could have arisen from the facts alleged in or claims made in this Litigation, and which the Class, and each member thereof, owns, has or may have

against the Releasees, whether known or unknown, from the beginning of time until the Effective Date.

106.    No promise has been made to pay or give the individual representatives of the Class, or any Class Member, any greater or further consideration other than as stated in this Agreement. All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties hereto concerning the subject matter of this Agreement are contained in this Agreement. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any Party hereto to any other Party concerning the subject matter of this Agreement.   All prior and contemporaneous negotiations, possible and alleged agreements, representations, covenants and warranties, between the Parties concerning the subject matter of this Settlement Agreement are merged into this Settlement Agreement.  This Agreement contains the entire agreement between the Parties.

107.    The Court's jurisdiction shall terminate, and the obligations under this Settlement Agreement shall be complete, consistent with the following procedures:

   a.    At any time after two years from the Effective Date, IDOC may make a written request that the Court terminate the Court's jurisdiction and the monitoring and reporting process described herein ("Termination Request").  The request can relate to this entire Settlement Agreement, or any portion thereof.

   b.    Following any Termination Request, Plaintiffs, through Class Counsel, shall have not less than sixty (60) days to respond. During those sixty (60) days, Plaintiffs shall have the opportunity to obtain information from IDOC concerning factual issues relevant to the determination of compliance.

40

Should IDOC not provide reasonably complete and timely information during this period, Plaintiffs may ask the Court to order IDOC to do so, and if the Court grants Plaintiffs' request, the Court shall extend Plaintiffs' time to respond to the Termination Request as appropriate, to allow Plaintiffs to receive sufficient information and evaluate it.

c.    If Plaintiffs oppose the Termination Request, in whole or in part, Plaintiffs must file an objection to the Termination Request within sixty (60) days, or within any longer time frame ordered by the Court.

d.    The Court will grant IDOC's Termination Request and terminate its jurisdiction and the reporting process, if the Court finds that IDOC has shown it has substantially complied with the terms of the Settlement Agreement. The Court may terminate its jurisdiction and the reporting process as it relates to the entirety of this Agreement, or any portion thereof. IDOC shall not be deemed in substantial compliance with the Settlement Agreement (or any portion thereof) if there have been a significant number of violations of provisions of the Settlement Agreement (or any portion thereof).

e.    Termination of the Court's jurisdiction over the Settlement Agreement, in whole or in part, may occur only in the event ordered by the Court, upon a successful Termination Request consistent with the terms of this Agreement.

108.    The Settlement Agreement shall remain in effect, and the Court shall retain its jurisdiction over the Settlement Agreement subject to the terms of this Settlement Agreement and

all applicable statutes, Rules of Court, and case law for no more than four (4) years after the Effective Date.

## XXIII.  AGREEMENT TO ENTRY OF SETTLEMENT AGREEMENT

109.    IDOC agrees to advocate for, and not to oppose entry of, this Settlement Agreement by this Court, or to challenge any provision of this Settlement Agreement prior to entry of the Settlement Agreement.

110.    The parties agree that, upon acceptance of this Settlement Agreement by the Court, the parties shall consent to proceed before the Magistrate Judge in this matter for the remainder of this litigation.  This litigation will not be dismissed, and will remain on the Magistrate Judge's active docket, until the Court's jurisdiction terminates consistent with the terms of this Settlement Agreement.

# EXHIBIT A
# TO
# STIPULATION OF
# SETTLEMENT

# ILLINOIS DEPARTMENT OF CORRECTIONS

**Auxiliary Aids and Services Assessment for Deaf or Hard of Hearing Offenders (Part I)**
*To be completed by Qualified Specialist*

Name: _____  ID#: _____  Facility: _____

Date: _____  Disability (check one): ☐ Deaf    ☐ Hard of Hearing

## 1. Assessment of Sign Language Ability

a. Offender uses sign language? (check one):  ☐ Yes      ☐ No
b. If yes, sign language is Offender's *primary* language: ☐ Yes      ☐ No
c. Offender's proficiency:      ☐ Beginner    ☐ Conversational    ☐ Fluent
d. Type of interpreter needed (check one):
    ☐ ASL (American Sign Language)      ☐ Signed English
    ☐ ASL + Certified Deaf Interpreter      ☐ Sign Language from other country
    ☐ Other _____

## 2. Assessment of Reading / Writing Ability

(For example: Is the person able to read and write? Does the person have the ability to engage in basic communications through reading/writing? If so, are there conditions required, such as no time constraints?)

_____
_____
_____
_____
_____

## 3. Assessment of Speaking Ability

(For example: Can the person speak sufficiently clearly for the average person to understand them? If so, are there conditions required, such as in a quiet setting?)

_____
_____
_____
_____
_____

## 4. Assessment of Lip-reading Ability

(For example: Can the person read lips? If so, are there conditions required, such as only when the person speaking speaks clearly and slowly, or only when the conversation is one-on-one and in a quiet setting, allowing the person to understand through a combination of lip reading and a hearing aid?)

_____
_____
_____
_____
_____

1

**5.    Communication Devices**

a. Uses:        □ Hearing Aid                □ Cochlear Implant/Implantable Device

b. Device:  □ Requires batteries          □ Is rechargeable

**6.    If This is a Re-Assessment, Changes Since Prior Assessment**

_____

_____

_____

_____

_____

_____

_____

_____

**7.    Additional Communication Assessment**

_____

_____

_____

_____

_____

_____

_____

_____

# ILLINOIS DEPARTMENT OF CORRECTIONS

## Auxiliary Aids and Services Assessment for Deaf or Hard of Hearing Offenders (Part II)
### *To be completed by Qualified Specialist*

**A.    Accommodations that must be provided for the following programs and activities:**

*For Interpreter Needed: Note whether Offender requires an interpreter. If Offender's primary language is sign language per the Qualified Specialist's assessment, presume an interpreter is needed for items 1-10.*

*For Other Accommodation: Note whether Offender requires other Auxiliary Aids/Services or Accommodations, such as one-on-one meetings in quiet room, exchange of written note, visual aids, etc.*

| Program, Service or Activity | Interpreter Needed? (yes/no) | Other Accommodation Needed? (list what is needed) |
|---|---|---|
| 1. Disciplinary investigations and proceedings | | |
| 2. Interviews with Internal Affairs or investigators | | |
| 3. Interviews or proceedings re: protective custody | | |
| 4. Meetings with IDOC staff to discuss auxiliary aids and services | | |
| 5. Pre-release meetings & programs, including pre-release parole meetings | | |
| 6. ARB grievance hearings | | |
| 7. Educational programs and testing that include a verbal component | | |
| 8. Vocational programs that include a verbal component | | |
| 9. Religious services | | |
| 10. Medical and mental health care services, including dental, vision, audiological, individual and group therapy (*Unless medical care and appointment is routine and does not involve substantial conversation – see 11 below*) | | |
| 11. Medical care that is routine and does not involve substantial conversation (*Routine blood work or tests, regular allergy shots, etc.*) | | |
| 12. Daily environments and basic communications, including | | |

| conversations with counselors, gym, meals, library *(Potential accommodations include the exchange of written notes, hand signals, and provision of visual aids or quiet spaces. An interpreter is not required for this section)* | | |
|---|---|---|

## B. Hearing Aids

Per the Audiologist Report, Offender will be provided with (mark all that apply):

☐ Hearing aid for right ear ☐ Hearing aid for left ear ☐ No hearing aid

Battery requirements: _____

## C. Identification Card

Identification Card will be marked as follows:

☐ Deaf ☐ Hard of Hearing ☐ Offender declines disability on ID Card

## D. Other Technologies

Offender shall be entitled to the following (mark all that apply):

☐ TTY ☐ Video Phone ☐ Amplified Phone ☐ Traditional Phone

☐ Vibrating Watch ☐ Tactile Notification System ☐ Over-the-ear headphones

## E. Other Auxiliary Aids/Services or Accommodations Needed

_____

_____

_____

**Signatures**

**Qualified Specialist:**

_____

Printed Name                    Signature                         Date

**Offender:**

_____

Printed Name                    Signature                         Date

4

# ILLINOIS DEPARTMENT OF CORRECTIONS
## ADA Communication Plan
*To be completed by ADA Coordinator documenting determinations of Qualified Specialist*

Name: _____ ID#: _____ Facility: _____

Date: _____ Disability (check one): ☐ Deaf ☐ Hard of Hearing

## A. Accommodations that must be provided for the following programs and activities:

*For Interpreter Needed: Note whether Offender requires an interpreter. If Offender's primary language is sign language per the Qualified Specialist's assessment, presume an interpreter is needed for items 1-10.*

*For Other Accommodation: Note whether Offender requires other Auxiliary Aids/Services or Accommodations, such as one-on-one meetings in quiet room, exchange of written note, visual aids, etc.*

| Program, Service or Activity | Interpreter Needed? (yes/no) | Other Accommodation Needed? (list what is needed) |
|---|---|---|
| 1. Disciplinary investigations and proceedings | | |
| 2. Interviews with Internal Affairs or investigators | | |
| 3. Interviews or proceedings re: protective custody | | |
| 4. Meetings with IDOC staff to discuss auxiliary aids and services | | |
| 5. Pre-release meetings & programs, including pre-release parole meetings | | |
| 6. ARB grievance hearings | | |
| 7. Educational programs and testing that include a verbal component | | |
| 8. Vocational programs that include a verbal component | | |
| 9. Religious services | | |
| 10. Medical and mental health care services, including dental, vision, audiological, individual and group therapy (*Unless medical care and appointment is routine and does not involve substantial conversation – see 11 below*) | | |
| 11. Medical care that is routine and does not involve substantial conversation (*Routine blood work or tests, regular allergy shots, etc.*) | | |

| 12. Daily environments and basic communications, including conversations with counselors, gym, meals, library *(Potential accommodations include the exchange of written notes, hand signals, and provision of visual aids or quiet spaces. An interpreter is not required for this section)* | | |

## B.    Hearing Aids

Per the Audiologist Report, Offender will be provided with (mark all that apply):

☐ Hearing aid for right ear          ☐ Hearing aid for left ear          ☐ No hearing aid

Battery requirements: _____

## C.    Identification Card

Identification Card will be marked as follows:

☐ Deaf                ☐ Hard of Hearing          ☐ Offender declines disability on ID Card

## D.    Other Technologies

Offender shall be entitled to the following (mark all that apply):

☐ TTY        ☐ Video Phone        ☐ Amplified Phone        ☐ Traditional Phone

☐ Vibrating Watch        ☐ Tactile Notification System        ☐ Over-the-ear headphones

## E.    Other Auxiliary Aids/Services or Accommodations Needed

_____

_____

_____

**ADA Coordinator:**

_____

Printed Name                              Signature                              Date

**Offender:**

_____

Printed Name                              Signature                              Date

Any Auxiliary Aid or Service may be modified, revised, or removed from the Communication Plan by agreement of the inmate and the applicable facility ADA coordinator.

# EXHIBIT B
# TO
# STIPULATION OF
# SETTLEMENT

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 C 2961 |
| v. | ) ) | Honorable Marvin E. Aspen |
| JOHN BALDWIN, Acting Director of Illinois Department of Corrections; *et al.,* | ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

**NOTICE PLAN**

In furtherance of their agreement to see this Court's approval of the Parties' proposed Settlement Agreement, Plaintiff Ralph Holmes and the other named Plaintiffs, on behalf of themselves and the Class certified by the Court, and Defendant John Baldwin (collectively, the "Parties"), propose that the notices more fully described below be approved by the Court as fully comporting with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process:

1. Defendant will provide, via personal delivery, notice set forth in Exhibit B-1 to all current IDOC inmates known by either Party to be deaf or hard of hearing. The Parties will work in collaboration to identify this list of possible class members. Defendant will effectuate such delivery by no later than **[DATE].**

2. Defendant will post notice in the form set forth in Exhibit B-2 in the law library and each living unit in each IDOC facility. Defendant will post notices by no later than **[DATE].**

3.      Class Counsel will create a video translating the notice set forth in Exhibit B-1 into

American Sign Language, and after Department approval, the video shall be

shown to all class members known by either Party to use American Sign

Language. The parties will work in collaboration to identify this list of possible

class members. Defendant will effectuate such notice by no later than **[DATE].**

Dated: April 23, 2018                          Respectfully submitted,

  _/s/ Robert L. Michels_____

Barry C. Taylor                                          Robert L. Michels
Amy F. Peterson                                        Kate Watson Moss
Laura J. Miller                                            Jennifer James
Rachel M. Weisberg                                 Winston & Strawn LLP
Equip for Equality                                    35 W. Wacker Dr.
20 North Michigan Avenue, Suite 300       Chicago, IL 60601-9703
Chicago, IL 60602                                     Telephone: (312) 558-5600
Telephone: (312) 341-0022                       rmichels@winston.com
rweisberg@equipforequality.org

Howard A. Rosenblum                             Alan S. Mills
National Association of the Deaf               Nicole Schult
8630 Fenton Street, Suite 820                   Uptown People's Law Center
Silver Spring, MD 20910                          4413 North Sheridan
Telephone: (301) 587-1788                       Chicago, IL 60640
howard.rosenblum@nad.org                    Telephone: (773) 769-1411
                                                                  alanmills@comcast.net

                                                                  *Counsel for Plaintiffs*

  _/s/ Michael Arnold_____

                                                                  Michael Arnold
                                                                  Assistant Attorney General
                                                                  General Law Bureau
                                                                  100 W. Randolph, 13th Floor
                                                                  Chicago, IL 60601
                                                                  Telephone: (312) 814-3720
                                                                  marnold@atg.state.il.us

                                                                  *Counsel for Defendant*

# EXHIBIT B-1
# TO
# STIPULATION OF
# SETTLEMENT

**EXHIBIT B-1**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11 C 2961 |
| v. | ) ) | Honorable Marvin E. Aspen |
| JOHN BALDWIN, Acting Director of Illinois Department of Corrections; *et al.* | ) ) ) | Magistrate Judge Young B. Kim |
| Defendants. | ) ) | |

**LEGAL NOTICE OF PROPOSED CLASS SETTLEMENT AND HEARING**

*If you are deaf or hard of hearing, this settlement may affect your rights. Please read.*

*This is a notice about a proposed settlement that will change how the Illinois Department of Corrections (IDOC) helps deaf and hard of hearing inmates communicate in prison.*

**This notice tells you about (1) the lawsuit; (2) who is impacted by the settlement (the "class"); (3) the proposed settlement agreement; (4) what to do if you do not like the agreement (how to object); and (5) how to get more information.**

## 1.    The Lawsuit

In 2011, a group of deaf and hard of hearing inmates filed a lawsuit against the IDOC called *Holmes v. Baldwin*. In the lawsuit, these inmates said that they needed "accommodations" or "auxiliary aids or services" to participate in IDOC programs, and that IDOC did not give them what they needed. For example, these inmates said that they needed sign language interpreters, hearing aids, video phones, closed captioning, a better alert system, and more. The lawsuit filed by the inmates does not ask for money.  Instead, the lawsuit asks the Court to order IDOC to provide these things to deaf and hard of hearing inmates so they can communicate effectively while in IDOC custody.  There is now a possible settlement that will resolve this lawsuit.

## 2.    Who Is Impacted By The Settlement (The "Class")

This settlement helps IDOC inmates who are deaf or hard of hearing.

The deaf and hard of hearing inmates who will benefit from the settlement are called the "settlement class."

You are part of the "settlement class" if you:

- Are in prison in an IDOC facility or will be in the future; *and*

- Cannot hear in one or both ears enough to understand someone who is speaking without a hearing aid or other hearing device; *and*

- Need devices or services to help you communicate (examples include hearing aids, sign language interpreters, telephone amplification, video phones or TTYs, closed captioning on your TV).

## 3.    The Proposed Agreement

In the settlement, IDOC has agreed to help deaf and hard of hearing inmates in a number of ways.  These ways include:

A.  Hearing Screenings. IDOC will use experts and testing to make sure it knows who is deaf and hard of hearing. It will do two types of hearing tests. IDOC will do a test for hearing loss for three groups of people: (1) everyone first coming to IDOC during intake; (2) anyone who says they think they have hearing loss during physical exams; and (3) anyone who asks for it or asks for a hearing aid.

B.  Audiological Evaluations. IDOC will send people who need more testing to an audiologist. The audiologist will decide if the person needs hearing aids.

C.  Meeting with Communication Specialists. To determine what deaf and hard of hearing inmates need to communicate effectively, IDOC will now use specialists who know how to test communication skills of deaf and hard of hearing inmates. These specialists will decide what IDOC should do to help the inmate communicate in prison. For example, the specialist will decide if the inmate needs accommodations like a sign language interpreter or to communicate in a quiet room. The specialist will decide this for every IDOC program, including medical appointments, classes, meetings and jobs. The name of this test is an "Auxiliary Aids and Services Assessment." Everyone who IDOC knows is deaf or hard of hearing will meet with these specialists. Everyone who is found to be deaf or hard of hearing will meet with these specialists.

D.  Communication Plan. The specialist's findings about what each deaf and hard of hearing inmate needs to communicate effectively will be written in a Communication Plan.  Each inmate's Communication Plan will be placed in their medical file and on a centralized database.

E.  Providing Accommodations and Auxiliary Aids and Services. IDOC will provide deaf and hard of hearing inmates with the accommodations and auxiliary aids and services listed in their Communication Plan. There are limited circumstances when IDOC can decide not to provide something written in the Communication Plan. If IDOC can show that the auxiliary aid or service would present a safety or security

2

concern, or cause an "undue financial burden," as defined by the ADA, it may deny the accommodation. But the decision to deny the accommodation must be made by the head of IDOC or his or her designee. Also, if IDOC denies an accommodation because it would cause an undue financial burden or pose a safety or security risk, IDOC must take the next best action that would not pose an undue financial burden or present a safety or security risk.

F. <u>Accommodations Before Auxiliary Aids and Services Assessment</u>. If an inmate needs an accommodation before his or her Auxiliary Aids and Services Assessment is finished, IDOC will provide the accommodation if the inmate asks for it, it is clear to IDOC that the inmate needs the accommodation, and IDOC is able to provide it. IDOC has agreed that it is generally able to provide accommodations like interpreters and video phones.

G. <u>Primary Consideration</u>. When determining what auxiliary aid and service to provide, the specialist and IDOC will give primary consideration to the accommodation requests of the deaf or hard of hearing inmate.

H. <u>Sign Language Interpreters</u>. If an inmate's primary language is American Sign Language, IDOC will provide interpreters for important programs, called "high stakes interactions." High stakes interactions include most medical and mental health care and appointments, disciplinary investigations and hearings, educational and vocational programs with a verbal component, transfer and classification meetings, and meetings with IDOC to discuss accommodations.

I. <u>Hearing Aids</u>. Deaf and hard of hearing inmates will be given the number of hearing aids recommended by the audiologist. IDOC will also promptly provide hearing aids and batteries and promptly send broken hearing aids for repair.

J. <u>Video Phones, TTYs, and Amplified Phones</u>. IDOC will make sure that every facility that has a deaf or hard of hearing inmate will have at least one video phone, two TTYs or equivalent technologies, and two telephones that allow for amplification. Deaf and hard of hearing inmates will not pay more than other inmates making and receiving calls, and will have equal access to telephones, except that in some facilities, if the communication equipment is not in the cell house, IDOC may require appointments during the same time as others may use the telephone.

K. <u>Televisions</u>. IDOC will make sure that all televisions already owned have open or closed captioning, and will only buy new televisions with open or closed captioning. IDOC also make sure all movies played are available in open or closed captioning. IDOC will provide, at no cost, headphones that are large enough to fit over the ears of deaf and hard of hearing inmates to allow them to hear television programming.

L. <u>Tactile Notification System</u>. The IDOC will provide a safe and effective tactile notification system that will tell deaf and hard of hearing inmates about events like

the arrival of visitors, meals, showers, yard time, doctor appointments, evacuations and emergencies.

M. Video Remote Interpreting for Medical Appointments. IDOC will make sure that every facility that has a deaf or hard of hearing inmate will have a Video Remote Interpreting (VRI) for communication about medical issues, and that the VRI will work and will meet the Department of Justice's requirements.

N. Orientation. IDOC will make sure that its orientation is accessible. It will use simple English in its written materials, and will play videos with closed captioning and in American Sign Language. If IDOC knows that an inmate is deaf or hard of hearing, it will meet separately with the inmate to review all materials and answer questions. If the inmate uses American Sign Language, IDOC will provide an interpreter for this separate meeting.

O. Employment. IDOC will not deny prison employment to any otherwise qualified deaf or hard of hearing inmate who can perform the essential functions of the position with or without a reasonable accommodation.

P. Hand Restraint Policy. IDOC may allow deaf and hard of hearing inmates to remove their hand restraints when they need to communicate through American Sign Language.

Q. Identification Card. IDOC will continue to give deaf and hard of hearing inmates an identification card that says the inmate is deaf or hard of hearing, and inmates may continue to say they do not want this ID card.

R. Housing. IDOC will not transfer a deaf or hard of hearing inmates to a different facility with a higher security level or different programming just because of their disability. IDOC will consider requests for deaf and hard of hearing inmates to be housed with another deaf or hard of hearing inmate.

S. Centralized Database. IDOC will use, and regularly update, a centralized database to that will include information about every deaf and hard of hearing inmate's accommodations.

T. Training. IDOC staff will be trained on a number of topics related to deaf and hard of hearing inmates, including communication needs, using interpreters and using telephone technologies.

U. Rights Materials. IDOC will update its orientation manuals to add information about the rights of deaf and hard of hearing inmates, and will give this information to all current and future deaf and hard of hearing inmates.

V. <u>Monitoring and Enforcement</u>. The Court and the attorneys representing the deaf and hard of hearing inmates (also called "Class Counsel") will monitor this settlement with IDOC to make sure that these changes are made. IDOC has to send Class Counsel documents and answer questions about what it is doing to meet the requirements of the settlement. If Class Counsel believes IDOC has not met its obligations under the settlement, the Court will resolve the dispute.

W. <u>Attorneys' Fees and Costs</u>. The lawyers who have handled the case for the deaf and hard of hearing inmates are called "Class Counsel." These lawyers have worked on this case for over 8 years and will continue working on the case for the next 4 years, to monitor IDOC and make sure that IDOC does what it is supposed to do under the settlement. As part of the settlement, IDOC will pay $1,500,000.00 to Class Counsel. This amount will help offset the costs the Class Counsel has spent on this case as well as Class Counsel's attorneys' fees for the past 8 years and the next 4 years. Class members do not have to pay anything to Class Counsel.

X. <u>Termination</u>. The Court will keep this case open to oversee, supervise and enforce the terms of the Agreement for at least two, but no more than four years, following approval of the Agreement. IDOC can ask the Court to stop monitoring the agreement if it shows that it has met any particular term of the Agreement before the four year time period.

## 4.   **What To Do If You Do Not Like The Agreement (How to Object)**

If you do not like the agreement, you can tell the lawyers and the judge. This is called sending an objection. To send an objection, mail a letter saying <u>why</u> you do not like the agreement. The judge will think about the objections before deciding whether the agreement is okay. If you have an attorney, you may talk to your attorney about this agreement.

Mail the letter saying why you do not like the agreement to **Holmes v. Baldwin Objections,** c/o Equip for Equality, 20 North Michigan Avenue, Suite 300, Chicago, IL 60602. The lawsuits must get your objection by **June 25, 2018.** Please be specific about why you do not like the agreement and do not write more than 15 pages.

The judge will hold a hearing to decide whether to approve the agreement. The hearing will take place on July 26, 2018 at 10:30 A.M., in Courtroom 2568 of the Everett McKinley Dirksen United States Courthouse at 219 South Dearborn Street, Chicago, IL.

If you like the agreement, you do not have to do anything.

## 5.   **How To Get More Information**

If you would like more information, you can contact the lawyers who represent the class. They can send you a copy of the Settlement Agreement and answer your questions.

- Robert Michels, Winston & Strawn, LLP, 35 W. Wacker Drive, Chicago, IL 60601-9703

- Alan Mills, Uptown People's Law Center, 4413 N. Sheridan, Chicago, IL 60640
- Barry C. Taylor, Equip for Equality, 20 N. Michigan Ave., Suite 300, Chicago, IL 60602

# EXHIBIT B-2
# TO
# STIPULATION OF
# SETTLEMENT

**EXHIBIT B-2**

  

## LEGAL NOTICE OF THE PROPOSED SETTLEMENT OF A LAWSUIT
## BROUGHT ON BEHALF OF DEAF AND HARD OF HEARING INMATES

*If you are deaf or hard of hearing, this Legal Notice may affect your rights. Please read.*

*This is a Legal Notice about a proposed settlement of a lawsuit. The lawsuit was brought to benefit deaf and hard of hearing inmates.*

*The settlement will change how the Illinois prisons provide deaf and hard of hearing inmates with ways to talk with other people.*

### WHAT IS THIS ABOUT?

In 2011, a group of deaf and hard of hearing inmates sued the Illinois prisons (called the "Illinois Department of Corrections" or "IDOC"). The name of the court case is *Holmes v. Baldwin*. These inmates said that they need things like interpreters, captioning, and hearing aids while in prison, but IDOC does not give them what they need. These inmates sued to get a court to order IDOC to give them those things. There was no request for money in this court case. Both sides have now agreed to a settlement. The settlement will end the case if it is approved by the court.

### WHO IS PART OF THE SETTLEMENT?

The group of inmates who will benefit from this settlement is called the settlement "Class." You are part of that group if:

- You are in prison in an Illinois prison or will go to an Illinois prison in the near future; *and*
- Without a hearing aid or other hearing device, you cannot hear in one or both ears enough to understand someone who is speaking; *and*
- To help you talk with hearing people, you need devices or services (such as hearing aids, sign language interpreters, amplified telephones, videophones or TTYs, closed captioning on your TV).

### WHAT IS THE AGREEMENT?

In the settlement, IDOC has agreed to help deaf and hard of hearing inmates in a number of ways. Here are some of the most important parts of the settlement:

- <u>Hearing Tests</u>. IDOC will give more hearing tests so that it knows who is deaf and hard of hearing. IDOC will send people who need more testing to an audiologist.

- <u>Communication Specialists</u>. IDOC will use specialists who know how to test communication skills of deaf and hard of hearing inmates. These specialists will decide what IDOC should do to help the inmate communicate in prison. For example, the specialist will decide when the inmate needs accommodations like a hearing aid or a sign language interpreter.

- <u>Communication Plan and Providing Accommodations</u>. What the "communication specialist" finds is the best way for you to talk with people may become your "ADA Communication Plan" if it is possible.

- <u>Hearing Aids</u>. IDOC may give you one or two hearing aids if the audiologist says you need them. If you need new batteries, IDOC must give them to you soon without a long wait. Also, if your hearing aid breaks, the IDOC must send it for repair without a long wait.

- <u>Sign Language Interpreters</u>. If you communicate in American Sign Language (ASL), then IDOC needs to provide you with sign language interpreters for important programs, such as: most doctor and counselor appointments, disciplinary investigations and hearings, classes, work programs that include talking with others, and others.

- <u>Video Phones, TTYs, and Amplified Phones</u>. Every Illinois prison with a deaf or hard of hearing inmate must have at least one videophone (VP), two TTYs, and two amplified telephones.

- <u>Alerts for Fires and Other Things</u>. Every Illinois prison that has a deaf or hard of hearing inmate must have a safe way to notify you about fires, emergencies, evacuations, meals, showers, yard time, your doctor or counselor appointments, and that your visitors are here to see you.

- <u>VRI.</u> The Illinois prisons must also give you Video Remote Interpreting (VRI) for doctor appointments when no sign language interpreter can come to the prison for your meeting with the doctor.

- <u>Information about Prison Rules.</u> For every new inmate who arrives at a prison from court, the Illinois prisons must give those inmates information and rules about what they can or cannot do while in prison. Illinois prisons must give you this information in ASL or with captioning on the videos. Illinois prisons must also meet with you to explain the rules to make sure you understand. Illinois prisons must also explain your rights to you.

- <u>Work.</u> All deaf and hard of hearing inmates can ask to work, and Illinois prisons must give you the same chance to work as any other inmate.

- <u>Hand Restraint.</u> If your hands are handcuffed or restrained, you cannot talk in ASL. Illinois prisons may  remove your handcuffs or hand restraints to let you talk in ASL.

- <u>ID Card.</u> You can ask for an ID card that shows you are deaf or hard of hearing. You can also ask for an ID card that does not say you are deaf or hard of hearing.

- <u>Where You Will Go.</u> You can ask to be in a prison with other deaf or hard of hearing inmates. IDOC can decide which prison you go to, but will consider your request. IDOC cannot move you to a prison with higher security just because you are deaf or hard of hearing.

- <u>Monitoring, Enforcement, Attorneys' Fees</u>. To make sure you are protected, the judge and the lawyers who work for you will watch the IDOC to make sure you get your rights and services. If the lawyers think that IDOC has not given you your rights and services, then the lawyers will ask the judge for help. The lawyers worked for over 8 years to get IDOC to

agree to give these rights and services to deaf and hard of hearing inmates. The judge will order IDOC to pay $1,500,000.00 to the lawyers for their work and the costs they have spent over the last 8 years, and to watch the IDOC for 4 more years. You do not have to pay any money for this case.

## CAN I DISAGREE?

If you do not like what the agreement, and you want something different, you can tell the lawyers and the judge by sending an "Objection." If you want to do this, then you need to write a letter (no more than 15 pages) saying why you do not like this agreement and mail the letter to: **Holmes v. Baldwin Objections,** c/o Equip for Equality, 20 North Michigan Avenue, Suite 300, Chicago, IL 60602. If you want to send this Objection, you need to make sure the lawyers get your Objection by **June 25, 2018.**

The judge will consider all objections and then decide yes or no for this agreement. The judge will have a hearing on July 26, 2018 at 10:30 A.M., in Courtroom 2568 of the Everett McKinley Dirksen United States Courthouse at 219 South Dearborn Street, Chicago, IL.

## HOW DO I GET MORE INFORMATION?

If you want more information, you can contact the lawyers who work for the deaf and hard of hearing inmates. They can answer your questions. They also can send you a copy of the Settlement Agreement. You can write to any of these lawyers:

- Robert Michels, Winston & Strawn LLP, 35 W. Wacker Drive, Chicago, IL 60601
- Alan Mills, Uptown People's Law Center, 4413 N. Sheridan, Chicago, IL 60640
- Barry Taylor, Equip for Equality, 20 N. Michigan Ave., Suite 300, Chicago, IL 60602

# Exhibit 98

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| RALPH HOLMES, *et al.,* on behalf of themselves and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) Case No. 11 C 2961 ) |
| v. | ) Honorable Marvin E. Aspen ) |
| JOHN BALDWIN, Acting Director of Illinois Department of Corrections; *et al.*, | ) Magistrate Judge Young B. Kim ) ) |
| Defendants. | ) |

## ORDER GRANTING FINAL APPROVAL TO
## CLASS SETTLEMENT AND OVERRULING OBJECTIONS

This Court, having read and reviewed the Parties' Joint Motion for Final Approval of Class Settlement and in Opposition to Objections ("Motion"), supporting memorandum of law, Stipulation of Settlement ("Settlement"), and any objections or comments submitted to the Court, hereby approves the Settlement as follows:

1.      On April 30, 2018, the Court preliminary approved the Settlement, and approved the class notice plan. *See* Dkt. No 438.

2.      Per the class notice plan, any member of the class that wished to file an objection was required to do so on or before June 25, 2018.

3.      The Court has considered all submitted objections and comments to the Settlement.

4.      The Court held a fairness hearing regarding final approval of the proposed Settlement on July 26, 2018.

5.      After a full and comprehensive review of the Motion, supporting memorandum, the Settlement, and any objections/comments raised, this Court finds that the Settlement is fair, reasonable, adequate, and in the best interests of the class.

6.      Further, in accordance with the terms of the Settlement and the Prison Litigation Reform Act, the Court finds that the provisions of the Settlement are narrowly drawn, extend no further than necessary to address the violations of federal rights alleged by Plaintiffs, are the least intrusive means necessary to address those alleged violations, and are not intended to have an adverse impact on public safety or the operation of a criminal justice system.

Accordingly, this Court grants the Parties' Joint Motion for Final Approval of the Class Settlement, approving the Settlement and overruling any objections.

ENTERED this 26th day of July 2018.

_____
Marvin E. Aspen
United States District Judge

# Exhibit 99

## SETTLEMENT AGREEMENT BETWEEN DEFENDANTS THE COMMONWEALTH OF KENTUCKY ET AL. AND PLAINTIFFS OSCAR ADAMS AND MICHAEL KNIGHTS

### I.    DEFINITIONS

1.  "ADA" means the Americans with Disabilities Act, codified at 42 U.S.C. § 12101 et seq., as amended by the ADA Amendments Act of 2008 (P.L. 110-325).

2.  "Auxiliary Aids and Services" include, but are not limited to, "Qualified Interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as hearing aids, computer-aided transcription services, assistive listening systems, closed caption decoders, open and closed captioning, "TDDs" or "TTYs" as defined below, videotext displays, written materials (*see* 28 C.F.R. § 35.104); as well as Videophones, access to telephone relay services, visual alert or alarm systems, and bed shakers.

3.  "Deaf Inmates" means Inmates who are unable to hear well enough to rely on their hearing as a means of processing information, who rely on Auxiliary Aids and Services to Effectively Communicate and who qualify as individuals with disabilities under the ADA, including deaf, hard of hearing, or hearing impaired persons. *See* 42 U.S.C. § 12102(4). .

4.  "Direct Threat" means a significant risk to the health or safety of one or more Deaf Inmates or others that cannot be reduced or eliminated by reasonable accommodation. A finding of Direct Threat must be based on and supported by objective evidence.

5.  "Effective Communication" and "Effectively Communicate" means communication with Deaf Inmates that is substantially as effective as communication with the general Inmate population (*see* 28 C.F.R. § 35.160(a)) and will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Interpreters. Effective Communication affords Deaf Inmates an opportunity to participate in, and enjoy the benefits of, the KDOC's services, programs, or activities in a way that is substantially equal to the opportunity provided to a similarly situated non-Deaf Inmate. In determining what form of Auxiliary Aids and Services is necessary, primary consideration shall be given to the request of the Deaf Inmate for such Auxiliary Aids and Services (*see* 28 C.F.R. § 160(b)(2)).

6.  "Effective Date" means thirty (30) days after this Agreement is filed with the Court.

7.  "Inmate" means any person in the custody of the KDOC.

8.  "KCDHH" means the Kentucky Commission on the Deaf and Hard of Hearing.

9. "KDOC" means Kentucky Department of Corrections.

10. "KDOC program" means any program or activity, or aid, benefit, or service as defined by the ADA and Section 504 (*see* 28 C.F.R. § 35.130, § 41.51) available to Inmates of KDOC for which the KDOC does more than only provide physical space at its facilities, including but not limited to, programs, activities, aids, benefits, or services mandated by law, qualifying for educational or early release credits, and/or ordered as part of an Inmate's sentence.

11. "KDOC employees," "KDOC staff," and "KDOC personnel" each and collectively include all employees, contractors, agents, and other staff of the KDOC whose job responsibilities place them on a regular basis in contact with Deaf Inmates, and the supervisors of those employees, contractors, agents, or other staff.

12. "KDOC Adult Institution" means any facility owned or operated by the KDOC for the care and custody Inmates, including but not limited to Bell Country Forestry Camp, Blackburn Correctional Complex, Eastern Kentucky Correctional Complex, Green River Correctional Complex, Kentucky Correctional Institute for Women, Kentucky State Penitentiary, Kentucky State Reformatory, Little Sandy Correctional Complex, Luther Luckett Correctional Complex, Northpoint Training Center, Roederer Correctional Complex, and Western Kentucky Correctional Complex.

13. "Off-site Medical Care" means medical care that is provided at a location not owned or operated by the KDOC.

14. "On-site Medical Care" means medical care that is provided at a KDOC facility, including medical care provided by third parties in facilities owned or operated by the KDOC.

15. "Parole hearing" means any hearing or meeting during which an Inmate is being offered the opportunity to be released from KDOC custody on parole.

16. "Plaintiffs" means, for purposes of this Agreement, Oscar Adams (inmate #243676) and Michael Knights (inmate #233021).

17. "Plaintiffs' Counsel" means attorneys-of-record for Plaintiffs in *Oscar Adams and Michael Knights, et al., v. Commonwealth of Kentucky, et al.*, Case No. 3:14-cv-00001 (E.D. Ky.) at the time this Agreement is signed.

18. "Qualified Interpreter" means a person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with an individual Deaf Inmate using any necessary specialized vocabulary. *See* 28 C.F.R. §35.104. A Qualified Interpreter could include an ASL interpreter, a sign language interpreter using more English-based signs, an oral interpreter, a cued speech transliterator or a tactile interpreter for a Deaf Inmate who is also blind. For sign language interpreters, a

Qualified Interpreter is one who holds current, valid certifications and licensure by the Kentucky Board of Interpreters for the Deaf and Hard of Hearing.

A Qualified Interpreter may be provided by the KDOC either in person, or via Video Remote Interpreting, videoconferencing or other similar means that provide Effective Communication.

19. "Section 504" means Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 et seq. (2014).

20. "Settlement Monitor" means Margo Schlanger, whose *curriculum vitae* is attached as Exhibit 1.

21. "TTYs" or "TDDs" means teletypewriters or telecommunications devices for the Deaf, which are devices used with a telephone to communicate with persons who are Deaf by typing and reading communications.

22. "Video Remote Interpreting" or "VRI" means a video-telecommunication interpreting service, which uses Qualified Interpreters and is delivered over a high-speed Internet connection. *See* 28 C.F.R. § 35.160(d).

23. "Videophone" means a telephone with a camera and screen for visual, real-time communications. The term Videophone as used in this Agreement is limited to Videophones intended for the use by Deaf Inmates within the custody of the KDOC, and does not include Videophones within KDOC Adult Institutions intended for the use of the general Inmate population.

## II.    GENERAL POLICIES

### A.    Non-discrimination Based on Disability

The KDOC will ensure that Deaf Inmates have full and equal access to and enjoyment of all services, privileges, facilities, advantages, and accommodations available to similarly situated non-Deaf Inmates. The KDOC shall provide Deaf Inmates with access to services, privileges, facilities, advantages, and accommodations substantially equivalent to those offered to similarly situated non-Deaf Inmates. The KDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf Inmates and therefore may not be able to provide such Deaf Inmates full and equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations. The KDOC will promptly notify the Settlement Monitor whenever any such determination is made and explain the reasoning in support of such determination.

### B.    ADA Coordinator

Within thirty (30) days after the Effective Date of this Agreement, the KDOC will assign a staff member at each KDOC Adult Institution the title, duties, and responsibilities of ADA Coordinator. The KDOC will maintain the ADA Coordinator position at each KDOC Adult

Institution as required by law. The ADA Coordinator responsibilities will be a part of the official duties assigned to the person in this role. The ADA Coordinator shall be trained on the requirements of federal and state law regarding the contents of this Agreement and the KDOC's obligations to provide full and equal access to, and enjoyment of, its services, privileges, facilities, advantages, and accommodations to Deaf Inmates.

Within thirty (30) days of the Effective Date of this Agreement, the KDOC will notify the Settlement Monitor of the identity of each KDOC employee assigned the title, duties and responsibilities of ADA Coordinator. The name and contact information for each ADA Coordinator will be displayed and regularly updated on the KDOC's website. The name and contact information of each KDOC Adult Institution's ADA Coordinator will be communicated to all Deaf Inmates incarcerated in each respective KDOC Adult Institution, and will also be prominently posted in a secure area in any housing unit in which Deaf Inmates are held.

ADA Coordinators will assist with providing, coordinating, and overseeing Auxiliary Aids and Services for Deaf Inmates and for implementing this Agreement. The ADA Coordinators will be provided with and responsible for knowing the contents of this Agreement, and will assist with implementing this Agreement. The ADA Coordinators will be available to assist with various aspects of accommodating Deaf Inmates. In such situations, ADA Coordinators will ensure Effective Communication for the Deaf Inmates.

## III. INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT

### A. General Policy

The KDOC will provide Deaf Inmates at initial intake, assessment, and classification with Effective Communication. The purpose is to facilitate communication between the Deaf Inmate and KDOC personnel (or other persons) during medical, psychological, and educational testing and evaluation, as well as to provide an explanation of prison policies and procedures, including Inmate discipline, grievances, and how to utilize the TTY, Videophone and other Auxiliary Aids and Services.

As of the date of this Agreement, initial intake, assessment, and classification for male Inmates occurs at Roederer Correctional Complex (RCC) and for female Inmates at the Kentucky Correctional Institution for Women (KCIW).

### B. Hearing Assessment

As part of the initial intake, assessment, and classification, medical staff will assess and, if necessary, test all persons who may be a Deaf Inmate for Deafness. If medical staff determines that an Inmate is Deaf, medical staff will note the disability in the Inmate's institutional file, and will promptly notify the appropriate ADA Coordinator. Any Deaf Inmate who was not assessed at the initial intake, assessment, and classification will be assessed at the annual classification review.

4

### C. Auxiliary Aids and Services Assessment

After medical staff determine that an Inmate is Deaf, the KDOC will presume that Auxiliary Aids and Services in the form of Qualified Interpreters, visual notifications, telecommunication devices, and other aids and services set forth in this Agreement are necessary to ensure Effective Communication and substantially equal services, privileges, facilities, advantages, and accommodations.

If any Deaf Inmate indicates that he or she does not require any or all of the Auxiliary Aids and Services set forth in this Agreement, he or she will sign a Waiver of Auxiliary Aids and Services and that document will be kept in the Inmate's institutional file.

If an Inmate is not found to have a hearing impairment at his or her initial intake, assessment, and classification, initially refuses, or does not request Auxiliary Aids and Services, but later believes that Auxiliary Aids and Services are necessary to ensure Effective Communication, he or she will fill out a Request for Auxiliary Aids and Services Form. KDOC will provide the Inmate who was initially not found to have a hearing impairment with a hearing assessment if so ordered by medical staff. If that individual is found to be Deaf, KDOC will follow the procedures set forth in this section.

### D. Ensuring Staff Awareness Through Identification Cards

The KDOC will take appropriate steps to ensure that all KDOC personnel having regular contact with any Deaf Inmate are made aware of such Inmate's need for Auxiliary Aids and Services so that Effective Communication with, and the safety of, the Deaf Inmate will be ensured. Upon identifying an Inmate as Deaf during initial intake, assessment, and classification, the Deaf Inmate will receive a distinct identification (ID) card that clearly identifies him or her as a Deaf Inmate. The ID card will signify to the KDOC personnel that the Inmate is Deaf, may not respond to verbal commands, and may require Auxiliary Aids and Services. If any KDOC staff takes any Deaf Inmate's ID card, the Deaf Inmate will be given another official indicator of his or her Deaf status.

All KDOC staff having regular contact with any Deaf Inmate will be trained on the meaning of the distinct ID cards.

The KDOC will post at the entrance to all KDOC Adult Institutions housing Deaf Inmates a notice clearly stating that the KDOC Adult Institution houses Deaf Inmates and that the Deaf Inmates carry an ID card or other official indicator with them. The notice will include a picture of the ID card and other official indicator carried by Deaf Inmates. The Notice will also be posted outside each housing unit where Deaf Inmates are held.

If any Deaf Inmate indicates that he or she does not wish to wear an ID card identifying him or her as Deaf as set forth in this Agreement, he or she will sign a Waiver of Deaf Inmate ID Card and that document will be kept in the Inmate's institutional file. If any Deaf Inmate signs a Waiver of Deaf Inmate ID Card but later requests to wear an ID card identifying him or her as Deaf as set forth in this Agreement, he or she will promptly be provided an opportunity to fill out

a Request for Deaf Inmate ID Card form.  The KDOC will then promptly provide the Inmate with a Deaf Inmate ID card and update the Deaf Inmate's institutional file.

### E.    Interpretation of Materials

The KDOC will provide the Deaf Inmate materials it provides to all Inmates.  In providing these materials, the KDOC agrees to Effectively Communicate with the Deaf Inmate.  *See, e.g.*, 28 CFR 35.160(b)(2).  At the request of the Deaf Inmate, the KDOC will provide that Deaf Inmate with a meaningful opportunity to meet with a KDOC staff member and a Qualified Interpreter to ask any questions regarding the written or interpreted materials.

### F.    Creation and Interpretation of Rights Materials

Within ninety (90) days of the Effective Date of this Agreement, the KDOC will provide each Deaf Inmate with materials providing information about the Auxiliary Aids and Services available to Deaf Inmates and instructions for how to obtain, request, or use those Auxiliary Aids and Services.  The KDOC will create these materials using language designed to be accessible to each Deaf Inmate.  The KDOC will provide these materials to Deaf Inmates with the orientation materials provided to all other Inmates at initial intake, assessment, and classification.

In providing these materials, the KDOC agrees to Effectively Communicate with the Deaf Inmate.  *See, e.g.*, 28 CFR 35.160(b)(2).  At the request of the Deaf Inmate, the KDOC will provide that Deaf Inmate with a meaningful opportunity to meet with a KDOC staff member and a Qualified Interpreter to ask any questions regarding the written or interpreted materials.

## IV.    HOUSING

### A.    General Policy

The KDOC has the discretion to house Deaf Inmates at whatever KDOC Adult Institution it deems appropriate.  *See, e.g.*, KY Corrections Policy and Procedure 18.7.

Wherever a Deaf Inmate is housed, that Deaf Inmate retains all rights as required by this Agreement, the U.S. Constitution, the ADA, Section 504, and Kentucky laws, along with any other applicable federal and state laws, and this Agreement.

### B.    Schedule of Accommodations

Within ninety (90) days of the Effective Date of this Agreement, KDOC personnel at those KDOC Adult Institutions where Deaf Inmates are housed shall provide each Deaf Inmate with a schedule showing when Qualified Interpreters and/or other Auxiliary Aids and Services are available.  When the schedule of accommodations changes, including when a Qualified Interpreter will be available, an updated schedule of accommodations will be given to all Deaf Inmates.

## V.    PROVISION OF AUXILIARY AIDS AND SERVICES

### A.    General Policy

In order to ensure substantial equality for Deaf Inmates, the KDOC will provide appropriate Auxiliary Aids and Services, as required by this Agreement, the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws.  This substantial equality will extend to include KDOC programs for or to Deaf Inmates provided by third party vendors, contractors, or state-funded entities, such as community colleges.

Appropriate Auxiliary Aids and Services, including Qualified Interpreters, will be made available so that Deaf Inmates may have an equal opportunity to participate in all services, privileges, and programs offered to other similarly situated Inmates in the KDOC's custody.  These services, privileges, and programs will include, but not be limited to: orientation; medical evaluations; On-site Medical Care and healthcare appointments; classification and transfer hearings; grievance, disciplinary, and Parole hearings; and rehabilitative, educational, work, or transitional KDOC programs offered to other similarly situated Inmates in the KDOC's custody.

In those instances where the KDOC permits volunteers to provide activities (religious or otherwise)—including programs, services, or meetings—to Inmates in KDOC Adult Institutions where Deaf Inmates are housed, the KDOC will allow the volunteer organization or individual to bring a Qualified Interpreter, subject to the KDOC Adult Institution's security requirements, and will work with the volunteer organization or individual in an effort to have a Qualified Interpreter at the volunteer-provided activities.  Such an accommodation must be initiated by request from the Deaf Inmate to the volunteer organization or individual.  The responsibility for finding the interpreter will not rest with the KDOC, and proper notice allowing the KDOC to conduct appropriate security clearances must be provided.  To the extent the KDOC provides, now or in the future, any religious activities at facilities housing Deaf Inmates, the KDOC shall provide a Qualified Interpreter at such activities upon the request of any Deaf Inmate.

The KDOC retains the discretion to determine that certain activities present a Direct Threat of injury or death to Deaf Inmates and may therefore choose not to provide such Deaf Inmates substantially equal enjoyment of some of its services, privileges, facilities, advantages, and accommodations.  The KDOC will promptly notify the Settlement Monitor whenever any such determination is made and explain the reasoning in support of such determination.

The KDOC will provide instructions for the use of all Auxiliary Aids and Services to ensure Deaf Inmates' full use and enjoyment of the Auxiliary Aids and Services.

### B.    Medical Devices

All Auxiliary Aids and Services required by this Agreement, the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws, which are deemed medically necessary, will be provided promptly upon request, free of charge, to Deaf Inmates subject to a co-payment for that medical device, just as

non-Deaf Inmates are charged a co-payment for other medical appliances or devices. This co-pay shall not apply, however, to hearing aid batteries or for any Deaf Inmate who is deemed indigent pursuant to Kentucky Corrections Policy and Procedure 15.7.

**C.    Maintenance of Auxiliary Aids and Services**

The KDOC shall maintain all Auxiliary Aids and Services in its custody in good working condition at all times.

## VI.    QUALIFIED SIGN LANGUAGE INTERPRETERS

**A.    General Policy**

The KDOC will provide Qualified Interpreters as required by this Agreement, the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws. The KDOC agrees that Deaf Inmates in need of interpreter services will receive a Qualified Interpreter able to facilitate Effective Communication with that particular Deaf Inmate. The KDOC shall provide an in-person Qualified Interpreter at KDOC Adult Institutions where Deaf Inmates are incarcerated in the following circumstances:

- communications concerning medical care and attention, including dental, vision, audiological, and mental health care;

- disciplinary hearings in which the Deaf Inmate may be a suspect of or charged with a rule infraction;

- transfer and classification processes that impact on the Deaf Inmate's status;

- transitional programming;

- rehabilitative programming, including, but not limited to, Alcoholics Anonymous (AA) and Narcotics Anonymous (NA); and

- educational programming.

The KDOC shall also provide an in-person Qualified Interpreter at KDOC Adult Institutions where Deaf Inmates are incarcerated as circumstances warrant. The KDOC will be responsible for scheduling and overseeing the provision of Qualified Interpreters.

When a Deaf Inmate is scheduled to appear at a Parole hearing, the appropriate ADA Coordinator will notify the Kentucky Parole Board of the Deaf Inmate's need for, and the Kentucky Parole Board's duty to provide, Auxiliary Aids and Services for Effective Communication. This notice shall be given no later than seven (7) days before the Deaf Inmate's scheduled Parole hearing.  In the event that the Deaf Inmate will be physically present at a KDOC Adult Institution for the Parole hearing, the KDOC will work with the Kentucky Parole

Board to ensure that any appointed Qualified Interpreter obtains security clearances in a timely manner.

**B.     Other Means of Communication**

KDOC employees will communicate with Deaf Inmates for such purposes, and to the same extent, as they would communicate with non-Deaf Inmates using all available means of communication. This provision in no way lessens the KDOC's obligation to provide Qualified Interpreters in certain situations and in a timely manner.

**C.     On-site Medical Care**

1.      General Policy

The KDOC will provide Effective Communication for all scheduled appointments between Deaf Inmates and medical personnel at KDOC facilities, including, but not limited to, review of medical history, medical appointments, follow up meetings or appointments, and treatment meetings. The parties agree that for many Deaf Inmates, a Qualified Interpreter may be a necessary means of providing Effective Communication in these circumstances.

2.      Informing Appropriate Medical Staff

The KDOC will ensure that all medical staff are made aware of an Inmate's Deafness. For each Deaf Inmate, the medical staff will note, in bold marking, the Deaf Inmate's disability on the medical file cover and in the Deaf Inmate's medical file.

3.      Scheduling Medical Appointments with Qualified Interpreters

The KDOC will provide Deaf Inmates with the ability to request Auxiliary Aids and Services to ensure Effective Communication at medical appointments. The KDOC will provide space on any forms used to request medical appointments for Deaf Inmates to request Auxiliary Aids and Services. Appointments for Deaf Inmates requiring Auxiliary Aids and Services will be scheduled within the same time period from the initial request as those for similarly situated non-Deaf Inmates.

4.      Emergency Events

Within ninety (90) days of the Effective Date of this Agreement, the KDOC will provide a Qualified Interpreter via VRI service for use in unscheduled medical emergencies. If VRI services are not appropriate in the situation, KDOC personnel will work in conjunction with medical staff to attempt to secure an in-person Qualified Interpreter as soon as possible. Lifesaving medical care should never be delayed because no interpretation services are available.

### D. Off-site Medical Care

As early as practicable, the KDOC will inform all off-site medical providers that a Deaf Inmate requiring a Qualified Interpreter or other Auxiliary Aid or Service will be seeking medical care from those off-site medical providers at a particular date and time.

In the case of an emergency, the KDOC will, as soon as possible, inform an off-site medical provider that a Deaf Inmate requiring a Qualified Interpreter or other Auxiliary Aid or Service is being transported to the off-site medical provider. Notification will include the Deaf Inmate's estimated time of arrival.

### E. Educational, Vocational, and Rehabilitative Programming

The KDOC shall provide appropriate Auxiliary Aids and Services for all KDOC programs, which are offered at KDOC Adult Institutions and which Deaf Inmates are qualified for, admitted into, or in which Deaf Inmates are actively participating. The following appropriate Auxiliary Aids and Services will be provided:

#### 1. Educational Programs

The KDOC will provide Deaf Inmates with written materials and open- or closed-captioned education materials where available. In addition, the KDOC will provide Effective Communication for educational KDOC program classes. The educational program classes include, without limitation, literacy, adult basic education, GED preparatory, and technical education and certification classes. In determining what form of Auxiliary Aids and Services are necessary, the KDOC shall give primary consideration to the request of the Deaf Inmate for such Auxiliary Aids and Services (*see* 28 C.F.R. § 160(b)(2)).

#### 2. Vocational/Work Programs

The KDOC will provide Deaf Inmates with written materials and open- or closed-captioned vocational/work materials where available. In addition, and as necessary, the KDOC will provide Effective Communication for vocational/work KDOC programs. In determining what form of Auxiliary Aids and Services is necessary, the KDOC shall give primary consideration to the request of the Deaf Inmate for such Auxiliary Aids and Services (*see* 28 C.F.R. § 160(b)(2)).

#### 3. KDOC Rehabilitative, Counseling, Therapeutic, Substance Abuse, and Evidence-Based Programs

The KDOC will provide Deaf Inmates with written materials and open- or closed-captioned materials where available. In addition, and as necessary, the KDOC will provide Effective Communication for rehabilitative, counseling, therapeutic, substance abuse, and evidence-based KDOC programs. In determining what form of Auxiliary Aids and Services is necessary, the KDOC shall give primary consideration to the request of the Deaf Inmate for such Auxiliary Aids and Services (*see* 28 C.F.R. § 160(b)(2)). The KDOC will provide Qualified Interpreters for Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) programs.

### F.   Work Assignments

The KDOC will provide Deaf Inmates opportunities for institutional work assignments that are consistent with the opportunities for the same assignments given to similarly situated non-Deaf Inmates. The KDOC retains the discretion to determine that certain work assignments present a Direct Threat of injury or death to a Deaf Inmate or others and may therefore choose not to provide the Deaf Inmate a substantially equal opportunity to those work assignments. The KDOC will promptly notify the Settlement Monitor whenever any such determination is made and explain the reasoning in support of such determination.

### G.   Religious Services

The KDOC shall encourage outside volunteers providing religious services to provide Effective Communication for Deaf Inmates as long as the volunteer meets the same security requirements that are imposed on all other outside volunteers.

No Deaf Inmate will be required to attend a religious service where a Qualified Interpreter is not provided in order to receive any religious meal, diet, or otherwise offered religious accommodation.

To the extent that the KDOC provides any religious services, now or in the future, the KDOC shall provide a Qualified Interpreter.

### H.   Transfer and Classification Matters

The KDOC will provide a Qualified Interpreter for any hearings or meetings relating to a Deaf Inmate's transfer to another facility, change in security classification, or any other classification hearing involving the exchange of information between the Deaf Inmate and the KDOC personnel that could affect the Deaf Inmate's status.

### I.   Transitional Programming – Post-Release Supervision (Including Parole)

Upon request, the KDOC will provide appropriate Auxiliary Aids and Services, which may include Qualified Interpreters, for Deaf Inmates under post-release supervision to Effectively Communicate with the individual supervising their post-release supervision.

### J.   Additional Communications

The KDOC will provide Effective Communication, which may include Qualified Interpreters, for any significant communications between Deaf Inmates and KDOC staff that is not specifically discussed in this Agreement. A significant communication includes any communication for which the Deaf Inmate requests an interpreter, subject to approval by the ADA Coordinator, the Warden, and/or the Warden's designee.

11

## VII.   DISCIPLINARY MATTERS

### A.    Qualified Interpreters For Disciplinary Proceedings

The KDOC must provide Deaf Inmates with a Qualified Interpreter in any disciplinary proceeding in which a Deaf Inmate is suspected of, charged with, or a witness to, a disciplinary infraction, including those proceedings carried out under Chapter 15 of the Kentucky Corrections Policy and Procedure and any other disciplinary policies and procedures now in force or subsequently adopted by the KDOC.   A Qualified Interpreter must be available to a Deaf Inmate at the following stages of the above-described disciplinary proceedings:

- staff investigations involving the exchange of information between a Deaf Inmate and KDOC personnel, prior to filing a disciplinary report or equivalent;

- investigative interviews that involve the exchange of information between a Deaf Inmate and KDOC personnel (such as when an adverse party is interviewed);

- during any part of the preparation of the disciplinary report that involves the exchange of information between a Deaf Inmate and KDOC personnel;

- during any part of the shift supervisor's review of the disciplinary report that involves the exchange of information between a Deaf Inmate and KDOC personnel;

- during any part of the investigator's review of the disciplinary report that involves the exchange of information between a Deaf Inmate and KDOC personnel;

- giving Miranda warnings to a Deaf Inmate;

- advising a Deaf Inmate of his or her right to consult with an assigned legal aide;

- advising a Deaf Inmate of the anticipated date, time, and place of hearing; and

- during any part of the hearing, or re-hearing, before the Adjustment Committee, Adjustment Officer or Unit Hearing Officer that involves the exchange of information between a Deaf Inmate and KDOC personnel.

Inmate or staff advisors will be provided and accessible to Deaf Inmates who are suspected of, charged with, or witnesses to a disciplinary infraction, on the same terms as they are provided to non-Deaf Inmates. To the extent that a Deaf Inmate has access to his or her advisor, a Qualified Interpreter shall be made available to the Deaf Inmate for any exchange of information between the Deaf Inmate and his or her advisor.

### B. Miscellaneous

If any Deaf Inmate is a witness at a disciplinary hearing, the KDOC will provide a Qualified Interpreter at the hearing.

The KDOC must hold disciplinary hearings for Deaf Inmates within the same time frame as it holds disciplinary hearings for non-Deaf Inmates.

Nothing in this Agreement precludes any Deaf Inmate who is suspected of or charged with a disciplinary infraction from voluntarily waiving his or her right to a Qualified Interpreter and to proceed through any stage of a disciplinary proceeding without the benefits of a Qualified Interpreter. If, as of the Effective Date of this Agreement, a Deaf Inmate is being punished or is scheduled to be punished for a disciplinary infraction as the result of a hearing in which he or she did not waive his or her right to a Qualified Interpreter, then the disciplinary hearing must be re-heard at a time that a Qualified Interpreter can be present.

## VIII. NON-AUDITORY ALERT NOTIFICATIONS

### A. General Policy

Deaf Inmates incarcerated at KDOC facilities should not miss announcements, alarms, or any other information audibly conveyed from KDOC staff to the general Inmate population solely because of their disability.

### B. Relaying Information

The KDOC shall provide an effective non-auditory alert system that will notify Deaf Inmates of both prison-wide events (including but not limited to announcements, visitations, and roll-calls) and events specific to Deaf Inmates. The non-auditory alert system must be capable of effectively alerting Deaf Inmates of such events in real time.

In addition, the KDOC will continue to publish the institution schedule in the handbook that every Inmate receives and to post promptly any schedule changes, which are done by memorandum from the Warden, in all dormitories, the library, and the gym at each KDOC Adult Institution in which a Deaf Inmate is housed. Further, the KDOC will provide all medically necessary hearing aids and assisting devices, including but not limited to, bed shakers.

The KDOC has the discretion as to which type of non-auditory alerts it shall employ and to change that system as it deems necessary. Nonetheless, the KDOC will promptly advise the Settlement Monitor and the KCDHH of all non-auditory alert systems that the KDOC is considering, and will consult with the Settlement Monitor and the KCDHH in determining whether such devices are acceptable for the stated purpose.

### C.  Non-Auditory Alarms and Emergency Evacuation

The KDOC will provide Deaf Inmates with an effective non-auditory alert system that will advise them of an emergency evacuation or other emergency. Such non-auditory alert systems must be sufficient to effectively notify Deaf Inmates of emergencies in real-time and can include flashing strobe lights and bed shakers. The KDOC has the discretion as to which type of non-auditory alerts it shall employ and to change that system as it deems necessary. Nonetheless, the KDOC will promptly advise the Settlement Monitor and the KCDHH of the non-auditory alert systems that the KDOC is considering, and will consult with the Settlement Monitor and the KCDHH in determining whether such systems are acceptable for the stated purpose.

KDOC personnel shall be responsible for the evacuation or safe relocation of Deaf Inmates during an emergency. Therefore, during emergencies, KDOC employees will personally and Effectively Communicate adequate information about the emergency to Deaf Inmates.

## IX.  TELECOMMUNICATIONS

### A.  General Policy

The KDOC will provide Deaf Inmates with access to telecommunication devices that enable them to have communication with people outside of the KDOC and that are substantially equivalent—in terms of the amount and quality of the information conveyed—to the communications that non-Deaf Inmates have with people outside of the KDOC using traditional telecommunication devices such as telephones.

### B.  Monitoring Communications

The KDOC may only provide for the monitoring of communications between Deaf Inmates and individuals outside of the KDOC to the same extent and with the same discretion applied to the monitoring of communications between non-Deaf Inmates and those outside of the KDOC.

### C.  Additional Time for Communication

The KDOC will implement a policy that allows Deaf Inmates at least twice as many minutes to complete a Videophone call, and at least three times as many minutes to complete a TTY call, as the number of minutes afforded to other non-Deaf Inmates to make calls using traditional telecommunication devices such as telephones. In the event the KDOC determines this usage arrangement results in less than equitable access to telephones and Videophones for non-Deaf Inmates and Deaf Inmates, after considering the needs and abilities of Deaf and non-Deaf Inmates, the KDOC may adjust the ratio of time provided for Videophone calls and TTY calls. The KDOC will document this determination, including the evidence and reasons in support thereof. The KDOC will promptly notify the Settlement Monitor whenever any such determination is made, and will explain the reasoning in support of such determination.

### D. Technology KDOC Will Provide

The KDOC will make the following communications technologies available at KDCO Adult Institutions where Deaf Inmates are incarcerated to facilitate communication between Deaf Inmates and people outside of KDOC facilities. This list of technological equipment is not exhaustive. The KDOC will keep abreast of evolving technology and will consider adding additional equipment to reflect technological advances, as it deems appropriate or as required by applicable federal and state law. KDOC will provide a list of available communications equipment to Deaf Inmates upon their arrival at the KDOC Adult Institutions in which they are housed.

#### 1. TTY or TDD

The parties acknowledge that there may be reasonable concerns over the theft and destruction of the TTY/TDD device(s), and that the TTY/TDD device(s) therefore must be maintained in a secured location when not in use. The parties also acknowledge that access to the TTY/TDD device(s) will be made available at times that the KDOC will designate. Nonetheless, for every KDOC Adult Institution at which any Deaf Inmate is incarcerated, in no event will TTY/TDD access for Deaf Inmates be less than equal to the access non-Deaf Inmates have to conventional telephones, except to the extent that Deaf Inmates must request access to the otherwise secured TTY/TDD device(s). A reasonable request by a Deaf Inmate to access the TTY/TDD device(s) will be granted. TTY/TDDs will be located in areas substantially as accessible to Deaf Inmates as conventional telephones are accessible to non-Deaf Inmates. TTY/TDDs will be available for Deaf Inmate use during the same days and hours as conventional telephones. At each KDOC Adult Institution where any Deaf Inmate is incarcerated, the KDOC will ensure that an alternate TTY or TDD unit is available for use when the regular TTY or TDD is broken or otherwise unavailable.

#### 2. Relay Services

For every KDOC Adult Institution at which any Deaf Inmate is incarcerated, the KDOC will enable all TTYs and TDDs to access publicly available relay service phone numbers such as 711 and 1-800 numbers. Deaf Inmates will not be charged any more than similarly situated non-Deaf Inmates for the use of relay services.

#### 3. Videophones

Within sixty (60) days of the Effective Date of this Agreement, Videophones shall be installed and accessible to Deaf Inmates in any KDOC Adult Institution that houses Deaf Inmates. Access to the Videophone will be made available at times that the KDOC will designate, but in no event will Videophone access for Deaf Inmates be less than equal to the access non-Deaf Inmates have to conventional telephones. Videophones will be located in areas as accessible to Deaf Inmates as conventional telephones are accessible to non-Deaf Inmates. Videophone will be available during the same days and hours as conventional telephones and will not require permission for use to the same extent that conventional telephones do not require permission for use. Deaf Inmates will not be charged for the use of Videophones.

Videophones will allow voice carry-over features.

### E. Responsibility for Maintaining Equipment and Training Staff

The KDOC will ensure that the technology used to permit communication between Deaf Inmates and people outside of KDOC Adult Institutions is in good working order. Further, the KDOC will ensure that all equipment under the KDOC's control that is used to accommodate Deaf Inmates is kept in good working order. KDOC staff shall attempt to resolve complaints about any malfunctioning equipment within a reasonable time of receiving that complaint. To the extent services, equipment, and resources that are outside KDOC's control are involved (for example services or equipment provided by cable, telephone, utilities, or various other companies), KDOC will agree to notify those providers/companies of any problems and, to the extent necessary or possible under the circumstances, work with them expeditiously to resolve the problem.

The KDOC will ensure that KDOC employees are adequately trained in the operation of the technology.

## X. MEDIA

The KDOC will ensure that all audio-visual media purchased for Inmate use in KDOC Adult Institutions housing Deaf Inmates includes open- or closed-captioning. Televisions purchased by the KDOC for Inmate use shall support open- or closed-captioning. Captioning will be turned on and remain on at any Deaf Inmate's request.

The KDOC will permit Deaf Inmates to purchase TVs, which reliably support open- or closed-captioning, with their own funds. In the event that the closed-captioning feature contained on TVs purchased through approved commercial channels malfunctions, KDOC personnel will work with the Deaf Inmate to the same extent that the KDOC works with other Inmates regarding malfunctioning personal property to address and resolve the problem within a reasonable time.

## XI. HAND RESTRAINTS

### A. General Policy

According to the KDOC's hand restraint policies, the KDOC will use hand restraints on Deaf Inmates only in the following circumstances:

- when transporting a Deaf Inmate to or from a KDOC Adult Institution;

- when transferring a Deaf Inmate into or out of the special management unit; and

- as needed in response to security threats.

16

The applicable portions of the KDOC hand restraint policy, summarized above, have been reviewed to confirm when hand restraints are used on Inmates confined to KDOC Adult Institutions. While the policy does not specify the manner in which mechanical restraints are used during Off-site Medical Care, an Affidavit is included as Appendix A to this Agreement describing the two-point bed restraint system used during Off-site Medical Care. The two-point system would allow a Deaf Inmate to use his or her hands for communicating via sign language to some degree. KDOC training will include both the two-point system as well as the agreement that hand restraints will be removed from a Deaf Inmate when the Deaf Inmate is in a secure environment, when security is no longer a threat, or there are other security devices in place to allow the Deaf Inmate to Effectively Communicate.

### B.   Off-site Medical Care

During Off-site Medical Care, the KDOC shall use a two-point hand restraint system to allow for the Deaf Inmate's need for Effective Communication while considering the safety and security of the Deaf Inmate and those located at Off-site Medical Care facilities. The KDOC will include training on use of the two-point hand restraint system in its regularly scheduled training for new and existing employees.

In the event a medical decision made by medical professionals or medical staff that requires or calls for removal or adjustment of hand restraints, the KDOC will follow its secured policy regarding the removal of mechanical restraints where necessary for treatment or emergencies.

### C.   On-Site Medical Care

The KDOC's hand restraint policy, summarized above in Section XI.A., will be followed for On-site Medical Care.

## XII.   MISCELLANEOUS DEVICES AND AIDS

Where devices such as vibrating clocks and in-line amplifiers are not deemed medically necessary, the KDOC agrees to consider on a case by case basis whether it will allow a particular Deaf Inmate the opportunity to purchase these devices at his or her own expense. The KDOC's decision in this regard will consider, among other issues, whether these devices pose a security risk. The KDOC will have the discretion to make the determination whether any of these devices, and the type of device, is permissible. The KDOC will promptly notify the Settlement Monitor whenever any such determination is made and explain the reasoning in support of such determination. Deaf Inmates will be allowed to purchase alerting devices, vibrating clocks, telephone amplifications, headset amplifiers, and televisions that meet the particular needs of their disability from an approved vendor so long as the items do not pose a security risk. The KDOC retains the discretion to limit purchases to devices that are available through the Commissary. Deaf Inmates may submit a request in writing to the ADA Coordinator responsible for the KDOC Adult Institution in which they are housed for devices not available from the Commissary. The KDOC will not deny any Deaf Inmate the right to purchase these devices except where they present an articulable security risk, which shall be documented. The ADA

17

Coordinator will maintain written records of all Deaf Inmate requests for these devices and the disposition of the request.

## XIII. TRAINING

### A. General Policy

The KDOC, with input from the KCDHH, will provide training as defined in Section XIII.B below to KDOC employees who interact with the Inmate population. The KDOC will incorporate this training into its regularly scheduled training for new and existing employees. This training will be included in current KDOC training within ninety (90) days of the Effective Date of this Agreement. The KDOC will update the training materials as required by law, including but not limited to, the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws.

The KDOC will provide any materials that may be used for training, as specified under Section XIV of this Agreement, to the Settlement Monitor for review prior to the first training session. In addition, the KDOC, with input from the KCDHH, will update and allow the KCDHH and the Settlement Monitor to review the training as defined in Section XIII.B. at least every two years.

### B. KDOC Employee Training

Within ninety (90) days of the Effective Date of this Agreement, the KDOC will begin training KDOC employees on the following topics:

- best practices for communicating with Deaf individuals;

- the unique needs and problems encountered by Deaf and late-Deafened individuals;

- identification of communication needs of persons who are Deaf;

- the psychological implications of Deafness and its relationship to interaction with hearing corrections personnel;

- the proper use and role of Qualified Interpreters;

- directions about using TTYs, TDDs, Videophones and any other telecommunication equipment, and other Auxiliary Aids and Services, currently available at the facility that facilitate communication with Deaf people;

- disciplinary matters, described in Section VII, and grievance proceedings, described in Section XIV;

18

- the KDOC's anti-discrimination policy;

- all equipment, services, and accommodations available to Deaf Inmates;

- hand restraint policies in the context of Deaf Inmates; and

- the requirements of this Agreement.

## XIV.   GRIEVANCES

All KDOC grievance coordinators will inform Deaf Inmates who file a grievance of the option to share that grievance (or any responses or outcomes) with the ADA Coordinator of the KDOC Adult Institution in which the Deaf Inmate is housed. If the Deaf Inmate agrees to share the grievance (or any responses or outcomes) with the ADA Coordinator, the grievance coordinator will forward a copy of that grievance (or grievance response or outcome) to the ADA Coordinator for review.

A written record of all Deaf Inmates' grievances (and any responses and outcomes) will be maintained by the KDOC. For five years following the Effective Date of this Agreement, the Settlement Monitor may request the records of any Deaf Inmate's grievances, as long as the Deaf Inmate signs a waiver of confidentiality pursuant to KRS 197.023, and a copy of that Deaf Inmate's records will be provided, free of charge, to the Settlement Monitor.

Within thirty (30) days of the Effective Date of this Agreement, and every three months thereafter, the KDOC will provide the Settlement Monitor with a written summary of grievances filed by Deaf Inmates concerning access to Effective Communication, Auxiliary Aids and Services, or any other issues raised in this Agreement. This written summary will describe, for each grievance, the issue raised by the Deaf Inmate, the KDOC Adult Institution where the grievance was filed, a summary of KDOC's response, and whether and how the grievance was resolved.

## XV.   MONITORING AND COMPLIANCE

### A.      Plaintiffs' Counsels' Right of Access

To the extent Plaintiffs' Counsel maintains a current or prospective attorney-client relationship with any Deaf Inmate, they shall be provided the same access to that Deaf Inmate and to the records relating to that Deaf Inmate, as any other attorney with a similar relationship to another non-Deaf Inmate.

**B.    The Settlement Monitor's Investigation**

For a period of five years after the Effective Date, the following will apply to the extent
necessary to permit the Settlement Monitor to thoroughly and objectively assess the KDOC's
compliance with and implementation of this Agreement:

- The Settlement Monitor will have unlimited access to all records, files, and
  papers maintained by the KDOC that relate to the terms of this Agreement.
  The KDOC will provide a written explanation for any refusal by the KDOC to
  provide any requested records, files, or papers, and the KDOC and the
  Settlement Monitor will attempt to reach an agreement before either the
  KDOC or the Settlement Monitor seek assistance from the Court.

- The Settlement Monitor will have access to all other materials relating to the
  case *Adams, et al. v. Commonwealth of Kentucky, et al.*, Case no. 14-cv-
  00001, except for those materials protected by the attorney-client privilege
  and/or work product doctrine. Any requested materials protected by the
  attorney-client privilege or work product doctrine will be logged with
  information including the author, date, nature of the material, reason for the
  claim of privilege, and persons to whom the material was disseminated, and
  this log will be provided to the Settlement Monitor.

- The Settlement Monitor will have access to all pertinent staff members and
  employees of the KDOC. The Settlement Monitor may engage in both formal
  and informal conferences with staff members and employees, including
  confidential or group interviews, and such persons will cooperate will the
  Settlement Monitor fully and will respond to all reasonable inquiries and
  requests relating to compliance efforts. The Settlement Monitor will contact
  the Warden or the Warden's designee to schedule these conferences and/or
  interviews, which will be treated as attorney visits under CPP 14.4.

- The Settlement Monitor may conduct confidential interviews with any Deaf
  Inmate or with groups of Deaf Inmates incarcerated at Adult KDOC
  Institutions. Within thirty (30) days of the Effective Date of this Agreement,
  and every six months thereafter, the KDOC will provide the Settlement
  Monitor with a current and up-to-date list of Deaf Inmates in the KDOC's
  custody, which identifies the name, DOC numbers and the KDOC Adult
  Institution for each Deaf Inmate. The Settlement Monitor will contact the
  Warden or the Warden's designee to schedule these conferences and/or
  interviews, which will be treated as attorney visits under CPP 14.4.

- The Settlement Monitor may request KDOC staff members and employees to
  prepare, where appropriate, written responses to any questions by the
  Settlement Monitor related to the implementation of the Agreement or issues
  in this litigation, so long as the request does not interfere with security
  obligations of KDOC staff members and employees. The KDOC will not

refuse or fail to respond to reasonable requests. Responses to these requests shall be provided in a timely manner that is reasonable and shall not interfere in the security obligations of any KDOC staff members or employees. The KDOC will provide a written explanation for any refusal by the KDOC staff members or employees to provide any requested responses, and the KDOC and the Settlement Monitor will attempt to reach an agreement before either the KDOC or the Settlement Monitor seek assistance from the Court.

- The Settlement Monitor may visit each KDOC Adult Institution so long as the KDOC is provided notice a minimum of thirty (30) days prior to the visit. All visits will be supervised by a KDOC employee. Visits will be limited to only those areas of a KDOC Adult Institution that are affected by this Agreement. Absent Court order or a separate agreement, the Settlement Monitor may visit each KDOC Adult Institution only once in a calendar year. The KDOC will pay the cost of and associated with providing Qualified Interpreters for the Settlement Monitor's visits to KDOC Adult Institutions.

The parties will not refuse reasonable requests for records, files, papers, or other materials or for access to people or other information. The Settlement Monitor will conduct the bulleted monitoring, above, in a reasonable manner to minimize interference with the daily operations of the KDOC. Absent a Court order requiring otherwise, the KDOC retains discretion to prohibit the Settlement Monitor from conducting the aforementioned monitoring on the buildings and premises under the control of the KDOC, but the KDOC will not unreasonably refuse requests for visits.

The Settlement Monitor may hire other persons as the Settlement Monitor determines to be necessary to carry out the Settlement Monitor's duties.

For a period of five years after the Effective Date of this Agreement, the Settlement Monitor will issue semi-annual reports to the Court and the parties detailing the parties' compliance with and implementation of this Agreement.

The KDOC will not pay for the fees and expenses due to the Settlement Monitor for the Settlement Monitor's services under this section.

## XVI.  RELEASE AND SETTLEMENT OF CLAIMS

### A.  Release

In consideration of the representations, promises and agreements set forth herein, including the payments as set forth in this Agreement, the sufficiency of which is hereby acknowledged, the Plaintiffs, on their behalf and on behalf of their assignees, heirs, executors, family members, beneficiaries, administrators, successors, and anyone acting, or claiming to act, on their behalf, hereby releases and forever discharges the Commonwealth of Kentucky, Kentucky Justice and Public Safety Cabinet, KDOC, J. Michael Brown, Ladonna Thompson, Kimberly Potter-Blair, Paula Holden, Jim Erwin, Randy White, Gregory Howard, Clark Taylor, Aaron Smith, Kathy Litteral, Steve Haney, Gary Beckstrom, Alan Brown, Janet Conover, Joseph Meko, Don

Bottoms, Ravonne Sims, Steve Woodward, and Bobbie Underwood from any and all claims and causes of action, known and unknown, asserted and unasserted, direct and indirect, and of any kind, nature or description whatsoever, which they had on or before the date of the execution of this Agreement arising out of the facts set forth in the discrimination charge they filed with the U.S. District Court for the Eastern District of Kentucky, Frankfort Division.

**B.  Dismissal**

The Plaintiffs agree to dismiss with prejudice all claims of the Amended Complaint filed with the U.S. District Court, Eastern District of Kentucky, Frankfort Division (the "Court"), Case Number 3:14-cv-00001.

The parties agree that the Court will retain jurisdiction over this Agreement as set out in Section XVI.E of this Agreement, below.

**C.  Attorneys' Fees, Costs, Disbursements and Expenses**

In settlement of all claims for attorneys' fees and costs, any disbursements and expenses, including expert fees, incurred on behalf of Plaintiffs in this litigation up to and including the Effective Date, the parties agree that within ninety (90) days of the Effective Date of this Agreement, the KDOC shall pay $250,000.00 as directed by Plaintiffs' counsel.

**D.  Damages**

Within ninety (90) days of the Effective Date of this Agreement, the KDOC shall directly pay (1) Plaintiff Oscar Adams $1,500.00 in damages and (2) Plaintiff Michael Knights $1,500.00 in damages. The KDOC also agrees to pay within ninety (90) days of the Effective Date of this Agreement Plaintiff Michael Knights $77.62 to compensate for lien charges assessed against him for communications with Plaintiffs' Counsel regarding this case and settlement.

**E.  Enforcement Powers**

During the term of the Agreement, as set out in Section XVII.H, Plaintiffs may move the court for reinstatement of the lawsuit, or may elect to seek specific performance or institute an action for breach. An action to enforce this Agreement does not include any action for damages, except for enforcement of Section XVI.D. A Plaintiff seeking to enforce this Agreement can only seek to have a court order the KDOC to comply with the terms of this Agreement.

The lawsuit may not be reinstated, nor a claim for breach or specific performance of this Agreement brought, before a Plaintiff first notifies the KDOC of the nature of the alleged material non-compliance and gives the KDOC sixty (60) days to cure the alleged breach. The parties agree to non-binding mediation prior to any Plaintiff moving to reinstate the lawsuit or filing an enforcement action.

## XVII.  MISCELLANEOUS PROVISIONS

### A.    Non-Admission

It is understood and agreed that this Agreement is a compromise of disputed claims, facts, or allegations.  Nothing in this Agreement constitutes an admission of any liability, wrongdoing, or violation of any law, or the admission of the validity of any defense.

### B.    Private Settlement Agreement

This Agreement is a private settlement agreement within the meaning of 18 U.S.C. § 3626.

### C.    Confidentiality

No part of this Agreement is or will be considered confidential by the parties.  This Agreement will be made available by request under the Freedom of Information Act.

### D.    Entire Agreement

This Agreement constitutes the entire Agreement between the parties.  There were no inducements or representations leading to the execution of this document, except as stated within the document itself.  The terms of this Agreement are contractual in nature.

All parties agree that the relief provided in this Agreement is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to correct the violation of Plaintiffs' federally protected rights.

### E.    Execution

This Agreement may be executed in counterpart originals, all of which, when so executed and taken together, shall be deemed an original and all of which shall constitute one and the same instrument.  Each counterpart may be delivered by email (as a .pdf attachment) or facsimile, and an email or facsimile signature shall have the same force and effect as an original signature.

### F.    Binding

This Agreement is final and binding on the Parties.  Each Party has a duty to so inform any such successor in interest.

### G.    Non-Waiver

Failure by the Plaintiffs to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances and provisions.

**H.    Severability**

In the event that a court determines that any provision of this Agreement is unenforceable, such provision will be severed from this Agreement and all other provisions will remain valid and enforceable, provided however that if the severance of any such provision materially alters the rights and obligations of the Parties hereunder, the Parties will attempt, through reasonable, good faith negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

**I.    Term of Agreement**

This Agreement shall remain in effect for five years from the Effective Date. The KDOC, however, will continue to provide all accommodations required under the law, including under the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws, regardless of any term limit applicable to this Agreement.

Signed _LaDonna Thompson_

_____
Kentucky Department of Corrections

_5/15/15_

_____
Attorney for Plaintiffs

_____
Date

_____
Date

24

Michael Knights
_____
Printed Name

_____
Signature

5/18/15
_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

Oscar D. Adams
_____
Printed Name

Oscar D. Adams
_____
Signature

5-18-15
_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

_____
Printed Name

_____
Signature

_____
Date

Approved as to ¶XVI(c)
WEIL, GOTSHAL & MANGES LLP

By: _____ for Ralph I. Miller with permission

Date: _____5/15/15_____

Approved as to ¶XVI(c)
WASHINGTON LAWYERS' COMMITTEE

By: _____ for Deborah M. Golden with permission

Date: _____5/15/15_____

Approved as to ¶XVI(c)
BELZLEYBATHURST ATTORNEYS

By: _____ for Greg Belzley with permission

Date: _____5/15/15_____

# EXHIBIT 1

# MARGO SCHLANGER
http://margoschlanger.net
mschlan@umich.edu
734-615-2618

## EMPLOYMENT

**Henry M. Butzel Professor of Law**, University of Michigan (2009–present; on leave 2010 and 2011).
**Director**, Civil Rights Litigation Clearinghouse, http://clearinghouse.net. Visiting Professor of Law, Fall 2009.

**Counsel to the Secretary**, U.S. Department of Homeland Security (Special Government Employee, part-time, 2012-2013). Advised Secretary of Homeland Security on civil rights matters.

**Officer for Civil Rights and Civil Liberties**, U.S. Department of Homeland Security (Presidential appointment, 2010 & 2011). (Chair, Privacy, Civil Rights, and Civil Liberties Subcommittee of the federal Information Sharing Environment's Information Sharing and Access Interagency Policy Committee; Chair, Interagency Coord. Council on Emergency Preparedness and Individuals with Disabilities; Member, U.S. Delegation, Universal Periodic Review.)

**Visiting Professor of Law**, University of California, Los Angeles (Spring 2009).

**Professor of Law**, Washington University in St. Louis (2004–2009); Director, Civil Rights Litigation Clearinghouse. Elected 2008 "David M. Becker Professor of the Year" by law students.

**Faculty Fellow**, Harvard University Center for Ethics and the Professions (2001/02).

**Assistant Professor of Law**, Harvard Law School (1998-2004).

**Senior Trial Attorney**, U.S. Dept. of Justice, Civil Rights Division, Special Litigation Section (1995-1998). Division Special Achievement Awards, 1996 and 1997.

**Law clerk**, Justice Ruth Bader Ginsburg; Supreme Court of the United States (1993-1995).

**Fact-checker**, *The New Yorker* (1989–1990).

## COURSES TAUGHT

Torts; Constitutional Law; Prisons and the Law; Constitutional Equality. Seminars include Civil Rights and Homeland Security; Empirical Inquiries into Civil Litigation; Institutional Reform Litigation.

## OTHER APPOINTMENTS

Reporter, American Bar Association task force on Standards relating to the Legal Status of Prisoners (2007–Jan. 2010). See http://www.americanbar.org/publications/criminal justice_section_archive/crimjust_standards_treatmentprisoners.html .

Commissioner, Commission on Safety and Abuse in America's Prisons (2006–2008). See http://www.prisoncommission.org.

## EDUCATION

**Yale Law School**, J.D. 1993.
Book Reviews Editor, *Yale Law Journal* (Vol. 102); Vinson Prize for excellence in clinical casework.
**Yale College**, B.A. 1989.
Honors: *magna cum laude*, distinction in the History major, National Merit Scholar.

## SCHOLARLY PUBLICATIONS, forthcoming and published

*Intelligence Legalism and the National Security Agency's Civil Liberties Gap*, forthcoming HARV. NAT. SEC. L.J. (2015), available at http://ssrn.com/abstract=2495844.

*Trends in Prisoner Litigation as the PLRA Enters Adulthood*, forthcoming, U.C. IRVINE L. REV (2015), available at http://ssrn.com/abstract=2506378.

*How Prisoners' Rights Lawyers are Preserving the Role of the Courts*, forthcoming, U. Miami L. Rev. (2015), available at http://ssrn.com/abstract=2478884.

*Offices of Goodness: Influence Without Authority within Federal Agencies*, 36 CARDOZO L. REV. 53 (2014).

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace* (with Pauline Kim), forthcoming WASH. U. L. REV. (2014) (draft available at http://ssrn.com/abstract=2309514).

*Prison Segregation: Symposium Introduction and Preliminary Data on Racial Disparities*, 18 MICH. J. RACE & LAW 241 (2013).

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics*, 48 HARV. CIV. RIGHTS-CIV. LIB. L. REV. 165 (2013).

*Women Behind the Wheel: Gender and Transportation Law, 1860-1930*, in Tracy A. Thomas & Tracey Jean Boisseau, eds., FEMINIST LEGAL HISTORY: ESSAYS ON WOMEN AND LAW (2011).

*Regulating Segregation: The Contribution of the ABA Criminal Justice Standards on the Treatment of Prisoners*, 47 AM. CRIM. L. REV. 1421 (2010)

*Against Secret Regulation: Why and How We Should End the Practical Obscurity of Injunctions and Consent Decrees*, 59 DEPAUL L. REV. 515 (2010).

*How to Study District Judge Decision-Making*, 29 WASH. U. J. LAW & POL'Y 83 (2009) (with Pauline Kim, Christina Boyd, Andrew D. Martin).

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, 11 U. PENN. J. CONST. LAW 139 (2008) (with Giovanna Shay).

*Jail Strip-Search Cases: Patterns and Participants*, 71 LAW & CONTEMP. PROB. 65 (2008).

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*, 2 JOURNAL OF TORT LAW (Aug. 2008).

*Hedonic Damages, Hedonic Adaptation, and Disability*, 60 VAND. L. REV. 745 (2007) (with Samuel Bagenstos).

*The Washington University Civil Rights Litigation Clearinghouse: Using Court Records for Research, Teaching, and Policymaking*, 75 UMKC L. REV. 153 (2006) (Symposium: Federal Civil Court Records of the National Archives: Opportunities for Empirical, Historical and Legal Research and Curriculum Design) (with Denise Lieberman).

*What We Know and What We Should Know About American Trial Trends*, 2006 J. DISP. RES. 35 (2006) (Vanishing Trial Symposium).

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*, 81 N.Y.U. L. REV. 550 (2006). Reprinted in 23 CIVIL RIGHTS LITIGATION AND ATTORNEY FEES ANNUAL HANDBOOK (Steven Saltzman, ed., 2007).

*Second Best Damage Action Deterrence*, 55 DePaul L. Rev. 517 (2006) (Clifford Symposium on Tort Law and Social Policy).

*Determinants of Civil Rights Filings in Federal District Court by Jail and Prison Inmates*, 1 J. Empirical Leg. Stud. 79 (2004) (with Anne Piehl).

*The Reliability of the Administrative Office of the U.S. Courts Database: An Initial Empirical Analysis*, 78 Notre Dame L. Rev. 1455 (2003) (with Theodore Eisenberg) (symposium issue)

*Inmate Litigation*, 116 Harv. L. Rev. 1555 (2003).

*Gender Matters: Teaching a Reasonable Woman Standard in Personal Injury Law*, 45 St. Louis U. L.J. 769 (2001).

*Beyond the Hero Judge: Institutional Reform Litigation as Litigation*, 76 Mich. L. Rev. 1994 (1999).

*Injured Women Before Common Law Courts, 1860–1930*, 21 Harv. Women's L.J. 79 (1998).

## NON-SCHOLARLY PUBLICATIONS

*The Supreme Court Gives a Subtle Boost to Free Speech*, The New Republic, May 28, 2014, available at http://www.newrepublic.com/article/117925/wood-v-moss-subtle-victory-free-speech.

*Even Conservative Judges Can't Deny the Constitutional Logic of Same-Sex Marriage*, Daily Beast, May 18, 2014, available at http://www.thedailybeast.com/articles/2014/05/18/even-conservative-judges-can-t-deny-the-constitutional-logic-of-same-sex-marriage.html.

*In the Story of Jonah, an Urgent Lesson About the Dangers of Solitary Confinement*, Tablet Magazine, Sept. 11, 2013.

*ABA Criminal Justice Standards on the Treatment of Prisoners*, Crim. Justice Mag., Summer 2010, at 14 (with Margaret Colgate Love & Carl Reynolds).

*Prison Litigation Reform Act Update*, in The State of Criminal Justice, 2007-2008 (American Bar Association, Criminal Justice Section, Apr. 2008).

*Professor Notes PLRA Flaws: Will Congress Act to Correct Them?*, Correctional Law Rep., Feb./Mar. 2008, at 65 (reprints testimony before the House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security: *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)).

*The Political Economy of Prison and Jail Litigation*, Prison Legal News, June 2007, at 1.

*Preserving the Rule of Law in America's Prisons: The Case for Amending the Prison Litigation Reform Act*, American Constitution Society Issue Brief, Mar. 28, 2007 (with Giovanna Shay).

*National Prison Commission Begins Work*, Correctional Law Rep., June/July 2005, at 1, and Prison Legal News, July 2005, at 17.

*Inmate Litigation: Results of a National Survey*, National Institute of Corrections Large Jail Network Exchange, July 2003, at 1.

## OTHER WORKS IN PROGRESS

Executive Order 12,333 and Civil Liberties; California Realignment in the Counties

# GRANTS

National Science Foundation SES-0718831 (co-PI, with Pauline Kim and Andrew Martin), "The Litigation Process in Government-Initiated Employment Discrimination Suits" (2007), $213,999.

Harvard University William F. Milton Fund (with Anne Morrison Piehl), "Litigated Intervention in the Management of Correctional Facilities" (2002), $33,607.

# SERVICE AND MEMBERSHIPS

## Professional

Bar admissions: New York, District of Columbia (inactive), Missouri; Supreme Court; 9th Cir., Eastern District of Missouri.

Organizing committee member, Prisoners' Advocates Conference (New Orleans, LA, Feb. 2014). Chair, Prison Litigation: A Workshop for Plaintiffs' Attorneys (Washington, DC, Mar. 2008);

Member, expert advisory committee on data collection and confidential reporting, Prison Rape Elimination Act Commission (2007).

Drafter, ABA Litigation Section Project, The Rule of Law in Times of Calamity (2006).

Counsel of record for amici curiae ACLU and other prison advocacy organizations, Woodford v. Ngo, 05-416 (U.S. Supreme Court, filed Feb. 2, 2006).

## General Academic

Co-editor (with Sharon Dolovich), SSRN abstracting "journal," Corrections & Sentencing Law & Policy (2006-2009, 2012-present). See http://ssrn.com.
Chair, American Association of Law Schools, Remedies Section (2014)
Chair, American Association of Law Schools, Section on Law & the Social Sciences (2007/08).
Member, Law & Society Association Dissertation Prize Committee (2007).
Member, Law & Society Association.

## University of Michigan

Chair, Senate Advisory Committee on University Affairs, Committee on Civil Liberties
Member, Law School Curriculum Committee (2014/2014)
Chair, Law School Tenure Committee (2013/2014), Member (2012/2013)
Chair, University of Michigan Committee on Civil Liberties (2014/2015), Member (2013/2014)
Faculty Advisor, Journal of Race & Law Symposium on Solitary Confinement (2013)
Convenor, Prison Law & Scholarship Roundtable (2012)

## Washington University in St. Louis

Member, Law School Promotions Committee (2007/08)
Advisory Board, Washington University Center for Empirical Research in the Law (2007/08)
Standing participant: Workshop on Empirical Research in Law (2004–2009)
Chair, Law School Lateral Appointments Committee (2006/07)
Chair, Law School Dean's Advisory Group on Improving Student Career Prospects (2005/06)
Chair, Law School Rules and Petitions Committee (2005/06)
Chair, Law School Ad Hoc Committee on Tenure Standards and Process (2004/5)
Member, University Committee on Senate By-Laws (2004/5)
Member, Law School Clerkship Committee (Fall 2004)

## PRESENTATIONS (2004–present)

*Intelligence Legalism and the NSA's Civil Liberties Gap*
- Association of American Law Schools, Annual Conference, National Security Law Section (chosen in call for papers) (Jan. 2014)
- University of Iowa Law School Faculty Workshop (Nov. 2014)
- University of Michigan Law School Legal Theory Workshop
- 7th Annual National Security Law Workshop (May 2014)

*Offices of Goodness: Influence without Authority in Federal Agencies*
- Emory Law School (Mar. 2014)
- Cardozo Law School (Feb. 2014)
- Law & Society Ass'n (May 2013)

*The Equal Employment Opportunity Commission and Structural Reform of the American Workplace*
- EEOC Datanet Conference (May 2014)
- Labor Law Research Network (June 2013)
- Stanford Law Faculty Workshop (Oct. 2009)
- Brooklyn Law School Faculty Workshop (Sept. 2009)
- Building Theory Through Empirical Legal Studies, Berkeley Center for the Study of Law & Society (April 2009)
- UCLA Law Faculty Workshop (Feb. 2009)
- University of Arizona Law Faculty Workshop (Feb. 2009)

*The Prison Litigation Reform Act and Litigation Dynamics*
- Loyola University New Orleans College of Law, Prisoners' Advocates Conference (Feb. 2014)

*The Present and Future of Institutional Reform Litigation: Current Trends in Prisoner Cases*
- U.C. Irvine Law School, Prisoners Access to Justice Symposium (Feb. 2014)
- University of Miami Law School, Leading from Below Symposium (Feb. 2014)

*Marriage Equality and the Constitution*, Alma College Constitution Day Speaker (Sept. 2013)

Plata v. Brown *and Realignment: Jails, Prisons, Courts, and Politics*,
- Law & Society Ass'n (May 2013) (as discussant in panel on *Plata v. Brown*)
- University of Illinois faculty workshop (Mar. 2013)

*Race and civil rights injunctions,* Ass'n of American Law Schools, Remedies Section (Jan. 2013)

Chair/discussant, panel on Immigration, Law & Society Association Conference (June 2012)

*Operationalizing Deterrence: Claims Management (in Hospitals, a Large Retailer, and Jails and Prisons)*
- University of Michigan Law Faculty Workshop (Sept. 2008)
- Insurance & Society Seminar, Boston (May 2008)
- Southern Methodist University Law Faculty Workshop (Jan. 2008)
- Law & Society Ass'n, Berlin (July 2007)
- University of North Carolina Law Faculty Workshop (Nov. 2006)
- Law & Society Ass'n, Baltimore (July 2006)

*Seminar teaching*
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2008)
- Ass'n of American Law Schools, Workshop for New Law Teachers (June 2007)

*Hedonic Damages, Hedonic Adaptation, and Disability*
- University of Illinois Law School, Seminar on Law, Psychology & Economics (Apr. 2008)
- Washington University Law Faculty Workshop (Aug. 2006)

*Civil Rights Injunctions Over Time: A Case Study of Jail and Prison Court Orders*
- University Management Team, Washington University in St. Louis (Apr. 2008)
- Prison Litigation: A Workshop for Plaintiffs' Attorneys (Washington, D.C., Mar. 2008)
- Law and Society Ass'n (Las Vegas, NV, June 2005)
- Junior Scholars Empirical Legal Studies conference, Cornell Law School (Oct. 2004)

The Prison Litigation Reform Act
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA*, Symposium, Penn. J. of Constitutional Law, Litigating the Eighth Amendment (Feb. 2008)
- Witness, National Prison Rape Elimination Comm'n, *The Role of Courts and Litigation in Regulating Prison and Jail Prevention of Sexual Violence and Misconduct* (Dec. 2007)
- Witness, House Judiciary Committee, Subcommittee on Crime, Terrorism, and Homeland Security, hearing: *Review of the Prison Litigation Reform Act: A Decade of Reform or an Increase in Prison Abuses* (Nov. 2007)
- Congressional staff briefing, proposed amendments to the PLRA (Sept. 2007)
- *Preserving the Rule of Law in America's Prisons: The Case for Amending the PLRA* American Constitution Society issue brief presentation, Washington DC (Apr. 2007)
- *The Past and Future of the PLRA*, National Association of Attorneys General, Baltimore, MD (Feb. 2007)
- Witness, ABA Criminal Justice Section Council, on proposed ABA policy to amend the Prison Litigation Reform Act (Nov. 2006)

*The Civil Rights Litigation Clearinghouse: Using Court Records for Research, Teaching, and Policymaking*
- Association of American Law Schools annual conference, Washington University Law breakfast (Jan. 2008)
- Presentation to social studies coordinators, Missouri Cooperating School Districts (Feb. 2007)
- Conference presentation ("Federal Civil Court Records of the National Archives: Opportunities for Empirical, Historical and Legal Research and Curriculum Design"), University of Missouri at Kansas City & National Archives and Records Administration (Oct. 2005)

Moderator/discussant, panel on Race, Empirical Legal Studies Conference (Nov. 2007).

*Fault and the Constitutional Law of Equality.* Invited response to David Strauss, Childress Lecture (*Little Rock and the Legacy of Brown*), Saint Louis University (Oct. 2007)

*Teaching the Equal Protection Clause.* Presentation to high school teachers, Street Law (Oct. 2007)

*The Plaintiffs' Bar and the Conceptualization of Litigation*
- Law & Society Ass'n, Berlin (July 2007)
- Washington University Law Faculty Workshop (May 2007)
- Conference presentation (The Plaintiff's Bar), New York Law School (Mar. 2006)

*The Litigation Process in Government-Initiated Employment Discrimination Suits* (hypotheses and preliminary evidence). Duke Law School Faculty Workshop (Apr. 2007)

Discussant, Katherine Barnes et al., *Life and Death Decisions: Prosecutorial Discretion and Capital Punishment in Missouri*, St. Louis U. conference (Mar. 2007).

Discussant, J.J. Prescott, *Empirical Evidence of Prosecutorial Charging Manipulation: And What it Tells Us About What Prosecutors are Trying to Do*, Empirical Legal Studies Conference, Austin Texas (Oct. 2006).

Moderator, panel on *Empirical Inquiries in Criminal Justice*, Law and Society Ass'n (July 2006).

*Women and the New Supreme Court*: University of Missouri–St. Louis, Sue Shear Institute for Women in Public Life (Jan. 2006).

Moderator, panel discussion of *Problems and Solutions in American Criminal Justice*, in conjunction with hearing held at Washington University in St. Louis by the Commission on Safety and Abuse in America's (Oct. 2005).

*What We Know and What We Could Know About the Vanishing Trial*: Featured Comment on Marc Galanter, "A World Without Trials," University of Missouri at Columbia, Distinguished Lecture on Alternative Dispute Resolution (Sept. 2005).

*Incarceration, Reform, and Politics*: presentation to undergraduate student groups (Apr. 2005).

*Second Best Damage Action Deterrence*
- University of Missouri at Columbia (Apr. 2005).
- Clifford Conference on Torts and Social Policy, DePaul University College of Law (Apr. 2005).
- UCLA faculty workshop (Mar. 2005)

*Collateral Consequences of Incarceration: Background on the Scope of the Carceral System*: Symposium on Poverty, Wealth and the Working Poor: Clinical and Interdisciplinary Perspectives (Apr. 2005).

Respondent to James B. Jacobs, *The Future of Imprisonment: Leadership, and Prison Reform*, St. Louis University Ass'n of Criminal Justice and Sociology (Oct. 2004).

# APPENDIX A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT FRANKFORT

CIVIL ACTION NO. 3:14-CV-00001-GPVT          ELECTRONICALLY FILED

OSCAR ADAMS and MICHAEL KNIGHTS,                              PLAINTIFFS

v.                    **AFFIDAVIT OF JAMES ERWIN**

COMMONWEALTH OF KENTUCKY, et al.,                            DEFENDANTS

---

Comes now the Affiant, James Erwin, and having been duly sworn and cautioned, states the following:

1.  I, James Erwin, am the Deputy Commissioner for Adult Institutions for the Department of Corrections, Commonwealth of Kentucky.

2.  In my official capacity, I am familiar with Corrections Policy and Procedure for the Kentucky Department of Corrections.

3.  I have reviewed Corrections Policy and Procedure ("CPP") 9.14 (a secured policy), that addresses, among other matters, hospital security protocol.

4.  CPP 9.14 provides that, typically, inmate patients admitted to a hospital are secured using arm bed restraints and leg bed restraints.

5.  The use of arm bed restraints rather than handcuffs allows hand movement which should make it possible for Deaf inmates who need their hands to communicate, to do so.

6.  While this should be the typical protocol, the Department as always has the responsibility to safe-guard officers, inmates, the public, etc., which could require an escalation of security depending upon the inmate and the situation.

Case: 3:14-cv-00001-GFVT-EBA   Document: 3630-12   Filed: 06/24/25   Page: 389 of 394   Page ID#:
1506
Case 4:04-cv-02307-CW   Document 3630-12   Filed 10/16/24   Page 194 of 659

7.   Further, the Affiant saith naught.

James Erwin
Affiant

COMMONWEALTH OF KENTUCKY        )
                                )
COUNTY OF Franklin              )


     Subscribed, sworn and acknowledged before me, a Notary Public, by James Erwin, on
this the 13th day of February , 2015.


     My commission expires:  November 3, 2018


Allison R. Brown
Notary Public

# General Information

| | |
|---|---|
| **Court** | United States District Court for the Eastern District of Kentucky; United States District Court for the Eastern District of Kentucky |
| **Federal Nature of Suit** | Prisoner Petitions - Prison Condition[555] |
| **Docket Number** | 3:14-cv-00001 |
| **Status** | Closed |

© 2016 The Bureau of National Affairs, Inc. All Rights Reserved. Terms of Service

Exhibit 100

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT FRANKFORT

Eastern District of Kentucky
**F I L E D**

MICHAEL KNIGHTS AND OSCAR ADAMS, )
    on behalf of themselves and )
    all others similarly situated, )
                         )
    **Plaintiffs** )
                         )
    **v.** )
                         )
**COMMONWEALTH OF KENTUCKY, et al.** )
                         )
    **Defendants.** )
                         )

**JUN 2 4 2015**

AT FRANKFORT
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

Case No.: 3:14-cv-00001-GFVT

## CONSENT JUDGMENT

WHEREAS, Plaintiffs Michael Knights and Oscar Adams (collectively, the "Plaintiffs")

filed an action alleging violations of their rights under the Americans with Disabilities Act, 42

U.S.C. § 12131 et seq., the Rehabilitation Act, 29 U.S.C. § 794 et seq., the Constitution of the

United States, the Religious Land Use and Institutionalized Persons Act of 2000, 42. U.S.C. §

200cc et seq., the Kentucky Civil Rights Act Provision of Interpreters, KRS 344.500, and the

Kentucky Civil Rights Act, KRS 344.120 (the "Complaint");

WHEREAS, the Plaintiffs and the Kentucky Department of Corrections (the

"Department, and, together with Plaintiffs, the "Parties") have entered into a settlement

agreement, attached hereto as Exhibit A (the "Settlement Agreement"), to resolve all claims

against all those named as defendants in the Complaint without trial or adjudication of any

further issue of fact or law;

WHEREAS, the Parties have agreed that this Consent Judgment may be signed by a

Judge in the Eastern District of Kentucky and consent to the entry of this Judgment;

WHEREAS, the Department confirms, agrees and acknowledges, that it will perform the obligations and duties set forth in the Settlement Agreement;

NOW THEREFORE, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

1.      The Department, any person or entity under the Department's control, and all of the Department's officers, assigns, successors in interest, predecessors in interest, parents, subsidiaries, affiliates, agents, licensees and employees are enjoined and restrained, for the duration of the Settlement Agreement (*see* Sections I. and XVII.I), from directly or indirectly breaching any terms of the Settlement Agreement.

2.      This Court will retain jurisdiction over the Parties to enforce the Consent Judgment and Permanent Injunction pursuant to Section XVI.B. of the Settlement Agreement.

3.      Pursuant to Section XV. of the Settlement Agreement, the Court appoints Margo Schlanger to serve as a Settlement Monitor to monitor the implementation of the Settlement Agreement. Pursuant to Section XV.B. of the Settlement Agreement, the Settlement Monitor will provide semi-annual reports to the Court and to the Parties concerning the status of Defendants' compliance with the Settlement Agreement or report to the Court pursuant to any schedule hereafter set by the Court.

4.      Except as provided herein, all claims alleged in the Complaint are dismissed with prejudice pursuant to Section XVI.B. of the attached Settlement Agreement and all pending motions are withdrawn.

Dated: May 29, 2015

On behalf of Plaintiffs,

*/s/ Ralph Miller*
Ralph Miller (admitted *pro hac vice*)
Kristen Murphy (admitted *pro hac vice*)
W. Sutton Ansley (admitted *pro hac vice*)
Zachary C. Garthe (admitted *pro hac vice*)
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington Dc 20005-3314
(202)682-7000
Fax: (202) 857-0939
ralph.miller@weil.com
kristen.murphy@weil.com
sutton.ansley@weil.com
zachary.garthe@weil.com

Gregory A. Blezley
BelzleyBathurst Attorneys
P.O. Box 278
Prospect, KY 40059
(502) 292-2452
gbelzley@aol.com

Deborah Golden
Elliot Mincberg (admitted *pro hac vice*)
Washington Lawyers' Committee
  For Civil Rights & Urban Affairs
11 DuPont Circle, NW, Suite 400
Washington, DC 20036
(202) 319-1000
(202)319-1010 (fax)
deborah_golden@washlaw.org
elliot_mincberg@washlaw.org

***Counsel for Plaintiffs***

On behalf of Defendants,

*/s/ Angela Dunham*
ANGELA T. DUNHAM
DEPARTMENT OF CORRECTIONS
Office of Legal Services
275 East Main Street
P.O. Box 2400
Frankfort, Kentucky 40602-2400
Telephone: (502) 782-2299
Fax: (502) 564-8765

***Counsel for Defendants***

SO ORDERED:

_____
The Honorable Judge Gregory F. Van Tatenhove

Dated: **6-24**_____, 2015

Exhibit 101

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# AT FRANKFORT

**OSCAR ADAMS and MICHAEL KNIGHTS**

    **Plaintiffs**

           v.

**COMMONWEALTH OF KENTUCKY, et al.**

    **Defendants.**

Case No. 3:14-cv-00001-GFVT

## Ninth Semi-Annual Report by the Settlement Monitor
## December 16, 2020

Margo Schlanger
Settlement Monitor
625 So. State Street
Ann Arbor, MI 48109

## I.   INTRODUCTION

The Settlement Agreement in this matter became effective on June 29, 2015, and was originally set to remain in effect for five years from that effective date. I filed my most recent prior report in May 2019, six months ago. It acknowledged the real effort and attention undertaken by KDOC headquarters and institution staff, but expressed concern that substantial compliance had not yet been achieved.

Responsive to that concern, the parties agreed to an extension of the settlement term to the end of 2020. See *Amendment to the Settlement Agreement between Defendants the Commonwealth of Kentucky and Plaintiffs Oscar Adams and Michael Knights*, ECF #98-1 (Aug. 3, 2020). That document also provided, "The KDOC, however, intends, but is not bound by this Agreement, to provide all accommodations required under the law, including under the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws, after this Agreement expires."

In this current filing, although the COVID pandemic has created real obstacles, I am pleased to report yet more progress. I cannot say that each KDOC prison is complying with each and every settlement agreement provision. However, compliance with many of the ADA/Settlement Agreement requirements has been accomplished. And I believe there is now a system in place that can—if the prison authorities so choose—succeed in maintaining that compliance and in solving remaining problems. In order to assist in that process, I continue to offer recommendations for the period after the settlement term closes.

This report is based on several sources of information:

- The self-audit process I have described in prior reports, with most information provided as of October 1, 2020. I shared the most current self-audit checklist with each KDOC ADA Coordinator and Warden on September 15, 2020, along with a request for other information. (The memo I sent is attached as Exhibit 1.) I asked that each institution complete and return it to me two weeks later. The resulting spreadsheet and, where they seem useful, other responses are attached as Exhibit 2. (I have redacted inmate names and id numbers.) I did several additional information requests, dated September 22, October 1, and November 21. All are attached, redacted, in Exhibit 1. I also circulated this report in draft on December 8, and received some additional information by December 14. This is described in Part II.2, below.
- Followups with institutions and KDOC headquarters about the areas of concern identified in the last report, and with KDOC's medical contractor, Wellpath, about ongoing audiology processing.
- Over 150 inmate telephone interviews, and other inmate communications via letter and J-Pay, a form of email.
- Telecommunications testing of TTYs and captioned telephones.

As usual, Table 1, below, tallies deaf/HOH inmates at each institution. The numbers presented are based primarily on the information received in October 2020; locations are as of November

2020. However, the count of deaf/HOH inmates listed at each institution is not simply the self-reported figure; instead, I supplemented the self-reporting using a master list of deaf/HOH inmates that I maintain based on all the institutions' prior reporting, and then updated locations using KDOC's online inmate lookup page. The result addws dozens of inmates to this cycle's self reporting. (I provided the list of added individuals to KDOC.) There is some remaining confusion around identification/tracking of individuals—I discuss this below at Part II.2.

**Table 1: KDOC Institutions**

| Institution | # HOH Inmates Apr. 2019 master list, locations as of Sept. 2019 | # HOH Inmates March 2020 | # HOH Inmates October 2020 |
|---|---|---|---|
| Blackburn Corr. Complex (BCC) | 12 (0 deaf) | 26 (0 deaf) | 26 (0 deaf) |
| Bell County Forestry Camp (BCFC) | 3 (0 deaf) | 6 (0 deaf) | 8 (0 deaf) |
| Eastern Ky. Corr. Complex (EKCC) | 59 (0 deaf) | 94 (0 deaf) | 138 (0 deaf) |
| Green River Corr. Complex (GRCC) | 49 (0 deaf) | 63 (1 deaf) | 91 (1 deaf) |
| Ky. Corr. Inst. For Women (KCIW) | 17 (2 deaf) | 32 (2 deaf) | 61 (2 deaf) |
| Ky. State Penitentiary (KSP) | 32 (1 deaf) | 69 (1 deaf) | 109 (1 deaf) |
| Ky. State Reformatory (KSR) | 217 (2 deaf) | 283 (1 deaf) | 327 (1 deaf) |
| Lee Adjustment Center (LAC) | 32 (0 deaf) | 42 (0 deaf) | 45 (0 deaf) |
| Luther Luckett Corr. Complex (LLCC) | 155 (2 deaf) | 211 (1 deaf) | 232 (1 deaf) |
| Little Sandy Corr. Complex (LSCC) | 92 (1 deaf) | 148 (1 deaf) | 165 (1 deaf) |
| Northpoint Training Center (NTC) | 76 (1 deaf) | 94 (1 deaf) | 150 (1 deaf) |
| Roederer Corr. Complex (RCC) | 26 (0 deaf) | 86 (0 deaf) | 111 (0 deaf) |
| Western Ky. Corr. Complex/Ross-Cash (WKCC) | 55 (0 deaf) | 52 (0 deaf) | 68 (0 deaf) |
| **TOTAL** | **825 (9 deaf)** | **1206 (8 deaf)** | **1531 (8 deaf)** |

In my prior report, I raised the issue whether the Settlement Agreement covers state inmates housed in county jails, which had become more salient because of a lawsuit filed by a hard-of-hearing inmate. See Hicks v. Williams, 5:20-cv-00081-TBR (W.D. Ky.). Complaining that he has been unable to get access to parole-required programming because of his hearing impairment, Mr. Hicks seeks to be moved from the Fulton County Jail to a jail or prison that complies with the Settlement Agreement in this case. I asked both plaintiffs' and defendants' counsel to share their thoughts about his case's appropriate connection to this litigation; both sides agreed that this case was not intended to reach Kentucky's jails, even for state inmates housed there. Mr. Hicks case remains open. In light of the parties' shared understanding about the scope of the instant case, and the fact that it is nearing its conclusion, I do not discuss jail issues further.

In what follows, in Part II, I begin with systemwide issues previously discussed. In this report, I repeat the prior identified action items in **bold text**, followed by a summary of the progress on each. My resulting recommendations for the period of time that follows this report—including after the close of the settlement agreement period—are in ***bold italic***. (For ease of reference, I also repeat these new recommendations, numbered, in the Conclusion.)

In Part III, I list additional issues that emerged with high frequency from the many interviews my assistants conducted, and make relevant recommendations for the period following the close of the settlement term.  (These, too, are repeated in the Conclusion.)

In Part IV, I move to statistics relating to audiology processing times. These are much improved. Part V lists a few institution-specific issues that seem important enough to memorialize and discuss. Part VI is the Conclusion.

## II.    PRIOR-IDENTIFIED SYSTEMWIDE ISSUES

### 1.  New ADA Coordinators

**Prior recommendation: KDOC should develop and implement an ADA Coordinator transition process, which should include processes for at least the following:**

- **informing new ADA Coordinators about available resources,**
- **linking them to other facilities' ADA Coordinators,**
- **walking them through auxiliary aid, reporting, and tracking processes,**
- **updating the recipients of ADA related emails (for example, automated transfer emails),**
- **updating the KDOC website list of ADA Coordinators.**

Progress: KDOC is now compliant with this recommendation. It seems that compliance extends even to its privately run institution, and is underway, as well, for a new institution scheduled to come on-line soon.

In October 2020, I conducted a (remote) 2-hour ADA and compliance training to ADA Coordinators and Wardens, via Zoom.  Training slides and a video of the session were provided to KDOC for any future personnel. The slides are attached as Exhibit 3.

### 2.  Inmate tracking, transfer alerts, etc.

**Prior recommendation: Someone at KDOC headquarters should check <u>each and every</u> inmate for whom there is a record of a hearing impairment, and ensure that each of them is being appropriately tracked in KOMS.**

**Individuals whose records have only a general alert, in Kentucky Offender Management System (KOMS) need an ADA alert. The transfer notification system needs to be tested and problems solved, from KDOC headquarters.**

**Whether the information comes automatically to medical or is relayed by the ADA Coordinator, medical staff responsible for intake should be informed that a deaf/HOH inmate is incoming, so that they can ensure that audiology processes are not interrupted, deal with lost hearing aids, etc.**

4

Progress: I previously noted that after some transitional difficulties all the prisons—including the private facility, Lee Adjustment Center—were getting transfer notices. New integration of medical records and KOMS has improved the system by which new identifications are flagged. The new system will automatically insert an ADA alert into an inmate's KOMS record whenever a medical provider confirms a diagnosis of a hearing impairment. (The system currently requires several steps for this to occur, but is being streamlined in the next several weeks.) Once some technical glitches are fixed, the new system will also send each ADA Coordinator a notice that there's been a new diagnosis entered for an inmate at his/her prison, so that the ADA Coordinator can then provide further details in the ADA tab's notes space. As the ADA Coordinators themselves confirmed (see prior report) it would be best for that space to record accommodations/auxiliary aids needed (and date issued); degree of hearing impairment; and communications method of choice. I do not know whether the ADA Coordinators have gone through their inmate lists and entered this information for all of the inmates.

***I recommend completion of the planned KOMS improvements. In addition, once the ADA flag is triggered by a medical diagnosis, I recommend that medical staff review the appropriate information for each one and place their diagnoses into KOMS.***

Notwithstanding these technical improvements, as of early December, there were a significant number of inmates—over 200—for whom some confusion remained. For over 100 inmates this reporting period, I received audiology-processing information but not auxiliary aid information, and for another several dozen I received auxiliary aid information but have never received audiology information. In addition, I had compiled a list of a few dozen more current inmates who were previously reported to me as Deaf/HOH, but whom no institution flagged in this reporting period. Last week, I provided a list of the problematic names and ID#s to KDOC, and asked that they investigate and report back promptly. For some of the inmates included in this exercise, investigation indicated that they were not Deaf/HOH, after all—some had subsequent medical testing that demonstrated no hearing impairment; others had a non-hearing disability. For others, the issue was that the last day covered by the two reports was not the same. But for quite a few, investigation revealed that the absence of an ADA flag was an oversight. And review of audiology records demonstrated that at some institutions, only hearing impairments classified as "significant" were leading to a hard-of-hearing diagnosis and the corresponding ADA flag. This was incorrect: even a moderate impairment should be recorded and tracked—and if necessary accommodated—once detected.

Wellpath's speciality clinic coordinator reviewed this issue and informed me that a solution was underway:

> I will be emailing my spreadsheet to all providers today so that they can verify that each of their HOH patients including "active", "does not qualify" "refused", and "released" have the correct diagnosis, precaution, and ADA alerts in their chart. I will also be checking any future HOH patient charts to ensure all the correct documentation is included moving forward. I also verified that diagnosis should be entered for any level of hearing loss even if they do not qualify for an Hearing aid.

This remedial plan seems very appropriate. To memorialize it in a recommendation, ***now that ADA identification issues are sorted out, I recommend that KDOC and Wellpath conduct records both retrospective and prospective review to ensure correct documentation and diagnosis flags.***

### 3. Audiology standards

**Prior recommendation: Providers at each institution should receive a new memo with the correct audiology standard, and the update should be emphasized in some kind of training or other communications.**

**Providers at each institution should be trained about how to evaluate the need for binaural hearing aids, and should review recent requests for two hearing aids and evaluate them against the policy, with oversight from the regional medical director. In addition, inmates who have hearing deficits in both ears should have the policy explained to them when they are denied binaural amplification, so that they can make an informed decision whether to grieve the denial.**

Progress: At this point, I am satisfied that providers have been appropriately informed about the binaural amplification policy. I continue to have some substantive concern about whether binaural amplification is being provided when appropriate, but I do not feel that either my role or expertise allows me to countermand the recent denials of binaural amplification. ***I recommend that KDOC make periodic efforts to remind medical providers that while binaural amplification is not to be provided routinely, it is appropriate where there is a safety or vocational need for it. In addition, it would be a good practice for medical grievances raising binaural amplification to be evaluated by a different physician, to bring a fresh perspective to the request.***

### 4. Audiology services delays

**a. Prior recommendation: KDOC's medical provider should centralize a reporting system so that if any inmate has not completed audiology processing in three months—from the first report of a hearing problem to provision of a hearing aid or other resolution—that is reported centrally and headquarters staff take a role in immediately solving the problem.**

Progress: Wellpath, KDOC's medical contractor, has now designated a "specialty clinic coordinator" to track and manage audiology progress. The COVID-19 pandemic has caused some delays (see Part IV, below), but it does seem that a system is now in place to monitor and solve problems.

**b. Prior recommendation: There needs to be an instruction to *both* the transferring and the new institution; the transferring institution should send a progress note for all inmates whose audiology evaluation/provision is in-process, and the new institution should do a thorough chart review for each inmate who might be HOH, to check for in-process audiology needs.**

Progress: The automated ADA alert in KOMS should help with this problem; if an inmate is flagged in KOMS, the ADA Coordinator and health staff will know about it and be able to look for pending audiology issues. The new "treatment team" approach, combined with case management by Wellpath, can then solve any delays. That said, since the KOMS flag itself does not take place until diagnostic confirmation by a provider, it is still possible for individuals to be accidentally dropped if they are transferred prior to such confirmation. Before the last report, KDOC shared with me a new "Workflow for Auxiliary Aid upon transfer," which included chart review completed by the institutional Provider "to determine if a patient is being worked up as HOH." In addition, it seems that Wellpath's specialty clinic coordinator is tracking people prior to diagnosis. So it seems plausible that this problem has been solved. That said, *I recommend that the specialty clinic coordinator conduct spot checking to ensure that her tracking list includes all inmates who are undergoing audiology workup, including prediagnosis, and solve any problems that emerge.*

### 5. *Auxiliary aids*

### a. Devices

Table 2 itemizes auxiliary aids I'm aware each institution has, based on their reporting.

**Table 2: Auxiliary Aids Available.**

| | BCC | BCFC | EKCC | GRCC | KCIW | KSP | KSR | LAC | LLCC | LSCC | NTC | RCC | WKCC/Ross |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Telecommunication devices/amplification** | | | | | | | | | | | | | |
| Captioned telephone* | Y | Y | Y | Y | Y | Y | Y | IP | Y | Y | Y | Y | Y |
| Portable phone amplifiers* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| TTY | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Videophone kiosk* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Non-telecommunication amplification** | | | | | | | | | | | | | |
| Assistive listening (FM radio transmitters)* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Earphones for orientation video* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Earphones for parole hearings* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Non-auditory alerts** | | | | | | | | | | | | | |
| ADA support inmates | Y | Y | Y | Y | | | Y | Y | Y | Y | Y | Y | Y |
| Bed shakers | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | |
| Lights flash for count etc.** | Y | Y | Y (HOH walks) | Y | | | | | | Y | | | Y |
| Pagers | | Y | | | | Y | Y | | | | | | |
| Vibrating watches* | Y | Y | Y | Y | | Y | Y | Y | Y | Y | Y | Y | Y |
| Vibrating alarm clocks* | Y | Y | Bed shaker is alarm clock | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Interpretation** | | | | | | | | | | | | | |
| VRI/VRS laptop* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

IP = In Progress  * = Recommended for every facility ** = Recommended wherever practicable

Of course, it is not enough to have auxiliary aids available—they need to be used, not set on a shelf. Table 3 demonstrates that KDOC's institutions are quite uneven in their usage rate of various auxiliary aids. For the institutions where usage is very low, it is likely that better education or access rules would increase the usefulness of these new accommodations.

## Table 3: Auxiliary Aids Issuance Rate

| Institution | # HOH inmates (October 2020) | Auxiliary Aids Issued | | | | |
|---|---|---|---|---|---|---|
| | | Vibrating clocks/ watches | Bed-shakers | Behind-head masks | Clear masks (issued to staff) | Captioned telephone access |
| BCC | 26 (0 deaf) | 0 | 5 | 2 | 0 | All |
| BCFC | 8 (0 deaf) | 0 | 0 | 1 | 0 | 8 |
| EKCC | 138 (0 deaf) | 22 | 0 | 7 | 0 | 25 |
| GRCC | 91 (1 deaf) | 14 | 6 | 25 | 6 | All |
| KCIW | 61 (2 deaf) | 8 | 4 | All | 0* | All |
| KSP | 109 (1 deaf) | 1 | 1 | 114 | 10 | 8 |
| KSR | 327 (1 deaf) | 86 | 45 | 159 | 187 | 2 |
| LAC | 45 (0 deaf) | 18 | 7 | 1 | 3 | No captel |
| LLCC | 232 (1 deaf) | 113 | 2 | All | 1 | 2 |
| LSCC | 165 (1 deaf) | 52 | 3 | 106 | 7 | 11 |
| NTC | 150 (1 deaf) | 13 | 3 | 15 | 120 | 8 |
| RCC | 111 (0 deaf) | 28 | 2 | 61 | 0 | 8 |
| WKCC (incl. Ross/Cash) | 68 (0 deaf) | 47 | 0 | 37 | 12 | 2 |
| TOTAL | 1531 (8 deaf) | 402 | 78 | 824 | 346 | 229 |

* Staff remove masks and maintain social distancing when speaking with two inmates who lip read for communication

*i. Videophones:*

**Prior recommendation: KDOC headquarters needs to solve the Purple videophone outage problem so that outages are both rare and brief, or make a systemwide switch to a more reliable videophone provider.**

Progress: Inmates who use the videophones have for several years reported connectivity issues— glitchy or poor connections and pixilation making use difficult (recall, these are videophones; if the user cannot see the image, that's like not being able to hear on a regular phone).  Prior to my May 2020 report, KDOC disagreed with these inmate accounts, and stated that no systemic problems existed. In that report, I urged the Department to evaluate further, and more deeply. I am not aware that this occurred.

In the most recent information request, I asked each institution how many out-of-service days its videophone experienced. I think the question was a little bit unclear in the reporting instrument, and so I only received partial responses. That said, two institutions reported issues: EKCC reported that the videophone is typically out-of-service one to two days per month, and LSCC reported an outage period of 30 days, before it received a new videophone. In addition, an inmate at NTC who uses the videophone reports that the camera frequently turns off in the middle of his calls.

*I recommend that, going forward, KDOC headquarters closely monitor outage periods and other technical difficulties and consider alternative vendors or other solutions.*

In addition, access issues still occasionally arise, particularly on evenings and weekends, where Deaf inmates are refused access to the videophone during some of the hours that hearing inmates have access to regular telephones. *The ADA Coordinators should periodically remind staff that access to the videophone, TTY, and captioned telephones should be afforded inmates during the same periods for which hearing inmates can access regular telephones.*

**Prior recommendation: Each institution in which the videophone is widely visible to other inmates should install such a curtain unless there is a significant security obstacle.**

Progress: It was reported to me that the ADA Coordinator at each institution reviewed this situation and solved it where applicable. I have not heard further complaints.

*ii. Portable phone amplifiers:*

**Prior recommendation: Portable phone amplifiers should be available at each institution.**

Progress: Compliant as to purchase; there remain some information and access issues which should be monitored. *Hard-of-hearing inmates should be informed that the amplifiers exist, and the process for using them should be made easy.*

*iii. Phone volume control.*

**Prior recommendation: There should be at least one volume-control phone in every grouping of phones in every institution, including the phones used in restrictive housing.**

Progress:  Compliant.  That said, hard-of-hearing inmates continue to report access difficulties, because these phones are popular for all inmates. *It would be appropriate to add additional volume-control phones wherever practicable.*

*iv. Captioned telephones (or "captels").*

**Prior recommendation: Captioned telephones should be made available in every institution, available at the same hours as a regular phone.**

Progress: At this point, all the facilities except the Lee Adjustment Center have captioned telephones. Installation and use has been challenging, but testing suggests that they all, finally, work. However, ongoing testing remains essential; phones that work this month can stop working for a variety of reasons.  *I strongly recommend that headquarters test both the TTYs and captioned telephones at least twice each year, to ensure that they all stay operational.*

In addition, as Table 3 tallies, some institutions have authorized only a very small number of inmates to use the captioned telephone.  It seems implausible that these institutions don't have

any inmate for whom this technology would help meet the ADA obligation of equal access to telephone services.  Access should be offered when needed.

*v. Amplified phones.*

**Prior recommendation: None of KDOC's institutions has an amplified phone, but these too would be worth looking into, centrally.**

Progress: KDOC determined that additional amplified phones were not needed. ***Captioned telephones have amplification features, so ADA Coordinators should inform hard-of-hearing inmates that these are available to them.***

*vi. TTYs.*

**Prior recommendation: Each institution needs to work out and test a protocol by which TTYs can be used—and then write that protocol into full instructions capable of being followed by someone who has never used a TTY before.**

Progress: After my prior report, testing demonstrated that there were many problems with TTY usability and access. After months of effort, all the TTYs are finally operational, and their instructions seem adequate.  But the testing experience over the settlement agreement period demonstrates that this situation is—always—temporary. ***I recommend that headquarters staff obtain access to an online TTY (via http://www.nextalk.com/) and then conduct at least twice yearly TTY-to-TTY and TTY-to-voice testing of each institution's TTY.***

*viii. Assistive listening systems.*

**Prior recommendation: At every institution, assistive listening devices should be made readily available for such environments: religious, educational, and rehabilitative programming. The need is particularly urgent for Substance Abuse Programming, which many institutions conduct in extremely noisy and difficult locations.**

Progress: Each facility now has FM transmitter devices to use for assistive listening. As previously reported, in some, these are going largely unused; in others, they seem to be quite successful.  Which is which seems to depend mostly on whether staff—and particularly the ADA Coordinator—demonstrates their usage to inmates who might benefit. ***I recommend that the ADA Coordinators for the institutions where the transmitter devices are being used successfully in classes and the like share with their colleagues that practices that are producing those successes.***

*ix: Earphones for video communication.*

**Prior recommendation: KDOC should ensure that earphones for video communication are available in each prison, and also anywhere parole hearings are held—that is, in county jails. In addition, individuals who might need this equipment should be informed that it is available.**

Progress: KDOC now reports that earphones are available in each prison. In addition, Kentucky's Parole Board Chair reports that there have been no problems providing accommodations to Deaf/HOH inmates. (I do not have any information either confirming or contradicting this latter report.) Before my May report, KDOC stated that it was planning to propose new standard language governing Parole accommodations at the next meeting of the Commission on Corrections:

> If the Parole Board is conducting a hearing where the offender has a hearing deficit, the Parole Board would not proceed without appropriate accommodations. The Parole Board would advise KDOC that services would need to be arranged for the offender to accommodate his/her hearing deficit. The arrangements would be made by DOC and the Board would proceed after verification that appropriate services are in place.

***The proposed standards language should be adopted.***

*x. Non-auditory alerts.*

**Prior recommendation: In any housing unit where it is practicable, KDOC should direct staff to flash the overhead lights to signal chow and pill-call. In addition, KDOC should direct implementation of some kind of personal notification to deaf/HOH inmates, so that they do not miss personal announcements (e.g., "John Smith, report to the Unit Administrator").**

Progress: KDOC previously explained that flashing overhead lights is not always practicable. Each facility now reports that it has some kind of system for alerting Deaf/HOH inmates of announcements.  Nonetheless, unequal access to alerts—alerts signally various routine moments every day (count, chow, pill-call, yard), and alerts for personal announcements—remains a major source of difficulty for deaf/HOH inmates. Accordingly, ***I continue to recommend that at every prison, (1) flashing lights be used for routine alerts where practicable, (2) Deaf/HOH (not just Deaf) inmates be provided a method by which they can obtain non-auditory alarm watches or clocks, and (3) in-person notifications be provided where needed for personal alerts, whether by staff or other inmates. This issue will require additional fine-tuning, training, and monitoring.***

**b. Inmate purchases of non-auditory alarm devices**.

**Prior recommendation: KDOC headquarters should check with the institutions that have already piloted the devices about models and methods, and then should make them available for purchase by deaf/HOH inmates at all the institutions. (When inmates transfer from one institution to another, they should be authorized to bring these devices with them.)**

Progress:  Substantial progress towards compliance. All the KDOC institutions now allow inmates to purchase non-auditory alert devices. It is important that these also be made available to indigent inmates. At BCC, for example, the policy that has been adopted and communicated to

inmates is: "The ADA Coordinator will loan non-auditory watches/alarm clocks to indigent individuals. If you are not indigent but are unable to pay for such devices, they are still available to you by loan via an inmate account lien, when sufficient money comes into your account the lien will be satisfied."

I do, however, have some concerns that in some of the institutions, the availability of non-auditory items has not been sufficiently communicated to inmates, or perhaps there's been a breakdown in the purchase system. As Table 3 sets out, usage is extremely low at some institutions. Perhaps inmate preferences are different in those institutions—but my educated guess is, some other implementation issue is dampening access to these useful devices. *ADA Coordinators should continue to communicate to inmates that they have access to non-auditory alarms that can help alert them to various scheduled events in the prison.*

**c. Bulletin boards**.

**Prior recommendation: Bulletin boards posting non-routine announcements should be provided in every housing area at each institution.**

Progress: KDOC agreed to use bulletin boards and other methods, but explained that bulletin boards are not always appropriate. *I continue to recommend that non-routine announcements be communicated in some non-auditory fashion; if bulletin boards are not a workable solution, some other solution is needed, in each housing unit.*

**d. Auxiliary aid processes**.

**Prior recommendation: KDOC should direct all institutions to implement auxiliary aid evaluations/reviews, and the process should have the following characteristics**:

- **An auxiliary aid evaluation should be conducted within 2 weeks—and ideally substantially sooner—of each deaf/HOH inmate's arrival at an institution or identification as deaf/HOH.**
- **The evaluation/process should be performed at a meeting between the inmate and the ADA Coordinator, so that the inmate learns who the ADA Coordinator is, and so that the inmate is given appropriate information about resources and services.**
- **Effective communication should be provided at the meeting—meaning that an interpreter is necessary for any inmate who signs to communicate, and that for inmates who do not read, any documents should be fully explained using accessible language.**
- **At the meeting, the inmate should be informed about all services/resources available—hearing aids, telephonic assistance, interpretation, captioning, etc. The brochure that has been developed for this should be kept on hand, and distributed at the meeting. It should be updated whenever necessary, as new devices or new procedures come online.**
- **Inmates should receive easy-to-provide resources no later than the meeting. For example, that is when they can get bed cards, hard-of-hearing IDs, etc. Criteria**

and a clear process should be developed for access to any limited resources (bed shakers, telephone amplifiers, etc.), and explained to the inmates.

- Inmates should be informed at the meeting about a clear process for getting any additional auxiliary aids/assistance they need.

Progress: KDOC reports that the auxiliary aid process has been folded into a "Treatment Team" process. *The key is for auxiliary aid meetings to be held in person with each inmate and for non-medical staff to affirmatively inform inmates of the available devices and services.*

## 6. Inmate handbook

**Prior recommendation: KDOC should standardize a notice for the Inmate Handbook, using text along the lines of what follows**:

> {Institution} is required to comply with the Americans with Disabilities Act (ADA). A disability is a physical or mental impairment that substantially limits a major life activity such as seeing, hearing, walking, bathing or breathing. (Temporary conditions, like a broken leg, are not considered a disability.) Under the Americans with Disabilities Act, {Institution} will ensure that inmates with disabilities have access to all services, privileges, facilities, advantages, and accommodations that is substantially equivalent to access provided similarly situated non-disabled inmates.

> {Institution} will communicate effectively with inmates who are deaf and/or blind, ensuring that they can receive information from and provide information to staff. When needed for effective communication, {Institution} will provide "auxiliary aids and services." This means devices or services that assist in communication, such as interpretation, hearing aids, captioning, videophones, amplifiers, etc. HOWEVER, if something a disabled inmate seeks—a particular job, for example— would be dangerous, posing a direct threat of injury or death to the inmate or others, {Institution} can bar the inmate's access to that job after individualized consideration and consultation with appropriate medical experts.

> {Institution} has an assigned ADA Coordinator who is responsible for training and advising staff in ADA matters and monitoring ADA concerns such as accessibility requirements and accommodations. The ADA Coordinator also reviews requests for adaptive equipment and accommodations as well as ADA complaints. To contact the ADA Coordinator, you may {HOW TO GET IN TOUCH} {e.g., send written correspondence via Institutional Mail or, in the event you are unable to submit a written request, you may contact your Classification and Treatment Officer who shall document and forward your request.}

> There is a federal court Settlement Agreement that governs services for deaf and hard-of-hearing inmates. It is available, along with additional information about such services, for all inmates to read on request, in the Inmate Legal Library.

Progress: Compliant.

## III. ISSUES RAISED REPEATEDLY BY INMATES DURING THIS REPORTING PERIOD

To substitute for site visits (which were not practicable given the pandemic), between August and November, my law-student assistants conducted over 150 phone/videophone interviews of KDOC Deaf/HOH inmates—at least 10 at each prison. In addition, for each inmate my assistants or I had not previously communicated with, I sent a J-Pay, explaining my role and asking about their experience. The most common complaints, across institutions, were:

1. Dozens of inmates reported difficulty hearing announcements, both inside and on the yard, leading to missing meals, mail call, pill call, and the like, and causing conflict and threats of disciplinary action. This is addressed above in Part II.5.a.x and II.5.b.

2. Masks are making it harder to read lips and understand staff, and masks that loop behind the wearer's ears physically interfering with behind-ear hearing aids.

   In response to this complaint, I urged KDOC to issue clear masks to staff who frequently encounter inmates who read lips as part of their communication strategy, and to issue behind-the-head masks to inmates who wear hearing aids. Responses have varied. While each institution reports that both types of masks are now available to staff/inmates, the actual issuance/usage rate varies greatly. (See Table 3.) WKCC's response seems to me useful for all the institutions to learn from; its ADA Coordinator reported that he interviewed 12 inmates with hearing aids, each of whom told him that the ear-loop masks were posing difficulties. Accordingly, WKCC issued tie-back masks to all 37 inmates with hearing aids.

   ***Recommendation: Clear masks and masks that attach behind the wearer's head, rather than behind the ears, are essential. Both are reportedly available at all KDOC institutions, but at some institutions seem to be in use only rarely. Inmates who are Deaf/HOH should be affirmatively asked if their comprehension would be assisted by clear masks for staff in their housing units, work-places, programs, etc., and if they answer yes, those masks should be issued/used accordingly. In addition, staff who will deal with Dear/HOH inmates more generally—the ADA Coordinator, Unit Administrators, etc., should be issued clear masks for use when appropriate. All inmates who wear hearing aids should be affirmatively offered behind-head masks.***

3. Telephones are difficult to use because of background noise. Telephone voice identification difficult for HOH people to use. Insufficient number of volume-adjustable and HOH phones.

   KDOC staff have confirmed that the voice identification and background noise complaints are often well-founded. ***Recommendation: ADA Coordinators should review phone issues, and ensure that (a) there are enough volume-adjustable and HOH phones for usage patterns, (b) phones are in a space quiet enough to allow HOH individuals to use them, (c) any voice-recognition issues are solved.***

4. Inmates not getting HOH ids, bed signs, other auxiliary aids; not being informed about available auxiliary aids. (E.g., not knowing they could purchase vibrating clock or watch). After ADA Coordinators met with these individuals in response to my questions, a fair number of these inmates needed additional auxiliary aids.

   ***Recommendation: These complaints suggest a need to conduct auxiliary aid meetings not just once on an inmate's arrival to a prison, but every year or two.***

5. Many inmates raised hearing aid issues: They report that their hearing aids are not working well, not replaced promptly. They are unhappy with bilateral hearing aid denials. They report confiscation and then loss of hearing aids on assignment to restrictive housing. And they report great difficulty getting hearing aid batteries—particularly in segregation, but elsewhere as well. One inmate reported that due to an unrelated medical issue, he lacks the manual dexterity to use his hearing aid—his prison's ADA Coordinator responded to me that there is only one kind of hearing aid available, so if he is unable to use it, there is nothing that can be done. Obviously, this is unacceptable—medical staff need to evaluate his situation and assess whether a different device would be accessible to him.

   ***Recommendation: The loss of hearing aids on transfer within and between prisons is a longstanding and demonstrated problem. The solution is additional staff training/alertness, and property checklists that include hearing-related equipment. The battery issue has become more prevalent during the pandemic; I recommend that Wellpath review battery availability, prison by prison, and ensure a sufficient stock to avoid shortages. In addition, KDOC/Wellpath should ensure that inmates receive hearing aids medically suited to their situation.***

6. Many inmates complain of disrespect and rudeness from officers, and that they have been threatened with discipline, or even received discipline, for conduct caused by their inability to hear (missing pill call and the like). On investigation, I found several disciplinary records that suggested that an inmate may have been punished for being unable to hear—or, at least, that the staff effort to avoid this unfair consequence was inadequately documented.

   ***Recommendation: Staff responsible for disciplinary adjudication should be trained that it is inappropriate to penalize someone for their disability (e.g., for failing to obey an order they did not hear), and that they should ask appropriate questions and document their thought processes with respect to this issue in relevant disciplinary cases. Each ADA Coordinator should conduct such training immediately for appropriate staff, and then repeat it as necessary when new employees assume the disciplinary adjudication role.***

## IV. AUDIOLOGY PROCESSING

Including all the information I have received since the settlement was entered about hearing aid provision and audiology processing, over the settlement term, KDOC institutions have conducted screening examinations of thousands of inmates for hearing impairments, and have provided over 1400 hearing aids. As in the May 2020 report, I focus below on the individuals who received hearing aids. This is the slowest group, in terms of processing time, so if these inmates are receiving timely services, that is very good news.

Processing timeliness has shown major improvements. My recommendation, made in December 2016, was for a two-month or less turn-around. This has not quite been achieved, but it's now very close. As Table 4 shows, for inmates whose hearing needs came to KDOC's attention in 2019, and who ended up getting hearing aids, it took on average 87 days for KDOC to evaluate/meet those needs. (This statistic is 11 days longer than I reported in my prior report, because it now includes all but one of the 11 cases that were ongoing as of May 2020, whose processing times were substantially longer than typical.) Table 3 shows the year-by-year trend (omitting four cases for which I do not have the start and/or the end dates):

**Table 4: Processing Times for Inmates Who Received Hearing Aids**

| When prison alerted to hearing issue | N | Avg. days to resolution | Still ongoing |
|---|---|---|---|
| 2016 (includes 11 from 2015) | 89 | 198 | 0 |
| 2017 | 205 | 149 | 0 |
| 2018 | 321 | 138 | 1 |
| 2019 | 477 | 87 | 1 |
| 2020 (through December 1) | 315 | 54 | 7 |
| **All, 2015 to present** | **1407** | 107 | 9 |

Moreover, so far, 2020 is looking notably better than 2019—the average of 54 days is both substantially shorter than the prior year's average, and it is distorted only by 9 ongoing cases, so is likely to be at least close to the final average, once those last handful of cases are resolved. (See below.) That said, 54 days is an average; resolution times were occasionally far longer. See Table 5:

**Table 5: 2020, distribution of processing time for inmates who received hearing aids.**

| Resolved in: | % | Cumulative % |
|---|---|---|
| <= 30 days | 19% | 19% |
| 30-60 days | 52% | 71% |
| 60-90 days | 20% | 91% |
| 90-120 days | 5% | 96% |
| 120-180 days | 3% | 99% |
| > 180 days | 1% | 100% |

As Table 5 shows, about 30% of cases in 2020 have taken over 2 months—one third of those (9%) have taken over 3 months. Moreover, both Table 4 and Table 5 slightly overstate the speed of resolution. As of December 1, there were 9 inmates whose audiology evaluation were still in process; the eight for whom I have data are tallied in Table 6. The COVID-19 pandemic is the reported cause for several of the delays.

**Table 6: Ongoing Audiology Needs, as of December 1, 2020**

| Date KDOC alerted | Progress/Cause for delay | Prison | Days in process (as of 12/1/2020) |
|---|---|---|---|
| 9/15/2018?? | No notes | NTC | 808 |
| 4/10/2019 | Being followed by outside ENT. | GRCC | 601 |
| 3/3/2020 | New cochlear implant ordered; waiting for offsite ENT to call when it's ready. COVID delay. | LLCC | 273 |
| 3/16/2020 | No notes | WKCC | 260 |
| 4/27/2020 | Outside ENT appointment scheduled for January 2021. | LSCC | 218 |
| 5/23/2020 | Awaiting offsite appointment to receive special hearing aid. | KSP | 192 |
| 9/18/2020 | Inconclusive hearing test performed September 2020; (delayed) chart review in November ordered a second test, but COVID lockdown has further delayed test. | LSCC | 74 |
| 9/19/2020 | Inconclusive hearing test performed September 2020; chart review 10 days later ordered a second test, but COVID diagnosis/lockdown has delayed that. | LSCC | 73 |

As of December 1, 2020, the ongoing cases were an average of 312 days old. Obviously by the time they are resolved, the average resolution time will be higher. But unlike in prior reports, there are only a few. And the pandemic obviously poses really significant challenges not previously present—this is particularly the case at LSCC.

These summary statistics mask considerable variation among facilities. Table 7 examines the issue facility by facility (omitting the cases for which dates are unavailable.). It shows days to resolution by prison, setting out both the average and various percentiles (10%ile, 25%ile, 50%ile, 75%ile, and 90%ile). Figures over the 60 day recommendation are highlighted in yellow;

outliers are highlighted in red.

**Table 7: Days to Resolution by Institution (Cases begun 2020, Hearing Aid Received)**

|         | N   | Avg. | 10%ile | 25%ile | 50%ile | 75%ile | 90%ile |
|---------|-----|------|--------|--------|--------|--------|--------|
| BCC     | 4   | 57.8 | 44     | 49.5   | 58     | 66     | 71     |
| BCFC    | 1   | 23.0 | 23     | 23     | 23     | 23     | 23     |
| EKCC    | 14  | 45.1 | 27     | 35     | 48     | 55     | 58     |
| GRCC    | 11  | 87.8 | 25     | 29     | 43     | 165    | 219    |
| KCIW    | 22  | 35.2 | 22     | 23     | 32     | 39     | 61     |
| KSP     | 19  | 45.8 | 22     | 29     | 40     | 63     | 83     |
| KSR     | 50  | 61.0 | 30.5   | 44     | 58.5   | 73     | 86     |
| LAC     | 6   | 46.5 | 35     | 42     | 44.5   | 52     | 61     |
| LLCC    | 27  | 52.7 | 26     | 31     | 36     | 59     | 113    |
| LSCC    | 24  | 52.8 | 27     | 36     | 50     | 65     | 94     |
| NTC     | 37  | 57.1 | 27     | 33     | 41     | 85     | 111    |
| RCC     | 77  | 52.7 | 28     | 33     | 44     | 64     | 78     |
| Ross    | 4   | 55.5 | 21     | 38.5   | 63.5   | 72.5   | 74     |
| WKCC    | 19  | 49.2 | 21     | 31     | 39     | 57     | 75     |
| **Total** | **315** | **53.5** | **26** | **33** | **44** | **65** | **86** |

The total picture on audiology processing demonstrates that the institution-wide focus on process efficiencies, tracking, and followup is paying off.

## V. OTHER ISSUES

A few other issues emerged from reporting:

- GRCC, LLCC, and RCC reported that even inmates who sign to communicate are transported with full hand-restraints. This renders such inmates unable to communicate. *Other institutions have implemented special restraints to be used during transport of inmates who sign; those that have that should consult with them and adjust accordingly.* See Settlement Agreement XI.A.2 ("The two-point system would allow a Deaf Inmate to use his or her hands for communicating via sign language to some degree. KDOC training will include both the two-point system as well as the agreement that hand restraints will be removed from a Deaf Inmate when the Deaf Inmate is in a secure environment, when security is no longer a threat, **or** there are other security devices in place to allow the Deaf Inmate to Effectively Communicate.").

- RCC reported that only a minority of HOH inmates know who the ADA Coordinator is; this suggests that in-person auxiliary aid assessments may not have been done, and that the ADA handout should include the information on how to reach the ADA Coordinator, for inmates' future reference.

- Several facilities reported that there is no method for an inmate to request a hearing-related accommodation during a disciplinary investigation and/or proceeding, using the KOMS form. This is a state-wide issue; *the KOMS entry screen relating to discipline should be adjusted to allow accommodation/interpretation requests.*

## VI. CONCLUSION

The new recommendations in this report are:

1. *I recommend completion of the planned KOMS improvements. In addition, once the ADA flag is triggered by a medical diagnosis, I recommend that medical staff review the appropriate information for each one and place their diagnoses into KOMS.*

2. *Now that ADA identification issues are sorted out, I recommend that KDOC and Wellpath conduct records both retrospective and prospective review to ensure correct documentation and diagnosis flags.*

3. *I recommend that KDOC make periodic efforts to remind medical providers that while binaural amplification is not to be provided routinely, it is appropriate where there is a safety or vocational need for it. In addition, it would be a good practice for medical grievances raising binaural amplification to be evaluated by a different physician, to bring a fresh perspective to the request.*

4. *I recommend that Wellpath's specialty clinic coordinator conduct spot checking to ensure that her tracking list includes all inmates who are undergoing audiology workup, including prediagnosis, and solve any problems that emerge.*

5. *I recommend that, going forward, KDOC headquarters closely monitor videophone outage periods and other technical difficulties and consider alternative vendors or other solutions.*

6. *The ADA Coordinators should periodically remind staff that access to the videophone, TTY, and captioned telephones should be afforded inmates during the same periods for which hearing inmates can access regular telephones.*

7. *Hard-of-hearing inmates should be informed that the phone amplifiers exist, and the process for using them should be made easy.*

8. *It would be appropriate to add additional volume-control phones wherever practicable.*

9. *I strongly recommend that headquarters test both the TTYs and captioned telephones at least twice each year, to ensure that they all stay operational.*

10. *Captioned telephones have amplification features, so ADA Coordinators should inform hard-of-hearing inmates that these are available to them.*

11. *I recommend that headquarters staff obtain access to an online TTY (via http://www.nextalk.com/) and then conduct at least twice yearly TTY-to-TTY and TTY-to-voice testing of each institution's TTY.*

12. *I recommend that the ADA Coordinators for the institutions where the transmitter devices are being used successfully in classes and the like share with their colleagues that practices that are producing those successes.*

13. *The proposed standards language relating to parole and deaf/HOH inmates should be adopted.*

14. *I continue to recommend that at every prison, (1) flashing lights be used for routine alerts where practicable, (2) Deaf/HOH (not just Deaf) inmates be provided a method by which they can obtain non-auditory alarm watches or clocks, and (3) in-person notifications be provided where needed for personal alerts, whether by staff or other inmates. This issue will require additional fine-tuning, training, and monitoring.*

15. *ADA Coordinators should continue to communicate to inmates that they have access to non-auditory alarms that can help alert them to various scheduled events in the prison.*

16. *I continue to recommend that non-routine announcements be communicated in some non-auditory fashion; if bulletin boards are not a workable solution, some other solution is needed, in each housing unit.*

17. *Auxiliary aid meetings should be held, in person, with each inmate and for non-medical staff to affirmatively inform inmates of the available devices and services.*

18. *Clear masks and masks that attach behind the wearer's head, rather than behind the ears, are essential. Both are reportedly available at all KDOC institutions, but at some institutions seem to be in use only rarely. Inmates who are Deaf/HOH should be affirmatively asked if their comprehension would be assisted by clear masks for staff in their housing units, work-places, programs, etc., and if they answer yes, those masks should be issued/used accordingly. In addition, staff who will deal with Dear/HOH inmates more generally—the ADA Coordinator, Unit Administrators, etc., should be issued clear masks for use when appropriate. All inmates who wear hearing aids should be offered behind-head masks.*

19. *ADA Coordinators should review phone issues, and ensure that (a) there are enough volume-adjustable and HOH phones for usage patterns, (b) phones are in a space quiet enough to allow HOH individuals to use them, (c) any voice-recognition issues are solved.*

20. *Complaints about accommodations suggest a need to conduct auxiliary aid meetings not just once on an inmate's arrival to a prison, but every year or two.*

21. *The loss of hearing aids on transfer within and between prisons is a longstanding and demonstrated problem. The solution is additional staff training/alertness, and property checklists that include hearing-related equiptment. The battery issue has become more prevalent during the pandemic; I recommend that Wellpath review battery availability, prison by prison, and ensure a sufficient stock to avoid shortages. In addition, KDOC/Wellpath should ensure that inmates receive hearing aids medically suited to their situation.*

22. *Staff responsible for disciplinary adjudication should be trained that it is inappropriate to penalize someone for their disability (e.g., for failing to obey an order they did not hear), and that they should ask appropriate questions and document their thought processes with respect to this issue in relevant disciplinary cases. Each ADA Coordinator should conduct such training immediately for appropriate staff, and then repeat it as necessary when new employees assume the disciplinary adjudication role.*

23. *Institutions that have not implemented special transport restraints for inmates who sign to communicate should consult with those who have implemented such restraints and adjust accordingly.*

24. *The KOMS entry screen relating to discipline should be adjusted to allow accommodation/interpretation requests.*

As has been true throughout the Settlement Agreement period, KDOC staff have been professional in their efforts to implement the agreement, and helpful to me as I ask them monitoring questions. In fact, 2020 saw a significant increase in efforts to improve compliance, led by KDOC headquarters; the resulting compliance improvements are apparent in this report.

As usual, there have been both successes and challenges to report—but the balance shifted in this report towards successes. At this point, I believe that KDOC has in place a system already compliant in large part with the ADA and the settlement agreement—and capable of maintaining its successes and improving going forward, if the Department continues to appoint, train, and support the ADA Coordinators and their efforts.

It has been a privilege to assist the parties and the Court in this lawsuit.


Respectfully submitted,


Margo Schlanger
Settlement Monitor
625 So. State Street
Ann Arbor, MI 48109
adams.settlement.monitor@gmail.com


December 16, 2020

# Exhibit 102

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONARD BRIGGS, GEORGE SKINDER, LOUIS MARKHAM, FRANCIS MCGOWAN, ERIC ROLDAN, ROLANDO S. JIMENEZ, AND JENNIFER WARD, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MASSACHUSETTS DEPARTMENT OF CORRECTION; CAROL A. MICI[1], COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF CORRECTION; JENNIFER A. GAFFNEY\*, DEPUTY COMMISSIONER OF CLASSIFICATION, PROGRAMS, AND REENTRY DIVISION; COLETTE M. GOGUEN\*, SUPERINTENDENT OF MCI-SHIRLEY; STEVEN SILVA, SUPERINTENDENT OF MCI-NORFOLK; LISA MITCHELL, SUPERINTENDENT OF THE MASSACHUSETTS TREATMENT CENTER; ALLISON HALLET\*, SUPERINTENDENT OF MCI-FRAMINGHAM; AND MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE, <br><br> Defendants. | C.A. No. 1:15-cv-40162-GAO-JGD |

## SETTLEMENT AGREEMENT

---

[1] These parties, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

## TABLE OF CONTENTS

I.    PARTIES TO SETTLEMENT AGREEMENT ...................................................... 1

II.    PURPOSE OF SETTLEMENT AGREEMENT ................................................... 1

III.    DEFINITIONS .................................................................................................... 1

IV.    IDENTIFICATION AND TRACKING OF DEAF AND HARD-OF-HEARING INMATES ........................................................................................................... 8

    A.    Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC Custody ....................................................................................................... 8

    B.    Intake Procedures Regarding Deaf and Hard-of-Hearing Inmates ............................ 9

    C.    Identification of Deaf and Hard-of-Hearing Inmates After Intake ........................... 12

    D.    Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services ........................................................................................... 13

    E.    Deaf and Hard-of-Hearing Inmates' Retention of Approved Hearing-Related Auxiliary Aids ........................................................................................ 18

    F.    Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody ................................ 19

    G.    Meetings with Institution ADA Coordinators Regarding Accommodations ............ 21

V.    CONTRACT MEDICAL PROVIDER'S CARE, TREATMENT, AND ACCOMMODATION OF DEAF AND HARD-OF-HEARING INMATES ................. 22

    A.    Audiologists' or Other Qualified Hearing Specialists' Recommendations ............. 22

    B.    Hearing Screening .................................................................................... 23

    C.    Hearing Aid Batteries ............................................................................... 24

    D.    Hearing Aid Repairs ................................................................................. 24

VI.    QUALIFIED SIGN LANGUAGE INTERPRETERS ......................................... 25

    A.    General Policy .......................................................................................... 25

    B.    Interpretation of Written Materials ........................................................... 29

    C.    Methods for Providing Interpreter Services .............................................. 30

        1.    Video Remote Interpreting .......................................................... 30

        2.    On-Site Live Qualified Sign Language Interpreters ...................................... 31

3. Choice Between On-Site Interpreter Services and VRI ................................. 32

D. Off-site Medical Care ......................................................................................... 32

E. Parole Hearings ................................................................................................... 32

F. Use of Inmates as Interpreters for Deaf or Hard-of-Hearing Inmates ...................... 32

VII. INSTITUTIONAL WORK ASSIGNMENTS ............................................................. 34

VIII. TELECOMMUNICATION ..................................................................................... 34

A. General Policy ..................................................................................................... 34

B. Telecommunication Services and Devices to Be Provided ................................ 35

1. Videophones & Video Relay Services ........................................................ 35

2. Captioned Telephones ................................................................................ 38

3. Teletypewriters .......................................................................................... 39

4. Amplification Available on Traditional Telephones ................................. 40

5. Hearing Aid Compatible Traditional Telephones ..................................... 40

C. Requesting Approval for and Access to Telecommunication Services and Devices ........................................................................................................... 40

D. Monitoring Communications ............................................................................. 42

E. Additional Time for Communication ................................................................. 42

F. Cost for Use of Telecommunication Services and Devices ................................ 42

G. Responsibility for Maintaining Equipment ...................................................... 42

H. Responsibility for Training Staff ....................................................................... 43

IX. VISUAL AND TACTILE NOTIFICATIONS ............................................................. 43

A. General Policy ..................................................................................................... 43

B. Relaying Non-Emergency Information ............................................................... 43

1. Visual or Tactile Notification Systems ...................................................... 44

2. Vibrating Watches ...................................................................................... 45

3. Supplementary Non-Auditory Information Relay Systems ...................... 45

X.   TRAINING ........................................................................................................ 46

    A.   Training Provided to Covered Employees ................................................ 46

    B.   Supplemental Training Provided to Institution ADA Coordinators........................ 47

XI.   REVISIONS TO RELEVANT DOC POLICIES IN ACCORDANCE WITH THIS AGREEMENT ................................................................................................. 48

XII.   HOUSING DETERMINATIONS ................................................................. 55

XIII.   MONITORING AND REPORTING ............................................................. 56

    A.   Settlement Monitor ................................................................................. 56

    B.   DOC Records and Reports ...................................................................... 58

    C.   Settlement Monitor's Reports ................................................................. 59

XIV.   RELEASE AND SETTLEMENT OF CLAIMS ........................................... 60

XV.   FINAL APPROVAL ...................................................................................... 60

XVI.   DISPUTE RESOLUTION AND ENFORCEMENT ..................................... 61

XVII.   FUNDING ....................................................................................................... 63

XVIII.   NO ADMISSION OF LIABILITY ............................................................... 64

XIX.   ATTORNEYS' FEES AND COSTS ............................................................. 64

XX.   MISCELLANEOUS ...................................................................................... 64

    A.   Governing Law ....................................................................................... 64

    B.   Confidentiality........................................................................................ 65

    C.   Entire Agreement ................................................................................... 65

    D.   Execution ................................................................................................ 65

    E.   Non-Waiver ............................................................................................ 66

    F.   Severability............................................................................................. 66

    G.   Amendments ........................................................................................... 66

    H.   Term of Agreement ................................................................................ 66

APPENDIX A .........................................................................................................70

## I.  PARTIES TO SETTLEMENT AGREEMENT

The Parties to this Settlement Agreement ("Agreement") are:

1.  Plaintiffs Leonard Briggs, George Skinder, Louis Markham, Francis McGowan, Eric Roldan, Rolando S. Jimenez, and Jennifer Ward;

2.  Members of any class that is certified in this Action; and

3.  Defendants Massachusetts Department of Correction; Carol A. Mici[2], Commissioner of the Massachusetts Department of Correction; Jennifer A. Gaffney*, Deputy Commissioner of Classification, Programs, and Reentry Division; Colette M. Goguen*, Superintendent of MCI-Shirley; Steven Silva, Superintendent of MCI-Norfolk; Lisa Mitchell, Superintendent of the Massachusetts Treatment Center; Allison Hallet*, Superintendent of MCI-Framingham.

## II.  PURPOSE OF SETTLEMENT AGREEMENT

The Parties acknowledge and agree that this Agreement is intended to be a partial settlement of the Action, resolving all claims in the Action except the Reserved Claims.

## III.  DEFINITIONS

1.  **"408 Policy"** refers to DOC's policy 103 DOC 408, "Reasonable Accommodations for Inmates."[3]

2.  **"Action"** means the above-captioned action.

---

[2] These Parties, named in their official capacities, have been substituted as successors in office, under Fed. R. Civ. P. 25(d).

[3] References to any statutes, regulations, and policies by name or number in this Agreement shall be construed as references to those statutes, regulations, and policies as named or numbered as of the date that this Agreement is executed.

3.  **"ADA"** means the Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101 et seq., as amended by the ADA Amendments Act of 2008 (P.L. 110-325).

4.  **"ASL"** means American Sign Language, a visual language that employs signs made by moving the hands combined with facial expressions and postures of the body with its own unique rules of grammar and syntax used predominantly in the United States and parts of Canada.

5.  **"Auxiliary Aids and Services"** shall refer to equipment, devices, or services that facilitate Effective Communication as well as effective access to DOC programs, services and activities for individuals with hearing-related disabilities. Auxiliary Aids and Services for deaf and hard-of-hearing inmates include, but are not limited to the following: **"**Qualified interpreters on-site or through video remote interpreting (VRI) services; notetakers; real-time computer-aided transcription services; written materials; exchange of written notes; telephone handset amplifiers; assistive listening devices; assistive listening systems; telephones compatible with hearing aids; closed caption decoders; open and closed captioning, including real-time captioning; voice, text, and video-based telecommunications products and systems, including text telephones (TTYs), videophones, and Captioned Telephones, or equally effective telecommunications devices; videotext displays; accessible electronic and information technology; or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." S*ee* 28 C.F.R § 35.104; *see also* 42 U.S.C. § 12103(1)(A).

6.   **"Captioned Telephone"** or **"CapTel"** means a specialized telephone that permits verbal communication in the same manner as a traditional telephone and

automatically connects to a captioning service that transcribes the content of the conversation, which provides captions on the device's built-in screen.

7.   **"Communication Access Realtime Translation" or "CART"** means a real-time captioning service that is used by deaf and hard-of-hearing individuals who use English as their first language and/or their language of instruction.

8. **"Contract Medical Provider"** means any provider of medical, dental, or mental health treatment who is not an employee of DOC and who provides such services through a contractual agreement with DOC.

9. **"Covered Employees"** means all DOC employees with care and custody functions; DOC Contract Medical Provider employees; DOC contract substance use treatment provider employees; and DOC Education Program principals.

10. **"Deaf"** denotes individuals who cannot hear or who, as a result of hearing loss, are impaired in processing linguistic information through hearing, with or without amplification.

11. **"Department ADA Coordinator for Inmates"** means the individual designated by DOC who is responsible for coordinating DOC's compliance with the ADA as it relates to inmates and the provisions of 103 DOC 408.

12. **"Department Investigation"** means DOC's collection of evidence that supports, fails to support, or refutes an allegation, or provides clarification of what occurred during an incident, including alleged misconduct.

13. **"Direct Threat"** means a significant risk to the health or safety of the deaf or hard-of-hearing inmate or others that cannot be eliminated by a modification of policies, practices or procedures, or by the provision of Auxiliary Aids and Services as provided in 28 CFR § 35.139.

14.  **"DOC"** shall refer to the Massachusetts Department of Correction, as established by Mass. Gen. Laws c. 27, § 1.

15.  **"DOC Facility"** or **"DOC Facilities"** shall refer to any correctional facility owned, operated, administered or subject to the control of DOC.

16.  **"Effective Communication"** means communication that is clear and understandable to persons with disabilities. For deaf and hard-of hearing inmates, Effective Communication is communication that is substantially as effective as communication with the general inmate population (*see* 28 C.F.R. § 35.160(a)). Effective Communication will, when necessary, include the provision of appropriate Auxiliary Aids and Services, such as Qualified Sign Language Interpreters.  Effective Communication affords deaf and hard-of-hearing inmates an opportunity to participate in, and enjoy the benefits of, DOC's services, programs, or activities in a manner that is substantially equal to the opportunity provided to similarly situated inmates who are neither deaf nor hard-of-hearing.

17.  **"Effective Date"** shall mean the date upon which this Agreement is finally approved and entered by the Court or a motion to finally approve or enter the Agreement is granted, whichever occurs first, as recorded on the Court's docket.

18.  **"Final Approval"** shall refer to the Court's entry of this Agreement as an Order of the Court following a hearing and finding that the Agreement is fair, reasonable an adequate, pursuant to Fed. R. Civ. P. 23(e).

19.  **"Hard-of-Hearing"** denotes individuals who have reduced hearing ability ranging from mild to severe.

20. **"Inmate"** means a committed offender or such other person as is placed in custody in a state correctional facility in accordance with law, as defined in Mass. Gen. Laws c. 125, § 1.

21. **"IMS"** means the Inmate Management System, DOC's automated information system that provides processing, storage and retrieval of inmate-related information needed by DOC.

22. **"Institution ADA Coordinator"** means the individual at a particular DOC Facility responsible for ensuring that facility's compliance with the ADA and 103 DOC 408 for inmates.

23. **"MCDHH"** means the Massachusetts Commission for the Deaf and Hard of Hearing, as established by Mass. Gen. Laws c. 6, § 192.

24. **"On-site Medical Appointment"** means a medical appointment that is conducted at a DOC Facility, including a medical appointment conducted by third parties in a DOC Facility.

25. **"Personalized Program Plan"** means a plan that charts the course of action for the inmate, the Correctional Program Officer, and the service providers on addressing the criminogenic needs of the inmate, progress made, and compliance issues. The plan begins at intake and is continuously updated based on the inmate's risk, needs assessment, if applicable, and record review including but not limited to any secondary assessment.

26. **"Plaintiffs' Counsel"** means attorneys-of-record for Plaintiffs in *Briggs, et al. v. Massachusetts Department of Correction, et al.*, Case No. 15-cv-40162-GAO-JGD (D. Mass.), as of the date this Agreement is signed.

27. **"Primary Consideration"** means that DOC must honor a deaf or hard-of-hearing inmate's expressed choice(s) of accommodations when determining what types of auxiliary aids and/or services are necessary to ensure that the inmate is able to communicate effectively and have effective, meaningful, and substantially equal access to DOC programs, services, and activities, unless DOC can demonstrate (1) that another means of Effective Communication is available or (2) that the means chosen by the inmate would result in a fundamental alteration in the service, program, or activity, in undue financial and administrative burdens, or will result in actual risks or impairment of the safe operation of a DOC Facility or the service, program, or activity in accordance with 28 C.F.R. § 35.130(h).

28. **"Qualified Hearing Specialist"** means a licensed professional specializing in hearing loss, namely audiologists and physicians who specialize in the diagnosis and treatment of hearing loss (such as otologists and neurologists).

29. **"Qualified Sign Language Interpreter"** means a person who, via a video remote interpreting ("VRI") service or an on-site appearance, can interpret effectively, accurately, and impartially, both receptively and expressively, using American Sign Language. *See* 28 C.F.R. § 35.104. For purposes of this Agreement, a Qualified Sign Language Interpreter is one who holds a current, valid certification and/or who has been screened and approved by one or more of the following organizations:

a. Registry of Interpreters for the Deaf, Inc., a nationally based professional organization;

b. National Association of the Deaf; and/or

c. MCDHH.

6

The Parties agree that other certifications that are the equivalent of those offered by the above organizations shall be considered valid minimum certification, so long as those certifications are kept current.

30. **"Reserved Claims"** means claims identified in the Complaint filed in this Action that have not been expressly resolved by this Agreement and that will be resolved through further litigation of this Action. The following are identified as Reserved Claims:

a. Claims regarding the adequacy of DOC's provision of notifications of safety announcements, emergency alerts and alarms, and emergency evacuations to deaf and hard-of-hearing inmates. Included in such claims are Plaintiffs' claims that: (1) DOC lacks effective visual systems for notifying deaf and hard-of-hearing inmates of emergency alarms and announcements, and (2) DOC has failed to take necessary safety precautions, install equipment, and establish procedures to ensure that deaf and hard-of-hearing inmates are made aware of emergency alarms and announcements.

b. Claims for attorneys' fees and costs, including claims for attorneys' fees and costs associated with the claims that have been resolved by this Agreement.

31. **"Teletypewriter"** or **"TTY"** or **"TDD"** means teletypewriters or telecommunications devices for the deaf, which are devices for text communication over a telephone line designed for use by persons with hearing disabilities.

32. **"Telecommunication Vendor"** means a company that furnishes, installs, and maintains for DOC Facilities an inmate calling system, which includes instruments

such as telephones, videophones, TTY/TDD devices, and Captioned Telephones, through a contractual agreement.

33. **"Videophone"** means a telecommunication device with a camera and a screen that allows for visual, real-time communication.

34. **"Video Relay Service"** or **"VRS"** means a video telecommunication service that allows persons who are deaf or hard-of-hearing to communicate over video telephones and similar technologies with hearing persons in real time, via a sign language interpreter.

35. **"Video Remote Interpreting"** or **"VRI"** means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering a high-speed, wide-bandwidth video connection that delivers high-quality video images. *See* 28 C.F.R. § 35.160(d).

## IV. IDENTIFICATION AND TRACKING OF DEAF AND HARD-OF-HEARING INMATES

### A. Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC Custody

To ensure that all current deaf and hard-of-hearing inmates known to DOC and its Contract Medical Provider have been identified for the purposes of DOC's provision of appropriate services to its inmate population and the monitoring of this Agreement, DOC shall complete a records audit within three (3) months of the Effective Date. This audit will consist of a search and review of the following: (1) records of all accommodations for current inmates related to hearing loss maintained by the Institution ADA Coordinators and the Department ADA Coordinator for Inmates as of the Effective Date; (2) records of all medical devices related to hearing loss (*e.g.*, hearing aids, pocket talkers, FM systems, etc.) provided by DOC Contract Medical Providers from

July 1, 2016 to the Effective Date; and (3) records of all audiological and otological consultations approved by DOC's Contract Medical Provider from July 1, 2016 to the Effective Date.

In addition to conducting the foregoing records audit, within three (3) months of the Effective Date, DOC shall prominently display in all DOC Facility inmate housing units and medical units a notice informing inmates that they may request a hearing screening consistent with **Section V(B) (Hearing Screening)**. This notice shall be prepared in both English and Spanish, as well as in any other "regularly encountered language" as defined by DOC's Interpreter Services Policy, 103 DOC 488. DOC will provide Plaintiffs with a copy of this notice before it is posted. Plaintiffs may provide comments to DOC regarding the notice. It may be removed after being posted for sixty (60) calendar days. Inmates who do not have access to the posted notice due to various safety or other restrictions imposed on them shall receive a copy of the notice.

Based on the results of both the records audit and of any hearing screenings requested pursuant to the posted notice, DOC shall prepare a list of deaf and hard-of-hearing inmates who are currently in DOC custody. The Department ADA Coordinator for Inmates will maintain this list consistent with the requirements of **Section IV(F) (Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody)**.

### B.     Intake Procedures Regarding Deaf and Hard-of-Hearing Inmates

Consistent with the 408 Policy, within twenty-four hours of a new inmate's admission into DOC custody, DOC booking, orientation, or Contract Medical Provider staff shall ask the newly admitted inmate if he or she requires an accommodation for a disability and shall record the inmate's response. As part of this process, DOC or Contract Medical Provider staff shall ask all newly admitted inmates whether he or she has hearing loss. For any inmate who self-identifies as deaf or hard-of-hearing, or who DOC or Contract Medical Provider staff believes may have a hearing disability, Contract Medical Provider staff shall ask: (1) whether the inmate has ever used

9

a hearing aid or any other device or service to help him or her hear; (2) whether the inmate has ever used a sign language interpreter; (3) whether the inmate believes he or she would benefit from an accommodation to help him or her hear; and (4) whether the inmate's primary language is ASL. The answers to these questions shall be recorded in a Hearing Accommodation Intake Questionnaire, which will be placed in the inmate's medical record.

DOC staff responsible for intake shall provide all newly admitted inmates with a copy of an "Offender/Inmate Orientation to ADA" form, which will inform them of their rights under the ADA and provide an additional opportunity to request a reasonable accommodation for any disability. Additionally, to those inmates who self-identify as deaf or hard-of-hearing, or who DOC or Contract Medical Provider staff believes may have a hearing disability requiring accommodation, DOC staff shall provide a copy of: (1) the Inmates with Disabilities Notice of Rights Under the Americans with Disabilities Act; and (2) the 408 Policy. DOC shall also notify such inmates of all telecommunication services and devices available at DOC Facilities, in accordance with **Section VIII(B) (Telecommunications Services and Devices to be Provided)**. DOC will ensure that all staff handling intake at each facility are trained regarding their responsibility to provide the above information prior to performing intake.

Whenever during the intake process any DOC staff or Contract Medical Provider staff become aware of any inmate who indicates he or she needs or who otherwise has been identified as potentially requiring a reasonable accommodation for his or her hearing disability, that DOC or Contract Medical Provider staff shall notify the inmate's Institution ADA Coordinator as soon as practicable. If a deaf or hard-of-hearing inmate is unable to effectively read or communicate through written English, the Institution ADA Coordinator shall promptly provide the inmate with those auxiliary aids and/or services that have been identified in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**

10

to enable the inmate to understand the 408 Policy and the Inmates with Disabilities Notice of Rights Under the Americans with Disabilities Act. For deaf or hard-of-hearing inmates whose primary language is ASL, DOC shall promptly provide Qualified Sign Language Interpreter services. The Institution ADA Coordinator shall maintain a monthly written record of all notifications as described above that have been received and all accommodations provided to deaf and hard-of-hearing inmates in keeping with this paragraph.

DOC shall require its Contract Medical Provider to promptly evaluate all newly admitted inmates who are identified as deaf and hard-of-hearing during intake within seventy-two (72) hours of admittance into DOC custody. Record of these evaluations shall be maintained in the inmates' medical records. Deaf or hard-of-hearing inmates who have identified their primary language as ASL shall receive Qualified Sign Language Interpretation for the purposes of this initial medical evaluation, in accordance with **Section VI (Qualified Sign Language Interpreters)** and **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**.

The Institution ADA Coordinator shall ensure that deaf and hard-of-hearing inmates receive such Auxiliary Aids and Services that have been identified in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)** to ensure Effective Communication during inmate orientation. All deaf or hard-of-hearing inmates whose primary language is ASL shall receive Qualified Sign Language Interpretation for the purposes of inmate orientation, interpretation of the Inmate Handbook, and interpretation of the notification regarding the telecommunication services and devices available to deaf and hard-of-hearing inmates at DOC Facilities. The Institution ADA Coordinator shall make a written record of any accommodations provided to deaf and hard-of hearing inmates for the purposes of orientation in each inmate's ADA Folder.

For deaf and hard-of-hearing inmates who can effectively communicate in written English, DOC will prepare, within six (6) months of the Effective Date of this Agreement, a video with closed captioning providing orientation information that is applicable to all facilities. The video shall be shown at all facilities during every inmate orientation session. Any site-specific information not included in the video shall be provided in writing to deaf and hard-of-hearing inmates who can effectively communicate in written English.

### C. Identification of Deaf and Hard-of-Hearing Inmates After Intake

At any time during his or her incarceration, a deaf or hard-of-hearing inmate may initiate a request for reasonable accommodation by: (1) making a verbal or written request to any DOC staff member; (2) making a verbal or written request to medical/mental health staff for a medically-related accommodation; or (3) completing a Request for Reasonable Accommodation Form. If it is determined that a deaf or hard-of-hearing inmate requires auxiliary aids and/or services to enable him or her to effectively request reasonable accommodations or to effectively appeal the denial or modification of a request for reasonable accommodation, the Institution ADA Coordinator shall ensure that DOC provides such auxiliary aids and/or services.

If, at any time during an inmate's incarceration, the inmate informs a DOC staff member that he or she is having hearing difficulties or a DOC staff member observes that an inmate may be having hearing difficulties, the staff member should notify the inmate that: (1) he or she may seek accommodations per the 408 Policy; and (2) he or she may also submit a sick call slip requesting to be seen by the Contract Medical Provider for an evaluation. DOC will conduct training with staff members to inform them that if they are informed or observe that an inmate may be having hearing difficulties, the proper practice is for them to notify inmates of the options described above.

If, at any time during an inmate's incarceration, an Institution ADA Coordinator is informed by an inmate or a member of DOC staff or observes that an inmate may be having hearing difficulties, he or she shall notify the inmate that: (1) he or she may seek accommodations per the 408 Policy; and (2) he or she may also submit a sick call slip requesting to be seen by the Contract Medical Provider for an evaluation.

DOC's Health Services Division shall ensure that its Contract Medical Provider conducts a hearing screening of any inmate not previously identified as deaf or hard-of-hearing who: (1) initiates a request for reasonable accommodation by reporting a hearing disability; (2) submits a sick call slip or makes a verbal report to medical staff concerning hearing issues; or (3) medical staff identifies as having potential hearing issues. DOC's Contract Medical Provider shall conduct such hearing screening consistent with **Section V(B) (Hearing Screening)**.

During the periodic physical examinations that must occur per DOC Policy 103 DOC 630.11, the Contract Medical Provider shall ask all inmates whether they have hearing difficulties and examine all inmates for hearing loss. Contract Medical Provider staff must record any relevant information, including any report or indication of hearing loss, in the inmate's medical record.

### D.     Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services

For every inmate who has been identified as deaf or hard-of-hearing, DOC's Department ADA Coordinator for Inmates or an Institution ADA Coordinator shall coordinate an assessment of the inmate's hearing-related needs so that the inmate may effectively communicate and receive effective, meaningful, and substantially equal access to DOC programs, services and activities during his or her incarceration. The Department ADA Coordinator for Inmates or Institution ADA Coordinator shall initiate the assessment no later than five (5) days after an inmate has been identified as deaf or hard-of-hearing and shall complete the assessment within thirty (30) days

13

thereafter, unless additional input about the nature of an inmate's hearing needs has been sought but cannot be obtained within the 30 days. In situations where an assessment has not been completed within 30 days, DOC must ensure that it completes the assessment as soon as is feasible after the 30-day period has expired.

No more than five (5) days after an inmate has been identified as deaf or hard-of-hearing, the Institution ADA Coordinator shall meet with that inmate for the purposes of, among other things, (1) addressing the specific hearing-related accommodations available at DOC, in accordance with the terms of this Agreement, and (2) assessing the inmate's need for such hearing-related accommodations. If the inmate is deaf or hard-of-hearing and his or her primary language is ASL, a Qualified Sign Language Interpreter shall be present at this meeting. If the deaf or hard-of-hearing inmate requires an alternative auxiliary aid or service to effectively participate in the meeting, it shall be provided.

At this meeting, the Institution ADA Coordinator and the deaf or hard-of-hearing inmate shall discuss, with the assistance of the Qualified Sign Language interpreter or other auxiliary aid where necessary, the inmate's areas of hearing-related need (*e.g.*, making phone calls, receiving instructions, participating in programming, etc.) and the inmate's preferred method of communication and of receiving information (*e.g.*, lip-reading, written language, ASL, etc.). The Institution ADA Coordinator shall provide the deaf or hard-of-hearing inmate with a list of hearing-related Auxiliary Aids and Services that have been approved for use in DOC Facilities in appropriate circumstances (*e.g.*, interpreter services, CART, physical devices that have passed a security review). Where necessary, including when the deaf or hard-of-hearing inmate is unfamiliar with any of the listed auxiliary aids or services, the Institution ADA Coordinator shall explain the Auxiliary Aids and Services available to the deaf or hard-of-hearing inmate, including what hearing-related need area they may help address and how. The Institution ADA Coordinator

and the deaf or hard-of-hearing inmate may also discuss any other topics that are relevant to the inmate's hearing-related needs, including whether the inmate has previously used other auxiliary aids or services not included on the provided list of available accommodations to enable him or her to effectively communicate or receive information. The Institution ADA Coordinator shall document the substance discussed at this meeting, including the inmate's preferred form of communication; the documentation will be stored in the inmate's ADA folder.

Based on the information provided, the deaf or hard-of-hearing inmate shall indicate at the meeting which auxiliary aids or services he or she believes are necessary to enable him or her to effectively communicate and participate in any DOC programs, services, and activities for which he or she is eligible. The Institution ADA Coordinator shall document which Auxiliary Aids and Services the inmate has selected; the documentation will be stored in the inmate's ADA folder. The inmate shall not be required to complete the Request for Reasonable Accommodation form.

The Institution ADA Coordinator shall review the deaf or hard-of-hearing inmate's selection and, within no more than thirty (30) days and in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, shall determine which accommodations shall be approved and provided to the deaf or hard-of-hearing inmate. In making this decision, the Institution ADA Coordinator shall give Primary Consideration to the preference expressed by the inmate for particular auxiliary aids or services, unless one of the exceptions set forth in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8,** applies. Any decision to deny an auxiliary aid or service selected by an inmate must be based on an individualized assessment of the inmate, and not on any set guidelines, protocols, or threshold levels of hearing loss shown on an inmate's audiogram. Notwithstanding the foregoing, in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, for deaf or hard-of-hearing inmates whose primary language is ASL, the

Institution ADA Coordinator shall approve and provide as soon as is feasible auxiliary aids in the form of Qualified Sign Language Interpreter services, the telecommunication services of the inmate's choosing, and the visual and/or tactile notification device (*e.g.*, facility-approved receiver/pager and vibrating watch) of the inmate's choosing. The Institution ADA Coordinator shall document the approved auxiliary aids or services in the inmate's ADA folder and in IMS. If the Institution ADA Coordinator denies or modifies any requested auxiliary aid or services, he or she shall document the reasons for such denial or modification in the inmate's ADA folder. A deaf or hard-of-hearing inmate shall have the opportunity to appeal any such denial or modification to the Department ADA Coordinator for Inmates. Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available to allow the inmate effective access to the appellate process. The Institution ADA Coordinator shall notify the Department ADA Coordinator for Inmates of (1) the inmate's requested accommodations, (2) whether such requested accommodations were granted, denied, or modified, and (3) where a requested accommodation was denied or modified, the reasons therefor. The Department ADA Coordinator for Inmates shall document this information in the centralized database that he or she maintains.

In accordance with **Section X(B) (Supplemental Training Provided to Institution ADA Coordinators)**, DOC shall coordinate with MCDHH or other community resources to provide Institution ADA Coordinators with supplemental training regarding the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates. Additionally, DOC shall coordinate with MCDHH or other community resources to prepare approved language that Institution ADA Coordinators should use to explain the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates.

Institution ADA Coordinators who have not yet received the supplemental training may initiate the initial assessment within five (5) days after an inmate has been identified as deaf or

hard-of-hearing if they use this approved language. However, they may not either complete the initial assessment or issue any decision denying the preferred auxiliary aids or services sought by a deaf or hard-of-hearing inmate unless they (1) receive input from MCDHH or a qualified specialist recommended by MCDHH or (2) consult with an Institution ADA Coordinator from another DOC Facility who has already received the supplemental training or the Department ADA Coordinator for Inmates.

The Institution ADA Coordinator who has received the supplemental training may solicit input and/or assistance from MCDHH, a qualified specialist recommended by MCDHH, DOC's Contract Medical Provider, or other community resources where he or she determines that such input or assistance would be helpful for determining which auxiliary aids or services would be appropriate for a particular deaf or hard-of-hearing inmate. If the Institution ADA Coordinator determines that input and/or assistance from MCDHH, a qualified specialist recommended by MCDHH, DOC's Contract Medical Provider, or other community resources would be beneficial, the Institution ADA Coordinator shall solicit such input and/or assistance as soon as practicable. Factors that the Institution ADA Coordinator may consider in deciding whether such input and/or assistance would be beneficial include, but are not limited to: (1) whether the deaf or hard-of-hearing inmate is able to identify auxiliary aids and/or services that he or she believes are necessary in order to enable him or her to effectively communicate or to participate in proffered DOC programs, services, activities; (2) whether the Institution ADA Coordinator believes the inmate's expressed preference for a particular accommodation or service should be denied; and (3) whether the deaf or hard-of-hearing inmate requests a hearing-related medical device that must be prescribed or provided by DOC's Contract Medical Provider. The Institution ADA Coordinator shall also request input or assistance from MCDHH, or a qualified specialist recommended by MCDHH, for profoundly or severely hearing-impaired inmates, unless the inmate declines such

input or assistance in writing. When an Institution ADA Coordinator requests and receives such input or assistance from MCDHH, documentation of the request(s) and response(s) from MCDHH, including any accommodations recommended by MCDHH, shall be included in the inmate's ADA folder.

Additionally, DOC officials shall request to meet with MCDHH, or a qualified specialist recommended by MCDHH, twice a year to consult with DOC concerning the accommodations provided by DOC to deaf and hard-of-hearing inmates and best practices in the correctional context. MCDHH may request, and DOC shall provide, with the inmate's written consent, access to documents showing the hearing-related accommodations provided to particular deaf or hard-of-hearing inmates to or at such meetings.

Any deaf or hard-of-hearing inmate who wishes to request accommodations prior to meeting with the Institution ADA Coordinator or request accommodations not documented in the inmate's ADA folder, the centralized database maintained by the Department ADA Coordinator for Inmates, or in IMS may do so at any time in accordance with the Reasonable Accommodation Process. DOC shall provide such assistance as is necessary to aid a deaf or hard-of-hearing inmate in completing a request for reasonable accommodation.

Additionally, if an inmate arrives in DOC custody with a hearing-related medical device or hearing-related auxiliary aid, he or she shall be permitted to retain such assistive device pending intake assessment by Contract Medical Provider staff, absent security concerns.

E.      **Deaf and Hard-of-Hearing Inmates' Retention of Approved Hearing-Related Auxiliary Aids.**

Notwithstanding the provision of any auxiliary aid in accordance with the terms of this Agreement, DOC reserves the right to confiscate any auxiliary aid if the deaf or hard-of-hearing inmate for whom it has been approved intentionally damages and/or destroys said auxiliary aid, or

intentionally misuses or alters said auxiliary aid in order to use it for an unintended purpose. If DOC confiscates an auxiliary aid under such circumstances, DOC shall take other action(s) to nevertheless ensure that the deaf or hard-of-hearing inmate receives effective access to DOC benefits or services.

DOC shall allow all deaf and hard-of-hearing inmates who utilize hearing aids to keep their hearing aids on their person if placed in restrictive housing, absent a legitimate health or security risk specifically related to the inmate's retention of the hearing aid(s). If DOC denies a deaf or hard-of-hearing prisoner access to hearing aids on this basis, the reason for this decision must be documented in the inmate's ADA Folder.

DOC shall ensure that, if a deaf or hard-of-hearing inmate who utilizes hearing aids is placed on a mental health watch, DOC's Contract Medical Provider shall not confiscate his or her hearing aids unless the Contract Medical Provider determines that the inmate's retention of the hearing aids presents a risk to the inmate's health, safety, or security. If the Contract Medical Provider confiscates a deaf or hard-of-hearing inmate's hearing aid(s) in such circumstances, the reason for that decision will be documented in the inmate's medical records.

### F.     Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody

DOC shall employ the following procedures to track inmates in DOC custody who have been identified as deaf or hard-of-hearing, as well as what reasonable accommodations have been requested, approved, denied, and/or modified:

- DOC shall note in IMS whether an inmate is deaf or hard-of-hearing as well as the hearing-related medical restrictions and hearing-related accommodations for which an inmate has been approved. Hearing-related medical restrictions shall also be documented in IMS by Contract Medical Provider staff.

- DOC shall note in IMS whether a deaf inmate's preferred language is ASL and/or that the inmate needs a Qualified Sign Language Interpreter for Effective Communication.

- Each Institution ADA Coordinator shall document deaf and hard-of-hearing inmates' approved reasonable accommodations in a manner that will ensure that the information will follow inmates if they transfer to another DOC Facility. Prior to the transfer, or as soon as possible thereafter, the Institution ADA Coordinator from a transferring facility shall contact the Institution ADA Coordinator at the receiving facility to inform the latter that a deaf or hard-of-hearing inmate who has been granted a reasonable accommodation will be or has recently arrived at his or her facility. Record of this contact between ADA Coordinators shall be maintained in the inmates' ADA folder at the receiving facility.

- A distinguishing mark, *e.g.*, a red dot, shall be placed on the bed book card of the inmate, identifying that they are deaf and/or hard-of-hearing, indicating that they may need assistance in case of an emergency. This distinguishing mark shall follow deaf and hard-of-hearing inmates to all DOC Facility placements.

- Deaf and hard-of-hearing inmates shall be offered an identification card or badge indicating that the nature of their hearing disability that they are able to carry on their person and present to staff and/or other inmates as necessary. Inmates may decline to accept such an identification card or badge.

- Deaf and hard-of-hearing inmates shall be offered an identification sign indicating the nature of their hearing disability that will be placed on their cell door. Inmates may decline to accept such an identification sign.

- The Department ADA Coordinator for Inmates shall maintain a centralized database that: (1) contains information regarding all requests for reasonable accommodation and whether the requests were granted, modified, or denied; and (2) documents which inmates have been identified as deaf or hard-of-hearing and the status of any related requests for reasonable accommodations. This information shall be updated at least monthly.

- Institution ADA Coordinators shall submit a monthly report to the Superintendent and the Department ADA Coordinator for Inmates that contains information regarding: (1) all Requests for Reasonable Accommodation made by deaf and hard-of-hearing inmates, including the accommodations requested, whether the requests were granted, modified, or denied, and the reasons for any modification or denial; and (2) any accommodations approved for deaf and hard-of hearing inmates without submission of a Request for Reasonable Accommodation.

G.   **Meetings with Institution ADA Coordinators Regarding Accommodations**

1.   Meetings between the Institution ADA Coordinator and a deaf or hard-of-hearing inmate whose primary language is ASL to discuss his or her request(s) for accommodations per the 408 Policy (103 DOC 408.07(3) and (5)-(7)) must be scheduled. Notwithstanding the foregoing, the Institution ADA Coordinator may meet with a deaf or hard-of-hearing inmate whose primary language is ASL to discuss accommodations without prior scheduling if qualified ASL interpreter services are available.

2.   The Institution ADA Coordinator shall keep a written record of all scheduled meetings referenced in Paragraph IV(G)(1) above. This record shall include information regarding: (1) the date of the meeting; (2) a summary of the discussion; and (3) any accommodations provided during the meeting, including the name of any interpreter utilized.

3.      Whenever pursuant to the 408 Policy (103 DOC 408.07(3) and (5)-(7)) the Institution ADA Coordinator and a deaf or hard-of-hearing inmate whose primary language is not ASL have a discussion about his or her request(s) for accommodations, the Institution ADA Coordinator shall keep a written record of that conversation. This record shall include information regarding: (1) the date of the meeting; (2) a summary of the discussion; and (3) any accommodations provided during the meeting, including the name of any interpreter or CART provider utilized.

## V.      CONTRACT MEDICAL PROVIDER'S CARE, TREATMENT, AND ACCOMMODATION OF DEAF AND HARD-OF-HEARING INMATES

### A.      Audiologists' or Other Qualified Hearing Specialists' Recommendations

Recognizing that reasonable medical opinions may differ, DOC will ensure that its Contract Medical Provider will follow audiologists' and/or other Qualified Hearing Specialists' recommendations for the care, treatment, and accommodation of deaf and hard-of-hearing inmates, unless the Contract Medical Provider determines, based on an individualized clinical assessment by a medical doctor, that implementation of a recommendation is not medically necessary for care and treatment of the inmate, and is not needed as an accommodation to enable that inmate to communicate and participate in DOC programs, services, and activities as effectively as hearing inmates. The Contract Medical Provider may not deviate from the audiologist's and/or Qualified Hearing Specialist's recommendations based on any administrative policy or practice that dictates a blanket approach to the treatment of deaf or hard-of-hearing inmates, such as the use of threshold levels of hearing loss in an inmate's audiogram.

Where the Contract Medical Provider concludes that any part of the audiologist's or other Qualified Hearing Specialist's recommendations need not be followed, the provider must: (1) document the objective clinical basis for that conclusion in the deaf or hard-of-hearing inmate's

medical record; (2) establish an alternative treatment plan that is sufficient to provide the deaf or hard-of-hearing inmate with necessary care, treatment, and/or accommodations; (3) document the alternative treatment plan in the inmate's medical records; and (4) promptly communicate both the conclusion and the alternative treatment plan to the deaf or hard-of-hearing inmate.

A deaf or hard-of-hearing inmate may seek further review of the Contract Medical Provider's conclusion that an audiologist's or other Qualified Hearing Specialist's recommendations need not be followed, in accordance with DOC's and the Contract Medical Provider's policies, by first exhausting the medical grievance and appeal process, and, then, if still dissatisfied, by submitting a Request for Reasonable Accommodation pursuant to the 408 Policy.

### B. Hearing Screening

DOC will ensure that its Contract Medical Provider performs clinical assessments of all inmates who complain, verbally or in writing, to the Contract Medical Provider of hearing loss to determine whether they should receive audiological evaluations by an audiologist or other Qualified Hearing Specialists. If the Contract Medical Provider permits its clinicians to use a "whisper test" as part of these clinical assessments, the Contract Medical Provider must have an established, written procedure by which it must conduct a "whisper test," the Contract Medical Provider clinician must follow this established procedure in administering the "whisper test," and the Contract Medical Provider may not decline to refer an inmate for an audiological assessment based solely on the results of a "whisper test." The Contract Medical Provider may consult with correctional staff about an inmate's hearing loss but may not decline to refer an inmate for an audiological assessment solely because correctional staff do not confirm that the inmate has hearing difficulties. If the Contract Medical Provider determines that the inmate should receive an audiological evaluation by a Qualified Hearing Specialist, such evaluation shall be scheduled to occur as soon as possible, but no later than within 60 days of the date that the referral request is

approved.  DOC will not be considered in breach of this provision if any delay in scheduling the audiological evaluation is caused by circumstances outside of DOC's or its Contract Medical Provider's control, including if there is no appointment available within 60 days of the date that the referral request is approved.  However, in situations where there is no appointment available within 60 days of the date that the referral request is approved, DOC must ensure that the audiological evaluation is scheduled as soon as is feasible after the 60-day period has expired.

### C. Hearing Aid Batteries

DOC, either directly or through its Contract Medical Provider, shall purchase and keep in stock appropriate types of hearing aid batteries and shall provide replacement batteries to inmates who need them as soon as possible, but no later than 24 hours after the inmate requests replacement batteries.  Record of requests for replacement batteries and the provision of replacement batteries shall be maintained in the inmates' medical records.

### D. Hearing Aid Repairs

DOC will ensure that its Contract Medical Provider arranges for hearing aids to be sent to a hearing aid repair company as soon as possible, but in any event no later than one business day following: (1) an inmate's submission of a "sick slip" requesting repair of his or her hearing aid; or (2) an inmate's in-person request for repair of his or her hearing aid during an appointment with the Contract Medical Provider.  DOC's Contract Medical Provider shall inform the inmate as soon as possible when his or her hearing aid was sent for repair and when it is anticipated that the inmate will receive a working hearing aid.  DOC, either directly or through its Contract Medical Provider, shall maintain written documentation of all hearing aid repairs, including information regarding the vendor used, the date the hearing aid was sent to the vendor, the date the hearing aid was returned to the DOC Facility, and the date the hearing aid was returned to the inmate.  DOC will take appropriate steps to provide the means for Effective Communication with the inmate and

allow the inmate to participate in and benefit from DOC programs, services, or activities during any period in which the inmate is without his or her hearing aid.

## VI.    QUALIFIED SIGN LANGUAGE INTERPRETERS

### A.    General Policy

DOC will provide Qualified Sign Language Interpreters consistent with the procedures set forth in the 408 Policy and as required by relevant law, including the ADA.  When it has been determined, in accordance with the provisions of **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids and Services)**, that a deaf or hard-of-hearing inmate needs a sign language interpreter to have communications that are substantially as effective as communications by hearing inmates, DOC shall ensure that Qualified Sign Language Interpreter services are available at the programs, appointments and/or major events listed below without requiring the inmate to submit a request for accommodation pursuant to the 408 Policy:

- Inmate orientation;

- Classification hearings;

- Sex offender treatment programming;

- Medical appointments, evaluations, mental health services, and the bi-weekly mental health rounds for inmates in Restrictive Housing, (but excluding routine medical events like daily insulin shots or trips through the medication line) that occur within DOC Facilities;

- Inner Perimeter Security or other DOC investigations and related questioning (*e.g.*, investigations into Prison Rape Elimination Act allegations);

- Disciplinary proceedings;

- Restrictive Housing proceedings at which the inmate has the opportunity to appear in person;

- Grievance interviews;

- Scheduled meetings with the Institutional ADA Coordinator, Department ADA Coordinator for Inmates, or Contract Medical Provider concerning requests for accommodations;

- Educational and vocational classes in which the inmate is enrolled;

- All programs included on the inmate's Personalized Program Plan in the Need Areas of Substance Abuse, Criminal Thinking, Anger, Cognitive/Behavioral, Academic Education/Vocational, and Sex Offender Treatment;

- Any other program in which the inmate is enrolled for which "earned time" may be awarded, leading to a possible reduction in sentence, or where a liberty interest may be implicated;

- Programs and meetings concerning reentry and discharge planning.

- Religious services; and

- Any specific pre-release DOC program recommended by the Parole Board.

For religious services, programs in the Personalized Program Plan Need Area of Low Risk Alternative that the inmate has accepted, and other programs that an inmate has signed up to attend (as opposed to being enrolled by DOC programming staff), DOC may engage in preliminary discussion(s) with the deaf or hard-of-hearing inmate to establish whether and how frequently the inmate intends to participate. DOC shall provide a Qualified Sign Language Interpreter to facilitate these preliminary discussions. Once it has been determined both that the inmate will attend and how frequently, DOC shall provide the deaf or hard-of-hearing inmate with Qualified Sign Language Interpreter services in accordance with that schedule without requiring that the inmate submit any subsequent requests for reasonable accommodation. The inmate should notify

DOC if his or her anticipated schedule changes, requiring more or less frequent assistance from Qualified Sign Language Interpreters. With respect to the programs discussed in this paragraph, in the event that the inmate's voluntary attendance, the inmate's preference for an interpreter as opposed to another (or no) auxiliary aid, or the nature of the program changes, DOC may engage in another discussion with the deaf or hard-of-hearing inmate to reassess the provision of Qualified Sign Language Interpreters.

DOC shall also provide Qualified Sign Language Interpreter services in other situations as circumstances may warrant. Deaf and hard-of-hearing inmates may request Qualified Sign Language Interpretation for any DOC program, service, activity, appointment, or major event by initiating a Request for Reasonable Accommodation pursuant to the 408 Policy. Nothing in this Agreement is intended to permit DOC to categorically deny or prohibit Qualified Sign Language Interpretation to a deaf or hard-of-hearing inmate for any DOC program, service, activity, appointment, or major event. All such inmate requests for Qualified Sign Language Interpretation shall be considered and processed in accordance with the 408 Policy.

DOC shall be responsible for scheduling and overseeing the provision of Qualified Sign Language Interpreter services for all of the programs, appointments, and/or major events listed above and as circumstances may warrant. When circumstances prevent DOC from providing necessary interpreter services for the programs, appointments, and/or major events listed above, DOC must document in writing the reason(s) that such services could not be provided and must take any other action to nevertheless ensure that, to the maximum extent possible, the deaf or hard-of-hearing inmate receives substantially equal access to the benefits or services provided by DOC.

DOC shall provide deaf and hard-of-hearing inmates with the opportunity to participate in the programs, appointments, and/or major events listed above, consistent with the opportunities for participation afforded to similarly situated hearing inmates, subject to the exceptions

recognized in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8,** of this Agreement.  Deaf and hard-of-hearing inmates shall not remain on waiting lists for the above programs, appointments, and/or major events for longer than hearing inmates, due to the fact of their disability.

For programs and services that do not fall within the programs, appointments, and/or major events listed above, and for which DOC permits volunteers to provide or facilitate, DOC will notify the volunteer organization or facilitator, if it is aware, that the program and service will be attended by one or more deaf or hard-of-hearing inmates whose primary language is sign language and encourage the volunteer organization or facilitator to arrange for sign language interpretation and make any other accommodations to facilitate the deaf or hard-of-hearing inmate's effective participation and communication.

Whether a sign language interpreter or other particular auxiliary aid or service is needed is based not only on the particular inmate's method of communication, but also on the nature, length, context, and complexity of the communication.  In determining what form of auxiliary aid or service is necessary, DOC shall give Primary Consideration to the request of the deaf or hard-of-hearing inmate.  DOC shall not be required to provide a sign language interpreter at any particular program, appointment, and/or event if: (1) the inmate knowingly and voluntarily waives in writing his right to a Qualified Sign Language Interpreter; (2) DOC can demonstrate that another substantially equal and effective means of communication is available; or (3) provision of a Qualified Sign Language Interpreter would not be required under 28 C.F.R. § 35.164.  To the extent that provision of a Qualified Sign Language Interpreter would not be required under 28 C.F.R. § 35.164, DOC must provide a written statement of the reasons for reaching that conclusion and must take any other action to nevertheless ensure that, to the maximum extent possible, the deaf or hard-of-hearing inmate receives the benefits or services provided by DOC.

DOC shall not rely on any statements, including written statements, made or obtained without a qualified ASL interpreter from a deaf or hard-of-hearing inmate whose primary language is ASL during an Inner Perimeter Security Investigation, other DOC Investigation, or informal investigative interviews conducted by Inner Perimeter Security, a Superintendent's Special Investigator, or the Internal Affairs Unit for purposes of disciplining said inmate. Nothing in this paragraph shall be interpreted to prevent DOC from responding as it deems appropriate in an emergency or rapidly developing situation, including when DOC must act quickly to prevent harm to the deaf or hard-of-hearing inmate, another inmate, staff, or the general public. In addition, nothing in this paragraph shall be interpreted to prevent DOC from relying on voluntary, unsolicited oral or written statements made by an inmate for the following purposes: (1) to discipline the inmate where the making of the statement itself is the violation, or (2) to initiate an investigation into a possible disciplinary infraction by the inmate.

**B.    Interpretation of Written Materials**

Where an inmate indicates that he or she so requires, DOC shall provide Qualified Sign Language Interpreter services to deaf and hard-of-hearing inmates whose primary language is ASL and who are unable to effectively understand written English or Spanish to permit those inmates to understand the content of written materials that DOC provides to all inmates, written communications from DOC to the deaf or hard-of-hearing inmate, and any forms that the inmate may need to complete.

If a deaf or hard-of hearing inmate whose primary language is ASL participates in any program or class, except one that is run by an outside academic institution, that has a written requirement that is to be completed outside of program or class time, *e.g.*, homework, DOC will provide the deaf or hard-of-hearing inmate with a reasonable accommodation for that written requirement. The reasonable accommodation may include providing a Qualified Sign Language

Interpreter to permit the deaf or hard-of-hearing inmate to effectively complete the written requirement, or making an adjustment to the written requirement, *e.g.*, allowing the work to be done in class or not in writing. However, Qualified Sign Language Interpretation shall not be provided to deaf and hard-of-hearing inmates for use during the Test of Adult Basic Education (TABE) reading and language components so that the resulting scores provide an accurate reflection of the inmate's English language abilities.

### C. Methods for Providing Interpreter Services

#### 1. Video Remote Interpreting

Either directly or through its Contract Medical Provider, DOC shall provide access to on-demand video remote interpreting at On-site Medical Appointments (but excluding routine medical events like daily insulin shots or trips through the medication line), unless VRI is not appropriate based on the circumstances or the needs of the deaf or hard-of-hearing inmate. The provision of VRI for any On-site Medical Appointment shall meet the requirements set forth in 28 C.F.R. § 35.160(d)(1)-(4).

Either directly or through its Contract Medical Provider, DOC will provide VRI for use in unscheduled on-site medical emergencies where the exigencies of the situation permit. Life-saving medical care will never be delayed because no interpretation services are available.

If remote interpreting services are unavailable or not appropriate in the situation, DOC will work in conjunction with the Contract Medical Provider to secure an in-person sign language interpreter as soon as possible. The Contract Medical Provider may arrange for the provision of in-person interpreters at On-site Medical Appointments through the MCDHH, pursuant to the Massachusetts state contract for interpreter services that MCDHH manages, or through other available community resources (*e.g.*, Partners Interpreting).

## 2. On-Site Live Qualified Sign Language Interpreters

DOC shall arrange for Qualified Sign Language Interpreter services and CART services for deaf and hard-of-hearing inmates through MCDHH, pursuant to the Massachusetts state contract for interpreter services that MCDHH manages. DOC shall consult with its contractual ASL interpreters, or shall contact MCDHH to arrange for Qualified Sign Language Interpreter services and CART services before scheduling meetings or hearings with deaf and hard-of-hearing inmates whose primary language is ASL, and before a deaf or hard-of-hearing inmate whose primary language is ASL begins attending a program in which he or she is enrolled. DOC has consulted with MCDHH to determine the most efficient methods for scheduling sign language interpreter and CART services and shall utilize those methods when arranging those services for deaf and hard-of-hearing inmates. Those methods include scheduling with MCDHH sign language interpreter and CART services as soon as reasonably possible after DOC becomes aware of the need for such services from MCDHH and identifying for MCDHH regularly occurring events so that MCDHH can schedule such services well in advance and on a regular basis. In addition, DOC shall also hire two sign language interpreters on a part-time, contract basis of up to 20 hours per week each to supplement interpreter services provided by MCDHH. If there is a material change, be it an increase or a decrease, in the number or DOC's assessment of the needs of deaf and hard-of-hearing inmates, DOC will re-evaluate the number and/or frequency of in-person sign language interpreters. Unforeseen circumstances outside of DOC's control may occasionally prevent it from providing necessary interpreter services or auxiliary aids (*e.g.*, institutional emergencies, institutional lock-downs, severe weather).

### 3.  Choice Between On-Site Interpreter Services and VRI

DOC shall retain discretion to decide whether to provide Qualified Sign Language Interpreter services through on-site interpreters or through VRI, except when VRI is not appropriate based on the deaf or hard-of-hearing inmate's needs or abilities.

### D.  Off-site Medical Care

DOC is not required to provide Qualified Sign Language Interpreter services or other communication access accommodations to deaf or hard-of-hearing inmates when those inmates receive medical care outside of a DOC Facility.  When a deaf or hard-of-hearing inmate who relies on Qualified Sign Language Interpreter services or other auxiliary aids for Effective Communication requires medical care offsite, DOC shall require its Contract Medical Provider to inform all offsite medical providers of that deaf or hard-of-hearing inmate's need for an interpreter or other auxiliary aid as soon as possible.

### E.  Parole Hearings

DOC is not required to provide Qualified Sign Language Interpreter services or other communication access accommodations to deaf or hard-of-hearing inmates at parole hearings because parole hearings are provided by the Massachusetts Parole Board, which is a separate public entity under Massachusetts law, not subject to DOC's jurisdiction.  *See* Mass. G.L. c. 27, § 4.  When a deaf or hard-of-hearing inmate who relies on sign language interpreter services or other auxiliary aids for Effective Communication has a scheduled parole hearing, DOC shall inform the Massachusetts Parole Board of that deaf or hard-of-hearing inmate's need for an interpreter or other auxiliary aid as soon as possible.

### F.  Use of Inmates as Interpreters for Deaf or Hard-of-Hearing Inmates

In accordance with 28 C.F.R. § 35.160(c)(1), DOC shall not require deaf and hard-of-hearing inmates to provide another inmate to interpret for them.  Inmates shall not be used as

32

interpreters for deaf or hard-of-hearing inmates in any of the areas listed in 103 DOC 488.03(1), except in an emergency situation in which institutional security or the health or safety of an individual, including the deaf or hard-of-hearing inmate, any other inmate, member of DOC or vendor staff, or member of the public, would be threatened if communication with the deaf or hard-of-hearing inmate was delayed until a Qualified Sign Language Interpreter could be provided.  If an inmate interprets for a deaf or hard-of-hearing in such emergency circumstances, DOC shall make available within a reasonable period of time a Qualified Sign Language Interpreter to review with the deaf or hard-of-hearing inmate the discussion conducted with the inmate interpreter.

If an inmate is used as an interpreter in an emergency situation, as described above, a written record shall be made of: (1) the name of the deaf or hard-of-hearing inmate, (2) the name of the inmate interpreting, (3) the name(s) of DOC or vendor staff whose communication required interpretation, (4) the date on which the interpretation occurred, and (5) the reason(s) that an inmate interpreter was used.  If inmate interpretation is provided during a medical or mental health appointment or evaluation on an emergency basis, said written record shall be included in the deaf or hard-of-hearing inmate's medical records.

If an inmate is used as an interpreter during an Inner Perimeter Security or other Department Investigation or for questioning related to such an investigation, all official notes concerning those communications shall be preserved.

A deaf or hard-of-hearing inmate shall never be asked or required to sign a waiver or release of his or her confidential CORI or medical information to an inmate serving as an interpreter.

If another inmate interprets for a deaf or hard-of-hearing inmate on an informal basis, neither the deaf or hard-of-hearing inmate nor the assisting inmate shall be subjected to disciplinary consequences solely because the assisting inmate provided interpretation.

A deaf or hard-of-hearing inmate's informal use of an inmate interpreter in a particular circumstance or use of an inmate interpreter in an emergency situation, as referenced above, shall not constitute or be construed as a general waiver of the deaf or hard-of-hearing inmate's request for a Qualified Sign Language Interpreter or as a general waiver of the deaf or hard-of-hearing inmate's confidentiality rights.

Deaf and hard-of-hearing inmates who request the assistance of another inmate to communicate during events and staff interactions for which DOC does not provide Qualified Sign Language Interpreters may, in DOC's discretion, be assigned inmate companions.

## VII.   INSTITUTIONAL WORK ASSIGNMENTS

DOC shall also provide deaf and hard-of-hearing inmates opportunities for institutional work assignments that are consistent with the opportunities for the same assignments afforded to hearing inmates, subject to the exceptions recognized in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, of this Agreement.  DOC shall retain the discretion to determine that certain work assignments present a Direct Threat of injury or death to the deaf or hard-of-hearing inmate or others and may choose not to provide the deaf or hard-of-hearing inmate a substantially equal opportunity to those work assignments on that basis.  If DOC denies a deaf or hard-of-hearing inmate access to work assignments on this basis, the reason for that decision must be documented in the inmate's ADA Folder.

## VIII.   TELECOMMUNICATION

### A.   General Policy

DOC shall provide deaf and hard-of-hearing inmates in its custody with access to telecommunication services and devices that enable Effective Communication with people outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.  DOC shall list and describe all

34

telecommunication services and devices available at a facility during an inmate's orientation at that DOC Facility and in that DOC Facility's inmate handbook.

**B.    Telecommunication Services and Devices to Be Provided**

By the dates specified below, DOC, through its Telecommunication Vendor, will make the telecommunication services and devices listed in Items 1 through 5 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)**, available to facilitate Effective Communication between deaf and hard-of-hearing inmates and individuals outside of DOC Facilities.  If unforeseen and unanticipated delays prohibit the provision of any of these Items by the dates specified, within ten days of DOC's receipt of notice of a delay, DOC will provide a written explanation to Plaintiffs' Counsel as to the source of the delay and a revised estimated timeline for the relevant telecommunication service(s) or device(s).

These telecommunication services and devices shall be made available to deaf and hard-of-hearing inmates in a manner that is consistent with DOC's general policy governing inmate telephone access and use, 103 CMR 482, and other relevant regulations and policies, except where specifically stated otherwise.  To be granted access to particular telecommunication service(s) or device(s), deaf and hard-of-hearing inmates must be approved for such access in accordance with the process set forth in **Section VIII(C) (Requesting Approval for and Access to Telecommunication Services and Devices)**.

**1.    Videophones & Video Relay Services**

DOC will make videophone technology available at each of its facilities to those inmates who have been identified as deaf or hard-of-hearing and whose primary language is sign language. The purpose of the videophones is to enable approved inmates who communicate using sign language to effectively communicate with sign language speakers outside of DOC Facilities

through point-to-point video communication and to effectively communicate with hearing individuals outside of DOC Facilities through the use of VRS.

### a. Stationary Videophones Available at Each Facility

DOC will ensure that at least one stationary videophone available at each DOC Facility with the exception of MCI-Shirley Minimum. The stationary videophone will be installed in a designated location at each facility, to be determined by each facility. The stationary videophone shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482. Deaf and hard-of-hearing inmates who have been approved to use the stationary videophone must request access to the stationary videophone each time they wish to use it by communicating to their unit correctional officers either in writing, if they are able, or by using the ASL sign for "phone". DOC personnel shall clearly communicate to each deaf inmate that the ASL sign for "phone" may be used to request access to the stationary videophone. Unit correctional officers will be trained to understand that an inmate signing in ASL "phone" is requesting access to the videophone. An approved inmate who requests access to a stationary videophone shall be provided such access as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes and that occasions in which access is not provided within 2 hours shall be the rare exception. In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482. If an inmate's access to a stationary videophone is prevented or delayed, DOC must notify the requesting inmate and provide access as soon as is feasible. The requirements of 103 DOC 482.07(1) shall apply to access to stationary videophones. DOC will ensure that there are staff members on each shift at each DOC Facility who know where the stationary videophone is located and the process by which deaf and hard-of-hearing inmates approved to use the videophone may access it. DOC shall ensure that the location

36

designated for stationary videophone use at each facility does not result in such frequent or repeated interruptions or interference to approved inmates' access and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with persons outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.

**b.    Mobile Videophones Available in Housing Units**

No later than November 30, 2019, DOC shall make at least one mobile videophone available in each housing unit in which an approved deaf or hard-of-hearing inmate is housed in a manner that is consistent with DOC's regulations governing telephone access and use (103 CMR 482).  Such mobile videophone technology will be generally available for use during the same hours, including nights and weeks, that hearing inmates have access to traditional telephones. Once a deaf or hard-of-hearing inmate has been approved to use the videophone phone, the approved inmate shall not be required to request access to the mobile videophone in his or her housing unit each time he or she wishes to use it.  Instead, an approved inmate's authorization to use the videophones shall be associated with that inmate's PIN number, as defined in the policy numbered 103 CMR 482.05.  When, consistent with DOC regulations, telephones are not available for general inmate use, the mobile housing unit videophone shall be stored in a location to be determined by each individual DOC Facility.  DOC will ensure that there are staff members on each shift in each housing unit in which an inmate approved to use videophones is housed who know where the mobile videophone is stored and are responsible for making it available in the housing unit for use in accordance with the foregoing.  The presence of a mobile videophone on a deaf or hard-of-hearing inmate's unit shall not prevent that inmate from accessing other types of telecommunication service(s) and device(s) that the inmate is approved to use.  In addition, in the event that a mobile videophone is not fully functional, deaf and hard-of-hearing inmates approved

for videophone use shall be able to request and access the stationary videophone installed at the inmate's facility.

In order to make mobile videophones available in each housing unit in which an approved inmate is housed in accordance with the foregoing, DOC shall ensure that the necessary infrastructure has been updated or installed in each housing unit to permit use of the mobile videophone. In making any such necessary infrastructure modifications, DOC shall prioritize those housing units in which a deaf or hard-of-hearing inmate whose primary language is ASL currently is housed.

### 2. Captioned Telephones

DOC will make at least one CapTel device available at each DOC Facility. DOC will provide additional CapTel devices in DOC Facilities when possible based on the location of analog telephone lines and availability of a suitable space for use thereof, as determined by DOC taking into consideration such factors as use of the space by correctional staff, operational needs, security concerns, technical needs and concerns, and the safe use and storage of the device. The portable CapTel device will be stored in a designated location at each facility, to be determined by each facility. The CapTel device shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482. Deaf and hard-of-hearing inmates who have been approved to use the CapTel device must request access to the CapTel device each time they wish to use it. An approved inmate who requests access to a CapTel device shall be provided as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes, and occasions in which access is not provided within 2 hours shall be the rare exception. In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482. If an inmate's access to a CapTel device is prevented or delayed,

DOC must notify the requesting inmate and provide access as soon as is feasible. The requirements of 103 DOC 482.07(1) shall apply to access to CapTel devices. DOC will ensure that there are staff members on each shift at each DOC Facility who know where the CapTel device(s) is stored and the process by which deaf and hard-of-hearing inmates approved to use the device may access it. DOC shall ensure that the location designated for CapTel use at each DOC Facility does not result in such frequent or repeated interruptions or interference to approved inmates' access and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with persons outside of DOC Facilities that is substantially equal to the access to telecommunication services and devices that DOC provides to inmates without hearing disabilities.

### 3. Teletypewriters

DOC will ensure that at least one TTY device is available at each DOC Facility. The portable TTY device will be stored in a designated location at each facility, to be determined by each facility. The TTY device shall be available during the same hours, including nights and weekends, that hearing inmates have access to traditional phones, consistent with 103 CMR 482. Deaf and hard-of-hearing inmates who have been approved to use the TTY device must request access to the TTY device each time they wish to use it. An approved inmate who requests access to a TTY device shall be provided such access as soon as possible and without delay, with the expectation that access will be provided within forty-five (45) minutes, and occasions in which access is not provided within 2 hours shall be the rare exception. In no event shall an approved inmate have to wait longer than two-and-a-half (2.5) hours, unless access must be prevented or delayed as permitted by 103 CMR 482. If an inmate's access to a TTY device is prevented or delayed, DOC must notify the requesting inmate and provide access as soon as is feasible. The requirements of 103 DOC 482.07(1) shall apply to access to TTY devices. DOC will ensure that there are staff members on each shift at each DOC Facility who know where the TTY device is

stored and the process by which deaf and hard-of-hearing inmates approved to use the device may

access it. DOC shall ensure that the location designated for TTY use at each DOC Facility does

not result in such frequent or repeated interruptions or interference to approved inmates' access

and use that deaf and hard-of-hearing inmates are deprived of Effective Communication with

persons outside of DOC Facilities that is substantially equal to the access to telecommunication

services and devices that DOC provides to inmates without hearing disabilities.

### 4.    Amplification Available on Traditional Telephones

DOC will ensure that all traditional telephones provided for inmate use include a built-in

user-controlled volume button that permits telephone users to amplify call volume.

### 5.    Hearing Aid Compatible Traditional Telephones

DOC will ensure that all traditional telephones provided for inmate use include handsets

that are hearing aid compatible in accordance with Federal Communications Commission

guidelines.

### C.    Requesting Approval for and Access to Telecommunication Services and Devices

DOC will provide access to videophone, TTY, and/or CapTel services and devices to those

deaf or hard-of-hearing inmates who have requested access thereto and whose requests have been

approved, or to deaf or hard-of-hearing inmates who have been otherwise approved, in accordance

with the procedures set forth in the 408 Policy. Deaf and hard-of-hearing inmates may be approved

for and receive regular access to more than one of the above telecommunication service(s) or

device(s). DOC shall maintain a record of a deaf or hard-of-hearing inmate's approval to access

certain telecommunication service(s) or device(s) in IMS as an open-ended medical restriction,

subject to periodic reviews for appropriateness. In the event of a transfer, approvals for

telecommunication service(s) and device(s) shall follow deaf and hard-of-hearing inmates from facility to facility.

Deaf and hard-of-hearing inmates who have been approved to access videophone, TTY, and/or CapTel services and devices shall not be required to submit a new Request for Reasonable Accommodation each time they wish to access the approved telecommunication service(s) and device(s). Once approved, deaf and hard-of-hearing inmates shall only require permission to use videophones on a particular occasion in the same limited circumstances in which other inmates require permission to use traditional telephones. For TTY and/or CapTel devices, once approved, deaf or hard-of-hearing inmates need only to informally notify DOC staff that they wish to access the device in question, and DOC staff shall permit and facilitate timely access thereafter, in keeping with the provisions above.

Inmates who have been identified as deaf or hard-of-hearing, either through self-identification or identification by DOC or its Contract Medical Provider, shall be notified during booking and admission and at inmate orientation of all telecommunication services and devices available at DOC Facilities, so that they are aware of what technologies exist and may submit a Request for Reasonable Accommodation for approval to access the appropriate service(s) or device(s). A written description of all available telecommunication services and devices shall also be included in each facility's Inmate Orientation Manual. If an inmate is later identified as deaf or hard-of-hearing while in DOC custody, either through self-identification or identification by DOC or its Contract Medical Provider, the Institutional ADA Coordinator or designee at the facility in which such inmate is housed shall notify the inmate of the telecommunication services and devices available so that the inmate may submit a Request for Reasonable Accommodation for approval to access the appropriate services and devices.

### D. Monitoring Communications

All calls placed by inmates, including but not limited to those placed by deaf and hard-of-hearing inmates through videophones, CapTel devices, and TTY machines, will be subject to monitoring, recording, and storage, consistent with 103 CMR 482.

### E. Additional Time for Communication

DOC agrees that it may be necessary to provide deaf and hard-of-hearing inmates with more time to use the services and devices listed in Items 1 through 3 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)** in order to provide them with equal access to Effective Communication. DOC therefore will allow deaf and hard-of-hearing inmates who have been approved to use videophones, TTY, and/or CapTel devices twice the amount of time to complete calls using such devices as is afforded to inmates who complete telephone calls using traditional telephones, subject to operational or security concerns or administrative constraints (*e.g.*, institutional emergencies).

### F. Cost for Use of Telecommunication Services and Devices

DOC agrees to make videophone, TTY, and CapTel services and devices available at no cost to deaf and hard-of-hearing inmates who have been approved to use such services and devices.

### G. Responsibility for Maintaining Equipment

DOC, through its Telecommunication Vendor, will ensure that the telecommunication services and devices used to permit communication between deaf and hard-of-hearing inmates and people outside of DOC Facilities are in good working order. DOC will attempt to resolve complaints about any malfunctioning equipment within one week of receiving that complaint. To the extent services, equipment, and resources that are outside of DOC's control are involved, DOC agrees to notify the relevant providers or companies of any equipment problems within one week

and, to the extent necessary or possible under the circumstances, work with these third parties to expeditiously resolve the problem(s).

### H. Responsibility for Training Staff

DOC will ensure that designated DOC employees are adequately trained in the operation of the services and devices listed in Items 1 through 3 of **Section VIII(B) (Telecommunication Services and Devices to Be Provided)**.

## IX. VISUAL AND TACTILE NOTIFICATIONS

### A. General Policy

Deaf and hard-of-hearing inmates housed in DOC Facilities should not miss announcements, alarms, or any other auditory information delivered by DOC staff to the general inmate population solely because of their disability.

### B. Relaying Non-Emergency Information

DOC shall provide an effective non-auditory alert system that will be used to notify deaf and hard-of-hearing inmates of prison-wide events (including by not limited to announcements, visitations, and count) and events specific to deaf and hard-of-hearing inmates. The non-auditory alert system must be capable of effectively alerting deaf and hard-of-hearing events in real time. As of the Effective Date of this Agreement, DOC intends to employ a non-auditory alert system that relies upon: (1) a visual or tactile notification system, and (2) in-person contact/communication between DOC staff and the deaf or hard-of-hearing inmate. DOC retains discretion as to which type of non-auditory alerts it shall employ and to change those systems as it deems necessary, including if new technology becomes available or if security concerns (either inmate-specific or institution-level) so require.

## 1. Visual or Tactile Notification Systems

As of the Effective Date of this Agreement, DOC has identified and beta-tested several visual/tactile notification systems that utilize a transmitter that can be triggered to send a signal to a receiver or pager unit. Based on this testing, DOC has identified for each of its facilities at least one such system that can function effectively at that facility to alert deaf and hard-of-hearing inmates to announcements and non-emergency events. The identified systems use a transmitter that can be manually triggered to send a signal to a corresponding receiver or pager unit. Depending on the system, the corresponding receiver or pager unit may vibrate, emit a flashing light, or display a short, typed message when manually triggered. When the receiver or pager unit has been activated, the deaf or hard-of-hearing inmate may seek additional information regarding the announcement or non-emergency alert from the DOC staff in the housing unit. DOC will employ a system that provides both a tactile or light alert and a short, typed message in those facilities where DOC has identified such a system that can function effectively.

DOC staff shall convey any information to the inmate using simple written English, flash cards containing simple pictures and words, or other such means of simple communication to effectively convey to the deaf or hard-of-hearing inmate the substance of the announcement or non-emergency alert. DOC shall provide Plaintiffs' Counsel with copies of the flash cards that it develops for such purpose.

In accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, DOC shall offer either a receiver or pager unit, depending on what is operational in the inmate's facility to deaf and hard-of-hearing inmates whose primary language is ASL without requiring the inmate to complete the Request for Reasonable Accommodation Form or follow the reasonable accommodation process. If a deaf or hard-of-hearing inmate whose primary language is ASL selects the receiver or pager unit available at the facility at which he or

she is housed, it shall be provided to him or her and a transmitter unit shall be placed in each such inmate's housing unit, which will be operated by DOC correctional staff within that unit. DOC staff responsible for operating the transmitter shall be properly trained in how to effectively use the technology and in accepted methods of communicating announcements or non-emergency alerts to the deaf or hard-of-hearing inmate.

### 2. Vibrating Watches

DOC has also identified vibrating watches that a deaf or hard-of-hearing inmate can program to vibrate at certain times.

In accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 2**, DOC shall offer a vibrating watch to deaf and hard-of-hearing inmates whose primary language is ASL without requiring the inmate to complete the Request for Reasonable Accommodation Form or follow the reasonable accommodation process. If a deaf or hard-of-hearing inmate whose primary language is ASL selects the vibrating watch, it shall be provided to him or her.

### 3. Supplementary Non-Auditory Information Relay Systems

In addition to the foregoing devices, DOC shall also publish the facility-specific schedule in the inmate handbook that each inmate receives when the inmate is housed in a specific facility and shall promptly post notice of any schedule changes in the housing unit of each deaf or hard-of-hearing inmate whose primary language is ASL.

Furthermore, DOC is in the process of updating the Master Antenna Television systems at each facility. When installation is complete, DOC shall configure each system such that facility announcements and schedules will be posted and may be viewed on a television tuned to a pre-determined channel. Deaf and hard-of-hearing inmates who have access to a television may view any facility announcements or schedules by tuning to that channel.

## X.     TRAINING

### A.     Training Provided to Covered Employees

DOC shall provide training as described below to Covered Employees. Subject to collective bargaining requirements, DOC will provide this training to: (1) existing Covered Employees within six (6) months of the Effective Date of this Agreement, and (2) new Covered Employees within three (3) months of the date upon which they begin their employment. Thereafter, Covered Employees shall receive this training no less than once every two (2) years, or as pertinent changes in law require. DOC will incorporate this training into its regularly scheduled training programs for new and existing employees. DOC shall retain discretion to determine the manner and/or format in which such training shall be conducted. DOC shall update training materials to reflect pertinent changes in law. DOC shall retain discretion to consult with outside parties, including MCDHH, to prepare or present relevant training materials.

DOC shall maintain records regarding each training provided to Covered Employees, including information regarding attendance and/or completion of training for each Covered Employee and copies of the training materials and/or content provided.

The training to be provided to Covered Employees shall include the following topics:

- the importance of Effective Communication and best practices for communicating with deaf and hard-of-hearing inmates in accordance with the ADA's Effective Communication requirements and other applicable standards and federal law;

- the unique needs of and problems encountered by deaf and hard-of-hearing inmates;

- deafness and hearing loss as a culture;

- literacy issues that may impact deaf and hard-of-hearing inmates' ability to communicate;

- methods of identifying a deaf or hard-of-hearing inmate's communication needs;

- the potential limitations of lip-reading and note writing as modes of communication with deaf and hard-of-hearing inmates;

- the potential impact of hearing loss on deaf and hard-of-hearing inmates' interactions with hearing correction officers;

- additional notification obligations that apply to correction officers when deaf or hard-of-hearing inmates are in their care and custody (this training shall only apply to DOC employees with care and custody functions);

- the proper use and role of Qualified Sign Language Interpreters;

- directions for using various Auxiliary Aids and Services that may be provided to enhance deaf and hard-of-hearing inmates' ability to communicate effectively;

- the need for additional time for uses of certain telecommunications devices, such as TTY and CapTel; and

- ADA standards and DOC policies and procedures as they relate to deaf and hard-of-hearing inmates.

This training may be delivered in electronic format to all Covered Employees other than DOC Deputies.

This training shall be delivered by an in-person presenter to all DOC Deputies.

**B.     Supplemental Training Provided to Institution ADA Coordinators**

In addition to the foregoing, DOC shall provide supplemental training as described below to all Institution ADA Coordinators.  DOC will provide this training to: (1) existing Institution ADA Coordinators within three (3) months of the Effective Date of this Agreement, and (2) new Institution ADA Coordinators within three (3) months of the date upon which they assume the position of Institution ADA Coordinator.

The supplemental training to be provided to Institution ADA Coordinators is such training sufficient to enable them to effectively explain the purpose and function of each available auxiliary aid and service to deaf and hard-of-hearing inmates so that deaf and hard-of-hearing inmates may make an informed request for Auxiliary Aids and Services in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids)**. This supplemental training shall include information regarding: (1) the Auxiliary Aids and Services available to deaf and hard-of-hearing inmates; (2) how such Auxiliary Aids and Services work, by including, to the extent possible, a demonstration of auxiliary aid devices; (3) the hearing-related communication access barrier(s) and/or need area(s) that each available auxiliary aid and service may help to address; (4) how to identify common communication access barriers and need areas for deaf and hard-of-hearing inmates; and (5) best practices for removing communication access barriers  and providing reasonable accommodations to deaf and hard-of-hearing inmates.

DOC shall coordinate with MCDHH or other community resources to provide Institution ADA Coordinators with the supplemental training described here.  This supplemental training shall be delivered to all Institution ADA Coordinators.

## XI.   REVISIONS TO RELEVANT DOC POLICIES IN ACCORDANCE WITH THIS AGREEMENT

DOC will update its policies, including the 408 Policy, where necessary, for consistency with this Agreement.  In particular, DOC shall revise its policies where necessary in accordance with the following:

1.   Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, when an inmate has been identified as deaf or hard-of-hearing at any time during his or her incarceration, including at intake or by DOC's Contract Medical Provider, in accordance with **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-**

**Related Auxiliary Aids and Services)**, an assessment shall be made of the inmate's hearing-related needs so that he or she may effectively communicate and receive effective, meaningful, and substantially equal access to DOC programs, services and activities during his or her incarceration.

2.    Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, as set out in this Agreement and unless declined by the inmate,  DOC shall provide deaf and hard-of-hearing inmates whose primary language is ASL with auxiliary aids in the form of: (1) Qualified Sign Language Interpreters at the events listed in **Section VI(A) (General Policy)**; (2)  telecommunications services (*i.e.* videophones, TTY, and/or CapTel); and (3) visual and/or tactile notification devices (*e.g.,* vibrating pagers),  without requiring the inmate to complete the Request for Reasonable Accommodation Form (103 DOC 408, Attachment A) or follow the reasonable accommodation process.  DOC will provide such accommodations as soon as is feasible after identifying a deaf or hard-of-hearing inmate whose primary language is ASL.

3.    Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC will provide appropriate auxiliary aids and/or services including, without limitation, Qualified Sign Language Interpretation and writing assistance, to deaf and hard-of-hearing inmates who cannot effectively complete DOC's reasonable accommodation process without such accommodations due to communication access issues.  Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available at all stages of DOC's reasonable accommodation process, including to assist the inmate in: (1) completing the request form (103 DOC 408, Attachment A); (2) effectively communicating with the Institution ADA Coordinator; (3) effectively communicating with Contract Medical Provider staff conducting an evaluation related to a medically prescribed

49

accommodation; (4) reading and fully understanding the content of a decision concerning a requested accommodation; and/or (5) completing the appeal form (103 DOC 408, Attachment B). Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively complete DOC's reasonable accommodation process, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified in (1) through (5) of this paragraph.

4. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, among other factors, including those listed in 28 C.F.R. § 35.160(b)(2), DOC shall give Primary Consideration, as that term is defined in **Section III (Definitions), ¶ 27**, to deaf and hard-of-hearing inmates' requested accommodations when determining what types of auxiliary aids and/or services are necessary to ensure that they are able to communicate effectively and have effective, meaningful, and substantially equal access to DOC programs, services, and activities.

5. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC, either directly or through its Contract Medical Provider, shall provide to a deaf or hard-of-hearing inmate those auxiliary aids and/or services that have been approved as reasonable accommodations to facilitate his or her Effective Communication and/or participation in DOC programs, services, and activities. If the inmate's hearing impairment has been identified as a clinical condition that is not expected to resolve or improve with time, DOC, either directly or through its Contract Medical Provider, shall designate such auxiliary aids and/or services as open-ended medical restrictions. The designation of an approved auxiliary aid and/or service as an open-ended medical restriction shall be subject to periodic review for appropriateness, including when and if the deaf or hard-of-hearing inmate transfers to another facility. The open-ended medical restriction shall remain active

during periodic reviews for appropriateness and shall not be discontinued or modified unless and until the affected inmate is notified and given the opportunity to discuss the discontinuation or modification with the Institution ADA Coordinator. Any decision to discontinue or modify an existing open-ended medical restriction, including the reasons justifying the discontinuation or modification in keeping with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 9**, must be documented in writing.

6.  In accordance with **Section VI (Qualified Sign Language Interpreters)**, relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that, if a deaf or hard-of-hearing inmate submits a Request for Reasonable Accommodation requesting access to Qualified Sign Language Interpreters for particular programs, appointments, or events and that request is approved, DOC will ensure that Qualified Sign Language Interpreter services are available for all the programs, appointments, and/or major events listed in **Section VI(A) (General Policy)** without requiring subsequent Requests for Reasonable Accommodation to receive interpreter services.

7.  Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC shall not assess the cost of approved accommodations to the disabled inmate, in accordance with 28 C.F.R. § 35.130(f).

8.  Relevant provisions of the 408 Policy (which includes those sections numbered 103 DOC 408.01, 408.07, and 408.11), and other DOC policies as necessary, shall clarify that the exceptions to DOC's obligation to make its programs, services, and activities accessible to disabled inmates (including deaf and hard-of-hearing inmates) are limited to those which are permitted under federal law, as well as any limitations or requirements incorporated

therein, including 28 C.F.R. §§ 35.130(h), 35.139(a)-(b), 35.150(a)(3). These exceptions include that DOC need not provide accommodations in the following circumstances:

(a)    If the accommodation will result in a fundamental alteration in the nature of a program, activity, or service or in undue financial or administrative burdens. The decision that an accommodation would result in a fundamental alteration or in undue financial or administrative burdens must be made by the Commissioner or his or her designee after considering all resources currently available for use in the funding and operation of DOC's programs and services, and must be accompanied by a written statement of reasons documenting that conclusion, in accordance with 28 C.F.R. §§ 35.150(a)(3) and 35.164;

(b)    If the accommodation will result in actual risks or impairment of the safe operation of a DOC program, activity, or service, in accordance with 28 C.F.R. § 35.130(h); or

(c)    If the inmate seeking to participate in or benefit from the DOC program, activity, or service, poses a Direct Threat to the health or safety of the inmate or others. To determine whether an inmate poses a Direct Threat, DOC must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk, in accordance with 28 CFR § 35.139(b).

9.    Relevant provisions of the 408 Policy (which may include those subsections numbered 103 DOC 408.05 and 408.07), and other DOC policies as necessary, shall clarify that the

Commissioner or a designee shall document DOC's basis for modifying or denying any requested accommodation. The Institution ADA Coordinator shall: (1) store this documentation in a designated Inmate ADA folder that shall follow the inmate if he or she transfers to another DOC Facility; and (2) shall give the inmate a hard copy of this documentation along with written notification of the decision modifying or denying the requested accommodation and notice of the inmate's right to appeal within no more than three (3) days after the decision is rendered.

10. Relevant provisions of the 408 Policy (which may include those subsections numbered 103 DOC 408.01, 408.05, and 408.07), and other DOC policies as necessary, shall clarify that, if DOC is not required to provide the inmate's requested accommodation under federal law, including for those reasons listed in **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement), ¶ 8**, DOC will: (1) determine what alternative reasonable accommodation(s) can be provided to ensure that the deaf or hard-of-hearing inmate receives effective, meaningful, and substantially equal access to DOC programs, services, and activities; and (2) will provide the deaf or hard-of-hearing inmate with such alternative reasonable accommodation(s).

11. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that a determination by medical staff not to prescribe a medical order or medical accommodation to a deaf or hard-of-hearing inmate shall not preclude the Institution ADA Coordinator or Department ADA Coordinator from approving other accommodations that are necessary for the inmate's Effective Communication or effective, meaningful, and substantially equal access to DOC programs, services, and activities.

12. Relevant provisions of the 408 Policy and/or other DOC policies as necessary, shall clarify that DOC will provide appropriate auxiliary aids and/or services including, without

limitation, Qualified Sign Language Interpretation and writing assistance, to deaf and hard-of-hearing inmates who need accommodation(s) to effectively complete DOC's grievance process, in keeping with 103 CMR 491.07(1).  Depending on the needs of the deaf or hard-of-hearing inmate, auxiliary aids and/or services will be made available at all stages of DOC's grievance process.  A deaf or hard-of hearing inmate who is unable to initiate a grievance process in writing as a result of his or her hearing impairment may inform a Correctional Program Officer or the Institution ADA Coordinator that he or she requires assistance to initiate or complete the grievance process.  Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively complete DOC's grievance process, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified this paragraph.

13. Relevant provisions of the 408 Policy, and other DOC policies as necessary, shall clarify that DOC will provide to deaf and hard-of-hearing inmates appropriate auxiliary aids and/or services, including, without limitation, Qualified Sign Language Interpretation and writing assistance, to ensure that they have effective access to Staff Access periods that is substantially equal to the access available to hearing inmates at the same DOC Facility; or, alternatively, that deaf and hard-of-hearing inmates have effective access to DOC staff who are available during Staff Access periods in a separate meeting at least as frequently as hearing inmates have access to such staff during Staff Access periods at the same DOC Facility.  Deaf and hard-of-hearing inmates who, by reason of their hearing disability, cannot effectively access DOC's Staff Access period, shall not be required to submit a written request or complete DOC's reasonable accommodation process in order to receive the assistance specified above.  However, where a deaf or hard-of-hearing inmate requires an auxiliary aid or services the use of which must be scheduled in advance (*e.g.*, Qualified

Sign Language Interpreters, CART services, etc.), DOC may engage in preliminary discussion(s) with the deaf or hard-of-hearing inmate to establish whether and how frequently the inmate intends to attend Staff Access periods. The inmate will be asked to notify DOC if his or her intent to attend changes. If the inmate does not attend Staff Access periods with the frequency he or she had previously indicated, DOC may have further discussion(s) with the inmates regarding attendance at Staff Access periods.

## XII.  HOUSING DETERMINATIONS

At a deaf or hard-of-hearing inmate's annual classification hearing, DOC shall inquire whether the inmate would prefer to be housed in a correctional facility that already houses another deaf or hard-of-hearing inmate. If an inmate indicates such a preference, DOC will consider the inmate's request at the classification hearing. DOC shall document the inmate's request in the inmate's classification report. If an inmate has made such a request and has been placed at a facility at which there are other deaf and hard-of-hearing inmates, the DOC staff responsible for making housing determinations at that facility will consider the inmate's request in determining his or her housing unit placement after any orientation period. Additionally, once a deaf or hard-of-hearing inmate has been placed at a facility, he or she may request to be housed with other deaf or hard-of-hearing inmates at that facility at any time by submitting a request to the facility Superintendent. DOC shall document the deaf or hard-of-hearing inmate's request to the facility Superintendent and the facility Superintendent's response thereto in IMS.

Such facility and housing placements would be in the sole discretion of the DOC and would be considered only after DOC has taken into account the various factors upon which it relies in making facility and housing placement decisions, including, but not limited to: classification status; individual programming needs; medical, mental health and sex offender treatment needs; the need for reasonable accommodations; and conflicts between and among the inmate population

(*e.g.*, enemy situations, STG affiliations, protective custody situations, etc.). Nothing in this section shall be interpreted to limit DOC's discretion to classify or house inmates in whatever correctional facility or housing unit it deems appropriate in keeping with the requirements of state and federal law. However, DOC will not place a deaf or hard-of-hearing inmate in a DOC Facility, housing unit, or cell in which it is unable to provide reasonable accommodations that ensure that the deaf or hard-of-hearing inmate is afforded access to DOC's programs, services, and activities that is substantially equal to the access afforded to hearing inmates placed in the same DOC Facility, housing unit, cell, or status. Additionally, regardless of the DOC Facility in which a deaf or hard-of-hearing inmate is housed, said inmate retains all rights required by this Agreement and state and federal law.

## XIII.  MONITORING AND REPORTING

### A.  Settlement Monitor

1.  The Parties will consult to identify a Settlement Monitor that is reasonably acceptable to both parties. The Settlement Monitor will serve to assess DOC's compliance with the terms of the Agreement. If the Parties cannot timely agree upon the selection of a Settlement Monitor, each Party shall submit name(s) of proposed monitor(s), along with a summary of their qualifications, from which the Court may select the Settlement Monitor.

2.  It is contemplated that Plaintiffs will pay for the fees and costs incurred by the Settlement Monitor and any consultants he or she retains out of any attorneys' fees paid by the Commonwealth of Massachusetts as part of this litigation. To the extent any award of attorneys' fees is insufficient to cover the fees and costs incurred by the Settlement Monitor and any consultants he or she retains, Plaintiffs reserve the right to seek such fees and costs from the Court. DOC will not pay fees and costs incurred by the Settlement Monitor or any consultants he or she retains unless so ordered by the Court.

3.     The Settlement Monitor shall have access to all DOC Facilities that house deaf or hard-of-hearing inmates, with reasonable notice, to conduct monitoring visits in order to assess DOC's compliance with this Agreement. There shall be no more than three monitoring visits in each year that the Agreement is in effect.  These visits may take up to three consecutive days each, and the Settlement Monitor may visit as many facilities as is practicable during each visit.

4.     During each monitoring visit, the Settlement Monitor shall have access to meet with and interview personnel whose duties pertain to the provision of accommodations and services to deaf or hard-of-hearing inmates.  The Settlement Monitor may ask DOC, through its in-house counsel, to provide timely written responses to questions she may pose related to the implementation of this Agreement.

5.     During each monitoring visit, the Settlement Monitor shall have a reasonable opportunity to conduct confidential interviews of deaf or hard-of-hearing inmates, or groups of such inmates (if a group setting does not present a safety or security concern), with the inmate or inmates' written consent obtained on the date of the interview or in advance thereof, to assess whether they are receiving the accommodations and other services called for by the Agreement.

6.     DOC shall designate one or more representatives with whom the Settlement Monitor shall conduct an in person or telephonic "exit interview." The Settlement Monitor shall conduct the exit interview before the conclusion of each monitoring visit and at a time mutually convenient to the Settlement Monitor and DOC.  Unless otherwise stated by the Settlement Monitor, any opinions or observations shared with DOC representatives during such exit interview shall be deemed to be preliminary and subject to revision.

7.      In addition to in-person interviews during monitoring visits, the Settlement Monitor may receive calls and correspondence from deaf or hard-of-hearing inmates, provided that deaf and hard-of-hearing inmates may only call the Settlement Monitor during regular hours when inmates have access to phones, consistent with 103 CMR 482. Such communications shall be treated as confidential and will be protected from discovery by DOC.

### B.      DOC Records and Reports

1.      Three times per year during the course of this Agreement, at intervals to be agreed upon by the parties, DOC will provide the Settlement Monitor and Plaintiffs' Counsel with data and documents collected by the DOC and its Contract Medical Provider to track DOC's compliance with the Agreement. This data will cover each DOC Facility that houses a deaf or hard-of-hearing inmate. The data and documents to be provided are set forth in Appendix A attached to this Agreement. Material and information provided in one report need not be repeated in subsequent reports; only new or updated information since the date of the last report must be provided.

2.      The Settlement Monitor shall have access to any other relevant records or documents to assess compliance with this Agreement, except documents protected by attorney-client or work product privileges or any applicable protective order entered by the Court. If these documents are requested in conjunction with a monitoring visit, the DOC will provide these documents to the extent feasible within ten (10) days prior to the visit.

3.      During the monitoring visits, the Settlement Monitor shall have reasonable access to current inmate records (subject to the inmate's written consent), including inmate ADA folders, six-part files, and medical records. If the Settlement Monitor requests copies of any inmate's ADA folder or other records, the DOC shall provide copies within thirty (30)

business days of the request. Within thirty (30) days of the Effective Date, the parties shall agree to a procedure to ensure access to and the confidentiality of inmate records.

4.    DOC shall also conduct an annual audit of its policies, practices and procedures to assess compliance with the terms of the Agreement and the ADA. The first such audit shall be completed within one (1) year of the Effective Date. At minimum, this audit shall address the issues described in the Settlement Monitor's inspection checklist described in **Section XII(C) (Settlement Monitor's Reports), ¶ 2**.

### C.    Settlement Monitor's Reports

1.    The Settlement Monitor shall prepare bi-annual written reports on DOC's efforts to meet the terms of this Agreement, and may also include additional advice, suggestions or proposals in the nature of quality assurance or quality improvement as she deems appropriate. The Settlement Monitor shall make her written report available to the DOC within thirty (30) days from the completion of her monitoring visit and the delivery by DOC of any documents requested by the Settlement Monitor at the monitoring visit, whichever is later, unless the time for submission is extended by agreement of the parties. Although DOC will give full consideration to advice, suggestions, and proposals offered by the Settlement Monitor, all decisions concerning the provision of accommodations and services to deaf and hard-of-hearing inmates will be made by DOC in accordance with the terms of this Agreement and statutory and other legal responsibilities. If the Settlement Monitor reports that DOC has not met the terms of any provision or provisions of this Agreement, she shall make recommendations as to actions she believes to be necessary to meet the terms of the provision(s). If DOC does not accept any recommendations made by the Settlement Monitor, it will explain its reasons to the Settlement Monitor and Plaintiffs' Counsel.

2.      Six (6) months from the Effective Date, the Settlement Monitor shall develop an inspection
checklist that canvasses all of the issues subject to the Agreement, and shall circulate it to
Plaintiffs and DOC.  The inspection checklist should serve as an aid for DOC to use as a
self-audit instrument.

## XIV.   RELEASE AND SETTLEMENT OF CLAIMS

 In consideration of the representations, promises, and agreements set forth herein, the
sufficiency of which is hereby acknowledged, the individual Plaintiffs and members of any class
that is certified in this Action, on behalf of themselves, their assignees, heirs, executors, family
members, beneficiaries, administrators, successors in interest, and anyone acting, or claiming to
act, on their behalf, hereby release and forever discharge the Commonwealth, the Executive Office
of Public Safety and Security, DOC, and their current and former employees from any and all
claims and causes of action arising out of the matters described in the Complaint filed in this
Action, except for the Reserved Claims, through the term of the Agreement.

Nothing in this Agreement shall constitute a waiver by any individual class member other
than the named Plaintiffs of any individual claim against DOC or against any individual defendant
in a court of competent jurisdiction for monetary damages.

## XV.   FINAL APPROVAL

For purpose of this Agreement and its Final Approval by the Court, the Parties agree to
stipulate that this Action shall be maintained as a class action under Fed. R. Civ. P. 23, with the
class  defined as all individuals who are currently in DOC custody or in the future are placed in
DOC custody, and who are currently or in the future become deaf or hard-of-hearing.

This Agreement shall be subject to the Final Approval of the Court.  The Parties shall
cooperate in presenting this Agreement to the Court for Final Approval and/or at any hearing under
Fed. R. Civ. P. 23(e).  If the Court grants Final Approval, the Parties stipulate that this Agreement

shall not be construed as a consent decree or its equivalent. If the Court does not grant Final Approval, this Agreement shall be null and void and of no force and effect, and nothing herein shall be deemed to prejudice the position of any Party with respect to the Action or otherwise, and neither the existence of this Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings connected with it, shall be admissible in evidence, referred to for any purpose in the Action or in any other litigation or proceeding, or construed as an admission, presumption, or concession by DOC of any liability or the truth of any of the allegations of the Action.

## XVI. DISPUTE RESOLUTION AND ENFORCEMENT

This Agreement may be enforced only by the Parties hereto. Nothing contained in this Agreement is intended to or shall be construed to evidence an intention to confer any rights or remedies upon any persons other than the Parties hereto. The Court shall be the sole forum for the enforcement of this Agreement.

If Plaintiffs believe that DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance, with any provision of this Agreement, Plaintiffs, through Plaintiffs' Counsel, shall provide DOC, in writing, notice of the specific reasons why it believes that DOC is not in substantial compliance with such provision or provisions, referencing the specific provision or provisions. Plaintiffs may not allege that DOC is not in substantial compliance based on minor or isolated delays in compliance. Plaintiffs may also not allege that DOC is not in substantial compliance without evidence of a pattern of non-compliance with regard to the particular provision or provisions. To the extent that Plaintiffs rely on observations or opinions of the Settlement Monitor to support an allegation that DOC is not in substantial compliance, Plaintiffs shall refer to the Settlement Monitor's written reports or to portions thereof that support Plaintiffs' belief. To the extent that Plaintiffs rely upon documents provided by DOC to support an allegation that DOC

is in not in substantial compliance, Plaintiffs shall make reference to the specific documentation that supports Plaintiffs' belief.

DOC shall have the opportunity to consult the Settlement Monitor with respect to Plaintiffs' allegations that DOC is not in substantial compliance with any provision or provisions. Any such consultation must be in writing and shared with Plaintiffs' Counsel. DOC shall provide Plaintiffs' Counsel with a written response to the notification of alleged substantial non-compliance within thirty (30) days of receipt. DOC's response shall contain a description of the steps it took to investigate the issues addressed in Plaintiffs' notice, the results of the investigation, and, where DOC proposes corrective action, a specific plan for addressing the described issues. If no corrective action is proposed by reason of the unavailability of appropriated funds, the lack of receipt of appropriated funds, legal considerations, or for other reasons, DOC's response shall specifically state those reasons as well as any statutes, regulations, evidence, or technical bases upon which it is relying in reaching such conclusion.

Plaintiffs will advise DOC of its acceptance or rejection of DOC's response within seven (7) business days of its receipt. Either DOC or Plaintiffs, in any of the written submissions pursuant to this section, may request a meeting to discuss and attempt to resolve any matter addressed in the written submissions. DOC and Plaintiffs shall meet within fourteen (14) business days of receipt of a request to meet, unless a later meeting is agreed to by the Parties.

If DOC and Plaintiffs are not successful in their efforts to resolve the issue, they may jointly or independently seek relief from the Court to effect substantial compliance with the Agreement, but not through a petition for contempt.

If the Court finds that DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance, with a provision or provisions of the Agreement, it may enter an order consistent with equitable principles, but not an order of contempt, that is designed to achieve compliance.

If Plaintiffs contend that DOC has not complied with an order entered under the immediately preceding paragraph, they may, after reasonable notice to DOC, move for further relief from the Court to obtain compliance with the Court's prior order. In ruling on such motion, the Court may apply equitable principles and may use any appropriate equitable or remedial power available to it.

The Parties shall not seek termination of or otherwise challenge this Agreement or any order approving this Agreement during the time that the Court retains jurisdiction. Nothing in this paragraph shall limit the Parties' rights to challenge or appeal any finding as to whether DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance, or any consequent order entered by the Court.

## XVII. FUNDING

The Parties acknowledge that full implementation of this Agreement may be subject to the availability and receipt of appropriated funds.

DOC agrees to make all possible good faith efforts to seek all necessary funding to implement fully the terms of this Agreement. In the event that DOC alleges that it is unable to fulfill any of its obligations under this Agreement because of inadequate appropriations by the Legislature or a lack of receipt of appropriated funds, the Parties shall meet and confer, and if necessary, consult the court.

In the event that the Parties remain unable to agree, Plaintiffs' Counsel reserve all rights to seek remedial orders from the Court to effect substantial compliance with this Agreement under the Dispute Resolution and Enforcement procedures in **Section XVI (Dispute Resolution and Enforcement)** of this Agreement, and DOC reserves all rights to respond to any such requested relief.

## XVIII. NO ADMISSION OF LIABILITY

Nothing in this agreement shall be construed in any way as an admission, presumption, or concession by DOC or any defendant of any liability or wrongdoing whatsoever. DOC specifically disclaims any liability or wrongdoing whatsoever on the part of itself, its agents, and its employees.

This Agreement may not be relied upon as precedent in any future claim.

## XIX. ATTORNEYS' FEES AND COSTS

The Parties agree to negotiate in good faith Plaintiffs' Counsel's claim to reasonable attorneys' fees and costs. If such negotiations are unsuccessful, Plaintiffs' Counsel reserve all rights to seek reasonable attorneys' fees and costs, including fees and costs associated with those claims resolved by this Agreement, and DOC reserves all rights to oppose any such petition for fees and costs.

Notwithstanding anything herein, the Parties agree that the Court's failure to approve any fee award sought by Plaintiffs' Counsel shall not be grounds for terminating this Agreement.

Plaintiffs' Counsel reserve all rights to seek reasonable attorneys' fees and costs for successful enforcement of this Agreement after Final Approval, and DOC reserves all rights to oppose any such petition for fees and costs.

## XX. MISCELLANEOUS

### A. Governing Law

This Agreement shall be deemed to be made and entered into in the Commonwealth of Massachusetts and shall in all respects be interpreted, enforced, and governed under the laws of said Commonwealth and the laws of the United States.

### B.      Confidentiality

No part of this Agreement is or will be considered confidential by the Parties.   This Agreement will be made available by request under the Massachusetts Public Records Law, Mass. Gen. Laws c. 66, § 10, or Freedom of Information Act, 5 U.S.C. § 552.

### C.      Entire Agreement

This Agreement constitutes the entire agreement of the Parties and, except for any Protective Order entered by the Court, supersedes all prior agreements, representations, negotiations, and undertakings in this litigation not set forth or incorporated herein.

Each Party represents and acknowledges that each Party is and has been represented by its own counsel.   Each Party further represents and acknowledges that, in executing this Agreement, no Party relies or has relied upon any representations or statements made by any other Party or its counsel other than the promises and representations set forth in this Agreement.   No other statement, promise, or agreement, either written or oral, made by any Party or agents of any Party this is not contained in this written Agreement, will be enforceable.

This Agreement is the result of an arm's-length negotiation.   Since all Parties contributed substantially, materially, and cooperatively in drafting this Agreement, it shall not be more strictly construed against one Party than as against any other.

### D.      Execution

This Agreement may be executed in counterpart originals, all of which, when so executed and taken together, shall be deemed an original and all of which shall constitute one and the same instrument.   Each counterpart may be delivered by email (as a PDF attachment) or facsimile, and an email or facsimile signature shall have the same force and effect as an original signature.

### E. Non-Waiver

Failure by Plaintiffs to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision will not be construed as a waiver to such enforcement with regard to other instances or provisions.

### F. Severability

Should any part, term, or provision of this Agreement be declared or be determined by any Court to be illegal, invalid, or otherwise unenforceable, the validity of the remaining parts, terms, or provisions shall not be affected thereby and said illegal, invalid, or other unenforceable part, term, or provision shall be deemed not to be part of this Agreement, unless the Court declines to approve this Agreement. However, if the severance of any illegal, invalid, or otherwise unenforceable part, term, or provision materially alters the rights or obligations of the parties hereunder, the Parties will attempt, through reasonable, good fair negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

### G. Amendments

Except as otherwise stated, this Agreement shall only be amended, revoked, changed, or modified through a written agreement executed by all Parties and approved by the Court. No waiver of any provision of this Agreement will be valid unless it is in writing and signed by the Party against whom such waiver is charged and approved by the Court.

### H. Term of Agreement

The term of this Agreement shall commence upon the date of Final Approval by this Court and shall extend for three (3) years from said date of Final Approval. The Court's jurisdiction shall terminate at the end of the three (3) year settlement period with respect to any provision or provisions of this Agreement for which there is no outstanding determination, or pending claim,

that DOC is not in substantial compliance, *i.e.*, is in substantial non-compliance.  If the Court determines that there has been substantial non-compliance by DOC with a provision or provisions of this Agreement at any time during the three (3) year period of this Agreement, the Court's jurisdiction with respect to such provision or provisions relating thereto shall continue for the remainder of the three (3) year period or for an additional period to be ordered by the Court of not more than two (2) years from the date of the Court's finding that DOC is not in substantial compliance.

Subject to the provisions set forth in this section and in **Section XVI (Dispute Resolution and Enforcement)**, this Agreement shall expire at the end of three (3) years from the date of Final Approval by the Court and the Action shall then be dismissed with prejudice.

However, DOC will continue to provide all accommodations required under law, including under the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Massachusetts law, along with any other applicable federal and state laws, regardless of any term limit applicable to this Agreement.

Signed:

_Carol A. Mici_

MASSACHUSETTS DEPARTMENT OF CORRECTION
Commissioner Carol A. Mici

5/28/19

Date

_____

DOC Defendants' Counsel
OFFICE OF THE ATTORNEY GENERAL MAURA HEALEY
Kirk G. Hanson
Anna Rachel Dray-Siegel
Assistant Attorneys General
Government Bureau

_____

Date

_____

DOC Defendants' Counsel
MASSACHUSETTS DEPARTMENT OF CORRECTION LEGAL DIVISION
Timothy M. Pomarole

_____

Date

Signed:

_____

MASSACHUSETTS DEPARTMENT OF CORRECTION
Commissioner Carol A. Mici

_____

Date

_____

DOC Defendants' Counsel
OFFICE OF THE ATTORNEY GENERAL MAURA HEALEY
Kirk G. Hanson
Anna Rachel Dray-Siegel
Assistant Attorneys General
Government Bureau

___May 28, 2019_____

Date

_____

DOC Defendants' Counsel
MASSACHUSETTS DEPARTMENT OF CORRECTION LEGAL DIVISION
Timothy M. Pomarole

___May 28, 2019_____

Date

Signed:

_____
Plaintiffs' Counsel
WILMER CUTLER PICKERING HALE AND DORR LLP
Lisa J. Pirozzolo
Lindsay Kosan
Alexandra B. Lavin

**5 | 28 | 19**
_____
Date

_____
Plaintiffs' Counsel
PRISONERS' LEGAL SERVICES
James R. Pingeon

**5 / 28 / 2019**
_____
Date

_____
Plaintiffs' Counsel
DISABILITY LAW CENTER, INC.
Tatum A. Pritchard

**5/28/2019**
_____
Date

_____
Plaintiffs' Counsel
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
Philip Fornaci

**5/28/2019**
_____
Date

69

## APPENDIX A

In accordance with the provisions of **Section XIII(B) (DOC Records and Reports), ¶ 1**, DOC shall provide the Settlement Monitor and Plaintiffs' Counsel with the data and documents set forth below as required by the corresponding Agreement Provisions, noted below:

**A.    In accordance with Section IV (Identification and Tracking of Deaf and Hard-of-Hearing Inmates)**

1. All DOC and institutional policies and procedures that implement this Agreement, including Orientation manuals, handbooks, and forms provided to inmates. (Also in accordance with **Section XI (Revisions to Relevant DOC Policies in Accordance with this Agreement**)).

2. The records audit described in **Section IV(A) (Identification of Deaf and Hard-of-Hearing Inmates Currently in DOC Custody)** of this Agreement.

3. A list of all deaf and hard-of-hearing inmates in DOC custody and the facility and unit where each such inmate is housed.

4. A copy of the IMS entry for each deaf and hard-of-hearing inmate identifying: (1) the severity of the inmate's hearing disorder; (2) any of the inmate's hearing-related medical restrictions; and (3) the hearing-related reasonable accommodations that have been approved for that inmate.

5. The monthly records that **Section IV(F) (Tracking Deaf and Hard-of-Hearing Inmates in DOC Custody)** of this Agreement requires each Institution ADA Coordinator to prepare, showing all notifications and accommodations provided under that Section.

6. The annual self-evaluations and compliance plans completed by each DOC institution Superintendent required, per the 408 Policy (103 DOC 408.03).

7. All audits conducted by DOC of its medical provider to ensure compliance with the requirements of this Agreement, including the requirement that the medical provider examine inmates for hearing loss as part of the periodic physical. (Also in accordance with **Section V (Contract Medical Provider's Care, Treatment, and Accommodation of Deaf and Hard-of-Hearing Inmates**)).

8. A monthly list of all deaf and hard-of-hearing inmates who have been transferred, including the date of the transfer, and the name of the sending and receiving facility.

9. A list of all inmates for whom a distinguishing mark has been placed on his or her bed book card, identifying that they are deaf and/or hard-of-hearing, indicating that they may need assistance in case of an emergency.

10. A list of all deaf or hard-of-hearing inmates provided an identification badge or card indicating the nature of their hearing disability, and a list of all deaf or hard-of-hearing inmates who have declined the badge or card.

11.     A list of all deaf or hard-of-hearing inmates offered an identification sign on their cell door indicating the nature of their hearing disability, and a list of all deaf or hard-of-hearing inmates who have declined the sign.

12.     Monthly reports showing all updates to the Centralized Database documenting: (1) all hearing-related Requests for Reasonable Accommodation(s) made by deaf and hard-of-hearing inmates and whether the requests were granted, modified, or denied; and (2) the list of inmates who have been identified as deaf or hard-of-hearing and the status of any hearing-related requests for accommodation(s).

13.     The monthly reports submitted to the Superintendent and Department ADA Coordinator for Inmates by each Institution ADA Coordinator that contain information regarding: (1) all hearing-related Requests for Reasonable Accommodation(s) made by deaf and hard-of-hearing inmates, including the nature of the hearing-related accommodations requested, whether the requests were granted, modified, or denied, and the reasons for any modification or denial; and (2) any hearing-related accommodations approved for deaf and hard-of hearing inmates without submission of a Request for Reasonable Accommodation.

14.     A list showing the names and contact information of the Institution ADA Coordinators for each DOC Facility and the Department's ADA Coordinator for Inmates.

15.     A description of facts showing DOC's compliance with the accommodation assessment provisions in **Section IV(D) (Initial Assessment to Determine Appropriate Hearing-Related Auxiliary Aids)** of the Agreement that shall include documentation of: (1) any conversation with the deaf or hard-of-hearing inmate; (2) an explanation of the reason(s) if the deaf or hard-of-hearing inmate's preferred accommodations were not approved; (3) documentation of any consultations with medical staff or outside consultants, such as MCDHH, and the names of the individuals consulted; (4) the recommendations of any outside consultants; and (5) whether the recommendations of outside consultants were approved, and, if not, an explanation of the reason(s) for why the recommendations were denied and what alternative accommodations have been provided to the inmate.

16.     The written records of any scheduled meetings between the Institution ADA Coordinator and a deaf or hard-of hearing inmate to discuss Requests for Reasonable Accommodations, as referenced in **Section IV(G) (Meetings with Institution ADA Coordinators Regarding Accommodations)** of the Agreement.

    **B.     In accordance with Section V (Contract Medical Provider's Care, Treatment, and Accommodation of Deaf and Hard-of-Hearing Inmates)**

17.     The minutes from all Monthly ADA Committee Meetings and from all Bi-Monthly Deputy Meetings in which accommodations are discussed. The minutes from the Bi-Monthly Deputy Meetings shall be redacted to reflect only those portions of the minutes related to the discussion of hearing-related accommodations.

18.     Monthly data showing: (1) all hearing screenings requested and conducted by DOC's Contract Medical Provider, and, where a screening was requested and not conducted, a description of the reasons for the denial; (2) a list of all inmates who were recommended

for an audiological consultation, and, where the consultation was not approved by the Contract Medical Provider's Utilization Management, a summary of the reasons for the denial; (3) information concerning all audiological and otological consultations, including any recommendations by the audiologist or otologist for hearing aids or other medical devices; (4) the date when the hearing aid or other device was provided; and (5) if the recommendation of the audiologist or otologist was not approved, a description of the reasons for the denial.  (Also in accordance with **Section IV (Identification and Tracking of Deaf and Hard-of-Hearing Inmates)**).

19. All guidelines or protocols used by DOC's Contract Medical Provider to determine whether to order an audiological or otological consultation or to approve an audiologist's or otologist's recommendation for hearing aids or other medical device(s).

20. Documentation showing each instance in which DOC's Contract Medical Provider provided an ASL interpreter, VRI, CART, or any other communication device to deaf and hard-of-hearing inmates during a medical or mental health appointment or session, including the name of the inmate, the date of the service, and the nature of the accommodation.

### C.   In accordance with Section VI (Qualified Sign Language Interpreters)

21. All notifications to volunteer organizations or facilitators that a given program or service may be attended by a deaf or hard-of-hearing inmate and any response, including whether a hearing-related accommodation was offered.

22. Monthly records showing: (1) the identity of all Qualified Sign Language Interpreters employed by DOC; (2) a log of the Qualified Sign Language Interpreters' schedules, showing the date and locations in which they provided services; (3) the program or activity for which such services were provided; and (4) the name of the inmate who received interpretation.

23. Records showing all DOC requests for Qualified Sign Language Interpreters or CART services made to MCDHH, including: (1) the date of the request; (2) the response; (3) the date the service was provided; and (4) all invoices submitted by the interpreter.

24. Monthly records showing each instance in which an inmate received an ASL interpreter or CART services, including: (1) the name of the inmate for whom the service was provided; (2) the date the service was provided; (3) the reason it was provided; and (4) the name of the interpreter.

25. Monthly records reflecting: (1) all educational and vocational programs in which deaf inmates who rely upon sign language as their primary means of communication are enrolled; (2) whether the deaf inmate has been provided a Qualified Sign Language Interpreter during the program; and (3) if so, the name of the interpreter.  If a Qualified Sign Language Interpreter was not provided, DOC shall document the reason(s) therefor, including the written statements required by **Section VI(A) (General Policy)** of the Agreement, documenting the reason(s) whenever circumstances prevented DOC from providing necessary interpreter services.

26.     Any written waivers showing that a deaf or hard-of-hearing inmate has declined Qualified Sign Language Interpreter services.

27.     The written records documenting the use of an inmate as a non-Qualified Sign Language Interpreter for a deaf or hard-of-hearing inmate in an emergency situation.

### D.      In accordance with Section VIII (Telecommunication)

28.     A description of facts showing DOC's provision of access to TTY, CapTel, VRI, and videophone services as required by this Agreement, and data showing their use at each DOC Facility.

29.     A list of: (1) all deaf and hard-of-hearing inmates who have requested permission to use a videophone, CapTel phone, or TTY device; (2) whether their request(s) were approved or denied; and (3) to the extent their request(s) were denied, the reason for the denial.

30.     For each DOC Facility, the name of each deaf or hard-of-hearing inmate authorized to use videophones, CapTel phones, or TTY devices.

31.     The location of the stationary videophone in each DOC Facility, the date it was installed, and a log showing its usage.

32.     The location of each mobile videophone in each DOC Facility; the location of all mobile videophone jacks in each DOC Facility and the date of installation; and a log showing the mobile videophone's usage.

33.     The location where each CapTel phone is stored in each DOC Facility and a log showing its usage.

34.     The location where each TTY device is stored in each DOC Facility and a log showing its usage.

### E.      In accordance with IX (Visual and Tactile Notifications)

35.     A report describing any visual/tactile non-emergency notification system(s) that DOC has implemented and the date of implementation.

### F.      In accordance with X (Training)

36.     Records regarding each training required by this Agreement, including information regarding attendance and/or completion of the training for each Covered Employee and copies of the training materials and/or content provided.

### G.      In accordance with XI (Revisions to Relevant DOC Policies in Accordance with this Agreement)

37.     All hearing-related Requests for Reasonable Accommodation(s) that were denied because the requests were not required under 28 CFR § 35.164, including DOC's written statements of the reasons for reaching that conclusion.

### H. In accordance with XIII (Monitoring and Reporting)

38. DOC's annual audit that addresses its compliance with the provisions of this Agreement.

39. All deaf or hard-of-hearing inmates' grievances and grievance appeals, including medical grievances, alleging facts that would violate the Agreement if true, and all responses, including a description of the resolution of the grievance.

40. The records of any disciplinary proceedings involving a deaf or hard-of-hearing inmate where the inmate's hearing may have been at issue, including, but not limited to, all disciplinary proceedings concerning a deaf or hard-of-hearing inmate missing count, missing an announced appointment, being out of place, or not responding to orders or announcements.

41. A description of any time a deaf or hard-of-hearing inmate was denied an opportunity to participate in an inmate work program as a result of his or her hearing loss.

# Exhibit 103

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

LEONARD BRIGGS, GEORGE SKINDER,
LOUIS MARKHAM, FRANCIS McGOWAN,
ERIC ROLDAN, ROLANDO S. JIMENEZ,
and JENNIFER WARD, on behalf of themselves
and others similarly situated,
     Plaintiffs,

     v.

MASSACHUSETTS DEPARTMENT
OF CORRECTION, _et al._,
     Defendants.

_____

CIVIL ACTION NO.
1:15-cv-40162-RGS

## DEFENDANTS' STATUS REPORT

Pursuant to the Court's April 4, 2024 Order (ECF 378), defendants[1] submit this status

report with respect to the Department of Correction's (Department's) compliance with the

settlement agreement in this case (ECF 362).  As discussed below, the systemic issues have been

resolved.

## UPDATES TO ACTIONS TO ADDRESS PLAINTIFFS' CONCERNS

Prior to the April 4, 2024 hearing, the Department had taken numerous actions to address

the plaintiffs' concerns about access to captioned telephones (CapTels) and pagers.  See ECF

372.  Since the April 4, 2024 hearing, the Department has taken several additional steps:

---

[1]    At the time the Answer was filed, the Department of Correction defendants were
identified as the Department of Correction; Carol Higgins O'Brien, Commissioner; Katherine
Chmiel, Deputy Commissioner of Classification, Programs, Re-Entry Division; Paul Henderson,
Acting Superintendent, MCI Framingham; Sean Medeiros, Superintendent, MCI Norfolk; Kelly
Ryan, Superintendent, MCI Shirley; and Steven O'Brien, Superintendent, Massachusetts
Treatment Center.  Pursuant to Fed. R. Civ. P. 25(d), the current office holders have succeeded
these parties, named in their official capacities.

- On April 10, 2024, the Department produced the discovery and related materials requested at the April 4 hearing.  The Department also (1) informed the plaintiffs that, as of April 9, 2024, the Department ADA Coordinator for Incarcerated Individuals had not received any appeals related to the recently completed Disability Accommodations Resources Assessment (DARA) forms; and (2) confirmed that the distribution of pager devices had been completed at all facilities.  The Department noted that it had not received from the plaintiffs any specific information raising concerns about the recently completed DARA forms.  Finally, the Department invited the plaintiffs to participate in a videoconference at the end of April to address any concerns about access to CapTels and pagers.  The plaintiffs did not respond to the invitation.

- By letter dated May 2, 2024, the plaintiffs requested additional information and documents about certain class members and reported that, in April, they had received a report that a CapTel at MCI-Norfolk was broken and unavailable for two weeks.  Despite the request for specific information regarding complaints or assertions of non-compliance as they arise so that the allegations could be timely investigated and addressed, the plaintiffs did not provide the name(s) of the class member(s) who made the allegations, the unit, or the specific dates that a CapTel was allegedly broken.

- On May 10, 2024, the Department provided the requested additional information and documentation about certain class members.  The Department also responded to the non-specific allegation about a broken CapTel at MCI-Norfolk.  Specifically, the Department ADA Coordinator for Incarcerated Individuals had received a complaint about a broken CapTel at MCI-Norfolk.  Upon review, institutional staff confirmed that the CapTel on the unit was working.  When interviewed, the class member indicated that the CapTel

3

was working.  The Department indicated that it would review other specific concerns if the plaintiffs provided the name(s) of the class member(s), the unit, and the dates of any alleged malfunctions.  The plaintiffs have not reported any additional concerns in this regard.

- By letter dated June 4, 2024, the plaintiffs informed the Department that they appreciate the steps the Department has taken to ensure that class members have appropriate access to CapTels and pagers.  The plaintiffs, however, proposed an extension of the Settlement Agreement until November 25, 2024, with ongoing document production but without monitoring.  Because all of the plaintiffs' systemic concerns have been fully addressed, the requested extension is absolutely unnecessary.

## **CONCLUSION**

These measures address the plaintiffs' systemic concerns.  For this reason, the Court should **DENY** the plaintiffs' motion.

DEFENDANTS
By their attorneys,
NANCY ANKERS WHITE
Special Assistant Attorney General

Date: June 10, 2024

/s/Mary P. Murray
Mary P. Murray
Deputy Supervising Counsel,
Bridgewater Correctional Complex,
    TC Supervising Counsel
Department of Correction Legal Division
Massachusetts Treatment Center
30 Administration Road
Bridgewater, MA 02324
(508) 279-8184
BBO #555215

4

/s/Daniel J. Dufresne
Daniel J. Dufresne
Counsel
Legal Division
Bridgewater State Hospital
20 Administration Road
Bridgewater, MA  02324
(508) 279-4539
BBO #673894
Daniel.Dufresne@doc.state.ma.us

## CERTIFICATE OF SERVICE

I, Daniel J. Dufresne, counsel for the DOC Defendants, hereby certify that I have this tenth day of June, 2024, filed electronically with the Court's electronic filing system the above document(s).

Date: June 10, 2024

/s/Daniel J. Dufresne
Daniel J. Dufresne, Counsel

# Exhibit 104

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| MARY ANN MCBRIDE, et al., | ) | |
| | ) | Civil Action No. 2:15-cv-11222 |
| *Plaintiffs*, | ) | |
| | ) | Hon. Sean F. Cox |
| v. | ) | Mag. David R. Grand |
| | ) | |
| MICHIGAN DEPARTMENT | ) | |
| OF CORRECTIONS, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

---

## EXHIBIT A

[Proposed] Settlement Agreement

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

MARY ANN MCBRIDE, et al.,   )
                                 )
*Plaintiffs,*         )
                                 )    Civil Action No. 2:15-cv-11222
v.                    )
                                 )    Hon. Sean F. Cox
MICHIGAN DEPARTMENT    )    Mag. David R. Grand
OF CORRECTIONS, et al.,    )
                                 )
*Defendants.*        )
                                 )

## SETTLEMENT AGREEMENT

Abraham Singer (P23601)
Law Offices of Abraham
Singer PLLC
30833 Northwestern Hwy
Suite 120
Farmington Hills, MI 48334
(248) 626-8888
asinger@singerpllc.com

Elliot M. Mincberg (of counsel)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
(202) 319-1000
elliot_mincberg@washlaw.org

Andrew D. Lazerow
Stephen C. Bartenstein
Philip J. Levitz
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
alazerow@cov.com
sbartenstein@cov.com
plevitz@cov.com

Chris E. Davis (P52159)
Mark A. Cody (P42695)
Michigan Protection and
Advocacy Service, Inc.
4095 Legacy Parkway, Ste 500
Lansing, MI 48911
(517) 487-1755
cdavis@mpas.org
mcody@mpas.org

Phoebe Yu (of counsel)
Brian Kempfer (of counsel)
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
pyu@cov.com
bkempfer@cov.com

*Attorneys for Plaintiffs*

Jeanmarie Miller (P44446)
James E. Long (P53251)
Allan J. Soros (P43702)
Assistant Attorneys General
MI Dept of Attorney General
Civil Litigation, Employment &
Elections Division
P.O. Box 30736
Lansing, MI 48909
(517) 373-6434

*Attorneys for Defendants*

## I.   INTRODUCTION

The Plaintiffs, Mary McBride, et al., and the Defendants, the Michigan Department of Corrections, et al. enter into this Settlement Agreement ("Agreement") in order to settle the litigation captioned *McBride et al. v. Michigan Department of Corrections et al.*, No. 2:15-cv-11222 (E.D. Mich.).  The Parties agree to comply with the following terms.  The Agreement is enforceable in federal court.

The Parties hereby stipulate and agree as follows:

**WHEREAS** Plaintiffs are deaf and hard of hearing individuals in the custody of the MDOC (whether now or in the future), who require hearing-related accommodations, including but not limited to interpreters, hearing devices, or other auxiliary aids or services, to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the MDOC;

**WHEREAS** Plaintiffs have filed a lawsuit against the Defendants in the United States District Court for the Eastern District of Michigan, styled *McBride et al. v. MDOC et al.*, No. 2:15-cv-11222, claiming violations of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*, and the U.S. Constitution, based upon Defendants' failure to provide adequate assistance required by prisoners who are deaf and/or hard of hearing to effectively communicate and participate in services, programs, and activities offered by the Defendants;

**WHEREAS** on March 9, 2018, the Court issued its Opinion and Order Adopting 2/8/18 Report and Recommendation (Doc. # 99), granting in part Plaintiffs' motion for summary judgment and ruling that Defendants have violated the Americans with Disabilities Act and Rehabilitation Act, and ordering the MDOC to implement specified relief;

**WHEREAS** the Defendants have denied and continue to deny such violations;

**WHEREAS** the Parties desire, through this Agreement, to resolve and settle the litigation without the costs and burdens associated with further litigation with respect to the claims and defenses raised in the litigation;

3

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and which consideration includes, but is not limited to, the mutual promises and covenants contained herein, the Parties hereby agree to be bound as follows:

## II. DEFINITIONS

1. "ADA" means the Americans with Disabilities Act, codified at 42 U.S.C. § 12101 et seq.

2. "Auxiliary Aids and Services" include, but are not limited to, "Qualified Interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments," 42 U.S.C. § 12103, such as hearing aids, computer-aided transcription services, assistive listening systems, closed caption decoders, open and closed captioning, "TDDs" or "TTYs" as defined below, videotext displays, written materials (*see* 28 C.F.R. § 35.104); as well as Videophones, access to telephone relay services, and visual alert or alarm systems.

3. "Deaf and/or Hard of Hearing Prisoners" means deaf and hard of hearing individuals incarcerated in a MDOC Facility (whether now or in the future), who require any Auxiliary Aids and Services to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the MDOC.

4. "Defendants" means MDOC; Heidi Washington, in her official capacity as Director of the Michigan Department of Corrections; Ken McKee, in his official capacity as Deputy Director of the Correctional Facilities Administration; Shawn Brewer, in his official capacity as Warden of the Women's Huron Valley Correctional Facility; Connie Horton, in her official capacity as Warden of the Chippewa Correctional Facility; and Shane Jackson, in his official capacity as Warden of the Carson City Correctional Facility.

5. "Designated Facility" means a MDOC Facility designated to house Deaf and/or Hard of Hearing Prisoners and required to have available the Auxiliary Aids and Services for Deaf and/or Hard of Hearing Prisoners specified under this Agreement.

6. "Effective Communication" and "Effectively Communicate" means communication with Deaf and/or Hard of Hearing Prisoners that is substantially as effective as communication with the general Prisoner population (*see* 28 C.F.R. § 35.160(a)) and will, when necessary, include the provision of appropriate Auxiliary Aids and Services. Effective Communication affords Deaf and/or Hard of Hearing Prisoners an opportunity to participate in, and enjoy the benefits of, the MDOC's services, programs, or activities in a way that is substantially equal to the opportunity provided to Prisoners who are not Deaf and/or Hard of Hearing.

7. "Effective Date" means the date upon which the Court approves this Agreement.

8. "Prisoner" means any person under the jurisdiction of the MDOC and currently incarcerated in a MDOC Facility.

9. "MDOC" means Michigan Department of Corrections.

10. "Personnel" mean all employees, contractors, and other staff of the MDOC whose job responsibilities entail interaction with Deaf and/or Hard of Hearing Prisoners, and the supervisors of those Personnel.

11. "MDOC Facility" means any facility owned by the MDOC for the care and custody of Prisoners, including but not limited to Alger Correctional Facility (LMF), Baraga Correctional Facility (AMF), Bellamy Creek Correctional Facility (IBC), Carson City Correctional Facility (DRF), Central Michigan Correctional Facility (STF), Charles Egeler Reception & Guidance Center (RGC), Chippewa Correctional Facility (URF), Cooper Street Correctional Facility (JCS), Detroit Reentry Center (DRC), Duane L. Waters Health Center (DWH), Earnest C. Brooks Correctional Facility (LRF), G. Robert Cotton Correctional Facility (JCF), Gus Harrison Correctional Facility (ARF), Ionia Correctional Facility (ICF), Kinross Correctional Facility (KCF), Lakeland Correctional Facility (LCF), Macomb Correctional Facility (MRF), Marquette Branch Prison (MBP), Michigan Reformatory (RMI), Muskegon Correctional Facility (MCF), Newberry Correctional Facility (NCF), Oaks Correctional Facility (ECF), Ojibway Correctional Facility (OCF), Parnall Correctional Facility (SMT), Richard A. Handlon Correctional Facility (MTU), Saginaw Correctional Facility (SRF),

Special Alternative Incarceration Facility (SAI), St. Louis Correctional Facility (SLF), Thumb Correctional Facility (TCF), Women's Huron Valley Correctional Facility (WHV), and Woodland Center Correctional Facility (WCC).

12. "Off-site Medical Care" means medical care that is provided at a location not owned or operated by the MDOC.

13. "On-site Medical Care" means medical care that is provided at a MDOC Facility, including medical care provided by third parties in facilities owned or operated by the MDOC.

14. "Parties" means, for the purposes of this Agreement, the Plaintiffs and the MDOC.

15. "Plaintiffs" means, for purposes of this Agreement, the class certified on July 20, 2017 by order of U.S. District Court Judge Sean F. Cox, consisting of "all Deaf and/or Hard of Hearing individuals in the custody of the MDOC (whether now or in the future), who require hearing related accommodations, including but not limited to interpreters, hearing devices, or other auxiliary aids or services, to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the MDOC."

16. "Plaintiffs' Counsel" means attorneys-of-record for Plaintiffs in *McBride et al. v. MDOC et al.*, No. 2:15-cv-11222 (E.D. Mich.). The current attorneys-of-record are Covington & Burling LLP, Law Offices of Abraham Singer PLLC, Michigan Protection and Advocacy Service, Inc., and Washington Lawyers' Committee for Civil Rights and Urban Affairs.

17. "Qualified Interpreter" means a person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with an individual Deaf and/or Hard of Hearing Prisoner using any necessary specialized vocabulary. *See* 28 C.F.R. § 35.104. A Qualified Interpreter must hold a valid certification from the National Registry of Interpreters for the Deaf or the National Association of the Deaf. Another MDOC prisoner shall not be considered a Qualified Interpreter.

A Qualified Interpreter may be provided by the MDOC either in person, or via video remote interpreting, videoconferencing, or other similar means that provide Effective Communication.

18. "Section 504" means Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 701 et seq. (2014).

19. "Settlement Monitor" means Michael K. Brady of Sabot Consulting.

20. "TTYs" or "TDDs" means teletypewriters or telecommunications devices for the Deaf, which are devices used with a telephone to communicate with persons who are Deaf by typing and reading communications.

21. "Video Remote Interpreting" or "VRI" means a video-telecommunication interpreting service, which uses Qualified Interpreters.

22. "Video Relay Services" means a form of Telecommunications Relay Service that enables persons with hearing disabilities who use American Sign Language to communicate with voice telephone users through video equipment.

23. "Videophone" means a telephone with a camera and screen for visual, real-time communications.

## III.  GENERAL POLICIES

### A.    Non-discrimination Based on Disability

The MDOC shall ensure that Deaf and/or Hard of Hearing Prisoners have full and equal access to the same programs, activities, services and accommodations available to non-Deaf and/or Hard of Hearing Prisoners.

### B.    ADA Coordinators and Supervisor

No later than sixty (60) days after the Effective Date of this Agreement, the MDOC shall assign a staff member at each MDOC Facility with the title, duties, and responsibilities of Worksite Offender ADA Coordinator.  The MDOC shall maintain ADA Coordinator positions with responsibilities for each MDOC

Facility. The Worksite Offender ADA Coordinator shall be trained on the implementation of the requirements of federal and state law regarding the contents of this Agreement and the MDOC's obligations to provide full and equal access to its programs, activities, services, and accommodations to Deaf and Hard of Hearing Prisoners.

The MDOC has and shall maintain a designated Statewide Offender ADA Coordinator at its central headquarters. The Statewide Offender ADA Supervisor and/or his/her designee shall oversee and supervise the Worksite Offender ADA Coordinators in their implementation of the requirements under this Agreement.

The contact information of each Worksite Offender ADA Coordinator shall be communicated to the Settlement Monitor and all Deaf and/or Hard of Hearing Prisoners incarcerated in the respective MDOC Facility and shall also be prominently posted in a secure area in any housing unit in which Deaf and/or Hard of Hearing Prisoners are held.

As set forth in MDOC P.D. 04.06.155 "Offenders with Disabilities," ADA Coordinators shall assist with providing, coordinating, and overseeing Auxiliary Aids and Services for Deaf and/or Hard of Hearing Prisoners. The Worksite Offender ADA Coordinators shall be provided with and responsible for knowing the contents of this Agreement and shall assist with implementing this Agreement. The ADA Coordinators shall be available to assist Deaf and/or Hard of Hearing Prisoners in learning about the resources available to them and training in the use of Auxiliary Aids and Services. If necessary, the Worksite Offender ADA Coordinators will be assisted by a Qualified Interpreter in carrying out these responsibilities.

## IV. INITIAL CLASSIFICATION, ASSESSMENT, AND ASSIGNMENT

### A. General Policy

The MDOC shall Effectively Communicate with Deaf and/or Hard of Hearing Prisoners at initial intake, assessment, and classification. The purpose is to facilitate communication between the Deaf and/or Hard of Hearing Prisoner and Personnel (or other persons) responsible for medical, psychological, and educational testing and evaluation, as well as to help provide an explanation of prison policies and procedures, including Prisoner discipline, grievances, and how to utilize the TTY/TDD, Videophone, and other Auxiliary Aids and Services.

## B.    Hearing Assessment

During initial intake and within 7 days of entering the MDOC prison system, every prisoner with a perceived or reported (including self-reported) hearing deficit shall receive an initial hearing assessment consistent with medical standards.  If there is indication of a potential hearing deficit, the prisoner shall be referred to a professionally accredited audiologist to perform a comprehensive hearing assessment.  These prisoners shall be housed in a Designated facility (barring any medical, security or programming needs requiring an alternative housing arrangement) pending this assessment.  If medical Personnel determine that a Prisoner is Deaf and/or Hard of Hearing, medical Personnel shall note the disability and comply with MDOC P.D. 04.06.160 "Medical Details and Special Accommodation Notices."  Any Deaf and/or Hard of Hearing Prisoner who was not assessed according to the requirements of this paragraph at his or her initial intake, or who requires reassessment due to perceived or reported changes in hearing, shall be assessed according to the requirements of this paragraph at the prisoner's annual physical exam.

## C.    Auxiliary Aids and Services Assessment

After a determination is made that a Prisoner is Deaf and/or Hard of Hearing, medical Personnel, which may include a professionally accredited audiologist, shall determine if Auxiliary Aids and Services are medically necessary and facilitate ordering those aids and services as provided in MDOC P.D. 04.06.160 "Medical Details and Special Accommodation Notices."  The Worksite Offender ADA Coordinator shall address all non-medical aids and services needed for the Deaf and/or Hard of Hearing Prisoner to Effectively Communicate.

If any Deaf and/or Hard of Hearing Prisoner indicates that he or she does not require any of the Auxiliary Aids and Services set forth in this Agreement, he or she shall sign a Waiver of Auxiliary Aids and Services and that document shall be kept in the Prisoner's medical file.  No prisoner may be coerced, pressured, or compelled to sign a Waiver.

If a Prisoner is found to have a hearing impairment at intake or a later hearing assessment and refuses or does not request Auxiliary Aids and Services, but later believes that Auxiliary Aids and Services are necessary to ensure Effective Communication, he or she may submit a kite requesting Auxiliary Aids and Services.  MDOC shall provide a Prisoner who was initially not found to have a hearing impairment with a hearing assessment if so ordered by medical Personnel.

If that individual is found to be Deaf and/or Hard of Hearing, MDOC shall follow the procedures set forth in MDOC P.D. 04.06.160.

### D.    Ensuring Personnel Awareness Through Identification Cards

The MDOC shall take appropriate steps to ensure that all Personnel having regular contact with any Deaf and/or Hard of Hearing Prisoner are made aware of such Prisoner's need for Auxiliary Aids and Services.  Upon identifying a Prisoner as Deaf and/or Hard of Hearing, the Deaf and/or Hard of Hearing Prisoner shall receive an identification (ID) card that clearly identifies him or her as a Deaf and/or Hard of Hearing Prisoner.  The ID card shall signify to the Personnel that the Prisoner has been classified by MDOC as "hearing impaired" with or without deficit.

All Personnel having regular contact with any Deaf and/or Hard of Hearing Prisoner shall be trained on the meaning of the ID cards.

The MDOC shall post in a prominent location in all MDOC Facilities housing Deaf and/or Hard of Hearing Prisoners a notice clearly stating that the MDOC Facility houses Deaf and/or Hard of Hearing Prisoners and that the Deaf and/or Hard of Hearing Prisoners carry an ID card or other official indicator with them.  The notice shall include a picture of the ID card and other official indicator carried by Deaf and/or Hard of Hearing Prisoners.  The Notice shall also be posted in each housing unit where Deaf and/or Hard of Hearing Prisoners are held.

### E.    Interpretation of Materials

Within thirty (30) days of the Effective Date of this Agreement, and upon any Deaf and/or Hard of Hearing Prisoner submitting a medical kite requesting Auxiliary Aids and Services, including but not limited to the services of a Qualified Interpreter, the MDOC shall provide the Deaf and/or Hard of Hearing Prisoner materials it provides to all Prisoners either:

- in a recorded video sign language interpreted format ("interpreted materials");[1] or

---

[1] If the MDOC chooses this option, the MDOC would also provide the equipment necessary to view the interpreted materials.

- closed captioning if the material is in video form and the prisoner can read and comprehend closed captioning; or

- by providing a Qualified Interpreter to permit the Deaf and/or Hard of Hearing Prisoner to understand the contents of the materials.

In providing these materials, the MDOC agrees to Effectively Communicate with the Deaf and/or Hard of Hearing Prisoner. At the request of the Deaf and/or Hard of Hearing Prisoner, the MDOC shall provide that Deaf and/or Hard of Hearing Prisoner with a meaningful opportunity to meet with Personnel and a Qualified Interpreter to ask any questions regarding the written or interpreted materials.

**F.     Creation and Interpretation of Rights Materials**

Within thirty (30) days of the Effective Date of this Agreement, the MDOC shall provide each Deaf and/or Hard of Hearing Prisoner with materials outlining the services available to them under this Agreement. The MDOC shall create these materials using language designed to be accessible to each Deaf and/or Hard of Hearing Prisoner. The MDOC shall provide these materials to Deaf and/or Hard of Hearing Prisoners with the orientation materials provided to all other Prisoners at initial intake, assessment, and classification.

The MDOC shall provide Deaf and/or Hard of Hearing Prisoners with these materials either:

- in a recorded video sign language interpreted format ("interpreted materials")[2]; or

- Closed captioning if the material is in video form and the prisoner can read and comprehend closed captioning; or

- by providing a Qualified Interpreter to interpret these materials to the Deaf and/or Hard of Hearing Prisoner.

---

[2] If the MDOC chooses this option, the MDOC would also provide the equipment necessary to view the interpreted materials.

## V.   HOUSING

### A.    General Policy

Except as otherwise set forth herein, the MDOC shall house Deaf and/or Hard of Hearing Prisoners at Designated Facilities.  The MDOC may house a Deaf and/or Hard of Hearing Prisoner at a non-Designated Facility when necessary to address safety or security issues, medical or programming needs, and unanticipated emergencies and in accordance with MDOC P.D. 04.06.155 "Offenders with Disabilities," P.D. 04.06.160 "Medical Details and Special Accommodation Notices," and P.D. 05.01.140 "Prisoner Placement and Transfer."  Within two (2) business days of a Deaf or Hard of Hearing Prisoner's transfer to a non-Designated Facility, the ADA Coordinator at the non-Designated Facility shall meet with the Prisoner to determine that Prisoner's accommodation needs and take all reasonable steps to ensure the Prisoner is provided appropriate accommodations to ensure substantially equal access to the MDOC's programs, activities, and services.  In the event the MDOC houses a Deaf or Hard of Hearing Prisoner at a non-Designated Facility, the MDOC shall provide the Settlement Monitor with the prisoner's name and prisoner number, and the reason for the housing assignment within two (2) business days of the transfer.  The MDOC shall consider advice from the Settlement Monitor regarding the housing assignment in light of legitimate safety or security concerns.

The MDOC's current Designated Facilities are DRC, DRF, JCF, SMT, SRF, TCF, WCC, and WHV.  Should the MDOC wish to designate any other facility as a Designated Facility, or de-designate a Designated Facility, it shall notify the Settlement Monitor before changing the facility's designation and consider advice from the Settlement Monitor regarding the proposed designation change.

Wherever a Deaf and/or Hard of Hearing Prisoner is housed, that Deaf and/or Hard of Hearing Prisoner retains all rights as required by this Agreement.

## VI.   PROVISION OF AUXILIARY AIDS AND SERVICES

### A.    General Policy

In order to ensure substantially equal access to the MDOC's programs, activities, and services, the MDOC shall provide appropriate Auxiliary Aids and Services to Deaf and/or Hard of Hearing Prisoners.  Substantial equality shall include providing appropriate auxiliary aids and services to Deaf and/or Hard of Hearing

Prisoners for MDOC core programs and services, including those set forth in section VII.A of this Agreement.

The MDOC shall provide instructions for the use of all Auxiliary Aids and Services to ensure Deaf and/or Hard of Hearing Prisoners' full use and enjoyment of the Auxiliary Aids and Services.

### B.    Medical Devices

Except as otherwise provided herein, all Auxiliary Aids and Services required by this Agreement which are deemed medically necessary by qualified medical Personnel, shall be provided promptly upon request, free of charge, to Deaf and/or Hard of Hearing Prisoners.

The prisoner shall be responsible for the cost of repair or replacement of damaged or lost Auxiliary Aids and Services that were issued by the MDOC except when verified that the damage or loss was not the fault of the prisoner (e.g. accident on an assignment, victim of an assault) or if only minor repair is necessary. If the prisoner does not have sufficient funds to pay the cost of repair or replacement, the cost shall be considered an institutional debt and collected as set forth in P.D. 04.02.105 "Prisoner Funds."

Healthcare at the facility where the Deaf or Hard of Hearing Prisoner is housed shall be responsible for facilitating the repair, replacement, and adjustment of medical devices such as hearing aids and shall be responsible for ensuring the delivery of the device. The MDOC will initiate a work order or other applicable mechanism for resolving the issue within two (2) business days of the complaint, and will attempt to resolve the complaint as promptly as possible. If there is a delay caused by third-party vendors outside of the MDOC's control, the MDOC will provide status updates to the Deaf and/or Hard of Hearing Prisoner until the issue is resolved. The MDOC shall pay for shipping costs associated with the repair and replacement of medical devices.

Prisoners who suffer bilateral hearing loss shall be offered hearing aids for both ears promptly upon request, and free of charge.

### C.    Maintenance of Non-Medical Auxiliary Aids and Services

The MDOC shall maintain all Auxiliary Aids and Services in its custody in good working condition.

13

The ADA Coordinator at the facility where the Deaf or Hard of Hearing Prisoner is housed shall be responsible to facilitate the repair, replacement, and adjustment of Auxiliary Aids and services. The MDOC shall pay for shipping costs associated with the repair and replacement of Auxiliary Aids and Services.

## VII.  QUALIFIED SIGN LANGUAGE INTERPRETERS

### A.    General Policy

The MDOC shall provide Qualified Interpreters as required by this Agreement. The MDOC agrees that Deaf and/or Hard of Hearing Prisoners in need of interpreter services shall receive a Qualified Interpreter to facilitate Effective Communication with that particular Deaf and/or Hard of Hearing Prisoner.  At a minimum, the MDOC shall provide Deaf and/or Hard of Hearing Prisoners with access to Qualified Interpreters in the following circumstances:

- Communications to and interviews with prisoners regarding their healthcare, including dental, vision, audiological, and mental healthcare;

- Communications to and interviews with prisoners for Parole Board hearings, Parole Eligibility Report (PER) preparations, Parole Board interviews, parole violation hearings, and institutional Parole Agents/transitional programming;

- Disciplinary hearings, investigative interviews, and any other communications with Deaf and/or Hard of Hearings Prisoners as part of the MDOC's investigatory or disciplinary processes for alleged misconduct or violations of law, policy, or other requirements.  This includes communications with Deaf and/or Hard of Hearing Prisoners who are suspected of, charged with, or witness to, disciplinary misconduct or violations;

- During Core programming as defined in Attachment A of MDOC P.D. 05.01.100;

- For administrative hearing proceedings, including required notices (e.g. Notice of Intent to Conduct an Administrative Hearing);

- Communications to and interviews with prisoners during the grievance process;

- Communications with legal writer if approved to receive services from the Legal Writer Program;

- During prisoner orientation at both intake and receiving facilities including any forms, multi-media, or educational information provided regarding the Prison Rape Elimination Act (PREA);

- Program classification and Security Classification Committee interviews;

- Any prison work/job-assignment related training for matters that are outside the routine day-to-day schedule;

- Formal meetings with facility administration or housing unit staff;

- Group religious services, whether organized by MDOC or by volunteers; and

- Individual (one-on-one) religious programs with clergy if requested by the prisoner and agreed to/approved by the qualified clergy that is to conduct the religious program, provided that the program is scheduled and coordinated by the facility chaplain or designee.

When a Deaf and/or Hard of Hearing Prisoner requests to attend a service or program set forth in this section VII.A, he/she may make a request for a Qualified Interpreter or Auxiliary Aids or Services as appropriate.

The MDOC shall be responsible for scheduling and overseeing the provision of Qualified Interpreters. Qualified Interpreters shall be made available either in-person or via a Video Remote Interpreter (VRI) Service. The MDOC shall provide an in-person Qualified Interpreter if requested by a prisoner and where a medical professional or Worksite Offender ADA Coordinator, in consultation with the prisoner, determines that the prisoner is unable to effectively communicate via VRI.

15

### B.   Other Means of Communication

####    1.   General Policy

Personnel shall communicate with Deaf and/or Hard of Hearing Prisoners for such purposes, and to the same extent, as they would communicate with non-Deaf and/or Hard of Hearing Prisoners.

####    2.   Video Remote Interpreting (VRI) Service

The MDOC has begun the process of providing access to on-demand VRI service in each of its Designated Facilities.  When installed and operational, the on-demand VRI service will comport with the following standards unless it is not possible in an emergency situation:

- high quality, clear, delay-free full-motion video and audio over a high-speed Internet connection;

- a clear, sufficiently large, and sharply delineated picture of the Qualified Interpreter's and the Deaf individual's heads, arms, hands, and fingers, regardless of the body position of the Deaf individual; and

- voices being transmitted are clear and easily understood.

MDOC shall make all reasonable efforts to ensure that the on-demand VRI service is installed and operational at each Designated Facility by December 1, 2018.  If VRI service will not be available at any Designated Facility by December 1, 2018, MDOC shall notify the Settlement Monitor and explain the reason for the delay and the expected timeline for making VRI service available.

### C.   On-site Medical Care

####    1.   General Policy

The MDOC shall provide Effective Communication for all scheduled appointments between Deaf and/or Hard of Hearing Prisoners and medical Personnel at MDOC facilities, including, but not limited to, review of medical history, medical appointments, follow up meetings or appointments, and treatment meetings.  The Parties agree that for many Deaf and/or Hard of Hearing Prisoners, a Qualified

Interpreter may be a necessary means of providing Effective Communication in these circumstances.

      2.    Informing Appropriate Medical Personnel

The MDOC shall ensure that all medical Personnel are made aware of a Prisoner's deafness or hearing disability by clearly noting the prisoner's disability in his/her medical file.

      3.    Scheduling Medical Appointments with Interpreters

Designated MDOC Personnel shall schedule all medical appointments requiring Qualified Interpreters. Appointments for Deaf and/or Hard of Hearing Prisoners requiring Qualified Interpreters shall be scheduled within the same time period from the initial request as those for non-Deaf and/or Hard of Hearing Prisoners.

      4.    Emergency Events

The MDOC shall provide a Qualified Interpreter via VRI service for use in unscheduled medical emergencies. If VRI services are not appropriate in the situation, MDOC Personnel shall make every reasonable effort in conjunction with medical Personnel to attempt to secure an in-person Qualified Interpreter as soon as possible. Lifesaving medical care should never be delayed because no interpretation services are available.

**D.    Off-site Medical Care**

When scheduling off-site medical care, the MDOC shall inform all off-site medical providers that a Deaf and/or Hard of Hearing Prisoner requiring a Qualified Interpreter or other Auxiliary Aids or Services shall be seeking medical care at a particular date and time.

In the case of an emergency, the MDOC shall, as soon as possible, inform an off-site medical provider that a Deaf and/or Hard of Hearing Prisoner requiring a Qualified Interpreter or other Auxiliary Aid or Service is being transported to the off-site medical provider. Notification shall include the Deaf and/or Hard of Hearing Prisoner's estimated time of arrival. The MDOC shall request that the off-site medical provider shall make available to the Deaf and/or Hard of Hearing Prisoner a Qualified Interpreter and/or other reasonable Auxiliary Aids or Services.

### E.    Work Assignments

The MDOC shall provide opportunities for institutional work assignments that are consistent with the opportunities for the same assignments given to non-Deaf and/or Hard of Hearing Prisoners.

### F.    Religious Services

No Deaf and/or Hard of Hearing Prisoner shall be required to attend a religious service where an interpreter is not provided in order to receive any religious meal, diet, or otherwise offered religious accommodation.

### G.    Additional Communications

The MDOC shall provide Qualified Interpreters for any significant communications that are not specifically discussed in this Agreement and that would otherwise be communicated to a prisoner that is not Deaf or Hard of Hearing. A significant communication includes any communication for which (i) the risks of miscommunication or misunderstanding are significant; and (ii) the consequences of miscommunication/misunderstanding would have significant negative repercussions for the Deaf and/or Hard of Hearing Prisoner.

## VIII. DISCIPLINARY MATTERS

The MDOC must hold disciplinary hearings for Deaf and/or Hard of Hearing Prisoners within the same time frame as it holds disciplinary hearings for non-Deaf and/or Hard of Hearing Prisoners, in accordance with MDOC P.D. 03.03.105 "Prisoner Discipline."

## IX.   NON-AUDITORY ALERT NOTIFICATIONS

### A.    General Policy

Adequate non-auditory systems of notification must be put in place to ensure that Deaf and/or Hard of Hearing Prisoners incarcerated at MDOC facilities do not miss announcements, alarms, or any other information audibly conveyed from Personnel to the general prisoner population because of their disability.

### B.     Relaying Information

The MDOC shall provide an effective non-auditory alert system that shall notify Deaf and/or Hard of Hearing Prisoners of events (including but not limited to announcements and visitations).  The non-auditory alert system must effectively alert Deaf and/or Hard of Hearing Prisoners of such events in real time.

### C.     Non-Auditory Alarms and Emergency Evacuation

The MDOC shall provide Deaf and/or Hard of Hearing Prisoners with an effective non-auditory alert system that shall advise them of an emergency evacuation or other emergency situation.  Such non-auditory alert system may include in-person contact/communication between Personnel and the Deaf and/or Hard of Hearing Prisoner and must notify Deaf and/or Hard of Hearing Prisoners of emergencies in real-time.  At a minimum, the non-auditory alert system shall include electronic messages through the Page Alert Broadcast System and flashing strobe lights. Further, the alarm and signaling notifications in each of the Designated Facilities shall comply with the National Fire Protection Association's (NFPA) Code 72 – "National Fire Alarm and Signaling Code," in effect at the time the alarm and signaling system was installed, including any provisions related to visible appliances and visible signaling for persons with hearing deficiencies.  As fire alarm and signaling systems are updated and/or replaced, the MDOC will ensure that the updated or new system complies with the version of NFPA Code 72 adopted by the Michigan Department of Licensing and Regulatory Affairs / Bureau of Fire Services at the time of installation.

Personnel shall be responsible for the evacuation or safe relocation of Deaf and/or Hard of Hearing Prisoners during an emergency.  Therefore, during emergencies, Personnel shall personally and effectively communicate adequate information about the emergency to Deaf and/or Hard of Hearing Prisoners.

## X.     TELECOMMUNICATIONS

### A.     General Policy

The MDOC shall provide Deaf and/or Hard of Hearing Prisoners with access to telecommunication devices that enable them to communicate with people outside of the MDOC in a manner that is substantially equivalent—in terms of the amount and quality of the information conveyed, as well as the expense incurred by the prisoner—to the communications that non-Deaf and/or Hard of Hearing Prisoners

have with people outside of the MDOC using traditional telecommunication devices such as telephones. This provision does not apply to charges incurred by offenders' family and friends for use of third-party telecommunications providers.

## B. Monitoring Communications

Telephone and videophone calls between Deaf and/or Hard of Hearing Prisoners and individuals outside of the MDOC will be monitored as provided in MDOC Policy Directive 05.03.130. The MDOC will monitor such calls in the same manner and to the same extent as any other prisoner call under PD 05.03.130 and shall not increase such monitoring solely because the call involves a Deaf and/or Hard of Hearing Prisoner. Consistent with its policies, the MDOC reserves the right to monitor any recorded audio phone call, recorded Video Relay Service session, TTY call, or recorded person-to-person video-phone call, including any related video feed or transcript.

## C. Additional Time for Communication

The MDOC shall implement a policy that allows Deaf and/or Hard of Hearing Prisoners at least twice as many minutes to complete a TTY/TDD call or Videophone call relying on VRS services as the number of minutes afforded to non-Deaf and/or Hard of Hearing Prisoners to make calls using traditional telecommunication devices such as telephones.

## D. Technology MDOC Shall Provide

The MDOC shall make the following communications technologies available at its facilities where Deaf and/or Hard of Hearing Prisoners are incarcerated to enable effective communication between Deaf and/or Hard of Hearing Prisoners and people outside of MDOC facilities. The MDOC shall consider adding additional equipment to reflect technological advances as they become available. MDOC shall provide a list of available communications equipment to Deaf and/or Hard of Hearing Prisoners upon their arrival in MDOC custody.

### 1. TTY or TDD

For every MDOC Facility at which any Deaf and/or Hard of Hearing Prisoner is incarcerated, access to the TTY/TDD shall be made available at times that the MDOC shall designate, but in no event shall TTY/TDD access for Deaf and/or Hard of Hearing Prisoners be less than equal to the access non-Deaf and/or Hard of

20

Hearing Prisoners have to conventional telephones. TTY/TDDs shall be located in areas as accessible to Deaf and/or Hard of Hearing Prisoners as conventional telephones are accessible to non-Deaf and/or Hard of Hearing Prisoners. TTY/TDDs shall be available during the same days and hours as conventional telephones. At each Designated Facility, if only one TTY/TDD is regularly utilized, the MDOC shall ensure that an alternate TTY or TDD unit is available for use when the regular TTY or TDD is broken or otherwise unavailable. Deaf and/or Hard of Hearing Prisoners shall not be charged by the MDOC or a MDOC contractor any more than non-Deaf and/or Hard of Hearing Prisoners for the functionally equivalent use of TTY/TDD services, although the MDOC has no control over charges incurred by offenders' family and friends for using third-party telecommunications providers.

2.      Telephone Relay Services

For every MDOC Facility at which any Deaf and/or Hard of Hearing Prisoner is incarcerated, the MDOC shall enable all TTYs and TDDs to access publicly available relay service phone numbers.

3.      Videophones

Videophones shall be installed and accessible to Deaf and/or Hard of Hearing Prisoners at MDOC's Designated Facilities. Access to the Videophones shall be made available at times that the MDOC shall designate, but no less than equal to the access non-Deaf and/or Hard of Hearing Prisoners have to conventional telephones. Videophones shall be located in areas as accessible to Deaf and/or Hard of Hearing Prisoners as conventional telephones are accessible to non-Deaf and/or Hard of Hearing Prisoners, except that no videophones will be located outside. Videophones shall be available during the same days and hours as conventional telephones. Deaf and/or Hard of Hearing Prisoners shall not be charged any more than non-Deaf and/or Hard of Hearing Prisoners for the functionally equivalent use of videophone services. Videophones shall allow voice carry-over features.

MDOC shall make all reasonable efforts to ensure that videophones are installed and operational at each Designated Facility by December 1, 2018. If videophones will not be available at any Designated Facility by December 1, 2018, MDOC shall notify the Settlement Monitor and explain the reason for the delay and the expected timeline for making videophones available.

4.    Video Relay Services

VRS shall be installed and accessible to Deaf and/or Hard of Hearing Prisoners in Designated Facilities in accordance with the terms and conditions of the contract between the MDOC/DTMB and the successful vendor/contractor for the pending contract number 171-1800000001124.

MDOC shall make all reasonable efforts to ensure that VRS services are available at each Designated Facility by December 1, 2018.  If VRS service will not be available at any Designated Facility by December 1, 2018, the MDOC shall notify the Settlement Monitor and explain the reason for the delay and the expected timeline for making VRS service available.

Consistent with the other telecommunications-related requirements set forth herein, Deaf and/or Hard of Hearing Prisoners shall be permitted to utilize videophones both to communicate directly with other persons outside of MDOC facilities using sign language (i.e., direct videophone to videophone communications that are not mediated through VRS), and to communicate with persons (including persons who do not know sign language) through the use of VRS services.

**E.    Responsibility for Maintaining Equipment and Training Staff**

The MDOC shall ensure that the contract entered between the successful vendor/contractor for prisoner telephone services requires, as a term of the contract, that technology used to permit communication between Deaf and/or Hard of Hearing Prisoners and people outside of MDOC facilities is in good working order.  Further, the MDOC shall ensure that all telecommunications and other equipment under the MDOC's control—as opposed to the contractor—that is used to accommodate Deaf and/or Hard of Hearing Prisoners is kept in good working order.  Personnel shall attempt to resolve complaints about any malfunctioning equipment within a reasonable time of receiving that complaint.  To the extent services, equipment, and resources that are outside the MDOC's control are involved (for example services or equipment provided by cable, telephone, utilities, or various other companies), the MDOC shall agree to notify those providers/companies of any problems and work with them expeditiously to resolve the problem.

The MDOC shall ensure that appropriately identified Personnel are adequately trained in the operation of the technology.

## XI.  MEDIA

The MDOC shall ensure that all audio-visual media purchased by the MDOC for Prisoner use in MDOC Facilities housing Deaf and/or Hard of Hearing Prisoners includes open- and closed-captioning.  Televisions purchased by the MDOC for Prisoner use shall support open- and closed-captioning.  Captioning shall be turned on and remain on at any Deaf and/or Hard of Hearing Prisoner's request.

## XII.  HAND RESTRAINTS

The MDOC shall implement an operating procedure relating to the handcuffing of Deaf inmates at MDOC Facilities that shall, whenever possible, and subject to safety and security considerations, permit Deaf inmates to use their hands for Effective Communication.  That procedure shall permit Personnel to consider the needs of a Deaf and/or Hard of Hearing Prisoners to use his or her hands for Effective Communication purposes.

## XIII.  MISCELLANEOUS DEVICES AND AIDS

A Deaf and/or Hard of Hearing Prisoner shall be allowed to purchase alerting devices, such as vibrating watches, and televisions that are offered through an MDOC approved vendor, to meet the particular needs of his or her disability.  The ADA Coordinator shall maintain written records of all Deaf and/or Hard of Hearing Prisoner requests for these devices and the dispositions of the requests.

The MDOC makes available to Deaf and/or Hard of Hearing Prisoners free of charge telephone amplification devices when such devices are needed by the prisoners to communicate effectively during standard telephone calls.

## XIV.  TRAINING

### A.    General Policy

The MDOC shall provide training as defined in Section XIV.B below to all MDOC officers and other Personnel who interact with the Prisoner population, all ADA Coordinators, and the ADA Supervisor. The MDOC shall incorporate this training into its regularly scheduled training for new and existing officers and other Personnel.  This training shall be included in MDOC's next scheduled training calendar, which is scheduled to begin October 1, 2018.

23

The MDOC shall provide training materials developed under Section XIV of this Agreement to the Settlement Monitor for review and comment prior to the first training session. The MDOC shall consider any reasonable advice from the Settlement Monitor regarding the training. Within 30 days following review and comment by the Settlement Monitor, the MDOC shall finalize its training module covering the areas set forth in Section XIV(B). Within 90 days after the MDOC has finalized its training module, MDOC Personnel shall complete the training topics as set forth in Section XIV(B).

The MDOC shall review the training at least every two years to determine if modifications or updates to the training are needed to ensure consistency with applicable legal requirements. Any time the MDOC updates the training, and during the course of the Settlement Monitor's appointment, the Settlement Monitor will be provided the updated training materials for review and comment prior to the first training session, and the MDOC shall consider advice from the Settlement Monitor regarding the training.

## B. Personnel Training

By October 1, 2018, the MDOC shall develop its fiscal year 2019 training calendar, which shall require training MDOC Personnel on the following topics:

- best practices in communicating with deaf and/or hard of hearing individuals;

- the unique needs and problems encountered by deaf, late-deafened, and hard of hearing individuals;

- identification of communication needs of persons who are deaf and/or hard of hearing;

- the psychological implications of deafness and its relationship to interaction with hearing corrections Personnel;

- the proper use and role of Qualified Interpreters, and the circumstances when Qualified Interpreters must be made available;

- directions about using TTYs, TDDs, Videophones, VRI, the page alert system, and any other telecommunication equipment available

at the facility that facilitates communication with Deaf and/or Hard
of Hearing Prisoners;

- the MDOC's anti-discrimination policy;

- all equipment, services, and accommodations available to Deaf
and/or Hard of Hearing Prisoners; and

- the requirements of this Agreement.

## XV.   GRIEVANCES

Complaints concerning reasonable accommodations filed by a Deaf and/or Hard of
Hearing Prisoner shall be handled in accordance with MDOC P.D. 04.06.155
"Offenders with Disabilities."

A written record of all Deaf and/or Hard of Hearing Prisoners' grievances (and any
responses and outcomes) shall be maintained by the MDOC. During the duration
of the Settlement Monitor's appointment, the Settlement Monitor may request the
records of any Deaf and/or Hard of Hearing Prisoner's grievances, and as long as
the Deaf and/or Hard of Hearing Prisoner consents, a copy of that Deaf and/or
Hard of Hearing Prisoner's grievance records shall be provided, free of charge, to
the Settlement Monitor.

## XVI.  MONITORING AND COMPLIANCE

### A.   Policies and Procedures

The MDOC shall develop and implement system-wide policy directives and
facility-specific operating procedures for each facility housing Deaf and/or Hard of
Hearing Prisoners documenting in writing the processes and procedures required to
satisfy the terms of this Agreement. The MDOC will consult with the Settlement
Monitor on the development of the policies and procedures, and will share copies
of draft policies and procedures with the Settlement Monitor for review and
feedback before finalizing the policies and procedures. The MDOC shall consider
advice from the Settlement Monitor regarding the policies and procedures.

**B.    ADA Coordinators Annual Audit**

The MDOC's appointed ADA Coordinators/Supervisors shall perform an annual audit of the MDOC's policies and procedures for compliance with the terms of this Agreement and other applicable federal and state laws.  A written report of the audit findings shall be presented to the Settlement Monitor.  This audit report shall consider, at a minimum:

- The location of the MDOC's Deaf and/or Hard of Hearing Prisoners, and whether all such prisoners are housed in Designated Facilities.  If any Deaf and/or Hard of Hearing Prisoners are not housed in Designated Facilities, the audit report shall explain why they are housed elsewhere, and whether such housing is consistent with the MDOC's requirements under this Agreement.

- The MDOC's compliance with its policies and procedures related to Deaf and/or Hard of Hearing Prisoners, including for:
  - Initial classification, assessment, and assignment of Deaf and/or Hard of Hearing Prisoners;
  - Providing Qualified Interpreters and other Auxiliary Aids and Services to Deaf and/or Hard of Hearing Prisoners;
  - Providing Deaf and/or Hard of Hearing Prisoners with access to telecommunications devices and services, including TTYs/TDDs, Telephone Relay Services, Videophones, and Video Relay Services; and
  - Providing Deaf and/or Hard of Prisoners with access to the types of non-auditory alert notifications required by this Agreement.

- The merits of grievances and/or other allegations of non-compliance by Deaf and/or Hard of Hearing Prisoners with the above-referenced policies and procedures, and remedial steps taken by the MDOC to correct established instances of non-compliance.

- Whether the MDOC's TTYs/TDDs, videophones, and non-auditory systems of notification for Deaf and/or Hard of Hearing Prisoners are in good working order at all Designated Facilities.

- Whether the MDOC is providing each of the types of training to its officers and other Personnel required by Section XIV, and Personnel participation in such trainings.

**C.     Plaintiffs' Counsels' Right of Access**

To the extent Plaintiffs' Counsel maintains a current or prospective attorney-client relationship with any Deaf and/or Hard of Hearing Prisoner, they shall be provided the same access to that Deaf and/or Hard of Hearing Prisoner and to the records relating to that Deaf and/or Hard of Hearing Prisoner, as any other attorney with a similar relationship to another non-Deaf and/or Hard of Hearing Prisoner.

**D.     The Settlement Monitor's Activities**

In addition to and without limiting the Settlement Monitor's activities and responsibilities specified elsewhere in this Agreement, on at least a six-month basis following the execution of this Agreement, the MDOC shall permit the Settlement Monitor:

- access to MDOC facilities that house Deaf and/or Hard of Hearing Prisoners or that the MDOC has identified to be designated to house Deaf and/or Hard of Hearing Prisoners, to evaluate efforts by the MDOC to provide Deaf and/or Hard of Hearing Prisoners with access to auxiliary aids and services, Qualified Interpreters, and non-auditory systems of notification;

- access to any medical records made during the preceding twelve (12) months or since the prior investigation, whichever is longer, provided the Deaf and/or Hard of Hearing Prisoner consents to such disclosure; and

- access to any non-security logs or other business records that the MDOC keeps in the regular course of business relating to Deaf and/or Hard of Hearing Prisoners generally, or any given Deaf and/or Hard of Hearing Prisoner in particular, prepared or updated during the preceding twelve (12) months or since the prior investigation, whichever is longer.

Deaf and/or Hard of Hearing Prisoners shall be provided with contact information for the Settlement Monitor, and shall be granted private access to the Settlement Monitor.  Depending on the preference of the Settlement Monitor, access shall be granted via videophone, TTY/TDD, or telephone, or through in-person visitation by the Settlement Monitor.

During the duration of the Settlement Monitor's appointment, the Settlement Monitor will issue semi-annual reports to the Court and the Parties detailing the Defendants' compliance with and implementation of this Agreement.

The Settlement Monitor's responsibilities shall continue for a period of two (2) years after the MDOC has implemented the terms of this Settlement Agreement, which include the installation and availability of Videophones, VRI, and a non-auditory alert system at all Designated Facilities, the adoption of required policies and/or procedures (consistent with Section XVI.A), the appointment of ADA Supervisor and Coordinators, and implementation of Personnel training (consistent with Section XIV). Subject to the Court's continuing oversight responsibilities under this Agreement, the Settlement Monitor's responsibilities will be discharged after this period if the Settlement Monitor issues written certification to the Court and the Parties that the MDOC is in substantial compliance with its obligations under this Settlement Agreement.

Covington & Burling LLP shall be responsible to pay all reasonable fees and expenses charged by the Settlement Monitor for his or her services from the attorneys' fees paid by the MDOC pursuant to Section XVII.C of this Agreement.

## XVII. RELEASE AND SETTLEMENT OF CLAIMS

### A.    Release

Plaintiffs hereby release and discharge Defendants, including their successors and assigns, of and from any claims or causes of action arising out of the matter described in the Plaintiffs' Complaint filed with the U.S. District Court for the Eastern District of Michigan (the "Court") in Case No. 2:15-cv-11222, through the period of the Settlement Monitor's appointment.

### B.    Dismissal

The Plaintiffs agree to dismiss with prejudice all claims of the Complaint in Case Number 2:15-cv-11222 subject to the continued enforcement powers of the Court and the Plaintiffs as set forth below in Section XVII.D.

The Parties agree that the Court shall retain jurisdiction over this Agreement as set out in Section XVII.D of this Agreement, below.

### C.    Attorneys' Fees, Costs, Disbursements and Expenses

In settlement of all of Plaintiffs' claims up to and including the submission of the Settlement Monitor's final report, including any claims for attorney fees and costs,

any disbursements and expenses, including expert fees incurred on behalf of Plaintiffs in this litigation, the Parties agree that within 30 days of the Effective Date, the MDOC shall pay $1,300,000 to Covington & Burling LLP, which shall equitably divide the payment with other Plaintiffs' Counsel.

### D.    Court Approval and Enforcement Powers

Upon execution of this Agreement, the Parties shall jointly move the Court for approval of this Agreement and dismissal of the claims in this action pursuant to Federal Rules of Civil Procedure 23(e) and 41(a). This dismissal shall be with prejudice subject to the Court's ongoing authority to enforce the terms of this Settlement Agreement.

The Court will retain jurisdiction over this action, *McBride et al. v. MDOC et al.*, No. 2:15-cv-11222, during the period of the Settlement Monitor's term of appointment, and shall have the power to enforce all terms of this Agreement.

Approval of this Agreement by the Court is a condition precedent to the Agreement's effectiveness.

## XVIII.    MISCELLANEOUS PROVISIONS

### A.    Entire Agreement

This Agreement constitutes the entire Agreement between the Parties. There were no inducements or representations leading to the execution of this document, except as stated within the document itself.

### B.    Binding

This Agreement is final and binding on the Parties and their successors in interest. Each Party has a duty to so inform any such successor in interest.

### C.    Non-Waiver

Failure by the Plaintiffs to seek enforcement of this Agreement pursuant to its terms with respect to any instance or provision shall not be construed as a waiver to such enforcement with regard to other instances and/or provisions.

### D.    Severability

In the event that a court determines that any provision of this Agreement is unenforceable, such provision will be severed from this Agreement and all other provisions will remain valid and enforceable, provided however that if the severance of any such provision materially alters the rights and obligations of the Parties hereunder, the Parties will attempt, through reasonable, good faith negotiations, to agree upon such other amendments to this Agreement as may be necessary to restore the Parties as closely as possible to the relative rights and obligations initially intended by them hereunder.

Consenting parties:

For the Defendants:

Heidi E. Washington
Printed Name

*Heidi E. Washington (signature)*
Signature

10/1/18
Date

For the Plaintiffs:

ANDREW LAZEROW
Printed Name

*Andrew Lazerow (signature)*
Signature

10/1/18
Date

# Exhibit 105

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| MARY ANN MCBRIDE, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | )   Civil Action No. 2:15-cv-11222 |
| v. | ) |
| | )   Hon. Sean F. Cox |
| MICHIGAN DEPARTMENT OF | )   Mag. David R. Grand |
| CORRECTIONS, et al., | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

## ORDER GRANTING THE PARTIES' JOINT MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

The Court, having reviewed the Parties' Joint Motion for Final Approval of Class Action Settlement ("Motion"), the supporting memorandum of law and accompanying declaration, the Proposed Settlement Agreement ("Agreement"), and all objections submitted to the Court, and having held a fairness hearing regarding the Agreement on March 28, 2019, hereby GRANTS the Motion, and ORDERS that:

1. The Agreement is approved as fair, reasonable, adequate, and in the best interests of the class pursuant to Federal Rule of Civil Procedure 23(e);

2. The award of fees and costs referenced in Section XVII.C of the Agreement is approved as reasonable given the rates charged, the size, reputation,

and experience of counsel, and the hours reasonably expended during this litigation.

3.    Pursuant to Section XVII of the Agreement and Federal Rule of Civil Procedure 41(a)(2), Plaintiffs' claims in this action are DISMISSED with prejudice, but this Court retains jurisdiction over this action  to enforce the terms of the Agreement as needed.

IT IS SO ORDERED.

Dated:  March 29, 2019             s/Sean F. Cox
                                   Sean F. Cox
                                   U. S. District Judge

The parties, through their respective counsel, stipulate to the entry of the above order.

Date:  March 14, 2019             Date:  March 14, 2019

*/s/ A. Peter Govorchin*          */s/ Andrew D. Lazerow*
A. Peter Govorchin (P31161)       Andrew D. Lazerow
Assistant Attorney General        Stephen C. Bartenstein
MI Dept of Attorney General       Philip J. Levitz
Complex Litigation Division       Covington & Burling LLP
P.O. Box 30736                    One CityCenter
Lansing, MI 48909                 850 Tenth Street, NW
(517) 373-6434                    Washington, DC 20001
govorchinp@michigan.gov           (202) 662-6000
                                  alazerow@cov.com
*Counsel for Defendants*          sbartenstein@cov.com
                                  plevitz@cov.com

                                  *Counsel for Plaintiffs*

# Exhibit 106

| MICHIGAN DEPARTMENT OF CORRECTIONS **POLICY DIRECTIVE** | EFFECTIVE DATE 05/01/2021 | NUMBER 04.06.156 |
|---|---|---|
| SUBJECT DEAF AND/OR HARD OF HEARING PRISONERS | SUPERSEDES 04.06.156 (11/02/2020) | |
| | AUTHORITY MCL 791.203 | |
| | PAGE 1   OF   9 | |

**POLICY STATEMENT:**

Deaf and/or hard of hearing prisoners shall be provided their primary method of communication and necessary accommodations to ensure they have full and equal access to the same programs, activities, services and accommodations available to non-deaf and/or non-hard of hearing prisoners.

**POLICY:**

<u>DEFINITIONS</u>

A.  <u>Auxiliary Aids and Services</u>: Aids and services that include, but are not limited to, qualified interpreters or effective methods of making aurally materials available to prisoners with hearing impairments such as hearing aids, assistive listening systems, closed caption decoders, open and closed captioning, "TDDs" or "TTYs" written materials; as well as Videophones, access to telephone relay services, and visual alert or alarm systems.

B.  <u>Effective Communication</u>: Means of communication with Deaf and/or Hard of Hearing Prisoners that substantially as effective as communication with the general prisoner population and will, when necessary, include the provision of appropriate auxiliary aids and services.

C.  <u>Lipreading and Speechreading:</u> Understanding a spoken message by observing a speaker's lips, face, expression, and body language; attending to relevant cues in the environment; and using knowledge of the rules of English and principles of interpersonal communication.

D.  <u>Page Alert Broadcast System (PABS)</u>: A pager-based, facility-wide, one-way communication system controlled from the State of Michigan (SOM) Network.  The PABS is set up to allow staff to send messages to a pager(s) through their computer.

E.  <u>Primary Method of Communication</u>: A method of communication that the prisoner has the ability to give and receive information based on their reported or perceived physical abilities and degree of hearing loss and may include American Sign Language, written communication, verbal communication with or without hearing aids, and lipreading.

F.  <u>Qualified Health Professional (QHP)</u>: A Physician, Psychiatrist, Nurse Practitioner, Physician Assistant, Psychologist, Social Worker, Licensed Professional Counselor, Dentist or Registered Nurse who is licensed and registered/certified by the State of Michigan to practice within the scope of their training.

G.  <u>Qualified Interpreter</u>: A person who is able to interpret effectively, accurately, and impartially, both receptively and expressively, with an individual deaf and/or hard of hearing prisoner using any necessary specialized vocabulary, and must hold a valid certification from the National Registry of Interpreters for the Deaf or the National Association of the Deaf.

Note: An MDOC prisoner shall not be used as a qualified interpreter.

H.  <u>Secondary Method of Communication</u>: A method of communication that may be used in encounters if the primary method of communication is not available.

I.  <u>Teletypewriters (TTY) and Telecommunication Devices (TTD)</u>: Devices used with a telephone to communicate with prisoners who are deaf and/or hard of hearing by typing and reading communications.

| DOCUMENT TYPE<br>POLICY DIRECTIVE | EFFECTIVE DATE<br>05/01/2021 | NUMBER<br>04.06.156 | PAGE  **2**  OF  **9** |
|---|---|---|---|

J.  Videophone: A telephone with a camera and screen for visual real-time communications.

K.  Video Relay Services (VRS): A service that enables deaf and/or hard of hearing prisoners who use American Sign Language to communicate with voice telephone users through video equipment.

L.  Video Remote Interpreting (VRI): A video telecommunications interpreting service that uses qualified interpreters for American Sign Language (ASL) and Oral Transliteration (OTC).

GENERAL INFORMATION

M.  All correctional facilities housing deaf and/or hard of hearing prisoners shall offer accommodations related to any prisoner identified by Health Care as having an "H-hearing impaired" Special Accommodation Notice (SAN). The Worksite Offender Americans with Disabilities Act (ADA) Coordinator shall address all non-medical aids and services needed for the deaf and/or hard of hearing prisoner to effectively communicate.

N.  Personnel shall communicate with deaf and/or hard of hearing prisoners to the same extent as they would communicate with non-deaf and/or hard of hearing prisoners.

O.  Complaints concerning reasonable accommodations filed by a deaf and/or hard of hearing prisoner shall be handled in accordance with PD 04.06.155 "Offenders with Disabilities."

P.  The primary method of communication shall be used in all instances in Paragraph II of this policy unless the communication method is not available, and/or an equally effective communication method is available.  If possible, these interactions shall be re-scheduled when the primary method is available. In all cases, if the secondary method of communication is used in encounters in Paragraph II, documentation shall be provided stating why the primary method was not used.

Q.  Prisoners who use lipreading to effectively communicate as a primary or secondary method of communication do not necessarily need an interpreter to successfully communicate.  In most encounters, prisoners utilizing this method of communication will be able to communicate directly to the staff.  However, due to unavoidable barriers (e.g., a mustache, protective masks, accents, or other physical characteristics) there may be times when staff are not able to effectively communicate using this method.  As a result, an OTC interpreter may be utilized.

HAND RESTRAINTS

R.  Unless there is a documented safety and security concern, deaf and/or hard of hearing prisoners shall be permitted to use their hands for effective communication (e.g., signing, writing, etc.).

HEARING ASSESSMENT

S.  During initial intake and within seven days of entering the Michigan Department of Corrections (MDOC) prison system, every prisoner with a perceived or reported (including self-reported) hearing impairment shall receive an initial hearing assessment consistent with medical standards.  If there is indication of a potential hearing impairment, the prisoner shall be referred to a professionally accredited audiologist to perform a comprehensive hearing assessment.  These prisoners shall be provided an H-hearing impaired Special Accommodation Notice (SAN) in accordance with PD 04.06.160 "Medical Details and Special Accommodation Notices" and be housed in a designated facility identified in Attachment A (barring any medical, security or programming needs requiring an alternative housing arrangement as approved by the Correctional Facilities Administration (CFA) Deputy Director or designee) pending this assessment. After the intake process, any deaf and/or hard of hearing prisoner who was not assessed according to the requirements of this paragraph at their initial intake, or who requires reassessment due to perceived or reported changes in hearing, shall be assessed by a QHP at the prisoner's request noted on a Healthcare Request (CHJ-549) or during the prisoner's annual health screen.   The prisoner shall subsequently be assessed by an Audiologist with the referral of a QHP in accordance with PD 03.04.100 "Health Services."   Any prisoner provided a SAN as H-hearing impaired shall be referred, in writing, by Health Care staff to the Worksite Offender ADA Coordinator within one business day.

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 05/01/2021 | 04.06.156 | PAGE 3 OF 9 |

HOUSING DEAF AND/OR HARD OF HEARING PRISONERS

T.    Accommodations for deaf and/or hard of hearing prisoners are outlined in Attachment A "Deaf and/or Hard of Hearing Related Special Accommodation Notices (SAN)." Unless there is an approved safety, security, medical, or programming need, or an unanticipated emergency, prisoners are to be housed as identified in Attachment A based on an individual assessment for medical and non-medical auxiliary aids and services for effective communication. Approval of the CFA Deputy Director or designee is required before transferring any H-hearing impaired prisoner to a non-designated facility if the placement is not in accordance with Attachment A.   Whenever a deaf and/or hearing prisoner is requested for any transfer the following notifications shall be made:

1.    The Health Unit Manager (HUM) or designee at the sending facility shall notify the transfer coordinator at the sending facility of the prisoner's H-accommodation.

2.    The transfer coordinator at the sending facility shall notify the transfer coordinator at the receiving facility and the Statewide ADA Coordinator of the prisoner's H-accommodation.

3.    The transfer coordinator at the receiving facility shall notify the Worksite Offender ADA Coordinator and HUM at the receiving facility in writing of the prisoner's destination and scheduled arrival date (if possible).

The notification of the prisoner's hearing impairment, and the CFA Deputy Director's approval if necessary, shall be documented in the comments section of the Transfer Order (CSJ-134).   The Prisoner Detail for Inter-Institutional Transfers (CAJ-959) shall note in the comment section the prisoner(s) is deaf and/or hard of hearing and note their primary method of communication as documented on the Checklist for Prisoner ADA Accommodations (CSJ-572).

U.    Within two business days of a deaf and/or hard of hearing prisoner's arrival, the Worksite Offender ADA Coordinator or designee shall meet with the prisoner to determine their non-medical accommodation needs and take all reasonable steps to ensure the prisoner is provided appropriate accommodations. The Worksite Offender ADA Coordinator shall also ensure the prisoner is provided substantially equal access to MDOC programs, activities, and services, and receives an overview of auxiliary aids and services.   The prisoner's completion of the overview of auxiliary aids and services shall be documented by the Worksite Offender ADA Coordinator on the Checklist for Prisoner ADA Accommodations (CSJ-572).   The CSJ-572 shall be forwarded to the Statewide ADA Coordinator or designee for approval and SAN entry as appropriate.   The CSJ-572 shall be finalized once it is approved by the Statewide ADA Coordinator or designee and returned to the Worksite Offender ADA Coordinator for distribution.

V.    All deaf and/or hard of hearing prisoners shall be housed in housing units in accordance with the facility's fire/evacuation operating procedure.

TRAINING

W.    All facility staff shall receive training in accordance with the training plan, on how to appropriately manage the deaf and/or hard of hearing population. The Corrections Academy and New Employee Training School shall also provide training on how to appropriately manage the deaf and/or hard of hearing population to all new MDOC hires. Volunteers and contractors may also receive training as appropriate.

IDENTIFICATION CARDS FOR DEAF AND/OR HARD OF HEARING PRISONERS

X.    When a prisoner is identified as being deaf and/or hard of hearing, the MDOC shall take appropriate steps to ensure their identification card indicates that they are deaf and/or hard of hearing. Staff who have regular contact with deaf and/or hard of hearing prisoners shall be shown where to find the deaf and/or hard of hearing identifier on the identification card.   It is the responsibility of the prisoner to present the identification card to staff as necessary.

| DOCUMENT TYPE<br>POLICY DIRECTIVE | EFFECTIVE DATE<br>05/01/2021 | NUMBER<br>04.06.156 | |
|---|---|---|---|
| | | | PAGE 4 OF 9 |

Y.     Housing unit count boards shall have the names and numbers identified of all the prisoners in that housing unit with a SAN of H-hearing impaired.   Additionally, these prisoners shall have a door card on or near their living area with, at minimum, their name, number, and a blue dot (roughly the size of a quarter) placed on the card.

POSTINGS

Z.     Facilities housing deaf and/or hard of hearing prisoners shall post in a prominent location (e.g., front desk) a notice clearly stating that the facility houses deaf and/or hard of hearing prisoners and that the deaf and/or hard of hearing prisoner's identification card notes that they are deaf and/or hard of hearing. The notice shall include a picture of a sample identification card.   The notice shall also be posted in each housing unit where deaf and/or hard of hearing prisoners are housed.

AA.    The contact information for both the Worksite Offender ADA Coordinator and the McBride Settlement Agreement Monitors shall also be prominently posted in a secure area in the housing unit(s) in which deaf and/or hard of hearing prisoners are housed.

AUXILIARY AIDS AND SERVICES ASSESSMENT

BB.    After a determination is made that a prisoner is deaf and/or hard of hearing, Health Care staff, which may include a professionally accredited audiologist, shall determine if auxiliary aids and services are medically necessary and facilitate ordering those aids and services free of charge as provided in PD 04.06.160 "Medical Details and Special Accommodation Notices."   The Worksite Offender ADA Coordinator shall address all non-medical aids and services needed for effective communication by prisoners who have an accommodation for H-hearing impaired. The MDOC shall provide deaf and/or hard of hearing prisoners with access to auxiliary aids and services in accordance with this policy, including Attachment A, based on the prisoner's accommodation needs free of charge.

CC.    Health Care staff at the facility where the Deaf or Hard of Hearing Prisoner is housed shall be responsible for facilitating the repair, replacement, and adjustment of medical devices such as hearing aids and shall be responsible for ensuring the delivery of the device in accordance with PD 04.06.160 "Medical Details and Special Accommodation Notices."   If the prisoner experiences any problems with their medical devices, they shall notify Health Care staff by submitting a Health Care Request form (CHJ-549).   Health Care staff shall begin to resolve the issue within two business days of receipt of the CHJ-549 and shall attempt to resolve any issues as promptly as possible. If there is a delay caused by third-party vendors outside of the MDOC's control, Health Care staff shall provide status updates to the prisoner until the issue is resolved. The MDOC shall pay for shipping costs associated with the repair and replacement of medical devices.   Prisoners who suffer bilateral hearing loss shall be offered hearing aids for both ears as set forth in Paragraph BB.

DD.    The ADA Coordinator at the facility where the deaf or hard of hearing prisoner is housed shall be responsible to facilitate the repair, replacement, and adjustment of non-medical auxiliary aids and services. The MDOC shall pay for shipping costs associated with the repair and replacement of auxiliary aids and services.

EE.    The prisoner may be responsible for the cost of repair or replacement of damaged or lost auxiliary aids and services that were issued by the MDOC except when there is verification that the damage or loss was not the fault of the prisoner (e.g., accident on an assignment, victim of an assault) or if only minor repair is necessary. If the prisoner does not have sufficient funds to pay the cost of repair or replacement, the cost shall be considered an institutional debt and collected as set forth in PD 04.02.105 "Prisoner Funds."

FF.    If a deaf and/or hard of hearing prisoner indicates that they do not require medically necessary auxiliary aids and services, they shall sign a waiver refusing the aids and services and the waiver shall be documented in the prisoner's health record.   Waivers for medically necessary aids and services shall be coordinated by medical staff.   If a deaf and/or hard of hearing prisoner indicates they do not require

| DOCUMENT TYPE<br>POLICY DIRECTIVE | EFFECTIVE DATE<br>05/01/2021 | NUMBER<br>04.06.156 | |
|---|---|---|---|
| | | | PAGE  5  OF  9 |

non-medical auxiliary aids and services, the waiver shall be documented on the Checklist for Prisoner ADA Accommodations (CSJ-572).  Waivers for non-medical aids or services shall be coordinated by the Worksite Offender ADA Coordinator. No prisoner may be coerced, pressured, or compelled to sign a waiver.

GG.    If a prisoner is found to have a hearing impairment at intake or at a later hearing assessment and refuses or does not request auxiliary aids and services, but later believes that auxiliary aids and services are necessary to ensure effective communication, they may submit a request for auxiliary aids and services using the process outlined in PD 04.06.155 "Offenders with Disabilities" even if the prisoner has previously signed a waiver. The MDOC shall provide a prisoner who was initially not found to have a hearing impairment with a hearing assessment by an Audiologist if ordered by Health Care staff.

EFFECTIVE COMMUNICATION

HH.    Wardens shall ensure that there is a system in place that notifies facility staff what a deaf and/or hard of hearing prisoner's primary and secondary method of communication is, as documented on the most recent Checklist for Prisoner ADA Accommodations (CSJ-572). This information shall be readily available and accessible for facility staff on their assignments. Staff shall ensure the prisoner's primary method of communication is used during the prisoner's participation in a program, service, or activity as noted in Paragraph P.

II.    Any person-to-person communication noted in numbers 1 - 14 of this paragraph with a prisoner who has a H-accommodation shall be documented as set forth in this paragraph. The documentation shall note the following: (1) The prisoner's primary method of communication (2) What method of communication was used, including why the secondary method was used in accordance with Paragraph P (3) How did the staff member determine that the communication was effective.  If these documentation requirements cannot be added to the controlling form(s) noted in 1-14 below (including electronic records, for example the electronic medical record and OMNI Case Notes) during the interaction, staff shall document effective communication on the Documentation of Effective Communication for Deaf and/or Hard of Hearing Prisoners form (CSJ-572C).

1.    Communications to, and interviews with, prisoners regarding their healthcare, including dental, vision, audiological, and mental healthcare (effective communication documentation noted in the prisoner health record);

2.    Communications to, and interviews with, prisoners for Parole Board hearings, Parole Eligibility Report (PER) preparations, Parole Board interviews, parole violation hearings, and Institutional Parole Agents/transitional programming (effective communication documentation noted in OMNI case notes or other reports as appropriate);

3.    Disciplinary hearings, investigative interviews, and any other communications with deaf and/or hard of hearings prisoners as part of the MDOC's investigatory or disciplinary processes for alleged misconduct or violations of law, policy, or other requirements.  This includes communications with deaf and/or hard of hearing prisoners who are suspected of, charged with, or witness to, disciplinary misconduct or violations (effective communication documentation placed on the misconduct reports during the review process, the hearing report, appeal forms (if interviewed), or other reports as appropriate);

4.    During Core programming as defined in Attachment A of PD 05.01.100 "Prisoner Program Classification (effective communication documentation placed on progress or completion reports if the prisoner is interviewed or other reports as appropriate);

5.    For administrative hearing proceedings, including required notices (e.g., Notice of Intent to Conduct an Administrative Hearing) (effective communication documentation placed on the Notice of Intent to Conduct an Administrative Hearing (CSJ-282) or other reports as appropriate);

6.    Communications to, and interviews with, prisoners during the grievance process (effective

| DOCUMENT TYPE POLICY DIRECTIVE | EFFECTIVE DATE 05/01/2021 | NUMBER 04.06.156 | |
|---|---|---|---|
| | | | PAGE **6** OF **9** |

communication documentation placed on all forms associated with the grievance process, PREA complaints, State Administrative Board claims, etc. or other reports as necessary);

7. Communications with the legal writer if approved to receive services from the Legal Writer Program (If effective communication is not obtained, the prisoner shall report the issue(s) to the Worksite Offender ADA Coordinator);

8. During prisoner orientation, at both intake and receiving facilities, including any forms, multi-media, or educational information provided regarding the Prison Rape Elimination Act (PREA) (effective communication documentation placed on the verification of orientation attendance or other reports as appropriate);

9. Program classification and Security Classification Committee interviews (effective communication documentation placed on the Program Classification Report (CSX-175), Security Reclassification Notice (CSJ-423), Segregation Behavior Review (CSJ-283), or other reports as appropr*iate.*

10. Any prison work/job-assignment related training for matters that are outside the routine day-to-day schedule (effective communication documentation placed on the Prisoner Worker Safety Training Record (CAJ-900), Prisoner Program and Work Assignment Evaluation (CSJ-363), or other reports as appropriate);

11. Formal meetings with facility administration or housing unit staff (effective communication documentation placed on reports as appropriate if a form is completed as a result of the communication);

12. Group religious services, whether organized by MDOC or by volunteers (If effective communication is not obtained, the prisoner shall report the issue(s) to the Worksite Offender ADA Coordinator);

13. Individual (one-on-one) religious programs with clergy if requested by the prisoner and agreed to/approved by the qualified clergy that is to conduct the religious program, provided that the program is scheduled and coordinated by the facility chaplain or designee (effective communication documentation placed on reports as appropriate if a form is completed as a result of the communication); and

14. Any significant communications that are not discussed in 1 - 13 above that would otherwise be communicated to a prisoner that is not deaf or hard of hearing. A significant communication includes any communication for which the risks of miscommunication or misunderstanding are significant, and the consequences of miscommunication/misunderstanding would have significant negative repercussions for the deaf and/or hard of hearing prisoner (effective communication documentation placed on reports as appropriate if a form is completed as a result of the communication).

JJ. When a deaf and/or hard of hearing prisoner requests to attend a service or program the prisoner or any other staff member may contact Worksite Offender ADA Coordinator or designee to request a qualified interpreter to assist them or request auxiliary aids and services. For prisoners whose primary method of communication is not sign language, staff shall ensure the prisoner's primary method of communication is used during the prisoner's participation in the program, service, or activity.

KK. The MDOC shall be responsible for scheduling and overseeing the provision of qualified interpreters for ASL or OTC. Every effort shall be made to utilize VRI. An in-person qualified interpreter shall be provided if requested by a prisoner and a QHP or Worksite Offender ADA Coordinator, in consultation with the prisoner, determines that the prisoner is unable to effectively communicate via VRI. An in-person interpreter shall be used in lieu of VRI during communication encounters that occur from the time of the prisoner's request to the time a QHP medically supports, or does not support, the prisoner's request.

LL. In accordance with PD 03.04.100 "Health Services," all medical appointments requiring qualified

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| POLICY DIRECTIVE | 05/01/2021 | 04.06.156 | PAGE  7  OF  9 |

interpreters for deaf and/or hard of hearing prisoners shall be scheduled within the same time period from the initial request as those for non-deaf and/or hard of hearing prisoners.

OFF-SITE MEDICAL CARE

MM.     When scheduling off-site medical care, including appointments to Duane Waters Health Center (DWHC) Specialty Clinics, Health Care staff shall inform the off-site medical provider that a deaf and/or hard of hearing prisoner requires a qualified interpreter or other auxiliary aids or services. The notification shall be documented on the Consultation Request.

NN.     In the case of an emergency, MDOC staff shall, as soon as possible, inform an off-site medical provider that a deaf and/or hard of hearing prisoner requiring a qualified interpreter or other auxiliary aid or service is being transported to the off-site medical provider.   Notification shall include the deaf and/or hard of hearing prisoner's estimated time of arrival. MDOC staff shall request that the off-site medical provider make available to the deaf and/or hard of hearing prisoner a qualified interpreter and/or other reasonable auxiliary aids or services. The Prisoner Detail (CSX-225) shall note that the prisoner is deaf and/or hard of hearing and note their primary method of communication.

WORK ASSIGNMENTS

OO.     The MDOC shall provide opportunities for institutional work assignments that are consistent with the opportunities for the same assignment given to non-deaf and/or hard of hearing prisoners.

RELIGIOUS SERVICES

PP.     No deaf and/or hard of hearing prisoner shall be required to attend a religious service where an interpreter or the prisoner's primary method of communication is not provided in order to receive any religious meal, diet, or otherwise offered religious accommodation.

NON-AUDITORY ALARMS AND EMERGENCY EVACUATIONS

QQ.     Each facility housing deaf and/or hard of hearing prisoners shall have a non-auditory alert system in place to advise deaf and/or hard of hearing prisoners of an emergency evacuation or other emergency. The non-auditory alert system may include in-person contact/communication between staff and the deaf and/or hard of hearing prisoner to notify them of emergencies in real-time. Additionally, those facilities designated to house the deaf and/or hard of hearing population (excluding WCC) shall have a non-auditory alert system that includes electronic messages through the Page Alert Broadcast System (PABS) and notification lights as needed. Facilities utilizing the PABS shall send electronic messages for any announcements that are sent through the integrated audio system (Public Address System) including personal notifications (prisoner visits, non-scheduled callouts, etc.), and log the sending of these messages in the appropriate logbook or other document. Additionally, facility staff shall document once per shift that the date and time on the PABS are set appropriately. Any discrepancies noted shall be reported and corrected as soon as possible. Facilities shall also add to their preventative maintenance plan a process to ensure that the continuous battery back-up attached to the PABS is operating as intended or is replaced as needed. These facilities are also responsible to ensure that there are enough pagers to be issued to the prisoner population and that the system is operating as intended.  If the system is not operating as intended, a maintenance request shall be entered immediately as well as a written communication to the Worksite Offender ADA Coordinator, and employees must provide effective non-auditory notification of announcements to deaf and/or hard of hearing prisoners while the system is not operational (e.g., whiteboard, notepad).

RR.     Person to Person (face to face) non-auditory systems of notification shall be put in place to ensure that deaf and/or hard of hearing prisoners do not miss non-emergent announcements (count times/warnings, visitations, med line, yard times, meals, etc.), alarms, or any other information audibly conveyed from staff to hearing prisoners.

TELECOMMUNICATIONS

SS.     TTY, TDD, VRS, videophones, and CapTel Services shall be available at facilities that are designated

| DOCUMENT TYPE<br>POLICY DIRECTIVE | EFFECTIVE DATE<br>05/01/2021 | NUMBER<br>04.06.156 | |
|---|---|---|---|
| | | | PAGE  8  OF  9 |

to house deaf and/or hard of hearing prisoners and other facilities identified by the Statewide ADA Coordinator or designee.  Telephone Amplifiers shall be available for prisoners in all facilities in housing units designated to house the deaf and/or hard of hearing prisoners. Fees associated with these services shall not exceed the fees incurred by prisoners using the traditional telephone system.

TT.     The requirements for prisoner access to deaf and/or hard of hearing telecommunication devices are outlined in Attachment A of this policy.   The MDOC shall provide deaf and/or hard of hearing prisoners with access to telecommunication devices that are consistent with the prisoner's primary/secondary method of communication and that enable them to communicate with people outside of the MDOC in a manner that is substantially equivalent in terms of the amount and quality of the information conveyed, as well as the expense incurred by the prisoner to the communications that non-deaf and/or hard of hearing prisoners have with people outside of the MDOC using traditional telecommunication devices such as telephones.   This provision does not apply to charges incurred by prisoners' family and friends for use of third-party telecommunications providers. Prisoners eligible to utilize VRS TTY, videophones, and CapTel may be required to complete a Telephone Agreement and Number List (CAJ-370) to have numbers added to their Personal Access Numbers listing prior to calls being made. Additional registration by the prisoner's friends and family members may be required for some services. All VRS, TTY, videophones, CapTel, and TDD systems shall be tested by the prisoner telephone vendor at least monthly.   If any of these systems are not operating as intended, the prisoner telephone vendor shall be notified immediately. All training on the use of these systems to prisoners and staff shall be coordinated by the Worksite Offender ADA Coordinator or designee as necessary.

MONITORING COMMUNICATIONS

UU.     Telephone and videophone calls between deaf and/or hard of hearing prisoners and individuals outside of the MDOC shall be monitored as provided in PD 05.03.130 "Prisoner Telephone Use."  The MDOC shall monitor such calls in the same manner and to the same extent as any other prisoner call under PD 05.03.130 and shall not increase such monitoring solely because the call involves a deaf and/or hard of hearing prisoner.  Any recorded audio phone call, recorded VRS session, TTY call, CapTel or recorded person-to-person videophone call, including any related video feed or transcript may also be monitored. Prisoners using the VRS system are subject to restrictions set forth in PD 05.03.130. Additionally, "Person to Person" video calls are subject to telephone restrictions for any conduct that would terminate an in-person prisoner visit (e.g., nudity, obscene actions, etc.) in accordance with PD 05.03.140 "Prisoner Visiting" and the CFA Visiting Standards.

VV.     Communication between deaf and/or hard of hearing prisoners and Settlement Monitors for the McBride lawsuit shall not be monitored.

ADDITIONAL TIME FOR COMMUNICATION

WW.     The MDOC shall allow deaf and/or hard of hearing prisoners at least twice as many minutes to complete a TTY/TDD/CapTel or videophone call afforded to non-deaf and/or hard of hearing prisoners to make calls using traditional telecommunication devices such as telephones.

MEDIA

XX.     All audio-visual media purchased by the MDOC, or the Prisoner Benefit Fund (PBF), for prisoner use in facilities housing deaf and/or hard of hearing prisoners shall include open and closed captioning. Captioning shall be turned on, and remain on, in housing units where deaf and/or hard of hearing prisoners are housed.

PROCEDURES

YY.     If necessary, to implement requirements set forth in this policy directive, Wardens shall ensure that procedures are developed or updated.

AUDIT ELEMENTS

ZZ.     A Primary Audit Elements List has been developed and is available on the Department's Document

| DOCUMENT TYPE POLICY DIRECTIVE | EFFECTIVE DATE 05/01/2021 | NUMBER 04.06.156 | PAGE 9 OF 9 |
|---|---|---|---|

Access System to assist with self-audit of this policy pursuant to PD 01.05.100 "Self-Audits and Performance Audits."

<u>ATTACHMENTS</u>

AAA.    Attachment A - Deaf and/or Hard of Hearing Related Special Accommodation Notices (SAN)

APPROVED: HEW 04/15/2021

| DOCUMENT TYPE | EFFECTIVE DATE | NUMBER | |
|---|---|---|---|
| PD ATTACHMENT | 04/04/2022 | 04.06.156A | PAGE 1 OF 2 |

**ATTACHMENT A**

## Deaf and/or Hard of Hearing Related Special Accommodation Notices (SAN)

<u>All Correctional Facilities</u> are required to have the ability to accommodate prisoners with the following non-medical accommodations for the deaf and/or hard of hearing prisoner population (These accommodations are in addition to the identification requirements of deaf and/or hard of hearing prisoners outlined in PD 04.06.156):

- ADA-Communication with HA – Prisoner indicated that they can effectively communicate with the use of a hearing aid(s).
- ADA–Communication without HA - Prisoner indicated that they can effectively communicate without the use of a hearing aid.
- ADA-LR - Lip Reading
- ADA-WS - Written Slate
- ADA-ALD - Assistive Listening Devices
- ADA-TTY - Text Telephone / Teletype Terminal / Telecommunication Device for the Deaf - Requested by the prisoner and approved by the Statewide ADA Coordinator and meet all requirements noted for TTY below.

The above listed prisoners will have one of the following designations representing approval for placement in a non-designated facility.
- ADA-PAR - Pending Audiogram results including receiving HA.
- ADA-DSW - Designated Site Accommodation Waiver – General population offender who do not require accommodations (*) available only designated facilities, offender waives accommodations and placement at a designated facility, and approved by the Statewide ADA Coordinator.
- ADA-DS with CFA Specific Override – Exceptions may include approved medical, security, or programming needs as approved by the Deputy Director or designee, prisoner will still carry the ADA-DS accommodation.

<u>Sites Designated to House the Deaf and Hard of Hearing</u> – Prisoners with the below noted SAN's must be housed in one of the below correctional facilities. Exceptions may include approved medical, security, or programming needs as approved by Deputy Director or designee (Currently the Classification Director). Designated facilities can accommodate these additional Non-Medical SANs.

- ADA-PABS - Page Alert Broadcast System
- ADA-VRS - Video Relay Service (Prisoner telephone system) - Requested by the prisoner and approved by the Statewide ADA Coordinator. must meet FCC guidelines, prisoner must know and use ASL, and meet all requirements noted for VRS below.
- ADA-ASL - American Sign Language (Including the use of Video Remote Interpreting (VRI))
- ADA-CapTel – Requested by the prisoner and approved by the Statewide ADA Coordinator. must meet FCC guidelines and meet all requirements noted for CapTel below.
- ADA-Videophone - Requested by the prisoner and approved by the Statewide ADA Coordinator. and meet all requirements noted for Videophone below.
- ADA-DS - Designated Site – Administrative designation requiring the prisoner's placement in a designated site as approved by the State-wide ADA Coordinator. Requested by CFA staff or the prisoner and approved by the Statewide ADA Coordinator.

1. Carson City Correctional Facility (DRF)
2. G. Robert Correctional Facility (JCF)
2. Parnall Correctional Facility (SMT)
3. Saginaw Correctional Facility (SRF)
4. Thumb Correctional Facility (TCF)
5. Women's Huron Valley Correctional Facility (WHV)
6. Woodland Center Correctional Facility (WCC)
   a.  Not including prisoners housed in Level I population
   b.  Exempt from Page Alert Broadcast System, prisoners with the ADA-PABS SAN may be housed at WCC.

***NOTE: Non-Medical SANs as noted and approved on the CSJ-572 Checklist for Prisoner ADA Accommodations. ***

| DOCUMENT TYPE<br>PD ATTACHMENT | EFFECTIVE DATE<br>04/04/2022 | NUMBER<br>04.06.156A | PAGE 2 OF 2 |
|---|---|---|---|

Waiver of Placement at a Designated Site - ADA-DSW – Any prisoner with an "*H-Hearing Impaired*" SAN who may elect to waive their placement at a designated site barring any medical, security, programming, or non-medical ADA accommodation needs. This waiver will not exempt the prisoner from transfers in accordance with PD 05.01.140 "Prisoner Placement and Transfer."

Accommodation aids and services may be added to any MDOC facility with the approval of the CFA-Deputy Director and Statewide ADA Coordinator.

Additional information regarding the procurement of equipment to accommodate the deaf and/or hard of hearing can be obtained by contacting the Statewide Offender ADA Coordinator.

Access to Telecommunication Devices:
NOTE: the below outline of telecommunication device access is a starting point based on the prisoner's reported or perceived physical abilities, degree of hearing loss, and ability to effectively communicate with the aid or service.  A prisoner may be provided access to multiple telecommunication devices based on their primary and secondary method of communication.   The below is only a guide.

☐  **Traditional Telephone With or Without an Amplification Device** – Any prisoner that can effectively communicate using a traditional telephone will be provided this service. Phone Amplifiers are available in all correctional facilities for prisoner use upon request. A prisoner's ability to use the traditional telephone can be self-reported or determined by a review of the prisoner's past phone usage. If a prisoner indicates they cannot effectively communicate on the traditional phone and the facility staff determine to the contrary, the Facility ADA Coordinator will communicate to the Statewide ADA Coordinator for a final determination.

☐  **VRS** – Access to VRS will be determined by (1) The prisoner knows and uses ASL (2) The prisoner cannot effectively communicate on the traditional telephone as stated in #1.

☐  **Videophones** – (1) The prisoner does not know and use ASL (2) The prisoner cannot effectively communicate on the traditional telephone as stated in #1 (3) The prisoner can communicate non-verbally with or without the aid of residual hearing (speech reading, SLI other than ASL, etc.).

☐  **CapTel** - (1) The prisoner does not know and use ASL (2) The prisoner cannot effectively communicate on the traditional telephone as stated in #1 (3) The prisoner cannot communicate non-verbally with or without the aid of residual hearing (speech reading, SLI other than ASL, etc) (4) The prisoner can speak clearly (5) The prisoner can read and write.

☐  **TTY / TDD** - (1) The prisoner does not know and use ASL (2) The prisoner cannot effectively communicate on the traditional telephone as stated in #1 (3) The prisoner cannot communicate non-verbally with or without the aid of residual hearing (speech reading, SLI other than ASL, etc) (4) The prisoner cannot speak clearly (5) The prisoner can read and write.

APPROVED: HEW 03/14/2022

Exhibit 107

| State of Vermont<br>Agency of Human Services<br>Department of Corrections | Title:<br>Effective Communication for Deaf<br>and Hearing Impaired | Page 1<br>of 9 |
|---|---|---|
| **Chapter:** Facilities- General | **#316** | **Supersedes:** NEW |

**Local Procedure(s) Required:** No local procedure required.

**Applicability**: All DOC staff, contractors and volunteers

**Security Level:** "B" - Anyone may have access to this document.

| SIGNED<br>**Nicholas J. Deml, Commissioner** | 12/20 /2021<br>**Date Signed** | 1/26 /2022<br>**Effective Date** |
|---|---|---|

**PURPOSE**

The purpose of this policy is to establish clear guidelines for Vermont Department of Corrections (DOC) staff and contractors when interacting with an incarcerated individual with a hearing disability.

**AUTHORITY**

Title II of the Americans with Disabilities Act of 1990; 42 U.S.C. §§ 12131-12134; 28 C.F.R. § 35.160-35.164; 9 V.S.A § 4500

**POLICY**

It is DOC policy to identify incarcerated individuals with a hearing disability as soon as reasonably possible and provide access to a qualified interpreter or other appropriate auxiliary aids and services to ensure effective communication. DOC shall take appropriate steps to ensure communications with persons with a hearing disability are as effective as communications with other incarcerated individuals.  DOC shall also provide incarcerated individuals with a hearing disability equal opportunity to participate in and enjoy the benefits of DOC services, programs, and activities.

## DEFINITIONS

**"Effective communication"** means communication with individuals who have hearing disabilities that is as effective as communication with others.  Effective communication is achieved by furnishing appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities an equal opportunity to participate in or benefit from the services, programs, or activities of a public entity.

**"Incarcerated Individual with Hearing Disabilities"** means an incarcerated individual who, if unaided by hearing aids or any medical device, is unable to hear in either one or both ears to a sufficient degree to be able to understand the spoken word.  Throughout this document, the term "incarcerated individual with hearing disabilities" is used to refer to incarcerated individuals who are deaf or hard of hearing.

**"Qualified Interpreter"** means an interpreter who, via a video remote interpreting (VRI) service or an on-site appearance, is able to interpret effectively, accurately, and impartially, both receptively and expressively, using any necessary specialized vocabulary, given the individual with hearing disabilities' language, skills and education.  Qualified interpreters include, for example, sign language interpreters, oral transliterators, and cued-language transliterators.  *See* 28 C.F.R. § 35.104, Pt. 35, App. A. "Qualified Interpreter."  A Certified Deaf Interpreter is also considered a qualified interpreter.

**"Secondary Hearing Assessment"** means a hearing assessment to (1) determine whether an incarcerated individual has a hearing disability, (2) obtain additional information on the extent of an incarcerated individual's hearing disability, and/or (3) help determine what auxiliary aids and services are required to ensure effective communication.  It may be ordered either after the initial Intake Hearing Screening, or when an individual who has been incarcerated presents with a suspected hearing disability during incarceration.  A Secondary Hearing Screening can be ordered at any time during an individual's incarceration.

**"Text Telephone/Teletype Terminal/Teletypewriter"** (TTY) means a device that allows individuals with hearing disabilities to use a telephone to type and send text messages.

**"Telecommunications Relay Service"** (TRS) means an operator service that allows people with hearing disabilities to place calls to standard telephone users via keyboard or assistive device.

**"Videophone"** means a telephone with a camera and screen for visual, real-time communication.

**"Video Relay Service"** (VRS) means a telephone service using interpreters connected to callers by video hook-up that is designed to provide persons with hearing disabilities who use American Sign Language with telephone services that are functionally equivalent to those provided to users who are hearing.

**"Video Remote Interpreting"** (VRI) means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering a high-speed, wide-bandwidth video connection that delivers high-quality video images as provided in 28 C.F.R. § 35.160(d).

## General Guidelines

**A. Initial Intake**

1. All staff will follow DOC policy on implementation of the Americans with Disabilities Act to identify any person with a hearing disability being admitted into a correctional facility to include ensuring the *Offender/Inmate Orientation to ADA Form* and the first section of *the Intake Hearing Assessment* form are completed.

2. If DOC suspects, or the person indicates (either in the *Request Section* of the *Request for Reasonable Accommodation/Response Form* or by the responses to the *Intake Hearing Assessment Form*) a hearing disability at the time of intake, DOC will provide access to Qualified Interpreters, or other appropriate auxiliary aids and services to aid in the intake process. Primary consideration will be given to the request of the incarcerated individual for a qualified interpreter or a specific auxiliary aid or service.

   a. In circumstances where an interpreter, aid, or service is requested to ensure effective communication, Booking staff will immediately notify the Shift Supervisor, to obtain an interpreter, either in person or by video telephone or video relay, or other auxiliary aid or service.

   b. The interpreters must be provided within 2 hours of a request.

3. Persons who indicate they are deaf, hard of hearing, or have a speech limitation at the time of intake will be referred to the Facility ADA Coordinator, designee, for development of a *Communication Plan*.

   a. The Facility ADA Coordinator, or designee, will complete as much of the Communication Plan as possible at intake.

   b. This Communication Plan will be considered temporary until it is completed after any necessary hearing screenings or assessments as set out in Section B.

4. If a person indicates at the time of facility intake that they are not deaf, hard of hearing, or have a speech limitation, they will sign the *Intake Hearing Assessment Form* confirming the information at the time of intake.

5. During the intake process, the incarcerated individual will be offered the opportunity to have a distinguished colored identification ("ID") bracelet that clearly identifies the person as having a hearing disability.

   a. Waiver of the distinguished colored ID bracelet does not waive the person's right and/or access to eligible services.  The incarcerated individual is not precluded from changing their preference during the period of incarceration to remove the waiver and may opt to have a distinguished colored ID bracelet issued at any time.

   b. The distinguished colored ID bracelet will be issued within 10 days of a request.

   c. The distinguished colored ID bracelet will signify to staff that the incarcerated individual has a hearing disability and as a result, may require auxiliary aids and services to understand and carry out correctional personnel's commands.  The distinguished colored ID bracelet will also indicate that additional information about specific auxiliary aids and services for the individual is available in the individual's Communication Plan or from the Facility ADA Coordinator.

**B. Hearing Screening**

1. The Facility ADA Coordinator and the Health Services Administrator will be notified when an incarcerated person identified with a hearing disability is admitted.
2. Within 72 hours of intake, a Qualified Health Care Professional (QHCP) will screen every person referred to the HSA for a hearing assessment based on the intake process.
3. QHCP staff will submit the screening *Intake Hearing Assessment Form* to the Facility ADA Coordinator.
4. The Facility ADA Coordinator will document the information on the *Intake Hearing Assessment Form* in the Offender Management System.
5. If a second hearing assessment is indicated, the QHCP will make a referral to an appropriate licensed professional.
6. The secondary hearing assessment referral must be made to an appropriate licensed professional within 7 calendar days of the Intake Hearing Screening and documented on the *Intake Hearing Assessment Form*.  An appointment will be made within 30 days of the referral.
7. If extenuating circumstances prevent an appointment within 30 days, an explanation for the delay must be documented on the *Intake Hearing Assessment Form* and the appointment must be made no later than 60 days from the date of the referral.
8. An incarcerated individual may request, at any time during incarceration, an assessment for a hearing disability. All requests for an assessment will be forwarded to the Facility ADA Coordinator and the Facility HSA using the established procedure on ADA accommodation requests.
   a. Referrals for Secondary Hearing Assessments under this section must be made within 14 days of the determination or request.
   b. If hearing aids or other auxiliary devices are recommended as a result of the Secondary Hearing Assessment under this section, they must be provided within 30 days of the date of the assessment.

**C. Communication Plan**

1. Within 30 days of an *Intake Hearing Screening*, or Secondary Hearing Assessment, the DOC ADA Compliance Director, Facility ADA Coordinator, and hearing-impaired person will finalize a *Communication Plan* and document the plan in OMS.
2. The Communication Plan will identify the auxiliary aids and services entitled to the person for effective communication in the following situations.
   a. Critical interaction;
   b. Disciplinary matters, including investigations and proceedings;
   c. Interviews with Corrections Investigations Unit or other investigators;
   d. Interview or proceeding related to protective custody or administrative segregation
   e. Meetings with DOC staff or contractors to discuss auxiliary aids and services;
   f. Pre-release meetings and programs, including pre-release parole hearings;

g.   Grievance interviews and processes;

h.   Educational programs and testing that include a verbal or auditory component;

i.    Vocational programs that include a verbal or auditory component;

j.    Risk Interventions services that include a verbal or auditory component;

k.   Religious Services;

l.    Medical and mental health care services, including dental, vision, audiological, individual and group therapy (unless medical care and appointment is routine and does not involve substantial conversation)

m.   Medical care that is routine and does not involve substantial conversation (e.g., routine blood work or tests, regular allergy shots);

n.   Daily environments such as recreation, meals, the library, facility job responsibilities, and basic communications, including conversations with facility staff.

3.   Primary consideration shall be given to the expressed choice of the incarcerated individual in determining the appropriate auxiliary aids and services to ensure effective communication.

4.   Deviation from the primary expressed choice of the incarcerated person is allowable only when it can be demonstrated that another equally effective means of communication is available, or that the use or means of accommodation requested would result in a fundamental alteration of if the service or activity, or an undue burden to DOC.

a.   A determination of "undue burden" must be made by the Central Office ADA Compliance Director with review by DOC General Counsel.

b.   In the case of a finding of "undue burden," DOC has an obligation to provide an alternative aid or services that provides effective communication. The ADA Facility Coordinator will assist in determining whether such an alternative exists.

c.   If an alternate means of communication is offered, the Facility ADA Coordinator will document the decision in the Communication Plan demonstrating that it is equally effective as the expressed choice of the incarcerated person.

5.   All auxiliary aids and services identified in the Communication Plan will be provided in a timely manner and for the entire duration of the programs, services, and activities addressed in the Communication Plan.

6.   The Facility ADA Coordinator will assess the effectiveness and availability of communication accommodations offered to incarcerated individuals at the facility a minimum of every 6 months by communicating with the incarcerated individual.

a.   The assessments will continue until the service or accommodation is terminated, either by request of the inmate or discharge of the individual from the facility.

b.   The assessment and results will be documented in the *Communication Plan* in OMS.

c.   Notice will be sent to the Facility ADA Coordinator and ADA Compliance Director when an assessment is overdue.

7.   An incarcerated person with a hearing disability may supplement or modify the information contained on their Communication Plan, upon request, at any time during their incarceration even if the person had previously declined service.

8. In accordance with established DOC policy on ADA accommodations, the Facility ADA Coordinator will ensure that all facility and medical staff having contact with an incarcerated individual with a hearing disability have access to the Communication Plan.

9. All changes must be documented in the Communication Plan. The most current version of the Communication Plan supersedes any previous version.

## D. Unanticipated Interactions

1. In the event an unanticipated interaction or condition arises that is not addressed in the Communication Plan, staff will consider the need to provide auxiliary aids and services broadly and use the most appropriate auxiliary aid or service that is comparable to similar interactions documented in the Communication Plan.

2. In an emergency involving an imminent threat to the safety or welfare of an individual, or when the security of the facility is at risk, the services and resources readily available at that time will be used to communicate with an incarcerated individual with a hearing disability.

3. If an incarcerated individual with a hearing disability expresses or demonstrates a medical condition that cannot wait for the availability of a qualified interpreter or service, or staff suspect a person may be experiencing a medical emergency requiring treatment, staff will respond by providing the person with the same medical care, treatment, evaluation, or service that would be provided to an incarcerated person without a hearing disability under similar circumstances.
   a. Staff will use the most effective means of communication available to them at the time.
   b. An interpreter or other auxiliary aids or services will be made available to the person as soon as possible, but within no more than 2 hours.

4. When a qualified interpreter is necessary to ensure effective communication, the activity, service, or program may be delayed until the interpreter is made available or within 4 hours, whichever is earlier, or the incarcerated individual may elect to delay participation in the activity, service, or program until the interpreter is available, except in situations or circumstances involving an emergency.

5. Unless an interpreter is scheduled in advance (e.g., for an upcoming disciplinary hearing or a scheduled medical appointment), the qualified interpreter will be provided at the earliest reasonable time, and in all events no later than 4 hours from the time an incarcerated person with hearing disabilities requests an interpreter, taking into consideration, without limitation, the time of day, day of the week, distance to be traveled, and the circumstances and location at which the service is to be provided. The incarcerated individual will not be required to attend the event without a qualified interpreter except in situations involving an emergency. However, the event (if it is specific to the individual) may be rescheduled until an interpreter can participate, but no later than 24 hours from the scheduled event, absent exigent circumstances.

6. Staff will use the most effective, readily available means of communicating with the

incarcerated individual until such time as a qualified interpreter is present.  VDOC will inform the incarcerated person of the current status of efforts being taken to secure a qualified interpreter on the inmate's behalf within 30 minutes of VDOC making the request for the interpreter service.  VDOC will provide additional updates to the inmate, as necessary, until an interpreter is secured.  Notification of efforts to secure a qualified interpreter does not obviate VDOC's obligation to provide qualified interpreters in a timely manner.

**E. Auxiliary Aids and Services**

1. In determining what type of auxiliary aid and service is necessary to accommodate the communication needs of an incarcerated person with a hearing impairment, DOC will give primary consideration to the requests of the offender with the disability, unless it would result in an undue burden (see C(4) above). The following accommodations may be provided but is not intended to be an exhaustive list. Each request received or need identified will be documented in the *Communication Plan* and considered on a case-by-case basis.
   a. Qualified interpreters available on-site or via video remote interpreting (VRI).
   b. Text Telephone/Teletype Terminal Teletypewriter (TTY).
   c. A telephone with volume control will be available on each housing unit where an inmate with a hearing or speech disability resides.
   d. Videophones and services.
   e. Telecommunications Relay Service (TRS).
   f. Captioned telephone (Captel).
   g. Over-the-Ear Headphones.
   h. Closed captioning.
   i. Written Materials.
2. All incarcerated individuals with a hearing disability will have three times the amount of time as an incarcerated person without a hearing disability for telephone calls to account for the time required to complete a telephone call using auxiliary aids or services, such as TTY, Captel.
3. All auxiliary aids provided to an incarcerated individual must be documented according to the DOC policy on Property.
4. Appropriate types of hearing aids and cochlear devices will be provided to an incarcerated individual at no cost to a person who has been prescribed such devices.
   a. Standard hearing aids and cochlear processor devices will be provided as soon as reasonably possible but not later than 30 days after the incarcerated individual's prescription is submitted.
   b. Standard replacement batteries will be provided, upon request, as soon as reasonably possible, but not later than 24 hours after a request is submitted and no later than 48 hours on weekends and holidays.

    c. Nonstandard replacement batteries will be ordered as soon as reasonably possible, but not later than 24 hours after a request is submitted and no later than 48 hours on weekends and holidays.

    d. When an incarcerated person's hearing aid, cochlear processor, or other such device is inoperable or malfunctioning, medical staff will send the device to an appropriate repair company as soon as possible, but not later than 24 hours (or up to 48 hours on weekends and holidays) after a medical request is submitted. A temporary hearing aid will be provided for use during the time that the original hearing aid is out for repairs. Upon request, medical staff will inform the incarcerated individual when the device was sent for repair and when it is expected to be returned by the repair company. Upon request, medical staff will provide the incarcerated individual with any written documentation provided by the repair company regarding the vendor used, the date of the repair, and the specific repairs performed.

    e. If the incarcerated individual's hearing loss warrants clinical reassessment, or the incarcerated individual requests reassessment to determine if the prescription for the hearing aid or other device needs to be adjusted before any repair or replacement is ordered, the incarcerated individual will be allowed to retain the original device (if functional), and medical staff will schedule a medical appointment as soon as reasonably possible.

    f. Medical staff will document the date any device is sent out for repairs in the individual's medical file and inform the facility ADA Coordinator, who in turn will document in OMS.

5. Staff will attempt to resolve complaints about malfunctioning equipment within one week from receiving a complaint and no later than one month after receiving the complaint.

**F. General Facility**

1. Staff will ensure that all incarcerated individuals with hearing disabilities do not miss announcements, fire alarms, mealtimes, recreation, education, work assignments, or other auditory information provided to incarcerated people without a hearing impairment.

    a. Visual alerts or other suitable notification systems or protocols must be utilized in areas where incarcerated individuals with hearing disabilities are present.

    b. Alerts may include in-person notification, flashing lights, postings of daily schedules and announcements, and other effective means of notifying those with hearing disabilities of normal and customary announcements.

2. An incarcerated individual with a hearing disability may be provided a personal pager, that includes visual as well as vibrating functions to supplement any alerts, notifications or protocols put into place to ensure they receive normal and customary announcements.

    a. If the individual declines the use of a personal pager, the decision shall be documented in the Communication Plan in OMS.

   b. Staff will be trained on the use of the pagers and responsible for transmitting messages and alerts at the same time messages and alerts are broadcast to incarcerated people without a hearing disability.
3. Unless a legitimate security or safety concern is present (which must be documented in an incident report), staff will ensure incarcerated individuals with a hearing disability are handcuffed or restrained in a manner that permits effective communication, for instance:
   a. Handcuffing in the front to allow the person to sign, and;
   b. Allowing one hand to be free to allow for writing.
4. Incarcerated individuals with a hearing disability will have the same access to captioned television programming, as incarcerated people of the same security classification level and status have to television.
5. Incarcerated individuals with a hearing disability will have equal access to common areas of the facility accessible to the general population.
6. DOC will not use another incarcerated person to interpret for an individual who has a hearing disability unless
   a. the individual with a disability specifically requests such assistance from another inmate, the inmate agrees, and reliance on that incarcerated person is appropriate under the circumstances; or
   b. in an emergency involving an imminent threat to the safety or welfare of the individual or the public where there is no interpreter available.
7. Except for DOC personnel hired specifically to serve as qualified sign language interpreters, DOC will not use its personnel to serve as sign language interpreters except in appropriate circumstances, such as:  informal communications, providing basic information to an inmate with a hearing disability while waiting for a qualified interpreter to arrive, or in an emergency involving an imminent threat to the safety or welfare of the individual or the public where there is no qualified interpreter available.
8. Staff will provide incarcerated individuals with a hearing disability the written materials it provides to all incarcerated individuals, and effectively communicate the contents of such written materials, including the Inmate Handbook.  This may require a Qualified Interpreter to ensure the individual understands the contents of the written materials.

**G. Intra-Facility Transfer and Community Supervision**

1. Every person who transfers between facilities will receive the same auxiliary aids and services at the receiving facility as were provided at the sending facility.
2. PPO/Field staff will update the Communication Plan to reflect the community supervision environment for any formerly incarcerated individual with a hearing disability.
3. After an initial request is made by either the formerly incarcerated person or by Parole and Probation staff, a Qualified Interpreter or auxiliary aids and services will be provided for all meetings involving significant or critical interactions.

4.  VDOC will give primary consideration to the request by the hearing-impaired person for the auxiliary aids and services they require.

# Exhibit 108

DocuSign Envelope ID: 99970EFF-5E53-499A-B3B8-23FA655C8232

State of California                                                                                          Department of Corrections and Rehabilitation

# Memorandum

Date:      December 21, 2023

To:        Associate Directors, Division of Adult Institutions
           Wardens
           Americans with Disabilities Act Coordinators

Subject:   **AMENDED ISSUANCE OF IPADS TO INCARCERATED PERSONS WITH A PERMANENT HEARING
           DISABILITY**

The purpose of this memorandum is to provide revised information to the November 22, 2023
memorandum, titled *Issuance of iPhones and iPads to Incarcerated Persons with a Hearing
Disability, Impacting Placement*.  The information being updated is specifically with regards to
who is eligible and clarification regarding purchasing. All previously issued iPhones/iPads shall
follow this revised direction.

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide
all incarcerated persons equal access to programs, services, and activities, as required by state
and federal law.  Reasonable accommodations shall be afforded incarcerated persons with
disabilities to ensure equally effective communication necessary to allow them to participate in
programs, services, and activities.

Beginning the week of December 18, 2023, the CDCR will begin the deployment of the iPad
(encased with an orange cover) devices to the institutions housing incarcerated persons with a
hearing impairment, impacting placement (DPH) and whose primary or alternative method of
communication is written notes, to include those who use Sign Language. The ADA Coordinator
shall interview each identified DPH incarcerated person regarding their decision to accept the
captioning technology and document this interaction on the attached CDC Form 128-B (see
attached).

The incarcerated person shall sign the iPad User Agreement CDCR Form 128-B. A copy of the
CDCR Form 128-B shall be forwarded to Case Records for scanning into the Electronic Records
Management System. Prior to the issuance of the iPad, the ADA Coordinator, or designee, will
enter the iPad data, including the serial number, on the Registerable Property screen via the
Strategic Offender Management System (SOMS) Module (identified as *ADA iPad*). The
requirements listed in the California Code of Regulations (CCR), Title 15, and Authorized Personal
Property Schedule, wherein the incarcerated persons receive equipment in clear color, shall not
be applied to the iPad. The iPad is not considered the property of the incarcerated person.

Incarcerated persons, who have received an iPad, are approved to have the device within their
possession during program, services, activities, and housing unit settings, including Restrictive
Housing and any off-site appointments (e.g., medical, same day court appearance, etc.).

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 2

For institutional transfers, the iPad shall be inventoried and packed with the incarcerated person's property for transfer. Upon parole, the iPad shall be collected by Receiving and Release (R&R) staff and sent to the ADA Coordinator for appropriate tracking.

The DPH incarcerated person may request a replacement of the iPad if reasonable wear and tear occurs. The DPH incarcerated person will receive a new iPad as a one-for-one exchange via submission of a Form GA 22 to the ADA office. In addition, the iPad shall be replaced if it has been determined the iPad was lost/destroyed due to staff neglect or due to no fault of the incarcerated person. The ADA Coordinator shall replace the iPad within five business days of notification.

In the event the iPad is reported lost or stolen, the ADA Coordinator or designee must contact their local Enterprise Information Services (EIS) team in order to complete an EIS Security Incident Report. The local EIS team will then attempt to locate the iPad.

If staff are notified that an iPad is not working properly, staff shall contact the ADA Coordinator and return the iPad, case, and charger to the ADA Coordinator. The ADA Coordinator will subsequently issue a replacement iPad. Staff shall not dispose of any inoperable/damaged iPads. The ADA office shall turn in any inoperable/damaged iPads to their local EIS team for proper disposal.

The issued orange case shall remain intact with the iPad at all times. If the orange case is intentionally removed, the iPad shall be collected and returned to the ADA Coordinator.

The ADA Field Training Sergeants shall inspect the iPads weekly to ensure there is no damage or alteration to the iPad. If the institution does not have a dedicated ADA Field Training Sergeant, the Warden or designee shall designate a supervisor to conduct the weekly inspection. If the iPad or any of the components (e.g., chargers, etc.) are altered or destroyed, the supervisor shall determine if it was intentional or unintentional based on the circumstances and provide all available information to the ADA Coordinator. The ADA Coordinator will determine the best course of action (i.e., replacement of iPad or provide an alternate reasonable accommodation). If the ADA Coordinator determines the best course of action is to remove the iPad, the ADA Coordinator shall also ensure it is removed from the incarcerated person's Registerable Property screen via the SOMS Module.

If an incarcerated person who is not designated DPH submits a request for an iPad, the incarcerated person shall submit a CDCR Form 1824, Request for Reasonable Accommodation. All requests will be considered on a case-by-case basis by the Reasonable Accommodation Panel.

All CDCR institutions shall update their Disability Placement Program (DPP) Local Operating Procedures (LOP) to reflect the direction included in this memorandum and provide a copy of the DPP LOP to their respective Mission Associate Director and the CAMU Mailbox

Associate Directors, Division of Adult Institutions
Wardens
Americans with Disabilities Act Coordinators
Page 3


(CDCR.CAMU@cdcr.ca.gov) within 60 days of the release date of this memorandum. The revision may be incorporated as an addendum to be included in the next scheduled revision of the LOP.

All custody supervisors and managers (i.e., Sergeants, Lieutenants, Captains, Associate Wardens, Chief Deputy Wardens, and Wardens) shall be trained via the Learning Management System course code 11063881 within 90 days of this memorandum.

If you have any local institution questions, please contact your local ADA Office.

If you have any headquarters level questions, please contact Darnell Mebane, Captain, CAMU, at (916) 202-5130 or Darnell.Mebane@cdcr.ca.gov.

DocuSigned by:

*Ronald Broomfield*

499F547FE65C411...

RON BROOMFIELD
Director
Division of Adult Institutions


Attachments


cc:    Joseph (Jason) Williams
       Jared D. Lozano
       Jennifer Benavidez
       Sadie Richmond
       Raquel Buckel
       Dawn Lorey
       Lourdes White
       W. Anthony Dobie, III
       Darnell Mebane
       Megan Roberts
       In-Service Training Managers

DocuSign Envelope ID: 99970FFF-5E53-499A-B3B8-22FA655C8232

Attachment A
Page 4

**Registerable Property Screen via the SOMS Module**

1. SOMS>Enter CDCR number
2. Under Prison tab>click personal property>click registerable property items
3. Click prepare to ADD>under category tab> enter appliances
4. Under Item Type>click ADA iPad>under serial number>type Property of California. Next,add the Property tag number which is located on the back of the device. (HC-XXXX)
5. Under Item tested> check Yes
6. Under Unit of Measure> enter 1

DocuSign Envelope ID: 99970EFF-5E53-499A-B3B8-23FA655C8232

Attachment B
Page 5

**Instructions for Turning on Captions on the iPad**

1.      Open *Settings*.
2.      Click *Accessibility*.
3.      Under the *Hearing* section, click *Live Captions*.
4.      Click *Live Captions (Beta)*.
5.      Using the *Appearance* function, you are able to bold and/or enlarge text.
6.      Click the dark gray caption. The caption can be enlarged to full screen by pressing the double ended arrow button.
7.      The user can click on *Play*, *Pause* or the *microphone* to begin the captioning.

**STATE OF CALIFORNIA**

**DEPARTMENT OF CORRECTIONS & REHABILITATION**
**CDCR 128 B**

**NAME and NUMBER:**

The California Department of Corrections and Rehabilitation (CDCR) has an obligation to provide all incarcerated persons equal access to programs, services, and activities, as required by state and federal law, including the Americans with Disabilities Act (ADA).

Regarding the recent deployment of Communication Access Real-Time (CART) Translation service, please answer the following questions:

| QUESTIONS | YES | NO |
|---|---|---|
| 1) Are you aware of the availability of CART service being provided during due process events?  If no, the ADA Coordinator will explain the service. | ○ | ○ |
| 2) Would you like to see a demonstration of CART? (*ADA Coordinators, the video is available on the CAMU SharePoint).* | ○ | ○ |
| 3) Would you like to use CART service? | ○ | ○ |
| 4) If you are requesting to use CART, which events and program(s) would you like to utilize CART services (i.e., due process events such as RVR hearings or committees, religious services, education, etc.)? | ○ | ○ |
| 5) If you do not want to use CART during due process events or an alternate captioning service during programming, what method of effective communication would you prefer staff use? | | |

_____    _____    _____
INCARCERATED PERSON NAME    CDCR NUMBER       INCARCERATED PERSON
                                               SIGNATURE


_____    _____    _____
STAFF NAME (PRINTED)        DATE              STAFF SIGNATURE

**DATE:**                   **GENERAL CHRONO**          **INSTITUTION:**

**STATE OF CALIFORNIA**                                    **DEPARTMENT OF CORRECTIONS & REHABILITATION**
                                                                                        **CDCR 128 B**

Although CART service is not currently available in all programming areas, CDCR has determined an interim solution has been identified via iPad functionality. Each spoken word is streamed in real-time onto the screen for the incarcerated person to view and read. The accommodation is designed to assist you while you are attending any program, service, or activity and does not replace your primary or alternative method of effective communication.

On (date), You, (incarcerated person name & CDCR #) have been granted approval for use of an iPad which contains instantaneous translation of spoken words into visual display as an interim accommodation. You will be able to maintain the possession of the iPad in all programs, services, or activities throughout the institution or any off-site appointments (e.g., same day court appearance, medical, etc.). This accommodation will begin immediately and remain in effect until further notice.

Please sign and date below indicating you understand why the device is being offered to you, when it may be used, and that you have been trained and understand how to operate the iPad. Furthermore, you also acknowledge that you are not allowed to have anyone else utilize this device or the iPad charger.

If the iPad or any of the components (e.g., chargers, etc.) are altered or destroyed, the supervisor shall determine if it was intentional or unintentional based on the circumstances and provide all available information to the ADA Coordinator. The ADA Coordinator will determine the best course of action (i.e., replacement of iPad or provide an alternate reasonable accommodation). If the ADA Coordinator determines the best course of action is to remove the iPad, the ADA Coordinator shall also ensure it is removed from your Registerable Property.

Furthermore, by signing you acknowledge your responsibility for maintaining possession of the iPad device. Lastly, you understand that staff will conduct a weekly security inspection of the device, case, and charger.

Do you wish to accept this iPad as a reasonable accommodation?  **YES**  ◯    **NO**  ◯


_____        _____        _____
INCARCERATED PERSON NAME                CDCR NUMBER                     INCARCERATED PERSON
                                                                         SIGNATURE


_____        _____        _____
STAFF NAME (PRINTED)                    DATE                            STAFF SIGNATURE

Orig:     ERMS
cc:       Facility Captain, Writer, Incarcerated Person


**DATE:**                              **IPAD USER AGREEMENT CHRONO**            **INSTITUTION:**

**Gunawan, Yenny@CDCR**

| | |
|---|---|
| **From:** | Sklyaruk, Karina@CDCR |
| **Sent:** | Thursday, December 21, 2023 1:28 PM |
| **To:** | CDCR Institutions DAI Associate Directors; CDCR Institutions Wardens; CDCR INST ADA COORDINATORS |
| **Cc:** | Broomfield, Ronald@CDCR; Williams, Joseph@CDCR; Lozano, Jared@CDCR; Benavidez, Jennifer@CDCR; Richmond, Sadie@CDCR; Buckel, Raquel@CDCR; Lorey, Dawn@CDCR; White, Lourdes@CDCR; Dobie, Willie@CDCR; Mebane, Darnell@CDCR; Roberts, Megan@CDCR (DAI); CDCR POSED IST Managers - ADULT |
| **Subject:** | Amended Issuance of iPads to Incarcerated Persons with a Permanent Hearing Disability |
| **Attachments:** | Amended Issuance of Ipads to Incarcerated Persons with a Permanent Hearing Disability.pdf; iPad CDCR 128-B.docx.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

*On behalf of*

**RON BROOMFIELD**
**Director**
**Division of Adult Institutions**

If you have any questions regarding the attached memorandum, please refer to contact information listed therein.

*thank you*

Karina Sklyaruk

Staff Services Analyst to

Jared D. Lozano

Deputy Director

Facility Support

916-445-7688

Exhibit 109

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
JACOB J. HUTT – 804428 (MJP)
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
CAROLINE JACKSON – 329980
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF JEN MCDONALD-PELTIER** |
| v. | |
| GAVIN NEWSOM, et al., | Judge:   Hon. Claudia Wilken |
| Defendants. | |

[4356643.1]

I, Jen McDonald-Peltier:

1. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2. I am an Assistive Technology (AT) and Augmentative and Alternative Communication (AAC) Specialist with over two decades of experience in access technologies and over three decades of experience working with people with disabilities. A copy of my resume is attached as Exhibit A.

3. I earned my Bachelor's Degree from the University of California, Berkeley, in 1992, a single subject English teaching credential in 1995, and my Master's Degree in Special Education from Southern Connecticut State University (SCSU) in 2005. I was a lab assistant in SCSU's Adaptive Technology Lab, where I wrote training modules for adaptive software tools and assessed students with disabilities to determine the appropriate assistive technologies to meet their individual needs.

4. I obtained a certification as an Assistive Technology Professional (ATP) from the Rehabilitation Engineering and Assistive Technology Society of North America (RESNA) in 2008. That certification has been renewed every two years since. In 2023, I earned a graduate certification in Augmentative and Alternative Communication from San Francisco State University.

5. Since 2000, I have worked at the Center for Accessible Technology in Berkeley, California, a nonprofit organization that works to provide technology-based solutions to increase access for people with disabilities. The Center for Accessible Technology provides training on digital access tools and access technologies. We provide training services directly to people with disabilities who need access to digital tools so that they can succeed in school, hold jobs, and use telephones, personal computers, email, and other digital advancements designed to help them participate equally in society. We also engage in capacity-building work by training stakeholders on access technologies. Stakeholders in this work can include school administrators, teachers, supervisors, employers, caretakers, and any other person who might be expected to facilitate disabled

1   persons' use of accessible technology.

2       6.    As part of my work, I routinely conduct AT and AAC assessments for

3   individuals across the need spectrum to determine the most suitable access tools based on

4   their individual needs and disabilities, and to provide training on identified technologies.

5   Over the course of my career, I have trained both individuals with disabilities and

6   stakeholders on both built-in and third-party access tools and their use. I have worked with

7   individuals with a variety of disabling conditions, including hearing loss and deafness

8   (both from birth and late-onset). I have also designed and provided training on technology

9   and digital literacy to older adults.

10       7.    I was retained as an expert by the Prison Law Office to work with Plaintiffs'

11   counsel in *Armstrong v. Newsom*. I was asked by Plaintiffs' counsel to advise them on

12   developing materials to train incarcerated people and correctional staff at one California

13   prison, the California Substance Abuse Treatment Facility and State Prison, Corcoran

14   (SATF), on use of the teletypewriter (TTY), also called the telecommunications device for

15   the deaf (TDD), and on captioned telephones. The TTY and captioned phone are assistive

16   technologies that can allow people with hearing and, in the case of the TTY, speech

17   disabilities to make phone calls.

18   I.    <u>Training Competence on Assistive Technology</u>

19       8.    When I train a client on assistive technology, I aim to support them in

20   developing two areas of competency. The first is operational competence. Operational

21   competence, or operational skills, are those skills needed to perform the actions required to

22   use the tool. To analogize to learning how to drive a car, achieving operational competence

23   would require knowing how to turn on the lights and turn signals, which pedal is which,

24   where the clutch is, and how to put the car in reverse.

25       9.    Building operational competence can be fast or slow depending on the

26   person. For example, a student driver might know that there is a knob to turn on the lights

27   and a knob to turn on the windshield wipers, but if they have trouble telling their left from

28   their right, like some people with dyslexia, it may take more time for them to learn which

knob does which. Building operational competence often involves exploration and troubleshooting. One of my roles when training on assistive technology is to be observant of problems that a client has with learning operational skills and to offer suggestions and strategies to accommodate them where necessary. In the analogy to lights and windshield wipers, this might mean offering the student driver a memory aid like a mnemonic to remember that the knob for the windshield wipers is on the passenger-side, while the knob to turn on the lights is on the driver-side, or putting a recognition aid like a tactile marker on one of the knobs, so that the student driver can tactilely discern one from the other.

10.     The second area of competency is strategic competence. Strategic competence requires knowing when, how, why, and where it is appropriate to employ operational skills to use different tool features. A student driver has achieved strategic competence when they know when and for what purpose they should use the turn signal, when to turn on their low beams versus their high beams, and how hard they should press the brake or accelerator pedals in different situations.

11.     Critically, mastery of operational skills alone does not automatically create strategic competence. As with operational competence, building strategic competence can be fast or slow depending on the person. A person who struggles to learn and remember *if-then* statements or rules, like some people with intellectual and cognitive disabilities, may need additional support to effectively employ situation-dependent operational skills (i.e., if it is dark and if there is no oncoming traffic, turn the knob to turn on your high beams). In an assistive technology training context, factors like low digital literacy and resulting technology anxiety can also be challenges to building strategic competence.

12.     Older adults may face particular barriers during assistive technology training. Although increasing numbers of older adults are using digital technology, they still have less access to digital technology. They often also present with physical, cognitive, perceptual, and psychological issues, as well as low self-efficacy (typically defined as belief in one's ability to complete a specific task or achieve a specific goal), that require additional training to overcome. Older learners of technology can also be more negatively

affected by errors than their younger, more technologically-experienced counterparts. I find, for example, that when a given technology inevitably behaves in an unexpected way, older users are more likely to attribute the errors to themselves, while younger users assume the error lies in the technology. Reliable attribution is an important strategic skill – whether the cause of an error is with the user or the technology determines what next steps are appropriate to try to correct the error.

13.    Although everyone learns differently, training an older adult who has had less technology exposure on a new piece of technology may well require more time and different strategies than training someone younger with more technology experience. When I am training older adults, I aim to spend more time teaching "reset" strategies (like refreshing a webpage, quitting an application, or turning a device off and on) or return to a "starting place" (like a home screen). Repeated presentation of new information and supported practice also are important for older learners, who typically do not learn as easily or quickly as their younger counterparts. Other strategies I have found helpful for older learners include limiting environmental distractions, using plain language and active voice, being as clear and specific as possible when providing instructions, presenting information in small chunks, and allowing time after each topic to demonstrate or review the information. Older learners also may have trouble applying lessons learned in training during *in situ* use of the device, and may therefore require support at the time of use to use the device successfully.

14.    Training strategies that are mindful of learners' individual needs are important for self-efficacy, the role of which in successfully building operational and strategic competence cannot be overstated. When I train on assistive technology, I always want my trainee to know that I am on their side and that I want them to succeed, without creating an expectation that they must do so on the first try. Ideally, I have the time and flexibility to provide training on an ongoing basis, so that the trainee has support when they identify new areas of frustration using the technology. If I am not able to answer a trainee's question or solve a problem during an initial training, it is my responsibility to

1    find a solution and communicate it to them so that they can carry out the desired functions.

2         15.    I also try to be a trainer of the troubleshooting process. I have trained social

3    workers in county government on using certain access applications, including

4    magnification, text-to-speech readback, and speech recognition for hands-free control.

5    After I initially provided training, trainees often came to me to ask for support on

6    performing specific tasks. I treated those questions as an opportunity to show trainees how

7    I would break down a task and try different ways to use various access tools. Doing so did

8    not require that I was an expert on all features of the technology, but it was necessary that I

9    had experience using the tools in addition to having other resources, like the user guide and

10    instructional materials, available for reference. Equally important in those situations is

11    modeling patience, calm, and curiosity, so that trainees do not associate technology

12    troubleshooting with unnecessary feelings of stress or anxiety. In my experience, trainees

13    who believe they can learn to be successful with a technology, even when faced with

14    challenges, are generally more likely to experience success.

15    II.    <u>TTY and Captioned Phone Trainees at SATF</u>

16         16.    To understand the characteristics of the people being trained on TTY and

17    captioned phones at SATF, I reviewed the *Armstrong* Remedial Plan and demographic

18    information about people at SATF who are assigned a DNH, DPH, and/or DPS code. I

19    understand that the DNH and DPH codes signify a hearing disability, while the DPS code

20    signifies a speech disability. Plaintiffs' counsel informed me that under the policy they

21    have developed with CDCR, people assigned these disability codes will receive training on

22    the TTY and captioned phone.

23         17.    Plaintiffs' counsel provided me with a report of people assigned DNH, DPH,

24    and DPS codes at SATF, which included age, reading score, time served in years, DDP

25    status, physical disability code(s), learning disability status, primary language, and limited

26    English proficiency status. A true and correct copy of the report I received from Plaintiffs'

27    counsel is attached as Exhibit B. I also reviewed the Declaration of Ilian Meza Peña,

28    attached as Exhibit C, which describes how Ms. Meza Peña generated the report. From

1  reviewing Ms. Meza Peña's declaration, I understand that the report includes 379

2  individuals identified from the Disability Placement Program (DPP) Roster Report dated

3  August 1, 2024, who are assigned a DNH, DPH, and/or DPS code and who still were in

4  custody as of August 15, 2024.

5      18.    Based on that information, I determined the following demographic and

6  disability-related information for these 379 potential trainees:

| | |
|---|---|
| **Age** | 177 trainees (46%) are aged 60 or older, 53 are aged 70 or older, and eight are aged 80 or older. |
| **Time Served** | 233 trainees have been incarcerated on their current term for ten or more years. Of those, 134 trainees have been incarcerated for 20 years or more, and 40 trainees have been incarcerated for 30 years or more. |
| **Literacy** | 108 trainees have no English-language reading score or an English-language reading score of 4.4 or below. I understand that reading scores traditionally correspond to grade level year (left of the decimal) and month (right of the decimal): for example, a 5.2 score usually means 5th grade, 2nd month of the school year (school years are typically 9 months long). Using this understanding, Exhibit B shows that as many as 28% of people with a documented hearing and/or speech disability at SATF read at a fourth-grade level or below. Similarly, as many as 47% (179) of people at SATF with these codes read at a seventh-grade level or below, as many as 53% (203) read at an eighth-grade level or below, and as many as 63% (240) read at or below a ninth-grade level. |
| **Language** | As many as 25 trainees have limited English proficiency, based on an answer other than "No" to "LEP." 40 trainees have a documented primary language other than English (Arabic, Romanian, Sign Language, Spanish, Tagalog, Vietnamese, or Unknown). |
| **Intellectual Disabilities** | 22 trainees have a documented intellectual, developmental, or cognitive disability signified by a "DDP Status" of DD1, DD2, or DD3. |
| **Vision Disabilities** | 15 trainees have a documented vision disability, signified by a DNV or DPV code. |

19.     Trainees may also experience additional disabilities that impact access in a variety of ways, such as neuropathy, arthritis, and missing digits. Plaintiffs' counsel informed me that some of these disabilities are not tracked by CDCR with a disability code.

20.     The demographic and disability-related information I reviewed leads me to believe that the learning needs of TTY and captioned phone trainees at SATF are diverse. Trainees include older adults whose specific learning needs I discussed above, and people who have been incarcerated for long periods of time who may be more unfamiliar with technology (and so more instinctually anxious, wary, or uncomfortable when faced with a new technology). The 35% of trainees who have been incarcerated for 20 years or more, for example, have been in prison since before mobile touchscreen devices were available on the market. As discussed above, self-efficacy is critical for successful training but can be negatively impacted by lack of experience, low levels of technological literacy, and resulting technology anxiety.

21.     Many trainees also have low literacy. Low literacy itself is an access disability in our text-based world, and in-person follow-up support and auditory access to text-based support materials at the time of use will be particularly important for people who cannot benefit from text-based support materials. Low literacy also can be an indicator of a learning disability – students with unaccommodated learning challenges may experience poor school performance and low literacy. I would expect approximately one in five people at SATF to have a learning disability, which is the average in the community. That only 20 potential trainees have been identified by CDCR as having verified or unverified learning disabilities suggests that CDCR may not be accurately identifying everyone with a learning disability.

22.     I would expect that some of these trainees will require additional time, support, and varied training strategies to learn operational and/or strategic skills with most assistive technologies, including TTY and captioned phones. I also would expect that some trainees will benefit from follow-up training and repeated practice, as well as support with

1  troubleshooting the devices at the time of use.

2

3  III.    <u>Review of Training Materials</u>

4      23.    To provide an opinion on what training resources will be necessary to

5  support these potential technology users, I reviewed two posters (one about TTY and one

6  about captioned phones) ("TTY-Captioned Phone Posters"), a set of instructions on

7  operating the TTY ("TTY Booklet"), an English-language user manual for the captioned

8  phone ("CapTel 840i How to Guide"), and a guidance document for training ("Training

9  Guidance"). Plaintiffs' counsel explained that these materials will be used to train

10  incarcerated people with disabilities under the policy they have developed with CDCR.

11  True and correct copies of the materials I reviewed are attached as Exhibit D. I also

12  reviewed two overview videos (one about TTY and one about captioned phones), which

13  Plaintiffs' counsel explained will be available on trainees' tablets and played on televisions

14  in housing unit dayrooms of housing units, and two text-based "disclaimers" (one about

15  TTY and one about captioned phones), which Plaintiffs' counsel said would be added to

16  each video. The <u>TTY video</u> and <u>captioned phone video</u> that I reviewed are available in the

17  embedded hyperlinks, and the "disclaimers" I reviewed are attached as Exhibit E.

18      24.    Text-based materials can be useful if they are written in plain language, as

19  the TTY Booklet is. Plain language is a critical access support: if users cannot understand

20  support materials because of the way those materials are written, they cannot effectively

21  use those materials. Plain language also is a resource to those supporting users of a

22  technology, who also must decipher the instructions to understand and follow them.

23  Although various tests of readability have been developed, it can generally be described as

24  a function of word complexity and sentence structure. Evidence-based strategies for

25  readability generally include the following:

26      • Use short, simple, and familiar words, avoiding jargon where possible.

27      • Use simple sentences, active voice, and present tense.

28      • Use culture- and gender-neutral language.

- Use correct grammar, punctuation, and spelling.
- When giving instructions, begin in the imperative by starting sentences with an action verb.
- Use graphic elements such as bulleted and numbered lists to make information visually accessible.

25.    Even if all written support materials were written in plain language, however, I do not believe that a user necessarily could learn to set up, use, and troubleshoot either device from these written materials alone. To illustrate my concerns, I provide comments on each of the documents below.

<u>TTY-Captioned Phone Posters</u>

26.    These posters include introductory language describing each technology and a brief set of operating instructions. Documents like this can be useful as "quick start" reference material for people who already have been trained. However, I would not suggest that they be used as standalone training materials or that they be the sole support materials made available following training because they are text-based and they do not contain some basic operational information (e.g., how to turn captions on and off during a call), device usage protocols (e.g., typing "GA" when a user finishes their message on TTY), or any troubleshooting guidance beyond one strategy to clear garbling on a TTY call.

27.    I also am concerned that these posters, because of the way they are written, will not be readable for the majority of trainees and potential users, and so will not serve their intended purpose as reference guides. Both posters have a Flesch Kincaid Grade Level score of roughly 8.0, which corresponds to roughly an eighth-grade level. As I noted above, nearly half of potential trainees at SATF are documented by CDCR as reading at below an eighth-grade level.

<u>TTY Booklet</u>

28.    The TTY Booklet's instructions can be confusing. For example, this image appears in the TTY user manual. The dotted lines are a little confusing, and it uses terms

like "acoustic cups," "function key row," and "signal light" that are not familiar or intuitive and do not appear to be defined. People may not understand what these terms mean, particularly those who have not had experience with similar technology before.



29.    The booklet also says, "Press 5 if you do not need the TTY yourself but are using it to call someone who uses a TTY through the Relay Service." The booklet does not explain why that person would need TTY at all and why they could not simply use a regular phone. It's important to explain why that's the case, particularly for staff facilitating access so they can understand who may need to use the TTY (as I understand from Plaintiffs' counsel that the population of people who do not themselves need to use the TTY but are calling someone who uses a TTY through the relay service will not automatically receive training).

30.    The TTY Booklet primarily supports operational competence, not strategic competence. The written materials do not include much detail about what to do when things go wrong. It is critically important that users and stakeholders have experience successfully making calls with both devices, and then seeing what happens when there are

problems and how to work through them. If the captioning does not come on, what step do you go back to? Do you hang up and try again?

<u>CapTel 840i How to Guide</u>

31.    This document is the most traditional user guide of the materials I reviewed and appears comprehensive. As with many user guides, however, the comprehensiveness of the information is balanced against the length of the document (116 pages). Long documents like this can be overwhelming for users who do not know how to find the information they might need. For users who are already struggling with a device, have limited time, or lack troubleshooting support at the time of use, user guides like this can be confusing and discouraging. I often find that people who are unfamiliar with the organization and presentation of information in user guides derive limited use from them, even if they are able to read and comprehend them. Although this document may have limited value to some users, parts of it can be a useful reference for someone facilitating a user's access and helping to troubleshoot.

32.    Some information in this user guide also appears extraneous. For example, Plaintiffs' counsel explained to me that incarcerated users cannot receive calls to the captioned phone – they can only place calls. However, the guide includes sections on answering calls and using an answering machine. Similarly, the guide begins with information about setting up and registering the device, which Plaintiffs' counsel informed me also does not apply to incarcerated people. Without cues as to what is relevant to an incarcerated user, this type of information can confuse and prolong the troubleshooting process and for some can be a barrier to learning.

33.    This guide may also not be readable to many potential captioned phone users at SATF. Based on a spot-check of sections of the guide, it appears to be written between a ninth- and twelfth-grade level. As discussed above, this document therefore is not accessible to the 53% of trainees who read at below a ninth-grade level.

<u>Training Guidance</u>

34.    This document outlines what information should be discussed during training

of potential technology users. Critically, it includes an opportunity for supported practice. Guided, hands-on use of a device in a structured, educational setting is an essential part of how I train on assistive technology. Furthermore, since training apparently will take place in small groups, potential users will have the opportunity to receive repeated exposure to directions and examples (e.g., when another trainee uses the device), and to learn collaboratively by practicing using the devices together. These are effective strategies for educating seniors, and can also be helpful for learners with learning challenges.

35.     The guidance document does not discuss tone and attitude, but I believe these will be important elements of the training as well. As explained above, effective assistive technology training requires that the trainer support the self-efficacy of the trainee – trainees who believe that trainers are on their side and want them to succeed generally will have more success. Particularly for older adults, training also will be more effective if trainers are patient and curious and model calm when faced with setbacks. The disposition of the trainer alone can help (or hurt) the outcomes of training.

36.     Finally, the guidance document provides for follow-up instruction upon request from "housing staff, ADA Coordinator, Compliance Sergeants, supervisory staff, or CAMU CC II." The staff identified are considered stakeholders, and to perform their role appropriately they must be familiar with the technologies and how to facilitate access to those technologies for people with disabilities. Follow-up training, repetition, and support at the time of use are important resources to offer to many learners, including those with the range of learning and disability needs present in the trainees at SATF. Trainers should assume that many of these learners will need additional support.

Videos with "Disclaimers"

37.     The videos I reviewed appear to be outreach materials for TTY and captioned phone services. The videos provide some general information about what each device is, but they do not provide any useful training information for users. The videos neither give operating instructions nor provide information about troubleshooting. In fact, the audience for the TTY video does not even appear to be TTY users – this video appears

intended for people in contact with TTY users (e.g., the "relay users, businesses, friends and family of TTY users" mentioned in the video), and not TTY users themselves. Neither video provides any information that would support a person attempting to make a call via TTY or captioned phone in actually using the device.

38.     The videos also appear to include some misleading, incorrect, or inapplicable information that could be confusing or off-putting for an incarcerated person learning about the devices. For example, the captioned phone video includes information about taking messages. In addition, the TTY user shown in the video is using a dedicated TTY which is not connected to a standard phone, and the scenario shown (changing a plane reservation) is not applicable to incarcerated users. The lengthy text-based "disclaimers" that cover a number of topics attempt to correct some (though not all) of this information and may in and of themselves pose access challenges.

IV.    Tool Abandonment

39.     Fully-realized use of assistive technology and augmentative and alternative communication can be transformative for the independence, social connectedness, and quality of life of people with disabilities. Nonetheless, many potential users of assistive technologies will abandon those technologies. This is known as "technology abandonment" or "tool abandonment." A variety of factors increase the likelihood of tool abandonment – relevant to this context are stigma and lack of adequate training and support.

40.     First, psychosocial factors can contribute to tool abandonment. Stigma associated with using assistive devices can lead users to discontinue using their devices. This is particularly true when the devices are conspicuous or otherwise socially stigmatizing, making users feel embarrassed or singled out. Plaintiffs' counsel provided me with the photograph below, which they explained shows the location where the TTY and captioned phone are used by someone in this housing unit. According to Plaintiffs' counsel, the area to the left of the phone is the hallway leading outside to the yard, which anyone entering or exiting the unit will pass through.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



IMG_1902-Picture of A2 rotunda with TTY phone on desk

41.    Based on this photograph, I would be concerned that the location of the TTY and captioned phone is conspicuous enough that a user would feel singled out, increasing the stigma associated with using the technology. It appears that there are boxes for forms and equipment and an announcement board immediately next to the TTY, which suggest that this may be a particularly busy pedestrian traffic area. In addition to being conspicuous, this therefore is likely to be a difficult environment for a user to focus on operating a TTY or captioned phone, which may also impede use.

42.    The second risk factor for tool abandonment relevant here is a lack of sufficient training and support. Potential users who lack sufficient knowledge about tools

1  and how to access them may abandon efforts to use those technologies. Users whose

2  training is inadequate at the outset or who do not receive ongoing support may struggle to

3  use a technology effectively, configure settings, and troubleshoot the technology as their

4  needs evolve, which increases frustration and the probability of eventual disuse. I routinely

5  make myself available for follow-up questions, troubleshooting support, and additional

6  education to reduce my clients' frustration using new technologies. In my experience,

7  third-party support and a plan for ongoing follow-up is of paramount importance for older

8  adults who are learning to use assistive technology in particular, since repeated practice

9  and training often are required for them to cement their skills.

10      43.    To understand the experiences of incarcerated users of TTY and captioned

11  phones at SATF and to provide an opinion on how to reduce the risk of tool abandonment,

12  I reviewed the Declaration of ▮▮▮▮▮▮▮▮ attached as Exhibit F, the Declaration of

13  ▮▮▮▮▮▮▮▮ attached as Exhibit G, and the Court Expert's Report Regarding Treatment

14  of People with Disabilities at SATF (ECF 3446). ▮▮▮▮▮ and ▮▮▮▮▮▮ are both deaf

15  or hard-of-hearing and both abandoned use of accessible phones at SATF.

16      44.    ▮▮▮▮▮▮▮ reports that he has been a user of the TTY for years due to his

17  hearing disability and because his daughter has a speech challenge that requires her to use

18  the TTY. Although I would therefore describe him as an experienced user of the

19  technology, he reports that it was difficult for him to use the device, and that he ultimately

20  stopped using the device, because custody officers would not always allow him the

21  opportunity to use the device, which was not located in his housing unit, when he

22  requested it. He reports that frequent denials caused "frustration and stress of being denied

23  communication with my family," which became overwhelming to the point of abandoning

24  the technology in favor of something that is a poorer fit with his disability and

25  communication needs, but that he can access more freely.

26      45.    Conversely, ▮▮▮▮▮▮ reports being a totally inexperienced user of both the

27  TTY and the captioned phone. He reports that he did not use the TTY for some period of

28  time because he believed it was not available. When he subsequently asked to use the

1   device, it did not work and was embarrassing to him because of how many people became

2   involved. When he asked again later, he was not provided training, and instead was

3   directed to someone else who had been trained. Similarly, he reports that he did not know

4   how to access the captioned phone after that tool was introduced, the supports available to

5   him (including instructional materials and staff) did not allow him to operate the device,

6   and when he was able to operate the device, it did not function as intended. He writes that:

7   "I gave up. I got so frustrated with the phone. It seemed like every time I wanted the

8   phone, there was a problem, so I just let it go." ███████'s experience is a textbook

9   example of tool abandonment.

10          46.     The Court Expert, in his report, wrote that people with disabilities at SATF

11   "report that staff often act like addressing the needs of the disabled population is not part

12   of their job but an extra burden" (page 5) and wrote that "it appears that many custody

13   staff believe it is the responsibility of SATF's ADA Office, and not individual custody

14   staff members, to ensure compliance with the ADA" (page 51). That attitude is a serious

15   concern to me, as I understand that custody staff at SATF will be expected to facilitate

16   access to the accessible phones and help people with disabilities troubleshoot them. As a

17   trainer and facilitator of access to disability accommodations, it is important that my

18   clients know that I am on their side and want them to succeed and that I will take the time

19   necessary to help them.

20          47.     ███████'s and ███████'s experiences – frustration with barriers that

21   prevent effective use of a technology becoming so overwhelming that the user abandons it

22   – are not uncommon. In my experience, frustration is often the common denominator for

23   tool abandonment, whether the source of that frustration is stigma, lack of training, or

24   some other environmental, functional, or procedural factor like the ones ███████

25   ███████ and the Court Expert describe. We can call these "abandonment plus" factors,

26   or factors that increase frustration and make tool abandonment more likely.

27          48.     Certain abandonment plus factors are out of my control as a trainer.

28   ███████ is an experienced technology user, but nonetheless was deterred from using the

1  technology because of these types of abandonment plus factors. As described by █████

2  ████ and █████████, abandonment plus factors for incarcerated users that cannot be

3  mitigated directly by training include:

4  • Not being housed in the same location as the needed technology;

5  • Slow or no responses to requests to use the needed technology;

6  • Needing to ask multiple staff or the "right" staff to be granted access to the

7  technology;

8  • Staff refusing to "unlock" or "let out" the user to access the technology at

9  certain times (such as during modified programming or foggy conditions);

10  • Being turned away from using the technology;

11  • The technology malfunctioning or not functioning as intended; and

12  • The location of the technology being public, exposed, or uncomfortable

13  (such as in a high-traffic area or outside in the elements).

14  49.  Although training cannot fix these problems, there are strategies and

15  supports I can put in place as a trainer to try to prepare technology users to face them. We

16  can call these "abandonment minus" factors, or factors that *decrease* frustration and make

17  tool abandonment less likely. In my experience, the most important of those that is within

18  my control as a trainer is ongoing and individualized training and support. Even

19  individuals who have received a one-time training will likely encounter challenges as they

20  begin to use a device themselves in real-world conditions. Patient and knowledgeable

21  troubleshooting support in those circumstances can be a critical abandonment minus factor.

22  The consequences of uninformed or inexperienced troubleshooting support are shown

23  clearly by █████████'s statement – a supporter being unable to operate a device despite

24  access to instructional materials caused ██████████ to doubt the reliability of the device

25  and consequently abandon it:

26  I tried calling the Prison Law Office again one more time that day with the
   ADA sergeant to test the instructions. The ADA sergeant said I shouldn't
27  dial a "9," but I had tried that and it didn't work. After that, I still wasn't sure
   what I should do to use the phone. Because I still wasn't sure how to use the
28  phone and didn't know if the connection problems had been worked out, I

didn't want to use the captioned phone to call anyone but the Prison Law Office, including my family. I didn't want to be wondering if the reason I couldn't connect with someone was because of problems with the captioned phone.

50.    Although stakeholders, or people in a position to support users of an assistive technology, cannot "abandon" technology in the same way a user can, my experience training stakeholders follows the same principles. A stakeholder who forms a negative association with a device due to failure or stigma is more likely to develop resistance to the technology, which will prevent them from providing the kind of support that could be an essential abandonment minus factor for the user. People supporting a user must feel comfortable enough with a technology that they are not afraid of it, so they are not anxious or embarrassed when something unexpectedly goes wrong (because something will go wrong). Some stakeholders may naturally approach troubleshooting these tools with calm curiosity, but many will not. Even as a professional technology trainer, it took me years to learn to become comfortable supporting users with technologies unfamiliar to me. For CDCR staff who will support users with disabilities in using TTY and captioned phones, it is critical that their first experience using these tools is not "in the wild," under time pressure and with an audience, but rather in a structured environment where they can first be the learner and have an opportunity to study the technology, ask questions, work through problems, and gain some operational and strategic competence. Supporting the supporters in these ways is as important as supporting the users.

V.    Monitoring and Self-Improvement

51.    Accessible technology training is only successful if it is effective. I am always looking for ways to improve how I train. Feedback is important to any trainer and is a critical part of my practice so I can improve how I train and support my clients in resolving other barriers they face to access. Indeed, a sector of the AT and AAC field is focused on researching, developing, and standardizing outcome measure instruments, which often take the form of surveys completed either by providers or by users themselves to assess functional efficacy, satisfaction, psychosocial impact, quality of life

improvements, and other impacts.

52.     In a system like CDCR where there may be multiple trainers of many people with disabilities, staff could elicit feedback on the training immediately after the training. This could include asking trainees to rank measures such as "How knowledgeable was the trainer about the technology?", "How well did the trainer explain the technology?", and "What else would you have liked to learn?"

53.     Staff should also follow-up with users after they have tried to apply what they learned in the training to their daily lives. I would recommend asking users to rank measures and give narrative responses, as opposed to asking binary "yes/no" questions. "Yes/no" questions like "Was the training effective?", "Have you used it successfully?" or "Do you have any issues?" are not designed to elicit useful, actionable information. For example, if you ask "Have you used it successfully?", it's not clear how the person should answer. They might think, "Well, it was really hard to use but I was able to get it turned on and communicate with the person, so I guess it's a yes." If you just get the "yes," you'll miss the opportunity to identify and address what made it hard.

54.     With my clients, I develop rating scale visual aids to make responding more accessible. They can select which rating applies to their experience.





55.     The declarations of TTY and captioned phone users I reviewed lead me to

1  believe that the barriers to accessing these technologies, due to lack of training or other

2  factors, may be varied. Ideally, CDCR would develop outcome measures to capture both

3  where training could be improved and how other roadblocks to access could be resolved.

4      I declare under penalty of perjury under the laws of the United States of America

5  that the foregoing is true and correct. This declaration is executed at Berkeley, California,

6  this 26th day of August, 2024.

Jen McDonald-Peltier

# Exhibit A

# JENNIFER MCDONALD-PELTIER

## Skills

- Dynamic and effective communicator in individual to large group settings, with people of all ages and backgrounds
- Broad knowledge of access and communication resources
- Excellent writing and layout abilities
- Adept at creative problem solving and program development
- Exceptionally skilled trainer in adaptive technology and augmentative & alternative communication
- Able to thrive in both individual and group settings

## Professional Experience

2000-current    **Center for Accessible Technology**                    Berkeley, CA
Non-profit organization that bridges digital access divides for consumers, creators, and constituients

*Assistive Technology Specialist*
- Conduct AT assessments and trainings for clients across age and access need spectra
- Conduct trainings, workshops, and labs for adults and children, for groups small and large, on various AT and AAC tools and topics.
- Present at conferences on AT and AAC topics
- Beta test new techology.
- Consult with educators and parents on AT and AAC issues.
- Oversaw AT computer lab and AAC iPad loan program.
- Designed and implemented Senior Connects computer lab and digital technology workshops

1999-2000    **Adaptive Technology Lab, Southern Connecticut State University**    New Haven, CT
Computer Lab with adaptive hardware and software for special needs users.

*Lab Assistant*
- Effectively assessed and trained several students in the use of appropriate AT for their needs.
- Wrote training modules for a number of adaptive software programs.
- Created training materials for two teacher training courses.
- Developed outreach material.
- Creatively met the various needs of daily lab users.

1995-1997    **The Archimedes Group**                    New Haven, CT
Non-profit disability information dissemination organization.

*Program Developer*
- Raised over $60,000 in grants for Disability Information Services Demonstration Project.
- Designed resource and fundraising databases.
- Implemented and managed client research service.
- Designed client outreach and research reporting materials.

1989-1998    **Individuals with various physical and developmental disabilities**    Berkeley, CA
New Haven, CT
*Personal Care Attendant*
- Assisted in activities of daily living: toileting, showering, dressing, transferring to and from wheelchairs, physical therapy, cooking, cleaning, filing, shopping, and chauffeuring.
- Applied prior professional experiences and broad information base to creatively streamline and enhance clients' life routines.

**1116 Derby Street, Berkeley, CA 94702  Google Voice 510-288-8502  E-mail jen@c4at.org**

## Licensure

| 2008 | RESNA<br>*Assistive Technology Professional, renewed biannually* | |
| 2000 | Center for Accessible Technology<br>*Assistive Technology Certificate* | |

## Education

| 2005 | Southern Connecticut State University<br>*M.S. Special Education*<br>• Interdiciplinary emphasis. | gpa 4.0 |
| 1995 | San Francisco State University<br>*Single Subject Teaching Credential, English Language and Literature*<br>• Rated highly competent in three of four performance competency areas. | gpa 4.0 |
| 1993 | University of California, Berkeley Extension<br>*Supplementary Teaching Authorization, English as a Second Language*<br>• Select classes: Cross-cultural Communication, Mainstreaming Handicapped Students. | gpa 4.0 |
| 1992 | University of California, Berkeley<br>*B.A. East Asian Languages*<br>• Japanese emphasis; Minor in Slavic Languages, Russian emphasis.<br>• 4 years academic honors, Phi Beta Kappa candidate. | gpa 3.7 |
| 1988 | Hokuyoh High School, Kushiro, Hokkaido, Japan<br>*Exchange Student*<br>• Spoke and wrote on cultural differences as an educational service. | |

## Presentations

| 2022 | Various schools and districts<br>*Chrome, iOS Access Tools* | https://bit.ly/chrome-udl2022<br>https://bit.ly/ios-udl-2022 |
| 2022 | Soledad Unified School District<br>*Select adapted MASTER PAL AAC partner*<br>*trainings (link is one example)* | https://bit.ly/c4-masterpal4 |
| 2021 | Disability Rights California<br>*Working with Clients with Complex Communication*<br>*Needs* | https://bit.ly/ccn-clients |
| 2020 | Brentwood Union School District<br>*Descriptive Teaching Method* | https://bit.ly/describe-teach-method |
| 2019 | AHWGO<br>*Flexible Thinking in the Digital Age panel discussion* | https://athomewithgrowingold.com |
| 2019-22 | SFCD and various school districts<br>*Approaching AAC* | https://www.supportforfamilies.org/ |
| 2018 | SFCD<br>*CVI Basics* | https://www.supportforfamilies.org/ |
| 2015-22 | SFCD and various school districts<br>*Approaching AT* | https://www.supportforfamilies.org/ |
| 2014 | OnCUE Magazine (Vol 36 No 2 Summer 2014)<br>*Universal Technological Design: Expanding Possibilities*<br>*in Technology-Integrated Education* | www.cue.org |
| 2013 | CUE<br>*Universal Design for Learning Panel discussion* | www.cue.org |

# Exhibit B

| Age | Time Served in Years | DDP Status | Code(s) | LD | Reading Score | Primary Language | LEP Status |
|---|---|---|---|---|---|---|---|
| 25 | 3.1 | | DNH | | 12 | English | No |
| 26 | 6.3 | | DPM,DNH | | 12.9 | English | No |
| 26 | 2.4 | | DNH | | 4 | English | No |
| 26 | 0.6 | | DNH | | 11 | English | No |
| 28 | 8.4 | | DPS | Unverified | 5 | English | No |
| 28 | 3.8 | | DNH | | 9 | English | No |
| 28 | 3.3 | | DNH | | 5.2 | English | No |
| 29 | 5.3 | | DNH | | 4 | English | No |
| 30 | 11.8 | | DNH | | 3 | English | No |
| 30 | 4.9 | | DPM,DPH | | 4 | **Sign Language** | No |
| 31 | 6.5 | | DNM,DNH | | 12.9 | English | No |
| 32 | 10.8 | | DNH | | 12.9 | English | No |
| 33 | 5.3 | | DNH | | 7 | English | No |
| 33 | 3.5 | | DNM,DNH | | 8 | English | No |
| 34 | 9.7 | | DNH | | 12.9 | English | No |
| 35 | 14.7 | | DNH | | 12.9 | English | No |
| 35 | 5.5 | | DPM,DNH | | 4 | English | No |
| 36 | 8.9 | | DNH | | 12.9 | English | No |
| 36 | 5.9 | | DNH | | 6 | English | No |
| 36 | 2 | | DNH | | 5 | English | No |
| 36 | 1.7 | | DNH | | 0 | English | No |
| 36 | 1.1 | DD2 | DPO,DNH | | 12 | English | No |
| 36 | 0.7 | | DNH | | 12 | English | No |
| 36 | 0.7 | | DNH | | 4 | English | No |
| 37 | 6.9 | | DNH | | 12.9 | English | No |
| 37 | 3.4 | | DNH | | 5 | **Spanish** | **Limited** |
| 37 | 2.2 | | DNH | | 12 | English | No |
| 37 | 1.5 | | DNH | Unverified | 1 | English | No |
| 37 | 1.4 | | DPM,DNH | | | English | No |
| 38 | 18.3 | | DNH | | 0 | English | No |
| 38 | 17.6 | | DNM,DNH | | 12.9 | English | No |
| 38 | 15.5 | | DPW,DNH | | 11 | English | No |
| 38 | 8.9 | | DNH | | 12 | English | No |
| 38 | 8.6 | | DLT,DNH | | 12.9 | English | No |
| 38 | 7.6 | | DNH | | 6.2 | English | No |
| 39 | 15.8 | | DLT,DNH | | 11.3 | English | No |
| 39 | 12.9 | | DNH,DPV | | 11 | English | No |
| 39 | 8.3 | | DPM,DNH | | 1 | English | No |
| 39 | 2.4 | | DNH | | 12 | English | No |
| 40 | 11 | | DNH | Unverified | 9.6 | English | No |
| 40 | 10.5 | | DNH | | 7.9 | English | No |
| 40 | 8.5 | | DNH | | 3 | English | No |
| 40 | 8.2 | | DNH | | 7 | English | No |
| 40 | 1.1 | | DNH | | 12 | English | No |
| 40 | 0.2 | | DNH | | | English | No |
| 41 | 18.5 | | DPM,DNH | | 10 | English | No |
| 41 | 14.2 | | DNH | | 0 | English | No |
| 41 | 8.8 | | DNH | | 12.9 | English | No |
| 41 | 6.5 | | DNH | | 6 | English | No |
| 41 | 1.4 | | DPO,DNH | | 7 | English | No |
| 41 | 1.1 | | DNH | | 8 | English | No |
| 42 | 20.7 | | DLT,DNH,DPV | | 1 | English | No |
| 42 | 19.3 | | DNH | | 10.5 | English | No |
| 42 | 7 | | DNH | | 5 | English | No |

| 42 | 6.4 |  | DPM,DNH |  | 8.6 | English | No |
|----|-----|--|---------|--|-----|---------|-----|
| 42 | 6.3 |  | DPM,DNH,DPV |  | 12.9 | English | No |
| 42 | 6.2 |  | DNH |  | 4 | English | No |
| 42 | 4.4 |  | DNH |  | 1 | **Spanish** | **Limited** |
| 42 | 3.3 |  | DNH |  | 8 | English | No |
| 42 | 2.5 |  | DNH |  | 4 | English | No |
| 42 | 0.7 |  | DNH |  | 3 | English | No |
| 42 | 0.5 |  | DNH |  |  | English | No |
| 43 | 19.6 |  | DNH |  | 11.8 | English | No |
| 43 | 8.6 |  | DNH |  | 12.9 | English | No |
| 43 | 3 | DD2 | DNH |  | 4 | English | No |
| 43 | 1.9 |  | DPO,DNH |  | 5 | English | No |
| 44 | 10.3 |  | DNH |  | 7 | English | No |
| 44 | 5.4 |  | DNH |  | 9 | English | No |
| 45 | 25.9 |  | DPM,DNH |  | 6 | English | No |
| 45 | 11.1 |  | DNH |  | 11 | English | No |
| 45 | 7.4 |  | DPM,DNH |  | 4.4 | English | No |
| 45 | 7.2 |  | DNH |  | 12.9 | English | No |
| 45 | 6.6 |  | DLT,DNH,DPV |  | 4 | English | No |
| 45 | 2 |  | DNH |  | 7 | English | No |
| 45 | 1.5 |  | DNH |  |  | **Spanish** | **Yes** |
| 45 | 1.2 |  | DNH |  | 0 | English | No |
| 45 | 1.1 |  | DLT,DNH |  | 10 | English | No |
| 45 | 1 |  | DPW,DNH |  | 8 | English | No |
| 46 | 22.5 |  | DPH |  | 4 | **Sign Language** | **Sign Language** |
| 46 | 21.4 |  | DNH |  | 7 | English | No |
| 46 | 19.2 |  | DPM,DNH | Unverified | 5 | **Spanish** | No |
| 46 | 7.4 |  | DLT,DNH |  | 5 | English | No |
| 46 | 6.9 |  | DNM,DNH |  | 7.8 | English | No |
| 46 | 2.4 |  | DNH |  | 9 | English | No |
| 47 | 23.7 |  | DNH |  | 8 | English | No |
| 47 | 22.9 |  | DPS |  | 7.6 | English | No |
| 47 | 20.6 | DD2 | DPS |  | 4 | English | No |
| 47 | 20.2 |  | DNH |  | 12.9 | English | No |
| 47 | 17.4 |  | DLT,DNH |  | 7.8 | English | No |
| 47 | 15.4 |  | DNH |  | 8.4 | English | No |
| 47 | 11.5 |  | DLT,DNH |  | 10.3 | English | No |
| 48 | 24.2 |  | DNH |  | 4 | English | No |
| 48 | 14.3 |  | DNH | Unverified | 9 | English | No |
| 48 | 14.1 |  | DNM,DNH |  | 3 | **Spanish** | No |
| 48 | 8.5 | DD2 | DNH |  | 10 | English | No |
| 48 | 5.8 |  | DNH |  | 8 | English | No |
| 48 | 2.8 |  | DPM,DNH |  | 4 | **Spanish** | **Yes** |
| 48 | 1.4 |  | DNH |  | 1 | English | No |
| 48 | 0.6 |  | DNH |  | 11 | English | No |
| 48 | 0.4 |  | DNH |  | 10 | English | No |
| 49 | 32.9 |  | DPW,DNH |  | 12.9 | English | No |
| 49 | 27.4 |  | DNH |  | 12.9 | English | No |
| 49 | 19.4 |  | DNH |  | 12.9 | English | No |
| 49 | 17.7 |  | DLT,DNH |  | 6 | English | No |
| 49 | 13.8 |  | DNH |  | 12 | English | No |
| 49 | 10.3 |  | DLT,DNH |  | 5.9 | English | No |
| 49 | 1.6 |  | DNM,DNH |  | 4 | English | No |
| 50 | 28.9 |  | DNM,DNH |  | 12 | English | No |
| 50 | 25 |  | DNH |  | 12.9 | English | No |
| 50 | 24.2 |  | DNH |  | 7 | English | No |

| 50 | 22.8 |     | DNH         |            | 7    | English | No      |
|----|------|-----|-------------|------------|------|---------|---------|
| 50 | 22.3 |     | DLT,DNH     |            | 9.9  | English | No      |
| 50 | 18.8 |     | DNH         |            | 11   | English | **Unknown** |
| 50 | 17.1 |     | DLT,DNH     |            | 9.6  | English | No      |
| 50 | 15.6 |     | DPM,DNH     |            | 10   | English | No      |
| 50 | 14.9 |     | DNH         |            | 10.3 | English | No      |
| 51 | 31   |     | DLT,DNH     |            | 12.9 | English | No      |
| 51 | 24.6 |     | DNH         |            | 4.4  | English | No      |
| 51 | 19.1 |     | DNH,DPV     | Unverified | 3    | English | No      |
| 51 | 18.6 |     | DNH         |            | 2.2  | **Spanish** | **Limited** |
| 51 | 14.5 |     | DNH         |            | 12.9 | English | No      |
| 51 | 14.1 | DD2 | DNH         |            | 3    | English | No      |
| 51 | 13.3 |     | DNH         |            | 9.9  | English | No      |
| 51 | 7.5  |     | DNM,DNH     |            | 10   | English | No      |
| 51 | 6.8  | DD1 | DNH         |            | 4    | English | No      |
| 51 | 2.3  |     | DNH         |            | 12   | English | No      |
| 51 | 1.3  |     | DNH         |            | 4    | English | No      |
| 52 | 28.2 |     | DPW,DNH     | Unverified | 12.9 | **Spanish** | No      |
| 52 | 19.7 |     | DNM,DNH     |            | 12.9 | English | No      |
| 52 | 17.3 |     | DPM,DNH     |            | 0    | **Spanish** | **Limited** |
| 52 | 12.8 |     | DNH         |            | 12.9 | English | No      |
| 52 | 11.8 |     | DNM,DNH     |            | 8    | English | No      |
| 52 | 9.6  |     | DNH         |            | 11.2 | English | No      |
| 52 | 6.4  |     | DNH         |            | 12.9 | English | No      |
| 52 | 3.8  |     | DNH         |            | 2    | English | No      |
| 53 | 21   |     | DNM,DNH     |            | 12.9 | English | No      |
| 53 | 20.7 |     | DPM,DNH     |            | 10.6 | English | No      |
| 53 | 20.3 |     | DLT,DNH     |            | 8    | English | No      |
| 53 | 19.7 | DD3 | DNM,DNH     |            | 9    | English | No      |
| 53 | 6.7  |     | DNH         |            | 7.6  | **Spanish** | No      |
| 53 | 4.7  |     | DNH         |            | 5    | English | No      |
| 54 | 29.5 |     | DLT,DNH     |            | 12.9 | English | No      |
| 54 | 17.2 |     | DNH         |            | 9.4  | English | No      |
| 54 | 14.2 |     | DNH         |            | 10.7 | English | No      |
| 54 | 12.7 | DD1 | DNH         | Unverified | 1.5  | English | No      |
| 54 | 9    |     | DNH         |            | 12.9 | English | No      |
| 54 | 1.7  |     | DPW,DNH     |            | 12.9 | English | No      |
| 55 | 33.4 |     | DNH         |            | 12.9 | English | **Unknown** |
| 55 | 28.1 |     | DNH         |            | 11.2 | English | No      |
| 55 | 24.6 |     | DNH         |            | 7    | English | No      |
| 55 | 23.9 |     | DNH         |            | 12.9 | English | No      |
| 55 | 23.8 |     | DPM,DNH     |            | 6.4  | English | No      |
| 55 | 23.5 |     | DNH         |            | 8    | English | No      |
| 55 | 17.1 |     | DLT,DNH     |            | 11.3 | English | No      |
| 55 | 14.9 |     | DNH         |            | 8    | English | No      |
| 55 | 12.8 |     | DNH         |            | 11   | English | No      |
| 55 | 10   |     | DPO,DNH     |            | 8    | English | No      |
| 55 | 9.9  |     | DNM,DNH     |            | 3.6  | English | No      |
| 55 | 9.7  | DD1 | DNM,DNH     |            | 1    | **Spanish** | **Yes**     |
| 55 | 6.8  |     | DNH         |            | 12.9 | English | No      |
| 55 | 5.9  |     | DPO,DNH     |            | 8    | English | No      |
| 55 | 2.4  | DD2 | DNH         |            | 8    | English | No      |
| 56 | 23.8 |     | DNM,DNH     |            | 4    | English | No      |
| 56 | 19.2 |     | DPM,DNH     |            | 4    | English | No      |
| 56 | 17.3 |     | DNH         |            | 10.3 | English | No      |
| 56 | 14.4 |     | DPM,DNH     |            | 7    | English | No      |
| 56 | 14   |     | DPM,DNH,DNV |            | 12.9 | English | No      |

| 56 | 11 | | DNH | | 11.3 | English | No |
|----|------|-----|--------------|------------|------|----------------|---------|
| 56 | 9.9 | DD1 | DNH | | 1 | English | No |
| 56 | 8.8 | | DPM,DNH | Unverified | 4 | English | No |
| 56 | 7.3 | | DNM,DNH | Yes | 4 | English | No |
| 56 | 4.4 | | DNH | | 10 | English | No |
| 57 | 21.5 | DD1 | DPM,DNH | Unverified | 10.3 | English | No |
| 57 | 21.5 | | DNH | | 2 | English | No |
| 57 | 18 | | DNH | | 12.9 | English | No |
| 57 | 16.4 | | DNH | | 12.9 | English | No |
| 57 | 5.4 | | DNM,DNH | | 7.9 | English | No |
| 57 | 0.8 | | DPO,DNH | | 11.2 | English | No |
| 58 | 30.8 | | DNH,DPV | | 12.9 | English | No |
| 58 | 28.9 | | DPM,DNH | | 4 | English | No |
| 58 | 28.9 | | DLT,DNH,DNV | | 12.9 | English | No |
| 58 | 26.2 | | DLT,DPH,DPV,DPS | | 2 | **Sign Language** | **Unknown** |
| 58 | 25.8 | | DPO,DNH | | 7.7 | English | No |
| 58 | 25.5 | | DPM,DNH | | 8 | English | No |
| 58 | 25.3 | | DPM,DNH | | 9 | English | No |
| 58 | 18.3 | | DLT,DNH | | 1 | **Vietnamese** | No |
| 58 | 16.5 | | DPM,DNH | | 0 | English | No |
| 58 | 12.2 | DD1 | DNH,DPS | | 5 | English | No |
| 58 | 8.9 | | DPM,DNH | | 12.9 | English | No |
| 58 | 4.9 | | DNH | | 12.9 | English | No |
| 58 | 3.7 | | DLT,DNH | | 12 | English | No |
| 58 | 0.8 | | DPO,DNH | | 7 | English | No |
| 59 | 35.2 | | DNM,DNH,DPV | | 10.9 | **Unknown** | **Unknown** |
| 59 | 31.5 | | DPO,DNH | | 8.2 | English | No |
| 59 | 26.2 | | DPO,DNH | | 0 | English | No |
| 59 | 26.1 | | DNH | | 12 | English | No |
| 59 | 23.9 | | DNH | | 3 | English | No |
| 59 | 23.4 | | DPW,DNH | | 10.9 | English | No |
| 59 | 19.9 | | DPO,DNH | | 10 | English | No |
| 59 | 8.5 | | DPW,DNH | | 7.8 | English | No |
| 59 | 4.8 | | DNH | | 10 | English | No |
| 59 | 4.6 | | DPO,DNH | | 9 | English | No |
| 60 | 32.7 | | DPO,DNH | | 4.1 | English | No |
| 60 | 31.4 | | DPM,DNH | | 4 | English | No |
| 60 | 27 | | DNH | | 12.9 | English | No |
| 60 | 24.5 | | DPM,DNH | | 10.7 | English | No |
| 60 | 19.4 | | DLT,DNH | | 7 | English | No |
| 60 | 19.4 | | DNH | | 9.9 | English | No |
| 60 | 17.2 | | DNH | | 12 | English | No |
| 60 | 14.9 | | DPO,DNH | | 12.9 | English | No |
| 60 | 7.4 | | DPM,DNH | | 4 | English | No |
| 60 | 6.1 | | DPW,DNH | | 12.9 | English | No |
| 60 | 0.2 | | DNH | | 4 | English | No |
| 61 | 32.7 | | DNH | | 4 | **Spanish** | No |
| 61 | 24.7 | | DNH | | 5 | English | No |
| 61 | 24.4 | | DPO,DNH | Unverified | 0 | **Spanish** | **Limited** |
| 61 | 21.2 | | DNH | | 9.4 | English | No |
| 61 | 14.4 | | DPM,DNH | | 9 | English | No |
| 61 | 13.5 | | DPM,DNH | Unverified | 11 | English | No |
| 61 | 12.7 | | DNH | | 9 | English | No |
| 61 | 11.3 | | DNM,DNH | | 10.7 | English | No |
| 61 | 9.8 | | DNH | | 11 | English | No |
| 62 | 42.8 | | DLT,DNH | | 7.6 | English | No |

| | | | | | | |
|---|---|---|---|---|---|---|
| 62 | 33.4 | | DNH | | 9.6 | English | No |
| 62 | 27.4 | | DNH | | 12.9 | English | No |
| 62 | 24.2 | | DNM,DNH | | 12.9 | English | No |
| 62 | 23.3 | | DPM,DNH | | 11.2 | English | No |
| 62 | 21.9 | | DNH | | 0 | English | No |
| 62 | 21.6 | | DPM,DNH | Unverified | 7 | English | No |
| 62 | 18.8 | | DPM,DNH | | 10.5 | English | No |
| 62 | 14.7 | | DPW,DNH | | 12.9 | English | No |
| 62 | 12.4 | | DNH | | 2 | **Spanish** | No |
| 62 | 7.5 | | DPW,DNH | | 5 | English | No |
| 63 | 43.3 | | DNH | Yes | 6 | English | No |
| 63 | 39.7 | | DNH | | 9 | English | No |
| 63 | 35.4 | | DPW,DNH | | 5 | **Arabic** | **No** |
| 63 | 32.7 | | DNH | | 3.5 | **Spanish** | **No** |
| 63 | 28 | | DPM,DNH | | 9.4 | English | No |
| 63 | 27.2 | | DNM,DNH | | 11 | English | No |
| 63 | 25.7 | | DNH | | 12.4 | English | No |
| 63 | 25.7 | | DLT,DNH | | 12.4 | English | No |
| 63 | 25.4 | | DPM,DNH | | 9.9 | English | No |
| 63 | 20.9 | | DPM,DNH | | 0 | English | No |
| 63 | 13.3 | | DPM,DNH | | 12.9 | English | No |
| 63 | 11.5 | | DPM,DNH | | 2 | **Spanish** | **Limited** |
| 63 | 8.4 | DD2 | DPW,DNH | | 4 | English | No |
| 63 | 3.5 | | DNH | | 7 | English | No |
| 63 | 0.7 | | DNH | | 12 | English | No |
| 63 | 0.7 | | DPM,DNH | | | **Spanish** | **No** |
| 63 | 0.3 | | DNH | | | English | No |
| 64 | 44.6 | | DPM,DNH | | 6.2 | English | **Unknown** |
| 64 | 42.3 | | DNH | | 12.9 | English | No |
| 64 | 35.2 | | DNH | | 10.2 | English | No |
| 64 | 33.4 | | DNH | | 8.5 | English | No |
| 64 | 28.2 | | DPW,DNH | | 12.9 | English | No |
| 64 | 26.4 | | DNM,DNH | | 4 | **Vietnamese** | No |
| 64 | 25.9 | | DNM,DNH | | 9 | English | No |
| 64 | 19.3 | | DPO,DNH | | 8.5 | English | No |
| 64 | 18.9 | | DNM,DNH | | 12.9 | English | No |
| 64 | 15.6 | | DPO,DNH | | 11 | English | No |
| 64 | 15.3 | | DPM,DNH | | 10.6 | English | No |
| 64 | 14.4 | | DPW,DNH | | 10.9 | English | No |
| 64 | 13.1 | | DNH | | 6.2 | **Spanish** | **No** |
| 64 | 11.9 | | DPW,DNH | | 2 | **Spanish** | **Limited** |
| 64 | 10.5 | | DPO,DNH | | 7.8 | English | No |
| 64 | 7.6 | | DNH | | 1 | **Spanish** | No |
| 64 | 7.3 | | DNH | | 9.4 | English | No |
| 64 | 4.5 | | DPM,DNH | | 10 | English | No |
| 64 | 3 | | DNH | | 4 | English | No |
| 65 | 39 | | DPM,DNH | | 7 | English | No |
| 65 | 33.5 | | DPW,DNH | | 2.3 | English | No |
| 65 | 27.9 | | DLT,DNH | | 11 | English | No |
| 65 | 25.4 | | DNH | | 1 | **Spanish** | **Limited** |
| 65 | 23.9 | | DNH | | 10.5 | English | No |
| 65 | 23.2 | | DPO,DNH | | 10.5 | English | No |
| 65 | 22.5 | | DPW,DNH,DNV | | 9 | English | No |
| 65 | 22 | | DNH | | 6.9 | English | No |
| 65 | 21.7 | | DPO,DNH | | 8 | English | No |
| 65 | 20.7 | | DPM,DNH | | 12.9 | English | No |
| 65 | 15.8 | | DNH | | 12.9 | English | No |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 66 | 43.7 | DD1 | DNH,DPV | | 9 | English | No |
| 66 | 43 | | DNH | | 6.6 | English | No |
| 66 | 41.7 | | DNM,DNH | | 1 | **Spanish** | No |
| 66 | 29.9 | | DPM,DNH | | 6.2 | English | No |
| 66 | 29.7 | | DNH | | 12.9 | English | No |
| 66 | 27.4 | | DPM,DNH | | 12.9 | English | No |
| 66 | 26.7 | | DPM,DNH | Unverified | 2.5 | English | No |
| 66 | 25.5 | | DPO,DNH | | 5.8 | English | No |
| 66 | 22.2 | | DPO,DNH | | 9 | English | No |
| 66 | 14.7 | | DNH | | 2 | **Spanish** | **Limited** |
| 66 | 8.3 | | DPW,DNH | | 8 | English | No |
| 66 | 1.9 | | DNH | | 8 | English | No |
| 66 | 0.2 | | DNH | | 3 | English | No |
| 67 | 31.9 | DD2 | DNM,DNH | | 5 | English | No |
| 67 | 15.1 | | DLT,DNH | | 4 | **Spanish** | No |
| 67 | 10.6 | | DPO,DNH | | 11 | English | No |
| 67 | 7.8 | | DPW,DNH | | 12.9 | English | No |
| 67 | 6.7 | | DPO,DNH | | 10 | English | No |
| 67 | 6.5 | DD2 | DNH | | | English | No |
| 68 | 44.6 | | DLT,DNH | | 12.9 | English | No |
| 68 | 42.7 | | DPM,DNH | | 12.9 | English | No |
| 68 | 38.3 | | DPW,DNH | | 2 | English | No |
| 68 | 31.4 | | DNH | | | English | **Unknown** |
| 68 | 29.8 | | DLT,DNH | | 9.4 | English | No |
| 68 | 27.8 | | DNH | | 11.8 | English | No |
| 68 | 21.3 | | DPW,DNH | Unverified | 0 | English | No |
| 68 | 17.1 | DD2 | DNH | | 9.9 | English | No |
| 68 | 12.6 | DD2 | DNH | | 0.7 | English | No |
| 68 | 10.8 | DD1 | DNH | | 2 | English | No |
| 68 | 9.3 | | DPO,DNH | | 3 | English | No |
| 68 | 5.3 | | DPO,DNH | | 3 | English | No |
| 68 | 0.9 | | DNH | | 9 | English | No |
| 68 | 0.2 | | DNH | | 6 | English | No |
| 69 | 29.2 | | DPM,DNH | | 5.9 | English | No |
| 69 | 28.8 | | DLT,DNH | | 1 | **Spanish** | **Limited** |
| 69 | 28.7 | | DNH | | 9.4 | English | No |
| 69 | 28.6 | | DPO,DNH | | 11.2 | English | No |
| 69 | 27.3 | | DLT,DNH | | 7.7 | English | No |
| 69 | 24.2 | | DPM,DNH | | 9 | English | No |
| 69 | 20.1 | | DNH | | 9.9 | English | No |
| 69 | 12.7 | | DNH | | 10.9 | English | No |
| 69 | 7.1 | | DNH | | 2 | English | No |
| 69 | 6.9 | | DPM,DNH | | 2 | English | No |
| 69 | 6.8 | DD2 | DLT,DNH | | 2 | English | No |
| 69 | 2.5 | | DNH | | 5 | English | No |
| 69 | 0.3 | | DNH | | | English | No |
| 70 | 35.6 | | DLT,DNH | | 9.9 | English | No |
| 70 | 34.1 | | DPO,DNH | | 6.9 | English | No |
| 70 | 27.4 | | DPM,DNH | | 6.4 | English | No |
| 70 | 25.5 | | DNM,DNH | | 12.9 | English | No |
| 70 | 21 | | DPW,DNH | | 12.9 | English | No |
| 70 | 17.1 | | DNH,DNV | | 9.9 | English | No |
| 70 | 11.2 | | DPM,DNH | | 0 | English | No |
| 70 | 5.9 | | DNM,DNH | | 12 | English | No |
| 70 | 5 | | DPO,DNH | | 3 | English | No |
| 71 | 37.4 | | DPM,DNH | | 3 | English | No |
| 71 | 31.9 | | DPO,DNH | | 0 | **Spanish** | **Unknown** |

| 71 | 23.9 | | DPM,DNH | | 5 | **Romanian** | **No** |
| 71 | 11.9 | | DPM,DNH | | 1 | English | No |
| 71 | 7.9 | | DPM,DPH | | 12 | English | No |
| 72 | 38.4 | | DPM,DNH | | 10 | English | No |
| 72 | 20.1 | | DPW,DNH | Unverified | 0 | **Spanish** | **Yes** |
| 72 | 19.5 | | DPO,DNH | | 11.8 | English | No |
| 72 | 12.9 | | DLT,DNH | Unverified | 0 | **Spanish** | **Limited** |
| 72 | 3.1 | | DPO,DNH | | 4 | English | No |
| 72 | 2.2 | | DPM,DNH | | 5 | English | No |
| 72 | 2 | | DPM,DNH | | 7 | English | No |
| 72 | 0.6 | | DLT,DNH | | 8 | English | No |
| 73 | 50.4 | | DPO,DNH | | 9.5 | English | No |
| 73 | 35.9 | | DPM,DNH | | 5 | English | No |
| 73 | 28.8 | | DPM,DNH | | 8 | English | No |
| 73 | 26.2 | | DPM,DNH | | 10.8 | English | No |
| 73 | 25.7 | | DPO,DNH | | 6 | English | No |
| 73 | 24 | | DLT,DNH | | 12.9 | English | No |
| 73 | 14.3 | | DNH | | 4 | **Spanish** | **No** |
| 73 | 0.9 | | DLT,DNH | | 6 | English | No |
| 74 | 18.7 | | DPO,DNH | | 11.8 | English | No |
| 74 | 18.2 | | DPW,DNH | Unverified | 6 | English | No |
| 74 | 0.7 | | DLT,DNH | | | English | No |
| 74 | 0.6 | | DPM,DNH | | 7 | English | No |
| 74 | 0.3 | | DPM,DNH | | 2 | English | No |
| 75 | 27.9 | | DPM,DNH | | 10.8 | English | No |
| 75 | 16.5 | | DPO,DNH | | 7.6 | English | No |
| 75 | 13.2 | DD1 | DPM,DNH | | 0 | **Spanish** | **No** |
| 76 | 32.2 | | DPW,DNH | | 9.7 | English | No |
| 76 | 25.8 | | DPO,DNH | | 5 | English | No |
| 77 | 33.4 | | DPW,DNH,DPV | | 9.9 | English | No |
| 77 | 5.6 | | DNH | | 10.9 | English | No |
| 78 | 5.8 | | DLT,DNH | | 10 | English | No |
| 78 | 0.6 | | DPM,DNH | | 0 | **Tagalog** | **Limited** |
| 79 | 0.4 | | DNH | | 5.9 | English | No |
| 80 | 40.9 | | DPW,DNH | | 9.9 | English | No |
| 80 | 31 | | DNH | | 12.9 | English | No |
| 80 | 24.3 | | DPW,DNH | | 12.9 | English | No |
| 80 | 1 | | DLT,DNH | | 12.9 | English | No |
| 81 | 10.7 | | DLT,DNH | | 11.8 | English | No |
| 82 | 0.3 | | DPM,DNH,DNV | | 3.4 | English | No |
| 83 | 10.2 | | DPW,DNH | | 6.6 | English | No |
| 89 | 8 | | DPO,DNH | | 1 | **Spanish** | **Limited** |

Exhibit C

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California 94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **DECLARATION OF ILIAN MEZA PEÑA** |
| v. | Judge:  Hon. Claudia Wilken |
| GAVIN NEWSOM, et al., | |
| Defendants. | |

I, Ilian Meza Peña, declare:

1.    I am an Investigator at the Prison Law Office, counsel of record for the Plaintiff class in *Armstrong v. Newsom*. I have personal knowledge of the facts set forth herein and, if called as a witness, I could competently so testify.

2.    Defendants in *Armstrong* regularly produce Disability Placement Program (DPP) Roster spreadsheets, which list all people with DPP codes in the California state prisons. Defendants in *Clark* similarly produce DDP Roster spreadsheets on a regular basis, which list all people with Developmental Disability Program (DDP) codes in the California state prisons.

3.    At the direction of Rita Lomio, a senior staff attorney at the Prison Law Office, I reviewed the August 1, 2024 DPP roster that had been produced by Defendants. I filtered the spreadsheet by prison (SATF). I then filtered by DPP code to identify those people with a DNH, DPH, and/or DPS code. There were 381 such people; 374 people as of August 1, 2024, at SATF had a DNH code; four had a DPH code; and five had a DPS code (two of whom also had a DNH or DPH code).

4.    I created a table of those people in a restricted Google Sheets document and imported information from the DPP roster for each regarding (a) their DPP codes, (b) whether they had been identified as having a learning disability, and (c) what their TABE score was.

5.    I added a column for "DDP Status" and entered, for each person, any DDP status (DD1, DD2, or DD3) by reviewing the DDP roster for August 1, 2024.

6.    I added a column for "Age" and entered, for each person, their age as of August 15 or 16, 2024, based on the publicly available California Incarcerated Records & Information Search (CIRIS) (https://apps.cdcr.ca.gov/ciris/). Based on CIRIS information, it appeared that two people on my list were no longer in custody, so I removed them from my list.

7.    Using the information from CIRIS, I then calculated the amount of time each person had spent in prison as of August 15, 2024, in days by using the DAYS function in

1  Google Sheets. I then added a column to calculate the time served in years, which was
2  calculated by dividing the "days" value by 365.

3      8.    I also reviewed the electronic medical records in CERNER for each of the
4  379 class members who remained in custody as of August 16, 2024, to identify their
5  documented primary language and LEP (limited English proficiency) status by reviewing
6  the "ADA / Effective Communication" tab in their medical record. I entered this
7  information in columns "Primary Language" and "LEP Status."

8      9.    A true and correct copy of the resulting spreadsheet is attached as **Exhibit A**.
9  Once I compiled this data, I used the AVERAGE function on Google Sheets to calculate
10  the average age, length of current term, and TABE score. I then sorted the data by age and
11  divided them into eight separate sheets to calculate these averages by 10-year age ranges
12  beginning with 20-29 and ending with 80-89. All of the class members were between 20-
13  89 years old. Finally, I used the "count" feature to determine how many class members fell
14  into each age range and to determine how many class members within each age range had
15  a TABE score of 4.0 or lower to produce the following table:

| Age Range | Count | Average Time Served | Average TABE | 4.0 TABE or lower |
|-----------|-------|---------------------|--------------|-------------------|
| 20-29 | 8 | 4.1 years | 8.3 | 2 |
| 30-39 | 31 | 7.3 years | 8.4 | 8 |
| 40-49 | 68 | 10.1 years | 7.4 | 17 |
| 50-59 | 95 | 16.3 years | 8.4 | 22 |
| 60-69 | 124 | 20.3 years | 7.6 | 32 |
| 70-79 | 45 | 17.8 years | 6.8 | 12 |
| 80-89 | 8 | 15.8 years | 8.9 | 2 |
| **All** | **379** | **15.7 years** | **7.8** | **95** |

25      10.    Based on the data I compiled, 233 people with hearing and/or speech
26  disabilities at SATF have been incarcerated on their current term for ten or more years. Of
27  those, 134 people have been incarcerated for more than 20 years, and 40 people have been
28  incarcerated for more than 30 years.

11.     Based on the data I compiled, I determined that 95 people with hearing and/or speech disabilities at SATF have a reading score of 4.0 or below. An additional ten class members with a hearing and/or speech disability have no documented reading score and 130 people have a documented TABE score of 6.0 or below (35 people have a TABE score between 4.1 and 6.0).

12.     Based on the data I compiled, as many as 25 people at SATF with a hearing and/or speech disability have limited English proficiency, based on an answer other than "No" to "LEP." (Answers other than "no" are "Yes," "Limited," "Sign Language," and "Unknown.") Forty people at SATF with these disabilities have a documented primary language other than English (Arabic, Romanian, Sign Language, Spanish, Tagalog, Vietnamese, or Unknown).

13.     Based on the data I compiled, 22 people at SATF with a hearing and/or speech disability also have a documented intellectual, developmental, or cognitive disability signified by a "DDP Status" of DD1, DD2, or DD3.

14.     Based on the data I compiled, 15 people at SATF with a hearing and/or speech disability also have a documented vision disability signified by a DNV or DPV code.

15.     Based on the data I compiled, 20 people at SATF with a hearing and/or speech disability also are identified by CDCR as having a "verified" or "unverified" learning disability.

16.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at Berkeley, California this 21st day of August, 2024.

Ilian Meza Peña

DECLARATION OF ILIAN MEZA PEÑA

# Exhibit A

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 71 | September 16, 1992 | August 15, 2024 | 11656 | 31.9 | | DPO,DNH | | 0 | Spanish | Unknown | H: Hearing Aids | | |
| | | 59 | June 8, 1998 | August 15, 2024 | 9565 | 26.2 | | DPO,DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | March 10, 2000 | August 15, 2024 | 8924 | 24.4 | | DPO,DNH | Unverified | 0 | Spanish | Limited | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 62 | September 25, 2002 | August 15, 2024 | 7995 | 21.9 | | DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | April 22, 2003 | August 15, 2024 | 7786 | 21.3 | | DPW,DNH | Unverified | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | September 17, 2003 | August 15, 2024 | 7638 | 20.9 | | DPM,DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | July 22, 2004 | August 15, 2024 | 7329 | 20.1 | | DPW,DNH | Unverified | 0 | Spanish | Yes | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | May 11, 2006 | August 15, 2024 | 6671 | 18.3 | | DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | May 17, 2007 | August 15, 2024 | 6300 | 17.3 | | DPM,DNH | | 0 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | February 11, 2008 | August 15, 2024 | 6030 | 16.5 | | DPM,DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | June 7, 2010 | August 15, 2024 | 5183 | 14.2 | | DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 75 | June 23, 2011 | August 15, 2024 | 4802 | 13.2 | DD1 | DPM,DNH | | 0 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | October 7, 2011 | August 15, 2024 | 4696 | 12.9 | | DLT,DNH | Unverified | 0 | Spanish | Limited | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | June 17, 2013 | August 15, 2024 | 4077 | 11.2 | | DPM,DNH | | 0 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 36 | November 29, 2022 | August 15, 2024 | 625 | 1.7 | | DNH | | 0 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | June 5, 2023 | August 15, 2024 | 437 | 1.2 | | DNH | | 0 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 78 | January 9, 2024 | August 15, 2024 | 219 | 0.6 | | DNH | | 0 | Tagalog | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | December 26, 2011 | August 15, 2024 | 4616 | 12.6 | DD2 | DNH | | 0.7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | December 6, 1982 | August 15, 2024 | 15228 | 41.7 | | DNM,DNH | | 1 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | November 6, 1995 | August 15, 2024 | 10510 | 28.8 | | DLT,DNH | | 1 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | April 7, 1999 | August 15, 2024 | 9262 | 25.4 | | DNH | | 1 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | November 9, 2003 | August 15, 2024 | 7555 | 20.7 | | DLT,DNH,DPV | | 1 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | April 24, 2006 | August 15, 2024 | 6688 | 18.3 | | DLT,DNH | | 1 | Vietnamese | No | H: Hearing Aids | H: Reads Lips | |
| | | 71 | September 27, 2012 | August 15, 2024 | 4340 | 11.9 | | DPM,DNH | | 1 | English | No | H: Reads Lips | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | October 8, 2014 | August 15, 2024 | 3599 | 9.9 | DD1 | DNM,DNH | | 1 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 55 | December 15, 2014 | August 15, 2024 | 3531 | 9.7 | DD1 | DNM,DNH | | 1 | Spanish | Yes | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 39 | May 3, 2016 | August 15, 2024 | 3026 | 8.3 | | DNH | | 1 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 89 | August 12, 2016 | August 15, 2024 | 2925 | 8.0 | | DPO,DNH | | 1 | Spanish | Limited | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | December 27, 2016 | August 15, 2024 | 2788 | 7.6 | | DNH | | 1 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | March 12, 2020 | August 15, 2024 | 1617 | 4.4 | | DNH | | 1 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | February 14, 2023 | August 15, 2024 | 548 | 1.5 | | DNH | Unverified | 1 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | March 20, 2023 | August 15, 2024 | 514 | 1.4 | | DNH | | 1 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | November 23, 2011 | August 15, 2024 | 4649 | 12.7 | DD1 | DNH | Unverified | 1.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 8, 1986 | August 15, 2024 | 13979 | 38.3 | | DPW,DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | May 28, 1998 | August 15, 2024 | 9576 | 26.2 | | DLT,DPH,DPV,DPS | | 2 | Sign Language | Unknown | H: American Sign Language S: America | H: Written Notes S: Written Notes | |
| | | 57 | February 11, 2003 | August 15, 2024 | 7856 | 21.5 | | DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | December 9, 2009 | August 15, 2024 | 5363 | 14.7 | | DNH | | 2 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | March 14, 2012 | August 15, 2024 | 4537 | 12.4 | | DNH | | 2 | Spanish | No | H: Hearing Aids | H: Reads Lips | |
| | | 64 | October 8, 2012 | August 15, 2024 | 4329 | 11.9 | | DPW,DNH | | 2 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | January 31, 2013 | August 15, 2024 | 4214 | 11.5 | | DPM,DNH | | 2 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | November 6, 2013 | August 15, 2024 | 3935 | 10.8 | DD1 | DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | July 20, 2017 | August 15, 2024 | 2583 | 7.1 | | DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | October 2, 2017 | August 15, 2024 | 2509 | 6.9 | | DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | October 26, 2017 | August 15, 2024 | 2485 | 6.8 | DD2 | DLT,DNH | | 2 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 52 | November 5, 2020 | August 15, 2024 | 1379 | 3.8 | | DNH | | 2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 74 | April 29, 2024 | August 15, 2024 | 108 | 0.3 | | DPM,DNH | | 2 | English | No | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 51 | January 17, 2006 | August 15, 2024 | 6785 | 18.6 | | DNH | | 2.2 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | February 13, 1991 | August 15, 2024 | 12237 | 33.5 | | DPW,DNH | | 2.3 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 66 | December 24, 1997 | August 15, 2024 | 9731 | 26.7 | | DPM,DNH | Unverified | 2.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 71 | March 20, 1987 | August 15, 2024 | 13663 | 37.4 | | DPM,DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | October 12, 2000 | August 15, 2024 | 8708 | 23.9 | | DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | July 11, 2005 | August 15, 2024 | 6975 | 19.1 | | DNH,DPV | Unverified | 3 | English | No | H: Hearing Aids V: Magnifier | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | June 30, 2010 | August 15, 2024 | 5160 | 14.1 | DD2 | DNH | | 3 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | July 1, 2010 | August 15, 2024 | 5159 | 14.1 | | DNM,DNH | | 3 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 30 | November 2, 2012 | August 15, 2024 | 4304 | 11.8 | | DNH | | 3 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 68 | May 4, 2015 | August 15, 2024 | 3391 | 9.3 | | DPO,DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | February 29, 2016 | August 15, 2024 | 3090 | 8.5 | | DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 1, 2019 | August 15, 2024 | 1933 | 5.3 | | DPO,DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | August 13, 2019 | August 15, 2024 | 1829 | 5.0 | | DPO,DNH | | 3 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | December 5, 2023 | August 15, 2024 | 254 | 0.7 | | DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | June 10, 2024 | August 15, 2024 | 66 | 0.2 | | DNH | | 3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 82 | May 8, 2024 | August 15, 2024 | 99 | 0.3 | | DPM,DNH,DNV | | 3.4 | | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 63 | December 6, 1991 | August 15, 2024 | 11941 | 32.7 | | DNH | | 3.5 | Spanish | No | H: Hearing Aids | H: Hearing Aids | |
| | | 55 | October 3, 2014 | August 15, 2024 | 3604 | 9.9 | | DNM,DNH | | 3.6 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 61 | December 26, 1991 | August 15, 2024 | 11921 | 32.7 | | DNH | | 4 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | April 7, 1993 | August 15, 2024 | 11453 | 31.4 | | DPM,DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 58 | September 27, 1995 | August 15, 2024 | 10550 | 28.9 | | DNM,DNH | | 4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 64 | April 3, 1998 | August 15, 2024 | 9631 | 26.4 | | DNM,DNH | | 4 | Vietnamese | No | H: Hearing Aids | H: Hearing Aids | |
| | | 48 | June 26, 2000 | August 15, 2024 | 8816 | 24.2 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | October 19, 2000 | August 15, 2024 | 8701 | 23.8 | | DNM,DNH | | 4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 46 | February 11, 2002 | August 15, 2024 | 8221 | 22.5 | | DPH | | 4 | Sign Language | Sign Language | H: American Sign Language S: Written Notes | | |
| | | 47 | January 28, 2004 | August 15, 2024 | 7505 | 20.6 | DD2 | DPS | | 4 | English | No | S: Written Notes | | |
| | | 56 | June 17, 2005 | August 15, 2024 | 6999 | 19.2 | | DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | June 30, 2009 | August 15, 2024 | 5525 | 15.1 | | DLT,DNH | | 4 | Spanish | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 73 | April 27, 2010 | August 15, 2024 | 5224 | 14.3 | | DNH | | 4 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | October 16, 2015 | August 15, 2024 | 3226 | 8.8 | | DPM,DNH | Unverified | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | March 22, 2016 | August 15, 2024 | 3068 | 8.4 | DD2 | DPW,DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | Adaptive Support Needs: * Victimization: Vulnerable to victimization * Communication: Slow simple language/repeat as needed, Give one or two step instructions * Rules & Policies: Assist to understand rules/procedures, Assist adjusting to new environments * Reading & Writing: Offer to read/write CDCR forms/paperwork |
| | | 60 | April 3, 2017 | August 15, 2024 | 2691 | 7.4 | | DPM,DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 56 | May 15, 2017 | August 15, 2024 | 2649 | 7.3 | | DNM,DNH | Yes | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | -Recommend student participates in after school tutoring.-Place in close proximity to the teacher to receive additional feedback and assistance.-Provide additional time to complete school assignments.-Teachers will use 1-2 step instructions.-Student may use a peer note-taker or be provided with note-taking assistance.-Student may use dictionary/thesaurus/computer-aided instruction. |
| | | 51 | October 27, 2017 | August 15, 2024 | 2484 | 6.8 | DD1 | DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 45 | January 3, 2018 | August 15, 2024 | 2416 | 6.6 | | DLT,DNH,DPV | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 42 | June 8, 2018 | August 15, 2024 | 2260 | 6.2 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 35 | February 20, 2019 | August 15, 2024 | 2003 | 5.5 | | DPM,DNH | | 4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 29 | April 16, 2019 | August 15, 2024 | 1948 | 5.3 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 30 | October 9, 2019 | August 15, 2024 | 1772 | 4.9 | | DPM,DPH | | 4 | Sign Language | No | H: American Sign Language S: America | H: Written Notes S: Written Notes | |
| | | 72 | June 29, 2021 | August 15, 2024 | 1143 | 3.1 | | DPO,DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 64 | July 29, 2021 | August 15, 2024 | 1113 | 3.0 | | DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 43 | August 20, 2021 | August 15, 2024 | 1091 | 3.0 | DD2 | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | November 5, 2021 | August 15, 2024 | 1014 | 2.8 | | DPM,DNH | | 4 | Spanish | Yes | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | March 4, 2022 | August 15, 2024 | 895 | 2.5 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 26 | April 7, 2022 | August 15, 2024 | 861 | 2.4 | | DNH | | 4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 49 | December 27, 2022 | August 15, 2024 | 597 | 1.6 | | DNM,DNH | | 4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 51 | April 20, 2023 | August 15, 2024 | 483 | 1.3 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | December 18, 2023 | August 15, 2024 | 241 | 0.7 | | DNH | | 4 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 60 | May 28, 2024 | August 15, 2024 | 79 | 0.2 | | DNH | | 4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | December 3, 1991 | August 15, 2024 | 11944 | 32.7 | | DPO,DNH | | 4.1 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | January 28, 2000 | August 15, 2024 | 8966 | 24.6 | | DNH | | 4.4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | April 6, 2017 | August 15, 2024 | 2688 | 7.4 | | DPM,DNH | | 4.4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 73 | September 16, 1988 | August 15, 2024 | 13117 | 35.9 | | DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | April 5, 1989 | August 15, 2024 | 12916 | 35.4 | | DPW,DNH | | 5 | Arabic | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 67 | September 16, 1992 | August 15, 2024 | 11656 | 31.9 | DD2 | DNM,DNH | | 5 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 76 | November 19, 1998 | August 15, 2024 | 9401 | 25.8 | | DPO,DNH | | 5 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 61 | December 3, 1999 | August 15, 2024 | 9022 | 24.7 | | DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 71 | September 28, 2000 | August 15, 2024 | 8722 | 23.9 | | DPM,DNH | | 5 | Romanian | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 46 | June 13, 2005 | August 15, 2024 | 7003 | 19.2 | | DNM,DNH | Unverified | 5 | Spanish | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 58 | May 30, 2012 | August 15, 2024 | 4460 | 12.2 | DD1 | DLT,DPS | | 5 | English | No | H: Hearing Aids | H: American Sign Language | |
| | | 28 | March 7, 2016 | August 15, 2024 | 3083 | 8.4 | | DPS | Unverified | 5 | English | No | S: Written Notes | | |
| | | 46 | February 23, 2017 | August 15, 2024 | 2730 | 7.5 | | DPW,DNH | | 5 | English | No | H: Hearing Aids | H: None | |
| | | 46 | March 14, 2017 | August 15, 2024 | 2711 | 7.4 | | DLT,DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | August 11, 2017 | August 15, 2024 | 2561 | 7.0 | | DNH | | 5 | English | No | H: Assistive Listening Device | H: Written Notes | |
| | | 53 | December 17, 2019 | August 15, 2024 | 1703 | 4.7 | | DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | March 17, 2021 | August 15, 2024 | 1247 | 3.4 | | DNH | | 5 | Spanish | Limited | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | February 25, 2022 | August 15, 2024 | 902 | 2.5 | | DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 72 | June 20, 2022 | August 15, 2024 | 787 | 2.2 | | DPM,DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | August 3, 2022 | August 15, 2024 | 743 | 2.0 | | DNH | | 5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 43 | September 15, 2022 | August 15, 2024 | 700 | 1.9 | | DPO,DNH | | 5 | English | No | H: Hearing Aids | H: Assistive Listening Device | |
| | | 28 | May 12, 2021 | August 15, 2024 | 1191 | 3.3 | | DNH | | 5.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | February 24, 1999 | August 15, 2024 | 9304 | 25.5 | | DPO,DNH | | 5.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | June 2, 1995 | August 15, 2024 | 10667 | 29.2 | | DPM,DNH | | 5.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | April 22, 2014 | August 15, 2024 | 3768 | 10.3 | | DLT,DNH | | 5.9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 79 | March 13, 2024 | August 15, 2024 | 155 | 0.4 | | DNH | | 5.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 63 | April 24, 1981 | August 15, 2024 | 15819 | 43.3 | | DNH | Yes | 6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | VERIFIED LEARNING DISABILITY PER CREDENTIALED SCHOOL PSYCHOLOGIST REPORT DATED 2/    p: 11 April 2019 14:17:47 --- User:                 (BOD0004) |
| | | 45 | October 1, 1998 | August 15, 2024 | 9450 | 25.9 | | DPM,DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | December 23, 1998 | August 15, 2024 | 9367 | 25.7 | | DPO,DNH | | 6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 74 | June 16, 2006 | August 15, 2024 | 6635 | 18.2 | | DPW,DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | December 15, 2006 | August 15, 2024 | 6453 | 17.7 | | DLT,DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | February 21, 2018 | August 15, 2024 | 2367 | 6.5 | | DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | October 8, 2018 | August 15, 2024 | 2138 | 5.9 | | DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | September 14, 2023 | August 15, 2024 | 336 | 0.9 | | DLT,DNH | | 6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 20, 2024 | August 15, 2024 | 87 | 0.2 | | DNH | | 6 | English | No | H: Need Staff to Speak Loudly and Clearly, Hearing Aids | H: Written Notes | |
| | | 64 | January 16, 1980 | August 15, 2024 | 16283 | 44.6 | | DPM,DNH | | 6.2 | English | Unknown | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | October 12, 1994 | August 15, 2024 | 10900 | 29.9 | | DPM,DNH | | 6.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | July 8, 2011 | August 15, 2024 | 4787 | 13.1 | | DNH | | 6.2 | Spanish | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 38 | January 27, 2017 | August 15, 2024 | 2757 | 7.6 | | DNH | | 6.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | April 9, 1997 | August 15, 2024 | 9990 | 27.4 | | DPM,DNH | | 6.4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 55 | October 20, 2000 | August 15, 2024 | 8700 | 23.8 | | DPM,DNH | | 6.4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | August 21, 1981 | August 15, 2024 | 15700 | 43.0 | | DNH | | 6.6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 83 | June 20, 2014 | August 15, 2024 | 3709 | 10.2 | | DPW,DNH | | 6.6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | August 3, 1990 | August 15, 2024 | 12431 | 34.1 | | DPO,DNH | | 6.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | August 6, 2002 | August 15, 2024 | 8045 | 22.0 | | DNH | | 6.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | August 29, 1985 | August 15, 2024 | 14231 | 39.0 | | DPM,DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | January 7, 2000 | August 15, 2024 | 8987 | 24.6 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | May 26, 2000 | August 15, 2024 | 8847 | 24.2 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | October 29, 2001 | August 15, 2024 | 8326 | 22.8 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | January 24, 2003 | August 15, 2024 | 7874 | 21.6 | | DPM,DNH | Unverified | 7 | English | No | H: Reads Lips | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | March 14, 2003 | August 15, 2024 | 7825 | 21.4 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | March 10, 2005 | August 15, 2024 | 7098 | 19.4 | | DLT,DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | March 19, 2010 | August 15, 2024 | 5263 | 14.4 | | DPM,DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 44 | April 18, 2014 | August 15, 2024 | 3772 | 10.3 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | May 24, 2016 | August 15, 2024 | 3005 | 8.2 | | DNH | | 7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 33 | April 26, 2019 | August 15, 2024 | 1938 | 5.3 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | February 1, 2021 | August 15, 2024 | 1291 | 3.5 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | August 2, 2022 | August 15, 2024 | 738 | 2.0 | | DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | August 17, 2022 | August 15, 2024 | 729 | 2.0 | | DPM,DNH | | 7 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | March 28, 2023 | August 15, 2024 | 506 | 1.4 | | DPO,DNH | | 7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 58 | October 11, 2023 | August 15, 2024 | 309 | 0.8 | | DPO,DNH | | 7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 74 | January 8, 2024 | August 15, 2024 | 220 | 0.6 | | DPM,DNH | | 7 | English | No | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 62 | October 23, 1981 | August 15, 2024 | 15637 | 42.8 | | DLT,DNH | | 7.6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | September 12, 2001 | August 15, 2024 | 8373 | 22.9 | | DPS | | 7.6 | English | No | H: Use Simple Language | H: None | |
| | | 75 | February 6, 2008 | August 15, 2024 | 6036 | 16.5 | | DPO,DNH | | 7.6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | November 30, 2017 | August 15, 2024 | 2450 | 6.7 | | DNH | | 7.6 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | April 24, 1997 | August 15, 2024 | 9975 | 27.3 | | DLT,DNH | | 7.7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 58 | October 27, 1998 | August 15, 2024 | 9424 | 25.8 | | DPO,DNH | | 7.7 | English | No | H: Hearing Aids | H: Assistive Listening Device | |
| | | 47 | March 14, 2007 | August 15, 2024 | 6364 | 17.4 | | DLT,DNH | | 7.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | March 5, 2014 | August 15, 2024 | 3816 | 10.5 | | DNH | | 7.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | February 22, 2016 | August 15, 2024 | 3097 | 8.5 | | DPW,DNH | | 7.8 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 46 | September 7, 2017 | August 15, 2024 | 2534 | 6.9 | | DNM,DNH | | 7.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | February 10, 2014 | August 15, 2024 | 3839 | 10.5 | | DNH | | 7.9 | English | No | H: Use Simple Language | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | March 18, 2019 | August 15, 2024 | 1977 | 5.4 | | DNM,DNH | | 7.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 73 | November 1, 1995 | August 15, 2024 | 10515 | 28.8 | | DPM,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | February 25, 1999 | August 15, 2024 | 9303 | 25.5 | | DPM,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 47 | December 12, 2000 | August 15, 2024 | 8647 | 23.7 | | DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | February 5, 2001 | August 15, 2024 | 8592 | 23.5 | | DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | December 2, 2002 | August 15, 2024 | 7927 | 21.7 | | DPO,DNH | | 8 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 53 | May 7, 2004 | August 15, 2024 | 7405 | 20.3 | | DLT,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | September 28, 2009 | August 15, 2024 | 5435 | 14.9 | | DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | November 5, 2012 | August 15, 2024 | 4301 | 11.8 | | DNM,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | August 13, 2014 | August 15, 2024 | 3655 | 10.0 | | DPO,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | May 4, 2016 | August 15, 2024 | 3025 | 8.3 | | DPW,DNH | | 8 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 55 | September 28, 2018 | August 15, 2024 | 2148 | 5.9 | | DPO,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | November 13, 2018 | August 15, 2024 | 2102 | 5.8 | | DNH | | 8 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 33 | February 18, 2021 | August 15, 2024 | 1274 | 3.5 | | DNM,DNH | | 8 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 42 | May 12, 2021 | August 15, 2024 | 1191 | 3.3 | | DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | March 29, 2022 | August 15, 2024 | 870 | 2.4 | DD2 | DNH | | 8 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 66 | September 6, 2022 | August 15, 2024 | 709 | 1.9 | | DNH | | 8 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 41 | July 28, 2023 | August 15, 2024 | 384 | 1.1 | | DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | August 7, 2023 | August 15, 2024 | 374 | 1.0 | | DPW,DNH | | 8 | English | No | H: Hearing Aids | H: Written Notes | |
| | | 72 | January 19, 2024 | August 15, 2024 | 209 | 0.6 | | DLT,DNH | | 8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | February 11, 1993 | August 15, 2024 | 11508 | 31.5 | | DPO,DNH | | 8.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | April 2, 2009 | August 15, 2024 | 5614 | 15.4 | | DNH | | 8.4 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 64 | March 21, 1991 | August 15, 2024 | 12201 | 33.4 | | DNH | | 8.5 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 64 | April 28, 2005 | August 15, 2024 | 7049 | 19.3 | | DPO,DNH | | 8.5 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 42 | March 23, 2018 | August 15, 2024 | 2337 | 6.4 | | DNH | | 8.6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | December 9, 1980 | August 15, 2024 | 15955 | 43.7 | DD1 | DNH,DPV | | 9 | English | No | H: Hearing Aids V: Read Documents Aloud | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | December 20, 1984 | August 15, 2024 | 14483 | 39.7 | | DNH | | 9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 64 | September 23, 1998 | August 15, 2024 | 9458 | 25.9 | | DNM,DNH | | 9 | English | No | H: Hearing Aids S: Written Notes | | |
| | | 58 | May 6, 1999 | August 15, 2024 | 9233 | 25.3 | | DPM,DNH | | 9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | May 25, 2000 | August 15, 2024 | 8848 | 24.2 | | DPM,DNH | | 9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | March 1, 2002 | August 15, 2024 | 8203 | 22.5 | | DPW,DNH,DNV | | 9 | English | No | H: Hearing Aids V: Large Print Material | H: Need Staff to Speak Loudly and Clearly V: Read Documents Aloud | |
| | | 66 | June 11, 2002 | August 15, 2024 | 8101 | 22.2 | | DPO,DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 53 | December 8, 2004 | August 15, 2024 | 7190 | 19.7 | DD3 | DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Assistive Listening Device | |
| | | 61 | April 8, 2010 | August 15, 2024 | 5243 | 14.4 | | DPM,DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 48 | April 30, 2010 | August 15, 2024 | 5221 | 14.3 | | DNH | Unverified | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 61 | December 8, 2011 | August 15, 2024 | 4634 | 12.7 | | DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 44 | March 27, 2019 | August 15, 2024 | 1968 | 5.4 | | DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 59 | January 15, 2020 | August 15, 2024 | 1674 | 4.6 | | DPO,DNH | | 9 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 28 | October 19, 2020 | August 15, 2024 | 1396 | 3.8 | | DNH | | 9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | April 4, 2022 | August 15, 2024 | 864 | 2.4 | | DNH | | 9 | English | No | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 68 | September 20, 2023 | August 15, 2024 | 330 | 0.9 | | DNH | | 9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | November 7, 1994 | August 15, 2024 | 10874 | 29.8 | | DLT,DNH | | 9.4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | December 5, 1995 | August 15, 2024 | 10481 | 28.7 | | DNH | | 9.4 | English | No | H: Use Simple Language S: Written Notes | | |
| | | 63 | August 30, 1996 | August 15, 2024 | 10212 | 28.0 | | DPM,DNH | | 9.4 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 61 | June 11, 2003 | August 15, 2024 | 7736 | 21.2 | | DNH | | 9.4 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | June 5, 2007 | August 15, 2024 | 6281 | 17.2 | | DNH | | 9.4 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 64 | May 1, 2017 | August 15, 2024 | 2663 | 7.3 | | DNH | | 9.4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 73 | April 1, 1974 | August 15, 2024 | 18399 | 50.4 | | DPO,DNH | | 9.5 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 62 | March 29, 1991 | August 15, 2024 | 12193 | 33.4 | | DNH | | 9.6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 50 | July 12, 2007 | August 15, 2024 | 6244 | 17.1 | | DLT,DNH | | 9.6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | August 5, 2013 | August 15, 2024 | 4028 | 11.0 | | DNH | Unverified | 9.6 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 76 | June 3, 1992 | August 15, 2024 | 11761 | 32.2 | | DPW,DNH | | 9.7 | English | No | H: Reads Lips | H: Hearing Aids | |
| | | 80 | September 26, 1983 | August 15, 2024 | 14934 | 40.9 | | DPW,DNH | | 9.9 | English | No | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 70 | December 30, 1988 | August 15, 2024 | 13012 | 35.6 | | DLT,DNH | | 9.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 77 | April 18, 1991 | August 15, 2024 | 12173 | 33.4 | | DPW,DNH,DPV | | 9.9 | English | No | H: Hearing Aids V: Text to Speech | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | March 18, 1999 | August 15, 2024 | 9282 | 25.4 | | DPM,DNH | | 9.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 50 | May 14, 2002 | August 15, 2024 | 8129 | 22.3 | | DLT,DNH | | 9.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | July 21, 2004 | August 15, 2024 | 7330 | 20.1 | | DNH | | 9.9 | English | No | H: Reads Lips S: Written Notes | | |
| | | 60 | April 6, 2005 | August 15, 2024 | 7071 | 19.4 | | DNH | | 9.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | July 18, 2007 | August 15, 2024 | 6238 | 17.1 | DD2 | DNH | | 9.9 | English | No | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 70 | July 25, 2007 | August 15, 2024 | 6231 | 17.1 | | DNH,DNV | | 9.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 51 | April 26, 2011 | August 15, 2024 | 4860 | 13.3 | | DNH | | 9.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 72 | April 10, 1986 | August 15, 2024 | 14007 | 38.4 | | DPM,DNH | | 10 | English | No | H: Need Aids S: Written Notes | | |
| | | 59 | September 30, 2004 | August 15, 2024 | 7259 | 19.9 | | DPO,DNH | | 10 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 41 | February 6, 2006 | August 15, 2024 | 6765 | 18.5 | | DPM,DNH | | 10 | English | No | H: Need Aids S: Written Notes | | |
| | | 50 | January 14, 2009 | August 15, 2024 | 5692 | 15.6 | | DPM,DNH | | 10 | English | No | H: Hearing Aids | | |
| | | 48 | February 16, 2016 | August 15, 2024 | 3103 | 8.5 | DD2 | DNH | | 10 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 51 | February 6, 2017 | August 15, 2024 | 2747 | 7.5 | | DNM,DNH | | 10 | English | No | H: Assistive Listening Device | H: Need Staff to Speak Loudly and Clearly | |
| | | 67 | December 7, 2017 | August 15, 2024 | 2443 | 6.7 | | DPO,DNH | | 10 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 78 | October 18, 2018 | August 15, 2024 | 2128 | 5.8 | | DLT,DNH | | 10 | English | No | H: Need Aids S: Written Notes | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | November 1, 2019 | August 15, 2024 | 1749 | 4.8 | | DNH | | 10 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 64 | February 6, 2020 | August 15, 2024 | 1652 | 4.5 | | DPM,DNH | | 10 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | March 3, 2020 | August 15, 2024 | 1620 | 4.4 | | DNH | | 10 | English | No | H: Hearing Aids | | |
| | | 45 | July 28, 2023 | August 15, 2024 | 384 | 1.1 | | DLT,DNH | | 10 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 48 | March 8, 2024 | August 15, 2024 | 160 | 0.4 | | DNH | | 10 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 64 | June 15, 1989 | August 15, 2024 | 12845 | 35.2 | | DNH | | 10.2 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | February 5, 2003 | August 15, 2024 | 7862 | 21.5 | DD1 | DPM,DNH | Unverified | 10.3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | May 10, 2007 | August 15, 2024 | 6307 | 17.3 | | DNH | | 10.3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | September 28, 2009 | August 15, 2024 | 5435 | 14.9 | | DNH | | 10.3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | February 8, 2013 | August 15, 2024 | 4206 | 11.5 | | DLT,DNH | | 10.3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | October 4, 2000 | August 15, 2024 | 8716 | 23.9 | | DNH | | 10.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | June 20, 2001 | August 15, 2024 | 8457 | 23.2 | | DPO,DNH | | 10.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | April 19, 2005 | August 15, 2024 | 7058 | 19.3 | | DNH | | 10.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | October 25, 2005 | August 15, 2024 | 6869 | 18.8 | | DPM,DNH | | 10.5 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | December 18, 2003 | August 15, 2024 | 7546 | 20.7 | | DPM,DNH | | 10.6 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | May 1, 2009 | August 15, 2024 | 5585 | 15.3 | | DPM,DNH | | 10.6 | English | No | H: Hearing Aids | | |
| | | 60 | February 23, 2000 | August 15, 2024 | 8940 | 24.5 | | DPM,DNH | | 10.7 | English | No | H: Hearing Aids | | |
| | | 54 | June 11, 2010 | August 15, 2024 | 5179 | 14.2 | | DNH | | 10.7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 61 | April 22, 2013 | August 15, 2024 | 4133 | 11.3 | | DNM,DNH | | 10.7 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 75 | October 2, 1996 | August 15, 2024 | 10179 | 27.9 | | DPM,DNH | | 10.8 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 73 | May 26, 1998 | August 15, 2024 | 9578 | 26.2 | | DPM,DNH | | 10.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | June 7, 1989 | August 15, 2024 | 12853 | 35.2 | | DNM,DNH,DPV | Unknown | 10.9 | Unknown | Unknown | H: Hearing Aids V: Large Print Material | H: Written Notes | |
| | | 59 | March 20, 2001 | August 15, 2024 | 8549 | 23.4 | | DPW,DNH | | 10.9 | English | No | H: Hearing Aids | H: None | |
| | | 64 | April 1, 2010 | August 15, 2024 | 5250 | 14.4 | | DPW,DNH | | 10.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 69 | November 23, 2011 | August 15, 2024 | 4649 | 12.7 | | DNH | | 10.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 77 | January 18, 2019 | August 15, 2024 | 2036 | 5.6 | | DNH | | 10.9 | English | No | H: Hearing Aids | | |
| | | 65 | September 23, 1996 | August 15, 2024 | 10188 | 27.9 | | DLT,DNH | | 11 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | June 24, 1997 | August 15, 2024 | 9914 | 27.2 | | DNM,DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 50 | November 2, 2005 | August 15, 2024 | 6861 | 18.8 | | DNH | | 11 | English | Unknown | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | January 20, 2009 | August 15, 2024 | 5686 | 15.6 | | DNH | | 11 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | February 13, 2009 | August 15, 2024 | 5662 | 15.5 | | DPW,DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 61 | February 24, 2011 | August 15, 2024 | 4921 | 13.5 | | DPM,DNH | Unverified | 11 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 39 | October 5, 2011 | August 15, 2024 | 4698 | 12.9 | | DNH,DPV | | 11 | English | No | H: Use Simple Language V: Text to Speech | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | October 27, 2011 | August 15, 2024 | 4676 | 12.8 | | DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 45 | July 22, 2013 | August 15, 2024 | 4042 | 11.1 | | DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | December 24, 2013 | August 15, 2024 | 3887 | 10.6 | | DPO,DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 61 | October 29, 2014 | August 15, 2024 | 3578 | 9.8 | | DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 48 | January 8, 2024 | August 15, 2024 | 220 | 0.6 | | DNH | | 11 | English | No | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | | |
| | | 26 | January 22, 2024 | August 15, 2024 | 206 | 0.6 | | DNH | | 11 | English | No | H: Need Staff to Speak Loudly and Clearly | | |
| | | 69 | January 26, 1996 | August 15, 2024 | 10429 | 28.6 | | DPO,DNH | | 11.2 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 55 | July 17, 1996 | August 15, 2024 | 10256 | 28.1 | | DNH | | 11.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | April 24, 2001 | August 15, 2024 | 8514 | 23.3 | | DPM,DNH | | 11.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | December 31, 2014 | August 15, 2024 | 3515 | 9.6 | | DNH | | 11.2 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | November 15, 2023 | August 15, 2024 | 274 | 0.8 | | DPO,DNH | | 11.2 | English | No | H: Hearing Aids | H: Written Notes | |
| | | 55 | July 20, 2007 | August 15, 2024 | 6236 | 17.1 | | DLT,DNH | | 11.3 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 39 | October 23, 2008 | August 15, 2024 | 5775 | 15.8 | | DLT,DNH | | 11.3 | English | No | H: Hearing Aids | H: Hearing Aids | |
| | | 56 | August 30, 2013 | August 15, 2024 | 4003 | 11.0 | | DNH | | 11.3 | English | No | H: Hearing Aids | | |
| | | 68 | October 30, 1996 | August 15, 2024 | 10151 | 27.8 | | DNH | | 11.8 | English | No | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 43 | December 27, 2004 | August 15, 2024 | 7171 | 19.6 | | DNH | | 11.8 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 72 | March 3, 2005 | August 15, 2024 | 7105 | 19.5 | | DPO,DNH | | 11.8 | English | No | H: Hearing Aids | | |
| | | 74 | November 30, 2005 | August 15, 2024 | 6833 | 18.7 | | DPO,DNH | | 11.8 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 81 | December 4, 2013 | August 15, 2024 | 3907 | 10.7 | | DLT,DNH | | 11.8 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 50 | October 5, 1995 | August 15, 2024 | 10542 | 28.9 | | DNM,DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | July 10, 1998 | August 15, 2024 | 9533 | 26.1 | | DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | June 21, 2007 | August 15, 2024 | 6265 | 17.2 | | DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | October 15, 2010 | August 15, 2024 | 5053 | 13.8 | | DNH | | 12 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 38 | September 14, 2015 | August 15, 2024 | 3258 | 8.9 | | DNH | | 12 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 71 | October 4, 2016 | August 15, 2024 | 2872 | 7.9 | | DPM,DPH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | September 13, 2018 | August 15, 2024 | 2163 | 5.9 | | DNM,DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | November 20, 2020 | August 15, 2024 | 1364 | 3.7 | | DLT,DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 25 | July 19, 2021 | August 15, 2024 | 1123 | 3.1 | | DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 39 | March 8, 2022 | August 15, 2024 | 891 | 2.4 | | DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | May 9, 2022 | August 15, 2024 | 829 | 2.3 | | DNH | | 12 | English | No | H: Written Notes | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | June 17, 2022 | August 15, 2024 | 790 | 2.2 | | DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | June 29, 2023 | August 15, 2024 | 413 | 1.1 | | DNH | | 12 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 36 | July 26, 2023 | August 15, 2024 | 386 | 1.1 | DD2 | DPO,DNH | | 12 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | November 17, 2023 | August 15, 2024 | 272 | 0.7 | | DNH | | 12 | English | No | H: Reads Lips | | |
| | | 36 | December 13, 2023 | August 15, 2024 | 246 | 0.7 | | DNH | | 12 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 63 | December 3, 1998 | August 15, 2024 | 9387 | 25.7 | | DNH | | 12.4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 63 | December 9, 1998 | August 15, 2024 | 9381 | 25.7 | | DLT,DNH | | 12.4 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | January 7, 1980 | August 15, 2024 | 16292 | 44.6 | | DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 68 | December 14, 1981 | August 15, 2024 | 15585 | 42.7 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | April 23, 1982 | August 15, 2024 | 15455 | 42.3 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | April 8, 1991 | August 15, 2024 | 12183 | 33.4 | | DNH | | 12.9 | English | Unknown | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | October 1, 1991 | August 15, 2024 | 12007 | 32.9 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | August 24, 1993 | August 15, 2024 | 11314 | 31.0 | | DLT,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 80 | August 26, 1993 | August 15, 2024 | 11312 | 31.0 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | November 4, 1993 | August 15, 2024 | 11242 | 30.8 | | DNH,DPV | | 12.9 | English | No | H: Use Simple Language V: Magnifier | H: Reads Lips | |
| | | 66 | December 7, 1994 | August 15, 2024 | 10844 | 29.7 | | DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 54 | February 21, 1995 | August 15, 2024 | 10768 | 29.5 | | DLT,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | September 28, 1995 | August 15, 2024 | 10549 | 28.9 | | DLT,DNH,DNV | | 12.9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 64 | June 5, 1996 | August 15, 2024 | 10298 | 28.2 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | June 28, 1996 | August 15, 2024 | 10275 | 28.2 | | DPW,DNH | Unverified | 12.9 | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | March 20, 1997 | August 15, 2024 | 10010 | 27.4 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | March 28, 1997 | August 15, 2024 | 10002 | 27.4 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | April 4, 1997 | August 15, 2024 | 9995 | 27.4 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | September 3, 1997 | August 15, 2024 | 9843 | 27.0 | | DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | March 2, 1999 | August 15, 2024 | 9298 | 25.5 | | DNM,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | August 17, 1999 | August 15, 2024 | 9130 | 25.0 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 80 | May 19, 2000 | August 15, 2024 | 8854 | 24.3 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | June 14, 2000 | August 15, 2024 | 8828 | 24.2 | | DNM,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 73 | August 30, 2000 | August 15, 2024 | 8751 | 24.0 | | DLT,DNH | | 12.9 | English | No | H: Hearing Aids | H: None | |
| | | 55 | October 4, 2000 | August 15, 2024 | 8716 | 23.9 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | August 7, 2003 | August 15, 2024 | 7679 | 21.0 | | DNM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 70 | August 28, 2003 | August 15, 2024 | 7658 | 21.0 | | DPW,DNH | | 12.9 | English | No | H: Reads Lips | H: Assistive Listening Device | |
| | | 65 | November 21, 2003 | August 15, 2024 | 7573 | 20.7 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | June 15, 2004 | August 15, 2024 | 7366 | 20.2 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | December 16, 2004 | August 15, 2024 | 7182 | 19.7 | | DNM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | March 23, 2005 | August 15, 2024 | 7085 | 19.4 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | October 5, 2005 | August 15, 2024 | 6889 | 18.9 | | DNM,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 57 | August 17, 2006 | August 15, 2024 | 6573 | 18.0 | | DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 38 | January 10, 2007 | August 15, 2024 | 6427 | 17.6 | | DNM,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 57 | March 25, 2008 | August 15, 2024 | 5987 | 16.4 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | November 18, 2008 | August 15, 2024 | 5749 | 15.8 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | September 14, 2009 | August 15, 2024 | 5449 | 14.9 | | DPO,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 62 | November 24, 2009 | August 15, 2024 | 5378 | 14.7 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 35 | November 25, 2009 | August 15, 2024 | 5377 | 14.7 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Assistive Listening Device | |
| | | 51 | March 1, 2010 | August 15, 2024 | 5281 | 14.5 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | August 6, 2010 | August 15, 2024 | 5123 | 14.0 | | DPM,DNH,DNV | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | April 28, 2011 | August 15, 2024 | 4858 | 13.3 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | November 15, 2011 | August 15, 2024 | 4657 | 12.8 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Written Notes | |

All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Today's Date | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Code(s) | LD | Reading Score | Primary Language | LEP Status | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 32 | October 21, 2013 | August 15, 2024 | 3951 | 10.8 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 34 | December 5, 2014 | August 15, 2024 | 3541 | 9.7 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | August 25, 2015 | August 15, 2024 | 3278 | 9.0 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | September 8, 2015 | August 15, 2024 | 3264 | 8.9 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | September 17, 2015 | August 15, 2024 | 3255 | 8.9 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | November 4, 2015 | August 15, 2024 | 3207 | 8.8 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 43 | January 8, 2016 | August 15, 2024 | 3142 | 8.6 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | January 25, 2016 | August 15, 2024 | 3125 | 8.6 | | DLT,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 67 | October 11, 2016 | August 15, 2024 | 2865 | 7.8 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 45 | June 14, 2017 | August 15, 2024 | 2619 | 7.2 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | September 28, 2017 | August 15, 2024 | 2513 | 6.9 | | DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 55 | October 23, 2017 | August 15, 2024 | 2488 | 6.8 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 31 | March 2, 2018 | August 15, 2024 | 2358 | 6.5 | | DNM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | April 2, 2018 | August 15, 2024 | 2327 | 6.4 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 26 | May 1, 2018 | August 15, 2024 | 2298 | 6.3 | | DPM,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | May 11, 2018 | August 15, 2024 | 2288 | 6.3 | | DPM,DNH,DPV | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | June 27, 2018 | August 15, 2024 | 2241 | 6.1 | | DPW,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 58 | September 18, 2019 | August 15, 2024 | 1793 | 4.9 | | DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | November 30, 2022 | August 15, 2024 | 624 | 1.7 | | DPW,DNH | | 12.9 | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 80 | August 18, 2023 | August 15, 2024 | 363 | 1.0 | | DLT,DNH | | 12.9 | English | No | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 68 | March 26, 1993 | August 15, 2024 | 11465 | 31.4 | | DNH | | | English | Unknown | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | February 7, 2018 | August 15, 2024 | 2381 | 6.5 | DD2 | DNH | | | English | No | H: Hearing Aids | H: Reads Lips | |
| | | 45 | February 28, 2023 | August 15, 2024 | 534 | 1.5 | | DNH | | | Spanish | Yes | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | March 21, 2023 | August 15, 2024 | 513 | 1.4 | | DPM,DNH | | | English | No | H: Hearing Aids | H: Written Notes | |
| | | 74 | November 20, 2023 | August 15, 2024 | 269 | 0.7 | | DLT,DNH | | | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | November 24, 2023 | August 15, 2024 | 265 | 0.7 | | DPM,DNH | | | Spanish | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | February 16, 2024 | August 15, 2024 | 181 | 0.5 | | DNH | | | English | No | H: Hearing Aids | H: None | |
| | | 69 | April 22, 2024 | August 15, 2024 | 115 | 0.3 | | DNH | | | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | May 14, 2024 | August 15, 2024 | 93 | 0.3 | | DNH | | | English | No | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | May 28, 2024 | August 15, 2024 | 79 | 0.2 | | DNH | | | English | No | | | |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 36 | 0 | November 29, 2022 | 625 | 1.7 | | C 008 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 0 | May 11, 2006 | 6671 | 18.3 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 41 | 0 | June 7, 2010 | 5183 | 14.2 | | D 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 0 | June 5, 2023 | 437 | 1.2 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 0 | May 17, 2007 | 6300 | 17.3 | | A 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 0 | February 11, 2008 | 6030 | 16.5 | | E 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 0 | June 8, 1998 | 9565 | 26.2 | | E 003 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 0 | March 10, 2000 | 8924 | 24.4 | | A 002 | DPO,DNH,LD | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 0 | September 25, 2002 | 7995 | 21.9 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 0 | September 17, 2003 | 7638 | 20.9 | | A 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 0 | April 22, 2003 | 7786 | 21.3 | | E 005 | DPW,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 0 | June 17, 2013 | 4077 | 11.2 | | E 003 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 71 | 0 | September 16, 1992 | 11656 | 31.9 | | S INF | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 0 | July 22, 2004 | 7329 | 20.1 | | E 002 | DPW,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 0 | October 7, 2011 | 4696 | 12.9 | | A 002 | DLT,DNH,LD | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 75 | 0 | June 23, 2011 | 4802 | 13.2 | DD1 | G 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 78 | 0 | January 9, 2024 | 219 | 0.6 | | E 004 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 0.7 | December 26, 2011 | 4616 | 12.6 | DD2 | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | 1 | February 14, 2023 | 548 | 1.5 | | D 005 | DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 39 | 1 | May 3, 2016 | 3026 | 8.3 | | C 001 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 42 | 1 | December 9, 2003 | 7555 | 20.7 | | D 002 | DLT,DNH,DPV | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 1 | March 12, 2020 | 1617 | 4.4 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 1 | March 20, 2023 | 514 | 1.4 | | F 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 1 | December 15, 2014 | 3531 | 9.7 | DD1 | G 002 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 56 | 1 | October 8, 2014 | 3599 | 9.9 | DD1 | G 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 58 | 1 | April 24, 2006 | 6688 | 18.3 | | G 002 | DLT,DNH | H: Hearing Aids | H: Reads Lips |
| | | 64 | 1 | December 27, 2016 | 2788 | 7.6 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 1 | April 7, 1999 | 9262 | 25.4 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 1 | December 6, 1982 | 15228 | 41.7 | | B 002 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 1 | November 6, 1995 | 10510 | 28.8 | | F 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 71 | 1 | September 27, 2012 | 4340 | 11.9 | | C 004 | DPM,DNH | H: Hearing Aids | H: Reads Lips |
| | | 89 | 1 | August 12, 2016 | 2925 | 8.0 | | F 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 54 | 1.5 | November 23, 2011 | 4649 | 12.7 | DD1 | G 002 | DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 2 | November 5, 2020 | 1379 | 3.8 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 2 | February 11, 2003 | 7856 | 21.5 | | D 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 2 | May 26, 1998 | 9576 | 26.2 | | D 002 | DLT,DPH,DPV,DPS | H: American Sign Language S: America | S: Written Notes |
| | | 62 | 2 | March 14, 2012 | 4537 | 12.4 | | E 005 | DNH | H: Hearing Aids | H: Reads Lips |
| | | 63 | 2 | January 31, 2013 | 4214 | 11.5 | | E 004 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 2 | October 8, 2012 | 4329 | 11.9 | | D 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 2 | December 9, 2009 | 5363 | 14.7 | | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 2 | May 8, 1986 | 13979 | 38.3 | | A 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 2 | November 6, 2013 | 3935 | 10.8 | DD1 | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 2 | July 20, 2017 | 2583 | 7.1 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 2 | October 2, 2017 | 2509 | 6.9 | | F 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 2 | October 26, 2017 | 2485 | 6.8 | DD2 | G 002 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 74 | 2 | April 29, 2024 | 108 | 0.3 | | E 003 | DPM,DNH | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 51 | 2.2 | January 17, 2006 | 6785 | 18.6 | | G 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 2.3 | February 13, 1991 | 12237 | 33.5 | | G 001 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 66 | 2.5 | December 24, 1997 | 9731 | 26.7 | | G 008 | DPM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 30 | 3 | November 2, 2012 | 4304 | | | B 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 40 | 3 | February 26, 2016 | 3090 | 8.5 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 3 | December 5, 2023 | 254 | 0.7 | | E 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 48 | 3 | July 1, 2010 | 5159 | 14.1 | | A 001 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 3 | July 11, 2005 | 6975 | 19.1 | | F 002 | DNH,DPV,LD | H: Hearing Aids V: Magnifier | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 3 | June 30, 2010 | 5160 | 14.1 | DD2 | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 3 | October 12, 2000 | 8708 | 23.9 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 3 | June 10, 2024 | 66 | 0.2 | | E 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 3 | May 4, 2015 | 3391 | 9.3 | | D 004 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 68 | 3 | May 1, 2019 | 1933 | 5.3 | | G 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 3 | August 13, 2019 | 1829 | 5.0 | | F 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 71 | 3 | March 20, 1987 | 13663 | 37.4 | | B 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 82 | 3.4 | May 8, 2024 | 99 | 0.3 | | G 002 | DPM,DNH,DNV | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 63 | 3.5 | December 6, 1991 | 11941 | 32.7 | | F 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 3.6 | October 3, 2014 | 3604 | 9.9 | | G 003 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 26 | 4 | April 7, 2022 | 861 | 2.4 | | Z 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 29 | 4 | April 16, 2019 | 1948 | 5.3 | | D 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 30 | 4 | October 9, 2019 | 1772 | 4.9 | | C 008 | DPM,DPH | H: American Sign Language S: America | H: Written Notes S: Written Notes |
| | | 35 | 4 | February 20, 2019 | 2003 | 5.5 | | E 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 4 | December 18, 2023 | 241 | 0.7 | | E 005 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 42 | 4 | June 8, 2018 | 2260 | 6.2 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 4 | March 4, 2022 | 895 | 2.5 | | F 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 43 | 4 | August 20, 2021 | 1091 | 3.0 | DD2 | E 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 4 | January 3, 2018 | 2416 | 6.6 | | G 003 | DLT,DNH,DPV | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 46 | 4 | February 11, 2002 | 8221 | 22.5 | | G 001 | DPH | H: American Sign Language S: America | H: Written Notes S: Written Notes |
| | | 47 | 4 | January 28, 2004 | 7505 | 20.6 | DD2 | G 001 | DPS | S: Written Notes | |
| | | 48 | 4 | June 26, 2000 | 8816 | 24.2 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 4 | November 5, 2021 | 1014 | 2.8 | | F 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 4 | December 27, 2022 | 597 | 1.6 | | C 004 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 51 | 4 | October 27, 2017 | 2484 | 6.8 | DD1 | G 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 51 | 4 | April 20, 2023 | 483 | 1.3 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 4 | October 19, 2000 | 8701 | 23.8 | | G 002 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 4 | June 17, 2005 | 6999 | 19.2 | | F 001 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 56 | 4 | October 16, 2015 | 3226 | 8.8 | | A 001 | DPM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 4 | May 15, 2017 | 2649 | 7.3 | | F 001 | DNM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 4 | September 27, 1995 | 10550 | 28.9 | | G 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 4 | April 7, 1993 | 11453 | 31.4 | | B 003 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 4 | April 3, 2017 | 2691 | 7.4 | | A 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 4 | May 28, 2024 | 79 | 0.2 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 4 | December 26, 1991 | 11921 | 32.7 | | D 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 4 | March 22, 2016 | 3068 | 8.4 | DD2 | B 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 4 | April 3, 1998 | 9631 | 26.4 | | B 002 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 4 | July 29, 2021 | 1113 | 3.0 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 67 | 4 | June 30, 2009 | 5525 | 15.1 | | A 001 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 72 | 4 | June 29, 2021 | 1143 | 3.1 | | G 003 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 4 | April 27, 2010 | 5224 | 14.3 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 4.1 | December 3, 1991 | 11944 | 32.7 | | F 001 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 4.4 | April 6, 2017 | 2688 | 7.4 | | F 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 4.4 | January 28, 2000 | 8966 | 24.6 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 28 | 5 | March 7, 2016 | 3083 | 8.4 | | G 003 | DPS,LD | S: Written Notes | |
| | | 36 | 5 | August 3, 2022 | 743 | 2.0 | | D 005 | DNH | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | 5 | March 17, 2021 | 1247 | 3.4 | | A 003 | DNH | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | 5 | August 11, 2017 | 2561 | 7.0 | | E 008 | DNH | H: Assistive Listening Device | H: Written Notes |
| | | 43 | 5 | September 15, 2022 | 700 | 1.9 | | E 003 | DPO,DNH | H: Hearing Aids | H: Assistive Listening Device |
| | | 46 | 5 | June 13, 2005 | 7003 | 19.2 | | F 001 | DPM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 46 | 5 | March 14, 2017 | 2711 | 7.4 | | C 008 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 5 | December 17, 2019 | 1703 | 4.7 | | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 5 | May 30, 2012 | 4460 | 12.2 | DD1 | G 002 | DNH,DPS | H: American Sign Language | H: Hearing Aids |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 61 | 5 | December 3, 1999 | 9022 | 24.7 | | F 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 5 | February 23, 2017 | 2730 | 7.5 | | G 003 | DPW,DNH | H: Hearing Aids | H: None |
| | | 63 | 5 | April 5, 1989 | 12916 | 35.4 | | C 008 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 67 | 5 | September 16, 1992 | 11656 | 31.9 | DD2 | G 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 69 | 5 | February 25, 2022 | 902 | 2.5 | | A 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 71 | 5 | September 28, 2000 | 8722 | 23.9 | | F 001 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 72 | 5 | June 20, 2022 | 787 | 2.2 | | E 005 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 5 | September 16, 1988 | 13117 | 35.9 | | F 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 76 | 5 | November 19, 1998 | 9401 | 25.8 | | A 003 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 28 | 5.2 | May 12, 2021 | 1191 | 3.3 | | D 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 5.8 | February 24, 1999 | 9304 | 25.5 | | B 001 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 5.9 | April 22, 2014 | 3768 | 10.3 | | A 001 | DLT,DNH | H: Hearing Aids | H: Reads Lips |
| | | 69 | 5.9 | June 2, 1995 | 10667 | 29.2 | | C 007 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 79 | 5.9 | March 13, 2024 | 155 | 0.4 | | E 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 36 | 6 | October 8, 2018 | 2138 | 5.9 | | D 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 41 | 6 | February 21, 2018 | 2367 | 6.5 | | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 6 | October 1, 1998 | 9450 | 25.9 | | Z 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 6 | December 15, 2006 | 6453 | 17.7 | | D 001 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 6 | April 24, 1981 | 15819 | 43.3 | | G 002 | DNH,LD | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 68 | 6 | May 20, 2024 | 87 | 0.2 | | E 004 | DNH | H: Need Staff to Speak Loudly and Clearly, Hearing Aids | H: Written Notes |
| | | 73 | 6 | December 23, 1998 | 9367 | 25.7 | | B 001 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 73 | 6 | September 14, 2023 | 336 | 0.9 | | G 001 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 6 | June 16, 2006 | 6635 | 18.2 | | A 003 | DPW,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 6.2 | January 27, 2017 | 2757 | 7.6 | | D 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 6.2 | January 16, 1980 | 16283 | 44.6 | | E 004 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 6.2 | July 8, 2011 | 4787 | 13.1 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 66 | 6.2 | October 12, 1994 | 10900 | 29.9 | | G 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 6.4 | October 20, 2000 | 8700 | 23.8 | | D 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 6.4 | April 9, 1997 | 9990 | 27.4 | | G 003 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 66 | 6.6 | August 21, 1981 | 15700 | 43.0 | | B 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 83 | 6.6 | June 20, 2014 | 3709 | 10.2 | | F 001 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 65 | 6.9 | August 6, 2002 | 8045 | 22.0 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 6.9 | August 3, 1990 | 12431 | 34.1 | | A 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 33 | 7 | April 26, 2019 | 1938 | 5.3 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 40 | 7 | May 24, 2016 | 3005 | 8.2 | | D 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 41 | 7 | March 28, 2023 | 506 | 1.4 | | G 003 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 44 | 7 | April 18, 2014 | 3772 | 10.3 | | E 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 7 | August 8, 2022 | 738 | 2.0 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 46 | 7 | March 14, 2003 | 7825 | 21.4 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 7 | May 26, 2000 | 8847 | 24.2 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 7 | October 29, 2001 | 8326 | 22.8 | | G 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 7 | January 7, 2000 | 8987 | 24.6 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 7 | March 19, 2010 | 5263 | 14.4 | | A 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 7 | October 11, 2023 | 309 | 0.8 | | E 004 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 7 | March 10, 2005 | 7098 | 19.4 | | D 001 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 7 | January 24, 2003 | 7874 | 21.6 | | A 003 | DPM,DNH,LD | H: Hearing Aids | H: Reads Lips |
| | | 63 | 7 | February 1, 2021 | 1291 | 3.5 | | F 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 7 | August 29, 1985 | 14231 | 39.0 | | S INF | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 7 | August 17, 2022 | 729 | 2.0 | | E 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 7 | January 8, 2024 | 220 | 0.6 | | E 004 | DPM,DNH | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 47 | 7.6 | September 12, 2001 | 8373 | 22.9 | | F 001 | DPS | H: Use Simple Language | H: None |
| | | 53 | 7.6 | November 30, 2017 | 2450 | 6.7 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 62 | 7.6 | October 23, 1981 | 15637 | 42.8 | | A 001 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | |
| | | 75 | 7.6 | February 5, 2008 | 6036 | 16.5 | | F 001 | DPO,DNH | H: Hearing Aids | |
| | | 58 | 7.7 | October 27, 1998 | 9424 | 25.8 | | D 004 | DPO,DNH | H: Assistive Listening Device | |
| | | 69 | 7.7 | April 24, 1997 | 9975 | 27.3 | | B 002 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | 7.8 | September 7, 2017 | 2534 | 6.9 | | Z 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 7.8 | March 14, 2007 | 6364 | 17.4 | | A 002 | DLT,DNH | H: Hearing Aids | |
| | | 59 | 7.8 | February 22, 2016 | 3097 | 8.5 | | F 002 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 7.8 | March 5, 2014 | 3816 | 10.5 | | A 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 40 | 7.9 | February 10, 2014 | 3839 | 10.5 | | D 001 | DNH | H: Use Simple Language | H: Hearing Aids |
| | | 57 | 7.9 | March 18, 2019 | 1977 | 5.4 | | B 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 33 | 8 | February 18, 2021 | 1274 | 3.5 | | D 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 41 | 8 | July 28, 2023 | 384 | 1.1 | | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 8 | May 12, 2021 | 1191 | 3.3 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 8 | August 7, 2023 | 374 | 1.0 | | C 003 | DPW,DNH | H: Hearing Aids | H: Written Notes |
| | | 47 | 8 | December 12, 2000 | 8647 | 23.7 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 8 | November 13, 2018 | 2102 | 5.8 | | A 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 52 | 8 | November 5, 2012 | 4301 | 11.8 | | D 005 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 8 | May 7, 2004 | 7405 | 20.3 | | D 004 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | February 5, 2001 | 8592 | 23.5 | | A 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | September 28, 2009 | 5435 | 14.9 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | August 13, 2014 | 3655 | 10.0 | | F 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | September 28, 2018 | 2148 | 5.9 | | G 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | March 29, 2022 | 870 | 2.4 | DD2 | G 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 58 | 8 | February 25, 1999 | 9303 | 25.5 | | D 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 8 | December 2, 2002 | 7927 | 21.7 | | B 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 66 | 8 | May 4, 2016 | 3025 | 8.3 | | G 002 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 66 | 8 | September 6, 2022 | 709 | 1.9 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 8 | January 19, 2024 | 209 | 0.6 | | C 007 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 8 | November 1, 1995 | 10515 | 28.8 | | E 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 8.2 | February 11, 1993 | 11508 | 31.5 | | F 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 8.4 | April 2, 2009 | 5614 | 15.4 | | F 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 8.5 | March 21, 1991 | 12201 | 33.4 | | A 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 8.5 | April 28, 2005 | 7049 | 19.3 | | B 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 42 | 8.6 | March 23, 2018 | 2337 | 6.4 | | D 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 28 | 9 | October 19, 2020 | 1396 | 3.8 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 44 | 9 | March 27, 2019 | 1968 | 5.4 | | G 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 46 | 9 | April 4, 2022 | 864 | 2.4 | | D 001 | DNH | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 48 | 9 | April 30, 2010 | 5221 | 14.3 | | D 003 | DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 9 | December 8, 2004 | 7190 | 19.7 | DD3 | G 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Assistive Listening Device |
| | | 58 | 9 | May 6, 1999 | 9233 | 25.3 | | D 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 9 | January 15, 2020 | 1674 | 4.6 | | A 001 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 61 | 9 | April 8, 2010 | 5243 | 14.4 | | F 002 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 61 | 9 | December 8, 2011 | 4634 | 12.7 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 63 | 9 | December 20, 1984 | 14483 | 39.7 | | A 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 9 | September 23, 1998 | 9458 | 25.9 | | A 003 | DNM,DNH | H: Hearing Aids S: Written Notes | H: Need Staff to Speak Loudly and Clearly V: Read Documents Aloud |
| | | 65 | 9 | March 1, 2002 | 8203 | 22.5 | | UNK-U | DPW,DNH,DNV | H: Hearing Aids V: Large Print Material | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 9 | December 9, 1980 | 15955 | 43.7 | DD1 | E 004 | DNH,DPV | H: Hearing Aids V: Read Documents Aloud | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 66 | 9 | June 11, 2002 | 8101 | 22.2 | | F 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 68 | 9 | September 20, 2023 | 330 | 0.9 | | A 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 9 | May 25, 2000 | 8848 | 24.2 | | G 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 54 | 9.4 | June 5, 2007 | 6281 | 17.2 | | A 001 | DNH | H: Hearing Aids | H: Reads Lips |
| | | 61 | 9.4 | June 11, 2003 | 7736 | 21.2 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 9.4 | August 30, 1996 | 10212 | 28.0 | | E 003 | DPM,DNH | H: Hearing Aids | H: Reads Lips |
| | | 64 | 9.4 | May 1, 2017 | 2663 | 7.3 | | F 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 68 | 9.4 | November 7, 1994 | 10874 | 29.8 | | A 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 69 | 9.4 | December 5, 1995 | 10481 | 28.7 | | G 002 | DNH | H: Use Simple Language S: Written Notes | |
| | | 73 | 9.5 | April 1, 1974 | 18399 | 50.4 | | C 008 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 40 | 9.6 | August 5, 2013 | 4028 | 11.0 | | Z 001 | DNH,LD | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 50 | 9.6 | July 12, 2007 | 6244 | 17.1 | | G 003 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 9.6 | March 29, 1991 | 12193 | 33.4 | | A 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 76 | 9.7 | June 3, 1992 | 11761 | 32.2 | | S INF | DPW,DNH | H: Reads Lips | H: Hearing Aids |
| | | 50 | 9.9 | May 14, 2002 | 8129 | 22.3 | | D 004 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 9.9 | April 26, 2011 | 4860 | 13.3 | | G 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 60 | 9.9 | April 6, 2005 | 7071 | 19.4 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 9.9 | March 18, 1999 | 9282 | 25.4 | | A 001 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 68 | 9.9 | July 18, 2007 | 6238 | 17.1 | DD2 | G 002 | DNH | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 69 | 9.9 | July 21, 2004 | 7330 | 20.1 | | A 002 | DNH | H: Reads Lips S: Written Notes | |
| | | 70 | 9.9 | December 30, 1988 | 13012 | 35.6 | | A 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 9.9 | July 25, 2007 | 6231 | 17.1 | | A 002 | DNH,DNV | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 77 | 9.9 | April 18, 1991 | 12173 | 33.4 | | C 008 | DPW,DNH,DPV | H: Hearing Aids V: Text to Speech | H: Need Staff to Speak Loudly and Clearly |
| | | 80 | 9.9 | September 26, 1983 | 14934 | 40.9 | | F 002 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 41 | 10 | February 6, 2006 | 6765 | 18.5 | | D 003 | DPM,DNH | H: Hearing Aids S: Written Notes | |
| | | 45 | 10 | July 28, 2023 | 384 | 1.1 | | E 002 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 48 | 10 | February 16, 2016 | 3103 | 8.5 | DD2 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 48 | 10 | March 8, 2024 | 160 | 0.4 | | E 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 50 | 10 | January 14, 2009 | 5692 | 15.6 | | E 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 10 | February 6, 2017 | 2747 | 7.5 | | D 002 | DNM,DNH | H: Assistive Listening Device | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 10 | March 9, 2020 | 1620 | 4.4 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 10 | September 30, 2004 | 7259 | 19.9 | | B 001 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 59 | 10 | November 1, 2019 | 1749 | 4.8 | | G 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 64 | 10 | February 6, 2020 | 1652 | 4.5 | | B 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 67 | 10 | December 7, 2017 | 2443 | 6.7 | | A 003 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 10 | April 10, 1986 | 14007 | 38.4 | | F 002 | DPM,DNH | H: Hearing Aids S: Written Notes | |
| | | 78 | 10 | October 18, 2018 | 2128 | 5.8 | | G 003 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.2 | June 15, 1989 | 12845 | 35.2 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 10.3 | February 8, 2013 | 4206 | 11.5 | | G 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 10.3 | September 28, 2009 | 5435 | 14.9 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 10.3 | May 10, 2007 | 6307 | 17.3 | | G 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 10.3 | February 5, 2003 | 7862 | 21.5 | DD1 | G 002 | DPM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 10.5 | April 19, 2005 | 7058 | 19.3 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 10.5 | October 25, 2005 | 6869 | 18.8 | | E 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 10.5 | October 4, 2000 | 8716 | 23.9 | | D 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 10.5 | June 20, 2001 | 8457 | 23.2 | | A 001 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 10.6 | December 18, 2003 | 7546 | 20.7 | | D 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.6 | May 1, 2009 | 5585 | 15.3 | | F 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 54 | 10.7 | June 11, 2010 | 5179 | 14.2 | | G 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 10.7 | February 23, 2000 | 8940 | 24.5 | | G 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 61 | 10.7 | April 22, 2013 | 4133 | 11.3 | | G 003 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 73 | 10.8 | May 26, 1998 | 9578 | 26.2 | | E 003 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 75 | 10.8 | October 2, 1996 | 10179 | 27.9 | | A 002 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 10.9 | June 7, 1989 | 12853 | 35.2 | | UNK-U | DNM,DNH,DPV | H: Hearing Aids V: Large Print Material | H: Written Notes |
| | | 59 | 10.9 | March 20, 2001 | 8549 | 23.4 | | A 003 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.9 | April 1, 2010 | 5250 | 14.4 | | G 002 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 69 | 10.9 | November 23, 2011 | 4649 | 12.7 | | F 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 77 | 10.9 | January 18, 2019 | 2036 | 5.6 | | S INF | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 26 | 11 | January 22, 2024 | 206 | 0.6 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 11 | February 13, 2009 | 5662 | 15.5 | | F 001 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 39 | 11 | October 5, 2011 | 4698 | 12.9 | | D 002 | DNH,DPV | H: Use Simple Language V: Text to Speech | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 11 | July 22, 2013 | 4042 | 11.1 | | C 006 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 48 | 11 | January 8, 2024 | 220 | 0.6 | | C 005 | DNH | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | |
| | | 50 | 11 | November 2, 2005 | 6861 | 18.8 | | G 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 11 | October 27, 2011 | 4676 | 12.8 | | E 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 11 | February 24, 2011 | 4921 | 13.5 | | E 001 | DPM,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 11 | October 29, 2014 | 3578 | 9.8 | | E 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 11 | June 24, 1997 | 9914 | 27.2 | | B 002 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 11 | January 20, 2009 | 5686 | 15.6 | | A 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 11 | September 23, 1996 | 10188 | 27.9 | | E 003 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 67 | 11 | December 24, 2013 | 3887 | 10.6 | | A 001 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 52 | 11.2 | December 31, 2014 | 3515 | 9.6 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 11.2 | July 17, 1996 | 10256 | 28.1 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 11.2 | November 15, 2023 | 274 | 0.8 | | E 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 62 | 11.2 | April 24, 2001 | 8514 | 23.3 | | B 002 | DPM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 69 | 11.2 | January 26, 1996 | 10429 | 28.6 | | E 003 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 39 | 11.3 | October 23, 2008 | 5775 | 15.8 | | A 001 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 55 | 11.3 | July 20, 2007 | 6236 | 17.1 | | A 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 11.3 | August 30, 2013 | 4003 | 11.0 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 43 | 11.8 | December 27, 2004 | 7171 | 19.6 | | A 001 | DNH | H: Hearing Aids | H: Reads Lips |
| | | 68 | 11.8 | October 30, 1996 | 10151 | 27.8 | | F 001 | DNH | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 72 | 11.8 | March 3, 2005 | 7105 | 19.5 | | E 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 11.8 | November 30, 2005 | 6833 | 18.7 | | F 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 81 | 11.8 | December 4, 2013 | 3907 | 10.7 | | F 001 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 25 | 12 | July 19, 2021 | 1123 | 3.1 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 12 | July 26, 2023 | 386 | 1.1 | DD2 | G 001 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 12 | December 13, 2023 | 246 | 0.7 | | E 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 37 | 12 | June 17, 2022 | 790 | 2.2 | | E 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 12 | September 14, 2015 | 3258 | 8.9 | | F 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 39 | 12 | March 8, 2022 | 891 | 2.4 | | G 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 40 | 12 | June 29, 2023 | 413 | 1.1 | | G 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 49 | 12 | October 15, 2010 | 5053 | 13.8 | | A 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 50 | 12 | October 5, 1995 | 10542 | 28.9 | | B 002 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 12 | May 9, 2022 | 829 | 2.3 | | D 002 | DNH | H: Written Notes | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 12 | November 20, 2020 | 1364 | 3.7 | | F 001 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 12 | July 10, 1998 | 9533 | 26.1 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 12 | June 21, 2007 | 6265 | 17.2 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 63 | 12 | November 17, 2023 | 272 | 0.7 | | E 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 70 | 12 | September 13, 2018 | 2163 | 5.9 | | G 002 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 71 | 12 | October 4, 2016 | 2872 | 7.9 | | F 002 | DPM,DPH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 12.4 | December 3, 1998 | 9387 | 25.7 | | F 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 63 | 12.4 | December 9, 1998 | 9381 | 25.7 | | G 003 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 26 | 12.9 | May 1, 2018 | 2298 | 6.3 | | A 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 31 | 12.9 | March 2, 2018 | 2358 | 6.5 | | D 001 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 32 | 12.9 | October 21, 2013 | 3951 | 10.8 | | F 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 34 | 12.9 | December 5, 2014 | 3541 | 9.7 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 35 | 12.9 | November 25, 2009 | 5377 | 14.7 | | D 005 | DNH | H: Hearing Aids | H: Assistive Listening Device |
| | | 36 | 12.9 | September 17, 2015 | 3255 | 8.9 | | D 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | 12.9 | September 28, 2017 | 2513 | 6.9 | | A 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 38 | 12.9 | January 10, 2007 | 6427 | 17.6 | | B 003 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 38 | 12.9 | January 25, 2016 | 3125 | 8.6 | | D 004 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly S: Written Notes | H: Hearing Aids |
| | | 41 | 12.9 | November 4, 2015 | 3207 | 8.8 | | D 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 12.9 | May 11, 2018 | 2288 | 6.3 | | D 001 | DPM,DNH,DPV | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 43 | 12.9 | January 8, 2016 | 3142 | 8.6 | | D 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 12.9 | June 14, 2017 | 2619 | 7.2 | | D 005 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 12.9 | June 15, 2004 | 7366 | 20.2 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 12.9 | October 1, 1991 | 12007 | 32.9 | | D 003 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 12.9 | March 28, 1997 | 10002 | 27.4 | | A 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 12.9 | March 23, 2005 | 7085 | 19.4 | | F 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 12.9 | August 17, 1999 | 9130 | 25.0 | | F 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 12.9 | August 24, 1993 | 11314 | 31.0 | | A 003 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 51 | 12.9 | March 1, 2010 | 5281 | 14.5 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 12.9 | June 28, 1996 | 10275 | 28.2 | | D 001 | DPW,DNH,LD | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 12.9 | December 16, 2004 | 7182 | 19.7 | | D 001 | DNM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 12.9 | November 15, 2011 | 4657 | 12.8 | | F 002 | DNH | H: Hearing Aids | H: Written Notes |
| | | 52 | 12.9 | April 2, 2018 | 2327 | 6.4 | | A 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 12.9 | August 7, 2003 | 7679 | 21.0 | | E 004 | DNM,DNH | H: Hearing Aids | H: Reads Lips |
| | | 54 | 12.9 | February 21, 1995 | 10768 | 29.5 | | B 003 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 54 | 12.9 | August 25, 2015 | 3278 | 9.0 | | G 001 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 54 | 12.9 | November 30, 2022 | 624 | 1.7 | | G 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 12.9 | April 8, 1991 | 12183 | 33.4 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 12.9 | October 4, 2000 | 8716 | 23.9 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 12.9 | October 23, 2017 | 2488 | 6.8 | | A 002 | DNH | H: Hearing Aids | H: Reads Lips |
| | | 56 | 12.9 | August 6, 2010 | 5123 | 14.0 | | C 004 | DPM,DNH,DNV | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 12.9 | August 17, 2006 | 6573 | 18.0 | | G 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 57 | 12.9 | March 25, 2008 | 5987 | 16.4 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 12.9 | November 4, 1993 | 11242 | 30.8 | | A 002 | DNH,DPV | H: Use Simple Language V: Magnifier | H: Hearing Aids |
| | | 58 | 12.9 | September 28, 1995 | 10549 | 28.9 | | F 001 | DLT,DNH,DNV | H: Hearing Aids | H: Reads Lips |
| | | 58 | 12.9 | September 8, 2015 | 3264 | 8.9 | | A 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 12.9 | September 18, 2019 | 1793 | 4.9 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 12.9 | September 3, 1997 | 9843 | 27.0 | | E 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 12.9 | September 14, 2009 | 5449 | 14.9 | | D 003 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 12.9 | June 27, 2018 | 2241 | 6.1 | | F 002 | DPW,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 12.9 | April 4, 1997 | 9995 | 27.4 | | D 003 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 12.9 | June 14, 2000 | 8828 | 24.2 | | A 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 12.9 | November 24, 2009 | 5378 | 14.7 | | F 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 12.9 | April 28, 2011 | 4858 | 13.3 | | A 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 12.9 | April 23, 1982 | 15455 | 42.3 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 12.9 | June 5, 1996 | 10298 | 28.2 | | E 001 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

Copy of All Data

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 64 | 12.9 | October 5, 2005 | 6889 | 18.9 | | F 002 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 65 | 12.9 | November 21, 2003 | 7573 | 20.7 | | B 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 12.9 | November 18, 2008 | 5749 | 15.8 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 66 | 12.9 | December 7, 1994 | 10844 | 29.7 | | G 001 | DNH | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | 12.9 | March 20, 1997 | 10010 | 27.4 | | E 001 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 67 | 12.9 | October 11, 2016 | 2865 | 7.8 | | F 001 | DPW,DNH | H: Hearing Aids | H: Reads Lips |
| | | 68 | 12.9 | January 7, 1980 | 16292 | 44.6 | | A 002 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 68 | 12.9 | December 14, 1981 | 15585 | 42.7 | | E 004 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 12.9 | March 2, 1999 | 9298 | 25.5 | | G 002 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 70 | 12.9 | August 28, 2003 | 7658 | 21.0 | | S INF | DPW,DNH | H: Reads Lips | H: Assistive Listening Device |
| | | 73 | 12.9 | August 30, 2000 | 8751 | 24.0 | | G 003 | DLT,DNH | H: Hearing Aids | H: None |
| | | 80 | 12.9 | August 26, 1993 | 11312 | 31.0 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 80 | 12.9 | May 19, 2000 | 8854 | 24.3 | | F 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 80 | 12.9 | August 18, 2023 | 363 | 1.0 | | E 004 | DLT,DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 37 | | March 21, 2023 | 513 | 1.4 | | G 002 | DPM,DNH | H: Hearing Aids | H: Written Notes |
| | | 40 | | May 28, 2024 | 79 | 0.2 | | E 001 | DNH | | |
| | | 42 | | February 16, 2024 | 181 | 0.5 | | C 001 | DNH | H: Hearing Aids | H: None |
| | | 45 | | February 28, 2023 | 534 | 1.5 | | E 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | | November 24, 2023 | 265 | 0.7 | | C 002 | DPM,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | | May 14, 2024 | 93 | 0.3 | | A 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 67 | | February 7, 2018 | 2381 | 6.5 | DD2 | G 001 | DNH | H: Hearing Aids | H: Reads Lips |
| | | 68 | | March 26, 1993 | 11465 | 31.4 | | C 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 69 | | April 22, 2024 | 115 | 0.3 | | A 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | | November 20, 2023 | 269 | 0.7 | | C 002 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56.7 | 7.8 | | | 15.7 | | | | | |

DNH only

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 89 | August 12, 2016 | 2925 | 8.0 | | F 002 | DPW,DNH | | 1 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 83 | June 20, 2014 | 3709 | 10.2 | | F 001 | DPW,DNH | | 6.6 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 82 | May 8, 2024 | 99 | 0.3 | | G 002 | DPM,DNH,DNV | | 3.4 | H: Written Notes | | |
| | | 81 | December 4, 2013 | 3907 | 10.7 | | F 001 | DLT,DNH | | 11.8 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 80 | September 26, 1983 | 14934 | 40.9 | | F 002 | DPW,DNH | | 9.9 | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 80 | August 26, 1993 | 11312 | 31.0 | | F 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 80 | May 19, 2000 | 8854 | 24.3 | | F 002 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 80 | August 18, 2023 | 363 | 1.0 | | E 004 | DLT,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 79 | March 13, 2024 | 155 | 0.4 | | E 004 | DNH | | 5.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 78 | October 18, 2018 | 2128 | 5.8 | | G 003 | DLT,DNH | | 10 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 78 | January 9, 2024 | 219 | 0.6 | | E 004 | DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 77 | April 18, 1991 | 12173 | 33.4 | | C 008 | DPW,DNH,DPV | | 10 | H: Hearing Aids V: Text to Speech | | |
| | | 77 | January 18, 2019 | 2036 | 5.6 | | S INF | DLT,DNH | | 10.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 76 | June 3, 1992 | 11761 | 32.2 | | S INF | DPW,DNH | | 9.7 | H: Reads Lips | H: Hearing Aids | |
| | | 76 | November 19, 1998 | 9401 | 25.8 | | A 003 | DPO,DNH | | 5 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 75 | October 2, 1996 | 10179 | 27.9 | | A 002 | DPM,DNH | | 10.8 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 75 | February 5, 2008 | 6036 | 16.5 | | F 001 | DPO,DNH | | 7.6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 75 | June 23, 2011 | 4802 | 13.2 | DD1 | G 002 | DPM,DNH | | 0 | H: Hearing Aids | H: Hearing Aids | |
| | | 74 | November 30, 2005 | 6833 | 18.7 | | F 002 | DPO,DNH | | 11.8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 74 | June 16, 2006 | 6635 | 18.2 | | A 003 | DPW,DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 74 | November 20, 2023 | 269 | 0.7 | | C 002 | DLT,DNH | | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 74 | January 8, 2024 | 220 | 0.6 | | E 004 | DPM,DNH | | 7 | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 74 | April 29, 2024 | 108 | 0.3 | | E 003 | DPM,DNH | | 2 | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 73 | April 1, 1974 | 18399 | 50.4 | | C 008 | DPO,DNH | | 9.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | September 16, 1988 | 13117 | 35.9 | | F 001 | DPM,DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | November 1, 1995 | 10515 | 28.8 | | E 003 | DPM,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | May 26, 1998 | 9578 | 26.2 | | E 003 | DPM,DNH | | 10.8 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | December 23, 1998 | 9367 | 25.7 | | B 001 | DPO,DNH | | 6 | H: Hearing Aids | | |
| | | 73 | August 30, 2000 | 8751 | 24.0 | | E 002 | DLT,DNH | | 12.9 | H: Hearing Aids | H: None | |
| | | 73 | April 27, 2010 | 5224 | 14.3 | | E 004 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 73 | September 14, 2023 | 336 | 0.9 | | G 001 | DLT,DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | April 10, 1986 | 14007 | 38.4 | | F 002 | DPM,DNH | | 10 | H: Hearing Aids S: Written Notes | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | July 22, 2004 | 7329 | 20.1 | Unverified | E 002 | DPW,DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | March 2, 2005 | 7105 | 19.5 | | E 002 | DPO,DNH | | 11.8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | October 7, 2011 | 4696 | 12.9 | Unverified | A 002 | DLT,DNH | | 6 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 72 | June 29, 2021 | 1143 | 3.1 | | G 003 | DPO,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | June 20, 2022 | 787 | 2.2 | | E 005 | DPM,DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | August 17, 2022 | 729 | 2.0 | | E 002 | DPM,DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 72 | January 19, 2024 | 209 | 0.6 | | C 007 | DLT,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 71 | March 20, 1987 | 13663 | 37.4 | | B 002 | DPM,DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 71 | September 16, 1992 | 11656 | 31.9 | | S INF | DPO,DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 71 | September 28, 2000 | 8722 | 23.9 | | F 001 | DPM,DNH | | 5 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | September 27, 2012 | 4340 | 11.9 | | C 004 | DPM,DNH | | 11.9 | H: Reads Lips | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | December 30, 1988 | 13012 | 35.6 | | A 002 | DLT,DNH | | 9.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | August 3, 1990 | 12431 | 34.1 | | A 002 | DPO,DNH | | 6.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | April 9, 1997 | 9990 | 27.4 | | G 003 | DPM,DNH | | 6.4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | March 2, 1999 | 9298 | 25.5 | | G 002 | DNM,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | August 28, 2003 | 7658 | 21.0 | | S INF | DPW,DNH | | 12.9 | H: Reads Lips | H: Assistive Listening Device | |
| | | 70 | July 25, 2007 | 6231 | 17.1 | | A 002 | DNH,DNV | | 9.9 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | June 17, 2013 | 4077 | 11.2 | | E 003 | DPM,DNH | | 0 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 70 | September 13, 2018 | 2163 | 5.9 | | G 002 | DNM,DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 70 | August 13, 2019 | 1829 | 5.0 | | F 002 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | June 2, 1995 | 10667 | 29.2 | | C 007 | DPM,DNH | | 5.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | November 6, 1995 | 10510 | 28.8 | | F 002 | DLT,DNH | | 1 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | December 5, 1995 | 10481 | 28.7 | | G 002 | DNH | | 9.4 | H: Use Simple Language S: Written Notes | | |
| | | 69 | January 26, 1996 | 10429 | 28.6 | | E 002 | DPO,DNH | | 11.2 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 69 | April 24, 1997 | 9975 | 27.3 | | B 002 | DLT,DNH | | 7.7 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 69 | May 25, 2000 | 8848 | 24.2 | | G 002 | DPW,DNH | | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | July 21, 2004 | 7330 | 20.1 | | A 002 | DNH | | 9.9 | H: Reads Lips S: Written Notes | | |

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 69 | November 23, 2011 | 4649 | 12.7 | | F 001 | DNH | | 10.9 | H: Reads Lips | | |
| | | 69 | July 20, 2017 | 2583 | 7.1 | | E 002 | DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | October 2, 2017 | 2509 | 6.9 | | F 002 | DPM,DNH | | 2 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 69 | October 26, 2017 | 2485 | 6.8 | DD2 | G 002 | DLT,DNH | | 2 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 69 | February 25, 2022 | 902 | 2.5 | | A 003 | DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 69 | April 22, 2024 | 115 | 0.3 | | A 003 | DNH | | | H: Hearing Aids | | |
| | | 68 | January 7, 1980 | 16292 | 44.6 | | A 002 | DLT,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 68 | December 14, 1981 | 15585 | 42.7 | | E 004 | DPM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 8, 1986 | 13979 | 38.3 | | A 001 | DPW,DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | March 26, 1993 | 11465 | 31.4 | | C 002 | DNH | | | H: Need Staff to Speak Loudly and Clearly | | |
| | | 68 | November 7, 1994 | 10874 | 29.8 | | A 002 | DLT,DNH | | 9.4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | October 30, 1996 | 10151 | 27.8 | | F 001 | DNH | | 11.8 | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 68 | April 22, 2003 | 7786 | 21.3 | | E 005 | DPW,DNH | Unverified | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | July 18, 2007 | 6238 | 17.1 | DD2 | G 002 | DNH | | 9.9 | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 68 | December 26, 2011 | 4616 | 12.6 | DD2 | G 002 | DNH | | 0.7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | November 6, 2013 | 3935 | 10.8 | DD1 | G 003 | DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 4, 2015 | 3391 | 9.3 | | D 004 | DPO,DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 1, 2019 | 1933 | 5.3 | | G 002 | DPO,DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | September 20, 2023 | 330 | 0.9 | | A 001 | DNH | | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 68 | May 20, 2024 | 87 | 0.2 | | E 004 | DNH | | 6 | H: Need Staff to Speak Loudly and Clearly, Hearing Aids | H: Written Notes | |
| | | 67 | September 16, 1992 | 11656 | 31.9 | DD2 | A 001 | DNM,DNH | | 5 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | June 30, 2009 | 5525 | 15.1 | | A 001 | DLT,DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | December 24, 2013 | 3887 | 10.6 | | A 001 | DPO,DNH | | 11 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 67 | October 11, 2016 | 2865 | 7.8 | | F 001 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Reads Lips | |
| | | 67 | December 7, 2017 | 2443 | 6.7 | | A 003 | DPO,DNH | | 10 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 67 | February 7, 2018 | 2381 | 6.5 | DD2 | G 001 | DNH | | | H: Hearing Aids | H: Reads Lips | |
| | | 66 | December 9, 1980 | 15955 | 43.7 | DD1 | E 004 | DNH,DPV | | 9 | H: Hearing Aids V: Read Documents Aloud | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | August 21, 1981 | 15700 | 43.0 | | B 002 | DNH | | 6.6 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 66 | December 6, 1982 | 15228 | 41.7 | | B 003 | DNM,DNH | | 1 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | October 12, 1994 | 10900 | 29.9 | | G 003 | DPM,DNH | | 6.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | December 7, 1994 | 10844 | 29.7 | | G 001 | DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 66 | March 20, 1997 | 10010 | 27.4 | | E 001 | DPM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | December 24, 1997 | 9731 | 26.7 | | G 002 | DPM,DNH | Unverified | 2.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | February 24, 1999 | 9304 | 25.5 | | B 001 | DPO,DNH | | 5.8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | June 11, 2002 | 8101 | 22.2 | | F 002 | DPO,DNH | | 9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 66 | December 9, 2009 | 5363 | 14.7 | | G 001 | DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | May 4, 2016 | 3025 | 8.3 | | G 002 | DPW,DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 66 | September 6, 2022 | 709 | 1.9 | | E 004 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 66 | June 10, 2024 | 66 | 0.2 | | E 001 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | August 29, 1985 | 14231 | 39.0 | | S INF | DPM,DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | February 13, 1991 | 12237 | 33.5 | | G 001 | DPW,DNH | | 2.3 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 65 | September 23, 1996 | 10188 | 27.9 | | E 003 | DLT,DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | April 7, 1999 | 9262 | 25.4 | | G 001 | DNH | | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | October 4, 2000 | 8716 | 23.9 | | G 002 | DNH | | 10.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | June 20, 2001 | 8457 | 23.2 | | A 001 | DPO,DNH | | 10.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | March 1, 2002 | 8203 | 22.5 | | UNK-U | DPW,DNH,DNV | | 9 | H: Hearing Aids V: Large Print Material V: Read Documents Aloud | | |
| | | 65 | August 6, 2002 | 8045 | 22.0 | | F 002 | DNH | | 6.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | December 2, 2002 | 7927 | 21.7 | | B 002 | DPO,DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 65 | November 21, 2003 | 7573 | 20.7 | | B 001 | DPM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 65 | November 18, 2008 | 5749 | 15.8 | | F 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | January 16, 1980 | 16283 | 44.6 | | E 004 | DNM,DNH | | 6.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | April 23, 1982 | 15455 | 42.3 | | E 004 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | June 15, 1989 | 12845 | 35.2 | | D 005 | DNH | | 10.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | March 21, 1991 | 12201 | 33.4 | | A 002 | DNH | | 8.5 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 64 | June 5, 1996 | 10298 | 28.2 | | E 001 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | April 3, 1998 | 9631 | 26.4 | | B 002 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 64 | September 23, 1998 | 9458 | 25.9 | | A 003 | DNM,DNH | | 9 | H: Hearing Aids S: Written Notes | | |
| | | 64 | April 28, 2005 | 7049 | 19.3 | | B 002 | DPO,DNH | | 8.5 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 64 | October 5, 2005 | 6889 | 18.9 | | F 002 | DNM,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 64 | January 20, 2009 | 5686 | 15.6 | | A 002 | DPO,DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 64 | May 1, 2009 | 5585 | 15.3 | | F 002 | DPW,DNH | | 10.6 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 64 | April 1, 2010 | 5250 | 14.4 | | G 002 | DPW,DNH | | 10.9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 64 | July 8, 2011 | 4787 | 13.1 | | F 002 | DNH | | 6.2 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 64 | October 8, 2012 | 4329 | 11.9 | | D 002 | DPW,DNH | | 2 | H: Hearing Aids | | |
| | | 64 | March 5, 2014 | 3816 | 10.5 | | A 003 | DPO,DNH | | 7.8 | H: Hearing Aids | | |
| | | 64 | December 27, 2016 | 2788 | 7.6 | | E 002 | DNH | | 1 | H: Hearing Aids | | |
| | | 64 | May 1, 2017 | 2663 | 7.3 | | F 001 | DNH | | 9.4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 64 | February 6, 2020 | 1652 | 4.5 | | B 003 | DPM,DNH | | 10 | H: Hearing Aids | | |
| | | 64 | July 29, 2021 | 1113 | 3.0 | | F 002 | DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 63 | April 24, 1981 | 15819 | 43.3 | | G 002 | DNH | Yes | 6 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | VERIFIED LEARNING DISABILITY PER CREDENTIALED SCHOOL PSYCHOLOGIST REPORT DATED 2/ --- p: 11 April 2019 14:17:47 --- User: [BODO004] |
| | | 63 | December 20, 1984 | 14483 | 39.7 | | A 001 | DNH | | 9 | H: Hearing Aids | H: Reads Lips | |
| | | 63 | April 5, 1989 | 12916 | 35.4 | | C 008 | DPW,DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | December 6, 1991 | 11941 | 32.7 | | F 003 | DNH | | 3.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | August 30, 1996 | 10212 | 28.0 | | E 003 | DPM,DNH | | 9.4 | H: Hearing Aids | H: Reads Lips | |
| | | 63 | June 24, 1997 | 9914 | 27.2 | | B 002 | DNM,DNH | | 11 | H: Hearing Aids | | |
| | | 63 | December 3, 1998 | 9387 | 25.7 | | F 002 | DNH | | 12.4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 63 | December 9, 1998 | 9381 | 25.7 | | G 003 | DLT,DNH | | 12.4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 63 | March 18, 1999 | 9282 | 25.4 | | A 001 | DPM,DNH | | 9.9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 63 | September 17, 2003 | 7638 | 20.9 | | A 001 | DPM,DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | April 28, 2011 | 4858 | 13.3 | | A 002 | DPM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | January 31, 2013 | 4214 | 11.5 | | E 004 | DPM,DNH | | 2 | H: Hearing Aids | | |
| | | 63 | March 22, 2016 | 3068 | 8.4 | DD2 | B 002 | DPW,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | Adaptive Support Needs: * Victimization: Vulnerable to victimization * Communication: Slow simple language/repeat as needed, Give one or two step instructions * Rules & Policies: Assist to understand rules/procedures, Assist adjusting to new environments * Reading & Writing: Offer to read/write CDCR forms/paperwork |
| | | 63 | February 1, 2021 | 1291 | 3.5 | | F 001 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | November 17, 2023 | 272 | 0.7 | | E 003 | DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 63 | November 24, 2023 | 265 | 0.7 | | C 002 | DPM,DNH | | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 63 | May 14, 2024 | 93 | 0.3 | | A 003 | DNH | | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | October 23, 1981 | 15637 | 42.8 | | A 001 | DLT,DNH | | 7.6 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 62 | March 29, 1991 | 12193 | 33.4 | | A 002 | DNH | | 9.6 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 62 | April 4, 1997 | 9995 | 27.4 | | D 003 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | June 14, 2000 | 8828 | 24.2 | | A 001 | DNM,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 62 | April 24, 2001 | 8514 | 23.3 | | B 002 | DPM,DNH | | 11.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | September 25, 2002 | 7995 | 21.9 | | G 003 | DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | January 24, 2003 | 7874 | 21.6 | | A 001 | DPM,DNH | | 4 | H: Hearing Aids | H: Reads Lips | |
| | | 62 | October 25, 2005 | 6869 | 18.8 | | E 002 | DPM,DNH | Unverified | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | November 24, 2009 | 5378 | 14.7 | | F 002 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 62 | March 14, 2012 | 4537 | 12.4 | | E 005 | DNH | | 2 | H: Hearing Aids | H: Reads Lips | |
| | | 62 | February 23, 2017 | 2730 | 7.5 | | G 003 | DPW,DNH | | 5 | H: Hearing Aids | H: None | |
| | | 61 | December 26, 1991 | 11921 | 32.7 | | D 001 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | December 3, 1999 | 9022 | 24.7 | | F 003 | DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | March 10, 2000 | 8924 | 24.4 | | A 002 | DPO,DNH | | 0 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | June 11, 2003 | 7736 | 21.2 | | G 002 | DNH | | 9.4 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | April 8, 2010 | 5243 | 14.4 | | F 002 | DPM,DNH | | 9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 61 | February 24, 2011 | 4921 | 13.5 | | E 001 | DPM,DNH | Unverified | 11 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | December 8, 2011 | 4634 | 12.7 | | F 002 | DNH | | 9 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 61 | April 22, 2013 | 4133 | 11.3 | | G 003 | DNM,DNH | | 10.7 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 61 | October 29, 2014 | 3578 | 9.8 | | E 003 | DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | December 3, 1991 | 11944 | 32.7 | | G 003 | DPO,DNH | | 4.1 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | April 7, 1993 | 11453 | 31.4 | | B 003 | DPM,DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | September 3, 1997 | 9843 | 27.0 | | E 002 | DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 60 | February 23, 2000 | 8940 | 24.5 | | G 001 | DPM,DNH | | 10.7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | March 10, 2005 | 7098 | 19.4 | | G 002 | DLT,DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | April 6, 2005 | 7071 | 19.4 | | E 002 | DNH | | 9.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | June 21, 2007 | 6265 | 17.2 | | G 003 | DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

DNH only

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 60 | September 14, 2009 | 5449 | 14.9 | | D 003 | DPO,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 60 | April 3, 2017 | 2691 | 7.4 | | A 002 | DPM,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 60 | June 27, 2018 | 2241 | 6.1 | | F 002 | DPW,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 60 | May 28, 2024 | 79 | 0.2 | | F 002 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | June 7, 1989 | 12853 | 35.2 | UNK-U | | DNM,DNH,DPV | | 10.9 | H: Hearing Aids V: Large Print Material | H: Written Notes | |
| | | 59 | February 11, 1993 | 11508 | 31.5 | | F 002 | DPO,DNH | | 8.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | June 8, 1998 | 9565 | 26.2 | | E 003 | DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | July 10, 1998 | 9533 | 26.1 | | D 005 | DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | October 12, 2000 | 8708 | 23.9 | | D 005 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | March 20, 2001 | 8549 | 23.4 | | A 003 | DPW,DNH | | 10.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 59 | September 30, 2004 | 7259 | 19.9 | | B 001 | DPO,DNH | | 10 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 59 | February 22, 2016 | 3097 | 8.5 | | F 002 | DPW,DNH | | 7.8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 59 | November 1, 2019 | 1749 | 4.8 | | G 001 | DNH | | 10 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 59 | January 15, 2020 | 1674 | 4.6 | | A 001 | DPO,DNH | | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | November 4, 1993 | 11242 | 30.8 | | A 002 | DNH,DPV | | 12.9 | H: Use Simple Language V: Magnifier | H: Reads Lips | |
| | | 58 | September 27, 1995 | 10550 | 28.9 | | A 001 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | September 28, 1995 | 10549 | 28.9 | | F 001 | DLT,DNH,DNV | | 12.9 | H: Hearing Aids | H: Reads Lips | |
| | | 58 | October 27, 1998 | 9424 | 25.8 | | D 004 | DPO,DNH | | 7.7 | H: Assistive Listening Device | | |
| | | 58 | February 25, 1999 | 9303 | 25.5 | | D 002 | DPM,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | May 6, 1999 | 9233 | 25.3 | | D 001 | DPM,DNH | | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | April 24, 2006 | 6688 | 18.3 | | G 002 | DLT,DNH | | 1 | H: Hearing Aids | H: Reads Lips | |
| | | 58 | February 11, 2008 | 6030 | 16.5 | | F 002 | DPM,DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | May 30, 2012 | 4460 | 12.2 | DD1 | G 002 | DNH,DPS | | 5 | H: American Sign Language | H: Hearing Aids | |
| | | 58 | September 8, 2015 | 3264 | 8.9 | | A 002 | DNH,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | September 18, 2019 | 1793 | 4.9 | | A 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | November 20, 2020 | 1364 | 3.7 | | F 001 | DLT,DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 58 | October 11, 2023 | 309 | 0.8 | | E 004 | DPO,DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | February 5, 2003 | 7862 | 21.5 | DD1 | G 003 | DPM,DNH | Unverified | 10.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | February 11, 2003 | 7856 | 21.5 | | G 002 | DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | August 17, 2006 | 6573 | 18.0 | | G 003 | DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 57 | March 25, 2008 | 5987 | 16.4 | | A 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 57 | March 18, 2019 | 1977 | 5.4 | | B 001 | DNM,DNH | | 7.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 57 | November 15, 2023 | 274 | 0.8 | | E 002 | DPO,DNH | | 11.2 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 56 | October 19, 2000 | 8701 | 23.8 | | G 002 | DNM,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | June 17, 2005 | 6999 | 19.2 | | F 001 | DPM,DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 56 | May 10, 2007 | 6307 | 17.3 | | G 002 | DNH | | 10.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | March 19, 2010 | 5263 | 14.4 | | A 002 | DPM,DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | August 6, 2010 | 5123 | 14.0 | | C 004 | DPM,DNH,DNV | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | August 30, 2013 | 4003 | 11.0 | | F 002 | DNH | | 11.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | October 8, 2014 | 3599 | 9.9 | DD1 | G 001 | DNH | | 1 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 56 | October 16, 2015 | 3226 | 8.8 | | A 001 | DPM,DNH | Unverified | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 56 | May 15, 2017 | 2649 | 7.3 | | F 002 | DNM,DNH | Yes | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | -Recommend student participates in after school tutoring.-Place in close proximity to the teacher to receive additional feedback and assistance.-Provide additional time to complete school assignments.-Teachers will use 1-2 step instructions.-Student may use a peer note-taker or be provided with note-taking assistance.-Student may use dictionary/thesaurus/computer-aided instruction. |
| | | 56 | March 9, 2020 | 1620 | 4.4 | | F 002 | DNH | | 10 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | April 8, 1991 | 12183 | 33.4 | | E 001 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | July 17, 1996 | 10256 | 28.1 | | F 002 | DNH | | 11.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | January 7, 2000 | 8987 | 24.6 | | F 002 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | October 4, 2000 | 8716 | 23.9 | | F 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | October 20, 2000 | 8700 | 23.8 | | D 003 | DPM,DNH | | 6.4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | February 5, 2001 | 8592 | 23.5 | | A 001 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | July 20, 2007 | 6236 | 17.1 | | A 002 | DLT,DNH | | 11.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | September 28, 2009 | 5435 | 14.9 | | G 003 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | October 27, 2011 | 4676 | 12.8 | | E 003 | DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | August 13, 2014 | 3655 | 10.0 | | F 002 | DPO,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | October 3, 2014 | 3604 | 9.9 | | G 003 | DNM,DNH | | 3.6 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | December 15, 2017 | 3531 | 9.7 | DD1 | G 002 | DNM,DNH | | 1 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 55 | October 23, 2017 | 2488 | 6.8 | | A 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 55 | September 28, 2018 | 2148 | 5.9 | | G 002 | DPO,DNH | | 8 | H: Hearing Aids | H: Hearing Aids | |
| | | 55 | March 29, 2022 | 870 | 2.4 | DD2 | G 002 | DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |

DNH only

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 54 | February 21, 1995 | 10768 | 29.5 | | B 003 | DLT,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | June 5, 2007 | 6281 | 17.2 | | A 001 | DNH | | 9.4 | H: Reads Lips | H: Reads Lips | |
| | | 54 | June 11, 2010 | 5179 | 14.2 | | G 003 | DNH | | 10.7 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 54 | November 23, 2011 | 4649 | 12.7 | DD1 | G 002 | DNH | Unverified | 1.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 54 | August 25, 2015 | 3278 | 9.0 | | G 001 | DNH | | 12.9 | H: Hearing Aids | H: Hearing Aids | |
| | | 54 | November 30, 2022 | 624 | 1.7 | | G 002 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | August 7, 2003 | 7679 | 21.0 | | E 004 | DNM,DNH | | 12.9 | H: Hearing Aids | H: Reads Lips | |
| | | 53 | December 18, 2003 | 7546 | 20.7 | | D 003 | DPM,DNH | | 10.6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | May 7, 2004 | 7405 | 20.3 | | D 004 | DLT,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | December 8, 2004 | 7190 | 19.7 | DD3 | G 001 | DNM,DNH | | 9 | H: Need Staff to Speak Loudly and Clearly | H: Assistive Listening Device | |
| | | 53 | November 30, 2017 | 2450 | 6.7 | | A 002 | DNH | | 7.6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 53 | December 17, 2019 | 1703 | 4.7 | | F 002 | DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | June 28, 1996 | 10275 | 28.2 | | D 001 | DPW,DNH | Unverified | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | December 16, 2004 | 7182 | 19.7 | | D 001 | DNM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | May 17, 2007 | 6300 | 17.3 | | A 001 | DNM,DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | November 15, 2011 | 4657 | 12.8 | | F 002 | DNH | | 12.9 | H: Hearing Aids | H: Written Notes | |
| | | 52 | November 5, 2012 | 4301 | 11.8 | | D 005 | DNM,DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | December 31, 2014 | 3515 | 9.6 | | A 002 | DNH | | 11.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | April 2, 2018 | 2327 | 6.4 | | A 003 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 52 | November 5, 2020 | 1379 | 3.8 | | E 004 | DNH | | 2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | August 24, 1993 | 11314 | 31.0 | | A 003 | DLT,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 51 | January 28, 2000 | 8966 | 24.6 | | A 002 | DNH | | 4.4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | July 11, 2005 | 6975 | 19.1 | | F 002 | DNH,DPV | Unverified | 3 | H: Hearing Aids V: Magnifier | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | January 17, 2006 | 6785 | 18.6 | | G 001 | DNH | | 2.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | March 1, 2010 | 5281 | 14.5 | | A 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | June 30, 2010 | 5160 | 14.1 | DD2 | G 002 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | April 26, 2011 | 4860 | 13.3 | | G 003 | DNH | | 9.9 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 51 | February 6, 2017 | 2747 | 7.5 | | D 002 | DNM,DNH | | 10 | H: Assistive Listening Device | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | October 27, 2017 | 2484 | 6.8 | DD1 | A 001 | DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 51 | May 9, 2022 | 829 | 2.3 | | D 002 | DNH | | 12 | H: Written Notes | H: Need Staff to Speak Loudly and Clearly | |
| | | 51 | April 20, 2023 | 483 | 1.3 | | A 001 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | October 5, 1995 | 10542 | 28.9 | | B 002 | DNM,DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | August 17, 1999 | 9130 | 25.0 | | F 001 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | May 26, 2000 | 8847 | 24.2 | | G 003 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | October 29, 2001 | 8326 | 22.8 | | G 001 | DNH | | 7 | H: Hearing Aids | H: Hearing Aids | |
| | | 50 | May 14, 2002 | 8129 | 22.3 | | D 004 | DLT,DNH | | 9.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | November 2, 2005 | 6861 | 18.8 | | G 001 | DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | July 12, 2007 | 6244 | 17.1 | | G 003 | DLT,DNH | | 9.6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | January 14, 2009 | 5692 | 15.6 | | E 003 | DPM,DNH | | 10 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 50 | September 28, 2009 | 5435 | 14.9 | | F 002 | DNH | | 10.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | October 1, 1991 | 12007 | 32.9 | | D 003 | DPW,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | March 28, 1997 | 10002 | 27.4 | | A 001 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | March 23, 2005 | 7085 | 19.4 | | F 003 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | December 15, 2006 | 6453 | 17.7 | | D 001 | DLT,DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 49 | October 15, 2010 | 5053 | 13.8 | | A 001 | DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 49 | April 22, 2014 | 3768 | 10.3 | | A 001 | DLT,DNH | | 5.9 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 49 | December 27, 2022 | 597 | 1.6 | | C 004 | DNM,DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 48 | June 26, 2000 | 8816 | 24.2 | | D 005 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | April 30, 2010 | 5221 | 14.3 | | G 003 | DNH | Unverified | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | July 1, 2010 | 5159 | 14.1 | | A 001 | DNM,DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | February 16, 2016 | 3103 | 8.5 | DD2 | G 002 | DNH | | 10 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 48 | November 13, 2018 | 2102 | 5.8 | | A 001 | DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 48 | November 5, 2021 | 1014 | 2.8 | | F 002 | DPM,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | March 20, 2023 | 514 | 1.4 | | F 003 | DNH | | 1 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 48 | January 8, 2024 | 220 | 0.6 | | C 005 | DNH | | 11 | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | | |
| | | 48 | March 8, 2024 | 160 | 0.4 | | E 002 | DNH | | 10 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 47 | December 12, 2000 | 8647 | 23.7 | | G 003 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | June 15, 2004 | 7366 | 20.2 | | A 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | March 14, 2007 | 6364 | 17.4 | | A 002 | DLT,DNH | | 7.8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | April 2, 2009 | 5614 | 15.4 | | F 001 | DNH | | 8.4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 47 | February 8, 2013 | 4206 | 11.5 | | G 002 | DLT,DNH | | 10.3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | March 14, 2003 | 7825 | 21.4 | | D 005 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | June 13, 2005 | 7003 | 19.2 | | F 001 | DPM,DNH | Unverified | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | March 14, 2017 | 2711 | 7.4 | | C 008 | DLT,DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | September 7, 2017 | 2534 | 6.9 | | Z 001 | DNM,DNH | | 7.8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 46 | April 4, 2022 | 864 | 2.4 | | D 001 | DNH | | 9 | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 45 | October 1, 1998 | 9450 | 25.9 | | Z 001 | DPM,DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

DNH only

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 45 | July 22, 2013 | 4042 | 11.1 | | C 006 | DNH | | 11 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 45 | April 6, 2017 | 2688 | 7.4 | | F 001 | DPM,DNH | | 4.4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | June 14, 2017 | 2619 | 7.2 | | D 005 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | January 3, 2018 | 2416 | 6.6 | | G 003 | DLT,DNH,DPV | | 4 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 45 | August 8, 2022 | 738 | 2.0 | | A 002 | DNH | | 7 | H: Hearing Aids | H: Hearing Aids | |
| | | 45 | February 28, 2023 | 534 | 1.5 | | E 002 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 45 | June 5, 2023 | 437 | 1.2 | | F 003 | DNH | | 0 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 45 | July 28, 2023 | 384 | 1.1 | | E 002 | DLT,DNH | | 10 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 45 | August 7, 2023 | 374 | 1.0 | | C 003 | DPW,DNH | | 8 | H: Hearing Aids | H: Written Notes | |
| | | 44 | April 18, 2014 | 3772 | 10.3 | | E 005 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 44 | March 27, 2019 | 1968 | 5.4 | | G 001 | DNH | | 9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 43 | December 27, 2004 | 7171 | 19.6 | | A 001 | DNH | | 11.8 | H: Hearing Aids | H: Reads Lips | |
| | | 43 | January 8, 2016 | 3142 | 8.6 | | D 004 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 43 | August 20, 2021 | 1091 | 3.0 | DD2 | E 003 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 43 | September 15, 2022 | 700 | 1.9 | | E 003 | DPO,DNH | | 5 | H: Hearing Aids | H: Assistive Listening Device | |
| | | 42 | December 9, 2003 | 7555 | 20.7 | | D 002 | DLT,DNH,DPV | | 1 | H: Hearing Aids | H: Hearing Aids | |
| | | 42 | April 19, 2005 | 7058 | 19.3 | | E 004 | DNH | | 10.5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | August 11, 2017 | 2561 | 7.0 | | C 008 | DNH | | 5 | H: Assistive Listening Device | H: Written Notes | |
| | | 42 | March 23, 2018 | 2337 | 6.4 | | D 001 | DPM,DNH | | 8.6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | May 11, 2018 | 2288 | 6.3 | | D 001 | DPM,DNH,DPV | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | June 8, 2018 | 2260 | 6.2 | | D 005 | DNH | | 4 | H: Hearing Aids | H: Hearing Aids | |
| | | 42 | March 12, 2020 | 1617 | 4.4 | | E 004 | DNH | | 1 | H: Hearing Aids | H: Hearing Aids | |
| | | 42 | May 12, 2021 | 1191 | 3.3 | | F 002 | DNH | | 8 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | March 4, 2022 | 895 | 2.5 | | F 003 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 42 | December 5, 2023 | 254 | 0.7 | | E 001 | DNH | | 3 | H: Hearing Aids | H: Hearing Aids | |
| | | 42 | February 16, 2024 | 181 | 0.5 | | C 001 | DNH | | 6 | H: Hearing Aids | H: None | |
| | | 41 | February 6, 2006 | 6765 | 18.5 | | D 003 | DPM,DNH | | 10 | H: Hearing Aids S: Written Notes | | |
| | | 41 | June 7, 2010 | 5183 | 14.2 | | D 001 | DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | November 4, 2015 | 3207 | 8.8 | | F 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | February 21, 2018 | 2367 | 6.5 | | G 002 | DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 41 | March 28, 2023 | 506 | 1.4 | | G 003 | DPO,DNH | | 7 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 41 | July 28, 2023 | 384 | 1.1 | | G 002 | DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 40 | August 5, 2013 | 4028 | 11.0 | | Z 001 | DNH | Unverified | 9.6 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 40 | February 10, 2014 | 3839 | 10.5 | | D 001 | DNH | | 7.9 | H: Use Simple Language | H: Hearing Aids | |
| | | 40 | February 29, 2016 | 3090 | 8.5 | | D 005 | DNH | | 3 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 40 | May 24, 2016 | 3005 | 8.2 | | D 003 | DNH | | 7 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 40 | June 29, 2023 | 413 | 1.1 | | G 003 | DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 40 | May 28, 2024 | 79 | 0.2 | | E 001 | DNH | | | | | |
| | | 39 | October 23, 2008 | 5775 | 15.8 | | A 001 | DLT,DNH | | 11.3 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 39 | October 5, 2011 | 4698 | 12.9 | | D 002 | DNH,DPV | | 11 | H: Use Simple Language V: Text to Speech | H: Hearing Aids | |
| | | 39 | May 3, 2016 | 3026 | 8.3 | | C 001 | DPM,DNH | | 1 | H: Hearing Aids | H: Reads Lips | |
| | | 39 | March 8, 2022 | 891 | 2.4 | | G 001 | DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | May 11, 2006 | 6671 | 18.3 | | F 002 | DNH | | 0 | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | January 10, 2007 | 6427 | 17.6 | | B 003 | DNM,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly S: Written Notes | | |
| | | 38 | February 13, 2009 | 5662 | 15.5 | | F 001 | DPW,DNH | | 11 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 38 | September 14, 2015 | 3258 | 8.9 | | F 001 | DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | H: Written Notes | |
| | | 38 | January 25, 2016 | 3125 | 8.6 | | D 004 | DLT,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 38 | January 27, 2017 | 2757 | 7.6 | | D 003 | DNH | | 6.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | September 28, 2017 | 2513 | 6.9 | | A 001 | DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 37 | March 17, 2021 | 1247 | 3.4 | | A 003 | DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | June 17, 2022 | 790 | 2.2 | | E 002 | DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | February 14, 2023 | 548 | 1.5 | | D 005 | DNH | Unverified | 1 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 37 | March 21, 2023 | 513 | 1.4 | | G 002 | DPM,DNH | | | H: Hearing Aids | H: Written Notes | |
| | | 36 | September 17, 2015 | 3255 | 8.9 | | D 004 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | October 8, 2018 | 2138 | 5.9 | | D 001 | DNH | | 6 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | August 3, 2022 | 743 | 2.0 | | D 005 | DNH | | 5 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | November 29, 2022 | 625 | 1.7 | | C 008 | DNH | | 0 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 36 | July 26, 2023 | 386 | 1.1 | DD2 | G 001 | DPO,DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 36 | December 13, 2023 | 246 | 0.7 | | E 002 | DNH | | 12 | H: Need Staff to Speak Loudly and Clearly | | |
| | | 36 | December 18, 2023 | 241 | 0.7 | | E 005 | DNH | | 4 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |

DNH only

| Name | CDC # | Age as of Aug. 15, 2024 | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Reading Score | Primary Communication Method | Alternate Communication Method | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 35 | November 25, 2009 | 5377 | 14.7 | | D 005 | DNH | | 12.9 | H: Hearing Aids | H: Assistive Listening Device | |
| | | 35 | February 20, 2019 | 2003 | 5.5 | | E 002 | DPM,DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 34 | December 5, 2014 | 3541 | 9.7 | | E 002 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 33 | April 26, 2019 | 1938 | 5.3 | | D 005 | DNH | | 7 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 33 | February 18, 2021 | 1274 | 3.5 | | D 001 | DNM,DNH | | 8 | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips | |
| | | 32 | October 21, 2013 | 3951 | 10.8 | | F 001 | DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 31 | March 2, 2018 | 2358 | 6.5 | | D 001 | DNM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 30 | November 2, 2012 | 4304 | 11.8 | | B 002 | DNH | | 3 | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids | |
| | | 29 | April 16, 2019 | 1948 | 5.3 | | D 003 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 28 | October 19, 2020 | 1396 | 3.8 | | G 003 | DNH | | 9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 28 | May 12, 2021 | 1191 | 3.3 | | D 004 | DNH | | 5.2 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 26 | May 1, 2018 | 2298 | 6.3 | | A 001 | DPM,DNH | | 12.9 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 26 | April 7, 2022 | 861 | 2.4 | | Z 001 | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 26 | January 22, 2024 | 206 | 0.6 | | E 004 | DNH | | 11 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | 25 | July 19, 2021 | 1123 | 3.1 | | G 003 | DNH | | 12 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |
| | | | | | | | | | | | | | |
| | | 69 | | NIC | NIC | | NIC (previously F2) | DNM,DNH | | 12.9 | H: Need Staff to Speak Loudly and Clearly | H: None | |
| | | 60 | | NIC | NIC | | NIC (previously B2) | DNH | | 4 | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly | |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 28 | 5 | March 7, 2016 | 3083 | 8.4 |  | G 003 | DPS,LD | Unverified | S: Written Notes |  |
|  |  | 26 | 12.9 | May 1, 2018 | 2298 | 6.3 |  | A 001 | DPM,DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 29 | 4 | April 16, 2019 | 1948 | 5.3 |  | D 003 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 28 | 9 | October 19, 2020 | 1396 | 3.8 |  | G 003 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 28 | 5.2 | May 12, 2021 | 1191 | 3.3 |  | D 004 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 25 | 12 | July 19, 2021 | 1123 | 3.1 |  | G 003 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 26 | 4 | April 7, 2022 | 861 | 2.4 |  | Z 001 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
|  |  | 26 | 11 | January 22, 2024 | 206 | 0.6 |  | E 004 | DNH |  | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 38 | 0 | May 11, 2006 | 6671 | 18.3 | | F 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 12.9 | January 10, 2007 | 6427 | 17.6 | | B 003 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 39 | 11.3 | October 23, 2008 | 5775 | 15.8 | | A 001 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 38 | 11 | February 13, 2009 | 5662 | 15.5 | | F 001 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 35 | 12.9 | November 25, 2009 | 5377 | 14.7 | | D 005 | DNH | | H: Hearing Aids | H: Assistive Listening Device |
| | | 39 | 11 | October 5, 2011 | 4698 | 12.9 | | D 002 | DNH,DPV | | H: Use Simple Language V: Text to Speech | H: Need Staff to Speak Loudly and Clearly |
| | | 30 | 3 | November 2, 2012 | 4304 | 11.8 | | B 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 32 | 12.9 | October 21, 2013 | 3951 | 10.8 | | F 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 34 | 12.9 | December 5, 2014 | 3541 | 9.7 | | E 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 12 | September 14, 2015 | 3258 | 8.9 | | F 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 36 | 12.9 | September 17, 2015 | 3255 | 8.9 | | D 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 38 | 12.9 | January 25, 2016 | 3125 | 8.6 | | D 004 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 39 | 1 | May 3, 2016 | 3026 | 8.3 | | C 001 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 38 | 6.2 | January 27, 2017 | 2757 | 7.6 | | D 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | 12.9 | September 28, 2017 | 2513 | 6.9 | | A 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 31 | 12.9 | March 2, 2018 | 2358 | 6.5 | | D 001 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 6 | October 8, 2018 | 2138 | 5.9 | | D 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 35 | 4 | February 20, 2019 | 2003 | 5.5 | | E 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 33 | 7 | April 26, 2019 | 1938 | 5.3 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 30 | 4 | October 9, 2019 | 1772 | 4.9 | | C 008 | DPM,DPH | | H: American Sign Language S: American Sign Language | H: Written Notes S: Written Notes |
| | | 33 | 8 | February 18, 2021 | 1274 | 3.5 | | D 001 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 37 | 5 | March 17, 2021 | 1247 | 3.4 | | A 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 39 | 12 | March 8, 2022 | 891 | 2.4 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | 12 | June 17, 2022 | 790 | 2.2 | | E 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 5 | August 3, 2022 | 743 | 2.0 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 0 | November 29, 2022 | 625 | 1.7 | | C 008 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | 1 | February 14, 2023 | 548 | 1.5 | | D 005 | DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 37 | | March 21, 2023 | 513 | 1.4 | | G 002 | DPM,DNH | | H: Hearing Aids | H: Written Notes |
| | | 36 | 12 | July 26, 2023 | 386 | 1.1 | DD2 | G 001 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 36 | 12 | December 13, 2023 | 246 | 0.7 | | E 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 36 | 4 | December 18, 2023 | 241 | 0.7 | | E 005 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 49 | 12.9 | October 1, 1991 | 12007 | 32.9 | | D 003 | DPW,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 12.9 | March 28, 1997 | 10002 | 27.4 | | A 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 6 | October 1, 1998 | 9450 | 25.9 | | Z 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 4 | June 26, 2000 | 8816 | 24.2 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 8 | December 12, 2000 | 8647 | 23.7 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 7.6 | September 12, 2001 | 8373 | 22.9 | | F 001 | DPS | | H: Use Simple Language | H: None |
| | | 46 | 4 | February 11, 2002 | 8221 | 22.5 | | G 003 | DPH | | H: American Sign Language S: Written Notes | S: Written Notes |
| | | 46 | 7 | March 14, 2003 | 7825 | 21.4 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 1 | December 9, 2003 | 7555 | 20.7 | | D 002 | DLT,DNH,DPV | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 4 | January 28, 2004 | 7505 | 20.6 | DD2 | G 001 | DPS | | S: Written Notes | |
| | | 47 | 12.9 | June 15, 2004 | 7366 | 20.2 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 43 | 11.8 | December 27, 2004 | 7171 | 19.6 | | A 001 | DNH | | H: Hearing Aids | H: Reads Lips |
| | | 49 | 12.9 | March 23, 2005 | 7085 | 19.4 | | F 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 10.5 | April 19, 2005 | 7058 | 19.3 | | E 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 46 | 5 | June 13, 2005 | 7003 | 19.2 | | F 001 | DPM,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 41 | 10 | February 6, 2006 | 6765 | 18.5 | | D 003 | DPM,DNH | | H: Hearing Aids S: Written Notes | |
| | | 49 | 6 | December 15, 2006 | 6453 | 17.7 | | D 001 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 7.8 | March 14, 2007 | 6364 | 17.4 | | A 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 47 | 8.4 | April 2, 2009 | 5614 | 15.4 | | F 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 9 | April 30, 2010 | 5221 | 14.3 | | D 003 | DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 41 | 0 | June 7, 2010 | 5183 | 14.2 | | D 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 3 | July 1, 2010 | 5159 | 14.1 | | A 001 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 12 | October 15, 2010 | 5053 | 13.8 | | A 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 47 | 10.3 | February 8, 2013 | 4206 | 11.5 | | G 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 11 | July 22, 2013 | 4042 | 11.1 | | C 006 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 40 | 9.6 | August 5, 2013 | 4028 | 11.0 | | Z 001 | DNH,LD | Unverified | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 40 | 7.9 | February 10, 2014 | 3839 | 10.5 | | D 001 | DNH | | H: Use Simple Language | H: Hearing Aids |
| | | 44 | 7 | April 18, 2014 | 3772 | 10.3 | | E 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 49 | 5.9 | April 22, 2014 | 3768 | 10.3 | | A 001 | DLT,DNH | | H: Hearing Aids | H: Reads Lips |
| | | 41 | 12.9 | November 4, 2015 | 3207 | 8.8 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 43 | 12.9 | January 8, 2016 | 3142 | 8.6 | | D 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 10 | February 16, 2016 | 3103 | 8.5 | DD2 | G 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 40 | 3 | February 29, 2016 | 3090 | 8.5 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 40 | 7 | May 24, 2016 | 3005 | 8.2 | | D 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 46 | 5 | March 14, 2017 | 2711 | 7.4 | | C 008 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 4.4 | April 6, 2017 | 2688 | 7.4 | | F 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 12.9 | June 14, 2017 | 2619 | 7.2 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 5 | August 11, 2017 | 2561 | 7.0 | | C 008 | DNH | | H: Assistive Listening Device | H: Written Notes |
| | | 46 | 7.8 | September 7, 2017 | 2534 | 6.9 | | Z 001 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 45 | 4 | January 3, 2018 | 2416 | 6.6 | | G 003 | DLT,DNH,DPV | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 41 | 6 | February 21, 2018 | 2367 | 6.5 | | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 8.6 | March 23, 2018 | 2337 | 6.4 | | D 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 12.9 | May 11, 2018 | 2288 | 6.3 | | D 001 | DPM,DNH,DPV | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 42 | 4 | June 8, 2018 | 2260 | 6.2 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 48 | 8 | November 13, 2018 | 2102 | 5.8 | | A 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 44 | 9 | March 27, 2019 | 1968 | 5.4 | | G 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 42 | 1 | March 12, 2020 | 1617 | 4.4 | | E 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 42 | 8 | May 12, 2021 | 1191 | 3.3 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 43 | 4 | August 20, 2021 | 1091 | 3.0 | DD2 | E 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 48 | 4 | November 5, 2021 | 1014 | 2.8 | | F 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 42 | 4 | March 4, 2022 | 895 | 2.5 | | F 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 46 | 9 | April 4, 2022 | 864 | 2.4 | | D 001 | DNH | | H: Need Staff to Speak Loudly and Clearly S: Written Notes | H: Need Staff to Speak Loudly and Clearly |
| 45 | 7 | August 8, 2022 | 738 | 2.0 | | A 002 | DNH | | H: Hearing Aids | H: Hearing Aids |
| 43 | 5 | September 15, 2022 | 700 | 1.9 | | E 003 | DPO,DNH | | H: Hearing Aids | H: Assistive Listening Device |
| 49 | 4 | December 27, 2022 | 597 | 1.6 | | C 004 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| 45 | | February 28, 2023 | 534 | 1.5 | | E 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 48 | 1 | March 20, 2023 | 514 | 1.4 | | F 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 41 | 7 | March 28, 2023 | 506 | 1.4 | | G 003 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 45 | 0 | June 5, 2023 | 437 | 1.2 | | F 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| 40 | 12 | June 29, 2023 | 413 | 1.1 | | G 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 41 | 8 | July 28, 2023 | 384 | 1.1 | | G 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| 45 | 10 | July 28, 2023 | 384 | 1.1 | | E 002 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| 45 | 8 | August 7, 2023 | 374 | 1.0 | | C 003 | DPW,DNH | | H: Hearing Aids | H: Written Notes |
| 42 | 3 | December 5, 2023 | 254 | 0.7 | | E 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 48 | 11 | January 8, 2024 | 220 | 0.6 | | C 005 | DNH | | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | |
| 42 | | February 16, 2024 | 181 | 0.5 | | C 001 | DNH | | H: Hearing Aids | H: None |
| 48 | 10 | March 8, 2024 | 160 | 0.4 | | E 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| 40 | | May 28, 2024 | 79 | 0.2 | | E 001 | DNH | | | |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 59 | 10.9 | June 7, 1989 | 12853 | 35.2 | | UNK-U | DNM,DNH,DPV | | H: Hearing Aids V: Large Print Material | H: Written Notes |
| | | 55 | 12.9 | April 8, 1991 | 12183 | 33.4 | | E 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 8.2 | February 11, 1993 | 11508 | 31.5 | | F 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 12.9 | August 24, 1993 | 11314 | 31.0 | | A 003 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 58 | 12.9 | November 4, 1993 | 11242 | 30.8 | | A 002 | DNH,DPV | | H: Use Simple Language V: Magnifier | H: Reads Lips |
| | | 54 | 12.9 | February 21, 1995 | 10768 | 29.5 | | B 003 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 4 | September 27, 1995 | 10550 | 28.9 | | G 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 12.9 | September 28, 1995 | 10549 | 28.9 | | F 001 | DLT,DNH,DNV | | H: Hearing Aids | H: Reads Lips |
| | | 50 | 12 | October 5, 1995 | 10542 | 28.9 | | B 002 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 52 | 12.9 | June 28, 1996 | 10275 | 28.2 | | D 001 | DPW,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 11.2 | July 17, 1996 | 10256 | 28.1 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 2 | May 28, 1998 | 9576 | 26.2 | | D 002 | DLT,DNH,DPV,DPS | | H: American Sign Language S: American Sign | H: Written Notes S: Written Notes |
| | | 59 | 0 | June 8, 1998 | 9565 | 26.2 | | E 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 12 | July 10, 1998 | 9533 | 26.1 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 7.7 | October 27, 1998 | 9424 | 25.8 | | D 004 | DPO,DNH | | H: Assistive Listening Device | |
| | | 58 | 8 | February 25, 1999 | 9303 | 25.5 | | D 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 58 | 9 | May 6, 1999 | 9233 | 25.3 | | D 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 12.9 | August 17, 1999 | 9130 | 25.0 | | F 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 7 | January 7, 2000 | 8987 | 24.6 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 51 | 4.4 | January 28, 2000 | 8966 | 24.6 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 7 | May 26, 2000 | 8847 | 24.2 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 12.9 | October 4, 2000 | 8716 | 23.9 | | F 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 3 | October 12, 2000 | 8708 | 23.9 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 4 | October 19, 2000 | 8701 | 23.8 | | G 002 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 6.4 | October 20, 2000 | 8700 | 23.8 | | D 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 55 | 8 | February 5, 2001 | 8592 | 23.5 | | A 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 10.9 | March 20, 2001 | 8549 | 23.4 | | A 003 | DPW,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 7 | October 29, 2001 | 8326 | 22.8 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 50 | 9.9 | May 14, 2002 | 8129 | 22.3 | | D 004 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 10.3 | February 5, 2003 | 7862 | 21.5 | DD1 | G 002 | DPM,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 57 | 2 | February 11, 2003 | 7856 | 21.5 | | D 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 12.9 | August 7, 2003 | 7679 | 21.0 | | E 004 | DNM,DNH | | H: Hearing Aids | H: Reads Lips |
| | | 53 | 10.6 | December 18, 2003 | 7546 | 20.7 | | D 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 53 | 8 | May 7, 2004 | 7405 | 20.3 | | D 004 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 59 | 10 | September 30, 2004 | 7259 | 19.9 | | B 001 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 53 | 9 | December 8, 2004 | 7190 | 19.7 | DD3 | G 001 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Assistive Listening Device |
| | | 52 | 12.9 | December 16, 2004 | 7182 | 19.7 | | D 001 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 56 | 4 | June 17, 2005 | 6999 | 19.2 | | F 001 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 51 | 3 | July 11, 2005 | 6975 | 19.1 | | F 002 | DNH,DPV,LD | Unverified | H: Hearing Aids V: Magnifier | H: Need Staff to Speak Loudly and Clearly |
| 50 | 11 | November 2, 2005 | 6861 | 18.8 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 51 | 2.2 | January 17, 2006 | 6785 | 18.6 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 1 | April 24, 2006 | 6688 | 18.3 | | G 002 | DLT,DNH | | H: Hearing Aids | H: Reads Lips |
| 57 | 12.9 | August 17, 2006 | 6573 | 18.0 | | G 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| 56 | 10.3 | May 10, 2007 | 6307 | 17.3 | | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 52 | 0 | May 17, 2007 | 6300 | 17.3 | | A 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 54 | 9.4 | June 5, 2007 | 6281 | 17.2 | | A 001 | DNH | | H: Hearing Aids | H: Reads Lips |
| 50 | 9.6 | July 12, 2007 | 6244 | 17.1 | | G 003 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 11.3 | July 20, 2007 | 6236 | 17.1 | | A 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 0 | February 11, 2008 | 6030 | 16.5 | | E 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 57 | 12.9 | March 25, 2008 | 5987 | 16.4 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 50 | 10 | January 14, 2009 | 5692 | 15.6 | | E 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 8 | September 28, 2009 | 5435 | 14.9 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 50 | 10.3 | September 28, 2009 | 5435 | 14.9 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 51 | 12.9 | March 1, 2010 | 5281 | 14.5 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 7 | March 19, 2010 | 5263 | 14.4 | | A 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 54 | 10.7 | June 11, 2010 | 5179 | 14.2 | | G 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 51 | 3 | June 30, 2010 | 5160 | 14.1 | DD2 | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 12.9 | August 6, 2010 | 5123 | 14.0 | | C 004 | DPM,DNH,D NV | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 51 | 9.9 | April 26, 2011 | 4860 | 13.3 | | G 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| 55 | 11 | October 27, 2011 | 4676 | 12.8 | | E 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 52 | 12.9 | November 15, 2011 | 4657 | 12.8 | | F 002 | DNH | | H: Hearing Aids | H: Written Notes |
| 54 | 1.5 | November 23, 2011 | 4649 | 12.7 | DD1 | G 002 | DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 5 | May 30, 2012 | 4460 | 12.2 | DD1 | G 002 | DNH,DPS | | H: American Sign Language | H: Hearing Aids |
| 52 | 8 | November 5, 2012 | 4301 | 11.8 | | D 005 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 11.3 | August 30, 2013 | 4003 | 11.0 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 8 | August 13, 2014 | 3655 | 10.0 | | F 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 3.6 | October 3, 2014 | 3604 | 9.9 | | G 003 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 1 | October 8, 2014 | 3599 | 9.9 | DD1 | G 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| 55 | 1 | December 15, 2014 | 3531 | 9.7 | DD1 | G 002 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 52 | 11.2 | December 31, 2014 | 3515 | 9.6 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 54 | 12.9 | August 25, 2015 | 3278 | 9.0 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 12.9 | September 8, 2015 | 3264 | 8.9 | | A 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 4 | October 16, 2015 | 3226 | 8.8 | | A 001 | DPM,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 59 | 7.8 | February 22, 2016 | 3097 | 8.5 | | F 002 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 51 | 10 | February 6, 2017 | 2747 | 7.5 | | D 002 | DNM,DNH | | H: Assistive Listening Device | H: Need Staff to Speak Loudly and Clearly |
| 56 | 4 | May 15, 2017 | 2649 | 7.3 | | F 002 | DNM,DNH,L D | Yes | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 12.9 | October 23, 2017 | 2488 | 6.8 | | A 002 | DNH | | H: Hearing Aids | H: Reads Lips |
| 51 | 4 | October 27, 2017 | 2484 | 6.8 | DD1 | G 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |
| 53 | 7.6 | November 30, 2017 | 2450 | 6.7 | | A 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 52 | 12.9 | April 2, 2018 | 2327 | 6.4 | | A 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 55 | 8 | September 28, 2018 | 2148 | 5.9 | | G 002 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 57 | 7.9 | March 18, 2019 | 1977 | 5.4 | | B 001 | DNM,DNH | H: Need Staff to Speak Loudly and Clearly | H: None |
| 58 | 12.9 | September 18, 2019 | 1793 | 4.9 | | A 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 59 | 10 | November 1, 2019 | 1749 | 4.8 | | G 001 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| 53 | 5 | December 17, 2019 | 1703 | 4.7 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 59 | 9 | January 15, 2020 | 1674 | 4.6 | | A 001 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 56 | 10 | March 9, 2020 | 1620 | 4.4 | | F 002 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 52 | 2 | November 5, 2020 | 1379 | 3.8 | | E 004 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 12 | November 20, 2020 | 1364 | 3.7 | | F 001 | DLT,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 55 | 8 | March 29, 2022 | 870 | 2.4 | DD2 | G 002 | DNH | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 51 | 12 | May 9, 2022 | 829 | 2.3 | | D 002 | DNH | H: Written Notes | H: Need Staff to Speak Loudly and Clearly |
| 54 | 12.9 | November 30, 2022 | 624 | 1.7 | | G 002 | DPW,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 51 | 4 | April 20, 2023 | 483 | 1.3 | | G 003 | DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 58 | 7 | October 11, 2023 | 309 | 0.8 | | E 004 | DPO,DNH | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 57 | 11.2 | November 15, 2023 | 274 | 0.8 | | E 002 | DPO,DNH | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 60 | 4.1 | December 3, 1991 | 11944 | 32.7 | | G 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 4 | April 7, 1993 | 11453 | 31.4 | | B 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 12.9 | September 3, 1997 | 9843 | 27.0 | | E 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 10.7 | February 23, 2000 | 8940 | 24.5 | | G 001 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 7 | March 10, 2005 | 7098 | 19.4 | | D 001 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 9.9 | April 6, 2005 | 7071 | 19.4 | | E 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 12 | June 21, 2007 | 6265 | 17.2 | | G 003 | DNH | | | H: Need Staff to Speak Loudly and Clearly |
| | | 60 | 12.9 | September 14, 2009 | 5449 | 14.9 | | D 003 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 4 | April 3, 2017 | 2691 | 7.4 | | A 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 12.9 | June 27, 2018 | 2241 | 6.1 | | F 002 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 60 | 4 | May 28, 2024 | 79 | 0.2 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 4 | December 26, 1991 | 11921 | 32.7 | | D 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 5 | December 3, 1999 | 9022 | 24.7 | | F 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 61 | 0 | March 10, 2000 | 8924 | 24.4 | | A 002 | DPO,DNH,LD | Unverified | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 61 | 9.4 | June 11, 2003 | 7736 | 21.2 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 9 | April 8, 2010 | 5243 | 14.4 | | F 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 61 | 11 | February 24, 2011 | 4921 | 13.5 | | E 001 | DPM,DNH,LD | Unverified | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 9 | December 8, 2011 | 4634 | 12.7 | | F 002 | DNH | | H: Written Notes | H: Need Staff to Speak Loudly and Clearly |
| | | 61 | 10.7 | April 22, 2013 | 4133 | 11.3 | | G 003 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 61 | 11 | October 29, 2014 | 3578 | 9.8 | | E 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 7.6 | October 23, 1981 | 15637 | 42.8 | | A 001 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 9.6 | March 29, 1991 | 12193 | 33.4 | | A 002 | DNH | | H: Hearing Aids | H: Reads Lips |
| | | 62 | 12.9 | April 4, 1997 | 9995 | 27.4 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 12.9 | June 14, 2000 | 8828 | 24.2 | | A 001 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 11.2 | April 24, 2001 | 8514 | 23.3 | | B 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 0 | September 25, 2002 | 7995 | 21.9 | | G 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 7 | January 24, 2003 | 7874 | 21.6 | | A 003 | DNM,DNH,LD | Unverified | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 62 | 10.5 | October 25, 2005 | 6869 | 18.8 | | E 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 62 | 12.9 | November 24, 2009 | 5378 | 14.7 | | F 002 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 62 | 2 | March 14, 2012 | 4537 | 12.4 | | E 005 | DNH | | H: Hearing Aids | H: Reads Lips |
| | | 62 | 5 | February 23, 2017 | 2730 | 7.5 | | G 003 | DNH | | H: Hearing Aids | H: None |
| | | 63 | 6 | April 24, 1981 | 15819 | 43.3 | | G 002 | DNH,LD | Yes | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 63 | 9 | December 20, 1984 | 14483 | 39.7 | | A 001 | DNH | | H: Hearing Aids | H: Reads Lips |
| | | 63 | 5 | April 5, 1989 | 12916 | 35.4 | | C 008 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 3.5 | December 6, 1991 | 11941 | 32.7 | | F 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 9.4 | August 30, 1996 | 10212 | 28.0 | | E 003 | DNM,DNH | | H: Hearing Aids | H: Reads Lips |
| | | 63 | 11 | June 24, 1997 | 9914 | 27.2 | | B 002 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 63 | 12.4 | December 3, 1998 | 9387 | 25.7 | | F 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 63 | 12.4 | December 9, 1998 | 9381 | 25.7 | | G 003 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 9.9 | March 18, 1999 | 9282 | 25.4 | | A 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 63 | 0 | September 17, 2003 | 7638 | 20.9 | | A 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 12.9 | April 28, 2011 | 4858 | 13.3 | | A 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 2 | January 31, 2013 | 4214 | 11.5 | | E 004 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 4 | March 22, 2016 | 3068 | 8.4 | DD2 | B 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 7 | February 1, 2021 | 1291 | 3.5 | | F 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | 12 | November 17, 2023 | 272 | 0.7 | | A 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 63 | | November 24, 2023 | 265 | 0.7 | | C 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 63 | | May 14, 2024 | 93 | 0.3 | | A 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 6.2 | January 16, 1980 | 16283 | 44.6 | | E 004 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 12.9 | April 23, 1982 | 15455 | 42.3 | | E 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.2 | June 15, 1989 | 12845 | 35.2 | | D 005 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 8.5 | March 21, 1991 | 12201 | 33.4 | | A 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 12.9 | June 5, 1996 | 10298 | 28.2 | | E 001 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 4 | April 3, 1998 | 9631 | 26.4 | | A 003 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 9 | September 23, 1998 | 9458 | 25.9 | | A 003 | DNH | | H: Hearing Aids S: Written Notes | |
| | | 64 | 8.5 | April 28, 2005 | 7049 | 19.3 | | B 002 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 12.9 | October 5, 2005 | 6889 | 18.9 | | F 002 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 11 | January 20, 2009 | 5686 | 15.6 | | A 002 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.6 | May 1, 2009 | 5585 | 15.3 | | F 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 10.9 | April 1, 2010 | 5250 | 14.4 | | G 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 64 | 6.2 | July 8, 2011 | 4787 | 13.1 | | F 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 64 | 2 | October 8, 2012 | 4329 | 11.9 | | D 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 7.8 | March 5, 2014 | 3816 | 10.5 | | A 003 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 1 | December 21, 2016 | 2788 | 7.6 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 64 | 9.4 | May 1, 2017 | 2663 | 7.3 | | F 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 10 | February 6, 2020 | 1652 | 4.5 | | B 003 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 64 | 4 | July 29, 2021 | 1113 | 3.0 | | F 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 65 | 7 | August 29, 1985 | 14231 | 39.0 | | S INF | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 65 | 2.3 | February 13, 1991 | 12237 | 33.5 | | G 001 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 65 | 11 | September 23, 1996 | 10188 | 27.9 | | E 003 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 1 | April 7, 1999 | 9262 | 25.4 | | G 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 10.5 | October 4, 2000 | 8716 | 23.9 | | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 10.5 | June 20, 2001 | 8457 | 23.2 | | A 001 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 9 | March 1, 2002 | 8203 | 22.5 | | UNK-U | DPW,DNH,DNV | | H: Hearing Aids V: Large Print Material | H: Need Staff to Speak Loudly and Clearly V: Read Documents Aloud |
| 65 | 6.9 | August 6, 2002 | 8045 | 22.0 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 8 | December 2, 2002 | 7927 | 21.7 | | B 002 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 65 | 12.9 | November 21, 2003 | 7573 | 20.7 | | A 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 65 | 12.9 | November 18, 2008 | 5749 | 15.8 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 9 | December 9, 1980 | 15955 | 43.7 | DD1 | E 004 | DNH,DPV | | H: Hearing Aids V: Read Documents Aloud | H: Need Staff to Speak Loudly and Clearly |
| 66 | 6.6 | August 21, 1981 | 15700 | 43.0 | | B 003 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 66 | 1 | December 6, 1982 | 15228 | 41.7 | | B 002 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 6.2 | October 12, 1994 | 10900 | 29.9 | | G 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 12.9 | December 7, 1994 | 10844 | 29.7 | | G 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 66 | 12.9 | March 20, 1997 | 10010 | 27.4 | | E 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 2.5 | December 24, 1997 | 9731 | 26.7 | | G 002 | DPM,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 5.8 | February 24, 1999 | 9304 | 25.5 | | B 001 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 9 | June 11, 2002 | 8101 | 22.2 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 2 | December 9, 2009 | 5363 | 14.7 | | G 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 8 | May 4, 2016 | 3025 | 8.3 | | G 002 | DPW,DNH | | H: Hearing Aids | H: Hearing Aids |
| 66 | 8 | September 6, 2022 | 709 | 1.9 | | E 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 66 | 3 | June 10, 2024 | 66 | 0.2 | | E 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 67 | 5 | September 16, 1992 | 11656 | 31.9 | DD2 | G 001 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 67 | 4 | June 30, 2009 | 5525 | 15.1 | | A 001 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 67 | 11 | December 24, 2013 | 3887 | 10.6 | | A 001 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 67 | 12.9 | October 11, 2016 | 2865 | 7.8 | | F 001 | DPW,DNH | | H: Hearing Aids | H: Reads Lips |
| 67 | 10 | December 7, 2017 | 2443 | 6.7 | | A 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 67 | | February 7, 2018 | 2381 | 6.5 | DD2 | G 002 | DNH | | H: Reads Lips | H: Need Staff to Speak Loudly and Clearly |
| 68 | 12.9 | January 7, 1980 | 16292 | 44.6 | | A 002 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| 68 | 12.9 | December 14, 1981 | 15585 | 42.7 | | E 004 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 2 | May 8, 1986 | 13979 | 38.3 | | A 002 | DPW,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | | March 26, 1993 | 11465 | 31.4 | | C 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 68 | 9.4 | November 7, 1994 | 10874 | 29.8 | | A 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 11.8 | October 30, 1996 | 10151 | 27.8 | | F 001 | DNH | | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| 68 | 0 | April 22, 2003 | 7786 | 21.3 | | E 005 | DPW,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 9.9 | July 18, 2007 | 6238 | 17.1 | DD2 | G 002 | DNH | | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| 68 | 0.7 | December 26, 2011 | 4616 | 12.6 | DD2 | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 2 | November 6, 2013 | 3935 | 10.8 | DD1 | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 3 | May 4, 2015 | 3391 | 9.3 | | D 004 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 3 | May 1, 2019 | 1933 | 5.3 | | G 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 9 | September 20, 2023 | 330 | 0.9 | | A 001 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 68 | 6 | May 20, 2024 | 87 | 0.2 | | E 004 | DNH | | H: Need Staff to Speak Loudly and Clearly, Hearing Aids | H: Written Notes |
| 69 | 5.9 | June 2, 1995 | 10667 | 29.2 | | C 007 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | 1 | November 6, 1995 | 10510 | 28.8 | | F 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | 9.4 | December 5, 1995 | 10481 | 28.7 | | G 002 | DNH | | H: Use Simple Language S: Written Notes | |
| 69 | 11.2 | January 26, 1996 | 10429 | 28.6 | | E 002 | DPO,DNH | | H: Hearing Aids | H: Hearing Aids |
| 69 | 7.7 | April 24, 1997 | 9975 | 27.3 | | B 002 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 69 | 9 | May 25, 2000 | 8848 | 24.2 | | G 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | 9.9 | July 21, 2004 | 7330 | 20.1 | | A 002 | DNH | | H: Reads Lips S: Written Notes | |
| 69 | 10.9 | November 23, 2011 | 4649 | 12.7 | | F 001 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| 69 | 2 | July 20, 2017 | 2583 | 7.1 | | G 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | 2 | October 2, 2017 | 2509 | 6.9 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | 2 | October 26, 2017 | 2485 | 6.8 | DD2 | G 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| 69 | 5 | February 25, 2022 | 902 | 2.5 | | A 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| 69 | | April 22, 2024 | 115 | 0.3 | | A 003 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 73 | 9.5 | April 1, 1974 | 18399 | 50.4 | | C 008 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 10 | April 10, 1986 | 14007 | 38.4 | | F 002 | DPM,DNH | | H: Hearing Aids S: Written Notes | H: Need Staff to Speak Loudly and Clearly |
| | | 71 | 3 | March 20, 1987 | 13663 | 37.4 | | B 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 5 | September 16, 1988 | 13117 | 35.9 | | F 001 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 9.9 | December 30, 1988 | 13012 | 35.6 | | A 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 6.9 | August 3, 1990 | 12431 | 34.1 | | A 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 77 | 9.9 | April 18, 1991 | 12173 | 33.4 | | C 008 | DPW,DNH,DPV | | H: Hearing Aids V: Text to Speech | H: Hearing Aids |
| | | 76 | 9.7 | June 3, 1992 | 11761 | 32.2 | | S INF | DPW,DNH | | H: Reads Lips | H: Hearing Aids |
| | | 71 | 0 | September 16, 1992 | 11656 | 31.9 | | S INF | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 8 | November 1, 1995 | 10515 | 28.8 | | E 002 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 75 | 10.8 | October 2, 1996 | 10179 | 27.9 | | A 002 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 6.4 | April 9, 1997 | 9990 | 27.4 | | G 003 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 73 | 10.8 | May 26, 1998 | 9578 | 26.2 | | E 003 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 76 | 5 | November 19, 1998 | 9401 | 25.8 | | A 003 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: None |
| | | 73 | 6 | December 23, 1998 | 9367 | 25.7 | | B 001 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 12.9 | March 2, 1999 | 9298 | 25.5 | | G 003 | DNM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 73 | 12.9 | August 30, 2000 | 8751 | 24.0 | | G 003 | DLT,DNH | | H: Hearing Aids | H: None |
| | | 71 | 5 | September 28, 2000 | 8722 | 23.9 | | F 001 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 70 | 12.9 | August 28, 2003 | 7658 | 21.0 | | S INF | DPW,DNH | | H: Reads Lips | H: Assistive Listening Device |
| | | 72 | 0 | July 22, 2004 | 7329 | 20.1 | | E 002 | DPW,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 11.8 | March 3, 2005 | 7105 | 19.5 | | E 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 11.8 | November 30, 2005 | 6833 | 18.7 | | F 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 6 | June 16, 2006 | 6635 | 18.2 | | A 003 | DPW,DNH,LD | Unverified | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 9.9 | July 25, 2007 | 6231 | 17.1 | | A 002 | DNH,DNV | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 75 | 7.6 | February 5, 2008 | 6036 | 16.5 | | F 001 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 4 | April 27, 2010 | 5224 | 14.3 | | E 004 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 75 | 0 | June 23, 2011 | 4802 | 13.2 | DD1 | G 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 0 | October 7, 2011 | 4696 | 12.9 | | A 002 | DLT,DNH,LD | Unverified | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 71 | 1 | September 27, 2012 | 4340 | 11.9 | | C 004 | DPO,DNH | | H: Reads Lips | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 0 | June 17, 2013 | 4077 | 11.2 | | E 003 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 71 | 12 | October 4, 2016 | 2872 | 7.9 | | F 002 | DPM,DPH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 12 | September 13, 2018 | 2163 | 5.9 | | G 002 | DNM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 78 | 10 | October 18, 2018 | 2128 | 5.8 | | G 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 77 | 10.9 | January 18, 2019 | 2036 | 5.6 | | S INF | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 70 | 3 | August 13, 2019 | 1829 | 5.0 | | F 002 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 4 | June 29, 2021 | 1143 | 3.1 | | G 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 5 | June 20, 2022 | 787 | 2.2 | | E 005 | DPM,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 7 | August 17, 2022 | 729 | 2.0 | | E 003 | DPO,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 73 | 6 | September 14, 2023 | 336 | 0.9 | | G 001 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | | November 20, 2023 | 269 | 0.7 | | C 002 | DLT,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 74 | 7 | January 8, 2024 | 220 | 0.6 | | E 004 | DPM,DNH | | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes |
| | | 78 | 0 | January 9, 2024 | 219 | 0.6 | | E 004 | DPM,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 72 | 8 | January 19, 2024 | 209 | 0.6 | | C 007 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 79 | 5.9 | March 13, 2024 | 155 | 0.4 | | E 002 | DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 74 | 2 | April 29, 2024 | 108 | 0.3 | | E 003 | DPM,DNH | | H: Hearing Aids, Need Staff to Speak Loudly and Clearly | H: Written Notes |

80s+

| Name | CDC # | Age as of Aug. 15, 2024 | Reading Score | Date Admitted to CDCR Custody Per CIRIS | Time Served in Days (as of Aug. 15, 2024) | Time Served in Years (as of Aug. 15, 2024) | DDP Status (as of Aug. 1, 2024) | Current Facility-Bed | Code(s) | LD | Primary Communication Method | Alternate Communication Method |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 80 | 9.9 | September 26, 1983 | 14934 | 40.9 | | F 002 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly S: Written Notes | |
| | | 80 | 12.9 | August 26, 1993 | 11312 | 31.0 | | F 002 | DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 80 | 12.9 | May 19, 2000 | 8854 | 24.3 | | F 002 | DPW,DNH | | H: Hearing Aids | H: Need Staff to Speak Loudly and Clearly |
| | | 81 | 11.8 | December 4, 2013 | 3907 | 10.7 | | F 001 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 83 | 6.6 | June 20, 2014 | 3709 | 10.2 | | F 001 | DPW,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Hearing Aids |
| | | 89 | 1 | August 12, 2016 | 2925 | 8.0 | | F 002 | DPO,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Need Staff to Speak Loudly and Clearly |
| | | 80 | 12.9 | August 18, 2023 | 363 | 1.0 | | E 004 | DLT,DNH | | H: Need Staff to Speak Loudly and Clearly | H: Reads Lips |
| | | 82 | 3.4 | May 8, 2024 | 99 | 0.3 | | G 002 | DPM,DNH,DNV | | H: Need Staff to Speak Loudly and Clearly | H: Written Notes |

# Exhibit D

# Teletypewriter (TTY) Phone



This is a phone for incarcerated persons with speech disabilities or who are deaf and hard of hearing. Below are instructions on how to utilize the TTY phone. These phones can be used by DPS, DPH, DNH and incarcerated persons with no disability with a family member who is deaf. If you do not have one of those codes but need the TTY, please talk to staff or file an 1824 to ask for it.

## <u>Below is a simple guide on how to make a TTY call:</u>

1. Take TTY Phone to TTY ViaPath payphone in designated housing units (A2, B2, C8, D2, E3, F1, G3, RHU, CTC). Plug in the TTY phone and turn it on. At the same time, press "Control", "Shift", "B", to ensure the TTY machine is on Baudot mode.

2. Lift the Via Path handset from payphone and place on TTY machine.

3. On Via Path payphone, press "3" to activate TTY mode. If you are calling someone who uses a TTY, press "4" instead.

4. The TTY machine may ask 1 for English and 2 for Spanish. Choose your language by pressing 1 or 2 on the payphone.

5. On the Via Path payphone, press "2", area code and phone number. Do not press "0," even if the TTY says to – that is not correct.

6. The TTY should start sending out a standard message regarding the call and who its coming from (An incarcerated person at a state institution).

7. Once the other party accepts the call, the CA Relay Service operator will start the process of relaying your message from the TTY machine to the called party. When the called party says something on their end, the CA Relay Operator will then relay back to the TTY machine for you to read. ***NOTE: If the message response from the called party is "garbled" or doesn't make sense, press AAA111 on the TTY machine and hit the "space bar" twice. This clears up the message per CA Relay Service Operator. The person you are calling will need to repeat what they said.***

8. During the same call, if you choose to use the Voice Carryover option, you must do the following: type "VCO Please" on the TTY phone. The operator will then switch to VCO mode, and they will be able to hear what you say and then type back the message on the TTY machine after you place the handset back on TTY. If a speech impaired incarcerated person choses the Hearing Carryover option, the same method is used by typing "HCO Please". The DPS incarcerated person will now be able to type a message, and then lift the headset to hear their family member. The DPS incarcerated person will then place the handset back on TTY and be able to send a response back on the TTY machine.

***If unable to make a successful call on either the TTY or Caption phone, please have staff call the ADA office to ensure a work order is placed. The buildings also have secondary Caption Phone to remedy immediately.***

# CapTel Caption Phone Information

This is a phone for incarcerated persons who are deaf or hard of hearing and who want to call loved ones who are deaf or hard of hearing.

These phones can be used by DPH, DNH and incarcerated persons with no disability with a family member who is deaf. If you do not have one of those codes but need the captioned phone, please talk to staff or file an 1824 to ask for it. The caption phones are in the RHU, A2, B2, C8, CTC, D2, E3, F1, and G3 housing units.




## Housing Unit CapTel "i" Model Instructions

1. **Set up the phone:** Ask the housing unit officer for the Primary CapTel i model phone located in custody office. Plug in the phone to the designated phone line, & ethernet port located inside the new lock box fastened to the wall. Plug in the power cord.

2. Lift handset and follow the ViaPath automated instructions.

3. Dial "2" followed by the area code and number.

4. Enter your PID and private code when prompted to do so (This is the same PID you use to utilize your tablet, and all other ViaPath technology) (If you need to register for a PID and private code refer to registration instructions located in all CapTel phone boxes)

5. After ViaPath completes the standard automated message, your party can then accept the call. The call will be recorded. You will have 40 minutes for the call.

## Chapel CapTel Model Instructions:

If the housing unit CapTel phones are not working, simply ask to utilize the original CapTel phone in the Chapel. The phone operates well if it's plugged in a couple of minutes before a call is made.

1. Power on the phone: Once the phone line is connected, it will take a few minutes to set up.

   *For local area code (559) calls*:  Dial 9 followed by the number (e.g., 9-992-7100). No area code is needed.

   *For long-distance calls*:  Do not dial a 9 first. Dial 1, followed by the area code and the number (e.g., 1-XXX-XXX-XXXX).

***If unable to make a successful call on either the TTY or Caption phone, please have staff call the ADA office to ensure a work order is placed. The buildings also have secondary Caption Phone to remedy immediately.***

# TTY PHONE INFO

Guide for Using TTY Phone



## BASIC TTY INFORMATION

The teletypewriter (TTY) phone is a device that attaches to a phone. It allows you to read what the person you called says. It also allows you to type what you want to say back. These phones can be used by people with **DNH**, **DPH**, and **DPS** codes. If you do not have one of those codes but need the TTY, please talk to staff or file an 1824 to ask for it. You can also use the TTY if you don't have a hearing disability but you have a family member who needs one. Tell your housing unit staff if you need to use the TTY because of a family member.

# TTY INSTRUCTIONS

1.  Ask the housing unit officer if you can make a TTY call. If no one else is using the TTY, you can make a TTY call. You can make calls even if it is not your scheduled dayroom time and during modified programming (lockdowns). You can also sign up to use the phone in advance.

2.  You must use the TTY with a regular phone. There are dedicated ViaPath payphones for TTY.

3.  Take the TTY Phone to the TTY Via Path payphone in one of these units on your yard: A2, B2, C8, D2, E3, F1, G3, RHU, CTC.

4.  Plug the TTY phone into designated outlet.

5.  Turn on the TTY by pressing the on/off switch.

6.  Press the "Control," "Shift," and "B" keys at the same time.



7.  Lift the handset from the **ViaPath payphone** and place on the acoustic cups of the TTY machine. Make sure the phone cord is on the left side of the TTY.

8.  On the **ViaPath payphone**, press "3" to make a call through the Relay Service. Press "4" if you are calling another TTY directly. Press "5" if you do not need the TTY yourself but are using it to call someone who uses a TTY through the Relay Service.

9.  The TTY machine will ask whether you want English or Spanish. Press 1 for English or 2 for Spanish **on the ViaPath payphone (not the TTY)** to choose the language.

10. On the **ViaPath payphone**, press "2", then the area code and phone number. Do not press "0," even if the TTY says to – that is not correct.

11. The TTY should start sending out a standard message regarding the call and who it is coming from ("This call is from an inmate at the California Dept of Corrections. This call will be recorded and monitored").

12. Once the other person accepts the call, you can start to type your messages **on the TTY**. If you are making a relay call, the CA Relay Service operator will read the messages you type on the TTY machine to the person you called. When the person you called says something, the CA Relay Operator will type it back to the TTY machine for you to read.

13. TTY calls use special language and abbreviations. "GA" means "Go Ahead," to show that you are done speaking and the other person can respond. "SK" means "Stop Keying" and means that you are ready to hang up. More information about TTY call rules is below.

## Conversation Etiquette

| | |
|---|---|
| **GA** | When you talk with another person by TTY, you type while the other person reads. When you want the other person to respond, type GA for "Go ahead." |
| **GA or SK** | To say goodbye, type GA OR SK. This gives the other person a chance to say any last words before ending the conversation. SKSK Type SKSK to end the conversation. |
| **Q** | Some people prefer to type **Q** instead of a question mark because it saves time and is easier to type. |

You can use punctuation marks such as commas and periods, although many people choose to omit them. You may also abbreviate words, such as:

| | | |
|---|---|---|
| **GA** – go ahead | **MTG** - meeting | **R** - are |
| **SK** – stop keying | **NBR** – number | **SHD** - should |
| **CD** - could | **OIC** – oh, I see | **THX** - thanks |
| **CUL** – see you later | **OPR** - operator | **TMW** - tomorrow |
| **CUZ** - because | **PLS** - please | **U** - you |
| **HD** - hold | **Q** – question mark | **UR** - your |

**Commented [MR1]:** CDCR Response: This picture does not fit in the booklet. A table of just the additional abbreviations has been added to the booklet.

# VCO AND HCO

TTY also offers Voice Carry-Over (VCO) and Hearing Carry-Over (HCO). VCO is for people with hearing loss who prefer to speak. HCO is for people who can hear but cannot speak.

# VOICE CARRY OVER

If you want to talk directly to the person you are calling, here is how to use **VCO**.

1. After you start your call, type "VCO Please" **on the TTY phone**. The operator will switch to VCO mode.

2. To speak, pick up the handset from the TTY. The person you are talking to will hear what you say.

3. When you are done speaking, put the handset back on the TTY. Then the relay operator will type back the other person's message.

4. Be sure to say "Go Ahead" when you are done speaking so that the person you are calling knows they can respond.

## HEARING CARRY OVER

If you want to listen to the person you called and type your response, here is how to use the HCO:

1. After you start your call, type "HCO Please" **on the TTY phone**. The operator will switch to HCO mode.

2. Type what you want to say **on the TTY machine**. The relay operator will speak your message to the person you are calling.

3. To listen, pick up the handset from the TTY. You will be able to hear what the person you are talking to says.

4. When you are done listening and ready to type back to the person you are calling, put the handset back on the TTY.

5. Be sure to type "GA," which stands for "Go Ahead" when you are done with your message so the person you are calling knows they can respond.

## MONITORING

The TTY will print a transcript of your call on a receipt.

If you are making a regular, non-confidential call, you will need to give the receipt to staff once your call is over. If you are making a confidential legal call, you can keep the receipt once your call is over.

## TROUBLESHOOTING

TTY calls sometimes have connection problems. When that happens, messages can be "garbled" or not make sense. "Garbling" might look like:

- (CA HERE GARBLE PLEASE REPEAT)

- ~`~XX~X~X~`--~

To fix garbling, press "AAA111" **on the TTY machine** and then hit the "space bar" twice. This clears up the message and the person will need to repeat their message per CA Relay Service Operator.

**If the message still doesn't make sense, ask staff for help.**

If you can't make a successful call on the TTY, please tell staff and ask them to call the ADA

office at extension 5257, 7516, 7260, or 5277. The ADA office will work to fix the phone. Staff will also explain how you can use another TTY on your yard or another yard at the same times and with the same frequency as you could use the phone that is not working.

# CapTel® 840i

# How-to Guide





305-021650 4/23

≣Ultratec®

## Action Needed – Registration

The Federal Communications Commission (FCC) requires that all *CapTel* 840i users register. As you set up your new phone, please follow the registration directions on the screen. The Captions feature cannot be activated until registration is complete. For directions, please see *Registering Your CapTel phone* on page 21.

Need help registering?  Call 1-888-269-7477

## *CapTel* 840i Specifications

**Physical Dimensions**
Size: 9" × 6.5" × 7.5"
Weight: 2 lb. 10 oz.

**Power**
AC Adapter: 5.9-6.0V, 2Amps
(barrel is negative)
Adapter is UL listed.

**Dial Pad**
Large Keys: 0.75" × 0.70"

**Display**
7" Backlit, graphical LCD
color display
840 × 480 pixels

**Function Buttons**
3 Programmable Speed Dial
1 Customer Service Speed Dial
Speaker
Flash
Mute
Tone
Caption
Volume
Up/Down/Yes/No

**Model**
CapTel 840iSP

**Controls**
Conversation: Amplification
0-40 dB gain
Tone
Ringer: off, low, medium, high
(0-87 dB at 1 meter)

**Indicator Lights**
Mute
Volume Levels (1 through 12)
Captions On/Off

**Handset**
Type: HAC (Hearing Aid
Compatible)

**Dialing**
Phone Book (97 entries)
Speed Dial (3 entries)
Redial (Last number dialed)

**Captions**
4 Caption font sizes
• Small        0.15"
   (14 lines of text)
• Medium    0.20"
   (10 lines of text)
• Large        0.25"
   (8 lines of text)
• Extra Large 0.33"
   (6 lines of text)
Adjustable colors for
background and captions font

**Connections**
Telephone line: requires RJ11
connection (can be standard
analog line, VOIP, DSL with
filter, Fiber Optic. Does not
support digital PBX system
unless analog port available).
3.5 mm Neckloop/Headset
2.5 mm Headset with microphone
Ethernet or WiFi wireless network
AC power

**Approvals**
FCC approved
ACTA Product-Labeling
Number:
US:D8KTE00BCAPTEL840
REN: 0.0B

**Conversation Memory**
Up to 50 conversations (or
62,000 characters) saved in
memory

**Caller ID History**
Up to 50 entries

**Answering Machine**
63 Recordable messages
(2 minute max per message)
Recordable greeting
Selectable number of rings
before answer
Ability to caption messages left
on an external answering machine
Remote access to Answering
Machine messages from
another phone

The CapTel Privacy Policy is available online at www.CapTel.com or by request at 877-464-9149.

NOTE: Your *CapTel* phone will periodically connect to the Captioning Service through the Internet and/or phone line connection to report its status and check for software updates.

# Congratulations on Choosing *CapTel*!

Welcome to the Captioned Telephone – *CapTel*! With *CapTel*, you can see captions of everything people say over the phone, letting you enjoy calls with confidence.

**Please take a moment to read this guide and learn:**

- How to start using your *CapTel* phone
- How your *CapTel* phone works
- How to get help when you have questions

We want the *CapTel* phone to be enjoyable and convenient for you. As you use your new phone, we welcome your questions and comments. If we can help, please call!

Thanks again for choosing *CapTel*.

Sincerely,

*CapTel* Customer Service
1-888-269-7477
www.CapTel.com

# T A B L E   O F   C O N T E N T S

## Overview – How *CapTel* Works ..............................................4

## Section 1: Getting Started .................................................5

What is in the box ..................................................................................5

Overview of *CapTel* 840i phone ..........................................................6

Using a headset or neckloop (optional) ...........................................11

Setting up your *CapTel* 840i ............................................................12

Registering your *CapTel* phone ........................................................21

Choosing your captioning preference ...............................................23

Getting help............................................................................................24

## Section 2: Making and Answering Calls....................25

Dialing a phone number directly........................................................26

Calling using the Speed Dial buttons.................................................27

Calling a number in the Phone Book..................................................28

Answering an incoming call.................................................................29

Adjusting the volume.............................................................................30

Adjusting the sound – TONE................................................................31

Knowing what sounds are on the line................................................32

## Section 3: Viewing Captions ...........................................33

Turning captions on/off during a call ...............................................34

Viewing corrections ..............................................................................34

Switching captioning methods during a call.....................................35

Reviewing captions during a call .......................................................36

Reviewing captions after hanging up .................................................37

Saving conversations.............................................................................39

Erasing conversations............................................................................41

Changing the caption font size............................................................42

Setting the color of the captions.........................................................44

Setting how captions scroll across the Display Screen ........................46

Adjusting the brightness of the Display Screen ......................................48

## Section 4: Call History ........................................................51

About Caller ID........................................................................................51

Using Call History to see recent calls ................................................52

Adding a Call History entry to the Phone Book ........................................54

Clearing all Caller ID entries ...............................................................56

## Section 5: Using the Answering Machine .................. **57**

Turning Answering Machine on/off ....................................................58
Playing your Answering Machine messages.................................................59
Clearing all messages ..............................................................62
Recording a personal greeting message.....................................................63
Setting the number of rings before answering ....................................65
Making incoming messages audible/silent.................................................67
Remote access to your Answering Machine messages.........................69
To access your Answering Machine messages remotely ......................71
Captioning external Answering Machine messages............................72

## Section 6: Using the Phone Book ................................. **74**

Adding a new contact to your Phone Book ..............................................75
Dialing a phone number from the Phone Book.....................................77
Editing an existing contact in the Phone Book.....................................78
Removing a contact from your Phone Book............................................80

## Section 7: Using Speed Dial Buttons ........................... **81**

About the Speed Dial buttons ................................................................81
Saving phone numbers in the Speed Dial buttons ..............................82
Editing phone numbers in the Speed Dial buttons.............................83
Dialing with the Speed Dial buttons.......................................................84

## Section 8: Settings ............................................................... **85**

Setting the Captions button to on/off ....................................................86
Turning Spanish captions on/off..............................................................88
Adjusting the volume of the Ringer.......................................................90
Setting the pitch of the Ringer................................................................91
Turning keypad lights on/off....................................................................92
Saving the volume.....................................................................................94
Setting your *CapTel* phone for Tone/Pulse dialing .................................96
Knowing when the phone line is already in use.....................................97
Changing the network settings ...............................................................99
Removing saved networks ..................................................................... 101
Setting the Time Zone............................................................................ 102
Using Call Waiting.................................................................................. 103
Dialing 911 with your *CapTel* 840i ..................................................... 104
Updating your *CapTel* phone .............................................................. 105

## Problem Solving ...................................................................**106**
## Index ........................................................................................**109**

OVERVIEW # How *CapTel* Works



The *CapTel* 840i connects to both your telephone service and to your Internet service. Every time you make a telephone call, the phone uses the Internet connection to access a no-cost Captioning Service. The Captioning Service uses speech recognition technology (either automated or operator-assisted) to create captions of everything your caller says. The captions appear on your *CapTel* 840i display screen for you to read.

You can enjoy conversations over the phone with the added help of written captions in case you miss anything.

**NOTE:** *The CapTel 840i phone does not generate captions of the phone call on its own. The phone works with the Captioning Service (over the Internet) to display captions during your calls.*

# Getting Started

*This section explains how to start using your new CapTel 840i phone.*

## TOPICS:

- **What is in the Box**
- **Overview of *CapTel* 840i Phone**
- **Using a Headset or Neckloop (Optional)**
- **Setting up your *CapTel* 840i**
- **Registering your *CapTel* 840i Phone**

## What is in the Box?

Your *CapTel* 840i includes the following parts:



- *CapTel* 840i Phone
- Telephone Cord



- Power Adapter –
  to plug into a
  wall outlet

*Important! Use only the power adapter that came in the box with your CapTel 840i*

- Ethernet Cable –
  to connect to
  Internet service
  *(not necessary for
  WiFi installations)*



- *CapTel* Setup
  Guide and *CapTel*
  How-to Guide



# Overview of *CapTel* 840i Phone



### 1. Display Screen

Shows captions, Caller ID, Answering Machine messages, Phone Book entries and more.



### 2. Information Bar

Gives you instructions and helpful tips.



### 3. YES Button

Allows you to select items that are highlighted in the Options list, and respond "Yes" to questions or commands on the display screen.



### 4. UP Arrow Button

Allows you to move up through items in the Options list and move through entries in your Phone Book, Answering Machine messages, or Call History. Also lets you go back during a call to review captions that have already scrolled off the display screen.

**TIP:** *If you hold down the UP arrow button, it will continue scrolling up automatically until you release the button.*



### 5. NO (Exit) Button

Allows you to respond "No" to questions or commands on the display screen and to Exit out of the Options list.



### 6. DOWN Arrow Button

Allows you to move down through items in the Options list and move through entries in your Phone Book, Answering Machine messages, or Call History. Also lets you scroll down through captions when reviewing calls.

**TIP:** *If you hold down the DOWN arrow button, it will continue scrolling down automatically until you release the button.*



## 7. CUSTOMER SERVICE Button

Our helpful customer service team is happy to help you set up and use your *CapTel* 840i telephone – we're only a button push away. Pressing the CUST SERV button will automatically dial the *CapTel* help line. In an office, you may need to dial 9 first.

**NOTE:** *Help is available 24 hours a day, 7 days a week (closed on major holidays). Help materials are also available online at* **www.CapTel.com**





## 8. SPEED DIAL Buttons

You can quickly dial up to three frequently-called phone numbers, just by pressing a speed dial button.



## 9. SPEAKER Button

Press the SPEAKER button (light on) to play your conversation aloud over the speaker. To turn off the speaker, lift the *CapTel* handset to listen to the call, or press the SPEAKER button again to turn off the speaker/end your call.




## 10. FLASH Button

Some telephone service features like Call Waiting require a "hook flash." The hook flash is a very brief interruption of the connection like hanging up the phone for one second. There is a brief click or silence on the line.

## 11. MUTE Button

Silences the sound from your end of the conversation. When the MUTE button is pressed (red light around the button is ON), the person on the other end of your call will not be able to hear you. You will still be able to hear the caller and get captions of everything they say. To turn the Mute feature off, press the MUTE button again (red light around the button is OFF).



## 12. TONE Button

Allows you to adjust the sound settings of the call, letting you enhance LOW, MED, or HIGH frequency tones to find the range that you hear best.

## 13. CAPTIONS Button

Whenever the red light is on around the CAPTIONS button, your calls will automatically be connected over the Internet to the Captioning Service, and you will get captions during the call. Captions can be turned on or off at any time. To turn the captions off, just press the CAPTIONS button to turn the red light off.



## 14. VOLUME Bar

Lets you adjust the volume to a comfortable level, up to a 40dB gain from min/max. To increase the volume, press the ▲ right side of the VOLUME bar. To decrease the volume, press the ▼ left side of the VOLUME bar. There are 12 volume levels. Watch the light panel above the VOLUME bar to know what the current volume setting is.

**WARNING:** *The maximum volume setting is very loud. People who do not need amplification should not use the phone at the highest volume setting. The volume level automatically returns to a mid-range setting whenever the phone is hung up.*

To prevent your *CapTel* phone from returning to a mid-range volume setting whenever the phone is hung up, see "Saving the Volume" on page 94.

**NOTE:** *Per FCC requirements, your CapTel handset includes a reminder that no one other than the registered CapTel user should use your phone with the Captions feature turned ON. If someone else wants to use your CapTel phone, make sure the CAPTIONS button is turned OFF.*

## Back (top) edge view of *CapTel* **840i**



**1**     **2**     **3**     **4**

### Features

**1. Telephone Line**
Plug the telephone cord here (RJ11 jack). Phone cord can be for analog, VOIP, fiber optic, Digital Cable service, or analog with DSL service. *CapTel* 840i should not be used with a PBX system unless an analog port is available, otherwise it will cause damage to the phone or PBX system.

**2. Ethernet Status Light**
Lets you know if your Ethernet cable is connected to the Internet and whether activity is on the line.
**NOTE:** *The LNK indicator does not light up when using a WiFi connection.*

**3. Ethernet Jack**
Plug the Ethernet cable (provided) here to connect to your Internet Service.
**NOTE:** *If you are connecting to the Internet using a WiFi network, you do not need to connect the Ethernet cable.*

**4. Power Jack**
Plug the AC power adapter here. Use only the AC power adapter that came with your *CapTel* phone.

# Using a Headset or Neckloop (Optional)

## Audio Jacks (2.5 mm/3.5 mm)

You can use earphones, a headset, neckloop, or other type of listening device with the *CapTel* 840i to maximize the audio quality or to enjoy your new phone hands-free. Simply plug the headset/assistive device into the appropriate 2.5 mm or 3.5 mm audio jack located on the right edge of the *CapTel* 840i phone. Open the protective cover to reach the jacks.



**Headset**

**or**

**Neckloop**

**2.5 mm**    **3.5 mm**

2.5 mm jack –
incoming/outgoing audio

3.5 mm jack –
incoming audio only

# Setting up Your *CapTel* 840i

*For complete instructions, please see the Setup Guide.*

## Requirements

1. High-speed Internet access using a DSL or Digital Cable modem (the *CapTel* 840i connects either via a WiFi network or with an Ethernet cable). Depending on your Internet setup, a router may also be required to allow you to connect more than one device to your Internet service.

2. Telephone service (can be analog line, DSL with filter, VOIP, fiber optic, or Digital Cable phone service). *CapTel* does not work with digital Private Branch Exchange (PBX) systems found in some office environments, residential facilities, and hotels, unless an analog port is available. Using *CapTel* with a PBX system without an analog port may damage the phone and the PBX system.

3. Standard electrical power (AC adapter plugs into standard wall outlet).

## Select a location

**Set up the *CapTel* 840i in a place where:**

- There is a high-speed Internet (Ethernet) jack or your wireless router is located nearby.
- There is a telephone jack nearby (can be analog line, DSL with filter, VOIP, fiber optic, or Digital Cable phone service).
- There is an electrical outlet nearby.
- The surface it will be set on, or mounted to, is stable and secure.
- The area is protected from excessive heat or humidity.

**NOTE:** *The outlets for power, the phone line, and the Ethernet connection should all be located nearby, as each cord needs to plug into your CapTel 840i. If your Internet access is located in a different room than where you plan to use the CapTel 840i, a WiFi setup is recommended. Please see the Setup Guide or contact CapTel Customer Service for help setting everything up.*

## Connect to your telephone service

1. Plug one end of the telephone cord into the telephone jack labeled "Line 1" located on the back (top) edge of the *CapTel* 840i. Use the telephone cord included with your new *CapTel* 840i phone.

2. Plug the other end of the telephone cord into a telephone wall outlet.

**NOTE:** *If you need to connect more than one device to the same telephone line, please see "Sharing a Telephone Line Jack" on page 108.*

## Connect to a power outlet

1. Plug the power adapter cord into the socket labeled "Power" located on the back (top) edge of the *CapTel* 840i.

2. Plug the power adapter into a wall outlet or power strip. The *CapTel* display screen will light up to let you know power is connected.

**TIP:** *Plug your power adapter into an electrical power surge protector to protect your CapTel 840i from damage caused by unspecified electrical voltage or damage caused by lightning.*



**WARNING:** *Be sure to use only the power adapter that came with your CapTel 840i. Using any other power adapter may damage your phone.*

**Telephone Line**    **Power Cord**

**Telephone Wall Outlet**    **Back (top) of *CapTel* 840i**    **Power Outlet**

Line 1    LNK   Ethernet   Power

Once you plug in the power, your *CapTel* phone will automatically check that everything is connected and working properly. You can follow along on the *CapTel* display screen, which will tell you what is happening during the setup process.

## Select a Language

You can set the *CapTel* 840i for either English or Spanish language. The *CapTel* menu options and conversation captions will appear in whichever language you select.



1. When the *CapTel* screen lights up, select which language you would like. Press the **UP** arrow or **DOWN** arrow until the language you want is highlighted.



| **Please Select Language** |
| English |
| Español |
| **Press YES to Accept** |



2. Press the **YES** button to accept.

**NOTE:** *You can change the Language setting at a later time. Please see "Turning Spanish Captions On/Off" on page 88.*

## Connect to your Internet service

There are two ways to connect to your Internet service:

Option 1: Wired – use an Ethernet cable to connect to the Internet. Please follow instructions for "Wired Installations" below.

Option 2: Wireless – use your home/office WiFi network to reach the Internet. Please follow instructions for "Wireless/WiFi Installations" on page 17.

### *For Wired Installations*

1. Plug one end of the Ethernet cable into the jack labeled "Ethernet". Located on the back (top) edge of the *CapTel* 840i. Be sure to use the Ethernet cable that came with your new *CapTel* 840i phone.

2. Connect the other end of the Ethernet cable into the jack you use to access your Internet service.

   Depending on how your Internet service is set up for your home/office, you could be plugging into any of the following:

   - An available Ethernet jack on a digital cable modem
   - An available Ethernet jack on a DSL modem
   - An available Ethernet jack on a router in your home
   - An available Ethernet jack in a wall outlet

**NOTE:** *When connected properly, LNK indicator light will glow. The LNK indicator light is located next to the Ethernet jack on the back (top) edge of the CapTel 840i.*



**Back (top) of *CapTel* 840i**

Use the examples on the following pages to match your setting with the correct installation method.

*All Outlets Located Together (Wired Setup)*

**Example 1:** All of the connection outlets *(telephone, Internet, and power)* are available in the same room that you are planning to use the *CapTel* 840i.



**Example 2:** If there is not an available Ethernet jack in your DSL or Cable Modem, you will need a router or switch that lets you connect more than one device to the Internet. Contact your Internet Service Provider to learn what router or switch will work with your modem. The router should support DHCP. Connect the router to your DSL/Cable Modem. Then connect the *CapTel* 840i to the router or switch using the Ethernet cable as shown below.



If your Internet outlet is in a different room from where you plan to use *CapTel*, see the Setup Guide for instructions.

*For Wireless/WiFi Installations*

If you have a wireless ("WiFi") network in your home or office, your *CapTel* phone can connect to the Internet using the WiFi network. You do not need to plug in an Ethernet cable.

To set up your *CapTel* for WiFi use, you will need to know the name of your wireless network *(also called the SSID)* as well as any passwords that may be necessary to access the network. The way you access your WiFi network with *CapTel* will be very similar to how you access the network from a computer or mobile device.





**NOTE:** *If someone helped install the wireless network in your home or office, it may be helpful to consult with them as you set up your CapTel phone.*

To set up your WiFi connection:



1. The display asks, **Press YES for WiFi Setup.** Press the **YES** button.

2. Your *CapTel* checks if any wireless networks have been used previously and are already saved in memory. If no previous networks are detected, *CapTel* scans for available networks in your location.



3. *CapTel* lists any WiFi networks detected, in order of the strongest signal strength to the weakest signal strength. Use the **UP/DOWN** arrows to highlight the wireless network you want to use. Press the **YES** button to select.

**NOTE:** *CapTel may detect wireless networks in your location that you do not recognize – such as a wireless network from a neighbor or nearby office. Be sure to select the SSID that matches your WiFi network.*





| SSID | Security | Ch. | Signal |
|------|----------|-----|--------|
| 2WIRE269 | WPA | 08 | |
| OfficeNet | WPA | 06 | |
| ACBRDBAND | WPA | 06 | |
| NETWORK1 | WPA | 04 | |
| Refresh Network List | | | |
| Enter Network Manually | | | |

**Press YES to Select a Wireless Network**
**Press NO to exit WiFi Setup**

If you do not see the network you want listed, try moving your *CapTel* phone to an area closer to your wireless router and selecting "Refresh Network List". *CapTel* will re-scan for available networks. See the Setup Guide for additional directions.

4. If required, *CapTel* asks for the password to access your WiFi network.

**NOTE:** *Where to find your WiFi password? This is the same password you need to access the WiFi network from any computer or mobile device. The password (sometimes called a "pass phrase" or "network key") is assigned by your Internet Service Provider or by whomever set up your wireless network. In some cases, the password may be listed directly on your wireless router.*

Use the dialing pad to enter the letters or numbers of your password. Look for the letters listed on the number keys to know which number key to press. For some letters/numbers, you will need to press the number key several times until the correct letter/number appears on the display screen. For special characters (i.e., %, &, #) press the 1 key repeatedly.



| SETUP - WiFi |
|---|
| Please Enter WPA Password: |
| 7547534933_ |
| **Press YES to Accept**<br>▲ for Shift, ▼ for Backspace, # for Space |

**TIP:** *Some passwords are case-sensitive. Press the UP arrow button to shift lock for capital letters. Press the UP arrow button again to return to lower case.* Example: To enter the letter "R", press the UP arrow key to set shift-lock to capital letters, then press the number 7 key three times until you see "R" on the display screen.

**NOTE:** *Depending on the type of security on your wireless network, you may not be asked to enter a password.*

**TIP:** *After you have typed your password, double-check that you have all the letters and numbers listed correctly, and that any capital/lower case letters are entered properly. If the password is not correct, CapTel will not be able to connect to your WiFi network.*



5. After you have entered the password, press the **YES** button to accept. *CapTel* will save your network settings, and connect to your wireless network.

**NOTE:** *Once your CapTel phone connects to the Internet, it automatically checks to make sure that you have the most current software version. If needed, your phone will automatically update its software over the Internet connection. Watch the display screen to follow the progress. Your CapTel phone may reboot as part of the update process. Once the entire process is completed, you will be able to continue with the installation.*

## STEP 4 – Set Time Zone



1. Use the **UP** or **DOWN** arrow buttons to highlight the Time Zone that your new *CapTel* phone is located in. Once the correct Time Zone is highlighted, press the **YES** button to select.





2. Do you live in an area that observes Daylight Savings Time? If so press the **YES** button. If not, press the **NO** button.



3. *CapTel* automatically sets the time, based on your answers.

**NOTE:** *If you move your CapTel phone to a different location outside of your current time zone, you can update the time zone setting in the Options menu to ensure the clock is set properly.*

# Registering Your *CapTel* Phone

The first time that you set up your *CapTel* 840i, you will be asked to register your phone and agree to the Terms & Conditions for using *CapTel*. Registration is required by the FCC before the Captions feature can be activated.

Once you complete this step, you will not need to register again, even if you move your phone to a new location.

**NOTE:** *If your phone display shows different directions than the instructions below, please follow the directions on your CapTel phone display screen to complete your registration.*

To register:

In some cases, the display screen may ask you to register your *CapTel* phone by going online or calling *CapTel* Customer Service. Follow the directions on the screen to register.

Register online at: www.CapTel.com/register



CUST SERV

Or, press the blue **Customer Service** button to reach an Installation Help Specialist.

CAPTIONS

Once you've registered, press the **CAPTIONS** button to clear the registration screen and continue.

1. The display screen alerts you that you should read and agree to the Terms & Conditions for using *CapTel*.

2. The display screen lists the Terms & Conditions for using the *CapTel* phone.

---

Please register your phone at www.CapTel.com or Contact CapTel Customer Service.

After registering your ESN (424C5500146) press the CAPTIONS button to continue.

**Press YES for Options**

---

*************** Terms & Conditions ***************
Before using the CAPTIONS feature, please register your phone at www.CapTel.com or Contact CapTel Customer Service.

This phone's ESN is 424C5500146

**Press NO to exit**

---

Before using CAPTIONS feature, please read and agree to the following Terms & Conditions

Downloading – Please Hold

---



3. Follow the directions on the display screen to review each of the Terms & Conditions. Press the **YES** button to accept each statement.

Once you've agreed to all the Terms & Conditions, the process is complete. Congratulations! You can begin making and answering calls with captions.



*************** Registration Terms ****4 of 5***
I understand that the cost of captioning each internet protocol captioned telephone call is funded through a federal program.

**Press YES to accept or press NO to deny**

*************** Registration Terms ***************
Your phone is now registered.

Thanks for choosing CapTel.

**Press any key to exit**

If you do not agree with the Terms & Conditions, press the **NO** button. The CAPTIONS feature will remain off during your calls. You can still use *CapTel* as a standard telephone, but you will not receive captions during your calls.

Captions will not be activated on your phone until the Terms & Conditions are accepted.



Terms & Conditions were not accepted.

Press CAPTIONS button to review terms & conditions.

**Press YES for Options            12:53 PM**



CAPTIONS To review the Terms & Conditions wording again, press the **CAPTIONS** button. The Terms & Conditions information will appear again, and you will have another opportunity to accept the Terms & Conditions by pressing the **YES** button.



CUST SERV If you have any questions about the Terms & Conditions or how to register your *CapTel* phone, please press the blue **Customer Service** button for assistance.

# Choosing your Captioning Preference

Your *CapTel* phone lets you select which captioniong method to use, either fully automated Auto Captions or enhanced Assisted Captions.

**With Auto Captions:** Captions are entirely computer-generated.

> ***Captioning Preference***
>
> Your CapTel phone now offers Auto Captions which provides computer-generated captions without the assistance of an operator. Auto Captioned calls are completely private and there is less wait time for captions to begin. You can switch to Assisted Captions at any time during your call. Continue with Auto Captions?
>
> **Press YES or NO**

- No operator on the call.
- Calls start almost immediately, no need to wait for an operator.
- Captions appear in real-time with no delays.

**With Assisted Captions:** An operator facilitates captioning, making corrections and providing call details.

- Operator makes corrections if needed.
- Captions include call details, such as background sounds, whether the speaker is male or female, music on hold, and the "beep" when you leave a voicemail message.
- If the line connection is poor of if there is static on the line, switching to Assisted Captions may improve accuracy.



Press the YES button to use Auto Captions, or press the NO button to use Assisted Captions.

Calls will start in whichever method you select. However, during a call, you can easily switch captioning methods – from Auto Captions to Assisted Captions – by following the onscreen instructions.

**NOTE:** *911 Calls are given priority and will be processed using Assisted Captions once an operator is available. CapTel may adjust the captioning method of any call under certain circumstances, to provide the best possible captioning experience.*

# Getting Help

If you have any questions, comments, or concerns as you use your new *CapTel* 840i, we're here to help. Use any of these ways to contact us:




### CUST SERV Button

Pick up the handset and press the **CUST SERV** button to automatically speed dial directly to our helpful Customer Service team. If you are in an office setting, you may need to dial "9" first and then press the **CUST SERV** button. (*Available 24 hours a day, 7 days a week. Closed on major holidays.*)

Help materials are also available online at our website.



Phone:       1-888-269-7477 (*Available 24 hours a day, 7 days a week*)
FAX:         (608) 238-3008
En Español:  1-866-670-9134

Mail:        CapTel Customer Service
             450 Science Drive
             Madison, WI 53711

Email:       CapTel@CapTel.com
Online:      www.CapTel.com
             *(Live Chat help available at our website)*

| SECTION 2 | Making and Answering Calls |

*This section explains how to place outgoing calls and how to answer incoming calls with your CapTel 840i.*

TOPICS:

- **Dialing a Phone Number Directly**
- **Calling Using the Speed Dial Buttons**
- **Calling a Number in the Phone Book**
- **Answering an Incoming Call**
- **Adjusting the Volume**
- **Adjusting the Sound – TONE**
- **Knowing What Sounds are on the Line**

# Dialing a Phone Number Directly



CAPTIONS

1. Lift the handset or press the **SPEAKER** button.

2. Make sure the **CAPTIONS** button is on (red light on). You can turn captions on/off at any time during your call by pressing the **CAPTIONS** button.

3. Dial the phone number of the person you wish to call.

**NOTE:** *If you need to dial a 9 or other number to get an "outside" line, enter that number first, then dial the phone number.*

4. As you dial, the display screen shows the status as your *CapTel* phone connects to the captioning service, letting you know when captions are ready.

**NOTE:** *It is okay if the captioning service connects before you finish dialing the phone number, just keep dialing.*

5. Listen or watch the signal meter to know when someone answers. Watch the display screen for captions. Begin your conversation as you normally would.



Dial a Number
or Press Speed Dial



Dialing:
321555

Waiting for Captions
Stage 7 of 8

(CapTel CA# C1234) (Tones)
(Ring) (Ring) (Ring) (M) Hello
this is John who is calling
please

3215557685

When you are done with your call, hang up the handset or press the **SPEAKER** button again to end the call.

**TIP:** *Need more time dialing? You can leave the CapTel handset down (hung up) and press the phone number buttons on the dial pad. When you are ready to place your call, pick up the CapTel handset. CapTel will dial the phone number you entered.*

**TIP:** *Remember to dial 1+ area code if the number you are calling is long distance.*

# Calling Using the Speed Dial Buttons

**NOTE:** *You must save telephone numbers in the Speed Dial buttons before they can be used to dial. Please see page 82 for directions.*

CAPTIONS

1. Make sure the **CAPTIONS** button is on (red light on).

SPEED DIAL
1

2. Press the **SPEED DIAL** button with the number that you want to call.



Dial a Number
or Press Speed Dial

3. Lift the handset or press the **SPEAKER** button. Your *CapTel* phone will dial the phone number for you automatically. As you dial, the display screen shows the status as your *CapTel* phone connects to the captioning service, letting you know when captions are ready.

Dialing:
Mary
3215551234
Waiting for Captions
Stage 7 of 8

4. Listen or watch the signal meter to know when someone answers. Watch the display screen for captions. Begin your conversation as you normally would.

When you are done with your call, hang up the handset or press the **SPEAKER** button again to end the call.



(CapTel CA# C1234) (Tones) (Ring) (Ring) (Ring) (F) Hello this is Mary who is calling please

Mary
3215551234

**Signal Meter**

# Calling a Number in the Phone Book

**NOTE:** *Phone numbers must already be saved in the Phone Book before you can use the Phone Book to dial. Please see page 75 for directions.*


CAPTIONS

1. Make sure the **CAPTIONS** button is on (red light on).



2. With the handset hung up, press the **YES** button to see the Options menu.



3. Check that **Dial from Phone Book** is highlighted. Press the **YES** button to select.



4. Press the **UP** arrow or **DOWN** arrow buttons to find the person you want to call.



5. Pick up the handset or press the **SPEAKER** button. Your *CapTel* phone dials the number for you automatically.



6. Listen or watch the signal meter to know when someone answers. Watch the display screen for captions. Begin your conversation as you normally would.

   When you are done with your call, hang up the handset or press the **SPEAKER** button again to end the call.

# Answering an Incoming Call

1. When your *CapTel* phone rings, the display will light up to alert you to an incoming call.

   **NOTE:** *If you have Caller ID service, you will see the name and/or the phone number of the person calling.*

CAPTIONS



2. Make sure the **CAPTIONS** button is on (red light on).

3. Pick up the handset or press the **SPEAKER** button, and answer the call as you normally would.

4. Listen or watch the signal meter for a response. Watch the display screen for captions.



RING!



(CapTel CA# C1234) (F) Hi mom it's Mary calling

Mary
5551234

**TIP:** *If you answer on an extension telephone and want to get captions, just pick up the CapTel handset. As long as the Line in Use feature is turned on, your CapTel phone will connect to the Captioning Service and you will be able to view captions of the call on the CapTel display screen. For more options, see "Line in Use" on page 97.*

# Adjusting the Volume

You can increase the volume of the person's voice coming through the handset or over the speakerphone, up to a 40dB gain from min/max on all calls. Watch the lights above the **VOLUME** bar to see what level the volume is set to.



> To increase the volume (make sounds louder) during a call, press the ▲ right side of the **VOLUME** bar.
>
> To decrease the volume (make sounds softer) during a call, press the ▼ left side of the **VOLUME** bar.

**WARNING:** *The maximum volume setting is very loud. People who do not need amplification should not use the phone at its highest volume setting. The volume level automatically returns to a mid-range setting whenever the phone is hung up.*

To save your volume setting so that it will be used during every call, see Saving the Volume on page 94.

# Adjusting the Sound – TONE

You can adjust the Tone setting to a frequency range that works best for your hearing level – to emphasize HIGH, MEDIUM, or LOW frequency sounds. The Tone setting can be adjusted during, before, or after a call. The setting will remain in effect until you change it again.

 If you hear low-frequency tones better, press the **TONE** button repeatedly until you see "Tone is Low" on the display screen.



 If you hear mid-range frequency tones better, press the **TONE** button repeatedly until you see "Tone is Medium" on the display screen.



 If you hear high-frequency tones better, press the **TONE** button repeatedly until you see "Tone is High" on the display screen.

**NOTE:** *You can also use a headset or neckloop to enhance the sound quality. Please see page 11 for instructions.*



# Knowing What Sounds Are on the Line

The display screen tells you what sounds are occurring during your call with two visual indicators: the Signal meter and the Outgoing Volume meter. These meters only appear during captioned calls.

## The Signal Meter

This helpful meter lights up to indicate sounds on the handset, such as the caller's voice or a busy signal. It shows whenever a sound is coming through the handset, even if the sound is not loud enough for you to hear. The size of this meter expands and contracts with the volume of the sound. Very loud sounds cause the meter to completely light up the whole box. Quiet sounds may cause just a single dot on the display to light up. This meter can help you gauge when a person is finished speaking or initially answers a call.



**Signal Meter**

## The Outgoing Volume Meter

This meter helps you see how loudly you are speaking. More of the bar lights up if you speak loudly. Less of the bar lights up if you speak quietly. You can use the volume meter to gauge the volume of your own voice during a call.



**Outgoing Volume Meter**

**NOTE:** *If the Outgoing Volume meter is filling completely or consistently turns red, you may be speaking too loudly or are holding the telephone handset too close to your mouth.*

| SECTION 3 | Viewing Captions |
|---|---|

*This section explains how to adjust and review conversation captions.*

## TOPICS:

- **Turning Captions On/Off During a Call**
- **Viewing Corrections**
- **Switching Captioning Method During a Call**
- **Reviewing Captions During a Call**
- **Reviewing Captions After Hanging Up**
- **Saving Conversations**
- **Erasing Conversations**
- **Changing the Caption Font Size**
- **Setting the Color of the Captions**
- **Setting how Captions Scroll Across the Display Screen**
- **Adjusting the Brightness of the Display Screen**

# Turning Captions On/Off During a Call



CAPTIONS

You can turn captions on at any time during your call by pressing the **CAPTIONS** button. When the red light around the **CAPTIONS** button is lit, you will see captions of everything the other party says. When the light is off, you will not receive captions.



CAPTIONS

If you turn captions on in the middle of a call, there will be a brief delay as your *CapTel* 840i phone connects to the Captioning Service. Then, captions will begin. During this time, you may still talk/listen to the other party. You do not need to wait for captions to begin if you can hear the other party well enough to carry on the conversation. You can speak at any time even if captions are not present.

**NOTE:** *Federal law prohibits anyone but registered users with hearing loss from using Internet Protocol (IP) Captioned Telephones with the captions turned on.*

# Viewing Corrections

On occasion, word errors may appear in the captions due to the speech recognition system the Captioning Service uses. The Captioning Service will try to correct any word errors as they occur. The corrected word appears in a different color than the rest of the captions to let you know a correction has been made.

There may be a slight delay before the word error is corrected. If you are unclear about what was said, ask your caller to clarify.

**NOTE:** *You can change the color of the corrections. Please see Setting the Color of the Captions on page 44.*

(CapTel CA# 1234) (F) we're looking forward to seeing you tonight  let's meet at the restaurant  lever on should be there by 8 o'clock   **Word Error**

16082385400

(CapTel CA# 1234) (F) we're looking forward to seeing you tonight  let's meet at the restaurant  everyone should be there by 8 o'clock

**Correction**

16082385400

# Switching Captioning Method During a Call

*CapTel* provides captions in two ways: either by fully-automated Auto Captions or by operator Assisted Captions. Calls start in whatever method you selected during setup.

If your calls start in Auto Captions, you can switch to Assisted Captions during a call. For example, if the telephone connection is poor or there is static on the line, switching to Assisted Captions may help improve accuracy. Assisted Captions also provides enhanced call information, such as background noises, showing whether the caller's voice is male or female, and sounds like the "beep" on an answering machine.

To switch to Assisted Captions during a call:



1. Press the **DOWN** arrow button.

2. An operator (Captioning Assistant) will come on the line to help facilitate captions for the remainder of your call.

**NOTE:** *If a CA is not immediately available, CapTel will continue captioning your conversation in Auto Captions until a CA can join the call.*

3. Once you hang up at the end of the call, the next call you make or receive will start in Auto Captions again.

**NOTE:** *To change your Captioning Preference default setting, please press the blue button to contact CapTel Customer Service for assistance.*

******** 5/14 11:16 AM ********
(Ring) hi this is puppy grooming center how may I help you ~
yes we have some time available this afternoon

Press ▼ for CA Assisted Captions
5551239876          Auto

**Indicates Auto Captions**

******** 5/14 11:16 AM ********
help you ~
yes we have some time available this afternoon ~
let me just check the schedule (Changing CA...) (CapTel CA# C6150)

5551239876          CA

**Indicates Assisted Captions**

******** 5/14 11:16 AM ********
(F) I have openings at 1:00 o'clock or 2:30 ~ (dog barking in background) do either of those times work ? ~
ok great we'll see you then ~

5551239876          CA

# Reviewing Captions During a Call



While on a call, press the **UP** arrow button to scroll back through captions that appeared earlier in the conversation. You can continue talking or listening while you review captions. Everything the other party says will continue to be captioned, even while you are looking back at earlier captions.

> (CapTel CA# 1234) (F) Hi mom how are you I am fine the weather is so nice outside and I am getting the garden ready what have you been up to oh that is nice did you have fun oh he's fine he's getting bigger mom he grew another inch
>
> ***Press NO to return to Conversation***

When you are ready to return to the live conversation captions, press the **NO** button. Anything the other party said during the time you were reviewing captions will appear, and the live captions will continue as usual.

You can go back, again, at any time during the call to review what was said. Just press the **UP** arrow button.

**NOTE:** *Your CapTel phone holds up to 50 conversations (or 62,000 characters) in conversation memory. If the conversation memory fills up entirely, older captions will be erased as new captions come in.*

# Reviewing Captions After Hanging Up

To review captions after your conversation is ended and the phone is hung up:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Conversations** is highlighted. Press the **YES** button to select.



3. Check that **Review Conversations** is highlighted. Press the **YES** button to select. You will see a list of your calls, with the most recent call on the top of the screen. Previous calls appear further down the list.



4. Press **UP** or **DOWN** arrow button to scroll through the list of calls. When the call you want is highlighted, press the **YES** button to select.



5. You will see captions of the selected conversation. Use the **UP** or **DOWN** arrow buttons to scroll through the conversation.

| OPTIONS |
| --- |
| 🔲 Dial from Phone Book |
| 📟 Answering Machine |
| 📇 Call History |
| 📖 Edit Phone Book |
| 🗒 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |

| CONVERSATIONS |
| --- |
| ⬆ Review Conversations |
| ⊞ Save Conversations |
| ✗ Erase All Conversations |
| |
| **Press YES to select or press NO to exit** |

| CONVERSATIONS |
| --- |
| 2/6 1:03 PM, Mary |
| 2/3 11:50 AM, Julie |
| 2/2 2:30 PM, CapTel Customer Service |
| 1/30 4:32 PM, 18004822424 |
| 1/29 3:30 PM, 18004822424 |
| 1/27 2:35 PM, 18004822424 |
| **Press ▲ or ▼ to Change the Selection** |
| **Press YES to select or press NO to exit** |

(CapTel CA# 1234) (F) Hi mom how are you I am fine the weather is so nice outside and I am getting the garden ready what have you been up to oh that is nice did you have fun oh he's fine he's getting bigger mom he grew another inch

**Press YES to Erase or NO to exit**
**2/3 11:50 AM, Julie**



6. When you are done, press **YES** to Erase or press **NO** to exit.



**NOTE:** *You can erase conversations one by one after you review them by pressing YES to Erase. To save the conversation, press NO.*



7. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *Your CapTel phone comes with the Save Conversations feature enabled, letting you view conversation captions after you've hung up the phone. To turn off this feature, please see page 39. If you turn off the Save Conversations feature, all conversation captions will be erased every time you hang up the phone.*

he grew another inch   we can't wait to see you this weekend  does 9:00 work for you?    I'll bring that recipe I told you about   okay    sounds good see you then    bye mom

Press YES to Erase or NO to exit
2/3 11:50 AM, Julie

# Saving Conversations

You can set your *CapTel* phone to Save Conversations after the call has ended and the phone is hung up. This allows you to go back and review what was said after you've hung up. You can review up to 50 conversations (or 62,000 characters). Or, you can have captions erased every time the phone is hung up. The default setting is to Save Conversations after the call is ended.

To change the Save Conversations setting:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Conversations** is highlighted. Press the **YES** button to select.



| OPTIONS |
|---|
| ▣ Dial from Phone Book |
| 📟 Answering Machine |
| 👥 Call History |
| 📖 Edit Phone Book |
| ▤ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |



3. Press the **DOWN** arrow button until **Save Conversations** is highlighted. Press the **YES** button to select.



| CONVERSATIONS |
|---|
| ▣ Review Conversations |
| ⊞ Save Conversations |
| ⊠ Erase All Conversations |
| **Press YES to select or press NO to exit** |



4. Press **UP** or **DOWN** arrow button to turn SAVE CONVERSATIONS on or off.

**Save Conversations On** saves conversation captions after the call is finished and the phone is hung up.

**Save Conversations Off** erases the conversation captions after every call.

| SAVE CONVERSATIONS CURRENTLY ON |
|---|
| ⊞ Save Conversations On |
| ⊠ Save Conversations Off |
| **Press YES to accept or NO to exit** |



5. After you've made your selection, press the **YES** button to accept or the **NO** button to exit out of Conversation Options.



**SAVE CONVERSATIONS CURRENTLY ON**

☐ Save Conversations On
☐ Save Conversations Off

**Press YES to accept or NO to exit**



6. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *This setting will remain On/Off until you change it again.*

**NOTE:** *Your CapTel phone holds up to 50 conversations (or 62,000 characters) in conversation memory. If the conversation memory fills up entirely, older captions will be erased as newer captions come in.*

# Erasing Conversations

You can erase individual conversations as you review each one (see page 38) or you can erase all conversation captions stored in memory. To delete all of your saved conversations:



1. With the handset hung up, press the **YES** button to see the Options menu.

| OPTIONS |
| --- |
| ▣ Dial from Phone Book |
| ▣ Answering Machine |
| ▣ Call History |
| ▣ Edit Phone Book |
| ▣ Conversations |
| ▣ Settings |
| **Press YES to select or press NO to exit Options** |



2. Press the **DOWN** arrow button repeatedly until **Conversations** is highlighted. Press the **YES** button to accept.



3. Press the **DOWN** arrow button until **Erase All Conversations** is highlighted. Press the **YES** button to accept.

| CONVERSATIONS |
| --- |
| ▣ Review Conversations |
| ▣ Save Conversations |
| ▣ Erase All Conversations |
| **Press YES to select or press NO to exit** |



4. The display screen asks **Would You Like to Erase All Conversations**? Press the **YES** button to erase captions. Or, press the **NO** button to exit.

| |
| --- |
| Would You Like to Erase All Conversations? |
| **Press YES to erase or NO to exit** |



5. Press the **NO** button repeatedly to exit out of the menu system.

| CONVERSATION OPTIONS |
| --- |
| Conversation Memory is Empty |

# Changing the Caption Font Size

You can adjust the font size of the conversation captions to be larger or smaller, making the captions easier to read. You need to change the font size before or after a call; you cannot change the font size during a live captioned call.

**NOTE:** *Changing the font size applies only to conversation captions. The font size and style for your CapTel 840i Options menu always remains the same.*

To change the caption font size:



1. With the handset hung up, press the **YES** button to see the Options menu.

| OPTIONS |
| --- |
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |



2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button repeatedly until **Display Settings** is highlighted. Press the **YES** button to select.

| SETTINGS |
| --- |
| Caption Settings |
| Phone Settings |
| Display Settings |
| Network Settings |
| Set the Time Zone |
| Update Phone |
| Press YES to select or press NO to exit |



4. Press the **DOWN** arrow button until **Set Conversation Font Size** is highlighted. Press the **YES** button to select.

| DISPLAY SETTINGS |
| --- |
| LCD Brightness |
| Set Conversation Colors |
| Set Conversation Font Size |
| Conversation Smooth Scroll |
| Press YES to select or press NO to exit |

5. The display screen shows what the current font size setting is.



6. Press **UP** or **DOWN** arrow buttons to select the font size you want: SMALL, MEDIUM, LARGE or EXTRA LARGE.



7. Once you've selected the font size, press the **YES** button to accept or press the **NO** button to exit.



8. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *You need to adjust/select the caption font size before or after a call. You cannot adjust the caption font size during a live call.*



**SET CONVERSATION FONT SIZE**

Conversation Font is:
SMALL

Use ▲ or ▼ to select Conversation Fonts
Press YES to accept Font or NO to exit



**SET CONVERSATION FONT SIZE**

Conversation Font is:
Medium

Use ▲ or ▼ to select Conversation Fonts
Press YES to accept Font or NO to exit



**SET CONVERSATION FONT SIZE**

Conversation Font is:
LARGE

Use ▲ or ▼ to select Conversation Fonts
Press YES to accept Font or NO to exit

**SET CONVERSATION FONT SIZE**

Conversation Font is:
EXTRA LARGE

Use ▲ or ▼ to select Conversation Fonts
Press YES to accept Font or NO to exit

# Setting the Color of the Captions

You can change the color of the caption font, background, and corrections on the display screen to a color combination that you prefer. You need to set the conversation colors before or after a call. You cannot change the caption colors during a live captioned call.

**NOTE:** *Changing the font colors applies only to conversation captions. The font size and style for your CapTel 840i menu options always remains the same.*

To change the caption font or background colors:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.

| OPTIONS |
| --- |
| 🔲 Dial from Phone Book |
| 📟 Answering Machine |
| 🖨 Call History |
| 🎴 Edit Phone Book |
| 🗐 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |



3. Press the **DOWN** arrow button repeatedly until **Display Settings** is highlighted. Press the **YES** button to select.

| SETTINGS |
| --- |
| 🗐 Caption Settings |
| 📞 Phone Settings |
| 🖾 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |



4. Press the **DOWN** arrow button until **Set Conversation Colors** is highlighted. Press the **YES** button to select.

| DISPLAY SETTINGS |
| --- |
| 🖥 LCD Brightness |
| A⃗ Set Conversation Colors |
| Aᴬᴬ Set Conversation Font Size |
| 🗐 Conversation Smooth Scroll |
| |
| **Press YES to select or press NO to exit** |



5. The display screen shows what the current text color and background color are set to, with an ▶ pointing toward the **Text Color** setting. Press the **YES** button to select **Text Color**.





6. A color palette appears on the bottom of the display. Use the **UP** and **DOWN** arrow keys to move through the various font color choices. When you find a font color you prefer, press the **YES** button to accept.





7. The display ▶ moves down to indicate **Background Color**. Press the **UP** and **DOWN** arrow keys to move through the various background color choices. When you find a background color you prefer, press the **YES** button to accept.





8. The display ▶ moves down to indicate **Correction Color**. Press the **UP** and **DOWN** arrow keys to move through the color choices. When you find a correction color you prefer, press the **YES** button to accept.





9. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *Whichever color you select for text or corrections will not be available as a background color choice.*

# Setting How Captions Scroll Across the Display Screen

You can control how the captions appear on your display screen: either appearing word-by-word as each word is captioned or by scrolling line-by-line in a continuous movement. The default setting is word-by-word. To turn on scrolling:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button repeatedly until **Display Settings** is highlighted. Press the **YES** button to select.



4. Press the **DOWN** arrow button repeatedly until **Conversation Smooth Scroll** is highlighted. Press the **YES** button to select.

| OPTIONS |
|---|
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |

| SETTINGS |
|---|
| Caption Settings |
| Phone Settings |
| Display Settings |
| Network Settings |
| Set the Time Zone |
| Update Phone |
| Press YES to select or press NO to exit |

| DISPLAY SETTINGS |
|---|
| LCD Brightness |
| Set Conversation Colors |
| Set Conversation Font Size |
| Conversation Smooth Scroll |
| Press YES to select or press NO to exit |



5. Press the **UP** or **DOWN** arrow button to highlight CONVERSATION SMOOTH SCROLL on or off.

| CONVERSATION SMOOTH SCROLL CURRENTLY OFF |
|---|
| ▤ Conversation Smooth Scroll On |
| ◩ Conversation Smooth Scroll Off |
| |
| |
| |
| **Press YES to accept or NO to exit** |

**Conversation Smooth Scroll On** rolls captions across the display screen line-by-line in a continuous movement.

**Conversation Smooth Scroll Off** displays captions word-by-word as each word is captioned.



6. After making your selection, press the **YES** button to accept or press the **NO** button to exit.



7. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *This setting will remain On/Off until you change it again.*

# Adjusting the Brightness of the Display Screen

You can adjust the brightness of your *CapTel* 840i display screen to make it easier to read in well-lit or dimly-lit environments.

**NOTE:** *You need to adjust the brightness of the Display Screen before or after a call. You cannot set the display screen brightness during a live captioned call.*

To adjust the brightness of the Display Screen:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



| OPTIONS |
|---|
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |

 3. Press the **DOWN** arrow button repeatedly until **Display Settings** is highlighted. Press the **YES** button to select.



| SETTINGS |
|---|
| Caption Settings |
| Phone Settings |
| Display Settings |
| Network Settings |
| Set the Time Zone |
| Update Phone |
| Press YES to select or press NO to exit |

 4. Check that **LCD Brightness** is highlighted. Press the **YES** button to select.





| DISPLAY SETTINGS |
|---|
| LCD Brightness |
| Set Conversation Colors |
| Set Conversation Font Size |
| Conversation Smooth Scroll |
| Press YES to select or press NO to exit |



5. The display screen shows what the current brightness level is set to: Minimum, Medium, or Maximum. Use the **UP** and **DOWN** arrows to highlight the level of brightness you would like. Press the **YES** button to select.



| LCD BRIGHTNESS CURRENTLY MAXIMUM |
|---|
| ☑ Minimum |
| ☑ Medium |
| ☑ Maximum |
| |
| |
| Press YES to accept or NO to exit |

**NOTE:** *The display screen will change brightness levels as you select the options.*



6. Press the **NO** button repeatedly to exit out of the Options menu.

# Getting Help

If you have any questions, comments, or concerns as you use your new *CapTel* 840i, we're here to help. Use any of these ways to contact us:



### CUST SERV Button



Pick up the handset and press the **CUST SERV** button to automatically speed dial directly to our helpful Customer Service team. If you are in an office setting, you may need to dial "9" first and then press the **CUST SERV** button. (*Available 24 hours a day, 7 days a week. Closed on major holidays.*)

Help materials are also available online at our website.

Phone:       1-888-269-7477 (*Available 24 hours a day, 7 days a week*)
FAX:         (608) 238-3008
En Español:  1-866-670-9134

Mail:        CapTel Customer Service
             450 Science Drive
             Madison, WI 53711

Email:       CapTel@CapTel.com
Online:      www.CapTel.com
             *(Live Chat help available at our website)*

| SECTION 4 | # Call History |
|---|---|

*This section explains how to use Call History to see who has called you and to see any incoming calls that you may have missed.*

## TOPICS:

- **About Caller ID**
- **Using Call History to See Recent Calls**
- **Adding a Call History Entry to the Phone Book**
- **Clearing All Caller ID Entries**

**NOTE:** *Call History requires Caller ID service from your phone company. If your phone service does not include Caller ID, you will not be able to view Call History with your CapTel 840i.*

## About Caller ID

If an incoming call is from someone whose information is already saved in your *CapTel* Phone Book, the Caller ID listing that appears on the display screen will show the name of the caller as it appears in your Phone Book. For example, if you saved a nickname in the *CapTel* Phone Book, the caller's nickname will appear in the Caller ID information.

# Using Call History to See Recent Calls

Your *CapTel* 840i phone keeps a list of the most recent incoming phone calls, including calls you may have missed. Your *CapTel* phone stores Call History information for up to 50 incoming phone calls.

The *CapTel* display screen automatically shows you the phone number of the person who called you most recently, even if you were not there to answer the call. Depending on your Caller ID service, the display screen may also list the name of the caller. To see other callers' information saved in **Call History**, press the DOWN arrow button to scroll back through recently received calls.

## Missed Calls

Any unanswered calls appear as New Calls in the display screen.

 1. To review calls, press the **DOWN** arrow button.

 2. Use the **UP** and **DOWN** arrow buttons to move backwards and forwards through previous call listings.

**NOTE:** *You can call the phone number shown in Call History by lifting the handset. Your CapTel phone will dial the number automatically.*



## Previous Calls

You can review Call History information from previous calls at any time.
To review recent calls in Call History:

 1. With the handset hung up press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Call History** is highlighted. Press the **YES** button to accept.

 3. Make sure **View Caller ID History** is highlighted. Press the **YES** button to accept.

4. The *CapTel* display screen will show you a list of phone numbers of calls to your *CapTel* 840i, listing the most recent call first and going back in chronological order.

 5. Use the **UP** and **DOWN** arrow buttons to move backward and forward through previous call listings.

**NOTE:** *You can call the phone number shown in Call History by lifting the handset. Your CapTel phone will dial the number automatically.*

 6. When you are done, press the **NO** button repeatedly to exit out of Call History.



**TIP:** *You can delete Call History entries individually as you review them. When you see the entry you want to delete, press the Yes button for more options. Make sure Delete Entry is highlighted, then press Yes to accept.*

# Adding a Call History Entry to the Phone Book

You can add the phone number and contact information from a Call History entry to your *CapTel* Phone Book, letting you save that caller's information to dial easily.

To add a Call History entry in the Phone Book:



1. With the handset hung up press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Call History** is highlighted. Press the **YES** button to accept.



3. Make sure **View Caller ID History** is highlighted. Press the **YES** button to accept.

4. The *CapTel* display screen will show you a list of phone numbers of calls to your *CapTel* 840i, listing the most recent call first and going back in chronological order.



5. Use the **UP** and **DOWN** arrow buttons to move through the call list until you find the entry you want to save to the Phone Book. Press the **YES** button for more options.



6. Press the **DOWN** arrow button to highlight **Add Entry to Phone Book**. Press the **YES** button to select.



7. The display shows different options for the telephone number format to save. For example, if the phone number is local, you do not need to save the area code with the phone number. If the phone number is long distance, you may need to save "1" plus the area code with the phone number.



Use the **UP** and **DOWN** arrow buttons to highlight the correct telephone number format. Press the **YES** button to accept.





8. The display shows the name and phone number that will be saved in the *CapTel* Phone Book. If needed, you can edit the Name listed by using the **UP** and **DOWN** arrow keys and the *CapTel* dialing pad to make changes. Press the **YES** button to accept.





9. If needed, you can edit the phone Number by using the **UP** and **DOWN** arrow keys and the *CapTel* dialing pad to make changes. Press the **YES** button to accept.

10. When you are done, press the **NO** button repeatedly to exit.



# Clearing All Caller ID Entries

You can delete individual Caller ID entries as you review them (see page 53) or you can erase all Caller ID listings at one time.

To clear (delete) all Caller ID entries at one time:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Call History** is highlighted. Press the **YES** button to select.



| OPTIONS |
|---|
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |



3. Use the **DOWN** arrow button to highlight **Clear All Caller ID**. Press the **YES** button to select.





| CALLER ID |
|---|
| View Caller ID History |
| Clear All Caller ID |
| Press YES to Select Press NO to exit Options |

4. The display asks **Would You Like to Clear All Caller ID?** Press **YES** to erase all Caller ID listings.



5. Press the **NO** button repeatedly to exit out of the Options menu.



| CLEAR CALLER ID |
|---|
| Would You Like to Clear All Caller ID? |
| Press YES to accept NO to exit |

# SECTION 5

# Using the Answering Machine

*This section explains how to use the built-in Answering Machine to see messages that people leave for you. You can hear the voice recording and press the CAPTIONS button to read captions of the message.*

## TOPICS:

- **Turning Answering Machine On/Off**

- **Playing Your Answering Machine Messages**

- **Clearing All Messages**

- **Recording a Personal Greeting Message**

- **Setting the Number of Rings Before Answering**

- **Making Incoming Messages Audible/Silent**

- **Remotely Accessing Your Answering Machine Messages**

- **To Access Your Answering Machine Messages Remotely**

- **Captioning External Answering Machine Messages**

# Turning Answering Machine On/Off

Your *CapTel* phone comes with a built-in answering machine that will answer calls and take messages for you when you are unavailable. The Answering Machine records the voice message and lets you play it back with captions. Up to 63 recordable messages can be saved, each message can be up to 2 minutes long.

To turn the Answering Machine On:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.



3. Check that **Answering Machine On/Off** is highlighted. Press the **YES** button to select.



4. Use the **UP** or **DOWN** arrow buttons to highlight **Answering Machine On** or **Off**. Press the **YES** button to select.



5. Press the **NO** button repeatedly to Exit.

The Answering Machine will stay on or off until you change this setting.



**OPTIONS**

- 📷 Dial from Phone Book
- 📟 Answering Machine
- 📱 Call History
- 📖 Edit Phone Book
- 📄 Conversations
- ⚙️ Settings

Press YES to select or press NO to exit Options



**ANSWERING MACHINE**

- 📟 Answering Machine On/Off
- 📧 Play/Erase Messages
- 📟 Clear All Messages
- 📟 Greeting Message
- ⚙️ Answering Machine Settings
- 📟 Caption External Ans. Machine

Press YES to select or press NO to exit



**ANSWERING MACHINE CURRENTLY ON**

- 📟 Answering Machine On
- 🚫 Answering Machine Off

Press YES to accept or NO to exit

**TIP:** *When the phone is not in use, the Answering Machine icon (📟) appears in the CapTel display screen whenever the Answering Machine is turned on, letting you quickly check at a glance if the Answering Machine is turned on or off.*

# Playing your Answering Machine Messages

You can listen to your Answering Machine messages over the *CapTel* handset, while at the same time reading captions of what the messages say. There are two ways to play your Answering Machine messages:

Option 1: From *CapTel* Display Screen



1. The *CapTel* display lets you know when there are new messages waiting for you. Press the **UP** button to listen to new messages.

2. Follow the directions on the display screen to lift the *CapTel* handset and listen to your messages.



3. The CAPTIONS light will go off and captions of the recorded message will appear on the display screen.

4. When you are finished listening to each message, you can:
   Press **YES** to erase the message;
   Press **NO** to replay the current message;
   Press **UP** arrow button to review previous messages;
   Press **DOWN** arrow button to move to the next message

5. Hang up the handset when you are finished playing your messages.





**NOTE:** *If you need to, you can have the message re-captioned. This is helpful if you notice a word error in the captions. Just press the CAPTIONS button, and the answering machine message will play over again – with new captions.*

Option 2: From the Options Menu



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button to highlight **Play/Erase Messages**. Press the **YES** button to select.

4. Follow the directions on the display screen to lift the *CapTel* handset and listen to your messages.


CAPTIONS

5. The CAPTIONS light will go off, and captions of the message will appear on the display screen while the message is playing.

---

**OPTIONS**

- 🔳 Dial from Phone Book
- 📟 Answering Machine
- 🎰 Call History
- 🗐 Edit Phone Book
- ▤ Conversations
- ✿ Settings

Press YES to select or press NO to exit Options

---

**ANSWERING MACHINE**

- 📟 Answering Machine On/Off
- 📟 Play/Erase Messages
- 📟 Clear All Messages
- 📟 Greeting Message
- ✿ Answering Machine Settings
- 📟 Caption External Ans. Machine

Press YES to select or press NO to exit

---

**PLAY ANSWERING MACHINE MESSAGES**

Please Lift Handset to Listen to Answering Machine Messages

2 New Messages
3 Old Messages

Press NO to exit

---



doing a little shopping after the kids get done with school so if you want to meet me please go ahead and give me a call back and we will set something up alright

**MARY SMITH 321-555-1234 5/16 10:30 AM**
**Press YES to Erase or Press NO to Skip Message**

---

6. When you are finished listening to each message, you can: Press **YES** to erase the message; Press **NO** to replay the current message; Press **UP** arrow button to review previous messages; Press **DOWN** arrow button to move to the next message

**NOTE:** *If you need to, you can have the message re-captioned. This is helpful if you notice a word error in the captions. Just press the CAPTIONS button, and the answering machine message will play over again – with new captions.*

7. When you are finished playing your messages, hang up the *CapTel* handset.

**NOTE:** *The CapTel display screen stays ON whenever there is a new answering machine message that has not been reviewed, alerting you to new messages (unless the Keypad Light Timeout feature is set – then the display screen will go off after 60 seconds of non-use).*

so if you want to meet me please go ahead and give me a call back and we will set something up alright  I hope you can make it   looking forward to seeing you  bye

**Press Captions Button to Re-caption this Message**
**Press YES to Erase, NO to Replay, ▲ Previous, ▼ Next**

**FINISHED PLAYING MESSAGES**

Hang Up the Phone to Exit

# Clearing All Messages

In addition to erasing messages one at a time as you play them, you can also erase all your saved Answering Machine messages at one time.

To clear all your Answering Machine messages:



1. With the handset hung up, press the **YES** button to see the Options menu.



**OPTIONS**

- 🔲 Dial from Phone Book
- 📟 Answering Machine
- 👤 Call History
- 📖 Edit Phone Book
- 🗐 Conversations
- ⚙ Settings

**Press YES to select or press NO to exit Options**



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button repeatedly to highlight **Clear All Messages**. Press the **YES** button to select.



**ANSWERING MACHINE**

- 📟 Answering Machine On/Off
- 📟 Play/Erase Messages
- 📟 Clear All Messages
- 📟 Greeting Message
- ⚙ Answering Machine Settings
- 📟 Caption External Ans. Machine

**Press YES to select or press NO to exit**



4. Press the **YES** button to erase all saved Answering Machine messages. If you don't want to erase all messages, press the **NO** button to exit.

5. *CapTel* confirms that your Answering Machine messages have been erased.



**CLEAR MESSAGES**

Press YES to Erase All
Answering Machine Messages
Press NO to exit

**Press YES to accept or NO to exit**

**NOTE:** *The display screen indicates when Answering Machine memory is close to filling up, letting you clear messages before the memory is completely full. If Answering Machine memory becomes full, CapTel will not be able to record new messages until older messages are cleared from memory.*

# Recording a Personal Greeting Message

Before you begin making/receiving calls, you may want to record a personal greeting message for the *CapTel* 840i Answering Machine. If you do not want to record a personal greeting, the Answering Machine will use a pre-recorded greeting that says, "*Hello. No one is available to take your call. Please leave a message after the tone.*"

To record a personal greeting message:



1. With the handset hung up, press the **YES** button to see the Options menu.

| OPTIONS |
| --- |
| 🔲 Dial from Phone Book |
| 📟 Answering Machine |
| 📱 Call History |
| 📞 Edit Phone Book |
| 🖿 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |



2. Press the **DOWN** arrow button to highlight **Answering Machine**. Press **YES** to select.

| ANSWERING MACHINE |
| --- |
| 📟 Answering Machine On/Off |
| 📟 Play/Erase Messages |
| 📟 Clear All Messages |
| 📟 Greeting Message |
| ⚙ Answering Machine Settings |
| 📟 Caption External Ans. Machine |
| **Press YES to select or press NO to exit** |



3. Press the **DOWN** arrow button to highlight **Greeting Message**. Press **YES** to select.

| GREETING MESSAGE |
| --- |
| 📟 Play Current Greeting |
| 📟 Record New Greeting |
| 📟 Use Default Greeting |
| |
| |
| **Press YES to select or press NO to exit** |



4. Press the **DOWN** arrow button to highlight **Record New Greeting**. Press **YES** to select.

5. Lift the *CapTel* handset and watch the display screen to know when to start speaking. When you see the **REC** message, begin speaking into the handset to record your greeting message. Your personalized greeting message may be up to 1 minute long.



6. When you are finished, press the **YES** button to stop. Your new message will be played back over the handset for you to review.

If you'd like to re-record your greeting, press the **NO** key to begin recording again.

7. When you are satisfied with your new greeting, hang up the telephone handset. *CapTel* will send out your personal greeting whenever the Answering Machine picks up a call.

---

**RECORD NEW GREETING**

Lift Handset to
Record Greeting or
Press NO to exit

---

**RECORD NEW GREETING**

Message Is Recording
Speak Into the Handset



Press YES to End Recording

---

# Setting the Number of Rings Before Answering

You can set the approximate number of times the *CapTel* will ring before the Answering Machine answers the call. The default setting is four (4) rings, but you can set it to be any number of rings between three and twenty (3–20).

**NOTE:** *The ring count may be slightly different in telephone systems that use "distinctive" ring patterns. Please experiment with this setting as needed for your specific phone system.*

To set the number of rings before answering:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.

| OPTIONS |
|---|
| 🔲 Dial from Phone Book |
| ☎ Answering Machine |
| 📇 Call History |
| 📖 Edit Phone Book |
| 🗐 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |



3. Press the **DOWN** arrow button repeatedly until **Answering Machine Settings** is highlighted. Press the **YES** button to accept.

| ANSWERING MACHINE |
|---|
| ☎ Answering Machine On/Off |
| ☎ Play/Erase Messages |
| ☎ Clear All Messages |
| ☎ Greeting Message |
| ⚙ Answering Machine Settings |
| ☎ Caption External Ans. Machine |
| **Press YES to select or press NO to exit** |



4. Check that **Answer Ring Count** is highlighted. Press the **YES** button to accept.

| ANSWERING MACHINE SETTINGS |
|---|
| ¹²₃ Answer Ring Count |
| ☎ Incoming Messages |
| ☎ Remote Access |
| |
| |
| **Press YES to select or press NO to exit** |





5. Use the **UP** or **DOWN** arrow buttons to select the number of rings, from 3 rings up to 20 rings. Press the **YES** button to select.



6. Press the **NO** button repeatedly to exit.

On incoming calls, your *CapTel* phone will ring this number of times before the Answering Machine picks up the call.

# Making Incoming Messages Audible/Silent

Just like with other Answering Machines, you can "screen" callers by having incoming messages played aloud on the *CapTel* phone for you to hear before you answer the call. While this is a convenient feature, there may be times when you do not want incoming messages to be played aloud, but instead taken silently for you to review at a later time. The default setting is for incoming messages to be muted (silent).

To make incoming calls audible or set them to be silent:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.

| OPTIONS |
|---|
| ⊡ Dial from Phone Book |
| ▧ Answering Machine |
| 👤 Call History |
| ⟦ Edit Phone Book |
| ▤ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |



3. Press the **DOWN** arrow button repeatedly until **Answering Machine Settings** is highlighted. Press the **YES** button to accept.

| ANSWERING MACHINE |
|---|
| ▧ Answering Machine On/Off |
| ▧ Play/Erase Messages |
| ▧ Clear All Messages |
| ▧ Greeting Message |
| ✿ Answering Machine Settings |
| ▧ Caption External Ans. Machine |
| **Press YES to select or press NO to exit** |



4. Press the **DOWN** arrow button so that **Incoming Messages** is highlighted. Press the **YES** button to accept.

| ANSWERING MACHINE SETTINGS |
|---|
| ¹₂₃ Answer Ring Count |
| ▧ Incoming Messages |
| ▧ Remote Access |
| ▧ Remote Access PIN |
| ▧ Remote Access Commands |
| |
| **Press YES to select or press NO to exit** |



5. Press the **UP** or **DOWN** arrow button to highlight **Incoming Messages Audible** or **Muted**. Press the **YES** button to accept the setting you want.



**Incoming Messages Audible:** will play incoming messages aloud on the *CapTel* phone as the message is being taken for you to listen to/screen as they are recorded.

**Incoming Messages Muted:** will take incoming messages silently, you will not be able to hear the message as it is being taken. You will be able to listen to and review the message after it has been recorded.

# Remote Access to Your Answering Machine Messages

*CapTel* lets you call in to play your Answering Machine messages when you are away from your home or office. This feature must be turned on and you must set a personal identification number (PIN) for security before this feature will work.

The default setting for Remote Access is OFF.

**NOTE:** *If possible, use a different CapTel phone when calling in to retrieve your messages, in order to be able to see captions of the messages. If you call using any other phone, you will be able to listen to the voice part of the Answering Machine messages but you will not be able to read captions at your remote location.*

To turn Remote Access ON and set a personal identification number (PIN):



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button until **Answering Machine** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button repeatedly until **Answering Machine Settings** is highlighted. Press the **YES** button to accept.

| OPTIONS |
|---|
| 🔲 Dial from Phone Book |
| 📞 Answering Machine |
| 👤 Call History |
| 🔢 Edit Phone Book |
| 🗒 Conversations |
| ⚙️ Settings |
| **Press YES to select or press NO to exit Options** |

| ANSWERING MACHINE |
|---|
| 📞 Answering Machine On/Off |
| 📞 Play/Erase Messages |
| 📞 Clear All Messages |
| 📞 Greeting Message |
| ⚙️ Answering Machine Settings |
| 📞 Caption External Ans. Machine |
| **Press YES to select or press NO to exit** |

  4. Press the **DOWN** arrow button until **Remote Access** is highlighted. Press the **YES** button to accept.

 5. Press the **UP** arrow button to highlight **Remote Access On**. Press the **YES** button to accept.

6. *CapTel* shows the default 4-digit Remote Access PIN. This is the number you need to enter when calling in remotely to play your Answering Machine messages.

   You should change the PIN to a different number for your own use. Use the DOWN arrow button to backspace over the existing PIN. Then, press the numbers on the *CapTel* keypad to set your own personal PIN. Be sure to write the PIN down for your own reference!

 7. When you have the number that you want, press the **YES** button to save. Or press the **NO** button to exit.

 8. *CapTel* displays the commands you may use when calling to access your messages remotely. When you have reviewed the commands, press the **NO** button to exit.

 9. Press the **NO** button repeatedly to exit.



| ANSWERING MACHINE SETTINGS |
| --- |
| 1 2 3 Answer Ring Count |
| Incoming Messages |
| Remote Access |
| Press YES to select or press NO to exit |



| REMOTE ACCESS |
| --- |
| Remote Access On |
| Remote Access Off |
| Press YES to select or press NO to exit |



| REMOTE ACCESS PIN |
| --- |
| Remote Access PIN: 1234_ |
| Press YES to save PIN or NO to exit ▼ for Backspace |



| REMOTE ACCESS COMMANDS |
| --- |
| Press 1 to Replay Message |
| Press 2 For Next Message |
| Press 3 to Delete Message |
| Press 4 to Quit |
| Press NO to exit |

**NOTE:** *When Remote Access is ON, you can review/change your PIN number and review the Remote Access commands in the Answering Machine Settings menu. These menu options do not appear when Remote Access is turned OFF.*

# To Access Your Answering Machine Messages Remotely

1. From a different phone, **call your own** *CapTel* **phone number** and let it ring until the Answering Machine greeting begins.

2. Once you hear/read the BEEP, **enter your 4-digit PIN** by pressing keys on the dial pad of the phone that you are using to call in.

3. Your *CapTel* 840i will start playing aloud any recorded messages (starting with the most recent one). If you are calling from a different *CapTel* phone, you will be able to see captions of the messages while they are played.

After each message is played, there is a pause that lets you enter one of the following commands on the phone's dial pad:

> 1 = Replay message
>
> 2 = Skip to the next message and start playing it
>
> 3 = Delete the message you just heard, start playing the next message
>
> 4 = Quit, which hangs up the phone.

If you do not press any of the dial pad keys, after 30 seconds your *CapTel* 840i will automatically hang up.

4. When you are done, **hang up** the phone you are calling from.

**NOTE:** *If possible, use a different CapTel phone when calling in to retrieve your messages, in order to be able to see captions of the messages. If you call using any other phone, you will be able to listen to the voice part of the Answering Machine messages but you will not be able to read captions at your remote location.*

# Caption External Answering Machine Messages

Your *CapTel* 840i can also show captions of messages that callers leave on your external voice answering machine. External answering machines are separate devices that you connect to your *CapTel* by a telephone line.

To get captions of your external answering machine messages:

 1. With the handset hung up, press the **YES** button to see Options.

 2. Press the **DOWN** button until **Answering Machine** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** button repeatedly until **Caption External Ans. Machine** is highlighted. Press the **YES** button to accept.

 4. The display shows that *CapTel* is ready to caption messages. Press the **YES** button to accept.

5. Lift the *CapTel* 840i handset, and place it next to your answering machine speaker. Make sure the mouth-piece of the handset is next to the speaker of your answering machine. While you do this, your *CapTel* 840i connects to the captioning service.

---

| OPTIONS |
|---|
| ▣ Dial from Phone Book |
| ▤ Answering Machine |
| ▥ Call History |
| ▦ Edit Phone Book |
| ▤ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |

| ANSWERING MACHINE |
|---|
| ▤ Answering Machine On/Off |
| ▤ Play/Erase Messages |
| ▤ Clear All Messages |
| ▤ Greeting Message |
| ✿ Answering Machine Settings |
| ▤ Caption External Ans. Machine |
| **Press YES to select or press NO to exit** |

| CAPTION EXTERNAL ANS. MACHINE |
|---|
| Caption External Answering Machine Messages |
| **Press YES to accept or NO to exit** |

Place Handset Mouthpiece Next To Answering Machine Speaker

---

6. The display shows you when captions are ready. Press the "PLAY" button on your answering machine to play the messages aloud.

Your *CapTel* 840i will show you captions of the answering machine messages as they are played. During this time, you may operate your answering machine the same way you normally do, using the answering machine features such as play, re-play, delete, or save messages.

7. When you are done listening to your messages/reading captions, hang up the *CapTel* 840i handset.

(CapTel CA# 1234) (F) Hi mom it's Mary calling   sorry I missed you   when you get a chance please call me back can't wait to talk with you  bye

**Press ▲ to Review the Conversation**

| SECTION 6 |
|---|

# Using the Phone Book

*This section explains how to save frequently-called phone numbers into your phone book for easy dialing.*

## TOPICS:

- **Adding a New Contact to your Phone Book**
- **Dialing a Phone Number from the Phone Book**
- **Editing an Existing Contact in the Phone Book**
- **Removing a Contact from your Phone Book**

# Adding a New Contact to your Phone Book

You can save 97 names and phone numbers in the *CapTel* 840i Phone Book. To add a new contact to the Phone Book:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Edit Phone Book** is highlighted. Press the **YES** button to select.

  3. Press the **DOWN** arrow button until **Add a New Contact** is highlighted. Press the **YES** button to select.

4. Use the dialing pad to enter the letters of the name of the person you wish to add. Look for the letters listed on the number keys to know which number key to press. For some letters, press the number key several times until the correct letter appears on the display screen.



| OPTIONS |
| --- |
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |



| PHONE BOOK |
| --- |
| Edit Existing Contact |
| Add a New Contact |
| Remove a Contact |
| Press YES to select or press NO to exit |



| EDIT PHONE BOOK |
| --- |
| Name:    Mary_ |
| Number: |
| Press YES to edit number or NO to Cancel |
| ▲ for Shift, ▼ for Backspace, # for Space |

 **Example:** To enter the letter "L", press the number 5 key three times until you see "L" on the display screen.

**Example:** To enter the name "Mary", press the 6 key for the letter "M", the 2 key for the letter "a", the 7 key three times for the letter "r", then the 9 key three times for the letter "y". You may need to wait for the cursor to change from | to _ when entering letters that are on the same number key.

**TIP:** *Press the DOWN arrow button for a backspace. Press the # button to add a space. Press the UP arrow button to shift lock for capital letters. Press UP again to return to lower case.*



5. Once you have entered the contact name, press the **YES** button to advance to the Number section.



6. Enter in the phone number by using the dialing pad. Use the **DOWN** arrow button to backspace. *CapTel* automatically inserts a hyphen as you enter the phone number.

>    **NOTE:** *If a dialing prefix is required to get an outside line, enter in the dialing prefix first, then the phone number. Use the* UP *button to add a 2-second delay.*





7. When you are done entering the phone number, press the **YES** button to save your new contact information.



Press the **YES** button to enter more contact names/phone numbers, or press the **NO** button repeatedly to exit the menu system.



>    **NOTE:** *Phone book entries are stored alphabetically by the first letter of the name.*

# Dialing a Phone Number from the Phone Book

To quickly dial any phone number listed in your Phone Book:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Make sure **Dial from Phone Book** is highlighted. Press the **YES** button to select.



3. The display screen shows you the first contact name and number listed in your Phone Book. Use the **UP** and **DOWN** arrows to move through the contacts in your Phone Book.

4. When you see the contact listing you want to dial, simply lift the handset. The *CapTel* phone will dial the number for you automatically.



5. Make sure the **CAPTIONS** button is on (red light on). You can turn captions on/off at any time in your conversation.

6. Listen or watch the signal meter to know when someone answers. Watch the display screen for captions. Begin your conversation as you normally would.

   When you are done with your call, hang up the handset.







# Editing an Existing Contact in the Phone Book

To make changes to an existing contact in the Phone Book:



1. With the handset hung up, press the **YES** button to see the Options menu.




2. Press the **DOWN** arrow button repeatedly until **Edit Phone Book** is highlighted. Press the **YES** button to accept.

3. Check that **Edit Existing Contact** is highlighted.



4. Press the **YES** button to select.




5. The display screen will show you the first listing in your Phone Book. Use the **UP** and **DOWN** arrow buttons to move through the various contacts in your Phone Book. When you find the contact you wish to change, press the **YES** button to select it.



| OPTIONS |
| --- |
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| Press YES to select or press NO to exit Options |



| PHONE BOOK |
| --- |
| Edit Existing Contact |
| Add a New Contact |
| Remove a Contact |
| |
| Press YES to select or press NO to exit |



| PHONE BOOK (1 of 7) |
| --- |
| UP |
| Name:    Mary |
| Number:  321-555-1234 |
| DOWN |
| Press YES to edit name or NO to exit |

 6. To edit the name, use the **DOWN** arrow button as a backspace to erase letters. You can enter new/different letters using the dialing pad. Look for the letters listed on the number keys to know which number key to press. For some letters, press the same number key several times until the correct letter appears on the display screen.

**EDIT PHONE BOOK**

Name:    Mary at Home_
Number: 321-555-1234

Press YES to edit number or NO to exit
▲ for Shift, ▼ for Backspace, # for Space

 7. When you are done editing the name, press the **YES** button to move to the Number.

**EDIT PHONE BOOK**

Name:    Mary at Home
Number: 321-555-1234_

Press YES to accept or NO to exit
▼ for Backspace, ▲ for 2 second delay

 To edit the phone number, use the **DOWN** arrow button as a backspace to erase numbers. You can enter new/different numbers using the dialing pad. Use the **UP** arrow button to insert a 2-second delay.

**NOTE:** *If a dialing prefix is required to get an outside line, enter in the dialing prefix first, then the phone number.*

**EDIT PHONE BOOK**

Name:    Mary at Home
Number: 321-777-4321

**Saved**

 8. When you are done editing the phone number, press the **YES** button to save your changes.

 9. Press the **YES** button to edit more contacts in your Phone Book, or press the **NO** button repeatedly to exit the menu system.



# Removing a Contact from your Phone Book

To remove a contact from your Phone Book:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Edit Phone Book** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** arrow button repeatedly until **Remove a Contact** is highlighted. Press the **YES** button to select.

 4. The display screen will show you the first listing in your Phone Book. Use the **UP** and **DOWN** arrow buttons to move through the various contacts in your Phone Book until you see the contact listing you wish to delete.

 5. Press the **YES** button to remove the contact listing. The name and phone number of the contact person will be deleted from the Phone Book.

 6. Press the **NO** button repeatedly to exit out of the Options menu.



| OPTIONS |
| --- |
| Dial from Phone Book |
| Answering Machine |
| Call History |
| Edit Phone Book |
| Conversations |
| Settings |
| **Press YES to select or press NO to exit Options** |



| PHONE BOOK |
| --- |
| Edit Existing Contact |
| Add a New Contact |
| Remove a Contact |
| **Press YES to select or press NO to exit** |



| PHONE BOOK (1 of 7) |
| --- |
| UP |
| Name:    Mary |
| Number: 321-555-1234 |
| DOWN |
| **Press YES to delete name or NO to exit** |

## SECTION 7

# Using Speed Dial Buttons

*This section tells you how to set up and use the three Speed Dial buttons on your CapTel phone.*

### TOPICS:

- **About the Speed Dial Buttons**
- **Saving Phone Numbers in the Speed Dial Buttons**
- **Editing Phone Numbers in the Speed Dial Buttons**
- **Dialing with the Speed Dial Buttons**

## About the Speed Dial Buttons

You can set up three speed dial buttons on your *CapTel* phone to easily dial your most frequently-called phone numbers. You may want to use these buttons for emergency speed dial buttons to call the fire department or police, or to quickly reach the phone numbers you call most often.

# Saving Phone Numbers in the Speed Dial Buttons



1. With the handset hung up, press the **SPEED DIAL** button you want to program.



2. Press the **YES** button to edit.

3. Use the dialing pad to enter the letters of the name of the person you wish to add. Use the letters on the number keys to know which key to press.





**Example:** To enter the name "Mary", press the 6 key for the letter "M", the 2 key for the letter "a", the 7 key three times for the letter "r", then the 9 key three times for the letter "y". You may need to wait for the cursor to change from | to _ when entering letters that are on the same number key.





4. Press the **YES** button to advance the selection to the Number section.

5. Enter in the phone number by using the dialing pad. *(NOTE: If a dialing prefix is required to get an outside line, enter in the dialing prefix then the numbers.)* Use the **DOWN** arrow button to backspace. Use the **UP** arrow button to insert a 2-second delay. *CapTel* will automatically insert a hyphen as you enter the phone number.



6. Press the **YES** button to save it.

# Editing Phone Numbers in the Speed Dial Buttons



1. Press the **SPEED DIAL** button you wish to edit.



2. Press the **YES** button to edit the name.



3. Use the **DOWN** arrow button to backspace/erase letters in the current name. Use the number pad keys to enter a new letter or name. Press the **YES** button when you are done editing the name.



4. The cursor moves to the Number entry. Use the **DOWN** arrow button to backspace/erase numbers in the current listing. Use the number pad key to change/enter a new phone number. Use the **UP** arrow button to insert a 2-second delay.

5. When you are finished making changes, press the **YES** button to accept.

---

**SPEED DIAL 1**

Name:     Mary
Number: 321-555-1234

Please lift handset to dial this number
Press YES to edit or NO to exit

---

**EDIT SPEED DIAL**

Name:     Mary Cell_
Number: 321-555-1234

Press YES to edit number or NO to exit
▲ for Shift, ▼ for Backspace, # for Space

---

**EDIT SPEED DIAL**

Name:     Mary Cell
Number: 321-789-3456_

Press YES to accept or NO to exit
▼ for Backspace, ▲ for 2 second delay

---

# Dialing with the Speed Dial Buttons



1. Make sure the **CAPTIONS** button is on (red light on).

2. Press the **SPEED DIAL** key with the number that you want to call.



**SPEED DIAL 1**

Name:    Mary Cell
Number: 321-789-3456

**Please lift handset to dial this number**
**Press YES to edit or NO to exit**

3. Lift the handset or press the **SPEAKER** button. Your *CapTel* phone will dial the phone number for you automatically.



Dialing:
Mary Cell
321-789-3456

4. Listen or watch the signal meter to know when someone answers. Watch the display screen for captions. Begin your conversation as you normally would.

When you are done with your call, hang up the handset or press the **SPEAKER** button again to end the call.



(CapTel CA# 1234) Ring) (Ring) (Ring) (F) Hello this is Mary Oh hi Mom how are you

**Press ▲ to Review the Conversation**

| SECTION 8 | Settings |
|---|---|

*This section explains how to adjust settings on your phone to fit your preferences.*

## TOPICS:

- **Setting the Captions Button to On/Off**
- **Turning Spanish Captions On/Off**
- **Adjusting the Volume of the Ringer**
- **Setting the Pitch of the Ringer**
- **Turning Keypad Lights On/Off**
- **Saving the Volume**
- **Setting your *CapTel* Phone for Tone/Pulse Dialing**
- **Knowing When the Phone Line is Already in Use**
- **Changing the Network Settings**
- **Removing Saved Networks**
- **Setting the Time Zone**
- **Using Call Waiting**
- **Dialing 911 with Your *CapTel* 840i**
- **Updating your *CapTel* Phone**

# Setting the Captions Button to On/Off

You can change the default setting of your *CapTel* 840i to always have the CAPTIONS button set to ON or to always have the CAPTIONS button set to OFF. Your *CapTel* 840i comes with the Captions button default set to ON.

**NOTE:** *No matter how you set the Captions button default, you can always turn the captions ON or OFF by pressing the CAPTIONS button at any point in the conversation.*



## Captions Button Default On

When the Captions button default is set to ON, every call (incoming or outgoing) is automatically connected to the Captioning Service. The light around the **CAPTIONS** button remains lit. You will receive captions on every call. You can still turn the captions off by pressing the **CAPTIONS** button at any time during the call.



## Captions Button Default Off

When the Captions button default is set to OFF, calls are not automatically connected to the Captioning Service. The light around the **CAPTIONS** button stays off. Calls are treated exactly like any regular telephone call, with you and the other party talking over the telephone line and no captions involved. Even with the Captions button default set to off, you can turn captions on by pressing the **CAPTIONS** button at any time during the call.

To change the Captions button setting:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly to highlight **Settings**.



3. Press the **YES** button to select.



4. Check that **Caption Settings** is highlighted. Press the **YES** button to select.



5. Check that **Captions Button** is highlighted. Press the **YES** button to select.



6. Press the **UP** or **DOWN** arrow button to select **Captions On** or **Captions Off**.

**Captions On:** Captions will automatically be on every call.

**Captions Off:** You will need to press the CAPTIONS button to turn the Captions feature on and off for each call.



7. Press the **YES** button to accept.



8. Press the **NO** button repeatedly to exit out of the Options menu.



| OPTIONS |
| --- |
| 🔢 Dial from Phone Book |
| 📟 Answering Machine |
| 👤 Call History |
| 📖 Edit Phone Book |
| 💬 Conversations |
| ⚙️ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
| --- |
| 📧 Caption Settings |
| 📞 Phone Settings |
| 🖼 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| 🔄 Update Phone |
| **Press YES to select or press NO to exit** |

| CAPTION SETTINGS |
| --- |
| ⚪ Captions Button |
| 🆎 Spanish Captions |
| **Press YES to select or press NO to exit** |



| CAPTIONS BUTTON CURRENTLY ON |
| --- |
| ⚪ Captions On |
| ⚪ Captions Off |
| **Press YES to accept or NO to exit** |

# Turning Spanish Captions On/Off

Your *CapTel* 840i phone can display captions in Spanish for Spanish-to-Spanish conversations. Setting the captions to Spanish language also changes the Options menu to display in Spanish.

**NOTE:** *Spanish captioning is available for Spanish-to-Spanish conversations only. The CapTel 840i phone does not translate from English conversations to Spanish captions.*

To turn Spanish captions on:



1. With the handset hung up, press the **YES** button to see the Options menu.



**OPTIONS**

- 🔟 Dial from Phone Book
- 📼 Answering Machine
- 🎎 Call History
- 📇 Edit Phone Book
- 🗐 Conversations
- ⚙️ Settings

**Press YES to select or press NO to exit Options**



2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



3. Check that **Caption Settings** is highlighted. Press the **YES** button to select.

**SETTINGS**

- 🗐 Caption Settings
- 📞 Phone Settings
- 🖼 Display Settings
- 📶 Network Settings
- 🕐 Set the Time Zone
- ⬇️ Update Phone

**Press YES to select or press NO to exit**




4. Press the **DOWN** arrow button to highlight **Spanish Captions**. Press the **YES** button to select.



**CAPTION SETTINGS**

- ⭕ Captions Button
- 🔘 Spanish Captions

**Press YES to select or press NO to exit**



5. Press the **UP** or **DOWN** arrow button to select **Spanish Captions On** or **Spanish Captions Off**.



6. Press the **YES** button to accept.



7. Press the **NO** button to exit out of the Options menu.

You are now ready to make and receive calls with captions in Spanish. To make a call with Spanish language captions, lift the handset and dial the number you want to call.



| SPANISH CAPTIONS CURRENTLY OFF |
| --- |
| ⓔ Spanish Captions On |
| ⓔ Spanish Captions Off |
| Press YES to accept or NO to exit |

| PROGRAMACIÓN DE SUBTÍTULOS |
| --- |
| ⓔ Botón de Subtítulos |
| ⓔ Subtítulos en Español |
| Presione YES para seleccionar o presione NO para salir |

| OPCIONES |
| --- |
| 📱 Marcar Desde Contactos |
| 📼 Contestador Automático |
| 👥 Historial de Llamadas |
| 🄲 Editar Libreta de Contactos |
| 🗐 Conversaciones |
| ⚙ Programación |
| Presione YES para seleccionar o presione NO para salir |

**NOTE:** *Spanish captions must be turned on in order for you to receive captions in Spanish. If Spanish captions are turned off and a Spanish-speaking person calls you, their captions will not appear in Spanish. You will need to ask them to call you back in a few minutes, after you've had a chance to turn Spanish captions on.*

**Spanish-to-Spanish captioning available every day**
**For Spanish-language Customer Support: 1-866-670-9134**

# Adjusting the Volume of the Ringer

You can set the volume of the *CapTel* 840i ringer to the volume that you hear best: Choose from minimum volume (105dB), medium volume (111dB), maximum volume (117dB), or Mute (turns Ringer off).

To set the Ringer volume:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button until **Settings** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** arrow button to highlight **Phone Settings**. Press the **YES** button to select.

4. Check that **Ringer Volume** is highlighted.

 5. Press the **YES** button to select.

 6. Press the **UP** or **DOWN** arrow button to select your desired Ringer Volume level. To turn the Ringer off entirely, select Mute.

 7. When the volume setting you want is highlighted, press the **YES** button to accept.

 8. Press the **NO** button repeatedly to exit out of the Options menu.



| OPTIONS |
|---|
| 🖼 Dial from Phone Book |
| 📼 Answering Machine |
| 👥 Call History |
| 📖 Edit Phone Book |
| ▤ Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| ▤ Caption Settings |
| 📞 Phone Settings |
| 🖼 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⚙ Update Phone |
| **Press YES to select or press NO to exit** |

| PHONE SETTINGS |
|---|
| 📶 Ringer Volume |
| 🎚 Ringer Pitch |
| ☀ Keypad Lights |
| 📞 Save Volume |
| ⚙ Tone or Pulse Dialing |
| ⤵ Line In Use |
| **Press YES to select or press NO to exit** |



| RINGER VOLUME CURRENTLY MINIMUM |
|---|
| 🔊 Mute |
| 🔊 Minimum |
| 🔊 Medium |
| 🔊 Maximum |
| |
| **Press YES to accept or NO to exit** |

# Setting the Pitch of the Ringer

You can select the Ringer Pitch that helps you hear best, selecting from Low, Medium, or High frequency pitch.

To set the Ringer pitch:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button until **Settings** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** arrow button to highlight **Phone Settings**. Press the **YES** button to select.

 4. Press the **DOWN** arrow button until **Ringer Pitch** is highlighted. Press the **YES** button to select.

 5. Press the **UP** or **DOWN** arrow button to select your desired Ringer Pitch level. The ringer will ring briefly as you switch levels.

 6. When the **Ringer Pitch** level that you want is highlighted, press the **YES** button to accept.

 7. Press the **NO** button repeatedly to exit out of the Options menu.

| OPTIONS |
|---|
| ⊡ Dial from Phone Book |
| ☎ Answering Machine |
| 🖨 Call History |
| 🗐 Edit Phone Book |
| ☰ Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| ☰ Caption Settings |
| ( Phone Settings |
| 🗒 Display Settings |
| 🛜 Network Settings |
| ⏱ Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |

| PHONE SETTINGS |
|---|
| 📶 Ringer Volume |
| 📶 Ringer Pitch |
| ☀ Keypad Lights |
| 📞 Save Volume |
| ⚙ Tone or Pulse Dialing |
| 📳 Line In Use |
| **Press YES to select or press NO to exit** |

| RINGER PITCH CURRENTLY LOW |
|---|
| 📶 Low |
| 📶 Medium |
| 📶 High |
| |
| |
| **Press YES to accept or NO to exit** |

# Turning Keypad Lights On/Off

The *CapTel* 840i dialing keypad is lit to make it easier to see the number keys. The lights on the number keypad can be turned off in the *CapTel* Options menu. When Keypad Lights Timeout is selected, the lights on the number keypad go off automatically after approximately 60 seconds of non-use.

To turn the lights on the number keypad off:



1. With the handset hung up, press the **YES** button to see the Options menu.

| OPTIONS |
|---|
| 🔲 Dial from Phone Book |
| 🔲 Answering Machine |
| 🔲 Call History |
| 🔲 Edit Phone Book |
| 🔲 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |



2. Press the **DOWN** arrow button until **Settings** is highlighted. Press the **YES** button to select.

| SETTINGS |
|---|
| 🔲 Caption Settings |
| ( Phone Settings |
| 🔲 Display Settings |
| 🔲 Network Settings |
| 🕐 Set the Time Zone |
| 🔲 Update Phone |
| **Press YES to select or press NO to exit** |



3. Press the **DOWN** arrow button to highlight **Phone Settings**. Press the **YES** button to select.

| PHONE SETTINGS |
|---|
| 🔊 Ringer Volume |
| 🔊 Ringer Pitch |
| ☀ Keypad Lights |
| 🔊 Save Volume |
| ⊗ Tone or Pulse Dialing |
| ⤴ Line In Use |
| **Press YES to select or press NO to exit** |



4. Press the **DOWN** arrow button repeatedly until **Keypad Lights** is highlighted. Press the **YES** button to select.



5. Press the **UP** or **DOWN** arrow button to turn Keypad Lights Always On or Keypad Lights Timeout.

**NOTE:** *When Keypad Lights Timeout is selected, the dialing keypad lights will go off whenever the display is blank (after approximately 60 seconds of non-use). The lights will remain on when the phone is in use.*



6. Press the **YES** button to select your option, or press the **NO** button to exit.



7. Press the **NO** button repeatedly to exit out of the Options menu.

**NOTE:** *The CapTel display screen typically stays on whenever you have new answering machine messages that have not been reviewed. If you set Keypad Light Timeout, however, the CapTel display screen will also turn off after approximately 60 seconds of non-use.*

---

| KEYPAD LIGHTS CURRENTLY TIMEOUT |
| --- |
| ☀ Keypad Lights Always On |
| ◉ Keypad Lights Timeout |
| |
| |
| |
| Press YES to accept or NO to exit |

---

# Saving the Volume

The volume level automatically returns to a mid-range setting each time you hang up the *CapTel* phone. You can set the *CapTel* to remember and use your preferred volume level on new calls, so that you don't have to re-set the volume level each time.

To save your volume setting:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



| OPTIONS |
|---|
| 🔢 Dial from Phone Book |
| 📟 Answering Machine |
| 👤 Call History |
| 🔃 Edit Phone Book |
| ▤ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |

 3. Press the **DOWN** arrow button until **Phone Settings** is highlighted. Press the **YES** button to select.



| SETTINGS |
|---|
| ▤ Caption Settings |
| 📞 Phone Settings |
| ▨ Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |

 4. Press the **DOWN** arrow button repeatedly until **Save Volume** is highlighted. Press the **YES** button to select.

| PHONE SETTINGS |
|---|
| 🔊 Ringer Volume |
| 〰 Ringer Pitch |
| ☀ Keypad Lights |
| 📞 Save Volume |
| ⚙ Tone or Pulse Dialing |
| 📞 Line In Use |
| **Press YES to select or press NO to exit** |



5. Use the **UP** or **DOWN** arrow buttons to highlight **Save Volume** or **Do Not Save Volume**. Press **YES** to select.





6. Press the **NO** button repeatedly to exit.

Now, during your next call, experiment with the volume button to find a level that works best for you. Whatever volume setting you choose will be saved in *CapTel* memory, and will be used for every call.

**NOTE:** *This setting will remain in effect until you go through the process again to select Do Not Save Volume.*

# Setting your *CapTel* Phone for Tone/Pulse Dialing

The dialing mode of your *CapTel* 840i phone is set to Tone dialing. To set the dialing mode to Pulse dialing:

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** arrow button to highlight **Phone Settings**. Press the **YES** button to select.

 4. Press the **DOWN** arrow button repeatedly until **Tone or Pulse Dialing** is highlighted.

 5. Press the **YES** button to select.

 6. Press the **UP** or **DOWN** arrow button to select **Tone Dialing** or **Pulse Dialing**.

 7. When the dialing mode you want is highlighted, press the **YES** button to accept.

 8. Press the **NO** button to exit out of the Options menu.

| OPTIONS |
|---|
| ▣ Dial from Phone Book |
| ▭ Answering Machine |
| 🏮 Call History |
| 🗟 Edit Phone Book |
| ▤ Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| ▤ Caption Settings |
| 📞 Phone Settings |
| ▨ Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⬇ Update Phone |
| **Press YES to select or press NO to exit** |

| PHONE SETTINGS |
|---|
| 🔊 Ringer Volume |
| ⁝⁝⁝ Ringer Pitch |
| ☼ Keypad Lights |
| 📞 Save Volume |
| ⊛ Tone or Pulse Dialing |
| 📞 Line In Use |
| **Press YES to select or press NO to exit** |

| CURRENTLY TONE DIALING |
|---|
| ⁞⁞⁞ Tone Dialing |
| ⊛ Pulse Dialing |
| |
| |
| |
| **Press YES to accept or NO to exit** |

# Knowing When the Phone Line is Already in Use

When the Line in Use feature is on, the *CapTel* display lets you know when an extension phone connected to the same telephone number is being used. This is helpful in environments where there are multiple phones on the same telephone line, to alert you so that you do not accidentally pick up and dial when a different call is already in progress. To join the call in progress, simply pick up the *CapTel* handset. The call will automatically connect to the Captioning Service, and you will see captions on the *CapTel* display. The default setting for Line in Use is ON.

To turn Line in Use off:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button to highlight **Phone Settings**. Press the **YES** button to select.



4. Press the **UP** or **DOWN** arrow button repeatedly until **Line in Use** is highlighted. Press the **YES** button to select.

| OPTIONS |
|---|
| 📇 Dial from Phone Book |
| ☎ Answering Machine |
| 👤 Call History |
| 📘 Edit Phone Book |
| 💬 Conversations |
| ⚙️ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| 🔲 Caption Settings |
| 📞 Phone Settings |
| 🖼 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⬇️ Update Phone |
| **Press YES to select or press NO to exit** |

| PHONE SETTINGS |
|---|
| 🔊 Ringer Volume |
| 🎵 Ringer Pitch |
| 💡 Keypad Lights |
| 📞 Save Volume |
| 🔄 Tone or Pulse Dialing |
| 📞 Line In Use |
| **Press YES to select or press NO to exit** |



5. Use the **UP** arrow button to highlight **Line In Use Off**. Press the **YES** button to select.



6. Press the **NO** button to exit out of the Options menu.



**NOTE:** *When Line in Use is OFF, you cannot join a call in progress by simply picking up the CapTel handset. You must first press one of the dial pad keys to connect the call to the Captioning Service. Once connected, you will see captions of the call in progress.*

# Changing the Network Settings

If you are connected to the Internet using a WiFi network and if you want to move your *CapTel* 840i to a different location, you may need to change the network settings.

 1. With the handset hung up, press the **YES** key to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.

 3. Press the **DOWN** arrow button repeatedly until **Network Settings** is highlighted. Press the **YES** button to select.



| OPTIONS |
|---|
| 🔲 Dial from Phone Book |
| 📷 Answering Machine |
| 📞 Call History |
| 🔲 Edit Phone Book |
| ▣ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| ▣ Caption Settings |
| 📞 Phone Settings |
| ▣ Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |

 4. To view your current Network Settings, check that **View Current Network** is highlighted. Press **YES** to select.



| NETWORK SETTINGS |
|---|
| 📶 View Current Network |
| 🔄 Change Network Connection |
| 📶 Remove Saved Networks |
| |
| **Press YES to select or press NO to exit** |

 *CapTel* shows you your current network configuration. Press the **NO** button to exit.

**NOTE:** *If you are connected to the Internet using an Ethernet cable instead of WiFi, the display indicates "Ethernet Connection".*

 5. Press the **DOWN** arrow button to highlight **Change Network Connection**. Press the **YES** button to select.

 6. *CapTel* asks **Are You Sure You Want To Leave This Network?** Press the **YES** button to leave current network. Or, press the **NO** button to exit.

**NOTE:** *If you leave the current network setting, all saved information about your network will be erased. The CapTel will go through the Network Setup process again to re-establish a connection over the Internet. See the CapTel 840i Setup Guide for details about re-setting up a network configuration.*

---

**CURRENT NETWORK INFORMATION**

2WIRE269
Security: WPA2
Channel: 08
Pass phrase:
3401239876

**Press NO to exit**

---

**NETWORK SETTINGS**

- 📶 View Current Network
- 🔄 Change Network Connection
- 📶 Remove Saved Networks

**Press YES to select or press NO to exit**

---

**NETWORK SETTINGS**

Are You Sure You Want To Leave This Network?

**Press YES to accept or NO to exit**

---

**NETWORK SETTINGS**

Leaving Network



**Press YES to accept or NO to exit**

---

# Removing Saved Networks

You can remove previously-saved WiFi networks from *CapTel* memory.

To remove saved networks:


1. With the handset hung up, press the **YES** button to see the Options menu.


2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted. Press the **YES** button to select.


3. Press the **DOWN** arrow button repeatedly until **Network Settings** is highlighted. Press the **YES** button to select.


4. Press the **DOWN** arrow button until **Remove Saved Networks** is highlighted. Press **YES** to select.


5. Use the **UP** or **DOWN** arrow buttons to highlight the network you want to remove. Press the **YES** button to select.


6. *CapTel* removes the network from memory.

**NOTE:** *You cannot remove the network connection that is currently being used by CapTel.*

| OPTIONS |
|---|
| 🔲 Dial from Phone Book |
| 📟 Answering Machine |
| 👤 Call History |
| 📘 Edit Phone Book |
| 📃 Conversations |
| ⚙️ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| 📃 Caption Settings |
| 📞 Phone Settings |
| 🖼 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |

| NETWORK SETTINGS |
|---|
| 📶 View Current Network |
| 🔄 Change Network Connection |
| 📶 Remove Saved Networks |
| |
| |
| **Press YES to select or press NO to exit** |

| NETWORK SETTINGS |
|---|
| 2WIRE269 |
| Mom Home Network |
| |
| |
| |
| **Press YES to select or press NO to exit** |

# Setting the Time Zone

To set the Time Zone:



1. With the handset hung up, press the **YES** button to see the Options menu.



2. Press the **DOWN** arrow button repeatedly until Settings is highlighted. Press the **YES** button to select.



3. Press the **DOWN** arrow button repeatedly until **Set the Time Zone** is highlighted. Press the **YES** button to select.



4. Use the **UP** or **DOWN** arrow buttons to highlight the Time Zone that your *CapTel* phone is located in. Once the correct Time Zone is highlighted, press the **YES** button to select.




5. Do you live in an area that observes Daylight Savings Time? If so press the **YES** button. If not, press the **NO** button.

6. *CapTel* automatically sets the time, based on your answers.

7. Press the **NO** button repeatedly to exit out of the menu system.

**NOTE:** *If you move your CapTel phone to a different location outside of your current time zone, update the time zone setting to ensure the clock is set properly.*

---

| OPTIONS |
|---|
| ▣ Dial from Phone Book |
| ▣ Answering Machine |
| ☎ Call History |
| ▣ Edit Phone Book |
| ▤ Conversations |
| ✿ Settings |
| **Press YES to select or press NO to exit Options** |

| SETTINGS |
|---|
| ▤ Caption Settings |
| ☏ Phone Settings |
| ▨ Display Settings |
| ⌢ Network Settings |
| ◔ Set the Time Zone |
| ⓘ Update Phone |
| **Press YES to select or press NO to exit** |

| SETUP - TIMEZONE |
|---|
| Eastern |
| Central |
| Mountain |
| Pacific |
| Alaskan |
| Hawaiian |
| **Press ▼ or ▲ to Change the Selection** |
| **Press YESS to Accept** |

| SETUP - DAYLIGHT SAVAINGS |
|---|
| Do You Observe Daylight Savings? |
| |
| Press YES or NO to answer |

---

# Using Call Waiting

You can use enhanced telephone features such as Call Waiting that you may have as part of your telephone service. With the *CapTel* 840i, you will see captions during your first conversation and during the second Call Waiting conversation as well.

To use Call Waiting:

1. During a conversation, listen for the beep or see (TONES) in the captions.

2. Inform the party you are speaking with on the initial call that you have another call on Call Waiting and ask if they wouldn't mind holding.

 3. Press the **FLASH** button to switch to the second call (you will receive captions of this call as well).

 4. Press the **FLASH** button to return to the first call if appropriate. You can press the **FLASH** button to change between the two calls.

> I am getting the garden ready what have you been up to oh that is wonderful (TONES) did you have a chance to ask about those new seeds (TONES)
>
> **Press ▲ to Review the Conversation**    ■

# Dialing 911 with Your *CapTel* 840i

With *CapTel* 840i, calls to 911 are handled exactly the same as if you called from any other phone connected to your telephone service, plus you get captions of the call directly from the *CapTel* Captioning Service. General instructions for dialing 911 are listed below. For detailed instructions about your phone service and 911, please check with your telephone service provider.

To Dial 911:

1. Pick up handset and dial 911. Your call will be directly connected to the local emergency center for your area.



CAPTIONS

2. Make sure the Caption button is on. If not, press the Caption button to turn the captions on. You will receive captions of everything the 911 call-taker says.

3. When 911 answers, state your emergency and confirm your location.

If you turn captions on in the middle of a call to 911, there will be a brief delay before the captions begin while the *CapTel* phone connects to the Captioning Service. During that time the 911 call-taker will be able to hear everything you say. If necessary, tell the 911 call-taker you are reading captions.

# Updating Your *CapTel* Phone

Occasionally, changes are made to the *CapTel* 840i software. Your phone can check whether new software is available and then perform an update as needed over the Internet connection.
**NOTE:** *Software downloads are encrypted for maximum security.*

To update your *CapTel* 840i software:



| OPTIONS |
| --- |
| 🔲 Dial from Phone Book |
| ☎ Answering Machine |
| 👥 Call History |
| 🗒 Edit Phone Book |
| 🗨 Conversations |
| ⚙ Settings |
| **Press YES to select or press NO to exit Options** |

 1. With the handset hung up, press the **YES** button to see the Options menu.

 2. Press the **DOWN** arrow button repeatedly until **Settings** is highlighted.

 Press the **YES** button to select.

| SETTINGS |
| --- |
| 🗔 Caption Settings |
| 📞 Phone Settings |
| 🖼 Display Settings |
| 📶 Network Settings |
| 🕐 Set the Time Zone |
| ⬇ Update Phone |
| **Press YES to select or press NO to exit** |

 3. Press the **DOWN** arrow button repeatedly until **Update Phone** is highlighted.

 Press the **YES** button to select.

| UPDATE PHONE |
| --- |
| Press YES to Update Phone |
| **Press NO to exit** |

 4. Press the **YES** button to begin updating your phone, or press the **NO** button to exit.





5. The *CapTel* phone checks to make sure that your software is up to date. If a new software version is available, your *CapTel* phone updates to the most current version, then resets (reboots) itself so you are ready to make calls.

| SETUP - UPDATE CAPTEL |
| --- |
| Contacting Update Server.    OK. Downloading Update |
| **Press NO to exit** |





# Problem Solving

## My *CapTel* 840i does not ring

Check that the RINGER is not set to Mute in the Options menu. See page 90.

## I want to make captioned calls at work, but I don't hear a dial tone when I pick up the handset.

If you need to dial a "9" or another number to get an outside line, then you must dial the "9" before placing your call. When programming a Speed Dial button, be sure to include the dialing prefix before the phone number.

## What does "No Network Connection" prompt on my screen mean?

It means that the *CapTel* 840i is not able to send and receive data over the Internet. Check your connections again to confirm that you are connected to Internet service, and that your Internet service is working properly. If the problem persists, please contact *CapTel* Customer Service for help.

## Can I use the Internet on my computer at the same time that I am on the *CapTel* 840i phone with captions?

Yes. At times, you may experience slightly slower captions. But there should be no major difficulty using both the Internet with your computer and using your *CapTel* phone at the same time.

## Using automated (touchtone) systems

With *CapTel*, you can easily navigate through automated phone menu systems (example: press "1" for sales, press "2" for shipping, etc.). You can press number buttons at any time during a call to make selections. You do not need to wait for captions prior to pressing your selection. The captioning service continuously transcribes anything that is said over the phone, regardless of what you are saying or which buttons you press.

**NOTE:** *Some automated systems have very short response times which may disconnect you. If this happens, simply hang up and try the call again.*

## Difficulty hearing over the *CapTel* 840i handset

- Try adjusting the volume setting by pressing the VOLUME bar. To increase the volume, press and hold the right side of the bar. Watch the status lights above the VOLUME bar to know what the setting is. See page 30.

- Try adjusting the TONE setting to enhance different frequency sounds. Press the TONE key to emphasize HIGH, MEDIUM, or LOW frequency sounds. See page 31 for details.

## Display screen seems to be "stuck" at Waiting for Captions status bar. Nothing seems to be happening.

- Press the CAPTIONS button off and then on again.

- Hang up your *CapTel* 840i phone and try to place the call again.

- If you are still experiencing the problem, unplug your *CapTel* 840i from the power adapter, wait 10 seconds, then plug the power back in again. This "resets" the *CapTel* 840i, in the same way you might "reset" your computer. Try making the call again. Warning: resetting the phone will erase any conversations saved in memory.

- Try unplugging the *CapTel* AC adapter, then turning off the Router and the Internet modem. Wait a few seconds, then turn on the modem (make sure it's fully reset, with lights going steady). Next, turn on the Router, making sure it is fully reset. Then plug in the *CapTel* phone AC adapter, all in that order. Wait for the logo screen to appear.

- If the problem still persists, please contact *CapTel* Customer Service for help.

## I sometimes see a word in blue in the middle of the captions. Why is the word a different color than the rest of the captions?

At times, the captioning service may correct word errors that occur in the captions. The corrected word appears in a different color than the rest of the captions to let you know a correction has been made. There may be a slight delay before the word error is corrected. If you are unclear about what was said, ask your caller to clarify.

## Using a Signaler with *CapTel*

To use an optional signaler light (sold separately) with *CapTel*, plug the device into an unused telephone extension jack. If you only have the one jack that is being used by your *CapTel*, you can use a "Y-jack (also called a "duplex jack"). Plug both the *CapTel* and the other device into the Y-jack and then plug the Y-jack in at the wall. You can purchase Y-jacks at any store that sells telephones.

## Sharing a Telephone Line Jack

Devices such as signalers or life line devices often have to be hooked up to the same telephone line as your *CapTel* phone. If a separate, unused telephone extension is not available/close by, you can use a "Y-jack (also called a "duplex jack") to connect the *CapTel* to the phone line. Plug both the *CapTel* and the other device into the Y-jack and plug the Y-jack in at the wall (see illustration). If you need to connect more than two devices at the same phone jack, please contact *CapTel* Customer Service for assistance. You can purchase a Y-Jack at any store that sells telephones.



## The Answering Machine is not taking Messages

If your *CapTel* Answering Machine is turned on but is not picking up calls the way you expect, check to see if there is a Voicemail feature on your telephone service. Voicemail is often included automatically with your telephone service, even if you did not request it. It could be that the Voicemail feature is answering your calls and taking messages before the *CapTel* Answering Machine ever activates.

How to check: Ask someone to call your phone number and don't answer, let it ring. Your caller can tell you what happens. Did they get a Voicemail message?

You can adjust the number of rings before your Answering Machine picks up a call. If you set it to a low number, your Answering Machine will answer the call before the Voicemail service has a chance to. See page 65 for details.

Or you can contact your telephone service directly to find out how to turn off the Voicemail service on your line.

# I N D E X

911 dialing .............................................. 104

Answering a call .................................... 29
  on an extension telephone ........... 29

Answering Machine ............................. 57
  caption external answering
    machine messages ......................... 72
  clearing messages ............................ 62
  making messages audible ............. 67
  playing messages ............................. 59
  record personal greeting ............... 63
  remote message retrieval .............. 69
  setting number of rings .................. 65
  turning on/off ................................... 58

Assistive listening devices .......... 11, 31
  using with *CapTel* 840i ............. 11, 31

Audio jacks ............................................. 11

Buttons .................................................. 6-9
  Captions ................. 6, 9, 22, 26, 27, 28,
    ..................... 29, 34, 59, 60, 77, 84, 104
  CUST SERV (Customer
    Service) ................... 8, 24, back cover
  Flash ............................................ 6, 8, 103
  Mute ..................................................... 6, 8
  Speaker .............................................. 6, 8
  Tone ............................................. 6, 9, 31

Calls ........................................................ 25
  Making/answering calls ........... 25-29
  Using Call History to see
    recent calls .................................. 52-53

Call History ............................................ 51
  clearing all Caller ID entries ........... 56
  dialing from Caller ID entry ..... 52-53
  deleting Caller ID entries ........ 53, 56
  reviewing Caller ID entries ...... 52-53

Caller ID ..................................................... 51

Call Waiting ..................................... 8, 103

Captions
  button ....... 9, 21, 22, 26, 27, 28, 29, 34,
    ....................59, 60, 77, 84, 86, 104, 107
  changing color of captions ........... 44
  changing size of captions ............. 42
  corrections ......................................... 34
  external answering
    machine messages ......................... 72
  reviewing captions after
    hanging up ....................................... 37
  reviewing captions
    during a call ..................................... 36
  saving captions after a call ............ 39
  seeing captions of answering
    machine messages ......................... 59
  turning captions on/off ....... 9, 26, 34

Conversations
  erase all conversations ................... 41
  erase individual conversations .... 38
  review conversations ...................... 36
  save conversations ........................... 39
  smooth scroll ..................................... 46

Corrections ............................................. 34

Customer Service
  button ...................... 8, 24, back cover
  calling for help ....... 8, 24, back cover
  Spanish customer service ............. 89

Dialing
  a phone number directly ............... 26
  dialing 9 in an
    office setting ....................... 26, 76, 79
  from the Phone Book .............. 28, 77
  using Speed Dial buttons ....... 27, 84

Display Screen
adjusting the brightness................ 48

Emergency dialing ............................ 104

Erase conversations
all conversations ............................... 41
individual conversations................ 38

External answering machine........... 72

Flash button .................................... 8, 103

Headsets, using with *CapTel* 840i ... 11

Internet
connecting to the Internet...... 15-20
requirements....................................... 12
using a router..................................... 15
using WiFi.....................................15-19

Lights, on keypad ................................. 92

Messages, Answering Machine
clearing messages ........................... 62
external answering machine.. 72-73
making messages audible/silent.. 67
playing messages ............................. 59

Mute button............................................ 8

Neckloop, using with ................... 11, 31

Network
change settings................................. 99
view current settings...............99-101
wireless/WiFi ..................................... 17

Phone Book
adding a new contact to the
phone book ..................................... 73
dialing from the phone book.. 28, 77
editing names/numbers in the
phone book ..................................... 78
removing a contact from the
phone book ..................................... 80

Options
Answering Machine ...................57-73
Call History ........................................ 51
Conversations .............................36-41
Dial from Phone Book .............. 28, 77
Edit Phone Book................................ 78
Settings ................................................ 85

Redial button ..........................................8

Register ...............................................22-23

Remote message retrieval................. 69

Reset (problem solving)....................107

Reviewing Calls ...............................36-40

Ringer
adjusting pitch.................................... 91
adjusting volume.............................. 90
turning off (mute)............................ 90

Scroll, captions on display................ 46

Set up........................................................ 12
help with set up..........24, back cover
requirements...................................... 12
using a router...............................15-19
using wireless/WiFi ......................... 17

Sharing a telephone line.................108

Signaler, using *CapTel* with............108

Spanish
captions................................................ 88
customer service in Spanish ......... 89

Speed Dial buttons
adding a name/number
to Speed Dial ................................... 82
dialing with the Speed
Dial buttons .............................. 27, 84
editing a name/number in
Speed Dial ........................................ 83

Telephone line in use .......................... 97

Telephone service requirements .... 12

Time zone, setting ....................... 20, 102

Tone
  adjusting for different
    frequencies ............................. 31, 107
  button .......................................... 31, 107

Update *CapTel* software ................... 105

Volume
  adjusting the volume ......... 9, 30, 107
  saving ................................................... 94
  Volume bar ...................................... 9, 30

Wireless/WiFi network ...... 17-20, 99, 101
  removing saved networks ........... 101

# CARE & MAINTENANCE

## Cleaning

Never use liquid or aerosol cleaners. Unplug the CapTel and wipe with a damp cloth. If necessary, use a small amount of mild soap such as dishwashing soap on the cloth.

# SAFETY INSTRUCTIONS

When using your CapTel, basic safety precautions should always be followed to reduce the risk of fire, electric shock, and injury to persons.

1. Read and understand all instructions.
2. Follow all warnings and instructions on the CapTel.
3. Unplug the CapTel from the wall outlet before cleaning. Do not use liquid or aerosol cleaners. Use a damp cloth for cleaning.
4. Do not use the CapTel near water, for example, near a bath tub, wash bowl, kitchen sink, laundry tub, in a wet basement or near a swimming pool.
5. Do not place the CapTel on an unstable cart, stand or table. The CapTel may fall, causing serious damage to the phone.
6. The CapTel should be operated only from the type of power source indicated on the marking label. If you are not sure of the type of power supply to your home, consult your dealer or local power company.
7. Do not allow anything to rest on the power cord. Do not locate the CapTel where people can walk on the cord.
8. Do not overload wall outlets and extension cords. This overloading can result in a fire or electric shock.
9. To reduce the risk of electric shock, do not disassemble the CapTel, but take it to a qualified service person when service or repair work is required. Opening or removing covers may expose you to dangerous voltages or other risks.

Incorrect re-assembly can cause electric shock when the CapTel is subsequently used.
10. Avoid using a telephone (other than a cordless type) during an electrical storm. There is a remote risk of electric shock from lightning.
11. Pressing the volume button may subject the user to dangerous volume levels.
12. Unplug the CapTel from the wall outlet and refer servicing to qualified service personnel under the following conditions:
    a. When the power supply cord or plug is damaged or frayed.
    b. If liquid has been spilled into the telephone.
    c. If the telephone has been exposed to rain or water.
    d. If the telephone does not operate normally by following the operating instructions. Adjust only those controls that are covered by the operating instructions. Improper adjustment of other controls may result in damage and will often require extensive work by a qualified technician to restore the telephone to normal operation.
    e. If the telephone has been dropped and/or damaged.
    f. If the telephone exhibits a distinct change in performance.
13. Do not use the telephone to report a gas leak in the vicinity of the leak.

## FCC Information

The CapTel has been tested and found to comply with the specifications for a Class B digital device pursuant to Part 15 of the FCC Rules. These limits are designed to provide reasonable protection against harmful interference in a residential installation. This equipment generates and uses radio frequency energy and if not installed and used in accordance with the instructions, may cause harmful interference to radio communications. However, there is no guarantee that interference will not occur in a particular installation.

If this equipment does cause harmful interference to radio or television reception, which can be determined by turning the equipment off and on, the user is encouraged to try to correct the interference by one or more of the following measures:
• Reorient or relocate the receiving antenna.
• Increase the separation between the CapTel and the receiver.
• Connect the CapTel to an outlet on a circuit different from that to which the receiver is connected.
• Consult the dealer or an experienced radio/TV technician for help.

This equipment complies with Part 68 of the FCC rules and the requirements adopted by the ACTA. A label is located on the underside of the CapTel containing, among other information, an ACTA Product-Labeling Number, US:D8KTE00BCAPTEL840. If requested, this number must be provided to the telephone company.

A plug and jack used to connect this equipment to the premises wiring and telephone network must comply with the applicable FCC Part 68 rules and requirements adopted by the ACTA. A compliant telephone cord and modular plug is provided with this product. It is designed to be connected to a compatible modular jack that is also compliant. See installation instructions for details.

The REN is used to determine the quantity of devices which may be connected to the telephone line. Excessive RENs on the line may result in the devices not ringing in response to an incoming call. In most, but not all, areas the sum of RENs should not exceed five (5.0). To be certain of the number of devices that may be connected to a line, as determined by the total RENs, contact the local telephone company. The REN for this product is 0.0B.

Should you experience trouble with this telephone equipment, please contact:

CapTel Customer Service
450 Science Drive
Madison, WI 53711
Phone: 888-269-7477 V/TTY
Email: CapTel@CapTel.com

For repair or warranty information, please contact CapTel Customer Service at 1-888-269-7477 (V/TTY). If the equipment is causing harm to the telephone network, the telephone company may request that you disconnect the equipment until the problem is resolved.

This equipment cannot be used on public coin phone service provided by the telephone company. Connection to party line service is subject to state tariffs.

If the CapTel causes harm to the telephone network, the telephone company will notify you in advance that temporary discontinuance of service may be required. But, if advance notice is not practical, the telephone company will notify you as soon as possible. Also, you will be advised of your right to file a complaint with the FCC if you believe it is necessary.

Occasionally, your telephone company may make changes in its facilities, equipment, operation, or procedures that could affect the operation of your equipment. If so, you will be given advance notice of the change to give you an opportunity to maintain uninterrupted service.

If your home has specially wired alarm equipment connected to the telephone line, ensure the installation of the CapTel does not disable it. If you have questions about what will disable alarm equipment, consult your telephone company or a qualified installer.

The CapTel telephone does not have any user-serviceable parts. Modification or changes to the CapTel not expressly approved by Ultratec, Inc. can void your authority to operate the equipment.

FEDERAL LAW PROHIBITS ANYONE BUT REGISTERED USERS WITH HEARING LOSS FROM USING INTERNET PROTOCOL (IP) CAPTIONED TELEPHONES WITH THE CAPTIONS TURNED ON.  Advanced speech recognition software is used to process calls, and, in certain circumstances, a live communications assistant may be included on the call. There is a cost for each minute of captions generated, paid from a federally administered fund. No cost is passed on to the CapTel user for using the service.

# Getting Help

If you have any questions, comments, or concerns as you use your new *CapTel* 840i, we're here to help. Use any of these ways to contact us:




### CUST SERV Button

Pick up the handset and press the **CUST SERV** button to automatically speed dial directly to our helpful Customer Service team. If you are in an office setting, you may need to dial "9" first and then press the **CUST SERV** button. (*Available 24 hours a day, 7 days a week. Closed on major holidays.*)

Help materials are also available online at our website.

Phone:       1-888-269-7477 (*Available 24 hours a day, 7 days a week*)
FAX:          (608) 238-3008
En Español: 1-866-670-9134

Mail:         CapTel Customer Service
              450 Science Drive
              Madison, WI 53711

Email:        CapTel@CapTel.com
Online:       www.CapTel.com
              *(Live Chat help available at our website)*

*CapTel* is the latest innovation from ≡**Ultratec**.

Ultratec, Inc.
450 Science Drive
Madison, WI 53711
(888) 269-7477 V/TTY
(866) 670-9134 (Spanish *CapTel* Customer Service)
Email: CapTel@CapTel.com • Fax: (608) 238-3008 • Web: www.CapTel.com

©2015-2023 Ultratec, Inc. All rights reserved.
Ultratec and *CapTel* are registered trademarks of Ultratec, Inc.

Attachment C

**Supervisory Staff Training Guidance for TTY/TDD/CapTel Captioned Phone**

The purpose of this training guide is for supervisory staff to consider and reiterate the following to incarcerated persons (DNH, DPH, DPS) when providing TTY/TDD and CapTel captioned phone training. Please ensure effective communication needs are met (e.g., iPad (captions), SLI, hearing aids, pocket talkers, written notes, foreign language interpreter). This training is voluntary, and no disciplinary action will result from refusal.

- This training can be done individually or in groups of no more than six class members. When possible, training should be done in groups of class members with similar disabilities and communication needs (e.g., deaf signers, people with speech disabilities, speakers of foreign languages). For DPH class members, this training shall be conducted one on one.
- When conducting the training, remember that your audience may not be able to look and listen at the same time if they rely on captioning or sign language interpretation. Be sure to first explain what you are doing, then show what you are doing.
  - For example, state "place the handset on the TTY," pause, and then place the handset on the TTY.
- Provide a description of what TTY/TDD and CapTel captioned phones are, for whom they are beneficial (DNH, DPH, DPS), the differences between the technologies, and when and where they are available, including in which housing units captioned phones are installed.
- Provide incarcerated persons with registration and release forms to access CapTel Caption phone in housing units (facilities A2, B2 C8, D2, E3, F1, G3, CTC dayroom, RHU). Explain the reason for the forms and offer class members assistance completing the forms if needed.
- Refer to TTY Booklet to demonstrate all features of the TTY phones, including voice carry over, hearing carry over, and non-English language relay services, and phone etiquette. Phone etiquette includes the user interface requirements and behavioral aspects of operating accessible phones that are not customary with other types of phones, such as typing "Go Ahead" or "GA" at the end of a sentence to indicate that the user is finished speaking.
- Supervisory staff should demonstrate common mistakes and troubleshooting techniques (e.g., phone not dialing out, how to address garbling). Supervisory staff should explain that class members can ask housing staff if they require assistance while making a TTY/TDD call from the housing unit, and supervisory staff, housing staff, or other staff present if they require assistance while making a CapTel captioned phone call from the designated housing units and facility chapel.
- Refer to instructional poster for how to operate CapTel captioned phone.
- Explain how non-confidential calls will be monitored.

- o For TTY, staff will remove the tape from the machine and review it for safety and security concerns.
- o For captioned phones located in the Chapel, staff will passively monitor the call from nearby, but will not directly monitor the call.
- o For captioned phones located in the housing units, staff will monitor the phone calls remotely using the same method currently used to monitor the calls on wall phones.

- Explain how confidential calls with attorneys will be completed with either the TTY/TDD or CapTel captioned phone in the Board of Parole Hearing conference room, or CapTel captioned phone in the office in each chapel, depending on the needs of the class member.

- Staff will demo the devices and offer each class member present at the training the opportunity to test the phones and the features they will require (such as VCO or HCO). Each class member will then practice using the phone until they are able to make a successful test call whereby both parties are able to communicate back and forth in a short conversation. Staff will provide assistance/feedback if needed until the class member has successfully demonstrated the ability to use the phone.

- Show the TTY/TDD CapTel Captioned phone signup sheet and explain how to use it. The purpose of the signup sheet is to allow a class member to reserve the phone in advance. If the phone is not already in use, no signup is required and the class member may use the phone during normal programming hours. In addition, explain how class members may request a phone call during modified programming. If dayroom program is modified class members may still access the TTY/TDD and CapTel captioned phones in their own or other housing units and chapels.

- Tell the incarcerated person what to do if the phone is not working (i.e., notify housing staff, ADA Coordinator, Compliance Sergeants, supervisory staff, or CAMU CC II). Explain to the incarcerated person how they will be allowed to use another TTY/TDD or CapTel captioned phone on their facility or on another facility at the same times and with the same frequency as they could use the broken phone.

- Tell incarcerated person that if they want additional or follow-up instruction on how to use the phone to let the housing staff, ADA Coordinator, Compliance Sergeants, supervisory staff, or CAMU CC II know.

# Exhibit E

**TTY/TDD Disclaimer-**

**Attention: This YouTube video about Teletypewriter (TTY) technology was made for South Dakota and was not made in a California Department of Corrections and Rehabilitation (CDCR) institution. Some of the information in the video doesn't apply to you.**

- **You can speak directly to the person you are calling and don't need to type to them.**
- **If your speech is hard to understand, you can also listen to the person you are calling and type your messages back.**
- **The operator won't ask if you've used a TTY service before.**
- **The operator will tell the person you call that you are calling from a CDCR institution.**
- **You can't use third-party calling.**
- **You won't be charged for long-distance calls.**
- **You can't receive call backs.**
- **You won't need to use 7-1-1 to make a call.**

**This video is just for basic information about the TTY. CDCR will give full instructions and training to people with DPH/DNH/DPS codes about how to use the TTY. If you have any questions about the video, please fill out a Form 22 and send it to the ADA office.**

**Caption Phone Disclaimer:**

**Attention: This YouTube video about Caption Phone technology was not made in a California Department of Corrections and Rehabilitation (CDCR) institution. Some of the information in the video doesn't apply to you.**

- **You won't be charged for using the Caption phone.**
- **You won't be charged for long-distance calls.**

**This video is just for basic information about how the Caption Phone works. CDCR will give full instructions and training to people with DPH/DNH codes about how to use the Caption Phone. If you have any questions about the video, please fill out a Form 22 and send it to the ADA office.**

Exhibit F

**DECLARATION OF** ███████ ██████

I, ███████, declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation (CDCR) number is ███████. I am currently housed at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF), on C yard. I am 46 years old.

3.     I have been incarcerated in CDCR on my current term since March 14, 2017.

<u>Hearing Disability</u>

4.     I cannot hear much with my right ear. The sound that I hear with my right ear isn't clear. I also have hearing loss in my left ear, though hearing in my left ear is more normal. CDCR has assigned me a DNH code.

5.     I am prescribed hearing aids for both ears but I don't currently have working hearing aids; they broke in February or March of this year.

6.     I have trouble hearing even when I have my hearing aids, especially in certain settings. It's very difficult to understand what people are saying in the dayroom because of background noise – television, people playing cards, slamming dominoes, people talking on the phone, the shower running. All of those different sounds echo. I look at people when they speak and try to read their lips and facial expressions. This helps to a certain extent, but it's still agitating to be in such a loud environment where I understand so little.

7.     I also have trouble understanding speech in the classroom. I was on D yard when I first transferred to SATF and was enrolled in Transitions, a class that helps people prepare for release. I had my hearing aids then, and they helped some, but I still felt like I missed things. It was especially hard when there was background noise from other people in class talking during a lecture or when we watched a video. It made me so frustrated not to understand – I needed to learn the content in Transitions, like how to open a bank

1

1  account, because it's stuff I've been away from for the last seven years. I have a daughter

2  and it's important for me to be able to show up for my family when I get out.

3  TTY/TDD

4      8.    I have used a teletypewriter (TTY) for phone calls for years while in CDCR

5  custody. I have used it because of my hearing disability and because the sound gets

6  distorted when I used the dayroom phone with my hearing aids even with volume control. I

7  also used it because I sometimes call loved ones who use TTY, including my daughter who

8  is mute.

9      9.    It was a headache to use the TTY at SATF.

10      10.    When I first got to SATF on October 16, 2023, I was housed in Building D3.

11  When I was there, I asked an officer if I could use the TTY. They responded, "What is

12  that?" The officer did not help me access it.

13      11.    I then put in a request to the ADA sergeant on D yard to use the TTY when I

14  was in D3. He later told me that he never got my request. *I was in D3 for around a month and I wasn't able to use the TTY at all while I was there.*

15      12.    When I came off of orientation status, I was moved from D3 to D4. The TTY

16  on D yard is in D2, so I wanted to move to D2. I told officers that I wanted to be housed in

17  D2 because I needed to use the TTY. They would not allow that, and I ended up agreeing

18  to move to D4 because the officers threatened me with a 115 (Rule Violation Report) if I

19  didn't.

20      13.    In order to access the TTY while I was housed in D4, I would have to get the

21  tower officer in my building to unlock my cell and let me out of the building so I could go

22  to D2 where the TTY was. When I asked the tower officer directly, he wouldn't let me out.

23  There were two regularly assigned floor officers who got me let out most of the time I

24  asked – they would talk to the tower officer for me. But the tower officer would only let

25  me out if the regular floor staff told him to.

26      14.    I asked a few times to be allowed to use the TTY during modified

27  programming but staff wouldn't usually let me out. I was told, "We don't do phone calls

28  during lockdowns." The last time I remember that happening on D yard was at the end of

2

1 February 2024. I thought about filing an 1824 but I didn't because I figured they just

2 would've denied me anyhow. → *see pg. 8 for additional*

3 <u>Announcements</u>

4 15. Like I mentioned above, it's difficult for me to understand what people are

5 saying in the dayroom. The same is true for announcements made over the public address

6 (PA) system. I can usually hear that an announcement is happening, but I often can't

7 understand what the officer is saying.

8 16. There have been a few officers who I could understand over the PA system.

9 An officer who used to work in the tower in my building was very loud and very clear

10 when he made announcements, and there is an officer who works in my building on one

11 shift two days a week who I can understand. Most of the time, though, I can't understand

12 announcements over the PA system, and I need to rely on someone else to tell me if the

13 announcement related to me and what it was for. *I have a particularly hard time understanding the regular tower officer who does not speak clearly. S.B. 8/15*

14 17. Some of the tower officers who work in my building just recently started

15 flashing the lights when they make an announcement. Not everyone does it – to my

16 knowledge, one of the regular tower officers has never flashed the lights for an

17 announcement – but other officers flash the lights consistently. *still, flashing the lights doesn't tell me what the announcement is for, only that it's happening. S.B 8/15*

18 18. Some announcements made over the PA system only apply to one person,

19 like announcements for medical appointments. Other announcements apply to multiple

20 people, like announcements for education or yard release, packages, law library, or open

21 line laundry.

22 19. I rarely get ducats for either individual or group appointments. I've gotten a

23 few ducats for physical therapy, but I otherwise don't remember ever getting a ducat for a

24 medical appointment. The only ducats I get consistently are for sweat lodge. Incarcerated

25 people are supposed to sign that they received a priority ducat, but staff who distribute

26 ducats don't always ask us to or give us the chance to sign.

27 20. When I do get a ducat, the time is often wrong, sometimes by hours. For

28 example, I might get an 8 am ducat but not get called until 12 pm. Staff won't let you out

*sometimes staff only give me the chance to sign for a ducat if I say something about it, but even then, staff don't always let me sign for the ducat anyways. S.B. 8/15*

3

1  at the time on the ducat. When I have told staff that I have a ducat, the officer has

2  responded, "They'll call for you."

3      21.    I was referred to see physical therapy, and I saw the physical therapist once

4  earlier this year. I thought I was going to keep going, but they stopped calling me.

5      22.    At some point in May, a woman came around to my door before breakfast

6  and asked why I'd been missing physical therapy. I told her I didn't know that I had

7  physical therapy, but that I'd go if I was called. I didn't sign a refusal form. *and she didn't ask me too.* A

8  representative from the Prison Law Office showed me the refusal form below, which they

9  said appears in my medical record. *Nobody ever asked me to sign this form.*

    *S.P. 8/15*



**REFUSAL OF EXAMINATION AND / OR TREATMENT**

| PATIENT NAME (TYPE OR PRINT CLEARLY) | CDCR NUMBER | INSTITUTION |
|---|---|---|
| ███████ | ███████ | SATF |

Having been fully informed of the risks and possible consequences involved in refusal of the examination and/or treatment in the manner and time prescribed for me, I nevertheless refuse to accept such examination and/or treatment. I agree to hold the Department of Corrections and Rehabilitation, the staff of the medical department and the institution free of any responsibility for injury or complications that may result from my refusal of this examination and/or treatment, specifically:

Describe the examination and/or treatment refused as well as the risks and benefit of the intervention:

*Patient refused Virtual PT on 5/28/24 for weekly visits. Patient states no one called for him, but kls. Re-educated patient on the risks + benefits of keeping medical appts.*



| PATIENT SIGNATURE | DATE | ☒ PATIENT REFUSES TO SIGN | DATE 5/28/24 |
|---|---|---|---|
| WITNESS | | | |
| NAME OF WITNESS (PRINT/TYPE) ███ | | ███ | |
| WITNESS SIGNATURE ███ | DATE 5/28/24 | ███ | DATE 5/28/24 |

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | CDCR #: ███ |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☑ Patient asked questions | Last Name: ███ |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☑ Patient summed information | First Name: ███  MI: |
| ☐ OPS ☐ DNH | ☐ Louder ☑ Slower | *Please check one)* | DOB: ███ |
| ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not reached ☑ Reached | |
| ☑ Not Applicable | ☐ Other* | *See chrono/notes | |
| 4. Comments: 0510 | | | |

4

23.    A representative from the Prison Law Office also told me that there is a note in my medical record from May 17, 2024, that says: "specialty clinic officer stated that pt refused to come to CTC for PT appt." *I never refused an appointment - I didn't know that I was called for physical*

24.    I went to physical therapy one other time after the woman came to my door. *therapy that day.* That was when a non-regular officer was working that day and asked me personally if I wanted to go, not through the PA system. *S.B 8/15*

25.    I also have trouble understanding announcements when I'm on the yard. Sometimes announcements on the yard come from the observation tower, but other times they are made by the building tower officers. *→ see pg. 9 for additional*

26.    When I was on D yard, I missed an appointment with the woman from parole services because I was out on the yard. I don't know if staff called me for that appointment. If they did, I didn't hear it, and no one came and told me that I had been called. *I learned that I missed the appointment when she came back the next day to meet with me. S.B 8/15*

27.    I filed an 1824 in February asking for a service dog because I don't hear a lot of the time when the tower calls me or I'm being paged on the PA system. I thought a service dog might be able to get my attention. The 1824 was assigned the log number 522096.

28.    No staff person came and interviewed me about my request, the problems I was having hearing announcements, or potential solutions. I just got a written denial about a month later.

29.    The Reasonable Accommodation Panel (RAP) misunderstood my request. The written response I got from the RAP said that I was "not requesting an accommodation at access Programs, Services, or Activities (PSA)s while incarcerated," and that someone would meet with me to help me with a benefits application for when I'm released. I think they thought I was asking for a service dog when I go home, but I was asking for one right now. The RAP didn't say anything back to me about the fact that I'm not getting announcements. *This RAP response, and other denials I've gotten from the RAP make me feel like there is a culture of denying requests, even when an individual officer might be willing to grant the request.*

*S.B. 8/15.*

5

30.    I also wrote up a regular officer in my building for not making announcements. I don't hear him call me when I have a medical appointment and I'm out on the yard. And when I do hear him make an announcement, I can't understand him at all because he mumbles.  → see page 9  for additional

<u>1824 Process</u>

31.    My teacher in Transitions, the class on D yard that I mentioned above, recommended that I ask for captioning for class. She told me there was a new program for captioning that might help me understand lectures and videos that she'd show us. She had tried to have me move up closer to the front of the room or sit by the speakers, but that alone didn't let me hear or understand everything happening in class.

32.    Based on what my teacher told me, I thought captioning could help me for other things too, like medical and mental health appointments. I especially have trouble understanding the provider at telemedicine appointments when they have an accent I don't recognize and can't hear well or when there's noise in the background.

33.    I filed two 1824s in March requesting captioning. The log numbers for those 1824s were 534889 and 539828. In the first 1824, I asked for a special tablet that does closed captioning. Then I learned from the Prison Law Office about the CART program for captioning, so I filed a second 1824 asking for CART for appointments, pre-release meetings, medical, and Transitions.

34.    Both responses from the RAP denied my request for captioning. The response to my first 1824 said that CART and the iPhone/iPad that provides captioning are only for people with hearing loss who use written notes for effective communication. The RAP said that "A review of SOMS indicates that you are designated DNH with a primary EC of hearing aids and alternate of need staff to speak loudly and clearly." The response to my second 1824 said that "With your hearing aids and [Personal Sound Amplification Device (PSAD)], you have demonstrated an ability to maintain a functional hearing level which enables you to achieve effective communication without written notes. Your current effective communication history demonstrates your ability to effectively communicate

6

1    with your current assistive devices and required methods of communication, which are the

2    use of your hearing aids and for staff to speak loudly and clearly."

3         35.    I do have a PSAD. I use it to listen to my television inside the cell, but it

4    doesn't help me in the dayroom because of the way sound echoes in the dayroom, and it

5    doesn't help me in other settings because of background noise.

6         36.    No one interviewed me about my 1824s, so I don't know how the RAP

7    decided that I can communicate with my hearing aids and PSAD alone in all prison

8    settings. The reasons given in the responses didn't make sense to me. Why don't I need the

9    accommodation? What's the reason? I would've wanted to explain my situation at the

10   RAP. It seems like they never call incarcerated people to be there, but a lot of people can't

11   articulate properly when they're writing – I'm a better speaker than I am a writer.

12        37.    Every 1824 I've filed since I got to this prison hasn't addressed my issue or

13   has been denied. They deny you, deny you, deny you, just because they can, until you push

14   the issue and do something extreme. It's more frustrating than I can say. The 1824 process

15   is supposed to be to help me. *there 58. 8/15* Just because I'm not completely disabled, they just

16   automatically want to deny me because I'm not completely deaf or quadriplegic. In the

17   normal world, I have an elderly mother, family with mental disabilities, and my dad was

18   paraplegic. I know the accommodations on the street are much easier to get, but I don't get

19   even basic accommodations just because I'm in prison. I'm still a human being.

20

21        I declare under penalty of perjury under the laws of the United States of America

22   that the foregoing is true and correct, and that this declaration is executed at Corcoran,

23   California, on this _____ *15* _____ day of August, 2024.

24

25   

26

27

28

14.5.    I couldn't always use it when I wanted to call my family or needed to make other calls to get ready to go home. I probably used the TTY dozens of times at SATF but I would've used it more if staff had let me and I didn't have to jump through so many hoops to get to the phone.    I    was moved to C yard in March 2024. I now only use my tablet to make phone calls from inside my cell  because I've been denied the TTY so many times that I want to avoid the frustration and stress of being  denied  communication with my family, especially as I am  so close to being released. I don't want to have any  problems  with staff. I was also recently provided over the ear headphones  with a microphone  to use with the tablet, and I  do not  have a cellmate, so  my cell has less background noise, which allows me to hear  my family. However,  I  cannot use  the tablet calls to communicate with  my  daughter because  she is mute  and cannot use a regular telephone to respond to me. The only  way  we have of communicating over the tablet is using the messaging app,  which  costs  5 cents  per  message (2,000 characters maximum per message). Sometimes  the wifi goes out when  I'm in the middle of writing  a message to my daughter and  the  message  is  completely lost.

S.P.  8-15-24

25.5.    I have the same problems understanding announcements made over the speakers on the yard as I do understanding announcements made over the PA system in the building, and in fact, it is usually harder to hear announcements on the yard because it is a larger open area with more activity going on.

S. P 8/15/24

30.5.    In this grievance, I also included details about other ways that the officer doesn't do his job, that affects staff's safety and policy, in the hopes that addressing staff safety would make CDCR take the 602 more seriously.

S. B 8/15

30.5 continued    Because of my hearing, I don't know whether I just can't hear him or if he's not making the announcement at all. Nothing has changed since I filed the 602 and I haven't yet gotten a response.

No matter where I am in the prison, I need to know if staff are making an announcement, if the announcement relates to me, and what the announcement was for. I thought a service dog might help alert me to announcements so I could ask for clarification, but SATF denied me that accommodation. My tablet isn't an option because I can't take my tablet onto the yard and I need announcements there too. It would be helpful to have something I could wear or take with me to different areas to alert me to announcements.

S. B 8/15

9.

# Exhibit G

**DECLARATION OF** ███████████

I, ███████████ declare:

1.     I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.     My California Department of Corrections and Rehabilitation (CDCR) number is ███████. I have been in CDCR custody since December 14, 2010. I am 66 years old.

3.     I am currently housed at the San Quentin Rehabilitation Center (SQ). Before I was at SQ, I lived for over ten years at the California Substance Abuse Treatment Facility and State Prison, Corcoran (SATF). I was housed at SATF from 2011 until October 2023, when I transferred to SQ.

<u>Hearing Disability</u>

4.     I am deaf. I have had hearing loss for my whole life, but I really lost my hearing as an adult when I was in county jail. I used to be able to hear a little with a pocket talker in quiet, one-on-one settings, but that was only for a short time and is no longer true. I don't wear hearing aids because they don't help me.

5.     The only way I can effectively understand what is going on around me is through written notes. I don't read lips. I am starting to learn American Sign Language through a class here at SQ, but I am not fluent yet.

6.     In December 2022, the Court Expert in the *Armstrong* case submitted a report about treatment of people with disabilities at SATF. In the report, the Court Expert wrote about a deaf person who did not know sign language, who the Court Expert called "Person E." I am Person E.

<u>TTY/TDD</u>

7.     Because of my hearing, I can't make voice calls using the dayroom phones or the phone call application on the ViaPath tablets. The only way I can reliably make phone calls is with a phone that captions what the person I am calling says. One option for making those calls is TTY.

1

8.    When I was at SATF, I was told that the TTY was broken and then that it was removed and wasn't available anymore. Because of that, I didn't make phone calls for a long time. I tried to keep in touch with my family through email, but they didn't always check their email or have an email address, and I eventually lost touch with several members of my family.

9.    Finally, I learned that there was supposed to be a TTY on my yard. I asked to use it in March or April 2023. I thought I'd try to call my family because everything else had failed. I tried it probably a dozen times that day – seven times in the morning, and four or five times in the afternoon, but it never worked. Everyone got involved – ADA workers, custody officers, other inmates. There was no privacy.

10.    After that, I decided I didn't want to mess with it anymore. I've been denied accommodations so many times, it feels like the same problem over and over when things like that happen. It's just trouble, and I get too tired of it. I didn't want to bother anyone with it anymore.

11.    A week after that, a lieutenant came to talk to me about the TTY. I told the lieutenant it didn't work and that I didn't want to use it anymore.

12.    Then a week after that, right before I met with someone from the Prison Law Office, staff sent me a note saying that they'd gotten the TTY fixed. I waved them away to say no, I didn't want to use the phone – it had been such a circus when I tried the first time. I said thanks for the update, but I don't want to use it.

13.    I tried to use the TTY again one time after that. The officer told me that I had to go to an ADA worker who had been trained to help me make the call. I wasn't trained myself. I said never mind – I didn't want to get involved in making a call with an ADA worker, since making a call means giving personal information. I haven't used the TTY since then.

Captioned Phones

14.    A representative from the Prison Law Office told me that captioned phones were coming to SATF. I waited for the captioned phone for a very long time. Finally, in

2

September 2023, someone from the Inmate Advisory Council (IAC) on my yard at SATF told me there was a captioned phone in the chapel on that yard (G yard).

15.    On the morning of September 13, 2023, the ADA Coordinator from the IAC (an incarcerated person) came with me to the chapel to sign up with the ADA sergeant to use the phone. The ADA sergeant wasn't there, so I left a note saying I wanted to make a call on the captioned phone that day or the next morning.

16.    That evening, an ADA sergeant came to talk with me, the ADA Coordinator for the IAC, and the housing staff in my unit. After the sergeant talked with the housing staff, the sergeant told me that the housing staff didn't have any sign-up sheets for the captioned phone, and that the sergeant would need to email a supervisor about adding me to the schedule for the phone the next day. The next morning, the housing staff finally called me to sign up to use the phone.

17.    I tried to call the Prison Law Office on the morning of September 14, 2023. An ADA sergeant was with me. We had to try making the call several times before the call actually connected, using two or three sets of instructions. When it connected, the quality of the connection was poor – I could tell by the responses I was reading that the person I was talking with didn't understand me. Then the call disconnected three times.

18.    After that, I gave up. I got so frustrated with the phone. It seemed like every time I wanted the phone, there was a problem, so I just let it go. I did file a grievance though, to tell CDCR how frustrating it was that after waiting so long for the captioned phone, I wasn't invited to the IAC meeting where it was introduced or told about it directly. I felt like I was the last person to find out about it, even though everyone knew that I needed it. It was like being told to go to an ADA worker to use the TTY all over again.

19.    I talked with the Prison Law Office on a confidential call after that. We didn't use the captioned phone – we had a video call where the representatives from the Prison Law Office shared their screen and typed notes to me. A representative from the Prison Law Office asked me about what would need to be better with the process for

3

signing up for and using the captioned phone, then asked me if I would be willing to try the captioned phone again. I told them I would try to sign up if they wanted me to. The Prison Law Office told me they would send an advocacy letter about my access to the captioned phone.

20.    I tried to use the captioned phone to call the Prison Law Office again a few days after that. An ADA sergeant was supposed to help me with the call, but we tried the Prison Law Office number and the number for the prison a dozen times and it either wouldn't connect or it wouldn't connect with captions. I had a set of instructions that I had asked for, and we followed all the steps – making sure the red light for the captions was on and dialing "9" for long-distance calls – but the call still didn't connect. I left because it wasn't working.

21.    I don't know what happened when I was gone, but I was called back to use the phone and there was a lady talking with someone from the Prison Law Office who got the call to connect. I wasn't sure what she had done to fix it.

22.    I tried calling the Prison Law Office again one more time that day with the ADA sergeant to test the instructions. The ADA sergeant said I shouldn't dial a "9," but I had tried that and it didn't work. After that, I still wasn't sure what I should do to use the phone.

23.    Because I still wasn't sure how to use the phone and didn't know if the connection problems had been worked out, I didn't want to use the captioned phone to call anyone but the Prison Law Office, including my family. I didn't want to be wondering if the reason I couldn't connect with someone was because of problems with the captioned phone – I wanted to know for sure that if I couldn't reach someone, it was for some other reason.

24.    There is a captioned phone at SQ, where I am now. The only captioned phone I know about is at 4 Post, which is in the front of the prison outside of my housing unit. I've tried to use the phone a few times, but I've had problems using it here too. To use the phone, I need to put the phone on the lid of a trash can the staff have there outside

4

of 4 Post, so that I'm standing outside even if it's raining. I can't use the phone if it's foggy because there's no movement allowed when there's fog, so I can't leave my housing unit. The officers are also standing right there, so I have no privacy. When I have tried to use the phone, I've been turned away, even at times I've signed up, or the phone hasn't worked. I've given up using the phone here too. I'd try to use it if it were in my housing unit – I think it would actually be accessible to me there.

<u>Captioning</u>

25.     Because I am deaf, I need captioning for other settings too, not just to use the phone. I asked for CART for captioning five years ago, in 2019, when I was at SATF. I still have never used CART for a class, church, group, or other program.

26.     In August 2023, when I was at SATF, there was a meeting on my yard about CART. During the meeting, I had a laptop that showed closed captions. I tried to follow along as best I could, but there were so many misspelled words and incomplete sentences. It scrolled so fast that I couldn't read it. It also looked sometimes like it was fast forwarding – it would put out one sentence then go to the next sentence, without time to read the first one. I didn't catch much. I don't think the laptop with closed captions was CART. The only thing I understood was a pre-made video they showed of CART on a laptop, because the video had already been captioned. No one came to talk to me about what happened after that, so I still don't know what was presented. All I got from that meeting was that CART is new, they were only doing it for certain things (although I wasn't sure what), staff are still in training, and that I should file an 1824 to get it started.

27.     The training made me feel excluded and even more confused than I was before. I don't think they showed CART, which I would've wanted so we could actually see how it works and what was being said by others at the meeting. I didn't have any idea what the other deaf and hard-of-hearing people at the meeting were talking about, because the captioning I was seeing on the laptop made absolutely no sense.

28.     I knew by that time that I would be transferring to SQ, so I didn't file an 1824 to ask for CART. I wasn't interested in trying at SATF anymore – nothing worked

1   when I was there – and I wanted to get out. I didn't want to deal with that institution

2   anymore for anything. I decided to wait until I got to SQ to see if they had CART.

3       29.    I learned later that staff use CART for only due process, like when you're in

4   trouble and have a 115 hearing or you have committee. CART still isn't provided for

5   programs. That makes me frustrated, because it seems like CART is only used when it

6   makes things easier for CDCR staff. I thought the whole idea behind CART was that I

7   could use it for me, for my program, so I can understand my programming. But it feels like

8   for that, they're dragging their feet.

9       30.    Like I said above, I still don't have CART for programs, but I now have an

10  iPad in an orange case for captioning. It's better than nothing, but it took a long time to

11  learn to use. At first, the words would disappear before I'd finished reading them, and I

12  couldn't go back to see what I'd missed. I would have to constantly look at the screen to

13  see what was said, and if my attention was pulled away for just a second, I would miss big

14  parts of a conversation.

15      31.    I've figured out how to keep more words on the screen now, but I still have

16  problems with the captions on the iPad. The captions on the iPad often miss words and

17  even full sentences. The range isn't very good. If the microphone isn't directly next to the

18  speaker, then sometimes nothing will show up at all. It's even worse in settings with

19  background noise. Words are often misspelled, which makes conversation hard to follow.

20  And sometimes the captions on the iPad show profanity, and I have to ask if someone

21  actually used the word that showed up on the screen. Often they didn't – the iPad just

22  added profanity where no one actually used it. For example, when I met with

23  representatives from the Prison Law Office last year, the iPad captioning transcribed

24  something they said as if they were cussing me out, saying b-tch and f-ck. I asked if that's

25  what they had said – they said no.

26      32.    The captions on the iPad also don't tell me who is speaking.

27

28

33.    I have a lot of trouble using the iPad in certain settings. Earlier this year, I was enrolled in a substance abuse class called ISUDT. The class was held in the gym. A representative from the Prison Law Office showed me the photographs of the gym below.





34.    These photographs look like the gym at SQ, although I've never seen beds in the gym. Instead, the gym was divided into eight to ten different bays, where different class groups met, including my class. The bays were divided with collapsible panels that were around eight feet tall. There were no roofs on the different class bays.

35.    There were around 12 people in my class, plus the counselor/teacher and a mentor (an incarcerated person). The room was set up with six tables in a horseshoe shape, facing the teacher and mentor's table at the front. I sat at one end of the horseshoe so I was closest to the teacher.

36.    I tried to use my iPad in the class, but the iPad caught so little. I set it up so the microphone faced the teacher, but then I could only understand her. Even then, I could only read what she said when she faced me directly. If she turned her head even slightly away, I couldn't understand her.

37.    I couldn't understand most of what happened in the class, so I stopped paying attention unless I saw the screen of my iPad light up. Then I knew that the teacher was probably facing me, speaking to me directly, and I would respond to her questions as best I could. I never understood what any of my classmates were saying or what the teacher was saying to other students. I think I missed probably 97 or 98% of everything that was said in that class.

38.    I've also tried to use my iPad at medical appointments. I often see the doctor on telemed, which means they're on a computer screen, and there's a nurse in the room with me. When I've tried to use the iPad to transcribe what the telemed doctor is saying directly, it doesn't pick up anything. I've tried to explain that to medical staff, but they don't always understand me at first. I have to teach them that the iPad won't pick up anything unless it's very close to the person speaking.

39.    When the iPad won't pick up what the telemed doctor says, the nurse in the room needs to repeat it to me. Even then, the captioning on the iPad often misses or misspells words, especially medical terms. Because of that, I'm not always sure that I've understood everything that medical staff is saying or if my understanding is correct.

8

40.    Medical staff have offered to handwrite notes to me, but I've noticed that when they handwrite notes, they write much less than the iPad transcribes (even if what the iPad transcribes isn't helpful). That makes me doubt that I'm getting all the information I should from handwritten notes.

41.    In January this year, I filed an 1824 asking for live closed captions for medical appointments so that I can communicate directly with the doctor. The log number for my 1824 is 511002.

42.    I don't remember anyone coming to talk to me about the 1824. Instead, I just got a response from the Reasonable Accommodation Panel that said that CCHCS equipment couldn't do closed captioning, and that medical staff would write notes to me legibly.

43.    Like I explained above, I don't think I get the same amount of information when staff write notes or when the nurse has to repeat what the doctor says, which makes me worry that I'm missing something related to my health. I see a few different specialists and I have multiple conditions I'm being treated for. Some of my medication hasn't been effective, so my doctor wants to do more examinations and might want to try other medication. It's important to me that I have all the information that I could need, but I don't feel right now like I have a totally clear understanding of what's going on with me or why.

44.    I also told ADA staff here that I want a microphone to use with my iPad to try to enhance the quality of sound and hopefully the quality of captions. I was told they don't hand them out individually. I suggested to ADA staff that they have microphones stationed in different places in the prison so I can check them out for use in those locations for programs and groups. The person I talked to, the CAMU CCII, said he would take it back to the group and discuss it, but I haven't heard anything since then. That was a few months ago.

45.    Last year, staff at SQ showed me two kinds of captioning. One board was smaller, with complete sentences, which showed multiple lines of text. The other board was larger, with two or three lines of text at the top.

46.    The larger board with two or three lines of text showed captions way too quickly for me to read. I preferred the board with complete sentences and multiple lines of text, so that I could follow along. Without multiple lines of text to orient myself to the conversation, I was worried that I missed important information. I have the same problem with the iPad – it might transcribe a full screen of text, but sometimes when it gets to the end, everything disappears instead of scrolling, so I'm lost if I didn't read to the end quickly enough. During the demonstration, I turned to watch the screen with more lines of text to understand what was going on, then looked at the screen with fewer lines of text and my iPad to see how much they were actually picking up.

47.    During the demonstration, the other deaf participants and I told AW Rosalez, the ADA Coordinator at SQ, that we needed more lines of text on the board with only two or three lines if it was going to be helpful. It just moved too fast for any of us to keep up.

48.    During the demonstration, the other deaf participants, who all use sign language, also said that the board with two or three lines transcribed some words differently than the sign language interpreter had interpreted them. They told AW Rosalez that they wanted to have a sign language interpreter inset in the corner of the screen, so they could compare what the interpreter was signing to what the screen was transcribing and hopefully understand more.

49.    After the demonstration, I filled out a written survey. A representative from the Prison Law Office showed me the survey below, which looks like the survey I filled out.

//
//
//

10

Questionnaire for DPH class members                    Date: _12-7-23_

Name_[redacted]_                    CDCR#_[redacted]_

DPP Code:_ DPH _

On behalf of CAMU, we'd like to thank you for voluntary participating in our CART/ViewSonic closed captioning demo at San Quentin. We appreciate you answering the questions below and providing CAMU your feedback. Thank you!

**Question#1:** Please tell us your opinion about the ViewSonic board closed captioning demo which was held in the Chapel? _Both screens are exellent for me._

**Question #2:** Please tell us your opinion about the CART services demo which was held in the Chapel? _The Voice activated is far better than getting a stenographer._

**Question #3:** Which services would you prefer (the ViewSonic board or CART)? _Both are good_

**Question #4:** What do you think about the iPad translation app? _The microphones should be able to pick up Better on softer Voices and a little further of distance_

**Question #5:** Do you have anything else to add for us to consider (i.e sonic view board, CART, iPad)? _Yes - add an extra line and maybe as suggested to have an interpreter in corner of screen_
_? How are you going to put these in motion to each class - When we are in different Programs?_

50.    In the survey, I said that both screens were excellent. When I said that, I was referring to the microphones. I also had my iPad at that meeting, and I saw that both screens were picking up the speaker much better than the iPad. I actually had to move to be closer to the speaker during the meeting to try to get my iPad to pick up what they were saying, but even that didn't work.

51.    In the survey, I said that having a voice-activated screen was better than having a stenographer. I thought both screens they showed were voice-activated. What I meant was that generally, it's probably easier to use a voice-activated screen than to hire a

11

1   stenographer. What I need is for something to be accurate, and for there to be enough lines

2   of text visible at a time that I can keep up, review the content, and understand what was

3   said. It doesn't matter to me if it's a human transcriptionist/stenographer as long as it

4   works for me.

5          52.    I also said in the survey that the larger board should have another line. Of the

6   two boards they showed at that meeting, only the one with more lines of text worked for

7   me. I haven't seen or heard anything about that or about the whiteboard since the

8   demonstration.

9          53.    There was an event here on the yard earlier this month about changes at SQ.

10  I sent a GA-22 form to the ADA office asking for a speech-to-text device so I could follow

11  along and give feedback and my ideas, since my iPad wouldn't work on the yard. I also

12  need captions in larger font because my vision isn't too good. I got a response after the

13  weekend the event happened, with a few pages of information about the event.

14         54.    I feel that it's hopeless to continue trying to get something that I've been

15  fighting for since I learned about it, years ago. It's hopeless to keep trying to get something

16  that will help me get in programs. I'm fatigued and I'm frustrated. I'm tired of getting my

17  hopes up. I don't have any more moxie, no more get up and go energy. It's the same thing

18  again and again – dead end, brick wall.  I don't want to keep filing 1824s. I shouldn't have

19  to wait for something I need now. I can't go to veteran groups, I can't go to church, I'm

20  not getting anything. I feel defeated. If it happens, it happens. If it don't, then it don't.

21         55.    I'll keep going to programs whether I learn something or not. But I have the

22  parole board in a few years, and I feel like I'm behind. I don't know what I'll tell them

23  when they ask what I learned in my groups. I worry about not being able to explain myself

24  and being criticized, like people often do when I try to explain that I'm deaf, I don't know

25  sign language, and I can't read lips. I read in the San Quentin newspaper about people who

26  have been here for years and keep doing all kinds of programming. They're old and they

27  keep getting denied at the parole board. I see them, and I think, that could be me.

28

56.     All I really do is read books, play games on my tablet, and sometimes go to the yard, because there's nothing else for me here. I can't play sports because I only have one kidney, I can only exercise a little bit, and it's lonely and boring. With the changes happening at SQ, I worry that if I don't do programs and really participate, they'll ship me off somewhere else and I won't have the opportunity to try anymore.

<u>Announcements</u>

57.     When I was at SATF, ADA workers would sometimes tell me about announcements. They very rarely brought a whiteboard with them to explain what the announcement was for – they would just expect me to hear them or read their lips, or they would tell someone else in the cell who was trying to learn sign language to fingerspell the information to me. Sometimes I would go to the podium to learn what had happened, and the officer would ask, "didn't they tell you?" I would explain that the ADA worker hadn't given me a note and that I didn't know what the announcement was for. Eventually ADA workers stopped coming to tell me about announcements, and I just had to rely on someone in my pod to tell me what an announcement was for and if it related to me.

58.     A representative from the Prison Law Office told me that CDCR was considering asking people at SATF designated DPH regularly whether staff and ADA workers provided individual notification of announcements to them. I've told staff before when ADA workers haven't given me announcements like they should, or when staff don't give announcements, and nothing changed. Sometimes things even got worse. I'm not sure how telling staff if I didn't get announcements would change anything – nothing really improved the whole time I was at SATF.

//
//
//
//
//

1      I declare under penalty of perjury under the laws of the United States of America

2   that the foregoing is true and correct, and that this declaration is executed at San Quentin,

3   California, on this ___20th___ day of August, 2024.

4

5   ██████████████████

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 110



*Executive Director:*
Margot Mendelson

*Attorneys:*
Rana Anabtawi
Patrick Booth
Tess Borden
Steven Fama
Mackenzie Halter
Alison Hardy
Sophie Hart
Marissa Hatton
Jacob Hutt
A.D. Lewis
Rita Lomio
Donald Specter

# PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

VIA EMAIL ONLY

May 8, 2024

Ms. Tamiya Davis
CDCR Office of Legal Affairs

RE:     *Armstrong* Advocacy Letter
        CART Eligibility

Dear Ms. Davis:

By policy, people designated DNH may request CART via the 1824 process, those requests shall be considered on a case-by-case basis, and staff shall provide CART unless they "can demonstrate that another equally effective means of communication is available." *See* CART Memo at 1-2 (July 24, 2023). When providing feedback on that policy prior to issuance, Plaintiffs' counsel repeatedly explained that RAPs need additional guidance on how to evaluate such 1824s and that Defendants must develop a reliable oversight mechanism to review denials of 1824s requesting CART.

On October 24, 2023, I wrote to Defendants with concerns about how the SATF RAP denied a request for CART by ████████████████ based only on a cursory review of his DPP code and primary and secondary forms of communication. *See* Exhibit 1. I asked that CDCR headquarters provide the field with additional direction, direct institutions to re-evaluate all denials of CART, and explain how it would audit denials going forward.

On November 9, 2023, you and I met with SATF ADA Coordinator Scaife and discussed his interpretation of the CART memorandum. At that meeting he explained that he read the memorandum to allow CART only for people who are designated DPH or who have written notes documented as a form of communication. He said, "I know it [the memorandum] says we offer on a case-by-case basis, but in my opinion, we offer equally accessible means." When I asked what those means were, he said that they were the primary and secondary forms of communication documented in SOMS.

I raised this issue again during a meeting with CDCR officials and attorneys and the Court Expert on November 21, 2023. At that meeting, you said, "We don't have a disagreement that the AW gave the wrong answer and that requires more direction and guidance to the field. His answer

**Board of Directors**
Jason Bell • Vanita Gaonkar • Nick Gregoratos • Christianne Hipps
Jean Lu • Claire McDonnell • Seth Morris • Vishal Shah • Adrienne Yandell

Ms. Tamiya Davis
Re: CART Eligibility
May 8, 2024
Page 2

was this is the crtieria for CART: particular code and particular method of communication." You said that the parties did not have a disagreement with the intent of the memorandum, concluding, "We need to correct that problem at SATF." I followed up by email that same day and provided another example of the SATF RAP denying a request for CART, this time from ████████ ████████████ without conducting an adequate individualized assessment. *See* Exhibit 2.

I was surprised, then, to receive a letter from SATF Warden Phillips **76 days later**, on February 5, 2024, and another on February 12, 2024 (dated February 8), doubling down on the the SATF RAP's previous approach. *See* Exhibits 3 & 4. Warden Phillips stated that the RAP "conducted a case-by-case evaluation of the request" for CART by ████████████ and that "[t]he RAP demonstrated that other equally effective means of communication were available." The RAP did no such thing. Instead, the RAP stated only:

> On 8/23/2023, the RAP reconvened to discuss your request. Your request to receive CART services was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

The RAP ignored, among other things, the fact that ████████ had expressly stated in his request that his hearing aids were not accommodating him.

> **WHAT DO YOU NEED?**
> WOULD LIKE TO PARTICIPATE IN C.A.R.T PROGRAM —
> Communication Access Realtime • AM DNH'. DONOVAN.
> VALLEY STATE — CDCR WORKING TOWARD REPLACING MY DIGITAL
> HEARING AIDS WITH DIGITAL. "FLAME 250 NOT "DIGITAL" NOT
> A HEARING AID AS ADVERTISED ON GOOGLE.

As to ████████ Warden Phillips asserted that the RAP conducted "a case-by-case review" by reviewing "the history of effective communication for the incarcerated person and discovered he had a detailed history up to current time, of successfully communicating and demonstrating repeated understanding using his existing primary and secondary means of communication." This, too, is not reflected in the RAP response.

> Your request to receive CART services during due process events was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

Neither ███████ nor ████████████ were interviewed to better understand their communication needs, even though their CDCR 1824 requests should have put the institution "on notice" that they "could not fully participate" in programs with their current accommodations alone. *See Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 274 (D.D.C. 2015) (Jackson, J.) (prison officials violated rights of deaf class member who requested an interpreter when they said written notes and lip reading were sufficient); *id.* at 271 (provision of reasonable accommodations "is best done through an informal, interactive process that involves" the person with the disability) (internal quotation marks and citations omitted).

The RAP also did not appear to demonstrate CART, a new technology in CDCR that people may not be familiar with, to the class members so they could make an informed decision as to whether it would help them or see if another accommodation would be appropriate, even though ████████ expressly requested additional information about CART.



Had the RAP interviewed ████████████ who is also designated DD2, they would have learned that he, too, had never used CART and knew only what he had seen on informational posters in his housing unit and on his tablet, so would have benefited from a demonstration of the technology.

**Reliance solely on documented "primary" and "alternate" forms of communication is insufficient.** The hard-of-hearing population is diverse, with diverse needs; people may need different, or multiple, devices to accommodate them in various settings and for different types of communication, including through use of captioning *and* hearing aids in tandem to attempt to fully understand communication.

The responses by the SATF Warden, which presumably were approved by both CDCR headquarters and the Office of Legal Affairs, indicate that the parties still do not agree regarding what constitutes a "case-by-case" evaluation, as required by law, when someone requests CART. *See* Dkt. No. 3583, Order at 40 (Mar. 20, 2024) (public entities must "give primary consideration to the requests of the [disabled person] with respect to auxiliary aid requests and give deference to such requests") (quoting *Updike v. Multnomah County*, 870 F.3d 939, 958 (9th Cir. 2017)).

The responses also diverge from the approach that Dawn Lorey repeatedly has asserted is "baked into the RAP process." In meetings held to discuss SATF Stipulation Items 1-3, on March 27, 2024, and again on April 24, 2024, Dawn Lorey has stated that the RAP routinely consults

Ms. Tamiya Davis
Re: CART Eligibility
May 8, 2024
Page 4

directly with class members regarding their need for accommodation. Yet that clearly did not happen in these instances.

It is critical that the parties resolve this issue without further delay—both to ensure that people have appropriate access to CART for due process encounters now, and to ensure access when captioning is rolled out to all programming and education (something the Court ordered in February 2023 must happen at SATF "as soon as possible"). By email on May 6, 2024, Defendants refused Plaintiffs' request to meet to figure out a timeline for resolving this issue. Plaintiffs will follow-up separately about that, but in the meantime we request the below information as soon as possible to determine whether the parties have a dispute and how best to address it going forward:

1.  All guidance provided to the field regarding evaluation of CART requests, including the guidance provided to ADA Coordinators on December 12, 2023.

2.  All recommendations by all CAMU CCIIs to institutions regarding their review of the 1824s submitted where CART has been requested. (This is discussed on page 2 of Warden Phillips's letters.)

3.  A written explanation of whether CDCR headquarters agrees with the responses provided by the SATF Warden and with the SATF Warden's analysis of what constitutes a "case-by-case" evaluation. If Defendants agree, please explain why. If Defendants do not agree, please explain why the responses were issued.

Sincerely yours,

Rita Lomio
Senior Staff Attorney

cc:   Ed Swanson, Audrey Barron (Court Expert)
      Co-counsel
      Patricia Ferguson, Nicholas (Nick) Meyer, Chor Thao, Ramon Ruiz, Ava Lau-Silviera, Ursula Stuter, OLA Armstrong (OLA)
      Lois Welch, Steven Faris (OACC)
      Brianne Burkart (CCHCS Legal)
      Diana Toche, Joseph Bick, John Dovey, Robin Hart, Joseph (Jason) Williams, Cathy Jefferson, Jason Anderson, Dawn Lorey, Jane Moses, Joshua (Jay) Leon Guerrero, Aaron Perez, CCHCS Accountability (CCHCS)

Ms. Tamiya Davis
Re: CART Eligibility
May 8, 2024
Page 5

Sharon Garske, Trace Maiorino, Sean Lodholz, Olena Likhachova, Anne Kammer, Gurpreet Sandhu (OAG)

Exhibit 111

**DIVISION OF ADULT INSTITUTION**
Ronald Broomfield, Director
1515 S Street Sacramento, CA 95811



September 10, 2024

<u>VIA EMAIL ONLY</u>

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

RE:    *ARMSTRONG v. NEWSOM - CART ELIGIBILITY*

Dear Ms. Lomio:

I write in response to your letter of May 8, 2024, regarding Communication Access Real-Time Translation (CART).  You requested that the California Department of Corrections and Rehabilitation (CDCR) provide: (1) guidance provided to the field regarding evaluation of CART requests; (2)  recommendations by Class Action Management Unit (CAMU) Correctional Counselor II's (CCII) to institutions regarding the 1824s requesting CART; and (3) an explanation of SATF's analysis of what constitutes a "case-by-case" evaluation.

I.    <u>Guidance provided to the field regarding evaluation of CART requests</u>

RESPONSE: CDCR has provided a copy of the statewide policy dated July 24, 2023, titled "Revised Implementation of Communication Access Real/Time Translation Services for Deaf and Hard of Hearing Incarcerated Persons." In addition, CAMU has provided additional direction during multiple statewide ADAC meetings. Lastly, CAMU is currently reviewing a sample size of five 1824s at each institution statewide.

II.    <u>Recommendations by CAMU CCIIs to institutions regarding the 1824s requesting CART</u>

RESPONSE:  CAMU directed the CAMU CCIIs to conduct a review of the 1824s submitted. If concerns or discrepancies were identified, this information was communicated to the institution as well as Headquarters.  However, CDCR will not be providing any internal communications.

III.    <u>An explanation of SATF's analysis of what constitutes a "case-by-case" evaluation</u>

RESPONSE: CDCR acknowledges the concerns raised in this letter. CDCR will continue to  work with all institutions on how to conduct a case-by-case evaluation.

Please let me know if you have any questions.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

*ARMSTRONG V. NEWSOM - CART ELIGIBILITY*
Page 2


Sincerely,

*Ronald Broomfield*          9/10/2024

**Ronald Broomfield**
Director, Division of Adult Institution

Cc:
Ed Swanson, Court Expert
Plaintiffs' Counsel
Defendants' Counsel

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**

# Exhibit 112

## Rita Lomio

| | |
|---|---|
| **From:** | Rita Lomio |
| **Sent:** | Tuesday, October 24, 2023 4:16 PM |
| **To:** | 'Ruiz, Ramon@CDCR'; 'Patricia.Ferguson@cdcr.ca.gov'; 'Davis, Tamiya@CDCR'; 'Weber, Nicholas@CDCR'; 'Thao, Chor@CDCR'; 'Ava.Lau-Silveira@cdcr.ca.gov'; 'Ursula.Stuter@cdcr.ca.gov'; 'OLAArmstrongCAT@cdcr.ca.gov'; 'Sharon.Garske@doj.ca.gov'; 'Trace.Maiorino@doj.ca.gov'; 'Sean.Lodholz@doj.ca.gov'; 'Olena.Likhachova@doj.ca.gov'; 'Anne.Kammer@doj.ca.gov'; 'Gurpreet.Sandhu@doj.ca.gov'; 'Mona.Houston@cdcr.ca.gov'; 'Lourdes.White@cdcr.ca.gov'; 'Jillian.Hernandez@cdcr.ca.gov'; 'Cory.Lo@cdcr.ca.gov'; 'm_CAMUAdvocacy@cdcr.ca.gov'; 'Brianne.Burkart@cdcr.ca.gov'; 'Lois.Welch@cdcr.ca.gov'; 'Steven.Faris@cdcr.ca.gov' |
| **Cc:** | 'Ed Swanson'; 'Audrey Barron'; Armstrong Team; 'Armstrong Team - RBG only' |
| **Subject:** | Armstrong \| SATF RAP's Improper Denial of 1824 Request for CART |
| **Attachments:** | 23-01531 ███████████ pdf |

Hi Ramon,

By policy, people designated DNH may request CART via the 1824 process, those requests shall be considered on a case-by-case basis, and staff shall provide CART unless they "can demonstrate that another equally effective means of communication is available." *See* CART Memo at 1-2 (July 24, 2023). Plaintiffs' counsel repeatedly explained that RAPs need additional guidance on how to evaluate such 1824s and proposed the following language, which Defendants declined to include in the policy memorandum: "An institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment" (Item 3, below). Plaintiffs' counsel also repeatedly explained that Defendants must develop a reliable oversight mechanism to review denials of 1824s requesting CART (Item 4, below) – something Defendants apparently still have not done.

Unfortunately, our exact concerns are reflected in a recent decision by the SATF RAP (attached). In particular, a DNH class member's request for CART was denied based on a cursory document review: "A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC." There is no indication that the class member, who noted in his 1824 that his hearing aids were not adequately accommodating him, was interviewed about his accommodation needs.

We request the following:

1. Please immediately provide written guidance to all RAPs that an institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment. Please produce a copy of such guidance to Plaintiffs' counsel.
2. Please instruct all institutions to re-evaluate all denials of requests for CART under the proper standard, including SATF's denial of ████████ s 1824, and report on the results of that process.
3. Please explain how Defendants will audit RAP denials of requests for CART going forward (also requested in Caroline's email yesterday).

Rita

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, July 7, 2023 6:32 PM

**To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Lex and Tamiya,

We reviewed the revised CART memorandum and Attachment A. Attached please find our edits and comments to Attachment A. I wanted to flag the first one in particular – the attachment says that "incarcerated person[s] who are defined as **DPV, DPH or DPS** can request CART Services by submitting a CDCR 1824." That is inconsistent with the memorandum; CART will not help people who are DPV or DPS unless they also have a hearing disability (DNH or DPH).

We appreciate that you incorporated several of our suggested edits into the memorandum. We have a number of remaining concerns:

1. It remains unclear whether and how Defendants will document whether someone requires CART so that the person does not need to request it (and staff do not need to offer it) for each separate encounter.

2. The policy should require staff to document any reason why CART could not be made available, the action taken, and the alternative method of communication provided, and report that information to the ADA office (and, as CART is being rolled out, to headquarters).

3. We continue to recommend that RAPs be provided additional guidance on how to evaluate requests for CART through examples of improper bases for denying CART ("An institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment."). This is based on our experience reviewing poor RAP responses to requests from people with hearing disabilities.

4. Defendants also declined to include any oversight mechanism to allow headquarters to monitor whether institutions are properly responding to requests for CART. This is critical; the Court recognized the need to develop systems "to enable Defendants to identify and correct, without the assistance of Plaintiffs' counsel or other external monitors, problems that prevent them from delivering reasonable accommodations to class members." Dkt. 3467 at 3. At our meeting last week, Defendants said that Retired Annuitant Jackie Jeter is providing some assistance to RAPs generally. If Defendants elect to use her to help monitor implementation of the CART memorandum, Defendants must put in place a clear process to ensure she gets access to relevant RAP responses. For example, the memorandum could say: "For a period of six months following issuance of this memorandum, institutions shall, on a monthly basis, submit all RAP responses denying requests for CART to Jackie Jeter, Retired Annuitant at *address*@cdcr.ca.gov. Staff may contact Jackie Jeter at any time to discuss individual 1824s and guidance regarding CART."

5. Defendants declined our proposed language: "At all effective communication evaluations of deaf and hard-of-hearing IPs (including at intake and whenever someone is assigned a DNH or DPH code), CDCR should educate the IP about the availability of CART and how to request it." It is not clear why; "it often takes late-deafened adults years to learn about coping strategies, assistive technology, and their basic rights to communication access." Marylyn Howe, Meeting the Needs of Late-Deafened Adults, 19 Am. Rehabilitation 25, *3 (Winter 1993). The outreach mechanisms in the current version of the policy focus on people who currently are designated DNH or DPH, but ignore people who, in the future, may become deaf or hard-of-hearing.

6. We continue to object to any forced transfer of, or housing limitations for, people who require access to CART to equally participate in programs, services, and activities.

I'm happy to discuss any of these issues further – please do not hesitate to reach out. We also are waiting for you to provide (1) the CART contract, (2) WebEx LOPs, (3) status of the connectivity assessments, and (4) proposed date for our next meeting.

Rita

---

**From:** Rita Lomio [mailto:rlomio@prisonlaw.com]
**Sent:** Thursday, July 6, 2023 1:35 PM
**To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Thanks, Tamiya. Unless we hear otherwise, I'll send you our comments on the draft policy tomorrow and then get you comments on the LOPs separately, after you've shared them with us.

---

**From:** Davis, Tamiya@CDCR [mailto:Tamiya.Davis@cdcr.ca.gov]
**Sent:** Wednesday, July 5, 2023 10:37 AM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Rita,

Lex is out today, returning tomorrow. And both Mona and Lourdes are out all week. I will try and get an update on this request for you.

Best,

*Tamiya Davis*
Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Cell: 916.247.5094

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Wednesday, July 5, 2023 8:28 AM
**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Lex,

I wanted to see if you have had a chance to locate the CART contract and WebEx LOPs. We'd appreciate seeing them as soon as possible.

Rita

**From:** Rita Lomio [mailto:rlomio@prisonlaw.com]
**Sent:** Friday, June 30, 2023 5:15 PM
**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Thanks, Lex. We also are very concerned that, notwithstanding a Court order that Defendants implement CART at SATF "as soon as possible" for "due process events, programming, and education," Dkt. No. 3467 at 3, Defendants today, over four months later, could not say whether and when a connectivity assessment would be conducted at SATF. We'd appreciate an update on the status of that as well when you get it.

**From:** Powell, Alexander@CDCR [mailto:Alexander.Powell@cdcr.ca.gov]
**Sent:** Friday, June 30, 2023 2:59 PM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Rita,

Please find attached the policy memorandum as well as the related Attachment A. I have forwarded your requests to the relevant people and I will send those over when I get those as well. Let me know if I can be of any more assistance.

Best,

Lex

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, June 30, 2023 2:52 PM
**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** CART Requests

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Lex,

We look forward to receiving a copy of the draft CART/due process memorandum and Attachment A later today. Would you also please share the following documents with us?

- Executed CART contract
- Revised WebEx LOPs

We'd appreciate these documents as soon as possible to help us turn around our comments to the draft memorandum quickly. We previously raised concerns with the WebEx LOPs and were glad to hear today that Captain Mebane worked with the institutions to revise them. Defendants said today that they were going to instruct institutions to simply replace "WebEx" with "CART" in the LOPs, so we would like to see what the revised WebEx LOPs look like.

And FYI – The deaf_hoh_work_group@prisonlaw.com address is for Caroline, Claudia, Marissa, Skye, Tovah, and me. Feel free to use it when you want to reach the folks on Plaintiffs' side working on deaf/hard-of-hearing issues if it makes things easier.

Rita

Rita K. Lomio
Pronouns: she/her
Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2632

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 08/16/2023   **Date IAC Received 1824:** 9/14/2023   **1824 Log Number:** SATF-F-23-01531

**Inmate's Name:** ███████   **CDCR #:** █████   **Housing:** F1-█

**RAP Staff Present:** DA Coordinator N. Scaife, Chief Medical Executive G. Ugweze, Psychologist ██████, Health Care Grievance Representative ██████, Custody Appeals Representative ██████, Registered Nurse ██████, Associate Governmental Program Analyst ██████ Staff Services Analyst ██████, Education Representative ██████.

**Summary of Inmate's 1824 Request:** The inmate alleges California Department of Corrections and Rehabilitation (CDCR), is working to replace his digital hearing aids with state issued hearing aids. The inmate requests use of Communication Access Realtime Translation (CART) Services and information on Signing Classes.

### Interim Accommodation:

☒ No interim accommodation required:  Your request for CART services will be reviewed during RAP.

### RAP RESPONSE:

**RAP is unable to process the following request(s):** The inmate alleges California Department of Corrections and Rehabilitation (CDCR), is working to replace his digital hearing aids with state issued hearing aids. The inmate requests use of Communication Access Realtime Translation (CART) Services and information on Signing Classes.

☒ Tabled: On 08/16/2023, the RAP met and discussed your 1824, Reasonable Accommodation Request. It was determined more time was required to review your request and gather information. Your request was scheduled to be seen again in RAP on 08/23/2023.

**Response:** On 08/22/223, you were provided a Personal Sound Amplification Device (PSAP) to assist you with improved access to Programs, Services, and Activities (PSA)s. This is being provided as an additional means for establishing Effective Communication (EC) due to your hearing disability. The PSAP will not replace your primary method of EC, which is achieved through the use of your prescribed hearing aids. The PSAP is an assistive device and may be used at due process events, and also during casual conversation. On 8/22/2023, you signed a chrono taking responsibility for loss, damage, or theft of the PSAP. Additionally, you agreed to pay replacement costs for the PSAP if it is lost, stolen, or intentionally damaged beyond repair.

On 8/23/2023, the RAP reconvened to discuss your request. Your request to receive CART services was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

If you disagree with this determination, you may submit a CDCR 602-1 and your concerns will be addressed through the Inmate Grievance Process.

**Direction if dissatisfied:**  If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

| N. Scaife | _(signature)_ | **Date sent to inmate:** | CSATF OFFICE |
| --- | --- | --- | --- |
| **ADA Coordinator/Designee** | **Signature** | | SEP 11 2023 |
| | | | OF GRIEVANCES |

RAP Response - rev 08-17-17.docx

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|
| SATF | SATF - F-23-01531 | AUG 13 2023 |

**\*\*\*\*\*\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\*\*\*\***

**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|
| ███████████ | ███████ | N/A | F-1 |

INSTRUCTIONS:
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**




**WHY CAN'T YOU DO IT?**




**WHAT DO YOU NEED?**

Would like to participate in C.A.R.T Program — Communication Access Realtime. I am DNH. Donovan, Valley State — CDCR working towards replacing my digital hearing aids with digital "Flame 250" not "digital" not a hearing aid as advertised on google.
Tell me anything more about CART & also signing classes.
*(Use the back of this form if more space is needed)*

| DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY? | Yes ☒ | No ☐ | Not Sure ☐ |
|---|---|---|---|

List and attach documents, if available:
Medical Records. USMC Viet Nam EBO Medical Records

I understand that staff have █████████████████e, and my failure to cooperate may cause this request to be disapproved.

August 14, 2023
**DATE SIGNED**

Assistance in completing this ████████████

| N/A | N/A | N/A |
|---|---|---|
| Last Name | First Name | Signature |

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) | LOG NUMBER (Staff Use Only) | DATE RECEIVED BY STAFF: |
|---|---|---|

| **\*\*\*\*\*\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\*\*\*\*** | |
|---|
| **DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC | |

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT | HOUSING |
|---|---|---|---|

INSTRUCTIONS:
- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity.  You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request.  Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process.  All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**

_____
_____
_____
_____

**WHY CAN'T YOU DO IT?**

_____
_____
_____
_____

**WHAT DO YOU NEED?**

_____
_____
_____
_____
_____
_____   *(Use the back of this form if more space is needed)*

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**     Yes ☐     No ☐     Not Sure ☐

List and attach documents, if available:

_____
_____

I understand that staff have a right to interview or examine me, and my failure to cooperate may cause this request to be disapproved.

_____          _____
**INMATE'S SIGNATURE**                    **DATE SIGNED**

Assistance in completing this form was provided by:

_____    _____    _____
Last Name                    First Name                    Signature

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day</u>.
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ▐▐▐▐▐▐▐     CDCR #: ▐▐▐▐▐     CDCR 1824 Log #: SATF-F-23-01531

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**          Date CDCR 1824 received by IAC: 08 / 14 / 23

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

[ ] **Yes / Unsure** (Complete Steps 2 &/or 3)          [✓] **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care appliances which involve safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.

| ▐▐▐▐▐ | AGPA | ▐▐▐▐▐ | 08 / 14 / 23 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**          *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____          Due back to IAC: ____ /.____ / ____          Returned to IAC: ____ / ____ / ____

Assigned to: _____          Title: _____

Information needed: _____

_____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:**_____   **Location:**_____

Interviewer notes: _____

_____

_____

**Staff Interviewed:** _____   Title: _____   Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

_____

**Staff Interviewed:** _____   Title: _____   Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

_____

***Notes:*** PER NEW CART MEMORANDUM, I/M DOES NOT MEET CRITERIA FOR AUTOMATIC INCLUSION. ADAC WILL REVIEW CASE FACTORS AND MAKE DETERMINATION. _____

_____

| | | | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

DRAFT

## IAP / Interview Worksheet

Inmate: ███████████    CDCR #: ███████    CDCR 1824 Log #: SATF-F-23-01531

---

**Step 3:**  DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY (See Note below)

☐  An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐  An Interim Accommodation **IS required**.

Reason: _____

_____

_____

**Accommodation(s) provided:**                                             **Date provided:**

_____  ____ / ____ / ____

_____  ____ / ____ / ____

_____  ____ / ____ / ____

Comments: _____

_____

_____

| ███████████ | AGPA | | 08 / 15 / 23 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note:  When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

**IAP processing instructions for the Appeals Coordinator**

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3.  The interviews conducted in Step 2 will help with the decision in Step 3.  Step 3 documents the decision.  When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter.  Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

**Step 2 Interviewer Instructions**

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2.  If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing.  Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder.  Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ▮▮▮▮▮▮▮▮

CDC #: ▮▮▮▮   PID #: ▮▮▮▮

CHSS035C **DPP Disability/Accommodation Summary** Monday August 14, 2023 02:55:2

As of: 08/14/2023 ➡

### OFFENDER/PLACEMENT

CDC#: ▮▮▮▮
Name: ▮▮▮▮▮
Facility: SATF-Facility F
Housing F 001 ▮▮▮▮
Area/Bed:
Placement 19
Score:
Custody Medium (A)
Designation:
Housing Non-Designated Program Facility
Program:
Housing Barrier Free/Wheelchair Accessible
Restrictions: Grab Bar Required
Ground Floor-No Stairs
Lower/Bottom Bunk Only
Trapeze Bar Required
Physical Full Time Wheelchair User
Limitations to Transport Vehicle with Lift
Job/Other: Special Cuffing Needed
Lifting Restriction- Unable to Lift more than
19 Pounds
No Rooftop Work
Permanent - 12/31/9999

### DISABILITY ASSISTANCE

Current DDP Status: NCF
DDP Adaptive None
Support Needs:
Current DDP Status Date: 10/17/2016
DPP Codes: DPW, DNH
DPP Determination Date: 04/22/2022
Current MH LOC: GP
Current MH LOC Date: 10/12/2016
SLI Required: No
Interview Date: 03/28/2017
Primary Method(s) - Hearing: Hearing Aids
Alternate Method - Hearing: Reads Lips
Non-Formulary
Accommodations/Comments:
Learning Disability:
Initial TABE Score: 12.9
Initial TABE Date: 09/24/2018
Durable Medical Equipment: Air Cushion (for
Wheelchair Seat)
Hearing Aid
Ankle Foot
Orthoses/Knee Ankle
Foot Orthoses
(AFO/KAFO)
Wrist Support Brace
Compression Stocking
Eyeglass Frames
Full Lower Denture
Foot Orthoses
Full Upper Denture
Hearing Impaired
Disability Vest
Incontinence Supplies
Therapeutic
Shoes/Orthotics
Wheelchair
Languages Spoken:

### IMPORTANT DATES

Date Received: 10/11/2016
Last Returned Date:
Release Date: 06/28/2033
Release Type: Minimum Eligible Parole Date

### WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start Date:
Status:
Position #:
Position Title:
Regular Days On:

8/14/2023

**Disability Verification Process (DVP)**
**Worksheet**
SIDE 1

| INMATE'S NAME (Print) ▮▮▮▮ | CDCR 1824 LOG NUMBER SATF - F |
|---|---|
| CDCR NUMBER ▮▮▮▮ | 23-01531 |

## INSTRUCTIONS

- **A SME Shall COMPLETE SECTION 1 prior to or during the INITIAL RAP.**

- **When the RAP needs more information,  the ADA Coordinator shall complete Section 2 during the RAP and assign the DVP for Section 3 to be completed (See back of form).**

**SECTION 1 – SME FINDINGS**

Person completing worksheet: _____▮▮▮▮_____   Title: _____AGPA_____

Type of Review: ☐ Health care review    ☐ Mental Health review    ☐ Education / learning disability review
                ☒ Other review: _____HCGO_____

☐ File Review conducted.  Documents obtained:

☐ CDCR 1845    dated: ___/___/___    ☐ CDCR 7410 dated: ___/___/___    ☐ CDCR 128-C2: dated: ___/___/___

☐ CDCR 7536    dated: ___/___/___    ☐ CDC 7221-DME dated: ___/___/___

☐ CDCR 128-C3: dated: ___/___/___    ☐ CDCR 7386: dated: ___/___/___    ☐ CDCR 7388:    dated: ___/___/___

☐ Other: _____ dated: ___/___/___    ☐ Other: _____ dated: ___/___/___

☐ Recently evaluated for this issue.    Date seen: ___/___/___

☐ Evaluation (exam/interview) scheduled.  Anticipated date to be seen: ___/___/___

Disability indicated: ☒ Yes    ☐ No    ☐ Unable to Determine    TABE   12.9   DPW, DNH

Summary of findings: _____
_____
_____

Summary of limitations: _____
_____
_____

Comments: _____GRIEVANCE REGARDING RAP ISSUE_____
_____
_____
_____

▮▮▮▮                                    8/16/2023
_____                         _____
                                        Date Signed

CDC-128B (Rev. 4/74)

**Inmate Name:** ███████    **CDC #** ██████    **CSATF/SP  F1-**████

On August 22, 2023, you are being issued this informational Chrono in response to a decision made by the ADA Coordinator. You are being issued a personal sound amplification device to assist you with improved access to Programs, Services and Activities (PSA's). This is being provided as an additional means for Effective Communication (EC) given your hearing disability.  It will not replace your primary method of communication, which is achieved through the use of your prescribed hearing aids.  It will also not replace your alternate method of communication, which is for staff to speak loudly and clearly.  This is only an assistive device, and may be used at due process events, and also during casual communication.  This accommodation will begin immediately and remain in effect until further notice.

This personal sound amplification device is a Super Ear SE7500, serial number 247787500.  It is your personal property, and you are responsible for any loss, damage, or theft of the item.  Replacement is not guaranteed.  It is not Durable Medical Equipment (DME).  It will be added to your property card in SOMS.

Please sign and date below indicating you understand the provided accommodation above.  In addition, you have read and understand the safety information (to include the safety warning) located in the user guide and have no questions on how to operate the pocket talker.

Furthermore, by signing, you are accepting responsibility for the equipment and agree to pay, in full, for replacement cost.  This includes equipment that is stolen, lost, or intentionally damaged beyond repair.

Original:  C-File
Cc.        Inmate

Field Training Sergeant
CSATF/SP at Corcoran

**DATE: 8/22/2023**        **Informational Chrono**                **CSATF/SP**

Exhibit 113

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    GAVIN NEWSOM, GOVERNOR

**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN**
BRYAN D. PHILLIPS, WARDEN
900 Quebec Avenue, Corcoran, CA 93212



February 5, 2023

<u>VIA EMAIL ONLY</u>

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

RE:     *ARMSTRONG v. NEWSOM* **- SATF RAP'S IMPROPER DENIAL OF 1824 REQUEST FOR CART**

Dear Ms. Lomio:

I write in response to your email of October 24, 2023, regarding the denial of ██████████ s, BB2085, request for Communication Access Real-Time Translation (CART) services. You ask that the California Substance Abuse Treatment Facility (SATF) re-evaluate the denial of CART to ██ ██████. Please see our response below.

**I.     Please immediately provide written guidance to all Reasonable Accommodation Panels (RAP)s that an institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment.**

The department has released its policy for CART to the field.  This policy provides guidance on the evaluations of CART requests through the RAP. CAMU provided guidance to the ADA Coordinators on December 12, 2023; reiterating, that an 1824 Request for Reasonable Accommodation must be reviewed on a case-by-case situation and provide an articulated response to support the approval or denial.

**II.     Please instruct all institutions to re-evaluate all denials of requests for CART under the proper standard, including SATF's denial of ██████████ s 1824, and report on the results of that process.**

The department issued instruction to the field in a memorandum dated July 24, 2023, titled, "Revised Implementation of Communication Access Real-Time Translation Services for Deaf and Hard of hearing Incarcerated Persons."  The memorandum states, "Staff shall offer the CART service to Inmate Patients (IP)s identified as DPH (permanent hearing impairment, impacting placement), who do not rely on a Sign Language Interpreter (SLI), and whose primary or alternate method of effective communication is written notes."  It also states, "IPs with verified hearing disabilities (DNH or DPH) shall be able to request CART services through the 1824/RAP process

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

*SATF RAP'S IMPROPER DENIAL OF 1824 REQUEST FOR CART*
Page 2

which shall be evaluated and granted on a case-by-case basis. Staff shall offer CART unless it can demonstrate that another equally effective means of communication is available."

The RAP conducted a case-by-case evaluation of the request, as the policy instructs.  Although the RAP did provide ███████████ a Personal Sound Amplification Device (PSAP) as a reasonable accommodation, the RAP did not specifically deny the request for CART due to the availability of that new assistive hearing device. The RAP demonstrated that other equally effective means of communication were available.

III.    **Please explain how Defendants will audit RAP denials of requests for CART going forward.**

Class Action Management Unit (CAMU) Headquarters (HQ) has directed the Field Correctional Counselor II's (CCII) to review the 1824s submitted to their respective institutions on a monthly basis where CART has been requested.  The CAMU CCII will provide recommendations to the institution while also reporting their findings up to CAMU HQ.


Please let me know if you have any questions.

Sincerely,


*Bryan Phillips*                2/5/2024

92548B2349FE4E7...

BRYAN D. PHILLIPS
WARDEN


Cc:
Ed Swanson, Court Expert
Plaintiffs' Counsel
Defendants' Counsel

# Exhibit 114

**Rita Lomio**

| | |
|---|---|
| **From:** | Rita Lomio |
| **Sent:** | Tuesday, November 21, 2023 6:25 PM |
| **To:** | 'Davis, Tamiya@CDCR'; 'Ruiz, Ramon@CDCR' |
| **Cc:** | 'Ed Swanson'; 'Audrey Barron'; Deaf and HOH Work Group |
| **Subject:** | FW: Armstrong | SATF RAP's Improper Denial of 1824 Request for CART |
| **Attachments:** | 23-01531 ███████████ pdf; 23-01511 ███████████ pdf |

Hi Tamiya and Ramon,

Here's the email I mentioned, as well as a second SATF 1824 denying CART. In light of what ADAC Scaife said, I would edit our proposed instructions to: "An institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; <u>because the person does not have "written notes" listed as a method of communication</u>; or because the institution does not have the necessary equipment."

If you could share any direction that goes out to the field on this, we'd appreciate it.

Rita

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Tuesday, October 24, 2023 4:16 PM
**To:** 'Ruiz, Ramon@CDCR' <ramon.ruiz@cdcr.ca.gov>; 'Patricia.Ferguson@cdcr.ca.gov' <Patricia.Ferguson@cdcr.ca.gov>; 'Davis, Tamiya@CDCR' <Tamiya.Davis@cdcr.ca.gov>; 'Weber, Nicholas@CDCR' <Nicholas.Weber@cdcr.ca.gov>; 'Thao, Chor@CDCR' <Chor.Thao@cdcr.ca.gov>; 'Ava.Lau-Silveira@cdcr.ca.gov' <Ava.Lau-Silveira@cdcr.ca.gov>; 'Ursula.Stuter@cdcr.ca.gov' <Ursula.Stuter@cdcr.ca.gov>; 'OLAArmstrongCAT@cdcr.ca.gov' <OLAArmstrongCAT@cdcr.ca.gov>; 'Sharon.Garske@doj.ca.gov' <Sharon.Garske@doj.ca.gov>; 'Trace.Maiorino@doj.ca.gov' <Trace.Maiorino@doj.ca.gov>; 'Sean.Lodholz@doj.ca.gov' <Sean.Lodholz@doj.ca.gov>; 'Olena.Likhachova@doj.ca.gov' <Olena.Likhachova@doj.ca.gov>; 'Anne.Kammer@doj.ca.gov' <Anne.Kammer@doj.ca.gov>; 'Gurpreet.Sandhu@doj.ca.gov' <Gurpreet.Sandhu@doj.ca.gov>; 'Mona.Houston@cdcr.ca.gov' <Mona.Houston@cdcr.ca.gov>; 'Lourdes.White@cdcr.ca.gov' <Lourdes.White@cdcr.ca.gov>; 'Jillian.Hernandez@cdcr.ca.gov' <Jillian.Hernandez@cdcr.ca.gov>; 'Cory.Lo@cdcr.ca.gov' <Cory.Lo@cdcr.ca.gov>; 'm_CAMUAdvocacy@cdcr.ca.gov' <m_CAMUAdvocacy@cdcr.ca.gov>; 'Brianne.Burkart@cdcr.ca.gov' <Brianne.Burkart@cdcr.ca.gov>; 'Lois.Welch@cdcr.ca.gov' <Lois.Welch@cdcr.ca.gov>; 'Steven.Faris@cdcr.ca.gov' <Steven.Faris@cdcr.ca.gov>
**Cc:** 'Ed Swanson' <ed@smllp.law>; 'Audrey Barron' <audrey@smllp.law>; Armstrong Team <arm-plo@prisonlaw.com>; 'Armstrong Team - RBG only' <ArmstrongTeam@rbgg.com>
**Subject:** Armstrong | SATF RAP's Improper Denial of 1824 Request for CART

Hi Ramon,

By policy, people designated DNH may request CART via the 1824 process, those requests shall be considered on a case-by-case basis, and staff shall provide CART unless they "can demonstrate that another equally effective means of communication is available." *See* CART Memo at 1-2 (July 24, 2023). Plaintiffs' counsel repeatedly explained that RAPs need additional guidance on how to evaluate such 1824s and proposed the following language, which Defendants declined to include in the policy memorandum: "An institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment" (Item

3, below). Plaintiffs' counsel also repeatedly explained that Defendants must develop a reliable oversight mechanism to review denials of 1824s requesting CART (Item 4, below) – something Defendants apparently still have not done.

Unfortunately, our exact concerns are reflected in a recent decision by the SATF RAP (attached). In particular, a DNH class member's request for CART was denied based on a cursory document review: "A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC." There is no indication that the class member, who noted in his 1824 that his hearing aids were not adequately accommodating him, was interviewed about his accommodation needs.

We request the following:

1. Please immediately provide written guidance to all RAPs that an institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment. Please produce a copy of such guidance to Plaintiffs' counsel.
2. Please instruct all institutions to re-evaluate all denials of requests for CART under the proper standard, including SATF's denial of ████████ s 1824, and report on the results of that process.
3. Please explain how Defendants will audit RAP denials of requests for CART going forward (also requested in Caroline's email yesterday).

Rita

---

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, July 7, 2023 6:32 PM
**To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Lex and Tamiya,

We reviewed the revised CART memorandum and Attachment A. Attached please find our edits and comments to Attachment A. I wanted to flag the first one in particular – the attachment says that "incarcerated person[s] who are defined as **DPV, DPH or DPS** can request CART Services by submitting a CDCR 1824." That is inconsistent with the memorandum; CART will not help people who are DPV or DPS unless they also have a hearing disability (DNH or DPH).

We appreciate that you incorporated several of our suggested edits into the memorandum. We have a number of remaining concerns:

1. It remains unclear whether and how Defendants will document whether someone requires CART so that the person does not need to request it (and staff do not need to offer it) for each separate encounter.

2. The policy should require staff to document any reason why CART could not be made available, the action taken, and the alternative method of communication provided, and report that information to the ADA office (and, as CART is being rolled out, to headquarters).

3. We continue to recommend that RAPs be provided additional guidance on how to evaluate requests for CART through examples of improper bases for denying CART ("An institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment."). This is based on our experience reviewing poor RAP responses to requests from people with hearing disabilities.

4. Defendants also declined to include any oversight mechanism to allow headquarters to monitor whether institutions are properly responding to requests for CART. This is critical; the Court recognized the need to develop systems "to enable Defendants to identify and correct, without the assistance of Plaintiffs' counsel or other external monitors, problems that prevent them from delivering reasonable accommodations to class members." Dkt. 3467 at 3. At our meeting last week, Defendants said that Retired Annuitant Jackie Jeter is providing some assistance to RAPs generally. If Defendants elect to use her to help monitor implementation of the CART memorandum, Defendants must put in place a clear process to ensure she gets access to relevant RAP responses. For example, the memorandum could say: "For a period of six months following issuance of this memorandum, institutions shall, on a monthly basis, submit all RAP responses denying requests for CART to Jackie Jeter, Retired Annuitant at *address*@cdcr.ca.gov. Staff may contact Jackie Jeter at any time to discuss individual 1824s and guidance regarding CART."

5. Defendants declined our proposed language: "At all effective communication evaluations of deaf and hard-of-hearing IPs (including at intake and whenever someone is assigned a DNH or DPH code), CDCR should educate the IP about the availability of CART and how to request it." It is not clear why; "it often takes late-deafened adults years to learn about coping strategies, assistive technology, and their basic rights to communication access." Marylyn Howe, Meeting the Needs of Late-Deafened Adults, 19 Am. Rehabilitation 25, *3 (Winter 1993). The outreach mechanisms in the current version of the policy focus on people who currently are designated DNH or DPH, but ignore people who, in the future, may become deaf or hard-of-hearing.

6. We continue to object to any forced transfer of, or housing limitations for, people who require access to CART to equally participate in programs, services, and activities.

I'm happy to discuss any of these issues further – please do not hesitate to reach out. We also are waiting for you to provide (1) the CART contract, (2) WebEx LOPs, (3) status of the connectivity assessments, and (4) proposed date for our next meeting.

Rita

---

**From:** Rita Lomio [mailto:rlomio@prisonlaw.com]
**Sent:** Thursday, July 6, 2023 1:35 PM
**To:** Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Thanks, Tamiya. Unless we hear otherwise, I'll send you our comments on the draft policy tomorrow and then get you comments on the LOPs separately, after you've shared them with us.

---

**From:** Davis, Tamiya@CDCR [mailto:Tamiya.Davis@cdcr.ca.gov]
**Sent:** Wednesday, July 5, 2023 10:37 AM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Rita,

Lex is out today, returning tomorrow. And both Mona and Lourdes are out all week. I will try and get an update on this request for you.

Best,

*Tamiya Davis*

Attorney, Class Action Team
Office of Legal Affairs
California Department of Corrections and Rehabilitation
Cell: 916.247.5094

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Wednesday, July 5, 2023 8:28 AM
**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

> **CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Lex,

I wanted to see if you have had a chance to locate the CART contract and WebEx LOPs. We'd appreciate seeing them as soon as possible.

Rita

**From:** Rita Lomio [mailto:rlomio@prisonlaw.com]
**Sent:** Friday, June 30, 2023 5:15 PM
**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Thanks, Lex. We also are very concerned that, notwithstanding a Court order that Defendants implement CART at SATF "as soon as possible" for "due process events, programming, and education," Dkt. No. 3467 at 3, Defendants today, over four months later, could not say whether and when a connectivity assessment would be conducted at SATF. We'd appreciate an update on the status of that as well when you get it.

**From:** Powell, Alexander@CDCR [mailto:Alexander.Powell@cdcr.ca.gov]
**Sent:** Friday, June 30, 2023 2:59 PM
**To:** Rita Lomio <rlomio@prisonlaw.com>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** RE: CART Requests

Hi Rita,

Please find attached the policy memorandum as well as the related Attachment A. I have forwarded your requests to the relevant people and I will send those over when I get those as well. Let me know if I can be of any more assistance.

Best,

Lex

**From:** Rita Lomio <rlomio@prisonlaw.com>
**Sent:** Friday, June 30, 2023 2:52 PM

4

**To:** Powell, Alexander@CDCR <Alexander.Powell@cdcr.ca.gov>; Davis, Tamiya@CDCR <Tamiya.Davis@cdcr.ca.gov>
**Cc:** Deaf and HOH Work Group <deaf_hoh_work_group@prisonlaw.com>; audrey@smllp.law; ed@smllp.law
**Subject:** CART Requests

**CAUTION:** This email originated from outside of CDCR/CCHCS. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Lex,

We look forward to receiving a copy of the draft CART/due process memorandum and Attachment A later today. Would you also please share the following documents with us?

- Executed CART contract
- Revised WebEx LOPs

We'd appreciate these documents as soon as possible to help us turn around our comments to the draft memorandum quickly. We previously raised concerns with the WebEx LOPs and were glad to hear today that Captain Mebane worked with the institutions to revise them. Defendants said today that they were going to instruct institutions to simply replace "WebEx" with "CART" in the LOPs, so we would like to see what the revised WebEx LOPs look like.

And FYI – The deaf_hoh_work_group@prisonlaw.com address is for Caroline, Claudia, Marissa, Skye, Tovah, and me. Feel free to use it when you want to reach the folks on Plaintiffs' side working on deaf/hard-of-hearing issues if it makes things easier.

Rita

Rita K. Lomio
Pronouns: she/her
Staff Attorney
Prison Law Office
1917 Fifth Street
Berkeley, CA 94710
(510) 280-2632

## REASONABLE ACCOMMODATION PANEL (RAP) RESPONSE

**RAP Meeting Date:** 8/23/2023     **Date IAC Received 1824:** 8/11/2023     **1824 Log Number:** SATF-G-23-01511

**Inmate's Name:** ▮▮▮▮▮     **CDCR #** ▮▮▮▮     **Housing:** G2-0▮

**RAP Staff Present:** ADA Coordinator N. Scaife, Chief Medical Executive G. Ugweze, Psychologist ▮▮▮▮, Health Care Grievance Representative ▮▮▮▮, Custody Appeals Representative ▮▮▮▮, Registered Nurse ▮▮▮▮, Associate Governmental Program Analyst ▮▮▮▮, Staff Services Analyst ▮▮▮▮, Education Representative ▮▮▮▮

**Summary of Inmate's 1824 Request:** Inmate requests approval to utilize Communication Access Realtime Translation (CART) services due to a hearing impairment.

---

**Interim Accommodation:**

☒ No interim accommodation required: Your request for CART services will be reviewed during RAP.

---

**RAP RESPONSE:**

**RAP is able to render a final decision on the following:** Inmate requests approval to utilize Communication Access Realtime Translation (CART) services due to a hearing impairment.

**Response:** On 8/16/2023, the RAP met and discussed your 1824, Reasonable Accommodation Request. It was determined more time was required to review your request and gather information. Your request was scheduled to be seen again in RAP on 8/23/2023.

You were provided a Personal Sound Amplification Device (PSAP) to assist you with improved access to Programs, Services, and Activities (PSA)s. This is being provided as an additional means for establishing Effective Communication (EC) due to your hearing disability. The PSAP will not replace your primary method of EC, which is achieved through the use of your prescribed hearing aids. The PSAP is an assistive device and may be used at due process events, and also during casual conversation. On 8/22/2023, you signed a chrono taking responsibility for loss, damage, or theft of the PSAP. Additionally, you agreed to pay replacement costs for the PSAP if it is lost, stolen, or intentionally damaged beyond repair.

Your request to receive CART services during due process events was reviewed by the RAP committee. A review of SOMS indicates you are designated DNH and are accommodated with hearing aids. A review of your communication methods shows that you do not require written notes to establish EC. Your request to use CART services has been denied. Staff will continue to establish EC with you by ensuring you are wearing your hearing aids and speaking loudly and clearly if your hearing aids are not available or not working.

You are encouraged to utilize the appropriate avenues to address requests or concerns. If you disagree with this determination, you may submit a CDCR 602-1 and your concerns will be addressed through the Inmate Grievance Process.

**Direction if dissatisfied:** If you disagree with this decision and want to file an appeal/grievance, be sure to attach a copy of this response along with your CDCR 1824 as supporting documents.

N. Scaife

**ADA Coordinator/Designee**     **Signature**

**Date sent to inmate:**

CSATF OFFICE

SEP 07 2023

OF GRIEVANCES

    RAP Response - rev 08-17-17.docx

STATE OF CALIFORNIA
**REASONABLE ACCOMMODATION REQUEST**
CDCR 1824 (Rev. 09/17)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| INSTITUTION (Staff use only) SATF | LOG NUMBER (Staff Use Only) SATF - 6-23 - 01511 | DATE RECEIVED BY STAFF: CSATF OFFICE AUG 11 2023 OF GRIEVANCES |
|---|---|---|

**\*\*\*\*\*\*\*\*\*\*\*TALK TO STAFF IF YOU HAVE AN EMERGENCY\*\*\*\*\*\*\*\*\*\*\***
**DO NOT** use a CDCR 1824 to request health care or to appeal a health care decision. This may delay your access to health care. Instead, submit a CDC 7362 or a CDCR 602-HC

| INMATE'S NAME (Print) | CDCR NUMBER | ASSIGNMENT Dennis Work G2 | HOUSING |
|---|---|---|---|

- You may use this form if you have a physical or mental disability or if you believe you have a physical or mental disability.
- You may use this form to request a specific reasonable accommodation which, if approved, will enable you to access and/or participate in a program, service or activity. You may also use this form to submit an allegation of disability-based discrimination.
- Submit this form to the Custody Appeals Office.
- The 1824 process is intended for an individual's accommodation request. Each individual's request requires a case-by-case review.
- The CDCR 1824 is a request process, not an appeal process. All CDCR 1824 requests will receive a response.
- If you have received an 1824 decision that you disagree with, you may submit an appeal (CDCR 602, or CDCR 602-HC if you are disagreeing with a medical diagnosis/treatment decision).

**WHAT CAN'T YOU DO / WHAT IS THE PROBLEM?**

**WHY CAN'T YOU DO IT?**

**WHAT DO YOU NEED?**

I would like to get CArt program
BC of hearing Impaired.

*(Use the back of this form if more space is needed)*

**DO YOU HAVE DOCUMENTS THAT DESCRIBE YOUR DISABILITY?**     Yes ☑ — No ☐     Not Sure ☐
List and attach documents, if available:

I understand that staff ha▮▮▮▮ examine me, and my failure to cooperate may cause this request to be disapproved.

**INMATE'S SIGNATURE**                    8/9/23    **DATE SIGNED**

Assistance in completing this form was provided by:

_____          _____          _____
Last Name                    First Name                    Signature

DRAFT

## Interim Accommodation Procedure (IAP) / Interview Worksheet

Upon receipt of a CDCR 1824, the Institution Appeals Coordinator (IAC) <u>shall complete Step 1 below within 1 working day.</u>
Step 2 should be completed whenever the inmate's request is unclear or when additional input from
the inmate and/or staff will help the RAP better understand the request.

Inmate: ██████████    CDCR #: ██████    CDCR 1824 Log #: SATF-G-23-01511

---

**STEP 1 INTERIM ACCOMMODATION ASSESSMENT**    Date CDCR 1824 received by IAC: 08 / 11 / 23

Does the inmate raise issues on the CDCR 1824 that may cause the **inmate injury or other serious harm** while it is being processed? **Base your assessment solely on the inmate's claim, assuming the claim is true.**

☐ **Yes / Unsure** (Complete Steps 2 &/or 3)    ☑ **No** (None of the issues below are present) [Note: IAC may still obtain information for RAP by completing Step 2]

Issues that may cause the **inmate injury or other serious harm** include, but are not limited to:

- Falling or the potential for falling.
- Cannot safely access upper bunk.
- Workplace safety concerns.
- Inability to perform essential manual tasks (e.g., access dining hall, carry food tray, shower, use toilet).
- Maintenance, repair, or replacement of health care appliances which involve safety concerns.
- Cannot safely navigate stairs.
- Seizure disorder and is assigned an upper bunk.
- Hearing or vision claims that may jeopardize safety.

| ██████████ | AGPA | ██████████ | 08 / 11 / 23 |
|---|---|---|---|
| Person Completing Step 1 | Title | Signature | Date Completed |

---

**STEP 2    CDCR 1824 INTERVIEWS**    *Note: Be sure to complete Step 3 when Step 1 was "Yes/Unsure"*

Date assigned: ____ / ____ / ____    Due back to IAC: ____ / ____ / ____    Returned to IAC: ____ / ____ / ____

Assigned to: _____    Title: _____

Information needed: _____

_____

_____

_____

Note 1: Attach a DECS printout listing inmate's current status (including DPP codes, DDP codes, TABE score, etc.)
Note 2: IAC and/or RAP may assign to self and obtain information either telephonically or in person.

**Inmate Interview Date/Time:** _____    **Location:** _____

Interviewer notes: _____

_____

_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

_____

**Staff Interviewed:** _____    Title: _____    Interview date: ____ / ____ / ____

Interviewer Notes: _____

_____

_____

***Notes:*** PER NEW CART MEMORANDUM, I/M DOES NOT MEET CRITERIA FOR AUTOMATIC INCLUSION. ADAC WILL REVIEW CASE FACTORS AND MAKE DETERMINATION.

_____

| _____ | _____ | _____ | ____ / ____ / ____ |
|---|---|---|---|
| Interviewer (Print Name) | Title | Signature | Date Completed |

DRAFT

## IAP / Interview Worksheet

Inmate: ██████████          CDCR #: ████          CDCR 1824 Log #: SATF-G-23-01511

---

**Step 3:  DECISION REGARDING WHETHER AN INTERIM ACCOMMODATION IS NECESSARY** (See Note below)

☐    An Interim Accommodation **IS NOT required**.

Reason: _____

_____

_____

☐    An Interim Accommodation **IS required**.

Reason: _____

_____

_____

**Accommodation(s) provided:**                                      **Date provided:**

_____          ____ / ____ / ____

_____          ____ / ____ / ____

_____          ____ / ____ / ____

Comments: _____

_____

_____

| ████████ | AGPA | | 08 / 14 / 23 |
|---|---|---|---|
| Person Completing Step 3 | Title | Signature | Date Completed |

Note:  When information is unable to prove or disprove a claim, consider an interim accommodation as a precautionary measure.

---

### IAP processing instructions for the Appeals Coordinator

- Step 1 must always be completed prior to the initial RAP.
- Step 2 should be completed whenever the inmate's request is unclear, or when additional input from the inmate and/or staff will help the RAP better understand the request.
- If Step 1 is "Yes/Unsure," proceed to Steps 2 and/or 3.  The interviews conducted in Step 2 will help with the decision in Step 3.  Step 3 documents the decision.  When the IAC is not able to complete steps 2 & 3 prior to the RAP (e.g, the request was received the day before the RAP) steps 2 and 3 may be completed during the RAP or shortly thereafter. Under no circumstances shall a decision regarding the need for an IAP exceed 5 working days.
- Consult with the ADA Coordinator when unsure which box to check in Step 1.
- Maintain ongoing communication with the ADA Coordinator regarding the interim accommodation process.

---

### Step 2 Interviewer Instructions

- Your task is to obtain additional information that will assist the Reasonable Accommodation Panel (RAP) better understand issues raised by an inmate on a CDCR 1824, Reasonable Accommodation Request Form.
- Take a moment to read the CDCR 1824 and then review the information being requested in Step 2.  If you need clarification, contact the Appeals Office or the ADA Coordinator.
- Interview the inmate who filed the CDCR 1824 and/or staff who may have knowledge about the inmate's request.
- Inmates often have difficulty expressing themselves in writing.  Your interview notes should try to clarify what the problem is, and what the inmate wants (e.g., cane, lower bunk, shower chair, job modification, etc.).
- Reminder.  Be sure to return this form to the Inmate Appeals Coordinator by the due date listed in Step 2.

Name: ▮▮▮▮▮

CDC #: ▮▮▮   PID #: ▮▮▮

CHSS035C **DPP Disability/Accommodation Summary** Friday August 11, 2023 02:31:17

As of: 08/11/2023 ➡

---

### OFFENDER/PLACEMENT

CDC#: ▮▮▮
Name: ▮▮▮
Facility: SATF-Facility G
Housing G 002 ▮▮▮
Area/Bed:
Placement 35
Score:
Custody Medium (A)
Designation:
Housing Non-Designated Program Facility
Program:
Housing
Restrictions:
Physical
Limitations to
Job/Other:

### DISABILITY ASSISTANCE

Current DDP Status: DD2
DDP Adaptive 1. Communication - Slow
Support Needs: simple language/repeat as
needed
2. Communication -
Requires frequent
reminders
3. Activities of Daily Living -
Prompt for ducats/med line
4. Activities of Daily Living -
Prompt for laundry
exchange
5. Activities of Daily Living -
Prompt & extra time:
showers
6. Rules and Procedures -
Assist to understand
Rules/Procedures
7. Victimization - Vulnerable
to pressuring/teasing
Current DDP Status Date: 05/05/2022
DPP Codes: DNH
DPP Determination Date: 05/08/2023
Current MH LOC: CCCMS
Current MH LOC Date: 07/01/2019
SLI Required: No
Interview Date: 05/10/2023
Primary Method(s) - Hearing: Hearing Aids
Alternate Method - Hearing: Need Staff to Speak Loudly
and Clearly
Non-Formulary
Accommodations/Comments:
Learning Disability:
Initial TABE Score: 04.0
Initial TABE Date: 12/20/2021
Durable Medical Equipment: Hearing Aid
Eyeglass Frames
Hearing Impaired Disability
Vest
Therapeutic Shoes/Orthotics
Languages Spoken:

---

### IMPORTANT DATES

Date Received: 08/20/2021
Last Returned
Date:
Release Date: 06/22/2041
Release Type: Earliest Possible Release Date

### WORK/VOCATION/PIA

Privilege Group: A
Work Group: A1
AM Job Start 06/17/2023
Date:
Status: Full Time
Position #: DRW.002.005
Position Title: G DINING ROOM WKR
Regular Days On: Sun, Mon,Tue,Wed,Sat (12:30:00 -
16:30:00)

---

Sun, Mon,Tue,Wed,Sat (17:00:00 - 20:00:00)

**Disability Verification Process (DVP) Worksheet**
SIDE 1

| INMATE'S NAME (Print) ███████ | CDCR 1824 LOG NUMBER SATF - G 23-01511 |
|---|---|
| CDCR NUMBER ███████ | |

## INSTRUCTIONS

- A SME Shall COMPLETE SECTION 1 prior to or during the <u>INITIAL</u> RAP.

- When the RAP needs more information, the ADA Coordinator shall complete Section 2 during the RAP and assign the DVP for Section 3 to be completed (See back of form).

---

**SECTION 1 – SME FINDINGS**

Person completing worksheet: _____ ███████ _____    Title: _____ AGPA _____

Type of Review: ☐ Health care review   ☐ Mental Health review   ☐ Education / learning disability review
☒ Other review: _____ HCGO _____

☐ File Review conducted.  Documents obtained:

☐ CDCR 1845   dated: ___/___/___   ☐ CDCR 7410 dated: ___/___/___   ☐ CDCR 128-C2: dated: ___/___/___
☐ CDCR 7536   dated: ___/___/___   ☐ CDC 7221-DME dated: ___/___/___
☐ CDCR 128-C3: dated: ___/___/___   ☐ CDCR 7386: dated: ___/___/___   ☐ CDCR 7388: dated: ___/___/___
☐ Other: _____ dated: ___/___/___   ☐ Other: _____ dated: ___/___/___

☐ Recently evaluated for this issue.    Date seen: ___/___/___

☐ Evaluation (exam/interview) scheduled.  Anticipated date to be seen: ___/___/___

TABE   4.0

Disability indicated: ☒ Yes   ☐ No   ☐ Unable to Determine   DNH

Summary of findings: _____
_____
_____

Summary of limitations: _____
_____
_____

GRIEVANCE REGARDING RAP ISSUE
Comments: _____
_____
_____
_____

███████                                     8/16/2023

                                              _____
                                              Date Signed

CDC-128B (Rev. 4/74)

**Inmate Name:** █████████    **CDC #** █████    **CSATF/SP  G2-**████

On August 22, 2023, you are being issued this informational Chrono in response to a decision made by the ADA Coordinator. You are being issued a personal sound amplification device to assist you with improved access to Programs, Services and Activities (PSA's). This is being provided as an additional means for Effective Communication (EC) given your hearing disability.  It will not replace your primary method of communication, which is achieved through the use of your prescribed hearing aids. It will also not replace your alternate method of communication, which is for staff to speak loudly and clearly.  This is only an assistive device, and may be used at due process events, and also during casual communication.  This accommodation will begin immediately and remain in effect until further notice.

This personal sound amplification device is a Super Ear SE7500, serial number 247787500.  It is your personal property, and you are responsible for any loss, damage, or theft of the item. Replacement is not guaranteed.  It is not Durable Medical Equipment (DME).  It will be added to your property card in SOMS.

Please sign and date below indicating you understand the provided accommodation above. In addition, you have read and understand the safety information (to include the safety warning) located in the user guide and have no questions on how to operate the pocket talker.

Furthermore, by signing, you are accepting responsibility for the equipment and agree to pay, in full, for replacement cost.  This includes equipment that is stolen, lost, or intentionally damaged beyond repair.

█████████████

Original:  C-File
Cc.         Inmate

███████████

Field Training Sergeant
CSATF/SP at Corcoran

**DATE: 8/22/2023**        **Informational Chrono**        **CSATF/SP**

# Exhibit 115

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                                  GAVIN NEWSOM, GOVERNOR

**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN**
BRYAN D. PHILLIPS, WARDEN
900 Quebec Avenue, Corcoran, CA 93212



February 8, 2024

<u>VIA EMAIL ONLY</u>

Rita Lomio
Prison Law Office
rlomio@prisonlaw.com

RE:    *ARMSTRONG v. NEWSOM* – SATF RAP'S IMPROPER DENIAL OF 1824 REQUEST FOR CART

Dear Ms. Lomio,

I write in response to your email of October 24, 2023, regarding California Substance Abuse Treatment Facility (SATF) Reasonable Accommodation Panel (RAP)'s denial of 1824 request for CART and a follow up email received November 21, 2023, regarding class member ███ ███████████████     You requested that the California Department of Corrections and Rehabilitation (CDCR): (1) Please immediately provide written guidance to all RAPs that an institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; because the person does not have "written notes" listed as a method of communication; or because the institution does not have the necessary equipment; (2) please instruct all institutions to re-evaluate all denials of requests for CART under the proper standard, including SATF's denial of ██████████'s, 1824, and report on the results of that process; and (3) please explain how Defendants will audit RAP denials of requests for CART going forward.

I.    **Please immediately provide written guidance to all RAPs that an institution may not deny CART solely on the grounds that a person has working hearing aids, another assistive hearing device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; because the person does not have "written notes" listed as a method of communication; or because the institution does not have the necessary equipment.**

Response: Division of Adult Institutions (DAI) Class Action Management Unit (CAMU) provided guidance to the ADA Coordinators on December 12, 2023, reiterating that an 1824 Request for Reasonable Accommodation must be reviewed on a case-by-base situation and provide an articulated response to support the approval or denial.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**
In providing this response, neither CCHCS nor CDCR accepts plaintiffs' representation of the facts set forth in the advocacy letter and only provides an answer to the questions asked.

*SATF RAP'S IMPROPER DENIAL OF 1824 REQUEST FOR CART*
Page 2

**II.**    **Please instruct all institutions to re-evaluate all denials of requests for CART under the proper standard, including SATF's denial of ▇▇▇▇▇▇▇s, ▇▇▇▇ 1824, and report on the results of that process.**

Response: The department issued instruction to the field in a memorandum titled "Revised Implementation of Communication Access Real-Time Translation Services for Deaf and Hard of Hearing Incarcerated Persons," stating that incarcerated persons with verified hearing disabilities (DNH) shall request CART services through the 1824/RAP process, which shall be evaluated and granted on a case-by-case basis.  Furthermore, the memo instructs staff to offer CART unless it can demonstrate that another equally effective means of communication is available. The Americans with Disabilities Act Coordinator (ADAC) performed as required by the policy and conducted a case-by-case evaluation of the request for CART from ▇▇▇▇▇▇. ▇▇▇▇▇▇ is designated DNH; his primary and secondary methods of effective communication are hearing aids and need staff to speak loudly and clearly.  The ADAC considered prior instruction not to deny a request for CART solely on the grounds that a person has working hearing aids, another assistive device, or documented low literacy; because the program, service, or activity relies in part on pre-written materials; or because the institution does not have the necessary equipment. The ADAC also considered whether any other equally effective means of communication were available.  In reaching a decision, the ADAC did not consider their ability to read, the existence of pre-written materials, or the availability of CART equipment.  The ADAC reviewed the history of effective communication for the incarcerated person and discovered he had a detailed history up to current time, of successfully communicating and demonstrating repeated understanding using his existing primary and secondary means of communication.  This constitutes a case-by-case review of the request. The ADAC also provided ▇▇▇▇▇▇ a Personal Sound Amplification Device (PSAP) for use during general communication and due process events, to further enhance his primary and secondary methods of communication.

**III.**    **Please explain how Defendants will audit RAP denials of requests for CART going forward).**

Response:  CAMU Headquarters (HQ) has directed the Field Correctional Counselor IIs (CCIIs) in their respective institutions to review on a monthly basis, any 1824s where CART has been requested. The CAMU CCIIs will provide recommendations to the institution and also report their findings up to CAMU HQ.

Sincerely,

*Bryan Phillips*
92548B2349FE4E7...

2/9/2024

BRYAN D. PHILLIPS
Warden (A)

Cc:
    Ed Swanson, Court Expert
    Plaintiffs' Counsel
    Defendants' Counsel

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDERS**